MDL 1358

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6 2000

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE:                                    :

MTBE LITIGATION                  :          MDL DOCKET NO. ____

                                                :

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2000 MAY 31  P 12:49

RECEIVED
CLERK'S OFFICE

**MTBE LITIGATION DEFENDANTS' MOTION TO TRANSFER
FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS UNDER 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407, Defendants BP Amoco Corporation ("BP Amoco"),

Amoco Oil Company ("Amoco Oil"), Atlantic Richfield Co., ("ARCO"), CITGO Petroleum

Corporation ("CITGO") and Chevron U.S.A., Inc. ("Chevron") jointly and respectfully move this

Court for an order transferring pending actions involving Defendants' alleged actions regarding

the gasoline additive methyl tertiary butyl ether ("MTBE") for coordinated and consolidated

pretrial proceedings.  BP Amoco, Amoco Oil, ARCO, CITGO and Chevron suggest transfer to

either the Southern District of New York or the Southern District of Illinois, the locations chosen

by plaintiffs' counsel in the two pending federal actions.  In further support of its motion, BP

Amoco, Amoco Oil, ARCO, CITGO and Chevron state as follows:

1.       Defendants face two putative class actions pending in separate federal

district courts, which allege multiple common questions of fact including, among other things,

OFFICIAL FILE COPY   IMAGED JUN 8 '00

PLEADING NO. - 1

that Defendants wrongfully marketed MTBE, that MTBE has certain harmful characteristics that make it "defective," that Defendants conspired with regard to MTBE, and that Defendants actions resulted in damages to certain plaintiffs.

2.     These actions include:

***England, et al. v. Atlantic Richfield Co., et al.,*** File Nos. 00-370-WDS, 00-371-DRH,[1] pending in the United States District Court for the Southern District of Illinois and;

***Berisha, et al. v. Amerada Hess, et al.,*** File No. 00-CIV 1898 (SAS), pending in the United States District Court for the Southern District of New York.

3.     The factual allegations in these actions are substantially identical concerning the actions of a core group of national defendants:

a.     Both actions seek similar relief from all Defendants on behalf of virtually identical classes -- persons who own real property in a state in which MTBE has been marketed as a gasoline additive.

b.     Both actions allegedly involve the same product -- gasoline containing MTBE.

c.     Both actions allege conspiracy, negligence, and multiple other practically identical causes of action.

d.     Both actions assert claims for relief for damage to property, "stigma" damages, and mandatory injunctive relief for testing of wells for the presence of MTBE.

4.     Common questions of facts alleged in the two Complaints include:

a.     MTBE "has rendered many thousands of wells throughout New York State unfit for normal uses."  (Berisha Amended Cplt ¶ 8)

MTBE "has caused widespread contamination to drinking water sources throughout the United States." (England Cplt ¶ 1)

_____

[1] The *England* case currently has two case numbers because it was removed to federal court on two separate motions, each of which was assigned to a different judge.

b.   MTBE is more soluble than other gasoline constituents, and is resistant to biodegradation.  (Berisha Amended Cplt  ¶¶ 7-9)

MTBE has "unique properties," including "enhanced water solubility," gives water a "foul taste," and is "not readily susceptible to natural biodegradation."  (England Cplt ¶ 23)

c.   Defendants knew gasoline with MTBE would leak from underground storage tanks.  (Berisha Amended Cplt. ¶ 95)

Defendants knew MTBE would enter the environment through leaks from underground storage tanks as well as customer spills and overfills. (England Cplt ¶¶ 33-34)

d.   Defendants conspired to misinform federal government officials about the nature of MTBE.  (Berisha Amended Cplt. ¶¶ 75-85)

Defendants "conspired to misrepresent to the government and the public the true characteristics of MTBE ...."  (England Cplt ¶ 24)

e.   Defendants' conspiracy included the American Petroleum Institute (Berisha Amended Cplt ¶ 95) and the Oxygenated Fuels Association. (Berisha Amended Cplt ¶ 133)

f.   Defendants conspiracy involved the American Petroleum Institute and the Oxygenated Fuels Association. (England Cplt ¶ 27)

5.   Even Plaintiffs' Complaints assert common questions of fact for class purposes that are common between the two actions.  Plaintiffs in *England v. Atlantic Richfield Co., et al.*, list the following as common questions of fact:

a.   Whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate.  (Cplt ¶ 47(1))

b.   Whether Defendants made false, misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the nation's groundwater.  (Cplt ¶ 47(7))

c.   Whether Defendants knew or should have known that MTBE is hazardous to ground acquifers and private water systems. (Cplt ¶ 47(6))

Mirroring these allegations, the *Berisha* plaintiffs allege common questions including:

a.   What are the properties of MTBE, including its water solubility, mobility,

3

and resistance to biodegradation.  (Amended Cplt ¶ 149(a))

b.    Whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the products' safety as alleged.  (Amended Cplt ¶ 149(t))

c.    Whether Defendants knew or should have known the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE.  (Amended Cplt ¶ 149(g))

6.    Transfer of all pending actions for consolidated pretrial proceedings will promote the just and efficient conduct of these actions and will avoid overlapping and conflicting discovery.

7.    As alleged, these putative class actions raise substantially identical claims and seek substantially identical relief from a core group of virtually identical Defendants, including Atlantic Richfield Company, BP Amoco Corporation, CITGO, ExxonMobil Corporation, Texaco, Chevron and others.  Accordingly, these actions should be transferred for consolidated pretrial proceedings in a single forum.

**WHEREFORE**, the undersigned Defendants respectfully request that this Court grant this Motion to Transfer for Coordinated or Consolidated Pretrial Proceedings Under 28 U.S.C. § 1407, and transfer all actions to the Southern District of New York, or the Southern

4

District of Illinois, or another convenient forum, and grant Defendants all such further relief as

the Panel deems just and necessary.

Dated: May 30, 2000                         Respectfully submitted,


Richard C. Godfrey
J. Andrew Langan
Thomas A. Tozer
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
(312) 861-2200 (FAX)

Mark E. Holstein
200 East Randolph Drive
Suite 2000
Chicago Illinois, 60601
(312) 861-5437

Attorneys for Defendants
BP AMOCO CORPORATION,
AMOCO OIL COMPANY and
ATLANTIC RICHFIELD COMPANY

*Nathan P. Eimer / sal*

Nathan P. Eimer
Pamela R. Hannebutt
Lisa S. Meyer
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois
(312) 853-7000
(312) 853-7036 (FAX)

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

Dan H. Ball
Kurt E. Reitz
Roman P. Wuller
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
(314) 552-6000
(314) 552-7000 (FAX)

OF COUNSEL:
THOMPSON COBURN LLP

Attorneys for Defendant
CHEVRON U.S.A., INC.

## CERTIFICATE OF SERVICE

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6 2000

FILED
CLERK'S OFFICE

The foregoing was served by first-class mail, postage-prepaid, on this 30th day of May, 2000, to:

| | |
|---|---|
| Norbert G. Jaworski, Clerk | James M. Parkison, Clerk |
| United States District Court | United States District Court |
| Southern District of Illinois | Southern District of New York |
| 750 Missouri Avenue | United States Courthouse |
| P.O. Box 249 | 500 Pearl Street |
| East St. Louis, IL 62202 | New York, New York 10007 |

CLERKS OF DISTRICT COURTS

---

| | |
|---|---|
| Stephen M. Tillery | Edward Masry |
| Christine J. Moody | Joseph D. Gonzalez |
| Carr, Korein, Tillery, Kunin, | Law Offices of Masry & Vititoe |
|    Montroy, Cates, Katz & Glass | 5707 Corsa Avenue, Second Floor |
| 10 Executive Woods Court | Westlake Village, California  91362 |
| Swansea, Illinois 62226 | |
| | Victor M. Sher |
| Scott Summy | Duane C. Miller |
| Celeste Evangelasti | A. Curtis Sawyer, Jr. |
| Cooper & Scully, P.C. | Miller, Sher & Sawyer |
| 900 Jackson Street, Suite 100 | 100 Howe Avenue, Suite S-120 |
| Dallas, Texas 75202 | Sacramento, California  95825-5407 |

ATTORNEYS FOR PLAINTIFFS
*England, et al. v. Atlantic Richfield Co., et al.*, Nos. 00-370-WDS and 00-371-DRH.

---

| | |
|---|---|
| Lewis J. Saul | Stanley Margolies |
| Lewis Saul & Associates, P.C. | Kurzman, Karelson & Frank, LLP |
| 501 Wisconsin Avenue, NW | 230 Park Avenue |
| Suite 550 | 23rd Floor |
| Washington, DC 20015 | New York, New York 10169 |

ATTORNEYS FOR PLAINTIFFS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00 CIV 1898 [SAS]

---

2000 MAY 31  P 12: 49
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
RECEIVED
CLERK'S OFFICE

Mr. Dan H. Ball
Mr. Kurt E. Reitz
Mr. Roman P. Wuller
Thompson Coburn LLP
One Firstar Plaza, Suite 3300
St. Louis, MO 63101
*Attorneys for Defendants Conoco, Inc.,*
*Chevron U.S.A., Inc., and Exxon Mobil*
*Corporation*

Mr. John Galvin
Mr. Lyndon Sommer
Sandberg, Phoenix & von Gontard
One City Centre, 15th Floor
515 North Sixth Street
St. Louis, MO 63101-1880
*Attorneys for Defendant Phillips Petroleum*
*Company*

Mr. Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace King Marraro & Branson,
   PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007

Mr. Robert W. Jones
Thompson & Knight
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
*Attorneys for Defendants Equilon*
*Enterprises, LLC, Shell Oil Company,*
*and Texaco Refining and Marketing,*
*Inc.*

ATTORNEYS FOR DEFENDANTS
*England v. Atlantic Richfield Co.*, Nos. 00-370-WDS and 00-371-DRH

-----

Christopher S. Colman
Associate General Counsel
Amerada Hess Corporation
One Hess Plaza
Woodbridge, NJ 07095

Robert H. Shulman
Mindy G. Davis
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20006
*Attorneys for Defendant Amerada Hess Corp.*

Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace, King, Marraro & Branson, PLLC
1050 Thomas Jefferson St., NW
Washington, DC 20007

Sharon M. Dutch
Sedwick, Detert, Moran & Arnold
125 Broad Street
Thirty-Ninth Floor
New York, NY 10004-2400

*Attorneys for Defendants Chevron USA, Inc., Exxon Corp., Mobil Oil Corp., Motiva Enterprises, LLC, Shell Oil Products Co., and Texaco Inc.*

Charlotte Biblow
Rivkin, Radler & Kremer LLP
EAB Plaza (Long Island)
Uniondale, NY 11556-0111
*Attorney for Defendant Getty Petroleum Corp.*

Mark E. Tully
Goodwin, Procter & Hoar LLP
Exchange Place
Boston, MA 02109-2881
*Attorney for Defendant Gulf Oil Ltd. Partnership*

John S. Guttmann
Beverage & Diamond, P.C.
1350 I Street, NW
Suite 700
Washington, D.C. 20005

Sy Gruza
Beverage & Diamond, P.C.
15th Floor
477 Madison Avenue
New York, NY 10022-5802
*Attorneys for Defendant Sunoco Inc.*

Kenneth Pasquale
Strook, Strook & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
*Attorney for Defendant Tosco Corp.*

ATTORNEYS FOR DEFENDANTS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00-CIV-1898 [SAS]

—————————————

J. Andrew Langan

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6 2000

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | : | |
| **IN RE:** | : | **MDL DOCKET NO. ____** |
| | : | |
| **MTBE LITIGATION** | : | |
| | : | |
| | : | |

RECEIVED
CLERK'S OFFICE
2000 MAY 31 P 12:
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## BRIEF IN SUPPORT OF CERTAIN MTBE LITIGATION DEFENDANTS' MOTION TO TRANSFER FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS UNDER 28 U.S.C. § 1407

KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
Attorneys for Defendants
AMOCO OIL COMPANY, and
ATLANTIC RICHFIELD COMPANY

SIDLEY & AUSTIN
One First National Plaza
Chicago, Illinois 6060
(312) 853-7000
Attorneys for Defendant
CITGO PETROLEUM CORPORATION

THOMPSON COBURN LLP
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
(314) 552-6000
Attorneys for Defendants
CHEVRON U.S.A., INC.

MAY 30, 2000

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       THE PUTATIVE CLASS ACTION IN *BERISHA V. AMERADA HESS* . . . . . . . . . . . 2
       THE PUTATIVE CLASS ACTION IN *ENGLAND V. AMOCO OIL* . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      THE VIRTUALLY IDENTICAL PUTATIVE CLASS ACTIONS SHOULD BE
        TRANSFERRED FOR COORDINATED OR CONSOLIDATED PRETRIAL
        PROCEEDINGS IN A SINGLE FORUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        A.    Transfer Will Avoid Duplicative And Overlapping Discovery. . . . . . . . . . . . . . 6
        B.    Transfer Will Avoid Inconsistent Pretrial Rulings. . . . . . . . . . . . . . . . . . . . . . 7
        C.    Transfer Will Avoid Wasted Resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        D.    Allegation of Classes in Individual States Does Not Weigh Against Transfer. . . 11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# **TABLE OF AUTHORITIES**

## Cases

*In re Asbestos Prod. Liab. Litig.*, 1996 WL 143826. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651 . . . . . . . . . . . . . . . . . . . . . . 9, 11

*In re Diet Drugs Prod. Liab. Litig.*, 990 F. Supp. 834 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re First Nat'l Bank, Heavener, Okla Sec. Litig.*, 451 F. Supp. 995 . . . . . . . . . . . . . . . . . . . . . 7

*In re Nissan Motor Corp. Antitrust Litig.*, 385 F. Supp. 1253 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Phonometrics, Inc., Elec. Long Distance Call*
    *Cost Computer and Recorder Patent Litig.*, 1997 WL 83673 . . . . . . . . . . . . . . . . . . . . . 10

*In re Plumbing Fixture Cases*, 298 F. Supp. 484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Public Air Travel Tariff Litig.,* 360 F. Supp. at 1399 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*In re Rio Hair Naturalizer Prod. Liab. Litig.*, 904 F. Supp. 1407 . . . . . . . . . . . . . . . . . . . . . . . 6, 11

*In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

## Statutes

28 U.S.C. § 1407(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C.A. § 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTRODUCTION

Two class actions brought on behalf of putative classes are presently before two federal courts: (1) *Berisha v. Amerada Hess, et al.,* No. 00 CIV 1898 pending in the Southern District of New York, and (2) *England v. Atlantic Richfield Co., et al.,* Nos. 00-370-WDS, 00-371-DRH, pending in the Southern District of Illinois. (A schedule as required by JPML Rule 10 and a table summarizing the allegations is attached as Ex. A).

These actions assert virtually identical allegations:

- The actions involve alleged property damage relating to alleged contamination by methyl tertiary butyl ether (MTBE), a gasoline additive that is one of a short list of oxygenates available to meet the strict Reformulated Gasoline requirements of the Clean Air Act of 1990 and related federal regulations;

- The actions allege identical conspiracy claims relating to the marketing of MTBE;

- The actions seek mandatory injunctive relief in the form of groundwater testing, and virtually identical other forms of relief from all Defendants;

- The factual allegations concerning the actions of Defendants are all but identical;

- Both actions assert these claims against a core group of Oil Marketer Defendants[1]; and

- Both actions involve purported "subclasses" of so-called "testing plaintiffs" whose property has not been impacted or who have no information whether their property has been impacted by MTBE.

Because the allegations in these actions are so nearly identical, the federal courts will address in one form or another the same disputed issues of judicial management including, among others: (i) discovery with respect to the claims and class issues; (ii) whether certification of a class is proper; (iii) what (if any) subclasses could be defined; and (iv) the proper form and

---

[1] A chart comparing the Defendants in both actions is attached as Exhibit B.

distribution of any class notice.  Separate courts simultaneously addressing these issues will result in duplicative and unnecessarily expensive proceedings.  Accordingly, under 28 U.S.C. §1407, the undersigned Defendants jointly request that this Court transfer all pending federal actions for coordinated or consolidated pretrial proceedings to a single forum that will maximize the convenience to the parties, witnesses, and judiciary, and minimize the duplicative efforts that will result from simultaneous actions.

These Defendants -- BP Amoco Corporation, Amoco Oil Company, Atlantic Richfield Company, CITGO Petroleum Corporation and Chevron U.S.A., Inc. -- suggest the Panel transfer these federal actions to either the Southern District of New York, where the action titled *Berisha v. Amerada Hess et al.*, No. 00 CIV 1898 is pending, or to the Southern District of Illinois, where *England v. Atlantic Richfield Co.*, Nos. 00-370-WDS, 00-371-DRH, is pending.

## BACKGROUND

### I.

### THE PUTATIVE CLASS ACTION IN *BERISHA V. AMERADA HESS*

The action pending in the Southern District of New York, *Berisha v. Amerada Hess, et al.,* Index No. 00 CIV 1898 is filed on behalf of two putative classes:

A.    <u>Contaminated Well Subclass.</u> This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well water was tested and the tests verified that it has been contaminated with MTBE in concentrations at or above 2 ppb.

B.    <u>Uncontaminated Well Subclass.</u> This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well has not yet tested positive for the presence of MTBE.

(First Am. Cplt. ¶ 145, Ex. C).  These putative classes allege, among other things, that

Defendants should pay for clean up of wells identified as contaminated with MTBE, and for

testing of all domestic wells in New York that have not been so identified.  Thus, the Complaint

alleges:

- That MTBE is a gasoline additive that travels quickly in groundwater, does not biodegrade readily, fouls wells, and is a "known carcinogen" linked to human health problems.  (Am. Cplt. ¶¶ 5-10, 56-57);

- That MTBE was introduced in gasoline in 1979 (Am. Cplt. ¶ 11);

- That Defendants knew about and misrepresented the nature of MTBE (Am. Cplt ¶ 45);

- That Defendants conspired to sell MTBE while not disclosing its risks (Am. Cplt. ¶ 47);

- That Defendants conspired to misrepresent MTBE to the federal government (Am. Cplt. ¶¶ 75-78).

On numerous theories -- including negligence, failure to warn, conspiracy, alleged

violation of the New York consumer protection statute, strict liability theories, common law

fraud, and others -- the putative class seeks the following relief: creation of a fund for annual

testing wells; creation of a public education program; damages for lost property values from

contamination and the "threat" of contamination; a constructive trust on MTBE profits; and

punitive damages. (First Am. Cplt., Prayer for Relief)

This action originally was filed in New York state court on January 14, 2000.  On

March 10, 2000, Defendant Texaco timely removed the action to the Southern District of New

York, which divested the New York state court judge of any further jurisdiction over the action.

Plaintiffs have not contested federal jurisdiction.  Defendants are preparing motions to dismiss

the Complaint; plaintiffs, however, have recently filed an amended Complaint, and the Court has

set the following schedule: Dispositive Motions, June 19, 2000; briefing to be completed by

August 28, 2000; Discovery, document review from two California state court MTBE cases by

June 5, 2000; document requests, plaintiffs by June 30, 2000, defendants by June 5, 2000,

discovery status, July 25, 2000.

## II.

### THE PUTATIVE CLASS ACTION IN *ENGLAND V. AMOCO OIL*

The action pending in the Southern District of Illinois, *England v. Amoco Oil Co.,*

Nos. 00-370-WDS, 00-371-DRH,  also is brought on behalf of a putative class in 16 states.

Other than geographical restriction, as alleged the classes in *England* are identical to the "testing"

and "contamination" classes proposed in *Berisha* in New York:

> All persons who own real property in the RFG states that is not used for
> commercial purposes upon which private water supply well exists that provides or
> may provide drinking water and/or water used for domestic purposes and who
> have had or would like to have their supply well tested for MTBE, and

> All persons who own real property in the RFG states that is not used for
> commercial purposes upon which private water supply well exists that provides or
> may provide drinking water and/or water used for domestic purposes which has
> been contaminated by MTBE.

(Cplt. ¶¶ 43-44, Ex. D)  The putative *England* class makes factual allegations identical to those in

the New York action, including among other things:

- That MTBE is a gasoline additive that travels quickly in groundwater,
  does not readily biodegrade, fouls wells, and is a known carcinogen linked
  to human health problems.  (Cplt. ¶ 23);

- That MTBE was introduced in gasoline in 1979 (Cplt. ¶ 24);

- That Defendants knew about and misrepresented the nature of MTBE
  (Cplt. ¶ 27-30, 40);

- That Defendants conspired to sell MTBE while not disclosing its risks (Cplt. ¶ 71); and

- That Defendants conspired to misrepresent MTBE to the federal government.  (Cplt. ¶¶ 66-73)

Moreover, based on virtually the same allegations concerning the core Defendants' actions as are made in *Berisha* -- specifically, conspiracy to mislead the public and government officials, failure to warn and negligence -- the putative class in the *England* case seeks identical relief from the same core group of Defendants.  That relief includes "damages" for annual testing of wells for MTBE, damages for providing bottled water to redress contamination where actually found (Cplt., Prayer for Relief, Counts I, II and III), and damages for diminution in value for actual contamination and for unknown, or "threatened" contamination (compare Prayer for Relief, Count IV and Count VII).

Plaintiff England filed this Complaint in Illinois state court on April 11, 2000. Defendants were served beginning April 12, 2000, and the action was timely removed to federal court on May 11, 2000.

## ARGUMENT

Whenever there are overlapping facts in the allegations or defenses in multiple federal actions, this Panel may transfer the actions to a single convenient forum for coordinated or consolidated pretrial proceedings.  28 U.S.C. § 1407(a).  The Panel should consider transferring the actions now pending in the district courts to either the Southern District of Illinois or the Southern District of New York for pretrial proceedings because:

- The actions assert substantially identical claims and seek substantially identical relief from Defendants, and thus transfer will avoid duplicative discovery and wasted resources;

- Transfer will avoid inconsistent pretrial rulings; and

- Either the Southern District of Illinois or the Southern District of New York will promote efficient resolution of these actions.

I.   **THE VIRTUALLY IDENTICAL PUTATIVE CLASS ACTIONS SHOULD BE TRANSFERRED FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS IN A SINGLE FORUM.**

A.   **Transfer Will Avoid Duplicative And Overlapping Discovery.**

As discussed above, these cases involve overlapping allegations of product characteristics, conspiracy, fraudulent representations, and the commonality of the core defendants.  Thus, the case will involve discovery of many of the same facts, documents and witnesses.  Consolidation will prevent duplicative discovery and save the parties, witnesses, and judiciary time and effort because both plaintiffs and defendants will undoubtedly seek discovery of many of the same documents and witnesses.  Such discovery "could best be pursued if coordinated under the supervision of a single judge."  *In re Public Air Travel Tariff Litig.,* 360 F. Supp. 1397, 1399 (J.P.M.L. 1973).  *See also In re Rio Hair Naturalizer Prod. Liab. Litig.,* 904 F.

Supp. 1407, 1408 (J.P.M.L. 1995) ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to overlapping class certification requests), and conserve the resources of the parties, their counsel and the judiciary"). The small number of currently pending actions is not a factor preventing transfer on efficiency grounds. *See In re First Nat'l Bank, Heavener, Oklahoma Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) ("Discovery on these complex factual questions will be time-consuming. Transfer under Section 1407 is thus necessary, even though only two actions are involved, in order to prevent duplicative pretrial proceedings and eliminate the possibility of inconsistent pretrial rulings."); Manual For Complex Litigation (Third) § 31.12 (1995) (noting "consolidation and transfer will fulfill the statutory objectives of eliminating duplication in discovery, avoid conflicting rulings and schedules, reduce litigation costs, and save time and effort on the part of the parties, their attorneys, the witnesses, and the judiciary.").

### B. Transfer Will Avoid Inconsistent Pretrial Rulings.

There is a substantial risk of inconsistent pretrial rulings where putative class actions proceed simultaneously in different forums. Indeed, it "is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968). This Panel has held that transfer and coordination or consolidation is particularly appropriate, if not essential, in class action cases. *See In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975); *In re First Nat'l Bank, Heavener, Oklahoma Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (Panel consolidated two class actions brought on behalf of similar plaintiff classes before a single judge for pretrial proceedings because "it is desirable to have a single judge oversee the class action issues"); *In re Public Air Travel Tariff Litig.*, 360 F. Supp. 1397, 1399 (J.P.M.L.

1973) (Panel transferred several actions where plaintiffs sought to represent the same class due to

the "real danger of conflicting class determinations").[2]

To determine if a class is proper in the putative class actions brought against the core

of identical Defendants, the courts will necessarily face a myriad of overlapping and duplicative

factual issues raised by overlapping and duplicative allegations in the complaints:

- The overlap in factual issues will result in overlapping discovery issues;

- Do individual issues predominate, thus precluding class certification, for instance, alleged damages to the value of unique real properties?;

- Does application of approximately 17 different states' laws-- involving different elements, different statutes of limitations and different defenses--create a predominance of individual legal and factual questions or preclude a finding of predominant commonality?

- Are the proposed classes too large, unmanageable and complex for class certification, where they allegedly comprise thousands of real property owners in 17 U.S. States, and scores of unique factual issues?[3]

---

[2]   *See also In re Texas Gulf Sulphur Sec. Litig.*, 344 F. Supp. 1398, 1400 (J.P.M.L. 1972) (possibility of conflicting class determinations an important factor favoring transfer); *In re Career Academy Antitrust Litig.*, 342 F. Supp. 753, 754 (J.P.M.L. 1972) (same); *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) ("There is another highly persuasive reason for transferring all these actions to one district for pretrial proceedings. We have consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists").

[3]   *See Indiana State Employees Ass'n, Inc. v. Indiana State Highway Comm'n.*, 78 F.R.D. 724, 725-726 (S.D. Ind. 1978); *Fertig v. Blue Cross Of Iowa*, 68 F.R.D. 53, 59 (N.D. Iowa 1974) (class of approximately 2 million "completely unmanageable"); *United Egg Producers v. Bauer Int'l Corp.*, 312 F. Supp. 319, 321 (S.D.N.Y. 1970) (class of "all consumers of eggs" denied certification); *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 235-236 (9th Cir. 1974) (proposed class of 400,000 denied), *cert. denied*, 421 U.S. 963 (1975).

- Will various individual and unmanageable issues inevitably cause any certified class to degenerate into thousands of mini-trials, thereby rendering class treatment inferior and defeating the purpose of class certification?[4]

In *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 654-55 (J.P.M.L. 1981), the Panel recognized that multiple class actions against Cuisinart brought on behalf of allegedly similar classes of purchasers had the potential for duplicative efforts and inconsistent rulings:

> "The [defendants'] argument concerning the untenability of nationwide and statewide classes in this litigation, although premature, demonstrates the difficulty of the class certification questions presented and therefore merely amplifies the need to have a single judge oversee the class action issues in these seven actions to avoid duplicative efforts and inconsistent rulings in this area."

506 F. Supp. 651, 655 (J.P.M.L. 1981).

Significantly, in each action here, the named plaintiffs themselves have alleged that a single forum is superior to support their class allegations. Thus, plaintiffs allege benefits to litigation in a single forum that will reduce the possibility of "inconsistent or varying adjudications with respect to individual class members." Ex. C, Berisha Am. Cplt., ¶ 153 (a). *See also*, Ex. D, England Cplt. ¶ 49 ("Concentrating this litigation in one forum would aid judicial economy and efficiency, promote parity among the claims of individual Class Members, and result in judicial consistency."); Ex. C, Berisha Am. Cplt., ¶ 154 ("Should separate actions be brought or be required to be brought, the resulting multiplicity of lawsuits would cause increased delay and expense to all parties and the judicial system.") Although Defendants dispute that trial or resolution of plaintiffs'

---

[4] *In re Northern Dist. Of Cal. Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 854-56 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983) (individual causation trials overwhelmed alleged common issues). The multitude of mini- and jury trials cannot be avoided by shortcuts. *See In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990).

claims as a single putative class action is proper, any time virtually identical putative classes raise substantially similar factual allegations, as they do here, consolidated pretrial proceedings under Section 1407 provide the same benefits of a single forum as requested by the named plaintiffs.

   The fact that the purported classes are geographically distinct does not matter to the analysis whether these cases are transferable for reasons relating to class certification. The classes are, as defined, all but identical except in geography and therefore are factually similar. Plaintiffs allege they are property owners harmed by, or "fearing" harm by a single product, MTBE, marketed by a core group of national Defendants through an alleged common scheme.

**C.**  **Transfer Will Avoid Wasted Resources.**

   Allowing these actions to proceed simultaneously in more than one federal court is a waste of resources for both the parties and the judiciary, will cause significant hardship on the witnesses, and will potentially necessitate the following duplicative proceedings: potentially conflicting discovery schedules; potentially conflicting discovery cut-offs; potentially conflicting case management orders; duplicative production of documents; duplicative production of witnesses; multiple class briefing covering many of the same issues; duplicative pretrial hearings, and; duplicative briefings and hearings on summary judgment and other dispositive motions.

   Coordinated or consolidated pretrial proceedings, therefore, are appropriate. *See Phonometrics, Inc., Elec. Long Distance Call Cost Computer and Recorder Patent Litig.*, 1997 WL 83673, *1 (J.P.M.L. Feb. 19, 1997) (Ex. E) ("Centralization under Section 1407 will thus eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties,

their counsel, and the judiciary."); *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 904 F. Supp. 1407, 1408 (J.P.M.L 1995).[5]

### D.   Allegation of Classes in Individual States Does Not Weigh Against Transfer.

The assertion of these purported class actions in separate States does not involve "local" or "unique" facts where the complaints assert a conspiracy of national scope against a core group of national defendants, and harm through an identical product.

First, the statute requires that cases to be consolidated involve an overlap of common questions of fact, not an identity of every allegation. 28 U.S.C. § 1407 (consolidation is proper in any "civil actions involving one or more common questions of fact ..."). There is clearly an overlap of common factual allegations here, where plaintiffs allege MTBE's characteristics make it more dangerous to groundwater and humans than gasoline without the additive, that MTBE is therefore "defective," that the core group of Defendants conspired to market MTBE despite these characteristics, and to deceive government entities and the public in the process, that Defendants were aware MTBE would be released from gasoline retail storage facilities, as well as other common factual questions. *See In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 654-55 (J.P.M.L. 1981); *In re Nissan Motor Corp. Antitrust Litig.*, 385 F. Supp. 1253 (J.P.M.L. 1974); *In re Diet Drugs Prod. Liab. Litig.*, 990 F. Supp. 834, 836 (J.P.M.L. 1998) ("Common factual questions arise because the more than 200 federal court actions in this litigation focus on alleged defects in

---

[5] The fact there are "only" two actions before the Panel at this time does not prevent transfer. The Statute requires no minimum number of actions to warrant transfer, and this Panel has transferred two actions in prior cases, especially when both actions are at the earlier stages of litigation. *See In re White Consol. Indus., Inc., Environmental Ins. Coverage Litig.,* 1994 WL 52568 (J.P.M.L. Feb. 16, 1994) (Ex. F); *In re Diamond Match Plant Hazardous Waste Cleanup Litig.,* 799 F. Supp. 1204 (J.P.M.L. 1992); *In re First Nat'l Bank, Heavener, Oklahoma Sec. Litig.,* 451 F. Supp. 995 (J.P.M.L. 1978).

three prescription drugs."); *In re Asbestos Prod. Liab. Litig.*, 1996 WL 143826 at *1 (J.P.M.L. Feb. 16, 1996) (Ex. G) ("[D]istinctions based on such matters as the pendency of motions or other matters before the transferor court, the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the presence of unique or additional claims ..." were not sufficient basis to warrant denying transfer.).

Second, the statute does not require unity of legal theories, nor does it even address the issue whether the legal theories in the consolidated actions are identical. Instead, the statute asks solely whether the factual allegations are sufficiently similar to warrant consolidation for pretrial discovery and other matters. That is plainly the fact here, as set forth in detail above.

## CONCLUSION

Proceeding separately with these putative class actions will lead to conflicting rulings, duplicative discovery, and wasted party and judicial resources. Therefore, the undersigned Defendants request the Panel order these actions transferred pursuant to 28 U.S.C.A. § 1407, for

coordinated or consolidated pretrial proceedings in a single forum -- either the Southern District

of New York or the Southern District of Illinois.

Dated: May 30, 2000                                Respectfully submitted,


Richard C. Godfrey
J. Andrew Langan
Thomas A. Tozer
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois  60602
(312) 861-2000
(312) 861-2200 (FAX)

Mark E. Holstein
200 East Randolph Drive
Suite 2000
Chicago Illinois, 60601
(312) 861-5437

Attorneys for Defendants
BP AMOCO CORPORATION,
AMOCO OIL COMPANY and
ATLANTIC RICHFIELD COMPANY

Nathan P. Eimer
Pamela R. Hannebutt
Lisa S. Meyer
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois
(312) 853-7000
(312) 853-7036 (FAX)

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

_Dan H. Ball/jaL_

Dan H. Ball
Kurt E. Reitz
Roman P. Wuller
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
(314) 552-6000
(314) 552-7000 (FAX)

OF COUNSEL:                                Attorneys for Defendant
THOMPSON COBURN LLP                        CHEVRON U.S.A., INC.

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6 ' 2000

## CERTIFICATE OF SERVICE

FILED
CLERK'S OFFICE

The foregoing was served by first-class mail, postage-prepaid, on this 30th day of May, 2000,

to:

Norbert G. Jaworski, Clerk
United States District Court
Southern District of Illinois
750 Missouri Avenue
P.O. Box 249
East St. Louis, IL 62202

James M. Parkison, Clerk
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

CLERKS OF DISTRICT COURTS

---

Stephen M. Tillery
Christine J. Moody
Carr, Korein, Tillery, Kunin,
    Montroy, Cates, Katz & Glass
10 Executive Woods Court
Swansea, Illinois 62226

Edward Masry
Joseph D. Gonzalez
Law Offices of Masry & Vititoe
5707 Corsa Avenue, Second Floor
Westlake Village, California 91362

Scott Summy
Celeste Evangelasti
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202

Victor M. Sher
Duane C. Miller
A. Curtis Sawyer, Jr.
Miller, Sher & Sawyer
100 Howe Avenue, Suite S-120
Sacramento, California 95825-5407

ATTORNEYS FOR PLAINTIFFS
*England, et al. v. Atlantic Richfield Co., et al.*, Nos. 00-370-WDS and 00-371-DRH.

---

Lewis J. Saul
Lewis Saul & Associates, P.C.
501 Wisconsin Avenue, NW
Suite 550
Washington, DC 20015

Stanley Margolies
Kurzman, Karelson & Frank, LLP
230 Park Avenue
23rd Floor
New York, New York 10169

ATTORNEYS FOR PLAINTIFFS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00 CIV 1898 [SAS]

---

2000 MAY 31 P 12: 50

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

RECEIVED
CLERK'S OFFICE

Mr. Dan H. Ball
Mr. Kurt E. Reitz
Mr. Roman P. Wuller
Thompson Coburn LLP
One Firstar Plaza, Suite 3300
St. Louis, MO 63101
*Attorneys for Defendants Conoco, Inc.,*
*Chevron U.S.A., Inc., and Exxon Mobil*
*Corporation*

Mr. John Galvin
Mr. Lyndon Sommer
Sandberg, Phoenix & von Gontard
One City Centre, 15th Floor
515 North Sixth Street
St. Louis, MO 63101-1880
*Attorneys for Defendant Phillips Petroleum*
*Company*

Mr. Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace King Marraro & Branson,
    PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007

Mr. Robert W. Jones
Thompson & Knight
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
*Attorneys for Defendants Equilon*
*Enterprises, LLC, Shell Oil Company,*
*and Texaco Refining and Marketing,*
*Inc.*

ATTORNEYS FOR DEFENDANTS
*England v. Atlantic Richfield Co.*, Nos. 00-370-WDS and 00-371-DRH

---

Christopher S. Colman
Associate General Counsel
Amerada Hess Corporation
One Hess Plaza
Woodbridge, NJ 07095

Robert H. Shulman
Mindy G. Davis
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20006
*Attorneys for Defendant Amerada Hess
Corp.*

Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace, King, Marraro & Branson, PLLC
1050 Thomas Jefferson St., NW
Washington, DC 20007

Sharon M. Dutch
Sedwick, Detert, Moran & Arnold
125 Broad Street
Thirty-Ninth Floor
New York, NY 10004-2400

*Attorneys for Defendants Chevron USA,
Inc., Exxon Corp., Mobil Oil Corp., Motiva
Enterprises, LLC, Shell Oil Products Co.,
and Texaco Inc.*

Charlotte Biblow
Rivkin, Radler & Kremer LLP
EAB Plaza (Long Island)
Uniondale, NY 11556-0111
*Attorney for Defendant Getty Petroleum
Corp.*

Mark E. Tully
Goodwin, Procter & Hoar LLP
Exchange Place
Boston, MA 02109-2881
*Attorney for Defendant Gulf Oil Ltd.
Partnership*

John S. Guttmann
Beverage & Diamond, P.C.
1350 I Street, NW
Suite 700
Washington, D.C. 20005

Sy Gruza
Beverage & Diamond, P.C.
15th Floor
477 Madison Avenue
New York, NY 10022-5802
*Attorneys for Defendant Sunoco Inc.*

Kenneth Pasquale
Strook, Strook & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
*Attorney for Defendant Tosco Corp.*

ATTORNEYS FOR DEFENDANTS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00-CIV-1898 [SAS]

_____

J. Andrew Langan

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -b  2000

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: | : |
| | : |
| MTBE LITIGATION | : |
| | : |
| | : |

MDL DOCKET NO. ____

RECEIVED
CLERK'S OFFICE
2000 JUN -2  A 10: 56
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## REVISED SCHEDULE OF ACTIONS PURSUANT TO
## RULE 10 OF THE RULES OF PROCEDURE OF
## THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION[1]

### Action No. 1

Complete Name of Case:   Donna Berisha, Steven C. Greene, Melanie J. Arcuri and Ron LaSusa on behalf of themselves and all others similarly situated  v. Amerada Hess Corporation, BP Amoco Corporation, Chevron U.S.A., Inc., CITGO Petroleum Corporation, Exxon Corporation, Getty Petroleum Corporation, Gulf Oil Ltd. Partnership, Mobil Oil Corporation, Shell Oil Products Company, Sunoco Inc., Texaco, Inc., Tosco Corporation, Atlantic Richfield Company, Coastal Corporation d/b/a Coastal Oil New York, Inc., Motiva Enterprises LLC, United Refining Company, Valero Energy Inc. d/b/a Valero Marketing and Supply Company, and Does 1 through 100 inclusive.

---

[1]  Replaces Exhibit A to Brief in Support of Certain Defendants' Motion to Transfer for Coordinated or Consolidated Pretrial Proceedings.

| | |
|---|---|
| <u>District Court</u>: | Southern District of New York |
| <u>Civil Action No.</u>: | No. 00 CIV 1898 [SAS] |
| <u>Assigned Judge</u>: | Judge S. Scheindlin |

## Action No. 2

| | |
|---|---|
| <u>Complete Name of Case</u>: | David England, Donna Azbill, James Bauer, Marvin Owca, Rhea Susan McMannis, and Claudia Christiansen, individually and on behalf of all others similarly situated v. Atlantic Richfield Company, BP Amoco Corporation, Amoco Oil Company, CITGO Petroleum Corporation, Conoco, Inc., Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation, Equilon Enterprises, LLC, Chevron USA, Inc., Phillips Petroleum Company, Shell Oil Company, and Texaco Refining and Marketing, Inc. |
| <u>District Court</u>: | Southern District of Illinois |
| <u>Civil Action No.</u>: | 00-370-WDS |
| <u>Assigned Judge</u>: | Judge William D. Stiehl |

## Action No. 3[2]

| | |
|---|---|
| <u>Complete Name of Case</u>: | David England, Donna Azbill, James Bauer, Marvin Owca, Rhea Susan McMannis, and Claudia Christiansen, individually and on behalf of all others similarly situated v. Atlantic Richfield Company, BP Amoco Corporation, Amoco Oil Company, CITGO Petroleum Corporation, Conoco, Inc., Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation, Equilon Enterprises, LLC, Chevron USA, Inc., Phillips Petroleum Company, Shell Oil Company, and Texaco Refining and Marketing, Inc. |

---

[2] Actions No. 2 and 3 are listed separately because the *England* case was removed to federal court on two separate motions. Each removal motion was assigned to a different judge.

District Court:          Southern District of Illinois

Civil Action No.:        00-371-DRH

Assigned Judge:          Judge David R. Herndon


Dated: June 1, 2000                     Respectfully submitted,

                                        Richard C. Godfrey
                                        J. Andrew Langan
                                        Thomas A. Tozer
                                        KIRKLAND & ELLIS
                                        200 East Randolph Drive
                                        Chicago, Illinois  60602
                                        (312) 861-2000
                                        (312) 861-2200 (FAX)

                                        Mark E. Holstein
                                        200 East Randolph Drive
                                        Suite 2000
                                        Chicago Illinois, 60601
                                        (312) 861-5437

                                        Attorneys for Defendants
                                        BP AMOCO CORPORATION,
                                        AMOCO OIL COMPANY and
                                        ATLANTIC RICHFIELD COMPANY

Nathan P. Eimer
Pamela R. Hannebutt
Lisa S. Meyer
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000
(312) 853-7036 (FAX)

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

- 4 -

_Dan H. Ball / JaL_

Dan H. Ball
Kurt E. Reitz
Roman P. Wuller
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
(314) 552-6000
(314) 552-7000 (FAX)

OF COUNSEL:                          Attorneys for Defendant
THOMPSON COBURN LLP                  CHEVRON U.S.A., INC.

**Summary Table of Allegations in *Berisha, et al. v. Amerada Hess, et al,* and *England et al. v Atlantic Richfield Co., et al.***

| *Berisha, et al. v. Amerada Hess, et al.* | Allegations |
|---|---|
| **Class Definition**: Testing subclass: "all persons or entities who have an interest in real property in New York and rely on well water from the property for drinking and/or other household uses that is not otherwise annually tested for the presence of MTBE." (Cplt., ¶ 134 A) | MTBE "has rendered many thousands of wells throughout New York State unfit for normal uses." (Amended Cplt ¶ 8) |
| Contaminated Subclass: "all persons or entities who have an interest in real property in New York and 1) rely on well water from the property for drinking or other household uses; and 2) their well water has been tested and the tests verify that it has been contaminated with MTBE concentrations above 2 ppb." (Cplt., ¶ 134 B) | MTBE is more soluble than other gasoline constituents, and is resistant to biodegradation. (Amended Cplt ¶¶ 7-9) |
| **Class definition, Amended Complaint** <u>Contaminated Well Subclass</u>.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well water was tested and the tests verified that it has been contaminated with MTBE in concentrations at or above 2 ppb. (Amended Cplt ¶ 145A) | "During the 1980s, ignoring the paramount importance of groundwater ... Defendants agreed to support the use of the gasoline additive MTBE...." (Amended Cplt, ¶ 58) |

| | |
|---|---|
| <u>Uncontaminated Well Subclass</u>.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well has not yet tested positive for the presence of MTBE. (Amended Cplt ¶ 145B) | Defendants knew gasoline with MTBE would leak from underground storage tanks. (Amended Cplt. ¶ 95) |
| | Defendants conspired to misinform federal government officials about the nature of MTBE.  (Amended Cplt. ¶¶ 75-85) |
| | Defendants' conspiracy included the American Petroleum Institute (Amended Cplt ¶ 95) and the Oxygenated Fuels Ass'n. (Amended Cplt ¶ 133) |
| | Plaintiffs agree multiple lawsuits will burden the courts and a single action is more efficient. (Amended Cplt. ¶ 154) |

|  | Plaintiffs list the following as questions of fact (Amended Cplt. ¶ 149 )<br><br>"What are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation."  (Amended Cplt ¶ 149(a))<br><br>"Whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the products' safety as alleged." (Amended Cplt ¶ 149(t))<br><br>"Whether Defendants knew or should have known the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE."  (Amended Cplt ¶ 149(g)) |
|  |  |
| *England et al. v. Atlantic Richfield Co., et al..* |  |
| **Class Definition**: "All persons who own real property in the RFG states that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE."  (Cplt ¶ 43) | MTBE "has caused widespread contamination to drinking water sources throughout the United States." (Cplt ¶ 1) |
| Proposed Sub-Class: "All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE." (Cplt ¶ 44) | MTBE has "unique properties," including "enhanced water solubility," gives water a "foul taste," and is "not readily susceptible to natural biodegradation."  (Cplt ¶ 23) |
|  | Defendants "conspired to misrepresent to the government and the public the true characteristics of MTBE ...."  (Cplt ¶ 24) |

| | |
|---|---|
| | Defendants conspiracy involved the American Petroleum Institute and the Oxygenated Fuels Association. (Cplt ¶ 27) |
| | Defendants knew MTBE would enter the environment through leaks from underground storage tanks as well as customer spills and overfills.  (Cplt ¶¶ 33-34) |
| | Plaintiffs agree a single forum is more efficient.  (Cplt ¶¶ 48-49) |
| | Plaintiffs list the following as questions of fact:<br><br>"Whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate." (Cplt ¶ 47(1))<br><br>"Whether Defendants made false misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the nation's groundwater."  (Cplt ¶ 47(7))<br><br>"Whether Defendants knew or should have known that MTBE is hazardous to ground acquifers and private water systems. (Cplt ¶ 47(6)) |

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6 2000

## CERTIFICATE OF SERVICE

On May 30, 2000, the parties listed below were served with Certain Defendants' Motion to Transfer for Coordinated or Consolidated Pretrial Proceedings, and Brief in Support thereof, by first-class mail, postage-prepaid.[1]  On June 1, 2000, all of the parties listed below were served with the foregoing Revised Schedule of Actions (Ex. A to the Brief), by first-class mail, postage pre-paid.

FILED
CLERK'S OFFICE

| | |
|---|---|
| Norbert G. Jaworski, Clerk | James M. Parkison, Clerk |
| United States District Court | United States District Court |
| Southern District of Illinois | Southern District of New York |
| 750 Missouri Avenue | United States Courthouse |
| P.O. Box 249 | 500 Pearl Street |
| East St. Louis, IL 62202 | New York, New York 10007 |

CLERKS OF DISTRICT COURTS

---

| | |
|---|---|
| Stephen M. Tillery | Edward Masry |
| Christine J. Moody | Joseph D. Gonzalez |
| Carr, Korein, Tillery, Kunin, | Law Offices of Masry & Vititoe |
| Montroy, Cates, Katz & Glass | 5707 Corsa Avenue, Second Floor |
| 10 Executive Woods Court | Westlake Village, California 91362 |
| Swansea, Illinois 62226 | |
| | Victor M. Sher |
| Scott Summy | Duane C. Miller |
| Celeste Evangelasti | A. Curtis Sawyer, Jr. |
| Cooper & Scully, P.C. | Miller, Sher & Sawyer |
| 900 Jackson Street, Suite 100 | 100 Howe Avenue, Suite S-120 |
| Dallas, Texas 75202 | Sacramento, California 95825-5407 |

ATTORNEYS FOR PLAINTIFFS
*England, et al. v. Atlantic Richfield Co., et al.*, Nos. 00-370-WDS and 00-371-DRH

RECEIVED
CLERK'S OFFICE
2000 JUN -2   A 10: 56
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

---

| | |
|---|---|
| Lewis J. Saul | Stanley Margolies |
| Lewis Saul & Associates, P.C. | Kurzman, Karelson & Frank, LLP |
| 501 Wisconsin Avenue, NW | 230 Park Avenue |
| Suite 550 | 23rd Floor |
| Washington, DC 20015 | New York, New York 10169 |

ATTORNEYS FOR PLAINTIFFS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00 CIV 1898 [SAS]

---

[1] Three of the parties listed below, each noted herein with an asterisk (*), were served with the Motion to Transfer and Brief in Support on May 31, 2000, by first-class mail, postage pre-paid.

Mr. Dan H. Ball
Mr. Kurt E. Reitz
Mr. Roman P. Wuller
Thompson Coburn LLP
One Firstar Plaza, Suite 3300
St. Louis, MO  63101
*Attorneys for Defendants Conoco, Inc.,*
*Chevron U.S.A., Inc., and Exxon Mobil*
*Corporation*

Mr. John Galvin
Mr. Lyndon Sommer
Sandberg, Phoenix & von Gontard
One City Centre, 15th Floor
515 North Sixth Street
St. Louis, MO  63101-1880
*Attorneys for Defendant Phillips Petroleum*
*Company*

Mr. Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace King Marraro & Branson,
  PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC  20007

Mr. Robert W. Jones
Thompson & Knight
1700 Pacific Avenue, Suite 3300
Dallas, TX  75201
*Attorneys for Defendants Equilon*
*Enterprises, LLC, Shell Oil Company,*
*and Texaco Refining and Marketing,*
*Inc.*

ATTORNEYS FOR DEFENDANTS
*England v. Atlantic Richfield Co.*, Nos. 00-370-WDS and 00-371-DRH

Christopher S. Colman
Associate General Counsel
Amerada Hess Corporation
One Hess Plaza
Woodbridge, NJ  07095

Robert H. Shulman
Mindy G. Davis
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC  20006
*Attorneys for Defendant Amerada Hess Corp.*

Richard E. Wallace, Jr.
Mr. Anthony F. King
Mr. Peter C. Condron
Wallace, King, Marraro & Branson, PLLC
1050 Thomas Jefferson St., NW
Washington, DC  20007

Sharon M. Dutch
Sedwick, Detert, Moran & Arnold
125 Broad Street
Thirty-Ninth Floor
New York, NY  10004-2400

*Attorneys for Defendants Chevron USA, Inc., Exxon Corp., Mobil Oil Corp., Motiva Enterprises, LLC, Shell Oil Products Co., and Texaco Inc.*

Charlotte Biblow
Rivkin, Radler & Kremer LLP
EAB Plaza (Long Island)
Uniondale, NY  11556-0111
*Attorney for Defendant Getty Petroleum Corp.*

Mark E. Tully
Goodwin, Procter & Hoar LLP
Exchange Place
Boston, MA  02109-2881
*Attorney for Defendant Gulf Oil Ltd. Partnership*

John S. Guttmann
Beverage & Diamond, P.C.
1350 I Street, NW
Suite 700
Washington, D.C. 20005

Sy Gruza
Beverage & Diamond, P.C.
15th Floor
477 Madison Avenue
New York, NY 10022-5802
*Attorneys for Defendant Sunoco Inc.*

Kenneth Pasquale
Strook, Strook & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
*Attorney for Defendant Tosco Corp.*

John Wagner*
Law Department
United Refining Company
15 Bradley Street
Warren, Pennsylvania 16365
*Attorney for Defendant United Refining Co.*

Coastal Corporation*
Law Department
Coastal Tower
9 Greenway Plaza
Houston, Texas 77046
*Attorneys for Defendant Coastal Corp.*

Valero Energy Corporation*
Law Department
One Valero Place
San Antonio, Texas 78212-3186
*Attorneys for Defendant Valero Energy Corp.*

ATTORNEYS FOR DEFENDANTS
*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00-CIV-1898 [SAS]

J. Andrew Langan

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUN -6  2000

FILED
CLERK'S OFFICE

A

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE:                          :

MTBE LITIGATION                 :        MDL DOCKET NO. ____

                                :

SEE REVISED SCHEDULE OF ACTIONS
BEFORE EXHIBITS

**THE JU** ... **LITIGATION**

RECEIVED
CLERK'S OFFICE
2000 MAY 31 P 12: 50
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**Action No. 1**

| | |
|---|---|
| Complete Name of Case: | Donna Farisha, Steven C. Greene, Melanie J. Arcuri and Ron LaSusa on behalf of themselves and all others similarly situated v. America Hess Corporation, BP Amoco Corporation, Chevron Corporation, CITGO Petroleum Corporation, Exxon Corporation, Getty Petroleum Corporation, Guld Oil Ltd. Partnership, Mobil Oil Corporation, Shell Oil Products Company, Sunoco Inc., Texaco, Inc., Tosco Corporation and Does 1 through 100 inclusive. |
| District Court: | Southern District of New York |
| Civil Action No.: | No. 00 CIV 1898 |
| Assigned Judge: | Judge S. Scheindlin |

## Action No. 2

Complete Name of Case:        David England, Donna Azbill, James Bauer, Marvin Owca, Rhea
Susan McMannis, and Claudia Christiansen, individually and on
behalf of all others similarly situated v. Atlantic Richfield
Company, BP Amoco Corporation, Amoco Oil Company, CITGO
Petroleum Corporation, Conoco, Inc., Exxon Mobil Corporation,
f/k/a Exxon Corporation and f/k/a Mobil Corporation, Equilon
Enterprises, LLC, Chevron USA, Inc., Phillips Petroleum
Company, Shell Oil Company, and Texaco Refining and
Marketing, Inc.

District Court:               Southern District of Illinois

Civil Action No.:             00-370-WDS, 00-371-DRH

Assigned Judge(s):           Judge William D. Stiehl, Judge David R. Herndon


Dated: May 30, 2000                    Respectfully submitted,

                                       Richard C. Godfrey
                                       J. Andrew Langan
                                       Thomas A. Tozer
                                       KIRKLAND & ELLIS
                                       200 East Randolph Drive
                                       Chicago, Illinois  60602
                                       (312) 861-2000
                                       (312) 861-2200 (FAX)

                                       Mark E. Holstein
                                       200 East Randolph Drive
                                       Suite 2000
                                       Chicago Illinois, 60601
                                       (312) 861-5437

                                       Attorneys for Defendants
                                       BP AMOCO CORPORATION,
                                       AMOCO OIL COMPANY and
                                       ATLANTIC RICHFIELD COMPANY

- 2 -

Nathan P. Eimer
Pamela R. Hannebutt
Lisa S. Meyer
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois
(312) 853-7000
(312) 853-7036 (FAX)

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

Dan H. Ball
Kurt E. Reitz
Roman P. Wuller
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
(314) 552-6000
(314) 552-7000 (FAX)

OF COUNSEL:                         Attorneys for Defendant
THOMPSON COBURN LLP                 CHEVRON U.S.A., INC.

**Summary Table of Allegations in *Berisha, et al. v. Amerada Hess, et al,* and *England et al. v Atlantic Richfield Co., et al.***

| *Berisha, et al. v. Amerada Hess, et al.* | Allegations |
|---|---|
| **Class Definition**: Testing subclass: "all persons or entities who have an interest in real property in New York and rely on well water from the property for drinking and/or other household uses that is not otherwise annually tested for the presence of MTBE." (Cplt., ¶ 134 A) | MTBE "has rendered many thousands of wells throughout New York State unfit for normal uses."  (Amended Cplt ¶ 8) |
| Contaminated Subclass: "all persons or entities who have an interest in real property in New York and 1) rely on well water from the property for drinking or other household uses; and 2) their well water has been tested and the tests verify that it has been contaminated with MTBE concentrations above 2 ppb." (Cplt., ¶ 134 B) | MTBE is more soluble than other gasoline constituents, and is resistant to biodegradation.  (Amended Cplt  ¶¶ 7-9) |
| **Class definition, Amended Complaint** <u>Contaminated Well Subclass</u>.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well water was tested and the tests verified that it has been contaminated with MTBE in concentrations at or above 2 ppb. (Amended Cplt ¶ 145A) | "During the 1980s, ignoring the paramount importance of groundwater ... Defendants agreed to support the use of the gasoline additive MTBE...."  (Amended Cplt, ¶ 58) |

| | |
|---|---|
| <u>Uncontaminated Well Subclass</u>.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well has not yet tested positive for the presence of MTBE. (Amended Cplt ¶ 145B) | Defendants knew gasoline with MTBE would leak from underground storage tanks. (Amended Cplt. ¶ 95) |
| | Defendants conspired to misinform federal government officials about the nature of MTBE.  (Amended Cplt. ¶¶ 75-85) |
| | Defendants' conspiracy included the American Petroleum Institute (Amended Cplt ¶ 95) and the Oxygenated Fuels Ass'n. (Amended Cplt ¶ 133) |
| | Plaintiffs agree multiple lawsuits will burden the courts and a single action is more efficient. (Amended Cplt. ¶ 154) |

|  | Plaintiffs list the following as questions of fact (Amended Cplt. ¶ 149 )

"What are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation."  (Amended Cplt ¶ 149(a))

"Whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the products' safety as alleged." (Amended Cplt ¶ 149(t))

"Whether Defendants knew or should have known the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE."  (Amended Cplt ¶ 149(g)) |
|---|---|
|  |  |
| *England et al. v. Atlantic Richfield Co., et al..* |  |
| **Class Definition**: "All persons who own real property in the RFG states that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE."  (Cplt ¶ 43) | MTBE "has caused widespread contamination to drinking water sources throughout the United States." (Cplt ¶ 1) |
| Proposed Sub-Class: "All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE."  (Cplt ¶ 44) | MTBE has "unique properties," including "enhanced water solubility," gives water a "foul taste," and is "not readily susceptible to natural biodegradation."  (Cplt ¶ 23) |
|  | Defendants "conspired to misrepresent to the government and the public the true characteristics of MTBE ...."  (Cplt ¶ 24) |

| | |
|---|---|
| | Defendants conspiracy involved the American Petroleum Institute and the Oxygenated Fuels Association. (Cplt ¶ 27) |
| | Defendants knew MTBE would enter the environment through leaks from underground storage tanks as well as customer spills and overfills.  (Cplt ¶¶ 33-34) |
| | Plaintiffs agree a single forum is more efficient.  (Cplt ¶¶ 48-49) |
| | Plaintiffs list the following as questions of fact:<br><br>"Whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate." (Cplt ¶ 47(1))<br><br>"Whether Defendants made false misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the nation's groundwater."  (Cplt ¶ 47(7))<br><br>"Whether Defendants knew or should have known that MTBE is hazardous to ground acquifers and private water systems. (Cplt ¶ 47(6)) |

B

ALL-STATE LEGAL   800-222-0510   E5511   RECYCLED

**EXHIBIT B**

**REPRESENTATIVE OVERLAPPING CORE DEFENDANTS IN THE
TWO PENDING PUTATIVE CLASS ACTIONS**

| CASE PENDING | BERISHA -- SOUTHERN DISTRICT OF NEW YORK | ENGLAND -- SOUTHERN DISTRICT OF ILLINOIS |
|---|---|---|
| **DEFENDANTS** | Atlantic Richfield Company | Atlantic Richfield Company |
| | BP Amoco Corporation | BP Amoco Corporation |
| | Citgo Petroleum Corporation | Citgo Petroleum Corporation |
| | Exxon Corporation and Mobil Oil Corporation | Exxon Mobil Corporation |
| | Chevron Corporation | Chevron USA, Inc. |
| | Shell Oil Products Company | Shell Oil Company |
| | Texaco, Inc. | Texaco Refining and Marketing |
| | Amereda Hess Corporation | Amoco Oil Company |
| | Gulf Oil, Ltd. Partnership | Equilon Enterprises LLC |
| | Getty Petroleum Corporation | Conoco Inc. |
| | Sunoco Inc. | Phillips Petroleum Company |
| | Tosco Corporation | |
| | Coastal Oil New York, Inc. | |
| | United Refining Company | |
| | Valero Marketing And Supply Company | |
| | Does 1-100 | |

C

ALL-STATE® LEGAL  800/222-0510  FORM 11   RECYCLED

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA BERISHA, ROBERT O'BRIEN, MELANIE J. ARCURI and RON LA SUSA on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>AMERADA HESS CORPORATION; ATLANTIC RICHFIELD COMPANY; BP AMOCO CORPORATION; CHEVRON USA INC.; CITGO PETROLEUM CORPORATION;COASTAL CORPORATION d/b/a COASTAL OIL NEW YORK, INC.; EXXON CORPORATION; GULF OIL LTD. PARTNERSHIP; MOBIL OIL CORPORATION; MOTIVA ENTERPRISES, LLC; SHELL OIL PRODUCTS COMPANY; SUNOCO INC.; TEXACO, INC; TOSCO CORPORATION; UNITED REFINING COMPANY; VALERO ENERGY INC. d/b/a VALERO MARKETING AND SUPPLY COMPANY; and DOES 1 through 100,inclusive,<br><br>    Defendants. | No. 00 CIV 1898 [SAS]<br><br>FIRST AMENDED CLASS ACTION COMPLAINT FOR: INJUNCTIVE RELIEF AND DAMAGES FOR STRICT LIABILITY FOR FAILURE TO WARN; STRICT LIABILITY FOR DESIGN DEFECT; STRICT LIABILITY FOR MISREPRESENTATIONS; DECEPTIVE BUSINESS ACTS AND PRACTICES; PUBLIC NUISANCE; PRIVATE NUISANCE; NEGLIGENCE; AND FRAUD<br><br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Donna Berisha, Robert O'Brien, Melanie J. Arcuri and Ron La Susa, on behalf of themselves and all others similarly situated, by and through their attorneys, for their complaint against Defendants, and each of them, allege:

### NATURE OF THE CASE

1.    Plaintiffs bring this case as a class action on behalf of a class of all persons or entities that during the relevant time herein had an interest in real property in New York State and relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes.

2.      Defendants named in this legal action are manufacturers of gasoline containing MTBE sold in New York.

3.      Plaintiffs seek mandatory injunctive relief on behalf of the entire class in the form of a court-supervised statewide well testing program to provide information to Plaintiffs and the Plaintiff class on the extent and location of groundwater contamination by the gasoline additive methyl tertiary-butyl ether ("MTBE"), and a court-supervised statewide public education program addressing the risk of groundwater contamination posed by MTBE.

4.      Plaintiffs also seek compensatory and punitive damages on behalf of two subclasses: the Contaminated Well Subclass, comprised of class members whose wells are confirmed by testing to be contaminated by MTBE, and the Uncontaminated Well Subclass, comprised of class members whose wells have not yet tested positive for MTBE contamination.

5.      The case concerns an unprecedented tragedy arising from the introduction and use of MTBE as a gasoline additive.  MTBE is an aliphatic ether that does not occur naturally.  It is produced from methanol and isobutylene, a waste by-product of the gasoline refining process.

6.      MTBE is a known animal carcinogen that is linked to many human health problems.  The U.S. Environmental Protection Agency ("EPA") classifies it as a possible human carcinogen.  At concentrations at or above five (5) parts per billion ("ppb"), MTBE can give otherwise pure water a foul turpentine-like taste and odor, rendering it unfit for consumption.

7.      MTBE is more than an order of magnitude more soluble in water than are other gasoline constituents.  It has a strong affinity for and dissolves easily in any available water.

8.      When gasoline with MTBE is spilled or leaks, MTBE in the fuel, unlike other toxic components, does not adhere to the soil particles but instead travels rapidly through soil, mixing with water and soon contaminating underground aquifers.  The greater the MTBE content

of gasoline the higher the risk to water, but even small concentrations of MTBE create an enhanced threat to groundwater.

9.     MTBE also does not readily break down and biodegrade in the ground or groundwater. Research now shows that it will persist in groundwater for decades, far longer than other components of gasoline.

10.     MTBE is volatile so during transport, storage and fueling some quantity evaporates into the atmosphere where it will mix with water vapor and return in rainfall.

11.     MTBE was first added to gasoline in or around 1979. In the years since its introduction, the additive has rendered many thousands of wells throughout New York State unfit for normal uses. Gasoline is always the source of the MTBE contamination, but most wells contaminated with MTBE show either none or mere trace amounts of the other components of gasoline. In other words, the addition of MTBE created an enhanced risk of groundwater contamination not posed by conventional gasoline. Defendants provided no warning of this risk to public officials; persons and entities engaged in the storage, transport, handling, retail sale, use and response to spills of such gasoline (hereinafter referred to as "Downstream Handlers"); or the general public.

12.     In or around 1992, Defendants, who had long known of the threat posed by MTBE to water, introduced gasoline with higher MTBE content (11-15% by volume) in New York City and vicinity, purportedly to improve air quality during winter months. Defendants thereby increased the threat of groundwater contamination, again without warning public officials, Downstream Handlers or the general public of the enhanced risk MTBE-laden gasoline poses to groundwater.

3

13.     In or around 1995, Defendants started distributing or selling high MTBE content gasoline throughout the downstate New York counties and to many upstate locations as well. Again Defendants failed to warn public officials, Downstream Handlers or the general public of the increased risk to groundwater.

14.     At average concentrations of 11% to 15% by volume, MTBE makes up one of the largest single components of the gasoline sold in New York.

15.     As a result of the introduction of MTBE-laden gasoline and the subsequent increase in the concentrations and distribution of the gasoline additive, MTBE has become the second most widespread organic pollutant in the groundwater throughout the state.

16.     Plaintiffs assert claims for: (1) strict liability for failure to warn; (2) strict liability for design defect; (3) strict liability for misrepresentation; (4) deceptive business acts and practices in violation of GBL § 349; (5) public nuisance; (6) private nuisance; (7) negligence; and (8) fraud.

17.     On behalf of the class, individual and representative Plaintiffs seek the following injunctive relief and damages under theories of market share and/or joint and several liability:

   a.     First, a mandatory injunction to compel Defendants to create a fund for a court-supervised statewide program of sampling and analysis of the well water of each class member to test for the presence of MTBE. Plaintiffs request that the procedure be repeated annually for a period of up to five (5) years after high MTBE content gasoline (sometimes known as "reformulated gasoline" with MTBE or MTBE RFG) ceases to be sold in New York; and

   b.     Second, compensatory damages on behalf of the Contaminated Well Subclass to recover for cleanup of MTBE contamination in their wells, replacement water, lost property value, stigma damages, loss of use and enjoyment and all other costs, and on behalf of the Uncontaminated Well Subclass to recover for lost property value, stigma damages, loss of use and enjoyment and all other costs.

4

## JURISDICTION, VENUE and PARTIES

17.    The relief sought is within the subject matter jurisdiction of this Court.

18.    Venue is proper in this district because one or more Defendants, including Amerada Hess Corporation and/or Mobil Oil Corporation, reside in New York County.

19.    The Court has personal jurisdiction over non-domiciliary entities named as defendants in that each did or does business in New York and/or contracts to supply goods and services to the State.

20.    Individual and Representative Plaintiff Donna Berisha is an adult citizen and resident of West Harrison in Westchester County New York.  During relevant times herein she had an interest in property on which she resided. Ms. Berisha relied on a well on such property as a source of water for drinking, bathing or general "domestic" purposes.  Water samples taken from her well in or around June 1999 showed that her water was contaminated with MTBE at a concentration of 9.4 ppb.

21.    Individual and Representative Plaintiff Robert O'Brien is an adult citizen and resident of Laurel in Suffolk County New York.  During relevant times herein he had an interest in property on which he resided and resides.  Mr. O'Brien relied on a well on such property as a source of water for drinking, bathing or general "domestic" purposes.  Water samples taken from his well in or around April 16, 1997 showed that his water was contaminated with MTBE at a concentration 75 ppb.

22.    Individual and Representative Plaintiff Melanie J. Arcuri is an adult citizen and resident of South Hampton in Suffolk County New York.  During relevant times herein she had an interest in property on which she resided and resides.  Ms. Arcuri relies on a well on such

property as a source of water for drinking, bathing or general "domestic" purposes. Her well water has not to her knowledge been tested for the presence of MTBE and she seeks such tests.

23.     Individual and Representative Plaintiff Ron La Susa is an adult citizen and resident of Wappingers Falls in Duchess County, New York. During relevant times herein he had an interest in property on which he resided and resides. Mr. La Susa relies on a well on such property as a source of water for drinking, bathing or general "domestic" purposes.. His well water has not to his knowledge been tested for the presence of MTBE and he seeks such tests.

24.     Plaintiffs and each of them have suffered damages arising from verified MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation or fear of such contamination. Their damages include: the necessity and costs of periodic testing of water to assure safety; diminished use and enjoyment of their water and property; diminished property value due to actual contamination and/or stigma and the widespread understanding or reasonable perception that well water is now less safe than other water supplies; and the cost of well water clean-up and replacement water.

25.     Plaintiffs face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment contaminates more wells, which once contaminated cannot be restored to pre-contamination purity.

26.     Defendant Amerada Hess Corporation is a corporation organized under the laws of the State of Delaware having its principal place of business at New York, NY and did or does business in New York.

27.     Defendant Atlantic Richfield Company ("ARCO") is a corporation organized under the laws of the State of Delaware having its principal place of business at Los Angeles, CA and did or does business in New York.

6

28.     Defendant BP Amoco Corporation is a corporation organized under the laws of the State of Indiana having its principal place of business at Chicago, IL and did or does business in New York.

29.     Defendant Chevron USA Inc. is a corporation organized under the laws of the State of Delaware having its principal place of business at San Francisco, CA and did or does business in New York.

30.     Defendant CITGO Petroleum Corporation is a corporation organized under the laws of the State of Delaware having its principal place of business at Tulsa, OK and did or does business in New York.

31.     Defendant Coastal Corporation d/b/a Coastal Oil New York, Inc. is a corporation organized under the laws of the State of Delaware having its principal place of business at Houston, TX and did or does business in New York.

32.     Defendant Exxon Corporation is a corporation organized under the laws of the State of New Jersey having its principal place of business at Irving, TX and did or does business in New York.

33.     Defendant Gulf Oil Limited Partnership is a corporation organized under the laws of the State of Delaware, having its principal place of business at Chelsea, MA and did or does business in New York.

34.     Defendant Mobil Oil Corporation is a corporation organized under the laws of the State of New York having its principal place of business at New York, NY and did or does business in New York.

7

35.     Defendant Motiva Enterprises, LLC is a corporation organized under the laws of the State of Delaware having its principal place of business at Houston, TX and did or does business in New York.

36.     Defendant Shell Oil Products Company is a corporation organized under the laws of the State of Delaware having its principal place of business at Houston, TX and did or does business in New York.

37.     Defendant Sunoco, Inc. is a corporation organized under the laws of the State of Pennsylvania having its principal place of business at Philadelphia, PA and did or does business in New York.

38.     Defendant Texaco, Inc. is a corporation organized under the laws of the State of Delaware having its principal place of business at White Plains, NY and did or does business in New York.

39.     Defendant Tosco Corporation is a corporation organized under the laws of the State of Nevada having its principal place of business at Stamford, CT and did or does business in New York.

40.     Defendant United Refining Company is a corporation organized under the laws of the State of Pennsylvania having its principal place of business at Warren, PA and did or does business in New York.

41.     Defendant Valero Energy Inc. d/b/a Valero Marketing and Supply Company is a corporation organized under the laws of the State of Delaware having its principal place of business at San Antonio, TX and did or does business in New York.

42.     Each of the foregoing corporations, collectively referred to as "Defendants," is, or was during the relevant time period, engaged in one or more phases of the petroleum business,

8

from the exploration for and extraction of crude oils to the refining and/or the distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE sold in New York State.

43.      Defendants Does 1-100 are corporations, partnerships, associations, natural persons or other entities that are not presently known to Plaintiffs.  The true names and identities of all of these defendants are not presently known to Plaintiffs, who therefore sue said defendants by fictitious names. Plaintiffs will pray leave to add parties and allege said defendants' true names when the true names become known to them.

44.      For purposes of this Complaint, when the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

45.      Defendants' conduct included acts and practices that operated as a fraud upon Plaintiffs, public officials, Downstream Handlers and the general public.  This conduct included false statements of material fact, or the making of statements which, in light of the circumstances, omitted material facts necessary to make such statements not misleading.

46.      The liability of each Defendant arises from the fact that each committed, and/or engaged in a conspiracy to accomplish, and/or aided and abetted in the commission of wrongful conduct alleged herein, and/or intentionally, knowingly, or in reckless disregard of the true facts, engaged in the alleged wrongful conduct.

47.      With respect to such wrongful conduct, Defendants conspired and acted in concert inter alia to create a market for and promote sales of gasoline containing MTBE, a product Defendants knew to be defective, while omitting to disclose the extraordinary risks to groundwater posed by the product.

48.     Defendants did acts in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator and their agents.

49.     As a direct and proximate cause of the wrongful acts and conspiracy described above, Plaintiffs and the Plaintiff class suffered damage as alleged herein.

50.     Defendants in this action are manufacturers which together control a very substantial share of New York State market for gasoline containing MTBE and therefore are substantially responsible for the enhanced threat to groundwater and for causing the damages complained of in this Complaint.

51.     Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that enables identification of the manufacturer of that particular batch.  Therefore precise identification of the specific manufacturer of any given quantity of gasoline containing MTBE found in a well or groundwater is impossible.

52.     Plaintiffs allege that market share liability attaches to all of the named defendants, and that liability of each shall be assigned according to its percentage of the New York State market.  In addition, or in the alternative, Defendants can be held jointly and severally liable.

53.     There are no limitations on liability as set forth in CPLR § 1601 applicable to this action in that one or more of the exceptions set forth in CPLR § 1602 apply, including subsections (5) and/or (11).

54.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the entity.

10

## SUMMARY OF FACTS

### The Introduction of MTBE

55.     Beginning in or around 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE added as an octane booster to higher grades of gasoline in concentrations averaging approximately 2 to 4%.  By the mid-1980s MTBE was in widespread use in high-octane gasoline sold throughout New York State.

56.     MTBE is many times more soluble in water than the other components of gasoline.  Because MTBE is "hydrophilic", or water seeking, it travels far more rapidly through soils to groundwater.  Whenever gasoline with MTBE leaks, spills or otherwise is released into the environment, the MTBE quickly reaches the water table and soon contaminates the wells that draw from the affected underground aquifers

57.     MTBE is a noxious compound, a known animal carcinogen and a suspected cause of cancer in humans.  Its foul and distressing taste and odor can be detected in water at low concentrations.  MTBE's odor and taste alone is enough to render previously sweet water unfit for consumption, although sensitivity to the odor and taste varies among different individuals.

58.     During the 1980s, ignoring the paramount importance of groundwater resources, Defendants became concerned that they, as manufacturers, distributors, sellers and/or suppliers of petroleum products, would lose market share if ethanol became the industry standard for a new generation of environmentally reformulated gas products.  Instead, Defendants agreed to support the use of the gasoline additive MTBE and the introduction of gasoline containing MTBE.

59.     Defendants decided and agreed to increase the concentration of MTBE in gasoline despite specific knowledge that even low concentrations of MTBE in gasoline could cause serious contamination of groundwater.  Since at least 1995, much of the gasoline sold in

11

New York State contains MTBE concentrations in the range of 11 to 15 percent, in contrast to the 2 to 4 percent concentrations used since 1979 to boost octane levels.

60.   Annual production figure for MTBE reflect the result of the oil industry's decision, increasing from 1.5 million barrels in 1980 to 75 million barrels in 1998.

61.   In addition to the knowledge gained from their own research into the properties of MTBE, including its environmental fate and effects, Defendants knew of other research that confirmed that MTBE was a serious and enhanced threat to groundwater.

62.   For example, as early as 1980, Defendants learned of an incident in Rockaway, New Jersey where MTBE was discovered to have caused substantial groundwater contamination and damage to drinking water supplies serving thousands of water consumers.

63.   A 1986 report by Peter Garrett *et al* (the "Garrett Report") analyzed MTBE groundwater contamination at two sites in Maine and was known to Defendants.[1]   The Garrett Report showed that high levels of MTBE contamination could result from spills of gasoline with low concentrations of MTBE.  It reported findings of extremely high concentrations of MTBE in the water and relatively low or no concentrations of other gasoline components.  The Garrett Report concluded that MTBE, because of its solubility in water and recalcitrance to degradation and clean-up, posed an unusual threat to groundwater.

64.   The Garrett Report was widely circulated in the oil industry at the time it was published, confirming that Defendants knew that when MTBE is added to gasoline, the properties of the additive greatly enhance the threat of groundwater contamination posed by gasoline.

---

[1]   Peter Garrett, Marcel Moreau & J.D.Lowry, "MTBE as a Ground Water Contaminate," *in* NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection, and

65.     Defendants, acting individually, jointly and through trade associations such as the American Petroleum Institute ("API"), an agent of Defendants, took issue with the Garrett Report, even though they knew that its findings regarding the threat that gasoline containing MTBE poses to groundwater were correct.  API, after disseminating the report to Defendants and in response to their wishes, made publication of the report conditional on the deletion of a recommendation that MTBE not be allowed in gasoline, language that would have served as a warning of the groundwater contamination problem.

66.     Privately, however, Defendants were aware and were forced to acknowledge that the major findings of the Garrett Report were correct.

67.     For example, on or around May 6, 1987 Defendant Mobil's laboratory prepared and circulated a memo that stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene."  The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE.  From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

68.     Communications among officials at Defendant Chevron were similar.  A 1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE.  One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX.  Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther

---

Restoration, Houston, TX, November 12-14, 1986 [Preceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

and spread faster than a gasoline leak that does not include MTBE as one of its constituents.

Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

69.     Defendants' awareness and private admissions of the groundwater spoiling propensity of MTBE did not prompt them to give any warnings to public officials, Downstream Handlers or the general public. In fact, to the contrary, Defendant BP Amoco (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true." This statement was itself false and misleading when made.

70.     Defendants' acts in response to the Garrett report, including those of their agent A.P.I., amounted to material misrepresentations of the safety of gasoline with MTBE and/or fraudulent concealment of a known defect.

71.     In or around March 1987, Defendants were aware of incidents in six locations on the eastern seaboard, including two sites in New York, where MTBE was detected in drinking water samples from wells – 8 of 21 wells were reported to be contaminated with MTBE only.

72.     Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants started planning a misleading campaign to convince Americans, including people in New York, that increasing concentrations of MTBE in gasoline would be desirable.

73.     Certain communications with public officials demonstrate the difference between Defendants' actual knowledge of the properties and behavior of MTBE and their public posture on MTBE, and are evidence of Defendants conduct at the time.

74.     For example, in 1986, the federal Interagency Testing Committee ("ITC") established pursuant to the Toxic Substances Control Act recommended testing and review to assess MTBE's health and environmental risks.[2]  The ITC characterized MTBE as having relatively high water solubility, and that its persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable.  The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment.  The ITC also recommended additional medical testing of MTBE.  The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

75.     The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.  On or about December 12, 1986, Defendant ARCO, speaking on behalf of and/or with the approval of the other Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE.  ARCO's comments included a Critique of the Dynamac Corporation's Information Review of MTBE on which the ITC had relied.  ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated."  In further comments to the EPA, ARCO stated the following:

> Characteristics – Moderate water solubility is reported.  However, an ARCO Technical Bulletin states that 'MTBE is only slightly soluble in water…'
>
> * * *
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.'  This conclusion is not supported by the available information.
>
> * * *
>
> Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility.  The closed nature of the manufacturing and transportation process reduces worker exposure and product loss.  Training and safety programs also lower the possibility of accidental spills.

---

[2]     Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

> Many current programs at EPA and industry are underway to monitor and
> reduce the possibility of gasoline loss from leaking underground storage
> tanks. . . . MTBE losses would be extremely small from this source.
>
> * * *
>
> VI. Environmental Information
>
> As has been reportedly stated, environmental entry would not occur in
> every stage of the gasoline marketing chain . . . . Environmental entry of
> MTBE from this source would be considerably less than the report
> indicates.
>
> MTBE is only slightly soluble so environmental fate projections based on
> this assumption will not be correct.

ARCO's comments, made with Defendants' explicit or implicit approval, were

misleading when made, improperly downplaying the risks of MTBE contamination of

groundwater and omitting material facts known to Defendants at the time.

76.     On or around December 17, 1986, EPA held a Public Focus Meeting to hear

comments on the need for additional testing of MTBE.  The Minutes of the meeting show that

government officials expressed concern over the need to assess the potential for groundwater

contamination.  The Minutes show that Defendant ARCO and Defendant Exxon made a

presentation to support the industry position that additional medical testing of MTBE was

unnecessary.  All other Defendants assented to these representations either explicitly or by their

silence.

77.     In or around early 1987, a group of oil companies, including, on information and

belief, Defendants ARCO, Amoco, Exxon, Sunoco and Texaco, formed a committee (the

"MTBE Committee") for the purpose of promoting the acceptance and increased use of MTBE.

78.     On or around February 27, 1987, the MTBE Committee submitted written

comments drafted to convince EPA not to require additional health and environmental testing of

16

MTBE.  The agenda of the MTBE Committee is reflected in the following excerpt from those

comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to
> complete, great uncertainty will be created as to whether MTBE is a safe fuel
> additive.  As a result demand for MTBE and expansion of productive capacity is
> not likely to grow significantly.  Refiners will be likely to commit capital to more
> costly alternative methods of octane enhancement such as isomerization and
> reformate plants that do not have the environmental benefits of MTBE.  Thus
> requiring long term testing of MTBE will have a significant adverse
> environmental and economic impact.

These representations by the MTBE Committee are evidence of Defendants' pattern of

exaggerating the environmental benefits of MTBE while understating or completely neglecting to

mention the real environmental hazards, all of which they knew or should have known at the

time.  The comments also give insight into Defendants' plans to forestall all public scrutiny of

their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important

health and environmental safety research.

79.    The MTBE Committee acknowledged in its February 21, 1987 comments that

MTBE had not been the subject of long term chronic health testing, but claimed that such testing

was unnecessary.  Under the heading "MTBE in Ground water", it stated that:

> [t]he results of a number of acute and subchronic health effect studies are
> presented in the Health Effects Summary of this report.  These data suggest that
> the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the
> organoleptic properties of MTBE are sufficient to protect against human ingestion
> of toxic quantities of MTBE.

It is clear that the purveyors of MTBE, including Defendants, wanted to be free to

represent that MTBE has been shown not to be a health risk without conducting the

research needed to reach such a conclusion.

17

80.     Moreover, research conducted by the State of Maine shows that homeowners are sometimes unaware of the presence of MTBE, even when it is present in water in concentrations well above the odor and taste threshold.[3]  In the Maine study it was learned that test subjects were drinking and bathing in MTBE contaminated water.  It has been shown that natural compounds in drinking water can mask the taste and odor of MTBE.

81.     On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study . . . reports that MTBE in the presence of gasoline has excellent biodegradation characteristics."  This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is evidence of Defendants' practice of using any available means to conceal from the public the actual risk that MTBE poses to groundwater.

82.     The MTBE Committee further represented that:

> The following discussion establishes that there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exist to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental and economic impact.

(emphasis added).  This statement is further evidence that Defendants and the rest of the oil industry were willing to ignore facts known to them and misrepresent the properties and impacts of MTBE in their zeal to sell more of it in gasoline.  Despite the duty arising from such unsupported assurances of safety, Defendants have still never properly disclosed their knowledge of the risks of MTBE to groundwater or warned Downstream

---

[3]   "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report," Maine Dep'ts of Human Serv., Env. Protection & Conservation. (Oct. 13, 1998) (the "Maine Report").

Handlers or the general public of the need to avoid even small spills of gasoline containing MTBE, to immediately clean up those that do occur and to test underground drinking water sources for the presence of MTBE.

83.     On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including Defendants Amoco, Exxon, Sunoco and Texaco signed a Testing Consent Order with EPA.  A subsequent notice showed that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[4]  The oil industry, including Defendants, misleadingly represented that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary.  Defendants knew at the time that this representation was false and misleading.

84.     These and other contacts with EPA are evidence of an oil industry campaign to rush into increased production of MTBE, relying on misrepresentations regarding health and the environmental safety of MTBE, while avoiding doing the kinds of research and testing that would have verified the problems, known to Defendants at the time, that have since come to plague New Yorkers who rely on well water.

85.     According to the EPA: "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."[5]  Under the circumstances, it was Defendants' responsibility to warn of the risks and problems created by the product they

---

[4]     Testing Consent Order on Methly Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

[5]     "Origin of the Reformulated Gasoline Program," U.S.E.P.A. Office of Mobile Sources, EPA 420-F-95-001 (April 1995).

generated, developed, promoted, marketed and sold.  They breached that duty, causing the

pervasive threat of groundwater contamination and other harm complained here.

### The Nature of the MTBE Groundwater Contamination Problem

86.      In their zeal to market, promote and sell a new product and growing revenue

source, all of the Defendants ignored or glossed over the properties that make MTBE a menace to

fresh water.

87.      In technical terms, MTBE has a low octanol water partition coefficient and high

solubility in water, particularly as compared to the other common gasoline components benzene,

toluene, ethylbenzene and xylene (collectively "BTEX" compounds).  When MTBE and gasoline

are spilled on the ground, the BTEX compounds tend to adsorb or bind to soil.  In contrast,

MTBE races to undergroundwater reservoirs.

88.      MTBE not only travels faster and further from spill and leak sources and is found

in far higher concentrations as a groundwater contaminant than BTEX compounds, it also is slow

to degrade or break down once it is released into the environment, particularly in the subsurface

of the ground.  Because of its "recalcitrance," plumes of MTBE can persist in underground

aquifers for decades.

89.      In internal correspondence, Defendants acknowledge the properties of MTBE that

make it a much greater threat to groundwater than BTEX compounds.  For example, a June 1997

Shell document entitled "Summary of Current MTBE Issues and Status" states:

> MTBE is relatively quite soluble in water (compared to other components in
> gasoline, like BTEX), and it moves essentially with the ground water, thus
> MTBE tends to "lead the plume" whenever there is a gasoline spill or leak.
> MTBE also has a very low biodegradation potential, which makes it more
> difficult to remove from ground water than other gasoline components such as
> BTEX.

90.     The threat of MTBE to groundwater gets more detailed treatment in a May 1999

paper by employees of Defendant Chevron entitled "Solving Problems From MTBE

Contamination – It's Not Just Regulating Underground Tanks." The document reads:

> These concerns on the mobility and persistence of MTBE in the environment
> are reinforced by a recent study and anecdotal information discussed at an
> EPA Blue Ribbon Panel on MTBE in January 1999.  This information
> indicates there is MTBE ground water contamination from small spills of
> gasoline (e.g. a spill in parking lot, a car accident) – incidences that stand in
> contrast to known historical causes of MTBE contamination (e.g. point source
> discharges from leaking underground storage tanks.)
>
> The physical and chemical properties of MTBE (and thus its mobility and
> persistence in the environment) differ markedly from other components of
> gasoline.  These differences make MTBE (and other ethers and heavy
> alcohols) more likely to get into ground water and problematic to contain and
> clean up when releases occur . . . .
>
> Short of eliminating car accidents, stopping customer overfilling, or other
> impractical approaches, changes in law or regulation can't fully eliminate
> releases, nor change the physical and chemical properties of MTBE and other
> oxygenates when they do get in the environment.

91.     Even though it is beyond dispute that the intrinsic properties of MTBE make the

compound a vicious threat to groundwater, Defendants decided to add it to gasoline, in fact,

schemed and fought to gain acceptance of gasoline with higher MTBE concentrations, while

shunning additional research and failing to make warnings critically needed to avoid or at least

minimize widespread drinking water contamination.

92.     On October 13, 1998, the State of Maine issued a report presenting findings from

the analysis of water samples collected from 951 randomly selected household wells.  MTBE

was detected in 150 wells, or 15.8% of the sampled private wells. Ten wells, or 1.1% of those

sampled, had MTBE levels exceeding the state's drinking water standard of 35 parts per billion.

Based on these results, the state estimated that some 1400 to 5200 private wells in the state fail

Maine's standard for potable water due to the presence of MTBE. The study also noted that other gasoline compounds were infrequently detected compared to MTBE and where detected were in all cases well below the drinking water standards.[6]

93.    A September 15, 1999 report by a special EPA Blue Ribbon Panel that reviewed the record of MTBE contamination of groundwater recommends substantial reductions in the use of MTBE. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[7] No actual plans or source of funds for such testing exist for New York or any other state.

94.    Despite knowing of the inevitability of MTBE contamination of groundwater, Defendants chose not to warn the public officials, Downstream Handlers or the general public. As production and sale of gasoline containing MTBE soared to record heights, Defendants neglected to warn that in the absence of special handling and care, ever more MTBE would be released into the environment and, to a far great extent than other gasoline constituents, would seek out and foul water and resist biodegradation.

95.    Every year more than nine million gallons of gasoline, equal to a full supertanker, escapes during transportation, storage, sale or use in the United States. Although Defendants were aware of the problem of such spills and leaks, and particularly the widespread problem of leaking underground storage tanks, they willfully and recklessly chose to put gasoline containing

---

[6]    Maine Report, *supra* note 3.

MTBE into commerce and, for example, into leaking tanks, knowing full well its tendency to contaminate groundwater.

96.     Instead of warning of the impending and then developing tragedy of fresh water contamination, Defendants touted gasoline containing MTBE as an environmental blessing.

97.     Defendants made misleading environmental claims with knowledge that these claims would assist them in their effort to establish the fuel as an industry standard, to gain favor with the public, and to increase markets and profits.

98.     The intentional and tortious conduct of the Defendants was aimed at and encompassed the entire country, including New York.  The effects have been felt in all states, particularly those in which reliance on groundwater is substantial, including New York.

99.     It has become apparent that MTBE does not even deliver Defendants' promise of cleaner air.  It is now widely reported that MTBE does little or nothing, contrary to industry assurances, to contribute to reductions in such air polluting car emissions as carbon monoxide.

100.     A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[8]

101.     On or around May 11, 1999, The National Research Council of the National Academy of Sciences ("NAS") reported that MTBE does little to reduce ozone air pollution and smog.[9]  NAS previously had concluded that reductions of carbon monoxide concentrations in the

---

[7]     "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

[8]     "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[9]     "The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

nation's air actually took place before MTBE was added to gasoline as a purported "clean air" additive.[10]

102.    In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself.

103.    Defendants, who have all marketed and promoted the use of gasoline containing MTBE for its purported environmental benefits, knew or should have known of the terrible downside of the proliferating use of the compound: widespread contamination of water.

### MTBE in New York

104.    Approximately six million New Yorkers rely on water from underground sources for drinking, bathing and other household uses.  Of those, some one million draw their water from private wells.

105.    Clean fresh water is a basic and most precious resource as well as a fundamental commodity of incalculable value. . Water serves direct human needs and also supports wildlife and natural resources that contribute to the health, economy and general well-being of the people of New York.  All New York citizens have a right to clean water.

106.    Plaintiffs and the Plaintiff class, all of whom rely on water from private wells, have a special and unique stake in the preservation of clean groundwater.  The widespread groundwater contamination by MTBE affects Plaintiffs and the Plaintiff class, different from the general public, even before their water becomes contaminated.  Such harm occurs by rendering their water source less secure and less desirable relative to all surface water sources and all public water systems that are regularly monitored.  Unlike the general public, Plaintiffs and the Plaintiff

---

[10]    "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels", Nat'l Research Council, Nat'l

24

Class now must get periodic water tests for MTBE to insure the integrity of their water and take early measures to pursue clean-up and remediation of contamination.

107.    After Defendants' successful campaign of the late 1980s to promote MTBE, Defendants started shipping high MTBE-content gasoline for sale in the New York metropolitan area in 1992 as part of in the Winter-time Oxygenated Fuels program established pursuant to certain Clean Air Act amendments.

108.    Defendants then made MTBE the additive of choice in reformulated gasoline when the public and government agencies sought year-round reductions in air pollution caused by cars, particularly in the counties of the downstate region of New York.

109.    In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce in all of downstate New York, the Albany region and in other areas of the state when moved by market factors and financial considerations to do so.  Gas stations owners and pump operators, who Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

110.    Today most if not all gasoline pumped in downstate New York is laced with high concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing the elevated concentrations of MTBE is often sold at other locations throughout the state at the discretion of the oil industry, including Defendants.

111.    As manufacturers, distributors, sellers, suppliers, marketers and/or promoters of gasoline containing MTBE, Defendants had a duty to Plaintiffs and the Plaintiff class arising from, among other things, their: (a) vastly superior knowledge and resources to those of Plaintiffs

---

Academy of Sciences (1996).

and the Plaintiff class, Downstream Handlers, the general public and even public officials; (b)

material misrepresentations and/or omissions concerning MTBE and gasoline containing MTBE;

and (c) marketing, promotion and sales of MTBE-laden gasoline without warning of the

foreseeable adverse impact it would have on groundwater, including the groundwater on which

Plaintiffs rely.

112.    Defendants duties include, but are not limited to, the duty: (a) to protect New

York's groundwater; (b) to timely inform public officials, Downstream Handlers and the general

public of the nature and risks of MTBE; (c) to warn public officials, Downstream Handlers and

the general public of MTBE's properties that make it a threat to groundwater; (d) to warn all

persons who own or rely on well water of MTBE's propensity to move great distances upon

being released into the environment, as well as its potential health risks and noxious properties

and the need for testing; and (e) such other duties as may be shown during discovery and at trial.

113.    Defendants breached their duties, causing damages including damages from

contamination of groundwater and damages from the threat of contamination of groundwater.

114.    Unbeknownst to New York consumers and property owners, who indirectly relied

on Defendants' misrepresentations regarding environmental safety, and directly and/or indirectly

relied on omissions of any warnings, the increased use of MTBE in gasoline in New York was

accompanied by a surge in incidents of serious groundwater contamination.

115.    That gasoline containing MTBE poses a much greater risk to groundwater than

traditional gasoline was or should have been known to Defendants before the start of sales of

gasoline with MTBE and long before they increased the concentrations of MTBE in the gasoline

sold in New York.  Defendants also knew or should have known that the systems currently used

26

for shipping, storing, pumping and using gasoline involved losses and spillage at all links of the chain.

116.    Defendants also knew or should have known that MTBE is remarkably recalcitrant to natural degradation and once dispersed in the environment is difficult to clean up.

117.    By May 1987, Defendant Mobil had compiled data on MTBE contamination in groundwater in New York State and elsewhere in the region.  For example, Mobil was aware of laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, NY and four wells in Port Jefferson, NY.  Thus, years before Defendants successfully implemented their plans to greatly increase MTBE concentrations in gasoline, Mobil was aware of tests finding MTBE with no other constituents of gasoline in well water.

118.    Two unrelated MTBE groundwater contamination events in Liberty, NY and East Patchogue, NY both preceded by several years the introduction gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

119.    At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988, sent a plume of MTBE into Long Island's sole source aquifer.  The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE.  Although trace levels of BTEX were eventually found in the well, it was not until the MTBE levels had reached the astounding level of 7,600 ppb.

120.    A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site.  In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site and the mass of these compounds was observed to be steadily decreasing.

121.    The Liberty incident started in or before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

122.    In December 1992, MTBE was again found in a sample of Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb. Two additional samples collected the next month confirmed the MTBE contamination of the town's water supply.

123.    In January 1993, the 4,200 citizens of Liberty Village learned for the first time of the MTBE contamination of their water. Since then the community and the state have borne substantial costs to access several different alternate sources of water, but periodically have been forced to again rely on the contaminated groundwater sources, the MTBE levels of which continue to fluctuate. The problem is still unresolved.

124.    The Liberty and E. Patchogue events were by no means the only instances of verified MTBE well contamination from "the field" known to Defendants. In New York alone, State and County governments have verified MTBE contamination of many hundreds of private wells throughout the state. The State has records of approximately 1,000 sites where tests of water samples show levels of MTBE in excess of the State's safe drinking water standard of 50 ppb.

125.    Large MTBE leaks or spills have occurred in every county in New York. As a result, MTBE has been found in drinking water at levels near or above the state's drinking water standard in communities all over the state including, but are not limited to, the towns of Bedford, Cairo, Churubosco, East Patchogue, Elmont, Glen Park, Greenburgh, Hudson Falls, Laurel,

Liberty, Madrid, Mayfield, Middle Island, Mahopac, New Windsor, Norfolk, Orient, Phelps, Pound Ridge, Schodack, Smithtown, West Harrison and West Kill.

126.    In 1997, the U.S. Geological Survey found MTBE in 125 of the 1,100 private water wells tested in New York, three of which had concentrations in excess of the state's drinking water standard.  The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places, like New York, where high MTBE-content gasoline is used.[11]

127.    In July 1999 the New York State Department of Health ("NY DOH") reported the results of an investigation it conducted in 1997 of well water in 10 New York counties.  As part of the research, NY DOH sampled and analyzed water from 111 private wells, many, but not all located within a half mile of a gasoline filling station.  The laboratory results showed that 30 of the 111 wells were contaminated with detectable levels of MTBE, 11 of these had contamination above 20 ppb, the level for U.S. EPA's drinking water advisory, and 3 wells were contaminated above New York's safe drinking water standard of 50 ppb.  Only one of the 30 contaminated wells also tested positive for BTEX compounds.

128.    The potential for new incidents of groundwater and well contamination is perpetuated every day that Defendants put more gasoline containing MTBE on the market in New York State.  The State records over 2,000 gasoline spills reports each year from just Nassau, Suffolk and Queens alone.  MTBE is found in rainfall in states, such as New York, where it is widely used as a gasoline additive, ensuring that all property statewide has been touched by MTBE.

---

[11]    Moran, Zogorski & Squillace, "MTBE in Ground Water in the United States – Occurrence, Potential Sources, and Long Range Transport" (1999).

129.    Given the properties of MTBE, and long history of gasoline spills, leaks and other losses during distribution, sale and use – all facts well known to Defendants but not to Plaintiffs and the general public -- widespread groundwater contamination was both inevitable and foreseeable.  Still Defendants chose not to warn anyone of this problem.

130.    The record shows that Defendants were misrepresenting the properties of MTBE and withholding information even as they were insisting that no such information existed. Only more recently, through the escalating and tragic contamination of groundwater resources, has the public become aware of the dangers of MTBE.

131.    In 1994, in response to a New York Newsday article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions."  The letter unambiguously represented to New Yorkers that there was "no basis to question the continued use of MTBE."  Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

132.    As the reality of widespread MTBE groundwater contamination came to light, Defendants "greenwashed" the shameful facts.

133.    For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" which said: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage

tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past.

134.    This kind of misleading communication utterly failed to alert public officials, Downstream Handlers or the general public to the danger posed by MTBE and completely omitted the kind of detailed directions that would be required to ensure safer use.

135.    In the April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to the reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

136.    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of experience in New York and elsewhere, where MTBE is often not merely the first, but also the worst or even the only contaminant found in water. Moreover, here and elsewhere, MTBE contamination is most often judged to be too costly to clean up.

137.    Even at this late date, Defendants continue to foster a grave threat to New York's fresh water with no new safeguards and no words of warning.

138.    The conduct of the Defendants was outrageous and/or so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of Plaintiffs and the Plaintiff class enabling them to recover punitive damages. This conduct includes but is not limited to: (1) manufacturing and marketing gasoline containing MTBE despite specific actual knowledge of a serious defect that lead inevitably to widespread contamination of groundwater and Plaintiffs' wells; (2) intentionally misrepresenting and concealing the properties of MTBE and gasoline containing MTBE; (3) marketing and promoting gasoline containing MTBE as

environmentally safe and beneficial despite specific knowledge to the contrary; and (4) issuing

no warnings as to its use, all while knowing of the certainty of long-lasting water contamination.

139.    Belatedly, some of the Defendants, such as Tosco and Chevron, have tried to

distance themselves publicly from MTBE and now concede that it is a serious groundwater

contaminant.  What they have not done is taken financial responsibility for damages caused to

people who rely on wells that are spoiled or imperiled by the product that they manufactured and

until recently embraced.

140.    More recently some gasoline sellers have even publicly acknowledged that

MTBE is neither environmentally safe nor necessary.  Getty Marketing, for example, placed full

page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing
> business in environmentally-friendly ways.  That's what we're doing at
> Getty.  We have replaced MTBE with **ethanol** in our gasoline because it
> helps clean the air without harming our drinking water.

141.    Defendant ExxonMobil stated in an opinion advertisement that "[t]oday's clean-

burning fuels and vehicles can meet stringent emission standards without adding oxygenates

[including MTBE]."  New York Times, April 13, 2000.

142.    In or around November 1999, Governor George Pataki directed New York's

Department of Environmental Conservation to lower the state's guidelines for remediation of

groundwater containing MTBE from 50 ppb to 10 ppb.  This announcement is part of a trend

among governments to take belated action to counter the problem of MTBE contamination of

water supplies and the resulting public health threat.

143.    It has been said that one can reach and impact the largest number of Americans

by adding something gasoline.  Before the 1980s, production and sales totals for MTBE were

negligible, but by 1996 it ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.  Indications are that Defendants, along with the rest of the oil industry, will eventually reduce or completely discontinue the use of MTBE as a gasoline additive because of the furor over its devastating impact to drinking water. Apparently, however, they will not willingly accept responsibility for the damage done to individual well owners in New York State and elsewhere.

## CLASS ACTION ALLEGATIONS

144.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and a class of all similarly situated persons or entities who, during the relevant time herein, had an interest in real property in New York and relied one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes.

145.   Plaintiffs seek injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) on behalf of the entire class.  They also seek compensatory and punitive damages pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of the following two subclasses:

A.    Contaminated Well Subclass.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well water was tested and the tests verified that it has been contaminated with MTBE in concentrations at or above 2 ppb.  The following named plaintiffs are representatives of this subclass: Donna Berisha and Robert O'Brien.

B.    Uncontaminated Well Subclass.  This subclass is comprised of and defined as: all persons or entities who, during the relevant time herein, had an interest in real property in New York and 1) relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic" purposes; and 2) their well has not yet tested positive for the presence of MTBE.  The following named plaintiffs are representatives of this subclass, subject to testing of their wells demonstrating MTBE contamination that would place them in the Contaminated Well Subclass: Melanie J. Arcuri and Ron La Susa.

146.    Specifically excluded from the proposed class and subclasses are: (1) all claims for personal injury by Plaintiffs and the Plaintiff class; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; (3) Counsel for Defendants and all firm members, associates, employees and their immediate families; (4) any wholesalers, retailers or resellers of MTBE and/or gasoline containing MTBE; (4) Counsel for Plaintiffs and the Plaintiff class and all firm members, associates, employees and their immediate families; and (5) any presiding Judge and members of their immediate families.

147.    This action may properly be maintained as a class action and satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23(a).

148.    The Plaintiff class is so numerous that the individual joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23(a)(1).  While the exact number of class members is unknown to Plaintiffs at this time, research by the State of New York has already shown numerosity.  It is generally ascertainable by existing records and appropriate discovery, and Plaintiffs are informed and believe that the class and each subclass includes thousands of members.

149.    Common questions of law and fact arising from Defendants' illegal conduct exist as to all members of the class, as required by Fed. R. Civ. P. 23(a)(2).  These common questions predominate over any questions, which affect individual members of the class.  These common questions include, without limitation:

(a)    what are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation;

34

(b)     what concentrations of MTBE in fresh water render the water unfit for consumption, bathing, showering, cleaning dishes, and utensils and other household uses;

(c)     what are the fate and effects of MTBE when released into the environment near groundwater sources;

(d)     whether gasoline containing MTBE is a defective product.

(e)     whether the private water supplies of Plaintiffs and the Plaintiff class have been contaminated by MTBE;

(f)     what Defendants knew about the problem of MTBE contamination of groundwater and when they knew it;

(g)     whether Defendants knew, or should have known, the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE;

(h)     what, if anything, Defendants told the public about the properties of MTBE and the increased threat to groundwater and when during the course MTBE's rapid increase in production and sales any such disclosure was made;

(i)     whether Defendants intentionally marketed gasoline with MTBE to the general public in an effort to make it the industry standard and protect their market share and profits;

(j)     whether Defendants owed a duty to Plaintiffs, the Plaintiff class, public officials, Downstream Handlers and the public generally to warn them of the changed properties of gasoline after the introduction of high levels of MTBE and the likely contamination of groundwater;

(k)     whether Defendants committed a breach of duties of care owed to Plaintiffs and members of the Plaintiff class;

(l)     whether Defendants' conduct constituted reckless disregard for the safety of private water supplies and the rights of Plaintiffs and the Plaintiff class;

(m)     whether Defendants' conduct amounted to outrageousness, recklessness or wanton negligence;

(n)     whether Defendants violated New York laws regulating business practices as alleged;

(o)     whether Defendants violated state common law as alleged;

(p)      whether Defendants, by virtue of their failure to warn of the risks to groundwater posed by gasoline containing MTBE, are strictly liable for the damages and losses resulting from existing widespread contamination of and the pervasive threat to groundwater;

(q)      whether Defendants by virtue of misrepresentations in the promotion and sale of a dangerous product are strictly liable for the damages and losses resulting from its contamination and the pervasive threat of contamination of groundwater;

(r)      whether Defendants engaged in materially deceptive and misleading acts and practices in the distribution, marketing and selling of gasoline containing MTBE in violation of GBL § 349;

(s)      whether and to what extent New York's air pollution problem requires or is improved by the use of gasoline containing high levels of MTBE as compared to alernatives;

(t)      whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the product's safety as alleged;

(u)      whether Defendants failed in any duty to remediate sites promptly where they know there is MTBE contaminated groundwater;

(v)      whether and to what extent widespread MTBE contamination of groundwater negatively impacts property values of well owners;

(w)      the appropriate nature of classwide, equitable and other non-monetary relief;

(x)      whether Plaintiffs and members of the Plaintiff class sustained damages and/or are entitled to equitable relief as a result of Defendants' wrongdoing and, if so, what is the proper measure and appropriate formula to be applied in determining just and proper relief;

(y)      whether Defendants are liable under a market share and/or joint and several theory of liability; and

(z)      whether Plaintiffs and the Plaintiff class are entitled to recover punitive damages.

150.      Plaintiffs' claims are typical of the claims of the members of the class under Fed.

R. Civ. P. 23(a)(3), since each has an interest in real property, each relies on a private well on

that property for water, each such well is either contaminated by MTBE or is threatened by such

contamination, and each was without knowledge of the true facts alleged herein and has suffered

damages. Plaintiffs and all members of the Plaintiff class sustained damages and/or costs arising

36

out of well and/or groundwater contamination or the treat of such contamination caused by Defendants' common course of conduct in violation of state law as complained of herein.

151.    The losses of each member of the class were caused directly by Defendants' wrongful conduct in violation of state statutory and common law as alleged herein.

152.    Plaintiffs will fairly and adequately represent the interests of the members of the class as required by Fed. R. Civ. P. 23(a)(4).  Plaintiffs' claims are typical of claims of the Plaintiff class and they have no interests that are adverse to the interests of the class members. Plaintiffs have retained competent legal counsel experienced in litigation of class action, consumer and environmental tort litigation.

153.    This action can be certified in respect of the injunctive relief sought:

a.    under Fed. R. Civ. P. 23(b)(1)(A), because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for the Defendants;

b.    under Fed. R. Civ. P. 23(b)(1)(B), because the ability of class members to protect their interests would be substantially impaired or impeded if adjudications proceeded individually; and

c.    under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the class, making injunctive relief with respect to the entire class appropriate.

154.    This action may be certified in respect of the compensatory and punitive damages sought with respect to each subclass under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over individual questions and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages

suffered by each individual member of the class, while not inconsequential, may be relatively small, the expense and burden of individual litigation would make it difficult or impossible to redress the wrongs done. Should separate actions be brought or be required to be brought, the resulting multiplicity of lawsuits would cause increased delay and expense to all parties and the judicial system. In contrast, litigating this matter as a class action presents far fewer management difficulties and conserves the resources of the parties and the court system. Representation by Plaintiffs and their attorneys, with the Court's oversight, also protects and advances the interests and rights of each class member.

## FIRST CAUSE OF ACTION
### Strict Liability For Failure to Warn

155.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

156.    As manufacturers, designers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty not to put on the market a product that poses a serious danger to groundwater that is the source of Plaintiffs' drinking household or commercial water without issuing warnings of the risk posed by the product to Plaintiffs, the public, public officials and Downstream Handlers.

157.    Defendants breached this duty by manufacturing, distributing, selling and marketing gasoline containing MTBE with actual or constructive knowledge that the product posed a high degree of risk to the real property and groundwater of Plaintiffs and the Plaintiff class, without issuing any warnings or without sufficient warnings of the enhanced risk.

158.    Defendants had actual and/or constructive knowledge that MTBE would be released into soil and groundwater all over New York. Defendants had actual and/or constructive

knowledge of the properties of MTBE that would ensure that, once released into the environment, MTBE would spread further than the other components gasoline and would contaminate more groundwater in greater concentrations than would the other components of gasoline.

159.    Defendants represented and warranted that gasoline containing MTBE could be handled and used in the same manner as gasoline not containing MTBE without causing any different or greater harm.

160.    Defendants knew that the product would be purchased and used without inspection for defects.

161.    Defendants failed to warn Plaintiffs and the Plaintiff class, public officials, Downstream Handlers or the general public, of the properties of MTBE and the changed characteristics of gasoline once MTBE is added.

162.    For example, Defendants failed or failed adequately to warn that MTBE:

    a.    is highly soluble in water and many times more soluble in water than the BTEX components of gasoline;

    b.    moves much faster and farther in groundwater than the BTEX of gasoline;

    c.    causes extensive groundwater contamination when used in its foreseeable intended manner;

    d.    resists natural degradation once in groundwater and is particularly difficult to remove;

    e.    renders water putrid, foul and unfit for consumption;

    f.    greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    g.    increases the need to maintain underground storage tanks, prevent overfills and respond immediately to the loss of any gasoline containing MTBE;

    h.    creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    i.    poses significant threats to human and animal health;

    j.    creates a need for those living near sites where MTBE is stored or used to frequently test their wells for early detection of MTBE; and

    k.    requires other warnings as may be shown at trial.

163.    Defendants knew or should have known of the properties and characteristics of MTBE and gasoline containing MTBE that comprise the risk and danger which is different in kind degree and magnitude from the risks and dangers inherent in the use of conventional gasoline without MTBE.

164.    Plaintiffs and the Plaintiff class were unaware of such risks, which were not of a kind that they would ordinarily discover or could protect themselves against in the absence of sufficient warning to others.

165.    Once the Defendants put MTBE into the stream of commerce, harm to Plaintiffs and the Plaintiff class was inevitable and could not be avoided or minimized due to the absence of warnings.

166.    Defendants conduct was unreasonable in the circumstances.

167.    Available scientific data, of which Defendants had actual or constructive knowledge, gives rise to the reasonable inference that the alleged dangers existed and were foreseeable.

168.    Defendants' failure to warn Plaintiffs and others, as alleged herein, proximately caused reasonably foreseeable damages to Plaintiffs and the Plaintiff class.

169.    The harm to Plaintiffs and the Plaintiff class proximately caused by Defendants' wrongful conduct includes: the necessity of periodic testing of their water to assure safety; diminished confidence in; use and enjoyment of their water and property; diminished property value due to actual, impending or threatened contamination; stigma and the reasonable perception that well water is now less safe than other water sources; and the cost of obtaining uncontaminated water and/or a clean-up of the contaminated groundwater.

170.    By engaging in said conduct, Defendants' sale of gasoline containing MTBE constitutes a defective or unreasonably dangerous practice because of Defendants' failure to warn, for which Defendants are strictly liable to Plaintiffs and the Plaintiff class.

## SECOND CAUSE OF ACTION
### Strict Liability for Design Defect

171.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

172.    Defendants during the relevant time period were designers, manufacturers, refiners, formulators and suppliers of petroleum products including gasoline with MTBE.

173.    Defendants had a duty of due care to design and manufacture reasonably safe petroleum products.

174.    Defendants had a duty of care to test the gasoline with MTBE to determine the risks posed to the environment generally, groundwater including groundwater used for drinking household and commercial purposes.

175.    Defendants had a duty not to put on the market an unsafe and defectively designed product that poses a serious danger to groundwater that is the source of Plaintiffs' drinking household or commercial water.

176.    Defendants breached said duties of due care when they manufactured and marketed a defectively designed product, namely gasoline with MTBE, with actual or constructive knowledge of the defect.

177.    Due to the design defect, gasoline with MTBE is not reasonably safe and protective of the environment generally and groundwater.

178.   The utility of gasoline with MTBE does not outweigh the risks inherent in manufacturing and marketing gasoline designed in that manner.

179.   The defective design of Defendants' gasoline with MTBE, as alleged herein, proximately caused reasonably foreseeable damages to Plaintiffs and the Plaintiff class.

180.   Defendants' conduct in the manufacture, sale and marketing of gasoline containing MTBE, a defective or unreasonably dangerous product, makes Defendants strictly liable to Plaintiffs and the Plaintiff class.

### THIRD CAUSE OF ACTION
### Strict Liability For Misrepresentations
### Restatement (Second) of Torts § 402B

181.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

182.   This claim for relief is brought under Restatement (Second) of Torts § 402B and/or the common law of product liability.

183.   As manufacturers, distributors, sellers, or suppliers of gasoline containing MTBE, Defendants, in the course of advertising and promoting their product, made misrepresentations of one or more material facts concerning the character and properties of the product.

184.   The misrepresentations included, but were not limited to, claims that the MTBE and/or gasoline containing MTBE: (a) was environmentally beneficial; (b) was "clean"; (c) was only slightly soluble in water; (d) did not pose a greater risk of groundwater contamination than gasoline without MTBE; (e) wass not more likely than other gasoline components to get into well water; (f) was safely contained during transport, storage, handling and use; (g) served to reduce public exposure to BTEX compounds by providing a benign warning; and (h) was adequately tested and shown not to pose a health hazard or an enhanced risk to the environment.

42

185.    Such misrepresentations were made to public officials, Downstream Handlers and the general public, who reasonably relied upon them.

186.    Plaintiffs and the Plaintiff class have suffered harm to their property from actual, anticipated and/or threatened MTBE contamination as described herein and above, as a direct and proximate result of Defendants' misrepresentations and omissions, on which Plaintiffs and the Plaintiff class indirectly and justifiably relied, causing the damages alleged herein.

## FOURTH CAUSE OF ACTION
### Deceptive Business Acts and Practices
### in Violation of GBL § 349

187.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

188.    Defendants are engaged in the business of providing gasoline containing MTBE to consumers, including Plaintiffs, in the State of New York.

189.    Defendants engaged in materially deceptive and misleading acts and practices in the distribution, marketing and selling of gasoline containing MTBE, including but not limited to:

(a)    overstating any environmental benefits of gasoline containing MTBE while neglecting to mention or understating its actual environmental costs;

(b)    marketing gasoline containing MTBE as a "clean" and environmentally beneficial fuel;

(c)    misrepresenting the properties of MTBE, including by stating the it is only slightly soluble in water;

(d)    representing that the product does not pose an unusual threat of groundwater contamination as compared to conventional gasoline;

(e)    failing to disclose that when gasoline containing MTBE it spilled, the MTBE was far more likely than other gasoline components to get into well water;

(f)    leading the public to believe that gasoline containing MTBE was safely contained during transport, storage and use;

(g)     stating that MTBE and gasoline containing MTBE were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

(h)      concealing the necessity for well owners, particularly those who live near sites where gasoline containing MTBE is stored, to test their water frequently for early detection of the presence of MTBE, a potential carcinogen

190.    Defendants' materially deceptive and misleading practices proximately caused harm and damage to Plaintiffs, including property damage, loss of use and enjoyment of their wells and property, the need for periodic well water testing, as well as economic losses including property devaluation, stigma damages, the cost of obtaining uncontaminated water and/or a clean-up and other needless expenditures of time and money.  Plaintiffs will continue to incur losses and damage in the future.

## FIFTH CAUSE OF ACTION
### Public Nuisance

191.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

192.    Defendants have manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of Plaintiffs and the Plaintiff class, causing inconvenience and annoyance.

193.    Defendants, by their negligent, reckless and willful acts and omissions as set forth above, have caused and permitted MTBE to contaminate a growing number of properties in the State of New York.  This contamination has migrated, or threatens to migrate, nearby to and/or onto Plaintiffs' properties, thereby contaminating the groundwater thereunder.

194.    Actual and threatened MTBE contamination caused by Defendants' conduct has damaged Plaintiffs' property and substantially and unreasonably interfered with Plaintiffs' use,

44

benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial inconvenience, annoyance and injury.

195.    The ongoing conditions found statewide, and the stigma created, also have caused and are causing a material loss of value to Plaintiffs' property because of actual and threatened MTBE contamination.

196.    Plaintiffs, who are all well owners, suffer special damages because, unlike the general public, they rely on their own wells for their drinking and household water. Much of the population of New York is served from surface water that is not susceptible to the problems caused by MTBE to groundwater. Additionally, public water supplies that rely on groundwater, unlike Plaintiff's private wells, are regularly monitored by a water district or agency that is able to guarantee clean water.

197.    Plaintiffs' special damages also include loss of property value arising from the increasingly widespread public perception based on actual fact that well water has been rendered less certain, safe and reliable. As a result, Plaintiffs suffer lost property value relative to owners of residential properties served by public water supplies.

198.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of Plaintiffs' properties.

199.    In the alternative, Defendants' have violated and/or threaten to violate a public right to pure water.

200.    As a direct and proximate result of Defendants' acts and omissions creating the above described nuisance, Plaintiffs, who constitute a considerable number of people, have

suffered special damages and injury in the form of damage to their properties and property values and endangerment of their health and safety.

## SIXTH CAUSE OF ACTION
### (On Behalf of Contaminated Well Subclass Only)
### Private Nuisance

201.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

202.    The property of each member of the Verified Contaminated Well Subclass has been contaminated by MTBE as a direct and proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

203.    MTBE contamination caused by Defendants' conduct has damaged subclass members' properties and substantially and unreasonably interfered with their use, benefit and enjoyment of their properties.

204.    The stigma created by MTBE contamination also has caused a material loss of value to subclass members' properties.

## SEVENTH CAUSE OF ACTION
### Negligence

205.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

206.    As manufacturers, distributors, sellers, suppliers, marketers and/or promoters of gasoline containing MTBE, Defendants had a duty to ensure that the product when used as intended was reasonably safe to groundwater and property belonging to Plaintiffs and the Plaintiff class and certainly no more hazardous than gasoline without MTBE.  Defendants failed to exercise due care in connection with this undertaking.

46

207.    Defendants had a duty and the financial and technical means to determine whether any latent defects exist in MTBE or gasoline containing MTBE and to warn public officials, Downstream Handlers and the general public of any such latent defects known to them, their agents and employees.  Defendants negligently breached this duty.

208.    Defendants had a duty to warn Plaintiffs and the Plaintiff class who rely on groundwater, public officials, Downstream Handlers and the general public of the properties that make MTBE and gasoline containing MTBE an enhanced threat to groundwater.

209.    Defendants affirmatively and voluntarily undertook to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE. Defendants failed to exercise due care in connection with this undertaking.

210.    Defendants breached their duties and committed acts of negligence towards Plaintiffs and the Plaintiff class in the design, manufacture, marketing and/or sale of gasoline containing MTBE, including but not limited to failing or failing adequately to test MTBE and/or gasoline containing MTBE before putting it in commerce; providing no or no adequate warnings of the enhanced risks to groundwater posed by MTBE and gasoline containing MTBE; and intentionally, recklessly and/or negligently concealing and/or omitting to disclose the true facts about MTBE and gasoline containing MTBE, while marketing and promoting their products.

211.    Further, Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE and gasoline containing MTBE posed a great and enhanced hazard to groundwater as describe above, that MTBE was a possible human carcinogen and posed a threat to health, and that owners of private water wells, including Plaintiffs, would suffer great property damage and other hardship from the contamination and loss of their water supply.

47

212.    Defendants' negligence proximately caused widespread contamination of groundwater throughout New York, contaminating and/or threatening contamination of Plaintiffs' water supplies.

213.    Plaintiffs and the Plaintiff class have suffered and been damaged, all as described herein and above, as a direct and proximate result of Defendants' negligence.

214.    As a further direct and proximate result of Defendants' negligence, Plaintiffs and the Plaintiff class have been or will be required to employ extraordinary measures to obtain clean and safe water.

215.    As a further direct and proximate result of Defendants' negligence, Plaintiffs and the Plaintiff class incurred losses and damages including property damage, loss of use and enjoyment of their peoperty, the need for periodic well water testing, and economic losses including property devaluation and needless expenditure of time and money.  They will continue to incur losses and damages in the future.

216.    Plaintiffs also face additional and imminent, irreparable harm as MTBE already released into the environment or that will be released into the environment contaminates more wells, which once contaminated cannot be restored to pre-contamination purity.

## EIGHTH CAUSE OF ACTION
### Fraud

217.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

218.    Each of the acts, practices, misrepresentations, omissions and other wrongs complained of above have been engaged in by Defendants with specific and deliberate intent to defraud and deceive Plaintiffs, public officials, Downstream Handlers and the general public, or

48

with reckless disregard for the truth or falsity of the claimed properties of MTBE and gasoline containing MTBE.

219.    Defendants made material misrepresentations of the properties of MTBE and gasoline containing MTBE and/or concealed known threats to environmental health and safety by such inter alia omitting to state material facts regarding the propensity of MTBE to seek out and contaminate groundwater and its recalcitrance to biodegradation and remediation.

220.    In making the material misrepresentations and omissions of fact as to MTBE and gasoline containing MTBE, Defendants intended to induce Plaintiffs, the Plaintiff class, public officials, Downstream Handlers and the general public to view gasoline containing MTBE as an environmentally beneficial product and to accept and buy it, but in other respects to handle and use gasoline containing MTBE no differently than they would gasoline without MTBE.

221.    The actual facts differed from Defendants' representations.  Gasoline containing MTBE, far from being environmentally beneficial, poses an enhanced and devastating risk to groundwater and, if used, requires extra care in handling to avoid even small spills and should be cleaned-up immediately if spilled.

222.    Defendants at all times had a great disparity of access and effectively controlled all information on matters related to the relevant properties of MTBE and the enhanced threat to groundwater following the introduction, sale and use of gasoline containing MTBE in New York. By virtue of Defendants' superior position and influence during all relevant transactions, Plaintiffs and others had no reasonable opportunity to discover the true facts before participating in and/or becoming victims of the fraudulent transactions.

223.   Plaintiffs' reliance on Defendants' materially false and misleading representations and on omissions of material information as to the properties of MTBE and gasoline containing MTBE can be presumed.

224.   The direct and/or indirect reliance of Plaintiffs, public officials, Downstream Handlers and the general public caused Plaintiffs' detriment, injuries and harms as alleged herein.

WHEREFORE, Plaintiffs pray for a judgment against these Defendants herein under market share and/or joint and several liability for:

1.   An order certifying this case as a class action, including any classes and sub-classes which this Court deems appropriate, pursuant to Fed. R. Civ. P. 23, and appointing Plaintiffs and their counsel to represent the Plaintiff class;

2.   An order to compel Defendants to create a fund for a Court-supervised statewide program for sampling and analysis for detectable quantities of MTBE in the private well water of all classmembers in the State of New York whose water has not been sampled and analyzed for MTBE within the last year, and to repeat this procedure once annually for up to five years after MTBE RFG ceases to be sold in New York;

3.   An order requiring Defendants to issue warnings to Downstream Handlers and the general public in New York, and to conduct or pay for a court-supervised statewide program of public education, concerning: (1) the extraordinary threat to wells and groundwater posed by MTBE in gasoline; (2) and the need for extraordinary care in the handling and use of MTBE-laden gasoline, and for immediate clean-up in the event of spills of any quantity;

4.   Compensatory damages for lost property values resulting from existing MTBE contamination and the threat of MTBE contamination, for loss of use and enjoyment of water and property, for the cost of clean-ups of all classmembers' well water known or determined to be contaminated with concentrations in excess of two (2) parts per billion MTBE, and incidental and consequential damages in an amount to be determined by the Court or a jury;

5.   For imposition of a constructive trust and asset freeze upon the profits received arising out of the sale of MTBE or gasoline containing MTBE, in order to assure that Plaintiffs and the Plaintiff class have an adequate remedy at law;

6.      Punitive damages in an amount sufficient to punish Defendants and to deter such conduct in the future;

7.      Interest on the damages according to law;

8.      Attorneys' fees and the costs and disbursements of this lawsuit; and

9.      Any other and further relief as the Court deems just, proper and equitable.

JURY TRIAL DEMANDED

Plaintiffs demands a trial by jury of all claims asserted in this Complaint.

Dated: New York, New York
        May 5, 2000

Lewis J. Saul, Esq. LS5101
LEWIS SAUL & ASSOCIATES, P.C.
Attorneys for Plaintiffs
5301 Wisconsin Avenue N.W., Suite 550
Washington, D.C. 20015
(202) 364-9700

KURZMAN KARELSEN & FRANK, LLP
Attn: Stanley E. Margolies, Esq.
New York Counsel
230 Park Avenue, 23rd Floor
New York, New York 10169
(212) 867-9500

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Plaintiffs' First Amended Class Action Complaint for: Injunctive Relief and Damages for Strict Liability for Failure to Warn; Strict Liability for Design Defect; Strict Liability for Misrepresentations; Deceptive Business Acts and Practices; Public Nuisance; Private Nuisance; Negligence; and Fraud** was served via First Class U.S. Postal Mail on this $\underline{5^{th}}$ day of May 2000 on Counsel for Defendants as follows:

| PARTIES | COUNSEL |
|---|---|
| Amerada Hess Corporation | Christopher S. Colman<br>Associate General Counsel<br>Amerada Hess Corporation<br>One Hess Plaza<br>Woodbridge, New Jersey 07095<br>Phone: (732) 750-6535<br>Fax:   (732) 750-6944 |
| | Robert Shulman<br>Mindy Davis<br>Howrey Simon Arnold & White<br>1299 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006 |
| BP Amoco Corporation | James Andrew Langan<br>Mark S. Lillie<br>Thomas Tozer<br>Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Phone: (312) 861-2000<br>Fax:   (312) 861-2200 |
| Chevron USA, Inc., Exxon Corporation,<br>Mobil Oil Corporation,<br>Shell Oil Products Company, Texaco Inc. | Richard E. Wallace, Jr.<br>Wallace, King, Marraro & Branson, PLLC<br>1050 Thomas Jefferson St., N.W.<br>Washington, D.C. 20007<br>Phone: (202) 204-1000<br>Fax:   (202) 204-1001 |

Certificate of Service—Berisha v. Amerada Hess
Page 2
May 5, 2000


Citgo Petroleum Coporation

Nathan P. Eimer
Lisa S. Meyer
Sidley & Austin
One First National Plaza
10 South Dearborn
Chicago, Illinois 60603
Phone: (312) 853-7594
Fax:    (312) 853-7036

Katherine L. Adams
Sidley & Austin
New York, New York 10022
Phone: (212) 906-2361
Fax:    (212) 906-2021

Getty Petroleum Corporation

Charlotte Biblow
Rivkin, Radler & Kremer LLP
EAB Plaza (Long Island)
Uniondale, New York 11556-0111
Phone: (516) 357-3000
Fax:    (516) 357-333

Gulf Oil Ltd., Partnership

Mark E. Tully
Goodwin, Proctor & Hoar LLP
Exchange Place
Boston, Massachusetts 02109-2881
Phone: (617) 570-1289
Fax:    (617) 523-1231

Sunoco Inc.

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I St., N.W.
Suite 700
Washington, D.C. 20005
Phone: (202) 789-6020
Fax:    (202) 789-6190

Sy Gzuza
15th Floor
477 Madison Avenue
New York, New York 10022-5802
Phone: (212) 702-5400
Fax:    (212) 702-5450

D

ALL-STATE® LEGAL  800 222 0510   EDS11   RECYCLED

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

DAVID ENGLAND, DONNA L. AZBILL, JAMES BAUER, )
MARVIN OWCA, RHEA SUSAN MCMANNIS, and )
CLAUDIA CHRISTIANSEN, Individually and on )
Behalf of All Others Similarly Situated, )
                                               )
         Plaintiffs, )
                                                 )
v.                                               )   Cause No. _QC L 331_
                                               )
ATLANTIC RICHFIELD COMPANY; BP AMOCO )
CORPORATION; AMOCO OIL COMPANY; CITGO )
PETROLEUM CORPORATION; CONOCO, INC.; EXXON )
MOBIL CORPORATION, f/k/a EXXON CORPORATION )
and f/k/a MOBIL CORPORATION; EQUILON )
ENTERPRISES, LLC; CHEVRON U.S.A. INC.; )
PHILLIPS PETROLEUM COMPANY; SHELL OIL )
COMPANY; and TEXACO REFINING AND )
MARKETING, INC. )
                                               )
         Defendants. )

**FILED**

APR 1 1 2000

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

_Hon George Moran_

## CLASS ACTION COMPLAINT

Come now Plaintiffs, by and through their undersigned counsel, on behalf of themselves and

all others similarly situated, and for their Complaint against Defendants, state as follows:

### NATURE OF THE CASE

1.     Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has

caused wide-spread contamination to drinking water sources throughout the United States.

2.     Plaintiffs, on behalf of themselves and all others similarly situated, bring this case as

a Class Action on behalf of all persons who own real property in the following states: California,

Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New

1

Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas , Wisconsin and Virginia (hereinafter referred to as "the RFG States") that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE. Plaintiffs bring this action for the costs of such testing or reimbursement of the cost of such testing and all necessary future testing.  Plaintiffs also bring this action on behalf of all persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes who have water that has been contaminated by MTBE. Plaintiffs request that, for those who own a water supply well that is found to have been contaminated by MTBE, Defendants be required to pay the costs associated with supplying bottled water on a temporary basis until a permanent hook up to the local municipal or private water system or a filter system is installed for those wells where a permanent water supply is unavailable.

## THE PARTIES

### The Plaintiffs

3.      Plaintiffs JAMES BAUER, MARVIN OWCA, DONNA L. AZBILL and RHEA SUSAN MCMANNIS are adult citizens and residents of Madison County, Illinois. They are owners of private wells reliant on groundwater, and are concerned with the risks MTBE poses to their water.  Their water supply wells have recently been tested for MTBE.  Although their wells were not contaminated with MTBE on the last date they were tested, they seek to recover reimbursement for the cost of such testing and the cost of future testing.

4.      Plaintiff DAVID ENGLAND is an adult citizen and resident of Madison County, Illinois.

2

He is an owner of a private well, reliant on groundwater, which is contaminated with MTBE.

5.      Plaintiff CLAUDIA CHRISTIANSEN is an adult citizen and resident of Amador County, California.  She is the owner of a private well, reliant on ground water, which is contaminated with MTBE.

6.      Plaintiffs bring this action on their own behalf and on behalf of the Class(es) they seek to represent, pursuant to 735 ILCS 5/2-801.

7.      Plaintiffs and all private water well owner residents of the RFG States have a stake in the preservation of clean groundwater, the protection of property, and the health and well-being of all citizens of the RFG States.

8.      All references to "Plaintiff[s]" throughout this Complaint are made on behalf of the named Plaintiffs and the putative Class(es), and vice versa.

**The Defendants**

9.      Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

10.     ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

11.     BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois.  Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

12.     CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

3

13.     CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

14.     CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

15.     EXXON MOBIL CORPORATION, formed as a result of the merger on November 30, 1999 of EXXON CORPORATION and MOBILE CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

16.     EQUILON ENTERPRISES, LLC ("EQUILON") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

17.     PHILLIPS PETROLEUM COMPANY ("PHILLIPS") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

18.     SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

19.     TEXACO REFINING AND MARKETING, INC. ("TEXACO") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

20.     When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment

4

or agency.

## Jurisdiction and Venue

21.      This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

22.      Venue is proper in this Court because at least one of the Plaintiffs resides and owns real property wherein a private well is located in Madison County, Illinois.

## STATEMENT OF FACTS

### MTBE's Characteristics and Defendants' Knowledge of Same

23.      Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive. MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process. MTBE is a member of a class of chemical compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to

contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water. Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

## Introduction of MTBE Into the Marketplace.

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

24.    In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

- *TSCA and the First Federal Register Notice Issued by EPA*

25.    The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks that such chemicals may present to health and the environment. Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601). TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

26.    On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its

6

persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable. For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

- *The Committees*

27.     Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information regarding MTBE and its risk to the environment from being known. Among the many Committees established was the "MTBE Committee." The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed. An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . . , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

28.     The Defendants, individually and via the MTBE Committee, submitted their written

7

comments to the EPA. However, despite the innocuous description of the MTBE Committee's goals, the information provided by Defendants was misleading and false. Clearly, the purpose behind the Defendants' comments was to dissuade the EPA from requiring additional health and environmental testing of MTBE. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, that MTBE had excellent biodegradation characteristics, and that additional testing should not be done. The representations made by the Defendants to the EPA were an alarming and inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid public scrutiny of the product and thereby maximize their profits. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of the people of the United States.

29.     Defendants misled not only the EPA, but Plaintiffs and Class members. Despite their duties to provide a safe product and to warn Plaintiffs, government regulators, and those who handle and store their product, of MTBE's dangerous properties and other known or reasonably knowable risks, Defendants failed to take proper action. Neither state agencies nor well owners were told of the existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence regarding MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

30.     Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information

8

Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990

*Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act*

31.    Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem.  The oil industry became concerned that Congress might consider alternative non-petroleum based fuels.  As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990.  In the Act, Congress mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems.  In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

*MTBE Became the Oxygenate of Choice*

32.    The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable.  MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available.  Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

9

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

33.    In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat.  Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiffs who were dependent on groundwater.   Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

34.    Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year.  In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the United States.  With this many fuel handling events, human error inevitably occurs.  Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater.  Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

35.    Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed.

10

It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

36.    One of the provisions of the Amendments to the Clean Air Act authorized the EPA to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[1] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

**MTBE Is Responsible for Massive Water Contamination across the Country**

37.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently

---

1    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

38.     MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

39.     As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiffs and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii) a duty to warn gasoline station operators and the general public, including the Plaintiffs, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

40.     Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents. Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there

12

were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater. Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice. Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiffs and the Class, of the various pathways that MTBE can enter the environment and its effect on groundwater. As a result, many of the RFG States' residents, including certain of Plaintiffs and the Class, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given the opportunity to avoid potentially harmful exposure to their drinking water supplies.

41.    Plaintiffs are informed and believe and therefore allege that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states. The specific manufacturer of MTBE for any particular groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiffs and members of the Class(es) they seek to represent.

42.    Plaintiffs and class members find themselves in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which they did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse

13

effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

## CLASS ACTION ALLEGATIONS

43.     This action is brought by Plaintiffs JAMES BAUER, MARVIN OWCA, DONNA L. AZBILL and RHEA SUSAN MCMANNIS, on their own behalf and on behalf of all other persons similarly situated, pursuant to 735 ILCS 5/2-801, on behalf of a Sub-Class (hereinafter referred to as the "Testing Sub-Class"), defined as follows:

> All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE.

44.     This action is also brought by Plaintiffs DAVID ENGLAND and CLAUDIA CHRISTIANSEN, on their own behalf and on behalf of all other persons similarly situated, pursuant to 735 ILCS 5/2-801, on behalf of a Sub-Class (hereinafter referred to as the "Alternative Water Source Sub-Class"), defined as follows:

> All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE.

45.     Specifically excluded from the proposed Sub-Classes are: (1) all other claims, including claims for any personal injury or other property damage sustained by the Class; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

14

46.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class Members is unknown at this time, it is generally ascertainable by appropriate discovery, and it is believed that the Class includes hundreds of thousands of members.

47.    Common questions of law or fact arising from Defendants' conduct exist as to all members of each Sub-Class, as required by 735 ILCS 5/2-801. These common questions predominate over any questions which affect individual members of each Sub-Class. These common questions include, without limitation:

1.    whether MTBE, if released into groundwater supplies, adversely impacts the groundwater;

2.    whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate;

3.    whether Defendants failed to adequately test MTBE, prior to its manufacture, distribution and/or sale, for risks to groundwater;

4.    whether Defendants failed to provide adequate warning to people in the business of operating gasoline stations and storage tanks containing MTBE regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

5.    whether Defendants failed to adequately warn Plaintiffs, government agencies and/or regulators, and/or the public regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

6.    whether Defendant knew or should have known that MTBE is hazardous to groundwater aquifers and private water systems;

7.    whether Defendants made false, misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the Nation's groundwater;

8.    whether Defendants conspired to conceal and/or misrepresent the characteristics of MTBE and the risks of MTBE use to public and private water supplies to Plaintiffs, government agencies and/or regulators and the public at large; and

9.    whether Defendant formed joint committees and/or task forces or other organizations

15

which generated misrepresentations or omissions regarding MTBE and its properties and/or characteristics.

48.     Class Action treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impracticable. The Class Action provides an appropriate and effective method whereby the enforcement of the rights of Plaintiffs and members of the Class can be fairly managed without unnecessary expense or duplication. The expense and burden of individual litigation of a case of this magnitude make it impractical for individual Class Members to seek redress for the wrongs done to them.

49.     Individual litigation of all claims which might be asserted by all Class Members would produce such a multiplicity of cases that the judicial systems having jurisdiction of the claims would remain congested for years. The certification of a Class would allow litigation of claims that, in view of the expenses of the litigation, may be insufficient in amount to support separate actions. Concentrating this litigation in one forum would aid judicial economy and efficiency, promote parity among the claims of individual Class Members, and result in judicial consistency.

50.     Plaintiffs will fairly and adequately protect the interests of the Class they represent. The interests of Plaintiffs, as the Class Representatives, are consistent with those of the members of the Class. In addition, Plaintiffs are represented by counsel experienced in complex class action litigation.

51.     The prosecution of separate actions by individual members of the Class would create a risk of:

1.     Inconsistent or varying adjudications with respect to individual members of the Class; and

16

2.      Adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

52.      Plaintiffs and Class Members envision no unusual difficulty in the management of this action as a Class Action.

## CLAIMS FOR RELIEF

### COUNT I — NEGLIGENCE

53.      Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

54.      The residents of the RFG States, including Plaintiffs, are and have been captives to the petroleum industry of which Defendants are a part. Literally every resident of the RFG States is heavily dependent upon gasoline in their day-to-day lives. Defendants are responsible for the design, manufacture, sale and distribution of all chemicals that are part of gasoline. As a result, the Plaintiffs and the residents of the RFG States are in a disadvantaged position where they must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage. Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiffs concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

55.      Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists. Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE. Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale

17

production, distribution and use of the chemicals they place and distribute in gasoline, including

MTBE.

56.     With respect to MTBE, Defendants knew or should have known, prior to and

subsequent to the wide scale production of MTBE, that:

a.     MTBE is an ether and is, therefore, water soluble;

b.     MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

c.     MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

d.     MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

e.     millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

f.     there is a tremendous problem with leaking USTs throughout the Country;

g.     the RFG States' and Plaintiffs' resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

h.     owners of private water wells, including Plaintiffs, would be unsuspecting and not test for MTBE on a regular basis, if at all.

57.   Defendants had a duty to:

a.     ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiffs and the Class;

b.     determine whether MTBE contains any latent defects and to warn Plaintiffs, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

c.     warn Plaintiffs and others who own or control a well that provides domestic water of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

18

d.  warn anyone who owns or operates a water well that it should frequently be tested for MTBE; and

e.  take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

58.  Defendants have negligently breached these duties by:

a.  Using MTBE as an oxygenate, knowing of its dangerous propensities;

b.  failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.  failing to adequately test, identify and remediate wells that are contaminated with MTBE;

d.  failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

e.  failing to adequately warn Plaintiffs, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

f.  forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

g.  failing to eliminate or minimize the harmful impacts and risks posed by MTBE,

h.  failing to curtail or reduce MTBE's manufacture and distribution;

i.  failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

j.  failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

k.  making material misrepresentations and/or omissions of material facts regarding MTBE.

59.  As a direct and proximate result of one or more of the foregoing acts or omissions of

19

negligence on the part of Defendants, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class. As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

60.     As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class. As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local or private municipal water system, or will be required to install a system to filter out MTBE from contaminated well water supplies.

61.     All of the damages of which Plaintiffs complain were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

### PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT I

### COUNT II - STRICT LIABILITY

62.     Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

63.     At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

        a.     MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation; and

20

b.    If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

c.    Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

    (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

    (ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

    (iii)    it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

    (iv)    testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

    (v)    secondary containment is essential to storing MTBE; and

    (vi)    in the event of a leak, anyone living or residing near a site should be immediately warned.

d.    Defendants failed to warn Plaintiffs and members of the Class(es) they seek to represent that:

    (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

    (ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

    (iii)    anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

    (iv)    that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

64.    As a direct and proximate result of the unreasonably dangerous and/or defective

21

condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class. As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

65.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class. As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local municipal or private water system, or will be required to install a system to filter out MTBE from contaminated well water supplies.

### PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT II

### COUNT III - CONSPIRACY

66.    Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

67.    As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

68.    Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

22

69.    Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

70.    With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater. Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiffs and the Class(es) they seek to represent.

71.    Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

72.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis. Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or downplay any adverse findings related to MTBE. Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiffs and the public at large, including members of the Class Plaintiffs seek to represent.

73.    Defendants did act in furtherance of the above-alleged conspiracy and ratified and

adopted the acts of each co-conspirator.

74.    As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class. As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

75.    As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class. As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local municipal or private water system, or will be required to install a system to filter out MTBE from contaminated well water supplies. Plaintiffs and members of the Alternative Water Source Sub-Class suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

**PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT III**

**PRAYER FOR RELIEF FOR COUNTS I, II AND III**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows:

1.    Ordering that the action be maintained as a class action pursuant to 735 ILCS 5 /2-801 and the following sub-classes be certified as follows:

a.    Testing Sub-Class:

All persons who own real property in the RFG States that is not used

24

for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE.

b.    <u>Alternative Water Source Sub-Class:</u>

All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE.

Specifically excluded from the proposed Sub-Classes are: (1) all other claims, including claims for any personal injury or other property damage sustained by the Class; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

2.    An Order appointing Plaintiffs and their counsel to represent the Class.

3.    Awarding Plaintiff and class members compensatory damages, costs of suit, and

attorneys' fees in an amount less than $75,000 per Plaintiff or class member, with compensatory

damages as follows:

a.    compensatory damages for the systematic sampling and analysis for detectable quantities of MTBE for all persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes who wish to have their well tested and to provide for reimbursement to those persons who have had their system or well tested. Plaintiffs also requests that this procedure be repeated at least once annually to provide testing to those who wish to have their well tested so long as Defendants manufacture and/or distribute gasoline containing MTBE in the RFG States, and for at least five (5) years thereafter; and

b.    compensatory damages associated with supplying bottled water and/or providing a permanent hook up to the local municipal or private water system, or providing a filter system to redress the contamination by MTBE for those Plaintiffs and Class Members who own a water supply well in the RFG States where the groundwater underlying such property is or has been

25

contaminated with MTBE.

## COUNT IV - NEGLIGENCE

76.     Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has caused wide-spread contamination to drinking water sources throughout the United States.

77.     Plaintiff DAVID ENGLAND is an adult citizen and resident of Madison County, Illinois. He is an owner of a private well, reliant on groundwater, which is contaminated with MTBE.

**The Defendants**

78.     Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

79.     ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

80.     BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois.  Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

81.     CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

82.     CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

83.     CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

84.     EXXON MOBIL CORPORATION,  formed as a result of the merger on November 30,

26

1999 of EXXON CORPORATION and MOBILE CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

85.    EQUILON ENTERPRISES, LLC ("EQUILON") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

86.    PHILLIPS PETROLEUM COMPANY ("PHILLIPS") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

87.    SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

88.    TEXACO REFINING AND MARKETING, INC. ("TEXACO") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

89.    When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### Jurisdiction and Venue

90.    This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the

Illinois courts consistent with traditional notions of fair play and substantial justice.

STATEMENT OF FACTS

**MTBE's Characteristics and Defendants' Knowledge of Same**

91.     Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive. MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process.  MTBE is a member of a class of chemical compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water.  Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

**Introduction of MTBE Into the Marketplace.**

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

92.     In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics

28

of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

- *TSCA and the First Federal Register Notice Issued by EPA*

93.    The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks that such chemicals may present to health and the environment. Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601). TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

94.    On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable. For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

- *The Committees*

95.    Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information

29

regarding MTBE and its risk to the environment from being known. Among the many Committees established was the "MTBE Committee." The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed. An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . . , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

96.     The Defendants, individually and via the MTBE Committee, submitted their written comments to the EPA. However, despite the innocuous description of the MTBE Committee's goals, the information provided by Defendants was misleading and false. Clearly, the purpose behind the Defendants' comments was to dissuade the EPA from requiring additional health and environmental testing of MTBE. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, that MTBE had excellent biodegradation characteristics, and that additional testing should not be done. The representations made by the Defendants to the EPA were an alarming and inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid public scrutiny of the product and thereby maximize their profits. In making and supporting such

30

representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of the people of the United States.

97.     Defendants misled not only the EPA, but Plaintiff. Despite their duties to provide a safe product and to warn Plaintiff, government regulators, and those who handle and store their product, of MTBE's dangerous properties and other known or reasonably knowable risks, Defendants failed to take proper action. Neither state agencies nor well owners were told of the existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence on MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

98.     Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990
### Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act

99.     Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem. The oil industry became concerned that Congress might consider alternative non-petroleum based fuels. As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990. In the Act, Congress

31

mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems. In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

*MTBE Became the Oxygenate of Choice*

100.    The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable. MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

101.    In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat. Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiff who was dependent on groundwater. Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

32

102.   Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year. In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the United States. With this many fuel handling events, human error inevitably occurs. Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

103.   Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed. It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiff, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

104.   One of the provisions of the Amendments to the Clean Air Act authorized the EPA

33

to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[2] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

**MTBE Is Responsible for Massive Water Contamination across the Country**

105.   Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

106.   MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant

---

2   Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

risk to the nation's drinking water supply."

107.    As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiff and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii) a duty to warn gasoline station operators and the general public, including Plaintiff, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

108.    Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents. Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater. Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice. Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiff, of the various pathways that MTBE can enter the environment and its effect on groundwater. As a result, many of the RFG States' residents, including Plaintiff, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given

35

the opportunity to avoid potentially harmful exposure to their drinking water supplies.

109.    Plaintiff is informed and believes and therefore alleges that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states. The specific manufacturer of MTBE for any particular groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiff.

110.    Plaintiff finds himself in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which he did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

111.    Plaintiff is in a disadvantaged position where he must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage. Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

112.    Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists. Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE. Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale

36

production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE.

113.   With respect to MTBE, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

     a.     MTBE is an ether and is, therefore, water soluble;

     b.     MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

     c.     MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

     d.     MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

     e.     millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

     f.     there is a tremendous problem with leaking USTs throughout the Country;

     g.     Plaintiff's resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

     h.     owners of private water wells, including Plaintiff, would be unsuspecting and not test for MTBE on a regular basis, if at all.

114.   Defendants had a duty to:

     a.     ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiff;

     b.     determine whether MTBE contains any latent defects and to warn Plaintiff, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

     c.     warn Plaintiff of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

37

      d.      warn Plaintiff that a water well that it should frequently be tested for MTBE; and

      e.      take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

115.    Defendants have negligently breached these duties by:

      a.      Using MTBE as an oxygenate, knowing of its dangerous propensities;

      b.      failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

      c.      failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

      d.      failing to adequately warn Plaintiff, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

      e.      forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

      f.      failing to eliminate or minimize the harmful impacts and risks posed by MTBE;

      g.      failing to curtail or reduce MTBE's manufacture and distribution;

      h.      failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

      i.      failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

      j.      making material misrepresentations and/or omissions of material facts regarding MTBE.

116.    As a direct and proximate result of one or more of the foregoing acts or omissions of

negligence on the part of Defendants, MTBE has contaminated the water well of Plaintiff, thereby

38

causing a diminution in the value of Plaintiff's real property.

117.   All of the damages of which Plaintiff complains were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT IV

COUNT V - STRICT LIABILITY

118.   Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 76 through 111 as if fully restated herein.

119.   At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

   a.   MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

   b.   If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

   c.   Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

      (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

      (ii)   if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

      (iii)  it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

39

    (iv)    testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

    (v)    secondary containment is essential to storing MTBE; and

    (vi)    in the event of a leak, anyone living or residing near a site should be immediately warned.

d.    Defendants failed to warn Plaintiff that:

    (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

    (ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

    (iii)    anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

    (iv)    that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

120.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT V

40

## COUNT VI - CONSPIRACY

121.    Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 76 through 111 as if fully restated herein.

122.    As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

123.    Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

124.    Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

125.    With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater.  Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiff.

126.    Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

127.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport

41

characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis. Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or downplay any adverse findings related to MTBE. Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiff.

128.   Defendants did act in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator.

129.   As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property. Plaintiff suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VI

## COUNT VII - NEGLIGENCE

130.   Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has caused wide-spread contamination to drinking water sources throughout the United States.

131.   Plaintiff CLAUDIA CHRISTIANSEN is an adult citizen and resident of Amador County, California. She is the owner of a private well, reliant on ground water, which is contaminated with MTBE.

42

**The Defendants**

132.    Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

133.    ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

134.    BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois.  Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

135.    CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

136.    CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

137.    CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

138.    EXXON MOBIL CORPORATION, formed as a result of the merger on November 30, 1999 of EXXON CORPORATION and MOBILE CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

139.    EQUILON ENTERPRISES, LLC ("EQUILON") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

140.    PHILLIPS PETROLEUM COMPANY ("PHILLIPS") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

141.    SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

142.    TEXACO REFINING AND MARKETING, INC. ("TEXACO") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

143.    When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## Jurisdiction and Venue

144.    This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

## STATEMENT OF FACTS

### MTBE's Characteristics and Defendants' Knowledge of Same

145.    Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive. MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process. MTBE is a member of a class of chemical

44

compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water. Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

**Introduction of MTBE Into the Marketplace.**

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

146.    In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

•    *TSCA and the First Federal Register Notice Issued by EPA*

147.    The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks

Case MDL No. 1358   Document 1   Filed 06/06/00   Page 155 of 180

that such chemicals may present to health and the environment. Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601). TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

148.     On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable. For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

- *The Committees*

149.     Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information regarding MTBE and its risk to the environment from being known. Among the many Committees established was the "MTBE Committee." The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed. An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee lauded

46

itself as "being a source of information to MTBE producers, users, the government and the public"

and stated that its goal was to "address environmental health and safety issues relating to MTBE

. . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[]

and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order

or Test Rule . . . , [and] make available to interested parties and the general public technical and

scientific information relating to the use of MTBE in fuels."

150.    The Defendants, individually and via the MTBE Committee, submitted their written

comments to the EPA.  However, despite the innocuous description of the MTBE Committee's

goals, the information provided by Defendants was misleading and false.  Clearly, the purpose

behind the Defendants' comments was to dissuade the EPA from requiring additional health and

environmental testing of MTBE.  For example, the Defendants provided information to the EPA

representing that MTBE is only slightly soluble in water, that potential environmental exposure is

not high, that MTBE had excellent biodegradation characteristics, and that additional testing should

not be done.  The representations made by the Defendants to the EPA were an alarming and

inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid

public scrutiny of the product and thereby maximize their profits.  In making and supporting such

representations, the Defendants demonstrated their willingness to use any means to place their

economic interest above the health, property and well-being of the people of the United States.

151.    Defendants misled not only the EPA, but Plaintiff.  Despite their duties to provide

a safe product and to warn Plaintiff, government regulators, and those who handle and store their

product, of MTBE's dangerous properties and other known or reasonably knowable risks,

Defendants failed to take proper action.  Neither state agencies nor well owners were told of the

existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence on MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

152.    Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990

*Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act*

153.    Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem. The oil industry became concerned that Congress might consider alternative non-petroleum based fuels. As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990. In the Act, Congress mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems. In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

48

*MTBE Became the Oxygenate of Choice*

154.    The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable. MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

155.    In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat. Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiff who was dependent on groundwater. Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

156.    Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year. In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the

United States. With this many fuel handling events, human error inevitably occurs. Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

157.    Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed. It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiff, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

158.    One of the provisions of the Amendments to the Clean Air Act authorized the EPA to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[3] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana,

---

3    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

## MTBE Is Responsible for Massive Water Contamination across the Country

159.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

160.    MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

161.    As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiff and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii)

51

a duty to warn gasoline station operators and the general public, including Plaintiff, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

162.   Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents.  Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater.  Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice.  Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiff, of the various pathways that MTBE can enter the environment and its effect on groundwater.  As a result, many of the RFG States' residents, including Plaintiff, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning  and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given the opportunity to avoid potentially harmful exposure to their drinking water supplies.

163.   Plaintiff is informed and believes and therefore alleges that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states.  The specific manufacturer of MTBE for any particular

groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiff.

164.    Plaintiff finds herself in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which she did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

165.    Plaintiff is in a disadvantaged position where she must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage.  Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

166.    Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists.  Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE.  Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE.

167.    With respect to MTBE, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

a.    MTBE is an ether and is, therefore, water soluble;

53

b.      MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

c.      MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

d.      MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

e.      millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

f.      there is a tremendous problem with leaking USTs throughout the Country;

g.      Plaintiff's resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

h.      owners of private water wells, including Plaintiff, would be unsuspecting and not test for MTBE on a regular basis, if at all.

168.    Defendants had a duty to:

a.      ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiff;

b.      determine whether MTBE contains any latent defects and to warn Plaintiff, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

c.      warn Plaintiff of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

d.      warn Plaintiff that a water well that it should frequently be tested for MTBE; and

e.      take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

169.    Defendants have negligently breached these duties by:

a.      Using MTBE as an oxygenate, knowing of its dangerous propensities;

b.  failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.  failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

d.  failing to adequately warn Plaintiff, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

e.  forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

f.  failing to eliminate or minimize the harmful impacts and risks posed by MTBE;

g.  failing to curtail or reduce MTBE's manufacture and distribution;

h.  failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

i.  failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

j.  making material misrepresentations and/or omissions of material facts regarding MTBE.

170.  As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

171.  All of the damages of which Plaintiff complains were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested

55

damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

**PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VII**

**COUNT VIII - STRICT LIABILITY**

172.     Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 130 through 163 as if fully restated herein.

173.     At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

a.     MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

b.     If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

c.     Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

(i)     MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

(ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

(iii)   it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

(iv)    testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

(v)     secondary containment is essential to storing MTBE; and

(vi)    in the event of a leak, anyone living or residing near a site should be

56

immediately warned.

d.   Defendants failed to warn Plaintiff that:

(i)   MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

(ii)   if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

(iii)   anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

(iv)   that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

174.   As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

**PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VIII**

### COUNT IX - CONSPIRACY

175.   Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 130 through 163 as if fully restated herein.

57

176.    As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

177.    Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

178.    Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

179.    With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater. Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiff.

180.    Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

181.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis. Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or

58

downplay any adverse findings related to MTBE. Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiff.

182.    Defendants did act in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator.

183.    As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property. Plaintiff suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT IX

CARR, KOREIN, TILLERY, KUNIN,
MONTROY, CATES, KATZ & GLASS

STEPHEN M. TILLERY #2834995
CHRISTINE J. MOODY #6211904
10 Executive Woods Court
Swansea, Illinois 62226
Telephone:    (618) 277-1180
Facsimile:    (314) 241-3525

59

**COOPER & SCULLY, P.C.**
SCOTT SUMMY, TX Bar No. 19507500
CELESTE EVANGELASTI, TX Bar No. 00793706
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone:     (214) 712-9500
Facsimile:     (214) 712-9540

**LAW OFFICES OF MASRY & VITITOE**
EDWARD MASRY, CA Bar No. 31016
JOSEPH D. GONZALEZ, CA Bar No. 189947
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
Telephone:     (818) 991-8900
Facsimile:     (818) 991-6200

**MILLER, SHER & SAWYER**
VICTOR M. SHER, CA Bar No. 96197
DUANE C. MILLER, CA Bar No. 57812
A. CURTIS SAWYER, JR., CA Bar No. 101324
100 Howe Avenue, Suite S-120
Sacramento, CA 95825-5407

**ROUNDTREE & SEAGLE, LLP**
J. HAROLD SEAGLE, NC Bar No. 8017
P.O. Box 1409
Wilmington, NC   28402-1409

*Attorneys for Plaintiffs and the Class*

60

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

DAVID ENGLAND, DONNA L. AZBILL, JAMES BAUER, )
MARVIN OWCA, RHEA SUSAN MCMANNIS, and )
CLAUDIA CHRISTIANSEN, Individually and on )
Behalf of All Others Similarly Situated, )
                               )
        Plaintiffs, )
                               )
v. )    Cause No. _____ 00 L 331 ____
                               )
ATLANTIC RICHFIELD COMPANY; BP AMOCO )
CORPORATION; AMOCO OIL COMPANY; CITGO )
PETROLEUM CORPORATION; CONOCO, INC.; EXXON )
MOBIL CORPORATION, f/k/a EXXON CORPORATION )
and f/k/a MOBIL CORPORATION; EQUILON )
ENTERPRISES, LLC; CHEVRON U.S.A. INC.; )
PHILLIPS PETROLEUM COMPANY; SHELL OIL )
COMPANY; and TEXACO REFINING AND )
MARKETING, INC. )
                               )
        Defendants. )

**FILED**

APR 11 2000

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

<u>**AFFIDAVIT OF STEPHEN M. TILLERY**</u>

       I, Stephen M. Tillery, being first duly sworn upon my oath, depose and state as follows:

       1.     That I am the attorney representing the Plaintiffs filing the above-captioned cause of action.

       2.     That the total of money damages sought by Plaintiffs in this cause of action exceeds Fifty Thousand Dollars ($50,000.00) but less than Seventy-five Thousand Dollars ($75,000.00) per plaintiff or class member.

       Further affiant sayeth not.

                                     _____
                                     STEPHEN M. TILLERY

STATE OF ILLINOIS )
                  ) SS
COUNTY OF ST. CLAIR )

Subscribed and sworn to before me, a notary public, this _11th_ day of April, 2000.

_____
Notary Public

"OFFICIAL SEAL"
Charlotte A Mabry
Notary Public, State of Illinois
My Commission Exp. 06/21/2003

E

ALL-STATE® LGAI  800.222.0510  E6511   RECYCLED

Not Reported in F.Supp.
(Cite as: 1997 WL 83673 (Jud.Pan.Mult.Lit.))

Page   1

## In re PHONOMETRICS, INC., ELECTRONIC LONG DISTANCE CALL COST COMPUTER AND RECORDER PATENT LITIGATION.

### No. 1141.

Judicial Panel on Multidistrict Litigation.

Feb. 19, 1997.

Before JOHN F. NANGLE, Chairman, ROBERT R. MERHIGE, JR., [FN*] WILLIAM B. ENRIGHT, CLARENCE A. BRIMMER, JOHN F. GRADY, BAREFOOT SANDERS and LOUIS C. BECHTLE, Judges of the Panel.

FN* Judge Merhige did not participate in the decision of this matter.

### TRANSFER ORDER

JOHN F. NANGLE, Chairman

*1 This litigation currently consists of 21 actions listed on the attached Schedule A and pending in two districts as follows: twenty actions in the Southern District of Florida and one action in the Northern District of California. [FN1]   Phonometrics, Inc. (Phonometrics), the plaintiff in all 21 actions, moves the Panel, pursuant to 28 U.S.C. § 1407, for an order centralizing this litigation in a single district for coordinated or consolidated pretrial proceedings.   After initially refraining from advocating selection of a specific transferee district, Phonometrics at oral argument on its Section 1407 motion announced its support for centralization in the Northern District of California.   All responding defendants, which include the defendants and a third party defendant in sixteen of the Florida actions and twelve of the defendants in the California action, oppose transfer.   Certain of the Florida defendants suggest that, if the Panel nevertheless orders transfer, the docket should be centralized in the Southern District of Florida.

FN1. The Section 1407 motion as filed pertained to three additional actions that were terminated prior to

the filing of the motion: Phonometrics, Inc. v. Walt Disney World Co., et al., M.D. Florida, C.A. No. 6:95-262;  Phonometrics, Inc. v. Radisson Hotels International, Inc., S.D. Florida, C.A. No. 0:94-6510;  and Phonometrics, Inc. v. Wooley/Sweeny Ltd., S.D. Florida, C.A. No. 0:94-6692.   Another S.D. Florida action, Phonometrics, Inc. v. Resinter North America Corp., C.A. No. 0:94-7129, was dismissed subsequent to the filing of the Section 1407 motion.   Accordingly, the question of transfer with respect to these four actions is moot.

On the basis of the papers filed and the hearing held, the Panel finds that the 21 actions in this litigation involve common questions of fact, and that centralization under Section 1407 in the Southern District of Florida will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.   Each of the actions is brought against hospitality industry users of telephone systems that are alleged to infringe the same Phonometrics patent.   The actions, which were stayed pending resolution of Phonometrics' infringement claims against manufacturers of telephone equipment used by the hospitality industry defendants, will likely share questions concerning such matters as patent validity, prior art, obviousness and interpretation of the claims of the patent. Depending on the outcome of the manufacturer claims, the actions may also be the subject of potentially dispositive pretrial motions raising additional common issues. Centralization under Section 1407 will thus eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

We are persuaded that the Southern District of Florida is the appropriate transferee forum for this litigation.   We note that 1) twenty of the 21 actions are already pending there;  and 2) the Florida actions are further advanced and are pending before a judge who has already developed an extensive familiarity with the issues in this docket.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the action listed

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                          **Page   2**
**(Cite as: 1997 WL 83673, \*1 (Jud.Pan.Mult.Lit.))**

on the attached Schedule A and pending in the Northern District of California be, and the same hereby is, transferred to the Southern District of Florida and, with the consent of that court, assigned to the Honorable Kenneth L. Ryskamp for coordinated or consolidated pretrial proceedings with the actions listed on Schedule A that are pending in that district.

ATTACHMENT
SCHEDULE A
MDL-1141--In re Phonometrics, Inc.,
Electronic Long Distance Call Cost Computer
and Recorder Patent Litigation
Northern District of California
**\*2**   Phonometrics,   Inc.   v.   Hospitality Franchise Systems, Inc., et al., C.A. No. 3:96-707

Southern District of Florida
Phonometrics, Inc. v. ITT Sheraton Corp., C.A. No. 0:94-6502-KLR
Phonometrics, Inc. v. Hilton Hotels Corp., C.A. No. 0:94-6503-KLR
Phonometrics, Inc. v. Westin Hotel Co., C.A. No. 0:94-6504-KLR
Phonometrics, Inc. v. Marriott International, Inc., et al., C.A. No. 0:94- 6533-KLR
Phonometrics, Inc. v. Hyatt Corp., C.A. No. 0:94-6688-KLR
Phonometrics, Inc. v. Holiday Inns, Inc., et al., C.A. No. 0:94-6689-KLR
Phonometrics,   Inc.   v.   Best   Western International, Inc., C.A. No. 0:94- 6690-KLR
Phonometrics,   Inc.   v.   Inter-Continental Hotels Corp., C.A. No. 0:94-6691- KLR
Phonometrics, Inc. v. Embassy Suites, Inc., C.A. No. 0:94-6949-KLR
Phonometrics, Inc. v. Forte Hotels, Inc., et al., C.A. No. 0:94-7085-KLR
Phonometrics, Inc. v. Concord Hotels, Inc., C.A. No. 0:94-7087-KLR
Phonometrics,   Inc.   v.   Choice   Hotels International, Inc., C.A. No. 0:94- 7097-KLR
Phonometrics, Inc. v. Wyndham Hotel Co., Ltd., C.A. No. 0:94-7106-KLR
Phonometrics,   Inc.   v.   Hospitality International, Inc., C.A. No. 0:94-7107- KLR
Phonometrics, Inc. v. Doral Hotels & Resorts Mgmt. Corp., C.A. No. 0:94- 7109-KLR
Phonometrics, Inc. v. Trimark Hotel Corp., C.A. No. 0:94-7110-KLR

Phonometrics, Inc. v. La Quinta Inns, Inc., C.A. No. 0:94-7127-KLR
Phonometrics, Inc. v. Continental Co., Inc., C.A. No. 0:94-7130-KLR
Phonometrics, Inc. v. Hampton Inns, Inc., C.A. No. 0:95-6209-KLR
Phonometrics, Inc. v. Promus Co., Inc., C.A. No. 0:95-6249-KLR

END OF DOCUMENT

Copr. ® West 2000 No Claim to Orig. U.S. Govt. Works

F

ALL-STATE® LEGAL   800 222 0510   E0511   RECYCLED

Not Reported in F.Supp.
(Cite as: 1994 WL 52568 (Jud.Pan.Mult.Lit.))

**In re WHITE CONSOLIDATED
INDUSTRIES, INC., ENVIRONMENTAL
INSURANCE COVERAGE
LITIGATION.
WHITE CONSOLIDATED INDUSTRIES,
INC.
v.
HARTFORD ACCIDENT & INDEMNITY
CO., et al., N.D. Ohio, C.A. No. 1:93-1967.
WHITE CONSOLIDATED INDUSTRIES,
INC.,
v.
HARTFORD ACCIDENT & INDEMNITY
CO., et al., E.D. Wisconsin, C.A. No. 2:93-
1011.**

**No. 996.**

Judicial Panel on Multidistrict Litigation.

Feb. 16, 1994.

Before JOHN F. NANGLE, Chairman,
MILTON POLLACK, [FN*] ROBERT R.
MERHIGE, JR., WILLIAM B. ENRIGHT,*
CLARENCE A. BRIMMER, JR., JOHN F.
GRADY, and BAREFOOT SANDERS, Judges
of the Panel.

TRANSFER ORDER

*JOHN F. NANGLE, Chairman.*

**\*1** This litigation consists of the two above-
captioned actions pending in the Northern
District of Ohio and the Eastern District of
Wisconsin, respectively. Before the Panel is a
motion, pursuant to 28 U.S.C. § 1407, by The
Travelers Indemnity Co. and Continental
Insurance Co. (two of the three defendants in
the two MDL-996 actions) for transfer of the
Wisconsin action to the Northern District of
Ohio for coordinated or consolidated pretrial
proceedings with the action pending there.
White Consolidated Industries, Inc. (White),
the plaintiff in both actions, opposes the
motion.

On the basis of the papers filed and the
hearing held, the Panel finds that the two
actions in this litigation involve common
questions of fact, and that centralization under

Section 1407 in the Northern District of Ohio
will best serve the convenience of the parties
and witnesses and promote the just and
efficient conduct of the litigation. White
brings both actions against the same three
insurance companies seeking to force them to
defend and indemnify White pursuant to the
terms of insurance policies issued to White by
the companies. The Wisconsin action contains
claims pertaining to environmental
contamination damage allegedly caused by
White subsidiaries at three sites, and the Ohio
action contains claims or counterclaims
pertaining to environmental contamination
damage allegedly caused by White
subsidiaries at fourteen other sites. The two
actions thus involve the same parties, the
same insurance policies, and the same
allegations by White that its actual or
potential liabilities for environmental
contamination are covered under defendants'
insurance policies. Centralization under
Section 1407 is necessary in order to eliminate
duplicative discovery of White and insurance
company witnesses, prevent inconsistent
pretrial rulings, and conserve the resources of
the parties, their counsel and the judiciary.

We are persuaded that the Northern District
of Ohio is the preferable forum. We note that:
1) the Ohio forum is more convenient--it is the
choice of the moving defendants and is the
location of the only opposing party's principal
place of business (thus many of White's
witnesses and documents are likely to be
found there, and any inconvenience to White
arising from transfer is likely to be greatly
minimized); and 2) the Ohio action is more
comprehensive by virtue of the total number
of involved sites.

IT IS THEREFORE ORDERED that,
pursuant to 28 U.S.C. § 1407, the above-
captioned action pending in the Eastern
District of Wisconsin be, and the same hereby
is, transferred to the Northern District of Ohio
and, with the consent of that court, assigned to
the Honorable Thomas D. Lambros for
coordinated or consolidated pretrial
proceedings with the action pending there.

FN* Judges Pollack and Enright took no part in the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
**(Cite as: 1994 WL 52568, \*1 (Jud.Pan.Mult.Lit.))**

decision of this matter.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

G

ALL-STATE® LEGAL  800-222-0510   E5511  RECYCLED

Not Reported in F.Supp.
(Cite as: 1996 WL 143826 (Jud.Pan.Mult.Lit.))
<KeyCite History>

## In re ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI).

### No. 875.

Judicial Panel on Multidistrict Litigation.

Feb. 16, 1996.

*1 Edgardo P. Gonzales v. Owens-Corning Fiberglas Corp., et al., N.D. California, C.A. No. 3:95-3705

Nicandor San Juan v. Owens-Corning Fiberglas Corp., et al., N.D. California, C.A. No. 3:95-3709

Catherine H. Simoneaux, et al. v. Exxon Corp., et al., M.D. Louisiana, C.A. No. 3:95-652

Faye Carlson, etc. v. Anchor Packing Co., et al., D. Oregon, C.A. No. 3:95-1337

Joseph R. Headley v. Anchor Packing Co., et al., D. Oregon, C.A. No. 3:95- 1543

Before JOHN F. NANGLE, Chairman, ROBERT R. MERHIGE, Jr., WILLIAM B. ENRIGHT, CLARENCE A. BRIMMER, JOHN F. GRADY, BAREFOOT SANDERS [FN*] and LOUIS C. BECHTLE, Judges of the Panel.

### TRANSFER ORDER

JOHN F. NANGLE, Chairman.

Presently before the Panel are motions, pursuant to Rule 12, R.P.J.P.M.L., 147 F.R.D. 589, 596 (1993), by plaintiffs in the five above-captioned N.D. California, M.D. Louisiana and D. Oregon actions requesting that the Panel vacate the portions of its orders conditionally transferring their respective action to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket before Judge Charles R. Weiner.

On the basis of the papers filed, [FN1] the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We find that transfer of these actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing centralization of all pending federal court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos containing products. See In re Asbestos Products Liability Litigation (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991). In particular, we note that in the Panel's original decision distinctions based on such matters as the pendency of motions or other matters before the transferor court, [FN2] the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the presence of unique or additional claims not relating to injury or death, and/or the unanimity of opposition to transfer by the parties to an action, were considered and rejected by the Panel as grounds for carving out exceptions to transfer in this extraordinary docket. We find no reason to depart from this approach in dealing with the question of transfer of the actions now before the Panel.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the five above-captioned actions be, and the same hereby are, transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FN* Judge Sanders took no part in the decision of this matter.

FN1.   The parties to the five actions waived oral argument and, accordingly, the question of Section 1407 transfer with respect to the actions was submitted on the briefs. Rule 17, R.P.J.P.M.L., 147 F.R.D. 589, 600-01 (1993).

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1996 WL 143826, *1 (Jud.Pan.Mult.Lit.))

FN2.  The plaintiffs in the California and Oregon actions have argued that transfer should be denied or deferred in order to permit the judges assigned the actions to rule on motions to remand to state court. There is no need to delay transfer in order to accommodate such interests. We note that: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer briefing on the question of transfer, the Panel hearing, and the issuance of the Panel's subsequent order 2) Panel Rule 18, R.P.J.P.M.L., supra, 147 F.R.D. at 601, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so those courts concluding that such issues should be addressed by the transferee judge need not rule on them and the process of 1407 transfer in MDL-875 can continue without any unnecessary interruption or delay

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works