JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 6 2000

FILED
CLERK'S OFFICE

**MDL 1358**

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | )   MDL Docket No. 1358 |
| Methyl Tertiary Butyl Ether ("MTBE") Products | ) |
| Liability Litigation | ) |
| | ) |

**RESPONSE OF DEFENDANTS AMERADA HESS CORPORATION AND
VALERO MARKETING AND SUPPLY COMPANY TO CERTAIN
DEFENDANTS' MOTION TO TRANSFER FOR COORDINATED OR
CONSOLIDATED PRETRIAL PROCEEDINGS UNDER 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and Rule 7.1(b) of the Rules of Procedure of the

Judicial Panel on Multidistrict Litigation, Defendants Amerada Hess Corporation

("Amerada Hess") and Valero Marketing and Supply Company ("Valero") hereby

respond as follows to the allegations in the motion to transfer filed on May 30, 2000 by

Defendants BP Amoco Corporation, Amoco Oil Company, Atlantic Richfield Company,

CITGO Petroleum Corporation, and Chevron U.S.A., Inc. (collectively, "Certain

Defendants") under 28 U.S.C. § 1407.

1.   In response to the allegations contained in paragraph 1 of the Motion,

Amerada Hess and Valero admit that the allegations contained in the complaints filed in

the actions *England, et al. v. Atlantic Richfield, et al.*, File Nos. 00-370-WDS, 00-371-

DRH (S.D. Ill.) and *Berisha, et al. v. Amerada Hess Corporation, et al.*, File No. 00-CIV

OFFICIAL FILE COPY
IMAGED JUN 28 '00

PLEADING NO. 10

1898 (SAS) (S.D.N.Y.) (the "Actions") are substantially similar, but maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

2.      In response to the allegations contained in paragraph 2 of the Motion, Amerada Hess and Valero admit the facts set forth in this paragraph.

3.      In response to the allegations contained in paragraph 3 of the Motion, Amerada Hess and Valero admit that the allegations contained in the complaints filed in the Actions are substantially similar, but maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

4.      In response to the allegations contained in paragraph 4 of the Motion, Amerada Hess and Valero admit that the allegations contained in the complaints filed in the Actions are substantially similar, but maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

5.      In response to the allegations contained in paragraph 5 of the Motion, Amerada Hess and Valero admit that the allegations contained in the complaints filed in the Actions are substantially similar, but maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

6.      In response to the allegations contained in paragraph 6 of the Motion, Amerada Hess and Valero maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the

MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

7.      In response to the allegations contained in paragraph 7 of the Motion, Amerada Hess and Valero admit that the allegations contained in the complaints filed in the Actions are substantially similar, but maintain, for the reasons set forth in the accompanying memorandum, that the Southern District of New York is the most apt forum for the MTBE actions, and will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

WHEREFORE, for the reasons set forth above and in the accompanying memorandum, Amerada Hess and Valero respectfully request that to the extent this Panel decides to coordinate and/or consolidate the actions, any such coordination and/or consolidation should take place in the United States District Court for the Southern District of New York.

Respectfully submitted,

Robert H. Shulman
Mindy G. Davis
Brent H. Allen
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 783-0800
(202) 383-6610 (fax)

Attorneys for Defendant
Amerada Hess Corporation

Dated:  June 26, 2000

Respectfully submitted,

*Steven L. Ceifer /JBF*

Of counsel:
Kenneth M. Bialo
BAKER BOTTS L.L.P.
599 Lexington Avenue
New York, NY  10022

Steven L. Leifer
Joshua B. Frank
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 639-7700
(202) 639-7890 (fax)

Attorneys for Defendant
Valero Marketing & Supply Company

Dated:  June 26, 2000

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 6 2000

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | )   MDL Docket No. 1358 |
| Methyl Tertiary Butyl Ether ("MTBE") Products | ) |
| Liability Litigation | ) |
|  | ) |

**MEMORANDUM IN SUPPORT OF RESPONSE OF DEFENDANTS AMERADA
HESS CORPORATION AND VALERO MARKETING AND SUPPLY COMPANY
TO CERTAIN DEFENDANTS' MOTION TO TRANSFER FOR COORDINATED
OR CONSOLIDATED PRETRIAL PROCEEDINGS UNDER 28 U.S.C. § 1407**

Defendants Amerada Hess Corporation ("Amerada Hess") and Valero Marketing

and Supply Company ("Valero") submit this memorandum in response to the motion to

transfer for consolidation of pretrial proceedings filed on May 30, 2000 by Defendants BP

Amoco Corporation, Amoco Oil Company, Atlantic Richfield Company, CITGO

Petroleum Corporation, and Chevron U.S.A., Inc. (collectively, "Certain Defendants")

under 28 U.S.C. § 1407.  The motion requests that the following two cases be

consolidated: *Berisha, et al. v. Amerada Hess, et al.*, File No. 00-CIV 1898 (SAS),

pending in the United States District Court for the Southern District of New York (the

"New York action"), and *England, et al. v. Atlantic Richfield Company, et al.*, Nos. 00-

370-WDS and 00-371-DRH, pending in the Southern District of Illinois (collectively,

"the East St. Louis actions").  Both of these actions are products liability putative class

1

actions involving Methyl Tertiary Butyl Ether ("MTBE") products.  While most of the

Certain Defendants are defendants in both the New York action and the East St. Louis

actions, Amerada Hess and Valero are defendants only in the New York action.  In

addition, five other defendants in the New York action also are not named in the East St.

Louis actions.

　　　　To the extent this Panel decides to coordinate and/or consolidate the New York

and East St. Louis actions, any such coordination and/or consolidation should take place

in the United States District Court for the Southern District of New York.  As discussed

below, the Southern District of New York is the most apt forum for the MTBE actions,

and will best serve the convenience of the parties and witnesses and promote the just and

efficient conduct of the litigation.

**I.　　　　THE NEW YORK ACTION IS SIGNIFICANTLY MORE
　　　　ADVANCED THAN THE EAST ST. LOUIS ACTIONS.**

　　　　This Panel repeatedly has recognized that the relative advancement of the cases to

be transferred is an important factor in determining where consolidated actions should lie.

*See, e.g., In re Litigation Arising from the Termination of the Retirement Plan for*

*Employees of Fireman's Fund Insurance Co.*, 422 F. Supp. 287, 291 (J.P.M.L. 1976)

("[W]e are persuaded that the District of New Jersey is the more preferable transferee

forum because ... the pretrial proceedings in the New Jersey action appear to be more

advanced than those in the Missouri action."); *In re L. E. Lay & Co. Antitrust Litigation*,

391 F. Supp. 1054, 1056 (J.P.M.L. 1975)  In particular, this Panel has cited the pendency

of substantive motions as a factor in choosing the transferee forum.  *See Glasstech, Inc. v.*

*AB Kyro OY*, 769 F.2d 1574, 1577 n.1 (Fed. Cir. 1985) ("[T]he stated policy of the

[MDL] Panel is to consider whether motions are pending in deciding whether and when

to transfer a case."); *In re L. E. Lay & Co. Antitrust Litigation*, 391 F. Supp. at 1056

("[W]e are reluctant to transfer any action that has an important motion under submission

with a court.").  Specifically, in a case where one judge has "conducted his first pretrial

conference ... and discovery has progressed under his careful supervision" for a period of
six months, this Panel found the judge's experience to be a "controlling" factor and held
that "the just and efficient conduct of these actions will be best furthered by their transfer
to a district wherein the assigned judge is already familiar with the proceedings and will
be able to insure that consolidated pretrial proceedings are conducted fairly and
expeditiously." *In re Multidistrict Private Civil Treble Damage Antitrust Litigation
Involving IBM*, 302 F. Supp. 796, 800 (J.P.M.L. 1969). *See also In re Multidistrict Civil
Antitrust Actions Involving Antibiotic Drugs*, 295 F. Supp. 1402, 1403 (J.P.M.L. 1968)
(emphasizing that "[t]he pretrial processes in the cases assigned to [the transferee judge]
are farther advanced than in any other action").

Because of the significant pre-trial motion and discovery practice that has taken
place in the New York action, versus the lack of any such activity in the East St. Louis
action, the *Berisha* and *England* cases should be consolidated in New York to the extent
the panel deems consolidation appropriate. The New York action has been pending in
federal court since March 10, 2000, and has been assigned to the Honorable Shira A.
Scheindlin, United Sates District Judge. The case has progressed substantially since the
complaint was filed. *See* Exhibit 1 (docket entries for the New York action). The New
York plaintiffs have amended their complaint once. The amended complaint is 51 pages
long and alleges eight causes of action, including strict liability, negligence, and fraud.
Two defendants have filed an answer to the amended complaint. *See* Exhibit 1 (docket
entries of June 19 and June 20, 2000). In accordance with the schedule established by the
court, a number of defendants filed an extensive motion to dismiss each claim. *See*
Exhibit 2 (Memorandum of Law in Support of the Joint Motion of Certain Defendants to
Dismiss the Amended Complaint). Plaintiffs' opposition to this motion must be filed on
August 7, 2000, and reply briefs are due on August 28, 2000.

Not only have there been substantive pleadings in the New York action, but
discovery is moving forward as well. Judge Scheindlin has entered a Confidentiality

Agreement and Order, governing the procedures for handling certain confidential material in the case. Exhibit 1 (docket entry of May 19, 2000). Plaintiffs already have reviewed documents from other MTBE cases as ordered by Judge Scheindlin. *See* Exhibit 3 (Transcript of Status Conference, dated April 24, 2000) at 34-35. Indeed, Judge Scheindlin already has issued an order regarding plaintiffs' review of such documents. *See* Exhibit 1 (docket entry of May 25, 2000). On June 5, 2000, defendants served their first set of requests for documents and interrogatories on plaintiffs. On April 24, 2000, Judge Scheindlin held a status conference and set dates for discovery and motion practice. Exhibit 3. Judge Scheindlin also has scheduled another status conference for July 21, 2000.

In contrast, no substantive events have occurred in the East St. Louis action. The East St. Louis actions were removed to federal court approximately six weeks ago. *See* Exhibits 4 and 5 (docket entries for each of the East St. Louis actions). Other than the plaintiffs' complaint, no substantive pleadings have been filed. *Id.* Indeed, as recently as May 31, 2000, Certain Defendants filed motions to stay all proceedings in each of the East St. Louis actions. *Id.*

## II.   JUDGE SCHEINDLIN IS EXPERIENCED WITH THE MTBE ISSUES IN THIS CASE, WITH MULTIDISTRICT LITIGATION, AND WITH COMPLEX CLASS ACTIONS.

This Panel has recognized the positive effect of transferring cases to a judge that is familiar with the cause of action and the issues that are likely to arise in litigation. *See, e.g., In re Ampicillin Antitrust Litigation*, 315 F. Supp. 317, (J.P.M.L. 1970) ("It is true that the availability of an experienced and capable judge familiar with the litigation is one of the more important factors in selecting a transferee forum ....").

Judge Scheindlin has already taken significant steps to move the New York action forward in terms of both discovery and substantive motion practice, and accordingly has greater familiarity with the issues than either of the judges in the Southern District of

4

Illinois. *See* Part II *supra. See also In re Panty Hose Seaming Patent Litigation*, 402 F. Supp. 1401, 1403 (J.P.M.L. 1975) (emphasizing the assigned judge's "opportunity to familiarize himself with the factual background of the dispute" and holding that "assignment to him is preferable because it will allow all parties and the judiciary to benefit from the expertise he has already gained in the matter").

In addition, Judge Scheindlin has presided over several complex class action suits involving such issues as environmental torts, Medicaid, securities fraud, tobacco, and mass torts. *See, e.g., Laborers Local 17 Health & Benefit Fund v. Phillip Morris, Inc.*, 7 F. Supp. 2d 277 (S.D.N.Y. 1998); *Rodriquez v. Bebuono*, No. 97 Civ. 0700, 1998 U.S. Dist. LEXIS 13112 (S.D.N.Y. Aug. 24, 1998). She also has presided over complex product liability actions. *See, e.g., Liriano v. Hobart Corp.*, No. 94 Civ. 5279, 1996 U.S. Dist. LEXIS 864 (S.D.N.Y. Jan. 30, 1996). In contrast, the judges assigned to the East St. Louis actions do not seem to have had experience presiding over these types of matters.

As a general matter, judges in the Southern District of New York have more experience with the issues at the core of the pending actions. According to the 1999 Annual Report of the Director of the United Stated Courts, the Southern District of New York had over 400 class actions pending as of September 30, 1999, and over 950 product liability cases commenced during the 1999 reporting year. *See* http://www.uscourts.gov/judbus1999/index.html at Tables X-4 and S-10. The Southern District of Illinois, by contrast, had only 11 class actions pending as of September 30, 1999, and 94 product liability actions commenced during the same reporting period. *Id.* Even though many more class action and product liability cases are filed in the Southern District of New York, the Southern District of New York is just as efficient in responding to its workload as the Southern District of Illinois, because the Southern District of New York encompasses approximately seven times as many judges as the Southern District of Illinois. *See, e.g., id.* at Table X-1A (indicating that for the 1999 reporting period, the

Southern District of New York averaged only 416 unweighted filings per judge, while the Southern District of Illinois averaged 413 unweighted filings per judge).

### III.  CONCLUSION

In their motion to transfer, Certain Defendants did not express any preference between the Southern District of New York and the Southern District of Illinois.  No other party has indicated any objection to transferring these matters to the Southern District of New York.  More defendants are only a party to the New York Action than those that are only parties to the East St. Louis Action.  For the reasons set forth above, the Southern District of New York is the most appropriate forum for these matters, if they are consolidated.

Respectfully submitted,

Robert H. Shulman
Mindy G. Davis
Brent H. Allen
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 783-0800
(202) 383-6610 (fax)

Attorneys for Defendant
Amerada Hess Corporation

Dated:  June 26, 2000

6

Respectfully submitted,

Steven L. Leifer /JBF

Of counsel:                          Steven L. Leifer
Kenneth M. Bialo                     Joshua B. Frank
BAKER BOTTS L.L.P.                   BAKER BOTTS L.L.P.
599 Lexington Avenue                 1299 Pennsylvania Ave., N.W.
New York, NY  10022                  Washington, D.C.  20004
                                     (202) 639-7700
                                     (202) 639-7890 (fax)

                                     Attorneys for Defendant
                                     Valero Marketing and Supply Company

Dated:  June 26, 2000

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 6 2000

FILED
CLERK'S OFFICE

1

PACER session date: Monday June 26, 2000 11:31:22 AM EDT
Case docket was last updated on: 06/23/00.


Docket as of June 23, 2000 10:03 pm                    Page 1

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

                        U.S. District Court
   Southern District of New York - Civil Database (Foley Square)

                CIVIL DOCKET FOR CASE #: 00-CV-1898

Berisha, et al v. Amerada Hess Corp., et al              Filed: 03/10/00
Assigned to: Judge Shira A. Scheindlin       Jury demand: Both
Demand: $0,000                               Nature of Suit: 385
Lead Docket: None                            Jurisdiction: Federal Question
Dkt # in State Court-Supreme : is 100884-00

Cause: 28:1452 Removal of Claim in Civil Action Related to BK. Case


DONNA BERISHA, on behalf of        Lewis Saul
herself and all others            [COR LD NTC]
similarly situated                5301 Wisconsin Avenue, N.W.
       plaintiff                  Suite 550
                                  Washington, DC 20015
                                  (202) 364-9700

                                  Stanley E. Margulies
                                  [COR LD NTC]
                                  Kurtzman, Karelson & Frank,
                                  L.L.P.
                                  230 Park Avenue
                                  23rd Floor
                                  New York, NY 10169
                                  (212) 867-9500


STEVEN C. GREENE, on behalf of     Lewis Saul
himself and all others            (See above)
similarly situated                [COR LD NTC]
       plaintiff
                                  Stanley E. Margolies
                                  [COR LD NTC]
                                  Kurtzman, Karelson & Frank,
                                  L.L.P.
                                  230 Park Avenue
                                  23rd Floor
                                  New York, NY 10169
                                  (212) 867-9500

MELANIE J. ARCURE, on behalf       Lewis Saul
of herself and all others         (See above)
similarly situated                [COR LD NTC]
    plaintiff

                                  Stanley E. Margolies
                                  (See above)
                                  [COR LD NTC]


Docket as of June 23, 2000 10:03 pm                    Page 2

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al


RON LA SUSA, on behalf of         Lewis Saul
himself and all others            (See above)
similarly situated                [COR LD NTC]
    plaintiff

                                  Stanley E. Margolies
                                  (See above)
                                  [COR LD NTC]


   v.


AMERADA HESS CORPORATION           Robert Shulman
    defendant        [COR LD NTC]
                                  Howrey & Simon
                                  1299 Pennsylvania Avenue, N.W.
                                  Washington, DC 20004-2402
                                  (202) 783-0800


BP AMOCO CORPORATION               James Andrew Langan
    defendant        [COR LD NTC]
                                  Mark S. Lillie
                                  [COR LD NTC]
                                  Kirkland & Ellis
                                  200 East Randolph Drive
                                  Chicago, IL 60601
                                  (312) 861-2000


CHEVRON CORPORATION                Peter C. Condron
    defendant        [COR LD NTC]
                                  Richard E. Wallace, Jr.
                                  [COR LD NTC]
                                  Anthony F. King
                                  [COR LD NTC]

```
                              Wallace, King, Marraro &
                              Branson, P.L.L.C.
                              1050 Thomas Jefferson St., N.W.
                              Washington, DC 20007
                              (202) 204-1000

                              Eric M. Kraus
                              [COR LD NTC]
                              Sedgwick, Deter, Moran & Arnold
                              125 Broad Street
                              39th Floor
                              New York, NY 10004
                              (212) 422-0202


CITGO PETROLEUM CORPORATION   Lisa Meyer
     defendant                [COR LD NTC]



Docket as of June 23, 2000 10:03 pm          Page 3

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

                              Nathan P. Eimer
                              [COR LD NTC]
                              Sidley & Austin
                              Bank One Plaza
                              10 South Dearborn
                              Chicago, IL 60603
                              (312) 853-7000

                              Katherine L. Adams
                              [COR LD NTC]
                              Sidley & Austin
                              875 Third Avenue
                              New York, NY 10022
                              (212) 906-2361


EXXON CORPORATION             Peter C. Condron
     defendant                (See above)
                              [COR LD NTC]
                              Richard E. Wallace, Jr.
                              (See above)
                              [COR LD NTC]
                              Anthony F. King
                              (See above)
                              [COR LD NTC]

                              Eric M. Kraus
                              (See above)
                              [COR LD NTC]
```

```
GETTY PETROLEUM CORPORATION       Charlotte A. Biblow
        defendant                   [term  05/08/00]
     [term  05/08/00]              [COR LD NTC]
                                   Rivkin, Radler & Kremer, L.L.P.
                                   EAB Plaza
                                   Uniondale, NY 11556
                                   (516) 357-3000


GULF OIL LTD. PARTNERSHIP         Mark E. Tully
        defendant                 [COR LD NTC]
                                  Goodwin, Procter & Hoar, L.L.P.
                                  Exchange Place
                                  Boston, MA 02109
                                  (617) 570-1289


MOBIL OIL CORPORATION             Peter C. Condron
        defendant                 (See above)
                                  [COR LD NTC]
                                  Richard E. Wallace, Jr.
                                  (See above)
                                  [COR LD NTC]


Docket as of June 23, 2000 10:03 pm              Page 4

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

                                  Anthony F. King
                                  (See above)
                                  [COR LD NTC]

                                  Eric M. Kraus
                                  (See above)
                                  [COR LD NTC]


SHELL OIL PRODUCTS COMPANY        Peter C. Condron
        defendant                 (See above)
                                  [COR LD NTC]
                                  Richard E. Wallace, Jr.
                                  (See above)
                                  [COR LD NTC]
                                  Anthony F. King
                                  (See above)
                                  [COR LD NTC]

                                  Eric M. Kraus
                                  (See above)
```

                              [COR LD NTC]


SUNOCO, INC.                  Robert Brager
     defendant               [COR LD NTC]
                             John Guttman
                             [COR LD NTC]
                             Beveridge & Diamond, P.C.
                             201 North Charles Street
                             Suite 2210
                             Baltimore, MD 21201
                             (410) 230-3850


TOSCO CORPORATION             Kenneth Pasquale
     defendant               [COR LD NTC]
                             Stroock, Stroock & Lavan,
                             L.L.P.
                             180 Maiden Lane
                             New York, NY 10038
                             (212) 806-5400


DOES 1 THROUGH 100, inclusive
     defendant


TEXACO INC.                   Peter C. Condron
     defendant               (See above)
                             [COR LD NTC]
                             Richard E. Wallace, Jr.
                             (See above)
                             [COR LD NTC]


Docket as of June 23, 2000 10:03 pm              Page 5

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

                              Anthony F. King
                              (See above)
                              [COR LD NTC]

                              Eric M. Kraus
                              (See above)
                              [COR LD NTC]


=========================


ATLANTIC RICHFIELD COMPANY

```
          defendant


UNITED REFINING COMPANY
      defendant


VALERO ENERGY, INC.
dba
Valero Marketing and Supply
Company
      defendant
```

Docket as of June 23, 2000 10:03 pm                 Page 6

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

3/10/00   1      NOTICE OF REMOVAL from Supreme State Court  County of New
                 York; State Court Case # 100884-00; FILING FEE $150.00.
                 RECEIPT # 369087. (em) [Entry date 03/13/00]

3/10/00   --      Magistrate Judge Ronald L. Ellis is so Designated. (em)
                 [Entry date 03/13/00]

3/10/00   2      RULE 1.9 CERTIFICATE filed by Texaco Inc. (em)
                 [Entry date 03/13/00] [Edit date 03/13/00]

3/10/00   3      NOTICE of notice of filing of notice of removal by Texaco
                 Inc. (sn) [Entry date 03/13/00] [Edit date 03/13/00]

3/22/00   4      ORDER; that the request for the pro hac vice admission of
                 Richard Wallace, and Anthony King to appear on behalf of
                 defts Texaco Inc., Chevron USA, Inc. (named by pltffs as
                 Chevron Corporation), Exxon Corporation, Mobil Oil
                 Corporation, and Shell Oil Products Company in this matter
                 is granted; the request for the pro hac vice admission of
                 Robert Jones, to appear on behalf of deft Texaco Inc. in
                 this matter is granted. ( signed by Judge Shira A.
                 Scheindlin ); Copies mailed. Document sent to Attorney
                 Admissions Clerk. (jp)

3/24/00   5      CERTIFICATE OF Mailing of a true and correct copy of the
                 Deft Texaco's Notice of Removal, Notice of Filing of Notice
                 of Removal and Notice of Notice of Filing of Notice of
                 Removal by Texaco Inc., by reg. mail on 3/14/00, to counsel
                 of record for both pltffs and defts (ls)
                 [Entry date 03/27/00]

4/12/00   6      ORDER; that the Motion for Admission Pro Hac Vice of
                 Visiting Attorneys, dated 4/7/00, with respect to Lewis J.

Saul, Jon Hinck, and Jennifer Martin-Frank in this case is
hereby granted. ( signed by Judge Shira A. Scheindlin );
Copies mailed; forwarded orig. document to the Atty.
Admissions Clerk. (pl)

4/24/00   --   Pretrial Conference held  before Judge Shira A. Scheindlin
. (jp) [Entry date 04/25/00]

4/28/00   7   Order admitting attorney pro hac vice; that Mark E. Tully
and Andrew R. Levin are admitted pro hac vice as counsel
for Gulf Oil Ltd. Partnership ( signed by Judge Shira A.
Scheindlin ); Copies mailed. Original document sent to
Attorney Admissions Clerk. (jp) [Entry date 05/01/00]

4/28/00   --   Received $50.00 in Cashiers Office on 4/28/00, Receipt
#372330. (jp) [Entry date 05/01/00]

5/1/00   --   Remark from cashiers' office on copy of pro hac vice Order
of 04/28/00 states: paid $75, receipt #372434 on 05/01/00
(djc) [Entry date 05/02/00]


Docket as of June 23, 2000 10:03 pm            Page 7

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

5/3/00   8   Transcript of record of proceedings  before Judge Shira A.
Scheindlin  for the date(s) of 03/17/00. (djc)

5/8/00   9   AMENDED COMPLAINT by Donna Berisha, Steven C. Greene,
Melanie J. Arcure, Ron La Susa  (Answer due 5/22/00 for
Texaco Inc., for Does 1 through 100, for Tosco Corporation,
for Sunoco, Inc., for Shell Oil Products, for Mobil Oil
Corp., for Gulf Oil Ltd., for Exxon Corporation, for Citgo
Petroleum, for Chevron Corporation, for BP Amoco
Corporation, for Amerada Hess Corp. ) amending against
Atlantic Richfield, United Refining, Valero Energy, Inc.;
Summons issued. (jp) [Entry date 05/09/00]

5/10/00   --   fld receipt of $25.00 fee re pro hac vice admission for
Lisa Meyer (cd) [Entry date 05/11/00]

5/11/00   --   Payment of fee for Pro Hac Vice admission in the amount of
$75.00, check #373206 on 5/11/00, for Richard C. Godfrey,
J. Andrew Lagan and Mark S. Lillie. (pl)
[Entry date 05/12/00]

5/11/00   10   ORDER; granting on admission pro hac vice of Richard C.
Godfrey, J. Andrew Langan and Mark S. Lillie as counsel to
BP Amoco Corpoartion; (signed by Judge Shira A. Scheindlin
); Copies mailed.  (docmt forwrded to Atty Admissions

Clerk) (djc) [Entry date 05/12/00]

5/19/00   11   CONFIDENTIALITY AGREEMENT AND ORDER; regarding procedures
                that will govern the handling of "Confidential Document(s),
                Information, or Other Things". ( signed by Judge Shira A.
                Scheindlin ); Copies mailed. (sn) [Entry date 05/22/00]

5/25/00   12   ORDER, for Katherine L. Adams to appear pro hac vice . ();
                Copies mailed. (djc)

5/25/00   12   ORDER the motion for Admission Pro Hac Vice of Lisa Meyer
                is allowed. Lisa Meyer is admitted pro hac vice as counsel
                for CITGO Petroleum Corporation; (signed by Judge Shira A.
                Scheindlin ); Copies mailed. (docmt forwarded to Atty
                Admissions Clerk) (djc)

5/25/00   13   ORDER; defts are to make available for inspection all
                documents produced in the Lake Tahoe and Santa Monica
                litigations. At this initial stage, defts are not required
                to make available documents produced in any other
                MTBE-related action. As litigation proceeds and the scope
                of discovery expands, defts may be required to make
                available those documents produced in MTBE-related actions
                other than the 2 California cases. Mr. Saul and Mr.
                Condron are directed to serve a copy of this letter order
                on all counsel. ( signed by Judge Shira A. Scheindlin );
                Copies mailed. (sn) [Entry date 05/26/00]


Docket as of June 23, 2000 10:03 pm          Page 8

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

6/7/00    --   Received payment at cashiers office on 6/7/00 for Pro Hac
                Vice fees in the amount of $25.00, check #375334 (pl)
                [Entry date 06/08/00]

6/9/00    14   Transcript of record of proceedings  before Judge Shira A.
                Scheindlin  for the date(s) of 4/24/00. (jp)

6/9/00    15   Order; that the request for the pro hac vice admission of
                Christopher S. Coleman, Esq. filed by Sedgwick, Detert
                Moran & Arnold, to appear on behalf of defendant Amerada
                Hess in the matter is hereby granted. ( signed by Judge
                Shira A. Scheindlin ); Copies mailed (Original forwarded to
                the Attorney Admissions Clerk) (ri) [Entry date 06/14/00]

6/16/00   16   STIPULATION AND ORDER of discontinuance; that the action is
                discontinued without prejudice as against Defendant Getty
                Properties Corp. and its related companies without costs to
                either party as against the other. ( signed by Judge Shira

                              A. Scheindlin ) (ri) [Entry date 06/20/00]

6/16/00   17      STIPULATION; that the time for deft Valero Energy, Inc. to
                  move, answer or otherwise respond to the First Amended
                  Complaint in this action is extended to and including
                  6/19/00. ( signed by Judge Shira A. Scheindlin) (jp)
                  [Entry date 06/20/00] [Edit date 06/21/00]

6/19/00   18      STIPULATION and ORDER; that Atlantic Richfield Company's
                  ("ARCO's") time to answer or otherwise move shall be
                  extended in accordance with the deadlines set forth in the
                  Court's Scheduling Order; ARCO will be joining in the
                  joint defts' motion to dismiss to be filed on 6/19/00. (
                  signed by Judge Shira A. Scheindlin ) (jp)
                  [Entry date 06/20/00]

6/19/00   19      ANSWER to Amended Complaint by Tosco Corporation (Attorney
                  Kenneth Pasquale from the Firm: Strook, Strook & Lavan). (jp)
                  [Entry date 06/20/00]

6/19/00   20      RULE 1.9 CERTIFICATE filed by Tosco Corporation . (jp)
                  [Entry date 06/20/00]

6/20/00   21      Affidavit of service as to Valero Energy, Inc. c/o CT
                  Corporation, by Nancy Schmidt on 5/24/00 . Answer due on
                  6/13/00 for Valero Energy, Inc. . (jp) [Entry date 06/22/00]
                  [Edit date 06/22/00]

6/20/00   22      Affidavit of service as to Atlantic Richfield c/o CT
                  Corporation by Nancy Schmidt on 5/24/00 . Answer due on
                  6/13/00 for Atlantic Richfield . (jp) [Entry date 06/22/00]

6/20/00   23      Affidavit of service as to United Refining c/o CT
                  Corporation, by Nancy Schmidt on 5/24/00 . Answer due on
                  6/13/00 for United Refining . (jp) [Entry date 06/22/00]


Docket as of June 23, 2000 10:03 pm                Page 9

Proceedings include all events.
1:00cv1898 Berisha, et al v. Amerada Hess Corp., et al

6/20/00   24      Affidavit of service as to Costal Oil New York, Inc. c/o CT
                  Corporation, by Nancy Schmidt on 5/24/00 . . (jp)
                  [Entry date 06/22/00]

6/20/00   25      Affidavit of service  by Nancy Schmidt on 5/24/00 . . (jp)
                  [Entry date 06/22/00]

6/20/00   26      Affidavit of service as to Atlantic Richfield, United
                  Refining, Valero Energy, Inc., Costal Oil New York, Inc.,
                  and Motiva Enterprises c/o CT Corporation, by Nancy Schmidt

on 5/24/00. (jp) [Entry date 06/22/00]

6/20/00   27      RULE 1.9 CERTIFICATE filed by Gulf Oil Ltd. . (pl)
                  [Entry date 06/22/00]

6/20/00   28      ANSWER to First Amended Class Action Complaint by Gulf Oil
                  Ltd.; (Attorney Mark E. Tully from the Firm: Goodwin,
                  Procter & Hoar LLP); jury demand. (pl) [Entry date 06/22/00]

6/22/00   29      NOTICE OF CROSS MOTION by Tosco Corporation to dismiss the
                  complaint purs to FRCP12(b)(6); for judgment on the
                  pleadings purs to FRCP 12(c); Return date 8/29/00 (cd)
                  [Entry date 06/23/00]

[END OF DOCKET: 1:00cv1898]


X----------------------------------------------------------------------X

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

DONNA BERISHA, *et al.*,

                Plaintiffs,

     v.

AMERADA HESS CORPORATION, *et al.*,

                Defendants.

-----------------------------------------------------------x

No. 00 CIV 1898 [SAS]

**MEMORANDUM OF LAW IN SUPPORT OF THE JOINT MOTION OF
CERTAIN DEFENDANTS TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

STATEMENT OF THE ALLEGATIONS ............................................................ 3

    A.    The "Contaminated Well Subclass" Plaintiffs ....................................... 3

    B.    The "Uncontaminated Well Subclass" Plaintiffs .................................... 4

    C.    The Complaint Fails To Identify Tortious Actions by
           Each Defendant ...................................................................................... 5

ARGUMENT ......................................................................................................... 8

I.    NONE OF THE NAMED PLAINTIFFS HAS ASSERTED
     VALID CAUSES OF ACTION AGAINST ANY DEFENDANT ................... 8

    A.    A Putative Class Representative Must Assert Valid Individual
           Causes of Action Against Each of the Defendants ................................. 8

    B.    None of the Plaintiffs Alleges Which Defendants Are
           Specifically Responsible for Their Claimed Injuries ............................. 9

II.    THE "UNCONTAMINATED WELL" PLAINTIFFS, ARCURI AND LA SUSA,
      LACK STANDING TO ASSERT A CAUSE OF ACTION ........................... 10

    A.    The Amended Complaint Does Not Allege Actual Damage or
           Physical Impact to the Properties of the "Uncontaminated Well" Plaintiffs. ....... 10

    B.    Plaintiffs Arcuri and La Susa Cannot Maintain a Claim for Damages
           Because They Do Not Allege Any Damage to Their Properties ......................... 11

    C.    Plaintiffs Arcuri and La Susa Also Lack Standing To Maintain
           a Claim for Testing To Determine Whether They Have a Valid
           Cause of Action .................................................................................... 13

III.    PLAINTIFFS' CLAIMS CHALLENGING DEFENDANTS' USE
      OF MTBE IN REFORMULATED GASOLINE ARE PREEMPTED UNDER
      FEDERAL LAW ........................................................................................... 15

    A.    Federal Law Preempts State Common-Law Tort Claims that Conflict
           with Federal Laws and Regulations ...................................................... 15

B.     Plaintiffs' Effort To Hold Defendants Liable for Their Selection of
MTBE from the Alternatives Available To Meet Clean Air Act
Requirements Is Preempted .......................................................................... 16

IV.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT
PRODUCTS LIABILITY BASED ON A FAILURE TO WARN.................................. 20

A.     Plaintiffs Do Not Assert That the Alleged Failure To Warn Proximately
Caused Their Purported Damages .................................................................. 21

B.     Plaintiffs Do Not Allege Facts Sufficient To Show that Defendants
Owed Plaintiffs a Duty To Warn .................................................................... 23

V.     PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT
LIABILITY FOR DESIGN DEFECT ................................................................. 25

A.     Plaintiffs Do Not Allege that the MTBE Allegedly Found in Their Wells
Resulted from Use of Gasoline in the Manner Normally Intended ..................... 25

B.     Plaintiffs Do Not Identify the Source of Their Alleged Injuries ........................... 26

C.     Plaintiffs Do Not Identify the Alleged Design Defect.......................................... 27

VI.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT
LIABILITY FOR MISREPRESENTATION, AS NEW YORK DOES NOT
RECOGNIZE THAT CAUSE OF ACTION ........................................................ 28

VII.   PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR FRAUD ...................... 29

A.     Plaintiffs Do Not Specify the False and Misleading Statements Defendants
Allegedly Made Regarding MTBE.................................................................. 29

B.     Plaintiffs Do Not Allege That They Were Aware of, Much Less Relied on,
Alleged Misrepresentations ........................................................................... 31

C.     The Alleged Damages Could Not Have Been Proximately Caused by the
Alleged Misrepresentations ........................................................................... 32

D.     Statements Made to EPA and Other Government Officials in the Course
of Lobbying Are Not Actionable .................................................................... 34

VIII.  PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR NEGLIGENCE ............ 35

A.     The "Uncontaminated Well Plaintiffs" Do Not Allege Any Damages
and Therefore Do Not Allege a Valid Negligence Claim..................................... 36

B.     The "Contamination Plaintiffs" Do Not Allege a Specific Claim of
       Negligence Against Any of the Defendants..........................................................37

IX.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM UNDER
       GENERAL BUSINESS LAW § 349 .................................................................................39

       A.     The Alleged "Deceptive Practices" Did Not Arise in the Context of a
              Commercial Transaction .................................................................................39

       B.     Plaintiffs Were Not Injured "By Reason Of" Defendants' Alleged
              Violations of GBL § 349.................................................................................40

X.     PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR PUBLIC
       NUISANCE .....................................................................................................................41

XI.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR PRIVATE
       NUISANCE .....................................................................................................................43

CONCLUSION.............................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*210 East 86th Street Corp. v. Combustion Eng'g, Inc.*, 821 F. Supp. 125 (S.D.N.Y. 1993)........ 26

*Ackerman v. Oryx Communications, Inc.*, 609 F. Supp. 363 (S.D.N.Y. 1984) .............................. 9

*Adams v. Star Enter.*, 51 F.3d 417 (4th Cir. 1995) .................................................................. 13

*Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715 (Mich. 1992) ..................................................... 13

*Adler v. Bureau of Professional Med. Conduct*, 211 A.D.2d 990, 622 N.Y.S.2d 609
    (3d Dep't 1995) ................................................................................................................. 30

*Alessandrini v. Weyerhauser Co.*, 207 A.D.2d 996, 617 N.Y.S.2d 101 (4th Dep't 1994).......... 23

*Allen v. Wright,* 468 U.S. 737 (1984) ........................................................................................ 40

*Amatulli v. Delhi Constr. Corp.*, 77 N.Y. 2d 525, 569 N.Y.S. 2d 337,
    571 N.E. 2d 645 (1991) ...................................................................................................... 9

*American Food & Vending Corp. v. IBM*, 245 A.D.2d 1089,
    667 N.Y.S.2d 545( 4th Dep't 1997) .................................................................................... 30

*Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422 (S.D.N.Y. 1999) ........................................... 25

*Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings,*
    2000 U.S. Dist. LEXIS 2919 (S.D.N.Y. 2000)...................................................................... 8

*Barnett Bank v. Nelson*, 517 U.S. 25 (1996).................................................................... 15, 16

*Bazerman v. Gardall Safe Corp.*, 203 A.D.2d 56, 609 N.Y.S. 610 (1st Dep't 1994) ............. 22, 23

*Belling v. Haugh's Pools, Ltd.,* 126 A.D.2d 958, 511 N.Y.S.2d 732 (4th Dep't 1987) ......... 21, 24

*Berg v. Underwood's Hair Adaption Process, Inc.*, 751 F.2d 136 (2d Cir. 1984) ................ 23, 24

*Berger v. Metra Elecs. Corp.*, 1994 U.S. Dist. LEXIS 3401 (S.D.N.Y. 1994) .............................. 9

*Berry v. Armstrong Rubber Co.*, 989 F.2d 822 (5th Cir. 1993), *cert. denied sub nom.*
    *Cooper v. Armstrong Rubber Co.*, 510 U.S. 1117 (1994) ....................................................... 13

*Boris v. Tops Mkts.*, 163 Misc. 2d 1088, 623 N.Y.S.2d 698 (Erie Co. 1995) .............................. 25

*Brenner v. American Cyanamid Co.*, 263 A.D.2d 165, 699 N.Y.S.2d 818 (4th Dep't 1999) ....... 27

*Burns Jackson Miller Summit & Spitzer v. Lindner*, 88 A.D.2d 50, 452 N.Y.S.2d 80
  (1st Dep't 1982), *aff'd*, 59 N.Y.2d 314, 451 N.E.2d 458,
  464 N.Y.S.2d 712 (1983)............................................................................................ 44

*Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 458,
  464 N.Y.S.2d 712 (1983)........................................................................................ 41-44

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) .................................... 16

*Carbone v. Alagna*, 239 A.D.2d 454, 658 N.Y.S.2d 48 (2d Dep't 1997).................... 22

*Chance v. BP Chems.*, 670 N.E.2d 985 (Ohio 1996).................................................. 13

*City of New York v. Lead Indus. Ass'n*, 241 A.D.2d 387, 660 N.Y.S.2d 422 (1st Dep't 1997) .... 32

*Cohen v. Standard Bank Inv. Corp.*, No. 97 Civ. 3802(SAS), 1998 WL 782024
  (S.D.N.Y. Nov. 6, 1998)............................................................................................ 36

*Coleman v. Chesebro-Whitman Co.*, 262 A.D.2d 265,
  690 N.Y.S.2d 729 (2d Dep't 1999) ........................................................... 21, 22, 24

*Conley v. Gibson*, 355 U.S. 41 (1957) .......................................................................... 8

*Copart Indus. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 362 N.E.2d 968,
  394 N.Y.S.2d 169 (1977)................................................................................ 41, 43, 44

*Copeland v. Weyerhaeuser Co.*, 124 A.D.2d 998, 509 N.Y.S.2d 227 (4th Dep't 1986)............... 41

*Cresser v. American Tobacco Co.*, 174 Misc. 2d 1, 662 N.Y.S.2d 374 (Kings Co. 1997) .......... 26

*Czerniejewski v. Steward-Glapat Corp.*, 236 A.D.2d 795,
  653 N.Y.S.2d 742 (4th Dep't 1997) .......................................................................... 23

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996)................................. 8, 28

*DeMartino v. United States*, 558 F. Supp. 1188 (E.D.N.Y. 1983) ............................... 36

*Dias v. Marriott Int'l*, 251 A.D.2d 367, 674 N.Y.S.2d 78 (2d Dep't 1998)........................... 21, 24

*DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242 (2d Cir. 1987)..................... 10

*Doll v. Digital Equip. Corp.*, No. 93-CV-0359E, 1996 WL 10711
  (W.D.N.Y. Mar. 6, 1996) ...................................................................................... 21, 24

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) .................... 34

*Eaton v. Newport Bd. of Educ.*, 975 F.2d 292 (6th Cir. 1992)....................................................... 34

*Elsroth v. Johnson & Johnson*, 700 F. Supp. 151 (S.D.N.Y. 1988) ............................................. 21

*Fane v. Zimmer, Inc.*, 927 F.2d 124 (2d Cir. 1991)....................................................................... 27

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) ........................... 36

*Fidelity Fed. Sav. & Loan Ass'n v. de la Questa*, 458 U.S. 141 (1982)................................... 15, 16

*Fisher v. Tynan*, 1993 U.S. Dist. LEXIS 8224 (S.D.N.Y. 1993)....................................................... 9

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995) ............................................... 29, 30

*Frank v. DaimlerChrysler Corp.*, No. 112945/99 (N.Y. Co. May 23, 2000) ......................... 12, 37

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)....................................................................... 16

*Fromer v. Yogel*, 50 F. Supp. 2d 227 (S.D.N.Y. 1999) ..................................................... 8, 29, 31

*Geier v. American Honda Motor Co.*, 68 U.S.L.W. 4425, 120 S. Ct. 1913
  (May 22, 2000) ............................................................................................................ 16, 17, 20

*Genesco Entertainment v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984)........................................... 39

*Goldhirsch v. Majewski*, 87 F. Supp. 2d 272 (S.D.N.Y. 2000) ............................................. 41, 43

*Gonzalez v. Morflo Indus.*, 931 F. Supp. 159 (E.D.N.Y. 1996)............................................. 22, 23

*Good Fund, Ltd.-1972 v. Church*, 540 F. Supp. 519 (D. Colo. 1982),
  *rev'd on other grounds sub nom. McKay v. United States*, 703 F.2d 464 (10th Cir. 1983)...... 13

*Halliday v. Norton Co.*, 265 A.D.2d 614, 696 N.Y.S.2d 549 (3d Dep't 1999) ..................... 12, 37

*Hamilton v. Accu-Tek*, 935 F. Supp. 1307 (E.D.N.Y. 1996) ........................................................ 35

*Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999).............................................................. 8

*Healey v. Firestone Tire & Rubber Co.*,
  87 N.Y.2d 596, 663 N.E.2d 901, 640 N.Y.S.2d 860 (1996) ................................................. 9, 26

*Hertz Corp. v. Avis Corp.*, 867 F. Supp. 208 (S.D.N.Y. 1994)................................................... 40

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ................................................................................... 16

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ........................................................................ 8

*Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 539 N.E.2d 1069,
541 N.Y.S.2d 941 (1989)..................................................................................... 26, 27

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), *cert. denied sub nom. General
Elec. Co. v. Ingrain,* 513 U.S. 1190 (1995)........................................................... 13

*In re Warfin Sodium Antitrust Litig.*, 1998 U.S. Dist. LEXIS 19555 (D. Del. 1998)................... 35

*Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir. 1990)........................................................... 26

*Kaufman v. Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970),
*cert. denied*, 401 U.S. 974 (1971)....................................................................... 9

*Kelly v. L.L. Cool J.*, 145 F.R.D. 32 (S.D.N.Y. 1992)................................................... 31

*Knier v. Albany Med. Cent. Hosp.*, 131 Misc. 2d 414,
500 N.Y.S.2d 490 (Albany Co. 1986)....................................................................... 24

*Kramer v. Pollack-Krasner Found.*, 890 F. Supp. 250 (S.D.N.Y. 1995)..................................... 39

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999) . 33

*Lancaster Silo & Block Co. v. Northern Propane Gas Co.*,
75 A.D.2d 55, 427 N.Y.S.2d 1009 (4th Dep't 1980)....................................................... 23

*Lewis v. General Elec. Co.*, 37 F. Supp. 2d 55 (D. Mass. 1999).......................................... 14

*Loewy v. Stuart Drug & Surgical Supply, Inc.*,
1999 U.S. Dist. LEXIS 1565 (S.D.N.Y. Feb. 11, 1999)..................................................... 28

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986)........................................................... 30

*Mangano v. United Finishing Serv. Corp.*, 261 A.D.2d 589,
690 N.Y.S.2d 680 (2d Dep't 1999)......................................................................... 23

*Manley v. New York Tel. Co.*, 303 N.Y. 18, 100 N.E.2d 113 (1951).......................................... 9

*McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997)..................................................... 28

*McDonald v. Gannett Publications*, 121 Misc. 2d 90, 467 N.Y.S.2d 300 (N.Y. Co. 1983) ........ 41

*McFarlane v. City of Niagara Falls*, 247 N.Y.340, 160 N.E. 391 (1928)..................................... 43

*McGinnis v. Tennessee Gas Pipeline Co.*,
No. 93-5393, 1994 U.S. App. LEXIS 12781 (6th Cir. May 31, 1994)....................................... 13

*McKay v. United States,* 703 F.2d 464 (10th Cir. 1983)................................................................. 13

*McMurry v. Inmont Corp.,* 264 A.D.2d 470, 694 N.Y.S.2d 157 (2d Dep't 1999) ....................... 38

*Mehlenbacher v. Akzo Nobel Salt, Inc.,* 71 F. Supp. 2d 179 (W.D.N.Y. 1999) ............... 11, 12, 37

*Mercer v. Rockwell Int'l Corp.,* 24 F. Supp. 2d 735 (W.D. Ky. 1998)........................................ 13

*Milbrand v. Smith & Wesson Corp.,*
   No. 96-CV-0806E(SC), 1998 WL 864885 (W.D.N.Y Dec. 1, 1998) ...................................... 38

*Millett v. Atlantic Richfield Co.,* No. CV-98-555 (Superior Ct. Cumberland Co., Maine) ...... 3, 32

*New York Pub. Interest Research Group v. Insurance Info. Inst.,*
   161 A.2d 204, 554 N.Y.S.2d 590 (1st Dep't 1990)................................................................. 39

*New York Trap Rock Corp. v. Town of Clarkstown,*
   299 N.Y. 77, 85 N.E.2d 873 (1949) ........................................................................................ 44

*Nietzke v. Williams,* 490 U.S. 319 (1989)...................................................................................... 8

*Ogden v. Star Enter.,* No. 94-2488, 1995 U.S. App. LEXIS 33686 (4th Cir., Dec. 4, 1995)....... 13

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
   85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995).................................................................................. 40

*Palsgraf v. Long Is. R.R. Co.,* 248 N.Y. 339 (1928)..................................................................... 24

*Pigliavento v. Tyler Equip. Corp.,* 248 A.D.2d 840, 669 N.Y.S.2d 747 (3d Dep't 1998), *lv.
   dismissed, lv. denied,* 92 N.Y.2d 868, 677 N.Y.S.2d 773 (1998)............................................ 23

*Port Auth. v. Arcadian Corp.,* 189 F.3d 305 (3d Cir. 1999)....................................................21-24

*Queens County Business Alliance v. New York Racing Ass'n,*
   98 A.D.2d 743, 469 N.Y.S.2d 448 (2d Dep't 1983)................................................................. 41

*Radigan v. Bristol Labs.,* 1989 U.S. Dist. LEXIS 17767 (S.D. Miss. 1989)............................... 35

*Raines v. Byrd,* 521 U.S. 811 (1997) ........................................................................................... 11

*Ramos v. Patrician Equities Corp.,* 765 F. Supp. 1196 (S.D.N.Y. 1991) ...................................... 9

*Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289 (1992)................................................ 35

*Red Rock Commodities, Ltd. v. ABN-Amro Bank*, 1995 U.S. Dist. LEXIS 18046
(S.D.N.Y. 1995)............................................................................................................ 32

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ............................................... 32

*Riddell Sports, Inc. v. Brooks*, 1997 U.S. Dist. LEXIS 3621 (S.D.N.Y. 1997)............................ 35

*Rose v. American Tobacco Co.*, 1997 N.Y. Misc. LEXIS 662 (N.Y. Co. 1997)...................... 9, 37

*Sabater v. Lead Indus. Ass'n*, 704 N.Y.S.2d 800 (Bronx Co. 2000) ............................................. 37

*Saks v. Petosa*, 184 A.D.2d 512, 584 N.Y.S.2d 321 (2d Dep't 1992) ..................................... 41, 42

*San Diego Bldgs. Trades Council v. Garmon*, 359 U.S. 236 (1959)...................................... 15, 20

*Santa Fe Ptnrshp. v. ARCO Prods. Co.*, 46 Cal. App. 4th 967,
54 Cal. Rptr. 2d 214 (Ct. App. 1996) .................................................................................... 13

*Schiller v. National Presto Indus., Inc.*, 225 A.D.2d 1053, 639 N.Y.S.2d 217
(4th Dep't 1996) ...................................................................................................................... 23

*Schimmenti v. Ply Gem Indus., Inc.*, 156 A.D.2d 658, 549 N.Y.S.2d 152
(2d Dep't 1989) ................................................................................................................. 21, 24

*Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 200 N.E. 824 (1936)..................... 36

*Schultz v. Navistar Int'l Transp. Corp.*, 103 F.3d 686 (2d Cir. 1996)......................................... 25

*Senart v. Mobay Chem. Corp.*, 597 F. Supp. 502 (D. Minn. 1984)............................................. 35

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987) ...................................... 31

*Simon v. Castello*, 172 F.R.D. 103 (S.D.N.Y. 1997) ................................................................. 10

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)..................................................... 8

*Small v. American Tobacco Co.*, 252 A.D.2d 1, 7, 679 N.Y.S.2d 593, 599 (1st Dep't 1998),
*aff'd sub nom. Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 698 N.Y.S.2d 615,
720 N.E.2d 892 (1999). .............................................................................................. 29, 31, 40

*Society of Plastics Indus. v. County of Suffolk*, 77 N.Y.2d 761, 573 N.E.2d 1034,
570 N.Y.S.2d 778 (1991)......................................................................................................... 40

*Spooner v. Sears Roebuck & Co.*, 161 A.D.2d 103, 554 N.Y.S.2d 540 (1st Dep't 1990)............. 23

*Spring-Gar Community Civic Ass'n v. Homes for the Homeless, Inc.,*
135 Misc. 2d 689, 516 N.Y.S.2d 399 (Queens Co. 1987)................................................ 41, 42

*Stancill v. E.I. du Pont de Nemours & Co.,*
No. 95-2560, 1996 U.S. App. LEXIS 11658 (4th Cir. May 21, 1996) ...................................... 12

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998)........................................ 10

*Suburban Restoration Co. v. ACMAT Corp.,* 700 F.2d 98 (2d Cir. 1983)................................ 35

*Swearingen v. Long,* 889 F. Supp. 587 (N.D.N.Y. 1995) ............................................ 41, 42

*Tompkins v. R.J. Reynolds Tobacco Co.,* 92 F. Supp. 2d 70 (N.D.N.Y. 2000) ........................... 32

*United Mine Workers v. Pennington,* 381 U.S. 657 (1965) ........................................... 34

*Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 450 N.E.2d 204 (1983)................................ 25

*Warren v. Forest Lawn Cemetery & Mausoleum,* 222 A.D.2d 1059, 635 N.Y.S.2d 874
(4th Dep't 1995) ................................................................................. 31

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) ....................................................... 10

*Wilson v. Amoco Corp.,* 33 F. Supp. 2d 981 (D. Wyo. 1998) ......................................... 13

*Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 423 N.Y.S.2d 95 (4th Dep't 1979) .......................... 38

*Younger v. Spartan Chem. Co.,* 252 A.D.2d 265, 686 N.Y.S.2d 152 (3d Dep't 1999) ................... 16

## Statutes

42 U.S.C. § 7545................................................................................ 15-20

GBL § 349..................................................................................... 37-41

## Rules

Fed. R. Civ. P. 8(a) ............................................................................ 27

Fed. R. Civ. P. 9(b) ..................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................. 1, 7, 8, 27

**Regulations**

Nineteenth Report of the Interagency Testing Committee to
the Administrator, 51 Fed. Reg. 41417 (Nov. 14, 1986)............................................................. 7

Testing Consent Order on Methyl Tert-Butyl Ether and Response to the
Interagency Testing Committee, 53 Fed. Reg. 10391 (March 31, 1988). .................................... 7

53 Fed. Reg. 1892 (Jan. 22, 1988) ............................................................................................. 7

53 Fed. Reg. 33846-903 (Sept. 1, 1988) .............................................................................. 15, 19

56 Fed. Reg. 31154 (July 9, 1991) ....................................................................................... 15, 19

6 NYCRR §§ 595-9, 612-14. ..................................................................................................... 22

**Other Authorities**

136 Cong. Rec. 10792 (1990)................................................................................................... 17

136 Cong. Rec. 3513 (1990) (remarks of Sen. Daschle) ........................................................... 18

136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ..................................................................... 18

136 Cong. Rec. H 2764 (remarks of Mr. Alexander) ................................................................ 18

136 Cong. Rec. S 16922 (1990) (remarks of Sen. Durenberger)................................................ 18

136 Cong. Rec. S 16954 (remarks of Sen. Chafee) ................................................................... 18

136 Cong. Rec. S 17252 (remarks of Sen. Simpson)................................................................. 18

136 Cong. Rec. S 17514 (remarks of Sen. Heinz) .................................................................... 18

136 Cong. Rec. S 17773-74 (remarks of Sen. Daschle) ............................................................ 18

136 Cong. Rec. S 2289 (remarks of Sen. Daschle).................................................................... 18

136 Cong. Rec. S 6459 (remarks of Sen. Daschle).................................................................... 18

1B New York Pattern Jury Instructions–Civil (3d ed. 2000) § 3:20 .......................................... 33

*Achieving Clean Air and Clean Water: Report of Blue Ribbon Panel
on Oxygenates in Gasoline* (Sept. 15, 1999). ........................................................................... 7

RESTATEMENT (SECOND) OF TORTS § 402B ............................................................................ 28

RESTATEMENT (SECOND) OF TORTS § 531 .............................................................................. 33

RESTATEMENT (SECOND) OF TORTS § 821C ........................................................................... 41

Defendants Amerada Hess Corp., Atlantic Richfield Co., BP Amoco Corp., CITGO Petroleum Corp., Exxon Corp., Mobil Oil Corp., Motiva Enterprises LLC, Shell Oil Products Co., Texaco Inc., and Valero Marketing and Supply Company[1] submit this memorandum in support of their motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

The amended complaint should be dismissed because no plaintiff alleges any valid cause of action against any of the defendants. The amended complaint contains vague, conclusory allegations on behalf of a purported class against defendants indiscriminately, without stating an actionable claim by any one plaintiff against any particular defendant. These failings cannot be excused as inartful pleading. Rather, the deficiencies in the amended complaint reflect fundamental flaws in plaintiffs' legal theories and claims.

Four named plaintiffs seek to act as representatives of two "subclasses" against numerous manufacturers, distributors and suppliers of gasoline products based on allegations that a gasoline additive known as methyl-tertiary butyl ether or "MTBE" may have contaminated their water wells. MTBE has been used in gasoline marketed in selected areas across the country mainly to reduce air pollution and to comply with federally-mandated clean air standards.

Two of the four plaintiffs allege that MTBE has been detected in their wells. They do not allege, however, how the MTBE reached their wells, where it came from or who was responsible for releasing it into the environment. They also do not allege that any particular defendant caused the contamination, much less that any defendant is liable to them as a result. The other two plaintiffs expressly allege that they do not know if their wells or properties have been

---

[1]      Valero Marketing and Supply Company was improperly named in the amended complaint as "Valero Energy Inc. d/b/a Valero Marketing and Supply Company." Any reference to "Valero" herein is to Valero Marketing and Supply Company.

affected at all.  They do not allege, for example, that any defendant released MTBE near their properties, yet they purport to bring a claim requiring all defendants to test their properties.  They seek to maintain the claim despite their own allegations which show that in all likelihood their wells are not impacted (for example, paragraphs 112-28 of the amended complaint cite studies indicating that MTBE was detected in only a very small percentage of wells tested).  These plaintiffs seek to maintain an unprecedented suit to compel an industry to test their wells to determine whether they have any basis for suing any particular member of the industry, despite their own allegations that in all likelihood there is no basis for any such suit.

Plaintiffs also assert vague claims against all defendants for fraud, misrepresentation, and deceptive business practices.  These claims suffer from a host of deficiencies, including the lack of any alleged misrepresentation about MTBE by any defendant, or any representation whatsoever by a defendant to a plaintiff, much less any misrepresentation to a plaintiff on which the plaintiff detrimentally relied.  Stripped of inflammatory rhetoric, the amended complaint at most alleges that some defendants advocated positions about MTBE before federal regulators, as defendants are privileged to do under the First Amendment's protections for petitioning the government.  Moreover, to the extent the claims challenge defendants' decisions to use MTBE, the claims are preempted under federal law because the federal government approved and even encouraged the use of MTBE to meet requirements of the Clean Air Act.

Given that the named plaintiffs have not asserted valid claims on their own behalf, the whole case should to be dismissed.  The fact that the plaintiffs seek to assert claims on behalf of a purported class is inconsequential at this stage.  If they cannot maintain their own claims, then they have no standing to maintain a class action and the case must be dismissed in its entirety.[2]

---

[2]    Although the class issues are not before the Court, it is worth noting that a state court in Maine recently rejected an effort by the same plaintiffs' counsel in this case to certify a class very similar to the class that plaintiffs'

## STATEMENT OF THE ALLEGATIONS

For purposes of this motion, the Court and defendants are constrained to accept as true all of the well-pled allegations of the amended complaint, although many of them are untrue, exaggerated or unfounded. The Court need not, however, accept conclusory allegations of law or plaintiffs' characterizations of facts, and when those are set aside, it becomes clear that plaintiffs fail to allege essential elements of each cause of action asserted.

The amended complaint purports to set forth claims on behalf of four named plaintiffs, who seek to represent two "subclasses." Plaintiffs Berisha and O'Brien seek to represent what the amended complaint calls the "contaminated well subclass," meaning all New Yorkers who own private water wells that contain some level of MTBE. Plaintiffs Arcuri and La Susa seek to represent a second subclass, the "uncontaminated well subclass," meaning all New Yorkers who own private water wells and have not tested them to determine if they contain MTBE.

### A.  The "Contaminated Well Subclass" Plaintiffs

Berisha and O'Brien allege that private wells that supply water to their properties have been impacted by MTBE. Berisha, identified only as a resident of West Harrison, Westchester County, pleads that her well is contaminated with a trace level of MTBE (less than the level of 10 ppb that New York deems acceptable for drinking water). (Am. Compl. ¶ 20.) Similarly, O'Brien, identified only as a resident of Laurel, Suffolk County, alleges that his well contains MTBE. (*Id.* ¶ 21.) Neither Berisha nor O'Brien identifies the specific locations of their properties; the alleged source of the MTBE in their wells; or which, if any, defendant caused contamination in their wells. Despite asserting claims under New York's consumer protection

---

counsel propose in this case. A copy of that decision, *Millett v. Atlantic Richfield Co.*, No. CV-98-555 (Superior Ct., Cumberland County, Maine), is submitted herewith (Tab A).

statute and a strict liability doctrine that applies only to consumers, neither Berisha nor O'Brien alleges any injury resulting from purchasing or consuming gasoline products containing MTBE.

Neither Berisha nor O'Brien alleges that they conducted any inquiry to determine the source of the contamination they allege, nor do they allege that identifying the source is difficult, much less impossible. Instead, both merely rest on their allegations that their wells are contaminated, and seek to impose liability on all defendants solely on the basis that they manufactured or marketed gasoline containing MTBE, regardless of whether a particular defendant could have caused their alleged damage.

Moreover, despite vague allegations that defendants made false and misleading statements regarding MTBE, neither Berisha nor O'Brien alleges when they became aware of those statements, if ever. Likewise, neither Berisha nor O'Brien identifies any action that they took or failed to take due to the alleged misrepresentations, nor do they explain the causal connection between the alleged misstatements and their alleged injuries.

### B.  The "Uncontaminated Well Subclass" Plaintiffs

Plaintiffs Arcuri and La Susa admit they have never tested their wells for MTBE and have no idea whether their wells are contaminated. (Am. Compl. ¶¶ 22-23.) They do not even allege facts to show that their wells are threatened. They do not allege, for example, that neighboring properties are contaminated, that there has been any spill or release of gasoline near their properties, or that MTBE-containing gasoline is even used or sold nearby.

These "uncontaminated well subclass" plaintiffs seek money damages for alleged diminution in property value, even though their properties are not known to be contaminated. Plaintiffs allege throughout the amended complaint that they seek damages for mere "stigma," rather than for actual, compensable injury: "the Uncontaminated Well Subclass [seeks] to

recover for lost property value, stigma damages, loss of use and enjoyment and all other costs." (Am. Compl. ¶ 17b; see also *id.* ¶¶ 24, 113, 169, 190.)  Under plaintiffs' theory, every owner of an uncontaminated well in New York State would be entitled not only to testing at defendants' expense, but also to compensatory and punitive damages, despite their lack of an injury.

Arcuri and La Susa also seek to recover damages based on alleged misrepresentations about MTBE, but like Berisha and O'Brien, neither alleges specific misrepresentations by any defendant.  Nor do they allege when, if ever, they became aware of such alleged misstatements, or any action they took or failed to take in reliance on alleged misrepresentations.

### D.   The Complaint Fails To Identify Tortious Actions by Each Defendant.

The amended complaint largely focuses on an alleged "conspiracy" among defendants to defraud "government officials and the general public" regarding the properties of MTBE.  (Am. Compl. ¶¶ 46-49.)  Despite its overall length, however, the amended complaint is remarkably short on the specifics of this alleged conspiracy.  Contrary to federal pleading requirements, it contains no information regarding the particulars of the alleged "agreement" among defendants, and although plaintiffs devote a large segment of their amended complaint to general allegations of misleading statements that the "oil industry" made about MTBE, plaintiffs fail to identify *any* statement by Amerada Hess, Chevron, CITGO, Coastal, Exxon, Gulf, Mobil, Motiva, Shell, Sunoco, Texaco, Tosco, United or Valero to either government regulators or the public.  Furthermore, the amended complaint fails to allege that any defendant is responsible in any way for releases of gasoline containing MTBE that allegedly contaminated plaintiffs' wells.  Indeed, aside from the caption and jurisdictional allegations, the amended complaint barely makes reference to any individual defendant.

- Texaco's name appears in the substantive allegations of the amended complaint only twice:  in paragraphs stating that Texaco was a member of the "MTBE Committee,"

(¶ 77), and that Texaco entered into a 1988 Testing Consent Decree with the U.S. Environmental Protection Agency (¶ 83).

- Chevron is mentioned three times: in a paragraph discussing an internal Chevron memorandum that plaintiffs do not allege was distributed and that plaintiffs apparently accept was accurate (¶ 68); in another paragraph discussing a Chevron internal paper that plaintiffs also claim was accurate (¶ 90); and in yet another paragraph stating that Chevron "now concede[s] that [MTBE] is a serious groundwater contaminant," which again plaintiffs claim is true (¶ 139).

- Exxon's name appears four times:  in a paragraph alleging that it made a presentation to EPA seeking approval of the use of MTBE without further testing, a presentation which plaintiffs do not allege contained any false or misleading information (¶ 76); in an allegation that Exxon was a member of the "MTBE Committee" (¶ 77); in an allegation that Exxon entered into a Testing Consent Order with EPA (¶ 83); and in an allegation quoting a press release from ExxonMobil stating that today's cleaner burning fuels do not require oxygenates, which plaintiffs also claim is true (¶ 141).

- Mobil is referenced twice:  in a paragraph about a Mobil laboratory report on MTBE, which plaintiffs allege was accurate (¶ 67); and in a paragraph stating that Mobil collected data on MTBE contamination (¶ 117).

- Shell appears only once, in a paragraph stating that Shell, in an internal memorandum, "acknowledge[d] the bad facts about MTBE" (¶ 79).

- BP Amoco's name appears three times: in a paragraph alleging BP Amoco said the Garrett-Moreau report (or some part of it) "isn't true" (¶ 69); in a paragraph alleging BP Amoco was part of the "MTBE Committee" (¶ 77); and alleging BP Amoco signed the 1988 Testing Consent decree with EPA (¶ 83).

- ARCO is mentioned three times: in a paragraph alleging ARCO "downplayed" the risks of MTBE (¶ 75); in a paragraph alleging that it made a presentation to EPA, a presentation plaintiffs do not allege contained any false or misleading information (¶ 76); and alleging ARCO was a member of the "MTBE Committee" (¶ 77).

- Aside from the caption and jurisdictional allegations, Amerada Hess, CITGO, Coastal, Motiva, United and Valero are not mentioned at all.

The only specific statements attributed to a defendant in the amended complaint that

plaintiffs allege to be "untrue," "false," or "misleading" are the following:

- An alleged public statement by defendant BP Amoco that a 1986 report prepared by Peter Garrett and others, which, according to plaintiffs, concluded that MTBE posed a risk to drinking water, "isn't true" (¶ 69).

- Statements by Atlantic Richfield Company that allegedly "downplayed the risks of MTBE to water" (¶ 75).

- Written comments made by the MTBE Committee to EPA in 1987 that plaintiffs claim "exaggerat[ed] the environmental benefits of MTBE while understating or completely neglecting to mention the real environmental hazards" (although the specific "exaggerations" and "misrepresentations" are not identified) (¶¶ 78-79, 82), and that reported on a Japanese study showing that MTBE has "excellent biodegradation characteristics" (¶ 81).

- Alleged misrepresentations by "the oil industry, including Defendants" to EPA that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore further testing was not required (¶ 83).

Nowhere is there a single allegation that any defendant made a false or misleading statement to any plaintiff, that any plaintiff was aware of such statements, or that any plaintiff took, or failed to take, any action in reliance on any of the alleged statements.

Virtually all of the allegedly "false and misleading" statements attributed to "Defendants" are alleged to have been made in the course of dealings with EPA over the use of MTBE as an oxygenate in reformulated gasoline to meet the mandates of the federal Clean Air Act.[3]

_____

[3]     The notion that defendants "defrauded" federal regulators or anyone else about MTBE is demonstrably false based on the very documents plaintiffs cite in their amended complaint, and other documents in the public record. For example, the following public records show that in the mid-1980s EPA was aware of the very environmental risks that plaintiffs allege the oil industry concealed:

"Persistence [of MTBE] in ground water following spills is unknown, but it may persist for long periods if volatilization is prevented, since MTBE is not likely to be readily biodegraded or otherwise transformed in ground water." Nineteenth Report of the Interagency Testing Committee to the Administrator, 51 Fed. Reg. 41417, 41425 (Nov. 14, 1986) (cited in Am. Compl. ¶ 74 & n.2.)

"[EPA] has recently identified MTBE as a high-risk-chemical for contamination of drinking water supplies and their sources . . . . Because of the potential for widespread contamination, EPA is listing MTBE on the first [Drinking Water Priority List]." 53 Fed. Reg. 1892, 1901 (Jan. 22, 1988) (adding MTBE to EPA's "Priority List of Drinking Water Contaminants").

"MTBE is relatively water soluble . . . . This solubility . . . indicates the potential ground water contamination problem." Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 10391, 10392 (March 31, 1988) (cited in Am. Compl. ¶ 83 & n.4.)

Fully aware of these concerns, EPA, at Congress's direction, went ahead with the reformulated gasoline program, knowing that because ethanol (the chief alternative to MTBE) was not (and still is not) manufactured in sufficient

## ARGUMENT

Under Fed. R. Civ. P. 12(b)(6), a complaint must be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings*, 2000 U.S. Dist. LEXIS 2919, *10 (S.D.N.Y. 2000) (Scheindlin, J.) (Tab B), quoting *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Although well-pled facts must be accepted as true, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Fromer v. Yogel*, 50 F. Supp. 2d 227, 232 (S.D.N.Y. 1999) (Scheindlin, J.), quoting *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996). If the facts a plaintiff alleges do not fit within a cognizable legal theory, the motion to dismiss should be granted. *Nietzke v. Williams,* 490 U.S. 319, 326-27 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

I.    **NONE OF THE NAMED PLAINTIFFS HAS ASSERTED
      VALID CAUSES OF ACTION AGAINST ANY DEFENDANT.**

      A.    **A Putative Class Representative Must Assert Valid Individual
            Causes of Action Against Each of the Defendants.**

Plaintiffs cannot avoid the necessity of alleging valid individual causes of action by seeking designation as "class representatives." The Supreme Court has stated that "named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and purport to represent.'" *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (citation omitted). In keeping with this fundamental tenet, courts have emphasized that "a

---

quantities to meet gasoline demand, gasoline manufacturers would be required to use MTBE to meet EPA requirements. *Achieving Clean Air and Clean Water: Report of EPA Blue Ribbon Panel on Oxygenates in Gasoline*, at 61 (Sept. 15, 1999) (cited in Am. Compl. ¶ 93 & n.7.)

predicate to a plaintiff's right to represent a class is his eligibility to sue in his own right. What

he may not achieve himself, he may not accomplish as a representative of a class." *Ackerman v.*

*Oryx Communications, Inc.,* 609 F. Supp. 363, 376 (S.D.N.Y. 1984), quoting *Kaufman v.*

*Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970), *cert. denied*, 401 U.S. 974 (1971); *Berger v.*

*Metra Elecs. Corp.*, 1994 U.S. Dist. LEXIS 3401, *9-10 (S.D.N.Y. 1994) (Tab C); *Fisher v.*

*Tynan*, 1993 U.S. Dist. LEXIS 8224, *12 (S.D.N.Y. 1993) (Tab D). Moreover, *each* putative

class representative must state a valid claim against *each* named defendant. *Ramos v. Patrician*

*Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("[a] plaintiff, including one who is

seeking to act as a class representative, must have individual standing to assert the claims in the

complaint against each defendant being sued by him"). Because none of the putative class

representatives has stated a cognizable claim for relief here, this action must be dismissed.

**B.      None of the Plaintiffs Alleges Which Defendants Are
           Specifically Responsible for Their Claimed Injuries.**

Under New York law, a plaintiff must identify the defendant that allegedly caused her

damages and that defendant's connection to the injury. *See, e.g., Healey v. Firestone Tire &*

*Rubber Co.*, 87 N.Y.2d 596, 601-02, 663 N.E.2d 901, 903, 640 N.Y.S.2d 860 (1996) (plaintiff in

products liability action must identify maker of injury-causing product); *Manley v. New York Tel.*

*Co.*, 303 N.Y. 18, 25, 100 N.E.2d 113, 116 (1951) ("plaintiff must establish first and foremost

the nature of the instrumentality which is alleged to have caused the injury . . . and its identity

with the defendant"). Thus, plaintiffs "must plead and prove a causal relationship between the

injury complained of and the actions of each defendant." *Rose v. American Tobacco Co.,* 1997

N.Y. Misc. LEXIS 662, *6 (N.Y. Co. 1997) (Tab E), citing *Amatulli v. Delhi Constr. Corp.,* 77

N.Y. 2d 525, 569 N.Y.S. 2d 337, 571 N.E. 2d 645 (1991). This is particularly so where plaintiffs

allege fraud against multiple defendants. In such cases, Fed. R. Civ. P. 9(b) requires that the

complaint allege sufficient facts to apprise each defendant of their contribution to the alleged

fraud. *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Simon v.*

*Castello*, 172 F.R.D. 103, 106 (S.D.N.Y. 1997).

Here, the amended complaint fails to provide the most basic factual information

necessary to plead a claim for relief. Plaintiffs' claims fail to identify the defendant(s) allegedly

responsible for contaminating their wells or causing their damages. Plaintiffs' fraud,

misrepresentation, and deceptive business practice claims are especially deficient because they

lack the particularity required under Fed. R. Civ. P. 9(b), and fail to allege essential elements of

the claims. Moreover, two of the named plaintiffs fail to allege any compensable injury.

## II.   THE "UNCONTAMINATED WELL" PLAINTIFFS, ARCURI AND LA SUSA, LACK STANDING TO ASSERT A CAUSE OF ACTION.

### A. The Amended Complaint Does Not Allege Actual Damage or Physical Impact to the Properties of the "Uncontaminated Well" Plaintiffs.

The claims of named plaintiffs Arcuri and La Susa and the "uncontaminated well

subclass" are fatally deficient because they do not allege any facts which, if true, would establish

that they have sustained actual injury. Both Arcuri and La Susa admit they have no idea whether

their wells contain MTBE and have not tested the wells to find out. (Am. Compl. ¶¶ 22-23.)

Plaintiffs apparently believe that they are not obligated to plead such facts, because the

amended complaint is replete with references to so-called "stigma" damages, meaning damages

for alleged diminution in property value caused solely by perception, even if the property itself is

not contaminated. Courts in New York and elsewhere do not recognize claims for "stigma"

damages, and therefore these plaintiffs have not pled facts sufficient to state a valid claim that

demonstrates the type of "actual injury" or "injury-in-fact" needed for standing.

Article III of the United States Constitution empowers federal courts to decide only "cases or controversies." Consistent with this constitutional limitation, a plaintiff must have standing to assert the claims alleged. *Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("[o]ne element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must have standing to sue"). To establish such standing, a plaintiff must allege "that he has suffered an 'injury in fact.' That injury, we have emphasized repeatedly, must be concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S. Ct. 1003, 1017 (1998) ("this triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement"). The Supreme Court has stressed that the alleged injury in fact must be "legally and judicially cognizable." *Raines*, 521 U.S. at 819.

### B. Plaintiffs Arcuri and La Susa Cannot Maintain a Claim for Damages Because They Do Not Allege Any Damage to Their Properties.

In New York, courts have held that mere diminution in property value is not enough to recover tort damages; rather, plaintiffs must demonstrate an actual impact upon their property. In *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 71 F. Supp. 2d 179 (W.D.N.Y. 1999), plaintiffs who owned surface property above and/or near a collapsed salt mine sought "stigma" damages on the theory that the market value of their properties decreased "due to public fear of future surface damage, *i.e.*, so-called 'stigma' damage." *Id.* at 181. Finding that "the threshold issue is whether, even assuming that there has been a decrease in the property's value ..., plaintiffs are entitled to recover damages for that decrease," *id.* at 182, the court examined "relevant cases from other jurisdictions" and found that "[i]n the absence of actual physical damage to a plaintiff's property, stigma damages alone are too remote and speculative to be recoverable." *Id.* at 185. Accordingly, the court concluded:

[T]he widely accepted if not universal view among the courts in this country is that causing the value of another's property to diminish is not in and of itself a basis for tort liability.  Something more – physical invasion or damage, or unreasonable interference with that person's use and enjoyment of the property – is required.

*Id.* at 188.  As a result, the court held that property owners in a tort action seeking damages for diminution in value could not recover unless they were able to demonstrate "(1) that their property has been physically damaged, or that their use and enjoyment has been unreasonably interfered with, by defendant's actions, and (2) either that the trespass or nuisance thus created cannot be fully remediated, or that cost of remediation would exceed the amount by which the value of property has been diminished." *Id.*  The court dismissed the claims of those plaintiffs who only sought damage for diminution in property value unrelated to actual physical damage. *Id.* at 193.

Similarly, in *Halliday v. Norton Co.*, 265 A.D.2d 614, 696 N.Y.S.2d 549 (3d Dep't 1999), the court affirmed summary judgment dismissing negligence and nuisance claims seeking damages for diminution in property values, arising from "stigma" caused by defendants' construction of a landfill adjacent to plaintiffs' properties.  The court held that "alleged consequential damages emanating, in part, from the adverse publicity associated with the landfill were [ ] not proven to have arisen from the migration of toxins or from defendants' actions." *Id.* at 617, 696 N.Y.S.2d at 551.  *Accord Frank v. DaimlerChrysler Corp.*, No. 112945/99 (N.Y. Co. May 23, 2000) (Tab F) (dismissing claims for negligence, fraud and unfair trade practices seeking costs to repair defective car seat where alleged defect had not and might never manifest itself).[4]

---

[4]      The New York rule applied in *Mehlenbacher* and *Halliday* is consistent with decisions from across the country dismissing claims for diminution in property value in the absence of actual physical impact on plaintiffs' property. *See, e.g., Stancill v. E.I. du Pont de Nemours & Co.*, No. 95-2560, 1996 U.S. App. LEXIS 11658 (4th Cir. May 21, 1996) (Tab G) (in action alleging contamination of nearby areas, "without physical damage to [plaintiffs']

Given the candid admission that plaintiffs Arcuri and La Susa do not know whether their properties are damaged, they cannot maintain claims for property damages. New York case law is clear on that point. Their claims for damages must therefore be dismissed.

### C. Plaintiffs Arcuri and La Susa Also Lack Standing To Maintain a Claim for Testing To Determine Whether They Have a Valid Cause of Action.

Plaintiffs' demand for injunctive relief does not eliminate the standing requirements they fail to meet. The amended complaint seeks "[a]n order to compel Defendants to conduct or pay for Court-approved sampling and analysis for detectable quantities of MTBE in the private well water of all class members in the state of New York whose water has not been sampled and analyzed for MTBE within the last calendar year, and to repeat this procedure once annually so long as gasoline containing MTBE is still sold in New York." (Am. Compl. p. 50.) In essence, plaintiffs do not allege any injury in fact; rather, they ask that the Court order defendants to determine which plaintiffs, if any, may have sustained an injury in fact. This approach puts the proverbial cart before the horse. More to the point, this approach offends the constitutional requirement of an injury in fact necessary to confer standing.

---

properties as opposed to mere diminution of property value or emotional distress, none of the causes of action – trespass, nuisance per accidens, or negligence – can be sustained under North Carolina law"); *Ogden v. Star Enter.*, No. 94-2488, 1995 U.S. App. LEXIS 33686 at *2-*3 (4th Cir., Dec. 4, 1995) (Tab H) ("Every court that has addressed the issue, including this one, has limited recovery to those plaintiffs who can show that their property has been actually contaminated or that they have suffered actual physical harm. Neither fear of harm nor diminution in property value resulting from mere proximity to the plume is enough"); *Adams v. Star Enter.*, 51 F.3d 417, 423-25 (4th Cir. 1995) (same; plaintiffs could not recover damages for alleged diminution in property values due to nearby contamination "absent a showing of a physical impact or physical injury" from the contamination); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993) (court rejected claim for damages from contamination on adjacent property, stating: "Plaintiffs have cited no case, and the court has found none, holding that Mississippi common law allows recovery for a decrease in property value caused by a public perception without accompanying physical harm to the property"), *cert. denied sub nom. Cooper v. Armstrong Rubber Co.*, 510 U.S. 1117 (1994); *McGinnis v. Tennessee Gas Pipeline Co.*, No. 93-5393, 1994 U.S. App. LEXIS 12781 (6th Cir. May 31, 1994) (Tab I); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 798 n.64 (3d Cir. 1994), *cert. denied sub nom. General Elec. Co. v. Ingrain*, 513 U.S. 1190 (1995); *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 981, 986 (D. Wyo. 1998); *Mercer v. Rockwell Int'l Corp.*, 24 F. Supp. 2d 735, 744 (W.D. Ky. 1998); *Santa Fe Ptnrshp. v. ARCO Prods. Co.*, 46 Cal. App. 4th 967, 54 Cal. Rptr. 2d 214 (Ct. App. 1996); *Chance v. BP Chems.*, 670 N.E.2d 985 (Ohio 1996); *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715 (Mich. 1992); *Good Fund, Ltd.-1972 v. Church*, 540 F. Supp. 519 (D. Colo. 1982), *rev'd on other grounds sub nom. McKay v. United States*, 703 F.2d 464 (10th Cir. 1983).

A federal district court in Massachusetts recently declined to issue an injunction requiring "testing" virtually identical to that sought here. In *Lewis v. General Elec. Co.*, 37 F. Supp. 2d 55 (D. Mass. 1999), the plaintiff brought suit, for herself and those similarly situated, based on the defendant's alleged historic practice of disposing of PCB-contaminated soils in plaintiff's neighborhood. As in this case, the plaintiff did not know if her property was contaminated, and alleged that she could not afford the testing necessary to determine whether the contamination had impacted her property. For that reason, she sought a mandatory preliminary injunction requiring the defendant to test her property. The court held that plaintiff simply could not meet the standard for mandatory relief:

> Indeed, plaintiff's request is particularly unusual because plaintiff asks this court to order GE to incur the cost of investigating plaintiff's case against GE. Normally, of course, a plaintiff bears the cost of determining whether and to what extent she has been injured. . . . To allow plaintiff's motion in this case would be to shift plaintiff's initial investigative costs to the defendant.

37 F. Supp. 2d at 63.

The court further held that plaintiff could not show an irreparable injury entitling her to injunctive relief. Plaintiff wanted the defendant to pay for testing. "But in the context of the injunctive relief analysis, 'if money damages will fully alleviate harm, then the harm cannot be said to be irreparable.' In this case, not only will money damages fully alleviate the harm, they are precisely what plaintiff seeks." *Lewis*, 37 F. Supp. 2d at 63-64 (citation omitted).

The order that the "uncontaminated well subclass" seeks here is no different than the injunction rejected in *Lewis*. As in *Lewis*, plaintiffs do not state that their properties have been physically impacted; instead, they allege that their properties *may* be impacted. As in *Lewis*, the injunction plaintiffs seek would shift the Rule 11 burden of investigating plaintiffs' claims to defendants and require defendants to pay damages – *i.e.,* the costs of testing – even in the

absence of injury. By not alleging an injury in fact, plaintiffs have failed to meet the minimum

requirements necessary to establish standing to seek redress, and their claims must be dismissed.

### III. PLAINTIFFS' CLAIMS CHALLENGING DEFENDANTS' USE OF MTBE IN REFORMULATED GASOLINE ARE PREEMPTED UNDER FEDERAL LAW.

Defendants produced reformulated gasoline containing MTBE to meet federally-

mandated oxygenated fuel requirements under the 1990 Clean Air Act Amendments. 42 U.S.C.

§ 7545(k), (m). Pursuant to its authority to regulate fuels, EPA specifically approved MTBE as

an acceptable fuel oxygenate to meet those requirements. 53 Fed. Reg. 33846-903 (Sept. 1,

1988); 56 Fed. Reg. 31154 (July 9, 1991) (listing MTBE as oxygenate "available for use by all

parties" to meet Clean Air Act requirements). As Congress and EPA noted, without using

MTBE, it would have been impossible for defendants to comply with the law. The essence of

plaintiffs' claims, particularly those for strict liability and negligence, is that defendants should

never have made reformulated gasoline using MTBE. Those claims conflict with the Clean Air

Act and EPA regulations, and they are therefore preempted and should be dismissed.

#### A. Federal Law Preempts State Common-Law Tort Claims that Conflict with Federal Laws and Regulations.

Federal preemption is rooted in the Constitution, which provides that federal law "shall

be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Preemption of state law is

mandated, therefore, whenever Congress intends for federal legislation or a federal regulatory

scheme to displace state law. *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996); *Fidelity Fed. Sav.

& Loan Ass'n v. de la Questa*, 458 U.S. 141, 153 (1982) ("federal regulations have no less

preemptive effect than federal statutes"). Federal preemption applies not only to state statutes

and regulations, but also to state common law that conflict with federal law. *San Diego Bldgs.*

*Trades Council v. Garmon,* 359 U.S. 236, 247 (1959); *Younger v. Spartan Chem*. Co., 252
A.D.2d 265, 267, 686 N.Y.S.2d 152, 153 (3d Dep't 1999).

Congressional intent to preempt state law may be manifested by an express provision, or
implicit in the legislative history or structure of the federal regulatory scheme. *Barnett Bank,*
517 U.S. at 31. Even where a federal statute contains an express preemption provision that does
not specifically encompass a particular claim, implied preemption is not precluded. *Geier v.
American Honda Motor Co*., 68 U.S.L.W. 4425, 120 S. Ct. 1913 (May 22, 2000) (Tab J);
*Freightliner Corp. v. Myrick,* 514 U.S. 280, 288 (1995). Implied preemption exists where state
law is an "obstacle to the accomplishment and execution of the full purposes and objectives of
Congress." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699 (1984), *quoting Hines v.
Davidowitz,* 312 U.S. 52, 57 (1941). A state standard poses an obstacle to the federal purpose
where the federal scheme is so pervasive that it does not leave room for state action, or where the
state claim purports to place restrictions on the range of choices granted by federal law. *Geier,*
(May 22, 2000) (common law claims for failure to equip car with airbags preempted by federal
standard that permitted various options to meet safety standard); *de la Questa,* 458 U.S. at 156
(finding conflict and preemption where state law limited availability of federally-permitted
option).

**B. Plaintiffs' Effort To Hold Defendants Liable for Their Selection of MTBE from
the Alternatives Available To Meet Clean Air Act Requirements Is Preempted.**

The Supreme Court's recent decision in *Geier* mandates dismissal of plaintiffs' claims on
preemption grounds. In *Geier,* an accident victim sued for damages claiming that her 1987
Honda Accord, which was equipped with seatbelts, was defective because it lacked an airbag,
which Honda had installed on other models and, she claimed, it had a duty to install in hers.
A federal safety standard gave auto manufacturers a choice of safety devices, including seatbelts,

- 16 -

to comply with federal regulations.  The Department of Transportation included airbags as "one of several 'equally acceptable devices'" and stated "it neither favored [n]or expected the introduction of airbag systems."  *Geier,* slip op. at 12, *citing* 35 Fed. Reg. 16927 (1970).  The standard deliberately provided manufacturers with choices for both safety and economic reasons. Slip op. at 12, 18.

Finding that "petitioners' tort action depends upon its claim that manufacturers had a duty to install an airbag when they manufactured the 1987 Honda Accord," the Court held that the claims had to be dismissed on federal preemption grounds because a state common-law rule that required manufacturers to install airbags in every model, irrespective of the choice offered under federal regulations, was inconsistent with the federal regulatory scheme implementing the National Traffic and Motor Vehicle Safety Act.  Slip op. at 18-19.  In effect, plaintiffs sought to establish a common law rule holding that the use of seatbelts rather than airbags was an actionable tort, and that rule would have eliminated the very choice among devices that the federal law and DOT regulations provided to manufacturers.  Slip op. at 19.  Accordingly, plaintiffs' claims "would have stood 'as an obstacle to the accomplishment and execution of' important means-related federal objectives."  Slip op. at 19.

As in *Geier*, the premise of plaintiffs' claims here is that defendants had a duty not to use MTBE, despite the fact that MTBE was one of the choices that EPA specifically approved to comply with the mandatory oxygenate requirements of the Clean Air Act.  Accordingly, plaintiffs' claims, which seek to hold defendants liable for choosing one government-approved option over another, would stand as an obstacle to the accomplishment and execution of the Clean Air Act oxygenate program and an important federal goal, namely reducing air pollution.

The 1990 Clean Air Act Amendments and the regulatory scheme implementing them are remarkably similar to the regulatory scheme found to preempt the plaintiffs' common-law claims in *Geier*. The amendments require that "any gasoline sold, or dispensed, to the ultimate consumer in carbon monoxide nonattainment area ... shall be blended ... to contain not less than 2.7 percent oxygen by weight." 42 U.S.C. § 7545(m)(2)(B). In developing the reformulated gasoline program, Congress sought, through use of oxygenates like MTBE, to reduce auto emissions to improve air quality. The legislative record establishes that Congress was fully aware of the MTBE option and expected, when enacting the Clean Air Act Amendments, that MTBE would be used to meet the oxygenate requirement. *E.g.,* 136 Cong. Rec. 10792 (1990) (remarks of Sen. Daschle) ("'[t]he 2.7-percent oxygenate requirement could be met by either ethanol, made from grain, or methanol, made from natural gas.' EPA predicts that the amendment will be met almost exclusively by MTBE, a methanol derivative"). One 1990 Congressional estimate stated that "the MTBE market is expected to expand by more than 20 percent every year for the next 5 years.... MTBE is going to be a major, if not 'the' major beneficiary of the [oxygenate] standard." 136 Cong. Rec. S 2289 (remarks of Sen. Daschle).

Congress not only sought to permit the use of MTBE to meet the oxygenate requirement, it affirmatively encouraged the use of MTBE. *See, e.g.,* 136 Cong. Rec. S 16954 (remarks of Sen. Chafee) (Clean Air Act Amendments "will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 17514 (remarks of Sen. Heinz) ("[t]he requirements for reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S 16922 (1990) (remarks of Sen. Durenberger) ("reformulated gasoline is to have not less than 2 percent oxygen by weight. This requirement can be met by blending gasoline with a variety of additives like

ethanol or MTBE"). Indeed, the oxygen content "level of 2.7 percent was chosen in part to provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether, or MTBE, and ethyl alcohol, or ethanol." 136 Cong. Rec. S 17252 (remarks of Sen. Simpson). And Congress also viewed use of oxygenates like MTBE in gasoline as "good for energy security and our balance of trade, as well as the environment," because reformulated gasoline with a 15% MTBE content required 15% less gasoline. 136 Cong. Rec. 3513 (1990) (remarks of Sen. Daschle).[5]

Under 42 U.S.C. § 7545(a) and (b), Congress delegated to EPA virtually exclusive authority to regulate vehicle fuels, and precluded sale of any fuel or fuel additive unless approved by EPA. Congress also granted EPA authority to prohibit the use of particular fuels or fuel additives after considering available scientific and economic data. 42 U.S.C. § 7545(c). The public record shows that EPA considered available scientific and economic data and specifically approved MTBE as an acceptable fuel oxygenate. 53 Fed. Reg. 33846-903 (Sept. 1, 1988); 56 Fed. Reg. 31154 (July 9, 1991) (listing MTBE as oxygenate "available for use by all parties" to meet Clean Air Act requirements). What is more, Congress expressly preempted state efforts to dictate the content of reformulated gasoline in the Clean Air Act, 42 U.S.C. § 7545(c)(4), because it "recognized the need for federal preemption of state fuel regulations in light of the interstate nature of petroleum and auto industries...." 59 Fed. Reg. 7716, 7809; *see also* 55 Fed. Reg. 36458, 36509 (Sept. 5, 1990) (because gasoline produced in one area is often

---

[5]    *See also* 136 Cong. Rec. S 17773-74 (remarks of Sen. Daschle) ("the reformulated gasoline program ... will jointly mean that well more than 25 percent of our Nation's gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program will allow for the use of MTBE and ethanol as additives to achieve the required level of oxygen"); 136 Cong. Rec. H 2764 (remarks of Mr. Alexander) ("you don't have to use ethanol to meet the requirements. You can use other additives like MTBE"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of gasoline complying with Clean Air Act on the assumption that MTBE would be used to meet oxygenate requirement).

sold throughout the nation, Congress included in the Clean Air Act an express preemption provision to prevent state action that could result in "an inefficient patchwork of potentially conflicting regulations").

Plaintiffs' claims in this action, which seek to hold defendants liable on the basis that they used MTBE to comply with the Clean Air Act Amendments, are no different than the tort claims the Court found to be preempted in *Geier*. Just as the *Geier* plaintiffs sought recovery by challenging Honda's choice of passenger restraints from among the federally approved alternatives, plaintiffs here seek to challenge defendants' choice of MTBE from among the federally approved alternative oxygenates for reducing air pollution and complying with the Clean Air Act Amendments. As in *Geier*, allowing plaintiffs to maintain their claims would result in the substitution of plaintiffs' judgment regarding the use of oxygenates for that of Congress and federal regulators. Both Congress and EPA considered the relevant environmental, scientific, economic and political factors, and came to a considered judgment that use of MTBE in reformulated gasoline was acceptable. Thus, application of the preemption doctrine is particularly appropriate here, where plaintiffs' lawsuit seeks to usurp the prerogatives of the elected representatives of the people and the agency charged by Congress with oversight of Clean Air Act programs. *Garmon*, 359 U.S. at 247. The claims challenging defendants' use of MTBE in reformulated gasoline should therefore be dismissed.

IV.   **PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT PRODUCTS LIABILITY BASED ON A FAILURE TO WARN.**

Plaintiffs purport to state a strict products liability cause of action premised on defendants' alleged failure to warn of risks posed by MTBE. (Am. Compl. ¶¶ 155-70). Plaintiffs' claim is deficient because they fail to allege causation, and seek to impose a duty to warn the "world" that is not recognized by New York law.

### A.   Plaintiffs Do Not Assert That the Alleged Failure To Warn Proximately Caused Their Purported Damages.

To state a valid claim, plaintiffs must allege that the failure to warn was a proximate cause of their injury. *Port Auth. v. Arcadian Corp.*, 189 F.3d 305, 320 (3d Cir. 1999); *Elsroth v. Johnson & Johnson*, 700 F. Supp. 151, 166 (S.D.N.Y. 1988); *Dias v. Marriott Int'l.* 251 A.D.2d 367, 368, 674 N.Y.S.2d 78 (2d Dep't 1998). Under New York law, proximate cause requires allegations that defendants' failure to warn was a "substantial factor" in bringing about plaintiffs' injury. *Arcadian*, 189 F.3d at 320; *Doll v. Digital Equip. Corp.*, No. 93-CV-0359E, 1996 WL 10711 at * 1 (W.D.N.Y. Mar. 6, 1996) (Tab K); *Coleman v. Chesebro-Whitman Co.*, 262 A.D.2d 265, 266, 690 N.Y.S.2d 729, 730 (2d Dep't 1999); *Elsroth*, 700 F. Supp. at 166; *Belling v. Haugh's Pools, Ltd.*, 126 A.D.2d 958, 959, 511 N.Y.S.2d 732, 733 (4th Dep't 1987). Where there are other possible causes of the injury, proximate cause has not been shown. *Schimmenti v. Ply Gem Indus., Inc.*, 156 A.D.2d 658, 659-60, 549 N.Y.S.2d 152, 153 (2d Dep't 1989). Moreover, proximate cause allegations must specifically identify "what the [warnings] would have warned against and in what way the lack of such warnings was a proximate cause of the accident." *Coleman*, 262 A.D.2d at 266, 690 N.Y.S.2d at 730.

The amended complaint utterly fails to explain how the alleged failure to warn was a "substantial factor" in causing plaintiffs' alleged injury. As an initial matter, plaintiffs cannot show any injury whatsoever to the "uncontaminated well subclass," let alone injury caused by a failure to warn. With respect to the "contaminated well subclass," the amended complaint states only the conclusory contention that "Defendants' failure to warn Plaintiffs and others ... proximately caused reasonably foreseeable damages to the Plaintiffs and the plaintiff class." (¶ 168). This conclusory assertion is the full extent of plaintiffs' causation allegations. Plaintiffs do not identify where the MTBE in their wells came from, how it reached their wells, or who

released it, much less how "the lack of such warnings" was a substantial factor in causing that contamination. The failure to allege specific causal facts is fatal to the claim. *Coleman*, 262 A.D.2d at 266, 690 N.Y.S.2d at 730; *see also Arcadian*, 189 F.3d at 320 ("[i]f the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then plaintiff would be required to show that an adequate warning or instruction would have prevented the harm").

The amended complaint must also fail to the extent it asserts that warnings to so-called "Downstream Handlers" (which plaintiffs define at ¶ 11 to include all "persons and entities engaged in the storage, transport, handling, retail sale, use and response to spills of such gasoline"), public officials and the general public might have caused those persons to handle MTBE more carefully in order to prevent the release of MTBE-containing gasoline. (Am. Compl. ¶¶ 161-62). Risks inherent in handling gasoline, with or without MTBE, are obvious and well known, and there is no duty to warn of such risks. *See, e.g.. Gonzalez v. Morflo Indus.*, 931 F. Supp. 159, 168 (E.D.N.Y. 1996); *Carbone v. Alagna*, 239 A.D.2d 454, 456, 658 N.Y.S.2d 48, 48 (2d Dep't 1997); *Bazerman v. Gardall Safe Corp.*, 203 A.D.2d 56, 57, 609 N.Y.S. 610, 611 (1st Dep't 1994) ("there is no liability for failure to warn where such risks and dangers are so obvious that they can ordinarily be appreciated by any consumer to the same extent that a formal warning would provide or where they can be recognized simply as a matter of common sense"). The amended complaint does not allege that intermediaries are ignorant of the dangers and do not already manage gasoline with care.[6]

---

[6]   The fuel storage and distribution industry is heavily regulated in New York as elsewhere. Virtually all aspects of the storage of gasoline, maintenance of service stations, and response to spills are governed by comprehensive federal, state and local regulations. These extensive regulations require, *inter alia*, that gasoline storage tanks be registered, permitted and maintained in accordance with stringent procedures, that spills be reported immediately to the Department of Environmental Conservation, and that any spill be addressed immediately. *See* 6 NYCRR §§ 595-9, 612-14.

Moreover, there is no duty to warn of a hazard a person already knows exists. *Mangano v. United Finishing Serv. Corp.*, 261 A.D.2d 589, 590, 690 N.Y.S.2d 680, 681 (2d Dep't 1999); *Pigliavento v. Tyler Equip. Corp.*, 248 A.D.2d 840, 842, 669 N.Y.S.2d 747, 749 (3d Dep't 1998), *lv. dismissed, lv. denied*, 92 N.Y.2d 868, 677 N.Y.S.2d 773 (1998); *Czerniejewski v. Steward-Glapat Corp.*, 236 A.D.2d 795, 796, 653 N.Y.S.2d 742, 742 (4th Dep't 1997); *Schiller v. National Presto Indus., Inc.*, 225 A.D.2d 1053, 1054, 639 N.Y.S.2d 217, 217 (4th Dep't 1996); *Spooner v. Sears Roebuck & Co.*, 161 A.D.2d 103, 554 N.Y.S.2d 540 (1st Dep't 1990); *Alessandrini v. Weyerhauser Co.*, 207 A.D.2d 996, 617 N.Y.S.2d 101 (4th Dep't 1994). In short, plaintiffs do not and cannot allege any duty to warn or any causal connection between their claimed injuries and the alleged failure to warn.

### B.   Plaintiffs Do Not Allege Facts Sufficient To Show that Defendants Owed Plaintiffs a Duty To Warn.

A duty to warn extends only to foreseeable users of a product. "Warnings must clearly *alert the user to avoid certain uses* of the product which would appear to be normal and reasonable." *Lancaster Silo & Block Co. v. Northern Propane Gas Co.*, 75 A.D.2d 55, 65, 427 N.Y.S.2d 1009, 1016 (4th Dep't 1980) (emphasis added); *see also Bazerman*, 203 A.D.2d at 57, 609 N.Y.S.2d 611 ("[i]n strict products liability, the ... defect is the inadequacy or absence of warning *regarding the proper use* of the product") (emphasis added). Whether a duty to warn applies is properly a question for the Court. *Arcadian*, 189 F.3d at 320; *Gonzales*, 931 F. Supp. at 168.

There is no generalized duty under New York law to warn the world at large of an alleged hazard. As the Second Circuit has explained, there is "no basis in New York law" for the contention that manufacturers and distributors have "a duty to warn all possible sources of the product, and the general public, of the potential hazard." *Berg v. Underwood's Hair Adaption*

- 23 -

*Process, Inc.*, 751 F.2d 136, 137 (2d Cir. 1984); *see also Knier v. Albany Med. Cent. Hosp.*, 131 Misc. 2d 414, 415, 500 N.Y.S.2d 490, 491 (Albany Co. 1986) (hospital has no duty to warn public that employee had come in contact with patient with communicable disease because "[o]rdinarily, a duty is owed to a particular person, or class of persons, and not to the public at large"). This is particularly true here, where there are no allegations that plaintiffs' injuries were caused by anyone to whom plaintiffs claim defendants had a duty to provide a warning; indeed, there are no specific allegations of how their alleged injuries occurred at all.

Throughout the amended complaint, plaintiffs make conclusory assertions that numerous actors in the gasoline chain of commerce failed to provide warnings about MTBE to numerous, vaguely-defined "others," *e.g.,* "government regulators," "public officials," and "Downstream Handlers." (*See, e.g.*, Am. Compl. ¶¶ 69, 82, 94, 112.) These allegations do not salvage their claim. Even if a duty to warn some intermediary could be shown (which it cannot), "a plaintiff cannot piggy-back into court 'as the vicarious beneficiary of a breach of duty [to warn] another.'" *Knier*, 131 Misc. 2d at 415, 500 N.Y.S.2d 490 (quoting *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 342 (1928)). Thus, plaintiffs cannot premise an alleged failure to warn them on a purported lack of warning to intermediaries.

Accordingly, because plaintiffs do not and cannot allege that any failure to warn proximately caused them any injury, or that defendants breached a duty to warn under the common law of products liability to any known or foreseeable user of MTBE, plaintiffs' failure to warn claim must be dismissed. *Arcadian*, 189 F.3d at 320-21; *Berg*, 751 F.2d at 137; *Doll*, 1996 WL 10711 at *2; *Coleman*, 262 A.D.2d at 266, 690 N.Y.S.2d at 730; *Dias*, 215 A.D.2d at 368, 674 N.Y.S.2d 78; *Schimmenti*, 156 A.D.2d at 659, 549 N.Y.S.2d at 153; *Belling*, 126 A.D.2d at 959, 511 N.Y.S.2d at 733.

### V.   PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT LIABILITY FOR DESIGN DEFECT.

Plaintiffs also purport to state a claim under New York law for strict liability for design defect. To prevail on such a claim, plaintiffs must show that (1) "the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe," and (2) "the defective design was a substantial factor in causing plaintiff's injury." *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 454 (S.D.N.Y. 1999) (quoting *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 450 N.E.2d 204, 207 (1983)). The amended complaint does not, and cannot, plead the necessary elements of a design defect for at least three reasons. First, plaintiffs have not pled that MTBE was being used in its normal and intended manner when it allegedly entered the wells. Second, plaintiffs do not identify which of the defendants produced the gasoline containing MTBE that allegedly contaminated their wells. Third, plaintiffs fail to specify the actual defect that forms the basis for their purported claim.

#### A.   Plaintiffs Do Not Allege that the MTBE Allegedly Found in Their Wells Resulted from Use of Gasoline in the Manner Normally Intended.

New York law requires that to set forth a *prima facie* claim for design defect, plaintiffs must allege that "at the time of the occurrence the product is being used ... for the purpose and in the manner normally intended." *Voss*, 59 N.Y.2d at 106, 450 N.E.2d at 207. The reason for this basic requirement is manifest:  improper use of a product may constitute a superseding act that negates a defendant's liability. *See Boris v. Tops Mkts.*, 163 Misc. 2d 1088, 623 N.Y.S.2d 698 (Erie Co. 1995). For example, if plaintiffs themselves, or some other third party, misused the gasoline and were thus responsible for the alleged release of MTBE into plaintiffs' wells, such misuse would prevent any liability from attaching to defendants. *Cf. Schultz v. Navistar Int'l Transp. Corp.*, 103 F.3d 686 (2d Cir. 1996) (dismissal of claim for alleged product defect affirmed where plaintiff failed to allege that the purported defect, which was the lack of a step on

- 25 -

a truck, was in the intended design, rather than a change that might have been caused by third parties removing or breaking the step).

Plaintiffs do not allege that the MTBE found in their wells resulted from use of gasoline for its intended purpose at the time it was allegedly released into the environment. Indeed, plaintiffs neglect entirely to identify the source of the MTBE in their wells. Under these circumstances, plaintiffs' claims are inadequate and should be dismissed.

### B. Plaintiffs Do Not Identify the Source of Their Alleged Injuries.

The amended complaint also is fatally defective because plaintiffs fail to link any particular defendant's gasoline to the MTBE allegedly found in their wells. As a threshold matter, to assert a claim of strict liability for a design defect, plaintiffs must identify the manufacturer of the allegedly defective product. Both federal and state courts in New York require a plaintiff to prove that the defendant is the source of the allegedly defective product, and courts will dismiss a complaint that fails to satisfy this element of a *prima facie* case. "[O]ne of the necessary elements plaintiff in a strict products liability cause of action must establish by competent proof is that it was the defendant who manufactured and placed in the stream of commerce the injury-causing defective product." *Healey,* 87 N.Y.2d at 596, 663 N.E.2d at 903, 640 N.Y.S.2d 860. "Under New York law, a plaintiff has the burden of proving that the product at issue is that of the defendant." *210 East 86th Street Corp. v. Combustion Eng'g, Inc.,* 821 F. Supp. 125, 142 (S.D.N.Y. 1993). *See also Johnson v. Celotex Corp.,* 899 F.2d 1281, 1286 (2d Cir. 1990) ("Plaintiff had to establish that his injury was proximately caused by appellants' [product] and produce evidence identifying each appellant's product as being a factor in his injury"); *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 504, 539 N.E.2d 1069, 1073, 541 N.Y.S.2d 941 (1989) ("[i]n a products liability action, identification of the exact defendant whose product injured the plaintiff is, of course, generally required"); *Cresser v. American*

*Tobacco Co.*, 174 Misc. 2d 1, 3-4, 662 N.Y.S.2d 374, 377 (Kings Co. 1997) (dismissing complaints for lack of specificity because plaintiffs failed to identify which defendant allegedly caused each individual plaintiff's injuries).

Here, plaintiffs do not identify the manufacturer of the gasoline that allegedly resulted in the MTBE in their wells. Rather, plaintiffs state that "[g]asoline containing MTBE ... lacks characteristics or 'a chemical signature' that enables identification of the manufacturer of that particular batch." (Am. Compl. ¶ 51.) That allegation does not relieve them of the basic requirement to name the manufacturer. They do not allege, for example, that they are incapable of determining the party responsible for allegedly contaminating their wells through other means (such as proximity to a known leak or by tracing MTBE to its source), and they do not set forth any facts regarding the investigation they performed. Plaintiffs' failure to state how their wells were contaminated means that they have not set forth a viable claim for defective design under New York law.[7]

### C. Plaintiffs Do Not Identify the Alleged Design Defect.

To plead a design defect claim, plaintiffs must specify the alleged defect, and must also allege that there was a safer, feasible alternative design for the product. *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991). On the most basic level, plaintiffs must identify the alleged defect in the design of the product with sufficient specificity to permit defendants to respond.

---

[7]     In an effort to sidestep this pleading requirement, plaintiffs attempt to set forth a "market share" theory of liability. (Am. Compl. ¶¶ 17, 52.) The Court of Appeals has sanctioned the use of market share liability only once, and that was for DES cases, which it found to be "singular." *Hymowitz*, 73 N.Y.2d at 508, 539 N.E.2d at 1075, 541 N.Y.S.2d 941. Market share liability is particularly inappropriate here because, among other reasons, (1) there are no allegations plaintiffs cannot determine the source of the MTBE in their wells, to the extent they are contaminated; (2) unlike DES, which caused injury when used as intended under similar circumstances in the same manner, the potential ways in which plaintiffs' wells became contaminated are legion and implicate potential misuse or failure to contain the product; (3) defendants did not have exclusive control over the product because, as plaintiffs allege, the product was handled by "Downstream Handlers." *See Brenner v. American Cyanamid Co.*, 263 A.D.2d 165, 699 N.Y.S.2d 818 (4th Dep't 1999) (refusing to apply market share theory to lead poisoning cases).

Fed.R.Civ.P. 8(a) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). *See De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir. 1996) ("[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)"). The requirement that plaintiff identify the defect and a feasible alternative design is particularly relevant here because under New York law, a product is not rendered inherently defective simply because it might contain some dangerous quality. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 155 (2d Cir. 1997) ("[t]his rule [defining a defective product] is tempered by the realization that some products ... must by their very nature be dangerous in order to be functional.").

The amended complaint fails to satisfy these basic requirements. Plaintiffs instead rely on a series of vague statements about the alleged properties of gasoline containing MTBE. (*See* Am. Compl. ¶¶ 56-57, 87-88, 99-103.) Nowhere do plaintiffs specify the defect on which their claim is based, nor do they allege an alternative design for reformulated gasoline that was both feasible and would have complied with the Clean Air Act reformulated gasoline mandates. Plaintiffs' design defect count should be dismissed.

## VI. PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR STRICT LIABILITY FOR MISREPRESENTATION, AS NEW YORK DOES NOT RECOGNIZE THAT CAUSE OF ACTION.

Plaintiffs seek to assert a claim for "Strict Liability for Misrepresentations [under] Restatement (Second) of Torts § 402B."[8] New York, however, has not recognized § 402B as a basis for liability, and the claim should be dismissed for this reason alone. *Loewy v. Stuart Drug & Surgical Supply, Inc.,* 1999 U.S. Dist. LEXIS 1565, *17 (S.D.N.Y. Feb. 11, 1999) (Tab L)

---

[8]      Section 402B provides: "One engaged in the business of selling chattels who . . .makes to the public a misrepresentation of material fact concerning the character or quality of the chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though (a) it is not made fraudulently or negligently...."

("New York has never adopted the strict liability approach set forth in Section 402B"). No New York decision of which defendants are aware has ever imposed liability on the basis of § 402B. Indeed, § 402B is inconsistent with New York law on misrepresentation, given that New York requires proof of a special or fiduciary relationship between the parties even for negligent misrepresentation claims. *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1232 (S.D.N.Y. 1995). Here, plaintiffs conceded they could not show such a relationship by dropping their negligent misrepresentation claim from the amended complaint. The claim should be dismissed.[9]

## VII.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR FRAUD.

To state a claim for fraud under New York law, plaintiffs must allege "(1) false representation(s) of (2) material fact with (3) intent to defraud thereby [scienter] and (4) reasonable reliance on the representation (5) causing damage to plaintiff." *Foxley,* 893 F. Supp. at 1228. Plaintiffs do not properly allege fraud because they do not allege that each defendant made a specific false or misleading statement, that any plaintiff relied on any alleged statement, or that plaintiffs' purported reliance caused well contamination or any other damage.

### A.    Plaintiffs Do Not Specify the False and Misleading Statements Defendants Allegedly Made Regarding MTBE.

Plaintiffs' fraud allegations are subject to the particularity requirements of Fed. R. Civ. P. 9(b). To apprise each defendant of the specific allegations against it, plaintiffs must identify

---

[9]    Even if New York did recognize a cause of action under § 402B, and even if the amended complaint adequately alleged misrepresentations by defendants – which it does not – plaintiffs still could not maintain a claim because plaintiffs do not allege injury as "consumers." Section 402B allows claims only by a consumer, defined as "one who makes use of the chattel in the manner in which a purchaser may be expected to use it." Restatement § 402B, comment (i). Moreover, plaintiffs' claim would also fail because they do not, and cannot, allege injuries resulting from "justifiable reliance." Under 402B, there is no claim "where the misrepresentation is not known, or there is indifference to it, and it does not influence the purchase or subsequent conduct." Restatement § 402B, comment (j). There are no allegations that any plaintiff was aware of the misrepresentations alleged in the amended complaint, and contrary to plaintiffs' assertions, the Court may not "presume" reliance. *Small v. American Tobacco Co.,* 252 A.D.2d 1, 7, 679 N.Y.S.2d 593, 599 (1st Dep't 1998) (in putative class action alleging fraud, "it cannot be presumed that each class member even knew of the alleged misrepresentations, let alone relied on them"), *aff'd sub nom. Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999).

each alleged misrepresentation by alleging what was said, who said it, when it was said, and where it was said. *Fromer*, 50 F. Supp. 2d at 246 ("allegations which fail to specify the time, place, speaker and, in some cases, the contents of the misrepresentations, lack the 'particulars' required by Rule 9(b)") (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).

Plaintiffs fail to allege what each defendant said that was supposedly false or misleading. All but one of the allegedly fraudulent statements are alleged "oil industry" statements made to EPA supporting approval of MTBE for use in federally required reformulated gasoline.

Only one allegedly false communication recited in the amended complaint is directly attributed to a particular defendant: an alleged statement by BP Amoco that a report prepared by Peter Garrett and others, which, according to plaintiffs, concluded that MTBE posed an "unusual risk" to water wells, was not "true." (Am. Compl. ¶¶ 53, 59). That alleged statement is not actionable for at least two reasons. First, the statement is opinion, and therefore cannot form the basis of a fraud claim. *American Food & Vending Corp. v. IBM*, 245 A.D.2d 1089, 667 N.Y.S.2d 545 (4th Dep't 1997) (statements such as "most likely there is nothing to worry about" are merely opinion and not actionable); *Adler v. Bureau of Professional Med. Conduct*, 211 A.D.2d 990, 622 N.Y.S.2d 609 (3rd Dep't 1995) (where difference of opinion existed as to efficacy of medical procedure, there was no fraud by physician using procedure). Here, all plaintiffs allege is that BP Amoco disagreed with one or more opinions expressed in the Garrett Report.

Second, a statement that the Garrett Report "isn't true" could mean nothing to individuals who had no knowledge of the opinions expressed in that report, and certainly could have no misleading effect on them. On the other hand, if the individuals to whom the statement allegedly

was made *knew* the contents of the Garrett Report, then those individuals were in as good a position as defendants to evaluate the truth or falsity of the Report.

In any event, the amended complaint fails to plead this allegation with particularity, as Rule 9(b) requires.  Plaintiffs do not allege when, where, by whom or to whom the alleged statement was made. (Am. Compl. ¶ 59.)  Nor do they allege whether any plaintiff relied on the alleged statement or was aware of the contents of the Garrett Report.  *Id.*

**B.      Plaintiffs Do Not Allege That They Were Aware of, Much Less Relied on, Alleged Misrepresentations.**

The amended complaint makes no allegation that any defendant ever communicated with any plaintiff about MTBE.  A plaintiff cannot state a claim for fraud "when he alleges merely that the misrepresentation in question was made to or relied upon by a third party." *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 38 n.8 (S.D.N.Y. 1992); *see also Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 682 (S.D.N.Y. 1987); *Warren v. Forest Lawn Cemetery & Mausoleum*, 222 A.D.2d 1059, 635 N.Y.S.2d 874 (4th Dep't 1995).  The amended complaint even fails to allege that statements made to third parties such as government regulators were *relayed* to plaintiffs.[10] And contrary to plaintiffs' assertion (Am. Compl. ¶ 209), the Court may not simply "presume" knowledge of or reliance on an alleged misrepresentation.  *Small*, 252 A.D.2d at 6, 679 N.Y.S.2d at 598.

A plaintiff cannot rely on a statement she has never seen or heard, and such a statement cannot form the basis of a fraud claim. *Foxley*, 893 F. Supp. at 1229 (noting that plaintiff "could not justifiably rely on a letter he had not read"); *Small*, 252 A.D.2d at 6, 679 N.Y.S.2d at 598;

---

[10]      Even if they had alleged that statements made to regulators were relayed to them (which they do not), plaintiffs do not fall within the "circle of interest" exception to the general rule that, to support a misrepresentation claim, a statement must be made directly to a plaintiff. *See* this Court's analysis in *Fromer*, 50 F. Supp. 2d at 243-44.  The amended complaint does not allege that defendants "expected or intended that their comments would be conveyed to Plaintiffs." *Id.* at 244.  Nor does it assert "actual reliance" by plaintiffs on the alleged misrepresentations made by defendants to third parties. *Id.*

*Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 82-83 (N.D.N.Y. 2000) (granting summary judgment on fraud claim absent a showing that smoker "read and relied upon" alleged false statements).  Furthermore, proof that a plaintiff relied on a statement that *was* seen or heard must be "individualized."  *Small*, 252 A.D.2d at 6, 679 N.Y.S.2d at 598; *Tompkins*, 92 F. Supp. 2d at 82.  Here, no plaintiff can maintain an action for fraud because none has identified a single statement that he or she heard or relied upon.  The amended complaint barely acknowledges, much less pleads, the reliance element necessary to plaintiffs' claims.[11]  *See* Fed. R. Civ. P. 9(b).

### C.   The Alleged Damages Could Not Have Been Proximately Caused by Alleged Misrepresentations.

Plaintiffs must also allege facts "which would establish a causal link between the alleged fraudulent misrepresentation and the asserted consequences."  *Red Rock Commodities, Ltd. v. ABN-Amro Bank*, 1995 U.S. Dist. LEXIS 18046, *12 (S.D.N.Y. 1995) (Tab M).  Further, "the requisite causation is established *only* where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes."  *Id.* at *13, quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89-90 (2d Cir. 1994).  Plaintiffs do not, and cannot, allege the required nexus between their "presumed" reliance on defendants' statements and the presence of MTBE in their wells because they cannot allege that the "misrepresentations and omissions caused a particular plaintiff's well to be contaminated."  *Millett*, No. CV-98-555, at 31-32.  The causal

---

[11]   This case is distinguishable from *City of New York v. Lead Indus. Ass'n ["LIA"]*, 241 A.D.2d 387, 660 N.Y.S.2d 422 (1st Dep't 1997), for a number of reasons.  First, the court in *LIA* held only that plaintiffs need not demonstrate *direct* reliance on defendants' alleged misrepresentations; it did not eliminate entirely the reliance requirement.  Plaintiffs in *LIA* were able to allege that they bought and used lead paint in indirect reliance on defendants' assurance of its safety.  Here, although plaintiffs claim they "indirectly relied" on the misrepresentations they allege, they plead no facts indicating that they took any action whatsoever in reliance on the alleged misrepresentations.  Second, plaintiffs in *LIA* alleged that their injuries were caused by the alleged misrepresentations because they purchased and used lead paint based on defendants' assurances of its safety, resulting in their injuries.  Here, plaintiffs do not allege that they purchased MTBE-containing gasoline because of defendants' alleged misrepresentations, nor do they allege that their injuries resulted from their purchase or use of gasoline.  Accordingly, unlike the plaintiffs in *LIA*, these plaintiffs can demonstrate neither reliance nor causation.  *See also Tompkins*, 92 F. Supp. 2d at 83-84 (refusing to follow *LIA* in light of subsequent First Department decision in *Small, supra,* requiring both reliance and causation in tobacco injury case).

chain between the alleged statements made to third parties by defendants and plaintiffs' alleged injuries is so tenuous that it cannot withstand even the most liberal application of federal pleading rules.

To sustain their fraud claim, plaintiffs must allege facts showing that a release of gasoline containing MTBE occurred *because of* plaintiffs' reliance on statements they never heard. Instead, plaintiffs offer only a conclusory declaration that their "presumed" reliance "caused [the] detriment, injuries and harms as alleged herein." (Am. Compl. ¶ 210.)

In *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999), the Second Circuit rejected a similar claim because the plaintiff could not demonstrate a "direct injury." The plaintiff in *Laborers* sought to recover damages from tobacco companies on the grounds that the tobacco companies' misrepresentations to union members caused the members to smoke, and that as a result of the members' smoking, the union incurred substantial smoking-related health costs. The Second Circuit rejected the union's claim on the ground that because the union's alleged injuries were entirely derivative of harm visited on others, the union could not demonstrate proximate cause. 191 F.3d at 235. That is also the case here. Plaintiffs are alleging that because defendants allegedly made misrepresentations to third parties on which those third parties relied, plaintiffs suffered injuries. Such allegations simply do not fulfill the "direct injury" requirement or the proximate cause nexus that plaintiffs must allege to state a valid claim.

It is not surprising that the standard causation analysis in a fraud case – which asks whether a plaintiff was induced to act or to refrain from acting due to plaintiff's reliance on a misrepresentation – does not fit plaintiffs' allegations here. Almost invariably, actions to recover economic loss caused by misrepresentations are tied to *transactions* between parties. *See, e.g.,*

1B New York Pattern Jury Instructions–Civil (3d ed. 2000) § 3:20 (noting that court should

inform jury of the "transaction" upon which a fraud claim is based); RESTATEMENT (SECOND) OF

TORTS § 531 illus. 1-9 (1977) (describing liability rule for fraudulent misrepresentation in the

context of a "type of transaction," and providing nine illustrations, each involving a transaction).

Plaintiffs fail to point to a "transaction" that was influenced by any alleged misrepresentation.

**D.    Statements Made to EPA and Other Government Officials
in the Course of Lobbying Are Not Actionable.**

The gravamen of plaintiffs' fraud allegations is that defendants allegedly made

misrepresentations about the properties of MTBE during the course of seeking EPA approval to

use MTBE.  The communications on which plaintiffs seek to base their claims include (1) a

presentation Exxon and ARCO made at an EPA Public Focus Meeting "to support the industry

position that additional medical testing of MTBE was not necessary" (Am. Compl. ¶ 65);

(2) draft comments submitted to EPA by the MTBE Committee "to convince EPA not to require

additional health and environmental testing of MTBE" (Am. Compl. ¶¶ 67-68, 70-71); and

(3) efforts by "MTBE and/or gasoline manufacturers and distributors" that successfully

"convinced the EPA that additional chemical fate testing was not necessary to determine the

environmental risk posed by MTBE."  (Am. Compl. ¶ 73.)

The conduct described in the amended complaint is protected activity under the First

Amendment of the United States Constitution and Article I, Section 9 of the New York

Constitution.  No liability can attach to defendants' efforts to influence government regulators

for the purpose of encouraging government action because defendants have a fundamental

constitutional right to petition the government.  This bedrock constitutional right was recognized

in *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965), and *Eastern R.R. Presidents

Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961).  *See also Eaton v. Newport Bd. of*

- 34 -

*Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (right to petition government not limited to furthering goals that others deem worthy).   Successful efforts to petition the government are *per se* lawful and no civil liability may be imposed.   *Noerr,* 365 U.S. at 144; *Pennington,* 381 U.S. at 671.

Although *Noerr-Pennington* protection originated in antitrust litigation. it applies to other kinds of claims as well.   *Riddell Sports, Inc. v. Brooks,* 1997 U.S. Dist. LEXIS 3621 (S.D.N.Y. 1997)(Tab N); *Suburban Restoration Co. v. ACMAT Corp.,* 700 F.2d 98 (2[d] Cir. 1983) (tortious interference); *Hamilton v. Accu-Tek*, 935 F. Supp. 1307, 1321, 1324-25 (E.D.N.Y. 1996) (negligence and products liability); *Senart v. Mobay Chem. Corp.*, 597 F. Supp. 502, 505-06 (D. Minn. 1984) (products liability and concerted action).

Plaintiffs' claims, therefore, cannot succeed because the "misrepresentations" they allege took place, under their own theory, during lobbying efforts designed to secure government approval for MTBE.   Because lobbying is constitutionally-protected conduct, the alleged statements cannot form the basis for a tort claim against defendants, even if the defendants allegedly made misstatements to government officials.   *In re Warfin Sodium Antitrust Litig.,* 1998 U.S. Dist. LEXIS 19555, *28-29 (D. Del. 1998) (Tab O); *Hamilton v. Accu-Tek*, 935 F. Supp. At 1321, 1324-25 (alleged misstatements to government officials could not form basis of fraud claim and were protected under First Amendment); *Radigan v. Bristol Labs.,* 1989 U.S. Dist. LEXIS 17767 (S.D. Miss. 1989) (Tab P) (lobbying to keep product from becoming "scheduled narcotic drug" under state law protected by First Amendment); *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289 (1992).   Accordingly, those claims must be dismissed.

## VIII.   PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR NEGLIGENCE.

To state a claim for negligence, each plaintiff must allege at a minimum "that a defendant owed her a cognizable duty of care, that the defendant breached that duty, and that the plaintiff

was injured as a proximate cause of the breach." *Cohen v. Standard Bank Inv. Corp.*, No. 97

Civ. 3802(SAS), 1998 WL 782024, *7 (S.D.N.Y. Nov. 6, 1998) (Scheindlin, J.)(Tab Q).

Because plaintiffs fail to identify compensable damages proximately caused by a breach of duty

by any particular defendant, their negligence claim must be dismissed.

### A. The "Uncontaminated Well Plaintiffs" Do Not Allege Any Damages and Therefore Do Not Allege a Valid Negligence Claim.

It is axiomatic under New York law that "negligence without damage gives rise to no

claim." *DeMartino v. United States*, 558 F. Supp. 1188, 1191 (E.D.N.Y. 1983). Damage is and

always has been "the very gist and essence" of a negligence allegation. *Schmidt v. Merchants*

*Despatch Transp. Co.*, 270 N.Y. 287, 300, 200 N.E. 824 (1936). Even when negligent action

"endanger[s] the person or property of another, no actionable wrong is committed if the danger is

averted . . . . It is only the injury to person or property arising from negligence which constitutes

the invasion of a personal right, protected by law, and, therefore, an actionable wrong." *Id.* The

requirement that plaintiffs allege actual (not possible) damage is based on the maxim that

"[l]iability does not exist in a vacuum." *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp.

595, 602 (S.D.N.Y. 1982).

As noted above, the "uncontaminated well plaintiffs" Arcuri and La Susa seek testing to

determine, as an initial matter, if they can state a claim for damages. Neither of these plaintiffs

alleges their properties have been impacted by MTBE. They point to no gasoline releases on or

near their properties. They do not claim their neighbors' properties have been contaminated, or

even that they live near a tank storing gasoline containing MTBE. As explained already,

plaintiffs' conclusory allegations of "stigma" damages do not eliminate these stark pleading

deficiencies, as New York law does not recognize a claim for diminution in property value

absent a "physical invasion or damage, or unreasonable interference with [a] person's use and

enjoyment of the property." *Mehlenbacher*, 71 F. Supp. 2d at 188; *see also Halliday*, 265

A.D.2d at 617, 696 N.Y.S.2d at 551. Furthermore, the lack of cognizable damages makes it

impossible for these plaintiffs ever to allege proximate causation. Regardless of considerations

of fault, defendants' alleged acts or omissions cannot proximately cause injuries that do not exist,

as a matter of common law and common sense. *See also Frank v. DaimlerChrysler Corp.*, No.

112945/99 (N.Y. Co. May 23, 2000) (dismissing negligence, fraud, and GBL § 349 claims where

plaintiffs failed to allege actual injury).

**B.     The "Contamination Plaintiffs" Do Not Allege a Specific
Claim of Negligence Against Any of the Defendants.**

The other plaintiffs allege only a set of generalized grievances levied against defendants

as a group. Not one alleged instance of contamination of a plaintiff's property is linked to the act

of any defendant, or to any release of MTBE-containing gasoline by anyone. Because of the

amended complaint's glaring lack of specificity, plaintiffs cannot satisfy the basic requirement

that they plead a "causal relationship between the injury complained of and the actions of *each*

defendant." *Rose*, 1997 N.Y. Misc. LEXIS 62, at *6 (emphasis added).

The amended complaint fails to allege facts sufficient to support the most basic elements

of a negligence claim. To maintain an action for negligent product design, "a plaintiff must

plead and prove that there was a feasible design alternative that would have made the product

safer." *Sabater v. Lead Indus. Ass'n*, 704 N.Y.S.2d 800 (Bronx Co. 2000). It is insufficient

simply to assert, as plaintiffs do here, that a product is defective because it is "so irremediably

and unreasonably dangerous that it should not have been produced at all." *Id.* (dismissing claim

that lead pigments were negligently designed). Plaintiffs do not allege that a reasonable, safer,

federally-permissible alternative design for reformulated gasoline existed. Instead, the

inescapable allegation central to plaintiffs' complaint, including any negligence claims, is that

- 37 -

MTBE-containing gasoline simply should never have been produced. This allegation, without more, cannot form the basis of a negligence claim.

Plaintiffs also attempt to plead a negligent failure to warn by alleging that defendants failed to warn "Plaintiffs..., the general public, intermediaries in the chain of gasoline commerce and officials charged with responding to gasoline spills" of the "enhanced risks" of MTBE. (Am. Compl. ¶ 184.) These allegations are also legally insufficient. As noted, under New York law, a failure to warn must be proximately linked with the injury. *Milbrand v. Smith & Wesson Corp.*, No. 96-CV-0806E(SC), 1998 WL 864885, at \*3 (W.D.N.Y Dec. 1, 1998) (Tab R) ("[p]roximate cause . . . requires a relationship between the failure to warn and the injury itself"). The amended complaint does not allege that plaintiffs' wells would not have been contaminated if a warning had been issued to them, because plaintiffs do not allege that their own handling caused contamination of their properties. Nor can plaintiffs claim that their alleged well contamination was caused by a failure to warn "intermediaries in the chain of gasoline commerce" and "officials charged with responding to gasoline spills." Plaintiffs never allege that those intermediaries and officials were unaware they should prevent and avoid releases of gasoline, with or without MTBE. Thus, plaintiffs allege no facts showing that a warning specific to MTBE would have prevented any releases from occurring, much less the releases that allegedly led to the contamination of their properties. When, as here, a "warning would not have added anything to the appreciation of [the] hazard," a negligent failure to warn claim cannot be maintained. *McMurry v. Inmont Corp.*, 264 A.D.2d 470, 472, 694 N.Y.S.2d 157, 159 (2d Dep't 1999).[12]

---

[12]    New York courts regard strict products liability and negligence claims for failure to warn as equivalent. *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979). Thus, if plaintiffs' strict liability claim fails, their negligence claim must fail as well.

Plaintiffs' failure to identify specific negligent acts committed by any defendant, or to link any instance of property damage to a defendant, makes their conclusory allegations of duty, breach and causation legally insufficient. Plaintiffs' negligence claim should be dismissed.

## IX.    PLAINTIFFS HAVE NOT STATED A VALID CLAIM UNDER GENERAL BUSINESS LAW § 349.

Plaintiffs seek to state a claim for "Deceptive Business Acts and Practices in Violation of GBL §349." Because plaintiffs do not allege that their injuries arose from a commercial transaction, and because they do not adequately allege that they were injured "by reason of" an alleged violation of the statute, their claims must be dismissed.

### A.    The Alleged "Deceptive Practices" Did Not Arise in the Context of a Commercial Transaction.

GBL § 349 is a consumer protection statute, and the courts have held that it only "prohibit[s], and ha[s] only been applied to, frauds or other deceptive practices *arising out of commercial transactions*." *New York Pub. Interest Research Group v. Insurance Info. Inst.*, 161 A.2d 204, 205, 554 N.Y.S.2d 590, 592 (1st Dep't 1990) (emphasis added). *Accord Genesco Entertainment v. Koch*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) ("Section 349 wears its purpose on its face; it is entitled 'Consumer Protection From Deceptive Acts and Practices"); *Kramer v. Pollack-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (dismissing § 349 claim where plaintiff did not allege that purchase from defendants caused damage).

Although plaintiffs allege they are "consumers" of gasoline, they do not allege that defendants made any misrepresentations to them in the course of selling them gasoline or that defendants induced them to buy gasoline through misrepresentations. Instead, plaintiffs allege that defendants made misrepresentations during the course of seeking regulatory approval for the use of MTBE. Plaintiffs do not even allege that they were aware of the statements or that those

statements caused them to perform or refrain from taking any action whatsoever. Nor do they

allege that their injuries resulted from purchasing or consuming MTBE-containing fuel. Rather,

their injuries, to the extent they have alleged any, resulted from contamination of groundwater

by MTBE. Thus, their claims under § 349 must be dismissed. *Cf. Allen v. Wright,* 468 U.S. 737,

751 (1984); *Society of Plastics Indus. v. County of Suffolk,* 77 N.Y.2d 761, 573 N.E.2d 1034, 570

N.Y.S.2d 778 (1991) (both holding that for standing to exist, injury alleged must fall within

"zone of interest" of statute invoked).

### B.   Plaintiffs Were Not Injured "By Reason Of" Defendants' Alleged Violations of GBL § 349.

GBL § 349 only provides a private right of action to plaintiffs who have "been injured by

reason of" a defendant's violation of the statute. GBL § 349(h); *Oswego Laborers' Local 214

Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995). Here,

plaintiffs' claim fails because there are no plausible allegations that their injuries resulted from

the conduct they allege. Specifically, Arcuri and La Susa make no allegations that give rise to a

reasonable belief that their wells may be contaminated. Section 349 requires a plaintiff to allege

actual, compensable harm. *See Oswego, supra* (plaintiff under § 349 must show that defendants'

conduct caused actual harm); *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 698 N.Y.S.2d 615,

620, 698 N.Y.S.2d 615 (1999) (dismissing GBL §349 claim because plaintiff failed to

demonstrate actual harm).

Likewise, although Berisha and O'Brien allege that their wells are contaminated, they

cannot allege a causal connection between the harm they claim (contamination of their wells)

and the violations of § 349 they allege (misrepresentations to EPA about MTBE). As explained

above, the amended complaint is devoid of any allegation that these plaintiffs were even aware

of the alleged misrepresentations on which they base their claim, and plaintiffs cannot allege that

they were injured "by reason of" alleged misrepresentations of which they were unaware. *See, e.g., Hertz Corp. v. Avis Corp.*, 867 F. Supp. 208, 214 (S.D.N.Y. 1994) (dismissing § 349 claim where plaintiff "failed to assert that it relied on the alleged representation"); *Copeland v. Weyerhaueser Co.*, 124 A.D.2d 998, 999, 509 N.Y.S.2d 227, 228 (4th Dep't 1986) (dismissing § 349 claim for failure to allege reliance on misrepresentation). For all of the foregoing reasons, the cause of action based on GBL §349 should be dismissed.

## X.   PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR PUBLIC NUISANCE.

Plaintiffs' fifth cause of action purports to state a claim for public nuisance. The authority to bring such claims lies almost exclusively with public entities. *See, e.g., Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 334, 451 N.E.2d 458, 468, 464 N.Y.S.2d 712 (1983) ("'invasions of rights common to all the public should be left to be remedied by action by public officials'") (quoting RESTATEMENT (SECOND) TORTS § 821C, comment b); *Copart Indus. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568, 362 N.E.2d 968, 971, 394 N.Y.S.2d 169 (1977); *Spring-Gar Community Civic Ass'n v. Homes for the Homeless, Inc.*, 135 Misc. 2d 689, 694, 516 N.Y.S.2d 399, 402 (Queens Co. 1987).

Private parties, therefore, generally do not have standing to bring an action for public nuisance. *See, e.g., Goldhirsch v. Majewski*, 87 F. Supp. 2d 272, 278 (S.D.N.Y. 2000); *Swearingen v. Long*, 889 F. Supp. 587, 593 (N.D.N.Y. 1995); *Saks v. Petosa*, 184 A.D.2d 512, 513, 584 N.Y.S.2d 321, 322 (2d Dep't 1992); *Queens County Business Alliance v. New York Racing Ass'n*, 98 A.D.2d 743, 744, 469 N.Y.S.2d 448 (2d Dep't 1983); *McDonald v. Gannett Publications*, 121 Misc. 2d 90, 92, 467 N.Y.S.2d 300, 301-02 (N.Y. Co. 1983); *Spring-Gar*, 135 Misc.2d at 695, 516 N.Y.S.2d at 403. Private individuals have only been allowed to bring a public nuisance action in those rare instances in which they suffer "special" damages; that is,

damages that are peculiar or unique to the individual, and differ in kind, rather than simply

degree, from the damages suffered by the public. *Burns*, 59 N.Y.2d at 334-35, 451 N.E.2d at

468-69, 464 N.Y.S.2d at 722; *Swearingen*, 889 F. Supp. at 593. Absent factual allegations that

could support a finding of special damages, a public nuisance claim brought by a private party

fails to state a claim and must be dismissed. *Burns*, 59 N.Y.2d at 334-35, 451 N.E.2d at 468-69.

464 N.Y.S.2d at 722; *Saks*, 184 A.D.2d at 513, 584 N.Y.S.2d at 322.

     Here, plaintiffs have not alleged facts showing that they have suffered a unique and

peculiar injury sufficient to satisfy the standing requirements of New York law. To the contrary,

they allege widespread injury, common to all class members. Plaintiffs identify only one type of

injury, and they allege that it is the same for all purported class members: actual or potential

contamination of private wells by MTBE in groundwater. Indeed, in an effort to lay the

groundwork for class certification, the amended complaint alleges that the same injury may

afflict the owners of wells all across the state (*see* Am. Compl. ¶¶ 103-04, 118-19, 121-25, 129),

and that "each subclass includes thousands of members." (Am. Compl. ¶ 148.)

     Allegations of widespread injury, common to all class members, are inadequate to show

special damages. *See Burns,* 59 N.Y.2d at 334-35, 451 N.E.2d at 468-69, 464 N.Y.S.2d at 721

(claim of "widespread economic dislocation and damage and substantial interference with the

public health, safety, comfort and convenience" from a transit strike was insufficient to show

special damages necessary for a public nuisance claim); *Spring-Gar*, 135 Misc. 2d at 695, 516

N.Y.S.2d at 403 (alleged injury to 500 member association held to be no different than injury to

community of 3,000). Here, plaintiffs simply cannot have it both ways: they cannot allege

common claims among purported class members too numerous to join while still alleging unique

damages for each plaintiff sufficient to confer standing for a public nuisance claim. Moreover,

since it would be impossible for plaintiffs to amend to allege special damages in light of the inherent contradictions between their sought-after status as class representatives and special damages, the claim should be dismissed without leave to replead. *Swearingen*, 889 F. Supp. at 593 (motion to amend complaint to allege special damages denied).

As if more were needed, plaintiffs also have failed to allege a causal connection between the conduct of the defendants and the alleged nuisance, namely the contamination of wells. This adds yet another reason why the public nuisance claim, like the other claims, should be dismissed. In the absence of an allegation that particular "conduct or omissions" has "cause[d] damage to the public," *Goldhirsch*, 87 F. Supp. 2d at 278, the nuisance claim is legally deficient and must be dismissed.

### XI. PLAINTIFFS HAVE NOT STATED A VALID CLAIM FOR PRIVATE NUISANCE.

Plaintiffs have amended the complaint to attempt to allege a private nuisance claim on behalf of plaintiffs Berisha and O'Brien and the Contaminated Well Subclass. (Am. Compl. ¶¶ 201-04). The private nuisance claim suffers from two fatal infirmities that require its dismissal.

First, it is well settled in New York that a private nuisance, by definition, "threatens one person or a relatively few." *Copart,* 41 N.Y.2d at 568, 362 N.E.2d at 971, 394 N.Y.S.2d 169 (citing *McFarlane v. City of Niagara Falls*, 247 N.Y.340, 344, 160 N.E. 391, 392 (1928) (Cardozo, J.) (stating that private nuisance threatens "one person or a few")). Here, the purported class plaintiffs are not "one person or a relatively few," *Copart*, 41 N.Y.2d at 568, 362 N.E.2d at 971, 394 N.Y.S.2d 169, but an indefinite number of persons plaintiffs estimate in the thousands across the state of New York. (*See, e.g.*, Am. Compl. ¶¶ 11, 124-25, 148.) Conduct or omissions such as those alleged here that supposedly cause damage to such a numerous class

do not constitute a private nuisance, but rather constitute conduct that may be "subject to abatement or prosecution on application of the *proper governmental agency*" as a "common" or "public" nuisance. *Copart*, 41 N.Y.2d at 568, 362 N.E.2d at 971, 394 N.Y.S.2d 169 (emphasis added); *see also Burns Jackson Miller Summit & Spitzer v. Lindner*, 88 A.D.2d 50, 66, 452 N.Y.S.2d 80, 90 (1st Dep't 1982), *aff'd*, 59 N.Y.2d 314, 464 N.Y.S.2d 712 (1983); *New York Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 82-84, 85 N.E.2d 873, 876 (1949).

Second, plaintiffs' private nuisance claim is also deficient because it fails to allege causation between any particular conduct by defendants and the alleged invasion of land. A defendant is subject to liability for a private nuisance only if it engages in conduct that constitutes a "legal cause of the invasion of the interest in the private use and enjoyment of land." *Copart,* 41 N.Y.2d at 569, 362 N.E.2d at 971, 594 N.Y.S.2d 169. Here, plaintiffs fail to allege the requisite causal connection between conduct of the defendants and the alleged nuisance (MTBE contamination of plaintiffs' property), as discussed above. The absence of any particular alleged conduct or omissions of defendants that constitutes the "legal cause of the invasion of the interest in the private use and enjoyment of [plaintiffs'] land," *Copart*, 41 N.Y.2d at 569, 362 N.E.2d at 971, 594 N.Y.S.2d 169, renders plaintiffs' private nuisance claim deficient and mandates that it be dismissed.

## CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss should be granted and the

amended complaint should be dismissed.

Dated:  June 19, 2000

Respectfully submitted,

Richard E. Wallace, Jr.
Anthony F. King
Peter C. Condron (PC4818)
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  202-204-1000
Facsimile:  202-204-1001

Attorneys for Defendants Exxon Corporation,
Mobil Oil Corporation, Motiva Enterprises LLC,
Shell Oil Products Company, and Texaco Inc.

Eric M. Kraus
SEDGWICK DETERT MORAN & ARNOLD
125 Broad Street, 39th Floor
New York, New York  10004-2400
Telephone: 212-422-0202
Facsimile: 212-422-0925

Attorneys for Defendants Motiva Enterprises LLC,
Shell Oil Products Company, and Texaco Inc.

Dated:  June 19, 2000

Respectfully submitted,

*Robert A Shulman*

Robert H. Shulman
Robert G. Abrams
Mindy G. Davis
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 783-0800
Facsimile:  (202) 383-6610

Attorneys for Defendant,
 Amerada Hess Corporation

_Richard C. Godfrey_

Richard C. Godfrey
J. Andrew Langan
Mark S. Lillie
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60602
(312) 861-2000
(312) 861-2200 (FAX)

Mark E. Holstein
200 East Randolph Drive
Suite 2000
Chicago Illinois, 60601
(312) 861-5437

Attorneys for Defendants
BP AMOCO CORPORATION and
ATLANTIC RICHFIELD COMPANY

Dated:  June 19, 2000

Respectfully submitted,

*Nathan P. Eimer / by per*

Nathan P. Eimer
Lisa S. Meyer
SIDLEY & AUSTIN
One First National Plaza
10 South Dearborn
Chicago, IL  60603
Telephone: (312) 853-7594
Facsimile: (312) 853-7036

Katherine Adams
SIDLEY & AUSTIN
875 Third Avenue
New York, New York 10022
Phone: (212) 906-2361
Fax: (212) 906-2021

Attorneys for CITGO Petroleum Corporation

Dated:  June 19, 2000

Respectfully submitted,

/s/
_____
Kenneth M. Bialo
BAKER BOTTS LLP
599 Lexington Avenue
New York, NY  10022-6030
Telephone:  212-705-5025
Facsimile:  212-705-5125

Steven L. Leifer
BAKER BOTTS LLP
1299 Pennsylvania Ave., N.W.
Washington, DC  20004-2400
Telephone:  202-639-7723
Facsimile:  202-585-1040

Attorneys for Valero Marketing and Supply
Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the Notice of Motion, Memorandum of Law in Support of Certain Defendants' Motion to Dismiss the Amended Complaint, and Appendix of Unreported Decisions Cited in Memorandum of Law in Support of Certain Defendants' Motion to Dismiss the Amended Complaint to be served by first class mail, postage prepaid, upon all counsel on the attached service list this 19th day of June 2000.

_____

Peter C. Condron

*Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00 CIV 1898 [SAS]

## SERVICE LIST

| **Parties** | **Counsel** |
|---|---|
| Plaintiffs | Lewis Saul<br>LEWIS SAUL & ASSOCIATES, PC<br>5301 Wisconsin Ave., N.W., Suite 550<br>Washington, DC  20015<br>Phone:  (202) 364-9700<br>Fax:  (202) 364-9701 |
| Plaintiffs | Stanley E. Margolies<br>KURZMAN KARELSEN & FRANK, LLP<br>230 Park Avenue, 23rd Floor<br>New York, NY  10169<br>Phone:  (212) 867-9500<br>Fax:  (212) 599-1759 |
| Amerada Hess Corp. | Robert Shulman<br>Mindy Davis<br>HOWREY, SIMON, ARNOLD & WHITE<br>1299 Pennsylvania Avenue, NW<br>Washington, D.C.  20005<br>Phone:  (202) 783-0800<br>Fax:  (202) 383-6610<br><br>Christopher S. Colman<br>Associate General Counsel<br>Amerada Hess Corporation<br>One Hess Plaza<br>Woodbridge, NJ  07095<br>Phone: (732) 750-6535<br>Fax: (732) 750-6944 |
| BP Amoco Corp. | James Andrew Langan<br>Mark S. Lillie<br>Thomas Tozer<br>Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, IL 60601<br>Phone:  (312) 861-2000<br>Fax:   (312) 861-2200 |

*Berisha v. Amerada Hess*                SERVICE LIST                Page 3


|  | Sy Gruza |
|  | 15th Floor |
|  | 477 Madison Ave. |
|  | New York, N.Y. 10022-5802 |
|  | Phone: (212) 702-5400 |
|  | Fax: (212) 702-5450 |

Tosco Corp.

Kenneth Pasquale
Stroock, Stroock & Lavan LLP
180 Maiden Lane
New York, N.Y.   10038-4982
Phone: (212) 806-5562
Fax: (212) 806-6006

Valero Energy Corp.

Steven L. Leifer
Baker Botts LLP
1299 Pennsylvania Ave., N.W.
Washington, DC  20004-2400
Phone:  202-639-7723
Fax: 202-585-1040

Kenneth M. Bialo
Baker Botts LLP
599 Lexington Avenue
New York, NY  10022-6030
Phone:  212-705-5025
Fax:  212-705-5125

3

ALLSTATE LEGAL 800-222-0510   ED1   RECYCLED

04OVBERC                                          1

 1 | UNITED STATES DISTRICT COURT
   | SOUTHERN DISTRICT OF NEW YORK
 2 | ------------------------------x

 3 | DONNA BERISHA, on behalf of
   | herself and all others
 4 | similarly situated, et al

 5 |           Plaintiffs,

 6 |      v.                              00 Civ. 1898 (SAS)

 7 | AMERADA HESS CORPORATION, BP
   | AMOCO CORPORATION, CHEVRON
 8 | CORPORATION, CITGO PETROLEUM
   | CORPORATION, EXXON CORPORATION,
 9 | GETTY PETROLEUM CORPORATION,
   | GULF OIL LTD. PARTNERSHIP,
10 | MOBIL OIL CORPORATION,
   | SHELL OIL PRODUCTS COMPANY,
11 | SUNOCO, INC., TOSCO CORPORATION,
   | DOES 1 THROUGH 100, inclusive,
12 | and TEXACO, INC.,
   |            Defendants.
13 |
   | ------------------------------x
14 |
   |                                 April 24, 2000
15 |                                 5:00 p.m.

16 |

17 |

   | Before:
18 |
   |              HON. SHIRA A. SCHEINDLIN,
19 |
   |                                 District Judge
20 |

21 |

22 |                     APPEARANCES

23 | LEWIS SAUL & ASSOCIATES, P.C.
   |       Attorneys for Plaintiffs
24 | BY: LEWIS SAUL
   |     JOHN HINCK
25 |

04OVBERC                                                    2

```
 1   BEVERIDGE & DIAMOND, P.C.
          Attorneys for Defendant Sunoco
 2   BY:  JOHN S. GUTTMANN
          SY GRUZA
 3
     RIVKIN RADLER & KREMER
 4        Attorneys for Defendant Getty Petroleum Corporation
     BY:  CHARLOTTE A. BIBLOW
 5
     WALLACE KING MARRARO & BRANSON
 6        Attorneys for Defendants Exxon, Mobil, Shell & Texaco
     BY:  RICHARD E. WALLACE, JR.
 7
     STROOK, STROOCK & LAVAN, L.L.P.
 8        Attorneys for Defendant Tosco Corporation
     BY:  MELVIN BROSTERMAN
 9        EMILY CULPEPPER
10   SEDGWICK DETERT MORAN & ARNOLD
          Attorneys for Defendant Texaco, Inc.
11   BY:  SHARON M. DUTCH
12   SIDLEY & AUSTIN
          Attorneys for Defendant Citgo Petroleum
13   BY:  NATHAN P. EIMER
          LISA MEYER
14        KATHERINE ADAMS
15   KIRKLAND & ELLIS
          Attorneys for Defendant BP Amoco Corporation
16   BY:  KIMBERLY ZIEV NIEHAUS
17   GOODWIN, PROCTER & HOAR, L.L.P.
          Attorneys for Defendant Gulf Oil Ltd. Partnership
18   BY:  ANDREW LEVIN (by telephone)
19
20
21
22
23
24
25
```

1              THE COURT:  I received a letter in this case, who

2       sent me a letter, from the one who's the lawyer for everybody.

3              You are you Mr. Wallace?

4              MR. WALLACE:  I'm Richard Wallace.

5              THE COURT:  Do you have a copy?  I left it in

6       chambers.

7              MR. WALLACE:  I'm sorry, your Honor.

8              THE COURT:  Does anybody have a copy?

9              Good afternoon, Mr. Saul.  You are Mr. Saul?

10             MR. SAUL:  Yes, good afternoon.

11             THE COURT:  And you are Mr. Hinck?

12             MR. HINCK:  Yes.

13             THE COURT:  You were the disembodied voice?

14             MR. HINCK:  Yes, somewhere near your desk.

15             THE COURT:  But you are still here.

16             Who is John Guttmann.

17             MR. GUTTMANN:  Here, your Honor.

18             THE COURT:  And is there a Mr. Gruza?

19             MR. GRUZA:  Yes, your Honor.

20             THE COURT:  And Ms. Biblow?

21             MS. BIBLOW:  Here, your Honor.

22             THE COURT:  Thank you.

23             And Mr. Wallace, you just stood; right?

24             There is somebody on the phone, Mr. Levin.  Hello,

25       Mr. Levin.

04OVBERC                                                              4

1          MR. LEVIN:  Yes.

2          THE COURT:  This is Judge Scheindlin speaking.  I'm

3   calling the roll.  You represent who, Mr. Levin?

4          MR. LEVIN:  Gulf Oil limited partnership.

5          THE COURT:  Anybody else here for that entity?

6          MR. LEVIN:  No, I'm the only one.

7          THE COURT:  Where are you located?

8          MR. LEVIN:  Boston.

9          THE COURT:  Mr. Brosterman?

10          MR. BROSTERMAN:  Good afternoon.

11          THE COURT:  Good afternoon.  And Ms. Culpepper?

12          MS. CULPEPPER:  Yes, good afternoon.

13          THE COURT:  Good afternoon, Ms. Dutch.

14          MS. DUTCH:  Good afternoon.

15          THE COURT:  Good afternoon.  And I don't know if you

16   are all here, are there three people here, Eimer.

17          MR. EIMER:  Good afternoon.  I'm Mr. Eimer.

18          THE COURT:  And you are?

19          MS. ADAMS:  Katherine Adams.

20          THE COURT:  And you are Ms. Meyer?

21          MS. MEYER:  Yes.

22          THE COURT:  And you are the Chicago group.

23          MS. ADAMS:  The New York --

24          THE COURT:  The New York office of.

25          MS. ADAMS:  Yes.

1          THE COURT:  And this is Ms. Niehaus?

2          MS. NIEHAUS:  Yes, your Honor.

3          THE COURT:  Are all defendants present either in

4    person or on the telephone?

5          MR. WALLACE:  I think there may be one missing and

6    that's Amerada Hess, unless there's somebody here appearing

7    for Amerada Hess.

8          THE COURT:  Everybody has been identified.  Let's see

9    on your letter.  You are supposed to be here for Amerada Hess.

10   The letter says Christopher Coleman, Associate General Counsel

11   or Robert Shulman or Mindy Davis from Howrey & Simon.

12         Before you speak, since there's so many names, say

13   your name.

14         MS. DUTCH:  Sharon Dutch for Texaco, Inc.

15         They called me this morning and asked me to let you

16   know that I would be putting in pro hac papers for them for

17   their attendance in the future, but they're not going to be

18   here.

19         THE COURT:  Tell them in the future, they are not

20   really entitled to absent themselves on their choice.  They

21   are required to be here when we have a conference, either in

22   person or on the phone.

23         MS. DUTCH:  O.K.

24         THE COURT:  Mr. Saul, you didn't respond, I think, to

25   Mr. Wallace's letter in writing.

04OVBERC                                                                    6

1              MR. SAUL:  We did not.

2              THE COURT:  Would you like to respond orally?

3              MR. SAUL:  This was the letter that was faxed to the

4    DV office today.

5              THE COURT:  I don't know.  It's dated April 20th and

6    since I don't have my copy, I don't know when I received it.

7    I'm looking at the April 20th letter, the one that asks to be

8    sure that I read at least 200 pages.

9              MR. SAUL:  Right.  We did not feel that there was any

10   necessity for 50-page briefs and 20-page replies, 10-page

11   surreplies and all of this, particularly when there's so many

12   defendants.  We could stick to the number of pages that are

13   usually permitted, but if the Court wishes --

14             THE COURT:  The funny thing about the letter is

15   there's a sentence that says the longer briefs would also

16   facilitate joint filings and, thus, might ultimately reduce

17   the submissions required.

18             Then I thought there was a sentence that said, in

19   addition to the joint brief that our clients intend to file,

20   there are other defendants who plan to move separately.  So,

21   at first, I thought you were saying that you were working on

22   coordinating all the defendants, that it made sense for me to

23   grant your request because at least I would have one neat

24   120-page book to read, which I'm going to have these

25   repetitive books to read, then I'm not going to do this.

1          Let me talk to the other defendants and see if they

2     are intending to separately move, even though apparently I

3     can't talk to Amerada Hess, which is frustrating.  Let's see

4     now who's on the phone.

5          Mr. Levin?

6          MR. LEVIN:  Yes.  We were answering -- actually going

7     to answer the complaint.  We might be joining in with someone

8     else's brief, but we won't be filing our own brief.

9          THE COURT:  Excellent.  Let me put a little check on

10    there.  That takes care of you.

11         Mr. Guttmann?

12         MR. GUTTMANN:  Yes, your Honor.

13         THE COURT:  What is your intention?

14         MR. GUTTMANN:  Our intention is to move separately.

15         THE COURT:  Why can't you coordinate as defendants

16    generally do in these situations?

17         MR. GUTTMANN:  I understand, your Honor.  On the

18    other hand, we may have our own views as to how to approach

19    the case.  Our client has its own views as to how to approach

20    the case and in some respects it differs.

21         THE COURT:  In some respects.  How about if I set a

22    staggered schedule and reduced your pages?  In other words,

23    what if I granted their request to file 50 pages and then said

24    you can supplement to no more than 15 anything you think they

25    didn't cover?  What about that idea?

```
 1              MR. GUTTMANN:  Well --

 2              THE COURT:  So, we try to act efficiently instead of

 3    inefficiently.

 4              MR. GUTTMANN:  I'm not sure why that way, rather than

 5    picking someone else in the defense group.

 6              THE COURT:  Because they have so many.  Look who they

 7    represent.  They represent --

 8              MR. GUTTMANN:  I believe they represent four.

 9              THE COURT:  Chevron, Exxon, Mobil, Shell Oil and

10    Texaco.  That's most of the names I'm familiar with in the

11    industry.  That's a lot of folks.

12              MR. GUTTMANN:  Well, there's a lot --

13              THE COURT:  You represent Sunoco?

14              MR. GUTTMANN:  Yes, that's correct.

15              THE COURT:  Well, there's five of them and one of

16    you.  That's a good enough reason.

17              MR. GUTTMANN:  Well, all I can tell you, Judge, is we

18    would like to file our own motion.  We think we can do it in

19    no less than 50 pages.

20              THE COURT:  My rules say 25 and I'm suggesting to you

21    that I'm going to cut it to you.  I'm going to cut it back.

22              What is your view, Ms. Biblow?

23              MS. BIBLOW:  We will join in with Mr. Wallace in his

24    brief.

25              THE COURT:  You are going to join in?
```

1          MS. BIBLOW:  Yes.

2          THE COURT:  Mr. Brosterman, what is your view?

3          MR. BROSTERMAN:  We'll be answering on behalf of

4    Tosco and we may, after reviewing the papers, make a motion

5    for pleadings incorporating, of course, the same arguments.

6          THE COURT:  In other words, it's more like Mr. Levin

7    said.  You would write a "me, too" letter.

8          MR. BROSTERMAN:  That's right.

9          THE COURT:  We accept the "me too" letters as long as

10   they are one page.

11         MR. BROSTERMAN:  I think we could do that.

12         THE COURT:  Ms. Dutch, what is your intention?

13         MS. DUTCH:  We are representing Texaco along with

14   Mr. Wallace.

15         THE COURT:  Sorry.  You are sitting along with

16   Mr. Wallace; right; Citgo?

17         Mr. Eimer, what is your intention?

18         MR. EIMER:  We are going to join in the consolidated

19   pleadings.  We will file nothing.  We will be joining in the

20   consolidated motion in Mr. Wallace's pleading.

21         THE COURT:  All right.  Good.

22         Amoco, Ms. Niehaus?

23         MS. NIEHAUS:  We'll be joining with Mr. Wallace as

24   well, your Honor.

25         THE COURT:  Has anybody spoken to the lawyers for

1  Amerada Hess?

2          MR. WALLACE:  I have, your Honor, and I believe that

3  they are going to be joining in the motion as well, but I

4  regret I can't certify that.

5          THE COURT:  But that's your hope and expectation at

6  the moment?

7          MR. WALLACE:  Yes, your Honor.

8          THE COURT:  I will go with that.

9          So, the only hold out here is Mr. Guttmann versus

10 Sunoco; right?  You want to do your own?

11         MR. GUTTMANN:  Yes, your Honor.

12         THE COURT:  Well, I really am not going to give them

13 50 and then give you 25 and then give them 50.  I'm not going

14 to read 200 pages.  It's unnecessary.  It's going to be

15 invariably repetitive and just going to end up causing judge

16 abuse.  We don't want to engage in that.

17         We really want to cut these pages down.  Let's see

18 what we can do.  Now, why do you need 50 pages, Mr. Wallace?

19 What are these many points you plan to make?  The fact that

20 the complaint is 49 pages long didn't impress me.  We see that

21 a lot in the Southern District of New York.

22         MR. WALLACE:  Understood.

23         THE COURT:  And the same thing with 10 counts.  We

24 see that a fair amount in the Southern District of New York.

25 Why does your case take 50 pages?

1          MR. WALLACE:  I think the 10 counts raise complicated

2    issues, all of them legal issues.  The statements of the

3    allegations would be very brief and we won't recite what

4    you've read in the complaint, the legal arguments of which

5    these 10 counts raise.

6          THE COURT:  I was just going to ask you that.  I'm

7    going to have to deal with novel and unprecedented issues.

8          MR. WALLACE:  I trust you will only have to deal with

9    them for a short while until you grant the motion to dismiss.

10          THE COURT:  They have not been dealt with already

11    court by court around the country?

12          MR. WALLACE:  Correct.

13          THE COURT:  Is that right, Mr. Saul?  Some of these

14    are going to be first impression?

15          MR. SAUL:  Some of them, yes.  We received today a

16    letter from Mr. Wallace which --

17          THE COURT:  He was supposed to do that.  I meant to

18    ask him if he complied with my individual rules.

19          MR. SAUL:  He did.  It's not that complicated.  It's

20    very simple.  It's all here.

21          THE COURT:  My rules say I don't take a copy of those

22    and that's between counsel to see if they can agree on

23    anything and reduce the briefing.

24          The purpose of that exercise, it's been a very

25    effective way of doing things for us, is to cut down on

 1   motions to dismiss altogether or at least on the issue they

 2   cover.

 3          And what my rules say is actually you are supposed to

 4   respond and the effort is to convince one another, if

 5   possible, either not to move on a certain point or to give in

 6   on a certain point.

 7          If you really read that and say to yourself, you know

 8   what, I can't win that one point, so I will drop the ninth

 9   cause of action, that already cuts back.

10          Or vice versa, you write a letter back saying you

11   can't win on that point in the Second Circuit because last

12   week the Circuit ruled X and you just can't prevail.  That's

13   supposed to be the point of the letter writing and it has for

14   us usually been effective.

15          So, I urge you to finish the letter exchange and

16   write back and see if anything they say convinces you or

17   anything you say convinces them because that could cut back.

18          Anyway, you don't think it's that complicated?

19          MR. SAUL:  It's complicated, if they make it

20   complicated.

21          THE COURT:  What is the essence of their motion?

22          MR. SAUL:  The essence of their motion if they say on

23   all counts that we raise that we fail to state a complaint

24   upon which relief can be granted essentially.

25          THE COURT:  That's almost impossible.  How can they

1    be so bad at pleading?

2            MR. SAUL:  I thought we did a pretty reasonable job.

3            THE COURT:  You didn't have any simple things like

4    statute of limitations has run or something ordinary as that.

5            MR. WALLACE:  We don't, in part, because we don't

6    have the facts to determine the precise claims of these

7    individually-named plaintiffs, of which there are four.  Those

8    four plaintiffs don't tell us where they live or which

9    defendant is responsible for allegedly causing the damage.

10           THE COURT:  I'm glad you mention that.  The other

11   thing that my letter-writing technique has achieved for us

12   sometimes is that you wish to amend before the motion

13   practice.  Sometimes people say, look, I see that they got a

14   point there.  All I have got to do is fix paragraphs 29, 38,

15   47, or whatever; that's it.

16           So, if you can amend to cure some of the points they

17   are making, you ought to do it because I don't want to go

18   through this thing twice.

19           MR. SAUL:  That's why we wanted the status conference

20   before, because we did want to amend the complaint which we

21   can do by a week from Friday, May 5th.

22           THE COURT:  And it might answer some of the items

23   raised in the letter, some.

24           MR. SAUL:  Yes.

25           THE COURT:  You want to do that by May 5th?

1            MR. SAUL:  If that's agreeable.

2            THE COURT:  In a case of this size which I'm

3    gathering is a large case, we should, and you can which you

4    can amend it and then assess it.  There will be an amended

5    complaint by May 5th.

6            Is this amended as of Friday?

7            MR. SAUL:  It's as of Friday.

8            THE COURT:  They haven't answered yet.  They will

9    stipulate anyway to this first amendment because it makes

10   sense.  If you don't need it, that would be May 5th.  And

11   then, please, if you see that some of the points that you

12   thought you can move on, you can't.  That's all I can say.

13           (Continued on next page)

1        MR. SAUL:  Your Honor, our suggestion, we had a

2   number of issues that we thought should be addressed today,

3   and let me just if I could just run through the five areas and

4   it may help on the issue that we are just talking about.

5        THE COURT:  Sure.  Let.

6        MR. SAUL:  The first issue is the amendment of the

7   complaint which we have dealt with.

8        The other four issues are as follows:  Discovery,

9   class certification, our written briefs for class

10   certification and then oral argument and the motion to

11   dismiss.  We believe --

12        THE COURT:  I think I missed one.  You said the

13   amended complaint May 5, discovery number 2, class

14   certification is number 3 and argument is number 4.

15        MR. SAUL:  Yes.  We believe your Honor should hear

16   class certification prior to the motion to dismiss.  Because

17   in a class action such as this, they can move to dismiss

18   against the individual plaintiffs but we are talking about

19   probably a million well owners.  Some of these causes of

20   action may be appropriate to be dismissed possibly against

21   these class representatives, but as your Honor well knows,

22   Rule 23 is a flexible rule and plaintiffs can be added, class

23   definition can be changed as we progress.

24        THE COURT:  But you need a class representative.

25        MR. SAUL:  We have class representatives.

1            THE COURT:  Let's say in theory none of them were

2    adequate as shown by the motion to dismiss, you would have a

3    problem.

4            MR. SAUL:  If none of them, yes.  But if two of

5    them --

6            THE COURT:  You'd be fine.  But from the way

7    Mr. Wallace described the preamendment at this early phase he

8    is saying none of them are adequate on any of the causes of

9    action.  That remains to be seen.  But if you were right,

10   wouldn't it more sensible to take up the motion to dismiss

11   first?

12           MR. SAUL:  If Mr. Hinck can speak to this point.

13           THE COURT:  Sure.

14           MR. HINCK:  The point that is being raised here, your

15   Honor, is that a decision on class certification preceding the

16   decision would then have the legal matter applying to the

17   entire class.  There is probably another very good reason to

18   put the class certification decision first and that is that if

19   this case is going to be similar to any of the other MTBE

20   cases filed there probably won't be a great deal of discussion

21   about the issue of numerosity.

22           THE COURT:  So they won't be talking about

23   numerosity.  It won't be their issue.

24           MR. HINCK:  In other words, we have all these people

25   in the State of New York that are similarly situated.  If a

1    decision is made whether or not the case can be certified they

2    know whether or not their claims are represented in court or

3    not and it changes the entire complexion of the case as to a

4    million people.  That decision being put off till later leaves

5    that question open indefinitely.

6              We can take care of the claims of these individuals

7    on a motion to dismiss, and some claims survive, perhaps.  We

8    seek to amend to improve the pleadings and this period goes on

9    while a million people don't know whether or not the case can

10   even be certified.

11             THE COURT:  Let's talk for a minute about discovery.

12   When you mentioned the word discovery did you mean on the

13   class certification issues or merits?

14             MR. SAUL:  We believe they are so intertwined as in

15   most cases that we would just like full discovery as quickly

16   as possible.  Many of these documents have been produced in

17   other cases.

18             THE COURT:  But if there has been other MTBE

19   litigation in other jurisdictions, why are these novel issues

20   here that haven't been decided around the country?

21             MR. SAUL:  Let me bring you up to speed.  There is a

22   case pending in Maine, it was removed to federal and remanded

23   and the motion --

24             THE COURT:  Now, it is in state court?

25             MR. SAUL:  State court.  And the motion for class

1   certification was recently denied but it is a totally

2   different theory in Maine. That is on appeal in Maine.

3          THE COURT:  Are you handling it?

4          MR. SAUL:  Yes.  In North Carolina, where I as well

5   am co-class counsel, the judge --

6          THE COURT:  Federal or state?

7          MR. SAUL:  State court.  The judge has suggested to

8   the parties and the parties agreed prior to him granting our

9   motion for class certification that we should mediate the

10  case.  So we are in mediation now in North Carolina.  And

11  there is an issue in North Carolina of bifurcation.  In North

12  Carolina first the testing class is to be tried and then the

13  contaminated well class is to be tried.

14         In California, there is a similar type of action, it

15  is under the consumer protection law, it is in state court as

16  well, and that's moving along.

17         THE COURT:  Where is it up to?

18         MR. HINCK:  They have a trial date.

19         THE COURT:  Has there been a class certification?

20         MR. HINCK:  It is not a class action.

21         MR. SAUL:  But it is similar in nature.  It is

22  under --

23         THE COURT:  But it is not a class action.  There is a

24  trial date.  Has there been a motion to dismiss?

25         MR. HINCK:  There was.  It was denied.

1          THE COURT:  Does it raise similar issues as this

2    motion?

3          MR. HINCK:  As far as I can tell from the scant

4    letter it would raise similar issues in some cases and I

5    imagine in other points it would not be.

6          MR. SAUL:  There are a number of cases around the

7    country, for instance, Lake Tahoe in California, that's

8    progressing quickly.  I think Mr. Wallace is involved in 50 or

9    a hundred cases around the country.

10          MR. WALLACE:  Two, your Honor.

11          MR. SAUL:  Somebody told me that you were --

12          THE COURT:  Two of the ones that you already

13    discussed?

14          MR. WALLACE:  Actually, no, I'm not involved in any

15    of the others that he has mentioned.  I know something about

16    them and would like an opportunity to set the record straight

17    but I'm not directly involved in the others.

18          MR. SAUL:  There is Lake Tahoe and also Santa Monica,

19    both in state court in California where a number of documents

20    have been produced.  So we believe that we would first like to

21    start with all the depositions and all the documents that have

22    been produced in these other cases --

23          THE COURT:  But if the documents have been produced

24    in these other cases and you are counsel in these cases then

25    you have the documents.

1          MR. SAUL:  I'm sorry, I'm not in California.

2  Documents have not been produced in Maine or North Carolina as

3  of yet.  So we would suggest a confidentiality order

4  immediately.  They have entered into one in California and we

5  are agreeable to that.  We would like the documents that have

6  already been produced plus the deposition transcripts that

7  have already been taken in any MTBE cases immediately and then

8  we will be able to see where we go from there.

9          There is one other additional case that has some sort

10  of potential overlap with our case.  That is in federal court

11  in Alabama.  It was called Peters before.  It was an

12  underground storage tank case but I believe the name has been

13  changed.

14          MR. WALLACE:  I am involved in that and it is called

15  Lynn.

16          THE COURT:  L-Y-N-N?

17          MR. WALLACE:  Yes.  In federal court.

18          THE COURT:  What's the status of that one?

19          MR. WALLACE:  This was a case filed in 1996.  The

20  federal court there has deferred all determination class

21  issues and has focused discovery in the current proceedings on

22  the claims of the individual named plaintiffs and summary

23  judgment motions are scheduled for July.  We are just coming

24  to the close of discovery now.

25          THE COURT:  Was there a motion to dismiss there?

1          MR. WALLACE:  Yes.

2          THE COURT:  Obviously you lost that, right?

3          MR. WALLACE:  Yes.  It is not an MTBE case.  It is

4   different.  As I say I could set the record straight on some

5   of these cases.

6          THE COURT:  No, I just wanted to know if there was

7   going to be a body of law that was not going to control but

8   guide my decision.  You know in tobacco and asbestos there are

9   a lots of courts doing these and you can look at the other

10  courts.  That's why I wanted to know what is going on around

11  the country in MTBE.  You don't think the Alabama motion to

12  dismiss decision is going to help much here?

13         MR. WALLACE:  No, the claims are quite different.

14  And I should say there has been only one class certification

15  decision in the various MTBE decisions and that was the

16  decision which Mr. Saul referenced in Maine.

17         THE COURT:  He said the complaint was different.

18         MR. WALLACE:  It is different in important respects.

19  the class issues I submit are very similar, the similarities

20  certainly outweigh the differences.  I understood Mr. Saul to

21  be suggesting that since he is class counsel in North Carolina

22  and that case has been bifurcated.

23         THE COURT:  I didn't get any of that.  It took from

24  what he said is that it is in state court, there has been no

25  certification, the judge wanted to go right into mediation and

1  it is in mediation.

2          MR. WALLACE:  And a motion to dismiss is pending.

3          THE COURT:  OK, a motion to dismiss is pending.  Is

4  it fully briefed?

5          MR. WALLACE:  I believe so.  So far as I know the

6  court has not bifurcated the case.  The plaintiffs sought

7  certification of just a subclass in the first instance.

8          THE COURT:  So no class has been certified anywhere

9  yet?

10         MR. SAUL:  Well, there has been a class as I

11  understand it, and Mr. Wallace will know better, but the

12  Alabama case has been certified as a class action.

13         THE COURT:  He said deferred the class issues.

14         MR. WALLACE:  When the case was first filed it was

15  filed in state court and the plaintiffs have obtained a drive

16  by certification, the federal court vacated it.  There has

17  been no hearings or briefings.

18         THE COURT:  It is not certified and it is an

19  underground storage case so there are two differences.

20         MR. HINCK:  One other point about the North Carolina

21  case, it is the Maynard case.  There has been motion to

22  certify the class for testing.  The untested well class.  That

23  has been fully briefed and it was at the hearing on class

24  certification that the judge raised the question of mediation

25  and suggested that the decision on class certification was

040gber mjd                                                    23

 1 | further along than was a motion to dismiss in that case.  If

 2 | that was any guidance from the state court in North Carolina.

 3 | MR. EIMER:  Your Honor, I am in the Maynard case in

 4 | North Carolina.  That was a hearing essentially devoted to the

 5 | motion to dismiss.  Some issues about class were discussed at

 6 | that hearing but the court, as your Honor noted, did nothing

 7 | and deferred everything until after mediation, so I haven't

 8 | crossed the first threshold.

 9 | THE COURT:  Let me ask about the mediation.  There is

10 | a whole crowd of defendants that are sitting here today.  Are

11 | you all in that?  Those that are on the phone, are you in that

12 | case?

13 | MR. LEVIN:  We are not.

14 | THE COURT:  Many are not.

15 | MR. EIMER:  It is essentially the sellers of gasoline

16 | in North Carolina.

17 | THE COURT:  We can't fold into their mediation.  It

18 | wouldn't work.

19 | MR. SAUL:  Your Honor, to be clear, that was not an

20 | accurate representation made to the court.  The majority of

21 | that hearing was for class certification.

22 | THE COURT:  I'm not interested in the percentage of

23 | time spent on each of the two issues.  Whether it was 38 or 53

24 | it is irrelevant to me.

25 | This has been very helpful.  All we have set so far

1   is the amended complaint date.  Let's talk a little bit about

2   discovery.  Why isn't Mr. Saul right that initially no matter

3   what you should provide to him discovery already provided in

4   any other court that has an MTBE case pending?  So if you have

5   already done a document production produce the same documents.

6   If you have already taken depositions provide him with

7   transcripts, all of that under a confidentiality order, but it

8   is the easiest way to start the process.  May be the fairest

9   way.

10              MR. WALLACE:  If I may, your Honor.  The case where

11   discovery as I understand it has been concentrated, and

12   Mr. Saul can correct me if I am mistaken here, has been the

13   South Lake Tahoe Public Utility District against various oil

14   companies.  My understanding is that's a case by a water

15   utility complaining about contamination in a water source, and

16   I don't know whether it is a reservoir, an aquifer, by local

17   operators in California, and much, if not the majority, of

18   that discovery has focused on the source of that gasoline sold

19   in that area.  And that discovery would have no bearing on

20   this case.

21              What's more, as the court is aware now, there are

22   distinctions between the defendants.  There is certainly some

23   overlap and some similarities.  Some of the defendants here

24   also are named in the California case.  But not all.  What's

25   more important, needless the to say, the plaintiffs are quite

040gber mjd                                                  25

1   different and the plaintiff's claims are very different.  I

2   think it would be going too far to suggest that even those

3   defendants that are in both cases should have to produce a

4   vast wealth of material to four name plaintiffs in New York

5   who have no resemblance to those plaintiffs in California,

6   particularly where the claims of the four named plaintiffs in

7   New York have not yet been tested by our motion to dismiss.

8        THE COURT:  I do not stay discovery pending

9   determinations of motions to dismiss.  I have never done it.

10  I don't believe in it.  I have to do it in security actions

11  because Congress told me to.  If Congress wanted that to apply

12  to all other actions, they would have told me to.

13       It is not my practice to stay discovery.  I don't

14  find it helpful.  And I must add that it's rare, rare that the

15  motion to dismiss is granted as to ten different causes of

16  action in every plaintiff.  It is a rare day.  So that's why I

17  don't stay discovery because cases tend to go past the motion

18  to dismiss stage.   Once in a long while they don't, but it is

19  rare.

20       MR. WALLACE:  Understood.  An important feature of

21  this motion will be to apprise the court that these named

22  plaintiffs have not asserted particular claims against

23  specific defendants.

24       THE COURT:  That's one of the things the amendment

25  might take care of.  So we may be a little premature in

040gber mjd                                              26

 1   discussions on that detail.  I must tell you I am going to

 2   permit discovery to go forward and so we should discuss the

 3   best way to permit it to go forward.

 4           Yes, Mr. Brosterman.

 5           MR. BROSTERMAN:  If I may, Judge, on the subject of

 6   California and New York, briefly.  They are very different

 7   claims involving, for example, Tasco is a party in California

 8   or a party in New York.  We were in that market in different

 9   times than we were in New York, different distribution

10   networks.  So the discovery in that case is largely if, not

11   entirely, inapplicable.

12           THE COURT:  You may have both convinced me that you

13   shouldn't produce the same documents, but discovery will go

14   forward.

15           MR. BROSTERMAN:  What I would suggest is this.

16   Instead of dealing with full-fledged merits discovery early on

17   in the case, that the first phase in the case for discovery,

18   and it would not be unusual to phase in discovery, would be

19   the class discovery.  We could have a date for the motion.  I

20   realize we have to deal -- the court has to deal with the

21   motion to dismiss first.

22           There is also a motion for class certification.  We

23   would want discovery in connection with that motion because

24   obviously if the case is not dismissed or if there are three

25   counts left out of the ten that remain that were originally

1    pled but the class certification is denied, then the entire

2    complexion of discovery changes in the case.

3          And what I don't want to see, and we are obviously

4    very sensitive to this because there are as many cases as

5    there are around the county, is what we don't want to see, and

6    I appreciate that there are confidentiality stips and I know

7    how far confidentiality stips can go, but what I don't want to

8    see is a situation where there is merits discovery in the case

9    where the merits discovery may not be relevant because of a

10    denial of class certification and that we find in this

11    burgeoning cottage industry the merits discovery in one case

12    becomes available indirectly, if not directly, as the source

13    of information for filing the next complaint.  That's a real

14    concern.

15          I appreciate that the court can enter a

16    confidentiality order.  I appreciate that plaintiffs and we

17    can agree in good faith to abide by that, but the information

18    sticks in their head and it --

19          THE COURT:  What you probably appreciate is that it

20    is somewhat inevitable, once these get started the discovery

21    will be packaged up and be around.

22          MR. BROSTERMAN:  There are different claims in

23    different markets and that's why I am suggesting perhaps the

24    first phase here is to have class discovery and then pick up

25    with the merits discovery at least after the class motion has

1   been made.

2         THE COURT:   I think from your perspective I

3   understand that you want to get the class discovery from the

4   plaintiffs.

5         MR. BROSTERMAN:   Also because I need the class

6   discovery and we know they have to make the motion and we know

7   we are going to oppose that motion and we know that no court

8   has granted class certificate yet and we hope this court

9   doesn't and if the court does not then what is relevant in

10  terms of merits discovery has changed dramatically.   Not only

11  are we dealing with the concerns I raised a moment ago, but

12  obviously if we go from this case to this case then we are

13  dealing with a very different world of documents, a very

14  different world of depositions, a very different world of

15  identification of distribution networks, how far out it goes.

16  So it really does change quite dramatically the scope of

17  merits discovery.

18        MR. HINCK:   Your Honor, very important point about

19  the case in Lake Tahoe.   One of the major claims is strict

20  product liability for failure to warrant.   Named for that

21  count are many of the same defendants here.   The documents

22  they produced in connection with that count had very little to

23  do with how a gas station was run in Lake Tahoe.   It had to do

24  with the introduction of the product of gasoline with MTBE in

25  it, how it was represented.   Many of the very same issues are

1   in this case.  It seems to me --

2          THE COURT:  How about addressing the point that

3   Mr. Brosterman raised that if it doesn't go forward as a class

4   action the scope of discovery would be extraordinarily

5   different?

6          MR. HINCK:  Well, actually we would have the same

7   claim, strict liability, strict product liability for failure

8   to warrant.

9          THE COURT:  On that claim.  But regardless of whether

10  it was a class or individual?

11         MR. HINCK:  Right.  And those kind of documents would

12  be exactly the same.  We could work something out with the

13  defendants that we are not that interested in the documents

14  dealing with the horrible Herbst gas station in South Lake

15  Tahoe, which is a large part of the documents that have been

16  produced and I'm afraid the court might have to look at it

17  after the discussion here today, but there was a tremendous

18  amount of material that is exactly on point to this case

19  having to do with the introduction of MTBE in gasoline.

20         Our claims are going to be very much the same issues

21  as plaintiffs were raising in the Tahoe case and also the

22  other case, which is abbreviated CBE.

23         THE COURT:  Which one is that?

24         MR. HINCK:  That's the case brought under --

25         THE COURT:  What state?

1           MR. HINCK:  In California, under California state

2    statute 17200, Section 17200.

3           Much of the discovery in that case proceeded

4    originally without a confidentiality order.  I think there was

5    a good reason for that.  We are not talking about trade secret

6    by and large in this case.  We are talking about historic

7    matter dealing with something that the oil companies by and

8    large on the public record have moved away from or are rapidly

9    moving away from.

10          Damage is created from that historic set of

11   circumstances that doesn't have a lot to do with how their

12   product is being produced today.  We are happy to enter into a

13   confidentiality order but I really don't think that that

14   should derail getting to the essence of this case.

15          THE COURT:  I understand.  I think what your

16   adversary is trying to say is that you said earlier that the

17   merits discovery and the class discovery was so intertwined

18   that it really wouldn't make sense to separate them, and I

19   think your adversary is concerned that I might have believed

20   that, but that maybe it is not so intertwined that couldn't be

21   separated out at the initial stages until we see if there is

22   going to be a certification because Second Circuit law is that

23   when deciding the certification issue I need to reach the

24   merits and that's a point that you are going to want to press

25   when the briefing comes, I'm sure of it.

1          You are going to say, in deciding certification, you

2  need to make a decision on the merits and there is in fact a

3  recent reversal where the court got involved with the merits

4  and the Second Circuit said "don't do that, don't assess the

5  merits."  So you are going to be interested in both sides of

6  the issue on the merits when you are working on the class

7  certification.

8          MR. SAUL:  Your Honor, our problem is that when we

9  decided not to remand this case we decided to move this case

10  along.  Every class action that I have ever been involved with

11  the defendants don't want to give you any discovery, and what

12  they do is say, OK, we will have to give you class discovery.

13  In the class discovery we will be back here every weekend

14  fighting whether this is class, whether this is merits.  All

15  these documents have already been produced.  We are not

16  putting an added burden on them.  It is a burden for us to

17  look through them, not for them to produce them.

18          THE COURT:  If all these documents have already been

19  produced, they are saying if you look to what was produced

20  there you will find that 90 percent of it is irrelevant so,

21  the 10 percent that might be relevant might not be all the

22  documents that you are really seeking.

23          MR. HINCK:  It is more likely the other way around.

24          THE COURT:  That's not what the defense is telling

25  me.  The defense is telling me that a good deal of the

040gber mjd                                                    32

1 | documents are peculiar both to the fact that the plaintiff is

2 | a water utility and to the local area in which the problem

3 | arose.  So for two reasons it is quite distinct from what you

4 | are raising here in New York.

5 | MR. SAUL:  Your Honor, if there was a court order

6 | saying that we were entitled to all the documents that have

7 | been produced before we will go to the source, the plaintiffs'

8 | counsel who has them, and say we have a court order, let's

9 | take a look at these documents, share the cost. . No burden to

10 | the defendants.

11 | THE COURT:  That's what I originally thought.  I

12 | really didn't understand why if it was already packaged up and

13 | produced it shouldn't be --

14 | MR. SAUL:  There is sometimes a turf war among

15 | plaintiffs' counsel, not that we are involved.

16 | THE COURT:  Mr. Brosterman?

17 | MR. BROSTERMAN:  Your Honor, relatedly there is a

18 | handful of individual plaintiffs.  If there is no class then

19 | depending on where these individual plaintiffs live, for

20 | example, where their wells are, one or more of the defendants

21 | may not be defendants under any set of circumstances because

22 | of the order in which they distribute gasoline or additives.

23 | So it does change.  It changes not only the complexion of

24 | discovery for all of the defendants but for those defendants

25 | who may ultimately be following the class motion and not even

1   be parties to this case.

2          MR. SAUL:  Aren't we entitled to these documents for

3   the motion to dismiss?  They are interlocking documents.  They

4   are going to have these documents under the custody, control,

5   they used them to dismiss our case and we can't even look at

6   them?

7          THE COURT:  You are not going to be using anything.

8   If you submit any documents I'm denying your motion.  Motions

9   to dismiss are on the face of the pleadings.  I don't want

10  anybody submitting any documents because I'm not interested in

11  the summary judgment at this time.  So don't even think about

12  it.  Let's see if I can solve this, put it all together and

13  make some decisions here so that you can move on.

14         I don't think that the class certification motion

15  should necessarily be litigated before the motion to dismiss,

16  but I do think that discovery should proceed both ways during

17  the period that the motions are pending because my view is

18  that at best the motion to dismiss might streamline or narrow

19  the issues but my strong guess is it won't eliminate this

20  case.  There will still be a case at the end of the day, I

21  think.  Whether there will be a class at the end of the day I

22  don't know, but I suspect there will be a case at the end of

23  the day.  And because of that suspicion I think discovery

24  should proceed.

25         So the defendants surely can prepare document

1   requests and interrogatories that address the class

2   certification issues because the sooner you start on that the

3   sooner we can move toward a briefing schedule and a hearing

4   schedule and class certification.  So I would ask that you get

5   that material out 30 days after you receive the amended

6   complaint so that if you serve your discovery requests on or

7   about June 5, which is a Monday.

8          With respect permitting the plaintiffs to inspect

9   what has already been produced in a different litigation, I

10  frankly think that is a good way to begin.  Even though for

11  this purpose I accept what the defense says that 90 percent of

12  it might be local and irrelevant, I don't know why that

13  initial production can't be done on an inspect basis.

14         In other words, if you have got that material in a

15  warehouse or in some rooms in your offices and they can come

16  in and begin to look through it, they will realize that it is

17  a waste of their money and time to start asking for copies of

18  documents that relate solely to gas stations or water

19  utilities in south Lake Tahoe.  It is just not this case.  And

20  this would be done under an order that would prevent them from

21  sharing the information that they gain.  But I think it would

22  be a cursory and quick review initially.

23         When they do have that review they can begin to

24  isolate that portion of the prior production that they need

25  copies of, and then they can supplement with a document

1  request.  So it seems to me initially you should be able to

2  inspect at the defendant's offices rather than the plaintiff's

3  office what they produced and begin to be able to make some

4  cuts by category of what you really don't need.  And then you

5  should submit a document request and interrogatories also that

6  relate to this case, and then we can talk about depositions.

7  But I think we would be getting ahead of ourselves to schedule

8  depositions today.  What I would rather do is have a fair

9  number of frequent conferences to stay in touch with the

10  progress.

11           So if you have this beginning inspection by June 5,

12  where you go to their offices and have your inspection, and

13  I'm not limiting your hours and neither should they, if you

14  want to spend three consecutive days so be it to get a good

15  handle on what there is and convince yourself of what

16  percentage is relevant or not to this lawsuit.  Then, if you

17  do that by June 5th you would have until June 30th to serve

18  document requests and interrogatories that are more focused on

19  this particular case.  And then I would try to have a

20  conference sometime in July to begin to hear objections, if

21  necessary, or a schedule for production and where we are

22  heading for the possibility of depositions.  So that's where I

23  begin with discovery.

24           Returning to the motion briefing, we are going to

25  have an amended complaint May 5th.  Frankly I think it would

1    be helpful, Mr. Wallace, if you would update your short letter

2    within a week of that.

3            MR. WALLACE:  Yes.

4            THE COURT:  Much of it will be similar.  Some of it

5    will be changed.  So if you would write them by May 12th, the

6    sort of letter as my rule requires and if they would write you

7    back, this is as short as I can make it, Mr. Saul, I know you

8    want to get going but this is as fast as I can do it, if you

9    write them back by May 19, then brief it.  If you can't

10   convince each other to drop any of the attacks or if they

11   can't convince you to do drop any of causes of action then it

12   will have to be done.

13           I really encourage you not to engage in judge abuse.

14   You are going to be stuck with me for a long time.  And if it

15   is really frivolous, I can always say I will remember it.  I

16   may not do anything about it but I would remember it.

17           MR. HINCK:  Your Honor, we would like to take

18   seriously at the outset about this first amendment.

19           THE COURT:  That would be great.  So you want to

20   change the date?

21           MR. HINCK:  No, the date is fine.  The letter that

22   defense counsel sent didn't quite match the description that

23   you had and I wanted to offer them the opportunity, you

24   suggested instances where law in the Second Circuit, for

25   example, precluded a claim for going forward.  This doesn't

1    cite law.  If they had such law on any of these I would be

2    happy to see it before we amended the complaint.

3           THE COURT:  That's fair enough.  I would encourage if

4    you want to supplement that letter to do so no later than May

5    1st.  If you do find a clearly controlling case on some issue,

6    and I don't know what's in this case because I haven't looked

7    at it but I certainly still remember the tobacco decision that

8    reversed my denying the motion to dismiss, but in any event I

9    still remember that one, so you might find interesting law

10   there.  But look around in the Second Circuit and see if you

11   can find something that you consider controlling and point it

12   out to your adversaries and not waste time.  If you find

13   something being, you find something.

14          MR. HINCK:  One other point of clarification --

15          THE COURT:  Nothing will be held up pending that.

16   The point is the more forthcoming you are the better.

17          MR. HINCK:  We would drop any claims that are not

18   worth fighting over.  The other point was on the order

19   regarding inspecting documents that had been produced.  I

20   assume that would cover either of the two, both of the two

21   California cases we were discussing?

22          THE COURT:  It should.  I assume that defendants who

23   produce have this material organized in some reasonable way.

24   These are all top notch firms.

25          So let's talk about the motion schedule.  The letter,

```
 1  the second letter is May 19th.  Assuming that after that there

 2  is no letter from the plaintiff or from the defendant that

 3  says we are withdrawing certain causes of actions or we are

 4  not going to make this motion, assuming that doesn't happen,

 5  how long after May 19 would you want to serve your motion to

 6  dismiss, Mr. Wallace?

 7           MR. WALLACE:  21 days.

 8           THE COURT:  That would be June 9.

 9           MR. WALLACE:  Yes, your Honor.  I can do my part.  I

10  trust that others will be able to do as well.

11           THE COURT:  Who is the others?  There is only one --

12  you mean others meaning to circulate what you have written for

13  their approval?

14           MR. WALLACE:  Yes, as I am thinking of it we are

15  trying to gather eight defendants to join in a single motion

16  and perhaps I am being a little overly aggressive.  If we are

17  going to be here in July --

18           THE COURT:  This is just serving your papers.  I was

19  hoping we would have more papers by the July conference.  So

20  let me give you ten more days and suggest Monday, June 19th to

21  actually serve.

22           MR. WALLACE:  Thank you.

23           THE COURT:  Who is our holdout here?

24           MR. GUTTMAN:  John Guttman, your Honor.  Your Honor,

25  I've thought some more about it.  We are happy to use the
```

1    procedure you suggested of looking at their papers and if we

2    think we have something to add to something --

3            THE COURT:  Right.  That's what I was going to

4    suggest.  You could have just really a week later because you

5    are going to see a draft before the final.  So you can have

6    until June 26.  So that's it for the defendants.

7            The way we will do the page limit thing is the joint

8    group can have up to 45 pages and if you need it, Mr. Guttman,

9    I hope you don't, you can have 15 and that's a lot of pages.

10           MR. LEVIN:  Your Honor, if I can interrupt.  In terms

11   of our answer, would that be pushed back until June?

12           THE COURT:  Why don't you work that out with

13   Mr. Saul.  I can't believe the two of you can't get it done in

14   a quick phone call tomorrow.

15           Mr. Saul, how long do you need to answer these

16   endless pages of writing?

17           MR. HINCK:  How many pages?

18           THE COURT:  45 and 15 if necessary.  But he's not

19   going to do the 15 for no reason.  It may be as little as 45.

20           MR. HINCK:  45 days.

21           THE COURT:  August 7th is six weeks, that's 42 days I

22   think but that's what it is.  So August 7th.  And for reply?

23           MR. WALLACE:  30 days, your Honor.

24           THE COURT:  You need 30?  How about three weeks for

25   that?  The beauty of that is it will still be August.  How

1   about August 28?

2           MR. WALLACE:   Thank you.

3           THE COURT:  'August 28 for reply.  The moving date

4   would be June 26 for the second brief.  Let's have a July

5   conference after all and have a status on discovery and on the

6   briefing because things will be happening in the briefing and

7   maybe at that time we will talk about class cert but maybe we

8   won't.  We will see where we are up to.  Many people take a

9   vacation in July, some of us don't, but are any of you lead

10  players taking vacations in July?  Front table, anybody

11  planning one?

12          MR. SAUL:  Not sure yet, your Honor.  Sorry.  We will

13  be here.  We will be here.

14          THE COURT:  All right.  Nobody is going to the ABA

15  meeting?

16          How about July 25th at 4:30?  How's that?

17          MR. WALLACE:  Yes.  Thank you.

18          THE COURT:  Let me just say one thing about all that

19  we have done.  We have been at this for a full hour and I

20  really don't want to do it again.  I know I said that in the

21  little case just before you but I seriously don't want to do

22  it again here.  This took a lot of thinking and effort to get

23  the dates worked out, the conference date and all the briefing

24  dates and the beginning efforts toward discovery.  Can I ask

25  you please to stick with this short of new clear attack or

1    something along those lines.  Please.  I don't want to do this

2    again.  Yes, Mr. Eimer.

3              MR. EIMER:  Judge, one thing.  I would like to see if

4    we can discuss the July 25 conference.

5              THE COURT:  Do you not like the date?

6              MR. EIMER:  No, the idea of the date is great.  I

7    would like to discuss the content if I may.  I think as your

8    Honor scheduled this now the plaintiffs will serve on the

9    defendants document requests and interrogatories on June 30 or

10   general merits issues or whatever they want to serve requests

11   on.

12             THE COURT:  Plaintiff will serve on defendants after

13   they have done their inspection.

14             MR. EIMER:  And the question I have, I don't want to

15   revisit your Honor's ruling on it but the issue that I think

16   is probably the leading edge of unique here is the so called

17   product liability theory and the duty to warn.  It also is the

18   broadest discovery and the most burdensome of the discovery

19   issues on us and it is the one that frankly had not been done

20   anywhere, and my question is your Honor will have our brief at

21   that point on those issues in hand by the conference.

22             We will have just received their request and will be

23   about the time we are supposed to respond to it or at least

24   file our objections and response.  I am wondering if we

25   couldn't come to you in the July 25 conference and discuss the

1  appropriateness of at that point of going forward with that

2  piece of the discovery as opposed to whose tank might have

3  leaked that might have caused damage to some person's well in

4  New York, which is a much more focused discovery.

5          THE COURT:  Failure to warn is failure to warn, isn't

6  it?

7          MR. EIMER:  The issue is who is getting the warning.

8          THE COURT:  But that's generic.  Is it the gas

9  station owners, individual well owners, is it property owners?

10  You could do groups of people who suffered allegedly as a

11  result of failure to warn.  So you can do it by category.  You

12  don't have to know it is John Jones, as long as you know it is

13  gas station owners or well owners.

14          MR. EIMER:  The issue is will warning have averted

15  their tank leaking.  And whether somebody got warned about

16  there being MTBE doesn't affect whether the tank didn't leak.

17  That's a legal issue that is going to get discussed in the

18  motion to dismiss.  My only issue is the discovery on that

19  issue is the entire use of MTBE in the United States, and it

20  is massive and it has never been pulled together before

21  because no court has gotten this far into this issue except in

22  the Lake Tahoe case where it is started.

23          My question is since we will have our motion to

24  dismiss at that point, your Honor will have a chance if you

25  wish to look at the legal argument, and see whether or not

1    that count in your belief is warranted to start discovery

2    before you deal with the motion to dismiss on that broad

3    issue.

4           THE COURT:  One thing I have learned is it is

5    dangerous to draw any conclusions in reading the papers from

6    one side without reading the response of the other because

7    generally the briefs are so good that you read it and say

8    that's right, that is right, and then you get the other and

9    say wow, that's right and you feel like Ping-Pong.  So I am

10   not sure I want to draw any preliminary conclusions from

11   reading it.  But I think it is not a bad suggestion that on

12   that day we do discuss it.

13          I am not expecting you to produce a million documents

14   on July 25, I understand that.  I thought by then you would

15   have really digested them and be able to write me some learned

16   letters with cases and say why this is overbroad or not right,

17   or please read pages blah blah of our brief for a lot of law

18   on who the victims are, and how it would impact them if there

19   was a failure to warn.  Yes, we could have a good discussion

20   on failure to warn at that conference.

21          MR. EIMER:  That's all I ask.

22          MR. HINCK:  A very important point, your Honor.  I

23   think for the third time in this short conference we have had

24   a casting of the gravamen of the complaint not by plaintiffs

25   but by defendants.  It is important to point out here that we

040gber mjd                                                    44

1    intentionally filed a case that is not addressing the tank

2    leak from a particular Exxon station.  We filed it as market

3    share liability case having to do with the act of putting MTBE

4    in gasoline in the State of New York.

5           Our theory is that all the damages that come from the

6    behavior of MTBE, because there were no warnings to anyone,

7    these defendants who encompass the market are responsible for

8    all of it.  I do think there will be a little tussle here as

9    the defendants seek to direct the Court's attention to the gas

10   station on the corner of Maple and 10th Avenue, and we suggest

11   that instead the important decisions that happened here were

12   the ones where a substance was added to gasoline that had

13   never previously been added thereby has as its characteristics

14   a tendency to contaminate groundwater and those

15   characteristics have proved to be exactly what controlled the

16   contamination that covered the class.  So therefore in this

17   little discovery discussion the same question is at issue.

18          We are looking to go to the matter of the decision to

19   put MTBE in gasoline and whether there were warnings to anyone

20   and they are hoping to direct the attention to the discovery

21   that occurred somewhere in Poughkeepsie at one specific gas

22   station.

23          THE COURT:  I understand.  OK.

24          MR. SAUL:  There are two other brief discovery issues

25   if I might, the confidentiality order, as well as we would

040gber mjd                                                   45

1   like a nondestruct order.

2           THE COURT:  All right.

3           MR. SAUL:  As far as the confidentiality order, your

4   Honor, we are prepared to accept the confidentiality order

5   that most of these defendants entered into in California.

6   That's fine with us.  We just don't want to have a two-month

7   squabble over confidentiality.

8           THE COURT:  If you entered into it in California can

9   you circulate the confidentiality order to all defendants and

10  to the plaintiff and see if the same format is agreeable to

11  everyone?

12          MR. WALLACE:  I think that's a sensible suggestion.

13  We would be happy to do it.

14          THE COURT:  If it turns out to be a squabble I'd like

15  to know about it sooner rather than later and have you all

16  back in.

17          MR. BROSTERMAN:  Mr. Levin and may I say, Judge, and

18  to save us certain phone calls if we could simply have the

19  answers due on June 19 which is the same day --

20          THE COURT:  Is that acceptable to you?

21          MR. LEVIN:  That's fine.

22          THE COURT:  Mr. Saul?

23          MR. SAUL:  Yes.

24          THE COURT:  June 19.  Mr. Saul, the nondestruct

25  order, doesn't that make sense?

040gber mjd                                                    46

1          MR. EIMER:  In my understanding the law is unless

2    there is some reasonable belief that we are all about to shed

3    documents, there is no basis for a nondestruct.

4          THE COURT:  Then it is there.

5          MR. EIMER:  Because we have the burden of the court

6    order in the sense that all of a sudden we are formally under

7    direction of the court in the way we retain our orders.  None

8    of the other courts have ever imposed a nondestruct order.

9          THE COURT:  I am concerned and maybe because I am

10   concerned about the computer and getting all this education,

11   and if you don't put a freeze on them, if you don't put a

12   freeze on what is there today it may not be there tomorrow,

13   and to the extent that it is there today I would like to see

14   they exist until we don't need them, maybe because you settled

15   the case or it was dismissed, but I'm not trying to get bad

16   publicity.  I just want to make sure nothing is destroyed.  If

17   you don't want a nondestruct order because it sounds bad we

18   will do that under seal.  I want you not to shift of the lay

19   of the land to make sure it doesn't happen.

20         MR. BROSTERMAN:  As a logistical matter what you have

21   is a client with lots of different offices where there be may

22   be documents, and lots of people may have documents.  If we

23   get a document request, we can coordinate it and circulate to

24   those people who are the likely areas of pockets where there

25   would be documents and say give us your documents.  The

1    problem with the nondestruct order, in addition to the

2    connotation, is it forces us to go to lots of people, even

3    maybe perhaps a broader category of people and say save all of

4    your documents or e-mails or computer records that relate in

5    any way, shape or form to this, which means we go out to a

6    larger group, we also have to go out-to them twice and it

7    leads inevitably to more confusion among people than one

8    targeted.  Here's the request, this is what we need, this is

9    what we have to have.  It is much easier.  This is not like we

10   are not dealing with three people or five people.  We are

11   potentially dealing with hundreds of beam.

12          THE COURT:  Mr. Brosterman, that I consider almost a

13   little bit insensitive.  I know exactly what you are dealing

14   with.  I know the size of the companies.  I've heard the names

15   of all the defendants here.  This is not news.  I understand

16   we are talking about possibly 30 or 40 offices worldwide and

17   talking about millions if not more.  I understand the scope of

18   the thing.  However, I am worried about preserving what there

19   is.  I would be satisfied to do it without an order if counsel

20   will each direct their clients in their own letters and I will

21   accept that at this stage, to preserve the status quo, so to

22   speak, and from this point forward not to destroy anything

23   that exists today.

24          MR. BROSTERMAN:  That's a sensible solution.

25          MR. EIMER:  We will do that.

040gber mjd                                                        48

1          THE COURT:  Thank you, Mr. Brosterman.  If you all do

2   that I would be very appreciative and I'll accept that for

3   now.  You work on a confidentiality order in the way we have

4   discussed, we have discussed the issue of document changing or

5   destruction, any shift in the landscape.  We have a schedule

6   on the motion to dismiss.  We have discovery under way, we

7   will talk about class cert and talk about what you say is this

8   huge scope of failure to warn at the next conference.  Unless

9   anybody has anything else, I'll see you on July 25th.

10          MR. SAUL:  Thank you, your Honor.

11          THE COURT:  OK.  You too.

12          (Proceeding adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

ALL-STATE® LEGAL  800-222-0510   EDI 1   RECYCLED

CourtLink Details for ** Case: 3:00cv00370 **

Date Printed: 6/26/2000 11:27:32 AM
Court: Federal District Court -- Southern District of Illinois (E. St. Louis)
Case: England, et al v. Atlantic Richfield, et al
Judge: Judge G. Patrick Murphy
Filed on: 05/11/00
Note: Dkt # in Madison Cty St Ct : is 00-L-331

Summary

Case Updated:       06/22/00
Jury demand:        Plaintiff
Demand:       $50,000
Nature of Suit:     Torts/Personal Property-Property Damage Product Liability
(385)
Lead Docket:        None
Jurisdiction:       Federal Question
Cause:       28:1332 Diversity-Product Liability

Names

Litigant      Litigant's Attorney

DAVID ENGLAND, Individually     Stephen M. Tillery
and on Behalf of All Others     618-277-9804 fax
Similarly Situated          [COR LD NTC]
      plaintiff     Carr, Korein et al.
        St. Clair County
        10 Executive Woods Court
        Swansea, IL 62226-2030
        618-277-1180
        FTS 277-9804

DONNA L AZBILL, Individually   Stephen M. Tillery
and on Behalf of All Others    (See above)
Similarly Situated          [COR LD NTC]
      plaintiff

JAMES BAUER, Individually and   Stephen M. Tillery
on Behalf of All Others (See above)
Similarly Situated          [COR LD NTC]
      plaintiff

MARVIN OWCA, Individually and   Stephen M. Tillery
on Behalf of All Others (See above)
Similarly Situated          [COR LD NTC]
      plaintiff

RHEA SUSAN MCMANNIS,       Stephen M. Tillery
Individually and on Behalf of (See above)
All Others Similarly Situated [COR LD NTC]
      plaintiff

CLAUDIA CHRISTIANSEN,    Stephen M. Tillery
Individually and on Behalf of (See above)
All Others Similarly Situated [COR LD NTC]
      plaintiff

    v.

ATLANTIC RICHFIELD COMPANY    James A. Langan
      defendant    312-861-2200 fax
        [COR LD NTC]
        Kirkland & Ellis
        Cook County
        200 East Randolph Drive
        Suite 6100
        Chicago, IL 60601
        312-861-2000
        FTS 861-2200

BP AMOCO CORPORATION
      defendant

AMOCO OIL COMPANY James A. Langan
      defendant    (See above)
        [COR LD NTC]

CITGO PETROLEUM CORPORATION    Nathan P. Eimer
      defendant    312-853-7036 fax
        [COR LD NTC]
        Pamela R. Hanebutt
        312-853-7036 fax
        [COR LD NTC]
        Sidley & Austin
        Cook County
        10 South Dearborn Street
        Bank One Plaza
        Chicago, IL 60603
        312-853-7000
        FTS 853-7036

        Lisa S. Meyer
        [COR LD NTC]
        unknown

CONOCO INC
      defendant

EXXON MOBIL CORPORATION Dan H. Ball
fka    618-236-3434 fax
Mobil Corporation [COR LD NTC]
fka    Thompson Coburn
Exxon Corporation St. Clair County
      defendant    525 West Main Street
        P.O. Box 750
        Belleville, IL 62220-0750

```
            618-277-4700
            FTS 236-3434

EQUILON ENTERPRISES LLC John E. Galvin
        defendant      314-231-7604 fax
         [COR LD NTC]
         Lyndon P. Sommer
         314-241-7604 fax
         [COR LD NTC]
         Sandberg, Phoenix et al.
         515 North Sixth Street
         One City Centre, 14th Floor
         St. Louis, MO 63101
         314-231-3332
         FTS 231-7604

CHEVRON USA INC    Dan H. Ball
        defendant     (See above)
         [COR LD NTC]

PHILLIPS PETROLEUM COMPANY
        defendant

SHELL OIL COMPANY
        defendant

TEXACO REFINING AND MARKETING John E. Galvin
INC   (See above)
        defendant      [COR LD NTC]
         Lyndon P. Sommer
         (See above)
         [COR LD NTC]

Docket

Sub # Date  Description

            Docket as of June 22, 2000 7:45 pm

1     5/11/00     NOTICE OF REMOVAL  from Madison Cty St Ct  Case Number:
            00-L-331 (dkb) [Entry date 05/17/00]

2     5/11/00     CLASS ACTION COMPLAINT  (copy of) Filing fee pd $ 150.00
            receipt # 300 67396 (dkb) [Entry date 05/17/00]
            [Edit date 05/18/00]

3     5/11/00     CONSENT TO AND JOINDER IN REMOVAL by defendants Atlantic
            Richfield, BP Amoco Corporation, and Amoco Oil Company (dkb)
            [Entry date 05/18/00]

4     5/11/00     CONSENT TO AND JOINDER IN REMOVAL by defendant Phillips
            Petroleum Company (dkb) [Entry date 05/18/00]

5     5/11/00     CONSENT TO AND JOINDER IN REMOVAL by defendant Shell Oil
```

Company (dkb) [Entry date 05/18/00]

6        5/11/00        CONSENT TO AND JOINDER IN REMOVAL by defendants Conoco Inc,
                 Exxon Mobil Corp, and Chevron USA Inc (dkb)
                 [Entry date 05/18/00]

--       5/11/00        Magistrate identification:  Mag/Judge Gerald B. Cohn (dkb)
                 [Entry date 05/18/00]

7        5/17/00        UNOPPOSED MOTION by defendants Atlantic Richfield, BP Amoco
                 Corporation, Amoco Oil Company, Citgo Petroleum Corp,
                 Conoco Inc, Exxon Mobil Corp, Equilon Enterprises, Chevron
                 USA Inc, Phillips Petr Co, Shell Oil Company, and Texaco
                 Refining for Extension of Time to answer, move to dismiss,
                 or otherwise respond to the Complaint until July 3, 2000
                 (dkb) [Entry date 05/18/00]

--       5/18/00        LETTER to all parties advising them of removal, case number
                 and judge assigned (dkb)

8        5/18/00        MOTION by plaintiffs for reference to the Bankruptcy Court
                 under Rule Br1001.1 (myz) [Entry date 05/23/00]

9        5/23/00        ORDER by Mag Judge Gerald B. Cohn granting motion for
                 Extension of Time to answer, move to dismiss, or otherwise
                 respond to the Complaint until July 3, 2000 [7-1]; brief
                 ddl set 7/3/00 (cc:  all counsel) (acm)
                 [Entry date 05/30/00]

10       5/31/00        ORDER  by Judge William D. Stiehl Case reassigned  to
                 Judge G. P. Murphy (cc:  all counsel) (jmf)

11       5/31/00        MOTION by defendant Atlantic Richfield (ARCO), defendant BP
                 Amoco Corporation, defendant Amoco Oil Company, defendant
                 Citgo Petroleum Corp, defendant Chevron USA Inc for stay
                 of proceedings (acm) [Entry date 06/06/00]

12       6/2/00        OBJECTIONS by defendant Equilon Enterprises, defendant
                 Texaco Refining to plaintiffs' motion for reference to the
                 Bankruptcy Court [8-1] (myz) [Entry date 06/08/00]

13       6/16/00        MOTION by defendant Citgo Petroleum Corp for attorney Lisa
                 S. Meyer to appear pro hac vice (acm) [Entry date 06/22/00]

14       6/16/00        ORDER (NGJ/car) granting motion for attorney Lisa S. Meyer
                 to appear pro hac vice for Gitgo Petroleum [13-1]  (cc: all
                 counsel) (acm) [Entry date 06/22/00]

15       6/16/00        MOTION by defendant Citgo Petroleum Corp for attorney
                 Pamela R. Hanebutt to appear pro hac vice (acm)
                 [Entry date 06/22/00]

16       6/16/00        ORDER (NGJ/car) granting motion for attorney Pamela R.
                 Hanebutt to appear pro hac vice for Gitgo Petroleum [15-1]

($55.00 fee paid receipt no. 300 68105) (cc: all counsel)
(acm) [Entry date 06/22/00]

17    6/16/00      MOTION by defendant Citgo Petroleum Corp for attorney
                   Nathan P. Eimer to appear pro hac vice (acm)
                   [Entry date 06/22/00]

18    6/16/00      ORDER (NGJ/car) granting motion for attorney Nathan P.
                   Eimer to appear pro hac vice for Gitgo Petroleum) [17-1]
                   ($55.00 fee paid, receipt no. 300 68105) (cc: all counsel)
                   (acm) [Entry date 06/22/00]


***** End of Report *****

5

ALL-STATE® LEGAL 800-222-0510   ED1   RECYCLED

CourtLink Details for ** Case: 3:00cv00371 **

Date Printed: 6/26/2000 11:31:02 AM
Court: Federal District Court -- Southern District of Illinois (E. St. Louis)
Case: England, et al v. Atlantic Richfield, et al
Judge: Judge David R Herndon
Filed on: 05/11/00
Note: Dkt # in Madison Cnty St Ct : is 00-L-331

Summary

Case Updated:        06/12/00
Jury demand:         Plaintiff
Demand:        $0,000
Nature of Suit:    Torts/Personal Property-Property Damage Product Liability
(385)
Lead Docket:        None
Jurisdiction:        Federal Question
Cause:         28:1331 Fed. Question

Names

Litigant    Litigant's Attorney

DAVID ENGLAND        Stephen M. Tillery
    plaintiff      618-277-9804 fax
    [COR LD NTC]
    Carr, Korein et al.
    St. Clair County
    10 Executive Woods Court
    Swansea, IL 62226-2030
    618-277-1180
    FTS 277-9804

DONNA L AZBILL       Stephen M. Tillery
    plaintiff     (See above)
    [COR LD NTC]

JAMES BAUER Stephen M. Tillery
    plaintiff     (See above)
    [COR LD NTC]

MARVIN OWCA Stephen M. Tillery
    plaintiff     (See above)
    [COR LD NTC]

RHEA SUSAN MCMANNIS       Stephen M. Tillery
    plaintiff     (See above)
    [COR LD NTC]

CLAUDIA CHRISTIANSEN       Stephen M. Tillery
    plaintiff     (See above)
    [COR LD NTC]

v.

ATLANTIC RICHFIELD COMPANY    James A. Langan
    defendant    312-861-2200 fax
    [COR LD NTC]
    Kirkland & Ellis
    Cook County
    200 East Randolph Drive
    Suite 6100
    Chicago, IL 60601
    312-861-2000
    FTS 861-2200

BP AMOCO CORPORATION    James A. Langan
    defendant    (See above)
    [COR LD NTC]

AMOCO OIL COMPANY James A. Langan
    defendant    (See above)
    [COR LD NTC]

CITGO PETROLEUM CORPORATION   Nathan P. Eimer
    defendant   312-853-7036 fax
    [COR LD NTC]
    Pamela R. Hanebutt
    312-853-7036 fax
    [COR LD NTC]
    Sidley & Austin
    Cook County
    10 South Dearborn Street
    Bank One Plaza
    Chicago, IL 60603
    312-853-7000
    FTS 853-7036

CONOCO INC   Dan H. Ball
    defendant   618-236-3434 fax
    [COR LD NTC]
    Thompson Coburn
    St. Clair County
    525 West Main Street
    P.O. Box 750
    Belleville, IL 62220-0750
    618-277-4700
    FTS 236-3434

    Roman P. Wuller
    314-552-7000 fax
    [COR LD NTC]
    Thompson Coburn
    One Firstar Plaza
    Suite 3500
    St. Louis, MO 63101-9702
    314-552-6000

v.

ATLANTIC RICHFIELD COMPANY      James A. Langan
        defendant      312-861-2200 fax
        [COR LD NTC]
        Kirkland & Ellis
        Cook County
        200 East Randolph Drive
        Suite 6100
        Chicago, IL 60601
        312-861-2000
        FTS 861-2200

BP AMOCO CORPORATION      James A. Langan
        defendant      (See above)
        [COR LD NTC]

AMOCO OIL COMPANY James A. Langan
        defendant      (See above)
        [COR LD NTC]

CITGO PETROLEUM CORPORATION   Nathan P. Eimer
        defendant      312-853-7036 fax
        [COR LD NTC]
        Pamela R. Hanebutt
        312-853-7036 fax
        [COR LD NTC]
        Sidley & Austin
        Cook County
        10 South Dearborn Street
        Bank One Plaza
        Chicago, IL 60603
        312-853-7000
        FTS 853-7036

CONOCO INC   Dan H. Ball
        defendant      618-236-3434 fax
        [COR LD NTC]
        Thompson Coburn
        St. Clair County
        525 West Main Street
        P.O. Box 750
        Belleville, IL 62220-0750
        618-277-4700
        FTS 236-3434

        Roman P. Wuller
        314-552-7000 fax
        [COR LD NTC]
        Thompson Coburn
        One Firstar Plaza
        Suite 3500
        St. Louis, MO 63101-9702
        314-552-6000

```
     FTS 552-7000

EXXON MOBIL CORPORATION Dan H. Ball
fka    (See above)
Mobil Corporation [COR LD NTC]
fka
Exxon Corporation Roman P. Wuller
     defendant    (See above)
      [COR LD NTC]


EQUILON ENTERPRISES LLC John E. Galvin
     defendant    314-231-7604 fax
      [COR LD NTC]
      Lyndon P. Sommer
      314-241-7604 fax
      [COR LD NTC]
      Sandberg, Phoenix et al.
      515 North Sixth Street
      One City Centre, 14th Floor
      St. Louis, MO 63101
      314-231-3332
      FTS 231-7604

CHEVRON USA INC   Dan H. Ball
     defendant    (See above)
      [COR LD NTC]

      Roman P. Wuller
      (See above)
      [COR LD NTC]


PHILLIPS PETROLEUM COMPANY    Lyndon P. Sommer
     defendant    (See above)
      [COR LD NTC]

SHELL OIL COMPANY John E. Galvin
     defendant    (See above)
      [COR LD NTC]
      Lyndon P. Sommer
      (See above)
      [COR LD NTC]

TEXACO REFINING AND MARKETING John E. Galvin
INC   (See above)
     defendant    [COR LD NTC]
      Lyndon P. Sommer
      (See above)
      [COR LD NTC]

Docket

Sub # Date  Description

            Docket as of June 12, 2000 7:45 pm
```

1      5/11/00      NOTICE OF REMOVAL   from Madison County State Court   Case
              Number: 00-L-331 (car) [Entry date 05/19/00]

2      5/11/00      COMPLAINT   (copy of) Filing fee pd $ 150.00 receipt # 300
              67397 (car) [Entry date 05/19/00]

--     5/11/00      Magistrate identification:  Mag/Judge Gerald B. Cohn (car)
              [Entry date 05/19/00]

3      5/11/00      CONSENT by defendant Citgo Petroleum Corp (car)
              [Entry date 05/19/00]

4      5/11/00      CONSENT by defendant Phillips Petr Co (car)
              [Entry date 05/19/00]

5      5/11/00      CONSENT by defendant Equilon Enterprises, defendant Shell
              Oil Company, defendant Texaco Refining (car)
              [Entry date 05/19/00]

6      5/11/00      NOTICE of filing Notice of Removal by Atlantic Richfield,
              BP Amoco Corporation, Amoco  Oil Company, Conoco Inc, Exxon
              Mobil Corp, Chevron USA Inc (car) [Entry date 05/19/00]

7      5/17/00      UNOPPOSED MOTION by defendants Atlantic Richfield, BP Amoco
              Corporation, Amoco Oil Company, Citgo Petroleum Corp,
              Conoco Inc, Exxon Mobil Corp, Equilon Enterprises, Chevron
              USA Inc, Phillips Petr Co, Shell Oil Company, Texaco
              Refining for extension of time to answer (car)
              [Entry date 05/22/00]

--     5/22/00      LETTER to counsel of record advising of removal and new
              case number assigned (car)

8      5/31/00      MOTION by defendants BP Amoco Corporation, Amoco Oil
              Company, Citgo Petroleum Corp, Chevron USA Inc for stay of
              proceedings (dlr) [Entry date 06/06/00]

9      6/1/00       ORDER  by Judge David R. Herndon  granting  motion for
              extension of time to answer [7-1] up to and including
              7/3/00 (cc: all counsel) (dlr) [Entry date 06/06/00]

10     6/7/00       CJRA Track C assigned by Judge David R. Herndon;
              presumptive jury trial set for month of 9/01  before Judge
              David R. Herndon in the USDC/East St. Louis, IL (cc: all
              counsel) (dlr) [Entry date 06/12/00]

11     6/7/00       NOTICE of Sched/Disc Conf set for 8:30 AM on 7/7/00 before
              Mag Judge Gerald B. Cohn in the USDC/East St. Louis, IL
              (cc: all counsel) (dlr) [Entry date 06/12/00]


***** End of Report *****

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 6 2000

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re:

Methyl Tertiary Butyl Ether ("MTBE") Products
Liability Litigation

)
)
)
)
)
)

MDL Docket No. 1358

### PROOF OF SERVICE

I certify, this 26th day of June, 2000, that eleven copies of the foregoing Response
of Defendants Amerada Hess Corporation and Valero Marketing and Supply Company to
Certain Defendants' Motion to Transfer for Coordinated or Consolidated Pretrial
Proceedings Under 28 U.S.C. § 1407, and Memorandum in Support, were served by hand
delivery on the Clerk of the Judicial Panel on Multidistrict Litigation, that a copy was
served by overnight delivery upon each of the parties listed on the attached Panel Service
List, and that a copy was served for filing by overnight delivery upon the Clerk of United
States District Court for the Southern District of New York and the Clerk of the United
States District Court for the Southern District of Illinois.

Brent H. Allen

RECEIVED
CLERK'S OFFICE
2000 JUN 26  P 4: 23

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION - PANEL ATTORNEY SERVICE LIST                                June 19, 2000

DOCKET: 1,358 - In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation                Page: 1
STATUS: Pending

TRANSFEREE INFORMATION
    Dist:
    Judge:

| ATTORNEY - FIRM | REPRESENTED PARTY(s) |
|---|---|
| Ball, Dan H.<br>Thompson & Coburn, L.L.P.<br>One Firstar Plaza<br>St. Louis, MO  63101 | => Chevron USA, Inc.; Conoco, Inc.*; Exxon Corp.; Exxon Mobil Corp.*; Mobil Oil Corp. |
| Eimer, Nathan P.<br>Sidley & Austin<br>Bank One Plaza<br>10 South Dearborn Street<br>Chicago, IL  60603 | => Citgo Petroleum Corp.* |
| Guttmann, John S.<br>Beveridge & Diamond, P.C.<br>1350 I Street, N.W.<br>Suite 700<br>Washington, DC  20005 | => Sunoco, Inc.* |
| Hinck, Jon<br>Lewis, Saul & Associates, P.C.<br>183 Middle Street<br>Suite 200<br>Portland, ME  04101 | => Arcuri, Melanie J.*; Berisha, Donna*; Greene, Steven C.; La Susa, Ron* |
| Langan, J. Andrew<br>Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, IL  60601 | => Amoco Oil Co.*; Atlantic Richfield Co.*; BP Amoco Corp.* |
| Leifer, Steven L.<br>Baker, Botts, L.L.P.<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 | => Valero Marketing  & Supply Co.* |
| O'Connor, Mark G.<br>Regional Counsel<br>Coastal Oil New York, Inc.<br>611 Rt. 46 West<br>Hasbrouck Heigh, NJ  07604 | => Coastal Corp.* |
| Pasquale, Kenneth<br>Stroock, Stroock & Lavan, L.L.P.<br>180 Maiden Lane<br>New York, NY  10038 | => Tosco Corp.* |
| Shulman, Robert H.<br>Howrey Simon Arnold & White, LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 | => Amerada Hess Corp.* |
| Sommer, Lyndon P.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO  63101 | => Phillips Petroleum Co. |
| Tillery, Stephen M.<br>Carr, Korein, Tillery, Kunin, Montroy &<br>Glass10 Executive Woods Court<br>Swansea, IL  62226 | => Azbill, Donna L.; Bauer, James; Christiansen, Claudia; England, David; McMannis, Rhea Susan; Owca, Marvin |
| Tully, Mark E.<br>Goodwin, Procter & Hoar, L.L.P. | => Gulf Oil Ltd. Partnership* |

NOTE: Please refer to the title page for complete report scope and key.
   *   Signifies that an appearance was made on behalf of the party by the representing attorney.
   #   Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
  NOTE: All dismissed parties (and counsel representing only dismissed parties) were suppressed.

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION - PANEL ATTORNEY SERVICE LIST
(1,358 Panel Attorney Service List Cont'd)

June 19, 2000

Page: 2

| ATTORNEY - FIRM | REPRESENTED PARTY(s) |
|---|---|
| 53 State Street<br>Boston, MA  02109 | |
| Wagner, John<br>Law Department<br>One Valero Place<br>San Antonio, TX  78212 | => United Refining Co. |
| Wallace, Richard E. Jr.<br>Wallace, King, Marraro & Branson, P.L.L.C.<br>1050 Thomas Jefferson Street, N.W.<br>Washington, DC  20007 | => Equilon Enterprises, L.L.C.*; Motiva Enterprises, L.L.C.*; Shell Oil Co.*; Shell Oil Products Co.*; Texaco Refining & Marketing, Inc.*; Texaco, Inc.* |

NOTE: Please refer to the title page for complete report scope and key.
   *   Signifies that an appearance was made on behalf of the party by the representing attorney.
   #   Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
   NOTE: All dismissed parties (and counsel representing only dismissed parties) were suppressed.