# ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2000

FILED
CLERK'S OFFICE

**MDL 1358**

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| In re: | ) | MDL DOCKET NO. 1358 |
| | ) | |
| METHYL TERTIARY BUTYL ETHER | ) | |
| ("MTBE") PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| ——————————————————— | ) | |

**RESPONSE OF INTERESTED PARTY;
NOTICE OF RELATED ACTION:
LYNN, _ET AL._ V. AMOCO OIL COMPANY, _ET AL._,
CIVIL ACTION NO. 96-T-940-N (M.D. ALA., J. THOMPSON)**

Elizabeth J. Cabraser
Morris A. Ratner
Scott P. Nealey
Lori E. Andrus
LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94121
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

[Additional Counsel Listed on Signature Page]

OFFICIAL FILE COPY

IMAGED JUL 3 '00

PLEADING NO. 13



# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    THE *LYNN* CASE IS RELATED TO THE ACTIONS STYLED "MTBE
       LITIGATION" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   COORDINATION OF *LYNN* WITH *BERISHA* AND *ENGLAND* IS
       APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.    Consolidation or Coordination Under Section 1407 Will Prevent
             Duplicative Discovery of Identical Documents, Facts, and Witnesses, and
             Will Conserve Judicial Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.    Consolidation or Coordination Through 28 U.S.C. § 1407 Will Prevent
             Inconsistent Class Determinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    THE MIDDLE DISTRICT OF ALABAMA IS AN APPROPRIATE
       TRANSFEREE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re Admissions Tickets
302 F. Supp. 1339 (J.P.M.L. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

In re Air Crash Near Van Cleve, Mississippi,
486 F. Supp. 926 (J.P.M.L. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Air West, Inc. Securities Litig.,
384 F. Supp. 609 (J.P.M.L. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Amoxicillin Patent and Antitrust Litigation
449 F. Supp. 601 (J.P.M.L. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

In re Boise Cascade Securities Litig.
364 F. Supp. 459 (J.P.M.L. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Celotex Corp. "Technifoam" Products Liability Litigations
424 F. Supp. 1077 (J.P.M.L. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

In re Equity Funding Corporation of America Securities Litigation
375 F. Supp. 1378 (J.P.M.L. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

In re Gas Meter Antitrust Litigation
464 F. Supp. 391 (J.P.M.L. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Holiday Magic Securities and Antitrust Litigation
375 F. Supp. 1400 (J.P.M.L. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

In re Japanese Electronics Products Antitrust Litigation
388 F. Supp. 565 (J.P.M.L. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re L.E. Lay and Co. Antitrust Litig.,
391 F. Supp. 1054 (J.P.M.L. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Multidistrict Private Civil Treble Damage Litigation Involving Gypsum Wallboard
303 F. Supp. 510 (J.P.M.L. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

In re Multi-piece Rim Products Liability Litigation
464 F. Supp. 969 (J.P.M.L. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

In re National Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Program
        Litigation
        399 F. Supp. 1405 (J.P.M.L. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Plumbing Fixture Cases
        298 F. Supp. 484 (J.P.M.L. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Public Air Travel Tariff Litigation
        360 F. Supp. 1397 (J.P.M.L. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Roadway Express, Inc. Employment Practices Litigation
        384 F. Supp. 612 (J.P.M.L. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Temporomandibular Joint (TMJ) Implants Prods. Liability Litigation
        844 F. Supp. 1553 (J.P.M.L. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

In re the Matter of Westec Corporation
        307 F. Supp. 559 (J.P.M.L. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re the Regents of the University of California
        964 F.2d 1128 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

In re the Upjohn Co. Antibiotic Products Liability Litigation ("Cleocin"),
        450 F. Supp. 1168 (J.P.M.L. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Vernitron Secs. Litigation,
        468 F. Supp. 297 (J.P.M.L. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


**FEDERAL STATUTES**

28 U.S.C.
        § 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 7, 8

## I.   **INTRODUCTION AND SUMMARY**

Individual and Representative Plaintiffs in a related oil contamination and MTBE class action — <u>Lynn, et al. v. Amoco Oil Company, et al.</u>, Civil Action No. 96-T-940-N (M.D. Ala., J. Thompson) — file this Response and Notice of Related Action to apprise the Judicial Panel on Multidistrict Litigation of the following facts:

1.     Several of the oil company movants who initiated this MDL transfer motion — Amoco Oil Company, BP Amoco Corporation, and Chevron USA Inc. — are named defendants in <u>Lynn</u>, <u>supra</u>, which is related to the actions which are the subject of the MDL motion, but which was filed four years ago and has therefore been pending for a longer period of time.

2.     The attorneys for Amoco Oil Company and BP Amoco Corporation — Kirkland & Ellis — are also counsel for BP Amoco in the <u>Lynn</u> case, and were aware of the pendency and status of the <u>Lynn</u> action when they filed their MDL motion.

3.     <u>Lynn</u> Plaintiffs believe that this MDL motion is an attempt by moving defendants to try to carve out a substantial portion of the <u>Lynn</u> case — MTBE contamination of water wells — from the United States District Court for the Middle District of Alabama, which has been presiding actively over related class claims, discovery and trial preparation for several years.

4.     The <u>Lynn</u> action involves parties and claims that substantially overlap with and/or subsume the parties and claims in the two actions that are the subject of the MDL motion, i.e., <u>Berisha, et al. v. Amerada Hess Corporation, et al.</u>, Civil Action No. 00 Civ. 1898 (S.D.N.Y., J. Scheindlin) and <u>England, et al. v. Atlantic Richfield Company, et al.</u>, Case No. 00-370 (S.D. Ill., J. Stiehl).

a.      Common defendants include BP/Amoco, Chevron, Mobil, Shell and Texaco.

b.      <u>Lynn</u> Plaintiffs — like the <u>Berisha</u> and <u>England</u> Plaintiffs — allege, <u>inter alia</u>, (i) a conspiracy among the oil companies (ii) to suppress information regarding MTBE contamination (iii) emanating principally from defendants' underground storage tanks and (iv) thereby contaminating surrounding property.

c.      Like the <u>Berisha</u> and <u>England</u> Plaintiffs, the <u>Lynn</u> Plaintiffs allege common law claims, including nuisance, fraud and conspiracy, and seek equitable relief, including testing and/or remediation, and damages.

5.      The <u>Lynn</u> case is broader than the <u>Berisha</u> and <u>England</u> cases; <u>Lynn</u> addresses all contaminated property, not just water wells, and it covers all constituents of gasoline, not just MTBE.

6.      As demonstrated herein, the <u>Lynn</u> case should be treated as a related action under 28 U.S.C. § 1407, and the <u>Lynn</u> court should be considered as the transferee forum.

## II.      THE *LYNN* CASE IS RELATED TO THE ACTIONS STYLED "MTBE LITIGATION"

<u>Lynn</u> is a class action seeking principally injunctive relief (<u>e.g.</u>, testing, cleanup, etc.) (<u>Lynn</u> complaint, attached, ¶ 39) for contamination including MTBE contamination. Property is defined in the <u>Lynn</u> case broadly and includes property on which water wells are situated (<u>id.</u>, ¶ 31). <u>Lynn</u> involves "petroleum" contamination ( <u>id.</u>, ¶ 33), which includes petroleum additives (most notably MTBE). (<u>Id.</u>, ¶¶ 34, 100-101.) The <u>Lynn</u> Plaintiffs allege, specifically, that gasoline contamination includes "MTBE, an additive used to oxygenate gasoline. MTBE is highly soluble in groundwater, travels faster and further than BTEX in groundwater, and is a suspected carcinogen." (<u>Id.</u>, ¶ 34.)

Lynn Plaintiffs allege that defendants conspired, in part through the American Petroleum Institute, to conceal their contamination problem (id., ¶¶ 51, 56, 65-66, 100.)

The Lynn class includes owners of property any portion of which is located within a 250-foot radius and 360° of the edge of a site containing, or that used to contain, an underground petroleum storage tank, where a leak has been reported, and where there is evidence of possible contamination, including MTBE contamination (¶ 36). Although the Lynn class definition includes a limitation of property within 250 feet of a gasoline contamination source (i.e., an underground storage tank), the proof that has been developed is not limited to such properties. Class certification has not been briefed or argued; and the Plaintiffs are of course free to seek certification of a class that is broader or narrower than the class alleged in the complaint, on due notice to defendants and upon application to the court. Fed. R. Civ. P. 23(c)(1).

The Lynn case is procedurally advanced. Lynn Plaintiffs have developed much of the same merits and expert discovery that relates to the fraud and conspiracy claims alleged in Berisha and England, which are not well advanced. Discovery in Lynn has focused on, among other issues, MTBE contamination. Both written and expert discovery have addressed the peculiar issues associated with MTBE. Merits discovery in the Lynn case has concluded, but only with respect to the class representatives' individual claims. Class discovery will resume once the court decides the merits of the individual Plaintiffs' claims.

The Lynn Court has decided to adjudicate Plaintiffs' individual claims before addressing class certification, to see if the issues can be narrowed/refined. Copies of the recent case scheduling orders in Lynn are attached. The scheduling orders contemplate mandatory mediation and the issue of MTBE water well contamination will be addressed by that mediation, potentially resolving all related litigation.

III.   **COORDINATION OF *LYNN* WITH *BERISHA* AND *ENGLAND* IS
       APPROPRIATE**

Given the substantially overlapping common issues of fact involved in the Lynn,

Berisha, and England actions, coordination of all three actions is appropriate.  The Lynn case

includes and subsumes many of the issues involved in Berisha and England.

The existence of "one or more common questions of fact" is the sole statutory

predicate to transfer of a pending action for consolidated or coordinated pretrial proceedings

under 28 U.S.C. § 1407.  In re Admissions Tickets, 302 F. Supp. 1339 (J.P.M.L. 1969).  Where,

as here, judicial economy demands a coordinated and consistent approach to resolution of related

civil proceedings, the Judicial Panel will exercise the transfer authority granted by § 1407.  This

overarching statutory goal is met when factual questions common to multiple actions are so

complex and time consuming that failure to coordinate would constitute a waste of judicial

resources.  In re Amoxicillin Patent and Antitrust Litigation, 449 F. Supp. 601, 603 (J.P.M.L.

1978) (holding that transfer under § 1407 is appropriate — regardless of number of cases

involved — when cases share "complex factual questions" discovery of which "will be both

complicated and time consuming.")  When either of these conditions is met, transfer is

appropriate to conserve resources, prevent duplicative discovery, and avoid inconsistent pretrial

rulings concerning class certification and summary judgment.  In re Temporomandibular Joint

(TMJ) Implants Prods. Liability Litigation, 844 F. Supp. 1553 (J.P.M.L. 1994).

Not only do common fact questions predominate over individualized issues in the

pending MTBE and gasoline contamination cases, but these common questions, which involve

environmental and other scientific/technical issues, are sufficiently complex and time-consuming

that failure to transfer under § 1407 would lead to a considerable waste of judicial resources.

Lynn, Berisha, and England allege overlapping causes of action on behalf of overlapping Plaintiff

classes against overlapping defendants. Consequently, numerous factual questions, including the qualities of MTBE, its effects on property, and the common defendants' knowledge of contamination resulting from its use, are common to all three cases. Discovery relating to these facts has relied and will likely rely on substantially similar documents and witnesses, and could easily and efficiently be coordinated under a single judge. Furthermore, the risk of inconsistent class determinations emanating from coordinate jurisdictions is an additional — and alone sufficient — reason for consolidation under § 1407.

A.   **Consolidation or Coordination Under Section 1407 Will Prevent Duplicative Discovery of Identical Documents, Facts, and Witnesses, and Will Conserve Judicial Resources.**

To satisfy § 1407's statutory predicate of "one or more common questions of fact," pending civil actions need not involve identical parties nor allege interchangeable legal theories. In re Multidistrict Private Civil Treble Damage Litigation Involving Gypsum Wallboard, 303 F. Supp. 510, 511 (J.P.M.L. 1969) ("neither the status of the plaintiff nor the legal basis for its action is conclusive on the transfer question."). Rather, § 1407 requires that the Judicial Panel look beyond the language of the pleadings to determine if the factual allegations necessary to sustain the actions are shared. "It is not unusual for plaintiffs in multidistrict litigation to base their claims for relief on different legal theories. But it is the facts underlying those theories which we must look to in making our determination under Section 1407." In re Holiday Magic Securities and Antitrust Litigation, 375 F. Supp. 1400, 1402 (J.P.M.L. 1974). When parallel actions require identical discovery to uncover facts common to even the most disparate claims, the statutory requirement for transfer is met. In re Multi-piece Rim Products Liability Litigation, 464 F. Supp. 969, 974 (J.P.M.L. 1979) (consolidating claims despite presence of individual

factual issues when some "documents and witnesses" were common to all actions and consolidation would therefore prevent duplicative discovery).

In <u>In re the Matter of Westec Corporation</u>, 307 F. Supp. 559 (J.P.M.L. 1969), for example, the Judicial Panel consolidated a libel action brought by a bank president against a publishing company with multiple securities fraud claims arising from a corporate bankruptcy. The plaintiff in the libel action was one of multiple defendants alleged to have participated in an illegal stock manipulation scheme affecting the corporation. The libel defendant was not a party to the securities litigation. Despite the vast differences in the legal claims and the lack of privity among the parties, the court found that the cases shared sufficient common questions of fact. Because the facts necessary to support the defenses of truth and fair comment in the libel claim were "sufficiently related to the facts necessary to establish liability (or nonliability) in all of the other related actions" the cases were "common within the meaning of Section 1407." <u>Westec</u>, 307 F. Supp. at 561. The libel action would "necessarily involve testimony from the same witnesses" and rely "upon the same documentary evidence" as the securities fraud cases. The libel plaintiff, therefore, could avoid repetitive discovery in two separate district courts only through transfer of the pending libel case pursuant to Section 1407. <u>Id</u>.

Similarly, in <u>In re Celotex Corp. "Technifoam" Products Liability Litigations</u>, 424 F. Supp. 1077 (J.P.M.L. 1977), co-defendants of Celotex in two actions in New York opposed transfer and consolidation of those actions with ongoing litigation against Celotex in Minnesota. Defendants argued that the products liability claims against them involved different products manufactured by different companies than the ongoing "Technifoam" litigation in Minnesota. <u>Technifoam Litigation</u>, 424 F. Supp. at 1078. The court ordered transfer for consolidation or coordination, holding that the existence of "parties and issues not present in the

other action . . . is no obstacle to transfer." Id. at 1078-1079. Rather, the claims against the common defendant, Celotex, were based on sufficiently similar factual allegations that transfer under Section 1407 was necessary to avoid duplicative discovery and prevent inconsistent pretrial rulings.[1]

Because Lynn, Berisha, and England allege damage caused by the release of MTBE into the groundwater and soil, all cases share common factual questions that will involve exhaustive expert testimony. Transfer and coordination adhere consistency, thoroughness and cost-efficiency in this process. Similarly, the conspiracy allegations contained in all pending cases present common factual questions concerning the defendants' knowledge and intent. Plaintiffs, as well, will be required to produce separate, but significantly overlapping, materials in all pending actions. In short, the Lynn and MTBE actions require overlapping discovery of many of the same facts, documents and witnesses. Such discovery "could best be pursued if coordinated under the supervision of a single judge." In re Public Air Travel Tariff Litigation, 360 F. Supp. 1397, 1399 (J.P.M.L. 1973).[2]

---

[1]See also In re the Upjohn Co. Antibiotic Products Liability Litigation ("Cleocin"), 450 F. Supp. 1168, 1170 (J.P.M.L. 1978) where the Judicial Panel consolidated fifteen separate products liability cases despite the presence of multiple defendants and individualized damage claims. The panel held that common factual questions concerning the testing, manufacturing, and marketing of the allegedly defective product; the causal relationship between ingestion of the product and contraction of severe side effects; and the common defendant's foreknowledge of these side effects were sufficient to trigger transfer under § 1407.

[2]The Lynn action also alleges harm from the release of additional chemicals contained in gasoline. This existence of individual factual issues is no hindrance to transfer as the transferee judge may arrange a schedule for discovery on the individual issues that proceeds concurrently with discovery on the common issues. In re Air Crash Near Van Cleve, Mississippi, 486 F. Supp. 926 (J.P.M.L. 1980); Cleocin, 450 F. Supp. at 1170. Parties need not participate in any discovery unrelated to their claims. In re Vernitron Secs. Litigation, 468 F. Supp. 297 (J.P.M.L. 1979).

The ultimate goal underlying § 1407 — promoting judicial efficiency — is equally met when cases involve few, but complex and time consuming, common factual questions as when myriad common factual questions predominate.  In In re Amoxicillin Patent and Antitrust Litigation, 449 F. Supp. 601, 603 (J.P.M.L. 1978), the Panel consolidated three actions for pretrial proceedings. The court found these cases proper for transfer — despite the minimal number of cases pending – because they involved "numerous complex questions of fact" discovery of which "will be both complicated and time consuming."  Likewise, in In re Gas Meter Antitrust Litigation, 464 F. Supp. 391, 393 (J.P.M.L. 1979), the Panel transferred a case for consolidated proceedings with three other pending cases after it determined that discovery pertaining to "the gas meter industry and the structure of the market for gas meters" would be "complex and time consuming."  Certainly if the issue of market definition in an antitrust action presents a sufficiently complex question to justify transfer under § 1407, the scientific issues shared by the pending environmental litigation warrant similar treatment.

**B.**     **Consolidation or Coordination Through 28 U.S.C. § 1407 Will Prevent Inconsistent Class Determinations.**

Because "it is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest," In re Plumbing Fixture Cases, 298 F. Supp. 484, 493 (J.P.M.L. 1968), the possibility of incompatible class determinations is among the most persuasive arguments for utilizing the transfer provisions of § 1407.  In fact, the Judicial Panel has alternatively cited the need for a single, consistent class determination as a "highly persuasive if not compelling reason for transfer of all actions to a single judge," In re Equity Funding Corporation of America Securities Litigation, 375 F. Supp. 1378, 1385 (J.P.M.L. 1973); a "crucial" factor favoring transfer, In re Roadway Express, Inc. Employment Practices Litigation, 384 F. Supp. 612, 613 (J.P.M.L. 1974);

548.UST

-8-

and a "compelling reason to bring these actions together for pretrial in a single jurisdiction." In re National Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Program Litigation, 399 F. Supp. 1405, 1406 (J.P.M.L. 1975).

In both National Airlines and Equity Funding, class allegations in multiple pending actions overlapped sufficiently that parallel motions for class certification risked conflicting class determinations. In both cases, consequently, the Judicial Panel consolidated the pretrial proceedings. In National, the panel transferred a gender discrimination claim from a district court in Virginia to one in Florida when pending actions in the two districts asserted similar legal claims on behalf of overlapping classes of employees. 399 F. Supp. at 1406. Because one action purported to represent all women employed by the defendant and a second sought certification of a class of female flight attendants only, the panel consolidated both cases in a single jurisdiction.[3]

Likewise, in Equity Funding, multiple actions based on various fraud claims and related securities violations were consolidated for pretrial proceedings so that a single class action determination could be made quickly. 375 F. Supp. at 1385. The numerous class actions consolidated in Equity Funding related generally to the collapse of a single financial services company. The various plaintiffs asserted fraud, securities violations, recission claims, claims against underwriters and claims against trustees on behalf of multiple, overlapping and

---

[3]The various plaintiffs in National also sought relief for overlapping, but not identical, violations of Title VII. While all plaintiffs alleged that the defendant's maternity leave policy violated federal law, one class also charged National with maintaining a discriminatory weight program.

inconsistent classes. The panel, cognizant that two districts had already certified conflicting

classes, transferred all pending actions to a single judge. <u>Id.</u> at 1383 n.11.

> The transferee judge, with all claims and all parties before him,
> will have a clear picture of the scope and complexity of the
> litigation, essential to making the class determinations. Once the
> class decisions are made, he will then be in a position to ascertain
> the scope of discovery common to all actions and formulate a
> pretrial schedule responsive to the various demands of the litigants.
> <u>Id.</u> at 1386.

Failure to consolidate the pending gasoline contamination case with the ongoing

MTBE cases would present the same risk of inconsistent and conflicting class determinations

repeatedly disfavored by the panel. The class definitions in these cases overlap.[4] All three class

definitions involve owners of property which is contaminated by defendants' gasoline and/or its

additives; as noted above, the <u>Lynn</u> class is simply broader than the classes in <u>Berisha</u> and

<u>England,</u> since <u>Lynn</u> includes more than properties contaminated with MTBE. The possibility

that coordinate jurisdictions may certify incompatible classes is, therefore, apparent. The risk of

---

[4]The Amended Complaint in <u>Berisha</u> identifies two subclasses. <u>The Contaminated Well
Subclass</u> consists of "all persons or entities who, during the relevant time herein, had an interest
in real property in New York and 1) relied on one or more wells on such property as a source of
water for drinking, bathing or general "domestic" purposes; and 2) their well water was tested
and the tests verified that it has been contaminated with MTBE in concentrations at or above
2 ppb." (<u>Berisha</u> Amended Complaint ¶ 145A.) The <u>Uncontaminated Well Subclass</u> consists of
"all persons or entities who, during the relevant time herein, had an interest in real property in
New York and 1) relied on one or more wells on such property as a source of water for drinking,
bathing or general "domestic" purposes; and 2) their well has not yet tested positive for the
presence of MTBE." (<u>Id.</u> ¶ 145B.) The Complaint in <u>England</u> includes the following class
definition: "All persons who own real property in the RFG states that is not used for commercial
purposes upon which a private water supply well exists that provides or may provide drinking
water and/or water used for domestic purposes and who have had or would like to have their
water supply well tested for MTBE." (<u>England</u> Complaint, ¶ 43.) The proposed subclass is:
"All persons who own real property in the RFG States that is not used for commercial purposes
upon which a private water supply well exists that provides or may provide drinking water and/or
water used for domestic purposes which has been contaminated by MTBE." (<u>Id.</u> ¶ 44.)

subsequent inconsistent pretrial rulings and ongoing duplicative discovery on questions common to the overlapping classes is commensurately heightened.  In re Japanese Electronics Products Antitrust Litigation, 388 F. Supp. 565, 567 (J.P.M.L. 1975) (consolidating two antitrust actions where class in first action was subsumed by second action to avoid duplicative discovery of the "conspiratorial issues common to both actions.")

## IV.   THE MIDDLE DISTRICT OF ALABAMA IS AN APPROPRIATE TRANSFEREE COURT

Several of the defendants who initiated a transfer motion which excludes the Lynn case have been actively involved in Lynn since it was commenced.  They have lost several significant discovery battles, and are in front of a court which has steadfastly maintained an expedited course of discovery, has managed this complex case with care and attention, is now familiar with the issues involved in all three cases, and has demonstrated a willingness and ability to grapple with these complex issues.  Lynn Plaintiffs respectfully submit that transfer of all of the related cases to the Middle District of Alabama is appropriate.

In In re the Regents of the University of California, the court of appeals upheld a Panel decision to coordinate pretrial proceedings in five suits involving various research arrangements.  964 F.2d 1128, 1136-37 (Fed. Cir. 1992).  The Panel's decision that the Southern District of Indiana was the appropriate transferee forum was based on the following factors: (1) the broader-based action was already in the Indiana court; (2) the earliest filed action was already in the Indiana court; (3) the Indiana court had developed more familiarity with the issues; (4) Indiana was centrally located (affording access for witnesses located throughout the world and for counsel located on both coasts of the United States); and (5) that many relevant

documents and witnesses were at one of the defendant's headquarters in the Indiana district. Id. at 1136 (citations omitted).

Similarly, the court in which the most discovery has already taken place may be the most appropriate forum for transfer.[5] The judge in that court generally will be most familiar with the issues, and the court itself may be the repository of the fruits of discovery such that the parties in other actions may be more easily provided access to discovery already had. See Moore's Federal Practice § 3d 112.04[2], p. 112-51. Such is the case here.

In In re L.E. Lay and Co. Antitrust Litig., the Panel found persuasive the fact that pretrial proceedings were significantly more advanced than those in any of the actions in other jurisdictions. 391 F. Supp. at 1056. The action pending in the transferee district was at a relatively advanced stage — an imminent trial had been set. Id. The court noted that:

> We have often held that a factor to be considered in the selection of
> a transferee district is whether the pretrial proceedings in the action
> or actions in a particular forum are significantly more advanced
> than those in any of the actions in the other jurisdictions.

Id. (citing In re Holiday Magic Securities and Antitrust Litig., 368 F. Supp. 806, 807 (J.P.M.L. 1973); In re Boise Cascade Securities Litig., 364 F. Supp. 459, 461 (J.P.M.L. 1973)).

For all these reasons, the Middle District of Alabama is an apt choice for transferee Court in these proceedings.

---

[5] In re L.E. Lay and Co. Antitrust Litig., 391 F. Supp. 1054 (J.P.M.L. 1975); accord In re Air West, Inc. Securities Litig., 384 F. Supp. 609 (J.P.M.L. 1974) (litigation transferred to district in which discovery had progressed steadily and in which the court was familiar with all factual issues raised in the litigation); In re Boise Cascade Securities Litig., 364 F. Supp. 459 (J.P.M.L. 1973) (transferee forum chosen where pretrial proceedings in actions consolidated in that district were further advanced).

Dated: June 26, 2000

LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP

*Morris A. Ratner / lea*

Morris A. Ratner

Elizabeth J. Cabraser
Morris A. Ratner
Scott P. Nealey
LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Fred D. Gray
GRAY, LANGFORD, SAPP
P.O. Box 830239
Tuskegee, AL 36083-0239
(334) 727-4830

Joseph R. Whatley, Jr.
Russell Jackson Drake
Peter H. Burke
WHATLEY DRAKE, LLC
1100 Financial Center
505 N. 20th Street
Birmingham, AL 35203
Telephone:  (205) 328-9576
Facsimile:  (205) 328-9669

Kenneth Ingram, Jr.
INGRAM AND ASSOCIATES
P.O. Box 1750
Alexander City, AL 35011
Telephone:  (256) 212-9700
Facsimile:  (256) 212-1342

A. Hoyt Rowell
NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
151 Meeting Street, Suite 600
Charleston, SC 29402
Telephone:  (803) 577-6747
Facsimile:  (803) 577-7513

Mitchell A. Toups
WELLER, GREEN, MCGOWN, TOUPS
551 Fanin Street
Beaumont, TX 77701
Telephone:  (409) 838-0101
Facsimile:  (409) 838-6780

Larry Morris
MORRIS, HAYNES & HORNSBY
131 Main Street
P.O. Box 1660
Alexander City, AL 35011-1660
Telephone:  (256) 329-2000
Facsimile:  (256) 329-2015

548.UST

-13-

Timothy J. Crowley
Richard Norman
CROWLEY & DOUGLAS, L.L.P.
1301 McKinney, Suite 3500
Houston, TX 77010
Telephone: (713) 651-1771
Facsimile: (713) 651-1775

Dennis Reich
REICH AND BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX 77027
Telephone: (713) 622-7271
Facsimile: (713) 623-8724

David Guin
Pam Slate
DONALDSON, GUIN & SLATE, L.L.C.
The Carriage House
1314 Cobb Lane
Birmingham, AL 35205
Facsimile: (205) 933-1512

Kenneth G. Gilman
John Martland
GILMAN AND PASTOR
One Boston Place, 28th Floor
Boston, MA 02108
Telephone: (617) 589-3750
Facsimile: (617) 589-3749

William H. Garvin, III
WELLER, GREEN, MCGOWN, TOUPS
2937 A-2 Kerry Forrest Parkway
Tallahassee, FL 32308
Telephone: (850) 906-9880
Facsimile: (850) 906-9878

T. Roe Frazer
Richard A. Freese
LANGSTON, FRAZER, SWEET & FREESE
201 North President Street
Jackson, MS 39201
Facsimile: (601) 968-3866

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2000

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| In re: | ) | MDL DOCKET NO. 1358 |
| | ) | |
| METHYL TERTIARY BUTYL ETHER | ) | |
| ("MTBE") PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| _____ | ) | |

**SCHEDULE OF ACTIONS PURSUANT TO
RULE 10 OF THE RULES OF PROCEDURE OF
THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Elizabeth J. Cabraser
Morris A. Ratner
Scott P. Nealey
LIEFF, CABRASER, HEIMANN
   & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94121
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

[Additional Counsel Listed on Signature Page]

## ACTION NO. 1

Complete Name of Case:   Buddy Lynn; Janet Lynn; Robert Pate, Jr.; Gloria Mobley; Rufus J. Vanable; Ola Mae Wells; Will R. Peterson; Archie L. Blaxley; Johnnie E. Williams; Earl C. Cunningham; Ronnie E. Chappel; Jimmie Jennings; Annette M. Fox, as Trustee of the Leger Realty Trust; Brian Yakimowsky; Carol A. Yakimowsky; and Robert M. Selby, as Trustee of The 158 Andover Street Realty Trust on behalf of themselves and as representatives of a class of persons similarly situated v. Amoco Oil Company; Texaco Refining and Marketing, Inc.; Chevron USA, Inc.; Chevron USA Products Company; Exxon Corporation d/b/a Exxon Company USA, Inc., an operating division of Exxon Corporation; B.P. Exploration & Oil, Inc.; Mobil Oil Corporation; Star Enterprise; Shell Oil Product Company.

District Court:   Middle District of Alabama

Civil Action No.:   96-T-940-N

Assigned Judge:   Judge Myron H. Thompson

## ACTION NO. 2

Complete Name of Case:   Donna Berisha, Steven C. Greene, Melanie J. Arcuri and Ron LaSusa on behalf of themselves and all others similarly situated v. Amerada Hess Corporation, BP Amoco Corporation, Chevron U.S.A., Inc., CITGO Petroleum Corporation, Exxon Corporation, Getty Petroleum Corporation, Gulf Oil Ltd. Partnership, Mobil Oil Corporation, Shell Oil Products Company, Sunoco Inc., Texaco, Inc., Tosco Corporation, Atlantic Richfield Company, Coastal Corporation d/b/a/ Coastal Oil New York, Inc., Motiva Enterprises LLC, United Refinery Company, Valero Energy Inc. d/b/a Valero Marketing and Supply Company, and Does 1 through 100 inclusive.

District Court:   Southern District of New York

Civil Action No.:   No. 00 CIV 1898 [SAS]

Assigned Judge:   Judge S. Scheindlin

## ACTION NO. 3

Complete Name of Case:    David England, Donna Azbill, James Bauer, Marvin Owca, Rhea Susan McMannis, and Claudia Christiansen, individually and on behalf of all others similarly situated v. Atlantic Richfield Company, BP Amoco Corporation, Amoco Oil Company, CITGO Petroleum Corporation, Conoco, Inc., Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation, Equilon Enterprises, LLC, Chevron USA, Inc., Phillips Petroleum Company, Shell Oil Company, and Texaco Refining and Marketing, Inc.

District Court:    Southern District of Illinois

Civil Action No.:    00-370-WDS

Assigned Judge:    Judge William D. Stiehl

## ACTION NO. 4[1]

Complete Name of Case:    David England, Donna Azbill, James Bauer, Marvin Owca, Rhea Susan McMannis, and Claudia Christiansen, individually and on behalf of all others similarly situated v. Atlantic Richfield Company, BP Amoco Corporation, Amoco Oil Company, CITGO Petroleum Corporation, Conoco, Inc., Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation, Equilon Enterprises, LLC, Chevron USA, Inc., Phillips Petroleum Company, Shell Oil Company, and Texaco Refining and Marketing, Inc.

District Court:    Southern District of Illinois

Civil Action No.:    00-371-DRH

Assigned Judge:    Judge David R. Herndon

---

[1] Actions No. 3 and 4 are listed separately because the England case was removed to federal court on two separate motions. Each removal motion was assigned to a different judge.

Dated: June __, 2000

LIEFF, CABRASER, HEIMANN
& BERNSTEIN, LLP

*Morris A. Ratner/clea*

Morris A. Ratner

Elizabeth J. Cabraser
Morris A. Ratner
Scott P. Nealey
LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Fred D. Gray
GRAY, LANGFORD, SAPP
P.O. Box 830239
Tuskegee, AL 36083-0239
(334) 727-4830

Joseph R. Whatley, Jr.
Russell Jackson Drake
Peter H. Burke
WHATLEY DRAKE, LLC
1100 Financial Center
505 N. 20th Street
Birmingham, AL  35203
Telephone:  (205) 328-9576
Facsimile:  (205) 328-9669

Kenneth Ingram, Jr.
INGRAM AND ASSOCIATES
P.O. Box 1750
Alexander City, AL  35011
Telephone:  (256) 212-9700
Facsimile:  (256) 212-1342

A. Hoyt Rowell
NESS, MOTLEY, LOADHOLT,
  RICHARDSON & POOLE
151 Meeting Street, Suite 600
Charleston, SC  29402
Telephone:  (803) 577-6747
Facsimile:  (803) 577-7513

Mitchell A. Toups
WELLER, GREEN, MCGOWN, TOUPS
551 Fanin Street
Beaumont, TX  77701
Telephone:  (409) 838-0101
Facsimile:  (409) 838-6780

Larry Morris
MORRIS, HAYNES & HORNSBY
131 Main Street
P.O. Box 1660
Alexander City, AL  35011-1660
Telephone:  (256) 329-2000
Facsimile:  (256) 329-2015

-3-
SCHEDULE OF ACTIONS PURSUANT TO RULE 10 OF THE
RULES OF PROCEDURE OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

Timothy J. Crowley
Richard Norman
CROWLEY & DOUGLAS, L.L.P.
1301 McKinney, Suite 3500
Houston, TX  77010
Telephone:  (713) 651-1771
Facsimile: (713) 651-1775

Dennis Reich
REICH AND BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX  77027
Telephone:  (713) 622-7271
Facsimile:  (713) 623-8724

David Guin
Pam Slate
DONALDSON, GUIN & SLATE, L.L.C.
The Carriage House
1314 Cobb Lane
Birmingham, AL  35205
Facsimile:  (205) 933-1512

Kenneth G. Gilman
John Martland
GILMAN AND PASTOR
One Boston Place, 28th Floor
Boston, MA  02108
Telephone:  (617) 589-3750
Facsimile:  (617) 589-3749

William H. Garvin, III
WELLER, GREEN, MCGOWN, TOUPS
2937 A-2 Kerry Forrest Parkway
Tallahassee, FL  32308
Telephone:  (850) 906-9880
Facsimile:  (850) 906-9878

T. Roe Frazer
Richard A. Freese
LANGSTON, FRAZER, SWEET & FREESE
201 North President Street
Jackson, MS  39201
Facsimile:  (601) 968-3866

SCHEDULE OF ACTIONS PURSUANT TO RULE 10 OF THE
RULES OF PROCEDURE OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

 **ORIGINAL** 

**JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

**JUN 2 8 2000**

**FILED
CLERK'S OFFICE**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BUDDY LYNN, et al.,

               Plaintiffs,

    v.

AMOCO OIL COMPANY, et al.,

               Defendants.

Case Number CV 96-T-940-N

## PROOF OF SERVICE BY OVERNIGHT DELIVERY AND U. S. MAIL

      I am employed in the County of San Francisco, State of California.  I am over the age of eighteen (18) years and not a party to the within action; my business address is 275 Battery Street, San Francisco, California 94111-3339.

      I am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice for collection and processing of documents for service <u>via Overnight Delivery</u>, and that practice is that the documents are delivered in-hand to an authorized overnight mail carrier the same day as the date listed on this Proof of Service.

      On June ___, 2000, I served **via overnight delivery** the following documents:

1.    **RESPONSE OF INTERESTED PARTY; NOTICE OF RELATED ACTION: <u>LYNN, ET AL. V. AMOCO OIL COMPANY, ET AL.,</u> CIVIL ACTION NO. 96-T-940-N (M.D. ALA., J. THOMPSON) (WITH ATTACHMENTS);**

2.    **SCHEDULE OF ACTIONS PURSUANT TO RULE 10 OF THE RULES OF PROCEDURE OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION;**

3.    **PROOF OF SERVICE BY OVERNIGHT DELIVERY AND U. S. MAIL**

MAILOVE3.UST

—1—

on the persons listed below by placing the document(s) in (a) sealed envelope(s) addressed to each of the below listed parties:

Norbert G. Jaworski, Clerk
UNITED STATES DISTRICT COURT
Southern District of Illinois
750 Missouri Avenue
P.O. Box 249
East St. Louis, IL  62202

James M. Parkison, Clerk
UNITED STATES DISTRICT COURT
Southern District of New York
500 Pearl Street
New York, NY  10007

Debbie Hackett, Clerk
UNITED STATES DISTRICT COURT
Middle District of Alabama
15 Lee Street
Montgomery, AL  36104

I am also readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice for collection and processing of documents for mailing with the United States Postal Service, and that practice is that the documents are deposited with the United States Postal Service with postage fully prepaid the same day as the day of collection in the ordinary course of business.

On June ___, 2000, I served **via U. S. mail** the aforementioned documents on the persons listed below by placing the document(s) in a sealed envelope for deposit in the United States Postal Service through the regular mail collection process at the law offices of Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street, 30th Floor, Embarcadero Center West, San Francisco, California 94111-3339, to be served by mail addressed as follows:

**ATTORNEY — FIRM**

Ball, Dan H.
THOMPSON & COBURN, L.L.P.
One Firstar Plaza
St. Louis, MO  63101

**REPRESENTED PARTY(IES):**

Chevron USA, Inc.; Conoco, Inc.; Exxon Corp.; Exxon Mobil Oil Corp.; Mobil Oil Corp.

| **ATTORNEY — FIRM** | **REPRESENTED PARTY(IES):** |
|---|---|
| Elmer, Nathan P.<br>SIDLEY & AUSTIN<br>Bank One Plaza<br>10 South Dearborn Street<br>Chicago, IL 60603 | Citgo Petroleum Corp. |
| Galvin, John S.<br>SANDBERG, PHOENIX &<br>von GONTARD<br>One City Centre, Suite 1500<br>St. Louis, MO 63101 | Phillips Petroleum Co. |
| Guttmann, John S.<br>BEVERIDGE & DIAMOND, P.C.<br>1350 "I" Street, N.W., Suite 700<br>Washington, DC 20005 | Sunoco, Inc. |
| Hinck, Jon<br>LEWIS, SAUL & ASSOCIATES, P.C.<br>183 Middle Street, Suite 200<br>Portland, ME 04101 | Arcuri, Melanie J.; Berisha, Donna; Greene,<br>Steven C.; La Susa, Ron |
| Langan, J. Andrew<br>KIRKLAND & ELLIS<br>200 East Randolph Drive<br>Chicago, IL 60601 | Amoco Oil Co.; Atlantic Richfield Co.; BP<br>Amoco Corp. |
| Leifer, Steven L.<br>BAKER, BOTTS, L.L.P.<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | Valero Marketing & Supply Co. |
| O'Connor, Mark G.<br>Regional Counsel<br>COASTAL OIL NEW YORK, INC.<br>611 Route 46 West<br>Hasbrouck Heigh, NJ 07604 | Coastal Corp. |
| Pasquale, Kenneth<br>STROOCK, STROOCK & LAVAN,<br>L.L.P.<br>180 Maiden Lane<br>New York, NY 10038 | Tosco Corp. |
| Shulman, Robert H.<br>HOWREY SIMON ARNOLD &<br>WHITE, LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | Amerada Hess Corp. |

| **ATTORNEY — FIRM** | **REPRESENTED PARTY(IES):** |
|---|---|
| Tillery, Stephen M.<br>CARR, KOREIN, TELLERY, KUNIN,<br>MONTROY & GLASS<br>10 Executive Woods Court<br>Swansea, IL 62226 | Azbill, Donna L.; Bauer, James;<br>Christianson, Claudia; England, David;<br>McManhis, Rhea Susan; Owca, Marvin |
| Tully, Mark E.<br>GOODWIN, PROCTOR & HOAR,<br>L.L.P.<br>53 State Street<br>Boston, MA 02109 | Gulf Oil Ltd. Partnership |
| Wagner, John<br>Law Department<br>One Valero Place<br>San Antonio, TX 78212 | United Refining Co. |
| Wallace, Richard E., Jr.<br>WALLACE, KING, MARRARO &<br>BRANSON, P.L.L.C.<br>1050 Thomas Jefferson Street, N.W.<br>Washington, DC 20007 | Equilon Enterprises, L.L.C.; Motiva<br>Enterprises, L.L.C.; Shell Oil Co.; Shell Oil<br>Products Co.; Texaco Refining &<br>Marketing, Inc.; Texaco, Inc. |

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Francisco, California on June _26_ 2000

*Ernest Crawford*

ERNEST CRAWFORD

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2000

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

In re:                                    )        MDL DOCKET NO. 1358
                                          )
METHYL TERTIARY BUTYL ETHER               )
("MTBE") PRODUCTS LIABILITY               )
LITIGATION                                )
_____  )

## ATTACHMENTS

| DOCUMENT | EXHIBIT |
|---|---|
| Lynn, et al. v. Amoco Oil Co., et al.<br>Third Amended Complaint | A |
| Scheduling Order<br>(entered July 1, 1999) | B |
| Amendment to July 1, 1999 Scheduling Order<br>(entered July 27, 1999) | C |
| Amendment to July 1, 1999 Scheduling Order<br>(entered February 7, 2000) | D |
| Amendment to July 1, 1999 Scheduling Order<br>(entered March 8, 2000) | E |

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

RECEIVED

OCT 0 7 1999

| | |
|---|---|
| BUDDY LYNN; JANET LYNN; ROBERT PATE, JR.; GLORIA MOBLEY; RUFUS J. VANABLE; OLA MAE WELLS; WILL R. PETERSON; ARCHIE L. BLAXLEY; JOHNNIE E. WILLIAMS; EARL C. CUNNINGHAM; RONNIE E. CHAPPEL; JIMMIE JENNINGS; ANNETTE M. FOX, as Trustee of THE LEGER REALTY TRUST; BRIAN A. YAKIMOWSKY; CAROL A. YAKIMOWSKY; and ROBERT M. SELBY, as Trustee of THE 158 ANDOVER STREET REALTY TRUST on behalf of themselves and as representative of a class of persons similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| AMOCO OIL COMPANY; TEXACO REFINING AND MARKETING, INC.; CHEVRON, USA INC.; CHEVRON USA PRODUCTS COMPANY; EXXON CORPORATION d/b/a EXXON COMPANY USA, INC., an operating division of Exxon Corporation; B.P. EXPLORATION & OIL INC.; MOBIL OIL CORPORATION; STAR ENTERPRISE; SHELL OIL PRODUCTS COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION NO.:

96-T-940-N

## THIRD AMENDED COMPLAINT

I.   **NATURE OF ACTION**

EXHIBIT 1

Plaintiffs bring this class action on behalf of all United States residents who own property situated near Defendants' leaking underground petroleum storage tank sites. Plaintiffs' class claims include fraudulent concealment, trespass, nuisance and conspiracy, and all arise out

of Defendants' uniform course of conduct in knowingly allowing their tanks to leak, creating

underground plumes of contamination which present an imminent and/or ongoing threat of harm

to plaintiffs and their property. Tank leaks have been reported to government agencies at each of

the sites at issue in this case; however, Defendants have withheld from the class information

regarding the existence and precise scope of the resulting contamination of surrounding

properties.

On behalf of the class, individual and representative Plaintiffs seek, principally

and first, injunctive relief in whatever form the Court deems appropriate, including in the form of

an order requiring Defendants to inspect plaintiffs' properties for contamination, and/or to inform

plaintiffs of the results of inspections. Secondarily, in a subsequent phase Plaintiffs will seek to

obtain compensatory damages to recover for property devaluation and clean up costs resulting

from Defendants' leaking tanks.

II.    **PARTIES**

Named Plaintiffs:

1. Many of the named Plaintiffs are persons who reside in, and/or own or

possess real property situated in Alabama, located adjacent to or near leaking USTs owned,

leased or controlled by one or more defendants. Other named plaintiffs reside in other states and

reside in, and/or own or possess similar real property.

2. Plaintiffs Buddy Lynn and Janet Lynn are citizens of Alabama residing at

Route I Box 118 Alexander City, AL 35010. Their property is located east of Brants Grocery,

where there has been a confirmed release of petroleum products.

3. Plaintiff Robert Pate, Jr. is an adult citizen of Alabama residing at Route 1

2

THIRD AMENDED COMPLAINT
96-T-940-N

Box 283 Alexander City, AL 35010. His property is located east of Brants Grocery where there has been a confirmed release of petroleum products.

4.    Plaintiff Gloria Mobley is a citizen of Alabama residing at P.O. Box 723 Eutaw, AL 35462. Her property is located adjacent to Hamilton Texaco, where there has been a confirmed release of petroleum products.

5.    Plaintiff Rufus J. Vanable is a citizen of Alabama residing at 503 Tuscaloosa St. Eutaw, AL 35462. His property is located near: the Eutaw Bait shop, where there has been a confirmed release of petroleum products. On information and belief, Mr. Vanable's well has been contaminated by the release of petroleum products from either Hamilton Texaco, the Eutaw Bait Shop, or both.

6.    Plaintiff Ola Mae Wells is a citizen of Alabama residing at 405 Tuscaloosa St. Eutaw, AL 35462. Her property is located near the Eutaw Bait shop, where there has been a confirmed release of petroleum products.

7.    Plaintiff Will R. Peterson is a citizen of Alabama residing at 202 3rd Ave. Eutaw, AL 35462. His property is located near the Eutaw Bait shop, where there has been a confirmed release of petroleum products.

8.    Plaintiff Archie L. Blaxley is a citizen of Alabama residing at 410 Constantine St. Eutaw, AL 35462. His property is located near the Eutaw Bait shop, where there has been a confirmed release of petroleum products.

9.    Plaintiff Johnnie E. Williams is a citizen of Alabama residing at 110 3rd Ave., Eutaw, AL 35462. Her property is located near the Eutaw Bait shop, where there has been a confirmed release of petroleum products.

3

THIRD AMENDED COMPLAINT
96-T-940-N

10.     Plaintiff Earl C. Cunningham is a citizen of Alabama residing at 1213 9th Place West, Birmingham, AL. His property is located near a Chevron station, where there has been a confirmed release of petroleum products.

11.     Plaintiff Ronnie E. Chappell is a citizen of Alabama residing at 1904 10th Avenue North, Bessemer, AL. His property is located near a Shell station, where there has been a confirmed release of petroleum products.

12.     Plaintiff Jimmie Jennings is a citizen of Mississippi and owns properties located at: 2001 N. West Street, 2003 N. West Street, 1527 N. West Street, 1245 N. West Street, Jackson, Mississippi 39207. Her properties are near a B.P. station where there has been a confirmed release of petroleum products.

13.     Plaintiff Annette M. Fox is the Trustee of The Leger Realty Trust and is an individual residing in Waltham, Commonwealth of Massachusetts. Plaintiffs property is located near a former ARCO Gasoline Station located at 487 Main Street, Waltham, Massachusetts where there has been a confirmed release of petroleum products.

14.     Plaintiffs Brian A. Yakimowsky and Carol A. Yakimowsky are individuals residing in Walpole, Massachusetts. Plaintiffs' property is located adjacent to a Mobil Oil Gasoline Station located at 751 Main Street, Walpole, Massachusetts where there has been a confirmed release of petroleum products.

15.     Plaintiff Robert M. Selby, is the Trustee of The 158 Andover Street Realty Trust. Plaintiffs property is located at 158 Andover Street, Danvers, Commonwealth of Massachusetts and is adjacent to the Exxon Gasoline Facility located at 160 Andover Street, Danvers Massachusetts where there has been a confirmed release of petroleum products.

4

THIRD AMENDED COMPLAINT
96-T-940-N

Named Defendants:

16.     The Defendants named herein are collectively referred to as "Defendants." They are all alleged to have participated in a conspiracy to commit fraud, trespass, and nuisance, by virtue of their concerted concealment and denial of their leaking tank problem, and refusal to take the basic steps they should have taken to detect and prevent tank leaks, long ago.

17.     Defendant Amoco Oil Company ("Amoco") is a Maryland corporation, with a principal place of business in Chicago, Illinois, and is presently conducting business in the state of Alabama.

18.     Defendant Texaco Refining and Marketing, Inc., ("Texaco") is a Delaware corporation presently conducting business in the state of Alabama.  Texaco Refining and Marketing, Inc., principal place of business is at 1111 Bagby Street, Houston, Texas 77002-2543.

19.     Defendant Chevron USA Inc. ('Chevron') is a Pennsylvania corporation, with a principal place of business in California, and is presently conducting business in the state of Alabama.

20.     Defendant Exxon Company U.S.A. Inc., an operating division of Exxon Corporation ("Exxon") is a New Jersey corporation, with a principal place of business in Irving, Texas, and is presently conducting business in the state of Alabama under the assumed name of Exxon Company, USA.

21.     Defendant B.P. Exploration & Oil Inc. ("BP"), is a foreign corporation registered to do and doing business in the state of Alabama.

22.     Defendant Star Enterprise ("Star") is a New York general partnership by and between Texaco Refining and Marketing, Inc., and Saudi Refining, Inc., presently

5

conducting business in Alabama.  Star manages a number of service station sites for Texaco.

Star maintains its principal place of business at 12700 Northborough Drive, Houston, Texas.

23.     Defendant Shell Oil Products Company, ("Shell") is a Delaware

corporation, with a principal place of business in Houston.  Texas, and is presently conducting

business in the state of Alabama.

24.     Defendant Mobil Oil Corporation ("Mobil") is a New York corporation,

with a principal place of business in Fairfax, Virginia, and is presently conducting business in the

state of Alabama.

III.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this diversity action

pursuant to 28 U.S.C. § 1332.  The representative Plaintiffs and Defendants are citizens of

different states, and the value of the matter in controversy as to each member of the class exceeds

$50,000, exclusive of interest and costs.  Plaintiffs seek punitive damages from the defendants.

26.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391 (a)(l), as a

substantial part of the events or omissions giving rise to plaintiffs' claim occurred here, and

plaintiffs' own property is located here.  Plaintiffs allege a nationwide conspiracy, which has

impacted properties throughout Alabama and the United States, including the properties of the

individual and representative plaintiffs.  This Court also has supplemental jurisdiction over the

claims of any non-named class members whose damages do not exceed $50,000.00 pursuant to

28 U.S.C. § 1367.

IV.     DEFINITIONS

6

27.     In this complaint, whenever the terms "UST systems" or "underground storage tank" or "tanks" or "UST's" are used, unless the context otherwise dictates, they are intended to refer to any one or combination of underground tanks and any connecting pipes, pumps and ancillary equipment, spill and overfill prevention equipment, release detection equipment, corrosion protection systems, secondary containment equipment, and all other related systems and equipment used to contain petroleum products, including gasoline and used oil.

28.     In this complaint, whenever the term "release" or "leak" is used, unless the context otherwise dictates, it is intended to refer to any spilling (including overfills), leaking, emitting, discharging, escaping, leaching, or disposing from a UST system into the surrounding property, groundwater, sediments, surface water, or subsurface soils.

29.     In this complaint, whenever the term "owner or operator" is used, unless the context otherwise dictates, it is intended to mean the person or entity designated by a State Environmental Agency ("SEA")[1] or the Environmental Protection Agency ("EPA") as the party or potentially responsible party responsible for investigation and cleanup of petroleum product contamination at a given location. Such locations may be active or closed service stations or distribution terminals currently owned and/or operated by one of Defendants, or formerly so owned and/or operated, or leased or formerly leased by or to one of Defendants, or branded, or formerly branded, by one of Defendants, or formerly owned and/or operated by one Defendant and now owned and/or operated by another Defendant, or locations where one of Defendants owns or owned part or all of the UST system.

30.     In this complaint, whenever the term "sites" is used, unless the context

---

[1]For example, the State Environmental Agency in Alabama is the Alabama Department of Environmental Management ("ADEM").

7

THIRD AMENDED COMPLAINT
96-T-940-N

otherwise dictates, it is intended to refer to those active or former service station locations which have been assigned a UST (underground storage tank) Incident number by an SEA or the EPA, which identify confirmed releases of petroleum product with resulting soil and/or groundwater contamination or the threat of such contamination. Site includes the UST system itself and any reported or known areas of contamination resulting from the release or leak. In a few cases, sites may be included for a Defendant where responsibility is shared with another party, or has been assumed by Defendant by agreement with another current or former owner or operator.

31.    In this petition, the term "property" means all forms of real property improved or unimproved, including commercial, industrial, institutional or residential, including single or multi-family dwellings or apartments.

32.    In this petition, the term "property owners" means ownership in fee.

33.    In this petition, the term "petroleum" refers to any and all petrochemical based products including gasoline and used oil, and their included additives or manufacturing residues.

34.    In this petition, the terms "contamination" or "pollution" refer to phase separated hydrocarbons (PSH) (i.e., freely floating on groundwater) and dissolved phase hydrocarbons (i.e., dissolved in groundwater), as well as soil and vapor contamination from petroleum. The toxic elements of gasoline generally measured and referred to as contaminants are benzene (a confirmed carcinogen), toluene, ethyl benzene and xylene. Together these toxic elements are referred to as BTEX. Gasoline may also contain methyl tertiary butyl ether, or MTBE, an additive used to oxygenate gasoline. MTBE is highly soluble in groundwater, travels faster and further than BTEX in groundwater, and is a suspected carcinogen.

8

35.     In this petition, whenever it is alleged that any Defendant did or are doing any act or thing, it is meant that such Defendant's officers, agents, servants, employees, attorneys, or representatives did or are doing such act or thing and that, at the time such act or thing was done, or is being done, it was or is done with the full express, implied, or apparent authorization or ratification of the Defendant or was and is done in the normal and routine course and scope of employment of Defendant's officers, agents, servants, employees, attorneys, or representatives.

## V.     CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action individually, and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:  United States residents and owners of property any portion of which is located within a 250-foot radius and 3600 of the edge of a site containing, or that used to contain, an underground petroleum storage tank, at which site or former site, a release or detected release of petroleum has been reported to the responsible SEA or EPA designated agency, and the SEA or EPA designated agency has listed, or can list, a defendant, or a group of defendants, as an owner or operator or responsible party at the site, or the SEA or EPA has received from an environmental consulting firm reports showing ground water or soil contamination.  Ground water, or soil contamination, in this context, shall mean the measurement of benzene in excess of five parts per billion, or MTBE in excess of 50 parts per billion, or any measurable amount of PSH (phase separated hydrocarbons or "free product").

37.     Excluded from the Class are:  (1) all claims for personal injury by Class members; (2) all claims by any person or entity that has already commenced an individual civil

9

action related to the subject matter of this litigation; (3) all claims that might be made by

governmental agencies or entities, such as state or local highway departments, federal, or state

agencies that may own property, common carriers such as railroads, or holders of surface or

subsurface easements, such as utilities or pipeline companies; (4) oil companies or similar

petroleum storage, distribution and/or marketing firms; (5) all Defendants, any parent,

subsidiary, affiliate, or controlled person of any Defendant; the officers, directors, agents,

servants, or employees of any of the same; and the members of the immediate families of any

such person; and (6) the Judge, Magistrate Judge and members of their immediate families.

38.    To identify the Class precisely and objectively, Plaintiffs have utilized

environmental reports filed by Defendants with the SEAs, including the Alabama Department of

Environmental Management ("ADEM"), or the EPA.  These reports must be filed to identify

UST system releases and the extent of resulting soil and groundwater contamination, at sites at

which Defendants have reported a petroleum release or releases (usually gasoline or waste oil)

and the SEA has confirmed the release(s) have resulted in soil and/or groundwater

contamination.  For all the sites, a responsible party has already been identified by the SEA, has

nominally begun some form of environmental investigation and has assumed responsibility to

address the contamination at the site.  However, at very few of these sites has the soil and/or

groundwater contamination been completely cleaned up.  Indeed, at most sites where there has

been a UST release and/or is confirmed contamination, Defendants do not know, or have not

revealed, the extent or scope of soil contamination nor the possible spread of groundwater

contamination.  At the vast majority of sites Defendants have not discovered the scope of

contamination, determined if the spread, or potential spread, of contamination has or will effect

10

neighboring parcels owned by class members, nor contained or cleaned up the release. At many sites, Defendants are actively seeking to "close" the sites without undertaking and/or completing the cleanup of contamination or testing neighboring parcels for contamination or insuring that there is no threat of contamination to surrounding property.

39.   Plaintiffs will seek to bifurcate the proceedings, asking the Court to first address Plaintiffs' claims for, and entitlement to, injunctive relief such as property inspection/plume mapping, and/or notification to affected property owners. With respect to this Phase I component of the litigation and Plaintiffs' injunctive relief claims, Plaintiffs seek to certify a mandatory class under Fed. R. Civ. P. 23(a)(I)-(4) and 23(b)(1) and/or (b)(2). In Phase II of the litigation, Plaintiffs anticipate addressing their compensatory damages claims under Fed. R. Civ. P. 23(a)(l)-(4) and 23(b)(3).

40.   The claims of Plaintiffs and the Class involve common questions of law and fact, including but not limited to:

(1)   whether and when Defendants knew, or should have known, that numerous UST systems for which they were responsible were or would soon be leaking, thus causing petroleum to pass into or threaten to pass into class members' property;

(2)   whether Defendants conducted corrosion studies, divestiture investigations, or similar tests or surveys on large numbers of their UST systems which gave them knowledge as to the risks of widespread contamination from such leaking UST systems;

(3)   whether Defendants knew of, or were reckless in not appreciating, the inadequacies of their UST systems and the risk of probable invasion, or threat of invasion by petroleum of neighboring property;

11

THIRD AMENDED COMPLAINT
96-T-940-N

(4)    whether Defendants concealed the risk of contamination, or actual

contamination, to surrounding property;

(5)    whether Defendants failed to test, inspect and maintain their UST

systems adequately;

(6)    whether Defendants failed to utilize UST systems which were used

outside the United States and/or at selected sites within the United States, which were

demonstrably more effective in preventing, detecting, and containing UST system leaks than

those installed and/or installed in place at many sites in Alabama and elsewhere;

(7)    whether Defendants failed to mount an appropriate response to the

problem of leaking UST systems in the past at the point when many existing and future leaks

could have been prevented, or their presence detected, and their environmental impact

minimized;

(8)    whether Defendants failed in a timely manner to employ

widespread use of state-of-the-art UST system technology for tank and pipe installation and

testing, inventory control, leak detection, overfill and over-spill prevention, secondary

containment of, and clean-up of petroleum contamination, so as to minimize or prevent damage

to Plaintiffs' and Class members' properties;

(9)    whether Defendants failed to follow established industry codes and

guidelines for inventory control, installation, maintenance, corrosion protection, testing, and leak

detection for UST systems, and spill and overfill prevention at UST sites;

(10)    whether the Defendants conspired to conceal or misrepresent the

extent of their collective UST leak problem in order to prevent the public, particularly affected

nearby landowners, from learning about and taking action to prevent the continuing spread of contamination;

(11)     whether Defendants took deliberate steps to avoid environmental liabilities for their UST systems, such as divestiture of problem sites and/or UST systems, avoidance of liability by contractual provisions, or by other means, under circumstances in which they knew or should have known such actions would result in leaking UST systems going undiscovered, unreported and/or unrepaired, with the consequential risk, invasion, or threatened invasion of surrounding property;

(12)     whether Defendants' public statements and/or internal programs for upgrading or replacement of UST systems established a duty to warn adjacent property owners of possible contamination;

(13)     whether Defendants owed a duty under either the common law and/or state regulation to inform Plaintiffs of the likely or actual spread of contamination from UST sites to their properties;

(14)     whether the Defendants have a duty to Plaintiffs and the Class to define fully the extent of the plumes of contamination migrating from their sites, and whether they have systematically and intentionally breached that duty;

(15)     whether there are adverse factors associated with contaminated soil and/or groundwater, or the threat or fear of such contamination, which negatively impact property values;

(16)     whether uncertainty about the presence of contamination on a property, or the threat of such contamination represents substantial interference with the use and

13

enjoyment of such property;

(17)   whether the acts and conduct of Defendants constitute trespass and/or nuisance;

(18)   whether the Defendants have engaged in a civil conspiracy with the illegal objectives alleged;

(19)   whether Plaintiffs and the Class are entitled to the benefits of the doctrine of collateral estoppel against one or more of the Defendants with respect to any factual or legal issue in the case;

(20)   whether Plaintiffs' property has been invaded, or faces a substantial risk of invasion, by contamination;

(21)   whether Defendants by failing to detect or prevent the spread of contamination from the sites of UST's have intentionally allowed contamination to spread to neighboring property;

(22)   whether Defendants willfully misrepresented the dangers posed to neighboring property by the presence of UST leaks on their property;

(23)   whether by misrepresenting the threat of leaks from UST sites Defendants intended to induce Plaintiffs, and members of the class, to fail to take action to prevent contamination, or the threat of contamination to their property;

(24)   whether Plaintiffs and the Class are entitled to an award of reasonable attorneys' fees, prejudgment and post-judgment interest and costs of suit.

(25)   whether Defendants intentionally relied on tank leak detection methods, such as inventory reconciliation, that were antiquated, unreliable, frequently not used

14

by dealers and which they knew or should have known were inadequate in any event to detect

many UST leaks;

(26)   whether Defendants failed to adequately train and/or supervise

their employees, agents, lessees, dealers, jobbers and others in proper methods of inventory

control, product delivery, leak detection and UST system maintenance in order to prevent, detect

and contain UST system leaks;

(27)   whether Defendants failed to promptly, and effectively remediate

sites at which they know there is soil and/or groundwater contamination;

(28)   whether Plaintiffs and the Class are entitled to recover

compensatory and/or exemplary damages.

41.   The Class is numerous.  The Class members are so numerous that joinder

of all members is not practical.  There are thousands of members of the Class, who are

geographically dispersed.

42.   The class representatives are adequate.  The Individual and representative

Plaintiffs are members of the Class they seek to represent.  The interests of Plaintiffs are

coincident with and not antagonistic to those of the other members of the Class they seek to

represent, and the is no conflict of interest in maintaining a class action.  Plaintiffs will fairly and

adequately protect the interests of the class.  Plaintiffs will fairly and adequately protect the

interests of the class.  Plaintiffs and the Class have retained counsel experienced and competent

in class actions, complex toxic tort litigation, and underground storage tank litigation.

43.   Plaintiffs' claims are typical.  Each of the named Plaintiffs seek injunctive

relief in the first instance, and, subsequently, seeks to obtain a finding of liability on the same

15

common law claims arising out of the same alleged course of conduct by Defendants.

44.     Common issues predominate.  Questions of law and fact common to all members of the Class predominate over any questions affecting only individual members.  The common issues represent the most significant issues in the case, and can be resolved for all members of the Class in one action.

45.     Class treatment is superior.  A class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Prosecution of this matter on a class basis will significantly reduce the possibility of repetitious litigation, while providing redress for Class members who would not or could not otherwise prosecute this complicated and expensive environmental litigation on an individual basis.  Without such uniform, prompt and comprehensive class treatment, Defendants will continue to reap the benefits of their illegal conduct, while inflicting continuing injury on Class members.

46.     The case can be managed as a class action.  Plaintiffs will recommend bifurcating the proceeding, so that the Court first addresses Plaintiffs' claims for injunctive relief in the form of property inspection/plume mapping, and, subsequently, addresses Plaintiffs' monetary damage claims, on the issue of liability.

47.     The litigation of separate cases by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class and would establish incompatible standards of conduct for Defendants, the parties opposing the Class.

48.     The litigation of separate cases by individual members of the Class would create the risk of adjudications with respect to individual members of the Class which would as a

16

practical matter be dispositive of the interests of the other members not parties to the adjudications and substantially impair or impede their ability to protect their interests.

49.    Defendants have acted on grounds generally applicable to the Class, thereby making the entry of injunctive relief, and eventually the final award of damages to the Class as a whole appropriate.

## VI.    SUMMARY OF DEFENDANTS' WRONGFUL CONDUCT[2]

50.    The contamination of soil and groundwater by leaking underground tank systems is an environmental disaster which will cost billions of dollars to rectify. The value of the properties owned by thousands of innocent nearby property owners such as the Plaintiff Class has been substantially reduced as a result of leaks from Defendants' leaking USTs.

51.    Plaintiffs will prove that this widespread environmental calamity need never have happened and would not have happened if the Defendants had not engaged in the conspiracy alleged in this complaint. The Defendants were well aware more than thirty (30) years ago of this problem and largely chose to ignore or conceal, or minimize it until forced to respond, while acting separately and in concert. They were aware of the leaking tank problem from, among other sources, their own leaking tanks, information available to them about leaking tanks generally, and the evidence that they individually and collectively developed, often in the course of adversarial proceedings such as individual litigation matters at which testimony and

---

[2]The plaintiffs are making these allegations without the benefit of formal discovery in this case. The plaintiffs believe that discovery will provide additional evidence showing that the Defendants engaged in the conspiracy and other wrongful conduct alleged in this Complaint.

17

THIRD AMENDED COMPLAINT
96-T-940-N

evidence was presented.

52.     Even then the Defendants' response was too little and too late.  In the face of this massive environmental crisis, affecting many neighborhoods and residential areas across Alabama and the entire nation, the Defendants, among them the largest corporations in the United States, chose to devote relatively little insight, analysis, initiative, or financial resources to avert or alleviate the harm.  While some Defendants elected to upgrade selected service station sites to replace aging UST systems, these programs were undertaken more for economic, marketing, and public relations objectives than for environmental protection.  Such upgrading was "prioritized" so that many UST systems needing testing or replacement were left to leak. For years, advanced technology which would have prevented the problem or reduced its environmental impact was not utilized.  Even when the Defendants did upgrade their UST systems, in many cases they failed to install state-of-the-art leak detection and containment technology, but merely replaced old tanks with new ones.  The Defendants knew, based on selective tests and on the condition of tanks and piping that were replaced, that hundreds of other UST systems, still underground, were or could soon be leaking.  The Defendants then conspired and acted in a concerted fashion to divest themselves of thousands of UST sites, in an effort to transfer liability to persons and entities which were not capable of resolving the environmental problem created by the Defendants.  Moreover, the Defendants routinely ignored evident contamination present at many of their sites and made no effort to investigate the extent of the spread of such contamination or to warn adjacent property owners.

53.     In many instances the Defendants upgraded only selected stations they owned and did not attempt to investigate potential leaks at stations they supplied, branded and

THIRD AMENDED COMPLAINT
96-T-940-N

derived profit from, but which were owned by or leased to others. Likewise, while the

Defendants' publicly endorsed efforts to insure the proper use of regular inventory controls, they

knew that at many sites inventory reconciliation was sporadic and ineffective. When it came to

environmental issues, the Defendants routinely advised their dealers and jobbers to install UST

systems which the Defendants knew or reasonably should have known would create an

environmental disaster and then attempted to leave those jobbers and dealers to fend for

themselves.

54.    In addition, as the Defendants realized that it was likely that they would be

held responsible for thousands of leaking underground storage tanks, they conspired and acted

separately to divest themselves of many of the tanks that were leaking or that the Defendants

knew would leak. The Defendants took this action in an attempt to avoid responsibility for the

environmental problem that they created and should be held responsible for.

55.    More recently, the Defendants have continued the conspiracy by taking

steps designed to avoid liability for many contaminated sites without any clean-up or with

limited clean-up and with no action taken to either remediate proximate properties or to pay for

the loss in value of those properties resulting from contamination from underground storage

tanks.

56.    In the late 1970's to mid 1980's, the Defendants conspired and

disseminated misleading information that was intended to lead the public to believe that any

problem was confined to only a small percentage of sites and that the industry was taking

effective steps to minimize any environmental danger. In reality the Defendants concealed the

true extent of what they knew to be massive environmental damage from thousands of leaking

19

sites for fear of large scale liability and expense, a strategy that largely succeeded, primarily because the contamination was occurring underground, beyond the ability of its victims to detect.

57.   By the 1990's, the Defendants had begun to monitor contamination at many of their leaking tank sites, prodded by a Federal Act requiring individual states to establish state programs that required prompt reporting of petroleum releases and generously paid for much of the cost of remediation.  The Defendants hastened to report thousands of leaking sites and applied for, and often received, thousands of dollars in public funds to monitor and supposedly initiate the cleanup of their contamination.  However, as state funds ran low after several years, the monetary incentive for action waned, and site cleanups slowed down.  In many instances, the oil companies became content to simply monitor the contamination as it spread at many sites, while taking virtually no initiative to voluntarily assess the extent of the contamination, clean it up, or prevent its spread.  There is no indication the Defendants spent any of their own vast assets, beyond minimal deductibles, to press ahead with site remediation, even at sites where contamination was clearly spreading off site.  Likewise, the Defendants failed to notify off-site owners affected by the contamination.  As a result, perhaps hundreds or even thousands of nearby property owners were denied the opportunity to have any input into the site assessment and remediation activities near their properties.  Today, at thousands of sites across the country, the Defendants are well aware that extensive groundwater contamination is being left to continue to migrate toward and onto surrounding properties, with no meaningful or systematic effort being undertaken to delineate the extent of, contain, or clean up the contamination, or notify affected property-owners.

58.   The Defendants are now acting collectively and as part of the on-going

20

conspiracy to perpetuate the RBCA process, which will be described more fully below, to avoid

liability not only for many contaminated underground storage tanks sites but also for off-site

contamination which has trespassed and affected the values of the property of class members.

59.     This complaint alleges culpability on the part of the Defendants in a

number of particulars, and their liability for nuisance, trespass as a result of the continuing

presence and migration of contaminated groundwater, as well as civil conspiracy in Defendants'

efforts to minimize their responsibility for cleanup, conceal the damage, avoid disclosure, delude

the public into thinking the problem was under control, and avoid notification of affected

landowners.

60.     The Plaintiffs and the Class contend their property has been severely

damaged by the nuisance, trespass, and fraud of the Defendants. In many cases groundwater and

soil contamination is or may in the future be present. In all cases, the stigma associated with

environmental contamination has negatively impacted property value. In Phase One of this

action, the Plaintiffs seek appropriate declaratory and injunctive relief based on Defendants'

conduct. A determination of Defendants' liability for Plaintiffs' compensatory damage claims

will be sought in a second Phase of this Action.

## VII.   STATEMENT OF ADDITIONAL FACTS

61.     During the 1950's and 1960's, as automobile use and interstate highway

travel increased at a rapid pace in the United States, thousands of service stations were built to

accommodate America's need for auto fuel. At these sites, hundreds of thousands of bare steel

underground storage tanks, with associated piping, joints, connectors, valves and pumps

(collectively referred to throughout this complaint as "UST systems") were installed. Many of

21

THIRD AMENDED COMPLAINT
96-T-940-N

the Defendants in this action owned, operated, leased and/or branded thousands of these sites

nationwide.  As the Defendants knew by the 1950s, over time corrosion, a natural enemy of steel,

attacked these buried UST systems.  By the late 1970's and early 1980's, and even before, many

UST systems had reached the end of their useful lives and had become so corroded that they

were by then leaking or were soon expected to leak.  In addition, cracks in the swing joints used

to connect piping to gasoline dispensers caused numerous leaks.  The UST systems, typically

consisting of two to four or more tanks with capacities of 2,000 to 10,000 gallons each, had the

potential for major environmental damage as they leaked gasoline into the soil and groundwater.

Nevertheless, since this contamination was occurring out-of sight below the ground surface,

there was little public awareness or outcry and virtually no government regulation or oversight.

62.    The Defendants had been aware for years of the problems of corrosion and

the dangers and damaging effects of contamination from petroleum and petroleum products.  For

example, in 1905, the United States Geological Survey documented the problems of oil-well

wastes:

> Since 1886, a date which marks the beginning of the oil and
> gas industry in eastern Indiana, there has been more or less
> speculation concerning the pollution of wells and streams in the oil
> fields in so far as such pollution impairs the purity of drinking
> water or damages water for domestic and industrial uses.  Within
> the past few years the matter has assumed a more serious aspect.
> Considerable litigation has resulted from attempts to collect
> compensation for damages to surface wells by this form of
> contamination.

63.    In 1913, the National Board of Fire Underwriters and the National Fire

Protection Association, warned Defendants of dangers associated with underground storage tanks

for petroleum products.

22

THIRD AMENDED COMPLAINT
96-T-940-N

64.     At one time or another, all of the Defendants have been active in the American Petroleum Institute ("API"). In 1933, the API included in its proceedings an article entitled: "Cathodic Protection of Underground Pipe Lines from Soil Corrosion." In that article, the electrochemical process of corrosion was described for all of the Defendants who were then active in the API. That same process resulted in corrosion of the metal underground storage tanks used by the Defendants. The Defendants, or many of them, have owned pipelines through which gasoline and other petroleum products were transported. By the early 1950s the Defendants were installing cathodic protection devices on many of those pipelines because of the same corrosive elements which attack underground storage tanks.[3] The Defendants knew of the problem of corrosion but took little, if any, action to combat it in underground storage tanks.

65.     In 1941, the National Fire Protection Association again warned Defendants of the dangers of underground storage tanks.

> The purpose of this brochure is to outline briefly a number of informative cases of leakage from underground gasoline storage tanks and to suggest good practices for the installation of tanks and for the location of sources of leakage.
>
> There are in this country more than 1,000,000 underground tanks which may contain some 400,000,000 gallons of gasoline. Experience seems to indicate that as the age of underground tanks increases the probability of leakage increases. This is due to a large extent to the corrosive action of certain soils. . . .

The report made several recommendations, including: "It might be well to have an analysis

---

[3]The plaintiffs are not in any way conceding that the Defendants took adequate steps to protect pipelines from corrosion or other causes of leaks. The point being made by the Plaintiffs is that the Defendants took even less action to protect underground storage tanks than they did for pipelines.

23

made, or an electrolytic corrosion test made of the soil before tanks are installed to see whether there is a probability of corrosion." Despite such warnings, which the Defendants either knew of or reasonably should have known of, the Defendants collectively refused to take appropriate action to address the problem. Instead, in 1951, the Defendants through API recommended that operators of service stations address the problem through inventory control as opposed to more expensive cathodic protection which the Defendants had collectively determined was needed for metal underground pipelines, even though it effectively admitted that inventory control was not an effective way to avoid leaks. "Inasmuch as gasoline is a highly volatile liquid, it is subject to vaporization losses, as well as to losses caused by spillage, leakage, mismeasurement, and other mishaps and acts of mismanagement."

66.     The Defendants, acting collectively and through API, and/or other formal or informal groups or associations, were aware of the National Fire Protection Association, but they established standards for underground storage tanks which did not include cathodic protection. In June of 1961, the Defendants through API published and distributed API Bulletin No. 1615, "Installation of Underground Gasoline Tanks and Piping at Service Stations." The Defendants admitted that they acted with concern for the "cost of installation". They also admitted that they had the goal, which would be become more apparent later, to "[a]void unnecessary legislation." The Defendants collectively, through their on-going conspiracy, established these inadequate standards, which they knew or reasonably should have known would create trespasses and nuisances, not only at sites owned by the Defendants but also at other UST sites being designed and used as service station locations.

67.     It is ironic that in the early 1960s, Amoco Chemicals, a subsidiary of

24

defendant Amoco, was experimenting with fiberglass tanks, using isophthalic acid, which it manufactured. Amoco Chemicals demonstrated that in the early 1960s that fiberglass tanks could be used as underground storage tanks for gasoline without suffering from corrosion. Nevertheless, Amoco and the other Defendants, acting as part of their on-going conspiracy, continued to use metal underground storage tanks without cathodic protection for decades, even though they knew or reasonably should have known that their conduct would continue to create trespasses and nuisances.

68.     By the mid 1960's, the oil industry knew or reasonably should have known even more about problems of leaking UST systems. In 1965 a nationally known corrosion engineer explained the problem in detail in a paper presented to engineers at Purdue University. He predicted "a large increase in tank failures over the next five to ten years." Internal industry publications repeatedly warned Defendants of the problem, particularly the corrosion threat. By 1969, the American Petroleum Institute (hereinafter the "API") the preeminent industry research and trade association, had established an "underground leak prevention program." In March of 1971, the API sponsored an address by F. Ronald McLean, an engineer and retired Mobil Safety Manager who had been with the company for 40 years. Mr. McLean had recently served on the API Task Force on improving underground tank testing methods. Mr. McLean, in part, stated as follows:

> "I can assure you that API member companies engaged in marketing gasoline and oil share your interest and concern in the problem of underground tank leakage and what to do about it. . . . In addition to economic loss, there are two wordy often heard today--Environment and Ecology. However, the problem to which they refer is really not so new. In the past there have been cases of underground water being contaminated . . .
>
> New testing methods and equipment provide means for such great

25

*accuracy in testing that there is no longer any opinion involved
Tightness or leakage are established facts. . . This new means of
testing was selected by a task force from [the API] . .. Three years
of use shows it works excellently. . . These two combined [methods
of testing described] complete the precise and reliable testing
method now available and widely, but not yet generally used
(There are fifty sets of the equipment scattered over the United
States, <u>mostly in the hands of Marketing Engineering Departments
of major oil companies</u>.)  "[Emphasis Added]*

Mr. McLean concluded by announcing that a tank tester was in operation at a Mobil station near

the auditorium so his listeners could see the equipment in operation.  However, despite such

comments that were made at API meetings, the Defendants failed or refused to take action to

avoid the nuisances and trespasses that they were creating.

      *69.*     In 1972, the API "Committee on Environmental Affairs" reported on a

study on migration of petroleum in soil and groundwater.  Under the subhead "Testing Storage

Tanks for Leaks," the report noted that *"considerable success with [tank testing] equipment has

been reported from several sources.  Commercially this equipment is identified as the Kent

Moore Tester Model 1000.  [This equipment, the same as that described by Mr. McLean, was

later called "Petro-Tite."]  Suitable equipment for determining the tightness of underground

tankage is no doubt available from other sources."*

      70.     The Defendants also knew that problems associated with UST systems had

historically been a concern of local fire officials, who had to deal with gasoline leaks and the

danger of explosive vapors.  They had been instrumental in the drafting of provisions dealing

with proper construction, installation and use of UST systems in the National Fire Protection

Association (NFPA) code.  The problem of corrosion of bare steel tanks, as well as recognized

methods of "cathodic protection" to reverse the underground electrical currents that caused

corrosion, were identified in NFPA Report No. 329M in 1959.

71.    There were alternatives to bare steel tanks available for many years.  By at

least 1965, non-rusting fiberglass underground storage tanks were on the market.  The

manufacturer's promotional efforts drew industry attention to the corrosion dangers of bare steel

tanks.  Also in 1969, a steel tank industry task force developed a corrosion-resistant steel tank,

the "Sti-P3," whose developers turned the trademark and procedures over to the Steel Tank

Institute--a trade association which licensed numerous companies to manufacture the tank, which

then came with a 20 year warranty against exterior corrosion.  These tanks proved extremely

reliable over subsequent years of use, and by 1988 the EPA observed that "very few failures [of

these tanks] have ever been reported."  Several of the Defendants tested one or more of these

technologies at selected sites beginning as early as the mid-1960's.  All of the Defendants, and

each of them, failed and refused to replace all leaking tanks with new tanks much better suited to

effectively avoid contamination of Plaintiff class members' properties.

72.    Toward the late 1970's, the serious environmental implications of

thousands of leaking UST systems gradually came to be recognized by environmental specialists

outside the oil industry.  In 1977, the U. S. Environmental Protection Agency (EPA) issued a

"Report to Congress:  Waste Disposal Practices and Their Effects on Groundwater," which

concluded that leaks from buried tanks were among the most important sources of groundwater

contamination with hydrocarbons being a principal contaminant.  As a result of several regional

studies, gasoline leaking from service stations was identified as a common problem affecting

groundwater quality.  The report cautioned that in some gasoline spills "a substantial quantity of

fluid will percolate down to the water table . . . it will tend to float or mix with the groundwater."

27

73.   In June of 1980, the National Petroleum News, a prominent oil industry

publication, published an article titled "Leak Detection: Still Top Priority." The article stated in

part:

> *"Leak detection at the service-station level has been receiving*
> *much attention lately as air-tight inventory control becomes the*
> *top marketing goal in this day of over $1 gal. gasoline.  Adding*
> *impetus to the endeavor is the periodic bad publicity from leaks*
> *that make their way into water and sewers and darken an already*
> *tarnished oil industry image.*
>
> *The invention of a new leak detector . . . . underscores the*
> *seriousness of the problem and points up the simple fact that the*
> *state-of the-art must constantly be upgraded particularly in an era*
> *when tens of thousands of storage tanks sunk in the boom years of*
> *the '50w and '60w are at the end of their useful lives."*

74.   In January, 1982, the National Petroleum News, a specialized industry

publication not read by the general public, called leaking UST systems a "serious problem now--

'literally a million time bombs in the form of underground tanks waiting to leak.'" The

magazine quoted one industry source as warning that "50,000 to 70,C00 underground tanks are

leaking at present--and this is a very conservative number." The same article stated that the API

was "coming to grips with the problem" by creating a "high-level task force" to establish a

voluntary industry-wide alliance "to cope with the growing number of underground tank leaks

before things get out of hand." The report observed that the "task force's membership roll is tacit

recognition of the seriousness of the situation." Several major executives of the Defendant oil

companies were among the committee members. The committee proposed an "Oil Industry Leak

Alliance" to determine the source of leaks and act promptly to clean them up if no responsible

party was ready or willing to do so. The group's Chairman, an executive of Chevron Oil, found

it "especially alarming that most leaks went undetected until they became a serious problem."

28

THIRD AMENDED COMPLAINT
96-T-940-N

75.     Within a few months this cooperative effort died.  The Defendants decided to attempt to cover-up and divest themselves of the problem through their on-going conspiracy rather than making a meaningful attempt to avoid the trespasses and nuisances.  In July 1982, the National Petroleum News reported that the "cooperative plan" had "fizzled out" and was a "bust."  The plan allegedly died because "various companies had their own ongoing programs, and were reluctant to take on somebody else's problems."  Apparently, the fact that thousands of tanks were leaking potentially millions of gallons of gasoline was to be viewed as "somebody else's problem" by the Defendants.  Instead, several of the Defendants announced their own plans to replace tanks, install corrosion protection and selectively upgrade facilities.  No attention was given to environmental damage already done, or containment of already contaminated groundwater, or investigation of the extent of contamination at the hundreds of sites already leaking.  Rather, the October 1982 National Petroleum News stated that "underground tank leaks, a problem of gasoline marketers that might be likened to an industrial cancer, will be given a close examination at an upcoming industry meeting.

76.     In February 1983, another industry publication, Super Service Station, described underground tank leaks as a cause of "headlines and headaches as industry finds new solutions to 20 year old problem."  The magazine reviewed expert predictions as to current and future leaks and predicted "an epidemic of tank leaks in the near future."  The article also set out what several of the Defendants had announced to be their programs to meet the threat, including tank replacement, inventory control, installation of cathodic protection, and tank testing.  Finally, the article listed seven state-of-the-art leak detection systems then available.

77.     In reality, the Defendants through their on-going conspiracy attempted to

29

conceal the fact in the early 1980's that thorough testing and investigation of all their UST

systems would have undoubtedly revealed an unfolding environmental disaster.  By then, the

Defendants had known for years that thousands of their UST systems were old enough to be

corroded and thus probably leaking.  Selective site tests, tank replacements, and various

corrosion prediction studies had confirmed the widespread nature of the problem.  Within the oil

industry in the internal meetings which were part of the conspiracy, the issue was widely

discussed but never confronted head on or truly treated as an environmental issue.

       78.    The nature of the problem — aging UST systems — was no secret to the

Defendants.  A 1982 Massachusetts survey had found that approximately 70% of the tanks for

which records existed were over 20 years old.  In 1984 the New York Department of

Environmental Conservation estimated that fully 50% of the steel tanks in the ground for fifteen

years or more were leaking.

       79.    Plaintiff property owners, on the other hand, were not informed of

contamination of their properties through sub-surface migration of petroleum.  Industry officials

understood, far better than the public or most government officials, that groundwater was

extremely vulnerable to gasoline contamination and once contaminated would be difficult — if

not impossible — to restore.  The legal and financial ramifications of opening up this

environmental Pandora's Box were simply too dangerous for the oil industry to seriously

address.  Thus, the problem was skirted by selectively replacing some aging tanks and repeating

in Congressional hearings and elsewhere the need for careful inventory controls, an approach

which the Defendants knew to be the least expensive, and least effective, method of leak

detection.  As a result of their deliberate inaction, Defendants knew, or reasonably should have

30

known, that thousands of UST systems were or would be discharging millions of gallons of gasoline into the ground.

80.    By the mid-1980's there were an estimated 1.4 million underground tanks. Gasoline marketing facilities were estimated by 1984 to account for over 600,000 individual tanks. Tanks with corrosion protection, however, represented less than 20% of the total tank population, even though the technology was widely accepted as being quite effective and had been internally recommended by API since at least 1973. High security double-walled tanks, available since 1970, were widely adopted in Europe in the 1970's but ignored by Defendants in this country who preferred to avoid the marginal increased cost of these and other superior storage systems. In fact, some of the Defendants, or related companies, used double-walled tanks less likely to cause contamination at their sites in Europe, while in the United States they were using the tanks more likely to cause trespasses and nuisances. The industry was well aware, through a 1981 API member survey, that tanks and piping unprotected from corrosion accounted for over 90% of all leaks reported, and that about one-third of tanks surveyed were more than sixteen years old. In the face of such evidence, however, industry estimates showed that less than half of the new tanks being installed as late as 1984 were protected from corrosion. One taboo subject never admitted or disclosed by Defendants was and is the fate of all the gasoline being leaked into the groundwater at thousands of sites. Only when municipal or private drinking wells became contaminated, or explosive vapor levels were detected, or gasoline came bubbling up out of the ground in someone's backyard, would Defendants admit that UST failures had occurred, and even in those cases Defendants intentionally misrepresented the probable consequences and extent of needed remediation of those sites.

31

81.     Although the Defendants relied heavily on routine inventory accounting as their principle method of leak detection through the 1980's, they were also aware that this antiquated, manual procedure was inadequate for detecting many smaller leaks.  Various leak incidents and early state regulatory experiences confirmed that inventory measurement was not effective for accurately determining product losses and was carried out on an irregular basis by many gas station operators.  Some of the major oil companies and tank manufacturers included provisions in their dealer leases requiring such inventory control as a part of the lease; such provisions, however, were not systematically enforced, even though the Defendants knew that the leaks were causing nuisances and trespasses.  The unwillingness of many station operators to conduct accurate daily inventory testing was widely acknowledged in the industry.

82.     Moreover, the Defendants viewed and presented tank inventory and maintenance practices of independent lessees, dealers and/or "jobbers" as being outside their own corporate responsibility.  This was despite the fact that the Defendants often retained ownership of the UST systems themselves, profited from the sale of gasoline to such dealers, rigidly controlled many aspects of the operation of such stations, and displayed their brand names over thousands of such sites.

83.     The Defendants also collectively planned and implemented through a common course of conspiratorial conduct a divestiture program through which they sold tanks and stations that would likely create liability in an attempt to avoid liability for the problem which the Defendants created, perpetuated, and exacerbated.  The Defendants sold tens of thousands, if not hundreds of thousands, of tanks, that would later leak or have to be replaced with the kind of cathodic protection which the Defendants had known since the 1930s was

32

needed for metal tanks used to store gasoline underground.  The divestiture program was part of the on-going conspiracy used by the Defendants to avoid the liability which this lawsuit seeks to impose.

84.     By late 1983 Defendants were informed by the EPA and others that 75,000 to 100,000 UST systems were leaking 11 million gallons of gasoline annually, and the number of such leaks was increasing.  (This is the rough equivalent in gallons to an annual Exxon Valdez disaster).  One expert estimated that at least 15% of such leaks were migrating off the station property and that 5% could be expected to cause severe environmental damage.  A 1982 industry publication estimated that as many as 350,000 tanks would be leaking within 5 years.  The Defendants were clearly on notice of the need to take widespread, immediate action to avert a nationwide environmental disaster of nuisances and trespasses.

85.     By 1984, an EPA Advisory publication warned Defendants that tank owners should have "an active leak identification program for every underground storage tank," including testing of tanks and piping for leaks.  EPA specified that "the important thing is that when a tank or piping leak is actually identified there should be quick action to inform the proper authorities, correct the problem, and clean up the leak."  Numerous state-of-the-art methods for inventory control, tank testing, and corrosion protection were identified by the EPA.  In July 1984, API's specialist on underground storage systems presented a state-of-the-art review in which he described automatic line leak detectors, observation wells with electronic monitoring devices and automatic inventory control devices which could be operated in a leak-detection mode.  He also described twelve different tank testing methods then available.  He noted several secondary containment options available as well as overfill protection systems to prevent spills

33

during bulk deliveries.

86.    In sum, by the early 1980's (at the latest) the Defendants had known for

years that corrosion in tanks and piping caused the vast majority of UST system leaks.  They also

knew not only how to prevent leaks but also how to detect leaks before they caused major

problems:  periodic tank testing, corrosion surveys, tank replacement with fiberglass and

cathodically protected steel tanks, installation of leak detectors and observation wells,

maintenance and frequent review of accurate daily inventory records, and strict supervision over

those with day-to-day responsibility for operations.  This awareness, and these obligations,

existed not only at service stations owned outright by the Defendants, but also at thousands of

other locations which displayed their brand and from which they derived profits as lessors and/or

as marketers of gasoline and other products.

87.    The API, Defendants' industry association, conducted another nationwide

survey of underground storage tanks owned by API member companies in 1984.  The study

identified 188,798 tanks of which 73% were owned by "major oil companies", presumably

including many of the Defendants herein.  The study confirmed that upgrading programs had

since 1975 resulted in only one-third of the tanks becoming fully upgraded, i.e., tank and piping

fully corrosion protected.  In spite of these facts, in August 1984, the National Petroleum News

quoted various oil industry officials as saying that the estimates of true leaking tanks were vastly

overstated, with the percentage of "true leakers" being more like 1 or 2%, with very few cases of

groundwater contamination.

88.    The Defendants have also met periodically and schemed to avoid liability

for leaking underground storage tanks.  These meetings have involved both the lawyers and

34

managers of the defendants who attempted to develop various strategies to avoid liability for this

massive problem that they have created.  Based on information and belief and without the benefit

of any discovery at this stage of the case, the plaintiffs allege that Defendants were also

represented at this and similar meetings and conferences at which the Defendants attempted to

develop strategies to avoid liability for the underground storage tank problem outlined in this

complaint.  The Defendants' motive for this on-going conspiracy is demonstrated by the manner

in which Sun's agent began his presentation:

> Good afternoon.
>
> PERPETUAL, DYNAMIC, CHRONIC are just a few of the
> words to describe the underground tank situation today.

Despite knowledge of this perpetual, dynamic and chronic problem of nuisances and trespasses,

no Defendant took adequate action to avoid or cure the problem.

89.     In 1987, the Defendants were informed by the EPA that an estimated 80%

of the 1.4 million existing UST systems were still bare, unprotected steel.  The EPA calculated

that there were 348,000 tanks controlled by refiners and branded jobbers at 93,000 stations.

Significantly, the EPA observed that despite the availability of state-of-the-art systems for a

number of years, "most existing UST systems do not yet have release detection."

90.     EPA also reported to Defendants a major study it had conducted entitled

"Underground Motor Fuel Storage Tanks:  A National Survey".  This survey concluded that

approximately one-third of all existing UST systems were over 20 years old, and that 35% would

fail a tank tightness test.  Likewise, EPA reported studies showing that in 6,200 tank tightness

tests conducted from 1980-86 one out of every four of the tank systems failed the test.

91.     The EPA report summarized for Defendants the national UST system

35

crisis:

> In summary, the nation may be facing a pervasive threat to its
> groundwater from leaking UST systems. If even only 10 percent
> of the nation's gasoline service stations have leaked or are leaking
> (as one company-sponsored [defendant Chevron] testing program
> of a typical cross-section of retail motor fuel outlets indicated),
> then releases to groundwater could exist at approximately 17,500
> retail gasoline sites nationally. Many of these releases could be
> damaging groundwater resources and presenting threats to human
> health and safety.

> The findings to date... are sufficient to demonstrate that leaking
> underground tanks may be a common occurrence throughout the
> nation. Significant impacts have occurred; in most cases the
> release is detected inadvertently, by sight or smell; and a variety of
> available control approaches that can be used to reduce the risk of
> damage to public health and the environment are not yet being
> implemented on a widespread basis. [Emphasis added].

EPA's 1987 estimates were, in retrospect, much too optimistic. There have now been more than

300,000 confirmed UST releases nationwide.

     92.    Prior to the late 1980's, many UST sites were routinely upgraded without

reporting past or present contamination uncovered in the process. Thus, prior to the advent of

reporting requirements, when evidence of contamination was uncovered, it was neither reported

nor investigated for off-site impact. Presumably, at thousands of sites upgraded throughout the

1970's and 1980's prior to the reporting requirements, the Defendants would have observed soil

and groundwater contamination, with the potential to spread off-site, but kept that knowledge to

themselves. Oftentimes, those sites were abandoned or converted to other commercial uses with

the neighboring landowners and those who may work at or frequent the sites or nearby properties

unaware of the continuing presence of subsurface contamination.

     93.    As the various state agencies reporting requirements have been

36

implemented since the late 1980's, the true magnitude of this unseen environmental tragedy has slowly begun to emerge. In 1992 a national environmental consulting firm reported that:

       (1)    there are 270,000 confirmed UST releases nationwide. [The figure is now above 300,000]. The vast majority of site cleanups from these leaks have yet to be accomplished. Only 25% of a total estimated 460,000 contaminated sites have been cleaned up. At present rates, UST clean-ups may take another thirty years and cost more than $41 Billion dollars;

       (2)    new UST releases (possibly old releases only now being discovered) were being reported at the rate of about 5,000 per month nationwide;

       (3)    the probable leak rate for UST systems has been about 20%, meaning that an estimated 193,000 leaking UST's remain to be discovered. The report concluded that EPA's 1988 leak projection rate of 15-20% (as opposed to the oil industry estimate of as few as 3 in 100) "has been more or less borne out by the work done in the four years since the prediction was made."

### THE STATE REGULATORY SCHEME

       94.    In 1984, Congress passed subchapter IX of the Resource Conservation and Recovery Act of 1984. See 42 U.S.C. §§ 6991-6991i. Pursuant to this Act, the EPA, or individual state SEAs, regulate underground storage tanks.

       95.    In 1986, Congress passed the Superfund Amendments and Reauthorization Act of 1986. See 42 U.S.C. §§ 9671 to 9675. Pursuant to this Act, Congress allowed the individual states to establish their own regulatory programs to provide evidence of financial responsibility for owners and operators of underground storage tanks. Thereafter, the individual

37

states began enacting legislation establishing regulatory schemes for regulation of the underground storage tanks.

96.     For example, in 1988 the legislature of Alabama enacted the "Alabama Underground Storage Tank and Wellhead Protection Act." According to this act, ADEM is authorized to promulgate rules and regulations governing underground storage tanks. Also in 1988, the legislature established the "Alabama Underground Storage Tank Trust Fund" which reimburses owners and/or operators of UST systems for the cost of cleaning up confirmed leaking UST sites. To date, this fund has paid out substantial reimbursements for site cleanup to the Defendant oil companies.

97.     Alabama's regulatory scheme is consistent with and similar to the regulatory schemes established in other states. For the convenience of the Court, however, we will only provide a general discussion of the common requirements of these state regulatory schemes. To qualify for reimbursement, releases have to be reported to the SEA. This requirement has led to the reporting to state agencies (not to surrounding land owners) of hundreds of thousands of releases across the United States. Just in Alabama alone, there have already been over two thousand documented UST system releases.

98.     Following report of a release, the SEA typically requires one or more "site characterization reports." Environmental consulting firms become involved in the site assessment process at an early stage. Eventually a monitoring and sometimes a cleanup plan is proposed and approved, and monthly, quarterly and/or annual groundwater monitoring reports are submitted. The SEA typically requires installation of monitoring wells at selected points on the site to monitor the level of contamination. By reviewing the periodic monitoring reports a

38

THIRD AMENDED COMPLAINT
96-T-940-N

precise picture of the makeup and extent of contamination is revealed, as well as the direction

and velocity of the groundwater that is transporting it.  More recently, the Defendants may at

some sites have begun to use sophisticated computer-based groundwater modeling programs to

predict the spread of the underground plumes of contamination.

99.    Historically, the SEAs have required UST site owners to monitor the

contamination until the levels of certain contaminants dropped below the "action levels" set by

the SEA.  The process of reducing contamination below such levels may take months or years,

or, in the view of many experts, may be impossible to ever achieve in some cases.  The SEAs

also usually require immediate action to be taken when "free product" or "phase separated

hydrocarbons" (PSH) is found floating on top of the groundwater.  This literally means gasoline

which has not dissolved in the groundwater but floats on top of it, below the ground, at

thicknesses that may range from a mere sheen to eight or more feet in depth.  Several of the sites

involved in this case have, or have had, "free product."

100.    At UST sites, the SEAs usually require measurement of four constituents

of gasoline:  benzene, toluene, ethylbenzene and xylene.  They may be measured separately and

are also combined to form a "BTEX" measurement.  Because of its carcinogenic effects, benzene

is a serious pollutant.  In one gallon of gasoline, there is enough benzene to contaminate 1.2

million gallons of water, or roughly the area of a football field to a depth of 5.3 feet.  Another

test often done is for a somewhat broader mix of chemicals called TPH, for total petroleum

hydrocarbons.  Together, these tests are used to determine the degree of contamination on a site.

There has also been sporadic testing for MTBE, which is a suspected carcinogen.  Over time, the

sampling of BTEX, TPH and MTBE from various monitoring wells on and off-site can help

39

determine where the "plume" of contaminated groundwater may be headed. Groundwater usually travels slowly underground, often in the same general direction as the surface contours of the site. Contaminated groundwater can also migrate along subsurface utility or sewer lines.

101.    The Defendants use of MTBE as an additive to gasoline in recent years has exacerbated the nuisance and trespass problem that the Defendants have created through their ongoing conspiracy. While MTBE has some positive effects in terms of air pollution, it creates soil and water pollution problems when there are leaking USTs. MTBE tends to migrate much further off of UST sites than the BTEX components of gasoline. Therefore, the use of MTBE has increased the damage caused by the Defendants' conspiracy, nuisances and trespasses.

102.    The SEAs usually request that the responsible party indicate in monitoring reports if the extent of the plume of contamination has been identified. At the many sites which will be involved in this lawsuit, the Defendants have repeatedly conceded, often over a period of years, that the plumes have not yet been defined. At many sites, there appears to be no sense of urgency on the Defendants' part to "define the plume," *i.e.,* find out where the contaminated groundwater has traveled, and the Defendants have made no effort to define the extent of the trespasses and nuisances or to notify affected property owners of the extent of the trespass. As a general matter, the Defendants have concealed the results of any mapping from surrounding property owners.

103.    Decisions on remediation efforts are being made on numerous sites suffering substantial on and off-site contamination with no opportunity for surrounding property owners to be heard on the crucial issues of cleanup versus site closure. Unless and until the Defendants are held accountable to their common law and statutory responsibilities of testing,

40

disclosure, cleanup, and compensation, this distorted process of trying to conserve scarce funds by addressing only the "highest priority" sites will continue, and contamination may be left in place at many other sites to spread to nearby properties for years to come.

104.   In sum, many UST site files include numerous documents prepared and filed by the Defendants themselves, revealing a distressingly similar fact pattern:

(1)   hundreds of UST sites which may have been leaking for years were only reported after state regulations required such reporting to an agency and state funding was available for cleanup;

(2)   many reports of releases came only after the Defendants did site assessments for purposes of selling the properties (which included installation of monitoring wells), or after reports of vapor or odor by utilities or construction workers; few releases were detected by review of inventory records (the form of detection touted by the oil industry) or by observation wells voluntarily installed by the Defendants to detect contamination; in some cases after-the-fact review of inventory records revealed that shortages had been apparent for considerable periods of time prior to report of the release; in many cases the volume of gasoline lost is unknown;

(3)   in cases where the nature of the UST system is known, the same defects are repeated in case after case:  corrosion causing holes in tanks or piping, leaks at swing joints under the dispensers, or chronic spilling and overfilling of tanks.  Technology to address all of these problems has been widely available for several decades, but was rarely used by defendants, until mandated by regulation;

(4)   the statutory requirements placed upon the Defendants of notifying

41

THIRD AMENDED COMPLAINT
96-T-940-N

affected off-site landowners, where applicable, appear to have been complied with only after regulatory agencies ordered that offsite monitoring wells be drilled. At hundreds of sites where there is proven, suspected, or easily confirmed off-site contamination, no notice has been given. At sites where off-site wells have been installed and contamination found, the property owners have been told nothing. There has been an obvious and concerted effort by the Defendants to prevent the public, especially those directly affected, from learning about this environmental threat in their neighborhoods.

105.   Within the past several years, the Defendants have eagerly embraced and financed the use at UST sites of Risk Based Corrective Action (RBCA or "Rebecca"), a sophisticated, computer-based damage assessment process. RBCA is, or will soon be, used by the Defendants at thousands of leaking UST sites nationwide in their dealings with the SEA's. In February 1996 Defendants Amoco, BP, Chevron, Exxon, Mobil and Shell formed PIRI (Partnership in RBCA Implementation) to promote RBCA and hasten its use at UST leak sites nationwide. Each company contributed at least $100,000 to promote RBCA. On information and belief, the Plaintiffs allege that other Defendants have also aided and participated in the RBCA process. Regardless of RBCA's scientific merit, not at issue here, the procedure is clearly designed to facilitate closure of thousands of leak sites. RBCA has no provision for affected property owner notification or involvement, and in fact no representative property owners have attended the regular PIRI meetings which have been taking place over the past year. In those meetings, the Defendants have conveniently concluded that concerns about contamination on the part of offsite landowners and others in the real estate and lending communities, constitute a "political and emotional issue" not to be addressed in RBCA. In effect, through RBCA the

42

Defendants have extended the objectives of the conspiracy by promoting a standardized approach to site assessment designed to absolve them of any regulatory responsibility for cleanup through a process which fails to provide for offsite landowner notification, thus perpetuating the likelihood of continuing nuisance and trespass upon, and damage to, such properties.

106.   As noted above, environmental reports filed by the Defendants themselves and others have formed and will form the basis for identification of the class sites which are at issue in this case. At this point, Plaintiffs do not know the full extent of this contamination, or whether or when in each case their properties have been or will be impacted. In some cases, off-site monitoring wells already register contamination. In many cases, contaminated wells on site and downgradient of the suspected source of the release raise the strong inference that contamination is spreading downgradient of the source and will eventually migrate off-site, if it has not done so already. The actual extent of the plumes may be determined subsequently by accepted scientific means such as groundwater modeling or actual testing. At this stage it is clear that the Plaintiffs and members of the Class are the innocent victims of widespread petroleum contamination caused by the Defendants. Plaintiffs fully intend to prove that this massive environmental assault on the soil and groundwater of Alabama and hundreds of her landowners was known or foreseeable to and preventable by the Defendants.

107.   All of the Defendants participated in the conspiracy alleged in this complaint. While some of the Defendants did not participate in the conspiracy at its inception, they all joined and participated in it as it proceeded, and while one or more Defendants have stopped being members of API and/or other associations or groups through which the conspiracy was implemented, none of the Defendants has withdrawn form the conspiracy.

43

108.   There have been numerous overt acts which were part of the conspiracy.

109.   It was foreseeable, and the Defendants knew or reasonably should have known, that the conspiracy would result in injuries and damages in this District.

## VIII.   CAUSES OF ACTION

### A.   Toxic Trespass

110.   Plaintiffs repeat and incorporate herein by reference the preceding paragraphs.

111.   The above-described conduct and actions of Defendants caused and continues to cause actual or the threat of imminent unauthorized and wrongful invasion and trespass by petroleum contamination into Plaintiffs' properties.  This unauthorized and wrongful invasion or imminent invasion has caused Plaintiffs' properties to suffer a loss of value, and has interfered with Plaintiffs' rightful possession and use of their properties.  Defendants knew or should have known that petroleum had leaked from UST systems, and further knew or should have known that said leakage could and/or would enter and trespass onto Plaintiffs' properties, and create a serious risk of damage to such property.  Despite said knowledge, Defendants deliberately, willfully, wantonly and with gross and reckless disregard for the rights of Plaintiffs failed to take the necessary actions to prevent the incursion and trespass of contaminants onto Plaintiffs' properties or the threat of such incursions.  The lack of detection, notification, and remediation has resulted in the damage or threat of damage to said properties.

112.   As a direct and proximate result of Defendants' acts and omissions in causing and allowing the unauthorized contamination to enter and trespass on the properties of

44

Plaintiffs, or of causing the immediate threat of such an entry and trespass. Such properties have been and/or eventually will be contaminated and polluted. As a result, the use and value of Plaintiffs' properties for current and future economic purposes has materially and substantially decreased or will be decreased if Defendants' conduct is not enjoined so as to prevent this imminent trespass from occurring. Plaintiffs may also be required to incur cleanup costs and other damages and losses, and Plaintiffs' use and possession of their properties has been or will be seriously, substantially and wrongly interfered with.

B.   NUISANCE

113. Plaintiffs repeat and incorporate herein by reference the preceding paragraphs.

114. Defendants are operating or have operated their UST sites in a manner that unreasonably and substantially interferes with the Class' use, benefit, and enjoyment of their properties. Defendants, by their negligent, reckless, willful and wanton acts and omissions as set forth above, have caused and permitted contaminants (including benzene, a known carcinogen and MTBE, a suspected carcinogen) to be discharged from the UST systems on their sites. Defendants' intentional, reckless, and negligent actions have caused the continuing or threatened contamination of neighboring properties. This contamination has migrated, or threatens to migrate, nearby to and/or onto Plaintiffs' properties, thereby contaminating the soil and groundwater thereunder. The threat of such contamination substantially and unreasonably interferes with Plaintiffs' use, benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial injury. The ongoing noxious condition at each site, and the stigma it creates, has caused and is causing a material loss of value to

45

Plaintiffs' properties both because of fear of contamination and actual contamination when such is present. Additionally, the Defendants knew or should have known that their use of the sites in the manner set forth above would and has unreasonably and seriously interfered with the ordinary comfort, use and enjoyment of Plaintiffs' properties.

115.   As a direct and proximate result of the Defendants' acts and omissions creating the above described nuisance, Plaintiffs' properties, and the soil and groundwater thereunder, have been contaminated and polluted, or such properties are located in close proximity to such contamination so as to cause an ordinary reasonable person to fear such contamination. As a result of the contamination and pollution of Plaintiffs' properties and/or properties in close proximity, the use and value of Plaintiffs' properties for current and future economic purposes has been materially and substantially decreased. Plaintiffs have suffered, or face the threat of suffering, a serious, substantial and unreasonable interference with the use, comfort and enjoyment of their properties. The continued migration of petroleum product contamination from the sites onto, toward or nearby to Plaintiffs' properties constitutes a continuing nuisance which necessitates injunctive relief from the Court. Plaintiffs otherwise lack an adequate remedy at law.

## C.   Fraudulent Concealment

116.   Plaintiffs repeat and incorporate herein by reference the preceding paragraphs.

117.   Over the past forty years, Defendants, acting individually and through API repeatedly represented to Plaintiffs, to the Class and to those who advance and protect public and private interests from petroleum contamination that they would discover and disclose all material

46

facts about the existence of actual and imminent UST discharges and would discover and

disclose resultant contamination of soil and groundwater affecting property owned by Plaintiffs

and the Class. Additionally, Defendants represented that they would take all appropriate steps to

remedy and remediate threatened or actual contamination from UST's.

118.     Operating under the general umbrella of the American Petroleum Institute

("API"), the nation's leading organization representing the petroleum industry and other formal

or informal groups or associations, Defendants repeatedly discussed the issue of leaking UST

systems from at least the 1960's onward. Despite representations to the contrary, neither the API

nor its members were aggressively finding and containing the contamination from known and

suspected UST leaks. In fact, beginning in at least the early 1980's API was essentially used as a

front to conceal the widespread nature of UST contamination from Plaintiffs and the Class and to

prevent governmental action which would otherwise have resulted in notice of UST

contamination to Plaintiffs and the Class, and efforts to determine the scope of contamination.

119.     All of the major vertically integrated oil companies, including each

Defendant in this case, have been during relevant times supporting members of the API. Each

Defendant has met repeatedly with each other in meetings organized under API auspices and

have exchanged information pertaining to and materially advancing their agreement to conceal,

misrepresent, delay action on and minimize the perception of the environmental consequences of

UST leaks in order to avoid, or attempt to avoid, costs believed to be associated with the

remediation of UST problems.

120.     Defendants, acting by and through their industry spokes group, API, have

made numerous representations over the course of the last 25 years to the U.S. Congress and to

THIRD AMENDED COMPLAINT
96-T-940-N

various State legislatures and elected representatives to the effect that they affirmatively recognized their obligation to discover, disclose and take all reasonable steps to remedy UST contamination. In March 1984, for example, API Vice President William O'Keefe, speaking on behalf of all of the Defendants, falsely informed the Senate that the API's members, including "6,000 individuals and 235 corporate members" were "united in their determination to deal effectively with the potential threat to groundwater posed by leaking underground storage tanks. . . . The result of our concern has been an industry-wide effort designed to prevent, detect, and, where necessary, mitigate the effect of leaks..." and that "efforts by the petroleum industry demonstrate a serious commitment to deal with the potential problem of ground water contamination." Similarly, Mr. O'Keefe also intentionally misrepresented the scope of UST discharges in Senate testimony to the effect that, "the vast majority of service station leaks are detected and dealt with before they cause a serious problem." These and similar statements by Defendant Exxon were, inter alia, instrumental in the industry's avoidance of inclusion of UST leaks under the strict provisions of CERCLA (the Superfund law) which would have held the industry fully responsible for the massive cost of cleanup of UST site contamination.

      121.   Statistics and statements on leaking tanks released by Defendants, often through API, in an effort to minimize the UST problem were often deliberately inaccurate and misleading, and did not reflect the true knowledge Defendants possessed concerning the nature and extent of the problem, particularly the widespread impact of contamination on groundwater at many sites. Similarly, manual inventory testing was universally touted as the solution to the problem, although Defendants knew this method was defective, widely ignored at many of their sites and obviously inferior to alternative methods which were generally not employed because

48

Defendants wished to save money.

122.   By virtue of repeated statements acknowledging their responsibility to avoid petroleum discharges and to disclose and clean up petroleum discharges which have occurred, and by virtue of their superior and exclusive knowledge of and/or superior ability to discover leaking tanks, Defendants assumed and had a duty to disclose to Plaintiffs and the Class all material facts about the existence of actual and imminent UST discharges and resultant contamination of soil and groundwater nearby to properties owned by Plaintiffs and the Class. Similarly, Defendants had and have a duty to remedy the UST problem by remediation existing contamination and avoiding future contamination.

123.   Defendants' knowledge of the material facts pertaining to the existence of thousands of leaking and potentially leaking UST's and resultant soil and groundwater contamination injuring Plaintiffs' and the Class's property was and is vastly superior to the knowledge of Plaintiffs and the Class. Similarly, Defendants have superior financial resources and exclusive custody and/or control of contamination sources which permit them to detect UST failures and resulting contamination, and likewise creates a duty to disclose.

124.   By virtue of their repeated statements acknowledging their responsibility to discover, clean up, and prevent the spread of petroleum discharges which have occurred, and the justifiable reliance by members of the Class therein, Defendants are estopped from denying they have a duty to determine the scope of contamination of each site and surrounding properties, and thereafter to disclose to Plaintiffs and the Class all material facts about the scope of actual contamination.

125.   At all relevant times, Defendants intentionally, willfully, and/or recklessly

49

failed to discover and/or disclose to Plaintiffs and to the Class material facts about the existence

of thousands, of leaking and potentially leaking UST's and resultant soil and groundwater

contamination, and also intentionally failed to remedy and remediate same. For example, and so

as to avoid their notification obligations, Defendants deliberately failed to employ effective leak

detection methods, long-available, which would easily and cost-effectively have identified

leaking UST's. Similarly, even where Defendants discovered a leak, Defendants deliberately

failed to notify Plaintiffs and the Class that the leak was, in all reasonable likelihood, resulting in

petroleum contamination of groundwater at or near their properties.

126.    Defendants and each of them also intentionally publicized misleading

statistics about the UST problems, repeatedly and intentionally portraying serious known

problems as nonexistent or de minimis. Similarly, misrepresentations were made about

Defendants' response to the UST leaks, such as API's public assurances in 1983 that oil

companies are replacing corroding steel underground tanks at filling stations as fast as

possible. . . "and that, "the industry has been working to develop its own policy for protecting

ground water."

127.    Defendants also repeatedly and intentionally falsely denied the existence

of widespread leaks and groundwater contamination. In December 1983, for example, Mobil Oil

Corporation's Executive Vice President falsely stated: "We don't have any leaks." Similarly,

William Beck, Manager, Mobil Oil Corporation's Northeast Region and Chairman of

Operations, falsely assured the Suffolk County (New York) Department of Health, during

testimony presented on June 21, 1979 that, "The industry recognizes the responsibility to insure

the tightness of underground systems." In May 1984, Sullivan Curran of Exxon, leader of API's

50

groundwater task force, stated that "only a very small percentage of the leaks affect groundwater." A principal goal of Defendants' fraud was their conscious decision to conceal contamination from neighboring property owners so as to avoid cleanup costs which could be expected to be very high given the severe nature of petroleum contamination and known difficulties in effectively remediating such pollution.

128. Defendants engaged in this uniform course of fraudulent concealment for the purposes of concealing petroleum contamination from Plaintiffs, the Class, and the government; to reap additional profits which would otherwise have been expended detecting and remediating soil and groundwater contamination; and to delay and/or avoid responding to soil and groundwater monitoring or remediation.

129. The facts concealed by Defendants were and are material; reasonable property owners would and do consider them important in making decisions affecting their property interests. Similarly, Plaintiff class members reasonably relied upon Defendants' misrepresentations and upon Defendants' active, fraudulent concealment of Plaintiffs' injuries and claims to their detriment.

130. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs have suffered and will continue to suffer substantial ongoing injury for which Plaintiffs are entitled to injunctive relief as requested herein, as well as compensatory and punitive damages.

### D.  Civil Conspiracy to Commit Fraudulent Concealment, And to Create Nuisances

131. Plaintiffs repeat and incorporate herein by reference to the preceding

51

paragraphs.[4]

132.    Prior to the 1970's, and continuing through the date of the filing of this amended complaint, Defendants have knowingly and willfully entered into agreements for the unlawful purposes of suppressing and concealing material information concerning the widespread failures, and imminent expected failures, of thousands of UST's nationwide.  These Defendants further agreed to represent falsely to Plaintiffs and Plaintiff Class that they had undertaken a special responsibility and duty to undertake all reasonable efforts to learn all of the facts pertaining to UST failures and to discover, disclose and remedy contamination from UST failures.  These Defendants further agreed to represent falsely to the public that these Defendants and each of them were united in their determination to deal effectively with the potential threat to groundwater posed by leaking UST's and to aggressively upgrade tanks and clean-up contamination at leaking sites.

133.    The Defendants agreed to act jointly and to secretly cooperate with each other in this conspiracy with the primary purpose of misleading Plaintiffs and the Class about the nature and extent of the UST problem so as to avoid UST leak detection and remediation, affected property owner notification, compensation for property damage and other costs. Defendants furthered the conspiracy by acting individually and collectively and through their industry spokes group API as detailed herein.  Specifically, the Defendants' conspiracy involved an agreement to perform each of the following fraudulent, tortuous and illegal activities:

(1)     to fraudulently suppress, conceal, minimize and actively

---

[4]As this conspiracy is still ongoing, Plaintiffs still do not know all of its details. Plaintiffs anticipate that discovery on the merits will fully reveal the scope of, and actions taken in support of, the conspiracy. The pleadings so far are the result of informal discovery.

THIRD AMENDED COMPLAINT
96-T-940-N

misrepresent the true extent of the leaking underground storage tank crisis as much as possible

from the public and in particular, from affected property owners including the Plaintiffs and the

Class and to conceal the extent of known and expected groundwater contamination and resultant

stigma damage to nearby properties affected by leaking UST's;

(2)    to knowingly conceal the extent of the UST problem by

deliberately allocating insufficient resources to address the problem and its consequences, and to

upgrade far fewer sites than the Defendants knew to be necessary to eliminate the spread of

contamination, all of which Defendants knew, or reasonably should have known, would and did

lead directly to thousands of UST discharges and resultant contamination, constituting thousands

of trespasses, threatened trespasses, and nuisances;

(3)    to adopt tank leak testing protocols which were known to be

inadequate and unlikely to lead to discovery of leaking tanks and to avoid using superior tank

leak testing procedures;

(4)    to intentionally refrain from undertaking adequate testing of sites,

or the property surrounding sites, or to institute adequate remediation plans at sites known to

have contamination; and

(5)    to commit trespass, nuisance and fraudulent concealment.

134.    As outlined throughout this complaint, the Defendants have in furtherance

of the conspiracy, knowingly and purposefully committed numerous affirmative acts and/or

refrained from taking acts and making disclosures required by statute and common law.  Those

actions include, but are not limited to the torts described above as well as the following:

(1)    Particularly during the years prior to reporting requirements, the

53

active concealment of data indicating the nature, extent, and potential damage associated with the problem of releases from UST systems. It is believed Defendants have for years possessed information tending to demonstrate that substantial numbers of their UST systems were already or would soon be leaking petroleum into soil and groundwater at hundreds of sites in Alabama and elsewhere. Private corrosion surveys and other internal tests and studies including "divestiture investigations," as well as physical observations of contamination made during tank replacements, and more recently computer-aided groundwater modeling, have provided Defendants with this knowledge. In spite of this information, Defendants systematically and deliberately failed to address potential or actual contamination present at many of their sites until more recently, when forced to do so by state requirements;

(2)     Operating under the general umbrella of API and through other informal or formal associations, Defendants repeatedly discussed the issue of leaking UST systems throughout the 1970's and 1980's. Each of Defendants have met repeatedly with each other in meetings organized under API auspices, and have provided data to API and each other which demonstrated the widespread nature of the problem. Defendants and each of them, through frequent API meetings of various committees such as the marketing, operations and equipment committees, furthered their agreement to work together to defraud Plaintiff Class, to commit trespass and to create nuisances by deliberately ignoring, concealing and misrepresenting UST leaks;

(3)     Statistics and statements on leaking tanks were regularly released by Defendants, often through API, in an effort to minimize the problem. This information was deliberately inaccurate and misleading, and did not reflect the true knowledge Defendants

54

possessed concerning the nature and extent of the problem.  In March 1984, for example, API

Vice President William O'Keefe falsely informed the Senate that the API, which served "6,000

individuals and 235 corporate members," and its members were "united in their determination to

deal effectively with the potential threat to groundwater posed by leaking underground storage

tanks... The result of our concern has been an industry-wide effort designed to prevent, detect,

and, where necessary, mitigate the effect of leaks..."  In fact, no such effort took place;

      (4)    Defendants' "tank management programs or similar approaches

portrayed in the 1980's as major efforts by the industry to fix the problem, were in reality

primarily station modernization programs, prioritized for marketing advantage rather than

environmental protection.  Similarly, Defendants knowingly failed to employ state-of-the-art

technology for leak detection and containment at hundreds of sites where they knew it was

needed to prevent the release and spread of contamination;

      (5)    Defendants knew, through various studies, surveys, statistical

analyses and other methods, including "divestiture studies," sometimes conducted by, for or with

other Defendants (as sites were sold among companies), that there were actual or potential

contamination problems at many sites.  In spite of this knowledge, they did little or nothing at

such sites to stop the spread of contamination or advise nearby property owners;

      (6)    Defendants deliberately and systematically avoided reaching

obvious conclusions that contamination had spread off-site in hundreds of cases, in an effort to

avoid state disclosure and notification requirements.  Over time, this deception has prevented

thousands of affected property owners from receiving any notice that their properties have been

contaminated, or face contamination, and has allowed contamination to spread unchecked

THIRD AMENDED COMPLAINT
96-T-940-N

beyond the boundaries of many of Defendants' sites; and

(7)     Within the past several years, Defendants have eagerly embraced

and financed the use at UST sites of Risk Based Corrective Action (RBCA or "Rebecca"), a

sophisticated, computer-based damage assessment process.  RBCA is, or will soon be, used by

Defendants at thousands of leaking UST sites nationwide in their dealings with the SEA's.  In

February 1996 Defendants Amoco, BP, Chevron, Exxon, Mobil and Shell formed PIRI

(Partnership in RBCA Implementation) to promote RBCA and hasten its use at UST leak sites

nationwide.  Each company contributed at least $100,000 to promote RBCA.  Regardless of

RBCA's scientific merit, not at issue here, the procedure is clearly designed to facilitate closure

of thousands of leak sites.  RBCA has no provision for affected property owner notification or

involvement, and in fact no representative property owners have attended the regular PIRI

meetings which have been taking place over the past year.  In those meetings, the Defendants

have conveniently concluded that concerns about contamination on the part of offsite landowners

and others in the real estate and lending communities, constitute a "political and emotional issue"

not to be addressed in RBCA.  In effect, through RBCA Defendants have extended the objectives

of the conspiracy by promoting a standardized approach to site assessment designed to absolve

them of any regulatory responsibility for cleanup through a process which fails to provide for

offsite landowner notification, thus perpetuating the likelihood of continuing nuisance and

trespass upon, and damage to, such properties.

135.    By these and other acts, Defendants intended and shared a commitment to

their common scheme to fraudulently conceal, to commit acts of trespass or threatened trespass

against, and to create nuisances affecting Plaintiffs and the members of the Class.  By agreeing to

56

act together as detailed above, these Defendants, and each of them, actively conspired to fraudulently conceal, trespass and nuisance upon Plaintiffs and the Class. In furtherance of their conspiracy, these Defendants also gave encouragement and substantial assistance to each other and otherwise aided and abetted each other in perpetrating these wrongful acts of fraudulent concealment, trespass and nuisance. These actions were done to benefit the conspirators, with the natural and necessary consequence of threatening to contaminate or contaminating Plaintiffs' properties and the Plaintiff Class' properties.

136.   As a direct and proximate result of such actions in furtherance of this conspiracy, Plaintiffs and the members of the Class have been damaged by virtue of severe petroleum contamination of their properties and/or nearby properties and are entitled to injunctive relief so as to determine the scope of harm from the conspiracy and to protect class members from the wrongful conduct of the conspirators. All Defendants participated in the conspiracy through the API and otherwise. At some point during the conspiracy, each Defendant was a member of the API. None of the Defendants has withdrawn from the conspiracy.

IX.   PRAYER FOR RELIEF

Plaintiffs propose bifurcating the proceedings, addressing first, on a mandatory class basis under Fed. R. Civ. P. 23(l)-(4) and (b)(l)(b)(2), Plaintiffs' claims for injunctive relief, and subsequently, in Phase II, Plaintiffs' monetary damage claims on an opt-out basis.

A.   Injunctive Relief (Phase I)

137.   As a direct and proximate result of Defendants' course of conduct, properties owned by the Class have become contaminated, or are likely to become contaminated,

THIRD AMENDED COMPLAINT
96-T-940-N

due to their close proximity to the sites owned by Defendants. Because of the lack of knowledge

regarding the scope of contamination on each site, and whether such contamination has entered

their property, the Class members are suffering an ongoing injury. Each Class member's

property either is suffering, or is at significant risk of suffering, a trespass by contamination

caused by Defendants. Class members' rights to the use and enjoyment of their property are

substantially and wrongfully being interfered with by the fear of, or threat of, contamination from

Defendants' sites.- Defendants' fraudulent concealment of the scope of contamination from

Defendants' UST sites, has caused and continues to cause Plaintiffs to be unaware of the scope of

contamination from Defendants' UST's. Moreover, the continuing and ongoing conspiracy

between and amongst Defendants has prevented and continues to prevent Plaintiffs from

knowing of, or understanding, the scope of contamination or potential contamination on their

property. These uncertainties constitute an ongoing harm.

138.   Given the ongoing course of conduct of the Defendants, designed to

prevent Plaintiff Class from understanding the scope of contamination, and thereby seeking, or

having adequate relief available, as well as the threat of continuing harm presented by

Defendant's actions, Plaintiff Class is faced with continuing and irreparable harm. Because of

the inability to discover the presence of, or scope of, contamination on property surrounding each

site due to the fraudulent misrepresentation and conspiracy of each and all Defendants, Plaintiffs

are unable to discover the scope or extent of contamination. As a result, Plaintiffs are at a

substantial risk of imminent trespass, and continue to face a nuisance interfering with their

enjoyment and use of their reasonable use and of their property.

139.   Due to Defendants' past and current actions, Plaintiffs face an inadequate

58

remedy at law. Furthermore they face continuing harm from Defendants' trespass and nuisance.

WHEREFORE, Plaintiffs request that the Defendants appear before the Court to answer and appear, and that after trial the Court award:

(1)    Appropriate injunctive relief, such as an order requiring that Defendants at their expense, to test for the presence of contamination at any property boundary of a site which borders on a Class member's property, where the border is located within 250 feet of the site of the leaking UST system, or the known area of contamination. Injunctive relief can also be provided in the form of an order requiring Defendants to disclose to class members the full scope of contamination at each site, and on any surrounding property, or to provide, at Defendants' expense, remediation;

(2)    Attorneys' fees and costs of suit; and

(3)    Such other and further relief to which plaintiffs may be justly entitled.

### B.    Monetary Damages (Phase II)

140.    As a direct and proximate result of Defendants' course of conduct properties owned by the Class have or reasonably threaten to become contaminated or be in close proximity to such contamination, and, as a result, the fair market value of Plaintiffs' properties has been diminished. Plaintiffs allege that the diminution in fair market value of their properties is permanent. Alternatively, Plaintiffs allege that the fair rental value of the properties has been impaired by the actions of the Defendants which constitute a temporary nuisance. Moreover, even after any remediation, Plaintiffs' properties will remain stigmatized by the negative market perception associated with previously contaminated property.

59

THIRD AMENDED COMPLAINT
96-T-940-N

141.    Plaintiffs will also be required to expend substantial sums to discover, remediate and clean up the pollution and contamination caused by Defendants' conduct described above.

142.    Each of Defendants' acts and omissions singularly and in combination with others of Defendants were undertaken with malicious intent towards Plaintiffs and/or with conscious disregard for the rights, welfare, and safety of Plaintiffs and their properties. Accordingly, Plaintiffs and the Class they represent seek compensatory and exemplary damages in such amounts as may be found proper under the facts and circumstances.

143.    Plaintiffs request a trial by jury on each claim to which they are so entitled.

WHEREFORE, Plaintiffs' request that Defendants be cited to appear and answer, and that on final trial Plaintiffs have:

(1)    Damages for diminution in market value of Plaintiffs' properties;

(2)    Damages for the cost of environmental testing, cleanup and remediation resulting from Defendants' conduct;

60

(3)    Damages for loss of use, loss of rental value, inconvenience, annoyance, and related costs, plus interest, as may be incurred by Plaintiffs in connection with contamination coming from the Defendants' sites and the cleanup of same on both the sites and/or on Plaintiffs' or nearby properties;

(4)    Exemplary damages in such amount as may be found proper and just under the facts and circumstances of this case as determined by the jury;

(5)    Pre-judgment and post-judgment interest as provided by law;

(6)    Attorney's fees and costs of suit;

(7)    Such other and further relief to which Plaintiffs may justly be entitled.

Respectfully Submitted,

Joe R. Whatley, Jr.

OF COUNSEL:

Joe R. Whatley, Jr.
Russell Jackson Drake
Peter H. Burke
WHATLEY DRAKE, LLC
1100 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 328-9576

Larry Morris
Clay Hornsby
MORRIS, HAYNES & HORNSBY
131 South Main Street
P.O. Box 1660
Alexander City, AL 35011
(205) 329-2000

61

THIRD AMENDED COMPLAINT
96-T-940-N

T. Roe Frazer, II
LANGSTON, FRAZER, SWEET
 & FREESE
201 N. President Street
Jackson, MS 39201

Richard A. Freese
Leslie E. McFall
LANGSTON, FRAZER, SWEET
 & FREESE, PA
Morgan Keegan Center
2900 Hwy 280, Suite 240
Birmingham, Alabama  35223
(205) 871-4144

Timothy J. Crowley
Richard Norman
CROWLEY & DOUGLAS
3500 Chevron Tower
1301 McKinney
Houston, TX 77010
(713) 651-1771

A. Hoyt Rowell, III
T. Christopher Tuck
NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
151 Meeting Street, Suite 600
Charleston, SC 29402
(803) 720-9200

Mitchell A. Toups
WELLER, GREEN, TOUPS & TERRELL
P.O. Box 350
Beaumont, TX 77704
(409) 838-0101

William H. Garvin, III
WELLER, GREEN, TOUPS & TERRELL
2937 A-2 Kerry Forrest Parkway
Tallahassee, FL 32308
(850) 906-9880

Dennis Reich
REICH AND BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX 77027
(713) 622-7271

Elizabeth Cabraser
Scott P. Nealey
LIEFF, CABRASER, HEISMANN
 & BERNSTEIN
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000

David J. Guin
Pamela Beard Slate
DONALDSON, GUIN & SLATE, LLC
The Morgan Keegan Center
2900 Highway 280, Suite 230
Birmingham, AL 35223
(205) 879-9994

Kenneth G. Gilman
John Martland
GILMAN AND PASTOR
One Boston Place, 28th Floor
Boston, MA 02108
(617) 589-3750

Kenneth Ingram, Jr.
INGRAM & ASSOCIATES
1055 Cherokee Road (35010)
P.O. Box 1750
Alexander City, AL 35011
(256) 212-9700

Morris A. Ratner
LIEFF, CABRASER, HEIMANN
 & BERNSTEIN
10 Rockefeller Plaza, 12th Floor
New York, NY 10020-1903

Fred D. Gray
GRAY, LANGFORD, SAPP,
 McGOWAN, GRAY & NATHANSON
P.O. Box 830239
Tuskegee, AL 36083-0239

THIRD AMENDED COMPLAINT
96-T-940-N

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon the following listed persons by placing a copy of the same in the United States Mail, postage prepaid and properly addressed, this the 4th day of October, 1999.

Richard E. Wallace, Jr.
WALLACE, KING, MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007

Sid Trant, Esq.
Bradley, Arant, Rose & White
2001 Park Place, Suite 1400
Birmingham, AL 35203

John M. Johnson, Esq.
Lightfoot, Franklin, White & Lucas
The Clark Building
400 20th Street North
Birmingham, AL 35203-2706

Lance L. Shea, Esq.
Fulbright & Jaworski
1301 McKinney
Suite 5100
Houston, TX 77027

Gregory H. Hawley
MAYNARD, COOPER & GALE, P.C.,
2400 AmSouth/Harbert Plaza
1901 6th Avenue North
Birmingham, Alabama 35203

Peter John Sacripanti
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605

63

THIRD AMENDED COMPLAINT
96-T-940-N

J. Andrew Langan, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL  60601

_____

Of Counsel

THIRD AMENDED COMPLAINT
96-T-940-N

**EXHIBIT B**

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE *FILED*

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

JUL 1 1999

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,                )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )   CIVIL ACTION NO. 96-T-940-N
                                     )
AMOCO OIL COMPANY, et al.,           )
                                     )
        Defendants.                  )

SCHEDULING ORDER

**THE COURT NOW ENTERS A SCHEDULING ORDER.**  Please read this order carefully.  These deadlines and responsibilities imposed by this order may not be changed without leave of the court.  All parties are expected to comply with this order in a timely manner, without unnecessary requests for extensions of time.  The parties are also expected to comply with the Middle District's Local Rules and the Middle District's Guidelines to Civil Discovery Practice, both of which can be found at http://www.almd.uscourts.gov/.

Under Rule 16, Federal Rules of Civil Procedure, as amended, the Court is required to set a schedule for the discovery and the filing of motions.  Accordingly, it is ORDERED by this Court as follows:

**SECTION 1.**  A pretrial hearing of this case is scheduled for November 6, 2000, at 8:00 a.m. in Montgomery, Alabama, and this cause is set for trial on December 1, 2000, at 10:00 a.m. in Montgomery, Alabama.

**SECTION 2.**  The first phase of this litigation will address the plaintiffs' claims and all defenses on the merit.  The issue of class certification will be addressed after the completion of this phase.

**SECTION 3.**  All motions for summary judgment must be filed on April 3, 2000, and not before or after this date. A brief and all supporting evidence shall be filed with any such motion. In all briefs filed by any party relating to the motion, the discussion of the evidence must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting

EXHIBIT *6*                    319

deposition or document.  Failure to make such specific reference will result in the evidence not being considered by the court.

**SECTION 4.**  Within twenty-one (21) days after the deadline for the filing of dispositive motions, counsel for all parties shall conduct a face-to-face settlement conference at which counsel shall engage in good faith settlement negotiations.  If settlement cannot be reached, counsel shall also discuss whether mediation will assist the parties in reaching settlement.  Not less than five (5) days after this conference, counsel for the plaintiff shall file a pleading titled "Notice Concerning Settlement Conference and Mediation".  This pleading shall indicate whether settlement was reached and, if not, whether the parties believe mediation will assist them in resolving this case short of trial.  Information about mediation is attached to this order.

**SECTION 5.**  Any motions to amend the pleadings and to add parties shall be filed by no later than November 1, 1999.

**SECTION 6.**  The failure to file a response to any motion -- either dispositive or non-dispositive -- within the time allowed by the court shall indicate that there is no opposition to the motion.

**SECTION 7.**  All discovery for the first phase shall be completed by March 1, 2000.

**SECTION 8.**  By November 1, 1999, with regard to phase one, each party shall disclose to the other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.  This includes any witness who may be asked to give an expert opinion.  With respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, this disclosure shall be accompanied by a written report prepared and signed by the witness.

The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

However, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party pursuant to this section, the disclosure shall be made within 30 days of the disclosure made by the other party.

All disclosures made pursuant to this section are subject to a duty of supplementation within 14 days of when a party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to other parties in the discovery process or in writing.

Unless specifically agreed between the parties or allowed by the Court for good cause shown, the parties shall be precluded from calling any witness whose identify should have been disclosed but was not as required by this section.

SECTION 9.  No later than three weeks prior to the pretrial hearing, each party shall exchange the names and addresses of all witnesses, separately identifying those whom the party expects to present and those whom the party may call if the need arises.  The witness list should include the names of any witnesses required to be disclosed under section 8.  Unless specifically agreed between the parties or allowed by the Court for good cause shown, the parties shall be precluded from calling any witness not so identified.

SECTION 10.  No later than three weeks prior to the trial date, the parties shall identify any part of a deposition or other document that a party expects to use at trial.  Adverse parties shall within one week thereafter identify any responsive parts of depositions expected to be used, and a party shall within three days of the designation of such responsive parts designate any part which is desired as a rebuttal thereto.  Unless specifically agreed between the parties or allowed by the Court for good cause shown, the parties shall be precluded from using any part of a deposition or other document not so listed, with the exception of parts of depositions or documents to be used solely for the purpose of impeachment.  Except to the extent written notice to the contrary is given no later than seven (7) days prior to the scheduled trial date, each party shall be deemed to have agreed that one of the conditions for admissibility under Rule 32 of the Federal Rules of Civil Procedure is satisfied with respect to any such deposition and that there is no objection to the testimony so designated.

SECTION 11.  On or before two weeks prior to the trial date, the parties shall furnish opposing counsel for copying and inspection all exhibits or tangible evidence to be used at the

3

trial, and proffering counsel shall have such evidence marked for identification prior to trial.  Unless specifically agreed between the parties or allowed by the Court for good cause shown, the parties shall be precluded from offering such evidence not so furnished and identified, with the exception of evidence to be used solely for the purpose of impeachment.  <u>Except to the extent written notice to the contrary is given no later than seven (7) days prior to the scheduled trial date, the evidence shall be deemed genuine and admissible in evidence.</u>  <u>The written notice shall set forth the grounds and legal authorities.</u>  <u>All trial exhibits must be premarked prior to trial.</u>

**SECTION 12.**  A trial docket will be mailed to counsel approximately one month prior to a trial term.  <u>If a jury trial</u>: The parties shall file any requested voir dire questions, motions in limine fully briefed, and any proposed jury instructions, together with citations of law thereon, on or before two weeks prior to the trial date unless said time is shortened by the court on motion of either party.  Trial counsel are DIRECTED to review the jury questionnaire used in this court and to avoid any duplication of matters addressed therein in their voir dire questions.

**SECTION 13.**  In cases involving jury trials, the term trial date as used in the foregoing deadlines shall mean the date set for jury selection.

**SECTION 14.**  The disclosures, exchanges and identifications required by sections 8, 9, 10, & 11 should be made between or among the parties and should <u>not</u> be filed with or submitted to the Court, unless requested by the Court or a party intends that they should be filed in support of some pleading or motion.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.


_____
UNITED STATES DISTRICT JUDGE

4

2:96-cv-00940

Elizabeth J. Cabraser                                    jac
Lieff, Cabraser, Heimann & Bernstein
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA  94111

----------------------------

N O T I C E

        The U.S. District Court for the Middle District of Alabama has adopted
the following policy: Pleadings, briefs and motions will no longer be
accepted in "letter form." Therefore, for example, a letter requesting
the continuance of a matter, will not be accepted.  Instead, a motion, with
the style of the case and containing a certificate of service, must be filed.

        The Court has adopted new Local Rules, effective January 1, 1998. Copies
are available in the office of the Clerk of Court.  ATTORNEYS ARE EXPECTED
TO BE FAMILIAR WITH THE NEW LOCAL RULES.  These changes include requirements
that jury demands, three-judge-court requests, and class-action requests must
be noted in the caption of the case under the case number in the pleading
requesting such.  In addition, attorneys signing any paper filed with the
Clerk must place one of the following identification numbers under his/her
signature line: (1) the Six-Digit Attorney Code maintained by the State's
Administrative Office of Courts; (2) the attorney number assigned by their
state's unified bar or, if not a member of a unified bar, the registration
number assigned by the highest court in their jurisdiction of admission; (3)
if an attorney has not been otherwise assigned a number, the attorney should
use his/her Social Security Number.  If the attorney has a FAX number, this
should also be included.  Finally, the certificate of service must show the
name and address of each attorney and/or party on whom the pleading, motion
or other paper was served.

        The Middle District of Alabama has established an Internet Web Page for
benefit of the Bar and the public.  The address is www.almd.uscourts.gov/. The
site contains telephone numbers, Local Rules, a hypertext version of the
Court's Guidelines to Civil Discovery, some research links, the Standards For
Professional Conduct and other useful information.

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

FILED

JUL 1 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA

JAMES PETERS, et al.,            )
                                 )
        Plaintiffs,              )
                                 )
    v.                           )   CIVIL ACTION NO. 96-T-940-N
                                 )
AMOCO OIL COMPANY, et al.,       )
                                 )
        Defendants.              )

ORDER

Based upon the representations made by the parties during a status conference held on June 30, 1999, it is ORDERED as follows:

(1)  The following motions are denied in their entirety but without prejudice: (i) motion to sever and transfer, etc., filed by defendant Sun Company, Inc. on March 3, 1998 (Doc. no. 228); (ii) motion to dismiss, filed by defendant Sun Company, Inc. for lack of personal jurisdiction and improper venue filed on March 3, 1998 (Doc. no. 227); and (iii) motion to dismiss for lack of in personam jurisdiction, filed by defendant Diamond Shamrock on March 3, 1998 (Doc. no. 230).

(2)  If defendants Sun Company, Inc. and Diamond Shamrock still desire to pursue said issues, they should refile their motions on July 31, 1999, and not before and not after, with accompanying briefs and any evidentiary materials, asserting lack of in personam jurisdiction and improper venue. In these motions, the court understands,

320

defendants will contend that discovery should be severely

limited as these issues.

The clerk of the court is DIRECTED to provide a copy of this

order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.

_____
UNITED STATES DISTRICT JUDGE

RECEIVED

JUL 0 6 1999

LIEFF CABRASER, HEIMANN & BERNSTEIN

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION **FILED**

JUL 1 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,                  )
                                       )
        Plaintiffs,                    )
                                       )
v.                                     )   CIVIL ACTION NO. 96-T-940-N
                                       )
AMOCO OIL COMPANY, et al.,             )
                                       )
        Defendants.                    )

<u>ORDER</u>

Based upon the representations made by the parties during a status conference held on June 30, 1999, it is ORDERED that status conferences are set for the following dates at 8:00 a.m. at the federal courthouse in Montgomery, Alabama: October 10, 1999, January 1, 2000, March 8, 2000, June 2, 2000, and August 14, 2000. The conferences shall be on the record, with a courtroom deputy and a court reporter present. At these conferences, the court will take up all pending motions and will inquire as to the general status of the case, including whether discovery is moving along as expected and all deadlines are being met.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.

UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

**FILED**

JUL 1 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al., )
)
    Plaintiffs, )
)
v. )   CIVIL ACTION NO. 96-T-940-N
)
AMOCO OIL COMPANY, et al., )
)
    Defendants. )

ORDER

Based upon the representations made by the parties during a status conference held on June 30, 1999, it is ORDERED that the parties are allowed until July 31, 1999, to submit jointly to the court their agreement as to the correct names of all defendants.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.

UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE FILED

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION   JUL 1 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,            )
                                 )
    Plaintiffs,             )
                                 )
    v.                      )   CIVIL ACTION NO. 96-T-940-N
                                 )
AMOCO OIL COMPANY, et al.,       )
                                 )
    Defendants.             )

## ORDER

Based upon the representations made by the parties during a status conference held on June 30, 1999, it is ORDERED that all defendants are allowed until July 31, 1999, to file their answers.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.

UNITED STATES DISTRICT JUDGE

3/6

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION **FILED**

**JUL 1 1999**

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,          )
                               )
    Plaintiffs,            )
                               )
v.                             )        CIVIL ACTION NO. 96-T-940-N
                               )
AMOCO OIL COMPANY, et al.,     )
                               )
    Defendants.            )

<u>ORDER</u>

    Based upon the representations made by the parties during a status conference held on June 30, 1999, it is ORDERED that the stay of discovery in this cause is lifted.

    The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

    DONE, this the 1st day of July, 1999.

                                 _____
                                 UNITED STATES DISTRICT JUDGE

317

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

FILED

JUL 1 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,            )
                                 )
        Plaintiffs,              )
                                 )
        v.                       )   CIVIL ACTION NO. 96-T-940-N
                                 )
AMOCO OIL COMPANY, et al.,       )
                                 )
        Defendants.              )

## ORDER

It is ORDERED that the motion to strike class allegations, etc., filed by defendants on June 30, 1999 (Doc. no. 311), is denied.  The court recognizes that it informed the parties otherwise on June 30, 1999; however, after further reflection, the court believes that the class issue should not be addressed at this time.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the 1st day of July, 1999.

_____
UNITED STATES DISTRICT JUDGE

-319



Printed on Recycled Paper
20% Post Consumer Waste

**EXHIBIT C**

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

FILED

JUL 27 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,                )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )   CIVIL ACTION NO. 96-T-940-N
                                     )
AMOCO OIL COMPANY, et al.,           )
                                     )
        Defendants.                  )

ORDER

For good cause, it is ORDERED that the scheduling order

entered on July 1, 1999 (Doc. no. 319), is amended to reflect that

the pretrial is set for December 6, 2000, at 8:00 a.m. and the

trial is set for January 8, 2001, at 10:00 a.m. with the deadlines

in said order adjusted accordingly.

DONE, this the ____ day of July, 1999.

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

EXHIBIT  c

330

2:96-cv-00940

Morris A. Ratner                                          jac
Lieff, Cabraser, Heimann & Bernstein
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA  94111

---------------------------------

N O T I C E

The U.S. District Court for the Middle District of Alabama has adopted
the following policy: Pleadings, briefs and motions will no longer be
accepted in "letter form." Therefore, for example, a letter requesting
the continuance of a matter, will not be accepted.  Instead, a motion, with
the style of the case and containing a certificate of service, must be filed.

The Court has adopted new Local Rules, effective January 1, 1998. Copies
are available in the office of the Clerk of Court.  ATTORNEYS ARE EXPECTED
TO BE FAMILIAR WITH THE NEW LOCAL RULES.  These changes include requirements
that jury demands, three-judge-court requests, and class-action requests must
be noted in the caption of the case under the case number in the pleading
requesting such.  In addition, attorneys signing any paper filed with the
Clerk must place one of the following identification numbers under his/her
signature line: (1) the Six-Digit Attorney Code maintained by the State's
Administrative Office of Courts; (2) the attorney number assigned by their
state's unified bar or, if not a member of a unified bar, the registration
number assigned by the highest court in their jurisdiction of admission; (3)
if an attorney has not been otherwise assigned a number, the attorney should
use his/her Social Security Number.  If the attorney has a FAX number, this
should also be included.  Finally, the certificate of service must show the
name and address of each attorney and/or party on whom the pleading, motion
or other paper was served.

The Middle District of Alabama has established an Internet Web Page for
benefit of the Bar and the public.  The address is www.almd.uscourts.gov/.  The
site contains telephone numbers, Local Rules, a hypertext version of the
Court's Guidelines to Civil Discovery, some research links, the Standards For
Professional Conduct and other useful information.

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

FILED

JUL 2 7 1999

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al., )
                              )
    Plaintiffs, )
                              )
    v. )    CIVIL ACTION NO. 96-T-940-N
                              )
AMOCO OIL COMPANY, et al., )
                              )
    Defendants. )

ORDER

For good cause, it is ORDERED that the scheduling order entered on July 1, 1999 (Doc. no. 319), is amended to reflect that the pretrial is set for December 6, 2000, at 8:00 a.m. and the trial is set for January 8, 2001, at 10:00 a.m. with the deadlines in said order adjusted accordingly.

DONE, this the __27th__ day of July, 1999.

_____
MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

330

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

*FILED*

*JUL 2 7 1999*

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

JAMES PETERS, et al.,                )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )        CIVIL ACTION NO. 96-T-940-N
                                     )
AMOCO OIL COMPANY, et al.,           )
                                     )
        Defendants.                  )

<u>ORDER</u>

For good cause, it is ORDERED that the scheduling order entered on July 1, 1999 (Doc. no. 319), is amended to reflect that the pretrial is set for December 6, 2000, at 8:00 a.m. and the trial is set for January 8, 2001, at 10:00 a.m. with the deadlines in said order adjusted accordingly.

DONE, this the ___27th___ day of July, 1999.

_____
        MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

330

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

FILED

FEB 7 2000

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

BUDDY LYNN, et al.,               )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )        CIVIL ACTION NO.
                                  )          96-T-940-N
AMOCO OIL COMPANY, et al.,        )
                                  )
        Defendants.               )

<u>ORDER</u>

The court having been requested to modify its July 1, 1999, Scheduling Order (Doc. 319), and for good cause shown, it is here ORDERED and DECREED by this court as follows:

**SECTION 3** of the Scheduling Order is amended so that all motions for summary judgment must be filed on May 8, 2000, and not before or after this date.

**SECTION 7** of the Scheduling Order is modified solely for the purpose of extending the time for taking expert depositions and no other discovery, and is modified so that defendants may take plaintiffs' expert depositions on or before April 28, 2000, and plaintiffs may take defendants' expert depositions on or before May 26, 2000.

**SECTION 8** of the Scheduling Order is modified to allow plaintiffs to supplement their expert reports on a rolling basis beginning on February 18, 2000, and to be completed on or

EXHIBIT _D_   GPN
477

before March 1, 2000, and allow defendants to serve rebuttal reports on or before April 28, 2000.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

DONE, this the ___2+___ day of February, 2000.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

**FILED**

MAR 8 2000

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| BUDDY LYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) 96-T-940-N |
| AMOCO OIL COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

<u>ORDER</u>

Based on the representations made at a status conference

on March 8, 2000, it is ORDERED that plaintiffs' motion to

modify, etc., filed March 7, 2000 (Doc. no. 507), is granted

to the extent that the scheduling order entered on July 1,

1999 (Doc. no. 319), is further amended as follows, <u>see also</u>

orders of July 27, 1999 (Doc. no. 330) and February 7, 2000

(Doc. no. 477):

> SECTION 1.  A pretrial hearing of this
> case is scheduled for March 19, 2001, at
> 8:00 a.m. in Montgomery, Alabama, and this
> cause is set for trial on April 23, 2001,
> at 10:00 a.m. in Montgomery, Alabama, with
> all related deadlines adjusted accordingly.

* * *

EXHIBIT _E_          513

SECTION 3.   All motions for summary judgment must be filed on June 12, 2000, and not before or after this date.  A brief and all supporting evidence shall be filed with any such motion.  In all briefs filed by any party relating to the motion, the discussion of the evidence must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.   Failure to make such specific reference will result in the evidence not being considered by the court.

* * *

SECTION 7.   All discovery for the first phase shall be completed by May 12, 2000.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

Done, this the 8th day of March, 2000.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

2:96-cv-00940

Elizabeth J. Cabraser                                    jac
Lieff, Cabraser, Heimann & Bernstein
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA  94111

-------------------------------------

N O T I C E

The U.S. District Court for the Middle District of Alabama has adopted
the following policy: Pleadings, briefs and motions will no longer be
accepted in "letter form." Therefore, for example, a letter requesting
the continuance of a matter, will not be accepted.  Instead, a motion, with
the style of the case and containing a certificate of service, must be filed.

The Court has adopted new Local Rules, effective January 1, 1998. Copies
are available in the office of the Clerk of Court.  ATTORNEYS ARE EXPECTED
TO BE FAMILIAR WITH THE NEW LOCAL RULES.  These changes include requirements
that jury demands, three-judge-court requests, and class-action requests must
be noted in the caption of the case under the case number in the pleading
requesting such.  In addition, attorneys signing any paper filed with the
Clerk must place one of the following identification numbers under his/her
signature line: (1) the Six-Digit Attorney Code maintained by the State's
Administrative Office of Courts; (2) the attorney number assigned by their
state's unified bar or, if not a member of a unified bar, the registration
number assigned by the highest court in their jurisdiction of admission; (3)
if an attorney has not been otherwise assigned a number, the attorney should
use his/her Social Security Number.  If the attorney has a FAX number, this
should also be included.  Finally, the certificate of service must show the
name and address of each attorney and/or party on whom the pleading, motion
or other paper was served.

The Middle District of Alabama has established an Internet Web Page for
benefit of the Bar and the public.  The address is www.almd.uscourts.gov/. The
site contains telephone numbers, Local Rules, a hypertext version of the
Court's Guidelines to Civil Discovery, some research links, the Standards For
Professional Conduct and other useful information.