**MDL 1358**

RECEIVED
CLERK'S OFFICE

2000 NOV 29 P 3: 43

FILED ON
JUDICIAL
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**NOV 2 9 2000**

FILED
CLERK'S OFFICE

PLEADING NO. 31

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

———————————————— :
                                        :
IN RE:                                  :
                                        :
METHYL-TERTIARY BUTYL ETHER :          **MDL Docket No. 1358**
("MTBE") LITIGATION                     :
                                        :
———————————————— :

### DEFENDANT, EXXON MOBIL CORPORATION'S, MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-1) ENTERED IN MDL 1358 – *IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION*

Exxon Mobil Corporation ("Exxon"), the defendant in *Young v. ExxonMobil Oil Corporation* ("*Young*,") Case No. 8:00-CV-1912-T-24C, currently pending in the Middle District of Florida, files this Motion to Vacate Conditional Transfer Order (CTO-1) entered in MDL 1358 – *In Re Methyl Tertiary Butyl Ether* ("MDL 1358") on the following grounds:

1. Section 1407 of Title 28 of the United States Code provides as follows:

    (a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers of such proceedings will promote the just and efficient conduct of such actions.

**OFFICIAL FILE COPY** IMAGED DEC 1 '00

2.      On October 10, 2000, the Judicial Panel on the Multidistrict Litigation ("Panel") transferred MDL 1358, *Berisha v. Amerada Hess, et al.,* No. 00-CIV-1898 ("*Berisha*"), pending in the Southern District of New York and *England v. Atlantic Richfield Co., et al.,* Nos. 00-370-WDS, 00-371-DRH ("*England*"), pending in the Southern District of Illinois to MDL 1358.

3.      The *Berisha* and *England* actions raise state law claims against twenty oil company defendants for alleged harms purportedly arising from the defendants' manufacture, distribution, and/or use of methyl tertiary butyl ether ("MTBE") as an additive in gasoline.[1]

4.      *England* is brought under Illinois law purportedly on behalf of putative subclasses of persons who own real property in sixteen states, while *Berisha* is brought under New York law on behalf of putative subclasses of persons having an interest in real property in New York.[2]

5.      The *Berisha* and *England* actions seek compensatory and injunctive relief premised on claims for conspiracy, strict liability for failure to warn, strict liability for design defect, strict liability for misrepresentation, fraud, negligence, deceptive business practices, and public nuisance.

6.      The *Berisha* and *England* actions were consolidated for pre-trial proceedings into MDL 1358 based on the following common questions of fact identified by the Panel: i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government, and the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination.

---

[1] The common defendants in both *Berisha* and *England* are Atlantic Richfield Company, BP Amoco Corporation, Citgo Petroleum Corporation, Exxon Mobil Corporation, Chevron Corporation/Chevron USA, Inc., Shell Oil Company, and Texaco, Inc.

[2] The sixteen states include: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin, and Virginia.

7.      Subsequently, the Panel issued a Conditional Transfer Order (CTO-1) relative to the transfer of *Young* and *Sutton Farms, Inc. v. Amerada Hess Corporation, et al,* ("*Sutton Farms*") Case No. 1:00-3544 currently pending in the Southern District of Florida.

8.      On November 24, 2000, Exxon timely filed a Notice of Opposition to the Transfer of *Young v. Exxonmobil Oil Corporation.*

9.      As will be fully demonstrated in Exxon's Brief in Support of the Motion to Vacate Conditional Transfer Order (CTO-1) In MDL 1358 In Re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, the conditional transfer order as to *Young* should be vacated because there are no common questions of fact that predominate over individual questions of fact, transfer would not serve the convenience of the parties or witnesses, and transfer would not promote the just and efficient conduct of the consolidated actions.   The following facts that support vacating the transfer include:

A)   The only named defendant in *Young* is Exxon and the only causes of     action raised in the Complaint are for trespass and nuisance arising under Florida law. Therefore, the issues in *Young* will be confined to the discrete elements necessary to prove claims of trespass and nuisance under Florida law.   The global factual issues, previously identified by the Panel, of whether the oil companies knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government, or the public are irrelevant to the *Young* action.

B)   The discovery in *Young* will undoubtedly focus on the parcel of real property owned by each of the plaintiffs, the nature and amount of any groundwater contamination, when each plaintiff first learned of such contamination, the location of actual gasoline leaks or spills in the vicinity of such properties, the subject geology and hydrogeology, whether each parcel has been impacted, and to what extent.

3

C)   The *Young* action involves uniquely local issues, including state and local environmental and administrative concerns, that will unquestionably predominate and, in fact, have no relevance to the alleged contaminated sites in the geographic areas pertinent to *Berisha* and *England*.

D)   The only common thread between the *Berisha, England,* and *Young* actions is the issue of whether MTBE has contaminated water wells in the jurisdictions at issue. This common thread will largely involve discovery of scientific and medical knowledge that is "readily available" and could be exchanged through a shared discovery process between the pending MTBE actions.

10.   Therefore, as set forth, in part, above, consolidated and coordinated pretrial proceedings clearly would not serve the convenience of the parties or witnesses, and would not promote the just efficient conduct of MDL 1358.

Wherefore, the Defendant, Exxon Mobil, respectfully requests that the Panel vacate the Conditional Transfer Order (CTO-1) as it pertains to *Young*.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 2 9 2000

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE:                                   :

METHYL-TERTIARY BUTYL ETHER  :          MDL Docket No. 1358
("MTBE") LITIGATION
                                         :

*DEFENDANT, EXXON MOBIL CORPORATION'S,*
*BRIEF IN SUPPORT OF MOTION TO VACATE*
*CONDITIONAL TRANSFER ORDER (CTO-1)*
*IN MDL 1358 IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")*
*PRODUCTS LIABILITY LITIGATION*

**BALES & WEINSTEIN, P.A.**
David B. Weinstein, Esq.
Kimberly S. Mello, Esq.
1715 N, Westshore Blvd., Ste. 190
Tampa, Florida  33607
813-223-2206
Attorneys for Defendant
EXXON MOBIL CORPORATION

November 29, 2000

# TABLE OF AUTHORITIES
## CASES

1    *In re 21st Century Products, Inc. "Trilsphere" Contract Litigation,*
        448 F. Supp. 271 (J.P.M.L. 1978) ...................................................12, 18

2    *In re Asbestos Products Liability Litigation (No. VI),*
        771 F. Supp. 415 (J.P.M.L. 1991) .................................................15, 17

3    *In re Asbestos and Asbestos Insulation Material Products Liability Litigation ("In Re Asbestos"),*
        431 F. Supp. 906 (1977) ....................................................14, 15, 16, 17, 18

4    *In re Brandywine Associates Antitrust and Mortgage Foreclosure Litigation,*
        407 F. Supp. 236 (J.P.M.L. 1976) ..........................................................16, 17

5    *In re Cessna Aircraft Distributorship Antitrust Litigation,*
        460 F. Supp. 159 (J.P.M.L. 1978) ...................................................12

6    *In re Environmental Protection Agency Pesticide Listing Confidentiality Litigation,*
        434 F. Supp. 1235 (J.P.M.L. 1977) ..........................................................16

7    *In re Harmony Loan Company, Inc., Securities Litigation,*
        372 F. Supp. 1406 (J.P.M.L. 1974) ....................................................13

8    *In re Magic Marker Securities Litigation,*
        470 F. Supp. 862 (J.P.M.L. 1979) ...................................................18

9    *In re Ortho Pharmaceutical "Lippes Loop" Products Liability Litigation,*
        447 F. Supp. 1073 (J.P.M.L. 1978) ...................................................12

10   *In re Rely Tampon Products Liability Litigation,*
        533 F. Supp. 1346 (J.P.M.L. 1982) .................................................13, 14, 17

11   *In re Royal Typewriter Co. (Royal Bond Copier) Breach of Warranty Litigation,*
        435 F. Supp 925 (J.P.M.L. 1977) ..........................................................15, 16

12   *In re Texas Instruments, Inc. Employment Practices Litigation,*
        441 F. Supp 928 (J.P.M.L. 1977) ...................................................18

13   *In re Westinghouse Electric Corp. Employment Discrimination Litigation,*
        438 F. Supp. 937 (J.P.M.L. 1977) ....................................................14, 16

## STATUTES

28 U.S.C. § 1407…………………………………………………………………………...............4

## TREATISE

17 Moore's Federal Practice 3d § 112.04[1][e]…………………………………………………......15

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

```
_____
                                  :
IN RE:                            :
                                  :
METHYL-TERTIARY BUTYL ETHER :          MDL Docket No. 1358
("MTBE") LITIGATION
                                  :
_____:
```

### *DEFENDANT, EXXON MOBIL CORPORATION'S, BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-1) IN MDL 1358 IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION*

Exxon Mobil Corporation ("Exxon"), the defendant in *Young v. ExxonMobil Oil Corporation* ("*Young*"), No., 8:00-CV-1912-T-24C, currently pending in the Middle District of Florida respectfully submits this Brief in Support of Motion to Vacate Conditional Transfer Order (CTO-1) in MDL 1358 -- *In re Methyl Tertiary Butyl Ether ("MTBE') Products Liability Litigation* ("MDL 1358").  As set forth below, it would not be appropriate to transfer *Young* pursuant to 28 U.S.C. § 1407, because there are no common questions of fact that predominate over individual questions of fact, transfer would not serve the convenience of the parties or witnesses, and transfer would not promote the just and efficient conduct of the litigation.

4

## BACKGROUND

### A.      Procedural History of MDL 1358

On October 10, 2000, the Judicial Panel on Multidistrict Litigation ("Panel") transferred *Berisha v. Amerada Hess, et al.,* No. 00 CIV 1898 ("*Berisha*"), pending in the Southern District of New York and *England v. Atlantic Richfield Co., et al.,* Nos. 00-370-WDS, 00-371-DRH ("*England*") pending in the Southern District of Illinois, to MDL 1358 for the purpose of coordinated and consolidated pre-trial proceedings.  The *Berisha* and *England* actions raise state law claims against twenty oil company defendants for alleged dangers purportedly arising from the named defendants' manufacture, distribution, and/or use of methyl tertiary butyl ether ("MTBE") as an additive in gasoline.[1]   The Panel's Transfer Order was premised on the following common questions of fact: i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government, and the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination.

Subsequently, on October 30, 2000, the Panel entered a Conditional Transfer Order (CTO-1) relative to the transfer of *Young* and *Sutton Farms, Inc. v. Amerada Hess Corporation, et al.,* ("*Sutton Farms*") C.A. No. 1:00-3544, pending in the Southern District of Florida.  On November 24, 2000, Exxon timely filed a Notice of Opposition to the Transfer of *Young v. Exxonmobil Oil Corporation* effectively staying transfer of the action.   A Notice of Opposition to the Transfer of *Sutton Farms* was filed by Equilon, Motiva, Shell, and Texaco.  In accordance with Rule 7.4, Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Exxon is filing its Motion to Vacate the Conditional Transfer Order and this supporting Brief.

---

[1] The common defendants in both *Berisha* and *England* are Atlantic Richfield Company, BP Amoco Corporation, Citgo Petroleum Corporation, Exxon Mobil Corporation, Chevron Corporation/Chevron USA, Inc., Shell Oil Company, and Texaco, Inc.

**B.**    **Status of the *Berisha* and *England* Actions**

**1)**    **England**

The *England* action was filed against eleven oil company defendants, purportedly on behalf of putative subclasses of persons who own real property in sixteen states.[2]  The subclasses sought to be certified are the "Testing Sub-Class" and "Alternative Water Source Sub-Class."  The Testing Sub-Class consists of "all persons who own real property in the Reformulated Gasoline ("RFG") states that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE."  *See England Class Action Complaint Prayer for Relief* at pages 24-25.  The "Alternative Water Source Sub-Class" consists of  "all persons who own real property in the RFG states that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE."  *See England Class Action Complaint Prayer for Relief* at pages 24-25.

The *England* Complaint raises causes of action for negligence,[3] strict liability,[4] and conspiracy.[5]  The compensatory relief sought against the defendants, jointly and severally, is as follows:

---

[2]  The sixteen states include California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin, and Virginia.

[3]  In its negligence count, plaintiff's contend that the defendants had a duty to: a) ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to plaintiffs and the class; b) determine whether MTBE contains any latent defects and to warn plaintiffs, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees; c) warn plaintiffs and other who own or control a well that provides domestic water of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects; d) warn anyone who owns or operates a water well that it should frequently be tested for MTBE'; e) take reasonable actions to minimize or eliminate the harmful impacts and risks of their product; and f) report to the Federal Environmental Protection Agency their knowledge of the substantial health and environmental risks associated with MTBE, as required by section 8(e) of TSCA, 15 U.S.C. § 2607(e). *See England Class Action Complaint* at ¶ 57.

6

compensatory damages for the systematic sampling and analysis for detectable quantities of MTBE for of all persons who own real property in the RFG states that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes who wish to have their well tested and to provide for reimbursement to those persons who have had their system or well tested. Plaintiffs also request that this procedure be repeated at least once annually to provide testing to those who wish to have their well tested so long as defendants manufacture and/or distribute gasoline containing MTBE in the RFG states, and for at least five years thereafter; and

compensatory damages associated with supplying bottled water and/or providing a permanent hook up to the local municipal or private water system, or providing a filter system to redress the contamination by MTBE for those plaintiffs and class members who own a water supply well in the RFG states where the groundwater underlying such property is or has been contaminated with MTBE.

Awarding Plaintiff, England, compensation for the diminution in the value of his real property as a result of MTBE contamination; and

Awarding Plaintiff, Christiansen, compensation for the diminution in the value of her real property as a result of MTBE contamination.

The *England* Complaint identifies the following common questions of fact among the proposed class:

whether MTBE, if released into groundwater supplies, adversely impacts the groundwater;

whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate

whether defendants failed to adequately test MTBE, prior to its manufacture, distribution and/or sale, for risks to groundwater;

---

[4] In their strict liability claims plaintiffs allege that "at the time defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses..." *See England Class Action Complaint* at ¶ 63.
[5] In their conspiracy count, plaintiffs assert that the defendants formed joint task-forces and committees with the express purpose of providing information about MBTE to the public and to government agencies and that the defendants concealed the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties. *See England Class Action Complaint* at ¶ 67-75.

> whether defendants failed to provide adequate warning to people in the business of operating gasoline stations and storage tanks containing MTBE regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

> whether defendants fail to adequately warn plaintiffs, government agencies and/or the public regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

> whether defendants knew or should have known that MTBE is hazardous to groundwater aquifers and private water systems;

> whether defendants made false, misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the nation's groundwater;

> whether defendants conspired to conceal and/or misrepresent the characteristics of MTBE and the risks of MTBE use to public and private water supplies to plaintiffs, government agencies and/or regulators and the public at large; and

> whether defendants formed joint committees and/or task forces or other organizations which generated misrepresentations or omissions regarding MTBE and its properties and/or characteristics.

*See England Class Action Complaint* at ¶ 47.

### C. Berisha

The *Berisha* action was filed against fifteen oil company defendants seeking to certify a putative class of persons that, during the relevant times, had an interest in real property in New York State and relied on one or more wells on such property as a source of water for drinking, bathing or general "domestic purposes."   The causes of action plead in *Berisha* include strict liability for failure to warn, strict liability for design defect, strict liability for misrepresentations,[6] deceptive business[7] acts and practices in violation of GBL § 349, public

---

[6] In their strict liability claims plaintiff allege that defendants had a duty not to put on the market a product that posed a serious danger to groundwater; that defendants designed a defective product; and that defendants made misrepresentations on one or more material facts concerning the character and properties of the product. *See Berisha Second Amended Complaint* at ¶ 154-188.

nuisance,[8] negligence,[9] and fraud.[10]    The *Berisha* action seeks injunctive relief under all causes of action on behalf of the entire class "in the form of a court supervised statewide well testing and monitoring program to provide information to plaintiff and the class on the extent and location of groundwater contamination by the gasoline additive MTBE and a court supervised program to provide class members with a source of water free of MTBE contamination." *See Berisha Second Amended Class Action Complaint* at ¶ 3.    The common questions of fact identified in the *Berisha* complaint are similar to those alleged in *England* and include the following additional grounds, in pertinent part:

- whether gasoline containing MTBE is a defective product;

- what defendants knew about the problem of MTBE contamination of groundwater and when they knew it;

- whether defendants knew, or should have known, the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE;

- whether defendants intentionally promoted and marketed gasoline with MTBE to the general public in an effort to make it the industry standard and protect their market share and profits;

- whether defendants owed a duty to plaintiff, the plaintiff class, public officials, downstream handlers and the public generally to warn them of the changed properties of gasoline after the introduction of high levels of MTBE and the likely contamination of groundwater;

- whether defendants' conduct constituted reckless disregard for the safety of private water supplies and the rights of plaintiff and the plaintiff class;

---

[7] The deceptive business acts and practices allegations include defendants engaged in materially deceptive and misleading acts and practices in the distribution, marketing, and selling of gasoline containing MTBE.  *See Berisha Second Amended Complaint* at ¶ 189-192.

[8] The public nuisance claim includes allegations that defendants' manufacture, distribution, and marketing of MTBE unreasonably endangered or injured property, health, safety, and comfort causing inconvenience and annoyance. *See Berisha Second Amended Complaint* at ¶ 193-202.

[9] The negligence count alleges that defendants knew or should have known of MTBE's threat to groundwater and had a duty to warn. *See Berisha Second Amended Complaint* at ¶ 203-215.

[10] In their fraud count plaintiffs allege that defendants made material misrepresentations pertaining to MTBE. *See Berisha Second Amended Complaint* at ¶ 216-223.

· whether defendants violated New York laws regulating business practices as alleged;

· whether defendants, by virtue of their failure to warn of the risks to groundwater posed by gasoline containing MTBE, are strictly liable for the injunctive relief needed to address existing widespread contamination of and the pervasive threat to groundwater;

· whether defendants by virtue of misrepresentations in the promotion and sale of a dangerous product are strictly liable for the injunctive relief needed to address its contamination and the pervasive threat of contamination of groundwater;

· whether defendants engaged in materially deceptive and misleading acts and practices in the distribution, marketing and selling of gasoline contain MTBE in violation of GBL § 349;

· whether and to what extent New York's air pollution problem requires or is improved by the use of gasoline containing high levels of MTBE as compared to alternatives;

· whether defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the product's safety as alleged;

· whether defendants failed in any duty to remediate sites promptly where they know there is MTBE contaminated groundwater;

· whether defendants are liable under market share liability, alternative liability, enterprise liability, concert of action and/or joint and several liability.

*See Berisha Second Amended Complaint* at ¶ 150.

### D.   Young

The *Young* action was filed solely against Exxon seeking to certify a putative class of persons who own or have an interest in real property in the state of Florida, who reside near an Exxon gas station or other site at which there has been a reported release of gasoline, and who

rely on one or more water wells on such property, that has been contaminated or is threatened by contamination from the gasoline additive known as MTBE. *See Exhibit A, Complaint* at ¶ 1.[10]

As a result of the alleged "actual" or "threatened" contamination, the plaintiffs primarily seek mandatory injunctive relief on behalf of the class, including court supervised testing and monitoring managed by Court-appointed and Court-supervised trustees to, among other things, provide information to plaintiffs and the plaintiff class on the extent and locations of groundwater contamination by methyl tertiary-butyl ether ("MTBE") to collect data on the flow and parameters of MTBE contamination. *See Exhibit A, Complaint* at ¶ 2.

Unlike the *Berisha* and *England* actions, the only causes of action plead are for trespass and nuisance under Florida law. Consequently, the only commonality between the causes of action in *Young* and MDL 1358 is the public nuisance claim which is contained only in *Berisha*. In fact, the common questions of fact identified by *Young* in the Complaint include only the following:

- whether and when defendants knew, or should have known, that MTBE posed a serious threat to human health and to the environment;

- whether defendants knew, or should have known, of the environmental hazards posed by MTBE;

- whether MTBE threatens to contaminate or continue to contaminate the property of plaintiff and the class members;

- whether defendants' conduct amounts to trespass or nuisance, or a violation of any state or federal statute.

*See Exhibit A, First Amended Complaint* at ¶ 94.

---

[10] The original plaintiff and class representative was Paul D. Young. Subsequently, a First Amended Complaint was filed that essentially, substituted Rebecca E. Young for Paul D. Young as the class representative and incorporated the allegations of the initial complaint. Therefore, all paragraph references will refer to the numbered paragraphs set forth in the initial complaint attached as Exhibit A.

Exxon's response to the Class Action Complaint will be served on November 30, 2000. Exxon intends to seek dismissal on multiple grounds, including lack of subject matter jurisdiction, preemption, and failure to state a claim upon which relief can be granted. Unlike the *Berisha* and *England* actions in which discovery is, and has been, ongoing, no discovery has been conducted in *Young* nor has a Case Management Order been entered.

It is against this background that Exxon respectfully moves the Panel to vacate the Conditional Transfer Order (CTO-1). Exxon's legal argument is set forth below.

## ARGUMENT

### I.  THE CONDITIONAL TRANSFER ORDER (CTO-1) SHOULD BE VACATED BECAUSE COMMON QUESTIONS DO NOT PREDOMINATE OVER INDIVIDUAL QUESTIONS OF FACT AND CONSOLIDATION WOULD NOT SERVE THE CONVENIENCE OF THE PARTIES OR WITNESSES.

To obtain a transfer pursuant to 28 U.S.C. § 1407, courts typically require that the actions involve common questions of fact, that transfer will serve the convenience of the parties and witnesses, and that it will promote the just and efficient conduct of the actions to be consolidated. *See* 28 U.S.C. § 1407(a). The mere showing of common questions of fact is not sufficient, in and of itself, to warrant transfer. *See In re Cessna Aircraft Distributorship Antitrust Litigation*, 460 F. Supp. 159, 161-62 (J.P.M.L. 1978) (denying transfer despite commonality of questions of fact).

Importantly, when only a small number of actions are involved, the Panel has denied transfer unless the common factual questions are sufficiently complex, and the accompanying discovery will be so time-consuming that transfer is nonetheless justified. *See In re 21st Century Products, Inc. "Trilsphere" Contract Litigation*, 448 F. Supp. 271, 272-273 (J.P.M.L.1978) (denying transfer of two actions involving some common questions of fact in which there were only two common defendants and five non-common defendants); *In re Ortho Pharmaceutical "Lippes Loop" Products Liability Litigation,* 447 F. Supp. 1073, 1074 (J.P.M.L. 1978) (common

12

factual issues in three actions alleging strict liability, negligence, and breach of warranty claims arising from use of intrauterine contraceptive devices not sufficiently complex and accompanying discovery not so time-consuming as to justify transfer).

> **A.    The Young action involves markedly different interests, requests different relief, and is at a different stage of development than the Berisha and England actions.**

When actions "seek to protect markedly different interests, request different relief, and are at different stages of development," transfer will be denied. *See In re Harmony Loan Co., Inc., Securities Litigation*, 372 F. Supp. 1406 (J.P.M.L. 1974). The *Young* action was brought on behalf of a purported class seeking injunctive relief for actual or threatened groundwater contamination. *Young* involves a single defendant, Exxon, and is limited to claims for trespass and nuisance under Florida law.[11] Because the only causes of action plead are for trespass and nuisance, *Young* is limited to the following issues: 1) whether Exxon committed a trespass by allegedly intentionally interfering with plaintiffs' exclusive possessory interest in their land by delivering MTBE to leaking underground storage tanks; and 2) whether Exxon, by allegedly delivering MTBE to leaking underground storage tanks, created a nuisance by interfering with the plaintiffs' use and enjoyment of their land.

In contrast, neither *Berisha* nor *England* involve claims of trespass and only *Berisha* involves a nuisance claim. On the contrary, claims of conspiracy, misrepresentation, fraud, and strict liability predominate *Berisha* and *England*. The *Young* action simply does not involve the overriding factual issues, previously identified by the Panel in its Transfer Order, of whether the defendant oil companies knew about and misrepresented the nature of MTBE, and conspired to

---

[11] Plaintiff also claims in its class action complaint an intent to amend the complaint to bring a cause of action under the Resource Conservation and Recovery Act ("RCRA") once the statutory notice period expires. However, to date, plaintiff has not sought to add a RCRA claim to the pending lawsuit. Moreover, if a RCRA claim is subsequently added, it would be the only RCRA claim in the MDL lawsuits. This provides further support that consolidation is not warranted.

13

market MTBE without disclosing its risks to downstream users, the federal government, or the public. In fact, the following factual issues in the *Berisha* and *England* actions have absolutely no relevance to the *Young* action:

- whether the private water supplies of plaintiffs and all residents of the seventeen states who are within the putative class have been contaminated and damaged by MTBE.

- whether the *Berisha* defendants have violated New York's common law and statutes regulating business practices.

- whether and to what extent New York's air pollution problem requires the use of gasoline containing MTBE.

- whether the defendants are liable under the various product liability theories raised.

- whether there are facts sufficient to prove a conspiracy under the laws of each of the states.

- whether the defendants provided sufficient product warnings in the sale or distribution of MTBE products in each state.

- whether defendants made representations regarding MTBE in each state.

Therefore, the consolidation and coordination of the *Young* action with MDL 1358 would encumber the *Young* action with a myriad of issues, including voluminous discovery pertaining to misrepresentation, conspiracy, fraud, and strict liability that have absolutely no relevance to *Young*. Likewise, the MDL 1358 proceeding would be encumbered with the myriad of issues involved in the *Young* trespass and nuisance claims brought under Florida law that do not have any bearing on the MDL proceeding. This argument is particularly compelling in light of the fact that discovery is ongoing in the MDL proceeding and has yet to commence in *Young*.

**B. The discovery that will be conducted in the Young action involves individual factual issues that predominate over common ones.**

The Panel has repeatedly denied transfer when common questions of fact do not predominate over the individual questions of fact in each action. *See In re Rely Tampon*

14

*Products Liability Litigation* ("*In re Rely Tampon*"), 533 F. Supp. 1346, 1347 (J.P.M.L.

1982)("*In re Rely Tampon*"); *In re Asbestos and Asbestos Insulation Material Products Liability*

*Litigation ("In re Asbestos")* 431 F. Supp. 906 (1977). Transfer is not warranted merely because

the case being considered for consolidation addresses a similar predominant theme; e.g., asbestos

exposure, employment discrimination, or, as here, MTBE contamination, when the discrete

factual issues predominant over the broader "common thread" of the various pending actions.

*See In re Westinghouse Electric Corp. Employment Discrimination Litigation,* 438 F. Supp. 937

(J.P.M.L. 1977) (transfer denied where allegations of specific discriminatory acts at the

individual facilities relating to the named plaintiffs predominated over the common issue of

"division-wide racial discrimination"); *See also In re Royal Typewriter, Co. (Royal Bond Copier)*

*Breach of Warranty Litigation,* 435 F. Supp 925 (J.P.M.L.1977) (individual issues predominated

because there were separate contractual relationships involved in each action and, as such, joint

discovery would neither serve the convenience of the parties nor promote the just and efficient

conduct of the litigation).

    The principle that transfer is inappropriate when individual issues predominate was

clearly demonstrated in *In re Asbestos,* where the Panel declined to transfer and consolidate 103

actions involving claims by workers who were exposed to asbestos dust.[12] *In re Asbestos,* 431 F.

Supp. at 906. The Panel was unpersuaded that the common thread of asbestos exposure was

enough to grant the motion because of the predominance of individualized issues including:

---

[12] The asbestos cases were later transferred and consolidated because the circumstances of the actions had changed. In re Asbestos Products Liability Litigation (No.VI), 771 F. Supp 415 (J.P.M.L. 1991); 17 Moore's Federal Practice 3d § 112.04[1][e]("[I]n 1977 the Panel declined to transfer asbestos litigation because the Panel was not convinced that such cases raised sufficient common questions of fact. By 1991, however, the number of asbestos cases in the federal courts had grown to more than 26,000. At that point, the Panel decided that transfer … was appropriate. In the 1991 opinion, the Panel … decided that changed circumstances had altered the scene dramatically. The Panel was 'persuaded that this litigation has reached a magnitude, not contemplated in the record before us in 1977, that threatens the administration of justice and that requires a new, streamlined approach.'" Significantly, in ordering transfer, the Panel did not repudiate the bases for its prior denials of transfer, but instead premised its decision on the fact that the overwhelming number of pending cases "has reached a magnitude, not contemplated in the record

specific causation, the actual injuries incurred by each plaintiff, and the fact that liability in the actions would be based on state substantive law. *Id.* at 909-910. "As a result, transfer would not promote the parties' and witnesses' convenience regarding discovery." *Id.* at 910. *See also Environmental Protection Agency Pesticide Listing Confidentiality Litigation, 434* F. Supp. *1235* (J.P.M.L.1977) 434 F. Supp. at 1236 (individual questions of whether data is exempt from disclosure predominated over the common question of EPA's interpretation of the disclosure statute and transfer would not serve the convenience of the parties or promote the just and efficient conduct of the actions).

Here, the only common thread between the MDL 1358 cases and *Young* is the issue of ___ whether MTBE has contaminated water wells in the relevant jurisdictions. The discovery in *Young* will undoubtedly focus on the parcel of real property owned by each of the plaintiffs, the nature and amount of any groundwater contamination, when each plaintiff first learned of such contamination, the location of actual gasoline leaks or spills in the vicinity of such properties, the subject geology and hydrogeology, whether each parcel has been impacted, and to what extent. Thus, *Young*, like the *Asbestos, Westinghouse,* and *Royal Typewriter* cases, involves discovery of many more different facts, documents, and witnesses on causation and damages than ones common to the *Berisha* and *England* actions. Therefore, the mere common thread of "MTBE ___ contamination" is insufficient to justify transfer.

C.     Since *Young* is a predominately local action, transfer should be denied.

Transfer of a predominately local action will be denied if the action is not sufficiently complex or the accompanying discovery so time-consuming that it overcomes the "inconvenience to the litigants and their witnesses, as well as the burden on the judiciary, of having the predominantly local ... action transferred to an out-of-state forum." *In re Brandywine*

before us in 1977 that threatens the administration of justice and that requires a new, streamlined approach." *In re*

16

*Associates Antitrust and Mortgage Foreclosure Litigation*, 407 F. Supp. 236, 238 (J.P.M.L. 1976). The Panel has been particularly reluctant to deny transfer when there are only a small number of actions involved and the issues are primarily based on state law concerns. In *In re Brandywine Associates Antitrust and Mortgage Foreclosure Litigation*, 407 F. Supp. 236 (J.P.M.L. 1980), the Panel denied transfer of three separate actions by the same plaintiff alleging related conspiracy claims under state law in connection with transactions involving financing, management, and foreclosures of real property. Although the Panel recognized that common questions of fact existed with respect to the nature, existence, and operation of the conspiracy, it held that the Plaintiff failed to meet the criteria for transfer of such a small number of actions under section 1407, stating:

> Only three actions are involved here. For the purposes of this litigation, the inconvenience to the party whose actions are proposed for transfer can be derived from the realization that the foreclosure aspect of the Florida and Illinois actions involves mostly, if not entirely, local, factual, legal and potentially administrative issues.

Here, too, the predominantly local aspects of *Young* demonstrate that coordinated pretrial proceedings would be inappropriate. Importantly, since the *Young* action solely involves water wells located in Florida, uniquely local issues, including state and local environmental and administrative concerns, will unquestionably predominate and, in fact, have no relevance to the alleged contaminated sites in the geographic areas pertinent to *Berisha* and *England*. Further, factors involving Exxon's specific role in the manufacture, production, and/or distribution of gasoline containing MTBE in Florida is separate from the twenty oil company defendants' involvement in the manufacturing, distribution, and production in the states at issue in *Berisha* and *England*. In nature there will be no overlap between *Berisha* and *England*. Additionally, due to Florida's unique environmental issues, the discovery witnesses will be local. Therefore,

---

*Asbestos Products Liability Litigation* (No. VI), 771 F.Supp. 415, 417-18 (J.P.M.L. 1991).

because local issues will predominate the discovery process, transfer would not promote the parties' and witnesses' convenience regarding discovery. *See In re Rely Tampon Products*, 533 F. Supp. at 1347; *In re Asbestos*, 431 F. Supp. at 909.

D.   **Common Issues of Fact Regarding the Chemical Properties of MTBE and the History of its Use as a Fuel Additive Are Not Sufficiently Complex to Warrant Transfer.**

Exxon, as noted earlier, recognizes that the MTBE contamination is a "common thread" shared with the *Berisha* and *England* actions and was, in fact, cited as a basis for transfer in the Panel's initial Transfer Order. However, the Panel has previously denied transfer when the only questions of fact common to the actions relate to readily available scientific and medical knowledge. *See In Re Asbestos,* 431 F. Supp. 906 (J.P.M.L. 1977) (only common question was scientific and medical knowledge concerning the risk of exposure to asbestos). The compelling factor in denying transfer was the fact that pertinent literature on the subject was readily available.

Moreover, when there are only a small number of cases presented for transfer consideration, the Panel has recognized a preference for alternatives to consolidation under §1407 that are far less burdensome and inconvenient to the parties, yet still further the goal of maximizing efficiency in discovery.   Such possible alternatives include noticing particular depositions concurrently in both actions, thereby making the  single deposition applicable in each action, stipulating that any discovery relevant to both actions may be used in each action, and/or seeking an order from the two district courts directing the parties to coordinate particular pretrial efforts. *See In re Magic Marker Securities Litigation,* 470 F. Supp. 862,865-66 (J.P.M.L. 1979*); In re Texas Instruments, Inc. Employment Practices Litigation,* 441 F. Supp. 928, 929; *In re 21st Century Products, Inc. "Thrilsphere" Contract Litigation,* 448 F. Supp. 271, 273 (J.P.M.L. 1978).

In the present case, the scientific and medical knowledge pertaining to the risks of MTBE are readily available.  Undoubtedly, the scientific and medical studies conducted by governmental organizations, including the EPA, and relevant state and local state agencies, in approving the use of MTBE as fuel additives are public knowledge and are "readily available."  Moreover, since *Young* involves claims solely against Exxon, any scientific or medical studies that Exxon conducted or obtained also also "readily available."  Finally, to the extent that scientific and medical studies were conducted by third parties, including other oil companies, these documents are also "readily available" through the discovery process.  In fact, such documents already have been cited by *Young* in her Complaint.[13]  Therefore, the common factual scientific and medical issues are not sufficiently complex to warrant transfer of the *Young* action for consolidated and coordinated proceedings.  Rather, to the extent that such discovery should be cooperatively shared, the Court or the parties can readily devise a method for exchanging the pertinent discovery.  This would be far less burdensome and inconvenient to the parties, yet still further the goal of maximizing efficiency in discovery.

## CONCLUSION

The mere fact that *Berisha, England,* and *Young* involve claims for relief based on alleged MTBE contamination is insufficient to warrant transfer.  The only discovery that likely will be conducted in all actions involve the scientific and medical knowledge concerning MTBE as a gasoline additive.  This documentation is not only readily available but could be cooperatively

---

[13] E.g., Peter Garrett, Marcel Moreau & J.D. Lowry. "MTBE as a Ground Water Contaminate," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water Prevention, Detection, and Restoration, Houston, TX, November 14-14, 1986[Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238; The presence of MTBE and other gasoline compounds in Maine's drinking water:  A preliminary Report: Maine Dept's Of Human Service Environmental Protector and Conservation. (Oct 13, 1988)(the"Maine Report"). Testing Consent Order on Methyl Tertiary-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988); "Achieving Clean Air and Clean Water.  The Report of the Blue Ribbon Panel on Oxygenates in Gasoline, "(Environmental Protection Agency Sept. 15, 1999); "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996);

shared between parties to the pending actions without consolidation for pre-trial purposes. It is clear that one of the primary reasons that the *Berisha* and *England* actions were transferred to MDL 1358 was because the Panel recognized that voluminous discovery would be conducted on the issue of whether <u>defendants</u> knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government and the public. However, in the *Young* action no discovery will be necessary on this issue because no causes of action for conspiracy, strict liability, fraud or misrepresentation have been raised by *Young*. Exxon, as the sole defendant in *Young,* should not be forced to participate in voluminous discovery that has no bearing on the plaintiffs class action litigation. Therefore, Exxon, respectfully request that based on the argument and authorities cited, the Panel vacate the Conditional Transfer Order as it pertains to the *Young* action.

Dated:  November 29, 20000

Respectfully submitted,

David B. Weinstein, Esq.
Florida Bar No. 604410
Kimberly S. Mello, Esq.
Florida Bar No. 0002964
BALES & WEINSTEIN, P.A.
1715 N. Westshore Blvd.
Suite 190
Tampa, Florida  33607
(813)223-2206

ATTORNEYS FOR
EXXON MOBIL CORPORATION

FILED

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA

as per Chambers

00 OCT 31 AM 10: 52

DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

PAUL DOUGLAS YOUNG, On Behalf of
Himself and All Others Similarly Situated,

    Plaintiff,

v.

EXXONMOBIL OIL CORPORATION,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

**CLASS ACTION**

**8:00-CV-1912-T24C**

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT

COMES NOW, the plaintiff in the above-styled action and, in accordance with Rule 15(a) of the Federal Rules of Civil Procedure, amends the original complaint as of right prior to the filing of a responsive pleading by the defendant, amending as follows:

    1.    Plaintiff substitutes Rebecca Young for Douglas Young as Plaintiff and Class Representative, and substitutes her name for Douglas Young's name in the original complaint, bringing all the claims brought therein on her behalf and on behalf of all those similarly situated, as described in the original complaint.

    2.    Plaintiff, Rebecca Young, incorporates by reference the entire original complaint, including all allegations, claims, and factual contentions contained therein.

    3.    Individual and Representative Plaintiff Rebecca Young is an adult citizen and is, and at all times mentioned in this Amended Complaint and the Original Complaint was, a resident of Temple Terrace in Hillsborough County, Florida. During relevant times mentioned in this Amended Complaint and the Original Complaint she had an interest in property on which she resided. Plaintiff Rebecca Young relied on a well on such property as a source of water for

RECEIVED
CLERK'S OFFICE
2000 NOV 29 P 3:34
MDL PANEL
MULTIDISTRICT
LITIGATION
SCANNED



EXHIBIT

A

5

drinking, bathing, or general domestic purposes. Water samples taken from his well showed that her water was contaminated with MTBE well above state action levels.

4.    Plaintiff Rebecca Young, and all others similarly situated, has been injured by MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation or fear of such contamination. Her injuries include the need to periodically test her water; diminished use and enjoyment of the water and property; diminished property value due to actual contamination and/or stigma and the widespread understanding or reasonable perception that well water is now less safe than other water supplies; and the cost of well water clean-up and replacement water.

5.    Plaintiff, and all others similarly situated, face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment contaminates more wells, and continues to contaminate and/or exacerbate the contamination of Plaintiff's well and property.

6.    As a direct and proximate cause of the wrongful acts described herein, Plaintiff Rebecca Young, and all others similarly situated were injured, and are entitled to the relief requested in the original complaint.

WHEREFORE, ABOVE PREMISES CONSIDERED, the plaintiff hereby amends the original complaint as of right in accordance with Rule 15(a) of the Federal Rules of Civil Procedure.

DATED: *Oct 10*            , 2000          Respectfully submitted,

Richard W. Bell
Florida Bar # 145765
2522 Valleydale Road, Suite 100
Birmingham, Alabama 35244
Telephone: (205) 980-4322

[ADDITIONAL COUNSEL]

CORY, WATSON, CROWDER & DEGARIS
Ernest Cory
C. Anthony Graffeo
2131 Magnolia Avenue
Birmingham, AL 35205
Telephone: (205) 328-2200

CROWLEY & DOUGLAS
Timothy Crowley
1301 McKinney, Suite 3500
Houston, TX 77010
Telephone: (713) 651-1771

LIEFF, CABRASER, HEIMANN &
BERNSTEIN
Elizabeth J. Cabraser
Morris Ratner
Scott P. Nealey
Lauri A. Andrus
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

REICH & BINSTOCK
Dennis C. Reich
4265 San Felipe, Ste. 1000
Houston, Texas 77027
Telephone: (713) 622-7271

WHATLEY DRAKE
Joe R. Whatley, Jr.
Jack Drake
505 North 20th Street
1100 Financial Center
Birmingham, AL 35203
Telephone: (205) 328-9576

WELLER, GREEN, McGOWN & TOUPS
Mitchell A. Toups
Nations Bank Bldg.
2615 Calder St., Ste. 400
Beaumont, TX 77701
Telephone: (409) 838-0101

NESS, MOTLEY, LOADHOLT,
RICHARDSON & POOLE
A. Hoyt Rowell
T. Christopher Tuck
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9200

**SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS:**

ExxonMobile Corporation
% Corporation Service Company
1201 Hays Street
Tallahassee, Florida 2525

RICHARD W. BELL
2522 VALLEYDALE ROAD, SUITE 100
BIRMINGHAM, ALABAMA 35244
205-980-4322
FLORIDA BAR # 145765

Attorney for Plaintiff
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| PAUL DOUGLAS YOUNG, on behalf of himself and all others similarly situated, | No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF FOR TRESPASS, NUISANCE AND CONSPIRACY** |
| vs. | |
| EXXONMOBIL OIL CORPORATION, | |
| Defendant. | |

Plaintiff Paul Douglas Young, on behalf of himself and all others similarly situated, by and through his attorneys, for his complaint against Defendant, alleges

## I.   NATURE OF THE ACTION

1.   Plaintiff brings this case as a class action on behalf of a class of persons who own or have an interest in real property in the State of Florida who reside near an ExxonMobil gas station or other site at which there has been a reported release of gasoline, and who rely on one or more water wells on such property that has been contaminated or is threatened by contamination from the gasoline oxygenate and additive known as MTBE.

2.   Plaintiffs seek mandatory injunctive relief on behalf of the class, including Court-supervised testing and monitoring, managed by Court-appointed and Court-supervised trustees, to, among other things, provide information to Plaintiffs and the Plaintiff class on the extent

014 MTB

-1-

1   and location of groundwater contamination by methyl tertiary-butyl ether ("MTBE") to collect data

2   on the flow and parameters of MTBE contamination.

3          3.      Defendant manufactured and/or distributed MTBE and gasoline containing

4   MTBE, conspired to conceal the dangerous nature of MTBE, committed trespass by unlawfully

5   interfering with class members possession of their property, committed nuisance through the creation

6   of, distribution of, and continuous presence of MTBE contamination in class members water wells,

7   violated the Resource Conservation Recovery Act ("RCRA"), and is liable for the contamination of

8   water wells across the State of Florida.

9          4.      This case concerns an environmental hazard arising from the introduction and

10  use of MTBE as a gasoline additive.  MTBE is an aliphatic ether that does not occur naturally.  It is

11  produced from methanol and isobutylene, a waste by-product of the gasoline refining product.

12  MTBE is highly soluble in water and does not adhere to soil particles.  These characteristics allow

13  MTBE to travel rapidly through soil, mix with water, and quickly contaminate underground aquifers.

14  As a result of Defendant's conduct, as described herein, MTBE is a pervasive contaminent that

15  poses a substantial and continuing threat to Plaintiffs and the class.

16         5.      MTBE is a known animal carcinogen.  The U.S. Environmental Protection

17  Agency ("EPA") classifies it as a possible human carcinogen.  MTBE can give otherwise pure water

18  a foul turpentine-like taste and odor, rendering it unfit for consumption.

19         6.      Underground Storage Tanks ("USTs") are commonly used to store gasoline

20  throughout the United States.  Leaking USTs present a serious environmental concern, which

21  Defendant and other oil companies have known about for decades.  Defendant has delivered gasoline

22  containing MTBE to leaking USTs in Florida, and has otherwise released MTBE into the

23  environment.  Defendant provided no warning of the risk involved with the storage, transport,

24  handling, retail sale, storage, use and response to spills of such gasoline, to the Plaintiffs and the

25  Class, the general public, or public officials.

26         7.      Since at least the beginning of the last century, the danger posed by leaking

27  USTs has been known to those in the oil industry, including the Defendant.  In 1905, the United

28

1    States Geological Survey documented the widespread problems associated with contamination from

2    petroleum wastes. Because of the danger such contamination presented, in 1913 the National Board

3    of Fire Underwriters and the National Fire Protection Association ("NFPA") warned the oil industry

4    of the danger associated with underground storage tanks used to hold petroleum products. In 1941,

5    the NFPA again warned the oil industry of the dangers posed by leaking underground storage tanks.

6    As the Association wrote,

7    The purpose of this brochure is to outline briefly a number of
     informative cases of leakage from underground gasoline storage tanks
8    and to suggest the good practices for the installation of tanks and for
     the location of sources of leakage.

9

10   There are in this country more than 1,000,000 underground tanks
     which may contain some 400,000,000 gallons of gasoline. Experience
     seems to indicate that as the age of underground tanks increases, the
11   probability of leakage increases. This is due to a large extent to the
     corrosive action of certain soils . . .

12

13    8.    The oil industry, including Defendant, has extensively discussed and

14   considered internally the risks posed by leaking USTs and by MTBE. Defendant was well aware of,

15   and took part in, these discussions. Defendant knew of their content and applicability to the various

16   UST systems they owned.

17    9.    Defendant knew of the threats posed by MTBE to drinking water supplies and

18   was aware that the presence of MTBE would exacerbate the threat associated with leaking USTs

19   across the country.

20    10.    Nevertheless, Defendant concealed the risk and dangers of contamination

21   from plaintiffs and the Class.

22    11.    By placing MTBE in the environment, through known leaking USTs and

23   otherwise, and by failing to adequately determine the scope of the resulting MTBE contamination,

24   and failing remediate the resulting damage to neighboring property owners and water systems,

25   Defendant presented and continues to present an imminent and substantial endangerment to human

26   health and the environment.

27   II.    JURISDICTION, VENUE, AND PARTIES TO THE ACTION

28   013:MTB

12. The parties are residents of different states. and plaintiffs seek individually relief worth in excess of $75,000. The relief sought is within the subject matter jurisdiction of this Court. This court has subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. §1332. Once the complaint is amended after the expiration of the statutory notice period to include a claim under RCRA, the Court will also have federal question jurisdiction.

13. Venue is proper in this district, pursuant to 28 U.S.C. § 1391 (a)(1), as a substantial part of the events or omissions giving rise to plaintiff's claim occurred here, and plaintiff's property is located here. This Court also has supplemental jurisdiction over the claims of any non-named class members whose damages do not exceed $75,000.00 pursuant to 28 U.S.C. § 1367.

14. The Court has personal jurisdiction over non-domiciliary Defendant because Defendant did and does business in Florida and/or contracts to supply goods and services to the State.

15. Individual and Representative Plaintiff Young is an adult citizen and is, and at all times mentioned in this Complaint was, a resident of Temple Terrace in Hillsborough County, Florida. During relevant times herein he had an interest in property on which he resided. Plaintiff Young relied on a well on such property as a source of water for drinking, bathing, or general "domestic" purposes. Water samples taken from his well showed that his water was contaminated with MTBE well above state action levels.

16. Plaintiff, and all others similarly situated, has been injured by MTBE contamination of groundwater and/or the threat. anticipation and reasonable expectation or fear of such contamination. His injuries include the need to periodically test his water: diminished use and enjoyment of the water and property: diminished property value due to actual contamination and/or stigma and the widespread understanding or reasonable perception that well water is now less safe than other water supplies: and the cost of well water clean-up and replacement water.

17. Plaintiff. and all others similarly situated. face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment

013 MTB

1    contaminates more wells. and continues to contaminate and/or exacerbate the contamination of

2    Plaintiff's well and property.

3          18.    Defendant ExxonMobil is a corporation, organized and existing under the

4    laws of the State of New Jersey, with its principal place of business in Texas, and did or does

5    business in the State of Florida. ExxonMobil is a successor in interest to both Exxon and Mobil Oil

6    Company.

7          19.    During the relevant time period, Defendant was engaged in one or more

8    phases of the petroleum business, from the exploration for and extraction of crude oils to the refining

9    and/or the distribution marketing and retail sale of gasoline, including the design and manufacture of

10   gasoline containing MTBE sold throughout the State of Florida.

11         20.    Defendant's conduct, as alleged herein, threatens Plaintiff and all others

12   similarly situated in this state with the contamination or further contamination of their property and

13   water wells. MTBE travels so aggressively, once released into the environment, and spills or leaks

14   are such a regular occurrence throughout the state, that, over the years, Defendant's conduct has

15   created a state-wide threat and environmental disaster. Only the requested class-wide injunctive

16   relief can provide a meaningful remedy to plaintiff and the class.

17         21.    Defendant's conduct included acts and practices that operated as a fraud upon

18   Plaintiff and all others similarly situated, public officials, and the general public. This conduct

19   included false statements of material fact, or the making of statements which, in the light of the

20   circumstances, omitted material facts necessary to make such statements not misleading.

21         22.    Defendant acted in concert with other oil companies to, inter alia, create a

22   market for and promote sales of gasoline containing MTBE. a product Defendant knew to be

23   dangerous. while omitting and concealing the extraordinary risks to groundwater posed by the

24   product.

25         23.    As a direct and proximate cause of the wrongful acts described herein.

26   Plaintiff and all others similarly situated were injured. and are entitled to the requested relief. Money

27

28   014.MTD

1   cannot provide the relief sought:  comprehensive and periodic testing, and, if appropriate, supply of

2   alternative water and/or remediation.

3       24.    In this Complaint, whenever it is alleged that a Defendant did or is doing any

4   act or thing, it is meant that such Defendant's officers, agents, servants, employees, attorneys,

5   predecessors. or representatives did or are doing such act or thing.

6   **III.    FACTUAL ALLEGATIONS OF REPRESENTATIVE PLAINTIFF YOUNG**

7

8       25.    MTBE is many times more soluble in water than the other components of

9   gasoline.  Because MTBE is "hydrophilic," or water-seeking, it travels far more rapidly through soils

10  to groundwater.  Whenever gasoline with MTBE leaks, spills or otherwise is released into the

11  environment, the MTBE quickly reaches the water table and soon contaminates the wells that draw

12  from the affected underground aquifers.

13      26.    When gasoline with MTBE is spilled or leaks, MTBE in the fuel, unlike other

14  toxic components, does not adhere to the soil particles but instead travels rapidly through soil,

15  mixing with water and soon contaminating underground aquifers. The greater the MTBE content of

16  gasoline the higher the risk to water, but even small concentrations of MTBE create an enhanced

17  threat to groundwater.

18      27.    MTBE also does not readily break down and biodegrade in the ground or

19  groundwater.  Research shows that it will persist in groundwater for decades, far longer than other

20  components of gasoline.

21      28.    MTBE is volatile. so during transport. storage and fueling some quantity

22  evaporates into the atmosphere. where it will mix with water vapor and return in rainfall.

23      29.    MTBE was first added to gasoline in or around 1979.  In the years since its

24  introduction. the additive has rendered wells throughout Florida unfit for normal uses.  Gasoline is

25  always the source of the MTBE contamination. but most wells contaminated with MTBE show

26  either none or mere trace amounts of the other components of gasoline.  In other words. the addition

27  of MTBE created an enhanced risk of groundwater contamination not posed by conventional

28

014.MTB

1 gasoline. Defendant provided no warning of this risk to public officials, persons and entities

2 engaged in the storage, transport, handling, retail sale, use and response to spills of such gasoline

3 (hereinafter referred to as "Downstream Handlers"), or to the general public.

4         30.    In addition to the knowledge gained from its own and other companies'

5 research into the properties of MTBE, including its environmental fate and effects, Defendant knew

6 of other research that confirmed that MTBE was a serious and enhanced threat to groundwater.

7         31.    For example, as early as 1980, Defendant learned of an incident in Rockaway,

8 New Jersey, where MTBE was discovered to have caused substantial groundwater contamination

9 and damage to drinking water supplies serving thousands of water consumers.

10         32.    A 1986 report by Peter Garrett, et al. (the "Garrett Report") analyzed MTBE

11 groundwater contamination at two sites in Maine, and was known to Defendant.[1]/ The Garrett

12 Report showed that high levels of MTBE contamination could result from spills of gasoline with low

13 concentrations of MTBE. It reported findings of extremely high concentrations of MTBE in the

14 water and relatively low or no concentrations of other gasoline components. The Garrett Report

15 concluded that MTBE, because of its solubility in water and recalcitrance to degradation and clean-

16 up, posed an unusual threat to groundwater.

17         33.    The Garrett Report was widely circulated in the oil industry at the time it was

18 published, confirming that Defendant knew that when MTBE is added to gasoline, the properties of

19 the additive greatly enhance the threat of groundwater contamination posed by gasoline.

20         34.    Defendant, acting individually and through trade associations such as the

21 American Petroleum Institute ("API"), an agent of Defendant, took issue with the Garrett Report,

22 even though it knew that its findings regarding the threat that gasoline containing MTBE poses to

23 groundwater were correct. API, after disseminating the report to Defendant and in response to its

24 wishes, made publication of the report conditional on the deletion of a recommendation that MTBE

25        [1]/Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate," in
NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water —
26   Prevention, Detection, and Restoration. Houston, TX, November 12-14, 1986 [Proceedings]; Dublin,
OH, National Water Well Ass'n, pp. 227-238.
27

28   014 MTB

1   not be allowed in gasoline, language that would have served as a warning of the groundwater

2   contamination problem.

3           35.    Privately, however, Defendant was aware and was forced to acknowledge that

4   the major findings of the Garrett Report were correct.

5           36.    For example, on or around May 6, 1987, Defendant Mobil's laboratory

6   prepared and circulated a memo that stated: "We agree that MTBE in gasoline will dissolve in

7   groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further

8   stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found,

9   we feel it is important for you to be aware of MTBE. From an environmental and engineering

10  standpoint, you may need to be informed of its presence to assist you in responding effectively to

11  regulatory and remedial requirements."

12          37.    Defendant's awareness and private admissions of the groundwater-spoiling

13  propensity of MTBE did not prompt it to give any warnings to public officials, Downstream

14  Handlers or the general public. Defendant's acts in response to the Garrett report, including those of

15  its agent A.P.I., amounted to material misrepresentations of the safety of gasoline with MTBE and/or

16  fraudulent concealment of a known defect.

17          38.    Despite its superior knowledge of the groundwater threat posed by MTBE,

18  Defendant helped plan and administer a misleading campaign to convince Americans, including the

19  Plaintiff and people in Florida, that MTBE was an appropriate oxygenate.

20          39.    On or around December 17, 1986, the EPA held a Public Focus Meeting to

21  hear comments on the need for additional testing of MTBE. The Minutes of the meeting show that

22  government officials expressed concern over the need to assess the potential for groundwater

23  contamination. The Minutes show that Defendant Exxon made a presentation to support the industry

24  position that additional medical testing of MTBE was unnecessary.

25          40.    In or around early 1987, a group of oil companies, including, on information

26  and belief, ARCO, Amoco, Exxon, Sunoco and Texaco, formed a committee (the "MTBE

27  Committee") for the purpose of promoting the acceptance and increased use of MTBE.

28  014 MTB

41.     On or around February 27, 1987, the MTBE Committee submitted written comments drafted to convince EPA not to require additional health and environmental testing of MTBE. The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

These representations by the MTBE Committee are evidence of Defendant's pattern of exaggerating the environmental benefits of MTBE while understating or completely neglecting to mention the real environmental hazards, all of which it knew or should have known at the time.

42.     The MTBE Committee acknowledged in its February 21, 1987 comments that MTBE had not been the subject of long term chronic health testing, but claimed that such testing was unnecessary. Under the heading "MTBE in Ground water," it stated that:

> [t]he results of a number of acute and subchronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

It is clear that the purveyors of MTBE, including Defendant, wanted to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

43.     Moreover, research conducted by the State of Maine shows that homeowners are sometimes unaware of the presence of MTBE, even when it is present in water in concentrations well above the odor and taste threshold.[1]  In the Maine study it was learned that test subjects were

---

[1] "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report." Maine Dep'ts of Human Serv., Env. Protection & Conservation. (Oct. 13, 1998) (the "Maine Report").

1   drinking and bathing in MTBE-contaminated water. It has been shown that natural compounds in

2   drinking water can mask the taste and odor of MTBE.

3           44.     On the issue of the persistence of MTBE, the MTBE Committee stated that "a

4   Japanese study . . . reports that MTBE in the presence of gasoline has excellent biodegradation

5   characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted

6   the contrary and more accurate information that MTBE was already known to be recalcitrant to

7   biodegradation, is evidence of Defendant's practice of using any available means to conceal from the

8   public the actual risk that MTBE poses to groundwater.

9   45.                     The MTBE Committee further represented that:

> The following discussion establishes that <u>there is no evidence that
> MTBE Doses any significant risk of harm to health or the
> environment, that human exposure to MTBE and release of MTBE to
> the environment is negligible</u>, that sufficient data exist to reasonably
> determine or predict that manufacture, processing, distribution, use and
> disposal of MTBE will not have an adverse effect on health or the
> environment, and that testing is therefore not needed to develop such
> data. Furthermore, issuance of a test rule requiring long term chronic
> testing will have a significant adverse environmental and economic
> impact.

16  (Emphasis added). This statement is further evidence that Defendant and the rest of the oil industry

17  were willing to ignore facts known to them and misrepresent the properties and impacts of MTBE in

18  their zeal to sell more of it in gasoline. Despite the duty arising from such unsupported assurances of

19  safety, Defendant has still never properly disclosed their knowledge of the risks of MTBE to

20  groundwater or warned Downstream Handlers or the general public of the need to avoid even small

21  spills of gasoline containing MTBE. to immediately clean up those that do occur and to test

22  underground drinking water sources for the presence of MTBE.

23          46.     On or around January 21, 1988. MTBE and/or gasoline manufacturers and

24  distributors. including Amoco. Sunoco and Texaco. and Defendant Exxon. signed a Testing Consent

25  Order with EPA. A subsequent notice showed that after extensive negotiation. the oil industry.

26  including Defendant. convinced EPA that additional chemical fate testing was not necessary to

27

28  013 MTB

1  determine the environmental risk posed by MTBE.[1/]  The oil industry, including Defendant,

2  misleadingly represented that the chemical fate of MTBE was sufficiently understood to ensure that

3  MTBE posed no undue risks to the environment and therefore that further testing was unnecessary.

4  Defendant knew at the time that this representation was false and misleading.

5         47.    These and other contacts with EPA are evidence of Defendant's and the oil

6  industry's campaign to rush into increased production of MTBE, relying on misrepresentations

7  regarding health and the environmental safety of MTBE, while avoiding doing the kinds of research

8  and testing that would have verified the problems, known to Defendant at the time, that have since

9  come to plague plaintiff and the Class.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 _____

   [1/]Testing Consent Order on Methyl Term-Butyl Ether and Response to the Interagency
26  Testing Committee. 53 Fed. Reg. 62 (1988).

27

28  014 MTB

1    48.    According to the EPA: "The concept of reformulated gasoline (REG) was

2    originally generated, developed and promoted by industry, not the Environmental Protection Agency

3    (EPA) or other parts of the federal government."[1/]  Under the circumstances, it was Defendant's

4    responsibility to warn of the risks and problems created by the product it generated, developed,

5    promoted, marketed and sold.  Defendant breached that duty, causing the pervasive threat of

6    groundwater contamination and other harm complained here.

7                    **The Nature of the MTBE Groundwater Contamination Problem**

8

9    49.    In its zeal to market, promote and sell a new product and growing revenue

10   source, all of the Defendant ignored or glossed over the properties that make MTBE a menace to

11   fresh water.

12   50.    In technical terms, MTBE has a low octinal water partition coefficient and

13   high solubility in water, particularly as compared to the other common gasoline components

14   benzene, toluene, ethylbenzene and xylene (collectively, "BTEX" compounds). When MTBE and

15   gasoline are spilled on the ground, the BTEX compounds tend to adsorb or bind to soil. In contrast,

16   MTBE races to undergroundwater reservoirs.

17   51.    MTBE not only travels faster and further from spill and leak sources and is

18   found in far higher concentrations as a groundwater contaminant than BTEX compounds, it also is

19   slow to degrade or break down once it is released into the environment, particularly in the subsurface

20   of the ground.  Because of its "recalcitrance," plumes of MTBE can persist in underground aquifers

21   for decades.

22   52.    Defendant knew of the properties of MTBE that make it a much greater threat

23   to groundwater than BTEX compounds.

24

25   _____

26   [1] "Origin of the Reformulated Gasoline Program." AESOP Office of Mobile Sources. EPA
     420-F-95-001 (April 1995).

27

28   014.MTB

1          53.     Nonetheless, Defendant decided to add it to gasoline, in fact, schemed and

2   fought to gain acceptance of gasoline with MTBE, while shunning additional research and failing to

3   make warnings critically needed to avoid or at least minimize widespread drinking water

4   contamination.

5          54.     On October 13, 1998, the State of Maine issued a report presenting findings

6   from the analysis of water samples collected from 951 randomly selected household wells. MTBE

7   was detected in 150 wells, or *15.8%* of the sampled private wells. Ten wells, or 1.1% of those

8   sampled, had MTBE levels exceeding the state's drinking water standard of 35 parts per billion.

9   Based on these results, the state estimated that some 1400 to 5200 private wells in the state fail

10   Maine's standard for potable water due to the presence of MTBE. The study also noted that other

11   gasoline compounds were infrequently detected compared to MTBE and where detected were in all

12   cases well below the drinking water standards.[5]

13          55.     A September 15, 1999 report by a special EPA Blue Ribbon Panel that

14   reviewed the record of MTBE contamination of groundwater recommends substantial reductions in

15   the use of MTBE. The Panel also recommended accelerating, particularly in those areas where high

16   MTBE-content gasoline is used. assessments of drinking water protection areas required under the

17   Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the

18   incidence of contamination of private wells by components of gasoline" and "regular water quality

19   testing of private wells."[6] No actual plans or source of funds for such testing exist for Florida or any

20   other state.

21          56.     Despite knowing of the inevitability of MTBE contamination of groundwater.

22   Defendant chose not to warn the public officials. Downstream Handlers or the general public. As

23   _____

24          [5] Maine Report. supra, note 3.

25          [6] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on
     Oxygenates in Gasoline" (September 15. 1999).

26

27

28   014.MTB                                    -13-

1    production and sale of gasoline containing MTBE soared to record heights. Defendant neglected to

2    warn that in the absence of special handling and care, ever more MTBE would be released into the

3    environment and, to a far great extent than other gasoline constituents, would seek out and foul water

4    and resist biodegradation.

5                57.    Every year more than nine million gallons of gasoline, equal to a full

6    supertanker, escapes during transportation, storage, sale or use in the United States. Although

7    Defendant was aware of the problem of such spills and leaks, and particularly the widespread

8    problem of leaking underground storage tanks, it willfully and recklessly chose to put gasoline

9    containing MTBE into commerce and, for example, into leaking tanks, knowing full well its

10   tendency to contaminate groundwater.

11               58.    Instead of warning of the impending and then developing tragedy of fresh

12   water contamination, Defendant touted gasoline containing MTBE as an environmental blessing.

13               59.    Defendant and other oil companies made misleading environmental claims

14   with knowledge that these claims would assist in the effort to establish the fuel as an industry

15   standard, to gain favor with the public, and to increase markets and profits.

16               60.    The intentional and tortious conduct of the Defendant was aimed at and

17   encompassed the entire country, including Florida. The effects have been felt in all states,

18   particularly those in which reliance on groundwater is substantial, including Florida.

19               61.    It has become apparent that MTBE does not even deliver the promise of

20   cleaner air. It is now widely reported that MTBE does little or nothing, contrary to industry

21   assurances, to contribute to reductions in such air polluting car emissions as carbon monoxide.

22               62.    A detailed 1998 report commissioned by the State of California concluded that

23   "There is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated

24   gasoline" when compared to alternative non-oxygenated formulations.[7]

25   _____

26   [7]"Health and Environmental Assessment of MTBE." Report to the Governor and Legislature
     of the State of California as sponsored by SB 521 (Nov. 12, 1998).

27

28   013.MTB                                   -14-
                                              Complaint

Received: 10/ 9/00                                          Page 19
··OCT. 9. 2000  3:42PM    TAD USA INC.                    NO. 6949   P. 19

1       63.     On or around May 11, 1999, The National Research Council of the National

2 Academy of Sciences ("NAS") reported that MTBE does little to reduce ozone air pollution and

3 smog.[8] NAS previously had concluded that reductions of carbon monoxide concentrations in the

4 nation's air actually took place before MTBE was added to gasoline as a purported "clean air"

5 additive.[9]

6       64.     In fact, combustion of gasoline containing MTBE in car engines actually

7 increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including

8 MTBE itself.

9       65.     Defendant, which marketed and promoted the use of gasoline containing

10 MTBE for its purported environmental benefits, knew or should have known of the terrible downside

11 of the proliferating use of the compound: widespread contamination of water.

12       66.     As manufacturer, distributor, seller, supplier, marketer and/or promoter of

13 gasoline containing MTBE, Defendant had a duty to Plaintiffs and the Plaintiff class arising from,

14 among other things, its: (a) vastly superior knowledge and resources to those of Plaintiffs and the

15 Plaintiff class, Downstream Handlers, the general public and even public officials; (b) material

16 misrepresentations and/or omissions concerning MTBE and gasoline containing MTBE; and

17 (c) marketing, promotion and sales of MTBE-laden gasoline without warning of the foreseeable

18 adverse impact it would have on groundwater, including the groundwater on which Plaintiffs rely.

19       67.     Defendant's duties include, but are not limited to, the duty: (a) to warn

20 plaintiffs, the Class, public officials, Downstream Handlers and the general public of the nature and

21 risks of MTBE; and (b) to test for and inform of known contamination by MTBE.

22       68.     Defendant breached its duties, causing damages including damages from

23 contamination of groundwater and damages from the threat of contamination of groundwater.

24 _____

25     [8]"The Ozone-Forming Potential of Reformulated Gasoline," Nat'l Research Council, Nat'l
Academy of Sciences (May11, 1999).

26     [9]"Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels", Nat'l
27 Research Council, Nat'l Academy of Sciences (1996).

28    013 MTB

1    69.    That gasoline containing MTBE poses a much greater risk to groundwater

2    than traditional gasoline was or should have been known to Defendant before the start of sales of

3    gasoline with MTBE, and as the Defendant continued to sell and distribute gasoline in this state:

4    Defendant also knew or should have known that the systems currently used for shipping, storing,

5    pumping and using gasoline involved losses and spillage at all links of the chain.

6    70.    Defendant also knew or should have known that MTBE is remarkably

7    recalcitrant to natural degradation and once dispersed in the environment is difficult to clean up.

8    71.    By May 1987, Defendant Mobil had compiled data on MTBE contamination

9    in groundwater in Florida State and elsewhere in the region.

10    72.    The potential for new incidents of groundwater and well contamination is

11    perpetuated every day that Defendant put more gasoline containing MTBE on the market in Florida.

12    73.    Given the properties of MTBE, and long history of gasoline spills, leaks and

13    other losses during distribution, sale and use — facts well known to Defendant but not to Plaintiffs

14    and the general public — widespread groundwater contamination was both inevitable and

15    foreseeable. Still, Defendant chose not to warn anyone of this problem.

16    74.    The record shows that Defendant was misrepresenting the properties of MTBE

17    and withholding information even as they were insisting that no such information existed.  Only

18    more recently, through the escalating and tragic contamination of groundwater resources, has the

19    public become aware of the dangers of MTBE.  As the reality of widespread MTBE groundwater

20    contamination came to light, Defendant and the oil industry "green washed" the shameful facts.

21    75.    For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an

22    agent of Defendant, published and distributed a pamphlet fashioned "Public Health Issues and

23    Answers" which said: "On rare occasions, MTBE has been discovered in private drinking water

24    wells where the source of MTBE has been attributed to leaks from nearby underground storage

25    tanks." OFA expressed confidence that federal regulations and industry practices made such

26    contamination largely a thing of the past.

27

28    01J MTB

76.    This kind of misleading communication utterly failed to alert public officials, Downstream Handlers or the general public to the danger posed by MTBE and completely omitted the kind of detailed directions that would be required to ensure safer use.

77.    In the April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to the reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

78.    The conduct of the Defendant was outrageous and/or so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of Plaintiffs and the Plaintiff class, enabling them to recover punitive damages. This conduct includes but is not limited to: (1) manufacturing and marketing gasoline containing MTBE despite specific actual knowledge of a serious defect that lead inevitably to widespread contamination of groundwater and Plaintiffs' wells; (2) intentionally misrepresenting and concealing the properties of MTBE and gasoline containing MTBE; (3) marketing and promoting gasoline containing MTBE as environmentally safe and beneficial despite specific knowledge to the contrary; and (4) issuing no warnings as to its use, all while knowing of the certainty of long-lasting water contamination.

79.    Some members of the oil industry, such as Tosco and Chevron, have recently and belatedly tried to distance themselves publicly from MTBE and now concede that it is a serious groundwater contaminant. What they have not done is taken financial responsibility for damages caused to people who rely on wells that are spoiled or imperiled by the product that they manufactured and until recently embraced.

80.    Even Defendant ExxonMobil stated in an opinion advertisement that "[t]oday's clean-burning fuels and vehicles can meet stringent emission standards without adding oxygenates [including MTBE]." The New York Times, April 13, 2000.

81.    It has been said that one can reach and impact the largest number of Americans by adding something to gasoline. Before the 1980s, production and sales totals for

014.MTB

-17-
Complaint

1   MTBE were negligible, but by 1996 it ranked second among all organic chemicals produced in the

2   United States, with virtually the entire production going into gasoline. Indications are that

3   Defendant, along with the rest of the oil industry, will eventually reduce or completely discontinue

4   the use of MTBE as a gasoline additive because of the furor over its devastating impact to drinking

5   water. Apparently, however, Defendant will not willingly accept responsibility for the damage done

6   to individual well owners in Florida and elsewhere.

7        82.   Plaintiff is, and at all times relevant to this action was, the owner in fee, in

8   possession, and in control of real property located at 13309 North 53rd Street, Temple Terrace,

9   Florida, 33617.

10        83.   Defendant ExxonMobil is, and at all times relevant to this action was, the

11   owner of real property, hereafter known as the "Mobil site," located at 5317 East Fletcher Avenue,

12   Temple Terrace, Florida. This site is used as the location for a service station. This service station

13   consists of certain buildings and an underground storage tank system ("UST system"). UST system

14   refers to the underground tanks and any connecting pipes, pumps, ancillary equipment, spill and

15   overflow prevention equipment, release detection equipment, corrosion protection systems,

16   secondary containment equipment, and all other related systems and equipment used to contain

17   petroleum products, including gasoline and used oil, located on the site.

18        84.   The above-described property of Plaintiff and Defendant's above-described

19   site are situated in close proximity geographically.

20        85.   Plaintiff is informed and believes, and based on that information and belief

21   alleges that, despite the available information warning of the dangers associated with leaking USTs

22   and with MTBE, Defendant continued to manufacture and deliver gasoline containing MTBE to

23   leaking USTs, including the tanks located nearby Plaintiff's property.

24        86.   As a direct and proximate result of Defendant Mobil's conduct, Plaintiff's

25   water well was contaminated with MTBE.

26

27

28   014.MTB

1    87.    Defendant's conduct, described herein, constitutes a violation of RCRA, the

2  Federal statute at 42 U.S.C. § 6972(a)(1)(B), which permits private citizens to bring actions to obtain

3  relief.

4    88.    Releases from Defendant's sites present an imminent and substantial

5  endangerment to health and the environment.

6  **IV.    CLASS ACTION ALLEGATIONS**

7

8    89.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on

9  behalf of himself and a class of all others similarly situated who have an interest in real property in

10  the State of Florida, located within 2,000 feet of a site owned, operated or supplied with MTBE

11  gasoline by Defendant, or any other site at which a release of gasoline has been reported, and who

12  have one or more water wells on such property which can be used as a source of water for drinking,

13  bathing, or general "domestic" purposes.

14    90.    Plaintiff seeks injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) on behalf

15  of the entire class, including testing and notice.

16    91.    Specifically excluded from the proposed class are:  (1) Defendant herein, any

17  entity in which Defendant has a controlling interest, and the employees, affiliates, legal

18  representative, heirs, successors, or assignees of Defendant; (2) any oil company; (3) Counsel for

19  Defendant and all firm members, associates, employees and their immediate families; (4) any

20  wholesalers, retailers or resellers of MTBE and/or gasoline containing MTBE; (5) Counsel for

21  Plaintiff and the Plaintiff Class and all firm members, associates, employees and their immediate

22  families; and (6) any presiding Judge and members of their immediate families.

23    92.    This action may properly be maintained as a class action and satisfies the

24  numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23(a).

25    93.    The Plaintiff class is so numerous that individual joinder of all members is

26  impracticable under the standards of Fed. R. Civ. P. 23(a)(1).  While the exact number of class

27  members is unknown to Plaintiff at this time, it is generally ascertainable by existing records and

28  014.MTD

1    appropriate discovery, and Plaintiff is informed and believes that the class includes thousands of

2    members.

3              94.    Common questions of law and fact arising from Defendant's illegal conduct

4    exist as to all members of the class, as required by Fed. R. Civ. P. 23(a)(2). These common

5    questions predominate over any questions which affect individual members of the class. These

6    common questions include, but are not limited to:

7                    1.    whether and when Defendant knew, or should have known, that

8    MTBE posed a serious threat to human health and to the environment;

9                    2.    whether Defendant knew, or should have known, of the environmental

10   hazards posed by MTBE;

11                   3.    whether MTBE threatens to contaminate or continue to contaminate

12   the property of Plaintiff and the class members;

13                   4.    whether Defendant's conduct amounts to trespass or nuisance, or a

14   violation of any state or federal statute;

15                   5.    whether Plaintiff and the class are entitled to injunctive relief; and

16                   6.    the appropriate nature of class-wide, equitable relief.

17             95.   Plaintiff's claims are typical of the claims of the members of the class under

18   Fed. R. Civ. P. 23(a)(3), since each has an interest in real property, each relies on a private water

19   well on that property for water, each such well is either contaminated by MTBE or is threatened by

20   such contamination, and each was without knowledge of the true facts alleged herein and has

21   suffered damages. Plaintiff and all members of the plaintiff class sustained damages and/or costs

22   arising out of water well and/or groundwater contamination or the threat of such contamination

23   caused by Defendant's common course of conduct in violation of law as complained of herein.

24             96.   The losses of each member of the class were caused directly by Defendant's

25   wrongful conduct in violation of state statutory and common law as alleged herein.

26             97.   Plaintiff will fairly and adequately represent the interests of the members of

27   the class as required by Fed. Civ. P. 23(a)(4). Plaintiff's claims are typical of the claims of the

28   014.MTB
                                              -20-
                                           Complaint

1  plaintiff class and he has no interest that is adverse to the interests of the class members.  Plaintiff

2  has retained competent legal counsel experienced in litigation of class action, consumer and

3  environmental tort litigation.

4          98.    This action can be certified in respect of the injunctive relief sought:

5  under Fed. R. Civ. P. 23(b)(1)(A), because inconsistent or varying adjudication with respect to

6  individual class members could establish incompatible standards of conduct for the Defendant;

7  under Fed. R. Civ. P. 23(b)(1)(B), because the ability of class members to protect their interests

8  would be substantially impaired or impeded if adjudications proceeded individually; and

9  under Fed. R. Civ. P. 23(b)(2), because Defendant has acted and refused to act on grounds generally

10  applicable to the class, making injunctive relief with respect to the entire class appropriate.

11          99.    Plaintiff has filed appropriate notice letters and intends to amend this

12  Complaint to include a cause of action based on violations of RCRA at the end of the 90-day notice

13  period.

14  **V.    CAUSES OF ACTIONS**

15      **A.    First Cause of Action — Toxic Trespass**

16

17          100.    Plaintiff repeats and incorporates herein by reference the allegations contained

18  in the preceding paragraphs of this Complaint.

19          101.    Plaintiff is, and at all times relevant was, in actual possession of his property.

20  Plaintiff class members are, and at all times relevant were, in actual possession of their property.

21          102.    The above-described conduct and actions of Defendant has caused and

22  continues to cause unlawful interference with plaintiff's possession of this property and with the

23  property of all others similarly situated.

24          103.    Defendant knew, or should have known, that the leaking UST systems and/or

25  other sources of Defendant's MTBE in groundwater would permit MTBE to enter Plaintiff's water

26  well, and water wells of all others similarly situated.  By failing to act to prevent the leak and

27  remediate the resulting spread of contamination Defendant's intentional, reckless, and negligent

28  014.MTB

1  conduct has intentionally allowed an unlawful interference with Plaintiff's property and with the

2  properties of all others similarly situated.

3        104.   As a direct and proximate result of Defendant's acts and omissions in causing

4  and allowing the unauthorized MTBE contamination of water wells, Plaintiff, and all others similarly

5  situated, have incurred or will incur cleanup costs as a result of Defendant's interference with their

6  possession of land.

**B.     Second Cause of Action — Nuisance**

7

8

9        105.   Plaintiff repeats and incorporates herein by reference the allegations contained

10  in the preceding paragraphs of this Complaint.

11        106.   Defendant, through the creation of, and continuous MTBE contamination of

12  water wells, has created, maintained, and concealed a private and public nuisance — the presence of

13  MTBE contamination, and the imminent threat of MTBE contamination.  Defendant has not taken

14  the actions necessary to permanently abate this nuisance, or to mitigate the ongoing damages caused

15  by the presence of MTBE contamination in water wells.

16        107.   Defendant manufactured, distributed, marketed, and promoted MTBE in a

17  manner that has unreasonably endangered or injured the property, health, safety and comfort of

18  Plaintiff and the plaintiff class, causing inconvenience and annoyance.

19        108.   Defendant, by its negligent, reckless and willful acts and omissions as set forth

20  above, have caused and permitted MTBE to contaminate a growing number of properties in the State

21  of Florida.  This contamination has migrated, or threatens to migrate, nearby to and/or onto

22  Plaintiff's property, and the property of all others similarly situated, thereby contaminating the

23  groundwater thereunder.

24        109.   Actual and threatened MTBE contamination caused by Defendant's conduct

25  has damaged Plaintiff's property, and the properties of all others similarly situated, and substantially

26  and unreasonably interfered with Plaintiff's use, and the use of all others similarly situated, as well as

27  the benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find

28

014.MTB

1   is a substantial inconvenience, annoyance and injury, including, but not limited to: (a) exposing

2   them to health risks, (b) decreasing property values and (c) invading their water supply.

3          110.   Defendant knew, or in the exercise of reasonable care, should have known that

4   the introduction and use of MTBE in gasoline would and has unreasonably and seriously

5   endangered, injured and interfered with the ordinary comfort, use and enjoyment of Plaintiff's

6   property, and of the properties of all others similarly situated.

7          111.   As a direct and proximate result of Defendant's acts and omissions creating

8   the above-described nuisance, Plaintiff and the plaintiff class, who constitute a considerable number

9   of people, have suffered special damages in the form of damage to their properties and property

10  values and endangerment of their health and safety.

11         112.   The MTBE contamination constitutes a nuisance in that the continuing

12  condition is injurious to Plaintiff and all others similarly situated, as well as their guests.

13  Defendant's acts have caused, and continue to cause, an interference in the free use and peaceful and

14  quiet enjoyment of Plaintiff's property, and the properties of all others similarly situated, as well as

15  the marketability of such properties.

16         113.   Plaintiff, and all others similarly situated, have suffered, and continue to suffer

17  serious, substantial and unreasonable interference with their use, and free, peaceful, and quiet

18  enjoyment of their properties. The continued MTBE contamination constitutes a continuing

19  nuisance which necessitates injunctive relief from the Court.

20         WHEREFORE, Plaintiff demands trial by jury, and judgment against the Defendant

21  as follows:

22         1.   For injunctive relief, including the establishment of a Court-supervised water-

23  well testing and monitoring program;

24         2.   For costs of suit and attorneys' fees;

25         3.   For prejudgment interest; and

26

27

28  014.MTB

1    4.    For any other and further relief the Court considers just and proper.

2

3    DATED: 9-14-00 , 2000        Respectfully submitted,

4

5

6                                 _____
                                  Richard W. Bell
7                                 Florida Bar # 145765
                                  2522 Valleydale Road, Suite 100
                                  Birmingham, Alabama 35244
8                                 Telephone: (205) 980-4322

9

                                 [ADDITIONAL COUNSEL]

10
     CORY, WATSON, CROWDER & DEGARIS     WHATLEY DRAKE
11   Ernest Cory                         Joe R. Whatley, Jr.
     C. Anthony Graffeo                  Jack Drake
12   2131 Magnolia Avenue                505 North 20th Street
     Birmingham, AL 35205                1100 Financial Center
13   Telephone: (205) 328-2200           Birmingham, AL 35203
                                         Telephone: (205) 328-9576
14
     CROWLEY & DOUGLAS                   WELLER, GREEN, McGOWN & TOUPS
15   Timothy Crowley                     Mitchell A. Toups
     1301 McKinney, Suite 3500           Nations Bank Bldg.
16   Houston, TX 77010                   2615 Calder St., Ste. 400
     Telephone: (713) 651-1771           Beaumont, TX 77701
17                                       Telephone: (409) 838-0101

18   LIEFF, CABRASER, HEIMANN &          NESS, MOTLEY, LOADHOLT,
     BERNSTEIN                           RICHARDSON & POOLE
19   Elizabeth J. Cabraser               A. Hoyt Rowell
     Morris Ratner                       T. Christopher Tuck
20   Scott P. Nealey                     28 Bridgeside Blvd.
     Lauri A. Andrus                     P.O. Box 1792
21   Embarcadero Center West             Mt. Pleasant, SC 29465
     275 Battery Street 30th Floor       Telephone: (843) 216-9200
22   San Francisco, CA 94111
     Telephone: (415) 956-1000
23
     REICH & BINSTOCK
24   Dennis C. Reich
     4265 San Felipe, Ste. 1000
25   Houston, Texas 77027
     Telephone: (713) 622-7271
26

27

28
     014.MTB
                                    -24-
                                 Complaint

1

2    <u>SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS</u>:

3    ExxonMobile Corporation
     % Corporation Service Company
4    1201 Hays Street
     Tallahassee, Florida 2525
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SCHEDULE OF ACTIONS

The Defendant, Exxon Mobil Corporation, by counsel and pursuant to Rule 7.2(a)(ii), Rules of

Procedure of the Judicial Panel on Multidistrict Litigation, files the schedule of actions as follows:

(A)   REBECCA YOUNG, On behalf of Herself and All Others Similarly Situated, Plaintiff, v.
      EXXONMOBIL OIL CORPORATION, Defendant;

(B)   United States District Court for the Middle District of Florida;

(C)   Civil Action No. 8:00-CV-1912-T-24C;

(D)   The Honorable Susan C. Bucklew.

RECEIVED
CLERK'S OFFICE

2000 NOV 29 P 3: 44

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 2 9 2000

FILED
CLERK'S OFFICE

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the following: Defendant, Exxon

Mobil's, Motion to Vacate Conditional Transfer Order (CTO1) Entered in MDL 1358 – *In re*

*Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* and Defendant, Exxon

Mobil Corporation's, Brief in Support of Motion to Vacate Conditional Transfer Order (CTO1)

in MDL 1358 In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, has

been hand-delivered to the Clerk of the Panel, and furnished to all counsel listed on the attached

PANEL SERVICE LIST by U. S. Mail, this 29th day of November, 2000.

David B. Weinstein
Florida Bar No.:  604410
**BALES & WEINSTEIN, P.A.**
1715 N. Westshore Boulevard, Suite 190
Tampa, Florida  33607
Telephone:  (813) 287-8777
Telecopier: (813) 287-1507
Attorneys for Defendant,
Exxon Mobil Corporation

RECEIVED
CLERK'S OFFICE
2000 NOV 29 P 3: 44
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**PANEL SERVICE LIST (EXCERPTED FROM CTO-1)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS**
**LIABILITY LITIGATION**

Elizabeth J. Cabraser
Lieff, Cabraser Heimann
      & Bernstein, L.L.P.
275 Battery Street, Suite 3000
San Francisco, CA  94111

Mitchell A. Toups
Weller, Green, McGown & Toups, L.L.P.
2615 Calder, Suite 400
PO Box 350
Beaumont, TX  77704

Joe R. Whatley
Whatley Drake, L.L.C.
505 North 20th Street
1100 Financial Center
Birmingham, AL  35203

Dan H. Ball
Thompson & Coburn, L.L.P.
One Firstar Plaza
St. Louis, MO  63101

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue, Suite 1776
Chicago, IL  60603

John E. Galvin
Sandberg, Phoenix & von Gontard
One City Center, Suite 1500
St. Louis, MO  63101

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, DC  20005

Jon Hinck
Lewis, Saul & Associates, P.C.
183 Middle Street, Suite 200
Portland, ME  04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL  60601

Steven L. Leifer
Baker, Botts, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004

Mark G. O'Connor
Regional Counsel
Coastal Oil New York, Inc.
611 Rt. 46 West
Hasbrouck Heights, NJ  07604

Kenneth Pasquale
Stroock, Stroock & Lavan, L.L.P.
180 Maiden Lane
New York, NY  10038

Robert H. Shulman
Howrey, Simon, Arnold & White, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004

Stephen M. Tillery
Carr, Korein, et al
Gateway One Building, Suite 300
701 Market Street
St. Louis, MO  63101

Richard E. Wallace
Wallace, King, Marraro &  Branson
1050 Thomas Jefferson Street, N.W.
Washington, DC   20007

Edward S. Weltman
Schneck, Weltman & Hashmall, L.L.P.
1285 Avenue of the Americas
New York, NY  10019

David B. Weinstein
Bales & Weinstein, P.A.
1715 N. Westshore Boulevard, Suite 190
Tampa, FL  33607