MDL **1358**

**ORIGINAL**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**DEC 1 9 2000**

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:** | |
| **METHYL-TERTIARY BUTYL ETHER ("MTBE") LITIGATION** | **MDL Docket No. 1358** |

### *YOUNG* PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER NO. 1.

**OFFICIAL FILE COPY** IMAGED DEC 2 0 '00

**PLEADING NO. 3 4**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY ..................................... 1

II.  *YOUNG* PLAINTIFFS HAVE ALREADY BEEN INFORMALLY
     PARTICIPATING  IN THE MDL PROCEEDING, AND ARE MOVING FOR
     LEAVE TO FILE AN AMENDED COMPLAINT ADOPTING THE MDL
     "MASTER COMPLAINT" ............................................. 2

III. THERE IS SUBSTANTIAL OVERLAP BETWEEN THE *YOUNG* CASE AND
     THE CASES THAT ARE PART OF MDL NO. 1358 ........................ 3

     A.  The Original *Young* Complaint Shares Substantially Overlapping
         Questions of Fact and Law with the Cases that are Part of MDL No. 1358. ...... 5

     B.  The Proposed Second Amended Complaint, With Respect to Which a
         Motion for Leave to Amend is Being Filed in the *Young* Case on
         December 19, Even More Closely Tracks the Facts and Theories at Issue
         in the MDL Proceeding ............................................. 6

     C.  The Fact that Classes Have Not Been Certified Does Not Weight Against
         Transfer ........................................................ 6

IV.  THE *YOUNG* CASE AND THE MDL CASE ARE IN SIMILAR PROCEDURAL
     POSTURES .......................................................... 7

V.   CONCLUSION ...................................................... 8

## I.    INTRODUCTION AND SUMMARY

A minority of the defendants in the above-captioned proceeding[1] have filed two motions to vacate the Panel's Conditional Transfer Order ("CTO") No. 1, transferring the Young and Sutton Farms cases as part of MDL No. 1358.[2] The objections to transfer are meritless because:

1.    The objections boil down to an attack on the Panel's October 10, 2000 order granting the motion to transfer related MTBE cases as part of MDL No. 1358, and were properly rejected by the Panel when it created MDL No. 1358.

2.    The objections rest on a mischaracterization of the nature of the claims alleged in the Young case.

3.    The objections are out of line with well-established authority regarding the factors favoring coordination and transfer, as explained more fully below.

4.    The Young Plaintiffs have been participating informally in the MDL proceeding, have appeared at an MDL status conference, participated in the preparation of the MDL Consolidated Master Complaint, and are filing a motion to amend their current complaint to adopt the allegations of the Master Complaint (allegations which are also being adopted by the plaintiffs who are currently part of the MDL proceeding).

---

[1]Defendant, ExxonMobil Corporation filed a motion to vacate. In addition, defendants Equilon, Motiva, Shell and Texaco filed a second motion to vacate CTO No. 1.

[2]The two cases that have so far been transferred as part of the MDL No. 1358 proceeding are Berisha, et al. v. Amerada Hess Corp., et al., Case No. 00-CIV-1898 (SAS) (S.D.N.Y.), and England, et al. v. Atlantic Richfield Co., et al., Case No. 3:00-370 and 3:00-371 (S.D. Ill.). In its order granting the motion for coordination and transfer, the Judicial Panel identified Young v. Exxon Mobile Oil Corp. ("Young"), Case No. 8:00-CV-1912-T-24C and Sutton Farms, Inc. v. Amerada Hess Corp., et al. ("Sutton Farms"), Case No. 1:00-3544, as tag along actions.

Counsel for the Equilon, Motiva, Shell and Texaco defendants, who have moved to vacate, CTO No. 1, opposed consolidation and transfer at the September 22, 2000 hearing before the Judicial Panel on Multidistrict Litigation. Their motion to vacate CTO No. 1 regurgitates arguments implicitly rejected by the Panel in its October 10, 2000 Transfer Order.

## II.   *YOUNG* PLAINTIFFS HAVE ALREADY BEEN INFORMALLY PARTICIPATING IN THE MDL PROCEEDING, AND ARE MOVING FOR LEAVE TO FILE AN AMENDED COMPLAINT ADOPTING THE MDL "MASTER COMPLAINT"

The Judicial Panel's October 10, 2000 Transfer Order identified the Young and Sutton Farms cases as "tag-along" actions. In light of that, plaintiffs in Young and Sutton Farms were invited to attend, and did attend, the November 2, 2000 status conference/case management conference in the MDL No. 1358 proceeding by the Court in that case. A copy of the transcript of that conference is attached as Exhibit A to the accompanying Declaration of Morris A. Rather ("Ratner Declaration"). At that conference, the parties discussed the scope and nature of the allegations of each of the cases, including the Young case, and the mechanism by which a "Master Complaint" would be filed, which would incorporate and supersede the allegations of the complaints in the coordinated MDL actions, to permit coordinated briefing on motions to dismiss, and to help coordinate other pre-trial matters. Id. (11/2/00 Hrg. Tr. at 18:10-33:25). It was expected that the MDL Master Complaint would include all the allegations that the parties present at the case management conference intended to pursue, and plaintiffs were directed by the MDL Court to serve their proposed Consolidated Master Complaint, as well as their "Proposed Amended Complaints" by December 6, 2000.[3/] On December 6, 2000, the Master Complaint, a

---

[3/]The order that came out of the November 2, 2000 case management conference in the MDL proceeding is Case Management Order No. 2, as well as a companion Practices and Procedures Order. Copies of those orders are attached to the Ratner Declaration as Exhibits B

copy of which to the Ratner Declaration as Exhibit D, was served on all parties in the MDL

proceeding.

The <u>Young</u> plaintiffs served a pleading on that same date on all defense counsel in

the MDL case, indicating the paragraphs of the Consolidated Master Complaint they intended to

adopt; a copy is attached as Exhibit E to the Ratner Declaration. The cover letter attaching the

<u>Young</u> Proposed Amended Complaint informed defense counsel in the MDL case that:

> It is our intention to shortly move for leave to file an amended
> complaint along the lines set forth in the attached 'Proposed
> Amended Complaint.' That motion will be filed, now, before the
> Conditional Transfer Order becomes effective and final, in the
> Florida federal court.

The motion papers for leave to amend the <u>Young</u> action in Florida federal court

are being filed Tuesday, December 19, 2000. A copy of the Proposed Second Amended

Complaint in that case is attached to the Ratner Declaration as Exhibit F. Although the original

<u>Young</u> complaint was appropriate for transfer to the MDL proceeding, for the reasons set forth

below, the Proposed Second Amended Complaint is even more obviously connected with that

proceeding, since plaintiffs' counsel in the <u>Young</u> case helped prepare the MDL Consolidated

Master Complaint, and are now moving to adopt most of the paragraphs in that Master

Complaint.

## III.   THERE IS SUBSTANTIAL OVERLAP BETWEEN THE *YOUNG* CASE AND THE CASES THAT ARE PART OF MDL NO. 1358

A copy of the <u>Young</u> complaint is attached to the Motion to Vacate Conditional

Transfer Order that was filed by defendant ExxonMobil Corporation. It is clear from the text of

that original <u>Young</u> complaint that there is substantial overlap between the issues that will be the

---

and C, respectively.

subject of pretrial proceedings in the MDL No. 1358 proceeding and in the <u>Young</u> case. "Section A" below addresses these commonalities. Moreover, plaintiffs in the <u>Young</u> case have moved for leave to file a second Amended Complaint, which specifically adopts most of the language of the Master Complaint in the MDL proceeding, making the <u>Young</u> case virtually identical to the other MDL cases, except with regard to the geographic scope of the <u>Young</u> class.

Transfer of action to another district for coordinated or consolidate pre-trial proceedings with an action pending there is not dependent on strict identity of issues[4] and parties but rather on the existence of one or more common questions of fact. <u>See</u> <u>In re Japanese Electronic Prod. Antitrust Litig.</u>, 388 F. Supp. 565, 567 (J.P.M.L. 1975) (citing <u>In re Gypsum Wallboard Cases</u>, 303 F. Supp. 510, 511 (J.P.M.L. 1969). It is common that transferred cases involve disparate defendants. <u>See e.g.</u>, <u>In re Roadway Express, Inc. Emp. Practices Litig.</u>, 384 F. Supp. 612, 612 (J.P.M.L. 1974) (several actions consolidated where cases brought against "same major defendants"); <u>In re Republic National Realty Equities Sec. Litig.</u>, 382 F. Supp. 1403, 1405 (J.P.M.L. 1974) (eighteen coordinated actions involved same *and additional* defendants). In fact, it is not implausible that actions in which there are <u>no</u> common defendants might be appropriate consolidated or coordinated for pre-trial proceedings. <u>See</u> <u>In re CBS Licensing Antitrust Litig.</u>, 328 F. Supp. 511, 512 (J.P.M.L. 1971) (though there were <u>no</u> common defendants in the actions, complaints of common plaintiff substantially similar and involved legality of same type of licensing agreements).

---

[4]Existence of different legal theories will not bar transfer.  <u>In re General Motors Class E Buyout Sec. Litig.</u>, 696 F. Supp. 1546, 1546-47 (J.P.M.L. 1988); <u>In re Stirling Homex Corp. Sec. Litig.</u>, 442 F. Supp. 547, 549 (J.P.M.L.1977).

A.   **The Original *Young* Complaint Shares Substantially Overlapping Questions of Fact and Law with the Cases that are Part of MDL No. 1358..**

The defendants mischaracterize the Young complaint as a "local" case involving the contamination of particular plaintiffs' waterwell.  On the contrary, the Young case, like the England case (which involves Illinois and more than a dozen other "RFG" states, in which defendants marketed and distributed gasoline containing MTBE, a hostile contaminant) and Berisha (involving the State of New York, in which various defendants marketed and distributed gasoline containing MTBE), involves an alleged conspiracy among various oil company defendants to increase profits, knowing that by marketing gasoline using MTBE, they would contaminate plaintiffs' properties, and injure the environment.

Young, like England and Berisha, *supra*, involves fundamental questions about the propriety of the defendants' decision to use MTBE, and regarding defendants' joint efforts to conceal the true effects of MTBE from plaintiffs, the public, and regulators, to avoid liability for contamination they knew would occur.  Finally, like England and Berisha, Young seeks principally injunctive relief in the form of testing and monitoring, on behalf of a class of persons similarly situated to the named plaintiffs in those cases, for the purpose of requiring the defendants to address the widespread environmental impacts on plaintiffs of the conspiracy described in those cases.  The Young complaint alleges, among other things:

> Defendant acted in concert with other oil companies to, *inter alia*, create a market for and promote sales of gasoline containing MTBE, a product defendant knew to be dangerous, while omitting and concealing the extraordinary risks to groundwater posed by the product.

First Amended Complaint, ¶ 22.

The allegations of the original <u>Young</u> complaint relate primarily — not to the particular aspect of the named plaintiff's property, or any particular source of contamination near the plaintiff's property but, rather — to the defendants' use of MTBE, the qualities of MTBE, the conspiracy among ExxonMobil and other major oil companies to use and conceal the effects of this product, etc. <u>See, e.g.</u>, <u>Young</u> First Amended Complaint, ¶¶ 25-88.

**B.**   **The Proposed Second Amended Complaint, With Respect to Which a Motion for Leave to Amend is Being Filed in the *Young* Case on December 19, Even More Closely Tracks the Facts and Theories at Issue in the MDL Proceeding.**

The <u>Young</u> plaintiffs have moved for leave to file a proposed Second Amended Complaint, which adopts most of the allegations of the Master Complaint. This proposed Second Amended Complaint adds and specifically names co-conspirator defendants who were referenced generally but not expressly identified in the prior-filed complaint in the <u>Young</u> case. In addition, it adds causes of action which are being pursued in the MDL proceeding, and which are applicable to the <u>Young</u> Florida class. Finally, it includes additional factual allegations which mirror the allegations in the MDL Master Complaint. The proposed Second Amended Complaint in <u>Young</u> is virtually identical to the MDL consolidated master complaint, and adopts nearly all of the allegations of that Complaint.

**C.**   **The Fact that Classes Have Not Been Certified Does Not Weight Against Transfer.**

The fact that the proposed, overlapping classes in <u>England</u>, <u>Berisha</u> and <u>Young</u> have yet to be certified is not a bar to transfer. <u>See</u> In re Refrigerant Gas Antitrust Litig., 334 F. Supp. 996, 997 (J.P.M.L.1971) (cases transferred where <u>proposed</u> classes overlapped). The class allegations in these cases are similar even if they differed, and because conflicting and overlapping class *allegations* raise the "indubitable possibility of inconsistent class

determinations by courts of coordinate jurisdiction. . . .[The Judicial Panel] has consistently held

that the existence of and the need to eliminate this possibility presents a *highly persuasive reason*

favoring transfer under Section 1407." See In re Roadway Express, Inc. Employment Practices

Litig., 384 F. Supp. 612, 612 (J.P.M.L. 1974) (emphasis added); In re Plywood Antitrust Litig.,

376 F. Supp. 1405, 1406 (J.P.M.L. 1974); In re Washington Public Power Supply Sys. Sec.

Litig., 568 F. Supp. 1250, 1251 (J.P.M.L. 1983).

The Judicial Panel has recognized that the "existence of conflicting and

overlapping class action claims raises substantial common questions of fact which justify transfer

under Section 1407." See In re Air Fare Litig., 322 F. Supp. 1013, 1015 (J.P.M.L. 1971).

Accordingly, the fact that Young's, Berisha's and England's overlapping classes have yet to be

certified is no bar to transfer; rather, the existence of overlapping proposed classes is *in itself*

sufficient to meet the requirement of common questions of fact.

## IV.   THE *YOUNG* CASE AND THE MDL CASE ARE IN SIMILAR PROCEDURAL POSTURES

In the MDL proceeding, the England and Berisha cases are involved in motion

practice regarding the allegations of the complaint. The Young case is also still in motion

practice regarding the allegations of the complaint. Although discovery is slightly more

advanced in the MDL proceeding, with the court having resolved certain disputes, that discovery

overlaps with the discovery that will need to be conducted in the Young case.

It is inevitable that litigation brought in several districts will be at different stages

of litigation when the question of transfer for multidistrict litigation arises. Despite this

axiomatic circumstance, the Judicial Panel on Multidistrict Litigation regularly transfers cases for

coordinated pre-trial litigation where the cases are at widely varying stages of litigation. See e.g.

In re International House of Pancakes Franchise Litig., 331 F. Supp. 556, 557 (J.P.M.L 1971)

(multidistrict antitrust actions transferred for coordinated pre-trial proceedings where the

Missouri cases were in a significantly more advanced stage than were those in any other district);

In re Bomb Disaster at Roseville, Cal., on April 28, 1973, 399 F. Supp. 1400, 1402 (J.P.M.L.

1975) (actions belonged in single district for coordinated pre-trial proceedings even though

discovery in one case was at a significantly advanced stage than in the other actions).  Similarly,

if substantial discovery remains to be had and no trial date has been set, the Panel will not

exclude an action or group of actions from transfer on the grounds that the pretrial proceedings

are too advanced.  See In re Helicopter Crash Near Marsh Island, Louisiana on Dec. 8, 1977,

461 F. Supp. 675, 676-77 (J.P.M.L. 1978).

In fact, the stage of any given litigation seems to implicate only the question of

*where* a case is to be transferred, and not *whether* such a case is to be transferred.  See e.g. In re

L.E. Lay & Co. Antitrust Litig., 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (antitrust class action

would be transferred to the E.D. of Texas for coordinated pre-trial proceedings with the antitrust

action pending there, since, inter alia, pre-trial proceedings in the Texas action had progressed to

a relatively advanced stage in contrast to those in the Arkansas action); In re Scientific Control

Corp. Sec. Litig., 380 F. Supp. 791, 793 (J.P.M.L. 1974) (S.D.N.Y. most appropriate forum

where New York court has moved steadily with pre-trial of action pending there and, as a result,

the New York action was at more advanced stage than either Kentucky or Texas actions).

V.    **CONCLUSION**

The Young case will involve many of the same issues in pre-trial motion practice

on the pleadings, and in discovery, that are at issue in the cases currently pending before the

MDL court, including (1) the nature of MTBE, (2) defendants' motives in using MTBE, (3) the

impact of the defendants' decision to use MTBE as an additive in gasoline, and (4) the

defendants' conspiracy to conceal the true effects of MTBE, and to commit nuisance and other

torts for profit.  Given the foregoing, and for the reasons the Panel initially granted on October

10, 2000, certain defendants' motion to coordinate and transfer the England and Berisha actions,

these defendants' motion to vacate CTO No. 1 should be denied.


DATED:  December 18, 2000                 Respectfully submitted,


                                          By: _____
                                              MORRIS A. RATNER

                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                          Embarcadero Center West
                                          275 Battery Street, 30th Floor
                                          San Francisco, CA  94111-3339
                                          Telephone:  (415) 956-1000
                                          Facsimile:  (415) 956-1008


                            [ADDITIONAL COUNSEL]


CORY, WATSON, CROWDER & DEGARIS          WHATLEY DRAKE
Tony Graffeo                             Joe R. Whatley, Jr.
2131 Magnolia Avenue                     Jack Drake
Birmingham, AL  35205                    505 North 20th Street
Telephone:  (205) 328-2200               1100 Financial Center
                                         Birmingham, AL  35203
                                         Telephone:  (205) 328-9576


CROWLEY & DOUGLAS                        WELLER, GREEN, McGOWN & TOUPS
Timothy Crowley                          Mitchell A. Toups
1301 McKinney, Suite 3500                Nations Bank Bldg.
Houston, TX  77010                       2615 Calder St., Ste. 400
Telephone:  (713) 651-1771               Beaumont, TX  77701
                                         Telephone:  (409) 838-0101

LIEFF, CABRASER, HEIMANN &
BERNSTEIN
Elizabeth J. Cabraser
Morris Ratner
Scott P. Nealey
Lauri A. Andrus
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

REICH & BINSTOCK
Dennis C. Reich
4265 San Felipe, Ste. 1000
Houston, Texas 77027
Telephone: (713) 622-7271

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
A. Hoyt Rowell
T. Christopher Tuck
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9200

Richard W. Bell
2522 Valleydale Road, Suite 100
Birmingham, AL 35244
Telephone: (205) 980-4322
Facsimile: (205) 408-1226

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**DEC 1 9 2000**

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE:

METHYL-TERTIARY BUTYL ETHER    **MDL Docket No. 1358**
("MTBE") LITIGATION

### DECLARATION OF MORRIS A. RATNER IN SUPPORT OF *YOUNG* PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER NO. 1.

1.       I am a partner in the law firm of Lieff, Cabraser, Heimann & Bernstein,

LLP. I am member of the State Bars of New York and California, and am also admitted to the

Bar of Washington, D.C. I am Plaintiffs' Liaison Counsel in MDL No. 1358. I am also one of

plaintiffs' counsel in <u>Young v. ExxonMobil Corporation</u>, Case No. 800-CV-1912-T-24C (M.D.

Fla.), which has been identified as potential tag-along action by the MDL Panel, and which the

Panel has conditionally transferred to MDL No. 1358. I make the statements herein based on

facts personally known to me.

2.       Attached hereto as Exhibit A is a true and correct copy of a transcript of

the case management conference held on November 2, 2000 before the Honorable Shira A.

Scheindlin, United States District Court for the Southern District of New York, and In re Methyl-Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No. 1358.

3.      Attached hereto as Exhibit B is a true and correct copy of the MDL No. 1358 Case Management Order No. 2.

4.      Attached hereto as Exhibit C is a true and correct copy of the MDL No. 1358 "Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a)."

5.      Attached hereto as Exhibit D is a true and correct copy of the Proposed "Master Complaint," served by Plaintiffs' Counsel in the MDL proceeding upon all defense counsel that is the subject of ongoing discussions in that proceeding.

6.      Attached hereto as Exhibit D is a true and correct copy of a letter from Young plaintiffs' counsel to the Court the MDL proceeding notifying the Court of the portions of the Master Complaint which will be adopted by the Young plaintiffs in the event that case is transferred to the MDL proceeding, and served on defense counsel, notifying them of the intent of Young plaintiffs' counsel to adopt most of the allegations of the MDL Master Complaint.

7.      Attached hereto as Exhibit E is a true and correct copy of the Proposed Second Amended Complaint that is being filed along with a motion for leave to filed an amended complaint on Tuesday, December 19, 2000 in the Florida federal court in which the Young case

is currently pending. That complaint is substantially identical to the Master Complaint in the MDL proceeding.

I declare under penalty of perjury under the laws of the states of California, New York and the United States that the foregoing is true and correct to the best of my knowledge, and that this declaration is being executed this __18th__ day of December, 2000, at San Francisco, California.

MORRIS A. RATNER

DECLARATION OF MORRIS A. RATNER

**EXHIBIT A**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
In re: METHYL TERTIARY BUTYL ETHER
("MTBE") Products Liability Litigation MDL No. 1358 SAS

This Document Relates To: All Cases
------------------------------x

November 2, 2000
10:15 a.m.

Before:

HON. SHIRA A. SCHEINDLIN,

District Judge

---

2

1          (In open court)

2          (Case called)

3          THE COURT: I think we should begin by discussing for

4    a moment Case Management Order No. 1, which has been submitted

5    to me actually a number of times by the plaintiffs. I hope I

6    have the right one. I am not sure. I have a cover letter

7    from Mr. Ratner on November 1st that says, "Attached please

8    find a slightly revised proposed Case Management Order No. 1."

9          Is that the most recent version, do you think?

10          MR. RATNER: Yes, it is, your Honor.

11          THE COURT: I meant to remind you, with so many

12    appearances, each time you stand, I would ask you for this

13    conference at least to state your name and just say plaintiffs

14    or defendants, something like that, so we have some kind of a

15    record.

16          Mr. Ratner, the one I just described attached to the

17    November 1st order which says, "Attached please find a

18    slightly revised proposed Case Management Order No. 1" is the

19    one that you would like to have signed?

20          MR. RATNER: Yes, your Honor.

21          THE COURT: Is there anyone who has anything to add

22    with respect to proposed Case Management Order No. 1?

23          MR. LANGAN: We don't object to the entry of this.

24          We think the issue of plaintiffs' organization is

25    really between the plaintiffs and the court. We have nothing

EXHIBIT A

**3**

1  to add on that. Thank you.

2  THE COURT: All the plaintiffs' attorneys who are

3  present have consented to this order?

4  VOICES: Yes, your Honor.

5  THE COURT: I am prepared to sign this as Case

6  Management Order No. 1. I am doing so now. That means, then,

7  that Mr. Saul, Mr. Gordon and Mr. Tillery will serve as

8  co-lead counsel.

9  A VOICE: Thank you, your Honor.

10  THE COURT: Now, I did want to note briefly whether

11  the folks who are here on the Young matter and the Sutton

12  Farms matter have yet formulated any position with respect to

13  transferring those cases here under the MDL, or is that still

14  under consideration?

15  I know there were a couple of plaintiffs' attorneys

16  who said they were here on those cases. Mr. Barisic, you're

17  here on Sutton Farms. Mr. Reich, you're here on Young.

18  MR. WHATLEY: I am here. I understand it has been

19  transferred.

20  THE COURT: Is that your understanding?

21  MR. WHATLEY: It has been transferred.

22  THE COURT: A conditional order of transfer, I

23  understand that. That was within a 15-day period.

24  A VOICE: We have discussed it with the defendants,

25  and we have no objection to the transfer.

**4**

1  THE COURT: I didn't know that. So the plaintiffs,

2  the three plaintiffs' lawyers who are present, are not going

3  to be objecting?

4  A VOICE: No.

5  A VOICE: That is correct, your Honor.

6  THE COURT: Your name?

7  MR. REICH: Dennis Reich for the plaintiffs.

8  THE COURT: How about defense counsel, does anybody

9  know on the defense side whether there is going to be any

10  objection within the 15-day period on the conditional order of

11  transfer?

12  MR. LANGAN: Our clients do not intend to object, our

13  clients, and I can't speak for everybody.

14  Also we have three defendants in the Sutton Farms

15  case that are in neither of the other cases. I believe that

16  is Marathon Crown Central and Transmontain. They have not

17  been even served in that case. We can't speak for them for

18  sure.

19  THE COURT: I am not sure I heard what you first

20  said. Those you do know, you say they do not intend to

21  object?

22  MR. LANGAN: My clients do not intend to object. I

23  can't speak for the others.

24  THE COURT: I understood the rest of it.

25  MR. WALLACE: Our clients are still considering

041.mtb

5

1  whether to object, and our decision will be informed in part

2  on discussions we expect to have with the plaintiffs to learn

3  more about how they intend to proceed with those cases.

4        Thank you.

5        THE COURT: That is helpful. What I understand from

6  that, then, is that we're still not certain at this point in

7  time that those cases will, indeed, be part of this process?

8        MR. WALLACE: Yes, your Honor.

9        THE COURT: Does anybody know of any other cases that

10  may be joining us?

11        MR. SAUL: I don't know that there are any filed

12  cases as of yet, but there are cases that we're confident will

13  be filed as time goes along.

14        THE COURT: You do expect further filings?

15        MR. SAUL: Yes.

16        THE COURT: You expect, given the structure of this,

17  they would come here as part of the MDL?

18        MR. SAUL: That is what we would expect, at least

19  some of them.

20        THE COURT: Thank you. That is helpful, too.

21        MR. WALLACE: Speaking for Shell, your Honor, Shell

22  is a defendant in a case that was filed in federal court.

23        THE COURT: Which federal court?

24        MR. WALLACE: In the District of Connecticut before

25  Judge Hall. It involves MTBE contamination, and it was a

041.mtb

6

1  purported class action. Just earlier this week Judge Hall

2  denied class certification in that case. It involves a single

3  service station, and we are analyzing whether that case ought

4  to be brought to the attention of the panel.

5        Our current thinking is that it need not be brought

6  and should not be brought to the panel's attention because it

7  does not allege any product liability claims. It does not

8  contend MTBE is a defective product. In that important

9  respect, it is different than the cases consolidated before

10  you.

11        THE COURT: Are any of these plaintiffs' attorneys

12  the attorneys in that case?

13        MR. SAUL: No. We would welcome guidance from the

14  court if it should choose to enlighten us. It is a difficult

15  decision. We find very little guidance from the case law in

16  that decision.

17        MR. SAUL: Your Honor, although not involved in that

18  case, we have been aware of that case for a year, and

19  Mr. Wallace's firm never brought that to the attention of the

20  MDL panel before today, so I really suspect that that case

21  will not be in this court.

22        THE COURT: Which is fine. Are any of the cases

23  significantly more advanced than these cases? Any of the

24  federal cases?

25        How about state cases? What is the status of various

041.mtb

7

1  state cases, if you know?

2      MR. SAUL:  There are two class actions pending that I

3  am aware of.  The main case in the State of Maine and the case

4  in North Carolina.  I think that the defendants have sent you

5  the decision in the Maine case at least 20 times, so you're

6  aware of the denial of class certification.

7      However, the judge I think last week said that he was

8  not convinced that the issue was over on class certification

9  and he has now ordered the parties to mediation on a

10  class-wide basis.

11      So Maine, we're in mediation on the class issues.

12  The same is correct in North Carolina.  We have gone through

13  mediation in North Carolina, and it is ongoing.

14      THE COURT:  What is the status of the North Carolina

15  case other than the fact that it has been sent to mediation?

16      MR. SUMMY:  The status of that case is that we have

17  had a class certification hearing and also hearings on

18  defendants' motions to dismiss.  The judge has taken those

19  under advisement pending the outcome of mediation.  The

20  mediation has been ongoing, and we're continuing our

21  discussions, and we're getting fairly close, but --

22      THE COURT:  Fairly close to a settlement?

23      MR. SUMMY:  It appears we are getting close to a

24  settlement, but I don't want to represent to the court it is

25  going to be settled because it very well may not.

8

1      THE COURT:  But if it does, who is the class?

2      MR. SUMMY:  What we're discussing right now is that a

3  settlement that would confer some benefits on the public, but

4  there would not be a settlement class, so to speak, and there

5  would not be releases that would be executed to the defendants

6  for a class.

7      THE COURT:  But geographically speaking --

8      MR. SUMMY:  Geographically, it would be just the

9  State of North Carolina.  I should also inform you of another

10  case I am involved in in California, where I represent

11  Communities for a Better Environment against a lot of the

12  defendants that are here.

13      That case involves a particular state statute.  It

14  involves the defendants' business practices associated with

15  the manufacture and distribution of MTBE and gasoline

16  containing MTBE.  It is not a class action.

17      In that case, the plaintiffs had put on their case in

18  chief.  It is a trial to the judge.

19      THE COURT:  One second now.  It was never brought as

20  a class action?

21      MR. SUMMY:  That's right.

22      THE COURT:  It is a judge trial?

23      MR. SUMMY:  That's correct.

24      THE COURT:  It is on trial?

25      MR. SUMMY:  The plaintiffs have put on their case in

9

1 chief two weeks ago in San Francisco. The defendants have
2 until April to respond and put on their case in chief.
3 Then the plaintiffs will do a rebuttal, and the judge
4 will make this decision. So that case, there has been a
5 tremendous amount of discovery that has been conducted.
6 THE COURT: Is that the discovery that we began with
7 here? You kept talking about all the boxes in California?
8 MR. SAUL: Yes, your Honor.
9 MR. SUMMY: That is it.
10 THE COURT: The plaintiffs there are a limited group?
11 MR. SUMMY: It is, yes, the Communities for a Better
12 Environment, and they are bringing the case under the Private
13 Attorney General Statute against the major oil companies that
14 deliver gasoline containing MTBE in the State of California.
15 THE COURT: So this group, Communities for Better --
16 whatever, that is the California group?
17 MR. SUMMY: Yes, your Honor.
18 THE COURT: And the Maine group, is that just Maine
19 plaintiffs?
20 MR. SAUL: Yes, that is a state class action for all
21 private well owners in the State of Maine.
22 THE COURT: Is that a completely state court case
23 pending?
24 MR. SAUL: There is -- Mr. Summy can speak to the
25 case in Lake Tahoe as well.

10

1 MR. SUMMY: Your Honor, there are several other cases
2 I am aware of. I am involved in one of the two. There is a
3 case which brought by Lake Tahoe. They are a municipality
4 that is suing the oil industry for contaminating their water
5 supply with MTBE.
6 In that case, substantial discovery has been --
7 THE COURT: The municipality is the plaintiff there?
8 MR. SUMMY: That's correct. There has been a
9 substantial amount of discovery conducted in that case as
10 well. That case, as I understand it, is set for trial in
11 January. It is in state court in San Francisco.
12 THE COURT: One second. January trial. This will be
13 a jury or nonjury?
14 MR. SUMMY: A jury trial, your Honor. The other case
15 I am involved in is also a municipality case. I, along with
16 several other firms, represent the plaintiff, the City of
17 Santa Monica, which is also a municipality, who has sued the
18 oil industry for contamination of half of their water supply.
19 That case was filed, I would say, about three or four months
20 ago.
21 THE COURT: Is that a class action? That is a
22 municipality?
23 MR. SUMMY: It is a water provider case. It is just
24 getting started.
25 THE COURT: Right. That was three or four months ago

11

1    just filed?

2        MR. SUMMY: Yes.

3        MR. HINCK: To be complete, there are a number of

4    others. There have been cluster cases filed as class actions.

5    One was mentioned here today that was filed in federal court

6    in Connecticut. There is a similar case that was filed in

7    Southern New Jersey.

8        THE COURT: Wait. In federal court?

9        MR. HINCK: That was in state court.

10       THE COURT: Let's go again. Connecticut, I know, is

11   federal, right?

12       MR. HINCK: That is a state court case.

13       THE COURT: You called it a cluster case?

14       MR. HINCK: Coming from a single site or believed to

15   be a single site, not necessarily involving just one

16   defendant. It is many plaintiffs most of the time.

17       There was a case filed within the last two weeks in

18   Buckingham Township, Pennsylvania.

19       THE COURT: I thought you said Southern Jersey?

20       MR. HINCK: Southern Jersey, I passed that one and

21   moved on to Pennsylvania.

22       THE COURT: I didn't get anything down in Southern

23   Jersey. Is that a class action?

24       MR. HINCK: I believe that was filed as a class

25   action.

12

1        THE COURT: Did it involve residents of New Jersey

2    only?

3        MR. HINCK: Yes.

4        THE COURT: Is that a fairly new filing?

5        MR. HINCK: That was within three months. Again, I

6    would call it a cluster case, not state-wide.

7        THE COURT: Then you started in Pennsylvania?

8        MR. HINCK: Buckingham Township, Pennsylvania right

9    next to Doylestown.

10       THE COURT: The state court?

11       MR. HINCK: State court.

12       THE COURT: Class action?

13       MR. HINCK: Class action.

14       THE COURT: Fairly new?

15       MR. HINCK: Within a week or two weeks at the most.

16       THE COURT: Is that what you also called a cluster

17   case or state-wide?

18       MR. HINCK: Yes.

19       THE COURT: Cluster?

20       MR. HINCK: Yes. Then there is what I would call a

21   cluster case case that was filed in Pound Ridge, New York. I

22   think the filing was more than a year ago. Trial started in

23   May. The trial went for two weeks, and a settlement was

24   reached.

25       THE COURT: Is that a class action?

## 13

1 MR. HINCK: That I do not believe was filed as a

2 class action, but there were multiple plaintiffs. I think in

3 all these cases, we have defendants represented by some

4 counsel in this room.

5 So far we've missed what could be a fairly

6 substantial case filed in Orange County, California in state

7 court, on behalf of the people of the State of California, I

8 believe limited to the residents of Orange County, being

9 handled by the District Attorney.

10 It includes the same statute that Mr. Summy mentioned

11 brought under 17200 of the Business and Professions Code of

12 California around a range of other statutory provisions and I

13 think common law claims for violation of law and seeking

14 certain penalties. I think, number one, a clean-up, and,

15 alternately, where clean-up is not feasible, penalties.

16 THE COURT: What is the status of that?

17 MR. HINCK: That one was filed earlier in the year,

18 and an amended complaint was filed in the last couple of weeks

19 which I think changed the nature of the case a bit. I have

20 only seen the amended complaint which was fairly detailed.

21 The defendants in that case are ARCO, Atlantic Richfield

22 Company, and chemical companies that were once affiliates of

23 Atlantic Richfield Company.

24 THE COURT: All right. Let's go back now.

25 Assuming for the moment that I end up with a Young

## 14

1 and Sutton Farms, two conditionally transferred cases, how

2 many states are we talking about geographically that I would

3 now have?

4 MR. RATNER: Your Honor, you would have 18 states.

5 THE COURT: With all four of the cases or five cases

6 I have?

7 MR. RATNER: Yes, your Honor. That is Florida, New

8 York and the 16 RFG states in the England case.

9 In the Sutton Farms case, right now that class is

10 alleged on behalf of all non-RFG states, which is a

11 substantial number of states, all the states other than the 17

12 RFG states, Sutton Farms in Florida. However, we have had

13 discussions with their plaintiffs' counsel, and there is a

14 good chance that might be limited to Florida.

15 Right now it is broader, but we think in the end it

16 will probably be a Florida case.

17 THE COURT: So it could be, if it doesn't go that

18 way, all the states at that point, all the non-RFG states,

19 which is all the remaining states, or it could be just

20 Florida?

21 MR. RATNER: That's right.

22 THE COURT: If it is just Florida, at this point I

23 would have a total of 18 states?

24 MR. RATNER: That's right.

25 THE COURT: All right. I have two different

15

1 proposals also here on so-called Case Management Order No. 2.
2 Here there is not agreement, and it seems to me that one of
3 the biggest areas of disagreement is this idea of a master
4 complaint and/or amended complaint and doing some scheduling
5 that would get the complaint, the pleadings set, so to speak.
6 I think we need to get the pleadings set here so we
7 can move to the motion to dismiss stage against the pleading
8 the plaintiffs want to file.
9 It seems to me, from reading the materials that you
10 folks have been submitting, that you're losing time in a way
11 exchanging letters on what the proposed amended complaint
12 might be and who might want to oppose the filing of the
13 proposed amended complaint and whether or not there should be
14 a master complaint.
15 Frankly, my view, if its helpful as guidance given
16 the size of what will be in my courtroom, is that the
17 plaintiffs should have the opportunity to put forth the
18 complaint that they want, but at that point they've had their
19 leave to amend.
20 Once they settle down and get the pleading that they
21 want, then that is the pleading that the defense can attack
22 but once; in other words, you can't be fixing and fixing and
23 amending and amending it. You need to now get together now
24 that there is 10 or 12 of you sitting here, put forth the best
25 complaint you want to put forth, and have the defendants do

16

1 their attack once in a coordinated way.
2 I think anything else is foolishness. I am not
3 really prepared in a sense to entertain opposition to leave to
4 amend other than quite perfunctory. It seems to me they
5 should coordinate and get the complaint they want on the
6 table, and then you can could attack the complaint that they
7 want. That is the best way to proceed.
8 Anything else to me is just time wasting in the end,
9 and it also wastes your efforts as well as your time. You
10 need to put effort I think into other aspects of this than
11 procedural jockeying.
12 I think we need to put effort into a briefing
13 schedule and motion to dismiss, briefing schedules on class
14 certification, discussions of how they're going to be handling
15 discovery, which we haven't begun to discuss today, but we
16 will, and anything, any major time spent on how the plaintiffs
17 should get their pleading on the table doesn't seem to me to
18 be productive.
19 It is almost the view that the defense said with
20 respect to Case Management Order No. 1. I am not so sure it
21 is your concern. They need to get their complaint on the
22 table. I am not so sure you need to have -- you, the
23 defendants, need to have a lot of input on how the plaintiffs
24 get their complaint on the table.
25 On the other hand, the plaintiffs need to get

Case MDL No. 1358    Document 34    Filed 12/19/00    Page 25 of 264

1 organized in a fairly tight time-frame. They have to settle
2 on the complaints they want. They had early letters, there
3 are three or four plaintiffs' cases in the room that are not
4 Berisha. There was discussion there as to a new amended
5 complaint that would be out damage claims, we have equitable
6 claims, there will be hopefully a judge trial earlier, and the
7 defendants responded and said that is an end-run, they're
8 trying to bifurcate.
9    We really want to get the equitable plaintiffs, the
10 claims before the court. We need to have a jury trial first
11 and take account of the jury's finding, and we had all that
12 conversation going on. We did not have any rulings. If
13 anybody thinks there were any rulings, and there weren't, and
14 I saw some defense letters that said I expressed views, we are
15 going to have a lot of conversation. Views are views and
16 rulings are rulings, and I made no rulings.
17    So you do need to have the plaintiffs decide how they
18 want to bring these cases, but once, and by deadline. Then we
19 have a briefing schedule. So from my perspective, the pending
20 motions to dismiss should probably be withdrawn, to be refiled
21 as soon as the plaintiffs settle on a pleading, and I think it
22 should be rapidly.
23    Now, I don't know who is liason counsel. Saul,
24 Ratner, and who is the third one, Tillery?
25    MR. TILLERY: Mr. Tillery.

1    THE COURT: Mr. Gordon?
2    MR. GORDON: Yes, Robert Gordon. Mr. Saul and myself
3 and Mr. Tillery are co-lead. Mr. Ratner is the liason
4 counsel.
5    THE COURT: Thanks for the correction.
6    In any event, it doesn't matter to me which of the
7 four of you address this question, but I would like to have a
8 proposal from you, which I will either accept or not, as to
9 when you will re-plead with the complaint you want to go with.
10    MR. RATNER: Your Honor, we've submitted to you
11 yesterday late in the afternoon our proposed version of Case
12 Management Order No. 2.
13    THE COURT: And I have that in front of me, I think.
14    MR. RATNER: Okay. I should say, just --
15    THE COURT: You said you were going to submit a
16 master complaint by November 30th?
17    MR. RATNER: That's right.
18    THE COURT: And then you said you will identify by
19 December 3rd the allegations of the master complaint that you
20 plan to adopt, I guess, case-by-case?
21    MR. RATNER: We were assuming in that paragraph, that
22 second paragraph under Heading 1 of the master complaint, that
23 the defendants were going to insist on an opportunity to
24 object to the effective amendment of any complaint that was
25 amended by adoption of the allegations of the master

19

1  complaint.

2      If that is not going to happen, we would simply file

3  the master complaint on the 30th and also indicate which of

4  the allegations of the master complaint that same date would

5  be adopted by each of the underlying actions.

6      THE COURT: Of which there are a total of five. Is

7  that right?

8      MR. RATNER: Four.

9      THE COURT: Are there not two England cases,

10 something like that? Weren't there two cases transferred from

11 that district?

12     MR. TILLERY: Actually, there were two separate

13 removals, your Honor, assigned two separate numbers. There is

14 one England case.

15     THE COURT: Why were there two?

16     MR. TILLERY: You have to address that to the --

17     THE COURT: There is really one case that came from

18 Chicago --

19     MR. TILLERY: It was.

20     THE COURT: -- Illinois?

21     MR. TILLERY: Yes. It was removed by two different

22 defendants a short time apart on the same day. They assigned

23 two separate numbers.

24     THE COURT: There is really one case?

25     MR. TILLERY: One case.

20

1      THE COURT: We originally had one case here, that was

2  Berisha, and then we have maybe Young and Sutton Farms, all of

3  four cases.

4      Why do we need the master complaint concept? I know

5  the defendants wrote, saying you're getting that model from

6  your other cases. You folks are very experienced plaintiffs'

7  counsel, you have many mass tort cases, and that concept of

8  the master complaint fits well in their 15,000 claims, 30,000

9  claims, six figures of individuals bringing claims.

10     Why does that model work when there are four

11 complaints? I know Mr. Saul said earlier there would very

12 likely be some more, but not in the thousands. There is going

13 to be a few more big ones, I suppose, that you expect to

14 bring, Mr. Saul, or some of you expect to bring. Still, that

15 is going to be under 10. Why do we need a master complaint

16 concept? Why is it helpful?

17     MR. RATNER: We are not wedded to the idea of a

18 master complaint. It isn't absolutely essential.

19     However, we think it is helpful for the court because

20 it allows for a single set of briefing initially on the

21 motions to dismiss.

22     THE COURT: Only if you're all adopting the master

23 complaint. The way I read your proposal, there was going to

24 be a master complaint, but there then there was going to be a

25 pick-and-choose approach per case. You will have the master

21

1 allegations, and nobody is going to sign onto the master
2 complaint, maybe.
3 Berisha might have Paragraph 1, 3, 5, 7. England may
4 pick 2, 4, 6, 8. Sutton Farm takes 12 and 18. I don't know
5 how we're advanced if nobody has that complaint. It creates
6 difficulty and confusion rather than streamlining, from my
7 perspective. If it is four cases, we'll have the complaints.
8 How does it help me to have the master complaint that
9 nobody is signing onto?
10 MR. RATNER: Everybody will be signing onto at least
11 a portion of it; that is, nobody would have allegations of an
12 underlying case that was not already in the master complaint.
13 It would just be because these cases, if we get past summary
14 judgment and we actually go to trial and there is no
15 settlement, will be transferred back to their original courts.
16 THE COURT: As I understand it, absent consent; is
17 that true?
18 MR. RATNER: Yes.
19 THE COURT: I thought so. In theory, there can be a
20 consent to transfer for all purposes to the transferee court.
21 Is that wrong?
22 MR. SAUL: I believe you can only try cases that are
23 filed in your court, your Honor.
24 THE COURT: Absent consent. The one I saw --
25 MR. LANGAN: I believe your Honor is correct, consent

22

1 changes things.
2 THE COURT: Yes. There is no reason to even discuss
3 that at this point, but in theory, theoretically there is
4 always that possibility. Otherwise, you're absolutely right,
5 my case will always be the Berisha case. The other cases will
6 return to their districts for trial absent somebody deciding
7 that there is some advantage, everybody deciding there is some
8 advantage to keeping them here. Go ahead.
9 MR. RATNER: For those cases, if any, that do not
10 stay here for trial purposes, when they go back to their
11 original court, the master complaint could be broader than the
12 states that they would be pursuing in their original court or
13 the claims pursuing.
14 THE COURT: Say that again.
15 MR. RATNER: The master complaint will include
16 everybody's claims. It will include all 18 states, it will
17 have Florida, you it will have New York, have 16 Berisha
18 states. It will include all the claims that all the
19 plaintiffs want to pursue in this proceeding, but if one of
20 those cases, say one of the Florida cases go back to Florida,
21 they wouldn't take the entire master complaint back with them
22 to Florida because it would be broader than the Florida case.
23 That is why people would be allowed to adopt a subset
24 of the master complaint allegations.
25 THE COURT: Mr. Ratner, you haven't explained to me

23

1   why it is an advantage.

2       MR. RATNER: Only because, as I said, your Honor, it

3   allows you to have one master answer, one master set of

4   motions to to dismiss. When later-filed cases come in,

5   instead of having disparate allegations that would result in

6   new motions to dismiss, they would instead adopt those

7   portions of the master complaint they deem to be most

8   appropriate for them, and there would already have been motion

9   practice on them.

10      In addition, for all pretrial discovery, discovery

11  disputes, class certification, everything could be done by

12  reference to a single master pleading which would be adopted

13  at least in part by every case that has been transferred here.

14  It doesn't have to be done that way, but that was the

15  concept.

16      THE COURT: I surely would like the advantage of a

17  single motion to dismiss, but there is no point of people

18  moving against allegations that nobody is signing onto.

19      All I am saying is, somebody in each of the four

20  cases has to be bringing an allegation of the master

21  complaint. There shouldn't any allegation in the master

22  complaint that no plaintiff, in essence, is adopting in its

23  complaint. As long as every allegation is picked up by

24  somebody, that is fine. I can't have a theoretical complaint

25  out there and having nobody signing onto it.

24

1   Do you see what I am saying?

2       MR. RATNER: Absolutely.

3       THE COURT: That is not fair.

4       MR. RATNER: That's right.

5       THE COURT: If what you are saying is that all the

6   master complaint is an organizational typing tool so that

7   you can analyze all allegations in one document, that is fine.

8   Then somebody has to be adopting at least some paragraphs.

9   There are no extraneous paragraphs.

10      MR. RATNER: That's right.

11      MR. SAUL: There are obviously benefits and burdens

12  to a master complaint. The downside to the master complaint

13  is there may be cases that are later filed that would not

14  necessarily be covered by the master complaint if one of these

15  four cases is not presently adopting some of those

16  allegations. So there is a balancing act.

17      THE COURT: Right. That is true.

18      In other words, if cases that come after you are

19  limited to something in the master complaint and they can't

20  leave anything outside the master complaint, the master

21  complaint has to be broad enough that one of you at least is

22  adopting every paragraph of it.

23      MR. SAUL: It is difficult at this time. A master

24  complaint helps with efficiency, but it also has some

25  tag-along issues.

25

1    THE COURT: But you want it? That is what your group
2  has decided, you want to do?
3    MR. RATNER: We are offering it for the court's
4  convenience, your Honor, and we think it will be effective and
5  efficient in this case.
6    We believe that there are procedures in place to deal
7  with later-filed cases and are hopeful that the complaint we
8  all agree upon by the 30th will be sufficiently broad and all
9  encompassing to include those future-filed cases in addition
10  to being adopted at least in part by everyone.
11    THE COURT: The time-frame between November 30th and
12  December 3rd is tight. That is just a few days for you to
13  circulate it and so that you can identify which paragraphs, in
14  essence, will come to Berisha complaint, will come to the
15  England complaint or Young or Sutton Farm?
16    MR. RATNER: If there is going to be no separate
17  briefing on motions for leave to amend, we are prepared to on
18  the 30th when refile the complaint, master complaint, and also
19  indicate on that date which provisions of it are being adopted
20  in which actions. We would just cut Paragraph No. 2 in our
21  proposed order.
22    THE COURT: Does anybody want to speak with respect
23  to this master complaint idea because now that I have fully
24  had a chance to hear about it from the plaintiffs, I don't
25  think it is a problem, either. It really sounds to me as kind

041.mtb

26

1    of a typing chart type of tool.
2    For example, the defendants submitted a chart, Ms.
3  Hanebutt, in her cover letter, submitted a chart which is a
4  nice tool. I don't know that this master complaint is much
5  more than this type of a chart, just the way it followed --
6  here are the common allegations and here are the ones that
7  equal the Berisha complaint and here are the ones that equal
8  the complaint.
9    MR. ROWELL: We anticipate we will be filing some
10  additional probably statewide class actions that may very well
11  be either original filings in this court, but certainly on
12  some occasions transfer cases to this court where this court
13  is the transferee court.
14    I would submit, your Honor, it would really expedite
15  things if, upon transfer, we knew by virtue of motion practice
16  what was going to survive and what was not going to survive.
17    It is not just a typing chart. We can really
18  expedite our case back to the transferrer court. From the
19  plaintiffs' standpoint, that is very important because when we
20  do file a case in another state and it is transferred here, if
21  we don't consent, we would like to get back there and try the
22  case.
23    THE COURT: Sure. When I say "typing tool," it still
24  is that to me. If you did your complaint separately and all
25  the motions to dismiss were made, you would get the rulings

041.mtb

27

1  anyway. It is just an organizational-convenient thing, as

2  Mr. Ratner described it. It is the same thing.

3      MR. ROWELL: It will speed the cases along.

4      THE COURT: Organizationally, yes; but, conceptually,

5  no. I am for it.

6      MR. LANGAN: We don't have much to add to what we put

7  in our letter to the court of yesterday. I would just like to

8  clarify one thing:

9      In the plaintiffs' submissions, they attached a

10  couple of orders that I think are not master complaint models

11  at all, but rather consolidated complaints. After the MDL

12  comes together, the plaintiff will file one new complaint that

13  supersedes all the prior ones.

14      THE COURT: I don't think that is what they have in

15  mind. I think they have in mind the master complaint process,

16  where you have every allegation from a collected group of

17  cases and picking and choosing per case which is their

18  complaint individually. I don't think they're talking about

19  one single, consolidated complaint.

20      MR. LANGAN: Right. And, therefore, that being the

21  case, for the reasons we said in our letter, we don't think it

22  will contribute to efficiency at all, but confusion.

23      THE COURT: Why is that?

24      MR. LANGAN: Because I think there will inevitably be

25  separate discussions, separate legal arguments about separate

28

1  plaintiffs, and we only have three or four cases here.

2      THE COURT: True, but what they're saying is you can

3  take on all the legal issues at once since everybody on the

4  plaintiffs' side collectively will have signed onto every

5  paragraph in the master complaint, will attack the entire

6  master complaint, I'll make the rulings such as they are, and

7  you'll know what is surviving and what is not surviving.

8      That is why I say it is really not more than a typing

9  exercise.

10      MR. LANGAN: Maybe viewed that way, your Honor may be

11  correct.

12      THE COURT: I think that is all it is. It is making

13  it easier for you to visualize what to attack because they're

14  all signing onto some part of it, so it tells you this is

15  everybody's complaint in one document. It may not be

16  anybody's complaint, but it is everybody's complaint, so to

17  speak. Do you understand what I am saying?

18      MR. LANGAN: Yes.

19      THE COURT: Collectively, all the theories are ready

20  for you to attack. Now the question is -- Mr. Eimer?

21      MR. EIMER: Your Honor, I haven't seen the master

22  complaint. We heard --

23      THE COURT: I haven't seen it, either. It is not

24  written. I don't think it is written yet.

25      MR. EIMER: So I am sort of relaying a conversation

29

1 which may not describe what is there at all.
2 My understanding, for instance, is that the master
3 complaint will claim damages on behalf of whoever it is that
4 is subject to the master complaint. And yet none of, as I
5 understand it, none of the plaintiffs before the court now in
6 what they opt for will be asserting a damage claim. They will
7 only be asserting conjunctive relief.
8 THE COURT: I just covered that with Mr. Ratner. I
9 said don't put anything in that master complaint that nobody
10 is signing onto.
11 MR. EIMER: That is what --
12 THE COURT: Nobody in this group at the front table
13 can sign onto it, it should not be a damage claim. If
14 somebody on the front table signs on, there can be a damage
15 claim and you can attack it.
16 They're not to put in some theoretical pleading that
17 applies to nobody sitting here. That is what Mr. Saul says,
18 this gets dizzy because there are cases coming. That is his
19 problem and not mine and yours right now. The master
20 complaint you file here, somebody has to sign onto every
21 paragraph. That covers your worry. Either it will or won't
22 have a damage claim.
23 MR. EIMER: The second concern I have is that at the
24 moment sitting in the Berisha case only, for instance, in
25 order to amend that complaint to drop damage claims, which

30

1 they may appear to want to do, because I think they don't like
2 where they are in the classification situation with the damage
3 claim --
4 THE COURT: They don't like where they are in the
5 classification?
6 MR. EIMER: They don't like the result of having a
7 damage claim on a class certification issue.
8 THE COURT: I see.
9 MR. EIMER: By dropping it, they can they can go to
10 (b)(2) certification, and they have to do notice to the class
11 and there is a different standard.
12 The issue that is before the court in Berisha which
13 we have raised with the court is whether they can do that
14 automatically as a matter of right now or the defendants have
15 an opportunity to address the court with respect to that
16 change in the complaint, the complaint having been answered
17 and no longer being amendable as a matter of right, and 222
18 (e) requires consent.
19 I think we should have an opportunity to address the
20 court before the court gave that consent. I don't know where
21 they are with this master complaint. It is hard to do this in
22 a vacuum, but we ought to at least have the right to look at
23 it and see whether we have something to say to the court about
24 their ability to amend that complaint if they're dropping
25 damage claims on behalf of Berisha or England or whatever is

31

1    going forward.

2        MR. RATNER:  Your Honor, we do not believe that the

3    defendants' efforts to try to force us to have a certain type

4    of pleading in the Berisha case is very legitimate.

5        However, what I would recommend is to the extent they

6    object to any substantive alteration of any one of these cases

7    through the use of the master complaint that is filed, they

8    can put that objection in their motion that they follow up on,

9    that they file.

10        THE COURT:  Motion to dismiss, in other words?

11        MR. RATNER:  Essentially.  They're going to file a

12    motion to dismiss under our proposed schedule 30 days after we

13    filed the master complaint by December 30th.  They can raise

14    any of those ancillary issues they wish to raise.

15        THE COURT:  They're saying probably there is a

16    misstep.  Procedurally, they would oppose your right to amend

17    your complaint in that way because it does affect the class

18    certification issues, and they say, without the legal court,

19    we don't have the right to do it.  They want to be heard

20    before you can do it.

21        I was also under another procedural link, there is a

22    way to fold it into the motion to dismiss.  It may not be

23    technically just so, but you would move to dismiss for because

24    it was inappropriate to amend in that way.  It would just be

25    so much more efficient than going around this twice.

32

1        Let's maybe see what the proposed master complaint is

2    and how it affects the individual cases, and we can revisit

3    this.  I see a lot of other folks are now standing.

4        MR. PASQUALE:  I have a little different issue that

5    some of the others may have in the room who are defendants

6    only in one case and my client's case only in the Berisha

7    case.

8        By pursuing the procedure we have been discussing the

9    last few minutes, I don't understand how my client responds to

10    claims in the master complaint that are raised, let's say,

11    adopted only by the England plaintiffs.

12        THE COURT:  You don't.

13        MR. PASQUALE:  My client doesn't directly, but if I

14    understand what is being proposed here, there is one motion to

15    dismiss that other defendants would be moving against.

16        THE COURT:  To the extent that you can sign onto the

17    one motion to dismiss, fine.  To the extent that you have a

18    single, separate issue, it would have to be your separate

19    brief, that is all.

20        MR. PASQUALE:  I understand that.

21        In effect, isn't this procedure binding those

22    defendants who are not in the other cases with respect to one

23    global motion that presumably we're all signing on with

24    respect to pleadings not against our clients?

25        THE COURT:  I don't understand your question.

MR. PASQUALE: It seems to me, if we are going to
have one motion to dismiss, we have one master complaint and
we have one allegation that is adopted, for example, only in
the England case, other defendants are going to have to move
against or may choose to move against that.

I guess I am concerned about arguments down the road
of collateral estoppel and the like.

THE COURT: That would be true in any case whether
there was an MDL or not, and there are other cases around the
country where you're not a defendant, you're not a defendant.

MR. PASQUALE: That is the point. Isn't the step of
this master complaint an unnecessary step?

THE COURT: No, no. It is just administrative
convenience. It doesn't affect you. Your complaint is still
the Berisha complaint, and the Berisha complaint is a separate
complaint. Once there is a master complaint, the Berisha
plaintiffs -- tell me if I am wrong -- have to tell me which
of the paragraphs are the Berisha complaint. You are not
moving, you are not moving against a master complaint, you are
moving against the Berisha complaint.

It is an administrative convenience. To me, it just
is a typing exercise. It puts it all in one place so
everybody can see all of the allegations, and those who are in
every case, there must be some defendants here in every case,
can move against the whole. The rest isn't your worry.

MR. GUTTMANN: There is just one additional thought I
think bears on the question of whether it really is
administratively convenient. I recognize it is convenience to
the court we are talking about. You will decide that.

To my knowledge, every claim in every one of the
cases is a claim under state law. No matter how you cut it,
we have to brief all the issues, all the claims under New York
law for the purposes of Berisha, and I am not in England, my
client is not there. It seems to me looking at it as an
outsider, they have to brief 16 states.

Query, your Honor, in that context, is it really
administratively convenient to have a magnum opus of a brief
that goes on for forever or better to have a brief that talks
about New York, brief that talks about Florida and so forth
because it will have to be presented to the court that way?

Unfortunately, Judge, you have to decide it that way.

THE COURT: There are no federal claims? What are we
doing here?

A VOICE: I don't believe we are.

MR. RATNER: Diversity jurisdiction, your Honor.

THE COURT: We are here for some reason.

MR. RATNER: It depends on the case. Bankruptcy
jurisdiction is what brought Berisha here. It was a removal,
your Honor, yes.

THE COURT: And the other cases?

35

1    MR. SAUL: Benisha was removed on the theory of

2    bankruptcy.

3    MR. TILLERY: The same thing in the England case as

4    respect to the federal jurisdiction in the Sutton Farms.

5    well.

6    THE COURT: How about the newer ones that may or may

7    not stay?

8    A VOICE: The other was also removed.

9    Sutton Farms, does anybody know how it got to federal

10    court?

11    MR. WALLACE: It was filed in federal court. The

12    defendants have not been served with Sutton Farms; and, hence,

13    haven't had an opportunity to remove it.

14    THE COURT: What is the allegation? Is it diversity?

15    What is the theory in the federal case called Sutton

16    Farms?

17    MR. WALLACE: I believe they have a federal cause of

18    action.

19    THE COURT: What is the federal cause of action?

20    A VOICE: This is the complaint here, and it is

21    negotiation among the plaintiffs' counsel as to where our

22    position will be in the case. If it certifies a class action

23    for non-RFG states, then it will be clustered, so many

24    different states are involved.

25    THE COURT: That wasn't very clear to me. Your name

36

1    was?

2    MR. BARISIC: Joseph Barisic.

3    THE COURT: I still couldn't hear your answer with

4    respect to the federal jurisdiction in the Sutton Farms.

5    MR. RATNER: I am not counsel in that case, but I

6    have read their complaint. The Young case and the Sutton

7    Farms case, I believe, are diversity cases.

8    THE COURT: You believe?

9    MR. RATNER: I believe they have state law claims.

10    THE COURT: Which is what Mr. Guttmann was saying.

11    MR. RATNER: If I may respond briefly to

12    Mr. Guttmann's comment, your Honor?

13    THE COURT: Yes.

14    MR. RATNER: Typically, we have cases where in a

15    single complaint, you will have a plaintiff who resides in one

16    state, another plaintiff in another state, and the motion to

17    dismiss that is filed in a single case where it is not an MDL

18    will often apply both the law of the state in which Plaintiff

19    A resides and the law of the state in which Plaintiff B

20    resides. That is not an unusual circumstance. That would

21    simply be what happens in this case.

22    I believe that for the purposes of the motions to

23    dismiss, that there are now three states' laws at issue:

24    Illinois, Florida and New York. Even though the classes that

25    are alleged cover more a broader set of states, the law used

37

1  for the purposes of determining the sufficiency of the

2  allegations would be the law of the states in which the

3  plaintiffs reside, in which the individual-named plaintiffs

4  reside.

5          MR. EIMER: Your Honor, we strongly disagree with

6  that. There is just no question in our mind at least that if

7  they're bringing a claim on behalf of a plaintiff that sits in

8  California, that case is not based on Illinois law or New York

9  law or anything else.

10         THE COURT: That is not what I want to discuss today.

11 I'll get to that when I have to get to that. That is

12 certainly not for today. I want to return to Mr. Guttman's

13 point. He was saying that is an argument against a master

14 complaint, and I don't see the argument.

15         The way it sounds to me, it is going to be

16 complicated no matter how you slice it whether it is four

17 complaints, which in reality it is. This master complaint, as

18 said over and over again, is a typing convenience. There

19 are four complaints. They're going to tell you which

20 paragraphs in a single document is their complaint. It is not

21 hard.

22         MR. EIMER: I don't understand the convenience

23 because we are going to file four motions to dismiss. At

24 best, it will be directed at each case and whether those cases

25 at action under that state law or federal law are sufficient.

38

1          THE COURT: It sets forth in one document all the

2  theories, that is all. It is nothing much more than a chart.

3          MR. EIMER: Or do we do one long brief or 17 briefs

4  or 18 briefs? It is going to be addressing the state law.

5          THE COURT: You are not going to do 17 or 18 briefs.

6  The most we have here is four cases.

7          MR. EIMER: Correct, your Honor.

8          THE COURT: That is maximum.

9          MR. EIMER: At least one of them will have 16 states

10 involved.

11         THE COURT: That is one case, one brief.

12         MR. EIMER: There is no question we are targeting

13 individual cases and the allegations in those cases.

14         THE COURT: That's right.

15         MR. EIMER: The question is what advantage -- I don't

16 see any advantage to have this master complaint other than

17 confusion.

18         THE COURT: No. I don't think there is any confusion

19 at all. I think it is very useful. It is a management tool.

20 It is nothing more than that. It puts it in a single document

21 that you can have on your desks whenever you want and you can

22 have color coding for which paragraphs are which of these four

23 cases. That is all. It makes for some common paragraphs.

24         Paragraph 3 of the master complaint is in all four

25 cases and everybody knows it. It is really just color coding.

## 39

1  Get yourself four pens and you have organized the whole thing.

2  That is it.

3      MR. BIALO: Your Honor, in the course of the

4  conversation, we have lost track of Mr. Eimer's earlier point.

5      THE COURT: Mister who?

6      MR. BIALO: Mr. Eimer's earlier point.

7      THE COURT: Opposing leave to amend.

8      MR. BIALO: As a defendant in the Berisha case, that

9  is quite an important point to us and others. We are hoping

10  that the court or together counsel will find a way to deal

11  with that.

12      We think we have the right, should have the right and

13  ability to oppose the amending process that the plaintiffs are

14  going to do in respect of the named plaintiffs and the claims

15  that they seem to want to bring.

16      THE COURT: It depends on the grounds. If you're

17  going to tell me they shouldn't be allowed to amend because it

18  doesn't state a claim, I would rather handle that on motion to

19  dismiss. It depends on the ground.

20      I don't want to run through that exercise twice, so I

21  think we should postpone this conversation until they

22  circulate the proposed master complaint, and Mr. Gordon said

23  that that will be done simultaneous with the color coding

24  identification, so to speak, of what the Berisha complaint

25  really is. When you see it, I am prepared to have another

## 40

1  conference where, if need be, we can renew this argument.

2  I should not immediately go to the motion to dismiss

3  stage, but I should reconsider the idea of opposing relief to

4  file at all.

5      MR. BIALO: Thank you.

6      THE COURT: We need to see it because we may not need

7  that conversation.

8      MR. SAUL: Just to be clear procedurally, we will

9  file a master complaint along with four individual complaints

10  adopting paragraphs.

11      THE COURT: Exactly.

12      MR. SAUL: We do not need to file a motion to amend

13  to file any of these complaints.

14      THE COURT: Wrong. What I just said, you will not be

15  able to file at all. You will have to serve it as a proposed

16  master complaint and a proposed complaint in each of the four

17  actions.

18      I will not give them more than three days or so to

19  think about that or have a conference. If they say we really

20  think there is a basis to oppose the amendment in Berisha

21  only, the others can be filed. I'll hear them immediately and

22  try to cope with the issue.

23      MR. SAUL: Fair enough.

24      THE COURT: So here is our proposal:

25      We will have three business days for someone to ask

41

1   for a court conference or we will accept it as a filing. It

2   is only a filing. Of course, you will have full opportunity

3   to move to dismiss.

4       MR. BIALO: Thank you.

5       THE COURT: It depends on the grounds. Don't tell me

6   they shouldn't file it because it doesn't state a claim. That

7   we can do on motion to dismiss.

8       MR. BIALO: I agree.

9       MR. GUTTMANN: One other point just occurred to me.

10  When we were last here, we were told that the named

11  plaintiff in Berisha, Ms. Berisha, was no longer going to be a

12  class representative and they were going to seek to sever her

13  claims but keep them before your Honor. We need to know what

14  is going on with things like that. It is not just her, but

15  anything else.

16      THE COURT: That's right. I don't know that you need

17  to know that this minute.

18      MR. GUTTMANN: I understand. As part of this

19  process, if we are defining what this case is all about, if

20  she will bring additional claims and she is not going to adopt

21  everything in the master complaint or is going to adopt things

22  that are different than I think O'Brien is intending to be the

23  name now, that should be coming to the surface as well.

24      THE COURT: It should. We are talking about four

25  cases. Who knows if by November 30th we are talking about

42

1   more cases. Mr. Saul has promised us additional filings, in

2   any event. He said you can be sure that there are more cases

3   coming.

4       MR. SAUL: I didn't promise; I suggested.

5       THE COURT: I thought it was --

6       MR. SAUL: Okay, I promised. Now I promise.

7       THE COURT: -- I thought it was with some confidence

8   the predicted additional cases.

9       We have to settle the pleadings. One of the aspects

10  of settling the pleadings are, are we dealing with four or

11  seven cases, are we dealing with four or 10? We need to know

12  how many different complaints there are.

13      MR. LANGAN: Just to echo what Mr. Guttmann said, if

14  named plaintiffs are, in fact, going to be dropped, it seems

15  to us there is a procedure for that. They have to seek leave

16  of the court to drop those people. Their claim should be

17  dismissed with prejudice.

18      There are things like that need to be examined.

19  The plaintiffs are proposing to let Berisha go on their merry

20  way and file a new case somewhere else. I don't think that is

21  the proposal.

22      THE COURT: I am not prepared to address any of that

23  until I see what plaintiffs decide to do. The first place of

24  the ball is in the plaintiffs' court. I said that an hour

25  ago. Now we spent an hour talking about it. Let them settle

43

1  their pleadings. Let them describe what this complaint is
2  going to be, let them decide what the other cases are. Let
3  them decide what allegations are in each complaint. When you
4  see that, you know what you have to talk about. Right now we
5  are speculating and worrying.
6       MR. LANGAN: Thank you.
7       THE COURT: The next thing is the timing.
8       In the proposal, plaintiff proposal, it says
9  defendants will have until December 15th. That was to oppose
10  the amendment. The motion to dismiss, they propose a month.
11  Assuming for the moment that we can get past the leave to
12  amend stage, can you do your motion to dismiss in a month,
13  given that actually you have fully briefing and you fully
14  briefed Berisha as it was and you attack many of the legal
15  issues that you will be attacking again?
16       Given that, don't you think 30 days is enough?
17       MR. LANGAN: Could we have until a little bit after
18  the holidays, perhaps early January? Maybe five weeks or six
19  weeks?
20       THE COURT: In total?
21       MR. LANGAN: Right.
22       THE COURT: You want to ruin New Year's as well as
23  Christmas?
24       MR. LANGAN: Under their proposal, both are ruined
25  regardless.

44

1       THE COURT: No, they won't. December 30th was for
2  you.
3       MR. LANGAN: Right.
4       THE COURT: You still have a good New Year's. Only
5  theirs will be ruined worrying about their reply papers.
6       MR. LANGAN: To answer your question, yes, I want to
7  ruin both.
8       THE COURT: I really don't understand why, to tell
9  you the truth. I think December 30th lets you enjoy one of
10  the two holidays, and what was the reply time you had
11  suggested? Responses due January 30th, defendants' reply
12  February 15th?
13       MR. RATNER: Actually, as I am looking at my
14  calendar, the 30th is a Saturday. It should be the 29th.
15       THE COURT: Right. I think given that so much has
16  been briefed already, I would like to stick with these dates,
17  January 30th and February 15th, and try to get one of the
18  plaintiffs' lawyers -- Mr. Rowell, we need rulings, and that
19  is true. Until it is fully briefed, I can't give you any.
20  The sooner you get this going, the better.
21       MR. WALLACE: I would like to request a little extra
22  time, for this reason: The Sutton Farms complaint, I gather,
23  is going to be included if the panel transfers it here. You
24  would expect --
25       THE COURT: It is conditionally transferred. Now I

041.mtb

45

1    am ruling on objections.

2        MR. WALLACE: I presume that within 15 days, if that

3    order becomes effective, they would be filing a complaint on

4    behalf of the Sutton Farms class, which may be one state or it

5    may be, if my math is right, could it be 34 states?

6        THE COURT: Sutton Farms could be what?

7        MR. WALLACE: Right now it purports to be a class

8    representing well owners in 34 states.

9        THE COURT: All of the non-RFG states, that is 34

10   states, right.

11       MR. WALLACE: I believe, by their count, that is 34

12   states.

13       THE COURT: Somebody stood, maybe it was Mr. Ratner,

14   I am not sure, and said, "or it might turn out to be just

15   Florida."

16       MR. WALLACE: Correct. Right. We don't know yet.

17       Indeed, we haven't been served in that case yet.

18       THE COURT: Right.

19       MR. WALLACE: If between now and the end of December

20   we are served and the case is transferred here, we expect to

21   move to dismiss the Sutton Farms case by the end of December.

22       THE COURT: If it turns out there are 34 states, and

23   if it looks like you have to look into the law of 34 states,

24   you will ask for a conference and say that is the basis for

25   new schedule. Again, why don't we worry about it if and when

46

1    it happens because it may turn out to be just Florida.

2        MR. WALLACE: I foresee a great deal of difficulty

3    coordinating among ourselves in this picking and choosing

4    progress who is going to adopt what portions of the brief in

5    motions to dismiss, who is going to be asserting which

6    arguments. I presume you prefer we present you with a joint

7    brief?

8        THE COURT: That's right, all.

9        MR. WALLACE: We also hope you will allow a short

10   period for individual defendants to file any separate special

11   arguments that they might have.

12       THE COURT: That's right, unique to their client and

13   unique to their position, right. I don't think this is going

14   to be as hard as you think.

15       I certainly accept your point that if that case is 34

16   states as opposed to one state, that changes the briefing

17   picture. I understand that. You have to start talking about

18   that kind of state law. The plaintiff will say it doesn't

19   involve 34 states' laws anyway. We need to discuss that.

20       Don't worry about it until we know if it is one state

21   or 34.

22       MR. WALLACE: Thank you.

23       THE COURT: This is a very accessible court. If you

24   ever want a conference, you really just have to ask, you get a

25   conference. We don't have to solve all of the world's

47

1 problems today. We would if we could. We can't even solve
2 ours much less the worlds.
3 MR. BIALO: I may be tilting at windmills on this
4 one.
5 THE COURT: It wouldn't be the first time.
6 MR. BIALO: Actually the windmills have been pretty
7 good to me, and I appreciate that.
8 The situation here -- I just pass this observation
9 along -- we have fewer days in which to make the motion to
10 dismiss than days left for preparing the opposition. It does
11 seem to me a little backwards.
12 THE COURT: They have 30 days to prepare the
13 opposition.
14 MR. BIALO: And we have 29 to prepare?
15 THE COURT: 29 days.
16 MR. BIALO: Could we get the end of the first week of
17 January, please?
18 THE COURT: The other fellow asked for?
19 MR. BIALO: He asked for six weeks. I am only asking
20 for four and a half.
21 THE COURT: I don't see it.
22 MR. BIALO: The Florida issues have not been briefed.
23 Those who are defendants in the Florida cases, it does seem
24 they're going to have to start from scratch.
25 THE COURT: That leads your way to cut them back to

48

1 January 29th if you were really worried they had one extra
2 day.
3 MR. BIALO: It wasn't about that.
4 THE COURT: I will move them back to January 29th.
5 Let's not go on much longer on this because I may have
6 flexibility anyway. Let's see what -- we just don't know what
7 we're going to get -- let's see what we get and what gets
8 transferred. We can meet again. Right now that is the
9 schedule.
10 There is not much to worry about right now because
11 you don't have any more information than you have with the
12 original complaints, and you already briefed England and
13 Berisha. This is a down time with respect to briefing. You
14 need to wait and see.
15 We should turn to discovery. Now, with respect to
16 discovery, we need to get a document depository going in this
17 case. I saw a little bit of correspondence that still haven't
18 figured out a single site. The plaintiffs were complaining
19 defendants want them to go to five different cities, et
20 cetera.
21 In the age of technology, in which I am not an
22 expert, I don't understand why we aren't going to be able to
23 create an online virtual depository. It has been done in
24 other multidistrict cases that have lots of documents. I
25 think this will be a document-intensive case. I assume I am

49

1 going to hear that the documents number in the hundreds of
2 thousands if not a million at some point.
3 If all of that becomes true, don't you need to work
4 out a highly technical operation here for your using computer
5 you are using online to create a depository which we'll have
6 access to for passwords, people have the ability to produce
7 documents through scanning into the computer.
8 I had a model of it in actually another oil and gas
9 case out of Texas, a big antitrust multidistrict case, and I
10 saw the orders in that case, and it was all done online.
11 Are any of you familiar with that? You are. For the
12 record, some heads nodded that they have been involved in that
13 Texas matter. They seem to be fairly well organized, so there
14 is a model. I don't have to reinvent this wheel. I don't
15 know if any of these plaintiffs' attorneys are involved in
16 this particular case since it is antitrust and not product
17 liability. It would seem to me to be well done.
18 MR. GORDON: I am also not as computer savvy as
19 perhaps many in the room. I was involved --
20 THE COURT: There is no excuse in your case given you
21 appear to be under 50. Go ahead.
22 MR. GORDON: I still turn to my 11-year-old son to
23 help me. Your Honor, I was on the plaintiffs' steering
24 committee in the breast implant litigation, and Judge Pointer
25 was very involved in the complex litigation. I wanted to try

50

1 to bring CD-Roms into the picture.
2 We also had, in addition to that, a single document
3 depository in Cincinnati, Ohio.
4 THE COURT: The physical one?
5 MR. GORDON: Physical, with hard copies that teams of
6 paralegals and attorneys could go to, could discuss, could
7 look at the same document, that there was no question about
8 the clarity of what is written in the margins, often a problem
9 with the CD-Roms. We had a CD-ROM program.
10 THE COURT: Three years is a lifetime in computer
11 technology. The ability to scan now isn't what it was then.
12 I understand you can scan 5 to 8 boxes in an hour. It is a
13 tremendous change already. All right.
14 MR. GORDON: We sold at cost to all the plaintiffs
15 the CD-Roms. It was a remarkably failure.
16 THE COURT: I understand. I am telling you three
17 years is a lifetime when you're talking technology.
18 MR. GORDON: Just in point of fact, a lot of the
19 attorneys are not necessarily going to be computer literate.
20 If there are later attorneys who come into this litigation
21 with other cases, they may not have the resources to use those
22 fully. Certainly our firms do a lot of work online, but the
23 attorneys just did not like to be stuck to a computer, wanted
24 to have a piece of paper that they could use, look at
25 together.

51

1    No. 2, and more importantly, it was extremely
2    expensive. That is just where we imaged the documents we
3    wanted. What your Honor will be calling for is for the
4    defendants to image virtually all of these millions of
5    documents, much of which we'll have no interest in. What we
6    envisioned, your Honor, was a document depository that the
7    plaintiffs could go to, look at, it would be maintained for
8    the benefit of future plaintiffs who come along, and then the
9    plaintiffs could make copies at their own expense of whatever
10   they wanted.
11       Then if the plaintiffs wished to put it on CD-ROM at
12   our expense, fine. I don't think we want to do that. There
13   have been others who have been involved in litigations who
14   have been working with the documents successfully in
15   identifying the documents we really need. Face it, we have to
16   look at all the documents.
17       We understand in any trial how many documents for
18   each defendant are we really going to be relying upon using,
19   handing to each other and presenting to a judge or to a jury.
20       THE COURT: Sure. If we organize this thing with a
21   trial in mind, we would be unrealistic as to the usual end in
22   civil litigation. The chances of trial are between 2 and 3
23   percent. So it is 97 percent likely you need all of this not
24   for trial at all, but for motion practice and settlement.
25   That is for that you need it for.

52

1    MR. GORDON: I agree with that. Again, even for
2    motion practice, I don't think we are going to be talking
3    about millions of documents we are actually going to be using
4    or thousands of documents, but rather a hundred or so
5    ultimately at the end of the day.
6        THE COURT: Maybe your requests are too broad. Maybe
7    you shouldn't be calling for millions of documents. If you
8    don't need them, don't call for them. Get into the years and
9    the issues you need and don't call for millions if you don't
10   want them. Mr. Eimer.
11       MR. EIMER: This is precisely another dispute the
12   defendants are having with plaintiffs right now. Mr. Gordon
13   and Mr. Breit have had exactly this discussion.
14       What is happening is, they realize responsive
15   documents are much broader than they ultimately want. We're
16   incurring the cost of copying, and I think it will be millions
17   of documents that they don't want.
18       Then they want the luxury to look through, come
19   through and look at the millions of documents we paid for,
20   they look through a couple they find interesting and that is
21   all they want.
22       They don't want us to take our responsive documents
23   and copy them at their expense. They want us to copy the
24   millions of documents or take the originals out of the company
25   and disrupt the company.

53

1     Getting back to your Honor's point of view, I don't
2 know what the other defendants have done, but CITGO is
3 completely electronic. We have done everything online. Our
4 document search has been only scanned documents. We have
5 Xeroxed nothing. We are in a dispute now because we want to
6 turn over to them discs with the documents on them, and
7 they're saying no, we one one want paper. Not only do we have the
8 cost of scanning the documents in, they want us to pay the
9 cost of blowing them into paper form and bringing them to New
10 York and into the depository.
11     It is a waste. We are producing millions of
12 documents they have no interest in, they won't pay for or
13 share the cost of. I am willing to say, and I wrote them a
14 letter and said we are scanning the documents in, it is
15 costing us 11 cents a page to scan the documents in.
16     THE COURT: Is that what it costs?
17     MR. EIMER: That is what it costs and we'll split it
18 with you. The answer was no, we are not going to split it
19     In the end, we have a CD that anyone can walk around
20 with in a suitcase. We don't have to have a depository.
21     The burden of this is all falling on us. The search
22 is massive. We are producing huge amounts of documents. They
23 say we don't want all of that. When we find the document or
24 two we we want or hundred or thousands, we'll pay the 10 cents to
25 Xerox no matter what form you have it and the rest is your

54

1 fault.
2     MR. GORDON: Judge, first of all, I don't want to
3 just --
4     THE COURT: You're in a transitional era between
5 paper and electronic. You are on that edge. This won't
6 happen again in 10 years. It didn't happen 10 years ago.
7 Is this the exact issue where this issue keeps coming
8 up?
9     MR. EIMER: I agree with that. Even in an all-paper
10 world, I have the same concern. In an all-paper world,
11 they're saying there are hundreds of thousands or hundreds of
12 documents they don't want, even though responsive, and they
13 want us to pay the cost of copying all those documents,
14 bringing them to New York.
15     THE COURT: They are not saying they don't want them.
16 They said they need to search them to find the key documents,
17 and you can find the 100 or 1,000 key ones unless you look at
18 the whole.
19     MR. EIMER: We would be glad to do that in response
20 to the court. Why are we the only ones paying for documents
21 and bringing them to New York? They asked for it. Normally,
22 under the federal rules, they pay for copying costs, not we
23 pay for copying costs.
24     THE COURT: I don't think we are up to the point of
25 copying cost. We are up to where they should be produced.

55

1 Should they be produced at the offices of 10 and 12
2 and 15 oil companies that are at 10 or 12 or 15 locations or
3 have one central document depository?
4 We are not up to the point of talking about copying.
5 I think that you have overstated your argument. We weren't at
6 that point. We are saying where is the document depository,
7 and Mr. Gordon is proposing one physical location, and I am
8 saying there should be a virtual depository online. Maybe
9 there should be both. I don't know.
10 The thought of it being scattered all over is not an
11 organized way to do things even though I understand it is much
12 more convenient for you not to have to transport them
13 anywhere, certainly not physically since you've got them all
14 on CD-ROM.
15 MR. EIMER: That brings up the cost issue.
16 Normally, we produce the documents where they are,
17 but the federal rules provide that the plaintiffs come down
18 and inspect the documents.
19 THE COURT: The federal rules have a lot of
20 flexibility. The ability to create a single document
21 depository is fully tested. You know I can do that.
22 MR. EIMER: Taking them away is another cost issue.
23 MR. WALLACE: Your Honor, there is something of a
24 compromise we have been considering in discussing with the
25 plaintiffs. We could make documents available for their

56

1 inspection in a limited number of locations, and I think that
2 number will probably be around eight for all the defendants.
3 They would review what is available and decide what they would
4 like to contribute to the depository.
5 Then those documents that they select could be imaged
6 and sent to the electronic depository or copied in hard form,
7 if that is the will of the group. I find appealing the idea
8 of an electronic depository. My concern is what goes into it
9 first. Is it a million documents or a hundred thousand
10 documents? How do they get selected?
11 I would like to urge the plaintiffs to use those few
12 limited locations to review the documents, for one important
13 reason: Our clients need to maintain those documents for
14 their own use and for production in the state cases as well.
15 THE COURT: That was one of the reasons I started out
16 with a background on the state cases. That was the very
17 reason I asked that question, to identify for myself all these
18 pending litigations because if we had a single depository,
19 surely if it was electronic, they would be invited in, too.
20 All these state cases would be invited in.
21 There will be one place to get documents and no other
22 place to get documents. I would be writing to these state
23 court judges and suggesting we coordinate. In the end, it
24 would be convenient for defendants to do it this way. You
25 would have one production and it would satisfy all cases.

1  I was thinking about those state cases. I was not

2  forgetting about them.

3  MR. WALLACE: The electronic solution may resolve

4  that concern about where do the plaintiffs in state cases go

5  to review documents.

6  THE COURT: Everybody goes online. The model is

7  there for those of you who recall the orders from the Texas

8  case. I though that were pretty good.

9  MR. WALLACE: That leaves the two issues: What goes

10  in the depository first place and how are they selected and

11  who pays for them.

12  MR. GORDON: We filed our case in state court. They

13  filed their case in state court.

14  THE COURT: Who is "they"?

15  MR. GORDON: The England plaintiffs. The defendants

16  removed to federal court. There was then a discussion in this

17  court about whether or not they would be filing an MDL, and

18  would we waive our request to remand back to state court if

19  they wouldn't move for MDL, and they wouldn't, and they did.

20  Why do they move for MDL? Because they want economy,

21  to save from the burden, expense of having to produce, for

22  example, documents over and over and over again in New York,

23  in Illinois, in Florida to all these state counsel as well if

24  we can coordinate them jointly with the federal and state

25  courts.

1  That is the savings they have. What they're getting

2  out of all of this in this MDL, which they requested and which

3  was granted, is a one-time production of virtually all the

4  universe of documents. The manual calls for the production of

5  the originals. We then can go and ask for copies at our

6  expense of the originals. I wish we were living in a time

7  when I can say turn over the thousand documents from each of

8  you that establish your liability. They won't do that.

9  I have to go through the very expensive burden of

10  going through every one of their documents and doing it,

11  hoping to create a product in case other future plaintiffs

12  come along and require the core product we have done for the

13  benefit of all.

14  We are planning to do that. It is very expensive.

15  We will have to establish our own place, war room or

16  depository where we can work without being monitored and

17  review the documents we choose.

18  The problem with the electronics, they're going to

19  ask for us to pay for 11 cents a page, think about that

20  expense, of virtually all of that we don't necessarily want

21  that much. We want to look at all of it to see if we want to

22  keep it and maintain it and use it. It is expensive, much

23  more than Xeroxing.

24  The manual calls for the production in a location of

25  plaintiffs' documents, separate production for defendants'

59

1 documents to be maintained and look at the sample order in the
2 manual, which is on Page 41.35, which talks about that the
3 documents produced by defendants, produced pursuant to formal
4 or informal requests, shall be placed in a defendant's
5 repository maintained at expense of defendants.
6 In Paragraph 3, the plaintiffs may obtain a copy or
7 obtain copies at the inspecting party's expense. We are just
8 trying to do what the manual suggests in the MDL, that they
9 requested, which is saving them countless reproductions and
10 maintain that in an organized fashion, Bates stamped, with an
11 understanding what were the documents they had been given in
12 boxes, to which interrogatories they are responding to with
13 those documents. The manual puts the burden of the
14 maintenance on them and the burden of copying what we want on
15 us. We like to follow the manual in that regard.
16 We didn't ask for the MDL. We think they are getting
17 a tremendous savings by having it, and we appreciate the fact
18 there is an MDL at this point to do that, but not if they get
19 the best of all worlds. What they are producing is called-for
20 production in five cities all across the United States in
21 addition to the five or six cities --
22 THE COURT: They --
23 MR. GORDON: -- two additional cities per defendant
24 and that if there are other active files, wherever those are.
25 It called for potentially up to 30 different

60

1 locations for production. I don't think that is going to be
2 very easy for one who comes along in six months filing perhaps
3 a statewide class in Pennsylvania who is then asked to, has to
4 go back to all of the places, not have any sort of organized
5 sense of where they are and evaluating them for their cases.
6 THE REPORTER: Your Honor, may we have a short
7 recess?
8 THE COURT: We will take a short recess.
9 (Recess)
10 THE COURT: Mr. Guttmann.
11 MR. GUTTMANN: Yes, your Honor.
12 Let me say one thing at the outset that, and I know
13 you may say it is not germane here, but I feel compelled to
14 respond, just to set the record straight, there are people at
15 the plaintiffs' table who oppose the MDL. There are people
16 who supported it at the plaintiffs' table. The same is true
17 at this table. My client and a number of other companies
18 involved in Beristia did not support MDL. Mr. Gordon's clients
19 did not support it, either.
20 THE COURT: The defendants moved for the MDL.
21 MR. GUTTMANN: Some of the defendants.
22 THE COURT: Fair enough. No plaintiff moved for MDL.
23 MR. GUTTMANN: But, but some of them supported it.
24 My only point is there is no substance to the
25 argument, which in effect boils down to you asked for it, now

61

1    you've got it.

2        THE COURT: I don't think it is worth our discussing

3    it, but I probably disagree with you because I go back to the

4    beginning in the Berisha case and I remember the very first

5    argument about remand, and I remember sort of a tentative deal

6    that was struck in terms of not making the motion to remand.

7        It is all history. It really doesn't matter. The

8    theoretical idea is that there would be no motion to take it

9    out of the court. The plaintiffs viewed the motion for MDL as

10   a breach of that. I don't remember the MDL discussed at

11   meeting. It might have been included in some minds as

12   included in the deal. It is really not important, but the

13   defendants were the ones who moved for MDL status. Whether

14   some plaintiffs did or didn't oppose it, historically that is

15   not accurate.

16       MR. GUTTMANN: Some defendants moved for it.

17       THE COURT: I hear that.

18       MR. GUTTMANN: It was argued before the panel and

19   some opposed it.

20       I would like to turn to the issue of electronic

21   depository. I would suggest to the court what we are really

22   talking about is an issue of cost. Who is going to pay for

23   what and how is notice going to be done, questions of fairness

24   and what and how should be done.

25       There is also, as Mr. Eimer is suggesting, questions

62

1    of what is appropriate in terms of what is really in front of

2    us. There may be other cases filed in the future, but they're

3    not necessarily going to be against my client, your Honor, or

4    against Mr. Eimer's client, et cetera. So that, to me, that

5    doesn't carry much weight in terms of whether I believe that

6    something electronic is appropriate. There is a cost factor.

7        We had a discussion during the break about what we

8    think is the case your Honor was referring to in Texas, the

9    other antitrust case, and obviously we don't know if it is the

10   same one. The one the people here are familiar with is the

11   one the documents themselves are not online. What is the

12   on a web site is all the pleadings, all the dockets, that sort

13   of thing and indexes of the documents.

14       The physical documents themselves are in a

15   depository. You may be referring to a different one.

16       THE COURT: I am sure I was referring to the same

17   case, MDL 1206, in release oil antitrust litigation.

18       MR. GUTTMANN: That is the one.

19       THE COURT: My recollection is there is a document

20   depository online. If I can get it now -- (pause) -- I don't

21   think I have that document.

22       (Pause)

23       THE COURT: I think you're right. I think what was

24   online was the indices. It looks like the indices were online

25   on the web site for MDL 1206, and there was a physical

63

1   depository in Corpus Christi.

2       MR. GUTTMANN: That's correct. The additional

3   point --

4       THE COURT: There is a paragraph that says documents

5   may also be placed on depository on DVD or CD-ROM. The

6   resolution for scanned images must be no less than 300 DPI.

7       Additionally, the DPI file must include on the CD or

8   DVD providing the beginning and ending MDL document number and

9   corresponding tipped image. Parties may purchase copies of

10  the DVD or CD-ROM from the depository for the cost of copying

11  from a copy service. The point is, it is a little bit of

12  both. You're right, it was a physical depository, but you

13  could place your documents in the depository on DVD or CD-ROM.

14  The web site had the indices and had the ability to order the

15  documents off the index.

16      MR. GUTTMANN: That's correct. My understanding is

17  we are really talking about a fairly limited universe of

18  documents, unlike what appears to be the situation here. So

19  that the --

20      THE COURT: Why do you say that it was not in the

21  millions?

22      MR. EIMER: I was counsel for CITGO in that case,

23  your Honor. All that was produced at the time -- the case has

24  been settled.

25      THE COURT: I know.

64

1       MR. EIMER: All that had been produced at that time

2   were certain contracts known as buy-sell agreements.

3       THE COURT: What was the contemplation? Wasn't it

4   contemplated there would be a huge number?

5       MR. EIMER: Had the litigation gone forward, it would

6   be a substantial number of documents. At the time when we

7   actually wound the litigation up for my client, it was a small

8   number of documents.

9       MR. GUTTMANN: The other point I was going to make,

10  if I might, is that we are, as the court put it, in a

11  transition period here in terms of this electronic way of

12  doing business. Mr. Eimer's client may very well be as high

13  tech as he indicated, but I would suggest to the court that is

14  really not true of all the companies on the defense side here.

15      The reality is that for that reason, that a number of

16  the defendants, including my client Sunoco, have not said come

17  to us. We have, in fact, taken complete sets of documents and

18  are shipping them all to plaintiffs. If those boxes of

19  documents have to end up in a depository some place, that is

20  one thing. I would suggest to the court that we simply would

21  prefer to do business that way. If they want to pick things

22  as Mr. Gordon indicated and scan them, I fully support that.

23  It is his right to do that. I may very well do it with my own

24  case. It is an expense issue.

25      THE COURT: All you're arguing, you don't want to be

65

1 required to have all of your documents electronically scanned
2 and available on disc?
3 MR. GUTTMANN: Right. If the court were to go the
4 way the Texas case went and go with the option, I have no
5 objections to that. Mr. Eimer can handle it as he sees fit
6 and so can I.
7 THE COURT: The Texas model had a physical
8 depository, had one location, they had indexes online, had the
9 choice of submitting the documents in hard copy or on CD or
10 DVD, and that is the model, basically that is the model I am
11 considering.
12 MR. GUTTMANN: The only issue that --
13 MR. WALLACE: Your Honor --
14 MR. GUTTMANN: -- only issue merits some discussion
15 is the question of indexes. My understanding is we are
16 talking in the case of some of the defendants of literally
17 hundreds and hundreds and hundreds of boxes which, as Mr.
18 Gordon suggests, in the end of the day in the main may have no
19 particular relevance here.
20 That, it seems to me, is an issue that merits some
21 consideration whether everything should be indexed because of
22 that. In terms of the depository, in terms of a web site to
23 deal with all these other cases in other respects in the way
24 that that decision talks about, Sunoco has no problem with it.
25 We would support it.

66

1 THE COURT: Mr. Wallace.
2 MR. WALLACE: Your Honor, I want to return to my
3 compromise suggestion, if you will, regarding what goes into a
4 central location, what goes into an electronic --
5 THE COURT: I understood. You don't have to repeat
6 it. I got it the first time. They should come visit eight
7 locations, take a look, and they asked what goes into the
8 central depository. You shouldn't have to bring it to the
9 central depository, but come to eight locations to take a
10 look?
11 MR. WALLACE: Correct. I neglected to mention, my
12 clients are either in the process of creating or already
13 maintaining a repository in these various locations of their
14 own documents that contain the universe or will contain the
15 universe of potentially responsive documents, that would
16 contain the documents that Mr. Gordon says the plaintiffs
17 aren't really interested in copying.
18 THE COURT: He doesn't know that. He says I hate to
19 look at the universe to find out what ultimately needs copied,
20 and he doesn't want to look in eight locations to find them.
21 I don't need any repetitive argument. I have too many
22 lawyers. Some new, I am happy to hear.
23 MR. RATNER: In addition to the model which we
24 support of having a single location, with the parties having
25 the option of putting their documents in and hard copy them or

67

1  put them on disc, the manual contains certain other suggested

2  details that I would throw out:

3        THE COURT: Tell me that again.

4        MR. RATNER: It was attached to my declaration in

5  support of our Case Management Order No. 2 as Exhibit A. It

6  was an order from Judge Higgins.

7        THE COURT: I don't think I have it. I may have

8  received yours by E-mail or fax. I may not have yet received

9  the hard copy.

10        MR.WHATLEY: Your Honor, may I hand up my copy?

11        THE COURT: Just so I can see if it looks familiar.

12  It may still be on the way if that is the original.

13        (Pause)

14        THE COURT: I have that right in front of me. Which

15  exhibit is it?

16        MR. RATNER: Exhibit A is Judge Higgins' Case

17  Management Order No. 1 creating the central depository.

18        THE COURT: I still don't have it. Exhibit A on mine

19  is your firm's resumes.

20        MR. RATNER: Sorry.

21        THE COURT: Exhibit A is your firm's resume.

22        MR.WHATLEY: Sorry.

23        THE COURT: Let's try again. The long and short and

24  in-between, I have not seen this yet. Is this a spare copy?

25        MR. RATNER: You may have that, yes.

---

68


67

1  put them on disc, the manual contains certain other suggested

2  details that I would throw out:

3        The first, if the documents all be Bates numbered;

4        The second, that the defendants identify which

5  categories of documents are responsive to which requests;

6        There was a third item, which is that the documents

7  are maintained in the repository at the expense of the

8  producing party. When any party goes in and wants copies of

9  something, whether it is copies of a subset of the documents

10  in the repository or copies of something that was on a CD-ROM,

11  they get the copies at their expense.

12        THE COURT: I missed the last point.

13        MR. RATNER: The documents and CD-ROM are maintained

14  in the repository at the expense of the producing party, as

15  the manual suggested. If we were to say go in and want 10

16  pages of whatever they put in there, we would take the 10

17  pages at our expense.

18        THE COURT: What is the expense of maintaining it

19  once you produce it at the repository?

20        MR. RATNER: It depends on how the repository is set

21  up. We have a case management agreement that we forwarded to

22  the court along with our proposal from the Columbia HCA case,

23  health care case, where there are millions of documents in a

24  single repository. The plaintiffs are paying for the portion

25  of the repository rental space that their documents take up

68

1  and the defendants are paying for the portion that their

2  documents take up.

3        THE COURT: Tell me that again.

4        MR. RATNER: It was attached to my declaration in

5  support of our Case Management Order No. 2 as Exhibit A. It

6  was an order from Judge Higgins.

7        THE COURT: I don't think I have it. I may have

8  received yours by E-mail or fax. I may not have yet received

9  the hard copy.

10        MR.WHATLEY: Your Honor, may I hand up my copy?

11        THE COURT: Just so I can see if it looks familiar.

12  It may still be on the way if that is the original.

13        (Pause)

14        THE COURT: I have that right in front of me. Which

15  exhibit is it?

16        MR. RATNER: Exhibit A is Judge Higgins' Case

17  Management Order No. 1 creating the central depository.

18        THE COURT: I still don't have it. Exhibit A on mine

19  is your firm's resumes.

20        MR. RATNER: Sorry.

21        THE COURT: Exhibit A is your firm's resume.

22        MR.WHATLEY: Sorry.

23        THE COURT: Let's try again. The long and short and

24  in-between, I have not seen this yet. Is this a spare copy?

25        MR. RATNER: You may have that, yes.

## 69

1    THE COURT: I haven't looked at it.

2    MR. LANGAN: I am reading the order that Mr. Ratner

3    refers to, and I think it is found on Page 8 and 9 of Exhibit

4    A. What this says is that at plaintiffs' expense, and

5    following plaintiffs' inspection and designation for copying,

6    defendants shall submit copies of documents selected by

7    plaintiffs to --

8    THE COURT: I don't know where you are. You are on

9    Page 8?

10    MR. LANGAN: The bottom of Page 8 and at the top of

11    Page 9.

12    THE COURT: Read it again.

13    MR. LANGAN: It says --

14    THE COURT: "At defendants' expense, plaintiffs shall

15    produce to defendant copies of all documents responsive to any

16    discovery requests made by defendant."

17    MR. LANGAN: Right.

18    THE COURT: At plaintiffs' expense and following

19    plaintiffs' inspection and designation for copying, defendants

20    shall submit copies of documents selected by plaintiffs to the

21    repository located at Nashville, Tennessee.

22    So what you're saying, you echo what Mr. Wallace

23    said. You said you looked at this order as a model. You

24    wouldn't even forward to the physical repository until the

25    plaintiffs looked and chose what they wanted sent. It says

## 70

1    following plaintiffs' inspection and designation, then

2    defendant submits copies to the repository.

3    MR. LANGAN: And also at their expense. That is the

4    first line of the second sentence, plaintiffs' expense.

5    THE COURT: I think you're misreading that. Anyway,

6    it is not my order. Whatever it says it says.

7    MR. RATNER: Mr. Rowell and Mr. Whatley and I are all

8    counsel in that case. Defendants put into the depository at

9    their own expense the universe of documents. We went to a

10    single repository, added plaintiffs and went to single

11    repository in Nashville, picked what we wanted from the

12    repository and took it back.

13    THE COURT: There was no prior selection of what got

14    sent to the repository?

15    MR. RATNER: Everything responsive was sent there. I

16    believe there were six million pages of documents in that

17    repository.

18    MR. GORDON: Your Honor, I can't speak for how many

19    documents they intend to produce. Your Honor specifically and

20    personally went through really above and beyond the call of

21    duty late into Friday evenings with all of us, going into the

22    requests and deciding whether they were reasonable or not for

23    the purposes of at least class certification issues, and there

24    may be additional ones which we'll get to next, another topic

25    that may be reasonable. I can't tell what they're going to --

71

1  how many documents will be in response to that. I hope it is
2  not a dumping and is responsive and they will tell us what it
3  is responding to.
4          In order to cooperate, one of the things we indicated
5  initially to the defendants is that for the documents that
6  have been turned over thus far in Berisha and in England,
7  which I am not sure there was anything produced over yet,
8  we'll give them back those documents, we'll put them in the
9  repository, we'll Bates stamp them.
10         We are not asking them to make additional copies. We
11  are not asking to make any copies. They can put the originals
12  in as the manual calls for, but obviously they'll want to keep
13  a set for themselves anyway.
14         So we would assist by not making them reproduce
15  everything that has been produced or just give it back to them
16  so they can produce in an organized manner, Bates stamp it, et
17  cetera. In addition, please note that we are not asking for
18  site-specific information to be in the repository, just as we
19  did not ask for that in Berisha. That is where many of the
20  defendants had extraordinary concerns, realistic concerns
21  about the volume of documents there.
22         THE COURT: The answer is I am reserving the
23  decision. I have the order. You have had a chance to be
24  heard. I have the samples in front of me. I have the
25  additional sample attached to Mr. Ratner's declaration in the

72

1  Columbia HCA Health Care Corporation case, and I have the
2  sample out of Texas.
3          I have my own ideas. I'll come out with an order.
4  When you get it, you get it, and you'll know what is required.
5  We are done discussing the mechanics of document production.
6          MR. EIMER: May I ask one question for clarification?
7          Given everyone's concern we are going to be producing
8  a lot of documents which are responsive but no one needs,
9  there is a lot of cost involved to us in identifying the
10  request that each of these documents is responsive to. That
11  is an extreme labor job. Our proposal to produce documents,
12  we usually produce them in the ordinary course as they're
13  found in whatever files they were and not squish them all over
14  the place and make a mess out of it.
15         If we do have to identify which document request each
16  document is responsive to, we are going to spend a lot of
17  money for nothing in documents they don't want. I urge the
18  court not to include that in the order your Honor issues.
19         THE COURT: Can we leave this subject now and move
20  on. Is the next subject class certification?
21         MR. RATNER: The next dispute between the parties is
22  in our Section 3 of our proposed order.
23         THE COURT: I was following your Section 3 is called
24  discovery. I thought we just talked about that.
25         MR. RATNER: No. We talked about the repository. We

73

1 still have to talk about additional discovery. We have
2 proposed -- and the defendants agree in principle -- that the
3 Berisha discovery that the court has already gone over and
4 with respect to which the court has resolved all sorts of
5 disputes should be the first wave of MDL discovery and it
6 should not apply to defendants who worked in Berisha and who
7 are now here.
8 The initial matters between the parties there, they
9 would like all the defendants in all the cases, as I
10 understand their proposal, to response to this first wave of
11 Berisha discovery only for the State of New York, not for the
12 other 16 RFG states or for the State of Florida.
13 THE COURT: The 16 RFG states is the England case?
14 MR. RATNER: The England case.
15 THE COURT: How could the defendants not have to
16 respond to the 16 RFG states? How could it possibly be
17 limited to New York? I have the England case now, and it
18 names 16 RFG states.
19 MR. EIMER: There are two issues up on discovery, not
20 just this one. The defendants' position, first of all, is
21 that we spend a lot of time with the court, a long Friday
22 evening, trying to work out what should be the initial wave of
23 discovery to get the case moving.
24 Issue one was should the Berisha discovery be what we
25 all work towards now, forget the state-specific stuff now, but

74

1 England defendants pick up Berisha orders the court already
2 issued.
3 THE COURT: I haven't heard the plaintiffs' position
4 on that. Mr. Ratner, he is saying put aside the issue of
5 which states, but the scope for this purpose.
6 Would you be satisfied with the first wave of the MDL
7 production if the rulings in Berisha applied to England and
8 other cases as a first wave scope-wide?
9 MR. RATNER: There are two issues that are getting
10 complicated. The answer is yes, the limitations you imposed
11 added to Berisha as to those requests apply to across the
12 board as to new defendants.
13 However, what they would like to do, in addition to
14 responding to the State of New York, is to not allow us to
15 have, except by leave of court, at any time prior to
16 certification any other discovery requests.
17 So, for example --
18 THE COURT: That is too long. The answer was yes,
19 without discussing the Berisha rulings, apply to other cases
20 and new defendants, yes.
21 MR. EIMER: The issue that we were discussing with
22 plaintiffs' counsel, and we didn't reach agreement on,
23 Mr. Tillery wants to have the ability to propound England
24 discovery now on top of Berisha discovery, and we said wait,
25 we've just spent a lot time figuring out what the appropriate

75

1 discovery is.
2     THE COURT: Mr. Eimer, the point is that was never
3 meant to be the final word on what is discoverable here. It
4 was first-wave discovery. It was pitched to class
5 certification issues, hopefully. We hope to be able to
6 rapidly move to the certification issue, so as Mr. Rowell
7 argued on another point, he'd know, he'd know whether there
8 were class actions or not class actions. Even if there were
9 no class actions doesn't mean there was no case.
10     MR. EIMER: We don't disagree.
11     THE COURT: There was a certain purpose in the
12 limitation, but it was never meant as a discovery bar.
13     The question for Mr. Tillery is whether he could live
14 with that as Wave 1, if he is getting it. I think we ought to
15 turn to the motion of the 16 states. That may be the key
16 point. Mr. Ratner stood up and said we would be satisfied if
17 the Berisha rulings apply to the other cases for Wave 1. We
18 want to discuss pretty soon when is Wave 2. That is probably
19 what Mr. Tillery wants to say, when do I get the rest of what
20 I want, and we'll turn to it.
21     The defendants need to concentrate on one thing at a
22 time to get dates that are kept and really produce the
23 so-called Wave 1 Berisha scope discovery for 16 states. That
24 is a lot of production. The question is when.
25     Then you can tell me Mr. Tillery, and everything else

76

1 what is Wave 2, why are you entitled to it now, should you
2 have it before the rulings on the motion to dismiss, should
3 you have it before the rulings on the class cert. I
4 understand where you want to go. Let's first get started on
5 Wave 1.
6     Now let's talk about 16 states, Mr. Eimer, what is
7 your position? Shouldn't you have to produce it for
8 plaintiffs in England?
9     MR. EIMER: Our only response, 16 states, it is a
10 huge piece of discovery. We would like to do a sampling of
11 those 16 states just to get started now. There are some huge
12 states. If we took a third, a quarter or half of them and got
13 started and --
14     THE COURT: You want them to prioritize their states
15 and you would like the following five first and next five next'
16 and last five after that? Sure.
17     MR. EIMER: Something like that.
18     THE COURT: That is not bad. Tell them your favorite
19 five states for the first week, next five states for --
20     MR. EIMER: Our critical issue is we don't want to
21 have outstanding England discovery which exists, requests for
22 documents and interrogatories and requests to admit. We don't
23 want to have the burden of dealing with that now.
24     We want to put that away and finish Berisha and come
25 back to court on another pretrial conference and discuss

77

1    later, that is the biggest problem.

2        THE COURT: Let's say you have to respond to all of

3    the 16 states. What is the time-frame, Mr. Eimer? What is

4    the time-frame? When can you do what you call the Berisha

5    limited issues for 16 states?

6        MR. EIMER: That, at this point, I don't even know.

7        We haven't gone back. It is a lot of documents. We have

8    collectively dozens and dozens of people looking for documents

9    right now on the states we have.

10       I assume we have to start finding this and be back.

11   The court instructed us to produce on a rolling basis. We are

12   not holding anything back.

13       THE COURT: Where are we up to on Berisha discovery;

14   in other words, is any schedule being set or met?

15       MR. SAUL: It seems like it has been slipping away

16   from us. We have gotten some responses, but very limited.

17       THE COURT: What is your recollection of the

18   schedule? Who remembers the schedule?

19       MR. GUTTMANN: Yes, your Honor. The short answer to

20   the questions is the court did not give a specific deadline by

21   which all documents have to be produced. You did indicate we

22   were to start with priority items. They designated certain

23   requests as priority items and produced those or in a couple

24   of cases, if I recall correctly, begin production of those by

25   a date certain. I am assuming all defendants have done that

78

1    and are now moving on to any additional documents they may

2    find with respect to that and leaving the rest.

3        The court never set a deadline for the completion of

4    the Berisha document discovery.

5        MR. BREIT: Your Honor, I can address some of what we

6    have gotten. As to certain defendants, I am --

7        THE COURT: I don't think that will be helpful right

8    now. What I really need is a schedule for finishing it.

9        Would you give a percentage, Mr. Breit, you have

10   gotten 10 or 15 percent or 20 percent of what you should have?

11       MR. BREIT: As to some defendants, I have more than

12   50 percent. As to some defendants, I have zero.

13       A part of that problem is because some of the

14   defendants have stood by the position you can only come to

15   Houston to see them or you can only come to San Francisco to

16   see them or you can only come to Chicago to see them. That is

17   not resolved.

18       As to those defendants producing directly to my

19   office, I would say that many are 50 percent or greater and

20   some are 10 to 25.

21       THE COURT: Sticking with Berisha for a moment, which

22   is only New York, what would you propose as a cutoff of the

23   original Berisha discovery?

24       The rulings we worked through, what would you propose

25   as a fair cutoff for just New York?

79

1    MR. SAUL: As part of that analysis, they have not

2  answered one interrogatory that was served several months ago.

3    As far as the interrogatories are concerned, they should have

4  them within a week or two, two weeks.

5    THE COURT: The documents?

6    MR. BREIT: 45 days.

7    THE COURT: From now which would take us to roughly

8  December 15th.

9    MR. SAUL: Fine.

10    MR. BREIT: 45 days.

11    THE COURT: That is your proposal. I will hear from

12  some defense counsel now.

13    MR. GALVIN: John Galvin. Your Honor, one of my

14  clients is Phillips Petroleum Company.

15    THE COURT: You're on England?

16    MR. GALVIN: Only in England.

17    THE COURT: I don't want to hear from you yet.

18    Are you only England?

19    A VOICE: Yes.

20    THE COURT: I am not interested yet. I want to know

21  whether December 15th is a reasonable cutoff for document

22  production in the Berisha case only, which is New York. We

23  have been doing this for months.

24    MR. BIALO: Valero has produced the last bulk of the

25  material we found that is responsive, and I don't see any

80

1  reason why, speaking for my defendant, we cannot complete the

2  task in 45 days.

3    THE COURT: Mr. Guttmann?

4    MR. GUTTMANN: We would propose the end of the year

5  simply because, unlike Valero, which is in some ways

6  relatively new as an entity, there are refineries all over the

7  place for these companies have to be searched. It is really a

8  monumental task. I suggest to push it to the end of the year.

9    MR. WALLACE: We can substantially comply by the end

10  of the year. We can make available large volumes of precisely

11  documents they requested. I hesitate to commit to absolutely

12  finding everything within that time period, but for reasons I

13  am sure the court can proceed.

14    MR. PASQUALE: Tosco like Sunoco, we have refineries

15  all over and corporate offices in a separate location. We,

16  too, ask for the end of the year.

17    MR. LILLIE: We agree, BP Amoco Arco agree with what

18  Mr. Wallace said. I feel constrained to say we are one of the

19  companies that we have selected two locations, only Chicago

20  and only Los Angeles, where existing repositories are already

21  in place and being used for litigation. We have offered them

22  the opportunity to come look at this.

23    My understanding was, as of the last hearing, that

24  counsel were going to be coming out to Chicago immediately to

25  looking at these documents. There has been no progress on the

81

1 plaintiffs' end, nor have plaintiffs yet signed the protective
2 order, which is another issue. We are prepared to continue to
3 make these documents available and they remain ready to look
4 at today.
5     THE COURT: Now, the interrogatory answers, why
6 aren't they answered?
7     MR. PASQUALE: Well, your Honor, I can tell you what
8 I was planning to do for Tosco, and many of the responses will
9 simply be a reference to documents. So it seemed to me to
10 make no sense to do that now, but to do it at some point in
11 the future if we are talking the end of the year or whenever.
12     THE COURT: You mean every interrogatory can be
13 answered with the option of, "Go see my document"?
14     MR. PASQUALE: I am not saying that, but certainly
15 many of them will be answered that way. I am certainly not
16 saying every one. I can't prepare an answer for my clients at
17 this point till I see the documents, until the search is
18 completed, so I can put together the right responses in
19 conjunction with my client. I didn't see any point to serving
20 a set now and then having to supplement that later.
21     MR. RATNER: Your Honor, what we would have expected
22 is that they would have responded within by no later than at
23 least 30 days of the date on which we all agreed on the second
24 amended set and given us what information they had at that
25 time. If they need to supplement at a later date by specific

82

1 reference to specific Bates numbers, that is fine, that is
2 acceptable. There has got to be something they know now that
3 can move this along.
4     MR. LILLIE: Your Honor, that is exactly what we are
5 doing. We have, as I sit here right now or stand here right
6 now, three or four letters in the works about to go out that
7 answer some of the interrogatories. They're not complete. I
8 know that. We intend to supplement them as we find additional
9 documents that help inform our answer.
10     THE COURT: With respect to the Berisha case only,
11 interrogatory answers are due November 29th and document
12 production is to be completed December 30th -- also 29th.
13 Both are 29th. November 29th interrogatories, December 29th
14 document production.
15     Now, this has to be treated, however, as real court
16 ordered cutoff dates so that we don't have slippage.
17     MR. BREIT: Your Honor, just one issue that is
18 raised. Maybe that will be subsumed within your order.
19     THE COURT: I suspect.
20     MR. BREIT: I've heard now Mr. Wallace and Mr. Lillie
21 both say we'll make these documents available.
22     THE COURT: I heard it, too.
23     MR. BREIT: I want to point that out.
24     THE COURT: Can we now talk about why there is not a
25 protective order being negotiated.

83

1    MR. BREIT: I can address that. We have executed the

2    original confidentiality order that was contemplated in

3    Berisha. There was one in June. It came up --

4    THE COURT: I don't like any history.

5    MR. BREIT: It is done, but that is just for Berisha.

6    There is, I think, the defendants are contemplating

7    that we readdress that issue in the MCL. My co-counsel are

8    not so comfortable with the existing confidentiality order in

9    Berisha. I don't know what we do with that other than to

10    perhaps reframe, re-discuss another confidentiality order,

11    perhaps using the MCL order as a model.

12    MR. SAUL: We have executed the confidentiality as

13    originally drafted. We put a little preamble in it, now there

14    is MDL, we reserve the right to go back to the court and

15    adjust things.

16    THE COURT: Did your adversary note and say there was

17    no signed protective order?

18    MR. LILLIE: I have not seen any signed protective

19    order.

20    THE COURT: Now apparently it is in Mr. Breit's hand.

21    As far as Berisha discovery goes with respect to

22    dates I just set, he can hand it across the table, but it

23    doesn't control this whole plaintiffs' table, yet they would

24    like to, in essence, renegotiate.

25    We are about to turn to England anyway and talk about

041.mtb

84

1    16 states and some schedule. They have the right to do this.

2    This is an MDL. If they want to use the MCL model to do that,

3    fine. If you want to hand that across the table, there is no

4    reason not to give him the Berisha discovery.

5    MR. SAUL: It is in this confidentiality agreement

6    that we cannot share these with other counsel at the table, so

7    I just want to be clear that we want this changed in the near

8    future. We wanted this to get rolling.

9    THE COURT: I want it handed across so it is not an

10    excuse for holding up the documents to you now.

11    MR. SAUL: Thank you.

12    THE COURT: Let's turn to England.

13    We are talking about the issue of the 16 states or

14    not 16 states. We covered that, really, at least with Mr.

15    Eimer. You said, I think, "I know I will have to do it as a

16    matter of prioritizing. I can't do 16 things at once." If

17    prioritized in time, fine. I asked you by when. You said you

18    couldn't give me a suggestion yet because -- why -- you

19    haven't discussed it with your client yet?

20    MR. EIMER: Correct. We haven't had a chance at look

21    at what it means in terms of number of locations we have to

22    cover.

23    THE COURT: How long have you had these complaints?

24    MR. EIMER: Complaints?

25    THE COURT: Yes, and requests?

041.mtb

85

1　MR. EIMER: The --
2　THE COURT: England, how long have you had the
3　England requests?
4　MR. EIMER: 60 days, some long time.
5　We are dealing with the Berisha requests brought on
6　to those 16 states, and it asks for different information. So
7　I've got -- we have never agreed to start producing in
8　England. So now for the first time we have got to go and
9　figure out where our locations are.
10　THE COURT: Some of this is overlapping. Some of it
11　is state-specific.
12　MR. EIMER: Yes.
13　THE COURT: The overlapping materials, as soon as
14　they negotiate the protective order, they will have access to
15　all that is being produced in Berisha for those who produced
16　in Berisha. Maybe now the defendants get to stand who weren't
17　producing anything in Berisha.
18　Then to the extent that there is new material based
19　per state, you need to just start the searches going. If I
20　add 30 days and say January 30th, that is it because there is
21　a tremendous overlap which will be shared once the
22　confidential order is worked out and then you have the
23　additional states.
24　MR. EIMER: Overlapping material for the Berisha
25　defendants is as --

86

1　THE COURT: I understand. I don't see why the new
2　defendants, so to speak, can't fall into December 30th. It is
3　still 60 days away. That is two months. Then another 30 days
4　to bring it up to all the 16 states. That is 90 days. So now
5　I know --
6　MR. GALVIN: Mr. Galvin.
7　THE COURT: And Mr. Whatley.
8　MR. GALVIN: One of my clients is Phillips Petroleum.
9　We are a defendant only in the England case at this
10　point, and there may be some overlap with discovery that we
11　have received in the England case 45 days ago, so some work
12　has been done.
13　THE COURT: Right.
14　MR. GALVIN: I don't suggest that we will need the
15　entire eight months or so that it has taken in the Berisha
16　case to the court's deadline that it has set. At this point
17　today for the first time it sounds like I'm going to hear that
18　there is a certain set of discovery that will be applicable to
19　me in 16 states.
20　At this point I don't yet even have a sense of how
21　that has been limited in the court's previously rulings that
22　have been discussed.
23　THE COURT: You used the operative word. Whatever it
24　was, it was less than they asked. It was limited. The
25　situation has improved from the time you received the England

87

1 request. It is narrower.
2   MR. GALVIN: There is a different set of requests
3 from the Berisha case and England case. My suggestion is
4 this: With the other defendants having had time to negotiate
5 this, having had some eight months to acquire this
6 information, as a practical matter, I do not think that for my
7 client and likely for the other defendants who are only in the
8 England case before, that we can get this material together in
9 a matter of 60 days or 90 days. As a practical matter, I
10 don't think that can be done.
11   THE COURT: I think it can be done.
12   MR. WHATLEY: I represent CONOCO in the England case
13 and not the Berisha case. I don't believe they're in any of
14 the California cases.
15   THE COURT: Is that true for your client also?
16   MR. GALVIN: Yes, it is. We are not in the
17 California cases. We were a member for very brief period of
18 time in the underground storage tank case.
19   THE COURT: You have never produced these documents
20 here?
21   MR. GALVIN: We are starting from the ground floor.
22   MR. WHATLEY: That's correct. While I have looked
23 now at what you order in the Berisha case and tried to sit
24 down with the client and discuss how long it will take, I
25 don't think we can do it in 60 or 90 days. We could make a

88

1 good-faith production in 120 days, understanding we might not
2 find it all by then, but we keep rolling out whatever we find.
3   MR. TILLERY: The England discovery has been on file
4 for some period of time. There is a great deal of overlap
5 between that discovery and the Berisha discovery.
6   As a matter of fact, with the 68 requests for
7 production in the England case, only 18 would not be
8 encompassed within the Berisha request for production, so
9 they've had a fair warning about what documents we are looking
10 for.
11   Also, as they go through for the State of New York,
12 presumably the documents are going to be centrally located and
13 they would be looking at the same group of documents. We have
14 proposed in Paragraph 3 (b) that by next week, a week from
15 today, that the England plaintiffs designate additional
16 interrogatories, requests, not new ones, but those that are
17 already outstanding in England, all of which can be pared
18 down. I have already done that. There are 18 requests for
19 production and there are eight interrogatories.
20   The reason I would like that is because we are
21 requesting information that is germane specifically to the
22 England case. I would like an opportunity by next week to
23 designate to them, and as they go through, as they respond to
24 our request for production, as they answer the
25 interrogatories, they can answer these as well.

89

1    THE COURT: You certainly can narrow your request.
2    They couldn't be happier to allow you the opportunity to
3    request less. That is fine.
4    MR. TILLERY: The reason I am narrowing them, the
5    Berisha discovery already encompasses a large amount of it.
6    THE COURT: I understand. You can go ahead and
7    narrow it. That is no problem. Are you requesting this for
8    16 states, right?
9    MR. TILLERY: Actually, we looked at November the
10   9th. By that time we would make that designation.
11   THE COURT: What designation?
12   MR. TILLERY: We would designate which of the current
13   England requests we would like answered that are not already
14   part of the --
15   THE COURT: You like them answered for 16 states?
16   MR. TILLERY: Yes, yes, I assume.
17   MR. RATNER: I am afraid there might have been a
18   disconnect. Just to clarify, he was saying we have this one
19   topic we are discussing right now of Berisha requests. He was
20   saying over and above --
21   MR. TILLERY: Exactly. I am sorry. Maybe the court
22   didn't understand me. I am talking about in addition. This
23   assumes that there has been for all 16 states compliance with
24   the Berisha discovery as applied to England.
25   MR. RATNER: Okay.

90

1    THE COURT: Then you want to designate what more you
2    want?
3    MR. TILLERY: Correct.
4    THE COURT: You you can designate it, but you haven't
5    turned to that for any other plaintiff yet. And Berisha, too,
6    had more that they want after the first wave. I am trying to
7    set a schedule for the first wave.
8    MR. EIMER: That is my only point. I want to make
9    sure we are doing a first wave. Mr. Tillery in his second
10   wave comes later and lets us finish this first.
11   MR. WALLACE: There is one category of documents and
12   only one that gives me particular pause as we extend the
13   Berisha discovery to the 16 states.
14       There was one request in Berisha that was sales
15   information about the volumes of gasoline sold containing MTBE
16   in New York. Seeking that information and breaking it down to
17   the other 16 states will be particularly cumbersome
18   particularly since the plaintiffs have asked for that
19   information over the span of 20 years.
20       I don't know how much of that information we will be
21   able to find or that still exists. I do know that it will
22   take a number of months for us to gather that information for
23   16 states. The remainder of the requests which constitute the
24   bulk of the requests are, I must say, easier for us to
25   address.

91

1     THE COURT: Since we have in place an order that
2  requires rolling production, it seems to me that with an
3  additional 30 days beyond the Berisha deadlines, that should
4  become a completion case for any new defendant and for the 16
5  states.
6     Is there anybody who has not previously produced and
7  anybody who is producing for the first time with respect to 16
8  additional geographic locations can now go out to February
9  28th, but I should add in the interrogatory answers, January
10  31st on the interrogatories and February 28th on the
11  documents, but that doesn't mean that you can hold it back
12  till that last day and then produce it all.
13     You have to by the earlier date, let's say the end of
14  December, which is 60 days from now, make your first
15  production. Everybody has to have produced some good-faith
16  percentage by the end of December. It is just that the new
17  defendants and the 16 states needn't conclude until 30 days
18  after the cutoff I just set for the Berisha case.
19     Do you understand what I say? You have got to start
20  producing your files to the plaintiffs in 60 days from today,
21  but you have 120 to complete it.
22     MR. LANGAN: There is one loose end with respect to
23  England written discovery. I understood that earlier your
24  Honor had tabled for the purposes of the Berisha case answers
25  for the request to admit as opposed to interrogatories.

92

1     I understand that is in a state of being tabled in
2  the England case, a number of requests to admit directed to a
3  number of defendants in the England case. Do I understand
4  those likely are tabled for now under your Honor's governing
5  order?
6     THE COURT: "Tabled for today," meaning subject to an
7  opportunity for Mr. Tillery to convince me otherwise, which I
8  don't think it can be done today. It is 12:30. We have a
9  couple of other general matters. If you for some reason
10  conclude that is unfair, you'll explain why, and we will
11  revisit it at the next status conference.
12     For today, that is absolutely right.
13     MR. LANGAN: Thank you.
14     THE COURT: I think we have addressed the discovery
15  timetable for the initial wave of interrogatories and document
16  production. My order, you will read when it is issued, will
17  tell you how to do it and where to do it. There can't be
18  anybody at zero.
19     Mr. Breit stood and said some defendants are at zero,
20  wasn't showing him anything in the Berisha case. That
21  shouldn't have happened. Maybe it was the fact you didn't
22  have a copy of the signed confidentiality order, which you do
23  now, and then hopefully there will be a new one negotiated
24  governing all of these proceedings. So there is no excuse to
25  be at zero.

93

1    Having said that, can we talk about class

2  certification? Are all of the actions in front of me brought

3  as class actions?  Is that true of England?

4    MR. TILLERY:  Yes.

5    THE COURT:  Is that true of Sutton Farms?

6    MR. BARISIC:  Yes.

7    THE COURT:  Is that true of Young?

8    MR. WHATLEY:  Yes.

9    THE COURT:  All of these are styled as class actions.

10   Should they all be on the same schedule in terms of

11 certification?

12   MR. RATNER:  We have proposed a single schedule for

13 class certification, which we in our proposal pegged to the --

14   THE COURT:  Ruling on the motions to dismiss?

15   MR. RATNER:  Yes.

16   THE COURT:  What do the defendants think of that as a

17 pegging date?

18   MR. LANGAN:  Your Honor, I think that makes sense.

19 That is what your Honor contemplated before in Berisha. That

20 same model makes sense.  The dates have to change, but the

21 model makes sense.

22   THE COURT:  That is agreeable all around that the

23 plaintiffs' opening brief seeking certification would be filed

24 60 days after the court rules on the motion to dismiss.  If

25 everybody wants that, that is what we'll do.

94

1    How about defendants' liaison counsel, is there

2  agreement on the proposal of Paragraph 5 of the plaintiffs'

3  version?

4    MR. LANGAN:  Yes, your Honor, there is, in terms of

5  us designating by December 1st, yes.

6    THE COURT:  I am still on the plaintiffs' version.

7  Paragraph 6, service of documents, is there any

8  difference there?

9    MR. LANGAN:  The defense also agreed, as noted in

10 Mr. Ratner's submission.

11   THE COURT:  What is left on anyone's agenda?

12 .   Mr. Ratner?

13   MR. RATNER:  Your Honor, I know the court is tired of

14 the discovery issue, but we did recommend in our Paragraph 3

15 (b) not that the defendants have to respond right away to a

16 second wave of discovery, but we get the ball rolling now to

17 allow, under a schedule we have proposed, an additional set of

18 non-duplicative requests to be served, a date for, a date for

19 defendants to file written responses and objections so that we

20 can be discussing these requests that some of our co-counsel

21 believe come before certification now while other things are

22 happening.

23   THE COURT:  When would you propose that the

24 plaintiffs serve their second wave of requests?

25   MR. RATNER:  When?  By November 9.

95

1 THE COURT: Is that realistic? That is a week from
2 today. You want to receive your second wave of requests by a
3 week from today?
4 MR. RATNER: They were served in August by the
5 England plaintiffs. There are things we just didn't do in
6 Berisha. So they already know they want them now. That is
7 what Mr. Tillery was referring to when he talked about his 18
8 additional document requests and additional interrogatories.
9 THE COURT: You don't think you should sort of serve
10 that at best simultaneous with your complaint on November 29th
11 when you really know what you have decided to press?
12 That makes a lot more sense to me when you've had
13 time to read, caucus and really pick out where you're heading
14 and not having them going down roads you are not going to
15 pursue yourself.
16 How about if we change that date to November 29?
17 MR. RATNER: That makes sense.
18 THE COURT: That is the first one. They can serve
19 the second wave November 29th. Then the question is, you
20 know, this written response and objections, I don't think the
21 written response does anything much for you here. To have
22 somebody type out a hundred times these will be produced for
23 inspection and copying at appropriate time and location, it
24 doesn't tell you anything.
25 The question is objections so that I can do the same

96

1 kind of ruling that I did a couple of months ago, and that is
2 not a bad idea. So we can have that very focused two or three
3 hour session going over the scope of that discovery.
4 If within 30 days thereafter, the end of December,
5 the defendants could be prepared to state their objections so
6 that the plaintiffs and defendants would then negotiate,
7 because you negotiated many of these issues successfully, I
8 didn't have to rule on every single thing, just after many
9 sessions of negotiation.
10 If you could negotiate, say, the first few weeks in
11 January, and I wouldn't have to become involved until the 4th
12 week of January, where you couldn't negotiate the issues and I
13 have to rule, that is when I would propose. I would propose,
14 that I would do that, that session in late January or early
15 February. How does that sound to you, reasonable?
16 MR. GUTTMANN: May I, your Honor?
17 THE COURT: Yes.
18 MR. GUTTMANN: John Guttmann. I would like to
19 suggest stepping back and looking at it from a broader
20 perspective as someone whose client Sunoco is only involved in
21 Berisha.
22 We went through an extensive exercise over a period
23 of months of taking the requests that had been put forth in
24 the Berisha case. The court said we're dealing only with the
25 first wave, but Wave No. 1 is the wave of stuff that bears on

97

1   issues of class certification. It deals with the merits, but
2   limited, and Wave No. 2 in the Berisha framework the court had
3   originally established was going to wait until after class
4   certification as we understood it.
5           We would suggest that should still apply here. What
6   Mr. Rafner is saying with respect to Berisha, putting aside
7   the issues regarding England, he wants to move off of that now
8   and promulgate additional requests in Berisha. We were also
9   part of the other cases. In Berisha, we would have to respond
10  to class certification.
11          I would suggest to the court we crossed that bridge
12  and that the appropriate thing to do here from my perspective
13  at least is to take the Berisha discovery and apply it to the
14  16 states. Unless there is good cause shown by Mr. Tillery
15  with respect to England, that should be it until we get
16  through class certification.
17          THE COURT: No, Mr. Tillery wasn't even heard. This
18  is a fluid situation, this is now an MDL, there are now four
19  cases here. There may be more soon. I don't think you can
20  say you ruled, that is the end of it, everybody was heard and
21  now it is cast in stone. I can't do that. I won't do that.
22  I haven't heard from half of the plaintiffs' counsel.
23          I think we should go right ahead and let them
24  formulate their second wave. You take a look at it, figure
25  out what you think you are willing to produce, what you're

98

1   not. You sit down and negotiate in January. I'll send you
2   the end of January. I may not require production once I see
3   what it is all about till down the road. We may as well be
4   active in the process of doing it before that, partly because,
5   as I said, nothing is fixed in stone. Some of the plaintiffs
6   were never heard. They may have an argument that it bears on
7   class certification and there are cases I have never heard.
8           In fairness to people who come here for the first
9   time, they're not bound by what happened pre-MDL when they
10  were never here and never heard. They need a chance to be
11  heard. They're actually accommodating you in agreeing the
12  first wave would be the so-called Berisha rulings. They need
13  a chance to tell me why they need some of the other requests
14  before they're even required to brief class certification.
15          MR. GUTTMANN: When we come back in February, I take
16  it we address both issues, what is appropriate?
17          THE COURT: And when.
18          MR. GUTTMANN: Yes.
19          THE COURT: Absolutely.
20          MR. SAUL: I may have missed something, and I
21  probably did, but I had these dates for production by the
22  defendants, but we don't as yet have the locations where they
23  have to produce them.
24          THE COURT: That is going to be in the order.
25          MR. SAUL: That will be in the order? We are not

99

1 going to start viewing these documents until we get your
2 order.
3     THE COURT: That is not entirely true. If you work
4 it out consensually, you will stay busy. I wouldn't take a
5 vacation in the next two weeks. There are people who are
6 sending you documents.
7     MR. SAUL: We are willing to do that.
8     THE COURT: Don't stop. This is not a stay pending
9 the court's order. The only thing I have asked you to
10 withdraw is the pending motions to dismiss so they won't
11 become old on my docket. We have our own internal problems
12 you don't need to hear about.
13     Work out a stipulation where you withdraw those, to
14 be refiled, and nobody loses the right to respond to the
15 complaints in a timely fashion. I am sure with all the lawyer
16 power here, you can work out the language. Those need to be
17 withdrawn so they don't become old on my docket. Other than
18 that, there are no stays. Everybody should keep working. I
19 will get the order out as soon as I can.
20     MR. LANGAN: In the plaintiffs' order, we do have
21 outstanding discovery due from the plaintiffs. I want to
22 mention in their proposed order they have agreed to respond to
23 outstanding discovery by December 1, in their Paragraph 3 (b).
24 That is generally acceptable to us, I believe.
25     THE COURT: Okay.

100

1     MR. LANGAN: If you are going to make an order, it
2 might be nice to have it in there, too.
3     THE COURT: Yes. The only other topic I want to
4 bring up is case management conferences and access to the
5 court. The defendants don't yet have a liaison counsel. On a
6 very temporary basis, we had to pick somebody to communicate
7 with.
8     I told my clerks to call Mr. Eimer once or twice. We
9 just did. It didn't have any great meaning. We remembered
10 your name and how to spell it. I apologize to your client for
11 that. No client wants to be a high-profile client, but so be
12 it.
13     We do need somebody to communicate with even on a
14 temporary basis. Even if you're not ready to tell us until
15 December 1st who is the liaison, would you agree to somebody
16 being the liaison for the next month solely for the purpose of
17 my chambers making one E-mail or one phone call, and that
18 person will notify all other defendants on a temporary basis
19 only. Is anybody willing to accept that role, the 30 days?
20     MR. EIMER: I would be glad to do that for the 30
21 days.
22     THE COURT: We'll stay with you for 30 days. I would
23 think in this case, we should schedule a so-called case
24 management conference at 30-day intervals just as a regular
25 matter.

## 101

1 Generally speaking, I schedule such matters for 4:30

2 only because I don't know what days I will be on trial and

3 which I won't. That is late to start a conference that may

4 run two hours. The question is when?

5 I'll put this in the case management order, too. The

6 first one I will probably have a better idea when I am on

7 trial and when not. If everybody decides there are no issues

8 to be heard, by stipulation you can cancel it. It will be my

9 plan to set up a regular monthly meeting which is the time in

10 which you can raise whatever issues need to be raised.

11 The only thing I would ask is, it is not helpful to

12 receive things the afternoon before. That is what happened

13 yesterday. I was traveling. I got back to the office at 6:00

14 pm and found all this mail. That is too hard for anybody to

15 cope with and read overnight.

16 We should have a standing rule. If you want me to

17 read something for the next conference, it really has to be in

18 72 hours in advance so I have a chance to read it, understand

19 it, digest it. That can be as simple as a list of agenda

20 items. It can actually be substantive letters. Whatever it

21 is you want me to consider for the next so-called case

22 management conference, make every effort to submit it within

23 72 hours of that date.

24 Today is November 2nd, and we are talking early

25 December. Let me see if I can find something other than 4:30.

041.mtb

## 102

1 (Pause)

2 THE COURT: December 8th looks good for me, at 10:00

3 o'clock. It is a Friday. How is Friday, December 8th, at

4 10:00 o'clock?

5 MR. GORDON: Fine, your Honor, for the plaintiffs.

6 THE COURT: That is what it is then, December 8th,

7 10:00 am, is the next case management conference with the 72

8 hour rule in place. You can send me agenda items or if you

9 need to address something substantive.

10 I also wanted you to consider some kind of a web site

11 that would be set up that on which we could post all orders,

12 all opinions, and other materials that everybody can have

13 access to without needing passwords and confidentiality.

14 You have more capacity to get that organized than I

15 do. So I would like you to consider with your adversaries, as

16 you begin to meet with each other and work things out, how we

17 could set up such a web site, what would go on it, how you

18 would have access, how we would do service through that so

19 that we can get out of the business of phone calling and we

20 could easily send out messages to everybody at once, sort of

21 like an electronic button board. Can you consider that

22 proposal how that would work, how to make our life easier?

23 Does anyone want to raise anything else today?

24 Good! Thank you.

25 (Court adjourned)

041.mtb

**EXHIBIT B**

11/13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------X
                                    :
In re: Methyl Tertiary Butyl Ether  :    **MDL No. 1358**
("MTBE") Products Liability Litigation:
                                    :     Master File
                                    :     C.A. No. 1:00-1898(SAS)
This Document Relates To: All Cases :
                                    :
------------------------------------X

<u>**Case Management Order No. 2**</u>

**1.   Service of Documents**

    **a.   Orders**

        A copy of each order will be provided to Morris A.

        Ratner, Esq., Plaintiffs' Liaison Counsel, and

        Defendants' Liaison Counsel [temporary or permanent],

        for appropriate distribution to other counsel and

        parties.

    **b.   Pleadings, Motions, and Other Documents**

        Plaintiffs' Liaison Counsel shall be provided with

        twelve (12) copies of each pleading, motion, or other

        document filed by any party; Defendants' Liaison

        Counsel [temporary or permanent] shall be provided with

        twenty (20) copies of each such document.  Pursuant to

        Federal Rule of Civil Procedure 5, service on Liaison

        Counsel constitutes service on other attorneys and

        parties for whom Liaison Counsel is acting, such

-1-

EXHIBIT *B*

service being deemed effective three (3) days after
service on Liaison Counsel.

**c.    Electronic Service**

To the extent practicable, when serving other parties
with pleadings, motions and other Court filings through
Liaison Counsel, the parties shall attempt to serve the
papers by electronic mail using standard electronic
formats. Permissible formats include Word, WordPerfect
and PDF files. Except as otherwise ordered, whenever
service on Liaison Counsel is effected through
electronic mail using standard formats, and whenever
such service requires parties to respond in a
particular time to the matter so served, an additional
one (1) day shall be added to the ordinary time
prescribed for such response to allow for the delay
occasioned by the service through Liaison Counsel.
This additional time is less than the three (3) days
allowed for service by ordinary paper copies.

**2.    Pleadings**

**a.    Consolidated "Master" Complaint**

Plaintiffs shall serve a Consolidated "Master"
Complaint ("Master Complaint") by no later than
November 30, 2000. Each plaintiff shall also serve a
pleading which identifies those allegations of the

-2-

Master Complaint that will be adopted as the Complaint in each of the consolidated actions. These pleadings shall be identified as "The Proposed Amended Complaints". If defendants object to the filing of the Proposed Amended Complaints, in any case, they must state their objections in writing by December 10, 2000. If no such objection is made, the Proposed Amended Complaints may be filed together with the Master Complaint. If objections are made, the plaintiffs may respond in writing by December 20, 2000, and the objections will be heard at a Special Case Management Conference scheduled for December 27, 2000 at 4:30 p.m.

b. **Responsive Pleadings**

1. All previously filed Motions to Dismiss are hereby withdrawn with leave to refile in response to the Amended Complaints. Time to respond to all pending Complaints or any Amended Complaints filed subsequent to this date is hereby extended to and including December 29, 2000.

2. If the Proposed Amended Complaints are filed without objection, defendants shall file motions to dismiss, if any, by no later than December 29, 2000. Where the Defendants' arguments overlap or address common subject matters, such arguments

-3-

shall be addressed in a single "joint" motion to
dismiss, not to exceed forty (40) pages in length.
Individual defendants may file supplemental briefs
addressing issues unique to them.  Supplemental
pleadings shall not exceed ten (10) pages in
length.  Plaintiffs' response to any motions to
dismiss are due on January 29, 2001.  This
response, which should be submitted in a single
consolidated brief addressing all issues, shall
not exceed fifty (50) pages in length.
Defendants' reply memorandum is due on or before
February 15, 2001.  One joint reply memorandum
shall be submitted on behalf of all defendants.
This reply memorandum shall not exceed twenty-five
(25) pages in length.  If any defendant decides
not to move to dismiss, its answer must be filed
no later than December 29, 2000.

3.   If any objection is made to the filing of the
Amended Complaints then motions to dismiss are to
be filed thirty (30) days after the Court rules on
whether the Amended Complaints may be filed.  The
time in which plaintiffs must respond to such
motions and defendants must reply shall be
calculated in accordance with paragraph 2, above.

-4-

> If any defendant decides not to move to dismiss, its answer must be filed within thirty (30) days of the Court's decision on whether the Amended Complaints may be filed.

3. **Class Certification**

Plaintiffs may move for class certification sixty (60) days from this Court's ruling on any Motions to Dismiss. Defendants must respond to any class certification motion within forty-five (45) days and plaintiffs must reply within fifteen (15) days of defendants' response. The moving and response briefs shall not exceed forty (40) pages, and the reply shall not exceed fifteen (15) pages.

4. **General Discovery Issues**

a. **Berisha** Action

Defendants' written responses and objections to the pending interrogatories, as previously modified by the Court, must be served by November 29, 2000. Responsive documents must be produced on a rolling basis, but such production must be completed by December 29, 2000. The form of production will be addressed at paragraph 5, below.

b. **England** Action

Previously served interrogatories and document requests are modified in accordance with the previous rulings in

the <u>Berisha</u> action.   All other discovery demands are

hereby withdrawn.   Defendants' written responses and

objections to the modified interrogatories must be

served by January 31, 2001.   Responsive documents shall

be produced on a rolling basis, but such production

must be completed by February 28, 2001.   The parties

shall endeavor to agree on a schedule for completing

the depositions of the named plaintiffs.   The parties

shall also endeavor to agree on a schedule and

procedure for allowing defendants access to the

properties of the named plaintiffs for purposes of

inspection and testing.

c.   **Additional Discovery**

Plaintiffs in any action may not serve additional

discovery demands until November 29, 2000.   Objections

to such additional requests must be made by December

29, 2000.   The parties shall meet and confer with

respect to such demands throughout January, 2001.   The

Court will address any objections that cannot be

resolved by the parties at a Case Management Conference

scheduled for January 30, 2001 at 10 a.m.

d.   **Subsequent Filings**

Discovery is hereby stayed in any action transferred to

this Court by Order of the MDL Panel, until such time

-6-

as the parties submit a proposed order governing the
timing of discovery, or the Court convenes a special
Case Management Conference for that purpose.

5.   **Document Discovery**

  a.   **Preservation**

Mitchell M. Breit, Esq., is hereby appointed as
custodian of the Document Depository, to be described
below.  Mr. Breit is hereby enjoined from destroying or
removing any document from the Depository until further
order of this Court.

  b.   **Numbering System**

Counsel shall develop an identification system using
unique numbers or symbols to identify each document
produced or referred to during the course of this
litigation.  All copies of the same document should
ordinarily be assigned the same identification number
or symbol.  Documents produced by each party shall bear
an alphabetic symbol assigned to that party, followed
by the pagination of each document in numerical
sequence ("Bates stamped").  Unless otherwise ordered
by this Court, original documents shall be maintained
by the producing party in such a manner so as to allow
access to such originals upon reasonable notice.

-7-

c.   **Avoiding Multiple Requests**

Counsel shall, to the extent possible, coordinate and
consolidate their requests for production and
examination of documents to eliminate duplicative
requests from the same party.  No party shall request
documents available to it at a Document Depository or
from its own Liaison Counsel.

d.   **Establishment of Document Depository**

A Document Depository shall be established at a
location to be determined.  This Depository shall
contain equipment for producing copies and separately
counting the copies that are made for each party.  All
counsel in these actions shall have access to all
documents produced in these actions, subject to the
provisions of any applicable protective order.  All
parties shall submit copies of any documents obtained
from a non-party, pursuant to a subpoena or other
formal request issued by a party in these actions, to
the Document Depository for access by all counsel.
Before being placed in the Depository, every document
must be given an identification number.  The parties
shall meet and confer to reach an agreement upon the
allocation of the cost of maintaining the Depository.
If the parties cannot agree, the issue of cost

-8-

allocation shall be submitted to the Court.   Any
confidential documents or other information subject to
a protective order shall be maintained in a separate,
protected location so that access thereto is strictly
limited to the specific terms of any applicable
protective order.

e.   **Production of Documents**

1.   **Defendants**

Each defendant must produce its documents for
inspection and designation for copying at a single
location or by forwarding copies to Plaintiffs'
Liaison Counsel either in hard copy or electronic
format.   Once plaintiffs have designated documents
for copying, defendant, at its expense, must
produce those documents, either in hard copy or in
an electronic format, at the Document Depository
described above.   Documents must be produced
either as kept in the ordinary course of business,
or organized in response to the document requests.
Documents not selected for copying must be
maintained by the producing counsel in the
location in which they were produced so that
further inspections can occur as needed.   At the
conclusion of <u>all</u> law suits that are or will be

-9-

part of MDL 1358, this Court will entertain a
motion for the return of documents to the
producing party.

**2.   Plaintiffs**

Plaintiffs at their expense must produce a single
copy of all documents sought by any defendant, at
a single location designated by Defendants'
Liaison Counsel.  Documents may be produced either
in hard copy or electronic format.

**f.   Filing System**

The filing party shall place the documents in the
Depository in sequential order according to the
document numbers, and the documents shall be organized
in groups in accordance with the document
identification prefixes (by party).  Parties are
encouraged to use computerization of discovery
material.

**g.   Access, Copying, Log**

Counsel appearing for any party in this litigation and
the staffs of their respective law firms working on
these cases shall have reasonable access during
business hours to each document in such Depository
and may copy or obtain copies at the inspecting
parties' expense.  Such inspection shall not be subject

-10-

to monitoring by any party.  A log will be kept of all persons who enter and leave the Depository, and only duplicate copies of documents may be removed from the Depository except by leave of court.  Access to, and copying of, confidential documents is subject to the limitations and requirements of any applicable order protecting against unauthorized disclosure of such documents.

h.   **Production to the Depository**

1.   Any party desiring to place documents in the Depository will contact the Depository to obtain a range of numbers for use on that party's documents.

2.   All documents placed in the Depository shall arrive pre-marked with "MDL 1358" and the assigned MDL depository number.  The documents must be legible.  Confidential documents must be so marked.  It is the responsibility of the party claiming the confidentiality of a document to mark the documents prior to producing it to a requesting party, or prior to placing the document in the Depository, as the case may be.

3.   All documents forwarded to the Depository must be accompanied by an electronic index.  The index

-11-

will be supplied in a comma-delimited ASCII

format, unless otherwise arranged in advance with

the Depository and shall contain the following

fields, in this order, and no others:

> Beginning MDL Document Number
> Ending MDL Document Number
> Previous Document Number, if any
> Document Date, if any
> Date Produced to the Depository
> Producing Party
> A <u>Brief</u> General Description of the Document
> Designation of "Confidential" if applicable.

Documents clearly related to each other may be

grouped for indexing purposes.  For example,

documents kept in a single file in the regular

course of business may be indexed together.

4.   The MDL 1358 Depository shall prepare and maintain

a compilation of indexes provided in accordance

with paragraph 3 above, using Summation 5.1

software (the "Depository Index"), and these

indices shall be posted at http://www.mdl1358.com

(see paragraph 5(j) below) and updated

periodically as new documents are received.  The

Depository Index shall contain the following

fields:

> Beginning MDL Document Number
> Ending MDL Document Number
> Number of Pages
> Previous Document Number, if any
> Document Date, if any

-12-

Date Produced to the Depository
Producing Party
A <u>Brief</u> General Description of the Document
Confidential Y/N
CD Volume Number

5. The Depository Index made available on the MDL 1358 website (see paragraph (j) below) will be forwarded on CD-ROM to any firm upon written request.  In the event the Depository Index does not accurately reflect documents placed in the Depository by a party, that party shall timely notify Liaison Counsel so that an accurate index can be prepared.

6. Prior to placing any document in the Depository, each party should review the Depository Index and make an effort to determine whether the document is already in the Depository.  The Depository staff should also review incoming documents for duplicates.  Duplicates shall be returned to the sender.  All parties shall endeavor to minimize the number of duplicate documents in the Depository.

7. Documents may also be placed in the Depository on DVD or CD-ROM.  The resolution for scanned images must be no less than 300 dpi.  Additionally the ".dii" file must be included on the CD or DVD,

-13-

providing the beginning and ending MDL document number and corresponding ".tiff" image.  Parties may purchase copies of the DVD or CD-ROM from the Depository for the cost of copying by a copy service.

8.   All documents in the Depository may be scanned by any party at that party's expense by using an outside contractor selected by the requesting party and approved in advance by the office of Mr. Breit.  Only one outside contractor may be in the Depository at any given time.

9.   The Depository shall also maintain a separate index of deposition and hearing transcripts. This index shall contain the following fields, and no others:

> Date of hearing or deposition
> Abbreviated Style of Case
> Deponent or Subject of Hearing
> Confidential Designation, if any

No actual transcripts shall be posted on the website.  Excerpts from transcripts shall be treated as any other document.  When an ASCII disk is available, the disk shall be produced at the Depository, rather than a paper copy of the transcript.  The disks will remain in the Depository and may be copied without charge.

-14-

i. **Subsequent Filings**

After the initial deposit of documents in the Depository, notice shall be given to both Liaison Counsel of all subsequent deposits.

j. **Depository Website**

1. Liaison Counsel shall prepare and maintain a website to be used by the parties to this case to transfer indexes contained in the document Depository. The website shall also be used to post filings with the Court and notices and orders issued by the Court. The URL of that website shall be http://www.mdl1358.com.

2. Only authorized persons shall have access to the website. Authorized persons shall include (i) Judge Shira A. Scheindlin, (ii) other judges presiding over similar cases, (iii) attorneys representing any party in the MDL, (iv) associates, clerks and support staff of the above, and (v) parties to this action. To gain access to this website, each person shall provide to the Liaison Counsel the following information:

> Name
> Firm Name
> Party Represented
> Email Address
> Contact Person

-15-

Voice Telephone Number
Fax Telephone Number

Once this information has been received by the
Liaison Counsel, a user ID and Password necessary
to access the website will be e-mailed to the
address provided.

3.  An e-mail notice of any newly posted materials on
the website shall be forwarded to each person who
has authorized access to the Depository.

4.  Notices and Orders from the Court shall be scanned
into a ".pdf" format and posted immediately upon
receipt by Liaison Counsel.  Adobe Acrobat Reader
3.0 will be available for download on the website
without cost.

5.  All parties filing documents with the Court shall
serve on Liaison Counsel, in addition to any
written copies served upon Liaison Counsel, a
"text-only" version of the filing via e-mail or on
"3 1/4" disk in either (i) Microsoft Word 6.0 (or
higher), (ii) Word Perfect 5.1 (or higher) or
(iii) ASCII format.  Exhibits not a part of the
actual document shall be scanned by Liaison
Counsel and posted separately.  A ".pdf." version
of each filing will be made available on the
website for downloading.

-16-

6.    Nothing contained in this Order shall be interpreted to permit posting on the website of any information designated as confidential pursuant to any protective order.

## 6.  Interrogatories

Counsel shall, to the extent possible, combine their interrogatories to any party into a single set of questions. No question shall be asked that has already been answered in response to interrogatories filed by another party unless there is reason to believe that a different answer will be given. Without leave of Court, interrogatories shall not include more than fifty (50) separate questions, including subparts.

## 7.  Depositions

### a.  Cooperation

Counsel are expected to cooperate with, and be courteous to, each other and deponents.

### b.  Stipulations

Unless contrary to an order of the Court, the parties (and when appropriate, a nonparty witness) may stipulate in any suitable writing to alter, amend, or modify any practice relating to noticing or conducting a deposition. Stipulations for the extension of discovery cutoffs set by the Court are not valid,

-17-

however, until approved by the Court.  Pursuant to Federal Rule of Civil Procedure 5(d) to take effect on December 1, 2000, no deposition transcripts are to be filed with the Court.

c. **Scheduling**

Absent extraordinary circumstances, counsel shall consult in advance with opposing counsel and unrepresented proposed deponents in an effort to schedule depositions at mutually convenient times and places.  The fact that some counsel may be unavailable shall not, however, in view of the number of attorneys involved in this litigation, be grounds for deferring or postponing a deposition if another attorney from the same firm or who represents a party with similar interests is able to attend.

d. **Attendance**

1. **Who May Be Present**

Unless otherwise ordered under Federal Rule of Civil Procedure 26(c), depositions may be attended by counsel of record, members and employees of their firms, attorneys specially engaged by a party for purposes of the deposition, the parties or the representative of a party, counsel for the deponent, and potential expert witnesses.  While a

-18-

deponent is being examined about any stamped
confidential document or the confidential
information contained therein, persons to whom
disclosure is not authorized under an applicable
confidentiality order shall be excluded.

### 2. Unnecessary Attendance

Unnecessary attendance by counsel is discouraged
and may not be compensated in any fee application
to the Court.  Counsel who have only marginal
interest in a proposed deposition or who expect
their interests to be adequately represented by
other counsel may elect not to attend.
Supplemental interrogation of the deponent will be
allowed should a review of the deposition
transcript reveal the need for such examination.

### e. Conduct

### 1. Examination

Each side should designate one attorney to conduct
the principal examination of the deponent, and
examination by other attorneys should be limited
to matters not previously covered.  Counsel should
cooperate in the allocation of time to ensure that
all time limits are complied with.  All
depositions are to be completed within seven (7)

-19-

hours, exclusive of recesses, as required by
Federal Rule of Civil Procedure 30(d)(2) to take
effect on December 1, 2000, unless otherwise
agreed by the parties or ordered by the Court.   In
addition, expert depositions must be completed in
two (2) business days, unless otherwise agreed by
the parties or ordered by the Court.

2.   **Objections and Directions Not to Answer**

Counsel shall comply with Federal Rule of Civil
Procedure 30(d)(1) to take effect on December 1,
2000.   When a privilege is claimed, the witness
should nevertheless answer questions relevant to
the existence, extent, or waiver of the privilege,
such as the date of a communication, who made the
statement, to whom and in whose presence the
statement was made, other persons to whom the
contents of the statement have been disclosed, and
the general subject matter of the statement,
unless such information is itself privileged.

3.   **Private Consultation**

Private conferences between deponents and their
attorneys in the course of interrogation are
improper except for the purpose of determining
whether a privilege should be asserted.

-20-

### 4. Continuation of a Deposition

If a deposition is not finished on Friday of a deposition week, it will continue on the following Monday, subject to the availability of the witness. If the witness is unavailable, it will resume on a newly noticed date.

## f. Documents

### 1. Production of Documents

Witnesses subpoenaed to produce documents should ordinarily be served at least thirty (30) days before the scheduled deposition. Arrangements should be made to permit inspection of the documents no later than seventy-two (72) hours before the interrogation commences.

### 2. Confidentiality Order

A copy of any confidentiality order shall be provided to the deponent before the deposition commences if the deponent is to produce or may be asked about documents that may contain confidential information. Counsel shall comply with the provisions of any confidentiality order when examining a deponent about confidential information.

-21-

3.   **Copies**

Extra copies of documents about which counsel
expect to examine the deponent should ordinarily
be provided to opposing counsel and the deponent.
Deponents should be shown a document before being
examined about it except when counsel seeks to
impeach or test the deponent's recollection.

4.   **Marking of Deposition Exhibits**

Documents shall be referred to by the Bates-stamp
number assigned by the Document Depository.

g.   **Depositions of Witnesses Who Have No Knowledge of the Facts**

An officer, director, or managing agent of a
corporation or a government official served with a
notice of a deposition or subpoena regarding a matter
about which such person has no knowledge, may submit to
the noticing party within a reasonable time before the
date noticed, an affidavit so stating and identifying a
person within the corporation or government entity
believed to have such knowledge.  Notwithstanding such
affidavit, the noticing party may proceed with the
deposition, subject to the right of the witness to seek
a protective order.  Any entity served with a Rule
30(b)(6) notice of deposition with specified areas of
questions has a duty to produce representatives

-22-

responsive to each area specified in the notice.   Thus, an entity may be required to produce more than one representative in response to a single 30(b)(6) request.

h.   **Recording Depositions by Nonstenographic Means**

   1.   **Tape-Recorded Depositions**

By so indicating in its notice of a deposition, a party may record the deposition by tape recording in lieu of stenographic recording pursuant to Federal Rules of Civil Procedure 30(b)(2) and (3). Other parties may, at their own expense, arrange for stenographic recording of the deposition, obtain a copy of the tape and transcript upon payment of a pro rata share of the noticing party's actual costs, and may prepare and file their own version of the transcript of the tape recording.

   2.   **Videotaped Depositions**

By so indicating in its notice of deposition, a party may record the deposition by videotape pursuant to Federal Rules of Civil Procedure 30(b)(2) and (3).

   (a)   **Rules for Videotaped Recording**

      (1)   **Video Operator**

-23-

The operator(s) of the video recording equipment shall be subject to the provisions of Federal Rule of Civil Procedure 28(c).  At the commencement of the deposition the operator(s) shall swear or affirm to record the proceedings fairly and accurately.

**(2)   Attendance**

Each witness, attorney, and other person attending the deposition shall be identified on camera at the commencement of the deposition.  Thereafter, only the deponent (and demonstrative materials used during the deposition) will be videotaped.

**(3)   Standards**

The deposition shall be conducted in a manner to replicate, to the extent feasible, the presentation of evidence at a trial.  Unless physically incapacitated, the deponent shall be seated at a table or in a witness box except when reviewing or presenting demonstrative materials for which a

-24-

change in position is needed.  To the extent practicable, the deposition shall be conducted in a neutral setting, against a solid background, with only such lighting as is required for accurate video recording.  Lighting, camera angle, lens setting, and field of view will be changed only to the extent necessary to record accurately the natural body movements of the deponent or to portray exhibits and materials used during the deposition.  Sound levels shall be altered only to the extent necessary to record satisfactorily the voices of counsel and the deponent.  Eating and smoking by deponents or counsel during the deposition will not be permitted.

**(4)    Interruptions**

The videotape shall run continuously throughout the active conduct of the deposition.

**(5)    Index**

The videotape operator shall use a

-25-

counter on the recording equipment and
after completion of the deposition shall
prepare a log, cross-referenced to
counter numbers, that identifies the
positions on the tape at which
examination by different counsel begins
and ends, the time at which objections
are made and examination resumes, the
time at which exhibits are identified,
and the time at which any interruption
of continuous tape recording occurs,
whether for recesses, "off the record"
discussions, mechanical failure, etc.

**(6)  Filing**

The operator shall preserve custody
of the original videotape in its
original condition until further order
of the Court.  No part of a videotaped
deposition shall be released or made
available to any member of the public
unless authorized by the Court.

**(7)  Objections**

Requests for pretrial rulings on the
admissibility of evidence obtained

-26-

during a videotaped deposition shall be
accompanied by appropriate pages of the
written transcript.  If needed for an
informed ruling, a copy of the videotape
and equipment for viewing the tape shall
also be provided to the Court.

**(8)  Use at Trial; Purged Tapes**

A party desiring to offer a videotaped
deposition at trial shall be responsible
for providing the appropriate playback
equipment and a trained operator.  After
the designation by all parties of the
portions of a videotape to be used at
trial, an edited copy of the tape,
purged of unnecessary portions (and any
portions to which objections have been
sustained), shall be prepared by the
offering party to facilitate continuous
playback; but a copy of the edited tape
shall be made available to other parties
at least twenty (20) days before it is
to be used, and the unedited original
version of the tape shall also be
available at the trial.

-27-

i.    **Telephonic Depositions**

By indicating in its notice of a deposition that it
wishes to conduct the deposition by telephone, a party
shall be deemed to have moved for such an order under
Federal Rule of Civil Procedure 30(b)(7).  Unless an
objection is filed and served within five (5) business
days after such notice is received, the Court shall be
deemed to have granted the motion.  Other parties may
examine the deponent telephonically or in person.
However, all persons present with the deponent shall be
identified in the deposition and shall not by word,
sign, or otherwise coach or suggest answers to the
deponent.

j.    **Waiver of Transcription**

The parties and deponents are authorized and encouraged
to waive transcription of depositions that prove to be
of little or no usefulness in the litigation, or to
agree to defer transcription until the need for using
the deposition arises.

k.    **Use; Supplemental Depositions**

1.    **Use**

Depositions may, under the conditions prescribed
in Federal Rules of Civil Procedure 32(a)(1)-(4)
or as otherwise permitted by the Federal Rules of

-28-

Evidence, be used against any party (including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court as part of this litigation):

(a)   who was present or represented at the deposition;

(b)   who had reasonable notice thereof; or

(c)   who, within thirty (30) days of the completion of the deposition (or, if later, within sixty (60) days after becoming a party in this Court in any action that is a part of this litigation), fails to show just cause why such deposition should not be usable against such party.

2.   **Supplemental Depositions**

Each party not present or represented at a deposition (including parties later added and parties in cases subsequently filed in, removed to, or transferred to this Court) may, within thirty (30) days after the completion of the deposition (or, if later, within sixty (60) days after becoming a party in this Court in any action that is a part of this litigation), request permission to conduct a supplemental deposition of

-29-

the deponent.  Such request includes the right to
take such deposition telephonically and/or by
nonstenographic means.  If permitted, the
deposition shall be treated as the resumption of
the deposition originally noticed; and each
deponent shall, at the conclusion of the initial
deposition, be advised of the opportunity of
nonattending parties to request a resumption of
such deposition, subject to the right of the
deponent to seek a protective order.  Such
subsequent examination, however, shall not be
repetitive of the prior interrogation.

1.  **Rulings**

1.  **Immediate Presentation**

During depositions, disputes arising that cannot
be resolved by agreement and if not resolved
immediately will significantly disrupt the
discovery schedule or require a rescheduling of
the deposition, may be presented by telephone to
the Court.  The presentation of the issue and
the Court's ruling will be recorded as part of the
deposition.

2.  **Extraterritorial Jurisdiction**

The undersigned will exercise by telephone the

-30-

authority granted under 28 U.S.C. § 1407(b) to act

as district judge in the district in which the

deposition is taken.

8.  **Later Filed Cases**

The terms of this Order shall apply automatically to actions

later instituted in, removed to, or transferred to this

Court (including cases transferred for pretrial purposes

under 28 U.S.C. § 1407).  Objections to any term of this

Order shall promptly be filed, with copies served on Liaison

Counsel for plaintiffs and defendants.

9.  **Electronic Bulletin Board**

Lead, Liaison and Steering Committee Counsel for Plaintiffs

and Defendants are directed to meet and confer for the

purpose of establishing an informational electronic bulletin

board capable of being accessed by computers.  Parties shall

use the bulletin board to obtain notices and announcements

relating to proceedings and events in this litigation, as

well as electronic versions of transcripts of status

conferences, orders, cases, opinions, schedules of

depositions, and some or all of the materials filed with

the Document Depository.  Counsel may recommend, by motion,

that a portion of the bulletin board be accessible only to

counsel for plaintiffs, counsel for defendants, or both.

Any limitations, however, should be restricted to (1)

-31-

matters that represent the work product of attorneys for plaintiffs or defendants and are not otherwise available to other persons, and (2) matters that are deemed confidential pursuant to an applicable protective order.  The bulletin board should be established so that it is compatible with most communications software, with a view towards making it publicly available.  Counsel using computers to prepare documents sent to the clerk or to the judge's chambers are asked to retain computer-readable text files of these documents.  The Court contemplates that procedures will be established for maintaining an electronic library and bulletin board of these files for quick and inexpensive access by other litigants and interested members of the public.

So Ordered:

Shira A. Scheindlin
United States District Judge

Dated: New York, New York
       November 13 , 2000

-32-

**EXHIBIT C**

*11/9/00*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------X
                                     :
In re: Methyl Tertiary Butyl Ether   :    **MDL No. 1358**
("MTBE") Products Liability Litigation:
                                     :    Master File
                                     :    C.A. No. 1:00-1898(SAS)
This Document Relates To: All Cases  :
                                     :
-------------------------------------X

### PRACTICE AND PROCEDURE ORDER UPON TRANSFER
### PURSUANT TO 28 U.S.C. § 1407(a)

1.   This Order shall govern the practice and procedure in those

     actions transferred to this Court by the Judicial Panel on

     Multidistrict Litigation pursuant to their Order of October

     10, 2000, as well as all related actions originally filed in

     this Court or transferred or removed to this Court.  These

     actions are listed in Appendix A, attached hereto.  This

     Order shall also govern the practice and procedure (1) in

     any tag-along actions transferred to this Court by the

     Judicial Panel on Multidistrict Litigation pursuant to Rule

     12 of the Rules of Procedure of that Panel subsequent to the

     filing of the final transfer order by the Clerk of this

     Court; and (2) in any related actions subsequently filed in

     this Court or otherwise transferred or removed to this

     Court.

2.   The actions described in paragraph 1 of this Order are

-1-



EXHIBIT _C_

consolidated for pretrial purposes.

3. A signed original and one copy of any pleading or paper shall be filed. All papers filed in these actions shall bear the identification "MDL NO. 1358", and when such paper relates to all of these actions, the MDL docket number shall be followed only by the notation "ALL CASES." If such paper does not relate to all of these actions, the individual docket numbers assigned by the Clerk of this Court (as listed in Appendix A hereto) to which the paper relates shall also be listed.

4. Any paper which is to be filed in any of these actions shall be filed with the Clerk of this Court and not with the transferor district court.

5. Counsel who appeared in the transferor district court prior to the transfer need not enter a separate appearance before this Court.

6. Service of all papers shall be made on each of the attorneys on the Panel Attorney Service List ("PASL"), attached hereto as Appendix B. Any attorney who wishes to have his or her name added to or deleted from the PASL may do so upon request to the Clerk of this Court with notice to all other persons on the PASL. Service shall be deemed sufficient if made upon all attorneys who appear on the PASL. Not more than three attorneys for each party separately represented

-2-

shall be included on the list.  Only those attorneys on the PASL will be permitted to appear in Court.

7.    Morris A. Ratner, Esq., has been appointed Liaison Counsel for the plaintiffs pursuant to Case Management Order No. 1, dated November 3, 2000.  Liaison Counsel for defendants shall be appointed by December 1, 2000.  Nathan P. Eimer, Esq., will act as Temporary Defendants' Liaison Counsel. Liaison Counsel shall be authorized to receive orders and notices from the Court on behalf of all parties within their liaison group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group.  Liaison Counsel shall be required to maintain complete files with copies of all documents served upon them and shall make such files available to parties within their liaison group upon request.  Liaison Counsel are also authorized to receive orders and notices from the Judicial Panel on Multidistrict Litigation pursuant to Rule 8(e) of the Panel's Rules of Procedure on behalf of all parties within their liaison group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group.

8.    No parties to any of these actions shall be required to obtain local counsel in this district and the requirements

-3-

of Rule 1.3 of the Local Rules of the Southern District of New York are waived as to any attorney appearing in these actions who is duly admitted to practice before any United States Court.

9. Hearings shall not be held on any motions filed except by Order of this Court and upon such notice as the Court may direct.

10. Any paper filed in any of these actions which is substantially identical to any other paper filed in another of these actions shall be sufficient if it incorporates by reference the paper to which it is substantially identical. Where counsel for more than one party plan to file substantially identical papers, they shall join in the submission of such papers and file only one paper on behalf of all so joined.

11. Any orders including protective orders previously entered by any transferor district court shall remain in full force and effect unless modified by this Court upon application.

12. The Court will be guided by the <u>Manual for Complex Litigation</u>, (3d ed. 1995), approved by the Judicial Conference of the United States; counsel are directed to familiarize themselves with that publication.  Additionally, counsel are directed to familiarize themselves with the Local Rules of the Southern District of New York and the

-4-

Individual Rules of this Court.  These Local and Individual
Rules are applicable unless modified by this Court herein or
otherwise.  Any attempt by the parties to modify response
times, answer times, etc. unless approved by this Court
shall be disregarded.

13. Pursuant to Federal Rule of Civil Procedure 5 to take effect
on December 1, 2000, discovery documents shall not be filed
with the Clerk of this Court.  Further, no written discovery
motions may be filed, unless expressly permitted by this
Court.  The Court anticipates scheduling regular monthly
conferences to monitor the pre-trial progression of these
actions.  Any and all discovery problems will be discussed
at these conferences.  You are instructed to give opposing
counsel and the Court advance notice of any discovery
disputes anticipated prior to each conference.  In the event
of an emergency discovery dispute, that is a discovery
dispute which needs resolution prior to the next scheduled
conference, the parties should notify the Court of their
need for an immediate conference.

14. It is the general practice of this Court to refer all
litigants before it to mediation.  However, the question of
when and how to mediate these cases will be discussed at a
regularly scheduled pre-trial conference.

15. Pre-trial conferences will be scheduled every month.  A

schedule of upcoming conferences will be distributed at the next pre-trial conference.  Counsel must submit proposed agenda items to the Court in writing within seventy-two (72) hours of each scheduled conference.  The next pre-trial conference is scheduled for December 8, 2000 at 10:00 a.m. Counsel shall furnish written suggestions of items to be included on the agenda for this Conference to the Court, and to both Liaison Counsel, on or before December 5, 2000 at 5:00 p.m.

So Ordered:

Shira A. Scheindlin
United States District Judge

Dated: New York, New York
       November 9 , 2000

-6-

### APPENDIX A

| CASE | TRANSFEROR COURT | DOCKET NO. | OUR CIVIL ACTION NO. |
|---|---|---|---|
| Donna Berisha, et al. v. Amerada Hess Corp, et al. | ---------- | ------------------ | 00 Civ. 1898 |
| David England, et al. v. Atlantic Richfield Co., et al. | S.D. Ill. | C.A. No. 3:00-370 C.A. No. 3:00-371 | 00 Civ. 7729 00 Civ. 7730 |
| * Sutton Farms (USA) Inc. v. Amerada Hess, et al. | S.D. Fla. | C.A. No. 1:00-3544 | ------------- |
| * Young v. ExxonMobil Oil Corp. | M.D. Fla. | C.A. No. 8:00-1912 | ------------- |

  * - A Conditional Transfer Order ("CTO-1") transferring these two cases to the Southern District of New York was filed with the Judicial Panel on Multidistrict Litigation on October 30, 2000.  The conditional transfer order is not yet a final order.

## APPENDIX B

## PANEL ATTORNEY SERVICE LIST
### ("PASL")

**Attorneys for Plaintiffs**

**Berisha**

Lewis J. Saul, Esq.
LEWIS SAUL & ASSOCIATES, P.C.
501 Wisconsin Avenue, N.W., Suite 550
Washington, D.C.  20015
Tel: 202-364-9700
Tel: 800-747-5342
Fax: 202-364-9701
lsaul@lewissaul.com

Jon Hinck, Esq.
LEWIS SAUL & ASSOCIATES, P.C.
183 Middle Street, Suite 200
Portland, ME  04101
Tel: 207-874-7407
Tel: 888-747-5342
Fax: 207-874-4930
jhinck@lewissaul.com

Mitchell M. Breit, Esq.
WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 17th Floor
New York, NY  10083
Tel: 212-558-5500
Fax: 212-344-5461
mbreit@weitzlux.com

**Young**

Elizabeth J. Cabraser, Esq.
Morris A. Ratner, Esq.
LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
780 Third Avenue
48th Floor
New York, NY  10017-2024
Tel: 212-355-9500
Fax: 212-355-9592
ecabraser@lchb.com
mratner@lchb.com

- 8 -

Joe R. Whatley, Jr., Esq.
WHATLEY DRAKE, L.L.C.
1100 Financial Center
505 North 20th Street
Birmingham, AL  35203-2605
Tel: 205-328-9576
Fax: 205-328-9669
jwhatley@whatleydrake.com

**England**

Stephen M. Tillery, Esq.
Steven A. Katz, Esq.
CARR, KOREIN, TILLERY, et al.
#10 Executive Woods Court
Belleville, IL  62226
Tel: 618-277-1180
Fax: 618-277-9840
stillery@legal-matters.com
katzman001@worldnet.att.net

Scott Summy, Esq.
COOPER & SCULLY, PC
900 Jackson Street, Suite 100
Dallas, TX  75202
Tel: 214-712-9300
Fax: 214-712-9540
ssummy@coopersculy.com
cevangel@cooperscully.com

**Sutton Farms**

D. Michael Campbell, Esq.
Gregory L. Denes, Esq.
Scott D. McKay, Esq.
CAMPBELL & DENES
6100 Southwest 76th Street
Miami, FL  33143-5002
Tel: 305-666-3820
Fax: 305-666-8430
mcampbell@campbelllaw.com
gdenes@campbelllaw.com
smckay@campbelllaw.com

**Attorneys for Defendants**

**Amerada Hess Corporation**

Robert H. Shulman, Esq.
Mindy G. Davis, Esq.
HOWREY SIMON ARNOLD & WHITE
1299 Pennsylvania Avenue, N.W.
Washington, D.C.   20006
Tel: 202-783-0800
Fax: 202-383-6610
shulmanr@howrey.com
davism@howrey.com

Christopher S. Colman, Esq.
Associate General Counsel
AMERADA HESS CORPORATION
One Hess Plaza
Woodbridge, NJ 07095
Tel: 732-750-6535
Fax: 732-750-6944
ccolman@hess.com

**BP Amoco Corporation**

Richard C. Godfrey, Esq.
J. Andrew Langan, Esq.
Mark S. Lillie, Esq.
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL   60602
Tel: 312-861-2000
Fax: 312-861-2200
richard_godfrey@chicago.kirkland.com
andrew_langan@chicago.kirkland.com
mark_lillie@chicago.kirkland.com

**Chevron USA, Inc.**

Richard E. Wallace, Jr., Esq.
Peter C. Condron, Esq.
WALLACE KING MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Tel: 202-204-1000
Fax: 202-204-1001
rwallace@wallaceking.com
pcondron@walaceking.com

Dan H. Ball, Esq.
THOMPSON COBURN LLP
One Firstar Plaza
Suite 3300
St. Louis, MO 63101
Tel: 314-552-6000
Fax: 314-552-7000
dball@thompsoncoburn.com
rwuller@thompsoncoburn.com

**CITGO Petroleum Corporation**

Nathan P. Eimer, Esq.
Pamela R. Hanebutt, Esq.
Lisa S. Meyer, Esq.
EIMER STAHL KLEVORN & SOLBERG
122 South Michigan Avenue
Suite 1776
Chicago, IL 60603
Tel: 312-660-7600
Fax: 312-692-1718
neimer@eimerstahl.com
phanebutt@eimerstahl.com
lmeyer@eimerstahl.com

**Coastal Corporation**

Robert H. Shulman, Esq.
Mindy G. Davis, Esq.
HOWREY SIMON ARNOLD & WHITE
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: 202-783-0800
Fax: 202-383-6610
shulmanr@howrey.com
davism@howrey.com

**Coastal Oil New York, Inc.**

Mark O'Connor, Esq.
COASTAL OIL NEW YORK, INC.
P.O. Box 818
611 Route 46 West
Tel: 201-393-4918
Fax: 201-393-4565

Mindy G. Davis, Esq.
Brent H. Allen, Esq.
HOWREY SIMON ARNOLD & WHITE
1299 Pennsylvania Avenue, N.W.
Washington, D.C.    20006
Tel: 202-783-0800
Fax: 202-383-6610
davism@howrey.com
allenb@howrey.com


**Conoco, Inc.**                    Dan H. Ball, Esq.
                                    Edward Cohen, Esq.
                                    Roman Wuller, Esq.
                                    THOMPSON COBURN LLP
                                    One Firstar Plaza, Suite 3300
                                    St. Louis, MO   63101
                                    Tel: 314-552-6000
                                    Fax: 314-552-7000
                                    dball@thompsoncoburn.com
                                    ecohen@thompsoncoburn.com
                                    rwuller@thompsoncoburn.com


**Equilon Enterprises, LLC**        Richard E. Wallace, Jr., Esq.
                                    Anthony F. King, Esq.
                                    Peter C. Condron, Esq.
                                    WALLACE KING MARRARO & BRANSON
                                    1050 Thomas Jefferson Street, N.W.
                                    Washington, D.C.   20007
                                    Tel: 202-204-1000
                                    Fax: 202-204-1001
                                    rwallace@wallaceking.com
                                    aking@wallaceking.com
                                    pcondron@wallaceking.com


**Exxon Corporation**               Richard E. Wallace Jr., Esq.
                                    WALLACE KING MARRARO & BRANSON
                                    1050 Thomas Jefferson Street, N.W.
                                    Washington, D.C.   20007
                                    Tel: 202-204-1000
                                    Fax: 202-204-1001
                                    rwallace@wallaceking.com

Peter Sacripanti, Esq.
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY  10020-1605
Tel: 212-547-5400
Fax: 212-547-5444
psacripanti@mwe.com

**Mobil Oil Corporation**

Richard E. Wallace, Jr., Esq.
WALLACE KING MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Tel: 202-204-1000
Fax: 202-204-1001
rwallace@wallaceking.com
pcondron@wallaceking.com

Peter Sacripanti, Esq.
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY  10020-1605
Tel: 212-547-5400
Fax: 212-547-5444
psacripanti@mwe.com

**Motiva Enterprises, LLC**

Richard E. Wallace, Jr., Esq.
Peter C. Condron, Esq.
WALLACE KING MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Tel: 202-204-1000
Fax: 202-204-1001
rwallace@wallaceking.com
pcondron@wallaceking.com

Peter Sacripanti, Esq.
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY  10020-1605
Tel: 212-547-5400
Fax: 212-547-5444
psacripanti@mwe.com

**Phillips Petroleum Company**

John E. Galvin, Esq.
Lyndon Sommer, Esq.
SANDBERG, PHOENIX & VON GONTARD
One City Centre
15th Floor
515 North Sixth Street
St. Louis, MO  63101-1880
Tel: 314-231-3332
Fax: 314-241-7604
jeg@spvg.com

**Shell Oil Products Company**

Richard E. Wallace, Jr., Esq.
Peter C. Condron, Esq.
WALLACE KING MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Tel: 202-204-1000
Fax: 202-204-1001
rwallace@wallaceking.com
pcondron@wallaceking.com

John E. Galvin, Esq.
SANDBERG, PHOENIX & VON GONTARD
One City Center, 15th Floor
515 North Sixth Street
St. Louis, MO  63101-1880
Tel: 314-231-3332
Fax: 314-241-7604
jeg@spvg.com

**Sunoco Inc.**

John S. Guttmann, Esq.
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C.  20005
Tel: 202-789-6020
Fax: 202-789-6190
jguttmann@bdlaw.com

Sy Gruza, Esq.
Heather Andrade, Esq.
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue
15th Floor
New York, NY  10022-5802
Tel: 212-702-5400
Fax: 212-702-5450
sgruza@bdlaw.com
handrade@bdlaw.com

**Texaco Inc.**

Richard E. Wallace, Jr., Esq.
Peter C. Condron, Esq.
WALLACE KING MARRARO & BRANSON
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Tel: 202-204-1000
Fax: 202-204-1001
rwallace@wallaceking.com
pcondron@wallaceking.com

Sharon Dutch, Esq.
SEDGWICK DETERT MORAN & ARNOLD
125 Broad Street, 39th Floor
New York, NY  10004-2400
Tel: 212-422-0202
Fax: 212-422-0925

**Tosco Corporation**

Melvin A. Brosterman, Esq.
Kenneth Pasquale, Esq.
Christine Fitzgerald, Esq.
STROOCK, STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038-4982
Tel: 212-806-5400
Fax: 212-806-6006
mbrosterman@stroock.com
kpasquale@stroock.com
cfitzgerald@stroock.com

- 15 -

**United Refining Corp.**

Edward S. Weltman, Esq.
Jonathan Price, Esq.
Christopher J. Garvey, Esq.
SCHNECK WELTMAN & HASHMALL
1285 Avenue of the Americas
New York, NY  10019
Tel: 212-956-1500
Fax: 212-956-3252
eweltman@swhllp.com
jprice@swhllp.com
cgarvey@swhllp.com

**Valero Marketing and Supply Co.**

Kenneth M. Bialo, Esq.
Matthew McCoy, Esq.
BAKER BOTTS LLP
599 Lexington Avenue
New York, NY  10022-6030
Tel: 212-705-5025
Fax: 212-705-5125
kbialo@bakerbotts.com
sconti@bakerbotts.com

Steven L. Leifer, Esq.
BAKER BOTTS LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Tel: 202-639-7723
Fax: 202-585-1040
sleifer@bakerbotts.com

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

In Re:       Methyl Tertiary Butyl Ether          Master File C.A. No.
("MTBE") Products Liability Litigation           1:00-1898(SAS)
                                                  MDL 1358

------------------------------------------------------

This Document Applies to All Actions

------------------------------------------------------


# MASTER COMPLAINT


**EXHIBIT** _ℓ_

**PAGE**

**TABLE OF CONTENTS OF MASTER COMPLAINT**

**PAGE**

NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I      What MTBE is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II     Why Defendants add MTBE to gasoline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    III    Gasoline containing MTBE has widely contaminated and continues
             to pose an extreme threat to groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    IV    The longstanding prevalence of unintended gasoline discharges ensures
             that gasoline with MTBE will contaminate groundwater. . . . . . . . . . . . . . . . . . 11

    V     Defendants have known all along that mixing MTBE with gasoline
             would result in massive groundwater contamination. . . . . . . . . . . . . . . . . . . . . 13

          A    Defendants' knowledge of the prevalence of unintended
               discharges of gasoline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          B    Defendants' knowledge of the threat to groundwater as a
               result of unintended discharges of gasoline mixed with MTBE . . . . . . . 14

               i     Defendants' constructive knowledge of MTBE's
                    threat to groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

               ii    Defendants' knowledge of specific instances of MTBE

**PAGE**

contamination of groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii    Defendants' awareness of the 1986 Garrett Report
specifically warning of inevitable MTBE contamination
of groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

iv    Defendants' internal documents demonstrating their
awareness of MTBE contamination of groundwater . . . . . . . . . 19

v    Defendants' knowledge that no adequate toxicity studies
had been done prior to Defendants' decision to add
MTBE to gasoline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI    Despite knowing that adding MTBE to gasoline inevitably results in
widespread MTBE groundwater contamination, Defendants
conspired to mislead the EPA and the public about the hazards of
adding MTBE to gasoline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A    Defendants misled the EPA into not testing MTBE under the
Toxic Substances Control Act (TSCA) in the late 1980's. . . . . . . . . . . . 23

B    Defendants misled Congress into effectively broadening the
market for MTBE by including oxygenate requirements in the
Reformulated Gasoline (RGF) Program adopted in the 1990
amendments to the Clean Air Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C    Defendants' misled the Plaintiffs and public, including all
downstream gasoline handlers, about the hazards of
gasoline with MTBE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VII    Defendants dramatically increased their use of MTBE in gasoline
after the creation of the RFG program. . . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII    MTBE has had a predictably catastrophic effect upon groundwater
and private wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IX    It is impossible to identify which manufacturer's gasoline poses
a threat of MTBE contamination or has already caused MTBE
contamination in any particular well . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

X    Defendants' substantial share of the market for gasoline containing

iii

**PAGE**

MTBE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XI     Additional Facts relating to injunctive relief . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

MARKET SHARE, CONCERTED ACTION, ENTERPRISE
and ALTERNATIVE LIABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CLASS ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CAUSES OF ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Count I - Strict Liability for Design Defect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Count II - Failure to Warn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Count III - Deceptive Business Acts and Practices in Violation of GBL § 349  . . . . . . . 56

Count IV - Public Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Count V - Negligence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Count VI - Civil Action to Compel Defendants to Comply with the Reporting
            Requirements of the Toxic Substances Control Act (TSCA)  . . . . . . . . . . 62

County VII - Conspiracy to Market a Product Known to be Unsafe  . . . . . . . . . . . . . . 63

PRAYER FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## NATURE OF THE CASE

1.      The Judicial Panel on Multidistrict Litigation has consolidated several cases from district courts around the country for pre-trial proceedings before Hon. Shira A. Scheindlin in the U.S. District Court for the Southern District of New York.[1]  These cases are all class actions for injunctive relief arising from the widespread contamination of groundwater as a result of the Defendants' use of a gasoline additive called methyl tertiary-butyl ether ("MTBE").  Plaintiffs are owners of private wells who, as a result of the enhanced risk to their drinking water, now require testing and monitoring of their wells and aquifers for MTBE.  Defendants are oil companies involved in the manufacture, design, refining, formulation, distribution, supply, sale and/or marketing of gasoline mixed with MTBE throughout the states in which Plaintiffs and class members reside and own private wells (hereafter, "the Affected States").  The Affected States include: New York, California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin, Virginia, and  Florida.

2.      Defendants have engaged in joint efforts and conspired to use and market MTBE as a gasoline additive for years with full knowledge of the serious threat MTBE poses to groundwater.  Defendants conspired to maximize their profits at the expense of class members and the environment and in furtherance of this conspiracy to conceal the problems associated with MTBE, to proliferate its use, to pollute Plaintiffs' wells, and to avoid responsibility for their

---

[1]Those cases include *Berisha v. Amerada Hess Corp., et al.* (No. 00 CIV 1898 [SAS], S.D.N.Y.) and *England v. Atlantic Richfield Company, et al.*, (No. 99-370-DRH, S.D. Ill.).  In addition, two Florida cases have been conditionally transferred; *Young v. Exxon Mobil Oil Corp.* (C.A. No. 8:00 - 192-T-24C, M.D. Fla.) and *Sutton Farms. v. Amerada Hess Corp., et al.*, (C.A. No. 1:00 - 3544, S.D. Fla).

contamination.

3.  All Plaintiffs seek one or more of the forms of relief set forth herein.  Some
Plaintiffs seek only a subset of such relief on behalf of the subclass or class they seek to
represent.  For the class, only injunctive relief is sought.  The injunctive relief sought by all
Plaintiffs includes a court-supervised program of MTBE testing, monitoring and education.
Certain Plaintiffs with MTBE contaminated wells also seek a court-supervised program to
provide class members with a source of water free from MTBE and/or to remediate (clean-up)
Plaintiffs' wells.  Certain individual Plaintiffs seek compensatory damages.

## PARTIES

### Plaintiffs

4.  Plaintiffs are present or former owners of private wells drawing from groundwater
which Plaintiffs used and/or use as a source of water for drinking, bathing, and general
"domestic" purposes.

### Defendants

5.  Defendants do business in the Affected States as manufacturers, designers,
refiners, formulators, distributors, suppliers, sellers and/or marketers of gasoline containing
MTBE.

6.  At all times relevant to this litigation, Defendants engaged in one or more phases
of the petroleum business, from the exploration for and extraction of crude oils to the refining
and/or the distribution, marketing and retail sale of gasoline, including the design and
manufacture of gasoline containing MTBE sold in Affected States.

7.  Any and all references to a Defendant or Defendants in this Master Complaint

2

include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant or Defendants.

8.     When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

9.     When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

10.    Atlantic Richfield Company ("Arco") is a Delaware corporation with its principal place of business in Los Angeles, California, and doing business in the States of New York, Illinois and other Affected States.

11.    BP Amoco Corporation ("Amoco") is an Indiana corporation with its principal place of business in Chicago, Illinois, and doing business in the States of New York, Illinois and other Affected States.

12.    Defendant Amoco Oil Company is a wholly owned subsidiary of Defendant BP Amoco Corporation and has its principal place of business in the State of Illinois and is doing business in Illinois and other Affected States.

13.    Citgo Petroleum Corporation ("Citgo") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, and doing business in the States of New York, Illinois and other Affected States.

3

14.     Conoco, Inc. ("Conoco") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

15.     Chevron U.S.A. Inc. ("Chevron") is a Delaware corporation with its principal place of business in San Francisco, California, and doing business in the States of New York, Illinois and other Affected States.

16.     Exxon Mobil Corporation ("Exxon Mobil"), formed as a result of the merger on November 30, 1999 of Exxon Corporation ("Exxon") and Mobil Corporation ("Mobil") is a New Jersey corporation with its principal place of business in Irving, Texas, and doing business in the States of New York, Illinois and other Affected States.

17.     Equilon Enterprises, LLC ("Equilon") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

18.     Phillips Petroleum Company ("Phillips") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois and other Affected States.

19.     Shell Oil Company ("Shell") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

20.     Texaco Refining and Marketing, Inc. ("Texaco") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois and other Affected States.

21.     Defendant Amerada Hess Corporation is a Delaware corporation with its principal place of business in New York, New York, and doing business in the State of New York and other Affected States.

4

22.     Defendant Coastal Corporation d/b/a Coastal Oil New York, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

23.     Defendant Motiva Enterprises, LLC is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

24.     Defendant Shell Oil Products Company is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

25.     Defendant Sunoco, Inc. is a Pennsylvania corporation with its principal place of business at Philadelphia, Pennsylvania, and doing business in the State of New York and other Affected States.

26.     Defendant Texaco, Inc. is a Delaware corporation with its principal place of business in White Plains, New York, and doing business in the State of New York and other Affected States.

27.     Defendant Tosco Corporation is a Nevada corporation with its principal place of business in Stamford, Connecticut, and doing business in the State of New York and other Affected States.

28.     Defendant United Refining Company is a Pennsylvania corporation with its principal place of business in Warren, Pennsylvania, and doing business in the State of New York and other Affected States.

29.     Defendant Valero Energy Inc. d/b/a Valero Marketing and Supply Company is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing

5

business in the State of New York and other Affected States.

30.    Defendants Does 1-100 are corporations, partnerships, associations, natural persons or other entities that are not presently known to Plaintiffs.  The true names and identities of all of these Defendants are not presently known to Plaintiffs, who therefore sue said Defendants by fictitious names.  Plaintiffs will pray leave to add parties and allege said Defendants' true names when the true names become known to Plaintiffs.

### JURISDICTION

31.    This Court has jurisdiction over Defendants in the *England* case transferred from the District Court for the Southern District of Illinois, because those Defendants are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

32.    The Court has jurisdiction over the New York domiciliary Defendants in the *Berisha* case, which was removed to this Court from New York state court, and over the non-domiciliary entities named as Defendants in *Berisha* because each non-domiciliary Defendant did or does business in New York and/or contracts to supply goods and services to the New York.

33.    This Court has jurisdiction over the Defendants because the Defendants are either incorporated in the State in which the case was filed, are registered with that state's secretary of

6

state, do sufficient business in the State and have minimum contacts with it, or otherwise

intentionally avail themselves of the State through the sale, manufacture, distribution, and/or

processing of petroleum related products in that State to render the exercise of jurisdiction over

Defendants by the States' courts consistent with traditional notions for fair play and justice.

## VENUE

34.    Venue in the *England* case is proper in the federal district court to which that case

was removed, because at least one of the *England* Defendants is subject to personal jurisdiction

in that district (the Southern District of Illinois).

35.    Venue in the *Berisha* case is proper in the Southern District of New York, because

one or more *Berisha* Defendants, including Amerada Hess Corporation and/or Mobil Oil

Corporation, reside in New York County.

36.    Venue is proper because one or more Defendants resides and/or conducts business

in the state in which each of the cases consolidated herein was originally filed.

## SUBSTANTIVE ALLEGATIONS

### I    What MTBE is

37.    MTBE is a member of a class of chemical compounds, aliphatic ethers, whose

unique properties include being "hydrophilic," or water-seeking, *i.e.*, having enhanced solubility

in water and chemical attraction to water molecules.

38.    MTBE does not occur naturally.

7

39.    MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process.

40.    Defendants used and continue to use MTBE as a gasoline additive.

**II**    **Why Defendants add MTBE to gasoline**

41.    In or after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

42.    By the mid-1980's, MTBE was in widespread use in high-octane gasoline.

43.    Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline.  Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution.  Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE.

44.    Ironically, it is now apparent that MTBE does not even deliver Defendants' promise of cleaner air.  MTBE does little or nothing, contrary to industry assurances, to contribute to reductions in such air-polluting car emissions as carbon monoxide or the creation of smog.

45.    A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated

8

gasoline" when compared to alternative non-oxygenated formulations.[2]

46.    In May, 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[3]  NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[4]

47.    In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself.

### III    Gasoline containing MTBE has widely contaminated and continues to pose an extreme threat to groundwater

48.    MTBE is more than an order of magnitude more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water.  In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other common gasoline components -- benzene, toluene, ethylbenzene and xylene (collectively "BTEX" compounds).

49.    Whenever gasoline with MTBE leaks, spills, or is otherwise released into the

---

[2]    "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[3]    "The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[4]    "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels", Nat'l Research Council, Nat'l Academy of Sciences (1996).

9

environment, the BTEX compounds in the gasoline tend to adsorb or bind to soil. In contrast, MTBE races to underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

50.     In addition to traveling faster and further from gasoline discharge sources than BTEX compounds, MTBE also is slow to degrade or break down after it is released into the environment, particularly in the subsurface of the ground. Because of its "recalcitrance" to biodegradation, plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Thus, although gasoline is always the source of MTBE contamination of groundwater, wells contaminated with MTBE frequently show either no or merely trace amounts of the BTEX compounds.

51.     When MTBE is released into the environment and contaminates groundwater, its foul taste and odor render the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

52.     Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as five (5) parts per billion ("ppb").

53.     Natural compounds in drinking water can mask the taste and odor of MTBE, and sensitivity to the odor and taste varies among different individuals. For example, research conducted by the State of Maine shows that homeowners were sometimes unaware of the presence of MTBE even when it is present in water in concentrations well above test subjects'

odor and taste threshold.[5]  In the Maine study, it was learned that some well owners were drinking and bathing in water with more than 200 ppb MTBE, six times higher than the Maine state safe drinking water standard.

54.   MTBE is a known animal carcinogen that is linked to many potential human health problems.  The U.S. Environmental Protection Agency ("EPA") classifies MTBE as a possible human carcinogen.

**IV   The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

55.   The potential for new incidents of groundwater and well contamination is present every day that Defendants put more gasoline containing MTBE on the market and so long as plumes of MTBE already unleashed in the subsurface are not cleaned up or contained.

56.   Every year more than nine million gallons of gasoline, equal to a full supertanker, escape during transportation, storage, sale or use in the United States.

57.   Prior to the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") were a known threat to the Affected States' water supply. The introduction of gasoline containing MTBE in ever greater quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs.  In addition, the addition of MTBE to gasoline, given MTBE's unique properties, created an entirely new threat from even very small leaks and spills of gasoline.

58.   Thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of USTs each year.  In

---

[5]   "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report," Maine Dep'ts of Human Serv., Env. Protection & Conservation. (Oct. 13, 1998) (the "Maine Report").

fact, it has been predicted that over 15 million UST over-filling events occur annually in this country and automotive over-fueling events occur continuously. These problems were prevalent long before the introduction of MTBE to gasoline.

59.     Gasoline is used and stored by nearly every adult person in the United States, creating additional potential for mishandling events.

60.     In addition to reaching the ground through gasoline leaks and spills, MTBE also reaches the ground through rainfall. MTBE's volatility causes some MTBE to evaporate into the atmosphere during transport, storage, and fueling and subsequently mix with water vapor and return in rainfall. MTBE's presence in rainfall in the Affected States where MTBE is widely used as a gasoline additive ensures that MTBE reaches property throughout those states.

61.     Given the properties of MTBE and long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable to Defendants.

V     **Defendants have known all along that mixing MTBE with gasoline would result in massive groundwater contamination.**

A     **Defendants' knowledge of the prevalence of unintended discharges of gasoline**

62.     At all times relevant to this litigation, Defendants were or should have been aware that there is a national crisis involving gasoline leaking from multiple sources, such as USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA document Defendants' knowledge that the systems used for shipping, storing, pumping, and

using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

63.     At all times relevant to this litigation, Defendants were or should have been aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

64.     At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional  mishandling events involving gasoline used and/or stored by nearly every American adult, as described above.

65.     At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

**B      Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline mixed with MTBE**

**i       Defendants' constructive knowledge of MTBE's threat to groundwater**

66.     At all times relevant to this litigation, Defendants were or should have been aware that MTBE's contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

67.     For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics,

13

formed a Toxicology Committee in or around 1980. The Toxicology Committee included

Defendants Texaco, Exxon, Shell, Mobil, Arco, Tosco and Chevron.

68.     API's Toxicology Committee had a specific program to study MTBE.  Meeting

minutes make plain that Committee members shared information and  repeatedly discussed

MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the

need for certain toxicological information due to MTBE's propensity to contaminate groundwater

and thus the likelihood of extensive ingestion of MTBE through drinking water.

69.     Despite early knowledge and a shared recognition of the need to do ingestion

studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

70.     Defendants possess and have always had knowledge, resources, experience and

other advantages which are vastly superior to those of Plaintiffs concerning the manufacture,

distribution, nature and properties of gasoline in general and MTBE in particular.  By virtue of

their tremendous economic power and analytical resources, including the employment of

scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all

times relevant to this litigation been in a position to know the threat which MTBE poses to

groundwater.

71.     In addition, by virtue of this superior knowledge, and/or by virtue of the

Defendants' partial and incorrect statements regarding the nature and impacts of MTBE,

Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

ii      **Defendants' knowledge of specific instances of MTBE**
        **contamination of groundwater**

72.     Defendants knew at least as early as 1980 of the impact of MTBE and its

contamination of water.

73.    As early as 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat which MTBE poses to drinking water supplies serving thousands of water consumers.

74.    By 1984, Defendants, including but not limited to Exxon, Shell and Chevron, were exchanging information on "major" MTBE contamination of groundwater incidents in Maryland, New York and Rhode Island dating back to 1978.  Defendants acknowledged then that MTBE would contaminate many more wells resulting in "high response costs."

75.    In or around March 1987, Defendants were aware of incidents in at least six locations on the eastern seaboard, including two sites in New York, where MTBE was detected in drinking water samples from wells – 8 of 21 wells were reported to be contaminated with MTBE only.

76.    Defendants were aware of two MTBE groundwater contamination events unrelated to each other in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

77.    At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer.  The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE.  Although trace levels of BTEX were eventually found in the well, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

78.    A decade after the spill in East Patchogue, government officials were still tracking

15

the MTBE plume through the aquifer thousands of feet from the site.  In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing through bidegradation.

79.   The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

80.   In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

81.   The Liberty and E. Patchogue events were by no means the only instances of verified MTBE well contamination from "the field" known to Defendants.  For example, in New York, State and County governments have verified MTBE contamination of hundreds of private wells throughout the state.  The State has records of approximately 1,000 sites where tests of water samples show levels of MTBE in excess of the State's safe drinking water standard.

> iii   **Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater**

82.   In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[6]  The paper described approximately 30 Maine wells contaminated with MTBE.  The authors explained that as a result of their experience

---

[6]   Peter Garrett, Marcel Moreau & J.D.Lowry, "MTBE as a Ground Water Contaminate," *in* NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Preceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

dealing with the contamination, they learned that: 1) groundwater contaminated with MTBE is difficult to remediate, 2) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and 3) MTBE has a distressing "terpene-like" odor in low concentrations.

83.   As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

84.   As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry.  Oil industry representatives,  including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE.  Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

85.   Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper.  Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions.  However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

17

86.     On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API, forwarded the Garrett Report to members of the GTTF including representatives of Shell, Arco, and Exxon.  These individuals were asked to review the Garrett Report and provide comments/critiques.  The stated reason was that the article was "of possible grave concern to the oxygenate producers."

87.     The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper.  The letter states in part:

> The authors' "recommendations" that MTBE . . be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion.  Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counter-productive.

88.     However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate.  These issues were not even addressed.

89.     Defendant BP Amoco (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

### iv      Defendants' internal documents demonstrating their awareness of MTBE contamination of groundwater

90.     Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct.  For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of

18

technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct. Arco Chemical, a division of Arco, in communications to others within the oil industry, was admitting that they had no data to refute the Garrett Report's authors' conclusions. For example, a letter dated February 4, 1987, states "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

91.    On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

92.    Communications among officials at Defendant Chevron were similar. A 1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.

19

> Further compounding the problem of increased solubility, MTBE
> is more difficult to remove from groundwater using current
> technology (air stripping or carbon adsorption). Because of its
> lower volatility, MTBE requires more than double the air stripping
> capacity to reach a 95 percent reduction. Removal using carbon
> adsorption is even worse. MTBE breaks through activated carbon
> four times faster than BTX.

93.     In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a

document entitled "MTBE WHITE PAPER- the Impact of MTBE on Groundwater." The

purpose of the document was to put together what was known about the movement of MTBE in

groundwater and the document was to be circulated internally among the employees of the

various Shell companies.

94.     According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble

than benzene and therefore, MTBE's plumes are expected to move faster and farther than

benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper indicates

that MTBE does not biodegrade in the subsurface environment. Finally, Shell's MTBE White

Paper indicates that MTBE has a low odor and taste threshold and that "at many locations odor

and taste criteria may determine clean-up levels."

95.     Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a
> few Shell marketing terminals and service stations to date.
> However, as the usage of this oxygenate begins to increase, a
> stringent clean-up criteria for MTBE will become adopted in more
> states, we should anticipate increased concerns over how its release
> to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

96.     A June 1997 Shell document entitled "Summary of Current MTBE Issues and

20

Status" states:

> MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak.  MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

97.    The threat MTBE poses to groundwater was also discussed in a May 1999 paper by employees of Defendant Chevron entitled "Solving Problems From MTBE Contamination – It's Not Just Regulating Underground Tanks."  The document reads:

> [C]oncerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999.  This information indicates there is MTBE ground water contamination from small spills of gasoline (e.g. a spill in parking lot, a car accident) – incidences that stand in contrast to known historical causes of MTBE contamination (e.g. point source discharges from leaking underground storage tanks.)

> The physical and chemical properties of MTBE (and thus its mobility and persistence in the environment) differ markedly from other components of gasoline.  These differences make MTBE (and other ethers and heavy alcohols) more likely to get into ground water and problematic to contain and clean up when releases occur . . . .

> Short of eliminating car accidents, stopping customer overfilling, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment.

> **v      Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline**

98.    Although this case does not involve class claims for personal injury, it is important to note that Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken.  It is common knowledge within the scientific community, and

21

Defendants knew, that prior to the introduction of a widely used chemical like MTBE,
toxicological tests must first be performed. However, Defendants did not perform the standard
toxicological procedures to test the effects of MTBE prior to placing it into the stream of
commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was
not needed. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential
harm without warning of the potential health risks associated with MTBE.

| | |
|---|---|
| VI | **Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.** |

99.     Despite their superior knowledge of the groundwater threat posed by MTBE,
Defendants, beginning in the early 1980's, formed various formal and informal task-forces and
committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants'
use of MTBE without regard to its impact on Plaintiffs and the Class members, and convincing
the public and regulators that increasing concentrations of MTBE in gasoline was desirable.
Defendants formed these joint task-forces and committees under the auspices of trade
organizations such as the API and the Oxygenated Fuels Association (OFA). Defendants, as
members of these joint task forces and committees, conspired to conceal the risk of MTBE
contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above
known-but-concealed harm to the environment and Plaintiffs and the Class.

| | |
|---|---|
| A | **Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980's.** |

100.     In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant
to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health

22

and environmental risks.[7]  The ITC characterized MTBE as having relatively high water

solubility, and stated that MTBE's persistence in groundwater following spills was unknown but

that it was likely not to be readily biodegradable.  The ITC recommended chemical fate

monitoring of MTBE to determine the risk MTBE poses to the environment.  The ITC also

recommended additional medical testing of MTBE and invited written comments.  The 1986

Notice credited the Dynamac Corporation for supplying the government with MTBE

information.

   101. The oil industry, including Defendants, mobilized to convince the EPA that

additional testing of MTBE was not needed.

   102. On or about December 12, 1986, Defendant Arco, speaking on behalf of and/or

with the approval of the other Defendants, responded to the 1986 Notice in an effort to derail

further testing of MTBE.  ARCO's comments included a critique of the Dynamac Corporation's

information review of MTBE, on which the ITC had relied.  ARCO stated that its "critique of the

CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the

hazards of MTBE to be seriously overestimated."  In further comments to the EPA, ARCO stated

the following:

> <u>Characteristics</u> – Moderate water solubility is reported.  However, an ARCO
> Technical Bulletin states that 'MTBE is only slightly soluble in water...'
>
>      * * *
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.'
> This conclusion is not supported by the available information.
>
>      * * *

---

[7] Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List
of Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

23

> Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks. . . . MTBE losses would be extremely small from this source.

<div align="center">* * *</div>

> VI. Environmental Information

> As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain . . . . Environmental entry of MTBE from this source would be considerably less than the report indicates.

> MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading when made, improperly downplaying the risks of MTBE contamination of groundwater and omitting material facts known to Defendants at the time.

103.    On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The Minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The Minutes show that Defendant Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

104.    In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants Amoco, Arco, Chevron, Citgo, Exxon, Shell, Sunoco, Texaco and Conoco.

<div align="center">24</div>

105.    The MTBE Committee lauded itself as "being a source of information to MTBE

producers, users, the government and the public" and stated that its goal was to "address

environmental health and safety issues relating to MTBE  . . . , provide technical data to

appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of

MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . .

, [and] make available to interested parties and the general public technical and scientific

information relating to the use of MTBE in fuels."

106.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the

MTBE Committee, had its first meeting.   The meeting minutes, circulated February 2, 1987,

indicate:

> [T]he plan of attack on the combined response to the EPA on the
> ITC report is as follows:  Since each producer must respond to the
> EPA before February 12 on the 8A and 8D [sic] questions and
> many will respond individually to production and economic
> questions which were also sought by EPA, a letter will be sent by
> George Dominguez requesting that information requested by the
> EPA be sent to the MTBE Committee before February 9.  A form
> will be included in George's letter . . . the Technical Committee
> will then meet on February 19 to combine the three reports from
> the working groups and draft a response to the EPA which will
> then be passed on to the Steering Committee for their approval on
> February 20. . . The combined response to the EPA will be
> submitted by February 27, to be followed shortly thereafter by a
> formal visit to EPA.  Dominguez will meet with EPA and notify
> them that the MTBE Committee has been formed and will be
> submitting its overview."

107.    Although Defendants were keenly aware that the EPA was interested in obtaining

more information about MTBE in groundwater, Defendants were not forthcoming in their

responses to the EPA. On February 12, 1987, Arco Chemical, a division of Arco, responded to

the EPA's request for information about "data gaps" concerning MTBE's environmental and

25

health effects in a letter stating:

> Item D requests more information on the presence and persistence
> of MTBE in groundwater. We are not aware of any incidents
> where MTBE contaminated groundwater at manufacturing
> facilities. Where gasoline containing MTBE is stored at refineries,
> terminals, or service stations, there is little information on MTBE
> in groundwater. We feel there are no unique handling problems
> when gasoline containing MTBE is compared to hydrocarbon-only
> gasoline.

108.    At the same time that Arco Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, Arco Chemical admitted to other Defendants that it

"had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat

of groundwater contamination."

109.    On or around February 27, 1987, the MTBE Committee submitted written

comments drafted to convince the EPA not to require additional health and environmental testing

of MTBE. The information provided by Defendants was misleading and false. For example, the

Defendants provided information to the EPA representing that MTBE is only slightly soluble in

water, that potential environmental exposure is not high, and that MTBE has excellent

biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm
> to health or the environment, that human exposure to MTBE and
> release of MTBE to the environment is negligible, that sufficient
> data exists to reasonably determine or predict that manufacture,
> processing, distribution, use and disposal of MTBE will not have
> an adverse effect on health or the environment, and that testing is
> therefore not needed to develop such data. Furthermore, issuance
> of a test rule requiring long term chronic testing will have a
> significant adverse environmental impact.

110.    The agenda of the MTBE Committee is reflected in the following excerpt from

those comments addressed to the issue of medical testing:

26

> If a test rule is issued requiring chronic testing that will take 3-4
> years to complete, great uncertainty will be created as to whether
> MTBE is a safe fuel additive. As a result, demand for MTBE and
> expansion of productive capacity is not likely to grow
> significantly. Refiners will be likely to commit capital to more
> costly alternative methods of octane enhancement such as
> isomerization and reformate plants that do not have the
> environmental benefits of MTBE. Thus, requiring long term
> testing of MTBE will have a significant adverse environmental and
> economic impact.

111.    The MTBE Committee acknowledged in its February 27, 1987, comments that

MTBE had not been the subject of long term chronic health testing, but claimed that such testing

was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect
> studies are presented in the Health Effects Summary of this report.
> These data suggest that the odor detection level of 700 ppb
> (approximately 0.7 mg/l) is such that the organoleptic properties of
> MTBE are sufficient to protect against human ingestion of toxic
> quantities of MTBE.

It is clear that the purveyors of MTBE, including Defendants, wanted to be free to represent that

MTBE has been shown not to be a health risk without conducting the research needed to reach

such a conclusion.

112.    On the issue of the persistence of MTBE, the MTBE Committee stated that "a

Japanese study . . . reports that MTBE in the presence of gasoline has excellent biodegradation

characteristics." This misrepresentation concerning the biodegradability of MTBE, which

omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from

government regulators and the public the actual risk that MTBE poses to groundwater.

113.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and

27

distributors, including Defendants Amoco, Exxon, Sunoco and Texaco signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[8] The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

114.   The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiffs particularly and the America public generally, and clearly intended to (a) continue to use MTBE without regard to its impact on Plaintiffs and one environment, and (b) prevent Plaintiffs and the class from becoming aware of the contamination and/or impact of contamination from MTBE.

---

[8]   Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

28

115.    Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing.  The MTBE Committee's Charter statement was intended to mislead the government and the public, including the Class members.  The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

**B        Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

116.    Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

117.    During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

118.    As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act.  According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

119.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems.  The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG

29

programs.[9] The following states are among those participating in the oxygenated fuel program: New York, California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin, and Virginia.

120.    In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

121.    The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE.  MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available.  Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol,  from a third-party.

122.    Safer, more environmentally sound alternatives were available.

C       **Defendants misled the Plaintiffs and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.**

123.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating and tragic contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

---

9    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

124.    On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a 1987 Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

125.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented to Plaintiffs and Class Members that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

126.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been

31

attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

127.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

128.    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or even the only, contaminant found in groundwater. Moreover, MTBE contamination is most often judged to be too costly to clean up.

129.    Even at this late date, Defendants continue to foster a grave threat to Plaintiffs' and Class members' groundwater in the Affected States with no new safeguards and entirely insufficient warnings, if any.

VII    **Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.**

130.    National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice:   MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

131.   Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

132.   Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in Affected States in 1992 as part of the Oxyfuel Program.

133.   Defendants then made MTBE the additive of choice throughout the Affected States when the public and government agencies sought year-round reductions in air pollution caused by cars.

134.   In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout the Affected States when moved by market factors and financial considerations to do so.  Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

135.   Today most if not all gasoline pumped in the RFG areas of the Affected States is laced with high concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated concentrations of MTBE is often sold at other locations at the discretion of the oil industry, including Defendants.

136.   According to the OFA, MTBE accounts for nearly 95 percent of the oxygenates used in New York and MTBE consumption statewide is approximately 17,500 to 21,500 barrels per day. OFA has filed a lawsuit on behalf of MTBE manufacturers to prevent a New York state law from going into effect that would ban MTBE in the year 2004.

137.   In making MTBE their oxygenate of choice, Defendants decided to forego safer

33

oxygenates, such as ethanol. Recently some gasoline sellers have publicly acknowledged that

MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full

page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing
> business in environmentally-friendly ways. That's what we're
> doing at Getty. We have replaced MTBE with **ethanol** in our
> gasoline because it helps clean the air without harming our
> drinking water.

### VIII   MTBE has had a predictably catastrophic effect upon groundwater and private wells.

138.    One can reach and affect the largest number of Americans by adding something to

gasoline. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996

MTBE ranked second among all organic chemicals produced in the United States, with virtually

the entire production going into gasoline.

139.    Since gasoline containing MTBE at increased levels was introduced in the early

1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second

most frequently detected chemical in groundwater in the United States. MTBE-contaminated

wells have been found from coast-to-coast with serious incidents in states from New Hampshire

to California.

140.    For example, large MTBE leaks or spills have occurred in every county in New

York. As a result, MTBE has been found in drinking water at levels near or above the state's

drinking water standard in communities all over the state including, but are not limited to, the

towns of Bedford, Cairo, Churubosco, East Patchogue, Elmont, Glen Park, Greenburgh, Hudson

Falls, Hyde Park, Laurel, Liberty, Madrid, Mayfield, Middle Island, Mahopac, New Windsor,

Norfolk, Orient, Phelps, Pound Ridge, Schodack, Smithtown, West Harrison and West Kill.

141.    In 1997, the USGS found MTBE in 125 of the 1,100 private water wells tested in New York, three of which had concentrations in excess of the state's drinking water standard. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places, like New York, where high MTBE-content gasoline is used.[10]

142.    In July 1999 the New York State Department of Health ("NY DOH") reported the results of an investigation it conducted in 1997 of well water in 10 New York counties. As part of the research, NY DOH sampled and analyzed water from 111 private wells, many, but not all, located within a half mile of a gasoline filling station. The laboratory results showed that 30 of the 111 wells were contaminated with detectable levels of MTBE, 11 of these had contamination above 20 ppb, the level for U.S. EPA's drinking water advisory, and three wells were contaminated above New York's safe drinking water standard of 50 ppb. Only one of the 30 contaminated wells also tested positive for BTEX compounds.

143.    In or around November 1999, Governor George Pataki directed New York's Department of Environmental Conservation to lower the state's guidelines for remediation of groundwater containing MTBE from 50 ppb to 10 ppb. This announcement is part of a trend among governments to take belated action to counter the problem of MTBE contamination of water supplies and the resulting public health threat.

144.    On October 13, 1998, the State of Maine issued a report presenting findings from the analysis of water samples collected from 951 randomly selected household wells. MTBE

---

[10]    Moran, Zogorski & Squillace, "MTBE in Ground Water in the United States – Occurrence, Potential Sources, and Long Range Transport" (1999).

35

was detected in 150 wells, or 15.8% of the sampled private wells. Ten wells, or 1.1% of those sampled, had MTBE levels exceeding the state's drinking water standard of 35 parts per billion. Based on these results, the state estimated that some 1400 to 5200 private wells in the state fail Maine's standard for potable water due to the presence of MTBE. The study also noted that other gasoline compounds were infrequently detected compared to MTBE and where detected were in all cases well below the drinking water standards.[11]

145.    A September 15, 1999, report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

146.    In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water

---

[11]    Maine Report, *supra* note 3.

quality testing of private wells."[12] No actual plans or source of funds for such testing exist in any state, including the states where Plaintiffs' and Class members' privately owned wells are located.

147.   Based upon the recommendations of the Blue Ribbon Panel, the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

**IX**   **It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular well.**

148.   Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

149.   The process of manufacturing and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the Affected States.

150.   A subsurface plume, even if it comes from a single tank or vessel, frequently originates from mixed batches of gasoline coming from different refiners.

151.   The East Patchogue case is typical: even though a source of the MTBE plume (an abandoned service station) was identified, State researchers could not determine the identity or even number of manufacturers whose gasoline containing the MTBE, contributed to the resulting MTBE contamination of well water.

---

[12]   "Achieving Clean Air <u>and</u> Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

152.    Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiffs and members of the Class(es) Plaintiffs seek to represent.

153.    Defendants are also jointly and severally liable because they conspired to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs' and the Class members' expense, to contaminate Plaintiffs' and the Class members' wells, and to avoid liability for such contamination.

## X    Defendants' Substantial Share of the Market for Gasoline Containing MTBE.

154.    Defendants in this action are manufacturers that together control a very substantial share of the market for gasoline containing MTBE in the Affected States and are jointly responsible for the enhanced threat to groundwater and for causing the injuries complained of in this Complaint.

## XI    Additional Facts Relating to Injunctive Relief.

155.    Plaintiffs and each of them have been injured by MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation or fear of such contamination amounting to present serious interference with their enjoyment of their land. Their injuries include (a) the necessity of periodic testing of water to assure safety; (b) diminished use and enjoyment of their water and property; (c) the ever increasing loss of confidence that private well water is safe for "domestic" purposes; (d) the need for well water clean-up or, where impracticable, replacement water.

38

156.     Plaintiffs face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment contaminates more wells, which once contaminated cannot be restored to pre-contamination purity.

157.     Plaintiffs and class members find themselves in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which they did not even know existed.  While Defendants have failed to warn government regulators, Downstream Handlers or the general public as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

158.     Clean groundwater is an essential and precious resource of incalculable value. Water serves direct human needs and also supports wildlife and natural resources that contribute to the health, economy and general well-being of the residents of all Affected States.

159.     In New York alone, approximately six million residents rely on water from underground sources for drinking, bathing and other household uses.  Of those, some one million New Yorkers draw their water from private wells.

160.     Money paid to individual Plaintiffs and Class members cannot provide the relief needed and sought.  Rather, only class-wide injunctive relief, including both a program of comprehensive and periodic testing and a second program to provide to each contaminated class member a source of water free of MTBE contamination, are essential.

161.     Plaintiffs seek mandatory injunctive relief under all causes of action on behalf of all classes in the form of a court-supervised well testing and monitoring program to remediate

39

MTBE groundwater contamination or where remediation is impracticable, to provide information to Plaintiffs and the Plaintiff class on the extent and location of groundwater contamination.

162.    Plaintiffs also seek a court-supervised program of notice to protect the class.

163.    Plaintiffs also seek a court-supervised program to provide class members whose wells test positive for the presence of MTBE with a source of water free of MTBE contamination.

164.    Data obtained from well testing and monitoring should be collected and recorded in a computerized database at a central repository and information exchange center and maintained as a "registry" to be used for mapping of MTBE plumes in groundwater, administering further relief and for education and research.

165.    A court-supervised testing and monitoring program will provide relief to Plaintiffs and contribute to the protection of groundwater resources and advancement of water quality awareness.  First, test data will give notice and warning to well owners in the Affected States whose wells, unbeknownst to them, are currently contaminated, and enable provision of further relief.  Second, the availability of data on the whereabouts of MTBE plumes data will also alert other well owners of groundwater hazards in proximity to their wells and assist them in making informed choices about water sources and will protection.  Third, the database developed through the program will provide researchers with information concerning the current status and vulnerability of groundwater resources to what has become one of the most, if not the most, pervasive manmade contaminants.  Fourth, the program will also provide important education regarding the need for greater care, vigilance and effective spill response.

166.    The court-supervised program will provide clean water to owners of contaminated

40

wells either by remediation of contaminated groundwater or, where remediation is impracticable, by tie-in to a monitored public drinking water source, or provision of a properly installed, monitored and maintained point-of-entry water treatment system. Where remediation is impracticable, class-wide injunctive relief under a court-supervised program will enable relief to be afforded in the most efficient manner, for example, in the case of clusters of contaminated properties, selecting between connection to a public water supply or filtration.

## MARKET SHARE, CONCERTED ACTION, ENTERPRISE and ALTERNATIVE LIABILITY

167.    Defendants control a substantial share of the market for gasoline containing MTBE in the Affected States and are therefore responsible for the increased threat to groundwater in the Affected States. Market share liability attaches to all Defendants and that liability of each shall be assigned according to its percentage of the market for gasoline containing MTBE in each Affected State at issue in this Complaint. MTBE is fungible, it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment, and each of these Defendants participated in a state-wide and national market for gasoline with MTBE during the relevant time.

168.    Concerted action liability attaches to all Defendants each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

169.    Enterprise liability attaches to all of the named Defendants.

170.    Alternative liability attaches to all of the named Defendants.

171.    There are no limitations on liability as set forth in CPLR § 1601 applicable to this action in that one or more of the exceptions set forth in CPLR § 1602 apply, including

41

subsections (5) and/or (11).

## CLASS ALLEGATIONS

172.    Some of the Plaintiffs in this coordinated proceeding are seeking to be appointed

as representatives of classes and/or subclasses that differ based on geographic scope, the types of

relief sought, and the claims with respect to which certification is sought.

173.    Certification of plaintiff classes is sought pursuant to Fed. R. Civ. P. 23, on behalf

of:

    (a)    all similarly situated persons;

    (b)    who own or have an interest in real property with one or more

water wells;

    (c)    where such wells do or may provide a source of water for drinking,

bathing, or general "domestic" purposes;

    (d)    and where such property is located in:

        i.    New York

        ii.    Florida

        iii.    Illinois

        iv.    Pennsylvania

        v.    Virginia

        vi.    California

        vii.    Connecticut

        viii.    Delaware

        ix.    Indiana

|      |       |
|------|-------|
| x.   | Kentucky |
| xi.  | Maryland |
| xii. | Massachusetts |
| xiii. | Missouri |
| xiv. | New Hampshire |
| xv.  | New Jersey |
| xvi. | Rhode Island |
| xvii. | Texas |
| xviii. | Wisconsin |

174.   Certain Plaintiffs will propose subclasses, consisting of:

(a)   a subclass for owners of property which has not yet tested positive for the presence of MTBE, including owners of property which has not yet been tested for the presence of MTBE, for injunctive relief, such as:

      i     a Court-supervised testing program,

      ii     a Court-supervised monitoring program,

      iii     a Court-supervised data-collection mapping program;

      iv     a Court-supervised notice to contaminated owners; and

      v     a Court-supervised education program.

(b)   a subclass for owners of property which has been found to be

contaminated with MTBE for injunctive relief, such as:

      i     monitoring,

      ii     or provision of clean water;

43

iii    or remediation.

175.   Specifically excluded from the proposed class and subclasses are:

(a)    Commercial entities;

(b)    Government entities;

(c)    Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants;

(d)    All public and private entities which sell or otherwise provide water to consumers;

(e)    Counsel for Defendants and all firm members, associates, employees and their immediate families;

(f)    Any wholesalers, retailers or resellers of MTBE and/or gasoline containing MTBE;

(g)    Counsel for Plaintiffs and the Plaintiff class and all firm members, associates, employees and their immediate families; and

(h)    Any presiding Judge and members of their immediate families.

176.   Specifically excluded from the relief sought by the class and subclasses are all claims for personal injury by Plaintiffs and the Plaintiff Class.

177.   This action may properly be maintained as a class action and satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23(a).

178.   The Plaintiff class is so numerous that the individual joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23(a)(1).  While the exact number of class

members is unknown to Plaintiffs at this time, it is estimated that there are thousands of class members. Class membership is objectively ascertainable by existing records and appropriate discovery.

179.    Common questions of law and/or fact arising from Defendants' illegal conduct exist as to all members of the class, as required by Fed. R. Civ. P. 23(a)(2). These common questions predominate over any questions which affect individual members of the class. These common questions include, without limitation:

(a)    what are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation;

(b)    whether MTBE, if released into groundwater supplies, adversely impacts the groundwater;

(c)    what concentrations of MTBE in groundwater render the water unfit for consumption, bathing, showering, cleaning dishes, and utensils and other household uses;

(d)    what are the fate and effects of MTBE when released into the environment near groundwater sources;

(e)    whether gasoline containing MTBE is a defective product;

(f)    whether the private water supplies of Plaintiffs and the Plaintiff class have been contaminated or are threatened by MTBE;

(g)    <u>what</u> Defendants knew about the problem of MTBE contamination of groundwater and <u>when</u> they knew it;

(h)    whether Defendants knew, or should have known, the extent to which

45

gasoline with MTBE is a greater threat to groundwater than is gasoline
without MTBE;

(i)    whether Defendants failed to adequately test MTBE and gasoline
containing MTBE, prior to its manufacture, distribution and/or sale, for
risks to groundwater;

(j)    what, if anything, Defendants told the public about the properties of
MTBE and the increased threat to groundwater and when during the
course of MTBE's rapid increase in production and sales any such
disclosure was made;

(k)    whether Defendants intentionally marketed gasoline with MTBE to the
general public in an effort to make it the industry standard and protect
their market share and profits;

(l)    whether Defendants owed a duty to Plaintiffs, the Plaintiff class, public
officials, Downstream Handlers and the public generally to warn them of
the changed properties of gasoline after the introduction of high levels of
MTBE;

(m)    whether Defendants committed a breach of duties of care owed to
Plaintiffs and members of the Plaintiff class;

(n)    whether Defendants failed to provide adequate warning to people in the
business of operating gasoline stations and storage tanks containing
MTBE regarding MTBE's properties and characteristics, including but not
limited to, its high solubility and its potential adverse impact on

46

groundwater if released into the environment;

(o)     whether Defendants failed to adequately warn Plaintiffs, government agencies and/or regulators, and/or the public regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

(p)     whether Defendants' conduct constituted reckless disregard for the safety of private water supplies and the rights of Plaintiffs and the Plaintiff class;

(q)     whether Defendants conspired to conceal and/or misrepresent the characteristics of MTBE and the risks of MTBE use to public and private water supplies to Plaintiffs, government agencies and/or regulators and the public at large;

(r)     whether Defendant formed joint committees and/or task forces or other organizations which generated misrepresentations or omissions regarding MTBE and its properties and/or characteristics;

(s)     whether Defendants' conduct amounted to outrageousness, recklessness or wanton negligence;

(t)     whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the product's safety as alleged;

(u)     whether Defendants failed in any duty to remediate sites promptly where they knew there was MTBE contaminated groundwater;

47

(v)     whether Plaintiffs and members of the Plaintiff class are entitled to equitable relief as a result of Defendants' wrongdoing and, if so, what is the proper measure and appropriate formula to be applied in determining just and proper relief; and

(w)     the appropriate nature of classwide, equitable and other non-monetary relief;

(x)     whether Defendants are liable under market share, concerted action, enterprise, alternative and/or joint and several conspiracy liability theories.

180.    Plaintiffs' claims are typical of the claims of the members of the class under Fed. R. Civ. P. 23(a)(3), since each plaintiff owns or has an interest in real property with one or more private water wells which do or may provide a source of water for drinking, bathing, general "domestic", or other purposes; each such well is either contaminated by MTBE or is threatened by such contamination, and each Plaintiff was without knowledge of the true facts alleged herein and has suffered injuries.  Plaintiffs and all members of the Plaintiff class have sustained injuries arising out of well and/or groundwater contamination or the treatment of such contamination caused by Defendants' common course of conduct in violation of law as complained of herein.

181.    The injuries of Plaintiffs and each member of the class were caused directly by Defendants' wrongful conduct in violation of statutory and common law as alleged herein.

182.    Plaintiffs will fairly and adequately represent the interests of the members of the class as required by Fed. R. Civ. P. 23(a)(4).  Plaintiffs' claims are typical of claims of the Plaintiff class and they have no interests that are adverse to the interests of the class members.

48

Plaintiffs have retained competent legal counsel experienced in litigation of class action,

consumer and environmental tort litigation.

183.   This action can be certified with respect to the claims for injunctive relief sought:

    1.    under Fed. R. Civ. P. 23(b)(1)(A), because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for the Defendants;

    2.    under Fed. R. Civ. P. 23(b)(1)(B), because the ability of class members to protect their interests would be substantially impaired or impeded if adjudications proceeded individually; and

    3.    under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the class, making injunctive relief with respect to the entire class appropriate.

## CAUSES OF ACTION

### COUNT I

### Strict Liability for Design Defect

184.   Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1

through 183 as if fully restated herein.

185.   Defendants during the relevant time period were designers, manufacturers,

refiners, formulators and suppliers of petroleum products including gasoline with MTBE.

186.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers

and marketers of petroleum products, including gasoline mixed with MTBE, Defendants owed

to all persons whom Defendants' petroleum products might foreseeably harm, including

Plaintiffs and the classes which Plaintiffs seek to represent, the duty not to market any product

which is unreasonably dangerous for its intended and foreseeable uses.

187.   When Defendants placed gasoline containing MTBE into the stream of

49

commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable

transportation, storage, handling, and uses for the following reasons:

    a.    Unintended discharges of gasoline are commonplace throughout the Affected States;

    b.    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.    Very low concentrations of MTBE will ruin the taste and smell of water; and

    f.    MTBE is a known animal carcinogen and a possible human carcinogen.

188.    Defendants failed to use reasonable care in the design of gasoline containing

MTBE.

189.    Gasoline containing MTBE poses greater dangers to groundwater than ordinary

persons such as Plaintiffs and  Downstream Handlers and the general public would generally

expect in the exercise of reasonable care.

190.    The risks which gasoline containing MTBE poses to groundwater outweigh

MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution

by increasing the oxygen content of gasoline.

191.    Safer alternatives to MTBE exist and have been available to Defendants at all

times relevant to this litigation, for the purposes of increasing both the octane level and oxygen

content of gasoline.  Such sensible alternatives to MTBE include, but are not limited to, ethanol

and other "oxygenates" and "octane enhancers."

192.   The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm caused by gasoline with MTBE.

193.   Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

MBTE reached the Plaintiffs' water wells in a substantially unchanged condition from that in which it was sold.

194.   As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to private wells owned by Plaintiffs;

    b.    required and/or will require testing and monitoring of private wells for MTBE contamination;

    c.    contaminated and/or will contaminate private wells owned by Plaintiffs or groundwater in the vicinity of Plaintiffs' properties;

    d.    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

    e.    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

    f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

51

## COUNT II

### Failure to Warn

195.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

196.    As manufacturers, designers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty not to put on the market a product that poses a serious danger to groundwater that is the source for Plaintiffs' private wells without issuing warnings of the risk posed by the product to Plaintiffs, the public, public officials and Downstream Handlers.

197.    Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without inspection for defects related to the hazards which MTBE poses to groundwater and private wells.

198.    At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and private wells throughout the Affected States:

        a.    Unintended discharges of gasoline are commonplace throughout the Affected States;

        b.    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

        c    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

        d.    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of

52

gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.    Very low concentrations of MTBE can ruin the taste and smell of water;

f.    MTBE is a known animal carcinogen and a possible human carcinogen;

g.    MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.    MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.    MTBE creates the need for regular testing and monitoring of private wells for early detection of MTBE; and

k.    The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

199.    Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiffs, public officials, Downstream Handlers, and/or the general public.

200.    Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiffs. Had Defendants provided sufficient warnings, MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate

cause of all such contamination.

201.    As a direct and proximate result Defendants' above-described failure to give

warnings, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to private wells owned by Plaintiffs;

    b.    required and/or will require testing and monitoring of private for MTBE contamination;

    c.    contaminated private wells owned by Plaintiffs;

    d.    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

    e.    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

    f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT III

### Deceptive Business Acts and Practices in Violation of GBL § 349

202.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1

through 183 as if fully restated herein.

203.    Defendants are engaged in the business of providing gasoline containing MTBE

to consumers, including Plaintiffs, in the State of New York.

204.    Defendants engaged in materially deceptive and misleading acts and practices in

the distribution, marketing and selling of gasoline containing MTBE, including but not limited

to:

    a.    overstating any environmental benefits of gasoline containing MTBE

while neglecting to mention or understating its actual environmental costs;

b.  marketing gasoline containing MTBE as a "clean" and environmentally beneficial fuel;

c.  misrepresenting the properties of MTBE, including by stating the it is only slightly soluble in water;

d.  representing that the product does not pose an unusual threat of groundwater contamination as compared to conventional gasoline;

e.  failing to disclose that when gasoline containing MTBE it spilled, the MTBE was far more likely than other gasoline components to get into well water;

f.  leading the public to believe that gasoline containing MTBE was safely contained during transport, storage and use;

g.  stating that MTBE and gasoline containing MTBE were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

h.  concealing the necessity for wells, particularly those located near sites where gasoline containing MTBE is stored, to be tested regularly for early detection of the presence of MTBE.

205.  Defendants' materially deceptive and misleading practices proximately caused injury to Plaintiffs, including loss of use and enjoyment of their wells and property, the need for periodic well water testing and monitoring, and the need to obtain a source of uncontaminated water.

## COUNT IV

### Public Nuisance

206.  Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

207.  Defendants have manufactured, distributed, marketed and promoted their product

in a manner that has unreasonably endangered or injured the property, health, safety and comfort of Plaintiffs and the Plaintiff class, causing inconvenience and annoyance.

208.    Defendants, by their negligent, reckless and willful acts and omissions as set forth above, have caused and permitted MTBE to contaminate a growing number of properties throughout the Affected States. This contamination has migrated, or threatens to migrate, nearby to and/or onto Plaintiffs' properties, thereby contaminating the groundwater thereunder.

209.    Actual and threatened MTBE contamination caused by Defendants' conduct has caused injury to Plaintiffs in the form of present serious interference with the use, benefit and/or enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial inconvenience, annoyance and injury.

210.    Plaintiffs, who are all well owners, suffer injuries different in kind from the community at large in that they rely on their own wells for their drinking and household water. Much of the population in the Affected States is served from surface water that is not susceptible to the problems caused by MTBE to groundwater. Additionally, public water supplies that rely on groundwater, unlike Plaintiff's private wells, are regularly monitored by a water district or agency that is able to guarantee clean water. 211.    Plaintiffs' special injuries include loss of property value arising from the increasingly widespread public perception based on actual fact that well water has been rendered less certain, safe and reliable relative to owners of residential properties served by public water supplies.

212.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of Plaintiffs'

56

properties.

213. In the alternative, Defendants have violated and/or threaten to violate a public right to pure water.

214. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs, who constitute a considerable number of people, have suffered special injuries to their properties, the threat of contamination and reduction of their property values and endangerment of their health and safety.

<div align="center">

**COUNT V**

**<u>Negligence</u>**

</div>

215. Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

216. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline mixed with MTBE, Defendants owed to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiffs, Downstream Handlers, and the general public a duty to exercise due care not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

217. At all times relevant to this litigation, Defendants knew or should have known that:

> a. Unintended discharges of gasoline are commonplace throughout the Affected States;
>
> b. When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;
>
> c. MTBE is highly soluble in water and many times more soluble in water than the other [BTEX] components of gasoline;

<div align="center">57</div>

d.    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other [BTEX] components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.    Very low concentrations of MTBE can ruin the taste and smell of water;

f.    MTBE is a known animal carcinogen and a possible human carcinogen;

g.    MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.    MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.    MTBE creates a need for regular testing and monitoring of private wells for early detection of MTBE; and

k.    The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

218.    Defendants have negligently breached their duty of due care to Plaintiffs,

Downstream Handlers, and the general public by:

a.    using MTBE as an octane-booster and oxygenate;

b.    failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.    failing to adequately test, identify and remediate wells that are contaminated with MTBE;

d.    forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

e.    voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing

58

MTBE and not conducting and reporting that research in a reasonably truthful manner;

f.  failing to design gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiffs and other private well owners;

g.  marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

h.  failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE,

i.  failing to curtail or reduce MTBE's manufacture and distribution;

j.  failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE; and

k.  failing to inspect, test and take the necessary steps to prevent the gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release.

l.  failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and use and to remediate such spills and leaks promptly.

219.  As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.  posed and continues to pose a threat to private wells owned by Plaintiffs;

b.  required and/or will require testing and monitoring of private wells for MTBE contamination;

c.  contaminated private wells owned by Plaintiffs;

d.  required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable, Plaintiffs with contaminated wells either to install a system to filter out MTBE or to obtain water from alternative sources, such as bottled water or connection

to a local municipal or private water system;

e.      diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

f.      diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT VI

### Civil Action to Compel Defendants to Comply with the Reporting Requirements of the Toxic Substances Control Act (TSCA)

220.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

221.    TSCA permits a civil action to be brought against any person who is alleged to be in violation of any provision of TSCA.  15 U.S.C. § 2619(a)(1).

222.    Plaintiffs in the *England* case have complied with TSCA's requirement that the complaining party give 60 days advance notice to both the EPA Administrator and the alleged TSCA violators prior to filing a civil action under TSCA.  15 U.S.C. § 2619(b)(1)(A).  The *England* Plaintiffs sent this notice on September 5, 2000.

223.    TSCA imposes a reporting requirement which provides as follows:

> Any person who manufacturers, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information

15 U.S.C. § 2607(e).

60

224.    As stated in their Notice to the EPA Administrator and the *England* Defendants, the *England* Plaintiffs believe that Defendants have violated their reporting duty under TSCA by failing to disclose to and continuing to withhold from the EPA the following information:

   a.    Gasoline leak sites which have been remediated by methods not specifically designed to remediate MTBE contamination of groundwater continue to pose a threat of groundwater contamination; and

   b.    MTBE released into groundwater may contain and/or biodegrade into TBA (tertiary butyl alcohol) and formaldehyde, chemicals which are known to pose a threat to human health.

225.    This Court should accordingly order Defendants to disclose the information described in the preceding paragraph to the EPA.

## COUNT VII

### Conspiracy to Market a Product Known to be Unsafe

226.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

227.    Defendants actually knew of the hazards which MTBE posed to groundwater throughout the Affected States.

228.    Beginning in the early 1980s and continuing through the date of the filing of this Master Complaint, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but

with the true, unlawful purpose of :

   a.    creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout the Affected States;

   b.    concealing the nature of MTBE, and its impact on Plaintiffs and the

environment;

c.    maximizing profits in a way Defendants knew would require them to contaminate Plaintiffs' and Class members' wells.

229.    Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

a.    intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

b.    concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c.    using their considerable resources to fight UST legislation; and

d.    collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program because MTBE was the most profitable oxygenate for Defendants to use.

230.    Each defendant knew that the activities of these task-forces and committees, and of the other Defendants, constituted a breach of duty owed to the Plaintiffs; each defendant gave substantial assistance and encouragement to the others in such activities; and each defendant's own conduct constituted a breach of duty owed to the Plaintiffs.

231.    Defendants ratified and adopted each of the foregoing overt acts and omissions in furtherance of their conspiracy.

232.    As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation has:

a.    posed and continues to pose a threat to private wells owned by Plaintiffs;

b.    required and/or will require testing and monitoring of private wells for

62

MTBE contamination;

c.     contaminated private wells owned by Plaintiffs;

d.     required and will require remediation of MTBe groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

e.     diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property. that well water is now less safe than water from other sources; and

f.     diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

63

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for a judgment against these Defendants for:

a.  an order certifying the requested class(es), including any classes and sub-classes which this Court deems appropriate, pursuant to Fed. R. Civ. P. 23, and appointing the Representative Plaintiffs and their counsel to represent the Plaintiff class;

b.  injunctive and equitable relief, for the Plaintiffs and the Class, as the Court deems appropriate, including:

    i    a Court-supervised testing program

    ii    a Court-supervised monitoring program

    iii    a Court-supervised data collection program

    iv    a Court-supervised program of notice to affected well-owners

    v    a Court-supervised public education program, including warnings regarding the environmental impact and the need for care in handling of MTBE.

    vi    a Court-supervised program to provide class members with clean water, free of MTBE contamination;

    vii    a Court-supervised program to provide remediation of contaminated wells.

c.  compensatory damages for named Plaintiffs who demonstrate an entitlement to such relief;

d.  attorneys' fees and the costs and disbursements of this lawsuit; and

e.  any other and further relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMANDED

233.  Individual Plaintiffs demand a trial by jury of all non-class claims asserted in this

Complaint.

Dated: New York, New York
         December 4, 2000

**EXHIBIT E**

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**

ATTORNEYS AT LAW

780 THIRD AVENUE, 48TH FLOOR
NEW YORK, NEW YORK 10017-2024
TELEPHONE: (212) 355-9500
FACSIMILE: (212) 355-9592
mail@lchb.com
www.lchb.com

MORRIS A. RATNER
PARTNER

December 4, 2000

**VIA E-MAIL AND FACSIMILE**
**(212) 805-7920**

Hon. Shira A. Scheindlin
United States District Judge
Southern District of New York
500 Pearl Street, Room 1050
New York, NY  10007-1312

Re:     In re:  Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,
MDL 1358

[Young v. ExxonMobil Oil Corporation,
Case No. 8:00-CV-1912-T24C]

Your Honor:

I write on behalf of Plaintiffs' Counsel in Young, et al. v. Exxon Mobil Oil Corporation, et al., Case No. 8:00-CV-1912-T24C, currently pending in the United States District Court for the Middle District of Florida, to identify the portions of the Master Complaint that will be adopted by the Plaintiffs in Young.  Although the Judicial Panel on Multidistrict Litigation's conditional transfer order has not yet become final, we anticipate that the objections of certain Defendants to the transfer will be overruled, and that the case will be transferred. Young's counsel participated in the most recent MDL case management conference, have been coordinating with Plaintiffs in the other MDL cases, and participated in the drafting of the Master Complaint.  It is our intention to shortly move for leave to file an amended complaint along the lines set forth in the attached "Proposed Amended Complaint."  That motion will be filed, now, before the conditional transfer order becomes effective and final, in the Florida federal court.

Respectfully,

Morris A. Ratner

MAR:jc
Enclosure
cc:     Peter Sacripanti, Defense Liaison Counsel (psacripanti@mwe.com)
scheindl10.mtb

EXHIBIT *E*

275 BATTERY STREET 30TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3339
TELEPHONE: (415) 956-1000
FACSIMILE: (415) 956-1008

214 UNION WHARF
BOSTON, MASSACHUSETTS 02109-1216
TELEPHONE: (617) 720-5000
FACSIMILE: (617) 720-5015

3319 WEST END AVENUE, SUITE 600
NASHVILLE, TENNESSEE 37203-1074
TELEPHONE: (615) 313-9000
FACSIMILE: (615) 313-9965

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
In Re:  Methyl Tertiary Butyl Ether                    MDL 1358
("MTBE") Products Liability Litigation                 Master File C.A. No. 1:00-1898(SAS)
-------------------------------------------------------x

This Document Relates to:

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

YOUNG, *et al.,*                          )   Case No. 8:00-CV-1912-T24C
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )
                                          )   **PROPOSED AMENDED**
EXXONMOBIL OIL CORPORATION, *et*          )   **COMPLAINT**
*al.,*                                    )
                                          )
              Defendants.                 )
_____)

## NATURE OF THE CASE

Plaintiff adopts paragraphs 1-3 of the Master Complaint.

## Plaintiffs

4.1     Individual and Representative Plaintiff Rebecca Young is an adult citizen and is

and at all times mentioned in the Complaint was a resident of Temple Terrace in Hillsborough

County, Florida.  She has had an interest in property on which she resided.  Ms. Young relied on

a well on such property as a source of water for drinking, bathing, and/or general domestic

purposes.  Initial tests have indicated that her water well is contaminated.  She has been injured

074.mtb                                    - 1 -

by among other things the need for additional monitoring of her well, the loss of use and

enjoyment of the well and her property, including diminished value of the property, and the threat

of additional and continuing contamination of her well by MTBE, and by the Defendants'

conduct as described in this Complaint.

**Defendants**

Plaintiff adopts paragraphs 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 23, and 26 of

the Master Complaint.

## JURISDICTION

Plaintiff adopts paragraph 33 of the Master Complaint.

## VENUE

Plaintiff adopts paragraph 36 of the Master Complaint.

## SUBSTANTIVE ALLEGATIONS

I    **What MTBE is**

Plaintiff adopts paragraphs 37-40 of the Master Complaint.

II    **Why Defendants add MTBE to Gasoline**

Plaintiff adopts paragraphs 41-47 of the Master Complaint.

III    **Gasoline containing MTBE was widely contaminated and continues to pose an extreme threat to groundwater.**

Plaintiff adopts paragraphs 48-54 of the Master Complaint.

IV    **The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

Plaintiff adopts paragraphs 55-61 of the Master Complaint.

074.mtb                                        - 2 -

**V**      **Defendants have known all along that mixing MTBE with gasoline would result in massive groundwater contamination.**

    **A**      **Defendants' knowledge of the prevalence of unintended discharges of gasoline**

Plaintiff adopts paragraphs 62-65 of the Master Complaint.

    **B**      **Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline mixed with MTBE**

        **i**      **Defendants' constructive knowledge of MTBE's threat to groundwater**

Plaintiff adopts paragraphs 61-71 of the Master Complaint.

        **ii**      **Defendants' knowledge of specific instances of MTBE contamination of groundwater**

Plaintiff adopts paragraphs 72-81 of the Master Complaint.

        **iii**      **Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater**

Plaintiff adopts paragraphs 82-89 of the Master Complaint.

        **iv**      **Defendants' internal documents demonstrating their awareness of MTBE contamination of groundwater**

Plaintiff adopts paragraphs 90-97 of the Master Complaint.

        **v**      **Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline**

Plaintiff adopts paragraph 98 of the Master Complaint.

**VI**      **Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.**

Plaintiff adopts paragraph 99 of the Master Complaint.

**A**     **Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980s.**

Plaintiff adopts paragraphs 100-115 of the Master Complaint.

**B**     **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

Plaintiff adopts paragraphs 116-122 of the Master Complaint.

**C**     **Defendants misled the Plaintiffs and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.**

Plaintiff adopts paragraphs 123-129 of the Master Complaint.

**VII**   **<u>Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.</u>**

Plaintiff adopts paragraphs 130-137 of the Master Complaint.

**VIII**  **<u>MTBE has had a predictably catastrophic effect upon groundwater and private wells.</u>**

Plaintiff adopts paragraphs 138-147 of the Master Complaint.

**IX**    **<u>It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular well.</u>**

Plaintiff adopts paragraphs 148-153 of the Master Complaint.

**X**     **<u>Defendants' Substantial Share of the Market for Gasoline Containing MTBE.</u>**

Plaintiff adopts paragraph 154 of the Master Complaint.

**XI**    **<u>Additional Facts Relating to Injunctive Relief.</u>**

Plaintiff adopts paragraphs 155-166 of the Master Complaint.

## MARKET SHARE, CONCERTED ACTION, ENTERPRISE and ALTERNATIVE LIABILITY

Plaintiff adopts paragraphs 167-171 of the Master Complaint.

## CLASS ALLEGATIONS

Plaintiff adopts paragraphs 172, 173(a)-(c), 173(d)(ii), 175, 177-183 of the Master Complaint.

## CAUSES OF ACTION

### COUNT I

### Strict Liability for Design Defect

Plaintiff adopts paragraphs 184-194 of the Master Complaint.

### COUNT II

### Failure to Warn

Plaintiff adopts paragraphs 195-201 of the Master Complaint.

### COUNT III

### Deceptive Business Acts and Practices in Violation of GBL §349

Not adopted.

### COUNT IV

### Public Nuisance

Plaintiff adopts paragraphs 206-214 of the Master Complaint.

### COUNT V

### Negligence

Plaintiff adopts paragraphs 215-219 of the Master Complaint.

## COUNT VI

### Civil Action to Compel Defendants to Comply with the Reporting Requirements of the Toxic Substances Control Act (TSCA)

Not adopted.

## COUNT VII

### Conspiracy to Market a Product Known to be Unsafe

Plaintiff adopts paragraphs 226-232 of the Master Complaint.

### PRAYER FOR RELIEF

Plaintiff adopts paragraphs a, b(i-v), (b)(vii), and (c)-(e) of the Master Complaint.

### JURY TRIAL DEMANDED

Individual Plaintiff adopts the Jury Trial Demand in the Master Complaint.

DATED:  December 4, 2000                    Respectfully submitted,


By: _____
            Morris A. Ratner


[ADDITIONAL COUNSEL]


CORY, WATSON, CROWDER & DEGARIS      WHATLEY DRAKE
Tony Graffeo                                              Joe R. Whatley, Jr.
2131 Magnolia Avenue                              Jack Drake
Birmingham, AL  35205                            505 North 20th Street
Telephone:  (205) 328-2200                      1100 Financial Center
                                                                    Birmingham, AL  35203
                                                                    Telephone:  (205) 328-9576

CROWLEY & DOUGLAS
Timothy Crowley
1301 McKinney, Suite 3500
Houston, TX 77010
Telephone: (713) 651-1771

LIEFF, CABRASER, HEIMANN &
BERNSTEIN
Elizabeth J. Cabraser
Morris Ratner
Scott P. Nealey
Lauri A. Andrus
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

REICH & BINSTOCK
Dennis C. Reich
4265 San Felipe, Ste. 1000
Houston, Texas 77027
Telephone: (713) 622-7271

WELLER, GREEN, McGOWN & TOUPS
Mitchell A. Toups
Nations Bank Bldg.
2615 Calder St., Ste. 400
Beaumont, TX 77701
Telephone: (409) 838-0101

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
A. Hoyt Rowell
T. Christopher Tuck
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9200

074.mtb

- 7 -

```
                   *******************************
              ***    MULTI TX/RX REPORT    ***
                   *******************************

TX/RX NO             3373
PGS.                 9
TX/RX INCOMPLETE     -----
TRANSACTION OK       (1)   *2134#1282#16182779804#
                     (2)   12023649701#
                     (3)   12123445461#
                     (4)   12053289669#
                     (5)   17136511775#
                     (6)   18432169440#
                     (7)   17136238724#
                     (8)   14098386780#
                     (9)   12053247896#
ERROR INFORMATION    -----
```

# LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

### ATTORNEYS AT LAW
### 780 THIRD AVENUE, 48TH FLOOR
### NEW YORK, NY  10017-2024
### TELEPHONE: (212) 355-9500
### FACSIMILE: (212) 355-9592

## FAX TRANSMITTAL

**DATE:**       December 4, 2000

**TO:**

| | |
|---|---|
| Stephen Tillery | (618) 277-9804 |
| Lewis Saul | (202) 364-9701 |
| Mitchell Breit | (212) 344-5461 |
| Joseph Whatley/Jack Drake | (205) 328-9669 |
| Tim Crowley | (713) 651-1775 |
| Hoyt Rowell/Chris Tuck | (843) 216-9440 |
| Dennis Reich | (713) 623-8724 |
| Mitchell Toups | (409) 838-6780 |
| Tony Graffeo | (205) 324-7896 |

**FROM:**      Morris A. Ratner

**RE:**        <u>MTB</u>

**COMMENTS:**      Please see attached.

Number of Pages Including This Sheet: *9*

# LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

## ATTORNEYS AT LAW
### 780 THIRD AVENUE, 48TH FLOOR
### NEW YORK, NY 10017-2024
### TELEPHONE: (212) 355-9500
### FACSIMILE: (212) 355-9592

## FAX TRANSMITTAL

**DATE:** December 4, 2000

**TO:**

| | |
|---|---|
| Stephen Tillery | (618) 277-9804 |
| Lewis Saul | (202) 364-9701 |
| Mitchell Breit | (212) 344-5461 |
| Joseph Whatley/Jack Drake | (205) 328-9669 |
| Tim Crowley | (713) 651-1775 |
| Hoyt Rowell/Chris Tuck | (843) 216-9440 |
| Dennis Reich | (713) 623-8724 |
| Mitchell Toups | (409) 838-6780 |
| Tony Graffeo | (205) 324-7896 |

**FROM:** Morris A. Ratner

**RE:** <u>MTB</u>

**COMMENTS:** Please see attached.

Number of Pages Including This Sheet: _9_

---

### CONFIDENTIALITY NOTICE

The information contained in this telefacsimile message and the documents accompanying this transmission are transmitted by or on behalf of attorneys, and may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in this transmission is strictly <u>PROHIBITED</u>. If you have received this transmission in error, please notify us immediately by telephone, mail the original transmission to us, and destroy any copies. Thank you.

---

**Please call (415) 956-1000 x314 if you do not receive all pages.**            counsel39.mtb

**EXHIBIT F**

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| REBECCA YOUNG, *et al.*, | ) | Case No. 8:00-CV-1912-T24C |
| Plaintiffs, | ) | |
| v. | ) | |
| EXXON MOBIL CORPORATION; ATLANTIC RICHFIELD CO.; BP AMOCO CORP.; AMOCO OIL CO.; CITGO PETROLEUM CORP.; CONOCO, INC.; CHEVRON U.S.A., INC.; EQUILON ENTERPRISES LLC; SHELL OIL CO.; TEXACO REFINING AND MARKETING, INC.; AMERADA HESS CORP.; MOTIVA ENTERPRISES LLC; and TEXACO, INC., | ) | |
| Defendants. | ) | |

## [PROPOSED] SECOND AMENDED COMPLAINT

### NATURE OF THE CASE

1.     Plaintiff and the class are owners of private wells who, as a result of the enhanced risk to and/or contamination of their drinking water, now require testing, monitoring, and/or remediation of their wells and aquifers for MTBE. Defendants are oil companies involved in the manufacture, design, refining, formulation, distribution, supply, sale and/or marketing of gasoline mixed with MTBE.

2.     Defendants have engaged in joint efforts and conspired to use and market MTBE as a gasoline additive for years with full knowledge of the serious threat MTBE poses to groundwater. Defendants conspired to maximize their profits at the expense of Plaintiff and the class members and of the environment, and to conceal the problems associated with MTBE, to

EXHIBIT _F_         099NY.MTB

proliferate its use, and to avoid responsibility for the contamination they knew would result and was resulting from their conduct.

        3.     The injunctive relief sought includes a court-supervised program of MTBE testing, monitoring and education. Plaintiff also seeks a court-supervised program to provide class members with a source of water free from MTBE and/or to remediate (clean-up) Plaintiff's and the class members' wells.

<div align="center">

**PLAINTIFFS**

</div>

        4.     [BLANK] (Several paragraphs are left blank, so that the numbering of the Second Amended Complaint corresponds with the numbering of the Master Complaint proposed in In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No. 1358, Master File C.A. No. 1:00-1898 (SAS).

        4.1     Individual and Representative Plaintiff Rebecca Young is an adult citizen and is and at all times mentioned in the Complaint was a resident of Temple Terrace in Hillsborough County, Florida. She has had and continues to have an interest in residential property located in Temple Terrace, Florida. Ms. Young relied on a well on such property as a source of water for drinking, bathing, and/or general domestic purposes. Initial tests have indicated that her water well is contaminated with MTBE far in excess of state and federal action levels. She has been injured by, among other things, the need for additional monitoring and remediation of her well, the loss of use and enjoyment of the well and her property, including diminished value of the property, inability to use her well water for any domestic purposes such as watering her lawn, damage to and death of plants on her property, death of her dog, past and future cost of alternative water sources, and the threat of additional and continuing contamination of her well by MTBE, and by the Defendants' conduct as described in this Complaint.

        4.2     Rebecca Young's spouse, Paul Douglas Young, originally brought this

action but was replaced by Rebecca Young by amendment. Although Mr. Young shares an interest in the property described above, he has chosen not to be a named class representative in this matter.

### DEFENDANTS

5.    Defendants do business in Florida as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of gasoline containing MTBE.

6.    At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from the exploration for and extraction of crude oils to the refining and/or the distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE sold in Florida.

7.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant or Defendants.

8.    When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

9.    When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

10.    Atlantic Richfield Company ("Arco") is a Delaware corporation with its principal place of business in Los Angeles, California, and doing business in the State of Florida.

11.    BP Amoco Corporation ("Amoco") is an Indiana corporation with its

principal place of business in Chicago, Illinois, and doing business in the State of Florida.

12.   Defendant Amoco Oil Company is a wholly owned subsidiary of Defendant BP Amoco Corporation and has its principal place of business in the State of Illinois and is doing business in Florida.

13.   Citgo Petroleum Corporation ("Citgo") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, and doing business in Florida.

14.   Conoco, Inc. ("Conoco") is a Delaware corporation with its principal place of business in Texas and doing business in Florida.

15.   Chevron U.S.A. Inc. ("Chevron") is a Delaware corporation with its principal place of business in San Francisco, California, and doing business Florida.

16.   Exxon Mobil Corporation ("Exxon Mobil"), formed as a result of the merger on November 30, 1999 of Exxon Corporation ("Exxon") and Mobil Corporation ("Mobil") is a New Jersey corporation with its principal place of business in Irving, Texas, and doing business in Florida.

17.   Equilon Enterprises, LLC ("Equilon") is a Delaware corporation with its principal place of business in Texas and doing business in Florida.

18.   [BLANK]

19.   Shell Oil Company ("Shell") is a Delaware corporation with its principal place of business in Texas and doing business in Florida.

20.   Texaco Refining and Marketing, Inc. ("Texaco") is a Delaware corporation with its principal place of business in New York and doing business in Florida.

21.   Defendant Amerada Hess Corporation is a Delaware corporation with its principal place of business in New York, New York, and doing business in Florida.

22.   [BLANK]

23.    Defendant Motiva Enterprises, LLC is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the States of Florida and New York and other Affected States.

24.    [BLANK]

25.    [BLANK]

26.    Defendant Texaco, Inc. is a Delaware corporation with its principal place of business in White Plains, New York, and doing business in Florida.

27.    [BLANK]

28.    [BLANK]

29.    [BLANK]

30.    Defendants Does 1-100 are corporations, partnerships, associations, natural persons or other entities that are not presently known to Plaintiffs.  The true names and identities of all of these Defendants are not presently known to Plaintiffs, who therefore sue said Defendants by fictitious names.  Plaintiffs will pray leave to add parties and allege said Defendants' true names when the true names become known to Plaintiffs.

## JURISDICTION

31.    [BLANK]

32.    [BLANK]

33.    This Court has jurisdiction over the Defendants because the Defendants do sufficient business in the State of Florida, and have minimum contacts with it, or otherwise intentionally avail themselves of the State through the sale, manufacture, distribution, and/or processing of petroleum related products in this State to render the exercise of jurisdiction over Defendants by the States' courts consistent with traditional notions for fair play and justice. Defendants each marketed and sold MTBE in Florida, and knowingly contaminated water wells

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

in this State, including Plaintiff's well.

33.1     Personal jurisdiction is proper pursuant to Florida Statute § 48.193.

Defendants, either personally or through an agent, have operated, conducted, engaged in, or have

carried on a business or business venture in this state or have an office or agency in this state.  In

addition, Defendants have committed a tortious act within this state or have caused injury to

persons or property within this state arising out of an act or omission by the Defendants outside

this state.  At or about the time of the injury, either the Defendants were engaged in solicitation

or service activities within this state; or products, materials, or things processed, serviced, or

manufactured by the defendants anywhere were used or consumed within this state in the

ordinary course of commerce, trade, or use.  Defendants are also engaged in substantial and not

isolated activity within this state, whether such activity is wholly interstate, intrastate, or

otherwise, and are subject to the jurisdiction of the courts of this state, whether or not the claim

arises from that activity.  Moreover, this Court can assert jurisdiction over the Defendants

without offending traditional notions of fairness because the Defendants are registered with the

Florida's secretary of state, do sufficient business in the State and have minimum contacts with

it, or otherwise intentionally avail themselves of the State through the sale, manufacture,

distribution, and/or processing of petroleum related products in Florida to render the exercise of

jurisdiction over Defendants by this Court consistent with traditional notions for fair play and

justice.  Defendants each marketed and sold MTBE in Florida, and knowingly contaminated

water wells in this State, including Plaintiff's well.

## VENUE

34.     [BLANK]

35.     [BLANK]

36.     Venue is proper because Defendants conduct business in Florida, sold

their product here, and contaminated the properties and wells of residents of this State.

## SUBSTANTIVE ALLEGATIONS

### I.   WHAT MTBE IS

37.   MTBE is a member of a class of chemical compounds, aliphatic ethers, whose unique properties include being "hydrophilic," or water-seeking, *i.e.*, having enhanced solubility in water and chemical attraction to water molecules.

38.   MTBE does not occur naturally.

39.   MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process.

40.   Defendants used and continue to use MTBE as a gasoline additive.

### II.   WHY DEFENDANTS ADD MTBE TO GASOLINE

41.   In or after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

42.   By the mid-1980's, MTBE was in widespread use in high-octane gasoline.

43.   Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE.

44.   Ironically, it is now apparent that MTBE does not even deliver Defendants' promise of cleaner air.  MTBE does little or nothing, contrary to industry assurances, to contribute to reductions in such air-polluting car emissions as carbon monoxide or

the creation of smog.

45.     A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

46.     In May, 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[2] NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

47.     In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself.

## III.    GASOLINE CONTAINING MTBE WAS WIDELY CONTAMINATED AND CONTINUES TO POSE AN EXTREME THREAT TO GROUNDWATER.

48.     MTBE is more than an order of magnitude more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water.  In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other common gasoline components -- benzene, toluene, ethylbenzene and xylene (collectively "BTEX" compounds).

---

[1]"Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[2]"The Ozone-Forming Potential of Reformulated Gasoline," Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[3]"Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996).

49.     Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the BTEX compounds in the gasoline tend to adsorb or bind to soil.  In contrast, MTBE races to underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

50.     In addition to traveling faster and further from gasoline discharge sources than BTEX compounds, MTBE also is slow to degrade or break down after it is released into the environment, particularly in the subsurface of the ground.  Because of its "recalcitrance" to biodegradation, plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline.  Thus, although gasoline is always the source of MTBE contamination of groundwater, wells contaminated with MTBE frequently show either no or merely trace amounts of the BTEX compounds.

51.     When MTBE is released into the environment and contaminates groundwater, its foul taste and odor render the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

52.     Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as five (5) parts per billion ("ppb").

53.     Natural compounds in drinking water can mask the taste and odor of MTBE, and sensitivity to the odor and taste varies among different individuals.  For example, research conducted by the State of Maine shows that homeowners were sometimes unaware of the presence of MTBE even when it is present in water in concentrations well above test

subjects' odor and taste threshold.[4]  In the Maine study, it was learned that some well owners

were drinking and bathing in water with more than 200 ppb MTBE, six times higher than the

Maine state safe drinking water standard.

54.    MTBE is a known animal carcinogen that is linked to many potential

human health problems.  The U.S. Environmental Protection Agency ("EPA") classifies MTBE

as a possible human carcinogen.

## IV.    THE LONGSTANDING PREVALENCE OF UNINTENDED GASOLINE DISCHARGES ENSURES THAT GASOLINE WITH MTBE WILL CONTAMINATE GROUNDWATER.

55.    The potential for new incidents of groundwater and well contamination is

present every day that Defendants put more gasoline containing MTBE on the market and so

long as plumes of MTBE already unleashed in the subsurface are not cleaned up or contained.

56.    Every year more than nine million gallons of gasoline, equal to a full

supertanker, escape during transportation, storage, sale or use in the United States.

57.    Prior to the introduction by Defendants of MTBE as a gasoline additive,

leaking underground storage tanks ("UST") were a known threat to the Affected States' water

supply.  The introduction of gasoline containing MTBE in ever greater quantities and

concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs.  In

addition, the addition of MTBE to gasoline, given MTBE's unique properties, created an entirely

new threat from even very small leaks and spills of gasoline.

58.    Thousands of gallons of gasoline enter the soil from gasoline dispensing

stations due to consumer overfills of automobile gas tanks and jobber overfills of USTs each

---

[4]"The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report," Maine Dep'ts of Human Serv., Env. Protection & Conservation. (Oct. 13, 1998) (the "Maine Report").

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

year.  In fact, it has been predicted that over 15 million UST over-filling events occur annually in this country and automotive over-fueling events occur continuously.  These problems were prevalent long before the introduction of MTBE to gasoline.

59.    Gasoline is used and stored by nearly every adult person in the United States, creating additional potential for mishandling events.

60.    In addition to reaching the ground through gasoline leaks and spills, MTBE also reaches the ground through rainfall.  MTBE's volatility causes some MTBE to evaporate into the atmosphere during transport, storage, and fueling and subsequently mix with water vapor and return in rainfall.  MTBE's presence in rainfall in the Affected States where MTBE is widely used as a gasoline additive ensures that MTBE reaches property throughout those states.

61.    Given the properties of MTBE and long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable to Defendants.

## V.    DEFENDANTS HAVE KNOWN ALL ALONG THAT MIXING MTBE WITH GASOLINE WOULD RESULT IN MASSIVE GROUNDWATER CONTAMINATION.

### A.    Defendants' Knowledge of the Prevalence of Unintended Discharges of Gasoline.

62.    At all times relevant to this litigation, Defendants were or should have been aware that there is a national crisis involving gasoline leaking from multiple sources, such as USTs.  Substantial industry reports, Congressional testimony, and concerns expressed by the EPA document Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

63.    At all times relevant to this litigation, Defendants were or should have

been aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

64. At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult, as described above.

65. At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

**B. Defendants' Knowledge of The Threat to Groundwater as a Result of Unintended Discharges of Gasoline Mixed With MTBE.**

     **1. Defendants' constructive knowledge of MTBE's threat to groundwater.**

66. At all times relevant to this litigation, Defendants were or should have been aware that MTBE's contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

67. For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980. The Toxicology Committee included Defendants Texaco, Exxon, Shell, Mobil, Arco, Tosco and Chevron.

68. API's Toxicology Committee had a specific program to study MTBE. Meeting minutes make plain that Committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE through

drinking water.

69.    Despite early knowledge and a shared recognition of the need to do ingestion studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

70.    Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiffs concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know the threat which MTBE poses to groundwater.

71.    In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

## 2.    Defendants' knowledge of specific instances of MTBE contamination of groundwater.

72.    Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

73.    As early as 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat which MTBE poses to drinking water supplies serving thousands of water consumers.

74.    By 1984, Defendants, including but not limited to Exxon, Shell and Chevron, were exchanging information on "major" MTBE contamination of groundwater incidents in Maryland, New York and Rhode Island dating back to 1978.  Defendants

acknowledged then that MTBE would contaminate many more wells resulting in "high response costs."

75.    In or around March 1987, Defendants were aware of incidents in at least six locations on the eastern seaboard, including two sites in New York, where MTBE was detected in drinking water samples from wells – 8 of 21 wells were reported to be contaminated with MTBE only.

76.    Defendants were aware of two MTBE groundwater contamination events unrelated to each other in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

77.    At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer.  The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE.  Although trace levels of BTEX were eventually found in the well, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

78.    A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site.  In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing through biodegradation.

79.    The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

80.    In December 1992, MTBE was again found in Liberty's water at

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

concentrations approximately three times higher than the New York State Department of Health

drinking water standard of 50 ppb.

81.     The Liberty and E. Patchogue events were by no means the only instances

of verified MTBE well contamination from "the field" known to Defendants.  For example, in

New York, State and County governments have verified MTBE contamination of hundreds of

private wells throughout the state.  The State has records of approximately 1,000 sites where tests

of water samples show levels of MTBE in excess of the State's safe drinking water standard.

### 3.     Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.

82.     In 1986, Peter Garrett and Marcel Moreau of the Maine Department of

Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground

Water Contaminant" ("the Garrett Report").[5/]  The paper described approximately 30 Maine

wells contaminated with MTBE.  The authors explained that as a result of their experience

dealing with the contamination, they learned that: 1) groundwater contaminated with MTBE is

difficult to remediate, 2) MTBE is more soluble than the other constituents of gasoline and

therefore a plume of MTBE in groundwater will be more extensive than the plume of the other

gasoline components, and 3) MTBE has a distressing "terpene-like" odor in low concentrations.

83.     As a result of MTBE's characteristics, the Garrett Report's authors

recommended that MTBE be banned as a gasoline additive or at least be stored in double-

contained facilities.  The paper was to be presented at and published in the proceedings of the

"Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by

---

[5/]Peter Garrett, Marcel Moreau & J.D.Lowry, "MTBE as a Ground Water Contaminate," *in* NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Preceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

the National Well Water Association and the API in November of 1986.

84.     As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

85.     Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

86.     On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API, forwarded the Garrett Report to members of the GTTF including representatives of Shell, Arco, and Exxon. These individuals were asked to review the Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

87.     The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE . . be either banned
> as gasoline additives or require double-lined storage is clearly a
> policy statement and not an objective credible scientific
> conclusion. Further, data presented in this paper as well as those
> generated by ongoing API research indicate that such a policy is

reactionary, unwarranted and counter-productive.

88.     However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate. These issues were not even addressed.

89.     Defendant BP Amoco (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

### 4.     Defendants' internal documents demonstrating their awareness of MTBE contamination of groundwater.

90.     Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct.  For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct.  Arco Chemical, a division of Arco, in communications to others within the oil industry, was admitting that they had no data to refute the Garrett Report's authors' conclusions.  For example, a letter dated February 4, 1987, states "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

91.     On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York.  In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in

groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report

further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are

not found, we feel it is important for you to be aware of MTBE. From an environmental and

engineering standpoint, you may need to be informed of its presence to assist you in responding

effectively to regulatory and remedial requirements."

> 92.    Communications among officials at Defendant Chevron were similar. A

1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk,
> and the second is increased solubility over normally regulated
> constituents of interest, i.e. benzene, toluene and xylene (BTX).

> MTBE is significantly more soluble in water than BTX.
> Consequently, the dissolved "halo" from a leak containing MTBE
> can be expected to extend farther and spread faster than a gasoline
> leak that does not include MTBE as one of its constituents.

> Further compounding the problem of increased solubility, MTBE
> is more difficult to remove from groundwater using current
> technology (air stripping or carbon adsorption). Because of its
> lower volatility, MTBE requires more than double the air stripping
> capacity to reach a 95 percent reduction. Removal using carbon
> adsorption is even worse. MTBE breaks through activated carbon
> four times faster than BTX.

> 93.    In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang

created a document entitled "MTBE WHITE PAPER- the Impact of MTBE on Groundwater."

The purpose of the document was to put together what was known about the movement of

MTBE in groundwater and the document was to be circulated internally among the employees of

the various Shell companies.

> 94.    According to Shell's MTBE White Paper, MTBE is nearly 25 times more

soluble than benzene and therefore, MTBE's plumes are expected to move faster and farther than

benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper indicates

that MTBE does not biodegrade in the subsurface environment.  Finally, Shell's MTBE White

Paper indicates that MTBE has a low odor and taste threshold and that "at many locations odor

and taste criteria may determine clean-up levels."

95.    Shell's MTBE White Paper further states:

MTBE has had an impact on groundwater management at only a
few Shell marketing terminals and service stations to date.
However, as the usage of this oxygenate begins to increase, a
stringent clean-up criteria for MTBE will become adopted in more
states, we should anticipate increased concerns over how its release
to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

96.    A June 1997 Shell document entitled "Summary of Current MTBE Issues

and Status" states:

MTBE is relatively quite soluble in water (compared to other
components in gasoline, like BTEX), and it moves essentially with
the ground water, thus MTBE tends to "lead the plume" whenever
there is a gasoline spill or leak.  MTBE also has a very low
biodegradation potential, which makes it more difficult to remove
from ground water than other gasoline components such as BTEX.

97.    The threat MTBE poses to groundwater was also discussed in a May 1999

paper by employees of Defendant Chevron entitled "Solving Problems From MTBE

Contamination – It's Not Just Regulating Underground Tanks."  The document reads:

[C]oncerns on the mobility and persistence of MTBE in the
environment are reinforced by a recent study and anecdotal
information discussed at an EPA Blue Ribbon Panel on MTBE in
January 1999.  This information indicates there is MTBE ground
water contamination from small spills of gasoline (e.g. a spill in
parking lot, a car accident) – incidences that stand in contrast to
known historical causes of MTBE contamination (e.g. point source
discharges from leaking underground storage tanks.)

The physical and chemical properties of MTBE (and thus its
mobility and persistence in the environment) differ markedly from
other components of gasoline.  These differences make MTBE
(and other ethers and heavy alcohols) more likely to get into

ground water and problematic to contain and clean up when releases occur . . . .

Short of eliminating car accidents, stopping customer overfilling, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment.

### 5. Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline.

98. Although this case does not involve class claims for personal injury, it is important to note that Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken. It is common knowledge within the scientific community, and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential harm without warning of the potential health risks associated with MTBE.

### VI. DESPITE KNOWING THAT ADDING MTBE TO GASOLINE INEVITABLY RESULTS IN WIDESPREAD MTBE GROUNDWATER CONTAMINATION, DEFENDANTS CONSPIRED TO MISLEAD THE EPA AND THE PUBLIC ABOUT THE HAZARDS OF ADDING MTBE TO GASOLINE.

99. Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiffs and the Class members, and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade

organizations such as the API and the Oxygenated Fuels Association (OFA). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiffs and the Class.

### A.   Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980s..

100.   In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.[6] The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

101.   The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

102.   On or about December 12, 1986, Defendant Arco, speaking on behalf of and/or with the approval of the other Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE. ARCO's comments included a critique of the Dynamac Corporation's information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made

---

[6]Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA,

ARCO stated the following:

> Characteristics – Moderate water solubility is reported. However,
> an ARCO Technical Bulletin states that 'MTBE is only slightly
> soluble in water...'
>
> * * *
>
> The CRSC/Dynamac report states that potential environmental
> exposure is 'high.' This conclusion is not supported by the
> available information.
>
> * * *
>
> Exposure from accidental spills of MTBE could occur, but should
> be regarded as a minimal possibility. The closed nature of the
> manufacturing and transportation process reduces worker exposure
> and product loss. Training and safety programs also lower the
> possibility of accidental spills. Many current programs at EPA and
> industry are underway to monitor and reduce the possibility of
> gasoline loss from leaking underground storage tanks. . . . MTBE
> losses would be extremely small from this source.
>
> * * *
>
> VI. Environmental Information
>
> As has been reportedly stated, environmental entry would not
> occur in every stage of the gasoline marketing chain . . . .
> Environmental entry of MTBE from this source would be
> considerably less than the report indicates.
>
> MTBE is only slightly soluble so environmental fate projections
> based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading

when made, improperly downplaying the risks of MTBE contamination of groundwater and

omitting material facts known to Defendants at the time.

     103.    On or around December 17, 1986, EPA held a Public Focus Meeting to

hear comments on the need for additional testing of MTBE. The Minutes of the meeting show

that government officials expressed concern over the need to assess the potential for groundwater contamination.  The Minutes show that Defendant Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary.  Other Defendants assented to these representations either explicitly or by their silence.

104.   In or around early 1987, Defendants formed the " MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE."  The MTBE Committee included Defendants Amoco, Arco, Chevron, Citgo, Exxon, Shell, Sunoco, Texaco and Conoco.

105.   The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE   . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . . , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

106.   On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting.  The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows:  Since each producer must respond to the EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9.  A form will be included in George's letter . . . the Technical Committee will then meet on February 19 to combine the three reports from

the working groups and draft a response to the EPA which will
then be passed on to the Steering Committee for their approval on
February 20. . . The combined response to the EPA will be
submitted by February 27, to be followed shortly thereafter by a
formal visit to EPA.  Dominguez will meet with EPA and notify
them that the MTBE Committee has been formed and will be
submitting its overview."

107.    Although Defendants were keenly aware that the EPA was interested in

obtaining more information about MTBE in groundwater, Defendants were not forthcoming in

their responses to the EPA.  On February 12, 1987, Arco Chemical, a division of Arco,

responded to the EPA's request for information about "data gaps" concerning MTBE's

environmental and health effects in a letter stating:

Item D requests more information on the presence and persistence
of MTBE in groundwater.  We are not aware of any incidents
where MTBE contaminated groundwater at manufacturing
facilities.  Where gasoline containing MTBE is stored at refineries,
terminals, or service stations, there is little information on MTBE
in groundwater. We feel there are no unique handling problems
when gasoline containing MTBE is compared to hydrocarbon-only
gasoline.

108.    At the same time that Arco Chemical was telling the EPA that MTBE

posed no significant environmental or health problems, Arco Chemical admitted to other

Defendants that it "had no data to refute the claims made in the Garrett Report that MTBE posed

a significant threat of groundwater contamination."

109.    On or around February 27, 1987, the MTBE Committee submitted written

comments drafted to convince the EPA not to require additional health and environmental testing

of MTBE.  The information provided by Defendants was misleading and false.  For example, the

Defendants provided information to the EPA representing that MTBE is only slightly soluble in

water, that potential environmental exposure is not high, and that MTBE has excellent

biodegradation characteristics. The MTBE Committee's Statement added:

there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

110.   The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

111.   The MTBE Committee acknowledged in its February 27, 1987, comments that MTBE had not been the subject of long term chronic health testing, but claimed that such testing was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

[t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

It is clear that the purveyors of MTBE, including Defendants, wanted to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

112.   On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study . . . reports that MTBE in the presence of gasoline has excellent

biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

113.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including Defendants Amoco, Exxon, Sunoco and Texaco signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[2] The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

114.    The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest

---

[2]Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

above the health, property and well-being of Plaintiffs particularly and the America public

generally, and clearly intended to (a) continue to use MTBE without regard to its impact on

Plaintiffs and one environment, and (b) prevent Plaintiffs and the class from becoming aware of

the contamination and/or impact of contamination from MTBE.

      115.    Although the MTBE Committee represented to the EPA that the

Committee was going to "address environmental issues related to MTBE by a) collecting data

from member companies and other sources, and b) sponsoring programs to develop data

unavailable from other sources," the MTBE Committee did no such thing.  The MTBE

Committee's Charter statement was intended to mislead the government and the public,

including the Class members.  The MTBE Committee disbanded approximately one year after

achieving its goal of avoiding testing.

**B.**    **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

      116.    Prior to 1990, Congress was preparing to take action to address the

Nation's smog problem.

      117.    During this time frame, the oil industry, including Defendants, became

concerned that Congress might consider requiring alternative non-petroleum based fuels.

      118.    As a result of tremendous lobbying efforts by the industry, including

Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990

Amendments to the Clean Air Act.  According to the EPA, "The concept of reformulated

gasoline (RFG) was originally generated, developed and promoted by industry, not the

Environmental Protection Agency (EPA) or other parts of the federal government."

      119.    In the 1990 Amendments to the Clean Air Act, Congress mandated the

use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[8/] The following states are among those participating in the oxygenated fuel program: New York, California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin, and Virginia.

120.    In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

121.    The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

122.    Safer, more environmentally sound alternatives were available.

C.    **Defendants misled the Plaintiffs and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE..**

123.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently,

---

[8/]Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

through the escalating and tragic contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

124.    On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a 1987 Conference on Alcohols and Octane.  Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience.  MTBE gasoline spills have been effectively dealt with."  Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

125.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions."  The letter unambiguously represented to Plaintiffs and Class Members that there was "no basis to question the continued use of MTBE."  Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

126.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts.  For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

099NY.MTB
—28—

attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

127.   In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

128.   This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or even the only, contaminant found in groundwater. Moreover, MTBE contamination is most often judged to be too costly to clean up.

129.   Even at this late date, Defendants continue to foster a grave threat to Plaintiffs' and Class members' groundwater in the Affected States with no new safeguards and entirely insufficient warnings, if any.

## VII.   DEFENDANTS DRAMATICALLY INCREASED THEIR USE OF MTBE IN GASOLINE AFTER THE CREATION OF THE RFG PROGRAM.

130.   National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice:  MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

131.   Much of the gasoline sold in non-attainment areas under the RFG Program

exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

132.    Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in Affected States in 1992 as part of the Oxyfuel Program.

133.    Defendants then made MTBE the additive of choice throughout the Affected States when the public and government agencies sought year-round reductions in air pollution caused by cars.

134.    In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout the Affected States when moved by market factors and financial considerations to do so.  Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

135.    Today most if not all gasoline pumped in the RFG areas of the Affected States is laced with high concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated concentrations of MTBE is often sold at other locations at the discretion of the oil industry, including Defendants.

136.    According to the OFA, MTBE accounts for nearly 95 percent of the oxygenates used in New York and MTBE consumption statewide is approximately 17,500 to 21,500 barrels per day. OFA has filed a lawsuit on behalf of MTBE manufacturers to prevent a New York state law from going into effect that would ban MTBE in the year 2004.

137.    In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol.  Recently some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

## VIII. <u>MTBE HAS HAD A PREDICTABLY CATASTROPHIC EFFECT UPON GROUNDWATER AND PRIVATE WELLS.</u>

138. One can reach and affect the largest number of Americans by adding something to gasoline. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996 MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

139. Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

140. For example, large MTBE leaks or spills have occurred in every county in New York. As a result, MTBE has been found in drinking water at levels near or above the state's drinking water standard in communities all over the state including, but are not limited to, the towns of Bedford, Cairo, Churubosco, East Patchogue, Elmont, Glen Park, Greenburgh, Hudson Falls, Hyde Park, Laurel, Liberty, Madrid, Mayfield, Middle Island, Mahopac, New Windsor, Norfolk, Orient, Phelps, Pound Ridge, Schodack, Smithtown, West Harrison and West Kill.

141. In 1997, the USGS found MTBE in 125 of the 1,100 private water wells tested in New York, three of which had concentrations in excess of the state's drinking water standard. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

spills, and now detects MTBE in over 20% of aquifers tested in places, like New York, where high MTBE-content gasoline is used.[2]

142.    In July 1999 the New York State Department of Health ("NY DOH") reported the results of an investigation it conducted in 1997 of well water in 10 New York counties. As part of the research, NY DOH sampled and analyzed water from 111 private wells, many, but not all, located within a half mile of a gasoline filling station. The laboratory results showed that 30 of the 111 wells were contaminated with detectable levels of MTBE, 11 of these had contamination above 20 ppb, the level for U.S. EPA's drinking water advisory, and three wells were contaminated above New York's safe drinking water standard of 50 ppb. Only one of the 30 contaminated wells also tested positive for BTEX compounds.

143.    In or around November 1999, Governor George Pataki directed New York's Department of Environmental Conservation to lower the state's guidelines for remediation of groundwater containing MTBE from 50 ppb to 10 ppb. This announcement is part of a trend among governments to take belated action to counter the problem of MTBE contamination of water supplies and the resulting public health threat.

144.    On October 13, 1998, the State of Maine issued a report presenting findings from the analysis of water samples collected from 951 randomly selected household wells. MTBE was detected in 150 wells, or 15.8% of the sampled private wells. Ten wells, or 1.1% of those sampled, had MTBE levels exceeding the state's drinking water standard of 35 parts per billion. Based on these results, the state estimated that some 1400 to 5200 private wells in the state fail Maine's standard for potable water due to the presence of MTBE. The study also noted that other gasoline compounds were infrequently detected compared to MTBE and where

---

[2]Moran, Zogorski & Squillace, "MTBE in Ground Water in the United States – Occurrence, Potential Sources, and Long Range Transport" (1999).

detected were in all cases well below the drinking water standards.[10/]

145.    A September 15, 1999, report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas.  As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

146.    In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely.  The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act.  The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[11/]  No actual plans or source of funds for such testing exist in any state, including the states where Plaintiffs' and Class members' privately owned wells are located.

147.    Based upon the recommendations of the Blue Ribbon Panel, the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

---

[10/]Maine Report, *supra* note 3.

[11/]"Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

## IX.   IT IS IMPOSSIBLE TO IDENTIFY WHICH MANUFACTURER'S GASOLINE POSES A THREAT OF MTBE CONTAMINATION OR HAS ALREADY CAUSED MTBE CONTAMINATION OF ANY PARTICULAR WELL.

148.    Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

149.    The process of manufacturing and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the Affected States.

150.    A subsurface plume, even if it comes from a single tank or vessel, frequently originates from mixed batches of gasoline coming from different refiners.

151.    The East Patchogue case is typical: even though a source of the MTBE plume (an abandoned service station) was identified, State researchers could not determine the identity or even number of manufacturers whose gasoline containing the MTBE, contributed to the resulting MTBE contamination of well water.

152.    Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiffs and members of the Class(es) Plaintiffs seek to represent.

153.    Defendants are also jointly and severally liable because they conspired to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs' and the Class members' expense, to contaminate Plaintiffs' and the Class members' wells, and to avoid liability for such contamination.

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

## X.  DEFENDANTS' SUBSTANTIAL SHARE OF THE MARKET FOR GASOLINE CONTAINING MTBE.

154.    Defendants in this action are manufacturers that together control a very substantial share of the market for gasoline containing MTBE in the Affected States and are jointly responsible for the enhanced threat to groundwater and for causing the injuries complained of in this Complaint.

## XI.  ADDITIONAL FACTS RELATING TO INJUNCTIVE RELIEF.

155.    Plaintiffs and each of them have been injured by MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation or fear of such contamination amounting to present serious interference with their enjoyment of their land. Their injuries include (a) the necessity of periodic testing of water to assure safety; (b) diminished use and enjoyment of their water and property; (c) the ever increasing loss of confidence that private well water is safe for "domestic" purposes; (d) the need for well water clean-up or, where impracticable, replacement water.

156.    Plaintiffs face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment contaminates more wells, which once contaminated cannot be restored to pre-contamination purity.

157.    Plaintiffs and class members find themselves in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which they did not even know existed.  While Defendants have failed to warn government regulators, Downstream Handlers or the general public as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

158.   Clean groundwater is an essential and precious resource of incalculable value.  Water serves direct human needs and also supports wildlife and natural resources that contribute to the health, economy and general well-being of the residents of all Affected States.

159.   In New York alone, approximately six million residents rely on water from underground sources for drinking, bathing and other household uses.  Of those, some one million New Yorkers draw their water from private wells.

160.   Money paid to individual Plaintiffs and Class members cannot provide the relief needed and sought.  Rather, only class-wide injunctive relief, including both a program of comprehensive and periodic testing and a second program to provide to each contaminated class member a source of water free of MTBE contamination, are essential.

161.   Plaintiffs seek mandatory injunctive relief under all causes of action on behalf of all classes in the form of a court-supervised well testing and monitoring program to remediate MTBE groundwater contamination or where remediation is impracticable, to provide information to Plaintiffs and the Plaintiff class on the extent and location of groundwater contamination.

162.   Plaintiffs also seek a court-supervised program of notice to protect the class.

163.   Plaintiffs also seek a court-supervised program to provide class members whose wells test positive for the presence of MTBE with a source of water free of MTBE contamination.

164.   Data obtained from well testing and monitoring should be collected and recorded in a computerized database at a central repository and information exchange center and maintained as a "registry" to be used for mapping of MTBE plumes in groundwater, administering further relief and for education and research.

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

099NY.MTB
–36–

165.    A court-supervised testing and monitoring program will provide relief to Plaintiffs and contribute to the protection of groundwater resources and advancement of water quality awareness. First, test data will give notice and warning to well owners in the Affected States whose wells, unbeknownst to them, are currently contaminated, and enable provision of further relief. Second, the availability of data on the whereabouts of MTBE plumes data will also alert other well owners of groundwater hazards in proximity to their wells and assist them in making informed choices about water sources and will protection. Third, the database developed through the program will provide researchers with information concerning the current status and vulnerability of groundwater resources to what has become one of the most, if not the most, pervasive manmade contaminants. Fourth, the program will also provide important education regarding the need for greater care, vigilance and effective spill response.

166.    The court-supervised program can also provide clean water to owners of contaminated wells.

## MARKET SHARE, CONCERTED ACTION, ENTERPRISE and ALTERNATIVE LIABILITY

167.    Defendants control a substantial share of the market for gasoline containing MTBE in the Affected States and are therefore responsible for the increased threat to groundwater in the Affected States. Market share liability attaches to all Defendants and that liability of each shall be assigned according to its percentage of the market for gasoline containing MTBE in each Affected State at issue in this Complaint. MTBE is fungible, it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment, and each of these Defendants participated in a state-wide and national market for gasoline with MTBE during the relevant time.

168.    Concerted action liability attaches to all Defendants each of which

participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

169.    Enterprise liability attaches to all of the named Defendants.

170.    Alternative liability attaches to all of the named Defendants.

171.    There are no limitations on liability as set forth in CPLR § 1601 applicable to this action in that one or more of the exceptions set forth in CPLR § 1602 apply, including subsections (5) and/or (11).

## CLASS ALLEGATIONS

172.    [BLANK]

173.    Certification of plaintiff classes is sought pursuant to Fed. R. Civ. P. 23, on behalf of:

    (a)    all similarly situated persons;

    (b)    who own or have an interest in real property with one or more water wells;

    (c)    where such wells do or may provide a source of water for drinking, bathing, or general "domestic" purposes;

    (d)    and where such property is located in Florida.

174.    [BLANK]

175.    Specifically excluded from the proposed class and subclasses are:

    (a)    Commercial entities;

    (b)    Government entities;

    (c)    Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants;

(d)     All public and private entities which sell or otherwise provide water to consumers;

(e)     Counsel for Defendants and all firm members, associates, employees and their immediate families;

(f)     Any wholesalers, retailers or resellers of MTBE and/or gasoline containing MTBE;

(g)     Counsel for Plaintiffs and the Plaintiff class and all firm members, associates, employees and their immediate families; and

(h)     Any presiding Judge and members of their immediate families.

176.    [BLANK]

177.    This action may properly be maintained as a class action and satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23(a).

178.    The Plaintiff class is so numerous that the individual joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23(a)(1). While the exact number of class members is unknown to Plaintiffs at this time, it is estimated that there are thousands of class members. Class membership is objectively ascertainable by existing records and appropriate discovery.

179.    Common questions of law and/or fact arising from Defendants' illegal conduct exist as to all members of the class, as required by Fed. R. Civ. P. 23(a)(2). These common questions predominate over any questions which affect individual members of the class. These common questions include, without limitation:

(a)     what are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation;

(b)     whether MTBE, if released into groundwater supplies, adversely

impacts the groundwater;

(c)    what concentrations of MTBE in groundwater render the water unfit for consumption, bathing, showering, cleaning dishes, and utensils and other household uses;

(d)    what are the fate and effects of MTBE when released into the environment near groundwater sources;

(e)    whether gasoline containing MTBE is a defective product;

(f)    whether the private water supplies of Plaintiffs and the Plaintiff class have been contaminated or are threatened by MTBE;

(g)    <u>what</u> Defendants knew about the problem of MTBE contamination of groundwater and <u>when</u> they knew it;

(h)    whether Defendants knew, or should have known, the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE;

(i)    whether Defendants failed to adequately test MTBE and gasoline containing MTBE, prior to its manufacture, distribution and/or sale, for risks to groundwater;

(j)    what, if anything, Defendants told the public about the properties of MTBE and the increased threat to groundwater and when during the course of MTBE's rapid increase in production and sales any such disclosure was made;

(k)    whether Defendants intentionally marketed gasoline with MTBE to the general public in an effort to make it the industry standard and protect their market share and profits;

(l)   whether Defendants owed a duty to Plaintiffs, the Plaintiff class, public officials, Downstream Handlers and the public generally to warn them of the changed properties of gasoline after the introduction of high levels of MTBE;

(m)   whether Defendants committed a breach of duties of care owed to Plaintiffs and members of the Plaintiff class;

(n)   whether Defendants failed to provide adequate warning to people in the business of operating gasoline stations and storage tanks containing MTBE regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

(o)   whether Defendants failed to adequately warn Plaintiffs, government agencies and/or regulators, and/or the public regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

(p)   whether Defendants' conduct constituted reckless disregard for the safety of private water supplies and the rights of Plaintiffs and the Plaintiff class;

(q)   whether Defendants conspired to conceal and/or misrepresent the characteristics of MTBE and the risks of MTBE use to public and private water supplies to Plaintiffs, government agencies and/or regulators and the public at large;

(r)     whether Defendant formed joint committees and/or task forces or other organizations which generated misrepresentations or omissions regarding MTBE and its properties and/or characteristics;

(s)     whether Defendants' conduct amounted to outrageousness, recklessness or wanton negligence;

(t)     whether Defendants fraudulently misrepresented the properties and environmental characteristics of MTBE and gasoline containing MTBE and/or concealed or failed to disclose material adverse facts concerning the product's safety as alleged;

(u)     whether Defendants failed in any duty to remediate sites promptly where they knew there was MTBE contaminated groundwater;

(v)     whether Plaintiffs and members of the Plaintiff class are entitled to equitable relief as a result of Defendants' wrongdoing and, if so, what is the proper measure and appropriate formula to be applied in determining just and proper relief; and

(w)     the appropriate nature of classwide, equitable and other non-monetary relief;

(x)     whether Defendants are liable under market share, concerted action, enterprise, alternative and/or joint and several conspiracy liability theories.

180.    Plaintiffs' claims are typical of the claims of the members of the class under Fed. R. Civ. P. 23(a)(3), since each plaintiff owns or has an interest in real property with one or more private water wells which do or may provide a source of water for drinking, bathing,

general "domestic", or other purposes; each such well is either contaminated by MTBE or is threatened by such contamination, and each Plaintiff was without knowledge of the true facts alleged herein and has suffered injuries. Plaintiffs and all members of the Plaintiff class have sustained injuries arising out of well and/or groundwater contamination or the treatment of such contamination caused by Defendants' common course of conduct in violation of law as complained of herein.

181.    The injuries of Plaintiffs and each member of the class were caused directly by Defendants' wrongful conduct in violation of statutory and common law as alleged herein.

182.    Plaintiffs will fairly and adequately represent the interests of the members of the class as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' claims are typical of claims of the Plaintiff class and they have no interests that are adverse to the interests of the class members. Plaintiffs have retained competent legal counsel experienced in litigation of class action, consumer and environmental tort litigation.

183.    This action can be certified with respect to the claims for injunctive relief sought:

1.    under Fed. R. Civ. P. 23(b)(1)(A), because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for the Defendants;

2.    under Fed. R. Civ. P. 23(b)(1)(B), because the ability of class members to protect their interests would be substantially impaired or impeded if adjudications proceeded individually; and

3.    under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the class, making injunctive relief with respect to the entire class appropriate.

## CAUSES OF ACTION

## COUNT I
### Strict Liability for Design Defect

184.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

185.    Defendants during the relevant time period were designers, manufacturers, refiners, formulators and suppliers of petroleum products including gasoline with MTBE.

186.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline mixed with MTBE, Defendants owed  to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiffs and the classes which Plaintiffs seek to represent, the duty not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

187.    When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable transportation, storage, handling, and uses for the following reasons:

(a)    Unintended discharges of gasoline are commonplace throughout the Affected States;

(b)    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

(c)    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

(d)    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX)

components of gasoline, because MTBE is recalcitrant to
biodegradation and bioremediation;

(e)     Very low concentrations of MTBE will ruin the taste and smell of
water; and

(f)     MTBE is a known animal carcinogen and a possible human
carcinogen.

188.    Defendants failed to use reasonable care in the design of gasoline
containing MTBE.

189.    Gasoline containing MTBE poses greater dangers to groundwater than
ordinary persons such as Plaintiffs and  Downstream Handlers and the general public would
generally expect in the exercise of reasonable care.

190.    The risks which gasoline containing MTBE poses to groundwater
outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air
pollution by increasing the oxygen content of gasoline.

191.    Safer alternatives to MTBE exist and have been available to Defendants at
all times relevant to this litigation, for the purposes of increasing both the octane level and
oxygen content of gasoline.  Such sensible alternatives to MTBE include, but are not limited to,
ethanol and other "oxygenates" and "octane enhances."

192.    The above-described defects exceeded the knowledge of the ordinary
person and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm
caused by gasoline with MTBE.

193.    Gasoline containing MTBE was distributed and sold in the manner
intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen
by Defendants.  MBTE reached the Plaintiffs' water wells in a substantially unchanged condition

from that in which it was sold.

194.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

(a)    posed and continues to pose a threat to private wells owned by Plaintiffs;

(b)    required and/or will require testing and monitoring of private wells for MTBE contamination;

(c)    contaminated and/or will contaminate private wells owned by Plaintiffs or groundwater in the vicinity of Plaintiffs' properties;

(d)    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

(e)    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

(f)    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT II
### Failure to Warn

195.    Plaintiffs reallege and reaffirm each and every allegation set forth in

paragraphs 1 through 183 as if fully restated herein.

196.    As manufacturers, designers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty not to put on the market a product that poses a serious danger to groundwater that is the source for Plaintiffs' private wells without issuing warnings of the risk posed by the product to Plaintiffs, the public, public officials and Downstream Handlers.

197.    Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without inspection for defects related to the hazards which MTBE poses to groundwater and private wells.

198.    At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and private wells throughout the Affected States:

(a)    Unintended discharges of gasoline are commonplace throughout the Affected States;

(b)    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

(c)    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

(d)    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

(e)    Very low concentrations of MTBE can ruin the taste and smell of

water;

(f)     MTBE is a known animal carcinogen and a possible human
        carcinogen;

(g)     MTBE greatly increases the importance of preventing leaks of
        gasoline, and for the first time makes it necessary to prevent very
        small quantities of gasoline from escaping containment to avoid
        groundwater contamination;

(h)     MTBE increases the need to maintain underground storage tanks,
        prevent overfills, and respond immediately to the loss of any
        gasoline containing MTBE;

(i)     MTBE creates the need to issue warnings to all groundwater users
        in the area of any spill of gasoline containing MTBE;

(j)     MTBE creates the need for regular testing and monitoring of
        private wells for early detection of MTBE; and

(k)     The foregoing facts relating to the hazards which MTBE poses to
        groundwater are not the sort of facts which Plaintiffs, Downstream
        Handlers, and the general public could ordinarily discover or
        protect themselves against in the absence of sufficient warnings.

    199.    Defendants breached their duty to warn by unreasonably failing to provide
warnings concerning any of the facts alleged herein to Plaintiffs, public officials, Downstream
Handlers, and/or the general public.

    200.    Defendants' failure to warn as alleged herein proximately caused
reasonably foreseeable injuries to Plaintiffs. Had Defendants provided sufficient warnings,
MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline

containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

201.    As a direct and proximate result Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

(a)    posed and continues to pose a threat to private wells owned by Plaintiffs;

(b)    required and/or will require testing and monitoring of private for MTBE contamination;

(c)    contaminated private wells owned by Plaintiffs;

(d)    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

(e)    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

(f)    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT III

202.    [BLANK]

203.    [BLANK]

204.    [BLANK]

205.    [BLANK]

## COUNT IV
### Public Nuisance

206.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

207.    Defendants have manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of Plaintiffs and the Plaintiff class, causing inconvenience and annoyance.

208.    Defendants, by their negligent, reckless and willful acts and omissions as set forth above, have caused and permitted MTBE to contaminate a growing number of properties throughout the Affected States.  This contamination has migrated, or threatens to migrate, nearby to and/or onto Plaintiffs' properties, thereby contaminating the groundwater thereunder.

209.    Actual and threatened MTBE contamination caused by Defendants' conduct has caused injury to Plaintiffs in the form of present serious interference with the use, benefit and/or enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial inconvenience, annoyance and injury.

210.    Plaintiffs, who are all well owners, suffer injuries different in kind from the community at large in that they rely on their own wells for their drinking and household

water. Much of the population in the Affected States is served from surface water that is not susceptible to the problems caused by MTBE to groundwater. Additionally, public water supplies that rely on groundwater, unlike Plaintiff's private wells, are regularly monitored by a water district or agency that is able to guarantee clean water.

211.    Plaintiffs' special injuries include loss of property value arising from the increasingly widespread public perception based on actual fact that well water has been rendered less certain, safe and reliable relative to owners of residential properties served by public water supplies.

212.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of Plaintiffs' properties.

213.    In the alternative, Defendants have violated and/or threaten to violate a public right to pure water.

214.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs, who constitute a considerable number of people, have suffered special injuries to their properties, the threat of contamination and reduction of their property values and endangerment of their health and safety.

## COUNT V
### Negligence

215.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

216.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline mixed with MTBE, Defendants

owed to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiffs, Downstream Handlers, and the general public a duty to exercise due care not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

217.    At all times relevant to this litigation, Defendants knew or should have known that:

    (a)    Unintended discharges of gasoline are commonplace throughout the Affected States;

    (b)    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    (c)    MTBE is highly soluble in water and many times more soluble in water than the other [BTEX] components of gasoline;

    (d)    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other [BTEX] components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    (e)    Very low concentrations of MTBE can ruin the taste and smell of water;

    (f)     MTBE is a known animal carcinogen and a possible human carcinogen;

    (g)    MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    (h)    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    (i)     MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    (j)     MTBE creates a need for regular testing and monitoring of private wells for early detection of MTBE; and

    (k)    The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

218.    Defendants have negligently breached their duty of due care to Plaintiffs, Downstream Handlers, and the general public by:

    (a)    using MTBE as an octane-booster and oxygenate;

    (b)    failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

    (c)    failing to adequately test, identify and remediate wells that are contaminated with MTBE;

(d)     forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

(e)     voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

(f)     failing to design gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiffs and other private well owners;

(g)     marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

(h)     failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE,

(i)     failing to curtail or reduce MTBE's manufacture and distribution;

(j)     failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE; and

(k)     failing to inspect, test and take the necessary steps to prevent the gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release.

(l)     failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or

minimize spills and leaks of gasoline in distribution, storage and use and to remediate such spills and leaks promptly.

219.    As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

    (a)    posed and continues to pose a threat to private wells owned by Plaintiffs;

    (b)    required and/or will require testing and monitoring of private wells for MTBE contamination;

    (c)    contaminated private wells owned by Plaintiffs;

    (d)    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable, Plaintiffs with contaminated wells either to install a system to filter out MTBE or to obtain water from alternative sources, such as bottled water or connection to a local municipal or private water system;

    (e)    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

    (f)    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT VI

220.    [BLANK]

221.    [BLANK]

222.    [BLANK]

223.    [BLANK]

224.   [BLANK]

225.   [BLANK]

## COUNT VII
### Conspiracy

226.   Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

227.   Defendants actually knew of the hazards which MTBE posed to groundwater throughout the Affected States.

228.   Beginning in the early 1980s and continuing through the date of the filing of this Master Complaint, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of :

(a)   creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout the Affected States;

(b)   concealing the nature of MTBE, and its impact on Plaintiffs and the environment;

(c)   maximizing profits in a way Defendants knew would require them to contaminate Plaintiffs' and Class members' wells.

229.   Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

(a)   intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

(b)   concealing the dangers of MTBE (including MTBE's adverse fate

and transport characteristics and the propensity of MTBE to

contaminate groundwater) from the government and the public by,

among other means, repeatedly requesting that information about

the dangers and health effects of MTBE be suppressed and not

otherwise published by third parties and by downplaying any

adverse findings related to MTBE;

(c)     using their considerable resources to fight UST legislation; and

(d)     collectively deciding to use MTBE rather than other, safer

oxygenates to satisfy the requirements of the RFG program

because MTBE was the most profitable oxygenate for Defendants

to use.

230.    Each defendant knew that the activities of these task-forces and

committees, and of the other Defendants, constituted a breach of duty owed to the Plaintiffs; each

defendant gave substantial assistance and encouragement to the others in such activities; and

each defendant's own conduct constituted a breach of duty owed to the Plaintiffs.

231.    Defendants ratified and adopted each of the foregoing overt acts and

omissions in furtherance of their conspiracy.

232.    As a direct and proximate result of Defendants' above-described

conspiracy, MTBE at all times relevant to this litigation has:

(a)     posed and continues to pose a threat to private wells owned by

Plaintiffs;

(b)     required and/or will require testing and monitoring of private wells

for MTBE contamination;

(c)     contaminated private wells owned by Plaintiffs;

(d)     required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

(e)     diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property. that well water is now less safe than water from other sources; and

(f)     diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment against these Defendants for:

(a)     an order certifying the requested class, including any classes and sub-classes which this Court deems appropriate, pursuant to Fed. R. Civ. P. 23, and appointing the Representative Plaintiffs and their counsel to represent the Plaintiff class;

(b)     injunctive and equitable relief, for the Plaintiff and the Class, as the Court deems appropriate, including:

     i.     a Court-supervised testing program

     ii.     a Court-supervised monitoring program

     iii.     a Court-supervised data collection program

     iv.     a Court-supervised program of notice to affected well-

owners

    v.    a Court-supervised program to provide class members with

clean water, free of MTBE contamination; and/or,

    vi.    a Court-supervised program to provide remediation of

contaminated wells.

    (c)    compensatory damages for the named Plaintiff; and

    (d)    [BLANK]

    (e)    any other and further relief as the Court deems just, proper and

equitable.

## **JURY TRIAL DEMANDED**

238.    Individual Plaintiff demands a trial by jury of all non-class claims asserted

in this Complaint.

DATED:  December __, 2000        Respectfully submitted,

By: _____

[ADDITIONAL COUNSEL]

CORY, WATSON, CROWDER & DEGARIS    WHATLEY DRAKE
Tony Graffeo                    Joe R. Whatley, Jr.
2131 Magnolia Avenue            Jack Drake
Birmingham, AL  35205          505 North 20th Street
Telephone:  (205) 328-2200       1100 Financial Center
                                Birmingham, AL  35203
                                Telephone:  (205) 328-9576

CROWLEY & DOUGLAS
Timothy Crowley
1301 McKinney, Suite 3500
Houston, TX 77010
Telephone: (713) 651-1771

LIEFF, CABRASER, HEIMANN &
BERNSTEIN
Elizabeth J. Cabraser
Morris Ratner
Scott P. Nealey
Lauri A. Andrus
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

REICH & BINSTOCK
Dennis C. Reich
4265 San Felipe, Ste. 1000
Houston, Texas 77027
Telephone: (713) 622-7271

WELLER, GREEN, McGOWN & TOUPS
Mitchell A. Toups
Nations Bank Bldg.
2615 Calder St., Ste. 400
Beaumont, TX 77701
Telephone: (409) 838-0101

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE
A. Hoyt Rowell
T. Christopher Tuck
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9200

Richard W. Bell
2522 Valleydale Road, Suite 100
Birmingham, AL 35244
Telephone: (205) 980-4322
Facsimile: (205) 408-1226

[PROPOSED] SECOND AMENDED COMPLAINT
8:00-CV-1912-T24C

099NY.MTB

–60–

ORIGINAL

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 1 9 2000

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: | |
| **METHYL-TERTIARY BUTYL ETHER ("MTBE") LITIGATION** | **MDL Docket No. 1358** |

### PROOF OF SERVICE VIA HAND DELIVERY AND U.S. MAIL

I am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice

for collection and processing of documents for mailing with the United States Postal Service, and

that practice is that the documents are deposited with the United States Postal Service with

postage fully prepaid the same day as the day of collection in the ordinary course of business.

I am also readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's

practice for collection and processing of documents for service via hand delivery, and that

practice is that the documents are collected by a hand-delivery point-to-point messenger the same

day as the date listed on this Proof of Service.

On December 18, 2000, I served the within documents:

1.  *YOUNG* PLAINTIFFS' RESPONSE TO CERTAIN DEFENDANTS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER NO. 1.;

2.  DECLARATION OF MORRIS A. RATNER; and

HAND_MDL.MTB
PROOF OF SERVICE VIA HAND DELIVERY AND U.S. MAIL

–1–

3.    **PROOF OF SERVICE BY HAND DELIVERY AND U. S. MAIL**

on the persons listed below by placing the document(s) in a sealed envelope for deposit in the

United States Postal Service through the regular mail collection process at the law offices of

Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street, 30th Floor, Embarcadero Center

West, San Francisco, California 94111-3339, addressed as follows:

[SEE ATTACHED PANEL SERVICE LIST]

and

| | |
|---|---|
| Hon. Susan C. Bucklew | Hon. Shira A. Scheindlin |
| U. S. District Judge | U. S. District Judge |
| Middle District of Florida | S. D. of New York |
| 801 North Florida Avenue, Room 223 | 500 Pearl Street, Room 1050 |
| Tampa, FL  33602-3800 | New York, NY  10007-1312 |

In addition, service of the above-noted documents was also made on

December 18, 2000 by overnight hand delivery on the persons listed below, addressed as

follows:

Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, D.C.  20002-8004

I declare under penalty of perjury that the foregoing is true and correct.  Executed

at San Francisco, California on December 18, 2000.

_____
BOBBY GOMEZ

**PANEL SERVICE LIST (EXCERPTED FROM CTO-1)**
**DOCKET NO. 1358**
**IN RE MTBE PRODUCTS LIABILITY LITIGATION**

Mitchell A. Toups
Weller, Green, McGown & Toups, LLP
2615 Calder, Suite 400
P. O. Box 350
Beaumont, TX 77704

Dan H. Ball
Thompson & Coburn, LLP
One Firstar Plaza
St. Louis, MO 63101

John E. Galvin
Sandberg, Phoenix & von Gontard
One City Center, Suite 1500
St. Louis, MO 63101

Jon Hinck
Lewis, Saul & Associates, P.C.
183 Middle Street, Suite 200
Portland, ME 04101

Steven L. Leifer
Baker, Botts, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Kenneth Pasquale
Stroock, Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038

Stephen M. Tillery
Carr, Korein, et al.
Gateway One Building, Suite 300
701 Market Street
St. Louis, MO 63101

Joe. R. Whatley
Whatley Drake, LLC
505 North 20th Street
1100 Financial Center
Birmingham, AL 35203

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue, Suite 1776
Chicago, IL 60603

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, NW
Suite 700
Washington, DC 20005

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Mark G. O'Connor
Regional Counsel
Coastal Oil New York, Inc.
611 Rt. 46 West
Hasbrouck Heights, NJ 07604

Robert H. Shulman
Howrey, Simon, Arnold & White, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Richard E. Wallace
Wallace, King, Marraro & Branson
1050 Thomas Jefferson Street, NW
Washington, DC 20007

svclist.mtb                           —1—

Edward S. Weltman
Schneck, Weltman & Hashmall, LLP
1285 Avenue of the Americas
New York, NY  10019

David B. Weinstein
Bales & Weinstein, P.A.
1715 N. Westshore Boulevard, Suite 190
Tampa, FL  33607