JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 0 2000

FILED
CLERK'S OFFICE

## MDL 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

----------------------------------------------------

IN RE:                                              :
                                                    :
METHYL-TERTIARY BUTYL ETHER :       **MDL Docket No. 1358**
("MTBE") PRODUCTS LIABILITY    :
LITIGATION                                  :
                                                    :

----------------------------------------------------

### CERTAIN DEFENDANTS' CONSOLIDATED RESPONSE TO ALL MOTIONS TO VACATE THE FIRST CONDITIONAL TRANSFER ORDER (CTO-1)

Defendants Amoco Oil Company, Atlantic Richfield Company and BP Amoco

Corporation support this Panel's Conditional Transfer Order (CTO-1), suggest that all pending

motions to vacate the order be denied, and urge the Panel to give CTO-1 effect by filing it with

the office of the Clerk of the United States District Court for the Southern District of New York.

*See* Rule 7.4(e), R.P.J.P.M.L., 192 F.R.D. 459, 469 (2000).  In addition, CITGO Petroleum

Corporation supports the CTO as it applies to *Sutton Farms (USA), Inc. v. Amerada Hess*

*Corporation, et al.* ("*Sutton Farms*"), C.A. No. 1:00-3544 (S.D. Fla.), and adopts the arguments

below relating to that case.

## OFFICIAL FILE COPY

IMAGED DEC 21'00

## Background

On October 10, 2000, after substantial briefing and a hearing, this Panel chose to consolidate *Berisha v. Amerada Hess, et al.* ("*Berisha*"), No. 00 CIV 1898 (S.D.N.Y.), and *England v. Atlantic Richfield Co., et al.* ("*England*"), Nos. 00-370-WDS, 00-371-DRH (S.D. Ill.), for coordinated and consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407. After becoming aware during the hearing of two recently filed MTBE class actions – *Young v. ExxonMobil Oil Corporation* ("*Young*"), No. 8:00-CV-1912-T-24C (M.D. Fla.) and *Sutton Farms* – the Panel noted in its order that those cases would be treated as "potential tag-along actions." (10/10/2000 Order at 1, n. 1)  Soon after consolidation, on October 30, 2000, those two actions were conditionally transferred to Judge Scheindlin after the Panel reviewed the complaints in the cases and determined that "they involve questions of fact which are common to the actions previously transferred . . . ." (10/30/2000 Order)

On November 29, 2000, defendant ExxonMobil filed a motion and brief opposing transfer of the *Young* action and seeking to vacate the CTO, and defendants Equilon, Motiva, Shell and Texaco jointly filed papers opposing transfer of both *Young* and *Sutton Farms* and seeking to vacate the CTO.

Both motions should be denied.  Under Panel Rule 1.1, a "tag-along" action is one that involves "common questions of fact with others previously transferred under Section 1407." The *Sutton Farms* case is very similar to the actions previously transferred, and involves the same "common questions of fact" already identified by this Panel.  The movants' arguments opposing transfer of *Young* should be rejected for the same reasons, and also have been potentially mooted by new developments in that case.  In both cases, movants raise arguments that have already been

2

rejected by this Panel in its order in MDL 1358 consolidating *Berisha* and *England* for pretrial proceedings.

### Sutton Farms

The factual allegations and legal claims in *Sutton Farms* are strikingly similar to those in *Berisha* and *England*, making the case particularly appropriate for "tag-along" treatment. Indeed, the *Sutton Farms* complaint implicates precisely the same "common questions of fact" that underscored this Panel's decision to create a multidistrict proceeding in the first place. Those common questions, according to the Panel order consolidating *Berisha* and *England*, are:

> i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination.

(10/10/2000 Order at 1).[1]

These two "common questions" are also squarely at issue in *Sutton Farms*. First, the complaint alleges that the defendants (nine of which are already involved in MDL 1358) "knew or should have known that the addition of MTBE to gasoline created grave new risks" and "failed to provide a warning of such risks to anyone." (*Sutton Farms* Cplt. ¶ 6) The *Sutton Farms* plaintiffs further allege – in paragraphs that appear to have been lifted almost *verbatim* from the *Berisha* and *England* complaints – that the defendants engaged in an elaborate conspiracy to mislead federal regulators about MTBE. (*Id.* at ¶¶ 37-51).

---

[1] Movants are correct that plaintiff-by-plaintiff factual issues predominate over facts common to the putative classes that plaintiffs seek to have certified. For that and other reasons, defendants will oppose class certification before Judge Scheindlin. But the present issue is whether any "common questions" exist among the *actions*, not whether common issues among individual plaintiffs predominate over individual issues. Those are two entirely unrelated inquiries.

3

Second, the *Sutton Farms* case plainly involves the question whether plaintiffs have "sustained drinking water contamination as a result of MTBE contamination." (10/10/2000 Order at 1) The complaint states that a nationwide class of well owners should be certified because "this case involves the poisoning of the water of the named Plaintiff and class members throughout the United States from the introduction of MTBE into the stream of commerce . . . ." (*Sutton Farms* Cplt. ¶ 7)[2]

Critically, those moving to vacate the CTO as to *Sutton Farms* do not argue that the case does not involve the two "common questions of fact" identified by the Panel. Instead, they point to two fairly minor distinctions between *Sutton Farms* and other MTBE cases. Those distinctions should not impact this Panel's decision whether to consolidate the case for pretrial purposes.

The movants first argue that *Sutton Farms* should not be consolidated because the putative class definition includes owners of both private domestic wells and private commercial wells. (Consolidated Motion and Brief of Shell-Texaco Defendants to Vacate CTO-1 ("Shell-Texaco Brief"), at 5) They argue that commercial well owners have "different claimed injuries involving different proofs . . . which would require discovery on issues that would differ substantially from the other cases." *Id.*

While it is possible that some minor differences may exist between domestic and commercial well owners in terms of possible relief, those differences would arise only in the trial

---

[2] Although only "common questions of fact" are needed to classify an action as a "tag-along," Rule 1.1, the *Sutton Farms* case also involves the same legal theories that are asserted in *Berisha* and *England*. Indeed, four of the six causes of action in the MDL 1358 Master Complaint (Ex. A) are also asserted in *Sutton Farms* (negligence, failure to warn, nuisance and conspiracy).

4

and post-trial phases of individual cases.  It is clear that for *pretrial purposes*, convenience and efficiency concerns militate in favor of transferring cases like *Sutton Farms* that involve factual allegations and legal theories that are virtually identical to the ones presented in the previously consolidated cases.

The Shell-Texaco defendants also argue against transferring *Sutton Farms* because the defendants have not yet been served with the complaint on file with the district court.  However, Panel Rule 7.5(c) explicitly permits transfer of tag-along cases that have not been served on "one or more of the defendants."  Movants are concerned about the effect of transferring an action that plaintiffs may not ultimately decide to prosecute.  But the act of transfer will not impact the *Sutton Farms* plaintiffs' ability to drop or otherwise fail to prosecute the action if that is the course they choose.

## Young

The movants principally argue that *Young* is an inappropriate "tag-along" candidate because it involves a single defendant, ExxonMobil, and because the plaintiffs only assert trespass and nuisance claims. *See* Shell-Texaco Brief at 4-5; ExxonMobil Brief in Support of Motion to Vacate CTO-1 ("Exxon Mobil Brief"), at 13-14)

Those arguments may now be moot.  The *Young* plaintiffs are scheduled to file an amended complaint that *adopts* the Master Complaint filed in *In re MTBE Products Liability Litigation* almost *verbatim*. (12/4/2000 Proposed Amended Complaint in *Young*) (Ex. B)  If the district court permits the plaintiffs to amend their complaint, the case will involve 13 defendants, each of which is already involved in MDL 1358.  And any factual or legal differences between

5

*Young* and *Berisha/England* – including the ones identified by movants – will disappear entirely. Transferring *Young* is now unquestionably appropriate.

Even if the *Young* plaintiffs were not permitted to amend their complaint, the case would still be a suitable "tag-along" action under the Panel Rules because it involves the two "common questions of fact" the Panel viewed as sufficient to justify the creation of a multidistrict proceeding. First, the *Young* complaint alleges that "Defendant [ExxonMobil] and the rest of the oil industry were willing to ignore facts known to them and misrepresent the properties and impacts of MTBE" and never "warned Downstream Handlers or the general public . . . ." (*Young* Cplt. ¶ 45). Second, the plaintiff alleges that she and the putative class members have "been injured by MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation of fear such contamination." (*Id.* ¶ 16)[3]

## Conclusion

The Panel has consistently expressed its belief that "a potential for conflicting or overlapping class actions presents one of the strongest reasons" for transfer. *See, e.g., In re Multidistrict Private Civil Treble Damages Litig. Involving Plumbing Fixtures*, 308 F. Supp. 242, 243-244 (J.P.M.L. 1970). That concern applies with equal force to the Panel's decisions regarding "tag-along" actions, even where the putative classes sought to be certified are geographically distinct. *See In re Nissan Motor Corp. Antitrust Litig.*, 385 F. Supp.. 1253

---

[3] Even if ExxonMobil were to remain the sole defendant in *Young*, transfer would still be proper. Since ExxonMobil is already a defendant in both cases that presently make up MDL 1358 (and in *Sutton Farms*), transferring the case would prevent duplicative discovery and would avoid the real risk of inconsistent pretrial rulings with respect to ExxonMobil. In any event, "[t]ransfer under Section 1407 is not dependent on a strict identity of . . . parties" in each action. *In re Japanese Elec. Prods. Antitrust Litig.*, 388 F. Supp. 565, 567 (J.P.M.L. 1975).

6

(J.P.M.L. 1974) (transferring tag-along class actions because transfer "will have the salutary effect of ensuring consistent application of Rule 23").

For the reasons stated above, and to "avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel and the judiciary," (10/10/2000 Order at 1), Amoco Oil Company, Atlantic Richfield Company and BP Amoco Corporation respectfully request that this Panel deny all pending motions to vacate CTO-1, and order the transfer of *Young* and *Sutton Farms* to Judge Scheindlin for coordinated and consolidated pretrial proceedings. Another defendant – CITGO – joins this request with respect to *Sutton Farms*.

Dated: December 19, 2000                    Respectfully submitted,

J. Andrew Langan
Mark S. Lillie
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois  60602
(312) 861-2000
(312) 861-2200 (FAX)

Mark E. Holstein
200 East Randolph Drive
Suite 2000
Chicago Illinois, 60601
(312) 861-5437

Attorneys for Defendants
**BP AMOCO CORPORATION,**
**AMOCO OIL COMPANY and**
**ATLANTIC RICHFIELD COMPANY**

7

Nathan P. Eimer
Eimer Stahl Klevorn & Solberg
122 South Michigan Avenue
Suite 1776
Chicago, Illinois 60603
Attorney for Defendant
**CITGO PETROLEUM CORPORATION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 0 2000

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

The foregoing was served by first-class mail, postage-prepaid, on this 19th day of December, 2000, to the parties listed on the attached Panel Service List, and to:

> Morris Ratner
> Lieff, Cabraser, Heimann
>         & Bernstein, LLP
> 275 Battery Street, Suite 3000
> San Francisco, CA 94111

J. Andrew Langan

2000 DEC 19 P 4: 32

RECEIVED
CLERK'S OFFICE

9

DEC. 18. 2000  2:43PM    JPML                NO. 6335   P. 1

OPTIONAL FORM 99 (7-90)
**FAX TRANSMITTAL**  # of pages ► 2

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION - PANEL .        mber 18, 2000

DOCKET: 1,358 - In re Methyl Tertiary Butyl Ether (          Page: 1
STATUS: Transferred

To John Amberg          From JPML
Dept/Agency
Phone # (202)502-2800
Fax # (312)861-2200   (202)502-2888
NSN 7540-01-817-7368   5099-101   GENERAL SERVICES ADMINISTRATION

TRANSFEREE INFORMATION
    Dist: NYS
    Judge: Scheindlin, Shira A.
    Date: 10/10/00

| ATTORNEY - FIRM | REPRESENTED PARTY(s) |
|---|---|
| Ball, Dan H.<br>Thompson & Coburn, L.L.P.<br>One Firstar Plaza<br>St. Louis, MO 63101 | => Chevron USA, Inc.; Conoco, Inc.*; Exxon Corp.; Exxon Mobil Corp.*; Mobil Oil Corp. |
| Eimer, Nathan P.<br>Eimer, Stahl, Klevorn & Solberg<br>122 South Michigan Avenue<br>Suite 1776<br>Chicago, IL 60603 | => Citgo Petroleum Corp.* |
| Galvin, John E.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>Suite 1500<br>St. Louis, MO 63101 | => Phillips Petroleum Co.* |
| Guttmann, John S.<br>Beveridge & Diamond, P.C.<br>1350 I Street, N.W.<br>Suite 700<br>Washington, DC 20005 | => Sunoco, Inc.* |
| Hinck, Jon<br>Lewis, Saul & Associates, P.C.<br>183 Middle Street<br>Suite 200<br>Portland, ME 04101 | => Arcuri, Melanie J.*; Berisha, Donna*; Greene, Steven C.; La Susa, Ron* |
| Langan, J. Andrew<br>Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, IL 60601 | => Amoco Oil Co.*; Atlantic Richfield Co.*; BP Amoco Corp.* |
| Leifer, Steven L.<br>Baker, Botts, L.L.P.<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | => Valero Marketing  & Supply Co.* |
| McKay, Scott D.<br>Campbell & Denes<br>6100 SW 76th Street<br>2nd Floor<br>Miami, FL 33143 | => Sutton Farms (USA), Inc.* |
| O'Connor, Mark G.<br>Regional Counsel<br>Coastal Oil New York, Inc.<br>611 Rt. 46 West<br>Hasbrouck Heigh, NJ 07604 | => Coastal Corp.* |
| Pasquale, Kenneth | => Tosco Corp.* |

NOTE: Please refer to the title page for complete report scope and key.
  *   Signifies that an appearance was made on behalf of the party by the representing attorney.
  #   Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
NOTE: All dismissed parties (and counsel representing only dismissed parties) were suppressed.

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION - PANEL ATTORNEY SERVICE LIST                 December 18, 2000
(1,358 Panel Attorney Service List Cont'd)

Page: 2

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Stroock, Stroock & Lavan, L.L.P.<br>180 Maiden Lane<br>New York, NY  10038 | |
| Shulman, Robert M.<br>Howrey Simon Arnold & White, LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 | => Amerada Hess Corp.* |
| Tillery, Stephen M.<br>Carr, Korein, et al.<br>Gateway One Building<br>Suite 300<br>701 Market Street<br>St. Louis, MO  63101 | => Azbill, Donna L.*; Bauer, James*; Christiansen, Claudia*; England, David*;<br>McMannis, Rhea Susan*; Owca, Marvin* |
| Wallace, Richard B. Jr.<br>Wallace, King, Marraro & Branson, P.L.L.C.<br>1050 Thomas Jefferson Street, N.W.<br>Washington, DC  20007 | => Equilon Enterprises, L.L.C.*; Motiva Enterprises, L.L.C.*; Shell Oil Co.*; Shell<br>Oil Products Co.*; Texaco Refining & Marketing, Inc.*; Texaco, Inc.* |
| Weinstein, David B.<br>Bales & Weinstein, P.A.<br>1715 N. Westshore Boulevard<br>Suite 190<br>Tampa, FL  33607 | => ExxonMobil Oil Corp. |
| Weltman, Edward S.<br>Schnock, Weltman & Hashmall, LLP<br>1285 Avenue of the Americas<br>New York, NY  10019 | => United Refining Co.* |

NOTE: Please refer to the title page for complete report scope and key.
  *    Signifies that an appearance was made on behalf of the party by the representing attorney.
  #    Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
NOTE: All dismissed parties (and counsel representing only dismissed parties) were suppressed.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 0 2000

FILED
CLERK'S OFFICE

RECEIVED
CLERK'S OFFICE

2000 DEC 19 P 4: 32

ALL-STATE® LEGAL 800-222-0510   E0511   RECYCLED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------

In Re:      Methyl Tertiary Butyl Ether           Master File C.A. No.
("MTBE") Products Liability Litigation            1:00-1898(SAS)
                                                  MDL 1358

--------------------------------------------------

This Document Applies to All Actions

--------------------------------------------------

# MASTER COMPLAINT

PAGE

## TABLE OF CONTENTS OF MASTER COMPLAINT

PAGE

NATURE OF THE CASE ...................................................... 1

PARTIES ................................................................. 2

    Plaintiffs ............................................................ 2

    Defendants ........................................................... 2

JURISDICTION ........................................................... 6

VENUE .................................................................. 7

SUBSTANTIVE ALLEGATIONS ............................................... 8

    I      What MTBE is ..................................................... 8

    II     Why Defendants add MTBE to gasoline ............................... 8

    III    Gasoline containing MTBE has widely contaminated and continues
          to pose an extreme threat to groundwater .............................. 9

    IV    The longstanding prevalence of unintended gasoline discharges ensures
          that gasoline with MTBE will contaminate groundwater. .................. 11

    V     Defendants have known all along that mixing MTBE with gasoline
          would result in massive groundwater contamination. ..................... 13

        A    Defendants' knowledge of the prevalence of unintended
            discharges of gasoline ......................................... 13

        B    Defendants' knowledge of the threat to groundwater as a
            result of unintended discharges of gasoline mixed with MTBE ....... 14

            i    Defendants' constructive knowledge of MTBE's
                 threat to groundwater ................................... 14

ii

**PAGE**

    ii       Defendants' knowledge of specific instances of MTBE
            contamination of groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    iii    Defendants' awareness of the 1986 Garrett Report
            specifically warning of inevitable MTBE contamination
            of groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    iv    Defendants' internal documents demonstrating their
            awareness of MTBE contamination of groundwater . . . . . . . . . . 19

    v       Defendants' knowledge that no adequate toxicity studies
            had been done prior to Defendants' decision to add
            MTBE to gasoline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI    Despite knowing that adding MTBE to gasoline inevitably results in
       widespread MTBE groundwater contamination, Defendants
       conspired to mislead the EPA and the public about the hazards of
       adding MTBE to gasoline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A     Defendants misled the EPA into not testing MTBE under the
           Toxic Substances Control Act (TSCA) in the late 1980's. . . . . . . . . . . . 23

    B     Defendants misled Congress into effectively broadening the
           market for MTBE by including oxygenate requirements in the
           Reformulated Gasoline (RGF) Program adopted in the 1990
           amendments to the Clean Air Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    C     Defendants' misled the Plaintiffs and public, including all
           downstream gasoline handlers, about the hazards of
           gasoline with MTBE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VII   Defendants dramatically increased their use of MTBE in gasoline
       after the creation of the RFG program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII  MTBE has had a predictably catastrophic effect upon groundwater
       and private wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IX    It is impossible to identify which manufacturer's gasoline poses

a threat of MTBE contamination or has already caused MTBE
contamination in any particular well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

X    Defendants' substantial share of the market for gasoline containing
MTBE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XI    Additional Facts relating to injunctive relief . . . . . . . . . . . . . . . . . . . . . . . . . 39

MARKET SHARE, CONCERTED ACTION, ENTERPRISE
and ALTERNATIVE LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Count I - Strict Liability for Design Defect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Count II - Failure to Warn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Count III - Deceptive Business Acts and Practices in Violation of GBL § 349 . . . . . . . 56

Count IV - Public Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Count V - Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Count VI - Civil Action to Compel Defendants to Comply with the Reporting
Requirements of the Toxic Substances Control Act (TSCA) . . . . . . . . . . . 62

County VII - Conspiracy to Market a Product Known to be Unsafe . . . . . . . . . . . . . . 63

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## NATURE OF THE CASE

1.      The Judicial Panel on Multidistrict Litigation has consolidated several cases from

district courts around the country for pre-trial proceedings before Hon. Shira A. Scheindlin in the

U.S. District Court for the Southern District of New York.[1]  These cases are all class actions for

injunctive relief arising from the widespread contamination of groundwater as a result of the

Defendants' use of a gasoline additive called methyl tertiary-butyl ether ("MTBE").  Plaintiffs

are owners of private wells who, as a result of the enhanced risk to their drinking water, now

require testing and monitoring of their wells and aquifers for MTBE.  Defendants are oil

companies involved in the manufacture, design, refining, formulation, distribution, supply, sale

and/or marketing of gasoline mixed with MTBE throughout the states in which Plaintiffs and

class members reside and own private wells (hereafter, "the Affected States").  The Affected

States include: New York, California, Connecticut, Delaware, Illinois, Indiana, Kentucky,

Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island,

Texas, Wisconsin, Virginia, and  Florida.

2.      Defendants have engaged in joint efforts and conspired to use and market MTBE

as a gasoline additive for years with full knowledge of the serious threat MTBE poses to

groundwater.  Defendants conspired to maximize their profits at the expense of class members

and the environment and in furtherance of this conspiracy to conceal the problems associated

---

[1] Those cases include *Berisha v. Amerada Hess Corp., et al.* (No. 00 CIV 1898 [SAS],
S.D.N.Y.) and *England v. Atlantic Richfield Company, et al.*, (No. 99-370-DRH, S.D. Ill.).  In
addition, two Florida cases have been conditionally transferred; *Young v. Exxon Mobil Oil Corp.*
(C.A. No. 8:00 - 192-T-24C, M.D. Fla.) and *Sutton Farms. v. Amerada Hess Corp., et al.*, (C.A.
No. 1:00 - 3544, S.D. Fla).

1

with MTBE, to proliferate its use, to pollute Plaintiffs' wells, and to avoid responsibility for their contamination.

3.     All Plaintiffs seek one or more of the forms of relief set forth herein.  Some Plaintiffs seek only a subset of such relief on behalf of the subclass or class they seek to represent.  For the class, only injunctive relief is sought.  The injunctive relief sought by all Plaintiffs includes a court-supervised program of MTBE testing, monitoring and education. Certain Plaintiffs with MTBE contaminated wells also seek a court-supervised program to provide class members with a source of water free from MTBE and/or to remediate (clean-up) Plaintiffs' wells.  Certain individual Plaintiffs seek compensatory damages.

## PARTIES

### Plaintiffs

4.     Plaintiffs are present or former owners of private wells drawing from groundwater which Plaintiffs used and/or use as a source of water for drinking, bathing, and general "domestic" purposes.

### Defendants

5.     Defendants do business in the Affected States as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of gasoline containing MTBE.

6.     At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from the exploration for and extraction of crude oils to the refining and/or the distribution, marketing and retail sale of gasoline, including the design and

manufacture of gasoline containing MTBE sold in Affected States.

7.    Any and all references to a Defendant or Defendants in this Master Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant or Defendants.

8.    When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

9.    When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

10.    Atlantic Richfield Company ("Arco") is a Delaware corporation with its principal place of business in Los Angeles, California, and doing business in the States of New York, Illinois and other Affected States.

11.    BP Amoco Corporation ("Amoco") is an Indiana corporation with its principal place of business in Chicago, Illinois, and doing business in the States of New York, Illinois and other Affected States.

12.    Defendant Amoco Oil Company is a wholly owned subsidiary of Defendant BP Amoco Corporation and has its principal place of business in the State of Illinois and is doing business in Illinois and other Affected States.

3

13.     Citgo Petroleum Corporation ("Citgo") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, and doing business in the States of New York, Illinois and other Affected States.

14.     Conoco, Inc. ("Conoco") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

15.     Chevron U.S.A. Inc. ("Chevron") is a Delaware corporation with its principal place of business in San Francisco, California, and doing business in the States of New York, Illinois and other Affected States.

16.     Exxon Mobil Corporation ("Exxon Mobil"), formed as a result of the merger on November 30, 1999 of Exxon Corporation ("Exxon") and Mobil Corporation ("Mobil") is a New Jersey corporation with its principal place of business in Irving, Texas, and doing business in the States of New York, Illinois and other Affected States.

17.     Equilon Enterprises, LLC ("Equilon") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

18.     Phillips Petroleum Company ("Phillips") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois and other Affected States.

19.     Shell Oil Company ("Shell") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois and other Affected States.

20.     Texaco Refining and Marketing, Inc. ("Texaco") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois and other

4

Affected States.

21.     Defendant Amerada Hess Corporation is a Delaware corporation with its principal place of business in New York, New York, and doing business in the State of New York and other Affected States.

22.     Defendant Coastal Corporation d/b/a Coastal Oil New York, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

23.     Defendant Motiva Enterprises, LLC is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

24.     Defendant Shell Oil Products Company is a Delaware corporation with its principal place of business in Houston, Texas, and doing business in the State of New York and other Affected States.

25.     Defendant Sunoco, Inc. is a Pennsylvania corporation with its principal place of business at Philadelphia, Pennsylvania, and doing business in the State of New York and other Affected States.

26.     Defendant Texaco, Inc. is a Delaware corporation with its principal place of business in White Plains, New York, and doing business in the State of New York and other Affected States.

27.     Defendant Tosco Corporation is a Nevada corporation with its principal place of business in Stamford, Connecticut, and doing business in the State of New York and other Affected States.

5

28. Defendant United Refining Company is a Pennsylvania corporation with its principal place of business in Warren, Pennsylvania, and doing business in the State of New York and other Affected States.

29. Defendant Valero Energy Inc. d/b/a Valero Marketing and Supply Company is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in the State of New York and other Affected States.

30. Defendants Does 1-100 are corporations, partnerships, associations, natural persons or other entities that are not presently known to Plaintiffs. The true names and identities of all of these Defendants are not presently known to Plaintiffs, who therefore sue said Defendants by fictitious names. Plaintiffs will pray leave to add parties and allege said Defendants' true names when the true names become known to Plaintiffs.

## JURISDICTION

31. This Court has jurisdiction over Defendants in the *England* case transferred from the District Court for the Southern District of Illinois, because those Defendants are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

32. The Court has jurisdiction over the New York domiciliary Defendants in the

*Berisha* case, which was removed to this Court from New York state court, and over the non-domiciliary entities named as Defendants in *Berisha* because each non-domiciliary Defendant did or does business in New York and/or contracts to supply goods and services to the New York.

33.     This Court has jurisdiction over the Defendants because the Defendants are either incorporated in the State in which the case was filed, are registered with that state's secretary of state, do sufficient business in the State and have minimum contacts with it, or otherwise intentionally avail themselves of the State through the sale, manufacture, distribution, and/or processing of petroleum related products in that State to render the exercise of jurisdiction over Defendants by the States' courts consistent with traditional notions for fair play and justice.

## **VENUE**

34.     Venue in the *England* case is proper in the federal district court to which that case was removed, because at least one of the *England* Defendants is subject to personal jurisdiction in that district (the Southern District of Illinois).

35.     Venue in the *Berisha* case is proper in the Southern District of New York, because one or more *Berisha* Defendants, including Amerada Hess Corporation and/or Mobil Oil Corporation, reside in New York County.

36.     Venue is proper because one or more Defendants resides and/or conducts business in the state in which each of the cases consolidated herein was originally filed.

## SUBSTANTIVE ALLEGATIONS

**I      What MTBE is**

37.      MTBE is a member of a class of chemical compounds, aliphatic ethers, whose unique properties include being "hydrophilic," or water-seeking, *i.e.*, having enhanced solubility in water and chemical attraction to water molecules.

38.      MTBE does not occur naturally.

39.      MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process.

40.      Defendants used and continue to use MTBE as a gasoline additive.

**II      Why Defendants add MTBE to gasoline**

41.      In or after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

42.      By the mid-1980's, MTBE was in widespread use in high-octane gasoline.

43.      Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline.  Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution.  Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE.

44.      Ironically, it is now apparent that MTBE does not even deliver Defendants'

8

promise of cleaner air. MTBE does little or nothing, contrary to industry assurances, to contribute to reductions in such air-polluting car emissions as carbon monoxide or the creation of smog.

45.     A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[2]

46.     In May, 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[3] NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[4]

47.     In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself.

**III     Gasoline containing MTBE has widely contaminated and continues to pose an extreme threat to groundwater**

48.     MTBE is more than an order of magnitude more soluble in water than other

---

[2]     "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[3]     "The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[4]     "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels", Nat'l Research Council, Nat'l Academy of Sciences (1996).

gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other common gasoline components -- benzene, toluene, ethylbenzene and xylene (collectively "BTEX" compounds).

49.     Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the BTEX compounds in the gasoline tend to adsorb or bind to soil. In contrast, MTBE races to underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

50.     In addition to traveling faster and further from gasoline discharge sources than BTEX compounds, MTBE also is slow to degrade or break down after it is released into the environment, particularly in the subsurface of the ground. Because of its "recalcitrance" to biodegradation, plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Thus, although gasoline is always the source of MTBE contamination of groundwater, wells contaminated with MTBE frequently show either no or merely trace amounts of the BTEX compounds.

51.     When MTBE is released into the environment and contaminates groundwater, its foul taste and odor render the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

52.     Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as five (5) parts per billion ("ppb").

10

53.     Natural compounds in drinking water can mask the taste and odor of MTBE, and sensitivity to the odor and taste varies among different individuals. For example, research conducted by the State of Maine shows that homeowners were sometimes unaware of the presence of MTBE even when it is present in water in concentrations well above test subjects' odor and taste threshold.[5] In the Maine study, it was learned that some well owners were drinking and bathing in water with more than 200 ppb MTBE, six times higher than the Maine state safe drinking water standard.

54.     MTBE is a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") classifies MTBE as a possible human carcinogen.

**IV      The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

55.     The potential for new incidents of groundwater and well contamination is present every day that Defendants put more gasoline containing MTBE on the market and so long as plumes of MTBE already unleashed in the subsurface are not cleaned up or contained.

56.     Every year more than nine million gallons of gasoline, equal to a full supertanker, escape during transportation, storage, sale or use in the United States.

57.     Prior to the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") were a known threat to the Affected States' water supply.

---

[5]     "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report," Maine Dep'ts of Human Serv., Env. Protection & Conservation. (Oct. 13, 1998) (the "Maine Report").

11

The introduction of gasoline containing MTBE in ever greater quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs. In addition, the addition of MTBE to gasoline, given MTBE's unique properties, created an entirely new threat from even very small leaks and spills of gasoline.

58.     Thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of USTs each year. In fact, it has been predicted that over 15 million UST over-filling events occur annually in this country and automotive over-fueling events occur continuously. These problems were prevalent long before the introduction of MTBE to gasoline.

59.     Gasoline is used and stored by nearly every adult person in the United States, creating additional potential for mishandling events.

60.     In addition to reaching the ground through gasoline leaks and spills, MTBE also reaches the ground through rainfall. MTBE's volatility causes some MTBE to evaporate into the atmosphere during transport, storage, and fueling and subsequently mix with water vapor and return in rainfall. MTBE's presence in rainfall in the Affected States where MTBE is widely used as a gasoline additive ensures that MTBE reaches property throughout those states.

61.     Given the properties of MTBE and long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable to Defendants.

12

**V**      **Defendants have known all along that mixing MTBE with gasoline would result in massive groundwater contamination.**

    **A**      **Defendants' knowledge of the prevalence of unintended discharges of gasoline**

62.      At all times relevant to this litigation, Defendants were or should have been aware that there is a national crisis involving gasoline leaking from multiple sources, such as USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA document Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

63.      At all times relevant to this litigation, Defendants were or should have been aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

64.      At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional  mishandling events involving gasoline used and/or stored by nearly every American adult, as described above.

65.      At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

    **B**      **Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline mixed with MTBE**

13

i       **Defendants' constructive knowledge of MTBE's threat to groundwater**

66.     At all times relevant to this litigation, Defendants were or should have been aware that MTBE's contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

67.     For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980. The Toxicology Committee included Defendants Texaco, Exxon, Shell, Mobil, Arco, Tosco and Chevron.

68.     API's Toxicology Committee had a specific program to study MTBE.  Meeting minutes make plain that Committee members shared information and  repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE through drinking water.

69.     Despite early knowledge and a shared recognition of the need to do ingestion studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

70.     Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiffs concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular.  By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all

14

times relevant to this litigation been in a position to know the threat which MTBE poses to

groundwater.

71.    In addition, by virtue of this superior knowledge, and/or by virtue of the

Defendants' partial and incorrect statements regarding the nature and impacts of MTBE,

Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

**ii     Defendants' knowledge of specific instances of MTBE
contamination of groundwater**

72.    Defendants knew at least as early as 1980 of the impact of MTBE and its

contamination of water.

73.    As early as 1980, Defendants learned of a serious incident of MTBE groundwater

contamination in Rockaway, New Jersey, which substantiated the threat which MTBE poses to

drinking water supplies serving thousands of water consumers.

74.    By 1984, Defendants, including but not limited to Exxon, Shell and Chevron,

were exchanging information on "major" MTBE contamination of groundwater incidents in

Maryland, New York and Rhode Island dating back to 1978.  Defendants acknowledged then that

MTBE would contaminate many more wells resulting in "high response costs."

75.    In or around March 1987, Defendants were aware of incidents in at least six

locations on the eastern seaboard, including two sites in New York, where MTBE was detected

in drinking water samples from wells – 8 of 21 wells were reported to be contaminated with

MTBE only.

76.    Defendants were aware of two MTBE groundwater contamination events

unrelated to each other in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by

15

several years the introduction of gasoline with higher concentrations of MTBE and presaged the

now widespread calamity.

77.     At the East Patchogue site, spilled gasoline left over from the operation of a filling

station whose underground storage tanks had been dug up and removed in 1988 sent a plume of

MTBE into Long Island's sole source aquifer.  The MTBE plume was detected when the water

from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350

ppb of MTBE.  Although trace levels of BTEX were eventually found in the well, that did not

happen until the MTBE levels had reached the astounding level of 7,600 ppb.

78.     A decade after the spill in East Patchogue, government officials were still tracking

the MTBE plume through the aquifer thousands of feet from the site.  In contrast, BTEX

compounds were found concentrated in the soils and water much closer to the spill site, and the

mass of these compounds was observed to be steadily decreasing through bidegradation.

79.     The Liberty incident started sometime before August 1990, when state health

officials learned that a sample of the Village of Liberty's public water supply, drawn from local

groundwater, tested positive for MTBE.

80.     In December 1992, MTBE was again found in Liberty's water at concentrations

approximately three times higher than the New York State Department of Health drinking water

standard of 50 ppb.

81.     The Liberty and E. Patchogue events were by no means the only instances of

verified MTBE well contamination from "the field" known to Defendants.  For example, in New

York, State and County governments have verified MTBE contamination of hundreds of private

16

wells throughout the state. The State has records of approximately 1,000 sites where tests of water samples show levels of MTBE in excess of the State's safe drinking water standard.

### iii    Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater

82.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[6] The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: 1) groundwater contaminated with MTBE is difficult to remediate, 2) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and 3) MTBE has a distressing "terpene-like" odor in low concentrations.

83.    As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

84.    As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry

---

[6]    Peter Garrett, Marcel Moreau & J.D.Lowry, "MTBE as a Ground Water Contaminate," *in* NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Preceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

17

representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

85.    Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

86.    On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API, forwarded the Garrett Report to members of the GTTF including representatives of Shell, Arco, and Exxon. These individuals were asked to review the Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

87.    The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE . . be either banned
> as gasoline additives or require double-lined storage is clearly a
> policy statement and not an objective credible scientific
> conclusion. Further, data presented in this paper as well as those
> generated by ongoing API research indicate that such a policy is
> reactionary, unwarranted and counter-productive.

18

88.     However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate.  These issues were not even addressed.

89.     Defendant BP Amoco (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

### iv     Defendants' internal documents demonstrating their awareness of MTBE contamination of groundwater

90.     Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct.  For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct.  Arco Chemical, a division of Arco, in communications to others within the oil industry, was admitting that they had no data to refute the Garrett Report's authors' conclusions.  For example, a letter dated February 4, 1987, states "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

91.     On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New

19

York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

92.   Communications among officials at Defendant Chevron were similar. A 1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

93.   In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a document entitled "MTBE WHITE PAPER- the Impact of MTBE on Groundwater." The purpose of the document was to put together what was known about the movement of MTBE in groundwater and the document was to be circulated internally among the employees of the various Shell companies.

94.     According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble

than benzene and therefore, MTBE's plumes are expected to move faster and farther than

benzene plumes emanating from a gasoline spill.  Further, Shell's MTBE White Paper indicates

that MTBE does not biodegrade in the subsurface environment.  Finally, Shell's MTBE White

Paper indicates that MTBE has a low odor and taste threshold and that "at many locations odor

and taste criteria may determine clean-up levels."

95.     Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a
> few Shell marketing terminals and service stations to date.
> However, as the usage of this oxygenate begins to increase, a
> stringent clean-up criteria for MTBE will become adopted in more
> states, we should anticipate increased concerns over how its release
> to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

96.     A June 1997 Shell document entitled "Summary of Current MTBE Issues and

Status" states:

> MTBE is relatively quite soluble in water (compared to other
> components in gasoline, like BTEX), and it moves essentially with
> the ground water, thus MTBE tends to "lead the plume" whenever
> there is a gasoline spill or leak.  MTBE also has a very low
> biodegradation potential, which makes it more difficult to remove
> from ground water than other gasoline components such as BTEX.

97.     The threat MTBE poses to groundwater was also discussed in a May 1999 paper

by employees of Defendant Chevron entitled "Solving Problems From MTBE Contamination –

It's Not Just Regulating Underground Tanks."  The document reads:

> [C]oncerns on the mobility and persistence of MTBE in the
> environment are reinforced by a recent study and anecdotal
> information discussed at an EPA Blue Ribbon Panel on MTBE in

21

January 1999. This information indicates there is MTBE ground
water contamination from small spills of gasoline (e.g. a spill in
parking lot, a car accident) – incidences that stand in contrast to
known historical causes of MTBE contamination (e.g. point source
discharges from leaking underground storage tanks.)

The physical and chemical properties of MTBE (and thus its
mobility and persistence in the environment) differ markedly from
other components of gasoline. These differences make MTBE
(and other ethers and heavy alcohols) more likely to get into
ground water and problematic to contain and clean up when
releases occur . . . .

Short of eliminating car accidents, stopping customer overfilling,
or other impractical approaches, changes in law or regulation can't
fully eliminate releases, nor change the physical and chemical
properties of MTBE and other oxygenates when they do get in the
environment.

    **v**    **Defendants' knowledge that no adequate toxicity studies had been
done prior to Defendants' decision to add MTBE to gasoline**

98.    Although this case does not involve class claims for personal injury, it is

important to note that Defendants added MTBE to gasoline even though no long-term cancer

studies had been undertaken. It is common knowledge within the scientific community, and

Defendants knew, that prior to the introduction of a widely used chemical like MTBE,

toxicological tests must first be performed. However, Defendants did not perform the standard

toxicological procedures to test the effects of MTBE prior to placing it into the stream of

commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was

not needed. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential

harm without warning of the potential health risks associated with MTBE.

**VI**    <u>**Despite knowing that adding MTBE to gasoline inevitably results in
widespread MTBE groundwater contamination, Defendants conspired to**</u>

22

**mislead the EPA and the public about the hazards of adding MTBE to gasoline.**

99.     Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiffs and the Class members, and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations such as the API and the Oxygenated Fuels Association (OFA). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiffs and the Class.

**A     Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980's.**

100.     In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.[7] The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also

---

[7]     Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

recommended additional medical testing of MTBE and invited written comments. The 1986

Notice credited the Dynamac Corporation for supplying the government with MTBE

information.

101.   The oil industry, including Defendants, mobilized to convince the EPA that

additional testing of MTBE was not needed.

102.   On or about December 12, 1986, Defendant Arco, speaking on behalf of and/or

with the approval of the other Defendants, responded to the 1986 Notice in an effort to derail

further testing of MTBE. ARCO's comments included a critique of the Dynamac Corporation's

information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the

CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the

hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated

the following:

> Characteristics – Moderate water solubility is reported. However, an ARCO
> Technical Bulletin states that 'MTBE is only slightly soluble in water...'
>
> * * *
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.'
> This conclusion is not supported by the available information.
>
> * * *
>
> Exposure from accidental spills of MTBE could occur, but should be regarded as
> a minimal possibility. The closed nature of the manufacturing and transportation
> process reduces worker exposure and product loss. Training and safety programs
> also lower the possibility of accidental spills. Many current programs at EPA and
> industry are underway to monitor and reduce the possibility of gasoline loss from
> leaking underground storage tanks. . . . MTBE losses would be extremely small
> from this source.
>
> * * *
>
> VI. Environmental Information

24

> As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain . . . . Environmental entry of MTBE from this source would be considerably less than the report indicates.

> MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading when made, improperly downplaying the risks of MTBE contamination of groundwater and omitting material facts known to Defendants at the time.

103.    On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The Minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The Minutes show that Defendant Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

104.    In or around early 1987, Defendants formed the " MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants Amoco, Arco, Chevron, Citgo, Exxon, Shell, Sunoco, Texaco and Conoco.

105.    The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE  . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of

25

MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . .

, [and] make available to interested parties and the general public technical and scientific

information relating to the use of MTBE in fuels."

106.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the

MTBE Committee, had its first meeting.   The meeting minutes, circulated February 2, 1987,

indicate:

> [T]he plan of attack on the combined response to the EPA on the
> ITC report is as follows:  Since each producer must respond to the
> EPA before February 12 on the 8A and 8D [sic] questions and
> many will respond individually to production and economic
> questions which were also sought by EPA, a letter will be sent by
> George Dominguez requesting that information requested by the
> EPA be sent to the MTBE Committee before February 9.  A form
> will be included in George's letter . . . the Technical Committee
> will then meet on February 19 to combine the three reports from
> the working groups and draft a response to the EPA which will
> then be passed on to the Steering Committee for their approval on
> February 20. . . The combined response to the EPA will be
> submitted by February 27, to be followed shortly thereafter by a
> formal visit to EPA.  Dominguez will meet with EPA and notify
> them that the MTBE Committee has been formed and will be
> submitting its overview."

107.    Although Defendants were keenly aware that the EPA was interested in obtaining

more information about MTBE in groundwater, Defendants were not forthcoming in their

responses to the EPA.  On February 12, 1987, Arco Chemical, a division of Arco, responded to

the EPA's request for information about "data gaps" concerning MTBE's environmental and

health effects in a letter stating:

> Item D requests more information on the presence and persistence
> of MTBE in groundwater.  We are not aware of any incidents
> where MTBE contaminated groundwater at manufacturing

> facilities. Where gasoline containing MTBE is stored at refineries,
> terminals, or service stations, there is little information on MTBE
> in groundwater. We feel there are no unique handling problems
> when gasoline containing MTBE is compared to hydrocarbon-only
> gasoline.

108.    At the same time that Arco Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, Arco Chemical admitted to other Defendants that it

"had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat

of groundwater contamination."

109.    On or around February 27, 1987, the MTBE Committee submitted written

comments drafted to convince the EPA not to require additional health and environmental testing

of MTBE. The information provided by Defendants was misleading and false. For example, the

Defendants provided information to the EPA representing that MTBE is only slightly soluble in

water, that potential environmental exposure is not high, and that MTBE has excellent

biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm
> to health or the environment, that human exposure to MTBE and
> release of MTBE to the environment is negligible, that sufficient
> data exists to reasonably determine or predict that manufacture,
> processing, distribution, use and disposal of MTBE will not have
> an adverse effect on health or the environment, and that testing is
> therefore not needed to develop such data. Furthermore, issuance
> of a test rule requiring long term chronic testing will have a
> significant adverse environmental impact.

110.    The agenda of the MTBE Committee is reflected in the following excerpt from

those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4
> years to complete, great uncertainty will be created as to whether

27

> MTBE is a safe fuel additive. As a result, demand for MTBE and
> expansion of productive capacity is not likely to grow
> significantly. Refiners will be likely to commit capital to more
> costly alternative methods of octane enhancement such as
> isomerization and reformate plants that do not have the
> environmental benefits of MTBE. Thus, requiring long term
> testing of MTBE will have a significant adverse environmental and
> economic impact.

111.    The MTBE Committee acknowledged in its February 27, 1987, comments that

MTBE had not been the subject of long term chronic health testing, but claimed that such testing

was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect
> studies are presented in the Health Effects Summary of this report.
> These data suggest that the odor detection level of 700 ppb
> (approximately 0.7 mg/l) is such that the organoleptic properties of
> MTBE are sufficient to protect against human ingestion of toxic
> quantities of MTBE.

It is clear that the purveyors of MTBE, including Defendants, wanted to be free to represent that

MTBE has been shown not to be a health risk without conducting the research needed to reach

such a conclusion.

112.    On the issue of the persistence of MTBE, the MTBE Committee stated that "a

Japanese study . . . reports that MTBE in the presence of gasoline has excellent biodegradation

characteristics." This misrepresentation concerning the biodegradability of MTBE, which

omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from

government regulators and the public the actual risk that MTBE poses to groundwater.

113.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and

28

distributors, including Defendants Amoco, Exxon, Sunoco and Texaco signed a Testing Consent

Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil

industry, including Defendants, convinced EPA that additional chemical fate testing was not

necessary to determine the environmental risk posed by MTBE.[8] The oil industry, including

Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently

understood to ensure that MTBE posed no undue risks to the environment and therefore that

further testing was unnecessary. Defendants knew or should have known at the time that this

representation was false and misleading.

114.    The foregoing representations by the MTBE Committee are evidence of

Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or

concealing the real environmental hazards, all of which Defendants knew or should have known

at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their

decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health

and environmental safety research that would have corroborated Defendants' knowledge of

MTBE's disastrous effect upon groundwater. In making and supporting such representations, the

Defendants demonstrated their willingness to use any means to place their economic interest

above the health, property and well-being of Plaintiffs particularly and the America public

generally, and clearly intended to (a) continue to use MTBE without regard to its impact on

Plaintiffs and one environment, and (b) prevent Plaintiffs and the class from becoming aware of

---

[8]    Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53
        Fed. Reg. 62 (1988).

the contamination and/or impact of contamination from MTBE.

115.    Although the MTBE Committee represented to the EPA that the Committee was

going to "address environmental issues related to MTBE by a) collecting data from member

companies and other sources, and b) sponsoring programs to develop data unavailable from other

sources," the MTBE Committee did no such thing.  The MTBE Committee's Charter statement

was intended to mislead the government and the public, including the Class members.  The

MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

> **B       Defendants misled Congress into effectively broadening the market
> for MTBE by including oxygenate requirements in the Reformulated
> Gasoline ("RFG") Program adopted in the 1990 amendments to the
> Clean Air Act.**

116.    Prior to 1990, Congress was preparing to take action to address the Nation's smog

problem.

117.    During this time frame, the oil industry, including Defendants, became concerned

that Congress might consider requiring alternative non-petroleum based fuels.

118.    As a result of tremendous lobbying efforts by the industry, including Defendants,

Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to

the Clean Air Act.  According to the EPA, "The concept of reformulated gasoline (RFG) was

originally generated, developed and promoted by industry, not the Environmental Protection

Agency (EPA) or other parts of the federal government."

119.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of

RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone

or smog problems.  The 1990 Amendments authorized the EPA to mandate that certain areas of

30

the country designated as non-attainment for carbon monoxide (CO) participate in RFG

programs.[9]  The following states are among those participating in the oxygenated fuel program:

New York, California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland,

Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas,

Wisconsin, and Virginia.

120.   In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated

Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline

in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter

months.

121.   The Clean Air Act requires the use of some oxygenate, but it does not require that

oxygenate to be MTBE.  MTBE became Defendants' "oxygenate of choice" because it was the

most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all

the oxygenates available.  Defendants could manufacture MTBE from their already available

refinery by-products and were therefore not forced to purchase a different oxygenate, such as

ethanol,  from a third-party.

122.   Safer, more environmentally sound alternatives were available.

**C**    **Defendants misled the Plaintiffs and public, including all downstream
gasoline handlers, about the hazards of gasoline with MTBE.**

123.   Defendants misrepresented the properties of MTBE and withheld information

even as they were insisting that no such information existed. Only more recently, through the

---

9   Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an
oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

31

escalating and tragic contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

124.    On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a 1987 Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

125.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented to Plaintiffs and Class Members that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

126.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the

32

Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks."  OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

127.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service.  According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

128.    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or even the only, contaminant found in groundwater.  Moreover, MTBE contamination is most often judged to be too costly to clean up.

129.    Even at this late date, Defendants continue to foster a grave threat to Plaintiffs' and Class members' groundwater in the Affected States with no new safeguards and entirely insufficient warnings, if any.

33

**VII    Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.**

130.    National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice:   MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

131.    Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

132.    Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in Affected States in 1992 as part of the Oxyfuel Program.

133.    Defendants then made MTBE the additive of choice throughout the Affected States when the public and government agencies sought year-round reductions in air pollution caused by cars.

134.    In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout the Affected States when moved by market factors and financial considerations to do so.  Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

135.    Today most if not all gasoline pumped in the RFG areas of the Affected States is laced with high concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated concentrations of MTBE is often sold at other locations at the discretion of the oil industry, including Defendants.

34

136.    According to the OFA, MTBE accounts for nearly 95 percent of the oxygenates used in New York and MTBE consumption statewide is approximately 17,500 to 21,500 barrels per day. OFA has filed a lawsuit on behalf of MTBE manufacturers to prevent a New York state law from going into effect that would ban MTBE in the year 2004.

137.    In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. Recently some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

**VIII    MTBE has had a predictably catastrophic effect upon groundwater and private wells.**

138.    One can reach and affect the largest number of Americans by adding something to gasoline. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996 MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

139.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

140.   For example, large MTBE leaks or spills have occurred in every county in New York. As a result, MTBE has been found in drinking water at levels near or above the state's drinking water standard in communities all over the state including, but are not limited to, the towns of Bedford, Cairo, Churubosco, East Patchogue, Elmont, Glen Park, Greenburgh, Hudson Falls, Hyde Park, Laurel, Liberty, Madrid, Mayfield, Middle Island, Mahopac, New Windsor, Norfolk, Orient, Phelps, Pound Ridge, Schodack, Smithtown, West Harrison and West Kill.

141.   In 1997, the USGS found MTBE in 125 of the 1,100 private water wells tested in New York, three of which had concentrations in excess of the state's drinking water standard. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places, like New York, where high MTBE-content gasoline is used.[10]

142.   In July 1999 the New York State Department of Health ("NY DOH") reported the results of an investigation it conducted in 1997 of well water in 10 New York counties. As part of the research, NY DOH sampled and analyzed water from 111 private wells, many, but not all, located within a half mile of a gasoline filling station. The laboratory results showed that 30 of the 111 wells were contaminated with detectable levels of MTBE, 11 of these had contamination above 20 ppb, the level for U.S. EPA's drinking water advisory, and three wells were contaminated above New York's safe drinking water standard of 50 ppb. Only one of the 30 contaminated wells also tested positive for BTEX compounds.

---

[10]   Moran, Zogorski & Squillace, "MTBE in Ground Water in the United States – Occurrence, Potential Sources, and Long Range Transport" (1999).

143.    In or around November 1999, Governor George Pataki directed New York's Department of Environmental Conservation to lower the state's guidelines for remediation of groundwater containing MTBE from 50 ppb to 10 ppb. This announcement is part of a trend among governments to take belated action to counter the problem of MTBE contamination of water supplies and the resulting public health threat.

144.    On October 13, 1998, the State of Maine issued a report presenting findings from the analysis of water samples collected from 951 randomly selected household wells. MTBE was detected in 150 wells, or 15.8% of the sampled private wells. Ten wells, or 1.1% of those sampled, had MTBE levels exceeding the state's drinking water standard of 35 parts per billion. Based on these results, the state estimated that some 1400 to 5200 private wells in the state fail Maine's standard for potable water due to the presence of MTBE. The study also noted that other gasoline compounds were infrequently detected compared to MTBE and where detected were in all cases well below the drinking water standards.[11]

145.    A September 15, 1999, report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

---

[11]    Maine Report, *supra* note 3.

37

146.    In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely.  The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act.  The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[12]  No actual plans or source of funds for such testing exist in any state, including the states where Plaintiffs' and Class members' privately owned wells are located.

147.    Based upon the recommendations of the Blue Ribbon Panel, the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

**IX      It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular well.**

148.    Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

149.    The process of manufacturing and distribution of petroleum products, including

---

[12]   "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

38

gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the Affected States.

150.    A subsurface plume, even if it comes from a single tank or vessel, frequently originates from mixed batches of gasoline coming from different refiners.

151.    The East Patchogue case is typical: even though a source of the MTBE plume (an abandoned service station) was identified, State researchers could not determine the identity or even number of manufacturers whose gasoline containing the MTBE, contributed to the resulting MTBE contamination of well water.

152.    Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiffs and members of the Class(es) Plaintiffs seek to represent.

153.    Defendants are also jointly and severally liable because they conspired to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs' and the Class members' expense, to contaminate Plaintiffs' and the Class members' wells, and to avoid liability for such contamination.

## X    Defendants' Substantial Share of the Market for Gasoline Containing MTBE.

154.    Defendants in this action are manufacturers that together control a very substantial share of the market for gasoline containing MTBE in the Affected States and are jointly responsible for the enhanced threat to groundwater and for causing the injuries complained of in

39

this Complaint.

**XI   Additional Facts Relating to Injunctive Relief.**

155.   Plaintiffs and each of them have been injured by MTBE contamination of groundwater and/or the threat, anticipation and reasonable expectation or fear of such contamination amounting to present serious interference with their enjoyment of their land. Their injuries include (a) the necessity of periodic testing of water to assure safety; (b) diminished use and enjoyment of their water and property; (c) the ever increasing loss of confidence that private well water is safe for "domestic" purposes; (d) the need for well water clean-up or, where impracticable, replacement water.

156.   Plaintiffs face additional and imminent irreparable harm as MTBE already released and/or that will be released into the environment contaminates more wells, which once contaminated cannot be restored to pre-contamination purity.

157.   Plaintiffs and class members find themselves in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which they did not even know existed. While Defendants have failed to warn government regulators, Downstream Handlers or the general public as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

158.   Clean groundwater is an essential and precious resource of incalculable value. Water serves direct human needs and also supports wildlife and natural resources that contribute

to the health, economy and general well-being of the residents of all Affected States.

159.    In New York alone, approximately six million residents rely on water from underground sources for drinking, bathing and other household uses. Of those, some one million New Yorkers draw their water from private wells.

160.    Money paid to individual Plaintiffs and Class members cannot provide the relief needed and sought. Rather, only class-wide injunctive relief, including both a program of comprehensive and periodic testing and a second program to provide to each contaminated class member a source of water free of MTBE contamination, are essential.

161.    Plaintiffs seek mandatory injunctive relief under all causes of action on behalf of all classes in the form of a court-supervised well testing and monitoring program to remediate MTBE groundwater contamination or where remediation is impracticable, to provide information to Plaintiffs and the Plaintiff class on the extent and location of groundwater contamination.

162.    Plaintiffs also seek a court-supervised program of notice to protect the class.

163.    Plaintiffs also seek a court-supervised program to provide class members whose wells test positive for the presence of MTBE with a source of water free of MTBE contamination.

164.    Data obtained from well testing and monitoring should be collected and recorded in a computerized database at a central repository and information exchange center and maintained as a "registry" to be used for mapping of MTBE plumes in groundwater, administering further relief and for education and research.

165.    A court-supervised testing and monitoring program will provide relief to Plaintiffs

41

and contribute to the protection of groundwater resources and advancement of water quality awareness. First, test data will give notice and warning to well owners in the Affected States whose wells, unbeknownst to them, are currently contaminated, and enable provision of further relief. Second, the availability of data on the whereabouts of MTBE plumes data will also alert other well owners of groundwater hazards in proximity to their wells and assist them in making informed choices about water sources and will protection. Third, the database developed through the program will provide researchers with information concerning the current status and vulnerability of groundwater resources to what has become one of the most, if not the most, pervasive manmade contaminants. Fourth, the program will also provide important education regarding the need for greater care, vigilance and effective spill response.

166.    The court-supervised program will provide clean water to owners of contaminated wells either by remediation of contaminated groundwater or, where remediation is impracticable, by tie-in to a monitored public drinking water source, or provision of a properly installed, monitored and maintained point-of-entry water treatment system. Where remediation is impracticable, class-wide injunctive relief under a court-supervised program will enable relief to be afforded in the most efficient manner, for example, in the case of clusters of contaminated properties, selecting between connection to a public water supply or filtration.

## MARKET SHARE, CONCERTED ACTION, ENTERPRISE and ALTERNATIVE LIABILITY

167.    Defendants control a substantial share of the market for gasoline containing MTBE in the Affected States and are therefore responsible for the increased threat to groundwater in the Affected States. Market share liability attaches to all Defendants and that

42

liability of each shall be assigned according to its percentage of the market for gasoline containing MTBE in each Affected State at issue in this Complaint. MTBE is fungible, it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment, and each of these Defendants participated in a state-wide and national market for gasoline with MTBE during the relevant time.

168.   Concerted action liability attaches to all Defendants each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

169.   Enterprise liability attaches to all of the named Defendants.

170.   Alternative liability attaches to all of the named Defendants.

171.   There are no limitations on liability as set forth in CPLR § 1601 applicable to this action in that one or more of the exceptions set forth in CPLR § 1602 apply, including subsections (5) and/or (11).

## CLASS ALLEGATIONS

172.   Some of the Plaintiffs in this coordinated proceeding are seeking to be appointed as representatives of classes and/or subclasses that differ based on geographic scope, the types of relief sought, and the claims with respect to which certification is sought.

173.   Certification of plaintiff classes is sought pursuant to Fed. R. Civ. P. 23, on behalf of:

> (a)   all similarly situated persons;
>
> (b)   who own or have an interest in real property with one or more

43

water wells;

(c)    where such wells do or may provide a source of water for drinking,

bathing, or general "domestic" purposes;

(d)    and where such property is located in:

    i.    New York

    ii.    Florida

    iii.    Illinois

    iv.    Pennsylvania

    v.    Virginia

    vi.    California

    vii.    Connecticut

    viii.    Delaware

    ix.    Indiana

    x.    Kentucky

    xi.    Maryland

    xii.    Massachusetts

    xiii.    Missouri

    xiv.    New Hampshire

    xv.    New Jersey

    xvi.    Rhode Island

    xvii.    Texas

44

xviii.   Wisconsin

174.   Certain Plaintiffs will propose subclasses, consisting of:

    (a)   a subclass for owners of property which has not yet tested positive for the presence of MTBE, including owners of property which has not yet been tested for the presence of MTBE, for injunctive relief, such as:

        i   a Court-supervised testing program,

        ii   a Court-supervised monitoring program,

        iii   a Court-supervised data-collection mapping program;

        iv   a Court-supervised notice to contaminated owners; and

        v   a Court-supervised education program.

    (b)   a subclass for owners of property which has been found to be contaminated with MTBE for injunctive relief, such as:

        i   monitoring,

        ii   or provision of clean water;

        iii   or remediation.

175.   Specifically excluded from the proposed class and subclasses are:

    (a)   Commercial entities;

    (b)   Government entities;

    (c)   Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal

45

representatives, heirs, successors, or assignees of Defendants;

(d)    All public and private entities which sell or otherwise provide water to consumers;

(e)    Counsel for Defendants and all firm members, associates, employees and their immediate families;

(f)    Any wholesalers, retailers or resellers of MTBE and/or gasoline containing MTBE;

(g)    Counsel for Plaintiffs and the Plaintiff class and all firm members, associates, employees and their immediate families; and

(h)    Any presiding Judge and members of their immediate families.

176.    Specifically excluded from the relief sought by the class and subclasses are all claims for personal injury by Plaintiffs and the Plaintiff Class.

177.    This action may properly be maintained as a class action and satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23(a).

178.    The Plaintiff class is so numerous that the individual joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23(a)(1).  While the exact number of class members is unknown to Plaintiffs at this time, it is estimated that there are thousands of class members.  Class membership is objectively ascertainable by existing records and appropriate discovery.

179.    Common questions of law and/or fact arising from Defendants' illegal conduct exist as to all members of the class, as required by Fed. R. Civ. P. 23(a)(2).  These common

46

questions predominate over any questions which affect individual members of the class. These common questions include, without limitation:

(a)    what are the properties of MTBE, including its water solubility, mobility, and resistance to biodegradation;

(b)    whether MTBE, if released into groundwater supplies, adversely impacts the groundwater;

(c)    what concentrations of MTBE in groundwater render the water unfit for consumption, bathing, showering, cleaning dishes, and utensils and other household uses;

(d)    what are the fate and effects of MTBE when released into the environment near groundwater sources;

(e)    whether gasoline containing MTBE is a defective product;

(f)    whether the private water supplies of Plaintiffs and the Plaintiff class have been contaminated or are threatened by MTBE;

(g)    what Defendants knew about the problem of MTBE contamination of groundwater and when they knew it;

(h)    whether Defendants knew, or should have known, the extent to which gasoline with MTBE is a greater threat to groundwater than is gasoline without MTBE;

(i)    whether Defendants failed to adequately test MTBE and gasoline containing MTBE, prior to its manufacture, distribution and/or sale, for

47

risks to groundwater;

(j)     what, if anything, Defendants told the public about the properties of

        MTBE and the increased threat to groundwater and when during the

        course of MTBE's rapid increase in production and sales any such

        disclosure was made;

(k)     whether Defendants intentionally marketed gasoline with MTBE to the

        general public in an effort to make it the industry standard and protect

        their market share and profits;

(l)     whether Defendants owed a duty to Plaintiffs, the Plaintiff class, public

        officials, Downstream Handlers and the public generally to warn them of

        the changed properties of gasoline after the introduction of high levels of

        MTBE;

(m)     whether Defendants committed a breach of duties of care owed to

        Plaintiffs and members of the Plaintiff class;

(n)     whether Defendants failed to provide adequate warning to people in the

        business of operating gasoline stations and storage tanks containing

        MTBE regarding MTBE's properties and characteristics, including but not

        limited to, its high solubility and its potential adverse impact on

        groundwater if released into the environment;

(o)     whether Defendants failed to adequately warn Plaintiffs, government

        agencies and/or regulators, and/or the public regarding MTBE's properties

48

and characteristics, including but not limited to, its high solubility and its

potential adverse impact on groundwater if released into the environment;

(p)    whether Defendants' conduct constituted reckless disregard for the safety

of private water supplies and the rights of Plaintiffs and the Plaintiff class;

(q)    whether Defendants conspired to conceal and/or misrepresent the

characteristics of MTBE and the risks of MTBE use to public and private

water supplies to Plaintiffs, government agencies and/or regulators and the

public at large;

(r)    whether Defendant formed joint committees and/or task forces or other

organizations which generated misrepresentations or omissions regarding

MTBE and its properties and/or characteristics;

(s)    whether Defendants' conduct amounted to outrageousness, recklessness or

wanton negligence;

(t)    whether Defendants fraudulently misrepresented the properties and

environmental characteristics of MTBE and gasoline containing MTBE

and/or concealed or failed to disclose material adverse facts concerning the

product's safety as alleged;

(u)    whether Defendants failed in any duty to remediate sites promptly where

they knew there was MTBE contaminated groundwater;

(v)    whether Plaintiffs and members of the Plaintiff class are entitled to

equitable relief as a result of Defendants' wrongdoing and, if so, what is

49

the proper measure and appropriate formula to be applied in determining just and proper relief; and

(w)   the appropriate nature of classwide, equitable and other non-monetary relief;

(x)   whether Defendants are liable under market share, concerted action, enterprise, alternative and/or joint and several conspiracy liability theories.

180.   Plaintiffs' claims are typical of the claims of the members of the class under Fed. R. Civ. P. 23(a)(3), since each plaintiff owns or has an interest in real property with one or more private water wells which do or may provide a source of water for drinking, bathing, general "domestic", or other purposes; each such well is either contaminated by MTBE or is threatened by such contamination, and each Plaintiff was without knowledge of the true facts alleged herein and has suffered injuries. Plaintiffs and all members of the Plaintiff class have sustained injuries arising out of well and/or groundwater contamination or the treatment of such contamination caused by Defendants' common course of conduct in violation of law as complained of herein.

181.   The injuries of Plaintiffs and each member of the class were caused directly by Defendants' wrongful conduct in violation of statutory and common law as alleged herein.

182.   Plaintiffs will fairly and adequately represent the interests of the members of the class as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' claims are typical of claims of the Plaintiff class and they have no interests that are adverse to the interests of the class members. Plaintiffs have retained competent legal counsel experienced in litigation of class action,

consumer and environmental tort litigation.

183.   This action can be certified with respect to the claims for injunctive relief sought:

    1.    under Fed. R. Civ.·P. 23(b)(1)(A), because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for the Defendants;

    2.    under Fed. R. Civ. P. 23(b)(1)(B), because the ability of class members to protect their interests would be substantially impaired or impeded if adjudications proceeded individually; and

    3.    under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the class, making injunctive relief with respect to the entire class appropriate.

## CAUSES OF ACTION

## COUNT I

## Strict Liability for Design Defect

184.   Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

185.   Defendants during the relevant time period were designers, manufacturers, refiners, formulators and suppliers of petroleum products including gasoline with MTBE.

186.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline mixed with MTBE, Defendants owed to all persons whom Defendants' petroleum products might foreseeably harm, including

Plaintiffs and the classes which Plaintiffs seek to represent, the duty not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

187.    When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable transportation, storage, handling, and uses for the following reasons:

        a.    Unintended discharges of gasoline are commonplace throughout the Affected States;

        b.    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

        c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

        d.    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

        e.    Very low concentrations of MTBE will ruin the taste and smell of water; and

        f.    MTBE is a known animal carcinogen and a possible human carcinogen.

188.    Defendants failed to use reasonable care in the design of gasoline containing MTBE.

189.    Gasoline containing MTBE poses greater dangers to groundwater than ordinary persons such as Plaintiffs and  Downstream Handlers and the general public would generally expect in the exercise of reasonable care.

190.    The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution

by increasing the oxygen content of gasoline.

191.   Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline.  Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

192.   The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm caused by gasoline with MTBE.

193.   Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

MBTE reached the Plaintiffs' water wells in a substantially unchanged condition from that in which it was sold.

194.   As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

a.   posed and continues to pose a threat to private wells owned by Plaintiffs;

b.   required and/or will require testing and monitoring of private wells for MTBE contamination;

c.   contaminated and/or will contaminate private wells owned by Plaintiffs or groundwater in the vicinity of Plaintiffs' properties;

d.   required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with

contaminated wells, either installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

e.     diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

f.     diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT II

### Failure to Warn

195.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

196.    As manufacturers, designers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty not to put on the market a product that poses a serious danger to groundwater that is the source for Plaintiffs' private wells without issuing warnings of the risk posed by the product to Plaintiffs, the public, public officials and Downstream Handlers.

197.    Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without inspection for defects related to the hazards which MTBE poses to groundwater and private wells.

198.    At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater

54

and private wells throughout the Affected States:

a.  Unintended discharges of gasoline are commonplace throughout the Affected States;

b.  When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

c   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.  When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.  Very low concentrations of MTBE can ruin the taste and smell of water;

f.  MTBE is a known animal carcinogen and a possible human carcinogen;

g.  MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.  MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.  MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.  MTBE creates the need for regular testing and monitoring of private wells for early detection of MTBE; and

k.  The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

199.  Defendants breached their duty to warn by unreasonably failing to provide

warnings concerning any of the facts alleged herein to Plaintiffs, public officials, Downstream

Handlers, and/or the general public.

200.    Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiffs.  Had Defendants provided sufficient warnings, MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up.  Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

201.    As a direct and proximate result Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

　　　a.　　posed and continues to pose a threat to private wells owned by Plaintiffs;

　　　b.　　required and/or will require testing and monitoring of private for MTBE contamination;

　　　c.　　contaminated private wells owned by Plaintiffs;

　　　d.　　required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

　　　e.　　diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

　　　f.　　diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT III

### Deceptive Business Acts and Practices in Violation of GBL § 349

56

202.   Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

203.   Defendants are engaged in the business of providing gasoline containing MTBE to consumers, including Plaintiffs, in the State of New York.

204.   Defendants engaged in materially deceptive and misleading acts and practices in the distribution, marketing and selling of gasoline containing MTBE, including but not limited to:

a.   overstating any environmental benefits of gasoline containing MTBE while neglecting to mention or understating its actual environmental costs;

b.   marketing gasoline containing MTBE as a "clean" and environmentally beneficial fuel;

c.   misrepresenting the properties of MTBE, including by stating the it is only slightly soluble in water;

d.   representing that the product does not pose an unusual threat of groundwater contamination as compared to conventional gasoline;

e.   failing to disclose that when gasoline containing MTBE it spilled, the MTBE was far more likely than other gasoline components to get into well water;

f.   leading the public to believe that gasoline containing MTBE was safely contained during transport, storage and use;

g.   stating that MTBE and gasoline containing MTBE were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

h.   concealing the necessity for wells, particularly those located near sites where gasoline containing MTBE is stored, to be tested regularly for early detection of the presence of MTBE.

205.   Defendants' materially deceptive and misleading practices proximately caused

injury to Plaintiffs, including loss of use and enjoyment of their wells and property, the need for periodic well water testing and monitoring, and the need to obtain a source of uncontaminated water.

## COUNT IV

### Public Nuisance

206.   Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

207.   Defendants have manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of Plaintiffs and the Plaintiff class, causing inconvenience and annoyance.

208.   Defendants, by their negligent, reckless and willful acts and omissions as set forth above, have caused and permitted MTBE to contaminate a growing number of properties throughout the Affected States.  This contamination has migrated, or threatens to migrate, nearby to and/or onto Plaintiffs' properties, thereby contaminating the groundwater thereunder.

209.   Actual and threatened MTBE contamination caused by Defendants' conduct has caused injury to Plaintiffs in the form of present serious interference with the use, benefit and/or enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial inconvenience, annoyance and injury.

210.   Plaintiffs, who are all well owners, suffer injuries different in kind from the community at large in that they rely on their own wells for their drinking and household water.  Much of the population in the Affected States is served from surface water that is not susceptible

58

to the problems caused by MTBE to groundwater. Additionally, public water supplies that rely on groundwater, unlike Plaintiff's private wells, are regularly monitored by a water district or agency that is able to guarantee clean water. 211.    Plaintiffs' special injuries include loss of property value arising from the increasingly widespread public perception based on actual fact that well water has been rendered less certain, safe and reliable relative to owners of residential properties served by public water supplies.

212.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of Plaintiffs' properties.

213.    In the alternative, Defendants have violated and/or threaten to violate a public right to pure water.

214.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs, who constitute a considerable number of people, have suffered special injuries to their properties, the threat of contamination and reduction of their property values and endangerment of their health and safety.

## COUNT V

### Negligence

215.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

216.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers

and marketers of petroleum products, including gasoline mixed with MTBE, Defendants owed

to all persons whom Defendants' petroleum products might foreseeably harm, including

Plaintiffs, Downstream Handlers, and the general public a duty to exercise due care not to market

any product which is unreasonably dangerous for its intended and foreseeable uses.

217.    At all times relevant to this litigation, Defendants knew or should have known

that:

a.    Unintended discharges of gasoline are commonplace throughout the
Affected States;

b.    When gasoline containing MTBE is released into the environment, MTBE
has a tendency to mix with groundwater and migrate great distances;

c.    MTBE is highly soluble in water and many times more soluble in water
than the other [BTEX] components of gasoline;

d.    When gasoline containing MTBE is released into the environment, MTBE
persists much longer than the other [BTEX] components of gasoline,
because MTBE is recalcitrant to biodegradation and bioremediation;

e.    Very low concentrations of MTBE can ruin the taste and smell of water;

f.    MTBE is a known animal carcinogen and a possible human carcinogen;

g.    MTBE greatly increases the importance of preventing leaks of gasoline,
and for the first time makes it necessary to prevent very small quantities of
gasoline from escaping containment to avoid groundwater contamination;

h.    MTBE increases the need to maintain underground storage tanks, prevent
overfills, and respond immediately to the loss of any gasoline containing
MTBE;

i.    MTBE creates the need to issue warnings to all groundwater users in the
area of any spill of gasoline containing MTBE;

j.    MTBE creates a need for regular testing and monitoring of private wells
for early detection of MTBE; and

60

k.     The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

218.    Defendants have negligently breached their duty of due care to Plaintiffs, Downstream Handlers, and the general public by:

a.     using MTBE as an octane-booster and oxygenate;

b.     failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.     failing to adequately test, identify and remediate wells that are contaminated with MTBE;

d.     forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

e.     voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

f.     failing to design gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiffs and other private well owners;

g.     marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

h.     failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE,

i.     failing to curtail or reduce MTBE's manufacture and distribution;

j.     failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE; and

k.     failing to inspect, test and take the necessary steps to prevent the gasoline

distribution and storage system from releasing MTBE in the general public's water or threatening such release.

l.    failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and use and to remediate such spills and leaks promptly.

219.    As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.    posed and continues to pose a threat to private wells owned by Plaintiffs;

b.    required and/or will require testing and monitoring of private wells for MTBE contamination;

c.    contaminated private wells owned by Plaintiffs;

d.    required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable, Plaintiffs with contaminated wells either to install a system to filter out MTBE or to obtain water from alternative sources, such as bottled water or connection to a local municipal or private water system;

e.    diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property; and

f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## COUNT VI

### Civil Action to Compel Defendants to Comply with the Reporting Requirements of the Toxic Substances Control Act (TSCA)

220.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1 through 183 as if fully restated herein.

221.    TSCA permits a civil action to be brought against any person who is alleged to be

in violation of any provision of TSCA. 15 U.S.C. § 2619(a)(1).

222.    Plaintiffs in the *England* case have complied with TSCA's requirement that the complaining party give 60 days advance notice to both the EPA Administrator and the alleged TSCA violators prior to filing a civil action under TSCA. 15 U.S.C. § 2619(b)(1)(A). The *England* Plaintiffs sent this notice on September 5, 2000.

223.    TSCA imposes a reporting requirement which provides as follows:

> Any person who manufacturers, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information

15 U.S.C. § 2607(e).

224.    As stated in their Notice to the EPA Administrator and the *England* Defendants, the *England* Plaintiffs believe that Defendants have violated their reporting duty under TSCA by failing to disclose to and continuing to withhold from the EPA the following information:

        a.    Gasoline leak sites which have been remediated by methods not specifically designed to remediate MTBE contamination of groundwater continue to pose a threat of groundwater contamination; and

        b.    MTBE released into groundwater may contain and/or biodegrade into TBA (tertiary butyl alcohol) and formaldehyde, chemicals which are known to pose a threat to human health.

225.    This Court should accordingly order Defendants to disclose the information

63

described in the preceding paragraph to the EPA.

**COUNT VII**

**<u>Conspiracy to Market a Product Known to be Unsafe</u>**

226.    Plaintiffs reallege and reaffirm each and every allegation set forth in paragraphs 1

through 183 as if fully restated herein.

227.    Defendants actually knew of the hazards which MTBE posed to groundwater

throughout the Affected States.

228.    Beginning in the early 1980s and continuing through the date of the filing of this

Master Complaint, Defendants formed joint task-forces and committees and otherwise colluded

for the avowed purpose of providing information about MTBE to the public and to government

agencies, but

with the true, unlawful purpose of :

        a.     creating a market for MTBE with full knowledge of the hazards which
               MTBE poses to groundwater throughout the Affected States;

        b.     concealing the nature of MTBE, and its impact on Plaintiffs and the
               environment;

        c.     maximizing profits in a way Defendants knew would require them to
               contaminate Plaintiffs' and Class members' wells.

229.    Defendants carried out their conspiracy by one or more of the following overt acts

or omissions:

        a.     intentionally misrepresenting to the EPA and the public that MTBE was
               safe and did not pose a risk to groundwater;

        b.     concealing the dangers of MTBE (including MTBE's adverse fate and
               transport characteristics and the propensity of MTBE to contaminate

64

groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c.  using their considerable resources to fight UST legislation; and

d.  collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program because MTBE was the most profitable oxygenate for Defendants to use.

230.  Each defendant knew that the activities of these task-forces and committees, and of the other Defendants, constituted a breach of duty owed to the Plaintiffs; each defendant gave substantial assistance and encouragement to the others in such activities; and each defendant's own conduct constituted a breach of duty owed to the Plaintiffs.

231.  Defendants ratified and adopted each of the foregoing overt acts and omissions in furtherance of their conspiracy.

232.  As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation has:

a.  posed and continues to pose a threat to private wells owned by Plaintiffs;

b.  required and/or will require testing and monitoring of private wells for MTBE contamination;

c.  contaminated private wells owned by Plaintiffs;

d.  required and will require remediation of MTBe groundwater contamination or, where remediation is impracticable for Plaintiffs with contaminated wells, either  installation of a system to filter out MTBE or procurement of water from alternative sources, such as bottled water or connection to a local municipal or private water system;

e.  diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiffs' water and property. that well water is now less

65

safe than water from other sources; and

f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination, which is an injury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for a judgment against these Defendants for:

a.    an order certifying the requested class(es), including any classes and sub-classes which this Court deems appropriate, pursuant to Fed. R. Civ. P. 23, and appointing the Representative Plaintiffs and their counsel to represent the Plaintiff class;

b.    injunctive and equitable relief, for the Plaintiffs and the Class, as the Court deems appropriate, including:

        i    a Court-supervised testing program

        ii    a Court-supervised monitoring program

        iii    a Court-supervised data collection program

        iv    a Court-supervised program of notice to affected well-owners

        v    a Court-supervised public education program, including warnings regarding the environmental impact and the need for care in handling of MTBE.

        vi    a Court-supervised program to provide class members with clean water, free of MTBE contamination;

        vii    a Court-supervised program to provide remediation of contaminated wells.

c.    compensatory damages for named Plaintiffs who demonstrate an

67

entitlement to such relief;

d.     attorneys' fees and the costs and disbursements of this lawsuit; and

e.     any other and further relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMANDED

233.   Individual Plaintiffs demand a trial by jury of all non-class claims asserted in this

Complaint.

Dated: New York, New York
       December 4, 2000

B

ALL-STATE® LEGAL  800-222-0510   E2931   RECYCLED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x

In Re:  Methyl Tertiary Butyl Ether          MDL 1358
("MTBE") Products Liability Litigation        Master File C.A. No. 1:00-1898(SAS)

---------------------------------------------x

This Document Relates to:

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

YOUNG, et al.,                      )    Case No. 8:00-CV-1912-T24C
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )    **PROPOSED AMENDED**
EXXONMOBIL OIL CORPORATION, et      )    **COMPLAINT**
al.,                                )
                                    )
            Defendants.             )
_____)

## NATURE OF THE CASE

Plaintiff adopts paragraphs 1-3 of the Master Complaint.

### Plaintiffs

4.1     Individual and Representative Plaintiff Rebecca Young is an adult citizen and is and at all times mentioned in the Complaint was a resident of Temple Terrace in Hillsborough County, Florida.  She has had an interest in property on which she resided.  Ms. Young relied on a well on such property as a source of water for drinking, bathing, and/or general domestic purposes.  Initial tests have indicated that her water well is contaminated.  She has been injured

by among other things the need for additional monitoring of her well, the loss of use and

enjoyment of the well and her property, including diminished value of the property, and the threat

of additional and continuing contamination of her well by MTBE, and by the Defendants'

conduct as described in this Complaint.

**Defendants**

Plaintiff adopts paragraphs 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 23, and 26 of

the Master Complaint.

## JURISDICTION

Plaintiff adopts paragraph 33 of the Master Complaint.

## VENUE

Plaintiff adopts paragraph 36 of the Master Complaint.

## SUBSTANTIVE ALLEGATIONS

I    **What MTBE is**

Plaintiff adopts paragraphs 37-40 of the Master Complaint.

II    **Why Defendants add MTBE to Gasoline**

Plaintiff adopts paragraphs 41-47 of the Master Complaint.

III    **Gasoline containing MTBE was widely contaminated and continues to pose an extreme threat to groundwater.**

Plaintiff adopts paragraphs 48-54 of the Master Complaint.

IV    **The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

Plaintiff adopts paragraphs 55-61 of the Master Complaint.

**V**    **Defendants have known all along that mixing MTBE with gasoline would result in massive groundwater contamination.**

    **A**    **Defendants' knowledge of the prevalence of unintended discharges of gasoline**

Plaintiff adopts paragraphs 62-65 of the Master Complaint.

    **B**    **Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline mixed with MTBE**

        **Defendants' constructive knowledge of MTBE's threat to groundwater**

Plaintiff adopts paragraphs 61-71 of the Master Complaint.

        **ii**    **Defendants' knowledge of specific instances of MTBE contamination of groundwater**

Plaintiff adopts paragraphs 72-81 of the Master Complaint.

        **iii**    **Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater**

Plaintiff adopts paragraphs 82-89 of the Master Complaint.

        **iv**    **Defendants' internal documents demonstrating their awareness of MTBE contamination of groundwater**

Plaintiff adopts paragraphs 90-97 of the Master Complaint.

        **v**    **Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline**

Plaintiff adopts paragraph 98 of the Master Complaint.

**VI**    **Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.**

Plaintiff adopts paragraph 99 of the Master Complaint.

074.mfb

A.     Defendants misled the EPA into not testing MTBE under the Toxic
       Substances Control Act (TSCA) in the late 1980s.

Plaintiff adopts paragraphs 100-115 of the Master Complaint.

B.     Defendants misled Congress into effectively broadening the market
       for MTBE by including oxygenate requirements in the Reformulated
       Gasoline ("RFG") Program adopted in the 1990 amendments to the
       Clean Air Act.

Plaintiff adopts paragraphs 116-122 of the Master Complaint.

C.     Defendants misled the Plaintiffs and public, including all downstream
       gasoline handlers, about the hazards of gasoline with MTBE.

Plaintiff adopts paragraphs 123-129 of the Master Complaint.

**Defendants dramatically increased their use of MTBE in gasoline after the
creation of the RFG program.**

Plaintiff adopts paragraphs 130-137 of the Master Complaint.

**MTBE has had a predictably catastrophic effect upon groundwater and
private wells.**

Plaintiff adopts paragraphs 138-147 of the Master Complaint.

IX     **It is impossible to identify which manufacturer's gasoline poses a threat of
       MTBE contamination or has already caused MTBE contamination of any
       particular well.**

Plaintiff adopts paragraphs 148-153 of the Master Complaint.

X      **Defendants' Substantial Share of the Market for Gasoline Containing
       MTBE.**

Plaintiff adopts paragraph 154 of the Master Complaint.

XI     **Additional Facts Relating to Injunctive Relief.**

Plaintiff adopts paragraphs 155-166 of the Master Complaint.

## MARKET SHARE, CONCERTED ACTION, ENTERPRISE and ALTERNATIVE LIABILITY

Plaintiff adopts paragraphs 167-171 of the Master Complaint.

## CLASS ALLEGATIONS

Plaintiff adopts paragraphs 172, 173(a)-(c), 173(d)(ii), 175, 177-183 of the Master Complaint.

## CAUSES OF ACTION

### COUNT I

### Strict Liability for Design Defect

Plaintiff adopts paragraphs 184-194 of the Master Complaint.

### COUNT II

### Failure to Warn

Plaintiff adopts paragraphs 195-201 of the Master Complaint.

### COUNT III

### Deceptive Business Acts and Practices in Violation of GBL §349

Not adopted.

### COUNT IV

### Public Nuisance

Plaintiff adopts paragraphs 206-214 of the Master Complaint.

### COUNT V

### Negligence

Plaintiff adopts paragraphs 215-219 of the Master Complaint.

## COUNT VI

### Civil Action to Compel Defendants to Comply with the Reporting Requirements of the Toxic Substances Control Act (TSCA)

Not adopted.

## COUNT VII

### Conspiracy to Market a Product Known to be Unsafe

Plaintiff adopts paragraphs 226-232 of the Master Complaint.

### PRAYER FOR RELIEF

Plaintiff adopts paragraphs a, b(i-v), (b)(vii), and (c)-(e) of the Master Complaint.

### JURY TRIAL DEMANDED

Individual Plaintiff adopts the Jury Trial Demand in the Master Complaint.

DATED: December 4, 2000                    Respectfully submitted,


By: _____
            Morris A. Ratner


[ADDITIONAL COUNSEL]

CORY, WATSON, CROWDER & DEGARIS          WHATLEY DRAKE
Tony Graffeo                            Joe R. Whatley, Jr.
2131 Magnolia Avenue                    Jack Drake
Birmingham, AL 35205                    505 North 20th Street
Telephone: (205) 328-2200               1100 Financial Center
                                        Birmingham, AL 35203
                                        Telephone: (205) 328-9576

CROWLEY & DOUGLAS
Timothy Crowley
1301 McKinney, Suite 3500
Houston, TX 77010
Telephone: (713) 651-1771

LIEFF, CABRASER, HEIMANN &
BERNSTEIN
Elizabeth J. Cabraser
Morris Ratner
Scott P. Nealey
Lauri A. Andrus
Embarcadero Center West
275 Battery Street 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

REICH & BINSTOCK
Dennis C. Reich
4265 San Felipe, Ste. 1000
Houston, Texas 77027
Telephone: (713) 622-7271

WELLER, GREEN, McGOWN & TOUPS
Mitchell A. Toups
Nations Bank Bldg.
2615 Calder St., Ste. 400
Beaumont, TX 77701
Telephone: (409) 838-0101

NESS, MOTLEY, LOADHOLT,
  RICHARDSON & POOLE
A. Hoyt Rowell
T. Christopher Tuck
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9200

074.mfb

- 7 -