**MDL 1358**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JAN 2 3 2001**

FILED
CLERK'S OFFICE



RECEIVED
CLERK'S OFFICE

2001 JAN 22 P 4: 27

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

PLEADING NO.

### DOCKET NO. 1358

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

### IN RE:  METHYL-TERTIARY BUTYL ETHER ("MTBE")
### PRODUCTS LIABILITY LITIGATION

### JOINT MOTION OF DEFENDANTS CHEVRON, GULF, AND CUMBERLAND FARMS TO VACATE CONDITIONAL TRANSFER ORDER (CTO-2)

Chevron U.S.A. Inc. (Chevron), Gulf Oil Corporation (Gulf), and Cumberland Farms,

Inc. (Cumberland Farms) file this Motion to Vacate Conditional Transfer Order (CTO-2).

1.      On October 10, 2000, the Panel consolidated two cases and created MDL 1358, *In

re Methyl Tertiary Butyl Ether (MTBE) Product Liability Litigation,* in the Southern District of

New York.  The two cases that comprise MDL 1358 are *Berisha v. Amerada Hess, et al.,* No. 00-

CIV-1898 [SAS] (S.D.N.Y.) ("*Berisha*"), and *England v. Atlantic Richfield Co., et al.,* Nos. 00-

370-WDS, 00-371-DRH (S.D. Ill.) ("*England*").  At present, those are the only two cases

consolidated in MDL 1358.

OFFICIAL FILE COPY

IMAGED JAN 25 '01

2.     The *Berisha* and *England* actions assert state common law claims purportedly on behalf of classes of well owners. The purported class in *Berisha* includes all well owners in New York State, while the purported class in *England* includes well owners in 16 states.

3.     The class claims in *Berisha* and *England* have been limited to claims for injunctive relief only, mainly consisting of well testing to determine whether the wells are affected by methyl tertiary butyl ether ("MTBE").

4.     Both *Berisha* and *England* are brought against numerous major oil companies, and both allege that defendants are liable as co-conspirators for allegedly concealing information about MTBE. In fact, in the Transfer Order that created MDL 1358, the Panel stated that the *Berisha* and *England* cases should be centralized because they both involve the following common questions: "i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government, and the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." Transfer Order, Oct. 10, 2000, Docket No. 1358.

5.     On November 21, 2000, pursuant to Panel Rule 7.5(e), the undersigned counsel for Chevron wrote the Clerk of the Panel to state that the case of *Holten v. Chevron U.S.A. Inc., et al.,* No. 3:00-4703 (D.N.J.), might be deemed a potential "tag-along" case. Chevron stated at the time that it was notifying the Clerk of the *Holten* case because Rule 7.5(e) seemed to require the notice, but that Chevron would oppose the transfer of the *Holten* case to MDL 1358.

6.     On December 21, 2000, the Clerk of the Panel issued a Conditional Transfer Order (CTO-2) proposing to transfer to the *Holten* case to MDL 1358. The Clerk apparently issued CTO-2 based solely on the letter from the undersigned counsel. No party in *Holten* or MDL 1358 requested that *Holten* be transferred.

7.      Quite the contrary, all parties in *Holten* -- plaintiffs and defendants both -- have since filed notices of opposition to CTO-2.  All parties in that case oppose the transfer of *Holten* to MDL 1358.  *See* Joint Notice Of Opposition Of Both Plaintiffs And Defendants In The *Holten* Case To Conditional Transfer Order (CTO-2), filed Jan. 5, 2001; Notice Of Opposition Of Cumberland Farms, Inc. To Conditional Transfer Order (CTO-2), filed Jan. 4, 2001.  Certain other parties that are involved in MDL 1358, but not in *Holten*, also filed a notice of opposition to CTO-2.  *See* Notice Of Opposition Of Defendants Equilon, Motiva, Shell And Texaco To Conditional Transfer Order (CTO-2), filed Jan. 5, 2001.  In sum, all parties in Holten oppose CTO-2; some parties in MDL 1358 also actively oppose CTO-2; no party moved for the transfer of Holten, and no party has expressed support for CTO-2.

8.      As explained more fully in an accompanying brief, CTO-2 should be vacated because there the differences between *Holten* and MDL 1358 outweigh any common questions, transfer would not serve the convenience of the parties or witnesses, and transfer would not promote the just and efficient conduct of the consolidated actions.  The facts that support vacating the transfer include:

A.      The *Holten* case involves claims of plaintiffs who allege damages from a single former service station site.  The station at issue was most recently owned and operated by Cumberland Farms, Inc., which is a defendant in *Holten* and is not named in any of the cases consolidated in MDL 1358.

B.      The only defendants in *Holten* are Chevron U.S.A. Inc., Gulf Oil Corporation and Cumberland Farms, Inc.  Of the three *Holten* defendants, only Chevron U.S.A. Inc. is a named defendant in any cases pending in MDL 1358.  Moreover, Chevron appears to have been named as a defendant merely because at one time it supplied gasoline to the service station at issue.

C.      *Holten* is not a class action.  The *Holten* case involves just individual claims of individual plaintiffs in one neighborhood in one small community in New Jersey, whereas the cases consolidated in MDL 1358 purport to be class actions involving putative plaintiffs in 17 states.

- 3 -

D.     The three defendants in *Holten* are joined together because of their alleged involvement with the single site at issue. There are no allegations of an industry-wide conspiracy in *Holten*, by contrast to *England* and *Berisha* where the conspiracy allegations are central to the plaintiffs' attempt to maintain claims against numerous defendants together.

E.     The focus of current proceedings in MDL 1358 is on discovery, with special emphasis on discovery relating to class certification, and motions and briefing on class certification will follow. The proceedings on class certification issues in the MDL cases have no bearing on *Holten*, which is not a class action.

F.     In *Holten*, the court has adopted a case management procedure that calls for discovery and motions to proceed in certain phases that are tailored to the unique circumstances of that case. The *Holten* case should proceed on an efficient track designed by the parties and the Court specially for that case. The resolution of that case would be impeded if it were transferred and consolidated with other cases in MDL 1358.

For all the foregoing reasons and those stated in the accompanying memorandum,

Chevron, Gulf, and Cumberland Farms respectfully request that the Panel vacate the Conditional

Transfer Order (CTO-2).

Richard E. Wallace, Jr.
Peter C. Condron
Steven C. Dubuc
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: 202-204-1000
Facsimile: 202-204-1001

Attorneys for Defendants Chevron U.S.A. Inc.
and Gulf Oil Corporation

Debra S. Rosen
Carlos M. Bollar
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Attorneys for Defendant Cumberland Farms, Inc.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN 2 3 2001

FILED
CLERK'S OFFICE

*DOCKET NO. 1358*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE: METHYL-TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION*

### BRIEF IN SUPPORT OF THE
### JOINT MOTION OF DEFENDANTS CHEVRON, GULF, AND CUMBERLAND FARMS
### TO VACATE CONDITIONAL TRANSFER ORDER (CTO-2)

Chevron U.S.A. Inc. (Chevron), Gulf Oil Corporation (Gulf), and Cumberland Farms,

Inc. (Cumberland Farms) submit this brief in support of their joint motion to vacate the

conditional transfer order entered in this matter on December 21, 2000 designated CTO-2.

CTO-2 proposes to transfer a case pending in the District of New Jersey, *Holten v.*

*Chevron U.S.A. Inc., et al.*, No. 3:00-4703, to an MDL proceeding in the Southern District of

New York, MDL 1358, where there are currently two cases consolidated.  Chevron and Gulf are

defendants in the *Holten* case.  The *Holten* case should not be transferred to MDL 1358 because

the differences between *Holten* and MDL 1358 outweigh any common questions, transfer would

not serve the convenience of the parties or witnesses, and transfer would not promote the just and efficient conduct of the consolidated actions.

All parties in *Holten* -- plaintiffs and defendants both -- have filed notices of opposition to CTO-2. All parties in that case oppose the transfer of *Holten* to MDL 1358. *See* Joint Notice Of Opposition Of Both Plaintiffs And Defendants In The *Holten* Case To Conditional Transfer Order (CTO-2), filed Jan. 5, 2001; Notice Of Opposition Of Cumberland Farms, Inc. To Conditional Transfer Order (CTO-2), filed Jan. 4, 2001. Certain other parties that are involved in MDL 1358, but not in *Holten*, also filed a notice of opposition to CTO-2. *See* Notice Of Opposition Of Defendants Equilon, Motiva, Shell And Texaco To Conditional Transfer Order (CTO-2), filed Jan. 5, 2001. In sum, all parties in Holten oppose CTO-2; some parties in MDL 1358 also actively oppose CTO-2; no party moved for the transfer of Holten, and no party has expressed support for CTO-2.

## BACKGROUND

### Procedural History of MDL 1358

On October 10, 2000, the Panel consolidated two cases and created MDL 1358, *In re Methyl Tertiary Butyl Ether (MTBE) Product Liability Litigation,* in the Southern District of New York. The two cases that comprise MDL 1358 are *Berisha v. Amerada Hess, et al.,* No. 00-CIV-1898 [SAS] (S.D.N.Y.) ("*Berisha*"), and *England v. Atlantic Richfield Co., et al.,* Nos. 00-370-WDS, 00-371-DRH (S.D. Ill.) ("*England*"). At present, those are the only two cases consolidated in MDL 1358.

The *Berisha* and *England* actions assert state common law claims purportedly on behalf of classes of well owners. The purported class in *Berisha* includes all well owners in New York State, while the purported class in *England* includes well owners in 16 states.

- 2 -

The class claims in *Berisha* and *England* have been limited to claims for injunctive relief only, mainly consisting of well testing to determine whether the wells are affected by methyl tertiary butyl ether ("MTBE").

Both *Berisha* and *England* are brought against numerous major oil companies, and both allege that defendants are liable as co-conspirators for allegedly concealing information about MTBE. In fact, in the Transfer Order that created MDL 1358, the Panel stated that the *Berisha* and *England* cases should be centralized because they both involve the following common questions: "i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government, and the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." Transfer Order, Oct. 10, 2000, Docket No. 1358.

On November 21, 2000, pursuant to Panel Rule 7.5(e), the undersigned counsel for Chevron wrote the Clerk of the Panel to state that the case of *Holten v. Chevron U.S.A. Inc., et al.*, No. 3:00-4703 (D.N.J.), might be deemed a potential "tag-along" case. Chevron stated at the time that it was notifying the Clerk of the *Holten* case because Rule 7.5(e) seemed to require the notice, but that Chevron would oppose the transfer of the *Holten* case to MDL 1358.

On December 21, 2000, the Clerk of the Panel issued CTO-2 proposing to transfer to the *Holten* case to MDL 1358. The Clerk apparently issued CTO-2 based solely on the letter from the undersigned counsel. No party in *Holten* or MDL 1358 requested that *Holten* be transferred.

## ARGUMENT

### I.    CTO-2 SHOULD BE VACATED BECAUSE ALL PARTIES TO THE CASE OPPOSE THE CONDITIONAL TRANSFER

As noted, all parties to the *Holten* action oppose the transfer of that case to MDL 1358. The Panel has held that such unanimous (or even near-unanimous) opposition is a very

persuasive factor against transfer of a case pursuant to 28 U.S.C. § 1407.  For example, the court

in *In re Asbestos and Asbestos Insulation Material Products Liability Litigation ("In re*

*Asbestos")*, 431 F. Supp. 906 (J.P.M.L. 1977), despite recognizing some common questions of

fact among the actions under consideration, denied transfer under section 1407 based on near-

unanimous opposition.  431 F. Supp. at 910.  The Panel noted that all but one of the parties

involved opposed transfer, and held that "[t]he virtually unanimous opposition of the parties to

transfer," while "not by itself determinative," was "a very persuasive factor in our decision to

deny transfer ...."  431 F. Supp. at 909, 910.  *See also In re Westinghouse Electric Corporation*

*Employment Discrimination Litigation*, 438 F. Supp. 937, 938-39 (J.P.M.L. 1977) (denying

transfer despite recognizing some common questions of fact, emphasizing in part "that all parties

to the two North Carolina actions [two of the five actions before the Panel] agree that those

actions should remain separate from the [three] Pennsylvania actions and that thereby the North

Carolina actions will be promptly resolved").

   The unanimous opposition of the parties in the *Holten* case to CTO-2 reflects the

considered judgment of those most familiar with the case – the parties themselves – that transfer

of the case will not serve the convenience of the parties and witnesses, and that transfer will not

promote the just and efficient conduct of the actions proposed to be consolidated.

## II.   CTO-2 SHOULD BE VACATED BECAUSE COMMON QUESTIONS DO NOT PREDOMINATE OVER INDIVIDUAL QUESTIONS OF FACT AND CONSOLIDATION WOULD NOT SERVE THE CONVENIENCE OF THE PARTIES OR WITNESSES

   A transfer pursuant to 28 U.S.C. § 1407 is typically allowed only if the actions involve

common questions of fact, that transfer will serve the convenience of the parties and witnesses,

and that the transfer will promote the just and efficient conduct of the actions to be consolidated.

*See* 28 U.S.C. § 1407(a).  The *Holten* case does not meet those standards.

A.     The *Holten* Action Involves Markedly Different Interests, Requests
       Different Relief, and Is at a Different Stage of Development Than the
       *Berisha* and *England* Actions

When actions "seek to protect markedly different interests, request different relief, and

are at different stages of development," transfer will be denied. *See In re Harmony Loan Co.,*

*Inc., Securities Litigation*, 372 F. Supp. 1406, 1406-07 (J.P.M.L. 1974). The *Holten* case

involves just individual claims of individual plaintiffs in one neighborhood in one small

community in New Jersey. The *Holten* plaintiffs allege that their drinking water has been

"contaminated with MTBE and/or BTEX." (First Amended Complaint, attached hereto as

Exhibit A, at ¶ 6.) Among the relief requested by the *Holten* plaintiffs is "[c]ompensatory

damages in an amount determined to be just and equitable by [the] Court." (First Amended

Complaint, attached hereto as Exhibit A, at ¶ 61.) The *Holten* case does not purport to be a class

action but merely asserts individual claims.

In contrast, the cases consolidated in MDL 1358 purport to be class actions involving

putative plaintiffs in many locations. The focus of current proceedings in MDL 1358 is on

discovery, with special emphasis on discovery relating to class certification, and motions and

briefing on class certification will follow. The proceedings on class certification issues in the

MDL cases have no bearing on *Holten*, which is not a class action. Indeed, MDL 1358 seeks to

protect markedly different interests than *Holten* and requests different relief. Plaintiffs' counsel

in MDL 1358 has disavowed any intention to assert claims for damages on behalf of any classes.

Importantly, plaintiffs' counsel in MDL 1358 seek to represent a class of those who *do not know*

whether their wells are contaminated, and they agreed with a suggestion by the Court in MDL

1358 that a notice should be made to the effect that "no class action suit is being pursued seeking

damages for those whose wells are contaminated." (*See* Transcript of Proceedings Before Hon.

Shira A. Sheindlin, In re: MTBE, MDL 1358, January 3, 2001, attached hereto as Exhibit B, at

21.)

Plaintiffs' counsel in MDL 1358 apparently contemplate that they can seek relief on

behalf of a class of those who do not know whether their wells are contaminated, such as court-

ordered testing of wells. If that testing showed that certain individuals had contamination in their wells, plaintiffs' counsel apparently contemplate that the claims of those individuals for damages would be severed out of MDL 1358 and instead proceed as one or more "companion case[s]." (*See* Transcript of Proceedings Before Hon. Shira A. Sheindlin, In re: MTBE, MDL 1358, January 3, 2001, attached hereto as Exhibit B, at 23 (comments of Mr. Ratner, plaintiffs' counsel, to the effect that "[w]e would for simplicity sever out the claims of Ms. Berisha and other plaintiffs [who find contamination in their wells] ... so that proceeds as a companion case.").)

In contrast, *Holten* is already at a more advanced stage, where the plaintiffs already allege that their properties are contaminated. They are pursuing claims for damages flowing from the alleged contamination. These are precisely the types of claims that plaintiffs' counsel in MDL 1358 disavow and seek to sever from MDL 1358.

### B.     There Is No Danger of Conflicting Class Determinations

As noted, the *Holten* case does not purport to be a class action. Accordingly, transferring *Holten* to MDL 1358 would not achieve any benefits in the way of avoiding the danger of conflicting class determinations, which the Panel has recognized as one of the purposes of section 1407. For example, in *In re: Multidistrict Private Civil Treble Damage Litigation Involving Plumbing Fixtures ("In re Plumbing Fixtures")*, 298 F. Supp. 484 (J.P.M.L. 1968), the Panel summarized a formal report dated March 2, 1965 by the original drafters of section 1407 that described the purposes and operation of the proposed section 1407. The report had a formal comment on the proposed section 1407 that "recognized the dangers in simultaneous prosecution of separate class actions under then proposed and now adopted Class Action Rule 23." *In re Plumbing Fixtures*, 298 F. Supp. at 492. The Panel went on to observe:

> *It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest.* Under the recently amended Class Action Rule 23, F.R. Civ. P., powers for defining classes of parties, including plaintiffs and defendants, are not expressly limited by space, time, description of party or nature of claim or defense. Already, in related multidistrict litigation coming to the attention of the Panel, separate district courts have been requested

to make conflicting class action determinations. In these circumstances it is not certain that each district court will always be able to learn of the conflicting requests made to other courts. *It is certain, however, that if these conflicting requests are determined under Section 1407 in a transferee court, the information and means for fair, speedy and economical coordinated determinations will exist.*

298 F. Supp. at 492 (emphasis added).

Other Panel decisions have similarly emphasized that one of the primary purposes of section 1407 is to avoid the danger of conflicting class determinations. For example, in *In re: Multidistrict Private Civil Treble Damage Litigation Involving Plumbing Fixtures*, 308 F. Supp. 242 (J.P.M.L. 1970), the Panel stated: "a potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring ... related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts." 308 F. Supp. at 243-44. *See also In re Harmony Loan Company, Inc., Securities Litigation*, 372 F. Supp. 1406, 1407 (J.P.M.L. 1974) (rejecting transfer based in part on the reasoning that "there is no danger in this litigation of conflicting class determinations since only [one of the actions being considered for consolidation] contains Rule 23 class allegations"); *In re Multidistrict Civil Antitrust Actions Involving Antibiotic Drugs*, 299 F. Supp. 1403, 1406 (J.P.M.L. 1969) (granting transfer based in part on the reasoning that a purported class in two of the cases under consideration "conflicts with other class action claims which are now before the Southern District of New York and *the resolution of these conflicting class action claims by a single court will clearly promote just and efficient conduct of these cases*"; emphasis added).

### C. The Discovery To Be Conducted in *Holten* Involves Individual Factual Issues that Predominate Over Any Common Issues

The Panel has repeatedly denied transfer when common questions of fact do not predominate over the individual questions of fact in each action. *In re Rely Tampon Products Liability Litigation*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982); *In re Asbestos and Asbestos Insulation Material Products Liability Litigation*, 431 F. Supp. 906 (J.P.M.L. 1977). Transfer is not warranted merely because the cases being considered for consolidation address a similar

theme such as asbestos exposure, employment discrimination, or, as here MTBE contamination. If discrete factual issues predominate over the common issues, transfer is inappropriate.

For example, in *In re Asbestos*, 431 F. Supp. 906 (J.P.M.L. 1977), the Panel declined to transfer and consolidate 103 actions involving claims by workers who were exposed to asbestos dust, despite the "common thread" of asbestos exposure in all cases, because individual issues were found to be predominant. 431 F. Supp. at 906-910.[1] For example, the Panel found that "the circumstances of exposure are predominantly individual to each action," including variables such as "type of vocational exposure ...; products to which exposed; conditions of exposure; duration and intensity of exposure; safety precautions taken by the worker; [and] medical, personal, employment, and family history of the worker over the long periods of exposure." 431 F. Supp. at 909. The Panel also found that "[t]he question of causation [i.e., whether an individual's disability was caused by asbestos exposure] is an individual issue." 431 F. Supp. at 909-910. The Panel further noted that "[t]he liability of each defendant in each action is predominantly an individual question" depending on a number of variables. 431 F. Supp. at 910. The Panel held that "[m]any factual questions unique to each action or to a group of actions already pending ... clearly predominate, and therefore transfer is unwarranted." *Id.*

The Panel has reached similar conclusions in numerous other cases where individual issues were predominant. *See In re Westinghouse Electric Corp. Employment Discrimination Litigation*, 438 F. Supp. 937 (J.P.M.L. 1977) (transfer denied where allegations of specific discriminatory acts at individual facilities predominated over common issue of "division-wide

---

[1]    The asbestos cases were later transferred and consolidated because the circumstances of the actions had changed. *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991); 17 Moore's Federal Practice 3d sec. 112.04[1][e] ("[I]n 1977 the Panel declined to transfer asbestos litigation because the Panel was not convinced that such cases raised sufficient common questions of fact. By 1991, however, the number of asbestos cases in the federal courts had grown to more than 26,000. At that point, the Panel decided that transfer ... was appropriate. In the 1991 opinion, the Panel ... decided that changed circumstances had altered the scene dramatically. The Panel was 'persuaded that this litigation has reached a magnitude, not contemplated in the record before us in 1977, that threatens the administration of justice and that requires a new, streamlined approach.'" Significantly, in ordering transfer, the Panel did not repudiate the bases for its prior denials of transfer, but instead premised its decision on the fact that the overwhelming number of pending cases "has reached a magnitude, not contemplated in the record before us in 1977 that threatens the administration of justice and that requires a new, streamlined approach." *In re Asbestos (No. VI)*, 771 F. Supp. at 417-18.

racial discrimination"); *In re Royal Typewriter Co. (Royal Bond Copier) Breach of Warranty Litigation*, 435 F. Supp. 925 (J.P.M.L. 1977) (individual issues predominated because there were separate contractual relationships involved in each action and, as such, joint discovery would neither serve the convenience of the parties nor promote the just and efficient conduct of the litigation); *Environmental Protection Agency Pesticide Listing Confidentiality Litigation*, 434 F. Supp. 1235, 1236 (J.P.M.L. 1977) (individual questions of whether data is exempt from disclosure predominated over the common question of EPA's interpretation of the disclosure statute and transfer would not serve the convenience of the parties or promote the just and efficient conduct of the actions).

Here, individual issues clearly predominate over any common issues among MDL 1358 and *Holten*. The discovery in *Holten* will focus on the source or cause of contamination in each of the individual plaintiffs' wells; responsibility for the single station at issue; the individual properties owned or occupied by each of the plaintiffs, and the nature and amount of any groundwater contamination at such properties; when each plaintiff first learned of such contamination; the location of actual gasoline leaks or spills in the vicinity of such properties (including leaks from locations other than the service station at issue); the geology and hydrogeology in the area in question; and the circumstances surrounding any alleged exposure to any contamination and any resulting personal injuries or property damages. None of these issues bears on the cases in MDL 1358. Rather, those cases focus on industry-wide product liability questions and allegations of conspiracy.

In sum, *Holten* involves discovery of many different facts, documents, and witnesses on causation and damages that are unrelated to the issues in MDL 1358. For these reasons, transfer should be rejected, just as the Panel rejected the transfer of disparate cases in the *Asbestos, Westinghouse,* and *Royal Typewriter* cases.

### D.   *Holten* **Is a Predominantly Local Action**

Transfer of a predominantly local action should be denied if the common questions of fact are not sufficiently complex or the accompanying discovery so time-consuming that it overcomes the "inconvenience to the litigants and their witnesses, as well as the burden on the judiciary, of having [a] predominantly local ... action[] transferred to an out-of-state forum." *In re Brandywine Associates Antitrust and Mortgage Foreclosure Litigation*, 407 F. Supp. 236, 238 (J.P.M.L. 1976). The Panel has been particularly reluctant to transfer when there are only a small number of actions involved and the issues are primarily based on local or state factual, legal and administrative issues. In *In re Brandywine Associates*, 407 F. Supp. at 236-238, the Panel denied transfer of three separate actions by the same plaintiff alleging related conspiracy claims under state law in connection with transactions involving financing, management, and foreclosures of real property. Although the Panel recognized that common questions of fact existed with respect to the nature, existence, and operation of the alleged conspiracy, it held that the Plaintiff failed to meet the criteria for transfer of such a small number of actions under section 1407, stating:

> Only three actions are involved here. For the purposes of this litigation, the inconvenience to the party whose actions are proposed for transfer can be derived from the realization that the foreclosure aspect of the Florida and Illinois actions involves mostly, if not entirely, local factual, legal and potentially administrative issues.

407 F. Supp. at 238.

Here, too, the predominantly local aspects of *Holten* demonstrate that coordinated pretrial proceedings would be inappropriate. Since the *Holten* action involves only water wells located in one neighborhood in one small community in New Jersey, uniquely local issues, including state and local environmental and administrative concerns, will unquestionably predominate. Much of the discovery will focus on whether the service station at issue is the source of any contamination of plaintiffs' properties.

Moreover, the *Holten* Complaint includes allegations that "[o]nce the contamination became publicly known, Defendants failed to control the contamination plume from continually

- 10 -

expanding into Bayville's soil and water wells [and] failed to remediate the MTBE and BTEX contamination." These allegations raise state and local administrative law issues, including primary jurisdiction issues, because the New Jersey Department of Environmental Protection (NJDEP) has already been extensively involved in directing the investigation and remediation of the contamination in the Bayville, New Jersey area. Beginning with a Field Directive issued in May, 2000 to Cumberland Farms, Inc., the NJDEP has exercised continuing authority over the investigation and remediation activities related to the discovery of the MTBE contamination in Bayville, New Jersey. The investigation activities have included continued monitoring of certain of the potable wells in the Bayville area as well as the installation of a number of monitoring wells to further investigate the source and movement of the contamination. A Remedial Action Workplan was submitted on October 2, 2000 and remediation, using multi-phase recovery (MPR), and investigation continues, as mandated by the NJDEP. Moreover, plaintiffs' counsel in *Holten* has been in direct contact with NJDEP concerning the investigation and remediation of the contamination, including a letter sent November 22, 2000 that requests that the State of New Jersey "immediately investigate [the] cause [of health problems seemingly caused by the air stripper remediation system] and determine why my clients' health and well-being have been adversely affected [by the remediation system]. Moreover, we request that the remediation process be halted immediately and remain so until the investigation is complete and the problem is resolved." (Letter from Shari M. Blecher to Robert C. Shinn, DEP Commissioner, and Gary Sanderson, DEP Case Manager, November 22, 2000, attached hereto as Exhibit C, p. 1.) Plaintiffs' counsel in *Holten* appear intent on having the Court examine whether the investigation and remediation being performed by Cumberland Farms under the NJDEP's direction is appropriate and adequate.

As the Panel observed in a similar case, transfer "in light of the factual disparity between the actions ... could needlessly complicate and delay final disposition of all the actions." *In re Harmony Loan Company, Inc., Securities Litigation*, 372 F. Supp. 1406, 1407 (J.P.M.L. 1974). In particular, the *Holten* case would be needlessly complicated and final disposition could be

- 11 -

needlessly delayed if it were transferred to MDL 1358 because there is little, if anything, of relevance to *Holten* that will be part of the discovery process in MDL 1358. In *Holten*, the court has adopted a case management procedure that calls for discovery and motions to proceed in certain phases that are tailored to the unique circumstances of that case. The *Holten* case should proceed on an efficient track designed by the parties and the Court specially for that case.

### E.    Common Issues of Fact Are Not Sufficiently Complex to Warrant Transfer

The Panel's initial Transfer Order cited as a basis for transfer the following common questions of fact between *Berisha* and *England*: "i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks to downstream users, the federal government, and the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." Transfer Order, Oct. 10, 2000, Docket No. 1358.

The *Holten* case cannot involve the first of these "common questions," since the defendants charged with the alleged conspiracy in *Berisha* and *England* are not even named in *Holten*. To the contrary, *Berisha* and *England* involve 20 oil company defendants, of which only Chevron is also named in *Holten*. Thus, the issues of whether the other 19 oil companies "knew about and misrepresented the nature of MTBE and conspired to market MTBE without first disclosing its risks" are completely irrelevant to *Holten*.

Similarly, the second "common question" in MDL 1358 is different from the questions presented in *Holten*. As explained already, the plaintiffs in *Berisha* and *England* seek injunctive relief to determine if their wells are contaminated and disavow class claims for damages, whereas the plaintiffs in *Holten* already allege damages.

### F.    There Is a Lack of Commonality Among the Parties in These Actions

The *Holten* case involves claims of plaintiffs who allege damages from a single former service station. The station at issue was most recently owned and operated by Cumberland Farms, Inc., which is a defendant in *Holten* but is not named in any of the cases consolidated in

MDL 1358. The other defendants in *Holten* are Gulf Oil Corporation and Chevron U.S.A. Inc. Only Chevron is named in cases pending in MDL 1358. None of the *Holten* plaintiffs is named in any of the MDL 1358 cases. Thus, there is just one party[2] that is involved in *Holten* and in any of the MDL 1358 cases. The Panel has recognized in similar cases that such a lack of commonality among the parties is a factor weighing against consolidation. *See, e.g., In re Asbestos*, 431 F. Supp. at 909, 910 (denying transfer despite recognizing some common questions of fact among the actions under consideration, and noting that the parties opposing transfer had pointed to the "lack of commonality among the parties" in the actions under consideration).

### CONCLUSION

For all the foregoing reasons, Chevron, Gulf, and Cumberland Farms respectfully request that the Panel vacate Conditional Transfer Order (CTO-2).

Dated: January 22, 2001        Respectfully submitted,

Richard E. Wallace, Jr.
Peter C. Condron
Steven C. Dubuc
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: 202-204-1000
Facsimile: 202-204-1001

Attorneys for Defendants Chevron U.S.A. Inc.
and Gulf Oil Corporation

---

[2]   Even this minimal commonality may be illusory. It appears from plaintiffs' allegations in *Holten* that they may be under the misimpression that Chevron either operated or directly supplied the station at issue during the relevant time period. In fact, Chevron never operated the station during the relevant time period and did not directly supply the station during the relevant time period. Chevron will accordingly seek to be dismissed from the *Holten* case based on these facts.

Debra S. Rosen
Carlos M. Bollar
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Attorneys for Defendant Cumberland Farms, Inc.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN 2 3 2001

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 22, 2001, I caused to be served a true and correct copy of

the foregoing via regular mail, postage prepaid, to those counsel noted on the Involved Counsel List

(CTO-2), to the following addresses:

Joseph D. Gonzalez, Esquire
Jeffrey A. White, Esquire
Law Offices of Masry & Vititoe
5707 Corsa Avenue, Second Floor
Westlake Village, CA  91362
Counsel for Plaintiffs in *Holten*

Nathan P. Eimer, Esquire
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue
Suite 1776
Chicago, IL  60603

Peter Sacripanti, Esquire
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY  10020-1605
Liaison Counsel for Defendants in MDL 1358

Morris A. Ratner, Esquire
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th Floor
New York, NY  10017
Liaison Counsel for Plaintiffs in MDL 1358

Steven C. Dubuc

*DOCKET NO. 1358*

JUDICIAL PANEL
MULTIDISTRICT
LITIGATION

2001 JAN 24  A 6: 33

RECEIVED
CLERK'S OFFICE

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE:  METHYL-TERTIARY BUTYL ETHER ("MTBE")*
*PRODUCTS LIABILITY LITIGATION*

## SUPPLEMENTAL CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 22, 2001 or January 23, 2001 (as specified below), I
caused to be served a true and correct copy of the following three documents via regular mail, postage
prepaid, to those counsel noted on the Panel Service List (CTO-2) at the addresses listed on the next two
pages:

1.  Joint Motion of Defendants Chevron, Gulf, and Cumberland Farms to Vacate
    Conditional Transfer Order (CTO-2),

2.  Plaintiffs' Joinder in Joint Motion of Defendants Chevron U.S.A., Gulf Oil
    Corporation, and Cumberland Farms, Inc. to Vacate Conditional Transfer Order
    (CTO-2), and

3.  Consolidated Motion and Brief of Defendants Equilon, Motiva, Shell and Texaco to
    Vacate Conditional Transfer Order CTO-2,

and I FURTHER CERTIFY that on January 23, 2001, I caused to be served a true and correct copy of
this Supplemental Certificate of Service, via regular mail, postage prepaid, to those counsel noted on the
Panel Service List (CTO-2) at the following addresses:

Dan H. Ball (January 23, 2001)
Thompson & Coburn, LLP
One Firstar Plaza
St. Louis, MO 63101

Nathan P. Eimer, Esquire (January 22, 2001)
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue
Suite 1776
Chicago, IL 60603

Peter Sacripanti, Esquire (January 22, 2001)
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605
Liaison Counsel for Defendants in MDL 1358

Joseph D. Gonzalez, Esquire (January 22, 2001)
Jeffrey A. White, Esquire
Law Offices of Masry & Vititoe
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362

Stuart J. Lieberman (January 23, 2001)
Lieberman & Blecher, PC
31 Jefferson Plaza
Princeton, NJ 08540
Counsel for Plaintiffs in *Holten*

Morris A. Ratner, Esquire (January 22, 2001)
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th Floor
New York, NY 10017
Liaison Counsel for Plaintiffs in MDL 1358

Debra S. Rosen (January 22, 2001)
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Matthew S. Slowinski (January 23, 2001)
Slowinski Atkins, LLP
One Neward Center

Newark, NJ  07102

Steven C. Dubuc

Exhibit A

US OFFICE PRODUCTS

**LIEBERMAN & BLECHER, P.C.**
31 Jefferson Plaza
Princeton, NJ 08540
(732) 355-1311

**LAW OFFICES OF MASRY & VITITOE**
5707 Corsa Avenue, Second Floor
Westlake Village, California 91362
(818) 991-8900

Attorneys for Plaintiffs

---

THEODORE HOLTEN, CRAIG HOLTEN,
EMILY HOLTEN, THEODORE HOLTEN, JR.,
EDWARD MAINETI, STANLEY ZALEWSKI,
JEAN ZALEWSKI, BEVERLY M. WINN,
RAYMOND M. WINN, ROSE DITOTO,
WILLIAM KINARD, SUZANNE KINARD,
JAIME KINARD, KACEY KINARD a minor,
by and through their guardian ad litem, BARRY
KLEIN, NANCY KLEIN, ANDREW KLEIN, a
minor, by and through their guardian ad litem
MERIDETH MCGOVERN, CHRISTOPHER
FELLOWS, DIANNE COTTRELL DANIEL
COTTRELL, SR., DANIEL COTTRELL
JR., a minor, by and through their guardian ad litem,
NICHOLAS COTTRELL, a minor, by and through
their guardian ad litem, JAKE COTTRELL, a minor,
by and through their guardian ad litem, ERIC
SQUIRE, CLAUDIA SQUIRE, JESSE SQUIRE,
ANGELA SQUIRE, AMANDA SQUIRE,
CAITLYN THOMPSETT, a minor, by and through
their guardian ad litem, JAMES SMITH, SR.,
JAMES SMITH, JR., MARYLIN SMITH,
KENNETH WEDDING, PATRICIA WEDDING,
KATHERINE WEDDING, BRIAN WEDDING,
JAMES J. LEWIS, SARAH ELIZABETH LEWIS,
a minor, by and through their guardian ad litem,
CHARLOTTE FORD, ANDREW FORD, TONYA
DEGUILIO, STEPHEN DEGULIO, CHERILYNN
DEGUILIO, JILLIAN DEGUILIO, STEPHEN T.
DEGUILIO, a minor, by and through their guardian
ad litem, HAZEL LUCE, THOMAS LUCE, SR.,
HEATHER MCCOMBIE, DOROTHY
MCCOMBIE, BRIAN WHITMAN, WILLIAM
ROSANIO, JOANN ROSANIO, WILLIAM R.
ROSANIO, JOSEPH A. ROSANIO, a minor, by
and through their guardian ad litem, JASON C.

:
:
:
:   *SUPERIOR COURT OF NEW JERSEY*
:   *COUNTY OF OCEAN*
:
:   *DOCKET NO.: OCN-L-2763-00*
:
:
:   **CIVIL ACTION**
:
:   ***FIRST AMENDED***
:   ***COMPLAINT AND JURY DEMAND***
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

ROSANIO, a minor, by and through their guardian :
ad litem, VINCENT FUSARO, PATRICIA L. :
FUSARO, MARYANN MOONEY, DANA :
MOONEY, a minor, by and through their guardian :
ad litem, KATHRYN MOONEY, a minor, by and :
through their guardian ad litem, MARK PAUL :
MINETTI, DAVID W. MINETTI, CHRISTIAN :
MINETTI, JASON BRITTON, a minor, by and :
through their guardian ad litem, TYLER MORONG,:
a minor, by and through their guardian ad litem, :
KIMBERLY MOONEY, CHARLES DANIEL :
MOONEY, RUTH M. BIANGARDI, PAUL :
MINETTI, CAROL MINETTI, JORDAN C. :
MINETTI, a minor, by and through their guardian :
ad litem, TINA HAMMOND, MATHEW :
DICENSO, DEBRAH DICENSO, AURORA :
DICENSO, a minor, by and through their guardian :
ad litem, LORRAINNE HILL, GORDON LEE :
HILL, RICHARD HILL, DAVID HILL, JUNE K. :
PIETRO, PAUL PIETRO, LAURA ANN :
MANCINI, ANTHONY MANCINI, CATHERINE :
MANCINI, a minor, by and through their guardian :
ad litem, BRITTANY MANCINI, a minor, by and :
through their guardian ad litem, ANTHONY J. :
MANCINI, a minor, by and through their guardian :
ad litem, MARIE GORDON, MICHAEL :
GORDON, MADISON GORDON, a minor, by and :
through their guardian ad litem, TIMOTHY :
YEOMAN, a minor, by and through their guardian :
ad litem, GARY GETTIS, TRACY GETTIS, GARY:
MICHAEL GETTIS, a minor, by and through their :
guardian ad litem, KAYLIN ROSE GETTIS, a :
minor, by and through their guardian ad litem, :
ROBERT MOORES, DEBORAH MOORES, :
JOSEPH FRANKS, DONNA M. FRANKS, :
CHRISTA M. FRANKS, a minor, by and through :
their guardian ad litem, BRIANNA FRANKS, :
a minor, by and through their guardian ad litem, :
CARMEN L. DIAZ, MARCELINA DIAZ, JR. :
LYDIA DIAZ, TELAH M. DIAZ, a minor, by and :
through their guardian ad litem, LETICIA :
ADAMES, a minor, by and through their guardian :
ad litem, CAROLINE HOLTEN, MATTHEW :
HOLTEN, GLENN MCCOMBIE, AMY FUSARO, :
CINDY FUSARO, BRIAN FUSARO, LISA WEBB:
TMOTHY YESMAN, a minor, by and through their:
 guardian ad litem, LOUIS F. BARBERIA, :
ALBERT MASCOLA, ANTHONY MASCOLA, :
KATHRYN GEIGER, MATTHEW GEIGER, :

2
**FIRST AMENDED COMPLAINT**

STANLEY SMOLUCHA, DAWN SCADUTO,      :
RAYMOND MERTZ, MARY MERTZ, MARIE      :
GEARL, STEVEN P. GEARL, JASON M. GEARL,:
NATASHA A. DELLAPERUTE, PETER MEROLA:
ALFRED APONTE, CARMEN I. APONTE,      :
SOMMER A. CAVANAUGH a minor, by and      :
through their guardian ad litem, CARMEN P.      :
CAVANAUGH, TRACY GARMON, MICHAEL      :
GARMON, JOSHUA C. GARMON a minor, by      :
and through their guardian ad litem, KRISTY L.      :
GARMON, a minor, by and through their guardian  :
ad litem, TYLER BENTLY, a minor, by and      :
through their guardian ad litem, JOHN MOLITOR, :
JENNIFER MOLITOR, ALESHA MOLITOR, a      :
minor, by and through their guardian ad litem,      :
EMILY MOLITOR, a minor, by and through their  :
guardian ad litem, KAREN AQUILINA, CHARLES:
AQUILINA, CHARLES AQUILINA, JR., JAMES  :
AQUILINA, KIM AQUILINA, TERESA DIAZ,      :
JOHN DOES 1-100, JANE DOES 1-100,      :
                                                                 :
                              Plaintiffs,                     :
                                                                 :
                                                                 :
          vs.                                                  :
                                                                 :
                                                                 :
CHEVRON  U.S.A., INC., a Pennsylvania      :
corporation, GULF OIL CORPORATION, a      :
foreign corporation, CUMBERLAND FARMS,      :
INC., a Massachusetts corporation, DOES 1-100,  :
                                                                 :
                              Defendants.                  :

Plaintiffs, by way of this Complaint, say:

## INTRODUCTION

1.      This case is about the reckless contamination and poisoning of numerous individual drinking wells located in the Township of Bayville, County of Ocean, New Jersey. The Defendants in this action destroyed and contaminated the community's drinking water supply by placing gasoline containing methyl tertiary butyl ether ("MTBE"), a gasoline additive, and Benzene Toluene Ethylbenzene and Xylene ("BTEX") common gasoline chemical components into leaking underground storage tanks, piping and dispensing systems (hereinafter

referred to collectively as "UST systems") and in negligently and intentionally placing MTBE into the stream of commerce without taking proper precautions and without warning of MTBE's propensity to contaminate drinking water.

2.     MTBE is toxic in that it is a known carcinogen in rats.  In fact, MTBE is more carcinogenic in laboratory test animals than the majority of currently regulated chemical carcinogens.

3.     MTBE is a colorless liquid that may cause water to contain foul taste and odor. While it has often been said that oil does not mix with water, MTBE mixes perfectly with water. It mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline.  Moreover, because MTBE takes more time to decompose, once discharged, it stays in the environment longer and wreaks much more havoc than other gasoline chemical components.

4.     MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product in the refining process.  MTBE is a member of a class of chemical compounds, ethers, whose unique properties are enhanced solubility in water and chemical attraction to water molecules.  MTBE does not readily attach to soil particles and is not susceptible to natural degradation.  Many Plaintiffs' private wells contained MTBE above New Jersey's maximum level and at least five Plaintiffs' well contained MTBE at 300 ppb.

5.     Benzene and Toluene are colorless liquids that are known to cause cancer in human beings.  Three of the Plaintiffs' private well contained Benzene and Toluene above New Jersey's maximum level.

6.     Plaintiffs are Bayville community members, and former community members, many of whom have had their drinking water contaminated with MTBE and/or BTEX.  Records from the New Jersey Department of Environmental Protection ("DEP") reflect that the Agency considers a former retail gasoline service station owned and operated by Gulf Oil Corporation ("Gulf"), now Chevron U.S.A., Inc. ("Chevron") and Cumberland Farms, Inc. ("Cumberland Farms") to be the exclusive or primary source of the drinking water contamination in the

community. That station is located at Route 9 and Morris Avenue, Bayville, New Jersey 08721 and is hereinafter referred to as the "site".

7. Defendant CHEVRON U.S.A., INC. is a Pennsylvania corporation (hereinafter referred to as "Chevron") doing business in New Jersey.

8. Defendant CUMBERLAND FARMS, INC. is a Massachusetts corporation (hereinafter referred to as "Cumberland Farms") doing business in New Jersey.

9. Defendant GULF OIL CORPORATION is a foreign corporation (hereinafter referred to as "Gulf") doing or having done business in New Jersey.

10. All of the fictitious Defendants are companies that buy, process, or otherwise take gasoline from oil refineries and deliver it to gasoline stations (hereafter referred to "Jobbers"). The Jobber Defendants in this Action have delivered MTBE laden gasoline to the Bayville gasoline station.

11. Gulf Oil, Chevron, Cumberland Farms and the Jobbers (hereinafter collectively referred to as "Defendants") intentionally, negligently and/or recklessly placed MTBE laced gasoline into the stream of commerce without warning of its dangers. The MTBE laced gasoline was sold and/or delivered to Cumberland Farms and was placed into underground storage tanks located at the site.

12. In or about May 2000, Plaintiff Theodore Holten learned that his water was contaminated with MTBE. He determined this because professional sampling of his drinking water yielded this information.

13. Shortly thereafter, the DEP determined that community wide sampling was required and other Plaintiffs discovered that they too had MTBE and/or BTEX in their drinking water.

14. On information and belief, the MTBE and BTEX chemicals were discharged from an underground storage tank at the Cumberland Farms gas station. This tank was in violation of Federal laws requiring that all tanks of similar design be removed from the ground.

15. In or about June 2000, several other groundwater samples taken in Bayville showed that MTBE and/or BTEX contamination was present at levels well above the New Jersey health advisory level for both MTBE and/or BTEX.

16. Plaintiffs were alarmed to learn that they had been drinking, cleaning and cooking with MTBE and/or BTEX contaminated water. What is worse, many Plaintiffs were terrified to find that they had been feeding and cleaning their children and grandchildren and children in their care, with the same contaminated water.

17. Starting in or about June 2000, certain Defendants agreed to provide bottled water to certain area residents. In addition, certain Defendants paid for certain Plaintiffs to be connected to a permanent alternate water supply. However, not all Plaintiffs received this benefit and in any event, none of the Plaintiffs can use their drinking water wells as a result of the water contamination.

18. As of this date, the Bayville area is still contaminated by MTBE and BTEX. The contamination has not been cleaned up.

19. As a result of Plaintiffs' exposure to MTBE, they have been placed at an increased risk of suffering nausea, vomiting, diarrhea, eyes, nose and throat irritation, rashes, as well as other illnesses now and in the future. Because of this increased risk of suffering future health problems, the Plaintiffs reasonably require medical surveillance. As a result of the exposure to Benzene and Toluene, some Plaintiffs have suffered and continue to suffer significant health impacts.

20. Today, numerous hard working people living in Bayville have no permanent source of drinking water. In addition, Plaintiffs' property values have plummeted and businesses have suffered. Some Plaintiffs have had to use bottled water to bathe and drink, and have generally had the quality of their lives disrupted as a result of the MTBE and/or BTEX contamination.

21. The harm suffered by the Plaintiffs was a result of the Defendants acts and omissions, and such acts and omissions where actuated by actual malice or accompanied by a wanton or willful disregard of the safety of product users, consumers, and others who

foreseeably might be harmed by the MTBE and BTEX, including the Plaintiffs. The Defendants engaged in intentional wrongdoing, in the sense of an evil minded acts, by allowing MTBE and BTEX to be placed into an UST system that they knew would leak chemicals into the ground and into the groundwater where it would contaminate people's drinking water. These defendants then failed to remediate the contamination for years. They simply allowed the contamination to spread and spread without warning and without concern for the health and safety of the neighbors nor their neighbors children.

22. Moreover, these Defendants placed MTBE into the stream of commerce knowing that the chemical possesses special dangers in that it has the propensity to contaminate even more water than BTEX. The Defendants knew full well of the probably hazards and ill effects that could be realized by unknowing individuals such as the Plaintiffs. Defendants also deliberately acted or failed to act with knowledge of a high degree of probability of harm to unknown persons such as the Plaintiffs and with reckless disregard of to the consequences of such actions or omissions.

23. When, in this complaint, reference is made to any act of the Defendants, such shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such acts, or failed and omitted to adequately supervise or to properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants and did so while acting within the scope of their employment or agency.

24. Defendants DOES 1-100, are named herein under fictitious names, their true names and capacities being unknown to Plaintiffs. Plaintiffs are informed and believe, and thereon allege, that each of said DOES is responsible, in some actionable manner, for the events and happenings hereinafter referred to, either through said Defendants' conduct, or through the conduct of Defendants' agents, servants or employees, or in some other manner, causing the harms alleged by Plaintiffs in this complaint.

25. Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious

names.   Plaintiffs will amend this complaint to set forth the names and capacities of said

Defendants along with appropriate charging allegations when the same have been ascertained.

## JURISDICTION AND VENUE

26.   This Court has subject matter jurisdiction over all causes of action asserted herein.

27.   This Court has jurisdiction over Defendants because they are New Jersey

corporations, corporations authorized to do business in New Jersey and/or registered with the

New Jersey Secretary of State, reside in New Jersey, do sufficient business with sufficient

minimum contacts in New Jersey, or otherwise intentionally avail themselves of the New Jersey

market through the sale, manufacturing, and/or processing of petroleum-related products in New

Jersey to render the exercise of jurisdiction over Defendants by the New Jersey courts consistent

with traditional notions of fair play and substantial justice.

28.   Venue is proper in this Court because the actions of Defendants give rise to

transitory causes of action and at least one of these Defendants resides and or does business in

Ocean County, New Jersey.   Furthermore, all of the Plaintiffs reside or did reside in Ocean

County, New Jersey.

## COUNT I
## NEGLIGENCE

29.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 28 inclusive.

30.   This lawsuit involves Defendants who mix, sell and/or transport MTBE laced gasoline. Defendants' MTBE laced gasoline was delivered to the site.

31.   MTBE's propensity to contaminate water is so menacing that even if gasoline storage tanks and pipelines were completely impenetrable, which they are not, the mixing of MTBE in gasoline would still pose a significant threat to groundwater.

32.   In fact, Chevron put together a "White Paper" to ". . . provide [its] perspective on the relation between the LUST [Leaking Underground Storage Tank] and MTBE issues." In the White Paper, Chevron provides the following observations:

> **The physical and chemical properties of MTBE make it more likely to reach groundwater than other gasoline components, as a result of incidental spills, overfills, and gasoline deliveries, _even without_ underground storage tank leaks. (emphasis original).**

> **These concerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999.   This information indicates there is MTBE groundwater contamination from small spills of gasoline (e.g. a spill in a parking lot, or a car accident) . . .**

> **. . . Short of eliminating car accidents, stopping customer overfilling of tanks, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they get in the environment.**

33.   However, despite Defendants' past and current knowledge of MTBE's negative characteristics, Defendants have placed, and continue to place, MTBE laced gasoline into the Country's stream of commerce without taking any special precautions to prevent MTBE discharges to people's drinking water.

9
**FIRST AMENDED COMPLAINT**

34. MTBE should have never been mass-produced and distributed to a place like Bayville without proper education and warning of MTBE's propensity to contaminate water. Moreover, Defendants should have also properly educated and warned the appropriate government agencies, gasoline station owners and operators, and the public of MTBE's negative environmental characteristics.

35. Prior to placing MTBE into the stream of commerce, Defendants knew or should have known that in the event MTBE was released into soil, it would easily mix with groundwater and spread its toxic plume over great distances without biodegradation or bioremediation.

36. Defendants further knew, or should have been known, that when MTBE was placed into Bayville's gasoline system there was a strong probability that it would escape into the surrounding environment and contaminate Plaintiffs' soil and well water.

## PRE-SALE DUTY TO PREVENT AND TO WARN

### A.   DUTY TO PREVENT

37. Defendants breached their duty to make sure that their product was safe before putting it into the stream of commerce. Specifically, Defendants failed to take appropriate precautions to protect public and private drinking water supplies, including Plaintiffs' water supplies, from being contaminated with MTBE. In failing to take adequate steps to prevent MTBE water contamination, Defendants also breached their duty to protect the public from unwittingly ingesting MTBE contaminated water.

38. Chevron, Gulf and Cumberland Farms further breached their duty to prevent gasoline from being discharged and released from the UST system into the soil and groundwater. Indeed, records taken from the New Jersey Department of Environmental Protection (hereinafter referred to as "NJDEP" or "State") indicated that these particular Defendants have known for years that gasoline was leaking from their UST system. They did nothing to stop the chemicals from leaking.

39.   In fact, even after a substantial amount of gasoline leaked into the ground, Defendants failed to prevent the continued migration of chemicals from the soil to groundwater. These Defendants knew, or should have known, that the petroleum contaminated soil acted as a continuous source of groundwater contamination that poisoned Bayville community members' private wells for years.  These Defendants were the only ones who were in a position to stop this contamination from spreading and yet they did nothing.

40.   To add insult to injury, to this date, Defendant Cumberland Farms continue to deny liability notwithstanding its knowledge that the UST systems on this site were leaking.  See Exhibits 1 and 2.

**B.   DUTY TO WARN**

41.   Defendants in this action failed in their duty to warn public agencies and owner/operators of "Mom & Pop" gasoline stations of MTBE's propensity to contaminate water.

42.   Specifically, Defendants failed to warn the Bayville community that as a result of having MTBE laced gasoline delivered to the Cumberland Farms gasoline station, their drinking water was in danger of being contaminated.  The people of Bayville deserved to be warned that their health and property might be placed in great danger as a result of Defendants' business activities.

43.   In addition to failing to warn the public of MTBE's negative characteristics, Defendants also failed in their duty to warn Bayville residents that they should obtain medical surveillance after they ingested MTBE and/or BTEX contaminated water.

44.   As a direct and proximate result of Defendants' breach of their duties, as outlined above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

**POST-SALE DUTY TO WARN AND REMEDIATE**

45.   Plaintiffs are informed and believe and thereon allege that Defendants placed MTBE laced gasoline into the stream of commerce.  Defendants' MTBE laced gasoline was delivered to the gasoline system located at the site without warning the proper governmental

authorities, or the operators of the Cumberland Farms gas station, of MTBE's dangers and defects. Defendants' MTBE laced gasoline was placed into the Cumberland Farms' gasoline system thereby causing Plaintiffs' water and soil to be contaminated with MTBE.

46. Defendants further knew that BTEX chemicals were being discharged into the soil and groundwater underneath the Cumberland Farms gasoline station and did nothing to prevent this contamination from spreading into Plaintiffs' drinking water.

47. Moreover, Defendants knew or should have known that, at the time the contamination was released, Plaintiffs' were defenseless to protect themselves because they had no knowledge of MTBE, Benzene and Toluene's carcinogenicity or of its negative impacts on soil and drinking water.

48. Also, once it became known that Bayville's drinking water had been contaminated, Defendants should have warned Plaintiffs of the problem and immediately remediated the contamination that their business activities had caused.

**A. DUTY TO WARN**

49. After realizing that Plaintiffs' soil and water had been contaminated as a result of Defendants' actions, Defendants failed to adequately warn the community that they needed to obtain medical surveillance.

**B. DUTY TO REMEDIATE**

50. Once the contamination became publicly known, Defendants failed to control the contamination plume from continually expanding into Bayville's soil and water wells.

51. Once the contamination became publicly known, Defendants failed to remediate the MTBE and BTEX contamination. Defendants have left Plaintiffs to fend for themselves knowing that Plaintiffs did not have the expertise or the resources to properly remediate the contamination plume that these Defendants created.

52. Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce has interfered with Plaintiffs' use and enjoyment of their property, and quality of life, and has diminished the value of their real property.

53. Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce caused Plaintiffs' need for medical surveillance.

54. Bayville community members are troubled by the fact that they have bathed in MTBE and/or BTEX contaminated water and have consumed this water.

55. Bayville community members are also troubled by the fact that they have unwittingly bathed their children in MTBE and/or BTEX contaminated water and given them this same water to drink.

56. Many Bayville community members have had to pay to be connected to an alternate water supply and incur monthly water expenses as a result of the MTBE and/or BTEX contamination.

57. As a direct and proximate result of Defendants' breach of their duties, as outlined above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

58. Defendants' actions, placing dangerous chemicals into the stream of commerce while knowing that they would surely contaminate drinking water, are wholly inappropriate.

59. Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of Plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

60. Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

61. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

1

2          d.   Compensatory damages in an amount determined to be just and equitable by

3   this Court.

4          e.   For special, exemplary and/or punitive damages according to proof.

5          f.   An order mandating that the Defendants, and each of them, and their

6   successors and assigns, take every action necessary to assure that all relief requested herein is

7   obtained and fully funded.

8          g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of

9   Court.

10         h.   For such other relief as this Court deems appropriate and just.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II
## STRICT PRODUCTS LIABILITY

62.    Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 61 inclusive.

63.    Defendants placed MTBE, a defective product, into the stream of commerce.

64.    Defendants mixed MTBE with gasoline thereby using it as an oxygenated additive.

65.    Defendants sold MTBE laced gasoline, thereby placing it into the stream of commerce. Said MTBE laced gasoline was then delivered to the site.

66.    Plaintiffs are informed and believe and thereon allege that MTBE is a particularly hazardous chemical in that it has a propensity to contaminate drinking and may cause serious disease and health problems.

67.    Defendants failed to warn appropriate governmental agencies, gasoline station operators and the potentially impacted public that MTBE had the propensity to contaminate water, including Bayville's drinking water.  Therefore, the MTBE placed into the stream of commerce by Defendants was defective because Defendants neither warned the appropriate governmental agencies nor the community of Bayville of MTBE's propensity to contaminate surrounding water resources when it is discharged into the environment.

68.    Thus, not only does the MTBE additive contain a design defect due to its inherent dangerous characteristics, it is also defective because Defendants failed to properly warn relevant regulatory agencies, distributors and consumers of MTBE's inherent dangerous characteristics.

69.    Defendants' action, placing an inherently dangerous chemical into the stream of commerce while knowing that it would surely contaminate drinking water, is wholly inappropriate.

70.    Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

71.   Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

72.   WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.   A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b.   Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c.   Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.   Compensatory damages in an amount determined to be just and equitable by this Court.

e.   For special, exemplary and/or punitive damages according to proof.

f.   An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.   For such other relief as this Court deems appropriate and just.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND FEAR OF FUTURE INJURY

73.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 72 inclusive.

74.   With conscious disregard for the safety of the Bayville residents, Defendants negligently placed MTBE laced gasoline into the stream of commerce.  The Defendants' MTBE laden gasoline was eventually delivered to the site.

75.   In placing MTBE into the stream of commerce the Defendants knew or should have known that MTBE was certain to invade Plaintiffs' homes, groundwater and property.

76.   Defendants' failure to properly warn governmental agencies, MTBE distributors, dispensers and sellers of MTBE's negative characteristics or otherwise take appropriate precautions in preventing the wide-spread contamination caused by MTBE led to the contamination of Plaintiffs' homes, groundwater and property.

77.   Defendants' failure to warn or take appropriate safety measures when placing this dangerous chemical into the stream of commerce constitutes outrageous acts that exceed all bounds of decency tolerated by our society.

78.   Defendants exhibited a reckless disregard for the probability of causing Plaintiffs severe emotional distress by contaminating Plaintiffs property, water supply, soil and environment, and by failing to take any steps to warn or otherwise remedy the likely impacts of their actions.

79.   Defendants negligently failed to take any steps to stop the contamination or to warn

Plaintiffs of the MTBE and/or BTEX contamination and its consequences.

80.   As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally

distressed due to their reasonable fear that MTBE and/or BTEX laced gasoline will continue to contaminate their drinking water and property, the drinking water and property of their neighbors, and cause more damage to their community.

81.    As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally distressed because Plaintiffs are now aware of the potential repercussions of exposure to MTBE and/or BTEX laced gasoline.  Plaintiffs suffer and will continue to suffer severe emotional distress due to the reasonable belief that the MTBE and/or BTEX contaminated water that they ingested, or were otherwise exposed to, will likely cause future medical health problems or complications.  Moreover, Plaintiffs are reasonably distressed at the prospect of their children and other family members suffering future medical health problems or complications as a result of the MTBE and/or BTEX exposure.

82.    Defendants' actions, placing dangerous chemicals into the stream of commerce while knowing that they would surely contaminate drinking water, are wholly inappropriate.

83.    Moreover, the Defendants willfully and intentionally breached their duty of care and acted with fraud, malice and oppression for which punitive and exemplary damages should be imposed.

84.    Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

85.    WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.  A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b.  Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.  Compensatory damages in an amount determined to be just and equitable by

**FIRST AMENDED COMPLAINT**

e.   For special, exemplary and/or punitive damages according to proof.

f.   An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.   For such other relief as this Court deems appropriate and just.

## COUNT IV
## QUALITY OF LIFE DAMAGE

86. Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 85 inclusive.

87. Plaintiffs' quality of life has deteriorated tremendously as a result of the MTBE and/or BTEX contamination in the Bayville area drinking water.

88. Plaintiffs have been unable to drink their water, bathe in their water, invite guests to their homes for fear that they too may be injured as a result of ingesting or coming into contact with the MTBE and/or BTEX laden water, swim, grow vegetables in their garden, wash their cars, allow their children to play in their yards.

89. Plaintiffs have suffered from medical injuries, including but not limited to, respiratory problems, rashes, dizziness, headaches, from consuming and otherwise using or coming into contact with their MTBE laden water.

90. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d. Compensatory damages in an amount determined to be just and equitable by this Court.

e. For special, exemplary and/or punitive damages according to proof.

f. An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

FIRST AMENDED COMPLAINT

g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.   For such other relief as this Court deems appropriate and just.

DATED:      September 22, 2000


LIEBERMAN  & BLECHER, P.C.


By:_____

Stuart J. Lieberman and
Shari M. Blecher

Attorneys for Plaintiffs


## CERTIFICATION

I Certify that there are no other lawsuits or actions relating to the subject of this litigation of which I am aware.


## DEMAND FOR INSURANCE COVERAGE INFORMATION


Pursuant to the New Jersey Rules of Court, please provide all required information relating to any insurance carriers who may provide coverage in this matter.

# ARCHER & GREINER

A PROFESSIONAL CORPORATION

COUNSELLORS AT LAW

**ONE CENTENNIAL SQUARE**

**P.O. BOX 3000**

**HADDONFIELD, N.J. 08033-0968**

856 - 795-2121

FAX 856 - 795-0574

HTTP://WWW.ARCHERLAW.COM

F. MORSE ARCHER, JR.
(1902-1984)

FREDERICK P. GREINER
(1906-1994)

THOMAS M. SANTIVOGLIO
FREDERICK J. ROHLOFF
KLEN L. HART, JR.
A. HYMERLING*
ERT R. KUGLER*
EDWARD C. LAIRD
L. GERALD RIGBY**
JULIAN RUNNEY*
FRANK R. DEMMERLY, JR.
ROBERT T. EGAN
STEVEN W. SUPLAS*
GARY L. GREEN*
GERALD E. DARLING*
SEAN T. O'MEARA*
CHRISTOPHER R. GIBSON*
THOMAS J. HURLEY
DENISE M. STURGA*
DEBRA S. ROSEN*
KEVIN L. LILLY
DEBORAH A. HAYS*
RICHARD F. ROY, JR.*
LOUIS L. CHIODOFF*
ARTHUR H. JONES, JR.*
STEVEN K. MIGNOGNA*
KATHERINE BENESCH*
CHRISTOPHER S. YOUNG*

GEORGE F. KUGLER, JR.
PETER E. DRISCOLL
CHARLES W. HEUSLER*
ROBERT G. HARRISON*
JOHN N. FIONELLA
ROBERT T. LEHMAN
ARTHUR F. RISDEN
GARY J. LESNESKI
JAMES H. CARLL
FRANK D. ALLEN**
WILLIAM J. THOMPSON*
GORDON F. MOORE II
TERENCE J. FOX
ROBERT W. BUCKMAN, JR.*
STEVEN J. FRAM*
ELLIS L. MEDOWAY*
THOMAS A. MUCCIFORI
NEAL L. SCHOENHAUT*
JOEL SCHNEIDER*
CRAIG J. HUBER
RICHARD M. CONLEY
JOHN C. CONNELL*
MICHAEL E. LIGORANO
MICHAEL W. SOZANSKY, JR.*
MARC A. ROLLO*

ALLYSON T. BACCINI
RITA M. BOSELLI*
NINA L. COHEN*
PETER FASCIA*
STEPHEN M. FOGLER*
PETER L. FRATTARELLI*
JEFFREY D. GORDON*
RICHARD GRUNGO, JR.*
THOMAS M. HERDELIN*
E. LYNNE HIRSCH*
DARRIN HOWARD*
PATRICK JUDGE, JR.*
KIMBERLY KERSEY*
ANTHONY R. LA RATTA*
RONALD G. LIEBERMAN
MELISSA MACLEOD*
LOREN M. MERSON
MARK J. OBERSTAEDT*
STEPHEN M. PACKMAN*
DAVID A. RAPUANO*
JESSE A. RODRIGUEZ*
STACEY J. SINCLAIR*
KATHLEEN P. STOCKTON
ANGELA C. TITUS*
MELISSA WHEATCROFT*
CARINE B. ZENHUSS*

HENRY G. BOENNING
DOUGLAS E. BURRY*
JOHN B. COMEGNO II*
PATRICK M. FLYNN
CRISTINA M. FRACCALVIERI*
PATRICIA GILBERT*
WILLIAM J. GROBLE*
SUSAN J. GUENZNER*
DAVID L. HERRMANN*
GULET D. HIRSCH
STACEY J. JASKOL*
EDWARD J. KELLEHER*
SIGRID B. KEP
KENN A. LAU*
NICHOLAS J. LOCHETTA II*
JOSEPH A. MARTIN
LEIF M. NISSEN*
WILLIAM J. O'KANE, JR.*
GREGORY J. PALAKOW
KATHLEEN M. RICCIARDI*
WILLIAM L. RYAN*
JAMIE A. SUSMA*
MICHAEL T. SWEENEY*
CHAD WARNKEN
CHRISTOPHER WISNIEWSKI*
SONYA K. N. ZEIGLER*

PHILADELPHIA OFFICE
ONE SOUTH BROAD STREET
SUITE 1620
PHILADELPHIA, PENNSYLVANIA 19107
215 - 568-4160
FAX 215 - 568-3643

PRINCETON OFFICE
PRINCETON PIKE CORPORATE CENTER
993 LENOX DRIVE, BUILDING TWO
CN 5349
PRINCETON, NJ 08543-5349
609-896-0011
FAX 609-896-0085

OF COUNSEL
RAYMOND B. DRAKE

SPECIAL COUNSEL
ROBERT J. FOGG*

FLEMINGTON OFFICE
100 MAIN STREET
FLEMINGTON, NJ 08822-1464
908 - 788-9700
FAX 908 - 788-7954

*Also Member of Pennsylvania Bar
**Member of Pennsylvania Bar Only
*Certified Civil Trial Attorney
§Certified Matrimonial Law Attorney

June 14, 2000

**Direct Dial**
(856) 354-3084

**Direct E-Mail**
drosen@archerlaw.com

**\*\*VIA TELECOPY & ORDINARY MAIL\*\***

Gary Sanderson
Bureau of Underground Storage Tanks
NJ Department of Environmental Protection
P.O. Box 433
401 E. State Street
Trenton, NJ 08625

RECEIVED

JUN 1 9 2000

RE:    **Cumberland Farms, Inc. - Former Gulf Service Station No. 2904**
       **Route 9 and Morris Boulevard**
       **Berkeley Township, Ocean County**
       **Case No. 99-07-27-1159-05**
       **UST No. 0058629**

Dear Mr. Sanderson:

        As a follow-up to our telephone conversation yesterday, I thought it appropriate to briefly outline the status of Cumberland Farms, Inc.'s (CFI) investigation in Berkeley Township, as well as its future plans, concerning the potable well contamination in Bel Aire Park. As you know, CFI has worked closely with its environmental consultant, Environmental Evaluation Group (EEG), in investigating both the potable well contamination and the ongoing groundwater investigation at the former Gulf service station.

        To date, EEG has sampled over 125 domestic wells in Bel Aire Park. Only seven of those wells have concentrations of MTBE at levels above drinking water Maximum Contaminant Levels (MCLs), and those seven homes have now been connected to the Berkeley water system. One additional home which tested at 66 ppb will also be connected to the water system and CFI is committed to continuing to connect those homeowners who test above MCLs and others on a case-by-case basis. CFI also intends to



EXHIBIT

*1*

ALL-STATE LEGAL SUPPLY CO.

Gary Sanderson
June 14, 2000
Page 2

continue monitoring, on a monthly basis, those potable wells that have been impacted with any level of contamination, or are in the area of other wells which have demonstrated levels of contamination above MCLs.

CFI is also working with EEG to continue the groundwater investigation so that we can understand the groundwater dynamics in the area. As you know, five additional monitoring wells are being installed this week. CFI believes it has been extremely cooperative with the Department in complying with all requests made, whether formally through the Field Directive or informally through various conversations with CFI and EEG. CFI certainly intends to keep the channels of communication open with regard to any technical concerns that the DEP may have concerning the ongoing investigation and potable well sampling, but is, quite frankly, somewhat disappointed in the scope of the Department's investigation with regard to other potential sources in the area which appear to be as likely, if not more likely, than the former Gulf service station.

As CFI's underground storage tank report indicated, after additional soil removal activities following the tank removal, only one soil sample had a slightly elevated concentration of MTBE. When this soil sample was averaged with the many other samples below standards, this site became appropriate for no further action for any remaining soil contamination and there cannot credibly be claimed to be an ongoing source of contamination in the soil at the former Gulf service station.

While the groundwater investigation does continue, it must be noted that there are fuel oil or other heavy constituents being found in the potable wells, generally as Tentatively Identified Compounds (TICs). This contamination could certainly be indicative of contamination from area fuel oil tanks used for home heating, or diesel fuel related to any at home servicing of trucks or other vehicles. Additionally, while MTBE is generally not a component of fuel oil, as I am sure you are aware, it has been found in many instances in fuel oil where fuel oil deliverers also deliver or store gasoline which contains MTBE.

Moreover, additional gasoline constituents, other than MTBE, are being found in some of the wells, which again could be indicative of various "housekeeping" activities, including filling and spillage related to lawn mowers or weed whackers, four wheel drive vehicles, which we understand are prevalent in this area, and other servicing of cars in the neighborhood, which we also understand is quite prevalent. Indeed, we have received information that at least two residents in the neighborhood do commercial automotive work from their homes. Chloroform is also showing up in virtually all of the potable wells at significant levels, indicating pesticide and insecticide contamination or other homeowner activities causing degradation of the groundwater in the Bel Aire Park area.

Lastly, CFI is most concerned about the lack of a groundwater investigation being conducted at the Kurnel's & Sons site. This location has been a known source of gasoline contamination in the area for several years and was the subject of an apparently aborted publicly funded investigation.

Given the many other potential sources for the contamination, CFI certainly believes it is premature to label CFI the "Responsible Party" in this matter or even the most likely <u>potentially</u>

Gary Sanderson
June 14, 2000
Page 3

responsible party in this matter. Indeed, given the multitude of other possible sources, CFI certainly reserves its right under the Spill Act and other statutory and regulatory provisions to seek to recover any monies it has spent to date from the responsible party and to seek contribution and treble damages as provided under law.

While it is premature for CFI to be required at this point to provide alternative water, in the form of connection to the water system, for all of Bel Aire Park, CFI would encourage the Department to support any efforts of the Township or otherwise to hasten the connection of the homeowners to the Berkeley water system. In addition, CFI would request the Department and County work with the Township to immediately pass an ordinance requiring well sealing in this area upon connection to the water system.

As I indicated to you on the telephone yesterday, CFI wants to remain cooperative with the Department and to keep open the channels of communication. We certainly do not want to change your procedure in dealing with Phil Brilliant of EEG or Paul Dandrade of CFI with respect to technical issues. If, however, the Department is looking to impose additional requirements on CFI or requests conferences with CFI on issues of such import as connecting the entire subdivision to the water system, CFI would appreciate those requests being made through me.

If you should have any questions at all, please do not hesitate to contact me.

Very truly yours,

DEBRA S. ROSEN

DSR:jmt
cc:    Kevin Kratina, Chief, Bureau of Underground Storage Tanks
       Emile C. Tayeh, P.E., Vice President, Environmental Affairs
       Mark G. Howard, Corporate General Counsel, Cumberland Farms, Inc.
       Philip Brilliant, EEG



# State of New Jersey
### Department of Environmental Protection

Christine Todd Whitman
*Governor*

Robert C. Shinn, Jr.
*Commissioner*

*Bureau of Underground Storage Tanks*
*PO Box 433*
*401 East State Street*
*Trenton, NJ 08625*

**Via FAX and CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Paul Dandrade
Cumberland Farms Incorporated
777 Dedham Street
Canton, MA 02021

JUN 2 6 2000

Debra Rosen, Esq.
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033

Re:   Cumberland Farms Incorporated – Gulf S/S # 2904
       Route 9 and Morris Blvd.
       Berkeley Township, Ocean County
       Case # 99-07-27-1159-05
       UST # 0058629

       Potable Well Contamination at Bel Aire Park

Dear Mr. Dandrade:

This is in response to Debra Rosen's letter dated June 14, 2000 regarding the above referenced site. The New Jersey Department of Environmental Protection ("Department") wishes to clarify several issues contained in Ms. Rosen's letter.

Ms. Rosen's stated that Cumberland Farms Incorporated would continue monitoring the potable wells in the Bel Aire Park Section on a monthly basis. Please be advised that by letter dated June 14, 2000, the Department increased the frequency of sampling in potable wells located in the Joy Place, Shelly Lane and Lee Avenue areas.

Ms. Rosen's letter states that there are several other potential sources of contamination in the area, which appear to be as likely, if not more likely, than the former Gulf Service Station. Although there may be other potential sources of contamination in the area, the Cumberland Farms investigation to date has not indicated the presence of any other confirmed sources of MTBE ground water contamination in the Bel Aire Park area. The information collected to date indicates that upon removal an 8,000-gallon gasoline tank, the tank was reported to contain a hole. Post excavation soil samples indicated the presence of elevated levels of benzene, toluene ethylbenzene and total xylene (BTEX) compounds in four soil samples. In one of these samples MTBE was detected at 27 part per million. Based on the post-excavation soil sample results, Cumberland Farms Incorporated removed approximately 366 tons of contaminated soil. Post remedial samples collected after the removal of the soil indicated the presence of MTBE in all seven samples; one of the samples contained MTBE at 5.6 ppm. To date, the full vertical extent of the MTBE contamination in the soil at the site has not been determined. Averaging of soil data before completion of the contaminant delineation is not acceptable. Based on the above, the claim that the soil at the site can not be considered an ongoing source of contamination is unfounded. Preliminary verbal results of the samples collected from the monitoring wells revealed the presence of elevated levels of MTBE at the site and off –site. In addition, results from 16 shallow temporary wells points installed throughout the Bel Aire Park Section did not reveal evidence of any additional sources of contamination. Regardless, an actual ground water impact at the Cumberland Farms site has been

*New Jersey is an Equal Opportunity Employer*
*Recycled Paper*

confirmed.

Concerning the tentatively identified compounds (TICs) found in some of the wells in the area, although it is true that these compounds appear to be originating from fuel oil, no correlation has been found between concentrations of MTBE and the presence of TICs. In addition, none of these compounds exceeded the Ground Water Quality Standards and or Safe Drinking Water MCIs as applicable.

Regarding the statement in Ms. Rosen's letter that additional gasoline constituents are being found, other than MTBE, in some of the wells, the Department is only aware of one property owner who submitted test results from their well indicating the presence of gasoline contaminants other than MTBE. These results have not been confirmed or reproduced after two subsequent sampling rounds conducted by Cumberland Farms Incorporated.

With respect to Chloroform being detected in the area's potable wells in significant levels, all potable well data submitted to date does not indicate levels of chloroform above the Safe Drinking Water Maximum Contaminant Level (MCLs) for trihlamethanes.

Lastly, Regarding the contention concerning the lack of a ground water investigation at the A. Kurnel and Sons site, please be advised that the Department has designated an impact area for the ground water contamination at the A. Kurnel and Sons site. All properties within that area have been provided an alternative potable water supply. Furthermore, from the investigation conducted to date, it has been determined that the ground water flow direction from the A. Kurnel and Son site is towards the east and is not towards the Bel Aire Park Section.

Environmental Evaluation Group has reported to the Department that they have been conducting Multi – Phase Recovery at the site on a weekly basis. Cumberland Farms Incorporated shall submit within 7 days of receipt of the letter data indicating the effectiveness of MPR on the recovery of contamination at the site. In order the gain hydraulic control of the contaminant plume, Cumberland Farms Incorporated shall conducted the following:

1. Conducted aquifer testing within seven day upon receipt of this letter;

2. Based on the aquifer test results, submit a design for a pump and treat ground water system within 14 days upon receipt of this letter. In additional all anticipated permit applications shall be submitted with the system design; and

3. Install and operate the system within 14 days upon receipt of the Department's approval.

The Department remains willing to provide Cumberland Farms Incorporated and its representatives technical guidance and assistance to completed the remedial investigation at the above referenced site.

Should you have any questions regarding this matter, please contact Gary Sanderson, of the Bureau of Underground Storage Tanks, at (609) 633-0544.

Sincerely,

Kevin F. Kratina, Chief
Bureau of Underground Storage Tanks

C:   Gary Sanderson, BUST
     Municipal Clerk, Berkeley Township
     Ocean County Health Department

Exhibit B

US OFFICE PRODUCTS

1

1134BERC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3
     IN RE:  MTBE                              MDL 1358
 4
 5   ------------------------------x
 6
                                      New York, NY
 7                                    January 3, 2001
                                      2:15 p.m.
 8
 9   Before:
10             HON. SHIRA A. SCHEINDLIN
11                                      District Judge
12
13
14                    o   O   o
15
16
17
18
19
20
21
22
23
24
25
```

1134BERC

```
 1        (Case called)
 2        THE COURT:  Good afternoon to everybody.  I have
 3   received a fair amount of correspondence in advance of today's
 4   conference, including letters from each side as to what should
 5   be on today's agenda.  Let me see if I can summarize for the
 6   record the correspondence I have received so you know what I
 7   have in front of me.  I have December 29 letters regarding the
 8   agenda from both Mr. Ratner on behalf of plaintiffs and
 9   Mr. Sacripanti for defendants.  Then I have, probably on this
10   proposed amended complaint issue, a letter dated December 13,
11   from Mr. Wallace and a response dated December 22 from
12   Mr. Ratner.  I have reviewed the August 25 and October 3
13   letters originally addressed to the question of bifurcation.
14   Then I have obviously received the proposed amended complaints
15   in Berisha, England, and Young, and a master complaint itself.
16   That describes the materials I have.
17        Let me tell you the agenda, although I know you all
18   know it, because it tracks your letters.  We need to discuss
19   the whole question of amending the complaint.  I think we will
20   do that last.  We will try to take up what I perceive as the
21   shorter, easier discussions first.  There are questions about
22   the confidentiality order, questions about the website,
23   questions about the document preservation/nondestruct order,
24   questions about the document depository, and questions about
25   the Bates stamping of documents being produced for inspection.
```

3

1134BERC

1    I think that's the entire agenda.  Did I leave any item out

2    that anybody notices.  This is a good time to mention that you

3    are to state your name each time before you speak or we will

4    not have a clear record in today's proceedings.  Try to

5    remember to do that.  Did I leave anything out of the agenda

6    that anybody thinks should be discussed today.  All right.

7            In an effort to do what I think is easiest first, I

8    don't think the document depository issues are terribly hard.

9    I mean that it's a common-sense decision on my part to make

10   and I am going to make it.  It seems to me if plaintiffs want

11   the space that they want because of its convenience, but that

12   space is twice as expensive that might be used but not nearly

13   as convenient, then the plaintiffs should bear any additional

14   cost.  If the space they believe is sufficient turns out to be

15   not sufficient, then it's their problem; they didn't have to

16   create this problem.  They could have had twice as much space

17   at the same cost in an inconvenient location.  They say we

18   think this is fine.  If you are right, you won't pay an extra

19   penny; if you are wrong, you will.  You will pay for the move

20   and whatever costs are associated with breaking the first

21   least.  That's what will be done.  That should help you

22   finalize where you go with the documents.

23           MR. BREIT:  There is one remaining issue on that

24   question of what would happen if we do require additional

25   space.  I think what you have ruled is that if there is an

SOUTHERN DISTRICT REPORTERS (212) 805-0300

4

1134BERC

1    additional cost for moving, that we have to bear that expense.

2         THE COURT:  If you have to break your lease, you have

3    to bear that expense.

4         MR. BREIT:  Then the question becomes whether under

5    defendants' terms we are then required to move the space

6    outside of Manhattan or whether we still choose to have it

7    where we want it.

8         THE COURT:  The additional space.  I gather you would

9    be in two locations; you would not be required to close up the

10   Manhattan space if you outgrow it.

11        MR. BREIT:  Right.

12        THE COURT:  But there might be additional space

13   needed; apparently, that's going to have to be an alternate

14   location.

15        MR. BREIT:  Defendants have requested that alternate

16   location be outside of Manhattan.  Are you ruling on that; do

17   we need to meet and confer on that if that's necessary?

18        THE COURT:  It seems to me that the additional space

19   should be where it's cheapest.  If you want it in Manhattan,

20   nonetheless, you pick up the differential over the cheaper

21   price, that's all.  For additional space, instead of having

22   the 75/25 split we have now, should you need only 500

23   additional square feet, the difference is $10 a square foot,

24   you want to be in Manhattan, you pay the differential.  Done.

25        MR. SACRIPANTI:  We reached agreement on the website

1134BERC

1   just prior to the conference.  The agreement is we will use

2   the vendor selected by the plaintiffs and we agree that that

3   vendor should have a website operational by February 3.  The

4   only outstanding issue we will meet and confer on is the

5   allocation of cost.

6           THE COURT:  Good.  The document preservation or

7   nondestruct order, there doesn't really seem to be much of a

8   disagreement here other than some producing to set limits to

9   get it done.  As I understand it, the draft from plaintiffs

10  was submitted to the defendants on December 28, which is just

11  a couple of days ago; they need a time frame for response and

12  for negotiation.  If you can't do it, I will do it.

13          MR. SAUL:  We have agreed with the defendants to put

14  this off until the next hearing in an attempt to come to terms

15  on this issue.

16          MR. GUTTMAN:  Yes.

17          THE COURT:  When is the next date.

18          MR. GUTTMAN:  January 30 I believe is the date.

19  That's the conference you set to deal with discovery issues

20  specifically.  We can take it up then if the court would like.

21          THE COURT:  I have to down for 10:00.  I am glad we

22  are doing this.  That's not a good day.  I would like to

23  change it.  It's not a not good day; it would be the second

24  day of a trial that was moved.  So I would prefer January 26

25  at 10:00, a Friday.

6

1134BERC

1    MR. SACRIPANTI:  If I may, your Honor, we have

2    scheduled some meet and confer dates that will probably push

3    not into that week but perhaps into that week.  Maybe we would

4    benefit by having the week after rather than the week before.

5        THE COURT:  It looks like there are going to be some

6    back-to-back trials.  I would like to give you enough time.  I

7    usually hold my status conferences at 4:30.  That won't be

8    enough time.  February 5 would be all right.  Do you want to

9    put it off until Monday, February 5, as opposed to Friday,

10   January 26.  It's about a one-week difference.

11       MR. SACRIPANTI:  That would work, I can tell by the

12   nodding of the heads for defendants.  I can't speak for

13   plaintiffs.

14       MR. RATNER:  That's fine, your Honor.

15       MR. GUTTMAN:  Would that be 10:00, your Honor.

16       THE COURT:  Yes.  The Bates stamping issue then.

17       MR. RATNER:  For plaintiffs, your Honor, we think

18   that there is not yet a dispute on this issue and I don't

19   think we have disagreement between the parties on this issue.

20       MR. SACRIPANTI:  I was told otherwise prior to the

21   hearing.

22       THE COURT:  The letters certainly indicated

23   otherwise.  If you don't have a dispute what is the agreement.

24       MR. RATNER:  We had a discussion regarding this.  We

25   did not intend to place it on the agenda today.  We had a

7

1134BERC

1     discussion with Mr. Sacripanti and I didn't put it in our

2     agenda.  I must have failed to adequately communicate with

3     him.  We are not going to raise this with the court.

4              THE COURT:  What's going to be done.

5              MR. RATNER:  I believe they are going to produce, as

6     I understand defendants, also through their view rooms, before

7     documents are selected for placing in a repository, documents

8     responsive to our requests.  Where these documents already

9     bear Bates numbers from prior litigations they will maintain

10    these Bates numbers on them.  Then when they are placed in the

11    repository, the repository index will reflect the original

12    Bates number and the MDL number in conformity with case

13    management order 2.

14              The only area we had that was of disagreement,

15    initially we were hoping defendants would agree to Bates stamp

16    all documents placed in the view room so we can always know

17    what we have seen, what we have not seen.  The defendants have

18    refused to do that.  Our position I believe based on

19    discussions that we have recently had among ourselves is that

20    we will go forward without forcing that issue, see how it

21    goes.  If it becomes a problem we will address it later.  For

22    now we are ready to go along the path outlined in

23    Mr. Sacripanti's letter.

24              THE COURT:  That leaves only the confidentiality

25    issue before we address the proposed amended complaints.

1134BERC

1        MR. HINCK:  On the positive side we came down to an

2    agreement on a number of outstanding issues.  On the

3    confidentiality agreement we were left with one.  The

4    agreement in conformance with what was discussed here in court

5    allows the lawyers representing plaintiffs in other MTBE

6    actions to sign a confidentiality order, view documents

7    produced in this case, in the MDL.  Plaintiffs, based on our

8    experience, wanted to have that go two ways, where we would be

9    able to look at documents that plaintiffs in other MTBE

10   actions have already gotten or organized, etc.

11       Our experience includes our difficulty right now

12   working with co-counsel even at this table who have had

13   documents produced to them by defendants in this case in

14   another litigation and they signed confidentiality orders that

15   constrain them from allowing us to look at those documents.

16   My understanding is that defendants' response is they are

17   going to produce the same document quite possibly in this case

18   if it's responsive to a request, etc., and survives motion

19   practice, or whatever, and, for example, we may be able to

20   find them right now in Houston.

21       We find that to be burdensome.  We think simply the

22   most efficient thing to do in some cases would be to turn to

23   our colleague Mr. Summy who has looked at a lot of documents

24   in other cases and ask Mr. Summy, can we see the deposition

25   that occurred in the California case.  Right now he says he

9

1134BERC

1   can't allow us to see it because of the confidentiality order

2   in that case.

3           We proposed language that would be in this

4   confidentiality agreement.  Defendants wouldn't go along with

5   that.  I told them we didn't insist it be in the

6   confidentiality agreement, we were hoping to accomplish that,

7   could they suggest a way that can be accomplished.  As far as

8   I can tell so far their position is that it shouldn't be

9   accomplished.

10          MR. SACRIPANTI:  You will recall at our last

11  conference there were several issues regarding the

12  confidentiality agreement that were discussed, that were

13  discussed, and it was ordered by the court that it was up to

14  us to put it together.  We have done that.  This is a new

15  issue.  In essence, what this issue does is ask for a greater

16  confidentiality agreement than had been executed in the other

17  cases.  It countermanded orders courts have given in other

18  cases.  It is problematical from our standpoint.

19          Let me correct the record and tell the court what we

20  are willing to do.  To the extent there is discovery that's

21  dispositive and responsive here, we are going to produce that

22  discovery.  We will produce it in the same form that it was

23  produced in other cases if it in fact is responsive to the

24  discovery in this case.  There will be no burden to the

25  plaintiffs.  Then that discovery will become subject to the

SOUTHERN DISTRICT REPORTERS (212) 805-0300

10

1134BERC

1    confidentiality agreement and order that we have discussed and

2    the court will hopefully sign.

3              MR. SUMMY:  If I could address that.  It is

4    burdensome.  Even if they produce the documents they have

5    already produced to me, it's taken me two years to glean out

6    what I could.  I have taken about 70 depositions that refer to

7    those documents.  I can't share that with my co-counsel here.

8    It just doesn't work.

9              THE COURT:  It doesn't; it's absolutely illogical.

10   The way to handle this, if anything has been previously

11   produced and is now called for, the prior confidentiality

12   order is no longer controlling in the sense you are producing

13   it in effect here if it's responsive.  Therefore, Mr. Summy

14   who has it can share it from his files.  Do you understand.

15   You need only confer that it's responsive here.  I don't see

16   how 70 depositions could be anything but responsive here; it

17   would boggle anybody's mind that would not be responsive here.

18             MR. SACRIPANTI:  We agree that to the extent it's

19   responsive that we will again produce it in that fashion.

20             THE COURT:  You said that.  I am saying that

21   Mr. Summy can share it as he has now organized it as soon as

22   it's clear it's responsive here.  Make up a request that says

23   anything previously produced we hereby request.  I will grant

24   it.  That's the end of it being responsive.  It seems silly to

25   know, unless there is a defendant not here who made previous

1134BERC

1   production, that defendant's production is under somebody

2   else's confidentiality order.  Is there any such production

3   you know of of a different defendant not here?

4           MR. SUMMY:  Yes, there would be two defendants,

5   Unical and Arco Chemical.  I would propose anything they gave

6   me that is confidential I will not share with counsel here.

7           THE COURT:  You can't give their documents away

8   within this group.

9           MR. SACRIPANTI:  Two other issues under the

10  confidentiality agreement, that nobody negotiated documents

11  designated as such would be identified to us would be stamped

12  every page confidential.  I don't think we get to that point

13  if plaintiffs' counsel are allowed to switch and exchange

14  documents without notifying us what documents they have in

15  fact shared with one another.

16          THE COURT:  They can do so.  I understand it's

17  burdensome.  They can identify it in some way.

18          MR. SACRIPANTI:  Then we would have a record just

19  like they would if they went into the view room of what

20  documents they have chosen to use that are confidential.  If

21  the court would be willing to do that, that would at least

22  satisfy some of the concerns defense has.

23          THE COURT:  I am willing to, it's burdensome, type

24  out lists of thousands of documents.  Hopefully you will find

25  a somewhat simpler way to do it.

12

1134BERC

1        MR. SUMMY:  I am willing to do that.  It goes back to

2   the problem they stamped everything confidential.  The list is

3   going to be very long.

4        THE COURT:  The second part of this order here or

5   this issue is that the defendants, if I understand, have asked

6   this court to resolve disputes between parties even if they

7   are not in this litigation but disputes involving documents

8   that may be placed in the repository here.  Did I get that

9   wrong.  I think I saw that in plaintiffs' letter.

10        MR. SACRIPANTI:  I think you read plaintiffs' letter

11   correctly.

12        THE COURT:  Let me hear from plaintiffs.

13        MR. HINCK:  Your Honor, I believe we raised it to

14   notify the court we don't have a strong position on it.  It

15   was something that defendants wanted.  We initially balked at

16   it, then thought it through.  It might be largely an issue for

17   the court.

18        THE COURT:  Who wants it now?

19        MR. SACRIPANTI:  Your Honor, to the extent lawyers

20   outside of the litigation come to the view room, take

21   confidential documents, they have to identify them, agree to

22   be bound by the order, agree to submit to your jurisdiction,

23   then should this MDL terminate, those other actions continue,

24   we would ask the court to maintain continuing jurisdiction

25   over that order to enforce that order.  That was a provision

1134BERC

1   we put in.  That's where I am assuming this discussion came

2   from.  I am not quite sure myself.

3          MR. RATNER:  That is where the discussion came from.

4   We are just flagging the issue for your Honor.  The question

5   is does this court want to extend its jurisdiction in this

6   way.  The court may and the court may not.  We wanted you to

7   be aware it had been included in the defendants' draft order.

8          MR. SAUL:  To be clear, plaintiffs don't have a

9   problem with this.  If the court wishes to continue having

10  continuing jurisdiction over these documents.

11         THE COURT:  Fine.  It seems at this early stage I

12  would accept that assignment subject to the fact that I may

13  some day say enough and just stop.

14         MR. SACRIPANTI:  Fair enough, your Honor.

15         THE COURT:  Done.  I think we are up to the big issue

16  for today's conference which has to do with the proposed

17  amended complaints and the master complaint from which the

18  proposed amended complaints stemmed.  This debate, shall I

19  say, caused me to do a lot of reading over the last two weeks.

20  Everybody was citing cases that probably would have been

21  better cited on motions to dismiss or to certify a class

22  action.  I am prepared for the next two motions down the road.

23  I have not read the cases cited by both sides.

24         I would like to share some of my thoughts to help you

25  maybe frame the comments you might wish to make.  Generally

1134BERC

1   speaking, I don't wish to go through a formal motion for leave

2   to amend and a formal response and then a formal decision then

3   have the amended complaints and motions to dismiss.  It

4   doesn't seem an efficient way to go.  I consider the extensive

5   letter-writing that you have all engaged in where you wrote

6   single-space letters, that would be the equivalent of 16 or 18

7   page briefs, to be briefs.

8          It seems to me the issue of a motion for leave to

9   amend has been well briefed in these letters.  While it's true

10  that the party who wishes to amend has to seek leave with the

11  court, Mr. Ratner can say I seek leave, you can stand up and

12  say I oppose, and I will rule.  That's the end of the leave to

13  amend phase.  Generally speaking, I agree with the plaintiffs;

14  I don't think it's a plaintiff and defendant issue.  Really,

15  the best place to handle this is either in a motion to dismiss

16  or in the class certification stage.

17         That said, I have problems with what plaintiffs

18  propose to do.  I do agree with the defendants that I need and

19  they need some answers.  We are just putting over the moment

20  in which you have to answer this.  This is as good a time as

21  any.  I can tell from the proposals, from the letter-writing

22  there is a lot of strategy here and probably lot of effort to

23  work around the decisions that have not been favorable.  I can

24  see from reading the pleadings you studied the opinion then

25  done everything you can to move away from the opinion, which I

1134BERC

1    understand fully.  There is a lot of thinking going on how to

2    structure the complaint.  There are questions I have.

3           Probably the biggest concern of all is, as I read the

4    proposed amended complaint, the only class plaintiff left in

5    what was the Berisha action is La Susa.  He is only purporting

6    to represent a class of those folks who don't know whether

7    their wells are contaminated or not.  He is seeking equitable

8    relief, injunctive relief only.  Is this a court-ordered,

9    court-supervised testing and monitoring class?

10          I don't have a big question as to whether it's

11   injunctive or not; it sounds injunctive enough to me because

12   of the way you carefully pled.  That's not a problem.  That's

13   the only class you have in there.  You no longer have any

14   class representative for any damages claim for anybody whose

15   well is known to be contaminated.  This may present problems

16   under 23(d)2 or (e).  Namely, the original complaint had such

17   a class representative so you purported to file an action on

18   behalf of folks whose wells were contaminated and who sought

19   damages flowing from that contamination.

20          You have abandoned that class action, so while under

21   all those cases that you cite me about how there is no need

22   under 23(e) to give any notice that the class action is not

23   dismissed, I understand that, these are just claims within a

24   class.  You claim to be just narrowing things.  Let's face it.

25   Let's get right to the heart.  There was one purported class

16

1134BERC

1    for well owners whose wells were contaminated seeking damages.

2    That class is abandoned.  With that it is a closure.  There

3    once was a case; there is no more case for that class.

4         What are we going to do?  You have a couple of

5    individual plaintiffs left, Berisha and O'Brien, who seem to

6    want to pursue their own individual damages claims for their

7    contaminated wells in the middle of a class action seeking

8    only injunctive relieve on behalf of those people who don't

9    know if their wells were contaminated.  I thought that was

10   odd, individual damages claims hanging with this single class

11   action or testing class.  I need to understand what you are

12   doing.

13        Specifically, when I say what you are doing, the

14   questions that worry me were notice, so anybody who thought

15   that there was about to be a class action for contaminated

16   wells realized that that's not this action.  If they relied on

17   it in any way, they may need some kind of notice in a

18   newspaper or something that there is no action going on, no

19   class action going on for those people who own wells that

20   already had testing and know there is contamination.

21        Another worry I have besides possible notice is res

22   judicata.  Are there people here who might get bound by some

23   discussions that come out of this case in some way that might

24   be detrimental to them if they had no voice at all in the

25   action.  I suppose a third and maybe the least important of my

1134BERC

1    questions still there is the defense concern that's been going

2    on for months about this notion of bifurcation and avoidance

3    of a jury trial.  I am not so sure that's as big a question

4    for me now because there is no class action for those whose

5    wells are contaminated who are seeking damages.

6           The only class action that apparently is being

7    brought in the MDL, there may be no other claims but equitable

8    claims I realize when wells are tested and people find out

9    they have contamination and they may wish to bring damages

10   claims eventually.  I don't know if they are going to do it

11   individually or still hope down the road to pursue that as a

12   class action.

13          If you think that you are going to pursue it as a

14   class action, we may have that bifurcation question.  If you

15   feel from some of the precedence you read carefully there will

16   never be a class action, if people want to bring damages

17   claims down the road, they are welcome to do so individually,

18   we may not have this so-called bifurcation issue and a jury

19   trial issue facing us.

20          Those are in some kind of order the major concerns I

21   have it seems to me on that.  Much more minor, I think the

22   defense is right.  You should tell me you are not bringing a

23   conspiracy cause of action, you know it doesn't exist as a

24   standalone action.  I have no problem in your pleading.  I

25   understand your letters.  You talk about it as bridge-proof

18

1134BERC

1    terms.  That's fine.  We are not going to go through huge

2    briefing.  There is no cause of action here.  I don't know

3    about everywhere in the United States, but here in New York,

4    you should settle that so to speak.  That's not a standalone

5    claim.  I have no problem with the pleading.

6         Defendants seem wrong on that.  If you want testing,

7    that's part of the issue, why you want testing, that's part of

8    the issue in the global sense.  That doesn't mean you are

9    bringing personal injury lawsuits.  I know you are not.  There

10   is nothing wrong with those allegations; they can stay where

11   they are.  The only one I didn't mention I wanted to bring up

12   is the dismissal of the misrepresentation fraud and private

13   nuisance claims.  I guess the only question here, is that

14   dismissal with prejudice so to speak, is that also something

15   that you think you may come back with in a different way in a

16   different time or not.  Some clarification would be useful.

17        That's the very end of the list.  That's a lot to

18   talk about.  Mr. Ratner, you are ready to talk about them.

19        MR. RATNER:  Yes, your Honor.  Let me begin just by

20   mentioning briefly, your Honor, that what defendants

21   characterize as an attempt on our part to circumvent bad case

22   law, I would characterize as an effort on our part in the

23   spirit of Rule 23 to identify those issues in the case that

24   are most appropriate for class treatment.

25        THE COURT:  I agree with you.  I said it in a more

SOUTHERN DISTRICT REPORTERS (212) 805-0300

19

1134BERC

1    positive way.  You have carefully studied the case law, tried

2    to figure out what you can do in the class action context.   I

3    realize that.

4            MR. RATNER:  Your Honor, I think the master complaint

5    and the proposed amended complaint represent our collective

6    best view what those claims are best pursued on class action

7    and individual bases.

8            THE COURT:  Now you have to deal with all the

9    questions.

10           MR. RATNER:  Starting, your Honor, with the issue of

11   the Berisha case and the remaining class representative Mr. La

12   Susa, the question of whether Rule 23(e) applies at all, I

13   would like to address that, and assuming just for the sake of

14   argument it did apply, address the question of whether notice

15   to the class would be required.

16           THE COURT:  Hold on.  I know it's not settlement, I

17   know it's not compromise; it was just that an action was

18   brought.  There is a body of law that seems to say

19   presumptively when it's brought it's a class action, it tolls

20   the statute of limitations.  People think there is a class

21   action out there until the court says there isn't.  There is;

22   you brought one.  I don't want to get into the technicalities

23   of the dismissal or settlement.  That is, the class, the

24   damages class for those who have contaminated wells is gone.

25   Don't tell me you have case law that says the case is not

20

1134BERC

1    dismissed.  That case is dismissed, that class.

2         MR. RATNER:  I hear what your Honor is saying.  I

3    think that's an important distinction.  I think, your Honor,

4    we don't dispute that 23(d) applies all the time.  But the

5    court any time under 23(d) has the duty and discretion to

6    judge whether there needs to be notice to the class.  The

7    reason we so vigorously oppose a 23(e) analysis --

8         THE COURT:  Don't bother with (e).  I want to talk

9    about once the allegation that the folks whose wells were

10   contaminated seek damages, that purported class has been

11   dropped, what am I going to do, what are you going to do, what

12   do we have to do.

13        MR. RATNER:  I would refer the court for a 23(d)

14   analysis to the case we cited for the instructive process, for

15   the analytical process that the court used in deciding whether

16   to give notice under similar circumstances --

17        THE COURT:  I don't want to know about other cases.

18   I want to know what has to be done.

19        MR. RATNER:  In the weighing of the benefits and

20   burdens in the case, the question is is there a burden imposed

21   on potential absent class members out there who may have heard

22   about these cases who may be relying on these cases to their

23   detriment as to their damages claims, how does that weigh with

24   the cost and expense of providing notice to those people.  I

25   think it's pretty heavily weighted in favor of not requiring

1134BERC

1    notice to go out, because these particular cases that are in

2    front of this court have not received substantial publicity.

3    There has been no previous notice.  We are not aware of

4    persons who are relying on the pendency of these cases to toll

5    the statute of limitations.

6         THE COURT:  I read an article in The New York Times.

7    It had Mr. Saul's name.  He was meeting with some folks in

8    Westchester or Putnam.  A very interesting article in the B

9    section.  I read it carefully.  That's big publicity.  A lot

10   of people in New York read The New York Times, a lot of people

11   outside of New York.  He was talking to folks, telling them

12   about their wells.

13        MR. RATNER:  Your Honor, I believe there has been

14   publicity about the nature of MTBE and the pendency of the

15   suits.  Whether that parses out a distinction between whether

16   injunctive relief or damages claims are being pursued, I don't

17   think that it has.

18        THE COURT:  I don't know the answer.  I don't know

19   that you know as you stand here.  It may be as simple as a

20   small newspaper ad in a similar type paper, just a general

21   notice that no class action suit is being pursued seeking

22   damages for those whose wells are contaminated.  The same ad

23   might say however, if you wish to know if you are seeking

24   testing whether your well is contaminated, an action is going

25   forward and the name is.  You can use it for good and bad at

SOUTHERN DISTRICT REPORTERS (212) 805-0300

22

1134BERC

1    the same time.  That's not so bad.  You may have to take out

2    such an ad that explains the good and the bad.

3              MR. RATNER:  Your Honor, we would support the

4    exercise of the court's discretion under 23(d) to do such a

5    thing.

6              THE COURT:  That may certainly answer the notice

7    question with respect to the decision not to pursue damages

8    actions for those whose wells have been tested and been shown

9    to be contaminated.  Have you thought where you would head on

10   behalf of those people eventually?  Is it your thought having

11   discussed and studied the case law if those folks are going to

12   pursue actions they would do so individually, not as a class?

13             MR. RATNER:  Yes, your Honor.  I think we took the

14   court's admonition at the November 2 hearing very seriously.

15   The court told us this matter of the complaint should include

16   to the extent practicable everything we plan to pursue in this

17   case.  We did that.  We indicated in this case we intend to

18   pursue those specific types of relief we listed in our prayer,

19   which we call injunctive relief on a class basis, not pursue

20   damages claims on a class basis.

21             THE COURT:  Good.  Your statements here today were

22   helpful.  The folks who have contaminated wells that have been

23   proven to have contamination from this product, they are going

24   to pursue actions, they are going to do what Ms. Berisha and

25   Mr. O'Brien are doing, namely bring individual damages claims.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

23

23

1134BERC

1   It's not your intention to follow up one class action with

2   another class action.

3        MR. RATNER:  This happens often where you have a case

4   that starts out one way, evolves over time, either because the

5   plaintiffs change the class definition or the court changes

6   the class definition under Rule 23.  We would for simplicity

7   sever out the claims of Ms. Berisha and other plaintiffs who

8   used to be class representatives so that proceeds as a

9   companion case.  They are really just cluttering things up.

10  We contemplated doing that.

11       THE COURT:  That's wise, because in the cases I was

12  reading, class representative may also have damages claims.

13  There was some court that said that it is not a problem for a

14  class representative to continue with a damages claim.  But

15  they are class representatives; they are sort of hanging in

16  this injunctive suit for no good reason I can come up with.

17  As you said, they are cluttering it up.  It probably should be

18  severed out.  I drew the Berisha case off.  It's really not

19  part of all this.  That's not part of this injunctive class

20  action.

21       There are a couple of other issues.  What about this

22  third point about impermissible bifurcation and jury trial

23  situation.

24       MR. RATNER:  Your Honor, I will address that along

25  with the res judicata issue you raised.  First let me say that

SOUTHERN DISTRICT REPORTERS (212) 805-0300

24

1134BERC

1    the defendants' arguments on this regard all center on Fifth

2    Circuit case law.

3          THE COURT:  I read the cases.

4          MR. RATNER:  I have two responses to the question.

5    First, outside the context of Allison, if you read Allison the

6    way defendants want you to read it, it undermines Rule

7    23(c)(4) which contemplates that an action may be brought or

8    maintained with respect to particular issues as opposed to all

9    issues in the class.  I have to say that the Second Circuit

10   has not adopted the Allison line of analysis with respect to

11   whether you can pursue injunctive relief claims only.  That

12   analysis is contrary to the case that we cite which is a

13   Southern District of New York case, Gelb, from 1993.

14         THE COURT:  Not a very analytical case I might add.

15         MR. RATNER:  Even within the analytical framework of

16   Allison, and important footnote --

17         THE COURT:  As a district court case, the real

18   question is is our circuit silent at the circuit level on this

19   issue.

20         MR. RATNER:  No case I know of in the Second Circuit

21   I found yet that squarely addresses the issue, although quite

22   a number of district court cases that do exactly what we would

23   like to be done in this case.  On the res judicata issue, with

24   respect to an Allison analytical framework, footnote 13 of

25   that decision on page 418, the Fifth Circuit there was

1134BERC

1   addressing plaintiff's argument that the holding of Allison

2   would prevent people from being able to go forward with these

3   types of actions in the future, in particular in this case

4   Title VII class actions, because they only want to do

5   injunctive relief.  They would be held to be inadequate

6   because of the res judicata effect on a damages claim.

7        The court here in the case on which defendants rely

8   said this is not an issue but that even if it were an issue,

9   it could be addressed by supplying notice and opt-out rights

10  to the 23(d)(2) class.  Even under Allison, which we don't

11  think applies, that court has held that the res judicata issue

12  would not truly be an issue.  That's consistent with the cases

13  that we have cited, numerous cases that are medical monitoring

14  cases, other types of single-issue injunctive relief cases

15  where plaintiffs successfully sought certification and got to

16  judgment on injunctive relief claims for monitoring.  Those

17  claim were obviously potential preludes to damages claims, but

18  courts did not stop those proceedings or refuse to certify.

19        THE COURT:  Then the distinction might be between a

20  mature and an immature tort, because what was being written in

21  all these letters is that if major issues are going to be

22  tried so to speak for the first time in an injunctive class

23  action case, that would be the first set of decisions on the

24  issues that would apply to any subsequent damages cases, such

25  as whether something is a contaminant, how it gets into the

1134BERC

1   groundwater, how soluble it is, whatever the issues are.  But

2   those would be tried, if I understand, for the first time.

3   They might be tried for the first time in your injunctive

4   class action case then would be binding on some of those

5   issues in subsequent damages cases.  They may not be more

6   mature torts where many of the issues have been tried many

7   times, then there is a medical monitoring class, but certain

8   basic major issues have been tried over and over again for

9   years.

10          MR. RATNER:  Two comments on that, your Honor.  We

11  will have to get to that issue in the certification stage as

12  well.  Just as a prelude, my initial thoughts for damages

13  cases for MTBE, those are immature torts.  From defendants'

14  records there have been quite a few suits involving MTBE

15  litigation, property damages cases, but secondly, there is a

16  distinction between injunctive relief components and damages

17  components, because while these cases are at the core testing

18  and monitoring cases, damages cases don't even kick in or

19  arise until after testing and monitoring have been conducted.

20          THE COURT:  Right, but in order to obtain injunctive

21  relief, you have to show risks.  Why should anybody order

22  testing and monitoring?  Because there is something risky

23  about those purported leaks and contamination.  I am sure I

24  got from reading the judge there was concerned his trial might

25  be the first time those issues were litigated.

1134BERC

1       MR. HINCK:  Your Honor, I do believe that aspect of

2    the Millet opinion that refers to a mature tort had to do with

3    the fact that the plaintiffs in the case named as defendants

4    the originators of the whole concept of putting MTBE in

5    gasoline.  They were not people shown to be sellers of

6    gasoline with MTBE, as are the defendants in Berisha.  The

7    immature tort was trying to hold product designers, the very

8    originators responsible, even though they are not sellers in

9    the main.  I think that's the part that troubled the court

10   more than some of these other issues which are not so much

11   immature torts.

12       MR. RATNER:  We hope to demonstrate to the court that

13   the issues involved in demonstrating entitlement testing and

14   monitoring are quite distinct from the issues involved in

15   proving liability for particular damages at a particular site.

16   The issues of risk to entire statewide populations of well

17   owners are really class issues that involve questions that we

18   will prove are distinct from the issues that involve the

19   precise amount of damages at a particular site, etc.

20       THE COURT:  Aren't there some common issues just as

21   basic as solubility of the product in the ground.

22       MR. RATNER:  I think there will be many common

23   factual questions like that, your Honor, but I don't believe

24   they would necessarily be case-determinative questions.  I

25   don't think someone could take a judgment that injunctive

28

1134BERC

1     relief should be provided here in the form of tests and go

2     walk into state court and identify who gets judgment on a

3     damages liability claim.  I think you will see as we develop

4     the issues with respect to injunctive relief that those are

5     not the same.

6           THE COURT:  You say that kind of question has been

7     tried around the country already sporadically.

8           MR. RATNER:  Yes, your Honor.  Defendants have been

9     defending in recent years individual site specific MTBE --

10          THE COURT:  Which have raised those questions?

11          MR. RATNER:  Yes, your Honor.  You also raised a

12    question of whether we are bifurcating claims.  If I could

13    just address that briefly.  We are not bifurcating claims.

14    What plaintiffs did in Allison, they went in with everything

15    on the table, they said we want a class certified for

16    injunctive relief.

17          THE COURT:  That's right.  You may have answered that

18    earlier when you said it's not my intention to follow up with

19    a damages class action case.  Having said that, you probably

20    are not bifurcating anything because you don't represent this

21    other class, you don't intend to.  If folks have their wells

22    tested, find out there is contamination, they may or may not

23    choose to pursue individual actions or others may get a class

24    action.  That's not your intention.

25          MR. RATNER:  At the risk of just beating a dead

1134BERC

1   horse, page 421 of the Allison opinion in section A-1 starts

2   off right off the bat on that section of that Fifth Circuit

3   decision saying central to this whole analysis is the fact

4   plaintiffs intend to pursue --

5        THE COURT:  You told us your intent.  I had a couple

6   more questions.  You have them written down.

7        MR. RATNER:  The reason we adopted the conspiracy

8   allegations the way we did was because we adopted the

9   allegations of the master complaint.  We recognize New York

10  does not have a standalone conspiracy claim.

11       THE COURT:  You are not trying to resurrect that in

12  New York at least.

13       MR. RATNER:  No, but we are going to proffer the

14  allegations in order to have another way besides market share

15  of having defendants be jointly responsible for whatever

16  relief must be provided.

17       THE COURT:  A question about having dropped the

18  misrepresentation of fraud allegations, share your intention

19  with respect to that.

20       MR. RATNER:  We wouldn't drop those with prejudice.

21  We got together, decided with respect to the master complaint

22  those claims we intend to pursue.  We understand the court is

23  going to be very reluctant to let us amend this group of

24  plaintiffs in this master complaint once we move forward with

25  it.  It is not necessary, clearly those claims have to be

SOUTHERN DISTRICT REPORTERS (212) 805-0300

30

1134BERC

1      dropped with prejudice.  We are not going to pursue them.  We

2      don't intend to have them pop up down the road.  Our plan is

3      as set forth in the master complaint.

4              THE COURT:  Thank you.  Anybody from defendants.

5              MR. WALLACE:  Thank you for posing the questions that

6      have concerned us.  We feel something at a disadvantage just

7      today receiving those questions.  I find myself in the

8      position of speaking on behalf of some defendants, I am sure

9      not all, because defendants are collectively just hearing

10     these answers for the first time.  This leads me to, at the

11     risk of beating a dead horse as Mr. Ratner said, reiterate our

12     request that plaintiffs bring on a motion, that we be given an

13     opportunity to respond in writing to some of these issues that

14     have been aired for the first time today.

15             THE COURT:  That's really inevitably denied.  I do

16     consider this huge pile in front of me to be the equivalent of

17     a motion.  As I said earlier, all that has to happen is that

18     Mr. Ratner says he seeks leave, you oppose, I grant it, we

19     move on.  Before I do any such thing I want to get to the

20     heart of the matter of the points you raised that I prepared

21     for that I think you were prepared for me to raise them.  It's

22     been a helpful discussion.  I am not done hearing you.  Go

23     ahead, say what you have to say.  It's all going to be

24     relevant down the road.  I don't consider it much of a loss if

25     we move to the amendment of the complaint then begin motion

1134BERC

1    practice.

2        MR. WALLACE:  I recognize that a lot of issues we

3    presented to you in our letters are issues the court would

4    have to revisit on a motion to dismiss, on a Rule 23 motion.

5    We want however to be clear as to our position from the

6    outset.  Some of our arguments we repeat at every opportunity,

7    including most importantly our concern with claim-splitting

8    and bifurcation.  Let me start with your question whether Mr.

9    La Susa's action, if it is being dropped as a class

10   representative, what impact that has on the claims.

11       THE COURT:  It has one solitary impact.  This is a

12   one-issue class.  It's only seeking one thing.  It's a class

13   made up of those people who have wells but those wells have

14   not been tested.  It seeks only injunctive relief in the sense

15   they want a court-supervised testing and monitoring program

16   that collects data, that pools data, however else I can phrase

17   it.  That's all this is now.  That's all.  There is no damages

18   case, none to follow by this group of plaintiffs.

19       MR. WALLACE:  That would certainly be appealing to

20   the defendants if we were assured the damages would not

21   follow.

22       THE COURT:  Somewhat assured.  It will not follow as

23   a class action brought by this group of plaintiffs.  There may

24   be 100,000 actions across the country.  Nobody will assure you

25   that won't happen.  All the folks will have a right to bring

1134BERC

1    damages claims.  I can't stop other plaintiffs, lawyers who

2    may get the idea of trying to bring a damages class some day.

3    That's not the intent of Mr. Ratner or this group of

4    plaintiffs' counsel.

5         MR. WALLACE:  I appreciate that.  I am grateful for

6    Mr. Ratner's candor.  As you observed, we can't be assured

7    others won't bring the same claims as classes or individuals.

8    If we focus even on Mr. La Susa and think about what he would

9    do in the event this testing, should the court approve it,

10   should detect MTBE as well.  There would be no doubt Mr. La

11   Susa would bring a complaint.  It's clear from the way these

12   plaintiffs' counsel have structured the claims in the first

13   instance, in the first amended and second amended complaints,

14   the real nub of their claims is for damages.

15        THE COURT:  Not the nub of this case they now want to

16   bring.

17        MR. WALLACE:  Quite right, not that portion of the

18   claim they seek to split off of what is really at the heart of

19   this case.  This is an unusual case.  Plaintiffs, like Mr. La

20   Susa who have not had their wells tested don't know whether

21   there is any MTBE in any water, would not have a claim if the

22   testing proves there is no MTBE in the water.

23        THE COURT:  They would not have a damages claim.

24        MR. WALLACE:  We will argue to you at the next stage

25   and at every opportunity that he does not have a valid claim,

1134BERC

1   doesn't have standing to sue merely for testing unless he can

2   show some injury.  I will set that aside.  We are back at the

3   Rule 15 stage.  Still it is clear that Mr. La Susa could not

4   sue merely for testing unless he expected there is a chance he

5   might find some damage.

6          THE COURT:  I don't think that's a fair assumption

7   right there.  Why wouldn't he want to sue to have the comfort

8   of knowing that, whether you have a problem or don't have a

9   problem.  You must analogize it to medical monitoring.  When

10   you get yourself medically monitored, it's not because you

11   hope to get cancer; you hope to know, have comfort in knowing

12   whether you do or you don't.  You will be far happier if you

13   find out you don't.

14          MR. WALLACE:  I don't mean to suggest that Mr. La

15   Susa wants to find MTBE.  If he does, he wants relief.  That's

16   really the strength of his claim.

17          THE COURT:  It may not be the strength.  The strength

18   may be just taking at face value what your adversary says.

19   It's a monitoring class.  Lots of folks have lots of wells.

20   They want testing.

21          MR. WALLACE:  Plaintiffs have drawn an analogy

22   between this unprecedented class they construct and medical

23   monitoring classes.

24          THE COURT:  There is nothing bad in being

25   unprecedented.  This is a property damages case for

34

1134BERC

1    monitoring.  If it has never been done it doesn't mean it's

2    bad.

3          MR. WALLACE:  We submit it has not been done for good

4    reason.  Let me draw a distinction between this claim for

5    property testing and a claim for medical monitoring.  There

6    are two important distinctions.  One is under the law as I

7    understand it in some states, medical monitoring is allowed

8    only on a showing of some actual injury at a minimum.  Under

9    all the laws of the states there is a requisite showing of

10   actual exposure.

11         Here, the whole point of this portion of this claim

12   plaintiffs propose to present as a class claim is to find out

13   whether there has been exposure, quite different from the

14   medical monitoring where exposure is an essential element.  In

15   the medical monitoring context, plaintiffs bring claims to

16   determine whether the illness that concerns them manifests

17   sometime in the future.  What plaintiffs here are proposing is

18   that you order defendants to pay to determine whether they,

19   like Mr. La Susa, have an injury today, not to monitor to find

20   out if in the future they might develop some sort of illness

21   as an observation of exposure or illness might manifest from

22   some exposure they can prove to you.  Rather they come here

23   saying we have no idea whether he have a claim, we want

24   defendants to pay so we can find out whether we have a claim.

25         To get back to more important points, the claim they

SOUTHERN DISTRICT REPORTERS (212) 805-0300

35

1134BERC

1    are trying to identify, the claim they try to find through

2    testing is a property claim for damages.  The Allison case

3    Mr. Ratner seeks to distinguish I suggest is quite relevant on

4    this point.  The Allison case provides if class claims are

5    really claims for damages, along with claims for injunctive

6    relief and then the claim for damages predominates, then those

7    claims can't be certified.

8            We submit plaintiffs are trying to circumvent that,

9    trying to prevent claims that can't stand alone by not

10   dismissing with prejudice claims for damages but rather

11·  deferring them.  They give you an assurance they personally

12   will not bring them back in this case.

13           THE COURT:  As a class action.

14           MR. WALLACE:  Correct.  That does that not resolve

15   the concerns about prejudice.  First, defendants are concerned

16   about facing a multiplicity of suits, from Mr. La Susa in this

17   case, then another.  We are also concerned about a

18   multiplicity of suits from other potential class members with

19   other class counsel that might bring damages claims later.  I

20   must say, although not really an object of our solicitude, the

21   court must, I submit, should be concerned also about the

22   interests of absent putative class members, because defendants

23   would contend, should Mr. La Susa or absent class members in

24   his position detect contamination bring suit later, that suit

25   is barred by res judicata.

36

1134BERC

1          THE COURT:  I don't understand that.

2          MR. WALLACE:  We contend that in subsequent suits

3     brought by absent class members here, even Mr. La Susa's claim

4     for damages would be barred by res judicata because it was

5     split from the claims here.  Many of the claims here required

6     the plaintiffs to submit all claims based on the same facts

7     and circumstances.  We would cite for that the Millet case

8     along with the Feinstein case in the Southern District of New

9     York, both of which hold that classes should not be certified

10    that present only some but not all claims available to class

11    members for fear the absent class members --

12         THE COURT:  This class member has no damages claim.

13    That's the beauty of what plaintiffs are trying to trying to

14    do if it works.  They don't represent people whose wells were

15    contaminated.

16         MR. WALLACE:  Perhaps your Honor reads the complaint

17    better than I.  I must say I am confused about this.  I read

18    the Berisha plaintiffs' proposed amended complaint which

19    adopted paragraph 123 of the master complaint.

20         THE COURT:  One second.

21         MR. WALLACE:  I understand plaintiffs to be

22    presenting claims on behalf of all well owners regardless

23    whether the wells are contaminated.

24         THE COURT:  I thought not.  Let me find out.  I

25    thought it was those well owners who do not know whether their

1134BERC

1    wells are contaminated.

2        MR. RATNER:  It's a testing and monitoring class.

3    One well owner can know his or her well is contaminated, but

4    because they have notice they have no idea about fluctuations.

5    The reason why monitoring is important in addition to the

6    initial testing is the unique benefit that comes from

7    court-supervised statewide monitoring for problems where data

8    is collected by a single entity.  The standard procedure that

9    our experts will tell the court is necessary over time is to

10   monitor wells.

11       THE COURT:  I just need to know your class

12   definition, Mr. Ratner.  For example, it would include

13   Ms. Berisha and Mr. O'Brien as class members in the La Susa

14   class because they seek ongoing monitoring.  It would include

15   any number of thousands, millions, whatever, in the class of

16   those who know theirs wells are contaminated.  Is that right?

17       MR. RATNER:  I believe so.

18       THE COURT:  I had not understood that.  Then we may

19   have a claim-splitting problem.  Those people, Ms. Berisha and

20   Mr. O'Brien, who want to pursue their damages claims now,

21   whether they do it in this case or separate, hardly matters.

22   They are pursuing a damages claim and injunctive claim

23   simultaneously but separately.  That's a question.  I had

24   thought the class definition did not include those who now

25   know, even though I realize once I assume you prevail, you

38

1134BERC

1    gain this testing and monitoring, there will come a time when

2    people will learn that their wells are contaminated, they are

3    still entitled to monitoring.

4           If they are part of the original class definition, if

5    they get a positive, then the monitoring goes on, part of the

6    data collection was partly mapping, all the things you spoke

7    of, the scientific effort, that would be fine, if they later

8    learned, I later learned.  I didn't realize your class

9    definition includes those who now know.  If they have a

10   damages claim and this present claim they may be claim

11   splitting.  I thought I was on safe ground until Mr. Wallace

12   raised the point.

13          MR. HINCK:  A small point of clarification.  Berisha

14   and O'Brien are differently situated.

15          THE COURT:  Than each other.

16          MR. HINCK:  Yes.  She doesn't own property with a

17   well any longer.  She sold the property with the contaminated

18   well, lost money.

19          THE COURT:  I don't see how she is part of the

20   monitoring and testing class.

21          MR. HINCK:  Exactly.

22          THE COURT:  O'Brien is a problem.

23          MR. RATNER:  The O'Brien issue --

24          THE COURT:  You need to address the definition of

25   your class.  Maybe you are not ready to do that.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

39

1134BERC

1    MR. RATNER:  I believe so.

2    THE COURT:  Why don't you confer.  I think that's

3    very wise.  We can use a break.

4    (Recess)

5    THE COURT:  Mr. Ratner.

6    MR. RATNER:  Thank you, your Honor.  Just to clarify

7    an initial matter, the discussion that we are having is

8    clearly for purposes of discussing litigation classes, what we

9    are for litigation purposes, not necessarily for settlement

10   purposes.  That would be a separate discussion if we have an

11   opportunity to have that with the court.

12   The plaintiff La Susa is perfectly willing to pursue

13   class claims and will file a proposed amended complaint that

14   pursues class claims only for persons similarly situated to

15   him who are untested well owners.  For testing, however, there

16   are other plaintiffs, for example, the England plaintiffs,

17   many of whom have already received some information, who will

18   continue to pursue injunctive relief, monitoring claims, and

19   either at the motion to dismiss argument phase or at the class

20   certification phase, we hope to demonstrate to the court's

21   satisfaction that's not impermissible claim splitting for a

22   host of reasons that I can go into preliminarily now.

23   THE COURT:  No.  I think everybody wants the answer

24   to what's going on now.  I have the answer.  Mr. Wallace had

25   it all along.  There it is.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

40

1134BERC

1          MR. WALLACE:  It bears emphasis that the named

2     plaintiffs in the England complaint expressly allege in the

3     proposed amended complaint the properties are contaminated.

4          THE COURT:  Mr. Ratner just said that La Susa doesn't

5     know.  He would represent the class of people who don't know,

6     who have not had their wells tested, who don't know if there

7     is contamination.  England represents a class of people who do

8     know.  With respect to that class definition you will make

9     your argument, he will make his response, I will make a

10    decision.  They are not walking away from those who do know.

11         MR. WALLACE:  Correct.  On behalf of those who do

12    know, they are proposing that you allow them to amend the

13    complaint such that they would assert only a portion of their

14    claims now.

15         THE COURT:  I realize the problem.

16         MR. WALLACE:  It's to that which I object.  To be

17    specific as to what the defendants want, we would like the

18    court to deny the motion for leave to amend to the extent

19    plaintiffs seek to drop claims for damages.  We would like in

20    effect for the court to require plaintiffs to bring now in

21    this suit all claims available to the plaintiffs they purport

22    to represent.  If that includes claims for damages, we submit

23    they must be asserted in this case.

24         THE COURT:  Anything else.

25         MR. WALLACE:  Yes.  A few more points on the

questions you posed to Mr. Ratner and his answers. You asked him about the immature tort issue. He suggested that this is not really an immature tort, there have been other cases litigated involving MTBE contamination. He is right only as to the point there is a very mature procedure available for litigating claims involving contamination from petroleum products including MTBE. Cases of that sort are litigated with some frequency individually on behalf of plaintiffs who know they have damages against parties responsible for releasing the contamination.

This case is quite different in important respects. This case is unprecedented, more than merely immature. There has not been to my knowledge a case litigated to its conclusion in which plaintiffs alleged MTBE is a defective product. As you know from the title of the MDL proceeding, this case is all about a product liability allegation. Never before has a court found that this product which the federal government affectively required these defendants to manufacture and sell is defective. Never before has a case of this sort established entitlement to the testing of properties to determine if they are contaminated with MTBE.

For those reasons we submit this truly is an immature tort. The court on that basis ought to tread cautiously in allowing these claims as you instructed the way plaintiffs propose at this state. We will repeat later why the court on

1134BERC

1    this basis ought not entertain a motion on the class action.

2          You asked Mr. Ratner about the conspiracy claim and

3    their intentions.  If I understood Mr. Ratner correctly, he

4    represented they do intend to maintain these conspiracy claims

5    as a standalone claim on behalf of the New York plaintiffs.

6    Was I mistaken?

7          MR. RATNER:  You are mistaken.  I said we were going

8    to maintain the allegation for the exact purpose for which the

9    cases say we may, which is to demonstrate that the defendants

10   are jointly responsible, not for purposes to link defendants

11   with respect to the underlying torts, not for purposes of

12   proving separate counts.  That alone is the standalone

13   conspiracy count.

14         MR. WALLACE:  We submit the court ought to deny the

15   motion for leave or request for leave to the extent that is

16   the state of the papers today.  What's more I think the

17   contention that the conspiracy claim ought to remain in the

18   case so the court can use it to spread liability suggests what

19   we have believed, that this is really a case about damages not

20   injunctive relief, that the objective of plaintiffs

21   maintaining that conspiracy claim is really to lay the

22   groundwork for a claim of damages.

23         You asked Mr. Ratner about dismissal with prejudice.

24   We suggest those claims ought to be dismissed with prejudice.

25   Again, we maintain plaintiffs ought to bring here all claims

43

1134BERC

1    available to them.  If they are not going to do that with

2    those particular legal theories we shouldn't face the risk of

3    those legal theories reappearing in the case at a later time.

4           THE COURT:  In this case, I don't think they are

5    going to reappear in this case.  I believe Mr. Ratner said

6    that.  They are not going to be ever added back to this

7    injunctive class action.  That doesn't mean people pursuing

8    individual damages claims down the road wouldn't raise them,

9    doesn't mean somebody else some day might try to bring a class

10   action for damages and won't raise them.  But it's not coming

11   back into this case.  The so-called Berisha case will not have

12   those claims.  The England case also will not have those

13   claims.

14          MR. RATNER:  That's correct.

15          THE COURT:  They are not coming back to this case.

16          MR. WALLACE:  I still submit that because we face the

17   risk of additional claims from these very plaintiffs in other

18   suits, these particular claims ought to be brought now or

19   dismissed with prejudice.  Thank you.

20          THE COURT:  Anybody else.

21          MR. GUTTMAN:  Your Honor, I want to make sure I

22   understand the situation with respect to Mr. La Susa.  Is the

23   lay of the land now that Mr. La Susa is bringing a claim only

24   with respect to people who do not know if they have

25   contamination, a pure testing class that is.

44

1134BERC

1      THE COURT:  I believe I heard that with respect to

2   what was once known as the Berisha case now known as La Susa.

3   It's not true for the England case.

4      MR. GUTTMAN:  I am directing it only to the La Susa

5   case.  Can we take that another step further, which is to say

6   Mr. La Susa is the only class representative, there is not

7   going to be someone else coming along to assert those claims

8   alongside Mr. La Susa to assert a claim for damages that Mr.

9   Wallace has been talking about.

10      THE COURT:  I understand the question.  I am sure

11   Mr. Ratner does.  I will pose it separately.  There may be

12   other plaintiffs who join Mr. La Susa as class representatives

13   with the same class definition, those whose wells have not yet

14   been tested.  We may go from one to more, but they will all be

15   of untested wells.  In the La Susa case you will not be trying

16   to add plaintiffs like England.  England has tested wells.

17      Will you be trying to add those to the La Susa case.

18      MR. RATNER:  Not to La Susa, not by these plaintiffs

19   or these counsel.  We cannot predict what will happen in the

20   future with other plaintiffs.

21      THE COURT:  The La Susa case will remain the case

22   that alleges injunctive class of testing and monitoring, of

23   those who at this point do not know whether these wells are

24   contaminated.  The England case also seeks testing and

25   monitoring.  The class definition includes both those who do

45

1134BERC

1   and don't know.  Those are two different cases I know about so

2   far.

3          MR. BALL:  One other distinction; the England case

4   seeks relief for contamination, plaintiffs, people found out

5   later to have contamination, in the form of remediation.  They

6   seek a different relief.

7          THE COURT:  Is that being called injunctive relief.

8          MR. BALL:  That's what they are trying to say.

9          MR. RATNER:  Your Honor, the England case does not

10  seek remediation.  It seeks clean water.  A case called Young

11  in Florida conditionally transferred, it may be here after the

12  18th, that case seeks remediation as a form of injunctive

13  relief because it's a court program.

14         THE COURT:  The England case seeks clean water as

15  opposed to remediation; that means different sources of water.

16         MR. RATNER:  It's typically done either by connecting

17  people to a city water line or by busing in water.

18         MR. BALL:  Your Honor, with due respect, in the

19  master complaint, all of which the prayer for relief is

20  adopted by the England plaintiffs, subparagraph B-6, they ask

21  for, page 70 of the master complaint.

22         THE COURT:  Mine only goes to 67.

23         MR. BALL:  The second to last page.

24         THE COURT:  Court supervised program to provide class

25  members with clean water free of MTBE contamination.  Court

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1134BERC

1    supervised program to provide remediation.

2              MR. BALL:  They do it for the England case.  They

3    have different prayers for relief between the Berisha and the

4    La Susa case versus the England case.

5              THE COURT:  Right.

6              MR. BALL:  That's not going to change; they are not

7    going to ask for something more?

8              THE COURT:  It looks like there are two different

9    class definitions simultaneously pressed.  Motions will have

10   to be addressed to two different definitions.  Either two will

11   survive, one will survive, none will survive.  We will learn

12   the outcome down the road.  Plaintiffs have a strategy because

13   they will see whether both works, one works, or none works.

14             MR. WALLACE:  Your Honor, at the risk of repeating

15   myself --

16             THE COURT:  No, what do you want to add.

17             MR. WALLACE:  We maintain that the claim of Mr. La

18   Susa would be barred by res judicata it if it turns out he has

19   contamination and should have known about it.

20             THE COURT:  Even though his well has not been tested.

21             MR. WALLACE:  Quite right.  Plaintiffs run the risk,

22   if they construct claims as they propose here, of subjecting

23   absent class members, even Mr. La Susa himself, to deference

24   of res judicata should they seek to assert damages later.

25   That same bar of res judicata would be asserted as against

1134BERC

1    those plaintiffs in England who affirmatively allege their

2    properties are contaminated.

3         THE COURT:  I understand with the England case;

4    that's your claim-splitting argument.  Either it will be a

5    winner or a loser somewhere at some court level.

6         MR. WALLACE:  One last point on the issue of notice.

7    If I understood him correctly he is suggesting notice under

8    23(e) should not be required if the court allows the proposed

9    amendment.  On behalf of I believe all defendants I can say we

10   too agree that 23(e) notice would not be required, would not

11   be appropriate if the court allows the amendment plaintiffs

12   have proposed for several reasons.

13        THE COURT:  What I proposed was some kind of one-time

14   or two-time newspaper general-type notice that would be out

15   there for those who read the papers to know there is no longer

16   a pending action seeking damages for those who know there is

17   MTBE contamination of their water supply.  I point out they

18   can also say what is proceeding, what is not.  There is a cost

19   of placing a newspaper ad.  They conferred, thought it wasn't

20   a bad idea.  The court would have some comfort if this general

21   notice went out, not individual notice, not a mailing, some

22   announcement to those who read papers that they should not

23   rely on the fact there was a one-time allegation seeking

24   damages for those people who have contaminated wells.

25        MR. WALLACE:  We submit the notice would be

48

1134BERC

1    unnecessary.

2           THE COURT:  That's your position.

3           MR. WALLACE:  It's potentially prejudicial to the

4    extent it alerts people to a problem that doesn't exist.

5           THE COURT:  You wrote letters telling me about a

6    problem that does exist.  People might have relied on the fact

7    the class initially brought damages claims for people whose

8    wells were contaminated.  Now their claims are being

9    abandoned, they might rely on it to their detriment, they

10   might not timely sue, give up a cause of action they have.  I

11   don't think it's gracious to switch that position at this late

12   hour.  Anything more.

13          MR. WALLACE:  Thank you, your Honor.

14          THE COURT:  Mr. Ratner, do you have a motion.

15          MR. RATNER:  Yes, your Honor.  I am moving on behalf

16   of all MDL plaintiffs, first on behalf of the Berisha, O'Brien

17   and La Susa plaintiffs to sever the Berisha and O'Brien claims

18   and on behalf of Mr. La Susa to file an amended complaint

19   along the lines we have discussed in court today consistent

20   with today's discussion.  On behalf of the England plaintiffs,

21   I am moving for leave to amend along the lines of the proposed

22   amended complaint with one caveat, that we may scale back, not

23   include a remediation claim.  I am not making a motion at this

24   time on behalf of the Young plaintiffs because that case is

25   not yet here.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

49

1134BERC

1              I would also be happy to submit a proposed 23(d)

2     order to the court on notice as well.

3              THE COURT:  Thank you.

4              Mr. Sacripanti, as liaison counsel are you opposing

5     this motion for the reasons generally set forth in the

6     correspondence directed at the court.

7              MR. SACRIPANTI:  We are, your Honor.

8              THE COURT:  Thank you.

9              I am going to allow the amended complaints to be

10    served and filed.  Would you like to schedule the motion

11    practice that I know will follow along the lines of the

12    correspondence I have already reviewed.  I don't want anybody

13    to think this has been much of less helpful process.  It

14    certainly delineated issues.  I think the defendants got some

15    answers from plaintiffs to some of the questions.  I know the

16    court did.  Everybody has a lot to think about.

17             Mr. Ratner may specifically file and serve the

18    amended complaints as you now wish to structure them.  There

19    is no harm done that they are slightly different than what I

20    had at the letter-writing stage.  You may do it as we have

21    discussed, I hope making it quite clear with respect to New

22    York there is no standalone claim for conspiracy.

23             Having said that, let's talk about a time frame for

24    filing and serving the complaints and then motions to dismiss.

25             MR. RATNER:  Your Honor, two things.  I think we will

SOUTHERN DISTRICT REPORTERS (212) 805-0300

50

1134BERC

1    also file with the court's permission the proposed master

2    complaint to make it part of the record.

3            THE COURT:  Yes.

4            MR. RATNER:  I believe we would be prepared to

5    formally file the amended complaints by Monday.  I believe the

6    court's existing case management order number 2 includes a

7    schedule for briefing.

8            THE COURT:  Good.  You can remind me.  I have case

9    management order number 2 with me.

10           MR. RATNER:  Page 3, B2 says if the proposed amended

11   complaints are filed without objection, defendants shall file

12   motions to dismiss -- I am sorry.

13           THE COURT:  Paragraph 2B doesn't sound like it works.

14   If an objection is made to the filing, motions to dismiss are

15   to be filed 30 days after the court rules whether the amended

16   complaints may be filed.  It's really paragraph 3 at page 4.

17   Having just ruled the amended complaints may be filed in

18   accordance with today's lengthy argument, they will be filed

19   January 8, and defendants may have until February 5 to file

20   their motions.

21           If you recall paragraph 2 says that it should be a

22   single joint motion not to exceed 40 pages, but individual

23   defendants may file supplemental briefs if their issue is

24   unique to them, not to exceed 10 pages.  Response due 30 days

25   thereafter.  If you need 30 additional days, plaintiffs may

1134BERC

1   respond by March 5.  Then the built-in reply time we had, that

2   was 2 weeks.  So, reply briefs would be due March 19.  That's

3   my understanding of the briefing schedule for motions to

4   dismiss.

5          MR. SACRIPANTI:  Your Honor, because there in essence

6   are two definitions of two classes do we have two motions to

7   make?

8          THE COURT:  No.  You will just include a point in the

9   same brief and say with respect to the England definition of

10  the class, we have a claim-splitting argument.  We all know

11  what the argument is going to be.

12         MR. SUMMY:  Your Honor, one issue.  Earlier at some

13  point in time you asked us to give you a list, a run-down of

14  other pending state court cases.  In going back and looking,

15  your Honor, Steve Tillary is not here, he and I realized we

16  did not inform the court of a case pending in Illinois.  We

17  wanted to do so at this time, a state court case.  The name of

18  the case is Mizukonis v. Atlantic Richfield Company, et al.

19  It's a class action pending in state court.  It was filed at

20  the time you asked us but only recently served, so for

21  purposes of just making sure we have divulged everything to

22  you, I wanted to make sure you know about that case.

23         THE COURT:  Thank you.

24         I will see you all next on February 5.  We will

25  follow all the same rules, an agenda, know where we are

52

1134BERC

1    heading on discovery issues.  Hopefully, you will resolve the

2    issues we began with with respect to confidentiality, the

3    nondestruct order, the website, etc.

4           Thank you.

5

6                              -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages
Subject
2-4
Depository costs and location:  plfs choice of a Mnahattan location is approved,
but plfs pay if more space is needed
4-5
Website:  to be up and running by 2/3; cost allocation still to be negotiated
5
Non-destruct order:  negotiations continue; to be completed by next hearing,
2/5, or court will decide
6-7
Bates stamping:  at least for now, plfs agree docs in view rooms need not be
separately stamped for this case; if there are piror numbers from other cases,
they'll remain; plfs reserve right to revisit the issue if they are unable to
identify docs they view
8-13
Confidentiality order:  plfs can share docs produced by current defs in prior
cases, but must lit the docs for defs (p. 11); ct will retain jurisdiction to
enforce the order

Exhibit C

US OFFICE PRODUCTS

# LIEBERMAN & BLECHER

A PROFESSIONAL CORPORATION

31 JEFFERSON PLAZA
PRINCETON, NEW JERSEY 08540
TEL: (609) 497-3930
(732) 355-1311
FAX:(732) 355-1310
WWW.LIEBERMANBLECHER.COM

SHARI M. BLECHER                                                                    E-MAIL: SMBLECHER@AOL.COM

November 22, 2000

## CERTIFIED MAIL R.R.R. & FASCIMILE

Robert C. Shinn, Commissioner
Department of Environmental Protection
PO Box 402
Trenton, New Jersey 08625-0402

Gary Sanderson, Case Manager
New Jersey Department of Environmental Protection
Site Remediation Program
PO Box 028
Trenton, New Jersey 08625-0028

> *Re:*   *Holten et. al. vs. Chevron U.S.A., Inc. et. al.*
>          *Bayville, New Jersey*

Dear Gentlemen:

We represent approximately 170 (one-hundred and seventy) people in Bayville, NJ whose drinking water wells have been contaminated by gasoline containing the additive MTBE. This matter is in litigation and the Defendants are Gulf Oil Corporation, Chevron U.S.A., Inc. and Cumberland Farms.  Your agency is not named as a Defendant in this case. In an effort to address the groundwater contamination, Cumberland Farms, one of the "responsible parties," has installed a system that treats the groundwater using a type of air stripper technology. Since the remediation efforts commenced, many of our clients began to complain of symptoms that did not exist prior to the remediation. They generally include intensive headaches in addition to severe asthma and respiratory difficulties. Many residents have sought medical attention and gained little, if any, relief.  Residents have also advised us that when the remediation system is not in use, their symptoms seem to dissipate. Some of the neighborhood children are often forced to stay home from school due to the severity of this problem.

This is truly an emergent matter and as such, we request that the State immediately investigate its cause and determine why my clients' health and well-being have been adversely affected.  Moreover, we request that the remediation process be halted immediately and remain so until the investigation is complete and the problem is resolved.

**LIEBERMAN & BLECHER**
A PROFESSIONAL CORPORATION

Commissioner Shinn
Mr. Sanderson
November 22, 2000
Page 2

_____

While we cannot verify that all of our clients' illnesses are attributable to the remediation, it does appear likely based on these observations. While it is imperative that the responsible parties clean the groundwater, I do not believe that the clean up efforts should be of a nature that adversely affects any resident's health.

I ask that you contact me to confirm that the State is taking the necessary steps to alleviate this problem.

Thank you for your immediate attention to this matter.

Very truly yours,

*Shari M. Blecher*

SHARI M. BLECHER

cc:    Governor Christine Whitman
       Senator Andrew R. Ciesla
       Assemblyman James W. Holzapfel
       Assemblyman David W. Wolfe
       Mayor Jason Yarano
       Mr. and Mrs. Charles Mooney

**HP OfficeJet T Series**
**Personal Printer/Fax/Copier/Scanner**

**Fax History Report** for
Lieberman & Blecher, P.C.
(732) 355-1310
Nov 22 2000 4:22pm

## Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Nov 22 | 4:21pm | Sent | 1-609-633-0544 | 0:00 | 0 | No answer |

**HP OfficeJet T Series**
**Personal Printer/Fax/Copier/Scanner**

**Fax History Report** for
Lieberman & Blecher, P.C.
(732) 355-1310
Nov 22 2000 4:21pm

## Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Nov 22 | 4:20pm | Sent | 1-609-292-7695 | 0:58 | 3 | OK |

Result:
   OK - black and white fax
   OK color - color fax