

PLEADING NO. 45

## DOCKET NO. 1358

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

### IN RE: METHYL-TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

### CONSOLIDATED MOTION AND BRIEF OF DEFENDANTS EQUILON, MOTIVA, SHELL AND TEXACO TO VACATE CONDITIONAL TRANSFER ORDER CTO-2

Pursuant to Panel Rule 7.4(D), Equilon Enterprises LLC, Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company, Texaco Inc., and Texaco Refining and Marketing Inc. (hereinafter collectively the "Shell-Texaco Defendants") submit this consolidated motion and brief to vacate the Conditional Transfer Order that the Clerk of the Panel entered in this matter on December 21, 2000 designated CTO-2.

CTO-2 proposes to transfer a case pending in the District of New Jersey, *Holten v. Chevron U.S.A. Inc., et al.*, No. 3:00-4703, to an MDL proceeding in the Southern District of New York, MDL 1358, where there are currently two cases consolidated. The *Holten* case should not be transferred to MDL 1358 because the differences between *Holten* and MDL 1358 outweigh any common questions, transfer would not serve the convenience of the parties or

OFFICIAL FILE COPY
IMAGED JAN 25 '01

witnesses, and transfer would not promote the just and efficient conduct of the consolidated actions.

The *Holten* case involves just individual claims of individual plaintiffs in one neighborhood in one small community in New Jersey. The *Holten* plaintiffs allege that their drinking water has been "contaminated with MTBE and/or BTEX." (First Amended Complaint, attached hereto as Exhibit A, at ¶ 6.) Among the relief requested by the *Holten* plaintiffs is "[c]ompensatory damages ...." (First Amended Complaint, attached hereto as Exhibit A, at ¶ 61.) The *Holten* case does not purport to be a class action but merely asserts individual claims.

In contrast, both cases in MDL 1358 purport to be class actions involving putative plaintiffs in many locations. Those two cases are *Berisha, et al. v. Amerada Hess Corp., et al.*, No. 00 CIV 1898 [SAS] (S.D.N.Y.), and *England, et al. v. Atlantic Richfield Co., et al.*, No. 3:00-370 and 3:00-371 (S.D. Ill.). Moreover, plaintiffs' counsel in those cases recently filed amended complaints that drop all class claims for damages and assert class claims only for injunctive relief. At a recent hearing, plaintiffs' counsel in MDL 1358 indicated they seek to represent a class of those who do not know whether their wells are contaminated, such as court-ordered testing of wells.[1] If such testing shows contamination, plaintiffs' counsel in MDL 1358 apparently contemplate severing out the claims of individuals with damages claims and allowing those cases to proceed in separate cases. Indeed, plaintiffs' counsel in MDL 1358 agreed that the court presiding over MDL 1358 should publish a notice stating that "no class action is being pursued seeking damages for those whose wells are contaminated."[2] In essence, the plaintiffs'

---

[1] *See* Transcript of Proceedings Before Hon. Shira A. Sheindlin, In re: MTBE Products Liability Litigation, MDL 1358, January 3, 2001, attached hereto as Exhibit B, at 21.

[2] *See* Transcript of Proceedings Before Hon. Shira A. Sheindlin, In re: MTBE Products Liability Litigation, MDL 1358, January 3, 2001, attached hereto as Exhibit B, at 21.

counsel in MDL 1358 seek to exclude from that case precisely the sort of claims that the plaintiffs in *Holten* assert.

All parties in *Holten* have filed notices of opposition to CTO-2. All parties in that case oppose the transfer of *Holten* to MDL 1358. *See* Joint Notice Of Opposition Of Both Plaintiffs And Defendants In The *Holten* Case To Conditional Transfer Order (CTO-2), filed Jan. 5, 2001; Notice Of Opposition Of Cumberland Farms, Inc. To Conditional Transfer Order (CTO-2), filed Jan. 4, 2001.

As indicated by this consensus of the parties against consolidation, the addition of *Holten* to MDL 1358 would not "promote the just and efficient conduct" of any of these cases. 28 U.S.C. § 1407(a).

The Shell-Texaco Defendants are actively involved in MDL 1358, but they are not involved at all in *Holten*. The Shell-Texaco Defendants oppose the proposed transfer of *Holten* to MDL 1358 in order to avoid the burden, expense and prejudice that they would face if MDL 1358 were expanded to include *Holten*. These defendants have no interest in *Holten* and do not want to be involved in that case even peripherally.

## ARGUMENT

### I.   CTO-2 SHOULD BE VACATED BECAUSE ALL PARTIES TO THE CASE OPPOSE THE CONDITIONAL TRANSFER

As noted, all parties to the *Holten* action oppose the transfer of that case to MDL 1358. The Panel has held that such unanimous (or even near-unanimous) opposition is a "very persuasive factor" that militates against transfer of a case pursuant to 28 U.S.C. § 1407. For example, the court in *In re Asbestos and Asbestos Insulation Material Products Liability Litigation ("In re Asbestos")*, 431 F. Supp. 906 (J.P.M.L. 1977), despite recognizing some common questions of fact among the actions under consideration, denied transfer under section

1407 based on near-unanimous opposition. 431 F. Supp. at 910. The Panel noted that all but one of the parties involved opposed transfer, and held that "[t]he virtually unanimous opposition of the parties to transfer," while "not by itself determinative," was "a very persuasive factor in our decision to deny transfer ...." 431 F. Supp. at 909, 910. *See also In re Westinghouse Electric Corporation Employment Discrimination Litigation*, 438 F. Supp. 937, 938-39 (J.P.M.L. 1977) (denying transfer despite recognizing some common questions of fact, emphasizing in part "that all parties to the two North Carolina actions [two of the five actions before the Panel] agree that those actions should remain separate from the [three] Pennsylvania actions and that thereby the North Carolina actions will be promptly resolved").

The unanimous opposition of the parties in the *Holten* case to CTO-2 reflects the considered judgment of those most familiar with the case that transfer of the case would not serve the convenience of the parties and witnesses, and would not promote the just and efficient conduct of the actions proposed to be consolidated.

## II. CTO-2 SHOULD BE VACATED BECAUSE COMMON QUESTIONS DO NOT PREDOMINATE OVER INDIVIDUAL QUESTIONS OF FACT AND CONSOLIDATION WOULD NOT SERVE THE CONVENIENCE OF THE PARTIES OR WITNESSES

A transfer pursuant to 28 U.S.C. § 1407 is typically allowed only if the actions involve common questions of fact, the transfer would serve the convenience of the parties and witnesses, and the transfer would promote the just and efficient conduct of the actions to be consolidated. *See* 28 U.S.C. § 1407(a). The contemplated transfer of the *Holten* case to MDL 1358 would not meet those standards.

### A. The *Holten* Action Involves Markedly Different Interests, Requests Different Relief, and Is at a Different Stage of Development Than the *Berisha* and *England* Actions

When actions "seek to protect markedly different interests, request different relief, and are at different stages of development," transfer will be denied. *See In re Harmony Loan Co., Inc., Securities Litigation*, 372 F. Supp. 1406, 1406-07 (J.P.M.L. 1974). The *Holten* case

involves just individual claims of individual plaintiffs in one neighborhood in one small community in New Jersey. The *Holten* plaintiffs allege that their drinking water has been "contaminated with MTBE and/or BTEX." (First Amended Complaint, attached hereto as Exhibit A, at ¶ 6.) Among the relief requested by the *Holten* plaintiffs is "[c]ompensatory damages in an amount determined to be just and equitable by [the] Court." (First Amended Complaint, attached hereto as Exhibit A, at ¶ 61.) The *Holten* case does not purport to be a class action but merely asserts individual claims.

In contrast, the cases consolidated in MDL 1358 purport to be class actions involving putative plaintiffs in many locations. The focus of current proceedings in MDL 1358 is on discovery, with special emphasis on discovery relating to class certification, and motions and briefing on class certification will follow. The proceedings on class certification issues in the MDL cases have no bearing on *Holten*, which is not a class action. Indeed, MDL 1358 seeks to protect markedly different interests than *Holten* and requests different relief. Plaintiffs' counsel in MDL 1358 have disavowed any intention to assert claims for damages on behalf of any classes. (*See* Transcript of Proceedings Before Hon. Shira A. Sheindlin, In re: MTBE, MDL 1358, January 3, 2001, attached hereto as Exhibit B, at 21.) As noted, plaintiffs' counsel in those cases would seek to sever any claims for damages by individual named plaintiffs and limit those cases to class claims only for injunctive relief. (*Id.*)

In contrast, plaintiffs in *Holten* assert exactly the sort of claims that plaintiffs' counsel in MDL 1358 seek to exclude: individual claims for damages based on allegations of actual contamination.

### B.    There Is No Danger of Conflicting Class Determinations

As noted, the *Holten* case does not purport to be a class action. Accordingly, transferring *Holten* to MDL 1358 would not achieve any benefits in the way of avoiding the danger of conflicting class determinations, which the Panel has recognized as one of the purposes of section 1407. *See, e.g., In re: Multidistrict Private Civil Treble Damage Litigation Involving*

*Plumbing Fixtures*, 308 F. Supp. 242 (J.P.M.L. 1970) ("a potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring ... related actions to a single district for coordinated or consolidated pretrial proceedings"); *In re Harmony Loan Company, Inc., Securities Litigation*, 372 F. Supp. 1406, 1407 (J.P.M.L. 1974) (rejecting transfer based in part on the reasoning that "there is no danger in this litigation of conflicting class determinations since only [one of the actions being considered for consolidation] contains Rule 23 class allegations"); *In re Multidistrict Civil Antitrust Actions Involving Antibiotic Drugs*, 299 F. Supp. 1403, 1406 (J.P.M.L. 1969) (granting transfer based in part on the reasoning that a purported class in two of the cases under consideration "conflicts with other class action claims which are now before the Southern District of New York and the resolution of these conflicting class action claims by a single court will clearly promote just and efficient conduct of these cases").

### C. The Discovery To Be Conducted in *Holten* Involves Individual Factual Issues that Predominate Over Any Common Issues

The Panel has repeatedly denied transfer when common questions of fact do not predominate over the individual questions of fact in each action. *In re Rely Tampon Products Liability Litigation*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982); *In re Asbestos and Asbestos Insulation Material Products Liability Litigation*, 431 F. Supp. 906 (J.P.M.L. 1977). Transfer is not warranted merely because the cases being considered for consolidation address a similar theme such as asbestos exposure, employment discrimination, or, as here MTBE contamination. If discrete factual issues predominate over the common issues, transfer is inappropriate. *See, e.g., In re Westinghouse Electric Corp. Employment Discrimination Litigation*, 438 F. Supp. 937 (J.P.M.L. 1977) (transfer denied where allegations of specific discriminatory acts at individual facilities predominated over common issue of "division-wide racial discrimination"); *In re Royal Typewriter Co. (Royal Bond Copier) Breach of Warranty Litigation*, 435 F. Supp. 925 (J.P.M.L. 1977) (individual issues predominated because there were separate contractual relationships involved in each action and, as such, joint discovery would neither serve the convenience of the parties nor promote the just and efficient conduct of the litigation); *Environmental Protection*

*Agency Pesticide Listing Confidentiality Litigation*, 434 F. Supp. 1235, 1236 (J.P.M.L. 1977) (individual questions of whether data is exempt from disclosure predominated over the common question of EPA's interpretation of the disclosure statute and transfer would not serve the convenience of the parties or promote the just and efficient conduct of the actions).

Here, individual issues clearly predominate over any common issues among MDL 1358 and *Holten*. Discovery in all these cases must necessarily focus on the presence and cause of any contamination at the particular properties of the individual plaintiffs. That is all site-specific. In any such case, for example, discovery would involve the source or cause of contamination in each of the individual plaintiff's wells; responsibility for the contamination or the source of the contamination; the individual properties owned or occupied by each of the plaintiffs, and the nature and amount of any groundwater contamination at such properties; when each plaintiff first learned of such contamination; the location of actual gasoline leaks or spills in the vicinity of such properties; the geology and hydrogeology in the area in question; and the circumstances surrounding any alleged exposure to any contamination and any resulting damages.

In sum, each of the cases at issue would involve discovery of many different facts, documents, and witnesses on causation and damages that are unrelated to the other cases.

### D.    There Is a Lack of Commonality Among the Parties in These Actions

As noted, the *Holten* case involves claims of plaintiffs who allege damages from a single former service station. The only defendant in that case that is also named in either *Berisha* or *England* is Chevron U.S.A. Inc. None of the *Holten* plaintiffs is named in either of the MDL 1358 cases. Thus, there is just one party that is involved in *Holten* and in any of the MDL 1358 cases. The Panel has recognized in similar cases that such a lack of commonality among the parties is a factor weighing against consolidation. *See, e.g., In re Asbestos*, 431 F. Supp. at 909, 910 (denying transfer despite recognizing some common questions of fact among the actions under consideration, and noting that the parties opposing transfer had pointed to the "lack of commonality among the parties" in the actions under consideration).

Here, the lack of commonality is the main objection of the Shell-Texaco Defendants. These defendants are parties to the cases in MDL 1358 but not to *Holten*. They do not want the cases to share a common forum and procedure that would entangle them in *Holten*.

## CONCLUSION

For all the foregoing reasons, the Shell-Texaco Defendants respectfully request that the Panel vacate Conditional Transfer Order (CTO-2).

Dated:  January 22, 2001                    Respectfully submitted,

Richard E. Wallace, Jr.
Peter C. Condron (PC4818)
Steven C. Dubuc
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  202-204-1000
Facsimile:  202-204-1001

Attorneys for Defendants Equilon Enterprises LLC, Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company, Texaco Inc., and Texaco Refining and Marketing Inc.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN 2 3 2001

FILED
CLERK'S OFFICE

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 22, 2001, I caused to be served a true and correct copy of

the foregoing via regular mail, postage prepaid, to those counsel noted on the Involved Counsel List

(CTO-2), to the following addresses:

Debra Rosen, Esquire
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033
Counsel for Cumberland Farms, Inc. in *Holten*

Joseph D. Gonzalez, Esquire
Jeffrey A. White, Esquire
Law Offices of Masry & Vititoe
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
Counsel for Plaintiffs in *Holten*

Nathan P. Eimer, Esquire
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue
Suite 1776
Chicago, IL 60603

Peter Sacripanti, Esquire
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605
Liaison Counsel for Defendants in MDL 1358

Morris A. Ratner, Esquire
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th Floor
New York, NY 10017
Liaison Counsel for Plaintiffs in MDL 1358

_____
Steven C. Dubuc

*DOCKET NO. 1358*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE:  METHYL-TERTIARY BUTYL ETHER ("MTBE")*
*PRODUCTS LIABILITY LITIGATION*

<u>SUPPLEMENTAL CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 22, 2001 or January 23, 2001 (as specified below), I caused to be served a true and correct copy of the following three documents via regular mail, postage prepaid, to those counsel noted on the Panel Service List (CTO-2) at the addresses listed on the next two pages:

1.    Joint Motion of Defendants Chevron, Gulf, and Cumberland Farms to Vacate Conditional Transfer Order (CTO-2),

2.    Plaintiffs' Joinder in Joint Motion of Defendants Chevron U.S.A., Gulf Oil Corporation, and Cumberland Farms, Inc. to Vacate Conditional Transfer Order (CTO-2), and

3.    Consolidated Motion and Brief of Defendants Equilon, Motiva, Shell and Texaco to Vacate Conditional Transfer Order CTO-2,

and I FURTHER CERTIFY that on January 23, 2001, I caused to be served a true and correct copy of this Supplemental Certificate of Service, via regular mail, postage prepaid, to those counsel noted on the Panel Service List (CTO-2) at the following addresses:

Dan H. Ball (January 23, 2001)
Thompson & Coburn, LLP
One Firstar Plaza
St. Louis, MO 63101

Nathan P. Eimer, Esquire (January 22, 2001)
Eimer, Stahl, Klevorn & Solberg
122 South Michigan Avenue
Suite 1776
Chicago, IL  60603

Peter Sacripanti, Esquire (January 22, 2001)
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY  10020-1605
Liaison Counsel for Defendants in MDL 1358

Joseph D. Gonzalez, Esquire (January 22, 2001)
Jeffrey A. White, Esquire
Law Offices of Masry & Vititoe
5707 Corsa Avenue, Second Floor
Westlake Village, CA  91362

Stuart J. Lieberman (January 23, 2001)
Lieberman & Blecher, PC
31 Jefferson Plaza
Princeton, NJ  08540
Counsel for Plaintiffs in *Holten*

Morris A. Ratner, Esquire (January 22, 2001)
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th Floor
New York, NY  10017
Liaison Counsel for Plaintiffs in MDL 1358

Debra S. Rosen (January 22, 2001)
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ  08033

Matthew S. Slowinski (January 23, 2001)
Slowinski Atkins, LLP
One Neward Center

Newark, NJ 07102

Steven C. Dubuc

Exhibit A

RECEIVED
CLERK'S OFFICE
2001 JAN 22  P 4: 25
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

US OFFICE PRODUCTS

1

2 **LIEBERMAN & BLECHER, P.C.**
31 Jefferson Plaza
3 Princeton, NJ 08540
(732) 355-1311
4

5 **LAW OFFICES OF MASRY & VITITOE**
5707 Corsa Avenue, Second Floor
6 Westlake Village, California 91362
(818) 991-8900
7

Attorneys for Plaintiffs
8

_____

9 THEODORE HOLTEN, CRAIG HOLTEN,      :
EMILY HOLTEN, THEODORE HOLTEN, JR.,  :
10 EDWARD MAINETI, STANLEY ZALEWSKI,   : *SUPERIOR COURT OF NEW JERSEY*
JEAN ZALEWSKI, BEVERLY M. WINN,      : *COUNTY OF OCEAN*
11 RAYMOND M. WINN, ROSE DITOTO,       :
WILLIAM KINARD, SUZANNE KINARD,      : *DOCKET NO.: OCN-L-2763-00*
12 JAIME KINARD, KACEY KINARD a minor, :
by and through their guardian ad litem, BARRY :
13 KLEIN, NANCY KLEIN, ANDREW KLEIN, a :
minor, by and through their guardian ad litem  : **CIVIL ACTION**
14 MERIDETH MCGOVERN, CHRISTOPHER     :
FELLOWS, DIANNE COTTRELL DANIEL     : ***FIRST AMENDED***
15 COTTRELL, SR., DANIEL COTTRELL      : ***COMPLAINT AND JURY DEMAND***
16 JR., a minor, by and through their guardian ad litem,:
NICHOLAS COTTRELL, a minor, by and through :
17 their guardian ad litem, JAKE COTTRELL, a minor:
by and through their guardian ad litem, ERIC  :
18 SQUIRE, CLAUDIA SQUIRE, JESSE SQUIRE, :
ANGELA SQUIRE, AMANDA SQUIRE,        :
19 CAITLYN THOMPSETT, a minor, by and through :
their guardian ad litem, JAMES SMITH, SR.,   :
20 JAMES SMITH, JR., MARYLIN SMITH,    :
KENNETH WEDDING, PATRICIA WEDDING,   :
21 KATHERINE WEDDING, BRIAN WEDDING,   :
JAMES J. LEWIS, SARAH ELIZABETH LEWIS, :
22 a minor, by and through their guardian ad litem, :
CHARLOTTE FORD, ANDREW FORD, TONYA  :
23 DEGUILIO, STEPHEN DEGULIO, CHERILYNN :
DEGUILIO, JILLIAN DEGUILIO, STEPHEN T. :
24 DEGUILIO, a minor, by and through their guardian :
ad litem, HAZEL LUCE, THOMAS LUCE, SR., :
25 HEATHER MCCOMBIE, DOROTHY            :
MCCOMBIE, BRIAN WHITMAN, WILLIAM    :
26 ROSANIO, JOANN ROSANIO, WILLIAM R.  :
ROSANIO, JOSEPH A. ROSANIO, a minor, by :
27 and through their guardian ad litem, JASON C. :
28

ROSANIO, a minor, by and through their guardian  :
ad litem, VINCENT FUSARO, PATRICIA L.  :
FUSARO, MARYANN MOONEY, DANA  :
MOONEY, a  minor, by and through their guardian :
ad litem, KATHRYN MOONEY, a minor, by and  :
through their guardian ad litem, MARK PAUL  :
MINETTI, DAVID W. MINETTI, CHRISTIAN  :
MINETTI, JASON BRITTON, a minor, by and  :
through their guardian ad litem, TYLER MORONG, :
a minor, by and through their guardian ad litem,  :
KIMBERLY MOONEY, CHARLES DANIEL  :
MOONEY, RUTH M. BIANGARDI, PAUL  :
MINETTI, CAROL MINETTI, JORDAN C.  :
MINETTI, a minor, by and through their guardian  :
ad litem, TINA HAMMOND, MATHEW  :
DICENSO, DEBRAH DICENSO, AURORA  :
DICENSO, a minor, by and through their guardian  :
ad litem, LORRAINNE HILL, GORDON LEE  :
HILL, RICHARD HILL, DAVID HILL, JUNE K.  :
PIETRO, PAUL PIETRO, LAURA ANN  :
MANCINI, ANTHONY MANCINI, CATHERINE :
MANCINI, a minor, by and through their guardian :
ad litem, BRITTANY MANCINI, a  minor, by and :
through their guardian ad litem, ANTHONY J.  :
MANCINI, a minor, by and through their guardian  :
ad litem, MARIE GORDON, MICHAEL  :
GORDON, MADISON GORDON, a minor, by and :
through their guardian ad litem, TIMOTHY  :
YEOMAN, a minor, by and through their guardian  :
ad litem, GARY GETTIS, TRACY GETTIS, GARY:
MICHAEL GETTIS, a minor, by and through their  :
guardian ad litem, KAYLIN ROSE GETTIS, a  :
minor, by and through their guardian ad litem,  :
ROBERT MOORES, DEBORAH MOORES,  :
JOSEPH FRANKS, DONNA M. FRANKS,  :
CHRISTA M. FRANKS, a minor, by and through  :
their guardian ad litem, BRIANNA FRANKS,  :
a minor, by and through their guardian ad litem,  :
CARMEN L. DIAZ, MARCELINA DIAZ, JR.  :
LYDIA DIAZ, TELAH M. DIAZ, a minor, by and  :
through their guardian ad litem, LETICIA  :
ADAMES, a minor, by and through their guardian  :
ad litem, CAROLINE HOLTEN, MATTHEW  :
HOLTEN, GLENN MCCOMBIE, AMY FUSARO, :
CINDY FUSARO, BRIAN FUSARO, LISA WEBB:
TMOTHY YESMAN, a minor, by and through their:
 guardian ad litem, LOUIS F. BARBERIA,  :
ALBERT MASCOLA, ANTHONY MASCOLA,  :
KATHRYN GEIGER, MATTHEW GEIGER,  :

2

**FIRST AMENDED COMPLAINT**

STANLEY SMOLUCHA, DAWN SCADUTO,                :
RAYMOND MERTZ, MARY MERTZ, MARIE           :
GEARL, STEVEN P. GEARL, JASON M. GEARL,:
NATASHA A. DELLAPERUTE, PETER MEROLA:
ALFRED APONTE, CARMEN I. APONTE,             :
SOMMER A. CAVANAUGH a minor, by and        :
through their guardian ad litem, CARMEN P.
CAVANAUGH, TRACY GARMON, MICHAEL :
GARMON, JOSHUA C. GARMON a minor, by         :
and through their guardian ad litem, KRISTY L.
GARMON, a minor, by and through their guardian :
ad litem, TYLER BENTLY, a minor, by and
through their guardian ad litem, JOHN MOLITOR, :
JENNIFER MOLITOR, ALESHA MOLITOR, a         :
minor, by and through their guardian ad litem,
EMILY MOLITOR, a minor, by and through their :
guardian ad litem, KAREN AQUILINA, CHARLES:
AQUILINA, CHARLES AQUILINA, JR., JAMES :
AQUILINA, KIM AQUILINA, TERESA DIAZ,
JOHN DOES 1-100, JANE DOES 1-100,               :
                                                                        :
                                    Plaintiffs,                         :
                                                                        :
                                                                        :
                 vs.                                                    :
                                                                        :
                                                                        :
CHEVRON  U.S.A., INC., a Pennsylvania           :
corporation, GULF OIL CORPORATION, a        :
foreign corporation, CUMBERLAND FARMS,        :
INC., a Massachusetts corporation, DOES 1-100,  :
                                                                        :
                                    Defendants.                      :

_____

Plaintiffs, by way of this Complaint, say:

## **INTRODUCTION**

1 .    This case is about the reckless contamination and poisoning of numerous

individual drinking wells located in the Township of Bayville, County of Ocean, New Jersey.

The Defendants in this action destroyed and contaminated the community's drinking water

supply by placing gasoline containing methyl tertiary butyl ether ("MTBE"), a gasoline additive,

and Benzene Toluene Ethylbenzene and Xylene ("BTEX") common gasoline chemical

components into leaking underground storage tanks, piping and dispensing systems (hereinafter

referred to collectively as "UST systems") and in negligently and intentionally placing MTBE into the stream of commerce without taking proper precautions and without warning of MTBE's propensity to contaminate drinking water.

2.    MTBE is toxic in that it is a known carcinogen in rats.  In fact, MTBE is more carcinogenic in laboratory test animals than the majority of currently regulated chemical carcinogens.

3.    MTBE is a colorless liquid that may cause water to contain foul taste and odor. While it has often been said that oil does not mix with water, MTBE mixes perfectly with water. It mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline.  Moreover, because MTBE takes more time to decompose, once discharged, it stays in the environment longer and wreaks much more havoc than other gasoline chemical components.

4.    MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product in the refining process.  MTBE is a member of a class of chemical compounds, ethers, whose unique properties are enhanced solubility in water and chemical attraction to water molecules.  MTBE does not readily attach to soil particles and is not susceptible to natural degradation.  Many Plaintiffs' private wells contained MTBE above New Jersey's maximum level and at least five Plaintiffs' well contained MTBE at 300 ppb.

5.    Benzene and Toluene are colorless liquids that are known to cause cancer in human beings.  Three of the Plaintiffs' private well contained Benzene and Toluene above New Jersey's maximum level.

6.    Plaintiffs are Bayville community members, and former community members, many of whom have had their drinking water contaminated with MTBE and/or BTEX.  Records from the New Jersey Department of Environmental Protection ("DEP") reflect that the Agency considers a former retail gasoline service station owned and operated by Gulf Oil Corporation ("Gulf"), now Chevron U.S.A., Inc. ("Chevron") and Cumberland Farms, Inc. ("Cumberland Farms") to be the exclusive or primary source of the drinking water contamination in the

community. That station is located at Route 9 and Morris Avenue, Bayville, New Jersey 08721 and is hereinafter referred to as the "site".

7. Defendant CHEVRON U.S.A., INC. is a Pennsylvania corporation (hereinafter referred to as "Chevron") doing business in New Jersey.

8. Defendant CUMBERLAND FARMS, INC. is a Massachusetts corporation (hereinafter referred to as "Cumberland Farms") doing business in New Jersey.

9. Defendant GULF OIL CORPORATION is a foreign corporation (hereinafter referred to as "Gulf") doing or having done business in New Jersey.

10. All of the fictitious Defendants are companies that buy, process, or otherwise take gasoline from oil refineries and deliver it to gasoline stations (hereafter referred to "Jobbers"). The Jobber Defendants in this Action have delivered MTBE laden gasoline to the Bayville gasoline station.

11. Gulf Oil, Chevron, Cumberland Farms and the Jobbers (hereinafter collectively referred to as "Defendants") intentionally, negligently and/or recklessly placed MTBE laced gasoline into the stream of commerce without warning of its dangers. The MTBE laced gasoline was sold and/or delivered to Cumberland Farms and was placed into underground storage tanks located at the site.

12. In or about May 2000, Plaintiff Theodore Holten learned that his water was contaminated with MTBE. He determined this because professional sampling of his drinking water yielded this information.

13. Shortly thereafter, the DEP determined that community wide sampling was required and other Plaintiffs discovered that they too had MTBE and/or BTEX in their drinking water.

14. On information and belief, the MTBE and BTEX chemicals were discharged from an underground storage tank at the Cumberland Farms gas station. This tank was in violation of Federal laws requiring that all tanks of similar design be removed from the ground.

1 5 .    In or about June 2000, several other groundwater samples taken in Bayville showed that MTBE and/or BTEX contamination was present at levels well above the New Jersey health advisory level for both MTBE and/or BTEX.

1 6 .    Plaintiffs were alarmed to learn that they had been drinking, cleaning and cooking with MTBE and/or BTEX contaminated water. What is worse, many Plaintiffs were terrified to find that they had been feeding and cleaning their children and grandchildren and children in their care, with the same contaminated water.

1 7 .    Starting in or about June 2000, certain Defendants agreed to provide bottled water to certain area residents.    In addition, certain Defendants paid for certain Plaintiffs to be connected to a permanent alternate water supply.    However, not all Plaintiffs received this benefit and in any event, none of the Plaintiffs can use their drinking water wells as a result of the water contamination.

1 8 .    As of this date, the Bayville area is still contaminated by MTBE and BTEX.    The contamination has not been cleaned up.

1 9 .    As a result of Plaintiffs' exposure to MTBE, they have been placed at an increased risk of suffering nausea, vomiting, diarrhea, eyes, nose and throat irritation, rashes, as well as other illnesses now and in the future.    Because of this increased risk of suffering future health problems, the Plaintiffs reasonably require medical surveillance.    As a result of the exposure to Benzene and Toluene, some Plaintiffs have suffered and continue to suffer significant health impacts.

2 0 .    Today, numerous hard working people living in Bayville have no permanent source of drinking water. In addition, Plaintiffs' property values have plummeted and businesses have suffered.    Some Plaintiffs have had to use bottled water to bathe and drink, and have generally had the quality of their lives disrupted as a result of the MTBE and/or BTEX contamination.

2 1 .    The harm suffered by the Plaintiffs was a result of the Defendants acts and omissions, and such acts and omissions where actuated by actual malice or accompanied by a wanton or willful disregard of the safety of product users, consumers, and others who

6

**FIRST AMENDED COMPLAINT**

foreseeably might be harmed by the MTBE and BTEX, including the Plaintiffs. The Defendants engaged in intentional wrongdoing, in the sense of an evil minded acts, by allowing MTBE and BTEX to be placed into an UST system that they knew would leak chemicals into the ground and into the groundwater where it would contaminate people's drinking water. These defendants then failed to remediate the contamination for years. They simply allowed the contamination to spread and spread without warning and without concern for the health and safety of the neighbors nor their neighbors children.

22. Moreover, these Defendants placed MTBE into the stream of commerce knowing that the chemical possesses special dangers in that it has the propensity to contaminate even more water than BTEX. The Defendants knew full well of the probably hazards and ill effects that could be realized by unknowing individuals such as the Plaintiffs. Defendants also deliberately acted or failed to act with knowledge of a high degree of probability of harm to unknown persons such as the Plaintiffs and with reckless disregard of to the consequences of such actions or omissions.

23. When, in this complaint, reference is made to any act of the Defendants, such shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such acts, or failed and omitted to adequately supervise or to properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants and did so while acting within the scope of their employment or agency.

24. Defendants DOES 1-100, are named herein under fictitious names, their true names and capacities being unknown to Plaintiffs. Plaintiffs are informed and believe, and thereon allege, that each of said DOES is responsible, in some actionable manner, for the events and happenings hereinafter referred to, either through said Defendants' conduct, or through the conduct of Defendants' agents, servants or employees, or in some other manner, causing the harms alleged by Plaintiffs in this complaint.

25. Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious

names.   Plaintiffs will amend this complaint to set forth the names and capacities of said Defendants along with appropriate charging allegations when the same have been ascertained.

## JURISDICTION AND VENUE

26.   This Court has subject matter jurisdiction over all causes of action asserted herein.

27.   This Court has jurisdiction over Defendants because they are New Jersey corporations, corporations authorized to do business in New Jersey and/or registered with the New Jersey Secretary of State, reside in New Jersey, do sufficient business with sufficient minimum contacts in New Jersey, or otherwise intentionally avail themselves of the New Jersey market through the sale, manufacturing, and/or processing of petroleum-related products in New Jersey to render the exercise of jurisdiction over Defendants by the New Jersey courts consistent with traditional notions of fair play and substantial justice.

28.   Venue is proper in this Court because the actions of Defendants give rise to transitory causes of action and at least one of these Defendants resides and or does business in Ocean County, New Jersey.   Furthermore, all of the Plaintiffs reside or did reside in Ocean County, New Jersey.

## COUNT I
## NEGLIGENCE

29.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 28 inclusive.

30.   This lawsuit involves Defendants who mix, sell and/or transport MTBE laced gasoline.  Defendants' MTBE laced gasoline was delivered to the site.

31.   MTBE's propensity to contaminate water is so menacing that even if gasoline storage tanks and pipelines were completely impenetrable, which they are not, the mixing of MTBE in gasoline would still pose a significant threat to groundwater.

32.   In fact, Chevron put together a "White Paper" to ". . . provide [its] perspective on the relation between the LUST [Leaking Underground Storage Tank] and MTBE issues."  In the White Paper, Chevron provides the following observations:

> **The physical and chemical properties of MTBE make it more likely to reach groundwater than other gasoline components, as a result of incidental spills, overfills, and gasoline deliveries, *even without* underground storage tank leaks. (emphasis original).**

> **These concerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999.   This information indicates there is MTBE groundwater contamination from small spills of gasoline (e.g. a spill in a parking lot, or a car accident) . . .**

> **. . . Short of eliminating car accidents, stopping customer overfilling of tanks, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they get in the environment.**

33.   However, despite Defendants' past and current knowledge of MTBE's negative characteristics, Defendants have placed, and continue to place, MTBE laced gasoline into the Country's stream of commerce without taking any special precautions to prevent MTBE discharges to people's drinking water.

34. MTBE should have never been mass-produced and distributed to a place like Bayville without proper education and warning of MTBE's propensity to contaminate water. Moreover, Defendants should have also properly educated and warned the appropriate government agencies, gasoline station owners and operators, and the public of MTBE's negative environmental characteristics.

35. Prior to placing MTBE into the stream of commerce, Defendants knew or should have known that in the event MTBE was released into soil, it would easily mix with groundwater and spread its toxic plume over great distances without biodegradation or bioremediation.

36. Defendants further knew, or should have been known, that when MTBE was placed into Bayville's gasoline system there was a strong probability that it would escape into the surrounding environment and contaminate Plaintiffs' soil and well water.

## PRE-SALE DUTY TO PREVENT AND TO WARN

### A.   DUTY TO PREVENT

37. Defendants breached their duty to make sure that their product was safe before putting it into the stream of commerce. Specifically, Defendants failed to take appropriate precautions to protect public and private drinking water supplies, including Plaintiffs' water supplies, from being contaminated with MTBE. In failing to take adequate steps to prevent MTBE water contamination, Defendants also breached their duty to protect the public from unwittingly ingesting MTBE contaminated water.

38. Chevron, Gulf and Cumberland Farms further breached their duty to prevent gasoline from being discharged and released from the UST system into the soil and groundwater. Indeed, records taken from the New Jersey Department of Environmental Protection (hereinafter referred to as "NJDEP" or "State") indicated that these particular Defendants have known for years that gasoline was leaking from their UST system. They did nothing to stop the chemicals from leaking.

39.   In fact, even after a substantial amount of gasoline leaked into the ground, Defendants failed to prevent the continued migration of chemicals from the soil to groundwater. These Defendants knew, or should have known, that the petroleum contaminated soil acted as a continuous source of groundwater contamination that poisoned Bayville community members' private wells for years.  These Defendants were the only ones who were in a position to stop this contamination from spreading and yet they did nothing.

40.   To add insult to injury, to this date, Defendant Cumberland Farms continue to deny liability notwithstanding its knowledge that the UST systems on this site were leaking.  See Exhibits 1 and 2.

**B.    DUTY TO WARN**

41.   Defendants in this action failed in their duty to warn public agencies and owner/operators of "Mom & Pop" gasoline stations of MTBE's propensity to contaminate water.

42.   Specifically, Defendants failed to warn the Bayville community that as a result of having MTBE laced gasoline delivered to the Cumberland Farms gasoline station, their drinking water was in danger of being contaminated.  The people of Bayville deserved to be warned that their health and property might be placed in great danger as a result of Defendants' business activities.

43.   In addition to failing to warn the public of MTBE's negative characteristics, Defendants also failed in their duty to warn Bayville residents that they should obtain medical surveillance after they ingested MTBE and/or BTEX contaminated water.

44.   As a direct and proximate result of Defendants' breach of their duties, as outlined above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

**POST-SALE DUTY TO WARN AND REMEDIATE**

45.   Plaintiffs are informed and believe and thereon allege that Defendants placed MTBE laced gasoline into the stream of commerce.  Defendants' MTBE laced gasoline was delivered to the gasoline system located at the site without warning the proper governmental

authorities, or the operators of the Cumberland Farms gas station, of MTBE's dangers and defects.  Defendants' MTBE laced gasoline was placed into the Cumberland Farms' gasoline system thereby causing Plaintiffs' water and soil to be contaminated with MTBE.

46.     Defendants further knew that BTEX chemicals were being discharged into the soil and groundwater underneath the Cumberland Farms gasoline station and did nothing to prevent this contamination from spreading into Plaintiffs' drinking water.

47.     Moreover, Defendants knew or should have known that, at the time the contamination was released, Plaintiffs' were defenseless to protect themselves because they had no knowledge of MTBE, Benzene and Toluene's carcinogenicity or of its negative impacts on soil and drinking water.

48.     Also, once it became known that Bayville's drinking water had been contaminated, Defendants should have warned Plaintiffs of the problem and immediately remediated the contamination that their business activities had caused.

**A. DUTY TO WARN**

49.     After realizing that Plaintiffs' soil and water had been contaminated as a result of Defendants' actions, Defendants failed to adequately warn the community that they needed to obtain medical surveillance.

**B. DUTY TO REMEDIATE**

50.     Once the contamination became publicly known, Defendants failed to control the contamination plume from continually expanding into Bayville's soil and water wells.

51.     Once the contamination became publicly known, Defendants failed to remediate the MTBE and BTEX contamination.  Defendants have left Plaintiffs to fend for themselves knowing that Plaintiffs did not have the expertise or the resources to properly remediate the contamination plume that these Defendants created.

52.     Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce has interfered with Plaintiffs' use and enjoyment of their property, and quality of life, and has diminished the value of their real property.

53. Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce caused Plaintiffs' need for medical surveillance.

54. Bayville community members are troubled by the fact that they have bathed in MTBE and/or BTEX contaminated water and have consumed this water.

55. Bayville community members are also troubled by the fact that they have unwittingly bathed their children in MTBE and/or BTEX contaminated water and given them this same water to drink.

56. Many Bayville community members have had to pay to be connected to an alternate water supply and incur monthly water expenses as a result of the MTBE and/or BTEX contamination.

57. As a direct and proximate result of Defendants' breach of their duties, as outlined above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

58. Defendants' actions, placing dangerous chemicals into the stream of commerce while knowing that they would surely contaminate drinking water, are wholly inappropriate.

59. Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of Plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

60. Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

61. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

   a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

   b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

   c. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.   Compensatory damages in an amount determined to be just and equitable by this Court.

e.   For special, exemplary and/or punitive damages according to proof.

f.   An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.   For such other relief as this Court deems appropriate and just.

## COUNT II
## STRICT PRODUCTS LIABILITY

62.     Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 61 inclusive.

63.     Defendants placed MTBE, a defective product, into the stream of commerce.

64.     Defendants mixed MTBE with gasoline thereby using it as an oxygenated additive.

65.     Defendants sold MTBE laced gasoline, thereby placing it into the stream of commerce.  Said MTBE laced gasoline was then delivered to the site.

66.     Plaintiffs are informed and believe and thereon allege that MTBE is a particularly hazardous chemical in that it has a propensity to contaminate drinking and may cause serious disease and health problems.

67.     Defendants failed to warn appropriate governmental agencies, gasoline station operators and the potentially impacted public that MTBE had the propensity to contaminate water, including Bayville's drinking water.  Therefore, the MTBE placed into the stream of commerce by Defendants was defective because Defendants neither warned the appropriate governmental agencies nor the community of Bayville of MTBE's propensity to contaminate surrounding water resources when it is discharged into the environment.

68.     Thus, not only does the MTBE additive contain a design defect due to its inherent dangerous characteristics, it is also defective because Defendants failed to properly warn relevant regulatory agencies, distributors and consumers of MTBE's inherent dangerous characteristics.

69.     Defendants' action, placing an inherently dangerous chemical into the stream of commerce while knowing that it would surely contaminate drinking water, is wholly inappropriate.

70.     Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

71.    Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

72.    WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.    A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b.    Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c.    Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.    Compensatory damages in an amount determined to be just and equitable by this Court.

e.    For special, exemplary and/or punitive damages according to proof.

f.    An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.    Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.    For such other relief as this Court deems appropriate and just.

## COUNT III
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND FEAR OF FUTURE INJURY

73.    Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 72 inclusive.

74.    With conscious disregard for the safety of the Bayville residents, Defendants negligently placed MTBE laced gasoline into the stream of commerce. The Defendants' MTBE laden gasoline was eventually delivered to the site.

75.    In placing MTBE into the stream of commerce the Defendants knew or should have known that MTBE was certain to invade Plaintiffs' homes, groundwater and property.

76.    Defendants' failure to properly warn governmental agencies, MTBE distributors, dispensers and sellers of MTBE's negative characteristics or otherwise take appropriate precautions in preventing the wide-spread contamination caused by MTBE led to the contamination of Plaintiffs' homes, groundwater and property.

77.    Defendants' failure to warn or take appropriate safety measures when placing this dangerous chemical into the stream of commerce constitutes outrageous acts that exceed all bounds of decency tolerated by our society.

78.    Defendants exhibited a reckless disregard for the probability of causing Plaintiffs severe emotional distress by contaminating Plaintiffs property, water supply, soil and environment, and by failing to take any steps to warn or otherwise remedy the likely impacts of their actions.

79.    Defendants negligently failed to take any steps to stop the contamination or to warn Plaintiffs of the MTBE and/or BTEX contamination and its consequences.

80.    As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally

distressed due to their reasonable fear that MTBE and/or BTEX laced gasoline will continue to contaminate their drinking water and property, the drinking water and property of their neighbors, and cause more damage to their community.

81. As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally distressed because Plaintiffs are now aware of the potential repercussions of exposure to MTBE and/or BTEX laced gasoline. Plaintiffs suffer and will continue to suffer severe emotional distress due to the reasonable belief that the MTBE and/or BTEX contaminated water that they ingested, or were otherwise exposed to, will likely cause future medical health problems or complications. Moreover, Plaintiffs are reasonably distressed at the prospect of their children and other family members suffering future medical health problems or complications as a result of the MTBE and/or BTEX exposure.

82. Defendants' actions, placing dangerous chemicals into the stream of commerce while knowing that they would surely contaminate drinking water, are wholly inappropriate.

83. Moreover, the Defendants willfully and intentionally breached their duty of care and acted with fraud, malice and oppression for which punitive and exemplary damages should be imposed.

84. Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

85. WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d. Compensatory damages in an amount determined to be just and equitable by

1

2       e.  For special, exemplary and/or punitive damages according to proof.

3       f.  An order mandating that the Defendants, and each of them, and their

4 successors and assigns, take every action necessary to assure that all relief requested herein is

5 obtained and fully funded.

6       g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of

7 Court.

8       h.  For such other relief as this Court deems appropriate and just.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT**

## COUNT IV
## QUALITY OF LIFE DAMAGE

86.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 85 inclusive.

87.  Plaintiffs' quality of life has deteriorated tremendously as a result of the MTBE and/or BTEX contamination in the Bayville area drinking water.

88.  Plaintiffs have been unable to drink their water, bathe in their water, invite guests to their homes for fear that they too may be injured as a result of ingesting or coming into contact with the MTBE and/or BTEX laden water, swim, grow vegetables in their garden, wash their cars, allow their children to play in their yards.

89.  Plaintiffs have suffered from medical injuries, including but not limited to, respiratory problems, rashes, dizziness, headaches, from consuming and otherwise using or coming into contact with their MTBE laden water.

90.  WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.  A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b.  Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.  Compensatory damages in an amount determined to be just and equitable by this Court.

e.  For special, exemplary and/or punitive damages according to proof.

f.  An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.  For such other relief as this Court deems appropriate and just.

DATED:      September 22, 2000

LIEBERMAN  & BLECHER, P.C.

By:

Stuart J. Lieberman and
Shari M. Blecher

Attorneys for Plaintiffs

# CERTIFICATION

I Certify that there are no other lawsuits or actions relating to the subject of this litigation of which I am aware.

# DEMAND FOR INSURANCE COVERAGE INFORMATION

Pursuant to the New Jersey Rules of Court, please provide all required information relating to any insurance carriers who may provide coverage in this matter.

# ARCHER & GREINER

A PROFESSIONAL CORPORATION

COUNSELLORS AT LAW

### ONE CENTENNIAL SQUARE
### P.O. BOX 3000
### HADDONFIELD, N.J. 08033-0968

856 - 795-2121

FAX 856 - 795-0574

HTTP://WWW.ARCHERLAW.COM

F. MORSE ARCHER, JR.
(1802-1984)

FREDERICK P. GREINER
(1805-1984)

THOMAS N. SANTIVOGLIO
FREDERICK J. ROHLOFF
*RLES L. HARP, JR.
A. NYMARLING*
JERT R. KUGLER*
EDWARD C. LAIRD
L. GERALD RIGBY**
JUHAN RUNKE*
FRANK R. DEMARILY, JR.
ROBERT T. EGAN
STEVEN W. SUFLAS*
GARY L. GREEN*
GERALD E. DARLING*
SEAN T. O'MEARA*
CHRISTOPHER R. GIBSON*
THOMAS J. HURLEY
DENISE M. KEYSER*
DEBRA S. ROSEN*
KEVIN L. LILLY
DEBORAH A. HAYS*
RICHARD F. ROY, JR.*
LOUIS L. CHODOFF*
ARTHUR H. JONES, JR.*
STEVEN K. MIGNOGNA*
KATHERINE BENESCH*
CHRISTOPHER S. YOUNG*

GEORGE F. KUGLER, JR.
PETER E. DRISCOLL
CHARLES W. HEUSLER*
ROBERT G. HARBESON*
JOHN V. FIORELLA
ROBERT T. LEHMAN
ARTHUR F. RISDEN
GARY J. LESNESKI
JAMES H. CARLL
FRANK O. ALLEN**
WILLIAM J. THOMPSON*
GORDON F. MOORE II
TERENCE J. FOX
ROBERT W. BUCKMAN, JR.*
STEVEN J. FRAM*
ELLIS L. MEDOWAY*
THOMAS A. MUCCIFORI
NEAL L. SCHOMHAUT*
JOEL SCHNEIDER*
CRAIG J. HUBER
RICHARD M. CONLEY
JOHN C. CONNELL*
MICHAEL E. LISORANO
MICHAEL W. SOZANSKY, JR.*
MARC A. ROLLO*

ALLYSON T. BACCINI
RITA M. BOSELLI*
NINA L. COHEN*
PETER FASCIA*
STEPHEN M. FOGLER*
PETER L. FRATTARELLI*
JEFFREY B. GORDON*
RICHARD GRANGO, JR.*
THOMAS M. HERDELIN*
E. LYNNE HIRSCH*
DARRIN HOWARD*
PATRICK JUDGE, JR.*
KIMBERLY KERSEY*
ANTHONY R. LA RATTA*
RONALD G. LIEBERMAN
MELISSA MACLEOD*
LOREN M. MERSON
MARK J. OBERSTAEDT*
STEPHEN M. PACKMAN*
DAVID A. RAPUANO*
JESSE A. RODRIGUEZ*
STACEY J. SINCLAIR*
KATHLEEN P. STOCKTON
ANGELA C. TITUS*
MELISSA WHEATCROFT*
CARINE B. ZEHPUSS*

HENRY O. BOENNING
DOUGLAS E. BURRY*
JOHN B. COMEGNO II*
PATRICK M. FLYNN
CRISTINA M. FRACCALVIERI*
PATRICIA GILBERT*
WILLIAM J. GROSKE*
SUSAN J. GUERNSEY*
DAVID L. HERRMANN*
GULET D. HIRSCH*
STACEY J. JASKOL*
EDWARD J. KELLEHER*
SIGRID E. REP
KEVIN J. LAU*
NICKOLAS J. LOCHETTA II*
JOSEPH A. MARTIN*
LISE M. NISSEN*
WILLIAM J. O'KANE, JR.*
GREGORY J. PALAKOW
KATHLEEN M. RICCIARDI*
WILLIAM L. RINN*
JAMIE A. RUBIN*
MICHAEL T. SWEENEY*
CHAD WARNKEN
CHRISTOPHER WISNIEWSKI*
SONYA K. N. ZEIGLER*

OF COUNSEL
RAYMOND B. DRAKE

SPECIAL COUNSEL
ROBERT J. FOGG*

*Also Member of Pennsylvania Bar
**Member of Pennsylvania Bar Only
*Certified Civil Trial Attorney
*Certified Matrimonial Law Attorney

PHILADELPHIA OFFICE
ONE SOUTH BROAD STREET
SUITE 1420
PHILADELPHIA, PENNSYLVANIA 19107
215 - 599-4166
FAX 215 - 599-3843

PRINCETON OFFICE
PRINCETON PIKE CORPORATE CENTER
993 LENOX DRIVE, BUILDING TWO
CN 5349
PRINCETON, N.J. 08543-5349
609-896-0011
FAX 609-896-0055

FLEMINGTON OFFICE
100 MAIN STREET
FLEMINGTON, NJ 08822-1464
908 - 788-8700
FAX 908 - 788-7854

Direct Dial
(856) 354-3084

Direct E-Mail
drosen@archerlaw.com

June 14, 2000

**VIA TELECOPY & ORDINARY MAIL**

Gary Sanderson
Bureau of Underground Storage Tanks
NJ Department of Environmental Protection
P.O. Box 433
401 E. State Street
Trenton, NJ 08625

RECEIVED
JUN 1 9 2000

RE:   **Cumberland Farms, Inc. - Former Gulf Service Station No. 2904**
      **Route 9 and Morris Boulevard**
      **Berkeley Township, Ocean County**
      **Case No. 99-07-27-1159-05**
      **UST No. 0058629**

Dear Mr. Sanderson:

As a follow-up to our telephone conversation yesterday, I thought it appropriate to briefly outline the status of Cumberland Farms, Inc.'s (CFI) investigation in Berkeley Township, as well as its future plans, concerning the potable well contamination in Bel Aire Park. As you know, CFI has worked closely with its environmental consultant, Environmental Evaluation Group (EEG), in investigating both the potable well contamination and the ongoing groundwater investigation at the former Gulf service station.

To date, EEG has sampled over 125 domestic wells in Bel Aire Park. Only seven of those wells have concentrations of MTBE at levels above drinking water Maximum Contaminant Levels (MCLs), and those seven homes have now been connected to the Berkeley water system. One additional home which tested at 66 ppb will also be connected to the water system and CFI is committed to continuing to connect those homeowners who test above MCLs and others on a case-by-case basis. CFI also intends to



EXHIBIT
1

ALL-STATE LEGAL SUPPLY CO.

Gary Sanderson
June 14, 2000
Page 2

continue monitoring, on a monthly basis, those potable wells that have been impacted with any level of contamination, or are in the area of other wells which have demonstrated levels of contamination above MCLs.

CFI is also working with EEG to continue the groundwater investigation so that we can understand the groundwater dynamics in the area. As you know, five additional monitoring wells are being installed this week. CFI believes it has been extremely cooperative with the Department in complying with all requests made, whether formally through the Field Directive or informally through various conversations with CFI and EEG. CFI certainly intends to keep the channels of communication open with regard to any technical concerns that the DEP may have concerning the ongoing investigation and potable well sampling, but is, quite frankly, somewhat disappointed in the scope of the Department's investigation with regard to other potential sources in the area which appear to be as likely, if not more likely, than the former Gulf service station.

As CFI's underground storage tank report indicated, after additional soil removal activities following the tank removal, only one soil sample had a slightly elevated concentration of MTBE. When this soil sample was averaged with the many other samples below standards, this site became appropriate for no further action for any remaining soil contamination and there cannot credibly be claimed to be an ongoing source of contamination in the soil at the former Gulf service station.

While the groundwater investigation does continue, it must be noted that there are fuel oil or other heavy constituents being found in the potable wells, generally as Tentatively Identified Compounds (TICs). This contamination could certainly be indicative of contamination from area fuel oil tanks used for home heating, or diesel fuel related to any at home servicing of trucks or other vehicles. Additionally, while MTBE is generally not a component of fuel oil, as I am sure you are aware, it has been found in many instances in fuel oil where fuel oil deliverers also deliver or store gasoline which contains MTBE.

Moreover, additional gasoline constituents, other than MTBE, are being found in some of the wells, which again could be indicative of various "housekeeping" activities, including filling and spillage related to lawn mowers or weed whackers, four wheel drive vehicles, which we understand are prevalent in this area, and other servicing of cars in the neighborhood, which we also understand is quite prevalent. Indeed, we have received information that at least two residents in the neighborhood do commercial automotive work from their homes. Chloroform is also showing up in virtually all of the potable wells at significant levels, indicating pesticide and insecticide contamination or other homeowner activities causing degradation of the groundwater in the Bel Aire Park area.

Lastly, CFI is most concerned about the lack of a groundwater investigation being conducted at the Kurnel's & Sons site. This location has been a known source of gasoline contamination in the area for several years and was the subject of an apparently aborted publicly funded investigation.

Given the many other potential sources for the contamination, CFI certainly believes it is premature to label CFI the "Responsible Party" in this matter or even the most likely potentially

Gary Sanderson
June 14, 2000
Page 3

responsible party in this matter. Indeed, given the multitude of other possible sources, CFI certainly reserves its right under the Spill Act and other statutory and regulatory provisions to seek to recover any monies it has spent to date from the responsible party and to seek contribution and treble damages as provided under law.

While it is premature for CFI to be required at this point to provide alternative water, in the form of connection to the water system, for all of Bel Aire Park, CFI would encourage the Department to support any efforts of the Township or otherwise to hasten the connection of the homeowners to the Berkeley water system. In addition, CFI would request the Department and County work with the Township to immediately pass an ordinance requiring well sealing in this area upon connection to the water system.

As I indicated to you on the telephone yesterday, CFI wants to remain cooperative with the Department and to keep open the channels of communication. We certainly do not want to change your procedure in dealing with Phil Brilliant of EEG or Paul Dandrade of CFI with respect to technical issues. If, however, the Department is looking to impose additional requirements on CFI or requests conferences with CFI on issues of such import as connecting the entire subdivision to the water system, CFI would appreciate those requests being made through me.

If you should have any questions at all, please do not hesitate to contact me.

Very truly yours,

DEBRA S. ROSEN

DSR:jmt
cc:     Kevin Kratina, Chief, Bureau of Underground Storage Tanks
        Emile C. Tayeh, P.E., Vice President, Environmental Affairs
        Mark G. Howard, Corporate General Counsel, Cumberland Farms, Inc.
        Philip Brilliant, EEG



ALL-STATE LEGAL SUPPLY CO.

### State of New Jersey

**Department of Environmental Protection**

Christine Todd Whitman
*Governor*

Robert C. Shinn, Jr.
*Commissioner*

*Bureau of Underground Storage Tanks*
*PO Box 433*
*401 East State Street*
*Trenton, NJ 08625*

**Via FAX and CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Paul Dandrade
Cumberland Farms Incorporated
777 Dedham Street
Canton, MA 02021

JUN 2 6 2000

Debra Rosen, Esq.
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033

Re:     Cumberland Farms Incorporated – Gulf S/S # 2904
        Route 9 and Morris Blvd.
        Berkeley Township, Ocean County
        Case # 99-07-27-1159-05
        UST # 0058629

        Potable Well Contamination at Bel Aire Park

Dear Mr. Dandrade:

This is in response to Debra Rosen's letter dated June 14, 2000 regarding the above referenced site. The New Jersey Department of Environmental Protection ("Department") wishes to clarify several issues contained in Ms. Rosen's letter.

Ms. Rosen's stated that Cumberland Farms Incorporated would continue monitoring the potable wells in the Bel Aire Park Section on a monthly basis. Please be advised that by letter dated June 14, 2000, the Department increased the frequency of sampling in potable wells located in the Joy Place, Shelly Lane and Lee Avenue areas.

Ms. Rosen's letter states that there are several other potential sources of contamination in the area, which appear to be as likely, if not more likely, than the former Gulf Service Station. Although there may be other potential sources of contamination in the area, the Cumberland Farms investigation to date has not indicated the presence of any other confirmed sources of MTBE ground water contamination in the Bel Aire Park area. The information collected to date indicates that upon removal an 8,000-gallon gasoline tank, the tank was reported to contain a hole. Post excavation soil samples indicated the presence of elevated levels of benzene, toluene ethylbenzene and total xylene (BTEX) compounds in four soil samples. In one of these samples MTBE was detected at 27 part per million. Based on the post-excavation soil sample results, Cumberland Farms Incorporated removed approximately 366 tons of contaminated soil. Post remedial samples collected after the removal of the soil indicated the presence of MTBE in all seven samples; one of the samples contained MTBE at 5.6 ppm. To date, the full vertical extent of the MTBE contamination in the soil at the site has not been determined. Averaging of soil data before completion of the contaminant delineation is not acceptable. Based on the above, the claim that the soil at the site can not be considered an ongoing source of contamination is unfounded. Preliminary verbal results of the samples collected from the monitoring wells revealed the presence of elevated levels of MTBE at the site and off –site. In addition, results from 16 shallow temporary wells points installed throughout the Bel Aire Park Section did not reveal evidence of any additional sources of contamination. Regardless, an actual ground water impact at the Cumberland Farms site has been

confirmed.

Concerning the tentatively identified compounds (TICs) found in some of the wells in the area, although it is true that these compounds appear to be originating from fuel oil, no correlation has been found between concentrations of MTBE and the presence of TICs. In addition, none of these compounds exceeded the Ground Water Quality Standards and or Safe Drinking Water MCIs as applicable.

Regarding the statement in Ms. Rosen's letter that additional gasoline constituents are being found, other than MTBE, in some of the wells, the Department is only aware of one property owner who submitted test results from their well indicating the presence of gasoline contaminants other than MTBE. These results have not been confirmed or reproduced after two subsequent sampling rounds conducted by Cumberland Farms Incorporated.

With respect to Chloroform being detected in the area's potable wells in significant levels, all potable well data submitted to date does not indicate levels of chloroform above the Safe Drinking Water Maximum Contaminant Level (MCLs) for trihlamethanes.

Lastly, Regarding the contention concerning the lack of a ground water investigation at the A. Kurnel and Sons site, please be advised that the Department has designated an impact area for the ground water contamination at the A. Kurnel and Sons site. All properties within that area have been provided an alternative potable water supply. Furthermore, from the investigation conducted to date, it has been determined that the ground water flow direction from the A. Kurnel and Son site is towards the east and is not towards the Bel Aire Park Section.

Environmental Evaluation Group has reported to the Department that they have been conducting Multi – Phase Recovery at the site on a weekly basis. Cumberland Farms Incorporated shall submit within 7 days of receipt of the letter data indicating the effectiveness of MPR on the recovery of contamination at the site. In order the gain hydraulic control of the contaminant plume, Cumberland Farms Incorporated shall conducted the following:

1. Conducted aquifer testing within seven day upon receipt of this letter;

2. Based on the aquifer test results, submit a design for a pump and treat ground water system within 14 days upon receipt of this letter. In additional all anticipated permit applications shall be submitted with the system design; and

3. Install and operate the system within 14 days upon receipt of the Department's approval.

The Department remains willing to provide Cumberland Farms Incorporated and its representatives technical guidance and assistance to completed the remedial investigation at the above referenced site.

Should you have any questions regarding this matter, please contact Gary Sanderson, of the Bureau of Underground Storage Tanks, at (609) 633-0544.

Sincerely,

Kevin F. Kratina, Chief
Bureau of Underground Storage Tanks

C:    Gary Sanderson, BUST
      Municipal Clerk, Berkeley Township
      Ocean County Health Department

Exhibit B

US OFFICE PRODUCTS

1

1134BERC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3
    IN RE:  MTBE                          MDL 1358
4

5   ------------------------------x

6
                                         New York, NY
7                                        January 3, 2001
                                         2:15 p.m.
8

9   Before:

10                  HON. SHIRA A. SCHEINDLIN

11                                       District Judge

12

13

14                      c   O   o

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS (212) 805-0300

2

1134BERC

```
1              (Case called)
2              THE COURT:  Good afternoon to everybody.  I have
3    received a fair amount of correspondence in advance of today's
4    conference, including letters from each side as to what should
5    be on today's agenda.  Let me see if I can summarize for the
6    record the correspondence I have received so you know what I
7    have in front of me.  I have December 29 letters regarding the
8    agenda from both Mr. Ratner on behalf of plaintiffs and
9    Mr. Sacripanti for defendants.  Then I have, probably on this
10   proposed amended complaint issue, a letter dated December 13,
11   from Mr. Wallace and a response dated December 22 from
12   Mr. Ratner.  I have reviewed the August 25 and October 3
13   letters originally addressed to the question of bifurcation.
14   Then I have obviously received the proposed amended complaints
15   in Berisha, England, and Young, and a master complaint itself.
16   That describes the materials I have.
17             Let me tell you the agenda, although I know you all
18   know it, because it tracks your letters.  We need to discuss
19   the whole question of amending the complaint.  I think we will
20   do that last.  We will try to take up what I perceive as the
21   shorter, easier discussions first.  There are questions about
22   the confidentiality order, questions about the website,
23   questions about the document preservation/nondestruct order,
24   questions about the document depository, and questions about
25   the Bates stamping of documents being produced for inspection.
```

3

1134BERC

1   I think that's the entire agenda.  Did I leave any item out

2   that anybody notices.  This is a good time to mention that you

3   are to state your name each time before you speak or we will

4   not have a clear record in today's proceedings.  Try to

5   remember to do that.  Did I leave anything out of the agenda

6   that anybody thinks should be discussed today.  All right.

7        In an effort to do what I think is easiest first, I

8   don't think the document depository issues are terribly hard.

9   I mean that it's a common-sense decision on my part to make

10  and I am going to make it.  It seems to me if plaintiffs want

11  the space that they want because of its convenience, but that

12  space is twice as expensive that might be used but not nearly

13  as convenient, then the plaintiffs should bear any additional

14  cost.  If the space they believe is sufficient turns out to be

15  not sufficient, then it's their problem; they didn't have to

16  create this problem.  They could have had twice as much space

17  at the same cost in an inconvenient location.  They say we

18  think this is fine.  If you are right, you won't pay an extra

19  penny; if you are wrong, you will.  You will pay for the move

20  and whatever costs are associated with breaking the first

21  least.  That's what will be done.  That should help you

22  finalize where you go with the documents.

23       MR. BREIT:  There is one remaining issue on that

24  question of what would happen if we do require additional

25  space.  I think what you have ruled is that if there is an

SOUTHERN DISTRICT REPORTERS (212) 805-0300

4

1134BERC

1   additional cost for moving, that we have to bear that expense.

2            THE COURT:  If you have to break your lease, you have

3   to bear that expense.

4            MR. BREIT:  Then the question becomes whether under

5   defendants' terms we are then required to move the space

6   outside of Manhattan or whether we still choose to have it

7   where we want it.

8            THE COURT:  The additional space.  I gather you would

9   be in two locations; you would not be required to close up the

10  Manhattan space if you outgrow it.

11           MR. BREIT:  Right.

12           THE COURT:  But there might be additional space

13  needed; apparently, that's going to have to be an alternate

14  location.

15           MR. BREIT:  Defendants have requested that alternate

16  location be outside of Manhattan.  Are you ruling on that; do

17  we need to meet and confer on that if that's necessary?

18           THE COURT:  It seems to me that the additional space

19  should be where it's cheapest.  If you want it in Manhattan,

20  nonetheless, you pick up the differential over the cheaper

21  price, that's all.  For additional space, instead of having

22  the 75/25 split we have now, should you need only 500

23  additional square feet, the difference is $10 a square foot,

24  you want to be in Manhattan, you pay the differential.  Done.

25           MR. SACRIPANTI:  We reached agreement on the website

5

1134BERC

1   just prior to the conference.  The agreement is we will use

2   the vendor selected by the plaintiffs and we agree that that

3   vendor should have a website operational by February 3.  The

4   only outstanding issue we will meet and confer on is the

5   allocation of cost.

6        THE COURT:  Good.  The document preservation or

7   nondestruct order, there doesn't really seem to be much of a

8   disagreement here other than some producing to set limits to

9   get it done.  As I understand it, the draft from plaintiffs

10  was submitted to the defendants on December 28, which is just

11  a couple of days ago; they need a time frame for response and

12  for negotiation.  If you can't do it, I will do it.

13       MR. SAUL:  We have agreed with the defendants to put

14  this off until the next hearing in an attempt to come to terms

15  on this issue.

16       MR. GUTTMAN:  Yes.

17       THE COURT:  When is the next date.

18       MR. GUTTMAN:  January 30 I believe is the date.

19  That's the conference you set to deal with discovery issues

20  specifically.  We can take it up then if the court would like.

21       THE COURT:  I have to down for 10:00.  I am glad we

22  are doing this.  That's not a good day.  I would like to

23  change it.  It's not a not good day; it would be the second

24  day of a trial that was moved.  So I would prefer January 26

25  at 10:00, a Friday.

6

1134BERC

1      MR. SACRIPANTI:  If I may, your Honor, we have

2  scheduled some meet and confer dates that will probably push

3  not into that week but perhaps into that week.  Maybe we would

4  benefit by having the week after rather than the week before.

5      THE COURT:  It looks like there are going to be some

6  back-to-back trials.  I would like to give you enough time.  I

7  usually hold my status conferences at 4:30.  That won't be

8  enough time.  February 5 would be all right.  Do you want to

9  put it off until Monday, February 5, as opposed to Friday,

10  January 26.  It's about a one-week difference.

11      MR. SACRIPANTI:  That would work, I can tell by the

12  nodding of the heads for defendants.  I can't speak for

13  plaintiffs.

14      MR. RATNER:  That's fine, your Honor.

15      MR. GUTTMAN:  Would that be 10:00, your Honor?

16      THE COURT:  Yes.  The Bates stamping issue then.

17      MR. RATNER:  For plaintiffs, your Honor, we think

18  that there is not yet a dispute on this issue and I don't

19  think we have disagreement between the parties on this issue.

20      MR. SACRIPANTI:  I was told otherwise prior to the

21  hearing.

22      THE COURT:  The letters certainly indicated

23  otherwise.  If you don't have a dispute what is the agreement.

24      MR. RATNER:  We had a discussion regarding this.  We

25  did not intend to place it on the agenda today.  We had a

SOUTHERN DISTRICT REPORTERS (212) 805-0300

7

1134BERC

1    discussion with Mr. Sacripanti and I didn't put it in our

2    agenda.  I must have failed to adequately communicate with

3    him.  We are not going to raise this with the court.

4         THE COURT:  What's going to be done.

5         MR. RATNER:  I believe they are going to produce, as

6    I understand defendants, also through their view rooms, before

7    documents are selected for placing in a repository, documents

8    responsive to our requests.  Where these documents already

9    bear Bates numbers from prior litigations they will maintain

10   these Bates numbers on them.  Then when they are placed in the

11   repository, the repository index will reflect the original

12   Bates number and the MDL number in conformity with case

13   management order 2.

14        The only area we had that was of disagreement,

15   initially we were hoping defendants would agree to Bates stamp

16   all documents placed in the view room so we can always know

17   what we have seen, what we have not seen.  The defendants have

18   refused to do that.  Our position I believe based on

19   discussions that we have recently had among ourselves is that

20   we will go forward without forcing that issue, see how it

21   goes.  If it becomes a problem we will address it later.  For

22   now we are ready to go along the path outlined in

23   Mr. Sacripanti's letter.

24        THE COURT:  That leaves only the confidentiality

25   issue before we address the proposed amended complaints.

1134BERC

1      MR. HINCK:  On the positive side we came down to an

2   agreement on a number of outstanding issues.  On the

3   confidentiality agreement we were left with one.  The

4   agreement in conformance with what was discussed here in court

5   allows the lawyers representing plaintiffs in other MTBE

6   actions to sign a confidentiality order, view documents

7   produced in this case, in the MDL.  Plaintiffs, based on our

8   experience, wanted to have that go two ways, where we would be

9   able to look at documents that plaintiffs in other MTBE

10  actions have already gotten or organized, etc.

11      Our experience includes our difficulty right now

12  working with co-counsel even at this table who have had

13  documents produced to them by defendants in this case in

14  another litigation and they signed confidentiality orders that

15  constrain them from allowing us to look at those documents.

16  My understanding is that defendants' response is they are

17  going to produce the same document quite possibly in this case

18  if it's responsive to a request, etc., and survives motion

19  practice, or whatever, and, for example, we may be able to

20  find them right now in Houston.

21      We find that to be burdensome.  We think simply the

22  most efficient thing to do in some cases would be to turn to

23  our colleague Mr. Summy who has looked at a lot of documents

24  in other cases and ask Mr. Summy, can we see the deposition

25  that occurred in the California case.  Right now he says he

9

1134BERC

1   can't allow us to see it because of the confidentiality order

2   in that case.

3        We proposed language that would be in this

4   confidentiality agreement.  Defendants wouldn't go along with

5   that.  I told them we didn't insist it be in the

6   confidentiality agreement, we were hoping to accomplish that,

7   could they suggest a way that can be accomplished.  As far as

8   I can tell so far their position is that it shouldn't be

9   accomplished.

10        MR. SACRIPANTI:  You will recall at our last

11   conference there were several issues regarding the

12   confidentiality agreement that were discussed, that were

13   discussed, and it was ordered by the court that it was up to

14   us to put it together.  We have done that.  This is a new

15   issue.  In essence, what this issue does is ask for a greater

16   confidentiality agreement than had been executed in the other

17   cases.  It countermanded orders courts have given in other

18   cases.  It is problematical from our standpoint.

19        Let me correct the record and tell the court what we

20   are willing to do.  To the extent there is discovery that's

21   dispositive and responsive here, we are going to produce that

22   discovery.  We will produce it in the same form that it was

23   produced in other cases if it in fact is responsive to the

24   discovery in this case.  There will be no burden to the

25   plaintiffs.  Then that discovery will become subject to the

1134BERC

1  confidentiality agreement and order that we have discussed and

2  the court will hopefully sign.

3       MR. SUMMY:  If I could address that.  It is

4  burdensome.  Even if they produce the documents they have

5  already produced to me, it's taken me two years to glean out

6  what I could.  I have taken about 70 depositions that refer to

7  those documents.  I can't share that with my co-counsel here.

8  It just doesn't work.

9       THE COURT:  It doesn't; it's absolutely illogical.

10  The way to handle this, if anything has been previously

11  produced and is now called for, the prior confidentiality

12  order is no longer controlling in the sense you are producing

13  it in effect here if it's responsive.  Therefore, Mr. Summy

14  who has it can share it from his files.  Do you understand.

15  You need only confer that it's responsive here.  I don't see

16  how 70 depositions could be anything but responsive here; it

17  would boggle anybody's mind that would not be responsive here.

18       MR. SACRIPANTI:  We agree that to the extent it's

19  responsive that we will again produce it in that fashion.

20       THE COURT:  You said that.  I am saying that

21  Mr. Summy can share it as he has now organized it as soon as

22  it's clear it's responsive here.  Make up a request that says

23  anything previously produced we hereby request.  I will grant

24  it.  That's the end of it being responsive.  It seems silly to

25  know, unless there is a defendant not here who made previous

11

1134BERC

1    production, that defendant's production is under somebody

2    else's confidentiality order.  Is there any such production

3    you know of of a different defendant not here?

4          MR. SUMMY:  Yes, there would be two defendants,

5    Unical and Arco Chemical.  I would propose anything they gave

6    me that is confidential I will not share with counsel here.

7          THE COURT:  You can't give their documents away

8    within this group.

9          MR. SACRIPANTI:  Two other issues under the

10   confidentiality agreement, that nobody negotiated documents

11   designated as such would be identified to us would be stamped

12   every page confidential.  I don't think we get to that point

13   if plaintiffs' counsel are allowed to switch and exchange

14   documents without notifying us what documents they have in

15   fact shared with one another.

16         THE COURT:  They can do so.  I understand it's

17   burdensome.  They can identify it in some way.

18         MR. SACRIPANTI:  Then we would have a record just

19   like they would if they went into the view room of what

20   documents they have chosen to use that are confidential.  If

21   the court would be willing to do that, that would at least

22   satisfy some of the concerns defense has.

23         THE COURT:  I am willing to, it's burdensome, type

24   out lists of thousands of documents.  Hopefully you will find

25   a somewhat simpler way to do it.

1134BERC

1          MR. SUMMY:  I am willing to do that.  It goes back to

2     the problem they stamped everything confidential.  The list is

3     going to be very long.

4          THE COURT:  The second part of this order here or

5     this issue is that the defendants, if I understand, have asked

6     this court to resolve disputes between parties even if they

7     are not in this litigation but disputes involving documents

8     that may be placed in the repository here.  Did I get that

9     wrong.  I think I saw that in plaintiffs' letter.

10          MR. SACRIPANTI:  I think you read plaintiffs' letter

11     correctly.

12          THE COURT:  Let me hear from plaintiffs.

13          MR. HINCK:  Your Honor, I believe we raised it to

14     notify the court we don't have a strong position on it.  It

15     was something that defendants wanted.  We initially balked at

16     it, then thought it through.  It might be largely an issue for

17     the court.

18          THE COURT:  Who wants it now?

19          MR. SACRIPANTI:  Your Honor, to the extent lawyers

20     outside of the litigation come to the view room, take

21     confidential documents, they have to identify them, agree to

22     be bound by the order, agree to submit to your jurisdiction,

23     then should this MDL terminate, those other actions continue,

24     we would ask the court to maintain continuing jurisdiction

25     over that order to enforce that order.  That was a provision

13

1134BERC

1   we put in.  That's where I am assuming this discussion came

2   from.  I am not quite sure myself.

3        MR. RATNER:  That is where the discussion came from.

4   We are just flagging the issue for your Honor.  The question

5   is does this court want to extend its jurisdiction in this

6   way.  The court may and the court may not.  We wanted you to

7   be aware it had been included in the defendants' draft order.

8        MR. SAUL:  To be clear, plaintiffs don't have a

9   problem with this.  If the court wishes to continue having

10  continuing jurisdiction over these documents.

11       THE COURT:  Fine.  It seems at this early stage I

12  would accept that assignment subject to the fact that I may

13  some day say enough and just stop.

14       MR. SACRIPANTI:  Fair enough, your Honor.

15       THE COURT:  Done.  I think we are up to the big issue

16  for today's conference which has to do with the proposed

17  amended complaints and the master complaint from which the

18  proposed amended complaints stemmed.  This debate, shall I

19  say, caused me to do a lot of reading over the last two weeks.

20  Everybody was citing cases that probably would have been

21  better cited on motions to dismiss or to certify a class

22  action.  I am prepared for the next two motions down the road.

23  I have not read the cases cited by both sides.

24       I would like to share some of my thoughts to help you

25  maybe frame the comments you might wish to make.  Generally

SOUTHERN DISTRICT REPORTERS (212) 805-0300

14

1134BERC

1   speaking, I don't wish to go through a formal motion for leave

2   to amend and a formal response and then a formal decision then

3   have the amended complaints and motions to dismiss.  It

4   doesn't seem an efficient way to go.  I consider the extensive

5   letter-writing that you have all engaged in where you wrote

6   single-space letters, that would be the equivalent of 16 or 18

7   page briefs, to be briefs.

8           It seems to me the issue of a motion for leave to

9   amend has been well briefed in these letters.  While it's true

10  that the party who wishes to amend has to seek leave with the

11  court, Mr. Ratner can say I seek leave, you can stand up and

12  say I oppose, and I will rule.  That's the end of the leave to

13  amend phase.  Generally speaking, I agree with the plaintiffs;

14  I don't think it's a plaintiff and defendant issue.  Really,

15  the best place to handle this is either in a motion to dismiss

16  or in the class certification stage.

17          That said, I have problems with what plaintiffs

18  propose to do.  I do agree with the defendants that I need and

19  they need some answers.  We are just putting over the moment

20  in which you have to answer this.  This is as good a time as

21  any.  I can tell from the proposals, from the letter-writing

22  there is a lot of strategy here and probably lot of effort to

23  work around the decisions that have not been favorable.  I can

24  see from reading the pleadings you studied the opinion then

25  done everything you can to move away from the opinion, which I

1134BERC

1    understand fully.  There is a lot of thinking going on how to

2    structure the complaint.  There are questions I have.

3        Probably the biggest concern of all is, as I read the

4    proposed amended complaint, the only class plaintiff left in

5    what was the Berisha action is La Susa.  He is only purporting

6    to represent a class of those folks who don't know whether

7    their wells are contaminated or not.  He is seeking equitable

8    relief, injunctive relief only.  Is this a court-ordered,

9    court-supervised testing and monitoring class?

10       I don't have a big question as to whether it's

11   injunctive or not; it sounds injunctive enough to me because

12   of the way you carefully pled.  That's not a problem.  That's

13   the only class you have in there.  You no longer have any

14   class representative for any damages claim for anybody whose

15   well is known to be contaminated.  This may present problems

16   under 23(d)2 or (e).  Namely, the original complaint had such

17   a class representative so you purported to file an action on

18   behalf of folks whose wells were contaminated and who sought

19   damages flowing from that contamination.

20       You have abandoned that class action, so while under

21   all those cases that you cite me about how there is no need

22   under 23(e) to give any notice that the class action is not

23   dismissed, I understand that, these are just claims within a

24   class.  You claim to be just narrowing things.  Let's face it.

25   Let's get right to the heart.  There was one purported class

1134BERC

1     for well owners whose wells were contaminated seeking damages.

2     That class is abandoned.  With that it is a closure.  There

3     once was a case; there is no more case for that class.

4          What are we going to do?  You have a couple of

5     individual plaintiffs left, Berisha and O'Brien, who seem to

6     want to pursue their own individual damages claims for their

7     contaminated wells in the middle of a class action seeking

8     only injunctive relieve on behalf of those people who don't

9     know if their wells were contaminated.  I thought that was

10    odd, individual damages claims hanging with this single class

11    action or testing class.  I need to understand what you are

12    doing.

13         Specifically, when I say what you are doing, the

14    questions that worry me were notice, so anybody who thought

15    that there was about to be a class action for contaminated

16    wells realized that that's not this action.  If they relied on

17    it in any way, they may need some kind of notice in a

18    newspaper or something that there is no action going on, no

19    class action going on for those people who own wells that

20    already had testing and know there is contamination.

21         Another worry I have besides possible notice is res

22    judicata.  Are there people here who might get bound by some

23    discussions that come out of this case in some way that might

24    be detrimental to them if they had no voice at all in the

25    action.  I suppose a third and maybe the least important of my

17

1134BERC

1    questions still there is the defense concern that's been going

2    on for months about this notion of bifurcation and avoidance

3    of a jury trial.  I am not so sure that's as big a question

4    for me now because there is no class action for those whose

5    wells are contaminated who are seeking damages.

6        The only class action that apparently is being

7    brought in the MDL, there may be no other claims but equitable

8    claims I realize when wells are tested and people find out

9    they have contamination and they may wish to bring damages

10   claims eventually.  I don't know if they are going to do it

11   individually or still hope down the road to pursue that as a

12   class action.

13       If you think that you are going to pursue it as a

14   class action, we may have that bifurcation question.  If you

15   feel from some of the precedence you read carefully there will

16   never be a class action, if people want to bring damages

17   claims down the road, they are welcome to do so individually,

18   we may not have this so-called bifurcation issue and a jury

19   trial issue facing us.

20       Those are in some kind of order the major concerns I

21   have it seems to me on that.  Much more minor, I think the

22   defense is right.  You should tell me you are not bringing a

23   conspiracy cause of action, you know it doesn't exist as a

24   standalone action.  I have no problem in your pleading.  I

25   understand your letters.  You talk about it as bridge-proof

1134BERC

1   terms.  That's fine.  We are not going to go through huge

2   briefing.  There is no cause of action here.  I don't know

3   about everywhere in the United States, but here in New York,

4   you should settle that so to speak.  That's not a standalone

5   claim.  I have no problem with the pleading.

6         Defendants seem wrong on that.  If you want testing,

7   that's part of the issue, why you want testing, that's part of

8   the issue in the global sense.  That doesn't mean you are

9   bringing personal injury lawsuits.  I know you are not.  There

10  is nothing wrong with those allegations; they can stay where

11  they are.  The only one I didn't mention I wanted to bring up

12  is the dismissal of the misrepresentation fraud and private

13  nuisance claims.  I guess the only question here, is that

14  dismissal with prejudice so to speak, is that also something

15  that you think you may come back with in a different way in a

16  different time or not.  Some clarification would be useful.

17        That's the very end of the list.  That's a lot to

18  talk about.  Mr. Ratner, you are ready to talk about them.

19        MR. RATNER:  Yes, your Honor.  Let me begin just by

20  mentioning briefly, your Honor, that what defendants

21  characterize as an attempt on our part to circumvent bad case

22  law, I would characterize as an effort on our part in the

23  spirit of Rule 23 to identify those issues in the case that

24  are most appropriate for class treatment.

25        THE COURT:  I agree with you.  I said it in a more

1134BERC

1    positive way.  You have carefully studied the case law, tried

2    to figure out what you can do in the class action context.  I

3    realize that.

4            MR. RATNER:  Your Honor, I think the master complaint

5    and the proposed amended complaint represent our collective

6    best view what those claims are best pursued on class action

7    and individual bases.

8            THE COURT:  Now you have to deal with all the

9    questions.

10           MR. RATNER:  Starting, your Honor, with the issue of

11   the Berisha case and the remaining class representative Mr. La

12   Susa, the question of whether Rule 23(e) applies at all, I

13   would like to address that, and assuming just for the sake of

14   argument it did apply, address the question of whether notice

15   to the class would be required.

16           THE COURT:  Hold on.  I know it's not settlement, I

17   know it's not compromise; it was just that an action was

18   brought.  There is a body of law that seems to say

19   presumptively when it's brought it's a class action, it tolls

20   the statute of limitations.  People think there is a class

21   action out there until the court says there isn't.  There is;

22   you brought one.  I don't want to get into the technicalities

23   of the dismissal or settlement.  That is, the class, the

24   damages class for those who have contaminated wells is gone.

25   Don't tell me you have case law that says the case is not

20

1134BERC

1    dismissed.  That case is dismissed, that class.

2         MR. RATNER:  I hear what your Honor is saying.  I

3    think that's an important distinction.  I think, your Honor,

4    we don't dispute that 23(d) applies all the time.  But the

5    court any time under 23(d) has the duty and discretion to

6    judge whether there needs to be notice to the class.  The

7    reason we so vigorously oppose a 23(e) analysis --

8         THE COURT:  Don't bother with (e).  I want to talk

9    about once the allegation that the folks whose wells were

10   contaminated seek damages, that purported class has been

11   dropped, what am I going to do, what are you going to do, what

12   do we have to do.

13        MR. RATNER:  I would refer the court for a 23(d)

14   analysis to the case we cited for the instructive process, for

15   the analytical process that the court used in deciding whether

16   to give notice under similar circumstances --

17        THE COURT:  I don't want to know about other cases.

18   I want to know what has to be done.

19        MR. RATNER:  In the weighing of the benefits and

20   burdens in the case, the question is is there a burden imposed

21   on potential absent class members out there who may have heard

22   about these cases who may be relying on these cases to their

23   detriment as to their damages claims, how does that weigh with

24   the cost and expense of providing notice to those people.  I

25   think it's pretty heavily weighted in favor of not requiring

21

1134BERC

1    notice to go out, because these particular cases that are in

2    front of this court have not received substantial publicity.

3    There has been no previous notice.  We are not aware of

4    persons who are relying on the pendency of these cases to toll

5    the statute of limitations.

6         THE COURT:  I read an article in The New York Times.

7    It had Mr. Saul's name.  He was meeting with some folks in

8    Westchester or Putnam.  A very interesting article in the B

9    section.  I read it carefully.  That's big publicity.  A lot

10   of people in New York read The New York Times, a lot of people

11   outside of New York.  He was talking to folks, telling them

12   about their wells.

13        MR. RATNER:  Your Honor, I believe there has been

14   publicity about the nature of MTBE and the pendency of the

15   suits.  Whether that parses out a distinction between whether

16   injunctive relief or damages claims are being pursued, I don't

17   think that it has.

18        THE COURT:  I don't know the answer.  I don't know

19   that you know as you stand here.  It may be as simple as a

20   small newspaper ad in a similar type paper, just a general

21   notice that no class action suit is being pursued seeking

22   damages for those whose wells are contaminated.  The same ad

23   might say however, if you wish to know if you are seeking

24   testing whether your well is contaminated, an action is going

25   forward and the name is.  You can use it for good and bad at

SOUTHERN DISTRICT REPORTERS (212) 805-0300

22

1134BERC

1   the same time.  That's not so bad.  You may have to take out

2   such an ad that explains the good and the bad.

3           MR. RATNER:  Your Honor, we would support the

4   exercise of the court's discretion under 23(d) to do such a

5   thing.

6           THE COURT:  That may certainly answer the notice

7   question with respect to the decision not to pursue damages

8   actions for those whose wells have been tested and been shown

9   to be contaminated.  Have you thought where you would head on

10  behalf of those people eventually?  Is it your thought having

11  discussed and studied the case law if those folks are going to

12  pursue actions they would do so individually, not as a class?

13          MR. RATNER:  Yes, your Honor.  I think we took the

14  court's admonition at the November 2 hearing very seriously.

15  The court told us this matter of the complaint should include

16  to the extent practicable everything we plan to pursue in this

17  case.  We did that.  We indicated in this case we intend to

18  pursue those specific types of relief we listed in our prayer,

19  which we call injunctive relief on a class basis, not pursue

20  damages claims on a class basis.

21          THE COURT:  Good.  Your statements here today were

22  helpful.  The folks who have contaminated wells that have been

23  proven to have contamination from this product, they are going

24  to pursue actions, they are going to do what Ms. Berisha and

25  Mr. O'Brien are doing, namely bring individual damages claims.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1134BERC

1    It's not your intention to follow up one class action with

2    another class action.

3         MR. RATNER:  This happens often where you have a case

4    that starts out one way, evolves over time, either because the

5    plaintiffs change the class definition or the court changes

6    the class definition under Rule 23.  We would for simplicity

7    sever out the claims of Ms. Berisha and other plaintiffs who

8    used to be class representatives so that proceeds as a

9    companion case.  They are really just cluttering things up.

10   We contemplated doing that.

11        THE COURT:  That's wise, because in the cases I was

12   reading, class representative may also have damages claims.

13   There was some court that said that it is not a problem for a

14   class representative to continue with a damages claim.  But

15   they are class representatives; they are sort of hanging in

16   this injunctive suit for no good reason I can come up with.

17   As you said, they are cluttering it up.  It probably should be

18   severed out.  I drew the Berisha case off.  It's really not

19   part of all this.  That's not part of this injunctive class

20   action.

21        There are a couple of other issues.  What about this

22   third point about impermissible bifurcation and jury trial

23   situation.

24        MR. RATNER:  Your Honor, I will address that along

25   with the res judicata issue you raised.  First let me say that

24

1134BERC

1      the defendants' arguments on this regard all center on Fifth

2      Circuit case law.

3              THE COURT:  I read the cases.

4              MR. RATNER:  I have two responses to the question.

5      First, outside the context of Allison, if you read Allison the

6      way defendants want you to read it, it undermines Rule

7      23(c)(4) which contemplates that an action may be brought or

8      maintained with respect to particular issues as opposed to all

9      issues in the class.  I have to say that the Second Circuit

10     has not adopted the Allison line of analysis with respect to

11     whether you can pursue injunctive relief claims only.  That

12     analysis is contrary to the case that we cite which is a

13     Southern District of New York case, Gelb, from 1993.

14             THE COURT:  Not a very analytical case I might add.

15             MR. RATNER:  Even within the analytical framework of

16     Allison, and important footnote --

17             THE COURT:  As a district court case, the real

18     question is is our circuit silent at the circuit level on this

19     issue.

20             MR. RATNER:  No case I know of in the Second Circuit

21     I found yet that squarely addresses the issue, although quite

22     a number of district court cases that do exactly what we would

23     like to be done in this case.  On the res judicata issue, with

24     respect to an Allison analytical framework, footnote 13 of

25     that decision on page 418, the Fifth Circuit there was

1134BERC

1    addressing plaintiff's argument that the holding of Allison

2    would prevent people from being able to go forward with these

3    types of actions in the future, in particular in this case

4    Title VII class actions, because they only want to do

5    injunctive relief.  They would be held to be inadequate

6    because of the res judicata effect on a damages claim.

7              The court here in the case on which defendants rely

8    said this is not an issue but that even if it were an issue,

9    it could be addressed by supplying notice and opt-out rights

10   to the 23(d)(2) class.  Even under Allison, which we don't

11   think applies, that court has held that the res judicata issue

12   would not truly be an issue.  That's consistent with the cases

13   that we have cited, numerous cases that are medical monitoring

14   cases, other types of single-issue injunctive relief cases

15   where plaintiffs successfully sought certification and got to

16   judgment on injunctive relief claims for monitoring.  Those

17   claim were obviously potential preludes to damages claims, but

18   courts did not stop those proceedings or refuse to certify.

19             THE COURT:  Then the distinction might be between a

20   mature and an immature tort, because what was being written in

21   all these letters is that if major issues are going to be

22   tried so to speak for the first time in an injunctive class

23   action case, that would be the first set of decisions on the

24   issues that would apply to any subsequent damages cases, such

25   as whether something is a contaminant, how it gets into the

26

1134BERC

1   groundwater, how soluble it is, whatever the issues are.  But

2   those would be tried, if I understand, for the first time.

3   They might be tried for the first time in your injunctive

4   class action case then would be binding on some of those

5   issues in subsequent damages cases.  They may not be more

6   mature torts where many of the issues have been tried many

7   times, then there is a medical monitoring class, but certain

8   basic major issues have been tried over and over again for

9   years.

10          MR. RATNER:  Two comments on that, your Honor.  We

11   will have to get to that issue in the certification stage as

12   well.  Just as a prelude, my initial thoughts for damages

13   cases for MTBE, those are immature torts.  From defendants'

14   records there have been quite a few suits involving MTBE

15   litigation, property damages cases, but secondly, there is a

16   distinction between injunctive relief components and damages

17   components, because while these cases are at the core testing

18   and monitoring cases, damages cases don't even kick in or

19   arise until after testing and monitoring have been conducted.

20          THE COURT:  Right, but in order to obtain injunctive

21   relief, you have to show risks.  Why should anybody order

22   testing and monitoring?  Because there is something risky

23   about those purported leaks and contamination.  I am sure I

24   got from reading the judge there was concerned his trial might

25   be the first time those issues were litigated.

1134BERC

1      MR. HINCK:  Your Honor, I do believe that aspect of

2  the Millet opinion that refers to a mature tort had to do with

3  the fact that the plaintiffs in the case named as defendants

4  the originators of the whole concept of putting MTBE in

5  gasoline.  They were not people shown to be sellers of

6  gasoline with MTBE, as are the defendants in Berisha.  The

7  immature tort was trying to hold product designers, the very

8  originators responsible, even though they are not sellers in

9  the main.  I think that's the part that troubled the court

10  more than some of these other issues which are not so much

11  immature torts.

12      MR. RATNER:  We hope to demonstrate to the court that

13  the issues involved in demonstrating entitlement testing and

14  monitoring are quite distinct from the issues involved in

15  proving liability for particular damages at a particular site.

16  The issues of risk to entire statewide populations of well

17  owners are really class issues that involve questions that we

18  will prove are distinct from the issues that involve the

19  precise amount of damages at a particular site, etc.

20      THE COURT:  Aren't there some common issues just as

21  basic as solubility of the product in the ground.

22      MR. RATNER:  I think there will be many common

23  factual questions like that, your Honor, but I don't believe

24  they would necessarily be case-determinative questions.  I

25  don't think someone could take a judgment that injunctive

28

1134BERC

1   relief should be provided here in the form of tests and go

2   walk into state court and identify who gets judgment on a

3   damages liability claim.  I think you will see as we develop

4   the issues with respect to injunctive relief that those are

5   not the same.

6          THE COURT:  You say that kind of question has been

7   tried around the country already sporadically.

8          MR. RATNER:  Yes, your Honor.  Defendants have been

9   defending in recent years individual site specific MTBE --

10         THE COURT:  Which have raised those questions?

11         MR. RATNER:  Yes, your Honor.  You also raised a

12  question of whether we are bifurcating claims.  If I could

13  just address that briefly.  We are not bifurcating claims.

14  What plaintiffs did in Allison, they went in with everything

15  on the table, they said we want a class certified for

16  injunctive relief.

17         THE COURT:  That's right.  You may have answered that

18  earlier when you said it's not my intention to follow up with

19  a damages class action case.  Having said that, you probably

20  are not bifurcating anything because you don't represent this

21  other class, you don't intend to.  If folks have their wells

22  tested, find out there is contamination, they may or may not

23  choose to pursue individual actions or others may get a class

24  action.  That's not your intention.

25         MR. RATNER:  At the risk of just beating a dead

29

1134BERC

1    horse, page 421 of the Allison opinion in section A-1 starts

2    off right off the bat on that section of that Fifth Circuit

3    decision saying central to this whole analysis is the fact

4    plaintiffs intend to pursue --

5         THE COURT:  You told us your intent.  I had a couple

6    more questions.  You have them written down.

7         MR. RATNER:  The reason we adopted the conspiracy

8    allegations the way we did was because we adopted the

9    allegations of the master complaint.  We recognize New York

10   does not have a standalone conspiracy claim.

11        THE COURT:  You are not trying to resurrect that in

12   New York at least.

13        MR. RATNER:  No, but we are going to proffer the

14   allegations in order to have another way besides market share

15   of having defendants be jointly responsible for whatever

16   relief must be provided.

17        THE COURT:  A question about having dropped the

18   misrepresentation of fraud allegations, share your intention

19   with respect to that.

20        MR. RATNER:  We wouldn't drop those with prejudice.

21   We got together, decided with respect to the master complaint

22   those claims we intend to pursue.  We understand the court is

23   going to be very reluctant to let us amend this group of

24   plaintiffs in this master complaint once we move forward with

25   it.  It is not necessary, clearly those claims have to be

SOUTHERN DISTRICT REPORTERS (212) 805-0300

30

1134BERC

1    dropped with prejudice.  We are not going to pursue them.  We

2    don't intend to have them pop up down the road.  Our plan is

3    as set forth in the master complaint.

4         THE COURT:  Thank you.  Anybody from defendants.

5         MR. WALLACE:  Thank you for posing the questions that

6    have concerned us.  We feel something at a disadvantage just

7    today receiving those questions.  I find myself in the

8    position of speaking on behalf of some defendants, I am sure

9    not all, because defendants are collectively just hearing

10   these answers for the first time.  This leads me to, at the

11   risk of beating a dead horse as Mr. Ratner said, reiterate our

12   request that plaintiffs bring on a motion, that we be given an

13   opportunity to respond in writing to some of these issues that

14   have been aired for the first time today.

15        THE COURT:  That's really inevitably denied.  I do

16   consider this huge pile in front of me to be the equivalent of

17   a motion.  As I said earlier, all that has to happen is that

18   Mr. Ratner says he seeks leave, you oppose, I grant it, we

19   move on.  Before I do any such thing I want to get to the

20   heart of the matter of the points you raised that I prepared

21   for that I think you were prepared for me to raise them.  It's

22   been a helpful discussion.  I am not done hearing you.  Go

23   ahead, say what you have to say.  It's all going to be

24   relevant down the road.  I don't consider it much of a loss if

25   we move to the amendment of the complaint then begin motion

1134BERC

1   practice.

2        MR. WALLACE:  I recognize that a lot of issues we

3   presented to you in our letters are issues the court would

4   have to revisit on a motion to dismiss, on a Rule 23 motion.

5   We want however to be clear as to our position from the

6   outset.  Some of our arguments we repeat at every opportunity,

7   including most importantly our concern with claim-splitting

8   and bifurcation.  Let me start with your question whether Mr.

9   La Susa's action, if it is being dropped as a class

10  representative, what impact that has on the claims.

11       THE COURT:  It has one solitary impact.  This is a

12  one-issue class.  It's only seeking one thing.  It's a class

13  made up of those people who have wells but those wells have

14  not been tested.  It seeks only injunctive relief in the sense

15  they want a court-supervised testing and monitoring program

16  that collects data, that pools data, however else I can phrase

17  it.  That's all this is now.  That's all.  There is no damages

18  case, none to follow by this group of plaintiffs.

19       MR. WALLACE:  That would certainly be appealing to

20  the defendants if we were assured the damages would not

21  follow.

22       THE COURT:  Somewhat assured.  It will not follow as

23  a class action brought by this group of plaintiffs.  There may

24  be 100,000 actions across the country.  Nobody will assure you

25  that won't happen.  All the folks will have a right to bring

SOUTHERN DISTRICT REPORTERS (212) 805-0300

32

1134BERC

1    damages claims.  I can't stop other plaintiffs, lawyers who

2    may get the idea of trying to bring a damages class some day.

3    That's not the intent of Mr. Ratner or this group of

4    plaintiffs' counsel.

5           MR. WALLACE:  I appreciate that.  I am grateful for

6    Mr. Ratner's candor.  As you observed, we can't be assured

7    others won't bring the same claims as classes or individuals.

8    If we focus even on Mr. La Susa and think about what he would

9    do in the event this testing, should the court approve it,

10   should detect MTBE as well.  There would be no doubt Mr. La

11   Susa would bring a complaint.  It's clear from the way these

12   plaintiffs' counsel have structured the claims in the first

13   instance, in the first amended and second amended complaints,

14   the real nub of their claims is for damages.

15          THE COURT:  Not the nub of this case they now want to

16   bring.

17          MR. WALLACE:  Quite right, not that portion of the

18   claim they seek to split off of what is really at the heart of

19   this case.  This is an unusual case.  Plaintiffs, like Mr. La

20   Susa who have not had their wells tested don't know whether

21   there is any MTBE in any water, would not have a claim if the

22   testing proves there is no MTBE in the water.

23          THE COURT:  They would not have a damages claim.

24          MR. WALLACE:  We will argue to you at the next stage

25   and at every opportunity that he does not have a valid claim,

1134BERC

1   doesn't have standing to sue merely for testing unless he can

2   show some injury.  I will set that aside.  We are back at the

3   Rule 15 stage.  Still it is clear that Mr. La Susa could not

4   sue merely for testing unless he expected there is a chance he

5   might find some damage.

6         THE COURT:  I don't think that's a fair assumption

7   right there.  Why wouldn't he want to sue to have the comfort

8   of knowing that, whether you have a problem or don't have a

9   problem.  You must analogize it to medical monitoring.  When

10  you get yourself medically monitored, it's not because you

11  hope to get cancer; you hope to know, have comfort in knowing

12  whether you do or you don't.  You will be far happier if you

13  find out you don't.

14        MR. WALLACE:  I don't mean to suggest that Mr. La

15  Susa wants to find MTBE.  If he does, he wants relief.  That's

16  really the strength of his claim.

17        THE COURT:  It may not be the strength.  The strength

18  may be just taking at face value what your adversary says.

19  It's a monitoring class.  Lots of folks have lots of wells.

20  They want testing.

21        MR. WALLACE:  Plaintiffs have drawn an analogy

22  between this unprecedented class they construct and medical

23  monitoring classes.

24        THE COURT:  There is nothing bad in being

25  unprecedented.  This is a property damages case for

34

1134BERC

1   monitoring.  If it has never been done it doesn't mean it's

2   bad.

3        MR. WALLACE:  We submit it has not been done for good

4   reason.  Let me draw a distinction between this claim for

5   property testing and a claim for medical monitoring.  There

6   are two important distinctions.  One is under the law as I

7   understand it in some states, medical monitoring is allowed

8   only on a showing of some actual injury at a minimum.  Under

9   all the laws of the states there is a requisite showing of

10   actual exposure.

11        Here, the whole point of this portion of this claim

12   plaintiffs propose to present as a class claim is to find out

13   whether there has been exposure, quite different from the

14   medical monitoring where exposure is an essential element.  In

15   the medical monitoring context, plaintiffs bring claims to

16   determine whether the illness that concerns them manifests

17   sometime in the future.  What plaintiffs here are proposing is

18   that you order defendants to pay to determine whether they,

19   like Mr. La Susa, have an injury today, not to monitor to find

20   out if in the future they might develop some sort of illness

21   as an observation of exposure or illness might manifest from

22   some exposure they can prove to you.  Rather they come here

23   saying we have no idea whether he have a claim, we want

24   defendants to pay so we can find out whether we have a claim.

25        To get back to more important points, the claim they

35

1134BERC

1   are trying to identify, the claim they try to find through

2   testing is a property claim for damages.  The Allison case

3   Mr. Ratner seeks to distinguish I suggest is quite relevant on

4   this point.  The Allison case provides if class claims are

5   really claims for damages, along with claims for injunctive

6   relief and then the claim for damages predominates, then those

7   claims can't be certified.

8           We submit plaintiffs are trying to circumvent that,

9   trying to prevent claims that can't stand alone by not

10  dismissing with prejudice claims for damages but rather

11  deferring them.  They give you an assurance they personally

12  will not bring them back in this case.

13          THE COURT:  As a class action.

14          MR. WALLACE:  Correct.  That does that not resolve

15  the concerns about prejudice.  First, defendants are concerned

16  about facing a multiplicity of suits, from Mr. La Susa in this

17  case, then another.  We are also concerned about a

18  multiplicity of suits from other potential class members with

19  other class counsel that might bring damages claims later.  I

20  must say, although not really an object of our solicitude, the

21  court must, I submit, should be concerned also about the

22  interests of absent putative class members, because defendants

23  would contend, should Mr. La Susa or absent class members in

24  his position detect contamination bring suit later, that suit

25  is barred by res judicata.

36

1134BERC

1          THE COURT:  I don't understand that.

2          MR. WALLACE:  We contend that in subsequent suits

3   brought by absent class members here, even Mr. La Susa's claim

4   for damages would be barred by res judicata because it was

5   split from the claims here.  Many of the claims here required

6   the plaintiffs to submit all claims based on the same facts

7   and circumstances.  We would cite for that the Millet case

8   along with the Feinstein case in the Southern District of New

9   York, both of which hold that classes should not be certified

10  that present only some but not all claims available to class

11  members for fear the absent class members --

12         THE COURT:  This class member has no damages claim.

13  That's the beauty of what plaintiffs are trying to trying to

14  do if it works.  They don't represent people whose wells were

15  contaminated.

16         MR. WALLACE:  Perhaps your Honor reads the complaint

17  better than I.  I must say I am confused about this.  I read

18  the Berisha plaintiffs' proposed amended complaint which

19  adopted paragraph 123 of the master complaint.

20         THE COURT:  One second.

21         MR. WALLACE:  I understand plaintiffs to be

22  presenting claims on behalf of all well owners regardless

23  whether the wells are contaminated.

24         THE COURT:  I thought not.  Let me find out.  I

25  thought it was those well owners who do not know whether their

1134BERC

1  wells are contaminated.

2      MR. RATNER:  It's a testing and monitoring class.

3  One well owner can know his or her well is contaminated, but

4  because they have notice they have no idea about fluctuations.

5  The reason why monitoring is important in addition to the

6  initial testing is the unique benefit that comes from

7  court-supervised statewide monitoring for problems where data

8  is collected by a single entity.  The standard procedure that

9  our experts will tell the court is necessary over time is to

10  monitor wells.

11      THE COURT:  I just need to know your class

12  definition, Mr. Ratner.  For example, it would include

13  Ms. Berisha and Mr. O'Brien as class members in the La Susa

14  class because they seek ongoing monitoring.  It would include

15  any number of thousands, millions, whatever, in the class of

16  those who know theirs wells are contaminated.  Is that right?

17      MR. RATNER:  I believe so.

18      THE COURT:  I had not understood that.  Then we may

19  have a claim-splitting problem.  Those people, Ms. Berisha and

20  Mr. O'Brien, who want to pursue their damages claims now,

21  whether they do it in this case or separate, hardly matters.

22  They are pursuing a damages claim and injunctive claim

23  simultaneously but separately.  That's a question.  I had

24  thought the class definition did not include those who now

25  know, even though I realize once I assume you prevail, you

38

1134BERC

1    gain this testing and monitoring, there will come a time when

2    people will learn that their wells are contaminated, they are

3    still entitled to monitoring.

4         If they are part of the original class definition, if

5    they get a positive, then the monitoring goes on, part of the

6    data collection was partly mapping, all the things you spoke

7    of, the scientific effort, that would be fine, if they later

8    learned, I later learned.  I didn't realize your class

9    definition includes those who now know.  If they have a

10   damages claim and this present claim they may be claim

11   splitting.  I thought I was on safe ground until Mr. Wallace

12   raised the point.

13        MR. HINCK:  A small point of clarification.  Berisha

14   and O'Brien are differently situated.

15        THE COURT:  Than each other.

16        MR. HINCK:  Yes.  She doesn't own property with a

17   well any longer.  She sold the property with the contaminated

18   well, lost money.

19        THE COURT:  I don't see how she is part of the

20   monitoring and testing class.

21        MR. HINCK:  Exactly.

22        THE COURT:  O'Brien is a problem.

23        MR. RATNER:  The O'Brien issue --

24        THE COURT:  You need to address the definition of

25   your class.  Maybe you are not ready to do that.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1134BERC

1          MR. RATNER:  I believe so.

2          THE COURT:  Why don't you confer.  I think that's

3    very wise.  We can use a break.

4          (Recess)

5          THE COURT:  Mr. Ratner.

6          MR. RATNER:  Thank you, your Honor.  Just to clarify

7    an initial matter, the discussion that we are having is

8    clearly for purposes of discussing litigation classes, what we

9    are for litigation purposes, not necessarily for settlement

10   purposes.  That would be a separate discussion if we have an

11   opportunity to have that with the court.

12         The plaintiff La Susa is perfectly willing to pursue

13   class claims and will file a proposed amended complaint that

14   pursues class claims only for persons similarly situated to

15   him who are untested well owners.  For testing, however, there

16   are other plaintiffs, for example, the England plaintiffs,

17   many of whom have already received some information, who will

18   continue to pursue injunctive relief, monitoring claims, and

19   either at the motion to dismiss argument phase or at the class

20   certification phase, we hope to demonstrate to the court's

21   satisfaction that's not impermissible claim splitting for a

22   host of reasons that I can go into preliminarily now.

23         THE COURT:  No.  I think everybody wants the answer

24   to what's going on now.  I have the answer.  Mr. Wallace had

25   it all along.  There it is.

40

1134BERC

1        MR. WALLACE:  It bears emphasis that the named

2    plaintiffs in the England complaint expressly allege in the

3    proposed amended complaint the properties are contaminated.

4        THE COURT:  Mr. Ratner just said that La Susa doesn't

5    know.  He would represent the class of people who don't know,

6    who have not had their wells tested, who don't know if there

7    is contamination.  England represents a class of people who do

8    know.  With respect to that class definition you will make

9    your argument, he will make his response, I will make a

10    decision.  They are not walking away from those who do know.

11        MR. WALLACE:  Correct.  On behalf of those who do

12    know, they are proposing that you allow them to amend the

13    complaint such that they would assert only a portion of their

14    claims now.

15        THE COURT:  I realize the problem.

16        MR. WALLACE:  It's to that which I object.  To be

17    specific as to what the defendants want, we would like the

18    court to deny the motion for leave to amend to the extent

19    plaintiffs seek to drop claims for damages.  We would like in

20    effect for the court to require plaintiffs to bring now in

21    this suit all claims available to the plaintiffs they purport

22    to represent.  If that includes claims for damages, we submit

23    they must be asserted in this case.

24        THE COURT:  Anything else.

25        MR. WALLACE:  Yes.  A few more points on the

SOUTHERN DISTRICT REPORTERS (212) 805-0300

41

1134BERC

1  questions you posed to Mr. Ratner and his answers.  You asked

2  him about the immature tort issue.  He suggested that this is

3  not really an immature tort, there have been other cases

4  litigated involving MTBE contamination.  He is right only as

5  to the point there is a very mature procedure available for

6  litigating claims involving contamination from petroleum

7  products including MTBE.  Cases of that sort are litigated

8  with some frequency individually on behalf of plaintiffs who

9  know they have damages against parties responsible for

10  releasing the contamination.

11       This case is quite different in important respects.

12  This case is unprecedented, more than merely immature.  There

13  has not been to my knowledge a case litigated to its

14  conclusion in which plaintiffs alleged MTBE is a defective

15  product.  As you know from the title of the MDL proceeding,

16  this case is all about a product liability allegation.  Never

17  before has a court found that this product which the federal

18  government affectively required these defendants to

19  manufacture and sell is defective.  Never before has a case of

20  this sort established entitlement to the testing of properties

21  to determine if they are contaminated with MTBE.

22       For those reasons we submit this truly is an immature

23  tort.  The court on that basis ought to tread cautiously in

24  allowing these claims as you instructed the way plaintiffs

25  propose at this state.  We will repeat later why the court on

42

1134BERC

1    this basis ought not entertain a motion on the class action.

2         You asked Mr. Ratner about the conspiracy claim and

3    their intentions.  If I understood Mr. Ratner correctly, he

4    represented they do intend to maintain these conspiracy claims

5    as a standalone claim on behalf of the New York plaintiffs.

6    Was I mistaken?

7         MR. RATNER:  You are mistaken.  I said we were going

8    to maintain the allegation for the exact purpose for which the

9    cases say we may, which is to demonstrate that the defendants

10   are jointly responsible, not for purposes to link defendants

11   with respect to the underlying torts, not for purposes of

12   proving separate counts.  That alone is the standalone

13   conspiracy count.

14        MR. WALLACE:  We submit the court ought to deny the

15   motion for leave or request for leave to the extent that is

16   the state of the papers today.  What's more I think the

17   contention that the conspiracy claim ought to remain in the

18   case so the court can use it to spread liability suggests what

19   we have believed, that this is really a case about damages not

20   injunctive relief, that the objective of plaintiffs

21   maintaining that conspiracy claim is really to lay the

22   groundwork for a claim of damages.

23        You asked Mr. Ratner about dismissal with prejudice.

24   We suggest those claims ought to be dismissed with prejudice.

25   Again, we maintain plaintiffs ought to bring here all claims

43

1134BERC

1   available to them.  If they are not going to do that with

2   those particular legal theories we shouldn't face the risk of

3   those legal theories reappearing in the case at a later time.

4           THE COURT:  In this case, I don't think they are

5   going to reappear in this case.  I believe Mr. Ratner said

6   that.  They are not going to be ever added back to this

7   injunctive class action.  That doesn't mean people pursuing

8   individual damages claims down the road wouldn't raise them,

9   doesn't mean somebody else some day might try to bring a class

10  action for damages and won't raise them.  But it's not coming

11  back into this case.  The so-called Berisha case will not have

12  those claims.  The England case also will not have those

13  claims.

14          MR. RATNER:  That's correct.

15          THE COURT:  They are not coming back to this case.

16          MR. WALLACE:  I still submit that because we face the

17  risk of additional claims from these very plaintiffs in other

18  suits, these particular claims ought to be brought now or

19  dismissed with prejudice.  Thank you.

20          THE COURT:  Anybody else.

21          MR. GUTTMAN:  Your Honor, I want to make sure I

22  understand the situation with respect to Mr. La Susa.  Is the

23  lay of the land now that Mr. La Susa is bringing a claim only

24  with respect to people who do not know if they have

25  contamination, a pure testing class that is.

SOUTHERN DISTRICT REPORTERS (212) 805-0300

44

1134BERC

 1          THE COURT:  I believe I heard that with respect to

 2   what was once known as the Berisha case now known as La Susa.

 3   It's not true for the England case.

 4          MR. GUTTMAN:  I am directing it only to the La Susa

 5   case.  Can we take that another step further, which is to say

 6   Mr. La Susa is the only class representative, there is not

 7   going to be someone else coming along to assert those claims

 8   alongside Mr. La Susa to assert a claim for damages that Mr.

 9   Wallace has been talking about.

10          THE COURT:  I understand the question.  I am sure

11   Mr. Ratner does.  I will pose it separately.  There may be

12   other plaintiffs who join Mr. La Susa as class representatives

13   with the same class definition, those whose wells have not yet

14   been tested.  We may go from one to more, but they will all be

15   of untested wells.  In the La Susa case you will not be trying

16   to add plaintiffs like England.  England has tested wells.

17          Will you be trying to add those to the La Susa case.

18          MR. RATNER:  Not to La Susa, not by these plaintiffs

19   or these counsel.  We cannot predict what will happen in the

20   future with other plaintiffs.

21          THE COURT:  The La Susa case will remain the case

22   that alleges injunctive class of testing and monitoring, of

23   those who at this point do not know whether these wells are

24   contaminated.  The England case also seeks testing and

25   monitoring.  The class definition includes both those who do

SOUTHERN DISTRICT REPORTERS (212) 805-0300

1134BERC

1    and don't know.  Those are two different cases I know about so

2    far.

3            MR. BALL:  One other distinction, the England case

4    seeks relief for contamination, plaintiffs, people found out

5    later to have contamination, in the form of remediation.  They

6    seek a different relief.

7            THE COURT:  Is that being called injunctive relief.

8            MR. BALL:  That's what they are trying to say.

9            MR. RATNER:  Your Honor, the England case does not

10   seek remediation.  It seeks clean water.  A case called Young

11   in Florida conditionally transferred, it may be here after the

12   18th, that case seeks remediation as a form of injunctive

13   relief because it's a court program.

14           THE COURT:  The England case seeks clean water as

15   opposed to remediation; that means different sources of water.

16           MR. RATNER:  It's typically done either by connecting

17   people to a city water line or by busing in water.

18           MR. BALL:  Your Honor, with due respect, in the

19   master complaint, all of which the prayer for relief is

20   adopted by the England plaintiffs, subparagraph B-6, they ask

21   for, page 70 of the master complaint.

22           THE COURT:  Mine only goes to 67.

23           MR. BALL:  The second to last page.

24           THE COURT:  Court supervised program to provide class

25   members with clean water free of MTBE contamination.  Court

SOUTHERN DISTRICT REPORTERS (212) 805-0300

46

1134BERC

1   supervised program to provide remediation.

2          MR. BALL:  They do it for the England case.  They

3   have different prayers for relief between the Berisha and the

4   La Susa case versus the England case.

5          THE COURT:  Right.

6          MR. BALL:  That's not going to change; they are not

7   going to ask for something more?

8          THE COURT:  It looks like there are two different

9   class definitions simultaneously pressed.  Motions will have

10  to be addressed to two different definitions.  Either two will

11  survive, one will survive, none will survive.  We will learn

12  the outcome down the road.  Plaintiffs have a strategy because

13  they will see whether both works, one works, or none works.

14         MR. WALLACE:  Your Honor, at the risk of repeating

15  myself --

16         THE COURT:  No, what do you want to add.

17         MR. WALLACE:  We maintain that the claim of Mr. La

18  Susa would be barred by res judicata it if it turns out he has

19  contamination and should have known about it.

20         THE COURT:  Even though his well has not been tested.

21         MR. WALLACE:  Quite right.  Plaintiffs run the risk,

22  if they construct claims as they propose here, of subjecting

23  absent class members, even Mr. La Susa himself, to deference

24  of res judicata should they seek to assert damages later.

25  That same bar of res judicata would be asserted as against

SOUTHERN DISTRICT REPORTERS (212) 805-0300

47

1134BERC

1   those plaintiffs in England who affirmatively allege their

2   properties are contaminated.

3           THE COURT:  I understand with the England case;

4   that's your claim-splitting argument.  Either it will be a

5   winner or a loser somewhere at some court level.

6           MR. WALLACE:  One last point on the issue of notice.

7   If I understood him correctly he is suggesting notice under

8   23(e) should not be required if the court allows the proposed

9   amendment.  On behalf of I believe all defendants I can say we

10  too agree that 23(e) notice would not be required, would not

11  be appropriate if the court allows the amendment plaintiffs

12  have proposed for several reasons.

13          THE COURT:  What I proposed was some kind of one-time

14  or two-time newspaper general-type notice that would be out

15  there for those who read the papers to know there is no longer

16  a pending action seeking damages for those who know there is

17  MTBE contamination of their water supply.  I point out they

18  can also say what is proceeding, what is not.  There is a cost

19  of placing a newspaper ad.  They conferred, thought it wasn't

20  a bad idea.  The court would have some comfort if this general

21  notice went out, not individual notice, not a mailing, some

22  announcement to those who read papers that they should not

23  rely on the fact there was a one-time allegation seeking

24  damages for those people who have contaminated wells.

25          MR. WALLACE:  We submit the notice would be

SOUTHERN DISTRICT REPORTERS (212) 805-0300

48

1134BERC

1    unnecessary.

2           THE COURT:  That's your position.

3           MR. WALLACE:  It's potentially-prejudicial to the

4    extent it alerts people to a problem that doesn't exist.

5           THE COURT:  You wrote letters telling me about a

6    problem that does exist.  People might have relied on the fact

7    the class initially brought damages claims for people whose

8    wells were contaminated.  Now their claims are being

9    abandoned, they might rely on it to their detriment, they

10   might not timely sue, give up a cause of action they have.  I

11   don't think it's gracious to switch that position at this late

12   hour.  Anything more.

13          MR. WALLACE:  Thank you, your Honor.

14          THE COURT:  Mr. Ratner, do you have a motion.

15          MR. RATNER:  Yes, your Honor.  I am moving on behalf

16   of all MDL plaintiffs, first on behalf of the Berisha, O'Brien

17   and La Susa plaintiffs to sever the Berisha and O'Brien claims

18   and on behalf of Mr. La Susa to file an amended complaint

19   along the lines we have discussed in court today consistent

20   with today's discussion.  On behalf of the England plaintiffs,

21   I am moving for leave to amend along the lines of the proposed

22   amended complaint with one caveat, that we may scale back, not

23   include a remediation claim.  I am not making a motion at this

24   time on behalf of the Young plaintiffs because that case is

25   not yet here.

1134BERC

1          I would also be happy to submit a proposed 23(d)

2    order to the court on notice as well.

3          THE COURT:  Thank you.

4          Mr. Sacripanti, as liaison counsel are you opposing

5    this motion for the reasons generally set forth in the

6    correspondence directed at the court.

7          MR. SACRIPANTI:  We are, your Honor.

8          THE COURT:  Thank you.

9          I am going to allow the amended complaints to be

10   served and filed.  Would you like to schedule the motion

11   practice that I know will follow along the lines of the

12   correspondence I have already reviewed.  I don't want anybody

13   to think this has been much of less helpful process.  It

14   certainly delineated issues.  I think the defendants got some

15   answers from plaintiffs to some of the questions.  I know the

16   court did.  Everybody has a lot to think about.

17         Mr. Ratner may specifically file and serve the

18   amended complaints as you now wish to structure them.  There

19   is no harm done that they are slightly different than what I

20   had at the letter-writing stage.  You may do it as we have

21   discussed, I hope making it quite clear with respect to New

22   York there is no standalone claim for conspiracy.

23         Having said that, let's talk about a time frame for

24   filing and serving the complaints and then motions to dismiss.

25         MR. RATNER:  Your Honor, two things.  I think we will

50

1134BERC

1    also file with the court's permission the proposed master

2    complaint to make it part of the record.

3              THE COURT:  Yes.

4              MR. RATNER:  I believe we would be prepared to

5    formally file the amended complaints by Monday.  I believe the

6    court's existing case management order number 2 includes a

7    schedule for briefing.

8              THE COURT:  Good.  You can remind me.  I have case

9    management order number 2 with me.

10             MR. RATNER:  Page 3, B2 says if the proposed amended

11   complaints are filed without objection, defendants shall file

12   motions to dismiss -- I am sorry.

13             THE COURT:  Paragraph 2B doesn't sound like it works.

14   If an objection is made to the filing, motions to dismiss are

15   to be filed 30 days after the court rules whether the amended

16   complaints may be filed.  It's really paragraph 3 at page 4.

17   Having just ruled the amended complaints may be filed in

18   accordance with today's lengthy argument, they will be filed

19   January 8, and defendants may have until February 5 to file

20   their motions.

21             If you recall paragraph 2 says that it should be a

22   single joint motion not to exceed 40 pages, but individual

23   defendants may file supplemental briefs if their issue is

24   unique to them, not to exceed 10 pages.  Response due 30 days

25   thereafter.  If you need 30 additional days, plaintiffs may

1134BERC

1  respond by March 5.  Then the built-in reply time we had, that

2  was 2 weeks.  So, reply briefs would be due March 19.  That's

3  my understanding of the briefing schedule for motions to

4  dismiss.

5          MR. SACRIPANTI:  Your Honor, because there in essence

6  are two definitions of two classes do we have two motions to

7  make?

8          THE COURT:  No.  You will just include a point in the

9  same brief and say with respect to the England definition of

10  the class, we have a claim-splitting argument.  We all know

11  what the argument is going to be.

12         MR. SUMMY:  Your Honor, one issue.  Earlier at some

13  point in time you asked us to give you a list, a run-down of

14  other pending state court cases.  In going back and looking,

15  your Honor, Steve Tillary is not here, he and I realized we

16  did not inform the court of a case pending in Illinois.  We

17  wanted to do so at this time, a state court case.  The name of

18  the case is Mizukonis v. Atlantic Richfield Company, et al.

19  It's a class action pending in state court.  It was filed at

20  the time you asked us but only recently served, so for

21  purposes of just making sure we have divulged everything to

22  you, I wanted to make sure you know about that case.

23         THE COURT:  Thank you.

24         I will see you all next on February 5.  We will

25  follow all the same rules, an agenda, know where we are

52

1134BERC

1    heading on discovery issues.  Hopefully, you will resolve the

2    issues we began with with respect to confidentiality, the

3    nondestruct order, the website, etc.

4           Thank you.

5

6                              -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages
Subject
2-4
Depository costs and location:  plfs choice of a Mnahattan location is approved,
but plfs pay if more space is needed
4-5
Website:  to be up and running by 2/3; cost allocation still to be negotiated
5
Non-destruct order:  negotiations continue; to be completed by next hearing,
2/5, or court will decide
6-7
Bates stamping:  at least for now, plfs agree docs in view rooms need not be
separately stamped for this case; if there are piror numbers from other cases,
they'll remain; plfs reserve right to revisit the issue if they are unable to
identify docs they view
8-13
Confidentiality order:  plfs can share docs produced by current defs in prior
cases, but must lit the docs for defs (p. 11); ct will retain jurisdiction to
enforce the order