

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| **IN RE:**<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | ) MDL Docket No. 1358<br>)<br>) This Document Relates to:<br>) *State of New Hampshire v. Amerada*<br>) *Hess Corp. et al.*, D.N.H. Case No. 03-<br>) CV-486, D.R.I. Case No. 03-0529L<br>)<br>) **PLAINTIFF STATE OF NEW**<br>) **HAMPSHIRE'S MOTION TO**<br>) **VACATE CONDITIONAL**<br>) **TRANSFER ORDER (CTO-4);**<br>) **BRIEF IN SUPPORT THEREOF**<br>)<br>)<br>) |

### PLAINTIFF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

1.     The State of New Hampshire ("State") is plaintiff in the action *State of New Hampshire v. Amerada Hess Corp., et al.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) (the "*State* Action" or "Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-4, issued by the Judicial Panel on Multidistrict Litigation ("Panel") on February 6, 2004.

2.     The State hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *State* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

3.     Specifically, resolution of the State's pending Remand Motion by the Transferee Court will result in no significant savings of judicial resources, because the jurisdictional issues

raised therein differ materially from those raised by the plaintiffs currently before the Transferee

Court. Second, even if the *State* Action is not remanded to state court, the likelihood of

inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) unique questions

of law and localized questions of fact overwhelmingly predominate in the Action; (b) discovery

regarding the few questions of fact shared with other case involving methyl tertiary butyl ether

("MTBE") already has largely been completed in the prior proceedings and can be made

available to all parties; and (c) the Transferee Court, as well as numerous other federal and state

courts, already have issued remarkably consistent rulings on most, if not all, common legal

issues.

     4.     This Motion is based on the attached Brief in support thereof, along with the

Declaration of Victor M. Sher, the Statement of Reasons Why Oral Argument Should Be Heard,

the files, pleadings, and documents on file with the Panel, and upon such further documentary

and oral evidence as may be presented in the hearing on this matter.

     WHEREFORE, the State respectfully requests that the Panel:

     A.     Vacate the Conditional Transfer Order as it applies to the *State* Action;

     B.     Schedule oral argument on this Motion; and

     C.     Grant such other relief deemed just and appropriate.

     Respectfully submitted,

     THE STATE OF NEW HAMPSHIRE
     PETER W. HEED, ATTORNEY GENERAL

Dated:  March 4, 2004

     Maureen D. Smith, NH Bar # 4857
     Senior Assistant Attorney General
     Environmental Protection Bureau
     33 Capitol Street
     Concord, NH  03301-6397

Tel: (603) 271-3679
Fax: (603) 223-6270

SHER LEFF, LLP
Victor M. Sher (Admitted *pro hac vice*)
Todd E. Robins (Admitted *pro hac vice*)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted *pro hac vice*)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

Counsel for Plaintiff State of New
Hampshire (*State of New Hampshire v.
Amerada Hess Corp., et al.*, Case No. 03-
486 (D.N.H.), 03-0529 (D.R.I.))

## BRIEF IN SUPPORT OF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

### I.    INTRODUCTION

The Panel should vacate the Conditional Transfer Order as it applies to the *State* Action because the State's case is fundamentally different from every other MTBE-related lawsuit. Unlike any other MTBE case before the Panel, the *State* Action is not brought by a single drinking water purveyor or well owner, but by a sovereign State, with its unique common law, statutory and constitutionally-based interests in protecting all waters and all citizens of the State. The *State* Action, therefore is uniquely based upon the State's ability to seek statewide relief, a factor that calls for separate adjudication. *See In re Tobacco/Governmental Health Care Costs Litig.*, 76 F. Supp. 2d 5, 9 (D.D.C. 1999) (denying 28 U.S.C. § 1407 transfer of governmental action "based on sections of United States Code that permit only the United States to seek relief," because case presented "entirely different, perhaps crucial, legal issues").

In addition to the broader set of interests involved, there is a substantial difference in scope between the *State* Action and other MTBE-related cases. The *State* Action involves the damage caused by MTBE to *all* State waters, which presents a host of issues related to breadth of liability and remedies that are exclusive to this case. *See In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (transfer denied where "tremendous, overriding difference in scope" between cases resulted in "critical factual and legal disparities"). As the potential breadth of the *State* Action dwarfs the other MTBE cases, consolidation poses the risk of overwhelming the transferee court. *In re Motion Picture Licensing Antitrust Litig.*, 479 F. Supp. 581, 592 (JPML 1979) (Panel "vitally concerned" that MDL proceedings "remain manageable;" inclusion of action with "unique legal and factual nuances would serve only to add further layers of complexity . . . without providing any overriding benefit").

4

The State's pending motion to remand vividly illustrates the critical differences between the *State* Action and other MTBE cases removed to federal court. The State's remand motion raises unique – and dispositive – jurisdictional issues related to state sovereignty and governmental police power not present in the remand motions currently before the presiding judge in MDL No. 1358 (the "Transferee Court"). Accordingly, no efficiencies will be gained by transferring the State's Action to MDL No. 1358 (or any other MDL) for consolidated treatment of remand motions.

Moreover, even if the Action were somehow to remain in federal court, there are few, if any, common questions of fact between the *State* Action and other MTBE cases on which discovery is not already largely completed. A great deal of the generally applicable liability discovery (including discovery on what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when) already has been completed in connection with the prior incarnation of MDL No. 1358 and other MTBE cases that were not consolidated, and this discovery is or can be made available to the parties in this Action. The discovery that remains – the bulk of the case —revolves primarily around New Hampshire-specific issues, such as the particulars of New Hampshire's gasoline market and infrastructure, the extent of MTBE contamination in State waters, who is responsible for the contamination in those waters, and what it will cost to remediate and treat.

Furthermore, potentially dispositive motions involving the State, including federal preemption, have been litigated in MDL No. 1358 and other cases with remarkably consistent outcomes. The Transferee Court published a lengthy opinion that provides useful guidance to any court applying common law tort doctrines in the MTBE context. *See In Re MTBE Products Liability Litig.,* 175 F. Supp. 2d 593 (S.D.N.Y. 2001). As a result, many of the threshold legal

questions that would normally justify MDL treatment already have been resolved and are extremely unlikely either to produce inconsistent outcomes or to require significant additional judicial energy.

In sum, MTBE litigation is sufficiently mature at this point that MDL handling is unwarranted. There is no "gathering storm" that will produce a blizzard of motions and conflicting opinions, notwithstanding the recent flurry of removal notices filed by defendants. Transfer of the *State* Action to the Southern District of New York, therefore, will not create efficiencies. Instead it will create delay and inconvenience by forcing the State to litigate this important lawsuit in a distant forum that has no particular expertise on the localized issues that overwhelmingly predominate in the case.

## II.  **BACKGROUND**

### A.  **The State Action.**

MTBE is a chemical used by some refiners in some gasoline products in some parts of the country. Writ of Summons and Declaration ("Complaint"), ¶ 26.[1] Contamination of New Hampshire's ground and surface waters with MTBE is widespread and involves thousands of drinking water sources. *Id.*, ¶¶ 68-71. Because defendants' choice to use MTBE in gasoline has created an unprecedented threat to the water resources of New Hampshire, the State of New Hampshire Attorney General filed the *State* Action in the Superior Court of Merrimack County, New Hampshire on September 30, 2003 against 22 major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE to retail gasoline stations in New Hampshire.

---

[1] The State's Complaint is attached as Exhibit 1 to the Declaration of Victor M. Sher ("Sher Decl.") submitted herewith.

This is the only MTBE-related action brought by a sovereign state.  The State seeks, among other things, to ensure that the costs of responding to MTBE contamination in the State's waters are borne by the companies that chose to make and use it, knowing of its risks and yet failing to take the steps (including warnings) necessary to avoid or mitigate them.  Complaint, ¶ 76, pp. 51-53.  The State asserts damages claims under state common law theories (including strict products liability, public nuisance, trespass, and negligence), as well as claims for cleanup costs and civil penalties under state statutes (including strict liability for environmental cleanup costs under N.H. Revised Statutes Annotated ("RSA") 146-A:3-a and penalties for violations of the State's consumer protection statute, RSA 358-A:2).  The Attorney General is uniquely situated to bring these claims on behalf of all citizens of the State to obtain statewide relief for a statewide problem.

## B.    Procedural History.

On November 10, 2003, certain defendants removed the *State* Action to the U.S. District Court for the District of New Hampshire, citing two bases for federal subject matter jurisdiction: (1) that, pursuant to 28 U.S.C. § 1442(a)(1), they were acting "under the direction" of federal officers when they chose to add MTBE to gasoline; and (2) that the Action somehow implicates a 1988 federal bankruptcy order pertaining to the predecessor of a single defendant.  On November 19, 2003, the State timely filed a motion to remand the Action to state court (the "Remand Motion") on the grounds that no federal subject matter jurisdiction exists over this matter.[2]  Soon thereafter, due to recusal by each of the district judges in the District of New

---

[2] Neither of the bases for federal jurisdiction asserted by defendants has merit.  First, no court has ever accepted the "federal officer" argument defendants advance in their removal notice. *See, e.g., Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411, 418 (D.N.H. 2002) (defendant's mere "participa[tion] in a regulated industry … is not enough to demonstrate that it acted under the direction of a federal officer"); *Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'"); *Good v. Armstrong*

Hampshire, the Action was referred to the Hon. Ronald R. Lagueux of the District of Rhode Island pursuant to a reciprocity agreement between District Courts of New Hampshire and Rhode Island.[3]  On or about December 1, 2003, certain defendants filed a motion to stay the hearing on the State's Remand Motion (and all other pretrial proceedings) pending possible transfer of the Action to MDL No. 1358.  On December 18, 2003, the court granted defendants' stay motion.

Meanwhile, on November 12, 2003, certain defendants filed with the Panel (but never served the State with) a Notice of Related, Tag-Along Actions alleging that certain recently filed actions, including the *State* Action, involve common questions of fact with actions previously transferred to MDL No. 1358.  MDL No. 1358 was an inactive MDL proceeding before the Hon. Shira A. Scheindlin in the U.S. District Court for the Southern District of New York that previously involved several consolidated "actions brought on behalf of private well-owners seeking relief from the contamination or threatened contamination of their wells" by MTBE.  *In Re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d at 598.[4]

On December 19, 2003, Judge Scheindlin held a hearing in connection with several MTBE cases filed by New York water purveyors that were removed to federal court and

---

*World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos).  Second, civil actions brought by governmental units pursuant to their police or regulatory powers, such this one, are exempt from removal on grounds of bankruptcy jurisdiction.  28 U.S.C. § 1452(a); *see In re Forster*, 146 B.R. 383 (Bkrtcy. N.D. Ohio 1992) (state action to enforce environmental legislation and recover cleanup costs could not be removed under §1452(a)).

[3] Pursuant to the Local Rules of District of New Hampshire, a complaint may be referred to the District of Rhode Island (or the District of Maine) due to recusal of the judges of the New Hampshire District. D.N.H. Local Rule 77.5.  When such a referral occurs, the New Hampshire local rules continue to apply to the referred action, all pleadings are filed in both districts, and conferences, hearings and pretrials may be held in either district.  *Id.*

[4] Judge Scheindlin later denied class certification in the matter, *see In Re: MTBE,* 209 F.R.D. 323 (S.D.N.Y. 2002), and all the cases were resolved.

assigned to her (the "December 19 Hearing"). *See* Transcript of December 19 Hearing (attached as Exhibit 5 to Sher Decl.). At the December 19 Hearing, the parties present before Judge Scheindlin (which did *not* include the State, *see* Sher Decl., ¶ 21) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. *Id.*, Exhibit 5 at 13-18. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties *they represented* to MDL No. 1358 for the same purposes. *Id.* That stipulation resulted in an order entered by Judge Scheindlin on December 23, 2003 stating that remand motions "in these and all similar removed actions, wherever filed," should be heard as part of MDL No. 1358. *Id.*, Exhibit 6. The State had no opportunity to participate in the December 19 Hearing or address the procedures stipulated by the parties at the Hearing, and subsequently notified Judge Scheindlin of its intent to object to any transfer of its case to the Southern District of New York. *Id.*, ¶23, Exhibit 8.[5] On February 13, 2004, Judge Scheindlin held oral argument on the remand motions before her, which remain pending at this time. *Id.*, Exhibit 9.

On February 6, 2004, the Panel issued CTO-4. On February 18, 2004, the State filed with the Panel a Notice of Opposition to the CTO. The State now moves to vacate.

## C.    Previous MTBE Litigation.

The *State* Action and other MTBE-related cases recently removed to federal courts in various parts of the country are preceded by a significant number of cases filed in federal and state courts regarding MTBE, some of which have produced universally-applicable discovery on

---

[5] Upon first learning of the December 19 Hearing in New York, the State initially anticipated that it may not object to transfer of this Action to the Southern District of New York, because it appeared that the procedures contemplated at that Hearing would have allowed the State's Remand Motion to be argued and resolved expeditiously in that court. Sher Decl., ¶ 24. However, no such procedure for transfer and prompt hearing of the State's Remand Motion came to pass, and other parties' remand motions have now proceeded in the Transferee Court without the State's participation. *Id.*

common questions of fact and consistent rulings on common legal questions. Sher Decl., ¶¶ 3-20. In at least three major cases – the prior proceedings in MDL No. 1358, *South Tahoe Public Utility District v. Atlantic Richfield Co.,* Cal. Super. Ct., S.F. Cty. Case No. 999128 ("*South Tahoe*"), and *Communities for a Better Environment v. Unocal Corp.,* Cal. Super. Ct., S.F. Cty. Case No. 997013 ("*CBE*") – the parties completed detailed, extensive and coordinated discovery on generally applicable issues related to defendant liability. Sher Decl., ¶¶ 7-10, 12-13, 14-16. The *South Tahoe* action went to trial on the issues of refiner/manufacturer liability, product defect and malice, and, after a four-month trial, resulted in a plaintiff's verdict on each of these issues. *Id.,* ¶¶ 7, 9. All of the discovery and testimony from these cases exists and can be made available to the parties in the *State* Action. *Id.,* ¶¶ 11, 13, 17-18, Exhibit 4.

### III.    LEGAL ARGUMENT

Regardless of how other MTBE cases are treated, the conditional transfer of the *State* Action to MDL No. 1358 (or any other MDL) should be vacated because transfer would neither further the just and efficient conduct of the litigation on common questions of fact or law, nor serve the convenience of the parties and witnesses. The statutory factors considered by the Panel in deciding whether to uphold the conditional transfer of an alleged tag-along action are: (1) whether there are common questions of fact between the alleged tag-along action and existing MDL cases; (2) whether transfer would serve the convenience of parties and witnesses; and (3) whether transfer would serve the just and efficient conduct of the actions. 28 U.S.C. § 1407; JPML Rule 1.1; *In re Managed Care Litig.,* 246 F. Supp 2d 1363, 1364 (JPML 2003); *In re Enron Corp.*, 227 F.Supp.2d 1389, 1391 (JPML 2002). The Panel has held that all three criteria must be met to justify transfer, *In re Highway Acc. Near Rockville, Connecticut, on December 30, 1972,* 388 F. Supp. 574, 575 (JPML 1975), and that the third criterion is the "most

important." *In re Tobacco/ Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 8, *citing* 15 C. Wright, A Miller & E. Cooper, Federal Practice And Procedure, § 3863 at 535 (1986). In analyzing whether transfer would serve the just and efficient conduct of actions under § 1407, the Panel considers primarily whether transfer and consolidation will avoid duplicative discovery and inconsistent pretrial rulings. *See, e.g., In re TMJ Implants Products Liability Litig.*, 844 F. Supp. 1553, 1554 (JPML 1994).

The *State* Action is singularly inappropriate for MDL treatment for two reasons. First, resolution of the State's Remand Motion – the first, and likely only, substantive motion to be considered by a federal court in this Action – by an MDL court will not conserve judicial resources, because jurisdictional issues raised therein differ materially from those raised by the plaintiffs currently before the Transferee Court. Second, even if the Action is not remanded to state court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) as the only case brought by a sovereign state to address MTBE contamination of natural resources on a statewide basis, unique questions of law and localized questions of fact overwhelmingly predominate in the Action; (b) discovery regarding the few questions of fact shared with other MTBE-related cases already has been completed in large part and is or can be made available to all parties; and (c) the Transferee Court, as well as numerous other federal and state courts, already have issued remarkably consistent rulings on most, if not all, common legal issues. Thus, the District of New Hampshire is in a position to rule expeditiously on the Remand Motion, as well as on other pretrial motions, and to preside over the remaining New Hampshire-specific discovery. For these reasons, the *State* Action will "proceed more expeditiously if left alone." *See In re Sears, Roebuck & Co. Employment Practices Litig.*, 487 F. Supp. 1362, 1363 (JPML 1980).

A.    **No Savings Of Judicial Resources Will Be Gained From Consolidated Treatment Of the State's Remand Motion.**

Because Judge Scheindlin did not have a copy of the complaint, removal notice, or

Remand Motion filed in the *State* Action before her, the determination in her December 23, 2003

Order that the remand issues raised in various "similar removed" cases around the country are

"appropriate" for MDL treatment should not apply to the *State* Action. *See* Sher Decl., ¶¶ 23,

26. The *State* Action is the only MTBE-related case filed by a sovereign state on behalf of all of

its citizens, and, therefore, certain of the State's grounds for seeking remand of its case to state

court are not raised in the remand motions currently pending before Judge Scheindlin. This

militates against MDL transfer, notwithstanding the presence of some common issues. *See also*

*In re 'East of the Rockies' Concrete Pipe Antitrust Cases*, 302 F. Supp. 244, 254 (JPML 1969)

(Weigel, J., conc.) ("neither the convenience of witnesses and parties nor the just and efficient

conduct of actions are served, ipso facto, by transfer just because there are common questions").

The State's Remand Motion differs from the remand motions before Judge Scheindlin in

several important respects. First, unlike any other MTBE case, the *State* Action is brought by a

state entity, whose Eleventh Amendment and sovereign immunities bar removal of this Action to

federal court.[6] Second, the State is a "governmental unit" that (among other things) seeks cost

recovery pursuant to its police and regulatory powers. Under 28 U.S.C. § 1452(a), such

governmental civil actions are exempt from removal on grounds of bankruptcy jurisdiction. The

State's status as sovereign thus raises unique – and dispositive – issues not addressed by the

remand motions pending in the Transferee Court. *See, e.g., In re Harmony Loan Company, Inc.*

---

[6] *See, e.g., People of State of Cal. v. Steelcase Inc.*, 792 F. Supp. 84, 86 (C.D. Cal. 1992) ("since the immunity granted by the Eleventh Amendment is an immunity from being made an involuntary party to an action in federal court, it should apply equally to the case where the state is a plaintiff in an action commenced in state court and the action is removed to federal court by the defendant"); *Moore ex rel. State of Mississippi v. Abbott Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995) (same); *contra, In re Rezulin Products Liability Litig.*, 133 F. Supp. 2d 272, 297 (S.D.N.Y. 2001).

*Securities Litigation*, 372 F. Supp. 1405, 1407 (JPML 1974) (denying motion to transfer where

case contained issues not common to other cases, including sovereign immunity); *In re*

*Tobacco/Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 9 (rejecting transfer

because federal government's action "is based on sections of United States Code that permit only

the United States to seek relief, thus presenting entirely different, perhaps crucial, legal issues").[7]

Because the State's Remand Motion raises additional issues not raised in those pending

before Judge Scheindlin, it cannot necessarily be resolved based on what Judge Scheindlin

decides in those cases. Thus, the risk of inconsistent rulings absent transfer, as well as any

perceived judicial economy, is illusory. As the court held in *Board of Trustees v. Worldcom*, 244

F. Supp. 2d 900, 903 (N.D. Ill. 2002):

> When remand motions in cases potentially subject to MDL
> consolidation raise unique issues of law or fact, channeling the
> decisions to a single court would result in little or no savings of
> judicial resources. The threat of inconsistent judgments in either
> case is de minimis.

*See also Havens Protected "C" Clamps, Inc., supra*, 2000 WL 382027, at *2 (holding that where

"resolution of the motion to remand does not necessarily implicate issues common to the other

actions currently pending before the MDL Panel-designated court," remand motion should be

considered by transferor court). Consequently, there is nothing but delay to be gained from

transferring this action to the Southern District of New York, when the District of New

Hampshire is at least as capable of deciding the unique issues raised in the State's Remand

Motion in an expeditious manner.

---

[7] In addition, a review of the transcript from the February 13, 2004 hearing on the remand motions before
the Transferee Court reveals that, in those cases, defendants' jurisdictional arguments hinge largely (if not
entirely) on specific allegations from the complaints in those cases, *see* Sher Decl., Exhibit 9 at 10-12, 20-
22, 25-28 – not a single one of which appears in the State's Complaint.

**B.**    **Even If the *State* Action Is Not Remanded to State Court, The Likelihood Of Inconsistent Pretrial Rulings And Duplicative Discovery Is Minimal.**

Even if the *State* Action were somehow to remain in federal court, pretrial consolidation would serve neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation because this Action differs materially in nature and scope from other recently removed MTBE cases.  Moreover, to the extent the *State* Action shares common questions of fact or law with other pending cases, discovery on common factual questions is largely completed and available and most common legal issues already have been addressed by the Transferee Court and other courts.

**1.**    **There Is A "Tremendous Overriding Difference in Scope" Between The *State* Action And Other MTBE-Related Cases.**

The *State* Action is a fundamentally different kind of lawsuit than any other MTBE case currently pending in the federal (or state) courts.  While virtually every other MTBE damages case is brought by an individual public or private purveyor of drinking water in connection with contamination of a particular well or water supply, this Action is brought by a sovereign state and seeks to address injury to statewide water resources caused by MTBE.  For purposes of § 1407 consolidation, both the unique sovereign status of the State and the overriding difference in the scope of the litigation constitute critical distinctions that militate against consolidation.

*In re Tobacco/Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d 5, should control here.  In that case, the U.S. District Court for the District of Columbia denied a motion to transfer the United States' health care costs recovery action against the tobacco industry to an MDL proceeding involving foreign government tobacco cases that was pending in the same district.  Applying § 1407, the court concluded that transfer would not serve the just and efficient conduct of the litigation on the following grounds:

> The United States' action is based on sections of the United States Code that permit only the United States to seek relief, thus presenting entirely different, perhaps crucial, legal issues from those implicated by the foreign government actions. The Court therefore concluded that most of the legal questions to be decided before trial are unique to the lawsuit filed by the United States, eliminating any increase in efficiency or justice to be gained by consolidation of the U.S. and foreign government actions.

*Id.* at 9.

The same is true here. Unlike other MTBE cases brought by water suppliers and well-owners pursuant to their usufructuary and other property interests, the State's Action is expressly based on specific state statutes and recognized legal doctrines unique to the State – such as the State's status as trustee of the resource and the *parens patriae* doctrine – that permit only the State to seek relief. Each and every claim asserted by the State is brought pursuant to sovereign, quasi-sovereign, public trust, police power, regulatory, property, and other legal interests in protecting ground and drinking water resources that are exclusively held by the State. *See* Complaint, ¶¶ 8-11. For example, the State's statutory claims for environmental remediation costs under RSA 146-A:3-a and civil penalties for violations of the State's consumer protection statute, RSA 358-A:2, may be brought only by the Attorney General on behalf of the State. *See* RSA 146-A:9; RSA 358-A:4; *see also Mesiti v. Microdot, Inc.*, 739 F. Supp. 57, 63 (D.N.H. 1990) (only the State may bring an action pursuant section 146-A:3-a in order "to hold those who discharge oil into surface or ground waters strictly liable for relevant [cleanup] costs").

The State's claims for statewide damages under various common law theories of recovery (products liability, nuisance, trespass), while superficially similar to those asserted in other MTBE cases, are also claims that only the State can assert in its capacity as *parens patriae* and public trustee of the waters of New Hampshire. *See* RSA 21-M:10, II (Attorney General authorized to enforce statutes pertaining to environmental protection, exercise common law

powers to protect the environment, and to bring public nuisance and other actions in the name of the State); *Coakley v. Maine Building and Casualty Co.,* 136 N.H. 402, 413 (1992) (groundwater is a "unique and irreplaceable government resource"); *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607 (1982) ("[i]n order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties, . . . [t]he State must express a quasi-sovereign interest"); *Maine v. M/V Tamano,* 357 F. Supp. 1097 (D.Me. 1973) (holding that under its *parens patriae* power state could pursue damages claim for injuries to natural resources caused by oil spill); *Colorado River Indian Tribes v. Town of Parker,* 776 F.2d 846, 848 (9th Cir. 1985) (municipalities may not sue as *parens patriae* "because their power is derivative and not sovereign"). The *State* Action, therefore, is distinct from other MTBE cases. In light of these significant and crucial differences from the typical drinking water purveyor case, the Panel should find, as the court did in *In re Tobacco,* that there is no efficiency or justice to be gained by consolidation.

The *State* Action is also much broader in scope than other pending MTBE cases. In *In re Gasoline Lessee Dealers Antitrust Litig., supra,* 479 F. Supp. 578, a case involving two groups of antitrust actions brought by service station lessees against major oil companies, the Panel denied a motion to transfer and consolidate the actions, finding that individual rather than common factual issues predominated. Noting that one set of actions alleged violations affecting "a relatively limited geographic area," while the other set alleged a broad, nationwide conspiracy, the Panel determined that there were "critical factual and legal disparities between those actions" because of this "tremendous, overriding difference in scope." *Id.* at 580. Similarly, in *In re Sears, Roebuck & Co. Employment Practices Litig., supra,* 487 F. Supp. at 1363, the Panel found that the "distinctive elements" in pending employment discrimination

cases against Sears "overwhelmingly predominate[d]," because the cases ranged from those involving allegations of discrimination at "no more than three facilities" to those "involving across-the-board allegations of sex discrimination at 3,000 facilities."

These distinctions apply with equal force here. First, unlike other MTBE cases from around the nation also designated as tag-alongs, this case involves MTBE contamination *only* in New Hampshire. Second, also unlike other MTBE cases (which generally seek the costs of treating a limited number of particular contaminated wells), the *State* Action seeks a broad, statewide remedy that will involve, among other things, the investigation, monitoring and treatment of potentially tens of thousands of publicly and privately owned drinking water supplies as well as restoration of waters held in trust for the public. *See* Complaint, pp. 51-53. As the court observed in *In re Gasoline Lessee Dealers*, *supra*, 479 F. Supp at 580, discovery and pretrial proceedings concerning common factual questions will "clearly be dwarfed" by the scope of individual factual issues presented by this case. Likewise, in light of the potential breadth of the *State* Action, consolidation with other MTBE cases poses a risk of overwhelming the resources of the Transferee Court. *In re Motion Picture Licensing Antitrust Litig.*, *supra*, 479 F. Supp. at 592 (Panel "vitally concerned" that MDL proceedings "remain manageable;" inclusion of action with "unique legal and factual nuances would serve only to add further layers of complexity," with no "overriding benefit"). As such, the *State* Action is simply in another league and will not benefit from MDL treatment.

2.    **There Are Relatively Few Common Questions Of Fact Between The *State* Action And Other MTBE Cases On Which Available Discovery Is Not Already Largely Completed.**

The Panel consistently has held that MDL transfer of later-filed actions is neither necessary nor appropriate when discovery relating to common issues already has been completed in the transferee court and/or can be made available to the parties in actions before the Panel

17

without recourse to § 1407.[8]  In this instance, discovery pertaining to the few common factual

questions shared between the *State* Action and other allegedly related MTBE cases is also largely

completed and available to all parties.  Accordingly, the risk of duplicative discovery is minimal,

and there is no need for MDL consolidation.

In their Notice of Related, Tag-Along Actions, defendants identify the following alleged

"common question of fact" arising in this and the other listed actions: "whether defendants knew

about and misrepresented the nature of MTBE and conspired to market MTBE without

disclosing its risks to downstream users, the federal government or the public."  Notice of

Related Tag-Along Actions, filed Nov. 12, 2003, ¶2.  To the extent this constitutes a question of

fact shared by the *State* Action and other alleged tag-along actions, discovery on this question as

to many of the defendants named in the *State* Action was largely completed in the prior

---

[8] *See, e.g., In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377, 1378 (JPML 2002) (transfer denied where litigation was mature, discovery nearly completed in some constituent actions in the docket, and alternatives to transfer existed to minimize the possibility of duplicative discovery); *In re Indian Motorcycle Bankruptcy and Receivership Litig.*, 206 F. Supp. 2d 1365 (JPML 2002) (same);  *In Re Air Crash Disaster Near Upperville, Virginia*, 430 F. Supp 1295, 1297 (JPML 1977) (CTO vacated where all actions in transferee court were already tried or settled, and all parties in the new actions before the Panel have access to all discovery obtained in the transferee district); *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, 505 F. Supp 221, 223 (JPML 1981) (CTO vacated where discovery of common issues has been completed in the transferee district and could be made available to the parties in the actions before the Panel without recourse to section 1407); *In Re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation,* 582 F Supp 890, 891 (JPML 1984) (same); *In re Western Electric Co., Inc. Semiconductor Patent Litigation*, 436 F. Supp. 404, 406 (JPML 1977) (transfer denied where discovery on common issues in transferee court "virtually completed"); *In re Eli Lilly & Co. "Oraflex" Products Liability Litig.*, 578 F. Supp. 422, 423 (JPML 1984) (transfer denied because possibility of duplicative discovery "eliminated" by availability of extensive discovery in areas of common factual inquiry from already concluded and well-advanced related actions); *In re Dow Chemical Co. "Polystyrene Foam" Products Liability Litig.*, 429 F. Supp. 1035, 1036 (JPML 1977) (need for transfer "obviated" because discovery on common questions of fact regarding defendants' knowledge and product's defectiveness had been completed and parties had agreed that such discovery would be applicable in all actions); *In re McDonald's Franchise Antitrust Litigation*, 472 F. Supp. 111, 114-115 (JPML 1979) (transfer denied where discovery on common questions was largely completed in some cases and available for use in less advanced cases).

incarnation of MDL No. 1358, as well as in the *South Tahoe* and *CBE* cases.[9] Sher Decl., ¶¶ 7-10, 12-13, 14-16, 19-20. The same is true with respect to expert discovery on the related question of whether MTBE and/or MTBE gasoline is a defective product. *Id.*, ¶¶ 10, 13, 15, 19-20. Overall, literally millions of liability-related documents have been produced and hundreds of witnesses have been deposed, including percipient witnesses at the defendant companies and at trade associations like the American Petroleum Institute and Oxygenated Fuels Association, and numerous expert witnesses. *Id.*, ¶¶ 8, 13, 15-16.

Moreover, all of this discovery is, or could easily be made, readily available to the parties in the *State* Action. *Id.*, ¶¶ 11, 13, 17-18. For example, the document depository in the Transferee Court, which still exists, was established with the specific purpose of making those documents available to parties in other cases. *Id.*, ¶ 17-18, Exhibit 4 (*In re MTBE Products Liability Litig.*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001) (providing that attorneys in any MTBE action may make use of documents produced in the litigation subject to the requirements of the order)). The documents, depositions and trial testimony from the *South Tahoe* and *CBE* cases also can be made available to the parties in the *State* Action. Sher Decl., ¶¶ 11, 13. Indeed, as the Panel has routinely recognized, procedures other than MDL consolidation are available to both courts and parties to permit use of discovery on common issues from prior related cases, such as stipulations and orders to show cause. *See, e.g. In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, *supra*, 199 F. Supp. 2d at 1378, citing Manual for Complex Litigation, Third, § 31.14 (1995).

In contrast, few, if any, of the remaining major factual issues in the *State* Action – such as causation, the nature of warnings given to particular vendees, the feasibility of alternatives to

---

[9] This "notice and knowledge" discovery is relevant to each of the State's common law claims against the refiner defendants, as well as its deceptive business practice claim under the State's consumer protection statute. *See* Complaint, ¶¶ 80, 96, 105, 124, 135-136, 147.

MTBE, the extent of contamination, the available remedies, the cost of those remedies, and liability for those damages – can be considered "common questions of fact," as they revolve primarily, if not exclusively, around New Hampshire-specific issues. For example, the questions of causation and product identification (*i.e.* whose MTBE and/or gasoline containing MTBE is in New Hampshire's waters), warnings, and the feasibility of alternatives will require extensive discovery regarding the gasoline infrastructure in New Hampshire and the way gasoline is supplied to the State from out-of-state refineries – discovery that will be "of no interest" to other MTBE plaintiffs in other parts of the country. *In re Gasoline Lessee Dealers*, *supra*, 479 F. Supp at 580 (denying transfer where discovery in one action would be "of no interest" to parties in another); *see also Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003) (economic effect of MTBE ban influenced by gasoline infrastructure, which varies from state to state); *In re MTBE Products Liability Litig.*, 209 F.R.D. 323, 347 (S.D.N.Y. 2002) (issues regarding warnings given to intermediate vendees and UST owners and operators are "individual").

Similarly, questions regarding the extent of contamination, available remedies, and implementation and cost of those remedies will also be New Hampshire-specific. In fact, in denying class certification in the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding contamination of any particular well present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each will require." *In re MTBE Products Liability Litig.*, *supra*, 209 F.R.D. at 337, 344; *see also In re Grand Funk Railroad Trademark Litig.*, 371 F. Supp. 1084, 1085 (JPML 1974) (no benefit from transfer where discovery "will focus localized factual issues"); *In re Air Crash at Pago Pago, Am. Samoa*, 394 F. Supp. 799, 800 (JPML 1975) (noting

that in tort litigation, common questions may pertain to liability, whereas the issue of damages is unique).

In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery is largely complete and available to all parties. The discovery that remains will focus primarily on New Hampshire-specific issues, which can be better handled by the District of New Hampshire.

### 3.   The Transferee Court And Other Courts Already Have Resolved Most Common Legal Issues.

Just as discovery on any common factual issues is already well-advanced in the Transferee Court (and elsewhere), common pretrial legal issues already have been decided by the Transferee Court, and by other federal and state courts. Indeed, the Transferee Court's prior rulings "provide a convenient expression of the conclusions of the transferee judge which have been reached through [her] familiarity with the litigation, and can serve as an aid in . . . preventing inconsistent pretrial rulings." *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation, supra*, 505 F. Supp at 223; *see also In re Western Electric Co., Inc. Semiconductor Patent Litigation, supra*, 436 F. Supp. at 406 (transfer unwarranted where transferee court's views on key legal issues are well documented, and will put home-court judge "closer to the shoes of the transferee judge").

In her landmark ruling on defendants' motions to dismiss in the original set of cases transferred to MDL No. 1358, Judge Scheindlin, in a lengthy and thorough opinion, set forth a roadmap for the many of the key common legal issues in these cases that other judges can easily follow. *See In re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d 593. First, the Court

rejected defendants' federal preemption defense, *id.* at 611-616,[10] as has every other published

opinion addressing the question.[11]  The Transferee Court also rejected defendants' primary

jurisdiction argument, as well as their related argument that defective product claims concerning

MTBE require an impermissible reexamination of EPA's cost-benefit analysis regarding MTBE.

*In re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d at 616-618, 623-625.  The court

further upheld the sufficiency of each of the common law tort claims asserted in the *State* Action,

including claims alleging refiner liability under theories of strict products liability, negligence,

nuisance and trespass.  *Id.* at 623-629.[12]

     With this extensive guidance already in place, the risk of inconsistent pretrial rulings on

these common legal questions in the *State* Action, if left to proceed in its home district, is

minimal.  At the same time, the pretrial legal questions raised in the *State* Action that have not

yet been resolved by the Transferee Court or other courts in the context of MTBE litigation –

such as the State's standing and authority to pursue damages claims on behalf of its residents, the

scope and applicability of the state statutory claims asserted in the case, the applicability of any

---

[10] Although Judge Scheindlin left open the factual question of whether there were practicable alternatives to MTBE available for defendants' use under the federal Clean Air Act, *id.* at 616, this question, as described in section III.B.2., *supra*, depends on the gasoline market and infrastructure in the relevant locality, and thus is not the kind of question on which coordinated discovery will yield any efficiencies.

[11] *See Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665 (9th Cir. 2003) (upholding California ban of MTBE in gasoline), *affirming Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182 (E.D. Cal. 2001); *ExxonMobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246 (9thCir. 2000) (upholding Nevada county regulation that effectively banned MTBE); *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA); *see also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").

[12] In evaluating the sufficiency of the plaintiffs' common law claims, the Transferee Court applied California, New York, Illinois and Florida law – not New Hampshire law.  To the extent there are any nuances in New Hampshire law that would affect any of the otherwise "common" legal questions in the *State* Action, the transferor court is equally, if not better, suited to address them.

statute of limitations or other defenses – are not shared with other MTBE cases. These questions

are best addressed by a court with more experience and familiarity with New Hampshire law.

Thus, the benefits of permitting this case to proceed on its own in its home district outweigh the

benefits (if any) of transfer. *See In re Grand Funk Railroad, supra*, 371 F. Supp. at 1085 ("Panel

must weigh any benefit that transfer would provide in the way of eliminating the possibility of

inconsistent pretrial decisions against the efficient administration of the litigation as a whole").

Accordingly, the Conditional Transfer Order (CTO-4) as it applies to the *State* Action should be

vacated.

## IV.    CONCLUSION

For the foregoing reasons the State's Motion to Vacate Conditional Transfer Order

(CTO-4) as it applies to the *State* Action should be granted.

Respectfully submitted,

THE STATE OF NEW HAMPSHIRE
PETER W. HEED, ATTORNEY GENERAL

Dated: March 4, 2004

Maureen D. Smith, NH Bar #4857
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679
Fax: (603) 223-6270

SHER LEFF, LLP
Victor M. Sher (Admitted *pro hac vice*)
Todd E. Robins (Admitted *pro hac vice*)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted *pro hac vice*)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

Counsel for Plaintiff State of New
Hampshire

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 0 9 2004

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| | ) MDL Docket No. 1358 |
| | ) |
| **IN RE:** | ) This Document Relates to: |
| | ) *State of New Hampshire v. Amerada* |
| **METHYL TERTIARY BUTYL ETHER** | ) *Hess Corp. et al.*, D.N.H. Case No. 03- |
| **PRODUCTS LIABILITY LITIGATION** | ) CV-486, D.R.I. Case No. 03-0529L |
| | ) |
| | ) **STATEMENT OF REASONS WHY** |
| | ) **ORAL ARGUMENT SHOULD BE** |
| | ) **HEARD RE: STATE OF NEW** |
| | ) **HAMPSHIRE'S MOTION TO** |
| | ) **VACATE CONDITIONAL** |
| | ) **TRANSFER ORDER (CTO-4)** |

## STATEMENT OF REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Plaintiff the State of New Hampshire ("State"), plaintiff in the action *State of New Hampshire v. Amerada Hess Corp., et al.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) (the "*State* Action"), hereby requests that oral argument be heard on its Motion to Vacate CTO-4, submitted herewith for the following reasons:

1.       The *State* Action is one of the most important environmental cases ever filed by the State of New Hampshire. The State chose to file this action in state court and seeks to return to state court. The possibility of litigation in a foreign venue with other non-state cases is a critical issue to the State. Thus, it is important that the State's reasons for objecting to transfer and consolidation with other non-state MTBE cases be fully aired through oral argument.

2.       Oral argument on the State's Motion will provide the Panel with an opportunity to fully explore all aspects of the State's Motion. The issues raised in the State's Motion are

1

complex, and it would benefit all parties and the decision-making process itself if the parties are available to address the Panel's questions and comments on those issues.

3.  Oral argument will facilitate the Panel's ability to rule on the State's Motion in a timely manner.

Respectfully submitted,

THE STATE OF NEW HAMPSHIRE
PETER W. HEED, ATTORNEY GENERAL

Dated:  March 4, 2004

Maureen D. Smith, NH Bar # 4557
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679
Fax: (603) 223-6270

SHER LEFF, LLP
Victor M. Sher (Admitted *pro hac vice*)
Todd E. Robins (Admitted *pro hac vice*)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted *pro hac vice*)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

Counsel for Plaintiff State of New
Hampshire

2

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 0 9 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| IN RE:<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | ) MDL Docket No. 1358<br>)<br>) This Document Relates to:<br>) *State of New Hampshire v. Amerada*<br>) *Hess Corp. et al.*, D.N.H. Case No. 03-<br>) CV-486, D.R.I. Case No. 03-0529L<br>)<br>) **DECLARATION OF VICTOR M.**<br>) **SHER IN SUPPORT OF**<br>) **PLAINTIFF STATE OF NEW**<br>) **HAMPSHIRE'S MOTION TO**<br>) **VACATE CONDITIONAL**<br>) **TRANSFER ORDER (CTO-4)**<br>)<br>) |

## DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

I, VICTOR M. SHER, DECLARE:

1.     I am an attorney licensed to practice law since 1980 in the State of California, and a founding principal of the law firm of Sher Leff, LLP (since January 1, 2003).   Unless otherwise stated, I make this declaration from personal knowledge and, if called to do so, could and would testify competently to the matters set forth below.

2.     My firm is lead outside counsel for plaintiff State of Hampshire ("State") in *State of New Hampshire v. Amerada Hess Corp., et al*., Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) (the "*State Action*"), one of the cases subject to the instant Conditional Transfer Order to MDL

1

1358.[1]  A true and correct copy of the Writ of Summons and Declaration in the State Action is attached hereto as Exhibit 1.

    3.    Since January 1998, my practice has consisted entirely of representing public water agencies in litigation to recover the costs of remediating and/or treating public drinking water supplies contaminated with a variety of chemicals.  Specifically, since November 1998, I have represented a number of public water agencies in litigation concerning contamination of public water supplies by Methyl Tertiary Butyl Ether (MTBE).  My current and past clients in MTBE-related litigation include (among others) the plaintiffs in *South Lake Tahoe Public Utility District v. Atlantic Richfield Co.*, Case No. 999128 (Cal. Super. Ct.) (complaint filed Nov. 10, 1998) ("*South Tahoe*"), *City of Dinuba v. Unocal Corp.*, Case No. 305450 (Cal. Super. Ct.) (complaint filed Aug. 5, 1999) ("*Dinuba*"), and *City of Santa Monica v. Shell Oil Co.*,  Case Nos. 01CC04311; 02CC11407 (Cal. Super. Ct.) (complaint filed June 19, 2000) ("*Santa Monica*").

    4.    In addition to my personal involvement in *South Tahoe*, *Dinuba*, and *Santa Monica*, I am also familiar with the proceedings in *Communities for a Better Environment v. Unocal Corp.*, Case No. 997013 (Cal. Super. Ct.) (complaint filed August 6, 1998) ("*CBE*"), since much of the discovery in *CBE* was coordinated with that in *South Tahoe*.  I am also informed and believe that approximately eighty-five additional lawsuits relating to MTBE contamination have been filed since 1998, not including the group of cases recently removed to federal court.

---

[1] I am also co-counsel of record for all of the plaintiffs in each of the following cases subject to CTO's to MDL 1358:  *California-American Water Co. v. Atlantic Richfield Co., et al.*, 03-5379 JSW (N.D. Cal.). *Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);  *City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.); *Quincy Community Services District v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.); *City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.); and *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.).  Further, I am co-counsel of record for all plaintiffs except the People of the State of California in *People of the State of California et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.).

5.      I am also aware of the proceedings in the original incarnation of MDL No. 1358 ("*Original MDL 1358*"), and have reviewed the Case Management Order (#2), the Confidentiality Agreement and Order, and indices to documents produced to the document depository for Original MDL 1358.

6.      In *South Tahoe, Dinuba, Santa Monica, CBE* and *Original MDL 1358*, each plaintiff's primary focus in their respective lawsuits was on: (1) the manufacturers of MTBE; and (2) the gasoline refiners, who blended MTBE into gasoline that subsequently was leaked or spilled and affected the plaintiffs' wells, regardless of whether those refiners owned or operated retail gasoline stations that actually released such gasoline into the subsurface.  Legal theories in each case – asserted under state common and statutory law – included participating in creating a nuisance, trespass, negligence, and strict liability for product defect.

7.      I was part of the litigation and trial team for the plaintiff in *South Tahoe*.  To my knowledge, *South Tahoe* was the first lawsuit in the country filed by a public water supplier seeking damages for MTBE contamination of public drinking water supply wells.  I am intimately familiar with all of the proceedings in the case and participated directly in all phases of pleadings, discovery, pretrial, trial and settlement.  To my knowledge, *South Tahoe* was also the first MTBE-related case in the country to proceed to trial on theories of refiner/manufacturer liability, and to obtain a special jury verdict on those issues.  As explained in more detail below, these issues were explored thoroughly in discovery, pretrial motions, trial testimony, and post-trial motions.

8.      The complaint in *South Tahoe* was filed November 10, 1998.  A true and correct copy of the complaint in *South Tahoe* is attached hereto as Exhibit 2.  The action named seventeen defendants, including all of the major gasoline refiners in California.  For nearly three

years, until the start of trial in September 2001, the parties conducted detailed and extensive

discovery into the issue of refiner/manufacturer liability for MTBE contamination. During this

discovery, millions of documents were produced and hundreds of witnesses were deposed. In

particular, more than sixty expert witnesses and more than one hundred and eighty percipient

(industry) witnesses were deposed, including those from defendant companies and from trade

associations like the American Petroleum Institute and the Oxygenated Fuels Association.

9.      The plaintiff in *South Tahoe* settled with all but seven defendants before trial, for

an aggregate of more than $30 million. However, the action proceeded to trial against Lyondell

(a manufacturer of MTBE); Shell, Texaco, Equilon, and Ultramar (refiners); and two local

gasoline retailers. *South Tahoe* was tried to a jury in phases, starting in September 2001. Phase I

focused entirely on refiner/manufacturer liability. Extensive testimony and exhibits during the

four-month Phase I of the trial addressed issues related to manufacturer/refiner liability. On

April 15, 2002, the jury returned a special verdict, a true and correct copy of which is attached

hereto as Exhibit 3. As reflected in that verdict, the jury concluded that: (1) MTBE was a

defective product by virtue of failure of the manufacturer defendant (Lyondell) to warn; (2)

gasoline containing MTBE was a defective product both because the environmental risks of the

product outweighed the benefits and because the refiner defendants failed to warn of those risks;

and (3) there was clear and convincing evidence that two defendants – Lyondell and Shell –

acted with malice.

10.      The millions of documents produced, the testimony of hundreds of deponents, and

the extensive trial testimony in *South Tahoe* cover, among other things, the following topics: i)

fate and transport of MTBE in the subsurface (including mobility and non-biodegradability); ii)

documented releases of MTBE to groundwater; iii) toxicity of MTBE; iv) taste and odor

thresholds for MTBE; v) alternatives to MTBE; vi) treatment technologies for MTBE water contamination; vii) economics of MTBE; viii) the oil companies' and manufacturer's early notice and knowledge of the risks of MTBE to groundwater; ix) the oil companies' and manufacturer's promotion and marketing of MTBE; x) the problem of (and defendants' knowledge of) leaking underground storage tanks; and xi) the production, sale and distribution of MTBE and gasoline containing MTBE in California.

11.     The above-described discovery and trial testimony and exhibits from *South Tahoe* still exist and could be made available to the parties in the *State Action*.

12.     I am informed and believe, based upon my familiarity with the pleadings and proceedings in the *CBE* action, that the *CBE* complaint was filed on August 6, 1998 and named twenty-seven defendants, all major refiners of MTBE and their related entities, in California, alleging that their business practices relating to MTBE were in violation of California's unfair trade practices statute.  The parties conducted approximately two years of discovery in *CBE*.  A two year bench trial was held beginning in 2000, and the plaintiff settled with all defendants after presenting their case in chief.  The settlement required defendants to address MTBE contamination at thousands of sites throughout the state.  Some defendants also agreed to stop blending MTBE into their gasoline (before California's regulatory ban took effect) and/or to provide certain warnings regarding the hazards of MTBE.

13.     Discovery in the *CBE* case resulted in the production of millions of pages of documents, as well as approximately eighty depositions covering the same categories of issues as those enumerated in paragraph 10 above.  I am informed and believe that the non-confidential discovery in *CBE*, including all of the documents demonstrating liability that were filed by the

plaintiffs as part of their case-in-chief, still exist and could be made available to the parties in the *State* Action.

14.     I am informed and believe that *Original MDL 1358* involved claims by private well owners around the country arising out of MTBE contamination. Several proposed class actions were designated by this Panel for multi-district treatment before Judge Scheindlin in the Southern District of New York. These actions were designated MDL No. 1358 on October 10, 2000. The parties conducted approximately one year of discovery. Judge Scheindlin issued several substantive rulings (including denying defendants' motions to dismiss and denying plaintiffs' motion for class certification). The claims of the representative plaintiffs were ultimately settled.

15.     Based on my review of indices of documents produced to the document depository for *Original MDL 1358*, and my discussions with counsel who were personally involved in *Original MDL 1358*, I am informed and believe that discovery in those proceedings similarly resulted in the production of millions of pages of documents covering the same categories of issues as those enumerated in paragraph 10 above, except that the materials relating to gasoline distribution focused on the specific markets involved in the MDL actions.

16.     By way of example of the volume of documents produced in *Original MDL 1358*, the index to the documents produced by the BP-Amoco entities alone is more than 100 pages long, single spaced.

17.     I am informed and believe that a centralized document depository was created for *Original MDL 1358* in which all discovery materials were made available to the parties, and that this depository still exists.

6

18.    The parties to *Original MDL 1358* stipulated to a Confidentiality Agreement and

Order which provided that materials produced in the litigation and identified as

"CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THINGS" could be made

available to counsel in other MTBE actions, defined as "an action where the complaint alleges

that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or

common law." Under the Order, materials identified as "CONFIDENTIAL MATERIALS –

FOR OUTSIDE COUNSEL ONLY" may be made available by order of the MDL judge. The

Confidentiality Agreement and Order does not apply to those materials not identified as

confidential. A true and correct copy of the Confidentiality Agreement and Order is attached

hereto as Exhibit 4.

19.    In my opinion, discovery on issues regarding the nature and behavior of MTBE,

and on questions regarding refiner liability such as "who knew what, and when," is substantially

mature with respect to MTBE litigation against gasoline refiners who used MTBE and the

manufacturers of MTBE. I base this conclusion on two factors: First, there has been (as

described above) extensive liability discovery and testimony already conducted in *South Tahoe*,

*CBE*, and *Original MDL 1358*. Second, subsequent cases involving assertions of such liability

(including most notably *Santa Monica* and *Dinuba*, as well as many others as to which I am

informed) have settled before trial.

20.    Given the extensive discovery that is already available on the nature and behavior

of MTBE, as well as the industry's early notice and knowledge of the hazards of MTBE, I

anticipate that the remaining discovery in the *State Action* will focus predominantly on New

Hampshire-specific issues such as the local gasoline distribution system, the extent of

contamination in State waters, and what it will cost to clean it up. Although some further,

7

generally-applicable discovery on liability may be necessary, localized issues will unquestionably predominate.

21.     I understand that on December 19, 2003, the Hon. Shira A. Scheindlin, the presiding judge in *Original MDL 1358*, held a hearing in connection with several recently-filed MTBE cases filed by New York water purveyors that were removed to federal court and assigned to her. At that hearing, the parties present before Judge Scheindlin (which did not include the State) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties they represented to MDL No. 1358 for the same purposes. A true and correct copy of the reporter's transcript of the December 19, 2003 hearing before Judge Scheindlin is attached hereto as Exhibit 5.

22.     On December 23, 2003, Judge Scheindlin issued an Order stating that remand motions in "similar removed actions, wherever filed" should be heard as part of MDL No. 1358. The Order is expressly based "upon stipulations there agreed to on the record by the parties present." A true and correct copy of the Judge Scheindlin's December 23, 2003 Order is attached hereto as Exhibit 6.

23.     The State had no opportunity to participate in the December 19, 2003 hearing, was not a party to the stipulations on which Judge Scheindlin's Order is based, and has not agreed to any transfer of this action to MDL No. 1358.

24.     On December 23, 2003, upon initially learning of the December 19, 2003 hearing, my office sent (over my signature) a letter to Judge Scheindlin on behalf of the State indicating that I anticipated that the State might not object to transfer of its action to the Southern District of

8

New York, because it appeared that the procedures contemplated at that Hearing would have allowed the State's Remand Motion to be argued and resolved expeditiously in that court. However, no such procedures for transfer and prompt hearing of the State's remand motion came to pass, and other parties' remand motions have now proceeded in the MDL court without the State's participation. A true and correct copy of my December 23, 2003 letter to Judge Scheindlin (without attachments or service list) is attached hereto as Exhibit 7.

25.     On January 28, 2004, I sent a second letter to Judge Scheindin on behalf of the State, indicating that the State intended to oppose transfer of the *State Action* to MDL No. 1358 if and when a conditional transfer order was issued. A true and correct copy of my January 28, 2004 letter to Judge Scheindlin (without attached service list) is attached hereto as Exhibit 8.

26.     On February 13, 2004, I understand that Judge Scheindlin held oral argument on the remand motions pending before her. The State had no opportunity to participate in that hearing, as the State's remand motion was not (and is not) before Judge Scheindlin. A true and correct copy of the reporter's transcript of the February 13, 2004 hearing before Judge Scheindlin is attached hereto as Exhibit 9.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 4th day of March, 2004, at San Francisco, California.

VICTOR M. SHER

# Exhibit 1

# The State of New Hampshire

## SUPERIOR COURT

MERRIMACK COUNTY

(　) COURT
(✓) JURY

### WRIT OF SUMMONS

State of New Hampshire

v.

Amerada Hess Corporation; ChevronTexaco Corporation; Chevron U.S.A., Inc.; Citgo Petroleum Corporation; ConocoPhillips Company; El Paso Merchant Energy-Petroleum Company; ExxonMobil Corporation; ExxonMobil Oil Corporation; Gulf Oil Limited Partnership; Irving Oil Corporation; Irving Oil Limited; Lyondell Chemical Company; Motiva Enterprises, LLC; Shell Oil Company; Statoil Marketing and Trading (US) Inc.; Sunoco, Inc. (R&M); Texaco Refining and Marketing, Inc.; Ultramar Energy, Inc.; Ultramar Limited; Unocal Corporation; Valero Energy Corporation; and Valero Marketing and Supply Company

The Sheriff or Deputy of any County is ordered to summon each defendant to file a written appearance with the Superior Court at the address listed below by the return day of this writ which is the first Tuesday of November ____ ,
____ 2003 ____ .
MONTH
YEAR

The PLAINTIFF(S) state(s):

See attached Declaration.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

_Kelly Ayotte for_
Peter W. Heed, Esq.
INDORSER (sign and print name)

September 30, 2003
DATE OF WRIT

#### NOTICE TO THE DEFENDANT

The Plaintiff listed above has begun legal action against you. **You do not have to physically appear** in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you will then be obligated to pay.

Witness, WALTER L. MURPHY, Chief Justice, Superior Court.

_William S. McGraw_
William S. McGraw, Clerk
NH Superior Court Merrimack County
PO Box 2880
Concord, NH 03302-2880
(603) 225-5501

_Maureen D. Smith_
SIGNATURE OF PLAINTIFF/ATTORNEY

Maureen D. Smith, Senior Assistant Attorney General
PRINTED/TYPED NAME
Office of the Attorney General
33 Capitol Street
ADDRESS
Concord, NH 03301-6397   / 271-3679
PHONE

213-003-5

Exhibit 1
Page 1 of 55

THE STATE OF NEW HAMPSHIRE

MERRIMACK, SS.                                    SUPERIOR COURT


State of New Hampshire

v.

Amerada Hess Corporation;
ChevronTexaco Corporation;
Chevron U.S.A., Inc.;
Citgo Petroleum Corporation;
ConocoPhillips Company;
El Paso Merchant Energy-Petroleum Company;
ExxonMobil Corporation;
ExxonMobil Oil Corporation;
Gulf Oil Limited Partnership;
Irving Oil Corporation;
Irving Oil Limited;
Lyondell Chemical Company;
Motiva Enterprises, LLC;
Shell Oil Company;
Statoil Marketing and Trading (US) Inc.;
Sunoco, Inc. (R&M);
Texaco Refining and Marketing, Inc.;
Ultramar Energy, Inc.;
Ultramar Limited;
Unocal Corporation;
Valero Energy Corporation; and
Valero Marketing and Supply Company.

## **DECLARATION**

The State of New Hampshire, by and through the New Hampshire Attorney

General, 33 Capitol Street, Concord, New Hampshire, complains against Amerada Hess

Corporation, 1185 Avenue of the Americas, New York, New York; ChevronTexaco

Corporation, 6001 Bollinger Road, San Ramon, California; Chevron U.S.A., Inc., 6001

Bollinger Road, San Ramon, California; Citgo Petroleum Corporation, 6100 South Yale

1

Avenue, Tulsa, Oklahoma; ConocoPhillips Company, 600 North Dairy Ashford, Houston, Texas; El Paso Merchant Energy-Petroleum Company, 1001 Louisiana Street, Houston, Texas; ExxonMobil Corporation, 5959 Las Colinas Boulevard, Irving, Texas; ExxonMobil Oil Corporation, 5959 Las Colinas Boulevard, Irving, Texas; Gulf Oil Limited Partnership, 90 Everett Avenue, Chelsea, Massachusetts; Irving Oil Corporation, 190 Commerce Way, Portsmouth, New Hampshire; Irving Oil Limited, 210 Crown Street/10 Sydney Street, Saint John, New Brunswick, Canada; Lyondell Chemical Company, 1221 McKinney Street, Suite 700, Houston, Texas; Motiva Enterprises, LLC, 1100 Louisiana, Suite 1000, Houston, Texas; Shell Oil Company, One Shell Plaza, 910 Louisiana, Houston, Texas; Statoil Marketing and Trading (US) Inc., 225 High Ridge Road, Stamford, Connecticut; Sunoco, Inc. (R&M), 1801 Market Street, Philadelphia, Pennsylvania; Texaco Refining and Marketing, Inc., One Shell Plaza, 910 Louisiana, Houston, Texas; Ultramar Energy, Inc., One Valero Place, San Antonio, Texas; Ultramar Limited, 2200 McGill College, Montreal, Quebec, Canada; Unocal Corporation, 2141 Rosencrans Avenue, Suite 4000, El Segundo, California; Valero Energy Corporation, One Valero Place, San Antonio, and Texas; Valero Marketing and Supply Company, One Valero Place, San Antonio, Texas; (hereinafter collectively, "defendants") and, based on information and belief and investigation of counsel, alleges as follows:

## I.      SUMMARY OF THE CASE

1.      The State of New Hampshire, by and through the Attorney General, (hereinafter the "State"), brings this action at law in order to protect and to remedy important state interests affected by widespread contamination of the waters of the State with methyl tertiary butyl ether ("MTBE"), a chemical used in some gasoline.

2

2.      The waters of the State, whether located above or below ground, constitute limited, precious and invaluable public resources that are held in trust for the public benefit and for which the State has the authority and responsibility to protect, conserve and manage in the interest of present and future generations.

3.      Defendants' use of MTBE in gasoline has created an unprecedented threat to both the surface and groundwaters of the State (hereinafter "waters of the State"), including many public and private drinking water supplies.  Unlike other gasoline constituents, MTBE contaminates and spreads in water resources quickly, and hides and resists removal and treatment, thereby presenting a serious threat to waters throughout the State.  MTBE has already contaminated numerous drinking water sources in the State and threatens to contaminate many more, as a result of normal and foreseen storage, purchase and use of gasoline by its residents.

4.      MTBE can cause significant adverse health effects, and, even at very low concentrations, can render drinking water foul, putrid and unfit for human consumption.

5.      The defendants in this action are major oil and chemical companies that manufacture MTBE and supply gasoline containing MTBE to the State.  The defendants include MTBE manufacturers and refiners and major-brand marketers of gasoline containing MTBE, which was entered and continues to be entered into the stream of the State's commerce and which has damaged and continues to damage the waters of the State.

6.      In addition to producing and/or supplying MTBE or gasoline containing MTBE for importation into and sale within the State, defendants knowingly and willfully promoted, marketed and sold MTBE and gasoline and other petroleum products

3

(hereinafter collectively, "gasoline") containing MTBE, when they knew or reasonably should have known that MTBE would be released into the environment and pollute the waters of the State in violation of New Hampshire law, would interfere with the State's interest in protecting and preserving surface and groundwaters and threaten public health and welfare and the environment, as has occurred and is continuing to occur within the State.

7.    The State alleges that under New Hampshire law defendants are: strictly liable for manufacturing and supplying a defective product and failing to provide adequate warnings in connection therewith; liable for creating a public nuisance; strictly liable for directly or indirectly causing or suffering the discharge of MTBE into the waters of the State; liable for trespass upon the waters of the State; liable for negligently causing damage to the waters of the State; liable for unfair and deceptive business acts; and liable for all resulting damages, including all costs to investigate, monitor, prevent, abate, contain and remove any contamination or threatened contamination from MTBE and to restore and protect State waters.  The State also alleges that certain defendants are liable for enhanced damages to reflect the aggravating circumstances caused by such defendants' wanton, malicious and oppressive conduct.  Finally, the State alleges that defendants are liable for civil penalties under State environmental and consumer protection laws.

## II.    PLAINTIFF

8.    Plaintiff is the State of New Hampshire (the "State"), as represented by and through the Attorney General of the State of New Hampshire, with principal offices at 33 Capitol Street, Concord, New Hampshire.   The State bring this action as a trustee

of the waters within New Hampshire and pursuant to its police power, which includes, but is not limited to, its power to prevent pollution of the surface and groundwaters of the State, to prevent nuisances and to prevent potential hazards to public health, welfare and the environment.

9.     The State also has a significant property interest in the waters of the State and a quasi-sovereign interest in protecting the quality of such waters.  The contamination of waters of the State by MTBE constitutes injury to the environment and to property held in public trust by the State for which the State seeks damages in its capacity as *parens patriae*.

10.     The Attorney General is expressly authorized to enforce statutes pertaining to environmental protection, control and preservation, to exercise common law powers to protect the environment, and to bring public nuisance and other actions in Superior Court in the name of the State when the activity complained of may have a substantial impact upon the environment of the State.  RSA 21-M:10, II.

11.     The Attorney General is expressly authorized to institute such legal or equitable action as he deems necessary to recover or obtain judgment for the costs of containment, cleanup, removal, corrective measures or civil penalties related to the discharge or spillage of oil, which includes petroleum products and their by-products of any kind, into the waters of the State.  RSA 146-A:9; RSA 146-G:3.  The Attorney General is also expressly authorized to bring an action under RSA 358-A:4 in the name of the State to prevent, remedy and penalize violations of the Consumer Protection Act.

DECLARATION
*State of New Hampshire v. Amerada Hess Corp., et al.*

Exhibit 1
Page 6 of 55

### III.   DEFENDANTS

12.    The defendants in this action are petroleum-related corporations doing business in New Hampshire.  The two categories of defendants are: (1) the refiners and major-brand marketers of gasoline containing MTBE; and (2) the manufacturers and promoters of MTBE that contaminates and threatens the waters of the State.

**A.    Refiner/Marketer Defendants**

13.    The following defendants, at all times relevant to this action, refined, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that each such defendant knew or should have known would be delivered into the State (or areas affecting the waters of the State):

(a)    Amerada Hess Corporation ("Hess") is a Delaware corporation with its principal place of business at 1185 Avenue of the Americas, New York, New York, doing business and registered to transact business in New Hampshire.

(b)    ChevronTexaco Corporation ("ChevronTexaco") is a Delaware corporation with its principal place of business at 6001 Bollinger Road, San Ramon, California, doing business in New Hampshire. On information and belief, the State alleges that ChevronTexaco was formed as a result of a merger in 2001 of Chevron Corporation and Texaco, Inc.  On information and belief, the State further alleges that ChevronTexaco owns and/or controls defendant Chevron U.S.A., Inc.

(c)    Chevron U.S.A., Inc. ("Chevron U.S.A.") is a Pennsylvania

6

corporation with its principal place of business at 6001 Bollinger

Road, San Ramon, California, doing business and registered to

transact business in New Hampshire.  The term "Chevron" as used

in this Writ refers to ChevronTexaco and/or Chevron U.S.A.

(d)     Citgo Petroleum Corporation ("Citgo") is a Delaware corporation

with its principal place of business at 6100 South Yale Avenue,

Tulsa, Oklahoma, doing business and registered to transact

business in New Hampshire.

(e)     ConocoPhillips Company ("ConocoPhillips") is a Delaware

corporation with its principal place of business at 600 North Dairy

Ashford, Houston, Texas, doing business and registered to transact

business in New Hampshire.  On information and belief, the State

alleges that ConocoPhillips was formed as the result of a merger in

2002 of Conoco, Inc. and Phillips Petroleum Company.  On

information and belief, the State further alleges that

ConocoPhillips is the successor corporation to Conoco, Inc. and

Phillips Petroleum Company.  The State is further informed and

believed that ConocoPhillips is the successor corporation to Tosco

Corporation, including its subsidiary Tosco Refining LP, which

was acquired by Phillips Petroleum Company in 2001.

(f)     El Paso Merchant Energy-Petroleum Company ("El Paso") is a

Delaware corporation with its principal place of business at 1001

7

Louisiana Street, Houston, Texas, doing business and registered to transact business in New Hampshire. On information and belief, the State alleges that El Paso is the successor corporation to Coastal Refining and Marketing, Inc.

(g)   ExxonMobil Corporation ("ExxonMobil Corp.") is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas, doing business and registered to transact business in New Hampshire. On information and belief, the State alleges that ExxonMobil was formed as a result of a merger in 1999 of Mobil Corporation and Exxon Corporation. On information and belief, the State alleges that ExxonMobil is the successor corporation to Exxon Corporation and Mobil Corporation.

(h)   ExxonMobil Oil Corporation ("ExxonMobil Oil") is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas, doing business and registered to transact business in New Hampshire. The term "ExxonMobil" as used in this Writ refers to ExxonMobil Corp. and/or ExxonMobil Oil.

(i)   Gulf Oil Limited Partnership ("Gulf") is a Delaware limited partnership with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts, doing business and registered to transact business in New Hampshire.

8

(j)     Irving Oil Corporation ("Irving Oil Corp.") is a Maine corporation

with its principal place of business at 190 Commerce Way,

Portsmouth, New Hampshire, doing business and registered to

transact business in New Hampshire.

(k)     Irving Oil Limited ("Irving Oil") is a Canadian corporation with its

principal place of business at 210 Crown Street/10 Sydney Street,

Saint John, New Brunswick, Canada, doing business in New

Hampshire.  The term "Irving" as used in this Writ refers to Irving

Oil Corp. and/or Irving Oil.

(l)     Lyondell Chemical Company ("Lyondell") is a Delaware

corporation with its principal place of business at 1221 McKinney

Street, Suite 700, Houston, Texas, and doing business and

registered to transact business in New Hampshire.  On information

and belief, the State alleges that Lyondell owns and/or controls

Lyondell-Citgo Refining, LP, which produces refined petroleum

products, including gasoline.

(m)     Motiva Enterprises, LLC ("Motiva") is a Delaware limited liability

company with its principal place of business at 1100 Louisiana,

Suite 1000, Houston, Texas, doing business and registered to

transact business in New Hampshire.  On information and belief,

the State alleges that Motiva is a successor in interest to certain

entities related to defendant Shell Oil Company and defendant

9

Texaco Refining and Marketing, Inc., and is owned and/or

controlled by defendant Shell Oil Company.

(n)   Shell Oil Company ("Shell Oil") is a Delaware corporation with its

principal place of business at One Shell Plaza, 910 Louisiana,

Houston, Texas, doing business and registered to transact business

in New Hampshire.  The term "Shell" as used herein refers to

Motiva and/or Shell Oil.

(o)   Statoil Marketing and Trading (US) Inc. is a Delaware corporation

with its principal place of business at 225 High Ridge Road,

Stamford, Connecticut, doing business and registered to transact

business in New Hampshire.

(p)   Sunoco, Inc. (R&M) ("Sunoco") is a Pennsylvania corporation

with its principal place of business at 1801 Market Street,

Philadelphia, Pennsylvania, doing business and registered to

transact business in New Hampshire.

(q)   Texaco Refining & Marketing, Inc. ("Texaco") is a Delaware

corporation with its principal place of business at One Shell Plaza,

910 Louisiana, Houston, Texas, doing business and registered to

transact business in New Hampshire.  On information and belief,

the State alleges that Texaco is owned and/or controlled by

defendant Shell Oil.

(r)   Ultramar Energy, Inc. ("Ultramar Energy") is a Delaware

10

corporation with its principal place of business at One Valero

Place, San Antonio, Texas, doing business and registered to

transact business in New Hampshire.

(s)     Ultramar Limited ("Ultramar") is a Canadian corporation with its

principal place of business at 2200 McGill College, Montreal,

Quebec, Canada, doing business in New Hampshire.

(t)     Unocal Corporation, individually and formerly known as Union

Oil Company of California ("Unocal"), is a Delaware corporation

with its principal place of business at 2141 Rosencrans Avenue,

Suite 4000, El Segundo, California, doing business and registered

to transact business in New Hampshire.

(u)     Valero Energy Corporation ("Valero Energy") is a Delaware

corporation with its principal place of business at One Valero

Place, San Antonio, Texas, doing business in New Hampshire.  On

information and belief, the State alleges that Valero merged with

Ultramar Diamond Shamrock Corporation in 2001, and that, as a

consequence of such merger, Valero owns and/or controls certain

entities related to Ultramar Diamond Shamrock Corporation,

including defendants Ultramar Energy and Ultramar.

(v)     Valero Marketing and Supply Company ("Valero Marketing") is a

Delaware corporation with its principal place of business at One

Valero Place, San Antonio, Texas, doing business and registered to

11

transact business in New Hampshire.  The term "Valero" as used in this Writ refers to Valero Energy, Valero Marketing, Ultramar and/or Ultramar Energy.

14.     The defendants identified in paragraphs 13(a) through 13(v) above will be collectively referred to as the "refiner/marketer defendants."   The refiner/marketer defendants, and each of them, among other things: (a) designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State), such that releases of MTBE contaminate and threaten the waters of the State; (b) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this Writ; (c) participated in one or more enterprises to promote MTBE and/or gasoline containing MTBE, despite the availability of reasonable alternatives and their actual or constructive knowledge that the pollution alleged herein would be the inevitable result of their conduct; and (d) in doing the tortious and wrongful acts alleged in this Writ, acted in the capacity of joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the named defendants.

**B.     Manufacturer Defendant**

15.    . Defendant Lyondell also manufactures MTBE for use in gasoline.  On information and belief, the State alleges that Lyondell is a successor in interest to ARCO Chemical Company, which Lyondell acquired in 1998.

16.    Lyondell manufactured, promoted and sold MTBE to gasoline refiners with actual or constructive knowledge that: (a) the refiners would blend such MTBE into gasoline; and (b) such gasoline would, in turn, be delivered into the State (or areas affecting the waters of the State).

17.    Lyondell will be referred to as the "manufacturer defendant."  The manufacturer defendant, among other things: (a) designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE that contaminates and threatens the waters of the State; (b) is legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this Writ; (c) participated in one or more enterprises to promote MTBE and/or gasoline containing MTBE, despite the availability of reasonable alternatives and its actual or constructive knowledge that the pollution alleged herein would be the inevitable result of its conduct; and (d) in doing the tortious and wrongful acts alleged in this Writ, acted in the capacity of joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the named defendants.

18.    The refiner/marketer defendants and manufacturer defendant are referred to collectively herein as "defendants."

19.    Among other things, the defendants knew, or reasonably should have known, that: (a) the gasoline distribution and retail system throughout the State contained leaking gasoline storage and delivery systems; (b) MTBE is more readily released from gasoline storage and delivery systems than the constituents of conventional gasoline; and (c) releases of MTBE into the environment would be an inevitable consequence of placing MTBE into the stream of commerce in the absence of precautionary measures to prevent or mitigate such releases – measures that the defendants failed to take.

20.    The defendants also knew, or reasonably should have known, that, unlike the constituents of conventional gasoline, MTBE, when released into the environment, would move great distances, mix easily with groundwater, resist biodegradation, render drinking water unsafe and/or non-potable, and require significant expenses to find and remove from public and private drinking water supplies.

21.    The defendants further knew, or reasonably should have known, that various consumer and commercial activities, such as use of snowmobiles, motorized watercraft and lawnmowers and operation of junkyards and vehicle maintenance and repair facilities, would result in releases of MTBE into waters of the State.

22.    Despite knowing the devastating risk of drinking water contamination posed by MTBE, and despite the availability of reasonable alternatives, the defendants failed to warn customers, retailers, regulators or public officials, including the State of New Hampshire, and failed to take any other precautionary measures to prevent or mitigate such contamination. Instead, defendants promoted MTBE, and gasoline containing MTBE, as environmentally sound products appropriate for widespread use. Moreover, certain defendants engaged in separate and joint activities to suppress, conceal

14

and/or discredit studies and other information regarding the hazards of MTBE. Defendants' wrongful conduct, among other things, encouraged the State to participate in the federal reformulated gasoline program without a full understanding of the risks to the State's water resources, which resulted in: (a) a dramatic increase in the use and presence of gasoline containing MTBE in the State; (b) the consequent injuries to the waters of the State; and (c) the substantial damages incurred by the State in response thereto.

23.     To the extent any act or omission of any of the defendants is alleged in this Writ, the officers, directors, agents, employees or representatives of each such defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of such defendants, and did so while acting within the scope of their duties, employment or agency.

## IV.     JURISDICTION AND VENUE

24.     Jurisdiction is vested in this Court pursuant to: (a) RSA 491:7, which grants this Court subject matter jurisdiction over all civil actions according to the course of the common law, except certain actions not applicable herein; (b) RSA 491:14 which grants this Court subject matter jurisdiction over suits in equity; (c) RSA 491:22 which grants this Court subject matter jurisdiction over claims for declaratory relief; (d) RSA 21-M:10, which authorizes the Court to hear public nuisance and other actions brought by the Attorney General in the name of the State; (e) RSA 146-A:9 and 146-G:3, which authorize the Court to hear legal and/or equitable actions instituted by the Attorney General to recover or obtain judgment for the costs of containment, cleanup, removal, corrective measures and/or civil penalties; and (f) RSA 358-A:4, which authorizes the

15

Attorney General to bring an action in the name of the State in this Court for temporary or permanent injunction, restitution and civil penalties.

25.     Venue is proper in Merrimack County pursuant to RSA 507:9.  This is a transitory action brought by the State in the county in which the capital is located.

## V.     FACTUAL ALLEGATIONS

**A.     The Contaminant MTBE.**

26.     MTBE is a chemical compound produced from methanol and isobutylene. It is used by some refiners in some gasoline.  As used in this Writ, MTBE consists not only of methyl tertiary butyl ether, but also the degradation byproducts of and contaminants in commercial grade MTBE, including but not limited to tertiary butyl alcohol.

27.     One way that MTBE contaminates the environment is through releases, leaks, overfills, and spills from gasoline delivery facilities, including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems ("gasoline delivery systems").

28.     Another way that MTBE contaminates the environment is through releases, leaks, overfills, and spills of gasoline associated with or incident to certain consumer activities, including but not limited to the use of lawnmowers, snowmobiles, and motorized watercraft, and certain commercial activities, including but not limited to the operation of junkyards and vehicle repair and maintenance facilities.

29.     As a result of its physical characteristics, MTBE finds unique pathways for release into the environment from gasoline delivery systems and is more readily released from such systems than conventional gasoline components.

16

30.     Once released to the environment, MTBE's unique characteristics cause

extensive environmental contamination and a corresponding threat to the public health

and welfare beyond that caused by gasoline that does not contain MTBE.  In particular,

the fate and transport of MTBE in the subsurface differs significantly from that of

gasoline constituents that have historically been of environmental and/or toxicological

concern, specifically the "BTEX compounds" (benzene, toluene, ethylbenzene, and

xylene).

31.     When released into the environment, MTBE separates from other gasoline

constituents in the presence of moisture.  In contrast to the BTEX compounds, MTBE has

a strong affinity for water, is easily dissolved and does not readily adhere to soil particles,

making it more mobile and able to penetrate great distances from the source of the

release.

32.     In groundwater, MTBE moves freely at approximately the rate of the

water's movement, unlike BTEX compounds, which tend to adhere to soil and float on

the surface of water.  This makes it more difficult to find and more difficult to remove or

treat than BTEX compounds.

33.     MTBE is also more persistent than BTEX compounds because it does not

readily biodegrade in groundwater.  As a result, MTBE is relatively more difficult and

expensive to remove from groundwater.

34.     In sum, when MTBE is released into the environment, it migrates farther

and faster through soil and groundwater, penetrates deeply into aquifers, resists

biodegradation and results in persistent contamination that is more costly to address.  As

17

a result of these properties, MTBE has contaminated, and continues to contaminate and threaten, the groundwaters of the State.

35.     MTBE also contaminates surface waters through releases, leaks, overfills and spills of gasoline associated with or incident to certain consumer and commercial activities, including but not limited to the use of snowmobiles and motorized watercraft.

36.     Not all of the MTBE contamination of water resources in the State can be traced to a specific source.

37.     Contamination of the State's waters with MTBE has damaged and continues to damage and threaten these precious resources, and threatens the health, safety and welfare of the citizens of the State.

38.     Federal and other studies link MTBE to a variety of adverse health effects.

39.     The State has established a health-based Primary Maximum Contaminant Level ("MCL") for MTBE of 13 parts per billion ("ppb"). This is one of the most stringent standards in the nation.

40.     The establishment of the health-based MCL for MTBE triggers certain state regulatory requirements if that level is exceeded in drinking water supplies. Such state requirements include, but are not limited to, required investigatory and remedial action to protect public health and the environment and remedial actions by public water suppliers.

41.     In addition to the health and environmental risks posed by MTBE in drinking water supplies, MTBE can render water supplies undrinkable by changing the taste and odor of water in such a manner that it becomes a foul smelling liquid with a turpentine odor and a chemical taste unfit for human consumption. Many individuals can

18

smell and/or taste MTBE in drinking water at levels well below the health-based MCL of 13 ppb.

**B.      History of MTBE in the State.**

42.      Oil companies began blending MTBE into gasoline in the late 1970's. Initially used as an octane enhancer, MTBE was used throughout the 1980's at low concentrations in some gasoline by some refiners, primarily in high-octane grades.

43.      In or about the late 1970's, the U.S. Environmental Protection Agency ("EPA") registered MTBE as a fuel additive that does not cause or contribute to the failure of any emission control device or system, pursuant to section 211 of the Clean Air Act, 42 U.S.C. § 7545.  Such registration did not and does not constitute endorsement, certification, or approval of MTBE as a fuel additive by any agency of the United States.

44.      Refiners, including defendants, significantly increased their use of MTBE in gasoline after 1990.  In 1990, Congress established the Reformulated Gasoline Program ("RFG Program") in section 211(k) of the Clean Air Act , 42 U.S.C. § 7545(k). The RFG Program requires the use of reformulated gasoline in certain metropolitan areas with the most severe summertime ozone ("smog") levels, none of which is located in New Hampshire.  The RFG Program also allows states with other, less serious, ozone non-attainment areas to opt into the program as a means to address their nonattainment.

45.      Unlike conventional gasoline, reformulated gasoline under the RFG Program must contain a specified chemical oxygen content.  The RFG Program requires that reformulated gasoline sold in areas subject to the RFG Program consist of approximately 2.0% oxygen by weight.

46.     The RFG Program is both fuel neutral and oxygenate neutral, in that it does not mandate the use of MTBE or any particular oxygenate. Rather, it leaves the decision on how to meet the oxygen requirements to individual refiners, including defendants. Alternative oxygenates other than MTBE have, at all relevant times, been available to defendants.

47.     New Hampshire sought to "opt in" four of its counties to the federal RFG Program as a means to address air quality problems in those counties. In particular, on October 22, 1991, the State submitted an application to EPA seeking to opt in to the RFG Program the four southern counties of Merrimack, Hillsborough, Rockingham and Strafford, effective January 1, 1995. EPA approved the State's application on December 23, 1991.

48.     At the time that New Hampshire opted into the federal RFG program, it had no control over which oxygenate would be added to gasoline supplied to New Hampshire.

49.     At the time that New Hampshire chose to opt into the RFG Program, the defendants had not provided the State with all of the information available to them concerning the unique characteristics and hazards associated with use of MTBE as an oxygenate in gasoline.

50.     Defendants made MTBE their oxygenate of choice for reformulated gasoline manufactured for and supplied to New Hampshire. From the date of approval of New Hampshire's opt-in of the four southern counties until the present, defendants' gasoline sold in New Hampshire has contained much greater concentrations of MTBE

20

than before the opt-in as a result of defendants' choice to meet the RFG requirements through use of MTBE.

51.     Gasoline containing low levels of MTBE was sold at various times, in various quantities and in various locations in New Hampshire before 1995. Reformulated gasoline containing significantly higher quantities of MTBE has been sold on a virtually universal basis in the four southern counties of Merrimack, Hillsborough, Rockingham and Strafford since 1995. Gasoline containing MTBE at various concentrations also has been and is sold in other locations throughout the State.

52.     On May 30, 2001, the State submitted a petition to EPA requesting to withdraw, or "opt out" of the RFG Program on an expedited basis, citing the significant contamination threat that MTBE poses to New Hampshire's surface and groundwater. The State's petition is still pending before EPA. The State has also adopted rules eliminating any requirement for a minimum oxygenate content in fuel supplied to the State.

## C.     State Regulation of MTBE

53.     The State regulates MTBE as an "oil" under oil discharge statutes, including RSA 146-A and RSA 146-C, as well as under other statutes and rules designed to protect the State's waters.

54.     MTBE contamination is associated with all transportation, storage and use of gasoline containing MTBE.

55.     The State provides funding for investigation, remediation, individual third-party damages and other activities related to MTBE contamination in the State through

State-administered petroleum reimbursement funds, the Oil Discharge Cleanup Fund under RSA 146-A, and through general funding.

56.    The State has incurred and will continue to incur significant costs and expenses in addressing releases of MTBE into the environment and into waters of the State.

**D.    Defendants' Promotion of MTBE and TBA.**

57.    Defendants, all of whom have promoted the use of gasoline containing MTBE for its purported environmental benefits, knew or should have known of the grave harm and threat to public health, safety and welfare and the environment represented by the proliferating use of MTBE, including (among other things): widespread pollution of groundwater with MTBE, contamination of public and private drinking water supplies by this harmful and noxious compound, the rendering of drinking water supplies unfit and unusable for consumption, and increased costs to the State in addressing MTBE contamination of drinking water supplies and other waters of the State.

58.    Despite knowing that pollution by MTBE was an inevitable consequence of their conduct, and despite the availability of reasonable alternatives (including, but not limited to, adequate warnings), defendants failed to warn customers, retailers, regulators or public officials, including the State, regarding the hazards of MTBE. As production and sales of MTBE and gasoline containing MTBE increased, defendants failed to take any reasonable, appropriate, and special precautions to ensure that gasoline containing MTBE was stored safely. Despite knowing the risk of harm posed by MTBE, defendants also failed to warn purchasers, the public, regulators, and/or the State that without such precautions, increasing amounts of MTBE would be released into the environment and

22

cause, among other significant adverse effects, long-term groundwater contamination, contamination of water supplies, and threats to public health, safety and welfare.

59.     At all relevant times, the defendants have represented to purchasers of MTBE and/or gasoline containing MTBE, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use.  Indeed, defendants represented that gasoline containing MTBE could be handled in the same fashion as conventional gasoline, and required no special measures to protect against, respond to, or mitigate suspected releases to the subsurface.

60.     Defendants knew, or reasonably should have known, that, throughout the State, the gasoline distribution and retail system contained leaking gasoline delivery systems, and that the nature of such systems involved frequent spillage, leaks and overfills that allowed gasoline to enter soils and waters of the State.

61.     Defendants knew, or reasonably should have known, that: (a) MTBE would escape from gasoline delivery systems more readily than the constituents of conventional gasoline; (b) gasoline storage facilities in the State were not designed to prevent any and all leakage of gasoline containing MTBE; and (c) the operators and users of these facilities either (i) were unaware of the special hazards posed by MTBE and the steps necessary to eliminate or mitigate those hazards or (ii) would fail to take such steps.

62.     Before introducing MTBE into gasoline delivery systems, the defendants knew, or reasonably should have known, among other things, that, once released into the environment, MTBE would mix easily with groundwater, move great distances, resist biodegradation, render drinking water unsafe and/or non-potable, cause significant

23

expenses to remove from public and private drinking water supplies and other waters of the State, and otherwise damage and threaten public health, safety and welfare and the environment.

63.     Defendants further exacerbated the situation by continued unreasonable and negligent acts, including providing gasoline containing MTBE to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent or mitigate releases of MTBE to the subsurface.  Defendants did so despite the fact that they knew, or reasonably should have known, that releases of MTBE were substantially certain to occur, because a substantial percentage of those gasoline stations would and, in fact, did: (a) place the gasoline into inadequate and leaking gasoline delivery systems; (b) suffer the routine spillage of appreciable quantities of gasoline containing MTBE in connection with the filling of storage tanks and the use of gasoline dispensing systems; (c) fail to take adequate measures to monitor, detect, and respond to releases of MTBE to soil, surface water and/or groundwater; and (d) fail to take adequate precautions to investigate, contain and clean up releases of MTBE.

64.     The widespread problems of gasoline spillage and leaking gasoline delivery systems were well known to the defendants prior to the introduction of MTBE into the State.  At least as early as the mid-1960's, defendants knew, or reasonably should have known, that gasoline delivery systems generally suffer significant and widespread leaks and failures, and release gasoline products into the environment, including into groundwater.

65.     Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Irving, Shell, Sunoco, Texaco, Unocal and Valero not only knew about the

24

widespread problems of leaking gasoline delivery systems generally, but, at all times

relevant to this action, had first-hand knowledge and experience regarding leaking

gasoline delivery systems and releases of MTBE to groundwater therefrom.  These

defendants obtained such first-hand knowledge and experience because each of them

owned and operated individual gasoline stations with leaking gasoline delivery systems,

including gasoline stations in the State, and/or exercised control over such gasoline

stations through a variety of means, including but not limited to written agreements,

inspection rights, prescribing certain procedures and operating practices, prescribing

specifications for products, conditions on sale of branded goods, agreements obligating

such stations to acquire, store and sell gasoline containing MTBE, and training.  Despite

their first-hand knowledge that contamination of waters of the State with MTBE was the

inevitable result of their conduct, these defendants continued to refine, market, promote,

and supply gasoline containing MTBE.

     66.     The manufacturers, refiners and suppliers of MTBE and gasoline

containing MTBE had a duty and breached their duty to evaluate and test MTBE

adequately and thoroughly to determine its environmental fate and transport

characteristics and potential human health and environmental impacts before they

produced and sold MTBE and gasoline containing MTBE.  They also had a duty and

breached their duty to minimize the environmental harm caused by MTBE and/or

gasoline containing MTBE.  Furthermore, they had a duty and breached their duty to take

precautions, including warnings, necessary to ensure that gasoline containing MTBE was

properly stored and that all necessary measures to promptly detect, contain, abate and

respond to spills and leaks were instituted.  Nonetheless, defendants, and each of them,

25

failed to adequately evaluate, test, store, warn, mitigate or otherwise ensure that gasoline

containing MTBE would not contaminate waters of the State.  As a direct, indirect and

proximate result of these failures, MTBE was released, and continues to be released, into

the environment, causing and threatening to cause widespread contamination of the

waters of the State.

      67.    In addition to the negligent and/or reckless conduct alleged herein,

Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell,

Sunoco, Texaco, Unocal and Valero also intentionally failed to warn downstream

handlers, the public and government officials, including the State, as to the threat caused

by MTBE and, by agreement and tacit understanding among them, each knowingly

pursued or took an active part in a common plan, design and conspiracy to market and

promote a product they knew to be dangerous to the environment.  In particular, the

defendants identified in this paragraph formed and participated in joint task-forces,

committees and trade associations for the specific purpose of suppressing, concealing and

minimizing information regarding MTBE hazards.  These defendants also engaged in

separate and joint activity to mislead government agencies, including the State, as well as

the public regarding these same dangers.  Such defendants' common plan, design and

conspiracy, and the acts taken in furtherance of such common plan, design and

conspiracy, are a direct, indirect and proximate cause of the MTBE contamination of the

waters of the State.

**E.    Impact of MTBE on Waters of the State**

      68.    MTBE has been found in drinking water supplies throughout the State in

varying amounts and at varying times.  As of 2002, MTBE was present in 13.2% of

26

public water supplies that were tested statewide, more than 23% of public water supplies that were tested in Rockingham County, more than 33% of public water supplies tested in Strafford County and more than 18% of public water supplies tested in Hillsborough and Merrimack Counties.

69.   As of 2003, preliminary results from a study of Rockingham County public water supplies indicate that MTBE is present at some level in more than 41% of the public drinking water supplies that were tested.

70.   Based upon studies conducted by other states, the State estimates that MTBE is present at some level in roughly 40,000 private drinking water wells.  The State has also estimated from other states' studies that MTBE is present at levels exceeding the health-based MCL of 13 ppb in roughly 3,100 of the 40,000 private drinking water wells estimated to be impacted by MTBE.

71.   A 2003 State study of Paugus Bay in Lake Winnepesaukee indicates that MTBE is also present in surface waters that are used as drinking water sources by residents of the State.

72.   At all times relevant to this action:

   (a)   The manufacturer defendant manufactured, promoted and supplied MTBE to refiners, including certain refiner/marketer defendants, for use as a component of gasoline.

   (b)   The refiner/marketer defendants, and each of them, refined, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered to commercial and consumer users such as retail gasoline stations and other gasoline

27

delivery systems in the State (and areas affecting waters of the State). Such supplies and deliveries of gasoline containing MTBE to such users in the State occurred over time and continue to occur.

(c)     Gasoline containing MTBE was released and continues to be released to the subsurface from retail gasoline facilities, from other commercial and consumer uses, and from other sources at locations throughout the State and/or in areas affecting waters of the State. Such releases of gasoline containing MTBE have occurred over time and are still occurring, all in varying amounts at different locations.

(d)     MTBE, which takes time to migrate from release points through the subsurface to locations where it may be detected in groundwater, has migrated from dispersed release points at or near the surface at retail gasoline facilities and other sources and facilities within or near the State's boundaries, causing and threatening to cause pollution, contamination, and substantial and continuing damage to the waters of the State, including drinking water, causing damage to the State at such times and in amounts within the jurisdictional limits of this Court.

(e)     Gasoline containing MTBE was released and continues to be released to surface waters of the State through normal consumer usage, including use of motorized watercraft, snowmobiles and other sources at dispersed locations throughout the State. Such

28

releases of gasoline containing MTBE have occurred over time and are still occurring, all in varying amounts at different locations, causing and threatening to cause contamination and substantial and continuing damage to the waters of the State, including drinking water, causing damage to the State at such times and in amounts within the jurisdictional limits of this Court.

73.    At all times relevant to this action, the refiner/marketer defendants together controlled virtually the entire market for gasoline containing MTBE in New Hampshire.

74.    MTBE is a fungible product.  Once released into the environment, MTBE lacks characteristics or a chemical signature that would enable identification of the refinery or company that manufactured the product.  Even when a source of a plume of MTBE – such as a leaking underground storage tank – is identified, the identity of the manufacturer of the MTBE and refiner of the offending gasoline frequently cannot be determined due to the refiner/marketer defendants' practice of trading, bartering, or otherwise exchanging their product with each other, as well as the chemical characteristics of MTBE.

75.    Defendants, and each of them, are jointly and severally liable for the costs and damages alleged herein.

76.    The injuries to the waters of the State caused and/or threatened by defendants' conduct as alleged herein constitute an unreasonable interference with natural resources that the State holds in trust for the benefit of the public.  Such injuries also constitute damages to limited, precious and invaluable public resources in which the State

29

has a significant property and quasi-sovereign interest. The State's unique interest in protecting the quality of its Waters constitutes a reason personal to the State for seeking damages for restoration of such waters.

## COUNT I

### (Strict Product Liability Based On Defective Design Against All Defendants)

77.     The State realleges paragraphs 1 through 76 above, and by this reference incorporates them as though set forth in full.

78.     The manufacturer defendant designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE to refiners, including certain refiner/marketer defendants, for use as a component of gasoline.

79.     The refiner/marketer defendants, and each of them, designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State).

80.     Defendants, and each of them, represented, asserted, claimed and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.

81.     Defendants, and each of them, knew that MTBE and/or gasoline containing MTBE were to be purchased and used without inspection for defects.

82.     MTBE and/or gasoline containing MTBE are defective and unreasonably dangerous products because, among other things:

(a)     MTBE escapes more readily from gasoline delivery systems than

30

the constituents of conventional gasoline.

(b)     MTBE causes extensive groundwater contamination, as well as surface water contamination, when used in its foreseeable and intended manner.

(c)     Even at extremely low levels, MTBE renders drinking water putrid, foul, and unfit for purveying as drinking water to the public.

(d)     MTBE poses significant threats to the public health and welfare and the environment.

(e)     Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of MTBE.

(f)     At all times relevant to this action, feasible alternatives to MTBE that would have eliminated the unreasonable danger posed by gasoline containing MTBE, without excessive costs or loss of product efficiency, were available to defendants.

(g)     Commercial grade MTBE is defectively manufactured when it contains and/or degrades into unnecessary but environmental harmful impurities such as tertiary butyl alcohol.

83.     At all times relevant to this action, MTBE and/or gasoline containing MTBE were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment posed by MTBE and/or gasoline containing MTBE outweighed the cost to defendants of reducing or eliminating such risk.

31

84.    At all time relevant to this action, MTBE and gasoline containing MTBE were used in a manner in which they were foreseeably intended to be used and without substantial change in their condition, and as a proximate result of the defects previously described, MTBE proximately caused the State to sustain the injuries and damages set forth in this Writ.

85.    As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred, is incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the waters of the State with MTBE, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

86.    As a further direct and proximate result of the acts and omissions of the defendants alleged in this Writ, the State has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

87.    The injuries to the waters of the State caused and/or threatened by defendants' acts and omissions as alleged herein are indivisible.

88.    Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of the waters of the State, public and private drinking water supplies, and property damage.  Nonetheless, the defendants identified in this paragraph intentionally failed to warn downstream handlers, the public and government

32

officials, including the State, as to the threat caused by MTBE, and engaged in separate and joint activities to suppress, conceal and/or minimize information regarding MTBE hazards in order to mislead government agencies, including the State, and the public regarding such hazards. These defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice and with conscious disregard of the health and safety of others, and of the State's interest in protecting its natural resources.

89.     The conduct alleged herein was performed to promote sales of MTBE and/or gasoline containing MTBE in conscious disregard of the known risks of injury to health, property and the environment. The defendants identified in the preceding paragraph acted with willful and conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the citizens and natural resources of the State. Therefore, the State requests an award of enhanced damages against these defendants that fairly reflects the aggravating circumstances alleged herein. After the completion of additional investigation and discovery, the State may seek leave of court to amend this Writ to allege a claim for enhanced damages against additional defendants if warranted by the facts.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

## COUNT II
### (Strict Product Liability Based On Failure to Warn Against All Defendants)

90.     The State realleges paragraphs 1 through 89 above, and by this reference incorporates them as though set forth in full.

33

91.     The manufacturer defendant designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE to refiners, including certain refiner/marketer defendants, for use as a component of gasoline.

92.     The refiner/marketer defendants, and each of them, designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State).

93.     Defendants, and each of them, represented, asserted, claimed and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.

94.     Defendants, and each of them, knew that MTBE and/or gasoline containing MTBE were to be purchased and used without inspection for defects.

95.     MTBE and/or gasoline containing MTBE are defective and unreasonably dangerous products for the reasons set forth in Paragraph 82 above.

96.     Defendants, and each of them, knew, or reasonably should have known, of the foreseeable risks and defects of MTBE and/or gasoline containing MTBE. Defendants nonetheless failed to provide adequate warnings of the known and foreseeable risks of MTBE and/or gasoline containing MTBE, including contamination of groundwater with MTBE.

97.     MTBE and/or gasoline containing MTBE were used in a manner in which they were foreseeably intended to be used, and as a proximate result of defendants' failure to warn of the risks of MTBE and/or gasoline containing MTBE that were known

34

to them, MTBE contaminates and threatens the waters of the State, causing the State to sustain the injuries and damages set forth in this Writ.

98.     As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred, is incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the waters of the State with MTBE, in an amount within the jurisdictional limit of this Court, for which defendants are strictly, jointly and severally liable.

99.     As a further direct and proximate result of the acts and omissions of the defendants alleged in this Writ, the State has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

100.    The injuries to the waters of the State caused and/or threatened by defendants' acts and omissions as alleged herein are indivisible.

101.    For the reasons set forth and specifically alleged in paragraphs 88 through 89, the State is entitled to an award of enhanced damages against defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero that fairly reflects the aggravating circumstances alleged herein.  After the completion of additional investigation and discovery, the State may seek leave of court to amend this Writ to allege a claim for enhanced damages against additional defendants if warranted by the facts.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

## COUNT III

### (Public Nuisance Against All Defendants)

102.   The State realleges paragraphs 1 through 101 above, and by this reference incorporates them as though set forth in full.

103.   The negligent, reckless, intentional and ultrahazardous activity of defendants, and each of them, alleged herein has resulted in the contamination and pollution of the waters of the State as alleged herein, and constitutes a public nuisance.

104.   The public nuisance caused, contributed to, maintained, and/or participated in by defendants, and each of them, has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the State's significant property and quasi-sovereign interests in the waters of the State, the State's ability to protect, conserve and manage the waters of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public, as well as the rights of the people of the State to enjoy a water supply free from unacceptable health risk, taste, odor, pollution, and contamination.

105.   Each defendant has, at all times relevant to this action, caused, maintained, participated in and/or assisted in the creation of such public nuisance. Among other things, each defendant is a substantial contributor to such public nuisance as follows:

(a)   The manufacturer defendant manufactured, promoted and supplied MTBE to refiners when it knew, or reasonably should have known, that: (i) the refiners would in turn blend the MTBE into gasoline; (ii) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the State; (iii)

36

MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and (iv) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

(b)     The refiner/marketer defendants, and each of them, refined, marketed and/or otherwise supplied gasoline containing MTBE that was delivered into the State (and areas affecting the waters of the State), when they knew, or reasonably should have known, that: (i) such gasoline would be placed into leaking gasoline delivery systems; (ii) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and (iii) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

(c)     Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Irving, Shell, Sunoco, Texaco, Unocal and Valero had first-hand knowledge and experience regarding leaking gasoline delivery systems and releases of MTBE to groundwater

37

therefrom. These defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or controlled individual gasoline stations with leaking gasoline delivery systems, including gasoline stations in the State.

(d)     Defendants, and each of them, manufactured, refined, marketed, promoted, and/or otherwise supplied MTBE and/or gasoline containing MTBE to downstream handlers, when they knew, or reasonably should have known, that MTBE would: (i) be released into the environment from commercial and consumer uses and sources in the State other than gasoline delivery systems; and (ii) contaminate the waters of the State.

(e)     Despite their knowledge that contamination of the waters of the State with MTBE was the inevitable consequence of their conduct as alleged herein, defendants, and each of them, failed to provide any warnings or special instructions, or take any other precautionary measures to prevent or mitigate such contamination.

(f)     Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero engaged in separate and joint activities to suppress, conceal and/or minimize information regarding the hazards of MTBE in order to mislead government agencies, including the State, and the public regarding the hazards of MTBE.

38

106.    The public nuisance caused, contributed to, maintained, and/or participated in by defendants, and each of them, has caused and/or threatens to cause substantial injury to the waters of the State, in which the State has significant property rights and quasi-sovereign interests.

107.    The contamination of the waters of the State with MTBE alleged herein has varied over time and has not yet ceased. MTBE continues to threaten, migrate into and enter the waters of the State.

108.    As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred, is incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the waters of the State with MTBE, in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

109.    As a further direct and proximate result of the acts and omissions of the defendants alleged in this Writ, the State has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

110.    The injuries to the waters of the State caused and/or threatened by defendants' acts and omissions as alleged herein are indivisible.

111.    For the reasons set forth and specifically alleged in paragraphs 88 through 89, the State is entitled to an award of enhanced damages against defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero that fairly reflects the aggravating circumstances alleged herein. After the

39

completion of additional investigation and discovery, the State may seek leave of court to amend this Writ to allege a claim for enhanced damages against additional defendants if warranted by the facts.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

## COUNT IV

### (Strict Liability Under RSA 146-A/146-G Against All Defendants)

112.    The State realleges paragraphs 1 through 111 above, and by this reference incorporates them as though set forth in full.

113.    RSA 146-A:3 provides that the discharge or spillage of oil into the surface water or groundwater of this State, or in a land area where the oil will ultimately seep into surface water or groundwater is prohibited.

114.    MTBE is an "oil" as defined in RSA 146-A, which includes petroleum products and their by-products of any kind, and in any form.

115.    RSA 146-A:3-a provides that any person who, without regard to fault, directly or indirectly causes or suffers the discharge of oil into or onto any surface water or groundwater of this State, or in a land area where oil will ultimately seep into any surface water or groundwater of the State in violation of chapter 146-A, or rules adopted thereunder, shall be strictly liable for costs directly or indirectly resulting from the violation relating to: (a) containment of the discharged oil; (b) cleanup and restoration of the site and surrounding environment, and corrective measures as defined under RSA 146-A:11-a, III(a) and (b); and (c) removal of the oil.

40

116.    RSA 146-A:9 and 146-G:3 expressly authorize the Attorney General, on behalf of the State, to recover or obtain judgment for the costs of containment, cleanup, removal and corrective measures.

117.    Defendants, and each of them, directly or indirectly caused or suffered the discharge of oil in the form of MTBE into or onto the waters of the State and/or in a land area where MTBE has seeped or will ultimately seep into the waters of the State, in violation of RSA 146-A and rules duly adopted by the State.

118.    As a direct or indirect result of such violations, the State has incurred, is incurring, and will continue to incur substantial costs including, but not limited to, costs relating to: (a) the investigation, containment, cleanup and removal of the discharged MTBE; (b) restoration of waters of the State contaminated by such discharges; and (c) the institution of corrective measures including, but not limited to, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage in amounts within the jurisdictional limits of this Court.

119.    Defendants are strictly, jointly and severally liable for any and all such costs and damages that the State has incurred and will incur as a result of defendants' actions.

120.    Defendants are subject to civil penalties under RSA 146-A:14.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

41

## COUNT V

### (Trespass Against All Defendants)

121.    The State realleges paragraphs 1 through 120 above, and by this reference incorporates them as though set forth in full.

122.    The State is the owner and/or actual possessor of property rights and interests in the waters of the State, as alleged herein, which the State holds in trust for the benefit of the public.  These property rights and interests include, but are not limited to, a quasi-sovereign interest in protecting the quality of such waters from contamination and pollution.

123.    Defendants, and each of them, intentionally manufactured, refined, marketed, and/or otherwise supplied MTBE and/or gasoline containing MTBE with the knowledge that contamination of the waters of the State with MTBE was substantially certain to result.

124.    Among other things, defendants, and each of them, intentionally caused MTBE to enter, invade, intrude upon and injure the waters of the State as follows:

   (a)    The manufacturer defendant manufactured, promoted and supplied MTBE to refiners when it knew that it was substantially certain that: (i) the refiners would in turn blend the MTBE into gasoline; (ii) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the State; (iii) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and (iv) when released into the subsurface, MTBE would spread farther and

42

faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

(b)     The refiner/marketer defendants, and each of them, refined, marketed and/or otherwise supplied gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State), when they knew that it was substantially certain that: (i) such gasoline would be placed into leaking gasoline delivery systems; (ii) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and (iii) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

(c)     Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Irving, Shell, Sunoco, Texaco, Unocal and Valero had first-hand knowledge and experience regarding leaking gasoline delivery systems and releases of MTBE to groundwater therefrom.  These defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or

43

controlled individual gasoline stations with leaking gasoline delivery systems, including gasoline stations in the State.

(d)     Defendants, and each of them, manufactured, refined, marketed, promoted, and/or otherwise supplied MTBE and/or gasoline containing MTBE to downstream handlers, when they knew that it was substantially certain that MTBE would: (i) be released into the environment from commercial and consumer uses and sources in the State other than gasoline delivery systems; and (ii) contaminate the waters of the State.

(e)     Despite their knowledge that groundwater contamination with MTBE was the inevitable consequence of their conduct as alleged herein, defendants, and each of them, failed to provide any warnings or special instructions, or take any other precautionary measures to prevent or mitigate such contamination.

(f)     Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero engaged in separate and joint activities to suppress, conceal and/or minimize information regarding the hazards of MTBE in order to mislead government agencies, including the State, and the public regarding the hazards of MTBE.

125.     The contamination of the waters of the State with MTBE alleged herein has varied over time and has not yet ceased.  MTBE continues to threaten, migrate into and enter the waters of the State.

44

126.    The State has not consented to and does not consent to the trespass alleged herein.  Defendants, and each of them, knew or reasonably should have known, that the State would not consent to this trespass.

127.    As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred, is incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the waters of the State with MTBE, in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

128.    As a further direct and proximate result of the acts and omissions of the defendants alleged in this Writ, the State has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

129.    The injuries to the waters of the State caused and/or threatened by defendants' acts and omissions as alleged herein are indivisible.

130.    For the reasons set forth and specifically alleged in paragraphs 88 through 89, the State is entitled to an award of enhanced damages against defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero that fairly reflects the aggravating circumstances alleged herein.  After the completion of additional investigation and discovery, the State may seek leave of court to amend this Writ to allege a claim for enhanced damages against additional defendants if warranted by the facts.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

45

## COUNT VI

### (Negligence Against All Defendants)

131.    The State realleges paragraphs 1 through 130 above, and by this reference incorporates them as though set forth in full.

132.    Defendants had a duty to the State to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

133.    Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise entrusted MTBE and gasoline containing MTBE that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the State, resulting in the damages alleged in this Writ.

134.    Defendants, and each of them, failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute public water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

135.    The manufacturer defendant, among other things, manufactured, promoted and/or otherwise supplied MTBE to refiners when it knew, or reasonably should have known, that: (a) the refiners would in turn blend the MTBE into gasoline; (b) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the State; (c) MTBE would be released even more readily than the

46

constituents of conventional gasoline from gasoline delivery systems; and (d) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

136.    The refiner/marketer defendants, and each of them, among other things, refined, marketed, and/or otherwise supplied gasoline containing MTBE that was delivered into the State and/or in areas affecting waters of the State, when they knew, or reasonably should have known, that: (a) such gasoline would be placed into leaking gasoline delivery systems; (b) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and (c) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

137.    Defendants Hess, Citgo, Chevron, ConocoPhillips, El-Paso, ExxonMobil, Gulf, Irving, Shell, Sunoco, Texaco, Unocal and Valero also had first-hand knowledge and experience regarding leaking gasoline delivery systems and releases of MTBE to groundwater therefrom.  These defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or controlled individual gasoline stations with leaking gasoline delivery systems, including gasoline stations in the State.

138.    Defendants, and each of them, manufactured, refined, marketed, promoted and/or otherwise supplied MTBE and/or gasoline containing MTBE to downstream handlers, when they knew, or reasonably should have known, that MTBE would: (i) be

released into the environment from commercial and consumer uses and sources in the State other than gasoline delivery systems; and (ii) contaminate the waters of the State.

139.   Despite their knowledge that groundwater contamination with MTBE was the inevitable consequence of their conduct as alleged herein, defendants, and each of them, failed to provide any warnings or special instructions, or take any other precautionary measures to prevent or mitigate such contamination.

140.   In light of the facts alleged herein, defendants, and each of them, breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

141.   As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred, is incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the waters of the State with MTBE, in an amount within the jurisdictional limit of this Court, for which defendants are jointly and severally liable.

142.   As a further direct and proximate result of the acts and omissions of the defendants alleged in this Writ, the State has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limit of this Court, for which defendants are jointly and severally liable.

143.   The injuries to the waters of the State caused and/or threatened by defendants' acts and omissions as alleged herein are indivisible.

144.    For the reasons set forth and specifically alleged in paragraphs 88 through 89, the State is entitled to an award of enhanced damages against defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero that fairly reflects the aggravating circumstances alleged herein.  After the completion of additional investigation and discovery, the State may seek leave of court to amend this Writ to allege a claim for enhanced damages against additional defendants if warranted by the facts.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

## COUNT VII

### (Unfair or Deceptive Business Acts In Violation of RSA 358-A:2 Against All Defendants)

145.    The State realleges paragraphs 1 through 144 above, and by this reference incorporates them as though set forth in full.

146.    The State enforces Consumer Protection laws through the Attorney General, who is expressly authorized to seek on behalf of New Hampshire consumers redress for deceptive trade practices.

147.    Defendants, and each of them, have engaged in acts and/or practices in the conduct of trade and commerce within the State that is unfair and deceptive in violation of RSA 358-A:2 in connection with their design, testing, manufacture, promotion, marketing and supply of gasoline containing MTBE.  Such acts and/or practices include, but are not limited to, the following:

(a)    Defendants, and each of them, represented that MTBE and/or gasoline containing MTBE were environmentally sound products appropriate for widespread production and use, when they were not

49

environmentally sound and appropriate for widespread production

and use.

(b)     Despite their knowledge that MTBE is more readily released from

gasoline delivery systems than conventional gasoline components,

and that, once released into the environment, the fate and transport

of MTBE in the subsurface differs significantly from that of

conventional gasoline constituents, defendants represented that

gasoline containing MTBE does not require special handling,

storage or other procedures to mitigate or prevent the special

dangers posed by MTBE.

(c)     Despite their knowledge that environmental contamination, and

particularly drinking water contamination, with MTBE was the

inevitable consequence of their conduct, defendants, and each of

them, failed to provide any warnings or special instructions

regarding the threat caused by MTBE, or take any other

precautionary measures to prevent or mitigate such contamination.

(d)     Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil,

Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero

engaged in separate and joint activities to suppress, conceal and/or

minimize information regarding the hazards of MTBE in order to

mislead government agencies, including the State, and the public

regarding such hazards.

50

148.   By committing the acts and omissions alleged above, among others, defendants, and each of them, have used unfair or deceptive acts or practices in violation of RSA §358-A:2.

149.   Pursuant to RSA 358-A:4, b, each defendant is subject to civil penalties of up to $10,000 for each violation.

150.   Pursuant to RSA 358-A:6, IV, defendants are subject to an award of the State's legal costs and expenses.

151.   Pursuant to RSA 358-A:5, prior notice to defendants of this action is unnecessary because the Attorney General has reason to believe that defendants would take action to the immediate and irreparable harm of the public if such notice were provided.

WHEREFORE, the State prays judgment against defendants as set forth hereafter.

## PRAYER FOR RELIEF

WHEREFORE, the State of New Hampshire respectfully requests a trial of this Action before a jury, and that, upon a favorable verdict, this Honorable Court enter judgment in favor of the State and against defendants, jointly and severally, as follows:

A.   Declare that defendants are jointly and severally liable for the full cost of all investigatory, remedial and other actions necessary to detect, abate, remove and remediate MTBE in the waters of the State and to restore such waters to their original condition, and for such orders as may be necessary to provide full relief to address risks to the State.

B.   Pursuant to RSA 146-A:3-a, order defendants to pay all costs related to investigation, containment, cleanup, restoration, corrective measures (as defined in RSA

51

146-A:11-a, III(a) and (b)) and removal directly or indirectly resulting from the contamination of waters of the State with MTBE.

C.    Order defendants to pay compensatory damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE, including but not limited to, the costs of:

> (1) testing all public and private drinking water supplies for the presence of MTBE;

> (2) treatment of all water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

> (3) present and future monitoring of surface and groundwaters to detect the presence of MTBE.

D.    Order defendants to pay all other damages sustained by the State as a direct and proximate result of defendant's acts and omissions alleged herein, according to proof, including but not limited to  remedial, administrative, oversight and legal expenses and compensation for damage to waters of the State.

E.    Order defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Texaco, Unocal and Valero to pay enhanced damages that fairly reflect the aggravating circumstances alleged herein.

F.    Order defendants to pay all appropriate civil penalties to the maximum extent permitted by law.

52

---

G.   Grant all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State.

H.   Order defendants to pay costs, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law.

I.   Grant such other further relief as this Honorable Court deems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL COUNTS SO TRIABLE.**

THE STATE OF NEW HAMPSHIRE

PETER W. HEED
ATTORNEY GENERAL

Dated:  September 30, 2003      By: *Maureen D. Smith*

Maureen D. Smith
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679

ORR & RENO, P.A.

Dated:  September 30, 2003      By: *Martha Van Oot*

Martha Van Oot
Orr & Reno, P.A.
One Eagle Square
P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381

53

OF COUNSEL:

SHER & LEFF, LLP
Victor M. Sher (Admitted in California)
Todd E. Robins (Admitted in California)
450 Mission Street, Suite 500
San Francisco, CA 94105
Tel: (415) 348-8300

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted in Massachusetts)
1280 Centre Street, Suite 230
Newton Center, MA 02459
Tel: (617) 641-9550

DECLARATION
*State of New Hampshire v. Amerada Hess Corp., et al.*

Exhibit 1
Page 55 of 55

# Exhibit 2

000004

1  Duane C. Miller, #57812
   Victor M. Sher, #96197
2  A. Curtis Sawyer, Jr. #101324
   **MILLER & SHER**
3  A Professional Corporation
   7 Park Center Drive, Suite 1
4  Sacramento, CA 95825-5407
   Telephone: (916) 924-8600
5  Facsimile: (916) 924-3426

6  Kevin J. Neese, #158492
   **HATCH & PARENT**
7  21 East Carrillo Street
   Santa Barbara, CA 93101
8  Telephone: (805) 963-7000
   Facsimile: (805) 965-4333

9
   Attorneys for Plaintiff
10 South Tahoe Public Utility District

Exempt From
Filing Fee
[Govt Code, § 6103]

ENDORSED
F I L E D
San Francisco County Superior Court

NOV 1 0 1998

ALAN CARLSON, Clerk
BY: _____
               DEBORAH ...
                     Deputy Clerk

PLAN I
STATUS CONFERENCE DATE:  APR 1 6 1999
9.00 A.M.

11        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12           **IN AND FOR THE COUNTY OF SAN FRANCISCO**

13 SOUTH TAHOE PUBLIC UTILITY          )
   DISTRICT;                           )   NO. **999128**
14                                     )
         Plaintiff,                    )   **COMPLAINT FOR DAMAGES**
15                                     )   **AND OTHER RELIEF**
   vs.                                 )   **(MTBE CONTAMINATION):**
16                                     )   **(1) STRICT LIABILITY;**
   ATLANTIC RICHFIELD COMPANY          )   **(2) NEGLIGENCE;**
17 ("ARCO"); ARCO CHEMICAL             )   **(3) TRESPASS;**
   COMPANY; SHELL OIL COMPANY;         )   **(4) NUISANCE;**
18 CHEVRON U.S.A., INC.; EXXON         )   **(5) DECLARATORY RELIEF; and**
   CORPORATION; B.P. AMERICA,          )   **(6) UNFAIR COMPETITION.**
19 INC.; TOSCO CORPORATION;            )
   ULTRAMAR, INC.; BEACON OIL          )
20 CO.; USA GASOLINE CORPORATION;)
   SHELL OIL PRODUCTS CO.;             )
21 TERRIBLE HERBST, INC.; ROTTEN )
   ROBBIE; J.E. TVETEN, CORP.;         )
22 TAHOE TOM'S GAS STATION; THE        )
   SOUTHLAND CORP.; PARADISE           )
23 CHEVRON; and DOES 1 through         )
   600, inclusive,                     )
24                                     )
         Defendants.                   )
25 _____)

26      Plaintiff, South Tahoe Public Utility District ("the

27 District"), alleges that at all relevant times:

28 / / /

Exhibit 2
Page 1 of 27

# I.  **SUMMARY OF THE CASE.**

1.  Ten plumes of methyl tertiary butyl ether ("MTBE") have contaminated and threaten the drinking water of approximately 12,700 homes and businesses in and around South Lake Tahoe, California.  The District is responsible for purveying drinking water to those homes and businesses.  Since September of 1997, the MTBE contamination has forced the District to stop pumping twelve (12) of its thirty-four (34) wells to protect its customers.  MTBE contamination forced the District last summer to institute a water conservation program and mandatory water use restrictions.

2.  The District has filed this lawsuit to recover the funds needed to secure alternative water supplies, to treat contaminated water, to abate and remove MTBE pollution, and to assure that the responsible parties – and not the District's customers – bear the expense.

3.  MTBE is an additive to gasoline sold in South Lake Tahoe.  It constitutes approximately eleven percent (11%) by volume of the finished products ultimately sold at gasoline pumps.

4.  MTBE reaches the environment through leaks and spills in gasoline storage, transfer, delivery, and dispensing systems ("gasoline systems").  Once released to the environment from gasoline systems, MTBE has a unique capacity to cause extensive environmental contamination and a corresponding threat to public health.  The chemical properties of MTBE enable it to move readily through soil into groundwater, where it is quite persistent.  Moreover, MTBE exacerbates pollution by other

2

Exhibit 2
Page 2 of 27

constituents of gasoline.

5. MTBE is known to cause cancer in animals, and is linked to a wide variety of threats to human health. Groundwater contaminated with MTBE is unsuitable for purveying to the District's customers. At extremely low concentrations – as little as 2 parts per billion (2 ppb) in some studies – MTBE can change the taste and odor of Tahoe's pristine snow melt into a foul smelling liquid with a turpentine odor and chemical taste which renders the water unfit for human consumption.

6. MTBE is many times more soluble in water than other components of gasoline. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other major constituents of gasoline. When MTBE and gasoline are spilled on the ground, the traditional gasoline components tend to bind or adsorb to soil. In contrast, MTBE races to groundwater where it degrades very slowly and it keeps moving and can quickly contaminate entire aquifers.

7. The defendants in this action are the designers, manufacturers, formulators, distributors, and retailers of the MTBE that contaminates and threatens the District's wells. In general, the defendants marketed MTBE in South Lake Tahoe, when they knew (or reasonably should have known) that MTBE would reach groundwater, pollute public water supplies, and threaten the public health. In particular, defendants have known for at least three decades that gasoline systems leak and cause extensive contamination. Moreover, defendants have known since at least 1986 that MTBE would exacerbate groundwater pollution from other

3

Exhibit 2
Page 3 of 27

toxic constituents of gasoline.  Nonetheless, defendants failed
to test MTBE adequately for environmental fate, human health
risks, and contamination potential, failed to take adequate steps
to assure that MTBE would not reach groundwater, pollute the
environment, and ruin drinking water supplies, and failed to warn
purchasers, regulatory officials, and the public of the dangers
of MTBE.

8.   The problems of leaking gasoline systems have been well
documented for decades.  Historically, the industry took few, if
any, measures to protect against leaks.  By some estimates, 50
percent of these underground gasoline tanks or their connecting
pipes leak.

9.   By 1988, the federal government instituted a mandatory
program to upgrade and replace these systems with leak detection
systems and double walled fiberglass tanks.  Since 1995,
California gasoline stations have also been required to install
containment facilities for gasoline dispensers under certain
conditions.  However, many gasoline stations still have
deteriorated and leaking systems with partial containment.  For
example, at least three of the MTBE plumes in South Lake Tahoe
come from leaking gasoline systems at stations with new storage
tanks and leak detection systems.

10.   MTBE has caused a statistically significant increase in
the incidence of cancer in scientific studies conducted on at
least two species of laboratory animals by multiple routes of
exposure.  The independent scientific community generally
classifies any chemical with these characteristics as a probable
human carcinogen.  In these studies, exposure to MTBE was

4

Exhibit 2
Page 4 of 27

associated with leukemia, lymphomas, testicular tumors, kidney cancer, and liver cancer.   Two metabolic by-products of MTBE – formaldehyde and tertiary butyl alcohol (TBA) – have also caused cancer in scientific experiments.

11.   The manufacturer defendants, who have promoted the use of MTBE for its purported environmental benefits, knew or should have known of the terrible downside of the proliferating use of the compound: widespread pollution of groundwater, contamination of drinking water, and threats to public health.

12.   Despite knowing that MTBE pollution was inevitable, defendants chose not to warn customers, retailers, or public officials, including the District.   As MTBE production and sales soared to record heights, defendants failed to warn that unless special precautions were taken, and prompt efforts were made to prevent, detect and clean-up spills and leaks, more and more MTBE would be released into the environment and cause long term groundwater contamination.

13.   Defendants further exacerbated the situation by indiscriminately selling MTBE to gas stations without appropriate warnings and precautions: (1) knowing that a large percentage of those gasoline stations would store MTBE in leaking gasoline systems; (2) knowing that certain gasoline stations possessed antiquated, rusted, and compromised gasoline systems which had not been upgraded or replaced; (3) knowing that underground storage tanks located in the areas of shallow groundwater, such as South Lake Tahoe, are subject to faster rates of deterioration and corrosion; and (4) knowing that MTBE accelerated the corrosion or failure rate of gasoline systems.

5

Exhibit 2
Page 5 of 27

14.   The District seeks millions of dollars in compensatory damages needed to investigate, remediate, and/or treat MTBE contamination, to secure alternative water supplies, distribution and transmission systems, and for damage to the District's water rights.   In addition, the District seeks punitive damages to punish certain defendants and deter future conduct and disgorgement of the manufacturers' MTBE related profits.

## II.  **THE PLAINTIFF.**

15.   Plaintiff, South Tahoe Public Utility District ("the District") is a public entity formed in 1950 pursuant to the Public Utility District Act, Public Utilities Code sections 15501, *et seq.*, with the power to sue under Public Utilities Code section 16402.   The District serves more than 12,700 homes and businesses in the South Lake Tahoe area which depend upon the District for their drinking water.   The District is charged with the responsibility of owning and operating a public water system, including approximately thirty-four (34) drinking water wells with related and ancillary equipment, pumps, pipes, water treatment equipment, delivery systems and infrastructure which will be referred to collectively as the "water system."   The water system includes the District's right to appropriate and use groundwater for water supplies.

16.   The District is a public water system that has incurred, is incurring, and will incur MTBE remediation or treatment costs.   By this action, the District seeks to recover, among other damages, the full cost of MTBE remediation and treatment from the defendants in this action, who are parties responsible for the MTBE contamination, pursuant to Water Code

6

Exhibit 2
Page 6 of 27

section 13285 and Health and Safety Code section 116366.

### III.   THE DEFENDANTS.

#### A.   The Manufacturer Defendants.

17.   Defendant, Atlantic Richfield Company ("ARCO"), is a corporation with its principal place of business located in Los Angeles, California.

18.   Defendant, ARCO Chemical Company ("ARCO Chemical"), is a corporation with its principal place of business located in Los Angeles, California.

19.   Defendant, Shell Oil Company ("Shell"), is a Delaware corporation with its principal place of business in Houston, Texas.

20.   Defendant, Chevron U.S.A., Inc. ("Chevron"), is a corporation with its principal place of business in San Francisco, California.

21.   Defendant, Exxon Corporation ("Exxon"), is a New Jersey corporation with its principal place of business in Irving, Texas.

22.   Defendant, B.P. America, Inc. ("B.P."), is a Delaware corporation with its principal place of business Cleveland, Ohio.

23.   Defendant, TOSCO Corporation ("TOSCO"), is a Nevada corporation with its principal place of business in Stamford, Connecticut.

24.   Defendant, Beacon Oil Co. ("Beacon"), is a Nevada corporation with its principal place of business in San Antonio, Texas.

25.   Plaintiff is ignorant of the true names and/or capacities of the defendants sued under the fictitious names DOES

7

Exhibit 2
Page 7 of 27

1 | 1 through 250, inclusive.

2 |     26.   Defendants ARCO, ARCO Chemical, Shell, Chevron, Exxon,

3 | B.P., TOSCO, Beacon, and DOES 1 through 200, and each of them:

4 | (1) manufactured, formulated, distributed, transported, packaged,

5 | sold, spilled, and/or released MTBE in the State of California;

6 | (2) were legally responsible for and committed each of the

7 | tortious and wrongful acts alleged in this Complaint; and (3) in

8 | doing the tortious and wrongful acts alleged in the Complaint,

9 | acted in the capacity of aider, abettor, joint-venturer, partner,

10 | agent, principal, successor-in-interest, surviving corporation,

11 | fraudulent transferee, fraudulent transferor, controller, alter-

12 | ego, co-conspirator, licensee, licensor, patent holder and/or

13 | indemnitor of each of the remaining DOE and named defendants.

14 |     27.   Each of the defendants named in paragraphs 17 through

15 | 25 above, and DOE defendants 1 through 200, will be collectively

16 | referred to as the "manufacturer defendants" or "manufacturers."

17 |    **B.**   **Distributor Defendants.**

18 |     28.   Plaintiff is ignorant of the true names and/or

19 | capacities of the defendants sued herein under the fictitious

20 | names DOES 201 through 400, inclusive.

21 |     29.   Defendants DOES 201 through 400 ("distributor

22 | defendants" or "distributors"), and each of them: (1) purchased

23 | gasoline containing MTBE from one or more of the manufacturer

24 | defendants, and then resold the gasoline to one or more of the

25 | gasoline station defendants in the State of California; (2)

26 | supplied gasoline containing MTBE to gasoline station defendants

27 | in South Lake Tahoe; (3) were legally responsible for and

28 | committed each of the tortious and wrongful acts alleged in this

1 complaint; and (4) in doing the tortious and wrongful acts
2 alleged in the complaint, acted in the capacity of co-
3 conspirator, aider, abettor, joint-venturer, partner, agent,
4 principal, successor-in-interest, surviving corporation,
5 fraudulent transferee, fraudulent transferor, controller, alter-
6 ego, licensee, licensor, patent holder and/or indemnitor of each
7 of the remaining DOE and named defendants.

8    30.  In addition to engaging in the distributor activities
9 more fully described in paragraph 29 above, DOES 300 through 400
10 also engaged in the manufacturing acts and activities fully
11 described in paragraph 26 above, which is incorporated in full
12 herein.

13    C.  **The Gasoline Station Defendants.**

14    31.  Defendant, Rotten Robbie ("Rotten"), is a business
15 organization (form unknown) with its principal place of business
16 located at 2601 Lake Tahoe Boulevard in the City of South Lake
17 Tahoe, California.

18    32.  Defendant, J.E. Tveten Corporation, is a corporation
19 with its principal place of business located in El Dorado County,
20 California.

21    33.  Defendant, USA Gasoline Corporation ("USA Gasoline"),
22 is a California corporation with its principal place of business
23 located in Agoura Hills, California.  USA Gasoline is doing
24 business as USA Service Station No. 7 located at 1140 Emerald Bay
25 Road, South Lake Tahoe, California.

26    34.  Defendant, Ultramar, Inc. ("Ultramar"), is a Nevada
27 corporation with its principal place of business located in San
28 Antonio, Texas.

Exhibit 2
Page 9 of 27

35.   Defendant, Shell Oil Products Company ("Shell Oil Products"), is doing business as "Shell" at 1866 Santa Fe Road in Tahoe Paradise, California.  The headquarters of Shell Oil Products Company, a corporation, is located in Martinez, California.

36.   Defendant, Tahoe Tom's Gas Station ("Tahoe Tom's") is a business organization (form unknown) with its principal place of business at 4029 Lake Tahoe Boulevard, South Lake Tahoe, California.

37.   Defendant, The Southland Corporation ("Seven-Eleven"), is a Texas corporation with its principal place of business located in Dallas, Texas.

38.   Defendant, Terrible Herbst, Inc. ("Terrible"), is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

39.   Defendant, Paradise Chevron, is a business organization (form unknown), with its principal place of business located at 2986 Highway 50, Tahoe Paradise, California.  Plaintiff will seek leave of court to allege the true name and capacity of this defendant when ascertained.

40.   Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein under the fictitious names DOES 401 through 600, inclusive.

41.   The defendants named in paragraphs 31 through 39 above, and DOES 401 through 600, and each of them: (1) negligently operated, designed, constructed, owned, repaired, controlled, installed, inspected and/or fabricated gasoline stations, including, but not limited to, gasoline storage, transfer,

10

Exhibit 2
Page 10 of 27

1 delivery, and dispensing systems ("gasoline stations"); (2) were
2 legally responsible for and committed each of the tortious and
3 wrongful acts alleged in this complaint; and (3) in doing the
4 tortious and wrongful acts alleged in the complaint, acted in the
5 capacity of co-conspirator, aider, abettor, joint-venturer,
6 partner, agent, principal, successor-in-interest, surviving
7 corporation, fraudulent transferee, fraudulent transferor,
8 controller, alter-ego, licensee, licensor, patent holder and/or
9 indemnitor of each of the remaining DOE and named defendants.

10   42.   Each of the defendants named in paragraphs 31 through
11 39, and DOE defendants 401 through 600, are collectively referred
12 to as the "gasoline station defendants."

13 **IV.   <u>BACKGROUND OF MTBE</u>.**

14   43.   MTBE was first produced by ARCO in the 1960's, when
15 ARCO patented a process for removing branched olefins such as
16 isobutylene from hydrocarbon streams.  By 1979, some
17 manufacturers, including ARCO, sold MTBE as a gasoline octane
18 booster.

19   44.   Defendants ARCO and ARCO Chemical first marketed
20 "reformulated gasoline" or RFG under the brand name EC-1 in the
21 late 1980's in California.  This venture commenced a pattern of
22 extravagant and largely unsubstantiated environmental claims for
23 MTBE.  For example, defendants ARCO and ARCO Chemical claimed
24 that MTBE represented a "bold step into the future" and "clean-
25 fuel leadership" as they introduced what they called the nation's
26 first "environmentally engineered fuel."  At all times since,
27 defendants have presented to the public and government agencies
28 that MTBE was environmentally sound and appropriate for

11

Exhibit 2
Page 11 of 27

1  widespread use in gasoline.

2      45.   Components of gasoline (including benzene, toluene,
3  ethyl benzene, and xylene -- "BTEX" compounds) are more soluble
4  in MTBE than they are in water.  Because MTBE promotes the
5  migration and persistence of other toxic components of gasoline
6  (including, BTEX compounds), the presence of MTBE in gasoline
7  increases the size of resulting plumes and the concentration of
8  chemical contaminants within these plumes.

9      46. The manufacturers of MTBE should have thoroughly tested
10 MTBE to determine its environmental fate and potential human
11 health impact before they sold MTBE and should have taken
12 precautions necessary to assure that MTBE was properly stored and
13 instituted all necessary measures to contain and promptly abate
14 the inevitable spills and leaks.  Nonetheless, the defendants,
15 and each of them, failed to adequately test, store, warn, or
16 control MTBE and failed to abate groundwater contamination caused
17 by MTBE.

18     47.   Nationwide, neighborhood gasoline stations have
19 installed hundreds of thousands of gasoline systems to hold and
20 dispense gasoline.  Historically, the petroleum industry failed
21 to take even minimal precautions, such as using corrosion
22 protection coatings on tanks, to avoid leaks.  The major cause of
23 leaks is external and internal corrosion of aging, unprotected
24 tanks, as well as spills, overfills, and other accidental
25 releases.  A typical steel tank in close proximity to a large
26 body of water, such as Lake Tahoe, may begin to leak as a result
27 of corrosion within seven (7) years of installation.  As early as
28 1982, even petroleum industry experts estimated that between

12

Exhibit 2
Page 12 of 27

1  75,000 and 100,000 tanks were leaking, and up to 350,000

2  additional tanks would be leaking by 1987.  If connecting pipes

3  are included, a very large percentage (as many as 50%) of the

4  underground tank systems currently leak, and an even larger

5  percentage (up to 75 percent by some expert estimates) will

6  foreseeably leak before they are repaired or replaced.

7      48.  By 1988, the federal government instituted a mandatory

8  program to upgrade and replace existing gasoline systems with

9  leak detection systems and double walled tanks.  These systems

10  require periodic maintenance and testing to assure their

11  integrity.  Since 1995, California gasoline service stations have

12  also been directed to install containment facilities under

13  gasoline dispensers when new systems are installed or concrete is

14  broken for other work.  In 1998, California's Underground Storage

15  Tank work group found that "a large population of tanks have not

16  yet installed dispenser pans and are avoiding such construction

17  that would force them to do so."  Moreover, the work group found

18  that leak detection system maintenance and testing was not being

19  performed.

20      49.  The widespread problem of leaking gasoline systems was

21  well known to the manufacturer defendants prior to the

22  introduction of MTBE.  At least as early as the mid-1960's, the

23  MTBE manufacturers and distributors knew, or reasonably should

24  have known, that gasoline systems suffer widespread leaks and

25  failures, and release gasoline products into the environment,

26  including into groundwater.  For example, by 1969 the API had

27  established an underground leak prevention program.  By the

28  1970s, the adverse environmental effects of leaking gasoline

13

Exhibit 2
Page 13 of 27

1   systems were well recognized, both in the petroleum industry and
2   elsewhere.   In 1972, the API Committee on Environmental Affairs
3   published a study of the migration of petroleum in soil and
4   groundwater.   In 1977, the U.S. Environmental Protection Agency
5   issued *A Report to Congress: Waste Disposal Practices and Their*
6   *Effects on Groundwater*, identified leaks from gasoline service
7   stations as a common problem affecting groundwater quality, and
8   warned that in some gasoline spills "a substantial quantity of
9   fluid will percolate down to the water table . . . it will tend
10  to float or mix with the groundwater."

11       50.   In June 1980, the *National Petroleum News*, an oil
12  industry publication, published an article titled "Leak
13  Detection: Still Top Priority."   In January 1982, the *National*
14  *Petroleum News*, a specialized industry publication, called
15  leaking gasoline systems a "serious problem now – literally a
16  million time bombs in the form of USTs waiting to leak."   The
17  article reported that API was forming an "Oil Industry Leak
18  Alliance" to "determine the source of leaks and act promptly to
19  clean them up if no responsible party was ready or willing to do
20  so."   In 1983, another industry publication, *Super Service*
21  *Station,* described the leakage problem as a cause of "headlines
22  and headaches as industry finds new solutions to twenty year old
23  problem."   The magazine reviewed expert predictions about current
24  and future leaks and predicted "an epidemic of tank leaks in the
25  near future."

26       51.   Before introducing MTBE into the gasoline market, the
27  MTBE manufacturers and refiners knew, or reasonably should have
28  known, that MTBE released into the environment would mix easily

with groundwater, move great distances, and resist biodegradation
or bioremediation.   These defendants knew, or they reasonably
should have known, that the gasoline distribution and retail
system state-wide – and in South Lake Tahoe – contained old,
deteriorated, or leaking gasoline systems.   They knew, or they
reasonably should have known, that gasoline stations, including
those in South Lake Tahoe, commonly lacked adequate storage
facilities for MTBE-containing gasoline.

52.   By 1986, the MTBE manufacturers and distributors knew
or should have known that MTBE would contaminate groundwater.
For example, proceedings of a 1986 conference of the American
Petroleum Institute (API) included a scientific paper by P.
Garrett (Maine Department of Environmental Protection) and J.
Lowry (University of Maine) titled "MTBE as a Ground Water
Contaminant."   The API is an oil industry trade association, and
is the primary U.S. national trade association serving the
petroleum industry.   This paper concluded that MTBE's solubility
is substantially greater than the other components of gasoline;
the migration of MTBE in groundwater is more extensive than
gasoline components without MTBE; and that MTBE causes higher
levels of contamination for all gasoline components.   The paper
stated:

> [W]e infer that a plume of MTBE in ground
> water should be more extensive than the plume
> of other gasoline components.   There should
> be areas on the outer fringes of the total
> plume where MTBE is the only detectable
> contaminant.   The MTBE plume will appear as a
> "halo" around the dissolved gasoline plume,
> which in turn appears as a halo around the
> free product plume.   The greater solubility
> of MTBE in water, combined with the near 100%
> solubility of all gasoline components in MTBE

15

Exhibit 2
Page 15 of 27

may increase the sum total of all dissolved
gasoline components in groundwater.  If this
is so, then spills which contain MTBE should
result in higher concentrations of total
dissolved hydrocarbons in ground water than
spills with no MTBE.

53.  A later article by P. Garrett, M. Moreau, and J. Lowry
concluded:

> 1)  MTBE is a more soluble and more rapidly spreading
> ground water contaminant than other components of
> gasoline,
>
> 2)  Its presence in spilled gasoline increases
> dissolved concentrations of gasoline in ground
> water in the immediate vicinity of the spill to
> about an order of magnitude above typical values
> for spills in which there is no MTBE, and
>
> 3)  It is more difficult to remove from contaminated
> water than the other components of gasoline.

54.  Scientists have continued to highlight the problems
posed by MTBE in groundwater at all times up to and including the
present.  For example, a recent report (June 1998) by the
University of California's Lawrence Livermore National Laboratory
concluded (among other things), that

> 1.  <u>MTBE is a frequent and widespread contaminant in
> shallow groundwater throughout California</u>. . . . A
> minimum estimate of the number of MTBE-impacted
> sites in California is greater than 10,000.
>
> 2.  <u>MTBE plumes are more mobile than BTEX
> plumes</u>. . . .
>
> 3.  <u>The primary attenuation mechanism for MTBE is
> dispersion</u>. . . . MTBE is not significantly
> degrading in existing monitoring networks.  Thus,
> MTBE may be regarded as recalcitrant under site-
> specific conditions . . .
>
> 4.  <u>MTBE has the potential to impact regional
> groundwater resources and may present a cumulative
> contamination hazard</u>.

/ / /

16

Exhibit 2
Page 16 of 27

## FIRST CAUSE OF ACTION

### (Strict Liability Against All Defendants)

55.   The District refers to paragraphs 1 through 54 above, and by this reference incorporates them as though set forth in full.

56.   The manufacturer defendants, distributor defendants, and gasoline station defendants, and each of them, designed, manufactured, formulated, packaged, distributed and/or sold gasoline containing MTBE.

57.   Defendants, and each of them, represented, asserted, claimed and warranted that MTBE could be used in a manner which would not cause injury or damage.

58.   Defendants, and each of them, manufactured, compounded, packaged, designed, distributed, tested, constructed, fabricated, analyzed, recommended, merchandised, advertised, promoted, and sold MTBE and its constituents, which was intended by defendants, and each of them, to be used as a gasoline additive.

59.   Defendants, and each of them, knew that said product was to be purchased and used without inspection for defects.

60.   MTBE is a defective product because, among other things:

    (a) It causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

    (b) Even at extremely low levels, MTBE renders drinking water putrid, foul, and unfit for purveying to consumers;

    (c) MTBE poses significant threats to public health;

    (d) Defendants failed to provide adequate warnings of the known and foreseeable risks of MTBE; and

17

Exhibit 2
Page 17 of 27

1    (e) Defendants failed to conduct scientific studies to
2 evaluate its environmental fate and potential human health
3 effects of MTBE.

4    61.  MTBE was used in a manner in which it was foreseeably
5 intended to be used, and as a proximate result of the defects
6 previously described, MTBE proximately caused the District to
7 sustain the injuries and damages set forth in this complaint.

8    62. As a direct and proximate result of the acts and
9 omissions of the defendants alleged herein, the District must
10 initiate a remedial program to assess, evaluate, investigate,
11 monitor, remove, clean-up, correct, and abate MTBE contamination
12 which has contaminated District wells and threatens additional
13 wells and to secure alternative water supplies with related
14 transmission facilities at significant expense, loss, and damage.

15    63. As a further direct and proximate result of the acts and
16 omissions of the defendants alleged herein, the District will
17 sustain substantially increased expenses, loss of the use of
18 water and loss of appropriative water rights, all to the
19 District's damage in an amount within the jurisdiction of this
20 court.  The District is also entitled to recover costs incurred
21 in prosecuting this action and prejudgment interest to the full
22 extent permitted by law.

23    64. Defendants ARCO, ARCO Chemical, Shell, Chevron, Exxon,
24 and DOES 50 through 100 knew that it was substantially certain
25 that their alleged acts and omissions described above would
26 threaten public health and cause extensive contamination of
27 public drinking water supplies and property damage.  Defendants
28 committed each of the above described acts and omissions

1 knowingly, willfully, and with oppression, fraud, and/or malice
2 and with conscious disregard of the health and safety of others.

3     65.  This conduct is reprehensible, despicable, and was
4 performed with the intent to induce reliance by a class of
5 persons including their customers, the public, regulatory
6 agencies and the District on false and misleading
7 representations, and to promote sales of MTBE in conscious
8 disregard of the known risks of injury to health and property.
9 Defendants acted with wilful and conscious disregard of the
10 probable dangerous consequences of that conduct and its
11 foreseeable impact upon the District.  Therefore, the District
12 requests an award of exemplary damages in an amount sufficient to
13 punish defendants ARCO, ARCO Chemical, Shell, Chevron, and Exxon.
14 After the completion of additional investigation and discovery,
15 the District may seek leave of court to amend this complaint to
16 allege a claim for exemplary damages against additional
17 defendants if warranted by the facts.

18                    **SECOND CAUSE OF ACTION**

19               **(Negligence - Against All Defendants)**

20     66. The District realleges paragraphs 1 through 65,
21 inclusive, of this complaint and incorporates them herein by
22 reference.

23     67. Defendants had a duty to use due care in the design,
24 manufacture, formulation, handling, control, disposal, sale,
25 testing, labeling, use, and instructions for use of MTBE and
26 gasoline systems.

27     68. The defendants named herein so negligently, carelessly,
28 and recklessly designed, manufactured, formulated, handled,

1 labeled, instructed, controlled (or the lack thereof), tested (or
2 the lack thereof), released, spilled, and/or sold MTBE, and so
3 negligently, carelessly and recklessly dispensed, spilled, and
4 released gasoline containing MTBE and so negligently, carelessly,
5 and recklessly dispensed MTBE into gasoline systems, that they
6 breached their duties and directly and proximately caused MTBE to
7 contaminate the District's wells resulting in the compensatory
8 and punitive damages alleged in this complaint.

9      69.  Defendants, and each of them, among other things,
10 negligently failed to: (1) prevent leaks of MTBE through the use
11 of appropriate technology; (2) install and maintain gasoline
12 systems that prevented leaks and facilitated prompt detection and
13 containment of any leaks; (3) monitor and discover leaks as soon
14 as possible; (4) warn those who may be injured as a result of the
15 leak; and (5) stop leak(s) and clean-up MTBE spill(s) as soon as
16 reasonably possible.

17      70.  The defendant manufacturers had actual control over the
18 gasoline station defendants through a variety of means, including
19 written agreements, inspection rights, prescribing certain
20 procedures and operating practices, sale of branded goods, and
21 training.  Therefore, the defendant manufacturers had actual
22 control over the gasoline station defendants with leaking
23 gasoline systems and/or were vicariously liable for the acts and
24 conduct of the gasoline station defendants.

25      71.  The manufacturer defendants also undertook tank system
26 testing, tank integrity testing, inventory reconciliation and
27 testing thereby affirmatively undertaking the duty to prevent
28 tank leaks, but negligently failing to properly discharge these

1   duties.

2       72.   The manufacturer and distributor defendants knew, or
3   should have known, that certain of the gasoline station
4   defendants had leaking gasoline systems, but nonetheless
5   negligently entrusted MTBE gas to these gasoline station
6   defendants knowing that MTBE would leak into the soil and
7   contaminate groundwater.

8       73.   Defendants' conduct as alleged in this complaint
9   constitutes a violation of the MTBE Public Health and
10  Environmental Protection Act of 1997.

11      74.   As a direct and proximate result of defendants' acts
12  and omissions as alleged herein, the District is a public water
13  system that has incurred, is incurring, and will continue to
14  incur MTBE remediation and treatment costs and expenses required
15  to obtain alternative water supplies, in an amount to be proved
16  at trial.

17                    **THIRD CAUSE OF ACTION**

18                 **(Trespass Against All Defendants)**

19      75. The District realleges paragraphs 1 through 74,
20  inclusive  of this complaint and incorporates them herein by
21  reference.

22      76. The District is the owner and/or actual possessor of
23  property, easements, wells, the right to appropriate and use
24  groundwater, and water rights.  Defendants, their agents and
25  employees, knew, or in the exercise of reasonable care should
26  have known, that MTBE is extremely hazardous to groundwater.

27      77. The defendants so negligently, recklessly and/or
28  intentionally failed to properly control, handle, store, contain,

1   and use MTBE and/or clean-up spills and leaks of MTBE that they

2   directly and proximately caused MTBE to contaminate the

3   District's wells as follows:

4        (a) The defendants participated in the use, storage,

5   and release of MTBE by regulating, monitoring, and controlling

6   the storage,  disposal, and testing of tanks, gasoline systems,

7   and gasoline stations.

8        (b)  Defendant manufacturers and distributors

9   negligently sold MTBE to the gasoline station defendants knowing

10  that there was a substantial danger that underground gasoline

11  systems and gasoline dispensing facilities were leaking, without

12  taking appropriate precautions to assure that the gasoline

13  containing MTBE they dispensed into gasoline systems would not

14  spill or escape into the environment.

15       (c) Defendant manufacturers, distributors, and DOES 350

16  through 400, inclusive, negligently overfilled gasoline systems

17  with gasoline containing MTBE and/or spilled it at gasoline

18  stations near the District wells.

19       (d) Defendants negligently tested (or the lack thereof)

20  MTBE to determine its environmental fate and potential human

21  health impact.

22       (e) When defendants learned, or should have learned,

23  that MTBE was persistent and a widespread source of groundwater

24  contamination, defendants failed to warn the appropriate entities

25  and individuals of known risks, spills, and/or leaks or failed to

26  undertake appropriate action to reduce, remediate, or abate MTBE

27  groundwater contamination.

28      78. The MTBE contamination of the District's wells has varied

1 and will vary over time and requires investigation, remediation,

2 abatement, and/or treatment. The District has engaged, or will

3 engage, in remediation, abatement, investigation, and/or

4 treatment programs and in securing replacement water supplies,

5 and thereby has sustained, is sustaining, and will sustain, the

6 damages alleged herein.

### FOURTH CAUSE OF ACTION

#### (Nuisance Against All Defendants)

9     79. The District realleges paragraphs 1 through 78 of this

10 complaint and incorporates them herein by reference.

11     80. The negligent, reckless, intentional and ultrahazardous

12 activity of the defendants, and each of them, alleged herein has

13 resulted in the contamination of the District's wells and

14 constitutes a nuisance as alleged herein.

15     81. The District's wells, water, and water rights are

16 adversely affected by the nuisance.

17     82. As a direct and proximate result of the nuisance, the

18 District has been damaged and is entitled to the compensatory and

19 exemplary damages alleged herein, or to such other appropriate

20 relief the District may elect at trial.

### FIFTH CAUSE OF ACTION

#### (Declaratory Relief Against All Defendants)

23     83. The District realleges paragraphs 1 through 82,

24 inclusive, and incorporates them herein by reference.

25     84. Defendants knew, or should have known, that if MTBE was

26 used in a foreseeable and intended manner that MTBE was dangerous

27 and created an unreasonable and excessive risk of harm to human

28 health and the environment.

23

Exhibit 2
Page 23 of 27

85.   The defendants intentionally, willfully, deliberately and/or negligently failed to properly design, manufacture, distribute, design, control, test, and/or sell MTBE and/or gasoline systems and warn users of the substantial and unreasonable threats to human health and safety and the environment which results from the foreseeable and intended use and storage of MTBE.

86.   The District must take costly remedial action to remove MTBE contamination and secure alternative water supplies which will result in substantial costs, expenses and damages within the jurisdiction of this court.

87.   Defendants, and each of them, have failed to reimburse the District for its remediation and clean-up costs and deny any responsibility or liability for these damages and expenses the District will incur in the future.

88.   In order to resolve this controversy, the District requests an order declaring that defendants are liable for all costs, expenses, losses, and/or damages sustained by the District as a proximate result of the defendants' conduct alleged herein.

### SIXTH CAUSE OF ACTION

**(Business & Professions Code, § 17200) (Unfair Competition)
Against the Manufacturer Defendants Only)**

89.   The District realleges paragraphs 1 through 88 and incorporates them herein by reference, and brings this claim on behalf of itself and its customers.

90.   The manufacturer defendants' conduct described above constituted unlawful, unfair and fraudulent business practices, and unfair, deceptive, untrue and/or misleading advertising in violation of California Business and Professions Code section

17200.

91.   California Business and Professions Code section 17202 allows for "specific or preventative relief [to] be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition."

92.   California Business and Professions Code section 17204 provides for suits to be brought as representative actions by private attorneys general: "Actions for any relief pursuant to this chapter shall be prosecuted . . . by any person acting for the interests of itself, its members or the general public."

93.   California Business and Professions Code section 17203 provides that "[t]he court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of unfair competition." Thus, a request for restitution under the California Unfair Competition Act for the disgorgement of unlawfully earned profits is specifically authorized by Business and Professions Code section 17200, *et seq.*

94.   By committing the acts alleged in this complaint, the manufacturer defendants have engaged, and continue to engage, in unlawful, unfair or fraudulent business practices within the meaning of California's Business and Professions Code section 17200, *et seq.*

95.   The manufacturer defendants have been in violation, and continue to violate, California's Unfair Competition Act by

1 conducting their business falsely representing MTBE as
2 environmentally safe and by acting and/or failing to act as
3 described in this complaint.  Beginning at an exact day unknown
4 to the District, the manufacturer defendants have committed
5 unlawful, unfair or fraudulent acts as defined by Business and
6 Professions Code section 17200, by engaging in the acts or
7 omissions mentioned in the complaint.

8     96.  As a proximate result of the manufacturer defendants'
9 conduct, they have caused a significant damage to the District
10 alleged herein and to the environment.  They have also gained
11 substantial profits.

12     97.  The manufacturer defendants should be forced to disgorge
13 MTBE-related profits.

14     **WHEREFORE**, the District requests judgment against
15 defendants, and each of them, for:

16     1.  Compensatory damages according to proof;

17     2.  Exemplary damages in an amount sufficient to punish
18 defendants ARCO, ARCO Chemical, Shell, Chevron, and Exxon and to
19 deter those defendants from ever committing the same or similar
20 acts;

21     3.  For an order (1) declaring that defendants are liable for
22 the full cost of all remedial and other actions necessary to
23 abate MTBE contamination of the District's wells, and (2)
24 disgorging the profits of the manufacturer defendants;

25     4.  For such and other further relief as the court may deem
26 just and proper; and

27 / / /
28 / / /

000030

1    5.  For the costs incurred herein in prosecuting this action,

2  and prejudgment interest to the full extent permitted by law.

3

4  Dated: November 9, 1998        MILLER & SHER

                              A Professional Corporation

5

6

7                            By:

                              DUANE C. MILLER

8                              Attorneys for Plaintiff

                              South Tahoe Public Utility

9                              District

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 3

029667

ORIGINAL

**F I L E D**
San Francisco County Superior Court

APR 1 5 2002

GORDON PARK-LI/Clerk
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION

DEPARTMENT NO. 514

| | |
|---|---|
| SOUTH TAHOE PUBLIC UTILITY DISTRICT, <br><br> Plaintiff, <br><br> vs. <br><br> ATLANTIC RICHFIELD COMPANY, et al., <br><br> Defendants. | CASE NO. 999128 <br><br> **SPECIAL VERDICT [PHASE I]** <br><br> (3/4/02) |

We, the jury in the above-entitled action, find as follows on the questions submitted to us:

Exhibit 3
Page 1 of 6

**Question No. 1:** Was gasoline containing MTBE manufactured, sold, or supplied by any of the following defendants defective in design because the risk of harm inherent in its design outweighed the benefits of that design?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ___ | Fall/Winter 1970 to 12·31·77 |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-98 to Present |
| Texaco, Inc. | ✓ | ___ | 1988 to 12·31·1997 |
| Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

If you answer "no" as to each defendant, then go to question No. 3. If you answer "yes" as to one or more defendants, then answer the next question only as to such defendants.

**Question No. 2:** As to each defendant for which you answered "yes" in Question No. 1, did the defect exist when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" for each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ___ | Fall/winter 1970 to 12·31·1997 |
| Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Present |
| Texaco, Inc. | ✓ | ___ | 1988 to 12·31·1997 |
| Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

Exhibit 3
Page 2 of 6

**Question No. 3:** Was gasoline containing MTBE manufactured, sold or supplied by any of the following defendants defective because of a failure to warn?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12·0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 10·2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

**Question No. 4:** As to each defendant for whom you answered "yes" in Question No. 3, did the defect exist, because of a failure to warn, when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12·0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 12·2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

\\\
\\\
\\\

Exhibit 3
Page 3 of 6

**Question No. 5**: Were the risks involved in the transportation, storage and handling of MTBE recognized by all of Lyondell Chemical Company's (ARCO Chemical Company's) California refiner and distributor customers, who transported, stored and handled MTBE in bulk? If not, during what time period were the risks not recognized?

Answer "yes" or "no." If you answer is "no," state the time period.

| | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 12·0 _____ | ✓ | 1992 to 1996 |

If you answered "no" to Question No. 5, then answer Question No. 6. If you answered "yes" to Question No. 5, then answer Question No. 9.

**Question No. 6**: Was MTBE manufactured, sold or supplied by defendant Lyondell Chemical Company (ARCO Chemical Company) defective because of a failure to warn?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11·1 ✓ | _____ | 1992 to 1996 |

If you answered Question No. 6 "yes", answer Question No. 7. If you answered Question No. 6 "no", answer question No. 9.

**Question No. 7**: Did the defect exist, because of a failure to warn, when the MTBE left the possession of defendant Lyondell Chemical Company (ARCO Chemical Company)?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11·1 ✓ | _____ | 1992 to 1996 |

If you answered Question No. 7 "yes", answer Question No. 8. If you answered Question

Exhibit 3
Page 4 of 6

No. 7 "no", answer question No. 9.

**Question No. 8:** Were the warnings of defendant Lyondell Chemical Company (ARCO Chemical Company) to all of its customers, as described in Question No. 5, above, adequate to make those customers aware of the risks and how to avoid or reduce such risks? If not, during what time period were such warnings of Lyondell Chemical Company (ARCO Chemical Company) inadequate?

Answer "yes" or "no."  If you answer "no," state the time period.

| | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 11-1 _____ | ✓ | 1987 to 1996 |

**Question No. 9:** If you answered "yes" to both Question No. 1 and Question No. 2 as to defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both Question No. 1 and Question No. 2 as to Shell Oil Company, then go to Question No. 10.

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with malice in selling gasoline containing MTBE that was defective in design because the risk of harm inherent in the design outweighed the benefits of that design?

Answer "yes" or "no".  If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | _____ | Fall/winter 1990 to 12-1997 |

\\\
\\\
\\\
\\\
\\\
\\\

Exhibit 3
Page 5 of 6

1

2   **Question No. 10**: If you answered "yes" to both Question No. 3 and Question No. 4 as to

3   defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both

4   Question No. 3 and Question No. 4 as to Shell Oil Company, then go to Question No. 11.

5       Do you find by clear and convincing evidence that defendant Shell Oil Company acted with

6   malice in selling gasoline containing MTBE that was defective in design because of a failure to

7   warn?

8       Answer "yes" or "no."  If you answer "yes," state the time period.

                                                     Yes         No                  If yes, time

9                                                                                                period

10  Answer:                           11-1 _✓_    ___    _Fall/Winter 1990 to 12-1997_

11

12  **Question No. 11**: If you answered "yes" to both Question No. 6 and Question No. 7 and

13  "no" to both Question No. 5 and Question No. 8, answer the question below. If you did not

14  answer "yes" to both Question No. 6 and Question No. 7 and "no" to both Question No. 5 and

15  Question No. 8, please sign and return this form.

16      Do you find by clear and convincing evidence that defendant Lyondell Chemical Company

17  (ARCO Chemical Company) acted with malice in selling MTBE that was defective in design

18  because of a failure to warn?

19      Answer "yes" or "no."  If you answer "yes," state the time period.

                                                     Yes         No                  If yes, time

20                                                                                                period

21  Answer:                           11-1 _✓_    ___    _1987 to 1996_

22

23

24

25  DATED: _April_ _15_, 2002                      _[signature]_

26                                             JURY FOREPERSON

27

28

Exhibit 3
Page 6 of 6

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:  Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation



MDL No. 1358

M 21-88 L

Master File C.A. No. 1:00-1898 (SAS)

DOC # 20

Confidentiality Agreement & Order

------------------------------------------------------------x

## I.   DEFINITIONS

### A.   This Action

As used in this Confidentiality Agreement and Order ("Order"), the term "THIS ACTION" shall refer to MDL 1358, In re: Methyl Tertiary Butyl Ether Products Liability Litigation and cases currently (Berisha and England) and to be consolidated under this MDL including any retrial or appeal of the cases.

### B.   Document(s), Information, or Other Thing(s)

As used in this Order, the term "DOCUMENT(S), INFORMATION, OR OTHER THING(S)" includes, but is not limited to interrogatory responses; responses to requests for production of documents and things; responses to requests for admissions; deposition testimony upon oral or written examination; deposition exhibits; motions; affidavits; exhibits; and any other writings made available or produced by the parties and/or submitted to the Court during THIS ACTION.

### C.   Days

As used in this Order, the terms "DAY" or "DAYS" shall mean calendar days.

Exhibit 4
Page 1 of 40

D.    Produced or Disclosed

As used in this Order, the term "PRODUCED OR DISCLOSED" includes, without limitation, all DOCUMENT(S), INFORMATION, OR OTHER THING(S) made available or produced by any party and/or submitted to the Court in THIS ACTION.

E.    Persons

The terms "PERSON" or "PERSONS" include a natural PERSON, firm, association, organization, partnership, business trust, corporation, or public entity.

## II.    AGREEMENT AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED by the parties hereto that with respect to DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs in THIS ACTION or Defendants in THIS ACTION, including Amerada Hess Corporation, Atlantic Richfield Company, BP Amoco Corporation; Chevron U.S.A., Inc., CITGO Petroleum Corporation; ~~The Coastal Corporation, Coastal Oil New York, Inc.,~~ El Paso CGP Company Conoco, Inc., Equilon Enterprises LLC, Exxon Corporation, Mobil Oil Corporation, Motiva Enterprises LLC, Phillips Petroleum, Shell Oil Company, Shell Oil Products Company; Sunoco Inc. (R&M), Texaco Inc., Texaco Refining and Marketing Inc., Tosco Corporation, United Refining Company, and Valero Marketing and Supply Company (collectively "Defendants"), the following terms, conditions, and restrictions shall govern:

A.    This Order shall apply to all DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or Defendants.

B.    Confidential Document(s), Information, or Other Thing(s). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or

Defendants which are stamped "Confidential" or "Proprietary" or "Confidential Materials – For Outside Counsel Only" shall be deemed "CONFIDENTIAL" subject to this Order. For purposes of this Order, "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" shall include DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are reviewed by an attorney, are stamped as "Confidential" or "Proprietary" and which are or contain a trade secret or other confidential research, development, or commercial information as those terms are used in Rule 26(c)(7) of the Federal Rules of Civil Procedure, including any copies, summaries, portions or abstracts thereof. CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) does not include DOCUMENT(S), INFORMATION, OR OTHER THING(S) (i) which are available or become available to the public other than through violation of this Order; (ii) that, at the time of production, the receiving party already possesses (for documents and things) or knows (for information), as evidenced by written documentation, and were obtained by that party without an obligation of confidentiality; (iii) that the receiving party rightfully received from a third party without an obligation of confidence; or (iv) that the receiving party develops independently through PERSONS who have had no access to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are stamped as "Confidential" or "Proprietary" shall be treated as "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" subject to this Order pending further order of the Court. The party asserting the confidentiality claim shall stamp, print, or write the term "Confidential" or "Proprietary" on at least the first page of any such document to be viewed only. With respect to documents selected and to be sent to the document depository, every page of such "Confidential" or "Proprietary" documents shall be so stamped, printed or written .

Any documents which are produced by a party which are not stamped as "Confidential" or "Proprietary" will not be subject to this Order unless otherwise agreed by the parties. The producing party shall make a good faith effort to notify the propounding party in writing of the production of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and the location of such materials if possible to denote. "CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY" shall mean, and be limited to, CONFIDENTIAL MATERIALS which pertain to: (i) recent and future business and marketing plans and activities; and (ii) recent and future research and development activities.

C.    The parties and any counsel who execute this agreement or agrees to be bound to its terms, hereby agree that all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) may not be used, disseminated or disclosed outside of THIS ACTION except as set forth in Paragraph D, subsection b and Paragraph E, below.

D.    CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced in THIS ACTION shall not be disseminated or disclosed to any PERSON except:

a.    Plaintiffs, their respective counsel and employees including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Plaintiffs in connection with the prosecution and preparation for trial of THIS ACTION, or Defendants, their respective counsel and employees, including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Defendants in connection with the defense and preparation for trial of THIS ACTION;

b.    To an attorney of record in an action where the complaint alleges that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or common law ("MTBE actions") and where the attorney provides written notice to counsel representing the

- 4 -

Exhibit 4
Page 4 of 40

party whose CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) are being reviewed that:  (i) he has read this agreement and agrees to be bound by its terms by executing a separate copy of this agreement; (ii) identifies each CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) reviewed; (iii) he agrees to submit to the jurisdiction of the Court in the Southern District of New York should any disputes arise under this agreement; (iv) in the event that the OTHER MTBE ACTION continues after this MDL terminates, the Court in the Southern District of New York shall maintain continuing jurisdiction to enforce this agreement until the end of the OTHER MTBE ACTION; and (v) he agrees to comply with the return or destroy provision of Paragraph J of the agreement at the conclusion of the OTHER MTBE ACTION.  Such attorney may then make use of the CONFIDENTIAL DOCUMENTS, INFORMATION OR OTHER THING(S) consistent with all limitations and controls set forth herein;

      c.     The Court, and those employed by the Court, in which event the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be filed under seal consistent with this Order, and kept under seal until further order of the Court;

      d.     Court reporters who record the depositions or other testimony in THIS ACTION;

      e.     Outside experts, consultants, witnesses or potential witnesses for Plaintiffs or Defendants, including their stenographic and clerical personnel, whose advice and consultation are being or will be used by any party in connection with the prosecution or defense of THIS ACTION, or their preparation for trial of THIS ACTION, and who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A;

Exhibit 4
Page 5 of 40

f.      A deponent and the deponent's counsel who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A, but only during the course of the deposition in THIS ACTION, or to the extent reasonably necessary in the preparation for such deposition; and

g.      Any other PERSON or entity upon order of the Court, upon stipulation of the parties, or upon the express written agreement of the producing party.

E.      CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY produced in THIS ACTION may be disclosed only to the following:

a.      Outside counsel for a party engaged in the conduct of  THIS ACTION, and any legal support personnel and outside experts and consultants of such counsel;

b.      The Court, and those employed by the Court, in which event the CONFIDENTIAL MATERIALS shall be filed under seal consistent with this Order, and kept under seal until further order of the Court; and

c.      Any other PERSON or entity upon order of the Court, upon stipulation of the PARTIES, or upon the express written agreement of the PRODUCING PARTY.

F.      Nothing in this Order shall require Plaintiffs or Defendants, or their respective counsel and employees, including stenographic and clerical personnel, to execute a copy of Exhibit A when testifying as to their own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

G.      Nothing in this Order shall prohibit a PERSON from releasing its own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) as it sees fit, and such release shall not constitute a waiver of any of the terms of this Order unless the release is made to the public domain.

- 6 -

Exhibit 4
Page 6 of 40

H.     No PERSON receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall disclose said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other PERSON, except as permitted by and in accord with this Order.

I.     The following Court procedures shall apply with respect to use of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S):

a.     Said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are submitted to the Court shall be filed with the Court in sealed envelopes or other appropriate sealed containers on which shall be endorsed the title of this action , an indication of the nature of the contents of the sealed envelope or other container, the word "CONFIDENTIAL," and a statement substantially in the following form:  "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court."   In the case of CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY, the label shall state as follows: "CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY" and a statement substantially in the following form: "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court."

A copy of this Order shall be submitted to the Court, together with any materials submitted under seal. Any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) filed with or submitted to the Court pursuant to this section shall be returned to the submitting party or destroyed in compliance with Paragraph J herein if the Court does not

Exhibit 4
Page 7 of 40

remove the confidential status from the DOCUMENT(S), INFORMATION, OR OTHER THING(S).

        b.     In the case of depositions upon oral examination, if counsel for a party has a reasonable and good faith belief that any question or answer contains or refers to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), counsel may state on the record, and request that all pages that include such CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) be marked CONFIDENTIAL. When testimony designated CONFIDENTIAL is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall be excluded from the deposition.   Transcripts containing testimony or exhibits designated as containing CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be marked by the court reporter, prior to transcript distribution, with the legend "THIS TRANSCRIPT CONTAINS CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)," and shall be treated in accordance with the provisions of this Order.  In addition to designating, during the deposition, any question or answer as CONFIDENTIAL, counsel may designate any portion of the deposition transcript as a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at any time within ten (10) DAYS of receiving the deposition transcript from the court reporter.  Notice of such designation shall be made in writing to the court reporter, with copies to all counsel in THIS ACTION, specifying the portion(s) of the transcript and exhibits that constitute or contain CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).  Until expiration of the ten (10) DAY period described above, all deposition transcripts shall be considered and treated as though containing CONFIDENTIAL

- 8 -

Exhibit 4
Page 8 of 40

DOCUMENT(S), INFORMATION, OR OTHER THING(S), unless otherwise agreed on the record at the deposition.

J.      Within thirty (30) DAYS after the expiration of the last applicable deadline for the last permitted appeal, rehearing, or reconsideration related to THIS ACTION, CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall be returned to counsel of record of the party who provided the information, or the party receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall have the option of destroying all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and providing an affidavit from its counsel of record to the designating party that the party in possession of the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) has destroyed it.

K.      Any party hereto may challenge the claim of confidentiality of any materials by notifying counsel for the party claiming confidentiality in writing of the basis of their challenge to the claim. Counsel for the party claiming confidentiality will respond in writing within ten (10) DAYS, and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such decision have been concluded, the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking the confidential designation.

L.      No party shall disclose any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other party except as provided herein, and

Exhibit 4
Page 9 of 40

except as may be required by applicable law or legal process. All parties shall take reasonable steps to keep an accurate record of the location of and insure proper and secure storage of all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

M.   Any inadvertent disclosure of any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not be a violation of this Order. The inadvertent disclosure of a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not constitute a waiver of any otherwise applicable privilege, either as to the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) so produced or as to any other CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) withheld under a claim of privilege. If any party is responsible for any inadvertent disclosure, that party will take all reasonable steps to remedy the inadvertent disclosure, including, but not limited, to retrieving all copies of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), and informing the recipients of such DOCUMENT(S), INFORMATION, OR OTHER THING(S) of its CONFIDENTIAL nature.

N.   Any party hereto that has the claim of alleged improper disclosure of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) or any other alleged violation of this Order shall notify counsel for the party making the alleged improper disclosure or other alleged violation of this Order in writing of the basis of their claim. Counsel for the party making the alleged improper disclosure or other alleged violation of this Order will respond in writing within ten (10) DAYS and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such alleged violations have been concluded, the

- 10 -

Exhibit 4
Page 10 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.      It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.      The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001                By: _____
                                            LEWIS J. SAUL & ASSOCIATES, P.C.
                                            501 Wisconsin Avenue, N.W., Suite 550
                                            Washington, D.C.  20015
                                            *Attorneys for Plaintiffs*

Exhibit 4
Page 11 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.   It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.   The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April __, 2001

By: _____
LEWIS F. SAUL & ASSOCIATES, P.C.
183 Middle Street, Suite 200
Portland, ME  04101
*Attorneys for Plaintiff*

- 12 -

Exhibit 4
Page 12 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:   April __, 2001          By:_____

WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 17th Floor
New York, NY 10083
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:   April ⅔, 2001                    By: _____
                                              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                              780 Third Avenue, 48th Floor
                                              New York, NY 10017-2024
                                              *Attorneys for Plaintiffs*

Exhibit 4
Page 14 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April __, 2001                  By: _____

NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE
28 Bridgeside Boulevard
Mt. Pleasant, S.C.  29464
*Attorneys for Plaintiffs*

- 15 -

Exhibit 4
Page 15 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: ~~April~~ May 11, 2001

By: _____
LAW OFFICES OF MASRY & VITITOR
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
*Attorneys for Plaintiffs*

- 16 -

Exhibit 4
Page 16 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April ___, 2001

By: _____

ROUNDTREE & SEAGLE, LLP
2419 Market Street
P.O. Box 1409
Wilmington, N.C. 28402-1409
*Attorneys for Plaintiffs*

-17-

Exhibit 4
Page 17 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.             It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.             The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:    April __, 2001          By: _____

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
*Attorneys for Plaintiffs*

- 18 -

Exhibit 4
Page 18 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

  O.      It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

  P.      The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001    By:

            CARR, KOREIN, TILLERY, KUNIN,
            MONTROY, CATES, CATZ & GLASS
            10 Executive Woods Court
            Swansea, IL  62226
            *Attorneys for Plaintiffs*

Exhibit 4
Page 19 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.      It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.      The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:  May 16  April  , 2001                   By: _____

MILLER SHER & SAWYER
100 Howe Avenue, Suite S0120
Sacramento, CA. 95825-5407
*Attorneys for Plaintiffs*

– 20 –

Exhibit 4
Page 20 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

     O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

     P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001

By: _____

WHATLEY DRAKE, LLC
1100 Financial Center
505 North 20th Street
Birmingham, AL 35203-2605
*Attorneys for Plaintiffs*

- 22 -

Exhibit 4
Page 21 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.          It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.          The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001          By: _____
                                 REICH & BINSTOCK
                                 4265 San Felipe, Suite 1000
                                 Houston, TX 77027
                                 *Attorneys for Plaintiffs*

Exhibit 4
Page 22 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.         It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.         The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April __, 2001          By: _____
                                       CROWLEY & DOUGLASS
                                       3500 Chevron Tower
                                       1301 McKinney Street
                                       Houston, TX 77010
                                       *Attorneys for Plaintiffs*

- 24 -

Exhibit 4
Page 23 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:    April 30, 2001          By: _Goodkind Labaton Rudoff & Sucharow LLP_

Goodkind Labaton Rudoff & Sucharow LLP
100 Park Avenue, 12th Floor
New York, New York 10017
*Attorneys for Plaintiffs*


24n

Exhibit 4
Page 24 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.      It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.      The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _Edward A. Cohen_

                                 THOMPSON COBURN LLP
                                 One Firstar Plaza, Suite 3300
                                 St. Louis, Missouri 63101
                                 *Attorneys for Defendants Conoco Inc., Chevron U.S.A., Inc., and Exxon Mobil Corporation*

- 25 -

Exhibit 4
Page 25 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____

                                 KIRKLAND & ELLIS
                                 200 East Randolph Drive
                                 Chicago, Illinois 60601-6636
                                 *Attorneys for Defendants Atlantic Richfield
                                 Company, BP Amoco Corporation, Amoco Oil
                                 Company*

- 26 -

Exhibit 4
Page 26 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 2X , 2001            By: _____

~~SANDBERG, PHOENIX & VON GONTARD~~
~~One City Centre - 15th Floor~~  *HOWLEY SIMON ARNOLD & WHITE, LLP*
~~St. Louis, Missouri 6311 1880~~  *1299 Pennsylvania Ave. NW*
*Attorneys for Defendant Phillips*  *Washington, DC 20039*
*Petroleum Company*

- 27 -

Exhibit 4
Page 27 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

  O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

  P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 16, 2001   By: _____
          WALLACE KING MARRARO & BRANSON,
          PLLC
          1050 Thomas Jefferson Street, N.W.
          Washington, DC 20007
          *Attorneys for Defendants Equilon*
          *Enterprises, LLC, Motiva Enterprises, LLC, Shell*
          *Oil Company, Shell Oil Products Co., Texaco Inc.*
          *and Texaco Refining and Marketing Inc.*

- 28 -

Exhibit 4
Page 28 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.      It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.      The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April ⚬, 2001          By: _Pamela R. Hanebutt_____

EIMER STAHL KLEVORN & SOLBERG
122 South Michigan Avenue
Suite 1776
Chicago, Illinois 60603
*Attorneys for Defendant*
*CITGO Petroleum Corporation*

- 29 -

Exhibit 4
Page 29 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 26, 2001          By:_____

BAKER BOTTS, L.L.P.
599 Lexington Avenue
New York, New York 10022
*Attorneys for Valero Marketing and
Supply Company*

- 30 -

Exhibit 4
Page 30 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.   It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.   The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____
                                 BEVERIDGE & DIAMOND, P.C.
                                 1350 I Street, N.W., Suite 700
                                 Washington, DC 20005
                                 *Attorneys for Defendant Sunoco, Inc.* (R & H)

- 31 -

Exhibit 4
Page 31 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004-2402
*Attorneys for Defendant ~~The Coastal Corporation~~*
El Paso CGP Company

- 32 -

Exhibit 4
Page 32 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 26, 2001                     By:_____

                                            GOODWIN PROCTER LLP
                                            1285 Avenue of the Americas
                                            New York, New York 10019
                                            *Attorneys for Defendant United Refining Company*

- 33 -

Exhibit 4
Page 33 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.   It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.   The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001

By: _Jennifer Pazcoole for StSLuf_

STROOCK STROOCK & LAVAN, LLP
180 Maiden Lane
New York, New York 10038-4982
*Attorneys for Defendant Tosco Corporation*

- 34 -

Exhibit 4
Page 34 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001                         By: _____

                                                HOWREY, SIMON, ARNOLD & WHITE, LLP
                                                1299 Pennsylvania Ave., NW
                                                Washington, DC 20004-2402
                                                202-783-0800
                                                202-383-6610 (FAX)
                                                *Attorneys for Defendant Phillips Petroleum Company*

- 35 -

Exhibit 4
Page 35 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001            By:_____
                                       HOWREY, SIMON, ARNOLD & WHITE, LLP
                                       1299 Pennsylvania Ave., NW
                                       Washington, DC  20004-2402
                                       *Attorneys for Defendant Amerada Hess*
                                       *Corporation*

- 36 -

Exhibit 4
Page 36 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:    April 16, 2001                    By: _____

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004-2402
*Attorneys for Defendant Coastal Oil New York, Inc.*
*El Paso CGP Company*

- 37 -

Exhibit 4
Page 37 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April **26**, 2001          By: _____

McDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
*Attorneys for Defendants Exxon Mobil Corporation,*
*Exxon Corporation and Mobil Oil Corporation*

Exhibit 4
Page 38 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   ~~April __, 2001~~
         May 30, 2001

SO ORDERED:

_____
HON. SHIRA A. SCHEINDLIN
United States District Court
Southern District of New York

- 39 -

Exhibit 4
Page 39 of 40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
                                                             :
In re:  Methyl Tertiary Butyl Ether ("MTBE")      :          MDL No. 1358
Products Liability Litigation                              :
                                                             :          Master File C.A. No.
                                                             :          1:00-1898 (SAS)
                                                             :
------------------------------------------------------------ :


## CONFIDENTIALITY AGREEMENT AND ORDER


### McDERMOTT, WILL & EMERY

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

50 ROCKEFELLER PLAZA

NEW YORK, NEW YORK  10020

(212) 547-5400

Exhibit 4
Page 40 of 40

# Exhibit 5

3CJLMTBC

1

3CJLMTBC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE:  MTBE, et al.                    00 MDL 1358 (SAS)
3  ------------------------------x
4  IN RE:
5  County of Nassau, et al.,
6          -against-                       93 CV 9543  (SAS)
7  Ameroda Hess, et al.
8  ------------------------------x
8                                          New York, N.Y.
9                                          December 19, 2003
9                                          10:17 a.m.
10
10  Before:
11
11              HON. SHIRA A. SCHEINDLIN,
12
12                                          District Judge
13
13                      APPEARANCES
14
14  WEIRZ & LUXEMBERG
15      Attorneys for Plaintiffs Nassau County, et al.
15  BY:  SANDERS MCNEW
16      ROBERT GORDON
16      STANLEY ALPERT
17
17  NAPOLI, KAISER & BERN, LLP
18      Attorneys for Plaintiffs Village of Mineola, et al.
18  BY:  MARC JAY BERN
19      TOM RALEIGH
19
20  MCDERMOTT, WILL & EMERY
20      Attorneys for Defendant Exxon Mobil
21  BY:  PETER JOHN SACRIPANTI
21      JAMES PARDO
22
22  EIMER, STAHL, KLEVORN & SOLBERG
23      Attorneys for Defendant Citgo Petroleum
23  BY:  NATHAN P. EIMER
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

2

3CJLMTBC
1                   APPEARANCES (cont.)
2  J. ANDREW LANGAN
2      Attorney for Defendants BP Products, et al.
3
3  WALLACE, KING, MARRARO & BRANSON
4      Attorneys for Defendants Chevron, USA, et al.
4  BY:  RICHARD E. WALLACE, JR.
5
5  PATTON, BOGGS
6      Attorneys for Defendant Texaco, Inc.
6  BY:  ROBERT JONES
7
7  BEVERIDGE & DIAMOND
              Page 1

Exhibit 5
Page 1 of 19

3CJLMTBC

8   Attorneys for Defendants Sunoco, Inc., et al.
8   BY:  HEATHER FUSCO
9
9   LATHAM & WATKINS
10      Attorneys for Defendants Conoco and Getty
10  BY:  JOHN MCGAHREN
11
11  GOODWIN, PROCTER, LLP
12      Attorneys for Defendant Gulf Oil Ltd. Partnership
12  BY:  CHRISTOPHER J. GARVEY                  .
13
13  BLANK, ROME, LLP
14      Attorneys for Defendant Lyondell Chemical Company
14  BY:  MICHAEL J. ROESSNER
15
15  HOWREY, SIIMON, ARNOLD & WHITE
16      Attorneys for Defendants Ameroda Hess, et al.
16  BY:  MINDY G. DAVIS
17
17  HUNTON & WILLIAMS
18      Attorneys for Defendant Koch Industries
18  BY:  LAUREN ROSENBLATT
19
20
21
22              * CONFERENCE *
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

3CJLMTBC                      Conference
                    (Case called)
1
2              THE COURT:  Mr. McNew?
3        MR. MCNEW:  Good morning, your Honor.
4        THE COURT:  Mr. Gordon?
5        MR. GORDON:  Good morning.
6        THE COURT:  Mr. Alpert?
7        MR. ALPERT:  Good morning, your Honor.
8        MR. BERN:  Good morning, your Honor.
9        MR. RALEIGH:  Good morning, your Honor.
10       THE COURT:  Good morning, Mr. Bern, Mr. Raleigh.
11  Mr. Sacripanti?
12       MR. SACRIPANTI:  Good morning, your Honor.
13       THE COURT:  Mr. Eimer?
14       MR. EIMER:  Good morning, your Honor.
15       THE COURT:  Mr. Pardo.
16       MR. PARDO:  Good morning, your Honor.
17       THE COURT:  Mr. Langan?
18       MR. LANGAN:  Good morning, your Honor.
19       THE COURT:  Mr. Wallace?
20       MR. WALLACE:  Good morning, your Honor.
21       MR. JONES:  Good morning, your Honor.
22       THE COURT:  Mr. Jones.  And Miss Fusco?
23       MS. FUSCO:  Good morning.
24       THE COURT:  Those are the folks on the seating chart
25  but good morning to the rest of you who aren't on the seating
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

3CJLMTBC                      Conference
1   chart, but are here.
                    Page 2

Exhibit 5
Page 2 of 19

3CJLMTBC

2   Well, it does seem a bit like a reunion, but that's
3   not why we're here, to have our annual reunion. We're here
4   because there have been filings, a number of remands around the
5   country, state court. There's been removal of those cases to
6   various federal courts around the country.
7       And there are two in this district: County of Nassau
8   versus Ameroda Hess and Western Nassau Nassau Water Authority versus
9   Ameroda Hess. The first one, County of Nassau, 03 CV 9543.
10  And the other one, Water Authority Western Nassau, 03 CV 9544.
11  Now, I'm not even sure that these two cases have been yet
12  assigned to me. They may have been marked as related to the
13  earlier cases pending my accepting them but it wouldn't matter
14  today because I'm also the Part 1 judge.
15      In any event, you would have been stuck with me today.
16  They are unassigned. So whether they're here as related cases,
17  here as Part 1 cases or here as potentially MDL 1358, it
18  doesn't matter, because it's before me.
19      So the issue we're here to discuss, I think, is
20  whether this Court should stay consideration of a pending
21  motion to remand, the courtesy copy papers of which we received
22  last night. The plaintiffs are moving to remand these two
23  cases to state court, probably moving to remand cases around
24  the country to state court. The question is whether those
25  motions should be stayed pending the decision by the federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

3CJLMTBC            Conference
1   MDL Panel as to where all removed federal cases should be
2   heard. Should they be heard by one MDL selected judge or
3   should they remain in their many jurisdictions around the
4   country? If these actions are not stayed pending decision of
5   the MDL Panel, of course, the risk is inconsistent rulings on
6   the remand issue. We may have differing remand decisions from
7   federal judges all over the country. If they were stayed
8   pending the MDL Panel's decision as to what to do with these,
9   what appears to be now maybe 40 cases, then the remand decision
10  would be made by the one judge that the MDL Panel selects, if
11  they decide to treated this as an MDL. I think that frames the
12  issue.
13      The history this week is that I received a letter from
14  the defendants asking for a stay. And I, too quickly, without
15  waiting to hear from the plaintiffs, endorsed it and granted
16  the stay, and then I got a letter from the plaintiffs and said,
17  No, there are good reasons not to grant a stay, and I said,
18  Well, I haven't heard from them, that's true, so I vacated the
19  stay and I invited you all to come in today and discuss this
20  with the thought that I would make a decision at the conference
21  today. So that's where we stand.
22      My first act, I heard from the one side, I vacated
23  that. I'd like to hear from both sides -- briefly, because I
24  have read your material -- and make a decision. So who would
25  like to be heard? Mr. McNew?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

3CJLMTBC            Conference
1   MR. MCNEW: Thank you, Judge. And thank you for
2   hearing us on short notice. We're grateful for that.
3       The narrow issue before you this morning, I believe,
4   is: Does it make more sense to hear the remand proceedings in
5   these two cases now or whether it makes sense to stay them
6   pending proceedings in other courts and before the Judicial

Page 3

Exhibit 5
Page 3 of 19

3CJLMTBC

7   Panel on Multidistrict Litigation. Whatever the merits of the
8   request to stay in other courts, Judge, we have a difficult
9   time understanding the logic of asking you to stay your
10  decision on these remand motions. Because unlike every other
11  court in the country, you, Judge, are the presiding judge over
12  MDL 1358. And the defendants' papers throughout the country
13  are all identical on this point. They in each case ask that
14  the Court not only remove the stay, they now move to have these
15  matters sent as tag-along actions to MDL 1358 with the
16  expectation, Judge, that these cases come to you through the
17  mechanism of the JPML for decision on a consolidated MDL basis.
18       Your Honor, while there may be some risk of
19  inconsistent rules in other jurisdictions, the notion that you
20  could enter a ruling today that would be inconsistent with your
21  ruling following a consolidation in MDL 1358 is illogical. And
22  frankly, Judge, if the goal here is to handle this with a
23  minimum of expenditure of federal judicial resources -- and
24  frankly, with a minimum of resources on the part of the parties
25  being expended -- the best thing for you to do is for you to

3CJLMTBC            Conference

1   decide these remand pages now.
2       THE COURT: That was very interesting; that was very
3   unexpected. I didn't think you were going to argue that. What
4   you're saying is you're going to assume that the MDL Panel will
5   agree to make an MDL decision for all pending cases and refer
6   them to me as part of MDL 1358. And if I knew all that, it
7   would be a fait accompli. There would be no risk of
8   inconsistent rulings around the country because the MDL panel
9   would say all 40 should be MDL, and the MDL should go to Judge
10  Scheindlin.
11       If all that were to be done today, I promise you, I'd
12  start working on the remand motion Monday. But nobody's done
13  that. I can't anticipate what the Judicial Panel of
14  Multidistrict Litigation will do because nobody invited me to
15  be on the panel and I don't get a vote. So I don't know if
16  they'll do that. Do you know if they'll do that?
17       MR. MCNEW: Well, your Honor, first, I would note, I'm
18  not sure if it's clear from the papers that have come to
19  chambers, but it is not the defense -- it's not the defendants'
20  tack to say to the JPML that they ought to consider whether
21  there should be an MDL for these cases. They've identified
22  these expressly as tag-along cases to MDL 1358. They've
23  expressly stated in their papers all around the country --
24       THE COURT: Okay, so the defendants have taken that it
25  should all come here. But what about the various and many

3CJLMTBC            Conference

1   plaintiffs' lawyers around the country?
2       MR. MCNEW: We are the various plaintiffs lawyers
3   around the country.
4       THE COURT: You're everybody? What are you all saying
5   to the judicial panel?
6       MR. MCNEW: If the transfer -- if the JPML decides to
7   transfer them to MDL, absolutely, this is where they belong.
8   No question in my mind.
9       THE COURT: So you're okay on the second half. But if
10  they're going to be MDL, they're going to be here. What do
11  they think about MDL tree?

Page 4

Exhibit 5
Page 4 of 19

3CJLMTBC

12    MR. McNEW: I think there's a decision tree here, if
13  the JPML decides that multidistrict litigation isn't warranted
14  here.
15    THE COURT: Isn't warranted?
16    MR. McNEW: Is not warranted here, okay, you still
17  have these two cases before you. You have to decide. So you
18  should decide them now.
19    THE COURT: Well, then I would know that that's their
20  decision and lots of judges around the country are going to be
21  making these remand decisions. I'll just be one of many. But
22  what is the plaintiffs' position before the panel? Are you
23  saying they should not be treated as MDL or they should be
24  treated as MDL? Which position are the plaintiff's lawyers
25  taking?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

3CJLMTBC                    Conference

1    MR. McNEW: Our position -- I just want to make sure
2  we're on the same page -- our position is if they are in the in
3  the federal court, then they absolutely should be in the MDL
4  before your Honor.
5    THE COURT: If they're in the federal court.
6    MR. McNEW: If they remain in federal court, if
7  they're not remanded, then absolutely they belong in this
8  courtroom.
9    THE COURT: Wait, wait, wait. That is a confusing
10  position. Surely you're seeking remand. I understand this.
11    MR. McNEW: We are.
12    THE COURT: Your first position is they don't belong
13  in the federal court at all. I do understand that.
14    MR. McNEW: That's correct.
15    THE COURT: But before the Judicial Panel on
16  Multidistrict Litigation are you saying, Let's quickly get them
17  MDL, for one federal judge to decide remand, so that if they
18  should go back to state court, according to that one judge,
19  they'll all go back? If that one judge says they shouldn't go
20  back, well, I guess we've lost that; we can appeal it but we've
21  lost it? So do you want the remand decisions made by as many
22  federal judges as there are around the country or are you not
23  resisting the MDL process so we can get the remand decided at
24  once?
25    MR. McNEW: We have decided, your Honor, to try and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

3CJLMTBC                    Conference

1  have cases remanded before a conditional transfer order comes
2  out. That has been our litigation strategy. We believe that
3  the removals are so facially defective on a jurisdictional
4  ground that it would be more efficient to have them sent down
5  rather than having to go through the laborious process of going
6  through the JPML proceedings.
7    THE COURT: My guess is you can't beat the process
8  that way, because judges work at various speeds around the
9  country. You're not going to get all the different federal
10  judges to decide remand motions before the Judicial Panel on
11  Multidistrict Litigation gets to decide whether they should be
12  transferred to one judge as part of an MDL or whether they
13  should stay before many judges. I don't think you can beat the
14  system that way. The Judicial Panel on Multidistrict
15  Litigation will hear the issue and will decide.
16    And I did look quickly or briefly at my own prior

Page 5

Exhibit 5
Page 5 of 19

3CJLMTBC

17  decision and at your moving papers on the remand issue to get a
18  sense of it, and I can certainly say that your papers are not
19  facially frivolous.  In other words, it's a serious remand
20  motion.
21          On the other hand, nor do I think the removals are
22  facially frivolous.  There are serious, hard issues to be
23  addressed.  It's going to take some work on both sides to
24  figure out -- at least what I think.  This is not the kind of
25  motion that can be decided over the weekend.  Maybe there are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

3CJLMTBC          Conference
1   many judges who are smarter and quicker and they'll do it --
2          MR. MCNEW:  Perhaps on a second reading, Judge.
3          THE COURT:  Whatever.  But I didn't get there that
4   fast.  For me it will take some work to figure out what to do.
5   So seeing as how I think it's a serious motion raising serious
6   issues on both sides, I don't think it's a good idea to risk
7   many inconsistent verdicts from around the country, and there
8   did seem to be a case in the Second Circuit, I thought this Ivy
9   case, 901 F2d 7, 2d Cir. 1990, the Second Circuit at least
10  seemed to take the position that it be wise to get the MDL
11  process organized first, transfer to one judge, and then the
12  Court said:
13          Once transferred, the jurisdictional objections can be
14  heard and resolved by a single court and reviewed at the
15  appellate level.  Consistence as well as economy is thus
16  served.  We hold, therefore, the MDL Panel has jurisdiction to
17  transfer a case in which a jurisdictional objection is pending.
18          And that's exactly this case procedurally.  There's a
19  real jurisdictional objection, a very important one.  You're
20  saying it should not be in the federal court, should be in the
21  state court.  There's no federal jurisdiction.  Nothing could
22  be more important.
23          Rather than have 40 federal judges over and over again
24  struggle with difficult issues of preemption and other
25  things -- not just preemption, there are other questions here

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

3CJLMTBC          Conference
1   about jurisdiction -- rather than have all that struggling
2   going on, if the panel would make a quick decision, would
3   decide if they want 40 judges to do it or they want one judge
4   to do it, and if so, which one, then your motion will be
5   reached quickly once -- to one side or the other, hopefully
6   quickly -- and then you can get to the merits of what you
7   eventually want to do.
8          MR. MCNEW:  Of course, Judge, this is a decision
9   that's committed to your discretion.  And I appreciate the
10  Second Circuit's decision, and certainly we are all guided by
11  it.  I would ask the Judge, though, to consider in this
12  particular instance there are extraordinary circumstances that
13  aren't present in the ordinary set of facts.  Because in this
14  particular instance, Judge, unlike every other one in the
15  country, by a happy coincidence, we happen to be before the MDL
16  judge.  The one judge that we all agree, if this is proper
17  subject for the MDL, we all agree that you're the judge to hear
18  it.  It's in their papers.  We're here telling you today we
19  absolutely agree with them:  You are the person to hear this
20  case.
21          THE COURT:  You are saying to the MDL Panel, While we

Page 6

Exhibit 5
Page 6 of 19

3CJLMTBC

22   oppose the MDL treatment, if you're going to MDL, get it to
23   Judge Scheindlin quickly?  Is what you're going to say?
24        MR. MCNEW:  Absolutely.
25        THE COURT:  When are they next hearing these things?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

13

3CJLMTBC                    Conference
     Does anybody know what their schedule is?
1         MR. LANGAN:  Your Honor, Andy Langan.  I've been
2    handling the MDL Panel file.  The state of play is reflected in
3    our letter.
4         THE COURT:  Give us the timeline.
5         MR. LANGAN:  Traditional transfer orders have not been
6    entered yet.  It really depends on what the plaintiffs do.  If
7    the plaintiffs object to conditional transfers, once they're
8    entered, it will take awhile.  I'm gratified to hear the
9    plaintiffs say they're not apparently intending to object.
10        THE COURT:  They didn't say that.  They said if it's
11   going to be treated as an MDL, then they think it belongs in
12   this Court.  Their first position before the panel is it should
13   not be MDL, prior to decision on the remand motions around the
14   country.
15        MR. LANGAN:  The MDL Panel routinely overrules that
16   argument.  There's 50 or 60 published decisions that say that's
17   not a ground to not MDL.  Your Honor is aware of that.  There's
18   a ton of cases I think that say that.
19        But to deflect timing -- the plaintiffs are going to
20   object -- it's going to take a couple of months to sort it all
21   out.
22        THE COURT:  And if they don't object?
23        MR. LANGAN:  It's a matter of weeks, once the
24   conditional transfer orders are out.  It's an administrative
25            SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

14

3CJLMTBC                    Conference
     issue with the panel's office.  I can't say why they haven't
1    entered them yet.
2         MR. MCNEW:  Judge, I'd like to finish my point,
3    because I think it's an important one.  In fact, I think it's
4    the key of this entire hearing.  And it's a simple point, and
5    that is that if we all agree -- we can go down the various
6    decision trees and various outcomes.  But at the end of the
7    day, any disposition of the remand issue in a federal forum, if
8    we lose on all the -- you may be right on the -- what happens
9    with the MDL and other courts' willingness to decide it before
10   the MDL.  But even in that case, we're all at the end of the
11   day back here, before you on the same papers that you have
12   before you today.  And rather than going through this process
13   of ensuring that you do not enter a decision today that is
14   going to be inconsistent with your decision when you decide
15   this in your capacity as an MDL judge --
16        THE COURT:  It's not that inconsistency that's
17   worrying me.  It's the inconsistency potentially with the many
18   other judges around the country.  Not that I can stay their
19   decision to see whether to proceed or not, but they may be
20   influenced by what I do.  You said that when I improvidently
21   signed the defendants' letter --
22        MR. MCNEW:  I never used that word, Judge.
23        THE COURT:  Well, quickly, without hearing from you,
24   when I did that, you pointed out they were circulating it to
25            SOUTHERN DISTRICT REPORTERS, P.C.
                         Page 7

Exhibit 5
Page 7 of 19

3CJLMTBC
(212) 805-0300

15

3CJLMTBC                    Conference
1  all these other courts already.  Saying even "she" did this.
2      My point is, if it's going to influence their
3  decision, there's a message I need to send, I think we need to
4  wait for the MDL Panel to decide whether they think this
5  warrants MDL treatment.
6      But I don't know that what the big consequence of this
7  is -- I'm not sure what the big consequence of this is, because
8  if I were to grant this stay, so to speak, of deciding the
9  remand motion while the MDL Panel works it out -- you know, you
10  don't have a camera planted in my chambers.  You're right,
11  eventually I'm going to have to decide whether or not they give
12  MDL treatment.  If they do, I've got them all; if they don't,
13  I've got the two new New York ones.  So there's still an
14  important signal that needs to be sent that I defer to the MDL
15  Panel to make its decision because in theory they might not do
16  it at all, or they might pick a different judge for whatever
17  reason.  I have to respect that.  But if I wish to, I can start
18  working now.
19      MR. MCNEW:  Let me make a suggestion, your Honor,
20  because I think there's a way to move this quickly to conserve
21  an awful lot of time and effort in a lot of different foras,
22  and I think you are the key to this because of the unusual
23  circumstance of having these individual cases come to you.
24      THE COURT:  They're only coming to me as related,
25  right?  How do I get these?  They're marked as related cases.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

3CJLMTBC                    Conference
1  This wasn't an accident of the wheel.
2      MR. MCNEW:  It was an accident.  We filed two in
3  New York Supreme for New York County.  There's a story behind
4  that -- that's another story.
5      THE COURT:  Okay.
6      MR. MCNEW:  What I'm trying to get to, Judge, is this:
7  You can -- rather than having us go through a process that will
8  frankly take months -- I have a hard time believing we'll be
9  back here in weeks -- don't stay your own decision on these two
10  cases, and I understand your concern about the message you'll
11  be sending.
12      THE COURT:  Not just the message.  In theory -- let's
13  say the MDL Panel decides on MDL treatment but says, for
14  whatever reason, it shouldn't be Judge Scheindlin, she has a
15  lot of work, a lot of other MDL's.  We'll select so-and-so?
16  which they'll have the power to do.  Well, I'll have wasted
17  work and we'll never decide these issues.
18      I don't suspect that's going to happen, because I have
19  the original MDL, 1358, and both the defense and the plaintiffs
20  apparently think I should have it, and yet you never know what
21  a group of federal judges will do.  They surprise us every
22  morning.  Who knows what they'll do?
23      So there is a small possibility that I would never
24  have these.  If they MDL it and give it to somebody else --
25  unlikely, but it could happen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

3CJLMTBC                    Conference
1      So I still think a stay according to the Second
2  Circuit is the way to go, pending the MDL's decision.  I'm not
Page 8

Exhibit 5
Page 8 of 19

3CJLMTBC

3   seeking to delay it.  I realize it would be a very important
4   motion to move up the list, though in front of one or two
5   important other motions I have pending.
6       MR. GORDON:  Robert Gordon, your Honor, for the
7   plaintiffs as well.  I want to first alert the Court it's not
8   just two cases.  Mr. Bern, who's the other plaintiff counsel
9   here, other than Weirz & Luxemberg, just received notice that
10  seven of his cases were removed to you.  So you now have nine.
11      THE COURT:  Because they were also in New York County?
12      MR. BERN:  Correct; your Honor.
13      MR. GORDON:  So you now have nine here to you.
14      I guess my point is:  We believe you're the MDL.  We
15  believe this is MDL 1358.  They're not opposing that.
16      THE COURT:  But you're opposing it.  I was told by
17  Mr. McNew you're going to tell the MDL Panel, We do not think
18  you should MDL this until the judges around the country have
19  decided remand.  Procedurally, we think remand comes first.  I
20  and all these federal judges should decide their own remand
21  motion, even though we realize it could be in Arizona, somebody
22  decides to go remand, and in Connecticut, somebody's going to
23  say not remand.  Yet that's our position.  Before the MDL.
24  That's what you're saying.  You're not saying we see the wisdom
25  of getting it all MDL now so one judge could decide it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

3CJLMTBC                           Conference
1       MR. GORDON:  We're going to the different federal
2   judges, telling all of them there's no subject matter
3   jurisdiction.
4       THE COURT:  And to decide remand before the MDL Panel
5   acts.
6       MR. GORDON:  But if they say no, I'm going to state
7   this, we, on behalf of our firm, which controls I think
8   99 percent of the cases -- not 100 percent -- for example, the
9   attorney general of New Hampshire is not our case -- that we
10  will not oppose conditional transfer to you so that we can make
11  the -- get the motion, get the motion on for you to remand it.
12  So we're not going to contest that in the JPMDL decision.
13  We're not going to put questions in MDL that they belong --
14      THE COURT:  You're only going to do that if judges
15  start to stay it, individual judges issue stays pending the
16  decision of the MDL Panel.  Then you're going to say, Nobody's
17  going to decide this remand.  Get to the MDL Panel, you have
18  our blessing, get it to MDL, get it to Judge Scheindlin, let's
19  get somebody to decide remand.  Either way -- we'll take it to
20  an appellate court if we lose; they'll take it to an appellate
21  court if they lose.  Let's get going.  So if you could get one
22  and instead of waiting for all these judges to either decide
23  remand or stay, why don't you just forgo it?
24      MR. GORDON:  We would not necessarily be opposed to
25  agreeing, since everyone's going to be deferential to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

3CJLMTBC                           Conference
    There's about 19 other federal judges --
1       THE COURT:  Talk to my children.
2       MR. GORDON:  They are another matter.  But federal
3   judges will say, what did the MDL judge do?  The proof in the
4   pudding is there:  Immediately on your stay, it was to Judge
5   Spatt before anybody could even spell his name.  That quickly.
6   I don't want to make it look like we're going to contest that
7
                           Page 9

Exhibit 5
Page 9 of 19

3CJLMTBC

8  there's an MDL 1358. We're not going to contest you're the
9  judge and these are tag-alongs. But you want to decide the
10  remands first.
11         THE COURT: That's not an issue here.
12         MR. GORDON: NO.
13         THE COURT: Then write a letter to all the judges,
14  say, we changed our position; we now believe it should all be
15  MDL, one judge should decide remand, we're agreeing about the
16  remand, we agree with the conditional tag-along transfer, and
17  I'll go to work on it.
18         MR. GORDON: We -- they necessarily want to have the
19  files transferred to the JPMDL to do that.
20         THE COURT: Fine.
21         MR. GORDON: We'll let them not rule on a stay and let
22  you rule.
23         THE COURT: You tell them that.
24         MR. GORDON: We would do that if your Honor would lift
25  this stay and get reply papers from them so you can decide.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

3CJLMTBC       Conference

1  Because de facto --
2         THE COURT: I think we could work something out here.
3         MR. GORDON: -- your decision would be controlling.
4         THE COURT: I think we can work something out here. I
5  think all you need to do is talk to your adversaries because
6  you could virtually do it by stipulation. If you're not
7  pressing your individual remand motions around the country but
8  going to a transfer so we can litigate it here, then we can
9  have a briefing schedule and litigate it here. Then it's got
10  to be litigated somewhere. Surely, Mr. Sacripanti, you don't
11  expect it not to be litigated.
12         MR. SACRIPANTI: No, your Honor.
13         THE COURT: And you don't want to litigate it before
14  30 judges, do you?
15         MR. SACRIPANTI: Your Honor, I don't, but there's one
16  problem with the analysis.
17         THE COURT: Yes.
18         MR. SACRIPANTI: They don't control all the cases.
19  And not to quibble with my friend Mr. Gordon, I don't think
20  it's 99 percent.
21         THE COURT: But how about these five lawyers at the
22  front table?
23         MR. SACRIPANTI: No, your Honor.
24         THE COURT: Even that?
25         MR. SACRIPANTI: There's a slew of cases throughout

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

3CJLMTBC       Conference

1  the country with other plaintiffs' firms -- California -- that
2  they don't control.
3         THE COURT: What if they bring them into a
4  stipulation? If they can arrange a stipulation, which is all
5  you want, you would like the remand -- Mr. Sacripanti, you
6  would like the remand motion heard in one court?
7         MR. SACRIPANTI: Indeed, your Honor.
8         THE COURT: Work it out. Try to work it out.
9         MR. SACRIPANTI: We're happy to try to do it. If your
10  Honor would issue a stay in the interim ...
11         THE COURT: The interim might be five or 10 minutes
12  while I'm taking a criminal case that's waiting to see me. Why

Page 10

Exhibit 5
Page 10 of 19

3CJLMTBC

13  don't you try to talk for a few minutes. Could you talk to
14  other for five or 10 minutes? Leave it at five or 10, because
15  at 11:00 I have to swear in the new citizens. I have to do
16  naturalization.
17          Why don't you talk five to 10 minutes, really, while I
18  do one criminal case. Then we'll come back and talk some more.
19  If we haven't worked something out, we'll take a break and I'll
20  come back to court and take care of you.
21          MR. GORDON: Can we leave our stuff?
22          THE COURT: I think so, sure.
23          (Recess)
24  (10:56 a.m.)
25          MR. SACRIPANTI: Your Honor, we apologize, we didn't

3CJLMTBC                    Conference
1   mean to keep you waiting.
2           THE COURT: That's all right.
3           MR. SACRIPANTI: We were thinking, your Honor, if you
4   talk to your children with the robe on, they may listen.
5           THE COURT: Never mind. They've seen that since 1982.
6   It didn't work then.
7           MR. SACRIPANTI: Your Honor, I think we need a little
8   time.
9           THE COURT: You want me to go swear in the citizens?
10          MR. SACRIPANTI: I think we do. I think we need a
11  little time, and we're working in earnest to try and solve
12  this.
13          THE COURT: If you don't mind, it takes about a half
14  an hour at the most to swear in the new citizens.
15          MR. GORDON: Can we explain to your Honor what the
16  question is, because it may be that you would or would not
17  consent to or even consider one as an option.
18          THE COURT: Sure.
19          MR. GORDON: Our position is, for the plaintiffs, we
20  would waive -- we would agree to a stay, and indeed to your
21  Honor issuing a stay of other courts deciding, if your Honor
22  would create an expedited briefing schedule, get them to
23  reply -- we filed our papers already -- and make a decision on
24  that. And we would support that. In all the cases that we're
25  in, which I do believe they now agree would be somewhere around

3CJLMTBC                    Conference
1   90 percent of the nation's cases, I think it's more -- but they
2   have a different proposal, and I'll let them explain it to you.
3   And I need to call cocounsel in the intervening time.
4           MR. EIMER: Nate Eimer. I think we're very close on
5   this. I think the issue is, one, we would request that your
6   Honor issue the order staying the other cases, which you can
7   under 1358. We're not certain of the effect of that, but
8   that's great; it's helpful. What we would propose is -- what
9   we understand Mr. Gordon's position to be or plaintiffs'
10  position to be is that they don't oppose transfer here and your
11  Honor deciding the remand issue. So what we've asked is that
12  plaintiffs, in addition to this, let us advise the JPML that
13  plaintiffs do not oppose issuance of a conditional transfer
14  order and transfer to your Honor, so we get the process started
15  sweeping these cases up and bring them here. That's the issue
16  Mr. Gordon needs to talk to Mr. Summy about, and if we get that
17  resolved, we have an understanding.
                         Page 11

Exhibit 5
Page 11 of 19

3CJLMTBC

18    THE COURT: It doesn't sound so --
19    MR. GORDON: We feel there's no subject matter
20  jurisdiction. I hate to go to any federal judge -- I'd rather
21  have them stay it rather than agree that it should go and get
22  transferred and start to go through the federal system and
23  transfer, when I believe that once your Honor rules as the MDL
24  judge, I believe -- which we still believe you are, and no
25  one's suggesting that you're not, and these are simply

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

3CJLMTBC               Conference

1  tag-alongs.
2    MR. MCNEW: Our common desire, your Honor, is that we
3  find a way, so this doesn't become enmired in the process of
4  going through the conditional transfer order process --
5    THE COURT: I understand.
6    MR. MCNEW: And to the extent your Honor has thoughts
7  about how we might do that, we would be grateful for your
8  guidance.
9    THE COURT: Okay.
10    MR. GORDON: I can't imagine that another fellow
11  judge, if they've been stayed to wait your ruling, then you
12  rule, that they would take a contrary position; and to the
13  extent that the defendants are worried, by the way, about some
14  cases being in state court, some being in federal court, that's
15  almost inescapable.
16    THE COURT: Yes, exactly.
17    MR. GORDON: There are existing state cases they've
18  never sought to remove. County of Suffolk, one of the biggest
19  in the country. Passco, Rhode Island, never sought to remove
20  it.
21    THE COURT: I think you're right, that's inescapable.
22  There are some cases in state court, there are. It's up to
23  them to remove them timely or not. Nothing to be done about
24  that.
25    But what they do want to avoid, I gather, is many,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

3CJLMTBC               Conference

1  many federal rulings which could potentially be inconsistent
2  and in different circuits and different appeal schedules and
3  all the rest of it, and everybody seems to favor a fast
4  adjudication one way or the other.
5    I'm not going to promise you a day. I've made one
6  promise this year, that's one too many. But there was a reason
7  in that case.
8    MR. EIMER: Nate Eimer. It's not an issue for any of
9  us here -- I was going to say a lot, I don't know how many,
10  defendants are who are not in these cases.
11    THE COURT: But even they are not pressing for the
12  remand question to be decided in various courts around the
13  country.
14    MR. EIMER: No, they're objecting, they're asking for
15  stays in each of the cases they're in.
16    THE COURT: So in theory, they basically all want to
17  be here, too.
18    MR. EIMER: They get to participate -- there are some
19  people who don't get to participate. It will go decided before
20  they get here. But I'm not concerned about that.
21    THE COURT: I'm not either because, as you say,
22  generally speaking they're seeking stays around the country.

Page 12

Exhibit 5
Page 12 of 19

3CJLMTBC

23  They want it to be in the MDL process, so they've been heard,
24  so to speak, indirectly.
25          MR. GORDON: And we're giving them the stays. It's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

26

3CJLMTBC                    Conference
1   the ones we're here on we want to move forward on.
2           THE COURT: I understand. So when I come back from my
3   naturalization, will you be here or will you go away?
4           MR. GORDON: We'll be here.
5           THE COURT: All right.
6           MR. SACRIPANTI: Can we use the courtroom?
7           THE COURT: Yes, you may. I'll be down in the
8   ceremonial courtroom.
9           (Recess)
10  (11:55 a.m.)
11          THE COURT: Can we get started?
12          MR. SACRIPANTI: I think so, your Honor.
13          MR. GORDON: Your Honor, thank you for your patience.
14  We were in touch with counsel in South Texas. It wasn't easy.
15          MR. MCNEW: They have telephones down there.
16          THE COURT: That's good. Reassuring.
17          MR. GORDON: Obviously, we don't speak for everybody
18  in the country -- neither do they -- but just for those here in
19  the courtroom and some of us that we've been able to reach have
20  agreed to, from the plaintiffs:
21          We would stipulate, first of all, Number 1: To
22  immediate transfer of all cases which counsel control including
23  some declaratory judgment actions that the defendants have just
24  filed in federal courts to you, Shira Scheindlin, in your
25  capacity as MDL 1358 judge. And we agree to not oppose the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

27

3CJLMTBC                    Conference
1   issuance or finality of the panel's conditional transfer order.
2           Number 2: We stipulate that your Honor, Judge
3   Scheindlin, use whatever judicial means at your disposal to
4   stay and cause the immediate transfer of any other cases to
5   this Court.
6           MR. SACRIPANTI: And for that, your Honor, if I may,
7   we would refer you to the manual, and we would hope that you
8   would, you know, contact those other judges. I know it's an
9   imposition, but....
10          THE COURT: Well, writing is easier certainly than
11  calling them. But if I end up with a list....
12          MR. SACRIPANTI: We're going to provide you with a
13  list, your Honor. Thank you.
14          MR. GORDON: Number 3: We, the plaintiffs, expressly
15  reserve our objections to federal jurisdiction and stipulate
16  that our agreement here is not a waiver.
17          Number 4: We agree -- all the parties here -- to an
18  expedited briefing hearing on the motions to remand and the
19  dates that we've suggested, the defendants agreed they would
20  get their papers in by January 9th; that we would take seven
21  days to apply, which would be January 16th; and that we'd ask
22  for a hearing the following week, which would be the week of
23  the 19th, which is Martin Luther King's birthday, but then that
24  Tuesday, Wednesday and Thursday -- Wednesday the 21st, perhaps,
25  is consistent with your Honor's schedule?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                        Page 13

Exhibit 5
Page 13 of 19

3CJLMTBC

28

1   THE COURT: A "hearing" meaning what?
2   MR. GORDON: Oral argument.
3   THE COURT: If the Court requires one, yes.
4   MR. GORDON: Yes. Number 5: Declaratory judgment
5   actions that were filed and just served on our clients
6   yesterday would be stayed pending the decision on remand.
7   And Number 6: The plaintiff agrees to file
8   appropriate papers staying other cases that we control pending
9   final MDL Panel action transferring the cases.
10   Did I say that correctly?
11   MR. LANGAN: Perfect, Rob. Thank you.
12   MR. WALLACE: Actually, your Honor -- this is Rick
13   Wallace for Shell, Chevron and other defendants -- a couple of
14   minor modifications:
15   I thought the proposal for Number 1 was to stay as
16   well as transfer all those cases that the plaintiffs control.
17   And on Number 3, I'd simply ask that that objection --
18   the preservation of objections to jurisdiction be reciprocal,
19   because there are some defendants that may also have objections
20   to personal jurisdiction.
21   MR. SACRIPANTI: Your Honor, if I may?
22   THE COURT: But it is consistent with the defendants
23   that all defendants are together in saying there is federal
24   jurisdiction; is that right? Or is there inconsistency on the
25   defense side?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

1   MR. WALLACE: I don't anticipate any inconsistency on
2   subject matter jurisdiction.
3   THE COURT: But personal jurisdiction, you want to
4   preserve your rights. Yes, okay. I hear you.
5   MR. SACRIPANTI: Which leads me, your Honor, to a
6   point: We can only bind and agree to be bound the clients that
7   we represent that are here. There are about, by my reckoning,
8   30 other defendants that are part of the actions that have been
9   removed before your Honor who are not present today. What your
10   Honor may want to do -- and I'll leave it to your Honor -- is
11   to set perhaps a date by which if anyone objects to this
12   stipulation, that they should come in, petition the Court and
13   you should have a conference on that.
14   May I suggest January 9th or 5th?
15   THE COURT: Let me ask this question: In terms of
16   briefing, however, would those defendants who are not present
17   anticipate folding into this briefing schedule?
18   MR. SACRIPANTI: I would assume they would, your
19   Honor. We're going to give notice of this to everyone. We're
20   going to do that immediately. I just want to preserve --
21   because frankly, I'm acting as coordinating counsel, but none
22   of us here have the power to bind anyone.
23   THE COURT: I understand that. It's your best
24   prediction, so to speak, that they all wish to stay their local
25   actions and wish it to be heard in one MDL proceeding. That's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

1   your best guess.
2   MR. SACRIPANTI: And would agree to the stipulation as
3   set forth by Mr. Gordon.

Page 14

Exhibit 5
Page 14 of 19

3CJLMTBC

4      THE COURT:  I understand.  When we actually tell them
5  the briefing schedule, there may become some objections.  Are
6  you kidding?  How are we going to get a coordinated brief in --
7  did you say January 9th?
8      MR. GORDON:  That's correct.
9      THE COURT:  With the two holidays falling in between,
10  you've got to circulate that to how many defendants?
11      MR. MCNEW:  But, Judge --
12      THE COURT:  That's really a tight schedule.
13      MR. MCNEW:  But if you think about the context, we've
14  already served motions to remand in all these cases.
15      THE COURT:  I understand.  I have one in front of me,
16  one Memorandum of Law in Support of Motion to Remand Case
17  Number 03 CV 9543, County of Nassau.  But I assume -- tell me
18  if I'm wrong -- that that brief will relate to all of the
19  original nine cases, so to speak, that I have, and if the rest
20  are transferred, it relates to all of them, it's not
21  case-specific -- is that right?
22      MR. MCNEW:  The removal papers and the remand motions
23  are identical, case-to-case.  There's no variation.
24      THE COURT:  When was it served?
25      MR. MCNEW:  Our first remand papers were served in
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

3CJLMTBC                    Conference
1  Connecticut, and I believe it was December 8th.  So defense
2  counsel have had these papers for awhile.
3      THE COURT:  Well, some.  I don't know who the
4  defendants were in Connecticut.  I really don't know if all of
5  them really did receive the papers.
6      But the point is, we want a coordinated brief.  We
7  don't want different defendants coming in and saying, you know,
8  No, given that schedule, I was not able to coordinate; I have
9  no input; I have a right to make my own papers.
10      I think if we actually give another week, it's a small
11  change, but it really does at least allow the defense brief to
12  be circulated throughout the defense group.  I don't want to be
13  so unrealistic that I end up with more than one brief.  That
14  would be self-defeating.  And I really can't bind the
15  defendants who aren't here today to agree that the defendants
16  who are here today are going to write a brief for them that
17  they have no chance to even read or comment on.
18      So efficiency tells me I'd rather see it moved up a
19  week, and that's tight, but at least it could be sent around to
20  every defendant and every case around the country so that they
21  all agree on one coordinated brief.  That's to the plaintiffs'
22  benefit, too.
23      MR. SACRIPANTI:  And, Judge, I would suggest that, if
24  I may, we will send notice to all the defendants, but your
25  Honor may want to set an interim conference date, which may not
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

3CJLMTBC                    Conference
1  be necessary, where people who do object -- and I can't say
2  people will -- they can come and voice their objections.
3      THE COURT:  The only objection they may have
4  potentially is to the dates.  And they can say, We need time to
5  be part of this brief.  That's their only real objection that I
6  gather they'd want is to be heard once and not 40 times.
7  Everybody wants that.  So they just want enough time to read it
8  and show it to their clients and make sure they don't have a
Page 15

Exhibit 5
Page 15 of 19

3CJLMTBC

```
 9  brilliant idea that somehow the seven brilliant people who are
10  here didn't have.
11          MR. SACRIPANTI:  I guarantee they will, your Honor.
12          THE COURT:  When you're working with a big,
13  coordinated group, that's for sure.  People want to read it and
14  have some input.
15          I think we should move the 9th to the 16th.
16          MR. GORDON:  The 16th.
17          THE COURT:  And what was the reply date you said
18  originally?  The 16th?
19          MR. GORDON:  But then -- we lose then the Martin
20  Luther King day.  Could we go to the following Monday, at
21  least?  The 26th?
22          THE COURT:  Sure.
23          MR. GORDON:  And then have the hearing still that same
24  week?
25          THE COURT:  No.  You can't have a hearing until I've
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

3CJLMTBC                    Conference

```
 1  read the briefs.  I can't have a hearing before I've read them.
 2          MR. GORDON:  No, have a hearing during the week of the
 3  26th.
 4          THE COURT:  Oh, that same week.
 5          MR. GORDON:  I'm moving everything up a week.  The
 6  only thing is I want over the weekend because of the Martin
 7  Luther King holiday.  In other words, the 16th for them; the
 8  26th for us; and the hearing perhaps the 28th, 29th, 30th of
 9  that week.  Whatever your Honor's schedule would accommodate.
10          THE COURT:  Actually, I don't usually hear oral
11  argument on motions, so I can't even predict.
12          MR. GORDON:  We can just actually leave that out.
13          THE COURT:  We could leave it out of the stipulation,
14  or we could say if necessary, there will be a hearing on -- so
15  that everybody at least can plan for it.
16          MR. GORDON:  Can I ask for the 27th rather than the
17  26th so we can actually get a work day to make up for that
18  Martin Luther King day?
19          THE COURT:  That's fine.  You have a lot of people to
20  coordinate with, too.
21          If it goes, I'm supposed to start a trial on the 26th.
22  So in terms of a hearing -- there's always that "if it goes",
23  but if it goes....
24          The best day for a hearing would probably be Friday,
25  February 13th -- not to be suspicious -- Friday the 13th at
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

3CJLMTBC                    Conference

```
 1  10:00 o'clock.  That's the best day I see for a hearing.  But
 2  that could be moved up if the two-week trial goes away, as
 3  trials tend to do.
 4          MR. GORDON:  I did not mean to imply we were
 5  requesting oral argument on this.  We'd be happy to waive that.
 6          THE COURT:  Let's see if I think I need it.  Let's
 7  also set a time on February 13th.  We'll make it at 10:00.  As
 8  far as Mr. Sacripanti's suggestion of scheduling a date --
 9          MR. SACRIPANTI:  I have a different suggestion now.
10  That's withdrawn.
11          THE COURT:  What's the latest one?
12          MR. SACRIPANTI:  The latest, Your Honor, is you set a
13  date, and may I suggest January 5th, that if anyone objects, to
```

Page 16

Exhibit 5
Page 16 of 19

3CJLMTBC
14   notify the Court by that date in writing.  And if they don't,
15   they don't.  I want to preserve for people who aren't here the
16   opportunity to say, Your Honor, those guys were nuts, okay?  So
17   if we can do January 5th, that would be great.
18           THE COURT:  Sounds okay with me.  What does anybody
19   else think?  If anybody objects to the stipulation who is not
20   part of the stipulation because they weren't here, they can
21   file a written objection, so to speak.  And we'll see, if we
22   get any, what to do about it.
23           MR. SACRIPANTI:  Right, exactly.
24           THE COURT:  In the meantime, everybody's committed to
25   the schedule who is here.

35

3CJLMTBC                   Conference
1            MR. SACRIPANTI:  We're committed to the schedule.  I
2    just want to represent those who aren't here.
3            MR. GORDON:  Here's my concern:  We're obligating
4    ourselves to take certain actions.
5            THE COURT:  And they are, too.  They're going to file
6    a brief on the 16th of January no matter what.  They want to
7    just say to anybody who wasn't here today who has something to
8    say, Say it by January 5th or forever hold their peace.
9            MR. GORDON:  Court's indulgence.
10           (Off the record)
11           MR. GORDON:  Judge, I just want to -- we're going to
12   other courts and taking a certain position.  If the stipulation
13   does not happen at the end of the day because on January 5th
14   people come in and say, We actually don't agree, we have to be
15   able to then no longer be bound by this.
16           THE COURT:  I think that's right.  Or for some reason
17   the stipulation is --
18           MR. SACRIPANTI:  Reversed, held -- voided.
19           THE COURT:  Voided.  That's a good word.  Thank you
20   very much.  Then everybody will act accordingly.  But I really
21   don't anticipate -- I think it's a fail-safe for people that
22   aren't here.
23           MR. SACRIPANTI:  And we'll make the notice shorter.
24   We don't want to be voided.  So we'll make the notice --
25           THE COURT:  No, I think January 5th is the right date.

36

3CJLMTBC                   Conference
1            MR. SACRIPANTI:  And we give people notice, and if
2    it's voided, all bets are off.
3            THE COURT:  I don't see why that should happen.  It's
4    an unlikely event.  It's an unlikely event.  It's just kind of
5    a due process.
6            MR. EIMER:  The only problem we have with this, now,
7    one last gap, there's some actions that need to be taken in
8    other districts as a result of remand motions they've filed,
9    and we're assuming we don't have to do anything, because there
10   will be a deal, we assume, but Mr. Gordon is saying he doesn't
11   want to stay those cases until after January 5th.
12           MR. GORDON:  I'm concerned about it, because I could
13   be tying my hands on the one hand while other guys hit me, is
14   my concern.
15           THE COURT:  Hit you with what?
16           MR. GORDON:  While they, in other jurisdictions,
17   they're moving for their courts to make decisions or not make
18   decisions or transfer.
                          Page 17

Exhibit 5
Page 17 of 19

3CJLMTBC

19   THE COURT: They're not. They were moving for stays
20   around the country, as you know. We have to be a little bit
21   realistic. I'll try to issue an order in the MDL cases that
22   incorporates this and sends it out everywhere. Most judges
23   aren't really anxious to work between Christmas and New Years
24   on a remand motion. It's not a high priority. Most people
25   want to buy presents and wrap them and celebrate. They're not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

3CJLMTBC                    Conference
1   dying to decide this.
2        MR. GORDON: Although this would make a nice present.
3        THE COURT: I'll issue an order. I think they have
4   other things to do in the next 10 days. I don't know that
5   they're rushing to decide a difficult remand motion.
6        What I need is a service list or something.
7        MR. SACRIPANTI: By close of business, we'll provide
8   you with a list of all removal issues and the judges.
9        THE COURT: And you'll coordinate with plaintiffs to
10   do your best to be sure that the list is complete?
11        MR. SACRIPANTI: Yes.
12        MR. GORDON: May I ask one question? I assume you
13   have everybody in here who was part of the DJ action, because I
14   know not all the defendants agreed to do that.
15        I know you sort of took the lead. I assume the part
16   that says that you're going to -- that you control the DJ
17   actions and you're agreeing to immediate transfer of those
18   cases, to a stay of that --
19        MR. SACRIPANTI: Marathon's not here. Marathon's not
20   here.
21        THE COURT: And you didn't try to call that party?
22        MR. LANGAN: I can't imagine it will be a problem. It
23   won't be.
24        THE COURT: There are expressions of confidence --
25        MR. GORDON: Can we get an answer to that by the end

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

3CJLMTBC                    Conference
1   of business today?
2        MR. SACRIPANTI: I can tell you we'll move posthaste
3   to all of them, reach out to them. But why don't you give me
4   till Monday.
5        MS. ROSENBLATT: I think he's out of town.
6        THE COURT: Who represents Marathon? What law firm?
7        MS. ROSENBLATT: Baker, Botts.
8        THE COURT: Just coordinate it.
9        Does anybody want to propose language for the order,
10   the very short order I'm going to try to draft in the MDL
11   manner? It will have an MDL caption. I'll try to draft
12   something, but if anybody has an idea of the proposed language,
13   I'd be happy to hear you.
14        MR. SACRIPANTI: Would you like us to send you --
15   we'll try to work and have a joint --
16        THE COURT: I'd like to get it out by the end of the
17   day.
18        MR. SACRIPANTI: So would we.
19        MR. EIMER: We'll work one out this afternoon.
20        THE COURT: You're welcome to stay. Sit around the
21   table and do it. Let's see what I have next.
22        I don't have a matter in this courtroom until 2:30.
23        MR. MCNEW: Okay.

Page 18

Exhibit 5
Page 18 of 19

3CJLMTBC

24        THE COURT:  Folks, if you find yourselves here, you're
25  welcome to work here.  There's no matter in this courtroom
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

39

3CJLMTBC                    Conference
1   until 2:30.
2            MR. SACRIPANTI:  Thank you, your Honor.
3            THE COURT:  You're welcome to stay.  We don't have
4   cookies or coffee, but you're welcome to stay.
5            (Adjourned sine die)
6                          o O o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

Page 19

Exhibit 5
Page 19 of 19

# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**ORDER**
Master File C.A. No.
1:00-1898(SAS)
MDL 1358

_____

This document refers to:

*County of Nassau v. Amerada Hess Corp., et al.*, No. 03-cv-9543
*Water Authority of Western Nassau County v. Amerada Hess Corp, et al.*, No. 03-cv-9544
*Incorporated Village of Mineola, et al. v. AGIP Inc., et al.*, No. 03-cv-10051
*West Hempstead Water District v. AGIP Inc., et al.*, No. 03-cv-10052
*Carle Place Water District v. AGIP Inc., et al.*, No. 03-cv-10053
*Town of Southampton v. AGIP Inc., et al.*, No. 03-cv-10054
*Village of Hempstead v. AGIP Inc., et al.*, No. 03-cv-10055
*Town of East Hampton v. AGIP Inc., et al.*, No. 03-cv-10056
*Westbury Water District v. AGIP Inc., et al.*, No. 03-cv-10057

_____

The Court, upon hearing counsel for plaintiffs and certain defendants at a conference in the above-referenced cases in response to defendants' motions to stay proceedings in these cases and plaintiffs' motions for their remand, and upon stipulations there agreed to on the record by the parties present, finds, in the above-captioned proceeding, that it is appropriate for the issues presented by these motions in these and all similar removed actions, wherever filed, to be heard and decided by this Court.

Accordingly, all proceedings in the cases set forth in the attached Schedule should be stayed pending transfer to this Court sitting in its capacity as the MDL No. 1358 court. This Court respectfully requests that all courts to which the scheduled cases have been removed GRANT ALL MOTIONS TO STAY those cases pending transfer to MDL No. 1358.

The parties have agreed to the following consolidated briefing schedule, which is hereby So Ordered: defendants' opposition to plaintiffs' motion to remand shall be served and filed by January 16, 2004, and plaintiffs' reply in further support of the motion to remand shall be served and filed by January 27, 2004. Defendants' motion to stay in the above-referenced cases is DENIED because this Court will consider and decide the consolidated motion to remand forthwith.

Dated: December 23, 2003

_____
Honorable Shira A. Scheindlin
United States District Judge

Exhibit 6
Page 1 of 5

## SCHEDULE

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|-------|-----------------|--------------|-----------------|----------------|
| CA | California-American Water Co. v. Unocal Corp., et al. | 11/26/03 | N.D. Cal. C 03-5379 JSW | Jeffrey S. White |
| CA | City of Fresno v. Chevron U.S.A. Inc., et al. | 11/26/03 | N.D. Cal. C 03-5378 JSW | Jeffrey S. White |
| CA | City of Riverside v. Atlantic Richfield Co., et al. | 12/12/03 | C.D. Cal. EDCV03-1460 RT SGLx | Robert J. Timlin |
| CA | City of Roseville v. Atlantic Richfield Company, et al. | Not yet removed | | |
| CA | Orange County Water District v. Unocal Corp., et al. (Amended) | 12/05/03 | C.D. Cal. SACV03-1742 JVS (ANx) | James V. Selna |
| CA | People v. Unocal Corp., et al. | 12/10/03 | E.D. Cal. CIV.S-03-2653 GEB DAD | Garland E. Burrell, Jr. |
| CA | Quincy Community Services District v. Atlantic Richfield Co., et al. | 12/17/03 | E.D. Cal. CIV S-03-2582 WBS DAD | Hon. William B. Shubb |
| CA | Silver, et al. v. Alon USA Energy, Inc., et al. | 12/03/03 | S.D. Cal. 03 CV 2408 WQH (RBB) | William Q. Hayes |
| | | | | |
| CT | American Distilling & Mfg. Co., Inc. v. Amerada Hess Corp., et al. | 11/10/03 | D. Conn. 3:03-CV-1926 | Hon. Stefan R. Underhill |
| CT | Canton Bd. of Education v. Amerada Hess, et al. | 11/10/03 | D. Conn. 3:03-CV-1921 | Hon. Stefan R. Underhill |
| CT | Childhood Memories v. Amerada Hess, et al. | 11/10/03 | D. Conn. 3:03-CV-1924 | Hon. Alvin W. Thompson |
| CT | Columbia Bd. of Education v. Amerada Hess, et al. | 11/10/03 | D. Conn. 3:03-CV-1923 | Hon. Stefan R. Underhill |
| CT | Our Lady of Rosary Chapel v. Amerada Hess Corp., et al. | 11/10/03 | D. Conn. 3:03-CV-1925 | Hon. Stefan R. Underhill |
| CT | Town of East Hampton v. Amerada Hess Corp., et al. | 11/10/03 | D. Conn. 3:03-CV-1927 | Hon. Stefan R. Underhill |
| CT | United Water Connecticut, Inc. v. Amerada Hess Corp., et al. | 11/10/03 | D. Conn. | Hon. Stefan R. Underhill |

Exhibit 6
Page 2 of 5

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| | | | 3:03-CV-2017 | |
| | | | | |
| FL | Escambia County Utilities Auth. v. Adcock Petroleum, Inc., et al. | 11/25/03 | N.D. Fla. (Pensacola) 3:03-CV-539 | Hon. L.A. Collier Hon. M. Davis, U.S.M.J. |
| IA | City of Galva, Ida Grove & Sioux City v. Amerada Hess Corp., et al. | 11/24/03 | S.D. Iowa 4:03-CV-90663 | Hon. Robert W. Pratt |
| IL | City of Crystal Lake v. Amerada Hess Corp. | 12/12/03 | N.D. Ill. (Eastern Div.) 03-CV-8973 | Hon. George W. Lindberg |
| IN | City of Mishawaka v. Amerada Hess Corporation, et al. | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-904 | Hon. Robert Miller, Jr. |
| IN | City of Rockport v. Amerada Hess Corp., et al. | 11/21/03 | S.D. Ind. (Evansville) 3:03-CV-201 | Hon. Richard L. Young Hon. William G. Hussmann, Jr., U.S.M.J. |
| IN | North Newton School Corporation v. Amerada Hess Corporation, e t al. | 12/12/03 | N.D. Ind. (Lafayette) 4:03-CV-013 | Hon. Allen Sharp |
| IN | City of South Bend v. Amerada Hess Corporation, et al. | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-905 | Hon. Allen Sharp |
| KS | Chisholm Creek Utility Auth v. Alon USA Energy, Inc., et al. | 12/15/03 | D. Kan. 03-CV-1457 | Hon. Wesley E. Brown |
| KS | City of Bel Aire v. Alon USA Energy, Inc., et al. | 12/15/03 | D. Kan. 03-CV-1458 | Hon. Wesley E. Brown |
| KS | City of Dodge City v. Alon USA Energy, Inc., et al. | 12/15/03 | D. Kan. 03-CV-1456 | Hon. Monti L. Belot |
| KS | City of Park City v. Alon USA Energy, Inc. | 12/15/03 | D. Kan. 03-CV-1455 | Hon. Thomas J. Marten |
| MA | Brimfield Housing Auth. v. Amerada Hess Corp., et al. | 11/26/03 | D. Mass. 03-CV-12399 | Hon. Richard G. Stearns |
| NH | City of Dover v. Amerada Hess Corporation, et al. | Not yet removed | | |

Exhibit 6

Page 3 of 5

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| NH | City of Portsmouth v. Amerada Hess Corporation, et al. | Not yet removed | | |
| NH | State of New Hampshire v. Amerada Hess Corp., et al. | 09/30/03 | D.R.I. 03-CV-529 | Hon. Ronald R. Lagueux |
| | | | | |
| NJ | NJ American Water Co., Inc. v. Amerada Hess Corp., et al. | 11/24/03 | D.N.J. 03-CV-5562 | Hon. William G. Bassler |
| | | | | |
| NY | Carle Place Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10053 | Hon. Shira A. Scheindlin |
| NY | County of Nassau v. Amerada Hess Corp., et al. | 12/02/03 | S.D.N.Y. 03-CV-9543 | Hon. Shira A. Scheindlin |
| NY | Long Island Water Corp. v. Amerada Hess, et al. | 12/04/03 | E.D.N.Y. 03-CV-6125 | Hon. Arthur D. Spatt<br>Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Town of East Hampton v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10056 | Hon. Shira A. Scheindlin |
| NY | Town of Southampton v. AGIP Inc, et al. | 12/18/03 | S.D.N.Y. 03-cv-10054 | Hon. Shira A. Scheindlin |
| NY | Village of Mineola; Water Dept. of Village of Mineola v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10051 | Hon. Shira A. Scheindlin |
| NY | Water Authority of Great Neck North v. Amerada Hess Corp., et al. | 10/28/03 | E.D.N.Y. 03-CV-6077 | Hon. Arthur D. Spatt<br>Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Water Authority of Western Nassau County v. Amerada Hess, et al. | 10/01/03 | S.D.N.Y. 03-CV-9544 | Hon. Shira A. Scheindlin |
| NY | Westbury Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10057 | Hon. Shira A. Scheindlin |
| NY | West Hempstead Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10052 | Hon. Shira A. Scheindlin |
| NY | Village of Hempstead v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10055 | Hon. Shira A. Scheindlin |
| | | | | |
| PA | Pennsylvania Suburban Water Co. v. Sunoco, Inc. | Not yet removed | | |
| | | | | |

Exhibit 6
Page 4 of 5

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| VA | Buchanan County School Board v. Amerada Hess Corporation | Not yet removed | | |
| VA | Greensville Co. Water & Sewer Authority v. Amerada Hess Corporation | Not yet removed | | |
| VA | Patrick County Sch. Board v. Amerada Hess Corp., et al. | Not yet removed | | |
| | | | | |
| VT | Town of Hartland, County of Windsor, Vermont Water System v. Amerada Hess Corp., et al. | 12/11/03 | D. Vt. 2:03-CV-337 | Hon. William K. Sessions, III |

Exhibit 6
Page 5 of 5

# Exhibit 7

Law Offices of

# SHER & LEFF

**VICTOR M. SHER**                                        **TODD E. ROBINS**
**ALEXANDER I. LEFF**                                     **LYNDA COLLINS**

December 23, 2003

*Via Overnight Courier*

The Honorable Shira A. Scheindlin
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1050
New York, New York 10007-1312

Re:     *In re MTBE Products Liability Litig.*, MDL No. 1358;
        *State of New Hampshire v. Amerada Hess Corp., et al.*, DNH Case No. 03-CV-486,
        DRI Case No. 03-0529L

Dear Judge Scheindlin:

        This firm is lead outside counsel for the State of New Hampshire in the above matter
that I understand will be transferred imminently as part of MDL No. 1358.  We have reviewed
the transcript of the proceeding in front of Your Honor of December 19, 2003, and anticipate
that New Hampshire will not be objecting to the conditional transfer of its MTBE case, under
the terms set forth in the hearing, to Your Honor for prompt resolution of remand motions.

        New Hampshire's case was filed in the Superior Court for Merrimack County, New
Hampshire, removed to federal court by certain defendants, and transferred to the District of
Rhode Island due to recusal of the New Hampshire federal judges.  The State filed a motion
for remand on November 19, 2003, and certain defendants moved for a stay pending a
decision on transfer of the case to an MDL on December 1, 2003.  It is our understanding that
Judge Ronald R. Lagueux granted defendants' stay motion on December 18, 2003.

        Enclosed are courtesy copies of the defendants' Notice of Removal and the State's
Remand Motion and supporting brief.  Please note that New Hampshire's case is the *only* case
filed by a State sovereign and raises certain significant issues with respect to federal subject
matter jurisdiction that are not at issue in other remand motions.  Please also note that the
Notice of Removal filed in this case differs from those filed in the other MTBE cases in that
defendants do not assert federal question jurisdiction.

December 23, 2003                                                              Page 2
The Hon. Shira A. Scheindlin


     Thank you for your attention to this matter and your efforts toward a prompt and fair process for all parties.

Sincerely,

Victor M. Sher


cc (by regular mail):     Clerk, U.S. District Court for the District of Rhode Island
                            Counsel/Parties listed on attached service list


Exhibit 7
Page 2 of 2

# Exhibit 8

Law Offices of

# SHER & LEFF

**VICTOR M. SHER**
**ALEXANDER I. LEFF**

**TODD E. ROBINS**
**LYNDA M. COLLINS**

January 28, 2004

*Via Facsimile and Federal Express Overnight Delivery*

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

> Re: *In re MTBE Products Liability Litigation* (MDL 1358); Master File C.A.
> No. 1:00-1898 (SAS)
>
> *State of New Hampshire v. Amerada Hess Corp. et al.*, DNH Case No
> 03-CV-486, DRI Case No. 03-0529L

Dear Judge Scheindlin:

This firm is lead outside counsel for plaintiff State of New Hampshire in *State of New Hampshire v. Amerada Hess Corp. et al.*, DNH Case No. 03-CV-486, DRI Case No. 03-0529L. We write to follow up on our January 5, 2004, letter to Your Honor concerning the relationship between that case and MDL 1358. As explained below, we have concluded – reluctantly -- that this case is not appropriate for transfer as a part of MDL 1358, nor, for that matter, as part of any multidistrict litigation.

We had hoped, as apparently contemplated by Your Honor and the parties who were present during the hearing on December 19, 2003 (which did not include the State), that the State's motion to remand its action (currently pending in the District Court of Rhode Island) could be resolved expeditiously by this Court on the schedule ultimately adopted in the Court's December 23, 2003, Order. However, that has not come to pass: Although defendants claim to have filed a Notice of Related, Tag-Along Action with the Judicial Panel on Multidistrict Litigation (JPML), we have not been served with any such documents, and the JPML has yet even to issue a conditional transfer order in this matter. Obviously, today our case is not before Your Honor in any capacity. Meanwhile, remand motions in other cases have proceeded without the State's participation, without the benefit of the record in our case (including the complaint, defendants' Notice of Removal, or the State's brief in support of its previously-filed motion for remand), and without briefing on or consideration of the State's unique status as sovereign.

Other than some commonality with respect to whether cases seeking damages for MTBE contamination of water should be in federal court at all, the State's action has

The Honorable Shira Scheindlin
January 28, 2004
Page 2 of 3

little if anything in common with MTBE actions filed by other parties.  Indeed, unlike all of the matters currently pending before Your Honor, plaintiff in this case is not a drinking water purveyor.  Rather, the State of New Hampshire asserts a plethora of sovereign, regulatory, property, usufructuary and other legal interests in protecting ground- and drinking water resources under the New Hampshire Constitution and state law from MTBE contamination.

In brief, this case is singularly inappropriate for inclusion in MDL 1358 for at least two fundamental reasons: (1) it is brought pursuant to constitutional, statutory and regulatory powers unique to the State; and (2) it raises few, if any, common factual or legal issues with MDL 1358.

First, the State brings this action pursuant to powers contained in the New Hampshire Constitution, New Hampshire statutes, and New Hampshire common law. These powers - specific to the State and uniquely asserted by it - provide it as sovereign, regulator, and owner/trustee of the groundwater resources of the State with exclusive standing, causes of action, and remedies.  We can anticipate that these matters will likely be the subject of substantial pre-trial proceedings.  Such proceedings will be entirely irrelevant to any other MTBE case, whether part of an MDL or otherwise.

Second, very few, if any, common factual issues remain that would benefit from MDL treatment.  The key factual background concerning the development and widespread distribution of MTBE, the characteristics of MTBE, and the industry's early knowledge of its risks, has already largely been elucidated through discovery and adjudications in previous litigation around the country, including in MDL 1358 as well as in litigation in California and elsewhere.  These materials are available to the parties and need not be duplicated in future MDL litigation.  In contrast, the overwhelming majority of factual issues remaining to be litigated in the State's current case are questions pertaining to matters such as local refining and gasoline distribution systems, and the State's damages.

Major legal issues – most notably defendants' federal preemption and other legal defenses -- have also been litigated extensively and resolved in previous MTBE litigation.  As noted above, the major legal issues that remain in the State's action pertain to the unique aspects of New Hampshire law.  For these and other reasons, we respectfully submit that an MDL court (whether in the Southern District of New York or

Exhibit 8
Page 2 of 3

The Honorable Shira Scheindlin
January 28, 2004
Page 3 of 3

elsewhere) is clearly not an efficient – certainly not the most efficient – forum for resolving these localized issues.[1]

     Accordingly, the State wishes to inform the Court, as a matter of courtesy, that it intends to object to any conditional transfer orders from the JPML.  The State believes that its case should be heard by the state court in which it filed its action and is not appropriate for multi-district consolidation.

     We will serve copies of this letter on the other counsel involved in these cases and those identified in the schedule attached to the Court's December 23rd Order.

     Respectfully submitted,

VICTOR M. SHER

VMS: jac
cc:  All Counsel per attached service list

---

[1] *See In re Air Crash Disaster Near Upperville Virginia on December 1, 1974* 430 F. Supp. 1295 (S.D. Ind., 1977) (conditional transfer order vacated since, although cases shared common issues and MDL court had expertise, all pre-trial proceedings had been concluded, plaintiffs had access to extensive discovery materials, and only damages issues unique to each case remained); *In re A. H. Robins Co., Inc.* 505 F.Supp. 221 (J.P.M.L, 1981) (conditional transfer order in product liability suit vacated where pretrial proceedings were no longer active in MDL, discovery of common issues had been completed and parties to new actions could have access to prior discovery); *In re Westinghouse Elec. Corp. Uranium Contract Litigation* 436 F.Supp. 990 (J.P.M.L., 1977) (conditional transfer order vacated where individual (conspiracy) issues predominated over common (contractual) issues).

Exhibit 8
Page 3 of 3

# Exhibit 9

42demtbc

1

```
42demtbc
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   IN RE:  METHYL TERTIARY BUTYL        MDL 1358
 3   ETHER ("MTBE") PRODUCTS              Master File C.A.
 4   LIABILITY LITIGATION                 No. 1:00-1898(SAS)
 4
 5   ------------------------------x
 5
 6                                        February 13, 2004
 6                                        10:00 a.m.
 7
 7   Before:
 8
 8                  HON. SHIRA A. SCHEINDLIN,
 9
 9                                        District Judge
10
10                        APPEARANCES
11
11   COOPER & SCULLY, P.C.
12        Attorneys for Plaintiffs
12   SCOTT SUMMY
13
13   WEITZ & LUXENBERG, P.C.
14        Attorneys for Plaintiff La Susa
14   ROBERT GORDON
15   SANDERS MCNEW
15
16   EIMER STAHL KLEVORN & SOLBERG
16        Attorneys for Defendant Citgo
17   NATHAN P. EIMER
17   JAMES SPETA
18   LISA MEYER
18
19   PATTON BOGGS
19        Attorneys for Defendants Chevron Texaco, Texaco, Inc.
20   ROBERT W. JONES
20
21   McDERMOTT, WILL & EMERY
21        Attorneys for Defendants Exxon Mobil Corp.
22        and defendants liaison counsel
22   PETER JOHN SACRIPANTI
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
42demtbc
 1              A P P E A R A N C E S (continued)
 2
 3   WALLACE KING MARRARO & BRANSON, PLLC
 3        Attorneys for Defendants Shell Oil Co.;
 4        Texaco Refining and Marketing, Inc.;
 4        Chevron U.S.A. Inc.; Motiva Enterprises;
 5        Equilon Enterprises, LLC
 5   RICHARD E. WALLACE, JR.
 6
 6   HOWREY SIMON ARNOLD & WHITE
```

Page 1

Exhibit 9
Page 1 of 40

42demtbc

7        Attorneys for Defendants Amerada Hess Corp.
7          El Paso, CGP Co., Phillips Petroleum Co.
8    MINDY DAVIS
8
9    BEVERIDGE & DIAMOND, P.C.
9          Attorneys for Defendant Sunoco, Inc. (R&M)
10   JOHN S. GUTTMANN
10
11   GOODWIN PROCTER LLP
11         Attorneys for Defendant United Refining Co.
12   ERIC D. MUSSELMON
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

42demtbc

1                (Case called)
2                THE COURT:  Good morning.  Is it Mr. Summy, Mr. McNew,
3    Mr. Gordon, Mr. Alpert, Mr. Sandman, Mr. Sacripanti, Mr. Eimer,
4    Mr. Speta -- how do you pronounce that?
5                MR. SPETA:  Speta.
6                THE COURT:  Mr. Jones, Mr. Wallace and everybody else.
7    I see some of the people did sign in, but I think it's
8    basically the same ones.
9                Anybody else actually think they're going to speak on
10   the record of the remaining people I didn't say good morning to
11   individually?  No.  OK.
12               All right.  We have a lot to cover this morning, it
13   seems to me.  It's a complicated argument, and it's the
14   plaintiffs' motion to remand.  So I would think that plaintiffs
15   would wish to start the argument.
16               Although I don't know quite how you plan to use the
17   time, the way I prepared for the argument was to think of this
18   as three possible bases for federal jurisdiction:  Possibly
19   bankruptcy, possibly federal preemption, possibly federal
20   agent; as part of preemption, something called substantial
21   federal question.  So there's three with a subpart, so I think
22   what we'll do, if that makes sense to you, is to argue each of
23   those separately.
24               Let's first talk about bankruptcy, if we want;
25   preemption, let the other side be heard on that; then go to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

42demtbc

1    another ground, let the other side be heard on that; and then
2    go to the third ground.  I think that would be easiest for me.
3                Does anybody disagree strongly with that approach?
4                MR. McNEW:  In fact, your Honor -- Sanders McNew for
5    the plaintiffs -- that would be fine with us.
6                MR. SACRIPANTI:  No objection, your Honor.
Page 2

Exhibit 9
Page 2 of 40

42demtbc

```
7          THE COURT:  Do you want to pick which of the three to
8    start with?
9          MR. McNEW:  Your Honor, would you prefer if we stay at
10   the table or use the lecturn?
11         THE COURT:  I don't prefer.
12         MR. McNEW:  Then I will stand right where I am.  I
13   like it.
14         Your Honor, I didn't come this morning with a long
15   speech on any of these topics because I believe that our papers
16   set out each of our positions.  If you would prefer to take the
17   bankruptcy point first --
18         THE COURT:  No, I don't prefer.
19         MR. McNEW:  Do you have a preference?
20         THE COURT:  No, I don't.
21         MR. McNEW:  Then I'll take the bankruptcy point first
22   because that was the point that the defense chose to lean most
23   heavily upon in their own papers.
24         To me this whole issues rises and falls on one point.
25   Had there been any injury at the time of the Texaco bankruptcy
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

42demtbc

```
1    in 1987?  We both agree, both sides agree on what the standard
2    is, what the legal standard is.  The legal standard is at 11
3    U.S.C., Section 105.  A debt is a liability on a claim.  Only
4    debts get discharged in bankruptcy.  Claim -- that's 11 U.S.C.
5    101(12).  A claim is a right to payment.  That's 11 U.S.C.
6    101(5).  It's clear that a right payment only arises when you
7    have an injury.  There's nothing in the record before your
8    Honor, nothing in the complaint, no allegation in the
9    complaint, no evidence nor even any allegation in the
10   defendant's papers to suggest that there was MTBE in the
11   plaintiffs' wells as of the petition date, the Texaco
12   bankruptcy petition date.
13         I'm sorry, your Honor.  I've been a bankruptcy lawyer
14   for the last 15 years and I have a terrible tendency to fall
15   into shorthand on bankruptcy matters.
16         These are clear principles, crystal clear principles,
17   absent an injury, there's no claim.  Absent a claim, there's no
18   discharge.  You can talk about related to and core and noncore
19   bankruptcy jurisdictions until you're blue in the face.
20   They're all nonsequiturs.  These issues by sheer happenstance I
21   happen to be quite intimately familiar with.  I've done this in
22   the context of asbestos bankruptcy since 1988.
23         The Manville bankruptcy, as I'm sure you were aware,
24   posed what was then a novel legal issue:  What do you do with
25   individuals who have been exposed to asbestos before bankruptcy
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

42demtbc

```
1    but who haven't manifested a disease?  Tydberg, Lifflin and
2    Knox finally ended up appointing a guardian ad litem, which he
3    calls a future representative, futures representative.  That
4    was actually a fellow from Fried Frank.  The futures
5    representative stood in the shoes of absent future victims who
6    hadn't yet manifested an injury; who had been injured, had
7    inhaled asbestos prepetition, had been injured in fact, didn't
8    know they had been injured because the injury hadn't manifested
9    yet.
10         Lifflin decided that the way to deal with this issue
11   was to -- was to create this guardian ad litem so that the due
```

Page 3

Exhibit 9
Page 3 of 40

42demtbc

12    process demands of Malane and its progeny could be met.  He
13    could have noticed by service on the futures rep.  That was
14    appealed by a commercial creditor who said, you can't do that,
15    you can't bind people who aren't before the Court.  The Second
16    Circuit in a case called Cain vs. Johns Manville -- I'm sorry,
17    Judge, I didn't bring the citation with me.
18               The Second Circuit ducked; said, we don't really know
19    if you can do this to people in that position.  But in any
20    event you don't have an interest here because you're a
21    commercial creditor.  You're not a futures victim, so we don't
22    have to think about it.
23               Because of that in front of me, because the Second
24    Circuit ducked, the Congress came back and amended the
25    bankruptcy code in a provision called 11 -- Title 11 of U.S.C.,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                      7

42demtbc
1     Section 524(g), which provides a whole panoply of safeguards
2     for people in the position of futures victim and asbestos
3     bankruptcy so that an asbestos bankruptcy could bind future
4     victims.  But absent those safeguards you can't bind them.
5               Now, it's an open question, frankly, whether even
6     524(g) gets you there.  Somebody who later manifests I think
7     has a compelling argument that you can't subvert Malane and the
8     constitutional requirements of due process even by legislation.
9     But that's an argument for another day.
10              The touchstone here is that you can't adjudicate the
11    rights of people who aren't before the Court somehow.  Water
12    providers such as the County of Nassau, the Western Nassau
13    Water Authority, were not before the Texaco bankruptcy.
14    There's nothing in this record to suggest that they had a claim
15    to assert.  In fact, if you read 524(g), they don't even talk
16    about future claims, they talk about future interests.  Future
17    interests.  There's no claim present from our clients at the
18    time of the Texaco bankruptcy that could have been discharged
19    by the Texaco bankruptcy.  There's a threshold fact.
20              THE COURT:  Let me explain what's worrying me.  I'm
21    trying to listen to you and I'm thinking, he's not talking
22    about what's worrying me, so I guess it's time to tell you
23    what's worrying me.
24              MR. MCNEW:  Please.
25              THE COURT:  If you're saying that there wasn't a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                      8

42demtbc
1     discharge in bankruptcy of claims, because there was no notice
2     and so there might still be a claim for something that occurred
3     before 1988 -- because you do allege that these companies knew
4     about it and there were discharges and there could have been
5     contamination all before 1988 -- and if you don't want to waive
6     such claims, then there may be -- you may still be making
7     claims against what was Texaco and is now Chevron or something,
8     and it would be a bankruptcy matter.
9               MR. MCNEW:  It's only --
10              THE COURT:  It's that simple, unless you want to waive
11    anything that happened pre1988 and say, we're never going to
12    seek any damages for anything that happened then.
13              MR. MCNEW:  Your Honor, I come back to what I believe
14    is the touchstone.  That presumes that there was a claim as of
15    1987.
16              THE COURT:  Almost the opposite -- oh, you mean -- say
                                Page 4

Exhibit 9
Page 4 of 40

42demtbc

17    it again, that there was?
18            MR. McNEW:  The bankruptcy petition was filed in 1987.
19            THE COURT:  No.  That presumes that you will not be
20    claiming that there was any injury that occurred before that
21    date?
22            MR. McNEW:  We have not alleged any injury before that
23    date.
24            THE COURT:  Well, you say you haven't alleged it and
25    yet you talk about events going that far back.  You say that

9

42demtbc

1    the defendants began adding MTBE to gasoline in 1979 and they
2    knew as early as 1980 that MTBE did contaminate groundwater.
3    If it did contaminate groundwater as early as '88, then you may
4    find that in those eight years there was contamination, and you
5    may want to make a claim.
6            In fact, you say in the bankruptcy there can't be a
7    discharge, that is a discharge in bankruptcy.  We weren't given
8    notice, so you're the one who's saying how could any such
9    possible claims have been discharged, because we didn't have
10    notice then.  So you are sort of saying, I want it both ways.
11    I want to be able to go back and make a claim because I wasn't
12    discharged in bankruptcy; on the other hand, I haven't made a
13    claim yet.  On the other hand, historically by complaint I
14    point out -- to the use in -- I'm sorry, the adding of MTBE
15    starting in '79, the knowledge by 1980 that it actually caused
16    contamination, and as this all develops you might find
17    contamination between 1980 and '88.
18            Then you might say, well, OK, I'll waive any claim for
19    anything I find out, but you're claiming enterprise liability.
20    The other defendants might not feel so generous.  They may say,
21    well, the plaintiff might be willing to waive any recovery of
22    damages for that eight-year period, but what does that do to
23    me?  I've got a bunch of defendants here and I might want my
24    share in this enterprise liability theory from Chevron Texaco
25    that's going to go right into that pre -- in the period before

10

42demtbc

1    the discharge and bankruptcy.  So there's a problem.
2            MR. McNEW:  I understand your discomfort, Judge.
3            THE COURT:  Well, that's good, because I'm not sure I
4    expressed it so clearly.  I'm glad you do.
5            MR. McNEW:  No, it's very clear to me.  And I --
6    again, I take you back to the touchstone of the definitional
7    provisions of Title 11, because absent an injury -- yes, that's
8    true, we allege a lot of things that occurred prepetition.
9            THE COURT:  Correct, including contamination of
10    groundwater.
11            MR. McNEW:  However, however, we do not allege
12    contamination of groundwater in Suffolk County -- I'm sorry, in
13    Nassau County.  We allege that they began their course of
14    conduct that led to the events that led to our clients'
15    contamination and liability well before Texaco's bankruptcy.
16    However, it is the fact of injury that gives rise to a claim.
17    If I represented an entity that had no groundwater
18    contamination and I came to this court and I sued based on
19    their bad conduct in the early 1980s, you would throw me out on
20    a 12(b)(6) motion because you'd say, where's your injury?  And
21    you would be right.

Page 5

Exhibit 9
Page 5 of 40

42demtbc

22   THE COURT:  Except that you had said in the complaint
23   as early as 1980 the defendants knew that MTBE actually
24   contaminated groundwater.  So where was that contamination?  Do
25   we know yet, or were you just saying generally we know it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

42demtbc

1   happened, now we'll discover where and we may discover that it
2   was in Nassau or Suffolk, whichever we have?
3         MR. McNEW:  It was Rockaway, New Jersey, your Honor.
4         THE COURT:  Oh.  And can you be sure that's all you're
5   going to discover, is that that's the only contamination that
6   occurred before 1988?
7         MR. McNEW:  Your Honor, I frankly can't -- I can't
8   divine the future.
9         THE COURT:  Correct.  So -- wait, wait, wait.  So
10   that's true.  You could say to me, well, if we discover
11   anything between 1980 and '88, we'll waive our claim to damages
12   for that period so we don't have a bankruptcy problem.  Then
13   the only problem I'd be left with is what I said before about
14   enterprise liability; that is, the question about the
15   defendants vis-a-vis each other, because if you said, I see
16   your point, we're not seeking, it's more than not finding right
17   now, not identifying contamination.  Even if we find it, we are
18   not going to seek damages for that period because we don't want
19   to complete the bankruptcy problem.  So we're ready to do that,
20   we're ready to make that agreement.
21         If you said that, then I would turn to Mr. Sacripanti
22   or team Sacripanti and say, who -- do we have a problem between
23   defendants on this enterprise liability theory, because if
24   you're out, you'd say, I followed the Court completely.  We're
25   not interested in seeking damages even if we find it between

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

42demtbc

1   1980 and '88, we're just not.
2         MR. McNEW:  To be honest, Judge, I have a hard time
3   imagining what damages we would allege during that period.
4         THE COURT:  That's good, because you're the one who
5   made a lot of points about not being discharged in the
6   bankruptcy, you didn't get notice.  It sounded like you wanted
7   to keep that open.
8         MR. McNEW:  No, Judge.  It's belts and braces.  There
9   are so many reasons why the one bankruptcy argument isn't firm.
10   I was just adding an additional reason why even if you could
11   get past the issue of no injury prepetition, why this argument
12   doesn't fly.
13         THE COURT:  OK, I thought you were holding it open to
14   say we were never discharged, we want to be able to go back and
15   seek damages against what was then Texaco if we find injury
16   during that period.  If you say yes, we're prepared to state in
17   this argument today that we don't seek any damages, even if we
18   find contamination for anything that happened pre'88 as to
19   Texaco --
20         MR. McNEW:  I think I'm giving up what is largely a
21   null set, so I don't have any problem saying that to you.
22         THE COURT:  That's easy.  So now I turn to the defense
23   table and say the plaintiffs, no matter what -- who's going do
24   address this from the defense side?  The plaintiffs no matter
25   what are not going to seek any damages for anything that

SOUTHERN DISTRICT REPORTERS, P.C.
Page 6

42demtbc
(212) 805-0300

13

42demtbc
1  occurred pre'88, even if they find it, it's not in the
2  complaint now and they don't want to seek damages.  So, how
3  does the bankruptcy enter into this thing?
4       MR. JONES:  Your Honor, a couple of points there.  One
5  of them is that is not what the plaintiffs' pleadings state.
6       THE COURT:  Well, that's what they state now.  They
7  can always amend to fix it.  They said this is our position, we
8  are not going to seek any damages for anything that occurred
9  before '88 as to Texaco.
10      MR. JONES:  All right.
11      THE COURT:  So assume it's amended to say that.
12      MR. JONES:  If it's amended to say that, the first
13 thing, your Honor, is that there is still an issue.  There
14 still would be an issue with regard to whether certain claims
15 do, in fact, arise before or after that date.  What the
16 plaintiff would try --
17      THE COURT:  What does that mean?  I don't know what
18 you mean by that.
19      MR. JONES:  If your Honor would indulge me a minute,
20 let me explain a little bit.  Some of the exhibits that were
21 presented in some of the briefing that was provided to the
22 Court involved a case in Texas called Timely Avengers.  In that
23 case -- it was a very similar case.  It was an environmental
24 case against Texaco in the Southern District of Texas.  It was
25 filed in state court in the Rio Grande Valley and --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14

42demtbc
1       THE COURT:  When?
2       MR. JONES:  It was in 1996, your Honor.
3       THE COURT:  OK.
4       MR. JONES:  And in that case, that case was -- it was
5  an environmental contamination; in fact, very similar because
6  it involved the leaking of underground storage tanks filed
7  against Texaco and multiple other defendants.  Texaco, again,
8  removed -- as Texaco did here, removed that case.
9       Initially there was a ruling from the federal court.
10 It was referred to the bankruptcy court for a recommendation.
11 Bankruptcy court recommended that there is jurisdiction, the
12 case should remain there.  District court adopted that
13 recommendation.  When that happened in Timely Avengers, here's
14 what the plaintiffs then tried to do.  The plaintiffs then
15 tried to -- they provided a stipulation, and in that
16 stipulation the plaintiffs actually said, we stipulate that we
17 are not going to seek recovery for any -- we recognize the
18 bankruptcy.  We recognize, in fact, the ruling of Sanders, the
19 bankruptcy court here in the Southern District of New York.  We
20 will abide by that.  We will not seek any recovery for pre1988
21 contamination.
22      THE COURT:  OK.
23      MR. JONES:  Based on that they filed a motion for
24 summary judgment.
25      THE COURT:  OK.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

42demtbc
1       MR. JONES:  And we opposed, we representing Texaco
2  opposed that motion for summary judgment.
                        Page 7

Exhibit 9
Page 7 of 40

42demtbc

3        The Court -- the bankruptcy court and the district
4  court in the Southern District of Texas rejected that motion
5  for summary judgment.  And the reason the court rejected that
6  is that the Court said, inevitably what's going to happen is
7  you are still going to be embroiled -- because of the
8  plaintiffs' allegations and because of the nature of the
9  contamination that was referred to, you would still be
10  embroiled in a dispute with regard to whether or not that -- on
11  which side of that line that contamination fell.  And what the
12  plaintiffs were trying to do was get back to state court --
13        THE COURT:  I don't really understand that ruling, I
14  must say.  I do not understand how it any longer affects the
15  bankrupt estate.  I mean, if nobody's making a claim on a
16  bankrupt estate, it's over.  The only thing that interested me
17  here was this theory of enterprise liability maybe, but I don't
18  really understand that case.
19        MR. JONES:  Well, your Honor, I think the reason is
20  because -- what happens is that that kind of a stipulation from
21  the plaintiffs here begs the question -- in other words, the
22  plaintiffs can't just say, we stipulate, or we agree that we
23  will not assert claims that arise -- that arise prior to 1988.
24        THE COURT:  It's not a matter of arising.  I can
25  understand the facts may have started there, the MTBE might

16

1  have been added then and the contamination begun, but they're
2  just saying, we're just not seeking any damages that might
3  affect the bankrupt estate.  We don't want anything for any
4  injury that occurred before '88.  The injury occurred when the
5  contamination occurred and we're only going to talk about
6  contamination occurring after '88.
7        MR. JONES:  That is exactly my point, because the way
8  that the Court just articulated that point, which is only
9  injury occurring after 1988, that is the issue that will be
10  disputed because take for example -- your Honor, the
11  plaintiffs' allegations, which included -- and if I might
12  indulge the Court, one of the plaintiffs' allegations here in
13  their complaint is that whenever gasoline with MTBE leaks,
14  spills or is otherwise released into the environment, the MTBE
15  races through underground water reservoirs spreading faster and
16  further than other chemical compounds contained in gasoline
17  reaching the water table and soon contaminating wells that draw
18  from the affected underground aquifers.
19        The point here is that there will be a dispute over
20  whether or not this contamination occurred before the 1988 time
21  line or after.  And if the Court -- might I refer the Court to
22  the standard of determining on which side of this line a claim
23  falls.  And I need to emphasize that there is a big difference
24  between property damage claims, which we have here, and the
25  personal injury claims that Mr. McNew referred to.  There's a

17

42demtbc

1  huge difference because of the issue of a -- manifestation of
2  future injury.
3        What all the case law is, there's a big difference.
4  In the standard for determining property damage, as the Court
5  in Sanders delineated, and that's been adopted and approved now
6  by the Second Circuit, it says if you have a discharge or a
7  threatened discharge prior to the cut-off date, if there is

Page 8

Exhibit 9
Page 8 of 40

42demtbc

8  contamination and if it can be detected scientifically, then
9  that is a prepetition claim.  So what the plaintiffs would try
10 to argue with their evidence is come in and say -- let's just
11 take, for example, what the plaintiffs would say is we
12 stipulate that we're not going to -- we're not going to assert
13 any claim that arises prior to 1988.  Then they come in with an
14 expert and that expert says, you know, I've examined this
15 aquifer and I find that even though this discharge -- even
16 though the discharge of contaminants started occurring in 1979,
17 I find as an expert that, in fact, this aquifer wasn't
18 contaminated until 1989.  We're entitled to challenge that and
19 say that's ridiculous.
20           To the extent --
21           THE COURT:  Yes, but wouldn't you then have a complete
22 win, because if your expert proves that it occurred in '87 and
23 they have waived any claim for any damage that occurred before
24 '88, there's no claim against the bankrupt estate, because in
25 advance of the ruling of which expert is right, they say if you

42demtbc

1  win on '87, we get zero, because we waived our right to get the
2  money.
3           MR. JONES:  But who is to resolve that dispute?
4  That's the point.
5           THE COURT:  You still win because if the state court
6  says it occurred in '87, you win.  They have waived the claim.
7  So whatever it is, the bankrupt estate is not threatened.
8           MR. JONES:  If we win, it is not, but the problem with
9  that is -- and this is the reason that the Court's reasoning in
10 Timely Avengers is sound.  What the Court said in that opinion
11 was that Texaco is entitled to a federal forum in which to
12 resolve that dispute, because the --
13           THE COURT:  Even though the bankruptcy estate can't be
14 threatened with this stipulation?  Because once it's found it
15 occurred in '87 -- this is hypothetical, of course -- once it
16 occurred in '87, whether state court or federal says it or
17 anybody says it, there's no threat on the bankrupt estate.  So
18 from the beginning there's no threat to the bankrupt estate.
19           MR. JONES:  Your Honor, what the Court is stating
20 there is a given under bankruptcy law.  Bankruptcy law and our
21 confirmation orders already say, if it arises prior to that
22 time, it's discharged.  That's already -- their stipulation --
23           THE COURT:  That's not true, because they're
24 challenging the discharge.  I'm putting all that aside.
25 They're challenging the discharge saying, we didn't have notice

42demtbc

1  of it, this and that.  I'm going further and saying with this
2  stipulation, I don't understand that the bankrupt estate is in
3  jeopardy any which way.  Even though I followed your
4  hypothetical about the competing experts and the expert, they
5  said that injury occurred in '89.  Your expert approves it
6  occurred in '87, but they've already waived.  They already
7  said, we have no claim, that's what we said; said it in order
8  to get back to state court, but we said it.  So the bankrupt
9  estate is fully protected, so how is it a bankruptcy issue?
10           MR. JONES:  Because the questions -- because the
11 issue, the legal issues and the issues that would need to be
12 applied to determine when that claim arose and whether or not

Page 9

Exhibit 9
Page 9 of 40

42demtbc

13    that claim arises in '87, '85, '83, '89 or '90, those are the
14    issues that are determined by -- those are bankruptcy law
15    federal law issues.
16                THE COURT:  I can't understand that, not if the
17    bankruptcy court isn't in jeopardy.
18                But I'm giving you another good theory and haven't
19    heard you talk about it yet.  Your codefendants may say, well,
20    wait a minute, '87, they're going to want all this money from
21    us for this '87 injury.  Plaintiff has said, we're not looking
22    to Texaco.  What about all of this enterprise liability, I want
23    my Texaco share.  Aha, I was bankrupt then and that involves
24    the bankruptcy estate.  I am at risk.  So it's still federal.
25    What about that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

20

42demtbc

1                MR. JONES:  That is certainly true, your Honor.
2                THE COURT:  Let's talk about that then, because I
3    think that may give you what you need.  I don't know.
4                MR. JONES:  It may give -- in fact, that may be more
5    appropriately addressed by --
6                THE COURT:  Then do it.  Who wants to talk, Mr. Eimer?
7                MR. EIMER:  Your Honor, I want to go to a subset, if I
8    can, first because I think it's broader.  And I will come to
9    that.  I'll come right back to it.  I looked -- their
10    enterprise theory of liability for the most part is based on
11    conspiracy allegations.  That's paragraph 80 through 83 of
12    their complaint.  Conspiracy allegations include Texaco and
13    says that beginning in early 1980s we all conspired, and the
14    natural consequence of that, they say, is contamination all the
15    way to today.
16                THE COURT:  Right.
17                MR. EIMER:  Texaco, when it entered into this
18    conspiracy supposedly in 1980, is responsible under this
19    conspiracy theory for contamination not just to the date of
20    bankruptcy but the natural consequences of that conspiracy,
21    which they say is until today.  So saying to Texaco, oh, we
22    won't claim for you up to '88 does not relieve Texaco of the
23    conspiracy liability they have alleged against it in this
24    complaint.
25                THE COURT:  But they say -- they could say it does.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

21

42demtbc

1    What do you say -- in other words, the plaintiffs can say I'm
2    still giving a free pass.
3                MR. EIMER:  The free pass has to be up to today
4    because a conspirator is responsible for natural consequence of
5    the conspiracy they create.  According to their complaint, the
6    natural consequence is a direct and proximate result of
7    defendant's above described conspiracy.  MTBE at all times
8    relevant to this litigation has contaminated plaintiffs'
9    aquifers and wells up to today.  So they say the natural
10    consequence of the conspiracy Texaco entered into in the early
11    '80s is the contamination of the aquifer throughout the 20-year
12    period of the conspiracy.
13                THE COURT:  And this threatens the bankruptcy estate
14    so to speak?
15                MR. EIMER:  Because Texaco is responsible here for its
16    supposedly illegal conduct in 1981, '82, '83, '84 up until '88.
17    And that would be within the bankruptcy period which should
                            Page 10

Exhibit 9
Page 10 of 40

42demtbc

18    have been discharged.  And they're saying it's not discharged.
19    So they're coming back in now and saying what you did
20    prebankruptcy entering into this conspiracy has resulted in 20
21    years' worth of injury.  And we're going to hold you
22    responsible for it in this courtroom.
23            So first by saying they're not going to recover
24    against Texaco only up to what happened up until 1988 does not
25    discharge Texaco for its prebankruptcy conspiracy liability.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

42demtbc

1     They're responsible for that, that's step one.  They have not
2     abolished Texaco's prebankruptcy liability.
3             Second, we have claims -- and your Honor's exactly
4     right, we have claims for contribution against them for this
5     entire period based on this conspiracy theory.  And those
6     certainly are not discharged.  Otherwise, they wipe out the
7     whole lawsuit because, first of all, we have claims pre1988 for
8     the 1988 discharges or contamination.  However, they want to
9     look at it.  That clearly is not being -- they say is waived
10    but has not been wiped out.
11            And I say the conspiracy means that Texaco
12    prebankruptcy liability is responsible for 20 years' worth of
13    liability.  That's what they're claiming in the complaint.  And
14    the only way they can relieve us of contribution claims is to
15    relieve Texaco of all 20 years' worth of claim and then
16    discharge us the same way, so it can't be.  It can't be that
17    Texaco is free here for the prebankruptcy conduct.
18            THE COURT:  Let me ask this, then:  Is this not a
19    damages issue that could be sorted out if and when there's a
20    judgment?  In other words, should this all go back to state
21    court and it's all played out -- liability is tried, judgment
22    is entered -- then when there's a fight about who paid, who's
23    got the money, that may be a bankruptcy issue.  And it comes
24    back to federal court as an enforcement of the judgment action,
25    so to speak.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

42demtbc

1             MR. EIMER:  I don't think so.  And the reason I don't
2     think so, first, the question of what is Texaco's prebankruptcy
3     liability going to be in this case?  In this case they could be
4     proving that Texaco entered into a conspiracy in 1987 and then
5     in unrelated station in 2000 got discharged.  And they're going
6     to hold Texaco responsible there.
7             THE COURT:  Wait, wait, wait.  You used the word
8     discharge and I didn't follow.  Say it again?  I know the word
9     is coming up.
10            MR. EIMER:  They could be saying that Texaco entered
11    into a conspiracy in 1984 and then in the year 2000 there was a
12    leak in some unrelated station and Texaco was jointly and
13    severally responsible for that --
14            THE COURT:  So you're saying it's part of the
15    liability theory in that case?
16            MR. EIMER:  Exactly.  And saying to Texaco, well, we
17    won't hold you responsible for leaks at your stations prior to
18    1988 doesn't resolve that 2000 leak at somebody else's station.
19    So that's an inherent part of it.  In this proceeding we
20    haven't gotten around to answering, but we may well be having
21    cross claims against each other.
22            THE COURT:  That's sort of what I presumed.  I guess

Page 11

Exhibit 9
Page 11 of 40

42demtbc
23  that takes it back to you, Mr. McNew, and at least flushes out
24  the problem area.
25          MR. McNEW:  Again, your Honor, I appreciate your
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              24

42demtbc
1   concern about it.  I hope at the end of the argument I will
2   have outlaid them.
3           THE COURT:  I want to make something else clear.  You
4   know, I'm not saying that these -- at this point I'm not saying
5   that these actions constitute proceedings arising under Title
6   11.  I'm not saying they arise in the case under Title 11.  The
7   one I'm worried about is related to the case under Title 11.
8           MR. McNEW:  I understand that, your Honor.
9           THE COURT:  OK.
10          MR. McNEW:  First of all, I want to go back to first
11  principles here.  What I just heard from the defense was a lot
12  of speculation and hypothesis.
13          THE COURT:  Some of it has to do with your pleading at
14  page 41, market share concert of action and enterprise
15  liability.  I mean, they're saying you have a conspiracy
16  theory.  Conspiracy goes back to 1980.
17          MR. McNEW:  I understand that.  Let me -- first I'm
18  talking about the question of injury and fact.
19          THE COURT:  OK.
20          MR. McNEW:  May have been released into an aquifer.
21  May have been discharged.  We allege that there were discharges
22  as early I believe as 1980.
23          THE COURT:  Right.
24          MR. McNEW:  This was to build the proof of early
25  knowledge of the defendants.
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              25

42demtbc
1           THE COURT:  I know why it's there.
2           MR. McNEW:  There's no allegation in the complaint
3   that any well that any of my clients had was contaminated, had
4   MTBE hits by 1988.
5           THE COURT:  Right, but he pointed out that would
6   become a fact question.  As long as you allege that the leaks
7   occurred or the discharges occurred, whatever the words are
8   pre -- say as early as 1980 becomes an expert question as to
9   when they would have hit the wells, because you have also
10  argued, I remember from the last time around, the speed that it
11  travels from the groundwater, etc., that's going to be a
12  question.  You may have reason to want to show that it wasn't
13  until post '88, but whatever reason, if it occurred at all, if
14  it did cause harm, it may have been before, that may become a
15  question.
16          MR. McNEW:  It is an old rule of law recognized by the
17  Supreme Court at least as early as the Pullman decision and
18  repeated ad nauseam thereafter that it's their burden.  It's
19  the defense's burden to prove their entitlement to removal
20  here.
21          A release into an aquifer, one release into an aquifer
22  which we did plead does not translate into contamination of my
23  client's water.  And it's their burden to show you, Judge.
24  It's their burden.  It's not my burden to disprove it.  It's
25  their burden to prove it.  This isn't a difficult point to
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                        Page 12

Exhibit 9
Page 12 of 40

42demtbc

26

42demtbc
1  prove.  The well hits are all matters of public record.  They
2  can and they have filed FOIA requests with the state
3  governments, the state departments of environmental protection
4  to get this information.  If there were pre1988 hits to these
5  wells, it was their burden to say, look, Judge, here's the
6  record.  Here are the facts.  These facts show that this was a
7  prepetitioned entry to Texaco and it triggers the Texaco
8  discharge.  They didn't do that, Judge.  It's their burden.
9        Now, on the conspiracy point -- I have to come back to
10  the conspiracy point, Judge.  That's a great point.  I wish I
11  had my copy of the code with me, but if you look back in the
12  code and what is a dischargeable debt under Title 11, you will
13  see that one of the exceptions to discharge are injuries
14  arising from willful torts.  A conspiracy is by definition a
15  willful tort.  If what they're saying is that their
16  discharge -- that they're able to claim that the discharge of
17  their confirmation order releases them from conspiracy
18  liabilities, that's just not the law.
19        THE COURT:  I think they're saying the opposite.
20  They're saying if, in fact, there's a colorable argument that
21  it doesn't, then it reopens or puts at risk the bankrupt estate
22  because you are alleging a conspiracy for which they may have
23  liability in a period before the discharge which you argue does
24  not discharge them, then it should be a bankruptcy matter
25  because it opens up the bankruptcy so to speak and puts the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

27

42demtbc
1  bankrupt estate at risk.
2        MR. McNEW:  How does it put the -- first of all --
3        THE COURT:  Because it's not discharged.  You just
4  said so.  Your theory is it's not discharged.
5        MR. McNEW:  If there were a claim, it would not have
6  been discharged.  There was not a claim.
7        THE COURT:  But there may be one now because you are
8  alleging a conspiracy going back to 1980.  It --
9        MR. McNEW:  A conspiracy claim by definition cannot be
10  discharged.
11        THE COURT:  OK.  I guess I'm saying -- because I'm not
12  a bankruptcy lawyer I may be saying this wrong, but I don't
13  know about discharge or nondischarge.  Is it not still put at
14  risk at the time of the bankruptcy?
15        MR. McNEW:  No.
16        THE COURT:  No.  Who has liability for action that
17  occurred then?
18        MR. McNEW:  There is no Texaco bankruptcy estate.
19        THE COURT:  The bankruptcy estate dies, right.
20        MR. McNEW:  Upon confirmation.  It doesn't exist
21  anymore.
22        THE COURT:  Right.
23        MR. McNEW:  It's a fiction, and the fiction is ended
24  upon the confirmation of the bankruptcy.
25        THE COURT:  Right.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

42demtbc
1        MR. McNEW:  So it's not as if there is some Texaco
2  bankruptcy estate out here that's going to be implicated by
3  this.  And there's a whole 'nother line of argument I didn't
                        Page 13

Exhibit 9
Page 13 of 40

42demtbc

4   bother the Court with, is whether you can have a related-to
5   jurisdiction when you're talking about any conceivable effect
6   on a bankruptcy, effect that doesn't exist because -- I didn't
7   go there because I thought it was an added layer of complexity.
8          THE COURT:  I thought it would reopen or put at risk
9   something that was closed.
10         MR. MCNEW:  It does not in any way put at risk the
11  Texaco confirmation order or cause the bankruptcy to become
12  reopened or to risk a post confirmation readjustment of the
13  rights and responsibilities of the creditors and other parties
14  and interests in the Texaco bankruptcy.  Doesn't do any of
15  those things, Judge.  We're talking here strictly about whether
16  Texaco has a defense in this case that its confirmation order
17  bars the bringing of these cases against it, full stop.  That's
18  all this does.
19         Now, we didn't brief this because they didn't bring
20  this up in their arguments.  This is a new argument this
21  morning, and I would be happy to provide your Honor with a
22  brief, but it is -- the idea that -- the idea that they have
23  that they can get a discharge because their conspiracy
24  activities give rise to a prepetition claim is like an orphan
25  asking for the Court's indulgence because he killed his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

42demtbc

1   parents.  I got that backwards.
2          THE COURT:  That's OK.
3          MR. MCNEW:  That was a George Bush way of putting it.
4          But, your Honor, the bottom line is they bear the
5   burden here.  They bear the burden of coming to you and showing
6   you an injury that occurred before the bankruptcy.  They didn't
7   do that.  Their burden.  It didn't shoulder it.  A conspiracy
8   point is a red herring.  I'm happy to brief it for you if you
9   want additional papers on that.
10         THE COURT:  Mr. --
11         MR. JONES:  Jones, your Honor.  Just one final thing,
12  if I might approach.  We have prepared a summary of the
13  allegations in the plaintiffs' complaint that I think put to
14  rest this issue of what they're alleging and whether they
15  allege damages that occur prior to 1988.  I think it's very
16  clear and we have summarized all of those allegations from
17  them.
18         THE COURT:  well, but they said -- we're back to the
19  proper stipulation.  whatever they said in the complaint, they
20  don't seek damages pre1988 conduct.  That's when Mr. Eimer rose
21  and started talking about conspiracy, and Mr. McNew rebuts that
22  and says conspiracy is a willful tort never dischargeable
23  anyway.
24         MR. JONES:  Mr. McNew is talking about individuals and
25  individual bankruptcies and in Chapter 7s.  We had a confirmed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

42demtbc

1   Chapter 11 plan here.  The confirmation order states that all
2   claims against Texaco that arose prior to the date of this
3   order are discharged and are barred.
4          THE COURT:  And can that cover intentional torts such
5   as conspiracy?
6          MR. JONES:  It does.
7          THE COURT:  You say so and he says no.  So that does
8   sound like a real legal dispute, I suppose, not a factual one.

Page 14

Exhibit 9
Page 14 of 40

42demtbc

```
 9        MR. JONES:  But that is also -- once again, your
10   Honor, the issues that are being raised here are issues with
11   regard to the scope of our confirmation order.  This is a
12   federal judgment.  The confirmation order is a federal
13   judgment.  The Sanders case itself, the Sanders case itself
14   addressed very similar issues, and the Court in Sanders found
15   that those claims were, in fact, barred.
16        The issues that Mr. McNew raises --
17        THE COURT:  Barred were intentional torts such as
18   conspiracy, actually barred you're saying, in Sanders?
19        MR. JONES:  I don't believe that that was -- I'm not
20   sure about the -- I don't know the answer to that, your Honor.
21        THE COURT:  So what are you saying about Sanders?
22        MR. JONES:  The point about Sanders was actually
23   addressing Mr. McNew's other point, which is the estate has
24   been closed and there is no longer any stay.  I think all of
25   the law says that in the event of enforcement of a discharge or
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

42demtbc

```
 1   enforcement of a confirmation order, of course the estate is
 2   closed.  As soon as you have a confirmation order, the estate
 3   goes away.
 4        THE COURT:  I accept that, but that isn't a main point
 5   or better point.  The other point is that intentional tort of
 6   conspiracy would never be dischargeable anyway, so what does
 7   that have to do with bankruptcy.
 8        MR. JONES:  If that is the contention, I'll address
 9   that argument because I firmly believe all of those claims are,
10   in fact, discharged by the Texaco confirmation order.
11        THE COURT:  You firmly believe that's not so?
12        MR. McNEW:  Judge, I've been a bankruptcy lawyer for
13   15 year.  He says it's a Chapter 7 bankruptcy, it is not.  He
14   says --
15        MR. JONES:  Confirmation of a plan.
16        MR. McNEW:  He said --
17        THE COURT:  I thought he said it was not a Chapter 7.
18        MR. McNEW:  He said it only applies to Chapter 7,
19   individual bankruptcies, and that's not true.  In fact, it's in
20   the part of Title 11 that relates to commercial Chapter 11
21   bankruptcies.  It's 11 U.S.C. 11(27) or (29) I think, or (44).
22   It's one of those three, it's either 11(27), 11(29) or 11(44).
23   Not sure which one of those three, but one of them talks about
24   the effects of confirmation upon close of a bankruptcy and the
25   debts that are discharged in a business reorganization.  This
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

42demtbc

```
 1   is not a matter of, you know, somebody committing credit card
 2   fraud, individual.  This is the scope of discharge in every
 3   Chapter 7 reorganization -- Chapter 11 reorganization, excuse
 4   me.
 5        THE COURT:  Well, you've just disagreed on the law
 6   with respect to that, and you're right, that can be easily
 7   handled in a post argument letter.  I don't need a brief.  The
 8   letter should be as short as this:  I cite the following two
 9   controlling cases or two controlling statutes.  The other side
10   should write back, here's the controlling case or controlling
11   statute and it's that simple.  I can read them.
12        Who wants to say more about bankruptcy, or are we done
13   with that part of the argument, I think?
```

Page 15

Exhibit 9
Page 15 of 40

42demtbc

14       MR. WALLACE:  I'd like to add one point.
15       Richard Wallace, I also represent Texaco.
16       And it strikes me that all the arguments you are
17  hearing today merely scratch the surface of the kinds of
18  arguments that a Court would have to resolve in order to
19  determine what claims are or are not discharged regardless of
20  what estimations the plaintiffs offer.  And we simply submit
21  that those questions need to be answered in federal court
22  rather than state court, precisely because they raise federal
23  issues.
24       MR. McNEW:  One last word, your Honor, in response to
25  that.  There are lots of cases out there that say that a party

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              33

42demtbc

1   can raise a discharge defense in state or federal court.
2   There's no magic to doing it in a federal forum.  If they have
3   a discharge defense, they can raise the discharge defense down
4   in state court.  I mean, this is, you know, grasping at the
5   slimmest reed to try and bring up a case that has dozens of
6   defendants that alleges only state law injuries into a federal
7   forum without even an effort on their part to provide the Court
8   with the evidentiary record that Pullman and its progeny
9   requires them to produce if they're going to remove this case
10  against the nonbankrupt defendants.  It goes to the heart of
11  the federal state relationship set forth in the Constitution.
12  It would be shocking to see this case brought up on a
13  bankruptcy point, your Honor.
14       THE COURT:  I have another question that in a sense
15  applies across the board to the three proffered bases for
16  jurisdiction.  Might as well quell the problem now and see what
17  you think on this one.
18       Strategically we put the declaratory judgment actions
19  to the side.  There's been no motions, there has been no
20  actions, but the burdens would be different.  In other words,
21  in the declaratory judgment action it would be a defense that
22  would be raised by the plaintiffs to say there's no federal
23  jurisdiction.  You would say the case should be dismissed,
24  shouldn't be in federal court, there's no federal jurisdiction.
25  Would that be what you would say with respect to the

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              34

42demtbc

1   declaratory judgment actions?
2       MR. McNEW:  That would certainly be one of our
3   responses, Judge.
4       THE COURT:  My point was going to be there you would
5   not be able to cite this law, Pullman line of cases, how they
6   have the burden to show the bases of their removal etc., etc.
7   because the burdens would be different.  There you would carry
8   the burden as a defense to say there's no federal jurisdiction.
9   The burden would shift.
10      Furthermore, if I find no federal jurisdiction on the
11  motion to dismiss the declaratory judgment action, it could be
12  appealed.  So if I said there's no federal jurisdiction, they
13  could go right to the circuit and get a ruling and say there is
14  or there isn't on the declaratory judgment actions.  The
15  removal remand issue is procedurally different, as you just
16  stressed; burdens of proof, appealability, different kettle of
17  fish.  Why weren't we doing them both at the same time, since
18  as a defense they're raising the exact same federal

                        Page 16

                        Exhibit 9
                       Page 16 of 40

42demtbc

19  jurisdiction issues with the right to be appealed?
20         MR. McNEW:  I am speaking off my head, but my
21  understanding is that once jurisdiction is challenged, it is
22  the burden of the party asserting the jurisdiction --
23         THE COURT:  That's true, too.
24         MR. McNEW:  -- to prove it.  I don't believe that --
25         THE COURT:  But appealability is still a point.  In

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

42demtbc

1  other words, if you move to dismiss a federal case on a lack of
2  subject matter jurisdiction and you win, that's appealable.  So
3  it could have -- put those to the side, but it troubles me
4  because the same arguments will be raised.
5         MR. McNEW:  Well, your Honor --
6         THE COURT:  I really wonder now if it shouldn't be
7  done as a package so that one way or another there could be
8  appellate review.
9         MR. McNEW:  There is a difference in the appealability
10  of the one and the other.  On the other hand, I don't think
11  there's any difference in the burdens --
12         THE COURT:  You've corrected me.  Thank you.
13         MR. McNEW:  And, you know, as to why we've done it
14  this way, could we have done it another way?  I think those are
15  kind of speculative.  The fact is --
16         THE COURT:  Not very speculative to me.  I began to
17  worry about that as I prepared for this oral argument.
18         MR. McNEW:  We're here on our motion to amend.
19         THE COURT:  I don't doubt that.  I'm worried about the
20  opportunity for appellate review of these very tricky issues,
21  such as the one we just had 50 minutes of argument on and we
22  probably barely scratched the surface of what it would take to
23  educate me about bankruptcy law.  Instead of eight hours it
24  would probably take eighty hours for me to really understand it
25  all.  Tricky stuff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

42demtbc

1         MR. McNEW:  That's why God created bankruptcy judges.
2         THE COURT:  You really know how to hurt a lady.  I'll
3  pretend you didn't say that.
4         MR. McNEW:  It's a definition of labor, your Honor.
5         THE COURT:  I don't think you can rescue it.  I'd let
6  that one go, it was so painful.  So painful.
7         Maybe we should use that to turn to either preemption
8  or -- what's the other one here, federal agent?  And, again, I
9  have no preference where we begin with that one.  Your choice.
10  Mr. McNew again, which one are you handling now?
11         MR. McNEW:  If you'd prefer preemption, we can take
12  that.
13         THE COURT:  I have no preferences.  We can do federal
14  agent.  We can do preemption.
15         MR. McNEW:  It's the next word on my list so it's as
16  good a one as any.
17         THE COURT:  Let me just get the notes in front of me.
18  Go ahead.
19         MR. McNEW:  I'm guided by our first colloquy.  I think
20  I spent a good five or ten minutes before I got to what you
21  were concerned about, and rather than --
22         THE COURT:  No, go ahead.  All right, well --
23         MR. McNEW:  Perhaps you could tell us what's of

Page 17

Exhibit 9
Page 17 of 40

42demtbc

24  concern to you and we would be happy to address those points.
25          THE COURT:  What's concerning to me now is I can't get
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

37

42demtbc

1  my papers in order, so give me a second to achieve that.
2          MR. McNEW:  I'll make an observation while you're
3  looking, your Honor, and the observation that I would make,
4  it's suggested in my papers, and I wish I just said it more
5  forthrightly, the crux of the argument on preemption, I
6  believe, is that the parade of horribles that will attend an
7  adverse ruling on MTBE, that if we are right and we win on the
8  state law issues, that it will disrupt the distribution of
9  gasoline.  I just want to make the point that that is frankly
10  an illogical position in my cases because I'm representing
11  New York cases.
12          The State of New York has already banned the use of
13  MTBE in New York starting January of this year.  It is
14  impossible for any ruling in these cases to have the least
15  effect on the distribution and sale of gasoline in New York
16  because New York's already banned it.
17          And, in fact, if you look at the 18 states that have
18  already banned or restricted the use of MTBE, they account for
19  over half the gasoline usage in the country.  So by
20  legislative -- and I would also add that the energy bill that
21  the defendants have been seeking to have enacted on Capitol
22  Hill, HR 6, which is currently inert but is about to be revived
23  by the defendants, provides for a nationwide ban of MTBE.  So
24  it's very difficult for me to understand how a plaintiffs'
25  verdict in this case would have any impact on the distribution
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

38

42demtbc

1  of gasoline.
2          If you'll direct me to the things of concern to you,
3  your Honor, I'd be happy to address them.
4          THE COURT:  I suppose one I have is with the language
5  of 42 U.S.C., Section 7545(z)(4)(A)(2), you know that one
6  sentence everybody talks about, no state or political
7  subdivision thereof may prescribe or attempt to enforce for
8  purposes of motor vehicle emission control --
9          MR. McNEW:  Yes, your Honor.
10          THE COURT:  -- any control or prohibition respecting
11  any characteristic or component of fuel or fuel additive.
12          And my question there is a simple one:  Is there any
13  purpose other than motor vehicle emission control for these
14  fuel additives?
15          MR. McNEW:  No.
16          THE COURT:  That is the only purpose?
17          MR. McNEW:  Yes, to my knowledge, as far as the
18  regulation goes there are commercial reasons why the defendants
19  choose to use MTBE.  It's a byproduct of the refining process.
20  They have to pay to dispose of it, otherwise they get to turn a
21  silk purse out of a sow's ear.  But the regulatory purpose of
22  it, I believe, is motor vehicle emission control.
23          THE COURT:  What are the options, then, if New York
24  has banned the use of MTBE?
25          MR. McNEW:  Correct, your Honor.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

39

Page 18

Exhibit 9
Page 18 of 40

42demtbc

```
 1            THE COURT:  So what's going to be used?
 2            MR. McNEW:  Nothing, your Honor.
 3            THE COURT:  And that's always been a viable
 4  alternative?
 5            MR. McNEW:  Always.  Well, the gallery laughs, your
 6  Honor, but the fact is it always has been.  It was on the list
 7  of approved --
 8            THE COURT:  I know it was on the list, but I thought
 9  the argument was the problem with that list is it was a list
10  with no options.  Essentially the government was mandating MTBE
11  because the other six weren't viable, so to speak.
12            MR. McNEW:  The record in the Pataki case, which was a
13  tried case in front of Judge Mordue up in the Northern District
14  of New York puts a lie to that.  Judge Mordue heard the
15  evidence, they put their best case on.  At that point Judge
16  Mordue ruled at most there would be some difficulty; six months
17  might find some shortages, transitional shortages for six
18  months.
19            MR. SACRIPANTI:  Just a point of clarification.
20  Mr. McNew says "they."  He's of course not referring to the
21  defendants here, which weren't defendants in that action.  I
22  assume he means the defendants or plaintiffs in that action?
23            MR. McNEW:  It was the Oxygenated Fuels Association,
24  which is the defendants' trade association.
25            MR. JONES:  No, it's not.
```

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            40

42demtbc

```
 1            MR. McNEW:  You'll have your chance.
 2            THE COURT:  I appreciate clarification on something I
 3  don't know if they can correct -- if there is a correction that
 4  I should hear, it's all right to do that.
 5            MR. McNEW:  Your Honor, if -- and I'm not arguing that
 6  they're estopped from raising these points.  I'm not raising it
 7  for the purpose of collateral estoppel, but the Oxygenated
 8  Fuels Association has -- because they are the trade association
 9  for manufacturers of MTBE, they have a compelling interest in
10  this matter.  They put their best case up in front of Judge
11  Mordue and he found that there was no basis for the facts.
12            THE COURT:  I guess that's the point Mr. Sacripanti
13  was referring to.  He didn't get a chance to put his best case
14  up only because he wasn't there.
15            MR. McNEW:  But, your Honor, if there is a -- if there
16  is a case to be made, they need to make it.  They can't just
17  make a vague allegation of it.
18            THE COURT:  I understand.  It's one of the questions I
19  was going to get to when they get their turn.
20            MR. GUTMAN:  May I just for purposes of clarification
21  one other point -- John Gutman for Sunoco.
22            Judge Mordue's decision is a recent ---
23            THE COURT:  You are going too fast.
24            MR. GUTMAN:  I know I'm injecting myself here, but the
25  allegations in these complaints go back to 1988, 1990.  And the
```

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            41

42demtbc

```
 1  issue under the plaintiffs' theories are whether or not the
 2  defendants suppressed knowledge about MTBE and -- versus other
 3  alternatives in 1988, '90, a fundamentally different question.
 4            MR. McNEW:  Your Honor, with all due respect, it's
```

                        Page 19

Exhibit 9
Page 19 of 40

42demtbc

5    corn.  I mean, it's a still.  I mean, they have been making
6    this stuff up in the hills of Kentucky since the 18th century.
7    There's no magic to making ethanol.  It's not rocket science to
8    make this stuff.  You have to build a plan.  It takes some time
9    to build it.
10         There already are large plants that make ethanol for a
11   variety of other purposes.  Will it take some time for them to
12   expand their production capacity?  Yes.  Was that capacity
13   large back in the 1980s?  Yes.  Could they have done it in the
14   1980s?  Yes.  Would it have taken more than a year?  Absolutely
15   not.  If they needed to use MTBE to transition, to segue while
16   they were using ethanol, could they have done that?  Yes.  Did
17   they ever in the 20 years look to ethanol, which would have
18   been an environmentally responsible thing to do?  Could they
19   have done that?  Yes.  Did they?  No.  They did not.  They
20   never once sought to use an environmentally acceptable product
21   here.
22         The notion that -- they're putting me in the position
23   of carrying their burden.
24         THE COURT:  You're right.  My fault, I should have
25   heard from them first.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              42

42demtbc
1         So who wants to speak on preemption?
2         MR. EIMER:  Good morning, your Honor.  Nate Eimer on
3    behalf of the defendants.
4         I'm not sure which question you'd like me to go to
5    first, but I'm glad to start with C4A to start with that.  Your
6    question was:  Are any of these fuel additives regulated for or
7    used for any other purpose other than motor fuel?  The answer
8    is yes.
9         And take a good example:  MTBE surprisingly -- it may
10   seem from what you hear in this courtroom, MTBE has medicinal
11   uses.  It's given to individuals who have gall stones for the
12   dissolution of gall stones.  So, yes, it has other uses.
13        I thought there's obviously a controversy about how
14   C4A should be read, and I think the first thing I'd like to
15   mention to the Court is regardless of how it's read, even read
16   the plaintiffs' way, their complaint walks right into the
17   express preemption language as they would read C4A.
18        And if I may hand the Court, I've just excerpted some
19   paragraphs of the complaint for the Court's benefit, if I may
20   approach the bench.  There's some paragraphs I will get to in a
21   minute starting with 74, which relate to some other issues on
22   federal question, but if your Honor would turn to paragraph 77,
23   which is on the second page.  I don't think one --
24        THE COURT:  77?
25        MR. EIMER:  Paragraph 77 of the complaint --
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                              43

42demtbc
1         THE COURT:  Oh, I see, behind the caption.
2         MR. EIMER:  Sorry.  I don't think one could have a
3    clearer allegation of an attempt to regulate emissions from
4    automobiles than paragraph 77.  It says, in fact, combustion of
5    gasoline containing MTBE in car engines actually increases
6    exhaust emissions of formaldehyde, nitrous oxide and other
7    atomic chemicals, including MTBE.  Itself, MTBE discharged to
8    the air contaminates groundwater because rain returns it to the
9    soil.

                          Page 20

Exhibit 9
Page 20 of 40

42demtbc

10      That's exactly what even their reading of C4A
11  prohibits:  A case brought to regulate emissions from
12  automobiles for any purpose.  And what they're saying in this
13  allegation is that there are -- is at least one source of MTBE
14  that's contaminating groundwater of their clients, and that's
15  MTBE found in the emissions of automobiles.  And those
16  emissions to automobiles are going into the air, going into the
17  rain contaminating the groundwater.  And in trying to ban MTBE
18  they're trying to ban it from the emissions of automobiles,
19  which runs directly into their reading of C4A, which says
20  states are preempted from regulating auto emissions.
21      Now, notice they call this exhaust emissions because
22  emissions isn't limited to what comes out of the tail pipe.
23  Those are called exhaust emissions, but there's also
24  evaporative emissions.  And if you'll look at the rest of the
25  paragraphs 89 to 196 and so forth, those all talk about
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                44

42demtbc
1  evaporation of MTBE when refueling cars or fueling cars and the
2  evaporation of MTBE from gasoline getting into the air, those
3  evaporative emissions getting into the air, being washed out of
4  the rain and contaminating groundwater.  Under any reading that
5  anyone has ever proposed of C4A, they are walking right into
6  the express preemption provision.
7      THE COURT:  Well, if it's so express, why didn't
8  Congress just say it?  Why didn't they put the express language
9  in that we have in ERISA and Second Circuit, now SLUSA, and the
10  third one that they have --
11      MR. EIMER:  C4A is expressed.  It says no state.
12      THE COURT:  The LMRA, the ERISA, now SLUSA are the
13  three found to really be expressed.
14      MR. EIMER:  And this is there, I'm reading the express
15  language of C4A, no state may proscribe or attempt to enforce
16  for purposes of motor vehicle emission control any control or
17  prohibition respecting any characteristic or component of a
18  fuel additive.
19      THE COURT:  That wasn't what I meant by express.  In
20  the Labor Management Relations Act, the statute says the
21  district courts of the United States shall have jurisdiction
22  without respecting the amount in controversy.
23      ERISA says suits may be brought in any district court
24  of the United States.
25      SLUSA says any covered class action brought in any
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                45

42demtbc
1  state court shall be removable to the federal district court.
2      That's the language I'm talking about.
3      MR. EIMER:  There's no express grant of federal
4  jurisdiction to deal with this.
5      THE COURT:  So what's new since I last ruled against
6  you on this?  My question is:  What's new since I last ruled
7  against you?
8      MR. EIMER:  Two things.  Your Honor did not consider
9  the fact -- your Honor did not rule against us on the basis
10  there was no express grant of federal jurisdiction.
11      THE COURT:  I said there's no express preemption.
12      MR. EIMER:  You said there was no express preemption.
13  What I'm bringing to the Court's attention which we did not
14  have before were express allegations that fall within the
                            Page 21

Exhibit 9
Page 21 of 40

42demtbc
15  express preemption provision as the Court read it and as the
16  plaintiffs read it.  The Court read the express preemption
17  provision to only preempt auto emissions, regulation of auto
18  emissions.  Their complaint seeks to regulate auto emissions.
19          THE COURT:  What?  I didn't even follow what you just
20  said.  You said the Court said last time?
21          MR. EIMER:  You said last time that the preemption
22  provision, C4A, is limited to preempting state regulation of
23  auto emissions.
24          THE COURT:  Right.
25          MR. EIMER:  Their complaint, paragraph 77 in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

46

42demtbc
1   particular is the clearest, seeks to regulate auto emissions.
2   That is exactly what the Court said was preempted, regulation
3   of auto emissions.  And, therefore, this lawsuit is preempted
4   by federal law.
5           THE COURT:  What else is new since I last ruled?
6           MR. EIMER:  The Rucker issue in the Supreme Court.  If
7   I may hand to your Honor one more paper, it's an excerpt from
8   the Rucker decision.  The Rucker decision was decided in 2002.
9           THE COURT:  Is that in your brief?
10          MR. EIMER:  Yes, it is.  I can get you the page
11  citation, if you like.  I think it's 23 offhand, but I don't
12  know.
13          THE COURT:  OK.  Go ahead.
14          MR. EIMER:  The Rucker decision was decided in 2002
15  after your Honor decided, and it had to do with interpretation
16  of statutory language and a construction of statutory language.
17          The Supreme Court was reviewing a decision by a Court
18  of Appeals that interpreted the part of the HUD regulations or
19  HUD statute relating to drug activity at housing projects.  And
20  the statutory language that was in review was the language
21  quoted in the sheet I've handed to the Court.  The language
22  was, "any drug related criminal activity engaged in by public
23  housing tenant, any member of the tenant's household or any
24  guest or other person under the tenant's control shall be cause
25  for termination."  And the Court of Appeals had read the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

47

42demtbc
1   qualifying phrase under the tenant's control as applying to all
2   the individuals listed, members of the tenant's household, any
3   guest or any other person -- and found that since the person
4   was a guest but wasn't under the tenant's control or wasn't --
5   the person shouldn't be evicted from their housing.  Supreme
6   Court said no.
7           This is the quote:  "The disjunctive "or" means that
8   the qualification placed after the disjunctive applies only to
9   the term after the disjunctive."
10          What I wanted to do then was apply that construction
11  to C4A.
12          THE COURT:  Right.
13          MR. EIMER:  No state may proscribe or attempt to
14  enforce.
15          THE COURT:  Go ahead.
16          MR. EIMER:  May proscribe -- perhaps it would help --
17          THE COURT:  I have it here.
18          MR. EIMER:  No state may proscribe or attempt to
19  enforce for purposes of motor vehicle emission control any
                            Page 22

Exhibit 9
Page 22 of 40

42demtbc
20  control or prohibition.
21          Using the Rucker decision as we argue now and didn't
22  have then, but the qualifying phrase for purposes of motor
23  vehicle emission would only apply to the term after the
24  disjunctive, attempt to enforce.  The way the Court and the
25  plaintiffs read it when the Court read it the first time, and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

48

42demtbc
1   the plaintiffs continue to read it now, the phrase applied to
2   both, which the Supreme Court specifically rejected in Rucker.
3           If I may hand to the Court a final --
4           THE COURT:  Wait.  I just want to hear your
5   interpretation.  Then does -- the limitation, for purposes of
6   motor vehicle emission, applies only to attempt to enforce?
7           MR. EIMER:  Correct.
8           THE COURT:  That's your view?
9           MR. EIMER:  And that's consistent with Rucker.
10          THE COURT:  I see.  And what difference does that
11  make?  It applies only to attempt to enforce?
12          MR. EIMER:  That's correct.
13          THE COURT:  If you're right, that it applies only to
14  attempt to enforce, what does that mean?
15          MR. EIMER:  It means the state can enforce existing
16  laws, tax laws, labeling laws, anything that would regulate --
17  fuel content or characteristics of the water fuel additive so
18  long as it's not for the purpose of motor vehicle emission, but
19  it can't proscribe any new laws for that purpose, for
20  controlling prohibition respecting characteristics of that.  It
21  can't proscribe any new laws for any purpose.
22          THE COURT:  I'm sorry.
23          MR. EIMER:  It's an absolute prohibition.  What it
24  would say is no state may proscribe any control or prohibition
25  respecting any characteristic or component of a fuel additive.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

49

42demtbc
1   That's the way the Supreme Court interpreted Rucker.  That's
2   the way we believe that ruling would teach us to interpret C4A.
3           The way the Court read it the first time and the way
4   the plaintiffs continue to read it, it was as though the
5   limiting phrase for purposes of motor vehicle emission control
6   came before the words it's attempting to modify.  So the way
7   the Court read it, the statute would have been written, no
8   state for purposes of motor vehicle emission control may
9   proscribe or attempt to enforce.  That's not the way the
10  Congress wrote the statute.
11          THE COURT:  The only difference with HUD vs. Rucker is
12  you've got a series of items all separated by a comma, right:
13  Tenant, comma, member of the household, comma, the get then the
14  or.  You don't have that comma here, so you don't have that
15  concept of series.  It just said may proscribe in attempt to
16  enforce.  That's together, comma.
17          MR. EIMER:  One would need the comma because they're
18  disjunctive and there's more than two, so the third item would
19  be separated by comma.
20          THE COURT:  They're all separated by comma.
21          MR. EIMER:  Because there's several, there's more than
22  two.  We only have two.
23          But the point of the Supreme Court was where there's a
24  disjunctive, "or," the qualifying term after the disjunctive
                         Page 23

Exhibit 9
Page 23 of 40

42demtbc

25    applies only to the last term.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

42demtbc
1          THE COURT:  I don't know, that's all very interesting.
2    Now I think the more interesting point that -- but those were
3    the two things that were new?
4          MR. EIMER:  On terms of C4A.
5          THE COURT:  The first one, again, was what, the
6    pleading?
7          MR. EIMER:  The pleading.
8          THE COURT:  Let's talk about this thing called
9    substantial federal question, which seems to be a subset of --
10   the way it's breached, this is part of the same point.
11         MR. EIMER:  No.  Substantial federal question is
12   different.
13         THE COURT:  Then there are four things?
14         MR. EIMER:  There are four things, actually.
15         THE COURT:  Go ahead.  I'm interested in that because
16   I don't think I've addressed that before.
17         MR. EIMER:  No, you've not addressed that before.
18         THE COURT:  OK.
19         MR. EIMER:  Your Honor, if the plaintiffs' complaint
20   taken as a whole and the plaintiffs' burden in this case
21   presents an issue of state law that requires resolution of a
22   federal question, then this Court has jurisdiction over this
23   case.  And it is very clear certainly from their product
24   liability claim that an element of their case is to show the
25   risk utility of MTBE and gasoline, or gasoline with MTBE in
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

42demtbc
1    order to show that as a defective product.  New York law is
2    clear on that.
3          Your Honor recited that in your earlier opinion on the
4    motion to dismiss.  An element of their cause of action for
5    defective product is a risk utility balance under New York law
6    to show that the risks of gasoline with MTBE outweigh its
7    utility.  Right?
8          THE COURT:  I can't remember.  What is the federal
9    question that's a necessary element of their state claim?
10   That's what I need to understand.  You probably just said it
11   but I didn't follow it.  It has to be a federal question, has
12   to be a necessary element.
13         MR. EIMER:  That's correct.
14         THE COURT:  OK.
15         MR. EIMER:  In resolving the risk utility balance, in
16   resolving the risk utility balance the jury will necessarily
17   have to get into several federal questions.
18         THE COURT:  Namely?
19         MR. EIMER:  The first federal question is whether or
20   not the benefits of the program outweigh the risks.  The
21   plaintiffs in their complaint challenged the benefits of MTBE
22   gasoline.
23         THE COURT:  which cause of action is this?  What's the
24   label of this --
25         MR. EIMER:  The defective product claim.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

42demtbc

Page 24

Exhibit 9
Page 24 of 40

42demtbc

1    If I may go back to the case law in New York, I think
2    it's Denny vs. Ford Motors is one in particular, that says they
3    have to do a risk utility benefit analysis.
4         THE COURT:  It's an element of their case, it's not a
5    defense.  They have to prove it.
6         MR. EIMER:  That's right.  In order to establish a
7    defective product, they have to prove that the risks outweigh
8    the utility of the product as an element of their case.
9         THE COURT:  Element of their case.  Well, that's what
10   this thing called substantial federal question jurisdiction is
11   about.  If it's a necessary element of a state claim and a
12   federal issue is a necessary element of a state claim, then
13   there's jurisdiction.  Maybe this is why we should carry the
14   plaintiff and say why that isn't so.  He says it's a necessary
15   element of the detective product claim to do this utility risk
16   balancing, so you'd have to -- that raises a federal issue.
17        MR. MCNEW:  And why is that a federal issue?
18        THE COURT:  Back to Mr. Eimer.  Stay at the podium, I
19   really need to understand that.  Fair enough, why is that a
20   federal issue?
21        MR. EIMER:  First --
22        THE COURT:  You asked, you better listen.
23   Why is it a federal issue?
24        MR. EIMER:  Paragraph 74 to 77 say there's no benefit
25   to the program at all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

42demtbc

1         THE COURT:  I'm sorry.  There's no benefit to the
2    program?
3         MR. EIMER:  To the program, the RFG program.  They
4    specifically in their complaint in 74 through 77 say MTBE, but
5    for this purpose they can say both ethanol and MTBE does not
6    deliver cleaner air, contrary to industry assurances MTBE does
7    little or nothing to reduce such air polluting emissions as
8    carbon dioxide or smog precursors.  So the benefits of the
9    program and MTBE in particular -- which Congress and the EPA
10   has found to be there, it was approved for the program -- are
11   now under attack and saying they're of no benefit.  The
12   question of the benefit is a matter of federal law.  The
13   federal government decided there was a benefit, and a federal
14   court should decide whether or not those benefits are there or
15   not.  So that's the first federal question.
16        THE COURT:  Let's stop there.  That's the first
17   federal question, he says.
18        MR. MCNEW:  Your Honor, we're not seeking to have the
19   New York Supreme Court for New York County invalidate the RFG
20   program.  We're not challenging or attacking that  -- we make
21   an allegation that it's part of showing the defendants' bad
22   conduct long before --
23        THE COURT:  You are straying from the immediate
24   question.  If you'd would stay with it, there's a cause of
25   action called defective product.  There's an element of proving

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

42demtbc

1    that cause of action is caused by a risk benefit weighing.  You
2    allege that there's no benefit to MTBE, use of MTBE; in fact,
3    it's harmful, there's no benefit.  Federal law has mandated
4    this is one of seven approved additives, and you have to use
5    one of the seven.

Page 25

Exhibit 9
Page 25 of 40

42demtbc

6    MR. McNEW:  That's right, but it expressly left the
7  EPA, and the EPA has said that it is not endorsing any one of
8  these oxygenates.  It just has a list of substances that it has
9  approved --
10    THE COURT:  Approved?  I don't find much different
11  from approved and endorsed.  They approved it for a purpose.
12  They say, we the federal government say this is the approved
13  list of seven.  Now you would want to prove that the federal
14  agency was wrong to approve it essentially?
15    MR. McNEW:  No.
16    THE COURT:  It was wrong to approve it, wrong to
17  include it on the list?
18    MR. McNEW:  They can use it for an oxygenate, but if
19  it causes injury, they have to pay for it.  Your Honor, this
20  whole argument has --
21    THE COURT:  You're essentially saying the federal
22  government made a mistake, it should never have included it?
23    MR. McNEW:  But they did include it.
24    THE COURT:  Has no benefit.
25    MR. McNEW:  We're not suggest --
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

42demtbc

1    THE COURT:  Did you just say they didn't include it?
2    MR. McNEW:  No.  No.  I said they did -- no, I didn't,
3  your Honor.  I'm sorry if I misspoke.
4    THE COURT:  No, I misheard.
5    MR. McNEW:  This whole argument has been conflating a
6  claim for damages with a notion which I have a difficult time
7  articulating, frankly; that somehow that if we win and we
8  collect damages for this, that we are regulating what they can
9  put in their gasoline.
10    THE COURT:  Well, you are.  You're saying that they
11  should never put MTBE in.  It was wrong.  It caused harm.  They
12  should pay for that harm and it shouldn't matter at all if the
13  federal government said you must use one of these seven.  These
14  are the approved list.
15    MR. McNEW:  That's right.  They could have used one of
16  the seven.
17    THE COURT:  Then that is a federal government ounce of
18  benefit, and you're saying there's no benefit.  How could one
19  believe the federal government put in something that had no
20  benefit?
21    MR. McNEW:  Your Honor, if -- if oxygenates work, then
22  I suppose MTBE and ethanol, all these other oxygenates -- I'm
23  not a scientist, I don't know, but I will assume --
24    THE COURT:  You told me you're a bankruptcy lawyer, 15
25  years.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

42demtbc

1    MR. McNEW:  I was a bankruptcy lawyer for 15 years.
2    THE COURT:  He deserved that.
3    MR. McNEW:  I did.  You know bankruptcy lawyers, we're
4  all bottom feeders, your Honor.
5    Listen, it's not -- the question here, you know, when
6  you say is there a substantial federal question, the question
7  here is not -- is not, does MTBE -- ought the EPA proscribe
8  MTBE as an oxygenate.  That's not the point.  Just as when they
9  were saying earlier that in going through this grammatical
10  exercise somehow this lawsuit seeks to regulate the use of
Page 26

Exhibit 9
Page 26 of 40

42demtbc

11 gasoline or regulate the composition of gasoline. We're not
12 seeking it to change the regulatory scheme. We're not seeking
13 to rewrite the EPA's regulations.
14          We've been injured. We're seeking damages. That's
15 different, your Honor. If I walk across the street out in --
16 across Centre Street and I get hit by a car because it didn't
17 put on its brakes and stop in time -- said it's a product
18 defect, brakes were improperly designed -- I get damages.
19 Maybe there are a lot of them and I bring a class action, I get
20 damages. That doesn't mean I'm regulating the type of brake
21 that the auto manufacturer can put in the car. That may
22 determine it is prohibitive economically to continue to
23 manufacture that brake, but that's a commercial decision. It's
24 not an effort to regulate.
25          These words are -- these words have meaning, Judge.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

57

42demtbc

1 You can't conflate the coercive effect of a judgment with the
2 state use of its inherent powers to regulate conduct of people
3 acting within its boundaries.
4          MR. GORDON: Your Honor, may I speak for a moment.
5          THE COURT: Sure.
6          MR. GORDON: I have never been a bankruptcy lawyer.
7          THE COURT: Add extra points for you.
8          MR. GORDON: I have, however, practiced product
9 liability litigation for over 20 years. In terms of whether or
10 not proving this is a defective product, we're going to show to
11 the jury that this product was unreasonably dangerous, did not
12 have any warning that could render it safer. And we are not
13 asking any jury to weigh the risk utility of the RFG program.
14          The government allowed MTBE, we will show, because
15 these companies represented by the defendants misled the
16 government intentionally about the dangers. They never told
17 the government in 1990 what they knew in 1984 about the fact
18 that they knew it was contaminating wells at a much more rapid
19 rate than any other of the contaminants. If they had told the
20 government that, the government would not have allowed MTBE.
21          Now the government knows about the story, it's being
22 banned. That's the problem with their argument. We're not
23 asking a jury to say what was back in 1990 the risk utility of
24 the Clean Air Act. These defendants lobbied for MTBE to be on
25 that list and the government specifically made the law neutral.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

58

42demtbc

1 They said, use what you want as long as you comply.
2          The risk utility of MTBE is different than the jury
3 deciding the risk utility of the entire RFG program. It had
4 nothing to do with that. They're trying to confuse the jury
5 with the issue. Just like in asbestos litigation where
6 asbestos was on the approved product list, you had to use it on
7 ships in World War II; had to, couldn't use anything else.
8 Wanted to use fiberglass? No way, the government said.
9          Asbestos litigation has been entirely in state court
10 for the last 25 years -- actually, since 1991 when there was an
11 MDL grade. Entirely no cases are processed in the federal
12 court. And it was the exact same situation even stronger where
13 the government said, no, you don't have a choice of seven
14 different products, asbestos is one of them; you don't have a
15 choice of seven different products. You had to use asbestos.
                                Page 27

Exhibit 9
Page 27 of 40

42demtbc

```
16   No analogy could be clearer.
17          MR. EIMER:  Completely different issue.
18          THE COURT:  Well, after yesterday you had to use
19   asbestos and you were a government contractor.  According to
20   Judge Weinstein, there would have been government jurisdiction,
21   which he said in the Agent Orange case yesterday.  That's what
22   you had to manufacture and you were a government contractor.
23          MR. EIMER:  And Mr. Gordon as a tort lawyer is
24   complaining not that we lied about the benefits of MTBE, we
25   lied about the risks of MTBE.  But the complaint says there
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

59

42demtbc

```
1    were no benefits to MTBE and Congress in putting it in the
2    program.  And they deliberately put MTBE into the program.  And
3    the EPA, in approving MTBE for the program, found there were
4    benefits to MTBE.  And those benefits in paragraph 74 to 77 of
5    the complaint are now being challenged, or 76.
6           THE COURT:  Is there any other state law cause of
7    action that has a necessary element that raises federal law,
8    other than the one you're relying on?
9           MR. EIMER:  There may be.
10          THE COURT:  I don't know about may be.  Do you know of
11   any?
12          MR. EIMER:  I believe the nuisance claim does.  That
13   would require the jury to weigh the relative risks of all this,
14   and I'd like to get to the second federal question that goes
15   up.  This is one on the benefits.
16          THE COURT:  OK, second one.
17          MR. EIMER:  The second is the plaintiffs here must
18   convince the jury that the risks to the water supply that
19   they're worried about here outweigh the benefits.  And the
20   question is how you balance those.  How does the pan scale work
21   that they want the jury to use?  That's a federal question, is
22   balancing, because the DC circuit's already weighed into this
23   in a case your Honor cited in your last opinion.  It's called
24   ABI vs. EPA.
25          And in that case the EPA decided early on in the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

60

42demtbc

```
1    beginning of the program that 30 percent of the RFG should be
2    made with ethanol because they decided that under one of the
3    provisions of the Clean Air Act, under one of the provisions of
4    the Clean Air Act, 7545(k)(1), the EPA was allowed to balance,
5    as your Honor may recall, all sorts of criteria, according to
6    the EPA, against the reduction of what was called the OCs,
7    certain contaminants that resulted in smog.  And one of those
8    things that the --
9           THE COURT:  I just want you to keep this simple and
10   fast enough so they can answer this second issue that you say
11   raises an issue of federal law.
12          MR. EIMER:  Let me read what the DC --
13          THE COURT:  Are you following the second issue so far,
14   yes or no?  Do you know where he's even headed.
15          MR. GORDON:  I think he's talking about the risk and
16   benefits of the RFG program, not MTBE.
17          THE COURT:  Are you?
18          MR. EIMER:  No.
19          THE COURT:  Say it again so they can catch what is the
20   second issue of federal law.
```
                              Page 28

Exhibit 9
Page 28 of 40

42demtbc

21          MR. EIMER:  The second issue of federal law is it's a
22  matter of federal law how the risks and utilities are to be
23  balanced.
24          THE COURT:  Of what?
25          MR. EIMER:  The risk of water contamination against

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

61

42demtbc

1   the benefits of OCs from the program.
2           THE COURT:  That's the whole program?  Are you raising
3   that in your complaint?
4           MR. GORDON:  No, not at all.
5           MR. EIMER:  Absolutely they are.
6           THE COURT:  Can we focus where in the complaint you
7   say they're raising and then he can respond to you.
8           MR. EIMER:  In the product defect claim they --
9   there's no question that MTBE -- according to the government,
10  that the MTBE has benefits in reducing the OC, which is smog
11  components.  That's why it was approved.  The program itself,
12  the clean air program was scaled by the EPA to take into
13  consideration the availability of MTBE.  In other words, EPA
14  allowed the program to expand or contract and was required to
15  take into consideration the amount of oxygenates of all kinds
16  that were available.  And if there wasn't sufficient oxygenate,
17  the program had to contract.  If there was enough, then the
18  program could expand.  So the program encompasses everything.
19          And so when one says the benefits, the benefits aren't
20  just the one thing.  It's the benefits of a program as a whole.
21  And when one attacks MTBE, you're attacking an integral part of
22  the program that the EPA designed.
23          THE COURT:  Can you answer that?  Who wants to answer
24  that?  Second issue of federal law, who wants to answer it,
25  that they say is -- you're deferring to the bankruptcy lawyer?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

42demtbc

1           MR. GORDON:  I'll stand up.  Robert Gordon again.
2           THE COURT:  I'm just teasing.
3           MR. GORDON:  That's fine.  I still don't see it,
4   Judge.  An element of our claim, we're claiming they
5   negligently designed a product.  They knew that it was
6   dangerous.  They failed to warn anybody about that, including
7   the federal government, and now they're seeking to say because
8   the federal government didn't consider at that time the
9   dangers -- which, by the way, we didn't tell them about and
10  which we must be the one responsible for.  We can't expect the
11  government to know about our product.  They're the
12  manufacturer.  They are, under product liability law, the one
13  who's the guarantor of its safety.  They're seeking to hide
14  behind that but -- and, again, the entire program, the program
15  was fuel neutral.  Use whatever you want that will comply, any
16  of these seven you say comply.  Fine.
17          They're trying to make this far too complex.  It's not
18  that complex a case.  They made a product.  They knew it was
19  dangerous.  They failed to warn and they continue to make it
20  and sell it.
21          MR. MCNEW:  Your Honor, doesn't the argument prove too
22  much?
23          THE COURT:  I don't know, I wasn't here to answer the
24  questions.  I thought I could ask them.
25          MR. MCNEW:  I mean, if what he's saying is right,

Page 29

Exhibit 9
Page 29 of 40

42demtbc
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

63

42demtbc
1  doesn't every product liability case that involves a regulated
2  product become a federal case?  I mean, that's where he's
3  taking you in this argument, I believe.  I mean, the products
4  liability cases are quintessential state law cases.  The notion
5  that you can somehow transmogrify a state law claim into a
6  federal claim because the product that's defective is regulated
7  and there are aspects of the regulation that may be called into
8  question just strikes me as sweeping with an awfully broad
9  broom.
10         I mean, I've heard the argument.  I read it -- I
11  confess, when I read it, I didn't understand it, because now
12  that I hear it, I think I understand it but I can't comprehend
13  it.
14         MR. EIMER:  I think it's very clear.  This is not an
15  ordinary regulatory scheme.  What's happened here is Congress
16  said to the EPA, do whatever you must do in regulating RFG and
17  sizing the program to reduce the OC admissions as much as you
18  can.  And as a secondary consideration you can balance other
19  things.  You can look at water quality, you can look at all
20  these other things that plaintiffs would like to look at now,
21  but the direction from Congress was the -- and this is what the
22  DC circuit says in the API case.  The direction from Congress
23  was, the primary goal of this country is clean air.  It is
24  primary over water quality.  It is the number one goal of this
25  country.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64

42demtbc
1         And as the DC circuit says, unless air quality and the
2  RFG program has an inordinate effect on water quality, air
3  quality is primary.  Air quality is primary in this country.
4         THE COURT:  As Mr. Gordon argued, what does that have
5  to do with MTBE?  We're told there are seven choices, you
6  figure it out?
7         MR. EIMER:  The EPA makes this determination all the
8  time.  Restricting the availability of oxygenates restricts the
9  size of the program.  And by restricting the size of the
10  program, one restricts the improvement to the air because fewer
11  states, fewer counties can participate if the available
12  oxygenate pool isn't as big.
13         THE COURT:  OK.  What have you told me about the pool?
14  In other words, have you proved or -- I can't say proved at
15  this point, but you offered anything to say the other six
16  wouldn't have filled the gap, so to speak?
17         MR. EIMER:  Yes.  Our remand petition says that we've
18  argued that all along our position in this litigation for four
19  years has been ethanol only could never have worked.
20         THE COURT:  Remand removal petition?
21         MR. EIMER:  Removal petition.
22         THE COURT:  Says what?
23         MR. EIMER:  That ethanol was insufficient to meet the
24  nation's demand, and that Congress and the EPA assumed and took
25  into consideration the availability of both oxygenates.  And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

42demtbc
1  our brief goes on to say that as the program was structured the

Page 30

Exhibit 9
Page 30 of 40

42demtbc

2  EPA was required to look at the available supply of oxygenates,
3  and they took into consideration the available supply of both
4  oxygenates in allowing states to come into the program.  And
5  only when there was sufficient supply was the EPA allowed to do
6  that.
7        If I could, your Honor, there's a long and
8  complicated -- and you might want to have someone else read
9  it -- review that the EPA did allowing Phoenix, Arizona, to opt
10  into the program in 1997, which appears at 62 Federal Register
11  30260.  And it's a long study of the availability of MTBE and
12  EPA and ethanol.  And the EPA concludes that for all of those
13  oxygenates, 90 percent of the capacity in that area is already
14  used up, but with 10 percent available, there's enough for
15  Phoenix to come in.  But it was a close call, they said.  If
16  one were to take MTBE out, then Phoenix couldn't have come into
17  the program.
18        And the national policy of improving the air over
19  everything unless, there's an inordinate effect on the water --
20        THE COURT:  Turning back to the very simple point of
21  federal jurisdiction, Mr. McNew's very articulate and simple
22  argument, is your argument proving too much?  Would this turn
23  every product liability case that involved a regulated industry
24  or regulated product into a federal jurisdiction that couldn't
25  be brought in state court?  I mean, drugs are regulated
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              66

42demtbc

1  carefully by the FDA and airplanes are by the FAA and whatnot,
2  but we don't have sole federal, exclusive federal jurisdiction.
3  We don't have federal preemption.  We don't require that all
4  those products are litigated in federal court when there's a
5  claim that they're defectively designed, even though they may
6  implicate the FDA or the FAA or any number of agencies.  How do
7  you answer his rhetorical questions?
8        MR. EIMER:  One, all claims are not but some are.
9  There is an FAA case, the Shrader case.  There's a passenger
10  who was evicted from an airplane and he brings a false arrest
11  claim in state court.  He says under the FAA regulations, we're
12  allowed to ensure the safety of the passengers.  And it calls
13  into question that policy.
14        THE COURT:  Is that a district court or circuit, do
15  you know?
16        MR. EIMER:  District, I believe.
17        THE COURT:  I think I know the case.
18        MR. EIMER:  That's exactly what --
19        THE COURT:  How about every drug case?  Tons of drug
20  cases that go on every day.
21        MR. EIMER:  It depends how it implicates federal
22  policy.
23        THE COURT:  They're all regulated by the FDA.
24        MR. EIMER:  It's not just the regulation that calls it
25  into question, it's whether or not the suit itself calls into
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              67

42demtbc

1  question the regulation or the policy that the government and
2  the federal government has imposed.  Here the risk utility
3  balance clearly --
4        THE COURT:  Let's make sure we have time.  I think
5  I've got the gist of your argument.  At least I was right about
6  one thing today, it's complicated and long.  I knew it was
                       Page 31

Exhibit 9
Page 31 of 40

42demtbc

7    going to take two hours.
8          Federal agent, who wants to -- this time I might as
9    well get it right and start with the defense.  Who wants to
10   talk about federal agent jurisdiction?
11         MR. EIMER:  I do.
12         THE COURT:  All right.  May as well start with
13   yesterday, right, Judge Weinstein, I guess.
14         MR. EIMER:  Judge Weinstein made it clear.
15         THE COURT:  He made it clear for that fact pattern.
16   I'm not sure that's this case at all.
17         MR. EIMER:  I think it's this case exactly.
18         THE COURT:  Who's the government contractor?
19         MR. EIMER:  We're directed by the federal government.
20         THE COURT:  Are you a government contractor?
21         MR. EIMER:  No.
22         THE COURT:  First of all, you're not a government
23   contractor.  Secondly, the government contractor there was
24   required to produce Agent Orange.  What we're told here is you
25   had seven choices.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

68

42demtbc

1          MR. EIMER:  No, that's not --
2          THE COURT:  You're not a government contractor and you
3    weren't mandated to make one contract.
4          MR. EIMER:  The question is:  Do we have a federal
5    defense?  We're mandated to make RFG, there's no doubt about
6    that.
7          THE COURT:  I know that, but you're not mandated to
8    use MTBE.
9          MR. EIMER:  That's the federal defense, we are
10   mandated.  We believe -- the federal defense we asserted was we
11   are mandated to make MTBE.
12         THE COURT:  Is that right, they said you had to do
13   MTBE?
14         MR. EIMER:  There was no choice because there wasn't
15   enough ethanol.
16         THE COURT:  I've got it, no choice because there
17   wasn't enough ethanol.  And at this stage of this remand motion
18   that would be enough in your argument to find jurisdiction
19   under federal agent jurisdiction?
20         MR. EIMER:  Yes.  And there's case after case, the
21   Riser case in this district and others, that say we don't have
22   to prove our defense.  The defense doesn't even have to be
23   likely to succeed, it just has to be colorable.
24         THE COURT:  But the defense that you're relying on is
25   that we had to make MTBE because there wasn't enough ethanol?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

69

42demtbc

1          MR. EIMER:  Correct, and, therefore, we had to follow
2    the regulation in using MTBE.  We had no choice.
3          THE COURT:  And you clearly acted under the direct of
4    a federal agency or officer?
5          MR. EIMER:  No question.
6          THE COURT:  No question, all right.  Then we'll have
7    the response.
8          Who wants to respond to this one, Mr. McNew?
9          MR. McNEW:  Well, your Honor, I won't belabor the
10   points because I think we've already addressed these issues.
11         THE COURT:  I need help.
                        Page 32

Exhibit 9
Page 32 of 40

42demtbc

12    MR. McNEW:  Again, it's a Pullman.  They are the ones
13 that have to come before the Court and do something more than
14 throw up an allegation that they couldn't --
15    THE COURT:  You mean I should have a hearing on
16 whether there was enough ethanol before I decide the remand
17 motion?
18    MR. McNEW:  No, Judge, but it's their allegations of
19 jurisdiction.
20    THE COURT:  Right, but they said it's my allegation of
21 jurisdiction.  I'm raising a colorable federal defense.  My
22 colorable federal defense is I was mandated to use MTBE because
23 there wasn't reasonably any other alternative.  Do I stop to
24 have a full-blown evidentiary hearing as to whether they stated
25 a colorable defense?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

70

42demtbc

1    MR. McNEW:  No.
2    THE COURT:  Do I accept it because they say it?
3    MR. McNEW:  You look at the record that you have
4 before you today.
5    THE COURT:  That's what I mean.  Once I go to the
6 record, what should I do, go through a full-blown evidentiary
7 record of affidavits, experts and maybe a hearing?  They're
8 saying it's enough to raise -- it's colorable.  They're saying
9 colorably, I'm telling you I had to make MTBE because I'm
10 telling you there wasn't enough ethanol.  Now, either you
11 accept that at face value, Judge, or you need a hearing, as we
12 often do, on jurisdictional issues.
13    MR. McNEW:  Well, I don't believe -- I believe, your
14 Honor --
15    THE COURT:  Why should I reject it out of hand, is
16 what I'm saying.
17    MR. McNEW:  Because they bore the burden of coming
18 into the court and doing something more than making an
19 allegation.
20    THE COURT:  I'm allowing them to meet the burden.
21 Should I stop and allow evidence?  In other words, first you're
22 telling me they haven't met the burden and I say, well, what
23 burden are you talking about?  You seem to be talking about an
24 evidentiary burden.  It's not closed today, and you said, look
25 at the record.  Once we're opening the record, my goodness, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71

42demtbc

1 previous record in the MDL was pretty big.  The record is open.
2 I can either cite to that record or they can put in evidence.
3 We can stop this whole darn thing and have another whole day on
4 hearings about the colorability, not proof -- not a jury, not
5 whether they proved by a preponderance of the evidence, but
6 whether it's colorably proved.
7    MR. McNEW:  I believe there is -- I believe that there
8 are -- there's several answers to that, and one of them, I
9 believe, is that in some ways there are predicates to getting
10 to that point.
11    THE COURT:  What are they?  Do you quarrel with the
12 first prong, it acted under the direction of a federal agency?
13    MR. McNEW:  Yes.  That's what -- you anticipate me
14 perfectly.
15    THE COURT:  OK.
16    MR. McNEW:  Yes, obviously we do.  A government --

Page 33

Exhibit 9
Page 33 of 40

42demtbc

17    actually, I did spend a year as a government contractor lawyer,
18    and a government contract is a very different set of facts from
19    what is here.
20        THE COURT:  Wait a minute.  Government contract is
21    what Judge Weinstein was writing about.  I'm talking about this
22    element acted under the direction of federal agency or officer.
23    Does that require a government contract?
24        MR. MCNEW:  It doesn't require a government contract
25    but it requires -- I mean, if you read Ryan and you read the

42demtbc

1    decision that came down this week, you read them together, I
2    think Judge Weinstein does a very good job of explaining the
3    sort of case that falls under the ambit of this doctorate.  In
4    the Ryan case you'll recall that it was a government contractor
5    who was making Agent Orange and seemingly within the confines
6    of the federal officer doctrine.
7        THE COURT:  You can never duck your past.  I lived
8    through Agent Orange firsthand, I remember all about it.  But
9    what I'm saying is still, this case, put aside Agent Orange,
10   acted under the direction of federal agency or officer; you
11   said does not require a contract, a government contract.  He
12   says the agency, the federal agency here, required, directed,
13   compelled these companies to do this, to add -- to come up with
14   these additives, oxygenates.  And he then says, my problem is
15   MTBE was the only viable choice.  I had to do it.  That becomes
16   the question of fact.
17        I know you say, nonsense, they could have distilled
18   corn, but that will require me to decide what's the burden of
19   proof on that.  If the word is colorable in the cases, how do I
20   decide what's colorable?
21        MR. MCNEW:  Well --
22        THE COURT:  That's a real question we all should think
23   about.  What's showing as sufficient?  Simply stating so in a
24   conclusory statement in a brief, is that enough?  Do they have
25   to come forward with real evidence, is that enough?  If it's

42demtbc

1    evident, what standard of evidence?
2        MR. MCNEW:  If your Honor -- if they had put anything
3    in this record to create a factual issue --
4        THE COURT:  I'm not going to stand on that because
5    they still could.  That's not a problem to me.  It's a serious
6    question and I would allow that.  That's easy.  But then you
7    put something in to rebut it, so I'm asking you seriously, do
8    we have a hearing on whether it's colorable, because you may
9    show it so patently ridiculous that that's the end of that,
10   it's no longer colorable.
11       But what level of evidence, if evidence at all, does a
12   party have to come up with to make a colorable defense?
13       MR. EIMER:  do you want to rely on -- you're saying all
14   I have to do is say the word, or do I have to put in some
15   evidence?
16       MR. EIMER:  Let me rely on the Riser case, first of
17   all.
18       THE COURT:  What case is that?
19       MR. EIMER:  Riser vs. Fitzmorris.
20       THE COURT:  District court?
21       MR. EIMER:  District court cases.

Page 34

Exhibit 9
Page 34 of 40

42demtbc
```
22          THE COURT:  They're not the highest authority around.
23          MR. EIMER:  How about Supreme Court?
24          THE COURT:  I'll take it.
25          MR. EIMER:  OK.  Supreme Court said justice --
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            74

42demtbc
```
 1          THE COURT:  In what case?
 2          MR. EIMER:  In Jefferson.
 3          THE COURT:  Jefferson County?
 4          MR. EIMER:  I think that's Jefferson County.  Yes,
 5  Jefferson County.
 6          Just as requiring clearly --
 7          THE COURT:  No, Mr. Eimer, slowly.
 8          MR. EIMER:  Just as requiring a clearly sustainable
 9  defense rather than a colorable defense would defeat the
10  purpose of the removal statute, so would demanding an air-tight
11  case on the merits in order to show the required causal
12  connection.
13          Accordingly, we credit the judge's theory of the
14  case -- the judges' theory of the case for purposes of both
15  elements of our jurisdictional inquiry, and conclude that the
16  judges have made an adequate threshold of showing the suit is
17  for an act under color of office.
18          THE COURT:  So I'd have to go back to the district
19  court case in that case and find out what the district court --
20          MR. EIMER:  This is, I think, either judges who are
21  the parties asserting federal officer jurisdiction -- I mean,
22  federal officer jurisdiction, and they're crediting the
23  judge -- here the judge is plaintiff, not judge as judge -- the
24  plaintiffs' theory of the case as sufficient.
25          THE COURT:  What?  I didn't get it.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            75

42demtbc
```
 1          MR. EIMER:  I believe --
 2          MR. SACRIPANTI:  The judges were the plaintiffs in the
 3  case.
 4          MR. EIMER:  The judges were the plaintiffs in the
 5  case.  The judges referred to in the language I just read to
 6  you are not the judge of the district court sitting there
 7  deciding things.  It's the judge as plaintiff bringing a
 8  federal officer case.  And it's their theory of the defense
 9  that is sufficient, according to the Supreme Court --
10          THE COURT:  The plaintiffs' theory of the defense?
11          MR. EIMER:  I'm sorry.  The defendant's theory of the
12  defense.
13          THE COURT:  So the judges were defendants?
14          MR. EIMER:  Yes.  And it's their removal of the case.
15  It's their theory of the defense that the Supreme Court finds
16  sufficient for 1442 purposes.
17          THE COURT:  So read the quote again slowly.
18          MR. EIMER:  Accordingly, we credit the judges' theory
19  of the case for purposes of both elements of our jurisdictional
20  inquiry, the 1442 inquiry, conclude that the judges have made
21  an adequate threshold of showing that the suit is for an act
22  under color of office.
23          THE COURT:  I'd have to look back and see what the
24  adequate threshold showing was.  Was it just a conclusory
25  statement in the brief, was it evidence?  I don't know the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            Page 35

Exhibit 9
Page 35 of 40

42demtbc
(212) 805-0300

76

42demtbc
1  case.
2           MR. EIMER:  Also Venezio vs. Robinson.  I don't know
3  what circuit this is, but 16 F.3d, 7th circuit.  Once the
4  federal defendant has a plausible federal defense, removal is
5  appropriate so that the federal court may determine whether the
6  defense succeeds.
7           Now, your Honor in your opinion, found that --
8           THE COURT:  Which opinion?
9           MR. EIMER:  The dismissal opinion that we've talked
10 about today. -- found that we had a plausible defense on
11 conflict preemption, if your Honor recalls, and said that was
12 sustained --
13          THE COURT:  I found that you had a plausible theory
14 under conflict preemption and on summary judgment.
15          MR. EIMER:  With establishment of appropriate facts we
16 might win on conflict preemption.
17          I would also bring to your Honor's attention the EPA's
18 Blue Ribbon Report, which you might recall from our last
19 go-around, the class certification.
20          THE COURT:  Actually, I don't.
21          MR. EIMER:  The EPA commissioned the Blue Ribbon
22 Report to study MTBE, and it concluded if there were a
23 nationwide ban on MTBE, it would take four years, four years of
24 sustained effort for there to be enough ethanol to meet the
25 nation's demand for RFG.  So the EPA has spoken to this in
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

77

42demtbc
1  terms of even the present, not going back to where things were
2  in '94.
3           THE COURT:  I think I've got it.
4           Who would like to speak now about federal agent
5  jurisdiction?
6           MR. GORDON:  Let me just make one point, if I could.
7           THE COURT:  Slow down.  Let me now make one point
8  about what?
9           MR. GORDON:  One point, then I'll turn it over to
10 Mr. McNew.
11          The defendants were not ordered by the federal
12 government to withhold information about the dangers of MTBE.
13 They were not ordered by the government to not put a warning on
14 the product.  This is the heart of what our case is about.  And
15 we're not -- in the claims we're making they were not ordered
16 to do something opposite by the federal government.
17          THE COURT:  They allege that they were ordered to use
18 MTBE, which you say is a dangerous and defective product
19 causing injury, but they were ordered to use it.
20          MR. GORDON:  One of our claims.  No, they were never
21 ordered to use it.
22          THE COURT:  But that's what they say.  They say they
23 were ordered to use it because there was no real alternative.
24 That's their defense; not yours, not mine.  That's their
25 defense.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

78

42demtbc
1           MR. GORDON:  I understand.  And factioning the
2  interesting story is if the ethanol industry was immature at
                              Page 36

Exhibit 9
Page 36 of 40

42demtbc

3   the time of 1990, it is solely because the defendants were
4   misrepresenting about the fact that -- claiming that MTBE was
5   safe and you didn't need to have another industry.  And of
6   course it was in their interest to use it.
7          THE COURT:  But by and by their defense is, the
8   government made us use MTBE because there was no viable
9   alternative.
10         MR. GORDON:  And that same defense that they have
11  raised in opposition to the banning of the product in
12  California and OFA vs. Governor Davis and in New York, after a
13  full hearing and a full record in the Northern District federal
14  court, OFA vs. Pataki, where they still say, you can't do this.
15  It's a -- we'll never be able to supply gasoline.  And they had
16  a hearing.  And the judge found, of course, you'd be able to
17  find gasoline.  Oh, but prices will skyrocket.  And they had a
18  hearing and an economist.  Prices won't skyrocket.  Guess what?
19  They haven't skyrocketed.  So they're continuing to make that
20  argument.  And there's been records in that regard and has not
21  been true.
22         THE COURT:  No, but because a district court in the
23  Northern District of New York tried a case and apparently
24  rejected that defense, does that make it no longer colorable
25  throughout the country, because a district court said that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79

42demtbc

1   wasn't a winning defense, so to speak?  Does it lose its
2   colorable defense status because one district court throughout
3   the country rejected it?
4          MR. GORDON:  First of all, it's not one district
5   court, wherever they have had it that it's failed.
6          THE COURT:  How many of those are there?
7          MR. GORDON:  They tested in California and New York.
8   There may be others as well.
9          THE COURT:  I don't know, but so is that a district
10  court in California?  Doesn't matter, a court.
11         But anyway, if it's two courts --
12         MR. GORDON:  Ninth Circuit.  It was federal court.
13         THE COURT:  Ninth Circuit did what?
14         MR. McNEW:  The Ninth Circuit upheld the district
15  court ruling in OFA vs. Davis, which heard and rejected these
16  arguments.
17         California represents, according to the government, I
18  can give you the web site listing --
19         THE COURT:  Wait a minute.  If that's the argument,
20  Mr. Eimer, that it's no longer colorable because you lost it in
21  a district court of New York, and even at the circuit level in
22  California, what does that do?
23         MR. EIMER:  Does nothing.
24         THE COURT:  Why?
25         MR. EIMER:  One, we didn't lose anything.  None of us

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

42demtbc

1   were parties to those cases, so it's not preclusive on us at
2   all and it's not preclusive on this Court.
3          Second, those courts were evaluating a different issue
4   than we're raising here.
5          THE COURT:  Namely?
6          MR. EIMER:  The issue that was raised in Judge
7   Mordue's courtroom was today, 1995 and '96, today will there be

Page 37

Exhibit 9
Page 37 of 40

42demtbc

8    a significant price effect in New York with respect to a
9    New York ban on MTBE?  That's not what we're talking about.
10           First, we're talking about what happened back in the
11    mid'90s to late '90s until today.
12           THE COURT:  So does -- the verdict in the Judge Mordue
13    case is talking about what alternatives you had today?
14           MR. EIMER:  Today and prospectively.
15           THE COURT:  Today starting when?
16           MR. EIMER:  I assume the day of the trial.
17           THE COURT:  Really, not '90, not 2000 -- anyway, in
18    that case what year was that?
19           MR. EIMER:  I think it was 2002.
20           THE COURT:  2002?
21           MR. EIMER:  2003.  The real question there is there's
22    a ban --
23           THE COURT:  I understand the question.  What about
24    California?
25           MR. EIMER:  California's the same thing.  The question

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

81

42demtbc

1    there is will the ban in California raise prices in California.
2           THE COURT:  So it has nothing to do with what you're
3    saying here, that you're accused, having used this thing all
4    these years, and your defense is, the government made me do it?
5           MR. EIMER:  Correct.
6           THE COURT:  And the reason the government made me do
7    it is I had to use one of the seven, and that was the only
8    viable alternative, and I want to present that defense?
9           MR. EIMER:  Correct.  Plus, neither of them -- in
10    addition to looking prospectively from 2002 or 2003 --
11           THE COURT:  I think I've got the element of colorable
12    federal defense, and I think I've got the element of nexus
13    between the federal direction and the conduct in question, so
14    to speak.  Maybe the only one left is under the direction of
15    federal agency or officer.  Mr. McNew says he doesn't agree
16    that you acted under the direction of a federal agency or
17    officer and you said, how could he quarrel with that?  The EPA
18    told -- or was it the EPA?  They told me what I had to do.
19           why do you say that element of the three prongs isn't
20    proved, Mr. McNew?
21           MR. MCNEW:  Because the statute is quite -- the
22    regulation is quite clear that they have a choice.
23           THE COURT:  I don't mean that, but the -- put the
24    choice aside, didn't the EPA say you have to go into this
25    program, you have to add something and act at the direction of

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

82

42demtbc

1    the agency?  And then they say, well, they had no real choice,
2    that's our defense.  But the first element, we acted at the
3    direction of an agency, the EPA commanded them to use
4    something.
5           MR. MCNEW:  Yes.
6           THE COURT:  And then their defense is, this is the
7    only viable choice we have.
8           MR. MCNEW:  Right.  But first of all, the notion they
9    only looked to price, price is a function of supply.
10           THE COURT:  I don't think anybody said the word price
11    the whole two hours.
12           MR. MCNEW:  I'm sorry.  I'm speaking in shorthand.  I

Page 38

Exhibit 9<br>Page 38 of 40

42demtbc

13  was speaking of his characterization of the OFA and Pataki and
14  Davis cases.
15          THE COURT:  All I'm saying about both of those cases
16  is they tested a current regulation going forward.  In other
17  words, the states passed a law and the question is whether that
18  law could survive.  And to decide that you have to look from
19  the time of the law forward.  Not trying to defend by saying we
20  had no alternative that was rejected.  That has nothing to do
21  with 1980 to the year 2002.  There was no law being tested.
22          MR. McNEW:  I'm not trying to estop the defendants by
23  reliance on these cases.  I'm not trying to bind them.  By
24  "them," I recognize that although their trade association was
25  litigating their interest, that they themselves were not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83

42demtbc

1  litigating it.
2          THE COURT:  It's a different issue anyway.  It's
3  what's available now from the time -- the new regulations,
4  New York's regulation or California's regulation going forward.
5  It's just a different issue as to what might be available in
6  the marketplace.
7          Well, actually, I have come to the end of my two hours
8  that I scheduled for this case.  I have another case at 12:00,
9  so if in the four minutes remaining to me -- can we summarize
10  where we're going?  There was going to be a very short, really
11  just a two-page-or-less letter that says, these are the
12  controlling cases about dischargeability of intentional torts
13  in a bankruptcy, essentially.  You were going to cite,
14  hopefully, really two pages.  It might just say, here are the
15  controlling cases and here's the controlling statute.  You read
16  them, Judge.  I want the answer to be just as short.
17          That's the only thing I thought.  If there was
18  anything else supplemental but really we didn't hear until
19  today for the first time, I will allow it to be addressed in a
20  letter, too, but can anybody else remember anything that was
21  really new that wasn't in the briefs?
22          MR. EIMER:  I think that's the only open item.
23          MR. GORDON:  I would just leave that last question,
24  with once again saying that similar to the asbestos cases, it
25  presumed department of AVA said if you were going to supply

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

84

42demtbc

1  insulation, it must contain asbestos, specifically asbestos.  I
2  don't see any difference between that and saying, if you're
3  going to sell gasoline, it has to contain one of seven
4  different things.  Here we're getting into the argument of
5  which one I could have supplied or not.  They're
6  specifically -- asbestos was the only choice, and defense has
7  never been held by any court to enforce the cases to go to
8  federal court.
9          THE COURT:  I don't know if it's been litigated in a
10  removal remand context.  I don't know if it's ever come up.
11  There's tons of diversity in federal courts that's been around,
12  but I don't know if anybody ever raised that, whether it was
13  litigated, whether it was decided.  So, you know, the sort of
14  general negative doesn't work.
15          MR. GORDON:  We'll look for that in terms of adding
16  that as well for your Honor, but I know the government
17  contractor defense was litigated in the asbestos --

Page 39

Exhibit 9
Page 39 of 40

42demtbc

18          THE COURT:  It's evolving even as of yesterday.
19          All right.  Well, it was -- well, I can't let you go
20  yet.  So there is one other thing you might want to think
21  about, and I raise it only once, but I really wanted to raise
22  it more than once.  And that's the appealability of a decision
23  on subject matter jurisdiction that would arise on the
24  declaratory judgment actions that doesn't arise on the remand.
25  And I'm still troubled by that.  I mention that in this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85

42demtbc

1  argument.  I said appellate review is an important part of our
2  process, for good or for bad, in my experience, but it's an
3  important part of our process.  And the question is, remand is
4  quite different than the defenses to the declaratory judgment
5  action.  And I know you have your own arrangements that you've
6  worked out on this, but I'm a little troubled because it's the
7  same bunch of arguments.
8          MR. EIMER:  I believe an additional basis of
9  jurisdiction in all of the declaratory judgment actions is
10  diversity.  There are diversities --
11          THE COURT:  All of them?
12          MR. EIMER:  All of them.  Every single one of them has
13  diversity.
14          THE COURT:  All right.  I've raised what I raised
15  about appellate review as best I can do.
16          OK, the matters are reserved.
17          (Adjourned)
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 0 9 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: | ) MDL Docket No. 1358 |
| | ) |
| **METHYL TERTIARY BUTYL ETHER** | ) This Document Relates to: |
| **PRODUCTS LIABILITY LITIGATION** | ) *State of New Hampshire v. Amerada* |
| | ) *Hess Corp. et al.*, D.N.H. Case No. 03- |
| | ) CV-486, D.R.I. Case No. 03-0529L |
| | ) |
| | ) **SCHEDULE Re: INVOLVED** |
| | ) **ACTION** |
| | ) |

///

///

///

## SCHEDULE RE: INVOLVED ACTION
## DOCKET NO. 1358
## IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

New Hampshire
NH District Court Case No. 03-486 (Hon. Ronand R. Lagueux)
RI District Court Case No. 03-0529L
The State of New Hampshire v. Amerada Hess Corporation; ChevronTexaco
Corporation; Chevron U.S.A., Inc.; Citgo Petroleum Corporation; ConocoPhillips
Company; El Paso Merchant Energy-Petroleum Company; ExxonMobil Corporation;
ExxonMobil Oil Corporation; Gulf Oil Limited Partnership; Irving Oil Corporation;
Irving Oil Limited; Lyondell Chemical Company; Motiva Enterprises, LLC; Shell Oil
Company; Statoil Marketing and Trading (US) Inc.;Sunoco, Inc. (R&M); Texaco
Refining and Marketing, Inc.; Ultramar Energy, Inc.; Ultramar Limited; Unocal
Corporation;Valero Energy Corporation; and Valero Marketing and Supply Company.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 0 9 2004

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:** | ) MDL Docket No. 1358 |
| | ) |
| **METHYL TERTIARY BUTYL ETHER** | ) This Document Relates to: |
| **PRODUCTS LIABILITY LITIGATION** | ) *State of New Hampshire v. Amerada* |
| | ) *Hess Corp. et al.*, D.N.H. Case No. 03- |
| | ) CV-486, D.R.I. Case No. 03-0529L |
| | ) |
| | ) **PROOF OF SERVICE** |

///

///

///

RECEIVED
CLERK'S OFFICE
2004 MAR -8  A 10: 23
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## CERTIFICATE OF SERVICE

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | ) ss |
| COUNTY OF SAN FRANCISCO | ) |

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to this action. My business address is 450 Mission Street, Suite 500, San Francisco, CA 94105.

On **MARCH 4, 2004**, I served the following documents described as:

1. **PLAINTIFF'S MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER AND BRIEF IN SUPPORT THEREOF**
2. **STATEMENT OF REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD RE: MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER**
3. **DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER**
4. **SCHEDULE CTO-4 TAG ALONG CASES**

[ X ]   by placing true copies thereof in sealed envelope(s) addressed as follows:

### SEE ATTACHED SERVICE LIST

[ X ]   (**BY MAIL**) I caused to such envelope to be deposited in the mail at San Francisco, California with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit. Executed on **MARCH 4, 2004**, at San Francisco, California.

[ X ]   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Julie Choate

{1000-002 / 00006007.DOC;1}

2

PANEL SERVICE LIST (Excerpted from CTO-4)
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Michael Axline
Miller Axline & Sawyer
1651 Response Road
Second Floor
Sacramento, CA 95815

Peter G. Beeson
Devine, Millimet & Branch PA
111 Amherst Street
PO Box 719
Manchester, NH 03105-0719

J. Stephen Bennett
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802

Rebecca L. Bouchard
Bingham McCutchen LLP
One State Street
Hartford, CT 06103-3178

Michael DeMarco
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corporation
376 S. Valencia Avenue
Brea, CA 92626

William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Dive, Suite 5400
Chicago, IL 60601

Matthew F. Madeiros
Little, Bulman, Medeiros & Whitney PC
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody LLP
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Stephen J. Riccardulli
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605

Colleen P. Doyle
Diane P. Martin
Bingham & McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson & Middleton
900 Elm Street
PO Box 326
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
PO Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond PC
1350 I Street, NW
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Lawrence P. Riff
Steptoe & Johnson LLP
633 West Fifth Street, Suite 700
Los Angeles, CA 90071

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
Bracewell & Patterson LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002

Andrew W. Serell
Rath, Young, & Pignatelli
PO Box 1500
Concord, NH 03302

Scott Summy
Baron & Budd PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

Stephen L. Tober
Tober Law Offices, PA
PO Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132

4

Hojoon Hwang
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105


MAILED FOR FILING TO:
James R. Starr
Clerk of the Court
United States District Court for the District of New Hampshire
55 Pleasant Street, Room 110
Concord, NH 03301-3941

David A. DiMarzio
Clerk of the Court
United States District Court for the District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02903

## PANEL SERVICE LIST (Excerpted from CTO-4)
## DOCKET NO. 1358
## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*California-American Water Co. v. Atlantic Richfield Co., et al.,*
N.D. California, C.A. No. 5:03-5379
*State of New Hampshire v. Amerada Hess Corp., et al.,*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Peter G. Beeson
Devine, Millimet & Branch, P.A.
111 Amherst Street
P.O. Box 719
Manchester, NH 03105-0719

Michael DeMarco
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92626

Colleen P. Doyle
Bingham McCutchen, LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue
Suite 350
Portsmouth, NH 03801

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson
& Middleton
900 Elm Street
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
P.O. Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W.
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson, LLP
33 New Montgomery Street
19th Floor
San Francisco, CA 94105

William J. Kayatta, Jr.
Pierce, Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Matthew F. Medeiros
Little, Bulman, Medeiros
& Whitney, P.C.
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody, L.L.P.
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann
& Bernstein, L.L.P.
780 Third Avenue
48th Floor
New York, NY 10017

Lawrence P. Riff
Steptoe & Johnson, LLP
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Andrew W. Serell
Rath, Young & Pignatelli
P.O. Box 1500
Concord, NH 03302-1500

Victor M. Sher
Sher & Leff
450 Mission St..
Suite 500
San Francisco, CA 94105

Stephen L. Tober
Tober Law Offices, P.A.
P.O. Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132



**SHER·LEFF** LLP

LAWYERS PROTECTING WATER

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MAR 0 9 2004**

FILED
CLERK'S OFFICE

March 8, 2004

*Via Facsimile and US Mail*

Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, DC 20002-8004

Request of Pltfs. State of New Hampshire and
California-American Water Company for an Extension of
Time to File Motion/Brief to Vacate CTO -- GRANTED
(cdm - 3/9/04)

Re:    Docket No. 1358; Motions to Vacate CTO-4 filed by the State of New Hampshire
and California-American Water Company; Requests for Extension

Dear Members of the Panel:

This office represents the State of New Hampshire in the action *State of New Hampshire
v. Amerada Hess Corp., et al.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.), and
California-American Water Company in the action *California-American Water Co. v.
Atlantic Richfield Co., et al.*, Case No. 03-5379 (N.D. Cal.). Both of these actions are
identified as "tag-along" cases in the schedule of district court civil actions subject to
Conditional Transfer Order (CTO-4), issued by the Panel on February 6, 2004.

On Thursday, March 4, 2004, we timely sent the State of New Hampshire's Motion to
Vacate and California-American Water Company's Motion to Vacate by overnight
courier to the Panel, to be delivered on a "priority" basis for filing on Friday, March 5,
2004. Due to circumstances completely out of our control, it appears that both of the
packages we sent were delayed by Federal Express, and not delivered to the Panel until
today, Monday, March 8, 2004.

Accordingly, I hereby request that the Panel grant the State of New Hampshire and
California-American Water Company a one-day extension of time to file their respective
motions to vacate.

True and correct copies of the Federal Express airbills for each motion package and
printouts of the shipment tracking details for each package from the Federal Express
website are attached hereto for the Panel's reference. If the panel requires further
documentation, such as a statement from Federal Express explaining the circumstances of
its failure to deliver the motions on time, we would be happy to obtain and provide it.

RECEIVED
CLERK'S OFFICE

Thank you for your consideration of this request.

Sincerely,

Victor M. Sher
Counsel for the State of New Hampshire
Counsel for California-American Water Company


Enclosures
cc: all counsel on attached service list

FedEx Express | Tracking | Results Detail

Page 1 of 2



Track Shipments
## Detailed Results

Printable Version    Quick Help

| | | | |
|---|---|---|---|
| **Tracking number** | 845200196675 | **Delivered to** | Recept/Frnt desk |
| **Signed for by** | T.WIMBUSH | **Delivery location** | WASHINGTON DC |
| **Ship date** | Mar 4, 2004 | **Service type** | Priority Overnight |
| **Delivery date/time** | Mar 8, 2004 10:15 am | | |

| Date/time | | Status | Location | Comments |
|---|---|---|---|---|
| **Mar 8, 2004** | 10:15 am | **Delivered** | WASHINGTON DC | |
| | 9:50 am | Delivery attempt | WASHINGTON DC | Recipient location security delay. Delivery will be reattempted. |
| | 8:42 am | On FedEx vehicle for delivery | WASHINGTON DC | |
| | 7:55 am | On FedEx vehicle for delivery | WASHINGTON DC | |
| | 6:38 am | Arrived at FedEx Destination Location | WASHINGTON DC | |
| **Mar 6, 2004** | 6:31 am | Arrived at FedEx Destination Location | WASHINGTON DC | |
| | 6:00 am | Package status | WASHINGTON DC | Package not due for delivery |
| **Mar 5, 2004** | 8:59 pm | Arrived at FedEx Ramp | DULLES VA | |
| | 4:40 pm | Left FedEx Sort Facility | MEMPHIS TN | |
| | 12:17 pm | Arrived at Sort Facility | MEMPHIS TN | |
| | 7:06 am | Package status | MEMPHIS TN | Delay beyond our control |
| **Mar 4, 2004** | 9:58 pm | Left FedEx Ramp | SAN FRANCISCO CA | |
| | 9:58 pm | Arrived at FedEx Ramp | SAN FRANCISCO CA | |

[ Signature proof ]    [ Track more shipments ]

Email your detailed tracking results (optional)

Enter your email, submit up to three email addresses (separated by commas), add your message (optional), and click **Send email.**

Add a message to this email.

From

To

[ Send email ]

Global Home | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms

**FedEx Express** USA Airbill    Cal-Am

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE
Sender's Copy

**1 From** Please print and press hard.

Date 3/4/04

Sender's FedEx
Account Number    8452 0019 6675

Sender's Name    Julie Choate

Phone ( 415 ) 348-8300

Company    SHER & LEFF

Address    450 MISSION ST STE 500

City    SAN FRANCISCO    State CA    ZIP 94105-2526

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

**3 To**

Recipient's Name    Michael J. Beck    Phone ( )

Company    Judicial Panel on Multidistrict Litigation

Address    Thurgood Marshall Federal Judiciary Bldg.
One Columbus Circle NE, RM-G-255 N Lobby

City    Washington    State DC    ZIP 20002-8004

FedEx Tracking Number    2777-1684-7

**4a Express Package Service**    Packages up to 150 lbs.

☒ FedEx Priority Overnight    ☐ FedEx Standard Overnight    ☐ FedEx First Overnight

☐ FedEx 2Day    ☐ FedEx Express Saver

**4b Express Freight Service**    Packages over 150 lbs.

☐ FedEx 1Day Freight    ☐ FedEx 2Day Freight

**5 Packaging**

☐ FedEx Envelope    ☒ FedEx Pak    ☐ Other

**6 Special Handling**

SATURDAY Delivery    ☐ HOLD Weekday    ☐ HOLD Saturday

Does this shipment contain dangerous goods?

☐ No    ☐ Yes    ☐ Yes    ☐ Dry Ice    ☐ Cargo Aircraft Only

**7 Payment Bill to:**

☐ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Total Packages    Total Weight    Total Declared Value $    .00

**8 Release Signature**    Sign to authorize delivery without obtaining signature.

0273227571

447

FedEx Express | Tracking | Results Detail

United States Home

Information Center  |  Customer Supp

Search

**FedEx**

| Package / Envelope Services | Freight Services | Same Day Services |
| Ship | Track | Rates | Pickup | Locations | Transit Time | Internation |

Track Shipments
## Detailed Results

Printable Version   (?) Quick Help

You can also track:
- By Alternate
- By Email
- TCN (Gov't

| | | | |
|---|---|---|---|
| **Tracking number** | 843276567145 | **Delivered to** | Recept/Frnt desk |
| **Signed for by** | T.WIMBUSH | **Delivery location** | WASHINGTON DC |
| **Ship date** | Mar 4, 2004 | **Service type** | Priority Overnight |
| **Delivery date/time** | Mar 8, 2004 10:15 am | | |

Track other FedEx
- FedEx Cust
  shipments
- FedEx Trad
  shipments
- Internationa

| Date/time | | Status | Location | Comments |
|---|---|---|---|---|
| **Mar 8, 2004** | 10:15 am | **Delivered** | WASHINGTON DC | |
| | 9:50 am | Delivery attempt | WASHINGTON DC | Recipient location security delay. Delivery will be reattempted. |
| | 8:42 am | On FedEx vehicle for delivery | WASHINGTON DC | |
| | 7:55 am | On FedEx vehicle for delivery | WASHINGTON DC | |
| | 6:46 am | Arrived at FedEx Destination Location | WASHINGTON DC | |
| **Mar 6, 2004** | 3:11 pm | Package status | WASHINGTON DC | Package in FedEx location |
| | 6:31 am | Arrived at FedEx Destination Location | WASHINGTON DC | |
| | 6:00 am | Package status | WASHINGTON DC | Package not due for delivery |
| **Mar 5, 2004** | 8:59 pm | Arrived at FedEx Ramp | DULLES VA | |
| | 4:40 pm | Left FedEx Sort Facility | MEMPHIS TN | |
| | 12:17 pm | Arrived at Sort Facility | MEMPHIS TN | |
| | 7:06 am | Package status | MEMPHIS TN | Delay beyond our control |
| **Mar 4, 2004** | 9:58 pm | Left FedEx Ramp | SAN FRANCISCO CA | |

Wrong Address?
Reduce future mistal
FedEx Address Che

Shipping Freight?
FedEx has LTL, air
surface and air exp
multi piece package
and ocean freight.

[ Signature proof ]   [ Track more shipments ]

Email your detailed tracking results (optional)

Enter your email, submit up to three email addresses (separated by commas), add your
message (optional), and click **Send email**.

Add a message to this email.

From

To

[ Send email ]

Global Home | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms

**FedEx Express**

USA Airbill

FedEx Tracking Number: 8432 7656 7145

NIH

**1 From** Please print and press hard.

Date 02/04/04    Sender's FedEx Account Number 2777-1884-7

Sender's Name Julie Choate    Phone (415) 348-8300

Company SHER & LEFF

Address 450 MISSION ST STE 500

City SAN FRANCISCO    State CA    ZIP 94105-2526

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name Michael J. Beck    Phone ( )

Company Judicial Panel on Multidistrict Litigation

Address Thurgood Marshall Federal Judiciary Bldg

Address One Columbus Cir NE Rm G-255 North Lobby

City Washington    State DC    ZIP 20001-8004

0267085716

**Sender's Copy**

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE.

**4a Express Package Service**    Packages up to 150 lbs.

☒ FedEx Priority Overnight    ☐ FedEx Standard Overnight    ☐ FedEx First Overnight

☐ FedEx 2Day    ☐ FedEx Express Saver

**4b Express Freight Service**    Packages over 150 lbs.

☐ FedEx 1Day Freight    ☐ FedEx 2Day Freight    ☐ FedEx 3Day Freight

**5 Packaging**

☐ FedEx Envelope    ☐ FedEx Pak    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling**

☐ SATURDAY Delivery    ☐ HOLD Weekday at FedEx Location    ☐ HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?

☐ No    ☐ Yes    ☐ Yes    ☐ Dry Ice    ☐ Cargo Aircraft Only

**7 Payment** Bill to:

☒ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Total Packages    Total Weight    Total Declared Value

$ .00

**8 Release Signature**

447

PANEL SERVICE LIST (Excerpted from CTO-4)
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379
*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Michael Axline
Miller Axline & Sawyer
1651 Response Road
Second Floor
Sacramento, CA 95815

Peter G. Beeson
Devine, Millimet & Branch PA
111 Amherst Street
PO Box 719
Manchester, NH 03105-0719

J. Stephen Bennett
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802

Rebecca L. Bouchard
Bingham McCutchen LLP
One State Street
Hartford, CT 06103-3178

Michael DeMarco
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corporation
376 S. Valencia Avenue
Brea, CA 92626

William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Dive, Suite 5400
Chicago, IL 60601

Matthew F. Madeiros
Little, Bulman, Medeiros & Whitney PC
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody LLP
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Stephen J. Riccardulli
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605

RECEIVED CLERK'S OFFICE
2004 MAR -8 P 3:52

Colleen P. Doyle
Diane P. Martin
Bingham & McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson & Middleton
900 Elm Street
PO Box 326
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
PO Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond PC
1350 I Street, NW
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Lawrence P. Riff
Steptoe & Johnson LLP
633 West Fifth Street, Suite 700
Los Angeles, CA 90071

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
Bracewell & Patterson LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002

Andrew W. Serell
Rath, Young, & Pignatelli
PO Box 1500
Concord, NH 03302

Scott Summy
Baron & Budd PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

Stephen L. Tober
Tober Law Offices, PA
PO Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132

Hojoon Hwang
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105