1 3 5 8

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 5 2004

FILED
CLERK'S OFFICE

1

2

3

4

5

6

7

8

9

10 **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11

| | |
|---|---|
| 12 IN RE: | MDL Docket No. 1358 |
| 13 METHYL BUTYL TERTIARY ETHER ("MTBE") | This Document Relates to *The People of the State of California, et* |
| 14 PRODUCTS LIABILITY LITIGATION | *al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.) |
| 15 | MOTION TO VACATE |
| 16 | CONDITIONAL TRANSFER ORDER (CTO-5) |

17

18 <u>**MOTION TO VACATE CONDITIONAL TRANSFER ORDER**</u>

19     TO ALL PARTIES AND THEIR COUNSEL OF RECORD: Please take notice that the

20 People of the State of California, a plaintiff in the action entitled *The People of the State of*

21 *California, et al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.), hereby moves

22 that the Judicial Panel on Multidistrict Litigation ("the Panel") vacate Conditional Transfer Order

23 Number Five ("CTO-5"), which has transferred this action to the Southern District of New York.

24     Filed herewith and incorporated by reference herein is a Memorandum of Points and

25 Authorities in support of this Motion, a Declaration of Russ Detrick With Attached Exhibits, and

26 a Statement of Reasons Why Oral Argument Should be Heard.

27

28 **OFFICIAL FILE COPY**

IMAGED MAR 26 '04

1

2   DATED: 3/22_____, 2004

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By:   _Russ Detrick_____
RUSS DETRICK
Supervising Deputy District Attorney
Consumer & Environmental
Protection Division, Sacramento Office
of the District Attorney
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660
Attorney for Plaintiff
The People of the State of California

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 5 2004

FILED
CLERK'S OFFICE

1

2

3

4

5

6

7

8

9

10        **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11

| | |
|---|---|
| IN RE: | MDL Docket No. 1358 |
| METHYL BUTYL TERTIARY ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | This Document Relates to *The People of the State of California, et al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.) |
| | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5) |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   TABLE OF CONTENTS ...................................................................................................ii

3   TABLE OF AUTHORITIES .............................................................................................iii

4       CASES ........................................................................................................................iii

5       STATUTES ..................................................................................................................v

6       PERIODICALS ...........................................................................................................vi

7   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
    VACATE CONDITIONAL TRANSFER ORDER (CTO-5)...........................................1
8
        I.      STATEMENT OF THE CASE ............................................................................1
9
        II.     ARGUMENT ......................................................................................................2
10
                A.      Because the People of the State of California are Sovereign and Immune
11                      From Process, the JPML Lacks Jurisdiction to Issue a Transfer Order in
                        this Case, and Must in Consequence Vacate the Conditional Transfer
12                      Order Already Issued .................................................................................3

13                      1.      Decisions by U.S. District Courts in the *Steelcase* and *Moore* Cases
                                Recognize that a State Cannot Be Removed to Federal Court
14                              Against Its Will, Even Where the State is a Plaintiff in an Action
                                Filed in State Court .........................................................................3
15
                        2.      The Decisions in *Steelcase* and *Moore,* Based on the Eleventh
16                              Amendment, are Consistent with Federal Precedent on the Broader
                                Basis of Sovereign Immunity .........................................................5
17
                        3.      The Decisions of Other Federal Courts, Failing to Follow *Steelcase*
18                              and *Moore*, are Incorrect as they Limit the Scope of Sovereign
                                Immunity to the "Mere Letter" of the Eleventh Amendment .........8
19
                B.      Even Assuming that the JPML has Jurisdiction, Transfer is Inappropriate
20                      Because the Moving Parties Have Failed to Meet Their Burden Pursuant to
                        28 U.S.C. § 1407(a) ..................................................................................12
21
                        1.      The Moving Parties Have Failed to Establish Sufficient
22                              Commonality of Facts ...................................................................13

23                              a.      This Case is Unique Given that a Sovereign is Involved ..13

24                              b.      Individual Rather Than Common Facts Predominate .......14

25                      2.      The Moving Parties Have Failed to Establish that Transfer Would
                                Best Serve the Convenience of Parties and Witnesses ................15
26
                        3.      The Moving Parties Have Failed to Establish that Transfer Would
27                              Promote the Just and Efficient Conduct of the Action .................16

28                              a.      The Risk of Duplicative Discovery is Minimal ................16

1             b.      The Risk of Inconsistent Rulings is Minimal ..................18

2    III.      CONCLUSION ....................................................................................................20

3 TABLE OF AUTHORITIES

4 <u>CASES</u>

5 *Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604 (N.D. Tex. 2002) ...................................19

6 *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed. 2d 1114 (1978) ....................................4

7 *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed. 2d 636 (1999) ........................3, 7, 8, 12

8 *Ames v. Kansas,* 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 (1884) ......................................9, 10, 11

9 *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed. 2d 171 (1985) ....7

10 *Banco y Agencia de Fianciamiento de la Vivienda e Puerto Rico v. Urbanizadora Villalba,* 681
11 F.Supp. 981 (D. P.R. 1988) ...................................................................................................8

12 *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 111 S.Ct. 2578, 115
L.Ed. 2d 686 (1991) ..............................................................................................................7

13 *California v. Acme Fill Corp.,* 1997 U.S. Dist. LEXIS 16847 (N.D. Cal. 1997) ........................11

14 *California v. Steelcase, Inc.,* 792 F.Supp. 84 (C.D. Cal. 1992) .....................3, 4, 5, 7, 8, 9, 11, 12

15 *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793) ..................................................5, 6

16 *Communities for a Better Environment v. Unocal Corp.,* Cal. Super. Ct., S.F. Cty. Case No.
17 997013 ..................................................................................................................................17

18 *Cornyn v. Real Parties in Interest,* 110 F.Supp. 2d 514 (E.D. Tex. 2000) ...................................11

19 *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed. 2d 662 (1974) ...................................4

20 *Ex Parte New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921) ........................................6

21 *ExxonMobil Corp. v. United States Environmental Protection Agency,* 217 F.3d 1246 (9th Cir.
2000) .....................................................................................................................................19

22 *Federal Maritime Commission v. South Carolina State Ports Authority,* 535 U.S. 743, 122 S.Ct.
23 1864, 152 L.Ed. 2d 962 (2002) .............................................................................................7

24 *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) .....................5, 6, 8, 10, 11, 12

25 *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed. 2d 712 (1972) ..........9, 10, 11

26 *In re AH Robbins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation,* 505 F.Supp. 221
(JPML 1981) .......................................................................................................................18

27 *In re Air Crash at Pago Pago, American Samoa on January 30, 1974,* 394 F.Supp. 799 (JPML
28 1975) ...................................................................................................................................14

1   *In re Gasoline Lessee Dealers Antitrust Litigation,* 479 F.Supp. 578 (JPML 1979) ...................15

2   *In re Grand Funk Railroad Trademark Litigation,* 371 F.Supp. 1084 (JPML 1974) .............15, 19

3   *In re Harmony Loan Company, Inc., Securities Litigation,* 372 F.Supp. 1406 (JPML 1974) ......14

4   *In re Highway Accident Near Rockville, Connecticut, on December 30, 1972,* 388 F.Supp. 574
    (JPML 1975) ...........................................................................................................................12

5

6   *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 175 F.Supp. 2d 593
    (S.D. N.Y. 2001) ....................................................................................................................19

7   *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 209 F.R.D. 323 (S.D.
    N.Y. 2002) ..............................................................................................................................18

8

9   *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* MDL 1358, Master
    File C.A. No. 1:00-1898 (SAS) (S.D. N.Y. Stay Order Dec. 23, 2003) ...................................2, 17

10  *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 2004 U.S. Dist.
    LEXIS 4068 (S.D. N.Y. March 16, 2004) ...................................................................................19

11

12  *In re Mirtazapine Patent Litigation,* 199 F.Supp.2d 1380 (JPML 2002) .........................12, 15, 16

    *In re National Student Marketing Litigation,* 368 F.Supp. 1311 (JPML 1973) ............................15

13
    *In re Pacific Gas & Electric Company,* 281 B.R. 1, 2002 Bankr. LEXIS 1400 (Bankr. N.D. Cal.
14  2002) ......................................................................................................................................11

15  *In re Rezulin Products Liability Litigation,* 133 F.Supp. 2d 272 (S.D. N.Y. 2001) .....................11

16  *In re Sears, Roebuck & Co. Employment Practices Litigation,* 487 F.Supp. 1362 (JPML 1980)
    ................................................................................................................................................15

17
    *In re State of New York v. Citibank, N.A.,* 537 F.Supp. 1192 (S.D. N.Y. 1982) ......................9, 10
18
    *In re Tobacco/Governmental Health Care Costs Litigation,* 76 F.Supp. 2d 5 (D. D.C. 1999)
19  ....................................................................................................................12, 13, 14, 16

20  *In re Truck Accident Near Alamargordo, New Mexico, on June 18, 1969,* 387 F.Supp. 732
    (JPML 1975) ...........................................................................................................................16

21
    *In re Western Electric Co. Semiconductor Patent Litigation,* 436 F.Supp. 404, 406 (JPML 1977)
22  ................................................................................................................................................18

23  *Kansas v. Home Cable Inc.,* 35 F.Supp. 2d 783 (D. Kan. 1998) ...................................................11

24  *Medtronic, Inc., v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed. 2d 700 (1996) ........................5

25  *Missouri v. Coeur D'Alene Tribe,* 1997 U.S. Dist. LEXIS 14980 (W.D. Mo. 1997), *vacated by*
    164 F.3d 1102 (8th Cir. 1999) ...................................................................................................11

26
    *Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) ...............................6, 7

27
    *Moore ex rel. Mississippi v. Abbott Laboratories, Inc.,* 900 F.Supp. 26 (S.D. Miss. 1995) ............
28  ..........................................................................................................3, 4, 5, 7, 8, 11, 12

*New Hampshire v. Amerada Hess Corp.*, D. N.H. Case No. 03-CV-386, D. R.I. Case No. 03-0529L ...................................................................................................................................13, 14

*New York ex rel. Lefkowitz v. Transcience Corp.*, 362 F.Supp. 922 (S.D. N.Y. 1973) ...............10

*Oklahoma ex rel. Edmondson v. Magnolia Marine Transport Co.*, 2004 U.S. App. LEXIS 3432 (10th Cir. February 24, 2004) ..............................................................................................11, 12

*Oregon v. City of Rajneeshpuram*, 1984 U.S. Dist LEXIS 14903 (D. Ore. 1984) .........................8

*Oxygenated Fuels Association v. Davis ("Davis II"),* 331 F.3d 665 (9th Cir. 2003), *affirming Oxygenated Fuels Association v. Davis ("Davis I"),* 163 F.Supp. 2d 1182 (E.D. Cal. 2001) .....19

*Oxygenated Fuels Association v. Pataki,* 158 F.Supp. 2d 248 (N.D. N.Y. 2001) ........................19

*Oxygenated Fuels Assocation v. Pataki,* 293 F.Supp. 2d 170 (N.D. N.Y. 2003) ........................19

*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ...........................................................................................................................................7

*Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed. 2d 605 (1993) .............................................................................................................16

*Regents of the University of California v. Eli Lilly & Co.,* 119 F.3d 1559 (Fed. Cir. 1997) ........11

*Regents of the University of Minnesota v. Glaxo Wellcome, Inc.,* 58 F.Supp.2d 1036 (D. Minn. 1999) ...........................................................................................................................................11

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed. 2d 252 (1996) .......
...................................................................................................................................................7, 8

*Smith v. Reeves*, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900) ..............................................6

*South Dakota State Cement Plant Commission v. Wausau Underwriters Insurance Company,* 778 F.Supp. 1515 (D. S.D. 1991) .........................................................................................................8

*South Tahoe Public Utility District v. Atlantic Richfield Co.,* Cal. Super. Ct., S.F. Cty. Case No. 999128 .................................................................................................................................16, 17

*State Engineer of Nevada v. South Fork Band of the Te-Moak Tribe of Western Shoshone Indians of Nevada,* 66 F.Supp. 2d 1163 (D. Nev. 1999), *aff'd* 339 F.3d 804 ..........................................11

*Terrebonne Parish School Board v. Mobil Oil Corporation,* 1989 U.S. Dist. LEXIS 13703 (E.D. La. 1989) .......................................................................................................................................8

*Vermont v. Oncor Communications, Inc.,* 166 F.R.D. 313 (D. Vt. 1996) ................8, 9, 10, 11, 12

## **STATUTES**

U.S. CONST. Art I, § 10 .................................................................................................................5

U.S. CONST. Amend. XI .....................................................................3, 4, 5, 6, 7, 8, 9, 10, 11

28 U.S.C. § 1407 ..........................................................................................2, 12, 13, 15, 16 20

1   28 U.S.C. § 1441 ...................................................................................................10

2   Cal. Bus. & Prof. Code § 17200 et seq. ..............................................................1, 4

3   Cal. Bus. & Prof. Code § 17500 et seq. ...................................................................1

4   Cal. Bus. & Prof. Code § 17580.5 ...........................................................................1

5   Cal. Civil Code § 3479 .............................................................................................1

6   Cal. Civil Code § 3480 .............................................................................................1

7   Cal. Fish & Game Code § 5650 ...............................................................................1

8   Cal. Health & Safety Code § 25189(d) ....................................................................1

9   Cal. Health & Safety Code § 25189.2(c) ..................................................................1

10                                    **PERIODICALS**

11   Alfred Hill, *In Defense of Our Law of Sovereign Immunity,* 42 B.C.L. Rev. 485 (2001) ..............3

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                                    I.   **STATEMENT OF THE CASE**

2          Plaintiffs are the People of the State of California, two cities, one investor-owned water

3   utility, and nine public agencies charged with managing and/or purveying water resources in

4   Sacramento County. Plaintiffs filed this action in Sacramento County Superior Court on

5   September 30, 2003, and filed a First Amended Complaint ("FAC") on October 31, 2003.[1]  The

6   FAC names as defendants 16 major oil and chemical companies that manufacture methyl tertiary

7   butyl ether ("MTBE"), refine gasoline containing MTBE, and/or supply gasoline containing

8   MTBE to retail gasoline stations in Sacramento County, as well as the owner/operators of certain

9   gasoline stations in the County. FAC, ¶¶ 37-63. Defendants' choice to use MTBE in gasoline

10   and/or their discharge of such gasoline to the subsurface has resulted in the contamination of

11   groundwater resources in Sacramento County - resources on which hundreds of thousands of

12   people ultimately depend for their drinking water. FAC, ¶¶ 1, 37.  The People and the other

13   plaintiffs have jointly sued for public nuisance (Cal. Civil Code §§ 3479, 3480) and jointly seek

14   declaratory relief. The People alone, in the exercise of their police powers, have sued for the

15   unauthorized disposal of hazardous waste under both strict liability (Cal. Health & Safety Code §

16   25189.2(c)) and negligence (Cal. Health & Safety Code § 25189(d)) theories, for water pollution

17   (Cal. Fish & Game Code § 5650), for false advertising and false environmental advertising (Cal.

18   Bus. & Prof. Code §§ 17500 et seq., 17580.5), for unfair business practices (Cal. Bus. & Prof.

19   Code § 17200 et seq.) and for civil conspiracy.  The remaining plaintiffs have brought suit in an

20   additional six causes of action under tort and other theories.

21          On or about December 8, 2003, certain defendants removed this action to the Eastern

22   District of California.[2]  A week later, on December 15, 2003, the plaintiffs filed a Motion to

23   Remand the case to state court.[3]  The defendants filed no substantive response to the plaintiffs'

24   motion, instead requesting on December 18, 2003[4] and then again *ex parte* on January 29, 2004[5]

25

26   ───────────────────────────────

      [1].   A true and correct copy of the FAC is attached as Exhibit 1
27    [2].   A true and correct copy of which is attached as Exhibit 2.
      [3].   A true and correct copy of which is attached as Exhibit 3.
28    [4].   A true and correct copy of which is attached as Exhibit 4.
      [5].   A true and correct copy of which is attached as Exhibit 5.

                                                    1

1   that a hearing on the matter be stayed pending a decision by the Judicial Panel on Multidistrict

2   Litigation ("JPML," or "the Panel") to transfer this case to the Southern District of New York.[6]

3   Plaintiffs opposed this request for a stay in briefs filed on January 30th [7] and February 6, 2004,[8]

4   to no avail; without conducting a hearing the Hon. Garland E. Burrell issued an indefinite stay on

5   February 6th and deemed the plaintiffs' Motion to Remand to be withdrawn without prejudice.[9]

6          On February 25, 2004, the JPML issued Conditional Transfer Order Number Five

7   ("CTO-5"), transferring this case to the Southern District of New York.  On March 11, 2004, the

8   plaintiffs filed a joint Notice of Opposition to this transfer. Because of the unique issues arising

9   from the fact that the People of the State of California are sovereign, we are filing this motion

10   with its accompanying points and authorities separately from the other plaintiffs.

11                              **II.  ARGUMENT**

12          Plaintiff moves to vacate CTO-5 on two bases: first, on the ground that the federal courts

13   lack jurisdiction in this matter given that the People of the State of California object to removal

14   and transfer pursuant to the doctrine of sovereign immunity, and second, even assuming for the

15   sake of argument that this Court has jurisdiction to issue a Transfer Order, it should not do so as

16   the moving parties have failed to meet their burden of proof pursuant to 28 U.S.C. § 1407(a).

17

18   _____

19   [6]   Parallel to these proceedings the defendants also filed with the JPML a Notice of Related, Tag-Along
      Actions to *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358, Master File

20   C.A. No. 1:00-1898 (SAS) (S.D. N.Y. stay order Dec. 23, 2003) (a true and correct copy of which is attached as
      Exhibit 6), which was at the time an inactive MDL proceeding pending before the Hon. Shira A. Scheindlin of the

21   Southern District Court of New York.  On December 19, 2003, Judge Scheindlin conducted a hearing concerning
      two new cases removed to her district that had pending remand and stay motions (see Reporter's Transcript ("RT") of

22   the Proceedings of December 19, 2003, a true and correct copy of which is attached as Exhibit 7).  Counsel for the
      plaintiffs present ultimately stipulated with defense counsel to the conditional transfer of a number of cases to Judge

23   Scheidlin's court to join the proceedings pending before her. The plaintiffs in this action were not present and did not
      consent to the stipulation.  Nonetheless, this case was included in a list of cases submitted to Judge Scheindlin by the

24   parties as a potential tag-along action (see the attachment to the Order of December 23, 2003, a true and correct copy
      of which is attached as Exhibit 8).  On December 23, 2003, Judge Scheindlin issued an order "respectfully

25   request[ing]" the district courts in any case on the list to stay proceedings pending transfer to her court (see the Order
      of December 23, 2003, a true and correct copy of which is attached as Exhibit 8).  The plaintiffs in this action

26   objected to any proposed transfer by letters directed to Judge Scheindlin dated January 5, 2004 (a true and correct
      copy of which is attached as Exhibit 9 to this Motion) and January 27, 2004 (a true and correct copy of which is

27   attached as Exhibit 10 to this Motion).  Counsel for one of the defendants in this action also objected to transfer by
      letter to Judge Scheindlin dated January 5, 2004 (a true and correct copy of which is attached as Exhibit 11).

      [7]   True and correct copies of which are attached as Exhibits 12 and 13.

28   [8]   A true and correct copy of which is attached as Exhibit 14.

      [9]   A true and correct copy of which is attached as Exhibit 15.

                                     2

1    **A.    Because the People of the State of California are Sovereign and Immune From
         Process, the JPML Lacks Jurisdiction to Issue a Transfer Order in this Case, and
2        Must in Consequence Vacate the Conditional Transfer Order Already Issued**

3            The People of the State of California object to the jurisdiction of this or any other federal

4    court on the ground that, as a separate sovereign, we cannot be compelled to attend this court

5    absent our consent - and we do not consent. The People submit that our rights as sovereign must

6    prevail over any statute authorizing the removal of this action to federal court, or the transfer of

7    this action from one federal court to another.

8            At the outset it needs to be made clear that the People are not relying solely upon the

9    plain wording of the Eleventh Amendment[10] to the U.S. Constitution in asserting this immunity,

10   but upon their broader sovereign rights.[11]   The distinction is important, but often overlooked.  As

11   the Supreme Court recently explained:

12              We have … sometimes referred to the States' immunity from suit
                as "Eleventh Amendment immunity." The phrase is convenient
13              shorthand but something of a misnomer, *for the sovereign
                immunity of the States neither derives from nor is limited by the
14              terms of the Eleventh Amendment.* Rather, as the Constitution's
                structure, and its history, and the authoritative interpretations by
15              this Court make clear, *the States' immunity from suit is a
                fundamental aspect of the sovereignty which the States enjoyed
16              before the ratification of the Constitution, and which they retain
                today* … except as altered by the plan of the Convention or certain
17              constitutional Amendments.

18   *Alden v. Maine*, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed. 2d 636 (1999) (emphasis added).

19          **1.    Decisions by U.S. District Courts in the *Steelcase* and *Moore* Cases Recognize
                 that a State Cannot Be Removed to Federal Court Against Its Will, Even
20               Where the State is a Plaintiff in an Action Filed in State Court**

21          Two District Courts have sustained Eleventh Amendment challenges to the jurisdiction of

22   federal courts in cases very similar to ours. In *California v. Steelcase, Inc.*, 792 F.Supp. 84

23   (C.D.Cal. 1992) the District Attorney of Los Angeles brought a civil enforcement action for

24

25

26   ────────────────
27   10. The Eleventh Amendment, adopted in 1798, provides that "The Judicial power of the United States shall
     not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by
     Citizens of another State, or by Citizens or Subjects of any Foreign State."
28   11. For a history of the law of sovereign immunity see Alfred Hill, *In Defense of Our Law of Sovereign
     Immunity*, 42 B.C.L. Rev. 485 (2001).

1   violation of the state antitrust and unfair competition statutes[12] in state court. The defendant

2   removed the action to federal court on the grounds of diversity of citizenship. The federal court

3   remanded the action back to state court on the grounds that a) citizenship was not in fact diverse

4   insofar as at least one cause of action was concerned[13] and b) the Eleventh Amendment

5   prohibited removal.  Insofar as this second ground was concerned the Court found that it lacked

6   jurisdiction because the Eleventh Amendment "is in 'the nature of a jurisdictional bar.'" *Steelcase*,

7   792 F. Supp. at 86, citing *Alabama v. Pugh*, 438 U.S. 781, 782 n.1, 98 S.Ct. 3057, 57 L.Ed. 2d

8   1114, (1978) (per curiam), which in turn quoted from *Edelman v. Jordan*, 415 U.S. 651, 678, 94

9   S.Ct. 1347, 39 L.Ed. 2d 662, (1974).  The court noted the defendant's argument that a literal

10  reading of the Eleventh Amendment provides immunity to states as defendants, not as plaintiffs,

11  but found this of no moment, stating at page 86 that:

12          since *the immunity* granted by the Eleventh Amendment is an
             immunity from being made an involuntary party to an action in
13          federal court, it *should apply* equally to the case *where the state is*
             *a plaintiff* in an action commenced in state court and the action is
14          *removed* to federal court by the defendant. (emphasis added).

15          *Steelcase* was subsequently followed in the case of *Moore ex rel. Mississippi v. Abbott*

16  *Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995).  In *Moore* the state Attorney General sued

17  corporations in state court on the same general grounds as in *Steelcase* - namely, violation of the

18  state antitrust statute and state consumer protection act.  The defendants removed the case to

19  federal court on diversity and federal question grounds, and the state moved to remand to state

20  court.  The district court discussed the language found in *Steelcase* and then said, at page 30,

21  that:

22          The Court finds the reasoning of the *Steelcase* court to be sound.
             By removing this matter to federal court, Defendants have
23          involuntarily subjected the State of Mississippi to the jurisdiction
             of this Court. Because the State does not consent to this removal,
24          the Court finds that it lacks subject matter jurisdiction over this
             action due to the Eleventh Amendment proscription ....
25

26  _____

27  12. Cal. Bus. & Prof. Code section 17200 et seq.  The People have brought this identical charge against the
     defendants in the instant case; see FAC Cause of Action Number Eight.

28  13. Because the unfair competition statute expressly allows prosecutions by District Attorneys in the name of
     the People of the State of California, and a state is not a citizen for diversity purposes, at least the second cause of
     action could not be removed pursuant to diversity jurisdiction. *Steelcase*,792 F. Supp. at 85-86.

4

1    Our case is indistinguishable from *Steelcase* and *Moore*.  In this case, as in *Steelcase* and

2    *Moore*, the sovereign is not just suing corporate defendants in state court - it is doing so in the

3    exercise of its police powers.[14]  In this case, as in *Steelcase* and *Moore*, the defendant

4    corporations have removed the action to federal court without the consent of that sovereign.  And

5    in this case, as in *Steelcase* and *Moore*, this Court must defer to the wishes of a sovereign people

6    who desire to litigate their police action in their own courts.

7    2.    **The Decisions in *Steelcase* and *Moore*, Based on the Eleventh Amendment,**
          **are Consistent with Federal Precedent on the Broader Basis of Sovereign**
8         **Immunity**

9        While neither the *Steelcase* nor *Moore* courts cited it, their reading of the scope of

10   sovereign immunity is consistent with the ruling in the seminal Eleventh Amendment case, *Hans*

11   *v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).  In *Hans* the defendant was a citizen

12   of the state he was suing, and brought action pursuant to the Contracts Clause of the U.S.

13   Constitution.[15]  The Eleventh Amendment recognizes the immunity enjoyed by states from suits

14   in federal court brought by citizens of other states and countries, but is silent on the subject of

15   suits brought against a state by its own citizens. The U.S. Supreme Court recognized that if it was

16   bound by the "mere letter" of the Eleventh Amendment suit might be had, but after an extensive

17   discussion of the history of the subject[16] it concluded that any attempt to limit sovereign

18   _____

19   14. The People submit that the protections afforded by sovereign immunity are absolute, and that it does not
     matter in what context a state is forced into federal court where its immunity is not waived, but it is appropriate to
20   emphasize how particularly important that immunity is where the exercise of the state's inherent police powers are
     concerned. "Throughout our history the several States have exercised their police powers to protect the health and
21   safety of their citizens. Because these are 'primarily, ... matter[s] of local concern,' the 'States traditionally have had
     great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet
22   of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed. 2d 700 (1996) (internal
     citations omitted).
23       15. It was alleged that the State of Louisiana was reneging on its obligation to pay bonds it had previously
     issued, in contravention of Article I, Section 10 of the Constitution.
24       16. In summary, the Court noted that the Eleventh Amendment was enacted in response to *Chisholm v.*
     *Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), where the Supreme Court, utilizing a literal interpretation, found
25   that the Constitution permitted a state to be sued by the citizens of another state.  While there had been rumblings
     during the debates over the enactment of the Constitution from opponents that a literal interpretation of the document
26   would lead to just such a result, supporters such as James Madison ("It is not in the power of individuals to call any
     state into court ...," *Hans*,134 U.S. at 14), John Marshall ("I hope that no gentleman will think that a State will be
27   called at bar of the federal court. . . . It is not rational to suppose that the sovereign power should be dragged before a
     court," *id*.) and Alexander Hamilton ("It is inherent in the nature of sovereignty not to be amenable to the suit of an
28   individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as
     one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union," *Hans*,134 U.S.

                                                 5

immunity to the "mere letter" of that amendment "is an attempt to strain the Constitution and the

law to a construction never imagined or dreamed of." *Hans*, 134 U.S. at 14 and 15. In spite of the

fact that the case fell outside the literal wording of the Eleventh Amendment the Supreme Court

dismissed the suit on the grounds that the doctrine of sovereign immunity was broader than the

Amendment, and that doctrine - if not the Eleventh Amendment per se - protected the state from

suits it did not agree to entertain.

There have been a number of cases since *Hans* in which the Supreme Court has sustained

state claims of sovereign immunity from suit - even though the language of the Eleventh

Amendment did not specifically immunize the state. See *Smith v. Reeves*, 178 U.S. 436, 445-448,

20 S.Ct. 919, 44 L.Ed. 1140 (1900) (claim of state sovereign immunity from suit sustained, even

though suit was brought by a federal corporation, which was not a citizen by the terms of the

Eleventh Amendment), *Ex Parte New York*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)

(claim of state sovereign immunity from suit sustained, even though the terms of the Eleventh

Amendment said nothing of suits brought in admiralty; "[t]hat a State may not be sued without its

consent is a fundamental rule of jurisprudence … [T]he entire judicial power granted by the

Constitution does not embrace authority to entertain a suit brought by private parties against a

State without consent given … because of the fundamental rule of which the Amendment is but

an exemplification," p. 497), *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282

(1934) (claim of state sovereign immunity from suit sustained, even though the Eleventh

Amendment did not specifically mention state immunity from suits brought by foreign states;

"Behind the words of the constitutional provisions are postulates which limit and control. There

---

at 13), denied it. When the Supreme Court opted for just such a literal interpretation in *Chisholm* the decision "created such a shock of surprise throughout the country that, at the first meeting of Congress thereafter, the Eleventh Amendment was almost unanimously proposed, and was in due course adopted by the legislatures of the States." *Hans*, 134 U.S. at 11. As the *Hans* court summarized it at p. 12:

> Looking back from our present standpoint at the decision in *Chisholm v. Georgia*, we do not greatly wonder at the effect which it had upon the country. Any such power as that of authorizing the federal judiciary to entertain suits by individuals against the States, had been expressly disclaimed, and even resented, by the great defenders of the Constitution whilst it was on its trial before the American people.

6

is the essential postulate that the controversies ... shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent ...," p. 322), *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed. 2d 686 (1991) (immunity from suit by Indian tribes; "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms," at 779), *Alden,* 527 U.S. at 730 (claim of sovereign immunity sustained where Congress permitted suit in state court, even though the terms of the Eleventh Amendment only addresses limits on the federal judicial branch), and *Federal Maritime Commission v. South Carolina State Ports Authority,* 535 U.S. 743, 753, 122 S.Ct. 1864, 152 L.Ed. 2d 962 (2002) (immunity from administrative actions; "the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity"). In case after case, for over a century, the Supreme Court has continued to reaffirm the principles, reasoning and ruling of *Hans.*

*Steelcase* and *Moore* are also consistent with caselaw holding that state consent to be sued in its own courts does not amount to consent that it be sued in federal court. See *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 100 n. 9, 104 S.Ct. 900, 79 L.Ed. 2d 67 (1984) ("the Court consistently has held that a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts"). Not only does a state have the right to decide whether it shall waive immunity from suit - it has the right to determine the forum in which immunity shall be waived. *Pennhurst,* 465 U.S. at 100 ("A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued"). Any waiver of sovereign immunity must be unequivocally expressed. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 239-240, 105 S.Ct. 3142, 87 L.Ed. 2d 171 (1985) ("we have held that a State will be deemed to have waived its immunity only where stated by the most express language or by such over-whelming implications from the text as [will] leave no room for any other reasonable construction" (internal quotes and citations omitted)). And immunity is not limited to those situations where a party is seeking a monetary judgment against a State - it serves as well to avoid "the indignity of subjecting a State to the coercive process of

7

1  judicial tribunals at the instance of private parties," *Seminole Tribe of Florida v. Florida*, 517

2  U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed. 2d 252 (1996) (internal quotation marks and citation

3  omitted). From all these decisions it is apparent that the *Steelcase* and *Moore* cases were

4  correctly decided - a defendant cannot remove a sovereign plaintiff to federal court without that

5  plaintiff's consent, let alone to a federal court 3,000 miles away.

6      **3.**    **The Decisions of Other Federal Courts, Failing to Follow *Steelcase* and**

7              **_Moore_, Are Incorrect as They Limit the Scope of Sovereign Immunity to the "Mere Letter" of the Eleventh Amendment**

8      Other federal districts have reviewed *Steelcase* and *Moore* and have refused to follow

9  them. The People submit, however, that these cases are in error given that they uniformly limit

10  themselves to a discussion of the "mere letter" of the Eleventh Amendment without reference to

11  the broader concept of sovereign immunity underlying it.[17]

12      It appears that the earliest dissenting voice to the *Steelcase/Moore* decisions can be found

13  in *Vermont v. Oncor Communications, Inc.*, 166 F.R.D. 313 (Vt. 1996).[18]  In *Oncor*

14  *Communications* the state sued a telecommunications company on the grounds that its practices

15

---

16      17. In fairness to these courts it must be said that their analyses were not aided by the fact that the *Steelcase*

17  and *Moore* courts did not discuss the broader concept of sovereign immunity either, limiting their discussion to the Eleventh Amendment proper. It would have been better for all of these courts if they had broadened the scope of their analyses, but as the quote from *Alden* above makes clear, courts have routinely resorted to the shorthand of

18  having the Eleventh Amendment apply to both concepts - even if the result is a distortion of the analysis.

    18. There are decisions earlier than *Steelcase* and *Moore*, but they are not particularly helpful. In *Oregon v.*

19  *City of Rajneeshpuram*, 1984 U.S.Dist.LEXIS 14903 (D. Ore. 1984), the federal district court denied the state's Eleventh Amendment claims in a remand motion - without any citation to authority - on the summarily stated

20  grounds that a federal question was raised. In *Banco y Agencia de Financiamiento de la Vivienda de Puerto Rico v. Urbanizadora Villalba*, 681 F.Supp. 981 (D. P.R. 1988) the court denied the Commonwealth's Eleventh Amendment

21  claims in a remand motion on the ground that the Eleventh Amendment protects the states as defendants but says nothing about states as plaintiffs. In *Terrebonne Parish School Board v. Mobil Oil Corporation*, 1989 U.S. Dist.

22  LEXIS 13703 (E.D. La. 1989) a school board sued an oil company over royalties due to it pursuant to a leasehold. The federal court denied the motion to remand because the Eleventh Amendment was unavailable for two reasons:

23  first because "[w]e are aware of no case holding that the Eleventh Amendment prevents removal of a suit filed by a state as a plaintiff," and second because it could not be said that the school board was litigating as the state's alter

24  ego.  And in *South Dakota State Cement Plant Commission v. Wausau Underwriters Insurance Company*, 778 F.Supp. 1515 (D. S.D. 1991) the federal court remanded to state court on the ground that diversity jurisdiction was

25  lacking. It made passing reference to the Eleventh Amendment, noting at page 1522 that "[i]n this case, the State is the plaintiff, not the defendant," but declined to rule on the claim - a ruling that would have been pointless in any

26  event given that federal jurisdiction was lacking on diversity grounds.  In none of these cases, however, is there a discussion of the broader concept of sovereign immunity underlying the Eleventh Amendment. As *Hans* made clear,

27  and as *Alden* reiterated only five years ago, the concept of sovereign immunity is broader than the "mere letter" of the Eleventh Amendment, and a determination that a suit does not fit within the parameters of the Eleventh

28  Amendment should only be the first step in a two-step analysis to determine whether sovereign immunity applies.  In none of these pre *Steelcase* and *Moore* cases was that second step taken.

violated state consumer fraud laws and FCC guidelines. The case was removed to federal court.

The state moved to remand, arguing (among other things) Eleventh Amendment immunity and

citing the *Steelcase* decision.  The court disagreed. Its reasoning in its entirety, found at page 321,

is as follows:

> It has long been the case that suits brought by a state against parties
> who are not other states may "be brought in or removed to the
> [District Courts] ..." *Illinois v. City of Milwaukee*, 406 U.S. 91,
> 101, 31 L.Ed. 2d 712, 92 S.Ct. 1385 (1972), quoting *Ames v.
> Kansas*, 111 U.S. 449, 470, 28 L.Ed. 482, 4 S.Ct. 437 (1884). See
> also *[In re] State of New York v. CitiBank, N.A.*, 537 F.Supp. 1192,
> 1197 (S.D.N.Y. 1982). The Eleventh Amendment does not bar
> removal of an action involving a federal question in which a state
> is the plaintiff.

The People submit that the authorities relied upon by *Oncor Communications* are

distinguishable and in consequence do not stand for the proposition stated.  *City of Milwaukee*

involved a suit by Illinois against Wisconsin public entities to abate a public nuisance. Illinois

sought leave to file the complaint with the U.S. Supreme Court - skipping over the federal district

and circuit courts - on the ground that the Supreme Court had original jurisdiction under the

Constitution where one state was suing another. The Supreme Court found, however, that in this

instance Wisconsin was not a mandatory party even if certain of its subdivisions might be.  Given

that, federal district courts also had jurisdiction, and the Court denied Illinois' request.  The issue

in *City of Milwaukee* was therefore not whether a state consented to suit in federal court - it

*wanted* to be in federal court - the issue was *which* federal court had subject matter jurisdiction.

The Eleventh Amendment, and the broader subject of the sovereign immunity underlying it, was

not at issue.

*Ames* was cited by *City of Milwaukee* because it, too, dealt with *which* federal court had

subject matter jurisdiction.  In *Ames* the state of Kansas challenged a proposed corporate merger

in state court. Because federal rights were allegedly involved the defendants sought to remove the

matter to federal Circuit Court. The state objected - not on the grounds of immunity, but on the

grounds that the Constitution vested exclusive jurisdiction over cases in which a state was a party

in the Supreme Court rather than some lesser federal court created by statute.  The Supreme

Court disagreed, finding that while the "judicial power of the United States exists under the

9

1   Constitution," Congress has the ability "to distribute that power among courts." *Ames*, 111 U.S.

2   at 472. Again, neither the Eleventh Amendment nor the principle of sovereign immunity factored

3   into the decision.

4        *Citibank* did not involve the Eleventh Amendment or sovereign immunity either.  In

5   *Citibank* the Attorney General of New York sued the defendant in state court over fraudulent use

6   of ATMs.  While the causes of action were state claims they were based exclusively upon

7   allegations of illegality under federal law - namely, the Electronic Fund Transfers Act (EFTA).

8   The defendant removed the case to federal court and the Attorney General moved to remand it

9   back to state court.  The Attorney General does not appear to have demanded remand as a matter

10   of right pursuant to sovereign immunity, but rather as a matter of discretion pursuant to federal

11   principles of comity.[19]  The federal district court declined to defer on the grounds that

12   construction of the EFTA was essential to the resolution of the state claims, adding that "[i]t is

13   clear that an action can be removed *notwithstanding the fact that a state is the plaintiff. Ames v.*

14   *Kansas*, 111 U.S. 449, 463, 4 S.Ct. 437, 443, 28 L.Ed. 482 ...." *Citibank*, 537 F.Supp. at 1197

15   (emphasis added). This language in *Citibank* appears to come closest to supporting the

16   proposition found in *Oncor Communcations*, but like *City of Milwaukee* it relies upon *Ames* for

17   this proposition, and again *Ames* does not deal with the Eleventh Amendment or sovereign

18   immunity issues at all.[20]

19        In short, none of the three cases relied upon by the *Oncor Communications* court dealt

20   with the issue posed here, and the *Oncor Communications* court's attempt to distinguish

21

---

22      19. See *Citibank*, 537 F. Supp at 1197: "The Attorney General insists that he should be permitted to pursue the relief he seeks in the state courts, as the state legislature intended. He is the people's representative by state law, and claims he should be allowed to proceed in the forum designated for the purpose by the legislation, and to seek

23   the remedies specified. He notes specifically the valid observation in *New York ex rel. Lefkowitz v. Transcience*

24   *Corp.*, 362 F. Supp. 922, 928 (S.D.N.Y. 1973), a section 63(12) proceeding, that a state forum for cases brought by the Attorney General is desirable to give 'free scope to the police power of the States' in consumer protection cases."

25      20. The *Citibank* court did cite to a different page in the *Ames* opinion than the *City of Milwaukee* court - namely, 111 U.S. at page 463.  At that page the *Ames* court dealt with the authority to remove an action to federal

26   court pursuant to the 1875 statute in place at the time. This forerunner of 28 U.S.C. section 1441(a) permitted either party to remove an action to federal court (the current version, of course, permits only defendants to do so), and the

27   *Ames* court noted that it made no distinction between suits with ordinary parties and those in which a State was a party.  This discussion of the scope of the statute, however, included no mention of the concept of sovereign

28   immunity or the Eleventh Amendment, which would trump any mere statute.  This is perhaps not surprising, given that *Ames* preceded *Hans* by some six years.

1  *Steelcase* and *Moore* on their authority must fail.  This did not, unfortunately, occur to a number

2  of subsequent federal district courts, which opted with little or no independent analysis to follow

3  *Oncor Communications* rather than *Steelcase* and *Moore* based on these same cases. See

4  *Missouri v. Coeur D'Alene Tribe,* 1997 U.S. Dist. LEXIS 14980, *7-8 (W.D. Mo. 1997), *vacated*

5  *by* 164 F.3d 1102 (8th Cir. 1999), *California v. Acme Fill Corp.*, 1997 U.S. Dist. LEXIS 16847,

6  *3-4 (N.D. Cal. 1997),[21]  *Kansas v. Home Cable Inc.*, 35 F.Supp.2d 783, 789 (D. Kan. 1998),

7  *Regents of the University of Minnesota v. Glaxo Wellcome, Inc.*, 58 F.Supp. 2d 1036, 1039 (D.

8  Minn. 1999), *In re Rezulin Products Liability Litigation,* 133 F.Supp. 272, 297 (S.D. N.Y. 2001),

9  and *In re Pacific Gas & Electric Company*, 281 B.R. 1, 2002 Bankr. LEXIS 1400 (Bankr. N.D.

10 Cal. 2002).[22]  Recently the Tenth Circuit weighed in on the issue in *Oklahoma ex rel. Edmondson*

11 *v. Magnolia Marine Transport Co.*, 2004 U.S. App. LEXIS 3432 (10th Cir. February 24, 2004).[23]

12 Unfortunately it, too, failed to discuss the broader concept of sovereign immunity.  It did at least

13 acknowledge - as no other court had done - that *City of Milwaukee* and *Ames* did not involve

14 Eleventh Amendment issues, but said that because "nearly every court to consider" the issue "has

15 relied on the unconditional holding of those cases, in conjunction with the pointed and specific

16 language used in the constitutional text itself" to bar Eleventh Amendment claims, it would do so

17

---

18  21. Interestingly, the court in *Acme Fill* not only mentioned *Hans* but noted that pursuant to it the "Supreme
Court has extended the Amendment's protection beyond its literal meaning to cover suits brought against a state by
19  its own citizens," *Acme Fill*, 1997 U.S. Dist. LEXIS 168947 at *3. It failed to discuss why the *Hans* court provided
that extension, however, or explain how it was that the *Hans* extension would affect the question before it.
20  22. Other cases criticized *Steelcase* without relying specifically on the authorities cited by *Oncor
Communications*, but are distinguishable for other reasons. In *State Engineer of Nevada v. South Fork Band of the
21  Te-Moak Tribe of Western Shoshone Indians of Nevada*, 66 F.Supp. 2d 1163, 1170 (D. Nev. 1999), *aff'd* 339 F.3d
804, the court found that *Steelcase* was not controlling because *Steelcase* was a diversity of citizenship case rather
22  than a federal question case. The distinction is of no moment - *Hans* involved a federal question rather than diversity
too, which had no bearing whatsoever on the sovereign immunity issue - but perhaps more to the point, given that the
23  state was suing the United States (among others), and the Eleventh Amendment clearly does not extend to suits
between those two sovereigns, there was no need to discuss let alone try to distinguish *Steelcase* at all. *Cornyn v.
24  Real Parties in Interest*, 110 F.Supp. 2d 514 (E.D. Tex. 2000) involved an action brought by the State of Texas in
state court against certain private attorneys it had retained to help in litigation against the tobacco industry after that
25  litigation was settled. The case was removed and the state tried to remand it.  The court refused, declining to follow
*Steelcase* and *Moore* and citing *Oncor Communications* and its progeny instead.  But it did not need to discuss these
26  cases at all.  Given that the state of Texas had originally brought the tobacco litigation in *federal* court, the Court
ruled that it had waived its sovereign immunity anyway.
27  23. Among the cases relied upon by *Edmondson* is *Regents of the University of California v. Eli Lilly & Co.*,
119 F.3d 1559, 1564 (Fed. Cir. 1997).  In *Regents*, however, the plaintiff university originally filed the case in
28  *federal* court - it later complained when it was transferred to another district.  That case is obviously very different
from this one.

11

1    too. *Edmondson*, *7.  The People submit that this is not a particularly helpful analysis. An error -

2    no matter how often repeated - remains an error.  These cases all fail because they ultimately

3    relied upon authority having nothing to do with sovereign immunity or the Eleventh Amendment

4    - merely repeating the error in *Oncor Communications* - and because they all neglected to

5    discuss, let alone appreciate, the distinction drawn by the *Hans* court and later reiterated by the

6    *Alden* court between the "mere letter" of the Eleventh Amendment and the much broader concept

7    of sovereign immunity underlying it.

8           In the final analysis *Steelcase* and *Moore* got it right.  A sovereign state cannot be hauled

9    in front of a federal court without its consent, and the mere decision to file suit in state court to

10   validate a police action does not constitute such consent.  Attempts to dismiss these cases while

11   ignoring the lessons taught by *Hans* and recently reiterated by *Alden* are neither persuasive nor

12   correct.  *Steelcase* and *Moore* should be followed by this Court.  This sovereign's immunity

13   should be recognized.  In light of the fact that this immunity exists, this Court by definition lacks

14   jurisdiction to issue a Transfer Order, and it should in consequence vacate the Conditional

15   Transfer Order already issued.

16   **B.     Even Assuming that the JPML has Jurisdiction, Transfer is Inappropriate Because
             the Moving Parties Have Failed to Meet Their Burden Pursuant to 28 U.S.C. §1407(a)**

17

18          In evaluating a request for transfer made pursuant to 28 U.S.C. § 1407(a) the JPML must

19   evaluate three often interconnected factors: 1) whether the actions raise common questions of

20   fact; 2) whether transfer and consolidation would best serve the convenience of the parties and

21   witnesses; and 3) whether transfer and consolidation would promote the just and efficient

22   conduct of the litigation. *In re Tobacco/Governmental Health Care Costs Litigation*, 76

23   F.Supp.2d 5, 8 (D. D.C. 1999).  Or, to put it another way, is transfer "necessary in order to

24   eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources

25   of the parties, their counsel and the judiciary." *In re Mirtazapine Patent Litigation*, 199

26   F.Supp.2d 1380, 1381 (JPML 2002). All three of these factors need to be met, *In re Highway*

27   *Accident Near Rockville, Connecticut, on December 30, 1972*, 388 F.Supp. 574, 575 (JPML

28   1975), and the burden is upon the moving party to establish that these criteria have been met, *In*

1   *re Tobacco/Governmental Health Care Costs Litigation*, 76 F.Supp. 2d at 7-8.  The People of the

2   State of California submit that, even if the Panel has jurisdiction over this matter, the moving

3   parties have failed to meet their burden of proving any one of these three factors. In consequence

4   their motion to transfer should be denied, and CTO-5 vacated.

5           **1.  The Moving Parties Have Failed to Establish Sufficient Commonality of Facts**

6        In their Notice of Related, Tag-Along Actions ("Notice"), the moving parties have alleged

7   two common questions of fact between this case and others: "whether defendants knew about and

8   misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks

9   to downstream users, the federal government or the public" and "whether plaintiffs sustained

10   drinking water contamination as a result of MTBE contamination." Notice at p. 2, quoting from

11   *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* Transfer Order at p. 1

12   (October 10, 2000). While the People agree that there is commonality insofar as the first of these

13   factors is concerned, the People submit that the second factor concerns site-specific information

14   that is uncommon rather than common among the parties.  In addition, neither of these listed

15   factors takes into account the differences inherent in the fact that this plaintiff is a sovereign.

16           **a.**      **This Case is Unique Given that a Sovereign is Involved**

17        Perhaps the greatest dissimilarity between this case and others currently consolidated is

18   that a sovereign is bringing the action under causes of action uniquely related to its police

19   powers.[24]  A similar situation arose in the case of *In re Tobacco/Government Health Care Costs*

20   *Litigation*, where a number of unions and foreign governments sued the tobacco industry.  They

21   wound up before separate judges in the same district.  The United States filed relatively late in

22   the litigation, and was placed in the same courtroom as the unions.  The defendants sought to

23   consolidate the U.S. case with the cases for the plaintiff foreign governments. Applying the

24   factors found in § 1407 the district court declined to do so, finding that consolidation would not

25   serve the just and efficient conduct of the litigation because:

26

27

28   24. The only other sovereign who is a party to the MTBE actions and tag-along actions that the People are
     aware of is the State of New Hampshire, plaintiff in *New Hampshire v. Amerada Hess Corp.*, D. N.H. Case No.
     03-CV-386, D. R.I. Case No. 03-0529L, transferred pursuant to CTO-4.

1
2
3
4
5

> The United States' action is based on sections of the United States Code that permit only the United States to seek relief, thus presenting entirely different, perhaps crucial, legal issues from those implicated by the foreign government actions. The Court therefore concludes that most of the legal questions to be decided before trial are unique to the lawsuit filed by the United States, eliminating any increase in efficiency or justice to be gained by the consolidation of the U.S. and foreign actions.

6   *Id.*, at 9.  Our case is analogous.  While the People and the other plaintiffs in this case

7   have jointly sued under a public nuisance cause of action, and both seek declaratory relief, the

8   People have brought six other causes of action in which they are the only plaintiff.  The People

9   are not aware of any other plaintiffs in any other case that have alleged the same causes of

10  action.[25]   The legal issues regarding these causes of action brought solely by a sovereign in the

11  valid exercise of its police power are therefore unique, and there is no reason to include them in

12  the raft of tort-related claims that are to be litigated in New York by private parties.  See also *In*

13  *re Harmony Loan Company, Inc., Securities Litigation*, 372 F.Supp. 1406, 1407 (JPML 1974)

14  (claim of sovereign immunity was a factor in denial of transfer).

15              **b.      Individual Rather Than Common Facts Predominate**

16              At one level - the level concerning the liability of the oil industry for the decisions it made

17  relative to the promotion, production and distribution of MTBE - there are common facts

18  between the actions the moving parties seek to have consolidated.  At another level, however, - at

19  the level concerning the damages done to individual plaintiffs as a result of the defendants'

20  collective decisions - there is little in common between the parties.  This can be a distinction of

21  import when weighing the first criterion; see, e.g., *In re Air Crash at Pago Pago, American*

22  *Samoa on January 30, 1974*, 394 F.Supp. 799, 800 (JPML 1975) (noting that in tort litigation,

23  common questions may pertain to liability, but the issue of damages will be unique). As will be

24  discussed further below, discovery for the facts common to these actions has been largely

25  completed.  What remains is discovery about the site-specific and community-specific damage -

26  discovery that will only be of interest to those parties involved in those site and

27

28

---

25. Similar charges may have been brought by New Hampshire, but of course under New Hampshire law.

14

1    community-specific cases.  When the balance between the common facts and individual facts

2    reach a certain level, the courts have found that the benefits of transfer and consolidation are

3    outweighed by the burdens.  In *In re Gasoline Lessee Dealers Antitrust Litigation*, 479 F.Supp.

4    578, 580 (JPML 1979), for example, the Panel found that even though the actions pending before

5    it "share some questions of fact," the "individual rather than common factual questions

6    predominate," and given that "discovery and other pretrial proceedings concerning the common

7    factual questions would clearly be dwarfed by matters" of little or no interest to certain of the

8    parties, transfer was inappropriate. And in the case of *In re Sears, Roebuck & Co. Employment*

9    *Practices Litigation*, 487 F.Supp. 1362, 1364 (JPML 1980), the Panel refused to consolidate and

10   transfer after finding that "whatever common questions of fact ... may be involved in

11   determining these motions are simply insufficient, in our view, to overcome the overall

12   predominance of individual factual questions ...."[26] So, too, here.  While there are facts in

13   common, they do not outweigh those that are independent of one another.  The moving parties

14   have failed to establish that there is sufficient commonality to justify herding all of this litigation

15   into one courtroom.

16       **2.   The Moving Parties Have Failed to Establish that Transfer Would Best Serve
     the Convenience of Parties and Witnesses**

17

18       The second criterion focuses on whether transfer and consolidation will "conserve the

19   resources of the parties, their counsel and the judiciary." *In re Mirtazapine Patent Litigation*, 199

20   F.Supp.2d at 1381.  Stated more bluntly, "[t]he basic purpose underlying the enactment of 28

21   U.S.C. § 1407 was to secure, in multi-district civil litigation as in all other civil litigation, the 'just,

22   speedy and inexpensive determination of every action.' [citation]" *In re National Student*

23   *Marketing Litigation*, 368 F.Supp. 1311, 1316 (JPML 1973).

24       The moving parties made no attempt in their Notice to establish how transfer would best

25   serve the convenience of the parties and witnesses in this case, other than to apparently assume

26   that because of the "substantially similar nature of the allegations involved" convenience would be

27

28         26. See also *In re Grand Funk Railroad Trademark Litigation*, 371 F.Supp. 1084, 1085 (JPML 1974) (no
     benefit where "discovery will focus on localized factual issues.")

                           15

1  a given.  Notice at pages 2-3.  Obviously the People disagree that there is sufficient commonality

2  for the reasons stated above, but even if the moving parties had met their burden of proof on the

3  first criterion, "a mere showing that common questions of fact exist amongst the actions for which

4  Section 1407 treatment is proposed is not sufficient, in and of itself, to warrant transfer by the

5  Panel. The other criteria of the statute must also be satisfied." *In re Truck Accident Near*

6  *Alamagordo, New Mexico, on June 18, 1969*, 387 F.Supp. 732, 733 (JPML 1975).

7        Litigating this matter in New York may well serve the convenience of the moving parties,

8  but these same moving parties elected to enter the market in California.  Transfer of this action

9  across the country is neither convenient nor agreeable to the People of the State of California, a

10  sovereign whose dignitary interests are entitled to respect.  *Puerto Rico Aqueduct and Sewer*

11  *Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed. 2d 605 (1993).

12        **3.   The Moving Parties Have Failed to Establish that Transfer Would Promote the**
           **Just and Efficient Conduct of the Action**

13

14        The third criterion is the "most important.*" In re Tobacco/Governmental Health Care*

15  *Costs Litigation*, 76 F.Supp.2d at 8.  In analyzing whether transfer would promote the just and

16  efficient conduct of actions, the JPML considers primarily whether transfer and consolidation will

17  avoid duplicative discovery and prevent inconsistent pretrial rulings. See, e.g., *In re Mirtazapine*

18  *Patent Litigation*, 199 F.Supp.2d at 1381.

19        The moving parties in their Notice again made no effort to establish that this criterion has

20  been met, other than to apparently assume that because the actions share common facts transfer

21  and consolidation would of necessity serve to promote the just and efficient conduct of the action.

22  For the reasons set forth below, they are wrong.

23        **a.   The Risk of Duplicative Discovery is Minimal**

24        The moving parties have identified as the first common fact "whether defendants knew

25  about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing

26  its risks to downstream users, the federal government or the public." Notice at p. 2.  Discovery on

27  this question as to many, if not all, of the defendants in this action was largely completed in the

28  prior incarnation of MDL No. 1358, as well as in *South Tahoe Public Utility District v. Atlantic*

16

1  *Richfield Co.*, Cal. Super. Ct., S.F. Cty. Case No. 999128 and *Communities for a Better*

2  *Environment v. Unocal Corp.*, Cal. Super. Ct., S.F. Cty. Case No. 997013. See Declaration of

3  Victor M. Sher ("Sher Decl.") attached to Plaintiff California-American Water Company's Motion

4  to Vacate CTO-4, filed March 4, 2004, at ¶¶ 7-10, 12-13, 14-16, 19-20.[27] The same is true with

5  respect to expert discovery on the related question of whether MTBE is a defective product. *Id.*,

6  ¶¶ 10, 13, 15, 19-20. Overall, millions of pages of discovery have been produced and hundreds of

7  witnesses deposed. *Id.*, ¶¶ 8, 13, 15-16.

8          Moreover all of this discovery is, or could easily be made, readily available to all of the

9  parties. *Id.*, ¶¶ 11, 13, 17-18. For example, the document depository in the Transferee Court,

10  which still exists, was established with the specific purpose of making those documents available

11  to parties in other cases. *Id.*, ¶¶ 17-18, *In re MTBE Products Liability Litigation*, Confidentiality

12  Agreement & Order (S.D.N.Y. June 1, 2001).[28] The documents, depositions and trial testimony

13  from the *South Tahoe* and *CBE* cases can also be made available to the parties. Sher Decl., ¶¶ 11,

14  13.

15          In contrast the remaining "common fact" cited by the moving parties - "whether plaintiffs

16  sustained drinking water contamination as a result of MTBE contamination" - will revolve

17  primarily around localized and site-specific issues.  A number of examples come to mind.

18  Determining where releases of MTBE have been detected will require examination of records

19  maintained in Sacramento by the County Environmental Management Department and the

20  Regional Water Quality Control Board, among others, and the number of these sites - and their

21  corresponding files - may be in the hundreds.  Determining the damage done or threatened by

22  these releases and the potential remedies and costs of those remedies will require experts to

23  evaluate and model groundwater aquifers with their attendant flow rates and flow directions.

24  Determining the sources of the MTBE found at these sites will require document productions

25  from and depositions of station owners and operators in the county, along with the truckers and

26  terminals who supplied them, the pipeline owners and operators who supplied the terminals, and

27

28      27. A true and correct copy of which is attached as Exhibit 16.
        28. A true and correct copy of which is attached as Exhibit 17.

1   ultimately the refineries proper - in short, there will be extensive discovery regarding the gasoline

2   infrastructure in northern California generally and Sacramento in particular.  While the discovery

3   will be carried out locally, all of the litigation about the propriety and scope of that discovery will

4   - if the moving parties have their way - take place 3,000 miles away.  The People fail to see the

5   efficiency. Certainly the moving parties have not shown it. In fact, in denying class certification in

6   the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding

7   contamination of any particular well present "a factually unique set of circumstances," because

8   there are "differences in the level of contamination ... and the nature of relief that each will

9   require." *In re MTBE Products Liability Litigation*, 209 F.R.D. 323, 337, 344 (S.D. N.Y. 2002).

10         In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery

11   is largely complete and available. The discovery that remains will focus primarily on issues

12   specific to Sacramento County - issues which can be better handled in California.

13                    **b.**     **The Risk of Inconsistent Rulings is Minimal**

14         Another potential reason for transfer and consolidation is that it would reduce the risk of

15   inconsistent rulings.  The People submit that there is little risk of that in this case. First, it should

16   go without saying that where cases are dissimilar the rulings in one will likely be irrelevant to

17   another.  For the reasons set forth in section "B1" above, the People submit that this case is so

18   different from the others consolidated in MDL No. 1358 that the decisions made in this case will

19   have little bearing on the decisions in other cases - and vice versa.

20         In addition, just as discovery on common factual issues is already well advanced,

21   published opinions from a number of courts provide clear precedent that any district court can

22   adopt.  Indeed, the Transferee Court's prior rulings "provide a convenient expression of the

23   conclusions of the transferee judge which have been reached through [her] familiarity with the

24   litigation, and can serve as an aid in ... preventing inconsistent rulings." *In re AH Robins Co. Inc.*

25   *"Dalkon Shield" IUD Products Liability Litigation*, 505 F.Supp. 221, 223 (JPML 1981); see also

26   *In re Western Electric Co. Inc. Semiconductor Patent Litigation*, 436 F.Supp. 404, 406 (JPML

27   1977) (transfer unwarranted where transferee court's views on key legal issues were well

28   documented, and would put the other judge "closer to the shoes of the transferee judge").

1    In her ruling on defendants' motions to dismiss in the original set of cases transferred to

2  MDL No. 1358, Judge Scheindlin set forth a roadmap for handling these cases which other judges

3  can easily follow.  See *In re MTBE Products Liability Litigation*, 175 F.Supp. 2d 593 (S.D. N.Y.

4  2001). First, the Court rejected the defendants' federal preemption defense, *id.*, at 611-616,[29] as

5  has the Ninth Circuit and every other published opinion addressing this question.[30]  The

6  Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related

7  argument that defective product claims concerning MTBE require an impermissible

8  reexamination of EPA's cost-benefit analysis regarding MTBE. *Id.*, at 616-618, 623-625. The

9  Court further upheld the sufficiency of each of the common law tort claims asserted, including

10  claims alleging refiner liability under a theory of public nuisance. *Id.,* at 627-629.

11    With this extensive guidance already in place, the risk of inconsistent pretrial rulings on

12  these common legal questions is minimal. At the same time, any pretrial legal questions raised by

13  virtue of the People's sovereign status and the exercise of our police power are not shared by the

14  vast majority of the other plaintiffs. These questions are best addressed by a court with more

15  experience and familiarity with California law. Thus, the benefits of permitting this case to

16  proceed in California outweigh the benefits (if any) of transfer. See *In re Grand Funk Railroad*

17  *Trademark Litigation*, 371 F.Supp. at 1085 ("the Panel must weigh any benefit that transfer would

18  provide in the way of eliminating the possibility of inconsistent pretrial decisions against the

19  efficient administration of the litigation as a whole"). Accordingly, CTO-5 should be vacated.

20

21

22

---

23    29.  Judge Scheindlin recently determined that a "colorable" claim of preemption was raised by defendants
   in the context of a motion to remand in her court in *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability*

24  *Litigation*, 2004 U.S. Dist. LEXIS 4068, *29-30 (S.D. N.Y. March 16, 2004). Given the lower burden of proof
   involved at the remand level the People do not anticipate that this ruling will much affect her ultimate ruling on

25  whether the defense is viable.
      30.  See *Oxygenated Fuels Association v. Davis ("Davis II")*, 331 F.3d 665 (9th Cir. 2003), *affirming*

26  *Oxygenated Fuels Association v. Davis ("Davis I")*, 163 F.Supp.2d 1182 (E.D. Cal. 2001), *ExxonMobil Corp. v.*
   *United States Environmental Protection Agency*, 217 F.3d 1246 (9th Cir. 2000), *Oxygenated Fuels Association v.*

27  *Pataki*, 158 F.Supp. 2d 248 (N.D. N.Y. 2001), *Oxygenated Fuels Association v. Pataki*, 293 F.Supp. 170 (N.D.
   N.Y. 2003), see also *Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002).

28

1

2

## III. CONCLUSION

For the reasons stated above the People of the State of California submit that this Court lacks jurisdiction to issue a Transfer Order in this case, and in consequence should vacate CTO-5 on the grounds of lack of jurisdiction. Alternatively, the People submit that the parties moving to transfer this matter to New York have failed to meet their burden pursuant to 28 U.S.C. § 1407(a), and in consequence CTO-5 should be vacated on the merits.

DATED: 3/22          , 2004

Respectfully submitted,

JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By:   RUSS DETRICK
Supervising Deputy District Attorney
Consumer & Environmental
Protection Division, Sacramento Office
of the District Attorney
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660
Attorney for Plaintiff
The People of the State of California

20

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 5 2004

FILED
CLERK'S OFFICE

1
2
3
4
5
6
7
8
9
10

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11

| | |
|---|---|
| IN RE:<br><br>METHYL BUTYL TERTIARY ETHER ("MTBE")<br>PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1358<br><br>This Document Relates to *The*<br>*People of the State of California, et*<br>*al., v. Atlantic Richfield Co., et al.,*<br>Case No. 03-2653 (E.D. Cal.)<br><br>STATEMENT OF REASONS WHY<br>ORAL ARGUMENT SHOULD BE<br>HEARD (CTO-5) |

12
13
14
15
16
17

18    Plaintiff the People of the State of California, a plaintiff in the action entitled *The People*

19 *of the State of California, et al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.),

20 hereby requests that oral argument be heard on its Motion to Vacate CTO-5, submitted herewith,

21 for the following reasons:

22    1.    Almost six months have passed since this action was filed in state court in our

23          community.  In that time we have not been given the opportunity to speak to a

24          judge or see the inside of a courtroom.

25    2.    We have been removed to federal court in the Eastern District of California and

26          thereafter transferred between judges within the Eastern District.

27

28

1

3.  Each time we received notice of transfer to a different judge in the Eastern District we have filed a new notice and renewed our motion seeking remand back to state court, none of which have been heard.

4.  We opposed defendants' ex parte motion for a stay of our remand motions filed in the Eastern District, again receiving notice that our case had been transferred without a hearing.

5.  We now find ourselves in the posture of being compelled to litigate this action, which is specific to our community, literally across the continent.

6.  As a sovereign representing a large and diverse community, seeking remedies under California law for violations occurring in our community and affecting our citizens, we should have a voice and the right for that voice to be heard.

DATED: 3/22 , 2004

Respectfully submitted,
JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By: _____

RUSS DETRICK
Supervising Deputy District Attorney
Consumer & Environmental
Protection Division, Sacramento Office
of the District Attorney
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660
Attorney for Plaintiff
The People of the State of California

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 5 2004

FILED
CLERK'S OFFICE

1

2

3

4

5

6

7

8

9

10 **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11

12 IN RE:

MDL Docket No. 1358

13 METHYL BUTYL TERTIARY ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

This Document Relates to *The People of the State of California, et al., v. Atlantic Richfield Co., et al.,*
14 Case No. 03-2653 (E.D. Cal.)

15 Schedule CTO-5 (Rule 7.2(a)(ii))

16

17 SCHEDULE

18 (A)   Parties

19      The People of the State of California; City of Elk Grove; Sacramento County Water

20 Agency; Sacramento Groundwater Authority; Citrus Heights Water District; Del Paso Manor

21 Water District; Fair Oaks Water District; Florin Resource Conservation District; Rio Linda

22 Elverta Community Water District; San Juan Water District; California-American Water

23 Company; City of Sacramento; Sacramento Suburban Water District v. Atlantic Richfield

24 Company; BP Products North America, Inc.; ChevronTexaco Corporation; Chevron USA Inc.;

25 Citgo Petroleum Corporation; ConocoPhillips Company; Equilon Enterprises LLC; Exxon Mobil

26 Corporation; Shell Oil Company; Shell Oil Products U.S.; Tesoro Refining and Marketing

27 Company; Texaco Refining and Marketing, Inc.; Ultramar, Inc.; Unocal Corporation,

28 Individually and Formerly Known as Union Oil Company of California; Valero Energy

1

1  Corporation; Lyondell Chemical Company, Individually and Formerly Known as Arco Chemical

2  Company; Circle K Stores Inc.; 7-Eleven, Inc.; and Does 1-1000, Inclusive.

3  (B)     District Court and Division

4          The Eastern District of California, Division Two

5  (C)     Civil Action Number

6          03-2653 GEB DAD

7  (D)     Judge Assigned

8          Hon. Garland E. Burrell, Jr.

9

10  DATED: __3/23__, 2004

     Respectfully submitted,
     JAN SCULLY, DISTRICT ATTORNEY
     ALBERT LOCHER,

11   Assistant Chief Deputy District Attorney

12

13

         By:     _____

14               RUSS DETRICK
                 Supervising Deputy District Attorney

15               Consumer & Environmental
                 Protection Division, Sacramento Office

16               of the District Attorney
                 906 G Street, Suite 700

17               Sacramento, CA 95814
                 Telephone: (916) 874-6174

18               Facsimile: (916) 874-7660
                 Attorney for Plaintiff

19               The People of the State of California

20

21

22

23

24

25

26

27

28

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 25 2004

FILED
CLERK'S OFFICE

1          CERTIFICATE OF SERVICE

2   STATE OF CALIFORNIA          )
                                 )   ss
3   COUNTY OF SACRAMENTO         )

4          I am a citizen of the United States and a resident of the County of Sacramento; I am over the

5   age of eighteen years and not a party to the within above-entitled action; my business address is 906

6   G Street, Suite 700, Sacramento, California, 95814.

7          On March 23, 2004, I served the foregoing document(s) described as:

8   **MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**
    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO**
9   **VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**
    **DECLARATION OF RUSS DETRICK IN SUPPORT OF MOTION TO VACATE**
10  **CONDITIONAL TRANSFER ORDER (CTO-5), WITH ATTACHED EXHIBITS**
    **STATEMENT OF REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD**
11  **(CTO-5)**
    **SCHEDULE CTO-5 (RULE 7.2(a)(ii))**
12
    on the party(s) in this action as follows:
13
14     ☒   (Mail) placing a true copy thereof enclosed in a sealed envelope with postage thereon fully
           prepaid in the United States mail at Sacramento, California, to:

15                        Please see attached Service List

16     ☒  (By Federal Express) placing a true copy thereof enclosed in a sealed envelope, prepaid and
           deposited with the Federal Express carrier-box at Sacramento, California.
17
18                        Clerk of the Panal
                          Judicial Panal on Multidistrict Litigation
19                        Thurgood Marshall Federal Judiciary Building
                          One Columbus Circle, N.E., Room G-255, North Lobby
20                        Washington, D.C. 20002-8004

21     ☐   (By Personal Service) delivering by hand and leaving a true copy with the person and/or
           secretary at the address shown above.

22     ☐  (By Facsimile) placing a true copy thereof into a facsimile machine addressed as stated above
           to said person and thereafter confirming the receipt of same
23
24     ☒  (Federal) I declare that I am employed in the office of the bar of this court at whose direction
           the service as made.

25         I declare under penalty of perjury under the laws of the State of California that the

26  foregoing is true and correct.

27                                     1
28

1   Executed on March 23, 2004, at Sacramento, California.

2   _Valerie Crow_

3   VALERIE CROW

MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5), Case No. 03-cv-2653 GEB DAD

# MASTER CTO-5 SERVICE LIST
## (Updated 3/10/04)

JON D ANDERSON
LATHAM & WATKINS
650 TOWN CENTER DR STE 2000
COSTA MESA CA 92626
**ATTORNEYS FOR TOSCO CORPORATION, CONOCO PHILLIPS COMPANY**

RONIT C BARRETT
EIMER STAHL KLEVON & SOLBERG LLP
224 S MICHIGAN AVENUTE STE 1100
CHICAGO IL 60604
**ATTORNEYS FOR CITGO PETROLEUM CORP., and CITGO REFINING and CHEMICAL INC.**

PATRICK E CAFFERTY JR
MUNGER TOLLES & OLSON
355 S GRAND AVE 35TH FL
LOS ANGELES CA 90071-1560
**ATTORNEYS FOR SHELL OIL COMPANY, SHELL OOIL PRODUCTS US, TEXACO REFINING and MARKETING INC., EQUILON ENTERPRISES LLC**

LAWRENCE ALLEN COX
ARNOLD & PORTER
777 S FIGUEROA ST 44TH FL
LOS ANGELES CA 90017-2513
**ATTORNEYS FOR ATLANTIC RICHFIELD COMPANY, BP PRODUCTS NOT\RTH AMERICA INC.**

MINDY G DAVIS
HOWREY SIMON ARNOLD & WHITE LLP
1299 PENNSYLVANIA AVE N W
WASHINGTON DC 20004-2402
**ATTORNEYS FOR AMERADA HESS CORPORATION, COASTAL EAGLE POINT OIL COMPANYCOASTAL MOBIL REFINING COMPANY, COASTAL STATES TRADING INC., COASTAL REFINING AND MARKETING, EL PASO CGP COMPANY and EL PASO CORPORATION**

CRAIG J DeRECAT
MANATT PHELPS & PHILLIPS
11355 W OLYMPIC BLVD
LOS ANGELES CA 90064-1614
**USA GASOLINE CORPORATION**

BRENDAN M DIXON
UNOCAL CORP
376 S VALENCIA AVE
BREA CA 92626
**ATTORNEYS FOR UNOCAL CORPORATION, UNION OIL COMPANY OF CALIFORNIA**

ROBERT P. DOTY, ESQ.
COX, CASTLE & NICHOLSON, LLP
555 MONTGOMERY STREET, 15TH FLOOR
SAN FRANCISCO, CA 94111-2585
**ATTORNEYS FOR DUKE ENERGY MERCHANTS LLC, DUKE ENERGY TRADING and MARKETING LLC, DUKE ENERGY MERCHANTS CALIFORNIA INC., NORTHRIDGE PETROLEUM MARKETING U.S. INC.**

COLLEEN P DOYLE
MCCUTCHEN DOYLE BROWN & ENERSEN
355 S GRAND AVE STE 4400
LOS ANGELES CA 90071-1560
**ATTORNEYS FOR EXXON MOBIL CORPORATION, MOBIL CORPORATION, TESORO REFINING and MARKETING INC.**

NATHAN P EIMER
EIMER STAHL KLEVON & SOLBERG
224 S MICHIGAN AVE STE 1100
CHICAGO IL 60603
**ATTORNEYS FOR CITGO PETROLEUM CORP., and CITGO REFINING and CHEMICAL INC.**

TAYLOR M FLORENCE
BULLIVANT HOUSER BAILEY ET AL
11335 GOLD EXPRESS DR STE 105
GOLD RIVER CA 95670-4491
**SIERRA ENERGY & TOMS SIERRA COMPANY**

PAMELA R HANEBUTT
EIMER STAHL KLEVON & SOLBERG LLP
224 S MICHIGAN AVE STE 1100
CHICAGO IL 60604
**ATTORNEYS FOR CITGO PETROLEUM CORP., and CITGO REFINING and CHEMICAL INC.**

MATTHEW T HEARTNEY
ARNOLD & PORTER LLP
777 S FIGUEROA ST 44TH FL
LOS ANGELES CA 90017
**ATTORNEYS FOR ATLANTIC RICHFIELD COMPANY, BP PRODUCTS NOT\RTH AMERICA INC.**

ALAN J HOFFMAN JR
BLANK ROME LLP
ONE LOGAN SQUARE
18TH & CHERRY STREETS
PHILADELPHIA PA 19103-6998
**ATTORNEYS FOR ARCO CHEMICAL COMPANY, LYONDELL CHEMICAL COMPANY**

HOJOON HWANG
MUNGER TOLLES & OLSON LLP
33 NEW MONTGOMERY ST 19TH FL
SAN FRANCISCO CA 94105
**ATTORNEYS FOR SHELL OIL COMPANY, SHELL OOIL PRODUCTS US, TEXACO REFINING and MARKETING INC., EQUILON ENTERPRISES LLC**

JOSEPH CONRAD KEARFOTT
HUNTON & WILLIAMS
RIVERFRONT PLAZA EAST TOWER
951 EAST BYRD STREET
RICHMOND VA 23219
**ATTORNEYS FOR KOCH INDUSTRIES INC.**

BEN M KROWICKI
BINGHAM McCUTCHEN LLP
ONE STATE STREET
HARTFORD CT 06103-3178
**ATTORNEYS FOR CROWN CENTRAL PETROLEUM CORP., TESORO PETRO CORPORATION, TESORO REFINING and MARKETING and TESORO WEST COAST**

JOHN J LYONS
LATHAM & WATKINS
650 TOWN CENTER DR STE 2000
COSTA MESA CA 92626-1925
**ATTORNEYS FOR TOSCO CORPORATION, CONOCO PHILLIPS COMPANY**

CHRISTOPHER J McNEVIN
PILLSBURY WINTHROP LLP
725 S FIGUEROA ST STE 2800
LOS ANGELES CA 90017-2513
**CITGO PETROLEUM CORPORATION**

CATHERINE NOEL MITCHELL
MORGAN LEWIS & BOCKIUS LLP
300 S GRAND AVE 22ND FL
LOS ANGELES CA 90071-3132
**ATTORNEYS FOR CHEVRON USA INC., TEXACO INC., CHEVRON TEXACO CORPORATION, CHEVRON ENVIRONMENTAL SERVICES COMPANY**

JEFFREY JOHN PARKER
SHEPPARD MULLIN RICHTER & HAMPTON
333 S HOPE ST STE 4800
LOS ANGELES CA 90071-1448
**EXXON MOBIL CORPORATION, EXXON MOBIL OIL CORPORATION, EXXON MOBIL CHEMICAL COMPANY, EXXON MOBIL PIPELINE COMPANY and MOBIL CORPORATION**

MORRIS A RATNER
LIEFF CABRASER HEIMANN & BERNSTEIN
780 THIRD AVE 48TH FL
NEW YORK NY 10017

LILA PANKEY RAY
BAKER & BOTTS
1299 PENNSYLVANIA AVE N W
WASHINGTON DC 20004-2400
**ATTORNEYS FOR MARATHON ASHLAND PETROLEUM LLC and MARATHON OIL CORPORATION**

TRACIE J RENFROE
BRACEWELL & PATTERSON
S TOWER PENNZOIL PL STE 2900
711 LOUISIANA ST
HOUSTON TX 77002
**ATTORNEYS FOR ALON USA ENERGY INC., ALON USA LP, DIAMOND SHAMROCK REFINING and MARKETING, FINA OIL and CHEMICAL COMPANY, ULTRAMAR INC., VALERO ENERGY CORPORATION, VALERO MARKETING and SUPPLY COMPANY, VALERO REFINING and MARKETING COMPANY, VALERO-COLORADO REFINING COMPANY, VALERO REFINING COMPANY, VALERO REFINING COMPANY-CALIFORNIA, VALERO REFINING COMPANY NEW JERSEY, VALERO REFINING COMPANY LOUISIANA, VALERO REFINING COMPANY TEXAS, ULTRAMAR ENERGY INC.**

## MASTER CTO-5 SERVICE LIST
### (Updated 3/10/04)

EDWARD ROMERO
GREENAN, PEFFER, SALLANDER & LALLY
TWO ANNABEL LANE, STE. 200
P.O. BOX 10
SAN RAMON, CA 94583
**BLUE STAR PETROLEUM INC., and FUEL
STAR INC.**

DAVID L SCHRADER
MORGAN LEWIS & BOCKIUS
300 S GRAND AVE 22ND FL
LOS ANGELES CA 90071-3132
**ATTORNEYS FOR CHEVRON USA INC.,
TEXACO INC., CHEVRON TEXACO
CORPORATION, CHEVRON
ENVIRONMENTAL SERVICES COMPANY**

VICTOR  M SHER
SHER & LEFF
450 MISSION STREET, SUITE 500
SAN FRANCISCO, CA 94105
**ATTORNEYS FOR CALIFORNIA-
AMERICAN WATER COMPANY,
CARMICHAEL WATER DISTRICT, CITRUS
HEIGHTS WATER DISTRICT, CITY OF
ELK GROVE, CITY OF RIVERSIDE, CITY
OF ROSEVILLE, CITY OF SACRAMENTO,
DEL PASO MANOR WATER DISTRICT,
FAIR OAKS WATER DISTRICT, FLORIN
RESOURCE CONSERVATION DISTRICT,
MARTIN SILVER, et al., QUINCY
COMMUNITY SERVICES DISTRICT, RIO
LINDA ELVERTA COMMUNITY WATER
DISTRICT, SACRAMENTO COUNTY
WATER AGENCY, SACRAMENTO
GROUNDWATER AUTHORITY,
SACRAMENTO SUBURBAN WATER
DISTRICT, SAN JUAN WATER DISTRICT,
ORANGE COUNTY WATER DISTRICT and
STATE OF NEW HAMPSHIRE**

ALISON N SHUE
MORGAN LEWIS & BOCKIUS
300 S GRAND AVE 22ND FL
LOS ANGELES CA 90071-3132
**ATTORNEYS FOR CHEVRON USA INC.,
TEXACO INC., CHEVRON TEXACO
CORPORATION, CHEVRON
ENVIRONMENTAL SERVICES COMPANY**

CATHERINE M STITES
BINGHAM McCUTCHEN LLP
355 S GRAND AVE STE 4400
LOS ANGELES CA 90071-3106
**ATTORNEYS FOR EXXON MOBIL
CORPORATION, MOBIL CORPORATION,
TESORO REFINING and MARKETING INC.**

WILLIAM D TEMKO
MUNGER TOLLES & OLSON
355 S GRAND AVE 35TH FL
LOS ANGELES CA 90071-1560
**ATTORNEYS FOR SHELL OIL COMPANY,
SHELL OOIL PRODUCTS US, TEXACO
REFINING and MARKETING INC.,
EQUILON ENTERPRISES LLC**

PETER JOHN WILSON
LATHAM & WATKINS
650 TOWN CENTER DR STE 2000
COSTA MESA CA 92626
**ATTORNEYS FOR TOSCO CORPORATION,
CONOCO PHILLIPS COMPANY**

CHRISTOPHER F  WONG
BRYAN CAVE LLP
120 BROADWAY STE 300
SANTA MONICA CA 90401
**PREMCOR INC., and THE PREMCOR
REFINING GROUP INC.**

MICHAEL T ZARRO
MORGAN LEWIS & BOCKIUS
300 GRAND AVE 22ND FL
LOS ANGELES CA 90071-3132
**ATTORNEYS FOR CHEVRON USA INC.,
TEXACO INC., CHEVRON TEXACO
CORPORATION, CHEVRON
ENVIRONMENTAL SERVICES COMPANY**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 25 2004

FILED
CLERK'S OFFICE

1

2

3

4

5

6

7

8

9

10       **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11

| | |
|---|---|
| IN RE:<br><br>METHYL BUTYL TERTIARY ETHER ("MTBE")<br>PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1358<br><br>This Document Relates to *The People of the State of California, et al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.)<br><br>DECLARATION OF RUSS DETRICK IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5), WITH ATTACHED EXHIBITS |

12

13

14

15

16

17

18

19   I, RUSS DETRICK, declare:

20       1.     A true and correct copy of the First Amended Complaint, filed on October 31,

21 2003, is attached as Exhibit 1.

22       2.     A true and correct copy of the Defendants' Notice of Removal, filed on or about

23 December 8, 2003, is attached as Exhibit 2.

24       3.     A true and correct copy of the Notice of Motion and Motion to Remand, filed on

25 December 15, 2003, is attached as Exhibit 3.

26       4.     A true and correct copy of the Notice of Motion and Motion for Temporary Stay

27 Pending Transfer, dated December 18, 2003, is attached as Exhibit 4.

28

RECEIVED
CLERK'S OFFICE
MAR 25 2004

1

5.      A true and correct copy of the Ex Parte Application for Order Continuing Hearing Presently Scheduled for February 23, 2004 on Plaintiff's Motion for Remand and Extending Time for Briefing, filed January 29, 2003, is attached as Exhibit 5.

6.      A true and correct copy of the Notice of Related Tag-Along Actions, filed December 21, 2003, is attached as Exhibit 6.

7.      A true and correct copy of the Reporter's Transcript for MDL No. 1358, dated December 19, 2001, is attached as Exhibit 7.

8.      A true and correct copy (with attachment) of the Order issued by Judge Shira A. Scheindlin concerning MDL No. 1358, dated December 23, 2003, is attached as Exhibit 8.

9.      A true and correct copy of the Plaintiff's letter of objection, dated January 5, 2004, is attached as Exhibit 9.

10.     A true and correct copy of the Plaintiff's letter of objection, dated January 27, 2004, is attached as Exhibit 10.

11.     A true and correct copy of the Defendant's letter of objection, dated January 5, 2004, is attached as Exhibit 11.

12.     A true and correct copy of the Memorandum of Points and Authorities in Opposition to Defendants' Ex Parte Motion for Continuance, filed January 30, 2004, is attached as Exhibit 12.

13.     A true and correct copy of the Plaintiffs' Opposition to Defendants' Ex Parte Application for Order Continuing February 23, 2004 Hearing on Plaintiffs' Motion to Remand, filed January 30, 2004, is attached as Exhibit 13.

14.     A true and correct copy of the Plaintiffs' Opposition to Defendants' Motion to Stay Proceedings; Declaration of Victor M. Sher in Support Thereof, filed on February 6, 2004, is attached as Exhibit 14.

15.     A true and correct copy of the Order issued by Judge Garland E. Burrell, Jr., concerning CV S-03-2653 GEB DAD, filed February 6, 2004, is attached as Exhibit 15.

16.   A true and correct copy of the Declaration of Victor M. Sher in Support of Plaintiff California-American Water Company's Motion to Vacate Conditional Transfer Order (CTO-4), dated March 4, 2004, is attached as Exhibit 16.

17.   A true and correct copy of the  Confidentiality Agreement and Order concerning MDL No. 1358, filed June 1, 2001, is attached as Exhibit 17.

DATED: 3/22        , 2004

Respectfully submitted,
JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER,
Assistant Chief Deputy District Attorney


By: _____
RUSS DETRICK
Supervising Deputy District Attorney
Consumer & Environmental
Protection Division, Sacramento Office
of the District Attorney
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660
Attorney for Plaintiff
The People of the State of California

3

# Exhibit 1

1  JAN SCULLY, District Attorney
   ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616
2  RUSS DETRICK, Supervising Deputy District Attorney SBN 119255
   SACRAMENTO COUNTY DISTRICT ATTORNEY
3  Environmental Protection Division
   906 G Street, Suite 700
4  Sacramento, CA 95814
   Telephone: (916) 874-6174
5  Facsimile: (916) 874-7660

6  Attorneys for Plaintiff the People of the State of California

7  Victor M. Sher, SBN 96197
   Todd E. Robins SBN 191853
8  SHER & LEFF, LLP
   450 Mission Street, 5th floor
9  San Francisco, CA 94105
   Telephone: (415) 348-8300
10 Facsimile: (415) 348-8333

11 Scott Summy, *Admitted in Texas*
   Celeste A. Evangelisti, SBN 225232
12 BARON & BUDD, P.C.
   3102 Oak Lawn Avenue, Suite 1100
13 Dallas, TX 75219-4281
   Telephone: (214) 523-6267
14 Facsimile: (214) 520-1181

15 Attorneys for Plaintiffs, City of Elk Grove, Sacramento County Water Agency, Sacramento
16 Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso
   Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio
17 Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water
   District, California-American Water Company and City of Sacramento.

18 **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

19 **IN AND FOR THE COUNTY OF SACRAMENTO**

20

21 THE PEOPLE OF THE STATE OF CALIFORNIA;          )   CASE NO. 03AS05452
   CITY OF ELK GROVE; SACRAMENTO COUNTY           )
22 WATER AGENCY; SACRAMENTO                        )   **FIRST AMENDED**
   GROUNDWATER AUTHORITY; CARMICHAEL             )   **COMPLAINT FOR CIVIL**
23 WATER DISTRICT; CITRUS HEIGHTS WATER          )   **PENALTIES, INJUNCTION,**
   DISTRICT; DEL PASO MANOR WATER DISTRICT;      )   **DAMAGES, AND OTHER**
24 FAIR OAKS WATER DISTRICT; FLORIN              )   **RELIEF (MTBE AND TBA**
   RESOURCE CONSERVATION DISTRICT; RIO           )   **CONTAMINATION):**
25 LINDA ELVERTA COMMUNITY WATER                 )   (1) PUBLIC NUISANCE;
   DISTRICT; SACRAMENTO SUBURBAN WATER          )   (2) DECLARATORY RELIEF;
26 DISTRICT; SAN JUAN WATER DISTRICT;            )   (3) HEALTH & SAFETY CODE;
   CALIFORNIA-AMERICAN WATER COMPANY;           )   (4) FISH & GAME CODE;
27 CITY OF SACRAMENTO.                            )   (5) BUSINESS &
                                                  )   PROFESSIONS CODE;
                                                  )   (6) CIVIL CONSPIRACY;
           Plaintiffs,                            )   (7) STRICT LIABILITY;
28         vs.                                    )   (8) NEGLIGENCE;

[Exempt
from filing
and motion
fees, Govt'l
Code
§ 6103]

1  ATLANTIC RICHFIELD COMPANY; BP PRODUCTS
   NORTH AMERICA, INC.; CHEVRONTEXACO
2  CORPORATION; CHEVRON U.S.A. INC.; CITGO
   PETROLEUM CORPORATION; CONOCOPHILLIPS
3  COMPANY;  EQUILON ENTERPRISES LLC;
   EXXON MOBIL CORPORATION;  SHELL OIL
4  COMPANY; SHELL OIL PRODUCTS U.S.; TESORO
   REFINING AND MARKETING COMPANY;
5  TEXACO REFINING AND MARKETING, INC.;
   ULTRAMAR, INC; UNOCAL CORPORATION,
6  INDIVIDUALLY AND FORMERLY KNOWN AS
   UNION OIL COMPANY OF CALIFORNIA; VALERO
7  ENERGY CORPORATION; LYONDELL CHEMICAL
   COMPANY, INDIVIDUALLY AND FORMERLY
8  KNOWN AS ARCO CHEMICAL COMPANY;
   CIRCLE K STORES INC.; 7-ELEVEN, INC.; AND
9  DOES 1-1000, INCLUSIVE.

10          Defendants.

(9) TRESPASS;
(10) WATER CODE; and
(11) CIVIL CODE.

**JURY TRIAL DEMANDED**

11

12        The PEOPLE OF THE STATE OF CALIFORNIA, by and through JAN SCULLY,

13  District Attorney of Sacramento; Plaintiffs, the City of Elk Grove, Sacramento County Water

14  Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus Heights Water

15  District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation

16  District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San

17  Juan Water District, California-American Water Company, and the City of Sacramento, based on

18  information and belief and investigation of counsel, except for information based upon personal

19  knowledge, hereby allege the following.

20                    **SUMMARY OF THE CASE**

21        1.        Plaintiffs bring this action to protect the groundwater of Sacramento County from oil

22  industry pollution.  Plaintiffs seek abatement of the public nuisance created by Defendants'

23  conduct; civil penalties for Defendants' violations of state laws; injunctive relief enjoining

24  Defendants from further creation of public nuisance and further violations of the law; recovery of

25  all costs of assessment and  remediation of injury to any natural resource necessitated by

26  Defendants' unlawful conduct; and punitive and all other damages, including all necessary funds

27  to investigate, assess, monitor, prevent, abate, treat and contain any methyl tertiary butyl ether

28

1   (hereinafter, "MTBE") [1] and/or tertiary butyl alcohol (hereinafter, "TBA") contamination of, or

2   pollution to the Groundwaters of the County and/or their drinking water supplies.

### I.

### JURISDICTION AND VENUE

5       2.    The California Superior Court has jurisdiction over this action pursuant to

6   California Constitution Article VI, Section 10, which grants the Superior Court "original

7   jurisdiction in all cases except those given by statute to other trial courts." The statutes under

8   which this action is brought do not grant jurisdiction to any other trial court.

9       3.    Defendants have transacted and do transact business at various locations

10  throughout the county of Sacramento and/or within the State of California. The violations of law

11  hereinafter described were committed wholly or in part within Sacramento County.

12      4.    The actions of Defendants, and each of them, as alleged herein, are in violation of

13  the laws and public policies of the State of California and are unlawful and inimical to the rights

14  and interests of the general public, and those of the named plaintiffs, and create an unreasonable

15  risk of harm to the environment.

16      5.    Venue of this action in this county is mandated by California Health & Safety

17  Code § 25182 and California Business & Professions Code §§ 17206.

### II.

### THE PARTIES: PLAINTIFFS

### A.  THE PEOPLE OF THE STATE OF CALIFORNIA

21      6.    Plaintiff, JAN SCULLY, District Attorney of Sacramento County, based on

22  information and belief, except for information based upon personal knowledge, and acting to

23  protect the environment from degradation and pollution and the public from health and safety

24  hazards, caused by oil industry contamination and pollution of the groundwater supply; and to

25  protect California consumers and lawful businesses from unfair, unlawful or fraudulent business

26  practices, brings this action in the public interest and in the name of THE PEOPLE OF THE

27

28  [1] The term "MTBE" will be used herein to refer to methyl tertiary butyl ether and its degradation by-products.

STATE OF CALIFORNIA.

7.     The District Attorney is authorized to bring this action pursuant to <u>California</u> <u>Code of Civil Procedure section 731</u>, <u>California Civil Code section 3494</u>; <u>California Health &</u> <u>Safety Code sections 25182, 25183</u>; <u>California Fish and Game Code sections 5650 and</u> <u>5650.1(d)</u>; <u>California Business and Professions Code sections 17200 – 17208, 17535, 17536</u> and other applicable laws, statutes, and regulations.

8.     By this action the District Attorney seeks to obtain abatement of each and every public nuisance caused by Defendants' conduct (<u>Code Civ. Pro. § 731</u>, <u>Civ. Code § § 3480,</u> <u>3494</u>); civil penalties for each and every one of Defendants' violations of state laws regulating the management of hazardous wastes (<u>Health & Saf. Code §§ 25189, 25189.2</u>); the protection of Waters of the State from petroleum and residuary petroleum substances (<u>Fish & Game Code §</u> <u>5650</u>); the protection of California consumers from untrue or misleading misrepresentations (<u>Bus. & Prof. Code § 17500</u>) and untrue, deceptive and/or misleading environmental marketing claims (<u>Bus. & Prof. Code § 17580.5</u>); the protection of California consumers and lawful California businesses from unlawful, unfair or fraudulent business acts and unfair competition (<u>Bus. & Prof. Code § 17200 et seq.</u>); and Defendants' agreements to commit these wrongful acts.

9.     Pursuant to <u>Health & Saf. Code § 25189.1</u>, the District Attorney also seeks all assessment costs to assess injury to, degradation or destruction of, or any loss of any natural resource resulting from Defendants' unlawful disposal of hazardous waste; and all costs to restore, rehabilitate, replace or acquire the equivalent of any natural resource injured, degraded, destroyed or lost as a result of Defendants' unlawful disposal of hazardous waste.

10.     The District Attorney further seeks to enjoin Defendants from violating the foregoing statutory schema, enacted to protect the natural resources and environment of the state from contamination, pollution and nuisance; to enjoin Defendants from making untrue, deceptive and misleading statements and environmental marketing claims; and to enjoin Defendants from committing unlawful, unfair and fraudulent business acts and/or practices, as alleged herein.

**B.     THE CITY PLAINTIFFS**

11.     Plaintiff CITY OF ELK GROVE is a municipal corporation in Sacramento

County whose property and/or other interests have been adversely affected by the contamination of the Groundwaters of the County. There are approximately 28,800 acres of land overlying groundwater within the City of Elk Grove. MTBE and/or TBA contamination of groundwater within or affecting the City of Elk Grove constitutes injury to such waters for which the City is entitled to, and hereby does, seek damages, recovery of costs and other appropriate relief.

12.     Plaintiff CITY OF SACRAMENTO is a municipal corporation in Sacramento County whose property and/or other interests have been adversely affected by the contamination of the Groundwaters of the County. There are approximately 63,000 acres of land overlying groundwater within the City of Sacramento. The City of Sacramento supplies drinking water to residents, businesses and other users within its borders. Among other things, the City of Sacramento has the right to, and in fact does, appropriate from and use the Groundwaters of the County for drinking water supplies. The City of Sacramento has a significant property interest in the Groundwaters of the County. MTBE and/or TBA contamination of groundwater within or affecting the City of Sacramento constitutes injury to such waters for which the City of Sacramento is entitled to, and hereby does, seek damages, recovery of costs and other appropriate relief.

13.     The Plaintiffs identified in paragraphs 11 and 12 will be collectively referred to herein as the "City Plaintiffs".

### C.     THE WATER AGENCY PLAINTIFFS

14.     Plaintiff, SACRAMENTO COUNTY WATER AGENCY ("SCWA"), was created in 1952 by a special legislative act of the State of California, the Sacramento County Water Agency Act. SCWA owns and operates a public drinking water system in the County that supplies drinking water to residents, businesses and other users in the County. Among other things, SCWA has the right to, and in fact does, appropriate from and use the Groundwaters of the County for drinking water supplies. SCWA has a significant property interest in the Groundwaters of the County, and has the power to do any and every lawful act necessary to be done that sufficient water may be available for any present or future beneficial use or uses of the lands or inhabitants within the County.

15.     In addition to its property and other rights and interests as a purveyor of drinking water, SCWA is a public regulator, custodian and/or manager of the drinking water resources, including groundwater, within or affecting the County. SCWA brings this action to protect its own rights and interests as a purveyor of drinking water, and, in a representative capacity, to protect the rights of all of the landowners and other users of water in the County. There are approximately 5,000 acres of land overlying groundwater and (enjoying water rights therein) within the territory of SCWA. MTBE and/or TBA contamination of groundwater within or affecting the County constitutes injury to such waters for which SCWA is entitled to, and hereby does, seek damages, recovery of costs and other appropriate relief.

16.     Plaintiff SACRAMENTO GROUNDWATER AUTHORITY ("SGA") is a joint powers authority created pursuant to the Joint Exercise of Powers Act in 1998, to collectively manage the Sacramento region's North Area Groundwater Basin, which includes all of Sacramento County north of the American River. SGA was formed pursuant to a joint powers agreement entered into by the County of Sacramento and the cities of Citrus Heights, Folsom, and Sacramento. Its Board of Directors includes representatives of local water purveyors (including water districts and water companies), as well as agricultural and industrial pumpers, and SGA represents the interests of all of these entities through its groundwater management programs.

17.     Plaintiff, CARMICHAEL WATER DISTRICT ("CWD"), is an Irrigation District established pursuant to Water Code section 20500 et seq. CWD owns and operates a public drinking water system in the County that supplies drinking water to residents, businesses and other users in the County. Among other things, CWD has the right to, and in fact does, appropriate from and use the Groundwaters of the County for drinking water supplies. CWD has a significant property interest in the Groundwaters of the County, and is authorized to commence and maintain any action or proceeding involving or affecting the ownership or use of waters or water rights within the district used or useful for any purpose of the district or of benefit to any land. CWD is also authorized to commence and maintain actions and proceedings to prevent

1   interference with any natural subterranean supply of waters which may (a) be used or be useful

2   for any purpose of the district or (b) be of common benefit to the land or its inhabitants.

3         18.    In addition to its property and other rights and interests as a purveyor of drinking

4   water, CWD is a public regulator, custodian and/or manager of the drinking water resources,

5   including groundwater, within or affecting the district.  CWD brings this action to protect its own

6   rights and interests as a purveyor of drinking water, and, in a representative capacity, to protect

7   the rights of all of the landowners and other users of water in the district.  There are

8   approximately 5,120 acres of land overlying groundwater and (enjoying water rights therein)

9   within the territory of CWD.  MTBE and/or TBA contamination of groundwater within or

10   affecting the district constitutes injury to such waters for which CWD is entitled to, and hereby

11   does, seek damages, recovery of costs and other appropriate relief.

12         19.    Plaintiff, CITRUS HEIGHTS WATER DISTRICT ("CHWD"), is an Irrigation

13   District established pursuant to Water Code § 20500 et seq.  CHWD owns and operates a public

14   drinking water system in the County that supplies drinking water to residents, businesses and

15   other users in the County.  Among other things, CHWD has the right to, and in fact does,

16   appropriate from and use the Groundwaters of the County for drinking water supplies.  CHWD

17   has a significant property interest in the Groundwaters of the County, and is authorized to

18   commence and maintain any action or proceeding involving or affecting the ownership or use of

19   waters or water rights within the district used or useful for any purpose of the district or of

20   benefit to any land.  CHWD is also authorized to commence and maintain actions and

21   proceedings to prevent interference with any natural subterranean supply of waters which may

22   (a) be used or be useful for any purpose of the district or (b) be of common benefit to the land or

23   its inhabitants.

24         20.    In addition to its property and other rights and interests as a purveyor of drinking

25   water, CHWD is a public regulator, custodian and/or manager of the drinking water resources,

26   including groundwater, within or affecting the district.  CHWD brings this action to protect its

7   own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

28   protect the rights of all of the landowners and other users of water in the district.  There are at

1  least 5,000 acres of land overlying groundwater and (enjoying water rights therein) within the

2  territory of CHWD.  MTBE and/or TBA contamination of groundwater within or affecting the

3  district constitutes injury to such waters for which CHWD is entitled to, and hereby does, seek

4  damages, recovery of costs and other appropriate relief.

5       21.      Plaintiff, DEL PASO MANOR WATER DISTRICT ("DPMWD"), is a County

6  Water District established pursuant to Water Code § 30000 et seq.  DPMWD owns and operates

7  a public drinking water system in the County that supplies drinking water to residents, businesses

8  and other users in the County.  Among other things, DPMWD has the right to, and in fact does,

9  appropriate from and use the Groundwaters of the County for drinking water supplies.  DPMWD

10  has a significant property interest in the Groundwaters of the County, and is authorized to

11  commence and maintain any action or proceeding involving or affecting the ownership or use of

12  waters or water rights within the district used or useful for any purpose of the district or of

13  benefit to any land.  DPMWD is also authorized to commence and maintain actions and

14  proceedings to prevent interference with any natural subterranean supply of waters which may

15  (a) be used or be useful for any purpose of the district or (b) be of common benefit to the land or

16  its inhabitants.

17       22.      In addition to its property and other rights and interests as a purveyor of drinking

18  water, DPMWD is a public regulator, custodian and/or manager of the drinking water resources,

19  including groundwater, within or affecting the district.  DPMWD brings this action to protect its

20  own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

21  protect the rights of all of the landowners and other users of water in the district.  There are

22  approximately 832 acres of land overlying groundwater and (enjoying water rights therein)

23  within the territory of DPMWD. MTBE and/or TBA contamination of groundwater within or

24  affecting the district constitutes injury to such waters for which DPMWD is entitled to, and

25  hereby does, seek damages, recovery of costs and other appropriate relief.

26       23.      Plaintiff, FAIR OAKS WATER DISTRICT ("FOWD"), is an Irrigation District

27  established pursuant to Water Code § 20500 et seq.  FOWD owns and operates a public drinking

28  water system in the County that supplies drinking water to residents, businesses and other users

1    in the County. Among other things, FOWD has the right to, and in fact does, appropriate from

2    and use the Groundwaters of the County for drinking water supplies. FOWD has a significant

3    property interest in the Groundwaters of the County, and is authorized to commence and

4    maintain any action or proceeding involving or affecting the ownership or use of waters or water

5    rights within the district used or useful for any purpose of the district or of benefit to any land.

6    FOWD is also authorized to commence and maintain actions and proceedings to prevent

7    interference with any natural subterranean supply of waters which may (a) be used or be useful

8    for any purpose of the district or (b) be of common benefit to the land or its inhabitants.

9        24.    In addition to its property and other rights and interests as a purveyor of drinking

10    water, FOWD is a public regulator, custodian and/or manager of the drinking water resources,

11    including groundwater, within or affecting the district. FOWD brings this action to protect its

12    own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

13    protect the rights of all of the landowners and other users of water in the district. There are

14    approximately 6,100 acres of land overlying groundwater and (enjoying water rights therein)

15    within the territory of FOWD. MTBE and/or TBA contamination of groundwater within or

16    affecting the district constitutes injury to such waters for which FOWD is entitled to, and hereby

17    does, seek damages, recovery of costs and other appropriate relief.

18        25.    Plaintiff, FLORIN RESOURCE CONSERVATION DISTRICT ("FRCD"), is a

19    Conservation district established pursuant to Public Resources Code section 9151 et seq. FRCD

20    owns and operates a public drinking water system in the County that supplies drinking water to

21    residents, businesses and other users in the County. Among other things, FRCD has the right to,

22    and in fact does, appropriate from and use the Groundwaters of the County for drinking water

23    supplies. FRCD has a significant property interest in the Groundwaters of the County.

24    In addition to its property and other rights and interests as a purveyor of drinking water, FRCD is

25    a public regulator, custodian and/or manager of the drinking water resources, including

26    groundwater, within or affecting the district. FRCD brings this action to protect its own rights

27    and interests as a purveyor of drinking water, and, in a representative capacity, to protect the

28    rights of all of the landowners and other users of water in the district. There are approximately

1   25,000 acres of land overlying groundwater and (enjoying water rights therein) within the

2   territory of FRCD.  MTBE and/or TBA contamination of groundwater within or affecting the

3   District constitutes injury to such waters for which FRCD is entitled to, and hereby does, seek

4   damages, recovery of costs and other appropriate relief.

5          26.    Plaintiff, RIO LINDA ELVERTA COMMUNITY WATER DISTRICT

6   ("RLECWD"), is a County Water District established pursuant to Water Code § 30000 et seq.

7   RLECWD owns and operates a public drinking water system in the County that supplies

8   drinking water to residents, businesses and other users in the County.  Among other things,

9   RLECWD has the right to, and in fact does, appropriate from and use the Groundwaters of the

10  County for drinking water supplies.  RLECWD has a significant property interest in the

11  Groundwaters of the County, and is authorized to commence and maintain any action or

12  proceeding involving or affecting the ownership or use of waters or water rights within the

13  district used or useful for any purpose of the district or of benefit to any land.  RLECWD is also

14  authorized to commence and maintain actions and proceedings to prevent interference with any

15  natural subterranean supply of waters which may (a) be used or be useful for any purpose of the

16  district or (b) be of common benefit to the land or its inhabitants.

17         27.    In addition to its property and other rights and interests as a purveyor of drinking

18  water, RLECWD is a public regulator, custodian and/or manager of the drinking water resources,

19  including groundwater, within or affecting the District.  RLECWD brings this action to protect

20  its own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

21  protect the rights of all of the landowners and other users of water in the district.  There are

22  approximately 11,415 acres of land overlying groundwater and (enjoying water rights therein)

23  within the territory of RLECWD.  MTBE and/or TBA contamination of groundwater within or

24  affecting the District constitutes injury to such waters for which RLECWD is entitled to, and

25  hereby does, seek damages, recovery of costs and other appropriate relief.

26         28.    Plaintiff, SACRAMENTO SUBURBAN WATER DISTRICT ("SSWD"), is a

27  County Water District established pursuant to Water Code § 30000 et seq.  SSWD owns and

28  operates a public drinking water system in the County that supplies drinking water to residents,

1   businesses and other users in the County.  Among other things, SSWD has the right to, and in

2   fact does, appropriate from and use the Groundwaters of the County for drinking water supplies.

3   SSWD has a significant property interest in the Groundwaters of the County, and is authorized to

4   commence and maintain any action or proceeding involving or affecting the ownership or use of

5   waters or water rights within the district used or useful for any purpose of the district or of

6   benefit to any land.  SSWD is also authorized to commence and maintain actions and

7   proceedings to prevent interference with any natural subterranean supply of waters which may

8   (a) be used or be useful for any purpose of the district or (b) be of common benefit to the land or

9   its inhabitants.

10      29.    In addition to its property and other rights and interests as a purveyor of drinking

11  water, SSWD is a public regulator, custodian and/or manager of the drinking water resources,

12  including groundwater, within or affecting the District.  SSWD brings this action to protect its

13  own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

14  protect the rights of all of the landowners and other users of water in the district.  MTBE and/or

15  TBA contamination of groundwater within or affecting the district constitutes injury to such

16  waters for which SSWD is entitled to, and hereby does, seek damages, recovery of costs and

17  other appropriate relief.

18      30.    Plaintiff, SAN JUAN WATER DISTRICT ("SJWD"), is a Community Services

19  District established pursuant to Government Code section 61000 et seq.  SJWD owns and

20  operates a public drinking water system in the County that supplies drinking water to residents,

21  businesses and other users in the County.  Among other things, SJWD has the right to, and in

22  fact does, appropriate from and use the Groundwaters of the County for drinking water supplies.

23  SJWD has a significant property interest in the Groundwaters of the County.

24      31.    In addition to its property and other rights and interests as a purveyor of drinking

25  water, SJWD is a public regulator, custodian and/or manager of the drinking water resources,

26  including groundwater, within or affecting the District.  SJWD brings this action to protect its

7   own rights and interests as a purveyor of drinking water, and, in a representative capacity, to

28  protect the rights of all of the landowners and other users of water in the district.  There are

1    approximately 19,000 acres of land overlying groundwater and (enjoying water rights therein)

2    within the territory of SJWD. MTBE and/or TBA contamination of groundwater within or

3    affecting the district constitutes injury to such waters for which SJWD is entitled to, and hereby

4    does, seek damages, recovery of costs and other appropriate relief.

5        32.    The Plaintiffs identified in paragraphs 14 through 31 will be collectively referred

6    to as the "Water Agency Plaintiffs."

7        **D.    INVESTOR-OWNED UTILITY PLAINTIFF**

8        33.    CALIFORNIA-AMERICAN WATER COMPANY is a California corporation

9    with its principal place of business in Chula Vista, California, doing business in California.

10    California-American Water Company owns and operates a public drinking water system in the

11    County that supplies drinking water to residents, businesses and other users in the County.

12    Among other things, California-American Water Company has the right to, and in fact does,

13    appropriate from and use the Groundwaters of the County for drinking water supplies.

14    California-American Water Company has significant property interests in the Groundwaters of

15    the County. MTBE and/or TBE contamination of California-American Water Company's

16    groundwater supplies constitutes injury to such waters for which California-American Water

17    Company is entitled to, and hereby does, seek damages, recovery of costs and other appropriate

18    relief.

19        34.    The Plaintiff identified in paragraph 33 will be referred to as the "Investor-Owned

20    Utility Plaintiff".

21        35.    Plaintiffs, the CITY OF ELK GROVE, SACRAMENTO COUNTY WATER

22    AGENCY, SACRAMENTO GROUNDWATER AUTHORITY, CARMICHAEL WATER

23    DISTRICT, CITRUS HEIGHTS WATER DISTRICT, DEL PASO MANOR WATER

24    DISTRICT, FAIR OAKS WATER DISTRICT, FLORIN RESOURCE CONSERVATION

25    DISTRICT, RIO LINDA ELVERTA COMMUNITY WATER DISTRICT, SACRAMENTO

26    SUBURBAN WATER DISTRICT, SAN JUAN WATER DISTRICT, CALIFORNIA-

7    AMERICAN WATER COMPANY, and CITY OF SACRAMENTO, file this lawsuit in order to

28    recover compensatory, punitive and all other damages, including all necessary funds to

1    investigate, monitor, prevent, abate, treat and contain any MTBE and/or TBA contamination of,

2    or pollution to the Groundwaters of the County and/or their drinking water supplies.

3        36.    Hereinafter, the People, the City Plaintiffs, Water Agency Plaintiffs, and Investor-

4    Owned Utility Plaintiff will be collectively referred to as "Plaintiffs."

5                                            **III.**

6                            **THE PARTIES: DEFENDANTS**

7        37.    The Defendants in this action are the manufacturers, designers, promoters,

8    marketers, formulators, refiners, suppliers, and retailers of the MTBE, TBA and gasoline

9    containing MTBE and/or TBA that contaminates and threatens the Groundwaters of the County

10   and the public drinking water supply.  Among other things, Defendants discharged, disposed of,

11   deposited, placed where they could pass into and/or caused or permitted the discharge, disposal,

12   or deposit of MTBE and TBA in the Groundwaters of the County, thereby committing the

13   statutory and other violations of law set forth below.  Further, the Defendants knowingly and

14   willfully promoted and marketed gasoline containing MTBE and TBA, when they knew or

15   reasonably should have known that, without adequate precautions, these compounds would reach

16   groundwater, pollute public water supplies, render drinking water unusable and unsafe, and

17   threaten the public health and welfare.  The Plaintiffs bring this action to protect the quality of

18   the County's common water supply; to prevent the contamination of wells; and to ensure that the

19   responsible parties, — not the Plaintiffs and not the public — bear the costs of groundwater

20   contamination caused by Defendants' conduct.

21       38.    Defendants are corporate members of the petroleum industry.  They include: the

22   refiners and major-brand suppliers of gasoline containing the MTBE and/or TBA that

23   contaminates and pollutes the Groundwaters of the County; the manufacturers and promoters of

24   MTBE and TBA; and the owners and operators of gasoline facilities that have released the

25   MTBE and/or TBA that contaminates and pollutes the Groundwaters of the County, including

26   the water supplies of the City Plaintiffs, Water Agency Plaintiffs and Investor-Owned Utility

27   Plaintiff.

28

39. The names and capacities, whether individual, corporate or otherwise, of Defendants named herein as DOES 1-1000, inclusive, are unknown at this time to Plaintiffs who therefore sue said Defendants by such fictitious names. Plaintiffs will amend the Complaint to show the true names and capacities of said Defendants when their identities and capacities have been ascertained.

### A.   REFINER/SUPPLIER DEFENDANTS

39. At all times relevant to this action, the following Defendants, and any applicable DOE defendants (hereinafter, "Refiner/Supplier Defendants"), designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed, packaged, transported and/or otherwise supplied (directly or indirectly) gasoline containing MTBE and/or TBA that was shipped to and stored at gasoline stations in the County and/or in areas affecting the Groundwaters of the County, such that the MTBE and/or TBA in such gasoline was released to the subsurface and contaminates the Groundwaters of the County.

40. Defendant ATLANTIC RICHFIELD COMPANY ("ARCO") is a Delaware corporation, with its principal place of business in Chicago, Illinois, doing business in California. Among other things, ARCO undertook a national campaign extolling the purported environmental benefits of MTBE-based gasoline, including providing its formulas for such gasoline to other refiners.

41. Defendant BP PRODUCTS NORTH AMERICA, INC. ("BP") is a Delaware Corporation with its principal place of business in Chicago, Illinois, doing business in California.

42. Defendant CHEVRONTEXACO CORPORATION ("ChevronTexaco") is a Delaware corporation with its principal place of business in San Ramon, California, doing business in California. Plaintiffs are informed and believe that ChevronTexaco was formed as a result of a merger in 2001 of Chevron Corporation and Texaco, Inc. Plaintiffs are further informed and believe that ChevronTexaco owns and/or controls Defendant Chevron U.S.A., Inc.

///

///

43.    Defendant CHEVRON U.S.A. INC. ("Chevron U.S.A.") is a Pennsylvania corporation with its principal place of business in San Ramon, California, doing business in California.[2]

44.    Defendant CITGO PETROLEUM CORPORATION ("Citgo") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, doing business in California.

45.    Defendant CONOCOPHILLIPS COMPANY ("ConocoPhillips") is a Delaware corporation with its principal place of business in Houston, Texas, doing business in California. Plaintiffs are informed and believe that ConocoPhillips was formed as the result of a merger in 2002 of Conoco, Inc. and Phillips Petroleum Company. Plaintiffs are further informed and believe that ConocoPhillips is the successor corporation to Conoco, Inc. and Phillips Petroleum Company. Plaintiffs are further informed and believe that ConocoPhillips is the successor corporation to Tosco Corporation, which was acquired by Phillips Petroleum Company in 2001.

46.    Defendant EQUILON ENTERPRISES LLC ("Equilon") is a Delaware limited liability company with its principal place of business in Houston, Texas, doing business in California. Plaintiffs are informed and believe that Equilon is a successor in interest to certain entities related to Defendant Shell Oil Company and Defendant Texaco Refining and Marketing, Inc, and is owned and/or controlled by Defendant Shell Oil Company.

47.    Defendant EXXONMOBIL CORPORATION ("ExxonMobil") is a New Jersey corporation with its principal place of business in Irving, Texas, doing business in California. Plaintiffs are informed and believe that ExxonMobil was formed as a result of a merger in 1999 of Mobil Corporation and Exxon Corporation. The Plaintiffs are informed and believe that ExxonMobil is the successor corporation to Exxon Corporation and Mobil Corporation.

48. .    Defendant SHELL OIL COMPANY ("Shell Oil") is a Delaware corporation with its principal place of business in Houston, Texas, doing business in California.

49.    Defendant SHELL OIL PRODUCTS U.S. ("Shell Oil Products") is a Delaware corporation with its principal place of business in Houston Texas, doing business in California.[3]

---

[2]    The term "Chevron" as used herein refers to ChevronTexaco and/or Chevron U.S.A.

50.   Defendant TESORO REFINING AND MARKETING COMPANY ("Tesoro") is a Delaware corporation with its principal place of business in San Antonio, Texas, doing business in California.

51.   Defendant TEXACO REFINING AND MARKETING, INC. ("Texaco") is a Delaware corporation with its principal place of business in Houston, Texas, doing business in California.

52.   Defendant ULTRAMAR INC. ("Ultramar") is a Nevada corporation with its principal place of business in San Antonio, Texas, doing business in California, and is a successor in interest to Beacon Oil Co.

53.   Defendant UNOCAL CORPORATION, individually and formerly known as Union Oil Company of California ("Unocal"), is a Delaware corporation with its principal place of business in El Segundo, California, doing business in California.  Plaintiffs are informed and believe that Unocal holds a patent for reformulated gasoline containing MTBE used in California.

54.   Defendant VALERO ENERGY CORPORATION ("Valero Energy") is a Delaware corporation with its principal place of business in San Antonio, Texas, doing business in California.  Plaintiffs are informed and believe that Valero merged with Ultramar Diamond Shamrock Corporation in 2001, and that, as a consequence of such merger, Valero owns and/or controls certain entities related to Ultramar Diamond Shamrock Corporation, including Defendant Ultramar.[4]

55.   The Defendants identified in paragraphs 40 through 54 inclusive, and any applicable DOE defendants, will be collectively referred to as the "Refiner/Supplier Defendants."

56.   Among other things, the Refiner/Supplier Defendants, and each of them:

    a.   Designed, manufactured, formulated, refined, set specifications for,

---

[3]   The term "Shell" as used herein refers to Shell Oil, Shell Oil Products and/or Equilon.

[4]   The term "Valero" as used herein refers to Valero Energy and/or Ultramar.

1    exchanged, promoted, marketed, packaged, transported and/or otherwise supplied (directly or

2    indirectly) gasoline containing the MTBE and/or TBA that is contaminating and polluting the

3    Groundwaters of the County.

4            b.      Discharged, disposed of, deposited, and/or caused or permitted the

5    discharge, deposit, or disposal of MTBE and/or TBA into the Groundwaters of the County.

6            c.      Permitted MTBE and/or TBA to pass into, and/or placed MTBE and/or

7    TBA where they could pass into the Groundwaters of the County.

8            d.      Participated in one or more enterprises to promote MTBE, TBA and/or

9    gasoline containing MTBE and/or TBA.

10           e.      Were legally responsible for and committed each of the multiple tortious

11   and ongoing wrongful acts alleged in this Complaint.

12           f.      In doing the tortious and wrongful acts alleged in this Complaint, acted in

13   the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest,

14   surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-

15   conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE

16   and named Defendants.

17           B.      MANUFACTURER DEFENDANTS

18           57.     At all times relevant to this action, the following Defendants, and any applicable

19   DOE defendants (hereinafter, "Manufacturer Defendants"), designed, manufactured, formulated,

20   refined, promoted, marketed, packaged, sold and/or otherwise supplied (directly or indirectly)

21   MTBE and/or TBA that was used as a component of gasoline shipped to and stored at gasoline

22   stations in the County and/or in areas affecting the Groundwaters of the County, such that MTBE

23   and/or TBA are released to the subsurface and contaminate the Groundwaters of the County.

24           58.     Defendant LYONDELL CHEMICAL COMPANY ("Lyondell") is a Delaware

25   corporation with its principal place of business in Houston, Texas, doing business in California.

26   Plaintiffs are informed and believe that Lyondell is a successor in interest to ARCO Chemical

27   Company, which Lyondell acquired in 1998.

28

59.     The Defendant identified in paragraph 58 and any applicable DOE defendants, will be collectively referred to as the "Manufacturer Defendants."  The Manufacturer Defendant(s), and each of them:

a.      Designed, manufactured, formulated, refined, promoted, marketed, packaged, sold and/or otherwise supplied (directly or indirectly) MTBE and/or TBA that is contaminating and polluting the Groundwaters of the County.

b.      Disposed of or caused the disposal of MTBE and/or TBA at unpermitted and/or unauthorized sites in the County.

c.      Placed, deposited, or permitted to pass into Waters of the State, including the groundwater, within Sacramento County, MTBE and/or TBA.

d.      Stated or implied that the presence of MTBE and/or TBA in gasoline was safe and did not pose a risk to public health and/or the environment.

e.      Participated in one or more enterprises to promote MTBE, TBA and/or gasoline containing MTBE and/or TBA.

f.      Knowingly agreed to commit the foregoing wrongful acts, and did commit them, thus contaminating the County's Groundwater, and thereby causing injury to Plaintiffs

g.      Were legally responsible for and committed each of the multiple unlawful, tortious and ongoing wrongful acts alleged in this Complaint.

h.      In doing the unlawful, tortious and wrongful acts alleged in this Complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named Defendants.

## C.     OWNER OPERATOR DEFENDANTS

60.     At all times relevant to this action, the following Defendants, and any applicable DOE defendants (hereinafter, "Owner/Operator Defendants"), owned, operated, controlled and/or were otherwise responsible for gasoline storage and delivery facilities, including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems

1  ("gasoline delivery systems") in the County and/or in areas affecting the Groundwaters of the

2  County.

3       61.     Defendant CIRCLE K STORES, INC., is a Texas corporation with its principal

4  place of business at Glendale, Arizona, doing business in California.

5       62.     Defendant 7-ELEVEN, INC., is a Texas corporation with its principal place of

6  business in Dallas, Texas, doing business in California.

7       63.     Defendants ARCO, BP, Chevron, ConocoPhillips, ExxonMobil, Shell, Texaco,

8  Unocal, and Valero, and each of them, owned and operated gasoline delivery systems in the

9  County and/or in areas affecting the Groundwaters of the County.

10      64.     The Defendants identified in paragraphs 61 through 63 inclusive, and any

11 applicable DOE defendants, will be collectively referred to as the "Owner/Operator Defendants."

12      65.     The Owner/Operator Defendants, and each of them, discharged, disposed of,

13 deposited, placed where they could pass into and/or caused or permitted the discharge, disposal,

14 or deposit of gasoline containing MTBE and/or TBA into the Groundwaters of the County.  The

15 Owner/Operator Defendants, and each of them, negligently, carelessly and/or recklessly spilled,

16 leaked, and/or released, gasoline containing MTBE and/or TBA into the environment where it

17 could, and in fact has contaminated and continues to contaminate the Groundwaters of the

18 County.

19      66.     In doing the unlawful, tortious and wrongful acts alleged in this Complaint, the

20 Owner/Operator Defendants acted in the capacity of aider, abettor, joint-venturer, partner, agent,

21 principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent

22 transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or

23 indemnitor of each of the remaining DOE and named Defendants; and in their own capacity as

24 owners and/or operators of gasoline delivery systems.

25      67.     The Refiner/Supplier Defendants, Manufacturer Defendants, and Owner Occupier

26 Defendants, including all applicable DOE Defendants are referred to collectively herein as

27 "Defendants."

28

68.     When, in this Complaint, reference is made to any act of the Defendants, such allegations shall be deemed to mean that the officers, directors, agents or employees, or representatives of said Defendants committed or authorized such acts while actively engaged in the management, direction, or control of the affairs of said Defendants, and did so while acting within the course and scope of their duties.

69.     References made herein to any act or acts of Defendants shall be deemed to mean the act of each Defendant acting individually, jointly and severally.

70.     The names and capacities, whether individual, corporate or otherwise of Defendants named herein as DOES 1-1000, inclusive, are unknown at this time to Plaintiffs who therefore sue said Defendants by such fictitious names.  Plaintiffs will amend the Complaint to show the true names and capacities of said Defendants when their identities and capacities have been ascertained.

71.     The actions of Defendants, and each of them, as alleged herein, are in violation of the laws and public policies of the State of California and are unlawful and inimical to the rights and interests of the general public and create an unreasonable risk of harm to the environment.

72.     Unless enjoined and restrained by an order of the Court, Defendants, and each of them, will continue to engage in the unlawful conduct set forth herein.

### IV.

### ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

### BY ALL PLAINTIFFS

73.     Plaintiffs are informed and believe, and, based upon such information and belief, allege the following.

A.     **The Contaminants:  MTBE and TBA.**

74.     MTBE is a chemical blended by some refiners into some gasoline.  As used herein, MTBE consists not only of methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE.  TBA is present in some gasoline.  TBA is variously a gasoline constituent, an impurity in commercial grade MTBE, and a degradation or breakdown product of MTBE.

75.   MTBE and TBA contaminate the environment primarily through discharges, disposals, deposits, leaks, and spills from gasoline delivery systems. Once released to the environment, MTBE and TBA have unique characteristics that cause extensive environmental contamination and a corresponding threat to the public health and welfare. In particular, the fate and transport of MTBE and TBA in the subsurface differs significantly from that of gasoline constituents that have historically been of environmental and/or toxicological concern, specifically the "BTEX compounds" (Benzene, Toluene, Ethylbenzene, and Xylene).

76.   Once released into the subsurface, MTBE and TBA separate from other gasoline constituents in the presence of moisture. In contrast to the BTEX compounds, MTBE and TBA have a strong affinity for water and do not readily adsorb (i.e., stick) to soil particles. Rather, they move freely with groundwater at approximately the rate of the water's movement. In addition, MTBE is more persistent than the BTEX compounds because it does not readily biodegrade in the subsurface. Thus, in comparison to BTEX constituents, MTBE and TBA are significantly more mobile in the subsurface and will migrate from the source area more quickly. MTBE and TBA are also more difficult and expensive to remove from water than BTEX compounds. If MTBE and/or TBA are released into the environment in sufficient quantities, these compounds have the capacity to migrate through the soil and groundwater, penetrate deep within the aquifer, and cause persistent contamination that can destroy and/or threaten the potability of drinking water wells. In short, MTBE and TBA spread farther and faster than other components of gasoline, resist biodegradation, are difficult and costly to remove from groundwater, and can continue to migrate to new areas of groundwater long after their initial discharge, contaminating an increasing number of drinking water wells as they move.

B.   **Regulatory Standards Applicable to MTBE and TBA.**

77.   No federal or state agency has approved MTBE or TBA as an additive to drinking water. No federal or state agency has approved releasing or discharging MTBE or TBA to surface water or groundwater.

78.   Along with its other vile properties, MTBE can render water supplies undrinkable by changing its odor and taste. Specifically, MTBE-contaminated water has a turpentine odor

and chemical taste unfit for human consumption.  The State of California has established a
Secondary Maximum Contaminant Level ("MCL") for MTBE of 5 parts per billion ("ppb").
This means that the law prohibits using water containing MTBE at or above this level for public
drinking water systems because of MTBE's aesthetic properties.  Many individuals, however,
can smell and taste MTBE in water at even lower levels.

79.     MTBE also presents a significant public health threat.  Because of MTBE's
potential for causing cancer, the State of California has established a Primary (health) MCL for
MTBE of 13 ppb.  This means that the law prohibits using water-containing MTBE at or above
this level for public drinking water systems because of MTBE's threat to public health.

80.     TBA also presents a significant threat to public health.  The State of California
has set an Action Level for TBA of 12 ppb in water, based on an interim assessment performed
by the California Office of Environmental Health Hazard Assessment.  The interim assessment
concluded that exposure to TBA at levels above 12 ppb in water creates an unacceptable public
health risk of cancer.

81.     The State of California has ordered state agencies to phase out the use of MTBE
in California motor fuel, and to achieve 100% removal no later than December 31, 2003.
Because of MTBE's threat to drinking water, the federal government has also announced its
intent to "significantly reduce or eliminate" MTBE from gasoline in an Advance Notice of
Proposed Rulemaking published in the Federal Register.

C.     **Defendants' Promotion of MTBE and TBA.**

82.     The Refiner/Supplier and Manufacturer Defendants, who have promoted the use
of gasoline containing MTBE and/or TBA for its purported environmental benefits, knew or
should have known, at all material times, of the grave harm to the public health and welfare that
would result from the proliferating use of these compounds.  Such harm includes, but is not
limited to: injury to a natural resource of the State of California and the County of Sacramento,
to wit, Waters of the State; widespread pollution of groundwater with MTBE and/or TBA;
contamination of public drinking water by these compounds; drinking water supplies rendered

1   unfit for human consumption; threats to public health; and significantly increased costs to public

2   water suppliers and their business and consumer customers.

3         83.    The manufacturers, refiners and suppliers of MTBE, TBA, and gasoline

4   containing MTBE and/or TBA had a duty, which they breached, to thoroughly test MTBE and

5   TBA to determine their environmental fate and transport characteristics and potential human

6   health impacts before they marketed, promoted, and sold MTBE, TBA and/or gasoline

7   containing MTBE and/or TBA.

8         84.    Before introducing MTBE and/or TBA into gasoline and gasoline delivery

9   systems, the Refiner/Supplier and Manufacturer Defendants knew, or reasonably should have

10   known, among other things, that MTBE and/or TBA released into the environment would be

11   disposed of at unpermitted and/or unauthorized sites, pollute Waters of the State including the

12   Groundwaters of the County, mix easily with groundwater, move great distances, resist

13   biodegradation and/or bioremediation, render drinking water unsafe and/or non-potable, be

14   costly and difficult to remove from public drinking water supplies, and otherwise threaten the

15   public health and welfare.

16         85.    These Defendants also knew, or they reasonably should have known, that the

17   gasoline distribution and retail system in the vicinity of the Groundwaters of the County, into

18   which they supplied gasoline containing MTBE and/or TBA, was woefully inadequate to contain

19   these hazardous compounds.  They knew, or they reasonably should have known, that gasoline

20   facilities, including those in the vicinity of the Groundwaters of the County, and including those

21   owned and operated by the Owner/Operator Defendants, commonly lacked adequate storage

22   facilities for gasoline containing MTBE and/or TBA, and that the operators of these facilities

23   were unaware of either the special hazards of MTBE and/or TBA or the steps necessary to

24   eliminate or mitigate those hazards.

25         86.    In particular, the Refiner/Supplier Defendants, and each of them, knew, or

26   reasonably should have known, that if they supplied gasoline containing MTBE and/or TBA to

27   gasoline stations without taking special precautions (including, but not limited to, adequate

28   warnings), such compounds would be released to the environment because recipient gasoline

1   stations, including those owned and operated by the Owner/Operator Defendants, would, and in

2   fact did: (a) place the gasoline in inadequate and leaking gasoline delivery systems; (b) suffer the

3   routine spillage of appreciable quantities of gasoline in connection with the filling of storage

4   tanks and the use of gasoline dispensing systems; (c) fail to take reasonable, appropriate, or

5   special measures to monitor, detect, and respond to releases of MTBE, and/or TBA to soil,

6   surface water and/or groundwater; and (d) fail to take reasonable, appropriate or special

7   precautions to investigate, contain and clean up releases of these compounds.  Defendants

8   nevertheless continued to negligently and unreasonably supply such gasoline stations with

9   gasoline containing MTBE and/or TBA.

10      87.    Defendants ARCO, BP, Chevron, ConocoPhillips, ExxonMobil, Shell, Texaco,

11   Tesoro, Unocal, and Valero, and each of them had firsthand knowledge and experience regarding

12   leaking gasoline delivery systems and releases of MTBE and/or TBA to groundwater therefrom.

13   These Defendants obtained such firsthand knowledge and experience because each of them

14   owned and operated individual gasoline stations with leaking gasoline delivery systems,

15   including gasoline stations within or near the County. Despite their firsthand knowledge that

16   groundwater contamination with MTBE and/or TBA was the inevitable result of their conduct,

17   these Defendants continued to refine, market, promote, supply and/or sell gasoline containing

18   these compounds without providing any warnings or special instructions, or taking any other

19   precautionary measures to prevent or mitigate such contamination.

20      88.    Despite knowing that MTBE and/or TBA pollution was inevitable unless special

21   precautions were taken, and despite the availability of reasonable alternatives, the

22   Refiner/Supplier and Manufacturer Defendants unreasonably failed to provide any adequate

23   warnings regarding the known and foreseeable risks of these compounds to customers, retailers,

24   regulators and/or public officials, including the Plaintiffs.

25      89.    Not only did the Refiner/Supplier and Manufacturer Defendants unreasonably fail

26   to provide adequate warnings regarding the dangers of MTBE and/or TBA, but, at all times

.7   relevant to this action, they represented to purchasers of MTBE, TBA and/or gasoline containing

28   MTBE and/or TBA, as well as to the general public and government agencies (including

1   Plaintiffs) that such products were environmentally sound and appropriate for widespread

2   production, distribution, sale and use.  Defendants also represented that gasoline containing

3   MTBE could be handled in the same manner as ordinary gasoline, and required no special

4   measures to protect against or respond to suspected releases to the subsurface. These

5   representations were deceptive, untrue, likely to deceive consumers, misleading, and were made

6   to induce purchasers to buy MTBE, TBA and/or gasoline containing MTBE and/or TBA.

7        90.     The Refiner/Supplier and Manufacturer Defendants, and each of them, knowingly

8   pursued or took an active part in a common plan, design and/or conspiracy to market and/or

9   promote MTBE, TBA and/or gasoline containing MTBE and/or TBA when they knew or

10  reasonably should have known these products to be dangerous to the environment.  In particular,

11  the Manufacturer and Refiner/Supplier Defendants formed and/or participated in joint task-

12  forces, committees and trade associations for the specific purpose of suppressing, concealing

13  and/or minimizing information regarding MTBE hazards.  These Defendants also engaged in

14  joint activity to deceive the government as well as the public regarding these same dangers.

15  Such Defendants' common plan, design and/or conspiracy, and the acts taken in furtherance of

16  such common plan, design and/or conspiracy, are a direct and proximate cause of the MTBE

17  contamination of the Groundwaters of the County.

18       91.     The Refiner/Supplier Defendants also exercised control over the Owner/Operator

19  Defendants who leaked, spilled, released, discharged, disposed of, deposited, placed where they

20  could pass into and/or caused or permitted the discharge, disposal, or deposit of gasoline

21  containing MTBE and/or TBA into the Groundwaters of the County.  The Refiner/Supplier

22  Defendants exercised such control through a variety of means, including but not limited to

23  written agreements, inspection rights, prescribing certain procedures and operating practices,

24  prescribing specifications for products, conditions on sale of branded goods, agreements

25  obligating such stations to acquire, store and sell gasoline containing MTBE and/or TBA, and

26  training.

     **D.    Summary of Allegations Applicable To All Causes Of Action**

7        92.     At all times relevant to this action:

28

a.      The Manufacturer and Refiner/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided MTBE, TBA and/or gasoline containing MTBE and/or TBA to downstream handlers, including but not limited to retail gasoline stations and/or other gasoline delivery systems within or near the County's boundaries, without providing any adequate warnings or taking other reasonable precautions. Such sales, exchanges, supplies, distributions, deliveries and/or other provisions of MTBE, TBA and/or gasoline containing MTBE and/or TBA to such facilities occurred over time through the end of 2002 and, for at least certain Defendants, beyond that date.

b.      Gasoline containing MTBE and/or TBA was released, discharged, and/or deposited to the subsurface from gasoline delivery systems owned, operated and/or controlled by the Owner/Operator Defendants, and each of them, and from other facilities at dispersed locations within or near the County's boundaries. Such releases of gasoline containing MTBE and/or TBA have occurred and are still occurring, all in varying amounts at different locations.

c.      Over time, MTBE and TBA have been disposed of at unpermitted and unauthorized sites, migrated and continue to migrate, in the subsurface from dispersed release points at or near the surface at retail gasoline facilities within or near the County's boundaries, causing pollution of Waters of the State, contamination, and damage to the Groundwaters of the County, in violation of California statutory and regulatory law and thereby causing appreciable injury to the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff and damaging these Plaintiffs at such times and in amounts to be proved at trial.

**V.**

**ALLEGATIONS APPLICABLE TO THE SIXTH, SEVENTH AND EIGHTH**

**CAUSES OF ACTION, BY THE PEOPLE OF THE STATE OF CALIFORNIA**

**AGAINST ALL DEFENDANTS**

93.     Plaintiffs, THE PEOPLE OF THE STATE OF CALIFORNIA, are informed and believe, and, based upon such information and belief, allege the following.

94.     For the economic benefit of the MTBE industry in general and Defendants' respective business interests and economic benefit in particular, the Refiner/Supplier Defendants

1  and Manufacturer Defendants, had an express or implied understanding to participate in a

2  common plan or design to commit unlawful and wrongful, tortious acts and statutory violations,

3  including, but not limited to: engaging in affirmative misrepresentations as to the harmful effects

4  of MTBE use in gasoline; concealing from or misleading federal, state and local governments,

5  and California consumers, information about the environmental and public health and safety

6  risks of such use; discouraging consideration, review and marketing of safer alternatives; thereby

7  gaining economic advantage from the widespread use of MTBE as a gasoline additive.

8      95.   Defendants did commit the above unlawful and wrongful acts as fully set forth

9  below, in furtherance of the common agreement.

10     96.   Defendants committed these acts, despite Defendants' knowledge that the MTBE

11  added to gasoline would contaminate groundwater and degrade water quality throughout

12  California and within the County of Sacramento, thereby threatening the natural environment,

13  and the public health and safety of the State and County.

14     97.   Defendants' wrongful acts did injure and continue to injure the Waters of the

15  State, to wit: the groundwater, a natural resource of the State of California and the County of

16  Sacramento.

17                                    **VI.**

18                          **CAUSES OF ACTION**

19

20                       **FIRST CAUSE OF ACTION**

21                          **PUBLIC NUISANCE**

22               **(CIVIL CODE SECTIONS 3479 AND 3480)**

23     **ON BEHALF OF ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

24     98.   The allegations in paragraphs 1 through 97 are incorporated herein by this

25  reference.

26     99.   The negligent, reckless, intentional and ultrahazardous activity of the Defendants,

27  and each of them, alleged herein has resulted in the contamination of and pollution to the

28  Groundwaters of the County as alleged herein and constitutes a public nuisance. The

1   contamination and pollution of the Groundwaters of the County with gasoline containing MTBE

2   and/or TBA is a public nuisance as defined in Civ. Code §§ 3479; Civ. Code § 3480; Health &

3   Saf. Code § 5410 and Water Code § 13050.

4        100.   Each Defendant has caused, maintained, assisted and/or participated in such

5   public nuisance, and is a substantial contributor to such public nuisance by committing the acts

6   and omissions described in this Complaint.

7        101.   Neither the People of the State of California nor any of the City Plaintiffs, Water

8   Agency Plaintiffs, or Investor-Owned Utility Plaintiff have consented to nor do they consent to

9   this nuisance.  Defendants, and each of them, knew or should have known that neither the People

10   nor any of the City Plaintiffs, Water Agency Plaintiffs, or Investor-Owned Utility Plaintiff,

11   would consent to this nuisance.

12        102.   The Plaintiffs are entitled to an order requiring Defendants to abate the public

13   nuisance by performing all acts necessary to do so.

14        103.   The public nuisance caused, contributed to, maintained, assisted and/or

15   participated in by Defendants, and each of them, has caused and continues to cause substantial

16   and special injury to the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility

17   Plaintiff, and each of them.  Plaintiffs, and each of them, have significant property and/or other

18   interests, including but not limited to their rights to appropriate, use, protect, conserve and/or

19   manage the Groundwaters of the County, including their water supplies. The public nuisance

20   caused, contributed to, maintained, assisted and/or participated in by Defendants, and each of

21   them, damages the ability of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned

22   Utility Plaintiff to maintain and/or purvey a water supply free from unacceptable health risk,

23   taste, odor, pollution and contamination.  These Plaintiffs' injuries are separate and distinct from

24   that of the public.

25        104.   In particular, as a direct and proximate result of Defendants' acts and omissions as

26   alleged herein, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff,

27   and each of them, have incurred, are incurring, and will continue to incur, investigation,

28   assessment, remediation, cleanup, restoration, removal, treatment and monitoring costs and

1  expenses related to contamination of the Groundwaters of the County, including their drinking
2  water supplies, with MTBE and/or TBA, in an amount to be proved at trial.

3      105.   The contamination of the Groundwaters of the County with MTBE and TBA
4  alleged herein has varied over time and has not ceased as of the date of this Complaint.  MTBE
5  and TBA continue to migrate into and enter the Groundwaters of the County.

6      106.   Unless restrained and enjoined by this court, Defendants will continue to maintain
7  the public nuisance and the acts complained of herein.  Injunctive relief is expressly authorized
8  pursuant to Code Civ. Pro. § § 526, 731.

9      107.   Defendants ARCO, BP, Chevron, Citgo, ConocoPhillips, Equilon, ExxonMobil,
10  Lyondell, Shell, Texaco, Ultramar, Unocal, and Valero knew that their alleged acts and
11  omissions described above would threaten public health and cause extensive contamination of
12  common water supplies, public drinking water supplies, and property damage.  Nonetheless, the
13  Defendants identified in this paragraph intentionally failed to warn downstream handlers, the
14  public and government officials, including Plaintiffs, as to the threat caused by MTBE, and
15  engaged in joint activities to suppress, conceal and/or minimize information regarding MTBE
16  hazards in order to deceive the government (including the City Plaintiffs and Water Agency
17  Plaintiffs) and the public regarding such hazards.  These Defendants committed each of the
18  above described acts and omissions knowingly, willfully, and with oppression, fraud, and/or
19  malice and with conscious disregard of the health and safety of others, and of the City Plaintiffs',
20  Water Agency Plaintiffs', and Investor-Owned Utility Plaintiff's interests in protecting their
21  drinking water supplies within the Groundwaters of the County.

22      108.   This conduct is reprehensible, despicable, and was performed to promote sales of
23  MTBE, TBA and/or gasoline containing MTBE and/or TBA in conscious disregard of the known
24  risks of injury to health and property.  Defendants acted with willful and conscious disregard of
25  the probable dangerous consequences of their conduct and its foreseeable impact upon the City
26  Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff.  Therefore, these
27  Plaintiffs are entitled to an award of exemplary damages in an amount sufficient to punish these
28  Defendants.  After the completion of additional investigation and discovery, the City Plaintiffs,

1   Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff may seek leave of court to amend

2   this Complaint to allege a claim for exemplary damages against additional Defendants if

3   warranted by the facts.

### SECOND CAUSE OF ACTION

### DECLARATORY RELIEF

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

7       109.    The allegations in paragraphs 1 through 108 are incorporated herein by this

8   reference.

9       110.    Defendants knew, or should have known, that MTBE, TBA and gasoline

10  containing MTBE and/or TBA, were dangerous and created an unreasonable and excessive risk

11  of harm to human health and the environment if MTBE, TBA, and/or gasoline containing such

12  compounds was used in a foreseeable and intended manner.

13      111.    The Defendants intentionally, willfully, deliberately and/or negligently failed to

14  properly design, test, manufacture, distribute, control, contain, and/or sell MTBE, TBA, gasoline

15  containing MTBE and/or TBA, and/or gasoline delivery systems and warn users of the

16  substantial and unreasonable threat to human health and safety and the environment that results

17  from the foreseeable and intended use and storage of MTBE, TBA, and/or gasoline containing

18  such compounds.

19      112.    Defendants knew, or should have known, and/or were negligent in not knowing

20  that gasoline containing MTBE and/or TBA would leak from gasoline delivery and containment

21  systems, into which Defendants placed the gasoline, thereby causing its disposal at unauthorized

22  and/or unpermitted sites, and Defendants failed to warn consumers, retailers and government

23  agencies of the public health and safety risks to persons and the environment, posed by the

24  disposal of MTBE and/or TBA at such sites.

25      113.    Defendants knew, or should have known, that gasoline containing MTBE and

26  TBA would leak from gasoline delivery and containment systems, into which Defendants placed

27  the gasoline, thereby facilitating its placement, deposit or passage into the Waters of the State,

28

1 and Defendants failed to warn consumers, retailers and government agencies of the public health
2 and safety risks to Waters of the State posed by the resulting MTBE and/or TBA pollution.

3   114.   Defendants knew, or should have known, that water quality contamination and
4 degradation would result from the presence of MTBE and/or TBA in gasoline leaking from
5 gasoline containment and delivery systems, into which Defendants placed the gasoline.

6   115.   Defendants knew or should have known that when they stated and implied that
7 gasoline containing MTBE and/or TBA was a benign substance, they were making untrue and
8 misleading statements and implications.  Defendants also knew, or should have known, when
9 they stated and implied that gasoline containing MTBE and/or TBA was environmentally safe,
10 that such statements and implications were untrue, deceptive and misleading.

11   116.   Among other things, the conduct of Defendants set forth above constitutes
12 multiple violations of California's consumer protection statutes designed to protect California
13 consumers from unlawful, unfair or fraudulent business acts and to protect lawful California
14 businesses from unfair competition.

15   117.   As a result of Defendants' conduct, the Plaintiffs must take costly remedial action
16 to investigate, assess, abate, monitor, and/or remove MTBE and/or TBA contamination and/or
17 secure alternative water supplies, all at substantial costs, expenses and damages within the
18 jurisdiction of this court.

19   118.   Defendants, and each of them, have failed to reimburse the Plaintiffs for their
20 MTBE and/or TBA-related assessment, investigation, remediation and clean-up costs and deny
21 any responsibility or liability for these damages and for the MTBE and/or TBA-related expenses
22 the Plaintiffs will incur in the future.

23   119.   An actual controversy exists concerning who is responsible for any liability
24 arising out of the contamination of the Groundwaters of the County by MTBE and/or TBA.

25   120.   In order to resolve this controversy, Plaintiffs seek an adjudication of the
26 respective rights and obligations of the parties, in conjunction with an award of damages, to the
27 extent necessary to provide full relief to the Plaintiffs.

28

### THIRD CAUSE OF ACTION

### HEALTH & SAFETY CODE SECTION 25189.2(c)

### (UNLAWFUL DISPOSAL OF HAZARDOUS WASTE: STRICT LIABILITY)

### BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA,

### AGAINST ALL DEFENDANTS

121.    The allegations in paragraphs 1 through 120 are incorporated herein by this reference.

122.    At times relevant herein, and within the applicable statute of limitations, Defendants herein, and each of them did dispose of or cause the disposal of a hazardous waste, to wit: MTBE and/or TBA, at an unpermitted site and/or at a point not authorized by Chapter 6.5 of Division 20 of the Health & Safety Code and Title 22 of the California Code of Regulations.

123.    The disposal or causing disposal of hazardous waste in violation of Chapter 6.5 of the California Health & Safety Code and Title 22 of the California Code of Regulations is a violation of Health & Saf. Code § 25189.2(c).

124.    Defendants herein, and each of them, are liable for a maximum penalty of $25,000 for each day of each violation pursuant to Health & Saf. Code § 25189.2(c).

125.    The actions of Defendants in committing the violations of law as set forth herein are unlawful and inimical to the welfare of the public and a threat to the environment and unless enjoined by order of this court, Defendants may continue to commit such violations of the law.

### FOURTH CAUSE OF ACTION

### HEALTH & SAFETY CODE SECTION 25189(d)

### (UNLAWFUL DISPOSAL OF HAZARDOUS WASTE: NEGLIGENCE)

### BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA,

### AGAINST (ALL) DEFENDANTS

126.    The allegations in paragraphs 1 through 125 are incorporated herein by this reference.

127.    At times relevant herein, within the applicable statute of limitations, Defendants herein, and each of them, did negligently dispose of or cause the disposal of a hazardous waste,

1  to wit: MTBE and/or TBA, at an unpermitted site and/or at a point not authorized by Chapter 6.5

2  of Division 20 of the Health & Safety Code and Title 22 of the California Code of Regulations.

3        128.    The negligent disposal or causing disposal of hazardous waste in violation of

4  Chapter 6.5 of the California Health & Safety Code and Title 22 of the California Code of

5  Regulations is a violation of law pursuant to Health & Saf. Code § 25189 (d).

6        129.    Defendants herein, and each of them, are liable for a maximum penalty of

7  $25,000 for each day in which the violation occurred pursuant to Health & Saf. Code § 25189(d).

8        130.    Each civil penalty imposed for any separate violation pursuant to this section is

9  separate and in addition to any other civil penalty imposed pursuant to this section or any other

10 provision of law pursuant to Health & Saf. Code § 25189(e).

11       131.    The actions of Defendants in committing the violations of law as set forth herein

12 are unlawful and inimical to the welfare of the public and a threat to the environment and unless

13 enjoined by order of this court, Defendants may continue to commit such violations of the law.

### FIFTH CAUSE OF ACTION

### FISH AND GAME CODE SECTION 5650

### (UNLAWFUL DEPOSIT OF PETROLEUM PRODUCT

### INTO WATERS OF THE STATE)

### BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA,

### AGAINST ALL DEFENDANTS

20       132.    The allegations in paragraphs 1 through 131 are incorporated herein by this

21 reference.

22       133.    At times relevant herein, within the applicable statute of limitations, Defendants

23 herein, and each of them, deposited, permitted to pass into, or placed where it could pass into the

24 Waters of the State, petroleum and/or residuary products of petroleum, including MTBE and/or

25 TBA, in violation of Fish & Game Code § 5650.

26       134.    The deposit, permitting or placement where it can pass into the Waters of the

27 State of petroleum and residuary petroleum products, including MTBE and/or TBA, is a

28 violation of Fish & Game Code § 5650a(1).

135.    Defendants, and each of them, are liable for a penalty up to $25,000 for each violation, in addition to any other penalties, pursuant to Fish & Game Code § 5650.1.

136.    The civil penalty imposed for each separate violation is separate and in addition to any other civil penalty imposed for a separate violation pursuant to this section, or any other violation of law, pursuant to Fish & Game Code § 5650.1.

137.    The actions of Defendants in committing the violations of law set forth herein are unlawful and inimical to the welfare of the public and a threat to the environment and unless enjoined by order of this court, Defendants may continue to commit such violations of the law.

### SIXTH CAUSE OF ACTION

### BUSINESS AND PROFESSIONS CODE SECTION 17500 et seq.

### (MISLEADING STATEMENTS)

### BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA,

### AGAINST ALL DEFENDANTS

138.    The allegations in paragraphs 1 through 137 are incorporated herein by this reference.

139.    At times relevant herein, and within the applicable statute of limitations, Defendants made and/or caused to be made representations to consumers/purchasers of their respective products, which Defendants knew, or reasonably should have known, were untrue and/or misleading, with the intent to induce members of the public to purchase the gasoline additives MTBE, TBA and/or gasoline containing MTBE and/or TBA.

140.    Defendants stated and implied that MTBE was a benign and unharmful substance when used as an additive to gasoline.  This representation was false and/or misleading because Defendants knew, or reasonably should have known, that groundwater contamination and water quality degradation would result from the addition of MTBE and/or TBA to gasoline sold throughout California, including Sacramento County.

141.    The making or causing to be made of representations that Defendants knew or reasonably should have known were untrue and/or misleading is a violation of Bus. & Prof. Code § 17500.

142.   Defendants, and each of them, are liable for a penalty up to $2,500 for each violation, in addition to any other penalties, pursuant to <u>Bus. & Prof. Code § 17500</u>.

143.   Penalties under this section are cumulative to each other and to the remedies or penalties available under all other laws of the state, pursuant to <u>Bus. & Prof. Code § 17535</u>.

144.   The actions of Defendants in committing the violations of law as set forth herein are unlawful and inimical to the welfare of the public and a threat to the environment and unless enjoined by order of this court, Defendants may continue to commit such violations of the law.

<strong>SEVENTH CAUSE OF ACTION</strong>

<strong>BUSINESS & PROFESSIONS CODE SECTION 17580.5</strong>

<strong>(MISLEADING ENVIRONMENTAL MARKETING CLAIMS)</strong>

<strong>BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA,</strong>

<strong>AGAINST ALL DEFENDANTS</strong>

145.   The allegations in paragraphs 1 through 144 are incorporated herein by this reference.

146.   At times relevant herein, and within the applicable statute of limitations, Defendants made and/or caused to be made environmental marketing representations to consumers and/or purchasers of their product, which Defendants knew, or by the exercise of reasonable care should have known, were untrue, deceptive and/or misleading, with the intent to induce the purchase of MTBE, TBA and/or gasoline containing MTBE and/or TBA.

147.   Making, or causing to be made, environmental marketing claims that Defendants knew or reasonably should have known were untrue, deceptive and/or misleading is a violation of <u>Bus. & Prof. Code § 17580.5</u>.

148.   Defendants, and each of them, are liable for a penalty up to $2,500 for each violation, in addition to any other penalties, pursuant to <u>Bus. & Prof. Code § 17581</u>.

149.   Remedies and penalties under this section are cumulative to each other and to the remedies or penalties available under all other laws of the state, pursuant to <u>Bus. & Prof. Code § 17205</u>.

150.   The actions of Defendants in committing the violations of law as set forth herein are unlawful and inimical to the welfare of the public and a threat to the environment and unless enjoined by order of this court, Defendants may continue to commit such violations of the law.

### EIGHTH CAUSE OF ACTION

### BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.

### (UNLAWFUL, UNFAIR AND/OR FRAUDULENT BUSINESS PRACTICES)

### BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA

### AGAINST (ALL) DEFENDANTS

151.   The allegations in paragraphs 1 through 150 are incorporated herein by this reference.

152.   At times relevant herein, and within the applicable statute of limitations, Defendants herein, and each of them, while acting in their capacity as businesses, committed unlawful, unfair or fraudulent acts, in violation of Bus. & Prof. Code § § 17200 -17208.  These acts include but are not limited to the following, which the People hereby reallege and incorporate by reference as though fully set forth herein.

a.   Defendants committed unlawful business acts and practices by committing the statutory and regulatory violations and other unlawful acts described in the Third through through Seventh causes of action, inclusive, within the applicable statute of limitations.

b.   Defendants committed business acts in violation of Water Code section 13260(a)(1).

153.   Defendants and each of them are liable for a penalty of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500) for each day of each separate violation as alleged, in addition to any and all other penalties, pursuant to Bus. & Prof. Code §§ 17200 - 17208.

154.   Remedies and penalties under this section are cumulative to each other and to the remedies or penalties available under all other laws of the state, pursuant to Bus. & Prof. Code § 17205.

155.   The actions of Defendants in committing the violations of law as set forth herein are unlawful and inimical to the welfare of the public and a threat to the environment and unless enjoined by order of this court, Defendants may continue to commit such violations of the law.

## NINTH CAUSE OF ACTION

## (CIVIL CONSPIRACY)

## BY PLAINTIFF, THE PEOPLE OF THE STATE OF CALIFORNIA

## AGAINST THE REFINER/SUPPLIER AND MANUFACTURER DEFENDANTS

156.   The allegations in paragraphs 1 through 155 are incorporated herein by this reference.

157.   The Refiner/Supplier Defendants and Manufacturer Defendant(s) entered into one or more agreements, express or implied, to commit the wrongful and unlawful acts alleged herein by the People, which constitute violations of Bus. & Prof. Code § 17500.

158.   The Refiner/Supplier Defendants and Manufacturer Defendants entered into one or more agreements, express or implied, to commit the wrongful and unlawful acts alleged herein by the People, which constitute violations of Bus. & Prof. Code § 17580.5

159.   The Refiner/Supplier Defendants and Manufacturer Defendants entered into one or more agreements, express or implied, to commit the unlawful acts alleged herein by the People, which they knew to be wrongful and which constitute violations of Bus. & Prof. § 17200.

160.   The Refiner/Supplier Defendants and Manufacturer Defendants knowingly, and with the purpose of securing economic and pecuniary benefit to Defendants' respective and joint business interests, did commit the unlawful and wrongful acts alleged herein and set forth above, which they had agreed to commit, in violation of Bus. & Prof. Code § § 17500, 17580.5, 17200.

161.   Defendants' conspiracy and wrongful acts caused an unreasonable and hazardous risk of injury to the natural resources, including the Groundwater, and public health and safety of the State and County, and to lawful businesses, and did cause such injury, while all Defendants have derived substantial profits from their wrongful acts at the expense of the State, the County and others.

162.     As a foreseeable and intended result of Defendants' conspiracy and wrongful and unlawful acts which the Refiner/Supplier Defendants and Manufacturer Defendants agreed to commit and did in fact commit, as set forth above, the People of the State of California suffered injury to the natural environment and resources of the State and Sacramento County, including but not limited to, its Groundwater; and the People further suffered injury to the public health and safety within the County and its environs, as a result of the contamination and pollution of the County's groundwater supply which is, *inter alia*, a primary source of the County's drinking water.

163.     The People seek damages from all Defendants who participated and concurred in the agreement and plan to commit the unlawful and wrongful conduct set forth above, knowing it to be wrongful and unlawful.

## TENTH CAUSE OF ACTION

## (STRICT LIABILITY BASED ON DESIGN DEFECT)

## BY  CITY PLAINTIFFS, WATER AGENCY PLAINTIFFS, AND INVESTOR-OWNED UTILITY PLAINTIFF AGAINST ALL DEFENDANTS

164.     The allegations in paragraphs 1 through 163 are incorporated herein by this reference.

165.     The Manufacturer Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE and/or TBA to refiners, including certain Refiner/Supplier Defendants, for use as components of gasoline.

166.     The Refiner/Supplier Defendants, and each of them, designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE and/or TBA that was delivered into gasoline delivery systems located in areas affecting the Groundwaters of the County.

167.     The Owner/Operator Defendants, and each of them, placed and/or stored gasoline containing MTBE and/or TBA in gasoline delivery systems located in areas affecting the Groundwaters of the County.

168.     The Manufacturer and Refiner/Supplier Defendants, and each of them,

1  represented, asserted, claimed and warranted that gasoline containing MTBE and/or TBA could

2  be used in the same manner as gasoline not containing these compounds, and/or otherwise did

3  not require any different or special handling or precautions.

4      169.   Defendants, and each of them, knew that said product(s) were to be purchased and

5  used without inspection for defects.

6      170.   MTBE, TBA and gasoline containing MTBE and/or TBA are defective and/or

7  unreasonably dangerous products because, among other things:

8          a.      MTBE and/or TBA cause extensive groundwater contamination when

9  used in their foreseeable and intended manner.

10          b.      Even at extremely low levels, MTBE and/or TBA render drinking water

11  putrid, foul, and unfit for purveying as drinking water to the public.

12          c.      MTBE and/or TBA pose significant threats to the public health and

13  welfare and the environment, as described in this Complaint.

14          d.      Defendants failed to conduct reasonable, appropriate or adequate scientific

15  studies to evaluate the environmental fate and transport and potential human health effects of

16  MTBE and/or TBA.

17          e.      At all times relevant to this action, MTBE, TBA and/or gasoline

18  containing MTBE and/or TBA were dangerous to an extent beyond that which would be

19  contemplated by the ordinary consumer.

20          f.      At all times relevant to this action, the risk of harm to public health and

21  welfare and the environment posed by adding MTBE and/or TBA to gasoline outweighed the

22  benefits of doing so.

23          g.      At all times relevant to this action, feasible alternatives to MTBE

24  and/or TBA that would have eliminated the unreasonable danger posed by gasoline containing

25  MTBE and/or TBA, without excessive costs or loss of product efficiency, were available to

26  Defendants.

27          h.      Commercial grade MTBE is defectively manufactured when it contains

28  and/or degrades into unnecessary but environmental harmful impurities such as TBA.

171.   MTBE, TBA and/or gasoline containing MTBE and/or TBA were used in a manner in which they were foreseeably intended to be used.

172.   As a proximate result of the defects previously described, MTBE and/or TBA proximately caused the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff to sustain the injuries and damages set forth in this Complaint.

173.   As a direct and proximate result of the acts and omissions of the Defendants alleged herein, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff must conduct remedial programs to assess, evaluate, investigate, monitor, abate, clean-up, correct, prevent, contain, and/or remove MTBE and/or TBA contamination in the Groundwaters of the County, all at significant expense, loss, and damage.

174.   As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff have sustained and will continue to sustain substantially increased expenses, all to their damage in an amount within the jurisdiction of this Court.  The City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff have and will also incur costs and attorneys' fees in prosecuting this action.

175.   Defendants are strictly, jointly and severally liable for all such damages, and the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to recover all such damages, together with court costs and reasonable attorneys' fees, in this action.

176.   For the reasons alleged in paragraphs 107 through 108 the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to an award of exemplary and punitive damages against Defendants ARCO, BP, Chevron, Citgo, ConocoPhillips, Equilon, Exxon, Lyondell, Shell, Texaco, Ultramar, Unocal and Valero.

///
///
///
///
///

### ELEVENTH CAUSE OF ACTION

### (STRICT LIABILITY BASED ON FAILURE TO WARN)

### BY CITY PLAINTIFFS, WATER AGENCY PLAINTIFFS, AND INVESTOR-OWNED

### UTILITY PLAINTIFF AGAINST THE MANUFACTURER AND REFINER/SUPPLIER

### DEFENDANTS

177.    The allegations in paragraphs 1 through 176 are incorporated herein by this reference.

178.    The Manufacturer Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE and/or TBA to refiners, including certain Refiner/Supplier Defendants, for use as a component of gasoline.

179.    The Refiner/Supplier Defendants, and each of them, designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE and/or TBA that was delivered into gasoline delivery systems located in areas affecting the Groundwaters of the County.

180.    The Owner/Operator Defendants, and each of them, placed and/or stored gasoline containing MTBE and/or TBA in gasoline delivery systems located in areas affecting the Groundwaters of the County.

181.    The Refiner/Supplier and Manufacturer Defendants, and each of them, represented, asserted, claimed and warranted that gasoline containing MTBE and/or TBA could be used in the same manner as gasoline not containing these compounds, and/or otherwise did not require any different or special handling or precautions.

182.    Defendants, and each of them, knew that said product(s) were to be purchased and used without inspection for defects.

183.    The Manufacturer and Refiner/Supplier Defendants, and each of them, knew, or reasonably should have known, of the special risks of MTBE and/or TBA and/or gasoline containing MTBE and/or TBA, as described in paragraphs 74 to 91 of this Complaint.

184.    Despite the special hazards associated with MTBE and/or TBA, these Defendants failed to provide any adequate warnings of the known and foreseeable risks of MTBE, TBA

1    and/or gasoline containing MTBE and/or TBA, including contamination of groundwater with

2    MTBE and/or TBA.

3    185.    MTBE, TBA and/or gasoline containing MTBE and/or TBA were used in a

4    manner in which they were foreseeably intended to be used, and as a proximate result of the

5    Manufacturer and Refiner/Supplier Defendants' failure to warn of the risks of MTBE, TBA

6    and/or gasoline containing MTBE and/or TBA that were known and/or reasonably should have

7    been known to them, MTBE and/or TBA contaminate the Groundwaters of the County.

8    186.    As a direct and proximate result of the acts and omissions of the Defendants

9    alleged herein, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff

10   must conduct remedial programs to assess, evaluate, investigate, monitor, abate, clean-up,

11   correct, contain, and/or remove MTBE and/or TBA contamination in the Groundwaters of the

12   County, all at significant expense, loss, and damage.

13   187.    As a further direct and proximate result of the acts and omissions of the

14   Defendants alleged in this Complaint, the City Plaintiffs, Water Agency Plaintiffs, and Investor-

15   Owned Utility Plaintiff have sustained and will continue to sustain substantially increased

16   expenses, all to their damage in an amount within the jurisdiction of this Court.  The City

17   Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff have and will also incur

18   costs and attorneys' fees in prosecuting this action.

19   188.    Defendants are strictly, jointly and severally liable for all such damages, and the

20   City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to

21   recover all such damages, together with court costs and reasonable attorneys' fees, in this action.

22   189.    For the reasons alleged in paragraphs 107 through 108, the City Plaintiffs, Water

23   Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to an award of exemplary and

24   punitive damages against Defendants ARCO, BP, Chevron, Citgo, ConocoPhillips, ExxonMobil,

25   Lyondell, Shell, Texaco, Unocal and Valero. After the completion of additional investigation and

26   discovery, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff may

27   seek leave of court to amend this Complaint to allege a claim for exemplary damages against

28   additional Defendants if warranted by the facts.

## TWELFTH CAUSE OF ACTION

## (NEGLIGENCE)

## BY CITY PLAINTIFFS, WATER AGENCY PLAINTIFFS, AND INVESTOR-OWNED UTILITY PLAINTIFF AGAINST ALL DEFENDANTS

190.   The allegations in paragraphs 1 through 189 are incorporated herein by this reference.

191.   Defendants had a duty to use due care in the design, manufacture, formulation, handling, control, containment, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE, and/or TBA and/or gasoline containing one or more such compounds.

192.   The Owner/Operator Defendants negligently, recklessly and/or carelessly, spilled, leaked, discharged, and/or released gasoline containing MTBE and/or TBA and thereby proximately caused gasoline containing MTBE and/or TBA to contaminate the Groundwaters of the County, including the drinking water supplies of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff.

193.   The Refiner/Supplier and Manufacturer Defendants so negligently, carelessly, and/or recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), contained (or failed to contained), tested (or failed to test), marketed, sold and/or otherwise entrusted MTBE, TBA and/or gasoline containing MTBE and/or TBA, that they breached their duties and directly and proximately caused MTBE, and/or TBA to contaminate the Groundwaters of the County including the drinking water supplies of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff resulting in the damages alleged in this Complaint.

194.   The Refiner/Supplier and Manufacturer Defendants negligently, carelessly, and/or recklessly failed to provide adequate warnings to retailers, the public, and government agencies about the foreseeable risks of MTBE, TBA and gasoline containing such compounds, and their failure to warn proximately caused MTBE, and/or TBA to contaminate the Groundwaters of the County including the drinking water supplies of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff, resulting in the damages alleged in this Complaint.

195.    In light of the facts alleged herein, Defendants, and each of them, breached their duty to use due care in the design, manufacture, formulation, handling, control, containment, marketing, sale, testing, labeling, use, and/or instructions for use of MTBE, TBA and/or gasoline containing one or more such compounds, and negligently failed to warn of the foreseeable risks of these products.

196.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff have incurred, are incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to contamination of the Groundwaters of the County, including their drinking water supplies, with MTBE, and/or TBA, in an amount to be proved at trial.

197.    The injuries to the Groundwaters of the County, including the City Plaintiffs', Water Agency Plaintiffs', and Investor-Owned Utility Plaintiff's drinking water supplies, caused and/or threatened by Defendants' acts and omissions as alleged herein are indivisible.

198.    For the reasons set forth and specifically alleged in paragraphs 107 through 108, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to an award of exemplary damages against Defendants ARCO, BP, Chevron, Citgo, ConocoPhillips, Equilon, ExxonMobil, Lyondell, Shell, Texaco, Ultramar, Unocal and Valero that fairly reflects the aggravating circumstances alleged herein. After the completion of additional investigation and discovery, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff may seek leave of court to amend this Complaint to allege a claim for exemplary damages against additional Defendants if warranted by the facts.

## THIRTEENTH CAUSE OF ACTION

## (TRESPASS)

## BY CITY PLAINTIFFS, WATER AGENCY PLAINTIFFS, AND INVESTOR-OWNED

## UTILITY PLAINTIFF AGAINST ALL DEFENDANTS

199.    The allegations in paragraphs 1 through 198 are incorporated herein by this reference.

200.    The City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are each the owner and/or actual possessor of property rights and interests in the Groundwaters of the County, including the right to appropriate and/or use such groundwater. The City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff additionally have the right and responsibility to regulate, protect and safeguard the groundwater resources within their respective jurisdictions.

201.    The Manufacturer and Refiner/Supplier Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE and TBA are extremely hazardous to groundwater and public water supplies, and to the property and/or other legal interests of Plaintiffs. These Defendants, and each of them manufactured, refined, promoted, marketed and/or otherwise supplied MTBE, TBA and/or gasoline containing MTBE and/or TBA when they knew or should have known that: (a) such gasoline would be delivered to gasoline delivery systems in areas affecting the Groundwaters of the County without any adequate warnings or other precautionary measures regarding the hazards of MTBE and TBA; and (b) MTBE and/or would be released from gasoline delivery systems; and (c) when released into the subsurface, MTBE and/or TBA would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

202.    Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE and TBA are extremely hazardous to groundwater and public water supplies, and to the property and/or other legal interests of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff. Defendants, and each of them, supplied, shipped, marketed, entrusted and/or sold gasoline containing MTBE and/or TBA in the County and/or areas affecting the Groundwaters of the County with the knowledge that contamination of such groundwaters with MTBE and/or TBA would result.

203.    At all times relevant to this action, MTBE, TBA and/or gasoline containing such compounds were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment

1    posed by MTBE, TBA and/or gasoline containing such compounds outweighed the cost to

2    defendants of reducing or eliminating such risk.

3        204.    Defendants, and each of them, negligently, recklessly and/or intentionally caused

4    MTBE and/or TBA to enter, invade, intrude upon and injure the Groundwaters of the County by

5    committing the acts and omissions described in this Complaint.

6        205.    The contamination of the Groundwaters of the County with MTBE and/or TBA

7    alleged herein has varied over time and has not yet ceased.  MTBE and/or TBA continue to

8    migrate into and enter the Groundwaters of the County and/or threaten the drinking water wells

9    of the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff. The City

10   Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff, and each of them, have

11   not consented to and do not consent to the trespass alleged herein.  Defendants, and each of

12   them, knew or reasonably should have known, that the City Plaintiffs, Water Agency Plaintiffs,

13   and Investor-Owned Utility Plaintiff would not consent to this trespass.

14       206.    As a direct and proximate result of Defendants' acts and omissions as alleged

15   herein, the City Plaintiffs, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff have

16   incurred, are incurring, and will continue to incur, investigation, remediation, cleanup,

17   restoration, removal, treatment and monitoring costs and expenses related to contamination of

18   the Groundwaters of the County including their drinking water supplies with MTBE and/or TBA,

19   in amounts to be proved at trial.

20       207.    For the reasons alleged in  paragraphs 107 through 108 the City Plaintiffs, Water

21   Agency Plaintiffs, and Investor-Owned Utility Plaintiff are entitled to an award of exemplary and

22   punitive damages against Defendants ARCO, BP, Chevron, Citgo, ConocoPhillips, Equilon,

23   Exxon, Lyondell, Shell, Texaco, Ultramar, Unocal and Valero.

24   ///

25   ///

26   ///

.7   ///

28   ///

## FOURTEENTH CAUSE OF ACTION

## CIVIL CODE SECTION 1882

## BY PLAINTIFF CITY OF SACRAMENTO, WATER AGENCY PLAINTIFFS AND

## INVESTOR-OWNED UTILITY PLAINTIFF

## AGAINST ALL DEFENDANTS

208.   The allegations in paragraphs 1 through 207 are incorporated herein by this reference.

209.   Plaintiff City of Sacramento, Water Agency Plaintiffs and Investor-Owned Utility Plaintiff are each utilities that provide utility services.

210.   The Groundwaters of the County are property owned or used by Plaintiff City of Sacramento, Water Agency Plaintiffs and Investor-Owned Utility Plaintiff to provide utility services.

211.   By introducing MTBE and/or TBA into the Groundwaters of the County as alleged in this Complaint, Defendants, and each of them, injured, altered, interfered with, and/or otherwise prevented from performing its normal or customary function property owned or used by Plaintiff City of Sacramento, Water Agency Plaintiffs and Investor-Owned Utility Plaintiff to provide utility services.

212.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff City of Sacramento, Water Agency Plaintiffs and Investor-Owned Utility Plaintiff have incurred, are incurring, and will continue to incur, investigation, remediation, cleanup, restoration, removal, treatment and monitoring costs and expenses related to the MTBE and/or TBA contamination of the Groundwaters of the County, in an amount to be proved at trial, for which Defendants are liable pursuant to Civil Code §1882.1.

213.   Pursuant to Civil Code §1882.2, Defendants are liable for three times the amount of actual damages sustained by Plaintiff City of Sacramento, Water Agency Plaintiffs and Investor-Owned Utility Plaintiff, plus the costs of this suit and reasonable attorney's fees.

///

## FIFTEENTH CAUSE OF ACTION

## HEALTH & SAFETY CODE SECTION 116366

## BY  PLAINTIFF CITY OF SACRAMENTO, WATER AGENCY PLAINTIFFS, AND

## INVESTOR-OWNED UTILITY PLAINTIFF

## AGAINST ALL DEFENDANTS

214.    The allegations in paragraphs 1 through 213 are incorporated herein by this reference.

215.    As a result of the conduct of Defendants, and each of them, alleged herein, Plaintiff City of Sacramento, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff, and each of them, have incurred, are incurring and/or will incur remediation and/or treatment costs associated with MTBE and/or gasoline containing MTBE.

216.    Defendants are responsible for the MTBE contamination alleged in this Complaint.

217.    Plaintiff City of Sacramento, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff are public water systems, and are entitled to recover the costs of remediation and treatment associated with MTBE and/or gasoline containing MTBE, pursuant to Health & Saf. Code § 116366.

## SIXTEENTH CAUSE OF ACTION

## WATER CODE SECTION 13285

## BY PLAINTIFF CITY OF SACRAMENTO, WATER AGENCY PLAINTIFFS, AND

## INVESTOR-OWNED UTILITY PLAINTIFF

## AGAINST ALL DEFENDANTS

218.    The allegations in paragraphs 1 through 217 are incorporated herein by this reference.

219.    As a result of the conduct of Defendants, and each of them, alleged herein, Plaintiff City of Sacramento, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff, and each of them, have incurred, are incurring and/or will incur remediation and/or treatment costs associated with MTBE and/or gasoline containing MTBE.

1    220.    Defendants are responsible for the MTBE contamination alleged in this

2  Complaint.

3    221.    Plaintiff City of Sacramento, Water Agency Plaintiffs, and Investor-Owned

4  Utility Plaintiff are public water systems, and are entitled to recover the costs of remediation and

5  treatment associated with MTBE and/or gasoline containing MTBE, pursuant to Water Code

6  §13285.

7             **SEVENTEETH CAUSE OF ACTION**

8             **WATER CODE SECTION 13304**

9    **BY CITY PLAINTIFFS AND WATER AGENCY PLAINTIFFS**

10            **AGAINST ALL DEFENDANTS**

11   222.    The allegations in paragraphs 1 through 221 are incorporated herein by this

12  reference.

13   223.    The Owner/Operator Defendants discharged MTBE and/or TBA into the Waters

14  of the State of California in violation of applicable waste discharge requirements in violation of

15  Water Code §13304.

16   224.    The Refiner and Manufacturer Defendants caused or permitted MTBE and/or

17  TBA to be discharged or deposited where it was, and/or probably would be, discharged into the

18  Waters of the State and thereby created a condition of pollution or nuisance in violation of Water

19  Code §13304.

20   225.    As a direct and proximate result of Defendants' conduct, the City Plaintiffs and

21  Water Agency Plaintiffs have initiated and/or must initiate remedial programs to assess, evaluate,

22  investigate, monitor, abate, clean-up, correct, contain, and remove MTBE and/or TBA from the

23  Groundwaters of the County, all at significant expense, loss, and damage.  The City Plaintiffs

24  and Water Agency Plaintiffs are entitled to recover the reasonable costs incurred in responding to

25  Defendants' discharges pursuant to Water Code § 13304.

26  ///

27  ///

28

## **PRAYER**

WHEREFORE, Plaintiffs respectfully request a trial of this Action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiffs and against Defendants as follows:

1.      Plaintiff, the <u>PEOPLE OF THE STATE OF CALIFORNIA</u>, pray that a permanent injunction issue, permanently enjoining and restraining Defendants herein, and each of them, and their agents, directors, employees, members, officers, representatives, successors and persons acting through, on behalf of or in concert or participation with them, any and all of them, with actual or constructive notice of any injunction or restraining order issued in this matter, from operating their businesses or activities incidental to their businesses throughout Sacramento County and the State of California, in a manner which, in the future and/or in addition to the violations alleged in this Complaint:

        a.      Violates any provision of the <u>California Civil Code</u>.

        b.      Violates any provision of the <u>California Health & Safety Code</u>.

        c.      Violates any provision of <u>California Code of Regulations Title 22 section 66001 et seq.</u>

        d.      Violates any provision of the <u>California Fish and Game Code</u>.

        e.      Violates any provision of the <u>California Water Code</u>.

        f.      Violates any provision of <u>California Business and Professions Code. Sections 17200-17208, 17500, and 17580.5</u>.

        h.      Creates or threatens to create any condition of contamination, pollution, public nuisance or danger to the public health or safety, including but not limited to, conditions of nuisance or danger to any natural resource of the State or County, including but not limited to Waters of the State.

2.      Plaintiff, <u>THE PEOPLE OF THE STATE OF CALIFORNIA</u>, pray that the court order such additional appropriate injunctive relief as is required to prevent future or additional violations of the above statutes.

3.      Plaintiff, THE PEOPLE OF THE STATE OF CALIFORNIA, pray that

Defendants herein and each of them, shall ensure that all of their agents, directors, employees,

members, officers, representatives, successors and persons acting through, on behalf of or in

concert or participation with them, any and all of them, comply with the terms of this permanent

injunction in their performance of their duties associated with matters addressed herein.

4.      Plaintiff, THE PEOPLE OF THE STATE OF CALIFORNIA, further pray for

judgment that:

a.      Pursuant to Code Civ. Pro. § 731, Defendants be ordered to abate the

public nuisance created by their contamination of the soil, groundwater, and wells of Sacramento

County.  The abatement must be performed to conform with applicable law and under the

supervision of all appropriate regulatory authorities.

b.      Pursuant to Health & Saf. Code § 25189.2(c) Defendants herein, and each of

them, be assessed TWENTY FIVE THOUSAND DOLLARS ($25,000) per each violation, per day,

as alleged in the third cause of action.

c.      In the alternative, pursuant to Health & Saf. Code § 25189(d), Defendants

herein, and each of them, be assessed TWENTY-FIVE THOUSAND DOLLARS ($25,000) per

each violation, per day, as alleged in the fourth cause of action.

d.      Pursuant to Fish & Game Code § 5650.1, Defendants herein, and each of

them, be assessed TWENTYY-FIVE THOUSAND DOLLARS ($25,000) per each violation as

alleged in the fifth cause of action.

e.      Pursuant to Bus. & Prof. Code § 17500, Defendants herein, and each of

them, be assessed TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500) per each violation as

alleged in the sixth cause of action.

f.      Pursuant to Bus. & Prof. Code § 17581, Defendants herein, and each of

them, be assessed TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500) per each violation as

alleged in the seventh cause of action.

1         g.    Pursuant to <u>Bus. & Prof. Code § 17200 *et seq.*</u>, Defendants herein, and each

2   of them, be assessed TW0 THOUSAND FIVE HUNDRED DOLLARS ($2,500) per each separate

3   violation as alleged in the eighth cause of action.

4         h.    Pursuant to <u>Bus. & Prof. Code § 17203</u>, the Court order Defendants to

5   notify all purchasers of the Products of the pendency of the claims set forth in this action for

6   purposes of providing restitution for such purchasers.

7         i.    Pursuant to <u>Bus. & Prof. Code § 17203</u>, the Court make such orders as

8   may be necessary to prevent the use or employment by Defendants of any act or practice

9   declared by this Court to be an unlawful, unfair or a fraudulent business act or practice.

10         k.    Pursuant to <u>Bus. & Prof. Code § 17203</u>, the Court make such additional

11   orders as may be necessary to restore any person in interest any money or property, real or

12   personal, which may have been acquired by means of any act or practice declared by this Court

13   to be an unlawful, unfair or a fraudulent business act or practice, plus pre- and post-judgment

14   interest thereon.

15         l.    Pursuant to <u>Bus. & Prof. Code § 17203</u>, the Court order Defendants to

16   notify all purchasers of the Products of the pendency of the claims set forth in this action for

17   purposes of providing restitution for such purchasers.

18         m.    The Court make an order awarding the District Attorney all costs incurred

19   in investigating and prosecuting this action, and prejudgment interest to the full extent permitted

20   by law.

21         n.    In addition to any civil penalty imposed pursuant to <u>Health and Saf. Code</u>

22   <u>§ § 25189, 25189.2</u>, and/or any other funds collected pursuant to Chapter 6.5 of Division 20 of

23   the Health & Safety Code and Title 22 of the California Code of Regulations; pursuant to <u>Health</u>

24   <u>& Saf. Code § 25189.1</u>, the Court make an order awarding the People: (1) all assessment costs to

25   assess injury to, degradation or destruction of, or any loss of any natural resource resulting from

26   Defendants' unlawful disposal of hazardous waste; and (2) all costs to restore, rehabilitate,

27   replace or acquire the equivalent of any natural resource injured, degraded, destroyed or lost as a

28   result of Defendants' unlawful disposal of hazardous waste.

1        o.    The Court make an order declaring that Defendants are liable for the full

2 cost of all remedial and other actions necessary to abate and remove MTBE and/or TBA which is

3 contaminating and threatening the Groundwaters of the County, and for such orders as may be

4 necessary to provide full relief to the People.

5        p.    The Court make an order declaring that the Owner/Operator Defendants'

6 gasoline delivery systems constitute a nuisance in the manner they are maintained and operated,

7 and abating that nuisance.

8        q.    The Court make an order compelling Defendants to abate the public

9 nuisance proximately caused by their conduct as alleged herein.

10        r.    The Court make an order that Defendants disgorge all monies acquired by

11 means of any act or practice found by this court to constitute an unlawful, unfair or fraudulent

12 business act or practice under Bus. & Prof. Code § 17200 et seq. and take all other steps necessary

13 to make Plaintiffs whole from the acts and omissions of Defendants set forth above.

14        s.    The Court make an order for such and other further relief as the court may

15 deem just and proper.

16

17    5.   THE CITY PLAINTIFFS, WATER AGENCY PLAINTIFFS, AND INVESTOR-

18 OWNED UTILITY PLAINTIFF request judgment against Defendants, and each of them, as

19 follows:

20        a.    That the Court make an award of compensatory damages according to

21 proof.

22        b.    That the Court make an award of exemplary damages in an amount

23 sufficient to punish Defendants Atlantic Richfield Company, BP Products North America,

24 Chevron Texaco Corporation, Chevron U.S.A. Inc., Citgo Petroleum Corporation, ConocoPhillips

25 Company, Equilon Enterprises LLC, ExxonMobil Corporation, Lyondell, Shell Oil Company,

26 Shell Oil Products US, Texaco Refining & Marketing, Inc., Ultramar, Inc., Unocal Corporation,

27 and Valero Energy Corporation, and to deter those Defendants from ever committing the same or

28 similar acts.

1      c.      That the Court make an order declaring that Defendants are liable for the

2  full cost of all remedial and other actions necessary to abate and remove MTBE and/or TBA

3  which is contaminating and threatening the Groundwaters of the County and for such orders as

4  may be necessary to provide full relief to these Plaintiffs.

5      d.      That the Court make an Order declaring that the Owner/Operator

6  Defendants' gasoline delivery systems constitute a nuisance in the manner they are maintained

7  and operated, and abating that nuisance.

8      e.      That the Court make an Order compelling Defendants to abate the

9  nuisance proximately caused by their conduct as alleged herein.

10      f.      That the Court make an order awarding the City Plaintiffs', Water Agency

11  Plaintiffs', and Investor-Owned Utility Plaintiff's attorneys' fees to the full extent permitted by

12  law.

13      g.      That the Court make an order awarding the City Plaintiffs, Water Agency

14  Plaintiffs, and Investor-Owned Utility Plaintiff their costs incurred in prosecuting this action,

15  including their reasonable attorney's fees, together with prejudgment interest, to the full extent

16  permitted by law.

17      h.      That the Court make an order awarding such and other further relief as the

18  Court may deem just and proper.

19

20      6.      PLAINTIFF CITY OF SACRAMENTO, WATER AGENCY PLAINTIFFS AND

21  INVESTOR-OWNED UTILITY PLAINTIFF additionally request judgment against Defendants,

22  and each of them, as follows:

23      a.      That the Court make an order awarding Plaintiff City of Sacramento,

24  Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff treble damages, pursuant to Civil

25  Code §1882.2.

26      b.      That the Court make an order awarding Plaintiff City of Sacramento,

27  Water Agency Plaintiffs and Investor-Owned Utility Plaintiff their costs incurred in prosecuting

28

1 | this action, including their reasonable attorneys' fees, together with prejudgment interest,

2 | pursuant to Civil Code §1882.2.

3 |      c.     That the Court, pursuant to Health & Saf. Code §116366, and pursuant to Water

4 |
5 | Code § 13285, award Plaintiff City of Sacramento, Water Agency Plaintiffs, and Investor-

6 | Owned Utility Plaintiff the reasonable costs they incur in responding to the Defendants' releases

7 | of MTBE.

8 |      d.     That the Court, pursuant to Health & Saf. Code §116585, award Plaintiff City

9 | of Sacramento, Water Agency Plaintiffs, and Investor-Owned Utility Plaintiff their litigation

10 | costs including, but not limited to, salaries, benefits, travel expenses, operating equipment,

11 | administrative, overhead, other litigation costs, and attorney's fees, as determined by the court.

12 |      e.     Such and other further relief as the Court may deem just and proper.

13 |

14 |      7.     THE CITY PLAINTIFFS AND WATER AGENCY PLAINTIFFS additionally

15 | request judgment against Defendants, and each of them, as follows:

16 |      a.     That the Court, pursuant to Water Code §13304, award the CITY

17 | PLAINTIFFS and WATER AGENCY PLAINTIFFS their reasonable costs incurred in

18 | responding to the Defendants' releases of MTBE, TBA, and/or gasoline containing MTBE

19 | and/or TBA.

20 |      b.     That the Court make an order for such and other further relief as the court

21 | may deem just and proper.

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 |

DATED: _____, 2003

2

3

4

5

6

7

8    DATED: *October 30*, 2003

9

10

11

12

13

14

16

17

18

19

20

21

22

23

24

25

26

27

IAN SCULLY, DISTRICT ATTORNEY

ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By: _____

RUSS DETRICK
Supervising Deputy District Attorney
Attorney for Plaintiff
The People of the State of California.

SHER & LEFF, LLP

By: _____

VICTOR M. SHER
TODD E. ROBINS

BARON & BUDD, P.C.
SCOTT SUMMY
CELESTE A. EVANGELISTI

Attorneys for Plaintiffs, City of Elk Grove,
Sacramento County Water Agency,
Sacramento Groundwater Authority,
Carmichael Water District, Citrus Heights
Water District, Del Paso Manor Water
District, Fair Oaks Water District, Florin
Resource Conservation District, Rio Linda
Elverta Community Water District,
Sacramento Suburban Water District, San
Juan Water District, California-American
Water Company, and City of Sacramento

# Exhibit 2

1   ARNOLD & PORTER
    MATTHEW T. HEARTNEY (Bar No. 123516)
2   LAWRENCE A. COX (State Bar No. 076140)
    STEPHANIE M. BONNETT (State Bar No. 204790)
3   777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844
4   Telephone:  (213) 243-4000
    Facsimile:  (213) 243-4199
5
6   Attorneys for Defendants
    ATLANTIC RICHFIELD COMPANY and
7   BP PRODUCTS NORTH AMERICA, INC.

8                   UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  THE PEOPLE OF THE STATE OF CALIFORNIA;  )  Case No.      CIV.S-03-2653 GEB DAD
    CITY OF ELK GROVE; SACRAMENTO COUNTY )
12  WATER AGENCY; SACRAMENTO                )  **NOTICE OF REMOVAL**
    GROUNDWATER AUTHORITY; CARMICHAEL )
13  WATER DISTRICT; CITRUS HEIGHTS WATER )
    DISTRICT; DEL PASO MANOR WATER         )
14  DISTRICT; FAIR OAKS WATER DISTRICT;     )
    FLORIN RESOURCE CONSERVATION           )
15  DISTRICT; RIO LINDA ELVERTA COMMUNITY )
    WATER DISTRICT; SACRAMENTO SUBURBAN )
16  WATER DISTRICT; SAN JUAN WATER          )
    DISTRICT; CALIFORNIA-AMERICAN WATER )
17  COMPANY; CITY OF SACRAMENTO.            )
                                            )
18                       Plaintiffs,        )
            vs.                             )
19                                          )
    ATLANTIC RICHFIELD COMPANY; BP          )
20  PRODUCTS NORTH AMERICA, INC.;           )
    CHEVRONTEXACO CORPORATION; CHEVRON )
21  U.S.A. INC.; CITGO PETROLEUM            )
    CORPORATION; CONOCOPHILLIPS COMPANY;)
22  EQUILON ENTERPRISES LLC; EXXON MOBIL )
    CORPORATION; SHELL OIL COMPANY; SHELL )
23  OIL PRODUCTS U.S.; TESORO REFINING AND )
    MARKETING COMPANY; TEXACO REFINING )
24  AND MARKETING, INC.; ULTRAMAR, INC.;    )
    UNOCAL CORPORATION, INDIVIDUALLY         )
25  AND FORMERLY KNOWN AS UNION OIL         )
    COMPANY OF CALIFORNIA; VALERO           )
26  ENERGY CORPORATION; LYONDELL            )
    CHEMICAL COMPANY, INDIVIDUALLY AND )
27                                          )

28

3619 2.DOC

FORMERLY KNOWN AS ARCO CHEMICAL )
COMPANY; CIRCLE K STORES INC.; 7- )
ELEVEN, INC.; AND DOES 1-1000, INCLUSIVE. )
                                                                    )
                    Defendants.                           )
_____ )

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF THIS COURT:

    The undersigned Defendants ("Defendants"), by their attorneys and pursuant to 28 U.S. C. §

1441, *et seq.*, file their Notice of Removal of the action captioned as *The People of the State of*

*California et al. v. Atlantic Richfield Co.*, Case No. 03AS0542 from the Superior Court of the State

of California for the County of Sacramento, to the United States District Court for the Eastern

District of California. The basis for removal is as follows:

    1.      On September 30, 2003, the People of the State of California et al, ("Plaintiffs") filed

this action in the Superior Court for the County of Sacramento.  On October 30, 2003, Plaintiffs

filed an amended complaint in the Superior Court for the County of Sacramento.  A copy of the

First Amended Complaint is attached hereto as Exhibit 1 (the "Complaint").  A copy of all other

"process, pleadings, and orders" in the underlying action are attached hereto as Exhibit 2. *See* 28

U.S.C. § 1446(a).

    2.      28 U.S.C. § 1441(a) provides that "any civil action brought in a State court of which

the district courts of the United States have original jurisdiction, may be removed by the defendant .

. . to the district court of the United States for the district and division embracing the place where

such action is pending." Moreover, 28 U.S.C. § 1442(a)(1) provides for removal of a state court

action against the United States or an agency of the United States, sued in an official or individual

capacity for any act under color of such office.  Under 28 U.S.C. § 1452(a) a party may "remove

any claim or cause of action in a civil action . . . to the district court for the district where such civil

1    action is pending, if such district court has jurisdiction of such claim or cause of action under

2    section 1334 of this title." Pursuant to 28 U.S.C. § 1334(b) the "district courts shall have original

3    but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to

4    cases under title 11."

5         3.      This action is one over which this Court has original jurisdiction under 28 U.S.C. §§

6    1331 (federal question) and 1334 (bankruptcy).  In addition, the Defendants were acting at the

7    direction of a federal agency at the time of the conduct of which Plaintiffs complain.

8

9         4.      This Notice of Removal is filed in the District Court of the United States for the

10   district in which this suit was filed.

11        5.      No Defendant was served prior to November 14, 2003.  Accordingly, this Notice of

12   Removal is filed within the time frame provided by 28 U.S.C. § 1446(b).

13        6.      All non-nominal Defendants who have been served have joined in this notice or

14   otherwise consented to this removal.  Fictitious or non-existent parties are not required to join in or

15

16   consent to the removal.[1]

17        7.      Pursuant to the requirements of 28 U.S.C. § 1446(d), Defendants will promptly file a

18   copy of this Notice of Removal with the Clerk of the Superior Court for the County of Sacramento,

19   where the action was originally filed.  Defendants have also served Plaintiffs with this Notice of

20   Removal.

21

22                                          **SUMMARY**

23        8.      This removal is necessitated by a broadside attack on the comprehensive federal

24   system that regulates the content of gasoline, which expressly authorizes and effectively requires

25

26   [1] *United Computer Sys., Inc. v. AMT Corp.*, 298 F.3d 756, 762 (9th Cir. 2002) ("nominal"
     defendants need not consent to removal); *Steel Valley Auth. v. Union Switch & Signal Div.*, 809
     F.2d 1006, 1009 n. 2 (3d Cir. 1987) ("nominal" parties are disregarded in determining whether all
27   defendants consent to removal); *GMFS, L.L.C. v. Bounds*, 275 F. Supp. 2d 1350, 1354 (S.D. Ala.
     2003) ("fictitious defendants need not join in or consent to removal"); *Hicks v. Emery*

28                                                              (Footnote Cont'd on Following Page)

the conduct that Plaintiffs seek to prohibit based on far-fetched theories of state common law. Approximately thirty lawsuits have been filed since September 30, 2003, in various state courts around the country, uniformly asserting that the inclusion of methyl tertiary butyl ether ("MTBE") in gasoline constitutes an inherent design defect. A list of the cases of which Defendants are aware is attached hereto as Appendix A. These cases - -seeking damages, fines, and injunctions under a patchwork of various states' laws as a result of the gasoline industry's use of MTBE to comply with the federal Clean Air Act and its implementing regulations - -threaten the integrated national system for the supply and distribution of gasoline and highlight the need for federal judicial resolution of these claims. At their core, the lawsuits challenge who may determine the content of gasoline nationwide: the EPA, charged by Congress with that authority, or disparate civil juries in state courts in multiple jurisdictions in countless separate actions.

9.       Piecemeal state court litigation will result in scores of state judges across the country independently interpreting the Clean Air Act ("CAA") and EPA regulations regarding fuel content. Inconsistent decisions from state to state would interfere with and disrupt the federal regulatory regime, putting the oil industry in the impossible situation of trying to comply with federal regulations at the risk of incurring substantial state penalties and civil liability. The orderly supply of gasoline would be threatened as would the viability of the national gasoline distribution system. In sum, the state MTBE actions implicate substantial federal questions in an area — the content of motor fuel — that has been pervasively occupied by federal statutes and regulations. Accordingly, these claims must be resolved in federal, rather than state, court.

10.      In 1999, several MTBE cases were removed and consolidated in the United States District Court for the Southern District of New York in MDL 1358 — *In re MTBE Products*

---

(Footnote Cont'd From Previous Page)

*Worldwide, Inc.*, 254 F. Supp. 2d 968, 975 (S.D. Ohio 2003) (nonexistent defendant need not consent to removal).

*Liability Litigation.* After the court dismissed much of those claims and refused to certify four statewide purported class actions, the individual actions were settled and dismissed. MDL 1358, although currently inactive, is still pending. Simultaneous with this Notice of Removal, Defendants will give notice of relatedness to the MDL Panel and request transfer of this action, and all other MTBE actions being removed to federal court, to MDL 1358.

  11. This Notice of Removal does not challenge Plaintiffs' ability to pursue state law claims against individuals or entities that leak or spill gasoline into the environment. Nor do Defendants assert that federal law preempts traditional state law claims such as trespass or nuisance grounded in the actual releases of gasoline which proximately cause environmental damage. State statutory and common law both provide well-established and tested civil remedies to parties who have suffered such injuries, to be asserted against the person or persons actually responsible for the release itself. Once this case is removed, this Court has supplemental jurisdiction to hear these state law causes of action, such as trespass and nuisance, as part of the entire case under 28 U.S.C. §1367. As a result, all of Plaintiffs' causes of action may be heard in one Court.

  12. However, federal law has preempted the narrow field of fuel content. Because federal law so pervades the area, state law claims premised on the gasoline itself being defective are preempted. Plaintiffs' claims require interpretation of federal law and regulations concerning fuel content. Thus, the Complaint presents on its face a substantial federal question in an area completely preempted by federal law.[2]

---

[2] Several courts have considered the preemption issue in MTBE litigation. *Kubas v. Unocal Corp.*, 2001 WL 1940938 (Cal. Supr. Ct., LA. Cty., Aug. 23. 2001); *Hixson v. Unocal Corp.*, No DC195295 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Holten v. Chevron USA*, 2001 U.S. Dist. LEXIS 17599 (D.N.J. 2001); *Coppola v. Amerada Hess Corp.*, No. 2001/3995 (N.Y. Supr. Ct., Dutchess Cty., Jul. 31, 2002); *Molloy v. Amerada Hess Corp.*, No. 2001/3996 (N.Y. Supr. Ct., Dutchess Cty., Aug. 1, 2002). *See also In re MTBE*, 175 F. Supp. 2d 593, 611-16 (S.D.N.Y. 2001) (existence of preemption a question of fact); *Contra Abundiz v. Explorer Pipeline Co.*, 2002 WL 1592604 (N.D. Tex., July 17, 2002); *Oxygenated Fuels Assoc., Inc. v. Davis*, 331 F.3d 665 (9th Cir. 2003); *Oxygenated Fuels Assoc., Inc. v. Pataki*, 158 F. Supp. 2d 248 (N.D.N.Y. 2001); *Oxygenated Fuels Assoc., Inc. v. Pataki*, 2003 WL 22845949 (N.D.N.Y. Nov. 21, 2003). Although preemption is not an issue of first impression, no court has addressed preemption in the context of an all-out

(Footnote Cont'd on Following Page)

**BACKGROUND**

13.     In 1977, Congress amended the CAA, by adding what has been codified as 42 U.S.C. § 7545, to federalize fuel content requirements.  Section 7545 empowers the EPA to require all fuels and fuel additives to be registered with the EPA, and prohibits the sale of any fuel or fuel additive anywhere in the country that has not been registered with the EPA Administrator.

14.     In 1977, Congress gave the EPA the express and exclusive authority to decide what fuels and fuel additives are sold nationwide.  In Section 7545(f)(1) and (3), Congress made it unlawful to sell any motor vehicle fuel or fuel additive "which is not substantially similar to any fuel or fuel additive" already on the market.  Under Section 7545(f)(4), Congress gave the EPA the exclusive authority to waive the prohibitions established under paragraphs (1) or (3) under certain conditions.  Once a fuel is waived into commerce under Section 7545(f)(4), it may be sold nationwide.

15.     The EPA has issued two § 7545(f) waivers for MTBE.  The first such waiver was issued in 1979, allowing MTBE to be "introduce[d] into commerce" at concentrations of 0 to 7 percent by volume in order to enhance octane in gasoline following the ban on lead.  44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979).  The EPA thereafter determined that a fuel would be "substantially similar" if it contained oxygen at up to 2.0 percent by weight.  See 46 Fed. Reg. 38,582 (July 28, 1981).  The EPA issued the second waiver in 1988, in this case "granting a waiver for a fuel consisting of a blend of up to 15 percent [MTBE] in unleaded gasoline . . . ."  53 Fed. Reg. 33,846 (Sept. 1, 1988).

16.     In 1990, Congress again comprehensively amended the CAA.  As part of those amendments, Congress created two broad-ranging programs requiring petroleum refiners to blend

(Footnote Cont'd From Previous Page)

assault on one of the central pillars of interstate commerce, one that raises the precise factual issue acknowledged by many of these courts - that these tort claims have the potential to interfere with

(Footnote Cont'd on Following Page)

oxygenates into gasoline sold throughout much of the country: the OxyFuel Program ("OFP") and the Reformulated Gasoline ("RFG") Program. Both programs were designed to reduce emissions of toxic air pollutants.[2]

17.     In mandating the RFG Program, Congress required the EPA to promulgate regulations regarding fuel content which:

> [s]hall require the greatest reduction in emissions of ozone forming volatile organic compounds . . . and emissions of toxic air pollutants . . . achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emissions reductions, any nonair quality and other air-quality related health and environmental impacts and energy requirements.

42 U.S.C. § 7545(k)(1).

18.     When it enacted these oxygenate mandates, Congress was well aware that only a small number of oxygenated compounds could be blended with gasoline to achieve the minimum oxygen levels set.

19.     Congress also knew the industry would have to blend MTBE into at least some of the gasoline sold in OFP and RFG areas in order to comply with these program requirements. Indeed, both Congress and the EPA fully understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States. *See* 136 Cong. Rec. S 6383, 6384 (1990) (remarks of Sen. Daschle) ("EPA predicts that the amendment will be met almost exclusively by MTBE"). One Congressional estimate stated that "the MTBE market is expected to expand by more than 20 percent every year for the next five years" as a result of the CAA amendments. 136 Cong. Rec. S. 2280, 2289 (1990) (remarks of Sen. Daschle). *See also* 136 Cong. Rec. S 17773-74 (remarks of Sen. Daschle) ("the [RFG] program ... will jointly mean that well more than 25 percent of our Nation's

---

(Footnote Cont'd From Previous Page)

federal gasoline regulation.

[2] "Oxygenates" are chemical compounds - ethers or alcohols - that, when blended with gasoline, materially increase its oxygen content, enabling it to burn "cleaner" and emit fewer volatile organic compounds into the air.

gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program will allow for the use of MTBE and ethanol as additives to achieve the required level of oxygen"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of gasoline complying with Clean Air Act on the assumption that MTBE would be used).

20.    Congress intended to affirmatively encourage the use of MTBE for these purposes. Conference Report, Clean Air Act Amendments of 1990, 1990 CAA Leg. Hist. 1451, 1787 ("[t]he agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992.  These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 16954 (1990) (remarks of Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S 17514 (1990) (remarks of Sen. Heinz) ("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE").  In fact, Congress viewed the increased use of oxygenates like MTBE as "good for energy security and our balance of trade, as well as the environment" because RFG with a 15% MTBE content required 15% less gasoline.  136 Cong. Rec. S 3513 (1990) (remarks of Sen. Daschle).

21.    Congress even drafted the Clean Air Act Amendments to make certain MTBE could be used to meet them.  For instance, the percentage weight requirements for oxygen were amended during the Senate's consideration of the 1990 Clean Air Act amendments to lower the amount of oxygen required in gasoline used in the OFP from 3.1 percent to 2.7 percent, precisely to ensure that refiners would be able to use MTBE to meet the oxygenate mandate requirement:

> The level of 2.7 percent was chosen in part to provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether (or MTBE), and ethyl alcohol (or ethanol). The [EPA] Administrator may not discriminate among these different oxygenates, and should encourage fair competition among them.

136 Cong. Rec. H 12848, 12859 (1990) (remarks of Mr. Sharp).

22.     Senator Daschle's comments are perhaps the most succinct evidence of Congressional intent: "We want MTBE . . . I want ETBE and ethanol and MTBE and other fuels to play a role in achieving a variety of national objectives." 136 Cong. Rec. S. 2280, 2289 (1990).

23.     Accordingly, in enacting the oxygenate mandates, Congress intended that petroleum refiners use MTBE in gasoline.

24.     Congress was also aware that efforts to comply with its new oxygenate mandates for fuel content could have a serious impact on gasoline supplies on a national, regional and local level. Consequently, Congress authorized EPA to delay each of the OFP and RFG requirements for up to two and three years, respectively, if the Administrator determined that domestic supplies of compliant gasoline were inadequate.  42 U.S.C. § 7545(k)(6)(B) & (m)(2).

25.     After the passage of the Clean Air Act amendments in 1990, the EPA began considering regulations for the implementation of both the OFP and RFG requirements.  The EPA engaged in a "regulatory-negotiation" process to develop these regulations.  This process involved the active participation of the EPA and recognized stakeholders - - petroleum refiners, environmental groups, etc. - - in negotiations relating to the details of how each program should be implemented.

26.     In 1991, the EPA approved only the following compounds as additives to achieve the requisite oxygen content in gasoline for the OFP: MTBE, ethanol, methanol, tertiary amyl methyl ether ("TAME"), ethyl tertiary butyl ether ("ETBE"), tertiary butyl alcohol ("TBA"), and diisopropyl ether ("DIPE"). *Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of Clean Air Act as Amended,* 56 Fed. Reg. 31151, 31154 (July 9, 1991).

27.     The EPA began implementing the OFP requirements in 1992.  Pursuant to section 7545(m), the Administrator considered and approved changes to State Implementation Plans to require the use of oxygenated fuels in nonattainment areas for carbon monoxide.

28.    Like Congress, the EPA understood that MTBE would be "the most common oxygenating compound" used by refiners to comply with the CAA's new air emissions standards. *Approval and Promulgation of Implementation Plan*, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991).

29.    In 1994, the EPA reaffirmed its approval of MTBE by formally certifying MTBE as an acceptable oxygenate for the RFG program. 40 C.F.R. § 80.46. Notably, the EPA again acknowledged that "[g]iven present and projected conditions, EPA . . . expects that MTBE and ethanol will be the most commonly used oxygenates during Phase I of the [RFG] program." *Final Rule, Regulation of Fuels sand Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994). The other six oxygenates approved for use in the OFP were the only oxygenates available for use in the RFG.

30.    RFG requirements went into effect on January 1, 1995.

31.    To refine, distribute, or market gasoline in any area subject to OFP or RFG requirements, consistent with EPA regulations, refiners must include one of the seven approved oxygenates in gasoline at the requisite concentration.

32.    In promulgating its requirements for RFG, the EPA also specifically and expressly concluded that its regulations of fuel content preempted state law relating to the content of such fuel. *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994).

33.    The EPA's regulations pertaining to fuel content cover more than 400 pages of the Code of Federal Regulations, set forth at 40 CFR Parts 79 and 80.

34.    At the time the EPA promulgated the RFG regulations, it knew of MTBE's potential to contaminate groundwater. *See Final Rule, Testing Consent Order Oil Methyl Tertiary-Butyl Ether and Response to the Inter-Agency Committee*, 53 Fed. Reg. 10391, 10392 (Mar. 31, 1988). It also knew there was not a sufficient capacity of ethanol, on a nationwide basis, nor sufficient infrastructure for ethanol, to comply with the regulation. Accordingly, it expected that refiners

would extensively use MTBE to comply with the oxygenate requirement. *See, e.g.,* 59 Fed. Reg.

7716, 7732; *Regulation of Fuel and Fuel Additives: Reformulated Gasoline Adjustment,* 65 Fed.

Reg. 42920 (Jul. 12, 2000). To comply with the EPA's oxygenate requirements for RFG, refining

companies - - many of whom are defendants in this case -- added MTBE to their gasoline.

35.   In addition to the comprehensive fuel content regulations, the federal government

promulgated extensive regulations covering the transport and storage of gasoline. It has long been

well understood that gasoline should not be permitted to escape into the environment. Indeed,

Congress specifically amended the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.

§ 6691 *et seq.*, to provide a comprehensive set of regulations governing the storage of gasoline, and

an equally comprehensive set of penalties to ensure compliance with federal mandate. Section

6691b provides the EPA with broad powers to order, outright, the cleanup of leaking tanks, and §

6691e provides civil fines to tank owners that do not comply with remediation orders. The

corresponding EPA regulations, 40 CFR 280.10 *et seq.*, were finalized in 1988, years before the

recent wave of state court suits was set in motion. These regulations impose, among other things, a

duty on underground storage tank owners to promptly investigate and abate the scope of any release

of gasoline into the environment. Significantly, these regulations are designed to protect against

any releases of gasoline, whether it includes MTBE or not.

## JURISDICTION AND BASIS FOR REMOVAL

36.   A defendant may remove to the appropriate federal district court "any civil action

brought in a State court of which the district courts of the United States have original jurisdiction."

*City of Chicago v. International College of Surgeons,* 522 U.S. 156, 163 (1997) (quoting 28 U.S.C.

§ 1441(a)).

37.   The district courts have original jurisdiction over cases "arising under the

Constitution, laws, or treaties of the United States." *Id.* at 163 (quoting 28 U.S.C. § 1331).

38.     Not only will federal jurisdiction exist if the plaintiff's well-pleaded complaint establishes that federal law creates the cause of action (*e.g.*, *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808 (1986)), but federal question jurisdiction also exists if the plaintiff's right to relief necessarily depends on the resolution of a "substantial question" of federal law. *Franchise Tax Bd. of the State of Calif. v. Construction Laborers Vacation Trust for So. Calif.* 463 U.S. 1, 13 (1983).

39.     On its face, the Complaint asserts that the use of MTBE in gasoline constitutes an inherent design defect.  The California Supreme Court has stated that when assessing the adequacy of a product (in this case, gasoline containing MTBE) that is not "within the common knowledge of lay jurors," the jury applies a risk/utility test to determine if it is defective.  *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 567 (1994); *see Barker v. Lull Engineering Co.*, 20 Cal. 3d 413 (1978).

40.     Under the risk/benefit test, a product will not be determined to be defective if, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. *Barker*, 20 Cal. 3d at 432.  The adequacy of a product's design is evaluated through consideration of various factors including, among other things, the feasibility, cost, and disadvantages of an alternative design. *Id.* at 431.  The presence of a practicable alternative satisfying the federal oxygenate mandates is therefore necessary to the determination of whether a product is defectively designed.  The content and composition of gasoline requires balancing multiple air quality, water quality, and economic concerns, and it is therefore a matter outside "the common knowledge of lay jurors." *Soule*, 8 Cal. 4th at 567.  As a result, to resolve plaintiff's claim, the jury must evaluate the relevant "risks and utilities" of the product - - and, specifically, whether a feasible alternative existed. *Id.*

41.     Plaintiffs acknowledge this element of its case by alleging that "[a]t all times relevant to this action, feasible alternatives to MTBE and/or TBA that would have eliminated the unreasonable danger posed by gasoline containing MTBE and/or TBA , without excessive costs or

loss of product efficiency, were available to Defendants." Complaint, ¶ 170; *see also id.* ¶ 88 (alleging "the availability of reasonable alternatives"), Ex. 1.

42.    Plaintiffs intend to have a California state court construe a complicated web of federal statutes and implementing regulations that reflects the EPA's own balancing and conclusions. The state court's conclusions could easily undermine the policy choices reflected in the EPA's initial waiver of MTBE into commerce and its subsequent registration of MTBE as one of the few oxygenates that could be used to comply with OFP and RFG requirements.[4]

43.    Removal is also appropriate where, as here, the federal government has completely preempted the field. *Beneficial Nat'l Bank v. Anderson*, 123 S. Ct. 2058, 2063 (2003). Through the Clean Air Act, Congress established the minimum oxygenate levels needed to comply with OFP and RFG mandates nationwide (specifically adjusting such levels, as described above, to permit use of MTBE), authorized the EPA to evaluate and specify the permissible gasoline additives used to satisfy such federal mandates, required the EPA to monitor closely the implementation of such oxygenate standards to avoid undue fuel supply impacts or other dislocations, and expressly directed the EPA to "tak[e] into consideration . . . any nonair quality . . . health and environmental impacts." 42 U.S.C. § 7545(k)(1); *Final Rule, Regulation of Fuels sand Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716 (Feb. 16, 1994). The EPA then comprehensively exercised its powers granted by this far-ranging federal statutory scheme by promulgating in exhaustive detail the timing and locations at which oxygenated fuels were required

---

[4] It is beyond dispute that the choice of gasoline components involves tradeoffs. Each of the approved oxygenates shares, to varying degrees, the very characteristics of MTBE of which Plaintiffs now complain. And certain oxygenates other than MTBE pose additional tradeoffs and risks. If state product liability claims such as those brought by Plaintiffs are permitted to coexist with federal fuel content regulations, there is no legal reason why comparable claims cannot be asserted against Defendants and others for using any of the oxygenates approved to comply with federal fuel content requirements. Thus, Defendants, although required by federal law to blend an oxygenate into gasoline, have had and will have no means of determining which oxygenates they may use without subjecting themselves to the uncertainties of what is, in effect, state-by-state fuel content regulation through individual tort actions for adding MTBE or adding any of the other "alternative" oxygenates contemplated by Congress and the EPA.

to be sold and approving the particular oxygenate additives used to comply with these federal

standards and by spelling out the myriad other requirements affecting the sale, blending and

transportation of oxygenated fuel essential to enable such standards to be implemented and

enforced. 42 U.S.C. § 6691 *et seq.*; *Final Rule, Regulation of Fuels and Fuel Additives: Standards*

*for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716 (Feb. 16, 1994). This

comprehensive scheme of federal regulation of fuel content, including particularly its specification

of the oxygenate additives added to gasoline to control motor vehicle emissions, wholly displaces

state law within the regulated field.[5]

44.     A purported state claim challenging the design of gasoline is really a federal claim

asserting that the EPA's cost-benefit analysis with respect to fuel content — grounded in that

Agency's technical expertise and nationally focused judgment — does not adequately protect the

environment. In fact, the Complaint, on its face, directly challenges the EPA's cost-benefit analysis

by alleging the purported availability of "feasible alternatives to MTBE that would have eliminated

the unreasonable danger posed by gasoline containing MTBE, without excessive costs or loss of

product efficiency . . . ." Complaint ¶ 170, Ex.1. Congress unambiguously authorized the EPA to

conduct this cost-benefit analysis. 42 U.S.C. § 7545(k)(1).

---

[5] 42 U.S.C. § 7545(c)(4)(B) granted to California a limited exception permitting imposition of a
"control or prohibition" affecting motor vehicle fuels designed to achieve vehicle emission
reductions going beyond that mandated by federal law. 61 Fed. Reg. 12030, 12038 (EPA revision
of reformulated gasoline regulations stating "[w]hile the federal standards for reformulated and
conventional gasoline do apply in California, if California has imposed its own more stringent
regulations, as it has regarding oxygen content, then fuels producers must abide by California's
more stringent standards"); *see also* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("On the
question of preemption, representatives of the State of California were clearly opposed to displacing
the State's right to set more stringent standards to meet peculiar local conditions"); 113 Cong. Reg.
32478 (1967) (remarks of Senator Murphy)("I am firmly convinced that the United States as a
whole will benefit by allowing California to continue setting its own more advanced standards for
control of motor vehicle emissions"). This exception, at most, relieves California from the ambit of
42 U.S.C. § 7545(c)(4)(A), a provision on which Defendants do not rely for purposes of this
removal petition. The exception is not inconsistent with Congress' intent to preempt the field (*i.e.*,
regulation of fuel content) but merely allowed California - and California only – to impose
requirements that were at least as restrictive as those imposed by federal law.

45.     Following promulgation of the federally-mandated oxygenate requirements, Plaintiffs did not challenge the EPA's exercise of discretion to preempt the entire field of motor vehicle fuel content, although they were free to do so under the exclusive terms for such review set forth in 42 U.S.C. § 7607(b)(1).  Accordingly, state court litigants cannot now collaterally challenge the EPA's determination on preemption in the guise of state tort actions.

46.     The Complaint requests that the California state court supplant the judgment and conclusions of Congress and the EPA regarding fuel content with its own.  It thus interferes with an area that Congress has expressed a clear intent to carve out for federal dominance, given the national reach of the gasoline transport and delivery system, and the effects of these products on the nation as a whole, not just on the citizens or environment of a particular state.  Indeed, Plaintiffs' claim presents precisely the issue that Congress placed within the sole purview of the EPA, when it gave the EPA the exclusive authority to determine whether a fuel or fuel additive could be introduced into commerce, and again when it required the agency to certify oxygenates for the federally-mandated oxygenate programs, "taking into consideration the cost of achieving such emission reductions, *any nonair-quality* and other air-quality *environmental impacts* and energy requirements." 42 U.S.C. § 7545(k)(1) (emphasis added).  And the federal law sets up a specific framework that the EPA must use in balancing these various factors.  Thus, a state law tort claim is in fact covered by the federal scheme and remitted to the EPA for its determination.[6]

47.     If thirty state courts determine the question of federal preemption, the result will be a jumble of legal and factual outcomes that likely will be inconsistent and at odds with Congressional intent and the EPA's decisions based on its interpretation of that intent, but at odds with one

---

[6] In *OFA v. Davis*, 331 F.3d 665, 670-673 (9th Cir. 2003), the Ninth Circuit rejected the attack mounted by the Oxygenated Fuels Association upon California's proposed phaseout of MTBE.  In *Davis*, the OFA relied upon different theories of preemption than those raised here as the basis of its challenge to this California regulation, and, in rejecting those theories, the Ninth Circuit did not address or decide the preemption issues underlying this removal petition.  *See* 331 F.3d at 670-71

(Footnote Cont'd on Following Page)

another. Each state has its own standards for what constitutes a dangerous or defective product, its own rules for the type of balancing a manufacturer has to undertake to supply its products in that state, and its own factors for evaluating the hazards to its citizenry. Within each state (or even within various subdivisions within the same state), judges can apply those standards differently or juries can draw different conclusions based on their understanding of the balancing tests. Conceivably, the industry could be held liable in one California court for its decisions to add MTBE, exonerated in another, fined in Massachusetts and subjected to substantial damages in Connecticut, or even held liable for using one or more of the alternate additives that were specifically approved by Congress and the EPA. Such disparate results will eviscerate the carefully constructed federal scheme and the industry's ability to rely upon the Congressional intent to both provide and maintain an assured supply of gasoline and to protect the nation's environment and its citizens.[7]

48. Yet another ground for removal of this case is, 28 U.S.C. § 1442(a)(1), which permits removal by corporations acting under the direction of federal officers or agencies. Pursuant to the Clean Air Act and its implementing regulations, the industry is required to use oxygenates in gasoline. Further, as explained more fully above, see ¶¶ 13-35 *supra*, both Congress and EPA fully understood and expected that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States. Therefore, a federal directive caused the conduct about which Plaintiff complains and removal under 28 U.S.C. § 1442(a)(1) is appropriate.

---

(Footnote Cont'd From Previous Page)

(relying solely upon "conflict" preemption theories); *id.* at 673 ("OFA does not argue that California's MTBE ban will inhibit federal efforts to fight air pollution").
[7] Recognizing how imperative uniformity is to the national distribution system, Congress did not even want to risk inconsistent results among the federal circuits with respect to judicial review of fuel content regulations. Accordingly, it vested exclusive jurisdiction in the D.C. Circuit Court of Appeals. 42 U.S.C. § 7607(6).

49.     Additionally, 28 U.S.C. § 1334(b) provides that the "district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in or related to cases* under title 11."

50.     On April 12, 1987, Texaco Inc., predecessor in interest to Defendant Chevron Texaco Corporation (collectively the "Texaco" or the "Texaco Defendant"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Jointly Administered Chapter 11 Case Nos. 87-B-20142, 87-B-20143, and 87-B-20144.

51.     On March 23, 1988, the United States Bankruptcy Court for the Southern District of New York confirmed Texaco's Second Amended Joint Plan of Reorganization (the "Texaco Confirmation Order"). Pursuant to the Texaco Confirmation Order, Texaco was discharged forever from any and all claims or liabilities arising before the date of the entry of the Texaco Confirmation Order, whether or not a proof of claim was filed, and whether or not the holder of such claim accepted the Plan of Reorganization. Furthermore, pursuant to Bankruptcy Code § 524(a)(2) and the Texaco Confirmation Order, any "commencement . . . of any action, the employment of process, or any act to collect, recover or offset any debt discharged herein" was permanently enjoined and restrained.

52.     In 1993, Circle K Corporation, predecessor in interest to Defendant Circle K Stores, Inc., filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona, Jointly Administered Chapter 11 Case Nos. 90-5052-PHX-GBN and 90-5075-PHX-GBN.

53.     On June 29, 1993, the United States Bankruptcy Court for the District of Arizona issued the Order Implementing Confirmation of Plan of Reorganization Under Chapter 11, Title 11, United States Code, Proposed By and for the Circle K Corporation and its Affiliated Debtors (the "Circle K Confirmation Order"). The Circle K Confirmation Order discharged Circle K

Corporation from any and all claims or liabilities brought by any party bound by or by parties who opted out of an agreement to settle all environmental claims. All such claims were deemed withdrawn and expunged for all purposes. Additionally, the Circle K Confirmation Order held that Environmental Lease Rejection Claims and Environmental Orphan Site Claims, as defined therein, were discharged pursuant to the U.S. Bankruptcy Code to the extent they were not withdrawn or expunged.

54.     Further, pursuant to the Texaco Confirmation Order and the Circle K Confirmation Order, all property of the bankruptcy estates and all property dealt with by the reorganization plans are free and clear of all claims and interests of creditors. Furthermore, Bankruptcy Code § 1141(c) provides that, "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors . . . ."

55.     This action seeks recovery from the successors in interest of Texaco and Circle K Corporation for alleged claims arising prior to entry of the Texaco Confirmation Order and the Circle K Confirmation Order, which discharged such claims. 11 U.S.C. §§ 1141 and 524. The Complaint therefore is a collateral attack upon the Texaco Confirmation Order and the Circle K Confirmation Order, and is filed in clear violation of any injunction contained in said Orders. *See Texaco Inv. v. Sanders* (In re Texaco Inc.), 182 B.R. 937 (Bankr. S.D.N.Y. 1995) (holding that the pursuit of discharged claims against Texaco violates the Bankruptcy Court's Confirmation Order and the discharge injunction).

56.     Here, Plaintiffs allege pre-confirmation claims that attack the integrity of the Texaco Confirmation Order and the Circle K Confirmation Order, and therefore implicate substantive federal law based rights created by the Bankruptcy Code. The Texaco Confirmation Order and the Circle K Confirmation Order, as well as the Bankruptcy Code, bar prosecution of pre-confirmation claims, and bar the claims themselves. Therefore, a matter such as the plaintiffs' state court lawsuit, which implicates enforcement and construction of the Texaco Confirmation Order and the Circle K

Confirmation Order, is a proceeding within core federal bankruptcy jurisdiction. *See* 28 U.S.C. §

157(b) (those matters within the "core" bankruptcy jurisdiction of federal courts include

"determinations as to the dischargeability of particular debts"); *Matter of Chicago, Milwaukee, St.*

*Paul & Pac. R.R.*, 6 F.3d 1184 (7th Cir. 1993) (matter which invokes the issue of a bankruptcy

discharge falls within federal bankruptcy jurisdiction); *In re National Gypsum Co.*, 118 F.3d

1056,1064 (5th Cir. 1997) (proceeding seeking interpretation of discharge provision of confirmation

order "is a core proceeding arising under title 11").

57.     The court that issued the Texaco Confirmation Order, the Bankruptcy Court for the

Southern District of New York, is the most appropriate court to interpret the scope of its own order.

The Texaco Defendant reserves the right to seek transfer of venue of this case or any proceeding

herein to the United States Bankruptcy Court for the Southern District of New York as such a

transfer would be consistent with transferring this action (along with other new MTBE cases) to the

court which handled the MDL 1358 MTBE proceeding.

58.     Removal of this case to this Court by the Texaco Defendant and Defendant Circle K

Stores, Inc. pursuant to 28 U.S.C. § 1452 does not require the consent of other Defendants. *Creasy*

*v. Coleman Furniture Corp.*, 763 F.2d 656, 660 (4th Cir. 1985)("Under the bankruptcy removal

statute . . . any one party has the right to remove the state court action without the consent of the

other parties").

59.     In addition to the jurisdiction over the claims against Defendants, as set forth above,

this Court has supplemental jurisdiction over the remainder of the state court claims pursuant to 28

U.S.C. § 1367.

1    WHEREFORE, Defendants hereby remove to this Court the action captioned *The People of*

2    *the State of California et al. v. Atlantic Richfield Co.*, Case No. 03AS0542 from the Superior Court

3    for the County of Sacramento.

4    Dated:  December 8, 2003                      ARNOLD & PORTER

5

6

7                                              By:  _____

8                                                   MATTHEW T. HEARTNEY
                                                    Attorneys for Defendant
9                                                   Atlantic Richfield Company and
                                                    BP Products North America Inc.

10   305619

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: _____
    David L. Schrader
    Attorneys for Defendants
    ChevronTexaco Corporation and
    Chevron U.S.A. Inc.

Dated: December 8, 2003

DAVID L. SCHRADER
ALLISON N. SHUE
MORGAN, LEWIS & BOCKIUS LLP
300 S. Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071
(213) 612-2500
Fax (213) 612-2501

1

2
                                      Respectfully submitted,

3
                                        BINGHAM McCUTCHEN LLP

4

5
                                    By:

6
                                            COLLEEN P. DOYLE

7
                                        CATHERINE M. STITES
                                        Attorneys for EXXON MOBIL
                                    CORPORATION AND MOBIL
                                        CORPORATION

8
    Dated: December 8, 2003

9
    BINGHAM McCUTCHEN LLP

10
    COLLEEN P. DOYLE (SBN 122060)
    DIANA PFEFFER MARTIN (SBN 149755)

11
    CATHERINE M. STITES (SBN 188534)
    355 South Grand Avenue, Suite 4400

12
    Los Angeles, CA  90071-3106

13
    Telephone:  (213) 680-6400

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 40252209.1/2006380-7083800233

Respectfully submitted,

BINGHAM McCUTCHEN LLP

By: _____

COLLEEN P. DOYLE
CATHERINE M. STITES
Attorneys for TESORO REFINING AND
MARKETING COMPANY

Dated: December 8, 2003

BINGHAM McCUTCHEN LLP
COLLEEN P. DOYLE (SBN 122060)
DIANA PFEFFER MARTIN (SBN 149755)
CATHERINE M. STITES (SBN 188534)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

CIRCLE K STORES, INC.

By: _____
      Peter J. Wilson
Counsel for Defendants ConocoPhillips
Company and Circle K Stores, Inc.

Dated: December 8, 2003

John J. Lyons
Jon D. Anderson
Peter J. Wilson
Michele D. Johnson
Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
(714) 540-1235
(714) 755-8290

908_2.DOC

OC\644908.2

NOTICE OF REMOVAL

# Exhibit 3

1  JAN SCULLY, District Attorney
   ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616
2  RUSS DETRICK, Supervising Deputy District Attorney SBN 192525
   SACRAMENTO COUNTY DISTRICT ATTORNEY
3  Environmental Protection Division
   906 G Street, Suite 700
4  Sacramento, CA 95814
   Telephone:  (916) 874-6174
5  Facsimile: (916) 874-7660

6  Attorneys for Plaintiff the People of the State of California

[Exempt from filing and motion fees, Govt. Code § 6103]

**FILED**

DEC 1 5 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY: _____
                DEPUTY CLERK

7  Victor M. Sher, SBN 96197
   Todd E. Robins SBN 191853
8  SHER & LEFF, LLP
   450 Mission Street, 5th floor
9  San Francisco, CA 94105
   Telephone: (415) 348-8300
10 Facsimile: (415) 348-8333

Scott Summy, *Admitted in Texas*
Celeste A. Evangelisti, SBN 225232
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

11 Attorneys for Plaintiffs, City of Elk Grove, Sacramento County Water Agency, Sacramento
    Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor
12 Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta
    Community Water District, Sacramento Suburban Water District, San Juan Water District,
13 California-American Water Company and City of Sacramento

14

15                   **UNITED STATES DISTRICT COURT**

             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

16

17 THE PEOPLE OF THE STATE OF CALIFORNIA, et   )   Case No. CIV.S-03-2653 GEB DAD
   al.,                                 )
18                                    )   NOTICE OF MOTION AND
                                 )   MOTION FOR REMAND
19           Plaintiffs,          )
                                 )   Hearing Date:  January 26, 2004
20    vs.                           )   Time:  9:00am
                                 )   Location: Courtroom 10
21                                )         501 I Street, Suite. 4-200,
   ATLANTIC RICHFIELD COMPANY, et al.,     )         Sacramento, CA 95814
22                                )
                               )   Hon. Garland E. Burrell, Jr.
23           Defendants.         )

24

25

26

27                                *15*

28

                                -i-

## NOTICE OF MOTION AND MOTION FOR REMAND

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Please take notice that on January 26, 2004, at 9:00 a.m., in the U.S. District Court for the District of Eastern California, 501 I Street, Suite. 4-200, Sacramento, California, Courtroom 10, plaintiffs, the People of the State of California, City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company and City of Sacramento ("Plaintiffs") will, and hereby do, move this Court for an order remanding the above-entitled action to the California Superior Court, on the grounds that this Court lacks federal subject matter jurisdiction over the action.

By this Motion, Plaintiffs respectfully request that the Court enter: (1) an Order remanding this case to the Superior Court of California, Sacramento County; (2) an Order awarding Plaintiffs their costs, including reasonable attorney's fees, incurred in connection with the removal of this action to federal court pursuant to 28 U.S.C. § 1447(c); and (3) for all other relief that this Court deems just and proper.

Filed herewith and incorporated herein by reference is a Memorandum of Points and Authorities in support of this Motion.

Respectfully submitted,

DATED: _12/15_____ , 2003

JAN SCULLY, DISTRICT ATTORNEY

ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By:    _Russ Detrick_

RUSS DETRICK
Supervising Deputy District Attorney
Attorney for Plaintiff
The People of the State of California.

- ii -

DATED: _Dec. 15_ , 2003

SHER & LEFF, LLP

By: _[signature]_

TODD E. ROBINS
VICTOR M. SHER

BARON & BUDD, P.C.
SCOTT SUMMY
CELESTE A. EVANGELISTI

Attorneys for Plaintiffs, City of Elk Grove,
Sacramento County Water Agency, Sacramento
Groundwater Authority, Carmichael Water
District, Citrus Heights Water District, Del Paso
Manor Water District, Fair Oaks Water District,
Florin Resource Conservation District, Rio
Linda Elverta Community Water District,
Sacramento Suburban Water District, San Juan
Water District, California-American Water
Company, and City of Sacramento

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- iii -

1 | JAN SCULLY, District Attorney
ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616
2 | RUSS DETRICK, Supervising Deputy District Attorney SBN
SACRAMENTO COUNTY DISTRICT ATTORNEY
3 | Environmental Protection Division
906 G Street, Suite 700
4 | Sacramento, CA 95814
Telephone: (916) 874-6174
5 | Facsimile: (916) 874-7660

**ORIGINAL FILED**

DEC 15 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

[Exempt from filing and motion fees, Govt. Code § 6103]

6 | Attorneys for Plaintiff the People of the State of California

7 | Victor M. Sher, SBN 96197
Todd E. Robins SBN 191853
8 | SHER & LEFF, LLP
450 Mission Street, 5th floor
9 | San Francisco, CA 94105
Telephone: (415) 348-8300
10 | Facsimile: (415) 348-8333

Scott Summy, *Admitted in Texas*
Celeste A. Evangelisti, SBN 225232
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

11 | Attorneys for Plaintiffs, City of Elk Grove, Sacramento County Water Agency, Sacramento
12 | Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor
Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta
13 | Community Water District, Sacramento Suburban Water District, San Juan Water District, California
American Water Company and City of Sacramento

14 |

### UNITED STATES DISTRICT COURT

15 |

### FOR THE EASTERN DISTRICT OF CALIFORNIA

16 |

17 |

18 | THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,

19 | Plaintiffs,

20 | vs.

21 |

22 | ATLANTIC RICHFIELD COMPANY, et al.,

23 | Defendants.

24 |

| | |
|---|---|
| ) | Case No. CIV.S-03-2653 GEB DAD |
| ) | |
| ) | MEMORANDUM OF POINTS and |
| ) | AUTHORITIES IN SUPPORT OF |
| ) | PLAINTIFFS' MOTION FOR |
| ) | REMAND |
| ) | |
| ) | Hearing Date: January 26, 2004 |
| ) | Time: 9:00am |
| ) | Location: Courtroom 10 |
| ) | 501 I Street, Suite. 4-200, |
| ) | Sacramento, CA 95814 |
| ) | |
| ) | Hon. Garland E. Burrell, Jr. |

25 |
26 |
27 |
28 |

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

# TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………..…………….…..…..1

II.   BACKGROUND…...........……………………………………………...……......4

III.  STANDARD OF REVIEW…............………………………………………..6

IV.   ARGUMENT……..………………………………………….…………………6

    A.   Defendants' "Complete Preemption" and "Substantial Federal Question" Arguments Have
       No Merit…………………………………………………………..………………...……6

       1. Complete preemption does not apply in this case because the CAA does not provide an
         exclusive (or any) cause of action for damages to drinking water caused by MTBE, and
         the Ninth Circuit has definitively rejected federal preemption of state action to address
         MTBE water contamination.........................................................................................7

       2. No "substantial federal question" arises in this case because Plaintiffs' defective product
         claim does not depend on resolution of any federal issue, and state court  resolution of
         such claim will have no effect whatsoever on federal CAA
         programs............................................................................................................11

       3. The existence of other allegedly similar state-law MTBE lawsuits has no bearing
         whatsoever on the propriety – or lack thereof – of removing this action to federal
         court…………………………...........................................................................14

    B.   Removal Under § 1442(a)(1) Is Improper Because Defendants Were Not Acting Under the
       Direction of Any Federal Official or Agency…………………………………....….. .15

       1. Defendants have no colorable federal defense. ……………………………..….…15

       2. As private regulated entities that are not performing any government function, and that
         voluntarily *chose* to use MTBE in gasoline despite its known hazards,  Defendants
         were never acting under the direction of any federal official. …………………..15

           a. Defendants' compliance with RFG regulations does not transform them
             into agents of the federal government…..……………………………..…16

           b. There is no causal connection between RFG program requirements and the
             conduct targeted by this lawsuit because refiners voluntarily chose to use
             MTBE from among several available options……………………………17

           c. Whether or not Congress and/or EPA anticipated that Defendants would
             make MTBE their oxygenate of choice is irrelevant…………………….19

    C.   The Court Should Remand and/or Abstain From Hearing This Case Because It Is Not  .
       "Related To" The Texaco Bankruptcy, and Even If It Were, the Abstention and Remand
       Provisions Under 28 U.S.C. §§ 1334(c) and 1452 Apply Squarely To This Case…..……20

       1. Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not
         "related to" the Texaco Bankruptcy………………………..………..…………………20

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

2. The Court must remand this action pursuant to § 1452(a) because it is a civil action by governmental units to enforce such governmental units' police or regulatory power.................................................................................................22

3. Alternatively, the Court must abstain from hearing this case pursuant to 28 U.S.C. §1334(c)(2), as it is a state-law action with no basis for federal jurisdiction other than its alleged relation to a Title 11 proceeding.................................................................23

4. There are also ample grounds for the court to exercise its discretion to abstain from hearing this action pursuant to § 1334(c)(1) and/or to remand it to state court pursuant to §1452(b).................................................................................................24

5. If the Court chooses not to abstain or remand the action in its entirety, it should at least remand all claims other than those involving conduct of Texaco, Inc. arising prior to 1988.................................................................................................25

D.  Plaintiffs Are Entitled To Its Removal-Related Attorneys' Fees and Costs.......................25

V.  CONCLUSION.................................................................................................25

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

TABLE OF AUTHORITIES

**Cases**

*Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604 *(N.D. Tex 2002)* ------------------------------9

*ARCO Environmental Remediation v. Montana Dept. of Health and Environmental Quality*,
    213 F.3d 1108 (9th Cir. 2000)------------------------------------------------------------------8, 10

*Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998) ---------------------------19

*Bakalis v. Crossland Savings Bank*, 781 F. Supp. 140 (E.D.N.Y. 1991)-------------------------------17

*BancOhio Corp. v. Fox*, 516 F.2d 29 (6th Cir.1975)-----------------------------------------------14

*Barker v. Lull*, 20 Cal.3d 413 (1978)----------------------------------------------------------*Passim*

*Beneficial National Bank v. Anderson* _ U.S._, 123 S. Ct. 2058 (2003)-------------------------*Passim*

*Bd. of Calif. v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983)-----------------------------6

*Botsford v. Blue Cross and Blue Shield of Montana, Inc.*, 314 F.3d 390 (9th Cir. 2002)----------------10

*Brown v. Philip Morris, Inc.*, 250 F.3d 789 (3rd Cir. 2001)----------------------------------------17

*Burns v. Windsor Ins. Co.*, 31 F.3d 1092 (11th Cir. 1994)------------------------------------------6

*Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct. Dutchess Cty. Jul. 31, 2002)--------------10

*Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246 (9thCir. 2000)-----------------------------*Passim*

*Franchise Tax Bd. of Calif. v. Construction Laboroers Vacation Trust*, 463 U.S. 1 (1983) ---------2, 7

*Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1992)---------------------------------------------15

*Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992)----------------------------------------------6

*Good v. Armstrong World Indus.*, 914 F. Supp. 1125 (E.D. Pa. 1996)------------------------------3, 18

*Hixon v. Unocal*, BC195295 (Cal. Sup. Ct. L.A. Cty. August 23, 2001)--------------------------------10

*Holten v. Chevron U.S.A.*, No. 00-4703 (D.N.J. July 10, 2001)--------------------------------------10

*In re Feitz*, 852 F.2d 455 (9th Cir. 1988)-----------------------------------------------------3, 21

*In re Forester*, 146 B.R. 383 (Bkrtcy. N.D. Ohio, 1992)--------------------------------------------22

*In re General Carriers Corp.*, 258 B.R. 181 (B.A.P. 9th Cir. 2001)-------------------------------21, 23

*In re Kennilworth Partners II LP v. Crisman*, 2001 WL 30534 (N.D. Cal. 2001)-------------------- 22

*In re McGhan*, 288 F.3d 1172 (9th Cir. 2002)------------------------------------------------3, 21

*In re Mosaid Technologies Inc. Patent Litigation,*

      283 F. Supp. 2d 1359 (Jud. Pan. Mult. Lit. 2003)--------------------------------------------14

*In re MTBE Litig.,* 175 F. Supp. 2d 593 (S.D.N.Y. 2001)----------------------------------------*Passim*

*In re Republic Readers Service, Inc.,* 81 B.R. 422 (Bkrtcy. S.D.Tex. 1987)------------------------22, 24

*In re Rezulin Products Liability Litig.* 133 F. Supp. 2d 272 (S.D.N.Y. 2001)-----------------------------1

*In re Texaco, Inc.,* 84 B.R. 893 (S.D.N.Y. 1988)----------------------------------------------------20

*In re Tucson Estates, Inc.,* 912 F.2d 1162 (9th Cir. 1990)----------------------------------------------24

*International Paper Co. v. Ouellette,* 479 U.S. 481 (1987)------------------------------------------- 9

*Kubas v. Unocal,* BC191876 (Cal. Sup. Ct. L.A. Cty. August 23, 2001)---------------------------------10

*Lippitt v. Raymond James Financial Serv.,* 340 F.3d 1033 (9th Cir. 2003)------------------------*Passim*

*Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838 (S.D. Ohio 2002)-------------------------------*Passim*

*Mangini v. RJ Reynolds Tobacco Co.,* 793 F. Supp 925 (N.D. Cal. 1992)--------------------------------6

*Merrell Dow Pharmaceuticals v. Thompson,* 478 U.S. 804 (1986)----------------------------------*Passim*

*Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987)--------------------------------------8

*Molloy v. Amerada Hess,* No. 2001/3996 (N.Y. Sup. Ct. dutchess Cty. July 31, 2002) ---------------10

*Moncure v. Olympus American,*

      __ F. Supp. 2d __, 2003 WL 22594314 (S.D. Miss. Oct 9, 2003)---------------------------------12

*Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665 (9th Cir. 2003)----------------------*Passim*

*Oxygenated Fuels Ass'n v. Pataki,* 158 F. Supp. 2d 248 (N.D.N.Y. 2001) -------------------------*Passim*

*People of the State of California v. Steelcase, Inc.* 792 F. Supp. 84 (C.D. Cal 1992)--------------------1

*Rains v. Criterion Systems, Inc.,* 80 F.3d 339 (9th Cir. 1996)----------------------------------------*Passim*

*Ryan v. Dow Chem. Co.*, 781 F. Supp. 934 (S.D.N.Y. 1992)----------------------------------------15, 18

*Shadie v. Aventis Pasteur*, 254 F. Supp. 2d 509 (M.D. Pa. 2003)----------------------------------2, 12

*Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941) ---------------------------------------------6

*Soule v. General Motors,* 8 Cal 4th 548 (1994)------------------------------------------------------12

*South Lake Tahoe Public Utilities District v. Atlantic Richfield Co., et al.* Case No. 999128 (S.F.

      Super. Ct. March 4, 2002)-------------------------------------------------------------------------1

*Taylor v. Anderson*, 234 U.S. 74 (1914)-----------------------------------------------------------6

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

1  *Texaco v. Sanders,* 182 B.R. 937 (Bkrtcy S.D.N.Y. 1995) ------------------------------------------------22

2  *Tremblay v. Philip Morris, Inc.,* 231 F. Supp. 2d 411 (D.N.H. 2002)------------------------------*Passim*

3  *Waste Control Specialists v. Environcare of Texas,* 199 F.3d 781 (5th Cir. 2000) ----------------------7

4  *Williams v. Shell Oil Co.,* 169 B.R. 684 (S.D. Cal. 1994)------------------------------------------------*Passim*

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

**Statutes**

28 U.S.C. § 1447(c) .........................................................................................1

28 U.S.C. § 1407............................................................................................ 14

28 U.S.C. § 1452........................................................................................22, 23

28 U.S.C. §§ 1334(c) .................................................................................3, 19, 25

28 U.S.C. §1334(b) ..................................................................................*Passim*

28 U.S.C. §1334(c)(2)........................................................................................3

28 U.S.C. §1442(a)(1)....................................................................................3, 14

28 U.S.C. §1447(c).......................................................................................... 24

28 U.S.C. §1452(b)..........................................................................................23

29 U.S.C. §185................................................................................................7

29 U.S.C. §1132................................................................................................7

42 U.S.C. § 2014(m) ...........................................................................................1

42 U.S.C. § 7545(f)..........................................................................................12

42 U.S.C. § 7545(k)(2)(B) ..............................................................................5, 17

42 U.S.C. § 7545(m)(2) .......................................................................................5

42 U.S.C. § 7604(e) ...........................................................................................8

Cal. Civil Code § 1882..........................................................................................6

Cal. Health & Saf. Code § 116366 ............................................................................6

Cal. Water Code § 13285.......................................................................................6

FEDERAL REGISTER

U.S. EPA, *Approval and Promulgation of Implementation Plans; Nevada State Implementation Plan Revision, Clark County*, 64 Fed. Reg. 29573 (June 2, 1999)............................*Passim*

U.S. EPA, *Final Rule, Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Inter-agency Testing Committee*, 53 Fed. Reg. 10391, 10392 (March 31, 1988)..............................13

U.S. EPA, *Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline*,

65 Fed. Reg. 16094 (Mar. 24, 2000)...................................................................... 5

U.S. EPA, *Announcement of the Draft Drinking Water Contaminant Candidate List*, 62 Fed. Reg. 52194 (Oct. 6, 1997)................................................................................13

<u>FEDERAL REGULATIONS</u>

40 C.F.R. §79.21(g)........................................................................................ 13

MPA ISO Plaintiffs' Motion for Remand----Case No. CIV.S-03-2653 GEB DAD

1

## I.  **INTRODUCTION**

2      This case involves state tort claims, including product liability claims, against manufacturers

3  and distributors of gasoline containing the oxygenate methyl tertiary butyl ether ("MTBE"), as well as

4  violations of State Regulatory Code Sections, California Health & Safety Code §§ 25189 and 25189.2

5  and California Fish & Game Code § 5650.  Defendants in this case have been at the losing end of

6  every published judicial decision addressing preemption of state regulation (including tort duties) of

7  MTBE in gasoline, and at least one California jury verdict finding that gasoline containing MTBE is a

8  defective product.  *See South Lake Tahoe Public Utilities District v. Atlantic Richfield Co., et al.*,

9  Case No. 999128 (S.F. Super. Ct. March 4, 2002) (copy attached as Exhibit A).  State regulatory

10  agencies agree that gasoline with MTBE poses a serious hazard, and eighteen states, including

11  California, have now either banned or are in the process of phasing out MTBE, in light of the

12  significant hazards it poses to public drinking water supplies.  *See* Exhibit B (attached).

13      The Court should remand this action to the Superior Court of California, Sacramento County,

14  where Plaintiffs[1] originally filed it, because no federal subject matter jurisdiction exists.[2]  Plaintiffs

15  seek damages, civil penalties and injunctive relief solely under state law for the contamination of the

16  drinking water supplies of Sacramento County by MTBE, a chemical used by some oil companies in

17

18  _____

[1] The plaintiffs in this action – the People of the State of California, City of Elk Grove, Sacramento
19  County Water Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus
Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource
20  Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water
District, San Juan Water District, California-American Water Company and City of Sacramento – will
21  be referred to collectively herein as "Plaintiffs."  However, it should be noted that the People of the
State of California have not asserted any tort claims against defendants; the People's claims are for
22  civil penalties and injunctive relief arising from defendants' violations of numerous state statutes. All
23  references to Plaintiff's tort claims (including product defect claims) exclude the People.

24  [2] Because the statutory grounds for remand and abstention are so clear in this case, the Court need not
address whether the Eleventh Amendment also bars removal of this case. *See People of State of Cal.*
25  *v. Steelcase Inc.*, 792 F. Supp. 84, 86 (C.D.Cal. 1992) ("since the immunity granted by the Eleventh
26  Amendment is an immunity from being made an involuntary party to an action in federal court, it
should apply equally to the case where the state is a plaintiff in an action commenced in state court
27  and the action is removed to federal court by the defendant"); *contra, In re Rezulin Products Liability*
*Litig.*, 133 F. Supp. 2d 272, 297 (S.D.N.Y. 2001).  However, nothing in this Motion waives any rights
28  the People may assert under the Eleventh Amendment with respect to removal of this action.

- 1 -

1   some gasoline in some parts of the country.  None of the bases for removal asserted in the Notice of

2   Removal (filed Dec. 8, 2003) (the "Notice") supports Defendants'[3] attempts to invoke federal court

3   jurisdiction.

4   *First*, Defendants' effort to find a "federal question" under the federal Clean Air Act[4] hidden

5   within Plaintiffs' state-law strict product liability claim is unavailing.[5]  In particular, Defendants'

6   contention that the CAA "completely preempts" Plaintiffs' product liability claim (Notice, ¶¶ 43-44)

7   founders on at least two obvious grounds:

8       (1)    The CAA provides neither the "exclusive cause of action for the claim asserted" by
    Plaintiffs for water-related damages, nor "procedures and remedies governing that cause of

9       action," although complete preemption would require both.  *Beneficial National Bank v.*
    *Anderson*, U.S., 123 S. Ct. 2058, 2063 (2003); and

10

11      (2)    *Every* published decision addressing preemption of state regulation (including tort
    duties) of MTBE in gasoline, including *two* Ninth Circuit decisions, has concluded that

12      nothing in the CAA limits state actions to protect the environment.  *See Oxygenated Fuels*
    *Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665, 670, 673 (9th Cir. 2003), *affirming Oxygenated*

13      *Fuels Assoc. v. Davis* ("*Davis I*")*,* 163 F. Supp. 2d 1185, 1187 (E.D. Cal. 2001); *Exxon*
    *Mobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253 (9thCir. 2000); *In re MTBE Litig.,* 175 F.

14      Supp. 2d 593, 615 (S.D.N.Y. 2001); *Oxygenated Fuels Ass'n v. Pataki,* 158 F. Supp. 2d 248,
    257 (N.D.N.Y. 2001).  Indeed, the U.S. EPA has expressly concluded that federal law does

15      not occupy this field.  U.S. EPA, *Approval and Promulgation of Implementation Plans;*
    *Nevada State Implementation Plan Revision, Clark County,* 64 Fed. Reg. 29573, 29578
    (June 2, 1999).

16

17  Defendants' attempt otherwise to find a "substantial federal question" in Plaintiffs' state-law

18  product liability claim (Notice, ¶¶ 39-42) likewise fails because:

19      (1)    California law alone establishes the elements of Plaintiffs' design defect claim. *See,*
    *e.g., Barker v. Lull,* 20 Cal.3d 413, 432 (1978) (setting forth alternative tests for design defect

20      under state law).  Thus, even if Defendants raise federal law as an affirmative defense, no
    federal question jurisdiction exists.  *Shadie v. Aventis Pasteur,* 254 F. Supp. 2d 509, 518

21

22  [3] Plaintiffs will refer to the defendants who signed the Notice – Atlantic Richfield Company, BP
Products North America, Inc., Chevron U.S.A., Inc., ChevronTexaco Corporation, ExxonMobil
Corporation, Mobil Corporation [not named in FAC], Tesoro Refining and Marketing, Inc.,

23  ConocoPhillips and Circle K Stores – as "Defendants."

24  [4] 42 U.S.C. § 7401 *et seq.* ("CAA").

25  [5] Under the well-pleaded complaint rule, "a defendant may not remove a case to federal court unless
the *plaintiff's* complaint establishes that the case 'arises under' federal law." *Franchise Tax Bd. of*

26  *Calif. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9 (1983) (emphasis in original).  As
Plaintiffs' state product liability claim (like the entire suit) arises solely under state law, Defendants

27  cannot establish "federal question" jurisdiction unless: (1) such claim is "completely preempted" by
federal law; or (2) a "substantial" federal law question is a "necessary element" of such claim.  *See*

28  *Lippitt v. Raymond James Financial Serv.,* 340 F.3d 1033, 1041 (9th Cir. 2003).

(M.D. Pa. 2003) (where defendants, not plaintiffs, ask court to interpret federal law, "[t]he mere presence of a federal issue . . . does not create federal jurisdiction"); *Rains v. Criterion Systems, Inc.*, 80 F.3d 339, 346 (9th Cir. 1996) ("[w]hen a claim can be supported by alternative and independent theories – one of which is a state law theory and one of which is a federal law theory – federal question jurisdiction does not attach");

(2)    A state court finding that MTBE gasoline is defective is unrelated to and will have no impact on the federal clean air program or the national gasoline distribution system, as California, along with seventeen other states, has banned the use of MTBE in gasoline. *See Davis II, supra*, 331 F.3d 665 (upholding California MTBE ban); Exhibit B; and

(3)    Defendants' purported concerns regarding "piecemeal litigation" and "inconsistent decisions" (Notice ¶ 9) do not constitute grounds for federal jurisdiction over this case. *See, e.g. Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 816 (1986) (defendant's concern about uniformity of interpretation of federal statute in state-law actions is not an "aspect of federal-question jurisdiction").

*Second,* the Court should reject as nonsense Defendants' efforts to cast themselves as "corporations acting under the direction of federal officers or agencies" (Notice, ¶49 ) for purposes of 28 U.S.C. §1442(a)(1).  Defendants are private, for-profit companies that produce a consumer product, and, like all manufacturing businesses in this country, are subject to federal and state environmental regulations.  They cannot avail themselves of § 1442(a)(1) because:

(1)    The federal courts have uniformly rejected Defendants' argument here that a consumer product manufacturer's compliance with federal regulatory requirements constitutes acting "under the direction" of a federal officer. *See, e.g., Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'"); and

(2)    There is no causal connection between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit because, among other things, Defendants voluntarily chose to use MTBE from among several available options. *See* 42 U.S.C. §7545(k)(2)(B) (CAA mandates *oxygen* content, not MTBE, in reformulated gasoline); *cf., e.g., Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos).

*Finally*, Defendants' attempt to predicate federal jurisdiction on the toehold of remote bankruptcy orders involving the predecessors of two defendants also fails because:

(1)    The outcome of this action can have no effect on the "administration of" bankruptcy proceedings that concluded more than a decade ago, and thus, there is no federal jurisdiction. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (no jurisdiction under 28 U.S.C. §1334(b) because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan*, 288 F.3d 1172, 1880 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court");

(2)    The court must remand this action to state court because it is a civil action brought by governmental units to enforce such governmental units' police and/or regulatory powers. 28 U.S.C. §§ 1452(a);

- 3 -

(3)     The court must abstain from hearing this case because it involves exclusively state-law claims and the only possible basis for federal jurisdiction is the remote bankruptcy issue; 28 U.S.C. §1334(c)(2). *See Williams v. Shell Oil Co.*, 169 B.R. 684, 692 (S.D. Cal. 1994) (abstention mandatory where state-law action could not have been commenced in the District Court absent § 1334 bankruptcy jurisdiction); and

(4)     The presence of exclusively state-law claims and the extreme remoteness of any possible bankruptcy issues in this case warrant discretionary abstention and/or remand pursuant to 28 U.S.C. §§ 1334(c)(1) and 1452(b).

In short, this case is not removable and should be remanded to state court.

## II.     BACKGROUND

Plaintiffs include the People of the State of California, two cities, one investor-owned water utility, and ten public agencies charged with managing and/or purveying drinking water resources in Sacramento County.  Plaintiffs filed this action in the Sacramento County Superior Court on September 30, 2003, and filed a First Amended Complaint (the "FAC") on October 31, 2003.[6]  The FAC names as defendants 16 major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE to retail gasoline stations in the vicinity of Sacramento County, as well as the owner/operators of certain gasoline stations in the County.  FAC, ¶¶ 37-63.  Defendants' choice to use MTBE in gasoline and/or their discharge of such gasoline to the subsurface has resulted in the contamination of the groundwater resources of Sacramento County on which hundreds of thousands of people ultimately depend for their drinking water.  FAC, ¶¶ 1, 37.

As alleged in the FAC, MTBE is a chemical used by some refiners in some gasoline products in some parts of the country.  FAC, ¶ 74.  MTBE is linked to a variety of potential adverse health effects and renders drinking water unpalatable even at very low levels.  *Id.*, ¶¶ 78-79.  MTBE reaches the environment via leaks from tanks, pipes, and spills at gas stations and other facilities, and, once in soil and groundwater, behaves differently than other gasoline components, with pernicious effect.  *Id.* ¶¶ 75-76.  As the U.S. Environmental Protection Agency ("EPA") has explained,

> Unlike other components of gasoline, MTBE dissolves and spreads readily in the groundwater underlying a spill site, resists biodegradation, and is difficult and costly to remove from groundwater.  Low levels of MTBE can render drinking water supplies unpotable due to its offensive taste and odor.  At higher

---

[6] A copy of the FAC is attached as Exhibit 1 to Defendants' Notice.

levels, it may also pose a risk to human health.

U.S. EPA, *Adv. Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline*, 65 Fed. Reg. 16094, 16094 (Mar. 24, 2000).

Originally introduced as an octane enhancer in some gasoline, MTBE came into widespread use in the mid-1990s, when some refiners chose it to meet the requirements of the Reformulated Gasoline ("RFG") and OxyFuel ("OFP") programs under the federal CAA, *see* 42 U.S.C. §§ 7545(k), (m), for gasoline in some areas of the country, including certain areas in California. *See* Notice, ¶¶ 15-19. The RFG program requires that reformulated gasoline sold in areas subject to the program consist of approximately 2.0% oxygen by weight. 42 U.S.C. § 7545(k)(2)(B). The OFP program requires that reformulated gasoline sold in areas subject to the program consist of approximately 2.7% oxygen by weight. 42 U.S.C. § 7545(m)(2). As Defendants acknowledge, the RFG and OFP programs are both fuel-neutral and oxygenate-neutral in that they do not mandate the use of MTBE or any particular oxygenate. *Id.*; Notice, ¶ 31. Rather, they leave the decision of how to meet the oxygen requirements to individual refiners, including Defendants.[7] *Id.*

The refiner Defendants supplied gasoline stations in the vicinity of Plaintiffs' drinking water resources with gasoline containing MTBE, even though they knew about the devastating risk of groundwater contamination posed by MTBE. FAC, ¶¶ 84-88. Despite this knowledge, these Defendants failed to warn customers, retailers, or regulators, and failed to take any other precautionary measures to prevent or mitigate such contamination. *Id.* Instead, they promoted MTBE, and gasoline containing MTBE, as environmentally sound products appropriate for widespread use. *Id.*¶¶ 82, 89. Certain Defendants even engaged in separate and joint activities to suppress, conceal or discredit studies and other information regarding the hazards of MTBE. *Id.*, ¶ 90. As a result, MTBE contaminates and threatens public drinking water supplies in dispersed locations throughout Sacramento County. *Id.*, ¶ 92. The costs of removing MTBE from the groundwater and preventing it from reaching the drinking public are enormous.

---

[7] As explained in the text *infra,* the published case law is uniformly consistent on this point.

- 5 -

In light of MTBE's significant hazards to ground and drinking water, California banned its use in gasoline effective December 31, 2003. Cal. Code Regs. Tit. 13, § 2262.6. The Ninth Circuit recently squarely upheld this ban against a federal preemption challenge, holding that it conflicts with neither the requirements nor the objectives of the CAA. *Davis II, supra*, 331 F.3d at 669. Seventeen other states have also acted to ban the use of MTBE from gasoline. *See* Exhibit B.

Plaintiffs' action seeks no injunctive relief regarding the content of Defendants' gasoline, but rather civil penalties and damages to ensure that the costs of responding to MTBE contamination of its public drinking water supplies are borne by the companies that chose to make and use it knowing of its risks. FAC, ¶ 3, pp. 28-29. Even a cursory examination of the FAC reveals that Plaintiffs assert only state law claims, for damages under state common law theories (including strict products liability, public nuisance, trespass, and negligence), as well as for cleanup costs under state statutes (including MTBE remediation costs under Cal. Health & Saf. Code § 116366 and Cal. Water Code § 13285 and treble damages for injury to public utility property under Cal. Civil Code § 1882).

### III.   STANDARD OF REVIEW

A defendant seeking to remove a state court action has the burden of demonstrating that the federal court has subject matter jurisdiction. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992) (noting "'strong presumption' against removal jurisdiction").[8] As demonstrated below, Defendants have failed utterly to meet their burden.

### IV.   ARGUMENT

**A.   Defendants' "Complete Preemption" and "Substantial Federal Question" Arguments Have No Merit.**

It has long been a "fundamental tenet of federal jurisdiction" that "a defendant may not remove a case to federal court unless the *plaintiff's* complaint establishes that the case 'arises under' federal law." *Lippitt v. Raymond James Financial Serv.*, 340 F.3d 1033, 1039 (9th Cir. 2003);

---

[8] Removal statutes are strictly construed in favor of state court jurisdiction. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100 (1941), and "[a]ny doubts as to removability are resolved in favor of remanding the case to state court." *Mangini v. RJ Reynolds Tobacco Co.,* 793 F. Supp. 925, 927 (N.D.Cal.1992); *see also Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir. 1994) ("where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand"); *Tremblay v. Phillip Morris,* 231 F. Supp. 2d 411, 414 (D.N.H. 2002) ("[i]f there is any doubt as to the right of removal, federal jurisdiction should be rejected and the case resolved in favor of remand")

- 6 -

1   *Franchise Tax Bd. of Calif. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 (1983) (emphasis

2   in original).  Under this "well-pleaded" complaint rule, "[w]hether a case is one arising under [federal

3   law] must be determined from what necessarily appears in the plaintiff's statement of his own claim."

4   *Lippitt, supra*, at 1040, *quoting Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914).  A defense to a state

5   law claim that relies on the allegedly preemptive effect of a federal statute "will not provide a basis

6   for removal."  *Beneficial National Bank v. Anderson, supra*, 123 S. Ct. at 2062.  Even a cursory

7   review of Plaintiffs' FAC reveals that it claims exclusively under California law, has nothing to do

8   with federal regulation of gasoline content, does not evoke or "arise under" federal law, and does not

9   belong in federal court.

10          Defendants' attempt to invoke the "artful pleading doctrine" – a very "limited" exception to

11  the well-pleaded complaint rule which allows courts to "delve beyond the face of the state court

12  complaint" to determine whether the plaintiff has "artfully phrased a federal law claim by dressing it

13  in state law attire," *Lippitt, supra*, at 1041 – is unavailing.  Courts apply this doctrine only in: (1)

14  "complete preemption" cases; and (2) "substantial federal question" cases, which include cases

15  "where the claim is necessarily federal in character," or "where the right to relief depends on the

16  resolution of a substantial, disputed federal question."  *Id.* at 1041-42.[9]  Plaintiffs' state-law action,

17  which can be resolved without any reference whatsoever to CAA regulations or any other federal law,

18  fits into neither of these categories.

19          **1.   Complete preemption does not apply in this case because the CAA does not**
            **provide an exclusive (or any) cause of action for damages to drinking water**
20          **caused by MTBE, and the Ninth Circuit has definitively rejected federal**
            **preemption of state action to address MTBE water contamination.**
21
            Defendants assert that the allegedly "far-ranging," "detailed" and "comprehensive" federal
22
    regulation of fuel content under the CAA "wholly displaces state law within the regulated field," and
23

24  _____

25  [9] Because no federal jurisdiction exists under either test, the Court need not address whether "federal
    question" jurisdiction exists in the absence of complete preemption.  "[A] state claim may be
26  removed ... in only two circumstances – when Congress expressly so provides ... or when a federal
    statute wholly displaces the state-law cause of action through complete preemption."  *Beneficial*
27  *National Bank, supra*, 123 S.Ct. at 2063.  *Accord, e.g., Waste Control Specialists v. Envirocare of*
    *Texas*, 199 F.3d 781, 783 (5th Cir. 2000) ("without complete preemption, the artful pleading doctrine
28  does not apply"); *but see Lippitt, supra*, 340 F.3d at 1041 (analyzing claims for federal question
    despite absence of complete preemption).

1    thus constitutes "complete preemption" for purposes of federal subject matter jurisdiction.  Notice,

2    ¶ 43.  This assertion, for which Defendants fail to offer a shred of applicable legal support, is

3    frivolous and should come as a surprise to the California Air Resources Board.

4        "In construing the defendants' preemption argument it is important to bear in mind that '[t]he

5    States traditionally have had great latitude under their police powers to legislate as to the protection of

6    the lives, limbs, health, comfort and quiet of all persons.' [citation]  Preemption analysis must begin

7    with the presumption that the federal statute at issue has not preempted the State's exercise of its

8    police powers."  *Davis I, supra,* 163 F. Supp. at 1188.

9        "Complete preemption is rare,"[10]  *ARCO Environmental Remediation v. Montana Dept. of*

10    *Health and Environmental Quality,* 213 F.3d 1108, 1114 (9th Cir. 2000), and the doctrine is narrowly

11    interpreted.  *Metropolitan Life Insurance Co. v. Taylor,* 481 U.S. 58, 65 (1987).  It only applies when

12    the "preemptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state

13    common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint

14    rule.'"  *Id.*; *Rains v. Criterion Systems, Inc., supra,* 80 F.3d at 344 (same).  In *Beneficial National*

15    *Bank, supra,* 123 S. Ct. at 2063 (the only complete preemption case Defendants cite), the Supreme

16    Court observed that complete preemption has been found *only* "when the federal statutes at issue

17    provided the exclusive cause of action for the claim asserted and also set forth procedures and

18    remedies governing that cause of action."

19        This "dispositive question"[11] ends Defendants' removal argument.  Far from providing "the

20    exclusive cause of action" for claims against refiners of MTBE gasoline for water pollution, the CAA

21

22

23 [10] As recently noted in *Beneficial National Bank v. Anderson, supra,* 123 S. Ct. at 2062-2064, the Supreme Court has found complete preemption in connection with only a handful of federal statutes: (1) the Price-Anderson Act, 42 U.S.C. §2014(hh) (expressly provides for removal of state-law tort

24 actions arising out of nuclear accidents); (2) the Labor Management Relations Act, 29 U.S.C. §185 (containing "unusually powerful" preemption provision displacing any state cause of action for

25 violation of contracts between an employer and a labor organization; (3) the Employee Retirement Income Security Act, 29 U.S.C. § 1132 (providing exclusive federal remedy for claims related to

26 benefits under ERISA-regulated plans); and (4) the National Bank Act, 12 U.S.C. §§ 85-86 (exclusive cause of action for usury claims against national banks), as well as possessory land claims under state

27 law brought by Indian tribes.

28 [11] *See id.* (the "dispositive question in this case [is]: Does National Bank Act provide the exclusive cause of action for usury claims against national banks?"); *Lippitt, supra,* 340 F.3d at 1042

-8-

1  provides *no* cause of action whatsoever for damages to public drinking water supplies.  To the

2  contrary, the CAA specifically *preserves* state common law claims, expressly stating:

3  > Nothing in this section shall restrict any right which any person (or class of
>  persons) may have under any statute or *common law* to seek enforcement of

4  > any emission standard or limitation *or to seek any other relief.*

5  42 U.S.C. § 7604(e) (emphasis added).[12]

6  Moreover, *every* published decision addressing preemption of state regulation (including tort

7  duties) of MTBE in gasoline, including *two* Ninth Circuit decisions, has concluded that nothing in the

8  CAA limits state actions to protect the environment (including drinking water), even by outright bans:

9  • *Davis II, supra,* 331 F.3d at 673 (California's MTBE ban not preempted because
10  "Clean Air Act's provisions regarding oxygenate fuel additives ... preserve state authority
   to adopt and enforce measures to prevent water pollution");

11  • *Exxon Mobil Corp. v. EPA, supra,* 217 F.3d at 1253 (affirming county regulation that
   effectively banned MTBE because "state authority to regulate oxygenate levels [was not]
12  limited" by the CAA);

13  • *In re MTBE Litig., supra,* 175 F. Supp. 2d at 615 (rejecting preemption challenge to
   state tort claims against MTBE gasoline refiners on grounds that CAA does nothing more
14  than "set a *minimum standard* for oxygen content for gasoline to be used in certain ...
   areas") (emphasis in original);[13]

15  • *OFA v. Pataki, supra,* 158 F. Supp. 2d at 257 (rejecting preemption challenge to New
16  York ban on MTBE on grounds that "preventing a state from [regulating] an oxygenate
   which it believes threatens its groundwater appears more likely to defeat rather than
17  advance the goals of Congress and [the] EPA");

18  • *Davis I, supra,* 163 F. Supp. 2d at 1187 (E.D. Cal. 2001) (upholding California MTBE
   ban against federal preemption challenge because "the Clean Air Act does not require that
19  MTBE be made available to refiners"), *aff'd,* 331 F.3d 665, *supra.*[14]

20

21  ("'dispositive' question is whether the Exchange Act provides 'the exclusive cause of action' for false
   advertising and deceptive marketing claims ...?").

22  [12] In *ARCO*, another recent "complete preemption" case, the Ninth Circuit found that a similar
23  savings clause in CERCLA constituted an express declaration by Congress that "it had no intent . . .
   to completely occupy the field of environmental regulation." *Supra*, 213 F.3d at 1114; *see also Int'l
24  Paper Co. v. Ouellette,* 479 U.S. 481, 492, (1987) (finding that the savings provision of the Clean
   Water Act – identical to the CAA's savings provision – "negates the inference that Congress 'left no
25  room' for state causes of action").

26  [13] Defendants seem to suggest that *In re MTBE Litigation* upheld their purported federal preemption
   defense.  *See* Notice n. 2.  As demonstrated in the quoted text above, however, the court rejected the
27  preemption defense asserted in that case.

28  [14] *See also Oxygenated Fuels Assoc. v. Pataki,* No. 1:00-CV-1073 (N.D.N.Y. November 24, 2003)
   (concluding after bench trial that New York MTBE ban does not conflict with any aspect of the
   CAA); *Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state law

-9-

EPA itself has also concluded that nothing in the CAA fuels programs "establishes a comprehensive federal presence." U.S. EPA, *supra*, 64 Fed. Reg. at 29578, *affirmed in ExxonMobil Corp. v. U.S. E.P.A., supra*, 217 F.3d 1246. Instead, such programs "explicitly preserve a role for the states in regulating fuels." 64 Fed. Reg. at 29578. Thus, "federal regulation here is not so pervasive as to preclude supplementation by states, nor is the federal interest in the field sufficiently dominant to preempt state action." *Id.* Defendants' contrarion contention that the "federal regulation of fuel content . . . wholly displaces state law" (Notice, ¶ 43) wholly lacks substance.

Finally (on this point), the Court should waste no time on Defendants' irrelevant assertion that the Ninth Circuit's recent holding in *Davis II* (i.e., that nothing in the CAA preempts California's ban of MTBE,) addressed "different theories of preemption than those raised here." Notice, n. 6. As the Ninth Circuit previously explained in *Botsford v. Blue Cross and Blue Shield of Montana, Inc.*,

> [t]o preempt state-law causes of action completely, a federal law must *both*: (1) conflict with state law (conflict preemption) *and* (2) provide remedies that displace state law remedies (displacement).

314 F.3d 390, 393 (9th Cir. 2002) (emphasis added). The law in this Circuit is entirely clear that California's outright ban of MTBE poses no conflict preemption, *see Davis II, supra,* 331 F.3d at 670-673, ending any possibility of "complete preemption" of Plaintiffs' state-law damages claims here.[15]

---

MTBE contamination case does "not conflict with the Congressional clean air objectives"). Defendants' citation of five unpublished trial court decisions regarding MTBE preemption (*see* Notice, n.2) is unavailing. All of these decisions were rendered before *Davis II*, the controlling case in this Circuit. In addition, two of them – *Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess*, No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis of the CAA. Two others – *Kubas v. Unocal*, No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal*, No. BC195295 (same) – incorrectly assumed that assessing tort damages was equivalent to a regulatory ban (which the Ninth Circuit in any event affirmed in *Davis II*). The fifth, *Holten v. Chevron U.S.A.*, No. 00-4703 (D.N.J. Jul. 10, 2001), did not concern preemption at all, but instead erroneously found that MTBE gasoline could not be defectively designed because Congress had approved its use. As described below (*see* Section A.3, *infra*), MTBE has never been approved by Congress or EPA.

[15] Defendants are of course correct in the sense that, "[u]nlike complete preemption, preemption that stems from a conflict between federal and state law is a defense to a state law cause of action and, therefore, does not confer federal jurisdiction over the case." *ARCO, supra*, 213 F.3d at 1114.

2.  **No "substantial federal question" arises in this case because Plaintiffs' defective product claim does not depend on resolution of any federal issue, and state court resolution of such claim will have no effect whatsoever on federal CAA programs.**

Defendants also contend that Plaintiffs' design defect claim (and only this claim) raises a substantial federal question, *see* Notice ¶¶ 11-12, 3, because, they claim, Plaintiffs' "right to relief necessarily depends on the resolution of a 'substantial question' of federal law." *Id.* ¶ 39.  Assuming (without conceding) that a "substantial federal question" can support removal in the absence of complete preemption,[16] a "substantial, disputed question of federal law [must be] a *necessary* element" of Plaintiffs' design defect claim. *See Rains, supra,* 80 F.3d at 345 (emphasis in original). Plaintiffs' design defect claim does not require resort to any federal law issue – substantial or otherwise.

First, under California law a product is defective in design "under either of two alternative tests": (1) "if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect"; or (2) "if the plaintiff demonstrates that the product's design proximately caused his injuries and the defendant fails to establish . . . that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." *See, e.g., Barker v. Lull*, 20 Cal.3d 413, 432 (1978); BAJI 9.00.5 (elements of state "risk-benefit" and "consumer expectation" tests). Obviously, nothing in either test depends on or otherwise references federal law. Likewise, nothing in Plaintiffs' complaint relies on (or even mentions) any CAA or other federal standard in connection with its defective design claim. Thus, federal law is not a necessary element of Plaintiffs' defective product claim. *See Merrell Dow, supra,* 487 U.S. at 814 (even where plaintiffs used standards set forth in the Food Drug and Cosmetics Act as elements of their strict products liability claims, interpretation of such standards did not present a substantial federal question).

Second, Defendants blithely ignore the California Supreme Court's "alternative" test (consumer expectation) for such cases, *Barker, supra,* 20 Cal.3d at 432, and simply assume that a jury would apply a "risk-benefit" test on Plaintiffs' claim. However, Plaintiffs' complaint alleges facts *in*

---

[16] *See* n. 8, *supra.*

- 11 -

1 | *the alternative* sufficient to meet either test.[17] *See* FAC, ¶ 67. "When a claim can be supported by

2 | alternative and independent theories – one of which is a state law theory and one of which is a federal

3 | law theory – federal question jurisdiction does not attach because federal law is not a necessary

4 | element of the claim." *Rains, supra*, 80 F.3d at 346; *Lippitt, supra*, 340 F.3d at 1043 (same).

5 |       Third, even if the risk/benefit test applied in this case, state law expressly puts the burden on

6 | the *defendant* to prove that the product's benefits outweigh its risks. *Barker, supra* at 431 ("once a

7 | plaintiff makes a prima facie showing that the injury was proximately caused by the product's design,

8 | the burden should appropriately shift to the defendant to prove . . . the adequacy of design under the

9 | 'risk-benefit' standard"). Accordingly, to the extent any tangential federal regulatory issues are

10 | raised, *Defendants,* not Plaintiffs, "would ask the California state court to construe" such issues. *See*

11 | Notice, ¶ 42. The rule is clear that no federal jurisdiction exists in such a case. *See, e.g., Shadie v.*

12 | *Aventis Pasteur, supra*, 254 F. Supp. 2d at 518 (rejecting removal of product liability action because

13 | "[i]t is not the plaintiffs who 'ask this Court' to interpret the [federal] Vaccine Act, but the defendants

14 | . . . . The mere presence of a federal issue . . . does not create federal jurisdiction"); *Moncure v.*

15 | *Olympus American*, __ F. Supp. 2d __, 2003 WL 22594314, *2 (S.D. Miss. Oct 9, 2003) (rejecting

16 | removal of product liability case because "[t]he fact that defendants participate in a regulated industry

17 | and their actions are guided by federal regulations does not create a substantial federal question").

18 |       Fourth, "EPA's initial waiver of MTBE into commerce and its subsequent registration of

19 | MTBE" (Notice ¶ 42) has nothing to do with a jury's risk-benefit assessment for purposes of

20 | assessing damages for breaches of state tort duties. EPA's initial "waiver" of MTBE constitutes a

21 | determination *only* that gasoline containing certain amounts of MTBE is "substantially similar" to

22 | certain baseline gasoline and, if not, that it "will not cause or contribute to the failure of any emission

---

24 | [17] Defendants, citing *Soule v. General Motors*, 8 Cal.4th 548, 567 (1994), suggest that the jury will be required to apply the risk/benefit test in this case because "assessing the adequacy" of MTBE gasoline

25 | is not "within the common knowledge of lay jurors." Notice, ¶ 39. Says who? Defendants provide no reason why a juror would not be able to evaluate from "everyday experience" whether a gasoline

26 | constituent that leaks, travels through the subsurface and contaminates groundwater far more readily than other components of gasoline fails to perform as safely as an ordinary consumer would expect.

27 | *See* 8 Cal.4th at 567. In any case, what *Soule* actually says is that the question of whether the jury must apply the risk/benefit test depends on the facts and evidence of the case. *Id*. at 568. Thus,

28 | Defendants' cannot simply eliminate the "consumer expectations test" from this case at this early stage.

- 12 -

control device or system." 42 U.S.C. § 7545(f).  Similarly, EPA's registration of certain fuel blends, including blends containing MTBE, that can be used to comply with OFP and RFG requirements represents nothing more than a determination that such blends comply with the 2.7% and 2.0% oxygen requirements of the respective programs. *See id.*, §§ 7545(k)(2)(B), (m)(2).[18]  In making these determinations, EPA never weighed, balanced, or even considered the risks to drinking water supplies that may arise from MTBE's use – the inquiry required under California products liability law.[19]

Fifth, Defendants' contention that a state court's evaluation of the relative risks and benefits of their use of MTBE in gasoline "could easily undermine [EPA's] policy choices" (Notice ¶ 42) regarding MTBE directly contradicts the purpose of the RFG program, which is to ensure that "oxygenates would compete in the marketplace," *In re MTBE Litig.*, *supra*, 175 F. Supp. 2d at 613, and that fuel content requirements would "change over time in response to . . . [market] factors," including the costs of complying with state tort duties. *Pataki*, *supra*, 158 F. Supp. 2d at 256. Indeed, "if a state rejects a fuel for purposes other than emission control, this rejection constitutes a factor which affects the market and which EPA must take into account in carrying out its responsibilities," not the other way around, as Defendants contend. *Id.* at 257, *accord In re MTBE Litig.*, *supra*, 175 F. Supp. 2d at 613.

Finally (on this point), Defendants' fear of a state court judgment upsetting EPA's "balancing

---

[18] Defendants' statement that MTBE was "approved" or "certified" by EPA (*see, e.g.*, Notice ¶¶ 43, 46) is both false and improper.  Indeed, federal regulations expressly prohibit Defendants from misrepresenting EPA's determination that an oxygenate is "available for use" as in any way "constitute[ing] endorsement, certification, or approval by any agency of the United States." 40 C.F.R. §79.21(g).

[19] Defendants allege that EPA was aware of MTBE's potential to contaminate groundwater as early as 1988. Notice, ¶ 34.  What the EPA actually said in 1988 was that there would "probably" be more contamination incidents caused by MTBE given the "rapid growth" in its use, but that there had only been a "few cases" documented to date, and documentation was difficult given that "laboratory analyses do not typically screen for this compound."  U.S. EPA, *Final Rule, Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Inter-agency Testing Committee*, 53 Fed. Reg. 10391, 10392 (March 31, 1988).  In 1997, two years after the RFG program took effect, EPA still had insufficient evidence to determine "the extent of contamination of drinking water supplies on a national scale."  U.S. EPA, *Announcement of the Draft Drinking Water Contaminant Candidate List*, 62 Fed. Reg. 52194, 52211 (Oct. 6, 1997).  Indeed, Plaintiffs allege in their complaint that defendants deliberately suppressed information regarding MTBE's hazards in order to deceive government regulators. *See* FAC, ¶ 90.

- 13 -

1   and conclusions" (Notice ¶42) regarding MTBE is entirely illusory, as the State of California has

2   already banned MTBE (effective December 31, 2003), and that ban has been definitively upheld as

3   not in conflict with the CAA. *Davis, II, supra.* Thus, resolution of Plaintiffs' damages claims in state

4   court will pose no conceivable threat to any federal interest under the CAA.

5       In short, Defendants have failed to uncover any "substantial federal question" necessary to the

6   resolution of Plaintiffs' defective product claim.

7       **3.**    **The existence of other allegedly similar state-law MTBE lawsuits has no bearing**

8           **whatsoever on the propriety – or lack thereof – of removing this action to federal court.**

9       Defendants suggest that this case should be transferred to a multidistrict litigation ("MDL") in

10   the Southern District of New York.  Notice ¶¶ 8-10.  Ironically, the court presiding over the very

11   MDL proceeding to which the Defendants would have this action transferred has already definitively

12   rejected the preemption arguments they raise here. *In re MTBE Litigation, supra*, 175 F.Supp.2d at

13   611-616.

14       In any case, Defendants' attempt to raise a specter of "[p]iecemeal state court litigation" and

15   "inconsistent decisions" in their Notice fatally confuses the standards for establishing federal subject

16   matter jurisdiction with those for transferring and consolidating related district court actions.  While

17   concern about uniform judicial treatment may be pertinent in considering whether to centralize or

18   transfer pending federal actions into a multidistrict litigation ("MDL") under 28 U.S.C. § 1407, *see,*

19   *e.g., In re Mosaid Technologies Inc. Patent Litigation*, 283 F. Supp. 2d 1359, 1360 (Jud. Pan. Mult.

20   Lit. 2003) (centralization pursuant to § 1407 necessary to "prevent inconsistent decisions," among

21   other things), it does not constitute grounds for "federal question" jurisdiction *over this case* in the

22   first instance. *See, e.g. Merrell Dow Pharmaceuticals v. Thompson, supra*, 478 U.S. at 816

23   (defendant's concern about uniformity of interpretation of federal statute in state-law actions is not an

24   "aspect of federal-question jurisdiction"); *see also In re MTBE Litigation, supra*, 175 F.Supp.2d at

25   603 ("[a] transfer of a case pursuant to 28 U.S.C. § 1407 cannot be made unless the transferee court

26   has subject matter jurisdiction"), *citing BancOhio Corp. v. Fox*, 516 F.2d 29, 32 (6th Cir.1975) ("[n]o

27   matter how desirable respondents feel it may be to consolidate . . . all litigation in any way related to

28   Equity Funding, . . . such a transfer cannot be unless the district court properly has jurisdiction

- 14 -

1   of the subject matter of the case"). As Defendants cannot bootstrap federal jurisdiction on the alleged

2   aggregate impact of multiple MTBE lawsuits, their entire "federal question" premise is untenable.

3   **B.      Removal Under § 1442(a)(1) Is Improper Because Defendants Were Not Acting Under**
        **the Direction of Any Federal Official or Agency.**

4        Defendants alternatively claim that they were acting under the direction of federal officer

5   pursuant to 28 U.S.C. §1442(a)(1). Notice ¶48.[20] The primary beneficiaries of §1442(a)(1) are

6   federal officers and agencies. *Tremblay v. Philip Morris, supra,* 231 F.Supp. 2d at 417. For a *private*

7   party defendant to invoke the statute, it must:  (1) assert a colorable defense based on federal law in

8   the notice of removal; (2) establish that it was acting under the direction of a federal officer; and (3)

9   show that its federally directed actions are causally connected to the harm about which the plaintiff

10  complains. *Fung v. Abex Corp.,* 816 F. Supp. 569, 571-72 (N.D. Cal. 1992). Defendants fail on each

11  of these required showings.

12       **1.      Defendants have no colorable federal defense.**

13       The only federal defense raised in Defendants' removal petition is federal preemption. *See*

14  Notice, ¶43. As demonstrated above, the Ninth Circuit has *twice* held that state actions to protect the

15  environment (including banning MTBE) are not preempted by the CAA. *Davis II, supra,* 331 F.3d at

16  673; *Exxon Mobil Corp. v. EPA, supra,* 217 F.3d at 1253. Defendants have no "colorable"

17  preemption defense.

18       **2.      As private regulated entities that are not performing any government function,**
        **and that voluntarily *chose* to use MTBE in gasoline despite its known hazards,**
19      **Defendants were never acting under the direction of any federal official.**

20       Defendants also cannot establish that they undertook their use of MTBE in gasoline and their

21  failure to warn of its known hazards "under the direction" of the federal government. *See Ryan v.*

22  *Dow Chem. Co.,* 781 F. Supp. 934, 945 (S.D.N.Y. 1992) ("the set of defendants who can avail

23  themselves of § 1442(a) is smaller than the set of defendants who can make a colorable claim to a

24  federal defense"). Their attempt to do so fails for at least three obvious reasons: (a) Defendants, as

25  private actors merely complying with federal regulations, fall far outside the class of protected

26  _____

27  [20] Section 1442(a)(1) provides, in pertinent part, that an action may be removed to federal court by
    "any officer (or any person acting under that officer) of the United States or of any agency thereof,
    sued in an official or individual capacity for any act under color of such office."  28 U.S.C. §
28  1442(a)(1).

1    persons under § 1442(a)(1); (b) because Defendants voluntarily chose to use MTBE from among

2    several available options, they cannot plausibly claim that they were acting "under the direction" of

3    EPA; and (c) whether or not Congress and/or EPA anticipated that Defendants would make MTBE

4    their oxygenate of choice is irrelevant.

5                    a.    **Defendants' compliance with RFG regulations does not transform them into agents of the federal government**.

6          Defendants' attempt to characterize their compliance with the federal RFG and OFP programs

7    as "acting under the direction of federal officers or agencies" strains credulity. *See* Notice, ¶ 48.  No

8    court ever has held that a private sector manufacturer merely subject to complex regulations, and not

9    acting under the operative *contractual* commands of federal officials, acts "under the direction" of the

10   federal government. *See, e.g., Little v. Purdue Pharma, supra*, 227 F. Supp. 2d at 860-61 ("body of

11   law" does not support position that defendant "merely 'subject to complex regulations'" is entitled to

12   removal under §1442(a)(1)).[21]

13        Defendants here are not federal contractors; they are not producing products for the

14   government; nor are they performing any other governmental function.  Rather, they are private

15   enterprises in the business of manufacturing and selling gasoline.  And, like virtually every other

16   manufacturing business in the United States, they are subject to a variety of federal environmental

17   regulations.  Courts have been unanimous in holding that mere participation in a regulated industry

18   does not constitute "acting under the direction" of the federal government under § 1442(a)(1).

19        For example, in *Tremblay v. Philip Morris, supra*, 231 F. Supp. 2d at 417, a cigarette

20   manufacturer removed the plaintiffs' state law deceptive advertising claims under § 1442(a)(1),

21   arguing that by "merely attempting to comply with the FTC's policies … when it engaged in the

22   conduct for which it has been sued," it was acting under the direction of the FTC.  The court flatly

23   rejected this argument, holding that "[a]lthough Philip Morris is a participant in a regulated industry,

24

25   _____

26   [21] *See also generally*, Wright, Miller and Cooper, Federal Practice & Procedure (2003), Ch. 7, § 3727, *and* 166 A.L.R. Fed. 297 (2000) (in all cited cases where corporate manufacturer defendants

27   successfully removed state court tort actions under § 1442(a)(1), the defendants were government contractors and the products at issue were produced for the government pursuant to contractual

28   specifications); *see also Ryan*, 781 F. Supp. at 943 (§ 1442 requires "narrow" and "restrictive" construction).

- 16 -

1 | this is not enough to demonstrate that it acted under the direction of a federal officer." *Id.* at 418.

2 | The Court explained:

> "The mere fact that a tobacco company has complied with the requirements of
> a federal law cannot suffice to transform it into a federal actor any more than
> the compliance of a myriad of private enterprises with federal law and
> administrative regulations could of itself work such a transformation."

*Id., quoting Brown v. Philip Morris, Inc.,* 250 F.3d 789, 801 (3rd Cir. 2001).

In *Little v. Purdue Pharma, supra,* 227 F. Supp. 2d at 861, pharmaceutical corporations sued for injuries allegedly caused by the drug OxyContin argued that FDA regulation and approval of the drug made them *de facto* federal officers for purposes of § 1442(a)(1). The court rejected removal, explaining:

> Corporate defendants herein do not operate at the discretion of federal
> authorities. They are private, for-profit business organizations which exist
> independently of the federal government. Lest participants in every regulated
> industry be entitled to "federal officer" status, corporate Defendants need to
> make a much greater showing than in doing the acts giving rise to Plaintiffs'
> claims, they were acting pursuant to a federal directive. Acting under the
> watchful eye of the federal government is not enough.

*Id.*

Similarly, in *Bakalis v. Crossland Savings Bank,* 781 F. Supp. 140, 145 (E.D.N.Y. 1991), the court held that even in cases involving "pervasive regulation" a corporate defendant seeking removal under § 1442(a)(1) must show "'regulation plus'" – *i.e.* that "the corporation is so intimately involved with the government functions as to occupy essentially the position of an employee of the government." Defendants have made no such showing here, nor can they. *Tremblay, Brown* and *Little* control here. To hold otherwise would create a loophole in this narrow removal statute large enough to accommodate the proverbial Mack Truck.

**b.   There is no causal connection between RFG program requirements and the conduct targeted by this lawsuit because refiners voluntarily chose to use MTBE from among several available options.**

Even if participants in a regulated industry could claim protection under § 1442(a)(1) as a general matter – which they cannot – Defendants have failed to establish any connection between a requirement under the CAA and either their use of MTBE in gasoline or their failure to warn about its known hazards.

The CAA mandates *oxygen* content, not MTBE. 42 U.S.C. § 7545(k)(2)(B). *Every* published

1    decision that has addressed the issue has concluded that neither the CAA nor its implementing

2    regulations requires refiners to use MTBE or any particular oxygenate in order to meet RFG

3    requirements.  *See, e.g., ExxonMobil*, 217 F.3d at 1251-53 (CAA "does not mandate a 'recipe' or so-

4    called government gas"); *In re MTBE Litigation*, 175 F. Supp. 2d at 615 (RFG Program does not

5    mandate the use of MTBE); *Davis I*, 163 F. Supp. 2d at 1188 (CAA neither requires nor forbids the

6    use of any particular oxygenate … [i]t's 'goal' is to assure a particular oxygen content").  Even

7    Defendants plainly and repeatedly acknowledge this.  Notice, ¶¶ 18, 19, 26, 29, 31.  Defendants' use

8    of MTBE is a matter of voluntary corporate choice, not a "necessary result" of CAA directives.

9          Defendants' choice to use MTBE breaks any causal connection between EPA's RFG and OFP

10    regulations and Defendants' use of MTBE.  In *Good v. Armstrong World Industries*, 914 F. Supp. at

11    1130, where the removing defendant was a manufacturer of asbestos-containing turbine generators for

12    use in Navy ships, the court remanded the plaintiff's asbestos-related personal injury claims to state

13    court on the grounds that the Navy had not "specified the use of asbestos in the design and

14    manufacture of the turbine generators."  Defendants here, like the defendant in *Good*, do not "meet

15    [their] burden to make a causal connection between the state claim and the conduct undertaken

16    pursuant to the direction given by an officer of the federal government."  *Id.*

17          Similarly, in *Ryan v. Dow Chemical Co*, a product liability suit against manufacturers of

18    Agent Orange, the court found that there was no "nexus" between plaintiffs' design defect claim and

19    defendants' provision of Agent Orange to the military during the Vietnam War (under threat of

20    criminal sanction), because defendant was "being sued for formulating and producing a product all of

21    whose components were developed without direct government control and all of whose methods of

22    manufacture were determined by defendants."  781 F. Supp. at 950; *accord, Little, supra,* 227 F.

23    Supp. 2d at 861 (because FDA was not involved in the "day-to-day drug development and

24    manufacturing process," defendants were "operating at their own initiative").  The same is true here.

25    As Defendants concede, refiners blended MTBE into gasoline long before the 1990 CAA

26    Amendments and the advent of RFG.  *See* Notice, ¶ 14.  While EPA may ultimately have registered

27    various blends of gasoline containing MTBE as compliant with the Act's oxygen requirements, the oil

28

1  refiners -- not the federal government -- designed, formulated, and sold such products.  There is no

2  "nexus" between Defendants' compliance with federal regulations and Plaintiffs' tort claims.

3      Indeed, in *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal. 1998) a

4  groundwater contamination case against manufacturers of government rocket engines, the court held

5  that the targeted conduct – failing to warn and improperly disposing of trichloroethylene ("TCE") –

6  was not "under the direction" of the government, even though the government contracts at issue had

7  specifically required use of TCE.   Here, where the government does *not* require use of MTBE, the

8  Defendants cannot fairly argue that federal directives "caused" the conduct on which State bases its

9  common law and statutory claims.

10          **c.**    **Whether or not Congress and/or EPA anticipated that Defendants would make MTBE their oxygenate of choice is irrelevant.**

11      Defendants' suggestion that the federal government made their choice to use MTBE for them

12  because Congress and EPA were allegedly "well aware" that refiners would use MTBE and

13  "affirmatively encouraged" them to do so (*see* Notice, ¶¶ 19-21)[22] misses the mark for at least two

14  reasons.  First, Defendants grossly distort the legislative and regulatory history pertaining to the RFG

15  program.  As the court explained in *In re MTBE Litigation, supra*, 175 F. Supp. 2d at 612-13:

16      [W]hile members of Congress may have anticipated that MTBE would be used

17  to meet the oxygenate requirements, . . . the legislative history of the 1990 CAA amendments indicates that Congress, through the RFG Program, sought

18  to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility

19  and other considerations." [citation omitted.]  Indeed, Congress expected that oxygenates would compete in the marketplace.

20      Second, Defendants' argument is irrelevant for purposes of § 1442(a)(1).  None of their

21  citations to the legislative history or EPA regulations even remotely suggests a federal intent to

22  impose federal *control* over Defendants' refining operations.  To the contrary, the legislative history

23  of the 1990 CAA Amendments indicates unequivocally that the RFG program was "in no way

24  intended to resurrect a 1970's DOE-type scheme of detailed government intervention in U.S. gasoline

25

26

27  [22] Similar attempts by the oil industry to delve into the legislative history of the CAA were rebuffed in

28  *Davis II* 331 F.3d at 671, where the Court stated that "We hesitate to examine the legislative history, for we find the test of the Act relatively clear."

1    markets." *Pataki*, 158 F. Supp. 2d at 256-57.  Neither the use of MTBE in gasoline nor the harm it

2    has wrought, is anyone's fault but Defendants' own.  There is no jurisdiction under § 1442(a)(1).

3    **C.    The Court Should Remand and/or Abstain From Hearing This Case Because It Is Not
       "Related To" The Texaco or Circle K Bankruptcies, and Even If It Were, the Abstention
4      and Remand Provisions Under 28 U.S.C. §§ 1334(c) and 1452 Apply Squarely To This
       Case.**

5          This Court should also reject Defendants' alternative assertion that federal bankruptcy

6    jurisdiction exists.  Their contention that this state-law environmental contamination lawsuit against

7    18 defendants represents a purported "collateral attack" against remote bankruptcy orders pertaining

8    to the alleged predecessors of two defendants (*see* Notice, ¶¶ 48-55) fails because: (1) federal

9    jurisdiction is lacking in the first instance, as this case neither arises under Title 11, arises in a case

10   under Title 11, nor is "related to" a case under Title 11; (2) removal of this action is barred by 28

11   U.S.C. § 1452(a) because it is a civil action brought by governmental units to enforce their police

12   and/or regulatory powers; (3) the mandatory abstention provision of 28 U.S.C. § 1334(c)(2) relating

13   to state-law actions applies; and (4) discretionary remand and/or abstention is obviously warranted in

14   light of the overwhelming – indeed, exclusive –  predominance of state-law issues on the one hand,

15   and the extreme remoteness of any bankruptcy issues on the other.[23]

16

17   **1.    Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not
       "related to" the Bankruptcies.**

18        Texaco, Inc., an alleged predecessor to Defendant ChevronTexaco Corp., filed for bankruptcy

19   under Title 11 in 1987 and obtained confirmation of its reorganization plan in 1988.  Notice, ¶51.

20   Circle K Corporation, an alleged predecessor to Defendant Circle K Stores Inc., filed for bankruptcy

21   in 1993 and obtained a confirmation order the same year.  Notice, ¶53.  Because the Title 11

22   proceedings (the "Bankruptcies") – both more than a decade old –  are no longer being administered,

23   and the rights of all creditors already have been determined in the confirmation orders, the outcome

24   of this case will have absolutely no effect on *the administration of* the Bankruptcies.  The instant

25   action is, therefore, not "related to" any Title 11 proceeding, and cannot form a basis for federal

26   _____

27   [23] In addition, nothing in either Defendants' Notice or the FAC demonstrate that any of Plaintiffs'
     claims that may pertain to Texaco and/or Circle K "arose" prior to entry of the confirmation orders,
28   or, even if they did, that Plaintiffs ever received any notice that such claims would be discharged.

1    jurisdiction.

2         Under 28 U.S.C. §1334(b), "district courts shall have original but not exclusive jurisdiction of

3    all civil proceedings arising under title 11, or arising in or related to cases under title 11." Cases

4    "arising under" Title 11 are those cases in which the cause of action is created by title 11, and those

5    "arising in a case under" Title 11 are those that, while not based on any right expressly created by title

6    11, nevertheless "would have no existence outside of the bankruptcy." *In re General Carriers Corp.*,

7    258 B.R. 181, 189 (B.A.P. 9th Cir. 2001). This case undoubtedly does *not* fit into either of these

8    jurisdictional categories, as the exclusively state-law causes of action asserted in the Complaint "exist

9    independently of bankruptcy law." *See Williams v. Shell Oil Co.*, *supra*, 169 B.R. at 688.

10        Nor is this case "related to" the long-since-resolved Bankruptcies. Whether a civil proceeding

11   is "related to" bankruptcy depends on "whether the outcome of the proceeding could conceivably

12   have any effect on the estate *being* administered." *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)

13   (emphasis added).[24] There is no conceivable chance that this case will affect the administration of the

14   Bankruptcies, because they are no longer being administered. By definitively discharging all claims

15   arising before their effective dates (Notice, ¶¶ 51, 53), entry of the confirmation orders more than a

16   decade ago destroyed any possible relationship between the outcome of this suit and the

17   *admi:::istration of* the Bankruptcies. Moreover, Plaintiffs have no interest in re-opening such

18   Bankruptcies or "collaterally attacking" the confirmation orders. Thus, the mere fact that allegations

19   in the Complaint may potentially cover some pre-1988 conduct of Texaco, and/or some pre-1993

20   conduct of Circle K Corporation, does not furnish grounds for federal "related to" jurisdiction under

21   § 1334(b). Rather, it means only that ChevronTexaco and/or Circle K Stores Inc. may have a

22   discharge defense based on the respective confirmation orders as to some small portion of their

23

24   ────────────────────

25   [24] *Feitz* involved a cross-claim filed by a debtor's wife against a mortgagee in her husband's
     bankruptcy proceeding. The cross-claim was filed a mere four months after the bankruptcy court's
26   entry of a confirmation order as to the bankruptcy estate. *Id.* at 456. Like the confirmation orders at
     issue here, the confirmation order in *Feitz* precluded creditors from asserting any other interest than
27   that provided for them in the confirmed plan. *Id.* at 458. The Ninth Circuit held there was no federal
     "related to" jurisdiction over the cross-claim because entry of the confirmation order "*destroyed any
28   possible relationship between the outcome of the suit and the administration of the bankruptcy
     estate.*" *Id.* (emphasis added).

- 21 -

1   liability – a defense that a state court is fully capable of adjudicating. *See In re McGhan, supra,* 288

2   F.3d at 1180 ("a state court [has] jurisdiction to construe or determine the applicability of a discharge

3   order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state

4   court").[25]

5          **2.**      **The Court must remand this action pursuant to § 1452(a) because it is a civil action by governmental units to enforce such governmental units' police or regulatory power.**

6

7         Section 1452(a) constitutes an additional and independent bar to the removal of this action.[26]

8   The District Attorney brings this action in the name of the People of the State of California, pursuant

9   to the state's police and regulatory powers.  The People seek, among other things, civil penalties and

10   cost recovery under state environmental and consumer protection statutes based on alleged violations

11   of those statutes.  *See* FAC ¶¶ 121-156.  The water district plaintiffs also bring this action pursuant to

12   their regulatory powers to safeguard water resources within their respective jurisdictions.  *Id.*, ¶ 14-

13   32.  As such, this case fits squarely within the § 1452(a) prohibition on removal of government

14   enforcement actions, and must be remanded.  *See In re Forster*, 146 B.R. 383 (Bkrtcy. N.D.

15   Ohio,1992) (state court action to enforce environmental legislation and recover costs resulting from

16

17

18

---

19   [25] Defendants' reliance on *Texaco v. Sanders (In re Texaco Inc.)*, 182 B.R. 937 (Bkrtcy. S.D.N.Y.
20   1995), for the proposition that this action constitutes a "collateral attack" on the 1988 Confirmation
     Order and is within the "core jurisdiction" of the federal bankruptcy court is misplaced.  That case did
21   not involve a motion to remand a state court action that had been removed to federal court by the
     debtor.  Instead, it involved an affirmative motion by the debtor (Texaco) – filed on the eve of trial in
22   a pending state court tort suit – to reopen its bankruptcy proceeding and to enforce the Confirmation
     Order against the plaintiffs in the state court case.  *Id.* at 940-41.  The federal bankruptcy court
23   granted Texaco's motion on the common sense grounds that "a proceeding such as this, *to enforce
     and construe a confirmation order issued by this Court in this case*, constitutes a proceeding 'arising
24   in or related to a case under title 11'" under § 1334(b).  *Id.* at 944 (emphasis added).  Thus, the
     Texaco bankruptcy court did not, and was not asked to, address the question presented here: whether
25   a state tort suit (potentially involving (some) pre-Confirmation Order Texaco conduct, and filed
     years after entry of such Order, is "related to" the Bankruptcy.  The answer to this question, as
26   explained above, is "no."

27   [26] Section 1452(a) provides: "[a] party may remove any claim or cause of action in a civil action
     *other than … a civil action by a governmental unit to enforce such governmental unit's police or
28   regulatory power* … if [the] district court has jurisdiction of such claim or cause of action under
     section 1334 of this title." (Emphasis added).

violations thereof was an action for enforcement of governmental unit's "police or regulatory power,"

and could not be removed to federal court under § 1452(a)).[27]

**3.   Alternatively, the Court must abstain from hearing this case pursuant to 28 U.S.C. § 1334(c)(2), as it is a state-law action with no basis for federal jurisdiction other than its alleged relation to a Title 11 proceeding.**

Even if this action were "related to" the Bankruptcies pursuant to § 1334(b) – which it is not –

the Court must nonetheless abstain from hearing it pursuant to 28 U.S.C. § 1334(c)(2).[28]  As the

Court held in *Williams, supra,* 169 B.R. at 692:

> Under section 1334, a court is required to abstain from hearing a motion when the following six elements are present:  (1) a party files a timely motion;  (2) the proceeding is based on a state law claim or cause of action; (3) the matter is "related to" a case under chapter 11 (and is not a proceeding "arising under" title 11 or "arising in" a case under title 11); (4) the action could not have been commenced in federal court absent bankruptcy;  (5) a state court action has been commenced;  and (6) the state court action can be timely adjudicated.

Each of these criteria applies here.  This Motion was made as soon as practicable following service of

the Notice of Removal.  As in *Williams,* this lawsuit is based exclusively on state-created rights, has

been commenced in state court and is capable of timely adjudication there.  As discussed above, this

case does not present a federal question, and thus could not have been commenced in the District

Court absent the Bankruptcies.  Finally, as discussed in section IV.C.1 *supra,* Plaintiffs' action neither

"arises under" nor "arises in" a case under Title 11.  *See In re General Carriers Corp., supra,* 258

B.R. at 189.

In *Williams v. Shell Oil Co., supra,* the court determined that mandatory abstention was proper

on facts strikingly similar to those here.  *Williams* was a multi-defendant mass tort case involving

polybutylene plumbing systems that was pending in state court, when a single defendant attempted

---

[27]  Additionally, paragraph 8 of the 1988 Texaco Confirmation Order states that it "does not impair … the claims of any governmental unit arising under any environmental legislation," and that such claims "will survive the Reorganization Cases as if they had not been commenced."  *In re Texaco Inc.,* 84 B.R. 893, 895 (S.D.N.Y. 1988).

[28] Section 1334(c)(2) provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

- 23 -

1    removal pursuant to 28 U.S.C. § 1452 on grounds that another defendant (with whom the removing

2    defendant had entered into an indemnification agreement) had filed for bankruptcy. 169 B.R. at 687.

3    Finding, *inter alia*, that "only state law causes of action are involved," the court concluded that it was

4    required to abstain and remand the case under § 1334(c)(2). As "[s]tate courts afford the best forum

5    for deciding issues whose resolution turns on interpretation of state law," this Court should do the

6    same. *See In re Republic Readers Service, Inc.*, 81 B.R. 422, 427 (Bkrtcy. S.D.Tex. 1987).

7         **4.    There are also ample grounds for the court to exercise its discretion to abstain
              from hearing this action pursuant to § 1334(c)(1) and/or to remand it to state
8             court pursuant to § 1452(b).**

9         As Defendants acknowledge, the District Court's jurisdiction over bankruptcy proceedings is

10   concurrent with that of state courts. 28 U.S.C. *§* 1334(b); *see* Notice, ¶ 49. Accordingly, even if this

11   Court were to somehow decline to abstain and remand under the mandatory provisions in §§

12   1334(c)(2) and 1452(a), then it should exercise its discretionary power to abstain and remand

13   pursuant to §§ 1334(c)(1) and 1452(b).[29]

14        In determining whether to exercise their equitable discretion under these statutes, courts have

15   looked to parallel sets of factors, which include: (1) the effect of the action on the administration of

16   the bankruptcy; (2) the extent to which issues of state law predominate over bankruptcy issues; (3) the

17   complexity or difficulty of applicable state law; (4) the presence of non-debtor parties; (5) the

18   existence of a right to a jury trial; and (6) the likelihood that the party claiming federal jurisdiction is

19   forum shopping. *See, e.g., In re Tucson Estates, Inc.*, 912 F.2d 1162, 1169 (9th Cir. 1990); *Williams*,

20   169 B.R. at 692-93.

21        In this case, every factor listed above favors abstention and remand: (1) the effect of this action

22   _____

23   [29] Section 1334(c)(1) provides as follows:

24        Nothing in this section prevents a district court in the interest of justice, or in
25        the interest of comity with State courts or respect for State law, from abstaining
         from hearing a particular proceeding arising under title 11 or arising in or
26        related to a case under title 11.

27   Section 1452(b) similarly provides that "the court to which [a] claim or cause of action is removed
     [pursuant to § 1334 jurisdiction] may remand such claim or cause of action on any equitable ground."
28   28 U.S.C. § 1452(b).

- 24 -

1   on the administration of the Bankruptcies is, at most, incredibly remote; (2) the action is based

2   entirely on state statutory and common law theories; (3) the case is best resolved by the state court

3   having expertise in such state-law theories (as well as the ability to decide any peripheral bankruptcy

4   issues that may arise); (4) the only alleged debtor parties in this 18-defendant case are the

5   predecessors of two defendants; (5) Plaintiffs' claims are triable by a jury; and finally, (6) given the

6   incredible remoteness of the bankruptcy issue to this case, the barely colorable nature of their other

7   jurisdictional bases for removal, and Defendants' stated intent to remove all pending State MTBE

8   cases to a federal judge in New York whose MTBE cases have already settled, it is apparent that they

9   are forum shopping.

10          **5.      If the Court chooses not to abstain from or remand the action in its entirety, it
11                  should at least remand all claims other than those involving conduct of Texaco,
                  Inc. arising prior to 1988.**

12          Finally, should this Court decide that it has jurisdiction over claims involving the pre-1988

13   conduct of Texaco, Inc., and/or the pre-1993 conduct of Circle K Corporation, and should it decline

14   to remand and/or abstain from hearing such claims under the mandatory and discretionary provisions

15   discussed above, then Plaintiffs respectfully request that the Court retain *only* those non-statutory,

16   bankruptcy-related claims related to such conduct, and remand all others.  *See* 28 U.S.C. § 1452

17   (permitting removal and remand of specific claims).

18   **D.     Plaintiffs Are Entitled To Their Removal-Related Attorneys' Fees and Costs.**

19          Under to 28 U.S.C. § 1447(c), an order remanding a case to state court "may require payment

20   of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  An

21   award of fees and costs to Plaintiffs in this case, where Defendants have removed this exclusively

22   state-law action and asserted jurisdictional grounds that are obviously lacking in merit, is clearly

23   warranted.  In conjunction with their reply brief in support of this Motion, Plaintiffs will submit

24   evidence (in the form of affidavits of counsel) sufficient to support an award of fees and costs.

## V.    CONCLUSION

25          This Court does not have subject matter jurisdiction over this action and/or should abstain

26   from hearing it.  Accordingly, the Court should grant this Motion and issue an order remanding this

27   case in its entirety to the Sacramento County Superior Court and awarding Plaintiffs their reasonable

28

1   fees and costs, subject to proof.

2   ───────────────────── Respectfully submitted,

3

4   DATED: 12/15 _____, 2003          JAN SCULLY, DISTRICT ATTORNEY

5                                      ALBERT LOCHER,
                                       Assistant Chief Deputy District Attorney
6

7                        By: _Russ Detrick_____

8
                                       RUSS DETRICK
9                                      Supervising Deputy District Attorney
                                       Attorneys for Plaintiff The People of the State of
10                                     California

11  DATED: Dec. 15 _____, 2003        SHER & LEFF, LLP

12

13                       By: _____

14                                     TODD E. ROBINS
15                                     VICTOR M. SHER

16                                     BARON & BUDD, P.C.
17                                     SCOTT SUMMY
                                       CELESTE A. EVANGELISTI
18

19                                     Attorneys for Plaintiffs City of Elk Grove,
                                       Sacramento County Water Agency, Sacramento
20                                     Groundwater Authority, Carmichael Water
                                       District, Citrus Heights Water District, Del Paso
21                                     Manor Water District, Fair Oaks Water District,
                                       Florin Resource Conservation District, Rio Linda
22                                     Elverta Community Water District, Sacramento
                                       Suburban Water District, San Juan Water
23                                     District, California-American Water Company,
                                       and City of Sacramento
24

25

26

27

28

**ORIGINAL**

# FILED

San Francisco County Superior Court

### APR 1 5 2002

GORDON PARK-LI, Clerk

BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION

DEPARTMENT NO. 514

SOUTH TAHOE PUBLIC UTILITY DISTRICT,

        Plaintiff,

    vs.

    et al.,

        Defendants.

CASE NO. 999128

**SPECIAL VERDICT [PHASE I]**

(3/4/02)



RECEIVED

APR 1 5 2002

BY:

Exhibit A
Page 1 of 11

**Question No. 1:** Was gasoline containing MTBE manufactured, sold, or supplied by any of the ~~defendants~~ ~~defective in design because the risk of harm inherent in its design~~ ~~outweighed the benefits of that design?~~

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any ~~defendant,~~ during what time period was the gasoline containing MTBE manufactured, sold, or ~~supplied by that defendant during that time period?~~

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: |  |  |  |
| 11-1  Shell Oil Company | ✓ | | fall/winter 1970 to 12·31·97 |
| Equilon Enterprises LLC | ✓ | | 1-1-98 to Present |
| Texaco, Inc. | ✓ | | 1983 to 12·31·1997 |
| 9-3  Tosco Corporation | ✓ | | April 92 to inch 1996 |

If you answer "no" as to each defendant, then go to question No. 3. If you answer "yes" as ~~to one or more defendants, then~~ answer the next question only as to such defendants.

**Question No. 2:** As to each defendant for which you answered "yes" in Question No. 1, did ~~the gasoline containing MTBE leave the possession of such defendant?~~ possession of such defendant?

Answer "yes" or "no" for each such defendant. If you answer "yes" as to any defendant, ~~during what~~ time period was the gasoline containing MTBE manufactured, sold, or supplied by that ~~defendant during that time period?~~

|  | Yes | No | If yes, time period |
|---|---|---|---|
| 11-1  Shell Oil Company | ✓ | | fall/winter 1970 to 1·31· 98 |
| Equilon Enterprises LLC | ✓ | | 1·1·1998 to Present |
| Texaco, Inc. | ✓ | | 1983 to 12·31·1997 |
| 9-3  Tosco Corporation | ✓ | | April 1992 to inch 1996 |

Exhibit A
Page 2 of 11

**Question No. 3:** Was gasoline containing MTBE manufactured, sold or supplied by any of

Answer "yes" or "no" after the name of each such defendant.  If you answer "yes" as to any

MTBE manufactured, sold, or

| | Yes | No | If yes, time period |
|---|---|---|---|
| Equilon Enterprises | ✓ | ___ | Fall/winter 1990 to 12-31-1997 |
| Texaco, Inc. | ✓ | ___ | 1-1-1998 to Present |
| Tosco Corporation | ✓ | ___ | 1992 to 12-31-1997 |
| | ✓ | ___ | April 1996 to Present |

**Question No. 4:** As to each defendant for whom you answered "yes" in Question

... because of a failure to warn, when the gasoline containing MTBE left the possession

Answer "yes" or "no" after the name of each such defendant.  If you answer "yes" as to any

gasoline containing MTBE manufactured, sold, or

| | Yes | No | If yes, time period |
|---|---|---|---|
| Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12-31-19.. |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-1998 to Present |
| Texaco, Inc. | ✓ | ___ | 1992 to 12-31-1997 |
| Tosco Corporation | ✓ | ___ | April 1996 to Present |

Exhibit A
Page 3 of 11

Question No. 5: Were the risks involved in the transportation, storage and handling of MTBE recognized by all of Lyondell Chemical Company's (ARCO Chemical Company's) California refiner and distributor customers, who transported, stored and handled MTBE in bulk? If not, during what time period were the risks not recognized?

Answer "yes" or "no." If you answer is "no," state the time period.

|  | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 12-0 | ✓ | 1992 to 1996 |

If you answered "no" to Question No. 5, then answer Question No. 6. If you answered "yes" to Question No. 5, then answer Question No. 9.

Question No. 6: Was MTBE manufactured, sold or supplied by defendant Lyondell Chemical Company (ARCO Chemical Company) defective because of a failure to warn?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

|  | Yes | No of each | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ |  | 112 TO 1116 |

If you answered Question No. 6 "yes", answer Question No. 7. If you answered Question No. 6 "no", answer question No. 9.

Question No. 7: Did the defect exist, because of a failure to warn, when the MTBE left the possession of defendant Lyondell Chemical Company (ARCO Chemical Company)?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ |  | 1992 to 1996 |

If you answered Question No. 7 "yes", answer Question No. 8. If you answered Question

Exhibit A
Page 4 of 11

**Question No. 8:** Were the warnings of defendant Lyondell Chemical Company (ARCO
~~...~~ Company) to all of its customers, as described in Question No. 5, above, adequate to make

were such warnings of Lyondell Chemical Company (ARCO Chemical Company)

Answer "yes" or "no." If you answer "no," state the time period.

|  | Yes | No | If no, time period |
|---|---|---|---|
| 11-1 |  | ✓ | 1987 to 1996 |

**Question No. 9:** If you answered "yes" to both Question No. 1 and Question No. 2 as to
defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with
gasoline containing MTBE that was defective in design because the risk of harm
design outweighed the benefits of that design?

Answer "yes" or "no." If you answer "yes," state the time period.

|  | Yes | No | If yes, time period |
|---|---|---|---|
| 11-1 | ✓ |  | Full Awinter 190 to 2-1997 |

~~...~~ ou answered Question ~~...~~

**Question No. 10:** If you answered "yes" to both Question No. 3 and Question No. 4 as to

Question No. 11.

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with

containing MTBE that was defective in design because of a failure to

warn

Answer "yes" or "no." If you answer "yes," state the time period.

|  | Yes | No | If yes, time period |
|---|---|---|---|
| 11-1 | ✓ | ___ | Full Answer 1990 to 12-1997 |

**Question No. 11:** If you answered "yes" to both Question No. 6 and Question No. 7 and

and Question No. 8, answer the question below. If you did not

Question No. 7 and "no" to both Question No. 5 and

, please sign and return this form

Do you find by clear and convincing evidence that defendant Lyondell Chemical Company

Company) acted with malice in selling MTBE that was defective in design

Answer "yes" or "no." If you answer "yes," state the time period.

|  | Yes | No | If yes, time period |
|---|---|---|---|
| 11-1 | ✓ | ___ | 1987 to 1996 |

_April_ _15_, 2002

_____
JURY FOREPERSON

Maps | Newsletters | Site Map | Subscribe to the Print Edition | Traffic | Wireless Delivery

## sacbee
### The Sacramento Bee
*Life. Captured daily.*

Advanced Search | Enter Keyword

still in the mood for a 20027 SUL

| News | Sports | Business | Politics | Opinion | Entertainment | Lifestyle | Travel | Women | Classifieds | Homes | Cars | Jobs | Shopping

Powered by: accessBee -- Internet f

Sacbee: / News

Sections:
- 24-Hour State News
- 24-Hour National News
- 24-Hour World News
- 24-Hour Science News
- Bee State News

- Corrections
- Crime
- Education
- Energy
- Environment

- Medical
- Neighbors
- Obituaries
- Religion
- Sacramento

- Science
- Special Projects
- Traffic
- Weather
- Weather News


INTERNET: SPECI
The Sacr

# News

Some people think any real estate company will do...

## Three oil firms lose MTBE suit
### A jury holds them responsible for Lake Tahoe well pollution.

**By Chris Bowman -- Bee Staff Writer**
Published 2:15 a.m. PDT Wednesday, April 17, 2002

A California jury has declared MTBE-containing gasoline a "defective product" that oil companies knew would endanger drinking-water supplies while they sold the product as environmentally beneficial.

The San Francisco Superior Court jury on Monday also held three oil companies -- Shell Oil Co., Texaco Inc. and Tosco Corp. -- responsible for MTBE leaking from gas stations on the south shore of Lake Tahoe and polluting more than one-quarter of the community's well-water supplies.

Jurors also found that Shell and Lyondell Chemical Co. of Houston, the largest domestic manufacturer of MTBE, acted with "malice" in failing to warn consumers that the chemical posed an extraordinary environmental hazard.

In five months of testimony, the oil companies argued that they had a mandate from Congress to make cleaner-burning gasoline with an oxygen-bearing chemical like MTBE and that they routinely advised distributors and dealers on how to safely store fuel.

After the jury reached its decision, Superior Court Judge Carlos Bea issued a gag order preventing attorneys and their clients from commenting on the case because it is still being tried.

The trial now moves to its second phase, scheduled to begin Monday, to

CURRENT TOP NI

The Sacram

**Three oil firms suit**
A California jury ha
MTBE-containing ga
"defective product"
companies knew wo
drinking-water supp
sold the product as
environmentally ben

**DNA clears rot suspects**
The two men faced
after being identifie
of a brutal home-in
two years ago as th
had terrorized their

**MTV peeks at sorority life**
Is Davis ready for li
up?

**Debate on a Bi**
ARCATA -- The supp
Meals here may soo
prospect greeted wi
from delight to rage
residents.

**Beleaguered c conspiracy**
LOS ANGELES -- Pc
Bernard C. Parks, w
charged appeal to t
on Tuesday, claime
and the police unior
deny him a second
city's top cop.

**Jury finds city. liable in dog a**
A federal jury Tues
city of Sacramento
Arturo Venegas Jr.
injuries from a can
saying the Police De
policy on the use of
excessive force

**City to add 46**
The trial now m

determine damages for the loss of the South Tahoe Public Utility District's well water, which it estimates to be $50 million.

South Lake Tahoe is one of about 50 California communities that have lost drinking-water supplies because of MTBE contamination, state health records show.

State officials say an estimated 6,700 leaking storage tanks beneath gas stations are within a half-mile of active public drinking-water wells.

The jury was the first in the country to consider whether MTBE is a "defective product," that is, whether its environmental risks outweighed its environmental benefits as a chemical purported to cut toxic and smog-forming vehicle emissions, attorneys following the case said.

The verdict is nationally significant because of the large number of product-liability lawsuits against companies that make the chemical or blend it into gasoline.

"Very similar evidence presented to the jury in the Tahoe case will be presented in these other cases," said Scott Summy, a Dallas attorney representing plaintiffs in such lawsuits brought in California, Illinois and New York.

Joseph Lawrence, assistant city attorney in Santa Monica, is using the same evidence in the city's case.

"Until now oil companies have been somewhat successful painting themselves as victims of MTBE," Lawrence said. "They are not victims at all. They are one of the chief culprits.

"They hid information about MTBE's risks. This is first case that most thoroughly revealed that."

Santa Monica lost more than half of its drinking-water supply because of MTBE contamination from leaking underground gasoline tanks.

Stephen Hall, executive director of the Association of California Water Agencies, said Tuesday that the U.S. Environmental Protection Agency is as much to blame as the oil industry for failing to disclose MTBE's environmental risks.

"They knew it had a high potential for polluting water," Hall said. "They were simply willing to trade clean water for clean air."

Attorneys for the oil companies argued that they had little choice but to more than triple the volume of MTBE in gasoline starting in 1996 when a federal mandate requiring low-polluting gasoline in smoggy regions took effect statewide in California. The rule requires the fuel to contain a certain amount of oxygen-enhancing compounds, and MTBE was the economical choice, they said.

Lyondell contended it only made MTBE, and that gasoline refiners, distributors and dealers knew of the additive's tendency to spread rapidly

officers
Forty-six new police patrolling the street Sacramento by the year, Police Chief A Jr. told the City Cou as he outlined his p concern about a me of retirements.

New city woul county
The new city of Ran would owe as much annually to reimbur County for lost reve approve incorporati November, accordir repayment deal app by the Board of Sup

Bumps in the I
Two controversial p heated debate over highlight a transpor scheduled to be app Thursday by the Sa Council of Governm

Foster system reforms
Two months after e relatives told count they were treated p Children's Protectiv officials Tuesday un of changes to make more family-friendl

underground.

Most of the 31 defendants -- major oil companies, refiners, distributors, dealers -- named in the 1998 lawsuit settled before the case reached the jury, paying the water district a total of $33 million, according to the district.

MTBE, or methyl tertiary butyl ether, migrates from leaking underground fuel storage tanks to groundwater faster than gasoline's other ingredients. Water filtration plants can't remove MTBE without expensive treatment upgrades.

Last month, Gov. Gray Davis postponed for a year his order to eliminate the troublesome additive from California gasoline.

Davis said delaying the ban until Jan. 1, 2004, buys more time for construction of transportation and fuel-blending facilities needed to replace MTBE with ethanol, produced mostly from corn grown in the Midwest. He feared disruption in ethanol supplies would cause long lines and price spikes at gas stations.

The jury in the Tahoe case reached its decisions Monday after deliberating seven weeks on evidence that delved into chemistry, geology and the complexities of gasoline distribution.

Sacramento lawyers Duane Miller and Victor Sher relied extensively on internal industry records in arguing the Tahoe water district's case.

The records showed that oil companies knew of the chemical properties making MTBE problematic in groundwater years before they increased its use in gasoline.

Industry studies showed that in some ways MTBE is more worrisome than gasoline's cancer-causing benzene.

"MTBE plumes are expected to move faster and further than benzene plumes emanating from a gasoline spill," three Shell researchers said in an internal 1992 paper.

Oil industry officials even assured the U.S. EPA that its concerns were unfounded in weighing whether to regulate the gasoline additive as a contaminant in drinking-water supplies.

"There is no evidence that MTBE poses any significant risk of harm to health or the environment," a group of 17 producers of gasoline and petrochemicals concluded in response to the agency's mid-1980s calls for information on the chemical's environmental and health effects.

Summy said such records undoubtedly had a strong influence on the Tahoe verdict.

"It's no different than the tobacco cases and other product-liability cases," Summy said.

Exhibit A
Page 9 of 11

4/17/02

"Jurors don't like it when evidence shows that companies had knowledge many years ago that their products had many problems, and those problems were covered up and end up causing harm."

**About the Writer**

The Bee's Chris Bowman can be reached at (916) 321-1069 or cbowman@sacbee.com

Contact Us/Feedback | Privacy Policy | Terms of Use

News | Sports | Business | Politics | Opinion | Entertainment | Lifestyle | Travel | Women

Cars | Classifieds | Homes | Jobs | Shopping

Help | Maps | Newsletters | Site Map | Subscribe to the Print Edition | Traffic | Wireless Delivery

About Us | Advertise in The Bee | Advertise Online | Contact Circulation Customer Service | Events

[ Sacramento Bee Web sites ]

MovieClub.com | Sacbee.com | Sacramento.com

Copyright © The Sacramento Bee / ver. 4

# Los Angeles Daily News

**Oil companies will pay for MTBE cleanup**

**By Associated Press**

**Friday, November 21, 2003** - SANTA MONICA -- Three oil companies will spend hundreds of millions of dollars to clean up drinking water wells contaminated with the gasoline additive MTBE, according to a settlement reached Friday.

The agreement will end three years of legal wrangling between Shell, ChevronTexaco and ExxonMobil and the city of Santa Monica. The deal still requires court approval.

"With this settlement we will immediately begin the process of restoring the city's most important drinking water source," Mayor Richard Bloom said.

The coastal Los Angeles suburb sued the oil companies after the 1996 discovery that methyl tertiary butyl ether, a suspected carcinogen, had contaminated five of its wells.

MTBE is a clean-air gasoline additive that California expects to phase out by Jan. 1, in large part because of the Santa Monica case.

ExxonMobil and ChevronTexaco agreed to settle with Santa Monica last year; Shell held out until recently.

The companies will fund the construction and operation of a treatment plant to clean up the contaminated groundwater that Santa Monica had relied on to meet about half of its daily need of 12 million gallons.

They will also pay the city $92.5 million to cover legal fees and other costs.

The cleanup could take a decade, although the plant could begin delivering treated water in half that time, city officials said.

Shell spokesman Johan Zaayman called the settlement "good for the community and good for the environment." ExxonMobil and ChevronTexaco did not immediately return calls for comment.

The settlement came as a national energy bill was blocked in the Senate, largely because of a provision that would stop liability lawsuits against makers of MTBE.

That provision helped garner the opposition of lawmakers from states where MTBE contamination is prevalent, including California and New Hampshire.

Exhibit A
Page 11 of 11

# MTBE Bans

*Tancred Lidderdale*

# Contents

1. Summary
2. MTBE Supply and Demand
3. Ethanol Supply
4. Gasoline Supply
5. Gasoline Prices
   A. Long-Term Equilibrium Price Analysis
   B. Short-Term Price Volatility
6. Conclusion
7. Appendix A. Estimating MTBE Consumption by State
8. Appendix B. MTBE Imports and Exports
9. Appendix C. Glossary of Terms
10. End Notes
11. References

# 1. Summary

The U.S. is beginning the summer 2003 driving season with lower gasoline inventories and higher prices than last year. Recovery from this tight gasoline market could be made more difficult by impending State bans on the blending of methyl tertiary butyl ether (MTBE) into gasoline that are scheduled to begin later this year.

Three impending State bans on MTBE blending could significantly affect gasoline markets this year. The Connecticut ban takes effect on Oct. 1, 2003, while California and New York bans follow on Jan. 1, 2004 (Connecticut may delay its ban until Jan. 1, 2004, see End Note 1). It is the California ban that presents the most immediate concern. Because the original date of the California ban was Jan. 1, 2003, several California refiners are phasing out MTBE in favor of ethanol in advance of the new deadline (End Note 2). Once facilities and systems have switched from MTBE to ethanol it is generally not possible to quickly revert back (End Note 3). This paper reviews the supply and price issues relating to MTBE bans with a particular focus on California.

Several years ago MTBE was detected in water supplies scattered throughout the country, but predominantly in areas using reformulated gasoline (RFG) (End Note 4). MTBE has apparently been making its way from leaking underground storage tanks, gasoline spills, and two-stroke gasoline engines into surface and ground water. (For more information refer to the Environmental Protection Agency web site on MTBE at http://www.epa.gov/mtbe/.) Concerns over drinking water quality have prompted 18 States and Reno, Nevada to enact legislation to restrict or prohibit the use of MTBE in gasoline.

Removal of MTBE from the gasoline pool requires not only the replacement of the lost volume but also the oxygen content, octane, and emissions-reducing properties it provides to RFG. The only oxygenate replacement that is currently considered is fuel ethanol. Although fuel ethanol has a high blending road octane value of 115 compared with 110 for MTBE (Meridian Corp., 1991), two qualities detract from its use:

1. Ethanol increases the vapor pressure (Rvp) of gasoline while MTBE has only a small effect. Because ethanol increases the vapor pressure of gasoline, low cost high vapor pressure components such as butane and pentanes must be removed from the RFG pool, which makes it more difficult and costly to produce RFG.

2. Ethanol tends to separate from gasoline if stored for an extended period of time, and if an ethanol-gasoline blend is exposed to water or water vapor (as in a pipeline), the ethanol tends to bring the water into solution and the gasoline may be rendered unusable (Environmental Protection Agency, 1996). Because of these handling problems, ethanol is shipped separately from gasoline (typically by rail car or truck but

## 2. MTBE Supply and Demand

The blending of MTBE into motor gasoline has increased dramatically since it was first produced over 20 years ago. MTBE usage grew in the early 1980's in response to octane demand resulting initially from the phaseout of lead from gasoline and later from rising demand for premium gasoline. The oxygenated gasoline program, which began in November 1992, stimulated an increase in MTBE production from 83,000 barrels per day in 1990 to 161,000 barrels per day in 1994. The RFG program, which began in January 1995, provided a further boost to oxygenate blending. MTBE demand increased to 266,000 barrels per day by 1997.

MTBE supply and demand balances in Table 1 show that during the first few years of the Federal RFG program almost all of the MTBE consumed in the Nation was in RFG and oxygenated gasoline. Over the last few years it appears that MTBE has found its way back into the conventional gasoline pool as an octane blending component.

State bans on MTBE use could further stimulate MTBE blending into conventional gasoline for use in States without MTBE bans. It is possible that MTBE displaced from RFG in States that have implemented bans must be replaced by another clean, high octane, and low vapor pressure blendstock such as alkylate. The use of MTBE in conventional gasoline could free up alkylate. Also the decline in MTBE demand arising from the State bans could depress the market price of MTBE such that it becomes economical to increase its use as an octane blendstock. However, the use of MTBE in conventional gasoline could also be constrained as the growing number of State bans makes it difficult to maintain separate pools of conventional gasoline with and without MTBE.

### Table 1. U.S. MTBE Supply and Demand Balance
(thousand barrels per day)

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| + MTBE Production | 163.5 | 185.1 | 197.1 | 205.5 | 216.2 | 211.5 | 206.7 |
| + MTBE Stock Draw (Build) | 13.9 | (3.6) | 4.9 | (3.9) | 4.3 | 2.3 | (1.1) |
| + MTBE Gross Imports | 45.1 | 47.7 | 59.9 | 67.8 | 74.8 | 73.5 | 76.6 |
| – MTBE Gross Exports | 5.9 | 8.3 | 11.6 | 25.9 | 20.7 | 23.8 | 21.2 |
| = MTBE Net U.S. Supply | 216.6 | 220.9 | 250.2 | 243.5 | 274.5 | 266.5 | 261.0 |
| + MTBE in RFG Imports | 12.9 | 19.1 | 17.7 | 19.8 | 20.9 | 21.7 | 23.7 |
| + MTBE in Oxy Gas Imports | 1.0 | 0 | 0 | 0 | 0 | 0.1 | 0.2 |
| = MTBE Total Supply | 230.5 | 240.0 | 267.9 | 263.3 | 295.4 | 288.2 | 285.1 |
| – Estimated MTBE Blended in RFG and Oxy Gas (Table 2) | 234.3 | 225.5 | 246.6 | 263.6 | 259.6 | 257.2 | 238.6 |
| = Discrepancy (MTBE in conventional gasoline) | (3.8) | 14.5 | 21.3 | (0.3) | 35.8 | 31.0 | 46.5 |

Notes:
• MTBE contained in RFG imports assumed to equal 11 percent by volume.
• MTBE contained in Oxy Gas (oxygenated gasoline) imports assumed to average 15 percent by volume.
• MTBE Net U.S. Supply = Production + Stock Draw + Gross Imports - Gross Exports.
• MTBE Total Supply = MTBE Net U.S. Supply + MTBE in RFG Imports + MTBE in Oxy Gas (oxygenated gasoline) imports.
• Discrepancy = MTBE Total Supply - Estimated MTBE Consumption.
Source: Energy Information Administration

Only five State bans should have a significant direct effect on MTBE and gasoline markets: California, Connecticut, Kentucky, Missouri, and New York. The five States shown in Table 2 consume about 50 percent of the MTBE blended into RFG and oxygenated gasoline, and about 44 percent of all MTBE consumed in the U.S. (although this latter market share could be higher because we do not account for the volume of MTBE blended into conventional gasoline.)

The other 11 States plus Reno, Nevada, currently consume little or no MTBE. However, as noted above, the many State bans may also make it difficult to blend MTBE into the conventional gasoline pool since it may not be possible for some refiners and terminals to maintain separate pools of conventional gasoline with and without MTBE.

**Table 2. Estimated MTBE Consumption in RFG and Oxygenated Gasoline by State**
(thousand barrels per day)

| State | MTBE Phaseout Date | | MTBE Average Annual Consumption | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
| **MTBE bans enacted:** | | | | | | | | | |
| California | Jan. 1, 2004 | | 71.2 | 78.8 | 86.5 | 97.3 | 103.6 | 102.4 | 79.7 |
| Connecticut | Oct. 1, 2003 | (11) | 10.6 | 9.4 | 10.0 | 10.0 | 9.0 | 8.5 | 9.4 |
| Kentucky | Jan. 1, 2006 | (1) | 1.8 | 2.2 | 2.4 | 2.1 | 2.2 | 2.2 | 2.2 |
| Missouri | Jul. 1, 2005 | (1) | 0.0 | 0.0 | 0.0 | 0.0 | 2.3 | 3.3 | 3.2 |
| New York | Jan. 1, 2004 | | 22.7 | 22.0 | 23.7 | 24.4 | 21.4 | 19.7 | 21.1 |
| Illinois | Jul. 24, 2004 | (1, 3) | 3.2 | 1.0 | 0.9 | 0.4 | 0 | 0 | 0 |
| Colorado | May 1, 2002 | | 0.3 | 0.3 | 0.3 | 0.2 | 0.1 | 0 | 0 |
| Indiana | Jul. 24, 2004 | (1) | 0.4 | 0.1 | 0.1 | 0.1 | 0 | 0 | 0 |
| Iowa | May 11, 2000 | (1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | Jul. 1, 2004 | (1, 6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | Jun. 1, 2003 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | Jul. 1, 2005 | (4) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | Jan. 1, 2001 | (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | Jan. 1, 2004 | (5) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | Jul. 1, 2005 | (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | July 1, 2000 | (7) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington | Jan. 1, 2004 | (8) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **No MTBE bans enacted:** | | | | | | | | | |
| Arizona | | (9) | 0.3 | 0.3 | 1.8 | 3.7 | 3.7 | 3.6 | 3.6 |
| Delaware | | | 2.6 | 2.2 | 2.6 | 2.8 | 3.0 | 3.0 | 3.0 |
| Dist. of Columbia | | | 1.1 | 0.8 | 0.9 | 0.8 | 0.8 | 0.8 | 0.7 |
| Maine | | (10) | 3.7 | 3.7 | 3.7 | 3.7 | 0.8 | 0 | 0 |
| Maryland | | | 13.4 | 10.1 | 11.2 | 11.1 | 11.2 | 11.7 | 12.6 |
| Massachusetts | | | 16.2 | 16.0 | 16.9 | 16.4 | 14.8 | 16.5 | 16.8 |
| New Hampshire | | | 2.0 | 2.1 | 2.3 | 2.6 | 2.6 | 2.9 | 3.2 |
| New Jersey | | | 30.7 | 29.0 | 31.4 | 32.5 | 28.1 | 26.5 | 27.1 |
| North Carolina | | | 0.4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania | | | 9.3 | 8.7 | 9.2 | 9.4 | 8.8 | 9.3 | 9.7 |
| Rhode Island | | | 3.8 | 3.5 | 3.4 | 3.5 | 2.9 | 2.9 | 2.6 |
| Texas | | | 25.9 | 23.7 | 27.0 | 29.2 | 31.2 | 30.3 | 30.5 |
| Utah | | | 0.0 | 0.0 | 0.1 | 0.1 | 0 | 0 | 0 |
| Virginia | | | 14.0 | 11.4 | 12.3 | 13.1 | 13.2 | 13.6 | 13.6 |

Notes:
This table does not include MTBE blended into conventional gasoline. For example, MTBE consumption in Maine in 2001 is shown in the table as zero because Maine had opted out of the reformulated gasoline program effective March 10, 1999. However, surveys conducted by the Maine Department of Environmental Protection indicate that the average MTBE concentration in gasoline sold in the State in 2001 was 2.4 volume percent (http://www.state.me.us/dep/air/mobile/fuelspage.htm), which is equivalent to about 1,250 barrels per day. Similarly, the Michigan Dept. of Agriculture reported that "in 2001, MTBE was detected in 17% of all samples obtained, with an average concentration of 4.75%." (http://www.deq.state.mi.us/documents/deq-std-MTBE1.doc).
(1) Maximum 0.5 volume percent MTBE
(2) Maximum 1.0 volume percent MTBE
(3) MTBE banned in Chicago beginning Dec. 2000
(4) Year-round State-wide oxygenated gasoline requirement with ethers limited to 0.33 volume percent after July 1, 2000, and banned after July 1, 2005.
(5) This is not a State-wide ban. Washoe County (Reno) MTBE maximum limit of 0.3 volume percent effective the same date as the California ban. Clark County (Las Vegas) adopted 10 volume percent ethanol requirement in 1999 for gasoline sold from October through March.
(6) This provision will take effect only if EPA grants the State a waiver to control or prohibit MTBE in gasoline.
(7) MTBE limited to 2.0 volume percent beginning Feb. 2000.
(8) Maximum 0.6 volume percent MTBE effective July 22, 2001
(9) Arizona Senate Bill 1504, approved by the Governor on April 28, 2000, states that it is the "policy" of the State that MTBE be phased out as soon as possible, but no later than 180-days after effective date of California ban if feasible.
(10) Maine Public Law Chapter 709 established a "goal" to eliminate MTBE in gasoline sold in the State by January 1, 2003.
(11) Connecticut may delay its ban on MTBE from Oct. 1, 2003, until Jan. 1, 2004, to make it consistent with New York State's scheduled ban. Senate Bill 640 passed the Joint House-Senate Environment Committee on March 17, 2003, and is awaiting State Senate and House action.
Source: EIA calculations. Refer to Appendix A for MTBE consumption estimation procedures.

## 3. Ethanol Supply

The ethanol industry is expected to be able to meet the demand for ethanol in the States that have banned MTBE without adding a single plant beyond those currently being built (Energy Information Administration, 2002a). The Renewable Fuels Association (RFA), an ethanol industry trade group, maintains a list of ethanol producers, their plant sizes, and their feedstocks. Table 3 shows that the producers on the RFA list have existing capacity of 178 thousand barrels per day, with almost all of that capacity located in the Midwest (PADD 2).

### Table 3. Ethanol Production Capacity by PAD District, March 2003
(thousand barrels per day)

|  | Existing Capacity | Capacity Under Construction |
|---|---|---|
| PADD 1 (East Coast) | 0.3 | 0.0 |
| PADD 2 (Midwest) | 175.2 | 32.9 |
| PADD 3 (Gulf Coast) | 1.0 | 0.0 |
| PADD 4 (Rocky Mountain) | 0.8 | 0.0 |
| PADD 5 (West Coast) | 0.6 | 0.0 |

Source: Compilation of online document: *Ethanol Production Facilities*. Renewable Fuels Association. Washington, DC, March 2003. (http://www.ethanolrfa.org/eth_prod_fac.html).

The United States imports a small quantity of fuel ethanol as well. In 2002, an average 416 barrels per day were imported from Canada, and an average 422 barrels per day were imported from Costa Rica. One reason for the low level of imports is the tariff of $0.54 per gallon that applies to most imported fuel ethanol to offset the gasoline excise tax exemption for ethanol blended gasoline (U.S. International Trade Commission, 2003).

## 4. Gasoline Supply

The Federal RFG program requires a minimum 2.1 percent oxygen by weight when averaging. This minimum oxygen requirement can be satisfied by blending approximately 5.5 volume percent ethanol or 11 volume percent MTBE. RFG is generally blended with the minimum required volume of ethanol or MTBE to minimize costs. Consequently, replacing MTBE with ethanol will result in a reduction of RFG volume.

When MTBE is removed and ethanol is added to gasoline, the vapor pressure (Rvp) of the gasoline blend increases and thus emissions of volatile organic compound (VOC) increase. Table 4 shows that blending 5 volume percent ethanol into 9.0 Rvp gasoline increases the Rvp to 10.1 while blending 10 volume percent MTBE increases the gasoline Rvp from 9.0 to 9.2. Because of the Rvp boost with ethanol, conventional gasoline that contains 10 volume percent ethanol (commonly called "gasohol") and sold outside of reformulated gasoline control areas is allowed a 1 pound per square inch (psi) Rvp waiver. The Environmental Protection Agency also allowed the Chicago and Milwaukee RFG areas to reduce by 2.0 percentage points (equivalent to an increase in Rvp of approximately 0.3 psi) the summertime VOC performance standard applicable to RFG blends containing 10 volume percent ethanol (66 *Federal Register* 137).

### Table 4. Rvp of Gasoline/Alcohol Blends
(pounds per square inch)

| Percent Gasoline | Percent Oxygenate | Vapor Pressure of Gasoline Blend With Ethanol | MTBE | Percent Gasoline |
|---|---|---|---|---|
| 100 | 0 | 9.00 | 9.00 | 100 |
| 95 | 5 | 10.10 | 9.40 |  |

Note: The vapor pressure of the gasoline blendstock before adding either MTBE or ethanol is ●p.
Source: Meridian Corp., 1991

To counter the increase in Rvp the gasoline blendstock that is to be combined with ethanol must be adjusted to a lower Rvp. This is accomplished by removing the light materials that boil at low temperatures and therefore have high Rvp's. These materials are generally lower cost C4 (e.g., butane) and C5 (e.g., pentane) hydrocarbons.

After C4's and C5's are reduced to achieve Rvp and 5.5 volume percent ethanol replaces 11 volume percent MTBE, the resulting distillation properties of the gasoline blend are different. The elimination of light, high-Rvp components in combination with a reduction in volume of oxygenates cause the T50 and T90 distillation temperatures for the gasoline blend to rise (the temperatures at which 50 percent and 90 percent of the gasoline boils off, respectively). These changes, in combination with less dilution of undesirable emission components, require further adjustments such as removing some of the heavier gasoline components from the base blend to meet emissions limits.

Thus, the shift to ethanol can result in a loss of volume in three ways:

- Less oxygenate volume (moving from 11 to 5.5 volume percent);
- Removal of light, high-Rvp volumes (C4's and C5's) to counter ethanol's higher Rvp; and
- Removal of heavy, high-boiling-temperature volumes to counter the loss of high-Rvp, low-boiling-temperature components and the net reduction in light volume oxygenate volume.

Several studies of the impact of MTBE bans on gasoline production volumes have been published. While the results of these studies vary because of different assumptions regarding the ability of refiners to adjust operations to make up for lost volume, they still reach the same conclusion that the loss of gasoline production capacity will be significant. For example, California refineries that produce only CARB (California Air Resources Board) RFG may see gasoline production fall by 10 to 17 percent (EIA, 2002b; Stillwater Assoc., 2002; and Stratco/Purvin & Gertz, 2000). The EIA (2002b) and Stillwater Assoc. (2002) cases are compared in Table 5.

**Table 5. Net Change in Gasoline Supply With California MTBE Ban**
(thousand barrels per day)

|  | Stillwater Assoc. (2002) | EIA (2002b) |
|---|---|---|
| MTBE removal | - 102 | - 102 |
| Ethanol addition | + 55 | + 55 |
| Loss of light and heavy components to balance ethanol properties | - 56 | - 68 |
| Net impact on volume | - 103 | - 114 |
| Percent reduction in total gasoline supply | - 11.0% | - 12.2% |

Note: Total CARB RFG production of 935,000 barrels per day is assumed.

Increasing the ethanol content from 5.8 to 10 volume percent to make up for some of the lost volume in California may not be an option. In EIA's study, ethanol could only be increased from 5.8 to 6.0 percent before the blend failed the CARB predictive model NO$_x$ emission test (EIA, 2002b). It was possible to get to a 7.0 percent ethanol if the refiner can also purchase additional volumes of alkylate and iso-octane, but 10 volume percent was not practically achievable.

Refiners outside of California face an additional constraint in the Mobile Source Air Toxics Rule (MSAT) (End Note 5). The MSAT caps refiners at their average toxic emission level achieved in 1998-2000 to prevent "backsliding." The replacement of MTBE with ethanol contributes to an increase in toxics emissions, particularly acetaldehyde, which would require refiners to make further adjustments to their gasoline pool or possibly reduce their production of RFG (End Note 6).

## 5. Gasoline Prices

The State MTBE bans are expected to increase the cost of producing RFG and raise the pump price of gasoline. There are several factors contributing to this price increase:

- Capital investment required for transportation, storage, and blending of ethanol and ethanol-based RFG is passed on to consumers.

- Because ethanol increases the vapor pressure of gasoline, low-cost high vapor pressure components such as butane and pentanes must be removed from the RFG pool, which makes it more difficult and costly to produce RFG.

- Because approximately two gallons of MTBE are being replaced by one gallon of ethanol, the net volume loss must be made up for with some other high-octane blend component with low vapor pressure. Availability of desirable blending components such as alkylate and iso-octane is very limited.

Most estimates of higher pump prices with ethanol-blended RFG are based on long-term equilibrium models that assume sufficient lead-time for investments and perfect foresight for investors. In reality, some market participants may respond to uncertainty by delaying investment decisions, thereby creating the possibility of supply imbalance and price spikes during the MTBE phase-out. Moreover, as it becomes more difficult to produce gasoline with strict quality requirements, supply sources become fewer and more distant. Unexpected events such as refinery outages may result in larger and longer price spikes than have been seen in the past.

Both the long-term modeling estimates of higher pump prices and potential price spikes associated with short-term market disruptions are discussed in the following two sections.

### Long-Term Equilibrium Price Analysis

The State MTBE bans are projected to increase the average price of RFG by 3.6 cents per gallon in 2004, with an increase in the average national motor gasoline price of 1.8 cents per gallon, compared to a reference case with no State MTBE bans (Energy Information Administration, 2002a). Although State-level projections are not available, it is generally expected that the increase in RFG prices in California, New York and Connecticut would be significantly higher than the national average. For example, the expected RFG price increase in PADD V, which is likely to use ethanol for all of its RFG by the end of 2004, is 9 cents per gallon. Table 6 shows the impact on RFG prices and the associated ethanol supply and RFG consumption at PADD levels.

### Table 6. Reformulated Gasoline Projections for 2004

|  | Ethanol Demand (thousand barrels per day) | RFG Consumption (thousand barrels per day) | RFG Price Increase (in 2000 dollars) |
|---|---|---|---|
| PADD I | 19 | 1,295 | $0.025/gallon |
| PADDs II - IV | 94 | 807 | $0.001/gallon |
| PADD V | 65 | 818 | $0.090/gallon |
| U.S. | 178 | 2,920 | $0.036/gallon |

Note: The average RFG price increase in PADD I is projected to be less than the national average because New York and Connecticut only account for approximately 27 percent of the MTBE in PADD I. Other primary PADD I States, such as New Jersey, Massachusetts, Pennsylvania, Maryland, and Virginia (jointly accounting for about 56 percent of the MTBE use in PADD I), have not passed legislation to formally phase out MTBE. Thus, projections for PADD I may not represent the possible gasoline price impact on New York and Connecticut consumers.
Source: Energy Information Administration, 2003.

Short-Term Price Volatility

The magnitude and duration of a price rise resulting from a supply disruption depends on the availability of alternative sources of supply and methods of delivery. For example, a loss of refining capacity on the East Coast or shutdown of a pipeline delivering gasoline from Gulf Coast refineries to the East Coast generally has small and short-term effects on prices because there are well-established alternatives available out of the Gulf Coast and Europe. California, however, presents a unique problem.

California is a unique market with three characteristics that contribute to the volatile gasoline prices that have been observed over the past few years and that are likely to continue:

1.  The West Coast market is isolated and has been self-sufficient;
2.  West Coast refiners are unable to keep up with demand growth; and
3.  CARB RFG product specifications are more restrictive than Federal RFG.

The West Coast gasoline market receives little if any supply from outside of the region. For example, in 2002, over 99 percent of the reformulated gasoline sold in PADD V was produced within the district (compared with 54 percent in PADD I). Any demand for supply outside of the West Coast must come from nontraditional sources.

Recent growth in gasoline demand on the West Coast has not been matched by new refining capacity in the region. Stillwater Associates (2002) suggest that "it is becoming increasingly difficult for refiners to expand capacity even by small increments because of restrictions imposed by their Clean Air Act Title V operating permits, and the costs of additional emission credits in the absence of feasible offsets. Moreover...the [recent] production gains in gasoline have come largely from additional conversion of heavier components, but the remaining production of residual fuels is approaching a point of diminishing returns." This implies that a disruption in production at a West Coast refinery cannot be readily made up from an increase in production at other refineries in the region.

Finally, because CARB RFG is more restrictive than Federal RFG sold elsewhere in the Nation, emergency supplies for the West Coast must come from nontraditional sources distant from the market that do not have CARB RFG in inventory or readily available. There is not only a transportation delay moving product from Asia, Canada, South America, or the U.S. Gulf Coast, but there would also be significant production delays.

We can see the increasing volatility of California gasoline prices in Figure 1. Beginning in early 1996, when the CARB RFG program began in California, price spikes have become larger and more frequent.



**Figure 1. Spot Price Volatility of Los Angeles RFG**
Source: Reuters

The MTBE ban in California may exacerbate gasoline price volatility. Meeting the CARB RFG specifications with

nontraditional sources may become more difficult to obtain. The Chicago market provides a good example of the potential increase in price volatility when MTBE is banned from gasoline. The Chicago market had effectively phased MTBE out of RFG by the end of 1998. Figure 2 shows that when the Federal Phase 2 RFG program (which required significant reductions in VOC emissions and gasoline Rvp) began in 2000, gasoline prices spiked at the start of the summer driving seasons in each of the following years.



**Figure 2. Chicago Pipeline Spot Prices Versus U.S. Gulf Coast (USGC)**
Note: RBOB is "reformulated gasoline blendstock for oxygenate blending" (see Appendix B, Glossary of Terms.)
Source: DRI/McGraw-Hill, Platt's Oilgram Price Report, Price Average Supplement (New York, NY), various issues 1999 - 2002.

## 6. Conclusion

The summer 2003 driving season may provide a hint of the challenges the petroleum industry will face over the next few years. MTBE is being banned by several States because of concerns over water quality. The cost of producing gasoline without MTBE is expected to rise by a small amount. As MTBE bans are implemented, the difficulty of producing RFG using ethanol to satisfy the required minimum oxygen content may contribute to temporary supply-demand imbalances and greater gasoline price volatility.

## 7. Appendix A. Estimating MTBE Consumption by State

The calculation of MTBE consumption by State is based on the following general procedures for reformulated gasoline and oxygenated gasoline.

### Reformulated Gasoline

1. We start with the Environmental Protection Agency's quality surveys of reformulated gasoline sold in each control area (EPA, *Information on Reformulated Gasoline (RFG) Properties and Emissions Performance by Area and Season*). The Federal RFG compliance program requires each control area to take random RFG samples for analysis. The EPA reports the results of the chemical analyses as well as estimated emissions. Averages of the MTBE concentration in the RFG during the summer and winter are used to calculate the volume of MTBE sold in each State. Differentiating between summer and winter gasoline is important because oxygenate concentrations

VDI-018 document 116 Filed 03/25/04 Page 170 of 481

2.7 percent oxygen by weight as compared with the 2.0 percent oxygen required (on annual averaging). Also, the use of ethanol may be higher during the winter versus the summer because of the relaxed gasoline vapor pressure restrictions.

2. MTBE concentrations in reformulated gasoline are reported in percent by weight and must be converted to percent by volume according to the formula:

Volume % oxygenate = weight % oxygenate x (density gasoline blend / density oxygenate)

For example, because MTBE is slightly heavier than gasoline during the winter, 10 weight percent MTBE will represent a slightly smaller volume percentage. The specific gravity of MTBE is 0.744 (or 6.19 pounds per gallon). The specific gravity of summertime gasoline is assumed to be 0.750 (or 6.24 pounds per gallon), and the specific gravity of winter gasoline is about 0.735 (6.12 pounds per gallon). The correction factor is the ratio of the specific gravity (or density) of gasoline to the specific gravity (or density) of MTBE. Thus, the MTBE weight-to-volume percentage correction factors are 1.0081 during the summer (0.750/0.744) and 0.9879 in the winter (0.735/0.744).

3. Since reformulated gasoline sales data are available only at the State level, MTBE concentrations reported for States with more than one control area are averaged using population weights. This implicitly assumes the mileage driven per capita and the average automobile fuel efficiency do not vary significantly across control areas. For example, Texas has two RFG areas: Houston and Dallas-Fort Worth. The July 1, 2001, population of the Houston control area was 4,795,974, while the population of the Dallas-Fort Worth area was 4,739,437, for a total Texas RFG control area population of 9,535,411. The average MTBE concentration of the winter RFG in Houston was 10.43 volume percent (10.21 weight percent) and for Dallas it was 10.10 volume percent (9.89 weight percent). A population-weighted average State MTBE concentration is then:

(4,795,974/9,535,411) x 10.43 + (4,739,437/9,535,411) x 10.10 = 10.27 volume percent

California represents a complication in that the entire State consumes reformulated gasoline, but only four areas are mandated by the EPA and have quality surveys reported. The Los Angeles and San Diego areas were mandated by the EPA at the start of the RFG program in 1995. Sacramento was added beginning Jan. 1, 1996, and the San Joaquin Valley joined on Dec. 10, 2002. In 2001, the three Federal RFG control areas (not including the San Joaquin Valley) represented about 64 percent of the total California population, and by assumption RFG sales. Although the EPA reported that these three areas have used MTBE exclusively the same cannot be assumed for the rest of California. For example, in 2001, the Federal Highway Administration reported that 94,164 barrels per day of gasohol, which contains ethanol, was sold in the State. The volume of non-Federal RFG that contains MTBE was calculated by subtracting the gasohol sales volume from the population-weighted share of total California RFG sales in non-Federal RFG areas as shown in Table A1.

EPA product quality surveys are also missing for Phoenix, Arizona, which is a State rather than Federal RFG program. Phoenix has a winter ethanol program. For the summer Phoenix allows use of either Federal RFG or CARB RFG with no oxygen mandate. Theoretically they could be MTBE-free, but Stillwater (2002) notes that "according to the Arizona Dept. of Weights and Measures, most of the summer gasoline is [Federal RFG], and most of the gasoline provided by the LA refiners to Arizona is [Federal RFG]." We assume that MTBE consumed during the summer months in Phoenix contains an average 10 volume percent MTBE.

### Table A1. Calculating the Volume of California non-Federal RFG
(barrels per day)

|                        | 1996      | 1997     | 1998     | 1999     | 2000     | 2001     |
|------------------------|-----------|----------|----------|----------|----------|----------|
| Total CA. RFG sales    | 798,664   | 910,576  | 940,145  | 943,760  | 953,171  | 971,438  |
| Non-Federal RFG share  | x 0.368   | 0.368    | 0.368    | 0.367    | 0.366    | 0.366    |
| Non-Federal RFG volume | 293,908   | 335,092  | 345,974  | 346,360  | 348,860  | 355,546  |
| Gasohol sales          | - 110,996 | 108,560  | 72,332   | 59,950   | 68,003   | 94,164   |
| Non-Federal RFG containing MTBE from RFG | 182,912 | 226,532 | 273,642 | 286,410 | 280,857 | 261,382 |

Sources:

• Non-Federal RFG Share: population of San Diego, Los Angeles, and Sacramento control areas as a fraction of the total State population.
• Gasohol Sales: Federal Highway Administration, *Highway Statistics* annual, Table MF-33e, Washington, DC, various issues,
http://www.fhwa.dot.gov/policy/ohpi/hss/sspubs.htm

4. Finally, the average MTBE concentration (percent by volume) in reformulated gasoline by State is then multiplied by total reformulated gasoline sales by State reported by the Energy Information Administration (*Petroleum Marketing Annual*, Table 48, "Prime Supplier Sales Volumes of Motor Gasoline by Grade, Formulation, PAD District, and State") to determine the volume of MTBE consumed.

We can compare our calculation on MTBE use in California reported in Table 2 with the survey of California refiners that was begun by the California Energy Commission (CEC) in January 2000. The CEC reports the quantity of MTBE blended at each of 13 refineries for use in the production of CARB RFG and intended for sale in the State.

### Table A2. MTBE Use in California
(thousand barrels per day)

|  | 2000 | 2001 | 2002 |
|---|---|---|---|
| California Energy Commission | 98.4 | 89.6 | 91.8 |
| EIA, Table 2 | 102.4 | 79.7 | n.a. |

Source: CEC - California Energy Commission. *Quarterly Report Concerning MTBE Use in California Gasoline.* Sacramento, CA, various issues. http://www.energy.ca.gov/mtbe/documents/index.html#2002quarterly

## Oxygenated Gasoline

The method for estimating the MTBE content of oxygenated gasoline is similar to that for reformulated gasoline except that EPA quality surveys of oxygenated gasoline are not available. However, EPA does report estimated MTBE and ethanol shares of the individual oxygenated gasoline markets (Environmental Protection Agency, State Winter Oxygenated Fuel Programs). Oxygenated gasoline sales for each control area are estimated based on State-wide sales times the control area population share. Each control area's oxygenated gasoline volume is multiplied by the MTBE market share. MTBE volumes are then calculated assuming the oxygenated gasoline contains 15 volume percent MTBE.

## 8. Appendix B. MTBE Imports and Exports

Virtually all MTBE imports come into the East and West Coasts (see Table B1). The phaseout of MTBE in California should have the greatest impact on MTBE imports. California consumes about 90,000 barrels per day of MTBE. About two-thirds of California's MTBE demand is supplied by imports from Canada, Malaysia, Venezuela, and the Middle East.

Most MTBE exports leave the U.S. from the Gulf Coast (see Table B2). Opportunities for increasing MTBE exports from the U.S. may be limited. With the exception of Mexico, most MTBE exports return to the U.S. in imports of finished reformulated gasoline. For example, during 2000-2001 an average 3,279 barrels per day of MTBE was exported to Canada. During the same period an average 65,600 barrels per day of finished reformulated gasoline, containing about 6,600 barrels per day of MTBE, was shipped from Canada to the U.S.

Europe is becoming a major consumer of MTBE. The maximum allowable concentration of MTBE in the European Union is 15 percent by volume. The MTBE share of the gasoline pool in the European Union averaged about 1.9 percent in 1997 (European Fuel Oxygenates Association, 2000). Italy has been the leading European consumer of MTBE (11.1 thousand barrels per day in 1998), followed by Germany (7.6 thousand barrels per day), and Spain (7.5 thousand barrels per day) (U.S. International Trade Commission, 1999).

## Table B1. Average Annual MTBE Gross Imports, 1995 - 2002
(barrels per day)

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| **Imports into PADD 1 (East Coast) from:** | | | | | | | | |
| Brazil | 0 | 0 | 145 | 1,340 | 1,477 | 2,189 | 3,266 | 3,425 |
| France | 940 | 705 | 3,578 | 4,123 | 4,838 | 1,096 | 219 | 0 |
| Netherlands | 1,027 | 1,158 | 2,025 | 3,573 | 2,827 | 817 | 2,079 | 940 |
| Saudi Arabia | 10,197 | 4,563 | 2,778 | 2,263 | 2,860 | 2,702 | 1,644 | 466 |
| Venezuela | 4,126 | 3,516 | 4,915 | 3,904 | 3,230 | 4,358 | 5,929 | 2,707 |
| Virgin Islands, U.S. | 0 | 0 | 855 | 2,252 | 797 | 0 | 241 | 137 |
| Other Countries (Note 1) | 0 | 117 | 145 | 0 | 0 | 284 | 1,477 | 351 |
| *Subtotals PADD 1* | 16,290 | 10,060 | 14,441 | 17,455 | 16,030 | 11,445 | 14,855 | 8,025 |
| **Total Imports into PADD 3 (Gulf Coast)** | 945 | 74 | 121 | 60 | 0 | 0 | 288 | 0 |
| **Imports into PADD 5 (West Coast) from:** | | | | | | | | |
| Brazil | 0 | 0 | 0 | 0 | 162 | 0 | 170 | 0 |
| Canada | 10,997 | 7,740 | 12,816 | 15,071 | 18,416 | 17,071 | 19,112 | 12,189 |
| Korea, Republic Of | 0 | 459 | 668 | 2,896 | 2,485 | 251 | 400 | 1,455 |
| Malaysia | 0 | 328 | 145 | 0 | 0 | 3,495 | 3,173 | 3,058 |
| Netherlands | 0 | 626 | 310 | 0 | 0 | 0 | 671 | 230 |
| Qatar | 0 | 0 | 0 | 0 | 0 | 7,940 | 7,244 | 6,022 |
| Saudi Arabia | 11,277 | 17,885 | 23,485 | 25,258 | 29,222 | 22,844 | 18,915 | 17,367 |
| Singapore | 0 | 0 | 1,732 | 570 | 181 | 36 | 337 | 285 |
| United Arab Emirates | 0 | 0 | 0 | 0 | 0 | 4,456 | 5,014 | 0 |
| Venezuela | 5,597 | 10,538 | 6,159 | 6,518 | 8,145 | 7,333 | 5,707 | 9,597 |
| Other Countries (Note 2) | 0 | 0 | 0 | 0 | 110 | 1,642 | 718 | 939 |
| *Subtotals PADD 5* | 27,871 | 37,577 | 45,315 | 50,312 | 58,721 | 65,068 | 61,460 | 51,142 |
| **Total U.S. Imports** | 45,107 | 47,710 | 59,877 | 67,827 | 74,751 | 76,514 | 76,603 | 59,167 |

**Notes:**
(1) Other countries shipping MTBE into PADD 1 include Belarus, Belgium, Finland, Germany, Poland, Portugal, Qatar, Spain, United Arab Emirates, and United Kingdom.
(2) Other countries shipping MTBE into PADD 5 include China, Dubai, Indonesia, South Africa, and Taiwan.
Source: Energy Information Administration (http://www.eia.doe.gov/oil_gas/petroleum/info_glance/importexport.html).

## Table B2. Average Annual MTBE Gross Exports, 1995 - 2002
(barrels per day)

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| **Exports from PADD 1 (East Coast) to:** | | | | | | | | |
| Canada | 4 | 29 | 68 | 51 | 483 | 2,381 | 2,937 | 2,620 |
| Mexico | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Netherlands | 7 | 0 | 0 | 6 | 95 | 139 | 133 | 115 |
| Other | 126 | 4 | 19 | 93 | 130 | 103 | 161 | 77 |
| *Subtotals PADD 1* | 138 | 33 | 87 | 150 | 708 | 2,624 | 3,232 | 2,812 |
| **Total Exports from PADD 2 (Midwest)** | 2 | 59 | 14 | 1 | 309 | 1 | 6 | 5 |
| **Exports from PADD 3 (Gulf Coast) to:** | | | | | | | | |
| Canada | 105 | 0 | 0 | 312 | 92 | 0 | 1,240 | 3,390 |
| Jamaica | 30 | 63 | 159 | 497 | 603 | 868 | 954 | 1,184 |
| Mexico | 3,342 | 3,568 | 3,239 | 2,320 | 10,415 | 8,836 | 6,574 | 9,948 |
| Netherlands | 0 | 0 | 0 | 44 | 89 | 1,363 | 375 | 705 |
| Venezuela | 1,732 | 1,553 | 1,665 | 12,220 | 7,774 | 9,659 | 8,318 | 5,176 |

Exhibit B

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Subtotals PADD 3 | | | | | | | | |
| Total Exports from PADD 4 (Rocky Mountain) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Exports from PADD 5 (West Coast) | 23 | 16 | 5 | 21 | 3 | 9 | 20 | 115 |
| Total U.S. Exports | 5,900 | 8,330 | 11,608 | 25,949 | 20,715 | 23,775 | 21,239 | 23,951 |

Source: Energy Information Administration (http://www.eia.doe.gov/oil_gas/petroleum/info_glance/importexport.html).

# 9. Appendix C. Glossary of Terms

**Alkylate**  A high-octane product from alkylation units. An alkylation unit is a refining process for chemically combining isobutane with olefin hydrocarbons (e.g., propylene, butylene) through the control of temperature and pressure in the presence of an acid catalyst, usually sulfuric acid or hydrofluoric acid. The product, alkylate, an isoparaffin, has high octane value and is blended with motor and aviation gasoline to improve the antiknock value of the fuel.

**CARB**  California Air Resources Board (http://www.energy.ca.gov)

**CARB RFG**  Finished motor gasoline formulated for use in motor vehicles in California, the composition and properties of which meet the requirements of the California Air Resources Board.

**EIA**  Energy Information Administration (http://www.eia.doe.gov)

**Ethanol**  Ethanol ($CH_3CH_2OH$) is a clear, colorless, flammable oxygenated hydrocarbon. Ethanol is typically produced chemically from ethylene, or biologically from fermentation of various sugars found in carbohydrates found in agricultural crops and cellulosic residues from crops or wood. It is used in the United States as a gasoline octane enhancer and oxygenate (blended up to 10 volume percent concentration). Ethanol can also be used in high concentrations (E85) in vehicles designed for its use.

**MTBE**  Methyl Tertiary Butyl Ether, $(CH_3)_3COCH_3$ is an ether intended for gasoline blending as described in "Oxygenates."

**MSAT**  Mobile Source Air Toxics. On March 29, 2001, EPA promulgated new regulations setting standards for gasoline toxics performance levels (61 Federal Register 17230). Under these new requirements, refiners must maintain their average 1998-2000 toxics performance levels, which are better than what regulations require, for benzene, formaldehyde, acetaldehyde, 1,3-butadiene, and POM, identified as "toxic air pollutants". For more information refer to the EPA Office of Mobile Sources web page at http://www.epa.gov/otaq/toxics.htm.

**Oxygenates**  Substances which, when added to gasoline, increase the amount of oxygen in that gasoline blend. Ethanol, Methyl Tertiary Butyl Ether (MTBE), Ethyl Tertiary Butyl Ether (ETBE), and Tertiary Amyl Methyl Ether (TAME) are common oxygenates.

**PADD**  Petroleum Administration for Defense District. Geographic aggregations of the 50 States and the District of Columbia into five districts by the Petroleum Administration for Defense in 1950. These districts were originally defined during World War II for purposes of administering oil allocation.
• PAD District I (East Coast): Connecticut, Delaware, District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia.
• PAD District II (Midwest): Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Wisconsin.
• PAD District III (Southwest): Alabama, Arkansas, Louisiana, Mississippi, New Mexico, Texas, Federal Offshore Gulf.
• PAD District IV (Rocky Mountain): Colorado, Idaho, Montana, Utah, Wyoming.
• PAD District V (West Coast): Alaska (North Slope and Other Mainland), Arizona, California, Hawaii, Nevada, Oregon, Washington, Federal Offshore California.

**RBOB**  "Reformulated Gasoline Blendstock for Oxygenate Blending" is a motor gasoline blending component which, when blended with a specified type and percentage of oxygenate, meets the definition of reformulated gasoline.

**RFG**  Finished motor gasoline formulated for use in motor vehicles, the composition and properties of which meet the requirements of the reformulated gasoline regulations promulgated by the U.S. Environmental Protection Agency under Section 211(k) of the Clean Air Act.

**Rvp**  "Reid vapor pressure" is a method of determining vapor pressure of gasoline and other petroleum products. Widely used in the petroleum industry as an indicator of the volatility (vaporization characteristics) of gasoline.

**VOC**  Volatile organic compounds are organic compounds that participate in atmospheric photochemical reactions.

Exhibit B

## 10. End Notes

1. Connecticut may delay its ban on MTBE from Oct. 1, 2003, until Jan. 1, 2004, to make it consistent with New York State's scheduled ban. Senate Bill 840 passed the Joint House-Senate Environment Committee on March 17, 2003, and is awaiting State Senate and House action.

2. ConocoPhillips is reported to already have completed the switch from MTBE to ethanol. Shell, BP, and ExxonMobil indicated their intention to switch out of MTBE blended gasoline in California markets by the first quarter of 2003. Valero, ChevronTexaco, and Tesoro do not intend to complete the switch to MTBE-free gasoline until California's MTBE ban comes into effect next January (Energy Information Administration, 2003). The California Energy Commission fourth quarter 2002 survey of California refiners, however, shows no reduction in MTBE use (California Energy Commission, 2003).

3. While separate MTBE- and ethanol-blended gasoline batches may each satisfy the RFG requirements, mixing the two may result in a blend that violates allowable VOC emissions because of the ethanol's effect on the vapor pressure of the MTBE-blended gasoline. EPA recently rejected a request from several trade groups for the California market to allow refiners and distributors to mix ethanol and MTBE-blended gasoline during the transition (Energy Information Administration, 2003).

4. MTBE currently provides more than 280 thousand barrels per day of volume to gasoline, which represents about 3 percent of total gasoline demand. Most of the MTBE (almost 90 percent) is used in reformulated gasoline (RFG), which makes up about one-third of the total U.S. gasoline market. RFG is gasoline that, on average, significantly reduces emissions of Volatile Organic Compounds (VOC) and Toxic Air Pollutants (TAP) relative to conventional gasolines. RFG is more difficult to produce than conventional gasoline and originally was mandated only in the nine cities with the worst smog (Los Angeles, San Diego, Chicago, Houston, Milwaukee, Baltimore, Philadelphia, Hartford, and New York City). Other areas that also have a history of smog problems voluntarily joined the RFG program. Today, RFG represents about 1/3 of gasoline consumption (Energy Information Administration, 1999)

5. On March 29, 2001, EPA promulgated regulations setting standards for gasoline toxics performance levels (61 Federal Register 17230). Under these requirements, refiners must maintain their average 1998-2000 toxics performance levels, which are better than what regulations require, for benzene, formaldehyde, acetaldehyde, 1,3-butadiene, and POM, identified as "toxic air pollutants". For more information refer to the EPA Office of Mobile Sources web page at http://www.epa.gov/otaq/toxics.htm.

6. Gasoline emissions are calculated using the EPA complex model (http://www.epa.gov/otaq/rfg.htm#models). A "baseline" fuel with 2.1 weight percent oxygen as MTBE lowers acetaldehyde emissions by 7.0 percent with a reduction in total toxics emissions of 6.9 percent. A baseline fuel with 2.1 weight percent oxygen as ethanol increases acetaldehyde emissions by 69 percent while lowering total toxics emissions by 3.5 percent. The increase in toxics emissions with ethanol versus MTBE could be higher when we account for the lower dilution effect with the smaller volume of ethanol blended to provide 2.1 weight percent oxygen.

## 11. References

California Energy Commission. *Quarterly Report Concerning MTBE Use in California Gasoline.* Publication P300-02-002V4. Sacramento, CA, February 2003. http://www.energy.ca.gov/mtbe/documents/2002_MTBE_4TH_QTR_REPORT.PDF.

Energy Information Administration. *Demand and Price Outlook for Phase 2 Reformulated Gasoline, 2000.* Washington, DC, August 1999. http://www.eia.doe.gov/emeu/steo/pub/special/rfg4.html.

Energy Information Administration (2002a). *Renewable Motor Fuel Production Capacity Under H.R.4.* Washington, DC, September 2002. http://www.eia.doe.gov/oiaf/servicerpt/fuel/pdf/question2.pdf.

http://www.eia.doe.gov/emeu/steo/pub/special/mtbeban.html

Energy Information Administration. *Status and Impact of State MTBE Ban.* Washington, DC, March 2003. http://www.eia.doe.gov/oiaf/servicerpt/mtbeban/index.html.

Environmental Protection Agency. *Water Phase Separation in Oxygenated Gasolines .* Washington, DC, February 27, 1996. http://www.epa.gov/otaq/regs/fuels/rfg/waterphs.pdf.

European Fuel Oxygenates Association. *MTBE Resource Guide,* Appendix 5, Table 2.4. Brussels, Belgium, Nov. 2000. http://www.efoa.org/fr/ressource_guide/here.htm.

Meridian Corp. *Properties of Alcohol Transportation Fuels.* U.S. Dept. of Energy, Washington, DC, 1991. http://www.hawaii.gov/dbedt/ert/afrw.html.

Stillwater Associates. *MTBE Phase Out in California.* California Energy Commission: Sacramento, Ca., March 2002. http://www.energy.ca.gov/reports/2002-03-14_600-02-008CR.PDF

Stratco/Purvin & Gertz. *Refining Options for MTBE-Free Gasoline.* Publication AM-00-53, presented at the 2002 NPRA Annual Meeting in San Antonio, TX. http://www.stratco.com/pdf/RefiningOptionsPaper.pdf.

U.S. International Trade Commission. *Methyl Tertiary-Butyl Ether (MTBE): Conditions Affecting the Domestic Industry,* Table 2-2. Publication 3231. Washington, DC, September 1999. http://www.usitc.gov/wais/reports/arc/w3231.htm.

U.S. International Trade Commission. *Harmonized Tariff Schedule of the United States (2003) (Rev. 1),* Chapter 99. Washington, DC, February 7, 2003. http://dataweb.usitc.gov/SCRIPTS/tariff/0301c99.pdf.



**www.eia.doe.gov**
**Energy Information Administration**

File last modified: April 6, 2003.

Contact:
Tancred Lidderdale
tlidderd@eia.doe.gov
Phone: (202) 586-7321

This page's URL: http://www.eia.doe.gov/emeu/steo/pub/special/mtbeban.html

*If you are having technical problems with this site, please contact the EIA Webmaster at wmaster@eia.doe.gov.*

# Exhibit 4

1  DAVID L. SCHRADER, State Bar No. 149638
   MICHAEL T. ZARRO, State Bar No. 110791
2  ALLISON N. SHUE, State Bar No. 193527
   MORGAN, LEWIS & BOCKIUS LLP
3  300 South Grand Avenue, Twenty-Second Floor
   Los Angeles, California 90071-3132
4  Tel: 213.612.2500
   Fax: 213.612.2501
5
   Attorneys for Defendants
6  Chevron U.S.A. Inc., Texaco Inc., and
   ChevronTexaco Corporation
7
   [ADDITIONAL MOVING PARTIES AND
8  COUNSEL LISTED ON SIGNATURE PAGES]
9
                  UNITED STATES DISTRICT COURT
10
           FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12  THE PEOPLE OF THE STATE OF          )  Case No. CIV.S-03-2653 GEB DAD
    CALIFORNIA; CITY OF ELK GROVE;      )
13  SACRAMENTO COUNTY WATER             )  Honorable Garland E. Burrell, Jr.
    AGENCY; SACRAMENTO                  )
14  GROUNDWATER AUTHORITY;              )  **NOTICE OF MOTION AND**
    CARMICHAEL WATER DISTRICT;          )  **MOTION FOR TEMPORARY**
15  CITRUS HEIGHTS WATER DISTRICT;      )  **STAY PENDING TRANSFER**
    DEL PASO MANOR WATER DISTRICT;      )
16  FAIR OAKS WATER DISTRICT; FLORIN    )  Date:  January 26, 2004
    RESOURCE CONSERVATION DISTRICT;     )  Time:  9:00 a.m.
17  RIO LINDA ELVERTA COMMUNITY         )  Place: Courtroom No. 10
    WATER DISTRICT; SACRAMENTO          )
18  SUBURBAN WATER DISTRICT; SAN        )
    JUAN WATER DISTRICT; CALIFORNIA-    )
19  AMERICAN WATER COMPANY; CITY        )
    OF SACRAMENTO,                      )
20                                      )
                    Plaintiffs,         )
21                                      )
                                        )
22       vs.                            )
                                        )
23                                      )
    ATLANTIC RICHFIELD COMPANY; BP      )
24  PRODUCTS NORTH AMERICA, INC.;       )
    CHEVRONTEXACO CORPORATION;          )
25  CHEVRON U.S.A. INC.; CITGO          )
    PETROLEUM CORPORATION;              )
26  CONOCOPHILLIPS COMPANY;             )
    EQUILON ENTERPRISES LLC; EXXON      )
27  MOBIL CORPORATION; SHELL OIL        )
    COMPANY; SHELL OIL PRODUCTS U.S.;   )
28  TESORO REFINING AND MARKETING       )

1-LA/749854.1                          1

COMPANY; TEXACO REFINING AND )
MARKETING, INC.; ULTRAMAR, INC.; )
UNOCAL CORPORATION, )
INDIVIDUALLY AND FORMERLY )
KNOWN AS UNION OIL COMPANY OF )
CALIFORNIA; VALERO ENERGY )
CORPORATION; LYONDELL CHEMICAL )
COMPANY, INDIVIDUALLY AND )
FORMERLY KNOWN AS ARCO )
CHEMICAL COMPANY; CIRCLE K )
STORES INC.; 7-ELEVEN, INC.; AND )
DOES 1-1000, INCLUSIVE )
)
                    Defendants. )
_____ )

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 26, 2004, at 9:00 a.m. or as soon thereafter as the matter may be heard in the Courtroom of the Honorable William Q. Hayes, located at Courtroom 10, at 501 I Street, Sacramento, California 95814, Defendants Chevron U.S.A. Inc., Texaco Inc. ChevronTexaco Corporation, Atlantic Richfield Company, Tesoro Corporation, Exxon Mobil Corporation and Shell Oil Company will, and hereby do, move the Court for an order under Fed. R. Civ. P. 16 temporarily staying discovery and pretrial activities in this action until the Judicial Panel on Multidistrict Litigation ("Panel") rules on Transfer and Consolidation of this action.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities and the Declaration of David L. Schrader concurrently filed and served herewith, the Proposed Order concurrently filed and served herewith, the files, pleadings, and documents on file with this Court, and upon such

1    further documentary and oral evidence as may be presented in the hearing on this

2    matter.

3    Dated:  December 18, 2003                    MORGAN, LEWIS & BOCKIUS LLP

4

5                                                By:

6                                                    David L. Schrader
                                                     Attorneys for Defendants
7                                                    Chevron U.S.A. Inc., Texaco Inc., and
                                                     ChevronTexaco Corporation

8

9    Dated:  December 18, 2003                    ARNOLD & PORTER

10

11                                               By
                                                    Matthew T. Heartney
12                                                  Attorneys for Defendant
                                                    Atlantic Richfield Company
13

14   Dated:  December 18, 2003                    BINGHAM McCUTCHEN, LLP

15

16                                               By
                                                    Colleen P. Doyle
17                                                  Attorneys for Defendants
                                                    ExxonMobil Corporation and
18                                                  Tesoro Corporation

19
     Dated:  December 18, 2003                    MUNGER, TOLLES & OLSON, LLP
20

21

22                                               By
                                                    William D. Temko
23                                                  Attorneys for Defendants
                                                    Shell Oil Company and Shell Oil
24                                                  Products U.S.

25

26

27

28

NOTICE OF MOTION / MOTION FOR TEMPORARY STAY PENDING TRANSFER
CASE NO. CIV .S-03-2653 GEB DAD

# PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 300 South Grand Avenue, Twenty-Second Floor, Los Angeles, CA 90071-3132. On December 18, 2003, I served the within documents:

NOTICE OF MOTION AND MOTION FOR
TEMPORARY STAY PENDING TRANSFER

☐   by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐   by placing the document(s) listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

*Please see attached Service List*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on December 18, 2003, at Los Angeles, California.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

*Victoria L. Rader*
Victoria L. Rader

NOTICE OF MOTION / MOTION FOR TEMPORARY STAY PENDING TRANSFER
CASE NO. CIV .S-03-2653 GEB DAD

# SERVICE LIST

| | |
|---|---|
| Jan Scully, District Attorney<br>Albert Locher, Assistant Chief Deputy DA<br>Russ Detrick, Supervising Deputy DA<br>Sacramento County District Attorney<br>Environmental Protection Division<br>906 G Street, Suite 700<br>Sacramento, California 95814<br>Telephone: (916) 874-6174<br>Facsimile: (916) 874-7660 | Attorney for Plaintiff<br>The People of the State of California |
| Victor M. Sher, Esq.<br>Todd E. Robins, Esq.<br>Sher & Leff<br>450 Mission Street, Suite 500<br>San Francisco, CA 94105<br>Telephone: (415) 348-8300<br>Facsimile: (415) 348-8333 | Attorney for Plaintiff<br>The People of the State of California |
| Scott Summy, Esq.<br>Celeste A. Evangelisti, Esq.<br>Baron & Budd, P.C.<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX 75219-4281<br>Telephone: (214) 525-6267<br>Facsimile: (214) 520-1181 | Attorney for Plaintiff<br>The People of the State of California |
| Nathan P. Eimer, Esq.<br>Pamela R. Hanebutt, Esq.<br>Lisa S. Meyer, Esq.<br>Eimer Stahl Klevorn & Solberg LLP<br>224 South Michigan Avenue, Suite 1100<br>Chicago, Illinois 60604<br>Telephone: (312) 660-7600<br>Facsimile: (312) 692-1718 | Attorneys for Defendants<br>Citgo Petroleum Corporation |
| Jon D. Anderson, Esq.<br>Michele D. Johnson, Esq.<br>Latham & Watkins<br>650 Town Center Drive, Suite 2000<br>Costa Mesa, CA 92626<br>Telephone: (714) 540-1235<br>Facsimile: (714) 755-8290 | Attorneys for Defendants<br>ConocoPhillips Company and Circle K<br>Stores Inc. |

1

2  Robert P. Doty, Esq.                          Attorneys for Defendant
   Cox, Castle & Nicholson, LLP                  7-Eleven, Inc.
3  555 Montgomery Street, 15th Floor
   San Francisco, CA  94111-2585
4  Telephone:  (415) 392-4200
   Facsimile:  (415) 392-4250

5

6

7  Hojoon Hwang, Esq.                            Attorneys for Defendants
   Karin S. Schwartz, Esq.                       Shell Oil Company, Shell Oil Products
8  Munger, Tolles & Olson, LLP                   Company, Shell Oil Products Company US,
   33 New Montgomery Street, 19th Floor   Equilon Enterprises, and Texaco Refining &
9  San Francisco, CA  94105                      Marketing, Inc.
   Telephone:  (415) 512-4000
10  Facsimile:  (415) 512-4077

11  William D. Temko, Esq.                        Attorneys for Defendants
   Munger, Tolles & Olson, LLP                   Shell Oil Company, Equilon Enterprises
12  355 South Grand Avenue, 35th Floor    LLC, Shell Oil Products US And Texaco
   Los Angeles, CA  90071-1560                   Refining & Marketing, Inc.
13  Telephone:  (213) 683-9100
   Facsimile:  (213) 687-3702
14

15  Colleen P. Doyle, Esq.                        Attorneys for Defendants
   Diana Pfeffer Martin, Esq.                    ExxonMobil Corporation and Tesoro
16  Catherine M. Stites, Esq.                     Refining and Marketing Company, Inc.
17  Bingham McCutchen, LLP
   355 South Grand Avenue, Suite 4400
18  Los Angeles, CA  90071
   Telephone:  (213) 680-6400
19  Facsimile:  (213) 680-6499

20

21  Alan J. Hoffman, Esq.                         Attorneys for Defendant
   Blank Rome, LLP                               Lyondell Chemical Company, formerly
22  One Logan Square                              known as Arco Chemical Company
   18th and Cherry Street
23  Philadelphia, PA  19103-6998
   Telephone:  (215) 569-5500
24  Facsimile:  (215) 569-5341

25

26

27

28

NOTICE OF MOTION / MOTION FOR TEMPORARY STAY PENDING TRANSFER
CASE NO. CIV .S-03-2653 GEB DAD

1

J. Clifford Gunter, Esq.                    Attorneys for Defendant
2      Tracie Renfroe, Esq.                        Ultramar, Inc. and Valero Energy
Bracewell & Patterson, LLP                  Corporation
3      711 Louisiana Street, Suite 2900
Houston, TX 77002-2781
4      Telephone: (713) 223-2900
Facsimile: (713) 221-1212
5

6      Brendan M. Dixon, Esq.                       Attorneys for Defendant
Unocal Corporation                           Unocal Corporation
7      376 South Valencia Avenue
Brea, California 90245
8      Telephone: (714) 577-2933
Facsimile: (714) 577-2980
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1-LA/749854.1                               7

1  DAVID L. SCHRADER, State Bar No. 149638
   MICHAEL T. ZARRO, State Bar No. 110791
2  ALLISON N. SHUE, State Bar No. 193527
   MORGAN, LEWIS & BOCKIUS LLP
3  300 South Grand Avenue, Twenty-Second Floor
   Los Angeles, California  90071-3132
4  Tel: 213.612.2500
   Fax: 213.612.2501
5
   Attorneys for Defendants
6  Chevron U.S.A. Inc., Texaco Inc., and
   ChevronTexaco Corporation
7
   [ADDITIONAL MOVING PARTIES AND
8  COUNSEL LISTED ON SIGNATURE PAGES]

ORIGINAL
FILED

DEC 1 9 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
      DEPUTY CLERK

9            UNITED STATES DISTRICT COURT

10       FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12  THE PEOPLE OF THE STATE OF          )   Case No. CIV.S-03-2653 GEB DAD
    CALIFORNIA; CITY OF ELK GROVE;      )
13  SACRAMENTO COUNTY WATER             )   Honorable Garland E. Burrell, Jr.
    AGENCY; SACRAMENTO                  )
14  GROUNDWATER AUTHORITY;              )   MEMORANDUM OF POINTS
    CARMICHAEL WATER DISTRICT;          )   AND AUTHORITIES IN
15  CITRUS HEIGHTS WATER DISTRICT;      )   SUPPORT OF MOTION FOR
    DEL PASO MANOR WATER DISTRICT;      )   TEMPORARY STAY PENDING
16  FAIR OAKS WATER DISTRICT; FLORIN    )   TRANSFER; DECLARATION
    RESOURCE CONSERVATION DISTRICT;     )   OF DAVID L. SCHRADER
17  RIO LINDA ELVERTA COMMUNITY         )
    WATER DISTRICT; SACRAMENTO          )   Date:  January 26, 2004
18  SUBURBAN WATER DISTRICT; SAN        )   Time:  9:00 a.m.
    JUAN WATER DISTRICT; CALIFORNIA-    )   Place: Courtroom No. 10
19  AMERICAN WATER COMPANY; CITY        )
    OF SACRAMENTO,                      )
20                                      )
               Plaintiffs,              )
21                                      )
                                        )
22        vs.                           )
                                        )
23  ATLANTIC RICHFIELD COMPANY; BP      )
    PRODUCTS NORTH AMERICA, INC.;       )
24  CHEVRONTEXACO CORPORATION;          )
    CHEVRON U.S.A. INC.; CITGO          )
25  PETROLEUM CORPORATION;              )
    CONOCOPHILLIPS COMPANY;             )
26  EQUILON ENTERPRISES LLC; EXXON      )
    MOBIL CORPORATION; SHELL OIL        )
27  COMPANY; SHELL OIL PRODUCTS U.S.;   )
    TESORO REFINING AND MARKETING       )

28

1-LA/749883.1                          1

23

1  COMPANY; TEXACO REFINING AND )
   MARKETING, INC.; ULTRAMAR, INC.; )
2  UNOCAL CORPORATION, )
   INDIVIDUALLY AND FORMERLY )
3  KNOWN AS UNION OIL COMPANY OF )
   CALIFORNIA; VALERO ENERGY )
4  CORPORATION; LYONDELL CHEMICAL )
   COMPANY, INDIVIDUALLY AND )
5  FORMERLY KNOWN AS ARCO )
   CHEMICAL COMPANY; CIRCLE K )
6  STORES INC.; 7-ELEVEN, INC.; AND )
   DOES 1-1000, INCLUSIVE )
7                                                        )
                   Defendants.          )
8  _____ )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV.S-03-2653 GEB DAD

## MEMORANDUM OF POINTS AND AUTHORITIES

The undersigned defendants ("Defendants") submit this Memorandum in Support of their Motion to Stay Proceedings Pending Ruling on Transfer and Consolidation by the Judicial Panel on Multidistrict Litigation.

### I.   FACTUAL BACKGROUND AND STATEMENT OF ISSUE

As described in detail in the December 3, 2003 Notice of Removal, this case is one of a wave of more than thirty lawsuits filed since September 30, 2003, in various state courts around the country, uniformly asserting that the inclusion of methyl tertiary butyl ether ("MTBE") in gasoline to comply with the Clean Air Act ("CAA") and United States Environmental Protection Agency ("EPA") fuel content regulations constitutes an inherent design defect.

Certain defendants have removed, or are in the process of removing, substantially all of the cases filed to date (listed in Exhibit 1, attached to Declaration of David L. Schrader) to the respective federal courts in those districts, have filed notices of relatedness to MDL 1358[1] with the JPML, and will continue to remove and file notices of relatedness with respect to any additional tag-along cases. Defendants will also seek to stay each removed action pending transfer to a single judge by the JPML. The scope of the allegations and the number of parties involved in the recent onslaught of cases dwarf the cases originally consolidated in MDL 1358.

Redundant proceedings in the numerous districts to which these cases are removed, before transfer by the JPML, would needlessly waste judicial resources, and may result in conflicting rulings on the same issues among the various MTBE

---

[1] MDL 1358 - *In re MTBE Product Liability Litigation* - was created in 2000, as a result of previous lawsuits attacking MTBE. Defendants there (including many of the same defendants involved in the present matter) removed several cases to federal court and successfully petitioned the JPML to consolidate them in the United States District Court for the Southern District of New York. After the judge in MDL 1358 rejected the plaintiffs' efforts to certify a class action, those cases were resolved individually and dismissed. MDL 1358, although currently inactive, is still pending.

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV .S-03-2653 GEB DAD

1   cases.  For instance, Defendants anticipate that MTBE plaintiffs across the country,

2   almost all of whose cases are managed by the same plaintiffs' counsel, will move to

3   remand each removed case.  Having numerous federal courts consider the nearly

4   identical jurisdictional issues over and over, potentially coming up with different

5   (and even conflicting) rulings, is antithetical to the underlying purpose of multi-

6   district litigation - to promote judicial economy and avoid prejudice to the parties.

7   Accordingly, Defendants seek a stay pending the JPML's decision.

8   **II.   ARGUMENT**

9        It is "incidental to the power inherent in every court to control the disposition

10  of the causes on its docket with economy of time and effort for itself, for counsel,

11  and for litigants."  *Landis v. Noah Amer. Co.*, 299 U.S. 248, 254 (1936); *accord*

12  *United States v. 6600 N. Mesa, El Paso, Tex.  (Ir re Ramu Corp.)*, 903 F.2d 312,

13  318 (5th Cir. 1990); 7B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND

14  PROCEDURE § 1792, at 293 (2d ed. 1986) ("When similar actions, either class or

15  individual, are proceeding before several courts, one or more of the tribunals may

16  stay the proceeding before it pending the outcome of the other action. . . ."); Federal

17  Judicial Center, *Manual for Complex Litigation* § 31.14 (3d ed. 1995) ("In

18  appropriate cases, a judge may order an action stayed pending resolution of a

19  related case in a federal court. . . .").

20       **A.   A Stay Is Appropriate Pending A Ruling By The JPML**

21       "Courts frequently grant stays pending a decision by the MDL Panel

22  regarding whether to transfer a case."  *Good v. Prudential Ins. Co. of Am.*, 5 F.

23  Supp.2d 804, 809 (N.D. Cal. 1998).  A stay is particularly appropriate in this

24  situation because the very "purpose of such [MDL] transfers is to further judicial

25  economy and to eliminate the potential for conflicting pretrial rulings."  *Id.* at 809;

26  *see also In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("[c]onsistency as well as economy

27  is thus served" by resolution of common issues by one transferee court); *In re New*

28  *York City Mun. Sec. Litig.*, 572 F.2d 49, 51-52 (2d Cir. 1978); *Rivers v. Walt*

4

1  *Disney Co.*, 980 F. Supp. 1360, 1362 (C.D. Cal. 1997); *Arthur Magna, Inc. v. Del-*
2  *Yal Fin. Corp.*, No. 90-437, 1991 U.S. Dist. LEXIS 1431 (D.N.J. Feb. l, 1991)
3  (granting stay because it fosters the purpose of the MDL statute to coordinate
4  related litigation).
5      Indeed, "a majority of Courts have concluded that it is often appropriate to
6  stay preliminary pretrial proceedings while a motion to transfer and consolidate is
7  pending with the JDM Panel because of the judicial resources that are conserved."
8  *Rivers*, 980 F. Supp. at 1362.  A number of courts have granted such stays.  *See,*
9  *e.g., Smith v. Mail Boxes, Etc. USA, Inc.*, 191 F. Supp.2d 1155 (E.D. Cal. 2002);
10  *Medical Soc'y of NY v. Connecticut Gen. Cord.*, 187 F. Supp.2d 89, 92 (S.D.N,Y.
11  2001); *Namovicz v. Cooper Tire & Rubber Co.*, 225 F. Supp .2d 582 (D. Md.
12  2001); *Siewert-Sitzmore v. Bridgestone/Firestone, Inc.*, No. 00-1289 (C.D. Ill. Sept.
13  14, 2000); *Falgoust v. Microsoft Corp.*, No. 00-0779, 2000 U.S. Dist. LEXIS 5417
14  (E.D . La. Apr. 19, 2000); *Weinke v. Microsoft Corp.*, 84 F. Supp.2d 989 (E.D. Wis.
15  2000); *Aikins v. Microsoft Corp.*, No. 00-0242, 2000 U.S. Dist. LEXIS 4371 (E.D.
16  La. Mar. 24, 2000); *D's Pet Supplies v. Microsoft Corp.*, Nos. 99-76056, 99-76086,
17  99-76202, 00-70481, 2000 U.S  Dist. LEXIS 16482 (E.D. Mich. Feb. 7, 2000);
18  *Dumont v. Charles Schwab & Co.*, Nos. 99-2840, 99-2841, 2000 U.S. Dist. LEXIS
19  619 (E.D. La. Jan. 19, 2000); *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5182,
20  1999 U.S. Dist. LEXIS 18023 (N.D. Ill. Nov. 10, 1999); *Aetna U.S. Healthcare,*
21  *Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp.2d 37, 43 (D.D.C. 1999); *American*
22  *Seafood, Inc. v. Magnolia Processing, Inc.*, Nos. 92-1030, 92-1086,1992 U.S. Dist.
23  LEXIS 7374 at *5 (E.D. Pa. May 7, 1992); *Portnoy v. Zenith Labs*, No. 86-3512,
24  1987 U.S. Dist. LEXIS 16134 (D.D.C. Apr. 21, 1987).  At least one court has
25  ordered a stay under these circumstances *sua sponte. See Correa-Rodriguez v.*
26  *Bridgestone/Firestone, Inc.*, No. 00-3805-CIV-GRAHAM (S.D. Fla. Oct. 19,
27  2000).
28

1    Factors relevant to whether a stay should be ordered include: (1) hardship to

2    the moving party if a stay is not granted; (2) the judicial resources saved by

3    avoiding duplicative litigation; and (3) potential prejudice to the non-moving party.

4    *See, e.g., Rivers*, 980 F. Supp. at 1360.  These factors weigh heavily in favor of a

5    stay in this case.

6           **1.    A Stay Will Conserve Judicial Resources And Prevent**
                     **Inconsistent Adjudications.**
7

8           Given the common issues of fact and law present by the actions listed in

9    Exhibit 1 and other potential tag-along cases, these cases clearly are suitable for

10   transfer and coordination.  As described above, the core issue in each of these cases

11   is whether use of MTBE in gasoline to comply with the CAA and EPA fuel content

12   regulations constitutes an inherent design defect.  As such, all of the complaints

13   allege nearly identical causes of action.  Transferring these actions, including this

14   case, to a single court would avoid the unnecessary waste of judicial resources to

15   deal with identical issues in multiple actions, and would prevent inconsistent

16   rulings on common issues from case to case.  The JPML therefore is likely to

17   transfer this action and the others.

18          Conflicting rulings among the cases also might result.  This case will likely

19   present a number of pretrial motions, a motion by Defendants to dismiss, and

20   motions for summary judgment, raising complex issues of federal preemption and

21   jurisdiction with which the transferee court can more efficiently familiarize itself,

22   and then apply the same rules consistently in all of the actions, avoiding conflicting

23   decisions.  *See, e.g., In re Bridgestone/Firestone, Inc., ATX, ATX II & Wireless*

24   *Tires Prods. Litzg.*, 2000 U.S. Dist. LEXIS 15926, at *6-7 (J.P.M.L. Oct. 24, 2000)

25   ("jurisdictional and remand motions can be presented to and decided by the

26   transferee judge").

27          Defendants fully expect that plaintiffs around the country will file motions to

28   remand similar to the one pending here.  If separate district judges in more than

1-LA/749883.1                                    6

1  thirty cases independently decide the issues raised in those motions, including

2  questions of federal jurisdiction, preemption and construction of the CAA and the

3  EPA's fuel content regulations, the result will be a landslide of legal and factual

4  outcomes potentially at odds with one another concerning Congressional intent and

5  EPA's interpretation of that intent.  If courts decide these before the JPML can act,

6  then some cases may be permanently returned to state court (with potentially no

7  appellate review of the remand), while others remain in federal court.  Even if the

8  vast majority of judges determines that a uniform federal resolution is appropriate,

9  their rulings could be undermined by a handful of other judges' decisions to

10  remand.  To avoid the prejudice inherent in these conflicting rulings, it is clearly

11  preferable that a single transferee judge decide, across the board, whether a federal

12  forum is appropriate for all of these cases.

13         Thus, courts often stay proceedings in anticipation of jurisdictional issues

14  being addressed by the transferee court selected by the JPML.  *See In re*

15  *Bridgestone/Firestone*, 2000 U.S. Dist. LEXIS 15926 at *6-7; *see also In re Ivy*,

16  901 F.2d at 9 (holding that JPML has jurisdiction to transfer a case in which a

17  jurisdictional issue is unresolved and that jurisdictional issue be resolved by the

18  transferee court); *Weinke*, 84 F. Supp. 2d at 989-90 (staying action pending MDL

19  ruling despite remand motion); *Siewert-Sitzmore*, slip. op. at 5-6 (granting stay and

20  noting that "issues of federal jurisdiction . . . have been raised in some and are

21  likely to be raised in other pending cases . . . this case appears to be appropriate for

22  JPML review and consolidation or coordination"); *Falgoust*, 2000 U.S . Dist.

23  LEXIS 5417 at *6-7 (staying action in deference to a pending MDL motion,

24  notwithstanding the filing of a motion to remand to state court); *Akins*, 2000 U.S.

25  Dist. LEXIS 4371 at *3-4 (same); *D's Pet Supplies*, 2000 U.S. Dist. LEXIS 16482

26  at *2 (same); *Tench*, 1999 U.S. Dist. LEXIS 18023 at *3 (same); *Johnson v. AMR*

27  *Corp.*, 1996 WL 164415 *4 (N.D. Ill. 1996) (staying any ruling on a pending

28  motion to remand until JPML ruled on transfer, stating that the "rewards of this

7

1  approach are consistency and economy" and that "[i]f the cases are transferred, it is

2  far better for the [transferee court] to resolve the jurisdictional question."); *Manual*

3  *for Complex Litigation*, supra, § 31.131 & n.795.

4      The JMPL has also recognized the benefits of efficiency, economy, and

5  consistency that result in having the court where the consolidated actions are

6  pending rule on any jurisdictional issues.  In *In re Federal Election Campaign Act*

7  *Litig.*, 511 F. Supp. 821, 824 (7PNIL, 1979), the Panel, in transferring a number of

8  actions where motions to dismiss for lack of subject matter jurisdiction were

9  pending, noted that having a single judge considering the motions "will have the

10  salutary effect of promoting judicial economy and avoiding inconsistent

11  adjudications regarding this particular issue."  *See also In re Consolidated Welfare*

12  *Fund "ERISA" Litig.*, 1992 WL 212348 *1 (S.D.N.Y. 1992 (JPML transferred case

13  for coordinated pretrial proceedings despite a motion to remand pending); *In re*

14  *Franklin Nat'l Sec. Litig.*, 393 F. Supp. 1093, 1095 (JPML 1975) (holding that

15  pending remand motion did not warrant delay of transfer and consolidation because

16  transferee judge could still decide remand issue); *In re Professional Hockey Litig.*,

17  369 F. Supp. 1117, 1118 (JPML 1974) (actions transferred despite pending remand

18  motion because transferee judge has power to decide remand issue).  Indeed, the

19  JPML's most recent pronouncement similarly endorsed "streamlining treatment of

20  the remand issue" in the transferee court.  *In re Wireless Telephone Federal Cost*

21  *Recovery Fees Litig.*, slip. op . at 2, No. 1559 (JPML Nov. 13, 2003).

22      If the Court proceeds with substantial pretrial activities, and then this case is

23  subsequently transferred, "this Court will have needlessly expended its energies

24  familiarizing itself with the intricacies of a case that would be heard by another

25  judge." *Rivers*, 980 F. Supp. at 1360.  Moreover, "any efforts on behalf of this

26  Court concerning case management will most likely have to be replicated by the

27  judge that is assigned to handle the consolidated litigation." *Id.* at 1360-61.

28

1-LA/749883.1

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV .S-03-2653 GEB DAD

1  Judicial economy thus counsels strongly against a substantial investment of this

2  Court's time in pretrial proceedings.

3          **2.**      **A Stay Will Prevent Prejudice To All Parties.**

4        Duplicative litigation also wastes the parties' resources.  Absent a stay, the

5  parties will have to litigate a number of complex issues before this Court, and

6  perhaps the courts where other MTBE actions are pending, even though the cases

7  likely will be transferred and the same issues relitigated in the transferee court.

8  This wasted effort can be avoided by a temporary stay.  *See, e.g., Am. Seafood*,

9  1992 U.S. Dist. LEXIS 7374 at *6 ("duplicative motion practice and discovery

10 proceedings demonstrate that judicial economy and prejudice to the defendants

11 weigh heavily in favor of the stay").

12       The same is true of discovery.  If discovery proceeds here, and at the same

13 time in the courts where the other actions are pending, a great deal of work will be

14 duplicated by all parties.  *Rivers*, 980 F. Supp. at 1362.  Given the similar or

15 identical allegations in many of the complaints, against a largely common group of

16 defendants, discovery in this action would overlap substantially with discovery in

17 the other cases.  Similarly, as many of the plaintiffs in these actions share common

18 counsel, they too will bear the burdens of overlapping discovery and the benefits of

19 coordinated discovery.  By contrast, a stay followed by multidistrict coordination

20 would enable the parties to respond to a consolidated set of comprehensive

21 discovery requests.  Thus, the Court should stay these proceedings pending a

22 decision by the JPML whether to coordinate the actions in one court for discovery

23 and other pretrial proceedings.

24       Moreover, any rulings made on substantive or discovery issues in the courts

25 in which the actions now are pending, including this Court, may be vacated after a

26 transfer.  "['T]ransferee judges have been known to vacate or modify previous

27 rulings of the transferor judge."  *Rivers*, 980 F. Supp. at 1361 (citing cases).  "[T]he

28 time aid energy that this Court would devote to airy rulings it might make . . . could

9

1  be for naught if this action is transferred to another court and that court modifies or

2  vacates any of this Court's orders." *Id.*

3      If the case proceeds here before a transfer, either or both sides may be

4  prejudiced by inconsistent rulings on important issues common to all of the MTBE

5  cases, several of which are identified above.  Given the integrated nature of the

6  national gasoline distribution system, inconsistent rulings would be particularly

7  prejudicial in this case.  Indeed, in enacting the CAA, Congress recognized how

8  imperative uniformly interpreted fuel content regulations are to national gasoline

9  distribution.  Congress vested exclusive jurisdiction with respect to judicial review

10  of fuel content regulations in the D.C. Circuit Court of Appeals, 42 U.S.C. §

11  7607(b), to avoid the possibility of inconsistent results even among the federal

12  circuits.

13      **3.**    **A Stay Will Not Prejudice Plaintiff.**

14      "[P]laintiff will not be substantially prejudiced by staying this action pending

15  the decision of the JPML.  The stay that the Court orders will only be in effect until

16  the JPML issues its decision.  Therefore, there will be no extended delay in the

17  commencement of discovery." *Am. Seafood*, 1992 U.S. Dist. LEXIS 7374, at *5,

18  *see also Aikins*, No. Civ. A. 00-0242, 2000 U.S. Dist. LEXIS 4371, at *5 (E.D. La,

19  Mar. 23, 2000) ("[p]laintiffs have failed to show any significant prejudice they

20  would suffer, beyond the slight delay pending the JPML decision").

21      A stay will impose no hardship upon Plaintiff, much less a "substantial" one.

22  Nothing in the Complaint would suggest significant prejudice from a short stay, and

23  there is no indication any evidence or witnesses would be last during a brief stay.

24

25

26

27

28

10

1  Indeed, transfer and coordination in a single court is likely to result, in the long run,

2  in a faster resolution, and more efficient discovery.[2]

3  **III.   CONCLUSION**

4      For the foregoing reasons, Defendants respectfully move for an order

5  temporarily staying proceedings in this action until the JPML determines whether it

6  should be transferred to another court and coordinated with other substantially

7  identical actions.

8  Dated:  December 18, 2003              MORGAN, LEWIS & BOCKIUS LLP

9

10                                         By: _____

11                                            David L. Schrader
                                             Attorneys for Defendants
                                             Chevron U.S.A. Inc., Texaco Inc., and
12                                            ChevronTexaco Corporation

13

14  Dated:  December 18, 2003              ARNOLD & PORTER

15

16                                         By _____
                                             Matthew T. Heartney
17                                            Attorneys for Defendant
                                             Atlantic Richfield Company

18

19

20

21

22

23  _____

24  [2] Even if plaintiff could be prejudiced by a brief stay, that minimal prejudice is offset by the
    obvious benefits of coordinated proceedings. *See, e.g., Rivers*, 980 F. Supp. at 1362 n.5 ("even if
    a temporary stay could be characterized as a delay that would be prejudicial . . . there are still
25  considerations of judicial economy that outweigh any prejudice"); Am. Seafood, 2992 U.S. Dist.
    LEXIS 7374 at *5 ("any prejudice to the plaintiffs is clearly outweighed by the considerations of
26  judicial economy and possible prejudice to the defendants"); Arthur-Magna, 1991 U.S. Dist.
    LEXIS 1432 at *4 ("even if a temporary stay can be characterized as a delay prejudicial to
27  plaintiffs, there are considerations of judicial economy and hardship to defendants that are
    compelling enough to warrant such a delay").

28

1-LA/749883.1                                   11

1    Dated: December 18, 2003        BINGHAM McCUTCHEN, LLP

2

3                              By _Colleen P. Doyle / pw_

                                     Colleen P. Doyle

4                                      Attorneys for Defendants

                                     ExxonMobil Corporation and

5                                      Tesoro Corporation

6    Dated: December 18, 2003        MUNGER, TOLLES & OLSON, LLP

7

8                                By _William T. Temko / pw_

9                                      William D. Temko

                                     Attorneys for Defendants

10                                      Shell Oil Company and Shell Oil

                                     Products U.S.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV.S-03-2653 GEB DAD

## DECLARATION OF DAVID L. SCHRADER

I, David L. Schrader, declare:

1. I am a partner in the law firm of Morgan, Lewis & Bockius LLP, counsel of record for defendants Chevron U.S.A. Inc., Texaco Inc., and ChevronTexaco Corporation in this matter. The following facts are true, based upon my information and belief.

2. MDL 1358 - *In re MTBE Product Liability Litigation* - was created in 2000, as a result of previous lawsuits attacking MTBE. Defendants there (including many of the same defendants involved in the present matter) removed several cases to federal court and successfully petitioned the JPML to consolidate them in the United States District Court for the Southern District of New York. After the judge in MDL 1358 rejected the plaintiffs' efforts to certify a class action, those cases were resolved individually and dismissed. MDL 1358, although currently inactive, is still pending.

3. Attached hereto as Exhibit 1 is a list of "MTBE" cases recently filed.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of December, 2003 at Los Angeles, California.

David L. Schrader

| | Filing Location | Filing Date | Case Number |
|---|---|---|---|
| **City of Fresno v. Chevron U.S.A., Inc.** | Superior Court of San Francisco County, CA<br><br>Removed to United States District Court, Northern District of California | 10/22/2003<br>Removed on 11/26/03 | CGC-03-425649<br><br>03-5378 |
| **City of Riverside v. Atlantic Richfield Co.** | Superior Court of Riverside County, CA | 10/17/2003 | 401628 |
| **City of Roseville v. Atlantic Richfield Co.** | Superior Court of Placer County, CA | 10/16/2003 | SCV-16282 |
| **Orange County Water District v. Atlantic Richfield Co.** | Superior Court of Orange County, CA | 05/06/2003 | 03CC00176 |
| **Quincy Community Services District v. Atlantic Richfield** | Superior Court of Sacramento County, CA | 11/07/2003 | 03AS06240 |
| **Silver v. Alon USA Energy, Inc.** | Superior Court of San Diego County, CA<br><br>Removed to United States District Court, Southern District of California | 09/30/2003<br>Removed on 12/03/03 | GIE019382<br><br>03 CV 2408 J (RBB) |
| **State of California v. Unocal** | Superior Court of Sacramento County, CA | 09/30/2003 | 03AS05452 |
| **American Distilling & Mfg. Inc. v. Amerada Hess** | Superior Court of the Judicial District of Middlesex at Middletown, CT | 10/22/2003 | |
| **Canton Board of Education v. Amerada Hess** | Superior Court of the Judicial District of Hartford, CT | 09/30/2003 | |
| **Childhood Memories v. Amerada Hess** | Superior Court of the Judicial District of Litchfield County, CA | 09/30/2003 | |
| **Columbia Board of Education v. Amerada Hess** | Superior Court of the Judicial District of Tolland at Rockville, CT | 09/30/2003 | |
| **Our Lady of Rosary Chapel v. Amerada Hess** | Superior Court of the Judicial District of Fairfield at Bridgeport, CT | 10/22/2003 | |
| **United Water Connecticut, Inc. v Amerada Hess** | Superior Court of the Judicial District of Litchfield County, CT | 11/06/2003 | |

| | Filing Location | Filing Date | Case Number |
|---|---|---|---|
| **Town of East Hampton v Amerada Hess** | Superior Court of the Judicial District of Middlesex at Middletown, CT | 10/22/203 | |
| **Escambia County Utilities Corp. v. Adcock Petroleum, Inc.** | Circuit Court of Escambia County, FL | 10/24/2003 | 2003CA-2171 |
| **City of Crystal Lake v. Amerada Hess** | Circuit Court of Cook County, IL | | |
| **Misukonis v. Alon USA Energy Inc.** | Circuit Court of Madison County, IL | | 2001L-1472 |
| **Village of East Alton v. Alon USA Energy Inc.** | Circuit Court of Madison County, IL | 09/30/2003 | 2003L-1337 |
| **City of Mishawaka v. Amerada Hess** | St. Joseph Circuit Court, IN | 11/18/2003 | 74C01-0311-PL-0521 |
| **City of Rockport v. Amerada Hess Corporation** | Spencer Circuit Court, IN | 10/23/2003 | 74001-0310-PL-0465 |
| **North Newton School Corp. v. Amerada Hess** | Newton Circuit Court, IN | 11/20/2003 | 56001-0311-PL-14 |
| **City of Galva v. Amerada Hess** | Polk County IA | 9/30/2003 | LACL 093811 |
| **City of Bel Aire** | District Court of Sedgwick County, KS | 11/14/2003 | 03cv-5005 |
| **Chisholm Creek Utility Authority** | District Court of Sedgwick County, KS | 11/14/2003 | 03cv-5004 |
| **Dodge City** | District Court of Sedgwick County, KS | 11/14/2003 | 03cv-5003 |
| **Park City** | District Court of Sedgwick County, KS | 11/18/2003 | 03cv-5048 |
| **Town of Chelmsford v. Amerada Hess** | Superior Court of Suffolk County, MA | 09/30/2003 | 03-4623-A |
| **Adams, Bobby** | Superior Court of Carteret County, NC | 08/15/2003 | |
| **Barnett** | General Court of Garteret County, NC | 10/23/2003 | |
| **City of Portsmouth v. Amerada Hess** | Superior Court of Rockingham County, NH | 10/23/2003 | |

1-LA/749883.1

15

**EXHIBIT 1**

| | Filing Location | Filing Date | Case Number |
|---|---|---|---|
| **State of New Hampshire v. Amerada Hess** | Superior Court of Merrimack County, NH | 09/30/2003 | 2003c-550 |
| **New Jersey American Water Inc. v. Amerada Hess** | Superior Court of New Jersey, Middlesex County, NJ | 10/24/2003 | L-7767-03 |
| **Long Island Water Corp. v. Amerada Hess** | Supreme Court of Nassau County, NY | 10/15/2003 | 015642/2003 |
| **County of Nassau v. Amerada Hess** | Supreme Court of New York County, NY | 09/30/2003 | 117205/2003 |
| **Village of Mineola v. Atlantic New York County, NY 09/30/2003 117211/2003** | | | |
| **West Hempstead Water District v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117212/2003 |
| **Carle Mace Water District v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117213/2003 |
| **Town of Southampton v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117214/2003 |
| **Village of Hempstead v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117215/2003 |
| **Town of East Hampton v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117216/2003 |
| **Westbury Water District v. Atlantic Richfield** | New York County, NY | 09/30/2003 | 117218/2003 |
| **Water Authority of Western Nassauv. Amerada Hess** | Supreme Court of New York, County, NY | 10/01/2003 | 117282/2003 |
| **Water Authority of Great Neck North v. Amerada Hess** | Supreme Court of Nassau County, NY | 10/28/2003 | 016272/2003 |
| **Town of Hartland v. Amerada Hess** | Windsor Superior Court, VT | 11/18/2003 | |
| **Patrick County School District** | Circuit Court of Patrick County, VA | 10/30/2003 | LH03-3234 |

16

**EXHIBIT 1**

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV .S-03-2653 GEB DAD

# PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 300 South Grand Avenue, Twenty-Second Floor, Los Angeles, CA 90071-3132. On December 18, 2003, I served the within documents:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY STAY PENDING TRANSFER; DECLARATION OF DAVID L. SCHRADER**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

*Please see attached Service List*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on December 18, 2003, at Los Angeles, California.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

*Victoria L. Rader*
Victoria L. Rader

MEMORANDUM OF POINTS AND AUTHORITIES RE MOTION FOR TEMPORARY STAY
CASE NO. CIV.S-03-2653 GEB DAD

# Exhibit 5

1  DAVID L. SCHRADER, State Bar No. 149638
   MICHAEL T. ZARRO, State Bar No. 110791
2  ALLISON N. SHUE, State Bar No. 193527
   MORGAN, LEWIS & BOCKIUS LLP
3  300 South Grand Avenue, Twenty-Second Floor
   Los Angeles, California  90071-3132
4  Tel:  213.612.2500
   Fax:  213.612.2501
5
   Attorneys for Defendants
6  Chevron U.S.A. Inc. and ChevronTexaco Corporation

7  [ADDITIONAL MOVING PARTIES AND COUNSEL
   LISTED ON SIGNATURE PAGES]
8

**ORIGINAL**

**FILED**

JAN 2 ? 2004

CLERK  U S  DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

9              UNITED STATES DISTRICT COURT

10         FOR THE EASTERN DISTRICT OF CALIFORNIA

11  THE PEOPLE OF THE STATE OF CALIFORNIA; CITY )   Case No. CIV.S-03-2653 GEB
    OF ELK GROVE; SACRAMENTO COUNTY WATER    )   DAD
12  AGENCY; SACRAMENTO GROUNDWATER           )
    AUTHORITY; CARMICHAEL WATER DISTRICT;    )   Honorable Garland E. Burrell, Jr.
13  CITRUS HEIGHTS WATER DISTRICT; DEL PASO  )
    MANOR WATER DISTRICT; FAIR OAKS WATER    )   **EX PARTE APPLICATION**
14  DISTRICT; FLORIN RESOURCE CONSERVATION   )   **FOR ORDER CONTINUING**
    DISTRICT; RIO LINDA ELVERTA COMMUNITY    )   **HEARING PRESENTLY**
15  WATER DISTRICT; SACRAMENTO SUBURBAN      )   **SCHEDULED FOR**
    WATER DISTRICT; SAN JUAN WATER DISTRICT; )   **FEBRUARY 23, 2004 ON**
16  CALIFORNIA-AMERICAN WATER COMPANY; CITY  )   **PLAINTIFF'S MOTION FOR**
    OF SACRAMENTO,                           )   **REMAND AND EXTENDING**
17                                           )   **TIME FOR BRIEFING**
                     Plaintiffs,             )
18                                           )
           vs.                               )
19                                           )
    ATLANTIC RICHFIELD COMPANY; BP PRODUCTS  )
20  NORTH AMERICA, INC.; CHEVRONTEXACO       )
    CORPORATION; CHEVRON U.S.A. INC.; CITGO  )
21  PETROLEUM CORPORATION; CONOCOPHILLIPS    )
    COMPANY; EQUILON ENTERPRISES LLC; EXXON  )
22  MOBIL CORPORATION; SHELL OIL COMPANY;    )
    SHELL OIL PRODUCTS U.S.; TESORO REFINING )
23  AND MARKETING COMPANY; TEXACO REFINING   )
    AND MARKETING, INC.; ULTRAMAR, INC.;     )
24  UNOCAL CORPORATION, INDIVIDUALLY AND     )
    FORMERLY KNOWN AS UNION OIL COMPANY OF   )
25  CALIFORNIA; VALERO ENERGY CORPORATION;   )
    LYONDELL CHEMICAL COMPANY, INDIVIDUALLY  )
26  AND FORMERLY KNOWN AS ARCO CHEMICAL      )
    COMPANY; CIRCLE K STORES INC.; 7-ELEVEN, )
27  INC.; AND DOES 1-1000, INCLUSIVE         )
                                             )
                     Defendants.             )
28

1-LA/755100.1                          1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that defendants Chevron U.S.A. Inc., ChevronTexaco Corporation, Atlantic Richfield Company, Exxon Mobil Corporation, Mobil Corporation, Tesoro Corporation and ConocoPhillips Company ("Defendants") will and hereby do move the Court *ex parte* for an order continuing the hearing date and briefing schedule on plaintiff's motion for remand, which is presently scheduled for hearing on February 23, 2004. This application is made on two grounds. First, the issue of whether federal courts have jurisdiction in cases, like this one, alleging claims based on MTBE in gasoline is presently pending before the presiding judge in MDL 1358 (In re MTBE Product Liability Litigation). Whether or not this case is ultimately transferred to the MDL Court, the complex issues raised in plaintiff's motion for remand should be decided first by the MDL Court, before the hearing in this matter, to avoid potentially inconsistent results and preserve judicial resources by not having multiple courts evaluate and decide the same issues at the same time. Second, this Court should first hear and decided Defendants' Motion to Stay this action pending transfer to the MDL Court by the JPML, which is presently set for hearing on February 23, 2004. Numerous courts across the country, including another court within this federal district (Hon. Lawrence K. Karlton), have entered stays pending transfer in related MTBE cases; however, under the current schedule, this Court will not have the opportunity to consider whether to stay this action pending transfer until the same hearing date as the Remand Motion. This application is made pursuant to Federal Rule of Civil Procedure 6(b) and based upon the Memorandum of Points and Authorities and Declaration of David L. Schrader filed concurrently herewith, the Court's files and records in this matter, and such other argument and evidence as the Court may consider.

Dated: January 28, 2004

MORGAN, LEWIS & BOCKIUS LLP

By: _____
David L. Schrader
Attorneys for Defendants
Chevron U.S.A. Inc. and ChevronTexaco
Corporation

2

1    Dated: January 28, 2004        ARNOLD & PORTER

2

3                       By _Matthew T. Heartney/with Permission_

                            Matthew T. Heartney

4                             Attorneys for Defendant

                            Atlantic Richfield Company

5

6    Dated: January 28, 2004        BINGHAM McCUTCHEN, LLP

7

8                       By _Colleen P. Doyle/with Permission_

                            Colleen P. Doyle

9                             Attorneys for Defendants

                            Exxon Mobil Corporation, Mobil

10                             Corporation and Tesoro Corporation

11    Dated: January 28, 2004        LATHAM & WATKINS

12

13                       By _Jon D. Anderson/with permission_

                            Jon D. Anderson

14                             Attorneys for Defendant

                            ConocoPhillips Company

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 300 South Grand Avenue, Twenty-Second

3   Floor, Los Angeles, CA  90071-3132.  On January 28, 2004, I served the within documents:

4      **EX PARTE APPLICATION FOR ORDER CONTINUING HEARING PRESENTLY SCHEDULED FOR FEBRUARY 23, 2004 ON PLAINTIFF'S**

5      **MOTION FOR REMAND AND EXTENDING TIME FOR BRIEFING**

6      ☒      by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

7

8      ☐      by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

9

10     ☐      by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

11

12     ☐      by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

13

*Please see attached Service List*

14

15     I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on

16   motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

17

18     Executed on January 28, 2004, at Los Angeles, California.

19     I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

20

21

22     *Victoria L. Rader*
       _____
       Victoria L. Rader

23

24

25

26

27

28

1-LA/755100.1                                    4

# Exhibit 6

RECEIVED
CLERK'S OFFICE

2003 DEC 12  P 12: 27

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| METHYL-TERTIARY BUTYL ETHER | : | MDL Docket No. 1358 |
| PRODUCTS LIABILITY | : | |
| LITIGATION | : | |
| | : | |
| | : | |

## NOTICE OF RELATED, TAG-ALONG ACTIONS

Pursuant to Rules 7.2(i) and 7.5(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, defendants Atlantic Richfield Company, ARCO Products Company, BP America Inc., BP Amoco Chemical Company, BP Company North America Inc., BP Products North America Inc. (f/k/a Amoco Oil Company), BP Corporation North America Inc. (f/k/a BP Amoco Corporation), BP Global Special Products (America) Inc., BP West Coast Products LLC, Citgo Petroleum Corporation, Exxon Mobil Chemical Company Inc., Exxon Mobil Corporation, Exxon Mobil Oil Corporation, Exxon Mobil Pipe Line Company, Exxon Mobil Refining and Supply Company, Mobil Corporation, and Sunoco, Inc. hereby notify the Clerk of the Panel of the following tag-along actions and state as follows:

1.      In addition to the cases identified in the Notices of Related, Tag-along Actions previously filed by the undersigned parties, the following tag-along cases also now are pending in various United States district courts:

- *Orange County Water District v. Unocal Corporation, et al.,* Case No. SACV03-1742 JVS(ANX) (C.D. Cal.) (Removal Petition with Complaint attached as Exhibit B)

- *People of the State of California, et al. v. Atlantic Richfield Co., et al.,* Case No. CIVS-03-2653 GEB DAD (E.D. Cal.) (Removal Petition with Complaint attached as Exhibit C)

- *Silver, et al. v. Alon USA Energy, Inc., et al.,* Case No. 03 CV2408 J(RBB) (S.D. Cal.) (Removal Petition with Complaint attached as Exhibit D)

- *Long Island Water Corporation v. Amerada Hess Corporation, et al.,* Case No. CV-03-6125 (E.D.N.Y.) (Removal Petition with Complaint attached as Exhibit E)

- *Exxon Mobil Corporation, et al., v. City of Portsmouth, et al.,* Case No. 03-CV-00518-JD (D.N.H.) (Complaint attached as Exhibit F)

2.      All of these related cases are tag-along actions because they involve "common questions of fact with actions previously transferred under Section 1407" to MDL No. 1358. *See* JPML Rule 1.1. The Panel transferred the original actions to MDL No. 1358 because they involved common questions of fact concerning "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." (*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* Transfer Order at 1 (Oct. 10, 2000), attached as Exhibit A) (hereinafter "MDL No. 1358") Each of the related actions allege these same common questions of fact.  Given the substantially similar nature of the allegations involved, the Panel should consolidate and transfer these related cases "for the convenience of the parties and

2

witnesses and [to] promote the just and efficient conduct of the actions" to <u>MDL No. 1358</u>.  28 U.S.C. § 1407.

       3.     The undersigned parties below note that <u>MDL No. 1358</u> remains an administratively open proceeding.  The undersigned parties further note that currently there are no actions pending in the Southern District of New York under the <u>MDL No. 1358</u> docket.

WHEREFORE, defendants Atlantic Richfield Company, ARCO Products Company, BP America Inc., BP Amoco Chemical Company, BP Company North America Inc., BP Products North America Inc. (f/k/a Amoco Oil Company), BP Corporation North America Inc. (f/k/a BP Amoco Corporation), BP Global Special Products (America) Inc., BP West Coast Products LLC, Citgo Petroleum Corporation, Exxon Mobil Chemical Company Inc., Exxon Mobil Corporation, Exxon Mobil Oil Corporation, Exxon Mobil Pipe Line Company, Exxon Mobil Refining and Supply Company, Mobil Corporation, and Sunoco, Inc. notify the Panel of the foregoing related tag-along cases.

December 12, 2003                         Respectfully submitted,

_____

J. Andrew Langan
Mark S. Lillie
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
312-861-2000
312-861-2200 (Facsimile)

Attorneys for Defendants:
Atlantic Richfield Company, ARCO Products Company, BP America Inc., BP Amoco Chemical Company, BP Company North America Inc., BP Products North America Inc. (f/k/a Amoco Oil Company), BP Corporation North America Inc. (f/k/a BP Amoco Corporation), BP Global Special Products (America) Inc., and BP West Coast Products LLC

4

Matthew T. Heartney
Lawrence A. Cox
ARNOLD & PORTER
777 South Figueroa Street
Los Angeles, CA 90017-2513
213-243-4000
213-243-4199 (Facsimile)

Attorneys for Defendants:
Atlantic Richfield Company and BP Products North
America Inc.

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
312-660-7600
312-692-1718 (Facsimile)

Attorneys for Defendant:
Citgo Petroleum Corporation

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
212-547-5400
212-547-5444 (Facsimile)

Attorneys for Defendants:
Exxon Mobil Chemical Company Inc., Exxon Mobil
Corporation, Exxon Mobil Oil Corporation, Exxon
Mobil Pipe Line Company, Exxon Mobil Refining
and Supply Company, and Mobil Corporation

5

John S. Guttmann
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C. 2005
202-789-6020
202-789-6190 (Facsimile)

Attorney for Defendant:
Sunoco, Inc.

# Exhibit 7

Trscpt MDL 1358 12.19.031

1

3CJLMTBC
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  MTBE, et al.                    00 MDL 1358 (SAS)
3    ------------------------------x
4    IN RE:
5    County of Nassau, et al.,
6            -against-                       93 CV 9543  (SAS)
7    Ameroda Hess, et al.
8    ------------------------------x
8                                            New York, N.Y.
9                                            December 19, 2003
9                                            10:17 a.m.
10
10   Before:
11
11                     HON. SHIRA A. SCHEINDLIN,
12
12                                            District Judge
13
13                       APPEARANCES
14
14   WEIRZ & LUXEMBERG
15        Attorneys for Plaintiffs Nassau County, et al.
15   BY:  SANDERS McNEW
16        ROBERT GORDON
16        STANLEY ALPERT
17
17   NAPOLI, KAISER & BERN, LLP
18        Attorneys for Plaintiffs Village of Mineola, et al.
18   BY:  MARC JAY BERN
19        TOM RALEIGH
19
20   MCDERMOTT, WILL & EMERY
20        Attorneys for Defendant Exxon Mobil
21   BY:  PETER JOHN SACRIPANTI
21        JAMES PARDO
22
22   EIMER, STAHL, KLEVORN & SOLBERG
23        Attorneys for Defendant Citgo Petroleum
23   BY:  NATHAN P. EIMER
24
25
                     SOUTHERN DISTRICT REPORTERS, P.C.

                              Page 1

Trscpt MDL 1358 12.19.031
(212) 805-0300

2

3CJLMTBC
                              APPEARANCES (cont.)
1
2    J. ANDREW LANGAN
2        Attorney for Defendants BP Products, et al.
3
3    WALLACE, KING, MARRARO & BRANSON
4        Attorneys for Defendants Chevron, USA, et al.
4    BY:  RICHARD E. WALLACE, JR.
5
5    PATTON, BOGGS
6        Attorneys for Defendant Texaco, Inc.
6    BY:  ROBERT JONES
7
7    BEVERIDGE & DIAMOND
8        Attorneys for Defendants Sunoco, Inc., et al.
8    BY:  HEATHER FUSCO
9
9    LATHAM & WATKINS
10       Attorneys for Defendants Conoco and Getty
10   BY:  JOHN McGAHREN
11
11   GOODWIN, PROCTER, LLP
12       Attorneys for Defendant Gulf Oil Ltd. Partnership
12   BY:  CHRISTOPHER J. GARVEY
13
13   BLANK, ROME, LLP
14       Attorneys for Defendant Lyondell Chemical Company
14   BY:  MICHAEL J. ROESSNER
15
15   HOWREY, SIIMON, ARNOLD & WHITE
16       Attorneys for Defendants Ameroda Hess, et al.
16   BY:  MINDY G. DAVIS
17
17   HUNTON & WILLIAMS
18      Attorneys for Defendant Koch Industries
18   BY:  LAUREN ROSENBLATT
19
20
21
22                          * CONFERENCE *
23
24
25

                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                              Page 2

Trscpt MDL 1358 12.19.031

3

3CJLMTBC                         Conference
 1                  (Case called)
 2          THE COURT:  Mr. McNew?
 3          MR. McNEW:  Good morning, your Honor.
 4          THE COURT:  Mr. Gordon?
 5          MR. GORDON:  Good morning.
 6          THE COURT:  Mr. Alpert?
 7          MR. ALPERT:  Good morning, your Honor.
 8          MR. BERN:  Good morning, your Honor.
 9          MR. RALEIGH:  Good morning, your Honor.
10          THE COURT:  Good morning, Mr. Bern, Mr. Raleigh.
11  Mr. Sacripanti?
12          MR. SACRIPANTI:  Good morning, your Honor.
13          THE COURT:  Mr. Eimer?
14          MR. EIMER:  Good morning, your Honor.
15          THE COURT:  Mr. Pardo.
16          MR. PARDO:  Good morning, your Honor.
17          THE COURT:  Mr. Langan?
18          MR. LANGAN:  Good morning, your Honor.
19          THE COURT:  Mr. Wallace?
20          MR. WALLACE:  Good morning, your Honor.
21          MR. JONES:  Good morning, your Honor.
22          THE COURT:  Mr. Jones.  And Miss Fusco?
23          MS. FUSCO:  Good morning.
24          THE COURT:  Those are the folks on the seating
chart
25  but good morning to the rest of you who aren't on the
seating

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

3CJLMTBC                         Conference
 1  chart, but are here.
 2              Well, it does seem a bit like a reunion, but
that's
 3  not why we're here, to have our annual reunion.  We're
here
 4  because there have been filings, a number of remands
around the
 5  country, state court.  There's been removal of those
cases to
 6  various federal courts around the country.
 7              And there are two in this district:  County of
Nassau
 8  versus Ameroda Hess and Western Nassau Water Authority

Page 3

Trscpt MDL 1358 12.19.031

versus
9       Ameroda Hess.   The first one, County of Nassau, 03 CV
9543.
10      And the other one, Water Authority Western Nassau, 03 CV
9544.
11      Now, I'm not even sure that these two cases have been yet
12      assigned to me.   They may have been marked as related to
the
13      earlier cases pending my accepting them but it wouldn't
matter
14      today because I'm also the Part 1 judge.
15              In any event, you would have been stuck with me
today.
16      They are unassigned.   So whether they're here as related
cases,
17      here as Part 1 cases or here as potentially MDL 1358, it
18      doesn't matter, because it's before me.
19              So the issue we're here to discuss, I think, is
20      whether this Court should stay consideration of a pending
21      motion to remand, the courtesy copy papers of which we
received
22      last night.   The plaintiffs are moving to remand these
two
23      cases to state court, probably moving to remand cases
around
24      the country to state court.   The question is whether
those
25      motions should be stayed pending the decision by the
federal

☐
5

3CJLMTBC                    Conference
1       MDL Panel as to where all removed federal cases should be
2       heard.   Should they be heard by one MDL selected judge or
3       should they remain in their many jurisdictions around the
4       country?   If these actions are not stayed pending
decision of
5       the MDL Panel, of course, the risk is inconsistent
rulings on
6       the remand issue.   We may have differing remand decisions
from
7       federal judges all over the country.   If they were stayed
8       pending the MDL Panel's decision as to what to do with
these,
9       what appears to be now maybe 40 cases, then the remand
decision

Page 4

Trscpt MDL 1358 12.19.031

10      would be made by the one judge that the MDL Panel
selects, if
11      they decide to treated this as an MDL.   I think that
frames the
12      issue.
13              The history this week is that I received a
letter from
14      the defendants asking for a stay.   And I, too quickly,
without
15      waiting to hear from the plaintiffs, endorsed it and
granted
16      the stay, and then I got a letter from the plaintiffs and
said,
17      No, there are good reasons not to grant a stay, and I
said,
18      Well, I haven't heard from them, that's true, so I
vacated the
19      stay and I invited you all to come in today and discuss
this
20      with the thought that I would make a decision at the
conference
21      today.   So that's where we stand.
22              My first act, I heard from the one side, I
vacated
23      that.   I'd like to hear from both sides -- briefly,
because I
24      have read your material -- and make a decision.   So who
would
25      like to be heard?   Mr. McNew?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

☐
     6

        3CJLMTBC                  Conference
1               MR. McNEW:   Thank you, Judge.   And thank you for
2       hearing us on short notice.   We're grateful for that.
3               The narrow issue before you this morning, I
believe,
4       is:  Does it make more sense to hear the remand
proceedings in
5       these two cases now or whether it makes sense to stay
them
6       pending proceedings in other courts and before the
Judicial
7       Panel on Multidistrict Litigation.   Whatever the merits
of the
8       request to stay in other courts, Judge, we have a
difficult

                            Page 5

Trscpt MDL 1358 12.19.031

9   time understanding the logic of asking you to stay your
10  decision on these remand motions.  Because unlike every other
11  court in the country, you, Judge, are the presiding judge over
12  MDL 1358.  And the defendants' papers throughout the country
13  are all identical on this point.  They in each case ask that
14  the Court not only remove the stay, they now move to have these
15  matters sent as tag-along actions to MDL 1358 with the
16  expectation, Judge, that these cases come to you through the
17  mechanism of the JPML for decision on a consolidated MDL basis.
18         Your Honor, while there may be some risk of
19  inconsistent rules in other jurisdictions, the notion that you
20  could enter a ruling today that would be inconsistent with your
21  ruling following a consolidation in MDL 1358 is illogical.  And
22  frankly, Judge, if the goal here is to handle this with a
23  minimum of expenditure of federal judicial resources -- and
24  frankly, with a minimum of resources on the part of the parties
25  being expended -- the best thing for you to do is for you to

□

7

3CJLMTBC                          Conference
1   decide these remand pages now.
2          THE COURT:  That was very interesting; that was very
3   unexpected.  I didn't think you were going to argue that.  What
4   you're saying is you're going to assume that the MDL Panel will
5   agree to make an MDL decision for all pending cases and refer
6   them to me as part of MDL 1358.  And if I knew all that, it
7   would be a fait accompli.  There would be no risk of
8   inconsistent rulings around the country because the MDL

Trscpt MDL 1358 12.19.031

panel
       9   would say all 40 should be MDL, and the MDL should go to
Judge
      10   Scheindlin.
      11            If all that were to be done today, I promise
you, I'd
      12   start working on the remand motion Monday.  But nobody's
done
      13   that.  I can't anticipate what the Judicial Panel of
      14   Multidistrict Litigation will do because nobody invited
me to
      15   be on the panel and I don't get a vote.  So I don't know
if
      16   they'll do that.  Do you know if they'll do that?
      17            MR. McNEW:  Well, your Honor, first, I would
note, I'm
      18   not sure if it's clear from the papers that have come to
      19   chambers, but it is not the defense -- it's not the
defendants'
      20   tack to say to the JPML that they ought to consider
whether
      21   there should be an MDL for these cases.  They've
identified
      22   these expressly as tag-along cases to MDL 1358.  They've
      23   expressly stated in their papers all around the country
--
      24            THE COURT:  Okay, so the defendants have taken
that it
      25   should all come here.  But what about the various and
many
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

☐
       8
            3CJLMTBC                    Conference
       1   plaintiffs' lawyers around the country?
       2            MR. McNEW:  We are the various plaintiffs
lawyers
       3   around the country.
       4            THE COURT:  You're everybody?  What are you all
saying
       5   to the judicial panel?
       6            MR. McNEW:  If the transfer -- if the JPML
decides to
       7   transfer them to MDL, absolutely, this is where they
belong.
       8   No question in my mind.
       9            THE COURT:  So you're okay on the second half.
                              Page 7

Trscpt MDL 1358 12.19.031

But if
10    they're going to be MDL, they're going to be here.  What do
11    they think about MDL tree?
12          MR. McNEW:  I think there's a decision tree here, if
13    the JPML decides that multidistrict litigation isn't warranted
14    here.
15          THE COURT:  Isn't warranted?
16          MR. McNEW:  Is not warranted here, okay, you still
17    have these two cases before you.  You have to decide.  So you
18    should decide them now.
19          THE COURT:  Well, then I would know that that's their
20    decision and lots of judges around the country are going to be
21    making these remand decisions.  I'll just be one of many.  But
22    what is the plaintiffs' position before the panel?  Are you
23    saying they should not be treated as MDL or they should be
24    treated as MDL?  Which position are the plaintiff's lawyers
25    taking?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

    9

      3CJLMTBC                    Conference
1          MR. McNEW:  Our position -- I just want to make sure
2     we're on the same page -- our position is if they are in the in
3     the federal court, then they absolutely should be in the MDL
4     before your Honor.
5          THE COURT:  If they're in the federal court.
6          MR. McNEW:  If they remain in federal court, if
7     they're not remanded, then absolutely they belong in this
8     courtroom.
9          THE COURT:  Wait, wait, wait.  That is a confusing
10    position.  Surely you're seeking remand.  I understand this.

                         Page 8

Trscpt MDL 1358 12.19.031
```
11          MR. McNEW:  We are.
12          THE COURT:  Your first position is they don't
belong
13   in the federal court at all.  I do understand that.
14          MR. McNEW:  That's correct.
15          THE COURT:  But before the Judicial Panel on
16   Multidistrict Litigation are you saying, Let's quickly
get them
17   MDL, for one federal judge to decide remand, so that if
they
18   should go back to state court, according to that one
judge,
19   they'll all go back?  If that one judge says they
shouldn't go
20   back, Well, I guess we've lost that; we can appeal it but
we've
21   lost it?  So do you want the remand decisions made by as
many
22   federal judges as there are around the country or are you
not
23   resisting the MDL process so we can get the remand
decided at
24   once?
25          MR. McNEW:  We have decided, your Honor, to try
and
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

```
3CJLMTBC                      Conference
1   have cases remanded before a conditional transfer order
comes
2   out.  That has been our litigation strategy.  We believe
that
3   the removals are so facially defective on a
jurisdictional
4   ground that it would be more efficient to have them sent
down
5   rather than having to go through the laborious process of
going
6   through the JPML proceedings.
7          THE COURT:  My guess is you can't beat the
process
8   that way, because judges work at various speeds around
the
9   country.  You're not going to get all the different
federal
10   judges to decide remand motions before the Judicial Panel
```

Page 9

Trscpt MDL 1358 12.19.031

on
11      Multidistrict Litigation gets to decide whether they
should be
12      transferred to one judge as part of an MDL or whether
they
13      should stay before many judges.  I don't think you can
beat the
14      system that way.  The Judicial Panel on Multidistrict
15      Litigation will hear the issue and will decide.
16              And I did look quickly or briefly at my own
prior
17      decision and at your moving papers on the remand issue to
get a
18      sense of it, and I can certainly say that your papers are
not
19      facially frivolous.  In other words, it's a serious
remand
20      motion.
21              On the other hand, nor do I think the removals
are
22      facially frivolous.  There are serious, hard issues to be
23      addressed.  It's going to take some work on both sides to
24      figure out -- at least what I think.  This is not the
kind of
25      motion that can be decided over the weekend.  Maybe there
are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
      11
                3CJLMTBC                Conference
      1      many judges who are smarter and quicker and they'll do it
--
      2                  MR. McNEW:  Perhaps on a second reading, Judge.
      3                  THE COURT:  Whatever.  But I didn't get there
that
      4      fast.  For me it will take some work to figure out what
to do.
      5      So seeing as how I think it's a serious motion raising
serious
      6      issues on both sides, I don't think it's a good idea to
risk
      7      many inconsistent verdicts from around the country, and
there
      8      did seem to be a case in the Second Circuit, I thought
this Ivy
      9      case, 901 F2d 7, 2d Cir. 1990, the Second Circuit at
least

Page 10

Trscpt MDL 1358 12.19.031

10    seemed to take the position that it be wise to get the MDL
11    process organized first, transfer to one judge, and then the
12    Court said:
13             Once transferred, the jurisdictional objections can be
14    heard and resolved by a single court and reviewed at the
15    appellate level.  Consistence as well as economy is thus
16    served.  We hold, therefore, the MDL Panel has jurisdiction to
17    transfer a case in which a jurisdictional objection is pending.
18             And that's exactly this case procedurally.  There's a
19    real jurisdictional objection, a very important one.  You're
20    saying it should not be in the federal court, should be in the
21    state court.  There's no federal jurisdiction.  Nothing could
22    be more important.
23             Rather than have 40 federal judges over and over again
24    struggle with difficult issues of preemption and other
25    things -- not just preemption, there are other questions here

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

          12

          3CJLMTBC                    Conference
1    about jurisdiction -- rather than have all that struggling
2    going on, if the panel would make a quick decision, would
3    decide if they want 40 judges to do it or they want one judge
4    to do it, and if so, which one, then your motion will be
5    reached quickly once -- to one side or the other, hopefully
6    quickly -- and then you can get to the merits of what you
7    eventually want to do.
8             MR. McNEW:  Of course, Judge, this is a decision
9    that's committed to your discretion.  And I appreciate the
10    Second Circuit's decision, and certainly we are all guided by
11    it.  I would ask the Judge, though, to consider in this

                              Page 11

Trscpt MDL 1358 12.19.031

12    particular instance there are extraordinary circumstances that
13    aren't present in the ordinary set of facts.  Because in this
14    particular instance, Judge, unlike every other one in the
15    country, by a happy coincidence, we happen to be before the MDL
16    judge.  The one judge that we all agree, if this is proper
17    subject for the MDL, we all agree that you're the judge to hear
18    it.  It's in their papers.  We're here telling you today we
19    absolutely agree with them:  You are the person to hear this
20    case.
21          THE COURT:  You are saying to the MDL Panel, While we
22    oppose the MDL treatment, if you're going to MDL, get it to
23    Judge Scheindlin quickly?  Is what you're going to say?
24          MR. McNEW:  Absolutely.
25          THE COURT:  When are they next hearing these things?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
      13

3CJLMTBC                    Conference
1.    Does anybody know what their schedule is?
2          MR. LANGAN:  Your Honor, Andy Langan.  I've been
3    handling the MDL Panel file.  The state of play is reflected in
4    our letter.
5          THE COURT:  Give us the timeline.
6          MR. LANGAN:  Traditional transfer orders have not been
7    entered yet.  It really depends on what the plaintiffs do.  If
8    the plaintiffs object to conditional transfers, once they're
9    entered, it will take awhile.  I'm gratified to hear the
10   plaintiffs say they're not apparently intending to object.
11          THE COURT:  They didn't say that.  They said if it's
12   going to be treated as an MDL, then they think it belongs in

Page 12

Trscpt MDL 1358 12.19.031

13      this Court.  Their first position before the panel is it
should
14      not be MDL, prior to decision on the remand motions
around the
15      country.
16                  MR. LANGAN:  The MDL Panel routinely overrules
that
17      argument.  There's 50 or 60 published decisions that say
that's
18      not a ground to not MDL.  Your Honor is aware of that.
There's
19      a ton of cases I think that say that.
20                  But to deflect timing -- the plaintiffs are
going to
21      object -- it's going to take a couple of months to sort
it all
22      out.
23                  THE COURT:  And if they don't object?
24                  MR. LANGAN:  It's a matter of weeks, once the
25      conditional transfer orders are out.  It's an
administrative

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
    14

3CJLMTBC                        Conference
1       issue with the panel's office.  I can't say why they
haven't
2       entered them yet.
3                   MR. McNEW:  Judge, I'd like to finish my point,
4       because I think it's an important one.  In fact, I think
it's
5       the key of this entire hearing.  And it's a simple point,
and
6       that is that if we all agree -- we can go down the
various
7       decision trees and various outcomes.  But at the end of
the
8       day, any disposition of the remand issue in a federal
forum, if
9       we lose on all the -- you may be right on the -- what
happens
10      with the MDL and other courts' willingness to decide it
before
11      the MDL.  But even in that case, we're all at the end of
the
12      day back here, before you on the same papers that you
have

Page 13

Trscpt MDL 1358 12.19.031

13    before you today.  And rather than going through this process
14    of ensuring that you do not enter a decision today that is
15    going to be inconsistent with your decision when you decide
16    this in your capacity as an MDL judge --
17              THE COURT:  It's not that inconsistency that's
18    worrying me.  It's the inconsistency potentially with the many
19    other judges around the country.  Not that I can stay their
20    decision to see whether to proceed or not, but they may be
21    influenced by what I do.  You said that when I improvidently
22    signed the defendants' letter --
23              MR. McNEW:  I never used that word, Judge.
24              THE COURT:  Well, quickly, without hearing from you,
25    when I did that, you pointed out they were circulating it to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

☐

     15

3CJLMTBC                        Conference
1     all these other courts already.  Saying even "she" did this.
2               My point is, if it's going to influence their
3     decision, there's a message I need to send, I think we need to
4     wait for the MDL Panel to decide whether they think this
5     warrants MDL treatment.
6               But I don't know that what the big consequence of this
7     is -- I'm not sure what the big consequence of this is, because
8     if I were to grant this stay, so to speak, of deciding the
9     remand motion while the MDL Panel works it out -- you know, you
10    don't have a camera planted in my chambers.  You're right,
11    eventually I'm going to have to decide whether or not they give
12    MDL treatment.  If they do, I've got them all; if they don't,

                            Page 14

Trscpt MDL 1358 12.19.031

13    I've got the two new New York ones.  So there's still an
14    important signal that needs to be sent that I defer to
the MDL
15    Panel to make its decision because in theory they might
not do
16    it at all, or they might pick a different judge for
whatever
17    reason.  I have to respect that.  But if I wish to, I can
start
18    working now.
19              MR. McNEW:  Let me make a suggestion, your
Honor,
20    because I think there's a way to move this quickly to
conserve
21    an awful lot of time and effort in a lot of different
foras,
22    and I think you are the key to this because of the
unusual
23    circumstance of having these individual cases come to
you.
24              THE COURT:  They're only coming to me as
related,
25    right?  How do I get these?  They're marked as related
cases.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

☐
   16

    3CJLMTBC                    Conference
 1   This wasn't an accident of the wheel.
 2              MR. McNEW:  It was an accident.  We filed two in
 3   New York Supreme for New York County.  There's a story
behind
 4   that -- that's another story.
 5              THE COURT:  Okay.
 6              MR. McNEW:  What I'm trying to get to, Judge, is
this:
 7   You can -- rather than having us go through a process
that will
 8   be
 9   frankly take months -- I have a hard time believing we'll
     back here in weeks -- don't stay your own decision on
these two
10   cases, and I understand your concern about the message
you'll
11   be sending.
12              THE COURT:  Not just the message.  In theory --
let's

                            Page 15

Trscpt MDL 1358 12.19.031

13    say the MDL Panel decides on MDL treatment but says, for
14    whatever reason, it shouldn't be Judge Scheindlin, she
has a
15    lot of work, a lot of other MDL's.  We'll select
so-and-so?
16    Which they'll have the power to do.  Well, I'll have
wasted
17    work and we'll never decide these issues.
18          I don't suspect that's going to happen, because
I have
19    the original MDL, 1358, and both the defense and the
plaintiffs
20    apparently think I should have it, and yet you never know
what
21    a group of federal judges will do.  They surprise us
every
22    morning.  Who knows what they'll do?
23          So there is a small possibility that I would
never
24    have these.  If they MDL it and give it to somebody else
--
25    unlikely, but it could happen.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

    17

        3CJLMTBC                    Conference
1          So I still think a stay according to the Second
2     Circuit is the way to go, pending the MDL's decision.
I'm not
3     seeking to delay it.  I realize it would be a very
important
4     motion to move up the list, though in front of one or two
5     important other motions I have pending.
6          MR. GORDON:  Robert Gordon, your Honor, for the
7     plaintiffs as well.  I want to first alert the Court it's
not
8     just two cases.  Mr. Bern, who's the other plaintiff
counsel
9     here, other than Weirz & Luxemberg, just received notice
that
10    seven of his cases were removed to you.  So you now have
nine.
11          THE COURT:  Because they were also in New York
County?
12          MR. BERN:  Correct, your Honor.
13          MR. GORDON:  So you now have nine here to you.
14          I guess my point is:  We believe you're the MDL.

Page 16

Trscpt MDL 1358 12.19.031

We
15      believe this is MDL 1358.  They're not opposing that.
16              THE COURT:  But you're opposing it.  I was told
by
17      Mr. McNew you're going to tell the MDL Panel, We do not
think
18      you should MDL this until the judges around the country
have
19      decided remand.  Procedurally, we think remand comes
first.  I
20      and all these federal judges should decide their own
remand
21      motion, even though we realize it could be in Arizona,
somebody
22      decides to go remand, and in Connecticut, somebody's
going to
23      say not remand.  Yet that's our position.  Before the
MDL.
24      That's what you're saying.  You're not saying we see the
wisdom
25      of getting it all MDL now so one judge could decide it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

     18

        3CJLMTBC                Conference
1               MR. GORDON:  We're going to the different
federal
2       judges, telling all of them there's no subject matter
3       jurisdiction.
4               THE COURT:  And to decide remand before the MDL
Panel
5       acts.
6               MR. GORDON:  But if they say no, I'm going to
state
7       this, we, on behalf of our firm, which controls I think
8       99 percent of the cases -- not 100 percent -- for
example, the
9       attorney general of New Hampshire is not our case -- that
we
10      will not oppose conditional transfer to you so that we
can make
11      the -- get the motion, get the motion on for you to
remand it.
12      So we're not going to contest that in the JPMDL decision.
13      We're not going to put questions in MDL that they belong
--
14              THE COURT:  You're only going to do that if
                          Page 17

Trscpt MDL 1358 12.19.031

judges
        15    start to stay it, individual judges issue stays pending
the
        16    decision of the MDL Panel.  Then you're going to say,
Nobody's
        17    going to decide this remand.  Get to the MDL Panel, you
have
        18    our blessing, get it to MDL, get it to Judge Scheindlin,
let's
        19    get somebody to decide remand.  Either way -- we'll take
it to
        20    an appellate court if we lose; they'll take it to an
appellate
        21    court if they lose.  Let's get going.  So if you could
get one
        22    and instead of waiting for all these judges to either
decide
        23    remand or stay, why don't you just forgo it?
        24            MR. GORDON:  We would not necessarily be opposed
to
        25    agreeing, since everyone's going to be deferential to
you.

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

☐
        19

        3CJLMTBC                       Conference
         1    There's about 19 other federal judges --
         2            THE COURT:  Talk to my children.
         3            MR. GORDON:  They are another matter.  But
federal
         4    judges will say, What did the MDL judge do?  The proof in
the
         5    pudding is there:  Immediately on your stay, it was to
Judge
         6    Spatt before anybody could even spell his name.  That
quickly.
         7    I don't want to make it look like we're going to contest
that
         8    there's an MDL 1358.  We're not going to contest you're
the
         9    judge and these are tag-alongs.  But you want to decide
the
        10    remands first.
        11            THE COURT:  That's not an issue here.
        12            MR. GORDON:  No.
        13            THE COURT:  Then write a letter to all the
judges,

                              Page 18

Trscpt MDL 1358 12.19.031

14      say, We changed our position; we now believe it should all be

15      MDL, one judge should decide remand, we're agreeing about the

16      remand, we agree with the conditional tag-along transfer, and

17      I'll go to work on it.

18              MR. GORDON:  We -- they necessarily want to have the

19      files transferred to the JPMDL to do that.

20              THE COURT:  Fine.

21              MR. GORDON:  We'll let them not rule on a stay and let

22      you rule.

23              THE COURT:  You tell them that.

24              MR. GORDON:  We would do that if your Honor would lift

25      this stay and get reply papers from them so you can decide.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐

    20

        3CJLMTBC              Conference

1       Because de facto --

2               THE COURT:  I think we could work something out here.

3               MR. GORDON:  -- your decision would be controlling.

4               THE COURT:  I think we can work something out here.  I

5       think all you need to do is talk to your adversaries because

6       you could virtually do it by stipulation.  If you're not

7       pressing your individual remand motions around the country but

8       going to a transfer so we can litigate it here, then we can

9       have a briefing schedule and litigate it here.  Then it's got

10      to be litigated somewhere.  Surely, Mr. Sacripanti, you don't

11      expect it not to be litigated.

12              MR. SACRIPANTI:  No, your Honor.

13              THE COURT:  And you don't want to litigate it before

14      30 judges, do you?

15              MR. SACRIPANTI:  Your Honor, I don't, but

Page 19

Trscpt MDL 1358 12.19.031

there's one
16    problem with the analysis.
17              THE COURT:  Yes.
18              MR. SACRIPANTI:  They don't control all the
cases.
19    And not to quibble with my friend Mr. Gordon, I don't
think
20    it's 99 percent.
21              THE COURT:  But how about these five lawyers at
the
22    front table?
23              MR. SACRIPANTI:  No, your Honor.
24              THE COURT:  Even that?
25              MR. SACRIPANTI:  There's a slew of cases
throughout

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
21

3CJLMTBC                    Conference
1     the country with other plaintiffs' firms -- California --
that
2     they don't control.
3              THE COURT:  What if they bring them into a
4     stipulation?  If they can arrange a stipulation, which is
all
5     you want, you would like the remand -- Mr. Sacripanti,
you
6     would like the remand motion heard in one court?
7              MR. SACRIPANTI:  Indeed, your Honor.
8              THE COURT:  Work it out.  Try to work it out.
9              MR. SACRIPANTI:  We're happy to try to do it.
If your
10    Honor would issue a stay in the interim ...
11              THE COURT:  The interim might be five or 10
minutes
12    while I'm taking a criminal case that's waiting to see
me.  Why
13    don't you try to talk for a few minutes.  Could you talk
to
14    other for five or 10 minutes?  Leave it at five or 10,
because
15    at 11:00 I have to swear in the new citizens.  I have to
do
16    naturalization.
17              Why don't you talk five to 10 minutes, really,
while I
18    do one criminal case.  Then we'll come back and talk some

Page 20

Trscpt MDL 1358 12.19.031

more.

19      If we haven't worked something out, we'll take a break
and I'll

20      come back to court and take care of you.

21              MR. GORDON:  Can we leave our stuff?

22              THE COURT:  I think so, sure.

23                  (Recess)

24      (10:56 a.m.)

25              MR. SACRIPANTI:  Your Honor, we apologize, we
didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
    22

        3CJLMTBC                    Conference

1       mean to keep you waiting.

2               THE COURT:  That's all right.

3               MR. SACRIPANTI:  We were thinking, your Honor,
if you

4       talk to your children with the robe on, they may listen.

5               THE COURT:  Never mind.  They've seen that since
1982.

6       It didn't work then.

7               MR. SACRIPANTI:  Your Honor, I think we need a
little

8       time.

9               THE COURT:  You want me to go swear in the
citizens?

10              MR. SACRIPANTI:  I think we do.  I think we need
a

11      little time, and we're working in earnest to try and
solve

12      this.

13              THE COURT:  If you don't mind, it takes about a
half

14      an hour at the most to swear in the new citizens.

15              MR. GORDON:  Can we explain to your Honor what
the

16      question is, because it may be that you would or would
not

17      consent to or even consider one as an option.

18              THE COURT:  Sure.

19              MR. GORDON:  Our position is, for the
plaintiffs, we

20      would waive -- we would agree to a stay, and indeed to
your

21      Honor issuing a stay of other courts deciding, if your
Honor

Page 21

Trscpt MDL 1358 12.19.031

22    would create an expedited briefing schedule, get them to
23    reply -- we filed our papers already -- and make a
decision on
24    that.  And we would support that.  In all the cases that
we're
25    in, which I do believe they now agree would be somewhere
around

23

3CJLMTBC                      Conference
1    90 percent of the nation's cases, I think it's more --
but they
2    have a different proposal, and I'll let them explain it
to you.
3    And I need to call cocounsel in the intervening time.
4             MR. EIMER:  Nate Eimer.  I think we're very
close on
5    this.  I think the issue is, one, we would request that
your
6    Honor issue the order staying the other cases, which you
can
7    under 1358.  We're not certain of the effect of that, but
8    that's great; it's helpful.  What we would propose is --
what
9    we understand Mr. Gordon's position to be or plaintiffs'
10   position to be is that they don't oppose transfer here
and your
11   Honor deciding the remand issue.  So what we've asked is
that
12   plaintiffs, in addition to this, let us advise the JPML
that
13   plaintiffs do not oppose issuance of a conditional
transfer
14   order and transfer to your Honor, so we get the process
started
15   sweeping these cases up and bring them here.  That's the
issue
16   Mr. Gordon needs to talk to Mr. Summy about, and if we
get that
17   resolved, we have an understanding.
18            THE COURT:  It doesn't sound so --
19            MR. GORDON:  We feel there's no subject matter
20   jurisdiction.  I hate to go to any federal judge -- I'd
rather
21   have them stay it rather than agree that it should go and
get

Page 22

Trscpt MDL 1358 12.19.031

```
       22    transferred and start to go through the federal system
and
       23    transfer, when I believe that once your Honor rules as
the MDL
       24    judge, I believe -- which we still believe you are, and
no
       25    one's suggesting that you're not, and these are simply
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
       24
             3CJLMTBC                    Conference
        1    tag-alongs.
        2               MR. McNEW:  Our common desire, your Honor, is
that we
        3    find a way, so this doesn't become enmired in the process
of
        4    going through the conditional transfer order process --
        5               THE COURT:  I understand.
        6               MR. McNEW:  And to the extent your Honor has
thoughts
        7    about how we might do that, we would be grateful for your
        8    guidance.
        9               THE COURT:  Okay.
       10               MR. GORDON:  I can't imagine that another fellow
       11    judge, if they've been stayed to wait your ruling, then
you
       12    rule, that they would take a contrary position; and to
the
       13    extent that the defendants are worried, by the way, about
some
       14    cases being in state court, some being in federal court,
that's
       15    almost inescapable.
       16               THE COURT:  Yes, exactly.
       17               MR. GORDON:  There are existing state cases
they've
       18    never sought to remove.  County of Suffolk, one of the
biggest
       19    in the country.  Passco, Rhode Island, never sought to
remove
       20    it.
       21               THE COURT:  I think you're right, that's
inescapable.
       22    There are some cases in state court, there are.  It's up
to
       23    them to remove them timely or not.  Nothing to be done
about
```

Page 23

Trscpt MDL 1358 12.19.031

24    that.
25         But what they do want to avoid, I gather, is many,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

3CJLMTBC                    Conference
1    many federal rulings which could potentially be inconsistent
2    and in different circuits and different appeal schedules and
3    all the rest of it, and everybody seems to favor a fast
4    adjudication one way or the other.
5         I'm not going to promise you a day.  I've made one
6    promise this year, that's one too many.  But there was a reason
7    in that case.
8         MR. EIMER:  Nate Eimer.  It's not an issue for any of
9    us here -- I was going to say a lot, I don't know how many,
10   defendants are who are not in these cases.
11        THE COURT:  But even they are not pressing for the
12   remand question to be decided in various courts around the
13   country.
14        MR. EIMER:  No, they're objecting, they're asking for
15   stays in each of the cases they're in.
16        THE COURT:  So in theory, they basically all want to
17   be here, too.
18        MR. EIMER:  They get to participate -- there are some
19   people who don't get to participate.  It will go decided before
20   they get here.  But I'm not concerned about that.
21        THE COURT:  I'm not either because, as you say,
22   generally speaking they're seeking stays around the country.
23   They want it to be in the MDL process, so they've been heard,
24   so to speak, indirectly.
25        MR. GORDON:  And we're giving them the stays.  It's

Page 24

Trscpt MDL 1358 12.19.031
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

3CJLMTBC                    Conference
1    the ones we're here on we want to move forward on.
2              THE COURT:  I understand.  So when I come back
from my
3    naturalization, will you be here or will you go away?
4              MR. GORDON:  We'll be here.
5              THE COURT:  All right.
6              MR. SACRIPANTI:  Can we use the courtroom?
7              THE COURT:  Yes, you may.  I'll be down in the
8    ceremonial courtroom.
9                 (Recess)
10   (11:55 a.m.)
11             THE COURT:  Can we get started?
12             MR. SACRIPANTI:  I think so, your Honor.
13             MR. GORDON:  Your Honor, thank you for your
patience.
14   We were in touch with counsel in South Texas.  It wasn't
easy.
15             MR. McNEW:  They have telephones down there.
16             THE COURT:  That's good.  Reassuring.
17             MR. GORDON:  Obviously, we don't speak for
everybody
18   in the country -- neither do they -- but just for those
here in
19   the courtroom and some of us that we've been able to
reach have
20   agreed to, from the plaintiffs:
21             We would stipulate, first of all, Number 1:  To
22   immediate transfer of all cases which counsel control
including
23   some declaratory judgment actions that the defendants
have just
24   filed in federal courts to you, Shira Scheindlin, in your
25   capacity as MDL 1358 judge.  And we agree to not oppose
the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

3CJLMTBC                    Conference
1    issuance or finality of the panel's conditional transfer
order.
2              Number 2:  We stipulate that your Honor, Judge
3    Scheindlin, use whatever judicial means at your disposal

Page 25

Trscpt MDL 1358 12.19.031

to
4      stay and cause the immediate transfer of any other cases
to
5      this Court.
6              MR. SACRIPANTI:  And for that, your Honor, if I
may,
7      we would refer you to the manual, and we would hope that
you
8      would, you know, contact those other judges.  I know it's
an
9      imposition, but....
10             THE COURT:  Well, writing is easier certainly
than
11     calling them.  But if I end up with a list....
12             MR. SACRIPANTI:  We're going to provide you with
a
13     list, your Honor.  Thank you.
14             MR. GORDON:  Number 3:  We, the plaintiffs,
expressly
15     reserve our objections to federal jurisdiction and
stipulate
16     that our agreement here is not a waiver.
17             Number 4:  We agree -- all the parties here --
to an
18     expedited briefing hearing on the motions to remand and
the
19     dates that we've suggested, the defendants agreed they
would
20     get their papers in by January 9th; that we would take
seven
21     days to apply, which would be January 16th; and that we'd
ask
22     for a hearing the following week, which would be the week
of
23     the 19th, which is Martin Luther King's birthday, but
then that
24     Tuesday, Wednesday or Thursday -- Wednesday the 21st,
perhaps,
25     is consistent with your Honor's schedule?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28
        3CJLMTBC                    Conference
1               THE COURT:  A "hearing" meaning what?
2               MR. GORDON:  Oral argument.
3               THE COURT:  If the Court requires one, yes.
4               MR. GORDON:  Yes.  Number 5:  Declaratory
                        Page 26

Trscpt MDL 1358 12.19.031

judgment

5   actions that were filed and just served on our clients
6   yesterday would be stayed pending the decision on remand.
7        And Number 6:  The plaintiff agrees to file
8   appropriate papers staying other cases that we control
pending
9   final MDL Panel action transferring the cases.
10        Did I say that correctly?
11        MR. LANGAN:  Perfect, Rob.  Thank you.
12        MR. WALLACE:  Actually, your Honor -- this is
Rick
13   Wallace for Shell, Chevron and other defendants -- a
couple of
14   minor modifications:
15        I thought the proposal for Number 1 was to stay
as
16   well as transfer all those cases that the plaintiffs
control.
17        And on Number 3, I'd simply ask that that
objection --
18   the preservation of objections to jurisdiction be
reciprocal,
19   because there are some defendants that may also have
objections
20   to personal jurisdiction.
21        MR. SACRIPANTI:  Your Honor, if I may?
22        THE COURT:  But it is consistent with the
defendants
23   that all defendants are together in saying there is
federal
24   jurisdiction; is that right?  Or is there inconsistency
on the
25   defense side?
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

☐
    29
            3CJLMTBC              Conference
1        MR. WALLACE:  I don't anticipate any
inconsistency on
2   subject matter jurisdiction.
3        THE COURT:  But personal jurisdiction, you want
to
4   preserve your rights.  Yes, okay.  I hear you.
5        MR. SACRIPANTI:  Which leads me, your Honor, to
a
6   point:  We can only bind and agree to be bound the
clients that

Page 27

Trscpt MDL 1358 12.19.031

```
 7    we represent that are here.  There are about, by my
reckoning,
 8    30 other defendants that are part of the actions that
have been
 9    removed before your Honor who are not present today.
What your
10    Honor may want to do -- and I'll leave it to your Honor
-- is
11    to set perhaps a date by which if anyone objects to this
12    stipulation, that they should come in, petition the Court
and
13    you should have a conference on that.
14              May I suggest January 9th or 5th?
15              THE COURT:  Let me ask this question:  In terms
of
16    briefing, however, would those defendants who are not
present
17    anticipate folding into this briefing schedule?
18              MR. SACRIPANTI:  I would assume they would, your
19    Honor.  We're going to give notice of this to everyone.
We're
20    going to do that immediately.  I just want to preserve --
21    because frankly, I'm acting as coordinating counsel, but
none
22    of us here have the power to bind anyone.
23              THE COURT:  I understand that.  It's your best
24    prediction, so to speak, that they all wish to stay their
local
25    actions and wish it to be heard in one MDL proceeding.
That's
```

30

```
      3CJLMTBC                    Conference
 1    your best guess.
 2              MR. SACRIPANTI:  And would agree to the
stipulation as
 3    set forth by Mr. Gordon.
 4              THE COURT:  I understand.  When we actually tell
them
 5    the briefing schedule, there may become some objections.
Are
 6    you kidding?  How are we going to get a coordinated brief
in --
 7    did you say January 9th?
 8              MR. GORDON:  That's correct.
 9              THE COURT:  With the two holidays falling in
```

Page 28

Trscpt MDL 1358 12.19.031

between,
```
        10    you've got to circulate that to how many defendants?
        11            MR. McNEW:  But, Judge --
        12            THE COURT:  That's really a tight schedule.
        13            MR. McNEW:  But if you think about the context,
we've
        14    already served motions to remand in all these cases.
        15            THE COURT:  I understand.  I have one in front
of me,
        16    one Memorandum of Law in Support of Motion to Remand Case
        17    Number 03 CV 9543, County of Nassau.  But I assume --
tell me
        18    if I'm wrong -- that that brief will relate to all of the
        19    original nine cases, so to speak, that I have, and if the
rest
        20    are transferred, it relates to all of them, it's not
        21    case-specific -- is that right?
        22            MR. McNEW:  The removal papers and the remand
motions
        23    are identical, case-to-case.  There's no variation.
        24            THE COURT:  When was it served?
        25            MR. McNEW:  Our first remand papers were served
in
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
        31

3CJLMTBC                    Conference
```
         1    Connecticut, and I believe it was December 8th.  So
defense
         2    counsel have had these papers for awhile.
         3            THE COURT:  Well, some.  I don't know who the
         4    defendants were in Connecticut.  I really don't know if
all of
         5    them really did receive the papers.
         6            But the point is, we want a coordinated brief.
We
         7    don't want different defendants coming in and saying, you
know,
         8    No, given that schedule, I was not able to coordinate; I
have
         9    no input; I have a right to make my own papers.
        10            I think if we actually give another week, it's a
small
        11    change, but it really does at least allow the defense
brief to
        12    be circulated throughout the defense group.  I don't want
to be
```

Page 29

Trscpt MDL 1358 12.19.031

13   so unrealistic that I end up with more than one brief. That

14   would be self-defeating.  And I really can't bind the

15   defendants who aren't here today to agree that the defendants

16   who are here today are going to write a brief for them that

17   they have no chance to even read or comment on.

18          So efficiency tells me I'd rather see it moved up a

19   week, and that's tight, but at least it could be sent around to

20   every defendant and every case around the country so that they

21   all agree on one coordinated brief.  That's to the plaintiffs'

22   benefit, too.

23          MR. SACRIPANTI:  And, Judge, I would suggest that, if

24   I may, we will send notice to all the defendants, but your

25   Honor may want to set an interim conference date, which may not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

3CJLMTBC                    Conference

1   be necessary, where people who do object -- and I can't say

2   people will -- they can come and voice their objections.

3          THE COURT:  The only objection they may have

4   potentially is to the dates.  And they can say, We need time to

5   be part of this brief.  That's their only real objection that I

6   gather they'd want is to be heard once and not 40 times.

7   Everybody wants that.  So they just want enough time to read it

8   and show it to their clients and make sure they don't have a

9   brilliant idea that somehow the seven brilliant people who are

10   here didn't have.

11          MR. SACRIPANTI:  I guarantee they will, your Honor.

12          THE COURT:  When you're working with a big,

13   coordinated group, that's for sure.  People want to read

Page 30

Trscpt MDL 1358 12.19.031

it and
14    have some input.
15             I think we should move the 9th to the 16th.
16             MR. GORDON:  The 16th.
17             THE COURT:  And what was the reply date you said
18    originally?  The 16th?
19             MR. GORDON:  But then -- we lose then the Martin
20    Luther King day.  Could we go to the following Monday, at
21    least?  The 26th?
22             THE COURT:  Sure.
23             MR. GORDON:  And then have the hearing still
that same
24    week?
25             THE COURT:  No.  You can't have a hearing until
I've

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
     33
          3CJLMTBC                    Conference
1    read the briefs.  I can't have a hearing before I've read
them.
2             MR. GORDON:  No, have a hearing during the week
of the
3    26th.
4             THE COURT:  Oh, that same week.
5             MR. GORDON:  I'm moving everything up a week.
The
6    only thing is I want over the weekend because of the
Martin
7    Luther King holiday.  In other words, the 16th for them;
the
8    26th for us; and the hearing perhaps the 28th, 29th, 30th
of
9    that week.  Whatever your Honor's schedule would
accommodate.
10            THE COURT:  Actually, I don't usually hear oral
11    argument on motions, so I can't even predict.
12            MR. GORDON:  We can just actually leave that
out.
13            THE COURT:  We could leave it out of the
stipulation,
14    or we could say if necessary, there will be a hearing on
-- so
15    that everybody at least can plan for it.
16            MR. GORDON:  Can I ask for the 27th rather than
the
17    26th so we can actually get a work day to make up for

Page 31

Trscpt MDL 1358 12.19.031

that
18   Martin Luther King day?
19          THE COURT:  That's fine.  You have a lot of
people to
20   coordinate with, too.
21          If it goes, I'm supposed to start a trial on the
26th.
22   So in terms of a hearing -- there's always that "if it
goes",
23   but if it goes....
24          The best day for a hearing would probably be
Friday,
25   February 13th -- not to be suspicious -- Friday the 13th
at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
   34
        3CJLMTBC                    Conference
1   10:00 o'clock.  That's the best day I see for a hearing.
But
2   that could be moved up if the two-week trial goes away,
as
3   trials tend to do.
4          MR. GORDON:  I did not mean to imply we were
5   requesting oral argument on this.  We'd be happy to waive
that.
6          THE COURT:  Let's see if I think I need it.
Let's
7   also set a time on February 13th.  We'll make it at
10:00.  As
8   far as Mr. Sacripanti's suggestion of scheduling a date
--
9          MR. SACRIPANTI:  I have a different suggestion
now.
10   That's withdrawn.
11          THE COURT:  What's the latest one?
12          MR. SACRIPANTI:  The latest, Your Honor, is you
set a
13   date, and may I suggest January 5th, that if anyone
objects, to
14   notify the Court by that date in writing.  And if they
don't,
15   they don't.  I want to preserve for people who aren't
here the
16   opportunity to say, Your Honor, those guys were nuts,
okay?  So
17   if we can do January 5th, that would be great.

Page 32

Trscpt MDL 1358 12.19.031
18          THE COURT:  Sounds okay with me.  What does anybody
19     else think?  If anybody objects to the stipulation who is not
20     part of the stipulation because they weren't here, they can
21     file a written objection, so to speak.  And we'll see, if we
22     get any, what to do about it.
23          MR. SACRIPANTI:  Right, exactly.
24          THE COURT:  In the meantime, everybody's committed to
25     the schedule who is here.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
☐
     35
       3CJLMTBC                    Conference
1          MR. SACRIPANTI:  We're committed to the schedule.  I
2     just want to represent those who aren't here.
3          MR. GORDON:  Here's my concern:  We're obligating
4     ourselves to take certain actions.
5          THE COURT:  And they are, too.  They're going to file
6     a brief on the 16th of January no matter what.  They want to
7     just say to anybody who wasn't here today who has something to
8     say, Say it by January 5th or forever hold their peace.
9          MR. GORDON:  Court's indulgence.
10            (Off the record)
11          MR. GORDON:  Judge, I just want to -- we're going to
12     other courts and taking a certain position.  If the stipulation
13     does not happen at the end of the day because on January 5th
14     people come in and say, We actually don't agree, we have to be
15     able to then no longer be bound by this.
16          THE COURT:  I think that's right.  Or for some reason
17     the stipulation is --
18          MR. SACRIPANTI:  Reversed, held -- voided.
19          THE COURT:  Voided.  That's a good word.  Thank you

                              Page 33

Trscpt MDL 1358 12.19.031

20     very much.  Then everybody will act accordingly.  But I really
21     don't anticipate -- I think it's a fail-safe for people that
22     aren't here.
23              MR. SACRIPANTI:  And we'll make the notice shorter.
24     We don't want to be voided.  So we'll make the notice --
25              THE COURT:  No, I think January 5th is the right date.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐
         36

3CJLMTBC                    Conference
1              MR. SACRIPANTI:  And we give people notice, and if
2     it's voided, all bets are off.
3              THE COURT:  I don't see why that should happen.  It's
4     an unlikely event.  It's an unlikely event.  It's just kind of
5     a due process.
6              MR. EIMER:  The only problem we have with this, now,
7     one last gap, there's some actions that need to be taken in
8     other districts as a result of remand motions they've filed,
9     and we're assuming we don't have to do anything, because there
10    will be a deal, we assume, but Mr. Gordon is saying he doesn't
11    want to stay those cases until after January 5th.
12             MR. GORDON:  I'm concerned about it, because I could
13    be tying my hands on the one hand while other guys hit me, is
14    my concern.
15             THE COURT:  Hit you with what?
16             MR. GORDON:  While they, in other jurisdictions,
17    they're moving for their courts to make decisions or not make
18    decisions or transfer.
19             THE COURT:  They're not.  They were moving for stays
20    around the country, as you know.  We have to be a little bit

Page 34

Trscpt MDL 1358 12.19.031
        21    realistic.  I'll try to issue an order in the MDL cases
that
        22    incorporates this and sends it out everywhere.  Most
judges
        23    aren't really anxious to work between Christmas and New
Years
        24    on a remand motion.  It's not a high priority.  Most
people
        25    want to buy presents and wrap them and celebrate.
They're not
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

    37
        3CJLMTBC                    Conference
        1    dying to decide this.
        2                 MR. GORDON:  Although this would make a nice
present.
        3                 THE COURT:  I'll issue an order.  I think they
have
        4    other things to do in the next 10 days.  I don't know
that
        5    they're rushing to decide a difficult remand motion.
        6                 What I need is a service list or something.
        7                 MR. SACRIPANTI:  By close of business, we'll
provide
        8    you with a list of all removal issues and the judges.
        9                 THE COURT:  And you'll coordinate with
plaintiffs to
        10   do your best to be sure that the list is complete?
        11                MR. SACRIPANTI:  Yes.
        12                MR. GORDON:  May I ask one question?  I assume
you
        13   have everybody in here who was part of the DJ action,
because I
        14   know not all the defendants agreed to do that.
        15                I know you sort of took the lead.  I assume the
part
        16   that says that you're going to -- that you control the DJ
        17   actions and you're agreeing to immediate transfer of
those
        18   cases, to a stay of that --
        19                MR. SACRIPANTI:  Marathon's not here.
Marathon's not
        20   here.
        21                THE COURT:  And you didn't try to call that
party?
        22                MR. LANGAN:  I can't imagine it will be a
                              Page 35

Trscpt MDL 1358 12.19.031

problem.  It
        23   won't be.
        24                THE COURT:  There are expressions of confidence
--
        25                MR. GORDON:  Can we get an answer to that by the
end

        38
            3CJLMTBC                    Conference
         1   of business today?
         2                MR. SACRIPANTI:  I can tell you we'll move
posthaste
         3   to all of them, reach out to them.  But why don't you
give me
         4   till Monday.
         5                MS. ROSENBLATT:  I think he's out of town.
         6                THE COURT:  Who represents Marathon?  What law
firm?
         7                MS. ROSENBLATT:  Baker, Botts.
         8                THE COURT:  Just coordinate it.
         9                Does anybody want to propose language for the
order,
        10   the very short order I'm going to try to draft in the MDL
        11   manner?  It will have an MDL caption.  I'll try to draft
        12   something, but if anybody has an idea of the proposed
language,
        13   I'd be happy to hear you.
        14                MR. SACRIPANTI:  Would you like us to send you
--
        15   we'll try to work and have a joint --
        16                THE COURT:  I'd like to get it out by the end of
the
        17   day.
        18                MR. SACRIPANTI:  So would we.
        19                MR. EIMER:  We'll work one out this afternoon.
        20                THE COURT:  You're welcome to stay.  Sit around
the
        21   table and do it.  Let's see what I have next.
        22                I don't have a matter in this courtroom until
2:30.
        23                MR. McNEW:  Okay.
        24                THE COURT:  Folks, if you find yourselves here,
you're
        25   welcome to work here.  There's no matter in this
courtroom

Trscpt MDL 1358 12.19.031
(212) 805-0300

39

3CJLMTBC                          Conference
1    until 2:30.
2              MR. SACRIPANTI:  Thank you, your Honor.
3              THE COURT:  You're welcome to stay.  We don't
have
4    cookies or coffee, but you're welcome to stay.
5              (Adjourned sine die)
6                              o 0 o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Page 37

# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**ORDER**
Master File C.A. No.
1:00-1898(SAS)
MDL 1358

This document refers to:

*County of Nassau v. Amerada Hess Corp., et al.*, No. 03-cv-9543
*Water Authority of Western Nassau County v. Amerada Hess Corp, et al.*, No. 03-cv-9544
*Incorporated Village of Mineola, et al. v. AGIP Inc., et al.*, No. 03-cv-10051
*West Hempstead Water District v. AGIP Inc., et al.*, No. 03-cv-10052
*Carle Place Water District v. AGIP Inc., et al.*, No. 03-cv-10053
*Town of Southampton v. AGIP Inc., et al.*, No. 03-cv-10054
*Village of Hempstead v. AGIP Inc., et al.*, No. 03-cv-10055
*Town of East Hampton v. AGIP Inc., et al.*, No. 03-cv-10056
*Westbury Water District v. AGIP Inc., et al.*, No. 03-cv-10057

----------------------------------------------------

The Court, upon hearing counsel for plaintiffs and certain defendants at a conference in the above-referenced cases in response to defendants' motions to stay proceedings in these cases and plaintiffs' motions for their remand, and upon stipulations there agreed to on the record by the parties present, finds, in the above-captioned proceeding, that it is appropriate for the issues presented by these motions in these and all similar removed actions, wherever filed, to be heard and decided by this Court.

Accordingly, all proceedings in the cases set forth in the attached Schedule should be stayed pending transfer to this Court sitting in its capacity as the MDL No. 1358 court. This Court respectfully requests that all courts to which the scheduled cases have been removed GRANT ALL MOTIONS TO STAY those cases pending transfer to MDL No. 1358.

The parties have agreed to the following consolidated briefing schedule, which is hereby So Ordered: defendants' opposition to plaintiffs' motion to remand shall be served and filed by January 16, 2004, and plaintiffs' reply in further support of the motion to remand shall be served and filed by January 27, 2004. Defendants' motion to stay in the above-referenced cases is DENIED because this Court will consider and decide the consolidated motion to remand forthwith.

Dated: December 23, 2003

Honorable Shira A. Scheindlin
United States District Judge

## SCHEDULE

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| CA | *California-American Water Co. v. Unocal Corp., et al.* | 11/26/03 | N.D. Cal.<br>C 03-5379 JSW | Jeffrey S. White |
| CA | *City of Fresno v. Chevron U.S.A. Inc., et al.* | 11/26/03 | N.D. Cal.<br>C 03-5378 JSW | Jeffrey S. White |
| CA | *City of Riverside v. Atlantic Richfield Co., et al.* | 12/12/03 | C.D. Cal.<br>EDCV03-1460 RT SGLx | Robert J. Timlin |
| CA | *City of Roseville v. Atlantic Richfield Company, et al.* | Not yet removed | | |
| CA | *Orange County Water District v. Unocal Corp., et al. (Amended)* | 12/05/03 | C.D. Cal.<br>SACV03-1742 JVS (ANx) | James V. Selna |
| CA | *People v. Unocal Corp., et al.* | 12/10/03 | E.D. Cal.<br>CIV.S-03-2653 GEB DAD | Garland E. Burrell, Jr. |
| CA | *Quincy Community Services District v. Atlantic Richfield Co., et al.* | 12/17/03 | E.D. Cal.<br>CIV S-03-2582 WBS DAD | Hon. William B. Shubb |
| CA | *Silver, et al. v. Alon USA Energy, Inc., et al.* | 12/03/03 | S.D. Cal.<br>03 CV 2408 WQH (RBB) | William Q. Hayes |
| | | | | |
| CT | *American Distilling & Mfg. Co., Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1926 | Hon. Stefan R. Underhill |
| CT | *Canton Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1921 | Hon. Stefan R. Underhill |
| CT | *Childhood Memories v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1924 | Hon. Alvin W. Thompson |
| CT | *Columbia Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1923 | Hon. Stefan R. Underhill |
| CT | *Our Lady of Rosary Chapel v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1925 | Hon. Stefan R. Underhill |
| CT | *Town of East Hampton v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1927 | Hon. Stefan R. Underhill |
| CT | *United Water Connecticut, Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. | Hon. Stefan R. Underhill |

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|-------|-----------------|--------------|-----------------|----------------|
| | | | 3:03-CV-2017 | |
| | | | | |
| FL | *Escambia County Utilities Auth. v. Adcock Petroleum, Inc., et al.* | 11/25/03 | N.D. Fla. (Pensacola) 3:03-CV-539 | Hon. L.A. Collier Hon. M. Davis, U.S.M.J. |
| | | | | |
| IA | *City of Galva, Ida Grove & Sioux City v. Amerada Hess Corp., et al.* | 11/24/03 | S.D. Iowa 4:03-CV-90663 | Hon. Robert W. Pratt |
| | | | | |
| IL | *City of Crystal Lake v. Amerada Hess Corp.* | 12/12/03 | N.D. Ill. (Eastern Div.) 03-CV-8973 | Hon. George W. Lindberg |
| | | | | |
| IN | *City of Mishawaka v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-904 | Hon. Robert Miller, Jr. |
| IN | *City of Rockport v. Amerada Hess Corp., et al.* | 11/21/03 | S.D. Ind. (Evansville) 3:03-CV-201 | Hon. Richard L. Young Hon. William G. Hussmann, Jr., U.S.M.J. |
| IN | *North Newton School Corporation v. Amerada Hess Corporation, e t al.* | 12/12/03 | N.D. Ind. (Lafayette) 4:03-CV-013 | Hon. Allen Sharp |
| IN | *City of South Bend v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-905 | Hon. Allen Sharp |
| | | | | |
| KS | *Chisholm Creek Utility Auth. v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1457 | Hon. Wesley E. Brown |
| KS | *City of Bel Aire v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1458 | Hon. Wesley E. Brown |
| KS | *City of Dodge City v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1456 | Hon. Monti L. Belot |
| KS | *City of Park City v. Alon USA Energy, Inc.* | 12/15/03 | D. Kan. 03-CV-1455 | Hon. Thomas J. Marten |
| | | | | |
| MA | *Brimfield Housing Auth. v. Amerada Hess Corp., et al.* | 11/26/03 | D. Mass. 03-CV-12399 | Hon. Richard G. Stearns |
| | | | | |
| NH | *City of Dover v. Amerada Hess Corporation, et al.* | Not yet removed | | |

| State | Short Case Name | Date Removed | Court/Index | Assigned Judge |
|---|---|---|---|---|
| NH | City of Portsmouth v. Amerada Hess Corporation, et al. | Not yet removed | | |
| NH | State of New Hampshire v. Amerada Hess Corp., et al. | 09/30/03 | D.R.I. 03-CV-529 | Hon. Ronald R. Lagueux |
| | | | | |
| NJ | NJ American Water Co., Inc. v. Amerada Hess Corp., et al. | 11/24/03 | D.N.J. 03-CV-5562 | Hon. William G. Bassler |
| | | | | |
| NY | Carle Place Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10053 | Hon. Shira A. Scheindlin |
| NY | County of Nassau v. Amerada Hess Corp., et al. | 12/02/03 | S.D.N.Y. 03-CV-9543 | Hon. Shira A. Scheindlin |
| NY | Long Island Water Corp. v. Amerada Hess, et al. | 12/04/03 | E.D.N.Y. 03-CV-6125 | Hon. Arthur D. Spatt / Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Town of East Hampton v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10056 | Hon. Shira A. Scheindlin |
| NY | Town of Southampton v. AGIP Inc, et al. | 12/18/03 | S.D.N.Y. 03-cv-10054 | Hon. Shira A. Scheindlin |
| NY | Village of Mineola; Water Dept. of Village of Mineola v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10051 | Hon. Shira A. Scheindlin |
| NY | Water Authority of Great Neck North v. Amerada Hess Corp., et al. | 10/28/03 | E.D.N.Y. 03-CV-6077 | Hon. Arthur D. Spatt / Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Water Authority of Western Nassau County v. Amerada Hess, et al. | 10/01/03 | S.D.N.Y. 03-CV-9544 | Hon. Shira A. Scheindlin |
| NY | Westbury Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10057 | Hon. Shira A. Scheindlin |
| NY | West Hempstead Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10052 | Hon. Shira A. Scheindlin |
| NY | Village of Hempstead v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10055 | Hon. Shira A. Scheindlin |
| | | | | |
| PA | Pennsylvania Suburban Water Co. v. Sunoco, Inc. | Not yet removed | | |
| | | | | |

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|-------|-----------------|--------------|-----------------|----------------|
| VA | Buchanan County School Board v. Amerada Hess Corporation | Not yet removed | | |
| VA | Greensville Co. Water & Sewer Authority v. Amerada Hess Corporation | Not yet removed | | |
| VA | Patrick County Sch. Board v. Amerada Hess Corp., et al. | Not yet removed | | |
| | | | | |
| VT | Town of Hartland, County of Windsor, Vermont Water System v. Amerada Hess Corp., et al. | 12/11/03 | D. Vt. 2:03-CV-337 | Hon. William K. Sessions, III |

# Exhibit 9

Law Offices of

# SHER & LEFF

**VICTOR M. SHER**
**ALEXANDER I. LEFF**

**TODD E. ROBINS**
**LYNDA M. COLLINS**

January 5, 2004

*Via Facsimile and Federal Express Overnight Delivery*
The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

     Re:   Order dated December 23, 2003 in In re MTBE Products Liability
             Litigation (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

     We write on behalf of the plaintiffs in *People et al. v. Unocal, et al.* CIV S-
032653 GEB/DAD (E.D. Cal.), one of the California lawsuits listed in the attachment to
the Court's December 23, 2003, Order. Plaintiffs in this action respectfully object to the
stay and/or transfer of this action, either for purposes of determining the already-pending
remand motion or for any other pretrial purpose.

     At the outset we note that we only today obtained a copy of Your Honor's final
form of Order. We had no chance to participate in the hearing before Your Honor on this
motion, we were not consulted concerning the plaintiffs' positions in the other cases
pending before Your Honor nor our position with respect to our own litigation, nor as of
today have we even been served with a copy of the referenced Order. We have however
managed to obtain a copy of the Order as well as of the transcript of the hearing on this
matter.

     We have already filed a motion for remand with the local District Court in the
pending action in California. Without rehashing all of the issues previously briefed in the
case file there, we submit there is no basis for rewarding defendants' efforts to delay the
proceedings in our case on the purported invocation of either federal jurisdiction that
does not exist or MDL procedures for a matter that does not warrant them.

     With respect to removal for purposes of determining the remand issues, the matter
should more properly be resolved by the transferor court before an MDL transfer or even
consideration of a stay motion. *See, e.g., Karofsky v. Abbott Labs.*, 921 F. Supp. 18, 21
n.4 (D. Me. 1996) (granting plaintiff's remand motion because "it is easier . . . to rule on
the jurisdictional issue [rather than to] transfer it to the Multidistrict Panel, which has
many other concerns"); *Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft*, 54 F.

450 Mission Street, 5th Floor, San Francisco, CA 94105
Phone: (415) 348-8300  Fax: (415) 348-8333

7

The Honorable Shira Scheindlin
January 5, 2004
Page 2 of 3

Supp. 2d 1042, 1048 (D. Kan. 1999) ("[f]or purposes of judicial economy, the jurisdictional issue should be resolved immediately. . . Judicial economy dictates a present ruling on the remand issue"); *see also* JPML Rules of Procedure, Rule 1.5 ("[t]he pendency of a motion . . . before the Panel . . .does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending). Indeed, a number of courts have held that the preliminary federal jurisdictional question "*must* be resolved before deciding whether to stay or transfer the case to the MDL panel." *Farkas v. Bridgestone/Firestone, Inc.*, 113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000) (emphasis added); *accord, e.g., Stern v. Mutual Life Insurance Co.*, 968 F. Supp. 637, 639 (N.D. Ala. 1997) ("[i]f the court lacks jurisdiction over the action *ab initio*, it is without jurisdiction to enter such a stay"); *Lloyd v. Cabell Huntington Hosp., Inc.*, 58 F. Supp. 2d 694, 696 (S.D. W. Va. 1999) ("[t]his Court cannot . . . stay proceedings in an action over which it lacks jurisdiction").

Nor is there any proper basis for treating this matter as an MDL for purposes other than the pending remand motions. This is not the first generation of MTBE litigation. Numerous dispositive motions – including most notably motions based on purported federal preemption of state tort claims – have been litigated in state and federal courtrooms, in California and elsewhere. The results, both in Your Honor's courtroom and around the Nation, have consistently rejected any federal preemption of the kinds of claims at issue in this case. Notably, the Ninth Circuit (the federal appellate court in which this case is currently pending) has twice expressly rejected federal preemption of state laws limiting (or banning) MTBE because of environmental concerns. *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 670-73 (9th Cir. 2003); *Exxon Mobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246, 1253 (9th Cir. 2000). Moreover, extensive discovery has already occurred in several lawsuits on the liability of most (if not all) of the defendant refiners and MTBE manufacturers. Finally, the parties this case in particular poses issues not common to other MTBE cases around the county because of the People's claims and the People's unique constitutional, statutory, and regulatory status. Consequently, it is unlikely that threshold legal questions common to all MTBE cases would require significant additional judicial energy by Your Honor or any other MDL judge.

The truth is that the primary focus of the current generation of MTBE cases will be on site specific issues: matters of variations in state law; local gasoline supply and distribution systems; and damages claims based on site-specific circumstances. We respectfully submit that neither the Southern District of New York nor any other out-of-state MDL jurisdiction is not an efficient – and certainly not the most efficient – forum in which to handle these issues as they relate to gasoline refined in Northern California and contaminating groundwater in Sacramento County, California.

In short, for the foregoing reasons plaintiffs in this case object to the arrangement proposed in the Court's December 23, 2003, Order for transfer for remand or any other MDL purposes. We further expressly reserve these parties' rights to assert in any

The Honorable Shira ●eindlin
January 5, 2004
Page 3 of 3

appropriate additional manner before Your Honor and/or the MDL Panel our opposition to MDL consolidation of this case.

We will serve copies of this letter by facsimile on the other counsel involved in this case, and will work with defense counsel to obtain service lists for the other MTBE cases identified in the schedule attached to the Court's December 23rd Order and will serve those counsel by facsimile as well as promptly as possible.

Respectfully submitted,

SHER & LEFF LLP

Victor M. Sher
Attorneys for plaintiffs: City of Elk Grove,
Sacramento County WaterAgency,
Sacramento Groundwater Authority,
Carmichael Water District, Citrus Heights
Water District, Del Paso Manor Water
District, Fair Oaks Water District, Florin
Resource Conservation District, Rio Linda
Elverta Community Water District,
Sacramento Suburban Water District, San
Juan Water District, California-American
Water Company and City of Sacramento

JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER, Assistant Chief Deputy
District Attorney
SACRAMENTO COUNTY DISTRICT
ATTORNEY

Russ Detrick
Supervising Deputy District Attorney
Attorney for plaintiff: the People of the
State of California

VMS: jac
cc: All Counsel
P:\Sacramento MTBE\Correspondence\Scheindlin-001.doc

# Exhibit 10

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

COPY

JAN SCULLY
District Attorney

CYNTHIA G. BESEMER
Chief Deputy

January 27, 2004

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re:   *In re. MTBE Products Liability Litigation (*MDL 1358); Master File C.A.
No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

This office represents the plaintiff the People of the State of California, Sacramento
County, in *People v. Unocal Corp., et al.* E.D. Cal. Civ.S-03-2653 GEB DAD. The
purpose of this letter is to renew our objection to inclusion of this matter, or any of our
causes of action, in MDL 1358, to reserve all objections we have relative to defendant's
original Removal Notice filed here in the Eastern District, to object to a stay of our
previously filed Remand Motion that is presently scheduled for hearing on February 23,
2004, and to clarify any misconception that might have been raised by representations
made by counsel for plaintiffs in other actions who were present during the hearing of
December 19, 2003 to the effect that they were speaking on our behalf.  They had no
authority to do so.

As of this date we have been served with a Notice of Removal received December 11,
2003 (removing our State complaint to Federal Court) and a Notice of Motion for
Temporary Stay Pending Transfer dated December 18, 2003.  We have not received any
notice or information that defendants have successfully joined our case with MDL 1358
or successfully transferred it via either a noticed motion or a Notice of Related Tag-along
Action with Judicial Panel on Multidistrict Litigation.   We thus are in the unusual
position of objecting to inclusion in MDL 1358 without having been formally included or
noticed that we are a party.   Nonetheless, we do object to inclusion.

The Peoples' causes of action allege that defendants directly or indirectly spilled, leaked, or caused spills or leaks of MTBE gasoline in Sacramento County, that in many instances the MTBE still remains, and that it constitutes both a public nuisance and a substantial threat to the drinking water of the 1.2 million residents of Sacramento County.  The spills and leaks violate the California Health and Safety Code and Fish and Game Code, and give rise to civil penalties.   Our nuisance and abatement causes of action only require proof that MTBE gasoline has been spilled or leaked where it threatens the groundwater, and that the defendants are directly or indirectly responsible.  Our claims do not involve or impact the Clear Air Act, nor do they disturb any efforts by Congress or the EPA to control or maintain a supply of gasoline.  We simply seek civil remedies against those responsible for leaking or spilling a dangerous contaminant where it would contaminate our groundwater.   We want the responsible parties (in this case the purveyors of the MTBE gasoline) to clean up the problem they created – one that they profited from handsomely – instead of placing that burden on our citizens.

Our case also alleges the defendants engaged in false advertising and unfair business practices under the California Business and Professions Code.  Again, these contentions do not impact the Clean Air Act or the EPA.  Instead, these allegations rest on what the defendants advertised they were doing, different from what they in fact knowingly did, regarding products they were distributing, and leaking underground storage tanks they maintained and used for that distribution.

Finally, I am aware that Victor Sher, counsel for co-plaintiffs (municipal and private Sacramento water purveyors), has objected to federal jurisdiction and also intends to object any to inclusion into MDL 1358 of this case, *People v. Unocal Corp., et al*. E.D. Cal. Civ.S-03-2653 GEB  DAD.  While our portion of the case is not identical to that of the water purveyors, we join in their objections to inclusion in MDL 1358, without waiving any further or future objections to defendant's previously filed motions, and while respectfully asserting that this Court does not have jurisdiction over this case.

Thank you for your consideration in this matter.

Sincerely yours,

JAN SCULLY
DISTRICT ATTORNEY

JS:gf

# Exhibit 11



**◄COX CASTLE NICHOLSON►**

Cox, Castle & Nicholson LLP
555 Montgomery Street, 15th Floor
San Francisco, California 94111-2585
P 415.392.4200  F 415.392.4250

Robert P. Doty
415.262.5115
rdoty@coxcastle.com

January 5, 2004

**VIA FACSIMILE AND FEDERAL EXPRESS**

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY  10007-1312

Re:   Order dated December 23, 2003 in In re MTBE Products Liability Litigation
      (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

This firm is counsel and co-counsel to certain defendants in three of the California actions addressed by the referenced Order. We were counsel to one of those entities in a prior MTBE case tried in California state court (the litigation concerning the drinking water at the south end of Lake Tahoe). We write to express our concerns with the potential for the Court's Order to implicate issues apart from the narrow question of remand.

In the action captioned *City of Fresno v. Chevron U.S.A., Inc. et al.* C 03-5378-JSW (N.D. Cal.), we represent three entities affiliated with Duke Energy. The Duke defendants are alleged middlemen in the gasoline supply chain as it relates to the City of Fresno matter (i.e., they neither manufacture MTBE, blend it into gasoline at a refinery, nor operate underground storage tanks that may have released MTBE-containing gasoline). In the action captioned *People v. Unocal Corp., et al.* CIV S-032653 GEB/DAD (E.D. Cal.), we represent the 7-Eleven convenience store chain, a retailer alleged to be partly responsible for the alleged contamination. We are co-counsel for 7-Eleven in the action captioned *Orange County Water District v. Unocal Corp. et al.* SACV03-1742 JVS(Anx) (C.D. Cal.).

Duke and 7-Eleven were asked some weeks ago to consent to removal of these actions. In each instance they did so (or have indicated they would do so) in a court filing expressing the following: (1) the consent was provided "[w]ithout joining in, adopting, or endorsing the contentions offered as grounds for removal" and (2) the consent was provided with "express disagree[ment] with any suggestion that may be included in the Notice Of Removal that [a particular] case should be transferred out of the . . . California [district courts]." Consistent

The Honorable Shira Scheindlin
January 5, 2004
Page 2

with the second point, Duke and 7-Eleven are concerned that the December 23rd Order may be used to vitiate their opportunities to oppose MDL consolidation of these cases.[1]

The first paragraph of the Order speaks in terms of the remand issue only. Duke and 7-Eleven appreciate the logic of having the propriety of federal removal jurisdiction, *vel non*, decided by a single federal court, so they have no per se objection to consolidated treatment of that issue. Indeed, other than a strong desire not to litigate these cases twice as a result of an invalid exercise of removal jurisdiction, the remand issue is not of great concern to Duke or 7-Eleven.

If, however, the Court's consideration and resolution of the remand issue carries with it some implicit determination that MDL consolidation is appropriate for all pretrial proceedings in the California litigation, Duke and 7-Eleven would strenuously object. Both are concerned that such an implicit determination might be asserted later by other litigants, on the grounds that MDL status was effectively extended to these cases by virtue of the fact that the Southern District exercised jurisdiction over the remand issue in the California litigation. Because silence in response to the Court's Order might be asserted to constitute acceptance of such a theory or a waiver of objections to de facto MDL consolidation, or might be argued to work an estoppel against Duke or 7-Eleven, they are submitting this letter.

Duke and 7-Eleven oppose any such implicit determination, waiver, or estoppel because they presently are planning to file objections with the MDL panel if conditional transfer orders are issued by the clerk of the MDL panel for the cases in which Duke and 7-Eleven are involved. The gist of their opposition is as follows.

With the exception of the removal jurisdiction/remand issue, MTBE litigation is sufficiently mature at this point that MDL handling is not warranted. The potentially dispositive motions, including federal preemption, have been litigated in both state and federal courts with remarkably consistent outcomes. State laws banning MTBE have now been upheld by federal district and appellate courts in New York and California, both before and after trial. As a result, threshold legal questions seem unlikely to require significant additional judicial energy. Furthermore, a great deal if not all of the generally applicable discovery (regarding the history of and the alleged skullduggery behind the widespread use of MTBE as a fuel oxygenate) already has been completed in connection with the South Lake Tahoe matter and other matters that have

---

[1] The first caveat reflects our concern about the legal basis for federal removal jurisdiction and our desire not to litigate these cases twice, once through the federal system and then a second time should removal jurisdiction be found invalid on appeal. Our research to this point leaves us with considerable doubt as to the validity of removal jurisdiction, hence the wording of the consents. If the Court proceeds with consolidated consideration of the remand motions, Duke and 7-Eleven will address this issue in more detail in a filing submitted consistent with the deadlines in the Order.

The Honorable Shira Scheindlin
January 5, 2004
Page 3

or are currently working their way through the state courts notwithstanding the recent flurry of removal notices.

In sum, 7-Eleven and Duke submit that is a considerable stretch to characterize MTBE litigation as a gathering storm that will produce a blizzard of motions and conflicting opinions. Duke and 7-Eleven further submit that as with other co-mingled contamination cases, the MTBE cases now revolve around location-specific issues: the extent of contamination, the available remedies, the implementation of those remedies, and the equitable apportionment of liability. With all due respect to the Court and the MDL panel, we submit that the Southern District of New York is not the most efficient forum in which to handle such issues as they relate to contaminated groundwater in Fresno, California (or Sacramento or Orange County for that matter).

For the foregoing reasons, Duke and 7-Eleven object to the arrangement proposed in the Court's Order unless the Court's consideration of the remand issue is somehow done without prejudice to 7-Eleven's and Duke's rights to oppose MDL consolidation of the cases in which Duke and 7-Eleven are involved.

The undersigned's office will serve copies of this letter by facsimile on the other counsel involved in the California cases identified above. We will work with counsel in those cases to obtain service lists for the other MTBE cases identified in the schedule attached to the Court's December 23rd Order and will serve those counsel by facsimile as promptly as possible.

We thank the Court in advance for its consideration.

Very truly yours,

Robert P. Doty

44510\38349v1
cc:    All Counsel

# Exhibit 12

1  JAN SCULLY, District Attorney
   ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616
2  RUSS DETRICK, Supervising Deputy District Attorney SBN 119255
   SACRAMENTO COUNTY DISTRICT ATTORNEY
3  Environmental Protection Division
   906 G Street, Suite 700
4  Sacramento, CA 95814
   Telephone: (916) 874-6174
5  Facsimile: (916) 874-7660

6  Attorneys for Plaintiff the People of the State of California

[Exempt
from filing
and motion
fees, Govt.
Code § 6103]

**ORIGINAL
FILED**

JAN 3 0 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

7

8              UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  THE PEOPLE OF THE STATE OF CALIFORNIA, et        )  Case No. CIV.S-03-2653 GEB DAD
    al.,                                              )
12                                                    )  **MEMORANDUM OF POINTS
                    Plaintiffs,                       )  AND AUTHORITIES IN
13                                                    )  OPPOSITION TO
            vs.                                       )  DEFENDANTS' EX PARTE
14                                                    )  MOTION FOR CONTINUANCE**
                                                      )
15  ATLANTIC RICHFIELD COMPANY, et al.,              )
                                                      )
16                                                    )
                    Defendants.                       )
17                                                    )
                                                      )
18  _____ )

19                        **PROCEDURAL HISTORY**

20         Plaintiffs filed their First Amended Complaint in Sacramento County Superior Court on

21  September 30, 2003.  Defendants removed the case to the United States Court for the Eastern District

22  of California.   The removal papers assert Defendants' intention to seek transfer of the action to

23  MDL 1358.

24         Currently before the Court are Plaintiffs Motion to Remand to State Court originally filed on

25  December 15, 2003, and Defendants Motion to Stay the Proceedings filed thereafter, both presently

26  set for hearing on February 23, 2004.

27         Plaintiffs have been informed that Defendants filed or intended to file a Notice of Related

28  Tag-along Action with the Judicial Panel on Multidistrict Litigation ("JDML.)  Plaintiffs have not

- 0 -

1   been served with any papers related to this filing.

2        Following a hearing on December 19, 2003, the Honorable Judge Shira Scheindlin in the

3   Southern District of New York requested, on December 23, 2003, that " … all similar removed

4   actions … be heard and decided by this Court" under MDL 1358.  The attachment to the order lists

5   the case of the People of the State of California et al v. Atlantic Richfield et al.

6        The People received no notice that Judge Scheindlin would be holding the December 19,

7   2003 hearing.  The People had no opportunity to brief Judge Scheindlin or present oral argument on

8   this matter.  The People were not present or represented at the hearing.

9   **ARGUMENT**

10        The People bring this case under their police powers to protect the public health, welfare and

11   safety under California's statutory schema.   The People's case has not been briefed before Judge

12   Scheindlin.  A pending, conditional transfer order to the MDL does not abrogate the authority of the

13   District Court to rule on matters properly before it, such as Plaintiffs' remand motion.  Judicial

14   economy demands that Plaintiffs' jurisdictional challenge to this court be resolved prior to the

15   expenditure of further federal judicial resources on the case.

16   I.    **The People's Police Power Action Alleges State Law Claims Only**

17        Plaintiffs in this case include the People, acting under their police powers to protect the

18   public, health, safety and welfare of the citizens of Sacramento County by protecting an essential

19   natural resource of the County, namely, its groundwater; public agencies with property and

20   usufructuary interests in the groundwater; and water purveyors.

21        The People's action seeks civil penalties and injunctive relief as remedies for Defendants'

22   violations of California statutory schema enacted to protect the public health, welfare and safety and

23   the natural resources of the State.  The action and remedies sought do not trigger federal jurisdiction,

24   nor do they implicate the Clean Air Act or interfere with efforts of the EPA or Congress to provide

25   an appropriate supply of gasoline to the United States as a whole.

26        The People expect to prevail in their Motion to Remand the case to state court.

27

28   ///

- 1 -

**II.    Plaintiffs' Case Has Not Been Briefed Before Judge Scheindlin**

Defendants assert two arguments in support of their motion: (1) that a continuance will allow Judge Scheindlin to rule on "virtually identical remand issues presently pending ..."; (2) it will allow this court to consider first whether to stay all proceedings in the case .."

First; the People's action is alleged under California state law, only. The People have alleged no actions under federal law. The People are aware of no case alleging California statutory causes of action that is pending before Judge Scheindlin. Further, the People believe, based on the attachment to Judge Scheindlin's Order, that there are no other California law enforcement agencies seeking site-specific civil penalties under California statutory authority. Thus, contrary to Defendants' broad-brush assertions, there are no "virtually identical remand issues" before Judge Scheindlin.

Defendants' second assertion is meaningless. If, indeed, this Court wishes to hear the Motion to Stay prior to considering the Motion to Remand, since both are set for hearing on February 23, 2004, the Court may do so. It is not necessary to continue the Motion to Remand in order that the Motion to Stay should be considered first. Moreover, if Defendants wished to have the Motion to Stay considered by this Court earlier in time than the Motion to Remand, they should have filed their motion accordingly, earlier in time. This Court should not permit Defendants to correct procedural inadequacies by filing un-noticed motions to disrupt regularly noticed briefing schedules.

It should also be noticed that Plaintiffs in this case have placed no matters before Judge Scheindlin. Plaintiffs have not briefed their Motion to Remand before Judge Scheindlin. Respectfully, the People have no indication that Judge Scheindlin has even seen, let alone considered the Peoples Complaint filed in this matter, a Complaint that asserts claims under California State law only.

**III.    A Pending or Conditional Transfer Order Does not Impede the Authority of the District Court to Rule on Matters Properly Before It.**

It is the People's position that transfer of this case to the MDL panel would be improper. It is also the People's position, as set forth above, that any conditional transfer order issued by Judge Scheindlin is improper in its application to Plaintiffs in this case, since Plaintiffs received no notice of the hearing and were not represented at the hearing.

-2-

1    However, assuming *arguendo* that a conditional transfer order exists and is properly

2    applicable to this case, it is Plaintiff's position that such a pending or conditional transfer order does

3    not impede the authority of the District Court to rule on matters properly before it, such as Plaintiffs'

4    remand motion.  The existence of such a transfer order does not defeat or limit the authority of this

5    Court to rule upon matters properly presented to it for decision.

6    A district judge should not automatically postpone rulings on pending motions, such as the

7    Motion to Remand in this case, upon a party's motion to the MDL panel for transfer and

8    consolidation.  *Rivers v. Walt Disney Co.* 980 F. Supp. 1358, 1360 (C.D. Cal. 1997.)

9    When there is a challenge to the federal court's jurisdiction, as here in the form of a Motion

10   to Remand, a Motion to Stay pending MDL transfer should be rejected and the remand issue

11   resolved because "whether this court has jurisdiction is a preliminary issue that should be resolved at

12   the outset."  *Smith v. Mail Boxes, Etc.* 191 F. Supp.2d 1155, 1157 (E.D. Cal. 2002.)

13   **IV.    Judicial Economy Demands that Resolution of the Jurisdictional Remand Issue Must**

14   **Precede Consideration of Other Motions**

15   It is the People's position that this action is properly heard by the courts of California.  If, as

16   the People anticipate, the case is properly a state court issue, then resolution of that jurisdictional

17   issue must logically be made before subjecting the case to the federal MDL process.  To do

18   otherwise is not only to put the logical horse before the cart, it is a complete waste of federal judicial

19   resources on a state court case.

20   Judicial economy is not served by the continuance sought by Defendants.  On the contrary,

21   judicial economy " … will be best served by addressing the remand issue …" since it will "facilitate

22   litigation in the appropriate forum .."  *Villareal  v. Chrysler Corp.*, 1996 U.S. Dist. Lexis 3159 (N.D.

23   Cal. 1996.)

24   A motion to remand should be resolved prior to a motion to transfer.  *Tortola Restaurants,*

25   *L.P. v. Kimberley Clark Corp.*, 987 F. Suopp.1186 (N.D. Cal. 1997.)

26   **V.    Defendants' Motion is Procedurally Improper**

27   Defendants' motion to continue the hearings presently scheduled is improperly noticed.

28   ///

1   *Ex parte* proceedings are generally disfavored by the court, and petitioners have demonstrated no

2   overriding necessity.  *Croplife Am. v. EPA*, 2002 U.S. App. LEXIS 13677.  Plaintiffs received an

3   oral advisement of Defendants' impending *ex parte* action at 1.35 pm on January 28, 2004.  Plaintiffs

4   received written notice of Defendants' motion at 4.30 p.m. on January 28, 2004.

5       Defendants have not offered sufficient justification for such *ex parte* action that would

6   warrant modification of Eastern District of California, Local Rule 78-230(b).  Motions shall be set

7   for hearing not less than twenty-eight days after personal service and filing of the motion or not less

8   than thirty-one days after mailed or electronic service and filing.  Local Rule 78-230(b).

9   **CONCLUSION**

10       Plaintiffs respectfully submit this action is not appropriate for multidistrict consolidation.

11   This case is not removable and should be remanded to the California court.  Plaintiffs' remand

12   motion is properly before this Court.  Since it challenges the jurisdiction of this Court to adjudicate

13   this case, it should be resolved prior to any further federal proceedings, including Defendants'

14   motion to stay.  Further, there are no matters before the Court of sufficient urgency to necessitate

15   abrogation of the application of the normal rules of procedure to Defendants' motion.

16   DATED: *1/30/0 4*            **JAN SCULLY, DISTRICT ATTORNEY**

17                            ALBERT LOCHER, Asst. Chief Deputy District Attorney.

18

19                   By:

20                            RUSS DETRICK

21                            Supervising Deputy District Attorney
                              Attorney for Plaintiff the People of the State of California

22

23

24

25

26

27

28

-4-

1  JAN SCULLY, District Attorney
   ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616
2  RUSS DETRICK, Supervising Deputy District Attorney SBN 119255
   SACRAMENTO COUNTY DISTRICT ATTORNEY
3  Environmental Protection Division
   906 G Street, Suite 700
4  Sacramento, CA 95814
   Telephone: (916) 874-6174
5  Facsimile: (916) 874-7660

6  Attorneys for Plaintiff the People of the State of California

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  THE PEOPLE OF THE STATE OF CALIFORNIA, et       ) Case No. CIV.S-03-2653 GEB DAD
    al.,                                            )
12                                                  ) **PROOF OF SERVICE**
                    Plaintiffs,                     )
13                                                  )
            vs.                                     )
14                                                  )
15  ATLANTIC RICHFIELD COMPANY, et al.,             )
                                                    )
16                                                  )
                    Defendants.                     )
17                                                  )
                                                    )
18  _____        )

19          I am a citizen of the United States and a resident of the County of Sacramento; I am over the

20  age of eighteen years and not a party to the within above-entitled action; my business address is 906

21  G Street, Suite 700, Sacramento, California, 95814.

22          On January 30, 2004, I served the foregoing document(s) described as:

23          *Memorandum of Points and Authorities in Opposition to Defendants' Ex Parte Motion*
            *for Continuance*
24
    on the party(s) in this action as follows:
25
            Please see attached Service List.
26

27

28  ///

                                            - 0 -

[Exempt
from filing
and motion
fees, Govt.
Code § 6103]

☐   (Mail) placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Sacramento, California.

☐   (By Federal Express) placing a true copy thereof enclosed in a sealed envelope, prepaid and deposited with the Federal Express carrier-box at Sacramento, California.

☐   (By Personal Service) delivering by hand and leaving a true copy with the person and/or secretary at the address shown above.

☒   (By Facsimile) placing a true copy thereof into a facsimile machine addressed as stated above to said person and thereafter confirming the receipt of same

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 30, 2004, at Sacramento, California.

LATICIA DONAHUE

- 1 -

PROOF OF SERVICE - CIV.S-03-2653 GEB DAD

1                              **SERVICE LIST**

2

3    Victor M. Sher, Esq.
     Todd E. Robins, Esq.
     Lynda M. Collins, Esq.
4    SHER & LEFF, LLP
     450 Mission Street, 5th Floor
5    San Francisco, CA 94105
     Telephone: (415) 348-8300
6    Facsimile: (415) 348-8333
     Attorney for Plaintiffs

7

     Scott Summy, Esq.
8    Celeste A. Evangelisti, Esq.
     BARON & BUDD PC
9    3102 Oak Lawn Avenue, Suite 1100
     Dallas, TX 75219-4281
10   Tel:  (214) 523-6267
     Fax:  (214) 520-1181
11   Attorney for Plaintiffs

12   Matthew T. Heartney, Esq.
     Lawrence A. Cox, Esq.
13   Stephanie M. Bonnett, Esq.
     ARNOLD & PORTER
.4   777 South Figueroa Street, 44th Floor
     Los Angeles, CA 90017-5844
15   Tel: (213) 243-4000
     Fax: (213) 243-4199
16   Attorneys for Defendants:          Atlantic Richfield Company
                                        BP Products North America, Inc.
17

     David L. Schrader, Esq.
18   John J. Wasilczyk, Esq.
     Allison N. Shue, Esq.
19   MORGAN, LEWIS & BOCKIUS LLP
     300 South Grand Ave., 22nd Floor
20   Los Angeles, CA 90071-3132
     Tel: (213) 612-2500
21   Fax: (213) 612-2501
     Attorneys for Defendants:          Chevron U.S.A. Inc.
22                                      Chevron Texaco Corporation
                                        Unocal Corporation
23

     John J. Lyons, Esq.
24   Jon D. Anderson, Esq.
     Michele D. Johnson, Esq.
25   LATHAM & WATKINS LLP
     650 Town Center Drive, Ste. 2000
26   Costa Mesa, California 92626
     Tel: (714) 540-1235
27   Fax: (714) 755-8290
     Attorneys for Defendant:           ConocoPhillips Company
28                                      Circle K Stores

                                    1

1    Colleen P. Doyle, Esq,
     Diana Pfeffer Martin, Esq.
2    BINGHAM McCUTCHEN LLP
     355 South Grand Ave., Ste. 4400
3    Los Angeles, CA 90071-3106
     Tel: (213) 680-6400
4    Fax: (213) 680-6499
     Attorneys for Defendants:          Exxon Mobil Corporation
5                                        Mobil Corporation
                                         Tesoro Refining And Marketing, Inc.
6

7    Alan J. Hoffman, Esq.
     BLANK ROME LLP
8    One Logan Square
     18th and Cherry Street
9    Philadelphia, PA 19103-6998
     Tel: (215) 569-5500
10   Fax: (215) 569-5341
     Attorneys for Defendant:           Lyondell Chemical Company
11

12   Hojoon Hwang, Esq.
     MUNGER, TOLLES & OLSON LLP
     33 New Montgomery Street, 19th Floor
13   San Francisco, CA 94105
     Tel: (415) 512-4000
14   Fax: (415) 512-4077
     Attorneys for Defendants:          Shell Oil Company
15                                       Shell Oil Products U.S.
                                         Texaco Refining & Marketing, Inc.
16                                       Equilon Enterprises LLC

17   William D. Temko, Esq.
     MUNGER, TOLLES & OLSON, LLP
18   355 South Grand Avenue, 35th Floor
     Los Angeles, CA 90071-1560
19   Tel (213) 683-9100
     Fax: (213) 687-3702
20   Attorneys for Defendants:          Shell Oil Company
                                         Shell Oil Products U.S.
21                                       Texaco Refining & Marketing, Inc.
                                         Equilon Enterprises LLC
22

23   J. Clifford Gunter, III, Esq.
     Tracie J. Renfroe, Esq.
     M. Coy Connelly, Esq.
24   BRACEWELL & PATTERSON, LLP
     711 Louisiana St., Ste. 2900
25   Houston, Texas 77002
     Tel: (713) 221-1404
26   Fax: (713) 221-2123
     Attorneys for Defendants:          Ultramar, Inc.
27                                       Valero Energy Corporation

28

                                      2

1    Brendan M. Dixon, Esq.
     376 South Valencia Ave.
2    Brea, CA 92823
     Tel: (714) 577-2933
3    Fax: (714) 577-2980
     Attorney for Defendants:            Unocal Corporation
4
     Robert P. Doty, Esq.
5    COX, CASTLE & NICHOLSON, LLP
     555 Montgomery Street, 15th Floor
6    San Francisco, CA 94111-2585
     Tel: (415) 392-4200
7    Fax: (415) 392-4250
     Attorney for Defendant:             7-Eleven, Inc.
8
     Nathan P. Eimer, Esq.
9    Pamela R. Hanebutt, Esq.
     Lisa S. Meyer, Esq.
10   EIMER, STAHL, KLEVONR & SOLBERG LLP
     224 South Michigan Avenue, Ste. 1100
11   Chicago, Illinois 60604
     Tel: (312) 660-7600
12   Fax: (312) 692-1718
     Attorneys for Defendant:            Citgo Petroleum Corporation
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
**********************
***  TX REPORT  ***
**********************

TRANSMISSION OK

TX/RX NO              0290
RECIPIENT ADDRESS     914153488333
DESTINATION ID
ST. TIME              02/03 08:06
TIME USE              04'01
PAGES SENT            11
RESULT               OK
```

# FACSIMILE TRANSMITTAL REQUEST

## *SACRAMENTO COUNTY*
## *DISTRICT ATTORNEY'S OFFICE*

### CONSUMER & ENVIRONMENTAL PROTECTION DIVISION / MTBE

### 906 G Street, Suite 700
### Sacramento, CA 95814
### Phone (916) 874-3358 * * Fax (916) 874-7660

CONFIDENTIALITY NOTICE

The information contained in this facsimile transmission is confidential, and may be legally privileged, legally protected attorney work-product, or may be inside information. The information is intended only for the use of the recipient(s) named below. If you have received this information in error, please immediately notify us by telephone to arrange for return of all documents. Any unauthorized disclosure, distribution, or taking of any action in reliance on the contents of this information is strictly prohibited and may be unlawful.

TRANSMISSION DATE AND TIME: 2/2/04  12:45 P.M.
2/3/04   8:00 AM

TO:   Victor M. Sher, Esq.
      Todd E. Robins, Esq.
      Lynda M. Collins, Esq.
      SHER & LEFF, LLP

ATTN:  Julie

RE:   People v. Atlantic Richfield Company, et al
      Case No. CIV.S-03-2653 GEB DAD

PHONE: (415) 348-8300

FAX: (415) 348-8333

OFFICE OF THE

# DISTRICT ATTORNEY

SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY



## **FAX COVER SHEET**

*didn't go through again!*

| | |
|---|---|
| **MESSAGE TO:** | Victor M. Sher, Esq.<br>Todd E. Robins, Esq.<br>Lynda M. Collins, Esq.<br>SHER & LEFF, LLP   **(Attention Julie)** |
| **TELEPHONE NO:** | (415) 348-8300 |
| **SENT TO FAX:** | (415) 348-8333 |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al.<br>Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Tish Donahue |
| **COMMENTS:** | Here is what I tried to fax this morning. |
| | |
| | |
| | |

**NUMBER OF PAGES BEING TRANSMITTED:  11**  (including this cover sheet)

*IMPORTANT/CONFIDENTIAL:  This communication is intended for the use of the individual or entity to which it is addressed.  This message contains information from the Sacramento County District Attorney's Office, which may be privileged, confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient, or the employee, or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of the*

```
***************************
***   ERROR TX REPORT   ***
***************************

TX FUNCTION WAS NOT COMPLETED

TX/RX NO                  0269
RECIPIENT ADDRESS         914153488333
DESTINATION ID
ST. TIME                  01/30 09:20
TIME USE                  00'00
PAGES SENT                   0
RESULT                    NG        #0018 BUSY/NO SIGNAL
```

*re-do this one
later !*

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY



**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

```
*****************************
***   ERROR TX REPORT   ***
*****************************

TX FUNCTION WAS NOT COMPLETED

TX/RX NO                 0286
RECIPIENT ADDRESS        914153488333
DESTINATION ID
ST. TIME                 02/02 11:57
TIME USE                 00'00
PAGES SENT               0
RESULT                   NG        #0018 BUSY/NO SIGNAL
```

*Nan's (handwritten)*

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# **FAX COVER SHEET**

| MESSAGE TO: | Victor M. Sher, Esq.<br>Todd E. Robins, Esq.<br>Lynda M. Collins, Esq.<br>SHER & LEFF, LLP   (Attention Julie) | *Julie - I'm faxing the 1st page again because I left the yellow sticky on — oops!* |
|---|---|---|
| TELEPHONE NO: | (415) 348-8300 | |
| SENT TO FAX: | (415) 348-8333 | |
| DATE: | 2·2·04 | |
| RE: | People v. Atlantic Richfield Company, et al.<br>Case No. CIV.S-03-2653 GEB DAD | |
| FROM: | Jan Stone , MTBE | |
| COMMENTS: | Tish had tried to refax and couldn't, so I'm trying this am. | |

```
***************************
***   ERROR TX REPORT   ***
***************************

TX FUNCTION WAS NOT COMPLETED

TX/RX NO              0284
RECIPIENT ADDRESS     914152488333
DESTINATION ID
ST. TIME              01/30 16:16
TIME USE              00'36
PAGES SENT               0
RESULT               NG        #0018 BUSY/NO SIGNAL
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# **FAX COVER SHEET**

| | |
|---|---|
| **MESSAGE TO:** | Victor M. Sher, Esq.<br>Todd E. Robins, Esq.<br>Lynda M. Collins, Esq.<br>SHER & LEFF, LLP   **(Attention Julie)** |
| **TELEPHONE NO:** | (415) 348-8300 |
| **SENT TO FAX:** | (415) 348-8333 |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al.<br>Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Tish Donahue |
| **COMMENTS:** | Here is what I tried to fax this morning. |
| | |
| | |

```
*****************************
***    ERROR TX REPORT    ***
*****************************

TX FUNCTION WAS NOT COMPLETED

TX/RX NO              0288
RECIPIENT ADDRESS     914153488333
DESTINATION ID
ST. TIME              02/02 12:52
TIME USE              00'00
PAGES SENT              0
RESULT               NG        #0018 BUSY/NO SIGNAL
```

# FACSIMILE TRANSMITTAL REQUEST

## *SACRAMENTO COUNTY*
## *DISTRICT ATTORNEY'S OFFICE*

### CONSUMER & ENVIRONMENTAL PROTECTION DIVISION / MTBE

### 906 G Street, Suite 700
### Sacramento, CA  95814
### Phone (916) 874-3358 * * Fax (916) 874-7660

CONFIDENTIALITY NOTICE

The information contained in this facsimile transmission is confidential, and may be legally privileged, legally protected attorney work-product, or may be inside information. The information is intended only for the use of the recipient(s) named below. If you have received this information in error, please immediately notify us by telephone to arrange for return of all documents. Any unauthorized disclosure, distribution, or taking of any action in reliance on the contents of this information is strictly prohibited and may be unlawful.

TRANSMISSION DATE AND TIME: 2/2/04  12:45 P.M.

TO:  Victor M. Sher, Esq.
     Todd E. Robins, Esq.
     Lynda M. Collins, Esq.
     SHER & LEFF, LLP

ATTN: Julie

RE:  People v. Atlantic Richfield Company, et al
     Case No. CIV.S-03-2653 GEB DAD

PHONE: (415) 348-8300

FAX: (415) 348-8333

```
      ***********************
  ***   TX REPORT   ***
      ***********************

TRANSMISSION OK

TX/RX NO              0270
RECIPIENT ADDRESS    912145201181
DESTINATION ID
ST. TIME             01/30 09:18
TIME USE             01'39
PAGES SENT            11
RESULT               OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| | |
|---|---|
| **MESSAGE TO:** | All Parties on Attached Service List |
| **TELEPHONE NO:** | |
| **SENT TO FAX:** | |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Russ Detrick, Supervising Deputy District Attorney |
| **COMMENTS:** | |
| | |
| | |

```
**********************
***   TX REPORT   ***
**********************

TRANSMISSION OK

TX/RX NO              0271
RECIPIENT ADDRESS     912132434199
DESTINATION ID
ST. TIME              01/30 09:21
TIME USE              03'17
PAGES SENT             11
RESULT                OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

```
************************
***   TX REPORT   ***
************************

TRANSMISSION OK

TX/RX NO                0272
RECIPIENT ADDRESS       912136122501
DESTINATION ID
ST. TIME                01/30 09:25
TIME USE                03'20
PAGES SENT               11
RESULT                  OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO              0273
RECIPIENT ADDRESS     917147558290
DESTINATION ID
ST. TIME              01/30 09:28
TIME USE              04'18
PAGES SENT             11
RESULT                OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

**CYNTHIA G. BESEMER**
CHIEF DEPUTY

## FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |

```
                        **********************
                        ***   TX REPORT   ***
                        **********************

     TRANSMISSION OK

     TX/RX NO               0268
     RECIPIENT ADDRESS      912136806499
     DESTINATION ID
     ST. TIME               01/30 08:54
     TIME USE               01'41
     PAGES SENT              11
     RESULT                 OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

**CYNTHIA G. BESEMER**
CHIEF DEPUTY

# FAX COVER SHEET

| | |
|---|---|
| **MESSAGE TO:** | All Parties on Attached Service List |
| **TELEPHONE NO:** | |
| **SENT TO FAX:** | |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Russ Detrick, Supervising Deputy District Attorney |
| **COMMENTS:** | |
| | |
| | |

```
************************
***   TX REPORT   ***
************************

TRANSMISSION OK

TX/RX NO            0275
RECIPIENT ADDRESS   912155695341
DESTINATION ID
ST. TIME            01/30 09:38
TIME USE            01'26
PAGES SENT          11
RESULT              OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# **FAX COVER SHEET**

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al.<br>Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |

```
                    ***********************
               ***    TX REPORT    ***
                    ***********************


     TRANSMISSION OK

     TX/RX NO                 0276
     RECIPIENT ADDRESS        914155124077
     DESTINATION ID
     ST. TIME                 01/30 09:40
     TIME USE                 02'33
     PAGES SENT                 11
     RESULT                   OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| | |
|---|---|
| **MESSAGE TO:** | All Parties on Attached Service List |
| **TELEPHONE NO:** | |
| **SENT TO FAX:** | |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Russ Detrick, Supervising Deputy District Attorney |
| **COMMENTS:** | |
| | |
| | |
| | |

```
                        *********************
                        ***   TX REPORT   ***
                        *********************

    TRANSMISSION OK

    TX/RX NO                0277
    RECIPIENT ADDRESS       912136873702
    DESTINATION ID
    ST. TIME                01/30 09:43
    TIME USE                02'02
    PAGES SENT                11
    RESULT                  OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

**CYNTHIA G. BESEMER**
CHIEF DEPUTY

# FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
| --- | --- |
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

```
      ***********************
***   TX REPORT   ***
      ***********************


TRANSMISSION OK

TX/RX NO             0278
RECIPIENT ADDRESS    917132212123
DESTINATION ID
ST. TIME             01/30 09:45
TIME USE             03'18
PAGES SENT             11
RESULT               OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

**CYNTHIA G. BESEMER**
CHIEF DEPUTY

# FAX COVER SHEET

| | |
|---|---|
| **MESSAGE TO:** | All Parties on Attached Service List |
| **TELEPHONE NO:** | |
| **SENT TO FAX:** | |
| **DATE:** | 1/30/04 |
| **RE:** | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| **FROM:** | Russ Detrick, Supervising Deputy District Attorney |
| **COMMENTS:** | |
| | |
| | |
| | |

```
                      *********************
                      ***   TX REPORT   ***
                      *********************


   TRANSMISSION OK

   TX/RX NO              0279
   RECIPIENT ADDRESS     917145772980
   DESTINATION ID
   ST. TIME              01/30 09:49
   TIME USE              01'35
   PAGES SENT              11
   RESULT                OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

### SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# **FAX COVER SHEET**

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al. Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

```
************************
***   TX REPORT   ***
************************

TRANSMISSION OK

TX/RX NO                0280
RECIPIENT ADDRESS       914153924250
DESTINATION ID
ST. TIME                01/30 09:51
TIME USE                02'55
PAGES SENT              11
RESULT                  OK
```

OFFICE OF THE

# DISTRICT ATTORNEY

## SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

CYNTHIA G. BESEMER
CHIEF DEPUTY

# FAX COVER SHEET

| MESSAGE TO: | All Parties on Attached Service List |
|---|---|
| TELEPHONE NO: | |
| SENT TO FAX: | |
| DATE: | 1/30/04 |
| RE: | People v. Atlantic Richfield Company, et al.<br>Case No. CIV.S-03-2653 GEB DAD |
| FROM: | Russ Detrick, Supervising Deputy District Attorney |
| COMMENTS: | |
| | |
| | |
| | |

# Exhibit 13

1  Victor M. Sher, SBN 96197
   Todd E. Robins, SBN 191853
2  Lynda M. Collins, SBN 229029
   SHER & LEFF, LLP
3  450 Mission Street, 5th floor
   San Francisco, CA 94105
4  Telephone: (415) 348-8300
   Facsimile: (415) 348-8333
5
   Scott Summy, *Admitted in Texas*
6  Celeste A. Evangelisti, SBN 225232
   BARON & BUDD, P.C.
7  3102 Oak Lawn Avenue, Suite 1100
   Dallas, TX 75219-4281
8  Telephone: (214) 523-6267
   Facsimile: (214) 520-1181
9
10 Attorneys for Plaintiffs, City of Elk Grove, Sacramento County Water Agency, Sacramento
   Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor
   Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta
11 Community Water District, Sacramento Suburban Water District, San Juan Water District,
   California-American Water Company and City of Sacramento

[Exempt from filing
and motion fees, Govt
Code § 6103]

ORIGINAL
FILED

JAN 3 0 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

FILED BY FAX
ATTORNEY'S DIVERSIFIED SERVICES

13              UNITED STATES DISTRICT COURT

14          FOR THE EASTERN DISTRICT OF CALIFORNIA

15
16 THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,     ) Case No. CIV.S-03-2653 GEB DAD
17              Plaintiffs,                            ) PLAINTIFFS' OPPOSITION TO
                                                      ) DEFENDANTS' EX PARTE
18         vs.                                        ) APPLICATION FOR ORDER
                                                      ) CONTINUING FEBRUARY 23,
19                                                    ) 2004 HEARING ON PLAINTIFFS'
   ATLANTIC RICHFIELD COMPANY, et al.,                ) MOTION TO REMAND
20                                                    )
                                                      ) Hon. Garland E. Burrell, Jr.
21              Defendants.                            )
22                                                    )

28

Plaintiffs' Opp. to Ex Parte App. to Continue Hearing; Sher Decl ----Case No. CIV.S-03-2653 GEB DAD

## I.   INTRODUCTION[1]

The Court should deny Defendants'[2] Ex Parte Application for Order Continuing Hearing Presently Scheduled for February 23, 2004 on Plaintiff's Motion to Remand, filed and served on January 29, 2004 (the "Application for Continuance" or "Application") because it offends fair process and violates substantive law.

The Application offends fair process because: (1) there is no emergency warranting *ex parte* procedures, much less one in which the Defendants played no role; (2) Defendants expressly agreed to a simultaneous briefing and hearing schedule for Plaintiffs' Remand Motion (on the one hand) and their Stay Motion (on the other); (3) their Application for Continuance constitutes nothing more than regurgitation of the same unmeritorious arguments in their pending Stay Motion; and (4) granting the Application would indefinitely delay consideration of the fundamental jurisdictional issues raised in Plaintiffs' Remand Motion, and, thereby, place the State's case in limbo pending some future ruling by an MDL court in which this lawsuit does not belong.[3]

The Application violates substantive law because: (1) there is no basis for delaying the threshold jurisdictional issues raised by Plaintiffs' Remand Motion based on the remote possibility of multidistrict consolidation;[4] and (2) the December 23, 2003 Order issued in Multidistrict Litigation No. 1358 binds neither this Court nor Plaintiffs.

---

[1] This Opposition is submitted on behalf of all plaintiffs in this action except the People of the State of California ("Plaintiffs"). We understand that the People intend to file a separate opposition.

[2] The moving defendants are ChevronTexaco Corporation, Chevron U.S.A., Inc., Atlantic Richfield Company, ExxonMobil Corporation, Mobil Corporation, Tesoro Corporation, and ConocoPhillips Company.

[3] *See In re Intermagnetics America, Inc.* 101 B.R. 191, 192-94 (C.D. Cal. 1989) (*ex parte* applications are "nearly always improper," and ought properly to be addressed to the *need* . . for [an extension of] time, rather than to the substance of the motion itself") (emphasis added); *Mission Power Engineering Company v. Continental Casualty Company*, 883 F.Supp. 488, 492 (C.D. Cal. 1995) (even "hybrid" *ex parte* motions involving minimal notice to the opposing party are "inherently unfair, and . . pose a threat to the administration of justice").

[4] *See Smith v. Mail Boxes, Etc.*, 191 F. Supp. 2d 1155, 1157 (E.D. Cal. 2002) (holding that "whether this court has jurisdiction is a preliminary issue that should be resolved at the outset"); *Villarreal v. Chrysler Corp.*, No. C-95-4414 FMS, 1996 WL 116832, at *1 (N.D. Cal. Mar. 12, 1996) (rejecting a

- 1 -

## II.   PROCEDURAL BACKGROUND

On or about December 3, 2003, certain Defendants filed a Notice of Removal, removing this action from the Sacramento County Superior Court where it was filed. In connection with their Notice of Removal, Defendants apparently also filed a with the Judicial Panel on Multidistrict Litigation ("JPML") notice of relatedness to MDL 1358, a currently inactive MDL proceeding pending before Hon. Shira Scheindlin of the U.S. District Court for the Southern District of New York, although Plaintiffs have never received copies of any such notice.

On December 19, 2003, Judge Scheindlin held a hearing in connection with several New York MTBE cases that were removed to federal court and assigned to her courtroom (the "New York Hearing"). At that hearing, the parties present before Judge Scheindlin (who did *not* include Plaintiffs) stipulated to a transfer of their cases to MDL 1358, resulting in Judge Scheindlin's December 23, 2003 order (the "Scheindlin Order") requesting that other federal courts enter stays in "similar removed actions." *See* Ds' MPA, Exh. 1.

It should be noted that the Scheindlin Order does not bind this Court. Plaintiffs did not participate at the New York Hearing, have not agreed to the procedures stipulated to by the parties at that Hearing, and have strenuously objected to any prospective transfer of their case to the Southern District of New York. *See* Declaration of Victor M. Sher ("Sher Decl."), Exh. 1. At the same time, the JPML has yet to issue a conditional transfer order, and Plaintiffs therefore have not yet had an opportunity to exercise their rights under the Multidistrict Rules to object to and oppose such transfer, and Plaintiffs have very strong grounds on which to do so. On January 5, 2004, the District Attorney, on behalf of the People, and counsel for water agency Plaintiffs jointly notified Judge Scheindlin by letter of Plaintiffs' objections to the Order and their intent to oppose transfer of this action to MDL 1358, *if and when* the JPML issues a conditional transfer order. *Id.* On January 27, 2004 Plaintiffs' counsel sent a second letter to Judge Scheindlin reiterating their position (and offering their views on the remand motions pending in that court). *Id.*, Exh 2.

---

stay pending MDL transfer) ("judicial economy will best be served by addressing the remand issue [as it] will facilitate litigation in the appropriate forum"); *Farkas v. Bridgestone/ Firestone, Inc.*, 113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000) ("[t]he jurisdictional issue must be resolved before deciding whether to stay or transfer the case to the MDL panel"). *See also* n. 5, *infra.*

- 2 -

Meanwhile, in California, Plaintiffs filed their Motion for Remand in this Court on

December 15, 2003, which was originally scheduled for hearing on January 26, 2004. Defendants

filed their Motion to Stay on December 18, 2004, which was also originally scheduled for hearing

on January 26. However, hearing dates for the Remand and Stay Motions were later vacated by the

Court on several occasions due to reassignments of the case to different judges. In each instance,

Plaintiffs sought to re-notice their Remand Motion for the earliest possible date. On January 14,

2004, immediately following re-assignment of this action to this Court, Plaintiffs re-noticed their

Remand Motion for February 23, 2004. Defendants subsequently re-noticed their Stay Motion for

the same date pursuant to an agreement between counsel to coordinate briefing and hearing

schedules for the dueling remand and stay motions in this and other MTBE-related cases in

California. *See* Sher Decl. ¶ 4. Despite their agreement to adhere to a simultaneous briefing and

hearing schedule, Defendants now apply *ex parte* for an indefinite continuance of Plaintiffs'

Remand Motion.

### III.   LEGAL ARGUMENT

Defendants' Application illustrates why *ex parte* applications "are nearly always improper,"

"pose a threat to the adversary system," "pose ethical problems for both the bench and the bar," and

"contravene the structure and the spirit of the Federal Rules of Civil Procedure and the Local Rules

of this court." *Intermagnetics, supra,* 101 B.R. at 192-193 [5]  Indeed, "filing an ex parte motion . . .

is the forensic equivalent of standing in a crowded theater and shouting 'Fire!' There had better be a

fire." *Id.* at 492. Here, there is not even a spark.

Citing Federal Rule of Civil Procedure 6(b), Defendants suggest that a continuance is a

"proper issue for *ex parte* relief." Ds' MPA at 3. However, *ex parte* applications in this federal

Circuit, including requests for continuances, require a showing that: (1) the moving party is without

fault in creating the crisis that requires *ex parte* relief; and (2) the moving party's cause will be

irreparably prejudiced if the underlying motion is heard according to regular noticed motion

---

[5] Even where an opposing party is given an opportunity to respond, such *ex parte* motions suffer
from the same defects, and "pose a threat to the administration of justice." *Mission Power
Engineering Co., supra,* 883 F.Supp. at 490.

Plaintiffs' Opp. to Ex Parte App. to Continue Hearing; Sher Decl ----Case No. CIV.S-03-2653 GEB DAD

Jan 30 2004 8:59AM                                    ( 4     48-8333                    P.6

1    procedures. *See U.S. v Real Property Located at 22 Santa Barbara Drive*, 264 F 3d 860 (9th Cir.

2    2001) ("ex parte proceedings are appropriate only in a narrow set of circumstances," citing with

3    approval *Intermagnetics, supra*); *Intermagnetics, supra*, 101 B.R. at 194 (setting forth standard for

4    obtaining *ex parte* relief, and specifically referencing "requests for continuances"); *Mission Power*

5    *Engineering Co , supra*, 883 F.Supp. at 492. Defendants' Application clearly fails on both counts.

6          There simply is no urgent crisis or other extenuating circumstance that warrants the relief

7    Defendants seek.  Rather, Defendants' request to have their Stay Motion heard prior to Plaintiffs'

8    Remand Motion is nothing more than an attempt to game the system, *see id.* at 490 (*ex parte*

9    motions "inherently unfair . . . due primarily to gamesmanship"), and thereby delay consideration of

10   the fundamental jurisdictional issues raised in Plaintiffs' Remand Motion pending a possible transfer

11   of this case to MDL 1358 – a process that may well take the better part of this year, and will, in any

12   event, likely result in a denial of their transfer request.

13         If anything, Defendants' Application puts the cart before the horse. "The requirement that

14   jurisdiction be established as a *threshold* matter . . . is inflexible and without exception." *Steel Co.*

15   *v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). As Judge Shubb of this Court recently

16   held, "whether this court has jurisdiction is a preliminary issue that should be resolved at the outset,"

17   before considering a stay for potential MDL treatment. *Smith v. Mail Boxes, Etc.*, *supra*, 191

18   F. Supp. 2d at 1157. Thus, the Court should consider the jurisdictional issue raised by Plaintiffs'

19   Motion for Remand *before* deciding Defendants' Motion to Stay.[6] Paramount jurisdictional

20

_____

21   [6] Following the Supreme Court, many courts have held that they cannot even consider a stay before
22   addressing a jurisdictional remand motion  *See Stern v Mutual Life Insurance Co.*, 968 F Supp
     637, 639 (N.D. Ala. 1997) ( "[i]f the court lacks jurisdiction over the action *ab initio*, it is without
23   jurisdiction to enter such a stay."); *Lloyd v Cabell Huntington Hosp., Inc* , 58 F. Supp 2d 694, 696
     (S D. W. Va. 1999), ("[the court] cannot... stay proceedings in an action over which it lacks
24   jurisdiction"); *Farkas v. Bridgestone/ Firestone, Inc* , *supra*, 113 F. Supp. 2d at 1115 n 8 ("[t]he
25   jurisdictional issue must be resolved before deciding whether to stay or transfer the case to the MDL
     panel"); *see also BancOhio Corp. v. Fox*, 516 F 2d 29, 32 (6th Cir. 1975) ("a transfer [to MDL]
26   cannot be made unless the district court properly has jurisdiction of the subject matter of the case").
     Other courts have held that judicial economy favors addressing the jurisdictional questions first.
27   *See Villarreal v Chrysler Corp* , No. C-95-4414 FMS, 1996 WL 116832, at *1 (N D. Cal Mar. 12,
28   1996), (rejecting a stay pending MDL transfer) ("judicial economy will best be served by addressing
     the remand issue [as it] will facilitate litigation in the appropriate forum"); *Karofsky v Abbott Labs* .

-4-

_____

Plaintiffs' Opp to Ex Parte App to Continue Hearing, Sher Decl ----Case No. CIV S-03-2653 GEB DAD

concerns, judicial economy and fairness all demand "urgent" consideration of the Plaintiffs'

Remand Motion, not Defendants' Stay Motion.

      The December 23, 2003 Scheindlin Order does not alter the analysis. It is elementary that this Court is in no way bound by the Scheindlin Order.[7] Only the JPML can issue an order transferring this case to MDL 1358. See Rules of the Panel on Multidistrict Litigation, Rule 7.4. Nor does the Scheindlin Order bind the Plaintiffs in this case, as they had no opportunity to participate in the New York Hearing and were not parties to the stipulations on which the Order is based. See Scheindlin Order, ¶1 (predicated "upon stipulations there agreed to on the record by the parties present) In fact, Plaintiffs have notified Judge Scheindlin of their objections to her Order and of their intent to resist any conditional transfer order (if and when it is issued by the JPML) Sher Decl., Exh. 1.

      The orders from other courts, attached as exhibits to Defendants' Application, are similarly unavailing because they were (with one exception) the result of stipulations by the parties, which is obviously not the case here. Ds' MPA, Exhs. 3, 4. The exception, Judge Karlton's order in *Quincy Community Services District* (Ds' MPA, Exh. 2) was issued before the plaintiff even had an opportunity to respond to defendants' stay motion. The plaintiff in that case is seeking

_____

*supra.* 921 F Supp. 18, 21 n.4 (D. Me 1996) ("it is easier for me to determine the impact of [state] law on this individual case and to rule on the jurisdictional issue [rather than to] transfer it to the [JPML], which has many other concerns"); *Aetna US Healthcare, Inc v Hoescht Aktiengesellschaft,* 54 F. Supp. 2d 1042, 1048 (D. Kan. 1999), ("[i]f federal jurisdiction does not exist, the case can be remanded before federal resources are further expended. . . . Judicial economy dictates a present ruling on the remand issue"). Finally some courts require at least a preliminary examination of the jurisdictional issues first. See *Meyers v. Bayer AG,* 143 F. Supp. 2d 1044 (E.D. Wis. 2001) Each of these approaches addresses the "threshold" question of jurisdiction raised in a remand motion prior to entertaining an MDL-related stay, which is consistent with, and indeed compelled, by, the "jurisdiction first" principle articulated by the Supreme Court in *Steel Co., supra,* 523 U.S. at 94

[7] See *Newton v. Thomason* 22 F.3d 1455, 1460 (9th Cir. 1994) (a federal court is not bound by federal court decisions outside its own circuit); *US v Hunter,* 70 F.Supp.2d 1100, 1108, n.8 (C.D. Cal. 1999) ("this Court is not bound by an unpublished decision of another district court"); *see also General Electric Company v Byrne* 611 F. 2d 670 (7th Cir. 1979) ("[w]e are aware of no statute or decision which would authorize us to issue a writ of mandamus directed to a district judge sitting in another circuit")

1   reconsideration (*see* Sher Decl., ¶ 5), but the important point is the Judge Karlton never received the

2   benefit of briefing from the plaintiff on the stay issue.[8]

3           Likewise, Defendants' contention that the remand issues before this Court are "complex and

4   virtually identical to the issues presented in remand motions before the MDL court" (Ds' MPA at 4)

5   is simply untrue.  This action differs substantially from the cases before Judge Scheindlin for at least

6   three reasons, all of which distinguish it from the actions pending in New York and which illustrate

7   why it is inappropriate for MDL treatment: (1) the case arises in the Ninth Circuit, which has

8   definitively rejected the preemption arguments on which Defendants' removal is based;[9] (2) the

9   parties in this case pose issues not common to other MTBE cases around the county because of the

10  People's claims and unique constitutional, statutory, and regulatory status, as well as the water

11  agency Plaintiffs' unique regulatory, property, usufructuary and other legal interests in protecting

12  ground- and drinking water resources; and (3) this case raises few, if any, common factual issues

13  with other cases that may be included in MDL 1358.  As this case is clearly not appropriate for

14  MDL treatment, with respect to the pending Remand Motion or otherwise, Defendants' Application

15  to delay the Remand Motion pending a transfer to MDL 1358 makes no sense, and should be

16  rejected.

17          Even if the simultaneous hearing of the Remand and Stay Motions somehow constituted an

18  urgent crisis potentially warranting relief (which it does not), the situation is of Defendants' making.

19  Considering that Defendants specifically agreed to have their Stay Motion in this case heard

20  simultaneously with Plaintiffs' Remand Motion (Sher Decl., ¶ 4), it is simply implausible to suggest

21  that Defendants are without fault in creating the circumstances – *i.e.* simultaneously scheduled

22

23  ─────────────────────

24  [8] Please note that Plaintiffs in this action intend to file a substantive opposition to Defendants' Stay
    Motion on or before the current deadline of February 6, 2004

25
    [9] *See Oxygenated Fuels Ass'n v Davis* ("*Davis II*"), 331 F.3d 665, 670, 673 (9th Cir. 2003)
26  (upholding California ban of MTBE in gasoline), *affirming Oxygenated Fuels Assoc. v Davis*
    ("*Davis I*"), 163 F. Supp. 2d 1185, 1187 (E.D. Cal. 2001); *Exxon Mobil Corp. v U S E.P.A.*, 217
27  F.3d 1246, 1253 (9thCir. 2000) (upholding Nevada county regulation that effectively banned
    MTBE).
28

                                              - 6 -

1    motions – from which they seek relief.  On these grounds alone, Defendants' Application should be

2    denied.

3           Finally, Defendants' Application should be denied because they have failed to show

4    anything approaching irreparable prejudice if the current hearing and briefing schedules are

5    followed.  Meanwhile, the stay they seek would undoubtedly prejudice Plaintiffs' and the public's

6    interest in a speedy resolution of this action alleging significant groundwater pollution.[10]  In *Meyers*

7    *v. Bayer AG, supra*, 143 F. Supp. 2d at 1048, the court observed that "even though a stay does not

8    directly implicate the merits of a case, it undeniably has important effects on the litigation."  In

9    particular, the court noted, "[r]emoving a case to federal court has long been known to impose a

10   burden upon plaintiffs . . . [by] requir[ing] the plaintiff to present its arguments for remand in a

11   foreign forum."  *Id.*  "Concerns about being haled into distant courts are particularly implicated by

12   the MDL system."  *Id.*  These observations clearly apply to Plaintiffs in this case.

                              IV.   CONCLUSION

14          This important water pollution case has suffered enough delay.  The Court should deny

15   Defendants' Application for Continuance and proceed along the current schedule toward resolution

16   of Plaintiffs' Remand Motion.

17                                            Respectfully submitted,

18
     DATED:  January 29, 2004                 SHER & LEFF, LLP
19

20                                    By:     _____

21                                            VICTOR M. SHER

22

23   _____

24   [10] *See CMAX, Inc. v. Hall* 300 F. 2d. 265, 268 (9th Cir. 1962) citing *Landis v. North American Co.*
     299 U.S. 248, 255 (1936) ("[t]he suppliant for a stay must make out a clear case of hardship or
25   inequity in being required to go forward, if there is even a fair possibility that the stay for which he
     prays will work damage to some one else"); *see also Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244
26   (9th Cir. 1972) (in deciding stay motion, court should consider hardship to the moving party in being
     required to go forward, prejudice to the non-moving party if the stay is granted, and judicial
27   economy).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARON & BUDD, P.C.
SCOTT SUMMY
CELESTE A. EVANGELISTI

Attorneys for Plaintiffs City of Elk Grove,
Sacramento County Water Agency, Sacramento
Groundwater Authority, Carmichael Water
District, Citrus Heights Water District, Del Paso
Manor Water District, Fair Oaks Water District,
Florin Resource Conservation District, Rio
Linda Elverta Community Water District,
Sacramento Suburban Water District, San Juan
Water District, California-American Water
Company, and City of Sacramento

## DECLARATION OF VICTOR M. SHER

I, Victor M. Sher, declare:

1.      I am a partner in the law firm of Sher & Leff, LLP, counsel of record for Plaintiffs City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company, and City of Sacramento ("Plaintiffs") in this matter. My office is also counsel of record for plaintiffs in certain other MTBE-related cases in California that were recently removed to federal court. Unless otherwise stated, the following facts are true and based upon my own personal knowledge.

2.      A true and correct copy of the January 5, 2004 letter I sent to the Hon. Shira Scheindlin of the Southern District of New York on behalf of Plaintiffs (without attached service list) is attached hereto as Exhibit 1.

3.      A true and correct copy of the January 27, 2004 letter I sent to the Hon. Shira Scheindlin of the Southern District of New York on behalf of Plaintiffs and other plaintiffs represented by my office in MTBE-related cases in California (without attached service list) is attached hereto as Exhibit 2.

4.      On January 14, 2004, David L. Schraeder, Esq., counsel for certain Defendants, contacted me by telephone to discuss briefing and hearing schedules related to remand and stay motions pending in various MTBE-related cases in California in which I serve as plaintiffs' counsel. During that conversation, Mr. Schrader and I agreed to establish simultaneous filing, briefing, and hearing schedules in each of these cases, including this case.

5.      My office represents the plaintiff in *Quincy Community Services District v. Atlantic Richfield Company, et al.*, Case No. CIV.S-03-2582 WBS DAD (E.D. Ca.). I learned of Judge Karlton's order in that case granting defendants' motion for stay, which is attached as Exhibit 2 to Defendants' Memorandum of Points and Authorities in support of this Ex Parte Application, for the first time upon reviewing the instant Application in this case. Judge Karlton issued that Order

-9-

1    before the plaintiff even had an opportunity to respond to defendants' stay motion.  I believe that it

2    is likely that Judge Karlton acted under the misapprehension that the plaintiff in that case had

3    acquiesced in a potential transfer to the Southern District of New York as part of MDL 1358  The

4    plaintiff in that case opposes the staty, and will seek reconsideration promptly

5            I declare under penalty of perjury under the laws of the United States of America that the

6    foregoing is true and correct.

7            Executed this 29th day of January, 2004 at San Francisco, California.

8

9

10                                      Victor M. Sher

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -

Jan 30 2004 9:02AM                                    (41   48-8333              P.13

Law Offices of
# SHER & LEFF

**VICTOR M. SHER**                                      **TODD E. ROBINS**
**ALEXANDER I. LEFF**                                   **LYNDA M. COLLINS**

January 5, 2004

*Via Facsimile and Federal Express Overnight Delivery*
The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re:    Order dated December 23, 2003 in In re MTBE Products Liability
      Litigation (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

    We write on behalf of the plaintiffs in *People et al. v. Unocal, et al.* CIV S-
032653 GEB/DAD (E.D. Cal.), one of the California lawsuits listed in the attachment to
the Court's December 23, 2003, Order. Plaintiffs in this action respectfully object to the
stay and/or transfer of this action, either for purposes of determining the already-pending
remand motion or for any other pretrial purpose.

    At the outset we note that we only today obtained a copy of Your Honor's final
form of Order. We had no chance to participate in the hearing before Your Honor on this
motion, we were not consulted concerning the plaintiffs' positions in the other cases
pending before Your Honor nor our position with respect to our own litigation, nor as of
today have we even been served with a copy of the referenced Order. We have however
managed to obtain a copy of the Order as well as of the transcript of the hearing on this
matter.

    We have already filed a motion for remand with the local District Court in the
pending action in California. Without rehashing all of the issues previously briefed in the
case file there, we submit there is no basis for rewarding defendants' efforts to delay the
proceedings in our case on the purported invocation of either federal jurisdiction that
does not exist or MDL procedures for a matter that does not warrant them.

    With respect to removal for purposes of determining the remand issues, the matter
should more properly be resolved by the transferor court before an MDL transfer or even
consideration of a stay motion. *See, e.g., Karofsky v Abbott Labs.*, 921 F. Supp. 18, 21
n.4 (D. Me. 1996) (granting plaintiff's remand motion because "it is easier . . . to rule on
the jurisdictional issue [rather than to] transfer it to the Multidistrict Panel, which has
many other concerns"); *Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft*, 54 F.

450 Mission Street, 5th Floor, San Francisco, CA 94105
Phone: (415) 348-8300  Fax: (415) 348-8333
Exhibit 1                                                    11

The Honorable Shira Scheindlin
January 5, 2004
Page 2 of 3

Supp. 2d 1042, 1048 (D. Kan. 1999) ("[f]or purposes of judicial economy, the
jurisdictional issue should be resolved immediately . . . Judicial economy dictates a
present ruling on the remand issue"); *see also* JPML Rules of Procedure, Rule 1.5 ("[t]he
pendency of a motion . . . before the Panel . . . does not affect or suspend orders and
pretrial proceedings in the district court in which the action is pending). Indeed, a
number of courts have held that the preliminary federal jurisdictional question "*must* be
resolved before deciding whether to stay or transfer the case to the MDL panel."
   *Farkas v. Bridgestone/Firestone, Inc.*, 113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000)
(emphasis added); *accord, e.g.*, *Stern v. Mutual Life Insurance Co.*, 968 F. Supp. 637,
639 (N.D. Ala. 1997) ("[i]f the court lacks jurisdiction over the action *ab initio*, it is
without jurisdiction to enter such a stay"); *Lloyd v. Cabell Huntington Hosp., Inc.*, 58 F.
Supp. 2d 694, 696 (S.D. W. Va. 1999) ("[t]his Court cannot . . . stay proceedings in an
action over which it lacks jurisdiction").

   Nor is there any proper basis for treating this matter as an MDL for purposes
other than the pending remand motions. This is not the first generation of MTBE
litigation. Numerous dispositive motions – including most notably motions based on
purported federal preemption of state tort claims – have been litigated in state and federal
courtrooms, in California and elsewhere. The results, both in Your Honor's courtroom
and around the Nation, have consistently rejected any federal preemption of the kinds of
claims at issue in this case. Notably, the Ninth Circuit (the federal appellate court in
which this case is currently pending) has twice expressly rejected federal preemption of
state laws limiting (or banning) MTBE because of environmental concerns. *Oxygenated
Fuels Ass'n v. Davis*, 331 F.3d 665, 670-73 (9th Cir. 2003); *Exxon Mobil Corp. v. U.S.
Environmental Protection Agency*, 217 F.3d 1246, 1253 (9th Cir. 2000). Moreover,
extensive discovery has already occurred in several lawsuits on the liability of most (if
not all) of the defendant refiners and MTBE manufacturers. Finally, the parties this case
in particular poses issues not common to other MTBE cases around the county because of
the People's claims and the People's unique constitutional, statutory, and regulatory
status. Consequently, it is unlikely that threshold legal questions common to all MTBE
cases would require significant additional judicial energy by Your Honor or any other
MDL judge.

   The truth is that the primary focus of the current generation of MTBE cases will
be on site specific issues: matters of variations in state law; local gasoline supply and
distribution systems; and damages claims based on site-specific circumstances. We
respectfully submit that neither the Southern District of New York nor any other out-of-
state MDL jurisdiction is not an efficient – and certainly not the most efficient – forum in
which to handle these issues as they relate to gasoline refined in Northern California and
contaminating groundwater in Sacramento County, California.

   In short, for the foregoing reasons plaintiffs in this case object to the arrangement
proposed in the Court's December 23, 2003, Order for transfer for remand or any other
MDL purposes. We further expressly reserve these parties' rights to assert in any

The Honorable Shira Scheindlin
January 5, 2004
Page 3 of 4

appropriate additional manner before Your Honor and/or the MDL Panel our opposition
to MDL consolidation of this case.

        We will serve copies of this letter by facsimile on the other counsel involved in
this case, and will work with defense counsel to obtain service lists for the other MTBE
cases identified in the schedule attached to the Court's December 23rd Order and will
serve those counsel by facsimile as well as promptly as possible.

Respectfully submitted,

SHER & LEFF LLP                          JAN SCULLY, DISTRICT ATTORNEY
                                         ALBERT LOCHER, Assistant Chief Deputy
                                         District Attorney
                                         SACRAMENTO COUNTY DISTRICT
                                         ATTORNEY

Victor M. Sher
Attorneys for plaintiffs:  City of Elk Grove,
Sacramento County WaterAgency,
Sacramento Groundwater Authority,        Russ Detrick
Carmichael Water District, Citrus Heights   Supervising Deputy District Attorney
Water District, Del Paso Manor Water     Attorney for plaintiff:  the People of the
District, Fair Oaks Water District, Florin   State of California
Resource Conservation District, Rio Linda
Elverta Community Water District,
Sacramento Suburban Water District, San
Juan Water District, California-American
Water Company and City of Sacramento

VMS: jac
cc:  All Counsel
P:\Sacramento MTBE\Correspondence\Scheindlin-001 doc

(4  )348-8333              p. 16

Law Offices of
# SHER & LEFF

**VICTOR M. SHER**                                    **TODD E. ROBINS**
**ALEXANDER I. LEFF**                                 **LYNDA M. COLLINS**

January 27, 2004

*Via Facsimile and Federal Express Overnight Delivery*

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

     Re:   *In re MTBE Products Liability Litigation* (MDL 1358); Master File C.A.
          No. 1:00-1898 (SAS) / Motions for Remand

Dear Judge Scheindlin:

    This firm serves as co-counsel for all of the plaintiffs in each of the following cases:

- *Orange County Water District v. Unocal, et al.*, Case No. SACV03-1742 JVS (ANx) (C.D. Ca.)

- *City of Riverside v. Atlantic Richfield Company, et al.*; Case No. EDCV03-1460 RT (SGLx) (C.D. Ca.)

- *California-American Water Company v. Atlantic Richfield Company, et al.*; Case No. C 03-5379 JSW (N.D. Ca.)

- *Quincy Community Services District v. Atlantic Richfield Company, et al.*; Case No. CIV.S-03-2582 WBS DAD (E.D. Ca.)

- *City of Roseville v. Atlantic Richfield Company, et al.*; Case No. CIV.S-03-2601 WBS GGH (E.D. Ca.)

- *Martin Silver, et al v. Alon USA Energy, Inc., et al.*; Case No. 03-CV-2408 WQH (S.D. Ca.)

In addition, we represent as co-counsel all of the plaintiffs except the People of the State of California in *People, et al. v. Unocal, et al.* CIV S-032653 GEB/DAD (E.D. Cal.); the Sacramento County District Attorney's Office represents the People separately in that action. We understand that counsel for the People intends to join in the positions asserted in this letter.

14

Exhibit 2

The Honorable Shira Scheindlin
January 27, 2004
Page 2 of 19


## PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS

Each of the California actions originated in state court, asserting only state-law claims. Certain defendants removed the matters to federal district court. The removal papers state defendants' intention to have these actions transferred to MDL 1358. We are informed (but have not been served with any papers) that defendants in each case filed a Notice of Related, Tag-along Action with the Judicial Panel on Multidistrict Litigation (JPML). In any event, the JPML has yet to issue conditional transfer orders in any of these matters.

Plaintiffs in these matters have not yet had any opportunity to object to any conditional transfer orders from the JPML, although in fact plaintiffs believe that these actions are not appropriate for multi-district consolidation. All of these plaintiffs in the California actions intend to file notices of opposition to, and to move to vacate, any such conditional transfer order(s) affecting them. Meanwhile, plaintiffs have filed timely motions for remand in each of the California cases.

Your Honor's December 23, 2003, Order states that remand motions in "all similar removed actions . . . [should] be heard and decided by this Court" under the auspices of MDL 1358. The attachment to the December 23 Order listed each of these California lawsuits. Of course, our clients had no chance to participate in the hearing before Your Honor leading to the December 23 Order, and we were not consulted concerning the plaintiffs' positions in the other cases pending before Your Honor nor our position with respect to our own litigation.

As of today these cases are not before Your Honor in any capacity. The merits of the motions for remand in them have not been briefed to this Court, nor are any of those motions before Your Honor. The Court has not even seen the complaints in these actions, which differ substantially from those before the Court in the New York actions. Indeed, unlike the matters pending before Your Honor, plaintiffs in these California cases consist not solely of drinking water purveyors (although some are purveyors); rather these plaintiffs include public agencies with a spectrum of regulatory, property, usufructuary and other legal interests in protecting ground- and drinking water resources under California law.

The December 23 Order did not specify how (if at all) parties to "similar removed actions" should participate in the remand motions pending before the Court. Accordingly, we submit this letter brief to address certain issues raised by those motions. Consistent with our position that these actions are not appropriate for multi-district consolidation, however, the plaintiffs in the California actions listed above expressly reserve their rights to object to any such consolidation. They further maintain that their actions are not properly before this Court in its capacity as the court handling MDL 1358 or otherwise, and respectfully reserve their rights to assert that orders issued by this Court

The Honorable Shira Scheindlin
January 27, 2004
Page 3 of 19

at this time have no effect in their actions.  Finally, by submitting this letter in limited
response to the moving and opposition papers in connection with the pending remand
motion before Your Honor, none of these plaintiffs concedes that this Court has any
jurisdiction over their California lawsuit.

## INTRODUCTION

None of the bases for federal subject matter jurisdiction asserted in the subject
Notices of Removal and discussed in the removing defendants' ("Defendants'")
opposition brief has any merit.  This letter makes the following three points:

*First*, state court findings in these cases that MTBE gasoline is defective will have
no impact on the federal clean air program or the gasoline distribution system.  Indeed,
18 states (including New York) have *already banned* the use of MTBE in gasoline, and
preemption challenges to such bans have been soundly rejected by the federal courts.[1]  If
a state's outright ban of MTBE does not conflict with the Clean Air Act ("CAA"), then
tort claims regarding Defendants' past use of MTBE cannot possibly affect any federal
interest under the CAA.  Moreover, Defendants' federal question analysis hinges entirely
on the very same federal preemption arguments that this Court has soundly rejected, as
has every other published opinion on the subject.[2]  Notwithstanding their effort to dress
the emperor in new clothes, Defendants' attempt to ground federal jurisdiction over these
cases on the same losing arguments should be rejected.

*Second,* Defendants' efforts to cast themselves as corporations acting under the
direction of federal officers or agencies for purposes of 28 U.S.C. §1442(a)(1) are
nonsense.  Defendants are private, for-profit companies that produce a consumer product,

---

[1] *See Oxygenated Fuels Ass'n v. Pataki ("Pataki I"),* 158 F. Supp. 2d 248, 257 (N.D.N.Y. 2001)
(rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state
from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to
defeat rather than advance the goals of Congress and [the] EPA"); *Oxygenated Fuels Ass'n v.
Pataki ("Pataki III"),* __ F. Supp. 2d __, 2003 WL 22845949, *9-*12 (N.D.N.Y. November 24,
2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect
of the CAA, including a finding of fact that the predicted economic impacts of such ban are "not
of a sufficient magnitude . . . to interfere with the achievement of the goals of the CAA"); *see
also Oxygenated Fuels Ass'n v. Davis ("Davis II"),* 331 F.3d 665, 670, 673 (9th Cir. 2003)
(upholding California's MTBE ban because, *inter alia,* there is "no support for [the] assertion that
the Clean Air Act's goals – for purposes of preemption analysis – are a smoothly functioning
market and cheap gasoline"), *affirming Oxygenated Fuels Assoc. v. Davis ("Davis I"),* 163 F.
Supp. 2d 1185, 1187 (E.D. Cal. 2001); *Exxon Mobil Corp. v. US E.P.A.,* 217 F.3d 1246, 1253
(9th Cir. 2000).

[2] *See In re MTBE Litig.,* 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001); *Pataki I, supra,* 158 F. Supp.
2d 248; *Pataki III, supra,* 2003 WL 22845949; *Davis II, supra,* 331 F.3d 665 *Davis I, supra,* 163
F. Supp. 2d 1185; *Exxon Mobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253 (9th Cir. 2000); .

The Honorable Shira Scheindlin
January 27, 2004
Page 4 of 19

and, like all manufacturing businesses in this country, are subject to both state and federal environmental regulations. Published federal decisions have uniformly rejected the argument that a consumer product manufacturer's compliance with federal regulatory requirements constitutes acting "under the direction" of a federal officer.[3]  Moreover, there is no causal connection between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.[4]

        *Finally*, Defendants' attempt to predicate federal jurisdiction over this purely state-law case on the toehold of a 1988 bankruptcy order involving a single defendant also fails, because the outcome of this action can have no effect on the "administration of" a bankruptcy that concluded 15 years ago.[5]  In addition, even if these actions were somehow "related to" the Texaco bankruptcy, the presence of exclusively state-law claims and the extreme remoteness of any possible bankruptcy issues in this case clearly warrant remand pursuant to 28 U.S.C. § 1452(b)

## DISCUSSION

A.    **Defendants' "Complete Preemption" and "Substantial Federal Question" Arguments Lack Merit.**

        We wish to bring to the Court's attention four issues in response to Defendants' federal question contentions.  First, Defendants' preemption-related grounds for removing these product liability actions to federal court are rendered irrelevant by the fact that New York has banned MTBE gasoline, and such ban has been definitively upheld, as both a matter of law and fact, as not in conflict with any CAA goal or requirement.  *See Pataki I, supra,* 158 F. Supp. 2d 248; *Pataki III, supra,* 2003 WL 22845949.  Second, Defendants' "complete preemption" and "substantial federal question" arguments are nothing more than recycled versions of the very same preemption arguments they litigated unsuccessfully in this Court in the prior incarnation

---

[3] *See, e.g., Little v. Purdue Pharma, LP,* 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'").

[4] *See* 42 U.S.C. §7545(k)(2)(B) (CAA mandates *oxygen* content, not MTBE, in reformulated gasoline); *cf., e.g., Good v. Armstrong World Indus.,* 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos).

[5] *See In re Feitz,* 852 F.2d 455, 457 (9th Cir. 1988) (no jurisdiction under 28 U.S.C. §1334(b) because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan,* 288 F.3d 1172, 1880 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

17

The Honorable Shira Scheindlin
January 27, 2004
Page 5 of 19

of MDL 1358. *See In re MTBE Litig.*, 175 F. Supp. 2d 593. Third, Defendants'
argument that the CAA and other federal statutes provide "exclusive remedies" for claims
regarding the design of MTBE gasoline ignores the fact that each of the cited federal
statutes expressly preserves state-law claims. *See* 42 U.S.C. §§ 7604(e), 6972(f); 15
U.S.C. §2617(a). Finally, Defendants' allegations of congressional and EPA intent to
"occupy the field" of fuels regulation grossly distort the relevant legislative and
regulatory history and ignore the case law examining such intent

> **1.      Tort litigation regarding MTBE will have no impact on the
>           federal Clean Air program.**

The premise of Defendants' federal question analysis – *i.e.* that state court
verdicts finding that MTBE gasoline is a defective product will undermine the federal
regulatory scheme and disrupt the gasoline distribution system – defies all logic. New
York, along with 17 other states, has already banned the use of MTBE in gasoline
(effective January 1, 2004) in order to protect the state's groundwater from
contamination. *See* L.2000, c. 35, §§ 2-3; *Pataki III, supra,* 2003 WL 22845949 at *2.
Moreover, the New York MTBE law has survived a preemption challenge brought by the
Oxygenated Fuels Association, one of Defendants' trade associations. *See Pataki I,
supra,* 158 F. Supp. 2d 248; *Pataki III, supra,* 2003 WL 22845949. After a six day bench
trial in that case, Judge Mordue of the Northern District of New York determined, among
other things, that the predicted economic impacts of the ban are "not of a sufficient
magnitude . . . to interfere with the achievement of the goals of the CAA." *Pataki III,
supra,* 2003 WL 22845949 at *9. The Ninth Circuit has similarly upheld California's ban
of MTBE, holding that there is "no support for [the] assertion that the Clean Air Act's
goals – for purposes of preemption analysis – are a smoothly functioning market and
cheap gasoline." *Davis II, supra,* 331 F.3d at 673.[6] If a state's complete ban of MTBE
does not conflict with the CAA or threaten the state's supply of reasonably priced fuel,
then damages claims regarding Defendants' past use of MTBE cannot possibly affect any
federal interest under the CAA.

Defendants' effort to raise the specter of an "inefficient patchwork" of differing
state fuel content standards (*see, e.g.* Ds' Opp. at 25) by reference to MTBE-related

---

[6] In light of the Ninth Circuit's definitive – and final – holding in *Davis II,* Defendants are
precluded under the doctrine of collateral estoppel from asserting their federal preemption
arguments in the California cases involving the plaintiffs we represent. *In re Cantrell* 329 F.3d
1119, 1123 (9th Cir. 2003) (issue preclusion applies where issue is identical to that decided in a
former proceeding, issue was actually litigated and decided in the former proceeding, the decision
in the former proceeding was final and on the merits, and the party against whom preclusion is
sought is the same as, or in privity with, the party to the former proceeding); *Tahoe Sierra
Preservation Council, Inc. v. Tahoe Regional Planning Council* 322 F.3d 1064, 1081 (9th Cir.
2003) (privity is a flexible concept, and may exist when the parties are not identical, as long as
there is "substantial identity" or "sufficient commonality of interest" between parties).

18

The Honorable Shira Scheindlin
January 27, 2004
Page 6 of 19

actions filed outside of New York does nothing to assist their argument, because, as the
*Pataki* and *Davis* cases demonstrate, nothing in the CAA limits state authority to regulate
MTBE in order to prevent water pollution.[7]  Their "patchwork" argument also confuses
the standards for establishing federal subject matter jurisdiction with those for
transferring and consolidating related district court actions.  *See, e.g. Merrell Dow
Pharmaceuticals v. Thompson, supra*, 478 U.S. at 816 (defendant's concern about
uniformity of interpretation of federal statute in state-law actions is not an "aspect of
federal-question jurisdiction").[8]  Defendants cannot bootstrap federal jurisdiction on the
alleged aggregate impact of multiple MTBE lawsuits.

> 2.  **This Court, along with every other published decision addressing
> preemption of state regulation of MTBE, has already rejected
> Defendants' "complete preemption" and "substantial federal
> question" arguments.**

This Court has already concluded that nothing in the CAA limits state-law tort
actions against refiners to recover damages to drinking water caused by their use of
MTBE, and thus has rejected the very preemption arguments on which Defendants'
federal question analysis is based.  *In re MTBE Litig., supra,* 175 F. Supp. 2d at 611-617,
623-625.  In fact, *every* published decision addressing preemption of state regulation of
MTBE – both before and since this Court's earlier decision in MDL 1358 – has rejected
Defendants' preemption arguments:

- *Davis II, supra,* 331 F.3d at 673 (California's MTBE ban not preempted
  because "Clean Air Act's provisions regarding oxygenate fuel additives …
  preserve state authority to adopt and enforce measures to prevent water
  pollution");

---

[7] *Pataki I, supra,* 158 F. Supp. 2d at 257 ("preventing a state from [regulating] an oxygenate
which it believes threatens its groundwater appears more likely to defeat rather than advance the
goals of Congress and [the] EPA"); *Davis II, supra,* 331 F.3d at 673 ("Clean Air Act's provisions
regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to
prevent water pollution").

[8] While concern about uniform judicial treatment may be pertinent in considering whether to
centralize or transfer pending federal actions into a multidistrict litigation ("MDL") under 28
U.S.C. § 1407, *see, e.g., In re Mosaid Technologies Inc. Patent Litigation,* 283 F. Supp. 2d 1359,
1360 (Jud. Pan. Mult. Lit. 2003) (centralization pursuant to § 1407 necessary to "prevent
inconsistent decisions," among other things), it does not constitute grounds for "federal question"
jurisdiction *over these cases* in the first instance.  *See also In re MTBE Litigation, supra,* 175
F.Supp.2d at 603 ("[a] transfer of a case pursuant to 28 U.S.C. § 1407 cannot be made unless the
transferee court has subject matter jurisdiction"), *citing BancOhio Corp v. Fox,* 516 F.2d 29, 32
(6th Cir.1975) ("[n]o matter how desirable respondents feel it may be to consolidate . . . all
litigation in any way related to Equity Funding, . . . such a transfer cannot be made unless the
district court properly has jurisdiction of the subject matter of the case").

The Honorable Shira Scheindlin
January 27, 2004
Page 7 of 19

- *Exxon Mobil Corp. v. EPA, supra*, 217 F.3d at 1253 (affirming county regulation that effectively banned MTBE because "state authority to regulate oxygenate levels [was not] limited" by the CAA);
- *Pataki I, supra*, 158 F. Supp. 2d at 257 (rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA");
- *Pataki III, supra*, 2003 WL 22845949 at *12 (NY MTBE law does not conflict with any aspect of CAA, even if "viewed in the larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations");
- *Davis I, supra*, 163 F. Supp. 2d at 1187 (E.D. Cal. 2001) (upholding California MTBE ban against federal preemption challenge because "the Clean Air Act does not require that MTBE be made available to refiners"), *aff'd*, 331 F.3d 665, *supra*.[9]

Despite this notable losing streak, Defendants here make the very same preemption arguments again – as Yogi Berra said, "it's déjà vu all over again." Specifically, the lengthy federal question analysis in Defendants' opposition hinges entirely on two arguments: (1) that state-law design defect claims somehow seek to "disturb the delicate balance" struck by Congress and EPA in permitting refiners to use MTBE in reformulated gasoline; and (2) that the CAA expressly preempts such design defect claims. This Court, however, already rejected the identical arguments in *In re MTBE*.

Specifically, Defendants' "substantial federal question" argument is predicated on the assertion that the New York Plaintiffs' design defect claims raise risk-utility questions

---

[9] *See also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state law MTBE contamination case does "not conflict with the Congressional clean air objectives"). Defendants' citation of four unpublished trial court decisions regarding MTBE preemption (*see* D's Opp., p. 21, n.20) is unavailing. Each of these decisions was rendered before *Davis II* and *Pataki III*. In addition, two of them – *Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess*, No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis of the CAA. Two others – *Kubas v. Unocal*, No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal*, No. BC195295 (same) – incorrectly assumed that assessing tort damages was equivalent to a regulatory ban (which the Ninth Circuit in any event affirmed in *Davis II*). State court opinions giving more than cursory attention to the preemption argument have, like federal courts, rejected the argument. *See, e.g., County of Suffolk v. Amerada Hess, et al.*, No. 007-011-MOT D (Sup. Ct. Suffolk Cty., N.Y., Jan. 2, 2004); *South Tahoe Public Utility District v. ARCO et al.*, No. 999128 (Cal. Super. Ct. Jan. 15, 2002); *City of Dinuba v. Unocal et al.*, No. 305450 (Cal Super. Ct. April 1, 2003); *Plainview Water District v. Exxon Mobil Corporation et al.*, No. 9975/01, (N.Y. Sup. Ct. May 22, 2002).

The Honorable Shira Scheindlin
January 27, 2004
Page 8 of 19

that "require a reassessment of all of the factors Congress directed EPA to consider in
promulgating RFG regulations so as to 'require the greatest reduction in emissions' . . .
[including] the cost of achieving such emission reductions, any non air-quality and other
air-quality related health and environmental impacts and energy requirements." Ds' Opp.
at 20-22.[10] Defendants made the same argument verbatim to this Court in *In re MTBE
Litig.*, and, as Defendants concede (see Ds' Opp. at 22), this Court disagreed:

> Defendants argue that any risk-utility analysis would impermissibly permit
> a reexamination of the mandatory cost-benefit analysis delegated to and
> performed by the EPA pursuant to its obligations under the C.A.A. More
> specifically, defendants note that Congress, through the RFG Program,
> authorized the EPA to issue regulations to reduce air pollution while
> taking into consideration "the cost of achieving such emission reductions,
> any non air-quality and other air-quality related health and environmental
> impacts and energy requirements." 42 U.S.C § 7545(k)(1). However, as
> discussed earlier, Congress did not mandate the use of MTBE, nor did the
> EPA's certification of gasoline containing MTBE require consideration of
> non air- quality factors. . . . Thus, while the EPA could consider the non
> air-quality impact of the use of MTBE, any such consideration was . . .
> not commensurate with a risk-utility analysis . . . Accordingly,
> defendants' motions to dismiss these [design defect] claims are denied.

Similarly, Defendants' "complete preemption" argument in these cases consists of
precisely the same express preemption argument they made and lost in *In re MTBE Litig.*
in 2001. *Compare* Ds' Opp. at 24-28 (plaintiffs' tort claims regarding MTBE
contamination of groundwater preempted because they would result in a "control or
prohibition respecting a[] characteristic or component of fuel" under 42 U.S.C. §
7545(c)(4)(A)), *with In re MTBE Litig., supra,* 175 F. Supp. 2d at 612-614 (rejecting
argument that "section 7545(c)(4) . . preempt[s] state law claims concerning the
contamination of groundwater caused by the use of MTBE"). Defendants themselves
concede, as they must, that "[t]his Court and several others have previously found that §
7545(c)(4)(A) does not prevent state regulation of fuels if that regulation is designed to
protect groundwater, as opposed to regulating emissions." Ds' Opp. at 25. Indeed, as
noted above, since this Court's 2001 opinion, the Ninth Circuit has concluded as a matter
of law that "California's MTBE ban ... does not 'frustrate [ ] the full effectiveness of
federal law,'" *Davis II, supra,* 331 F.3d at 673, and the Northern District of New York

---

[10] Of course, Plaintiffs' design defect claims do not require resort to any federal law issue –
substantial or otherwise. *Eastern States, supra,* 11 F. Supp. 2d at 390 (substantial federal
question jurisdiction requires showing that "a disputed question of federal law is a necessary
element of one of the well-pleaded state claims"); *Shadie v. Aventis Pasteur,* 254 F. Supp. 2d 509,
518 (M.D. Pa. 2003) (where defendants, not plaintiffs, ask court to interpret federal law, "[t]he
mere presence of a federal issue   . does not create federal jurisdiction").

The Honorable Shira Scheindlin
January 27, 2004
Page 9 of 19

has reached the same result for New York's ban as a matter of both fact and law in *Pataki III.*

Defendants' assertion that they have "never presented," and this Court has not rejected, the federal question arguments they raise in support of removal, *see* Ds' Opp. at 2, is simply not true. To the extent Defendants suggest that the Court's prior ruling rejecting preemption under both express and conflict preemption theories does not preclude their current complete preemption argument here, they misconstrue the narrow scope of complete preemption. "Complete preemption is rare," and only applies when the "preemptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *ARCO Environmental Remediation v. Montana Dept. of Health and Environmental Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 65 (1987). If state tort remedies related to MTBE contamination do not expressly or impliedly conflict with any requirement, goal or objective under the CAA, such remedies cannot conceivably be "completely preempted." Indeed, as the Supreme Court has held, even a potentially valid federal preemption defense (which Defendants do not have) is not sufficient to establish removability under the complete preemption doctrine, because "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-399 (1987).

Thus, Defendants cannot escape this Court's prior preemption rulings simply by dressing the same preemption arguments in new clothing.[11] As those preemption arguments are the *sine qua non* of their attempt to find a federal question hidden within these state-law tort actions, Defendants' removal pursuant to 28 U.S.C. § 1331 was improper.

3.    **Defendants fail to show that the CAA or any other federal statute contains the exclusive cause of action for Plaintiffs' claims.**

According to the U.S. Supreme Court, complete preemption has been found *only* "when the federal statutes at issue provided the exclusive cause of action for the claim

---

[11] As it would appear that "the litigation of this particular issue has reached such a stage that [there is] no really good reason for permitting it to be litigated again.," *Zdanok v. Glidden Company, Durkee Famous Foods Division*, 327 F.2d 944, 955 (2d Cir. 1964), the combination of this Court's previous legal holdings in *In re MTBE* and the court's factual findings in *Pataki III* likely bar Defendants from relitigating their preemption arguments here. *See, e.g., Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996) (underlying "matters actually litigated and determined" in prior proceeding were "identical" to those asserted in subsequent case, and therefore barred by doctrine of issue preclusion/collateral estoppel). However, the Court need not address this concern in order to grant the New York Plaintiffs' motions to remand.

The Honorable Shira Scheindlin
January 27, 2004
Page 10 of 19

asserted and also set forth procedures and remedies governing that cause of action."
*Beneficial National Bank v. Anderson,* __ U.S __, 123 S. Ct. 2058, 2062 (2003). Of
course, the CAA provides neither the exclusive cause of action for the claims asserted by
the New York Plaintiffs for water-related damages, nor procedures and remedies
governing those causes of action.

Defendants blithely assert that various administrative remedies under the CAA,
Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.* ("SWDA")[12] and Toxic Substances
Control Act, 15 U.S.C. § 2601 *et seq.* ("TSCA") provide "exclusive remedies for parties
seeking to alter the design of reformulated gasoline." Ds' Opp. at 28.  Defendants then
contradict themselves by acknowledging (as they must) that federal law does *not* provide
"the only remedy for the presence of MTBE in groundwater." Ds' Opp. at 30. Of
course, under *Beneficial National Bank, supra,* 123 S.Ct. 2062, this concession alone
destroys Defendants' complete preemption argument -- as federal law must provide the
"exclusive" remedy in order to completely preempt a state cause of action for
jurisdictional purposes. Defendants' citation to *Pacific Gas & Electric Co. v. State
Energy Res. Conserv. & Dev. Comm'n,* 461 U.S. 190, 212 (1983), for the proposition that
complete preemption can apply to an "identifiable portion" of a field is unavailing. That
case, which addressed, and rejected, an occupation-of-the-field preemption defense on
the merits, did not involve the complete preemption exception to the well-pleaded
complaint rule, and thus is inapposite.

In any case, Defendants' argument fails to overcome an obvious point that was
central to this Court's previous rejection of their preemption defense: the CAA
specifically *preserves* state common law claims, expressly providing that "[n]othing in
this section shall restrict any right which any person (or class of persons) may have under
any statute or *common law* to seek enforcement of any emission standard or limitation *or
to seek any other relief.*" 42 U.S.C. § 7604(e) (emphasis added); *In re MTBE Litig.,
supra,* 175 F. Supp. 2d at 613, n.35 ("Congress' intent to allow some state causes of
action is also evidenced by the CAA's citizen suit savings provision, codified at 42
U.S.C. § 7604(e)"); *see also Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492, (1987)
(identical savings language in the Clean Water Act "negates the inference that Congress
'left no room' for state causes of action"). The SWDA contains a savings provision
identical the CAA provision quoted above. *See* 42 U.S.C. § 6972(f). TSCA contains a
similar savings clause, which provides that, except where EPA has promulgated certain
rules pertaining to a toxic substance – which it has not in this case – "nothing in this
chapter shall affect the authority of any State or political subdivision of a State to
establish or continue in effect regulation of any chemical substance, mixture, or article
containing a chemical substance or mixture." 15 U.S.C. §2617(a).[13]  Accordingly,

_____

[12] Defendants incorrectly refer to the SWDA by its prior name, the Resource Conservation &
Recovery Act.

[13] Defendants cite *Bastien v. AT&T Wireless,* 205 F.3d 983 (7th Cir. 2000), for the proposition
that a savings clause does not necessarily preclude a finding of complete preemption. Ds' Opp. at

The Honorable Shira Scheindlin
January 27, 2004
Page 11 of 19

Defendants' citations to statutory remedies for non-water related objections to CAA,
SWDA and TSCA implementation do not support their "exclusive cause of action"
argument.

       4.     Congress and EPA intended to preserve state flexibility, not limit it.

      Citing certain statements from the legislative history of the 1990 CAA
amendments, Defendants allege that Congress had "the specific knowledge and
expectation that MTBE would be the principal means by which refiners met oxygenate
requirements." Ds' Opp. at 13. They suggest that this somehow evinces as a
congressional intent to "occupy the field" of fuels regulation to the exclusion of state
action to remedy water pollution caused by MTBE.[14]  This distortion of the legislative
history has also been addressed, and rejected, by this Court.  As the Court explained in *In
re MTBE Litig., supra*:

> [W]hile members of Congress may have anticipated that MTBE would be
> used to meet the oxygenate requirements, . . . the legislative history of the
> 1990 CAA amendments indicates that Congress, through the RFG
> Program, sought to reduce harmful vehicle emissions in the "larger
> context of market forces, health and environmental impacts, regional
> priorities, technological feasibility and other considerations." [citation
> omitted.] Indeed, Congress expected that oxygenates would compete in
> the marketplace and 'preventing a state from [regulating] an oxygenate
> which it believes threatens its groundwater appears more likely to defeat
> rather than advance the goals of Congress and [the] EPA....'

175 F. Supp. 2d at 612-13.

      Defendants' selective reference to out of context EPA statements regarding the
agency's intent to occupy the field of fuels regulation, *see* Ds' Opp. at 16, 24-25, 28;
*citing* 59 Fed. Reg. 7716, 7809 (Feb. 16, 1994), ignores the Agency's own express
conclusion that nothing in the CAA fuels programs "establishes a comprehensive federal
presence" with respect to MTBE.  U.S. EPA, *Approval and Promulgation of*

---

30.  But in *Bastien*, unlike the case here, the court found that the plaintiff's claims fell squarely
within the express preemption provision of the Federal Communications Act, 47 U.S.C. §
332(c)(3)(A), and that application of the savings clause would thus nullify the preemption
provision. 205 F.3d at 987. Here, as described above, this Court, along with every other
published decision addressing the question, has found that the CAA's express preemption
provision does not apply to state regulation of MTBE in order to prevent water pollution.

[14] Similar attempts by the oil industry to delve into the legislative history of the CAA were
rebuffed in *Davis II*, 331 F.3d at 671, where the Court stated: "We hesitate to examine the
legislative history, for we find the text of the Act relatively clear."

The Honorable Shira Scheindlin
January 27, 2004
Page 12 of 19

*Implementation Plans; Nevada State Implementation Plan Revision, Clark County*, 64
Fed. Reg. 29573, 29578 (Jun. 2, 1999), *affirmed in ExxonMobil Corp. v. U.S. E.P.A.,
supra*, 217 F.3d 1246. According to EPA, "federal regulation here is not so pervasive as
to preclude supplementation by states, nor is the federal interest in the field sufficiently
dominant to preempt state action." 64 Fed. Reg. at 29578. Instead, such programs
"explicitly preserve a role for the states in regulating fuels," and "[w]hile Congress
deliberately rejected a federal mandate that would reduce market opportunities for
various oxygenates, *it did this with the goal of preserving state flexibility, not limiting it.*"
*Id.* (emphasis added). As Defendants admit, the court in *Pataki I, supra*, 158 F. Supp. 2d
at 255-57, squarely rejected the industry's attempt to unearth any EPA intent to occupy
this field. In short, Defendants' position has been rejected soundly both by EPA itself
and the courts.

**B.    Removal Under § 1442(a)(1) Is Improper Because Defendants Were Not
        Acting Under the Direction of Any Federal Official or Agency.**

        Defendants alternatively claim that they were acting under the direction of federal
officers pursuant to 28 U.S.C. §1442(a)(1).[15]  The primary beneficiaries of §1442(a)(1)
are federal officers and agencies. *Tremblay v. Philip Morris, supra*, 231 F. Supp. 2d at
417. For a *private* party defendant to invoke the statute, it must: (1) assert a colorable
defense based on federal law in the notice of removal; (2) establish that it was acting
under the direction of a federal officer; and (3) show that its federally directed actions are
causally connected to the harm about which the plaintiff complains. *Jefferson County v.
Acker*, 527 U.S. 423, 431 (1989). Defendants fail on each of these required showings.

        **1.    Defendants have no colorable federal defense.**

        The only federal defense Defendants raise is conflict preemption. *See* Ds' Opp. at
32. As discussed above: (1) this Court has already rejected this purported defense in an
earlier phase of this MDL proceeding; and (2) such defense cannot possibly succeed on
the merits in any event, as New York has already banned MTBE and such ban has been
definitively upheld in the courts. Defendants have thus failed to raise a "colorable"
federal defense.

        Defendants suggest that their preemption defense is still viable because this Court
"described the . . . issue as one which needed development as a matter of fact." Ds' Opp.
at 32. In *In re MTBE Litig, supra*, 175 F. Supp. 2d at 616, the Court observed that,
whether alternatives to MTBE "are 'practicable' and have been available to the
defendants for their use in the RFG Program is a question of fact that the Court cannot
address on a motion to dismiss." Subsequently, however, Defendants had the opportunity

---

[15] Section 1442(a)(1) provides, in pertinent part, that an action may be removed to federal court
by "any officer (or any person acting under that officer) of the United States or of any agency
thereof, sued in an official or individual capacity for any act under color of such office." 28
U.S.C. § 1442(a)(1).

The Honorable Shira Scheindlin
January 27, 2004
Page 13 of 19

to prove their case regarding "practicability," and failed. In *Pataki III, supra*, 2003 WL 22845949 at *9, the court found that Defendants' trade association failed to show that New York's MTBE ban would cause supply shortfalls "sufficient to support a finding of conflict preemption."

> 2.    **As private regulated entities that voluntarily *chose* to use MTBE in gasoline despite its known hazards, Defendants never acted under the direction of any federal official.**

Defendants also cannot establish that they undertook their use of MTBE in gasoline and their failure to warn of its known hazards "under the direction" of the federal government. *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 945 (E.D.N.Y. 1992) ("the set of defendants who can avail themselves of § 1442(a) is smaller than the set of defendants who can make a colorable claim to a federal defense"). Their attempt to do so fails for at least three reasons: (a) Defendants, as private actors merely complying with federal regulations, fall outside the class of protected persons under § 1442(a)(1); and (b) because Defendants voluntarily chose to use MTBE from among several available options, they cannot plausibly claim that they were acting "under the direction" of EPA.

> a.    **Defendants' compliance with RFG regulations does not transform them into agents of the federal government**

Defendants' attempt to characterize their choice of MTBE to comply with the federal RFG and OFP programs as "acting under the direction of federal officers or agencies" strains credulity. No published decision ever has held that a private sector manufacturer merely subject to complex regulations, and not acting under the operative *contractual* commands of federal officials, acts "under the direction" of the federal government. *See, e.g., Little v. Purdue Pharma, supra*, 227 F. Supp. 2d at 860-61 ("body of law" does not support position that defendant "merely 'subject to complex regulations'" is entitled to removal under §1442(a)(1)).[16]

Defendants here are not federal contractors; they are not producing products for the government; nor are they performing any other governmental function. Rather, they are private enterprises in the business of manufacturing and selling gasoline. Like virtually every other manufacturing business in the United States, they are subject to a variety of federal environmental regulations. Published federal decisions are unanimous in holding that mere participation in a regulated industry does not constitute "acting under the direction" of the federal government under § 1442(a)(1).

---

[16] *See also generally*, WRIGHT, MILLER & COOPER, *supra*, Ch. 7, § 3727, *and* 166 A.L.R. Fed 297 (2000) (in all cited cases where corporate manufacturer defendants successfully removed state court tort actions under § 1442(a)(1), the defendants were government contractors and the products at issue were produced for the government pursuant to contractual specifications); *see also Ryan*, 781 F. Supp. at 943 (§ 1442 requires "narrow" and "restrictive" construction).

The Honorable Shira Scheindlin
January 27, 2004
Page 14 of 19

In *Tremblay v. Philip Morris*, 231 F. Supp. 2d 411, 417 (D.N.H. 2002), a cigarette
manufacturer removed the plaintiffs' state law deceptive advertising claims under §
1442(a)(1), arguing that by "merely attempting to comply with the FTC's policies .
when it engaged in the conduct for which it has been sued," it was acting under the
direction of the FTC. The court flatly rejected this argument, holding that "[a]lthough
Philip Morris is a participant in a regulated industry, this is not enough to demonstrate
that it acted under the direction of a federal officer." *Id.* at 418. The Court explained:
"The mere fact that a tobacco company has complied with the requirements of a federal
law cannot suffice to transform it into a federal actor any more than the compliance of a
myriad of private enterprises with federal law and administrative regulations could of
itself work such a transformation." *Id.*, *quoting Brown v. Philip Morris, Inc.*, 250 F 3d
789, 801 (3rd Cir. 2001).

In *Little v. Purdue Pharma*, *supra*, 227 F. Supp. 2d at 861, pharmaceutical
corporations sued for injuries allegedly caused by the drug OxyContin argued that FDA
regulation and approval of the drug made them *de facto* federal officers for purposes of §
1442(a)(1). The court rejected removal, explaining:

> Corporate defendants herein do not operate at the discretion of federal
> authorities. They are private, for-profit business organizations which exist
> independently of the federal government. Lest participants in every
> regulated industry be entitled to "federal officer" status, corporate
> Defendants need to make a much greater showing than in doing the acts
> giving rise to Plaintiffs' claims, they were acting pursuant to a federal
> directive. Acting under the watchful eye of the federal government is not
> enough.

*Id.*

Similarly, in *Bakalis v. Crossland Savings Bank*, 781 F. Supp. 140, 145 (E.D.N.Y.
1991), the court held that even in cases involving "pervasive regulation" a corporate
defendant seeking removal under § 1442(a)(1) must show "'regulation plus'" – *i.e.* that
"the corporation is so intimately involved with the government functions as to occupy
essentially the position of an employee of the government." Defendants have made no
such showing here, nor can they. Indeed, none of the legislative history or EPA
regulations cited by Defendants even remotely suggests a federal intent to impose federal
*control* over Defendants' refining operations. To the contrary, the legislative history of
the 1990 CAA Amendments indicates unequivocally that the RFG program was "in no
way intended to resurrect a 1970's DOE-type scheme of detailed government
intervention in U S. gasoline markets." *Pataki I*, 158 F. Supp. 2d at 256-57. Neither the
use of MTBE in gasoline nor the harm it has wrought, is anyone's fault but Defendants'
own. There is no jurisdiction under § 1442(a)(1).

The Honorable Shira Scheindlin
January 27, 2004
Page 15 of 19

Defendants' sole support for their novel position to the contrary is *Watson v. Philip Morris*, No. 4:03-CV-519 GTE (E.D. Ark., Dec. 12, 2003), a recent unpublished opinion out of the Eastern District of Arkansas. As the *only* case to ever hold that a private consumer product manufacturer's mere compliance with federal rules constitutes "acting under the direction of a federal officer" for purposes of section 1442(a)(1), *Watson* is clearly an aberration, and should be ignored.[17] *Tremblay, Brown* and *Little* should control here. To hold otherwise would create a loophole in this narrow removal statute large enough to accommodate the proverbial Mack Truck.

        **b.**    **There is no causal connection between RFG program requirements and the conduct targeted by this lawsuit because refiners voluntarily chose to use MTBE from among several available options.**

The CAA mandates *oxygen* content, not MTBE. 42 U.S.C. § 7545(k)(2)(B). *Every* published decision that has addressed the issue has concluded that neither the CAA nor its implementing regulations requires refiners to use MTBE or any particular oxygenate in order to meet RFG requirements. *See, e.g., In re MTBE Litig.*, 175 F. Supp. 2d at 615 (RFG Program does not mandate the use of MTBE); *ExxonMobil, supra*, 217 F.3d at 1251-53 (CAA "does not mandate a 'recipe' or so-called government gas"); *Davis I*, 163 F. Supp. 2d at 1188 (CAA neither requires nor forbids the use of any particular oxygenate ... [i]ts 'goal' is to assure a particular oxygen content"). Defendants' use of MTBE is a matter of voluntary corporate choice, not a "necessary result" of CAA directives.

Defendants' choice to use MTBE breaks any causal connection between EPA's RFG and OFP regulations and Defendants' use of MTBE. *See Good v. Armstrong World Industries*, 914 F. Supp. at 1130 (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos); *Ryan v. Dow Chemical Co., supra*, 781 F. Supp. at 950 (no nexus between design defect claim and defendants' provision of Agent Orange to the military, because defendant was "being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by defendants"); *accord, Little, supra*, 227 F. Supp. 2d at 861 (because FDA was not involved in the "day-to-day drug development and manufacturing process," defendants were "operating at their own initiative"); *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal.

---

[17] In any event, *Watson* is easily distinguishable from this case. In *Watson*, Philip Morris was sued for deceptive advertising in connection with tar and nicotine ratings derived from a testing method mandated by the FTC. Thus, the court concluded, plaintiffs' misleading advertising claim "squarely confronts the FTC's mandate." *Watson* at 23. Here, as explained below, there is no causal connection whatsoever between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.

The Honorable Shira Scheindlin
January 27, 2004
Page 16 of 19

1998) (target conducted in groundwater contamination case against manufacturers of
government rocket engines – failing to warn and improperly disposing of
trichloroethylene ("TCE") – was not "under the direction" of the government, even
though the government contracts at issue had specifically required use of TCE).   As the
government does *not* require use of MTBE, Defendants cannot fairly argue that federal
directives "caused" the conduct on which the District bases its common law and statutory
claims.

C.      **The Court Should Remand This Case Because It Is Not "Related To"  The**
        **Texaco Bankruptcy, and Even If It Were, the Remand Provision Under 28**
        **U.S.C. § 1452(b) Applies Squarely To This Case.**

        This Court should also reject Defendants' alternative assertion of federal
bankruptcy jurisdiction.  Their contention that these state-law environmental
contamination lawsuits against numerous defendants represents a purported "collateral
attack" against a 15-year-old bankruptcy order pertaining to a single defendant fails
because: (1) federal jurisdiction is lacking in the first instance, as this case neither arises
under Title 11, arises in a case under Title 11, nor is "related to" a case under Title 11; (2)
remand is obviously warranted in light of the overwhelming – indeed, exclusive –
predominance of state-law issues on the one hand, and the extreme remoteness of any
bankruptcy issues on the other.[18]

        1.      **Federal bankruptcy jurisdiction is lacking in the first instance, as this**
                **case is not "related to" the Texaco Bankruptcy.**

        Texaco, Inc. filed for bankruptcy under Title 11 in 1987 and obtained
confirmation of its reorganization plan in 1988.  *In re Texaco, Inc.*, 84 B.R. 893
(S.D.N.Y. 1988).  Because the 15-year-old Title 11 proceedings (the "Texaco
Bankruptcy") are no longer being administered, and the rights of all creditors already
have been determined in the Confirmation Order, the outcome of this case will have
absolutely no effect on *the administration of* the Bankruptcy.  It is, therefore, not "related
to" this action, and cannot form a basis for federal jurisdiction.

        Under 28 U.S.C. § 1334(b), "district courts shall have original but not exclusive
jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases
under title 11."  Cases "arising under" Title 11 are those cases in which the cause of
action is created by title 11, and those "arising in a case under" Title 11 are those that,
while not based on any right expressly created by title 11, nevertheless "would have no
existence outside of the bankruptcy."  *In re Chargit Inc.*, 81 B.R. 243, 246-247 (Bankr.

---

[18]   In addition, as the New York Plaintiffs' ably point out in their Reply Brief, nothing in either
Defendants' removal notices or the operative complaints demonstrate that any of the Plaintiffs'
claims that may pertain to Texaco "arose" prior to entry of Texaco's Confirmation Order, or are
even covered by the Confirmation Order.

The Honorable Shira Scheindlin
January 27, 2004
Page 17 of 19

S.D.N.Y. 1987). This case undoubtedly does *not* fit into either of these jurisdictional categories, as the exclusively state-law causes of action asserted in the complaints "exist independently of bankruptcy law." *See Williams v. Shell Oil Co*, 169 B.R. 684, 688 (S.D. Cal. 1994).

Defendants' contrary suggestion – that this case "invokes substantive rights created by the federal bankruptcy laws" (Ds' Opp. at 5) – has absolutely no merit. Each of the three cases they cite is easily distinguishable from this case. Neither *In re National Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997), *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184 (7th Cir. 1993) nor *Texaco, Inc. v. Sanders (In re Texaco, Inc.)* 182 B.R. 937 (Bankr. S.D.N.Y. 1995) involved a motion to remand a state court action that had been removed to federal court by the debtor. Instead, each involved actions brought originally in federal bankruptcy court. For example, *Texaco v. Sanders* involved a motion by the debtor (Texaco) to reopen its bankruptcy proceeding and enforce its Confirmation Order against the plaintiffs in a state court case. *Id.* at 940-41. The federal bankruptcy court granted Texaco's motion on the common sense grounds that "a proceeding such as this, *to enforce and construe a confirmation order issued by this Court in this case*, constitutes a proceeding 'arising in or related to a case under title 11'" under § 1334(b). *Id.* at 944 (emphasis added). Thus, the Texaco bankruptcy court did not, and was not asked to, address the question presented here: whether a state court suit (potentially) involving (some) pre-Confirmation Order Texaco conduct, and filed years after entry of such Order, is "related to" the Bankruptcy. The answer to this question, as explained above, is "no."[19]

Nor is this case "related to" the long-since-resolved Texaco Bankruptcy. Whether a civil proceeding is "related to" bankruptcy depends on "whether the outcome of the proceeding could conceivably have any effect on the estate *being* administered." *In re Chargit Inc., supra*, 81 B.R. at 247(emphasis added). "Although the optimist may argue that anything is 'conceivable,' any practical definition of this term of art must be tempered by a measure of reasonableness." *Id.* There is no conceivable chance that this case will affect the administration of the Texaco Bankruptcy, because it is no longer being administered.

By definitively discharging any and all claims or liabilities arising before its effective date, entry of the Texaco Confirmation Order fifteen years ago destroyed any possible relationship between the outcome of this suit and the *administration of* the Texaco Bankruptcy. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988).[20] As is evident

---

[19] The string of recent, simultaneously decided cases from the Southern District of Texas cited by Defendants in favor of their bankruptcy arguments should be disregarded. Although they involved motions to remand, the court's decisions in these cases were predicated expressly on *Texaco v. Sanders*, which, as described above, has no bearing on this case.

[20] *Feitz* involved a cross-claim filed by a debtor's wife against a mortgagee in her husband's bankruptcy proceeding. The cross-claim was filed a mere four months after the bankruptcy

The Honorable Shira Scheindlin
January 27, 2004
Page 18 of 19

from their complaints, which say nothing at all about the Texaco bankruptcy, the New
York Plaintiffs surely have no interest in re-opening such Bankruptcy or "collaterally
attacking" the Confirmation Order. The mere fact that allegations in the complaints may
potentially cover some pre-1988 conduct of Texaco does not furnish grounds for federal
"related to" jurisdiction under § 1334(b). Rather, it means only that Texaco may have a
discharge defense based on the Confirmation Order as to some small portion of its
liability – a defense that a state court is fully capable of adjudicating. *See In re McGhan,
supra,* 288 F.3d at 1180 ("a state court [has] jurisdiction to construe or determine the
applicability of a discharge order when discharge in bankruptcy is raised as a defense to a
state cause of action filed in state court").

> **2.    There are also ample grounds for the court to remand this action
> pursuant to § 1452(b).**

Defendants acknowledge, as they must, that the District Court's jurisdiction over
bankruptcy proceedings is concurrent with that of state courts. 28 U.S.C. *§* 1334(b); *see*
Ds' Opp. at 3. Thus, even if these actions were "related to" the Texaco Bankruptcy
pursuant to § 1334(b) – which they are not – the Court should remand them to state court
nonetheless, pursuant to 28 U.S.C. §1452(b).[21]

Section 1452(b) provides that "the court to which [a] claim or cause of action is
removed [pursuant to § 1334 jurisdiction] may remand such claim or cause of action on
any equitable ground." 28 U.S.C. § 1452(b). In determining whether to exercise their
equitable discretion under this statute, courts generally consider the following factors: (1)
the effect on the efficient administration of the bankruptcy estate; (2) the extent to which
issues of state law predominate; (3) the difficulty or unsettled nature of the applicable
state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the

---

court's entry of a confirmation order as to the bankruptcy estate. *Id.* at 456  Like the Texaco
Confirmation Order at issue here, the confirmation order in *Feitz* precluded creditors from
asserting any other interest than that provided for them in the confirmed plan. *Id.* at 458. The
Ninth Circuit held there was no federal "related to" jurisdiction over the cross-claim because
entry of the confirmation order *"destroyed any possible relationship between the outcome of the
suit and the administration of the bankruptcy estate." Id.* (emphasis added).

[21] While we recognize that some cases in this Circuit have questioned whether the mandatory
abstention provision in 28 U.S.C. §1334(c)(2) applies to removed cases, *see Rennaisance
Cosmetics, Inc. v. Dev. Specialists Inc.,* 277 B.R. 5, 13 (S.D.N.Y. 2002), we note that conditions
for mandatory abstention are met in this case. *See Allied Mechanical and Plumbing v. Dynamic
Hostels Housing Dev. Fund Co.,* 62 B.R. 873, 876 (Bankr.S.D.N.Y.1986) (setting out mandatory
abstention factors)  The pending remand motions were filed as soon as practicable following
service of the notices of removal. These lawsuits, which could not have been commenced in the
District Court absent the alleged bankruptcy issue, are based exclusively on state-created rights,
have been commenced in state court and are capable of timely adjudication there once remanded.

The Honorable Shira Scheindlin
January 27, 2004
Page 19 of 19

main bankruptcy case; and (6) the existence of the right to a jury trial. *Rennaisance Cosmetics, Inc., supra,* 277 B.R. at 14.

Here, every factor favors remand: (1) the effect of these actions on the administration of the Texaco Bankruptcy is, at most, incredibly remote; (2) the actions are based entirely on state-law causes of action; (3) as Defendants are sure to argue in motions to come, the cases raise difficult questions of state tort law, as well as complex, site-specific factual issues; (4) as New York law predominates, these cases are brought by subdivisions of the state and involve environmental and public issues of statewide importance, principles of comity clearly favor remand; (5) as described above, the remoteness of these cases to the Texaco Bankruptcy is extreme; and (6) the Plaintiffs' claims are triable by a jury. In light of these factors, and the fact that the New York state courts are fully capable of resolving any potential, remote Confirmation Order defense Texaco may assert, the equities not only favor, but demand, a remand of this case to state court. As the court concluded in *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.,* 130 B.R. 405, 408 (S.D.N.Y. 1991), these are "state law action[s] and a state court is better able to respond to a suit involving state law."

## CONCLUSION

This Court does not have subject matter jurisdiction over these actions. Even assuming the Court has jurisdiction over the Texaco Bankruptcy, the equities obviously favor remand. Accordingly, the Court should grant the instant motions for remand.

We will serve copies of this letter on the other counsel involved in these cases and those identified in the schedule attached to the Court's December 23rd Order.

Respectfully submitted,

VICTOR M. SHER

VMS: jac
cc: All Counsel per attached Service List

32

## CERTIFICATE OF SERVICE

1

2   STATE OF CALIFORNIA          )
                                )   ss
3   COUNTY OF SAN FRANCISCO      )

4   *The People of the State of California, et al v. Atlantic Richfield Company, et al*
    Superior Court Case No. 03AS05452
5   Eastern District Court Case No. CIV S-03-2653 GEB DAD

6           I am employed in the County of San Francisco, State of California. I am over the age of 18
    and not a party to this action. My business address is 450 Mission Street, 5th Floor, San Francisco,
7   CA 94105.

8           On **January 29, 2004**, I served the following documents described as:

9   PLAINTIFF'S OPPOSITION TO DEFENDANT'S EX PARTE APPLICATION FOR ORDER
    CONTINUING HEARING; DECLARATION OF VICTOR M. SHER IN SUPPORT THEREOF

10

11  [ X ] by transmitting via facsimile to the fax numbers set forth below on this date before 11:59pm.

12  DAVID L. SCHRADER                    213-612-2501
    MATTHEW T. HEARTNEY                  213-243-4199
13  COLLEEN P. DOYLE                     213-680-6499
    JON D. ANDERSON                      714-755-8290

14          On **JANUARY 30, 2004**, I served the following documents described as:

15  PLAINTIFF'S OPPOSITION TO DEFENDANT'S EX PARTE APPLICATION FOR ORDER
    CONTINUING HEARING; DECLARATION OF VICTOR M. SHER IN SUPPORT THEREOF
16
    [ X ] by placing true copies thereof in sealed envelope(s) addressed as follows:
17

18                       SEE ATTACHED SERVICE LIST

    [  ]  (**BY FEDERAL EXPRESS**) I am readily familiar with the business practices of collecting
19  and processing items for pick up and next business day delivery by Federal Express. Under said
    practices, items to be delivered the next business day are either picked up by Federal Express or
20  deposited in a box or other facility regularly maintained by Federal Express in the ordinary course of
    business on that same day  I placed such sealed envelope for delivery by Federal Express to the
21  offices of the addressee(s) as indicated on the attached mailing list on the date hereof following
    ordinary business practices. Executed on **January 29, 2004** at San Francisco, California.
22

23  [ X ]  (**BY MAIL**) I caused to such envelope to be deposited in the mail at Sacramento, California
    with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and
    processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day
24  in the ordinary course of business. I am aware that on motion of party served, service is presumed
    invalid if postal cancellation date or postage meter date is more than one day after day of deposit for
25  mailing in affidavit. Executed on **January 29, 2004** at San Francisco, California.

26  [ X ]   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at
    whose direction the service was made.
27

28

                                        Julie Choate

    _____
    Plaintiffs' Opp. to Ex Parte App. to Continue Hearing; Sher Decl ----Case No. CIV S-03-2653 GEB DAD

## SERVICE LIST

| | |
|---|---|
| Scott Summy, Esq. | Attorneys for Plaintiffs |
| Celeste A. Evangelisti, Esq. | |
| BARON & BUDD PC. | |
| 3102 Oak Lawn Avenue, Suite 1100 | |
| Dallas, TX 75219-4281 | |
| Tel: (214) 523-6267 | |
| Fax: (214) 520-1181 | |

Matthew T. Heartney, Esq.          Attorneys for Defendants:
Lawrence A. Cox, Esq.              Atlantic Richfield Company
Stephanie M. Bonnett, Esq.        BP Products North America, Inc.
ARNOLD & PORTER
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199

David L. Schrader, Esq.           Attorneys for Defendants:
John J. Wasilczyk, Esq.           Chevron U.S.A. Inc.
Allison N. Shue, Esq.             Chevron Texaco Corporation
MORGAN, LEWIS & BOCKIUS LLP       Unocal Corporation
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
Tel: (213) 612-2500
Fax: (213) 612-2501

John J. Lyons, Esq.               Attorneys for Defendants:
Jon D. Anderson, Esq.             ConocoPhillips Company
Michele D. Johnson, Esq.          Circle K Stores
LATHAM & WATKINS LLP
650 Town Center Drive, Ste. 2000
Costa Mesa, California 92626
Tel: (714) 540-1235
Fax: (714) 755-8290

Colleen P. Doyle, Esq,            Attorneys for Defendants:
Diana Pfeffer Martin, Esq.        Exxon Mobil Corporation
BINGHAM McCUTCHEN LLP             Mobil Corporation
355 South Grand Ave., Ste. 4400   Tesoro Refining And Marketing, Inc.
Los Angeles, CA 90071-3106
Tel: (213) 680-6400

Alan J. Hoffman, Esq              Attorneys for Defendant:
BLANK ROME LLP                    Lyondell Chemical Company
One Logan Square
18th and Cherry Street
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Fax: (215) 569-5341

| | | |
|---|---|---|
| 1 | Hojoon Hwang, Esq. | Attorneys for Defendants: |
| | MUNGER, TOLLES & OLSON LLP | Shell Oil Company |
| 2 | 33 New Montgomery Street, 19th Floor | Shell Oil Products U.S. |
| | San Francisco, CA 94105 | Texaco Refining & Marketing, Inc. |
| 3 | Tel: (415) 512-4000 | Equilon Enterprises LLC |
| | Fax: (415) 512-4077 | |
| 4 | | |
| | William D. Temko, Esq. | Attorneys for Defendants: |
| 5 | MUNGER, TOLLES & OLSON, LLP | Shell Oil Company |
| | 355 South Grand Avenue, 35th Floor | Shell Oil Products U.S. |
| 6 | Los Angeles, CA 90071-1560 | Texaco Refining & Marketing, Inc. |
| | Tel (213) 683-9100 | Equilon Enterprises LLC |
| 7 | Fax: (213) 687-3702 | |
| 8 | J. Clifford Gunter, III, Esq. | Attorneys for Defendants: |
| | Tracie J. Renfroe, Esq. | Ultramar, Inc. |
| 9 | M. Coy Connelly, Esq. | Valero Energy Corporation |
| | BRACEWELL & PATTERSON, LLP | |
| 10 | 711 Louisiana St., Ste. 2900 | |
| | Houston, Texas 77002 | |
| 11 | Tel: (713) 221-1404 | |
| | Fax: (713) 221-2123 | |
| 12 | | |
| | Brendan M. Dixon, Esq. | Attorney for Defendant: |
| 13 | 376 South Valencia Ave | Unocal Corporation |
| | Brea, CA 92823 | |
| 14 | Tel: (714) 577-2933 | |
| | Fax: (714) 577-2980 | |
| 15 | | |
| | Robert P. Doty, Esq. | Attorney for Defendant: |
| 16 | COX, CASTLE & NICHOLSON, LLP | 7-Eleven, Inc. |
| | 555 Montgomery Street, 15th Floor | |
| 17 | San Francisco, CA 94111-2585 | |
| | Tel: (415) 392-4200 | |
| 18 | Fax: (415) 392-4250 | |
| 19 | Nathan P. Eimer, Esq. | Attorneys for Defendant: |
| | Pamela R. Hanebutt, Esq. | Citgo Petroleum Corporation |
| 20 | Lisa S. Meyer, Esq. | |
| | EIMER, STAHL, KLEVONR & SOLBERG | |
| 21 | LLP | |
| | 224 South Michigan Avenue, Ste. 1100 | |
| 22 | Chicago, Illinois 60604 | |
| | Tel: (312) 660-7600 | |
| 23 | Fax: (312) 692-1718 | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

# Exhibit 14

JAN SCULLY, District Attorney                      [Exempt
ALBERT LOCHER, Assistant Chief Deputy District Attorney SBN 66616    from filing
RUSS DETRICK, Supervising Deputy District Attorney SBN 119255      and motion
SACRAMENTO COUNTY DISTRICT ATTORNEY               fees, Govt.
Environmental Protection Division                         Code § 6103]
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660

Attorneys for Plaintiff: the People of the State of California

Victor M. Sher, SBN 96197            Scott Summy, *Admitted in Texas*
Todd E. Robins SBN 191853           Celeste A. Evangelisti, SBN 225232
Lynda M. Collins SBN 229029         BARON & BUDD, P.C.
SHER & LEFF, LLP                   3102 Oak Lawn Avenue, Suite 1100
450 Mission Street, 5th floor          Dallas, TX 75219-4281
San Francisco, CA 94105            Telephone: (214) 523-6267
Telephone: (415) 348-8300        Facsimile: (214) 520-1181
Facsimile: (415) 348-8333

Attorneys for Plaintiffs: City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company and City of Sacramento

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISON

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, et al., | )   CASE No. 03-cv-2653 GEB DAD |
| | ) |
| Plaintiffs, | )   PLAINTIFFS' OPPOSITION TO |
| | )   DEFENDANTS' MOTION TO STAY |
| vs. | )   PROCEEDINGS; DECLARATION OF |
| | )   VICTOR M. SHER IN SUPPORT |
| | )   THEREOF |
| ATLANTIC RICHFIELD COMPANY, et al., | ) |
| | )   Hon. Garland E. Burrell, Jr. |
| | ) |
| Defendants. | )   Hearing Date: February 23, 2004 |
| | )   Time:  9:00 a.m. |
| | )   Location:  Courtroom 10 |
| |            501 I Street, #4-200 |
| |            Sacramento, CA 95814 |

0

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

# **TABLE OF CONTENTS**

I.    INTRODUCTION…………………………………………...…………………………….1

II.   PROCEDURAL BACKGROUND…………………………………………………...…3

III.  LEGAL ARGUMENT…………………………………………………………………… 4

    A.   THIS COURT SHOULD CONSIDER JURISDICTION FIRST, BEFORE
         DECIDING ON ANY POTENTIAL STAY PENDING POSSIBLE MDL
         TRANSFER…………………………………………………………………………… 4

    B.   THIS COURT CAN AND SHOULD DECLINE JUDGE SCHEINDLIN'S
         REQUEST TO ENTER A STAY, AS THE SCHEINDLIN ORDER
         DOES NOT BIND THIS COURT, AND WAS NOT EVEN INTENDED
         TO AFFECT THIS CASE…………………………………………………………….. 10

    C.   DEFENDANTS HAVE NOT DEMONSTRATED THE REQUISITE
         HARDSHIP TO JUSTIFY A STAY, WHILE PLAINTIFFS WOULD BE
         PREJUDICED IF THE STAY IS GRANTED……………………...………........13

IV.  CONCLUSION…………………………………………...……………………….16

i

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

## **TABLE OF AUTHORITIES**

**Cases**

*Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft,*

  54 F. Supp. 2d 1042 (D. Kan. 1999)…………………………………..…5, 7

*Aikins v. Microsoft,*

  2000 WL 310391 (E.D. La. 2000)……………………………..………….8

*American Seafood, Inc. v. Magnolia Processing, Inc.,*

  Nos. 92-1030, 92-1086, 1992 WL 102762 (E.D. Pa. May 7, 1992) …………….………..7

*Arthur Magna, Inc. v. Del-Val Fin. Corp.,*

  No. 90-4378, 1991 WL 13725 (D.N.J. Feb. 1, 1991)……………………..………………7

*BancOhio Corp. v. Fox,*

  516 F.2d 29 (6th Cir. 1975)…………………………………………………… 4

*Bd. of Trs. v. Worldcom, Inc.,*

  244 F. Supp. 2d 900 (N.D. Ill. 2002)…………………………..………………… 5

*Correa-Rodriguez v. Bridgestone/Firestone Inc.,*

  No. 00-3805-CIV-GRAHAM (S.D. Fla. Oct. 19, 2000)…………….………………7

*D's Pet Supplies v. Microsoft Corp.,*

  Nos. 99-76056, 99-76086, 99-76202, 00-70481, 2000 U.S. Dist. LEXIS 16482

  (E.D. Mich. Feb. 7, 2000)……………………………………………….…..…7

*Dix v. ICT Group, Inc.,*

  No. CS-03-0315-LRS, 2003 WL 22852135t *8 (E.D. Wash. Oct. 20, 2003)………. ….…..5

*Dumont v. Charles Schwab & Co.,*

  Nos. 99-2840, 99-2841, 2000 U.S. Dist. LEXIS 619, at *8 (E.D. La. Jan. 19, 2000) ……..7

*Ex parte McCardle,*

  74 U.S. 506 (1868)…………………………………………………….….. 5

*ExxonMobil Corp. v. U.S. E.P.A.,*

  217 F.3d 1246 (9th Cir. 2000)……………………………...…….….. 6, 10

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

*Falgoust v. Microsoft,*

    2000 WL 462919, at *2 (E.D. La. 2000)…….…..……………..….………………………8

*Farkas v. Bridgestone/Firestone, Inc.,*

    113 F. Supp. 2d 1107 (W.D. Ky. 2000)………………………………………...…….. 4

*Favaloro v. S/S Golden Gate,*

    687 F. Supp. 475 (N.D. Cal. 1987)……………………………………….………. 2, 12

*Filtrol Corp. v. Kelleher,*

    467 F.2d 242 (9th Cir. 1972)………………………………………………….……..12

*General Electric Company v. Byrne,*

    611 F.2d 670 (7th Cir. 1979)…………………………………………………………..9

*Good v. Armstrong World Indus.,*

    914 F. Supp. 1125 (E.D. Pa. 1996)……………………………………….…….……..6

*Good v. Prudential Insurance Co. of America,*

    5 F. Supp. 2d 804 (N.D. Cal 1998)………………………………………………... .7

*Havens Protected "C" Clamps, Inc. v. Pilkington PLC,*

    No. 00-2035-JWL, 2000 WL 382027, at *2 (D. Kan. March 28, 2000)…………………….5

*In re Air Crash Disaster Near Upperville Virginia on December 1, 1974,*

    430 F. Supp. 1295 (S.D. Ind. 1977)… ……… …………………………………….....11

*In re A. H. Robins Co., Inc.*

    505 F. Supp. 221 (JPML 1981)………………………………………………….……12

*In re Bridgestone/Firestone Inc.,*

    2000 WL 33416573 (JPML Oct. 24, 2000)……………………………………...……7

*In re Consolidated Fen-Phen Cases,*

    2003 WL 22682440, *3 (E.D.N.Y. Nov. 12, 2003)……………………………………. 8

*In re Consolidated Welfare Fund "Erisa" Litigation*

    1992 WL 212348 (S.D.N.Y. Aug. 21, 1992)…………………………...……….……..7

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

*In re Enron,*
    296 B.R. 505 (C.D. Cal. 2003)……………………………………..…..6

*In re Federal Election Campaign Act Litigation*
    511 F. Supp. 821 (JPML 1979) ………………………………...…..…7

*In re Franklin National Bank Securities Litigation,*
    393 F. Supp. 1093 (JPML 1975) …………………………………....…7

*In re: MTBE,*
    175 F. Supp. 2d 593 (S.D.N.Y. 2001)……………..………………...……..3

*In Re: MTBE,*
    209 F.R.D. 323 (S.D.N.Y. 2002)……………………………..…………..3

*In re New York City Mun. Sec. Litig.,*
    572 F.2d 49 (2d Cir. 1978)……………………………………….…..7

*In re Professional Hockey Antitrust Litigation,*
    369 F. Supp. 117 (JPML 1974)………………………………….....8

*In re Wireless Telephone Federal Cost Recovery Fees Litigation*
    2003 WL 22720008 (JPML Nov. 13, 2003)…………... …………………..…….8

*Ivy v. Diamond Shamrock,*
    901 F. 2d 7 (2d Cir. 1990)………………………………………….. 7, 8

*Johnson v. AMR Corporation,*
    1996 WL 164415, at *3-4 (N.D. Ill. 1996)…………………………………..8

*Karofsky v. Abbott Labs.,* supra,
    921 F. Supp. 18 (D. Me. 1996)……………………………….…..……5

*Landis v. North American Co.,*
    299 U.S. 248 (1936) …………………………………………......12

*Little v. Purdue Pharma, LP,*
    227 F. Supp. 2d 838, (S.D. Ohio 2002)………………………...……………......6

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1 | *Lloyd v. Cabell Huntington Hosp., Inc.,*
2 | 58 F. Supp. 2d 694 (S.D. W. Va. 1999)...................................................4
3 | *Medical Society of the State of New York v. Conn. General Corp.,*
4 | 187 F. Supp. 2d 89 (S.D.N.Y. 2001)...................................................8
5 | *Meyers v. Bayer AG,*
6 | 143 F. Supp. 2d 1044 (E.D. Wis. 2001).........................................*passim*
7 | *Namovicz v. Cooper Tire & Rubber Co.,*
8 | 225 F. Supp. 2d 582 (D. Md. 2001)...................................................7
9 | *Newton v. Thomason*
10 | 22 F.3d 1455 (9th Cir. 1994)...................................................2, 9
11 | *Oxygenated Fuels Ass'n v. Davis,*
12 | 331 F.3d 665 (9th Cir. 2003)...................................................*passim*
13 | *Oxygenated Fuels Assoc. v. Davis,*
14 | 163 F. Supp. 2d 1182 (E.D. Cal 2001)...................................................*passim*
15 | *Portnoy v. Zenith Labs.,*
16 | No. 86-3512, 1987 U.S. Dist. LEXIS 16134 (D.D.C. Apr. 21, 1987)...................................................7
17 | *Rivers v. Walt Disney Co.,*
18 | 980 F. Supp. 1360, 1362 (C.D. Cal. 1997)...................................................7
19 | *Siewart-Sitzmore v. Bridgestone/Firestone, Inc.,*
20 | No. 00-1289 (C.D. Ill. Sept. 14, 2000)...................................................7
21 | *Smith v. Mail Boxes, Etc.,*
22 | 191 F. Supp. 2d 1155 (E.D. Cal. 2002)...................................................*passim*
23 | *South Tahoe Public Utility District v. Atlantic Richfield Co.,*
24 | Case No. 999128 (S.F. Super. Ct. Apr. 15, 2002) ...................................................11
25 | *Steel Co. v. Citizens for a Better Environment,*
26 | 523 U.S. 83 (1998)...................................................1, 4

27

28

1 | *Stern v. Mutual Life Insurance Co.*,
2 |        968 F. Supp. 637 (N.D. Ala. 1997)..................................................................4
3 | *Tench v. Jackson National Life Insurance Co.*,
4 |        1999 WL 1044923, at *2 (N. D. Ill. 1999).....................................................8, 10
5 | *Tortola Restaurants, L.P. v. Kimberly-Clark Corp.*,
6 |        987 F. Supp. 1186 (N.D. Cal 1997)................................................................5
7 | *U.S. v. Hunter*,
8 |        70 F.Supp.2d 1100 (C.D. Cal. 1999)..............................................................9
9 | *Villarreal v. Chrysler Corp.*,
10 | No. C-95-4414 FMS, 1996 WL 116832, at *1 (N.D. Cal. Mar. 12, 1996)...........................1, 5
11 | *Weinke v. Microsoft*,
12 |        84, F. Supp. 2d 989 (E.D.Wis. 2000)..............................................................8
13 | **Statutes**
14 | 28 U.S.C. § 1452(b)..................................................................................6
15 | 42 U.S.C. § 7401......................................................................................11
16 | **Other Authorities**
17 | *Cal. Government Code*, §§ 61600, 61622...........................................................11
18 | Mike Roberts, *Multidistrict Litigation and the Judicial Panel, Transfer and Tag-Along*
19 |        *Orders Prior to a Determination of Remand: Procedural and Substantive Problem or*
20 |        *Effective Judicial Public Policy?,*
21 |        23 Memphis St. U.L.Rev. 841, 843 (1993)...... ..............................................13
22 | Earle F. Kyle, IV, *The Mechanics of Motion Practice Before the Judicial Panel on*
23 |        *Multidistrict Litigation,*
24 |        175 F.R.D. 589, 590 (1998) ........................................................................12
25 | JPML Rule of Procedure 1.5..........................................................................14
26 | JPML Rule of Procedure 7.4..........................................................................11
27 |
28 |

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

# I.    **INTRODUCTION**

The Court should deny Defendants'[1] Motion to Stay Proceedings Pending Ruling on Transfer and Consolidation by the Judicial Panel on Multidistrict Litigation ("Stay Motion").  Instead, the Court should immediately consider (and grant) Plaintiffs' pending motion for remand ("Remand Motion") and issue an order remanding the case to the state court in which it was filed.

Defendants wrongfully removed this purely state-law action to federal court.  Rather than have the Court address the threshold issue of whether it has jurisdiction to hear any aspect of this case, they now seek to delay indefinitely consideration of the fundamental jurisdictional issues raised in Plaintiffs' Remand Motion pending some possible future action by the Judicial Panel on Multidistrict Litigation ("JPML") – a process that, if it occurs at all, may well take the better part of this year, and will, in any event, result in a denial of the request to include this case in any multidistrict litigation.

This Court should deny Defendants' Stay Motion for the following reasons:

- *First*, jurisdictional issues raised in a remand motion should be resolved *prior to* consideration of a stay pending MDL transfer, particularly where, as here, the jurisdictional bases for removal are frivolous.  To rule otherwise would violate the long-standing "requirement that jurisdiction be established as a *threshold* matter," *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94 (1998) (jurisdiction-first rule "is inflexible and without exception").  As Judge Shubb of this Court recently explained, "jurisdiction is a preliminary issue that should be resolved at the outset," despite the possibility of an MDL transfer.  *Smith v. Mail Boxes, Etc.,* 191 F. Supp. 2d 1155, 1157 (E.D. Cal. 2002).  The overwhelming weight of authority on this point agrees.  *See, e.g., Villarreal v. Chrysler Corp.,* No. C-95-4414 FMS, 1996 WL 116832, at *1 (N.D. Cal.

---

[1] The defendants who signed the Stay Motion – Chevron U.S.A., Inc.; ChevronTexaco Corporation; Atlantic Richfield Company; Tesoro Corporation; Shell Oil Company; Shell Oil Products U.S.; and ExxonMobil Corporation – are collectively referred to herein as "Defendants."

1

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

Mar. 12, 1996) ("judicial economy will best be served by addressing the remand issue [as it] will facilitate litigation in the appropriate forum").

- *Second*, the December 23, 2003 order entered by the Hon. Shira A. Scheindlin in several unrelated cases pending in the U.S. District Court for the Southern District of New York (the "Scheindlin Order") does not support Defendants' Stay Motion. The Scheindlin Order has no binding effect on this Court, *see, e.g., Newton v. Thomason* 22 F.3d 1455, 1460 (9th Cir. 1994) (a federal court is not bound by federal court decisions outside its own circuit), and was never even intended to affect cases (like this one) involving parties not represented by counsel present at a December 19, 2003 hearing in New York that resulted in the Order. In fact, Plaintiff had no opportunity to participate in the New York hearing, was not a party to the stipulations on which the Scheindlin Order is expressly based, has not agreed to any transfer of this action to New York or a stay of this action pending any such transfer, and has strenuously objected to any such stay or prospective transfer.

- *Third*, Defendants have failed to demonstrate a clear case of hardship to justify the granting of a stay, while a stay would prejudice Plaintiffs' interest in a speedy resolution of this action alleging significant groundwater pollution. *Favaloro v. S/S Golden Gate*, 687 F. Supp. 475, 481 (N.D. Cal. 1987) ("[t]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else"); *Meyers v. Bayer AG,* 143 F. Supp. 2d 1044, 1048 (E.D. Wis. 2001) ("even though a stay does not directly implicate the merits of a case, it undeniably has important effects on the litigation . . . [i.e.] [r]emoving a case to federal court has long been known to impose a burden upon plaintiffs . . . [by] requir[ing] the plaintiff to present its arguments for remand in a foreign forum").

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

## II.   **PROCEDURAL BACKGROUND**

Plaintiffs in this action are the People of the State of California, two cities, one investor-owned water utility, and ten public agencies charged with managing and/or purveying drinking water resources in Sacramento County ("Plaintiffs").  Plaintiffs filed this action on September 30, 2003, against 18 oil and chemical industry defendants alleging purely state-law causes of action, including strict products liability, public nuisance, trespass, and negligence, as well as claims for cleanup costs and civil penalties under state statutes.

On or about December 8, 2003, certain defendants filed a Notice of Removal, removing this action to this Court.  In connection with their Notice of Removal, certain defendants apparently also filed with the Judicial Panel on Multidistrict Litigation ("JPML") a notice of relatedness to MDL 1358, *In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, a currently inactive MDL proceeding pending before Judge Scheindlin in the Southern District of New York, although Plaintiff has never received copies of any such notice.  *See* Declaration of Victor M. Sher, ¶ 2.  MDL No. 1358 involved several consolidated "actions brought on behalf of *private* well-owners seeking relief from the contamination or threatened contamination of their wells" by MTBE.  *In re: MTBE*, 175 F. Supp. 2d 593, 598 (S.D.N.Y. 2001) (emphasis added).  The court denied class certification in the matter (*see In Re: MTBE,* 209 F.R.D. 323 (S.D.N.Y. 2002)) and all the cases were resolved.  However, Defendants contend that the proceeding is technically still pending.  Defendants' Memorandum of Points and Authorities/ Declaration of David Schrader in Support of Stay Motion ("Ds' MPA") at 3, n.1.

On December 19, 2003, Judge Scheindlin held a hearing in connection with several recently-filed New York MTBE cases that were removed to federal court and assigned to her courtroom (the "New York Hearing").  *See* Transcript of New York Hearing (Sher Decl., Exhibit 1).  At that Hearing, the parties present before Judge Scheindlin (who did *not* include Plaintiffs) stipulated to a transfer of *their* cases to MDL 1358.  *Id.* at 13-18.  In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties *they represented* to MDL 1358.

3

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1    *Id*. That stipulation resulted in Judge Scheindlin's December 23, 2003 order (the "Scheindlin

2    Order") requesting that other federal courts enter stays in "similar removed actions."

3    Plaintiffs had no chance to participate at the New York Hearing, have not agreed to the

4    procedures stipulated to by the parties at that Hearing, and have strenuously objected to any

5    prospective transfer of their case to the Southern District of New York. *See* Sher Decl., ¶ 4; Exhibits

6    2-4. The JPML has not even issued a conditional transfer order, and Plaintiffs therefore have not yet

7    had an opportunity to exercise their rights under the Multidistrict Rules to object to and oppose such

8    transfer. *Id*., ¶ 2. On January 5, 2004, the District Attorney (on behalf of the People) and counsel

9    for the remaining Plaintiffs jointly notified Judge Scheindlin by letter of Plaintiffs' objections to the

10    Scheindlin Order and their intent to oppose transfer of this action to MDL 1358, *if and when* the

11    JPML issues a conditional transfer order. *Id*., Exhibit 2. On January 27, 2004, the District Attorney

12    and counsel for the remaining Plaintiffs sent additional letters under separate cover to Judge

13    Scheindlin reiterating their positions (and offering their respective views on the remand motions

14    pending in that court). *Id*., Exhibits 3-4.

15    Meanwhile, in California, Plaintiffs filed their Remand Motion in this Court on December

16    15, 2003. Defendants filed their Stay Motion on or about December 19, 2003.

## III.   ′LEGAL ARGUMENT

### A.    This Court Should Consider Jurisdiction First, Before Deciding On Any Potential Stay Pending Possible MDL Transfer.

20    Paramount jurisdictional concerns, judicial economy and fairness all require resolution of a

21    motion to remand *prior* to consideration of a stay pending a possible MDL transfer. "The

22    requirement that jurisdiction be established as a *threshold* matter . . . is inflexible and without

23    exception." *Steel Co. v. Citizens for a Better Environment, supra*, 523 U.S. at 94. As Judge Shubb

24    of this District recently held, "whether this court has jurisdiction is a preliminary issue that should

25    be resolved at the outset," before considering a stay for potential MDL treatment. *Smith v. Mail

26    Boxes, Etc., supra*, 191 F. Supp. 2d at 1157. Indeed, the overwhelming majority of cases adhere to

27    the "jurisdiction first" principle articulated by the Supreme Court in *Steel Co*. and followed by Judge

28

4

1   Shubb in *Smith*. These cases address the "threshold" question of jurisdiction raised in a remand

2   motion prior to entertaining an MDL-related stay for at least three reasons: (1) if federal jurisdiction

3   is lacking, then the court has no power to enter a stay and must immediately remand the case to state

4   court; (2) judicial economy favors resolution of the jurisdictional issue prior to MDL transfer (if

5   any); and (3) at a minimum, the court must take a "quick look" at the

6   jurisdictional issue to determine the best forum for resolving it.

7         The overriding reason to consider a remand motion before granting a stay is that a federal

8   court lacking subject matter jurisdiction over an action lacks the power to stay it.  Courts faced with

9   competing remand and stay motions have recognized this jurisdictional imperative.  *See Stern v.*

10  *Mutual Life Insurance Co.,* 968 F. Supp. 637, 639 (N.D. Ala. 1997) ( "[i]f the court lacks

11  jurisdiction over the action *ab initio*, it is without jurisdiction to enter such a stay"); *Lloyd v. Cabell*

12  *Huntington Hosp., Inc.,* 58 F. Supp. 2d 694, 696 (S.D. W. Va. 1999) ("[the court] cannot... stay

13  proceedings in an action over which it lacks jurisdiction"); *Farkas v. Bridgestone/Firestone, Inc.,*

14  113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000)  ("[t]he jurisdictional issue must be resolved

15  before deciding whether to stay or transfer the case to the MDL panel"); *see also BancOhio Corp. v.*

16  *Fox,* 516 F.2d 29, 32 (6th Cir. 1975) ("a transfer [to MDL] cannot be made unless the district court

17  properly has jurisdiction of the subject matter of the case"); *Ex parte McCardle,* 74 U.S. 506, 514

18  (1868) ("[w]ithout jurisdiction the court cannot proceed *at all* in any cause...").

19        Second, even if this court had jurisdictional *power* to address the Stay Motion judicial

20  economy strongly favors resolution of jurisdictional issues prior to considering issues related to

21  MDL transfer.  *See Villarreal v. Chrysler Corp., supra,* 1996 WL 116832, at *1 ("judicial economy

22  will best be served by addressing the remand issue [as it] will facilitate litigation in the appropriate

23  forum"); *Tortola Restaurants, L.P. v. Kimberly-Clark Corp.*, 987 F. Supp. 1186, 1188–89 (N.D. Cal.

24  1997) (motion to remand should be resolved prior to motion to transfer); *Dix v. ICT Group, Inc.*, No.

25  CS-03-0315-LRS, 2003 WL 22852135, at *8 (E.D. Wash. Oct. 20, 2003) ("[c]ontrary to

26  Defendants' contention, for purposes of judicial economy, the jurisdiction issue should be resolved

27

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1   immediately . . . before federal resources are further expended," despite pending MDL transfer

2   motion).[2]

3        Third, even if the Court is inclined to consider Defendants' Stay Motion on the merits, it

4   should at a minimum, make a preliminary assessment of the jurisdictional issue before considering

5   the Stay Motion. *See Meyers v. Bayer AG, supra*, 143 F. Supp. 2d 1044. If the Court determines

6   that removal was improper, it should immediately remand the case to state court. *Id.* at 1049. *Only*

7   if the preliminary assessment reveals that the jurisdictional question is legally or factually difficult,

8   should the Court move to the next steps, and: (1) assess whether the jurisdictional question is similar

9   to the issue in the other cases that may be transferred to the MDL; and (2) assess whether a stay

10  should be granted. *Id.; see also Bd. of Trs. v. Worldcom, Inc.*, 244 F. Supp. 2d 900, 902-03 (N.D.

11  Ill. 2002).

12       Application of the *Meyers* "quick look" methodology to this case will result in a denial of

13  Defendants' Stay Motion and an immediate remand of the case to state court. As demonstrated in

14  the Remand Motion, even a preliminary assessment of the jurisdictional issues raised here reveals

15  that removal was improper.[3] Defendants' attempt to find a "federal question" under the federal

16  Clean Air Act hidden within Plaintiffs' state-law strict product liability claim is frivolous, since it

17  hinges entirely on preemption arguments that have already been squarely and soundly rejected by

18  Judge Levi of this Court and the Ninth Circuit. *See Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"),

19  331 F.3d 665, 670, 673 (9th Cir. 2003) (upholding California ban of MTBE in gasoline), *affirming*

20  —————————————

21  [2] *See also Havens Protected "C" Clamps, Inc. v. Pilkington PLC*, No. 00-2035-JWL, 2000 WL

22  382027, at *2 (D. Kan. March 28, 2000) ("in the interests of judicial economy . . . court can
perceive no benefit to deferring ruling" on plaintiffs' remand motion, notwithstanding conditional

23  transfer order from JPML); *Karofsky v. Abbott Labs*, 921 F. Supp. 18, 21 n.4 (D. Me. 1996) ("it is
easier for me to determine the impact of [state] law on this individual case and to rule on the

24  jurisdictional issue [rather than to] transfer it to the [JPML], which has many other concerns");
*Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft,* 54 F. Supp. 2d 1042, 1048 (D. Kan.

25  1999) ("[i]f federal jurisdiction does not exist, the case can be remanded before federal resources are
further expended. . . . Judicial economy dictates a present ruling on the remand issue").

26

27  [3] Even some co-defendants have expressed strong reservations about the jurisdictional bases for
removal asserted by the removing Defendants. *See* Sher Decl., Ex. 5.

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1    *Oxygenated Fuels Assoc. v. Davis ("Davis I")*, 163 F. Supp. 2d 1182, 1187 (E.D. Cal. 2001);

2    *ExxonMobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1253 (9th Cir. 2000) (upholding Nevada county

3    regulation that effectively banned MTBE). Further, no court has ever accepted the "federal officer"

4    argument Defendants advance in their removal notice.[4] Likewise, Defendants' attempt to predicate

5    federal jurisdiction on the toehold of remote bankruptcy orders involving the predecessors of two

6    defendants also has no merit, especially in light of the obviously applicable remand factors under 28

7    U.S.C. § 1452(b). *See In re Enron*, 296 B.R. 505 (C.D. Cal. 2003) ("[c]omity dictates that

8    California courts should have the right to adjudicate the exclusively state law claims involving

9    California-centric plaintiffs and California-centric transactions").[5] Since removal was obviously

10   improper in this case, the Court should decline to consider the Stay Motion and instead immediately

11   remand the case to state court.

12          Defendants rely on a slew of cases that have nothing to do with the situation presented here,

13   many of which actually support Plaintiffs' position that the Remand Motion should be heard first.[6]

14

15   _____

16   [4] *See, e.g., Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of
     law" does not support removal where defendant is "merely 'subject to complex regulations'"); *Good
     v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy

17   procurement contract for turbines and state complaint regarding asbestos exposure where contract
     did not require manufacturer to use asbestos).

18

19   [5] Even if the Court were to find that the jurisdictional issues herein are "difficult," the circumstances
     do not favor a stay under the second "prong" of the *Meyers* analysis. *See Meyers, supra*, 143 F.

20   Supp. 2d at 1049. For example, unlike other MTBE contamination cases Defendants have removed
     to federal court, this case arises within the Ninth Circuit which has definitively rejected defendants'

21   federal preemption arguments. In addition, this case poses issues not common to other MTBE cases
     around the county because of (among other things) the People's claims and the People's unique

22   constitutional, statutory, and regulatory status. Thus, the second prong of *Meyers*, which requires
     similarity, is not satisfied in this case.

23

24   [6] Defendants cite, but did not provide courtesy copies of, several unpublished slip opinions and/or
     orders that Plaintiff was unable to locate, including *Correa-Rodriguez v. Bridgestone/Firestone Inc.*,

25   No. 00-3805-CIV-GRAHAM (S.D. Fla. Oct. 19, 2000); and *Siewart-Sitzmore v.
     Bridgestone/Firestone, Inc.*, No. 00-1289 (C.D. Ill. Sept. 14, 2000); *D's Pet Supplies v. Microsoft

26   Corp.*, Nos. 99-76056, 99-76086, 99-76202, 00-70481, 2000 U.S. Dist. LEXIS 16482 (E.D. Mich.

27   Feb. 7, 2000). Accordingly, the Court should disregard these cases.

28

                                                    7

1   *See Smith, supra,* 191 F. Supp. 2d at 1157 (Ds' MPA at 5) ("whether this court has jurisdiction is a

2   preliminary issue that should be resolved at the outset"); *Good v. Prudential Insurance Co. of*

3   *America,* 5 F. Supp. 2d 804, 806-809 (N.D. Cal. 1998) (D's MPA at 4) (deciding plaintiff's remand

4   motion *before* proceeding to defendant's stay motion).[7]  Many of the cases cited by Defendants

5   purporting to show the appropriateness of a stay are simply inapposite, as they do not involve a

6   pending motion to remand on jurisdictional grounds, and thus do not address the question presented

7   here.[8]  JPML and transferee court decisions cited by Defendants are likewise irrelevant since they

8   also do not address the question of whether a *transferor* court should resolve a jurisdictional remand

9   motion prior to an MDL-related stay.[9]

10

11

12   _____

13   [7] *See also Namovicz v. Cooper Tire & Rubber Co.,* 225 F. Supp. 2d 582 (D. Md. 2001) (Ds' MPA at
     5) (granting stay only after finding removal proper and denial of remand  warranted); *Aetna U.S.*
14   *Healthcare, Inc., supra,* 48 F. Supp. 2d at 43 (Ds' MPA at 5) (granting stay only after deciding
     remand issue); *Dumont v. Charles Schwab & Co.,* Nos. 99-2840, 99-2841, 2000 U.S. Dist. LEXIS
15   619, at *8 (E.D. La. Jan. 19, 2000) (Ds' MPA at 5) (ruling on jurisdiction issues raised by motion to
     dismiss on grounds of no Article III case or controversy prior to considering MDL-related stay
16   request).

17
     [8] *See Rivers v. Walt Disney Co.,* 980 F. Supp. 1360, 1362 (C.D. Cal. 1997) (Ds' MPA at 4) ( no
18   pending remand motion, and thus no "need to resolve any basic jurisdictional issues" before
     addressing the requested stay); *In re New York City Mun. Sec. Litig.,* 572 F.2d 49 (2d Cir. 1978)
19   (Ds' MPA at 4) (no pending remand or stay motion); *Arthur Magna, Inc. v. Del-Val Fin. Corp.,* No.
     90-4378, 1991 WL 13725 (D.N.J. Feb. 1, 1991) (Ds' MPA at 5) (no pending remand motion);
20   *American Seafood, Inc. v. Magnolia Processing, Inc.,* Nos. 92-1030, 92-1086, 1992 WL 102762
     (E.D. Pa. May 7, 1992) (Ds' MPA at 5) (same); *Portnoy v. Zenith Labs.,* No. 86-3512, 1987 U.S.
21   Dist. LEXIS 16134 (D.D.C. Apr. 21, 1987) (Ds' MPA at 5) (same).

22
     [9] *Ivy v. Diamond Shamrock Chem. Co.,* 901 F.2d 7 (2d Cir. 1990) (Ds' MPA at 4); *In re*
23   *Bridgestone/Firestone Inc.,* 2000 WL 33416573 (JPML Oct. 24, 2000) (Ds' MPA at 6); *In re*
     *Consolidated Welfare Fund "Erisa" Litigation* 1992 WL 212348 (S.D.N.Y. Aug. 21, 1992) (Ds'
24   MPA at 8);  *In re Federal Election Campaign Act Litigation* 511 F. Supp. 821 (JPML 1979) (Ds'
     MPA at 8); *In re Franklin National Bank Securities Litigation* 393 F. Supp. 1093 (JPML 1975) (Ds'
25   MPA at 8); *In re Professional Hockey Antitrust Litigation,* 369 F. Supp. 117 (JPML 1974) (Ds'
     MPA at 8); *In re Wireless Telephone Federal Cost Recovery Fees Litigation* 2003 WL 22720008
26   (JPML Nov. 13, 2003) (Ds' MPA at 8).

27

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1    Finally, while Defendants cite a few cases in which a stay was granted by the potential

2    transferor court despite a pending jurisdictional objection,[10] each of these minority-view, out-of-

3    circuit decisions is readily distinguishable.  In *Tench, Johnson, Weinke, Aikins,* and *Falgoust,* the

4    MDL transfer and consolidation process was well underway, and a final ruling by the JPML

5    regarding transfer was imminent in each case.  *Tench, supra,* 1999 WL 1044923, at *1  (JPML

6    hearing on transfer scheduled for one week after district court decision on stay and remand

7    motions); *Johnson, supra,* 1996 WL 164415, at *3  (conditional transfer order had been issued,

8    motion to vacate had been filed, and JPML was expected to rule "shortly" after defendants filed

9    their opposition); *Weinke, supra,* F. Supp. 2d at 989  (granting stay "in light of the pending MDL

10   Panel ruling on transfer") ; *Aikins, supra,* 2000 WL 310391, at *1  (motions pending before JPML

11   for consolidation of all cases against Microsoft); and *Falgoust, supra,* 2000 WL 462919, at *1

12   (motions pending before JPML for consolidation of all cases against Microsoft).[11]  Here, by

13   contrast, the JPML has not issued a conditional transfer order or taken any other action with respect

14   to this case – and may never do so.  *See* Sher Decl., ¶ 2.  Nor is there any pending motion to

15   consolidate.  Indeed, other than Defendants' vague representations regarding their submission of a

16   notice of related tag-along case, there is nothing in the record to suggest any imminent action by the

17

---

18   [10] *Tench v. Jackson National Life Insurance Co.,* 1999 WL 1044923, at *2 (N. D. Ill. 1999) (Ds'
19   MPA at 5, 7); *Johnson v. AMR Corporation,* 1996 WL 164415, at *3-4 (N.D. Ill. 1996) (Ds' MPA at
     7); *Weinke v. Microsoft* 84, F. Supp. 2d 989 (E.D.Wis., 2000) (Ds' MPA at 5); *Aikins v. Microsoft*
20   2000 WL 310391 (E.D. La. 2000) (Ds' MPA at 5, 7); *Falgoust v. Microsoft* 2000 WL 462919, at *2
     (E.D. La. 2000) (Ds' MPA at 5, 7); *Medical Society of the State of New York v. Conn. General*
21   *Corp.,* 187 F. Supp. 2d 89 (S.D.N.Y. 2001) (Ds' MPA at 5).
22   [11] In *Medical Society of the State of New York,* the transfer status of the case at the time of the court's
     decision is unclear.  However, *Medical Society* is distinguishable on several other grounds.  First, in
23   accord with *Meyers v. Bayer AG, supra,* 143 F. Supp. 2d 1044, the court acknowledged that "fairly
     obvious" jurisdictional questions (like the ones at issue in this case) should be ruled on first.  187 F.
24   Supp. 2d at 92.  In addition, the court erroneously predicated its decision on the Second Circuit's
     inapposite holding in *Ivy v. Diamond Shamrock, supra,* 901 F.2d 7 (JPML has authority to transfer
25   case despite pending jurisdictional objection).  In fact, in the more recent case, *In re Consolidated*
     *Fen-Phen Cases,* 2003 WL 22682440, *3, n.4 (E.D.N.Y. Nov. 12, 2003), the court specifically
26   recognized that *Ivy* has no bearing on the question of a potential transferor court's authority, and
     expressly rejected the court's rationale in *Medical Society* as "unconvincing."
27

28

9

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1  JPML regarding this case.[12] *Id.* Thus, given that this wrongfully removed action is in the extremely

2  early stages of an MDL transfer process that is unlikely ever to come to fruition, granting an

3  indefinite stay before determining whether there is even jurisdiction would be contrary to the

4  overwhelming weight of applicable authority.

5  **B.    This Court Can and Should Decline Judge Scheindlin's Request to Enter a Stay, As the
   Scheindlin Order Does Not Bind This Court, and Was Not Even Intended To Affect**

6  **This Case.**

7      The December 23, 2003 Scheindlin Order does not alter the analysis. It is elementary that the

8  Scheindlin Order has no legally binding effect on this Court. *See Newton v. Thomason* 22 F.3d

9  1455, 1460 (9th Cir. 1994) (a federal court is not bound by federal court decisions outside its own

10  circuit); *U.S. v. Hunter*, 70 F.Supp.2d 1100, 1108, n.8 (C.D. Cal. 1999) ("this Court is not bound by

11  an unpublished decision of another district court"); *see also General Electric Company v. Byrne*

12  611 F.2d 670 (7th Cir. 1979) ("[w]e are aware of no statute or decision which would authorize us to

13  issue a writ of mandamus directed to a district judge sitting in another circuit"). It is also clear that

14  only the JPML, rather than the putative transferee court, has the authority to issue an order

15  transferring this case to MDL 1358. *See* JPML Rule 7.4. Judge Scheindlin herself expressly

16  recognized this at the New York Hearing. *See* Transcript of New York Hearing, Sher Decl., Exhibit

17  1 at 4. ("I can't anticipate what the Judicial Panel of Multidistrict Litigation will do because

18  nobody invited me to be on the panel and I don't get a vote. So I don't know if they'll [transfer the

19  potential tag-alongs to MDL 1358]"). It is not surprising, then, that the Scheindlin Order was

20  predicated solely "upon stipulations there agreed to on the record *by the parties present*,"

21  Scheindlin Order, ¶1 (emphasis added), and thus, was never intended to affect cases (like this one)

22  involving parties (like Plaintiff) represented by counsel who were not present at the New York

23  Hearing.[13]

24  _____

25  [12] Moreover, if and when the JPML ever issues a conditional transfer order in this case, Plaintiffs
   intend to strenuously object to transfer of this action, Sher Decl., ¶ 4 – and, as explained in Section

26  III.B below, have strong grounds on which to do so.

27  [13] A review of the transcript from the New York Hearing further reveals that Judge Scheindlin
   appears to have been under the mistaken impression that counsel for the plaintiffs in the New York

28

10

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1    Plaintiffs, of course, had no opportunity to participate in the New York Hearing, were not a

2    party to the stipulations on which the Scheindlin Order is based, and have not agreed to any transfer

3    of this action to MDL 1358 or a stay of this action pending any such transfer. Sher Decl., ¶ 4. To

4    the contrary, Plaintiffs have communicated their objections to any prospective transfer of this case to

5    the Southern District of New York to Judge Scheindlin (see Sher Decl., Exhibits 1-2), and intend to

6    pursue those objections strenuously if and when the JPML ever issues a conditional transfer order

7    affecting this case.[14]  Sher Decl., ¶ 4.

8    Defendants' confident prediction that "[t]he JPML …is likely to transfer this action,"

9    because this and other MTBE-related cases recently removed to federal court "raise common issues

10   of fact and law" and "allege nearly identical causes of action," Ds' MPA at 6, is based on a false

11   premise.  In fact, Plaintiffs' claims in the instant case raise unique legal and factual issues that are

12   not appropriate for MDL treatment.

13   With respect to Plaintiff's Remand Motion, this action differs substantially from MTBE-

14   related lawsuits filed in other regions of the country.  Among other things, it arises within the Ninth

15   Circuit, which (in affirming a decision by Judge Levi) definitively rejected the Clean Air Act

16   preemption arguments on which Defendants base their assertion of federal jurisdiction in this case.

17   See Davis II, supra, 331 F.3d 665, affirming Davis I, supra, 163 F. Supp. 2d 1182; see also

18

19

20   _____

21   cases before her were in a position to stipulate to stays and transfers of most other MTBE-related
     cases pending in federal courts around the country.  See Transcript. of New York Hearing, Sher
22   Decl., Exhibit 1 at 4, 9.

     [14] If the JPML issues a conditional transfer order, JPML Rule of Procedure 7.4(a) provides that
23   "[t]he Clerk of the Panel shall serve this order on each party to the litigation but, in order to afford
     all parties the opportunity to oppose transfer, shall not send the order to the clerk of the transferee
24   district court for fifteen days from the entry thereof."  Within the 15 day period, Plaintiff intends to
     file a Notice of Opposition to transfer pursuant to Rule 7.4(c) and will subsequently file a Motion to
25   Vacate the conditional transfer order in accordance with Rule 7.4(d).  At that point the "Chairman of
     the Panel shall set the motion for the next appropriate hearing session of the Panel."  JPML Rule
26   7.4(d).

27

28

11

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1   *ExxonMobil Corp, supra*, 217 F.3d 1246.[15]  This case is also different given that the People bring

2   their claims pursuant to their unique constitutional, statutory, and regulatory powers, and the water

3   agency Plaintiffs similarly assert unique regulatory, property, usufructuary and other legal interests

4   in protecting ground and drinking water resources that will likely be the subject of pre-trial motions.

5   Such motions will be entirely irrelevant to the other MDL cases.  In short, this case contains unique

6   legal issues, and therefore does not stand to benefit from consolidation in an MDL.

7          Likewise, very few, if any, common factual issues remain that would benefit from MDL

8   treatment.  The key factual background concerning the development and widespread distribution of

9   MTBE, the characteristics of MTBE, and the industry's early knowledge of its risks, has already

10  been elucidated through discovery and adjudications in previous litigation.  *See Davis II, supra*

11  (addressing nature of MTBE, legislative history of federal Clean Air Act oxygenate requirements,

12  and California's unique regulatory powers over gasoline content); *Davis I, supra* (same); *In re:*

13  *MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) (surveying nature of oil industry's

14  knowledge of MTBE's risks, legislative history of Clean Air Act oxygenate requirements, and

15  industry's conspiracy to mislead the public and the EPA); *South Tahoe Public Utility District v.*

16  *Atlantic Richfield Co.*, Case No. 999128 (S.F. Super. Ct. Apr. 15, 2002) (special jury verdict finding

17  MTBE and gasoline containing MTBE defective products).  Thus, the factual issues remaining to be

18  litigated in this case are localized questions pertaining to matters such as local refining and gasoline

19  distribution systems, and Plaintiffs' damages.  An MDL court in the Southern District of New York

20  is clearly not an efficient – and certainly not the most efficient – forum for resolving these localized

21

22

_____

23  [15] Defendants assert primarily federal question and federal direction jurisdiction; both purported

24  grounds rely on a finding that the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, required Defendants to
    use MTBE.  *See* Notice of Removal, ¶¶ 38-43.  The Ninth Circuit has rejected that contention.  *See*

25  *e.g. Davis II, supra*, 331 F.3d at 673 (California's MTBE ban not preempted because "Clean Air
    Act's provisions regarding oxygenate fuel additives ... preserve state authority to adopt and enforce

26  measures to prevent water pollution").  The *Davis* decisions also recognized that California enjoys

27  powers over gasoline regulation not shared by other states.  *See id.* at 668, 669; *Davis I, supra,* 163
    F. Supp. 2d at 1185-1187.

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

issues.[16]

Instead of producing efficiencies in this case, the MDL process is likely to be highly burdensome to Plaintiffs because it will tie this local case up with other cases from around the country that share little in common with Plaintiffs' action. The logistical burdens of MDL practice are well known and likely to delay significantly resolution of Plaintiffs' case. *See* Earle F. Kyle, IV, *The Mechanics of Motion Practice Before the Judicial Panel on Multidistrict Litigation,* 175 F.R.D. 589, 590 (1998) ("the Panel can seize control of your case, thrust you into someone else's litigation halfway across the country, and relegate you to '100th chair' status in an already over-lawyered mass litigation"). Given the very poor fit between this action and the MDL process, this Court should decline Defendants' request to "tee up" the case for MDL transfer through the issuance of a stay.

## C.   Defendants Have Not Demonstrated the Requisite Hardship to Justify a Stay, While Plaintiffs Would Be Prejudiced If the Stay is Granted.

Defendants have not satisfied the requisites for obtaining a stay in any event. "The suppliant for a stay *must make out a clear case of hardship or inequity* in being required to go forward, if there is even a *fair possibility* that the stay for which he prays will work damage to some one else." *Favaloro, supra,* 687 F. Supp. at 481, *citing Landis v. North American Co.,* 299 U.S. 248, 255 (1936) (emphasis added); *see also Filtrol Corp. v. Kelleher,* 467 F.2d 242, 244 (9th Cir. 1972) (in deciding stay motion, court should consider hardship to the moving party in being required to go forward and prejudice to the non-moving party if the stay is granted).

---

[16] At least one defendant in this case, who did not join in Defendants' Stay Motion, fully agrees with Plaintiffs on this point. *See* January 5, 2004 Letter of Robert P. Doty on behalf of Defendant 7-Eleven, Inc. (Sher Decl., Exhibit 5) (expressing 7-Eleven's intent to oppose MDL transfer in this case on grounds that litigation of ostensibly local issues in New York would be "inefficient"). *See also In re Air Crash Disaster Near Upperville Virginia on December 1, 1974,* 430 F. Supp. 1295 (S.D. Ind. 1977) (conditional transfer order vacated since, although cases shared common issues and MDL court had expertise, all pre-trial proceedings had been concluded, plaintiffs had access to extensive discovery materials, and only damages issues unique to each case remained); *In re A. H. Robins Co., Inc.* 505 F. Supp. 221 (JPML 1981) (conditional transfer order in product liability suit vacated where pretrial proceedings were no longer active in MDL, discovery of common issues had been completed and parties to new actions could have access to prior discovery).

13

1    Here, Defendants have failed to make out a "clear case of hardship" in the event their Stay

2    Motion is denied. With a minimum of discussion, Defendants suggest that the "wasted effort" of

3    having to "relitigate" unspecified issues before a potential transferee court can be avoided by a

4    temporary stay. Ds' MPA at 9. However, in the context of Plaintiffs' Remand Motion, this

5    assertion hardly constitutes a showing of "hardship or inequity." A ruling on the Remand Motion by

6    this Court now will result in a remand of this action to state court, not a deluge of "duplicative

7    motion practice."[17] Moreover, to the extent Defendants – who are each represented by multiple law

8    firms and possess considerable resources – face any risk of duplicative effort by having to litigate at

9    least some similar jurisdictional issues in multiple courts, they have not made out a "clear case of

10   hardship." Indeed, as demonstrated above, the vast majority of courts agree that immediately

11   addressing jurisdictional issues *saves* time and resources, and outweighs any risk of duplicated

12   effort.

13    Defendants also suggest that "both sides may be prejudiced by inconsistent rulings on

14   important issues common to all of the MTBE cases," in light of the alleged congressional

15   "imperative" regarding uniform interpretation of federal clean air regulations. Ds' MPA at 10. To

16   the extent Defendants are referring to a federal preemption defense they intend to raise in this case,

17   their argument has no more merit than it does as a basis for jurisdiction, since *Davis II, supra,* has

18   shut the door on this argument. In any event, with respect to removal and remand issues, the risk of

19   inconsistent rulings is remote at best, because Defendants' grounds for removal are frivolous and

20   very unlikely to be sustained in any court.

21

22

───────────────

23   [17] Defendants' arguments about the hardship they will face if discovery and other pre-trial
24   proceedings are not stayed is a red herring, as their real goal is to postpone a hearing on Plaintiffs'
     Remand Motion. If the Court addresses the merits of the Remand Motion now – as it should – the
25   case will be remanded. In the unlikely event that it is not, the case should obviously move forward
     notwithstanding any pending transfer decision by the JPML, pursuant to JPML Rule of Procedure
26   1.5 ("[t]he pendency of . . . conditional transfer order . . .does not affect or suspend orders and
27   pretrial proceedings in the district court in which the action is pending").

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1    While Defendants will not be prejudiced by the Court denying a stay, the granting of a stay

2   will prejudice Plaintiffs by thrusting them into a distant forum not of their choosing.[18]   In *Meyers v.*

3   *Bayer AG, supra*, 143 F. Supp. 2d at 1048, the court observed that "even though a stay does not

4   directly implicate the merits of a case, it undeniably has important effects on the litigation."   In

5   particular, the court noted, "[r]emoving a case to federal court has long been known to impose a

6   burden upon plaintiffs . . . [by] requir[ing] the plaintiff to present its arguments for remand in a

7   foreign forum."   *Id.*   "Concerns about being haled into distant courts are particularly implicated by

8   the MDL system."   *Id.*   These observations apply with equal force to Plaintiffs in this case.

9    Most importantly, granting the requested stay would prejudice Plaintiffs by delaying

10   progress of this important water pollution case for months, if not the better part of this year.   During

11   this period of delay, Plaintiffs' case will be at a standstill, while the MTBE released by Defendants'

12   wrongful conduct contaminates an ever-increasing portion of the County's groundwater resources.

13   *See* Complaint, ¶¶ 74-76, 92 (MTBE, which is linked to a variety of potential adverse health effects

14   and renders drinking water unpalatable even at very low levels, spreads farther and faster than other

15   groundwater contaminants).

16    This important water pollution case has been delayed long enough.   The Court should

17   immediately remand it to state court so that the action can be heard and Plaintiffs can get on with

18   cleaning up the County's contaminated groundwater.

19

20

21

22

23

24   ────────────────

25   [18] *See* Mike Roberts, *Multidistrict Litigation and the Judicial Panel, Transfer and Tag-Along Orders
     Prior to a Determination of Remand: Procedural and Substantive Problem or Effective Judicial*

26   *Public Policy?*, 23 Memphis St. U.L.Rev. 841, 843 (1993) (observing that a plaintiff may be

27   "swiftly transferred from his state court to his home federal district and then whisked to an
     unknown, unpredictable United States district judge").

28

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

1          IV.   **CONCLUSION**

2          For the foregoing reasons, the Court should deny Defendants' Stay Motion.

3

4                                              Respectfully submitted,

5    DATED:  February 6, 2004                 JAN SCULLY, DISTRICT ATTORNEY

6                                              ALBERT LOCHER,
                                               Assistant Chief Deputy District Attorney
7

8                                        By:

9                                              RUSS DETRICK
                                               Supervising Deputy District Attorney
10                                             Attorneys for Plaintiff The People of the State of
                                               California
11
     DATED:  February 6, 2004                 SHER & LEFF, LLP
12

13

14                                       By:   _Victor M. Sher, with permission_

15                                             VICTOR M. SHER

16                                             BARON & BUDD, P.C.
                                               SCOTT SUMMY
17                                             CELESTE A. EVANGELISTI

18                                             Attorneys for Plaintiffs City of Elk Grove,
                                               Sacramento County Water Agency, Sacramento
19                                             Groundwater Authority, Carmichael Water
                                               District, Citrus Heights Water District, Del Paso
20                                             Manor Water District, Fair Oaks Water District,
                                               Florin Resource Conservation District, Rio
21                                             Linda Elverta Community Water District,
                                               Sacramento Suburban Water District, San Juan
22                                             Water District, California-American Water
                                               Company, and City of Sacramento
23

24

25

26

27

28

                                          16

     PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

**DECLARATION OF VICTOR M. SHER**

I, Victor M. Sher, declare:

      1.     I am a principal in the law firm of Sher & Leff, LLP, counsel of record for Plaintiffs City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Carmichael Water District, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company, and City of Sacramento in this matter. My office is jointly prosecuting this action with the Office of the Sacramento County District Attorney, who represents the People of the State of California. The plaintiffs represented by my office and the People are referred to collectively herein as "Plaintiffs." My office is also counsel of record for plaintiffs in certain other MTBE-related cases in California that were recently removed to federal court. Unless otherwise stated, the following facts are true and based upon my own personal knowledge.

      2.     On or about December 8, 2003, certain defendants ("Defendants") filed a Notice of Removal, removing this action from the Sacramento County Superior Court where it was filed. In connection with their Notice of Removal, it is my understanding that Defendants apparently also filed with the Judicial Panel on Multidistrict Litigation ("JPML") a notice of relatedness to MDL 1358, *In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, a currently inactive MDL proceeding pending before the Hon. Shira A. Scheindlin of the U.S. District Court for the Southern District of New York, although Plaintiff has never received copies of any such notice. At the same time, to my knowledge, the JPML has not issued a conditional transfer order in this case, and Plaintiffs therefore have not yet had an opportunity to exercise their rights under the Multidistrict Rules to object to and oppose such transfer. Other than Defendants' representations regarding their submission of a notice of related tag-along case, there is nothing in the record of this case that I am aware of to suggest any imminent action by the JPML regarding this case.

      3.     In support of their Motion to Stay, Defendants cite a December 23, 2003 Order issued by Judge Scheindlin (the "Scheindlin Order") related to several New York MTBE-related cases pending before her. I am informed that the Scheindlin Order is the result of certain

17

1   stipulations agreed to by certain parties during a hearing before Judge Scheindlin on December 19,

2   2003 (the "New York Hearing").  A true and correct copy of a transcript of the New York Hearing

3   obtained by my office is attached hereto as Exhibit 1.

4          4.      Plaintiffs had no opportunity to participate in the New York Hearing, were not a

5   party to the stipulations on which the Scheindlin Order is based, and have not agreed to any transfer

6   of this action to Multidistrict Litigation Case No. 1358 or a stay of this action pending any such

7   transfer.  To the contrary, Plaintiffs have communicated their objections to any prospective transfer

8   of this case to the Southern District of New York to Judge Scheindlin, and intend to pursue those

9   objections strenuously *if and when* the Judicial Panel on Multidistrict Litigation ever issues a

10  conditional transfer order affecting this case.

11         5.      A true and correct copy of the January 5, 2004 letter I sent to Judge Scheindlin on

12  behalf of Plaintiffs (without attached service list) is attached hereto as Exhibit 2.

13         6.      A true and correct copy of the January 27, 2004 letter I sent to Judge Scheindlin on

14  behalf of the plaintiffs in this case represented by my office and other California plaintiffs

15  represented by my office (without attached service list) is attached hereto as Exhibit 3.

16         7.      A true and correct copy of the January 27, 2004 letter sent by the District Attorney's

17  Office to Judge Scheindlin on behalf of the People (without attached service list), a copy of which

18  was served on and received by my office, is attached hereto as Exhibit 4.

19         8.      A true and correct copy of a January 5, 2004 letter sent by Robert P. Doty, Esq. to

20  Judge Scheindlin on behalf of defendant 7-Eleven, Inc. (without attached service list), a copy of

21  which was served on and received by my office, is attached hereto as Exhibit 5.

22         I declare under penalty of perjury under the laws of the United States of America that the

23  foregoing is true and correct.

24         Executed this 6th day of February, 2004 at San Francisco, California.

25

26

27                                          Victor M. Sher

28

                                          18

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

<u>CERTIFICATE OF SERVICE</u>

STATE OF CALIFORNIA          )
                             )        ss
COUNTY OF SACRAMENTO         )

I am a citizen of the United States and a resident of the County of Sacramento; I am over the age of eighteen years and not a party to the within above-entitled action; my business address is 906 G Street, Suite 700, Sacramento, California, 95814.

On February 6, 2004, I served the foregoing document(s) described as:

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PROCEEDINGS; DECLARATION OF VICTOR M. SHER IN SUPPORT THEREOF

on the party(s) in this action as follows:

Please see attached Service List.

☐   (Mail) placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Sacramento, California.

☒  (By Federal Express) placing a true copy thereof enclosed in a sealed envelope, prepaid and deposited with the Federal Express carrier-box at Sacramento, California.

☐   (By Personal Service) delivering by hand and leaving a true copy with the person and/or secretary at the address shown above.

☐  (By Facsimile) placing a true copy thereof into a facsimile machine addressed as stated above to said person and thereafter confirming the receipt of same

☒  (Federal) I declare that I am employed in the office of the bar of this court at whose direction the service as made.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 6, 2004, at Sacramento, California.

LATICIA DONAHUE

PLAINTIFF'S OPPOSITION TO STAY MOTION; SHER DECL.-- Case No. 03-cv-2653 GEB DAD

1

## SERVICE LIST

2

| | |
|---|---|
| Jan Scully, Esq. | Attorneys for Plaintiff: |
| Albert Locher, Esq. | The People of the State of California |
| Russ Detrick, Esq. | |
| SACRAMENTO COUNTY DISTRICT | |
| ATTORNEY | |
| Environmental Protection Division | |
| 906 G Street, Suite 700 | |
| Sacramento, CA 95814 | |
| Telephone:  (916) 874-6174 | |
| Facsimile: (916) 874-7660 | |

3

4

5

6

7

8

| | |
|---|---|
| Scott Summy, Esq. | Attorneys for Plaintiff: |
| Celeste A. Evangelisti, Esq. | Sacramento County Water District |
| BARON & BUDD PC | |
| 3102 Oak Lawn Avenue, Suite 1100 | |
| Dallas, TX 75219-4281 | |
| Tel:  (214) 523-6267 | |
| Fax:  (214) 520-1181 | |

9

10

11

12

| | |
|---|---|
| Matthew T. Heartney, Esq. | Attorneys for Defendants: |
| Lawrence A. Cox, Esq. | Atlantic Richfield Company |
| Stephanie M. Bonnett, Esq. | BP Products North America, Inc. |
| ARNOLD & PORTER | |
| 777 South Figueroa Street, 44th Floor | |
| Los Angeles, CA 90017-5844 | |
| Tel: (213) 243-4000 | |
| Fax: (213) 243-4199 | |

13

14

15

16

17

| | |
|---|---|
| David L. Schrader, Esq. | Attorneys for Defendants: |
| John J. Wasilczyk, Esq. | Chevron U.S.A. Inc. |
| Allison N. Shue, Esq. | Chevron Texaco Corporation |
| MORGAN, LEWIS & BOCKIUS LLP | Unocal Corporation |
| 300 South Grand Ave., 22nd Floor | |
| Los Angeles, CA 90071-3132 | |
| Tel: (213) 612-2500 | |
| Fax: (213) 612-2501 | |

18

19

20

21

| | |
|---|---|
| John J. Lyons, Esq. | Attorneys for Defendants: |
| Jon D. Anderson, Esq. | ConocoPhillips Company |
| Michele D. Johnson, Esq. | Circle K Stores |
| LATHAM & WATKINS LLP | |
| 650 Town Center Drive, Ste. 2000 | |
| Costa Mesa, California 92626 | |
| Tel: (714) 540-1235 | |
| Fax: (714) 755-8290 | |

22

23

24

25

| | |
|---|---|
| Colleen P. Doyle, Esq, | Attorneys for Defendants: |
| Diana Pfeffer Martin, Esq. | Exxon Mobil Corporation |
| BINGHAM McCUTCHEN LLP | Mobil Corporation |
| 355 South Grand Ave., Ste. 4400 | Tesoro Refining And Marketing, Inc. |
| Los Angeles, CA 90071-3106 | |
| Tel: (213) 680-6400 | |

26

27

28

20

| | |
|---|---|
| 1 | |
| 2 | Alan J. Hoffman, Esq. |
| | BLANK ROME LLP |
| 3 | One Logan Square |
| | 18th and Cherry Street |
| | Philadelphia, PA 19103-6998 |
| 4 | Tel: (215) 569-5500 |
| | Fax: (215) 569-5341 |

Alan J. Hoffman, Esq.
BLANK ROME LLP
One Logan Square
18th and Cherry Street
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Fax: (215) 569-5341

Attorneys for Defendant:
Lyondell Chemical Company

Hojoon Hwang, Esq.
MUNGER, TOLLES & OLSON LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
Fax: (415) 512-4077

Attorneys for Defendants:
Shell Oil Company
Shell Oil Products U.S.
Texaco Refining & Marketing, Inc.
Equilon Enterprises LLC

William D. Temko, Esq.
MUNGER, TOLLES & OLSON, LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Tel (213) 683-9100
Fax: (213) 687-3702

Attorneys for Defendants:
Shell Oil Company
Shell Oil Products U.S.
Texaco Refining & Marketing, Inc.
Equilon Enterprises LLC

J. Clifford Gunter, III, Esq.
Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
BRACEWELL & PATTERSON, LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002
Tel: (713) 221-1404
Fax: (713) 221-2123

Attorneys for Defendants:
Ultramar, Inc.
Valero Energy Corporation

Brendan M. Dixon, Esq.
376 South Valencia Ave.
Brea, CA 92823
Tel: (714) 577-2933
Fax: (714) 577-2980

Attorney for Defendant:
Unocal Corporation

Robert P. Doty, Esq.
COX, CASTLE & NICHOLSON, LLP
555 Montgomery Street, 15th Floor
San Francisco, CA 94111-2585
Tel: (415) 392-4200
Fax: (415) 392-4250

Attorney for Defendant:
7-Eleven, Inc.

Nathan P. Eimer, Esq.
Pamela R. Hanebutt, Esq.
Lisa S. Meyer, Esq.
EIMER, STAHL, KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Ste. 1100
Chicago, Illinois 60604
Tel: (312) 660-7600
Fax: (312) 692-1718

Attorneys for Defendant:
Citgo Petroleum Corporation

21

PLAINTIFFS' OPPOSITION TO STAY MOTION; SHER DECL. -- Case No. 03-cv-2653 GEB DAD

**EXHIBIT 1**

3CJLMTBC

1

| | 3CJLMTBC |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 1 | SOUTHERN DISTRICT OF NEW YORK |
| 2 | -----------------------------x |

IN RE:  MTBE, et al.                    00 MDL 1358 (SAS)
-----------------------------x
IN RE:
County of Nassau, et al.,
          -against-                     93 CV 9543  (SAS)
Ameroda Hess, et al.
-----------------------------x
                                        New York, N.Y.
                                        December 19, 2003
                                        10:17 a.m.


Before:

                    HON. SHIRA A. SCHEINDLIN,

                                        District Judge

                            APPEARANCES

WEIRZ & LUXEMBERG
      Attorneys for Plaintiffs Nassau County, et al.
BY:  SANDERS MCNEW
     ROBERT GORDON
     STANLEY ALPERT

NAPOLI, KAISER & BERN, LLP
      Attorneys for Plaintiffs Village of Mineola, et al.
BY:  MARC JAY BERN
     TOM RALEIGH

MCDERMOTT, WILL & EMERY
      Attorneys for Defendant Exxon Mobil
BY:  PETER JOHN SACRIPANTI
     JAMES PARDO

EIMER, STAHL, KLEVORN & SOLBERG
      Attorneys for Defendant Citgo Petroleum
BY:  NATHAN P. EIMER

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

3CJLMTBC
                         APPEARANCES (cont.)
J. ANDREW LANGAN
      Attorney for Defendants BP Products, et al.

WALLACE, KING, MARRARO & BRANSON
      Attorneys for Defendants Chevron, USA, et al.
BY:  RICHARD E. WALLACE, JR.

PATTON, BOGGS
      Attorneys for Defendant Texaco, Inc.
BY:  ROBERT JONES

BEVERIDGE & DIAMOND
                            Page 1

3CJLMTBC

8          Attorneys for Defendants Sunoco, Inc., et al.
8     BY:  HEATHER FUSCO
9
9     LATHAM & WATKINS
10          Attorneys for Defendants Conoco and Getty
10    BY:  JOHN MCGAHREN
11
11    GOODWIN, PROCTER, LLP
12          Attorneys for Defendant Gulf Oil Ltd. Partnership
12    BY:  CHRISTOPHER J. GARVEY
13
13    BLANK, ROME, LLP
14          Attorneys for Defendant Lyondell Chemical Company
14    BY:  MICHAEL J. ROESSNER
15
15    HOWREY, SIIMON, ARNOLD & WHITE
16          Attorneys for Defendants Ameroda Hess, et al.
16    BY:  MINDY G. DAVIS
17
17    HUNTON & WILLIAMS
18          Attorneys for Defendant Koch Industries
18    BY:  LAUREN ROSENBLATT
19
20
21
22                    * CONFERENCE *
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                         3

3CJLMTBC                      Conference
                 (Case called)
1          THE COURT:  Mr. McNew?
2          MR. MCNEW:  Good morning, your Honor.
3          THE COURT:  Mr. Gordon?
4          MR. GORDON:  Good morning.
5          THE COURT:  Mr. Alpert?
6          MR. ALPERT:  Good morning, your Honor.
7          MR. BERN:  Good morning, your Honor.
8          MR. RALEIGH:  Good morning, your Honor.
9          THE COURT:  Good morning, Mr. Bern, Mr. Raleigh.
10   Mr. Sacripanti?
11         MR. SACRIPANTI:  Good morning, your Honor.
12         THE COURT:  Mr. Eimer?
13         MR. EIMER:  Good morning, your Honor.
14         THE COURT:  Mr. Pardo.
15         MR. PARDO:  Good morning, your Honor.
16         THE COURT:  Mr. Langan?
17         MR. LANGAN:  Good morning, your Honor.
18         THE COURT:  Mr. Wallace?
19         MR. WALLACE:  Good morning, your Honor.
20         MR. JONES:  Good morning, your Honor.
21         THE COURT:  Mr. Jones.  And Miss Fusco?
22         MS. FUSCO:  Good morning.
23         THE COURT:  Those are the folks on the seating chart
24   but good morning to the rest of you who aren't on the seating
25              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                         4

3CJLMTBC                      Conference
1    chart, but are here.
                            Page 2

3CJLMTBC

2  Well, it does seem a bit like a reunion, but that's
3  not why we're here, to have our annual reunion.  We're here
4  because there have been filings, a number of remands around the
5  country, state court.  There's been removal of those cases to
6  various federal courts around the country.
7  And there are two in this district:  County of Nassau
8  versus Ameroda Hess and Western Nassau Water Authority versus
9  Ameroda Hess.  The first one, County of Nassau, 03 CV 9543.
10 And the other one, Water Authority Western Nassau, 03 CV 9544.
11 Now, I'm not even sure that these two cases have been yet
12 assigned to me.  They may have been marked as related to the
13 earlier cases pending my consideration but it wouldn't matter
14 today because I'm also the Part 1 judge.
15 In any event, you would have been stuck with me today.
16 They are unassigned.  So whether they're here as related cases,
17 here as Part 1 cases or here as potentially MDL 1358, it
18 doesn't matter, because it's before me.
19 So the issue we're here to discuss, I think, is
20 whether this Court should stay consideration of a pending
21 motion to remand, the courtesy copy papers of which we received
22 last night.  The plaintiffs are moving to remand these two
23 cases to state court, probably moving to remand cases around
24 the country to state court.  The question is whether those
25 motions should be stayed pending the decision by the federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

3CJLMTBC                    Conference

1  MDL Panel as to where all removed federal cases should be
2  heard.  Should they be heard by one MDL selected judge or
3  should they remain in their many jurisdictions around the
4  country?  If these actions are not stayed pending decision of
5  the MDL Panel, of course, the risk is inconsistent rulings on
6  the remand issue.  We may have differing remand decisions from
7  federal judges all over the country.  If they were stayed
8  pending the MDL Panel's decision as to what to do with these,
9  what appears to be now maybe 40 cases, then the remand decision
10 would be made by the one judge that the MDL Panel selects, if
11 they decide to treated this as an MDL.  I think that frames the
12 issue.
13 The history this week is that I received a letter from
14 the defendants asking for a stay.  And I, too quickly, without
15 waiting to hear from the plaintiffs, endorsed it and granted
16 the stay, and then I got a letter from the plaintiffs and said,
17 No, there are good reasons not to grant a stay, and I said,
18 well, I haven't heard from them, that's true, so I vacated the
19 stay and I invited you all to come in today and discuss this
20 with the thought that I would make a decision at the conference
21 today.  So that's where we stand.
22 My first act, I heard from the one side, I vacated
23 that.  I'd like to hear from both sides -- briefly, because I
24 have read your material -- and make a decision.  So who would
25 like to be heard?  Mr. McNew?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

3CJLMTBC                    Conference

1  MR. McNEW:  Thank you, Judge.  And thank you for
2  hearing us on short notice.  We're grateful for that.
3  The narrow issue before you this morning, I believe,
4  is:  Does it make more sense to hear the remand proceedings in
5  these two cases now or whether it makes sense to stay them
6  pending proceedings in other courts and before the Judicial

Page 3

3CJLMTBC

```
 7   Panel on Multidistrict Litigation.  Whatever the merits of the
 8   request to stay in other courts, Judge, we have a difficult
 9   time understanding the logic of asking you to stay your
10   decision on these remand motions.  Because unlike every other
11   court in the country, you, Judge, are the presiding judge over
12   MDL 1358.  And the defendants' papers throughout the country
13   are all identical on this point.  They in each case ask that
14   the Court not only remove the stay, they now move to have these
15   matters sent as tag-along actions to MDL 1358 with the
16   expectation, Judge, that these cases come to you through the
17   mechanism of the JPML for decision on a consolidated MDL basis.
18              Your Honor, while there may be some risk of
19   inconsistent rules in other jurisdictions, the notion that you
20   could enter a ruling today that would be inconsistent with your
21   ruling following a consolidation in MDL 1358 is illogical.  And
22   frankly, Judge, if the goal here is to handle this with a
23   minimum of expenditure of federal judicial resources -- and
24   frankly, with a minimum of resources on the part of the parties
25   being expended -- the best thing for you to do is for you to
```

3CJLMTBC                    Conference

```
 1   decide these remand pages now.
 2              THE COURT:  That was very interesting; that was very
 3   unexpected.  I didn't think you were going to argue that.  What
 4   you're saying is you're going to assume that the MDL Panel will
 5   agree to make an MDL decision for all pending cases and refer
 6   them to me as part of MDL 1358.  And if I knew all that, it
 7   would be a fait accompli.  There would be no risk of
 8   inconsistent rulings around the country because the MDL panel
 9   would say all 40 should be MDL, and the MDL should go to Judge
10   Scheindlin.
11              If all that were to be done today, I promise you, I'd
12   start working on the remand motion Monday.  But nobody's done
13   that.  I can't anticipate what the Judicial Panel of
14   Multidistrict Litigation will do because nobody invited me to
15   be on the panel and I don't get a vote.  So I don't know if
16   they'll do that.  Do you know if they'll do that?
17              MR. MCNEW:  Well, your Honor, first, I would note, I'm
18   not sure if it's clear from the papers that have come to
19   chambers, but it is not the defense -- it's not the defendants'
20   tack to say to the JPML that they ought to consider whether
21   there should be an MDL for these cases.  They've identified
22   these expressly as tag-along cases to MDL 1358.  They've
23   expressly stated in their papers all around the country --
24              THE COURT:  Okay, so the defendants have taken that it
25   should all come here.  But what about the various and many
```

3CJLMTBC                    Conference

```
 1   plaintiffs' lawyers around the country?
 2              MR. MCNEW:  We are the various plaintiffs lawyers
 3   around the country.
 4              THE COURT:  You're everybody?  What are you all saying
 5   to the judicial panel?
 6              MR. MCNEW:  If the transfer -- if the JPML decides to
 7   transfer them to MDL, absolutely, this is where they belong.
 8   No question in my mind.
 9              THE COURT:  So you're okay on the second half.  But if
10   they're going to be MDL, they're going to be here.  What do
11   they think about MDL tree?
```

3CJLMTBC

12      MR. MCNEW:  I think there's a decision tree here, if
13  the JPML decides that multidistrict litigation isn't warranted
14  here.
15      THE COURT:  Isn't warranted?
16      MR. MCNEW:  Is not warranted here, okay, you still
17  have these two cases before you.  You have to decide.  So you
18  should decide them now.
19      THE COURT:  Well, then I would know that that's their
20  decision and lots of judges around the country are going to be
21  making these remand decisions.  I'll just be one of many.  But
22  what is the plaintiffs' position before the panel?  Are you
23  saying they should not be treated as MDL or they should be
24  treated as MDL?  Which position are the plaintiff's lawyers
25  taking?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

3CJLMTBC              Conference
1       MR. MCNEW:  Our position -- I just want to make sure
2   we're on the same page -- our position is if they are in the in
3   the federal court, then they absolutely should be in the MDL
4   before your Honor.
5       THE COURT:  If they're in the federal court.
6       MR. MCNEW:  If they remain in federal court, if
7   they're not remanded, then absolutely they belong in this
8   courtroom.
9       THE COURT:  Wait, wait, wait.  That is a confusing
10  position.  Surely you're seeking remand.  I understand this.
11      MR. MCNEW:  We are.
12      THE COURT:  Your first position is they don't belong
13  in the federal court at all.  I do understand that.
14      MR. MCNEW:  That's correct.
15      THE COURT:  But before the Judicial Panel on
16  Multidistrict Litigation are you saying, Let's quickly get them
17  MDL, for one federal judge to decide remand, so that if they
18  should go back to state court, according to that one judge,
19  they'll all go back?  If that one judge says they shouldn't go
20  back, well, I guess we've lost that; we can appeal it but we've
21  lost it?  So do you want the remand decisions made by as many
22  federal judges as there are around the country or are you not
23  resisting the MDL process so we can get the remand decided at
24  once?
25      MR. MCNEW:  We have decided, your Honor, to try and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

3CJLMTBC              Conference
1   have cases remanded before a conditional transfer order comes
2   out.  That has been our litigation strategy.  We believe that
3   the removals are so facially defective on a jurisdictional
4   ground that it would be more efficient to have them sent down
5   rather than having to go through the laborious process of going
6   through the JPML proceedings.
7       THE COURT:  My guess is you can't beat the process
8   that way, because judges work at various speeds around the
9   country.  You're not going to get all the different federal
10  judges to decide remand motions before the Judicial Panel on
11  Multidistrict Litigation gets to decide whether they should be
12  transferred to one judge as part of an MDL or whether they
13  should stay before many judges.  I don't think you can beat the
14  system that way.  The Judicial Panel on Multidistrict
15  Litigation will hear the issue and will decide.
16      And I did look quickly or briefly at my own prior

Page 5

3CJLMTBC

17  decision and at your moving papers on the remand issue to get a
18  sense of it, and I can certainly say that your papers are not
19  facially frivolous.  In other words, it's a serious remand
20  motion.
21          On the other hand, nor do I think the removals are
22  facially frivolous.  There are serious, hard issues to be
23  addressed.  It's going to take some work on both sides to
24  figure out -- at least what I think.  This is not the kind of
25  motion that can be decided over the weekend.  Maybe there are

11

3CJLMTBC                        Conference
1  many judges who are smarter and quicker and they'll do it --
2          MR. MCNEW:  Perhaps on a second reading, Judge.
3          THE COURT:  Whatever.  But I didn't get there that
4  fast.  For me it will take some work to figure out what to do.
5  So seeing as how I think it's a serious motion raising serious
6  issues on both sides, I don't think it's a good idea to risk
7  many inconsistent verdicts from around the country, and there
8  did seem to be a case in the Second Circuit, I thought this Ivy
9  case, 901 F2d 7, 2d Cir. 1990, the Second Circuit at least
10 seemed to take the position that it be wise to get the MDL
11 process organized first, transfer to one judge, and then the
12 Court said:
13          Once transferred, the jurisdictional objections can be
14 heard and resolved by a single court and reviewed at the
15 appellate level.  Consistence as well as economy is thus
16 served.  We hold, therefore, the MDL Panel has jurisdiction to
17 transfer a case in which a jurisdictional objection is pending.
18          And that's exactly this case procedurally.  There's a
19 real jurisdictional objection, a very important one.  You're
20 saying it should not be in the federal court, should be in the
21 state court.  There's no federal jurisdiction.  Nothing could
22 be more important.
23          Rather than have 40 federal judges over and over again
24 struggle with difficult issues of preemption and other
25 things -- not just preemption, there are other questions here

12

3CJLMTBC                        Conference
1  about jurisdiction -- rather than have all that struggling
2  going on, if the panel would make a quick decision, would
3  decide if they want 40 judges to do it or they want one judge
4  to do it, and if so, which one, then your motion will be
5  reached quickly once -- to one side or the other, hopefully
6  quickly -- and then you can get to the merits of what you
7  eventually want to do.
8          MR. MCNEW:  Of course, Judge, this is a decision
9  that's committed to your discretion.  And I appreciate the
10 Second Circuit's decision, and certainly we are all guided by
11 it.  I would ask the Judge, though, to consider in this
12 particular instance there are extraordinary circumstances that
13 aren't present in the ordinary set of facts.  Because in this
14 particular instance, Judge, unlike every other one in the
15 country, by a happy coincidence, we happen to be before the MDL
16 judge.  The one judge that we all agree, if this is proper
17 subject for the MDL, we all agree that you're the judge to hear
18 it.  It's in their papers.  We're here telling you today we
19 absolutely agree with them:  You are the person to hear this
20 case.
21          THE COURT:  You are saying to the MDL Panel, While we
Page 6

3CJLMTBC

22  oppose the MDL treatment, if you're going to MDL, get it to
23  Judge Scheindlin quickly?  Is what you're going to say?
24          MR. McNEW:  Absolutely.
25          THE COURT:  When are they next hearing these things?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13

3CJLMTBC                        Conference
    Does anybody know what their schedule is?
1          MR. LANGAN:  Your Honor, Andy Langan.  I've been
2   handling the MDL Panel file.  The state of play is reflected in
3   our letter.
4          THE COURT:  Give us the timeline.
5          MR. LANGAN:  Traditional transfer orders have not been
6   entered yet.  It really depends on what the plaintiffs do.  If
7   the plaintiffs object to conditional transfers, once they're
8   entered, it will take awhile.  I'm gratified to hear the
9   plaintiffs say they're not apparently intending to object.
10         THE COURT:  They didn't say that.  They said if it's
11  going to be treated as an MDL, then they think it belongs in
12  this Court.  Their first position before the panel is it should
13  not be MDL, prior to decision on the remand motions around the
14  country.
15         MR. LANGAN:  The MDL Panel routinely overrules that
16  argument.  There's 50 or 60 published decisions that say that's
17  not a ground to not MDL.  Your Honor is aware of that.  There's
18  a ton of cases I think that say that.
19         But to deflect timing -- the plaintiffs are going to
20  object -- it's going to take a couple of months to sort it all
21  out.
22         THE COURT:  And if they don't object?
23         MR. LANGAN:  It's a matter of weeks, once the
24  conditional transfer orders are out.  It's an administrative
25                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14

3CJLMTBC                        Conference
1   issue with the panel's office.  I can't say why they haven't
2   entered them yet.
3          MR. McNEW:  Judge, I'd like to finish my point,
4   because I think it's an important one.  In fact, I think it's
5   the key of this entire hearing.  And it's a simple point, and
6   that is that if we all agree -- we can go down the various
7   decision trees and various outcomes.  But at the end of the
8   day, any disposition of the remand issue in a federal forum, if
9   we lose on all the -- you may be right on the -- what happens
10  with the MDL and other courts' willingness to decide it before
11  the MDL.  But even in that case, we're all at the end of the
12  day back here, before you on the same papers that you have
13  before you today.  And rather than going through this process
14  of ensuring that you do not enter a decision today that is
15  going to be inconsistent with your decision when you decide
16  this in your capacity as an MDL judge --
17         THE COURT:  It's not that inconsistency that's
18  worrying me.  It's the inconsistency potentially with the many
19  other judges around the country.  Not that I can stay their
20  decision to see whether to proceed or not, but they may be
21  influenced by what I do.  You said that when I improvidently
22  signed the defendants' letter --
23         MR. McNEW:  I never used that word, Judge.
24         THE COURT:  Well, quickly, without hearing from you,
25  when I did that, you pointed out they were circulating it to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            Page 7

3CJLMTBC
(212) 805-0300

15

3CJLMTBC                    Conference
1   all these other courts already.  Saying even "she" did this.
2          My point is, if it's going to influence their
3   decision, there's a message I need to send, I think we need to
4   wait for the MDL Panel to decide whether they think this
5   warrants MDL treatment.
6          But I don't know that what the big consequence of this
7   is -- I'm not sure what the big consequence of this is, because
8   if I were to grant this stay, so to speak, of deciding the
9   remand motion while the MDL Panel works it out -- you know, you
10  don't have a camera planted in my chambers.  You're right,
11  eventually I'm going to have to decide whether or not they give
12  MDL treatment.  If they do, I've got them all; if they don't,
13  I've got the two new New York ones.  So there's still an
14  important signal that needs to be sent that I defer to the MDL
15  Panel to make its decision in theory they might not do
16  it at all, or they might pick a different judge for whatever
17  reason.  I have to respect that.  But if I wish to, I can start
18  working now.
19         MR. MCNEW:  Let me make a suggestion, your Honor,
20  because I think there's a way to move this quickly to conserve
21  an awful lot of time and effort in a lot of different foras,
22  and I think you are the key to this because of the unusual
23  circumstance of having these individual cases come to you.
24         THE COURT:  They're only coming to me as related,
25  right?  How do I get these?  They're marked as related cases.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

16

3CJLMTBC                    Conference
1   This wasn't an accident of the wheel.
2          MR. MCNEW:  It was an accident.  We filed two in
3   New York Supreme for New York County.  There's a story behind
4   that -- that's another story.
5          THE COURT:  Okay.
6          MR. MCNEW:  What I'm trying to get to, Judge, is this:
7   You can -- rather than having us go through a process that will
8   frankly take months -- I have a hard time believing we'll be
9   back here in weeks -- don't stay your own decision on these two
10  cases, and I understand your concern about the message you'll
11  be sending.
12         THE COURT:  Not just the message.  In theory -- let's
13  say the MDL Panel decides on MDL treatment but says, for
14  whatever reason, it shouldn't be Judge Scheindlin, she has a
15  lot of work, a lot of other MDL's.  We'll select so-and-so?
16  which they'll have the power to do.  Well, I'll have wasted
17  work and we'll never decide these issues.
18         I don't suspect that's going to happen, because I have
19  the original MDL, 1358, and both the defense and the plaintiffs
20  apparently think I should have it, and yet you never know what
21  a group of federal judges will do.  They surprise us every
22  morning.  Who knows what they'll do?
23         So there is a small possibility that I would never
24  have these.  If they MDL it and give it to somebody else --
25  unlikely, but it could happen.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

17

3CJLMTBC                    Conference
1          So I still think a stay according to the Second
2   Circuit is the way to go, pending the MDL's decision.  I'm not
                          Page 8

3CJLMTBC

3  seeking to delay it.  I realize it would be a very important
4  motion to move up the list, though in front of one or two
5  important other motions I have pending.
6        MR. GORDON:  Robert Gordon, your Honor, for the
7  plaintiffs as well.  I want to first alert the Court it's not
8  just two cases.  Mr. Bern, who's the other plaintiff counsel
9  here, other than Weirz & Luxemberg, just received notice that
10  seven of his cases were removed to you.  So you now have nine.
11       THE COURT:  Because they were also in New York County?
12       MR. BERN:  Correct; your Honor.
13       MR. GORDON:  So you now have nine here to you.
14      I guess my point is:  we believe you're the MDL.  We
15  believe this is MDL 1358.  They're not opposing that.
16       THE COURT:  But you're opposing it.  I was told by
17  Mr. McNew you're going to tell the MDL Panel, we do not think
18  you should MDL this until the judges around the country have
19  decided remand.  Procedurally, we think remand comes first.  I
20  and all these federal judges should decide their own remand
21  motion, even though we realize it could be in Arizona, somebody
22  decides to go remand, and in Connecticut, somebody's going to
23  say not remand.  Yet that's our position.  Before the MDL.
24  That's what you're saying.  You're not saying we see the wisdom
25  of getting it all MDL now so one judge could decide it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

3CJLMTBC      Conference
1       MR. GORDON:  We're going to the different federal
2  judges, telling all of them there's no subject matter
3  jurisdiction.
4       THE COURT:  And to decide remand before the MDL Panel
5  acts.
6       MR. GORDON:  But if they say no, I'm going to state
7  this, we, on behalf of our firm, which controls I think
8  99 percent of the cases -- not 100 percent -- for example, the
9  attorney general of New Hampshire is not our case -- that we
10  will not oppose conditional transfer to you so that we can make
11  the -- get the motion, get the motion on for you to remand it.
12  So we're not going to contest that in the JPMDL decision.
13  We're not going to put questions in MDL that they belong --
14       THE COURT:  You're only going to do that if judges
15  start to stay it, individual judges issue stays pending the
16  decision of the MDL Panel.  Then you're going to say, Nobody's
17  going to decide this remand.  Get to the MDL Panel, you have
18  our blessing, get it to MDL, get it to Judge Scheindlin, let's
19  get somebody to decide remand.  Either way -- we'll take it to
20  an appellate court if we lose; they'll take it to an appellate
21  court if they lose.  Let's get going.  So if you could get one
22  and instead of waiting for all these judges to either decide
23  remand or stay, why don't you just forgo it?
24       MR. GORDON:  We would not necessarily be opposed to
25  agreeing, since everyone's going to be deferential to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

3CJLMTBC      Conference
1  There's about 19 other federal judges --
2       THE COURT:  Talk to my children.
3       MR. GORDON:  They are another matter.  But federal
4  judges will say, What did the MDL judge do?  The proof in the
5  pudding is there:  Immediately on your stay, it was to Judge
6  Spatt before anybody could even spell his name.  That quickly.
7  I don't want to make it look like we're going to contest that

Page 9

3CJLMTBC

8    there's an MDL 1358. We're not going to contest you're the
9    judge and these are tag-alongs. But you want to decide the
10   remands first.
11          THE COURT: That's not an issue here.
12          MR. GORDON: No.
13          THE COURT: Then write a letter to all the judges,
14   say, We changed our position; we now believe it should all be
15   MDL, one judge should decide remand, we're agreeing about the
16   remand, we agree with the conditional tag-along transfer, and
17   I'll go to work on it.
18          MR. GORDON: We -- they necessarily want to have the
19   files transferred to the JPMDL to do that.
20          THE COURT: Fine.
21          MR. GORDON: We'll let them not rule on a stay and let
22   you rule.
23          THE COURT: You tell them that.
24          MR. GORDON: We would do that if your Honor would lift
25   this stay and get reply papers from them so you can decide.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

3CJLMTBC               Conference

1    Because de facto --
2          THE COURT: I think we could work something out here.
3          MR. GORDON: -- your decision would be controlling.
4          THE COURT: I think we can work something out here. I
5    think all you need to do is talk to your adversaries because
6    you could virtually do it by stipulation. If you're not
7    pressing your individual remand motions around the country but
8    going to a transfer so we can litigate it here, then we can
9    have a briefing schedule and litigate it here. Then it's got
10   to be litigated somewhere. Surely, Mr. Sacripanti, you don't
11   expect it not to be litigated.
12          MR. SACRIPANTI: No, your Honor.
13          THE COURT: And you don't want to litigate it before
14   30 judges, do you?
15          MR. SACRIPANTI: Your Honor, I don't, but there's one
16   problem with the analysis.
17          THE COURT: Yes.
18          MR. SACRIPANTI: They don't control all the cases.
19   And not to quibble with my friend Mr. Gordon, I don't think
20   it's 99 percent.
21          THE COURT: But how about these five lawyers at the
22   front table?
23          MR. SACRIPANTI: No, your Honor.
24          THE COURT: Even that?
25          MR. SACRIPANTI: There's a slew of cases throughout

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

3CJLMTBC               Conference

1    the country with other plaintiffs' firms -- California -- that
2    they don't control.
3          THE COURT: What if they bring them into a
4    stipulation? If they can arrange a stipulation, which is all
5    you want, you would like the remand -- Mr. Sacripanti, you
6    would like the remand motion heard in one court?
7          MR. SACRIPANTI: Indeed, your Honor.
8          THE COURT: Work it out. Try to work it out.
9          MR. SACRIPANTI: We're happy to try to do it. If your
10   Honor would issue a stay in the interim ...
11          THE COURT: The interim might be five or 10 minutes
12   while I'm taking a criminal case that's waiting to see me. Why

Page 10

3CJLMTBC

13  don't you try to talk for a few minutes.  Could you talk to
14  other for five or 10 minutes?  Leave it at five or 10, because
15  at 11:00 I have to swear in the new citizens.  I have to do
16  naturalization.
17          Why don't you talk five to 10 minutes, really, while I
18  do one criminal case.  Then we'll come back and talk some more.
19  If we haven't worked something out, we'll take a break and I'll
20  come back to court and take care of you.
21          MR. GORDON:  Can we leave our stuff?
22          THE COURT:  I think so, sure.
23          (Recess)
24  (10:56 a.m.)
25          MR. SACRIPANTI:  Your Honor, we apologize, we didn't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              22

3CJLMTBC                    Conference
1  mean to keep you waiting.
2          THE COURT:  That's all right.
3          MR. SACRIPANTI:  We were thinking, your Honor, if you
4  talk to your children with the robe on, they may listen.
5          THE COURT:  Never mind.  They've seen that since 1982.
6  It didn't work then.
7          MR. SACRIPANTI:  Your Honor, I think we need a little
8  time.
9          THE COURT:  You want me to go swear in the citizens?
10         MR. SACRIPANTI:  I think we do.  I think we need a
11  little time, and we're working in earnest to try and solve
12  this.
13         THE COURT:  If you don't mind, it takes about a half
14  an hour at the most to swear in the new citizens.
15         MR. GORDON:  Can we explain to your Honor what the
16  question is, because it may be that you would or would not
17  consent to or even consider one as an option.
18         THE COURT:  Sure.
19         MR. GORDON:  Our position is, for the plaintiffs, we
20  would waive -- we would agree to a stay, and indeed to your
21  Honor issuing a stay of other courts deciding, if your Honor
22  would create an expedited briefing schedule, get them to
23  reply -- we filed our napers already -- and make a decision on
24  that.  And we would support that.  In all the cases that we're
25  in, which I do believe they now agree would be somewhere around
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              23

3CJLMTBC                    Conference
1  90 percent of the nation's cases, I think it's more -- but they
2  have a different proposal, and I'll let them explain it to you.
3  And I need to call cocounsel in the intervening time.
4          MR. EIMER:  Nate Eimer.  I think we're very close on
5  this.  I think the issue is, one, we would request that your
6  Honor issue the order staying the other cases, which you can
7  under 1358.  We're not certain of the effect of that, but
8  that's great; it's helpful.  What we would propose is -- what
9  we understand Mr. Gordon's position to be or plaintiffs'
10  position to be is that they don't oppose transfer here and your
11  Honor deciding the remand issue.  So what we've asked is that
12  plaintiffs, in addition to this, let us advise the JPML that
13  plaintiffs do not oppose issuance of a conditional transfer
14  order and transfer to your Honor, so we get the process started
15  sweeping these cases up and bring them here.  That's the issue
16  Mr. Gordon needs to talk to Mr. Summy about, and if we get that
17  resolved, we have an understanding.
                            Page 11

3CJLMTBC

18   THE COURT: It doesn't sound so --
19   MR. GORDON: We feel there's no subject matter
20   jurisdiction. I hate to go to any federal judge -- I'd rather
21   have them stay it rather than agree that it should go and get
22   transferred and start to go through the federal system and
23   transfer, when I believe that once your Honor rules as the MDL
24   judge, I believe -- which we still believe you are, and no
25   one's suggesting that you're not, and these are simply
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

3CJLMTBC                    Conference
1   tag-alongs.
2       MR. MCNEW: Our common desire, your Honor, is that we
3   find a way, so this doesn't become enmired in the process of
4   going through the conditional transfer order process --
5       THE COURT: I understand.
6       MR. MCNEW: And to the extent your Honor has thoughts
7   about how we might do that, we would be grateful for your
8   guidance.
9       THE COURT: Okay.
10      MR. GORDON: I can't imagine that another fellow
11  judge, if they've been stayed to wait your ruling, then you
12  rule, that they would take a contrary position; and to the
13  extent that the defendants are worried, by the way, about some
14  cases being in state court, some being in federal court, that's
15  almost inescapable.
16      THE COURT: Yes, exactly.
17      MR. GORDON: There are existing state cases they've
18  never sought to remove. County of Suffolk, one of the biggest
19  in the country. Passco, Rhode Island, never sought to remove
20  it.
21      THE COURT: I think you're right, that's inescapable.
22  There are some cases in state court, there are. It's up to
23  them to remove them timely or not. Nothing to be done about
24  that.
25      But what they do want to avoid, I gather, is many,
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

3CJLMTBC                    Conference
1   many federal rulings which could potentially be inconsistent
2   and in different circuits and different appeal schedules and
3   all the rest of it, and everybody seems to favor a fast
4   adjudication one way or the other.
5       I'm not going to promise you a day. I've made one
6   promise this year, that's one too many. But there was a reason
7   in that case.
8       MR. EIMER: Nate Eimer. It's not an issue for any of
9   us here -- I was going to say a lot, I don't know how many,
10  defendants are who are not in these cases.
11      THE COURT: But even they are not pressing for the
12  remand question to be decided in various courts around the
13  country.
14      MR. EIMER: No, they're objecting, they're asking for
15  stays in each of the cases they're in.
16      THE COURT: So in theory, they basically all want to
17  be here, too.
18      MR. EIMER: They get to participate -- there are some
19  people who don't get to participate. It will go decided before
20  they get here. But I'm not concerned about that.
21      THE COURT: I'm not either because, as you say,
22  generally speaking they're seeking stays around the country.
Page 12

3CJLMTBC

23   They want it to be in the MDL process, so they've been heard,
24   so to speak, indirectly.
25            MR. GORDON:  And we're giving them the stays.  It's
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                26

3CJLMTBC                    Conference
1    the ones we're here on we want to move forward on.
2             THE COURT:  I understand.  So when I come back from my
3    naturalization, will you be here or will you go away?
4             MR. GORDON:  We'll be here.
5             THE COURT:  All right.
6             MR. SACRIPANTI:  Can we use the courtroom?
7             THE COURT:  Yes, you may.  I'll be down in the
8    ceremonial courtroom.
9                 (Recess)
10   (11:55 a.m.)
11            THE COURT:  Can we get started?
12            MR. SACRIPANTI:  I think so, your Honor.
13            MR. GORDON:  Your Honor, thank you for your patience.
14   We were in touch with counsel in South Texas.  It wasn't easy.
15            MR. MCNEW:  They have telephones down there.
16            THE COURT:  That's good.  Reassuring.
17            MR. GORDON:  Obviously, we don't speak for everybody
18   in the country -- neither do they -- but just for those here in
19   the courtroom and some of us that we've been able to reach have
20   agreed to, from the plaintiffs:
21            We would stipulate, first of all, Number 1:  To
22   immediate transfer of all cases which counsel control including
23   some declaratory judgment actions that the defendants have just
24   filed in federal courts to you, Shira Scheindlin, in your
25   capacity as MDL 1358 judge.  And we agree to not oppose the
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                27

3CJLMTBC                    Conference
1    issuance or finality of the panel's conditional transfer order.
2             Number 2:  We stipulate that your Honor, Judge
3    Scheindlin, use whatever judicial means at your disposal to
4    stay and cause the immediate transfer of any other cases to
5    this Court.
6             MR. SACRIPANTI:  And for that, your Honor, if I may,
7    we would refer you to the manual, and we would hope that you
8    would, you know, contact those other judges.  I know it's an
9    imposition, but....
10            THE COURT:  Well, writing is easier certainly than
11   calling them.  But if I end up with a list....
12            MR. SACRIPANTI:  We're going to provide you with a
13   list, your Honor.  Thank you.
14            MR. GORDON:  Number 3:  We, the plaintiffs, expressly
15   reserve our objections to federal jurisdiction and stipulate
16   that our agreement here is not a waiver.
17            Number 4:  We agree -- all the parties here -- to an
18   expedited briefing hearing on the motions to remand and the
19   dates that we've suggested, the defendants agreed they would
20   get their papers in by January 9th; that we would take seven
21   days to apply, which would be January 16th; and that we'd ask
22   for a hearing the following week, which would be the week of
23   the 19th, which is Martin Luther King's birthday, but then that
24   Tuesday, Wednesday or Thursday -- Wednesday the 21st, perhaps,
25   is consistent with your Honor's schedule?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                        Page 13

3CJLMTBC

28

1   THE COURT:  A "hearing" meaning what?
2   MR. GORDON:  Oral argument.
3   THE COURT:  If the Court requires one, yes.
4   MR. GORDON:  Yes.  Number 5:  Declaratory judgment
5   actions that were filed and just served on our clients
6   yesterday would be stayed pending the decision on remand.
7   And Number 6:  The plaintiff agrees to file
8   appropriate papers staying other cases that we control pending
9   final MDL Panel action transferring the cases.
10   Did I say that correctly?
11   MR. LANGAN:  Perfect, Rob.  Thank you.
12   MR. WALLACE:  Actually, your Honor -- this is Rick
13   Wallace for Shell, Chevron and other defendants -- a couple of
14   minor modifications:
15   I thought the proposal for Number 1 was to stay as
16   well as transfer all those cases that the plaintiffs control.
17   And on Number 3, I'd simply ask that that objection --
18   the preservation of objections to jurisdiction be reciprocal,
19   because there are some defendants that may also have objections
20   to personal jurisdiction.
21   MR. SACRIPANTI:  Your Honor, if I may?
22   THE COURT:  But it is consistent with the defendants
23   that all defendants are together in saying there is federal
24   jurisdiction; is that right?  Or is there inconsistency on the
25   defense side?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

3CJLMTBC                    Conference

1   MR. WALLACE:  I don't anticipate any inconsistency on
2   subject matter jurisdiction.
3   THE COURT:  But personal jurisdiction, you want to
4   preserve your rights.  Yes, okay.  I hear you.
5   MR. SACRIPANTI:  Which leads me, your Honor, to a
6   point:  We can only bind and agree to be bound the clients that
7   we represent that are here.  There are about, by my reckoning,
8   30 other defendants that are part of the actions that have been
9   removed before your Honor who are not present today.  What your
10   Honor may want to do -- and I'll leave it to your Honor -- is
11   to set perhaps a date by which if anyone objects to this
12   stipulation, that they should come in, petition the Court and
13   you should have a conference on that.
14   May I suggest January 9th or 5th?
15   THE COURT:  Let me ask this question:  In terms of
16   briefing, however, would those defendants who are not present
17   anticipate folding into this briefing schedule?
18   MR. SACRIPANTI:  I would assume they would, your
19   Honor.  We're going to give notice of this to everyone.  We're
20   going to do that immediately.  I just want to preserve --
21   because frankly, I'm acting as coordinating counsel, but none
22   of us here have the power to bind anyone.
23   THE COURT:  I understand that.  It's your best
24   prediction, so to speak, that they all wish to stay their local
25   actions and wish it to be heard in one MDL proceeding.  That's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

3CJLMTBC                    Conference

1   your best guess.
2   MR. SACRIPANTI:  And would agree to the stipulation as
3   set forth by Mr. Gordon.

Page 14

3CJLMTBC

```
 4        THE COURT:  I understand.  When we actually tell them
 5   the briefing schedule, there may become some objections.  Are
 6   you kidding?  How are we going to get a coordinated brief in --
 7   did you say January 9th?
 8        MR. GORDON:  That's correct.
 9        THE COURT:  With the two holidays falling in between,
10   you've got to circulate that to how many defendants?
11        MR. MCNEW:  But, Judge --
12        THE COURT:  That's really a tight schedule.
13        MR. MCNEW:  But if you think about the context, we've
14   already served motions to remand in all these cases.
15        THE COURT:  I understand.  I have one in front of me,
16   one Memorandum of Law in Support of Motion to Remand Case
17   Number 03 CV 9543, County of Nassau.  But I assume -- tell me
18   if I'm wrong -- that that brief will relate to all of the
19   original nine cases, so to speak, that I have, and if the rest
20   are transferred, it relates to all of them, it's not
21   case-specific -- is that right?
22        MR. MCNEW:  The removal papers and the remand motions
23   are identical, case-to-case.  There's no variation.
24        THE COURT:  When was it served?
25        MR. MCNEW:  Our first remand papers were served in
```

31

3CJLMTBC                    Conference

```
 1   Connecticut, and I believe it was December 8th.  So defense
 2   counsel have had these papers for awhile.
 3        THE COURT:  Well, some.  I don't know who the
 4   defendants were in Connecticut.  I really don't know if all of
 5   them really did receive the papers.
 6        But the point is, we want a coordinated brief.  We
 7   don't want different defendants coming in and saying, you know,
 8   No, given that schedule, I was not able to coordinate; I have
 9   no input; I have a right to make my own papers.
10        I think if we actually give another week, it's a small
11   change, but it really does at least allow the defense brief to
12   be circulated throughout the defense group.  I don't want to be
13   so unrealistic that I end up with more than one brief.  That
14   would be self-defeating.  And I really can't bind the
15   defendants who aren't here today to agree that the defendants
16   who are here today are going to write a brief for them that
17   they have no chance to even read or comment on.
18        So efficiency tells me I'd rather see it moved up a
19   week, and that's tight, but at least it could be sent around to
20   every defendant and every case around the country so that they
21   all agree on one coordinated brief.  That's to the plaintiffs'
22   benefit, too.
23        MR. SACRIPANTI:  And, Judge, I would suggest that, if
24   I may, we will send notice to all the defendants, but your
25   Honor may want to set an interim conference date, which may not
```

32

3CJLMTBC                    Conference

```
 1   be necessary, where people who do object -- and I can't say
 2   people will -- they can come and voice their objections.
 3        THE COURT:  The only objection they may have
 4   potentially is to the dates.  And they can say, We need time to
 5   be part of this brief.  That's their only real objection that I
 6   gather they'd want is to be heard once and not 40 times.
 7   Everybody wants that.  So they just want enough time to read it
 8   and show it to their clients and make sure they don't have a
```

Page 15

3CJLMTBC

9    brilliant idea that somehow the seven brilliant people who are
10   here didn't have.
11           MR. SACRIPANTI:  I guarantee they will, your Honor.
12           THE COURT:  When you're working because of the Martin
13   coordinated group, that's for sure.  People want to read it and
14   have some input.
15           I think we should move the 9th to the 16th.
16           MR. GORDON:  The 16th.
17           THE COURT:  And what was the reply date you said
18   originally?  The 16th?
19           MR. GORDON:  But then -- we lose then the Martin
20   Luther King day.  Could we go to the following Monday, at
21   least?  The 26th?
22           THE COURT:  Sure.
23           MR. GORDON:  And then have the hearing still that same
24   week?
25           THE COURT:  No.  You can't have a hearing until I've

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

3CJLMTBC              Conference
1    read the briefs.  I can't have a hearing before I've read them.
2            MR. GORDON:  No, have a hearing during the week of the
3    26th.
4            THE COURT:  Oh, that same week.
5            MR. GORDON:  I'm moving everything up a week.  The
6    only thing is I want over the weekend because of the Martin
7    Luther King holiday.  In other words, the 16th for them; the
8    26th for us; and the hearing perhaps the 28th, 29th, 30th of
9    that week.  Whatever your Honor's schedule would accommodate.
10           THE COURT:  Actually, I don't usually hear oral
11   argument on motions, so I can't even predict.
12           MR. GORDON:  We can just actually leave that out.
13           THE COURT:  We could leave it out of the stipulation,
14   or we could say if necessary, there will be a hearing on -- so
15   that everybody at least can plan for it.
16           MR. GORDON:  Can I ask for the 27th rather than the
17   26th so we can actually get a work day to make up for that
18   Martin Luther King day?
19           THE COURT:  That's fine.  You have a lot of people to
20   coordinate with, too.
21           If it goes, I'm supposed to start a trial on the 26th.
22   So in terms of a hearing -- there's always that "if it goes",
23   but if it goes....
24           The best day for a hearing would probably be Friday,
25   February 13th -- not to be suspicious -- Friday the 13th at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

3CJLMTBC              Conference
1    10:00 o'clock.  That's the best day I see for a hearing.  But
2    that could be moved up if the two-week trial goes away, as
3    trials tend to do.
4            MR. GORDON:  I did not mean to imply we were
5    requesting oral argument on this.  We'd be happy to waive that.
6            THE COURT:  Let's see if I think I need it.  Let's
7    also set a time on February 13th.  We'll make it at 10:00.  As
8    far as Mr. Sacripanti's suggestion of scheduling a date --
9            MR. SACRIPANTI:  I have a different suggestion now.
10   That's withdrawn.
11           THE COURT:  What's the latest one?
12           MR. SACRIPANTI:  The latest, Your Honor, is you set a
13   date, and may I suggest January 5th, that if anyone objects, to

Page 16

3CJLMTBC

```
14    notify the Court by that date in writing.  And if they don't,
15    they don't.  I want to preserve for people who aren't here the
16    opportunity to say, Your Honor, those guys were nuts, okay?  So
17    if we can do January 5th, that would be great.
18              THE COURT:  Sounds okay with me.  What does anybody
19    else think?  If anybody objects to the stipulation who is not
20    part of the stipulation because they weren't here, they can
21    file a written objection, so to speak.  And we'll see, if we
22    get any, what to do about it.
23              MR. SACRIPANTI:  Right, exactly.
24              THE COURT:  In the meantime, everybody's committed to
25    the schedule who is here.
```

35

3CJLMTBC                    Conference

```
 1              MR. SACRIPANTI:  We're committed to the schedule.  I
 2    just want to represent those who aren't here.
 3              MR. GORDON:  Here's my concern:  we're obligating
 4    ourselves to take certain actions.
 5              THE COURT:  And they are, too.  They're going to file
 6    a brief on the 16th of January no matter what.  They want to
 7    just say to anybody who wasn't here today who has something to
 8    say, Say it by January 5th or forever hold their peace.
 9              MR. GORDON:  Court's indulgence.
10              (off the record)
11              MR. GORDON:  Judge, I just want to -- we're going to
12    other courts and taking a certain position.  If the stipulation
13    does not happen at the end of the day because on January 5th
14    people come in and say, we actually don't agree, we have to be
15    able to then no longer be bound by this.
16              THE COURT:  I think that's right.  Or for some reason
17    the stipulation is --
18              MR. SACRIPANTI:  Reversed, held -- voided.
19              THE COURT:  Voided.  That's a good word.  Thank you
20    very much.  Then everybody will act accordingly.  But I really
21    don't anticipate -- I think it's a fail-safe for people that
22    aren't here.
23              MR. SACRIPANTI:  And we'll make the notice shorter.
24    We don't want to be voided.  So we'll make the notice --
25              THE COURT:  No, I think January 5th is the right date.
```

36

3CJLMTBC                    Conference

```
 1              MR. SACRIPANTI:  And we give people notice, and if
 2    it's voided, all bets are off.
 3              THE COURT:  I don't see why that should happen.  It's
 4    an unlikely event.  It's an unlikely event.  It's just kind of
 5    a due process.
 6              MR. EIMER:  The only problem we have with this, now,
 7    one last gap, there's some actions that need to be taken in
 8    other districts as a result of remand motions they've filed,
 9    and we're assuming we don't have to do anything, because there
10    will be a deal, we assume, but Mr. Gordon is saying he doesn't
11    want to stay those cases until after January 5th.
12              MR. GORDON:  I'm concerned about it, because I could
13    be tying my hands on the one hand while other guys hit me, is
14    my concern.
15              THE COURT:  Hit you with what?
16              MR. GORDON:  While they, in other jurisdictions,
17    they're moving for their courts to make decisions or not make
18    decisions or transfer.
```

Page 17

3CJLMTBC

19    THE COURT: They're not. They were moving for stays
20    around the country, as you know. We have to be a little bit
21    realistic. I'll try to issue an order in the MDL cases that
22    incorporates this and sends it out everywhere. Most judges
23    aren't really anxious to work between Christmas and New Years
24    on a remand motion. It's not a high priority. Most people
25    want to buy presents and wrap them and celebrate. They're not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

3CJLMTBC                    Conference
1    dying to decide this.
2        MR. GORDON: Although this would make a nice present.
3        THE COURT: I'll issue an order. I think they have
4    other things to do in the next 10 days. I don't know that
5    they're rushing to decide a difficult remand motion.
6        What I need is a service list or something.
7        MR. SACRIPANTI: By close of business, we'll provide
8    you with a list of all removal issues and the judges.
9        THE COURT: And you'll coordinate with plaintiffs to
10    do your best to be sure that the list is complete?
11        MR. SACRIPANTI: Yes.
12        MR. GORDON: May I ask one question? I assume you
13    have everybody in here who was part of the DJ action, because I
14    know not all the defendants agreed to do that.
15        I know you sort of took the lead. I assume the part
16    that says that you're going to -- that you control the DJ
17    actions and you're agreeing to immediate transfer of those
18    cases, to a stay of that --
19        MR. SACRIPANTI: Marathon's not here. Marathon's not
20    here.
21        THE COURT: And you didn't try to call that party?
22        MR. LANGAN: I can't imagine it will be a problem. It
23    won't be.
24        THE COURT: There are expressions of confidence --
25        MR. GORDON: Can we get an answer to that by the end

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

3CJLMTBC                    Conference
1    of business today?
2        MR. SACRIPANTI: I can tell you we'll move posthaste
3    to all of them, reach out to them. But why don't you give me
4    till Monday.
5        MS. ROSENBLATT: I think he's out of town.
6        THE COURT: Who represents Marathon? What law firm?
7        MS. ROSENBLATT: Baker, Botts.
8        THE COURT: Just coordinate it.
9        Does anybody want to propose language for the order,
10    the very short order I'm going to try to draft in the MDL
11    manner? It will have an MDL caption. I'll try to draft
12    something, but if anybody has an idea of the proposed language,
13    I'd be happy to hear you.
14        MR. SACRIPANTI: Would you like us to send you --
15    we'll try to work and have a joint --
16        THE COURT: I'd like to get it out by the end of the
17    day.
18        MR. SACRIPANTI: So would we.
19        MR. EIMER: We'll work one out this afternoon.
20        THE COURT: You're welcome to stay. Sit around the
21    table and do it. Let's see what I have next.
22        I don't have a matter in this courtroom until 2:30.
23        MR. MCNEW: Okay.

Page 18

3CJLMTBC
```
24          THE COURT:  Folks, if you find yourselves here, you're
25      welcome to work here.  There's no matter in this courtroom
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3CJLMTBC                    Conference
```
 1      until 2:30.
 2              MR. SACRIPANTI:  Thank you, your Honor.
 3              THE COURT:  You're welcome to stay.  We don't have
 4      cookies or coffee, but you're welcome to stay.
 5                  (Adjourned sine die)
 6                          o 0 o
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**EXHIBIT 2**

Law Offices of

# SHER & LEFF

**VICTOR M. SHER**                                    **TODD E. ROBINS**
**ALEXANDER I. LEFF**                                 **LYNDA M. COLLINS**

January 5, 2004

*Via Facsimile and Federal Express Overnight Delivery*
The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re:     Order dated December 23, 2003 in In re MTBE Products Liability
        Litigation (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

        We write on behalf of the plaintiffs in *People et al. v. Unocal, et al.* CIV S-
032653 GEB/DAD (E.D. Cal.), one of the California lawsuits listed in the attachment to
the Court's December 23, 2003, Order. Plaintiffs in this action respectfully object to the
stay and/or transfer of this action, either for purposes of determining the already-pending
remand motion or for any other pretrial purpose.

        At the outset we note that we only today obtained a copy of Your Honor's final
form of Order. We had no chance to participate in the hearing before Your Honor on this
motion, we were not consulted concerning the plaintiffs' positions in the other cases
pending before Your Honor nor our position with respect to our own litigation, nor as of
today have we even been served with a copy of the referenced Order. We have however
managed to obtain a copy of the Order as well as of the transcript of the hearing on this
matter.

        We have already filed a motion for remand with the local District Court in the
pending action in California. Without rehashing all of the issues previously briefed in the
case file there, we submit there is no basis for rewarding defendants' efforts to delay the
proceedings in our case on the purported invocation of either federal jurisdiction that
does not exist or MDL procedures for a matter that does not warrant them.

        With respect to removal for purposes of determining the remand issues, the matter
should more properly be resolved by the transferor court before an MDL transfer or even
consideration of a stay motion. *See, e.g., Karofsky v. Abbott Labs.*, 921 F. Supp. 18, 21
n.4 (D. Me. 1996) (granting plaintiff's remand motion because "it is easier . . . to rule on
the jurisdictional issue [rather than to] transfer it to the Multidistrict Panel, which has
many other concerns"); *Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft*, 54 F.

450 Mission Street, 5th Floor, San Francisco, CA 94105
Phone: (415) 348-8300  Fax: (415) 348-8333

The Honorable Shira Sheindlin
January 5, 2004
Page 2 of 3

Supp. 2d 1042, 1048 (D. Kan. 1999) ("[f]or purposes of judicial economy, the jurisdictional issue should be resolved immediately. . . Judicial economy dictates a present ruling on the remand issue"); *see also* JPML Rules of Procedure, Rule 1.5 ("[t]he pendency of a motion . . . before the Panel . . .does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending). Indeed, a number of courts have held that the preliminary federal jurisdictional question "*must* be resolved before deciding whether to stay or transfer the case to the MDL panel."
 *Farkas v. Bridgestone/Firestone, Inc.,* 113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000) (emphasis added); *accord, e.g., Stern v. Mutual Life Insurance Co.,* 968 F. Supp. 637, 639 (N.D. Ala. 1997) ("[i]f the court lacks jurisdiction over the action *ab initio,* it is without jurisdiction to enter such a stay"); *Lloyd v. Cabell Huntington Hosp., Inc.,* 58 F. Supp. 2d 694, 696 (S.D. W. Va. 1999) ("[t]his Court cannot . . . stay proceedings in an action over which it lacks jurisdiction").

    Nor is there any proper basis for treating this matter as an MDL for purposes other than the pending remand motions. This is not the first generation of MTBE litigation. Numerous dispositive motions – including most notably motions based on purported federal preemption of state tort claims – have been litigated in state and federal courtrooms, in California and elsewhere. The results, both in Your Honor's courtroom and around the Nation, have consistently rejected any federal preemption of the kinds of claims at issue in this case. Notably, the Ninth Circuit (the federal appellate court in which this case is currently pending) has twice expressly rejected federal preemption of state laws limiting (or banning) MTBE because of environmental concerns. *Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 670-73 (9th Cir. 2003); *Exxon Mobil Corp. v. U.S. Environmental Protection Agency,* 217 F.3d 1246, 1253 (9th Cir. 2000). Moreover, extensive discovery has already occurred in several lawsuits on the liability of most (if not all) of the defendant refiners and MTBE manufacturers. Finally, the parties this case in particular poses issues not common to other MTBE cases around the county because of the People's claims and the People's unique constitutional, statutory, and regulatory status. Consequently, it is unlikely that threshold legal questions common to all MTBE cases would require significant additional judicial energy by Your Honor or any other MDL judge.

    The truth is that the primary focus of the current generation of MTBE cases will be on site specific issues: matters of variations in state law; local gasoline supply and distribution systems; and damages claims based on site-specific circumstances. We respectfully submit that neither the Southern District of New York nor any other out-of-state MDL jurisdiction is not an efficient – and certainly not the most efficient – forum in which to handle these issues as they relate to gasoline refined in Northern California and contaminating groundwater in Sacramento County, California.

    In short, for the foregoing reasons plaintiffs in this case object to the arrangement proposed in the Court's December 23, 2003, Order for transfer for remand or any other MDL purposes. We further expressly reserve these parties' rights to assert in any

The Honorable Shirl [  ] heindlin
January 5, 2004
Page 3 of 4

appropriate additional manner before Your Honor and/or the MDL Panel our opposition to MDL consolidation of this case.

We will serve copies of this letter by facsimile on the other counsel involved in this case, and will work with defense counsel to obtain service lists for the other MTBE cases identified in the schedule attached to the Court's December 23rd Order and will serve those counsel by facsimile as well as promptly as possible.

Respectfully submitted,

SHER & LEFF LLP

Victor M. Sher
Attorneys for plaintiffs:  City of Elk Grove,
Sacramento County WaterAgency,
Sacramento Groundwater Authority,
Carmichael Water District, Citrus Heights
Water District, Del Paso Manor Water
District, Fair Oaks Water District, Florin
Resource Conservation District, Rio Linda
Elverta Community Water District,
Sacramento Suburban Water District, San
Juan Water District, California-American
Water Company and City of Sacramento

JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER, Assistant Chief Deputy
District Attorney
SACRAMENTO COUNTY DISTRICT
ATTORNEY

Russ Detrick
Supervising Deputy District Attorney
Attorney for plaintiff:  the People of the
State of California

VMS: jac
cc:  All Counsel
P:\Sacramento MTBE\Correspondence\Scheindlin-001.doc

# EXHIBIT 3

Law Offices of

# SHER & LEFF

**VICTOR M. SHER**
**ALEXANDER I. LEFF**

**TODD E. ROBINS**
**LYNDA M. COLLINS**

January 27, 2004

*Via Facsimile and Federal Express Overnight Delivery*

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re:  *In re MTBE Products Liability Litigation* (MDL 1358); Master File C.A.
No. 1:00-1898 (SAS) / Motions for Remand

Dear Judge Scheindlin:

This firm serves as co-counsel for all of the plaintiffs in each of the following cases:

- *Orange County Water District v. Unocal, et al.*, Case No. SACV03-1742 JVS (ANx) (C.D. Ca.)

- *City of Riverside v. Atlantic Richfield Company, et al.;* Case No. EDCV03-1460 RT (SGLx) (C.D. Ca.)

- *California-American Water Company v. Atlantic Richfield Company, et al.*; Case No. C 03-5379 JSW (N.D. Ca.)

- *Quincy Community Services District v. Atlantic Richfield Company, et al.*; Case No. CIV.S-03-2582 WBS DAD (E.D. Ca.)

- *City of Roseville v. Atlantic Richfield Company, et al.;* Case No. CIV.S-03-2601 WBS GGH (E.D. Ca.)

- *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*; Case No. 03-CV-2408 WQH (S.D. Ca.).

In addition, we represent as co-counsel all of the plaintiffs except the People of the State of California in *People, et al. v. Unocal, et al.* CIV S-032653 GEB/DAD (E.D. Cal.); the Sacramento County District Attorney's Office represents the People separately in that action. We understand that counsel for the People intends to join in the positions asserted in this letter.

The Honorable Shira Scheindlin
January 27, 2004
Page 2 of 19

## PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS

Each of the California actions originated in state court, asserting only state-law claims. Certain defendants removed the matters to federal district court. The removal papers state defendants' intention to have these actions transferred to MDL 1358. We are informed (but have not been served with any papers) that defendants in each case filed a Notice of Related, Tag-along Action with the Judicial Panel on Multidistrict Litigation (JPML). In any event, the JPML has yet to issue conditional transfer orders in any of these matters.

Plaintiffs in these matters have not yet had any opportunity to object to any conditional transfer orders from the JPML, although in fact plaintiffs believe that these actions are not appropriate for multi-district consolidation. All of these plaintiffs in the California actions intend to file notices of opposition to, and to move to vacate, any such conditional transfer order(s) affecting them. Meanwhile, plaintiffs have filed timely motions for remand in each of the California cases.

Your Honor's December 23, 2003, Order states that remand motions in "all similar removed actions . . . [should] be heard and decided by this Court" under the auspices of MDL 1358. The attachment to the December 23 Order listed each of these California lawsuits. Of course, our clients had no chance to participate in the hearing before Your Honor leading to the December 23 Order, and we were not consulted concerning the plaintiffs' positions in the other cases pending before Your Honor nor our position with respect to our own litigation.

As of today these cases are not before Your Honor in any capacity. The merits of the motions for remand in them have not been briefed to this Court, nor are any of those motions before Your Honor. The Court has not even seen the complaints in these actions, which differ substantially from those before the Court in the New York actions. Indeed, unlike the matters pending before Your Honor, plaintiffs in these California cases consist not solely of drinking water purveyors (although some are purveyors); rather these plaintiffs include public agencies with a spectrum of regulatory, property, usufructuary and other legal interests in protecting ground- and drinking water resources under California law.

The December 23 Order did not specify how (if at all) parties to "similar removed actions" should participate in the remand motions pending before the Court. Accordingly, we submit this letter brief to address certain issues raised by those motions. Consistent with our position that these actions are not appropriate for multi-district consolidation, however, the plaintiffs in the California actions listed above expressly reserve their rights to object to any such consolidation. They further maintain that their actions are not properly before this Court in its capacity as the court handling MDL 1358 or otherwise, and respectfully reserve their rights to assert that orders issued by this Court

The Honorable Shira Scheindlin
January 27, 2004
Page 3 of 19

at this time have no effect in their actions. Finally, by submitting this letter in limited
response to the moving and opposition papers in connection with the pending remand
motion before Your Honor, none of these plaintiffs concedes that this Court has any
jurisdiction over their California lawsuit.

## INTRODUCTION

None of the bases for federal subject matter jurisdiction asserted in the subject
Notices of Removal and discussed in the removing defendants' ("Defendants'")
opposition brief has any merit. This letter makes the following three points:

*First*, state court findings in these cases that MTBE gasoline is defective will have
no impact on the federal clean air program or the gasoline distribution system. Indeed,
18 states (including New York) have *already banned* the use of MTBE in gasoline, and
preemption challenges to such bans have been soundly rejected by the federal courts.[1] If
a state's outright ban of MTBE does not conflict with the Clean Air Act ("CAA"), then
tort claims regarding Defendants' past use of MTBE cannot possibly affect any federal
interest under the CAA. Moreover, Defendants' federal question analysis hinges entirely
on the very same federal preemption arguments that this Court has soundly rejected, as
has every other published opinion on the subject.[2] Notwithstanding their effort to dress
the emperor in new clothes, Defendants' attempt to ground federal jurisdiction over these
cases on the same losing arguments should be rejected.

*Second,* Defendants' efforts to cast themselves as corporations acting under the
direction of federal officers or agencies for purposes of 28 U.S.C. §1442(a)(1) are
nonsense. Defendants are private, for-profit companies that produce a consumer product,

---

[1] *See Oxygenated Fuels Ass'n v. Pataki ("Pataki I"),* 158 F. Supp. 2d 248, 257 (N.D.N.Y. 2001)
(rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state
from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to
defeat rather than advance the goals of Congress and [the] EPA"); *Oxygenated Fuels Ass'n v.
Pataki ("Pataki III"),* __ F. Supp. 2d __, 2003 WL 22845949, *9-*12 (N.D.N.Y. November 24,
2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect
of the CAA, including a finding of fact that the predicted economic impacts of such ban are "not
of a sufficient magnitude . . . to interfere with the achievement of the goals of the CAA"); *see
also Oxygenated Fuels Ass'n v. Davis ("Davis II"),* 331 F.3d 665, 670, 673 (9th Cir. 2003)
(upholding California's MTBE ban because, *inter alia*, there is "no support for [the] assertion that
the Clean Air Act's goals – for purposes of preemption analysis – are a smoothly functioning
market and cheap gasoline"), *affirming Oxygenated Fuels Assoc. v. Davis ("Davis I"),* 163 F.
Supp. 2d 1185, 1187 (E.D. Cal. 2001); *Exxon Mobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253
(9th Cir. 2000).

[2] *See In re MTBE Litig.,* 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001); *Pataki I, supra,* 158 F. Supp.
2d 248; *Pataki III, supra,* 2003 WL 22845949; *Davis II, supra,* 331 F.3d 665 *Davis I, supra,* 163
F. Supp. 2d 1185; *Exxon Mobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253 (9th Cir. 2000); .

The Honorable Shira Scheindlin
January 27, 2004
Page 4 of 19

and, like all manufacturing businesses in this country, are subject to both state and federal environmental regulations.  Published federal decisions have uniformly rejected the argument that a consumer product manufacturer's compliance with federal regulatory requirements constitutes acting "under the direction" of a federal officer.[3]  Moreover, there is no causal connection between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.[4]

   *Finally*, Defendants' attempt to predicate federal jurisdiction over this purely state-law case on the toehold of a 1988 bankruptcy order involving a single defendant also fails, because the outcome of this action can have no effect on the "administration of" a bankruptcy that concluded 15 years ago.[5]  In addition, even if these actions were somehow "related to" the Texaco bankruptcy, the presence of exclusively state-law claims and the extreme remoteness of any possible bankruptcy issues in this case clearly warrant remand pursuant to 28 U.S.C. § 1452(b).

## DISCUSSION

**A.**   **Defendants' "Complete Preemption" and "Substantial Federal Question" Arguments Lack Merit.**

   We wish to bring to the Court's attention four issues in response to Defendants' federal question contentions.  First, Defendants' preemption-related grounds for removing these product liability actions to federal court are rendered irrelevant by the fact that New York has banned MTBE gasoline, and such ban has been definitively upheld, as both a matter of law and fact, as not in conflict with any CAA goal or requirement.  *See Pataki I, supra,* 158 F. Supp. 2d 248; *Pataki III, supra,* 2003 WL 22845949.  Second, Defendants' "complete preemption" and "substantial federal question" arguments are nothing more than recycled versions of the very same preemption arguments they litigated unsuccessfully in this Court in the prior incarnation

---

[3] *See, e.g., Little v. Purdue Pharma, LP,* 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'").

[4] *See* 42 U.S.C. §7545(k)(2)(B) (CAA mandates *oxygen* content, not MTBE, in reformulated gasoline); *cf., e.g., Good v. Armstrong World Indus.,* 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos).

[5] *See In re Feitz,* 852 F.2d 455, 457 (9th Cir. 1988) (no jurisdiction under 28 U.S.C. §1334(b) because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan,* 288 F.3d 1172, 1880 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

The Honorable Shira Scheindlin
January 27, 2004
Page 5 of 19

of MDL 1358. *See In re MTBE Litig.*, 175 F. Supp. 2d 593. Third, Defendants'
argument that the CAA and other federal statutes provide "exclusive remedies" for claims
regarding the design of MTBE gasoline ignores the fact that each of the cited federal
statutes expressly preserves state-law claims. *See* 42 U.S.C. §§ 7604(e), 6972(f); 15
U.S.C. §2617(a). Finally, Defendants' allegations of congressional and EPA intent to
"occupy the field" of fuels regulation grossly distort the relevant legislative and
regulatory history and ignore the case law examining such intent.

>   1.   **Tort litigation regarding MTBE will have no impact on the
>        federal Clean Air program.**

The premise of Defendants' federal question analysis – *i.e.* that state court
verdicts finding that MTBE gasoline is a defective product will undermine the federal
regulatory scheme and disrupt the gasoline distribution system – defies all logic.  New
York, along with 17 other states, has already banned the use of MTBE in gasoline
(effective January 1, 2004) in order to protect the state's groundwater from
contamination. *See* L.2000, c. 35, §§ 2-3; *Pataki III, supra*, 2003 WL 22845949 at *2.
Moreover, the New York MTBE law has survived a preemption challenge brought by the
Oxygenated Fuels Association, one of Defendants' trade associations. *See Pataki I,
supra*, 158 F. Supp. 2d 248; *Pataki III, supra*, 2003 WL 22845949.  After a six day bench
trial in that case, Judge Mordue of the Northern District of New York determined, among
other things, that the predicted economic impacts of the ban are "not of a sufficient
magnitude . . . to interfere with the achievement of the goals of the CAA." *Pataki III,
supra*, 2003 WL 22845949 at *9.  The Ninth Circuit has similarly upheld California's ban
of MTBE, holding that there is "no support for [the] assertion that the Clean Air Act's
goals – for purposes of preemption analysis – are a smoothly functioning market and
cheap gasoline." *Davis II, supra*, 33! F.3d at 673.[6]  If a state's complete ban of MTBE
does not conflict with the CAA or threaten the state's supply of reasonably priced fuel,
then damages claims regarding Defendants' past use of MTBE cannot possibly affect any
federal interest under the CAA.

Defendants' effort to raise the specter of an "inefficient patchwork" of differing
state fuel content standards (*see, e.g.* Ds' Opp. at 25) by reference to MTBE-related

---

[6] In light of the Ninth Circuit's definitive – and final – holding in *Davis II*, Defendants are
precluded under the doctrine of collateral estoppel from asserting their federal preemption
arguments in the California cases involving the plaintiffs we represent. *In re Cantrell* 329 F.3d
1119, 1123  (9th Cir. 2003) (issue preclusion applies where issue is identical to that decided in a
former proceeding, issue was actually litigated and decided in the former proceeding, the decision
in the former proceeding was final and on the merits, and the party against whom preclusion is
sought is the same as, or in privity with, the party to the former proceeding); *Tahoe Sierra
Preservation Council, Inc. v. Tahoe Regional Planning Council* 322 F.3d 1064, 1081  (9th Cir.
2003) (privity is a flexible concept, and may exist when the parties are not identical, as long as
there is "substantial identity" or "sufficient commonality of interest" between parties).

The Honorable Shira Scheindlin
January 27, 2004
Page 6 of 19

actions filed outside of New York does nothing to assist their argument, because, as the *Pataki* and *Davis* cases demonstrate, nothing in the CAA limits state authority to regulate MTBE in order to prevent water pollution.[7]  Their "patchwork" argument also confuses the standards for establishing federal subject matter jurisdiction with those for transferring and consolidating related district court actions.  *See, e.g. Merrell Dow Pharmaceuticals v. Thompson, supra*, 478 U.S. at 816 (defendant's concern about uniformity of interpretation of federal statute in state-law actions is not an "aspect of federal-question jurisdiction").[8]  Defendants cannot bootstrap federal jurisdiction on the alleged aggregate impact of multiple MTBE lawsuits.

> **2.   This Court, along with every other published decision addressing preemption of state regulation of MTBE, has already rejected Defendants' "complete preemption" and "substantial federal question" arguments.**

This Court has already concluded that nothing in the CAA limits state-law tort actions against refiners to recover damages to drinking water caused by their use of MTBE, and thus has rejected the very preemption arguments on which Defendants' federal question analysis is based.  *In re MTBE Litig., supra*, 175 F. Supp. 2d at 611-617, 623-625.  In fact, *every* published decision addressing preemption of state regulation of MTBE – both before and since this Court's earlier decision in MDL 1358 – has rejected Defendants' preemption arguments:

- *Davis II, supra*, 331 F.3d at 673 (California's MTBE ban not preempted because "Clean Air Act's provisions regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to prevent water pollution");

---

[7] *Pataki I, supra*, 158 F. Supp. 2d at 257 ("preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA"); *Davis II, supra*, 331 F.3d at 673 ("Clean Air Act's provisions regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to prevent water pollution").

[8] While concern about uniform judicial treatment may be pertinent in considering whether to centralize or transfer pending federal actions into a multidistrict litigation ("MDL") under 28 U.S.C. § 1407, *see, e.g., In re Mosaid Technologies Inc. Patent Litigation*, 283 F. Supp. 2d 1359, 1360 (Jud. Pan. Mult. Lit. 2003) (centralization pursuant to § 1407 necessary to "prevent inconsistent decisions," among other things), it does not constitute grounds for "federal question" jurisdiction *over these cases* in the first instance. *See also In re MTBE Litigation, supra*, 175 F.Supp.2d at 603 ("[a] transfer of a case pursuant to 28 U.S.C. § 1407 cannot be made unless the transferee court has subject matter jurisdiction"), *citing BancOhio Corp. v. Fox*, 516 F.2d 29, 32 (6th Cir.1975) ("[n]o matter how desirable respondents feel it may be to consolidate . . . all litigation in any way related to Equity Funding, . . . such a transfer cannot be made unless the district court properly has jurisdiction of the subject matter of the case").

The Honorable Shira Scheindlin
January 27, 2004
Page 7 of 19

- *Exxon Mobil Corp. v. EPA, supra,* 217 F.3d at 1253 (affirming county regulation that effectively banned MTBE because "state authority to regulate oxygenate levels [was not] limited" by the CAA);
- *Pataki I, supra,* 158 F. Supp. 2d at 257 (rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA");
- *Pataki III, supra,* 2003 WL 22845949 at *12 (NY MTBE law does not conflict with any aspect of CAA, even if "viewed in the larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations");
- *Davis I, supra,* 163 F. Supp. 2d at 1187 (E.D. Cal. 2001) (upholding California MTBE ban against federal preemption challenge because "the Clean Air Act does not require that MTBE be made available to refiners"), *aff'd,* 331 F.3d 665, *supra.*[9]

Despite this notable losing streak, Defendants here make the very same preemption arguments again – as Yogi Berra said, "it's déjà vu all over again." Specifically, the lengthy federal question analysis in Defendants' opposition hinges entirely on two arguments: (1) that state-law design defect claims somehow seek to "disturb the delicate balance" struck by Congress and EPA in permitting refiners to use MTBE in reformulated gasoline; and (2) that the CAA expressly preempts such design defect claims. This Court, however, already rejected the identical arguments in *In re MTBE*.

Specifically, Defendants' "substantial federal question" argument is predicated on the assertion that the New York Plaintiffs' design defect claims raise risk-utility questions

---

[9] *See also Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state law MTBE contamination case does "not conflict with the Congressional clean air objectives"). Defendants' citation of four unpublished trial court decisions regarding MTBE preemption (*see* D's Opp., p. 21, n.20) is unavailing. Each of these decisions was rendered before *Davis II* and *Pataki III.* In addition, two of them – *Coppola v. Amerada Hess,* No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess,* No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis of the CAA. Two others – *Kubas v. Unocal,* No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal,* No. BC195295 (same) – incorrectly assumed that assessing tort damages was equivalent to a regulatory ban (which the Ninth Circuit in any event affirmed in *Davis II*). State court opinions giving more than cursory attention to the preemption argument have, like federal courts, rejected the argument. *See, e.g., County of Suffolk v. Amerada Hess, et al.,* No. 007-011-MOT D (Sup. Ct. Suffolk Cty., N.Y., Jan. 2, 2004); *South Tahoe Public Utility District v. ARCO et al.,* No. 999128 (Cal. Super. Ct. Jan. 15, 2002); *City of Dinuba v. Unocal et al.,* No. 305450 (Cal Super. Ct. April 1, 2003); *Plainview Water District v. Exxon Mobil Corporation et al.,* No. 9975/01, (N.Y. Sup. Ct. May 22, 2002).

The Honorable Shira Scheindlin
January 27, 2004
Page 8 of 19

that "require a reassessment of all of the factors Congress directed EPA to consider in promulgating RFG regulations so as to 'require the greatest reduction in emissions' . . . [including] the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements." Ds' Opp. at 20-22.[10]  Defendants made the same argument verbatim to this Court in *In re MTBE Litig.*, and, as Defendants concede (see Ds' Opp. at 22), this Court disagreed:

> Defendants argue that any risk-utility analysis would impermissibly permit a reexamination of the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the CAA.  More specifically, defendants note that Congress, through the RFG Program, authorized the EPA to issue regulations to reduce air pollution while taking into consideration "the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements." 42 U.S.C § 7545(k)(1).  However, as discussed earlier, Congress did not mandate the use of MTBE, nor did the EPA's certification of gasoline containing MTBE require consideration of non air-quality factors. . . . Thus, while the EPA could consider the non air-quality impact of the use of MTBE, any such consideration was . . . not commensurate with a risk-utility analysis. . . . Accordingly, defendants' motions to dismiss these [design defect] claims are denied.

Similarly, Defendants' "complete preemption" argument in these cases consists of precisely the same express preemption argument they made and lost in *In re MTBE Litig.* in 2001.  *Compare* Ds' Opp. at 24-28 (plaintiffs' tort claims regarding MTBE contamination of groundwater preempted because they would result in a "control or prohibition respecting a[] characteristic or component of fuel" under 42 U.S.C. § 7545(c)(4)(A)), *with In re MTBE Litig., supra,* 175 F. Supp. 2d at 612-614 (rejecting argument that "section 7545(c)(4) . . . preempt[s] state law claims concerning the contamination of groundwater caused by the use of MTBE").  Defendants themselves concede, as they must, that "[t]his Court and several others have previously found that § 7545(c)(4)(A) does not prevent state regulation of fuels if that regulation is designed to protect groundwater, as opposed to regulating emissions." Ds' Opp. at 25.  Indeed, as noted above, since this Court's 2001 opinion, the Ninth Circuit has concluded as a matter of law that "California's MTBE ban ... does not 'frustrate [ ] the full effectiveness of federal law,'" *Davis II, supra,* 331 F.3d at 673, and the Northern District of New York

---

[10] Of course, Plaintiffs' design defect claims do not require resort to any federal law issue – substantial or otherwise.  *Eastern States, supra,* 11 F. Supp. 2d at 390 (substantial federal question jurisdiction requires showing that "a disputed question of federal law is a necessary element of one of the well-pleaded state claims"); *Shadie v. Aventis Pasteur,* 254 F. Supp. 2d 509, 518 (M.D. Pa. 2003) (where defendants, not plaintiffs, ask court to interpret federal law, "[t]he mere presence of a federal issue . . . does not create federal jurisdiction").

The Honorable Shira Scheindlin
January 27, 2004
Page 9 of 19

has reached the same result for New York's ban as a matter of both fact and law in *Pataki III*.

Defendants' assertion that they have "never presented," and this Court has not rejected, the federal question arguments they raise in support of removal, *see* Ds' Opp. at 2, is simply not true. To the extent Defendants suggest that the Court's prior ruling rejecting preemption under both express and conflict preemption theories does not preclude their current complete preemption argument here, they misconstrue the narrow scope of complete preemption. "Complete preemption is rare," and only applies when the "preemptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *ARCO Environmental Remediation v. Montana Dept. of Health and Environmental Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 65 (1987). If state tort remedies related to MTBE contamination do not expressly or impliedly conflict with any requirement, goal or objective under the CAA, such remedies cannot conceivably be "completely preempted." Indeed, as the Supreme Court has held, even a potentially valid federal preemption defense (which Defendants do not have) is not sufficient to establish removability under the complete preemption doctrine, because "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-399 (1987).

Thus, Defendants cannot escape this Court's prior preemption rulings simply by dressing the same preemption arguments in new clothing.[11] As those preemption arguments are the *sine qua non* of their attempt to find a federal question hidden within these state-law tort actions, Defendants' removal pursuant to 28 U.S.C. § 1331 was improper.

   3.   **Defendants fail to show that the CAA or any other federal statute contains the exclusive cause of action for Plaintiffs' claims.**

According to the U.S. Supreme Court, complete preemption has been found *only* "when the federal statutes at issue provided the exclusive cause of action for the claim

---

[11] As it would appear that "the litigation of this particular issue has reached such a stage that [there is] no really good reason for permitting it to be litigated again.," *Zdanok v. Glidden Company, Durkee Famous Foods Division*, 327 F.2d 944, 955 (2d Cir. 1964), the combination of this Court's previous legal holdings in *In re MTBE* and the court's factual findings in *Pataki III* likely bar Defendants from relitigating their preemption arguments here. *See, e.g., Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir.1996) (underlying "matters actually litigated and determined" in prior proceeding were "identical" to those asserted in subsequent case, and therefore barred by doctrine of issue preclusion/collateral estoppel). However, the Court need not address this concern in order to grant the New York Plaintiffs' motions to remand.

The Honorable Shira Scheindlin
January 27, 2004
Page 10 of 19

asserted and also set forth procedures and remedies governing that cause of action."
*Beneficial National Bank v. Anderson*, __ U.S. __, 123 S. Ct. 2058, 2062 (2003).  Of
course, the CAA provides neither the exclusive cause of action for the claims asserted by
the New York Plaintiffs for water-related damages, nor procedures and remedies
governing those causes of action.

Defendants blithely assert that various administrative remedies under the CAA,
Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.* ("SWDA")[12] and Toxic Substances
Control Act, 15 U.S.C. § 2601 *et seq.* ("TSCA") provide "exclusive remedies for parties
seeking to alter the design of reformulated gasoline." Ds' Opp. at 28.  Defendants then
contradict themselves by acknowledging (as they must) that federal law does *not* provide
"the only remedy for the presence of MTBE in groundwater." Ds' Opp. at 30.  Of
course, under *Beneficial National Bank, supra*, 123 S.Ct. 2062, this concession alone
destroys Defendants' complete preemption argument – as federal law must provide the
"exclusive" remedy in order to completely preempt a state cause of action for
jurisdictional purposes.  Defendants' citation to *Pacific Gas & Electric Co. v. State
Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 212 (1983), for the proposition that
complete preemption can apply to an "identifiable portion" of a field is unavailing.  That
case, which addressed, and rejected, an occupation-of-the-field preemption defense on
the merits, did not involve the complete preemption exception to the well-pleaded
complaint rule, and thus is inapposite.

In any case, Defendants' argument fails to overcome an obvious point that was
central to this Court's previous rejection of their preemption defense: the CAA
specifically *preserves* state common law claims, expressly providing that "[n]othing in
this section shall restrict any right which any person (or class of persons) may have under
any statute or *common law* to seek enforcement of any emission standard or limitation *or
to seek any other relief*." 42 U.S.C. § 7604(e) (emphasis added); *In re MTBE Litig.,
supra*, 175 F. Supp. 2d at 613, n.35 ("Congress' intent to allow some state causes of
action is also evidenced by the CAA's citizen suit savings provision, codified at 42
U.S.C. § 7604(e)"); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, (1987)
(identical savings language in the Clean Water Act "negates the inference that Congress
'left no room' for state causes of action").  The SWDA contains a savings provision
identical the CAA provision quoted above.  *See* 42 U.S.C. § 6972(f).  TSCA contains a
similar savings clause, which provides that, except where EPA has promulgated certain
rules pertaining to a toxic substance – which it has not in this case – "nothing in this
chapter shall affect the authority of any State or political subdivision of a State to
establish or continue in effect regulation of any chemical substance, mixture, or article
containing a chemical substance or mixture." 15 U.S.C. §2617(a).[13]  Accordingly,

---

[12] Defendants incorrectly refer to the SWDA by its prior name, the Resource Conservation &
Recovery Act.

[13] Defendants cite *Bastien v. AT&T Wireless*, 205 F.3d 983 (7th Cir. 2000), for the proposition
that a savings clause does not necessarily preclude a finding of complete preemption.  Ds' Opp. at

The Honorable Shira Scheindlin
January 27, 2004
Page 11 of 19

Defendants' citations to statutory remedies for non-water related objections to CAA,
SWDA and TSCA implementation do not support their "exclusive cause of action"
argument.

> 4.   **Congress and EPA intended to preserve state flexibility, not limit it.**

Citing certain statements from the legislative history of the 1990 CAA
amendments, Defendants allege that Congress had "the specific knowledge and
expectation that MTBE would be the principal means by which refiners met oxygenate
requirements." Ds' Opp. at 13. They suggest that this somehow evinces as a
congressional intent to "occupy the field" of fuels regulation to the exclusion of state
action to remedy water pollution caused by MTBE.[14]  This distortion of the legislative
history has also been addressed, and rejected, by this Court.  As the Court explained in *In
re MTBE Litig., supra*:

> [W]hile members of Congress may have anticipated that MTBE would be
> used to meet the oxygenate requirements, . . . the legislative history of the
> 1990 CAA amendments indicates that Congress, through the RFG
> Program, sought to reduce harmful vehicle emissions in the "larger
> context of market forces, health and environmental impacts, regional
> priorities, technological feasibility and other considerations." [citation
> omitted.]  Indeed, Congress expected that oxygenates would compete in
> the marketplace and 'preventing a state from [regulating] an oxygenate
> which it believes threatens its groundwater appears more likely to defeat
> rather than advance the goals of Congress and [the] EPA....'

175 F. Supp. 2d at 612-13.

Defendants' selective reference to out of context EPA statements regarding the
agency's intent to occupy the field of fuels regulation, *see* Ds' Opp. at 16, 24-25, 28;
*citing* 59 Fed. Reg. 7716, 7809 (Feb. 16, 1994), ignores the Agency's own express
conclusion that nothing in the CAA fuels programs "establishes a comprehensive federal
presence" with respect to MTBE. U.S. EPA, *Approval and Promulgation of*

---

30.  But in *Bastien*, unlike the case here, the court found that the plaintiff's claims fell squarely
within the express preemption provision of the Federal Communications Act, 47 U.S.C. §
332(c)(3)(A), and that application of the savings clause would thus nullify the preemption
provision.  205 F.3d at 987.  Here, as described above, this Court, along with every other
published decision addressing the question, has found that the CAA's express preemption
provision does not apply to state regulation of MTBE in order to prevent water pollution.

[14] Similar attempts by the oil industry to delve into the legislative history of the CAA were
rebuffed in *Davis II,* 331 F.3d at 671, where the Court stated: "We hesitate to examine the
legislative history, for we find the text of the Act relatively clear."

The Honorable Shira Scheindlin
January 27, 2004
Page 12 of 19

*Implementation Plans; Nevada State Implementation Plan Revision, Clark County*, 64
Fed. Reg. 29573, 29578 (Jun. 2, 1999), *affirmed in ExxonMobil Corp. v. U.S. E.P.A.*,
*supra*, 217 F.3d 1246. According to EPA, "federal regulation here is not so pervasive as
to preclude supplementation by states, nor is the federal interest in the field sufficiently
dominant to preempt state action." 64 Fed. Reg. at 29578. Instead, such programs
"explicitly preserve a role for the states in regulating fuels," and "[w]hile Congress
deliberately rejected a federal mandate that would reduce market opportunities for
various oxygenates, *it did this with the goal of preserving state flexibility, not limiting it.*"
*Id.* (emphasis added). As Defendants admit, the court in *Pataki I, supra*, 158 F. Supp. 2d
at 255-57, squarely rejected the industry's attempt to unearth any EPA intent to occupy
this field. In short, Defendants' position has been rejected soundly both by EPA itself
and the courts.

B.    **Removal Under § 1442(a)(1) Is Improper Because Defendants Were Not
      Acting Under the Direction of Any Federal Official or Agency.**

      Defendants alternatively claim that they were acting under the direction of federal
officers pursuant to 28 U.S.C. §1442(a)(1).[15]  The primary beneficiaries of §1442(a)(1)
are federal officers and agencies. *Tremblay v. Philip Morris, supra*, 231 F. Supp. 2d at
417. For a *private* party defendant to invoke the statute, it must:  (1) assert a colorable
defense based on federal law in the notice of removal; (2) establish that it was acting
under the direction of a federal officer; and (3) show that its federally directed actions are
causally connected to the harm about which the plaintiff complains. *Jefferson County v.
Acker*, 527 U.S. 423, 431 (1989). Defendants fail on each of these required showings.

      1.    **Defendants have no colorable federal defense.**

      The only federal defense Defendants raise is conflict preemption. *See* Ds' Opp. at
32. As discussed above: (1) this Court has already rejected this purported defense in an
earlier phase of this MDL proceeding; and (2) such defense cannot possibly succeed on
the merits in any event, as New York has already banned MTBE and such ban has been
definitively upheld in the courts. Defendants have thus failed to raise a "colorable"
federal defense.

      Defendants suggest that their preemption defense is still viable because this Court
"described the . . . issue as one which needed development as a matter of fact." Ds' Opp.
at 32. In *In re MTBE Litig, supra*, 175 F. Supp. 2d at 616, the Court observed that,
whether alternatives to MTBE "are 'practicable' and have been available to the
defendants for their use in the RFG Program is a question of fact that the Court cannot
address on a motion to dismiss." Subsequently, however, Defendants had the opportunity

---

[15] Section 1442(a)(1) provides, in pertinent part, that an action may be removed to federal court
by "any officer (or any person acting under that officer) of the United States or of any agency
thereof, sued in an official or individual capacity for any act under color of such office." 28
U.S.C. § 1442(a)(1).

The Honorable Shira Scheindlin
January 27, 2004
Page 13 of 19

to prove their case regarding "practicability," and failed.  In *Pataki III, supra*, 2003 WL 22845949 at *9, the court found that Defendants' trade association failed to show that New York's MTBE ban would cause supply shortfalls "sufficient to support a finding of conflict preemption."

> **2.**  **As private regulated entities that voluntarily *chose* to use MTBE in gasoline despite its known hazards, Defendants never acted under the direction of any federal official.**

Defendants also cannot establish that they undertook their use of MTBE in gasoline and their failure to warn of its known hazards "under the direction" of the federal government.  *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 945 (E.D.N.Y. 1992) ("the set of defendants who can avail themselves of § 1442(a) is smaller than the set of defendants who can make a colorable claim to a federal defense").  Their attempt to do so fails for at least three reasons: (a) Defendants, as private actors merely complying with federal regulations, fall outside the class of protected persons under § 1442(a)(1); and (b) because Defendants voluntarily chose to use MTBE from among several available options, they cannot plausibly claim that they were acting "under the direction" of EPA.

> **a.**  **Defendants' compliance with RFG regulations does not transform them into agents of the federal government.**

Defendants' attempt to characterize their choice of MTBE to comply with the federal RFG and OFP programs as "acting under the direction of federal officers or agencies" strains credulity.  No published decision ever has held that a private sector manufacturer merely subject to complex regulations, and not acting under the operative *contractual* commands of federal officials, acts "under the direction" of the federal government.  *See, e.g., Little v. Purdue Pharma, supra*, 227 F. Supp. 2d at 860-61 ("body of law" does not support position that defendant "merely 'subject to complex regulations'" is entitled to removal under §1442(a)(1)).[16]

Defendants here are not federal contractors; they are not producing products for the government; nor are they performing any other governmental function.  Rather, they are private enterprises in the business of manufacturing and selling gasoline.  Like virtually every other manufacturing business in the United States, they are subject to a variety of federal environmental regulations.  Published federal decisions are unanimous in holding that mere participation in a regulated industry does not constitute "acting under the direction" of the federal government under § 1442(a)(1).

---

[16] *See also generally*, WRIGHT, MILLER & COOPER, *supra*, Ch. 7, § 3727, *and* 166 A.L.R. Fed. 297 (2000) (in all cited cases where corporate manufacturer defendants successfully removed state court tort actions under § 1442(a)(1), the defendants were government contractors and the products at issue were produced for the government pursuant to contractual specifications); *see also Ryan*, 781 F. Supp. at 943 (§ 1442 requires "narrow" and "restrictive" construction).

The Honorable Shira Scheindlin
January 27, 2004
Page 14 of 19

In *Tremblay v. Philip Morris,* 231 F. Supp. 2d 411, 417 (D.N.H. 2002), a cigarette manufacturer removed the plaintiffs' state law deceptive advertising claims under § 1442(a)(1), arguing that by "merely attempting to comply with the FTC's policies … when it engaged in the conduct for which it has been sued," it was acting under the direction of the FTC. The court flatly rejected this argument, holding that "[a]lthough Philip Morris is a participant in a regulated industry, this is not enough to demonstrate that it acted under the direction of a federal officer." *Id.* at 418. The Court explained: "The mere fact that a tobacco company has complied with the requirements of a federal law cannot suffice to transform it into a federal actor any more than the compliance of a myriad of private enterprises with federal law and administrative regulations could of itself work such a transformation." *Id., quoting Brown v. Philip Morris, Inc.,* 250 F.3d 789, 801 (3rd Cir. 2001).

In *Little v. Purdue Pharma, supra,* 227 F. Supp. 2d at 861, pharmaceutical corporations sued for injuries allegedly caused by the drug OxyContin argued that FDA regulation and approval of the drug made them *de facto* federal officers for purposes of § 1442(a)(1). The court rejected removal, explaining:

> Corporate defendants herein do not operate at the discretion of federal authorities. They are private, for-profit business organizations which exist independently of the federal government. Lest participants in every regulated industry be entitled to "federal officer" status, corporate Defendants need to make a much greater showing than in doing the acts giving rise to Plaintiffs' claims, they were acting pursuant to a federal directive. Acting under the watchful eye of the federal government is not enough.

*Id.*

Similarly, in *Bakalis v. Crossland Savings Bank,* 781 F. Supp. 140, 145 (E.D.N.Y. 1991), the court held that even in cases involving "pervasive regulation" a corporate defendant seeking removal under § 1442(a)(1) must show "'regulation plus'" – *i.e.* that "the corporation is so intimately involved with the government functions as to occupy essentially the position of an employee of the government." Defendants have made no such showing here, nor can they. Indeed, none of the legislative history or EPA regulations cited by Defendants even remotely suggests a federal intent to impose federal *control* over Defendants' refining operations. To the contrary, the legislative history of the 1990 CAA Amendments indicates unequivocally that the RFG program was "in no way intended to resurrect a 1970's DOE-type scheme of detailed government intervention in U.S. gasoline markets." *Pataki I,* 158 F. Supp. 2d at 256-57. Neither the use of MTBE in gasoline nor the harm it has wrought, is anyone's fault but Defendants' own. There is no jurisdiction under § 1442(a)(1).

The Honorable Shira Scheindlin
January 27, 2004
Page 15 of 19

Defendants' sole support for their novel position to the contrary is *Watson v. Philip Morris*, No. 4:03-CV-519 GTE (E.D. Ark., Dec. 12, 2003), a recent unpublished opinion out of the Eastern District of Arkansas. As the *only* case to ever hold that a private consumer product manufacturer's mere compliance with federal rules constitutes "acting under the direction of a federal officer" for purposes of section 1442(a)(1), *Watson* is clearly an aberration, and should be ignored.[17]  *Tremblay*, *Brown* and *Little* should control here. To hold otherwise would create a loophole in this narrow removal statute large enough to accommodate the proverbial Mack Truck.

> **b.    There is no causal connection between RFG program requirements and the conduct targeted by this lawsuit because refiners voluntarily chose to use MTBE from among several available options.**

The CAA mandates *oxygen* content, not MTBE.  42 U.S.C. § 7545(k)(2)(B). *Every* published decision that has addressed the issue has concluded that neither the CAA nor its implementing regulations requires refiners to use MTBE or any particular oxygenate in order to meet RFG requirements. *See, e.g.*, *In re MTBE Litig.*, 175 F. Supp. 2d at 615 (RFG Program does not mandate the use of MTBE); *ExxonMobil, supra*, 217 F.3d at 1251-53 (CAA "does not mandate a 'recipe' or so-called government gas"); *Davis I*, 163 F. Supp. 2d at 1188 (CAA neither requires nor forbids the use of any particular oxygenate ... [i]ts 'goal' is to assure a particular oxygen content").  Defendants' use of MTBE is a matter of voluntary corporate choice, not a "necessary result" of CAA directives.

Defendants' choice to use MTBE breaks any causal connection between EPA's RFG and OFP regulations and Defendants' use of MTBE. *See Good v. Armstrong World Industries*, 914 F. Supp. at 1130 (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos); *Ryan v. Dow Chemical Co., supra*, 781 F. Supp. at 950 (no nexus between design defect claim and defendants' provision of Agent Orange to the military, because defendant was "being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by defendants"); *accord, Little, supra*, 227 F. Supp. 2d at 861 (because FDA was not involved in the "day-to-day drug development and manufacturing process," defendants were "operating at their own initiative"); *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal.

---

[17] In any event, *Watson* is easily distinguishable from this case.  In *Watson*, Philip Morris was sued for deceptive advertising in connection with tar and nicotine ratings derived from a testing method mandated by the FTC.  Thus, the court concluded, plaintiffs' misleading advertising claim "squarely confronts the FTC's mandate." *Watson* at 23.  Here, as explained below, there is no causal connection whatsoever between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.

The Honorable Shira Scheindlin
January 27, 2004
Page 16 of 19

1998) (target conducted in groundwater contamination case against manufacturers of government rocket engines – failing to warn and improperly disposing of trichloroethylene ("TCE") – was not "under the direction" of the government, even though the government contracts at issue had specifically required use of TCE).   As the government does *not* require use of MTBE, Defendants cannot fairly argue that federal directives "caused" the conduct on which the District bases its common law and statutory claims.

**C.**     **The Court Should Remand This Case Because It Is Not "Related To"  The Texaco Bankruptcy, and Even If It Were, the Remand Provision Under 28 U.S.C. § 1452(b) Applies Squarely To This Case.**

This Court should also reject Defendants' alternative assertion of federal bankruptcy jurisdiction.  Their contention that these state-law environmental contamination lawsuits against numerous defendants represents a purported "collateral attack" against a 15-year-old bankruptcy order pertaining to a single defendant fails because: (1) federal jurisdiction is lacking in the first instance, as this case neither arises under Title 11, arises in a case under Title 11, nor is "related to" a case under Title 11; (2) remand is obviously warranted in light of the overwhelming – indeed, exclusive – predominance of state-law issues on the one hand, and the extreme remoteness of any bankruptcy issues on the other.[18]

> **1.     Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not "related to" the Texaco Bankruptcy.**

Texaco, Inc. filed for bankruptcy under Title 11 in 1987 and obtained confirmation of its reorganization plan in 1988.  *In re Texaco, Inc.*, 84 B.R. 893 (S.D.N.Y. 1988).  Because the 15-year-old Title 11 proceedings (the "Texaco Bankruptcy") are no longer being administered, and the rights of all creditors already have been determined in the Confirmation Order, the outcome of this case will have absolutely no effect on *the administration of* the Bankruptcy.  It is, therefore, not "related to" this action, and cannot form a basis for federal jurisdiction.

Under 28 U.S.C. § 1334(b), "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Cases "arising under" Title 11 are those cases in which the cause of action is created by title 11, and those "arising in a case under" Title 11 are those that, while not based on any right expressly created by title 11, nevertheless "would have no existence outside of the bankruptcy."  *In re Chargit Inc.*, 81 B.R. 243, 246-247 (Bankr.

---

[18]  In addition, as the New York Plaintiffs' ably point out in their Reply Brief, nothing in either Defendants' removal notices or the operative complaints demonstrate that any of the Plaintiffs' claims that may pertain to Texaco "arose" prior to entry of Texaco's Confirmation Order, or are even covered by the Confirmation Order.

The Honorable Shira Scheindlin
January 27, 2004
Page 17 of 19

S.D.N.Y. 1987). This case undoubtedly does *not* fit into either of these jurisdictional categories, as the exclusively state-law causes of action asserted in the complaints "exist independently of bankruptcy law." *See Williams v. Shell Oil Co*, 169 B.R. 684, 688 (S.D. Cal. 1994).

Defendants' contrary suggestion – that this case "invokes substantive rights created by the federal bankruptcy laws" (Ds' Opp. at 5) – has absolutely no merit. Each of the three cases they cite is easily distinguishable from this case. Neither *In re National Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997), *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184 (7th Cir. 1993) nor *Texaco, Inc. v. Sanders (In re Texaco, Inc.)* 182 B.R. 937 (Bankr. S.D.N.Y. 1995) involved a motion to remand a state court action that had been removed to federal court by the debtor. Instead, each involved actions brought originally in federal bankruptcy court. For example, *Texaco v. Sanders* involved a motion by the debtor (Texaco) to reopen its bankruptcy proceeding and enforce its Confirmation Order against the plaintiffs in a state court case. *Id.* at 940-41. The federal bankruptcy court granted Texaco's motion on the common sense grounds that "a proceeding such as this, *to enforce and construe a confirmation order issued by this Court in this case*, constitutes a proceeding 'arising in or related to a case under title 11'" under § 1334(b). *Id.* at 944 (emphasis added). Thus, the Texaco bankruptcy court did not, and was not asked to, address the question presented here: whether a state tort suit (potentially) involving (some) pre-Confirmation Order Texaco conduct, and filed years after entry of such Order, is "related to" the Bankruptcy. The answer to this question, as explained above, is "no."[19]

Nor is this case "related to" the long-since-resolved Texaco Bankruptcy. Whether a civil proceeding is "related to" bankruptcy depends on "whether the outcome of the proceeding could conceivably have any effect on the estate *being* administered." *In re Chargit Inc., supra*, 81 B.R. at 247(emphasis added). "Although the optimist may argue that anything is 'conceivable,' any practical definition of this term of art must be tempered by a measure of reasonableness." *Id.* There is no conceivable chance that this case will affect the administration of the Texaco Bankruptcy, because it is no longer being administered.

By definitively discharging any and all claims or liabilities arising before its effective date, entry of the Texaco Confirmation Order fifteen years ago destroyed any possible relationship between the outcome of this suit and the *administration of* the Texaco Bankruptcy. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988).[20] As is evident

_____

[19] The string of recent, simultaneously decided cases from the Southern District of Texas cited by Defendants in favor of their bankruptcy arguments should be disregarded. Although they involved motions to remand, the court's decisions in these cases were predicated expressly on *Texaco v. Sanders*, which, as described above, has no bearing on this case.

[20] *Feitz* involved a cross-claim filed by a debtor's wife against a mortgagee in her husband's bankruptcy proceeding. The cross-claim was filed a mere four months after the bankruptcy

The Honorable Shira Scheindlin
January 27, 2004
Page 18 of 19

from their complaints, which say nothing at all about the Texaco bankruptcy, the New York Plaintiffs surely have no interest in re-opening such Bankruptcy or "collaterally attacking" the Confirmation Order. The mere fact that allegations in the complaints may potentially cover some pre-1988 conduct of Texaco does not furnish grounds for federal "related to" jurisdiction under § 1334(b). Rather, it means only that Texaco may have a discharge defense based on the Confirmation Order as to some small portion of its liability – a defense that a state court is fully capable of adjudicating. *See In re McGhan, supra*, 288 F.3d at 1180 ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

      **2.**     **There are also ample grounds for the court to remand this action pursuant to § 1452(b).**

Defendants acknowledge, as they must, that the District Court's jurisdiction over bankruptcy proceedings is concurrent with that of state courts. 28 U.S.C. *§* 1334(b); *see* Ds' Opp. at 3. Thus, even if these actions were "related to" the Texaco Bankruptcy pursuant to § 1334(b) – which they are not – the Court should remand them to state court nonetheless, pursuant to 28 U.S.C. §1452(b).[21]

Section 1452(b) provides that "the court to which [a] claim or cause of action is removed [pursuant to § 1334 jurisdiction] may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). In determining whether to exercise their equitable discretion under this statute, courts generally consider the following factors: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the

---

court's entry of a confirmation order as to the bankruptcy estate. *Id.* at 456. Like the Texaco Confirmation Order at issue here, the confirmation order in *Feitz* precluded creditors from asserting any other claim than that provided for them in the confirmed plan. *Id.* at 458. The Ninth Circuit held there was no federal "related to" jurisdiction over the cross-claim because entry of the confirmation order "*destroyed any possible relationship between the outcome of the suit and the administration of the bankruptcy estate.*" *Id.* (emphasis added).

[21] While we recognize that some cases in this Circuit have questioned whether the mandatory abstention provision in 28 U.S.C. §1334(c)(2) applies to removed cases, *see Rennaisance Cosmetics, Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 13 (S.D.N.Y. 2002), we note that conditions for mandatory abstention are met in this case. *See Allied Mechanical and Plumbing v. Dynamic Hostels Housing Dev. Fund Co.*, 62 B.R. 873, 876 (Bankr.S.D.N.Y.1986) (setting out mandatory abstention factors). The pending remand motions were filed as soon as practicable following service of the notices of removal. These lawsuits, which could not have been commenced in the District Court absent the alleged bankruptcy issue, are based exclusively on state-created rights, have been commenced in state court and are capable of timely adjudication there once remanded.

The Honorable Shira ●eindlin
January 27, 2004
Page 19 of 19

main bankruptcy case; and (6) the existence of the right to a jury trial. *Rennaisance Cosmetics, Inc., supra,* 277 B.R. at 14.

Here, every factor favors remand: (1) the effect of these actions on the administration of the Texaco Bankruptcy is, at most, incredibly remote; (2) the actions are based entirely on state-law causes of action; (3) as Defendants are sure to argue in motions to come, the cases raise difficult questions of state tort law, as well as complex, site-specific factual issues; (4) as New York law predominates, these cases are brought by subdivisions of the state and involve environmental and public issues of statewide importance, principles of comity clearly favor remand; (5) as described above, the remoteness of these cases to the Texaco Bankruptcy is extreme; and (6) the Plaintiffs' claims are triable by a jury. In light of these factors, and the fact that the New York state courts are fully capable of resolving any potential, remote Confirmation Order defense Texaco may assert, the equities not only favor, but demand, a remand of this case to state court. As the court concluded in *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.,* 130 B.R. 405, 408 (S.D.N.Y. 1991), these are "state law action[s] and a state court is better able to respond to a suit involving state law."

## CONCLUSION

This Court does not have subject matter jurisdiction over these actions. Even assuming the Court has jurisdiction over the Texaco Bankruptcy, the equities obviously favor remand. Accordingly, the Court should grant the instant motions for remand.

We will serve copies of this letter on the other counsel involved in these cases and those identified in the schedule attached to the Court's December 23rd Order.

Respectfully submitted,

VICTOR M. SHER

VMS: jac
cc: All Counsel per attached Service List

32

**EXHIBIT 4**



OFFICE OF THE

# DISTRICT ATTORNEY

SACRAMENTO COUNTY

**JAN SCULLY**
District Attorney

CYNTHIA G. BESEMER
Chief Deputy

January 27, 2004


The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312


Re: *In re. MTBE Products Liability Litigation* (MDL 1358); Master File C.A.
No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

This office represents the plaintiff the People of the State of California, Sacramento
County, in *People v. Unocal Corp., et al.* E.D. Cal. Civ.S-03-2653 GEB DAD. The
purpose of this letter is to renew our objection to inclusion of this matter, or any of our
causes of action, in MDL 1358, to reserve all objections we have relative to defendant's
original Removal Notice filed here in the Eastern District, to object to a stay of our
previously filed Remand Motion that is presently scheduled for hearing on February 23,
2004, and to clarify any misconception that might have been raised by representations
made by counsel for plaintiffs in other actions who were present during the hearing of
December 19, 2003 to the effect that they were speaking on our behalf. They had no
authority to do so.

As of this date we have been served with a Notice of Removal received December 11,
2003 (removing our State complaint to Federal Court) and a Notice of Motion for
Temporary Stay Pending Transfer dated December 18, 2003. We have not received any
notice or information that defendants have successfully joined our case with MDL 1358
or successfully transferred it via either a noticed motion or a Notice of Related Tag-along
Action with Judicial Panel on Multidistrict Litigation. We thus are in the unusual
position of objecting to inclusion in MDL 1358 without having been formally included or
noticed that we are a party. Nonetheless, we do object to inclusion.

P.O. Box 749 · 901 G Street · Sacramento, California 95812-0749

(916) 874-6218

The Peoples' causes of action allege that defendants directly or indirectly spilled, leaked, or caused spills or leaks of MTBE gasoline in Sacramento County, that in many instances the MTBE still remains, and that it constitutes both a public nuisance and a substantial threat to the drinking water of the 1.2 million residents of Sacramento County. The spills and leaks violate the California Health and Safety Code and Fish and Game Code, and give rise to civil penalties. Our nuisance and abatement causes of action only require proof that MTBE gasoline has been spilled or leaked where it threatens the groundwater, and that the defendants are directly or indirectly responsible. Our claims do not involve or impact the Clear Air Act, nor do they disturb any efforts by Congress or the EPA to control or maintain a supply of gasoline. We simply seek civil remedies against those responsible for leaking or spilling a dangerous contaminant where it would contaminate our groundwater. We want the responsible parties (in this case the purveyors of the MTBE gasoline) to clean up the problem they created – one that they profited from handsomely – instead of placing that burden on our citizens.

Our case also alleges the defendants engaged in false advertising and unfair business practices under the California Business and Professions Code. Again, these contentions do not impact the Clean Air Act or the EPA. Instead, these allegations rest on what the defendants advertised they were doing, different from what they in fact knowingly did, regarding products they were distributing, and leaking underground storage tanks they maintained and used for that distribution.

Finally, I am aware that Victor Sher, counsel for co-plaintiffs (municipal and private Sacramento water purveyors), has objected to federal jurisdiction and also intends to object any to inclusion into MDL 1358 of this case, *People v. Unocal Corp., et al.* E.D. Cal. Civ.S-03-2653 GEB  DAD. While our portion of the case is not identical to that of the water purveyors, we join in their objections to inclusion in MDL 1358, without waiving any further or future objections to defendant's previously filed motions, and while respectfully asserting that this Court does not have jurisdiction over this case.

Thank you for your consideration in this matter.

Sincerely yours,

JAN SCULLY
DISTRICT ATTORNEY

JS:gf

**EXHIBIT 5**

COX CASTLE NICHOLSON ►

Cox, Castle & Nicholson LLP
555 Montgomery Street, 15th Floor
San Francisco, California 94111-2585
**P** 415.392.4200  **F** 415.392.4250

Robert P. Doty
415.262.5115
rdoty@coxcastle.com

**received**
01/05/04 email

January 5, 2004

**VIA FACSIMILE AND FEDERAL EXPRESS**

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re:   Order dated December 23, 2003 in In re MTBE Products Liability Litigation
      (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

        This firm is counsel and co-counsel to certain defendants in three of the California
actions addressed by the referenced Order.  We were counsel to one of those entities in a prior
MTBE case tried in California state court (the litigation concerning the drinking water at the
south end of Lake Tahoe).  We write to express our concerns with the potential for the Court's
Order to implicate issues apart from the narrow question of remand.

        In the action captioned *City of Fresno v. Chevron U.S.A., Inc. et al.* C 03-5378-
JSW (N.D. Cal.), we represent three entities affiliated with Duke Energy.  The Duke defendants
are alleged middlemen in the gasoline supply chain as it relates to the City of Fresno matter (i.e.,
they neither manufacture MTBE, blend it into gasoline at a refinery, nor operate underground
storage tanks that may have released MTBE-containing gasoline).  In the action captioned
*People v. Unocal Corp., et al.* CIV S-032653 GEB/DAD (E.D. Cal.), we represent the 7-Eleven
convenience store chain, a retailer alleged to be partly responsible for the alleged contamination.
We are co-counsel for 7-Eleven in the action captioned *Orange County Water District v. Unocal
Corp. et al.* SACV03-1742 JVS(Anx) (C.D. Cal.).

        Duke and 7-Eleven were asked some weeks ago to consent to removal of these
actions.  In each instance they did so (or have indicated they would do so) in a court filing
expressing the following:  (1) the consent was provided "[w]ithout joining in, adopting, or
endorsing the contentions offered as grounds for removal" and (2) the consent was provided with
"express disagree[ment] with any suggestion that may be included in the Notice Of Removal that
[a particular] case should be transferred out of the . . . California [district courts]."   Consistent

The Honorable Shira Scheindlin
January 5, 2004
Page 2

with the second point, Duke and 7-Eleven are concerned that the December 23rd Order may be used to vitiate their opportunities to oppose MDL consolidation of these cases.[1]

The first paragraph of the Order speaks in terms of the remand issue only. Duke and 7-Eleven appreciate the logic of having the propriety of federal removal jurisdiction, *vel non*, decided by a single federal court, so they have no per se objection to consolidated treatment of that issue. Indeed, other than a strong desire not to litigate these cases twice as a result of an invalid exercise of removal jurisdiction, the remand issue is not of great concern to Duke or 7-Eleven.

If, however, the Court's consideration and resolution of the remand issue carries with it some implicit determination that MDL consolidation is appropriate for all pretrial proceedings in the California litigation, Duke and 7-Eleven would strenuously object. Both are concerned that such an implicit determination might be asserted later by other litigants, on the grounds that MDL status was effectively extended to these cases by virtue of the fact that the Southern District exercised jurisdiction over the remand issue in the California litigation. Because silence in response to the Court's Order might be asserted to constitute acceptance of such a theory or a waiver of objections to de facto MDL consolidation, or might be argued to work an estoppel against Duke or 7-Eleven, they are submitting this letter.

Duke and 7-Eleven oppose any such implicit determination, waiver, or estoppel because they presently are planning to file objections with the MDL panel if conditional transfer orders are issued by the clerk of the MDL panel for the cases in which Duke and 7-Eleven are involved. The gist of their opposition is as follows.

With the exception of the removal jurisdiction/remand issue, MTBE litigation is sufficiently mature at this point that MDL handling is not warranted. The potentially dispositive motions, including federal preemption, have been litigated in both state and federal courts with remarkably consistent outcomes. State laws banning MTBE have now been upheld by federal district and appellate courts in New York and California, both before and after trial. As a result, threshold legal questions seem unlikely to require significant additional judicial energy. Furthermore, a great deal if not all of the generally applicable discovery (regarding the history of and the alleged skullduggery behind the widespread use of MTBE as a fuel oxygenate) already has been completed in connection with the South Lake Tahoe matter and other matters that have

---

[1] The first caveat reflects our concern about the legal basis for federal removal jurisdiction and our desire not to litigate these cases twice, once through the federal system and then a second time should removal jurisdiction be found invalid on appeal. Our research to this point leaves us with considerable doubt as to the validity of removal jurisdiction, hence the wording of the consents. If the Court proceeds with consolidated consideration of the remand motions, Duke and 7-Eleven will address this issue in more detail in a filing submitted consistent with the deadlines in the Order.

The Honorable Shira Scheindlin
January 5, 2004
Page 3

or are currently working their way through the state courts notwithstanding the recent flurry of removal notices.

      In sum, 7-Eleven and Duke submit that is a considerable stretch to characterize MTBE litigation as a gathering storm that will produce a blizzard of motions and conflicting opinions. Duke and 7-Eleven further submit that as with other co-mingled contamination cases, the MTBE cases now revolve around location-specific issues: the extent of contamination, the available remedies, the implementation of those remedies, and the equitable apportionment of liability. With all due respect to the Court and the MDL panel, we submit that the Southern District of New York is not the most efficient forum in which to handle such issues as they relate to contaminated groundwater in Fresno, California (or Sacramento or Orange County for that matter).

      For the foregoing reasons, Duke and 7-Eleven object to the arrangement proposed in the Court's Order unless the Court's consideration of the remand issue is somehow done without prejudice to 7-Eleven's and Duke's rights to oppose MDL consolidation of the cases in which Duke and 7-Eleven are involved.

      The undersigned's office will serve copies of this letter by facsimile on the other counsel involved in the California cases identified above. We will work with counsel in those cases to obtain service lists for the other MTBE cases identified in the schedule attached to the Court's December 23rd Order and will serve those counsel by facsimile as promptly as possible.

      We thank the Court in advance for its consideration.

                   Very truly yours,

                   Robert P. Doty

44510\38349v1
cc:   All Counsel

The Honorable Shira Scheindlin
January 5, 2004
Page 4


bcc:   Ron Haggerty (Duke)
       Courtney Jones (for 7-Eleven)
       Dave Moore
       Rick Kranz
       Alicia Vaz
       Karleen O'Connor

Burke-Moody. Eileen (DA)

**To:**       Stone. Jan (DA)
**Subject:**  PS Opposition to Motion to Stay Filed 020604

Jan

Attached is an endorsed copy of our Opposition to the Motion to Stay, which we filed Feb.6, 2004 (and lost!).  Please scan it into our databaseof original documents - in the "Federal" folder unless we have a "Motion to Stay" folder (in which case it should go in there.)  Please place this hardcopy version into our "Federal" binder in the war room.  I will give a personal copy to Russ.

Can you also send a copy of the scanned cover page to Todd Robins at Sher & Leff (trobins@sherleff.com) *confirmation*

Thanks Jan!!

Eileen

1

## Stone. Jan (DA)

| | |
|---|---|
| **From:** | Todd Robins [trobins@sherleff.com] |
| **⅃:** | Stone. Jan (DA) |
| **Sent:** | Monday, February 09, 2004 9:57 AM |
| **Subject:** | Read: PS OPPOSITION TO MOTION TO STAY FILED COVER LETTER |

Your message

  To:        trobins@sherleff.com
  Subject:

was read on 2/9/2004 9:57 AM.

# Exhibit 15

FILED

FEB - 6 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA, )
et al.,                            )       NO. CV S-03-2653 GEB DAD
                                   )
                  Plaintiffs,      )
                                   )
        v.                         )       ORDER
                                   )
ATLANTIC RICHFIELD COMPANY,        )
et al.,                            )
                                   )
                  Defendants.      )
_____)

        Pending are Plaintiffs' motion to remand, Defendants' motion
to stay this action, and Defendants' *ex parte* application to continue
the hearing on Plaintiffs' motion.  Defendants' motion to stay
requires consideration of a letter received on January 21, 2004, from
United States District Judge Shira A. Scheindlin.  Judge Scheindlin
indicates that Defendants' motion to stay should be granted and that a
stay be imposed until the Judicial Panel on Multidistrict Litigation
("JPML") decides whether to transfer this action to MDL 1358.

        This action will be stayed as indicated in Judge
Scheindlin's January 21 letter.  Because of the stay about to be
imposed, Plaintiffs' remand motion is deemed withdrawn without
prejudice.  Further, this will moot Defendants' *ex parte* application

1   to continue the hearing on Plaintiffs' remand motion; therefore that
2   application is denied.  This action is stayed until the JPML decides
3   whether to transfer it to MDL 1358.
4
5           IT IS SO ORDERED.
6   DATED:   February 5, 2004
7                                    GARLAND E. BURRELL, JR.
8                                    UNITED STATES DISTRICT JUDGE
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

kdc

United States District Court
for the
Eastern District of California
February 6, 2004

* * CERTIFICATE OF SERVICE * *

2:03-cv-02653

People State of CA

v.

Atlantic Richfield

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  February 6, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Victor M Sher                        SF/GEB
Sher and Leff
450 Mission Street
Suite 500
San Francisco, CA  94105

Russ Detrick
Sacramento County District Attorney
P O Box 749
901 G Street
Sacramento, CA  95814

Matthew T Heartney
Arnold and Porter
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017-2513

David L Schrader
Morgan Lewis and Bockius LLP
300 South Grand Avenue
22nd Floor
Los Angeles, CA  90017-3132

Allison Nancy Shue
Morgan Lewis and Bockius LLP

300 South Grand Avenue
22nd Floor
Los Angeles, CA  90017-3132

Ronit C Barrett
Eimer Stahl Klevorn and Solberg
224 S Michigan Avenue
Suite 1100
Chicago, IL  60604

Christopher J McNevin
Pillsbury Winthrop LLP
725 South Figueroa Street
Suite 2800
Los Angeles, CA  90017-2513

Peter John Wilson
Latham and Watkins
650 Town Center Drive
20th Floor
Costa Mesa, CA  92626

William D Temko
NOT EDCA ADMITTED
Munger Tolles and Olson
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071-1560

Catherine Mary Stites
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA  90071-1560

Colleen P Doyle
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA  90071-1560

M Coy Connelly
PRO HAC VICE
Bracewell and Patterson
South Tower Pennzoil Place
711 Louisiana
Suite 2900
Houston, TX  77002-2781

Tracie J Renfroe
PRO HAC VICE
Bracewell and Patterson
South Tower Pennzoil Place
711 Louisiana
Suite 2900
Houston, TX  77002-2781

J Clifford Gunter III
PRO HAC VICE
Bracewell and Patterson

South Tower Pennzoil Place
711 Louisiana
Suite 2900
Houston, TX 77002-2781

Kevin M McDonald
PRO HAC VICE
Valero Energy Corporation
PO Box 500
One Valero Place
San Antonio, TX 78292-0500

Alan J Hoffman
NOT EDCA ADMITTED
Blank Rome
One Logan Square
18th and Cherry Street
Philadelphia, PA 19103-6998

Jack L. Wagner, Clerk

BY: J Carlen

Deputy Clerk

# Exhibit 16

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:**<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | ) MDL Docket No. 1358<br>)<br>) This Document Relates to:<br>) *California-American Water Company*<br>) *v. Atlantic Richfield Co., et al.*, Case<br>) No. 03-5379 JSW (N.D. Cal.)<br>)<br>) **DECLARATION OF VICTOR M.**<br>) **SHER IN SUPPORT OF**<br>) **PLAINTIFF CALIFORNIA-**<br>) **AMERICAN WATER COMPANY'S**<br>) **MOTION TO VACATE**<br>) **CONDITIONAL TRANSFER**<br>) **ORDER (CTO-4)**<br>) |

## DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFF CALIFORNIA-AMERICAN WATER COMPANY'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

I, VICTOR M. SHER, DECLARE:

1.     I am an attorney licensed to practice law since 1980 in State of California, and a founding principal of the law firm of Sher Leff, LLP (since January 1, 2003).   Unless otherwise stated, I make this declaration from personal knowledge and, if called to do so, could and would testify competently to the matters set forth below.

2.     My firm is lead counsel for plaintiff California-American Water Company ("Cal-American") in *California-American Water Co. v. Atlantic Richfield Co., et al.*, Case No. 03-5379 (N.D. Cal.) (the "*Cal-American* Action" or "Action"), one of the cases subject to the instant

Conditional Transfer Order to MDL 1358.[1]  A true and correct copy of the First Amended

Complaint in the *Cal-American* Action is attached hereto as Exhibit 1.

3.    Since January 1998, my practice has consisted entirely of representing public

water agencies in litigation to recover the costs of remediating and/or treating public drinking

water supplies contaminated with a variety of chemicals.  Specifically, since November 1998, I

have represented a number of public water agencies in litigation concerning contamination of

public water supplies by Methyl Tertiary Butyl Ether (MTBE).  My current and past clients in

MTBE-related litigation include (among others) the plaintiffs in *South Lake Tahoe Public Utility*

*District v. Atlantic Richfield Co.*, Case No. 999128 (Cal. Super. Ct.) (complaint filed Nov. 10,

1998) ("*South Tahoe*"), *City of Dinuba v. Unocal Corp.*, Case No. 305450 (Cal. Super. Ct.)

(complaint filed Aug. 5, 1999) ("*Dinuba*"), and *City of Santa Monica v. Shell Oil Co.*, Case Nos.

01CC04311; 02CC11407 (Cal. Super. Ct.) (complaint filed June 19, 2000) ("*Santa Monica*").

4.    In addition to my personal involvement in *South Tahoe*, *Dinuba*, and *Santa*

*Monica*, I am also familiar with the proceedings in *Communities for a Better Environment v.*

*Unocal Corp.*, Case No. 997013 (Cal. Super. Ct.) (complaint filed August 6, 1998) ("*CBE*"),

since much of the discovery in *CBE* was coordinated with that in *South Tahoe*.  I am also

informed and believe that approximately eighty-five additional lawsuits relating to MTBE

contamination have been filed since 1998, not including the group of cases recently removed to

federal court.

---

[1] I am also co-counsel of record for all of the plaintiffs in each of the following cases subject to CTO's to
MDL 1358:  *California-American Water Co. v. Atlantic Richfield Co., et al.*, 03-5379 JSW (N.D. Cal.).
*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);  *City of Riverside v.*
*Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.); *Quincy Community Services District v.*
*Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.); *City of Roseville v. Atlantic Richfield Co.,*
*et al.*, 03-2601 MCE GGH (E.D. Cal.); and *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408
WQH (S.D. Cal.).  Further, I am co-counsel of record for all plaintiffs except the People of the State of
California in *People of the State of California et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD
(E.D.Cal.).

5.     I am also aware of the proceedings in the original incarnation of MDL No. 1358 ("*Original MDL 1358*"), and have reviewed the Case Management Order (#2), the Confidentiality Agreement and Order, and indices to documents produced to the document depository for Original MDL 1358.

6.     In *South Tahoe, Dinuba, Santa Monica, CBE* and *Original MDL 1358*, each plaintiff's primary focus in their respective lawsuits was on: (1) the manufacturers of MTBE; and (2) the gasoline refiners, who blended MTBE into gasoline that subsequently was leaked or spilled and affected the plaintiffs' wells, regardless of whether those refiners owned or operated retail gasoline stations that actually released such gasoline into the subsurface. Legal theories in each case – asserted under state common and statutory law – included participating in creating a nuisance, trespass, negligence, and strict liability for product defect.

7.     I was part of the litigation and trial team for the plaintiff in *South Tahoe*. To my knowledge, *South Tahoe* was the first lawsuit in the country filed by a public water supplier seeking damages for MTBE contamination of public drinking water supply wells. I am intimately familiar with all of the proceedings in the case and participated directly in all phases of pleadings, discovery, pretrial, trial and settlement. To my knowledge, *South Tahoe* was also the first MTBE-related case in the country to proceed to trial on theories of refiner/manufacturer liability, and to obtain a special jury verdict on those issues. As explained in more detail below, these issues were explored thoroughly in discovery, pretrial motions, trial testimony, and post-trial motions.

8.     The complaint in *South Tahoe* was filed November 10, 1998. A true and correct copy of the complaint in *South Tahoe* is attached hereto as Exhibit 2. The action named seventeen defendants, including all of the major gasoline refiners in California. For nearly three

years, until the start of trial in September 2001, the parties conducted detailed and extensive

discovery into the issue of refiner/manufacturer liability for MTBE contamination. During this

discovery, millions of documents were produced and hundreds of witnesses were deposed. In

particular, more than sixty expert witnesses and more than one hundred and eighty percipient

(industry) witnesses were deposed, including those from defendant companies and from trade

associations like the American Petroleum Institute and the Oxygenated Fuels Association.

      9.    The plaintiff in *South Tahoe* settled with all but seven defendants before trial, for

an aggregate of more than $30 million. However, the action proceeded to trial against Lyondell

(a manufacturer of MTBE); Shell, Texaco, Equilon, and Ultramar (refiners); and two local

gasoline retailers. *South Tahoe* was tried to a jury in phases, starting in September 2001. Phase I

focused entirely on refiner/manufacturer liability. Extensive testimony and exhibits during the

four-month Phase I of the trial addressed issues related to manufacturer/refiner liability. On

April 15, 2002, the jury returned a special verdict, a true and correct copy of which is attached

hereto as Exhibit 3. As reflected in that verdict, the jury concluded that: (1) MTBE was a

defective product by virtue of failure of the manufacturer defendant (Lyondell) to warn; (2)

gasoline containing MTBE was a defective product both because the environmental risks of the

product outweighed the benefits and because the refiner defendants failed to warn of those risks;

and (3) there was clear and convincing evidence that two defendants – Lyondell and Shell –

acted with malice.

      10.    The millions of documents produced, the testimony of hundreds of deponents, and

the extensive trial testimony in *South Tahoe* cover, among other things, the following topics: i)

fate and transport of MTBE in the subsurface (including mobility and non-biodegradability); ii)

documented releases of MTBE to groundwater; iii) toxicity of MTBE; iv) taste and odor

thresholds for MTBE; v) alternatives to MTBE; vi) treatment technologies for MTBE water contamination; vii) economics of MTBE; viii) the oil companies' and manufacturer's early notice and knowledge of the risks of MTBE to groundwater;  ix) the oil companies' and manufacturer's promotion and marketing of MTBE; x) the problem of (and defendants' knowledge of) leaking underground storage tanks; and  xi) the production, sale and distribution of MTBE and gasoline containing MTBE in California.

11.    The above-described discovery and trial testimony and exhibits from *South Tahoe* still exist and could be made available to the parties in the *Cal-American* Action.

12.    I am informed and believe, based upon my familiarity with the pleadings and proceedings in the *CBE* action, that the *CBE* complaint was filed on August 6, 1998 and named twenty-seven defendants, all major refiners of MTBE and their related entities, in California, alleging that their business practices relating to MTBE were in violation of California's unfair trade practices statute.  The parties conducted approximately two years of discovery in *CBE*.  A two year bench trial was held beginning in 2000, and the plaintiff settled with all defendants after presenting their case in chief.  The settlement required defendants to address MTBE contamination at thousands of sites throughout the state.  Some defendants also agreed to stop blending MTBE into their gasoline (before California's regulatory ban took effect) and/or to provide certain warnings regarding the hazards of MTBE.

13.    Discovery in the *CBE* case resulted in the production of millions of pages of documents, as well as approximately eighty depositions covering the same categories of issues as those enumerated in paragraph 10 above.  I am informed and believe that the non-confidential discovery in *CBE*, including all of the documents demonstrating liability that were filed by the

plaintiffs as part of their case-in-chief, still exist and could be made available to the parties in the *Cal-American* Action.

14.     I am informed and believe that *Original MDL 1358* involved claims by private well owners around the country arising out of MTBE contamination. Several proposed class actions were designated by this Panel for multi-district treatment before Judge Scheindlin in the Southern District of New York. These actions were designated MDL No. 1358 on October 10, 2000. The parties conducted approximately one year of discovery. Judge Scheindlin issued several substantive rulings (including denying defendants' motions to dismiss and denying plaintiffs' motion for class certification). The claims of the representative plaintiffs were ultimately settled.

15.     Based on my review of indices of documents produced to the document depository for *Original MDL 1358*, and my discussions with counsel who were personally involved in *Original MDL 1358*, I am informed and believe that discovery in those proceedings similarly resulted in the production of millions of pages of documents covering the same categories of issues as those enumerated in paragraph 10 above, except that the materials relating to gasoline distribution focused on the specific markets involved in the MDL actions.

16.     By way of example of the volume of documents produced in *Original MDL 1358*, the index to the documents produced by the BP-Amoco entities alone is more than 100 pages long, single spaced.

17.     I am informed and believe that a centralized document depository was created for *Original MDL 1358* in which all discovery materials were made available to the parties, and that this depository still exists.

6

18.     The parties to *Original MDL 1358* stipulated to a Confidentiality Agreement and Order which provided that materials produced in the litigation and identified as "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THINGS" could be made available to counsel in other MTBE actions, defined as "an action where the complaint alleges that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or common law." Under the Order, materials identified as "CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY" may be made available by order of the MDL judge. The Confidentiality Agreement and Order does not apply to those materials not identified as confidential. A true and correct copy of the Confidentiality Agreement and Order is attached hereto as Exhibit 4.

19.     In my opinion, discovery on issues regarding the nature and behavior of MTBE, and on questions regarding refiner liability such as "who knew what, and when," is substantially mature with respect to MTBE litigation against gasoline refiners who used MTBE and the manufacturers of MTBE. I base this conclusion on two factors: First, there has been (as described above) extensive liability discovery and testimony already conducted in *South Tahoe*, *CBE*, and *Original MDL 1358*. Second, subsequent cases involving assertions of such liability (including most notably *Santa Monica* and *Dinuba*, as well as many others as to which I am informed) have settled before trial.

20.     Given the extensive discovery that is already available on the nature and behavior of MTBE, as well as the industry's early notice and knowledge of the hazards of MTBE, I anticipate that the remaining discovery in the *Cal-American* Action will focus predominantly on localized and site-specific issues such as the local gasoline distribution system, the extent of contamination threatening Cal-American's wells, and what it will cost to treat it. Although some

further, generally-applicable discovery on liability may be necessary, localized issues will unquestionably predominate.

21.     I understand that on December 19, 2003, the Hon. Shira A. Scheindlin, the presiding judge in *Original MDL 1358*, held a hearing in connection with several recently-filed MTBE cases filed by New York water purveyors that were removed to federal court and assigned to her. At that hearing, the parties present before Judge Scheindlin (which did not include Cal-American) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties they represented to MDL No. 1358 for the same purposes. A true and correct copy of the reporter's transcript of the December 19, 2003 hearing before Judge Scheindlin is attached hereto as Exhibit 5.

22.     On December 23, 2003, Judge Scheindlin issued an Order stating that remand motions in "similar removed actions, wherever filed" should be heard as part of MDL No. 1358. The Order is expressly based "upon stipulations there agreed to on the record by the parties present." A true and correct copy of the Judge Scheindlin's December 23, 2003 Order is attached hereto as Exhibit 6.

23.     Cal-American had no opportunity to participate in the December 19, 2003 hearing, was not a party to the stipulations on which Judge Scheindlin's Order is based, and has not agreed to any transfer of this action to MDL No. 1358.

24.     A true and correct copy (without attached service list) of a letter I sent to Judge Scheindlin on January 5, 2004 on behalf of Cal-American is attached hereto as Exhibit 7.

8

25.     A true and correct copy (without attached service list) of a letter I sent to Judge Scheindlin on January 27, 2004 on behalf of Cal-American is attached hereto as Exhibit 8.

26.     On February 13, 2004, I understand that Judge Scheindlin held oral argument on the remand motions pending before her.  Cal-American had no opportunity to participate in that hearing, as Cal-American's remand motion was not (and is not) before Judge Scheindlin.  A true and correct copy of the reporter's transcript of the February 13, 2004 hearing before Judge Scheindlin is attached hereto as Exhibit 9.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed this 4th day of March, 2004, at San Francisco, California.

VICTOR M. SHER

9

# Exhibit 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re:  Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

MDL No. 1358

Master File C.A. No. 1:00-1898 (SAS)

Confidentiality Agreement & Order

-------------------------------------------------------x

## I.   DEFINITIONS

A.   This Action

As used in this Confidentiality Agreement and Order ("Order"), the term "THIS ACTION" shall refer to MDL 1358, In re: Methyl Tertiary Butyl Ether Products Liability Litigation and cases currently (Berisha and England) and to be consolidated under this MDL including any retrial or appeal of the cases.

B.   Document(s), Information, or Other Thing(s)

As used in this Order, the term "DOCUMENT(S), INFORMATION, OR OTHER THING(S)" includes, but is not limited to interrogatory responses; responses to requests for production of documents and things; responses to requests for admissions; deposition testimony upon oral or written examination; deposition exhibits; motions; affidavits; exhibits; and any other writings made available or produced by the parties and/or submitted to the Court during THIS ACTION.

C.   Days

As used in this Order, the terms "DAY" or "DAYS" shall mean calendar days.

Exhibit 4
Page 1 of 40

D.    Produced or Disclosed

As used in this Order, the term "PRODUCED OR DISCLOSED" includes, without limitation, all DOCUMENT(S), INFORMATION, OR OTHER THING(S) made available or produced by any party and/or submitted to the Court in THIS ACTION.

E.    Persons

The terms "PERSON" or "PERSONS" include a natural PERSON, firm, association, organization, partnership, business trust, corporation, or public entity.

## II.    AGREEMENT AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED by the parties hereto that with respect to DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs in THIS ACTION or Defendants in THIS ACTION, including Amerada Hess Corporation, Atlantic Richfield Company, BP Amoco Corporation; Chevron U.S.A., Inc., CITGO Petroleum Corporation; ~~The Coastal Corporation, Coastal Oil New York, Inc.~~ El Paso CGP Company, Conoco, Inc., Equilon Enterprises LLC, Exxon Corporation, Mobil Oil Corporation, Motiva Enterprises LLC, Phillips Petroleum, Shell Oil Company, Shell Oil Products Company; Sunoco Inc. (R&M), Texaco Inc., Texaco Refining and Marketing Inc., Tosco Corporation, United Refining Company, and Valero Marketing and Supply Company (collectively "Defendants"), the following terms, conditions, and restrictions shall govern:

A.    This Order shall apply to all DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or Defendants.

B.    Confidential Document(s), Information, or Other Thing(s). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or

Defendants which are stamped "Confidential" or "Proprietary" or "Confidential Materials – For Outside Counsel Only" shall be deemed "CONFIDENTIAL" subject to this Order. For purposes of this Order, "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" shall include DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are reviewed by an attorney, are stamped as "Confidential" or "Proprietary" and which are or contain a trade secret or other confidential research, development, or commercial information as those terms are used in Rule 26(c)(7) of the Federal Rules of Civil Procedure, including any copies, summaries, portions or abstracts thereof. CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) does not include DOCUMENT(S), INFORMATION, OR OTHER THING(S) (i) which are available or become available to the public other than through violation of this Order; (ii) that, at the time of production, the receiving party already possesses (for documents and things) or knows (for information), as evidenced by written documentation, and were obtained by that party without an obligation of confidentiality; (iii) that the receiving party rightfully received from a third party without an obligation of confidence; or (iv) that the receiving party develops independently through PERSONS who have had no access to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are stamped as "Confidential" or "Proprietary" shall be treated as "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" subject to this Order pending further order of the Court. The party asserting the confidentiality claim shall stamp, print, or write the term "Confidential" or "Proprietary" on at least the first page of any such document to be viewed only. With respect to documents selected and to be sent to the document depository, every page of such "Confidential" or "Proprietary" documents shall be so stamped, printed or written .

Any documents which are produced by a party which are not stamped as "Confidential" or "Proprietary" will not be subject to this Order unless otherwise agreed by the parties.  The producing party shall make a good faith effort to notify the propounding party in writing of the production of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and the location of such materials if possible to denote.  "CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY" shall mean, and be limited to, CONFIDENTIAL MATERIALS which pertain to:  (i) recent and future business and marketing plans and activities; and (ii) recent and future research and development activities.

     C.     The parties and any counsel who execute this agreement or agrees to be bound to its terms, hereby agree that all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) may not be used, disseminated or disclosed outside of THIS ACTION except as set forth in Paragraph D, subsection b and Paragraph E, below.

     D.     CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced in THIS ACTION shall not be disseminated or disclosed to any PERSON except:

          a.     Plaintiffs, their respective counsel and employees including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Plaintiffs in connection with the prosecution and preparation for trial of THIS ACTION, or Defendants, their respective counsel and employees, including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Defendants in connection with the defense and preparation for trial of THIS ACTION;

          b.     To an attorney of record in an action where the complaint alleges that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or common law ("MTBE actions") and where the attorney provides written notice to counsel representing the

- 4 -

Exhibit 4
Page 4 of 40

party whose CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) are being reviewed that: (i) he has read this agreement and agrees to be bound by its terms by executing a separate copy of this agreement; (ii) identifies each CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) reviewed; (iii) he agrees to submit to the jurisdiction of the Court in the Southern District of New York should any disputes arise under this agreement; (iv) in the event that the OTHER MTBE ACTION continues after this MDL terminates, the Court in the Southern District of New York shall maintain continuing jurisdiction to enforce this agreement until the end of the OTHER MTBE ACTION; and (v) he agrees to comply with the return or destroy provision of Paragraph J of the agreement at the conclusion of the OTHER MTBE ACTION.  Such attorney may then make use of the CONFIDENTIAL DOCUMENTS, INFORMATION OR OTHER THING(S) consistent with all limitations and controls set forth herein;

       c.     The Court, and those employed by the Court, in which event the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be filed under seal consistent with this Order, and kept under seal until further order of the Court;

       d.     Court reporters who record the depositions or other testimony in THIS ACTION;

       e.     Outside experts, consultants, witnesses or potential witnesses for Plaintiffs or Defendants, including their stenographic and clerical personnel, whose advice and consultation are being or will be used by any party in connection with the prosecution or defense of THIS ACTION, or their preparation for trial of THIS ACTION, and who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A;

- 5 -

Exhibit 4
Page 5 of 40

f.      A deponent and the deponent's counsel who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A, but only during the course of the deposition in THIS ACTION, or to the extent reasonably necessary in the preparation for such deposition; and

g.      Any other PERSON or entity upon order of the Court, upon stipulation of the parties, or upon the express written agreement of the producing party.

E.      CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY produced in THIS ACTION may be disclosed only to the following:

a.      Outside counsel for a party engaged in the conduct of  THIS ACTION, and any legal support personnel and outside experts and consultants of such counsel;

b.      The Court, and those employed by the Court, in which event the CONFIDENTIAL MATERIALS shall be filed under seal consistent with this Order, and kept under seal until further order of the Court; and

c.      Any other PERSON or entity upon order of the Court, upon stipulation of the PARTIES, or upon the express written agreement of the PRODUCING PARTY.

F.      Nothing in this Order shall require Plaintiffs or Defendants, or their respective counsel and employees, including stenographic and clerical personnel, to execute a copy of Exhibit A when testifying as to their own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

G.      Nothing in this Order shall prohibit a PERSON from releasing its own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) as it sees fit, and such release shall not constitute a waiver of any of the terms of this Order unless the release is made to the public domain.

- 6 -

Exhibit 4
Page 6 of 40

H.   No PERSON receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall disclose said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other PERSON, except as permitted by and in accord with this Order.

I.   The following Court procedures shall apply with respect to use of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S):

a.   Said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are submitted to the Court shall be filed with the Court in sealed envelopes or other appropriate sealed containers on which shall be endorsed the title of this action , an indication of the nature of the contents of the sealed envelope or other container, the word "CONFIDENTIAL," and a statement substantially in the following form:  "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court."   In the case of CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY, the label shall state as follows: "CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY" and a statement substantially in the following form: "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court."

A copy of this Order shall be submitted to the Court, together with any materials submitted under seal.  Any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) filed with or submitted to the Court pursuant to this section shall be returned to the submitting party or destroyed in compliance with Paragraph J herein if the Court does not

- 7 -

Exhibit 4
Page 7 of 40

remove the confidential status from the DOCUMENT(S), INFORMATION, OR OTHER THING(S).

        b.     In the case of depositions upon oral examination, if counsel for a party has a reasonable and good faith belief that any question or answer contains or refers to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), counsel may state on the record, and request that all pages that include such CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) be marked CONFIDENTIAL. When testimony designated CONFIDENTIAL is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall be excluded from the deposition.    Transcripts containing testimony or exhibits designated as containing CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be marked by the court reporter, prior to transcript distribution, with the legend "THIS TRANSCRIPT CONTAINS CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)," and shall be treated in accordance with the provisions of this Order.  In addition to designating, during the deposition, any question or answer as CONFIDENTIAL, counsel may designate any portion of the deposition transcript as a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at any time within ten (10) DAYS of receiving the deposition transcript from the court reporter.  Notice of such designation shall be made in writing to the court reporter, with copies to all counsel in THIS ACTION, specifying the portion(s) of the transcript and exhibits that constitute or contain CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).  Until expiration of the ten (10) DAY period described above, all deposition transcripts shall be considered and treated as though containing CONFIDENTIAL

- 8 -

Exhibit 4
Page 8 of 40

DOCUMENT(S), INFORMATION, OR OTHER THING(S), unless otherwise agreed on the record at the deposition.

J.     Within thirty (30) DAYS after the expiration of the last applicable deadline for the last permitted appeal, rehearing, or reconsideration related to THIS ACTION, CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall be returned to counsel of record of the party who provided the information, or the party receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall have the option of destroying all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and providing an affidavit from its counsel of record to the designating party that the party in possession of the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) has destroyed it.

K.     Any party hereto may challenge the claim of confidentiality of any materials by notifying counsel for the party claiming confidentiality in writing of the basis of their challenge to the claim. Counsel for the party claiming confidentiality will respond in writing within ten (10) DAYS, and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such decision have been concluded, the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking the confidential designation.

L.     No party shall disclose any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other party except as provided herein, and

- 9 -

Exhibit 4
Page 9 of 40

except as may be required by applicable law or legal process. All parties shall take reasonable steps to keep an accurate record of the location of and insure proper and secure storage of all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

M.    Any inadvertent disclosure of any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not be a violation of this Order. The inadvertent disclosure of a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not constitute a waiver of any otherwise applicable privilege, either as to the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) so produced or as to any other CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) withheld under a claim of privilege. If any party is responsible for any inadvertent disclosure, that party will take all reasonable steps to remedy the inadvertent disclosure, including, but not limited, to retrieving all copies of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), and informing the recipients of such DOCUMENT(S), INFORMATION, OR OTHER THING(S) of its CONFIDENTIAL nature.

N.    Any party hereto that has the claim of alleged improper disclosure of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) or any other alleged violation of this Order shall notify counsel for the party making the alleged improper disclosure or other alleged violation of this Order in writing of the basis of their claim. Counsel for the party making the alleged improper disclosure or other alleged violation of this Order will respond in writing within ten (10) DAYS and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such alleged violations have been concluded, the

- 10 -

Exhibit 4
Page 10 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001

By: _____
LEWIS J. SAUL & ASSOCIATES, P.C.
501 Wisconsin Avenue, N.W., Suite 550
Washington, D.C.  20015
*Attorneys for Plaintiffs*

- 11 -

Exhibit 4
Page 11 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:   April __, 2001              By: _____
                                     LEWIS F. SAUL & ASSOCIATES, P.C.
                                     183 Middle Street, Suite 200
                                     Portland, ME  04101
                                     *Attorneys for Plaintiff*

- 12 -

Exhibit 4
Page 12 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.


Dated:   April 2, 2001          By:_____
                                     WEITZ & LUXENBERG, P.C.
                                     180 Maiden Lane, 17th Floor
                                     New York, NY  10083
                                     *Attorneys for Plaintiffs*


- 13 -

Exhibit 4
Page 13 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 6, 2001

By:_____
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017-2024
*Attorneys for Plaintiffs*

- 14 -

Exhibit 4
Page 14 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April __, 2001            By: _____

NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE
28 Bridgeside Boulevard
Mt. Pleasant, S.C. 29464
*Attorneys for Plaintiffs*

- 15 -

Exhibit 4
Page 15 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: _May 11_ April _, 2001

By: _____
LAW OFFICES OF MASRY & VITITOR
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

      O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

      P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:  April ___, 2001        By _____

                          ROUNDTREE & SEAGLE, LLP
                          2419 Market Street
                          P.O. Box 1409
                          Wilmington, N.C. 28402-1409
                          *Attorneys for Plaintiffs*

-17-

05/09/01   WED 17:10   (TX/RX NO 9344)

Exhibit 4
Page 17 of 40

*CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)* at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

      O.                It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

      P.                The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April __, 2001         By:_____
                                COOPER & SCULLY, P.C.
                                900 Jackson Street, Suite 100
                                Dallas, TX  75202
                                *Attorneys for Plaintiffs*

- 18 -

Exhibit 4
Page 18 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.          It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.          The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001          By: _____
                                    CARR, KOREIN, TILLERY, KUNIN,
                                    MONTROY, CATES, CATZ & GLASS
                                    10 Executive Woods Court
                                    Swansea, IL  62226
                                    *Attorneys for Plaintiffs*

Exhibit 4
Page 19 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:  ~~April~~ May 16, 2001          By: _____

MILLER, SIER & SAWYER
100 Howe Avenue, Suite S0120
Sacramento, CA  95825-5407
*Attorneys for Plaintiffs*

- 20 -

Exhibit 4
Page 20 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001              By: _____
                                     WHATLEY DRAKE, LLC
                                     1100 Financial Center
                                     505 North 20th Street
                                     Birmingham, AL 35203-2605
                                     *Attorneys for Plaintiffs*

- 22 -

Exhibit 4
Page 21 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.          It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.          The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 25, 2001          By:_____
                                 REICH & BINSTOCK
                                 4265 San Felipe, Suite 1000
                                 Houston, TX 77027
                                 *Attorneys for Plaintiffs*

- 23 -

Exhibit 4
Page 22 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April __, 2001               By:_____
                                          CROWLEY & DOUGLASS
                                          3500 Chevron Tower
                                          1301 McKinney Street
                                          Houston, TX  77010
                                          *Attorneys for Plaintiffs*

- 24 -

Exhibit 4
Page 23 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

     O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

     P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 30, 2001     By: _Goodkind Labaton Rudoff & Sudharow LLP_

                              Goodkind Labaton Rudoff & Sucharow, LLP
                              100 Park Avenue, 12th Floor
                              New York, New York 10017
                              *Attorneys for Plaintiffs*

24a

Exhibit 4
Page 24 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 26, 2001          By: _Edward A. Cohen_

THOMPSON COBURN LLP
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
*Attorneys for Defendants Conoco Inc., Chevron U.S.A., Inc., and Exxon Mobil Corporation*

- 25 -

Exhibit 4
Page 25 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001            By: _____
                                   KIRKLAND & ELLIS
                                   200 East Randolph Drive
                                   Chicago, Illinois  60601-6636
                                   *Attorneys for Defendants Atlantic Richfield*
                                   *Company, BP Amoco Corporation, Amoco Oil*
                                   *Company*

- 26 -

Exhibit 4
Page 26 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    April 2%, 2001

By: _____

SANDBERG, PHOENIX & VON GONTARD
One City Centre - 15th Floor  *HOWLEY SIMON ARNOLD & WHITE, LLP*
St. Louis, Missouri 6311-1880  *1299 Pennsylvania Ave. NW*
Attorneys for Defendant Phillips  *Washington, DC 20004*
Petroleum Company

- 27 -

Exhibit 4
Page 27 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 16, 2001

By:_____
WALLACE KING MARRARO & BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC  20007
*Attorneys for Defendants Equilon Enterprises, LLC, Motiva Enterprises, LLC, Shell Oil Company, Shell Oil Products Co., Texaco Inc. and Texaco Refining and Marketing  Inc.*

- 28 -

Exhibit 4
Page 28 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 2, 2001          By: _Pamela Phlevelritt_____
                                     EIMER STAHL KLEVORN & SOLBERG
                                     122 South Michigan Avenue
                                     Suite 1776
                                     Chicago, Illinois 60603
                                     *Attorneys for Defendant*
                                     *CITGO Petroleum Corporation*

- 29 -

Exhibit 4
Page 29 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____

                                 BAKER BOTTS, L.L.P.
                                 599 Lexington Avenue
                                 New York, New York 10022
                                 *Attorneys for Valero Marketing and*
                                 *Supply Company*

- 30 -

Exhibit 4
Page 30 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001                     By:_____
                                                            BEVERIDGE & DIAMOND, P.C.
                                                            1350 I Street, N.W., Suite 700
                                                            Washington, DC  20005
                                                            *Attorneys for Defendant Sunoco, Inc.* (PSH)

- 31 -

Exhibit 4
Page 31 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
*Attorneys for Defendant ~~The Coastal Corporation~~*
*El Paso CGP Company*

- 32 -

Exhibit 4
Page 32 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001          By: _____

GOODWIN PROCTER LLP
1285 Avenue of the Americas
New York, New York 10019
*Attorneys for Defendant United Refining Company*

- 33 -

Exhibit 4
Page 33 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001                    By: _____

STROOCK STROOCK & LAVAN, LLP
180 Maiden Lane
New York, New York 10038-4982
*Attorneys for Defendant Tosco Corporation*

- 34 -

Exhibit 4
Page 34 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 2⁶, 2001          By:_____

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004-2402
202-783-0800
202-383-6610 (FAX)
*Attorneys for Defendant Phillips Petroleum Company*

- 35 -

Exhibit 4
Page 35 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:  April 26, 2001                    By:_____
                                            HOWREY, SIMON, ARNOLD & WHITE, LLP
                                            1299 Pennsylvania Ave., NW
                                            Washington, DC  20004-2402
                                            *Attorneys for Defendant Amerada Hess Corporation*

- 36 -

Exhibit 4
Page 36 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.     It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.     The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April 26, 2001                    By: _____

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
*Attorneys for Defendant Coastal Oil New York, Inc.*
El Paso CGP Company

- 37 -

Exhibit 4
Page 37 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order.  This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:   April **26**, 2001                    By: _____
                                                      McDERMOTT, WILL & EMERY
                                                      50 Rockefeller Plaza
                                                      New York, NY 10020-1605
                                                      *Attorneys for Defendants Exxon Mobil Corporation,*
                                                      *Exxon Corporation and Mobil Oil Corporation*

- 38 -

Exhibit 4
Page 38 of 40

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O.    It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P.    The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated:    ~~April __, 2001~~

May 30, 2001

SO ORDERED:

_____
HON. SHIRA A. SCHEINDLIN
United States District Court
Southern District of New York

- 39 -

Exhibit 4
Page 39 of 40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                                        :
                                                        :
In re:  Methyl Tertiary Butyl Ether ("MTBE")            :        MDL No. 1358
Products Liability Litigation                           :        Master File C.A. No.
                                                        :        1:00-1898 (SAS)
                                                        :
------------------------------------------------------ :


# CONFIDENTIALITY AGREEMENT AND ORDER


## McDERMOTT, WILL & EMERY

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

50 ROCKEFELLER PLAZA

NEW YORK, NEW YORK  10020

(212) 547-5400


Exhibit 4
Page 40 of 40