

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE:**

**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION**

**MDL Docket No. 1358**

This Document Relates to:

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

**PLAINTIFFS' JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5); BRIEF IN SUPPORT THEREOF**

## PLAINTIFFS' JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)

1. City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water

RECEIVED CLERK'S OFFICE

IMAGED MAR 30 '04

OFFICIAL FILE COPY

District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company and City of Sacramento ("Sacramento County Plaintiffs") are plaintiffs in the action *People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, Case No. 03-2653 GEB DAD (E.D.Cal.) ("*Sacramento County* Action"),[1] which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. The Sacramento County Plaintiffs hereby move the Panel to vacate the above-referenced conditional transfer order as it applies to the *Sacramento County* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

2. Orange County Water District is the plaintiff in the action *Orange County Water District v. Unocal, et al.*, Case No. 03-1742 JVS (ANx) (C.D. Cal.) ("*Orange County* Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. Orange County Water District hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *Orange County* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

3. City of Riverside is the plaintiff in the action *City of Riverside v. Atlantic Richfield Co., et al.,* Case No. 04-53 JVS (ANx) (C.D. Cal.) ("*Riverside* Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. The City of Riverside hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *Riverside* Action on the

[1] The Sacramento County Plaintiffs identified in Paragraph 1 of this Motion to Vacate comprise all plaintiffs in the *Sacramento County* Action except the People of the State of California. It is the understanding of undersigned counsel that the People are filing a separate motion to vacate CTO-5.

grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

4. Quincy Community Services District is the plaintiff in the action *Quincy Community Services District v. Atlantic Richfield Co., et al.,* Case No. 03-2582 LKK DAD (E.D. Cal.) ("*Quincy* Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. Quincy Community Services District hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *Quincy* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

5. City of Roseville is the plaintiff in the action *City of Roseville v. Atlantic Richfield Co., et al.*, Case No. 03-2601 MCE GGH (E.D. Cal.) ("*Roseville* Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. City of Roseville hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *Roseville* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

6. Martin Silver, Pauline Silver, Laura Silver, John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and Adrian Kruso ("Silver Plaintiffs") are the plaintiffs in the action *Martin Silver, et al. v. Alon USA Energy, Inc., et al.,* Case No. 03-2408 WQH (S.D. Cal.) ("*Silver* Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-5, issued by the Panel on February 25, 2004. The Silver Plaintiffs hereby move the Panel to vacate the above-referenced conditional transfer order as it applies to

the *Silver* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

7. The Sacramento County Plaintiffs, Orange County Water District, City of Riverside, Quincy Community Services District, City of Roseville and the Silver Plaintiffs (collectively, "Plaintiffs") file this joint Motion to Vacate on the following specific grounds: First, assuming *arguendo* that Plaintiffs' respective actions remain in federal court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) discovery regarding the few questions of fact shared with other cases involving methyl tertiary butyl ether ("MTBE") already has largely been completed in the prior proceedings and can be made available to all parties; and (b) the Transferee Court, as well as numerous other federal and state courts, already have issued remarkably consistent rulings on most, if not all, common legal issues. Second, resolution by the Transferee Court of Plaintiffs' respective pending motions to remand will result in no significant savings of judicial resources, because the jurisdictional arguments raised therein differ materially from those raised by the plaintiffs currently before the Transferee Court.

8. This Motion is based on the attached Brief in support thereof, along with the Declaration of Victor M. Sher, the Statement of Reasons Why Oral Argument Should Be Heard, the files, pleadings, and documents on file with the Panel, and upon such further documentary and oral evidence as may be presented in the hearing on this matter.

WHEREFORE, Plaintiffs respectfully request that the Panel:

A. Vacate the Conditional Transfer Order (CTO-5) as it applies to the *Sacramento County*, *Orange County*, *Riverside*, *Quincy*, *Roseville* and *Silver* Actions;

B. Schedule oral argument on this Motion; and

C. Grant such other relief deemed just and appropriate.

Dated: March 24, 2004

Respectfully submitted,

[signature]

SHER LEFF, LLP
Victor M. Sher
Todd E. Robins
450 Mission Street, Suite 500
San Francisco, CA 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

Counsel for Orange County Water District, City of Riverside, Quincy Community Services District, City of Roseville, City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company, City of Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and Adrian Kruso

BARON & BUDD, P.C.
Scott Summy
Celeste A. Evangelisti
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for City of Riverside, Quincy Community Services District, City of Roseville, City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company, City of Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and Adrian Kruso

MILLER, AXLINE & SAWYER
Duane A. Miller
Michael D. Axline
1050 Fulton Avenue, Ste. 100
Sacramento, CA 95825
Telephone: (916) 488-6688
Facsimile: (916) 488-4288

Counsel for Orange County Water District

**BRIEF IN SUPPORT OF PLAINTIFFS' JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**

## I. INTRODUCTION

The Panel should vacate the Conditional Transfer Order as it applies to the *Sacramento County*, *Orange County*, *Riverside*, *Quincy*, *Roseville* and *Silver* Actions (collectively, the "California Actions") because transfer of these exclusively state-law cases, each regarding local contamination caused by a product manufactured, sold and distributed entirely to uniquely California specifications, to an already over-burdened district court 3,000 miles away will benefit neither the parties nor the judicial system. In light of the distinctly local and state-specific factual and legal issues on which they are focused, the California Actions are substantially different from the other actions subject to CTO-5, as well as virtually all of the actions subject to CTO-4.[1] Whatever may be appropriate for other recently removed MTBE-related cases, it is not appropriate to transfer these California Actions to the Southern District of New York.

If the California Actions somehow remain in federal court (which the California Parties believe they should not), the Actions share with other MTBE cases few, if any, common questions of fact on which discovery is not already largely completed. A great deal of the generally applicable liability discovery (including discovery on what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when) was conducted in connection with the prior incarnation of MDL No. 1358 and/or other MTBE cases that were not consolidated, and this discovery is or can be made available to the parties in the California Actions. Indeed, this discovery has been pursued in exceptional depth with respect to

[1] Two similarly situated California cases subject to CTO-4 (*California-American Water Company v. Atlantic Richfield Co., et al.*, 03-5379 (N.D. Cal.) and *City of Fresno v. Chevron U.S.A., Inc., et al.*, 03-5378 (N.D. Cal.)) and the State of New Hampshire's unique statewide MTBE suit (*State of New Hampshire v. Amerada Hess Corp. et al.*, 03-486 (D.N.H.), 03-0529 (D.R.I)) are the only other cases with parties resisting transfer to MDL No. 1358.

California-related defendants. The discovery that remains – the bulk of these cases – revolves almost exclusively around local and state-specific issues, such as the unique and isolated gasoline refining and distribution system in California, the sources and extent of contamination affecting each Plaintiff, and what it will cost to remediate and treat it.

Nor is the legal landscape for these cases novel or challenging. Potentially dispositive motions already have been resolved in prior MTBE litigation with remarkably consistent outcomes. For example, both the Ninth Circuit and the Transferee Court have definitively rejected defendants' federal preemption defense. *See Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 670, 673 (9th Cir. 2003) (upholding California ban of MTBE in gasoline); *ExxonMobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253 (9thCir. 2000) (upholding Nevada county regulation that effectively banned MTBE); *In re MTBE Products Liability Litig.* ("*In re MTBE*"), 175 F. Supp. 2d 593, 611-616 (S.D.N.Y. 2001) (rejecting federal preemption of state tort claims). In fact, the Transferee Court published a lengthy opinion that provides useful guidance to any court applying common law tort doctrines in the MTBE context. *In re MTBE, supra* at 606-635. As a result, many of the threshold legal questions that would normally justify MDL treatment already have been litigated and are unlikely to produce inconsistent outcomes or to require significant additional judicial energy.

Even Plaintiffs' respective motions to remand these California Actions to state court illustrate that there is neither convenience nor savings of judicial resources to be gained by transferring these cases to MDL No. 1358. Plaintiffs' remand motions raise unique – and dispositive – jurisdictional arguments related to federal preemption not applicable to the remand motions recently ruled upon by the presiding judge in MDL No. 1358 (the "Transferee Court"). As these unique issues ultimately will have to be addressed by whatever court decides Plaintiffs'

remand motions, no efficiencies will be gained by transferring the California Actions to MDL No. 1358 for consolidated treatment.

In sum, MTBE litigation is sufficiently mature at this point that MDL handling of the California Actions is unwarranted. There is no "gathering storm" that will produce a blizzard of motions and conflicting opinions, notwithstanding the recent flurry of removal notices filed by defendants. Transfer of the California Actions to the Southern District of New York, therefore, will not create efficiencies. Instead it will create delay and inconvenience by forcing Plaintiffs to litigate these important lawsuits in a distant forum that has no particular expertise on the localized issues that overwhelmingly predominate in these cases.

## II. BACKGROUND

### A. The California Actions.

The Sacramento County Plaintiffs include two cities that own and operate public drinking water systems, one investor-owned water utility, and nine public agencies charged with managing and/or purveying water resources in Sacramento County, California. *See* First Amended Complaint in *Sacramento County* Action ("Sacramento County Complaint"), ¶¶ 11-33 (attached as Exhibit 1 to the Declaration of Victor M. Sher ("Sher Decl.")).[2]

Orange County Water District is a special water agency formed pursuant to the Orange County Water District Act ("OCWDA"), Cal. Water Code Appendix, § 40-1 *et seq.*, to manage and protect the groundwater resource in much of Orange County, California. *See* First Amended Complaint in *Orange County* Action ("Orange County Complaint"), ¶ 4 (Sher Decl., Exhibit 2).

The City of Riverside and City of Roseville are California cities that own and operate public drinking water systems. *See* First Amended Complaint in *Riverside* Action ("Riverside

[2] Carmichael Water District is named as a plaintiff in the Sacramento County Complaint, but has since withdrawn from the case.

Complaint"), ¶ 4 (Sher Decl., Exhibit 3); First Amended Complaint in *Roseville* Action ("Roseville Complaint"), ¶¶ 4-5 (Sher Decl., Exhibit 4).

Quincy Community Services District is a community services district, formed pursuant to Cal. Government Code § 61000 *et seq.*, that owns and operates a public drinking water system in Quincy, California. *See* Complaint in *Quincy* Action ("Quincy Complaint"), ¶ 4 (Sher Decl., Exhibit 5).

The Silver Plaintiffs are owners of Alpine Mobile Home Estates, a mobile home park located in Alpine, California, in connection with which they own and operate a public drinking water system. *See* First Amended Complaint in *Silver* Action ("Silver Complaint"), ¶ 2 (Sher Decl., Exhibit 6).

MTBE is a chemical used by some refiners in some gasoline products in some parts of the country.[3] Expanding plumes of MTBE are contaminating and threatening Plaintiffs' drinking water supplies and groundwater resources. Beginning in May, 2003, Plaintiffs filed their respective lawsuits in California state court against the major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE in California, as well as the local gasoline distributors and retailers allegedly responsible for releasing MTBE to the subsurface in areas affecting Plaintiffs' drinking water supplies and groundwater resources.

[3] Originally introduced as an octane enhancer in some gasoline, MTBE came into widespread use in the mid-1990s, when some refiners chose it to meet the requirements of the Reformulated Gasoline ("RFG") and Oxygenated Fuels programs under the federal Clean Air Act, *see* 42 U.S.C. §§ 7545(k) and (m), for gasoline in some areas of the country. *See* 40 C.F.R. § 80.70 (listing areas covered by RFG program); 40 C.F.R. §81.305 (listing carbon monoxide nonattainment areas). The MTBE contamination at issue in the *Quincy* Action occurred in an area never subject to RFG or Oxygenated Fuels program requirements. *Id.*

| Action | Date Filed | State Court |
|---|---|---|
| *Orange County* Action | May 6, 2003 | Orange County Superior Court |
| *Sacramento* Action | September 30, 2003 | Sacramento County Superior Court |
| *Silver* Action | September 30, 2003 | San Diego County Superior Court |
| *Roseville* Action | October 16, 2003 | Placer County Superior Court |
| *Riverside* Action | October 17, 2003 | Riverside County Superior Court |
| *Quincy* Action | November 7, 2003 | Sacramento County Superior Court |

Plaintiffs each seek, among other things, to ensure that the costs of responding to MTBE contamination are borne by the companies that chose to make and use it, while knowing of its risks and yet failing to take the steps (including warnings) necessary to avoid or mitigate them. Plaintiffs each assert damages claims under state common law theories (including strict products liability, public nuisance, trespass, and negligence). Orange County Water District asserts a statutory claim for clean up costs under the OCWDA. Certain Sacramento County Plaintiffs, City of Riverside, City of Roseville and Quincy Community Services District also assert claims for cleanup costs under state statutes (Cal. Health & Safety Code §116366 and Cal. Water Code §§ 13285 and 13304) and statutory claims for treble damages for utility tampering (Cal. Civil Code § 1882).

**B. Procedural History.**

In December 2003, certain oil company defendants removed each of the California Actions to federal district court, citing four bases for federal subject matter jurisdiction in each case: (1) that Plaintiffs' claims are "completely preempted" by the federal Clean Air Act; (2) that "a substantial federal question" is a necessary element of Plaintiffs' state-law defective product claims; (3) that, pursuant to 28 U.S.C. § 1442(a)(1), defendants were acting "under the direction" of federal officers when they chose to add MTBE to gasoline; and (4) that the Actions somehow implicate long-since-concluded bankruptcy proceedings pertaining to one or two defendants (depending on the Action). Plaintiffs immediately filed motions to remand their respective

Actions to state court (the "Remand Motions") on the grounds that no federal subject matter jurisdiction exists over these cases. At or around the same time, the removing defendants filed motions to stay the hearings on Plaintiffs' respective Remand Motions (and all other pretrial proceedings in the Actions) pending possible transfer to MDL No. 1358.

| **Action** | **Removal** | **Federal District Court** | **Remand Motion filed** | **Stay Motion filed** |
|---|---|---|---|---|
| *Orange County* Action | Dec. 1, 2003 | C.D. Cal. | Jan. 6, 2004 | Jan. 6, 2004 |
| *Silver* Action | Dec. 3, 2003 | S.D. Cal. | Dec. 18, 2003 | Dec. 16, 2003 |
| *Sacramento County* Action | Dec. 8, 2003 | E.D. Cal. | Dec. 15, 2003 | Dec. 19, 2003 |
| *Riverside* Action | Dec. 12, 2003 | C.D. Cal. | Jan. 8, 2004 | Jan. 9, 2004 |
| *Quincy* Action | Dec. 15, 2003 | E.D. Cal. | Dec. 22, 2003 | Dec. 31, 2003 |
| *Roseville* Action | Dec. 18, 2003 | E.D. Cal. | Dec. 23, 2003 | Dec. 31, 2003 |

Stays have been granted in the *Sacramento County*, *Orange County*, *Riverside*, *Roseville* and *Quincy* Actions, although Quincy Community Services District has moved for reconsideration of the order granting the stay in the *Quincy* Action. The Remand and stay motions in the *Silver* Action are currently set for hearing on April 16, 2004.

Meanwhile, certain defendants filed with the Panel Notices of Related, Tag-Along Actions alleging that certain recently filed actions, including the California Actions, involve common questions of fact with actions previously transferred to MDL No. 1358. MDL No. 1358 was an inactive MDL proceeding before the Hon. Shira A. Scheindlin in the U.S. District Court for the Southern District of New York that previously involved several consolidated "actions brought on behalf of private well-owners seeking relief from the contamination or threatened contamination of their wells" by MTBE. *In re MTBE, supra*, 175 F. Supp. 2d at 598.[4]

On December 19, 2003, Judge Scheindlin held a hearing in connection with several MTBE cases filed by New York water purveyors that were removed to federal court and

[4] Judge Scheindlin denied class certification in the matter, *see In re MTBE,* 209 F.R.D. 323 (S.D.N.Y. 2002), and all the cases were resolved.

assigned to her (the "December 19 Hearing"). *See* Transcript of December 19 Hearing (Sher Decl., Exhibit 10). At the December 19 Hearing, the parties present before Judge Scheindlin (which did *not* include Plaintiffs here, *see* Sher Decl., ¶ 26) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. *Id.*, Exhibit 10 at 13-18. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties *they represented* to MDL No. 1358 for the same purposes. *Id.* That stipulation resulted in an order entered by Judge Scheindlin on December 23, 2003 stating that remand motions "in these and all similar removed actions, wherever filed," should be heard as part of MDL No. 1358. *Id.*, Exhibit 11. Plaintiffs had no opportunity to participate in the December 19 Hearing or address the procedures stipulated by the parties at the Hearing, and, subsequently notified Judge Scheindlin of their intent to object to any transfer of their cases to the Southern District of New York. *Id.*, ¶28, Exhibits 12-13. On February 13, 2004, Judge Scheindlin held oral argument on the remand motions before her. *Id.*, Exhibit 14.

On February 25, 2004, the Panel issued CTO-5. On March 11, 2004, Plaintiffs filed with the Panel a Notice of Opposition to CTO-5. On March 16, 2004, Judge Scheindlin issued an opinion and order denying the remand motions before her. *Id.*, Exhibit 15. Plaintiffs now move to vacate CTO-5 as it applies to them.

**C. Previous MTBE Litigation.**

The California Actions and other MTBE-related cases recently removed to federal courts in various parts of the country are preceded by a significant number of cases filed in federal and state courts regarding MTBE, some of which have produced universally-applicable discovery on common questions of fact and consistent rulings on common legal questions. Sher Decl., ¶¶ 8-

25. In at least three major cases – the prior proceedings in MDL No. 1358, *South Lake Tahoe Public Utility District v. Atlantic Richfield Co., et al.*, No. 999128 (Cal. Super. Ct. filed Nov. 10, 1998) ("*South Tahoe*"), and *Communities for a Better Environment v. Unocal Corp., et al.*, No. 997013 (Cal. Super. Ct. filed August 6, 1998) ("*CBE*") – the parties completed detailed, extensive and coordinated discovery on generally applicable issues related to defendant liability. Sher Decl., ¶¶ 12-15, 17-18, 19-21. The *South Tahoe* action went to trial on the issues of refiner/manufacturer liability, product defect and malice, and, after a four-month trial, resulted in a plaintiff's verdict on each of these issues. *Id.*, ¶¶ 12, 14. All of the discovery and testimony from these cases exists and can be made available to the parties in the California Actions. *Id.*, ¶¶ 16, 18, 22-23, Exhibit 9.

Moreover, a significant number of pending MTBE cases are currently proceeding in state courts around the country. Sher Decl., ¶ 9, Exhibit 17. Defendants never sought to remove these cases to federal court, and now cannot. *See* 28 U.S.C. § 1446(b). Accordingly, no matter what happens with respect to the cases now before the Panel, MDL treatment will not result in consolidation of all MTBE cases before a single judge.

## III. LEGAL ARGUMENT

Regardless of how other MTBE cases are treated, the conditional transfer of the California Actions to MDL No. 1358 (or any other MDL) should be vacated because transfer would neither further the just and efficient conduct of the litigation on common questions of fact or law, nor serve the convenience of the parties and witnesses. The statutory factors considered by the Panel in deciding whether to uphold the conditional transfer of an alleged tag-along action are: (1) whether there are common questions of fact between the alleged tag-along action and existing MDL cases; (2) whether transfer would serve the convenience of parties and witnesses;

and (3) whether transfer would serve the just and efficient conduct of the actions. 28 U.S.C. § 1407; JPML Rule 1.1; *In re Managed Care Litig.,* 246 F. Supp 2d 1363, 1364 (JPML 2003); *In re Enron Corp.*, 227 F.Supp.2d 1389, 1391 (JPML 2002). The Panel has held that all three criteria must be met to justify transfer, *In re Highway Acc. Near Rockville, Connecticut, on December 30, 1972,* 388 F. Supp. 574, 575 (JPML 1975), and that the third criterion is the "most important." *In re Tobacco/Governmental Health Care Costs Litig.*, 76 F. Supp. 2d 5, 8 (D.D.C. 1999) *citing* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3863 at 535 (1986). In analyzing whether transfer would serve the just and efficient conduct of actions under section 1407, the Panel primarily considers whether transfer and consolidation will avoid duplicative discovery and inconsistent pretrial rulings. *See, e.g., In re TMJ Implants Products Liability Litig.,* 844 F. Supp. 1553, 1554 (JPML 1994).

The California Actions are inappropriate for MDL treatment for at least two fundamental reasons. First, even assuming *arguendo* that the California Actions remain in federal court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) discovery regarding the few questions of fact shared with other MTBE-related cases already has largely been completed and is or can be made available to all parties; and (b) the Transferee Court, as well as numerous other federal and state courts, already have issued remarkably consistent rulings on most, if not all, common legal issues. Second, resolution of Plaintiffs' Remand Motions – the first, and likely only, substantive motions to be considered by a federal court in these Actions – by the Transferee Court will not conserve judicial resources, because jurisdictional arguments raised therein differ materially from those raised in remand motions recently ruled upon by the Transferee Court. Thus, the California district courts where the California Actions are currently pending are in a position to rule expeditiously on the Remand

Motions, as well as on other pretrial motions, and to preside over the remaining localized and site-specific discovery. For these reasons, the California Actions will "proceed more expeditiously if left alone." *See In re Sears, Roebuck & Co. Employment Practices Litig.*, 487 F. Supp. 1362, 1363 (JPML 1980).

**A. If The California Actions Remain in Federal Court, The Likelihood Of Inconsistent Pretrial Rulings And Duplicative Discovery Is Minimal.**

Even if the California Actions were somehow to remain in federal court, pretrial transfer to MDL No. 1358 would serve neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation. To the extent that the Actions share common questions of fact or law with other pending cases, (1) discovery on common factual questions is largely completed and available, and (2) most common legal issues already have been addressed by the Transferee Court and other courts.

**1. There Are Relatively Few Common Questions Of Fact Shared By The California Actions And Other MTBE Cases On Which Available Discovery Is Not Already Largely Completed.**

The Panel consistently has held that MDL transfer of later-filed actions is neither necessary nor appropriate when discovery relating to common issues already has been completed in the transferee court and/or can be made available to the parties in actions before the Panel without recourse to § 1407.[5] In this instance, discovery pertaining to the few common factual

[5] *See, e.g., In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377, 1378 (JPML 2002) (transfer denied where litigation was mature, discovery nearly completed in some constituent actions in the docket, and alternatives to transfer existed to minimize the possibility of duplicative discovery); *In re Indian Motorcycle Bankruptcy and Receivership Litig.*, 206 F. Supp. 2d 1365 (JPML 2002) (same); *In Re Air Crash Disaster Near Upperville, Virginia*, 430 F. Supp 1295, 1297 (JPML 1977) (CTO vacated where all actions in transferee court were already tried or settled, and all parties in the new actions before the Panel have access to all discovery obtained in the transferee district); *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, 505 F. Supp 221, 223 (JPML 1981) (CTO vacated where discovery of common issues has been completed in the transferee district and could be made available to the parties in the actions before the Panel without recourse to section 1407); *In re Petroleum Products Antitrust Litigation*, 476 F. Supp. 455, 458 (JPML 1979) (conditional transfer order vacated because common-question discovery already completed in transferee

questions shared between the California Actions and other allegedly related MTBE cases is also largely completed and available to all parties. Accordingly, the risk of duplicative discovery is minimal, and there is no need for MDL consolidation.

In their Notices of Related, Tag-Along Actions, defendants identify the following alleged "common question of fact" arising in this and the other listed actions: "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public." Notices of Related Tag-Along Actions, filed December 12, 2003, December 19, 2003, and December 31, 2003, ¶ 2. To the extent this constitutes a question of fact shared by the California Actions and other alleged tag-along actions, discovery on this question as to many, if not all, of the defendants named in the California Actions was largely completed in the prior incarnation of MDL No. 1358, and was pursued in exceptional depth in the *South Tahoe* and *CBE* cases with respect to the California-related defendants named in the California Actions. Sher Decl., ¶¶ 12-15, 17-18, 19-21, 24-25.[6] The same is true with respect to expert discovery on the related question of whether MTBE and/or MTBE gasoline is a defective product. *Id.*, ¶¶ 15, 18, 20, 24-

court and "unique discovery" in new cases "would disrupt and substantially delay the orderly progress of pretrial proceedings in the transferee district"); *In re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation,* 582 F Supp 890, 891 (JPML 1984) (same); *In re Western Electric Co., Inc. Semiconductor Patent Litigation*, 436 F. Supp. 404, 406 (JPML 1977) (transfer denied where discovery on common issues in transferee court "virtually completed"); *In re Eli Lilly & Co. "Oraflex" Products Liability Litig.*, 578 F. Supp. 422, 423 (JPML 1984) (transfer denied because possibility of duplicative discovery "eliminated" by availability of extensive discovery in areas of common factual inquiry from already concluded and well-advanced related actions); *In re Dow Chemical Co. "Polystyrene Foam" Products Liability Litig.*, 429 F. Supp. 1035, 1036 (JPML 1977) (need for transfer "obviated" because discovery on common questions of fact regarding defendants' knowledge and product's defectiveness had been completed and parties had agreed that such discovery would be applicable in all actions); *In re McDonald's Franchise Antitrust Litigation*, 472 F. Supp. 111, 114-115 (JPML 1979) (transfer denied where discovery on common questions was largely completed in some cases and available for use in less advanced cases).

[6] This "notice and knowledge" discovery is relevant, among other things, to each of Plaintiffs' common law claims against the refiner defendants. *See* Sher Decl., Exhibits 1-6.

25. Overall, literally millions of liability-related documents have been produced and hundreds of witnesses have been deposed, including percipient witnesses at the defendant companies and at trade associations like the American Petroleum Institute and Oxygenated Fuels Association, and numerous expert witnesses. *Id.*, ¶¶ 13, 18, 20-21.

Moreover, all of this discovery is, or could easily be made, readily available to the parties in the California Actions. *Id.*, ¶¶ 16, 18, 22-23. For example, the document depository in the Transferee Court, which still exists, was established with the specific purpose of making those documents available to parties in other cases. *Id.*, ¶ 22-23, Exhibit 9 (*In re MTBE*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001) (providing that attorneys in any MTBE action may make use of documents produced in the litigation subject to the requirements of the order)). The documents, depositions and trial testimony from the *South Tahoe* and *CBE* cases also can be made available to the parties in the California Actions. Sher Decl., ¶¶ 16, 18. Indeed, as the Panel has routinely recognized, procedures other than MDL consolidation are available to both courts and parties to permit use of discovery on common issues from prior related cases, such as stipulations and orders to show cause. *See, e.g. In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, *supra*, 199 F. Supp. 2d at 1378, *citing* Manual for Complex Litigation, Third, § 31.14 (1995).

In contrast, few, if any, of the remaining major factual issues in the California Actions – such as causation, the nature of warnings given to particular vendees, the feasibility of alternatives to MTBE, the extent of contamination, the available remedies, the cost of those remedies, and liability for those damages – can be considered "common questions of fact" with other MTBE cases, as they revolve primarily, if not exclusively, around localized and site-specific issues. For example, the questions of causation and warnings in each California Action

will require extensive, site-specific product identification discovery (*i.e.* discovery of whose MTBE and/or gasoline containing MTBE was delivered to release sites affecting Plaintiffs' respective water supplies and/or groundwater resources) that will be unique to each Action. *See In re MTBE*, 209 F.R.D. 323, 344, 347 (S.D.N.Y. 2002) (denying class certification because (1) there are differences in the source of contamination for each well owner and (2) issues regarding warnings given to intermediate vendees and UST owners and operators are "individual").

Questions related to causation, warnings and the feasibility of alternatives will also require discovery into the particulars of California's gasoline infrastructure. Such discovery will be completely irrelevant to parties in MTBE cases outside California, because the regulatory regime, refining centers and distribution systems in California are distinct and/or isolated from those in other gasoline markets in the United States. *See, e.g.*, *Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003) (gasoline infrastructures in California and New York "could not be more divergent"). As the only "state that regulated automotive emissions before Congress entered the field," California is the only state with authority to regulate fuels without EPA approval. *Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182, 1885-1187 (E.D. Cal. 2001) (observing that, under the Clean Air Act, 42 U.S.C. § 7545(c)(4)(B), California has broad authority in the field of fuels regulation). Pursuant to this authority, California Air Resources Board ("CARB") regulations impose special requirements on gasoline sold in the state. *See* Cal. Code of Regulations, Title 13, §§ 2250 *et seq*. As a result, gasoline sold in California is formulated differently than gasoline in the rest of the country. *See, e.g.*, *Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 838 (2001) (gasoline used in California is "unique" and state's gasoline market is "isolated" in light of CARB fuel content regulations).

To serve this unique market, approximately 90 percent of California gasoline is refined in-state and distributed by means of a pipeline, terminal and distribution system that is separate and distinct from the gasoline infrastructure serving other regions of the country. *See* California Energy Commission, *Question & Answers: California Gasoline Price Increases*, March 5, 2004 (Sher Decl., Exhibit 16 at 1). According to the California Energy Commission,

> California is . . . isolated from other refining centers in the United States. Our gasoline must meet stringent air quality requirements to burn cleanly to protect public health and the environment. [Therefore,] our gasoline is different from others made in the U.S.

*Id.* Discovery regarding gasoline formulation, refining and distribution in the California Actions thus will be "of no interest" to non-California plaintiffs. *See In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (denying transfer where discovery in one action would be "of no interest" to parties in another).

Similarly, questions regarding the extent of contamination, available remedies, and implementation and cost of those remedies will also be location and site-specific.[7] In denying class certification in the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding contamination of any particular well present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each will require." *In re MTBE*, *supra*, 209 F.R.D. at 337, 344; *see also In re Grand Funk Railroad Trademark Litig.*, 371 F. Supp. 1084, 1085 (JPML 1974) (no benefit from transfer where discovery "will focus localized factual issues"); *In re Air Crash at Pago Pago, Am. Samoa,* 394 F. Supp. 799, 800 (JPML 1975) (noting that in tort litigation, common questions may pertain to liability, whereas the issue of damages is unique).

[7] Defendants allege in their Notices of Related, Tag-Along Actions that "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination" is a "common question of fact" in these cases. *See* Notices of Related Tag-Along Actions, filed December 12, 2003, December 19, 2003, and December 31, 2003, ¶ 2. As set forth in the text, this is obviously not the case.

Finally (on this point), transferring the instant actions to MDL 1358 will not reduce the risk of inconsistent discovery rulings (if any), as there are a significant number of other MTBE cases proceeding in different state courts around the country that have not been, and cannot be, removed to federal court and transferred to MDL No. 1358. *See* Sher Decl., ¶ 9, Exhibit 17; *In re Tobacco/ Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 9 (denying transfer in part because the defendants "will be faced with rulings by two different judges on discovery requests made of [them] regardless of whether the consolidation motion is granted or denied").

In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery is largely complete and available to all parties. The discovery that remains will focus almost exclusively on California and site-specific issues, which can be better handled by the local district courts where the California Actions are pending.

**2. The Transferee Court And Other Courts Already Have Resolved Most Common Legal Issues.**

Just as discovery on any common factual issues is already well-advanced in the Transferee Court (and elsewhere), common pretrial legal issues already have been decided by the Transferee Court, and by other federal and state courts. Indeed, the Transferee Court's prior rulings "provide a convenient expression of the conclusions of the transferee judge which have been reached through [her] familiarity with the litigation, and can serve as an aid in . . . preventing inconsistent pretrial rulings." *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation, supra*, 505 F. Supp at 223; *see also In re Western Electric Co., Inc. Semiconductor Patent Litigation, supra*, 436 F. Supp. at 406 (transfer unwarranted where transferee court's views on key legal issues are well documented, and will put home-court judge "closer to the shoes of the transferee judge").

In her landmark ruling on defendants' motions to dismiss in the original set of cases transferred to MDL No. 1358, Judge Scheindlin, in a lengthy and thorough opinion, set forth a roadmap for many of the key common legal issues in these cases that other judges can easily follow. *See In re MTBE, supra*, 175 F. Supp. 2d at 606-635. First, the Court rejected defendants' federal preemption defense, *id.* at 611-616,[8] as has the Ninth Circuit and every other published opinion addressing the question.[9] The Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related argument that defective product claims concerning MTBE require an impermissible reexamination of EPA's cost-benefit analysis regarding MTBE. *In re MTBE, supra*, 175 F. Supp. 2d at 616-618, 623-625. The court further upheld the sufficiency of each of the common law tort claims which are also asserted in the California Actions, including claims alleging refiner liability under theories of strict products liability, negligence, nuisance and trespass. *Id.* at 623-629.[10] In addition, at least one California jury has found that MTBE gasoline is a defective product. Sher Decl., Exhibit 8.

With this extensive guidance already in place, the risk of inconsistent pretrial rulings on these common legal questions in the California Actions, if left to proceed in their home districts,

---

[8] Although Judge Scheindlin left open the factual question of whether there were practicable alternatives to MTBE available for defendants' use under the federal Clean Air Act, *id.* at 616, the Ninth Circuit has closed the door on this question by holding as a matter of law that a smoothly functioning gasoline market and inexpensive gasoline are not goals of the Clean Air Act. *Davis II, supra*, 331 F.3d at 673. In any case, as described in section III.A.1., *supra*, the question of feasibility of alternatives depends on the gasoline market and infrastructure in the relevant locality, and thus is not the kind of question on which coordinated discovery will yield any efficiencies.

[9] *See Davis II*, 331 F.3d 665, *affirming Davis I,* 163 F. Supp. 2d 1182; *ExxonMobil, supra,* 217 F.3d 1246; *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA); *see also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").

[10] In evaluating the sufficiency of the plaintiffs' common law claims, the Transferee Court specifically applied California law. *See id.* at 620-623, 625, 627-628, 632-633.

is minimal. At the same time, the pretrial legal questions raised in the California Actions that have not yet been resolved by the Transferee Court or other courts in the context of MTBE litigation – such as the scope and applicability of the state-specific and even plaintiff-specific (*e.g.*, the OCWDA) statutory claims asserted in these Actions and the applicability of any statute of limitations or other defenses, to name a few – are not shared with other MTBE cases. These questions are best addressed by a court with more experience and familiarity with California law. Thus, the benefits of permitting these cases to proceed on their own in their home districts outweigh the benefits (if any) of transfer to the Southern District of New York. *See In re Grand Funk Railroad, supra*, 371 F. Supp. at 1085 ("Panel must weigh any benefit that transfer would provide in the way of eliminating the possibility of inconsistent pretrial decisions against the efficient administration of the litigation as a whole").[11] Accordingly, the Conditional Transfer Order (CTO-5) as it applies to the California Actions should be vacated.

**B. No Savings Of Judicial Resources Will Be Gained From Consolidated Treatment Of Plaintiffs' Remand Motions.**

Because Judge Scheindlin did not have copies of the complaints, removal notices, or Remand Motions filed in any of the California Actions before her, the determination in her December 23, 2003 Order that the remand issues raised in various "similar removed" cases around the country are "appropriate" for MDL treatment should not apply to the California Actions. *See* Sher Decl., ¶¶ 28, 31. In fact, Plaintiffs' Remand Motions differ from, and, are significantly less complex than, the remand motions recently ruled upon by Judge Scheindlin. This also militates against transfer.

In her March 16, 2004 opinion and order denying the remand motions before her, Judge Scheindlin ruled that, based on the allegations in the defendants' removal notices, defendants

[11] The significant number of pending MTBE cases in various state courts (*see* Sher Decl., ¶ 9, Exhibit 17) also illustrates the lack of efficacy that would result from transferring these actions to MDL 1358.

were acting "under the direction" of the federal government for purposes of 42 U.S.C. § 1442(a)(1) when they added MTBE to gasoline in order to comply with Clean Air Act regulations. *See* Sher Decl., Exhibit 15. A necessary element of this ruling was Judge Scheindlin's finding that, in the cases before her, defendants' preemption arguments constitute a "colorable federal defense." *Id.*; *see also Jefferson County v. Acker*, 527 U.S. 423, 431 (removal under § 1442(a)(1) proper only where defendant alleges a "colorable federal defense").

The California Actions present an entirely different set of circumstances. Unlike the MTBE cases in the Transferee Court, the California Actions arise in the Ninth Circuit, which has *twice* definitively rejected *as a matter of law* the Clean Air Act preemption arguments on which defendants base their assertion of "federal officer" jurisdiction. *Davis II, supra,* 331 F.3d at 670, 673; *ExxonMobil, supra,* 217 F.3d at 1253. As defendants have no "colorable" preemption defense in the Ninth Circuit, Judge Scheindlin's March 16 ruling regarding defendants' "federal officer" argument has no bearing on the Remand Motions in the California Actions.[12]

Additionally, the conduct at issue in the *Quincy* Action occurred in an area that has never been subject to the requirements of the federal RFG or Oxygenated Fuels programs. *See* 40 C.F.R. §§ 80.70, 81.305. As such, the *sine qua non* of defendants' federal officer basis for

---

[12] None of the other bases for federal jurisdiction asserted by defendants has merit. As with defendants' "federal officer" assertions, their "substantial federal question" and "complete preemption" arguments depend entirely on preemption arguments that already have been soundly rejected by the Ninth Circuit as a matter of law. *See Oxygenated Fuels Ass'n v. Davis II*, 331 F.3d 665; *ExxonMobil, supra,* 217 F.3d 1246. Second, Defendants' attempt to predicate federal jurisdiction on the toehold of remote bankruptcy orders has no merit, as these Actions can have no conceivable effect on the administration of already-concluded bankruptcy proceedings. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (no bankruptcy jurisdiction because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"). Even if there were bankruptcy jurisdiction, it is non-exclusive, *see In re McGhan*, 288 F.3d 1172 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court"), and remand is warranted in light of the obviously applicable remand factors under 28 U.S.C. § 1452(b).

removal – that they were required by federal law to use MTBE – has no possible basis in fact in the *Quincy* Action.[13]

Consequently, although the jurisdictional bases asserted by the defendants in the California Actions may overlap with those raised by oil company defendants in other recently removed MTBE cases, Plaintiffs' Remand Motions cannot be resolved based on Judge Scheindlin's March 16 opinion and order. *See In re 'East of the Rockies' Concrete Pipe Antitrust Cases*, 302 F. Supp. 244, 254 (JPML 1969) (Weigel, J., conc.) ("neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, ipso facto, by transfer just because there are common questions"). The underlying legal arguments and factual circumstances raised in Plaintiffs' Remand Motions are different, and the risk of inconsistent rulings absent transfer, as well as any perceived judicial economy, is therefore illusory. As the court held in *Board of Trustees v. Worldcom*, 244 F. Supp. 2d 900, 903 (N.D. Ill. 2002):

> When remand motions in cases potentially subject to MDL consolidation raise unique issues of law or fact, channeling the decisions to a single court would result in little or no savings of judicial resources. The threat of inconsistent judgments in either case is de minimis.

*See also Havens Protected "C" Clamps, Inc. v. Pilkington PLC*, No. 00-2035-JWL, 2000 WL 382027, at *2 (D. Kan. March 28, 2000) (holding that where "resolution of the motion to remand does not necessarily implicate issues common to the other actions currently pending

---

[13] Plaintiffs in the California Actions also raise unique arguments with respect to bankruptcy jurisdiction – an issue not decided in Judge Scheindlin's March 16 ruling. Orange County Water District, City of Riverside, City of Roseville, Quincy Community Services District and all but one of the twelve Sacramento County Plaintiffs are "governmental units" that (among other things) seek cost recovery pursuant to regulatory powers established by specific state statutes. *See* Sher Decl., Exhibit 1 (Fourteenth-Seventeenth Causes of Action); Exhibit 2 (Fifth Cause of Action); Exhibit 3 (Sixth-Ninth Causes of Action); Exhibit 4 (Sixth-Ninth Causes of Acton); Exhibit 5 (Sixth-Ninth Causes of Action). Under 28 U.S.C. §1452(a), such civil actions are exempt from removal on grounds of bankruptcy jurisdiction. This argument was not addressed by the remand motions recently decided Judge Scheindlin.

before the MDL Panel-designated court," remand motion should be considered by transferor court). There is, therefore, nothing but delay to be gained from transferring the California Actions to the Southern District of New York, when the local district courts where these Actions are pending are at least as capable of deciding the unique issues raised in Plaintiffs' Remand Motions in an expeditious manner.

## IV.   CONCLUSION

The Panel should grant Plaintiffs' Joint Motion to Vacate Conditional Transfer Order (CTO-5) as it applies to the California Actions.

Respectfully submitted,

Dated:  March 24, 2004

SHER LEFF, LLP
Victor M. Sher
Todd E. Robins
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

Counsel for Orange County Water District, City of Riverside,
Quincy Community Services District, City of Roseville, City of
Elk Grove, Sacramento County Water Agency, Sacramento
Groundwater Authority, Citrus Heights Water District, Del Paso
Manor Water District, Fair Oaks Water District, Florin Resource
Conservation District, Rio Linda Elverta Community Water
District, Sacramento Suburban Water District, San Juan Water
District, California-American Water Company, City of
Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T.
Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and
Adrian Kruso

BARON & BUDD, P.C.
Scott Summy
Celeste A. Evangelisti
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for City of Riverside, Quincy Community Services
District, City of Roseville, City of Elk Grove, Sacramento County
Water Agency, Sacramento Groundwater Authority, Citrus Heights
Water District, Del Paso Manor Water District, Fair Oaks Water
District, Florin Resource Conservation District, Rio Linda Elverta
Community Water District, Sacramento Suburban Water District,
San Juan Water District, California-American Water Company,
City of Sacramento, Martin Silver, Pauline Silver, Laura Silver,
John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K.
Crandall, and Adrian Kruso

MILLER, AXLINE & SAWYER
Duane A. Miller
Michael D. Axline
1050 Fulton Avenue, Ste. 100
Sacramento, CA 95825
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288

Counsel for Orange County Water District

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE:**

**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION**

**MDL Docket No. 1358**

This Document Relates to:

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

**STATEMENT OF REASONS WHY ORAL ARGUMENT SHOULD BE HEARD RE: PLAINTIFFS' JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**

RECEIVED
CLERK'S OFFICE
2004 MAR 26 A 10: 30
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**STATEMENT OF REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company and City of Sacramento (plaintiffs in the action *People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, Case No. 03-2653 GEB DAD (E.D.Cal.)), Orange County Water District (plaintiff in the action *Orange County Water District v. Unocal, et al.,* Case No. 03-1742 JVS (ANx) (C.D. Cal.)), City of Riverside (plaintiff in the action *City of Riverside v. Atlantic Richfield Co., et al.,* Case No. 04-53 JVS (ANx) (C.D. Cal.)), Quincy Community Services District (plaintiff in the action *Quincy Community Services District v. Atlantic Richfield Co., et al.,* Case No. 03-2582 LKK DAD (E.D. Cal.)), City of Roseville (plaintiff in the action *City of Roseville v. Atlantic Richfield Co., et al.*, Case No. 03-2601 MCE GGH (E.D. Cal.)), and Martin Silver, Pauline Silver, Laura Silver, John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and Adrian Kruso (plaintiffs in the action *Martin Silver, et al. v. Alon USA Energy, Inc., et al.,* Case No. 03-2408 WQH (S.D. Cal.)), hereby request that oral argument be heard on their Joint Motion to Vacate CTO-5 submitted herewith for the following reasons:

1. The *Sacramento County*, *Orange County*, *Riverside*, *Quincy*, *Roseville*, and *Silver* Actions are large enough and significant enough cases, and the MDL proceeding to which such Actions would be transferred is a far enough distance from Plaintiffs' respective home districts, to warrant the fullest possible ventilation of the issues raised in the Motion.

2. Oral argument on Plaintiffs' Joint Motion will provide the Panel with an opportunity to fully explore all aspects of Plaintiffs' Motion. The issues raised in Plaintiffs'

Motion are complex, and it would benefit all parties and the decision-making process itself if the

parties are available to address the Panel's questions and comments on those issues.

     3.     Oral argument will facilitate the Panel's ability to rule on Plaintiffs' Motion in a

timely manner.

Respectfully submitted,

Dated: March 24, 2004

SHER LEFF, LLP
Victor M. Sher
Todd E. Robins
450 Mission Street, Suite 500
San Francisco, CA 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

Counsel for Orange County Water District, City of Riverside,
Quincy Community Services District, City of Roseville, City of
Elk Grove, Sacramento County Water Agency, Sacramento
Groundwater Authority, Citrus Heights Water District, Del Paso
Manor Water District, Fair Oaks Water District, Florin Resource
Conservation District, Rio Linda Elverta Community Water
District, Sacramento Suburban Water District, San Juan Water
District, California-American Water Company, City of
Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T.
Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and
Adrian Kruso

BARON & BUDD, P.C.
Scott Summy
Celeste A. Evangelisti
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for City of Riverside, Quincy Community Services
District, City of Roseville, City of Elk Grove, Sacramento County
Water Agency, Sacramento Groundwater Authority, Carmichael
Water District, Citrus Heights Water District, Del Paso Manor
Water District, Fair Oaks Water District, Florin Resource
Conservation District, Rio Linda Elverta Community Water
District, Sacramento Suburban Water District, San Juan Water
District, California-American Water Company, City of
Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T.
Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and
Adrian Kruso

MILLER, AXLINE & SAWYER
Duane A. Miller
Michael D. Axline
1050 Fulton Avenue, Ste. 100
Sacramento, CA 95825
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288

Counsel for Orange County Water District

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE:**

**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION**

**MDL Docket No. 1358**

This Document Relates to:

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

**SCHEDULE RE: INVOLVED ACTIONS**

RECEIVED
CLERK'S OFFICE
2004 MAR 26 A 10: 30
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

///

///

///

**SCHEDULE RE: INVOLVED ACTIONS**
**DOCKET NO. 1358**
**IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

*People of the State of California; City of Elk Grove; Sacramento County Water Agency; Sacramento Groundwater Authority; Citrus Heights Water District; Del Paso Manor Water District; Fair Oaks Water District; Florin Resource Conservation District; Rio Linda Elverta Community Water District; Sacramento Suburban Water District; San Juan Water District; California-American Water Company; City of Sacramento.*

*v.*

*Atlantic Richfield Company; BP Products North America, Inc.; ChevronTexaco Corporation; Chevron U.S.A., Inc.; Citgo Petroleum Corporation' ConocoPhillips Company; Equilon Enterprises LLC; Exxon Mobil Corporation; Shell Oil Company; Shell Oil Products U.S.; Tesoro Refining and Marketing Company; Texaco Refining and Marketing, Inc.; Ultramar, Inc.; Unocal Corporation, Individually and Formerly Known as Union Oil Company of California; Valero Energy Corporation; Lyondell Chemical Company, Individually and Formerly Known as ARCO Chemical Company; Circle K Stores, Inc; 7-Eleven, Inc.; and Does 1-1000, Inclusive.*

District Court/Division: District Court for the Eastern District of California, Sacramento Division
Case Number: 03-2653 GEB DAD
Judge: Hon. Garland E. Burrell, Jr.

* * *

*Orange County Water District*

*v.*

*Unocal Corporation, Individually and Formerly Known as Union Oil Company of California; Union Oil Company of California, Individually and DBA as Unocal [Doe 1]; Tosco Corporation; ConocoPhillips Company; Chevron U.S.A., Inc.; ChevronTexaco Corporation; Texaco Refining and Marketing, Inc.; Equilon Enterprises, LLC; Shell Oil Company; Exxon Mobil Corporation; Mobil Corporation; Ultramar, Inc.; Valero Refining Company- California; Atlantic Richfield Company; BP Products North America, Inc.; ARCO Chemical Company [Doe 201]; Lyondell Chemical Company, Individually and Formerly Known as ARCO Chemical Company; G&M Oil Company, Inc.; 7-Eleven, Inc.; USA Gasoline Corporation; and Does 2 through 200 and 202 through 1000 Inclusive.*

District Court/Division: United States District Court for the Central District of California, Santa Ana Division
Case Number: 03-1742 JVS (ANx)
Judge: Hon. James V. Selna

* * *

*City of Riverside*

*v.*

*Atlantic Richfield Company; BP Products North America, Inc.; ChevronTexaco Corporation; Chevron U.S.A., Inc.; ConocoPhillips Company; Equilon Enterprises LLC; Exxon Mobil Corporation; Shell Oil Company; Shell Oil Products U.S.; Tesoro Refining and Marketing Company; Texaco Refining and Marketing, Inc.; Ultramar, Inc.; Union Oil Company of California; Unocal Corporation; Valero Energy Corporation; Valero Refining Company- California; Lyondell Chemical Company, Individually and Formerly Known as ARCO Chemical Company; Circle K Stores, Inc.; and Does 1-1000, Inclusive.*

District Court/Division: United States District Court for the Central District of California, Santa Ana Division
Case Number: Case No. 04-53 JVS (ANx)
Judge: Hon. James V. Selna

*　　*　　*

*City of Roseville*

*v.*

*Atlantic Richfield Company; BP Products North America, Inc.; ChevronTexaco Corporation; Chevron U.S.A., Inc.; ConocoPhillips Company; Equilon Enterprises LLC; Exxon Mobil Corporation; Shell Oil Company; Shell Oil Products U.S.; Tesoro Refining and Marketing Company; Texaco Refining and Marketing, Inc.; Ultramar, Inc.; Union Oil Company of California; Unocal Corporation; Valero Energy Corporation; Valero Refining Company- California; Lyondell Chemical Company, Individually and Formerly Known as ARCO Chemical Company; Circle K Stores, Inc.; and Does 1-1000, Inclusive.*

District Court/Division: United States District Court for the Eastern District of California, Sacramento Division
Case Number: 03-2601 MCE GGH
Judge: Hon. Morrison C. England

*　　*　　*

*Quincy Community Services District*

*v.*

*Atlantic Richfield Company; BP Products North America; ChevronTexaco Corporation; Chevron U.S.A., Inc.; ConocoPhillips Company; Equilon Enterprises LLC; Exxon Mobil Corporation; Shell Oil Company; Shell Oil Products U.S.; Tesoro Refining and Marketing Company; Texaco Refining and Marketing, Inc.; Ultramar, Inc.; Unocal Corporation; Union Oil Company of California; Valero Energy Corporation; Valero Refining Company- California; Lyondell Chemical Company, Individually and Formerly Known as ARCO Chemical Company; G.N. Renn, Inc.; Sierra Energy; Tom's Sierra Company, Inc.; Warner Petroleum, Inc.; Washoe Fuel, Inc.; Blue Star Petroleum, Inc.; Fuel Star, Inc.; and Does 1-1000, Inclusive.*

District Court/Division: United States District Court for the Eastern District of California, Sacramento Division
Case Number: 03-2582 LKK DAD
Judge: Hon. Lawrence K. Karlton

* * *

*Martin Silver; Pauline Silver; Laura Silver; John T. Kruso; Dennis A. Kruso; Stephen L. Kruso; Diane K. Crandall; and Adrian Kruso.*

*v.*

*Alon USA Energy, Inc.; Alon USA LP; Amerada Hess Corporation; Atlantic Richfield Company, Individually and Doing Business as ARCO Products Company (f/k/a Arco Petroleum Co.); and Also Known as ARCO; Atofina Petrochemicals, Inc., Individually and Formerly Known as Fina Oil and Chemical Company; BP America, Inc.; BP Amoco Chemical Company, Individually and Formerly Known as Amoco Chemical Company; BP Company North America, Inc.; BP Corporation North America, Inc., Individually and Formerly Known as BP Amoco Corporation and Amoco Corporation; BP Products North America, Inc., Individually and Formerly Known as BP Marine Americas; Bp West Coast Products LLC; ChevronTexaco Corporation, Individually and as Successor-In-Interest to Chevron Corporation and as Successor-In-Interest to Texaco, Inc.; Chevron U.S.A., Inc., Individually and Formerly Known as Gulf Oil Corporation (d/b/a Chevron Products Company, d/b/a Chevron Chemical Company); Citgo Petroleum Corporation; Citgo Refining and Chemical LP; Coastal Eagle Point Oil Company; Coastal Mobile Refining Company; ConocoPhillips Company, Individually and Successor-In-Interest to Conoco, Inc. and Phillips Petroleum Company, and d/b/a Phillips 66 Company; Crown Central Petroleum Corporation; Diamond Shamrock Refining and Marketing Company; El Paso CGP Company, Individually and Formerly Known as The Coastal Corporation; El Paso Corporation, Individually and Formerly Known as El Paso Energy Corporation; El Paso Merchant Energy-Petroleum Company, Individually and Formerly Known as Coastal Refining and Marketing, Inc. and Formerly Known as Coastal States Trading, Inc.; Equilon Enterprises LLC, Individually and Also Known as Shell Oil Products US; Exxon Mobil Chemical Company, Inc., Individually and Formerly Known as Mobil Chemical Company, Inc.; Exxon Mobil Corporation, Individually and as Successor-In-Interest to Exxon Corporation and as Successor-In-Interest to Mobil Corporation (and d/b/a ExxonMobil Refining and Supply Company); ExxonMobil Corporation, Individually and Formerly Known as Mobil Oil Corporation; Gulf Oil LP; Koch Industries, Inc.; Lyondell Chemical Company, Individually and Formerly Known as Lyondell Petrochemical Company, and Formerly Known as Arco Chemical Company; Marathon Ashland Petroleum LLC; Marathon Oil Corporation, Individually and Formerly Known as USX Corporation (f/k/a United States Steel Corporation); Mobil Corporation; Motive Enterprises LLC, Individually and Formerly Known as Star Enterprises LLC; Premcor, Inc.; The Premcor Refining Group, Inc., Individually and Formerly Known as Clark Refining; Shell Oil Company; Shell Oil Products Company; Shell Oil Products Company LLC; Shell Petroleum, Inc.; Shell Trading (US) Company, Individually and Formerly Known as Equiva Trading Company, and Also Known as Stusco; Sunoco, Inc., Individually and Formerly Known as Sun Oil Company and Formerly Known as Sun Company, Inc.; Sunoco, Inc. (R&M), Individually and Formerly Known as Sun Refining and marketing Company and Formerly Known as Sun Company, Inc. (R&M); Tesoro Petroleum Corporation; Tesoro Refining and Marketing Company, Inc., Individually and Formerly Known as Tesoro West Coast; Texaco, Inc.; Texaco Refining and Marketing, Inc.; Tosco Corporation, Individually and Also Known as Tosco Marketing Company; Total Holdings USA, Inc., Individually and Formerly Known as*

*Total America, Inc.; Ultramar, Inc.; Unocal Corporation, Individually and Formerly Known as Union Oil Company of California; Valero Energy Corporation; Valero Marketing and Supply Company; Valero Refining and Marketing Company.*

District Court/Division: United States District Court for the Southern District of California, San Diego Division
Case Number: 03-2408 WQH
Judge: Hon. William Q. Hayes

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE:**

**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION**

**MDL Docket No. 1358**

This Document Relates to:

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

**DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFFS' JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**

RECEIVED
CLERK'S OFFICE
2004 MAR 26 A 10: 30
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFF'S JOINT MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)**

I, VICTOR M. SHER, DECLARE:

1. I am an attorney licensed to practice law since 1980 in the State of California, and a founding principal of the law firm of Sher Leff LLP (since January 1, 2003). Unless otherwise stated, I make this declaration from personal knowledge and, if called to do so, could and would testify competently to the matters set forth below.

2. My firm is lead outside counsel for plaintiffs City of Elk Grove, Sacramento County Water Agency, Sacramento Groundwater Authority, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, Sacramento Suburban Water District, San Juan Water District, California-American Water Company and City of Sacramento ("Sacramento County Plaintiffs") in the action *People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, Case No. 03-2653 GEB DAD (E.D.Cal.) ("*Sacramento County* Action"),[1] one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358. A true and correct copy of the First Amended Complaint in the *Sacramento County* Action is attached hereto as Exhibit 1.

3. My firm is co-counsel for plaintiff Orange County Water District in the action *Orange County Water District v. Unocal, et al.,* Case No. 03-1742 JVS (ANx) (C.D. Cal.) ("*Orange County* Action"), one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358. A true and correct copy of the First Amended Complaint in the *Orange County* Action is attached hereto as Exhibit 2.

[1] The Sacramento County Plaintiffs identified herein comprise all plaintiffs in the *Sacramento County* Action except the People of the State of California. It my understanding that the People will be filing a separate motion to vacate CTO-5.

4. My firm is lead outside counsel for plaintiff City of Riverside in the action *City of Riverside v. Atlantic Richfield Co., et al.,* Case No. 04-53 JVS (ANx) (C.D. Cal.) ("*Riverside* Action"), one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358. A true and correct copy of the First Amended Complaint in the *Riverside* Action is attached hereto as Exhibit 3.

5. My firm is lead outside counsel for plaintiff City of Roseville in the action *City of Roseville v. Atlantic Richfield Co., et al.*, Case No. 03-2601 MCE GGH (E.D. Cal.) ("*Roseville* Action"), one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358. A true and correct copy of the First Amended Complaint in the *Roseville* Action is attached hereto as Exhibit 4.

6. My firm is lead outside counsel for plaintiff Quincy Community Services District in the action *Quincy Community Services District v. Atlantic Richfield Co., et al.,* Case No. 03-2582 LKK DAD (E.D. Cal.) ("*Quincy* Action"), one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358. A true and correct copy of the Complaint in the *Quincy* Action is attached hereto as Exhibit 5.

7. My firm is co-counsel for plaintiffs Martin Silver, Pauline Silver, Laura Silver, John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and Adrian Kruso ("Silver Plaintiffs") in the action *Martin Silver, et al. v. Alon USA Energy, Inc., et al.,* Case No. 03-2408 WQH (S.D. Cal.) ("*Silver* Action"), one of the cases subject to the instant Conditional Transfer Order (CTO-5) to MDL 1358.[2]

[2] The *Sacramento County*, *Orange County*, *Riverside*, *Quincy*, *Roseville* and *Silver* Actions are referred to collectively herein as the "California Actions." The Sacramento County Plaintiffs, Orange County Water District, City of Riverside, Quincy Community Services District, City of Roseville and the Silver Plaintiffs are referred to collectively herein as "Plaintiffs."

A true and correct copy of the First Amended Complaint in the *Silver* Action is attached hereto as Exhibit 6.[3]

8. Since January 1998 my practice has consisted entirely of representing public water agencies in litigation to recover the costs of remediating and/or treating public drinking water supplies infested by a variety of chemicals. Specifically, since November 1998, I have represented a number of public water agencies in litigation concerning contamination of public water supplies by Methyl Tertiary Butyl Ether (MTBE). My current and past clients in MTBE-related litigation include (among others) the plaintiffs in *South Lake Tahoe Public Utility District v. Atlantic Richfield Co., et al.*, No. 999128 (Cal. Super. Ct. filed Nov. 10, 1998) ("*South Tahoe*"), *City of Dinuba v. Unocal Corp. et al.*, No. 305450 (Cal. Super. Ct. filed Aug. 5, 1999) ("*Dinuba*"), and *City of Santa Monica v. Shell Oil Co., et al.*, Nos. 01CC04311; 02CC11407 (Cal. Super. Ct. filed June 19, 2000) ("*Santa Monica*").

9. In addition to my personal involvement in *South Tahoe*, *Dinuba*, and *Santa Monica*, I am also familiar with the proceedings in *Communities for a Better Environment v. Unocal Corp., et al.*, No. 997013 (Cal. Super. Ct. filed August 6, 1998) ("*CBE*"), since much of the discovery in *CBE* was coordinated with that in *South Tahoe*. I am also informed and believe that approximately eighty-five additional lawsuits relating to MTBE contamination have been filed since 1998, including a significant number of pending MTBE cases that are currently proceeding in state courts around the country. These cases do not include those matters recently

[3] My firm is also lead outside counsel of record for the State of New Hampshire in the action *State of New Hampshire v. Amerada Hess Corp. et al.*, No. 03-CV-486 (D.N.H.); No. 03-0529L (D.R.I.), and for California-American Water Company in the action *California-American Water Co. v. Atlantic Richfield Co., et al.*, Case No. 03-5379 JSW (N.D. Cal.). Both of these cases are also subject to conditional transfer orders (CTO-4) to MDL 1358.

removed to federal court and subject to CTO 4 or 5. A partial list of pending MTBE cases that are currently proceeding in state courts around the country is attached hereto as Exhibit 17.

10. I am also aware of the proceedings in the original incarnation of MDL No. 1358 ("*Original MDL 1358*"), and have reviewed the Case Management Order (#2), the Confidentiality Agreement and Order, and indices to documents produced to the document depository for Original MDL 1358.

11. In *South Tahoe*, *Dinuba*, *Santa Monica*, *CBE* and *Original MDL 1358*, each plaintiff's primary focus in the respective lawsuits was on: (1) the manufacturers of MTBE; and (2) the gasoline refiners (who blended MTBE into gasoline that was subsequently leaked or spilled and affected the plaintiffs' wells) regardless of whether those refiners owned or operated retail gasoline stations that actually released such gasoline into the subsurface. Legal theories in each case – asserted under state common and statutory law – included participating in creating a nuisance, trespass, negligence, and strict liability for product defect.

12. I was a senior member of the litigation and trial team for the plaintiff in *South Tahoe*. To my knowledge, *South Tahoe* was the first lawsuit in the country filed by a public water supplier seeking damages for MTBE contamination of public drinking water supply wells. I am intimately familiar with all of the proceedings in the case and participated directly in all phases of pleadings, discovery, pretrial, trial and settlement. To my knowledge, *South Tahoe* was also the first MTBE-related case in the country to proceed to trial on theories of refiner/manufacturer liability, and to obtain a special jury verdict on those issues. As explained in more detail below, these issues were explored thoroughly in discovery, pretrial motions, trial testimony, and post-trial motions.

13.     The complaint in *South Tahoe* was filed November 10, 1998. A true and correct copy of the complaint in *South Tahoe* is attached hereto as Exhibit 7. The action named seventeen defendants, including all of the major gasoline refiners in California. For nearly three years, until the start of trial in September 2001, the parties conducted detailed and extensive discovery into the issue of refiner/manufacturer liability for MTBE contamination. During this discovery, millions of documents were produced and hundreds of witnesses were deposed. In particular, more than sixty expert witnesses and more than one hundred and eighty percipient (industry) witnesses were deposed, including those from defendant companies and from trade associations like the American Petroleum Institute and Oxygenated Fuels Association.

14.     Plaintiff settled with all but seven defendants before trial, for an aggregate of more than $30 million. However, the action proceeded to trial against Lyondell (a manufacturer of MTBE); Shell, Texaco, Equilon, and Ultramar (refiners); and two local gasoline retailers. *South Tahoe* was tried to a jury in phases, starting in September 2001. Phase I focused entirely on refiner/manufacturer liability. Extensive testimony and exhibits during the four-month Phase I of the trial addressed issues related to manufacturer/refiner liability. On April 15, 2002, the jury returned a special verdict, a true and correct copy of which is attached hereto as Exhibit 8. As reflected in that verdict, the jury concluded that: (1) MTBE was a defective product by virtue of failure of the manufacturer defendant (Lyondell) to warn; (2) gasoline containing MTBE was a defective product both because the environmental risks of the product outweighed the benefits and because the refiner defendants failed to warn of those risks; and (3) there was clear and convincing evidence that two defendants – Lyondell and Shell – acted with malice.

15.     The millions of documents produced, the testimony of hundreds of deponents, and the extensive trial testimony in *South Tahoe* cover, among other things, the following topics: i)

fate and transport of MTBE in the subsurface (including mobility and non-biodegradability); ii) documented releases of MTBE to groundwater; iii) toxicity of MTBE; iv) taste and odor thresholds for MTBE; v) alternatives to MTBE; vi) treatment technologies for MTBE water contamination; vii) economics of MTBE; viii) the oil companies' and manufacturers' early notice and knowledge of the risks of MTBE to groundwater; ix) the oil companies' and manufacturers' promotion and marketing of MTBE; x) the problem of (and defendants' knowledge of) leaking underground storage tanks; and xi) the production, sale and distribution of MTBE and gasoline containing MTBE in California.

16.    The above-described discovery and trial testimony and exhibits from *South Tahoe* still exist and could be made available to the parties in the California Actions.

17.    I am informed and believe, based on my familiarity with the pleadings and proceedings in the *CBE* action, that the *CBE* complaint was filed on August 6, 1998 and named twenty-seven defendants, all major refiners of MTBE and their related entities, in California, alleging that their business practices relating to MTBE were in violation of California's unfair trade practices statute. The parties conducted approximately two years of discovery in *CBE*. A two year bench trial was held beginning in 2000, and the plaintiff settled with all defendants after presenting their case in chief. The settlement required defendants to address MTBE contamination at thousands of sites throughout the state. Some defendants also agreed to stop blending MTBE into their gasoline (before California's regulatory ban took effect) and/or to provide certain warnings regarding the hazards of MTBE.

18.    Discovery in the *CBE* case resulted in the production of millions of pages of documents, as well as approximately eighty depositions covering the same categories of issues as those enumerated in paragraph 15 above. I am informed and believe that the non-confidential

discovery in *CBE*, including all of the documents demonstrating liability which were filed by the plaintiffs as part of their case in chief, still exist and could be made available to the parties in the California Actions.

19.     I am informed and believe that *Original MDL 1358* involved claims by private well owners around the country arising out of MTBE contamination. Several proposed class actions were designated by this Panel for multi-district treatment before Judge Scheindlin in the Southern District of New York. These actions were designated MDL No. 1358 on October 10, 2000. The parties conducted approximately one year of discovery. Judge Scheindlin issued several substantive rulings (including denying defendants' motions to dismiss and denying plaintiffs' motion for class certification). The claims of the representative plaintiffs were ultimately settled.

20.     Based on my review of indices of documents produced to the document depository for *Original MDL 1358*, and my discussions with counsel who were personally involved in *Original MDL 1358*, I am informed and believe that discovery in those proceedings similarly resulted in the production of millions of pages of documents covering the same categories of issues as those enumerated in paragraph 15 above, except that the materials relating to gasoline distribution focused on the specific markets involved in the MDL actions.

21.     By way of example of the volume of documents produced in *Original MDL 1358*, the index to the documents produced by the BP-Amoco entities alone is more than 100 pages long, single spaced.

22.     I am informed and believe that a centralized document depository was created for *Original MDL 1358* in which all discovery materials were made available to the parties, and that this depository still exists.

23.     The parties to *Original MDL 1358* stipulated to a Confidentiality Agreement and Order which provided that materials produced in the litigation and identified as "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THINGS" could be made available to counsel in other MTBE actions, defined as "an action where the complaint alleges that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or common law." Under the Order, materials identified as "CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY" may be made available by order of the MDL judge. The Confidentiality Agreement and Order does not apply to those materials not identified as confidential. A true and correct copy of the Confidentiality Agreement and Order is attached hereto as Exhibit 9.

24.     In my opinion, discovery on issues regarding the nature and behavior of MTBE, and on questions regarding refiner liability such as "who knew what, and when," is substantially mature with respect to MTBE litigation against gasoline refiners who used MTBE and the manufacturers of MTBE. I base this conclusion on two factors: First, there has been (as described above) extensive liability discovery and testimony already conducted in *South Tahoe*, *CBE*, and *Original MDL 1358*. Second, subsequent cases involving assertions of such liability (including most notably *Santa Monica* and *Dinuba*, as well as many others, I am informed) have settled before trial.

25.     Given the extensive discovery that is already available on the nature and behavior of MTBE, as well as the industry's early notice and knowledge of the hazards of MTBE, I anticipate that the remaining discovery in the California Actions will focus predominantly on local and site-specific issues such as product identification (*i.e.* whose MTBE and/or gasoline containing MTBE was delivered to release sites affecting the respective water supplies and/or

groundwater resources at issue in each Action), the extent of contamination in the relevant drinking water supplies and/or groundwater resources, and what it will cost to clean it up. Although some further, generally applicable discovery on liability may be necessary, localized issues will unquestionably predominate in each Action.

26.     I understand that on December 19, 2003, the Hon. Shira A. Scheindlin, the presiding judge in *Original MDL 1358*, held a hearing in connection with several recently-filed MTBE cases filed by New York water purveyors that were removed to federal court and assigned to her courtroom. At that hearing, the parties present before Judge Scheindlin (which did not include Plaintiffs in any of the California Actions) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties they represented to MDL No. 1358 for the same purposes. A true and correct copy of the reporter's transcript of the December 19, 2003 hearing before Judge Scheindlin is attached hereto as Exhibit 10.

27.     On December 23, 2003, Judge Scheindlin issued an Order stating that remand motions in "similar removed actions, wherever filed" should be heard as part of MDL No. 1358. The Order is expressly based "upon stipulations there agreed to on the record by the parties present." A true and correct copy of the Judge Scheindlin's December 23, 2003 Order is attached hereto as Exhibit 11.

28.     Plaintiffs here had no opportunity to participate in the December 19, 2003 hearing, were not a party to the stipulations on which Judge Scheindlin's Order is based, and have not agreed to any transfer of this action to MDL No. 1358.

29. On January 5, 2004, I sent a letter to Judge Scheindin on behalf of Plaintiffs (not including Orange County Water District), indicating that Plaintiffs intended to oppose transfer of their respective Action to MDL No. 1358 if and when a conditional transfer order was issued. A true and correct copy of my January 5, 2004 letter to Judge Scheindlin (without attached service list) is attached hereto as Exhibit 12.

30. On January 27, 2004, I sent a second letter to Judge Scheindin on behalf of Plaintiffs (including Orange County Water District), reiterating that Plaintiffs intended to oppose transfer of their respective Actions to MDL No. 1358 if and when a conditional transfer order was issued (and offering Plaintiff's views on the motions to remand pending before Judge Scheindlin). A true and correct copy of my January 27, 2004 letter to Judge Scheindlin (without attached service list) is attached hereto as Exhibit 13.

31. On February 13, 2004, I understand that Judge Scheindlin held oral argument on the remand motions pending before her. Plaintiffs in the California Actions had no opportunity to participate in that hearing, as their respective Remand Motions were not (and are not) before Judge Scheindlin. A true and correct copy of the reporter's transcript of the February 13, 2004 hearing before Judge Scheindlin is attached hereto as Exhibit 14.

32. A true and correct copy of Judge Scheindlin's March 16, 2004 Opinion and Order denying the remand motions before her is attached hereto as Exhibit 15.

///

///

///

///

///

33. A true and correct copy of an internet web page published by the California Energy Commission entitled *Question & Answers: California Gasoline Price Increases*, updated March 5, 2004 (http://www.energy.ca.gov/gasoline/gasoline_q-and-a.html) is attached hereto as Exhibit 16.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 24th day of March, 2004, at San Francisco, California.

VICTOR M. SHER

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

MAR 26 2004

FILED CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE:**

**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION**

MDL Docket No. 1358

This Document Relates to:
**MDL Docket No. 1358**

This Document Relates to:

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

**PROOF OF SERVICE**

2004 MAR 26 A 10: 30

RECEIVED CLERK'S OFFICE

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN FRANCISCO )

*People of the State of California, et al. v. Atlantic Richfield Co., et. al.*, 03-2653 GEB DAD (E.D.Cal.);

*Orange County Water District v. Unocal, et al.*, 03-1742 JVS (ANx) (C.D. Cal.);

*City of Riverside v. Atlantic Richfield Co., et al.*, 04-53 JVS (ANx) (C.D. Cal.);

*Quincy Comm. Serv. Dist. v. Atlantic Richfield Co., et al.*, 03-2582 LKK DAD (E.D. Cal.);

*City of Roseville v. Atlantic Richfield Co., et al.*, 03-2601 MCE GGH (E.D. Cal.);

*Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 03-2408 WQH (S.D. Cal.)

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to this action. My business address is 450 Mission Street, Suite 500, San Francisco, CA 94105.

On **MARCH 25, 2004**, I served the following documents described as:

1. PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-5) AND BRIEF IN SUPPORT THEREOF
2. STATEMENT OF REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD RE: PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-5)
3. DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-5)
4. SCHEDULE RE: INVOLVED ACTIONS

[ X ] by placing true copies thereof in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

[ X ] (**BY MAIL**) I caused to such envelope to be deposited in the mail at San Francisco, California with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit. Executed on **MARCH 25, 2004**, at San Francisco, California.

[ X ] **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

RECEIVED
CLERK'S OFFICE
2004 MAR 26 A 10:30

Julie Choate

SCHEDULE OF ACTIONS AND PANEL SERVICE LIST (Excerpted from CTO-5)
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

Central District of California
*City of Riverside v. Atlantic Richfield Co., et al.,* C.A. No. 8:04-53
*Orange County Water District v. Unocal, et al.,* C.A. No. 8:03-1742

Eastern District of California
*Quincy Community Services District v. Atlantic Richfield Co., et al.,* C.A. No. 2:03-2582
*City of Roseville v. Atlantic Richfield Co., et al.,* C.A. No. 2:03-2601
*People of the State of California, et al. v. Atlantic Richfield Co., et. al.,* C.A. No. 2:03-2653

Southern District of California
*Martin Silver, et al. v. Alon USA Energy, Inc., et al.,* C.A. No. 3:03-2408

Jon D. Anderson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Ronit C. Barrett
Eimer, Stahl, Klevorn & Solberg LLP
224 S. Michigan Avenue
Suite 1100
Chicago, IL 60604

Patrick E. Caffety, Jr.
Munger, Tolles & Olson
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560

Lawrence Allen Cox
Arnold & Porter LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017

Mindy G. Davis
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Russ Detrick
Sacramento County District Attorney
Environmental Protection Division
901 G Street, Suite 700
Sacramento, CA 95814

Brendan M. Dixon
Unocal Corporation
376 S. Valencia Avenue
Brea, CA 92626

Robert P. Doty
Cox, Castle & Nicholson LLP
555 Montgomery Street
15th Floor
San Francisco, CA 94111-2585

Colleen P. Doyle
Bingham & McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Taylor M. Florence
Bullivant, Houser, Bailey, et al.
11335 Gold Express Drive
Suite 105
Goldriver, CA 95670-4491

Pamela R. Hanebutt
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Matthew T. Heartney
Arnold & Porter LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017

Alan J. Hoffman, Jr.
Blank Rome LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105

Michele D. Johnson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Joseph Conrad Kearfott
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Ben M. Krowicki
Bingham & McCutchen LLP
One State Street
Hartford, CT 06103-3178

John J. Lyons
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Bruce W. Felmly
McLane, Graf, Raulerson & Middleton
900 Elm Street
PO Box 326
Manchester, NH 03105-0326

Christopher J. McNevin
Pillsbury Winthrop LLP
725 South Figueroa Street
Suite 2800
Los Angeles, CA 90017-2513

Alison N. Shue
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

Thomas J. Pappas
Wiggin & Nourie PA
PO Box 808
Manchester, NH 03105-0808

Catherine Noel Mitchell
Morgan Lewis & Bockius LLP
300 S. Grand Avenue
22nd Floor
Los Angeles, CA 900071-3132

Catherine M. Stites
Bingham & McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106

Elizabeth E. Skilling
Harman, Claytor, Corrigan and Wellman
PO Box 70280
Richmond, VA 23255

Jeffrey John Parker
Sheppard, Mullin, Richter & Hampton
333 South Hope Street
Suite 4800
Los Angeles, CA 90071-1448

William D. Temko
Munger, Tolles & Olson
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071

Mark L. Tripp
Bradshaw Law Firm
800 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein LLP
780 Third Avenue
48th Floor
New York, NY 10017

Peter John Wilson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Mark E. Tully
Goodwin Procter, LLP
Exchange Place, 2nd Floor
Boston, MA 02109

Lila Pankey Ray
Baker & Botts
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400

Christopher F. Wong
Bryan Cave LLP
120 Broadway
Suite 300
Santa Monica, CA 90401

John Val Wachtel
Klenda, Mitchell, Austerman & Zuercher LLC
1600 Epic Center, 301 N. Main
Wichita, KS 67202

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
Bracewell & Patterson LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002

Michael T. Zarro
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

Edward Romero
Greenan, Peffer, Sallander & Lally LLP
Two Annabel Lane
Suite 200
PO Box 10
San Ramon, CA 94583

Craig J. de Recat
Manatt Phelps & Phillips
11355 W. Olympic Boulevard
Los Angeles, CA 90064-1614

David L Schrader
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

SENT BY COURIER TO BE FILED IN THE FOLLOWING COURTS:

Central District of California
*City of Riverside v. Atlantic Richfield Co., et al.,* C.A. No. 8:04-53
*Orange County Water District v. Unocal, et al.,* C.A. No. 8:03-1742
United States District Court for the Central District of California
Santa Ana Division
Ronald Reagan Federal Building, U.S. Courthouse
411 W. Fourth Street, Suite I-053
Santa Ana, CA 92701-4516

Eastern District of California
*Quincy Community Services District v. Atlantic Richfield Co., et al.,* C.A. No. 2:03-2582
*City of Roseville v. Atlantic Richfield Co., et al.,* C.A. No. 2:03-2601
*People of the State of California, et al. v. Atlantic Richfield Co., et. al.,* C.A. No. 2:03-2653
United States District Court for the Eastern District of California
Sacramento Division
501 "I" Street, Room 4-200
Sacramento, CA 95814

Southern District of California
*Martin Silver, et al. v. Alon USA Energy, Inc., et al.,* C.A. No. 3:03-2408
United States District Court for the Southern District of California
U.S. Courthouse
880 Front Street, Suite 4290
San Diego, CA 92101-5600



# NOTICE

**PLEASE SEE OFFICIAL FILES**
**FOR**

**MDL-1358**
**PLEADING 118**
**EXHIBITS 1-7 (out of 17)**

March 30, 2004

Michael J. Beck
CLERK OF THE PANEL

# Exhibit 8

ORIGINAL

FILED
San Francisco County Superior Court

APR 1 5 2002

GORDON PARK-LI, Clerk
BY: [signature]
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION

DEPARTMENT NO. 514

| | |
|---|---|
| SOUTH TAHOE PUBLIC UTILITY DISTRICT,<br>Plaintiff,<br>vs.<br>ATLANTIC RICHFIELD COMPANY, et al.,<br>Defendants. | CASE NO. 999128<br><br>**SPECIAL VERDICT [PHASE I]**<br>(3/4/02) |

We, the jury in the above-entitled action, find as follows on the questions submitted to us:

117-001_0064027

**Question No. 1:** Was gasoline containing MTBE manufactured, sold, or supplied by any of the following defendants defective in design because the risk of harm inherent in its design outweighed the benefits of that design?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

Answer:

| | Yes | No | If yes, time period |
|---|---|---|---|
| 1-1 Shell Oil Company | ✓ | ___ | Fall/Winter 1990 to 12-31-97 |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-98 to Present |
| Texaco, Inc. | ✓ | ___ | 1988 to 12-31-1997 |
| 1-3 Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

If you answer "no" as to each defendant, then go to question No. 3. If you answer "yes" as to one or more defendants, then answer the next question only as to such defendants.

**Question No. 2:** As to each defendant for which you answered "yes" in Question No. 1, did the defect exist when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" for each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

Answer:

| | Yes | No | If yes, time period |
|---|---|---|---|
| 2-1 Shell Oil Company | ✓ | ___ | Fall/Winter 1990 to 12-31-1997 |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-1998 to Present |
| Texaco, Inc. | ✓ | ___ | 1988 to 12-31-1997 |
| 2-3 Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

117-001_0064028

**Question No. 3:** Was gasoline containing MTBE manufactured, sold or supplied by any of the following defendants defective because of a failure to warn?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

Answer:

| | Yes | No | If yes, time period |
|---|---|---|---|
| 12-0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12-31-1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1-1-1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12-31-1997 |
| 10-2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

**Question No. 4:** As to each defendant for whom you answered "yes" in Question No. 3, did the defect exist, because of a failure to warn, when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

Answer:

| | Yes | No | If yes, time period |
|---|---|---|---|
| 12-0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12-31-1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1-1-1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12-31-1997 |
| 10-2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

\\\

\\\

\\\

117-001_0064029

**Question No. 5:** Were the risks involved in the transportation, storage and handling of MTBE recognized by all of Lyondell Chemical Company's (ARCO Chemical Company's) California refiner and distributor customers, who transported, stored and handled MTBE in bulk? If not, during what time period were the risks not recognized?

Answer "yes" or "no." If you answer is "no," state the time period.

| | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 12-0 ___ | ✓ | 1992 to 1996 |

If you answered "no" to Question No. 5, then answer Question No. 6. If you answered "yes" to Question No. 5, then answer Question No. 9.

**Question No. 6:** Was MTBE manufactured, sold or supplied by defendant Lyondell Chemical Company (ARCO Chemical Company) defective because of a failure to warn?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | 1992 to 1996 |

If you answered Question No. 6 "yes", answer Question No. 7. If you answered Question No. 6 "no", answer question No. 9.

**Question No. 7:** Did the defect exist, because of a failure to warn, when the MTBE left the possession of defendant Lyondell Chemical Company (ARCO Chemical Company)?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | 1992 to 1996 |

If you answered Question No. 7 "yes", answer Question No. 8. If you answered Question

117-001_0064030

No. 7 "no", answer question No. 9.

**Question No. 8:** Were the warnings of defendant Lyondell Chemical Company (ARCO Chemical Company) to all of its customers, as described in Question No. 5, above, adequate to make those customers aware of the risks and how to avoid or reduce such risks? If not, during what time period were such warnings of Lyondell Chemical Company (ARCO Chemical Company) inadequate?

Answer "yes" or "no." If you answer "no," state the time period.

| | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 11-1 ___ | ✓ | 1987 to 1996 |

**Question No. 9:** If you answered "yes" to both Question No. 1 and Question No. 2 as to defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both Question No. 1 and Question No. 2 as to Shell Oil Company, then go to Question No. 10.

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with malice in selling gasoline containing MTBE that was defective in design because the risk of harm inherent in the design outweighed the benefits of that design?

Answer "yes" or "no". If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | Fall/winter 1990 to 12-1997 |

\\\

\\\

\\\

\\\

\\\

\\\

117-001_0064031

**Question No. 10:** If you answered "yes" to both Question No. 3 and Question No. 4 as to defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both Question No. 3 and Question No. 4 as to Shell Oil Company, then go to Question No. 11.

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with malice in selling gasoline containing MTBE that was defective in design because of a failure to warn?

Answer "yes" or "no." If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | Fall/winter 1990 to 12-1997 |

**Question No. 11:** If you answered "yes" to both Question No. 6 and Question No. 7 and "no" to both Question No. 5 and Question No. 8, answer the question below. If you did not answer "yes" to both Question No. 6 and Question No. 7 and "no" to both Question No. 5 and Question No. 8, please sign and return this form.

Do you find by clear and convincing evidence that defendant Lyondell Chemical Company (ARCO Chemical Company) acted with malice in selling MTBE that was defective in design because of a failure to warn?

Answer "yes" or "no." If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | 1987 to 1996 |

DATED: April 15, 2002

[signature]
JURY FOREPERSON

117-001_0064032

# Exhibit 9

RECEIVED CHAMBERS OF
MAY 30
JUDGE SCHEINDLIN
U.S. DISTRICT COURT FILED JUN - 1 2001 S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---x

**In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation**

MDL No. 1358
M21-88
Master File C.A. No. 1:00-1898 (SAS)

DOC # 20

Confidentiality Agreement & Order

RECEIVED CHAMBERS OF
MAY 30
JUDGE SCHEINDLIN

---x

## I. DEFINITIONS

A. This Action

As used in this Confidentiality Agreement and Order ("Order"), the term "THIS ACTION" shall refer to MDL 1358, In re: Methyl Tertiary Butyl Ether Products Liability Litigation and cases currently (Berisha and England) and to be consolidated under this MDL including any retrial or appeal of the cases.

B. Document(s), Information, or Other Thing(s)

As used in this Order, the term "DOCUMENT(S), INFORMATION, OR OTHER THING(S)" includes, but is not limited to interrogatory responses; responses to requests for production of documents and things; responses to requests for admissions; deposition testimony upon oral or written examination; deposition exhibits; motions; affidavits; exhibits; and any other writings made available or produced by the parties and/or submitted to the Court during THIS ACTION.

C. Days

As used in this Order, the terms "DAY" or "DAYS" shall mean calendar days.

MICROFILM
JUN - 1 2001 -3 00 PM

D. Produced or Disclosed

As used in this Order, the term "PRODUCED OR DISCLOSED" includes, without limitation, all DOCUMENT(S), INFORMATION, OR OTHER THING(S) made available or produced by any party and/or submitted to the Court in THIS ACTION.

E. Persons

The terms "PERSON" or "PERSONS" include a natural PERSON, firm, association, organization, partnership, business trust, corporation, or public entity.

## II. AGREEMENT AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED by the parties hereto that with respect to DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs in THIS ACTION or Defendants in THIS ACTION, including Amerada Hess Corporation, Atlantic Richfield Company, BP Amoco Corporation; Chevron U.S.A., Inc., CITGO Petroleum Corporation; El Paso CGP Company ~~The Coastal Corporation, Coastal Oil New York, Inc.~~, Conoco, Inc., Equilon Enterprises LLC, Exxon Corporation, Mobil Oil Corporation, Motiva Enterprises LLC, Phillips Petroleum, Shell Oil Company, Shell Oil Products Company; Sunoco Inc. (R&M), Texaco Inc., Texaco Refining and Marketing Inc., Tosco Corporation, United Refining Company, and Valero Marketing and Supply Company (collectively "Defendants"), the following terms, conditions, and restrictions shall govern:

A. This Order shall apply to all DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or Defendants.

B. Confidential Document(s), Information, or Other Thing(s). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) PRODUCED OR DISCLOSED by Plaintiffs or

Defendants which are stamped "Confidential" or "Proprietary" or "Confidential Materials – For Outside Counsel Only" shall be deemed "CONFIDENTIAL" subject to this Order. For purposes of this Order, "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" shall include DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are reviewed by an attorney, are stamped as "Confidential" or "Proprietary" and which are or contain a trade secret or other confidential research, development, or commercial information as those terms are used in Rule 26(c)(7) of the Federal Rules of Civil Procedure, including any copies, summaries, portions or abstracts thereof. CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) does not include DOCUMENT(S), INFORMATION, OR OTHER THING(S) (i) which are available or become available to the public other than through violation of this Order; (ii) that, at the time of production, the receiving party already possesses (for documents and things) or knows (for information), as evidenced by written documentation, and were obtained by that party without an obligation of confidentiality; (iii) that the receiving party rightfully received from a third party without an obligation of confidence; or (iv) that the receiving party develops independently through PERSONS who have had no access to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S). All DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are stamped as "Confidential" or "Proprietary" shall be treated as "CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)" subject to this Order pending further order of the Court. The party asserting the confidentiality claim shall stamp, print, or write the term "Confidential" or "Proprietary" on at least the first page of any such document to be viewed only. With respect to documents selected and to be sent to the document depository, every page of such "Confidential" or "Proprietary" documents shall be so stamped, printed or written .

Any documents which are produced by a party which are not stamped as "Confidential" or "Proprietary" will not be subject to this Order unless otherwise agreed by the parties. The producing party shall make a good faith effort to notify the propounding party in writing of the production of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and the location of such materials if possible to denote. "CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY" shall mean, and be limited to, CONFIDENTIAL MATERIALS which pertain to: (i) recent and future business and marketing plans and activities; and (ii) recent and future research and development activities.

C. The parties and any counsel who execute this agreement or agrees to be bound to its terms, hereby agree that all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) may not be used, disseminated or disclosed outside of THIS ACTION except as set forth in Paragraph D, subsection b and Paragraph E, below.

D. CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced in THIS ACTION shall not be disseminated or disclosed to any PERSON except:

a. Plaintiffs, their respective counsel and employees including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Plaintiffs in connection with the prosecution and preparation for trial of THIS ACTION, or Defendants, their respective counsel and employees, including stenographic and clerical personnel, whose advice, consultation or assistance are being or will be used by Defendants in connection with the defense and preparation for trial of THIS ACTION;

b. To an attorney of record in an action where the complaint alleges that the manufacture, distribution or sale of gasoline containing MTBE violates statutory or common law ("MTBE actions") and where the attorney provides written notice to counsel representing the

party whose CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) are being reviewed that: (i) he has read this agreement and agrees to be bound by its terms by executing a separate copy of this agreement; (ii) identifies each CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) reviewed; (iii) he agrees to submit to the jurisdiction of the Court in the Southern District of New York should any disputes arise under this agreement; (iv) in the event that the OTHER MTBE ACTION continues after this MDL terminates, the Court in the Southern District of New York shall maintain continuing jurisdiction to enforce this agreement until the end of the OTHER MTBE ACTION; and (v) he agrees to comply with the return or destroy provision of Paragraph J of the agreement at the conclusion of the OTHER MTBE ACTION. Such attorney may then make use of the CONFIDENTIAL DOCUMENTS, INFORMATION OR OTHER THING(S) consistent with all limitations and controls set forth herein;

c. The Court, and those employed by the Court, in which event the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be filed under seal consistent with this Order, and kept under seal until further order of the Court;

d. Court reporters who record the depositions or other testimony in THIS ACTION;

e. Outside experts, consultants, witnesses or potential witnesses for Plaintiffs or Defendants, including their stenographic and clerical personnel, whose advice and consultation are being or will be used by any party in connection with the prosecution or defense of THIS ACTION, or their preparation for trial of THIS ACTION, and who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A;

f. A deponent and the deponent's counsel who have agreed in writing to be bound by this Order by executing a copy of the agreement attached hereto as Exhibit A, but only during the course of the deposition in THIS ACTION, or to the extent reasonably necessary in the preparation for such deposition; and

g. Any other PERSON or entity upon order of the Court, upon stipulation of the parties, or upon the express written agreement of the producing party.

E. CONFIDENTIAL MATERIALS - FOR OUTSIDE COUNSEL ONLY produced in THIS ACTION may be disclosed only to the following:

a. Outside counsel for a party engaged in the conduct of THIS ACTION, and any legal support personnel and outside experts and consultants of such counsel;

b. The Court, and those employed by the Court, in which event the CONFIDENTIAL MATERIALS shall be filed under seal consistent with this Order, and kept under seal until further order of the Court; and

c. Any other PERSON or entity upon order of the Court, upon stipulation of the PARTIES, or upon the express written agreement of the PRODUCING PARTY.

F. Nothing in this Order shall require Plaintiffs or Defendants, or their respective counsel and employees, including stenographic and clerical personnel, to execute a copy of Exhibit A when testifying as to their own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

G. Nothing in this Order shall prohibit a PERSON from releasing its own CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) as it sees fit, and such release shall not constitute a waiver of any of the terms of this Order unless the release is made to the public domain.

H. No PERSON receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall disclose said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other PERSON, except as permitted by and in accord with this Order.

I. The following Court procedures shall apply with respect to use of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S):

a. Said CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) which are submitted to the Court shall be filed with the Court in sealed envelopes or other appropriate sealed containers on which shall be endorsed the title of this action , an indication of the nature of the contents of the sealed envelope or other container, the word "CONFIDENTIAL," and a statement substantially in the following form: "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court." In the case of CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY, the label shall state as follows: "CONFIDENTIAL MATERIALS – FOR OUTSIDE COUNSEL ONLY" and a statement substantially in the following form: "This envelope is sealed pursuant to order of this Court, contains confidential information, and is not to be opened or the contents revealed except by order of the Court."

A copy of this Order shall be submitted to the Court, together with any materials submitted under seal. Any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) filed with or submitted to the Court pursuant to this section shall be returned to the submitting party or destroyed in compliance with Paragraph J herein if the Court does not

remove the confidential status from the DOCUMENT(S), INFORMATION, OR OTHER THING(S).

b. In the case of depositions upon oral examination, if counsel for a party has a reasonable and good faith belief that any question or answer contains or refers to CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), counsel may state on the record, and request that all pages that include such CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) be marked CONFIDENTIAL. When testimony designated CONFIDENTIAL is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall be excluded from the deposition. Transcripts containing testimony or exhibits designated as containing CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall be marked by the court reporter, prior to transcript distribution, with the legend "THIS TRANSCRIPT CONTAINS CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S)," and shall be treated in accordance with the provisions of this Order. In addition to designating, during the deposition, any question or answer as CONFIDENTIAL, counsel may designate any portion of the deposition transcript as a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at any time within ten (10) DAYS of receiving the deposition transcript from the court reporter. Notice of such designation shall be made in writing to the court reporter, with copies to all counsel in THIS ACTION, specifying the portion(s) of the transcript and exhibits that constitute or contain CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S). Until expiration of the ten (10) DAY period described above, all deposition transcripts shall be considered and treated as though containing CONFIDENTIAL

DOCUMENT(S), INFORMATION, OR OTHER THING(S), unless otherwise agreed on the record at the deposition.

J. Within thirty (30) DAYS after the expiration of the last applicable deadline for the last permitted appeal, rehearing, or reconsideration related to THIS ACTION, CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) produced pursuant to this Order shall be returned to counsel of record of the party who provided the information, or the party receiving CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall have the option of destroying all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) and providing an affidavit from its counsel of record to the designating party that the party in possession of the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) has destroyed it.

K. Any party hereto may challenge the claim of confidentiality of any materials by notifying counsel for the party claiming confidentiality in writing of the basis of their challenge to the claim. Counsel for the party claiming confidentiality will respond in writing within ten (10) DAYS, and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such decision have been concluded, the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking the confidential designation.

L. No party shall disclose any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) to any other party except as provided herein, and

except as may be required by applicable law or legal process. All parties shall take reasonable steps to keep an accurate record of the location of and insure proper and secure storage of all CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S).

M. Any inadvertent disclosure of any CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not be a violation of this Order. The inadvertent disclosure of a CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) shall not constitute a waiver of any otherwise applicable privilege, either as to the CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) so produced or as to any other CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) withheld under a claim of privilege. If any party is responsible for any inadvertent disclosure, that party will take all reasonable steps to remedy the inadvertent disclosure, including, but not limited, to retrieving all copies of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S), and informing the recipients of such DOCUMENT(S), INFORMATION, OR OTHER THING(S) of its CONFIDENTIAL nature.

N. Any party hereto that has the claim of alleged improper disclosure of CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) or any other alleged violation of this Order shall notify counsel for the party making the alleged improper disclosure or other alleged violation of this Order in writing of the basis of their claim. Counsel for the party making the alleged improper disclosure or other alleged violation of this Order will respond in writing within ten (10) DAYS and the parties will meet and confer to resolve the dispute. If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution. Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such alleged violations have been concluded, the

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: Lewis Saul
LEWIS J. SAUL & ASSOCIATES, P.C.
501 Wisconsin Avenue, N.W., Suite 550
Washington, D.C. 20015
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: [signature]
LEWIS J. SAUL & ASSOCIATES, P.C.
183 Middle Street, Suite 200
Portland, ME 04101
*Attorneys for Plaintiff*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: ______________________

WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 17th Floor
New York, NY 10083
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: ______________________
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April __, 2001

By: A. Hoyt Rowell III
NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE
28 Bridgeside Boulevard
Mt. Pleasant, S.C. 29464
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: ~~April~~ May 11, 2001

By: [signature]
LAW OFFICES OF MASRY & VITITOE
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April __, 2001

By: [signature]
ROUNDTREE & SEAGLE, LLP
2419 Market Street
P.O. Box 1409
Wilmington, N.C. 28402-1409
*Attorneys for Plaintiffs*

05/09/01 WED 17:10 [TX/RX NO 9344]

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April __, 2001

By: [signature]
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By:________________________
CARR, KOREIN, TILLERY, KUNIN, MONTROY, CATES, CATZ & GLASS
10 Executive Woods Court
Swansea, IL 62226
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: ~~April~~ May 16, 2001

By: [signature]
MILLER SHER & SAWYER
100 Howe Avenue, Suite S0120
Sacramento, CA 95825-5407
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: ______________________
WHATLEY DRAKE, LLC
1100 Financial Center
505 North 20th Street
Birmingham, AL 35203-2605
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 25, 2001

By: ______________________
REICH & BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX 77027
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April __, 2001

By:____________________
CROWLEY & DOUGLASS
3500 Chevron Tower
1301 McKinney Street
Houston, TX 77010
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 30, 2001

By: Goodkind Labaton Rudoff & Sucharow LLP
Goodkind Labaton Rudoff & Sucharow LLP
100 Park Avenue, 12th Floor
New York, New York 10017
*Attorneys for Plaintiffs*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: Edward A. Cohen
THOMPSON COBURN LLP
One Firstar Plaza, Suite 3300
St. Louis, Missouri 63101
*Attorneys for Defendants Conoco Inc., Chevron U.S.A., Inc., and Exxon Mobil Corporation*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601-6636
*Attorneys for Defendants Atlantic Richfield Company, BP Amoco Corporation, Amoco Oil Company*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]

~~SANDBERG, PHOENIX & VON GONTARD~~ Howrey Simon Arnold & White, LLP
~~One City Centre - 15th Floor~~ 1299 Pennsylvania Ave. NW
~~St. Louis, Missouri 6311-1880~~ Washington, DC 20004
*Attorneys for Defendant Phillips Petroleum Company*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 24, 2001

By: [signature]
WALLACE KING MARRARO & BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007
*Attorneys for Defendants Equilon Enterprises, LLC, Motiva Enterprises, LLC, Shell Oil Company, Shell Oil Products Co., Texaco Inc. and Texaco Refining and Marketing Inc.*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 2, 2001

By: [signature]
EIMER STAHL KLEVORN & SOLBERG
122 South Michigan Avenue
Suite 1776
Chicago, Illinois 60603
*Attorneys for Defendant*
*CITGO Petroleum Corporation*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: ______________________

BAKER BOTTS, L.L.P.
599 Lexington Avenue
New York, New York 10022
*Attorneys for Valero Marketing and Supply Company*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W., Suite 700
Washington, DC 20005
*Attorneys for Defendant Sunoco, Inc.* (R&M)

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]
HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
*Attorneys for Defendant* ~~The Coastal Corporation~~ El Paso CGP Company

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26 2001

By: ______________________
GOODWIN PROCTER LLP
1285 Avenue of the Americas
New York, New York 10019
*Attorneys for Defendant United Refining Company*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature] for StSHLaf
STROOCK STROOCK & LAVAN, LLP
180 Maiden Lane
New York, New York 10038-4982
*Attorneys for Defendant Tosco Corporation*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]

HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202-783-0800
202-383-6610 (FAX)
*Attorneys for Defendant Phillips Petroleum Company*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]
HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
*Attorneys for Defendant Amerada Hess Corporation*

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: [signature]
HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
*Attorneys for Defendant* ~~Coastal Oil New York, Inc.~~ El Paso CGP Company

CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: April 26, 2001

By: ______________________

McDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
*Attorneys for Defendants Exxon Mobil Corporation, Exxon Corporation and Mobil Oil Corporation*



CONFIDENTIAL DOCUMENT(S), INFORMATION, OR OTHER THING(S) at issue in the dispute shall continue to be deemed "CONFIDENTIAL" under the terms of this Order. This Order does not affect the burden of proof which remains with the party seeking to protect the confidential designation and/or otherwise remedy the alleged violation of this Order.

O. It will be in the Court's sole discretion to award costs and appropriate attorney's fees to the prevailing party in any dispute over alleged improper and knowing and/or intentional disclosure of CONFIDENTIAL DOCUMENTS, INFORMATION, OR OTHER THING(S); alleged erroneous designations of documents as "Confidential" or "Proprietary"; or any other matters arising under this agreement which constitute knowing and/or intentional violations.

P. The Court shall retain jurisdiction over the enforcement of this agreement notwithstanding the termination of MDL No. 1358.

Dated: ~~April __, 2001~~ May 30, 2001

SO ORDERED:

HON. SHIRA A. SCHEINDLIN
United States District Court
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

MDL No. 1358

Master File C.A. No. 1:00-1898 (SAS)

---

**CONFIDENTIALITY AGREEMENT AND ORDER**

McDERMOTT, WILL & EMERY

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

50 ROCKEFELLER PLAZA

NEW YORK, NEW YORK 10020

(212) 547-5400

# Exhibit 10

3CJLMTBC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: MTBE, et al. 00 MDL 1358 (SAS)
------------------------------x

IN RE:
County of Nassau, et al.,
-against-
Ameroda Hess, et al. 93 CV 9543 (SAS)
------------------------------x

New York, N.Y.
December 19, 2003
10:17 a.m.

Before:

HON. SHIRA A. SCHEINDLIN,

District Judge

APPEARANCES

WEIRZ & LUXEMBERG
Attorneys for Plaintiffs Nassau County, et al.
BY: SANDERS MCNEW
ROBERT GORDON
STANLEY ALPERT

NAPOLI, KAISER & BERN, LLP
Attorneys for Plaintiffs Village of Mineola, et al.
BY: MARC JAY BERN
TOM RALEIGH

MCDERMOTT, WILL & EMERY
Attorneys for Defendant Exxon Mobil
BY: PETER JOHN SACRIPANTI
JAMES PARDO

EIMER, STAHL, KLEVORN & SOLBERG
Attorneys for Defendant Citgo Petroleum
BY: NATHAN P. EIMER

APPEARANCES (cont.)

J. ANDREW LANGAN
Attorney for Defendants BP Products, et al.

WALLACE, KING, MARRARO & BRANSON
Attorneys for Defendants Chevron, USA, et al.
BY: RICHARD E. WALLACE, JR.

PATTON, BOGGS
Attorneys for Defendant Texaco, Inc.
BY: ROBERT JONES

BEVERIDGE & DIAMOND

Attorneys for Defendants Sunoco, Inc., et al.
BY: HEATHER FUSCO

LATHAM & WATKINS
Attorneys for Defendants Conoco and Getty
BY: JOHN McGAHREN

GOODWIN, PROCTER, LLP
Attorneys for Defendant Gulf Oil Ltd. Partnership
BY: CHRISTOPHER J. GARVEY

BLANK, ROME, LLP
Attorneys for Defendant Lyondell Chemical Company
BY: MICHAEL J. ROESSNER

HOWREY, SIIMON, ARNOLD & WHITE
Attorneys for Defendants Ameroda Hess, et al.
BY: MINDY G. DAVIS

HUNTON & WILLIAMS
Attorneys for Defendant Koch Industries
BY: LAUREN ROSENBLATT

* CONFERENCE *

(Case called)

THE COURT: Mr. McNew?

MR. MCNEW: Good morning, your Honor.

THE COURT: Mr. Gordon?

MR. GORDON: Good morning.

THE COURT: Mr. Alpert?

MR. ALPERT: Good morning, your Honor.

MR. BERN: Good morning, your Honor.

MR. RALEIGH: Good morning, your Honor.

THE COURT: Good morning, Mr. Bern, Mr. Raleigh. Mr. Sacripanti?

MR. SACRIPANTI: Good morning, your Honor.

THE COURT: Mr. Eimer?

MR. EIMER: Good morning, your Honor.

THE COURT: Mr. Pardo.

MR. PARDO: Good morning, your Honor.

THE COURT: Mr. Langan?

MR. LANGAN: Good morning, your Honor.

THE COURT: Mr. Wallace?

MR. WALLACE: Good morning, your Honor.

MR. JONES: Good morning, your Honor.

THE COURT: Mr. Jones. And Miss Fusco?

MS. FUSCO: Good morning.

THE COURT: Those are the folks on the seating chart but good morning to the rest of you who aren't on the seating

chart, but are here.

3CJLMTBC

Well, it does seem a bit like a reunion, but that's not why we're here, to have our annual reunion. We're here because there have been filings, a number of remands around the country, state court. There's been removal of those cases to various federal courts around the country.

And there are two in this district: County of Nassau versus Ameroda Hess and Western Nassau Water Authority versus Ameroda Hess. The first one, County of Nassau, 03 CV 9543. And the other one, Water Authority Western Nassau, 03 CV 9544. Now, I'm not even sure that these two cases have been yet assigned to me. They may have been marked as related to the earlier cases pending my accepting them but it wouldn't matter today because I'm also the Part 1 judge.

In any event, you would have been stuck with me today. They are unassigned. So whether they're here as related cases, here as Part 1 cases or here as potentially MDL 1358, it doesn't matter, because it's before me.

So the issue we're here to discuss, I think, is whether this Court should stay consideration of a pending motion to remand, the courtesy copy papers of which we received last night. The plaintiffs are moving to remand these two cases to state court, probably moving to remand cases around the country to state court. The question is whether those motions should be stayed pending the decision by the federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

3CJLMTBC Conference

MDL Panel as to where all removed federal cases should be heard. Should they be heard by one MDL selected judge or should they remain in their many jurisdictions around the country? If these actions are not stayed pending decision of the MDL Panel, of course, the risk is inconsistent rulings on the remand issue. We may have differing remand decisions from federal judges all over the country. If they were stayed pending the MDL Panel's decision as to what to do with these, what appears to be now maybe 40 cases, then the remand decision would be made by the one judge that the MDL Panel selects, if they decide to treated this as an MDL. I think that frames the issue.

The history this week is that I received a letter from the defendants asking for a stay. And I, too quickly, without waiting to hear from the plaintiffs, endorsed it and granted the stay, and then I got a letter from the plaintiffs and said, No, there are good reasons not to grant a stay, and I said, Well, I haven't heard from them, that's true, so I vacated the stay and I invited you all to come in today and discuss this with the thought that I would make a decision at the conference today. So that's where we stand.

My first act, I heard from the one side, I vacated that. I'd like to hear from both sides -- briefly, because I have read your material -- and make a decision. So who would like to be heard? Mr. McNew?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

3CJLMTBC Conference

MR. MCNEW: Thank you, Judge. And thank you for hearing us on short notice. We're grateful for that.

The narrow issue before you this morning, I believe, is: Does it make more sense to hear the remand proceedings in these two cases now or whether it makes sense to stay them pending proceedings in other courts and before the Judicial

Page 3

Panel on Multidistrict Litigation. Whatever the merits of the request to stay in other courts, Judge, we have a difficult time understanding the logic of asking you to stay your decision on these remand motions. Because unlike every other court in the country, you, Judge, are the presiding judge over MDL 1358. And the defendants' papers throughout the country are all identical on this point. They in each case ask that the Court not only remove the stay, they now move to have these matters sent as tag-along actions to MDL 1358 with the expectation, Judge, that these cases come to you through the mechanism of the JPML for decision on a consolidated MDL basis.

Your Honor, while there may be some risk of inconsistent rules in other jurisdictions, the notion that you could enter a ruling today that would be inconsistent with your ruling following a consolidation in MDL 1358 is illogical. And frankly, Judge, if the goal here is to handle this with a minimum of expenditure of federal judicial resources -- and frankly, with a minimum of resources on the part of the parties being expended -- the best thing for you to do is for you to

decide these remand pages now.

THE COURT: That was very interesting; that was very unexpected. I didn't think you were going to argue that. What you're saying is you're going to assume that the MDL Panel will agree to make an MDL decision for all pending cases and refer them to me as part of MDL 1358. And if I knew all that, it would be a fait accompli. There would be no risk of inconsistent rulings around the country because the MDL panel would say all 40 should be MDL, and the MDL should go to Judge Scheindlin.

If all that were to be done today, I promise you, I'd start working on the remand motion Monday. But nobody's done that. I can't anticipate what the Judicial Panel of Multidistrict Litigation will do because nobody invited me to be on the panel and I don't get a vote. So I don't know if they'll do that. Do you know if they'll do that?

MR. MCNEW: Well, your Honor, first, I would note, I'm not sure if it's clear from the papers that have come to chambers, but it is not the defense -- it's not the defendants' tack to say to the JPML that they ought to consider whether there should be an MDL for these cases. They've identified these expressly as tag-along cases to MDL 1358. They've expressly stated in their papers all around the country --

THE COURT: Okay, so the defendants have taken that it should all come here. But what about the various and many

plaintiffs' lawyers around the country?

MR. MCNEW: We are the various plaintiffs lawyers around the country.

THE COURT: You're everybody? What are you all saying to the judicial panel?

MR. MCNEW: If the transfer -- if the JPML decides to transfer them to MDL, absolutely, this is where they belong. No question in my mind.

THE COURT: So you're okay on the second half. But if they're going to be MDL, they're going to be here. What do they think about MDL tree?

MR. MCNEW: I think there's a decision tree here, if the JPML decides that multidistrict litigation isn't warranted here.

THE COURT: Isn't warranted?

MR. MCNEW: Is not warranted here, okay, you still have these two cases before you. You have to decide. So you should decide them now.

THE COURT: Well, then I would know that that's their decision and lots of judges around the country are going to be making these remand decisions. I'll just be one of many. But what is the plaintiffs' position before the panel? Are you saying they should not be treated as MDL or they should be treated as MDL? Which position are the plaintiff's lawyers taking?

MR. MCNEW: Our position -- I just want to make sure we're on the same page -- our position is if they are in the in the federal court, then they absolutely should be in the MDL before your Honor.

THE COURT: If they're in the federal court.

MR. MCNEW: If they remain in federal court, if they're not remanded, then absolutely they belong in this courtroom.

THE COURT: Wait, wait, wait. That is a confusing position. Surely you're seeking remand. I understand this.

MR. MCNEW: We are.

THE COURT: Your first position is they don't belong in the federal court at all. I do understand that.

MR. MCNEW: That's correct.

THE COURT: But before the Judicial Panel on Multidistrict Litigation are you saying, Let's quickly get them MDL, for one federal judge to decide remand, so that if they should go back to state court, according to that one judge, they'll all go back? If that one judge says they shouldn't go back, Well, I guess we've lost that; we can appeal it but we've lost it? So do you want the remand decisions made by as many federal judges as there are around the country or are you not resisting the MDL process so we can get the remand decided at once?

MR. MCNEW: We have decided, your Honor, to try and

have cases remanded before a conditional transfer order comes out. That has been our litigation strategy. We believe that the removals are so facially defective on a jurisdictional ground that it would be more efficient to have them sent down rather than having to go through the laborious process of going through the JPML proceedings.

THE COURT: My guess is you can't beat the process that way, because judges work at various speeds around the country. You're not going to get all the different federal judges to decide remand motions before the Judicial Panel on Multidistrict Litigation gets to decide whether they should be transferred to one judge as part of an MDL or whether they should stay before many judges. I don't think you can beat the system that way. The Judicial Panel on Multidistrict Litigation will hear the issue and will decide.

And I did look quickly or briefly at my own prior

decision and at your moving papers on the remand issue to get a sense of it, and I can certainly say that your papers are not facially frivolous. In other words, it's a serious remand motion.

On the other hand, nor do I think the removals are facially frivolous. There are serious, hard issues to be addressed. It's going to take some work on both sides to figure out -- at least what I think. This is not the kind of motion that can be decided over the weekend. Maybe there are

many judges who are smarter and quicker and they'll do it --

MR. MCNEW: Perhaps on a second reading, Judge.

THE COURT: Whatever. But I didn't get there that fast. For me it will take some work to figure out what to do. So seeing as how I think it's a serious motion raising serious issues on both sides, I don't think it's a good idea to risk many inconsistent verdicts from around the country, and there did seem to be a case in the Second Circuit, I thought this Ivy case, 901 F2d 7, 2d Cir. 1990, the Second Circuit at least seemed to take the position that it be wise to get the MDL process organized first, transfer to one judge, and then the court said:

Once transferred, the jurisdictional objections can be heard and resolved by a single court and reviewed at the appellate level. Consistence as well as economy is thus served. We hold, therefore, the MDL Panel has jurisdiction to transfer a case in which a jurisdictional objection is pending.

And that's exactly this case procedurally. There's a real jurisdictional objection, a very important one. You're saying it should not be in the federal court, should be in the state court. There's no federal jurisdiction. Nothing could be more important.

Rather than have 40 federal judges over and over again struggle with difficult issues of preemption and other things -- not just preemption, there are other questions here

about jurisdiction -- rather than have all that struggling going on, if the panel would make a quick decision, would decide if they want 40 judges to do it or they want one judge to do it, and if so, which one, then your motion will be reached quickly once -- to one side or the other, hopefully quickly -- and then you can get to the merits of what you eventually want to do.

MR. MCNEW: Of course, Judge, this is a decision that's committed to your discretion. And I appreciate the Second Circuit's decision, and certainly we are all guided by it. I would ask the Judge, though, to consider in this particular instance there are extraordinary circumstances that aren't present in the ordinary set of facts. Because in this particular instance, Judge, unlike every other one in the country, by a happy coincidence, we happen to be before the MDL judge. The one judge that we all agree, if this is proper subject for the MDL, we all agree that you're the judge to hear it. It's in their papers. We're here telling you today we absolutely agree with them: You are the person to hear this case.

THE COURT: You are saying to the MDL Panel, while we

Case MDL No. 1358 Document 118 Filed 03/26/04 Page 109 of 232

3CJLMTBC

oppose the MDL treatment, if you're going to MDL, get it to Judge Scheindlin quickly? Is what you're going to say?

MR. MCNEW: Absolutely.

THE COURT: When are they next hearing these things?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

3CJLMTBC Conference

Does anybody know what their schedule is?

MR. LANGAN: Your Honor, Andy Langan. I've been handling the MDL Panel file. The state of play is reflected in our letter.

THE COURT: Give us the timeline.

MR. LANGAN: Traditional transfer orders have not been entered yet. It really depends on what the plaintiffs do. If the plaintiffs object to conditional transfers, once they're entered, it will take awhile. I'm gratified to hear the plaintiffs say they're not apparently intending to object.

THE COURT: They didn't say that. They said if it's going to be treated as an MDL, then they think it belongs in this Court. Their first position before the panel is it should not be MDL, prior to decision on the remand motions around the country.

MR. LANGAN: The MDL Panel routinely overrules that argument. There's 50 or 60 published decisions that say that's not a ground to not MDL. Your Honor is aware of that. There's a ton of cases I think that say that.

But to deflect timing -- the plaintiffs are going to object -- it's going to take a couple of months to sort it all out.

THE COURT: And if they don't object?

MR. LANGAN: It's a matter of weeks, once the conditional transfer orders are out. It's an administrative

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

3CJLMTBC Conference

issue with the panel's office. I can't say why they haven't entered them yet.

MR. MCNEW: Judge, I'd like to finish my point, because I think it's an important one. In fact, I think it's the key of this entire hearing. And it's a simple point, and that is that if we all agree -- we can go down the various decision trees and various outcomes. But at the end of the day, any disposition of the remand issue in a federal forum, if we lose on all the -- you may be right on the -- what happens with the MDL and other courts' willingness to decide it before the MDL. But even in that case, we're all at the end of the day back here, before you on the same papers that you have before you today. And rather than going through this process of ensuring that you do not enter a decision today that is going to be inconsistent with your decision when you decide this in your capacity as an MDL judge --

THE COURT: It's not that inconsistency that's worrying me. It's the inconsistency potentially with the many other judges around the country. Not that I can stay their decision to see whether to proceed or not, but they may be influenced by what I do. You said that when I improvidently signed the defendants' letter --

MR. MCNEW: I never used that word, Judge.

THE COURT: Well, quickly, without hearing from you, when I did that, you pointed out they were circulating it to

SOUTHERN DISTRICT REPORTERS, P.C.
Page 7

Exhibit 10
Page 7 of 19

all these other courts already. Saying even "she" did this.

My point is, if it's going to influence their decision, there's a message I need to send, I think we need to wait for the MDL Panel to decide whether they think this warrants MDL treatment.

But I don't know that what the big consequence of this is -- I'm not sure what the big consequence of this is, because if I were to grant this stay, so to speak, of deciding the remand motion while the MDL Panel works it out -- you know, you don't have a camera planted in my chambers. You're right, eventually I'm going to have to decide whether or not they give MDL treatment. If they do, I've got them all; if they don't, I've got the two new New York ones. So there's still an important signal that needs to be sent that I defer to the MDL Panel to make its decision because in theory they might not do it at all, or they might pick a different judge for whatever reason. I have to respect that. But if I wish to, I can start working now.

MR. MCNEW: Let me make a suggestion, your Honor, because I think there's a way to move this quickly to conserve an awful lot of time and effort in a lot of different foras, and I think you are the key to this because of the unusual circumstance of having these individual cases come to you.

THE COURT: They're only coming to me as related, right? How do I get these? They're marked as related cases.

This wasn't an accident of the wheel.

MR. MCNEW: It was an accident. We filed two in New York Supreme for New York County. There's a story behind that -- that's another story.

THE COURT: Okay.

MR. MCNEW: What I'm trying to get to, Judge, is this: You can -- rather than having us go through a process that will frankly take months -- I have a hard time believing we'll be back here in weeks -- don't stay your own decision on these two cases, and I understand your concern about the message you'll be sending.

THE COURT: Not just the message. In theory -- let's say the MDL Panel decides on MDL treatment but says, for whatever reason, it shouldn't be Judge Scheindlin, she has a lot of work, a lot of other MDL's. We'll select so-and-so? Which they'll have the power to do. Well, I'll have wasted work and we'll never decide these issues.

I don't suspect that's going to happen, because I have the original MDL, 1358, and both the defense and the plaintiffs apparently think I should have it, and yet you never know what a group of federal judges will do. They surprise us every morning. Who knows what they'll do?

So there is a small possibility that I would never have these. If they MDL it and give it to somebody else -- unlikely, but it could happen.

So I still think a stay according to the Second Circuit is the way to go, pending the MDL's decision. I'm not

seeking to delay it. I realize it would be a very important motion to move up the list, though in front of one or two important other motions I have pending.

MR. GORDON: Robert Gordon, your Honor, for the plaintiffs as well. I want to first alert the Court it's not just two cases. Mr. Bern, who's the other plaintiff counsel here, other than Weirz & Luxemberg, just received notice that seven of his cases were removed to you. So you now have nine.

THE COURT: Because they were also in New York County?

MR. BERN: Correct, your Honor.

MR. GORDON: So you now have nine here to you.

I guess my point is: We believe you're the MDL. We believe this is MDL 1358. They're not opposing that.

THE COURT: But you're opposing it. I was told by Mr. McNew you're going to tell the MDL Panel, we do not think you should MDL this until the judges around the country have decided remand. Procedurally, we think remand comes first. I and all these federal judges should decide their own remand motion, even though we realize it could be in Arizona, somebody decides to go remand, and in Connecticut, somebody's going to say not remand. Yet that's our position. Before the MDL. That's what you're saying. You're not saying we see the wisdom of getting it all MDL now so one judge could decide it.

MR. GORDON: We're going to the different federal judges, telling all of them there's no subject matter jurisdiction.

THE COURT: And to decide remand before the MDL Panel acts.

MR. GORDON: But if they say no, I'm going to state this, we, on behalf of our firm, which controls I think 99 percent of the cases -- not 100 percent -- for example, the attorney general of New Hampshire is not our case -- that we will not oppose conditional transfer to you so that we can make the -- get the motion, get the motion on for you to remand it. So we're not going to contest that in the JPMDL decision. We're not going to put questions in MDL that they belong --

THE COURT: You're only going to do that if judges start to stay it, individual judges issue stays pending the decision of the MDL Panel. Then you're going to say, Nobody's going to decide this remand. Get to the MDL Panel, you have our blessing, get it to MDL, get it to Judge Scheindlin, let's get somebody to decide remand. Either way -- we'll take it to an appellate court if we lose; they'll take it to an appellate court if they lose. Let's get going. So if you could get one and instead of waiting for all these judges to either decide remand or stay, why don't you just forgo it?

MR. GORDON: We would not necessarily be opposed to agreeing, since everyone's going to be deferential to you.

There's about 19 other federal judges --

THE COURT: Talk to my children.

MR. GORDON: They are another matter. But federal judges will say, What did the MDL judge do? The proof in the pudding is there: Immediately on your stay, it was to Judge Spatt before anybody could even spell his name. That quickly. I don't want to make it look like we're going to contest that

there's an MDL 1358. We're not going to contest you're the judge and these are tag-alongs. But you want to decide the remands first.

THE COURT: That's not an issue here.

MR. GORDON: No.

THE COURT: Then write a letter to all the judges, say, We changed our position; we now believe it should all be MDL, one judge should decide remand, we're agreeing about the remand, we agree with the conditional tag-along transfer, and I'll go to work on it.

MR. GORDON: We -- they necessarily want to have the files transferred to the JPMDL to do that.

THE COURT: Fine.

MR. GORDON: We'll let them not rule on a stay and let you rule.

THE COURT: You tell them that.

MR. GORDON: We would do that if your Honor would lift this stay and get reply papers from them so you can decide.

Because de facto --

THE COURT: I think we could work something out here.

MR. GORDON: -- your decision would be controlling.

THE COURT: I think we can work something out here. I think all you need to do is talk to your adversaries because you could virtually do it by stipulation. If you're not pressing your individual remand motions around the country but going to a transfer so we can litigate it here, then we can have a briefing schedule and litigate it here. Then it's got to be litigated somewhere. Surely, Mr. Sacripanti, you don't expect it not to be litigated.

MR. SACRIPANTI: No, your Honor.

THE COURT: And you don't want to litigate it before 30 judges, do you?

MR. SACRIPANTI: Your Honor, I don't, but there's one problem with the analysis.

THE COURT: Yes.

MR. SACRIPANTI: They don't control all the cases. And not to quibble with my friend Mr. Gordon, I don't think it's 99 percent.

THE COURT: But how about these five lawyers at the front table?

MR. SACRIPANTI: No, your Honor.

THE COURT: Even that?

MR. SACRIPANTI: There's a slew of cases throughout

the country with other plaintiffs' firms -- California -- that they don't control.

THE COURT: What if they bring them into a stipulation? If they can arrange a stipulation, which is all you want, you would like the remand -- Mr. Sacripanti, you would like the remand motion heard in one court?

MR. SACRIPANTI: Indeed, your Honor.

THE COURT: Work it out. Try to work it out.

MR. SACRIPANTI: We're happy to try to do it. If your Honor would issue a stay in the interim ...

THE COURT: The interim might be five or 10 minutes while I'm taking a criminal case that's waiting to see me. Why

don't you try to talk for a few minutes. Could you talk to other for five or 10 minutes? Leave it at five or 10, because at 11:00 I have to swear in the new citizens. I have to do naturalization.

Why don't you talk five to 10 minutes, really, while I do one criminal case. Then we'll come back and talk some more. If we haven't worked something out, we'll take a break and I'll come back to court and take care of you.

MR. GORDON: Can we leave our stuff?

THE COURT: I think so, sure.

(Recess)

(10:56 a.m.)

MR. SACRIPANTI: Your Honor, we apologize, we didn't

mean to keep you waiting.

THE COURT: That's all right.

MR. SACRIPANTI: We were thinking, your Honor, if you talk to your children with the robe on, they may listen.

THE COURT: Never mind. They've seen that since 1982. It didn't work then.

MR. SACRIPANTI: Your Honor, I think we need a little time.

THE COURT: You want me to go swear in the citizens?

MR. SACRIPANTI: I think we do. I think we need a little time, and we're working in earnest to try and solve this.

THE COURT: If you don't mind, it takes about a half an hour at the most to swear in the new citizens.

MR. GORDON: Can we explain to your Honor what the question is, because it may be that you would or would not consent to or even consider one as an option.

THE COURT: Sure.

MR. GORDON: Our position is, for the plaintiffs, we would waive -- we would agree to a stay, and indeed to your Honor issuing a stay of other courts deciding, if your Honor would create an expedited briefing schedule, get them to reply -- we filed our papers already -- and make a decision on that. And we would support that. In all the cases that we're in, which I do believe they now agree would be somewhere around

90 percent of the nation's cases, I think it's more -- but they have a different proposal, and I'll let them explain it to you. And I need to call cocounsel in the intervening time.

MR. EIMER: Nate Eimer. I think we're very close on this. I think the issue is, one, we would request that your Honor issue the order staying the other cases, which you can under 1358. We're not certain of the effect of that, but that's great; it's helpful. What we would propose is -- what we understand Mr. Gordon's position to be or plaintiffs' position to be is that they don't oppose transfer here and your Honor deciding the remand issue. So what we've asked is that plaintiffs, in addition to this, let us advise the JPML that plaintiffs do not oppose issuance of a conditional transfer order and transfer to your Honor, so we get the process started sweeping these cases up and bring them here. That's the issue Mr. Gordon needs to talk to Mr. Summy about, and if we get that resolved, we have an understanding.

THE COURT: It doesn't sound so --

MR. GORDON: We feel there's no subject matter jurisdiction. I hate to go to any federal judge -- I'd rather have them stay it rather than agree that it should go and get transferred and start to go through the federal system and transfer, when I believe that once your Honor rules as the MDL judge, I believe -- which we still believe you are, and no one's suggesting that you're not, and these are simply

tag-alongs.

MR. MCNEW: Our common desire, your Honor, is that we find a way, so this doesn't become enmired in the process of going through the conditional transfer order process --

THE COURT: I understand.

MR. MCNEW: And to the extent your Honor has thoughts about how we might do that, we would be grateful for your guidance.

THE COURT: Okay.

MR. GORDON: I can't imagine that another fellow judge, if they've been stayed to wait your ruling, then you rule, that they would take a contrary position; and to the extent that the defendants are worried, by the way, about some cases being in state court, some being in federal court, that's almost inescapable.

THE COURT: Yes, exactly.

MR. GORDON: There are existing state cases they've never sought to remove. County of Suffolk, one of the biggest in the country. Passco, Rhode Island, never sought to remove it.

THE COURT: I think you're right, that's inescapable. There are some cases in state court, there are. It's up to them to remove them timely or not. Nothing to be done about that.

But what they do want to avoid, I gather, is many,

many federal rulings which could potentially be inconsistent and in different circuits and different appeal schedules and all the rest of it, and everybody seems to favor a fast adjudication one way or the other.

I'm not going to promise you a day. I've made one promise this year, that's one too many. But there was a reason in that case.

MR. EIMER: Nate Eimer. It's not an issue for any of us here -- I was going to say a lot, I don't know how many, defendants are who are not in these cases.

THE COURT: But even they are not pressing for the remand question to be decided in various courts around the country.

MR. EIMER: No, they're objecting, they're asking for stays in each of the cases they're in.

THE COURT: So in theory, they basically all want to be here, too.

MR. EIMER: They get to participate -- there are some people who don't get to participate. It will go decided before they get here. But I'm not concerned about that.

THE COURT: I'm not either because, as you say, generally speaking they're seeking stays around the country.

Case MDL No. 1358 Document 118 Filed 03/26/04 Page 115 of 232

3CJLMTBC

They want it to be in the MDL process, so they've been heard, so to speak, indirectly.

MR. GORDON: And we're giving them the stays. It's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

3CJLMTBC Conference

the ones we're here on we want to move forward on.

THE COURT: I understand. So when I come back from my naturalization, will you be here or will you go away?

MR. GORDON: We'll be here.

THE COURT: All right.

MR. SACRIPANTI: Can we use the courtroom?

THE COURT: Yes, you may. I'll be down in the ceremonial courtroom.

(Recess)

(11:55 a.m.)

THE COURT: Can we get started?

MR. SACRIPANTI: I think so, your Honor.

MR. GORDON: Your Honor, thank you for your patience. We were in touch with counsel in South Texas. It wasn't easy.

MR. MCNEW: They have telephones down there.

THE COURT: That's good. Reassuring.

MR. GORDON: Obviously, we don't speak for everybody in the country -- neither do they -- but just for those here in the courtroom and some of us that we've been able to reach have agreed to, from the plaintiffs:

We would stipulate, first of all, Number 1: To immediate transfer of all cases which counsel control including some declaratory judgment actions that the defendants have just filed in federal courts to you, Shira Scheindlin, in your capacity as MDL 1358 judge. And we agree to not oppose the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

3CJLMTBC Conference

issuance or finality of the panel's conditional transfer order.

Number 2: We stipulate that your Honor, Judge Scheindlin, use whatever judicial means at your disposal to stay and cause the immediate transfer of any other cases to this Court.

MR. SACRIPANTI: And for that, your Honor, if I may, we would refer you to the manual, and we would hope that you would, you know, contact those other judges. I know it's an imposition, but....

THE COURT: Well, writing is easier certainly than calling them. But if I end up with a list....

MR. SACRIPANTI: We're going to provide you with a list, your Honor. Thank you.

MR. GORDON: Number 3: We, the plaintiffs, expressly reserve our objections to federal jurisdiction and stipulate that our agreement here is not a waiver.

Number 4: We agree -- all the parties here -- to an expedited briefing hearing on the motions to remand and the dates that we've suggested, the defendants agreed they would get their papers in by January 9th; that we would take seven days to apply, which would be January 16th; and that we'd ask for a hearing the following week, which would be the week of the 19th, which is Martin Luther King's birthday, but then that Tuesday, Wednesday or Thursday -- Wednesday the 21st, perhaps, is consistent with your Honor's schedule?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 13

Exhibit 10
Page 13 of 19

THE COURT: A "hearing" meaning what?
MR. GORDON: Oral argument.
THE COURT: If the Court requires one, yes.
MR. GORDON: Yes. Number 5: Declaratory judgment actions that were filed and just served on our clients yesterday would be stayed pending the decision on remand.
And Number 6: The plaintiff agrees to file appropriate papers staying other cases that we control pending final MDL Panel action transferring the cases.
Did I say that correctly?
MR. LANGAN: Perfect, Rob. Thank you.
MR. WALLACE: Actually, your Honor -- this is Rick Wallace for Shell, Chevron and other defendants -- a couple of minor modifications:
I thought the proposal for Number 1 was to stay as well as transfer all those cases that the plaintiffs control.
And on Number 3, I'd simply ask that that objection -- the preservation of objections to jurisdiction be reciprocal, because there are some defendants that may also have objections to personal jurisdiction.
MR. SACRIPANTI: Your Honor, if I may?
THE COURT: But it is consistent with the defendants that all defendants are together in saying there is federal jurisdiction; is that right? Or is there inconsistency on the defense side?

MR. WALLACE: I don't anticipate any inconsistency on subject matter jurisdiction.
THE COURT: But personal jurisdiction, you want to preserve your rights. Yes, okay. I hear you.
MR. SACRIPANTI: Which leads me, your Honor, to a point: We can only bind and agree to be bound the clients that we represent that are here. There are about, by my reckoning, 30 other defendants that are part of the actions that have been removed before your Honor who are not present today. What your Honor may want to do -- and I'll leave it to your Honor -- is to set perhaps a date by which if anyone objects to this stipulation, that they should come in, petition the Court and you should have a conference on that.
May I suggest January 9th or 5th?
THE COURT: Let me ask this question: In terms of briefing, however, would those defendants who are not present anticipate folding into this briefing schedule?
MR. SACRIPANTI: I would assume they would, your Honor. We're going to give notice of this to everyone. We're going to do that immediately. I just want to preserve -- because frankly, I'm acting as coordinating counsel, but none of us here have the power to bind anyone.
THE COURT: I understand that. It's your best prediction, so to speak, that they all wish to stay their local actions and wish it to be heard in one MDL proceeding. That's

your best guess.
MR. SACRIPANTI: And would agree to the stipulation as set forth by Mr. Gordon.

THE COURT: I understand. When we actually tell them the briefing schedule, there may become some objections. Are you kidding? How are we going to get a coordinated brief in -- did you say January 9th?

MR. GORDON: That's correct.

THE COURT: With the two holidays falling in between, you've got to circulate that to how many defendants?

MR. MCNEW: But, Judge --

THE COURT: That's really a tight schedule.

MR. MCNEW: But if you think about the context, we've already served motions to remand in all these cases.

THE COURT: I understand. I have one in front of me, one Memorandum of Law in Support of Motion to Remand Case Number 03 CV 9543, County of Nassau. But I assume -- tell me if I'm wrong -- that that brief will relate to all of the original nine cases, so to speak, that I have, and if the rest are transferred, it relates to all of them, it's not case-specific -- is that right?

MR. MCNEW: The removal papers and the remand motions are identical, case-to-case. There's no variation.

THE COURT: When was it served?

MR. MCNEW: Our first remand papers were served in

Connecticut, and I believe it was December 8th. So defense counsel have had these papers for awhile.

THE COURT: Well, some. I don't know who the defendants were in Connecticut. I really don't know if all of them really did receive the papers.

But the point is, we want a coordinated brief. We don't want different defendants coming in and saying, you know, No, given that schedule, I was not able to coordinate; I have no input; I have a right to make my own papers.

I think if we actually give another week, it's a small change, but it really does at least allow the defense brief to be circulated throughout the defense group. I don't want to be so unrealistic that I end up with more than one brief. That would be self-defeating. And I really can't bind the defendants who aren't here today to agree that the defendants who are here today are going to write a brief for them that they have no chance to even read or comment on.

So efficiency tells me I'd rather see it moved up a week, and that's tight, but at least it could be sent around to every defendant and every case around the country so that they all agree on one coordinated brief. That's to the plaintiffs' benefit, too.

MR. SACRIPANTI: And, Judge, I would suggest that, if I may, we will send notice to all the defendants, but your Honor may want to set an interim conference date, which may not

be necessary, where people who do object -- and I can't say people will -- they can come and voice their objections.

THE COURT: The only objection they may have potentially is to the dates. And they can say, We need time to be part of this brief. That's their only real objection that I gather they'd want is to be heard once and not 40 times. Everybody wants that. So they just want enough time to read it and show it to their clients and make sure they don't have a

brilliant idea that somehow the seven brilliant people who are here didn't have.

MR. SACRIPANTI: I guarantee they will, your Honor.

THE COURT: When you're working with a big, coordinated group, that's for sure. People want to read it and have some input.

I think we should move the 9th to the 16th.

MR. GORDON: The 16th.

THE COURT: And what was the reply date you said originally? The 16th?

MR. GORDON: But then -- we lose then the Martin Luther King day. Could we go to the following Monday, at least? The 26th?

THE COURT: Sure.

MR. GORDON: And then have the hearing still that same week?

THE COURT: No. You can't have a hearing until I've

read the briefs. I can't have a hearing before I've read them.

MR. GORDON: No, have a hearing during the week of the 26th.

THE COURT: Oh, that same week.

MR. GORDON: I'm moving everything up a week. The only thing is I want over the weekend because of the Martin Luther King holiday. In other words, the 16th for them; the 26th for us; and the hearing perhaps the 28th, 29th, 30th of that week. Whatever your Honor's schedule would accommodate.

THE COURT: Actually, I don't usually hear oral argument on motions, so I can't even predict.

MR. GORDON: We can just actually leave that out.

THE COURT: We could leave it out of the stipulation, or we could say if necessary, there will be a hearing on -- so that everybody at least can plan for it.

MR. GORDON: Can I ask for the 27th rather than the 26th so we can actually get a work day to make up for that Martin Luther King day?

THE COURT: That's fine. You have a lot of people to coordinate with, too.

If it goes, I'm supposed to start a trial on the 26th. So in terms of a hearing -- there's always that "if it goes", but if it goes....

The best day for a hearing would probably be Friday, February 13th -- not to be suspicious -- Friday the 13th at

10:00 o'clock. That's the best day I see for a hearing. But that could be moved up if the two-week trial goes away, as trials tend to do.

MR. GORDON: I did not mean to imply we were requesting oral argument on this. We'd be happy to waive that.

THE COURT: Let's see if I think I need it. Let's also set a time on February 13th. We'll make it at 10:00. As far as Mr. Sacripanti's suggestion of scheduling a date --

MR. SACRIPANTI: I have a different suggestion now. That's withdrawn.

THE COURT: What's the latest one?

MR. SACRIPANTI: The latest, Your Honor, is you set a date, and may I suggest January 5th, that if anyone objects, to

notify the Court by that date in writing. And if they don't, they don't. I want to preserve for people who aren't here the opportunity to say, Your Honor, those guys were nuts, okay? So if we can do January 5th, that would be great.

THE COURT: Sounds okay with me. What does anybody else think? If anybody objects to the stipulation who is not part of the stipulation because they weren't here, they can file a written objection, so to speak. And we'll see, if we get any, what to do about it.

MR. SACRIPANTI: Right, exactly.

THE COURT: In the meantime, everybody's committed to the schedule who is here.

MR. SACRIPANTI: We're committed to the schedule. I just want to represent those who aren't here.

MR. GORDON: Here's my concern: We're obligating ourselves to take certain actions.

THE COURT: And they are, too. They're going to file a brief on the 16th of January no matter what. They want to just say to anybody who wasn't here today who has something to say, Say it by January 5th or forever hold their peace.

MR. GORDON: Court's indulgence.

(Off the record)

MR. GORDON: Judge, I just want to -- we're going to other courts and taking a certain position. If the stipulation does not happen at the end of the day because on January 5th people come in and say, We actually don't agree, we have to be able to then no longer be bound by this.

THE COURT: I think that's right. Or for some reason the stipulation is --

MR. SACRIPANTI: Reversed, held -- voided.

THE COURT: Voided. That's a good word. Thank you very much. Then everybody will act accordingly. But I really don't anticipate -- I think it's a fail-safe for people that aren't here.

MR. SACRIPANTI: And we'll make the notice shorter. We don't want to be voided. So we'll make the notice --

THE COURT: No, I think January 5th is the right date.

MR. SACRIPANTI: And we give people notice, and if it's voided, all bets are off.

THE COURT: I don't see why that should happen. It's an unlikely event. It's an unlikely event. It's just kind of a due process.

MR. EIMER: The only problem we have with this, now, one last gap, there's some actions that need to be taken in other districts as a result of remand motions they've filed, and we're assuming we don't have to do anything, because there will be a deal, we assume, but Mr. Gordon is saying he doesn't want to stay those cases until after January 5th.

MR. GORDON: I'm concerned about it, because I could be tying my hands on the one hand while other guys hit me, is my concern.

THE COURT: Hit you with what?

MR. GORDON: While they, in other jurisdictions, they're moving for their courts to make decisions or not make decisions or transfer.

THE COURT: They're not. They were moving for stays around the country, as you know. We have to be a little bit realistic. I'll try to issue an order in the MDL cases that incorporates this and sends it out everywhere. Most judges aren't really anxious to work between Christmas and New Years on a remand motion. It's not a high priority. Most people want to buy presents and wrap them and celebrate. They're not

dying to decide this.

MR. GORDON: Although this would make a nice present.

THE COURT: I'll issue an order. I think they have other things to do in the next 10 days. I don't know that they're rushing to decide a difficult remand motion.

What I need is a service list or something.

MR. SACRIPANTI: By close of business, we'll provide you with a list of all removal issues and the judges.

THE COURT: And you'll coordinate with plaintiffs to do your best to be sure that the list is complete?

MR. SACRIPANTI: Yes.

MR. GORDON: May I ask one question? I assume you have everybody in here who was part of the DJ action, because I know not all the defendants agreed to do that.

I know you sort of took the lead. I assume the part that says that you're going to -- that you control the DJ actions and you're agreeing to immediate transfer of those cases, to a stay of that --

MR. SACRIPANTI: Marathon's not here. Marathon's not here.

THE COURT: And you didn't try to call that party?

MR. LANGAN: I can't imagine it will be a problem. It won't be.

THE COURT: There are expressions of confidence --

MR. GORDON: Can we get an answer to that by the end

of business today?

MR. SACRIPANTI: I can tell you we'll move posthaste to all of them, reach out to them. But why don't you give me till Monday.

MS. ROSENBLATT: I think he's out of town.

THE COURT: Who represents Marathon? What law firm?

MS. ROSENBLATT: Baker, Botts.

THE COURT: Just coordinate it.

Does anybody want to propose language for the order, the very short order I'm going to try to draft in the MDL manner? It will have an MDL caption. I'll try to draft something, but if anybody has an idea of the proposed language, I'd be happy to hear you.

MR. SACRIPANTI: Would you like us to send you -- we'll try to work and have a joint --

THE COURT: I'd like to get it out by the end of the day.

MR. SACRIPANTI: So would we.

MR. EIMER: We'll work one out this afternoon.

THE COURT: You're welcome to stay. Sit around the table and do it. Let's see what I have next.

I don't have a matter in this courtroom until 2:30.

MR. MCNEW: Okay.

THE COURT: Folks, if you find yourselves here, you're welcome to work here. There's no matter in this courtroom

until 2:30.

MR. SACRIPANTI: Thank you, your Honor.

THE COURT: You're welcome to stay. We don't have cookies or coffee, but you're welcome to stay.

(Adjourned sine die)

o 0 o

# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

**ORDER**

Master File C.A. No. 1:00-1898(SAS)
MDL 1358

This document refers to:

*County of Nassau v. Amerada Hess Corp., et al.*, No. 03-cv-9543
*Water Authority of Western Nassau County v. Amerada Hess Corp, et al.*, No. 03-cv-9544
*Incorporated Village of Mineola, et al. v. AGIP Inc., et al.*, No. 03-cv-10051
*West Hempstead Water District v. AGIP Inc., et al.*, No. 03-cv-10052
*Carle Place Water District v. AGIP Inc., et al.*, No. 03-cv-10053
*Town of Southampton v. AGIP Inc., et al.*, No. 03-cv-10054
*Village of Hempstead v. AGIP Inc., et al.*, No. 03-cv-10055
*Town of East Hampton v. AGIP Inc., et al.*, No. 03-cv-10056
*Westbury Water District v. AGIP Inc., et al.*, No. 03-cv-10057

The Court, upon hearing counsel for plaintiffs and certain defendants at a conference in the above-referenced cases in response to defendants' motions to stay proceedings in these cases and plaintiffs' motions for their remand, and upon stipulations there agreed to on the record by the parties present, finds, in the above-captioned proceeding, that it is appropriate for the issues presented by these motions in these and all similar removed actions, wherever filed, to be heard and decided by this Court.

Accordingly, all proceedings in the cases set forth in the attached Schedule should be stayed pending transfer to this Court sitting in its capacity as the MDL No. 1358 court. This Court respectfully requests that all courts to which the scheduled cases have been removed GRANT ALL MOTIONS TO STAY those cases pending transfer to MDL No. 1358.

The parties have agreed to the following consolidated briefing schedule, which is hereby So Ordered: defendants' opposition to plaintiffs' motion to remand shall be served and filed by January 16, 2004, and plaintiffs' reply in further support of the motion to remand shall be served and filed by January 27, 2004. Defendants' motion to stay in the above-referenced cases is DENIED because this Court will consider and decide the consolidated motion to remand forthwith.

Dated: December 23, 2003

Honorable Shira A. Scheindlin
United States District Judge

SCHEDULE

| State | Short Case Name | Date Removed | Court/Docket No. | Assigned Judge |
|---|---|---|---|---|
| CA | *California-American Water Co. v. Unocal Corp., et al.* | 11/26/03 | N.D. Cal.<br>C 03-5379 JSW | Jeffrey S. White |
| CA | *City of Fresno v. Chevron U.S.A. Inc., et al.* | 11/26/03 | N.D. Cal.<br>C 03-5378 JSW | Jeffrey S. White |
| CA | *City of Riverside v. Atlantic Richfield Co., et al.* | 12/12/03 | C.D. Cal.<br>EDCV03-1460 RT SGLx | Robert J. Timlin |
| CA | *City of Roseville v. Atlantic Richfield Company, et al.* | Not yet removed | | |
| CA | *Orange County Water District v. Unocal Corp., et al. (Amended)* | 12/05/03 | C.D. Cal.<br>SACV03-1742 JVS (ANx) | James V. Selna |
| CA | *People v. Unocal Corp., et al.* | 12/10/03 | E.D. Cal.<br>CIV.S-03-2653 GEB DAD | Garland E. Burrell, Jr. |
| CA | *Quincy Community Services District v. Atlantic Richfield Co., et al.* | 12/17/03 | E.D. Cal.<br>CIV S-03-2582 WBS DAD | Hon. William B. Shubb |
| CA | *Silver, et al. v. Alon USA Energy, Inc., et al.* | 12/03/03 | S.D. Cal.<br>03 CV 2408 WQH (RBB) | William Q. Hayes |
| | | | | |
| CT | *American Distilling & Mfg. Co., Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1926 | Hon. Stefan R. Underhill |
| CT | *Canton Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1921 | Hon. Stefan R. Underhill |
| CT | *Childhood Memories v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1924 | Hon. Alvin W. Thompson |
| CT | *Columbia Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1923 | Hon. Stefan R. Underhill |
| CT | *Our Lady of Rosary Chapel v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1925 | Hon. Stefan R. Underhill |
| CT | *Town of East Hampton v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn.<br>3:03-CV-1927 | Hon. Stefan R. Underhill |
| CT | *United Water Connecticut, Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. | Hon. Stefan R. Underhill |

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| | | | 3:03-CV-2017 | |
| | | | | |
| FL | *Escambia County Utilities Auth. v. Adcock Petroleum, Inc., et al.* | 11/25/03 | N.D. Fla. (Pensacola) 3:03-CV-539 | Hon. L.A. Collier Hon. M. Davis, U.S.M.J. |
| | | | | |
| IA | *City of Galva, Ida Grove & Sioux City v. Amerada Hess Corp., et al.* | 11/24/03 | S.D. Iowa 4:03-CV-90663 | Hon. Robert W. Pratt |
| | | | | |
| IL | *City of Crystal Lake v. Amerada Hess Corp.* | 12/12/03 | N.D. Ill. (Eastern Div.) 03-CV-8973 | Hon. George W. Lindberg |
| | | | | |
| IN | *City of Mishawaka v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-904 | Hon. Robert Miller, Jr. |
| IN | *City of Rockport v. Amerada Hess Corp., et al.* | 11/21/03 | S.D. Ind. (Evansville) 3:03-CV-201 | Hon. Richard L. Young Hon. William G. Hussmann, Jr., U.S.M.J. |
| IN | *North Newton School Corporation v. Amerada Hess Corporation, e t al.* | 12/12/03 | N.D. Ind. (Lafayette) 4:03-CV-013 | Hon. Allen Sharp |
| IN | *City of South Bend v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-905 | Hon. Allen Sharp |
| | | | | |
| KS | *Chisholm Creek Utility Auth. v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1457 | Hon. Wesley E. Brown |
| KS | *City of Bel Aire v. Alon USA Energy. Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1458 | Hon. Wesley E. Brown |
| KS | *City of Dodge City v. Alon USA Energy. Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1456 | Hon. Monti L. Belot |
| KS | *City of Park City v. Alon USA Energy. Inc.* | 12/15/03 | D. Kan. 03-CV-1455 | Hon. Thomas J. Marten |
| | | | | |
| MA | *Brimfield Housing Auth. v. Amerada Hess Corp., et al.* | 11/26/03 | D. Mass. 03-CV-12399 | Hon. Richard G. Stearns |
| | | | | |
| NH | *City of Dover v. Amerada Hess Corporation, et al.* | Not yet removed | | |

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| NH | *City of Portsmouth v. Amerada Hess Corporation, et al.* | Not yet removed | | |
| NH | *State of New Hampshire v. Amerada Hess Corp., et al.* | 09/30/03 | D.R.I. 03-CV-529 | Hon. Ronald R. Lagueux |
| | | | | |
| NJ | *NJ American Water Co., Inc. v. Amerada Hess Corp., et al.* | 11/24/03 | D.N.J. 03-CV-5562 | Hon. William G. Bassler |
| | | | | |
| NY | *Carle Place Water District v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10053 | Hon. Shira A. Scheindlin |
| NY | *County of Nassau v. Amerada Hess Corp., et al.* | 12/02/03 | S.D.N.Y. 03-CV-9543 | Hon. Shira A. Scheindlin |
| NY | *Long Island Water Corp. v. Amerada Hess, et al.* | 12/04/03 | E.D.N.Y. 03-CV-6125 | Hon. Arthur D. Spatt<br>Hon. Michael L. Orenstein, U.S.M.J. |
| NY | *Town of East Hampton v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10056 | Hon. Shira A. Scheindlin |
| NY | *Town of Southampton v. AGIP Inc, et al.* | 12/18/03 | S.D.N.Y. 03-cv-10054 | Hon. Shira A. Scheindlin |
| NY | *Village of Mineola; Water Dept. of Village of Mineola v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10051 | Hon. Shira A. Scheindlin |
| NY | *Water Authority of Great Neck North v. Amerada Hess Corp., et al.* | 10/28/03 | E.D.N.Y. 03-CV-6077 | Hon. Arthur D. Spatt<br>Hon. Michael L. Orenstein, U.S.M.J. |
| NY | *Water Authority of Western Nassau County v. Amerada Hess, et al.* | 10/01/03 | S.D.N.Y. 03-CV-9544 | Hon. Shira A. Scheindlin |
| NY | *Westbury Water District v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10057 | Hon. Shira A. Scheindlin |
| NY | *West Hempstead Water District v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10052 | Hon. Shira A. Scheindlin |
| NY | *Village of Hempstead v. AGIP Inc., et al.* | 12/18/03 | S.D.N.Y. 03-cv-10055 | Hon. Shira A. Scheindlin |
| | | | | |
| PA | *Pennsylvania Suburban Water Co. v. Sunoco, Inc.* | Not yet removed | | |
| | | | | |

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| VA | *Buchanan County School Board v. Amerada Hess Corporation* | Not yet removed | | |
| VA | *Greensville Co. Water & Sewer Authority v. Amerada Hess Corporation* | Not yet removed | | |
| VA | *Patrick County Sch. Board v. Amerada Hess Corp., et al.* | Not yet removed | | |
| | | | | |
| VT | *Town of Hartland, County of Windsor, Vermont Water System v. Amerada Hess Corp., et al.* | 12/11/03 | D. Vt. 2:03-CV-337 | Hon. William K. Sessions, III |

# Exhibit 12

Law Offices of

**SHER & LEFF**

**VICTOR M. SHER**
**ALEXANDER I. LEFF**

**TODD E. ROBINS**
**LYNDA M. COLLINS**

January 5, 2004

*Via Facsimile and Federal Express Overnight Delivery*
The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re: Order dated December 23, 2003 in In re MTBE Products Liability Litigation (MDL 1358); Master File C.A. No. 1:00-1898 (SAS)

Dear Judge Scheindlin:

This firm is co-counsel for plaintiffs in each of the following cases, all of which are listed in the attachment to the Court's December 23, 2003, Order:

- *California-American Water Company v. Atlantic Richfield Company, et al.*; Case No. C 03-5379 JSW (N.D. Ca.)
- *Quincy Community Services District v. Atlantic Richfield Company, et al.*; Case No. CIV.S-03-2582 WBS DAD (E.D. Ca.)
- *City of Riverside v. Atlantic Richfield Company, et al.;* Case No. EDCV03-1460 RT SGLx (C.D. Ca.)
- *City of Roseville v. Atlantic Richfield Company, et al.;* Case No. CIV.S-03-2601 WBS GGH (E.D. Ca.)
- *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*; Case No. 03-CV-2408 WQH (S.D. Ca.)

Plaintiffs in these actions respectfully object to the stay and/or transfer of these actions, either for purposes of determining remand motions or for any other pretrial purpose.

At the outset we note that we only today obtained a copy of Your Honor's final form of Order. We had no chance to participate in the hearing before Your Honor on this motion, we were not consulted concerning the plaintiffs' positions in the other cases pending before Your Honor nor our position with respect to our own litigation, nor as of today have we even been served with a copy of the referenced Order. We have however

**450 Mission Street, 5th Floor, San Francisco, CA 94105**
**Phone: (415) 348-8300 Fax: (415) 348-8333**

managed to obtain a copy of the Order as well as of the transcript of the hearing on this matter.

We have already filed or are in the process of filing motions for remand in each of these cases with the local District Courts in the pending actions in California. We submit there is no basis for rewarding defendants' efforts to delay the proceedings in our case on the purported invocation of either federal jurisdiction that does not exist or MDL procedures for a matter that does not warrant them.

With respect to removal for purposes of determining the remand issues, the matters should more properly be resolved by the transferor courts before an MDL transfer or even consideration of a stay motion. *See, e.g., Karofsky v. Abbott Labs.*, 921 F. Supp. 18, 21 n.4 (D. Me. 1996) (granting plaintiff's remand motion because "it is easier . . . to rule on the jurisdictional issue [rather than to] transfer it to the Multidistrict Panel, which has many other concerns"); *Aetna U.S. Healthcare, Inc. v. Hoescht Aktiengesellschaft*, 54 F. Supp. 2d 1042, 1048 (D. Kan. 1999) ("[f]or purposes of judicial economy, the jurisdictional issue should be resolved immediately. . . Judicial economy dictates a present ruling on the remand issue"); *see also* JPML Rules of Procedure, Rule 1.5 ("[t]he pendency of a motion . . . before the Panel . . .does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending). Indeed, a number of courts have held that the preliminary federal jurisdictional question "*must* be resolved before deciding whether to stay or transfer the case to the MDL panel." *Farkas v. Bridgestone/Firestone, Inc.*, 113 F. Supp. 2d 1107, 1115 n.8 (W.D. Ky. 2000) (emphasis added); *accord, e.g., Stern v. Mutual Life Insurance Co.*, 968 F. Supp. 637, 639 (N.D. Ala. 1997) ("[i]f the court lacks jurisdiction over the action *ab initio*, it is without jurisdiction to enter such a stay"); *Lloyd v. Cabell Huntington Hosp., Inc.*, 58 F. Supp. 2d 694, 696 (S.D. W. Va. 1999) ("[t]his Court cannot . . . stay proceedings in an action over which it lacks jurisdiction").

Nor is there any proper basis for treating these matters as appropriate for an MDL for purposes other than the pending remand motions. This is not the first generation of MTBE litigation. Numerous dispositive motions – including most notably motions based on purported federal preemption of state tort damages claims – have been litigated in state and federal courtrooms, in California and elsewhere. The results, both in Your Honor's courtroom and around the Nation, have consistently rejected any federal preemption of the kinds of claims at issue in this case. Notably, the Ninth Circuit (the federal appellate Circuit in which all of these California cases are currently pending) has twice expressly rejected federal preemption of state laws limiting (or banning) MTBE because of environmental concerns. *Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 670-73 (9th Cir. 2003); *Exxon Mobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246, 1253 (9th Cir. 2000). Moreover, extensive discovery has already occurred in several lawsuits on the liability of most (if not all) of the defendant refiners and MTBE manufacturers. Consequently, it is unlikely that threshold legal questions common to all

MTBE cases would require significant additional judicial energy by Your Honor or any other MDL judge.

The truth is that the primary focus of the current generation of MTBE cases will be on site specific issues: matters of variations in state law; local gasoline supply and distribution systems; and damages claims based on site-specific circumstances. We respectfully submit that neither the Southern District of New York nor any other out-of-state MDL jurisdiction represents an efficient – and certainly not the most efficient – forum in which to handle these issues as they relate to gasoline refined in California refineries and contaminating groundwater in that State.

In short, for the foregoing reasons plaintiffs in these cases object to the arrangement proposed in the Court's December 23, 2003, Order for transfer for remand or any other MDL purposes. We further expressly reserve these parties' rights to assert in any appropriate additional manner before Your Honor and/or the MDL Panel our opposition to MDL consolidation of these matters.

We will serve copies of this letter by facsimile on the other counsel involved in these cases, and will work with defense counsel to obtain service lists for the other MTBE cases identified in the schedule attached to the Court's December 23rd Order and will serve those counsel by facsimile as well as promptly as possible.

Respectfully submitted,

SHER & LEFF, LLP

Victor M. Sher

VMS:jac
cc: All Counsel

P:\Cal-American\Correspondence\Scheindlin-001.doc

# Exhibit 13

Law Offices of
**SHER & LEFF**

VICTOR M. SHER
ALEXANDER I. LEFF

TODD E. ROBINS
LYNDA M. COLLINS

January 27, 2004

*Via Facsimile and Federal Express Overnight Delivery*

The Honorable Shira Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1050
New York, NY 10007-1312

Re: *In re MTBE Products Liability Litigation* (MDL 1358); Master File C.A. No. 1:00-1898 (SAS) / Motions for Remand

Dear Judge Scheindlin:

This firm serves as co-counsel for all of the plaintiffs in each of the following cases:

- *Orange County Water District v. Unocal, et al.*, Case No. SACV03-1742 JVS (ANx) (C.D. Ca.)
- *City of Riverside v. Atlantic Richfield Company, et al.;* Case No. EDCV03-1460 RT (SGLx) (C.D. Ca.)
- *California-American Water Company v. Atlantic Richfield Company, et al.*; Case No. C 03-5379 JSW (N.D. Ca.)
- *Quincy Community Services District v. Atlantic Richfield Company, et al.*; Case No. CIV.S-03-2582 WBS DAD (E.D. Ca.)
- *City of Roseville v. Atlantic Richfield Company, et al.;* Case No. CIV.S-03-2601 WBS GGH (E.D. Ca.)
- *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*; Case No. 03-CV-2408 WQH (S.D. Ca.).

In addition, we represent as co-counsel all of the plaintiffs except the People of the State of California in *People, et al. v. Unocal, et al.* CIV S-032653 GEB/DAD (E.D. Cal.); the Sacramento County District Attorney's Office represents the People separately in that action. We understand that counsel for the People intends to join in the positions asserted in this letter.

## PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS

Each of the California actions originated in state court, asserting only state-law claims. Certain defendants removed the matters to federal district court. The removal papers state defendants' intention to have these actions transferred to MDL 1358. We are informed (but have not been served with any papers) that defendants in each case filed a Notice of Related, Tag-along Action with the Judicial Panel on Multidistrict Litigation (JPML). In any event, the JPML has yet to issue conditional transfer orders in any of these matters.

Plaintiffs in these matters have not yet had any opportunity to object to any conditional transfer orders from the JPML, although in fact plaintiffs believe that these actions are not appropriate for multi-district consolidation. All of these plaintiffs in the California actions intend to file notices of opposition to, and to move to vacate, any such conditional transfer order(s) affecting them. Meanwhile, plaintiffs have filed timely motions for remand in each of the California cases.

Your Honor's December 23, 2003, Order states that remand motions in "all similar removed actions . . . [should] be heard and decided by this Court" under the auspices of MDL 1358. The attachment to the December 23 Order listed each of these California lawsuits. Of course, our clients had no chance to participate in the hearing before Your Honor leading to the December 23 Order, and we were not consulted concerning the plaintiffs' positions in the other cases pending before Your Honor nor our position with respect to our own litigation.

As of today these cases are not before Your Honor in any capacity. The merits of the motions for remand in them have not been briefed to this Court, nor are any of those motions before Your Honor. The Court has not even seen the complaints in these actions, which differ substantially from those before the Court in the New York actions. Indeed, unlike the matters pending before Your Honor, plaintiffs in these California cases consist not solely of drinking water purveyors (although some are purveyors); rather these plaintiffs include public agencies with a spectrum of regulatory, property, usufructuary and other legal interests in protecting ground- and drinking water resources under California law.

The December 23 Order did not specify how (if at all) parties to "similar removed actions" should participate in the remand motions pending before the Court. Accordingly, we submit this letter brief to address certain issues raised by those motions. Consistent with our position that these actions are not appropriate for multi-district consolidation, however, the plaintiffs in the California actions listed above expressly reserve their rights to object to any such consolidation. They further maintain that their actions are not properly before this Court in its capacity as the court handling MDL 1358 or otherwise, and respectfully reserve their rights to assert that orders issued by this Court

at this time have no effect in their actions. Finally, by submitting this letter in limited response to the moving and opposition papers in connection with the pending remand motion before Your Honor, none of these plaintiffs concedes that this Court has any jurisdiction over their California lawsuit.

## INTRODUCTION

None of the bases for federal subject matter jurisdiction asserted in the subject Notices of Removal and discussed in the removing defendants' ("Defendants'") opposition brief has any merit. This letter makes the following three points:

First, state court findings in these cases that MTBE gasoline is defective will have no impact on the federal clean air program or the gasoline distribution system. Indeed, 18 states (including New York) have *already banned* the use of MTBE in gasoline, and preemption challenges to such bans have been soundly rejected by the federal courts.[1] If a state's outright ban of MTBE does not conflict with the Clean Air Act ("CAA"), then tort claims regarding Defendants' past use of MTBE cannot possibly affect any federal interest under the CAA. Moreover, Defendants' federal question analysis hinges entirely on the very same federal preemption arguments that this Court has soundly rejected, as has every other published opinion on the subject.[2] Notwithstanding their effort to dress the emperor in new clothes, Defendants' attempt to ground federal jurisdiction over these cases on the same losing arguments should be rejected.

Second, Defendants' efforts to cast themselves as corporations acting under the direction of federal officers or agencies for purposes of 28 U.S.C. §1442(a)(1) are nonsense. Defendants are private, for-profit companies that produce a consumer product,

---

[1] *See Oxygenated Fuels Ass'n v. Pataki ("Pataki I")*, 158 F. Supp. 2d 248, 257 (N.D.N.Y. 2001) (rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA"); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), __ F. Supp. 2d __, 2003 WL 22845949, *9-*12 (N.D.N.Y. November 24, 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA, including a finding of fact that the predicted economic impacts of such ban are "not of a sufficient magnitude . . . to interfere with the achievement of the goals of the CAA"); *see also Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665, 670, 673 (9th Cir. 2003) (upholding California's MTBE ban because, *inter alia*, there is "no support for [the] assertion that the Clean Air Act's goals – for purposes of preemption analysis – are a smoothly functioning market and cheap gasoline"), *affirming Oxygenated Fuels Assoc. v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1185, 1187 (E.D. Cal. 2001); *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1253 (9th Cir. 2000).

[2] *See In re MTBE Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001); *Pataki I, supra*, 158 F. Supp. 2d 248; *Pataki III, supra*, 2003 WL 22845949; *Davis II, supra*, 331 F.3d 665 *Davis I, supra*, 163 F. Supp. 2d 1185; *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1253 (9th Cir. 2000); .

and, like all manufacturing businesses in this country, are subject to both state and federal environmental regulations. Published federal decisions have uniformly rejected the argument that a consumer product manufacturer's compliance with federal regulatory requirements constitutes acting "under the direction" of a federal officer.[3] Moreover, there is no causal connection between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.[4]

*Finally*, Defendants' attempt to predicate federal jurisdiction over this purely state-law case on the toehold of a 1988 bankruptcy order involving a single defendant also fails, because the outcome of this action can have no effect on the "administration of" a bankruptcy that concluded 15 years ago.[5] In addition, even if these actions were somehow "related to" the Texaco bankruptcy, the presence of exclusively state-law claims and the extreme remoteness of any possible bankruptcy issues in this case clearly warrant remand pursuant to 28 U.S.C. § 1452(b).

## DISCUSSION

### A. Defendants' "Complete Preemption" and "Substantial Federal Question" Arguments Lack Merit.

We wish to bring to the Court's attention four issues in response to Defendants' federal question contentions. First, Defendants' preemption-related grounds for removing these product liability actions to federal court are rendered irrelevant by the fact that New York has banned MTBE gasoline, and such ban has been definitively upheld, as both a matter of law and fact, as not in conflict with any CAA goal or requirement. *See Pataki I, supra,* 158 F. Supp. 2d 248; *Pataki III, supra*, 2003 WL 22845949. Second, Defendants' "complete preemption" and "substantial federal question" arguments are nothing more than recycled versions of the very same preemption arguments they litigated unsuccessfully in this Court in the prior incarnation

[3] *See, e.g., Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'").

[4] *See* 42 U.S.C. §7545(k)(2)(B) (CAA mandates *oxygen* content, not MTBE, in reformulated gasoline); *cf., e.g., Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos).

[5] *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (no jurisdiction under 28 U.S.C. §1334(b) because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan*, 288 F.3d 1172, 1880 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

of MDL 1358. *See In re MTBE Litig.*, 175 F. Supp. 2d 593. Third, Defendants' argument that the CAA and other federal statutes provide "exclusive remedies" for claims regarding the design of MTBE gasoline ignores the fact that each of the cited federal statutes expressly preserves state-law claims. *See* 42 U.S.C. §§ 7604(e), 6972(f); 15 U.S.C. §2617(a). Finally, Defendants' allegations of congressional and EPA intent to "occupy the field" of fuels regulation grossly distort the relevant legislative and regulatory history and ignore the case law examining such intent.

**1. Tort litigation regarding MTBE will have no impact on the federal Clean Air program.**

The premise of Defendants' federal question analysis – *i.e.* that state court verdicts finding that MTBE gasoline is a defective product will undermine the federal regulatory scheme and disrupt the gasoline distribution system – defies all logic. New York, along with 17 other states, has already banned the use of MTBE in gasoline (effective January 1, 2004) in order to protect the state's groundwater from contamination. *See* L.2000, c. 35, §§ 2-3; *Pataki III, supra*, 2003 WL 22845949 at *2. Moreover, the New York MTBE law has survived a preemption challenge brought by the Oxygenated Fuels Association, one of Defendants' trade associations. *See Pataki I, supra,* 158 F. Supp. 2d 248; *Pataki III, supra*, 2003 WL 22845949. After a six day bench trial in that case, Judge Mordue of the Northern District of New York determined, among other things, that the predicted economic impacts of the ban are "not of a sufficient magnitude . . . to interfere with the achievement of the goals of the CAA." *Pataki III, supra*, 2003 WL 22845949 at *9. The Ninth Circuit has similarly upheld California's ban of MTBE, holding that there is "no support for [the] assertion that the Clean Air Act's goals – for purposes of preemption analysis – are a smoothly functioning market and cheap gasoline." *Davis II, supra*, 331 F.3d at 673.[6] If a state's complete ban of MTBE does not conflict with the CAA or threaten the state's supply of reasonably priced fuel, then damages claims regarding Defendants' past use of MTBE cannot possibly affect any federal interest under the CAA.

Defendants' effort to raise the specter of an "inefficient patchwork" of differing state fuel content standards (*see, e.g.* Ds' Opp. at 25) by reference to MTBE-related

[6] In light of the Ninth Circuit's definitive – and final – holding in *Davis II*, Defendants are precluded under the doctrine of collateral estoppel from asserting their federal preemption arguments in the California cases involving the plaintiffs we represent. *In re Cantrell* 329 F.3d 1119, 1123 (9th Cir. 2003) (issue preclusion applies where issue is identical to that decided in a former proceeding, issue was actually litigated and decided in the former proceeding, the decision in the former proceeding was final and on the merits, and the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding); *Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Council* 322 F.3d 1064, 1081 (9th Cir. 2003) (privity is a flexible concept, and may exist when the parties are not identical, as long as there is "substantial identity" or "sufficient commonality of interest" between parties).

actions filed outside of New York does nothing to assist their argument, because, as the *Pataki* and *Davis* cases demonstrate, nothing in the CAA limits state authority to regulate MTBE in order to prevent water pollution.[7] Their "patchwork" argument also confuses the standards for establishing federal subject matter jurisdiction with those for transferring and consolidating related district court actions. *See, e.g. Merrell Dow Pharmaceuticals v. Thompson, supra*, 478 U.S. at 816 (defendant's concern about uniformity of interpretation of federal statute in state-law actions is not an "aspect of federal-question jurisdiction").[8] Defendants cannot bootstrap federal jurisdiction on the alleged aggregate impact of multiple MTBE lawsuits.

**2. This Court, along with every other published decision addressing preemption of state regulation of MTBE, has already rejected Defendants' "complete preemption" and "substantial federal question" arguments.**

This Court has already concluded that nothing in the CAA limits state-law tort actions against refiners to recover damages to drinking water caused by their use of MTBE, and thus has rejected the very preemption arguments on which Defendants' federal question analysis is based. *In re MTBE Litig., supra,* 175 F. Supp. 2d at 611-617, 623-625. In fact, *every* published decision addressing preemption of state regulation of MTBE – both before and since this Court's earlier decision in MDL 1358 – has rejected Defendants' preemption arguments:

- *Davis II, supra*, 331 F.3d at 673 (California's MTBE ban not preempted because "Clean Air Act's provisions regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to prevent water pollution");

[7] *Pataki I, supra,* 158 F. Supp. 2d at 257 ("preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA"); *Davis II, supra*, 331 F.3d at 673 ("Clean Air Act's provisions regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to prevent water pollution").

[8] While concern about uniform judicial treatment may be pertinent in considering whether to centralize or transfer pending federal actions into a multidistrict litigation ("MDL") under 28 U.S.C. § 1407, *see, e.g., In re Mosaid Technologies Inc. Patent Litigation*, 283 F. Supp. 2d 1359, 1360 (Jud. Pan. Mult. Lit. 2003) (centralization pursuant to § 1407 necessary to "prevent inconsistent decisions," among other things), it does not constitute grounds for "federal question" jurisdiction *over these cases* in the first instance. *See also In re MTBE Litigation, supra*, 175 F.Supp.2d at 603 ("[a] transfer of a case pursuant to 28 U.S.C. § 1407 cannot be made unless the transferee court has subject matter jurisdiction"), *citing BancOhio Corp. v. Fox*, 516 F.2d 29, 32 (6th Cir.1975) ("[n]o matter how desirable respondents feel it may be to consolidate . . . all litigation in any way related to Equity Funding, . . . such a transfer cannot be made unless the district court properly has jurisdiction of the subject matter of the case").

- *Exxon Mobil Corp. v. EPA, supra,* 217 F.3d at 1253 (affirming county regulation that effectively banned MTBE because "state authority to regulate oxygenate levels [was not] limited" by the CAA);
- *Pataki I, supra,* 158 F. Supp. 2d at 257 (rejecting preemption challenge to New York ban on MTBE on grounds that "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA");
- *Pataki III, supra*, 2003 WL 22845949 at *12 (NY MTBE law does not conflict with any aspect of CAA, even if "viewed in the larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations");
- *Davis I, supra,* 163 F. Supp. 2d at 1187 (E.D. Cal. 2001) (upholding California MTBE ban against federal preemption challenge because "the Clean Air Act does not require that MTBE be made available to refiners"), *aff'd,* 331 F.3d 665, *supra.*[9]

Despite this notable losing streak, Defendants here make the very same preemption arguments again – as Yogi Berra said, "it's déjà vu all over again." Specifically, the lengthy federal question analysis in Defendants' opposition hinges entirely on two arguments: (1) that state-law design defect claims somehow seek to "disturb the delicate balance" struck by Congress and EPA in permitting refiners to use MTBE in reformulated gasoline; and (2) that the CAA expressly preempts such design defect claims. This Court, however, already rejected the identical arguments in *In re MTBE.*

Specifically, Defendants' "substantial federal question" argument is predicated on the assertion that the New York Plaintiffs' design defect claims raise risk-utility questions

[9] *See also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state law MTBE contamination case does "not conflict with the Congressional clean air objectives"). Defendants' citation of four unpublished trial court decisions regarding MTBE preemption (*see* D's Opp., p. 21, n.20) is unavailing. Each of these decisions was rendered before *Davis II* and *Pataki III.* In addition, two of them – *Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess*, No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis of the CAA. Two others – *Kubas v. Unocal*, No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal*, No. BC195295 (same) – incorrectly assumed that assessing tort damages was equivalent to a regulatory ban (which the Ninth Circuit in any event affirmed in *Davis II*). State court opinions giving more than cursory attention to the preemption argument have, like federal courts, rejected the argument. *See, e.g., County of Suffolk v. Amerada Hess, et al.*, No. 007-011-MOT D (Sup. Ct. Suffolk Cty., N.Y., Jan. 2, 2004); *South Tahoe Public Utility District v. ARCO et al.*, No. 999128 (Cal. Super. Ct. Jan. 15, 2002); *City of Dinuba v. Unocal et al.*, No. 305450 (Cal Super. Ct. April 1, 2003); *Plainview Water District v. Exxon Mobil Corporation et al.*, No. 9975/01, (N.Y. Sup. Ct. May 22, 2002).

that "require a reassessment of all of the factors Congress directed EPA to consider in promulgating RFG regulations so as to 'require the greatest reduction in emissions' . . . [including] the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements." Ds' Opp. at 20-22.[10] Defendants made the same argument verbatim to this Court in *In re MTBE Litig.*, and, as Defendants concede (see Ds' Opp. at 22), this Court disagreed:

> Defendants argue that any risk-utility analysis would impermissibly permit a reexamination of the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the CAA. More specifically, defendants note that Congress, through the RFG Program, authorized the EPA to issue regulations to reduce air pollution while taking into consideration "the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements." 42 U.S.C § 7545(k)(1). However, as discussed earlier, Congress did not mandate the use of MTBE, nor did the EPA's certification of gasoline containing MTBE require consideration of non air- quality factors. . . . Thus, while the EPA could consider the non air-quality impact of the use of MTBE, any such consideration was . . . not commensurate with a risk-utility analysis. . . . Accordingly, defendants' motions to dismiss these [design defect] claims are denied.

Similarly, Defendants' "complete preemption" argument in these cases consists of precisely the same express preemption argument they made and lost in *In re MTBE Litig.* in 2001. *Compare* Ds' Opp. at 24-28 (plaintiffs' tort claims regarding MTBE contamination of groundwater preempted because they would result in a "control or prohibition respecting a[] characteristic or component of fuel" under 42 U.S.C. § 7545(c)(4)(A)), *with In re MTBE Litig., supra,* 175 F. Supp. 2d at 612-614 (rejecting argument that "section 7545(c)(4) . . . preempt[s] state law claims concerning the contamination of groundwater caused by the use of MTBE"). Defendants themselves concede, as they must, that "[t]his Court and several others have previously found that § 7545(c)(4)(A) does not prevent state regulation of fuels if that regulation is designed to protect groundwater, as opposed to regulating emissions." Ds' Opp. at 25. Indeed, as noted above, since this Court's 2001 opinion, the Ninth Circuit has concluded as a matter of law that "California's MTBE ban ... does not 'frustrate [ ] the full effectiveness of federal law,'" *Davis II, supra,* 331 F.3d at 673, and the Northern District of New York

[10] Of course, Plaintiffs' design defect claims do not require resort to any federal law issue – substantial or otherwise. *Eastern States, supra*, 11 F. Supp. 2d at 390 (substantial federal question jurisdiction requires showing that "a disputed question of federal law is a necessary element of one of the well-pleaded state claims"); *Shadie v. Aventis Pasteur*, 254 F. Supp. 2d 509, 518 (M.D. Pa. 2003) (where defendants, not plaintiffs, ask court to interpret federal law, "[t]he mere presence of a federal issue . . . does not create federal jurisdiction").

has reached the same result for New York's ban as a matter of both fact and law in *Pataki III*.

Defendants' assertion that they have "never presented," and this Court has not rejected, the federal question arguments they raise in support of removal, *see* Ds' Opp. at 2, is simply not true. To the extent Defendants suggest that the Court's prior ruling rejecting preemption under both express and conflict preemption theories does not preclude their current complete preemption argument here, they misconstrue the narrow scope of complete preemption. "Complete preemption is rare," and only applies when the "preemptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *ARCO Environmental Remediation v. Montana Dept. of Health and Environmental Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 65 (1987). If state tort remedies related to MTBE contamination do not expressly or impliedly conflict with any requirement, goal or objective under the CAA, such remedies cannot conceivably be "completely preempted." Indeed, as the Supreme Court has held, even a potentially valid federal preemption defense (which Defendants do not have) is not sufficient to establish removability under the complete preemption doctrine, because "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-399 (1987).

Thus, Defendants cannot escape this Court's prior preemption rulings simply by dressing the same preemption arguments in new clothing.[11] As those preemption arguments are the *sine qua non* of their attempt to find a federal question hidden within these state-law tort actions, Defendants' removal pursuant to 28 U.S.C. § 1331 was improper.

**3. Defendants fail to show that the CAA or any other federal statute contains the exclusive cause of action for Plaintiffs' claims.**

According to the U.S. Supreme Court, complete preemption has been found *only* "when the federal statutes at issue provided the exclusive cause of action for the claim

[11] As it would appear that "the litigation of this particular issue has reached such a stage that [there is] no really good reason for permitting it to be litigated again.," *Zdanok v. Glidden Company, Durkee Famous Foods Division*, 327 F.2d 944, 955 (2d Cir. 1964), the combination of this Court's previous legal holdings in *In re MTBE* and the court's factual findings in *Pataki III* likely bar Defendants from relitigating their preemption arguments here. *See, e.g., Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir.1996) (underlying "matters actually litigated and determined" in prior proceeding were "identical" to those asserted in subsequent case, and therefore barred by doctrine of issue preclusion/collateral estoppel). However, the Court need not address this concern in order to grant the New York Plaintiffs' motions to remand.

asserted and also set forth procedures and remedies governing that cause of action." *Beneficial National Bank v. Anderson,* __ U.S. __, 123 S. Ct. 2058, 2062 (2003). Of course, the CAA provides neither the exclusive cause of action for the claims asserted by the New York Plaintiffs for water-related damages, nor procedures and remedies governing those causes of action.

Defendants blithely assert that various administrative remedies under the CAA, Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.* ("SWDA")[12] and Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* ("TSCA") provide "exclusive remedies for parties seeking to alter the design of reformulated gasoline." Ds' Opp. at 28. Defendants then contradict themselves by acknowledging (as they must) that federal law does *not* provide "the only remedy for the presence of MTBE in groundwater." Ds' Opp. at 30. Of course, under *Beneficial National Bank, supra*, 123 S.Ct. 2062, this concession alone destroys Defendants' complete preemption argument – as federal law must provide the "exclusive" remedy in order to completely preempt a state cause of action for jurisdictional purposes. Defendants' citation to *Pacific Gas & Electric Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 212 (1983), for the proposition that complete preemption can apply to an "identifiable portion" of a field is unavailing. That case, which addressed, and rejected, an occupation-of-the-field preemption defense on the merits, did not involve the complete preemption exception to the well-pleaded complaint rule, and thus is inapposite.

In any case, Defendants' argument fails to overcome an obvious point that was central to this Court's previous rejection of their preemption defense: the CAA specifically *preserves* state common law claims, expressly providing that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or *common law* to seek enforcement of any emission standard or limitation *or to seek any other relief*." 42 U.S.C. § 7604(e) (emphasis added); *In re MTBE Litig., supra,* 175 F. Supp. 2d at 613, n.35 ("Congress' intent to allow some state causes of action is also evidenced by the CAA's citizen suit savings provision, codified at 42 U.S.C. § 7604(e)"); *see also Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492, (1987) (identical savings language in the Clean Water Act "negates the inference that Congress 'left no room' for state causes of action"). The SWDA contains a savings provision identical the CAA provision quoted above. *See* 42 U.S.C. § 6972(f). TSCA contains a similar savings clause, which provides that, except where EPA has promulgated certain rules pertaining to a toxic substance – which it has not in this case – "nothing in this chapter shall affect the authority of any State or political subdivision of a State to establish or continue in effect regulation of any chemical substance, mixture, or article containing a chemical substance or mixture." 15 U.S.C. §2617(a).[13] Accordingly,

---

[12] Defendants incorrectly refer to the SWDA by its prior name, the Resource Conservation & Recovery Act.

[13] Defendants cite *Bastien v. AT&T Wireless*, 205 F.3d 983 (7th Cir. 2000), for the proposition that a savings clause does not necessarily preclude a finding of complete preemption. Ds' Opp. at

Defendants' citations to statutory remedies for non-water related objections to CAA, SWDA and TSCA implementation do not support their "exclusive cause of action" argument.

**4. Congress and EPA intended to preserve state flexibility, not limit it.**

Citing certain statements from the legislative history of the 1990 CAA amendments, Defendants allege that Congress had "the specific knowledge and expectation that MTBE would be the principal means by which refiners met oxygenate requirements." Ds' Opp. at 13. They suggest that this somehow evinces as a congressional intent to "occupy the field" of fuels regulation to the exclusion of state action to remedy water pollution caused by MTBE.[14] This distortion of the legislative history has also been addressed, and rejected, by this Court. As the Court explained in *In re MTBE Litig., supra*:

> [W]hile members of Congress may have anticipated that MTBE would be used to meet the oxygenate requirements, . . . the legislative history of the 1990 CAA amendments indicates that Congress, through the RFG Program, sought to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations." [citation omitted.] Indeed, Congress expected that oxygenates would compete in the marketplace and 'preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA....'

175 F. Supp. 2d at 612-13.

Defendants' selective reference to out of context EPA statements regarding the agency's intent to occupy the field of fuels regulation, *see* Ds' Opp. at 16, 24-25, 28; *citing* 59 Fed. Reg. 7716, 7809 (Feb. 16, 1994), ignores the Agency's own express conclusion that nothing in the CAA fuels programs "establishes a comprehensive federal presence" with respect to MTBE. U.S. EPA, *Approval and Promulgation of*

---

30. But in *Bastien*, unlike the case here, the court found that the plaintiff's claims fell squarely within the express preemption provision of the Federal Communications Act, 47 U.S.C. § 332(c)(3)(A), and that application of the savings clause would thus nullify the preemption provision. 205 F.3d at 987. Here, as described above, this Court, along with every other published decision addressing the question, has found that the CAA's express preemption provision does not apply to state regulation of MTBE in order to prevent water pollution.

[14] Similar attempts by the oil industry to delve into the legislative history of the CAA were rebuffed in *Davis II*, 331 F.3d at 671, where the Court stated: "We hesitate to examine the legislative history, for we find the text of the Act relatively clear."

*Implementation Plans; Nevada State Implementation Plan Revision, Clark County*, 64 Fed. Reg. 29573, 29578 (Jun. 2, 1999), *affirmed in ExxonMobil Corp. v. U.S. E.P.A.*, *supra*, 217 F.3d 1246. According to EPA, "federal regulation here is not so pervasive as to preclude supplementation by states, nor is the federal interest in the field sufficiently dominant to preempt state action." 64 Fed. Reg. at 29578. Instead, such programs "explicitly preserve a role for the states in regulating fuels," and "[w]hile Congress deliberately rejected a federal mandate that would reduce market opportunities for various oxygenates, *it did this with the goal of preserving state flexibility, not limiting it*." *Id.* (emphasis added). As Defendants admit, the court in *Pataki I, supra*, 158 F. Supp. 2d at 255-57, squarely rejected the industry's attempt to unearth any EPA intent to occupy this field. In short, Defendants' position has been rejected soundly both by EPA itself and the courts.

**B. Removal Under § 1442(a)(1) Is Improper Because Defendants Were Not Acting Under the Direction of Any Federal Official or Agency.**

Defendants alternatively claim that they were acting under the direction of federal officers pursuant to 28 U.S.C. §1442(a)(1).[15] The primary beneficiaries of §1442(a)(1) are federal officers and agencies. *Tremblay v. Philip Morris, supra*, 231 F. Supp. 2d at 417. For a *private* party defendant to invoke the statute, it must: (1) assert a colorable defense based on federal law in the notice of removal; (2) establish that it was acting under the direction of a federal officer; and (3) show that its federally directed actions are causally connected to the harm about which the plaintiff complains. *Jefferson County v. Acker*, 527 U.S. 423, 431 (1989). Defendants fail on each of these required showings.

**1. Defendants have no colorable federal defense.**

The only federal defense Defendants raise is conflict preemption. *See* Ds' Opp. at 32. As discussed above: (1) this Court has already rejected this purported defense in an earlier phase of this MDL proceeding; and (2) such defense cannot possibly succeed on the merits in any event, as New York has already banned MTBE and such ban has been definitively upheld in the courts. Defendants have thus failed to raise a "colorable" federal defense.

Defendants suggest that their preemption defense is still viable because this Court "described the . . . issue as one which needed development as a matter of fact." Ds' Opp. at 32. In *In re MTBE Litig, supra*, 175 F. Supp. 2d at 616, the Court observed that, whether alternatives to MTBE "are 'practicable' and have been available to the defendants for their use in the RFG Program is a question of fact that the Court cannot address on a motion to dismiss." Subsequently, however, Defendants had the opportunity

---

[15] Section 1442(a)(1) provides, in pertinent part, that an action may be removed to federal court by "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1).

to prove their case regarding "practicability," and failed. In *Pataki III, supra*, 2003 WL 22845949 at *9, the court found that Defendants' trade association failed to show that New York's MTBE ban would cause supply shortfalls "sufficient to support a finding of conflict preemption."

**2. As private regulated entities that voluntarily *chose* to use MTBE in gasoline despite its known hazards, Defendants never acted under the direction of any federal official.**

Defendants also cannot establish that they undertook their use of MTBE in gasoline and their failure to warn of its known hazards "under the direction" of the federal government. *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 945 (E.D.N.Y. 1992) ("the set of defendants who can avail themselves of § 1442(a) is smaller than the set of defendants who can make a colorable claim to a federal defense"). Their attempt to do so fails for at least three reasons: (a) Defendants, as private actors merely complying with federal regulations, fall outside the class of protected persons under § 1442(a)(1); and (b) because Defendants voluntarily chose to use MTBE from among several available options, they cannot plausibly claim that they were acting "under the direction" of EPA.

**a. Defendants' compliance with RFG regulations does not transform them into agents of the federal government.**

Defendants' attempt to characterize their choice of MTBE to comply with the federal RFG and OFP programs as "acting under the direction of federal officers or agencies" strains credulity. No published decision ever has held that a private sector manufacturer merely subject to complex regulations, and not acting under the operative *contractual* commands of federal officials, acts "under the direction" of the federal government. *See, e.g., Little v. Purdue Pharma, supra*, 227 F. Supp. 2d at 860-61 ("body of law" does not support position that defendant "merely 'subject to complex regulations'" is entitled to removal under §1442(a)(1)).[16]

Defendants here are not federal contractors; they are not producing products for the government; nor are they performing any other governmental function. Rather, they are private enterprises in the business of manufacturing and selling gasoline. Like virtually every other manufacturing business in the United States, they are subject to a variety of federal environmental regulations. Published federal decisions are unanimous in holding that mere participation in a regulated industry does not constitute "acting under the direction" of the federal government under § 1442(a)(1).

---

[16] *See also generally*, WRIGHT, MILLER & COOPER, *supra*, Ch. 7, § 3727, *and* 166 A.L.R. Fed. 297 (2000) (in all cited cases where corporate manufacturer defendants successfully removed state court tort actions under § 1442(a)(1), the defendants were government contractors and the products at issue were produced for the government pursuant to contractual specifications); *see also Ryan*, 781 F. Supp. at 943 (§ 1442 requires "narrow" and "restrictive" construction).

In *Tremblay v. Philip Morris,* 231 F. Supp. 2d 411, 417 (D.N.H. 2002), a cigarette manufacturer removed the plaintiffs' state law deceptive advertising claims under § 1442(a)(1), arguing that by "merely attempting to comply with the FTC's policies ... when it engaged in the conduct for which it has been sued," it was acting under the direction of the FTC. The court flatly rejected this argument, holding that "[a]lthough Philip Morris is a participant in a regulated industry, this is not enough to demonstrate that it acted under the direction of a federal officer." *Id.* at 418. The Court explained: "The mere fact that a tobacco company has complied with the requirements of a federal law cannot suffice to transform it into a federal actor any more than the compliance of a myriad of private enterprises with federal law and administrative regulations could of itself work such a transformation." *Id., quoting Brown v. Philip Morris, Inc.,* 250 F.3d 789, 801 (3rd Cir. 2001).

In *Little v. Purdue Pharma, supra,* 227 F. Supp. 2d at 861, pharmaceutical corporations sued for injuries allegedly caused by the drug OxyContin argued that FDA regulation and approval of the drug made them *de facto* federal officers for purposes of § 1442(a)(1). The court rejected removal, explaining:

> Corporate defendants herein do not operate at the discretion of federal authorities. They are private, for-profit business organizations which exist independently of the federal government. Lest participants in every regulated industry be entitled to "federal officer" status, corporate Defendants need to make a much greater showing than in doing the acts giving rise to Plaintiffs' claims, they were acting pursuant to a federal directive. Acting under the watchful eye of the federal government is not enough.

*Id.*

Similarly, in *Bakalis v. Crossland Savings Bank,* 781 F. Supp. 140, 145 (E.D.N.Y. 1991), the court held that even in cases involving "pervasive regulation" a corporate defendant seeking removal under § 1442(a)(1) must show "'regulation plus'" – *i.e.* that "the corporation is so intimately involved with the government functions as to occupy essentially the position of an employee of the government." Defendants have made no such showing here, nor can they. Indeed, none of the legislative history or EPA regulations cited by Defendants even remotely suggests a federal intent to impose federal *control* over Defendants' refining operations. To the contrary, the legislative history of the 1990 CAA Amendments indicates unequivocally that the RFG program was "in no way intended to resurrect a 1970's DOE-type scheme of detailed government intervention in U.S. gasoline markets." *Pataki I,* 158 F. Supp. 2d at 256-57. Neither the use of MTBE in gasoline nor the harm it has wrought, is anyone's fault but Defendants' own. There is no jurisdiction under § 1442(a)(1).

Defendants' sole support for their novel position to the contrary is *Watson v. Philip Morris*, No. 4:03-CV-519 GTE (E.D. Ark., Dec. 12, 2003), a recent unpublished opinion out of the Eastern District of Arkansas. As the *only* case to ever hold that a private consumer product manufacturer's mere compliance with federal rules constitutes "acting under the direction of a federal officer" for purposes of section 1442(a)(1), *Watson* is clearly an aberration, and should be ignored.[17] *Tremblay*, *Brown* and *Little* should control here. To hold otherwise would create a loophole in this narrow removal statute large enough to accommodate the proverbial Mack Truck.

**b. There is no causal connection between RFG program requirements and the conduct targeted by this lawsuit because refiners voluntarily chose to use MTBE from among several available options.**

The CAA mandates *oxygen* content, not MTBE. 42 U.S.C. § 7545(k)(2)(B). *Every* published decision that has addressed the issue has concluded that neither the CAA nor its implementing regulations requires refiners to use MTBE or any particular oxygenate in order to meet RFG requirements. *See, e.g., In re MTBE Litig.*, 175 F. Supp. 2d at 615 (RFG Program does not mandate the use of MTBE); *ExxonMobil, supra*, 217 F.3d at 1251-53 (CAA "does not mandate a 'recipe' or so-called government gas"); *Davis I*, 163 F. Supp. 2d at 1188 (CAA neither requires nor forbids the use of any particular oxygenate ... [i]ts 'goal' is to assure a particular oxygen content"). Defendants' use of MTBE is a matter of voluntary corporate choice, not a "necessary result" of CAA directives.

Defendants' choice to use MTBE breaks any causal connection between EPA's RFG and OFP regulations and Defendants' use of MTBE. *See Good v. Armstrong World Industries*, 914 F. Supp. at 1130 (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos); *Ryan v. Dow Chemical Co., supra*, 781 F. Supp. at 950 (no nexus between design defect claim and defendants' provision of Agent Orange to the military, because defendant was "being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by defendants"); *accord, Little, supra*, 227 F. Supp. 2d at 861 (because FDA was not involved in the "day-to-day drug development and manufacturing process," defendants were "operating at their own initiative"); *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal.

[17] In any event, *Watson* is easily distinguishable from this case. In *Watson*, Philip Morris was sued for deceptive advertising in connection with tar and nicotine ratings derived from a testing method mandated by the FTC. Thus, the court concluded, plaintiffs' misleading advertising claim "squarely confronts the FTC's mandate." *Watson* at 23. Here, as explained below, there is no causal connection whatsoever between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit, because Defendants voluntarily chose to use MTBE from among several available options.

1998) (target conducted in groundwater contamination case against manufacturers of government rocket engines – failing to warn and improperly disposing of trichloroethylene ("TCE") – was not "under the direction" of the government, even though the government contracts at issue had specifically required use of TCE). As the government does *not* require use of MTBE, Defendants cannot fairly argue that federal directives "caused" the conduct on which the District bases its common law and statutory claims.

C. **<u>The Court Should Remand This Case Because It Is Not "Related To" The Texaco Bankruptcy, and Even If It Were, the Remand Provision Under 28 U.S.C. § 1452(b) Applies Squarely To This Case.</u>**

This Court should also reject Defendants' alternative assertion of federal bankruptcy jurisdiction. Their contention that these state-law environmental contamination lawsuits against numerous defendants represents a purported "collateral attack" against a 15-year-old bankruptcy order pertaining to a single defendant fails because: (1) federal jurisdiction is lacking in the first instance, as this case neither arises under Title 11, arises in a case under Title 11, nor is "related to" a case under Title 11; (2) remand is obviously warranted in light of the overwhelming – indeed, exclusive – predominance of state-law issues on the one hand, and the extreme remoteness of any bankruptcy issues on the other.[18]

1. **Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not "related to" the Texaco Bankruptcy.**

Texaco, Inc. filed for bankruptcy under Title 11 in 1987 and obtained confirmation of its reorganization plan in 1988. *In re Texaco, Inc.*, 84 B.R. 893 (S.D.N.Y. 1988). Because the 15-year-old Title 11 proceedings (the "Texaco Bankruptcy") are no longer being administered, and the rights of all creditors already have been determined in the Confirmation Order, the outcome of this case will have absolutely no effect on *the administration of* the Bankruptcy. It is, therefore, not "related to" this action, and cannot form a basis for federal jurisdiction.

Under 28 U.S.C. § 1334(b), "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Cases "arising under" Title 11 are those cases in which the cause of action is created by title 11, and those "arising in a case under" Title 11 are those that, while not based on any right expressly created by title 11, nevertheless "would have no existence outside of the bankruptcy." *In re Chargit Inc.*, 81 B.R. 243, 246-247 (Bankr.

---

[18] In addition, as the New York Plaintiffs' ably point out in their Reply Brief, nothing in either Defendants' removal notices or the operative complaints demonstrate that any of the Plaintiffs' claims that may pertain to Texaco "arose" prior to entry of Texaco's Confirmation Order, or are even covered by the Confirmation Order.

S.D.N.Y. 1987). This case undoubtedly does *not* fit into either of these jurisdictional categories, as the exclusively state-law causes of action asserted in the complaints "exist independently of bankruptcy law." *See Williams v. Shell Oil Co*, 169 B.R. 684, 688 (S.D. Cal. 1994).

Defendants' contrary suggestion – that this case "invokes substantive rights created by the federal bankruptcy laws" (Ds' Opp. at 5) – has absolutely no merit. Each of the three cases they cite is easily distinguishable from this case. Neither *In re National Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997), *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184 (7th Cir. 1993) nor *Texaco, Inc. v. Sanders (In re Texaco, Inc.)* 182 B.R. 937 (Bankr. S.D.N.Y. 1995) involved a motion to remand a state court action that had been removed to federal court by the debtor. Instead, each involved actions brought originally in federal bankruptcy court. For example, *Texaco v. Sanders* involved a motion by the debtor (Texaco) to reopen its bankruptcy proceeding and enforce its Confirmation Order against the plaintiffs in a state court case. *Id.* at 940-41. The federal bankruptcy court granted Texaco's motion on the common sense grounds that "a proceeding such as this, *to enforce and construe a confirmation order issued by this Court in this case*, constitutes a proceeding 'arising in or related to a case under title 11'" under § 1334(b). *Id.* at 944 (emphasis added). Thus, the Texaco bankruptcy court did not, and was not asked to, address the question presented here: whether a state tort suit (potentially) involving (some) pre-Confirmation Order Texaco conduct, and filed years after entry of such Order, is "related to" the Bankruptcy. The answer to this question, as explained above, is "no."[19]

Nor is this case "related to" the long-since-resolved Texaco Bankruptcy. Whether a civil proceeding is "related to" bankruptcy depends on "whether the outcome of the proceeding could conceivably have any effect on the estate *being* administered." *In re Chargit Inc., supra*, 81 B.R. at 247(emphasis added). "Although the optimist may argue that anything is 'conceivable,' any practical definition of this term of art must be tempered by a measure of reasonableness." *Id.* There is no conceivable chance that this case will affect the administration of the Texaco Bankruptcy, because it is no longer being administered.

By definitively discharging any and all claims or liabilities arising before its effective date, entry of the Texaco Confirmation Order fifteen years ago destroyed any possible relationship between the outcome of this suit and the *administration of* the Texaco Bankruptcy. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988).[20] As is evident

---

[19] The string of recent, simultaneously decided cases from the Southern District of Texas cited by Defendants in favor of their bankruptcy arguments should be disregarded. Although they involved motions to remand, the court's decisions in these cases were predicated expressly on *Texaco v. Sanders*, which, as described above, has no bearing on this case.

[20] *Feitz* involved a cross-claim filed by a debtor's wife against a mortgagee in her husband's bankruptcy proceeding. The cross-claim was filed a mere four months after the bankruptcy

from their complaints, which say nothing at all about the Texaco bankruptcy, the New York Plaintiffs surely have no interest in re-opening such Bankruptcy or "collaterally attacking" the Confirmation Order. The mere fact that allegations in the complaints may potentially cover some pre-1988 conduct of Texaco does not furnish grounds for federal "related to" jurisdiction under § 1334(b). Rather, it means only that Texaco may have a discharge defense based on the Confirmation Order as to some small portion of its liability – a defense that a state court is fully capable of adjudicating. *See In re McGhan, supra*, 288 F.3d at 1180 ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

2. **There are also ample grounds for the court to remand this action pursuant to § 1452(b).**

Defendants acknowledge, as they must, that the District Court's jurisdiction over bankruptcy proceedings is concurrent with that of state courts. 28 U.S.C. § 1334(b); *see* Ds' Opp. at 3. Thus, even if these actions were "related to" the Texaco Bankruptcy pursuant to § 1334(b) – which they are not – the Court should remand them to state court nonetheless, pursuant to 28 U.S.C. §1452(b).[21]

Section 1452(b) provides that "the court to which [a] claim or cause of action is removed [pursuant to § 1334 jurisdiction] may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). In determining whether to exercise their equitable discretion under this statute, courts generally consider the following factors: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the

---

court's entry of a confirmation order as to the bankruptcy estate. *Id.* at 456. Like the Texaco Confirmation Order at issue here, the confirmation order in *Feitz* precluded creditors from asserting any other interest than that provided for them in the confirmed plan. *Id.* at 458. The Ninth Circuit held there was no federal "related to" jurisdiction over the cross-claim because entry of the confirmation order "*destroyed any possible relationship between the outcome of the suit and the administration of the bankruptcy estate.*" *Id.* (emphasis added).

[21] While we recognize that some cases in this Circuit have questioned whether the mandatory abstention provision in 28 U.S.C. §1334(c)(2) applies to removed cases, *see Rennaisance Cosmetics, Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 13 (S.D.N.Y. 2002), we note that conditions for mandatory abstention are met in this case. *See Allied Mechanical and Plumbing v. Dynamic Hostels Housing Dev. Fund Co.*, 62 B.R. 873, 876 (Bankr.S.D.N.Y.1986) (setting out mandatory abstention factors). The pending remand motions were filed as soon as practicable following service of the notices of removal. These lawsuits, which could not have been commenced in the District Court absent the alleged bankruptcy issue, are based exclusively on state-created rights, have been commenced in state court and are capable of timely adjudication there once remanded.

main bankruptcy case; and (6) the existence of the right to a jury trial. *Rennaisance Cosmetics, Inc., supra,* 277 B.R. at 14.

Here, every factor favors remand: (1) the effect of these actions on the administration of the Texaco Bankruptcy is, at most, incredibly remote; (2) the actions are based entirely on state-law causes of action; (3) as Defendants are sure to argue in motions to come, the cases raise difficult questions of state tort law, as well as complex, site-specific factual issues; (4) as New York law predominates, these cases are brought by subdivisions of the state and involve environmental and public issues of statewide importance, principles of comity clearly favor remand; (5) as described above, the remoteness of these cases to the Texaco Bankruptcy is extreme; and (6) the Plaintiffs' claims are triable by a jury. In light of these factors, and the fact that the New York state courts are fully capable of resolving any potential, remote Confirmation Order defense Texaco may assert, the equities not only favor, but demand, a remand of this case to state court. As the court concluded in *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 408 (S.D.N.Y. 1991), these are "state law action[s] and a state court is better able to respond to a suit involving state law."

**CONCLUSION**

This Court does not have subject matter jurisdiction over these actions. Even assuming the Court has jurisdiction over the Texaco Bankruptcy, the equities obviously favor remand. Accordingly, the Court should grant the instant motions for remand.

We will serve copies of this letter on the other counsel involved in these cases and those identified in the schedule attached to the Court's December 23rd Order.

Respectfully submitted,

VICTOR M. SHER

VMS: jac
cc: All Counsel per attached Service List

# Exhibit 14

00005418

42demtbc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

MDL 1358
Master File C.A.
No. 1:00-1898(SAS)

------------------------------x

February 13, 2004
10:00 a.m.

Before:

HON. SHIRA A. SCHEINDLIN,

District Judge

APPEARANCES

COOPER & SCULLY, P.C.
Attorneys for Plaintiffs
SCOTT SUMMY

WEITZ & LUXENBERG, P.C.
Attorneys for Plaintiff La Susa
ROBERT GORDON
SANDERS MCNEW

EIMER STAHL KLEVORN & SOLBERG
Attorneys for Defendant Citgo
NATHAN P. EIMER
JAMES SPETA
LISA MEYER

PATTON BOGGS
Attorneys for Defendants Chevron Texaco, Texaco, Inc.
ROBERT W. JONES

MCDERMOTT, WILL & EMERY
Attorneys for Defendants Exxon Mobil Corp. and defendants liaison counsel
PETER JOHN SACRIPANTI

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42demtbc

A P P E A R A N C E S (continued)

WALLACE KING MARRARO & BRANSON, PLLC
Attorneys for Defendants Shell Oil Co.; Texaco Refining and Marketing, Inc.; Chevron U.S.A. Inc.; Motiva Enterprises; Equilon Enterprises, LLC
RICHARD E. WALLACE, JR.

00005418

HOWREY SIMON ARNOLD & WHITE
Attorneys for Defendants Amerada Hess Corp.
El Paso, CGP Co., Phillips Petroleum Co.
MINDY DAVIS

BEVERIDGE & DIAMOND, P.C.
Attorneys for Defendant Sunoco, Inc. (R&M)
JOHN S. GUTTMANN

GOODWIN PROCTER LLP
Attorneys for Defendant United Refining Co.
ERIC D. MUSSELMON

(Case called)

THE COURT: Good morning. Is it Mr. Summy, Mr. McNew, Mr. Gordon, Mr. Alpert, Mr. Sandman, Mr. Sacripanti, Mr. Eimer, Mr. Speta -- how do you pronounce that?

MR. SPETA: Speta.

THE COURT: Mr. Jones, Mr. Wallace and everybody else. I see some of the people did sign in, but I think it's basically the same ones.

Anybody else actually think they're going to speak on the record of the remaining people I didn't say good morning to individually? No. OK.

All right. We have a lot to cover this morning, it seems to me. It's a complicated argument, and it's the plaintiffs' motion to remand. So I would think that plaintiffs would wish to start the argument.

Although I don't know quite how you plan to use the time, the way I prepared for the argument was to think of this as three possible bases for federal jurisdiction: Possibly bankruptcy, possibly federal preemption, possibly federal agent; as part of preemption, something called substantial federal question. So there's three with a subpart, so I think what we'll do, if that makes sense to you, is to argue each of those separately.

Let's first talk about bankruptcy, if we want; preemption, let the other side be heard on that; then go to

another ground, let the other side be heard on that; and then go to the third ground. I think that would be easiest for me.

Does anybody disagree strongly with that approach?

00005418

MR. McNEW: In fact, your Honor -- Sanders McNew for the plaintiffs -- that would be fine with us.

MR. SACRIPANTI: No objection, your Honor.

THE COURT: Do you want to pick which of the three to start with?

MR. McNEW: Your Honor, would you prefer if we stay at the table or use the lecturn?

THE COURT: I don't prefer.

MR. McNEW: Then I will stand right where I am. I like it.

Your Honor, I didn't come this morning with a long speech on any of these topics because I believe that our papers set out each of our positions. If you would prefer to take the bankruptcy point first --

THE COURT: No, I don't prefer.

MR. McNEW: Do you have a preference?

THE COURT: No, I don't.

MR. McNEW: Then I'll take the bankruptcy point first because that was the point that the defense chose to lean most heavily upon in their own papers.

To me this whole issues rises and falls on one point. Had there been any injury at the time of the Texaco bankruptcy

in 1987? We both agree, both sides agree on what the standard is, what the legal standard is. The legal standard is at 11 U.S.C., Section 105. A debt is a liability on a claim. Only debts get discharged in bankruptcy. Claim -- that's 11 U.S.C. 101(12). A claim is a right to payment. That's 11 U.S.C. 101(5). It's clear that a right payment only arises when you have an injury. There's nothing in the record before your Honor, nothing in the complaint, no allegation in the complaint, no evidence nor even any allegation in the defendant's papers to suggest that there was MTBE in the plaintiffs' wells as of the petition date, the Texaco bankruptcy petition date.

I'm sorry, your Honor. I've been a bankruptcy lawyer for the last 15 years and I have a terrible tendency to fall into shorthand on bankruptcy matters.

These are clear principles, crystal clear principles, absent an injury, there's no claim. Absent a claim, there's no discharge. You can talk about related to and core and noncore bankruptcy jurisdictions until you're blue in the face. They're all nonsequiturs. These issues by sheer happenstance I happen to be quite intimately familiar with. I've done this in the context of asbestos bankruptcy since 1988.

The Manville bankruptcy, as I'm sure you were aware, posed what was then a novel legal issue: What do you do with individuals who have been exposed to asbestos before bankruptcy

but who haven't manifested a disease? Tydberg, Lifflin and Knox finally ended up appointing a guardian ad litem, which he calls a future representative, futures representative. That was actually a fellow from Fried Frank. The futures representative stood in the shoes of absent future victims who hadn't yet manifested an injury; who had been injured, had

inhaled asbestos prepetition, had been injured in fact, didn't know they had been injured because the injury hadn't manifested yet.

Lifflin decided that the way to deal with this issue was to -- was to create this guardian ad litem so that the due process demands of Malane and its progeny could be met. He could have noticed by service on the futures rep. That was appealed by a commercial creditor who said, you can't do that, you can't bind people who aren't before the Court. The Second Circuit in a case called Cain vs. Johns Manville -- I'm sorry, Judge, I didn't bring the citation with me.

The Second Circuit ducked; said, we don't really know if you can do this to people in that position. But in any event you don't have an interest here because you're a commercial creditor. You're not a futures victim, so we don't have to think about it.

Because of that in front of me, because the Second Circuit ducked, the Congress came back and amended the bankruptcy code in a provision called 11 -- Title 11 of U.S.C.,

Section 524(g), which provides a whole panoply of safeguards for people in the position of futures victim and asbestos bankruptcy so that an asbestos bankruptcy could bind future victims. But absent those safeguards you can't bind them.

Now, it's an open question, frankly, whether even 524(g) gets you there. Somebody who later manifests I think has a compelling argument that you can't subvert Malane and the constitutional requirements of due process even by legislation. But that's an argument for another day.

The touchstone here is that you can't adjudicate the rights of people who aren't before the Court somehow. Water providers such as the County of Nassau, the Western Nassau Water Authority, were not before the Texaco bankruptcy. There's nothing in this record to suggest that they had a claim to assert. In fact, if you read 524(g), they don't even talk about future claims, they talk about future interests. Future interests. There's no claim present from our clients at the time of the Texaco bankruptcy that could have been discharged by the Texaco bankruptcy. There's a threshold fact.

THE COURT: Let me explain what's worrying me. I'm trying to listen to you and I'm thinking, he's not talking about what's worrying me, so I guess it's time to tell you what's worrying me.

MR. MCNEW: Please.

THE COURT: If you're saying that there wasn't a

discharge in bankruptcy of claims, because there was no notice and so there might still be a claim for something that occurred before 1988 -- because you do allege that these companies knew about it and there were discharges and there could have been contamination all before 1988 -- and if you don't want to waive such claims, then there may be -- you may still be making claims against what was Texaco and is now Chevron or something, and it would be a bankruptcy matter.

MR. MCNEW: It's only --

00005418

THE COURT: It's that simple, unless you want to waive anything that happened pre1988 and say, we're never going to seek any damages for anything that happened then.

MR. MCNEW: Your Honor, I come back to what I believe is the touchstone. That presumes that there was a claim as of 1987.

THE COURT: Almost the opposite -- oh, you mean -- say it again, that there was?

MR. MCNEW: The bankruptcy petition was filed in 1987.

THE COURT: No. That presumes that you will not be claiming that there was any injury that occurred before that date?

MR. MCNEW: We have not alleged any injury before that date.

THE COURT: Well, you say you haven't alleged it and yet you talk about events going that far back. You say that

the defendants began adding MTBE to gasoline in 1979 and they knew as early as 1980 that MTBE did contaminate groundwater. If it did contaminate groundwater as early as '88, then you may find that in those eight years there was contamination, and you may want to make a claim.

In fact, you say in the bankruptcy there can't be a discharge, that is a discharge in bankruptcy. We weren't given notice, so you're the one who's saying how could any such possible claims have been discharged, because we didn't have notice then. So you are sort of saying, I want it both ways. I want to be able to go back and make a claim because I wasn't discharged in bankruptcy; on the other hand, I haven't made a claim yet. On the other hand, historically by complaint I point out -- to the use in -- I'm sorry, the adding of MTBE starting in '79, the knowledge by 1980 that it actually caused contamination, and as this all develops you might find contamination between 1980 and '88.

Then you might say, well, OK, I'll waive any claim for anything I find out, but you're claiming enterprise liability. The other defendants might not feel so generous. They may say, well, the plaintiff might be willing to waive any recovery of damages for that eight-year period, but what does that do to me? I've got a bunch of defendants here and I might want my share in this enterprise liability theory from Chevron Texaco that's going to go right into that pre -- in the period before

the discharge and bankruptcy. So there's a problem.

MR. MCNEW: I understand your discomfort, Judge.

THE COURT: Well, that's good, because I'm not sure I expressed it so clearly. I'm glad you do.

MR. MCNEW: No, it's very clear to me. And I -- again, I take you back to the touchstone of the definitional provisions of Title 11, because absent an injury -- yes, that's true, we allege a lot of things that occurred prepetition.

THE COURT: Correct, including contamination of groundwater.

MR. MCNEW: However, however, we do not allege contamination of groundwater in Suffolk County -- I'm sorry, in

Nassau County. We allege that they began their course of conduct that led to the events that led to our clients' contamination and liability well before Texaco's bankruptcy. However, it is the fact of injury that gives rise to a claim. If I represented an entity that had no groundwater contamination and I came to this court and I sued based on their bad conduct in the early 1980s, you would throw me out on a 12(b)(6) motion because you'd say, where's your injury? And you would be right.

THE COURT: Except that you had said in the complaint as early as 1980 the defendants knew that MTBE actually contaminated groundwater. So where was that contamination? Do we know yet, or were you just saying generally we know it

happened, now we'll discover where and we may discover that it was in Nassau or Suffolk, whichever we have?

MR. MCNEW: It was Rockaway, New Jersey, your Honor.

THE COURT: Oh. And can you be sure that's all you're going to discover, is that that's the only contamination that occurred before 1988?

MR. MCNEW: Your Honor, I frankly can't -- I can't divine the future.

THE COURT: Correct. So -- wait, wait, wait. So that's true. You could say to me, well, if we discover anything between 1980 and '88, we'll waive our claim to damages for that period so we don't have a bankruptcy problem. Then the only problem I'd be left with is what I said before about the enterprise liability; that is, the question about the defendants vis-a-vis each other, because if you said, I see your point, we're not seeking, it's more than not finding right now, not identifying contamination. Even if we find it, we are not going to seek damages for that period because we don't want to complete the bankruptcy problem. So we're ready to do that, we're ready to make that agreement.

If you said that, then I would turn to Mr. Sacripanti or team Sacripanti and say, who -- do we have a problem between defendants on this enterprise liability theory, because if you're out, you'd say, I followed the Court completely. We're not interested in seeking damages even if we find it between

1980 and '88, we're just not.

MR. MCNEW: To be honest, Judge, I have a hard time imagining what damages we would allege during that period.

THE COURT: That's good, because you're the one who made a lot of points about not being discharged in the bankruptcy, you didn't get notice. It sounded like you wanted to keep that open.

MR. MCNEW: No, Judge. It's belts and braces. There are so many reasons why the one bankruptcy argument isn't firm. I was just adding an additional reason why even if you could get past the issue of no injury prepetition, why this argument doesn't fly.

THE COURT: OK, I thought you were holding it open to say we were never discharged, we want to be able to go back and seek damages against what was then Texaco if we find injury

during that period. If you say yes, we're prepared to state in this argument today that we don't seek any damages, even if we find contamination for anything that happened pre'88 as to Texaco --

MR. McNEW: I think I'm giving up what is largely a null set, so I don't have any problem saying that to you.

THE COURT: That's easy. So now I turn to the defense table and say the plaintiffs, no matter what -- who's going do address this from the defense side? The plaintiffs no matter what are not going to seek any damages for anything that

occurred pre'88, even if they find it, it's not in the complaint now and they don't want to seek damages. So, how does the bankruptcy enter into this thing?

MR. JONES: Your Honor, a couple of points there. One of them is that is not what the plaintiffs' pleadings state.

THE COURT: Well, that's what they state now. They can always amend to fix it. They said this is our position, we are not going to seek any damages for anything that occurred before '88 as to Texaco.

MR. JONES: All right.

THE COURT: So assume it's amended to say that.

MR. JONES: If it's amended to say that, the first thing, your Honor, is that there is still an issue. There still would be an issue with regard to whether certain claims do, in fact, arise before or after that date. What the plaintiff would try --

THE COURT: What does that mean? I don't know what you mean by that.

MR. JONES: If your Honor would indulge me a minute, let me explain a little bit. Some of the exhibits that were presented in some of the briefing that was provided to the Court involved a case in Texas called Timely Avengers. In that case -- it was a very similar case. It was an environmental case against Texaco in the Southern District of Texas. It was filed in state court in the Rio Grande Valley and --

THE COURT: When?

MR. JONES: It was in 1996, your Honor.

THE COURT: OK.

MR. JONES: And in that case, that case was -- it was an environmental contamination; in fact, very similar because it involved the leaking of underground storage tanks filed against Texaco and multiple other defendants. Texaco, again, removed -- as Texaco did here, removed that case.

Initially there was a ruling from the federal court. It was referred to the bankruptcy court for a recommendation. Bankruptcy court recommended that there is jurisdiction, the case should remain there. District court adopted that recommendation. When that happened in Timely Avengers, here's what the plaintiffs then tried to do. The plaintiffs then tried to -- they provided a stipulation, and in that stipulation the plaintiffs actually said, we stipulate that we are not going to seek recovery for any -- we recognize the bankruptcy. We recognize, in fact, the ruling of Sanders, the

00005418

bankruptcy court here in the Southern District of New York. We will abide by that. We will not seek any recovery for pre1988 contamination.

THE COURT: OK.

MR. JONES: Based on that they filed a motion for summary judgment.

THE COURT: OK.

MR. JONES: And we opposed, we representing Texaco opposed that motion for summary judgment.

The Court -- the bankruptcy court and the district court in the Southern District of Texas rejected that motion for summary judgment. And the reason the court rejected that is that the Court said, inevitably what's going to happen is you are still going to be embroiled -- because of the plaintiffs' allegations and because of the nature of the contamination that was referred to, you would still be embroiled in a dispute with regard to whether or not that -- on which side of that line that contamination fell. And what the plaintiffs were trying to do was get back to state court --

THE COURT: I don't really understand that ruling, I must say. I do not understand how it any longer affects the bankrupt estate. I mean, if nobody's making a claim on a bankrupt estate, it's over. The only thing that interested me here was this theory of enterprise liability maybe, but I don't really understand that case.

MR. JONES: Well, your Honor, I think the reason is because -- what happens is that that kind of a stipulation from the plaintiffs here begs the question -- in other words, the plaintiffs can't just say, we stipulate, or we agree that we will not assert claims that arise -- that arise prior to 1988.

THE COURT: It's not a matter of arising. I can understand the facts may have started there, the MTBE might

have been added then and the contamination begun, but they're just saying, we're just not seeking any damages that might affect the bankrupt estate. We don't want anything for any injury that occurred before '88. The injury occurred when the contamination occurred and we're only going to talk about contamination occurring after '88.

MR. JONES: That is exactly my point, because the way that the Court just articulated that point, which is only injury occurring after 1988, that is the issue that will be disputed because take for example -- your Honor, the plaintiffs' allegations, which included -- and if I might indulge the Court, one of the plaintiffs' allegations here in their complaint is that whenever gasoline with MTBE leaks, spills or is otherwise released into the environment, the MTBE races through underground water reservoirs spreading faster and further than other chemical compounds contained in gasoline reaching the water table and soon contaminating wells that draw from the affected underground aquifers.

The point here is that there will be a dispute over whether or not this contamination occurred before the 1988 time line or after. And if the Court -- might I refer the Court to

00005418

the standard of determining on which side of this line a claim falls. And I need to emphasize that there is a big difference between property damage claims, which we have here, and the personal injury claims that Mr. McNew referred to. There's a

huge difference because of the issue of a -- manifestation of future injury.

What all the case law is, there's a big difference. In the standard for determining property damage, as the Court in Sanders delineated, and that's been adopted and approved now by the Second Circuit, it says if you have a discharge or a threatened discharge prior to the cut-off date, if there is contamination and if it can be detected scientifically, then that is a prepetition claim. So what the plaintiffs would try to argue with their evidence is come in and say -- let's just take, for example, what the plaintiffs would say is we stipulate that we're not going to -- we're not going to assert any claim that arises prior to 1988. Then they come in with an expert and that expert says, you know, I've examined this aquifer and I find that even though this discharge -- even though the discharge of contaminants started occurring in 1979, I find as an expert that, in fact, this aquifer wasn't contaminated until 1989. We're entitled to challenge that and say that's ridiculous.

To the extent --

THE COURT: Yes, but wouldn't you then have a complete win, because if your expert proves that it occurred in '87 and they have waived any claim for any damage that occurred before '88, there's no claim against the bankrupt estate, because in advance of the ruling of which expert is right, they say if you

win on '87, we get zero, because we waived our right to get the money.

MR. JONES: But who is to resolve that dispute? That's the point.

THE COURT: You still win because if the state court says it occurred in '87, you win. They have waived the claim. So whatever it is, the bankrupt estate is not threatened.

MR. JONES: If we win, it is not, but the problem with that is -- and this is the reason that the Court's reasoning in Timely Avengers is sound. What the Court said in that opinion was that Texaco is entitled to a federal forum in which to resolve that dispute, because the --

THE COURT: Even though the bankruptcy estate can't be threatened with this stipulation? Because once it's found it occurred in '87 -- this is hypothetical, of course -- once it occurred in '87, whether state court or federal says it or anybody says it, there's no threat on the bankrupt estate. So from the beginning there's no threat to the bankrupt estate.

MR. JONES: Your Honor, what the Court is stating there is a given under bankruptcy law. Bankruptcy law and our confirmation orders already say, if it arises prior to that time, it's discharged. That's already -- their stipulation --

THE COURT: That's not true, because they're challenging the discharge. I'm putting all that aside.

00005418

They're challenging the discharge saying, we didn't have notice

of it, this and that. I'm going further and saying with this stipulation, I don't understand that the bankrupt estate is in jeopardy any which way. Even though I followed your hypothetical about the competing experts and the expert, they said that injury occurred in '89. Your expert approves it occurred in '87, but they've already waived. They already said, we have no claim, that's what we said; said it in order to get back to state court, but we said it. So the bankrupt estate is fully protected, so how is it a bankruptcy issue?

MR. JONES: Because the questions -- because the issue, the legal issues and the issues that would need to be applied to determine when that claim arose and whether or not that claim arises in '87, '85, '83, '89 or '90, those are the issues that are determined by -- those are bankruptcy law federal law issues.

THE COURT: I can't understand that, not if the bankruptcy court isn't in jeopardy.

But I'm giving you another good theory and haven't heard you talk about it yet. Your codefendants may say, well, wait a minute, '87, they're going to want all this money from us for this '87 injury. Plaintiff has said, we're not looking to Texaco. What about all of this enterprise liability, I want my Texaco share. Aha, I was bankrupt then and that involves the bankruptcy estate. I am at risk. So it's still federal. What about that?

MR. JONES: That is certainly true, your Honor.

THE COURT: Let's talk about that then, because I think that may give you what you need. I don't know.

MR. JONES: It may give -- in fact, that may be more appropriately addressed by --

THE COURT: Then do it. Who wants to talk, Mr. Eimer?

MR. EIMER: Your Honor, I want to go to a subset, if I can, first because I think it's broader. And I will come to that. I'll come right back to it. I looked -- their enterprise theory of liability for the most part is based on conspiracy allegations. That's paragraph 80 through 83 of their complaint. Conspiracy allegations include Texaco and says that beginning in early 1980s we all conspired, and the natural consequence of that, they say, is contamination all the way to today.

THE COURT: Right.

MR. EIMER: Texaco, when it entered into this conspiracy supposedly in 1980, is responsible under this conspiracy theory for contamination not just to the date of bankruptcy but the natural consequences of that conspiracy, which they say is until today. So saying to Texaco, oh, we won't claim for you up to '88 does not relieve Texaco of the conspiracy liability they have alleged against it in this complaint.

THE COURT: But they say -- they could say it does.

00005418

what do you say -- in other words, the plaintiffs can say I'm still giving a free pass.

MR. EIMER: The free pass has to be up to today because a conspirator is responsible for natural consequence of the conspiracy they create. According to their complaint, the natural consequence is a direct and proximate result of defendant's above described conspiracy. MTBE at all times relevant to this litigation has contaminated plaintiffs' aquifers and wells up to today. So they say the natural consequence of the conspiracy Texaco entered into in the early '80s is the contamination of the aquifer throughout the 20-year period of the conspiracy.

THE COURT: And this threatens the bankruptcy estate so to speak?

MR. EIMER: Because Texaco is responsible here for its supposedly illegal conduct in 1981, '82, '83, '84 up until '88. And that would be within the bankruptcy period which should have been discharged. And they're saying it's not discharged. So they're coming back in now and saying what you did prebankruptcy entering into this conspiracy has resulted in 20 years' worth of injury. And we're going to hold you responsible for it in this courtroom.

So first by saying they're not going to recover against Texaco only up to what happened up until 1988 does not discharge Texaco for its prebankruptcy conspiracy liability.

They're responsible for that, that's step one. They have not abolished Texaco's prebankruptcy liability.

Second, we have claims -- and your Honor's exactly right, we have claims for contribution against them for this entire period based on this conspiracy theory. And those certainly are not discharged. Otherwise, they wipe out the whole lawsuit because, first of all, we have claims pre1988 for the 1988 discharges or contamination. However, they want to look at it. That clearly is not being -- they say is waived but has not been wiped out.

And I say the conspiracy means that Texaco prebankruptcy liability is responsible for 20 years' worth of liability. That's what they're claiming in the complaint. And the only way they can relieve us of contribution claims is to relieve Texaco of all 20 years' worth of claim and then discharge us the same way, so it can't be. It can't be that Texaco is free here for the prebankruptcy conduct.

THE COURT: Let me ask this, then: Is this not a damages issue that could be sorted out if and when there's a judgment? In other words, should this all go back to state court and it's all played out -- liability is tried, judgment is entered -- then when there's a fight about who paid, who's got the money, that may be a bankruptcy issue. And it comes back to federal court as an enforcement of the judgment action, so to speak.

00005418

MR. EIMER: I don't think so. And the reason I don't think so, first, the question of what is Texaco's prebankruptcy liability going to be in this case? In this case they could be proving that Texaco entered into a conspiracy in 1987 and then in unrelated station in 2000 got discharged. And they're going to hold Texaco responsible there.

THE COURT: Wait, wait, wait. You used the word discharge and I didn't follow. Say it again? I know the word is coming up.

MR. EIMER: They could be saying that Texaco entered into a conspiracy in 1984 and then in the year 2000 there was a leak in some unrelated station and Texaco was jointly and severally responsible for that --

THE COURT: So you're saying it's part of the liability theory in that case?

MR. EIMER: Exactly. And saying to Texaco, well, we won't hold you responsible for leaks at your stations prior to 1988 doesn't resolve that 2000 leak at somebody else's station. So that's an inherent part of it. In this proceeding we haven't gotten around to answering, but we may well be having cross claims against each other.

THE COURT: That's sort of what I presumed. I guess that takes it back to you, Mr. McNew, and at least flushes out the problem area.

MR. MCNEW: Again, your Honor, I appreciate your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

42demtbc

concern about it. I hope at the end of the argument I will have outlaid them.

THE COURT: I want to make something else clear. You know, I'm not saying that these -- at this point I'm not saying that these actions constitute proceedings arising under Title 11. I'm not saying they arise in the case under Title 11. The one I'm worried about is related to the case under Title 11.

MR. MCNEW: I understand that, your Honor.

THE COURT: OK.

MR. MCNEW: First of all, I want to go back to first principles here. What I just heard from the defense was a lot of speculation and hypothesis.

THE COURT: Some of it has to do with your pleading at page 41, market share concert of action and enterprise liability. I mean, they're saying you have a conspiracy theory. Conspiracy goes back to 1980.

MR. MCNEW: I understand that. Let me -- first I'm talking about the question of injury and fact.

THE COURT: OK.

MR. MCNEW: May have been released into an aquifer. May have been discharged. We allege that there were discharges as early I believe as 1980.

THE COURT: Right.

MR. MCNEW: This was to build the proof of early knowledge of the defendants.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

42demtbc

THE COURT: I know why it's there.

MR. MCNEW: There's no allegation in the complaint that any well that any of my clients had was contaminated, had

00005418

MTBE hits by 1988.

THE COURT: Right, but he pointed out that would become a fact question. As long as you allege that the leaks occurred or the discharges occurred, whatever the words are pre -- say as early as 1980 becomes an expert question as to when they would have hit the wells, because you have also argued, I remember from the last time around, the speed that it travels from the groundwater, etc., that's going to be a question. You may have reason to want to show that it wasn't until post '88, but whatever reason, if it occurred at all, if it did cause harm, it may have been before, that may become a question.

MR. MCNEW: It is an old rule of law recognized by the Supreme Court at least as early as the Pullman decision and repeated ad nauseam thereafter that it's their burden. It's the defense's burden to prove their entitlement to removal here.

A release into an aquifer, one release into an aquifer which we did plead does not translate into contamination of my client's water. And it's their burden to show you, Judge. It's their burden. It's not my burden to disprove it. It's their burden to prove it. This isn't a difficult point to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

42demtbc

prove. The well hits are all matters of public record. They can and they have filed FOIA requests with the state governments, the state departments of environmental protection to get this information. If there were pre1988 hits to these wells, it was their burden to say, look, Judge, here's the record. Here are the facts. These facts show that this was a prepetitioned entry to Texaco and it triggers the Texaco discharge. They didn't do that, Judge. It's their burden.

Now, on the conspiracy point -- I have to come back to the conspiracy point, Judge. That's a great point. I wish I had my copy of the code with me, but if you look back in the code and what is a dischargeable debt under Title 11, you will see that one of the exceptions to discharge are injuries arising from willful torts. A conspiracy is by definition a willful tort. If what they're saying is that their discharge -- that they're able to claim that the discharge of their confirmation order releases them from conspiracy liabilities, that's just not the law.

THE COURT: I think they're saying the opposite. They're saying if, in fact, there's a colorable argument that it doesn't, then it reopens or puts at risk the bankrupt estate because you are alleging a conspiracy for which they may have liability in a period before the discharge which you argue does not discharge them, then it should be a bankruptcy matter because it opens up the bankruptcy so to speak and puts the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

42demtbc

bankrupt estate at risk.

MR. MCNEW: How does it put the -- first of all --

THE COURT: Because it's not discharged. You just said so. Your theory is it's not discharged.

MR. MCNEW: If there were a claim, it would not have been discharged. There was not a claim.

00005418

THE COURT: But there may be one now because you are alleging a conspiracy going back to 1980. It --

MR. MCNEW: A conspiracy claim by definition cannot be discharged.

THE COURT: OK. I guess I'm saying -- because I'm not a bankruptcy lawyer I may be saying this wrong, but I don't know about discharge or nondischarge. Is it not still put at risk at the time of the bankruptcy?

MR. MCNEW: No.

THE COURT: No. Who has liability for action that occurred then?

MR. MCNEW: There is no Texaco bankruptcy estate.

THE COURT: The bankruptcy estate dies, right.

MR. MCNEW: Upon confirmation. It doesn't exist anymore.

THE COURT: Right.

MR. MCNEW: It's a fiction, and the fiction is ended upon the confirmation of the bankruptcy.

THE COURT: Right.

MR. MCNEW: So it's not as if there is some Texaco bankruptcy estate out here that's going to be implicated by this. And there's a whole 'nother line of argument I didn't bother the Court with, is whether you can have a related-to jurisdiction when you're talking about any conceivable effect on a bankruptcy, effect that doesn't exist because -- I didn't go there because I thought it was an added layer of complexity.

THE COURT: I thought it would reopen or put at risk something that was closed.

MR. MCNEW: It does not in any way put at risk the Texaco confirmation order or cause the bankruptcy to become reopened or to risk a post confirmation readjustment of the rights and responsibilities of the creditors and other parties and interests in the Texaco bankruptcy. Doesn't do any of those things, Judge. We're talking here strictly about whether Texaco has a defense in this case that its confirmation order bars the bringing of these cases against it, full stop. That's all this does.

Now, we didn't brief this because they didn't bring this up in their arguments. This is a new argument this morning, and I would be happy to provide your Honor with a brief, but it is -- the idea that -- the idea that they have that they can get a discharge because their conspiracy activities give rise to a prepetition claim is like an orphan asking for the Court's indulgence because he killed his

parents. I got that backwards.

THE COURT: That's OK.

MR. MCNEW: That was a George Bush way of putting it.

But, your Honor, the bottom line is they bear the burden here. They bear the burden of coming to you and showing you an injury that occurred before the bankruptcy. They didn't do that. Their burden. It didn't shoulder it. A conspiracy point is a red herring. I'm happy to brief it for you if you want additional papers on that.

00005418

THE COURT: Mr. --

MR. JONES: Jones, your Honor. Just one final thing, if I might approach. We have prepared a summary of the allegations in the plaintiffs' complaint that I think put to rest this issue of what they're alleging and whether they allege damages that occur prior to 1988. I think it's very clear and we have summarized all of those allegations from them.

THE COURT: Well, but they said -- we're back to the proper stipulation. Whatever they said in the complaint, they don't seek damages pre1988 conduct. That's when Mr. Eimer rose and started talking about conspiracy, and Mr. McNew rebuts that and says conspiracy is a willful tort never dischargeable anyway.

MR. JONES: Mr. McNew is talking about individuals and individual bankruptcies and in Chapter 7s. We had a confirmed

Chapter 11 plan here. The confirmation order states that all claims against Texaco that arose prior to the date of this order are discharged and are barred.

THE COURT: And can that cover intentional torts such as conspiracy?

MR. JONES: It does.

THE COURT: You say so and he says no. So that does sound like a real legal dispute, I suppose, not a factual one.

MR. JONES: But that is also -- once again, your Honor, the issues that are being raised here are issues with regard to the scope of our confirmation order. This is a federal judgment. The confirmation order is a federal judgment. The Sanders case itself, the Sanders case itself addressed very similar issues, and the Court in Sanders found that those claims were, in fact, barred.

The issues that Mr. McNew raises --

THE COURT: Barred were intentional torts such as conspiracy, actually barred you're saying, in Sanders?

MR. JONES: I don't believe that that was -- I'm not sure about the -- I don't know the answer to that, your Honor.

THE COURT: So what are you saying about Sanders?

MR. JONES: The point about Sanders was actually addressing Mr. McNew's other point, which is the estate has been closed and there is no longer any stay. I think all of the law says that in the event of enforcement of a discharge or

enforcement of a confirmation order, of course the estate is closed. As soon as you have a confirmation order, the estate goes away.

THE COURT: I accept that, but that isn't a main point or better point. The other point is that intentional tort of conspiracy would never be dischargeable anyway, so what does that have to do with bankruptcy.

MR. JONES: If that is the contention, I'll address that argument because I firmly believe all of those claims are, in fact, discharged by the Texaco confirmation order.

THE COURT: You firmly believe that's not so?

MR. MCNEW: Judge, I've been a bankruptcy lawyer for

00005418

15 year. He says it's a Chapter 7 bankruptcy, it is not. He says --

MR. JONES: Confirmation of a plan.

MR. McNEW: He said --

THE COURT: I thought he said it was not a Chapter 7.

MR. McNEW: He said it only applies to Chapter 7, individual bankruptcies, and that's not true. In fact, it's in the part of Title 11 that relates to commercial Chapter 11 bankruptcies. It's 11 U.S.C. 11(27) or (29) I think, or (44). It's one of those three, it's either 11(27), 11(29) or 11(44). Not sure which one of those three, but one of them talks about the effects of confirmation upon close of a bankruptcy and the debts that are discharged in a business reorganization. This

is not a matter of, you know, somebody committing credit card fraud, individual. This is the scope of discharge in every Chapter 7 reorganization -- Chapter 11 reorganization, excuse me.

THE COURT: Well, you've just disagreed on the law with respect to that, and you're right, that can be easily handled in a post argument letter. I don't need a brief. The letter should be as short as this: I cite the following two controlling cases or two controlling statutes. The other side should write back, here's the controlling case or controlling statute and it's that simple. I can read them.

Who wants to say more about bankruptcy, or are we done with that part of the argument, I think?

MR. WALLACE: I'd like to add one point.

Richard Wallace, I also represent Texaco.

And it strikes me that all the arguments you are hearing today merely scratch the surface of the kinds of arguments that a Court would have to resolve in order to determine what claims are or are not discharged regardless of what estimations the plaintiffs offer. And we simply submit that those questions need to be answered in federal court rather than state court, precisely because they raise federal issues.

MR. McNEW: One last word, your Honor, in response to that. There are lots of cases out there that say that a party

can raise a discharge defense in state or federal court. There's no magic to doing it in a federal forum. If they have a discharge defense, they can raise the discharge defense down in state court. I mean, this is, you know, grasping at the slimmest reed to try and bring up a case that has dozens of defendants that alleges only state law injuries into a federal forum without even an effort on their part to provide the Court with the evidentiary record that Pullman and its progeny requires them to produce if they're going to remove this case against the nonbankrupt defendants. It goes to the heart of the federal state relationship set forth in the Constitution. It would be shocking to see this case brought up on a bankruptcy point, your Honor.

THE COURT: I have another question that in a sense applies across the board to the three proffered bases for

jurisdiction. Might as well quell the problem now and see what you think on this one.

Strategically we put the declaratory judgment actions to the side. There's been no motions, there has been no actions, but the burdens would be different. In other words, in the declaratory judgment action it would be a defense that would be raised by the plaintiffs to say there's no federal jurisdiction. You would say the case should be dismissed, shouldn't be in federal court, there's no federal jurisdiction. Would that be what you would say with respect to the

declaratory judgment actions?

MR. MCNEW: That would certainly be one of our responses, Judge.

THE COURT: My point was going to be there you would not be able to cite this law, Pullman line of cases, how they have the burden to show the bases of their removal etc., etc. because the burdens would be different. There you would carry the burden as a defense to say there's no federal jurisdiction. The burden would shift.

Furthermore, if I find no federal jurisdiction on the motion to dismiss the declaratory judgment action, it could be appealed. So if I said there's no federal jurisdiction, they could go right to the circuit and get a ruling and say there is or there isn't on the declaratory judgment actions. The removal remand issue is procedurally different, as you just stressed; burdens of proof, appealability, different kettle of fish. Why weren't we doing them both at the same time, since as a defense they're raising the exact same federal jurisdiction issues with the right to be appealed?

MR. MCNEW: I am speaking off my head, but my understanding is that once jurisdiction is challenged, it is the burden of the party asserting the jurisdiction --

THE COURT: That's true, too.

MR. MCNEW: -- to prove it. I don't believe that --

THE COURT: But appealability is still a point. In

other words, if you move to dismiss a federal case on a lack of subject matter jurisdiction and you win, that's appealable. So it could have -- put those to the side, but it troubles me because the same arguments will be raised.

MR. MCNEW: Well, your Honor --

THE COURT: I really wonder now if it shouldn't be done as a package so that one way or another there could be appellate review.

MR. MCNEW: There is a difference in the appealability of the one and the other. On the other hand, I don't think there's any difference in the burdens --

THE COURT: You've corrected me. Thank you.

MR. MCNEW: And, you know, as to why we've done it this way, could we have done it another way? I think those are kind of speculative. The fact is --

THE COURT: Not very speculative to me. I began to worry about that as I prepared for this oral argument.

MR. MCNEW: We're here on our motion to amend.

00005418

THE COURT: I don't doubt that. I'm worried about the opportunity for appellate review of these very tricky issues, such as the one we just had 50 minutes of argument on and we probably barely scratched the surface of what it would take to educate me about bankruptcy law. Instead of eight hours it would probably take eighty hours for me to really understand it all. Tricky stuff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

42demtbc

MR. MCNEW: That's why God created bankruptcy judges.

THE COURT: You really know how to hurt a lady. I'll pretend you didn't say that.

MR. MCNEW: It's a definition of labor, your Honor.

THE COURT: I don't think you can rescue it. I'd let that one go, it was so painful. So painful.

Maybe we should use that to turn to either preemption or -- what's the other one here, federal agent? And, again, I have no preference where we begin with that one. Your choice. Mr. McNew again, which one are you handling now?

MR. MCNEW: If you'd prefer preemption, we can take that.

THE COURT: I have no preferences. We can do federal agent. We can do preemption.

MR. MCNEW: It's the next word on my list so it's as good a one as any.

THE COURT: Let me just get the notes in front of me. Go ahead.

MR. MCNEW: I'm guided by our first colloquy. I think I spent a good five or ten minutes before I got to what you were concerned about, and rather than --

THE COURT: No, go ahead. All right, well --

MR. MCNEW: Perhaps you could tell us what's of concern to you and we would be happy to address those points.

THE COURT: What's concerning to me now is I can't get

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

42demtbc

my papers in order, so give me a second to achieve that.

MR. MCNEW: I'll make an observation while you're looking, your Honor, and the observation that I would make, it's suggested in my papers, and I wish I just said it more forthrightly, the crux of the argument on preemption, I believe, is that the parade of horribles that will attend an adverse ruling on MTBE, that if we are right and we win on the state law issues, that it will disrupt the distribution of gasoline. I just want to make the point that that is frankly an illogical position in my cases because I'm representing New York cases.

The State of New York has already banned the use of MTBE in New York starting January of this year. It is impossible for any ruling in these cases to have the least effect on the distribution and sale of gasoline in New York because New York's already banned it.

And, in fact, if you look at the 18 states that have already banned or restricted the use of MTBE, they account for over half the gasoline usage in the country. So by legislative -- and I would also add that the energy bill that the defendants have been seeking to have enacted on Capitol

00005418

Hill, HR 6, which is currently inert but is about to be revived by the defendants, provides for a nationwide ban of MTBE. So it's very difficult for me to understand how a plaintiffs' verdict in this case would have any impact on the distribution

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

42demtbc

of gasoline.

If you'll direct me to the things of concern to you, your Honor, I'd be happy to address them.

THE COURT: I suppose one I have is with the language of 42 U.S.C., Section 7545(z)(4)(A)(2), you know that one sentence everybody talks about, no state or political subdivision thereof may prescribe or attempt to enforce for purposes of motor vehicle emission control --

MR. MCNEW: Yes, your Honor.

THE COURT: -- any control or prohibition respecting any characteristic or component of fuel or fuel additive.

And my question there is a simple one: Is there any purpose other than motor vehicle emission control for these fuel additives?

MR. MCNEW: No.

THE COURT: That is the only purpose?

MR. MCNEW: Yes, to my knowledge, as far as the regulation goes there are commercial reasons why the defendants choose to use MTBE. It's a byproduct of the refining process. They have to pay to dispose of it, otherwise they get to turn a silk purse out of a sow's ear. But the regulatory purpose of it, I believe, is motor vehicle emission control.

THE COURT: What are the options, then, if New York has banned the use of MTBE?

MR. MCNEW: Correct, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

42demtbc

THE COURT: So what's going to be used?

MR. MCNEW: Nothing, your Honor.

THE COURT: And that's always been a viable alternative?

MR. MCNEW: Always. Well, the gallery laughs, your Honor, but the fact is it always has been. It was on the list of approved --

THE COURT: I know it was on the list, but I thought the argument was the problem with that list is it was a list with no options. Essentially the government was mandating MTBE because the other six weren't viable, so to speak.

MR. MCNEW: The record in the Pataki case, which was a tried case in front of Judge Mordue up in the Northern District of New York puts a lie to that. Judge Mordue heard the evidence, they put their best case on. At that point Judge Mordue ruled at most there would be some difficulty; six months might find some shortages, transitional shortages for six months.

MR. SACRIPANTI: Just a point of clarification. Mr. McNew says "they." He's of course not referring to the defendants here, which weren't defendants in that action. I assume he means the defendants or plaintiffs in that action?

MR. MCNEW: It was the Oxygenated Fuels Association, which is the defendants' trade association.

00005418

MR. JONES: No, it's not.

MR. McNEW: You'll have your chance.

THE COURT: I appreciate clarification on something I don't know if they can correct -- if there is a correction that I should hear, it's all right to do that.

MR. McNEW: Your Honor, if -- and I'm not arguing that they're estopped from raising these points. I'm not raising it for the purpose of collateral estoppel, but the Oxygenated Fuels Association has -- because they are the trade association for manufacturers of MTBE, they have a compelling interest in this matter. They put their best case up in front of Judge Mordue and he found that there was no basis for the facts.

THE COURT: I guess that's the point Mr. Sacripanti was referring to. He didn't get a chance to put his best case up only because he wasn't there.

MR. McNEW: But, your Honor, if there is a -- if there is a case to be made, they need to make it. They can't just make a vague allegation of it.

THE COURT: I understand. It's one of the questions I was going to get to when they get their turn.

MR. GUTMAN: May I just for purposes of clarification one other point -- John Gutman for Sunoco.

Judge Mordue's decision is a recent ---

THE COURT: You are going too fast.

MR. GUTMAN: I know I'm injecting myself here, but the allegations in these complaints go back to 1988, 1990. And the

issue under the plaintiffs' theories are whether or not the defendants suppressed knowledge about MTBE and -- versus other alternatives in 1988, '90, a fundamentally different question.

MR. McNEW: Your Honor, with all due respect, it's corn. I mean, it's a still. I mean, they have been making this stuff up in the hills of Kentucky since the 18th century. There's no magic to making ethanol. It's not rocket science to make this stuff. You have to build a plan. It takes some time to build it.

There already are large plants that make ethanol for a variety of other purposes. Will it take some time for them to expand their production capacity? Yes. Was that capacity large back in the 1980s? Yes. Could they have done it in the 1980s? Yes. Would it have taken more than a year? Absolutely not. If they needed to use MTBE to transition, to segue while they were using ethanol, could they have done that? Yes. Did they ever in the 20 years look to ethanol, which would have been an environmentally responsible thing to do? Could they have done that? Yes. Did they? No. They did not. They never once sought to use an environmentally acceptable product here.

The notion that -- they're putting me in the position of carrying their burden.

THE COURT: You're right. My fault, I should have heard from them first.

00005418

So who wants to speak on preemption?

MR. EIMER: Good morning, your Honor. Nate Eimer on behalf of the defendants.

I'm not sure which question you'd like me to go to first, but I'm glad to start with C4A to start with that. Your question was: Are any of these fuel additives regulated for or used for any other purpose other than motor fuel? The answer is yes.

And take a good example: MTBE surprisingly -- it may seem from what you hear in this courtroom, MTBE has medicinal uses. It's given to individuals who have gall stones for the dissolution of gall stones. So, yes, it has other uses.

I thought there's obviously a controversy about how C4A should be read, and I think the first thing I'd like to mention to the Court is regardless of how it's read, even read the plaintiffs' way, their complaint walks right into the express preemption language as they would read C4A.

And if I may hand the Court, I've just excerpted some paragraphs of the complaint for the Court's benefit, if I may approach the bench. There's some paragraphs I will get to in a minute starting with 74, which relate to some other issues on federal question, but if your Honor would turn to paragraph 77, which is on the second page. I don't think one --

THE COURT: 77?

MR. EIMER: Paragraph 77 of the complaint --

THE COURT: Oh, I see, behind the caption.

MR. EIMER: Sorry. I don't think one could have a clearer allegation of an attempt to regulate emissions from automobiles than paragraph 77. It says, in fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other atomic chemicals, including MTBE. Itself, MTBE discharged to the air contaminates groundwater because rain returns it to the soil.

That's exactly what even their reading of C4A prohibits: A case brought to regulate emissions from automobiles for any purpose. And what they're saying in this allegation is that there are -- is at least one source of MTBE that's contaminating groundwater of their clients, and that's MTBE found in the emissions of automobiles. And those emissions to automobiles are going into the air, going into the rain contaminating the groundwater. And in trying to ban MTBE they're trying to ban it from the emissions of automobiles, which runs directly into their reading of C4A, which says states are preempted from regulating auto emissions.

Now, notice they call this exhaust emissions because emissions isn't limited to what comes out of the tail pipe. Those are called exhaust emissions, but there's also evaporative emissions. And if you'll look at the rest of the paragraphs 89 to 196 and so forth, those all talk about

evaporation of MTBE when refueling cars or fueling cars and the evaporation of MTBE from gasoline getting into the air, those evaporative emissions getting into the air, being washed out of the rain and contaminating groundwater. Under any reading that anyone has ever proposed of C4A, they are walking right into the express preemption provision.

THE COURT: Well, if it's so express, why didn't Congress just say it? Why didn't they put the express language in that we have in ERISA and Second Circuit, now SLUSA, and the third one that they have --

MR. EIMER: C4A is expressed. It says no state.

THE COURT: The LMRA, the ERISA, now SLUSA are the three found to really be expressed.

MR. EIMER: And this is there, I'm reading the express language of C4A, no state may proscribe or attempt to enforce for purposes of motor vehicle emission control any control or prohibition respecting any characteristic or component of a fuel additive.

THE COURT: That wasn't what I meant by express. In the Labor Management Relations Act, the statute says the district courts of the United States shall have jurisdiction without respecting the amount in controversy.

ERISA says suits may be brought in any district court of the United States.

SLUSA says any covered class action brought in any

state court shall be removable to the federal district court.

That's the language I'm talking about.

MR. EIMER: There's no express grant of federal jurisdiction to deal with this.

THE COURT: So what's new since I last ruled against you on this? My question is: What's new since I last ruled against you?

MR. EIMER: Two things. Your Honor did not consider the fact -- your Honor did not rule against us on the basis there was no express grant of federal jurisdiction.

THE COURT: I said there's no express preemption.

MR. EIMER: You said there was no express preemption. What I'm bringing to the Court's attention which we did not have before were express allegations that fall within the express preemption provision as the Court read it and as the plaintiffs read it. The Court read the express preemption provision to only preempt auto emissions, regulation of auto emissions. Their complaint seeks to regulate auto emissions.

THE COURT: What? I didn't even follow what you just said. You said the Court said last time?

MR. EIMER: You said last time that the preemption provision, C4A, is limited to preempting state regulation of auto emissions.

THE COURT: Right.

MR. EIMER: Their complaint, paragraph 77 in

particular is the clearest, seeks to regulate auto emissions. That is exactly what the Court said was preempted, regulation of auto emissions. And, therefore, this lawsuit is preempted

00005418

by federal law.

THE COURT: What else is new since I last ruled?

MR. EIMER: The Rucker issue in the Supreme Court. If I may hand to your Honor one more paper, it's an excerpt from the Rucker decision. The Rucker decision was decided in 2002.

THE COURT: Is that in your brief?

MR. EIMER: Yes, it is. I can get you the page citation, if you like. I think it's 23 offhand, but I don't know.

THE COURT: OK. Go ahead.

MR. EIMER: The Rucker decision was decided in 2002 after your Honor decided, and it had to do with interpretation of statutory language and a construction of statutory language.

The Supreme Court was reviewing a decision by a Court of Appeals that interpreted the part of the HUD regulations or HUD statute relating to drug activity at housing projects. And the statutory language that was in review was the language quoted in the sheet I've handed to the Court. The language was, "any drug related criminal activity engaged in by public housing tenant, any member of the tenant's household or any guest or other person under the tenant's control shall be cause for termination." And the Court of Appeals had read the

qualifying phrase under the tenant's control as applying to all the individuals listed, members of the tenant's household, any guest or any other person -- and found that since the person was a guest but wasn't under the tenant's control or wasn't -- the person shouldn't be evicted from their housing. Supreme Court said no.

This is the quote: "The disjunctive "or" means that the qualification placed after the disjunctive applies only to the term after the disjunctive."

What I wanted to do then was apply that construction to C4A.

THE COURT: Right.

MR. EIMER: No state may proscribe or attempt to enforce.

THE COURT: Go ahead.

MR. EIMER: May proscribe -- perhaps it would help --

THE COURT: I have it here.

MR. EIMER: No state may proscribe or attempt to enforce for purposes of motor vehicle emission control any control or prohibition.

Using the Rucker decision as we argue now and didn't have then, but the qualifying phrase for purposes of motor vehicle emission would only apply to the term after the disjunctive, attempt to enforce. The way the Court and the plaintiffs read it when the Court read it the first time, and

the plaintiffs continue to read it now, the phrase applied to both, which the Supreme Court specifically rejected in Rucker.

If I may hand to the Court a final --

THE COURT: Wait. I just want to hear your interpretation. Then does -- the limitation, for purposes of motor vehicle emission, applies only to attempt to enforce?

00005418

MR. EIMER: Correct.
THE COURT: That's your view?
MR. EIMER: And that's consistent with Rucker.
THE COURT: I see. And what difference does that make? It applies only to attempt to enforce?
MR. EIMER: That's correct.
THE COURT: If you're right, that it applies only to attempt to enforce, what does that mean?
MR. EIMER: It means the state can enforce existing laws, tax laws, labeling laws, anything that would regulate -- fuel content or characteristics of the water fuel additive so long as it's not for the purpose of motor vehicle emission, but it can't proscribe any new laws for that purpose, for controlling prohibition respecting characteristics of that. It can't proscribe any new laws for any purpose.
THE COURT: I'm sorry.
MR. EIMER: It's an absolute prohibition. What it would say is no state may proscribe any control or prohibition respecting any characteristic or component of a fuel additive.

That's the way the Supreme Court interpreted Rucker. That's the way we believe that ruling would teach us to interpret C4A.
The way the Court read it the first time and the way the plaintiffs continue to read it, it was as though the limiting phrase for purposes of motor vehicle emission control came before the words it's attempting to modify. So the way the Court read it, the statute would have been written, no state for purposes of motor vehicle emission control may proscribe or attempt to enforce. That's not the way the Congress wrote the statute.
THE COURT: The only difference with HUD vs. Rucker is you've got a series of items all separated by a comma, right: Tenant, comma, member of the household, comma, the get then the or. You don't have that comma here, so you don't have that concept of series. It just said may proscribe in attempt to enforce. That's together, comma.
MR. EIMER: One would need the comma because they're disjunctive and there's more than two, so the third item would be separated by comma.
THE COURT: They're all separated by comma.
MR. EIMER: Because there's several, there's more than two. We only have two.
But the point of the Supreme Court was where there's a disjunctive, "or," the qualifying term after the disjunctive applies only to the last term.

THE COURT: I don't know, that's all very interesting. Now I think the more interesting point that -- but those were the two things that were new?
MR. EIMER: On terms of C4A.
THE COURT: The first one, again, was what, the pleading?
MR. EIMER: The pleading.
THE COURT: Let's talk about this thing called substantial federal question, which seems to be a subset of --

00005418

the way it's breached, this is part of the same point.

MR. EIMER: No. Substantial federal question is different.

THE COURT: Then there are four things?

MR. EIMER: There are four things, actually.

THE COURT: Go ahead. I'm interested in that because I don't think I've addressed that before.

MR. EIMER: No, you've not addressed that before.

THE COURT: OK.

MR. EIMER: Your Honor, if the plaintiffs' complaint taken as a whole and the plaintiffs' burden in this case presents an issue of state law that requires resolution of a federal question, then this Court has jurisdiction over this case. And it is very clear certainly from their product liability claim that an element of their case is to show the risk utility of MTBE and gasoline, or gasoline with MTBE in

order to show that as a defective product. New York law is clear on that.

Your Honor recited that in your earlier opinion on the motion to dismiss. An element of their cause of action for defective product is a risk utility balance under New York law to show that the risks of gasoline with MTBE outweigh its utility. Right?

THE COURT: I can't remember. What is the federal question that's a necessary element of their state claim? That's what I need to understand. You probably just said it but I didn't follow it. It has to be a federal question, has to be a necessary element.

MR. EIMER: That's correct.

THE COURT: OK.

MR. EIMER: In resolving the risk utility balance, in resolving the risk utility balance the jury will necessarily have to get into several federal questions.

THE COURT: Namely?

MR. EIMER: The first federal question is whether or not the benefits of the program outweigh the risks. The plaintiffs in their complaint challenged the benefits of MTBE gasoline.

THE COURT: Which cause of action is this? What's the label of this --

MR. EIMER: The defective product claim.

If I may go back to the case law in New York, I think it's Denny vs. Ford Motors is one in particular, that says they have to do a risk utility benefit analysis.

THE COURT: It's an element of their case, it's not a defense. They have to prove it.

MR. EIMER: That's right. In order to establish a defective product, they have to prove that the risks outweigh the utility of the product as an element of their case.

THE COURT: Element of their case. Well, that's what this thing called substantial federal question jurisdiction is about. If it's a necessary element of a state claim and a federal issue is a necessary element of a state claim, then

00005418

there's jurisdiction. Maybe this is why we should carry the plaintiff and say why that isn't so. He says it's a necessary element of the detective product claim to do this utility risk balancing, so you'd have to -- that raises a federal issue.

MR. McNEW: And why is that a federal issue?

THE COURT: Back to Mr. Eimer. Stay at the podium, I really need to understand that. Fair enough, why is that a federal issue?

MR. EIMER: First --

THE COURT: You asked, you better listen.

Why is it a federal issue?

MR. EIMER: Paragraph 74 to 77 say there's no benefit to the program at all.

THE COURT: I'm sorry. There's no benefit to the program?

MR. EIMER: To the program, the RFG program. They specifically in their complaint in 74 through 77 say MTBE, but for this purpose they can say both ethanol and MTBE does not deliver cleaner air, contrary to industry assurances MTBE does little or nothing to reduce such air polluting emissions as carbon dioxide or smog precursors. So the benefits of the program and MTBE in particular -- which Congress and the EPA has found to be there, it was approved for the program -- are now under attack and saying they're of no benefit. The question of the benefit is a matter of federal law. The federal government decided there was a benefit, and a federal court should decide whether or not those benefits are there or not. So that's the first federal question.

THE COURT: Let's stop there. That's the first federal question, he says.

MR. McNEW: Your Honor, we're not seeking to have the New York Supreme Court for New York County invalidate the RFG program. We're not challenging or attacking that -- we make an allegation that it's part of showing the defendants' bad conduct long before --

THE COURT: You are straying from the immediate question. If you'd would stay with it, there's a cause of action called defective product. There's an element of proving

that cause of action is caused by a risk benefit weighing. You allege that there's no benefit to MTBE, use of MTBE; in fact, it's harmful, there's no benefit. Federal law has mandated this is one of seven approved additives, and you have to use one of the seven.

MR. McNEW: That's right, but it expressly left the EPA, and the EPA has said that it is not endorsing any one of these oxygenates. It just has a list of substances that it has approved --

THE COURT: Approved? I don't find much different from approved and endorsed. They approved it for a purpose. They say, we the federal government say this is the approved list of seven. Now you would want to prove that the federal agency was wrong to approve it essentially?

MR. McNEW: No.

00005418

THE COURT: It was wrong to approve it, wrong to include it on the list?

MR. McNEW: They can use it for an oxygenate, but if it causes injury, they have to pay for it. Your Honor, this whole argument has --

THE COURT: You're essentially saying the federal government made a mistake, it should never have included it?

MR. McNEW: But they did include it.

THE COURT: Has no benefit.

MR. McNEW: We're not suggest --

THE COURT: Did you just say they didn't include it?

MR. McNEW: No. No. I said they did -- no, I didn't, your Honor. I'm sorry if I misspoke.

THE COURT: No, I misheard.

MR. McNEW: This whole argument has been conflating a claim for damages with a notion which I have a difficult time articulating, frankly; that somehow that if we win and we collect damages for this, that we are regulating what they can put in their gasoline.

THE COURT: Well, you are. You're saying that they should never put MTBE in. It was wrong. It caused harm. They should pay for that harm and it shouldn't matter at all if the federal government said you must use one of these seven. These are the approved list.

MR. McNEW: That's right. They could have used one of the seven.

THE COURT: Then that is a federal government ounce of benefit, and you're saying there's no benefit. How could one believe the federal government put in something that had no benefit?

MR. McNEW: Your Honor, if -- if oxygenates work, then I suppose MTBE and ethanol, all these other oxygenates -- I'm not a scientist, I don't know, but I will assume --

THE COURT: You told me you're a bankruptcy lawyer, 15 years.

MR. McNEW: I was a bankruptcy lawyer for 15 years.

THE COURT: He deserved that.

MR. McNEW: I did. You know bankruptcy lawyers, we're all bottom feeders, your Honor.

Listen, it's not -- the question here, you know, when you say is there a substantial federal question, the question here is not -- is not, does MTBE -- ought the EPA proscribe MTBE as an oxygenate. That's not the point. Just as when they were saying earlier that in going through this grammatical exercise somehow this lawsuit seeks to regulate the use of gasoline or regulate the composition of gasoline. We're not seeking it to change the regulatory scheme. We're not seeking to rewrite the EPA's regulations.

We've been injured. We're seeking damages. That's different, your Honor. If I walk across the street out in -- across Centre Street and I get hit by a car because it didn't put on its brakes and stop in time -- said it's a product defect, brakes were improperly designed -- I get damages.

00005418

Maybe there are a lot of them and I bring a class action, I get damages. That doesn't mean I'm regulating the type of brake that the auto manufacturer can put in the car. That may determine it is prohibitive economically to continue to manufacture that brake, but that's a commercial decision. It's not an effort to regulate.

These words are -- these words have meaning, Judge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

42demtbc

You can't conflate the coercive effect of a judgment with the state use of its inherent powers to regulate conduct of people acting within its boundaries.

MR. GORDON: Your Honor, may I speak for a moment.

THE COURT: Sure.

MR. GORDON: I have never been a bankruptcy lawyer.

THE COURT: Add extra points for you.

MR. GORDON: I have, however, practiced product liability litigation for over 20 years. In terms of whether or not proving this is a defective product, we're going to show to the jury that this product was unreasonably dangerous, did not have any warning that could render it safer. And we are not asking any jury to weigh the risk utility of the RFG program.

The government allowed MTBE, we will show, because these companies represented by the defendants misled the government intentionally about the dangers. They never told the government in 1990 what they knew in 1984 about the fact that they knew it was contaminating wells at a much more rapid rate than any other of the contaminants. If they had told the government that, the government would not have allowed MTBE.

Now the government knows about the story, it's being banned. That's the problem with their argument. We're not asking a jury to say what was back in 1990 the risk utility of the Clean Air Act. These defendants lobbied for MTBE to be on that list and the government specifically made the law neutral.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

42demtbc

They said, use what you want as long as you comply.

The risk utility of MTBE is different than the jury deciding the risk utility of the entire RFG program. It had nothing to do with that. They're trying to confuse the jury with the issue. Just like in asbestos litigation where asbestos was on the approved product list, you had to use it on ships in World War II; had to, couldn't use anything else. Wanted to use fiberglass? No way, the government said.

Asbestos litigation has been entirely in state court for the last 25 years -- actually, since 1991 when there was an MDL grade. Entirely no cases are processed in the federal court. And it was the exact same situation even stronger where the government said, no, you don't have a choice of seven different products, asbestos is one of them; you don't have a choice of seven different products. You had to use asbestos. No analogy could be clearer.

MR. EIMER: Completely different issue.

THE COURT: Well, after yesterday you had to use asbestos and you were a government contractor. According to Judge Weinstein, there would have been government jurisdiction, which he said in the Agent Orange case yesterday. That's what

00005418

you had to manufacture and you were a government contractor.

MR. EIMER: And Mr. Gordon as a tort lawyer is complaining not that we lied about the benefits of MTBE, we lied about the risks of MTBE. But the complaint says there

were no benefits to MTBE and Congress in putting it in the program. And they deliberately put MTBE into the program. And the EPA, in approving MTBE for the program, found there were benefits to MTBE. And those benefits in paragraph 74 to 77 of the complaint are now being challenged, or 76.

THE COURT: Is there any other state law cause of action that has a necessary element that raises federal law, other than the one you're relying on?

MR. EIMER: There may be.

THE COURT: I don't know about may be. Do you know of any?

MR. EIMER: I believe the nuisance claim does. That would require the jury to weigh the relative risks of all this, and I'd like to get to the second federal question that goes up. This is one on the benefits.

THE COURT: OK, second one.

MR. EIMER: The second is the plaintiffs here must convince the jury that the risks to the water supply that they're worried about here outweigh the benefits. And the question is how you balance those. How does the pan scale work that they want the jury to use? That's a federal question, is balancing, because the DC circuit's already weighed into this in a case your Honor cited in your last opinion. It's called ABI vs. EPA.

And in that case the EPA decided early on in the

beginning of the program that 30 percent of the RFG should be made with ethanol because they decided that under one of the provisions of the Clean Air Act, under one of the provisions of the Clean Air Act, 7545(k)(1), the EPA was allowed to balance, as your Honor may recall, all sorts of criteria, according to the EPA, against the reduction of what was called the OCs, certain contaminants that resulted in smog. And one of those things that the --

THE COURT: I just want you to keep this simple and fast enough so they can answer this second issue that you say raises an issue of federal law.

MR. EIMER: Let me read what the DC --

THE COURT: Are you following the second issue so far, yes or no? Do you know where he's even headed.

MR. GORDON: I think he's talking about the risk and benefits of the RFG program, not MTBE.

THE COURT: Are you?

MR. EIMER: No.

THE COURT: Say it again so they can catch what is the second issue of federal law.

MR. EIMER: The second issue of federal law is it's a matter of federal law how the risks and utilities are to be balanced.

THE COURT: Of what?

00005418

MR. EIMER: The risk of water contamination against

the benefits of OCs from the program.

THE COURT: That's the whole program? Are you raising that in your complaint?

MR. GORDON: No, not at all.

MR. EIMER: Absolutely they are.

THE COURT: Can we focus where in the complaint you say they're raising and then he can respond to you.

MR. EIMER: In the product defect claim they -- there's no question that MTBE -- according to the government, that the MTBE has benefits in reducing the OC, which is smog components. That's why it was approved. The program itself, the clean air program was scaled by the EPA to take into consideration the availability of MTBE. In other words, EPA allowed the program to expand or contract and was required to take into consideration the amount of oxygenates of all kinds that were available. And if there wasn't sufficient oxygenate, the program had to contract. If there was enough, then the program could expand. So the program encompasses everything.

And so when one says the benefits, the benefits aren't just the one thing. It's the benefits of a program as a whole. And when one attacks MTBE, you're attacking an integral part of the program that the EPA designed.

THE COURT: Can you answer that? Who wants to answer that? Second issue of federal law, who wants to answer it, that they say is -- you're deferring to the bankruptcy lawyer?

MR. GORDON: I'll stand up. Robert Gordon again.

THE COURT: I'm just teasing.

MR. GORDON: That's fine. I still don't see it, Judge. An element of our claim, we're claiming they negligently designed a product. They knew that it was dangerous. They failed to warn anybody about that, including the federal government, and now they're seeking to say because the federal government didn't consider at that time the dangers -- which, by the way, we didn't tell them about and which we must be the one responsible for. We can't expect the government to know about our product. They're the manufacturer. They are, under product liability law, the one who's the guarantor of its safety. They're seeking to hide behind that but -- and, again, the entire program, the program was fuel neutral. Use whatever you want that will comply, any of these seven you say comply. Fine.

They're trying to make this far too complex. It's not that complex a case. They made a product. They knew it was dangerous. They failed to warn and they continue to make it and sell it.

MR. MCNEW: Your Honor, doesn't the argument prove too much?

THE COURT: I don't know, I wasn't here to answer the questions. I thought I could ask them.

MR. MCNEW: I mean, if what he's saying is right,

00005418

42demtbc

doesn't every product liability case that involves a regulated product become a federal case? I mean, that's where he's taking you in this argument, I believe. I mean, the products liability cases are quintessential state law cases. The notion that you can somehow transmogrify a state law claim into a federal claim because the product that's defective is regulated and there are aspects of the regulation that may be called into question just strikes me as sweeping with an awfully broad broom.

I mean, I've heard the argument. I read it -- I confess, when I read it, I didn't understand it, because now that I hear it, I think I understand it but I can't comprehend it.

MR. EIMER: I think it's very clear. This is not an ordinary regulatory scheme. What's happened here is Congress said to the EPA, do whatever you must do in regulating RFG and sizing the program to reduce the OC admissions as much as you can. And as a secondary consideration you can balance other things. You can look at water quality, you can look at all these other things that plaintiffs would like to look at now, but the direction from Congress was the -- and this is what the DC circuit says in the API case. The direction from Congress was, the primary goal of this country is clean air. It is primary over water quality. It is the number one goal of this country.

42demtbc

And as the DC circuit says, unless air quality and the RFG program has an inordinate effect on water quality, air quality is primary. Air quality is primary in this country.

THE COURT: As Mr. Gordon argued, what does that have to do with MTBE? We're told there are seven choices, you figure it out?

MR. EIMER: The EPA makes this determination all the time. Restricting the availability of oxygenates restricts the size of the program. And by restricting the size of the program, one restricts the improvement to the air because fewer states, fewer counties can participate if the available oxygenate pool isn't as big.

THE COURT: OK. What have you told me about the pool? In other words, have you proved or -- I can't say proved at this point, but you offered anything to say the other six wouldn't have filled the gap, so to speak?

MR. EIMER: Yes. Our remand petition says that we've argued that all along our position in this litigation for four years has been ethanol only could never have worked.

THE COURT: Remand removal petition?

MR. EIMER: Removal petition.

THE COURT: Says what?

MR. EIMER: That ethanol was insufficient to meet the nation's demand, and that Congress and the EPA assumed and took into consideration the availability of both oxygenates. And

42demtbc

00005418

our brief goes on to say that as the program was structured the EPA was required to look at the available supply of oxygenates, and they took into consideration the available supply of both oxygenates in allowing states to come into the program. And only when there was sufficient supply was the EPA allowed to do that.

If I could, your Honor, there's a long and complicated -- and you might want to have someone else read it -- review that the EPA did allowing Phoenix, Arizona, to opt into the program in 1997, which appears at 62 Federal Register 30260. And it's a long study of the availability of MTBE and EPA and ethanol. And the EPA concludes that for all of those oxygenates, 90 percent of the capacity in that area is already used up, but with 10 percent available, there's enough for Phoenix to come in. But it was a close call, they said. If one were to take MTBE out, then Phoenix couldn't have come into the program.

And the national policy of improving the air over everything unless, there's an inordinate effect on the water --

THE COURT: Turning back to the very simple point of federal jurisdiction, Mr. McNew's very articulate and simple argument, is your argument proving too much? Would this turn every product liability case that involved a regulated industry or regulated product into a federal jurisdiction that couldn't be brought in state court? I mean, drugs are regulated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

42demtbc

carefully by the FDA and airplanes are by the FAA and whatnot, but we don't have sole federal, exclusive federal jurisdiction. We don't have federal preemption. We don't require that all those products are litigated in federal court when there's a claim that they're defectively designed, even though they may implicate the FDA or the FAA or any number of agencies. How do you answer his rhetorical questions?

MR. EIMER: One, all claims are not but some are. There is an FAA case, the Shrader case. There's a passenger who was evicted from an airplane and he brings a false arrest claim in state court. He says under the FAA regulations, we're allowed to ensure the safety of the passengers. And it calls into question that policy.

THE COURT: Is that a district court or circuit, do you know?

MR. EIMER: District, I believe.

THE COURT: I think I know the case.

MR. EIMER: That's exactly what --

THE COURT: How about every drug case? Tons of drug cases that go on every day.

MR. EIMER: It depends how it implicates federal policy.

THE COURT: They're all regulated by the FDA.

MR. EIMER: It's not just the regulation that calls it into question, it's whether or not the suit itself calls into

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

42demtbc

question the regulation or the policy that the government and the federal government has imposed. Here the risk utility balance clearly --

00005418

THE COURT: Let's make sure we have time. I think I've got the gist of your argument. At least I was right about one thing today, it's complicated and long. I knew it was going to take two hours.

Federal agent, who wants to -- this time I might as well get it right and start with the defense. Who wants to talk about federal agent jurisdiction?

MR. EIMER: I do.

THE COURT: All right. May as well start with yesterday, right, Judge Weinstein, I guess.

MR. EIMER: Judge Weinstein made it clear.

THE COURT: He made it clear for that fact pattern. I'm not sure that's this case at all.

MR. EIMER: I think it's this case exactly.

THE COURT: Who's the government contractor?

MR. EIMER: We're directed by the federal government.

THE COURT: Are you a government contractor?

MR. EIMER: No.

THE COURT: First of all, you're not a government contractor. Secondly, the government contractor there was required to produce Agent Orange. What we're told here is you had seven choices.

MR. EIMER: No, that's not --

THE COURT: You're not a government contractor and you weren't mandated to make one contract.

MR. EIMER: The question is: Do we have a federal defense? We're mandated to make RFG, there's no doubt about that.

THE COURT: I know that, but you're not mandated to use MTBE.

MR. EIMER: That's the federal defense, we are mandated. We believe -- the federal defense we asserted was we are mandated to make MTBE.

THE COURT: Is that right, they said you had to do MTBE?

MR. EIMER: There was no choice because there wasn't enough ethanol.

THE COURT: I've got it, no choice because there wasn't enough ethanol. And at this stage of this remand motion that would be enough in your argument to find jurisdiction under federal agent jurisdiction?

MR. EIMER: Yes. And there's case after case, the Riser case in this district and others, that say we don't have to prove our defense. The defense doesn't even have to be likely to succeed, it just has to be colorable.

THE COURT: But the defense that you're relying on is that we had to make MTBE because there wasn't enough ethanol?

MR. EIMER: Correct, and, therefore, we had to follow the regulation in using MTBE. We had no choice.

THE COURT: And you clearly acted under the direct of a federal agency or officer?

MR. EIMER: No question.

THE COURT: No question, all right. Then we'll have

00005418

the response.

Who wants to respond to this one, Mr. McNew?

MR. MCNEW: Well, your Honor, I won't belabor the points because I think we've already addressed these issues.

THE COURT: I need help.

MR. MCNEW: Again, it's Pullman. They are the ones that have to come before the Court and do something more than throw up an allegation that they couldn't --

THE COURT: You mean I should have a hearing on whether there was enough ethanol before I decide the remand motion?

MR. MCNEW: No, Judge, but it's their allegations of jurisdiction.

THE COURT: Right, but they said it's my allegation of jurisdiction. I'm raising a colorable federal defense. My colorable federal defense is I was mandated to use MTBE because there wasn't reasonably any other alternative. Do I stop to have a full-blown evidentiary hearing as to whether they stated a colorable defense?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

70

42demtbc

MR. MCNEW: No.

THE COURT: Do I accept it because they say it?

MR. MCNEW: You look at the record that you have before you today.

THE COURT: That's what I mean. Once I go to the record, what should I do, go through a full-blown evidentiary record of affidavits, experts and maybe a hearing? They're saying it's enough to raise -- it's colorable. They're saying colorably, I'm telling you I had to make MTBE because I'm telling you there wasn't enough ethanol. Now, either you accept that at face value, Judge, or you need a hearing, as we often do, on jurisdictional issues.

MR. MCNEW: Well, I don't believe -- I believe, your Honor --

THE COURT: Why should I reject it out of hand, is what I'm saying.

MR. MCNEW: Because they bore the burden of coming into the court and doing something more than making an allegation.

THE COURT: I'm allowing them to meet the burden. Should I stop and allow evidence? In other words, first you're telling me they haven't met the burden and I say, well, what burden are you talking about? You seem to be talking about an evidentiary burden. It's not closed today, and you said, look at the record. Once we're opening the record, my goodness, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71

42demtbc

previous record in the MDL was pretty big. The record is open. I can either cite to that record or they can put in evidence. We can stop this whole darn thing and have another whole day on hearings about the colorability, not proof -- not a jury, not whether they proved by a preponderance of the evidence, but whether it's colorably proved.

MR. MCNEW: I believe there is -- I believe that there are -- there's several answers to that, and one of them, I believe, is that in some ways there are predicates to getting

to that point.

THE COURT: What are they? Do you quarrel with the first prong, it acted under the direction of a federal agency?

MR. McNEW: Yes. That's what -- you anticipate me perfectly.

THE COURT: OK.

MR. McNEW: Yes, obviously we do. A government -- actually, I did spend a year as a government contractor lawyer, and a government contract is a very different set of facts from what is here.

THE COURT: Wait a minute. Government contract is what Judge Weinstein was writing about. I'm talking about this element acted under the direction of federal agency or officer. Does that require a government contract?

MR. McNEW: It doesn't require a government contract but it requires -- I mean, if you read Ryan and you read the

decision that came down this week, you read them together, I think Judge Weinstein does a very good job of explaining the sort of case that falls under the ambit of this doctorate. In the Ryan case you'll recall that it was a government contractor who was making Agent Orange and seemingly within the confines of the federal officer doctrine.

THE COURT: You can never duck your past. I lived through Agent Orange firsthand, I remember all about it. But what I'm saying is still, this case, put aside Agent Orange, acted under the direction of federal agency or officer; you said does not require a contract, a government contract. He says the agency, the federal agency here, required, directed, compelled these companies to do this, to add -- to come up with these additives, oxygenates. And he then says, my problem is MTBE was the only viable choice. I had to do it. That becomes the question of fact.

I know you say, nonsense, they could have distilled corn, but that will require me to decide what's the burden of proof on that. If the word is colorable in the cases, how do I decide what's colorable?

MR. McNEW: Well --

THE COURT: That's a real question we all should think about. What's showing as sufficient? Simply stating so in a conclusory statement in a brief, is that enough? Do they have to come forward with real evidence, is that enough? If it's

evident, what standard of evidence?

MR. McNEW: If your Honor -- if they had put anything in this record to create a factual issue --

THE COURT: I'm not going to stand on that because they still could. That's not a problem to me. It's a serious question and I would allow that. That's easy. But then you put something in to rebut it, so I'm asking you seriously, do we have a hearing on whether it's colorable, because you may show it so patently ridiculous that that's the end of that, it's no longer colorable.

But what level of evidence, if evidence at all, does a party have to come up with to make a colorable defense?

00005418

Mr. Eimer, do you want to rely on -- you're saying all I have to do is say the word, or do I have to put in some evidence?

MR. EIMER: Let me rely on the Riser case, first of all.

THE COURT: What case is that?

MR. EIMER: Riser vs. Fitzmorris.

THE COURT: District court?

MR. EIMER: District court cases.

THE COURT: They're not the highest authority around.

MR. EIMER: How about Supreme Court?

THE COURT: I'll take it.

MR. EIMER: OK. Supreme Court said justice --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

42demtbc

THE COURT: In what case?

MR. EIMER: In Jefferson.

THE COURT: Jefferson County?

MR. EIMER: I think that's Jefferson County. Yes, Jefferson County.

Just as requiring clearly --

THE COURT: No, Mr. Eimer, slowly.

MR. EIMER: Just as requiring a clearly sustainable defense rather than a colorable defense would defeat the purpose of the removal statute, so would demanding an air-tight case on the merits in order to show the required causal connection.

Accordingly, we credit the judge's theory of the case -- the judges' theory of the case for purposes of both elements of our jurisdictional inquiry, and conclude that the judges have made an adequate threshold of showing the suit is for an act under color of office.

THE COURT: So I'd have to go back to the district court case in that case and find out what the district court --

MR. EIMER: This is, I think, either judges who are the parties asserting federal officer jurisdiction -- I mean, federal officer jurisdiction, and they're crediting the judge -- here the judge is plaintiff, not judge as judge -- the plaintiffs' theory of the case as sufficient.

THE COURT: What? I didn't get it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

42demtbc

MR. EIMER: I believe --

MR. SACRIPANTI: The judges were the plaintiffs in the case.

MR. EIMER: The judges were the plaintiffs in the case. The judges referred to in the language I just read to you are not the judge of the district court sitting there deciding things. It's the judge as plaintiff bringing a federal officer case. And it's their theory of the defense that is sufficient, according to the Supreme Court --

THE COURT: The plaintiffs' theory of the defense?

MR. EIMER: I'm sorry. The defendant's theory of the defense.

THE COURT: So the judges were defendants?

MR. EIMER: Yes. And it's their removal of the case. It's their theory of the defense that the Supreme Court finds

00005418

sufficient for 1442 purposes.

THE COURT: So read the quote again slowly.

MR. EIMER: Accordingly, we credit the judges' theory of the case for purposes of both elements of our jurisdictional inquiry, the 1442 inquiry, conclude that the judges have made an adequate threshold of showing that the suit is for an act under color of office.

THE COURT: I'd have to look back and see what the adequate threshold showing was. Was it just a conclusory statement in the brief, was it evidence? I don't know the

case.

MR. EIMER: Also Venezio vs. Robinson. I don't know what circuit this is, but 16 F.3d, 7th circuit. Once the federal defendant has a plausible federal defense, removal is appropriate so that the federal court may determine whether the defense succeeds.

Now, your Honor in your opinion, found that --

THE COURT: Which opinion?

MR. EIMER: The dismissal opinion that we've talked about today. -- found that we had a plausible defense on conflict preemption, if your Honor recalls, and said that was sustained --

THE COURT: I found that you had a plausible theory under conflict preemption and on summary judgment.

MR. EIMER: With establishment of appropriate facts we might win on conflict preemption.

I would also bring to your Honor's attention the EPA's Blue Ribbon Report, which you might recall from our last go-around, the class certification.

THE COURT: Actually, I don't.

MR. EIMER: The EPA commissioned the Blue Ribbon Report to study MTBE, and it concluded if there were a nationwide ban on MTBE, it would take four years, four years of sustained effort for there to be enough ethanol to meet the nation's demand for RFG. So the EPA has spoken to this in

terms of even the present, not going back to where things were in '94.

THE COURT: I think I've got it.

Who would like to speak now about federal agent jurisdiction?

MR. GORDON: Let me just make one point, if I could.

THE COURT: Slow down. Let me now make one point about what?

MR. GORDON: One point, then I'll turn it over to Mr. McNew.

The defendants were not ordered by the federal government to withhold information about the dangers of MTBE. They were not ordered by the government to not put a warning on the product. This is the heart of what our case is about. And we're not -- in the claims we're making they were not ordered to do something opposite by the federal government.

THE COURT: They allege that they were ordered to use MTBE, which you say is a dangerous and defective product

00005418

causing injury, but they were ordered to use it.

MR. GORDON: One of our claims. No, they were never ordered to use it.

THE COURT: But that's what they say. They say they were ordered to use it because there was no real alternative. That's their defense; not yours, not mine. That's their defense.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

78

42demtbc

MR. GORDON: I understand. And factioning the interesting story is if the ethanol industry was immature at the time of 1990, it is solely because the defendants were misrepresenting about the fact that -- claiming that MTBE was safe and you didn't need to have another industry. And of course it was in their interest to use it.

THE COURT: But by and by their defense is, the government made us use MTBE because there was no viable alternative.

MR. GORDON: And that same defense that they have raised in opposition to the banning of the product in California and OFA vs. Governor Davis and in New York, after a full hearing and a full record in the Northern District federal court, OFA vs. Pataki, where they still say, you can't do this. It's a -- we'll never be able to supply gasoline. And they had a hearing. And the judge found, of course, you'd be able to find gasoline. Oh, but prices will skyrocket. And they had a hearing and an economist. Prices won't skyrocket. Guess what? They haven't skyrocketed. So they're continuing to make that argument. And there's been records in that regard and has not been true.

THE COURT: No, but because a district court in the Northern District of New York tried a case and apparently rejected that defense, does that make it no longer colorable throughout the country, because a district court said that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79

42demtbc

wasn't a winning defense, so to speak? Does it lose its colorable defense status because one district court throughout the country rejected it?

MR. GORDON: First of all, it's not one district court, wherever they have had it that it's failed.

THE COURT: How many of those are there?

MR. GORDON: They tested in California and New York. There may be others as well.

THE COURT: I don't know, but so is that a district court in California? Doesn't matter, a court.

But anyway, if it's two courts --

MR. GORDON: Ninth Circuit. It was federal court.

THE COURT: Ninth Circuit did what?

MR. MCNEW: The Ninth Circuit upheld the district court ruling in OFA vs. Davis, which heard and rejected these arguments.

California represents, according to the government, I can give you the web site listing --

THE COURT: Wait a minute. If that's the argument, Mr. Eimer, that it's no longer colorable because you lost it in a district court of New York, and even at the circuit level in

00005418

California, what does that do?

MR. EIMER: Does nothing.

THE COURT: Why?

MR. EIMER: One, we didn't lose anything. None of us

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

42demtbc

were parties to those cases, so it's not preclusive on us at all and it's not preclusive on this Court.

Second, those courts were evaluating a different issue than we're raising here.

THE COURT: Namely?

MR. EIMER: The issue that was raised in Judge Mordue's courtroom was today, 1995 and '96, today will there be a significant price effect in New York with respect to a New York ban on MTBE? That's not what we're talking about.

First, we're talking about what happened back in the mid'90s to late '90s until today.

THE COURT: So does -- the verdict in the Judge Mordue case is talking about what alternatives you had today?

MR. EIMER: Today and prospectively.

THE COURT: Today starting when?

MR. EIMER: I assume the day of the trial.

THE COURT: Really, not '90, not 2000 -- anyway, in that case what year was that?

MR. EIMER: I think it was 2002.

THE COURT: 2002?

MR. EIMER: 2003. The real question there is there's a ban --

THE COURT: I understand the question. What about California?

MR. EIMER: California's the same thing. The question

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81

42demtbc

there is will the ban in California raise prices in California.

THE COURT: So it has nothing to do with what you're saying here, that you're accused, having used this thing all these years, and your defense is, the government made me do it?

MR. EIMER: Correct.

THE COURT: And the reason the government made me do it is I had to use one of the seven, and that was the only viable alternative, and I want to present that defense?

MR. EIMER: Correct. Plus, neither of them -- in addition to looking prospectively from 2002 or 2003 --

THE COURT: I think I've got the element of colorable federal defense, and I think I've got the element of nexus between the federal direction and the conduct in question, so to speak. Maybe the only one left is under the direction of federal agency or officer. Mr. McNew says he doesn't agree that you acted under the direction of a federal agency or officer and you said, how could he quarrel with that? The EPA told -- or was it the EPA? They told me what I had to do.

Why do you say that element of the three prongs isn't proved, Mr. McNew?

MR. McNEW: Because the statute is quite -- the regulation is quite clear that they have a choice.

THE COURT: I don't mean that, but the -- put the choice aside, didn't the EPA say you have to go into this

00005418
program, you have to add something and act at the direction of

the agency? And then they say, well, they had no real choice, that's our defense. But the first element, we acted at the direction of an agency, the EPA commanded them to use something.

MR. MCNEW: Yes.

THE COURT: And then their defense is, this is the only viable choice we have.

MR. MCNEW: Right. But first of all, the notion they only looked to price, price is a function of supply.

THE COURT: I don't think anybody said the word price the whole two hours.

MR. MCNEW: I'm sorry. I'm speaking in shorthand. I was speaking of his characterization of the OFA and Pataki and Davis cases.

THE COURT: All I'm saying about both of those cases is they tested a current regulation going forward. In other words, the states passed a law and the question is whether that law could survive. And to decide that you have to look from the time of the law forward. Not trying to defend by saying we had no alternative that was rejected. That has nothing to do with 1980 to the year 2002. There was no law being tested.

MR. MCNEW: I'm not trying to estop the defendants by reliance on these cases. I'm not trying to bind them. By "them," I recognize that although their trade association was litigating their interest, that they themselves were not

litigating it.

THE COURT: It's a different issue anyway. It's what's available now from the time -- the new regulations, New York's regulation or California's regulation going forward. It's just a different issue as to what might be available in the marketplace.

Well, actually, I have come to the end of my two hours that I scheduled for this case. I have another case at 12:00, so if in the four minutes remaining to me -- can we summarize where we're going? There was going to be a very short, really just a two-page-or-less letter that says, these are the controlling cases about dischargeability of intentional torts in a bankruptcy, essentially. You were going to cite, hopefully, really two pages. It might just say, here are the controlling cases and here's the controlling statute. You read them, Judge. I want the answer to be just as short.

That's the only thing I thought. If there was anything else supplemental but really we didn't hear until today for the first time, I will allow it to be addressed in a letter, too, but can anybody else remember anything that was really new that wasn't in the briefs?

MR. EIMER: I think that's the only open item.

MR. GORDON: I would just leave that last question, with once again saying that similar to the asbestos cases, it presumed department of AVA said if you were going to supply

00005418

42demtbc

insulation, it must contain asbestos, specifically asbestos. I don't see any difference between that and saying, if you're going to sell gasoline, it has to contain one of seven different things. Here we're getting into the argument of which one I could have supplied or not. They're specifically -- asbestos was the only choice, and defense has never been held by any court to enforce the cases to go to federal court.

THE COURT: I don't know if it's been litigated in a removal remand context. I don't know if it's ever come up. There's tons of diversity in federal courts that's been around, but I don't know if anybody ever raised that, whether it was litigated, whether it was decided. So, you know, the sort of general negative doesn't work.

MR. GORDON: We'll look for that in terms of adding that as well for your Honor, but I know the government contractor defense was litigated in the asbestos --

THE COURT: It's evolving even as of yesterday.

All right. Well, it was -- well, I can't let you go yet. So there is one other thing you might want to think about, and I raise it only once, but I really wanted to raise it more than once. And that's the appealability of a decision on subject matter jurisdiction that would arise on the declaratory judgment actions that doesn't arise on the remand. And I'm still troubled by that. I mention that in this

42demtbc

argument. I said appellate review is an important part of our process, for good or for bad, in my experience, but it's an important part of our process. And the question is, remand is quite different than the defenses to the declaratory judgment action. And I know you have your own arrangements that you've worked out on this, but I'm a little troubled because it's the same bunch of arguments.

MR. EIMER: I believe an additional basis of jurisdiction in all of the declaratory judgment actions is diversity. There are diversities --

THE COURT: All of them?

MR. EIMER: All of them. Every single one of them has diversity.

THE COURT: All right. I've raised what I raised about appellate review as best I can do.

OK, the matters are reserved.

(Adjourned)

00005418

# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

This Document Relates To: All Cases

**OPINION AND ORDER**

**MDL No. 1358 (SAS)**

---

SHIRA A. SCHEINDLIN, U.S.D.J.:

This consolidated multi-district litigation ("MDL") initially involved several putative class actions brought on behalf of private well-owners seeking relief from contamination of their wells. By opinion and order dated July 16, 2002, I denied plaintiffs' motion for class certification, *see In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 209 F.R.D. 323 (S.D.N.Y. 2002), and the putative class actions subsequently settled.

In 2003, dozens of new MTBE products liability cases were filed in state courts around the country. The new actions are brought by numerous plaintiffs, including states, cities, municipalities and entities, seeking relief from contamination or threatened contamination of groundwater. Defendants removed many of the actions to federal court. Many of the cases removed to the Southern District of New York were assigned to me as the presiding judge over MDL 1358; others removed to this district were transferred to me as related cases. Defendants

asked that cases removed to other federal district courts be transferred to this Court, pursuant to Rule 7.4 of the Rules of the Judicial Panel on Multidistrict Litigation ("JPML") and 28 U.S.C. § 1407. On February 6, 2004, the JPML transferred thirteen cases to this Court,[1] and an additional thirty cases were conditionally transferred on February 25, 2004.

Plaintiffs now move to remand all of these actions to the state courts, arguing that the federal court lacks subject matter jurisdiction.

## I. BACKGROUND

### A. The Allegations

The complaints, though not identical, allege essentially the same facts.[2] MTBE is a chemical compound that is a by-product of the gasoline refining process. It has enhanced solubility in water, and is chemically attracted to water

---

[1] Originally, the February 6 transfer order conditionally transferred sixteen cases to the Southern District of New York. Within fifteen days of the conditional transfer, parties in three of the actions filed objections. Therefore, the transfers of those three cases is stayed pending resolution by the Panel of the objections. No objections were filed in the remaining thirteen actions, and the transfer of those actions became effective on February 24, 2004.

[2] The facts recited herein are mere allegations, and do *not* constitute findings of the Court. Because the facts alleged in the various complaints are more or less identical, and any differences do not affect the jurisdictional analysis, for purposes of this motion I will describe and refer to the allegations set forth in *Water Authority of Western Nassau v. Amerada Hess Corp. et al.*, No. 03 Civ. 9544, and defendants' Notice of Removal in the same action.

molecules. Sometime after 1979, in an effort to boost the octane level in higher grades of gasoline, defendants began manufacturing, distributing and/or selling gasoline containing MTBE in concentrations averaging approximately two to four percent by weight. Since 1990, defendants have added MTBE to gasoline in concentrations of up to fifteen percent. The publicly articulated justification for adding MTBE to gasoline is that it helps fuel burn more efficiently, thereby reducing air pollution. *See* Complaint ¶¶ 68-70, 72, 74, 155, 158.

Whenever gasoline containing MTBE leaks, spills or is otherwise released into the environment, it travels rapidly and contaminates groundwater. This contamination causes water to have a foul smell, and renders it unusable and unfit for human consumption. Moreover, MTBE is a known animal carcinogen, and is linked to many potential human health problems. Water contamination occurs from normal, everyday use of gasoline containing MTBE -- *e.g.* gasoline drips from gas station pumps -- and when MTBE is stored in leaking underground tanks. MTBE is also discharged into the air as exhaust as a bi-product of car engine combustion of gasoline containing MTBE. As a result, groundwater is further contaminated because rain returns the discharged MTBE to the soil. *See id.* ¶¶ 78, 80-84, 121.

Plaintiffs allege that as early as 1980, defendants were aware of the risk that MTBE posed to groundwater because of well contamination in Rockaway, New Jersey. Throughout the 1980s and 90s, subsequent contamination of other wells and aquifers, as well as scientific studies and reports, confirmed the risks posed by MTBE. Although defendants publicly denied the risks, their own documents confirm that they were aware of the harm posed by their use of MTBE. *See id.* ¶¶ 97-106, 113-120.

Because adding MTBE to gasoline allowed defendants to cheaply increase the octane levels in gasoline, and provided a use for the refining process by-product, defendants conspired to convince the public and the Environmental Protection Agency ("EPA") that adding MTBE to gasoline is safe and desirable. Defendants thereafter failed to provide EPA with information it sought regarding MTBE's safety, and persuaded EPA not to undertake additional testing of MTBE *See id.* ¶¶ 122-136, 147-149. These actions constitute "Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing MTBE's real environmental hazards, all of which Defendants knew or should have known . . .". *Id.* ¶ 137.

Despite their knowledge of the threat posed by MTBE, defendants have continued to use MTBE as an oxygenate in gasoline and have even increased

the concentrations, although safer alternatives are available. Moreover, plaintiffs claim that defendants had a duty to disclose the risk of MTBE, but failed to do so. *See id.* ¶¶ 96, 144, 145, 158, 161.

As a result of defendants' actions and their failure to warn, MTBE is the second most frequently detected chemical in groundwater in the United States, and wells throughout the country are contaminated. The nation's drinking water is threatened by the contamination. *See id.* ¶¶ 163-168.

Based on these facts, plaintiffs assert causes of action for (1) public nuisance, (2) strict liability for design defective and/or defective product, (3) failure to warn, (4) negligence, (5) private nuisance, (6) deceptive business acts and practices in violation of New York's General Business Law, and (7) violation of the New York Oil Spill Prevention, Control and Compensation Act. *See id.* ¶¶ 184-233. Plaintiffs also allege that defendants conspired to conceal the dangers of MTBE and mislead the public and the EPA. Because MTBE released into the environment lacks identifying characteristics, it is impossible to identify the manufacturer responsible for specific groundwater contamination. Plaintiffs therefore allege market share, concert of action and enterprise liability. *See id.* ¶¶ 170, 174, 176, 178, 180-183.

### B. Grounds for Removal

Defendants removed the actions to federal court, asserting four grounds for federal subject matter jurisdiction: (1) federal agent jurisdiction pursuant to section 1442(a)(1) of Title 28; (2) preemption; (3) bankruptcy jurisdiction, pursuant to section 1334(b) of Title 28[3]; and (4) substantial federal question.

In support of removal, defendants allege that in 1977, Congress amended the Clean Air Act to federalize fuel content requirements. *See* 42 U.S.C. § 7545. Pursuant to the amendment, EPA has express and exclusive authority to determine what fuels and fuel additives are sold nationwide. *See* Defendants' Notice of Removal ¶¶ 13, 14. By Federal Regulations issued in 1979 and 1981, EPA allowed MTBE to be added to gasoline in amounts of up to fifteen percent by weight.[4] *See* 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979); 46 Fed. Reg. 38,582 (July 28, 1981); Defendants' Notice of Removal ¶ 15.

---

[3] It is undisputed that Texaco, the predecessor to defendant ChevronTexaco, filed for bankruptcy on April 12, 1987. The bankruptcy court confirmed Texaco's reorganization plan on March 23, 1988.

[4] Notably, EPA's regulations pertaining to fuel content span more than 400 pages of the Code of Federal Regulations. Defendants' Notice of Removal ¶ 33.

In 1990, Congress further amended the Clean Air Act. Among other things, the amendments created two programs that require petroleum refiners to blend oxygenates into gasoline sold throughout much of the country. These programs -- the Oxygenated Fuel Program ("OFP") and the Reformulated Gasoline ("RFG") Program -- were designed to reduce emission of toxic air pollutants. According to defendants, at the time the amendments were enacted, Congress was aware that only a limited number of oxygenates could be blended with gasoline to meet the requirements, and MTBE would have to be used for at least some of the gasoline sold in areas affected by the programs. Defendants' Notive of Removal ¶¶ 16-20. Moreover, "Congress and [the] EPA fully understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States," *id.* ¶ 19 (citing 136 Cong. Rec. S6383 (daily ed. May 16, 1990) (statement of Sen. Daschle)), and "intended that petroleum refiners use MTBE in gasoline," *id.* ¶ 23.

In 1991, pursuant to the 1990 amendment to the Clean Air Act, the EPA approved the use of seven compounds to achieve the requirements set forth in the OFP.[5] These additives are: (1) MTBE, (2) ethanol, (3) methanol, (4) tertiary

---

[5] In 1994, EPA approved the same seven additives for use in the RFG Program. *See id.* ¶ 29.

amyl methyl ether, (5) ethyl tertiary butyl ether, (6) tertiary butyl alcohol, and (7) diisoproyl ether. *See id.* ¶ 26 (citing Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of the Clean Air Act as Amended, 56 Fed. Reg. 31,151, 31,154 (July 9, 1991)). According to defendants, "[l]ike Congress, the EPA understood that MTBE would be 'the most common oxygenating compound' used by refiners to comply with the CAA's new air emissions standards." *Id.* ¶ ¶ 28 (quoting Approval and Promulgation of Implementation Plan, 56 Fed. Reg. 5,458, 5,465 (Feb. 11, 1991)), 29, 31.

Finally, defendants claim that when the EPA approved MTBE for use in compliance with the OFP and RFG Program, it knew of the risk that MTBE posed to groundwater, and further knew that there was not a sufficient nationwide supply of ethanol, or even an infrastructure to create ethanol, to satisfy the program requirements. Accordingly, EPA knew that the *only* way refining companies could meet the requirements promulgated in the OFP and RFG Programs, and thereby comply with the Clean Air Act, was to use MTBE as a gasoline additive. Congress and the EPA therefore effectively directed defendants to use, manufacture and/or sell gasoline that contains MTBE. *See id.* ¶¶ 19, 23, 34.

## II. APPLICABLE LAW

### A. General Principles

A defendant seeking removal bears the burden of establishing federal subject matter jurisdiction. *See Carson v. Dunham*, 121 U.S. 421, 425-26 (1887); *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). Moreover, the rules for removal are strictly construed. *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31 (2002). It is well-established that "[t]o determine whether the claim arises under federal law, [courts] examine the 'well pleaded' allegations of the complaint and ignore potential defenses: 'a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution.'" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, --, 123 S. Ct. 2058, 2062 (2003) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1914)). "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Id* at 2062.

There are, however, two exceptions to the general rule. *First*, a state law claim may be removed to federal court when the claim is completely preempted by federal law. "When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of

action, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b), which authorizes any claim that 'arises under' federal law to be removed to federal court." *Beneficial Nat'l Bank*, 123 S. Ct. at 2063. The Supreme Court has found "complete preemption" in only two types of cases: certain causes of action under the Labor Management Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA"). *See id.* Recently, the Second Circuit found complete preemption in a third category of cases: those arising under the Securities Litigation Uniform Standards Act ("SLUSA"). See *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 124 n. 5 (2d Cir. 2003). In so finding, the Court of Appeals emphasized that "the complete preemption doctrine must be applied sparingly and with great restraint." *Id.*

*Second*, an action may be removed to federal court where Congress so provides. Thus, where a statute specifically gives federal courts jurisdiction over a particular subject matter, and states that actions involving that subject matter may be removed to federal court despite the absence of federal claims, removal is proper even where the "well-pleaded complaint" rule is not satisfied. *See, e.g.*, 42 U.S.C. § 2014 (providing federal courts with jurisdiction over tort actions arising from nuclear accidents expressly allowing removal of such actions even when only

state law claims are asserted); *see also Beneficial Nat'l Bank*, 123 S. Ct. at 2062-63 (discussing statutes that expressly allow removal to federal court even where no federal cause of action is asserted on the face of the complaint).

**B. Federal Agent Jurisdiction**

**1. Background**

Section 1442(a) of Title 28 provides that, "[a] civil action [] commenced in a State court against [] the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: [] Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office . . .". 28 U.S.C. § 1442(a)(1). This statute falls into the second of the two exceptions to the well-pleaded complaint rule because Congress has expressly provided that actions against persons acting under color of an office or agency of the United States may be removed to federal court, despite the absence of any federal cause of action. *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) ("Suits against federal officers are exceptional in this regard. Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint"); 16 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 107.15[1][b] ("[T]here is no requirement that the state action [removed

pursuant to section 1442(a)] be one that could have been originally filed in the federal courts.").

Although section 1442(a) permits removal regardless of whether the complaint *states* a federal cause of action, the action must nonetheless *raise* an issue of federal law. *See* U.S. Const., art. III § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority. . ."). This requirement is met if the defense depends on federal law. "It is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." *Mesa v. California*, 489 U.S. 121, 126 (1989). *See also Jefferson County*, 527 U.S. at 430-31 ("Under the federal officer removal statute . . . the federal-question element is met if the defense depends on federal law.").

The Supreme Court has explained the justification for the federal officer removal statute:

> The purpose of [the statute in its various forms throughout history] is not hard to discern. As this Court said nearly 90 years ago in *Tennessee v. Davis*, 100 U.S. 257, 263, 25 L. Ed. 648

> (1880), the Federal Government can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,--if their protection must be left to the action of the State court,--the operations of the general government may at any time be arrested at the will of one of its members. For this very basic reason, the right of removal under s 1442(a)(1) is made absolute whenever a suit in a state court is for any act under color of federal office, regardless of whether the suit could originally have been brought in a federal court. Federal jurisdiction rests on a federal interest in the matter, the very basic interest in the enforcement of federal law through federal officials.

*Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (citations and quotation marks omitted); *see also Mesa*, 489 U.S. at 126.

The Supreme Court has emphasized that the federal officer removal statute is neither narrow nor limited, and has rejected lower court interpretations that circumscribe its scope. *See Willingham*, 395 U.S. at 406 (the policies underlying section 1442(a) "should not be frustrated by a narrow, grudging interpretation"); *Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981); *Reiser v. Fitzmaurice*, No. 94 Civ. 7512, 1996 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996) ("The policy of supremacy underlying section 1442(a)(1) has prompted federal courts to construe it broadly . . ."). A defendant seeking to remove pursuant to

section 1442(a) need only provide "candid, specific and positive" allegations that the conduct complained of was undertaken pursuant to the directions of a federal office or agency. *Willingham*, 395 U.S. at 409. "A plaintiff may not challenge the factual allegations in the notice of removal, but the plaintiff may challenge their legal sufficiency." 16 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 107.15[1][b][iv][B]; *see also Colorado v. Symes*, 286 U.S. 510, 518-19 (1932).

Moreover, if a case is properly removed pursuant to section 1442(a)(1), the district court has discretion to retain jurisdiction and adjudicate the merits of the case even after the federal officer or agency aspect is dismissed. *See IMFC Prof. Derv. of Florida, Inc. v. Latin America Home Health, Inc.*, 676 F.2d 152, 158-60 (5th Cir. 1982) ("[E]limination of the federal officer from a removed case does not oust the district court of jurisdiction"); *Watkins v. Grover*, 508 F.2d 920, 921 (9th Cir. 1974) ("The modern rule (and the law of this circuit) is that a federal court does have the power to hear claims that would not be independently removable even after the basis for removal jurisdiction is dropped from the proceedings."); *New Jersey Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Serv. Inc.*, 719 F. Supp. 325, 334 (D.N.J. 1989) ("If a court dismisses the federal defendant from [] a case [removed pursuant to section 1442(a)(1)], it must use its

discretion to decide whether to remand the remaining ancillary claims to state court or to maintain jurisdiction over those claims.").

### 2. Requirements

Under section 1442, a private party may remove a state court action if (1) it acted under the direction of a federal agency or officer; (2) it has a colorable federal defense; and (3) there is a causal nexus between the federal direction and the conduct in question. *See Jefferson County*, 527 U.S. at 431; *Mesa*, 489 U.S. at 124-25; *In re Agent Orange Product Liab. Litig.*, No. 98 Civ. 6383, 2004 WL 231187, at *3 (E.D.N.Y. Feb. 9, 2004)[6]; 16 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 107.15[1][b][ii].

---

[6] In *In re Agent Orange*, Judge Jack B. Weinstein described the three requirements slightly differently: "First, a defendant must demonstrate that it is a 'person' within the meaning of the statute. Second, the defendant must establish that the suit is for any act under color of [federal] office, i.e., there is a causal connection between the charged conduct and asserted official authority. Causation exists if the predicate acts of the state suit were undertaken while a person was acting as or under a federal officer, and the acts were under color of the relevant federal office. Third, defendants must raise a colorable claim to a federal law defense." 2004 WL 231187 at *3 (quotation marks omitted). Nonetheless, the substance of the requirements is the same.

There is no doubt that the defendants in these actions constitute "persons" for purposes of section 1442(a) because "unless the context indicates otherwise . .. the words 'person' and 'whoever' include corporations, companies, . . . , and joint stock companies, as well as individuals. . . ." 1 U.S.C. § 1; *see also Group Health Inc. v. Blue Cross Ass'n*, 587 F. Supp. 887, 890 (S.D.N.Y. 1984) (corporations are entitled to remove under section 1442(a)).

A defendant meets the first requirement of "acting under the direction of a federal agency or officer" by "showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 946-47 (E.D.N.Y. 1992); *see also Bakalis v. Crossland Sav. Bank*, 781 F. Supp. 140, 145 (E.D.N.Y. 1991) ("The rule that appears to emerge from the case law is one of 'regulation plus.'"). Although there is "no precise standard for the extent of control necessary to bring an individual with the 'acting under' clause," *Gurda Farms Inc. v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841, 844 (S.D.N.Y. 1973), "a cursory survey of the application of [section 1442(a)] reveals it has been construed broadly, and its 'persons acting under' provision particularly so," *id.* at 843.[7] *See also Agent Orange Product Liab. Litig.*,

[7] The *Gurda* court undertook a thorough analysis of cases in which courts have found that defendants were "persons acting under" a federal office or agency. These include *State of Texas ex rel. Faulkner v. National Bank of Commerce*, 290 F.2d 229 (5th Cir. 1961) (quo warranto proceeding against banks operating branch offices on military bases held removable); *State of Texas v. Heaton*, 58 F.2d 656 (N.D.Tex. 1932) (upholding removal of a murder prosecution against federal prohibition agents and an informer working for them); *People of the State of Colorado v. Maxwell*, 125 F. Supp. 18 (D. Colo. 1954) (murder prosecution properly removed where city police chief, under the direction of an Air Force captain, arrested and shot a soldier); *Teague v. Grand River Dam Authority*, 279 F. Supp. 703 (N.D. Okl. 1968) (wrongful death action properly removed where defendant, acting under license from the Federal Power Commission and at the direction of a member of the Army Corps of Engineers,

2004 WL 231187, at *4 ("Courts interpret the [persons acting under color of federal office or agency] rule broadly to achieve the protective purpose of the statute.").

The second requirement for federal officer removal -- a colorable federal defense -- is also broadly construed. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. We therefore do not require the officer virtually to 'win his case before he can have it removed.'" *Jefferson County*, 527 U.S. at 431 (citation omitted) (quoting *Willingham*, 395 U.S. at 407). Thus, a defense may be "colorable" even if it is ultimately rejected by the court. *See id.* "[A]t the removal stage, it is not the Court's role to assess the validity of a particular defense. The Supreme Court made clear in *Willingham* that the phrase 'under color of . . .

---

opened floodgates resulting in a death); *Kuenstler v. Occidental Life Ins. Co.*, 292 F. Supp. 532 (C.D. Cal. 1968) (upholding removal of an action for $72 from the Small Claims Court against a private insurance company which had contracted with the federal government to administer benefit provisions of Medicare); *Allen v. Allen*, 291 F. Supp. 312 (S.D. Iowa 1968) (allowing removal of a garnishment action against a doctor who treated patients under Medicare); *State of Oregon v. Cameron*, 290 F. Supp. 36 (D. Or. 1968) (upholding removal of a criminal trespass action against VISTA volunteers who entered property to render medical assistance, on the grounds that the VISTA workers were persons acting under an officer of the United States and performed work contemplated by a federal statute, 42 U.S.C. § 2991, though they were not federal employees).

office' allows removal even if, on the record then existing, it could not be said that 'the officers had a clearly sustainable defense.'" *Reiser*, 1996 WL 54326, at *3 (alteration in original); *see also Symes*, 286 U.S. at 519 (where a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith.").

Finally, the "causal nexus" element of section 1442(a) requires that the defendant aver, in the removal notice, that the act complained of by the plaintiff was undertaken pursuant to the directions of a federal office or agency. The Supreme Court has explained:

> The prosecution to be removed under the [federal officer removal statute] must have been instituted on account of acts done by the defendant as a federal officer under color of his office []. There must be causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him for whatever offense has arisen out of the acts done by him under color of federal authority and in enforcement of federal law . . .

*Maryland v. Soper*, 270 U.S. 9, 33 (1926) (quotation marks omitted). "The 'causal nexus' is [] satisfied when there is evidence of intimate government involvement in the design decisions causally related to the alleged tort. . . . [D]efendants must show that the government directed the actions on which the plaintiffs based their

claims." *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *5 (citing *Arness v. Boeing North America Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal. 1998)); *see also Willingham*, 395 U.S. at 409.

## III. DISCUSSION

### A. Defendants Allege They "Acted Under a Federal Agency" When They Used MTBE as an Additive

In their Notice of Removal, defendants allege that the Clean Air Act, and regulations promulgated thereunder, require them to blend oxygenates into gasoline. Although the EPA has identified seven additives that may be used to meet these requirements, MTBE is the only approved oxygenate that is available in quantities sufficient to comply with the Act and regulations. Moreover, defendants allege that at the time the Clean Air Act was amended and the seven oxygenates were approved for use, both Congress and the EPA were aware that defendants would *have to use* MTBE in order to comply with the Act's requirements. *See supra* Part I.B. Thus, defendants have sufficiently alleged that they added MTBE to gasoline at the direction of the EPA, a federal agency, thereby meeting the first requirement of removal pursuant to section 1442(a)(1). *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998) (holding that manufacturers of Agent Orange acted at the direction of a federal

office or agency, for purposes of the federal officer removal statute, because the federal government required defendants to produce Agent Orange to certain specifications).

This conclusion is supported by the case law and the policies underlying the federal officer removal statute. As noted above, the "persons acting under" requirement is broadly construed. *See Gurda Farms*, 358 F. Supp. at 844; *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *4. Moreover, remanding these cases to state court would pose precisely the risk that the Supreme Court warned against in *Willingham*. Specifically, defendants, having acted pursuant to directives of the federal government, would be "brought to trial in a State court, for an alleged offense against the law of the State, [and] . . . the general government [would be] powerless to interfere at once for their protection." 395 U.S. at 406. Such a prosecution has the potential to interfere with the enforcement of federal law.

Plaintiffs argue that a finding that defendants acted at the direction of a federal agency will "in effect, [] Federalize all tort litigation against manufacturers of products subject to Federal regulation -- cigarettes, automobiles, pharmaceuticals, asbestos, and many other consumer and industrial products too numerous too mention." Plaintiffs' Memorandum of Law in Support of Motion

To Remand ("Pl. Mem.") at 12. This argument is not persuasive. Defendants do not seek removal simply because gasoline is subject to regulation. Instead, defendants argue that the federal government *required* them to add MTBE to gasoline, the conduct upon which plaintiffs' claims are based. Thus, removal pursuant to section 1442(a)(1) is premised not on defendants' participation in a regulated industry, but rather the fact that defendants took actions at the express direction of the federal government, and those actions are the basis for the complaints. There is simply no reason to believe that this invocation of the federal officer removal statute will "[f]ederalize all tort litigation," Pl. Mem at 12, because defendants in tort litigation do not typically assert that their actions were undertaken at the direction of the federal government.[8]

---

[8] Moreover, the cases upon which plaintiffs rely in support of their argument are unavailing. As an initial matter, *Ryan*, 781 F. Supp. 934, is no longer good law, to the extent it rejects invocation of the federal officer removal statute in the context of Agent Orange litigation. *See Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *1 ("Federal jurisdiction is properly asserted under the federal officer removal statute. A prior decision of this court reached a contrary conclusion in an Agent Orange case. The *Ryan* decision is no longer persuasive. As the Court of Appeals for the Fifth Circuit pointed out in rejecting *Ryan*'s conclusion, this court recognized its decision on the point as 'close' and 'uncertain.'" (citation omitted) (citing *Winters*, 149 F.3d at 392)).

Plaintiffs' reliance on *Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411 (D.N.H. 2002), and *Little Purdue Pharma L.P.*, 227 F. Supp. 2d 838 (S.D. Ohio 2002), is similarly misplaced. In *Tremblay*, plaintiffs alleged that Philip Morris designed light cigarettes and manipulated their content to produce

**B. Defendants Allege a Colorable Federal Defense**

Defendants claim that plaintiffs' state law claims are expressly preempted. Specifically, section 7545(c)(4)(A)(ii) of Title 42[9], a provision of the

---

misleading tar and nicotine ratings as measured by a method endorsed by the Federal Trade Commission. Neither plaintiffs nor defendant argued that Philip Morris designed the cigarettes and manipulated their content *at the direction of the FTC or any other federal agency*. Thus, plaintiffs' claims were not based on actions undertaken at the direction of a federal office or agency, and the district court rejected defendant's invocation of the federal officer removal statute. 231 F. Supp. 2d at 417-19.

Similarly, in *Little Purdue Pharma*, plaintiffs sought recovery for injuries arising from exposure to the prescription drug OxyContin. Defendants removed the action to federal court pursuant to section 1442(a)(1), arguing that because of the "highly regulated nature of the pharmaceutical industry, [] pharmaceutical manufacturers [should] be regarded as de facto federal officers." 227 F. Supp. 2d at 860. But the *Little Purdue Pharma* defendants did *not* allege that their actions giving rise to the complaint were undertaken at the direction of a federal office or agency, and the district court therefore rejected their argument. *See id.* at 861-62.

[9] Section 7545(c)(4)(A)(ii) of the Clean Air Act states, in pertinent part,

> [N]o State (or political subdivision thereof) may prescribe or attempt to prescribe, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle engine . . . if [EPA] has prescribed . . . a control or prohibition applicable to such characteristic or component of a fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by [EPA].

42 U.S.C. § 7545(c)(4)(A)(ii).

Clean Air Act, "forbade the states to regulate the content of fuels or fuel additives." Defendants' Opposition to Plaintiffs' Motion to Remand ("Def. Opp.") at 11. According to defendants, this provision expressly preempts any state statute that interferes with federal controls and/or prohibitions on fuel and fuel additives. Defendants argue that plaintiffs' state law claims seek to penalize defendants for adding MTBE to gasoline, and to ban MTBE's future use. Therefore, say defendants, the state law claims constitute an attempt to regulate the content of fuel and fuel additives, in violation of section 7545(c)(4)(A)(ii.). *See* Def. Opp. at 11, 23-28.

Alternatively, defendants contend that the doctrine of conflict preemption bars plaintiffs' state law claims. Conflict preemption requires a finding that either (1) it would be impossible for defendants to comply with both the state law sought to be imposed and the federal requirements; or (2) the state law sought to be imposed would prove an obstacle to the achievement and execution of the full purposes and objectives of Congress. *See English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). Defendants submit that because MTBE is the only approved oxygenate available in quantities necessary to meet the Clean Air Act's requirements, it would be impossible for them to adhere to the state laws sought to be imposed -- which would effectively ban MTBE -- and the federal

requirements. Moreover, defendants argue that "finding them liable for using MTBE, one of a limited number of federally approved oxygenates, would present an obstacle to the achievement of the federal objectives of the CAA and the RFG program." *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 175 F. Supp. 2d 593, 614 (S.D.N.Y, 2001) ("*MTBE I*").

At this stage of the litigation, there is no need to decide whether defendants will prevail on either of these defenses. The only issue is whether one or both of these defenses is colorable. *See Jefferson County*, 527 U.S. at 431; *Willingham*, 395 U.S. at 407; *Symes*, 286 U.S. at 519; *Reiser*, 1996 WL 54326, at *3. Although I previously have rejected defendants' preemption arguments, *see MTBE I*, 175 F. Supp. 2d at 611-16, defendants urge me to reconsider that ruling, and emphasize that the allegations now before the Court are different than the allegations in *MTBE I*.

The preemption defenses argued in *MTBE I* were, without doubt, colorable. Moreover, since that decision, several courts have concluded that state law claims involving MTBE contamination *are* conflict preempted. *See Molloy v. Amerada Hess Corp.*, No. 2001/396, slip op. at 5 (Dutchess Co. Aug. 1, 2002); *Coppola v. Amerada Hess Corp.*, No. 2001/3995, slip op. at 5 (Dutchess Co. July 31, 2002); *Hixon v. Unocal Corp.*, Case No. BC 195295 (Super. Ct. Los Angeles

County, Aug. 23, 2001); *Kubas v. Unocal*, Case No. BC 191876 (Super. Ct. Los Angeles County, Aug. 23, 2001). Given these circumstances, I have no doubt that the preemption defenses asserted by defendants in this litigation are colorable. The allegations now before me are somewhat different than the allegations that were before me in *MTBE I*. Accordingly, defendants have the right to assert these defenses in the context of the current complaints. Because defendants need only assert a "colorable" federal defense in support of removal pursuant to section 1442(a)(1), they have met their burden.

**C. Defendants Allege a "Causal Nexus"**

Finally, defendants clearly allege that the acts upon which plaintiffs' claims are based -- namely, manufacturing and selling gasoline containing MTBE -- were undertaken at the direction of the EPA, a federal agency. Not only do defendants allege that they are participants in a highly regulated industry, they also claim that the federal government was "intimately [] involved" in their decision to add MTBE to gasoline. *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *5; *see also Willingham*, 395 U.S. at 409. Therefore, defendants sufficiently aver, in their notice of removal, the "causal nexus" required for removal pursuant to the federal officer removal statute.

## IV. Other Grounds for Removal Not Considered

Because I conclude that the actions were properly removed pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), I need not address defendants' other proffered grounds for jurisdiction. *See Horne v. Coughlin*, 178 F.3d 603, 606 (2d Cir. 1999) (courts should avoid issuing advisory opinions on issues unnecessary for adjudication of the case before the court). Notably, however, defendants' preemption argument is the "colorable federal defense" underlying the removal pursuant to section 1442(a)(1), *see supra* Part III.B, and therefore undoubtedly will be fully addressed in subsequent motion practice.

Additionally, I note that defendants' argument regarding jurisdiction on the basis of a "substantial federal question" is troubling. The Supreme Court has said that a case may arise under federal law "where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 9 (1983). However, the Court has cautioned against broad interpretations of *Franchise Tax Board*, saying that it,

> did not purport to disturb the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction. . . . Far from creating some kind of automatic test, *Franchise Tax Board* thus candidly recognized the need for careful judgments about the

> exercise of federal judicial power in an area of uncertain jurisdiction. Given the significance of the assumed congressional determination to preclude federal private remedies, the presence of the federal issue as an element of the state tort is not the kind of adjudication for which jurisdiction would serve congressional purposes and the federal system.

*Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 813-14 (1986). As noted above, though, I need not decide at this time whether jurisdiction based on substantial federal question would run afoul of *Merrell Dow Pharmaceuticals.*

Finally, though Texaco's 1987 bankruptcy may provide this Court with jurisdiction over ChevronTexaco, that bankruptcy certainly does not divest the state court of jurisdiction. Because it is unclear that this litigation will implicate the bankruptcy at all, *see* Transcript of 2/13/04 oral argument, and the issue of the bankruptcy will not even arise until after a finding of liability, I would be hesitant to exercise jurisdiction over dozens of defendants in a multi-district litigation merely because a single defendant filed for bankruptcy and reorganized under Chapter 11 more than fifteen years ago. However, I do not decide that question today.

## V. CONCLUSION

Defendants have sufficiently averred facts supporting removal pursuant to section 1442(a)(1) of Title 28. Specifically, defendants allege that (1) they added MTBE to gasoline at the direction of the EPA, a federal agency; (2) they have a colorable federal defense of preemption; and (3) there is a causal connection between plaintiffs' claims and the acts defendants undertook at the direction of the EPA. For this reason, plaintiffs' motions to remand are denied. The Clerk of the Court is directed to close these motions. A conference is scheduled for March 23, 2004 at 10:30 a.m..

SO ORDERED:

____________________
Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
March 16, 2004

**- Appearances -**

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

# Exhibit 16

Welcome to the California Energy Commission

# QUESTIONS & ANSWERS: CALIFORNIA GASOLINE PRICE INCREASES

Also visit our gasoline-saving tips page.

## Where does our oil and gasoline come from?

California consumes substantial amounts of gasoline - about 15.5 billion gallons per year. Cru is made into gasoline, and the crude comes from within-state oil wells (48%), Alaska (22%) a foreign sources (30%).

Most (about 90%) of our gasoline is refined in-state, but additional quantities of gasoline and blending components are imported because refining capacity cannot keep pace with growing demand.

California is also isolated from other refining centers in the United States. Our gasoline must r stringent air quality requirements to burn cleanly to protect public health and the environmen Because our gasoline is different from others made in the U.S., this limits the state's ability to alternative sources when supplies are constrained and prices increase. Additional supplies can several weeks to arrive by ocean-going vessels.

## What happened to oil and gasoline prices this year?

Retail regular-grade California gasoline prices increased to $2.11 per gallon on March 1, 2004 51.4 cents from December 29, 2003.

Spot wholesale gasoline prices in California increased to $1.58 per gallon on February 19, 200 59 cents from $0.99 on December 31, 2003, before falling to $1.38 on February 27, 2004.

California retail diesel prices have been affected less than gasoline, but still rose to $1.94 on M 1, 2004, up 26 cents from December 29, 2003.

## Why did this occur?

Gasoline consumption typically rises significantly between January and August. Many more pe are on the road during the "summer driving season." For example, in 2002 and 2003, daily ga demand rose 8 percent and 9 percent, respectively, between those months.

Refineries prepare for this increased demand by doing their routine maintenance during Janua and February. Refineries are taken off line during what is called the "turn-around."

At the start of the refinery maintenance season, inventories of gasoline were at high levels. Bı above normal refinery turn-arounds this year, combined with unexpected problems with resta and other difficulties, cut deeply into production and stocks, causing sharp price increases.

Six refineries began turnarounds in January, one in February, and another will start in March. other refinery had unexpected problems in late February. While restarting, three of these refir experienced difficulties that, combined, caused unplanned purchases of about a million barrels gasoline to meet requirements.

High world crude oil prices have contributed to raising the price of all petroleum products. Hov in the most recent California gasoline price spike, oil prices are secondary to lost refinery prod and resulting product shortages.

## What are the various costs associated with gasoline?

There are four main areas associated with the price of gasoline:

1. Crude oil cost
2. Taxes
3. Refinery costs and profit margin
4. Dealer costs and profit margin

About the only area that doesn't change much are taxes.

Crude oil cost is the price paid for a barrel of crude oil on the international market divided by · gallons in a barrel. This will give the price of crude oil per each gallon of gasoline. This is ofter most volatile price of the fuel. Crude oil is traded as a commodity, and as the price goes up, p for gasoline can change very quickly. When prices for crude come down, the price for gasoline typically comes down -- but very slowly. This is typical for most commodities.

For every one dollar increase of the cost of a barrel of crude oil, there is an average increase ( about 2.5-cents per gallon of gasoline. So, a $10 increase per barrel in crude prices means a : cent increase at the pump. A $15 increase in crude oil means a 37.5-cent a gallon increase in gasoline prices. This additional cost will not go away until crude oil prices start to come down.

Taxes for gasoline in California are: 15.4 cents/gallon for federal excise taxes; 18 cents/gallor state excise taxes; and local and state sales taxes. Sales taxes vary depending on the city an( county you may be in...but on average the sales tax adds between 9 and 12 cents to a gallon gasoline, depending on final price. Diesel fuel taxes are different. The federal excise tax decre from 18.4-cents/gallon to 15.4-cents/gallong because of the use of ethanol being blended in t gasoline at a concentrate of 5.7 percent. Ethanol as a transportation fuel is taxed at a differen than gasoline, hence the decrease in federal excise tax.

Dealer costs and profit margin (or the amount that the dealer charges for the fuel) includes al associated with the distribution and retailing of motor fuel, including but not limited to: franch fees and/or rents, wages, utilities, supplies, equipment maintenance, environmental fees, lice permitting fees, credit card fees, insurance, depreciation, advertising and profit. Dealer margi normally lags changes in the wholesale price of gasoline.

Refinery costs and profit margin (or the prices charged by the oil companies) must cover all c associated with production, distribution, and acquisition of gasoline. The refinery costs and pr margin covers all costs associated with refining and terminal operation: crude oil processing, oxygenate/ethanol, product shipment and storage, oil spill fees, depreciation, brand advertisir

purchases of gasoline to cover refinery shortages and profits.

Also during times of market disturbance - when there are supply shortages or even perceived supply shortages - production (and acquisition) costs will increase beyond normal values beca market fears and speculation. Prices can also escalate very quickly during these situations.

## Why not just tell the oil companies to lower their prices? Why can't govern something about the prices?

Ronald Reagan removed regulations on oil companies and petroleum prices when he was Pres Since then, gasoline prices have been dictated by supply and demand and free market econor There are no government controls on the price of oil or gasoline. So, government cannot tell gasoline companies to hold their prices at one level or to decrease them.

## Does a free market really exist with gasoline? It seems all the gasoline sta at the same price.

This is untrue. There are differences between stations and prices. Some stations have lower p because they typically do not take credit cards - they take only cash or ATM cards. Credit carc add about two to three percent to the cost of the transaction. This extra cost is passed on to t customer in higher prices at the pump for the convenience of using a credit card. Other statioı such as independents and so-called "Mom and Pop" stations usually have lower prices becaus do not have multi-million dollar advertising campaigns to convince you to buy their product. S their prices usually are lower than the "name brand" stations.

The independents and non-branded stations buy gasoline usually on what's called the unbranc "spot" market. This is the wholesale market that is most vulnerable to refinery problems and t fluctuating cost of crude oil. The price is normally lower than the branded wholesale prices. Bu can have unbranded prices soar higher than branded prices when the supplies get tight. So, tl independents and "Mom and Pop" stations sometimes will have to price their gasoline higher t branded stations.

## Aren't the oil companies all in collusion to set their prices at the same leve they all price fixing?

Rumors and charges of collusion among the oil companies have been raised for decades with nothing ever proven. Investigations have been undertaken by California Attorney General and federal authorities looking into these allegations.

## Why do the gasoline stations raise their prices almost daily, and it seems li sometimes do it hourly?

Prices are set by what the station owner will have to pay for the NEXT delivery of gasoline. If are going up on the wholesale level, The station operator has to pay for what the next shipme cost when it's delivered. If the delivery is going to cost more than what the dealer is charging pump now, they are going to lose money on the higher-priced new gasoline. So, the dealer ha increase his price whenever there is an increase in the wholesale price of the fuel to pay for th more expensive gasoline in the future.

But sometimes, station owners will hold down their price increases in order to remain more competitive with other stations, temporarily costing them money. This can be especially true f independent service station owners during period of rapid wholesale price increases.

## What is going to happen this spring?

It's hard to predict the future, especially with a commodity like gasoline, whose price is extrer volatile.

As refineries come back into normal production, upward pressure on gasoline prices will ease inventories return to normal. However, unplanned refinery outages can occur at any time. Depending on their extent and duration, and prevailing market conditions at the time, these e could sharply increase gasoline and diesel prices.

The transition to summer-grade gasoline could also make gasoline prices increase. As of Janu 2004, most of California's gasoline uses ethanol instead of MTBE (methyl-tertiary butyl ether) oxygenate to help burn the gas more cleanly. Other states are also changing and not using M because of the problems with that additive. As the U.S. East Coast makes this transition to MT free gasoline for the first time, competition for valuable gasoline blend stocks could raise the c making California gasoline..

Wholesale ethanol prices generally declined during the gasoline price spike. Short-term chang ethanol prices are a relatively small factor directly affecting gasoline prices.

Strong demand for gasoline and diesel in California and the U.S. would increase the pressure prices.

If OPEC crude oil production cuts are made as planned, the dollar remains weak against other currencies, and crude oil inventories do not build, gasoline prices will be higher than normal, e no California refinery problems arise.

## What can I do to cut my gasoline use and expenses?

We have another website devoted to consumer information. Please visit our gasoline-saving ti page.

| Main Section Page | Commission Homepage | Site Index | Search Site | Glossary | Links | Contact Us |

Page Updated: March 5, 2004

# Exhibit 17

**Partial List of MTBE Cases Pending in State Courts** *

| State | Short Case Name | Court/Index Number |
|---|---|---|
| Cal. | *City of Santa Monica v. Shell Oil Company et al.* | Cal. Super. Ct. 01-CC-04331 |
| Cal. | *D.J. Nelson Trust, dba Fruitridge Vista Water Company v. ARCO, et al.* | Cal. Super. Ct. 02AS00535 |
| Ill. | *Frances Misukonis and Frank Provasnik, Individually and on Behalf of All Others Similary Situated v. Atlantic Richfield Company, et al.* | 3d Cir. Ct. Ill. 00-L-1472 |
| Ill. | *Village of East Alton v. Premcor Refining Group, Inc. f/k/a Clark Refining & Marketing, Inc., et al.* | 3d Cir. Ct. Ill. 01-L-1171 |
| N.C. | *Bobbie Adams, et al. v. BP Products North America, Inc., et al.* | N.C. Super. Ct. 03 CVS 912 |
| N.J. | *Bichmaf, et al. v. Exxon Mobil Corp. & Shotmeyer Brothers Fuel Corp. et al.* | N.J. Super. Ct. L-2827-01 |
| N.Y. | *County of Suffolk and Suffolk County Water Authority v. Amerada Hess, et al.* | N.Y. Sup. Ct. 2002/22305 |
| N.Y. | *Helen Armstrong, et al., v. Sunoco, Inc., et al.* | N.Y. Sup. Ct. 2003/3717 |
| N.Y. | *Plainview Water District v. Exxon Mobil, Inc., et al.* | N.Y. Sup. Ct. 2001/009975 |
| N.Y. | *Valley Stream Union Free School District #30 v. Exxon Mobil, Inc., et al.* | N.Y. Sup. Ct. 2002/005093 |
| N.Y. | *Coppola v. Amerada Hess Corporation, et al.* | N.Y. Sup. Ct. 2001/3995 |
| N.Y. | *Molloy v. Amerada Hess Corporation, et al.* | N.Y. Sup. Ct. 2001/3996 |
| N.Y. | *Roberton v. Amoco Oil Co., et al.* | N.Y. Sup. Ct. 2002/5005 |
| N.Y. | *Atkins, et al. v. Exxon Mobil et al.* | N.Y. Sup. Ct. 2001/0175 |
| R.I. | *Craig Waltz, et al., v. Exxon Mobil et al.* | R.I. Super. Ct. PC02-2436 |
| R.I. | *Edward Grille, Executive Director for the Pascoag Utility District v. Exxon Mobil Corporation, et al.* | R.I. Super Ct. PC02-2437 |
| R.I. | *St. Ours v. Exxon Mobil, Inc.* | R.I. Super Ct. 03-0079 |

| Tex. | *Thomas G. and Christy J. Browning, et al. v. Explorer Pipeline Company, Inc.* | 354th Jud. Dist. Tex. 63769 |
|---|---|---|

* This list includes only those cases of which the declarant is aware. There may be other MTBE cases pending in state courts.