MDL 1358

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | ) | MDL Docket No. 1358 |
| | ) | |
| **IN RE:** | ) | |
| | ) | This Document Relates to: |
| **METHYL TERTIARY BUTYL ETHER** | ) | *City of Fresno v. Chevron U.S.A., Inc.,* |
| **PRODUCTS LIABILITY LITIGATION** | ) | Case No. C-03-5378-JSW (N.D. Cal.) |
| | ) | |
| | ) | **CERTAIN DEFENDANTS'** |
| | ) | **CONSOLIDATED OPPOSITION TO** |
| | ) | **DUKE ENERGY'S MOTION TO** |
| | ) | **VACATE CONDITIONAL TRANSFER** |
| | ) | **ORDER (CTO-4) AND BRIEF IN** |
| | ) | **SUPPORT THEREOF** |
| | ) | |

## CERTAIN DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFF DUKE ENERGY'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4) AND BRIEF IN SUPPORT THEREOF

Pursuant to Rule 7.1(b) of the Rules of Procedure Of The Panel On Multidistrict

Litigation, the undersigned defendants file this Certain Defendants' Consolidated Opposition To

Duke Energy's Motion To Vacate Conditional Transfer Order (CTO-4) filed on March 25, 2004

in Docket No. 1358 *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*

("Duke Energy's motion"). This opposition pertains to the action captioned *City of Fresno v.*

*Chevron U.S.A., Inc.,* Case No. C-03-5378-JSW (N.D. Cal.), which is a tag-along case in the

schedule of actions subject to CTO-4, issued by the Panel on February 6, 2004. Duke Energy

filed a Motion To Vacate Conditional Transfer Order on March 8, 2004. Although Duke

IMAGED MAR 30 '04                    OFFICIAL FILE COPY

Energy's motion does not contain any separately numbered paragraphs to which the undersigned defendants must respond, the undersigned defendants make the following averments:

1.     The undersigned defendants oppose Duke Energy's motion and state that the *Fresno* action satisfies the criteria for transfer pursuant to 28 U.S.C. § 1407.

2.     The undersigned defendants state that transfer of the *Fresno* action is clearly a tag-along case that is appropriately transferred to MDL 1358 because: (i) *Fresno* raises the same common questions of fact as the other cases transferred to MDL 1358; (ii) transferring *Fresno* will serve the convenience of the parties and witnesses and prevent duplicative discovery; and (iii) giving effect to CTO-4 is necessary for the efficient conduct of the litigation, avoiding inconsistent pretrial rulings and judicial economy.   Moreover, the undersigned defendants state that none of Duke Energy's  arguments in its motion to vacate or accompanying memorandum are meritorious.

3.     The undersigned defendants further state that in addition to this Opposition, they have separately filed today Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4) ("Consolidated Response").   The undersigned defendants' Consolidated Response responds to (i) Cal-American's Brief In Support Of California-American Water Company's Motion To Vacate Conditional Transfer Order (CTO-4) filed March 4, 2004, (ii) New Hampshire's Brief In Support Of New Hampshire's Motion To Vacate Conditional Transfer Order (CTO-4) filed March 4, 2004, and (iii) Duke Energy's Memorandum In Support Of Motion To Vacate Conditional Transfer Order filed March 8, 2004.

WHEREFORE, certain Defendant's respectfully requests that the Panel:

A.     Transfer the *Fresno* action, along with all other actions listed in CTO-4, to the United States District Court for the Southern District of New York for consolidated proceedings before the MDL 1358 Court pursuant to 28 U.S.C. § 1407, the Panel's October 10, 2000 transfer order creating MDL 1350, the Panel's CTO-4 and the MDL 1358 Court's December 23, 2003 Order.

B.     Schedule oral argument on Duke Energy's motion.

C.     Deny Duke Energy's request for relief in its entirety.


March 25, 2004                              Respectfully submitted,

                                           _____
                                           J. Andrew Langan
                                           Mark S. Lillie
                                           Wendy L. Bloom
                                           R. Chris Heck
                                           KIRKLAND & ELLIS LLP
                                           200 East Randolph Drive
                                           Chicago, Illinois  60601-6636
                                           312-861-2000
                                           312-861-2200 (Facsimile)

                                           Matthew T. Heartney
                                           Lawrence Allen Cox
                                           ARNOLD & PORTER LLP
                                           777 South Figueroa Street, 44th Floor
                                           Los Angeles, CA 90017-5844
                                           (213) 243-4000
                                           (213) 243-4199 (Facsimile)

                                           Attorneys for Defendants Atlantic Richfield Company
                                           and BP Products North America Inc.

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
(212) 547-5400
(212) 547-5444 (Facsimile)

Attorneys for Defendants:  Exxon Mobil Chemical
Company Inc., Exxon Mobil Corporation, Exxon
Mobil Oil Corporation, Exxon Mobil Pipe Line
Company, Exxon Mobil Refining and Supply
Company, and Mobil Corporation

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (Facsimile)

Attorneys for Defendants Chevron Chemical
Company, Chevron U.S.A., Inc., Equilon Services
LLC, Equiva Enterprises LLC, Gulf Oil Corp.,
Motiva Enterprises LLC, Shell Oil Company, Shell
Oil Products Company LLC, Shell Oil Products US,
Shell Trading (US) Company, Star Enterprises,
Texaco  Inc., Texaco Refining and Marketing Inc.,
Texaco Refining and Marketing (East) Inc., TRMI
Holding

Ben M. Krowicki
Rebecca L. Bouchard
BINGHAHM McCUTCHEN LLP
One State Street
Hartford, CT 06103
(860) 240-2842
(860) 240-2818 (facsimile)

Attorneys for Defendant Crown Central Petroleum
Corp.

4

John S. Guttman
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 789-6020
(202) 789-6190 (facsimile)

Attorneys for Defendants Sunoco Inc. and Sunoco Inc. (R&M)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| | ) MDL Docket No. 1358 |
| | ) |
| | ) |
| **IN RE:** | ) This Document Relates to: |
| | ) *State of New Hampshire v. Amerada* |
| | ) *Hess Corp., et al.,* D.N.H. Case No. |
| **METHYL TERTIARY BUTYL ETHER** | ) 03-CV-486, No. 03-0529L; *Cal-American* |
| **PRODUCTS LIABILITY LITIGATION** | ) *Water Company v. Atlantic Richfield Co.,* |
| | ) Case No. 03-5379 JSW (N.D. Cal.); *City of* |
| | ) *Fresno v. Chevron U.S.A., Inc.,* Case No. |
| | ) C-03-5378-JSW (N.D. Cal.) |
| | ) |
| | ) **CERTAIN DEFENDANTS'** |
| | ) **STATEMENT OF REASONS WHY** |
| | ) **ORAL ARGUMENT SHOULD BE** |
| | ) **HEARD REGARDING ALL MOTIONS** |
| | ) **TO VACATE CONDITIONAL** |
| | ) **TRANSFER ORDER (CTO-4)** |
| | ) |

## CERTAIN DEFENDANTS' STATEMENT OF REASONS
## WHY ORAL ARGUMENT SHOULD BE HEARD REGARDING
## ALL MOTIONS TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

Pursuant to Rule 16.1(b) of the Rules of Procedure Of The Panel On Multidistrict

Litigation, the undersigned defendants file this Certain Defendants' Statement Of Reasons Why

Oral Argument Should Be Heard Regarding All Motions To Vacate Conditional Transfer Order

(CTO-4). The undersigned defendants hereby request that oral argument be heard on the

following motions (i) Plaintiff California-American Water Company's Motion To Vacate

Conditional Transfer Order (CTO-4) ("Cal-American's Motion) opposing transfer of *Water*

*Company v. Atlantic Richfield Co.*, Case No. 03-5379 JSW (N.D. Cal.) case to the MDL 1358 Court; (ii) Plaintiff State of New Hampshire's Motion To Vacate Conditional Transfer Order (CTO-4) ("New Hampshire's Motion) opposing transfer of the *State of New Hampshire v. Amerada Hess Corp.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) case to the MDL 1358 court; and (iii) Defendant Duke Energy's Motion To Vacate Conditional Transfer Order (CTO-4) opposing tranfer of the *City of Fresno v. Chevron U.S.A., Inc.*, C-03-5378-JSW (N.D. Cal.) case to the MDL 1358 Court. The undersigned defendants respectfully request that oral argument be heard on these three motions for the following reasons:

1.      Currently more than forty MTBE cases are before Judge Scheindlin for coordinated pre-trial proceedings in MDL 1358. *Cal-American*, *New Hampshire* and *Fresno* are clearly tag-along cases that are appropriately transferred to MDL 1358. Absent transfer of these matters to Judge Scheindlin, defendants face enormous inefficiencies in litigation, the likelihood of duplicative discovery and the significant risk of inconsistent pretrial rulings. In light of the serious consequences implicated by the Cal-American, New Hampshire and Duke Energy Motions to Vacate CTO-4, oral argument should be heard to enable all parties to be fully heard.

2.      Oral argument will facilitate the Panel's ability to rule on the three motions because all parties will be available to address any questions and comments of the Panel.

2

March 25, 2004

Respectfully submitted,

J. Andrew Langan
Mark S. Lillie
Wendy L. Bloom
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
312-861-2000
312-861-2200 (Facsimile)

Matthew T. Heartney
Lawrence Allen Cox
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
(213) 243-4000
(213) 243-4199 (Facsimile)

Attorneys for Defendants Atlantic Richfield Company
and BP Products North America Inc. (join in
opposing Cal-American and New Hampshire
Motions)

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
(212) 547-5400
(212) 547-5444 (Facsimile)

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

3

Attorneys for Defendants: Exxon Mobil Chemical Company Inc., Exxon Mobil Corporation, Exxon Mobil Oil Corporation, Exxon Mobil Pipe Line Company, Exxon Mobil Refining and Supply Company, and Mobil Corporation (join in opposing Cal-American, Duke Energy and New Hampshire Motions)

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (Facsimile)

Attorneys for Defendants Chevron Chemical Company, Chevron U.S.A., Inc., Equilon Services LLC, Equiva Enterprises LLC, Gulf Oil Corp., Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Oil Products US, Shell Trading (US) Company, Star Enterprises, Texaco Inc., Texaco Refining and Marketing Inc., Texaco Refining and Marketing (East) Inc., TRMI Holding (join in opposing Duke Energy, Cal-American and New Hampshire Motions)

Ben M. Krowicki
Rebecca L. Bouchard
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
(860) 240-2842
(860) 240-2818 (facsimile)

Attorneys for Defendant Crown Central Petroleum Corp. (joins in opposing New Hampshire's Motion)

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

4

Attorneys for Defendant: Tesoro Refining & Marketing Co (joins in opposing Cal-American's Motion)

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys for Defendant: Westport Petroleum, Inc. (joins in opposing Duke Energy's Motion)

John J. Lyons
LATHAM & WATKINS
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626-1925
(213) 485-1234
(213) 891-8763 (Facsimile)

Attorneys for Defendant: ConocoPhillips Company (join in opposing Duke Energy, New Hampshire and Cal-American Motions)

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600
(312) 692-1718 (Facsimile)

Attorneys for Defendant: CITGO Petroleum Corporation (join in opposing New Hampshire's Motion)

John S. Guttman
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 789-6020
(202) 789-6190 (facsimile)

Attorneys for Defendants Sunoco Inc. and Sunoco Inc. (R&M) (joins in opposing New Hampshire's motion)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| ) | MDL Docket No. 1358 |
| ) | |
| ) | This Document Relates to: |
| **IN RE:** ) | *California-American Water Company* |
| ) | *v. Atlantic Richfield Co., et al.,* |
| **METHYL TERTIARY BUTYL ETHER** ) | Case No. 03-5379 JSW (N.D. Cal.) |
| **PRODUCTS LIABILITY LITIGATION** ) | |
| ) | **CERTAIN DEFENDANTS'** |
| ) | **CONSOLIDATED OPPOSITION TO** |
| ) | **CALIFORNIA-AMERICAN WATER** |
| ) | **COMPANY'S MOTION TO VACATE** |
| ) | **CONDITIONAL TRANSFER ORDER** |
| ) | **(CTO-4) AND BRIEF IN SUPPORT** |
| ) | **THEREOF** |

**CERTAIN DEFENDANTS' CONSOLIDATED OPPOSITION TO
PLAINTIFF CALIFORNIA-AMERICAN WATER COMPANY'S
MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)
AND BRIEF IN SUPPORT THEREOF**

Pursuant to Rule 7.1(b) of the Rules of Procedure Of The Panel On Multidistrict

Litigation, the undersigned defendants file this Certain Defendants' Consolidated Opposition To

Plaintiff California-American Water Company's Motion To Vacate Conditional Transfer Order

(CTO-4) on March 25, 2004 in Docket No. 1358 *In re Methyl Tertiary Butyl Ether ("MTBE")*

*Products Liability Litigation* ("Cal-American's motion"). This opposition pertains to the action

captioned *California-American Water Co. v. Atlantic Richfield*, Case No. 03-5379 (N.D. Cal.),

which is a tag-along case in the schedule of actions subject to CTO-4, issued by the Panel on

February 6, 2004.

1.      With respect to Paragraph One of Cal-American's motion, the undersigned defendants admit the information averred.

2.      With respect to Paragraph 2 of Cal-American's motion, the undersigned defendants admit that Cal-American has filed a motion to vacate CTO-4 as it applies to the *Cal-American* action.  The undersigned defendants oppose Cal-American's motion and state that the *Cal-American* action satisfies the criteria for transfer pursuant to 28 U.S.C. § 1407.

3.      With respect to Paragraph 3 of Cal-American's motion, the undersigned defendants deny all averments made by Cal-American.  The undersigned defendants state that transfer of the *Cal-American* action is clearly a tag-along case that is appropriately transferred to MDL 1358 because:  (i) *Cal-American* raises the same common questions of fact as the other cases transferred to MDL 1358; (ii) transferring *Cal-American* will serve the convenience of the parties and witnesses and prevent duplicative discovery; and (iii) giving effect to CTO-4 is necessary for the efficient conduct of the litigation, avoiding inconsistent pretrial rulings and judicial economy.  Moreover, the undersigned defendants state that none of Cal-American's arguments in its motion to vacate or accompanying brief are meritorious.

4.      With respect to Paragraph 4 of Cal-American's motion, the undersigned defendants admit that Cal-American filed the documents it identifies.   The undersigned defendants further state that in addition to this Opposition, they have separately filed today Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4) ("Consolidated Response").  The undersigned defendants' Consolidated Response responds to (i) Cal-American's Brief In Support Of California-American Water Company's Motion To Vacate Conditional Transfer Order (CTO-4) filed March 4, 2004, (ii) New Hampshire's Brief In Support Of New Hampshire's Motion To Vacate Conditional

2

Transfer Order (CTO-4) filed March 4, 2004, and (iii) Duke Energy's Memorandum In Support Of Motion To Vacate Conditional Transfer Order filed March 8, 2004.

WHEREFORE, certain Defendant's respectfully requests that the Panel:

A.      Transfer the *Cal-American* action, along with all other actions listed in CTO-4, to the United States District Court for the Southern District of New York for consolidated proceedings before the MDL 1358 Court pursuant to 28 U.S.C. § 1407, the Panel's October 10, 2000 transfer order creating MDL 1350, the Panel's CTO-4 and the MDL 1358 Court's December 23, 2003 Order.

B.      Schedule oral argument on Cal-American's motion.

C.      Deny Cal-American's request for relief in its entirety.


March 25, 2004                              Respectfully submitted,


                                           J. Andrew Langan
                                           Mark S. Lillie
                                           Wendy L. Bloom
                                           R. Chris Heck
                                           KIRKLAND & ELLIS LLP
                                           200 East Randolph Drive
                                           Chicago, Illinois  60601-6636
                                           312-861-2000
                                           312-861-2200 (Facsimile)

                                           Matthew T. Heartney
                                           Lawrence Allen Cox
                                           ARNOLD & PORTER LLP
                                           777 South Figueroa Street, 44th Floor
                                           Los Angeles, CA 90017-5844
                                           (213) 243-4000
                                           (213) 243-4199 (Facsimile)

                                           Attorneys for Defendants Atlantic Richfield Company
                                           and BP Products North America Inc.

3

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys for Defendants: Exxon Mobil Chemical
Company Inc., Exxon Mobil Corporation, Exxon
Mobil Oil Corporation, Exxon Mobil Pipe Line
Company, Exxon Mobil Refining and Supply
Company, and Mobil Corporation,

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys for Defendant: Tesoro Refining &
Marketing Co.

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (Facsimile)

Attorneys for Defendants Chevron Chemical
Company, Chevron U.S.A., Inc., Equilon Services
LLC, Equiva Enterprises LLC, Gulf Oil Corp.,
Motiva Enterprises LLC, Shell Oil Company, Shell
Oil Products Company LLC, Shell Oil Products US,
Shell Trading (US) Company, Star Enterprises,
Texaco Inc., Texaco Refining and Marketing Inc.,
Texaco Refining and Marketing (East) Inc., TRMI
Holding

4

John J. Lyons
LATHAM & WATKINS
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626-1925
(213) 485-1234
(213) 891-8763 (Facsimile)

Attorneys for Defendant:  ConocoPhillips Company
(joins in opposing New Hampshire, Cal-American
and Duke Energy Motions)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | ) | MDL Docket No. 1358 |
| | ) | |
| | ) | This Document Relates to: |
| IN RE: | ) | *State of New Hampshire v. Amerada* |
| | ) | *Hess Corp., et al.,* D.N.H. Case No. |
| METHYL TERTIARY BUTYL ETHER | ) | 03-CV-486, No. 03-0529L |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | **CERTAIN DEFENDANTS'** |
| | ) | **CONSOLIDATED OPPOSITION TO** |
| | ) | **PLAINTIFF STATE OF NEW** |
| | ) | **HAMPSHIRE'S MOTION TO VACATE** |
| | ) | **CONDITIONAL TRANSFER ORDER** |
| | ) | **(CTO-4) AND BRIEF IN SUPPORT** |
| | ) | **THEREOF** |

### CERTAIN DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4) AND BRIEF IN SUPPORT THEREOF

Pursuant to Rule 7.1(b) of the Rules of Procedure Of The Panel On Multidistrict Litigation, the undersigned defendants file this Certain Defendants' Consolidated Opposition To Plaintiff State Of New Hampshire's Motion To Vacate Conditional Transfer Order (CTO-4) on March 25, 2004 in Docket No. 1358 *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* ("New Hampshire's motion"). This opposition pertains to the action captioned *State of New Hampshire v. Amerada Hess Corp.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) (*"New Hampshire* action") which is a tag-along case in the schedule of actions subject to CTO-4, issued by the Panel on February 6, 2004.

1.    With respect to Paragraph One of New Hampshire's motion, the undersigned defendants admit the information averred.

2.    With respect to Paragraph 2 of New Hampshire's motion, the undersigned defendants admit that New Hampshire has filed a motion to vacate CTO-4 as it applies to the *New Hampshire* action.  The undersigned defendants oppose New Hampshire's motion and state that the *New Hampshire* action satisfies the criteria for transfer pursuant to 28 U.S.C. § 1407.

3.    With respect to Paragraph 3 of New Hampshire's motion, the undersigned defendants deny all averments made by New Hampshire.  The undersigned defendants state that transfer of the *New Hampshire* action is clearly a tag-along case that is appropriately transferred to MDL 1358 because:  (i) *New Hampshire* raises the same common questions of fact as the other cases transferred to MDL 1358; (ii) transferring *New Hampshire* will serve the convenience of the parties and witnesses and prevent duplicative discovery; and (iii) giving effect to CTO-4 is necessary for the efficient conduct of the litigation, avoiding inconsistent pretrial rulings and judicial economy.  Moreover, the undersigned defendants state that none of New Hampshire's arguments in its motion to vacate or accompanying brief are meritorious.

4.    With respect to Paragraph 4 of New Hampshire's motion, the undersigned defendants admit that New Hampshire filed the documents it identifies.  The undersigned defendants further state that in addition to this Opposition, they have separately filed today Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4) ("Consolidated Response").  The undersigned defendants' Consolidated Response responds to (i) Cal-American's Brief In Support Of California-American Water Company's Motion To Vacate Conditional Transfer Order (CTO-4) filed March 4, 2004, (ii) New Hampshire's Brief In Support Of New Hampshire's Motion To Vacate Conditional

2

Transfer Order (CTO-4) filed March 4, 2004, and (iii) Duke Energy's Memorandum In Support Of Motion To Vacate Conditional Transfer Order filed March 8, 2004.

WHEREFORE, certain Defendant's respectfully requests that the Panel:

A.    Transfer the *New Hampshire* action, along with all other actions listed in CTO-4, to the United States District Court for the Southern District of New York for consolidated proceedings before the MDL 1358 Court pursuant to 28 U.S.C. § 1407, the Panel's October 10, 2000 transfer order creating MDL 1350, the Panel's CTO-4 and the MDL 1358 Court's December 23, 2003 Order.

B.    Schedule oral argument on New Hampshire's motion.

C.    Deny New Hampshire's request for relief in its entirety.


March 25, 2004                                  Respectfully submitted,

                                                Peter John Sacripanti
                                                James A. Pardo
                                                Stephen J. Riccardulli
                                                MCDERMOTT, WILL & EMERY
                                                50 Rockefeller Plaza
                                                New York, NY 10020-1605
                                                (212) 547-5400
                                                (212) 547-5444 (Facsimile)

                                                Attorneys for Defendants:  Exxon Mobil Chemical Company Inc., Exxon Mobil Corporation, Exxon Mobil Oil Corporation, Exxon Mobil Pipe Line Company, Exxon Mobil Refining and Supply Company, and Mobil Corporation

3

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (Facsimile)

Attorneys for Defendants Chevron Chemical Company, Chevron U.S.A., Inc., Equilon Services LLC, Equiva Enterprises LLC, Gulf Oil Corp., Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Oil Products US, Shell Trading (US) Company, Star Enterprises, Texaco Inc., Texaco Refining and Marketing Inc., Texaco Refining and Marketing (East) Inc., TRMI Holding

Ben M. Krowicki
Rebecca L. Bouchard
BINGHAHM McCUTCHEN LLP
One State Street
Hartford, CT 06103
(860) 240-2842
(860) 240-2818 (facsimile)

Attorneys for Defendant Crown Central Petroleum Corp.

John S. Guttman
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 789-6020
(202) 789-6190 (facsimile)

Attorneys for Defendants Sunoco Inc. and Sunoco Inc. (R&M)

4

John J. Lyons
LATHAM & WATKINS
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626-1925
(213) 485-1234
(213) 891-8763 (Facsimile)

Attorneys for Defendant: ConocoPhillips Company

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600
(312) 692-1718 (Facsimile)

Attorneys for Defendant:     CITGO   Petroleum
Corporation

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

-----------------------------------------------------
                                    :

IN RE:                         :
                                      :

**METHYL-TERTIARY BUTYL ETHER** :    **MDL Docket No. 1358**
**PRODUCTS LIABILITY**        :
**LITIGATION**                :
                                      :
                                      :
-----------------------------------------------------

## CERTAIN DEFENDANTS' CONSOLIDATED RESPONSE OPPOSING ALL MOTIONS TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

The undersigned defendants support this Panel's Conditional Transfer Order (CTO-4), request that all motions to vacate any part of CTO-4 be denied, and urge that the *California-American Water Co. v. Atlantic Richfield Co., et al.*, Case No. 03-5379 (N.D. Cal.) ("*Cal-American*"), *City of Fresno v. Chevron U.S.A., Inc., et al.*, CV 03-5378-JSW (N.D. Cal.) ("*Fresno*"), and *State of New Hampshire v. Amerada Hess Corp., et al.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) ("*State*") cases be transferred to MDL 1358. Though the Panel has already transferred almost forty MTBE actions to MDL 1358 over the past month, the plaintiffs in *Cal-American* and *State* and a single group of affiliated defendants (Duke Energy) in *Fresno*

have filed motions to vacate the transfer of three MTBE cases.[1]  All three cases raise precisely the same common questions of fact -- e.g., what defendants knew and represented about MTBE, whether gasoline with MTBE is a defective product, and whether plaintiffs' water was contaminated by MTBE -- that led to MDL 1358's creation in 2000 and the more recent transfer of forty MTBE actions.  The parties to these actions should receive the benefits of convenience, justice, and efficiency resulting from centralized proceedings under a judge experienced in MTBE litigation.

Plaintiffs assert that they plead different legal theories in arguing for remand to state court, that common discovery is "largely completed"; and that some unique issues exist in addition to the common issues.  The Panel has repeatedly rejected similar arguments, including in the very decision that established MDL 1358.  Therefore, these three cases should join the others listed in CTO-4 in being transferred to the Southern District of New York for consolidated proceedings.

## BACKGROUND

### I.       Creation Of MDL 1358.

The Panel created MDL 1358 on October 10, 2000 to centralize two putative class actions brought by private well owners.  (*MTBE* Transfer Order, attached as Exh. A)  Plaintiffs in one of the cases, *England v. Amoco Oil Co.*, Nos. 00-370-WDS, 00-371-DRH, sought to represent well owners in eighteen states, including California and New Hampshire.  The Panel found that the actions involved two common questions of fact: "whether defendants knew about and misrepresented the nature of MTE and conspired to market MTBE without disclosing its

---

[1] In addition defendants Irving Oil Corporation and Irving Oil Limited in the *State* action -- just two out of the twenty-two named defendants in that case -- filed a Rule 7.4(c) Notice of Opposition to CTO-4 on February 23, 2004, but failed to timely file a motion to vacate CTO-4 by the March 10, 2004 deadline.

risks to downstream users, the federal government or the public" and "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." *Id.* The Panel explained that centralization would be more convenient for parties and witnesses, promote justice and efficiency, avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary. (*Id.*)

In reaching these conclusions, the Panel explicitly rejected the argument made by opponents of transfer -- the same argument made by the objectors here -- that individual factual questions for each location weighed against Section 1407 proceedings. (*Id.* at 1-2.) The Panel found that putting the cases before a single judge would have the "salutary effect" of allowing the coordination of both non-common and common issues. (*Id.*) Pursuant to the Transfer Order, Judge Scheindlin of the Southern District of New York became the transferee judge for the MTBE cases.

## II.     Prior Proceedings In MTBE 1358.

Starting in 2000, Judge Scheindlin spent the next three years managing MDL 1358, becoming extensively familiar with the facts and legal theories presented by MTBE cases. Even the objecting parties here acknowledge Judge Scheindlin's thoroughness in considering the issues. (Br. In Suppt. Of State of N.H.'s Mot. To Vacate ("N.H. Br.") at 21-22; (Br. In Suppt. Of Cal-Amer.'s Mot. To Vacate ("Cal-Am. Br.") at 17)  The MDL 1358 Court ruled on various substantive motions, including defendants' motions to dismiss and plaintiffs' motion for class certification. Because *England* included California putative class members, the MDL 1358 Court issued opinions interpreting California law on collective liability, nuisance, and other subjects. *E.g., In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 620-22, 627 n.1 (S.D.N.Y. 2001). Judge Scheindlin also oversaw class certification and other discovery, including creation of a document depository in New York. Judge Scheindlin entered a document preservation

3

order, oversaw electronic and paper document production, and had the parties create an MDL 1358 website.  In short, the MDL 1358 Court has extensive expertise managing all aspects of MTBE cases much like the *Cal-American*, *Fresno*, and *State* actions.

## III.    The New Wave Of MTBE Cases.

Beginning in Fall 2003, a new round of MTBE cases were filed in state courts throughout the nation, seeking to impose conflicting state standards on refiners' use of MTBE in gasoline to satisfy federal requirements.  As of today, almost 60 new cases in 15 different states have been filed since September 30, 2003.  In the large majority of these cases, the plaintiffs are municipalities or water authorities instead of private well owners.  Though the plaintiffs have changed, the allegations and claims remain the same, and the cases involve many of the same plaintiffs' counsel as in the original MDL 1358 actions.  Most of the complaints are virtually identical to each other and bear a significant resemblance to the Consolidated Master Complaint filed in MDL 1358, although the pleadings are not identical and have some important differences.  The thrust of each complaint is that gasoline with MTBE is a defective product, while also raising nuisance, trespass, negligence and other claims.  All of the complaints allege that plaintiffs' water supplies have been (or are threatened with being) contaminated by gasoline with MTBE and that the defendants misrepresented the nature of MTBE.

In response to this wave of actions threatening to disrupt the nation's gasoline supply through a patchwork of potentially conflicting state regimes, defendants began removing the cases to federal court with the goal of having a single court issue uniform rulings.  As a result of removing this large number of dispersed actions, MTBE cases are now pending in 20 different federal district courts.  Immediately after removal, the defendants began filing tag-along notices

alerting the Panel that the new actions were subject to transfer pursuant to the October 2000

Order in MDL 1358.[2] These cases in the new wave of MTBE actions are in the earliest stages of

litigation. The only substantive filings in each case are the complaints and remand motions. No

answers or motions to dismiss have been filed, and activity has focused on removal and stays

pending decision on transfer to the MDL 1358 Court. The same is true for the *Cal-American*,

*Fresno*, and *State* cases.

Judge Scheindlin signaled her approval of the proposed MDL transfers at a

December 19, 2003 hearing concerning the scheduling for plaintiffs' motions to remand in two

MTBE cases that had been removed to the Southern District of New York and assigned to Judge

Scheindlin. At that hearing, counsel for the vast majority of plaintiffs in the new MTBE cases

stipulated to the immediate transfer of the cases they controlled to MDL 1358, and further agreed

not to oppose any CTOs issued by the Panel to accomplish that goal. (12/19/03 Tr. at 26-28,

attached as Exh. B) Judge Scheindlin, acting in her capacity as the MDL 1358 Court, issued an

order finding "that it is appropriate for the issues presented by these [remand] motions in these

and all similar removed actions, wherever filed to be heard and decided by this Court."

(12/23/03 Order, attached as Exh. C) The MDL 1358 Court then specifically requested that

forty-seven MTBE actions pending in other courts, which were listed on a schedule attached the

order, be stayed pending transfer. This schedule included *Cal-American*, *Fresno*, and *State*.

The Order also provided for an expedited briefing schedule on remand motions

for several Southern District of New York cases pending before Judge Scheindlin. The removal

notices and remand motions in those Southern District of New York cases are nearly identical to

---

[2] MDL 1358 became temporarily inactive in the Southern District of New York after the Court denied the private-well-owner plaintiffs' motion for class certification on July 16, 2002.

(or at least quite similar to) those filed in most of the other MTBE actions pending in federal courts throughout the nation. Indeed, plaintiffs' counsel in *Cal-American* and *State*, Victor Sher, has continually injected his clients into the proceedings in Judge Scheindlin's court, writing several letters making legal arguments in the Southern District of New York. Four days after the hearing before Judge Scheindlin, he wrote to Judge Scheindlin that he had "reviewed the transcript of the proceeding in front of Your Honor on December 19, 2003, and anticipate that New Hampshire will *not* be objecting to the conditional transfer of its MTBE case, under the terms set forth in the hearing, to Your Honor for prompt resolution of remand motions." (Sher State Decl. ¶ 24, Exh. 7, emphasis added)  Over a month later, Mr. Sher again wrote to Judge Scheindlin, but, apparently disappointed that the *State* case had not yet been transferred to MDL 1358, advised that he would now *oppose* transfer. (Sher State Decl. at ¶ 25, Exh. 8, emphasis added)

On February 5, 2004, this Panel issued CTO-4 covering sixteen MTBE cases. There was no objection to transferring thirteen cases, which are now on their way to the MDL 1358 Court. A few weeks later the Panel issued CTO-5 including thirty actions, twenty-five of which were not objected to and so also are headed for MDL 1358. Thus, currently almost forty MTBE cases will have coordinated pre-trial proceedings in MDL 1358, with more on the way. The plaintiffs in most of the cases transferred to MDL 1358 without objection are represented by the Baron & Budd firm, which is co-counsel to Mr. Sher in the *Cal-American* case.

On March 16, 2004, Judge Scheindlin denied the motions to remand in the cases removed to the Southern District of New York, holding that the defendants had established federal agent jurisdiction supporting removal under 28 U.S.C. § 1442. In so holding, the Court found that the defendants had presented a colorable federal defense (an element of federal agent

6

jurisdiction) that federal regulations effectively required the use of MTBE and so preempted

state law. (March 16, 2004 Remand Opinion at 24-25, attached as Ex. D)  Judge Scheindlin

observed that, since the Court's prior MDL 1358 holding that preemption was not a basis for

dismissing the claims under FRCP 12(b)(6), "several courts have concluded that state law claims

involving MTBE contamination *are* conflict preempted." (*Id.* at 24, emphasis in original)  The

Court also noted that the MTBE "allegations now before me are somewhat different than the

allegations that were before me in *MTBE I*," (*id.* at 25), suggesting that the Court's previous

preemption decision might be reconsidered in the context of the new wave of MTBE cases.

Judge Scheindlin is already managing the new wave of cases in MDL 1358.   On

March 22, Judge Scheindlin convened a status conference of all counsel in the 40 plus MDL

1358 cases now before her without objection.  At the conference, attended by dozens of counsel

for the parties, Judge Scheindlin indicated that she intends to promptly enter a case management

order that (1) appoints liaison counsel for plaintiffs and defendants and lead counsel and an

executive committee for plaintiffs; (2) sets a schedule for amending the pleadings; (3) creates a

master file for the filing and tracking of pleadings; (4) provides for electronic service of

pleadings; (5) establishes a procedure for consideration of preliminary motions including motins

relating to personal jurisdiction; and (6) outlines the initial bounds of discovery, pending

resolution of motions directed to the pleadings and other preliminary motions.   Ironically,

plaintiffs' proposed case management order, attached as Exhibit G, presented to Judge Scheindlin

suggests as one of plaintiffs' lead counsel in MDL 1358 Victor Sher, Esq., who is lead counsel

for Cal-American and New Hampshire who object to CTO-4.  Mr. Sher attended the March 22

conference before Judge Scheindlin and was again proposed to be one of plaintiffs' lead counsel

in open court.  Judge Scheindlin set April 22 for the next status conference for all counsel.

**ARGUMENT**

In light of the fact that CTOs have become effective for almost forty MTBE cases, and many more on the way, there is no question that there will be a renewed MDL 1358 before Judge Scheindlin. The only question is whether the few cases where counsel have objected to the CTO will be excluded from the benefits of coordination, efficiency, and consistency that MDL 1358 will provide. There is no reason for splintering *Cal-American*, *Fresno*, or *State* off from the large number of MTBE actions being centralized before Judge Scheindlin -- each of these actions are classic tag-along cases that easily meet the standards for transfer. Conversely, the arguments offered for the motions to vacate are just the type that the Panel routinely rejects.

**I.     *Cal-American, Fresno*, And *State* Are Clearly Tag-Along Cases That Are Appropriately Transferred To MDL 1358.**

Each of the reasons identified in the Transfer Order establishing MDL 1358 -- common questions of fact, convenience of parties and witnesses, just and efficient conduct of the litigation, avoiding duplicative discovery, avoiding inconsistent pretrial rulings, and judicial economy -- applies to the three actions here. Indeed, counsel for New Hampshire implicitly admitted as much for the *State* action in his December 23, 2003 letter to Judge Scheindlin.

**A.     The Three Actions Raise The Same Common Questions Of Fact As The Other Cases Transferred To MDL 1358.**

To begin with, the objectors do not, and cannot, seriously dispute that both common questions of fact found by the Panel in the MTBE Transfer Order form the basis of the three actions here. As stated by the Panel, those common questions include "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." The first

8

three paragraphs of the *Cal-American* and *Fresno* complaints (whose factual allegations are nearly the same) entitled "Summary of the Case" demonstrate that the two cases are about the common questions of fact in their entirety.  Both complaints allege:[3]

- "Expanding plumes of methyl tertiary butyl ether ("MTBE") ... contaminate and threaten" the water supplies of both plaintiffs. (*Cal-American* Compl. ¶ 1; *Fresno* Compl. ¶ 1)

- "Among other things, the defendants knowingly and willfully promoted ... gasoline containing MTBE and/or TBA, when they knew or reasonably should have known that ... these compounds would reach groundwater, pollute public water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare." (*Cal-American* Compl. ¶ 2; *Fresno* Compl. ¶ 2).

The *State* complaint also alleges the same questions of fact set forth in MTBE Transfer Order:

- "Defendants' use of MTBE in gasoline has created an unprecedented threat to both the surface and groundwaters of the State ..., including many public and private drinking water supplies. ... MTBE has already contaminated numerous drinking water sources in the State and threatens to contaminate many more ... ." (*State* Compl. ¶ 3)

- "The defendants also knew, or reasonable should have known, that, unlike the constituents of conventional gasoline, MTBE, when released into the environment, would move great distances, mix easily with groundwater, resist biodegradation, render drinking water unsafe and/or non-potable, and require significant expenses to find and remove from public and private drinking water supplies." (*State* Compl. ¶ 20)

- "Despite knowing the devastating risk of drinking water contamination posed by MTBE, and despite the availability of reasonable alternatives, the defendants failed to warn customers, retailers, regulators or public officials, including the State of New Hampshire, and failed to take any other precautionary measures to prevent or mitigate such contamination. Instead, defendants promoted MTBE, and gasoline containing MTBE, as environmentally sound products appropriate for widespread use." (*State* Compl. ¶ 22)

---

[3] Certain phrases in one complaint are not included in the other, and at points the word tenses vary between the two complaints.  Thus, the quotation of the two complaints is not absolutely exact.  The *Cal-American* Complaint is Exhibit 1 to Mr. Sher's Cal-American Declaration.  The *Fresno* Complaint is attached hereto as Exh. E.  The *State* Complaint is Exhibit 1 to Mr. Sher's State Declaration.

In short, these three actions raise the exact same common questions of fact as the MTBE actions already transferred to MDL 1358. This fact is not in serious dispute.

### B. Transferring The Cases Will Serve The Convenience Of The Parties And Witnesses And Prevent Duplicative Discovery.

The same convenience to parties and witnesses and avoidance of duplicative discovery that supported the creation of MDL 1358 applies to transfer of the *Cal-American, Fresno* and *State* cases. These three actions involve the same factual allegations, similar claims, and are brought against many of the same defendants as the cases already transferred to MDL 1358. Thus, these three cases will involve discovery on many of the same factual issues. Indeed, counsel for Cal-American and New Hampshire acknowledges that "some further, generally-applicable discovery on liability may be necessary." (Sher State Decl. ¶ 20; Sher Cal-Am. Decl. ¶ 20). If so, that discovery should proceed in a coordinated fashion in the MDL 1358 Court. Indeed, Judge Scheindlin has already managed significant MTBE discovery and established a New York depository for documents. Having document production and depositions occur in a single centralized proceeding will avoid duplicative discovery and be more convenient for parties and witnesses than producing the same documents and witnesses over and over. *In re Data General Corp. Antitrust Litig.*, 510 F. Supp. 1220, 1227 (J.P.M.L. 1979) (transferring cases under CTO to "avoid duplicative discovery and prevent waste of resources by the parties, their counsel and the courts."); *In re Armored Car Antitrust Litig.*, 462 F. Supp. 394, 396 (J.P.M.L. 1978) (transferring action brought by State of Maryland pursuant to CTO "to eliminate the potential for duplicative discovery, inconsistent pretrial rulings and waste of judicial resources."); *In re "Fine Paper" Antitrust Litig.*, 453 F. Supp. 118, 121 (J.P.M.L. 1978) (transferring cases covered by CTO "to prevent duplicative discovery and eliminate any possibility of conflicting class and other pretrial rulings").

10

**C.**   **Giving Effect To The CTOs Is Necessary For The Efficient Conduct Of The Litigation, Avoiding Inconsistent Pretrial Rulings, And Judicial Economy.**

The undersigned defendants anticipate that some defendants will file motions to dismiss for lack of personal jurisdiction over certain parties and for failure to state a claim, motions for summary judgment and other motions for the *Cal-American*, *Fresno* and *State* cases that largely duplicate the motions that will be filed for the cases already transferred to MDL 1358. Filing these motions in multiple courts rather than only before Judge Scheindlin runs a high risk of conflicting rulings. Additionally, allowing these three actions to proceed separately from MDL 1358 will likely result in conflicting discovery schedules and case management orders.

There simply is no need to consume judicial resources by having multiple courts each familiarize themselves with the issues presented by MTBE litigation and consider and rule on the same questions. This is especially true given that Judge Scheindlin is well versed in the facts and the law of the cases. *E.g., In re Crown Life Ins. Premium Litig.*, 178 F. Supp. 2d 1365, 1366 (J.P.M.L. 2001) (noting that "judge's familiarity with this [MDL] docket furthers the expeditious resolution of the litigation taken as a whole."); *In re Sugar Indus. Antitrust Litig. (East Coast)*, 437 F. Supp. 1204, 1208 (J.P.M.L. 1977) (same). Thus, centralizing *Cal-American*, *Fresno* and *State* with the other MTBE cases is appropriate. *See Data General*, 510 F. Supp. at 1227; *Armored Car*, 462 F. Supp. at 396; *"Fine Paper,"* 453 F. Supp. at 121.

**II.**   **None Of The Arguments In The Motions To Vacate Merit Vacating CTO-4.**

Despite the almost identical nature of the allegations between *Cal-American*, *Fresno* and *State* and the cases now centralized in MDL 1358, one party to each of the cases has moved to vacate CTO-4. None of the objections by the parties who have moved to vacate withstands scrutiny -- in fact, the Panel regularly rejects similar arguments. *First*, plaintiffs in

11

Cal-American and State argue that their remand motions present different remand theories than those in other MDL 1358 cases, yet the reality is that their remand arguments are similar to those just rejected by the MDL 1358 Court and differences in legal theories are irrelevant to whether a case should be transferred. **Second**, the objectors assert that common discovery has been completed, which is not accurate and ignores that the MDL 1358 Court will be in the best position to coordinate use of previous discovery and additional discovery on common and individualized issues. **Third**, the three objectors claim that most common legal issues already have been resolved, which is not true. **Fourth**, the objectors claim that local issues prevail over common ones, an argument previously rejected by this Panel when it created MDL 1358.[4]

### A.   Differences In Legal Theories For Remand Are Not A Basis For Denying Transfer Of A Factually Identical Case.

The plaintiffs in *Cal-American* and *State* wrongly assert that purported differences between their remand motions and the remand motions decided by Judge Scheindlin constitutes a sufficient basis for vacating the CTO. (Cal-Am. Br. at 12; N.H. Br. at 13). This assertion overlooks several key points.

**First,** the Panel routinely holds that pendency of a remand motion is not grounds for denying transfer. *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("the MDL Panel has jurisdiction to transfer a case in which a jurisdictional objection is pending, that objection to be resolved by the transferee court") (citation omitted); *see also In re National Century Fin. Enters., Inc.*, 293 F.

---

[4] Duke Energy makes the additional claim in the introduction to its memorandum that defendants pursued transfer of the *Fresno* matter for "potential tactical advantage." (Duke Energy Mem. In Suppt. Of Mot. To Vacate CTO ("Duke Energy Mem.") at 2) While untrue, this assertion must be disregarded for the additional reason that "the possibility that another district judge may be more favorably disposed to a litigant's contentions" is "simply not [a] factor[] considered by the Panel in determining whether and where to transfer under Section 1407 is appropriate." *In re Beef Industry Antitrust Litig.*, 419 F. Supp. 720, 721 (J.P.M.L. 1979); *see also In re Suess Patent Infringement Litig.*, 384 F. Supp. 1405, 1407 (J.P.M.L. 1974) (same).

Supp. 2d 1375, 1377 (J.P.M.L. 2003); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 293 F.

Supp. 2d 1378, 1380 (J.P.M.L. 2003); *In re Enron Corp. Sec. Litig.*, 227 F. Supp. 2d 1389, 1391

(J.P.M.L. 2002); *In re Crown Life Ins. Co. Premium Litig.*, 178 F. Supp. 2d 1365, 1366 (J.P.M.L.

2001). If the plaintiffs believe they have novel legal theories for remand, they can present those

theories to the MDL Court. Indeed, counsel for New Hampshire and Cal-American already has

submitted several letter briefs on remand issues to Judge Scheindlin.

   ***Second,*** the presence of different or additional legal theories (in this case relating

to remand) does not support having factually similar cases proceed in different forums. *See In re*

*Bridgestone/Firestone, Inc.*, 2000 WL 33416573, at *2 (J.P.M.L. Oct. 24, 2000) ("Nor is the

presence of additional or differing legal theories significant when the underlying actions still

arise from a common factual core.").[5]

   ***Third,*** the remand motions filed by Cal-American and New Hampshire do not

differ significantly from those already decided and rejected by Judge Scheindlin on March 16,

2004. With respect to the *Cal-American* action, defendants raise precisely the same grounds for

removal in *Cal-American* as in the New York cases just decided by Judge Scheindlin. Even the

plaintiff concedes that the jurisdictional bases asserted by defendants in *Cal-American* "may

overlap" with those raised in other MTBE cases recently removed by defendants. (Cal-Am. Br.

at 11) The only supposed "difference" plaintiff identifies regarding its remand motion as

---

[5] *See also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F.Supp.2d 1377, 1379 (J.P.M.L. 2001) (transferring factually similar actions even though cases were based on different "legal theories of recovery" and objectors argued that their particular cases "involve unique matters not present in other actions"); *In re Continental Grain Co., Inc.*, 482 F. Supp. 330, 332 (J.P.M.L. 1979) (Cases appropriately transferred because the "presence of differing legal theories in some of the actions does not negate the existence of common questions of fact."); *In re Holiday Magic Sec. & Antitrust Litig.*, 375 F. Supp. 1400, 1402 (J.P.M.L. 1974) ("It is not unusual for plaintiffs in multidistrict litigation to base their claims for relief on different legal theories. But it is the facts underlying those theories which we must look to in making our determination under Section 1407.").

compared to the those in the New York actions is the existence of two Ninth Circuit opinions

rejecting arguments that the Clean Air Act preempts state law.[6]  But this has no bearing on

federal removal jurisdiction under 28 U.S.C. §1442, for the requirement that a removing

defendant have a "colorable federal defense" is "broadly construed" such that a defense may be

"colorable" even if ultimately rejected by the court.  (Exh. D, Remand Opinion at 17)  Here,

Judge Scheindlin has opined that defendants' preemption arguments satisfy the "colorable

federal defense" requirement, and Cal-American cannot demonstrate any reason why this ruling

should not apply with equal force to its remand motion.  (*Id*. at 22-25)

>    With respect to the *State* action, federal officer jurisdiction is a grounds for

removal asserted by defendants in both the *State* and New York actions.  In its motion to vacate

before this Panel, plaintiff suggests that its remand motion differs from those in the New York

actions because New Hampshire's "Eleventh Amendment and sovereign immunities bar

removal."  (N.H. Br. at 12)  But, remarkably, plaintiff's actual remand motion *nowhere* includes

this argument.  (N.H. Remand Mot., attached as Exh. F)  In any event, the argument is meritless.

*See Oklahoma v. Magnolia Marine Transp. Co.*, 2004 WL 339372, at *2-3 (10th Cir. Feb. 24,

2004) ("the Eleventh Amendment's abrogation of federal judicial power 'over any suit ...

commenced or prosecuted against one of the United States' does not apply to suits commenced

---

[6] In any event the Ninth Circuit cases cited by Cal-American, *Oxygenated Fuels Ass'n., Inc. v. Davis*, 331 F.3d 665 (9th Cir. 2003) and *Exxon Mobil Corp. v. United States Environmental Protection Agency*, 217 F.3d 1246 (9th Cir. 2000) are distinguishable and not dispositive of any preemption arguments made by defendants in this new wave of MTBE cases.  First, the Ninth Circuit opinions address California's ban on MTBE in 2003, not the federal mandates regarding MTBE usage in the 1990's, and, thus, conflict preemption and the feasibility of using other oxygenates presented by the new round of cases were not at issue.  Second, different parties are involved in this new wave of MTBE cases and arguments that will be asserted by defendants here were not raised by the parties arguing preemption in *Davis* or *Exxon Mobil*.  Moreover, as Judge Scheindlin acknowledged in her recent order denying remand of New York cases, several California lower courts in more analogous MTBE cases have held that state law claims are preempted by federal law.  Cal-American fails to cite these lower court opinions.  (Exh. D, Remand Opinion at 23-25; *see Kubas v. Unocal Corp.*, 2001 WL 1940938 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Hixson v. Unocal Corp.*, No DC195295 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001) (unpublished))

or prosecuted *by* a state) (emphasis in original); *Illinois v. City of Milwaukee,* 406 U.S. 91, 100 (1972) ("where a state is suing parties who are not other States. . . those suits may now be brought in or removed to the [federal] Courts without regard to the character of the parties").

      *Finally*, the two cases cited by Cal-American and New Hampshire as support for their claim that their remand motions warrant vacating CTO-4 -- neither of which are decisions by this Panel but rather involve district court decisions on whether to stay cases pending Panel action -- are inapposite. In *Board of Trustees v. Worldcom*, 244 F. Supp. 2d 900 (N.D. Ill. 2002), the court *rejected* the argument made by plaintiffs here that cases should not be transferred in light of pending remand motions, and held that having one court decide "complex jurisdictional issues obviously saves judicial resources." *Id.* at 905. As plaintiffs' parentheticals acknowledge, the court in *Havens Protected "C" Clamps, Inc. v. Pilkington PLC*, 2000 WL 382027, at *2 (D. Kan. Mar. 28, 2000), stated only that a remand motion should be considered rather than stayed if that motion "does not necessarily implicate issues common to the other actions currently pending before the MDL Panel-designated court."

      In sum, as explained above, the factual background of the remand motions in *Cal-American* and *State* are common with other MTBE cases, as are most of the legal theories such as federal officer jurisdiction and bankruptcy jurisdiction. Moreover, the transferor courts for the *New Hampshire* matter and many of the California tag-along actions identified in CTO-4 and CTO-5, have stays pending this Panel's decision, suggesting that the remand motions pending in the actions should be considered by the transferee court.[7] Further, the MDL 1358 Court itself

---

[7] Stays have been issued in the following five California cases: *Orange County Water District v. Unocal Corp.,* CV03-1742 JNS (C.D. Calif.), *City of Riverside v. Atlantic Richfield Co.,* CV03-1460 JNS (C.D. Calif.), *People of the State of California v. Unocal Corp.,* CIV-030cv-2653 GEB DAD (E.D. Calif.), *Quincy Community Services District v. Atlantic Richfield Co.,* CIV-03-2582 LKK (E.D. Calif.), and *City of Roseville v. Atlantic Richfield Co.,* (Continued...)

has issued an order stating that it is the appropriate forum for deciding whether *Cal-American* and *State* should stay in federal court.  (Exh. C, 12/23/03 Order)

      **B.**     **The MDL 1358 Court Can Coordinate The Use Of Prior Discovery As Well As Remaining Discovery On Both Common And Individual Issues.**

      The objectors' argument that all common discovery in the *Cal-American*, *Fresno* and *State* actions is complete is both factually wrong and a legally insufficient to deny transfer. (Cal-Am. Br. 13-16, N.H. Br. 17-21; Duke Energy Mem. 7-10)  As an initial matter, discovery has yet to begin in any of those actions.  Though plaintiffs point to the discovery in MDL 1358 itself, as well as two California state actions (*South Tahoe* and *CBE*), common discovery remains to be done.  The discovery in MDL 1358 focused primarily on class certification and did not include exhaustive merits discovery.  As for *South Tahoe* and *CBE*, although some overlap is involved, there is a different group of defendants in both cases than those sued in the *Cal-American*, *Fresno*, and *State* actions.  The following defendants were not defendants in *CBE* or *South Tahoe* but are named in at least *Cal-American*, *Fresno* or *State*:  Duke Energy, CITGO Petroleum Corporation (dismissed from *South Tahoe* before significant discovery conducted), Kern Oil & Refining Company, New West Petroleum LLC, Northridge Petroleum Marketing U.S., Inc., Pacific Southwest Trading, Westport Petroleum Inc., Amerada Hess Corporation, El Paso Merchant Energy-Petroleum Company and Irving Oil Corporation.  Plaintiffs in the new MTBE cases can be expected to seek common discovery of these and other refiners that were not defendants in *South Tahoe* or *CBE*, but which are defendants in the new MDL 1358 cases.

---

CIV 03-2601 MCE (E.D. Calif.).  Motions to say proceedings are pending in the *Cal-American, Fresno* and *Silver* matters.  No California court has denied a motion to stay.

As counsel for plaintiffs in the *Cal-American* and *State* cases frankly admits, "some further, generally-applicable discovery on liability may be necessary." (Sher State Decl. ¶ 20; Sher Cal-Am. Decl. ¶ 20). In fact, in recent MTBE cases where discovery is ongoing, and which involve some of the same plaintiffs' counsel as for New Hampshire and Cal-American, plaintiffs have routinely asked for updated and different discovery beyond what was produced by the discrete group of defendants in the original MTBE 1358 actions and/or the California matters.[8]

The need to coordinate the use of prior discovery from MTBE cases, remaining common discovery, and discovery on issues unique to each case only confirms that these MTBE cases should be transferred to the MDL 1358 Court. As this Panel has explained previously in rejecting arguments very similar those by the objectors' here:

> [T]ransfer under Section 1407 will have the salutary effect of placing fourteen actions presently pending in eight districts before a single judge who can formulate a pretrial program that: 1) enables appropriate discovery already completed in earlier actions to be made applicable to actions that are later filed; 2) if appropriate, allows discovery with respect to any unique issues to proceed concurrently with discovery on common issues . . .

*In re Dow Chem. Co. Sarabond Prods. Liab. Litig.*, 650 F. Supp. 187, 189 (J.P.M.L. 1986).[9] The objectors' suggestion that the parties instead coordinate to exchange documents in existing

---

[8] For example, in more recent MTBE cases such as *Adams/Barnett* (North Carolina), *County of Suffolk* (New York), and *Fruitridge* (California), plaintiffs' counsel have sought written and other discovery that goes far beyond the discovery taken in either the original MDL 1358 or in the *CBE* and *South Tahoe* cases.

[9] *See In re Cygnus Telecomms. Techn., LLC, Patent Litig.*, 177 F. Supp. 2d 1375, 1376 (J.P.M.L. 2001) (transferring cases even though "most of the relevant discovery" on common issues had already been conducted and could be made available to the parties because "transfer under Section 1407 has the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions."); *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 655 (J.P.M.L. 1981) ("The transferee judge, of course, has the authority to schedule discovery and other pretrial proceedings on any issue unique to a particular action or party to proceed in separate tracks (Continued...)

document depositories hardly provides a complete solution to discovery issues likely to be raised, and would be far less efficient that the more complete supervision provided by an MDL Court. *See In re Mosaid Technologies, Inc. Patent Litig.*, 283 F. Supp.2d 1359, 1360 (J.P.M.L. 2003) (rejecting objectors' proposed alternatives to Section 1407 transfer because MDL transfer provides more comprehensive mechanism for addressing discovery issues).[10]

In fact, the objectors' argument here that discovery unique to each case predominates over common discovery is simply another version of the argument rejected by the Panel in creating MDL 1358. In the MTBE Transfer Order, the Panel overruled objections that site-specific issues dominated common ones, answering that transfer would allow "pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues." (Exh. A, MTBE Transfer Order at 1-2)[11]  Moreover, the cases cited by objectors are distinguishable.[12]

---

concurrently with the common pretrial proceedings, thus enhancing the efficient conduct of all aspects of this litigation).

[10] *See also In re IBP Continental Bus. Docs. Litig.*, 491 F. Supp. 1359, 1361 (J.P.M.L. 1980) (suggestion by opponents of transfer that parties informally cooperate regarding discovery rejected as inadequate); *In re Oil Spill by The "Amoco Cadiz" Off the Coast of France on March 16, 1978*, 471 F. Supp. 473, 477 (J.P.M.L. 1979) (rejecting argument by nation of France that making prior production, which amounts to hundreds of thousands of documents, available to all parties was an adequate substitute for transfer under Section 1407); *In re Bristol Bay, Alaska Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506 (J.P.M.L. 1976) (rejecting objectors' proposal that parties voluntarily cooperate regarding discovery; explaining that the Panel "prefers to place the actions under the control of a single judge in order to ensure that the objectives of Section 1407 are met.").

[11] *See also In re 1980 Decennial Census Adjustment Litig.*, 506 F.Supp. 648, 651 (J.P.M.L. 1981) ("the transferee judge . . . has the authority to schedule discovery and other pretrial proceedings on any issues unique to a particular geographic area or party to proceed in separate tracks concurrently with the common pretrial proceedings, thus enhancing the efficient conduct of all aspects of this litigation"); *In re Beef Indus. Antitrust Litig.*, No. 248, 1977 WL 1559, at *2 (J.P.M.L. June 7, 1977) (rejecting argument by CTO opponents that their actions were in a "geographically concentrated market area in and around Iowa to which discovery will be restricted, whereas the [previously transferred] actions involve a national market and a nationwide discovery program" and ordering transfer).

[12] *Gasoline Lessee Dealer Antitrust Litig.*, 479 F. Supp. 578, 580-81 (J.P.M.L. 1979), involved cases pending in only two districts, all at an advanced stage with discovery substantially completed, while here the cases are scattered
(Continued...)

The MDL 1358 Court has significant experience in managing discovery in MTBE cases. That Court is most capable of determining what discovery remains to be done as well as creating a program for coordinating discovery among the almost sixty MTBE actions currently pending in federal court. Thus, the objectors' discovery-based arguments are to no effect.

**C.    Serious Risk of Inconsistent Pre-Trial Rulings Exists Absent Transfer Of These Cases.**

The objectors claim that most common legal issues "already have been decided." (N.H. Br. at 21-23, Cal-Am. Br. at 16-18) This is wrong. MDL 1358 now involves multiple cases against several defendants not previously involved in MTBE litigation in California state courts or in the earlier private well owner actions before the MDL 1358 Court. Motion practice and discovery are just beginning in the new MTBE cases before the MDL 1358 Court.

This new wave of MTBE cases will raise legal issues not previously raised with the MDL 1358 Court. Defendants plan to propose a Case Management Order that sets forth an orderly approach for addressing anticipated preliminary motions, which include motions to dismiss for lack of personal jurisdiction and lack of standing. Moreover, the objectors overlook summary judgment as a stage of pre-trial proceedings that is most appropriately handled by the MDL 1358 Court. Thus, that some courts have issued legal rulings (and inconsistent rulings at that) in MTBE actions does not warrant denying transfer.[13] *Cf. In re Molinaro/Catanzaro Patent*

---

among twenty different districts and all are at the very beginning of proceedings with discovery yet to commence. And, in the *Grand Funk Railroad Trademark Litigation*, 371 F. Supp. 1084 (J.P.M.L. 1974), the Panel denied transfer because common questions among the actions were few and limited, *id.* at 1085, as opposed to the strong similarities among the factual allegations and theories among the MTBE actions.

[13] The Panel decisions cited in the objectors' briefs are easily distinguishable. In *A.H. Robins Co. "Dalkon Shield" IUD Prods. Liability Litig.*, 505 F. Supp 221 (J.P.M.L. 1981), by the time the Panel began denying transfer of Dalkon Shield cases, the MDL had been active for several years, the transferee court had prepared a final pre-trial order, and *all* the parties had begun agreeing that no further actions should be transferred. *Id.* at 222-23. Similarly, in *In re Western Elec. Co. Semiconductor Patent Litig.*, 436 F. Supp. 404 (J.P.M.L. 1977), all the previously (Continued...)

*Litig.*, 380 F. Supp. 794, 795-96 (J.P.M.L. 1974) (transferring action where transferor courts have already ruled on motion to dismiss and transferee court had already made tentative findings on key issue); *In re Peruvian Road Litig.*, 380 F. Supp. 796, 798 (J.P.M.L. 1974) (transferring action where transferee court had already ruled on aspects of defendants' jurisdictional motions).[14]

Nor are objectors correct in suggesting that the MDL 1358 Court has "decided" defendants' federal preemption defense by denying an earlier motion to dismiss. To begin with, the objectors fail to cite the many decisions holding that MTBE actions based on state law claims are preempted by federal law.[15] The MDL 1358 Court in its decision denying remand in the New York actions expressly acknowledged these decisions in finding that the defendants had raised a colorable federal defense of preemption.[16] (Exh. D, Remand Opinion at 23-25)  And,

---

transferred cases had either been, or were about to be, tried, and so all discovery and pre-trial proceedings were complete. By contrast, the new wave of MTBE cases pending in MDL 1358 are all at their earliest stages.

[14] The objectors also argue that transferor courts will be in the best position to handle issues of local state law or apply the decisions of the circuits in which the transferor courts sit, but this is a non-starter as MDL courts regularly apply the laws of numerous states and circuits. *In re Data General Corp. Antitrust Litigation*, 510 F. Supp. 1220, 1227-28 (J.P.M.L. 1979) ("It is within the very nature of coordinated or consolidated pretrial proceedings in multidistrict litigation for the transferee judge to be called upon to apply the law of more than one state. Thus, all parties can be assured that the law of the transferor district, as well as any other state's law, if appropriate, will be duly applied by the transferee judge.") (citations and brackets omitted).  Indeed, Judge Scheindlin already has interpreted and applied California law in the course of ruling on various issues. *E.g., In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 620-22, 627 n.1 (S.D.N.Y. 2001).

[15] *See Kubas,* 2001 WL 1940938 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Hixson,* No DC195295 (Cal. Supr. Ct., LA. Cty., Aug. 23, 2001); *Holten v. Chevron USA,* 2001 U.S. Dist. LEXIS 17599 (D.N.J. 2001); *Coppola v. Amerada Hess Corp.,* No. 2001/3995 (N.Y. Supr. Ct., Dutchess Cty., Jul. 31, 2002); *Molloy v. Amerada Hess Corp.,* No. 2001/3996 (N.Y. Supr. Ct., Dutchess Cty., Aug. 1, 2002).

[16] Thus, there have been inconsistent decisions on preemption, the very kind of harm that MDL is created to prevent. *See, e.g., In re U-Haul Intern'l, Inc.,* 249 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003) (transfer necessary to "prevent inconsistent pretrial rulings"); *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.,* 170 F. Supp. 2d 1356, 1358 (J.P.M.L. 2001) (similar).  This concern is particularly acute because no court has addressed preemption in the context of an all-out assault on the interstate gasoline distribution system, which is the effect of the almost sixty MTBE actions filed over the last six months.

Judge Scheindlin acknowledged that the preemption defense asserted by defendants in this new wave of MTBE cases raise "somewhat different" issues than those in the prior MTBE cases brought by private well owners. (*Id.* at 25)   In finding preemption to be a colorable federal defense, the MDL Court has left open the issue of whether the new mass of MTBE complaints is preempted by federal law. (*See Id.*)   Moreover, as the objectors acknowledge, the MDL 1358 Court earlier ruled on preemption arguments only on a motion to dismiss, holding that the issue turned partly on the factual question of whether practical alternatives to MTBE were available to satisfy federal mandates. *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d at 616.   Thus, in addition to potentially filing a new motion to dismiss based on the "somewhat different" allegations and context of the new MTBE complaints, defendants may raise preemption again on summary judgment.

### D.   The Objectors' Scope Arguments Are Rejected Regularly By The Panel.

Finally, the objectors' claim that the scope of their MTBE actions somehow renders transfer inappropriate is equally baseless. (N.H. Br. at 14-16; Cal-Am. Br. at 13-16, Duke Energy Mem. at 6-7)   In particular, the objectors claim that the remaining issues are location-specific rather than common.   This is the same objection that was rejected by the Panel in its October 2000 Order establishing MDL 1358, where the Panel noted that opponents of transfer argued "that the presence of individual questions of fact militate against 1407 transfer" but responded that transfer would allows "pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues." (Exh. A, MTBE Transfer Order at 1-2); *see also In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. at 654-55 (rejecting argument that transfer was inappropriate because some actions involved "unique or localized factual issues."); *In re Dept. of Energy Stripper Well Exemption Litig.*, 472 F. Supp. 1282, 1285-86 (J.P.M.L. 1979) (same); *1980 Decennial Census*, 506 F. Supp. at 651;

*Beef Industry*, 1977 WL 1559, at *2 (same). Any unique issues can be handled by Judge

Scheindlin or dealt with after remand to the transferor court.[17]

New Hampshire makes a fundamentally similar (and similarly flawed) argument

that because it is a State its action differs in scope from other MTBE cases. To begin with, New

Hampshire's counsel wrote Judge Scheindlin on December 19, 2003, indicating that the State did

not anticipate opposing transfer. (Sher State Decl. ¶ 24, Exh. 7) In any case, this Panel has

rejected similar attempts by States to seek special treatment. In *In re Armored Car Antitrust*

*Litigation*, 462 F. Supp. 394 (J.P.M.L. 1978), Maryland argued that a case should not be

transferred from a Maryland court. *Id.* at 396. Maryland claimed that the case concerned the

authority of the Maryland Attorney General, involved certain kinds of state-specific defenses and

there was no danger of inconsistent rulings, but this Panel was not persuaded. The Panel found

that because the Maryland actions clearly shared common factual questions with other

transferred actions, giving effect to the CTO was appropriate. *Id.*; *see also "Amoco Cadiz,"* 471

F. Supp. at 477-78 (ordering transfer opposed by nation of France). The same is true here --

*State* alleges the same fact questions as other MTBE cases and allowing it to proceed separately

waste resources and creates serious risks of inconsistent rulings.

---

[17] Likewise Duke Energy's claim that transfer will be inconvenient for parties and witnesses in the *Fresno* matter is not a reason for denying transfer (Duke Energy Mem. at 11), for Duke Energy wrongly infers that transfer of the *Fresno* matter would require depositions and other discovery of California witnesses to occur in New York instead of California. *See In re Bristol Bay, Alaska Salmon Fishery Antitrust Litig.*, 424 F. Supp. at 506-07 (rejecting objector's claim that transfer would impose hardship, and explaining that transfer generally does not result in the need for parties or witnesses to travel to transferee district and that judicious use of liaison counsel and steering committees eliminates need for most counsel to travel to transferee district); *In re Falstaff Brewing Corp. Antitrust Litig.*, 434 F. Supp. 1225, 1228 (J.P.M.L. 1977) (similar). Moreover, any inconvenience and expense to Duke Energy is a parochial concern at best and is outweighed by the overall cost savings to *all* parties that will be achieved by including the *Fresno* matter in the coordinated MDL 1358 proceeding. *See In re Sugar Indus. Antitrust Litig.*, 471 F. Supp. 1089, 1094 (J.P.M.L. 1979); *In re Viatron Computer Systems*, 462 F. Supp. 382, 389 (J.P.M.L. 1978).

Once New Hampshire's claim to special treatment is stripped away, its underlying arguments on scope are the same as those commonly rejected by the Panel. New Hampshire claims to proceed under legal theories such as Eleventh Amendment immunity, *parens patriae*, and public trustee that it claims are not available to other plaintiffs, though at the same time New Hampshire admits its legal theories for recovery are "superficially similar to those asserted in other MTBE cases." (N.H. Br. at 15) Regardless, differences in legal theories do not support denying transfer. *See, e.g., PPA*, 173 F. Supp. 2d at 1379; *Bridgestone/Firestone, Inc.*, 2000 WL 33416573, at *2; *Continental Grain*, 482 F. Supp. at 332; *Holiday Magic*, 375 F. Supp. at 1402. Likewise, New Hampshire claims that its action is different because it involves "MTBE contamination *only* in New Hampshire" (N.H. Br. at 17), but each action involves only a limited geographic area. The Panel previously held that these geographic differences did not prevent transfer. (Exh. A, MTBE Transfer Order at 1-2); *see also In re 1980 Decennial Census Adjustment Litig.*, 506 F. Supp. at 651; *In re Beef Industry Antitrust Litig.*, 1977 WL 1559, at *2. Finally, New Hampshire claims to seek a broad remedy including monitoring and treatments of thousands of wells, but again this is no different than actions in larger counties in New York (or California) that seek the same remedies for a large number of wells. New Hampshire's arguments on this score only confirm that its action is fundamentally the same as those already pending in MDL 1358, and that it should be transferred as well.

## CONCLUSION

The need to consolidate the next wave of MTBE litigation -- currently at almost 60 cases brought in 15 different states and removed to 20 different federal courts -- is apparent. The undersigned defendants, who represent many of the defendants in the MTBE actions, have stipulated to the actions being transferred to MDL 1358. So have the plaintiffs' attorneys who control a large share of these cases. Judge Scheindlin, presiding over MDL 1358, has welcomed

these cases and can be expected to bring experience and expertise to bear in guiding the MTBE actions forward, just as occurred in the Court's recent ruling on the New York remand motions. In light of the substantial economies to be saved, the justice and efficiency to be achieved, and the inconsistencies to be avoided, the few objectors who filed motions to vacate should not be permitted to fracture the new round of MTBE litigation to the detriment of the other participants. This is especially true where the only arguments the objectors can offer have been rejected time and again by this Panel.  Therefore, for the reasons stated above, the undersigned defendants respectfully request that the Panel deny all pending motion to vacate any part of CTO-4 and order the transfer of *Cal-American*, *Fresno*, and *State* to MDL 1358 for coordinated and consolidated pretrial proceedings.

March 25, 2004                                 Respectfully submitted,

                                              J. Andrew Langan
                                              Mark S. Lillie
                                              Wendy L. Bloom
                                              R. Chris Heck
                                              KIRKLAND & ELLIS LLP
                                              200 East Randolph Drive
                                              Chicago, Illinois  60601-6636
                                              312-861-2000
                                              312-861-2200 (Facsimile)

                                              Matthew T. Heartney
                                              Lawrence Allen Cox
                                              ARNOLD & PORTER LLP
                                              777 South Figueroa Street, 44th Floor
                                              Los Angeles, CA 90017-5844
                                              (213) 243-4000
                                              (213) 243-4199 (Facsimile)

Attorneys for Defendants Atlantic Richfield Company and BP Products North America Inc. (join in opposing Cal-American and New Hampshire Motions)

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
(212) 547-5400
(212) 547-5444 (Facsimile)

Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys for Defendants: Exxon Mobil Chemical Company Inc., Exxon Mobil Corporation, Exxon Mobil Oil Corporation, Exxon Mobil Pipe Line Company, Exxon Mobil Refining and Supply Company, and Mobil Corporation (join in opposing Cal-American, Duke Energy and New Hampshire Motions)

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (Facsimile)

Attorneys for Defendants Chevron Chemical Company, Chevron U.S.A., Inc., Equilon Services LLC, Equiva Enterprises LLC, Gulf Oil Corp., Motiva Enterprises LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Oil Products US, Shell Trading (US) Company, Star Enterprises,

Texaco  Inc., Texaco Refining and Marketing Inc.,
Texaco Refining and Marketing (East) Inc., TRMI
Holding   (join in opposing Duke Energy, Cal-
American and New Hampshire Motions)


Ben M. Krowicki
Rebecca L. Bouchard
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
(860) 240-2842
(860) 240-2818 (facsimile)

Attorneys for Defendant Crown Central Petroleum
Corp. (joins in opposing New Hampshire's Motion)


Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys   for   Defendant:   Tesoro   Refining   &
Marketing Co (joins in opposing Cal-American's
Motion)


Colleen P. Doyle
Diana Pfeffer Martin
BINGHAM McCUTCHEN LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400
(213) 680-6499 (Facsimile)

Attorneys for Defendant:  Westport Petroleum, Inc.
(joins in opposing Duke Energy's Motion)

John J. Lyons
LATHAM & WATKINS
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626-1925
(213) 485-1234
(213) 891-8763 (Facsimile)

Attorneys for Defendant: ConocoPhillips Company
(join in opposing Duke Energy, New Hampshire and
Cal-American Motions)


Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600
(312) 692-1718 (Facsimile)

Attorneys for Defendant: CITGO Petroleum
Corporation (join in opposing New Hampshire's
Motion)


John S. Guttman
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 789-6020
(202) 789-6190 (facsimile)

Attorneys for Defendants Sunoco Inc. and Sunoco
Inc. (R&M) (joins in opposing New Hampshire's
motion)

27

MAR. 24. 2004  11:28AM      JPML                                        NO. 4135   P. 1

FAX TRANSMITTAL SHEET



# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

One Columbus Circle, NE
Thurgood Marshall Federal Judiciary Building
Room G-255
Washington, DC  20002-8004

Website: http://www.jpml.uscourts.gov

Telephone:  (202) 502-2800        FAX N⁰:   (202) 502-2888

**Date:**                                   **Time:**

To: *Wendy Bloom*

From: *Raynal Cobb*

Re: *MDL# 1358*

**Notes:**

Number of pages transmitted (including this page)   *3*

Original document is being ___ *mailed* _____ *retained in our file.*

Please call the Panel office regarding any difficulties involved in this transmission.

Thank You.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

MAR 2 4 2004

FILED
CLERK'S OFFICE

200 East Randolph Drive
Chicago, Illinois 60601

Wendy L. Bloom
To Call Writer Directly:
312 861-2343
wbloom@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

Dir. Fax 312 861-2200

March 23, 2004

**By Facsimile**

Michael Beck, Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
1 Columbus Circle, N.E.
Room G-255, North Lobby
Washington, D.C. 20002-8004

REQUEST BY DEFTS. ATLANTIC RICHFIELD CO. AND
BP NORTH AMERICA INC. TO EXCEED 20-PAGE BRIEF
LIMIT -- GRANTED TO TOTAL OF 30 PAGES
(mjb 3/24/04)

Re: Docket No. 1358 *In re Methyl Tertiary Butyl Ether ("MTBE") Products
Liability Litigation* -- Defendants' Opposition to Motions to Vacate

Dear Mr. Beck:

We represent defendants Atlantic Richfield Company and BP Products North America
Inc. in many of the MDL 1358 matters. On March 25, 2004, we would like to file, on behalf of
over 30 defendants, a consolidated opposition brief opposing motions to vacate CTO-4 filed by
three different parties in three different tag-along actions listed in CTO-4. We respectfully
request approval to file a brief that is approximately 27 pages in length. Rather than file separate
opposition briefs for each of the three tag-along cases, and rather than have multiple defendants
file opposition briefs in each of the three cases, defendants believe it would be more efficient to
consolidate our responses into a single opposition brief. To do so, however, we require
approximately seven additional pages beyond the 20-page limit for briefs provided in Rule 7.1.

In particular, defendants will be responding to the following oppositions to vacate CTO-
4: (i) California-American Water Company's Motion To Vacate Conditional Transfer Order
(CTO-4) ("Cal-American's motion") opposing transfer of the action captioned *California-
American Water Co. v. Atlantic Richfield*, Case No. 03-5379 (N.D. Cal.) (ii) State Of New
Hampshire's Motion To Vacate Conditional Transfer Order (CTO-4) ("New Hampshire's
motion") opposing transfer of the action captioned *State of New Hampshire v. Amerada Hess
Corp.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) and (iii) Duke Energy's Motion To Vacate
Conditional Transfer Order (CTO-4) ("Duke Energy's motion") opposing transfer of the action
captioned *City of Fresno v. Chevron U.S.A., Inc.*, Case No. C-03-5378-JSW (N.D. Cal.). We
note that the State of New Hampshire's brief alone is 23 pages.

**KIRKLAND & ELLIS LLP**

Michael Beck, Clerk of the Panel
March 23, 2004
Page 2


      Defendants appreciate your consideration of our request.  Please contact me directly if you require additional information at 312-861-2343 (phone), 312-861-2200 (facsimile).

            Sincerely,

            Wendy L. Bloom

            Wendy L. Bloom

WLB/lcf

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2004

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **METHYL TERTIARY BUTYL ETHER** | ) |
| **PRODUCTS LIABILITY LITIGATION** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

MDL Docket No. 1358

This Document Relates to:

*California-American Water Company v.*
*Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 03-5379

*State of New Hampshire v. Amerada*
*Hess Corporation, et al.*
D. New Hampshire, C.A. No. 03-486

*City of Fresno v. Chevron U.S.A., Inc.*
N.D. California, C-03-5378-JSW

**PROOF OF SERVICE**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

2004 MAR 25  A 10: 26

RECEIVED
CLERK'S OFFICE

<u>**CERTIFICATE OF SERVICE**</u>

STATE OF ILLINOIS      )
                           )      ss
COUNTY OF COOK      )

MDL Docket No. 1358

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

*City of Fresno v. Chevron U.S.A., Inc.*
N.D. California, C-03-5378-JSW

       I am employed in the County of Cook County, State of Illinois. I am over the age of 18 and not a party to this action. My business address is 200 East Randolph Drive, Suite 5400, Chicago, IL 60601.

       On **MARCH 25, 2004**, I served the following documents described as:

       1. Certain Defendants' Consolidated Opposition To Duke Energy's Motion To Vacate Conditional Transfer Order (CTO-4) And Brief In Support Thereof.

       2. Certain Defendants' Consolidated Opposition To California-American Water Company's Motion To Vacate Conditional Transfer Order (CTO-4) And Brief In Support Thereof.

       3. Certain Defendants' Consolidated Opposition To Plaintiff State Of New Hampshire's Motion To Vacate Conditional Transfer Order (CTO-4) And Brief In Support Thereof.

       4. Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4).

       5. Appendix To Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4).

       6. 3/24/04 Letter from MDL Panel granting defendants' 30 pages for Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer Order (CTO-4).

    7.  Certain Defendants' Statement Of Reasons Why Oral Argument Should Be Heard Regarding All Motions To Vacate Conditional Transfer Order (CTO-4).


[ X ]   by placing true copies thereof in sealed envelop(s) addressed as follows:

## SEE ATTACHED SERVICE LIST

[ X ]   (**BY MAIL**)  I caused such envelope to be deposited in the mail at Chicago, Illinois, with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion to party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit.  Executed on **MARCH 25, 2004**, at Chicago, Illinois.

[ X ]   **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


                                                   _Lesley C. Fairley_
                                                     Lesley C. Fairley

**Judicial Panel on Multidistrict Litigation - Panel Attorney Service List**

Docket: 1358 - In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation
Status:  Transferred on 10/10/2000
Transferee District: NYS    Judge: Scheindlin, Shira Ann

Printed on 03/23/2004

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Axline, Michael<br>Miller, Axline & Sawyer<br>1050 Fulton Avenue<br>Suite 100<br>Sacramento, CA 95825 | ⇒ City of Fresno |
| Ball, Dan H.<br>Bryan Cave, L.L.P.<br>One Metropolitan Square<br>Suite 3600<br>211 N. Broadway<br>St. Louis, MO 63102 | ⇒ Conoco, Inc.*; Exxon Mobil Corp.* |
| Bennett, J. Stephen<br>Baker & Daniels<br>111 E. Wayne Street<br>Suite 800<br>Fort Wayne, IN 46802 | ⇒ Lassus Bros. Oil, Inc.* |
| Davis, Mindy G.<br>Howrey Simon Arnold & White, LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2402 | ⇒ Amerada Hess Corp.*; Coastal Eagle Point Oil Co.*; Coastal Mobile Refining Co.*; El Paso CGP Co.*;<br>El Paso Corp.*; El Paso Merchant Energy-Petroleum Co.* |
| Detrick, Russ<br>Sacramento County District Attorney<br>Environmental Protection Division<br>901 G Street, Suite 700<br>Sacramento, CA 95814 | ⇒ People of the State of California* |
| Doty, Robert P.<br>Cox, Castle & Nicholson, LLP<br>555 Montgomery Street<br>15th Floor<br>San Francisco, CA 94111-2585 | ⇒ 7-Eleven, Inc.; Duke Energy Merchants California, Inc.; Duke Energy Merchants, LLC; Duke Energy<br>Trading & Marketing, L.L.C.; Northridge Petroleum Marketing U.S., Inc. |
| Doyle, Colleen P.<br>Bingham McCutchen, LLP<br>355 South Grand Avenue<br>Suite 4400<br>Los Angeles, CA 90071 | ⇒ Exxon Corp.*; Mobil Corp.*; Tesoro Refining & Marketing Co.* |
| Eimer, Nathan P.<br>Eimer, Stahl, Klevorn & Solberg<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604 | ⇒ Citgo Petroleum Corp.* |
| Felmly, Bruce W.<br>McLane, Graf, Raulerson & Middleton<br>900 Elm Street<br>Manchester, NH 03105 | ⇒ Irving Oil Corp.*; Irving Oil Limited; Irving Oil Terminals, Inc.* |
| Florence, Taylor M.<br>Bullivant, Houser, Bailey, et al.<br>11335 Gold Express Drive | ⇒ Sierra Energy, LLC*; Toms Sierra Co., Inc.* |

Note: Please refer to the report title page for complete report scope and key.

*(Panel Attorney Service List for MDL 1,358 Continued)*

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Ste 105<br>Goldriver, CA 95670-4491 | |
| Galvin, John E.<br>Fox Galvin, LLC<br>One Memorial Drive<br>Eighth Floor<br>St. Louis, MO 63102 | => Phillips Petroleum Co.* |
| Gordon, Robert J.<br>Weitz & Lutzenberg<br>180 Maiden Lane<br>17th Floor<br>New York, NY 10038 | => American Distilling & Manufacturing Co., Inc.*; Canton Board of Education (Cherry Brook School)*;<br>City of Dover*; City of Portsmouth, New Hampshire*; Columbia Board of Education (Horace Porter<br>School)*; Long Island Water Corp.*; New Jersey American Water Co., Inc.; Our Lady of the Rosary<br>Chapel*; Town of East Hampton*; Town of Hartland*; United Water Connecticut, Inc.*; Water<br>Authority of Great Neck North* |
| Guttmann, John S.<br>Beveridge & Diamond, P.C.<br>1350 I Street, N.W.<br>Suite 700<br>Washington, DC 20005 | => Sunoco, Inc.*; Sunoco, Inc. (R&M)* |
| Hoffman, Alan J.<br>Blank Rome L.L.P.<br>One Logan Square<br>18th & Cherry Streets<br>Philadelphia, PA 19103-6998 | => Arco Chemical Co.*; Lyondell Chemical Co.* |
| Kearfott, Joseph Conrad<br>Hunton & Williams<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219 | => Flint Hill Resources LP*; Flint Hills Resources LLC*; Koch Industries, Inc.* |
| Krowicki, Ben M.<br>Bingham McCutchen, LLP<br>One State Street<br>Hartford, CT 06103-3178 | => Crown Central Petroleum Corp.* |
| Langan, J. Andrew<br>Kirkland & Ellis<br>200 East Randolph Drive<br>Suite 5400<br>Chicago, IL 60601 | => Amoco Oil Co.*; Arco Products Co.*; Atlantic Richfield Co.*; BP America, Inc.*; BP Amoco Chemical<br>Co.*; BP Amoco Corp.*; BP Co. North America, Inc.*; BP Corp. North America, Inc.*; BP Global<br>Special Products (America), Inc.*; BP Products North America, Inc.*; BP West Coast Products, LLC* |
| Leifer, Steven L.<br>Baker, Botts, L.L.P.<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | => Marathon Ashland Petroleum, LLC; Marathon Oil Co.; Marathon Oil Corp. |
| Lyons, John J.<br>Latham & Watkins<br>650 Town Center Drive<br>Suite 2000<br>Costa Mesa, CA 92626-1925 | => ConocoPhillips Co.* |
| Martin, Diana P.<br>Bingham McCutchen, LLP<br>355 South Grand Avenue<br>Suite 4400 | => Westport Petroleum, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

*(Panel Attorney Service List for MDL 1,358 Continued)*

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|

Los Angeles, CA 90071

McGahren, John
Latham & Watkins
One Newark Center
16th Floor
Newark, NJ 07101-3174

=> Getty Properties Corp.*

Pappas, Thomas J.
Wiggin & Nourie, P.A.
P.O. Box 808
Manchester, NH 03105

=> Sprague Energy Co.*

Renfroe, Tracie J.
Bracewell & Patterson
South Tower Pennzoil Place
Suite 2900
711 Louisiana
Houston, TX 77002

=> Alon USA Energy, Inc.*; Alon USA, LP*; Atofina Petrochemicals Inc.*; Diamond Shamrock Refining & Marketing; Total Holdings USA, Inc.*; Ultramar Energy, Inc.*; Ultramar Limited*; Ultramar, Inc.*; Valero Energy Corp*; Valero Marketing & Supply Co.*; Valero Refining Co. Louisiana*; Valero Refining & Marketing Co.*; Valero Refining Co.*; Valero Refining Co. New Jersey*; Valero Refining Co.-California*; Valero Refining Company-Texas*

Sacripanti, Peter J.
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

=> ExxonMobil Chemical Co.*; ExxonMobil Oil Corp.*; ExxonMobil Pipe Line Co.*; ExxonMobil Refining & Supply Co.*

Sher, Victor M.
Sher & Leff
450 Mission St..
Suite 500
San Francisco, CA 94105

=> California-American Water Co.*; Carmichael Water District*; Citrus Interstate Pipeline Co.*; City of Elk Grove*; City of Riverside*; City of Roseville*; City of Sacramento*; Crandall, Diane K.*; Del Paso Manor Water District*; Fair Oaks Water District*; Florin Resource conservation District*; Kruso, Adrian*; Kruso, Dennis A.*; Kruso, John T.*; Kruso, Stephen L.*; Orange County Water District*; Quincy Community Services District*; Rio Products Corp.*; Sacramento County Water Agency*; Sacramento Groundwater Authority*; Sacramento Suburban Water District*; San Juan Water District*; Silver, Laura*; Silver, Martin*; Silver, Pauline*; State of New Hampshire

Skilling, Elizabeth E.
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255

=> Parker Holding Co.. Inc.*; Parker Oil Co., Inc.*

Summy, Scott
Baron & Budd
The Centrum Building, Suite 1100
3102 Oak Lawn Avenue
Dallas, TX 75219-3605

=> Brimfield Housing Authority*; Centerville-Osterville-Marstons Mills Water Dept.*; Chelmsford Water District*; Chisolm Creek Utility Authority*; City of Bel Aire (County of Sedgwick Water Authority)*; City of Brockton*; City of Dodge City, Kansas*; City of Galva*; City of Ida Grove*; City of Methuen*; City of Mishawaka*; City of Peabody*; City of Rockport*; City of Sioux City*; City of South Bend, Indiana*; Cotuit Fire District Water Department*; Dedham Westwood Water District*; East Chelmsfor Water District*; Escambia County Utilities Authority*; Greensville County Water & Sewer Authority*; Hillcrest Water District*; Leicester Water Supply District*; Massasoit Hills Trailer Parks, Inc.*; North Chelmsford Water District*; North Newton School Corp.*; North Raynham Water District*; Patrick County School Board*; Sandwich Water District*; South Sagamore Water District*; Sudbury Water District*; Town of Avon*; Town of Bedford*; Town of Bellingham*; Town of Charlton*; Town of Danvers*; Town of Dover*; Town of Dudley*; Town of Duxbury*; Town of East Bridgewater*; Town of East Brookfield*; Town of Easton*; Town of Edgartown*; Town of Halifax*; Town of Hanover*; Town of Hanson*; Town of Holliston*; Town of Hudson*; Town of Marion*; Town of Maynard*; Town of Merrimac*; Town of Millis*; Town of Monson*; Town of Natick*; Town of Norfolk*; Town of North Attleborough*; Town of North Reading*; Town of Norton*; Town of Norwell*; Town of Pembroke*; Town of Reading*; Town of Spencer*; Town of Stoughton*; Town of Tewksbury*; Town of Tynsgborough*; Town of Ware*; Town of Wayland*; Town of West Bridgewater*; Town of West Brookfield*; Town of Weymouth*; Town of Wilmington*; Town of Yarmouth*; Village of Island Lake*; Westport Federal Credit Union*; Westview Farm, Inc.*

Note: Please refer to the report title page for complete report scope and key.

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Tillery, Stephen M.<br>Korein Tillery, LLC<br>St. Claire County<br>10 Executive Woods Court<br>Swansea, IL 62226-2030 | ⇒ Azbill, Donna L.*; Christiansen, Claudia*; England, David*; Owca, Marvin* |
| Tripp, Mark L.<br>Bradshaw, Fowler, Proctor & Fairgrave, P.C.<br>801 Grand Avenue<br>Suite 3700<br>Des Moines, IA 50309-8004 | ⇒ Fauser Oil Co., Inc.* |
| Tully, Mark E.<br>Goodwin Procter<br>Exchange Place<br>Second Floor<br>Boston, MA 02109-2881 | ⇒ Chelsea Sandwich, LLC*; Global Companies, LLC*; Global Montello Group*; Global Petroleum Corp.*; Gulf Oil Ltd. Partnership* |
| Wachtel, John V.<br>Klenda, Mitchell, Austerman & Zuercher<br>1600 Epic Center<br>301 North Main<br>Wichita, KS 67202 | ⇒ National Cooperative Refinery Association* |
| Wallace, Jr. Richard E.<br>Wallace, King, Marraro & Branson, P.L.L.C.<br>1050 Thomas Jefferson Street, N.W.<br>Washington, DC 20007 | ⇒ Chevron Chemical Co.*; Chevron Corp.*; Chevron Environmental Services Co.*; Chevron Texaco Corp.*; Chevron USA, Inc.*; Equilon Enterprises, L.L.C.*; Equiva Services, LLC*; Equiva Trading Co.*; Gulf Oil Corp.*; Motiva Enterprises, L.L.C.*; Shell Oil Co., Inc.*; Shell Oil Products Co.*; Shell Oil Products Co., LLC*; Shell Petroleum, Inc.*; Shell Trading (US) Co.*#; Star Enterprises*; Texaco Refining & Marketing (East), Inc.*; Texaco Refining & Marketing, Inc.*; Texaco, Inc.*; TRMI Holdings, Inc.* |
| Weinstein, David B.<br>Bales & Weinstein, P.A.<br>1715 N. Westshore Boulevard<br>Suite 190<br>Tampa, FL 33607 | ⇒ Exxon Mobil Oil Corp. |
| de Recat, Craig J.<br>Manatt Phelps & Phillips<br>11355 W. Olympic Boulevard<br>Los Angeles, CA 90064-1614 | ⇒ U.S.A. Gasoline Corp.* |

Note: Please refer to the report title page for complete report scope and key.

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

DEC 21 2000

FILED
CLERK'S OFFICE

### DOCKET NO. 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*Holten, et al. v. Chevron U.S.A., Inc., et al.*, D. New Jersey, C.A. No. 3:00-4703

### CONDITIONAL TRANSFER ORDER (CTO-2)

On October 10, 2000, the Panel transferred two civil actions to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. §1407. With the consent of that court, all such actions have been assigned to the Honorable Shira A. Scheindlin.

It appears from the pleadings filed in the above-captioned action that it involves questions of fact which are common to the actions previously transferred to the Southern District of New York and assigned to Judge Scheindlin.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 192 F.R.D. 459, 468-69 (2000), the above-captioned action is hereby transferred under 28 U.S.C. §1407 to the Southern District of New York for the reasons stated in the order of October 10, 2000, and, with the consent of that court, assigned to the Honorable Shira A. Scheindlin.

This order does not become effective until it is filed in the office of the Clerk of the United States District Court for the Southern District of New York. The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Michael J. Beck*
Michael J. Beck
Clerk of the Panel

**PANEL ATTORNEY SUPPLEMENTAL SERVICE LIST**
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 03-486

*City of Fresno v. Chevron U.S.A., Inc.*
N.D. California, C-03-5378-JSW

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Dixon, Brendan M.<br>UNOCAL CORPORATION<br>376 S. Valencia Avenue<br>Brea, CA  90245 | Unocal Corporation and Union Oil Company of California |
| O'Connell, W. Scott<br>NIXON PEABODY LLP<br>889 Elm Street<br>Manchester, NH  03101-2019 | StarOil Marketing and Trading (US) Inc. |

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:** ) | MDL Docket No. 1358 |
| ) | |
| **METHYL TERTIARY BUTYL ETHER** ) | This Document Relates to: |
| **PRODUCTS LIABILITY LITIGATION** ) | |
| ) | *California-American Water Company v.* |
| ) | *Atlantic Richfield Company, et al.* |
| ) | N.D. California, C.A. No. 03-5379 |
| ) | |
| ) | *State of New Hampshire v. Amerada* |
| ) | *Hess Corporation, et al.* |
| ) | D. New Hampshire, C.A. No. 03-486 |
| ) | |
| ) | *City of Fresno v. Chevron U.S.A., Inc.* |
| ) | N.D. California, C-03-5378-JSW |
| ) | |
| ) | **AMENDED PROOF OF SERVICE** |
| ) | |

RECEIVED
CLERK'S OFFICE

2004 MAR 26  A 10: 13

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## AMENDED CERTIFICATE OF SERVICE

STATE OF ILLINOIS            )
                             )        ss
COUNTY OF COOK               )

MDL Docket No. 1358

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

*City of Fresno v. Chevron U.S.A., Inc.*
N.D. California, C-03-5378-JSW


        I am employed in the County of Cook County, State of Illinois.  I am over the age of 18
and not a party to this action.  My business address is 200 East Randolph Drive, Suite 5400,
Chicago, IL 60601.

        On **MARCH 26, 2004**, I served the following documents described as:

        1.  Certain Defendants' Consolidated Opposition To Duke Energy's Motion To Vacate
Conditional Transfer Order (CTO-4) And Brief In Support Thereof.

        2.  Certain Defendants' Consolidated Opposition To California-American Water
Company's Motion To Vacate Conditional Transfer Order (CTO-4) And Brief In Support
Thereof.

        3.  Certain Defendants' Consolidated Opposition To Plaintiff State Of New Hampshire's
Motion To Vacate Conditional Transfer Order (CTO-4) And Brief In Support Thereof.

        4.  Certain Defendants' Consolidated Response Opposing All Motions To Vacate
Conditional Transfer Order (CTO-4).

        5.  Appendix To Certain Defendants' Consolidated Response Opposing All Motions To
Vacate Conditional Transfer Order (CTO-4).

        6.  3/24/04 Letter from MDL Panel granting defendants' 30 pages for Certain
Defendants' Consolidated Response Opposing All Motions To Vacate Conditional Transfer
Order (CTO-4).

7.   Certain Defendants' Statement Of Reasons Why Oral Argument Should Be Heard Regarding All Motions To Vacate Conditional Transfer Order (CTO-4).


[ X ]   by placing true copies thereof in sealed envelop(s) addressed as follows:

### SEE ATTACHED SERVICE LIST

[ X ]   **(BY MAIL)** I caused such envelope to be deposited in the mail at Chicago, Illinois, with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion to party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit.  Executed on **MARCH 26, 2004**, at Chicago, Illinois.

[ X ]   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


*Lesley C. Fairley*

Lesley C. Fairley

**PANEL SERVICE LIST (Excerpted from CTO-4)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

*California-American Water Co. v. Atlantic Richfield Co., et al.,*
N.D. California, C.A. No. 5:03-5379
*State of New Hampshire v. Amerada Hess Corp., et al.,*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Peter G. Beeson
Devine, Millimet & Branch, P.A.
111 Amherst Street
P.O. Box 719
Manchester, NH 03105-0719

Michael DeMarco
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92626

Colleen P. Doyle
Bingham McCutchen, LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Wiener & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue
Suite 350
Portsmouth, NH 03801

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson
& Middleton
900 Elm Street
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
P.O. Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W.
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson, LLP
33 New Montgomery Street
19th Floor
San Francisco, CA 94105

William J. Kayatta, Jr.
Pierce, Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Matthew F. Medeiros
Little, Bulman, Medeiros
& Whitney, P.C.
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody, L.L.P.
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann
& Bernstein, L.L.P.
780 Third Avenue
48th Floor
New York, NY 10017

Lawrence P. Riff
Steptoe & Johnson, LLP
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Andrew W. Serell
Rath, Young & Pignatelli
P.O. Box 1500
Concord, NH 03302-1500

Victor M. Sher
Sher & Leff
450 Mission St.
Suite 500
San Francisco, CA 94105

Stephen L. Tober
Tober Law Offices, P.A.
P.O. Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

## PANEL SERVICE LIST (Excerpted from CTO-4)
## DOCKET NO. 1358
## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY
## LITIGATION

*City of Fresno v. Chevron U.S.A., Inc., et al.*, N.D. California, C.A. No. 3:03-5378

Jon D. Anderson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Paul S. Aronowitz
Aronowitz & Skidmore
200 Auburn Folsom Road
Suite 305
Auburn, CA 95603

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92626

Robert P. Doty
Cox, Castle & Nicholson, LLP
555 Montgomery Street
15th Floor
San Francisco, CA 94111-2585

Colleen P. Doyle
Bingham McCutchen, LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Jeffrey L. Fillerup
Luce, Forward, Hamilton & Scripp
Rincon Center II
121 Spear Street
Suite 200
San Francisco, CA 94105

Alan J. Hoffman, Jr.
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson, LLP
33 New Montgomery Street
19th Floor
San Francisco, CA 94105

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Brian M. Ledger
Gordon & Rees, LLP
101 West Broadway
Suite 1600
San Diego, CA 92101-3541

Spencer T. Malysiak
11335 Gold Express Drive
Suite 105
Gold River, CA 95670

Duane C. Miller
Miller & Sawyer
1651 Response Road
Second Floor
Sacramento, CA 95825-5253

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th Floor
New York, NY 10017

Tracie J. Renfroe
Bracewell & Patterson
South Tower Pennzoil Place
Suite 2900
711 Louisiana
Houston, TX 77002

Lawrence P. Riff
Steptoe & Johnson, LLP
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

```
-------------------------------------------
                                        :
IN RE:                                  :
                                        :
METHYL-TERTIARY BUTYL ETHER  :          MDL Docket No. 1358
PRODUCTS LIABILITY           :
LITIGATION                   :
                                        :
                                        :
-------------------------------------------
```

## APPENDIX OF EXHIBITS TO
## CERTAIN DEFENDANTS' CONSOLIDATED
## RESPONSE OPPOSING ALL MOTIONS TO VACATE
## <u>CONDITIONAL TRANSFER ORDER (CTO-4)</u>

| TAB | DESCRIPTION |
|-----|-------------|
| A | 10/10/2000 MTBE Transfer Order |
| B | 12/19/2003 Hearing Transcript |
| C | 12/23/2003 Order by Judge Scheindlin |
| D | 03/16/2004 Remand Opinion and Order by Judge Scheindlin |
| E | *City of Fresno v. Chevron U.S.A. Inc., et al* Complaint |
| F | 11/19/2003 State of New Hampshire's Motion for Remand and Memorandum of Law in Support |
| G | [Plaintiffs' Proposed] Case Management Order |

A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 0 2000

FILED
CLERK'S OFFICE

## DOCKET NO. 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-370
*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-371
*Donna Berisha, et al. v. Amerada Hess Corp., et al.*, S.D. New York, C.A. No. 1:00-1898

## BEFORE JOHN F. NANGLE, CHAIRMAN, LOUIS C. BECHTLE, JOHN F. KEENAN, WM. TERRELL HODGES,[*] MOREY L. SEAR,[*] BRUCE M. SELYA[*] AND JULIA SMITH GIBBONS, JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of three actions pending in the following federal districts: two actions in the Southern District of Illinois and one action in the Southern District of New York.[1] Before the Panel is a motion by five oil company defendants seeking centralization of these actions, pursuant to 28 U.S.C. §1407, in the Southern District of Illinois for coordinated or consolidated pretrial proceedings. Five additional defendants agree that centralization is appropriate, although two of these defendants prefer centralization in the Southern District of New York. The Illinois plaintiffs support centralization in the Illinois court. The New York plaintiffs along with eight defendants oppose centralization; if the Panel deems centralization appropriate, the New York plaintiffs and at least one opposing defendant favor centralization in the New York court.[2]

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact concerning i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination. Centralization under Section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Section 1407 proceedings are desirable in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.

Opponents of transfer argue that the presence of individual questions of fact militate against 1407 transfer. We are unpersuaded by this argument. Indeed, we point out that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who

---

[*] Judges Hodges, Sear and Selya took no part in the decision of this matter.

[1] The Panel has been notified that two potentially related actions have been recently filed in the Middle and Southern Districts of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 192 F.R.D. 459, 468-470 (2000).

[2] In an interested party response, plaintiffs in a potentially related action – *Buddy Lynn, et al. v. Amoco Oil Company, et al.*, M.D. Alabama, C.A. No. 96-940 – suggest centralization of MDL-1358 in the Middle District of Alabama.

- 2 -

can formulate a pretrial program that: 1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or an action can be remanded to their transferor district for trial in advance of completion of the other actions in the transferee district. But we are unwilling, on the basis of the record before us, to make such a determination at this time. Should the transferee judge deem remand of any claims or an action appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 192 F.R.D. 459, 470-472 (2000).

We are persuaded that centralization of this litigation in the Southern District of New York is appropriate. We note that the New York action is proceeding apace before Judge Shira Ann Scheindlin and we are confident in her ability to conduct pretrial proceedings in this litigation in an expeditious manner.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the above-captioned actions pending in the Southern District of Illinois be, and the same hereby are, transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for coordinated or consolidated pretrial proceedings with the action pending there.

FOR THE PANEL:

John F. Nangle
Chairman

B

3CJLMTBC

1

```
 1   3CJLMTBC
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   IN RE:  MTBE, et al.                    00 MDL 1358 (SAS)
 3   ------------------------------x
 4   IN RE:
 5   County of Nassau, et al.,
 6              -against-                    93 CV 9543  (SAS)
 7   Ameroda Hess, et al.
 8   ------------------------------x
 8                                           New York, N.Y.
 9                                           December 19, 2003
 9                                           10:17 a.m.
10
10   Before:
11
11                   HON. SHIRA A. SCHEINDLIN,
12
12                                      District Judge
13
13                       APPEARANCES
14
14   WEIRZ & LUXEMBERG
15        Attorneys for Plaintiffs Nassau County, et al.
15   BY:  SANDERS MCNEW
16        ROBERT GORDON
16        STANLEY ALPERT
17
17   NAPOLI, KAISER & BERN, LLP
18        Attorneys for Plaintiffs Village of Mineola, et al.
18   BY:  MARC JAY BERN
19        TOM RALEIGH
19
20   MCDERMOTT, WILL & EMERY
20        Attorneys for Defendant Exxon Mobil
21   BY:  PETER JOHN SACRIPANTI
21        JAMES PARDO
22
22   EIMER, STAHL, KLEVORN & SOLBERG
23        Attorneys for Defendant Citgo Petroleum
23   BY:  NATHAN P. EIMER
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
 1   3CJLMTBC
                     APPEARANCES (cont.)
 2   J. ANDREW LANGAN
 2       Attorney for Defendants BP Products, et al.
 3
 3   WALLACE, KING, MARRARO & BRANSON
 4       Attorneys for Defendants Chevron, USA, et al.
 4   BY:  RICHARD E. WALLACE, JR.
 5
 5   PATTON, BOGGS
 6       Attorneys for Defendant Texaco, Inc.
 6   BY:  ROBERT JONES
 7
 7   BEVERIDGE & DIAMOND
```

Page 1

Exhibit 5
Page 1 of 19

```
                          3CJLMTBC
8        Attorneys for Defendants Sunoco, Inc., et al.
8    BY:  HEATHER FUSCO
9
9    LATHAM & WATKINS
10       Attorneys for Defendants Conoco and Getty
10   BY:  JOHN McGAHREN
11
11   GOODWIN, PROCTER, LLP
12       Attorneys for Defendant Gulf Oil Ltd. Partnership
12   BY:  CHRISTOPHER J. GARVEY
13
13   BLANK, ROME, LLP
14       Attorneys for Defendant Lyondell Chemical Company
14   BY:  MICHAEL J. ROESSNER
15
15   HOWREY, SIIMON, ARNOLD & WHITE
16       Attorneys for Defendants Ameroda Hess, et al.
16   BY:  MINDY G. DAVIS
17
17   HUNTON & WILLIAMS
18       Attorneys for Defendant Koch Industries
18   BY:  LAUREN ROSENBLATT
19
20
21
22                     * CONFERENCE *
23
24
25
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              3
```

```
     3CJLMTBC                   Conference
1              (Case called)
2         THE COURT:  Mr. McNew?
3         MR. McNEW:  Good morning, your Honor.
4         THE COURT:  Mr. Gordon?
5         MR. GORDON:  Good morning.
6         THE COURT:  Mr. Alpert?
7         MR. ALPERT:  Good morning, your Honor.
8         MR. BERN:  Good morning, your Honor.
9         MR. RALEIGH:  Good morning, your Honor.
10        THE COURT:  Good morning, Mr. Bern, Mr. Raleigh.
11   Mr. Sacripanti?
12        MR. SACRIPANTI:  Good morning, your Honor.
13        THE COURT:  Mr. Eimer?
14        MR. EIMER:  Good morning, your Honor.
15        THE COURT:  Mr. Pardo.
16        MR. PARDO:  Good morning, your Honor.
17        THE COURT:  Mr. Langan?
18        MR. LANGAN:  Good morning, your Honor.
19        THE COURT:  Mr. Wallace?
20        MR. WALLACE:  Good morning, your Honor.
21        MR. JONES:  Good morning, your Honor.
22        THE COURT:  Mr. Jones.  And Miss Fusco?
23        MS. FUSCO:  Good morning.
24        THE COURT:  Those are the folks on the seating chart
25   but good morning to the rest of you who aren't on the seating
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              4
```

```
     3CJLMTBC                   Conference
1    chart, but are here.
                              Page 2
```

Exhibit 5
Page 2 of 19

3CJLMTBC

2      Well, it does seem a bit like a reunion, but that's
3  not why we're here, to have our annual reunion. We're here
4  because there have been filings, a number of remands around the
5  country, state court. There's been removal of those cases to
6  various federal courts around the country.
7      And there are two in this district: County of Nassau
8  versus Ameroda Hess and Western Nassau Water Authority versus
9  Ameroda Hess. The first one, County of Nassau, 03 CV 9543.
10  And the other one, Water Authority Western Nassau, 03 CV 9544.
11  Now, I'm not even sure that these two cases have been yet
12  assigned to me. They may have been marked as related to the
13  earlier cases pending my accepting them but it wouldn't matter
14  today because I'm also the Part 1 judge.
15      In any event, you would have been stuck with me today.
16  They are unassigned. So whether they're here as related cases,
17  here as Part 1 cases or here as potentially MDL 1358, it
18  doesn't matter, because it's before me.
19      So the issue we're here to discuss, I think, is
20  whether this Court should stay consideration of a pending
21  motion to remand, the courtesy copy papers of which we received
22  last night. The plaintiffs are moving to remand these two
23  cases to state court. The question is whether those
24  the country to state court. The question is whether those
25  motions should be stayed pending the decision by the federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

3CJLMTBC              Conference

1  MDL Panel as to where all removed federal cases should be
2  heard. Should they be heard by one MDL selected judge or
3  should they remain in their many jurisdictions around the
4  country? If these actions are not stayed pending decision of
5  the MDL Panel, of course, the risk is inconsistent rulings on
6  the remand issue. We may have differing remand decisions from
7  federal judges all over the country. If they were stayed
8  pending the MDL Panel's decision as to what to do with these,
9  what appears to be now maybe 40 cases, then the remand decision
10  would be made by the one judge that the MDL Panel selects, if
11  they decide to treated this as an MDL. I think that frames the
12  issue.
13      The history this week is that I received a letter from
14  the defendants asking for a stay. And I, too quickly, without
15  waiting to hear from the plaintiffs, endorsed it and granted
16  the stay, and then I got a letter from the plaintiffs and said,
17  No, there are good reasons not to grant a stay, and I said,
18  Well, I haven't heard from them, that's true, so I vacated the
19  stay and I invited you all to come in today and discuss this
20  with the thought that I would make a decision at the conference
21  today. So that's where we stand.
22      My first act, I heard from the one side, I vacated
23  that. I'd like to hear from both sides -- briefly, because I
24  have read your material -- and make a decision. So who would
25  like to be heard? Mr. McNew?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

3CJLMTBC              Conference

1      MR. MCNEW: Thank you, Judge. And thank you for
2  hearing us on short notice. We're grateful for that.
3      The narrow issue before you this morning, I believe,
4  is: Does it make more sense to hear the remand proceedings in
5  these two cases now or whether it makes sense to stay them
6  pending proceedings in other courts and before the Judicial

Page 3

Exhibit 5
Page 3 of 19

3CJLMTBC

7   Panel on Multidistrict Litigation.  Whatever the merits of the
8   request to stay in other courts, Judge, we have a difficult
9   time understanding the logic of asking you to stay your
10  decision on these remand motions.  Because unlike every other
11  court in the country, you, Judge, are the presiding judge over
12  MDL 1358.  And the defendants' papers throughout the country
13  are all identical on this point.  They in each case ask that
14  the Court not only remove the stay, they now move to have these
15  matters sent as tag-along actions to MDL 1358 with the
16  expectation, Judge, that these cases come to you through the
17  mechanism of the JPML for decision on a consolidated MDL basis.
18          Your Honor, while there may be some risk of
19  inconsistent rules in other jurisdictions, the notion that you
20  could enter a ruling today that would be inconsistent with your
21  ruling following a consolidation in MDL 1358 is illogical.  And
22  frankly, Judge, if the goal here is to handle this with a
23  minimum of expenditure of federal judicial resources -- and
24  frankly, with a minimum of resources on the part of the parties
25  being expended -- the best thing for you to do is for you to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            7

3CJLMTBC                    Conference
1   decide these remand pages now.
2           THE COURT:  That was very interesting; that was very
3   unexpected.  I didn't think you were going to argue that.  What
4   you're saying is you're going to assume that the MDL Panel will
5   agree to make an MDL decision for all pending cases and refer
6   them to me as part of MDL 1358.  And if I knew all that, it
7   would be a fait accompli.  There would be no risk of
8   inconsistent rulings around the country because the MDL panel
9   would say all 40 should be MDL, and the MDL should go to Judge
10  Scheindlin.
11          If all that were to be done today, I promise you, I'd
12  start working on the remand motion Monday.  But nobody's done
13  that.  I can't anticipate what the Judicial Panel of
14  Multidistrict Litigation will do because nobody invited me to
15  be on the panel and I don't get a vote.  So I don't know if
16  they'll do that.  Do you know if they'll do that?
17          MR. MCNEW:  Well, your Honor, first, I would note, I'm
18  not sure if it's clear from the papers that have come to
19  chambers, but it is not the defense -- it's not the defendants'
20  tack to say to the JPML that they ought to consider whether
21  there should be an MDL for these cases.  They've identified
22  these expressly as tag-along cases to MDL 1358.  They've
23  expressly stated in their papers all around the country --
24          THE COURT:  Okay, so the defendants have taken that it
25  should all come here.  But what about the various and many
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            8

3CJLMTBC                    Conference
1   plaintiffs' lawyers around the country?
2           MR. MCNEW:  We are the various plaintiffs lawyers
3   around the country.
4           THE COURT:  You're everybody?  What are you all saying
5   to the judicial panel?
6           MR. MCNEW:  If the transfer -- if the JPML decides to
7   transfer them to MDL, absolutely, this is where they belong.
8   No question in my mind.
9           THE COURT:  So you're okay on the second half.  But if
10  they're going to be MDL, they're going to be here.  What do
11  they think about MDL tree?
                        Page 4

                        Exhibit 5
                        Page 4 of 19

3CJLMTBC

12　　　　MR. MCNEW: I think there's a decision tree here, if
13　the JPML decides that multidistrict litigation isn't warranted
14　here.
15　　　　THE COURT: Isn't warranted?
16　　　　MR. MCNEW: Is not warranted here, okay, you still
17　have these two cases before you. You have to decide. So you
18　should decide them now.
19　　　　THE COURT: Well, then I would know that that's their
20　decision and lots of judges around the country are going to be
21　making these remand decisions. I'll just be one of many. But
22　what is the plaintiffs' position before the panel? Are you
23　saying they should not be treated as MDL or they should be
24　treated as MDL? Which position are the plaintiff's lawyers
25　taking?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

3CJLMTBC　　　　　　　　Conference

1　　　　MR. MCNEW: Our position -- I just want to make sure
2　we're on the same page -- our position is if they are in the in
3　the federal court, then they absolutely should be in the MDL
4　before your Honor.
5　　　　THE COURT: If they're in the federal court.
6　　　　MR. MCNEW: If they remain in federal court, if
7　they're not remanded, then absolutely they belong in this
8　courtroom.
9　　　　THE COURT: Wait, wait, wait. That is a confusing
10　position. Surely you're seeking remand. I understand this.
11　　　　MR. MCNEW: We are.
12　　　　THE COURT: Your first position is they don't belong
13　in the federal court at all. I do understand that.
14　　　　MR. MCNEW: That's correct.
15　　　　THE COURT: But before the Judicial Panel on
16　Multidistrict Litigation are you saying, Let's quickly get them
17　MDL, for one federal judge to decide remand, so that if they
18　should go back to state court, according to that one judge,
19　they'll all go back? If that one judge says they shouldn't go
20　back, Well, I guess we've lost that; we can appeal it but we've
21　lost it? So do you want the remand decisions made by as many
22　federal judges as there are around the country or are you not
23　resisting the MDL process so we can get the remand decided at
24　once?
25　　　　MR. MCNEW: We have decided, your Honor, to try and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

3CJLMTBC　　　　　　　　Conference

1　have cases remanded before a conditional transfer order comes
2　out. That has been our litigation strategy. We believe that
3　the removals are so facially defective on a jurisdictional
4　ground that it would be more efficient to have them sent down
5　rather than having to go through the laborious process of going
6　through the JPML proceedings.
7　　　　THE COURT: My guess is you can't beat the process
8　that way, because judges work at various speeds around the
9　country. You're not going to get all the different federal
10　judges to decide remand motions before the Judicial Panel on
11　Multidistrict Litigation gets to decide whether they should be
12　transferred to one judge as part of an MDL or whether they
13　should stay before many judges. I don't think you can beat the
14　system that way. The Judicial Panel on Multidistrict
15　Litigation will hear the issue and will decide.
16　　　　And I did look quickly or briefly at my own prior

Page 5

Exhibit 5
Page 5 of 19

3CJLMTBC

17 decision and at your moving papers on the remand issue to get a
18 sense of it, and I can certainly say that your papers are not
19 facially frivolous.  In other words, it's a serious remand
20 motion.
21         On the other hand, nor do I think the removals are
22 facially frivolous.  There are serious, hard issues to be
23 addressed.  It's going to take some work on both sides to
24 figure out -- at least what I think.  This is not the kind of
25 motion that can be decided over the weekend.  Maybe there are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

11

3CJLMTBC                      Conference
many judges who are smarter and quicker and they'll do it --
1         MR. MCNEW:  Perhaps on a second reading, Judge.
2         THE COURT:  Whatever.  But I didn't get there that
3 fast.  For me it will take some work to figure out what to do.
4 So seeing as how I think it's a serious motion raising serious
5 issues on both sides, I don't think it's a good idea to risk
6 many inconsistent verdicts from around the country, and there
7 did seem to be a case in the Second Circuit, I thought this Ivy
8 case, 901 F2d 7, 2d Cir. 1990, the Second Circuit at least
9 seemed to take the position that it be wise to get the MDL
10 process organized first, transfer to one judge, and then the
11 Court said:
12         Once transferred, the jurisdictional objections can be
13 heard and resolved by a single court and reviewed at the
14 appellate level.  Consistence as well as economy is thus
15 served.  We hold, therefore, the MDL Panel has jurisdiction to
16 transfer a case in which a jurisdictional objection is pending.
17         And that's exactly this case procedurally.  There's a
18 real jurisdictional objection, a very important one.  You're
19 saying it should not be in the federal court, should be in the
20 state court.  There's no federal jurisdiction.  Nothing could
21 be more important.
22         Rather than have 40 federal judges over and over again
23 struggle with difficult issues of preemption and other
24 things -- not just preemption, there are other questions here
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

12

3CJLMTBC                      Conference
about jurisdiction -- rather than have all that struggling
1 going on, if the panel would make a quick decision, would
2 decide if they want 40 judges to do it or they want one judge
3 to do it, and if so, which one, then your motion will be
4 reached quickly once -- to one side or the other, hopefully
5 quickly -- and then you can get to the merits of what you
6 eventually want to do.
7         MR. MCNEW:  Of course, Judge, this is a decision
8 that's committed to your discretion.  And I appreciate the
9 Second Circuit's decision, and certainly we are all guided by
10 it.  I would ask the Judge, though, to consider in this
11 particular instance there are extraordinary circumstances that
12 aren't present in the ordinary set of facts.  Because in this
13 particular instance, Judge, unlike every other one in the
14 country, by a happy coincidence, we happen to be before the MDL
15 judge.  The one judge that we all agree, if this is proper
16 subject for the MDL, we all agree that you're the judge to hear
17 it.  It's in their papers.  We're here telling you today we
18 absolutely agree with them:  You are the person to hear this
19 case.
20         THE COURT:  You are saying to the MDL Panel, While we
21                          Page 6

Exhibit 5
Page 6 of 19

3CJLMTBC

22  oppose the MDL treatment, if you're going to MDL, get it to
23  Judge Scheindlin quickly?  Is what you're going to say?
24          MR. MCNEW:  Absolutely.
25          THE COURT:  When are they next hearing these things?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

13

3CJLMTBC                    Conference
1   Does anybody know what their schedule is?
2           MR. LANGAN:  Your Honor, Andy Langan.  I've been
3   handling the MDL Panel file.  The state of play is reflected in
4   our letter.
5           THE COURT:  Give us the timeline.
6           MR. LANGAN:  Traditional transfer orders have not been
7   entered yet.  It really depends on what the plaintiffs do.  If
8   the plaintiffs object to conditional transfers, once they're
9   entered, it will take awhile.  I'm gratified to hear the
10  plaintiffs say they're not apparently intending to object.
11          THE COURT:  They didn't say that.  They said if it's
12  going to be treated as an MDL, then they think it belongs in
13  this Court.  Their first position before the panel is it should
14  not be MDL, prior to decision on the remand motions around the
15  country.
16          MR. LANGAN:  The MDL Panel routinely overrules that
17  argument.  There's 50 or 60 published decisions that say that's
18  not a ground to not MDL.  Your Honor is aware of that.  There's
19  a ton of cases I think that say that.
20          But to deflect timing -- the plaintiffs are going to
21  object -- it's going to take a couple of months to sort it all
22  out.
23          THE COURT:  And if they don't object?
24          MR. LANGAN:  It's a matter of weeks, once the
25  conditional transfer orders are out.  It's an administrative
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

14

3CJLMTBC                    Conference
1   issue with the panel's office.  I can't say why they haven't
2   entered them yet.
3           MR. MCNEW:  Judge, I'd like to finish my point,
4   because I think it's an important one.  In fact, I think it's
5   the key of this entire hearing.  And it's a simple point, and
6   that is that if we all agree -- we can go down the various
7   decision trees and various outcomes.  But at the end of the
8   day, any disposition of the remand issue in a federal forum, if
9   we lose on all the -- you may be right on the -- what happens
10  with the MDL and other courts' willingness to decide it before
11  the MDL.  But even in that case, we're all at the end of the
12  day back here, before you on the same papers that you have
13  before you today.  And rather than going through this process
14  of ensuring that you do not enter a decision today that is
15  going to be inconsistent with your decision when you decide
16  this in your capacity as an MDL judge --
17          THE COURT:  It's not that inconsistency that's
18  worrying me.  It's the inconsistency potentially with the many
19  other judges around the country.  Not that I can stay their
20  decision to see whether to proceed or not, but they may be
21  influenced by what I do.  You said that when I improvidently
22  signed the defendants' letter --
23          MR. MCNEW:  I never used that word, Judge.
24          THE COURT:  Well, quickly, without hearing from you,
25  when I did that, you pointed out they were circulating it to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 7

Exhibit 5
Page 7 of 19

3CJLMTBC
(212) 805-0300

15

3CJLMTBC                    Conference
1  all these other courts already.  Saying even "she" did this.
2       My point is, if it's going to influence their
3  decision, there's a message I need to send, I think we need to
4  wait for the MDL Panel to decide whether they think this
5  warrants MDL treatment.
6       But I don't know that what the big consequence of this
7  is -- I'm not sure what the big consequence of this is, because
8  if I were to grant this stay, so to speak, of deciding the
9  remand motion while the MDL Panel works it out -- you know, you
10 don't have a camera planted in my chambers.  You're right,
11 eventually I'm going to have to decide whether or not they give
12 MDL treatment.  If they do, I've got them all; if they don't,
13 I've got the two new New York ones.  So there's still an
14 important signal that needs to be sent that I defer to the MDL
15 Panel to make its decision because in theory they might not do
16 it at all, or they might pick a different judge for whatever
17 reason.  I have to respect that.  But if I wish to, I can start
18 working now.
19       MR. MCNEW:  Let me make a suggestion, your Honor,
20 because I think there's a way to move this quickly to conserve
21 an awful lot of time and effort in a lot of different foras,
22 and I think you are the key to this because of the unusual
23 circumstance of having these individual cases come to you.
24       THE COURT:  They're only coming to me as related,
25 right?  How do I get these?  They're marked as related cases.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

16

3CJLMTBC                    Conference
1  This wasn't an accident of the wheel.
2       MR. MCNEW:  It was an accident.  We filed two in
3  New York Supreme for New York County.  There's a story behind
4  that -- that's another story.
5       THE COURT:  Okay.
6       MR. MCNEW:  What I'm trying to get to, Judge, is this:
7  You can -- rather than having us go through a process that will
8  frankly take months -- I have a hard time believing we'll be
9  back here in weeks -- don't stay your own decision on these two
10 cases, and I understand your concern about the message you'll
11 be sending.
12       THE COURT:  Not just the message.  In theory -- let's
13 say the MDL Panel decides on MDL treatment but says, for
14 whatever reason, it shouldn't be Judge Scheindlin, she has a
15 lot of work, a lot of other MDL's.  We'll select so-and-so?
16 Which they'll have the power to do.  Well, I'll have wasted
17 work and we'll never decide these issues.
18       I don't suspect that's going to happen, because I have
19 the original MDL, 1358, and both the defense and the plaintiffs
20 apparently think I should have it, and yet you never know what
21 a group of federal judges will do.  They surprise us every
22 morning.  Who knows what they'll do?
23       So there is a small possibility that I would never
24 have these.  If they MDL it and give it to somebody else --
25 unlikely, but it could happen.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

17

3CJLMTBC                    Conference
1       So I still think a stay according to the Second
2  Circuit is the way to go, pending the MDL's decision.  I'm not
                        Page 8

Exhibit 5
Page 8 of 19

3CJLMTBC

3  seeking to delay it.  I realize it would be a very important
4  motion to move up the list, though in front of one or two
5  important other motions I have pending.
6        MR. GORDON:  Robert Gordon, your Honor, for the
7  plaintiffs as well.  I want to first alert the Court it's not
8  just two cases.  Mr. Bern, who's the other plaintiff counsel
9  here, other than Weirz & Luxemberg, just received notice that
10 seven of his cases were removed to you.  So you now have nine.
11        THE COURT:  Because they were also in New York County?
12        MR. BERN:  Correct; your Honor.
13        MR. GORDON:  So you now have nine here to you.
14        I guess my point is:  We believe you're the MDL.  We
15 believe this is MDL 1358.  They're not opposing that.
16        THE COURT:  But you're opposing it.  I was told by
17 Mr. McNew you're going to tell the MDL Panel, We do not think
18 you should MDL this until the judges around the country have
19 decided remand.  Procedurally, we think remand comes first.  I
20 and all these federal judges should decide their own remand
21 motion, even though we realize it could be in Arizona, somebody
22 decides to go remand, and in Connecticut, somebody's going to
23 say not remand.  Yet that's our position.  Before the MDL.
24 That's what you're saying.  You're not saying we see the wisdom
25 of getting it all MDL now so one judge could decide it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

3CJLMTBC              Conference
1        MR. GORDON:  We're going to the different federal
2  judges, telling all of them there's no subject matter
3  jurisdiction.
4        THE COURT:  And to decide remand before the MDL Panel
5  acts.
6        MR. GORDON:  But if they say no, I'm going to state
7  this, we, on behalf of our firm, which controls I think
8  99 percent of the cases -- not 100 percent -- for example, the
9  attorney general of New Hampshire is not our case -- that we
10 will not oppose conditional transfer to you so that we can make
11 the -- get the motion, get the motion on for you to remand it.
12 So we're not going to contest that in the JPMDL decision.
13 We're not going to put questions in MDL that they belong --
14        THE COURT:  You're only going to do that if judges
15 start to stay it, individual judges issue stays pending the
16 decision of the MDL Panel.  Then you're going to say, Nobody's
17 going to decide this remand.  Get to the MDL Panel, you have
18 our blessing, get it to MDL, get it to Judge Scheindlin, let's
19 get somebody to decide remand.  Either way -- we'll take it to
20 an appellate court if we lose; they'll take it to an appellate
21 court if they lose.  Let's get going.  So if you could get one
22 and instead of waiting for all these judges to either decide
23 remand or stay, why don't you just forgo it?
24        MR. GORDON:  We would not necessarily be opposed to
25 agreeing, since everyone's going to be deferential to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

3CJLMTBC              Conference
1  There's about 19 other federal judges --
2        THE COURT:  Talk to my children.
3        MR. GORDON:  They are another matter.  But federal
4  judges will say, what did the MDL judge do?  The proof in the
5  pudding is there:  Immediately on your stay, it was to Judge
6  Spatt before anybody could even spell his name.  That quickly.
7  I don't want to make it look like we're going to contest that

Page 9

Exhibit 5
Page 9 of 19

3CJLMTBC

8  there's an MDL 1358.  We're not going to contest you're the
9  judge and these are tag-alongs.  But you want to decide the
10  remands first.
11      THE COURT:  That's not an issue here.
12      MR. GORDON:  No.
13      THE COURT:  Then write a letter to all the judges,
14  say, We changed our position; we now believe it should all be
15  MDL, one judge should decide remand, we're agreeing about the
16  remand, we agree with the conditional tag-along transfer, and
17  I'll go to work on it.
18      MR. GORDON:  We -- they necessarily want to have the
19  files transferred to the JPMDL to do that.
20      THE COURT:  Fine.
21      MR. GORDON:  We'll let them not rule on a stay and let
22  you rule.
23      THE COURT:  You tell them that.
24      MR. GORDON:  We would do that if your Honor would lift
25  this stay and get reply papers from them so you can decide.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

3CJLMTBC                    Conference

1  Because de facto --
2      THE COURT:  I think we could work something out here.
3      MR. GORDON:  -- your decision would be controlling.
4      THE COURT:  I think we can work something out here.  I
5  think all you need to do is talk to your adversaries because
6  you could virtually do it by stipulation.  If you're not
7  pressing your individual remand motions around the country but
8  going to a transfer so we can litigate it here, then we can
9  have a briefing schedule and litigate it here.  Then it's got
10  to be litigated somewhere.  Surely, Mr. Sacripanti, you don't
11  expect it not to be litigated.
12      MR. SACRIPANTI:  No, your Honor.
13      THE COURT:  And you don't want to litigate it before
14  30 judges, do you?
15      MR. SACRIPANTI:  Your Honor, I don't, but there's one
16  problem with the analysis.
17      THE COURT:  Yes.
18      MR. SACRIPANTI:  They don't control all the cases.
19  And not to quibble with my friend Mr. Gordon, I don't think
20  it's 99 percent.
21      THE COURT:  But how about these five lawyers at the
22  front table?
23      MR. SACRIPANTI:  No, your Honor.
24      THE COURT:  Even that?
25      MR. SACRIPANTI:  There's a slew of cases throughout

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

3CJLMTBC                    Conference

1  the country with other plaintiffs' firms -- California -- that
2  they don't control.
3      THE COURT:  What if they bring them into a
4  stipulation?  If they can arrange a stipulation, which is all
5  you want, you would like the remand -- Mr. Sacripanti, you
6  would like the remand motion heard in one court?
7      MR. SACRIPANTI:  Indeed, your Honor.
8      THE COURT:  Work it out.  Try to work it out.
9      MR. SACRIPANTI:  We're happy to try to do it.  If your
10  Honor would issue a stay in the interim ...
11      THE COURT:  The interim might be five or 10 minutes
12  while I'm taking a criminal case that's waiting to see me.  Why

Page 10

Exhibit 5
Page 10 of 19

3CJLMTBC

13  don't you try to talk for a few minutes.  Could you talk to
14  other for five or 10 minutes?  Leave it at five or 10, because
15  at 11:00 I have to swear in the new citizens.  I have to do
16  naturalization.
17      why don't you talk five to 10 minutes, really, while I
18  do one criminal case.  Then we'll come back and talk some more.
19  If we haven't worked something out, we'll take a break and I'll
20  come back to court and take care of you.
21      MR. GORDON:  Can we leave our stuff?
22      THE COURT:  I think so, sure.
23          (Recess)
24  (10:56 a.m.)
25      MR. SACRIPANTI:  Your Honor, we apologize, we didn't
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                        22

3CJLMTBC              Conference
1   mean to keep you waiting.
2       THE COURT:  That's all right.
3       MR. SACRIPANTI:  We were thinking, your Honor, if you
4   talk to your children with the robe on, they may listen.
5       THE COURT:  Never mind.  They've seen that since 1982.
6   It didn't work then.
7       MR. SACRIPANTI:  Your Honor, I think we need a little
8   time.
9       THE COURT:  You want me to go swear in the citizens?
10      MR. SACRIPANTI:  I think we do.  I think we need a
11  little time, and we're working in earnest to try and solve
12  this.
13      THE COURT:  If you don't mind, it takes about a half
14  an hour at the most to swear in the new citizens.
15      MR. GORDON:  Can we explain to your Honor what the
16  question is, because it may be that you would or would not
17  consent to or even consider one as an option.
18      THE COURT:  Sure.
19      MR. GORDON:  Our position is, for the plaintiffs, we
20  would waive -- we would agree to a stay, and indeed to your
21  Honor issuing a stay of other courts deciding, if your Honor
22  would create an expedited briefing schedule, get them to
23  reply -- we filed our papers already -- and make a decision on
24  that.  And we would support that.  In all the cases that we're
25  in, which I do believe they now agree would be somewhere around
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                        23

3CJLMTBC              Conference
1   90 percent of the nation's cases, I think it's more -- but they
2   have a different proposal, and I'll let them explain it to you.
3   And I need to call cocounsel in the intervening time.
4       MR. EIMER:  Nate Eimer.  I think we're very close on
5   this.  I think the issue is, one, we would request that your
6   Honor issue the order staying the other cases, which you can
7   under 1358.  We're not certain of the effect of that, but
8   that's great; it's helpful.  What we would propose is -- what
9   we understand Mr. Gordon's position to be or plaintiffs'
10  position to be is that they don't oppose transfer here and your
11  Honor deciding the remand issue.  So what we've asked is that
12  plaintiffs, in addition to this, let us advise the JPML that
13  plaintiffs do not oppose issuance of a conditional transfer
14  order and transfer to your Honor, so we get the process started
15  sweeping these cases up and bring them here.  That's the issue
16  Mr. Gordon needs to talk to Mr. Summy about, and if we get that
17  resolved, we have an understanding.
                    Page 11

Exhibit 5
Page 11 of 19

3CJLMTBC

18    THE COURT: It doesn't sound so --
19    MR. GORDON: We feel there's no subject matter
20 jurisdiction. I hate to go to any federal judge -- I'd rather
21 have them stay it rather than agree that it should go and get
22 transferred and start to go through the federal system and
23 transfer, when I believe that once your Honor rules as the MDL
24 judge, I believe -- which we still believe you are, and no
25 one's suggesting that you're not, and these are simply

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

3CJLMTBC                    Conference

1 tag-alongs.
2    MR. MCNEW: Our common desire, your Honor, is that we
3 find a way, so this doesn't become enmired in the process of
4 going through the conditional transfer order process --
5    THE COURT: I understand.
6    MR. MCNEW: And to the extent your Honor has thoughts
7 about how we might do that, we would be grateful for your
8 guidance.
9    THE COURT: Okay.
10    MR. GORDON: I can't imagine that another fellow
11 judge, if they've been stayed to wait your ruling, then you
12 rule, that they would take a contrary position; and to the
13 extent that the defendants are worried, by the way, about some
14 cases being in state court, some being in federal court, that's
15 almost inescapable.
16    THE COURT: Yes, exactly.
17    MR. GORDON: There are existing state cases they've
18 never sought to remove. County of Suffolk, one of the biggest
19 in the country. Passco, Rhode Island, never sought to remove
20 it.
21    THE COURT: I think you're right, that's inescapable.
22 There are some cases in state court, there are. It's up to
23 them to remove them timely or not. Nothing to be done about
24 that.
25    But what they do want to avoid, I gather, is many,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

3CJLMTBC                    Conference

1 many federal rulings which could potentially be inconsistent
2 and in different circuits and different appeal schedules and
3 all the rest of it, and everybody seems to favor a fast
4 adjudication one way or the other.
5    I'm not going to promise you a day. I've made one
6 promise this year, that's one too many. But there was a reason
7 in that case.
8    MR. EIMER: Nate Eimer. It's not an issue for any of
9 us here -- I was going to say a lot, I don't know how many,
10 defendants are who are not in these cases.
11    THE COURT: But even they are not pressing for the
12 remand question to be decided in various courts around the
13 country.
14    MR. EIMER: No, they're objecting, they're asking for
15 stays in each of the cases they're in.
16    THE COURT: So in theory, they basically all want to
17 be here, too.
18    MR. EIMER: They get to participate -- there are some
19 people who don't get to participate. It will go decided before
20 they get here. But I'm not concerned about that.
21    THE COURT: I'm not either because, as you say,
22 generally speaking they're seeking stays around the country.

Page 12

Exhibit 5
Page 12 of 19

3CJLMTBC

23   They want it to be in the MDL process, so they've been heard,
24   so to speak, indirectly.
25          MR. GORDON:  And we're giving them the stays.  It's
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

26

3CJLMTBC                    Conference
     the ones we're here on we want to move forward on.
1          THE COURT:  I understand.  So when I come back from my
2    naturalization, will you be here or will you go away?
3          MR. GORDON:  We'll be here.
4          THE COURT:  All right.
5          MR. SACRIPANTI:  Can we use the courtroom?
6          THE COURT:  Yes, you may.  I'll be down in the
7    ceremonial courtroom.
8               (Recess)
9    (11:55 a.m.)
10         THE COURT:  Can we get started?
11         MR. SACRIPANTI:  I think so, your Honor.
12         MR. GORDON:  Your Honor, thank you for your patience.
13   We were in touch with counsel in South Texas.  It wasn't easy.
14         MR. MCNEW:  They have telephones down there.
15         THE COURT:  That's good.  Reassuring.
16         MR. GORDON:  Obviously, we don't speak for everybody
17   in the country -- neither do they -- but just for those here in
18   the courtroom and some of us that we've been able to reach have
19   agreed to, from the plaintiffs:
20         We would stipulate, first of all, Number 1:  To
21   immediate transfer of all cases which counsel control including
22   some declaratory judgment actions that the defendants have just
23   filed in federal courts to you, Shira Scheindlin, in your
24   capacity as MDL 1358 judge.  And we agree to not oppose the
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

27

3CJLMTBC                    Conference
     issuance or finality of the panel's conditional transfer order.
1          Number 2:  We stipulate that your Honor, Judge
2    Scheindlin, use whatever judicial means at your disposal to
3    stay and cause the immediate transfer of any other cases to
4    this Court.
5          MR. SACRIPANTI:  And for that, your Honor, if I may,
6    we would refer you to the manual, and we would hope that you
7    would, you know, contact those other judges.  I know it's an
8    imposition, but....
9          THE COURT:  Well, writing is easier certainly than
10   calling them.  But if I end up with a list....
11         MR. SACRIPANTI:  We're going to provide you with a
12   list, your Honor.  Thank you.
13         MR. GORDON:  Number 3:  We, the plaintiffs, expressly
14   reserve our objections to federal jurisdiction and stipulate
15   that our agreement here is not a waiver.
16         Number 4:  We agree -- all the parties here -- to an
17   expedited briefing hearing on the motions to remand and the
18   dates that we've suggested, the defendants agreed they would
19   get their papers in by January 9th; that we would take seven
20   days to apply, which would be January 16th; and that we'd ask
21   for a hearing the following week, which would be the week of
22   the 19th, which is Martin Luther King's birthday, but then that
23   Tuesday, Wednesday or Thursday -- Wednesday the 21st, perhaps,
24   is consistent with your Honor's schedule?
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                          Page 13

Exhibit 5
Page 13 of 19

3CJLMTBC

28

1       THE COURT: A "hearing" meaning what?
2       MR. GORDON: Oral argument.
3       THE COURT: If the Court requires one, yes.
4       MR. GORDON: Yes. Number 5: Declaratory judgment
5 actions that were filed and just served on our clients
6 yesterday would be stayed pending the decision on remand.
7       And Number 6: The plaintiff agrees to file
8 appropriate papers staying other cases that we control pending
9 final MDL Panel action transferring the cases.
10      Did I say that correctly?
11      MR. LANGAN: Perfect, Rob. Thank you.
12      MR. WALLACE: Actually, your Honor -- this is Rick
13 Wallace for Shell, Chevron and other defendants -- a couple of
14 minor modifications:
15      I thought the proposal for Number 1 was to stay as
16 well as transfer all those cases that the plaintiffs control.
17      And on Number 3, I'd simply ask that that objection --
18 the preservation of objections to jurisdiction be reciprocal,
19 because there are some defendants that may also have objections
20 to personal jurisdiction.
21      MR. SACRIPANTI: Your Honor, if I may?
22      THE COURT: But it is consistent with the defendants
23 that all defendants are together in saying there is federal
24 jurisdiction; is that right? Or is there inconsistency on the
25 defense side?

29

1       MR. WALLACE: I don't anticipate any inconsistency on
2 subject matter jurisdiction.
3      THE COURT: But personal jurisdiction, you want to
4 preserve your rights. Yes, okay. I hear you.
5      MR. SACRIPANTI: Which leads me, your Honor, to a
6 point: We can only bind and agree to be bound the clients that
7 we represent that are here. There are about, by my reckoning,
8 30 other defendants that are part of the actions that have been
9 removed before your Honor who are not present today. What your
10 Honor may want to do -- and I'll leave it to your Honor -- is
11 to set perhaps a date by which if anyone objects to this
12 stipulation, that they should come in, petition the Court and
13 you should have a conference on that.
14      May I suggest January 9th or 5th?
15      THE COURT: Let me ask this question: In terms of
16 briefing, however, would those defendants who are not present
17 anticipate folding into this briefing schedule?
18      MR. SACRIPANTI: I would assume they would, your
19 Honor. We're going to give notice of this to everyone. We're
20 going to do that immediately. I just want to preserve --
21 because frankly, I'm acting as coordinating counsel, but none
22 of us here have the power to bind anyone.
23      THE COURT: I understand that. It's your best
24 prediction, so to speak, that they all wish to stay their local
25 actions and wish it to be heard in one MDL proceeding. That's

30

1 your best guess.
2      MR. SACRIPANTI: And would agree to the stipulation as
3 set forth by Mr. Gordon.

Page 14

Exhibit 5
Page 14 of 19

3CJLMTBC

4      THE COURT:  I understand.  When we actually tell them
5  the briefing schedule, there may become some objections.  Are
6  you kidding?  How are we going to get a coordinated brief in --
7  did you say January 9th?
8      MR. GORDON:  That's correct.
9      THE COURT:  With the two holidays falling in between,
10  you've got to circulate that to how many defendants?
11      MR. MCNEW:  But, Judge --
12      THE COURT:  That's really a tight schedule.
13      MR. MCNEW:  But if you think about the context, we've
14  already served motions to remand in all these cases.
15      THE COURT:  I understand.  I have one in front of me,
16  one Memorandum of Law in Support of Motion to Remand Case
17  Number 03 CV 9543, County of Nassau.  But I assume -- tell me
18  if I'm wrong -- that that brief will relate to all of the
19  original nine cases, so to speak, that I have, and if the rest
20  are transferred, it relates to all of them, it's not
21  case-specific -- is that right?
22      MR. MCNEW:  The removal papers and the remand motions
23  are identical, case-to-case.  There's no variation.
24      THE COURT:  When was it served?
25      MR. MCNEW:  Our first remand papers were served in
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

3CJLMTBC                Conference
1  Connecticut, and I believe it was December 8th.  So defense
2  counsel have had these papers for awhile.
3      THE COURT:  Well, some.  I don't know who the
4  defendants were in Connecticut.  I really don't know if all of
5  them really did receive the papers.
6      But the point is, we want a coordinated brief.  We
7  don't want different defendants coming in and saying, you know,
8  No, given that schedule, I was not able to coordinate; I have
9  no input; I have a right to make my own papers.
10      I think if we actually give another week, it's a small
11  change, but it really does at least allow the defense brief to
12  be circulated throughout the defense group.  I don't want to be
13  so unrealistic that I end up with more than one brief.  That
14  would be self-defeating.  And I really can't bind the
15  defendants who aren't here today to agree that the defendants
16  who are here today are going to write a brief for them that
17  they have no chance to even read or comment on.
18      So efficiency tells me I'd rather see it moved up a
19  week, and that's tight, but at least it could be sent around to
20  every defendant and every case around the country so that they
21  all agree on one coordinated brief.  That's to the plaintiffs'
22  benefit, too.
23      MR. SACRIPANTI:  And, Judge, I would suggest that, if
24  I may, we will send notice to all the defendants, but your
25  Honor may want to set an interim conference date, which may not
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

3CJLMTBC                Conference
1  be necessary, where people who do object -- and I can't say
2  people will -- they can come and voice their objections.
3      THE COURT:  The only objection that they may have
4  potentially is to the dates.  And they can say, We need time to
5  be part of this brief.  That's their only real objection that I
6  gather they'd want is to be heard once and not 40 times.
7  Everybody wants that.  So they just want enough time to read it
8  and show it to their clients and make sure they don't have a
Page 15

Exhibit 5
Page 15 of 19

3CJLMTBC

```
 9    brilliant idea that somehow the seven brilliant people who are
10    here didn't have.
11            MR. SACRIPANTI:  I guarantee they will, your Honor.
12            THE COURT:  When you're working with a big,
13    coordinated group, that's for sure.  People want to read it and
14    have some input.
15            I think we should move the 9th to the 16th.
16            MR. GORDON:  The 16th.
17            THE COURT:  And what was the reply date you said
18    originally?  The 16th?
19            MR. GORDON:  But then -- we lose then the Martin
20    Luther King day.  Could we go to the following Monday, at
21    least?  The 26th?
22            THE COURT:  Sure.
23            MR. GORDON:  And then have the hearing still that same
24    week?
25            THE COURT:  No.  You can't have a hearing until I've
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

3CJLMTBC                       Conference

```
 1    read the briefs.  I can't have a hearing before I've read them.
 2            MR. GORDON:  No, have a hearing during the week of the
 3    26th.
 4            THE COURT:  Oh, that same week.
 5            MR. GORDON:  I'm moving everything up a week.  The
 6    only thing is I want over the weekend because of the Martin
 7    Luther King holiday.  In other words, the 16th for them; the
 8    26th for us; and the hearing perhaps the 28th, 29th, 30th of
 9    that week.  Whatever your Honor's schedule would accommodate.
10            THE COURT:  Actually, I don't usually hear oral
11    argument on motions, so I can't even predict.
12            MR. GORDON:  We can just actually leave that out.
13            THE COURT:  We could leave it out of the stipulation,
14    or we could say if necessary, there will be a hearing on -- so
15    that everybody at least can plan for it.
16            MR. GORDON:  Can I ask for the 27th rather than the
17    26th so we can actually get a work day to make up for that
18    Martin Luther King day?
19            THE COURT:  That's fine.  You have a lot of people to
20    coordinate with, too.
21            If it goes, I'm supposed to start a trial on the 26th.
22    So in terms of a hearing -- there's always that "if it goes",
23    but if it goes....
24            The best day for a hearing would probably be Friday,
25    February 13th -- not to be suspicious -- Friday the 13th at
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

3CJLMTBC                       Conference

```
 1    10:00 o'clock.  That's the best day I see for a hearing.  But
 2    that could be moved up if the two-week trial goes away, as
 3    trials tend to do.
 4            MR. GORDON:  I did not mean to imply we were
 5    requesting oral argument on this.  We'd be happy to waive that.
 6            THE COURT:  Let's see if I think I need it.  Let's
 7    also set a time on February 13th.  We'll make it at 10:00.  As
 8    far as Mr. Sacripanti's suggestion of scheduling a date --
 9            MR. SACRIPANTI:  I have a different suggestion now.
10    That's withdrawn.
11            THE COURT:  What's the latest one?
12            MR. SACRIPANTI:  The latest, Your Honor, is you set a
13    date, and may I suggest January 5th, that if anyone objects, to
```

Page 16

Exhibit 5
Page 16 of 19

3CJLMTBC

14   notify the Court by that date in writing.  And if they don't,
15   they don't.  I want to preserve for people who aren't here the
16   opportunity to say, Your Honor, those guys were nuts, okay?  So
17   if we can do January 5th, that would be great.
18          THE COURT:  Sounds okay with me.  What does anybody
19   else think?  If anybody objects to the stipulation who is not
20   part of the stipulation because they weren't here, they can
21   file a written objection, so to speak.  And we'll see, if we
22   get any, what to do about it.
23          MR. SACRIPANTI:  Right, exactly.
24          THE COURT:  In the meantime, everybody's committed to
25   the schedule who is here.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    35
3CJLMTBC              Conference
 1          MR. SACRIPANTI:  We're committed to the schedule.  I
 2   just want to represent those who aren't here.
 3          MR. GORDON:  Here's my concern:  We're obligating
 4   ourselves to take certain actions.
 5          THE COURT:  And they are, too.  They're going to file
 6   a brief on the 16th of January no matter what.  They want to
 7   just say to anybody who wasn't here today who has something to
 8   say, Say it by January 5th or forever hold their peace.
 9          MR. GORDON:  Court's indulgence.
10          (Off the record)
11          MR. GORDON:  Judge, I just want to -- we're going to
12   other courts and taking a certain position.  If the stipulation
13   does not happen at the end of the day because on January 5th
14   people come in and say, We actually don't agree, we have to be
15   able to then no longer be bound by this.
16          THE COURT:  I think that's right.  Or for some reason
17   the stipulation is --
18          MR. SACRIPANTI:  Reversed, held -- voided.
19          THE COURT:  Voided.  That's a good word.  Thank you
20   very much.  Then everybody will act accordingly.  But I really
21   don't anticipate -- I think it's a fail-safe for people that
22   aren't here.
23          MR. SACRIPANTI:  And we'll make the notice shorter.
24   We don't want to be voided.  So we'll make the notice --
25          THE COURT:  No, I think January 5th is the right date.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    36
3CJLMTBC              Conference
 1          MR. SACRIPANTI:  And we give people notice, and if
 2   it's voided, all bets are off.
 3          THE COURT:  I don't see why that should happen.  It's
 4   an unlikely event.  It's an unlikely event.  It's just kind of
 5   a due process.
 6          MR. EIMER:  The only problem we have with this, now,
 7   one last gap, there's some actions that need to be taken in
 8   other districts as a result of remand motions they've filed,
 9   and we're assuming we don't have to do anything, because there
10   will be a deal, we assume, but Mr. Gordon is saying he doesn't
11   want to stay those cases until after January 5th.
12          MR. GORDON:  I'm concerned about it, because I could
13   be tying my hands on the one hand while other guys hit me, is
14   my concern.
15          THE COURT:  Hit you with what?
16          MR. GORDON:  While they, in other jurisdictions,
17   they're moving for their courts to make decisions or not make
18   decisions or transfer.
                        Page 17

                        Exhibit 5
                      Page 17 of 19

3CJLMTBC

19          THE COURT:  They're not.  They were moving for stays
20     around the country, as you know.  We have to be a little bit
21     realistic.  I'll try to issue an order in the MDL cases that
22     incorporates this and sends it out everywhere.  Most judges
23     aren't really anxious to work between Christmas and New Years
24     on a remand motion.  It's not a high priority.  Most people
25     want to buy presents and wrap them and celebrate.  They're not
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    37

3CJLMTBC                    Conference
 1     dying to decide this.
 2          MR. GORDON:  Although this would make a nice present.
 3          THE COURT:  I'll issue an order.  I think they have
 4     other things to do in the next 10 days.  I don't know that
 5     they're rushing to decide a difficult remand motion.
 6          What I need is a service list or something.
 7          MR. SACRIPANTI:  By close of business, we'll provide
 8     you with a list of all removal issues and the judges.
 9          THE COURT:  And you'll coordinate with plaintiffs to
10     do your best to be sure that the list is complete?
11          MR. SACRIPANTI:  Yes.
12          MR. GORDON:  May I ask one question?  I assume you
13     have everybody in here who was part of the DJ action, because I
14     know not all the defendants agreed to do that.
15          I know you sort of took the lead.  I assume the part
16     that says that you're going to -- that you control the DJ
17     actions and you're agreeing to immediate transfer of those
18     cases, to a stay of that --
19          MR. SACRIPANTI:  Marathon's not here.  Marathon's not
20     here.
21          THE COURT:  And you didn't try to call that party?
22          MR. LANGAN:  I can't imagine it will be a problem.  It
23     won't be.
24          THE COURT:  There are expressions of confidence --
25          MR. GORDON:  Can we get an answer to that by the end
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    38

3CJLMTBC                    Conference
 1     of business today?
 2          MR. SACRIPANTI:  I can tell you we'll move posthaste
 3     to all of them, reach out to them.  But why don't you give me
 4     till Monday.
 5          MS. ROSENBLATT:  I think he's out of town.
 6          THE COURT:  Who represents Marathon?  What law firm?
 7          MS. ROSENBLATT:  Baker, Botts.
 8          THE COURT:  Just coordinate it.
 9          Does anybody want to propose language for the order,
10     the very short order I'm going to try to draft in the MDL
11     manner?  It will have an MDL caption.  I'll try to draft
12     something, but if anybody has an idea of the proposed language,
13     I'd be happy to hear you.
14          MR. SACRIPANTI:  Would you like us to send you --
15     we'll try to work and have a joint --
16          THE COURT:  I'd like to get it out by the end of the
17     day.
18          MR. SACRIPANTI:  So would we.
19          MR. EIMER:  We'll work one out this afternoon.
20          THE COURT:  You're welcome to stay.  Sit around the
21     table and do it.  Let's see what I have next.
22          I don't have a matter in this courtroom until 2:30.
23          MR. MCNEW:  Okay.
                         Page 18

                         Exhibit 5
                      Page 18 of 19

3CJLMTBC

24        THE COURT:  Folks, if you find yourselves here, you're
25   welcome to work here.  There's no matter in this courtroom
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                          39

3CJLMTBC              Conference
1    until 2:30.
2         MR. SACRIPANTI:  Thank you, your Honor.
3         THE COURT:  You're welcome to stay.  We don't have
4    cookies or coffee, but you're welcome to stay.
5         (Adjourned sine die)
6                    o O o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

Exhibit 5
Page 19 of 19

C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**ORDER**

In Re: Methyl Tertiary Butyl Ether ("MTBE")          Master File C.A. No.
Products Liability Litigation                                        1:00-1898(SAS)
                                                                              MDL 1358

---

This document refers to:

*County of Nassau v. Amerada Hess Corp., et al.*, No. 03-cv-9543
*Water Authority of Western Nassau County v. Amerada Hess Corp, et al.*, No. 03-cv-9544
*Incorporated Village of Mineola, et al. v. AGIP Inc., et al.*, No. 03-cv-10051
*West Hempstead Water District v. AGIP Inc., et al.*, No. 03-cv-10052
*Carle Place Water District v. AGIP Inc., et al.*, No. 03-cv-10053
*Town of Southampton v. AGIP Inc., et al.*, No. 03-cv-10054
*Village of Hempstead v. AGIP Inc., et al.*, No. 03-cv-10055
*Town of East Hampton v. AGIP Inc., et al.*, No. 03-cv-10056
*Westbury Water District v. AGIP Inc., et al.*, No. 03-cv-10057

---

The Court, upon hearing counsel for plaintiffs and certain defendants at a conference in the above-referenced cases in response to defendants' motions to stay proceedings in these cases and plaintiffs' motions for their remand, and upon stipulations there agreed to on the record by the parties present, finds, in the above-captioned proceeding, that it is appropriate for the issues presented by these motions in these and all similar removed actions, wherever filed, to be heard and decided by this Court.

Accordingly, all proceedings in the cases set forth in the attached Schedule should be stayed pending transfer to this Court sitting in its capacity as the MDL No. 1358 court. This Court respectfully requests that all courts to which the scheduled cases have been removed GRANT ALL MOTIONS TO STAY those cases pending transfer to MDL No. 1358.

The parties have agreed to the following consolidated briefing schedule, which is hereby So Ordered: defendants' opposition to plaintiffs' motion to remand shall be served and filed by January 16, 2004, and plaintiffs' reply in further support of the motion to remand shall be served and filed by January 27, 2004. Defendants' motion to stay in the above-referenced cases is DENIED because this Court will consider and decide the consolidated motion to remand forthwith.

Dated: December 23, 2003

Honorable Shira A. Scheindlin
United States District Judge

Exhibit 6
Page 1 of 5

## SCHEDULE

| Sate | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|------|-----------------|--------------|-----------------|----------------|
| CA | *California-American Water Co. v. Unocal Corp., et al.* | 11/26/03 | N.D. Cal. C 03-5379 JSW | Jeffrey S. White |
| CA | *City of Fresno v. Chevron U.S.A. Inc., et al.* | 11/26/03 | N.D. Cal. C 03-5378 JSW | Jeffrey S. White |
| CA | *City of Riverside v. Atlantic Richfield Co., et al.* | 12/12/03 | C.D. Cal. EDCV03-1460 RT SGLx | Robert J. Timlin |
| CA | *City of Roseville v. Atlantic Richfield Company, et al.* | Not yet removed | | |
| CA | *Orange County Water District v. Unocal Corp., et al. (Amended)* | 12/05/03 | C.D. Cal. SACV03-1742 JVS (ANx) | James V. Selna |
| CA | *People v. Unocal Corp., et al.* | 12/10/03 | E.D. Cal. CIV.S-03-2653 GEB DAD | Garland E. Burrell, Jr. |
| CA | *Quincy Community Services District v. Atlantic Richfield Co., et al.* | 12/17/03 | E.D. Cal. CIV S-03-2582 WBS DAD | Hon. William B. Shubb |
| CA | *Silver, et al. v. Alon USA Energy, Inc., et al.* | 12/03/03 | S.D. Cal. 03 CV 2408 WQH (RBB) | William Q. Hayes |
| | | | | |
| CT | *American Distilling & Mfg. Co., Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. 3:03-CV-1926 | Hon. Stefan R. Underhill |
| CT | *Canton Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn. 3:03-CV-1921 | Hon. Stefan R. Underhill |
| CT | *Childhood Memories v. Amerada Hess, et al.* | 11/10/03 | D. Conn. 3:03-CV-1924 | Hon. Alvin W. Thompson |
| CT | *Columbia Bd. of Education v. Amerada Hess, et al.* | 11/10/03 | D. Conn. 3:03-CV-1923 | Hon. Stefan R. Underhill |
| CT | *Our Lady of Rosary Chapel v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. 3:03-CV-1925 | Hon. Stefan R. Underhill |
| CT | *Town of East Hampton v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. 3:03-CV-1927 | Hon. Stefan R. Underhill |
| CT | *United Water Connecticut, Inc. v. Amerada Hess Corp., et al.* | 11/10/03 | D. Conn. | Hon. Stefan R. Underhill |

Exhibit 6
Page 2 of 5

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| | | | 3:03-CV-2017 | |
| | | | | |
| FL | *Escambia County Utilities Auth. v. Adcock Petroleum, Inc., et al.* | 11/25/03 | N.D. Fla. (Pensacola) 3:03-CV-539 | Hon. L.A. Collier Hon. M. Davis, U.S.M.J. |
| IA | *City of Galva, Ida Grove & Sioux City v. Amerada Hess Corp., et al.* | 11/24/03 | S.D. Iowa 4:03-CV-90663 | Hon. Robert W. Pratt |
| IL | *City of Crystal Lake v. Amerada Hess Corp.* | 12/12/03 | N.D. Ill. (Eastern Div.) 03-CV-8973 | Hon. George W. Lindberg |
| IN | *City of Mishawaka v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-904 | Hon. Robert Miller, Jr. |
| IN | *City of Rockport v. Amerada Hess Corp., et al.* | 11/21/03 | S.D. Ind. (Evansville) 3:03-CV-201 | Hon. Richard L. Young Hon. William G. Hussmann, Jr., U.S.M.J. |
| IN | *North Newton School Corporation v. Amerada Hess Corporation, e t al.* | 12/12/03 | N.D. Ind. (Lafayette) 4:03-CV-013 | Hon. Allen Sharp |
| IN | *City of South Bend v. Amerada Hess Corporation, et al.* | 12/12/03 | N.D. Ind. (South Bend) 3:03-CV-905 | Hon. Allen Sharp |
| KS | *Chisholm Creek Utility Auth  v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1457 | Hon. Wesley E. Brown |
| KS | *City of Bel Aire v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1458 | Hon. Wesley E. Brown |
| KS | *City of Dodge City v. Alon USA Energy, Inc., et al.* | 12/15/03 | D. Kan. 03-CV-1456 | Hon. Monti L. Belot |
| KS | *City of Park City v. Alon USA Energy, Inc.* | 12/15/03 | D. Kan. 03-CV-1455 | Hon. Thomas J. Marten |
| MA | *Brimfield Housing Auth. v. Amerada Hess Corp., et al.* | 11/26/03 | D. Mass. 03-CV-12399 | Hon. Richard G. Stearns |
| NH | *City of Dover v. Amerada Hess Corporation, et al.* | Not yet removed | | |

Exhibit 6
Page 3 of 5

| State | Short Case Name | Date Removed | Court / Index No. | Assigned Judge |
|---|---|---|---|---|
| NH | City of Portsmouth v. Amerada Hess Corporation, et al. | Not yet removed | | |
| NH | State of New Hampshire v. Amerada Hess Corp., et al. | 09/30/03 | D.R.I. 03-CV-529 | Hon. Ronald R. Lagueux |
| | | | | |
| NJ | NJ American Water Co., Inc. v. Amerada Hess Corp., et al. | 11/24/03 | D.N.J. 03-CV-5562 | Hon. William G. Bassler |
| | | | | |
| NY | Carle Place Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10053 | Hon. Shira A. Scheindlin |
| NY | County of Nassau v. Amerada Hess Corp., et al. | 12/02/03 | S.D.N.Y. 03-CV-9543 | Hon. Shira A. Scheindlin |
| NY | Long Island Water Corp. v. Amerada Hess, et al. | 12/04/03 | E.D.N.Y. 03-CV-6125 | Hon. Arthur D. Spatt Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Town of East Hampton v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10056 | Hon. Shira A. Scheindlin |
| NY | Town of Southampton v. AGIP Inc, et al. | 12/18/03 | S.D.N.Y. 03-cv-10054 | Hon. Shira A. Scheindlin |
| NY | Village of Mineola; Water Dept. of Village of Mineola v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10051 | Hon. Shira A. Scheindlin |
| NY | Water Authority of Great Neck North v. Amerada Hess Corp., et al. | 10/28/03 | E.D.N.Y. 03-CV-6077 | Hon. Arthur D. Spatt Hon. Michael L. Orenstein, U.S.M.J. |
| NY | Water Authority of Western Nassau County v. Amerada Hess, et al. | 10/01/03 | S.D.N.Y. 03-CV-9544 | Hon. Shira A. Scheindlin |
| NY | Westbury Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10057 | Hon. Shira A. Scheindlin |
| NY | West Hempstead Water District v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10052 | Hon. Shira A. Scheindlin |
| NY | Village of Hempstead v. AGIP Inc., et al. | 12/18/03 | S.D.N.Y. 03-cv-10055 | Hon. Shira A. Scheindlin |
| | | | | |
| PA | Pennsylvania Suburban Water Co. v. Sunoco, Inc. | Not yet removed | | |
| | | | | |

Exhibit 6
Page 4 of 5

| State | Short Case Name | Date Removed | Court/Index No. | Assigned Judge |
|---|---|---|---|---|
| VA | Buchanan County School Board v. Amerada Hess Corporation | Not yet removed | | |
| VA | Greensville Co. Water & Sewer Authority v. Amerada Hess Corporation | Not yet removed | | |
| VA | Patrick County Sch. Board v. Amerada Hess Corp., et al. | Not yet removed | | |
| | | | | |
| VT | Town of Hartland, County of Windsor, Vermont Water System v. Amerada Hess Corp., et al. | 12/11/03 | D. Vt. 2:03-CV-337 | Hon. William K. Sessions, III |

Exhibit 6
Page 5 of 5

D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
                                              :
**In re: Methyl Tertiary Butyl Ether**        :
**("MTBE") Products Liability Litigation**    :
                                              :     **OPINION AND ORDER**
                                              :
**This Document Relates To:   All Cases**     :     **MDL No. 1358 (SAS)**
                                              :
                                              :
-------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

 This consolidated multi-district litigation ("MDL") initially involved

several putative class actions brought on behalf of private well-owners seeking

relief from contamination of their wells.  By opinion and order dated July 16,

2002, I denied plaintiffs' motion for class certification, *see In re: Methyl Tertiary*

*Butyl Ether ("MTBE") Products Liability Litigation*, 209 F.R.D. 323 (S.D.N.Y.

2002), and the putative class actions subsequently settled.

 In 2003, dozens of new MTBE products liability cases were filed in

state courts around the country.  The new actions are brought by numerous

plaintiffs, including states, cities, municipalities and entities, seeking relief from

contamination or threatened contamination of groundwater.  Defendants removed

many of the actions to federal court.  Many of the cases removed to the Southern

District of New York were assigned to me as the presiding judge over MDL 1358;

others removed to this district were transferred to me as related cases.  Defendants

asked that cases removed to other federal district courts be transferred to this

Court, pursuant to Rule 7.4 of the Rules of the Judicial Panel on Multidistrict

Litigation ("JPML") and 28 U.S.C. § 1407.  On February 6, 2004, the JPML

transferred thirteen cases to this Court,[1] and an additional thirty cases were

conditionally transferred on February 25, 2004.

Plaintiffs now move to remand all of these actions to the state courts,

arguing that the federal court lacks subject matter jurisdiction.

## I.    BACKGROUND

### A.    The Allegations

The complaints, though not identical, allege essentially the same

facts.[2]  MTBE is a chemical compound that is a by-product of the gasoline refining

process.  It has enhanced solubility in water, and is chemically attracted to water

---

[1]    Originally, the February 6 transfer order conditionally transferred sixteen cases to the Southern District of New York.  Within fifteen days of the conditional transfer, parties in three of the actions filed objections.  Therefore, the transfers of those three cases is stayed pending resolution by the Panel of the objections.  No objections were filed in the remaining thirteen actions, and the transfer of those actions became effective on February 24, 2004.

[2]    The facts recited herein are mere allegations, and do *not* constitute findings of the Court.  Because the facts alleged in the various complaints are more or less identical, and any differences do not affect the jurisdictional analysis, for purposes of this motion I will describe and refer to the allegations set forth in *Water Authority of Western Nassau v. Amerada Hess Corp. et al.*, No. 03 Civ. 9544, and defendants' Notice of Removal in the same action.

2

molecules. Sometime after 1979, in an effort to boost the octane level in higher grades of gasoline, defendants began manufacturing, distributing and/or selling gasoline containing MTBE in concentrations averaging approximately two to four percent by weight. Since 1990, defendants have added MTBE to gasoline in concentrations of up to fifteen percent. The publicly articulated justification for adding MTBE to gasoline is that it helps fuel burn more efficiently, thereby reducing air pollution. *See* Complaint ¶¶ 68-70, 72, 74, 155, 158.

Whenever gasoline containing MTBE leaks, spills or is otherwise released into the environment, it travels rapidly and contaminates groundwater. This contamination causes water to have a foul smell, and renders it unusable and unfit for human consumption. Moreover, MTBE is a known animal carcinogen, and is linked to many potential human health problems. Water contamination occurs from normal, everyday use of gasoline containing MTBE -- *e.g.* gasoline drips from gas station pumps -- and when MTBE is stored in leaking underground tanks. MTBE is also discharged into the air as exhaust as a bi-product of car engine combustion of gasoline containing MTBE. As a result, groundwater is further contaminated because rain returns the discharged MTBE to the soil. *See id.* ¶¶ 78, 80-84, 121.

3

Plaintiffs allege that as early as 1980, defendants were aware of the risk that MTBE posed to groundwater because of well contamination in Rockaway, New Jersey. Throughout the 1980s and 90s, subsequent contamination of other wells and aquifers, as well as scientific studies and reports, confirmed the risks posed by MTBE. Although defendants publicly denied the risks, their own documents confirm that they were aware of the harm posed by their use of MTBE. *See id.* ¶¶ 97-106, 113-120.

Because adding MTBE to gasoline allowed defendants to cheaply increase the octane levels in gasoline, and provided a use for the refining process by-product, defendants conspired to convince the public and the Environmental Protection Agency ("EPA") that adding MTBE to gasoline is safe and desirable. Defendants thereafter failed to provide EPA with information it sought regarding MTBE's safety, and persuaded EPA not to undertake additional testing of MTBE *See id.* ¶¶ 122-136, 147-149. These actions constitute "Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing MTBE's real environmental hazards, all of which Defendants knew or should have known . . .". *Id.* ¶ 137.

Despite their knowledge of the threat posed by MTBE, defendants have continued to use MTBE as an oxygenate in gasoline and have even increased

4

the concentrations, although safer alternatives are available.  Moreover, plaintiffs

claim that defendants had a duty to disclose the risk of MTBE, but failed to do so.

*See id.* ¶¶ 96, 144, 145, 158, 161.

As a result of defendants' actions and their failure to warn, MTBE is

the second most frequently detected chemical in groundwater in the United States,

and wells throughout the country are contaminated.  The nation's drinking water is

threatened by the contamination.  *See id.* ¶¶ 163-168.

Based on these facts, plaintiffs assert causes of action for (1) public

nuisance, (2) strict liability for design defective and/or defective product, (3)

failure to warn, (4) negligence, (5) private nuisance, (6) deceptive business acts

and practices in violation of New York's General Business Law, and (7) violation

of the New York Oil Spill Prevention, Control and Compensation Act.  *See id.* ¶¶

184-233.  Plaintiffs also allege that defendants conspired to conceal the dangers of

MTBE and mislead the public and the EPA.  Because MTBE released into the

environment lacks identifying characteristics, it is impossible to identify the

manufacturer responsible for specific groundwater contamination.  Plaintiffs

therefore allege market share, concert of action and enterprise liability.  *See id.* ¶¶

170, 174, 176, 178, 180-183.

5

### B.    Grounds for Removal

Defendants removed the actions to federal court, asserting four grounds for federal subject matter jurisdiction: (1) federal agent jurisdiction pursuant to section 1442(a)(1) of Title 28; (2) preemption; (3) bankruptcy jurisdiction, pursuant to section 1334(b) of Title 28[3]; and (4) substantial federal question.

In support of removal, defendants allege that in 1977, Congress amended the Clean Air Act to federalize fuel content requirements. *See* 42 U.S.C. § 7545.  Pursuant to the amendment, EPA has express and exclusive authority to determine what fuels and fuel additives are sold nationwide. *See* Defendants' Notice of Removal ¶¶ 13, 14.  By Federal Regulations issued in 1979 and 1981, EPA allowed MTBE to be added to gasoline in amounts of up to fifteen percent by weight.[4] *See* 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979); 46 Fed. Reg. 38,582 (July 28, 1981); Defendants' Notice of Removal ¶ 15.

---

[3]        It is undisputed that Texaco, the predecessor to defendant ChevronTexaco, filed for bankruptcy on April 12, 1987.  The bankruptcy court confirmed Texaco's reorganization plan on March 23, 1988.

[4]        Notably, EPA's regulations pertaining to fuel content span more than 400 pages of the Code of Federal Regulations.  Defendants' Notice of Removal ¶ 33.

In 1990, Congress further amended the Clean Air Act. Among other things, the amendments created two programs that require petroleum refiners to blend oxygenates into gasoline sold throughout much of the country. These programs -- the Oxygenated Fuel Program ("OFP") and the Reformulated Gasoline ("RFG") Program -- were designed to reduce emission of toxic air pollutants. According to defendants, at the time the amendments were enacted, Congress was aware that only a limited number of oxygenates could be blended with gasoline to meet the requirements, and MTBE would have to be used for at least some of the gasoline sold in areas affected by the programs. Defendants' Notice of Removal ¶¶ 16-20. Moreover, "Congress and [the] EPA fully understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the United States," id. ¶ 19 (citing 136 Cong. Rec. S6383 (daily ed. May 16, 1990) (statement of Sen. Daschle)), and "intended that petroleum refiners use MTBE in gasoline," id. ¶ 23.

In 1991, pursuant to the 1990 amendment to the Clean Air Act, the EPA approved the use of seven compounds to achieve the requirements set forth in the OFP.[5] These additives are: (1) MTBE, (2) ethanol, (3) methanol, (4) tertiary

---

[5]    In 1994, EPA approved the same seven additives for use in the RFG Program. See id. ¶ 29.

amyl methyl ether, (5) ethyl tertiary butyl ether, (6) tertiary butyl alcohol, and (7) diisoproyl ether. *See id.* ¶ 26 (citing Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of the Clean Air Act as Amended, 56 Fed. Reg. 31,151, 31,154 (July 9, 1991)). According to defendants, "[l]ike Congress, the EPA understood that MTBE would be 'the most common oxygenating compound' used by refiners to comply with the CAA's new air emissions standards." *Id.* ¶ ¶ 28 (quoting Approval and Promulgation of Implementation Plan, 56 Fed. Reg. 5,458, 5,465 (Feb. 11, 1991)), 29, 31.

Finally, defendants claim that when the EPA approved MTBE for use in compliance with the OFP and RFG Program, it knew of the risk that MTBE posed to groundwater, and further knew that there was not a sufficient nationwide supply of ethanol, or even an infrastructure to create ethanol, to satisfy the program requirements. Accordingly, EPA knew that the *only* way refining companies could meet the requirements promulgated in the OFP and RFG Programs, and thereby comply with the Clean Air Act, was to use MTBE as a gasoline additive. Congress and the EPA therefore effectively directed defendants to use, manufacture and/or sell gasoline that contains MTBE. *See id.* ¶¶ 19, 23, 34.

8

## II.   APPLICABLE LAW

### A.   General Principles

A defendant seeking removal bears the burden of establishing federal

subject matter jurisdiction. *See Carson v. Dunham*, 121 U.S. 421, 425-26 (1887);

*Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). Moreover, the rules

for removal are strictly construed. *See Syngenta Crop Prot., Inc. v. Henson*, 537

U.S. 28, 31 (2002). It is well-established that "[t]o determine whether the claim

arises under federal law, [courts] examine the 'well pleaded' allegations of the

complaint and ignore potential defenses: 'a suit arises under the Constitution and

laws of the United States only when the plaintiff's statement of his own cause of

action shows that it is based upon those laws or that Constitution.'" *Beneficial*

*Nat'l Bank v. Anderson*, 539 U.S. 1, --, 123 S. Ct. 2058, 2062 (2003) (quoting

*Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1914)). "As a

general rule, absent diversity jurisdiction, a case will not be removable if the

complaint does not affirmatively allege a federal claim." *Id* at 2062.

There are, however, two exceptions to the general rule. *First*, a state

law claim may be removed to federal court when the claim is completely

preempted by federal law. "When the federal statute completely pre-empts the

state-law cause of action, a claim which comes within the scope of that cause of

9

action, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b), which authorizes any claim that 'arises under' federal law to be removed to federal court." *Beneficial Nat'l Bank*, 123 S. Ct. at 2063. The Supreme Court has found "complete preemption" in only two types of cases: certain causes of action under the Labor Management Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA"). *See id.* Recently, the Second Circuit found complete preemption in a third category of cases: those arising under the Securities Litigation Uniform Standards Act ("SLUSA"). See *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 124 n. 5 (2d Cir. 2003). In so finding, the Court of Appeals emphasized that "the complete preemption doctrine must be applied sparingly and with great restraint." *Id.*

*Second*, an action may be removed to federal court where Congress so provides. Thus, where a statute specifically gives federal courts jurisdiction over a particular subject matter, and states that actions involving that subject matter may be removed to federal court despite the absence of federal claims, removal is proper even where the "well-pleaded complaint" rule is not satisfied. *See, e.g.*, 42 U.S.C. § 2014 (providing federal courts with jurisdiction over tort actions arising from nuclear accidents expressly allowing removal of such actions even when only

10

state law claims are asserted); *see also Beneficial Nat'l Bank,* 123 S. Ct. at 2062-63 (discussing statutes that expressly allow removal to federal court even where no federal cause of action is asserted on the face of the complaint).

**B.   Federal Agent Jurisdiction**

**1.   Background**

Section 1442(a) of Title 28 provides that, "[a] civil action [] commenced in a State court against [] the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:  [] Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office . . .".  28 U.S.C. § 1442(a)(1).  This statute falls into the second of the two exceptions to the well-pleaded complaint rule because Congress has expressly provided that actions against persons acting under color of an office or agency of the United States may be removed to federal court, despite the absence of any federal cause of action.  *See Jefferson County v. Acker,* 527 U.S. 423, 431 (1999) ("Suits against federal officers are exceptional in this regard.  Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint"); 16 James Wm. Moore et al., *Moore's Federal Practice,* ¶ 107.15[1][b] ("[T]here is no requirement that the state action [removed

11

pursuant to section 1442(a)] be one that could have been originally filed in the federal courts.").

Although section 1442(a) permits removal regardless of whether the complaint *states* a federal cause of action, the action must nonetheless *raise* an issue of federal law. *See* U.S. Const., art. III § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority. . ."). This requirement is met if the defense depends on federal law. "It is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." *Mesa v. California*, 489 U.S. 121, 126 (1989). *See also Jefferson County*, 527 U.S. at 430-31 ("Under the federal officer removal statute . . . the federal-question element is met if the defense depends on federal law.").

The Supreme Court has explained the justification for the federal officer removal statute:

> The purpose of [the statute in its various forms throughout history] is not hard to discern. As this Court said nearly 90 years ago in *Tennessee v. Davis*, 100 U.S. 257, 263, 25 L. Ed. 648

12

> (1880), the Federal Government can act only through its officers
> and agents, and they must act within the States. If, when thus
> acting, and within the scope of their authority, those officers can
> be arrested and brought to trial in a State court, for an alleged
> offense against the law of the State, yet warranted by the Federal
> authority they possess, and if the general government is powerless
> to interfere at once for their protection,--if their protection must
> be left to the action of the State court,--the operations of the
> general government may at any time be arrested at the will of one
> of its members. For this very basic reason, the right of removal
> under s 1442(a)(1) is made absolute whenever a suit in a state
> court is for any act under color of federal office, regardless of
> whether the suit could originally have been brought in a federal
> court.    Federal jurisdiction rests on a federal interest in the
> matter, the very basic interest in the enforcement of federal law
> through federal officials.

*Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (citations and quotation marks

omitted); *see also Mesa*, 489 U.S. at 126.

The Supreme Court has emphasized that the federal officer removal

statute is neither narrow nor limited, and has rejected lower court interpretations

that circumscribe its scope. *See Willingham*, 395 U.S. at 406 (the policies

underlying section 1442(a) "should not be frustrated by a narrow, grudging

interpretation"); *Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981); *Reiser v.*

*Fitzmaurice*, No. 94 Civ. 7512, 1996 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996)

("The policy of supremacy underlying section 1442(a)(1) has prompted federal

courts to construe it broadly . . ."). A defendant seeking to remove pursuant to

13

section 1442(a) need only provide "candid, specific and positive" allegations that the conduct complained of was undertaken pursuant to the directions of a federal office or agency. *Willingham*, 395 U.S. at 409. "A plaintiff may not challenge the factual allegations in the notice of removal, but the plaintiff may challenge their legal sufficiency." 16 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 107.15[1][b][iv][B]; *see also Colorado v. Symes*, 286 U.S. 510, 518-19 (1932).

Moreover, if a case is properly removed pursuant to section 1442(a)(1), the district court has discretion to retain jurisdiction and adjudicate the merits of the case even after the federal officer or agency aspect is dismissed. *See IMFC Prof. Derv. of Florida, Inc. v. Latin America Home Health, Inc.*, 676 F.2d 152, 158-60 (5th Cir. 1982) ("[E]limination of the federal officer from a removed case does not oust the district court of jurisdiction"); *Watkins v. Grover*, 508 F.2d 920, 921 (9th Cir. 1974) ("The modern rule (and the law of this circuit) is that a federal court does have the power to hear claims that would not be independently removable even after the basis for removal jurisdiction is dropped from the proceedings."); *New Jersey Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Serv. Inc.*, 719 F. Supp. 325, 334 (D.N.J. 1989) ("If a court dismisses the federal defendant from [] a case [removed pursuant to section 1442(a)(1)], it must use its

discretion to decide whether to remand the remaining ancillary claims to state court or to maintain jurisdiction over those claims.").

## 2.   Requirements

Under section 1442, a private party may remove a state court action if (1) it acted under the direction of a federal agency or officer; (2) it has a colorable federal defense; and (3) there is a causal nexus between the federal direction and the conduct in question. *See Jefferson County*, 527 U.S. at 431; *Mesa*, 489 U.S. at 124-25; *In re Agent Orange Product Liab. Litig.*, No. 98 Civ. 6383, 2004 WL 231187, at *3 (E.D.N.Y. Feb. 9, 2004)[6]; 16 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 107.15[1][b][ii].

---

[6]   In *In re Agent Orange*, Judge Jack B. Weinstein described the three requirements slightly differently: "First, a defendant must demonstrate that it is a 'person' within the meaning of the statute. Second, the defendant must establish that the suit is for any act under color of [federal] office, i.e., there is a causal connection between the charged conduct and asserted official authority. Causation exists if the predicate acts of the state suit were undertaken while a person was acting as or under a federal officer, and the acts were under color of the relevant federal office. Third, defendants must raise a colorable claim to a federal law defense." 2004 WL 231187 at *3 (quotation marks omitted). Nonetheless, the substance of the requirements is the same.

There is no doubt that the defendants in these actions constitute "persons" for purposes of section 1442(a) because "unless the context indicates otherwise . .. the words 'person' and 'whoever' include corporations, companies, . . . , and joint stock companies, as well as individuals. . . ." 1 U.S.C. § 1; *see also Group Health Inc. v. Blue Cross Ass'n*, 587 F. Supp. 887, 890 (S.D.N.Y. 1984) (corporations are entitled to remove under section 1442(a)).

15

A defendant meets the first requirement of "acting under the direction of a federal agency or officer" by "showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 946-47 (E.D.N.Y. 1992); *see also Bakalis v. Crossland Sav. Bank*, 781 F. Supp. 140, 145 (E.D.N.Y. 1991) ("The rule that appears to emerge from the case law is one of 'regulation plus.'"). Although there is "no precise standard for the extent of control necessary to bring an individual with the 'acting under' clause," *Gurda Farms Inc. v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841, 844 (S.D.N.Y. 1973), "a cursory survey of the application of [section 1442(a)] reveals it has been construed broadly, and its 'persons acting under' provision particularly so," *id.* at 843.[7] *See also Agent Orange Product Liab. Litig.*,

---

[7]      The *Gurda* court undertook a thorough analysis of cases in which courts have found that defendants were "persons acting under" a federal office or agency. These include *State of Texas ex rel. Faulkner v. National Bank of Commerce*, 290 F.2d 229 (5th Cir. 1961) (quo warranto proceeding against banks operating branch offices on military bases held removable); *State of Texas v. Heaton*, 58 F.2d 656 (N.D.Tex. 1932) (upholding removal of a murder prosecution against federal prohibition agents and an informer working for them); *People of the State of Colorado v. Maxwell*, 125 F. Supp. 18 (D. Colo. 1954) (murder prosecution properly removed where city police chief, under the direction of an Air Force captain, arrested and shot a soldier); *Teague v. Grand River Dam Authority*, 279 F. Supp. 703 (N.D. Okl. 1968) (wrongful death action properly removed where defendant, acting under license from the Federal Power Commission and at the direction of a member of the Army Corps of Engineers,

2004 WL 231187, at *4 ("Courts interpret the [persons acting under color of federal office or agency] rule broadly to achieve the protective purpose of the statute.").

The second requirement for federal officer removal -- a colorable federal defense -- is also broadly construed. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. We therefore do not require the officer virtually to 'win his case before he can have it removed.'" *Jefferson County*, 527 U.S. at 431 (citation omitted) (quoting *Willingham*, 395 U.S. at 407). Thus, a defense may be "colorable" even if it is ultimately rejected by the court. *See id.* "[A]t the removal stage, it is not the Court's role to assess the validity of a particular defense. The Supreme Court made clear in *Willingham* that the phrase 'under color of . . .

---

opened floodgates resulting in a death); *Kuenstler v. Occidental Life Ins. Co.*, 292 F. Supp. 532 (C.D. Cal. 1968) (upholding removal of an action for $72 from the Small Claims Court against a private insurance company which had contracted with the federal government to administer benefit provisions of Medicare); *Allen v. Allen*, 291 F. Supp. 312 (S.D. Iowa 1968) (allowing removal of a garnishment action against a doctor who treated patients under Medicare); *State of Oregon v. Cameron*, 290 F. Supp. 36 (D. Or. 1968) (upholding removal of a criminal trespass action against VISTA volunteers who entered property to render medical assistance, on the grounds that the VISTA workers were persons acting under an officer of the United States and performed work contemplated by a federal statute, 42 U.S.C. § 2991, though they were not federal employees).

17

office' allows removal even if, on the record then existing, it could not be said that 'the officers had a clearly sustainable defense.'"   *Reiser*, 1996 WL 54326, at *3 (alteration in original); *see also Symes*, 286 U.S. at 519 (where a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith.").

Finally, the "causal nexus" element of section 1442(a) requires that the defendant aver, in the removal notice, that the act complained of by the plaintiff was undertaken pursuant to the directions of a federal office or agency. The Supreme Court has explained:

> The prosecution to be removed under the [federal officer removal statute] must have been instituted on account of acts done by the defendant as a federal officer under color of his office []. There must be causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him for whatever offense has arisen out of the acts done by him under color of federal authority and in enforcement of federal law . . .

*Maryland v. Soper*, 270 U.S. 9, 33 (1926) (quotation marks omitted). "The 'causal nexus' is [] satisfied when there is evidence of intimate government involvement in the design decisions causally related to the alleged tort. . . . [D]efendants must show that the government directed the actions on which the plaintiffs based their

18

claims." *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *5 (citing

*Arness v. Boeing North America Inc.*, 997 F. Supp. 1268, 1275 (C.D. Cal. 1998));

*see also Willingham*, 395 U.S. at 409.

## III.   DISCUSSION

### A.   Defendants Allege They "Acted Under a Federal Agency" When They Used MTBE as an Additive

In their Notice of Removal, defendants allege that the Clean Air Act,

and regulations promulgated thereunder, require them to blend oxygenates into

gasoline.  Although the EPA has identified seven additives that may be used to

meet these requirements, MTBE is the only approved oxygenate that is available

in quantities sufficient to comply with the Act and regulations.  Moreover,

defendants allege that at the time the Clean Air Act was amended and the seven

oxygenates were approved for use, both Congress and the EPA were aware that

defendants would *have to use* MTBE in order to comply with the Act's

requirements.  *See supra* Part I.B.  Thus, defendants have sufficiently alleged that

they added MTBE to gasoline at the direction of the EPA, a federal agency,

thereby meeting the first requirement of removal pursuant to section 1442(a)(1).

*See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998)

(holding that manufacturers of Agent Orange acted at the direction of a federal

19

office or agency, for purposes of the federal officer removal statute, because the federal government required defendants to produce Agent Orange to certain specifications).

This conclusion is supported by the case law and the policies underlying the federal officer removal statute. As noted above, the "persons acting under" requirement is broadly construed. *See Gurda Farms*, 358 F. Supp. at 844; *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *4. Moreover, remanding these cases to state court would pose precisely the risk that the Supreme Court warned against in *Willingham*. Specifically, defendants, having acted pursuant to directives of the federal government, would be "brought to trial in a State court, for an alleged offense against the law of the State, [and] . . . the general government [would be] powerless to interfere at once for their protection." 395 U.S. at 406. Such a prosecution has the potential to interfere with the enforcement of federal law.

Plaintiffs argue that a finding that defendants acted at the direction of a federal agency will "in effect, [] Federalize all tort litigation against manufacturers of products subject to Federal regulation -- cigarettes, automobiles, pharmaceuticals, asbestos, and many other consumer and industrial products too numerous too mention." Plaintiffs' Memorandum of Law in Support of Motion

20

To Remand ("Pl. Mem.") at 12.  This argument is not persuasive.  Defendants do not seek removal simply because gasoline is subject to regulation.  Instead, defendants argue that the federal government *required* them to add MTBE to gasoline, the conduct upon which plaintiffs' claims are based.  Thus, removal pursuant to section 1442(a)(1) is premised not on defendants' participation in a regulated industry, but rather the fact that defendants took actions at the express direction of the federal government, and those actions are the basis for the complaints.  There is simply no reason to believe that this invocation of the federal officer removal statute will "[f]ederalize all tort litigation," Pl. Mem at 12, because defendants in tort litigation do not typically assert that their actions were undertaken at the direction of the federal government.[8]

---

[8]    Moreover, the cases upon which plaintiffs rely in support of their argument are unavailing.  As an initial matter, *Ryan*, 781 F. Supp. 934, is no longer good law, to the extent it rejects invocation of the federal officer removal statute in the context of Agent Orange litigation.  *See Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *1 ("Federal jurisdiction is properly asserted under the federal officer removal statute.  A prior decision of this court reached a contrary conclusion in an Agent Orange case.  The *Ryan* decision is no longer persuasive.  As the Court of Appeals for the Fifth Circuit pointed out in rejecting *Ryan*'s conclusion, this court recognized its decision on the point as 'close' and 'uncertain.'" (citation omitted) (citing *Winters*, 149 F.3d at 392)).

Plaintiffs' reliance on *Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411 (D.N.H. 2002), and *Little Purdue Pharma L.P.*, 227 F. Supp. 2d 838 (S.D. Ohio 2002), is similarly misplaced.  In *Tremblay*, plaintiffs alleged that Philip Morris designed light cigarettes and manipulated their content to produce

21

### B.   Defendants Allege a Colorable Federal Defense

Defendants claim that plaintiffs' state law claims are expressly

preempted. Specifically, section 7545(c)(4)(A)(ii) of Title 42[9], a provision of the

---

misleading tar and nicotine ratings as measured by a method endorsed by the Federal Trade Commission. Neither plaintiffs nor defendant argued that Philip Morris designed the cigarettes and manipulated their content *at the direction of the FTC or any other federal agency*. Thus, plaintiffs' claims were not based on actions undertaken at the direction of a federal office or agency, and the district court rejected defendant's invocation of the federal officer removal statute. 231 F. Supp. 2d at 417-19.

Similarly, in *Little Purdue Pharma*, plaintiffs sought recovery for injuries arising from exposure to the prescription drug OxyContin. Defendants removed the action to federal court pursuant to section 1442(a)(1), arguing that because of the "highly regulated nature of the pharmaceutical industry, [] pharmaceutical manufacturers [should] be regarded as de facto federal officers." 227 F. Supp. 2d at 860. But the *Little Purdue Pharma* defendants did *not* allege that their actions giving rise to the complaint were undertaken at the direction of a federal office or agency, and the district court therefore rejected their argument. *See id.* at 861-62.

[9]      Section 7545(c)(4)(A)(ii) of the Clean Air Act states, in pertinent part,

> [N]o State (or political subdivision thereof) may prescribe or attempt to prescribe, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle engine . . . . if [EPA] has prescribed . . . a control or prohibition applicable to such characteristic or component of a fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by [EPA].

42 U.S.C. § 7545(c)(4)(A)(ii).

Clean Air Act, "forbade the states to regulate the content of fuels or fuel additives." Defendants' Opposition to Plaintiffs' Motion to Remand ("Def. Opp.") at 11. According to defendants, this provision expressly preempts any state statute that interferes with federal controls and/or prohibitions on fuel and fuel additives. Defendants argue that plaintiffs' state law claims seek to penalize defendants for adding MTBE to gasoline, and to ban MTBE's future use. Therefore, say defendants, the state law claims constitute an attempt to regulate the content of fuel and fuel additives, in violation of section 7545(c)(4)(A)(ii.). *See* Def. Opp. at 11, 23-28.

Alternatively, defendants contend that the doctrine of conflict preemption bars plaintiffs' state law claims. Conflict preemption requires a finding that either (1) it would be impossible for defendants to comply with both the state law sought to be imposed and the federal requirements; or (2) the state law sought to be imposed would prove an obstacle to the achievement and execution of the full purposes and objectives of Congress. *See English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). Defendants submit that because MTBE is the only approved oxygenate available in quantities necessary to meet the Clean Air Act's requirements, it would be impossible for them to adhere to the state laws sought to be imposed -- which would effectively ban MTBE -- and the federal

23

requirements.  Moreover, defendants argue that "finding them liable for using

MTBE, one of a limited number of federally approved oxygenates, would present

an obstacle to the achievement of the federal objectives of the CAA and the RFG

program."  *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability

Litigation*, 175 F. Supp. 2d 593, 614 (S.D.N.Y, 2001) ("*MTBE I*").

> At this stage of the litigation, there is no need to decide whether

defendants will prevail on either of these defenses.  The only issue is whether one

or both of these defenses is colorable.  *See Jefferson County*, 527 U.S. at 431;

*Willingham*, 395 U.S. at 407; *Symes*, 286 U.S. at 519; *Reiser*, 1996 WL 54326, at

*3.  Although I previously have rejected defendants' preemption arguments, *see*

*MTBE I*, 175 F. Supp. 2d at 611-16, defendants urge me to reconsider that ruling,

and emphasize that the allegations now before the Court are different than the

allegations in *MTBE I*.

> The preemption defenses argued in *MTBE I* were, without doubt,

colorable.  Moreover, since that decision, several courts have concluded that state

law claims involving MTBE contamination *are* conflict preempted.  *See Molloy v.*

*Amerada Hess Corp.*, No. 2001/396, slip op. at 5 (Dutchess Co. Aug. 1, 2002);

*Coppola v. Amerada Hess Corp.*, No. 2001/3995, slip op. at 5 (Dutchess Co. July

31, 2002); *Hixon v. Unocal Corp.*, Case No. BC 195295 (Super. Ct. Los Angeles

County, Aug. 23, 2001); *Kubas v. Unocal*, Case No. BC 191876 (Super. Ct. Los Angeles County, Aug. 23, 2001). Given these circumstances, I have no doubt that the preemption defenses asserted by defendants in this litigation are colorable. The allegations now before me are somewhat different than the allegations that were before me in *MTBE I*. Accordingly, defendants have the right to assert these defenses in the context of the current complaints. Because defendants need only assert a "colorable" federal defense in support of removal pursuant to section 1442(a)(1), they have met their burden.

### C.    Defendants Allege a "Causal Nexus"

Finally, defendants clearly allege that the acts upon which plaintiffs' claims are based -- namely, manufacturing and selling gasoline containing MTBE -- were undertaken at the direction of the EPA, a federal agency. Not only do defendants allege that they are participants in a highly regulated industry, they also claim that the federal government was "intimately [] involved" in their decision to add MTBE to gasoline. *Agent Orange Product Liab. Litig.*, 2004 WL 231187, at *5; *see also Willingham*, 395 U.S. at 409. Therefore, defendants sufficiently aver, in their notice of removal, the "causal nexus" required for removal pursuant to the federal officer removal statute.

25

## IV.   Other Grounds for Removal Not Considered

Because I conclude that the actions were properly removed pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), I need not address defendants' other proffered grounds for jurisdiction. *See Horne v. Coughlin*, 178 F.3d 603, 606 (2d Cir. 1999) (courts should avoid issuing advisory opinions on issues unnecessary for adjudication of the case before the court). Notably, however, defendants' preemption argument is the "colorable federal defense" underlying the removal pursuant to section 1442(a)(1), *see supra* Part III.B, and therefore undoubtedly will be fully addressed in subsequent motion practice.

Additionally, I note that defendants' argument regarding jurisdiction on the basis of a "substantial federal question" is troubling. The Supreme Court has said that a case may arise under federal law "where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 9 (1983). However, the Court has cautioned against broad interpretations of *Franchise Tax Board*, saying that it,

> did not purport to disturb the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction. . . . Far from creating some kind of automatic test, *Franchise Tax Board* thus candidly recognized the need for careful judgments about the

26

> exercise of federal judicial power in an area of uncertain jurisdiction. Given the significance of the assumed congressional determination to preclude federal private remedies, the presence of the federal issue as an element of the state tort is not the kind of adjudication for which jurisdiction would serve congressional purposes and the federal system.

*Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 813-14 (1986).  As noted above, though, I need not decide at this time whether jurisdiction based on substantial federal question would run afoul of *Merrell Dow Pharmaceuticals*.

Finally, though Texaco's 1987 bankruptcy may provide this Court with jurisdiction over ChevronTexaco, that bankruptcy certainly does not divest the state court of jurisdiction.  Because it is unclear that this litigation will implicate the bankruptcy at all, *see* Transcript of 2/13/04 oral argument, and the issue of the bankruptcy will not even arise until after a finding of liability, I would be hesitant to exercise jurisdiction over dozens of defendants in a multi-district litigation merely because a single defendant filed for bankruptcy and reorganized under Chapter 11 more than fifteen years ago.  However, I do not decide that question today.

27

## V.   CONCLUSION

Defendants have sufficiently averred facts supporting removal pursuant to section 1442(a)(1) of Title 28. Specifically, defendants allege that (1) they added MTBE to gasoline at the direction of the EPA, a federal agency; (2) they have a colorable federal defense of preemption; and (3) there is a causal connection between plaintiffs' claims and the acts defendants undertook at the direction of the EPA. For this reason, plaintiffs' motions to remand are denied. The Clerk of the Court is directed to close these motions. A conference is scheduled for March 23, 2004 at 10:30 a.m..

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 16, 2004

28

- Appearances -

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel:  (212) 558-5500
Fax:  (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel:  (212) 547-5583
Fax:  (212) 547-5444

E

1  Duane C. Miller #57812
   A. Curtis Sawyer, Jr. #101324
2  Tracey L. O'Reilly #206230
   Tamarin E. Austin #207903
3  Evan Eickmeyer #166652
   Daniel Boone #148841
4  **MILLER & SAWYER**
   A Professional Corporation
5  1651 Response Road, Second Floor
   Sacramento, California 95825-5253
6  Telephone: (916) 927-8600
   Facsimile:  (916) 927-9267
7
   Attorneys for Plaintiff
8  City of Fresno

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF SAN FRANCISCO

11  CITY OF FRESNO                            CASE NO.  **CGC -03-425649**

12          Plaintiff,                        )  **COMPLAINT FOR DAMAGES AND**
                                              )  **OTHER RELIEF FOR:**
13  vs.                                       )
                                              )  **(1) STRICT LIABILITY**
14  CHEVRON U.S.A. INC.; CHEVRON              )  **(2) NEGLIGENCE**
    ENVIRONMENTAL SERVICES                    )  **(3) TRESPASS**
15  COMPANY; SHELL OIL COMPANY;               )  **(4) NUISANCE**
    EXXON CORPORATION; TOSCO                  )
16  CORPORATION; UNOCAL                       )
    CORPORATION; UNION OIL COMPANY            )
17  OF CALIFORNIA; KERN OIL &                 )
    REFINING COMPANY; VALERO                  )      CASE MANAGEMENT CONFERENCE SET
18  REFINING COMPANY - CALIFORNIA;            )
    TEXACO REFINING AND MARKETING             )      PLAN I   MAR 2 6 2004   9:00 AM
19  INC.; ULTRAMAR, INC.; ARCO                )
    CHEMICAL COMPANY; LYONDELL                )      DEPARTMENT 212
20  CHEMICAL COMPANY; EXXON MOBIL             )
    CORPORATION; CONOCOPHILLIPS               )
21  CORPORATION; ATLANTIC                     )
    RICHFIELD COMPANY; EQUIVA                 )
22  SERVICES LLC; TEXACO, INC.;               )
    EQUILON ENTERPRISES LLC ;                 )
23  CHEVRONTEXACO CORPORATION;                )
    NEW WEST PETROLEUM; DUKE                  )
24  ENERGY MERCHANTS, LLC; DUKE               )
    ENERGY TRADING AND MARKETING,             )
25  LLC; PACIFIC SOUTHWEST TRADING;           )
    NORTHRIDGE PETROLEUM                      )
26  MARKETING U.S., INC.; DUKE                )
    ENERGY MERCHANTS CALIFORNIA,              )
27  INC.; NEW WEST PETROLEUM, LLC;            )
    WESTPORT PETROLEUM INC.; NELLA            )
28  OIL COMPANY LLC; AND DOES 1               )

                                  1

THROUGH 200, 201 THROUGH 400, and )
401 THROUGH 600, inclusive, )
                       )
         Defendants. )
                       )

Plaintiff City of Fresno hereby alleges as follows:

## I. SUMMARY OF THE CASE

1. The City of Fresno is responsible for purveying clean, safe drinking water to approximately 450,000 people in the County of Fresno, California. Expanding plumes of methyl tertiary butyl ether ("MTBE") and tertiary butyl alcohol ("TBA") contaminate and threaten the water system and drinking water on which Fresno's schools, hospitals, businesses, residents and visitors depend.

2. The defendants in this action are the refiners who manufacture gasoline containing MTBE and TBA, manufacturers of MTBE, and the designers, promoters, marketers, formulators, distributors, suppliers, and retailers of gasoline containing MTBE and TBA, which contaminate and threaten Fresno's water system and public water supply. Among other things, the defendants knowingly and willfully promoted and marketed MTBE and TBA and/or gasoline containing MTBE and/or TBA, when they knew or reasonably should have known that these compounds would reach groundwater, pollute public water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare, as they have in Fresno.

3. Fresno filed this lawsuit to recover compensatory and all other damages, including all necessary funds to remove MTBE and TBA pollution from public drinking water supplies, to restore the reliability of Fresno's water system and drinking water supply, to abate MTBE and TBA plumes, and to assure that the responsible parties -- and not the City of Fresno nor the public -- bear the expense.

## II. PLAINTIFF

4. Plaintiff City of Fresno ("Fresno") provides water to the residents of Fresno. The City of Fresno bears the responsibility of owning and operating a water system which serves the public, including drinking water wells with related and ancillary equipment, pumps, pipes, water treatment equipment, delivery systems and infrastructure which will be referred to collectively in

2

Complaint for Damages and Other Relief

1 this complaint as the "water system." The drinking water sources for the Fresno water system

2 include more than two hundred and fifty (250) wells owned and operated by Fresno within or near

3 city limits. Among other things, the water system includes Fresno's right to appropriate and use

4 groundwater for water supplies.

5

## III. DEFENDANTS

6     5. Most of the defendants in this action are corporate members of the gasoline industry.

7 As described below, the defendants include manufacturers and promoters of gasoline containing

8 MTBE and/or TBA, distributors of gasoline containing MTBE and/or TBA, manufacturers and

9 promoters of MTBE and/or TBA, and owners and operators of facilities that released MTBE

10 and/or TBA and/or gasoline containing MTBE and/or TBA into the environment. MTBE, TBA,

11 and gasoline containing MTBE and/or TBA have contaminated, polluted and threatened, and

12 continue to contaminate, pollute and threaten, Fresno's water system.

13     6. When this complaint refers to any act or omission of the defendants, such reference

14 shall be deemed to mean that the officers, directors, agents, employees, or representatives of the

15 defendants committed or authorized such act or omission, or failed to adequately supervise or

16 properly control or direct their employees while engaged in the management, direction, operation

17 or control of the affairs of defendants, and did so while acting within the scope of their

18 employment or agency.

19     A. Refiner Defendants

20     7. These defendants owned and operated refineries in California and/or designed,

21 formulated, refined, manufactured, promoted, marketed, supplied and provided gasoline

22 containing MTBE and/or TBA which, at all times relevant to this complaint, was distributed and

23 sold in areas affecting Fresno's water system:

24     8. Defendant Chevron U.S.A. Inc. ("Chevron USA") is a Pennsylvania corporation with its

25 principal place of business in San Ramon, California.

26     9. Defendant Shell Oil Company ("Shell") is a Delaware corporation doing business in

27 California.

28     10. Defendant Exxon Corporation ("Exxon") is a New Jersey corporation with its

3

1   principal place of business located in Texas.

2      11. Defendant Tosco Corporation ("Tosco") is a Nevada corporation with its principal

3   place of business in Stamford, Connecticut.

4      12. Defendant Unocal Corporation ("Unocal") is a Delaware corporation doing business in

5   California.

6      13. Defendant Union Oil Company of California ("Union Oil") is a California corporation

7   with its principle place of business in El Segundo, California.

8      14. Defendant Kern Oil & Refining Company ("Kern Oil") is a California corporation

9   with its principal place of business located in Long Beach, California.

10      15. Defendant Valero Refining Company-California ("Valero") is a Delaware corporation

11   doing business in California.

12      16. Defendant Texaco Refining and Marketing Inc. ("TRMI") is a Delaware corporation

13   with its principal place of business in New York.

14      17. Defendant Ultramar, Inc. ("Ultramar") is a Nevada corporation with its principal place

15   of business in San Antonio, Texas.

16      18. Defendant Exxon Mobil Corporation ("ExxonMobil") is a New Jersey corporation

17   with its principal place of business located in Texas.  Plaintiff is informed that Exxon Mobil was

18   formed on or about November 30, 1999 as a result of a merger of Mobil Corporation and Exxon

19   Corporation and is a successor in interest to Exxon Corporation and Mobil Corporation.

20      19. Defendant ConocoPhillips Corporation ("Conoco") is a Delaware Corporation doing

21   business in California and is a successor in interest to Tosco Corporation.

22      20. Defendant ChevronTexaco Corporation ("ChevronTexaco") is a Delaware corporation

23   with its headquarters in San Ramon California.  Plaintiff is informed and believes that

24   ChevronTexaco Corporation is a successor in interest to certain Chevron-related and Texaco-

25   related entities.

26      21. Defendant Equilon Enterprises LLC ("Equilon") is a Delaware Limited Liability

27   Company.  Plaintiff is informed and believes that Equilon Enterprises LLC is a successor in

28   interest to certain Shell-related and Texaco-related entities.

4

1    22. Defendants Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero,

2  TRMI, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 1 through 100, will

3  be collectively referred to hereafter as the "Refiner Defendants."  The Refiner Defendants, and

4  each of them, owned and/or operated gasoline refineries that manufactured and supplied gasoline

5  containing MTBE and/or TBA to locations in the vicinity of Fresno's water system, such that

6  releases of such products to the subsurface contaminated and polluted the water system.  Among

7  other things, these defendants (1) designed, formulated, refined, manufactured, promoted,

8  marketed, distributed, transported, packaged, exchanged and/or sold gasoline containing MTBE

9  and/or TBA, which is contaminating, polluting and threatening Fresno's public water supplies;

10  (2) owned, operated, and/or controlled gasoline delivery systems including, but not limited to,

11  gasoline stations, gasoline storage, transfer, delivery, and dispensing systems (collectively herein

12  "gasoline delivery systems") in areas affecting Fresno's water system; (3) were legally

13  responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in

14  this complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or

15  gasoline containing MTBE and/or TBA;  (5) negligently designed, constructed, installed,

16  fabricated, owned, operated, controlled, inspected and/or repaired gasoline delivery systems from

17  which MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6)

18  negligently and/or intentionally failed and refused to take appropriate remediation action to abate

19  MTBE and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems;

20  and (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of

21  aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving

22  corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator,

23  licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named

24  defendants.

25    23.  Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein

26  under the fictitious names DOES 1 through 100, inclusive.

27  **B. MTBE/TBA Manufacturer Defendants**

28    24.  These defendants manufactured, promoted, marketed, sold, supplied and provided

5

1  MTBE and/or TBA which, at all times relevant to this complaint, was added to gasoline which

2  was distributed and sold in areas affecting Fresno's water system:

3        25.   Defendant ARCO Chemical Company ("Arco Chemical") is a corporation with its

4  principal place of business in Los Angeles, California.

5        26.   Defendant Lyondell Chemical Company ("Lyondell"), as successor-in-interest to

6  ARCO Chemical Company, is a corporation with its headquarters in Houston, Texas, and doing

7  business in California.

8        27. Defendant Coastal Chem, Inc. ("Coastal") is a Delaware corporation.

9        28.   Defendant Chevron Environmental Services Company is a Delaware corporation with

10  its principal place of business in San Francisco, California.

11        29.   Defendants Arco Chemical, Lyondell, Coastal, Chevron Environmental Services

12  Company, and also defendants Chevron USA, Shell, Exxon, Tosco, Valero, Ultramar,

13  ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 101 through 200, will be collectively

14  referred to hereafter as the "MTBE/TBA Manufacturer Defendants."  The MTBE/TBA

15  Manufacturer Defendants, and each of them, manufactured and supplied MTBE and/or TBA for

16  use in gasoline which was distributed to and sold in locations in the vicinity of Fresno's water

17  system, such that releases of that gasoline to the subsurface contaminated, polluted, and threaten

18  the water system.  Among other things, these defendants (1) negligently designed, manufactured,

19  formulated, refined, promoted, marketed, distributed, failed to adequately warn about,

20  transported, packaged, exchanged and/or sold MTBE and/or TBA, which is contaminating,

21  polluting, and threatening Fresno's public water supplies; (2) owned, operated, and controlled

22  gasoline delivery systems in areas affecting Fresno's water system; (3) were legally responsible

23  for and committed each of the multiple tortious and ongoing wrongful acts alleged in this

24  complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or

25  gasoline containing MTBE and/or TBA;  (5) negligently operated , designed, constructed, owned,

26  repaired, controlled, installed, inspected, and/or fabricated gasoline delivery systems from which

27  MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6) negligently

28  and/or intentionally failed and refused to take appropriate remediation action to abate MTBE

6

1  and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems; and

2  (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider,

3  abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation,

4  fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee,

5  licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

6      **C.  Distributor Defendants**

7      30.  These defendants have supplied and continue to supply gasoline containing MTBE

8  and/or TBA for resale in areas that affect Fresno's water system:

9      31. Defendant Atlantic Richfield Company ("ARCO"), is a Delaware corporation doing

10  business in California.

11      32. Defendant Equiva Services LLC ("Equiva") is a Delaware Limited Liability Company

12  doing business in California.

13      33. Defendant New West Petroleum ("New West") is a California corporation with its

14  principle place of business in Sacramento, California.

15      34. Defendant Duke Energy Merchants, LLC ("Duke Energy") is a limited liability

16  company, incorporated in Delaware and doing business in California.

17      35. Defendant Duke Energy Trading and Marketing, LLC ("Duke Marketing") is a limited

18  liability company, incorporated in Delaware and doing business in California.

19      36. Defendant Pacific Southwest Trading, also known as PS Trading, Inc., ("PS Trading")

20  is a California corporation.

21      37. Defendant New West Petroleum LLC ("New West LLC") is a California limited

22  liability company with its principal place of business in Sacramento, California.

23      38. Defendant Northridge Petroleum Marketing U.S., Inc., ("Northridge") is a Colorado

24  corporation doing business in California.

25      39.  Defendant Duke Energy Merchants California, Inc., ("Duke Energy California")

26  formerly known as Northridge Petroleum Marketing U.S., Inc., is a Colorado corporation doing

27  business in California.

28      40. Defendant Westport Petroleum Inc. ("Westport") is a California corporation with its

1   principal place of business in Pasadena, California.

2       41. Defendant Nella Oil Company LLC ("Nella") is a California limited liability company

3   with its principle place of business in Auburn, California.

4       42. Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein

5   under the fictitious names DOES 201 through 400, inclusive.

6       43. Defendants Arco, Equiva, New West, Duke Energy, Duke Marketing, PS Trading,

7   New West LLC, Northridge, Duke Energy California, Westport, Nella and also defendants

8   Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar,

9   ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 201 through 400, will be collectively

10  referred to herein as the "Distributor Defendants." The Distributor Defendants, and each of them:

11  (1) designed, manufactured, formulated, promoted, marketed, distributed, transported, packaged,

12  and sold gasoline containing MTBE and/or TBA which is contaminating and threatening Fresno's

13  public water supplies; (2) were legally responsible for and committed each of the tortious and

14  wrongful acts alleged in this complaint; (3) participated in one or more enterprises to promote

15  MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; and (4) in doing the tortious

16  and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer,

17  partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee,

18  fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or

19  indemnitor of each of the remaining DOE and named defendants.

20      **D.  Owner/Operator Defendants**

21      44. These defendants own and/or operate gasoline delivery facilities, including, but not

22  limited to, pipelines, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems

23  (collectively herein "gasoline delivery systems") in areas affecting Fresno's water system:

24      45. Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein

25  under the fictitious names DOES 401 through 600, inclusive.

26      46. DOES 401 through 600, shall be referred to collectively herein as the

27  "Owner/Operator Defendants."  The Owner/Operator Defendants, and each of them: (1)

28  designed, constructed, installed, fabricated, owned, operated, controlled, inspected and/or

Complaint for Damages and Other Relief

1  repaired gasoline delivery systems from which gasoline containing MTBE and/or TBA is
2  contaminating, polluting, and threatening Fresno's water system;  (2) were legally responsible for
3  and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint;
4  (3) participated in one or more enterprise(s) to promote, market, distribute, and sell gasoline
5  containing MTBE and/or TBA;  and (4) in doing the tortious and wrongful acts alleged in this
6  complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal,
7  successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor,
8  controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of
9  the remaining DOE and named defendants.

10  ## IV. ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

11  ### A. The Contaminants: MTBE and TBA

12  47.  MTBE is an additive to gasoline.  Wherever referred to in this complaint, MTBE
13  means not only methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE,
14  as well as other oxygenates and ethers, including, but not limited to, TAME, DIPE, and ETBE.

15  48.  TBA is present in some gasoline.  TBA is variously a gasoline constituent, an
16  impurity in commercial grade MTBE, and a degradation or breakdown product of MTBE.

17  49.  MTBE and TBA contaminate the environment through leaks and spills from gasoline
18  delivery systems.  Once released to the environment from gasoline delivery systems, MTBE and
19  TBA each have unique characteristics that cause extensive environmental contamination and a
20  corresponding threat to the public health and welfare.  In particular, the fate and transport of
21  MTBE and TBA in the subsurface differs significantly from that of gasoline constituents that
22  have historically been of environmental and/or toxicological concern, specifically the "BTEX
23  compounds" (benzene, toluene, ethylbenzene, and xylene).

24  50.  Once released into the subsurface, MTBE and TBA separate from other gasoline
25  constituents in the presence of moisture.  In contrast to the BTEX compounds, MTBE and TBA
26  have a strong affinity for water.  If MTBE and/or TBA are released into the environment in
27  sufficient quantities, MTBE and/or TBA have the capacity to migrate through the soil, the
28  groundwater, penetrate deeper within the aquifer, and cause persistent contamination that can

9

1   threaten the potability of drinking water wells.  There is a potentially lengthy delay, based on site

2   specific factors, between the time MTBE and/or TBA are released and the time they accumulate

3   in potentially usable ground water in sufficient quantities to contaminate public drinking water

4   resources.

5        51.  MTBE and TBA spread farther and faster than other components of gasoline, resist

6   biodegradation, and are difficult and costly to remove from groundwater and drinking water

7   supplies.

8        **B. Regulatory Standards Applicable to MTBE and TBA**

9        52.  No federal or state agency has approved either MTBE or TBA as an additive to

10   drinking water.  No federal or state agency has approved releasing MTBE or TBA into

11   groundwater.  No federal or state agency has ever required that gasoline contain MTBE and/or

12   TBA.

13        53.  Along with its other properties, MTBE can render water supplies undrinkable by

14   changing the taste and odor of water into a foul smelling liquid with a turpentine odor and

15   chemical taste unfit for human consumption.  The State of California established a Secondary

16   Maximum Contaminant Level ("MCL") for MTBE of 5 parts per billion ("ppb").  This means that

17   the law prohibits using water containing MTBE at or above this level in public drinking water

18   because of MTBE's aesthetic properties.  Individuals, however, can smell and taste MTBE in

19   water at even lower levels.

20        54.  MTBE also presents a significant public health threat.  Because of MTBE's potential

21   for causing cancer, the State of California has established a Primary (health) MCL for MTBE of

22   13 ppb.  This means that the law prohibits using water containing MTBE at or above this level in

23   public drinking water because of MTBE's threat to public health.

24        55.  TBA also presents a significant threat to public health.  The State of California has set

25   an Action Level for TBA of 12 parts per billion in water, based on an interim assessment

26   performed by the California Office of Environmental Health Hazard Assessment.  The interim

27   assessment concluded that exposure to TBA at levels above 12 ppb in water creates an

28   unacceptable public health risk of cancer.

10

56.  California Governor Gray Davis ordered state agencies to phase out MTBE use in motor fuel in California, to achieve 100% removal no later than December 31, 2003.  Because of MTBE's threat to drinking water, the federal government has also announced its intent to "significantly reduce or eliminate" MTBE from gasoline in an Advance Notice of Proposed Rulemaking published in the Federal Register.  Eighteen states, including California, have either banned or are phasing out the use of MTBE in gasoline.

## C.  Defendants' Promotion of MTBE and TBA

57.  The Refiner Defendants and MTBE/TBA Manufacturer Defendants, all of whom have promoted the use of MTBE and/or TBA, and/or gasoline containing MTBE and/or TBA, for its purported environmental benefits, knew or should have known of the grave harm and threat to the public health and welfare represented by the proliferating use of these compounds, including (among other things): widespread pollution of groundwater with MTBE and TBA, contamination of public drinking water by these compounds, drinking water supplies rendered unfit and unusable for consumption, public health threatened, and increased costs to public water suppliers and their ratepayers.  Plaintiff is informed and believes, however, and based thereon alleges, that defendants Tosco and Ultramar did not gain this knowledge until 1996, due to concealment of information by another defendant or defendants, including but not limited to ARCO Chemical.

58.  Despite knowing that MTBE and TBA pollution was inevitable, and despite the availability of reasonable alternatives, (including, but not limited to, adequate warnings), defendants chose not to warn customers, retailers, regulators or public officials, including the City of Fresno.  As production and sales of these compounds and gasoline containing them increased, defendants failed to take any reasonable, appropriate and special precautions to store gasoline containing MTBE and/or TBA safely, or to prevent, detect, and clean up spills and leaks of gasoline containing these products.  Despite knowing the risk of harm posed by these compounds, defendants also failed to warn purchasers, the public, the City of Fresno, and/or regulators, that without such precautions more and more MTBE and/or TBA would be released into the environment and cause, among other significant adverse effects, long term groundwater contamination, pollution of public drinking water supplies, and threats to public health and safety.

11

59. The Refiner and Distributor Defendants further exacerbated the situation by continuing unreasonable intentional and/or negligent acts, including providing gasoline containing MTBE and/or TBA to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent releases of MTBE and/or TBA to the subsurface, knowing that release to the environment of these compounds would be inevitable because a substantial percentage of those gasoline stations would store such gasoline without taking reasonable, appropriate or special precautions, such as by placing the gasoline in inadequate and leaking gasoline delivery systems, and without taking reasonable, appropriate or special measures to monitor, detect, and respond to releases of MTBE and/or TBA to soil and/or groundwater, and without taking reasonable, appropriate or special precautions to investigate, contain, and clean up releases of these compounds.

60. At all times, the Refiner Defendants and MTBE/TBA Manufacturer Defendants and Distributor Defendants have represented to purchasers of MTBE, TBA, and/or gasoline containing MTBE and/or TBA, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use. Indeed, defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface.

61. The Refiner Defendants and MTBE/TBA Manufacturer Defendants and Distributor Defendants had a duty (which they breached) to test MTBE and TBA thoroughly to determine their environmental fate and transport characteristics, and potential human health impacts, before they sold these compounds and/or gasoline containing them, and had a further duty (which they breached) to take precautions necessary to assure that gasoline containing MTBE and/or TBA was properly stored and to institute all necessary measures to contain and promptly abate the inevitable spills and leaks. Nonetheless, the defendants, and each of them, failed to adequately test, store, warn, or control gasoline containing MTBE and/or TBA, and, among other things, failed to abate groundwater contamination caused by MTBE and/or TBA, including contamination in and threats to Fresno's water system.

12

62. The widespread problems of leaking gasoline delivery systems were well known to the defendants prior to the introduction of MTBE and TBA. At least as early as the mid-1960's these defendants knew, or reasonably should have known, that gasoline delivery systems suffer significant and widespread leaks and failures, and release gasoline products into the environment, including into groundwater.

63. Before introducing MTBE and/or TBA into gasoline delivery systems, the Refiner Defendants and MTBE/TBA Manufacturer Defendants and Distributor Defendants knew, or reasonably should have known, among other things, that MTBE and/or TBA released into the environment would mix easily with groundwater, move great distances, resist biodegradation or bioremediation, render drinking water unsafe and/or non-potable, cause significant expenses to remediate and to remove from public drinking water supplies, and otherwise threaten the public health and welfare. The defendants knew, or they reasonably should have known, that the gasoline distribution and retail system statewide – and in the vicinity of Fresno's water system – contained leaking gasoline delivery systems. They knew, or they reasonably should have known, that gasoline facilities, including those in the vicinity of Fresno's water system, commonly lacked adequate storage facilities for gasoline containing MTBE and/or TBA and that the operators of these facilities were unaware of either the special hazards of MTBE and/or TBA or the steps necessary to eliminate or mitigate those hazards.

64. At all times relevant to this action:

(a) the MTBE/TBA Manufacturer Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided MTBE and/or TBA to the Refiner Defendants, and the Refiner Defendants and Distributor Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided gasoline containing MTBE and/or TBA to retail gasoline stations and/or other gasoline delivery systems within or near the District's boundaries. Such sales, exchanges, supplies, distributions, deliveries and/or other provisions of gasoline containing MTBE and/or TBA to such facilities occurred over time through the end of 2002 and, for at least certain defendants, beyond;

13

    (b)    gasoline containing MTBE and/or TBA was released to the subsurface from retail gasoline facilities owned and/or operated by the Owner/Operator Defendants, and each of them, and from other facilities at dispersed locations within or near Fresno's water system.  Such releases of gasoline containing MTBE and/or TBA have occurred over time and are still occurring, all in varying amounts at different locations; and

    (c)    MTBE and TBA take time to migrate from release points to locations within the subsurface at which they have an appreciable impact on groundwater resources. MTBE and TBA have over time migrated in the subsurface from dispersed release points at or near the surface at retail gasoline facilities within or near Fresno's water system, causing pollution, contamination, and substantial damage to the groundwater resources of Fresno, causing appreciable injury to Fresno within the past three years, currently and continuously damaging Fresno at such times and in amounts to be proved at trial.

65.  The City of Fresno seeks compensatory damages needed to investigate, remediate, and remove MTBE and/or TBA from drinking water supplies, to secure alternative water supplies on an interim basis, to make associated changes to its operating systems and practices, and for past, present, and future damage to Fresno's water system and water rights.  In addition, Fresno seeks punitive damages to punish certain defendants and deter future wrongful and harmful conduct, and other relief as described in the Prayer below.

## FIRST CAUSE OF ACTION

### (Strict Liability Against All Defendants)

66.  Fresno refers to paragraphs 1 through 65 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

67.  The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants, and each of them, designed, formulated, compounded, refined, manufactured, packaged, distributed, recommended, merchandised, advertised, promoted, and/or sold gasoline containing MTBE and/or TBA.

14

68. The MTBE/TBA Manufacturer defendants, and each of them, designed, formulated, compounded, manufactured, packaged, distributed, recommended, merchandised, advertised, promoted, and/or sold MTBE and/or TBA and their constituents, which were intended by defendants, and each of them, to be used as gasoline additive(s).

69. Defendants' design and manufacture of these products was defective, and defendants failed to adequately warn against the dangers of these products.

70. Defendants, and each of them, falsely represented, asserted, claimed and warranted that gasoline containing MTBE and/or TBA could be used in the same manner as gasoline not containing these compounds, and did not require any different or special handling or precautions.

71. Defendants, and each of them, knew that said product(s) were to be purchased and used without inspection for defects.

72. Gasoline containing MTBE and/or TBA, and MTBE and TBA themselves, are defective products because, among other things:

    (a)    The benefits of using MTBE and/or TBA in gasoline, if any, are greatly outweighed by the associated costs and negative impacts imposed on society, consumers, and the environment, and on the City of Fresno's water system, and those who rely on it;

    (b)    MTBE and TBA cause extensive groundwater contamination, even when used in their foreseeable and intended manner;

    (c)    Even at extremely low levels, MTBE renders drinking water putrid, foul, and unfit for purveying to consumers, and TBA also renders drinking water unfit for purveying as drinking water to the pubic;

    (d)    MTBE and TBA and gasoline containing MTBE and/or TBA pose significant threats to public health;

    (e)    Defendants failed to provide adequate warnings of the known and foreseeable risks of MTBE and TBA and gasoline containing MTBE and/or TBA, including but not limited to groundwater contamination with both MTBE and TBA;

15

(e)     Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of MTBE and/or TBA and gasoline containing MTBE and/or TBA; and

(f)     Commercial grade MTBE is defectively designed and manufactured when it contains unnecessary but environmentally harmful impurities such as TBA.

73.  MTBE, and/or TBA, and/or gasoline containing MTBE and/or TBA, were used in a manner in which they were forseeably intended to be used, and as a proximate result of the defects previously described, MTBE and/or TBA and gasoline containing MTBE and/or TBA proximately caused the City of Fresno to sustain the injuries and damages set forth in this complaint.

74.  As a direct and proximate result of the acts and omissions of the defendants alleged herein, the City of Fresno must assess, evaluate, investigate, monitor, abate, clean-up, correct, contain, and remove MTBE and/or TBA from Fresno's water system, and secure alternative water supplies (with related operational impacts), all at significant expense, loss, and damage.

75.  As a further direct and proximate result of the acts and omissions of the defendants alleged herein, Fresno will sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Fresno's damage in an amount within the jurisdiction of this court.  Fresno is also entitled to recover costs incurred in prosecuting this action and prejudgment interest to the full extent permitted by law.

76.  Defendants ARCO, Chevron USA, Chevron Environmental Services Company, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and DOES 100-200 knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.  These defendants committed each of the above described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice and with conscious disregard of the health and safety of

16

1   others, and of plaintiff's water rights.

2       77. This conduct is reprehensible, despicable, and was performed to promote sales of

3   MTBE and/or TBA and/or gasoline containing MTBE and/or TBA in conscious disregard of the

4   known risks of injury to health and property. These defendants acted with willful and conscious

5   disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon

6   Fresno. Therefore, Fresno requests an award of exemplary damages in an amount sufficient to

7   punish ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil,

8   Valero, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and DOES

9   100-200. After the completion of additional investigation and discovery, Fresno may seek leave

10   of court to amend this complaint to allege a claim for exemplary damages against additional

11   defendants if warranted by the facts.

12   ## SECOND CAUSE OF ACTION

13   ### (Negligence Against All Defendants)

14       78. Fresno refers to paragraphs 1 through 77 above, and by this reference incorporates

15   them into this cause of action as though fully set forth herein.

16       79. Defendants had a duty to use due care in the design, manufacture, formulation,

17   handling, control, disposal, sale, testing, labeling, warnings, use, and instructions for use of

18   MTBE and TBA, and gasoline containing MTBE and/or TBA, and gasoline delivery systems.

19       80. Defendants so negligently, carelessly, and/or recklessly designed, manufactured,

20   formulated, handled, labeled, instructed, controlled (or the lack thereof), tested (or the lack

21   thereof), released, spilled, failed to warn, and/or sold MTBE and/or TBA, and/or so negligently,

22   carelessly and recklessly designed, manufactured, formulated, handled, labeled, instructed,

23   entrusted, controlled (or the lack thereof), tested (or the lack thereof), released, spilled, failed to

24   warn, dispensed and/or sold gasoline containing MTBE and/or TBA, and/or so negligently,

25   carelessly, and recklessly dispensed MTBE and/or TBA and/or gasoline containing MTBE and/or

26   TBA into gasoline delivery systems, and/or so negligently, carelessly and/or recklessly designed,

27   installed, failed to warn, operated and/or maintained gasoline delivery systems for use with

28   gasoline containing MTBE and/or TBA, that they breached their duties to plaintiff and directly

17

1   and proximately caused MTBE and/or TBA to contaminate, pollute and threaten Fresno's water

2   system, resulting in the harm which warrants the award of compensatory and punitive damages as

3   prayed for in this complaint.

4   　　　81.  Defendants, and each of them, among other things, negligently, carelessly, and/or

5   recklessly failed to: (1) use appropriate technology to prevent leaks of gasoline containing MTBE

6   and/or TBA;  (2) install and maintain gasoline delivery systems that prevented leaks and

7   facilitated prompt detection and containment of any leaks;  (3) monitor and discover leaks as soon

8   as possible;  (4) warn those who may be injured as a result of the leaks; (5) warn those who

9   handled MTBE of its properties; and (6) clean up and abate spills of gasoline containing MTBE

10  and/or TBA as thoroughly and as soon as reasonably possible and in a manner necessary to

11  prevent harm and injury.

12  　　　82.  The Refiner Defendants and Distributor Defendants had actual control over the

13  Owner/Operator Defendants through a variety of means, including but not limited to written

14  agreements, inspection rights, prescribing certain procedures and operating practices, training,

15  sale of branded goods, and agreements obligating the respective Owner/Operator Defendants to

16  acquire, store and sell gasoline containing MTBE and/or TBA.  Therefore, the Refiner and

17  Distributor Defendants had actual control over the Owner/Operator Defendants with leaking

18  gasoline delivery systems and/or were vicariously liable for the acts and conduct of the

19  Owner/Operator Defendants.

20  　　　83.  The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants

21  also undertook tank system testing, tank integrity testing, inventory reconciliation and testing,

22  thereby affirmatively undertaking the duty to prevent releases of gasoline containing MTBE

23  and/or TBA from gasoline delivery systems, but they negligently failed to properly discharge

24  these duties.

25  　　　84.  The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants

26  further undertook to retain consultants to conduct environmental investigations and cleanups,

27  thereby affirmatively undertaking the duty to detect and remediate releases of gasoline containing

28  MTBE and/or TBA from gasoline delivery systems, but they negligently failed to properly

18

1   discharge these duties.

2   85. The Refiner Defendants and Distributor Defendants knew, or should have known, that

3   certain of the Owner/Operator Defendants had leaking gasoline delivery systems, but nonetheless

4   negligently supplied, sold, and/or entrusted gasoline containing MTBE and/or TBA to these

5   Owner/Operator Defendants knowing that MTBE and/or TBA would leak into the soil and

6   contaminate groundwater.

7   86. By their conduct defendants, and each of them, among other things, are:

8      (a)    Committing, authorizing, aiding and/or abetting the tampering with property

9             owned and/or used by Fresno as a public agency to provide water to its water

10             customers within the meaning of Civil Code section 1882 et seq.;

11      (b)    Causing and/or permitting the discharge of wastes into Fresno's public drinking

12             water supplies, creating conditions of pollution and/or nuisance within the

13             meaning of California Water Code section 13050;

14      (c)    Using Fresno's public water supply for waste disposal, an unreasonable and non-

15             beneficial use, in violation of California Constitution Article 10, Section 2;

16      (d)    Interfering with Fresno's vested water rights;

17      (e)    Impairing Fresno's right to appropriate water whose quality is not impaired.

18   87. As a direct and proximate result of defendants' acts and omissions as alleged herein,

19   Fresno has incurred, is incurring, and will continue to incur MTBE and/or TBA investigation,

20   remediation and treatment costs and expenses required to restore its water system and to obtain

21   alternative water supplies, and other damages, in an amount to be proved at trial.

22   88. Defendants ARCO, Chevron USA, Chevron Environmental Services Company, Shell,

23   Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar (after 1996),

24   Conoco, Equilon, ARCO Chemical, Lyondell and DOES 100-200 knew that it was substantially

25   certain that their acts and omissions described above would threaten public health and cause

26   extensive contamination of public drinking water supplies and property damage. These Refiner

27   Defendants and MTBE/TBA Manufacturer Defendants committed each of the above-described

28   acts and omissions with reckless disregard of the health and safety of others, and of plaintiff's

19

1  water rights.

2      89. This conduct is reprehensible, despicable, and was performed to promote sales of

3  MTBE and/or TBA and/or gasoline containing MTBE and/or TBA in reckless disregard of the

4  known risks of injury to health and property. These Refiner Defendants and MTBE/TBA

5  Manufacturer Defendants acted with reckless disregard of the probable dangerous consequences

6  of that conduct and its foreseeable impact upon the City of Fresno. Therefore, the City requests

7  an award of exemplary damages in an amount sufficient to punish Defendants ARCO, Chevron

8  USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar

9  (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and DOES 100-200. After the

10 completion of additional investigation and discovery, Fresno may seek leave of court to amend

11 this complaint to allege a claim for exemplary damages against additional defendants if warranted

12 by the facts.

### THIRD CAUSE OF ACTION

### (Trespass Against All Defendants)

15     90. Fresno refers to paragraphs 1 through 89 above, and by this reference incorporates

16 them into this cause of action as though fully set forth herein.

17     91. Fresno is the owner and/or actual possessor of property rights and interests,

18 easements, wells, the right to appropriate and use groundwater, and water rights. Defendants,

19 their agents and employees, knew, or in the exercise of reasonable care should have known, that

20 MTBE and TBA and gasoline containing MTBE and/or TBA are extremely hazardous to

21 groundwater and to public water systems, including the property and other rights of the City of

22 Fresno.

23     92. The defendants so negligently, recklessly and/or intentionally released, spilled, and/or

24 failed to properly control, handle, store, contain, and use gasoline containing MTBE and/or TBA,

25 and/or failed to clean up spills and leaks of gasoline containing MTBE and/or TBA, that they

26 directly and proximately caused MTBE and/or TBA to contaminate Fresno's water system as

27 follows:

28     (a)     The defendants participated in the use, storage, and release of gasoline containing

Complaint for Damages and Other Relief

MTBE and/or TBA by owning, controlling, regulating, designing, installing, operating, monitoring, inspecting and testing, or by failing to do so, the gasoline delivery systems and thereby proximately caused gasoline containing MTBE and/or TBA to be released into groundwater;

(b) The Refiner Defendants and MTBE/TBA Manufacturer Defendants negligently provided instructions and/or warnings to the Distributor Defendants and Owner/Operator Defendants concerning MTBE and/or TBA, knowing that there was a substantial danger that if their instructions and/or warnings were followed that gasoline containing MTBE and/or TBA dispensed into gasoline delivery systems would escape into the environment and contaminate groundwater;

(c) The Refiner Defendants and Distributor Defendants negligently delivered (directly or indirectly) gasoline containing MTBE and/or TBA into gasoline delivery systems which they knew, or should have known, were inadequate, old, leaking, and/or defective, and thereby created a substantial known danger that MTBE and TBA would be released into the environment and contaminate groundwater; and negligently provided instructions and/or warnings to the Owner/Operator Defendants concerning MTBE and TBA, knowing that there was a substantial danger that if their instructions and/or warnings were followed that gasoline containing MTBE and/or TBA dispensed into gasoline delivery systems would escape into the environment and contaminate groundwater;

(d) Defendants retained consultants and negligently controlled and/or directed their cleanup and remediation activities (or the lack thereof) at gasoline station sites, thereby causing and permitting MTBE and/or TBA to contaminate and threaten Fresno's water system, and defendants failed to warn the appropriate entities and individuals, including Fresno, of known risks, spills, releases and/or leaks, and/or failed to undertake reasonable, appropriate, or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

(e) Defendants negligently overfilled gasoline delivery systems with gasoline

21

containing MTBE and/or TBA, and/or spilled or released it at gasoline facilities near Fresno's water system.

   (f)   When defendants learned, or reasonably should have learned, that MTBE and/or TBA were persistent, significant and/or widespread sources of groundwater contamination, or threatened to be so, defendants failed to warn the appropriate entities and individuals, including Fresno, of known risks, spills, releases and/or leaks, and/or failed to undertake reasonable, appropriate or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

93. The Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants through a variety of means, including but not limited to written agreements, inspection rights, prescribing certain procedures and operating practices, sale of branded goods, agreements obligating the respective Owner/Operator Defendants to acquire, store and sell gasoline containing MTBE and/or TBA, and training. Therefore, the Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the Owner/Operator Defendants.

94. The MTBE and TBA contamination of Fresno's water system has varied and will vary over time and requires investigation, remediation, abatement, and/or treatment. The City of Fresno has engaged, or will engage, in remediation, abatement, investigation, and/or treatment programs and in securing replacement water supplies, and thereby has sustained, is sustaining, and will sustain, the damages alleged herein.

95. For the reasons alleged herein, Fresno is entitled to an award of exemplary damages against defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and DOES 100 through 200. After the completion of additional investigation and discovery, Fresno may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

/ / /

22

## FOURTH CAUSE OF ACTION

### (Nuisance Against All Defendants)

96. Fresno refers to paragraphs 1 through 95 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

97. The negligent, reckless, intentional and ultrahazardous activity of the defendants and each of them, as alleged herein, has resulted in the contamination and pollution of and threats to Fresno's water system and thereby constitutes a nuisance. The contamination, pollution, and threats to Fresno's water system with MTBE and/or TBA and gasoline containing MTBE and/or TBA is a public nuisance as defined in Civil Code section 3479, Civil Code section 3480, Health and Safety Code section 5410, and Water Code section 13050, as it is injurious to health, indecent and offensive to the senses, obstructs the free use of property, interferes with the comfortable enjoyment of life or property, and is reasonably abatable.

98. Fresno's water system is adversely affected by the nuisance.

99. The nuisance caused by defendants, and each of them, has substantially interfered with and obstructed Fresno's ability to provide a water supply free from unacceptable health risk, taste, odor, color, pollution and contamination, and to protect its water system and groundwater supplies from such harm.

100. Fresno owns and holds property rights and interests damaged by the nuisance. Fresno's injury is separate and distinct from that of the public.

101. Fresno has not consented to and does not consent to this nuisance. Defendants, and each of them, knew or should have known, that Fresno would not consent to this nuisance.

102. The Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants through a variety of means, including but not limited to written agreements, inspection rights, prescribing certain procedures and operating practices, sale of branded goods, agreements obligating the respective Owner/Operator Defendants to acquire, store and sell gasoline containing MTBE and/or TBA, and training. Therefore, the Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the Owner/Operator

23

1   Defendants.

2       103. As a direct and proximate result of the nuisance, Fresno has been damaged and is

3   entitled to the compensatory and exemplary damages alleged herein, or to such other appropriate

4   relief as Fresno may elect at trial, including, but not limited to equitable relief in the form of an

5   order requiring the defendants to abate the nuisance properly as to Fresno.

6       104. For the reasons alleged herein, Fresno is entitled to an award of exemplary damages

7   against Defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil,

8   Kern Oil, Valero, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and

9   DOES 100-200. After the completion of additional investigation and discovery, Fresno may seek

10  leave of court to amend this complaint to allege a claim for exemplary damages against additional

11  defendants if warranted by the facts.

12                              **PRAYER**

13      **WHEREFORE**, the City of Fresno requests judgment against defendants, and each of

14  them, for:

15      1. Compensatory damages according to proof;

16      2. Exemplary damages in an amount sufficient to punish defendants ARCO, Chevron

17  USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, Valero, TRMI, Ultramar

18  (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell and DOES 100-200 and to deter those

19  defendants from ever committing the same or similar acts;

20      3. An Order declaring that the defendants' gasoline delivery systems constitute a nuisance

21  in the manner they are maintained and operated, and compelling defendants to abate that

22  nuisance;

23      4. Pursuant to Civil Code section 1882.2, three times the amount of actual damages, plus

24  the cost of the suit and reasonable attorneys' fees;

25      5. Reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5 or

26  otherwise, and costs incurred in prosecuting this action, and prejudgment interest to the full extent

27  permitted by law; and

28  / / /

1      6. Such and other further relief as the court may deem just and proper.

2   Dated:  October 21, 2003                    **MILLER & SAWYER**
                                                A Professional Corporation
3

4                                               By:  _____
5                                                    DUANE MILLER
                                                     Attorneys for Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Damages and Other Relief

F



# Orr&Reno

*Professional Association*

One Eagle Square, P.O. Box 3550, Concord, NH 03302-3550
Telephone 603-224-2381 • Facsimile 603-224-2318
www.orr-reno.com

Dudley W. Orr
(1907-2002)
Robert H. Reno
(1917-1998)
Charles H. Toll, Jr.
(1916-1989)
Malcolm McLane
(Of Counsel)

———————

Ronald L. Snow
Charles F. Leahy
Richard B. Couser
Mary Susan Leahy
William L. Chapman
George W. Roussos
Howard M. Moffett
James E. Morris
John A. Malmberg
Martha Van Oot
Douglas L. Patch
Connie L. Rakowsky
Jill K. Blackmer
James P. Bassett
Emily Gray Rice
Ann Meissner Flood
Charles A. Szypszak
Steven L. Winer
Peter F. Burger
Lisa Snow Wade
Megan R. MacMullin
Jennifer A. Eber
Marcia Hennelly Moran
Roy S. McCandless
Virginia Symmes Sheehan
Laura E. Tobin
Jonathan A. Chorlian
Pamela E. Phelan
Judith A. Fairclough
Connie Boyles Lane
Jeffrey C. Spear
Phillip S. Bixby
Melissa C. Guldbrandsen

November 19, 2003

**VIA HAND DELIVERY**

James R. Starr, Clerk
United States District Court
55 Pleasant Street
Concord, NH 03301

> **Re:**   ***State of New Hampshire v. Amerada Hess Corporation, et al.***
> ***Docket No.:  03-486-JD***

Dear Mr. Starr:

Enclosed for filing with the Court in the above-referenced matter please find the Plaintiff's Motion for Remand and Memorandum of Law in Support of Motion to Remand.

Please call me should you have any questions.

Very truly yours,

Martha Van Oot

MVO/aec
Enclosures
cc:   see attached service list
346907_1.DOC

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| State of New Hampshire ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. 03-486-JD |
| ) | |
| v. ) | |
| ) | |
| Amerada Hess Corporation, et al. ) | |
| ) | |
| Defendants. ) | |

## STATE OF NEW HAMPSHIRE'S
## MOTION FOR REMAND

On November 10, 2003, defendants Citgo Petroleum Corporation, Statoil Marketing & Trading (US) Inc., Motiva Enterprises, LLC, Shell Oil Company, Texaco Refining and Marketing, Inc., ChevronTexaco Corporation, Chevron U.S.A., Inc. and Sunoco, Inc. (R&M) (collectively, "Defendants") filed a Notice of Removal, effectuating the removal of this action from the Superior Court of Merrimack County, New Hampshire.

Plaintiff the State of New Hampshire (the "State") hereby moves this Court to remand the above-entitled action for the following reasons:

1.    This case is not removable.  This Court does not have subject matter jurisdiction over this case under either 28 U.S.C. §1442(a)(1) or 28 U.S.C. §1334(b), as Defendants claim.

2.    This case is also subject to the mandatory abstention provisions of 28 U.S.C. §1334(c)(2) and the provision in 28 U.S.C. §1452(a) prohibiting removal of actions brought by governmental units pursuant to their police or regulatory powers.

3.     This case is further subject to the discretionary abstention provisions in 28 U.S.C.

§1334(c)(1) and the discretionary remand provision in 28 U.S.C. §1452(b), and meets all of the

applicable criteria for abstention and/or remand pursuant to those provisions.

4.     Counsel for the defendants who joined in the Notice of Removal, except the Irving Oil

defendants, object to the relief sought by this Motion.  Counsel for the Irving Oil defendants takes no

position on this Motion.

5.     Filed herewith in accordance with Local Rules 7.1(a)(2) and (3) is a Memorandum of

Law in support of this dispositive motion.

WHEREFORE, the State respectfully requests that the Court enter an Order remanding this case

to the Superior Court of Merrimack County, New Hampshire, and for all other relief that this Court

deems just and proper.

Respectfully submitted,

THE STATE OF NEW HAMPSHIRE
PETER W. HEED, ATTORNEY GENERAL

Dated:  November 19, 2003

Maureen D. Smith (NH Bar #4857)
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679
Fax: (603) 223-6270

ORR & RENO, P.A.
Martha Van Oot (NH Bar #963)
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

**OF COUNSEL:**

SHER & LEFF, LLP
Victor M. Sher (Adm. in CA)
Todd E. Robins (Adm. in CA)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300

LAW OFFICES OF MATTHEW F.
PAWA, P.C.
Matthew F. Pawa (Adm. in MA)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550

## CERTIFICATE OF SERVICE

I, Maureen D. Smith, hereby certify on this 19th day of November, 2003 that I have forwarded a copy of the foregoing pleading by first class U.S. mail to all parties on the attached service list.

By: _Maureen D. Smith_
Maureen D. Smith

347524_1.DOC

UNITED STATES DISTRICT COURT
DISTRICT OF STATE OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| State of New Hampshire | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 03-486-JD |
| v. | ) | |
| | ) | |
| | ) | |
| Amerada Hess Corporation, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SERVICE LIST

Maureen D. Smith, Esq.
Senior Assistant Attorney General
Environmental Protection Bureau
Office of the Attorney General
33 Capitol Street
Concord, NH 03301-6397
Counsel to the State of New Hampshire

Victor M. Sher, Esq.
Sher & Leff, LLP
450 Mission Street, Suite 500
San Francisco, CA 94105
Counsel to the State of New Hampshire

Todd E. Robins, Esq.
Sher & Leff, LLP
450 Mission Street, Suite 500
San Francisco, CA 94105
Counsel to the State of New Hampshire

Matthew F. Pawa, Esq.
Law Offices of Matthew Pawa, P.C.
1280 Centre Street, Suite 230
Newton Center, MA 02459
Counsel to the State of New Hampshire

Lawrence M. Edelman, Esq.
Pierce Atwood
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
Counsel to **Lyondell Chemical Company**

William J. Kayatta, Jr., Esq.
Pierce Atwood
One Monument Square
Portland, ME 04101
Counsel to **Lyondell Chemical Company**

Alan J. Hoffman, Esq.
Blank Rome, LLP
One Logan Square
Philadelphia, PA 19103-6998
Counsel to **Lyondell Chemical Company**

John V. Dwyer, Esq.
Winer and Bennett, LLP
111 Concord Street
P.O. Box 488
Nashua, NH 03061-0488
Counsel to **Exxon Mobil Corporation and ExxonMobil Oil Corporation**

Stephen L. Tober, Esq.
Tobert Law Offices, P.A.
381 Middle Street
P.O. Box 1377
Portsmouth, NH 03802
Counsel to **ConocoPhillips Company**

Michael DeMarco, Esq.
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109
Counsel to **ConocoPhillips Company**

Daniel E. Rosenfield, Esq.
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109
Counsel to **ConocoPhillips Company**

W. Scott O'Connell, Esq.
Nixon Peabody LLP
889 Elm Street
Manchester, NH 03101-2019
Counsel to **Statoil Marketing and Trading (US), Inc.**

Charles T. O'Brien, Esq.
225 High Ridge Road
Stamford, CT 06905
Counsel to **Statoil Marketing and Trading (US), Inc.**

Andrew W. Serell, Esq.
Rath, Young & Pignatelli
One Capital Plaza
P.O. Box 1500
Concord, NH 03302-1500
Counsel to **Motiva Enterprises, LLC; Texaco Refining and Marketing, Inc.; Shell Oil Company; ChevronTexaco Corporation and Chevron U.S.A., Inc.**

Richard E. Wallace, Jr., Esq.
Wallace King Marraro & Branson, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Counsel to **Motiva Enterprises, LLC; Texaco Refining and Marketing, Inc.; Shell Oil Company; ChevronTexaco Corporation and Chevron U.S.A., Inc.**

Bruce W. Felmly, Esq.
McLane, Graf, Raulerson & Middleton
900 Elm Street
P.O. Box 326
Manchester, NH 03105-0326
Counsel to **Irving Oil Corporation and Irving Oil Limited**

Peter W. Mosseau, Esquire
Jeffrey A. Meyers, Esquire
Nelson, Kinder, Mosseau & Saturley, PC
99 Middle Street
Manchester, NH 03101
Counsel to **Citgo Petroleum Corporation**

Nathan P. Eimer, Esq.
Pamela R. Hanebutt, Esq.
Lisa S. Meyer, Esq.
Eimer Stahl Klevorn & Solberg LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Counsel to **Citgo Petroleum Corporation**

Steven M. Gordon, Esq.
Shaheen & Gordon, PA
Two Capitol Plaza
P.O. Box 2703
Concord, NH 03302
Counsel to **Ultramar Energy, Inc.; Ultramar Limited; Valero Energy Corporation and Valero Marketing and Supply Company**

Peter G. Beeson, Esq.
Devine Millimet, P.A.
111 Amherst Street
Manchester, NH 03101
Counsel to **Sunoco, Inc. (R&M)**

John S. Guttmann, Esq.
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, D.C. 20005
Counsel to **Sunoco, Inc. (R&M)**

CT Corporation System
9 Capitol Street
Concord, NH 03301
Registered Agent of **Amerada Hess Corporation**

CT Corporation System
9 Capitol Street
Concord, NH 03301
Registered Agent of **El Paso Merchant Energy-Petroleum Company**

CT Corporation System
9 Capitol Street
Concord, NH 03301
Registered Agent of **Gulf Oil Limited Partnership**

4

Brigitte M. Dewez, Corporate Secretary
**Unocal Corporation**
2141 Rosecrans Avenue, Suite 4000
El Segundo, CA 90245

346181_1.DOC

UNITED STATES DISTRICT COURT
DISTRICT OF STATE OF NEW HAMPSHIRE

| | | |
|---|---|---|
| State of New Hampshire | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | CIVIL ACTION NO. 03-486-JD |
| v. | ) | |
| | ) | |
| | ) | |
| Amerada Hess Corporation, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
STATE OF NEW HAMPSHIRE'S
MOTION FOR REMAND**

**TABLE OF CONTENTS TO**
**MEMORANDUM OF LAW IN SUPPORT OF STATE OF NEW HAMPSHIRE'S**
**MOTION FOR REMAND**

Description                                                                                        Page

I.      Introduction ...................................................................................................................1

II.     Background ....................................................................................................................3

III.    Standard of Review ......................................................................................................5

IV.    Discussion .......................................................................................................................6

A.   Removal Under § 1442(a)(1) Is Improper Because Defendants Have Not
Raised a Colorable Federal Defense, They Were Not Acting Under the Direction
of Any Federal Official, and This Lawsuit Does Not Threaten Any Cognizable
Federal Interest..........................................................................................................6

1.   The federal defense asserted by Defendants has been unanimously rejected
in the published case law, and is not "colorable" as a matter of law.................6

2.   As private regulated entities that are not performing any government
function, and that voluntarily *chose* to use MTBE in gasoline despite its
known hazards, Defendants were never acting under the direction of any
federal official.........................................................................................................8

a.   Defendants' compliance with RFG regulations does not transform them into
agents of the federal government....................................................................9

b.   There is no causal connection between RFG program requirements and the
conduct targeted by this lawsuit because refiners voluntarily chose to use
MTBE from among several available options .............................................12

c.   Whether or not Congress and/or EPA anticipated that Defendants would
make MTBE their oxygenate of choice is irrelevant ....................................15

3.   This state-law action to recover damages to State waters does not threaten the
federal Clean Air program or Defendants' ability to comply with it...................16

B.   The Court Should Remand and/or Abstain From Hearing This Case Because
It is  Is Not "Related To" The Texaco Bankruptcy, and Even If It Were, the
Abstention and Remand Provisions Under 28 U.S.C. § 1334 (c) and 1452 Apply
Squarely To This Case ............................................................................................17

i

1. Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not "related to" the Texaco Bankruptcy....................................................................17

2. Alternatively, the Court must abstain from hearing this case pursuant to 28 U.S.C. § 1334 (c)(2), because it is a state-law action with no basis for federal jurisdiction other than its alleged relation to a Title 11 proceeding .......................20

3. The Court must remand this action pursuant to § 1452(a) because it is a civil action by a governmental unit to enforce such governmental unit's police or regulatory power......................................................................................................................22

4. There are also ample grounds for the court to exercise its discretion to abstain from hearing this action pursuant to § 1334(c)(1) and/or to remand it to state court pursuant to . § 1452(b)..................................................................................................................23

5. If the Court chooses not to abstain or remand the action in its entirety, it should at least remand all claims other than those involving conduct of Texaco, Inc. arising prior to 1988.........................................................................................................................24

V.   Conclusion................................................................................................................25

## TABLE OF AUTHORITIES

**Statutes**
28 U.S.C. § 1334(b) .................................................................................................*passim*
28 U.S.C. § 1334(c) ...............................................................................................17
28 U.S.C. § 1334(c)(1) ..........................................................................................*passim*
28 U.S.C. § 1334(c)(2) ..........................................................................................*passim*
28 U.S.C. § 1442(a)(1) ..........................................................................................*passim*
28 U.S.C. § 1452 ....................................................................................................*passim*
28 U.S.C. § 1452(a) ..............................................................................................*passim*
28 U.S.C. § 1452(b) ..............................................................................................*passim*
42 U.S.C. § 7545(k) ..............................................................................................4
42 U.S.C. § 7545(k)(2)(B) .....................................................................................*passim*

**New Hampshire Revised Statutes Annotated**
RSA 146-A:3-a ......................................................................................................*passim*
RSA 358-A:2 .........................................................................................................5, 9

## Federal Regulations
56 Fed. Reg. 31154 ...............................................................................................15
62 Fed. Reg. 52194 ...............................................................................................15
65 Fed. Reg. 16094 ...............................................................................................4
40 C.F.R. § 79.21(g) .............................................................................................8

A.L.R. Fed. 297 (2000) .........................................................................................9

## Cases
*Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604 (N.D. Tex. 2002)........................7
*Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268 (C.D. Cal 1998) ...............10, 14
*Bakalis v. Crossland Savings Bank* 231 F. Supp. 2d 418 (E.D.N.Y. 1991) ..................12
*Brown v. Philip Morris, Inc.*, 250 F.3d 789 (3rd Cir. 2001)................................11
*Burdett v. Weiss*, 119 B.R. 385 (D.R.I. 1990)..........................................................24
*Burns v. Windsor Ins. Co.*, 31 F.3d 1092 (11th Cir. 1994) .....................................5
*Camacho v. Autoridad de Telefonos*, 868 F.2d 482 (1st Cir. 1989) ...........................*passim*
*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) .............................................8
*Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct., July 31, 2002) ......................7
*Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1 (1st Cir. 1999) .............................5, 6
*ExxonMobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246
    (9th Cir. 2000)................................................................................................
*Fidelity Fed. Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141 (1986) .......................8
*Fleet Bank-NH v. Engeleiter*, 753 F. Supp. 417 (D.N.H. 1991)..........................................6
*Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132 (1963)......................................8
*Garland & Lachance Constr. Co. v. City of Keene by Planning Bd*, 144 B.R. 586
    (D.N.H. 1991) ................................................................................................*passim*
*Geier v. American Honda*, 529 U.S. 861 (2000) .............................................................8
*Good v. Armstrong World Indus.*, 914 F. Supp. 1125 (E.D. Pa. 1996) .....................*passim*

*Hixon v. Unocal*, No. BC195295(Cal. Sup. Ct., L.A. Cty. Aug. 23, 2001).........................7

*Holten v. Chevron U.S.A.*, No. 00-4703 (D.N.J. Jul. 10, 2001).............................................7

*In re Branded Products*, 154 B.R. 936 (Bkrtcy W.D. Tex. 1993)...............................20, 21

*In re Casal*, 998 F.2d 28 (1st Cir. 1993)..............................................................................18

*In re Feitz*, 852 F.2d 455 (9th Cir. 1988)........................................................................2, 18

*In re Forster*, 146 B.R. 383 (Bkrtcy. N.D. Ohio 1992) ..................................................2, 22

*In re G.S.F. Corp.*, 938 F.2d 1467 (1st Cir. 1991)..............................................................18

*In re McGhan*, 288 F.3d 1172 (9th Cir. 2002)...............................................................2, 20

*In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61 (1st Cir. 2002)...............18, 21

*In re MTBE Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001)............................................*passim*

*In re Republic Readers Service, Inc.*, 81 B.R. 422 (Bkrtcy S.D. Tex. 1987) ....................22

*In re Rezulin Products Liability Litig.*, 133 F. Supp. 2d 272 (S.D.N.Y. 2001) .................24

*In re Santa Clara County Child Care Consortium*, 223 B.R. 40 (1st Cir. 1998) ...............24

*In re Texaco, Inc.*, 84 B.R. 893 (S.D.N.Y. 1988) ........................................................*passim*

*Jefferson County v. Acker*, 527 U.S. 423 (1999) ...........................................................3, 10

*Kubas v. Unocal*, No. BC191876 (Cal. Sup. Ct., L.A. Cty. Aug. 23, 2001) ......................7

*Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838 (S.D. Ohio 2002).......................*passim*

*Molloy v. Amerada Hess*, No. 2001/3996 (N.Y. Sup. Ct., July 31, 2002)...........................7

*Oxygenated Fuels Ass'n v. Davis ("Davis I")*, 163 F. Supp. 2d 1185 (E.D. Cal. 2001) *passim*

*Oxygenated Fuels Ass'n v. Davis ("Davis II")*, 331 F.3d 665 (9th Cir. 2003) ...........*passim*

*Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp. 2d 248 (N.D.N.Y. 2001)................*passim*

*People of State of Cal. v. Steelcase, Inc.*, 792 F. Supp. 84 (C.D. Cal. 1992) ....................24

*Ryan v. Dow Chem. Co.*, 781 F. Supp. 934 (S.D.N.Y. 1992) ......................................*passim*

*State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990) .............................................................8

*Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411 (D.N.H. 2002)........................*passim*

*Williams v. Shell Oil Co.*, 169 B.R. 684 (S.D. Cal. 1994) ..........................................*passim*

*Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195 (C.D. Tex. 1995)..............10

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF STATE OF NEW HAMPSHIRE'S MOTION FOR REMAND

## I.   INTRODUCTION

The Court should remand this action to the Superior Court of Merrimack County, New Hampshire, where plaintiff the State of New Hampshire (the "State") originally filed it, because no federal subject matter jurisdiction exists.  The action seeks damages and penalties for the fouling of New Hampshire's water resources by methyl tertiary butyl ether ("MTBE"), a chemical used by some oil companies in some gasoline in some parts of the country.  As explained more thoroughly below, neither of the two bases for removal asserted in the Notice of Removal (filed Nov. 10, 2003) (the "Notice") supports Defendants'[1] attempts to invoke federal court jurisdiction.

The Court should reject as nonsense Defendants' efforts to cast themselves as "corporations acting under the direction of federal officers or agencies" (Notice, ¶34) for purposes of 28 U.S.C. §1442(a)(1).  Congress designed §1442(a)(1) to protect federal officers, federal agencies and those acting "strictly and solely at federal behest," *Camacho v. Autoridad de Telefonos*, 868 F.2d 482, 486 (1st Cir.1989), against "interference in the course of their duties by hostile state courts." *Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411, 417 (D.N.H. 2002).  Defendants, of course, are private, for-profit companies that produce a consumer product; like all manufacturing businesses they are subject to federal environmental regulations.  Defendants' argument fails because:

> (1) No court has ever held that a private consumer product manufacturer's compliance with federal regulatory requirements constitutes acting "under the direction" of a federal officer. *See Tremblay*, 231 F. Supp. 2d at 418 (defendant's mere "participa[tion] in a

---

[1] The State will refer to the defendants who signed the Notice - Citgo Petroleum Corporation, Statoil Marketing & Trading (US) Inc., Motiva Enterprises, LLC, Shell Oil Company, Texaco Refining and Marketing, Inc., ChevronTexaco Corporation, Chevron U.S.A., Inc. and Sunoco, Inc. (R&M)- collectively, as "Defendants."  There are 14 defendants in this case who did not join in the removal.

1

regulated industry ... is not enough to demonstrate that it acted under the direction of a federal officer"); *Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support position that defendant "merely 'subject to complex regulations'" is entitled to removal under §1442(a)(1));

(2) There is no causal connection between Defendants' federal clean air obligations and the water pollution-related conduct at issue in this lawsuit because, among other things, Defendants voluntarily chose to use MTBE from among several available options. *See* 42 U.S.C. §7545(k)(2)(B) (mandates *oxygen* content, not MTBE in reformulated gasoline); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos); *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 950 (S.D.N.Y. 1992) (no nexus between design defect claim and defendants' provision of Agent Orange to the military, because defendant was "being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by defendants"); and

(3) The only federal defense Defendants allege to possess – federal preemption – is one that has been rejected by every published decision to have addressed the issue. *See Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665, 670, 673 (9th Cir. 2003) (joining decisions of other federal courts in rejecting preemption of state regulation of MTBE in order to prevent water pollution); *Exxon Mobil Corp. v. U.S. Environmental Protection Agency*, 217 F.3d 1246, 1253 (9thCir. 2000); *In re MTBE Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001); *Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp. 2d 248, 257 (N.D.N.Y. 2001); *Oxygenated Fuels Assoc. v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1185, 1187 (E.D. Cal. 2001).

Second, Defendants' attempt to predicate federal jurisdiction on the toehold of a 1988 bankruptcy order involving the predecessor of a single defendant also fails because:

(1) The outcome of this action can have no effect on the "administration of" a bankruptcy proceeding that concluded 15 years ago, and thus, there is no federal jurisdiction. *See In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (no jurisdiction under 28 U.S.C. §1334(b) because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan*, 288 F.3d 1172 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court");

(2) The court must abstain from hearing this case because it involves exclusively state-law claims and the only possible basis for federal jurisdiction is the remote bankruptcy issue; 28 U.S.C. §1334(c)(2). *See Garland & Lachance Constr. Co. v. City of Keene by Planning Bd.*, 144 B.R. 586, 591 (D.N.H. 1991) (abstention mandatory where state-law "action could not have been commenced in the District Court absent the jurisdiction conferred under §1334 for Title 11 cases");

(3) The State brings this action pursuant to its police and regulatory powers, and 28 U.S.C. §1452(b) expressly prohibits removal of such governmental actions. *See In re Forster*,

146 B.R. 383 (Bkrtcy. N.D. Ohio 1992) (state action to enforce environmental legislation and recover cleanup costs could not be removed under §1452(a)); and

(4) The presence of exclusively state-law claims and the extreme remoteness of any possible bankruptcy issues in this case warrant discretionary abstention and/or remand pursuant to 28 U.S.C. §§1334(c)(1) and 1452(b).

In short, this case is not removable and should be remanded back to New Hampshire courts.[2]

## II.   BACKGROUND

The State filed this action in the Merrimack County Superior Court on September 30, 2003 against 22 major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE to retail gasoline stations in New Hampshire.[3]  Defendants' choice to use MTBE in gasoline has created an unprecedented threat to the water resources of the State.  Complaint, ¶ 3.

As alleged in the Complaint, MTBE is a chemical used by some refiners in some gasoline products in some parts of the country.  Complaint, ¶ 26.  MTBE, which is linked to a variety of potential adverse health effects and renders drinking water unpalatable even at very low levels, has created the most serious groundwater contamination problem ever encountered in New Hampshire, and the problem is increasing.  *Id.*, ¶¶ 3, 38, 41, 68-71.  MTBE reaches the environment via leaks from tanks, pipes, and spills at gas stations and other facilities, and, once in soil and groundwater, behaves differently than other gasoline components, with pernicious effect.  *Id.*, ¶¶ 27-35.  As the U.S. Environmental Protection Agency ("EPA") has explained,

---

[2] Defendants also suggest in a footnote of their Notice that this lawsuit raises "serious and substantial federal questions." Notice at p. 4, n. 1. However, they do not assert federal question jurisdiction as a basis for removal, because, as they implicitly recognize, the State's Complaint raises exclusively state-law claims. Under the "well pleaded complaint" rule, the question of whether removal is warranted is determined by looking only to the face of the plaintiff's well pleaded complaint rather than to the potential existence of a defense based on federal law. *See Jefferson County v. Acker*, 527 U.S. 423, 431-32 (1999). In any event, as explained below, Defendants have no valid federal defense in this case.

[3] *See* the State's Writ of Summons and accompanying Declaration, attached as Exhibit 1 to the Notice. The Writ of Summons and Declaration are referred to herein collectively as the "Complaint."

3

> Unlike other components of gasoline, MTBE dissolves and spreads readily in the groundwater underlying a spill site, resists biodegradation, and is difficult and costly to remove from groundwater. Low levels of MTBE can render drinking water supplies unpotable due to its offensive taste and odor. At higher levels, it may also pose a risk to human health.

U.S. EPA, *Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline*, 65 Fed. Reg. 16094, 16094 (Mar. 24, 2000). Because of its peculiar properties, MTBE is showing up in an increasing number of public and private water supplies throughout New Hampshire, even where there is no known gasoline spill or leak nearby. Complaint, ¶¶ 36, 68-71.

Originally introduced as an octane enhancer in some gasoline, MTBE came into widespread use in the mid-1990s, when some refiners chose it to meet the requirements of the Reformulated Gasoline ("RFG") program under the federal Clean Air Act, *see* 42 U.S.C. § 7545(k), for gasoline in some areas of the country, including the four southern New Hampshire counties of Merrimack, Hillsborough, Rockingham and Strafford.[4] *See* Notice, ¶¶ 15-19; Complaint, ¶¶ 42-52. The RFG program requires that reformulated gasoline sold in areas subject to the program consist of approximately 2.0% oxygen by weight. 42 U.S.C. § 7545(k)(2)(B). As Defendants acknowledge, the RFG Program is both fuel-neutral and oxygenate-neutral in that it does not mandate the use of MTBE or any particular oxygenate. *Id.*; Notice, ¶ 30. Rather, it leaves the decision of how to meet the oxygen requirements to individual refiners, including Defendants. *Id.*[5]

Defendants supplied the State with gasoline containing MTBE (and continue to do so), even though they knew about the devastating risk of drinking water contamination posed by MTBE. *Id.*, ¶¶ 19-22. Despite this knowledge, Defendants failed to warn customers, retailers, or

---

[4] The "Oxyfuel Program" described in the Notice has never been in effect in New Hampshire.

[5] As explained in the text *infra*, the published case law is uniformly consistent on this point.

4

regulators, and failed to take any other precautionary measures to prevent or mitigate such contamination. *Id.* Instead, Defendants promoted MTBE, and gasoline containing MTBE, as environmentally sound products appropriate for widespread use. *Id.*¶¶ 57-67. Certain Defendants even engaged in separate and joint activities to suppress, conceal or discredit studies and other information regarding the hazards of MTBE. *Id.* As a result, MTBE contamination in New Hampshire is widespread and the costs of cleaning it up are enormous.

The State seeks by this action neither to ban the use of MTBE nor otherwise to regulate the content of gasoline in New Hampshire, but rather to ensure that the costs of responding to MTBE contamination in the State's waters are borne by the companies that chose to make and use it knowing of its risks yet failing to take the steps (including warnings) necessary to avoid or mitigate them. Complaint, ¶ 76, pp. 51-53. Accordingly, the Complaint asserts damages claims under state common law theories (including strict products liability, public nuisance, trespass, and negligence), as well as claims for cleanup costs and civil penalties under state statutes (including strict liability for environmental cleanup costs under N.H. Revised Statutes Annotated ("RSA") 146-A:3-a and penalties for violations of the State's consumer protection statute, RSA 358-A:2).

## III.   STANDARD OF REVIEW

A defendant seeking to remove a state court action has the burden of demonstrating that the federal court has subject matter jurisdiction. *Tremblay v. Philip Morris, supra,* 231 F. Supp. 2d at 414; *see also Danca v. Private Health Care Sys., Inc.,* 185 F.3d 1, 4 (1st Cir. 1999). If there is any doubt about the propriety of removal, the Court should reject federal jurisdiction and remand the case. *Tremblay,* 231 F. Supp. 2d at 414; *see also Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir. 1994) ("where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand"); *Danca,* 185 F.3d at 4 ("removal statutes are

5

strictly construed"). As demonstrated below, Defendants have failed utterly to meet their burden of establishing that the federal court has subject matter jurisdiction in this case.

## IV.   DISCUSSION

### A.   Removal Under § 1442(a)(1) Is Improper Because Defendants Have Not Raised a Colorable Federal Defense, They Were Not Acting Under the Direction of Any Federal Official, and This Lawsuit Does Not Threaten Any Cognizable Federal Interest.

Section 1442(a)(1) provides, in pertinent part, that an action may be removed to federal court by "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1). The primary beneficiaries of this statute are federal officers and agencies. *Tremblay*, 231 F. Supp. 2d at 417; *see also Fleet Bank-NH v. Engeleiter*, 753 F. Supp. 417, 419 (D.N.H. 1991) (§ 1442(a)(1) enacted "to provide the protection of a federal forum for federal officers"). For a private party defendant to invoke the statute, the defendant must: (1) assert a colorable defense based on federal law in the notice of removal; (2) establish that it was acting under the direction of a federal officer and that its federally directed actions are causally connected to the harm about which the plaintiff complains; and (3) demonstrate that adjudication of the plaintiff's claims in state court sufficiently threaten the enforcement of federal policy to warrant removal. *Tremblay*, 231 F. Supp. 2d at 417; *Ryan v. Dow Chemical Co., supra*, 781 F. Supp. at 949. Defendants fail on each of these required showings.

### 1.   The federal defense asserted by Defendants has been unanimously rejected in the published case law, and is not "colorable" as a matter of law.

The Court should not countenance Defendants bald assertion that federal preemption represents a "legitimate" federal defense in this case. Notice, ¶ 37. To the contrary, *every* published decision addressing preemption of state regulation (including tort duties) of MTBE has concluded that nothing in the Clean Air Act limits a state's authority to protect its drinking water, including by banning the substance outright. *Davis II, supra*, 331 F.3d at 673

6

(California's MTBE ban not preempted because "Clean Air Act's provisions regarding oxygenate fuel additives … preserve state authority to adopt and enforce measures to prevent water pollution"); *Exxon Mobil Corp. v. EPA, supra,* 217 F.3d at 1253 (affirming local regulation that effectively banned MTBE, because "state authority to regulate oxygenate levels [was not] limited" by the Clean Air Act); *In re MTBE Litig., supra,* 175 F. Supp. 2d at 615 (rejecting preemption challenge to state tort claims against MTBE gasoline refiners on grounds that Clean Air Act does nothing more than "set a *minimum standard* for oxygen content for gasoline to be used in certain … areas") (emphasis in original);[6] *OFA v. Pataki, supra,* 158 F. Supp. 2d at 257 (upholding New York ban on MTBE because "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA"); *Davis I, supra,* 163 F. Supp. 2d at 1187 (E.D. Cal. 2001) (upholding California MTBE ban against federal preemption challenge because "the Clean Air Act does not require that MTBE be made available to refiners"), *aff'd,* 331 F.3d 665, *supra; see also Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").[7]

---

[6] In Footnote 3 of their Notice, Defendants seem to suggest that *In re MTBE Litigation* upheld their purported federal preemption defense. As demonstrated in the quoted text above, the court rejected their preemption defense in that case.

[7] Defendants' citation of five unpublished trial court decisions regarding MTBE preemption (*see* Notice at 11, n.3) is unavailing. All of these decisions were rendered prior to *Davis II,* the first federal appellate decision squarely to reject a federal preemption defense to a state ban on MTBE. In addition, two of those decisions – *Coppola v. Amerada Hess,* No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess,* No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis of the Clean Air Act. Two others – *Kubas v. Unocal,* No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal,* No. BC195295 (same) – incorrectly assumed that assessing tort damages was equivalent to a regulatory ban. The fifth, *Holten v. Chevron U.S.A.,* No. 00-4703 (D.N.J. Jul. 10, 2001), did not concern preemption at all, but instead erroneously found that MTBE gasoline could not be defectively designed because Congress had approved its use. As described below (*see* footnote 9, *infra*), MTBE has never been approved by Congress or EPA.

Moreover, Defendants have failed to allege facts sufficient to establish a "colorable" preemption defense. *See State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990) (removing defendant must "allege facts that would support a colorable ... defense if those facts were true").  In particular, their claim that preemption applies because "EPA mandated RFG and approved and effectively required MTBE as an oxygenate in RFG" (Notice, ¶ 37) is insufficient as a matter of law because the type of conflict preemption alleged by Defendants[8] exists only where compliance with both federal and state law is a "physical impossibility." *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142-43 (1963).  Defendants concede (as they must) that the federal RFG program *at most* requires refiners to use any one of seven different oxygenates. Notice, ¶ 30.  As such, Defendants confirm that there can be no irreconcilable conflict between their federal obligations and a state law determination that one such oxygenate – MTBE – is defective.  As Defendants have failed even to allege that tort liability creates a "physical impossibility," the Court must reject their assertion that they have a colorable conflict preemption defense.[9]

**2. As private regulated entities that are not performing any government function, and that voluntarily *chose* to use MTBE in gasoline despite its known hazards, Defendants were never acting under the direction of any federal official.**

Whether or not their purported federal preemption defense is "colorable," Defendants cannot establish that they undertook their use of MTBE in gasoline, their failure to warn of its

---

[8] Based on the allegations in their Notice, Defendants do not contend that any other form of federal preemption – such as express preemption, *see Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992); occupation of the field, *see Fidelity Fed. Savings & Loan Assn. v. De la Cuesta,* 458 U.S. 141 (1986); or frustration of federal purpose, *see Geier v. American Honda,*  529 U.S. 861 (2000) – applies in this case. In any event, courts have repeatedly rejected these alternative preemption theories in MTBE cases. *See, e.g., Davis II,* 331 F.3d at 668-673 (rejecting express preemption and frustration of federal purpose arguments); *In re MTBE Litig.,* 175 F. Supp. 2d at 612-616 (same).

[9] In addition, Defendants' statement that MTBE was approved by EPA is both false and improper.  Under EPA's regulations, the agency's determination that an oxygenate is "available for use" pursuant to a "substantially similar" determination or a waiver (*see* Notice, ¶¶ 14-15) in no way "constitutes endorsement, certification, or approval by any agency of the United States." 40 C.F.R. §79.21(g). Indeed, these federal regulations expressly prohibit Defendants from making any such representations, here or anywhere else.

8

known hazards, their "direct or indirect" responsibility for its discharge to State waters (RSA

146-A:3-a), and their deceptive statements (RSA 358-A:2) "under the direction" of the federal

government. *See Ryan*, 781 F. Supp. at 945 ("the set of defendants who can avail themselves of

§ 1442(a) is smaller than the set of defendants who can make a colorable claim to a federal

defense"). Their attempt to do so fails for at least three obvious reasons: (a) Defendants, as

private actors merely complying with federal regulations, fall far outside the class of protected

persons under § 1442(a)(1); (b) because Defendants voluntarily chose to use MTBE from among

several available options, they cannot plausibly claim that they were acting "under the direction"

of EPA; and (c) this damages action regarding water contamination does not threaten any federal

clean air objectives.

> a. **Defendants' compliance with RFG regulations does not transform them into agents of the federal government**.

Defendants' attempt to characterize their compliance with the federal RFG program as

"acting under the color of federal authority" strains credulity. No court ever has held that a

private sector manufacturer merely subject to complex regulations, and not acting under the

operative *contractual* commands of federal officials, is acting "under the direction" of the federal

government pursuant to § 1442(a)(1). *See, e.g., Little v. Purdue Pharma, LP*, 227 F. Supp. 2d

838, 860-61 (S.D. Ohio 2002) ("body of law" does not support position that defendant "merely

'subject to complex regulations'" is entitled to removal under §1442(a)(1)); *see also generally*,

Wright, Miller and Cooper, *Federal Practice & Procedure (2003)*, Ch. 7, § 3727, *and* 166

A.L.R. Fed. 297 (2000) (in all cited cases where corporate manufacturer defendants successfully

removed state court tort actions under § 1442(a)(1), the defendants were government contractors

and the products at issue were produced for the government pursuant to contractual

specifications); *see also Ryan*, 781 F. Supp. at 943 (§ 1442 requires "narrow" and "restrictive"

construction).

Even the cases cited by Defendants in the Notice only highlight how far beyond the purview of § 1442(a)(1) this case lies.  *See Jefferson County v. Acker*, 527 U.S. 423 (1999) (removal upheld where defendants were federal court judges); *Camacho v. Autoridad de Telefonos*, 868 F.2d 482, 486 (1st Cir.1989) (removal upheld where defendants were quasi-public phone companies that facilitated federal agents' wiretapping of plaintiffs' calls "strictly and solely at federal behest"); *Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195, 1199 (C.D. Tex. 1995) (removal upheld where defendant chemical manufacturers "were compelled under threat of criminal sanctions to deliver Agent Orange to the Defense Department" during Vietnam War).[10]  Indeed, unlike the defendants in the cited cases, Defendants here are not federal contractors; they are not producing products for the government; they are not assisting federal agents in any law enforcement activity; nor are they performing any other governmental function.  Rather, they are private enterprises in the business of manufacturing and selling gasoline.  And, like virtually every other manufacturing business in the United States, they are subject to a variety of federal environmental regulations.

The New Hampshire federal district court last year squarely held that such participation in a regulated industry does not constitute "acting under the direction" of the federal government under § 1442(a)(1) in *Tremblay v. Philip Morris, supra.*  Like the Defendants here, the defendant cigarette manufacturer in *Tremblay* based their attempted removal of the plaintiffs' state law deceptive advertising claims on § 1442(a)(1), arguing that by "merely attempting to comply with the FTC's policies … when it engaged in the conduct for which it has been sued," it was acting under the direction of the FTC.  231 F. Supp. 2d at 417.  The court flatly rejected this argument, holding that "[a]lthough Philip Morris is a participant in a regulated industry, this is not enough

---

[10]  In each of the two other cases cited by Defendants in apparent support of their position – *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998) and *Ryan, supra*, 781 F. Supp. 934 – the courts also rejected the corporate defendants' attempts to remove under § 1442(a)(1).

10

to demonstrate that it acted under the direction of a federal officer." *Id.* at 418.  The Court
explained:

> The mere fact that a tobacco company has complied with the requirements
> of a federal law cannot suffice to transform it into a federal actor any more
> than the compliance of a myriad of private enterprises with federal law
> and administrative regulations could of itself work such a transformation.

*Id., quoting Brown v. Philip Morris, Inc.,* 250 F.3d 789, 801 (3rd Cir. 2001).  In *Little v. Purdue*

*Pharma, supra,* 227 F. Supp. 2d at 861, pharmaceutical corporations sued for injuries allegedly

caused by the drug OxyContin argued that FDA regulation and approval of the drug made them

*de facto* federal officers for purposes of § 1442(a)(1).  The court rejected removal, explaining:

> Corporate defendants herein do not operate at the discretion of federal
> authorities.  They are private, for-profit business organizations which exist
> independently of the federal government.  Lest participants in every
> regulated industry be entitled to "federal officer" status, corporate
> Defendants need to make a much greater showing than in doing the acts
> giving rise to Plaintiffs' claims, they were acting pursuant to a federal
> directive.  Acting under the watchful eye of the federal government is not
> enough.

*Id.*

Defendants' try (in a footnote, *see* Notice at 11 n.4) to distinguish *Tremblay* by

contrasting Philip Morris' "voluntary" compliance with proposed regulations on the one hand,

and their compliance with the comprehensive "federally mandated RFG program" on the other.[11]

*Id.*  However, *Little* eviscerates even this purported distinction, as nothing about the "highly

---

[11] Ironically, Defendants also try to distinguish *Tremblay* on the grounds that the plaintiffs' claims
focused on Philip Morris's "manipulat[ion of] the FTC's policies," while here the State allegedly seeks
recovery from the refiners "precisely because they complied with the RFG program."  Notice at 11 n.4.
In truth, in the very passage quoted by Defendants, the *Tremblay* court saw through Philip Morris's
transparent attempt to do exactly what Defendants are trying to do here – self-servingly recast the
plaintiff's allegations.  231 F. Supp. 2d at 419 ("The complaint does not allege that Philip Morris is liable
simply for complying with … FTC advertising policies …  Philip Morris's attempted recasting of
[plaintiffs'] claims is irrelevant").  This Court should reject Defendants' similar attempt to recast the
State's complaint, which does not allege that defendants are liable for complying with the Clean Air Act,
but rather alleges that they are liable for knowingly manufacturing and marketing a defective product that
has fouled the State's water supply.

regulated nature" of the pharmaceutical industry supported removal in that case. 227 F. Supp. at

860-61. Similarly, in *Bakalis v. Crossland Savings Bank* (cited by the *Tremblay* court, 231 F.

Supp. 2d at 418), the court held that even in cases involving "pervasive regulation" a corporate

defendant seeking removal under § 1442(a)(1) must show "'regulation plus'" – *i.e.* that "the

corporation is so intimately involved with the government functions as to occupy essentially the

position of an employee of the government." 781 F. Supp. 140, 145 (E.D.N.Y. 1991).

Defendants have made no such showing here, nor can they. *Tremblay*, *Brown* and *Little* control

here. To hold otherwise would create a huge loophole in this narrow removal statute.

      **b.**   <u>**There is no causal connection between RFG program requirements and**</u>
              <u>**the conduct targeted by this lawsuit because refiners voluntarily chose to**</u>
              <u>**use MTBE from among several available options.**</u>

      Even if participants in a regulated industry could claim protection under § 1442(a)(1) as a

general matter – which they cannot – Defendants have failed to establish any connection

whatsoever between any requirement under the Clean Air Act and either their use of MTBE in

gasoline or their failure to warn about its known hazards.[12]  Instead, Defendants simply

regurgitate phrases from the case law. *See, e.g., Ryan,* 781 F. Supp. at 947 (holding that a

defendant must act under the "direct and detailed control" of a federal officer, not merely the

"general auspices of federal direction" in order to obtain removal under § 1442(a)(1)).

Defendants present no support for their allegations of unusual levels of federal involvement in

their industry other than the length of EPA regulations pertaining to fuel content. Notice, ¶32.

This, however, is insufficient to support removal. *See, e.g., Good, supra,* 914 F. Supp. at 1129

(recitation of long list of federal employees with oversight authority over defendant "does not

---

[12] In fact, in their Notice, Defendants say almost nothing about the purported nexus between the RFG
program and the conduct at issue in this lawsuit, other than to allege baldly that: (a) "the federal
government directed and controlled the design of RFG," Notice, p. 11, n.4; (b) "federal involvement in
the refiners' use of RFG … far exceeds a government's general regulatory activity," *Id.*; and (c)
"[t]herefore, a federal directive caused the conduct about which plaintiff complains." *Id.,* ¶ 39.

support the blanket assertion that ... [the federal government] provided direct and detailed control over" defendant).

In any event, the Clean Air Act mandates *oxygen* content, not MTBE.  42 U.S.C. § 7545(k)(2)(B).  *Every* published decision that has addressed the issue has concluded that neither the Clean Air Act nor its implementing regulations requires refiners to use MTBE or any particular oxygenate in order to meet RFG requirements.  *See, e.g., ExxonMobil*, 217 F.3d at 1251-53 (Clean Air Act "does not mandate a 'recipe' or so-called government gas"); *In re MTBE Litigation,* 175 F. Supp. 2d at 615 (RFG Program does not mandate the use of MTBE); *Davis I,* 163 F. Supp. 2d at 1188 (Clean Air Act neither requires nor forbids the use of any particular oxygenate ... [i]t's 'goal' is to assure a particular oxygen content").  Even Defendants plainly and repeatedly acknowledge this. Notice, ¶¶ 18, 19, 25, 28, 30; n.4.  Defendants' use of MTBE is a matter of voluntary corporate choice, not a "necessary result" of Clean Air Act directives.

Defendants' choice to use MTBE breaks any causal connection between EPA's RFG regulations and Defendants' use of MTBE.  In *Good v. Armstrong World Industries*, where the removing defendant was a manufacturer of asbestos-containing turbine generators for use in Navy ships, the court remanded the plaintiff's asbestos-related personal injury claims to state court on the grounds that the Navy had not "specified the use of asbestos in the design and manufacture of the turbine generators."  914 F. Supp. at 1130.  Defendants here, like the defendant in *Good*, do not "meet [their] burden to make a causal connection between the state claim and the conduct undertaken pursuant to the direction given by an officer of the federal government." *Id.*[13]

---

[13] Defendants not only choose to use MTBE on their own, they also design and manufacture their own gasoline products, maintain control over their own distribution and retail networks (where applicable), and retain responsibility for their own warnings (or lack thereof) to downstream handlers, state officials and others.  Compliant, ¶¶ 14, 62-65.  Defendants do not (and cannot) contend otherwise.  Thus, the state-

13

The cases Defendants cite in their Notice actually illustrate why removal is inappropriate here. In *Ryan v. Dow Chemical Co*, a product liability suit against manufacturers of Agent Orange, the court found that there was no "nexus" between plaintiffs' design defect claim and defendants' provision of Agent Orange to the military during the Vietnam War (under threat of criminal sanction), because defendant was "being sued for formulating and producing a product all of whose components were developed without direct government control and all of whose methods of manufacture were determined by defendants." 781 F. Supp. at 950; *accord, Little, supra,* 227 F. Supp. 2d at 861 (because FDA was not involved in the "day-to-day drug development and manufacturing process," defendants were "operating at their own initiative"). The same is true here. As Defendants concede, refiners blended MTBE into gasoline long before the 1990 Clean Air Act Amendments and the advent of RFG. *See* Notice, ¶ 15. While EPA may ultimately have certified that various blends of gasoline containing MTBE comply with the Act's oxygen requirements, the oil refiners -- not the federal government -- designed, formulated, and sold such products. There is no "nexus" between Defendants' compliance with federal regulations and the State's tort claims.

Indeed, in *Arness v. Boeing North America, Inc., supra,* a groundwater contamination case against manufacturers of government rocket engines, the court held that the targeted conduct – failing to warn and improperly disposing of trichloroethylene ("TCE") – was not "under the direction" of the government, even though the government contracts at issue had specifically required use of TCE. 997 F. Supp. at 1275. Here, where the government does *not* require use of MTBE, the Defendants cannot fairly argue that federal directives "caused" the conduct on which State bases its common law and statutory claims.

---

law tort and statutory claims asserted in the State's complaint (including defective design, failure to warn, nuisance, "direct or indirect" responsibility for discharges of MTBE to water, and deceptive business practices) target conduct over which neither EPA nor any other federal agency had any control.

**c.** **Whether or not Congress and/or EPA anticipated that Defendants would make MTBE their oxygenate of choice is irrelevant.**

Defendants' suggestion that the federal government made their choice to use MTBE for them because Congress and EPA were allegedly "well aware" that refiners would use MTBE and "affirmatively encouraged" them to do so (see Notice, ¶¶ 19-20, 38-39) misses the mark for at least two reasons. First, Defendants grossly distort the legislative and regulatory history pertaining to the RFG program. As the court explained in *In re MTBE Litigation*,

> [W]hile members of Congress may have anticipated that MTBE would be used to meet the oxygenate requirements, . . . the legislative history of the 1990 CAA amendments indicates that Congress, through the RFG Program, sought to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations." [citation omitted.] Indeed, Congress expected that oxygenates would compete in the marketplace.

175 F. Supp. 2d at 612-13. The truth is that EPA specifically contemplated use of ethanol, blends of methanol/gasoline grade tertiary butyl ether, blends of methanol and various other cosolvent alcohols, as well as MTBE, because all were "available for use" under fuel registration provisions. *See* U.S. EPA, *Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of the Clean Air Act as Amended*, 56 Fed. Reg. 31154, 31161 (Jul. 9, 1991).[14]

Second, Defendants' argument is irrelevant for purposes of § 1442(a)(1). None of their citations to the legislative history or EPA regulations even remotely suggests a federal intent to impose federal *control* over Defendants' refining operations. To the contrary, the legislative history of the 1990 Clean Air Act Amendments indicates unequivocally that the RFG program

---

[14] Defendants also allege that EPA was aware of MTBE's potential to contaminate groundwater as early as 1988. Notice, ¶ 33. This is as disingenuous as it is misleading. In 1997, two years after the RFG program took effect, EPA still had insufficient evidence to determine "the extent of contamination of drinking water supplies on a national scale." 62 Fed. Reg. 52194, 52211 (Oct. 6, 1997). Indeed, the State alleges in its Complaint that defendants deliberately suppressed information regarding MTBE's hazards in order to deceive government regulators. *See* Complaint, ¶ 67.

15

was "in no way intended to resurrect a 1970's DOE-type scheme of detailed government intervention in U.S. gasoline markets." *Pataki*, 158 F. Supp. 2d at 256-57. Accordingly, Defendants fail to show that either their use of MTBE in gasoline, or the harm it has wrought, is anyone's fault but their own.

### 3. This state-law action to recover damages to State waters does not threaten the federal Clean Air program or Defendants' ability to comply with it.

Defendants' attempt to avail themselves of § 1442(a)(1) fails, finally, because the State's lawsuit in no way conflicts with either the requirements or purposes of the federal RFG program. The underlying purpose of § 1442(a)(1) is to make a federal forum available "when particular litigation implicates a cognizable federal interest." *Camacho*, 868 F.2d at 487. Defendants suggest that the State seeks to "prohibit" conduct "effectively required" by the RFG program. This "straw man" argument is nonsense, not just because the RFG program does not actually require use of MTBE, but because this lawsuit does not seek to prohibit defendants from doing anything that would implicate any federal law obligation.

As the Complaint makes clear, this case is about water pollution, while the RFG program seeks to control air emissions. *See, e.g. Davis II*, 331 F.3d at 668 (state MTBE ban not preempted by Clean Air Act in part because state seeks to protect groundwater, not regulate air emissions). In addition, the State does not seek to regulate the content of gasoline, but seeks *damages*, because, among other things, the defendants knowingly disseminated a dangerous product, failed to provide adequate warnings regarding its hazards, and otherwise breached their state law duties to avoid unreasonable and foreseeable harm to the State's water resources. As *Davis I, Davis II, Pataki* and *Exxon Mobil* (all discussed in Section IV.A.1, *supra*) make clear, nothing in the Clean Air Act stands in the way of even a total state ban of MTBE. Accordingly, assessing tort liability for failing to take the steps that would have avoided polluting the State's

16

waters does not prevent Defendants' or other refiners' use of MTBE, let alone their compliance with RFG requirements.[15]

Resolution of the state-law tort and statutory duties asserted in this case in state court will, therefore, pose no conceivable threat to any federal interest under the Clean Air Act. For all these reasons, Defendants have failed to establish jurisdiction under § 1442(a)(1).

**B. The Court Should Remand and/or Abstain From Hearing This Case Because It Is Not "Related To" The Texaco Bankruptcy, and Even If It Were, the Abstention and Remand Provisions Under 28 U.S.C. §§ 1334(c) and 1452 Apply Squarely To This Case.**

This Court should also reject Defendants' alternative assertion that federal bankruptcy jurisdiction exists. Their contention that this state-law environmental contamination lawsuit against 22 defendants represents a purported "collateral attack" against a 15-year-old bankruptcy order pertaining to the alleged predecessor of a single defendant (*see* Notice, ¶¶ 40-45) fails because: (1) federal jurisdiction is lacking in the first instance as this case neither arises under Title 11, arises in a case under Title 11, nor is "related to" a case under Title 11; (2) the mandatory abstention provision of 28 U.S.C. §1334(c)(2) relating to state-law actions applies; (3) the very removal provision on which Defendants predicate their Notice expressly prohibits removal of government "police power or regulatory" actions like this one; and (4) discretionary remand and/or abstention is obviously warranted in light of the overwhelming – indeed, exclusive – predominance of state-law issues on the one hand, and the extreme remoteness of any bankruptcy issues on the other.

**1. Federal bankruptcy jurisdiction is lacking in the first instance, as this case is not "related to" the Texaco Bankruptcy.**

Texaco, Inc., an alleged predecessor to Defendant ChevronTexaco Corp., filed for

---

[15] It is true that one way Defendants could have avoided the injuries alleged by the State would have been to use a different oxygenate; indeed, had the Defendants ever considered the cost of cleaning up fouled drinking water (as they should have), they may well have avoided MTBE from the start.

bankruptcy under Title 11 in 1987 and obtained confirmation of its reorganization plan in 1988.

Notice, ¶42; *In re Texaco, Inc.*, 84 B.R. 893 (S.D.N.Y. 1988). Because the 15-year-old Title 11

proceedings (the "Texaco Bankruptcy") are no longer being administered, and the rights of all

creditors already have been determined in the Confirmation Order, the outcome of this case will

have absolutely no effect on *the administration of* the Bankruptcy. It is, therefore, not "related

to" this action, and cannot form a basis for federal jurisdiction.

Under 28 U.S.C. §1334(b), "district courts shall have original but not exclusive

jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under

title 11." Cases "arising under" Title 11 are "those cases in which the cause of action is created

by title 11," and those "arising in a case under" Title 11 are those that, while "not based on any

right expressly created by title 11, ... nevertheless, would have no existence outside of the

bankruptcy." *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 68 (1st Cir. 2002).

This case undoubtedly does *not* fit into either of these jurisdictional categories, as the exclusively

state-law causes of action asserted in the Complaint "exist independently of bankruptcy law."

*Williams v. Shell Oil Co.*, 169 B.R. 684, 688 (S.D. Cal. 1994).

Nor is this case "related to" the long-since-resolved Texaco Bankruptcy. Whether a civil

proceeding is "related to" bankruptcy depends on "whether the outcome of the proceeding could

conceivably have any effect on the estate *being* administered." *In re G.S.F. Corp.*, 938 F.2d

1467, 1475 (1st Cir. 1991), *abrogated on other grnds, In re Casal*, 998 F.2d 28 (1st Cir. 1993)

(emphasis added); *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (same). *Feitz* involved a cross-

claim filed by a debtor's wife against a mortgagee in her husband's bankruptcy proceeding. The

cross-claim was filed a mere four months after the bankruptcy court's entry of a confirmation

order as to the bankruptcy estate. *Id.* at 456. Like the Texaco Confirmation Order at issue here,

the confirmation order in *Feitz* precluded creditors from asserting any other interest than that

18

provided for them in the confirmed plan. *Id.* at 458. The Ninth Circuit held there was no federal "related to" jurisdiction over the cross-claim because entry of the confirmation order "*destroyed any possible relationship between the outcome of the suit and the administration of the bankruptcy estate.*" *Id.* (emphasis added).

Likewise, there is no conceivable chance that this case will affect the administration of the Texaco Bankruptcy, because it is no longer being administered. By definitively "discharg[ing] forever any and all claims or liabilities arising before" its effective date (Notice, ¶42), entry of the Texaco Confirmation Order fifteen years ago destroyed any possible relationship between the outcome of this suit and the *administration of* the Texaco Bankruptcy. Moreover, the State has no interest in re-opening such Bankruptcy or "collaterally attacking" the Confirmation Order. Thus, the mere fact that allegations in the Complaint may potentially cover some pre-1988 conduct of Texaco (as defendant ChevronTexaco's predecessor in interest), does not furnish grounds for federal "related to" jurisdiction under § 1334(b). Rather, it means only that ChevronTexaco may have a discharge defense based on the Confirmation Order as to some small portion of its liability – a defense that a state court is fully capable of adjudicating. *See In re McGhan*, 288 F.3d 1172 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

Defendants' reliance on *Texaco v. Sanders (In re Texaco Inc.)*, 182 B.R. 937 (Bkrtcy. S.D.N.Y. 1995), for the proposition that this action constitutes a "collateral attack" on the 1988 Confirmation Order and is within the "core jurisdiction" of the federal bankruptcy court is misplaced. That case did not involve a motion to remand a state court action that had been removed to federal court by the debtor. Instead, it involved an affirmative motion by the debtor (Texaco) – filed on the eve of trial in a pending state court tort suit – to reopen its bankruptcy

19

proceeding and to enforce the Confirmation Order against the plaintiffs in the state court case. *Id.* at 940-41.[16] The federal bankruptcy court granted Texaco's motion on the common sense grounds that "a proceeding such as this, *to enforce and construe a confirmation order issued by this Court in this case*, constitutes a proceeding 'arising in or related to a case under title 11'" under § 1334(b). *Id.* at 944 (emphasis added). Thus, the Texaco bankruptcy court did not, and was not asked to, address the question presented here: whether a state tort suit (potentially) involving (some) pre-Confirmation Order Texaco conduct, and filed years after entry of such Order, is "related to" the Bankruptcy. The answer to this question, as explained above, is "no."

## 2. Alternatively, the Court must abstain from hearing this case pursuant to 28 U.S.C. § 1334(c)(2), because it is a state-law action with no basis for federal jurisdiction other than its alleged relation to a Title 11 proceeding.

Even if this action were "related to" the Texaco Bankruptcy pursuant to § 1334(b) – which it is not – the Court must nonetheless abstain from hearing it pursuant to 28 U.S.C. § 1334(c)(2).[17] Section 1334(c)(2) provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

As this Court held in *Garland & Lachance Const. Co., Inc. v. City of Keene by Planning Bd.*:

---

[16] *Texaco v. Sanders* is also readily distinguishable on its facts: the state court plaintiffs' entire case consisted of claims based on pre-confirmation conduct by Texaco, whereas here only a negligible portion of this multi-defendant action could possibly implicate Texaco's pre-confirmation conduct. *Id.* at 951.

[17] Although a small minority of courts have held that mandatory abstention (absent a motion to remand) is inapplicable to removed cases because it is a dismissal device and would leave no claim to go forward, *see, e.g., In re Branded Products*, 154 B.R. 936 (Bkrtcy. W.D. Tex. 1993), the majority of courts have rejected this "hypertechnical" interpretation and held that mandatory abstention is applicable to removed cases. *Williams*, 169 B.R. at 691. Of course, in this case, the State has filed a combination remand/abstention motion.

> Mandatory abstention is required when the Motion for Abstention is
> timely made and the underlying proceeding is (a) based on a state law
> claim or cause of action; (b) commenced in the state court; (c) capable of
> timely adjudication in the state court; (d) an action that could not have
> been commenced in a court of the United States absent the jurisdiction
> conferred under § 1334 for Title 11 cases; and (e) is related to a case
> under Title 11, but is not a case arising under Title 11 or arising in a case
> under Title 11.

144 B.R. 586, 591 (D.N.H. 1991).

Each of these criteria applies here. This Motion was made as soon as practicable

following service of the Notice of Removal. As in *Garland,* this lawsuit is based exclusively on

state-created rights, has been commenced in state court and is capable of timely adjudication

there. Resolution of the action "does not present a federal question, a constitutional challenge or

a basis for diversity jurisdiction, and [in light of the lack of jurisdiction under § 1442(a)(1), as

discussed in Section A, *supra*] the action could not have been commenced in the District Court

absent the jurisdiction conferred under § 1334 for Title 11 cases." *See Garland,* 144 B.R. 586 at

591. Finally, as discussed in section IV.B.1 *supra,* the State's action neither "arises under" nor

"arises in" a case under Title 11. *See In re Middlesex Power Equipment & Marine, Inc.,* 292

F.3d at 68.

In *Williams v. Shell Oil Co., supra,* the court applied the same factors articulated in

*Garland,* and determined that mandatory abstention was proper on facts strikingly similar to

those here. *Williams* was a multi-defendant mass tort case involving polybutylene plumbing

systems that was pending in state court, when a single defendant attempted removal pursuant to

28 U.S.C. § 1452 on grounds that another defendant (with whom the removing defendant had

entered into an indemnification agreement) had filed for bankruptcy. 169 B.R. at 687. Finding,

*inter alia,* that "only state law causes of action are involved," the court concluded that it was

required to abstain and remand the case under § 1334(c)(2). As "[s]tate courts afford the best

forum for deciding issues whose resolution turns on interpretation of state law," this Court

21

should do the same. *See In re Republic Readers Service, Inc.*, 81 B.R. 422, 427 (Bkrtcy. S.D.Tex. 1987).

### 3. The Court must remand this action pursuant to § 1452(a) because it is a civil action by a governmental unit to enforce such governmental unit's police or regulatory power.

Section 1452(a) constitutes an additional and independent bar to the removal of this action. Defendants cite § 1452(a) in their Notice (¶4), but omit the portion of that provision that is fatal to removal in this case. The pertinent portions of § 1452(a) read in full:

> A party may remove any claim or cause of action in a civil action *other than ... a civil action by a governmental unit to enforce such governmental unit's police or regulatory power* .. if [the] district court has jurisdiction of such claim or cause of action under section 1334 of this title [emphasis added].

The State brings this action expressly pursuant to both its police and regulatory powers. *See, e.g.,* Complaint ¶¶ 8, 10. The State seeks, among other things, civil penalties and cost recovery under state environmental and consumer protection statutes based on alleged violations of those statutes. As such, this case fits squarely within the § 1452(a) prohibition on removal of government enforcement actions, and must be remanded. *See In re Forster*, 146 B.R. 383 (Bkrtcy. N.D. Ohio,1992) (state court action to enforce environmental legislation and recover costs resulting from violations thereof was an action for enforcement of governmental unit's "police or regulatory power," and could not be removed to federal court under § 1452(a)).[18]

While Defendants may argue that § 1452(a) does not bar removal of the State's common law damages claims, the argument is academic since the State's statutory environmental claim under RSA 146-A:3-a (Complaint, Count IV), which is clearly subject to the bar, provides a complete and independent basis for virtually all of the relief sought by the State – *i.e.* recovery of

---

[18] Additionally, paragraph 8 of the 1988 Texaco Confirmation Order states that it "does not impair ... the claims of any governmental unit arising under any environmental legislation," and that such claims "will survive the Reorganization Cases as if they had not been commenced." *In re Texaco Inc.*, 84 B.R. at 895.

22

all costs to remediate, treat and restore contaminated waters and the surrounding environment.

See RSA 146-A:3-a. Consequently, the government enforcement bar to removal in § 1452(a)

renders the exercise of federal jurisdiction over the State's remaining common law claims

duplicative and unnecessary. At the very least, remand of the State's statutory enforcement

claims (Complaint, Counts IV and VII) is required under § 1452(b).

   **4.  There are also ample grounds for the court to exercise its discretion to abstain
       from hearing this action pursuant to § 1334(c)(1) and/or to remand it to state
       court pursuant to § 1452(b).**

   As Defendants acknowledge, the District Court's jurisdiction over bankruptcy

proceedings is concurrent with that of state courts. 28 U.S.C. § 1334(b); see Notice, ¶ 40.

Accordingly, even if this Court were to somehow decline to abstain and remand under the

mandatory provisions in §§ 1334(c)(2) and 1452(a), then it should exercise its discretionary

power to abstain and remand pursuant to §§ 1334(c)(1) and 1452(b).

   Section 1334(c)(1) provides as follows:

   Nothing in this section prevents a district court in the interest of justice, or
   in the interest of comity with State courts or respect for State law, from
   abstaining from hearing a particular proceeding arising under title 11 or
   arising in or related to a case under title 11.

28 U.S.C. §1334(c)(1). Section 1452(b) similarly provides that "the court to which [a] claim or

cause of action is removed [pursuant to § 1334 jurisdiction] may remand such claim or cause of

action on any equitable ground." 28 U.S.C. § 1452(b). In determining whether to exercise their

equitable discretion under these statutes, courts have looked to parallel sets of factors, which

include: (1) the effect of the action on the administration of the bankruptcy; (2) the extent to

which issues of state law predominate over bankruptcy issues; (3) the complexity or difficulty of

applicable state law; (4) comity; (5) the existence of a right to a jury trial; (6) the effect of

bifurcating the claims and parties to an action and the possibility of inconsistent results; and (7)

23

prejudice to the parties involuntarily removed from state court. *See, e.g., In·re Santa Clara County Child Care Consortium,* 223 B.R. 40, 46 (1st Cir. 1998); *Burdett v. Weiss,* 119 B.R. 385, 387 (D.R.I. 1990); *Williams,* 169 B.R. at 692-93; *In Re Foster,* 146 B.R. 383.

In this case, every factor listed above favors abstention and remand: (1) the effect of this action on the administration of the Texaco Bankruptcy is, at most, incredibly remote; (2) the action is based entirely on state statutory and common law theories; (3) the case is best resolved by the state court having expertise in such state-law theories (as well as the ability to decide any peripheral bankruptcy issues that may arise); (4) the state court has an overriding interest in the action, since it involves state-law issues and contamination of state resources; (5) the State's claims are triable by a jury; (6) bifurcation, and the potential for inconsistent rulings, is inevitable if this Court does not remand the entire action (since the statutory environmental claims, which present the same or similar questions of fact as the State's common law nuisance and trespass claims, cannot be removed pursuant to § 1452(a)); and, finally, (7) all non-consenting parties will suffer prejudice if this action is removed to a federal forum based solely on the bankruptcy of one defendant's predecessor.[19]

## 5. If the Court chooses not to abstain or remand the action in its entirety, it should at least remand all claims other than those involving conduct of Texaco, Inc. arising prior to 1988.

Finally, should this Court decide that it has jurisdiction over claims involving the pre-1988 conduct of Texaco, Inc., and should it decline to remand and/or abstain from hearing such claims under the mandatory and discretionary provisions discussed above, then the State

---

[19]   Because the statutory grounds for remand and mandatory and/or discretionary abstention are so clear, the Court need not address whether the State's Eleventh Amendment sovereign immunity also bars removal of this case. *People of State of Cal. v. Steelcase Inc.,* 792 F. Supp. 84, 86 (C.D.Cal. 1992) ("since the immunity granted by the Eleventh Amendment is an immunity from being made an involuntary party to an action in federal court, it should apply equally to the case where the state is a plaintiff in an action commenced in state court and the action is removed to federal court by the defendant"); *contra, In re Rezulin Products Liability Litig.,* 133 F. Supp. 2d 272, 297 (S.D.N.Y. 2001). However, nothing in this Motion waives any rights the State may have under the Eleventh Amendment with respect to removal of this action.

respectfully requests that the Court retain *only* those non-statutory, bankruptcy-related claims related to Texaco's pre-1988 conduct, and remand all others. *See* 28 U.S.C. § 1452 (permitting removal and remand of specific claims).

## V.    CONCLUSION

For the foregoing reasons, this Court does not have subject matter jurisdiction over this action and/or should abstain from hearing it. Accordingly, the State respectfully requests that this Court grant this Motion, and issue an order remanding this case in its entirety to the Merrimack County Superior Court.

Respectfully submitted,

THE STATE OF NEW HAMPSHIRE
PETER W. HEED, ATTORNEY GENERAL

Dated: November 19, 2003

Maureen D. Smith, NH Bar # 4857
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679
Fax: (603) 223-6270

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

OF COUNSEL:

SHER & LEFF, LLP
Victor M. Sher (Adm. in California)
Todd E. Robins (Adm. in California)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

LAW OFFICES OF MATTHEW F.
PAWA, P.C.
Matthew F. Pawa (Adm. in Massachusetts)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re: Methyl Tertiary Butyl Ether                    MDL No. 1358
("MTBE") Products Liability Litigation
                                                       Master File C.A. No. 1:00-1898 (SAS)

-------------------------------------------------------X

This Document Relates To: All Cases

-------------------------------------------------------X

## [PLAINTIFFS' PROPOSED]
## CASE MANAGEMENT ORDER

### I.    Prior Orders; Filing; Service

Except as otherwise noted below, this Order supersedes prior Case Management Orders

in MDL No. 1358.  Attached hereto as Appendix A is a list of the cases that are currently

consolidated in this multidistrict litigation, designated MDL 1358, which have either been filed

in his Court or transferred to this Court pursuant to 28 U.S.C. § 1407.  A Copy of this Order shall

be filed in each case listed in Appendix A.  In cases subsequently filed in, removed or transferred

to this Court as part of MDL 1358, a copy of this Order shall be provided by the Clerk to each

plaintiff at the time the case is filed in or transferred to this Court, and each Plaintiff shall

promptly serve a copy of this Order on any defendant not previously a party in MDL 1358.

### II.   Interim Measures

#### A.    Pre-Trial Consolidation

The cases listed in Appendix A are consolidated for pre-trial proceedings.  This Order

does not constitute a determination that these actions shall be consolidated for trial, nor does it

have the effect of making any entity a party to an action in which it has been joined or served in

accordance with Federal Rules of Civil Procedure.  All cases subsequently filed in, removed or

transferred to this Court as part of MDL No. 1358, shall be similarly consolidated for pre-trial proceedings.

**B.** **Master Docket and File**

The Clerk will maintain a master docket and case file under the style In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No. 1358, as Master File No. 1:00-1898 (SAS). Orders, pleadings, motions and other documents bearing a caption similar to that of this Order will, when docketed and filed in the master file, be deemed docketed and filed in each individual case to the extent applicable, and ordinarily will not be docketed separately or physically filed in such individual cases.

**C.** **Captions; Separate Filing**

Orders, pleadings, motions and other documents will bear a caption similar to that of this Order. If generally applicable to all consolidated matters, they shall include in the caption the notation that they relate to "all cases" and shall be filed and docketed only in the master file. Documents intended to apply only to particular cases will indicate in their caption the name(s) of the case(s) to which they apply, and extra copies shall be provided to the Clerk to facilitate filing and docketing both in the master file and each of the specified individual files.

**III.** **Party Organization; Liaison Counsel**

**A. Liaison Counsel**

The Court directs the parties to coordinate their actions through Liaison Counsel. Nothing herein shall restrict the substantive rights of any party, including the right to be represented by separate counsel or to take separate positions from other parties. For purposes of nominating and coordinating with the Liaison Counsel, the parties to the declaratory judgment actions in

2

Appendix A shall be reversed, so that the nominal plaintiffs in those actions are aligned with defendants in the other cases and vice-versa.  Liaison Counsel shall:

1. Maintain and distribute to co-counsel and to the opposing Liaison Counsel an up-to-date service list;

2. Coordinate with opposing Liaison Counsel and with the Court on scheduling issues;

3. Be responsible for the service and filing of joint pleadings and communications with the Court to the extent practicable;

4. Receive and, as appropriate, distribute to co-counsel orders from the Court and documents from opposing parties and counsel; and

5. Maintain and make available to co-counsel at reasonable hours a complete file of all documents served by or upon each party except such documents as may be available at a document depository.

Plaintiffs designate as their liaison counsel Stanley N. Alpert, Weitz & Luxenberg, 180 Maiden Lane, 17th Floor, New York, New York 10038.  Defendants shall designate a liaison counsel within 10 days of the entry of this CMO, and serve notice of its deisgnation upon all parties in accordance with the terms of this CMO.

**B.**    **Plaintiffs' Co-Lead Counsel  and Executive Committee**

The Court hereby incorporates Parts III.A ("Plaintiffs' Co-Lead Counsel") and III.C ("Plaintiffs' Executive Committee") from Case Management Order No. 1 filed Nov. 8, 2000. The following attorneys shall serve as co-lead counsel pursuant to Part III.A of CMO No. 1: Robert J. Gordon, Weitz & Luxenberg, 180 Maiden Lane, 17th Floor, New York, New York

3

10038; Victor M. Sher, Sher Leff, 450 Mission Street, Suite 500, San Francisco, California

94105; and Scott Summy, Baron & Budd, 3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas

71209.  The Plaintiffs' Executive Committee shall consist of Co-Lead Counsel as well as the

following attorneys pursuant to Part III.C of CMO 1:  Marc Bern, Napoli Kaiser & Bern, New

York, New York, and Duane Miller, Miller, Axline and Sawyer, Sacramento, California.


## IV.    Service of Documents

### A.    Orders

A copy of each order will be provided to Plaintiffs' Liaison Counsel and Defendants'

Liaison Counsel for distribution as appropriate to other counsel and parties.  Plaintiffs' Liaison

Counsel shall distribute copies to other counsel for plaintiffs; defendants' Liaison Counsel shall

distribute copies to other counsel for defendants.

### B.    Pleadings, Motions, and Other Documents

The parties shall serve other parties with all pleadings, motions and other Court filings in

PDF format by electronic means, either by electronic mail or by such other method as the parties

and the Court might agree.  Pursuant to Fed. R. Civ. P. 5, service on Liaison Counsel constitutes

service on other attorneys and parties for whom Liaison Counsel acts.  For the purpose of

computing time under Fed. R. Civ. P. 6, 1 day shall be added to the prescribed period when

effecting service by electronic means under this CMO.

## V.    Motions; Pleadings; Discovery

### A.    Reconsideration; Interlocutory Appeal

Any party who wishes to move for reconsideration or certification for interlocutory appeal

4

of the Court's March 16, 2004, order denying remand shall do so within 15 days from the entry of this Case Management Order. In the event any party files such a motion, any party opposing the motion shall file its briefs in opposition within 15 days of the motion's filing date, and movants may file reply briefs within 10 days of the filing of the opposition briefs.

**B.**   **Misjoinder; personal Jurisdiction**

Any defendant who contends that it was improperly named, or that personal jurisdiction over it is lacking, shall identify themselves in writing to counsel for plaintiffs, with an explanation of the factual and legal grounds for that contention, within 10 days from the date of entry of this order.

**C.**   **Amendments To Complaints**

Any plaintiff in any removed action that wishes to amend its complaint may do so as of right within 30 days from the date of entry of this order.

**D.**   **Answers; Rule 12(b) Motions**

1. *Removed actions.* Defendants shall answer or move for relief from the complaint within 20 days from the expiration of the period set forth in Paragraph V.C supra. In the event defendants move under Fed. R. Civ. 12(b) to dismiss the complaints, plaintiffs shall file briefs in opposition to the motion within 30 days of the filing of defendants' motion, and defendants shall file any replies within 10 days of the filing of plaintiffs' opposition brief.

2. *Declaratory judgment actions.* Within 30 days from entry of this CMO, plaintiffs in the declaratory judgment actions consolidated herein will either dismiss them voluntarily, or else inform the parties and the Court that they intend to pursue those actions in MDL 1358 with a short written explanation of the reasons for that decision.. In the event the declaratory judgment

5

plaintiffs elect to proceed with those actions, defendants to those actions shall have 20 days from

the expiration of that 30-day period to answer or move for relief from the declaratory judgment

complaints. In the event the declaratory judgment defendants move under Fed. R. Civ. 12(b) to

dismiss the complaints, plaintiffs shall file briefs in opposition to the motion within 30 days of

the filing of defendants' motion, and defendants shall file any replies within 10 days of the filing

of plaintiffs' opposition brief.

### E. Discovery

To assure that all parties who may be named as defendants are promptly identified and

served, discovery relating to the identification of entities that manufactured, distributed or sold

MTBE or TBA, or gasoline containing MTBE or TBA, shall commence immediately upon entry

of this CMO.

### F. Consolidated Papers

In all motions and briefs filed in this MDL, plaintiffs and defendants are each instructed,

to the extent possible, to file consolidated papers to avoid a multiplicity of motions and briefs in

this case.

## VI. Disclosures Pursuant to Rule 26(a)

Disclosures pursuant to Rule 26(a)(1) shall not be required in this matter.

## VII. Subsequent Cases and Case Management Orders

The Court may issue additional case management orders as appropriate to provide for the

prompt, fair and efficient administration of this matter. As and when additional cases may be

transferred or removed to or filed in this Court as part of MDL 1358, the Court will issue orders

6

calling for those cases to proceed in a manner consistent with the procedure set forth herein and, to the extent practicable, will require those cases to follow a schedule that is the same as or similar to the schedule herein.  Parties so transferred or removed to this Court shall have 30 days in which to move for remand or to assert such other objections to jurisdiction as may be available to them.

## VIII.   <u>Privileges Preserved</u>

No communication among Plaintiffs' Counsel and Plaintiffs or among Defendants' Counsel and Defendants shall be taken as a waiver of any privilege or protection to which they would otherwise be entitled.

_____
HON. SHIRA A. SCHEINDLIN
United States District Court Judge
Southern District of New York

Dated: March 23, 2004
New York, New York

7