1358

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 0 1 2004

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| **IN RE:**<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | **MDL Docket No. 1358**<br><br>This Document Relates to:<br>*California-American Water Company v. Atlantic Richfield Co., et al.*, Case No. 03-5379 JSW (N.D. Cal.)<br><br>**PLAINTIFF CALIFORNIA-AMERICAN WATER COMPANY'S REPLY BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)** |

Transferring the *California-American Water Company* Action to MDL 1358 will serve neither convenience, justice nor efficiency. Unlike each of the cases voluntarily transferred to MDL 1358, the *Cal-American* Action involves local contamination caused by a product manufactured, sold and distributed entirely to uniquely California specifications. In light of the distinctly local and state-specific factual and legal issues on which it is focused, the *Cal-American* Action is substantially different from all non-California actions subject to CTO-4 (and CTO-5). Thus, whatever may be appropriate for other recently removed MTBE cases, it is not appropriate to transfer this California case to the Southern District of New York.

At the same time, what Defendants describe as the "new wave" of MTBE litigation does not arise in a vacuum. MTBE litigation is well-advanced in both the Transferee Court and state courts around the country. Several MTBE cases have gone to trial and numerous others are

OFFICIAL FILE COPY

IMAGED APR 1 '04

1

currently proceeding toward trial.  Thus, Cal-American has shown that if the *Cal-American* Action is left to proceed on its own: (1) the risk of duplicative discovery is minimal, because common-issue discovery is largely completed and available; and (2) there is little risk of inconsistent legal rulings, because the Transferee Court, as well as numerous other federal and state courts, already have issued rulings on most common legal issues.  In mature litigation like this, the Panel consistently has held that transfer of later-filed actions is unnecessary and inappropriate.

In their Response, Defendants allege that Cal-American is "factually wrong" in asserting that common-issue discovery is largely complete.  And even if it were, they argue, it would not be "legally sufficient" to justify transfer.  Yet, they submit nothing to contradict Cal-American's evidence, which shows that: (a) millions of common-issue discovery documents pertaining to the vast majority of defendants already have been produced in MDL 1358 and other cases; and (b) such discovery is available – including the MDL 1358 document depository, which is available to parties in MTBE cases whether they are transferred to the MDL or not.  Defendants also seek to mischaracterize Cal-American's position as proposing mere "informal cooperation" as an alternative to transfer, when, in fact, formal mechanisms are available to both courts and parties to permit use of discovery on common issues from prior related cases, as the Panel has routinely recognized.

Finally, although they argue that separate prosecution of the *Cal-American* Action may lead to inconsistent rulings, Defendants fail to identify a single new "common" legal issue that would benefit from MDL treatment and/or create a risk of inconsistent rulings if addressed in the Northern District of California.  They also disregard the fact that transfer will do nothing to reduce the risk of inconsistent rulings, because at least *eighteen* MTBE cases are currently

2

proceeding in state courts around the country that Defendants never sought to remove to federal court, and now cannot. Accordingly, Cal-American's Motion should be granted.

## A.  Separate Prosecution Of The *Cal-American* Action Will Not Increase The Risk Of Duplicative Discovery.

If the *Cal-American* Action is left to proceed on its own, the risk of duplicative discovery is minimal. In support of this argument, Cal-American: (1) provided a detailed analysis of the specific questions of fact raised in the *Cal-American* Action; (2) submitted evidence establishing that virtually all the discovery regarding the few questions of fact shared with other MTBE cases already has been completed and is available to all parties; (3) presented authority – including findings by the Transferee Court in MDL 1358 – demonstrating that the remaining questions are localized and case-specific; and (4) cited a long line of Panel decisions holding that, in mature litigation such as this, transfer of later-filed actions is unnecessary and inappropriate.

Defendants' response only reinforces these points. First, Defendants identify only three allegedly "common" questions of fact. Two of these questions – (i) what defendants knew and represented about MTBE and (ii) whether gasoline with MTBE is a defective product – are the same two "common" questions of fact identified by Cal-American as issues already covered substantially by discovery completed in prior cases. Defendants' Consolidated Response at 2; Cal-American's Motion to Vacate at 13-14.

The third "common" question Defendants allege is "whether plaintiffs' water was contaminated by MTBE." Ds' Resp. at 2, 8. Defendants cite the Panel's October 2000 order consolidating certain private well-owner cases into MDL 1358, but ignore the fact that the Transferee Court subsequently reached the opposite conclusion. Judge Scheindlin determined that questions regarding contamination present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each

will require." *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 337, 344 (S.D.N.Y. 2002).[1] As

the Transferee Court has already acknowledged, questions about the extent of contamination,

available remedies, and implementation and cost of those remedies in the *Cal-American* Action

will be location and site-specific; discovery in these areas will not duplicate other cases.[2]

Defendants fail to address, and therefore concede, that the remaining major factual issues

in the *Cal-American* Action – such as causation, the nature of warnings given to particular

vendees, the feasibility of alternatives to MTBE – are not "common questions of fact" with

MTBE cases outside California. These factual issues will require discovery into the particulars

of California's gasoline infrastructure that will be completely irrelevant to parties in MTBE cases

outside California, because the regulatory regime, refining centers and distribution systems in

California are distinct and/or isolated from those in other gasoline markets in the United States.

*See, e.g., Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003)

(gasoline infrastructures in California and New York "could not be more divergent").[3]

---

[1] In *In re Decennial Census Adjustment Litig.*, 506 F. Supp. 648, 651 (JPML 1981), a case cited by Defendants (Ds' Response at 18, n. 11), the Panel emphasized that the transferee judge is "in the best position" to determine whether factual issues are purely local in nature. Under this rule, the Panel should defer to Judge Scheindlin's determination that factual issues regarding contamination are unique in each case.

[2] The cases Defendants cite involving "localized factual issues" miss the mark, as none of them involve the question presented here: *i.e.*, whether transfer is inappropriate when discovery on common issues is complete, and only unique or localized factual issues remain. *See In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 654-655 (JPML 1981) (Ds' Resp. at 21) (cases transferred because discovery on common allegations of national conspiracy remained); *In re Dept. of Energy Stripper Well Exemption Litig.*, 472 F. Supp. 1282, 1285-1286 (JPML 1979) (no contention by objecting parties that only individual, localized issues remained); *In re Beef Industry Antitrust Litig.*, 1977 WL 1559, at *2 (JPML 1977) (cases transferred because discovery on common questions remained).

[3] As the only "state that regulated automotive emissions before Congress entered the field," California is the only state with authority to regulate fuels without EPA approval. *Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182, 1885-1187 (E.D. Cal. 2001) (observing that, under the Clean Air Act, 42 U.S.C. § 7545(c)(4)(B), California has broad authority in the field of fuels regulation). Pursuant to this authority, California Air Resources Board ("CARB") regulations impose special requirements on gasoline sold in the state. *See* Cal. Code of Regulations, Title 13, §§ 2250 *et seq.* As a result, gasoline

Discovery regarding gasoline formulation, refining and distribution in the California Actions

thus will be "of no interest" to non-California plaintiffs. *See In re Gasoline Lessee Dealers*

*Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (denying transfer where discovery in one

action would be "of no interest" to parties in another).[4]

Defendants next contend that Cal-American is "factually wrong" in asserting that

common-issue discovery (*i.e.* notice and knowledge and defective product discovery) is largely

complete (Ds' Resp. at 16), but they submit no evidence whatsoever to support this contention.

For example, while acknowledging "overlap" with the discovery in *South Tahoe* and *CBE*,

Defendants state that "discovery in MDL 1358 focused primarily on class certification and did

not include exhaustive merits discovery." *Id.* Yet, they allege no facts and offer no evidence to

contradict the evidence submitted by Cal-American, which shows that millions of documents

were produced in *South Tahoe, CBE,* and MDL 1358 relating to precisely the issues Defendants

identify as "common" issues.[5] Defendants also fail to identify any significant area of common

---

sold in California is formulated differently than gasoline in the rest of the country. *See, e.g., Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 838 (2001) (gasoline used in California is "unique" and state's gasoline market is "isolated" in light of CARB fuel content regulations). To serve this unique market, approximately 90 percent of California gasoline is refined in-state and distributed by means of a pipeline, terminal and distribution system that is separate and distinct from the gasoline infrastructure serving other regions of the country. *See* California Energy Commission, *Question & Answers: California Gasoline Price Increases*, March 5, 2004 (attached as Exhibit 16 to the Declaration of Victor M. Sher In Support Plaintiffs' Joint Motion to Vacate CTO-5 filed with the Panel on March 26, 2004) at 1.

[4] Defendants attempt to distinguish *Gasoline Lessee Dealer Antitrust Litigation* based on the advanced status of the pending actions in that case. Ds' Resp. at 18, n. 12. This argument fails, because the status of the involved actions had no bearing on the Panel's conclusion that transfer is unwarranted when "critical legal and factual disparities" exist between cases. 479 F. Supp. at 580.

[5] *See* Declaration of Victor M. Sher filed with this Motion ("Sher Decl."), ¶¶ 10, 15 (documents produced in MDL 1358 "cover, among other things, the following topics: i) fate and transport of MTBE in the subsurface (including mobility and non-biodegradability); ii) documented releases of MTBE to groundwater; iii) toxicity of MTBE; iv) taste and odor thresholds for MTBE; v) alternatives to MTBE; vi) treatment technologies for MTBE water contamination; vii) economics of MTBE; viii) the oil companies' and manufacturers' early notice and knowledge of the risks of MTBE to groundwater; ix) the oil companies' and manufacturers' promotion and marketing of MTBE; x) the problem of (and defendants'

discovery that remains incomplete.[6]  To the contrary, they acknowledge that the discovery

produced in MDL 1358, *South Tahoe* and *CBE* has been updated and expanded in more recent

MTBE cases currently proceeding in various state courts (Ds' Resp. at 17) – obviously this

discovery could also be made available to the parties in this case.

Similarly, while apparently conceding that the millions of common-issue discovery

documents are indeed available to the parties, Defendants conclude without explanation that

informal "coordination" regarding the use of such documents "hardly provides a complete

solution to discovery issues likely to be raised" and "would be far less efficient that [sic] the

more complete supervision provided by an MDL Court." Ds' Resp. at 18.  There are at least two

fatal problems with this argument.

First, it misconstrues Cal-American's position.  Cal-American has not proposed that mere

informal cooperation is a sufficient alternative to transfer under section 1407.  Rather, as the

Panel has routinely recognized, formal mechanisms are available to both courts and parties to

permit use of discovery on common issues from prior related cases, such as orders to show

cause.  *See, e.g. In re Telecomm. Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp.

2d 1377, 1378 (JPML 2002) *citing* Manual for Complex Litigation, Third, § 31.14 (1995); *In re*

*McDonalds Franchise Antitrust Litig.*, 472 F. Supp. 111, 115 (JPML 1979) ("should [voluntary]

efforts] fail to eliminate potential discovery problems, any party could seek orders from the

---

knowledge of) leaking underground storage tanks; and  xi) the production, sale and distribution of MTBE
and gasoline containing MTBE" in various markets").

[6] Defendants list ten oil companies who were not defendants in *South Tahoe* or *CBE*, from whom
"plaintiffs in the new MTBE cases can be expected to seek common discovery." Ds' Response at 16.
However, *none* of those companies is named in the Cal-American Action.  Thus, Defendants' suggestion
that common-issue discovery will need to begin at square one for multiple defendants in the *Cal-
American* Action is patently incorrect.

involved district courts directing the parties to harmonize their remaining pretrial efforts").[7]

Second, Defendants' unsupported conclusion that use of existing discovery would be inefficient

without Transferee Court supervision ignores the fact that the Transferee Court itself established

the existing document depository for (among other things) the specific purpose of making prior

common-issue discovery available to parties in other MTBE cases – whether they are transferred

to MDL 1358 or not.  *See* Sher Decl., Exhibit 4 at 4-5 (§ II.D.b).

Finally, although Defendants argue that the advanced stage and availability of common-

issue discovery from past and existing non-MDL MTBE cases is "legally insufficient to deny

transfer" (Ds' Resp. at 16), they fail to distinguish any of the Panel decisions that expressly hold

to the contrary.  Indeed, of the nine cases Cal-American cited in its moving papers[8] Defendants

mentioned only two – *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability

Litigation* and *In re Western Electric Co., Inc. Semiconductor Patent Litigation.* Ds' Resp. at 19-

20, n.13.  Defendants claim that these two cases are "distinguishable" because in each the pre-

trial proceedings (including common issue discovery) in the transferee court were nearly

complete, while the "new wave of MTBE cases pending in MDL 1358 are all at their earliest

---

[7] *See also In re Indian Motorcycle Bankr. And Receivership Litig.*, 206 F. Supp. 2d 1365, 1365 (JPML 2002); *In re Richardson-Merrell, Inc.*, 582 F. Supp. 890, 891 (JPML 1984); *In re Air Crash Disaster Near Upperville, Virginia On December 1, 1974*, 430 F. Supp. 1295, 1297 (JPML 1977); *In re W. Elec. Co., Inc. Semiconductor Patent Litig.*, 436 F. Supp. 404, 406 (JPML 1977); *In re Petroleum Prods. Antitrust Litig.*, 476 F. Supp. 455, 458 (JPML 1979); *In re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (JPML 2002); *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (JPML 1980); *In re G.D. Searle & Co. "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. 1343, 1345 (JPML 1980); *In re Chiropractic Antitrust Litig.*, 483 F. Supp. 811, 813-14 (JPML 1980); *In re Penitentiary Postal Procedure Litig.*, 465 F. Supp. 1293, 1294-95 (JPML 1979); *In re Oklahoma Ins. Holding Co. Act Litig.*, 464 F. Supp. 961, 966 (JPML 1979); *In re Allen Compound Bow Patent Litig.*, 446 F. Supp. 248, 250 (JPML 1978); *In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (JPML 1978); *In re Fotomat Franchisee Litig.*, 394 F. Supp. 798, 799 (JPML 1975).

[8] *See* Cal-American's Motion to Vacate at 13, n. 5; *see also In re Petroleum Products Antitrust Litigation*, 476 F. Supp. 455, 458 (JPML 1979) (conditional transfer order vacated because common-question discovery already completed in transferee court and "unique discovery" in new cases "would disrupt and substantially delay the orderly progress of pretrial proceedings in the transferee district").

stages." *Id.* Defendants' argument misses the point. It is not the status of cases recently

transferred to MDL 1358 that matters, but the status of discovery in the *prior* incarnation of

MDL 1358 and other "first wave" MTBE cases such as *South Tahoe* and *CBE*. Like in *AH*

*Robins* and *Western Electric*, discovery (and other pre-trial proceedings) on common issues was

largely completed in these earlier cases, making transfer of newly-filed actions unnecessary.

Unlike *AH Robins* and *Western Electric*, the cases Defendants cite on this point are, in

fact, easily distinguishable. For example, most of Defendants' cases are inapplicable because

they do not involve proposals by parties in later-filed cases to use already-completed common-

issue discovery obtained in earlier litigation.[9] In the remaining cases they cite, the Panel rejected

informal/voluntary cooperation on discovery as an alternative to transfer – something Cal-

American does not propose here.[10] Thus, just as Defendants have failed to identify a single

significant "common" question of fact on which discovery is not already completed and

available, they have also failed to undermine the legal basis of Cal-American's position.

**B.  Separate Prosecution Of The *Cal-American* Action Will Not Increase The Risk Of Inconsistent Pre-trial Legal Rulings.**

If the *Cal-American* Action proceeds on its own, the risk of inconsistent pretrial legal

rulings is also minimal. As Defendants acknowledge, the *Cal-American* Action is by no means

the first case seeking damages for water pollution caused by MTBE. Thus, as described in detail

---

[9] *See In re Mosaid Technologies, Inc. Patent Litig.,* 283 F. Supp. 2d 1359, 1360 (JPML 2003) (Ds' Resp. at 18); *In re IBP Continental Bus. Docs. Litig.,* 491 F. Supp. 1359, 1361 (JPML 1980) (Ds' Resp. at 18, n. 10); *In re Bristol Bay, Alaska Salmon Fishery Antitrust Litig.,* 424 F. Supp. 504, 506 (JPML 1976) (Ds' Resp. at 18, n.10); *In re Cuisinart Food Processor Antitrust Litig., supra,* 506 F. Supp. at 655 (Ds' Resp. at 17, n. 9).

[10] *See In re Mosaid Technologies, Inc. Patent Litig., supra; In re IBP Continental Bus. Docs. Litig., supra; In re Bristol Bay, Alaska Salmon Fishery Antitrust Litig., supra; In re Dow Chem. Co. Sarabond Prods. Liab. Litig.,* 650 F. Supp. 187, 189 (JPML 1986) (Ds' Resp. at 17); *In re Cygnus Telecomms. Techn., LLC, Patent Litig.,* 177 F. Supp. 2d 1375, 1376 (JPML 2001) (Ds' Resp. at 17, n. 9); *In re Oil Spill by The "Amoco Cadiz" Off the Coast of France on March 16, 1978, supra,* 417 F. Supp. at 477 (Ds' Resp. at 18, n. 10).

in Cal-American's moving papers, most pretrial legal issues shared in common between this

Action and other MTBE cases already have been decided by the Transferee Court (and by other

federal and state courts), and such prior decisions "can serve as an aid in . . . preventing

inconsistent pretrial rulings." *See In re AH Robins Co. Inc. "Dalkon Shield" IUD Prods. Liab.

Litig., supra*, 505 F. Supp at 223.[11]

Defendants maintain that a "serious risk" of inconsistent legal rulings exists absent

transfer of the *Cal-American* Action. Ds' Resp. at 19. However, they fail to recognize a notable

inconsistency in their position: transferring this Action to MDL 1358 will do nothing to prevent

inconsistent rulings because at least *eighteen* MTBE cases are currently proceeding in state

courts around the country that Defendants never sought to remove to federal court, and now

cannot.[12] *See* 28 U.S.C. § 1446(b). Accordingly, even if the *Cal-American* Action were

transferred, it would not have the "salutary effect" of consolidating all MTBE cases before a

single judge.

Defendants also suggest that significant common legal issues remain undecided. Ds'

Resp. at 19. However, except for federal preemption (*see* below), Defendants do not appear to

take issue with either (a) Cal-American's comprehensive categorization of common and unique

legal issues likely to arise in the Action or (b) its description of prior rulings on the common

issues. Instead, Defendants cite two additional legal issues likely to be presented in upcoming

---

[11] According to Defendants, "that some courts have issued legal rulings . . . in MTBE actions does not warrant denying transfer." Ds' Resp. at 19. But the cases they cite in support of this assertion are inapposite. *See In re Molinaro/Catanzaro Patent Litig.*, 380 F. Supp. 794 (JPML 1974) (Ds' Resp. at 19-20) (party opposing transfer never argued, and the Panel never addressed, whether transferee court's prior legal rulings in mature litigation can guide other courts in later-filed cases and reduce risk of inconsistent rulings); *In re Peruvian Road Litig.*, 380 F. Supp. 796, 798 (JPML 1974) (Ds' Resp. at 20) (same).

[12] A partial list of MTBE cases pending in state courts, which was attached to the Declaration of Victor M. Sher In Support Plaintiffs' Joint Motion to Vacate CTO-5 filed with the Panel on March 26, 2004, is attached hereto as Exhibit A for the Panel's reference.

defense motions – personal jurisdiction and standing – which they allege are both "common" to all MTBE cases and "not previously raised." *Id.*  Neither characterization is correct.

Personal jurisdiction is not a "common" legal issue that will benefit from consolidated treatment, even if raised by multiple defendants in multiple MTBE cases.  The inquiry in any personal jurisdiction case is whether the defendant had sufficient minimum contacts with the forum state. *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945).  Any personal jurisdiction analysis in the *Cal-American* Action will depend entirely on the objecting defendant's contacts with California, and therefore will differ materially from the analysis in cases filed in other states.[13]

Defendants' argument that standing is a common issue that will benefit from MDL treatment is also flawed, because Cal-American's standing is in part based on California statutory provisions authorizing California public water suppliers to seek recovery of MTBE-related costs. *See* Sher Decl., Exhibit 1 at 25-26.  Moreover, even if "common" standing issues exist (which they do not), such issues *have* been previously raised and addressed by the Transferee Court (at least as they pertain to private well owners), as Defendants are well aware. *In re MTBE*, 175 F. Supp. 2d 593, 606-611 (S.D.N.Y. 2001) (setting out standard for establishing standing in a private-well MTBE case).[14]  Thus, to the extent common standing issues exist, the

---

[13] In addition, Defendants' suggestion the personal jurisdiction will be the subject of "anticipated preliminary motions" that will require significant judicial energy is, at best, an exaggeration.  At the March 23, 2004 status conference in MDL 1358, defense counsel represented that the parties are "trying to work out" the personal jurisdiction issues and "hope that we won't have to impose on the Court with any of this." *See* Reporter's Transcript of March 23, 2003 Hearing (attached hereto as Exhibit B) at 14.

[14] In the recent proposed Case Management Order they submitted to Judge Scheindlin, Defendants noted that "Your Honor has previously ruled that plaintiffs that cannot show actual contamination or an imminent threat of contamination do not have standing to pursue claims such as those asserted in these cases," citing *In re MTBE, supra.*

Transferee Court's prior ruling provides sufficient guidance to other courts and mitigates the risk of inconsistent rulings.

Regarding the federal preemption issue, Defendants contend that the Transferee Court did not "decide" that defense by denying an earlier motion to dismiss. Ds' Resp. at 20. This contention is beside the point for cases arising in the Ninth Circuit, where the Court of Appeals has twice definitively rejected federal preemption of state regulation of MTBE to prevent water pollution. *Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665 (9th Cir. 2003) (upholding California MTBE ban); *ExxonMobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246 (9th Cir. 2000) (upholding Nevada county regulation that effectively banned MTBE). Defendants suggest that these Ninth Circuit holdings are not "dispositive of any preemption arguments made in this new wave of MTBE cases," because they only addressed prospective regulatory bans and did not address the economic feasibility of alternatives to MTBE in the 1990's. Ds' Resp. at 14, n. 6. However, this is a distinction without a difference. In *Davis II*, the court held *as a matter of law* that a smoothly functioning gasoline market and cheap gasoline are not objectives of the Clean Air Act that preempt state law. *Davis II, supra,* 331 F.3d at 673. Thus, the economic feasibility of alternative oxygenates is irrelevant to the preemption analysis in the Ninth Circuit, no matter when the conduct occurred.[15]

Moreover, even assuming a factual dispute on preemption regarding the feasibility of alternative oxygenates were possible in the *Cal-American* Action, this would still leave a location-specific inquiry that depends on the gasoline market and infrastructure in the relevant

---

[15] Defendants also suggest that the preemption landscape in the Ninth Circuit is somehow altered by two unpublished state trial court decisions decided *prior* to *Davis II: Kubas v. Unocal,* No. BC191876 (Cal. Sup. Ct., L.A. Cty., Aug. 23, 2001) and *Hixon v. Unocal,* No. BC195295 (same). Ds' Resp. at 14, n. 6. Ironically, in these allegedly "more analogous" MTBE cases, the court assumed that assessing tort damages was *equivalent* to a regulatory ban. Thus, *Davis II* undoubtedly renders *Kubas* and *Hixon* bad law.

locality. *See, e.g., Pataki, supra*, No. 1:00-CV-1073 at 5-6 (accepting industry's argument that

gasoline infrastructures in different states "could not be more divergent"). This is not the kind of

question on which coordinated discovery or motion practice will yield any efficiencies.

Defendants' reliance on the Transferee Court's March 16, 2004 jurisdictional ruling is

also unavailing. Judge Scheindlin's determination that Defendants' preemption defense is

"colorable" for purposes of 28 U.S.C. § 1442(a)(1) says nothing about the validity of their

defense and in no way constitutes a reversal of her prior ruling. Sher Decl., Exhibit 15 at 17

("[a]t the removal stage, it is not the Court's role to assess the validity of a particular defense");

*Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (defense may be "colorable" even if

ultimately rejected).[16] Nor is the Court's reference to several aberrant, unpublished preemption

rulings of any consequence here.[17] *Every* published decision addressing preemption of state

regulation (including tort duties) of MTBE has concluded that nothing in the Clean Air Act

limits a state's authority to protect its drinking water,[18] as have many unpublished opinions.[19]

---

[16] Just as Defendants are wrong in suggesting that Judge Scheindlin's recent jurisdictional ruling somehow reinvigorates the merits of their preemption defense, they are also wrong in suggesting that Cal-American's pending remand motion does not "differ significantly" from the remand motions she ruled upon. *See* Ds' Resp. at 13. For the reasons described in the text above, Defendants have no "colorable" preemption defense in the Ninth Circuit. *See State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990) ("colorable" federal defense must have some possible chance of success). Thus, Judge Scheindlin's ruling regarding defendants' "federal officer" argument has no bearing on Cal-American's remand motion.

[17] In addition to *Kubas* and *Hixon, supra*, Defendants reference three other unpublished cases. Two – *Coppola v. Amerada Hess*, No. 2001/3995 (N.Y. Sup. Ct., Dutchess Cty., Jul. 31, 2002) and *Molloy v. Amerada Hess*, No. 2001/3996 (same) – contained a single paragraph finding preemption with no analysis. The third, *Holten v. Chevron U.S.A.*, No. 00-4703 (D.N.J. Jul. 10, 2001), did not concern preemption at all, but instead erroneously found that MTBE gasoline could not be defectively designed because Congress had approved its use. MTBE has never been approved by Congress or EPA. *See* 40 C.F.R. §79.21(g) (EPA registration of fuel additives does not "constitute[] endorsement, certification, or approval by any agency of the United States").

[18] *See In re MTBE, supra*, 175 F. Supp. 2d at 611-616; *Davis II, supra*, 331 F.3d 665, *affirming Davis I, supra*, 163 F. Supp. 2d 1182; *ExxonMobil Corp., supra.*, 217 F.3d 1246; *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels*

Defendants' Response thus fails to identify a single "common" legal issue raised in the *Cal-American* Action that would benefit from MDL treatment and/or create a risk of inconsistent rulings if addressed in the Northern District of California.

## C.   The Panel Should Ignore Defendants' Superfluous Allegations About The Actions Of Cal-American's Outside Counsel.

Defendants present a potentially misleading description of the actions of Cal-American's lead outside counsel in an apparent effort to question the vigor of Cal-American's opposition to transfer.  In particular, Defendants allege that Cal-American's counsel has "continually injected his clients into the proceedings in Judge Scheindlin's court."  Ds' Resp., at 6.  However, Cal-American has never appeared in a proceeding before Judge Scheindlin, never argued the merits of its Remand Motion to Judge Scheindlin, nor ever consented to transfer of its Action to MDL 1358.  Sher Decl., ¶¶ 23, 26.  The actions of counsel to which Defendants refer constitute nothing more than an attorney's reasonable and on-going efforts to protect his client's interests in a complex and changing situation.

In particular, counsel's attendance at the March 23, 2004 status conference in MDL 1358 is irrelevant to this Motion.  Counsel did not enter an appearance on behalf of Cal-American (or any other party) at the conference.  *See* Exhibit B at 5.  Rather, he appeared at the conference for the sole purpose of answering the Court's "questions about the status of the [present]

---

*Ass'n v. Pataki*, 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the Clean Air Act).

[19] *See, e.g., County of Suffolk v. Amerada Hess, et al.*, No. 22305-2202, at 6 (N.Y. Sup. Ct. Jan. 2, 2004) (denying defendants' motion to dismiss on preemption grounds); *City of Dinuba v. Unocal et al.*, No. 305450, at 5 (Cal Super. Ct. April 1, 2003) (order denying defendants' motion for summary adjudication on federal preemption grounds); *Plainview Water District v. Exxon Mobil Corporation et al.*, No. 9975/01, at 6 (N.Y. Sup. Ct. May 22, 2002) (order denying defendant's motion to dismiss on federal preemption grounds); *Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, at *5 (N.D. Tex. 2002) (order denying defendant's motion to dismiss on preemption grounds); *South Tahoe Public Utility District v. ARCO et al.*, No. 999128, at 3 (Cal. Super. Ct. Jan. 15, 2002) (order denying defendants' motion for nonsuit on issue of federal preemption).

proceedings" before the Panel; and Judge Scheindlin stated that counsel was "welcome to be here" for that purpose. *Id.* Moreover, counsel's designated role as co-lead counsel in MDL 1358 reflects an assessment of the common benefit to be obtained in the MDL as a whole from his participation. Finally, considering that this Action involves significant injury to Cal-American's most significant asset – its drinking water supply – it makes perfect sense that its lawyer would want to monitor and influence key decisions in a remote forum that could affect its case.

**D.      Conclusion.**

In light of the significant differences between the *Cal-American* Action and non-California MTBE cases, transfer will not contribute to the efficient conduct of the litigation, but undermine it. Given the maturity of MTBE litigation, availability of common-issue discovery and guidance of prior rulings, separate prosecution of the *Cal-American* Action poses little risk of duplicative discovery or inconsistent rulings. Defendants fail to rebut Cal-American's evidence and fail to distinguish Cal-American's supporting case law. The Panel should therefore grant Cal-American's Motion to Vacate.

Respectfully submitted,

Dated:  March 31, 2004

SHER LEFF LLP
Victor M. Sher, SBN 96197
Todd E. Robins, SBN 191853
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

BARON & BUDD, P.C.
Scott Summy (Admitted *Pro Hac Vice*)
Celeste A. Evangelisti, SBN 225232
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for Plaintiff California-American Water Company

14

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 0 1 2004

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| **IN RE:** | ) | MDL Docket No. 1358 |
| | ) | |
| **METHYL TERTIARY BUTYL ETHER** | ) | This Document Relates to: |
| **PRODUCTS LIABILITY LITIGATION** | ) | *California-American Water Company* |
| | ) | *v. Atlantic Richfield Co., et al.*, Case |
| | ) | No. 03-5379 JSW (N.D. Cal.) |
| | ) | |
| | ) | **PROOF OF SERVICE** |

///

///

///

2004 APR -1 A 10: 55
RECEIVED CLERK'S OFFICE

1

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA          )
                             )          ss
COUNTY OF SAN FRANCISCO       )

*California-American Water Company v. Atlantic Richfield Co., et al.*, Case No. 03-5379 JSW (N.D. Cal.)

  I am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to this action.  My business address is 450 Mission Street, Suite 500, San Francisco, CA 94105.

  On **MARCH 31, 2004**, I served the following documents described as:

### Plaintiff California-American Water Company's Reply Brief in Support of Motion to Vacate Conditional Transfer Order (CTO-4)

[ X ] by placing true copies thereof in sealed envelope(s) addressed as follows:

### SEE ATTACHED SERVICE LIST

[ X ] (**BY MAIL**) I caused to such envelope to be deposited in the mail at San Francisco, California with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit.  Executed on **MARCH 31, 2004**, at San Francisco, California.

[ X ] **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

June Choate

PANEL SERVICE LIST (Excerpted from CTO-4)
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Michael Axline
Miller Axline & Sawyer
1651 Response Road
Second Floor
Sacramento, CA  95815

Peter G. Beeson
Devine, Millimet & Branch PA
111 Amherst Street
PO Box 719
Manchester, NH 03105-0719

J. Stephen Bennett
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802

Rebecca L. Bouchard
Bingham McCutchen LLP
One State Street
Hartford, CT 06103-3178

Michael DeMarco
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corporation
376 S. Valencia Avenue
Brea, CA 92626

William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Dive, Suite 5400
Chicago, IL 60601

Matthew F. Madeiros
Little, Bulman, Medeiros & Whitney PC
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody LLP
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Stephen J. Riccardulli
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY  10020-1605

Colleen P. Doyle
Diane P. Martin
Bingham & McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson & Middleton
900 Elm Street
PO Box 326
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
PO Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond PC
1350 I Street, NW
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Lawrence P. Riff
Steptoe & Johnson LLP
633 West Fifth Street, Suite 700
Los Angeles, CA 90071

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
Bracewell & Patterson LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002

Andrew W. Serell
Rath, Young, & Pignatelli
PO Box 1500
Concord, NH 03302

Scott Summy
Baron & Budd PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas  75219-4281

Stephen L. Tober
Tober Law Offices, PA
PO Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132

Hojoon Hwang
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105

Pursuant to JPML Rules of Procedure Rule 5.2(b), these documents were filed electronically in the United States District Court for the Northern Division of California.

**PANEL SERVICE LIST (Excerpted from CTO-4)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

*California-American Water Co. v. Atlantic Richfield Co., et al.,*
  N.D. California, C.A. No. 5:03-5379
*State of New Hampshire v. Amerada Hess Corp., et al.,*
  D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Peter G. Beeson
Devine, Millimet & Branch, P.A.
111 Amherst Street
P.O. Box 719
Manchester, NH 03105-0719

Michael DeMarco
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92626

Colleen P. Doyle
Bingham McCutchen, LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue
Suite 350
Portsmouth, NH 03801

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson
& Middleton
900 Elm Street
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
P.O. Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W.
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson, LLP
33 New Montgomery Street
19th Floor
San Francisco, CA 94105

William J. Kayatta, Jr.
Pierce, Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Matthew F. Medeiros
Little, Bulman, Medeiros
& Whitney, P.C.
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody, L.L.P.
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann
& Bernstein, L.L.P.
780 Third Avenue
48th Floor
New York, NY 10017

Lawrence P. Riff
Steptoe & Johnson, LLP
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Andrew W. Serell
Rath, Young & Pignatelli
P.O. Box 1500
Concord, NH 03302-1500

Victor M. Sher
Sher & Leff
450 Mission St..
Suite 500
San Francisco, CA 94105

Stephen L. Tober
Tober Law Offices, P.A.
P.O. Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

6

# Exhibit A

**Partial List of MTBE Cases Pending in State Courts \***

| State | Short Case Name | Court/Index Number |
|-------|-----------------|---------------------|
| Cal. | *City of Santa Monica v. Shell Oil Company et al.* | Cal. Super. Ct. 01-CC-04331 |
| Cal. | *D.J. Nelson Trust, dba Fruitridge Vista Water Company v. ARCO, et al.* | Cal. Super. Ct. 02AS00535 |
| Ill. | *Frances Misukonis and Frank Provasnik, Individually and on Behalf of All Others Similary Situated v. Atlantic Richfield Company, et al.* | 3d Cir. Ct. Ill. 00-L-1472 |
| Ill. | *Village of East Alton v. Premcor Refining Group, Inc. f/k/a Clark Refining & Marketing, Inc., et al.* | 3d Cir. Ct. Ill. 01-L-1171 |
| N.C. | *Bobbie Adams, et al. v. BP Products North America, Inc., et al.* | N.C. Super. Ct. 03 CVS 912 |
| N.J. | *Bichmaf, et al. v. Exxon Mobil Corp. & Shotmeyer Brothers Fuel Corp. et al.* | N.J. Super. Ct. L-2827-01 |
| N.Y. | *County of Suffolk and Suffolk County Water Authority v. Amerada Hess, et al.* | N.Y. Sup. Ct. 2002/22305 |
| N.Y. | *Helen Armstrong, et al., v. Sunoco, Inc., et al.* | N.Y. Sup. Ct. 2003/3717 |
| N.Y. | *Plainview Water District v. Exxon Mobil, Inc., et al.* | N.Y. Sup. Ct. 2001/009975 |
| N.Y. | *Valley Stream Union Free School District #30 v. Exxon Mobil, Inc., et al.* | N.Y. Sup. Ct. 2002/005093 |
| N.Y. | *Coppola v. Amerada Hess Corporation, et al.* | N.Y. Sup. Ct. 2001/3995 |
| N.Y. | *Molloy v. Amerada Hess Corporation, et al.* | N.Y. Sup. Ct. 2001/3996 |
| N.Y. | *Roberton v. Amoco Oil Co., et al.* | N.Y. Sup. Ct. 2002/5005 |
| N.Y. | *Atkins, et al. v. Exxon Mobil et al.* | N.Y. Sup. Ct. 2001/0175 |
| R.I. | *Craig Waltz, et al., v. Exxon Mobil et al.* | R.I. Super. Ct. PC02-2436 |
| R.I. | *Edward Grille, Executive Director for the Pascoag Utility District v. Exxon Mobil Corporation, et al.* | R.I. Super Ct. PC02-2437 |
| R.I. | *St. Ours v. Exxon Mobil, Inc.* | R.I. Super Ct. 03-0079 |

| Tex. | *Thomas G. and Christy J. Browning, et al. v. Explorer Pipeline Company, Inc.* | 354th Jud. Dist. Tex. 63769 |
|------|------|------|

\* This list includes only those cases of which the declarant is aware.  There may be other MTBE cases pending in state courts.

# Exhibit B

43RTMTBEC

1

| | |
|---|---|
| 43RTMTBEC          Conference | |
| 1  UNITED STATES DISTRICT COURT | |
| 1  SOUTHERN DISTRICT OF NEW YORK | |
| 2  -----------------------------x | |
| 2 | |
| 3  IN RE:  METHYL TERTIARY BUTYL | MDL 1358 |
| 3  ETHER ("MTBE") PRODUCTS LIABILITY | Master File C.A. |
| 4  LITIGATION, | No. 1:00-1898 (SAS) |
| 4  -----------------------------x | |

```
 5
 5                                    New York, N.Y.
 6                                    March 23, 2004
 6                                    10:30 a.m.
 7
 7
 8   Before:
 8
 9                    HON. SHIRA A. SCHEINDLIN,
 9
10                                       District Judge
10
11
11                        APPEARANCES
12
12   WEITZ & LUXENBERG
13        Attorneys for Plaintiff
13   STANLEY N. ALPERT
14   C. SANDERS McNEW
14   ROBERT GORDON
15
15   BARON & BUDD
16        Attorneys for Plaintiff
16   SCOTT SUMMY
17
17   SHER, LEFF
18        Attorneys
18   VICTOR M. SHER
19
19   MILLER, AXLINE & SAWYER
20        Attorneys for Plaintff
20   BY:  DUANE MILLER
21
21   NAPOLI, KAISER & BERN
22        Attorneys for Plaintiff
22   BY:  MARC JAY BERN
23        TOM RALEIGH
23
24   McDERMOTT, WILL & EMERY
24        Attorneys for Defendant Exxon Mobil
25   BY:  PETER JOHN SACRIPANTI
25        JAMES A. PARDO
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

2

```
     43RTMTBEC          Conference
 1                      APPEARANCES
 2   WALLACE, KING, MARRARO & BRANSON
 2        Attorneys for Defendants Shell, Chevron, Texaco
 3   BY:  RICHARD E. WALLACE, JR.
 3
 4   EIMER STALL
 4        Attorneys for Defendant Citgo
                          Page 1
```

43RTMTBEC

```
 5     BY:  NATHAN P. EIMER
 5
 6     KIRKLAND & ELLIS
 6          Attorneys for Defendants BP Products, Atlantic Richfield
 7     BY:  J. ANDREW LANGAN
 7
 8     BEVERIDGE & DIAMOND
 8          Attorneys for Defendant Sunoco
 9     BY:  JOHN S. GUTTMAN
 9
10     PORZIO, BROMBERG & NEWMAN
10          Attorneys for Defendant American Agip Co.
11     BY:  LISA K. AXELROD
11
12     BINGHAM MCCUTCHEN
12          Attorneys for Defendant Crown Central Petroleum Corp.
13     BY:  BEN M. KROWICKI
13
14     CULLEN & DYKMAN BLEAKLEY PLATT
14          Attorneys for Defendant Getty Marketing
15     BY:  JOHN J. FANNING
15
16     MORGAN LEWIS
16          Attorneys for Defendant Chevron USA, Union Oil Co.
17     BY:  DAVID L. SCHRADER
17
18     BAKER BOTTS
18          Attorneys for Defendant Marathon Oil
19     BY:  STEVEN L. LEIFER
19
20     BLANK ROME
20          Attorneys for Defendant Lyondell Chemical
21     BY:  LAURENCE S. SHTASEL
21
22     EDWARDS & ANGELL
22          Attorneys for Defendant Union Oil Co.
23     BY:  LYNN WRIGHT
23
24     PEPE & HAZARD
24          Attorneys for Defendant Premcor
25     BY:  KAREN A. MIGNONE
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                     3

```
       43RTMTBEC                  Conference
                                 APPEARANCES
 1
 2     NAPOLI, KAISER & BERN
 2          Attorneys
 3     BY:  THOMAS W. RALEIGH
 3
 4     HOWREY, SIMON, ARNOLD & WHITE
 4          Attorneys for Defendant Amerada Hess
 5     BY:  MINDY G. DAVIS
 5
 6     HUNTON & WILLIAMS
 6          Attorneys for Defendant Koch Industries
 7     BY:  JOSEPH C. KEARFOTT
 7
 8     LATHAM & WATKINS
 8          Attorneys for Defendant Conocophillips
 9     BY:  JOHN McGAHREN
 9          JOHN J. LYONS
10
```

Page 2

Exhibit B
Page 2 of 28

43RTMTBEC

10   BRACEWELL & PATTERSON
11        Attorneys
11   BY:  TRACIE J. RENFROE
12
12   GOODWIN PROCTOR
13        Attorneys for Defendants Gulf Oil, Cumberland Farms
13   BY:  CHRISTOPHER J. GARVEY
14
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

43RTMTBEC            Conference
1        (Case called)
2        THE COURT:  All right.  Mr. Sacripanti, there were a
3   lot of counsel around the country who called and asked if they
4   could participate by phone.  We said no, because I don't think
5   logically we could have handled it well, but I think we
6   referred them to you.  So if you got those calls, you have to
7   understand why we didn't think the phone call was going to
8   work.
9        MR. SACRIPANTI:  I understand, your Honor.
10        THE COURT:  And you probably have been present when I
11   dealt with phone conversations, and it's very frustrating; the
12   person talks and you're trying to interrupt and it's a way to
13   get them very nervous.
14        MR. SACRIPANTI:  We understand, your Honor.  Thank
15   you.
16        THE COURT:  Now I have got some submissions from the
17   defense, a letter dated March 19, 2004, which I'm sure the
18   plaintiffs received, and one thing attached to it was a service
19   list appears to be for plaintiffs and for defendants.  Then
20   attached also was an idea of a questionnaire, which we'll turn
21   to, and a proposed case management order.
22        I haven't received any submissions from the
23   plaintiffs, have I, to today's conference?
24        MR. McNEW:  Your Honor, we handed up before the
25   hearing a proposed case management order.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

43RTMTBEC            Conference
1        THE COURT:  Before the hearing, you mean before this
2   morning?
3        MR. McNEW:  Yes.
4        THE COURT:  I see it now, but of course I haven't had
5   the chance to read it because you did it this morning.
6        MR. McNEW:  Correct.
7        THE COURT:  Actually I think my clerk brought it to me
8   about five or ten minutes ago.
9        Well, I still haven't had a chance to read it, so
10   you'll have to kind of go step by step as we work through some

Page 3

Exhibit B
Page 3 of 28

43RTMTBEC

11  of the suggestions in the defendant's letter which I did have
12  time to look through.
13          So on page two of Mr. Sacripanti's letter it starts
14  with suggested subjects for the March 23rd conference, and the
15  first subject that he talks about is the status of proceedings
16  before the judicial panel on multidistrict litigation.
17          Mr. Sacripanti, I don't know whether you wish to
18  address that orally or whatever you said in writing is the
19  status.
20          MR. LANGAN:  Your Honor, we are satisfied with what we
21  said.  We think it's accurate, but we're happy to address any
22  questions, assuming the objections and motions to vacate that
23  have been filed remain in play, including some by counsel for
24  the plaintiffs that are sitting here today, they have objected,
25  but they're here.  Assuming those objections continue to play
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

6

43RTMTBEC                    Conference

1   out, it's going to take several months before that is all
2   resolved before the panel, but in the meantime we've come here
3   and are already here.
4           THE COURT:  Right.  I have three charts attached, an
5   A, cases transferred, or B, transferred without objection.
6           MR. SUMMY:  Yes, your Honor.
7           THE COURT:  Attachment B, cases that are subject to
8   the transfer order but there's been an objection.
9           MR. LANGAN:  Yes.
10          THE COURT:  And Chart C, additional MTBE cases in
11  federal court not yet subject to the transfer orders.  I notice
12  in fact there's a number of those in the Southern District of
13  New York.
14          MR. LANGAN:  Right.
15          THE COURT:  How does one start the process of dealing
16  with that last group?
17          MR. LANGAN:  Well, where applicable, we have filed
18  notices of tag along, and we --
19          THE COURT:  Have you done it for all the Attachment C?
20          MR. LANGAN:  I'm not sure that we have done it for
21  every last one.  We would like to get critical mass and do it
22  periodically.  I'm not sure the panel issues a CTO if the case
23  is in the Southern District.
24          THE COURT:  We should do that administratively, I
25  should reach out to the judges, which happens all the time in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

7

43RTMTBEC                    Conference

1   this district, and they sort of reach out to me when they have
2   consolidated cases.
3           MR. LANGAN:  Yes.
4           THE COURT:  That isn't very many anyway, that looks
5   like three.  Do you know the judges on those three?  Do you
6   have the docket number with initials?  You list docket numbers
7   for some of the earlier cases, the Louisiana but not the three
8   in the Southern District.
9           MR. LANGAN:  I believe those were just recently
10  removed, so don't have the docket numbers in front of me, but
11  we could get that the front of you within 24 hours.
12          THE COURT:  Would you get that to my chambers in some
13  way so I can contact those judges?
14          All right.  Do the plaintiffs want to say something
15  about the status of the proceedings before the judicial panel
                            Page 4

                          Exhibit B
                        Page 4 of 28

43RTMTBEC

16    before I move along to another topic?
17        MR. SHER:  Your Honor, I just want to address the
18    comment by counsel that the plaintiffs' counsels appear who
19    have objected, since I am one of those.  I'm not appearing this
20    morning on behalf of any of those clients, but I thought you
21    might have questions about the status of the proceedings and I
22    wanted to be here.
23        THE COURT:  You're welcome to be here.
24        MR. SHER:  The list of cases is accurate, so far as I
25    know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

43RTMTBEC                    Conference
1        THE COURT:  All right.  The second topic, as the
2    defense side stated, is general plan and schedule for
3    responsive pleadings and motions, and it goes on to say
4    defendants anticipate some preliminary Rule 12 motions, and
5    then there are details later in the proposed case management
6    order.
7        Let me start by asking the plaintiffs this:  Do the
8    plaintiffs intend to do a master complaint or are we going to
9    be dealing with 40, 50, 60 or more complaints?
10        MR. GORDON:  I'm not certain that we can do a master
11    complaint.  If this is an MDL that we had sought, perhaps we
12    would feel that way.  We feel there are differences in the
13    case, and actually one of the first orders of business we would
14    like to discuss, Mr. Summy is prepared to discuss it, with
15    regard to the fact that some of the cases are not in RFG states
16    and some are, and your Honor's order was only on cases that
17    were RFG state cases, the New York cases that were before you.
18        And let me turn it over to Mr. Summy if he could
19    explain that as well.
20        MR. SUMMY:  Your Honor, as this case comes together in
21    the MDL, there are a number of cases that are being transferred
22    and have been transferred and there's no objection to them.
23        In your ruling as of this last week you ruled that
24    there was subject matter jurisdiction based upon the federal
25    agency doctrine or federal officer doctrine.  There are a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

43RTMTBEC                    Conference
1    number of cases where the plaintiff and the plaintiffs' wells
2    are located in non-RFG, non-oxygenated fuels program areas.
3    And in that instance there are, as a matter of law, there could
4    be no federal officer jurisdiction over those areas because
5    there was no requirement whatsoever to add oxygen, much less
6    than MTBE.
7        THE COURT:  How many cases in Exhibit A would that
8    apply to?
9        MR. SUMMY:  What I did, your Honor, is I counted there
10    are 37 cases on Exhibit A, and I counted 14 that I think I can
11    represent to the Court that are in non-RFG, non-OFP areas.
12        Now there may be additional ones, because for example
13    in Connecticut, if you look at Exhibit A there's about seven or
14    eight cases listed, I didn't count any of those as the 14
15    because I am still in the process of putting a map together
16    that will show you the RFG areas, the OFP areas and where wells
17    are located.
18        THE COURT:  And the OFP areas would have the same
19    argument, so to speak?
20        MR. SUMMY:  Yes, your Honor, the non-OFP areas and
Page 5

Exhibit B
Page 5 of 28

43RTMTBEC

```
21  non-RFG areas.
22          For example, in Connecticut there are probably five or
23  six counties that are RFG, outside of those counties in the
24  state it's non-RFG.
25          THE COURT:  So you're saying in the same state there
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

43RTMTBEC                    Conference
```
 1  are some that would and some that wouldn't?
 2          MR. SUMMY:  Correct, your Honor.  I think that one of
 3  the misunderstandings that is labeled all the time, there are
 4  17 RFG states, but when you really look at it, in the 17
 5  reformulated gasoline states, it's not like the whole state
 6  requires oxygen, it's just certain areas of that state, but
 7  there it labeled as an RFG state.
 8          THE COURT:  So if I'm translating correctly, for a
 9  number of these 37 cases you think in fact that ruling
10  shouldn't apply and we have to go back and look at subject
11  matter jurisdiction again?
12          MR. SUMMY:  That's correct, your Honor.  I wanted to
13  make sure that I raised that early.
14          THE COURT:  You did, that's early, we've only about
15  here about eight minutes.
16          MR. GORDON:  Judge, may I approach to give you a map
17  of reformulated gasoline areas to give you a sense of how many?
18          THE COURT:  Sure.  Biggest sense I'm getting is more
19  work on subject matter jurisdiction.
20          So let me hear briefly from the defense on that.  If
21  it's an non-RFG state, Mr. Eimer, does the federal officer
22  theory hold as the basis or do I have to go back now and do
23  what I avoided doing, which is the issue on the grounds?
24          MR. EIMER:  I believe the ruling on RFG is going to
25  cover probably all of these cases, because the distribution
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

43RTMTBEC                    Conference
```
 1  system and the system of production of gasoline would require
 2  in effect gasoline to be put into the system and into play, and
 3  if a county is neighboring another county and one's an RFG
 4  county, it is impossible to segregate gasoline out that finely.
 5          THE COURT:  That may be true for adjoining counties in
 6  Connecticut, and I thought of that even as you spoke.  What
 7  about a really non-RFG state?
 8          MR. EIMER:  I think a non-RFG state there is a
 9  movement of gasoline through that state from one to another.
10  They have alleged all sorts of spills that cause these
11  contaminations.  There could be a car, according to them, that
12  drives across a state that has an accident and spills into and
13  contaminates a well that could have been filled up in St.
14  Louis, which is an RFG area, and spilled in another state, so
15  we don't know the cause is.
16          So until we get the research done to find the cause of
17  the contamination, to find the source of what that gasoline
18  was, we won't know.  So the well could good be in a non-RFG
19  area but the gasoline could have been purchased in an RFG area
20  and transported, not but the us, but by a consumer or someone
21  else.  So when sold it could have been required by us to be
22  sold as RFG, which spilled, could have been transported by
23  somebody else and spilled somewhere else.
24          So our defense would be the same.  When we sold it, it
25  was required to be sold as RFG gasoline, where it was spilled
```

Page 6

43RTMTBEC
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43RTMTBEC                    Conference
1   somewhere else, we don't know by whom or where or how it got
2   there, and until discovery reveals the source of that gasoline,
3   we won't know, we just won't know.
4           THE COURT:  It's a long way from Indiana to
5   California.
6           MR. EIMER:  But not from Illinois.
7           MR. SUMMY:  Your Honor, could I address that?
8           THE COURT:  No, I understand your point.  But in any
9   event, I understand your point, it's simple enough, but
10  plaintiff's point is this vast part of the country that wasn't
11  required by any federal agency to do anything, is there a basis
12  for federal jurisdiction other than federal agent jurisdiction
13  I understand why you would say federal agent would still work,
14  but they're saying maybe you better reach the second ground
15  sooner.
16          MR. EIMER:  And the second ground which the Court
17  didn't reach.
18          THE COURT:  Again namely the bankruptcy jurisdiction?
19          MR. EIMER:  No, express pre-emption and applied
20  pre-emption, federal question and bankruptcy.
21          THE COURT:  Federal question being?
22          MR. EIMER:  The federal question being whether or not
23  in saying that MTBE shouldn't be added to gasoline, they're
24  getting in the same kind of questions that the EPA weighed and
25  balanced in deciding that MTBE was an appropriate oxygenator.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

43RTMTBEC                    Conference
1           THE COURT:  That's the pre-emption argument all over
2   again; isn't it?
3           MR. EIMER:  In part, but the question is when you have
4   a single national distribution system, that national
5   distribution system has to avail itself not just of little
6   pockets where most of the people are, it's not little pockets,
7   it's where the metropolitan area is.  So this gasoline
8   distribution system is geared towards transporting millions and
9   millions of gasoline to those submetropolitan areas, and along
10  the way gasoline gets dropped off.  And can a distribution
11  system gear to this kind of distribution network and yet drop
12  off to little pockets outside of the metropolitan areas?  I
13  don't believe so.
14          THE COURT:  Were the companies making both gasoline
15  that had the additive and gasoline that didn't have the
16  additive at the same time?
17          MR. EIMER:  In places, but not all companies and not
18  all places.
19          THE COURT:  You're saying for 15 years now you have
20  been working on two tracks distributing some without the MTBE
21  and some with the MTBE?
22          MR. EIMER:  At times.
23          THE COURT:  Continuously all these last 15 years, or
24  were -- what I'm asking you is:  Or were there years when you
25  were only distributing with the additive?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

43RTMTBEC                    Conference
1           MR. EIMER:  No, I believe -- it depends on the
                              Page 7

43RTMTBEC

```
 2    company, but my belief is certain companies were distributing
 3    to places without the additive and to places with the additive.
 4          THE COURT:  So all companies were doing two tracks all
 5    the times?
 6          MR. EIMER:  I don't know about all the companies, I
 7    don't think we can say that as general rule, I don't think that
 8    we could say yet.
 9          THE COURT:  Some companies have been doing only with
10    the MTBE?
11          MR. EIMER:  Correct.  And I do believe when refiners
12    manufacture RFG, it moves up from refineries to the Gulf Cost
13    to the upper Midwest or the East Coast, and along the way --
14          THE COURT:  I know, I was trying to find out very
15    briefly if you knew whether everybody was producing two
16    different kinds throughout these years continuously or were
17    some companies at some times only doing it with the additive.
18          MR. EIMER:  I don't know enough to answer that.
19          MR. SUMMY:  Your Honor, could I respond?
20          MR. BERN:  Sure.
21          MR. SUMMY:  I have been looking into this quite a bit
22    over the last few days, and his argument is completely
23    overreaching and is untrue.  There are records that the EPA
24    keeps as to what is contained in gasoline in these varies areas
25    of the country, and in many instances they would add MTBE not
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

43RTMTBEC                    Conference

```
 1    as an oxygenant to comply with the Clean Air Act, but what they
 2    would do is add two to five percent, somewhere in there, MTBE
 3    as an octane enhancer in these non-RFG areas; no requirement
 4    anywhere to do that, no federal statute requiring it.  They
 5    were doing it because it was a cheap filler and they wanted to
 6    add it to gasoline, but that in no way would they be acting as
 7    a federal officer, and we would certainly be willing to do
 8    discovery on that issue because they are not right on that
 9    issue.
10          THE COURT:  And you're suggesting that maybe that
11    discovery would proceed the renewed motion to remand?
12          MR. SUMMY:  If the Court would like us to do that.
13          THE COURT:  There are some fact questions I might
14    have.  I don't want to continue down the road completely, but I
15    think already the wheels were turning, if this than that, I
16    won't say more.
17          MR. SUMMY:  When I was thinking yesterday, I figured
18    the first thing they would do is stand up and say this complex
19    distribution system requires us to add it everywhere, and it is
20    simply not true, so I am willing to -- what I was going to
21    do --
22          THE COURT:  He didn't say they add it everywhere, he's
23    saying they're transporting it the places that they need to
24    transport it to.
25          MR. SUMMY:  I understand.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

43RTMTBEC                    Conference

```
 1          THE COURT:  So through all the states anyway.  So I
 2    wondered whether some companies made only the EPA compliant, so
 3    to speak, type of gas, and then I would understand it better,
 4    but if there were two different kinds of -- two different
 5    distribution routes and the rest, that may play out
 6    differently.
```

Page 8

Exhibit B
Page 8 of 28

43RTMTBEC

7    MR. SUMMY:  What I was going to do when we filed our
8  renewed motion is ask the Court to take judicial notice of a
9  number of public records which show what was in the gasoline in
10  these various areas.  They actually tracked this.  And when you
11  look at this, we have cases coming in from Florida, Iowa,
12  Indiana, Kansas, and there is simply no reason whatsoever to be
13  adding MTBE to the gasoline in these areas, even though it's in
14  our clients' wells.  There is no requirement whatsoever, and
15  there aren't RFG areas around, there shouldn't be any reason to
16  put it in pipelines and going up that way because there was
17  nothing that requires it.
18    THE COURT:  But you still have I guess trucking.  You
19  got to move it; don't you have to move this stuff?
20    MR. SUMMY:  Yes, but what happens is they put it in a
21  pipeline and they send it up and it gets into terminals and
22  trucks pick up it, but there is no requirement in these areas
23  to adding MTBE.  At times they're adding it as an octane
24  enhancer in conventional gas, but certainly no requirements
25  under the Clean Air Act whatsoever, and that's why the federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

43RTMTBEC                    Conference
1  officer jurisdiction would not apply to the wells and well
2  owners in these areas that aren't covered.
3    And we certainly would be willing to do discovery on
4  that, your Honor, if that's what you would like us to do.
5    THE COURT:  Well, no, it's not a matter what I would
6  like.  I think that if you're comfortable making the renewed
7  motion for those areas, not rearguing the areas for now where
8  the RFG is a requirement, but in the non-RFG areas you're
9  comfortable moving now, and you don't think you need discovery
10  to make the motion, that's up to you.  I don't know if they
11  think they need discovery to oppose that, because when I asked
12  Mr. Eimer some questions, he said, in candor, I don't have the
13  answers myself yet.  So they may need to gather some
14  information to oppose it, in which case they may say we want
15  discovery.
16    So you may want to confer a little, but I don't think
17  there's a rush, so long as you preserved your right to do it.
18  In other words, if there is any time on the remand it is
19  essentially made but stayed for this purpose.  So I don't think
20  you're under any time pressure, really, you have to do what is
21  best.  You may want to talk to your adversary about it.
22    MR. SUMMY:  What I would stay is that certainly for
23  the cases that are transferred and coming in and the plaintiffs
24  who are in these non-RFG, non-OFP areas, we would intend, and I
25  think that we are prepared without discovery to move for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

43RTMTBEC                    Conference
1  reconsideration of those cases only.
2    Now there are certainly --
3    THE COURT:  Would that really be technically styled a
4  reconsideration in a sense?  It may be forming when I ruled,
5  because maybe some non-RFG areas were and some of weren't.
6    MR. SUMMY:  We debated it because we weren't sure if
7  the ruling that you made was applicable to just the New York
8  cases that came up or were they applicable to everything that
9  was transferred.
10    THE COURT:  I meant -- I'll answer.  I had meant them
11  to be applicable to everything that was transferred without

Page 9

43RTMTBEC

```
12   objection, but nobody was mentioning to me any oral argument
13   about RFG and non-RFG.
14        MR. SUMMY:  And that's the way that we took it after
15   the ruling.  Prior to the ruling the reason we did not put it
16   in the briefing was we thought we were briefing just the New
17   York cases, which would be an RFG area, so we didn't put it in
18   the briefing.  But after rereading the opinion and realized
19   that it looks like it applies to everything that has been
20   transferred without an objection, then this obviously came to
21   mind and we felt like we needed to raise it, and we debated on
22   what do you call that, and we decided it was a motion for
23   reconsideration.  If the Court would suggest a different --
24        THE COURT:  Well, it's semantics, it doesn't matter,
25   but make it clear that it's directed only to some of the cases.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

43RTMTBEC                    Conference
```
 1        MR. SUMMY:  And I will also point out to the Court
 2   that we represent obviously public entities kind of in 16
 3   different states, and there are some entities we believe that
 4   are requesting us to file a certification under 1292, so that
 5   some of the clients will ask for that and you will see that
 6   coming out as well.
 7        THE COURT:  Okay.  Can we talk some scheduling even
 8   for this issue?
 9        MR. GORDON:  In our proposed case management order,
10   which we apologize --
11        THE COURT:  That's okay, I have it now.
12        MR. GORDON:  If your Honor looks at page four,
13   subsection five, the bottom, and I apologize for this being
14   late, we had to get attorneys from all over the country and we
15   have California attorneys.
16        THE COURT:  Okay.  Here we are.
17        MR. GORDON:  If you see at the bottom, there's a
18   proposal.  I should say in many respects, up until that page,
19   our order is fairly identical to the defendants.
20        THE COURT:  Is this schedule acceptable to the
21   defense?  In other words, I don't have a problem, it would be
22   within 15 days of the entry of this case management order.
23   That's not our usual time limit for reconsideration, but I'm
24   waiving that.  It doesn't make sense, because I see that it's
25   partly a brand new argument, so I don't have a problem with
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

43RTMTBEC                    Conference
```
 1   waiving the ten day time limit, so it would be 15 days from the
 2   entry of this order, not a problem.
 3        But how does the defense feel about responding within
 4   15 days.  Is there any reason to be on that fast a track?  They
 5   can move to reserve their rights, so to speak, I'm waiving the
 6   ten days anyway from the date of March.
 7        MR. WALLACE:  It strikes me that if we, the
 8   defendants, need to assemble information to answer the
 9   questions that you pose, that is going to be rather time
10   consuming.  We will want to demonstrate information about the
11   distribution scheme.
12        THE COURT:  It may be a fact intensive motion, your
13   point about the non-RFG areas, the federal agent question.
14        MR. WALLACE:  I would add, your Honor, that we
15   anticipate additional coming to you in which the plaintiffs may
16   raise the very same issue, and it strikes me that you may want
```

Page 10

43RTMTBEC

17  to address the issue and those various cases together, which
18  counsel is in favor of our taking time to assemble the
19  information and the Court waiting until the other cases reach
20  the Court before it scheduled the actual filing of motions and
21  the briefing.
22          MR. GORDON:  It could take months and months before
23  some of those cases that we have objected to transfer ever
24  getting here.
25          THE COURT:  I would think it would be more efficient

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

43RTMTBEC                    Conference
1  to start briefing the issue.  Some of the cases already here
2  squarely raise the issue.  The ruling I think would probably
3  apply across the board, either your theory makes some sense
4  about what Mr. Eimer was starting to articulate about the
5  movements, the distribution system all that, or it doesn't.
6  And I don't see why not to get started.
7          MR. LANGAN:  With respect to how long the panel is
8  going to take to act, I believe there are eight or nine cases
9  where there have been objections, eight of them are California
10  cases, one is the state of New Hampshire, and I believe the
11  state of New Hampshire is an RFG area.  I believe that all the
12  California cases are.
13          THE COURT:  Those are RFG states?
14          MR. LANGAN:  Yes.  Not the entire state, but my point
15  being that in the long haul from the panel, I don't know that
16  it is squarely relevant to the Mr. Wallace's point.  In other
17  words, I think the cases that you're going to get here, it's
18  not going to take months and months.
19          THE COURT:  You're supposed to stick together.  When
20  you disagree it gets confusing.  It doesn't matter because I
21  agree that we should get going on the motion anyway.
22          MR. GORDON:  My point with regard to that --
23          THE COURT:  But I think they may need more than 15
24  days.
25          MR. GORDON:  I agree, your Honor, but there's no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

43RTMTBEC                    Conference
1  mystery here, they're not going to be presenting any different
2  questions than your Honor already asked them.  I assume the
3  research for them is gong start today on that issue.
4          THE COURT:  But I can't believe I thought of all the
5  questions, I wish I was that good.  I took two seconds and came
6  up with something, but that's not the beginning or end of this
7  inquiry, so they need time.  So what is the appropriate amount
8  of time to respond to the motion?
9          MR. EIMER:  Your Honor, I haven't had a chance to talk
10  to the group, but I could think 60 days.
11          THE COURT:  We could vote.  How many think 60 days?
12          MR. EIMER:  I would say 60 days to respond.
13          THE COURT:  You want to move within 15 days of today,
14  how does the plaintiffs feel?  That puts you at, I don't know,
15  April something or other.  Today is March 23rd, you want to
16  roughly move -- let's say you want to move, I don't know, give
17  you to the end of the week, the 9th of April, they want to take
18  until the 9th of June to respond.
19          what do you think of that, Mr. Gordon?  Probably they
20  don't respond until mid June because they're saying it's very
21  fact intensive and they're going to be putting a lot of facts
Page 11

43RTMTBEC

22    before me.
23            MR. GORDON:  Judge, the lawyer may not know the facts,
24    their clients certainly know the national distribution a lot
25    better than we do in this regard.  One of the reasons that a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                23
43RTMTBEC                   Conference
1     lot of people perhaps around the country, clients are concerned
2     about all cases all going to this monolith of the MDL is that
3     they're concerned that everything is going to be delayed, held
4     back, we're going to do all the discovery the way the
5     defendants want to do it.  The proposal, as you can see, asks
6     us to all of our discovery while they sit back and do nothing.
7            THE COURT:  You know that I would never allow that.
8            MR. GORDON:  I know that, and I have been reassuring
9     clients and counsel throughout the country that this is a Court
10    that is going to move, and on this issue they have 15 days to
11    start this before they even see our papers.  I ask they get 30
12    days, maybe 45 days.  60 days seems like a long time.
13            In addition, there are other motions as well that we
14    will be asking to be filed, which counsel indicated.  There
15    will be some states that are RFG states, whether or not they're
16    counties or not counties, who also want to either appeal or
17    move for reconsideration, whatever we're calling it.
18            THE COURT:  I think you're moving for certification
19    because I think reconsideration you couldn't meet the standard.
20    You would have to tell me what fact or law I overlooked, but I
21    doubt it.  They're basically saying we disagree, we would like
22    to go to the circuit.  You want a 1292, I don't think that you
23    want a consideration.
24            MR. GORDON:  I agree, I was referring to the
25    in-between group.  I was referring to the non-RFG state and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                24
43RTMTBEC                   Conference
1     non-RFG county, that was the twilight zone between the county.
2     That was my only concern in that regard, perhaps a separate
3     response date from the defendants would be appropriate.
4            THE COURT:  Well, I'll go with the 45 just on the
5     generalized theory that everybody likes to try to move quickly
6     as much as possible.  So you want to move by April 9th.  I gave
7     you a few extra days, but there are couple of holidays in there
8     for everybody, so April 9th for the moving papers.
9            MR. ALPERT:  Your Honor --
10            THE COURT:  I guess about May 24.
11            Mr. Alpert?
12            MR. ALPERT:  Thank you, your Honor.  On behalf the
13    plaintiffs, it may be that you will also see grounds for
14    reconsideration of things that weren't fully considered in your
15    decision.
16            THE COURT:  Well, I'll be very sensitive.  Don't upset
17    me about the standard.  You got to say I overlooked, then tell
18    me what controlling case I overlooked.
19            MR. ALPERT:  Regulation.
20            THE COURT:  I don't know about that.  What controlling
21    case did I overlook?
22            MR. ALPERT:  The regulations, your Honor, not a case.
23            THE COURT:  I don't know about that.  Was that in your
24    briefs?
25            MR. ALPERT:  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            Page 12

43RTMTBEC
(212) 805-0300

43RTMTBEC                    Conference
1   THE COURT:  There's a controlling regulation in your
2   brief that I overlooked.  Then you don't have any work to do.
3   Fax the controlling regulation over this afternoon so I know
4   exactly what I overlooked.  Because I don't have time to waste,
5   I got a lot of serious motions, I doubt reconsideration is one
6   of them.  Go ahead, take that to the circuit, but fax me the
7   controlling regulation that I overlooked and copy your
8   adversary.
9           So the answer to the question about a master complaint
10  is no, there is no interest in that; is that what you said,
11  Mr. Gordon?  Even for the so-called RFG, nothing?
12          MR. GORDON:  I don't think this is going to be one of
13  those MDLs where we have 20 thousand individual cases.
14          THE COURT:  I don't know about that.  If it can't be
15  done, it can't be done.
16          MR. SUMMY:  Your Honor, I think that one of the
17  reasons that it can't be done, for example, is when you take,
18  for example, the district attorney's complaint in Sacramento,
19  the standing that gives him certain powers and authorities to
20  take action is totally different than any of the other public
21  entities, and I think it would be different and complex.
22          THE COURT:  Okay.  Let's turn to something easy then
23  for a minute to get a rest from the hard stuff.  On the easy
24  stuff you all talked about the interim measures, pretrial
25  consolidation, and you said it was pretty much the same, so
            SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

43RTMTBEC                    Conference
1   that's fine.  The master docket and file, you had no
2   differences, so that's fine, captions and separate filing,
3   that's fine.
4           Organization, who is going to be liaison counsel?
5           MR. GORDON:  For the plaintiffs, your Honor,
6   Mr. Alpert.  As you instructed him to fax something to you
7   today, that starts the relationship nicely.
8           THE COURT:  All right.
9           MR. SACRIPANTI:  I believe we will serve as liaison
10  counsel.
11          THE COURT:  Mr. Sacripanti?
12          MR. SACRIPANTI:  Yes.
13          THE COURT:  All right.  So we don't have to wait 30
14  days for that, the order I suppose is within 30 days of this
15  order.  In fact, there's no reason not to appoint Mr. Alpert
16  today, Mr. Sacripanti today, as liaison counsel respectively.
17          And how about the duties listed, page 3?  Everybody
18  wrote the same things down, so that would be the duties.  Do
19  you agree to maintain and distribute, et cetera, coordinate, be
20  responsible, the five thing listed on page three?
21          Then those are the duties.  How about co-lead counsel
22  and executive committee?
23          MR. GORDON:  Your Honor, you had a -- MDL 1358 had a
24  prior PFC, it's really no longer applicable due to the types of
25  cases and the lack of interest of some of those attorneys in
            SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

43RTMTBEC                    Conference
1   this litigation and some new attorneys.  You have here my firm
2   represented, Mr. Summy, Mr. Sher, Mr. Miller and Mr. Bern, with
                        Page 13

43RTMTBEC

```
 3    the three of us serving just internally as co-lead counsel.
 4          THE COURT:  Who is the three of us?
 5          MR. GORDON:  Me, Mr. Summy and Mr. Sher.  And we would
 6    ask your Honor to just allow us to organize ourselves in that
 7    way, and what you have there are the counsel who either have
 8    cases here or who may have cases here in the near future.
 9          THE COURT:  Okay.  That sounds good.  Then we're up to
10    service of documents.  Would you serve this electronically?
11    Everything served electronically?  We're talking about
12    distributing copies to other counsel and all that, aren't you
13    going to set up electronic service?
14          MR. McNEW:  That's what I suggested in our alternate
15    form.  We took the defense counsel points B and C and conflated
16    them into a single point B which requires all parties to be
17    served by electronic mail or other means to the Court.  And
18    parties agree, we thought that some sort of internet based
19    system for posting to a simple site where everyone could
20    download the documents would make a lot of sense rather than
21    sending a bunch of e-mails back and forth.
22          THE COURT:  Right.
23          MR. McNEW:  So we're happy to.
24          THE COURT:  Is that fine with the defense?
25          MR. SACRIPANTI:  Yes, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

43RTMTBEC                    Conference

```
 1          THE COURT:  So you'll organize that?
 2          MR. SACRIPANTI:  We will.
 3          THE COURT:  We are doing this very successfully in the
 4    IPO litigation.  I don't know if the defense firms overlap.
 5    Are any of the defense firms in the IPO cases?
 6          MR. LANGAN:  Kirkland Ellis.
 7          THE COURT:  Talk to them.  It worked well for the
 8    Court, worked well for all the parties.  We do everything
 9    electronically.
10          Okay.  Now I guess we do turn to all these motions and
11    possible discovery.  The defendants have raised personal
12    jurisdiction -- sorry, yeah, personal jurisdiction, and they
13    have raised standing issues.
14          Do you want to talk about those, Mr. Sacripanti?
15          MR. SACRIPANTI:  Your Honor, Mr. Wallace is going to
16    handle the --
17          MR. WALLACE:  Yes, your Honor, and shall we start with
18    personal jurisdiction?  By our count, based on a rough internal
19    survey of the defendants, it appears that there may be
20    approaching 50 different defendants that have various
21    objections to personal jurisdiction.  We have been trying to
22    work those out with the plaintiffs in the hope that we won't
23    have to impose on the Court with any of this.
24          And our objective is to try to reach agreement with
25    the plaintiffs to drop those defendants that don't belong in
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

43RTMTBEC                    Conference

```
 1    the case, and we have measures that I think would protect the
 2    plaintiffs and we hope induce them to reach agreement with us.
 3          Thus far, however, we have made only limited success
 4    in reaching that agreement.  We suggest that, in essence --
 5          THE COURT:  Is that because you haven't had enough
 6    time yet to play out the negotiations?
 7          MR. WALLACE:  Yes.
```

Page 14

43RTMTBEC

```
 8            THE COURT:  So it may yet be fruitful.
 9            MR. WALLACE:  Indeed.  And we suggest that this be
10  postponed for a period of time to allow us to continue those
11  negotiations.
12            THE COURT:  When do you think we should next address
13  potential personal jurisdiction motions?
14            MR. WALLACE:  We would commit to identifying these
15  defendants to the plaintiffs promptly.  I think it may be 60 or
16  90 days before we could provide the information they say they
17  need in order to satisfy ourselves that the defendants don't
18  belong in the case.
19            THE COURT:  Does that make sense to you or Mr. Summy?
20            MR. LANGAN:  I think my office has been handling it
21  mostly with the defendants.  That's fine with us, we just
22  request that they give us some affidavits that show those
23  parties should not be in the case.
24            THE COURT:  That's what he is going to do, he says he
25  should reconvene with the Court on that issue in about 60 days.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

43RTMTBEC                    Conference

```
 1            MR. SUMMY:  That's fine, your Honor.
 2            MR. McNEW:  Your Honor, just one housekeeping matter.
 3  This point relates to points B and C in our alternate order.
 4  One of the things that we have done in our alternate order is
 5  we have a provision providing for amendment to the complaint.
 6            One of the reasons for that was to align the parties
 7  so the parties would be properly stated.  We will probably have
 8  other housekeeping measures, we are not trying amend to affect
 9  the Court's jurisdiction one way or the other, but going
10  forward in the federal forum there may be additional
11  allegations in certain ways to make sense to put it so the
12  table is properly set for what goes forward.
13            And the one thing that needed to be dealt with is
14  to get the parties properly stated so we can at least get the
15  names right in the caption.  If it's longer, we provided a 30
16  day period for amendment in ours, and we made it an amendment
17  as of right, so perhaps if we can make some language that says
18  we have a second, if we adhere to that 30 day period, we have
19  the ability to amend and to come back and fix the caption.
20  Basically a housekeeping matter to keep all these different
21  pieces in.
22            THE COURT:  So we can set the date now.  So for April
23  23rd, by April 23rd.
24            MR. McNEW:  That would be April 23rd to amend the
25  complaint?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

43RTMTBEC                    Conference

```
 1            THE COURT:  Yes.
 2            MR. SACRIPANTI:  Is that the caption only by April
 3  23rd?
 4            THE COURT:  No, I gather it's more than that.  You may
 5  add something to the claims that you think that he should
 6  assert here or may want to realign parties, he has all kinds of
 7  things in mind.
 8            MR. McNEW:  But we're mindful of the rule you can't
 9  amend the complaint to strip the Court of jurisdiction.
10            THE COURT:  Right.  April 23.
11            So we're putting this off.  Now what about B?  I
12  focused on your order, but B says any defendant who contends it
```

Page 15

43RTMTBEC

13    was improperly named should explain it to you within ten days.
14    I assume you don't like that ten days limit.
15            MR. WALLACE:  Correct.
16            THE COURT:  Will 30 days be enough so that the
17    negotiations would end in 60 days?  In other words, if you give
18    them your materials within 30 days, they could get back within
19    the next month and I could schedule conference approximately
20    two months from now on that issue and see what is what.
21            MR. WALLACE:  We can commit to giving every defendant
22    something within 30 days.
23            THE COURT:  Okay.  April 23rd, and we will take it up
24    again in the end of May.  So by the end of May the plaintiffs
25    will be able to come back and say essentially this is the group
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

32

43RTMTBEC                    Conference
1     that we didn't work out and we think we have jurisdiction and
2     they think we don't, let's reschedule the motions.
3             MR. McNEW:  Your Honor, it may make sense, rather than
4     going through two iterations of the complaint, it might make
5     sense to just provide all amendments that might be done in May,
6     rather than having an April amendment and a May amendment.
7             THE COURT:  I don't understand what you mean.  What's
8     wrong April 23rd?  Why couldn't you get all your amendments
9     done by then?
10            MR. McNEW:  I presume by the end of this process we
11    will have to add and drop parties.
12            THE COURT:  But that is nothing.  That to me, that's
13    mild stuff, just that's mild stuff.  I may not worry about
14    that.
15            MR. McNEW:  Okay.
16            THE COURT:  They may say they do on those.
17            Now you said on standing, which is what I was going to
18    turn to, standing is really not addressed in the plaintiff's
19    proposed order; right?  So let's discuss it.
20            In the defendants' letter they cite a decision I
21    issued in 2001 which I held that the plaintiffs must be able to
22    show actual contamination or imminent threat of contamination
23    to have standing.  And he's saying here that there may be some
24    plaintiffs who can't meet that standard, because some of them
25    have publicly acknowledged, you believe, that they are filing
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

33

43RTMTBEC                    Conference
1     suit, using his words, merely as a place holder to avoid a
2     potential legislative bar and to preserve the possibility of
3     asserting claims that might occur.
4             In any event, to take care of the problem, the defense
5     has proposed a questionnaire, which they want the Court to
6     think is simple, but is anything but simple, but what was your
7     response to the questionnaire about the concept of having come
8     forward with some showing of standing early on?
9             MR. GORDON:  You say to cure the problem --
10            THE COURT:  I didn't say to cure the problem, I said
11    to address the point that they made in the letter, and given
12    the prior ruling there may be a lack of standing.  How would
13    you address their point?
14            MR. GORDON:  I appreciate that, I meant they said
15    there was a problem that has to be cured.
16            THE COURT:  I didn't say that at all, I said how do
17    you address the point raised in their letter that they point
                            Page 16

Exhibit B
Page 16 of 28

43RTMTBEC

18  out that prior ruling of this Court that set up the standard
19  for standing.  And they want to know if you have got it for all
20  plaintiffs that are now here.
21          MR. GORDON:  We do.
22          THE COURT:  How are you going to show that to them?
23          MR. GORDON:  We think through the discovery process,
24  if at the end of day we don't have any damages in the case, if
25  there is no contamination or no imminent threat of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                34
43RTMTBEC                    Conference
1   contamination.
2           THE COURT:  But let's say there's one plaintiff in the
3   case, one plaintiff and only one plaintiff, should a defendant
4   have to do two years of expensive discovery if you say at the
5   end of the day oh, well, turns out we didn't have any damages,
6   so it's okay, goodbye.  You wouldn't say that in a one
7   plaintiff case.  You would say one of the things that I want to
8   do right in front is find out if he had standing to bring the
9   suit.  So it's not enough to say I don't have any damage at the
10  end, it's no harm done.  There is harm done because two years
11  of discovery and expensive motion practice.  So that's why they
12  want to say do you have standing or don't you.  Standing is a
13  threshold question.
14          MR. GORDON:  Getting words from my co-counsel.
15          THE COURT:  I see that.
16          MR. GORDON:  Standing is a pleading requirement.  We
17  have pled actual contamination or imminent threat.  We are well
18  aware of the Court's ruling, which was in the context, much
19  different context by way of individual well owners.
20          THE COURT:  I remember.
21          MR. GORDON:  Here we represent entities have that
22  spent money to try to deal already with the MTBE problem, with
23  the contamination and the imminent threat of contamination.  It
24  is a pleadings issue.  We have plead it in every case.  I don't
25  know why they say that there have been cases filed with
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                35
43RTMTBEC                    Conference
1   absolutely no contamination or threat of contamination.  Were
2   we concerned about a legislative bar?  Absolutely.  Were we
3   concerned about the attempt to make it retroactive?  Yes.
4           That's the reason why we filed cases and our clients
5   came to us and said we should file this case and what concerns
6   of public relations implications they had, but they all had
7   contamination or imminent threat.
8           THE COURT:  If that's your representation, and you're
9   fully aware of your Rule 11 obligations, maybe you're
10  representing for every plaintiff who is here or will be here,
11  if they can satisfy the standard that I set forth in the 2001
12  case, whether you agreed with it or not, that it seems to me I
13  suppose the law of the case now, if you think those plaintiffs
14  are satisfied I suppose that's enough.
15          MR. SUMMY:  Your Honor, I need to let the Court be
16  aware of this, that there are public agencies in certain states
17  that had statutory standing that is under a different standard
18  than what the Court has enunciated in MTB-1, but those were
19  pled properly in complaints.  They may not fall square on the
20  face of what the Court says is the standard.
21          THE COURT:  I understand, but there is some statute
22  that says that.
                        Page 17

                        Exhibit B
                      Page 17 of 28

43RTMTBEC

23      MR. SUMMY:  That's correct.
24      THE COURT:  Why don't you write a letter, and it may
25  take a little while to write up, but say something like that,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

43RTMTBEC                    Conference
1   that one group of plaintiffs, and you could list them, would
2   meet the standard you set forth in your opinion.  The next
3   group of plaintiffs meet the statutory standing test in their
4   various states, and here they are, list them by state and
5   statute, that's it, that's everybody.
6       Now we have identified every plaintiff and we have
7   identified whether it comes under the Court standard or
8   statutory standard, and there is no third, there is no third or
9   is there?  It's either a statute or meets the standard I set
10  forth in the prior opinion, everybody meets one or the other.
11      Do you want to confer, Mr. Sher?
12      MR. SHER:  Your Honor, one point about some of the
13  cases that actually may not end up here is that they involve
14  entities that are very different from the plaintiffs who
15  already are here who are all water purveyors.
16      THE COURT:  Like?
17      MR. SHER:  Well, all of the entities before you now
18  purvey safe water to the public for drinking purposes.  The
19  state of New Hampshire is not a purveyor.  Most of the agencies
20  in the Sacramento County cases, which were referred to as the
21  district attorney cases, are not water purveyors.  The Orange
22  County Water District is not a water purveyor, and so their
23  injuries, for purposes of standing are going to be very
24  different from the standard that you set out for contaminated
25  wells.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

43RTMTBEC                    Conference
1       THE COURT:  I understand, but my question, Mr. Sher,
2   is do I have any of those cases now that wouldn't fall under
3   the two standards that I was talking about, one is the standard
4   I did set forth in my opinion of contamination or imminent
5   threat, or two, a statutory standard.  Is there a third group
6   that I don't have any of yet?
7       MR. SHER:  I don't know, your Honor.  I was just
8   responding to the notion that those two categories were
9   exclusive for all the cases that may come here.
10      THE COURT:  But what I'm asking today is do I have any
11  cases in the third category, and you don't know the answer.
12      MR. SHER:  I can't tell you.
13      THE COURT:  So I'm going to help you.  So if I have
14  any of the cases in the third group, put that in the same
15  letter too and say and yet there's a third group that has
16  standing for yet a different reason, and you only have one or
17  two of those.  Now you may have more, but that reason is, just
18  say it and be done with it.  If there is nothing more to be
19  done right now, there's nothing more to be done now.
20      MR. GORDON:  Again when I make my comments I'm taking
21  about the cases where I'm an attorney.  What the pleadings say
22  in the pleadings, what the basis for the standing is and under
23  of case law, and we have a case here I think from the First
24  Circuit, but we think is sort of obvious, but there's a case on
25  point that standing issues are to be judged on the pleadings

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 18

Exhibit B
Page 18 of 28

43RTMTBEC

38

43RTMTBEC                    Conference
1   themselves and they should file the motion to dismiss if
2   they're not adequate.  But again, I don't know why they raise
3   this issue.  I think it's a straw dog.
4          THE COURT:  It may be, but I don't need any
5   unnecessary motions.  It may be satisfactory if you sort of
6   summarize the standing theory by groups, that's all.  Because
7   once I know that some of the people are here under a statutory
8   standing theory and not under an injury or threat of imminent
9   injury, they need to know that too.
10          Then they'll look at that letter and understand.
11  Hopefully there will no motion, hopefully, or they'll look at
12  it and the pleadings and the case law that says standing should
13  be judged on the basis of pleading and say we need to move.  I
14  think that I would require a premotion conference on that one.
15  I would want to hear why they think that's a valid motion if
16  it's supposed to be judged on the face of the pleading and
17  pointed to the face of the pleadings, as I asked you by these
18  three groups, that maybe that would go away for now.
19          Is any defense lawyer ready to tell me now why the
20  face of pleading is not sufficient on the standing?
21          MR. EIMER:  Yes, your Honor, the allegations in the
22  complaint are vague and unsubstantiated and the Court is not
23  obliged to accept those vague and conclusory allegations.
24          THE COURT:  That's the whole point.  What case is
25  that?  Because there are times we do absolutely accept vague
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

39

43RTMTBEC                    Conference
1   and conclusionary allegations.  12B6 motions we have had
2   tremendous guidance from the Supreme Court, everyone knows all
3   about Swerkowitz, we do accept it.  If it's pled, it's pled.
4          So I don't know the law in the standing area.  Do we
5   not accept it if it's -- in other words, what's the standard?
6   Is the Court required to accept it because they say so or at
7   the pleadings stage do you have to open up discovery on
8   standing motion in order to decide?
9          Now he thinks that he has a First Circuit case that
10  says clearly you do not open it up, you accept the face of the
11  pleadings.  That's nice, that may be true in the First Circuit.
12  Is there Second Circuit law or does that not matter because we
13  have everybody's law to worry about anyway?
14          So I'm not sure you're ready on this, that's why I
15  said a premotion conference may be beneficial at the
16  appropriate time.
17          MR. EIMER:  Agreed.
18          THE COURT:  So I'm asking the plaintiffs to basically
19  write a fairly simple letter grouping the claims and saying the
20  vast number are there because they pled injury or threat of
21  imminent injury, which meets your first standard.  There is a
22  group that has a special statutory standing under the local
23  statute, and there may be a third group Mr. Sher just described
24  that has yet another theory of standing.  Then you look at it,
25  you look at the law, we'll discuss it the next time.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

40

43RTMTBEC                    Conference
1          MR. GORDON:  We have no problem with that.  The only
2   thing I ask is that I don't think it's something that we could
3   do as a PSC but rather as a counsel for our cases.  I will
                        Page 19

Exhibit B
Page 19 of 28

43RTMTBEC

```
 4    write that letter for my cases, Mr. Sher for his cases --
 5         THE COURT:  Well, he only has to do it for the cases
 6    that are here.  I don't think Mr. Sher has to do it with cases
 7    that are not here.
 8         MR. GORDON:  Mr. Bern has his cases.
 9         THE COURT:  I understand, if they're here, they're
10    here.
11         MR. GORDON:  I think each plaintiff counsel should
12    write that letter for their cases.
13         THE COURT:  But I think that as liaison counsel
14    Mr. Alpert may want to collect the letters and read them first
15    and hand them in as a group.
16         MR. McNEW:  Your Honor, I submit at some point, I
17    propose it be sooner rather than later, we are entitled to
18    additional information on it.
19         THE COURT:  I'm only asking you to do the research
20    first.  Look at the cases on standing motions and see what you
21    have.  After I had chance to -- I don't know what the First
22    Circuit case is.  What's the name of that case?
23         MR. McNEW:  Your Honor, it's Dubois versus United
24    States Department of Agriculture, it's 102 F.3d 1273 (First
25    Circuit 1996) and the operative language was in footnote 13,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

43RTMTBEC          Conference

```
 1    which was page 1283.
 2         THE COURT:  And it says?
 3         MR. McNEW:  It says the standing issue is raised in --
 4         THE COURT:  Slow down.
 5         MR. McNEW:  Whereas here the defendants have not
 6    contradicted the factual allegations concerning standing that
 7    we deem adequate at the motion to dismiss stage, we will not
 8    subject these allegations to the summary judgment level
 9    scrutiny in the absence of motion for summary judgment on the
10    issue.
11         So we are at the pleading stage, your Honor and we --
12         THE COURT:  That may be right, it may be that it has
13    to come later in the discovery, but let the defense team look
14    at the issue on the law and the facts as you give them, and
15    come back and have a premotion conference if they think they
16    should be moving at the pleading stage with no factual
17    development.
18         MR. WALLACE:  If I may add a few more words to the
19    subject, my understanding is the Court is obligated to accept
20    the well pled allegations in fact in the complaint, and I dare
21    say none of these complaints have any allegations of fact about
22    the alleged threat to the wells or contamination of wells.
23         THE COURT:  I don't know that.  Mr. Gordon stood up
24    and said that they did.  He said we have alleged actual
25    contamination or threat of imminent harm.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

43RTMTBEC          Conference

```
 1         MR. WALLACE:  They allege vaguely either contaminated
 2    or threatened, and threatened is an allegation of law.
 3         THE COURT:  No, it's not.  I disagree with you.  I
 4    will make it short and sweet for now, I disagree with that.
 5    They made that allegation, in the pleading context that might
 6    be sufficient, but I'm not saying that I know the law on
 7    standing motions.  I don't know whether you treat it as you
 8    would a motion, typical motion to dismiss or you accept it all
```

Page 20

43RTMTBEC
```
 9   or whether you have to move to a summary judgment if you are
10   going to start putting in a lot of factual material.  If that's
11   so, then it's down the road.
12          MR. WALLACE:  Your Honor, we have undertaken some
13   research of the public record in order to develop some
14   information that I think the Court would find informative in
15   addressing the standard.
16          THE COURT:  It might be informative, but it may no
17   longer be a motion to dismiss, it may be a summary judgment
18   once you're putting in material outside the pleading.  If
19   that's the case, people need some discovery.  We don't do
20   summary judgement without discovery.
21          MR. MCNEW:  Your Honor, Rule 8A --
22          THE COURT:  Please, I feel like I wrote Rule 8A.  Read
23   all my voluminous writing about Rule 8A.  I don't think anyone
24   addressed that more in the whole word.
25          MR. MCNEW:  We only wanted to apologize, your Honor,
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                43

43RTMTBEC                    Conference
```
 1   that our complaint as it stands is some hundred pages already.
 2          THE COURT:  Anything but short and plain.
 3          MR. MCNEW:  We felt that we met the requirements.
 4          MR. WALLACE:  Our proposal called for a bit more
 5   information than simply which category the plaintiffs are in.
 6          THE COURT:  I know it did, but you really were seeking
 7   a way to get discovery.
 8          MR. WALLACE:  That's fair enough.
 9          THE COURT:  You were seeking to go way beyond the four
10   corners of the complaint and really get detailed discovery.  As
11   Mr. Gordon said earlier, if we're going into discovery, let's
12   have a schedule and everybody will start having discovery, and
13   that's right.
14          MR. SACRIPANTI:  Your Honor, may I take one try at
15   this, your Honor, and I'll sit down quickly after you listen to
16   me, but I'll read something.
17          THE COURT:  You mean after I disseminate your
18   position?
19          MR. SACRIPANTI:  Yes.  But may I read something that
20   is on a web site from one of the plaintiffs?
21          THE COURT:  If you read slowly.
22          MR. SACRIPANTI:  I will.  Long Island American Water
23   shares our customers' concerns about the reports of MTBE in
24   groundwater, and we are pleased to report that we have been
25   testing for MTBE in our well since 1998 and none has been
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                44

43RTMTBEC                    Conference
```
 1   detected in any well.
 2          When we find something like that, your Honor, our
 3   inclination, and perhaps we overreached with our questionnaire,
 4   and maybe the response is to have a more simple questionnaire,
 5   and maybe it has two or three questions that says:  Are your
 6   wells contaminated?  If the answer is no, then maybe the next
 7   question --
 8          THE COURT:  That's what I suspect.  Mr. Gordon's word
 9   is on the line, because he said, and let's talk about the Long
10   Island -- what did you call it?
11          MR. WALLACE:  Long Island Water Corporation.
12          THE COURT:  I mean if he has alleged in a suit that
13   features them as a plaintiff that he has alleged actual
```
                              Page 21

43RTMTBEC

14  contamination or threat of imminent harm and he meets the
15  standard that I wrote in that district court opinion long ago,
16  then his signature is on the line.  And either we accept Rule
17  11 or we don't.  Generally we do.
18          MR. SACRIPANTI:  I guess what we were trying to do,
19  your Honor, is obviate the need for motion practice on this,
20  and perhaps like we're addressing personal jurisdiction.
21          THE COURT:  I agree, but I already tried that.  I said
22  to Mr. Gordon you were aware of whatever I wrote.  He said very
23  much so.  Then Mr. Summy said there are also statutes.  Then
24  Mr. Sher said there is a third category.  Okay, but for that
25  large first category, that's not the special statutes and it's
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    45

43RTMTBEC                    Conference
1   not whatever it is Mr. Sher was referring to, but it's the
2   group that Mr. Gordon says we know what you wrote and we're
3   aware of it and believe that all our plaintiffs, except for the
4   other two categories, fall in there, then he has to have a
5   basis to have said that.
6           MR. SACRIPANTI:  May I ask the question:  Will he in
7   his letter say the following plaintiffs are here because their
8   wells are contaminated here or it's under imminent threat, and
9   here is what we call an imminent threat?
10          I mean I would think that would elucidate this issue,
11  especially for premotion conference when we get before your
12  Honor and say gee, we think that we want to bring a motion for
13  standing.  And you say to us why?  We say well, here's why, on
14  the basis of the letter and perhaps some of the public record
15  information, I'm concerned if his letter is merely perfunctory
16  and just says here's the reasons why it's standing, we won't
17  have enough information at that time and won't facilitate the
18  resolution.
19          THE COURT:  I had expected that it will be
20  perfunctory.  I thought basically he would draw the allegation
21  from the various complaints and say for the Long Island Water
22  Company we alleged in paragraph 12 actual injury, or we alleged
23  in paragraph 12 the threat of imminent harm.
24          MR. SACRIPANTI:  And is he going say what that threat
25  is?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    46

43RTMTBEC                    Conference
1           THE COURT:  No.  Which one did you allege?  Do you
2   know for that particular case, or you wouldn't know as you sit
3   here?
4           MR. GORDON:  I wouldn't know as I sit here.  But I
5   would like to address some of these things.  As I sort of
6   implied before, your Honor, water authorities are extremely
7   reluctant to bring lawsuits about contamination of the water
8   when they're trying to sell that water.  I cannot control what
9   a company does on its web site.  But what is absolutely clear
10  is there are two things; number one, it's the Long Island Water
11  Corporation.  Long Island is a sole source aquifer, the aquifer
12  is contaminated with MTBE up and down Long Island from Suffolk
13  to Nassau Counties.  That's number one.  Number two, they have
14  spent money, as they indicated already in this web site, to
15  test for MTBE, money that they should not be out of pocket.
16  That's an injury that we believe as well, and there is an
17  imminent threat.
18          We will have to go through an entire trial, which is
                          Page 22

43RTMTBEC

19  ultimately where we would like to get to, to get to the point
20  whether there is an injury and there is standing to bring this
21  lawsuit.  It's certainly their water in terms of standing.
22          THE COURT:  But I think I already ruled that merely
23  feeling that they ought to test wouldn't meet the standing
24  requirement.  The fact that they spent money testing, and this
25  is only one district judge's opinion, but I wrote then that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

43RTMTBEC                    Conference

1   wouldn't be enough to say that I thought I better test, I did,
2   and I found absolutely nothing, so I am pleased to report I
3   found absolutely nothing.  If that was all you had, that you
4   spent money on testing and came up completely clean, I would
5   say, and I think I have said, that that is not standing,
6   Mr. Gordon.
7           MR. GORDON:  And we may need to readdress that,
8   because it is the sort of situation where we have a private
9   person has their own well as opposed to a public water
10  authority that has many towns on a sole source aquifer that is
11  contaminated.
12          THE COURT:  But that's the key word.  If it is
13  contaminated, you got it.
14          MR. GORDON:  The aquifer is but the well may not be
15  yet or maybe it was.
16          THE COURT:  Your argument is that's an actual injury.
17          MR. GORDON:  Yes.
18          THE COURT:  I understand, that's easy.  As long as you
19  got that, tell it to Mr. Sacripanti and he'll make of it what
20  he will, but you got it.  You said there is an actual injury to
21  the aquifer that we rely on.
22          MR. SACRIPANTI:  Well, your Honor, not to debate this
23  issue right now, but just to talk about what an aquifer means,
24  does that mean that if there's a spilling of gasoline in
25  Catskill, New York or Dutchess County, New York, that someone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

43RTMTBEC                    Conference

1   in lower Westchester County who might take from the same
2   aquifer over 50 or 70 miles --
3           THE COURT:  Mr. Gordon's point is well taken, I'm not
4   worried about that single person 70 miles away, I'm worried
5   about the Long Island Water Authority, and from their
6   perspective, if they've got a contaminated aquifer, they have a
7   big problem, it means they have an actual contamination aquifer
8   or imminent threat.
9           It may be that we shouldn't be discussing this further
10  at this time, because then you find lines of transcripts to
11  quote, and that's not what I'm trying to say, but I'm saying
12  it's quite a different standard for an individual's well 70
13  miles away.  It's a different standard for this entity.  The
14  entity's injury, I already said in this conference, can't be
15  just I chose to spend money on testing and everything is great,
16  that wouldn't do it.  But if they have actually showed injury
17  to something that one can look as sort of their source, their
18  property, under their control, any words you want, they may
19  have an actual injury.  So it's quite a different issue than
20  the last time.
21          What's your name?
22          MR. LYONS:  Your Honor, I'm John Lyons, I represent
23  Conoco Phillips.  What I wanted to raise is two points, simply,

Page 23

43RTMTBEC
24    and as you say, we don't want to do this off the cuff.  These
25    water districts do not own the aquifer water.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

43RTMTBEC          Conference
1         THE COURT:  But it may be their sole source of water.
2         MR. LYONS:  But your Honor, their rights for that
3    water are only use of property rights.  If the aquifer is going
4    to be contaminated but is not going to be drawn into their
5    wellhead immediately, they have no rights to that water
6    whatsoever and they have nothing to stand on to sue.  And that
7    is something that we need to brief.
8         THE COURT:  Right.
9         MR. LYONS:  One other point, a practical issue that
10   you raised, in California we have litigated heavily, Mr. Miller
11   I have spent quite a bit of time, in one case their claim was
12   an imminent threat to a well, for instance.  It turns out at
13   after three years of litigation, all the sources of gasoline in
14   the area, et cetera, that what they meant by imminent threat
15   was an expert report that said 15 years from the date, if all
16   things remained equal, MTBE would reach that well.
17        On a motion in limine --
18        THE COURT:  Who is the plaintiff there?
19        MR. LYONS:  South Lake Tahoe, your Honor.  And there
20   were some wells that differed, but in a motion in limine, after
21   three years of wasted expense concerning those wells, how the
22   gasoline around those wells were supplied and so forth, the
23   judge said 15 years from now is not imminent.
24        Now the plaintiffs could say, with good faith, that
25   they had an expert who would say 15 years from now it will hit
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

43RTMTBEC          Conference
1    that well, but at some point early on I would suggest, your
2    Honor, we should -- we have 60 days where we could have a lot
3    of those kinds of problems, we will be going all over the
4    country looking at sources of gasolines for wells that aren't
5    likely to get hit for decades.
6         And to be clear, these plaintiffs do not have the
7    right to assert generalized contamination in the aquifer, the
8    only the right they have is to draw clean water from those
9    aquifers.  Thank you.
10        THE COURT:  I don't understand the difference, the
11   last phrase, the right to draw clean water from that aquifer.
12   What if that right is being affected?
13        MR. LYONS:  I'll give you a specific example.  In Long
14   Island, your Honor, that aquifer contains 90 trillion gallons
15   of water that they draw from.  On an average rain day, 500
16   million gallons of water is added to that aquifer, so to say
17   that some portion of that aquifer somewhere has contamination
18   near a gasoline site is not to say that it affects every water
19   company that draws from that 90 trillion gallon aquifer.
20   That's impossible.  And what they have to show, in my mind, is
21   something that that contamination is going to get to water that
22   they're going to draw out.
23        THE COURT:  Let's go back to the basics before
24   Mr. Sacripanti said I want to be heard just one more time, and
25   that is when and how is the way to do this?  Is it a cleaning
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

Page 24

43RTMTBEC

43RTMTBEC                    Conference
1  motion?  Is it a summary judgement?  Does it have some
2  discovery both ways?  Do you have the opportunity to ask the
3  kinds of questions that you ask in this proposed questionnaire?
4  When do you have it?  When is the right time to engage in this
5  standing issue?  And that I would like you to do more research
6  on, and we've scheduled another case management conference and
7  we'll talk about it then.
8          MR. SACRIPANTI:  We'll address it then, thank you,
9  your Honor.
10         THE COURT:  So now let's talk about discovery a little
11  bit, which seems to be exactly where we're up to anyway.  I'm
12  in the defendant's proposed order page 7, number D, that's says
13  pending the resolution of motions to dismiss, discovery shall
14  be limited to subjects necessary to the resolution, such as
15  personal jurisdiction and standing, additional discovery shall
16  be deferred, and will also facilitate participation in
17  subsequent parties.
18         The plaintiffs say to be sure that all parties who may
19  be named are properly identified, the discovery relating to the
20  identification of entities that manufacture, distribute or sold
21  MTBE or TBA or gasoline containing it shall commence
22  immediately upon entry.
23         So there is a difference here as to what each side
24  anticipates, but both sides have early needs, and maybe what is
25  good for the goose is good for the gander, and if plaintiffs
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

52

43RTMTBEC                    Conference
1  want to start the discovery that they have described, trying to
2  figure out who manufactured, distributed or sold from the
3  defendants so they can properly name parties.  By the same
4  token, maybe the standing discovery should begin; not to maybe
5  the degree of the initial proposed questionnaire, but as you
6  said, Mr. Sacripanti, maybe a modified questionnaire so that
7  sides are getting started on this.
8          And as long as we're at it, years ago there was some
9  request for document preservation, and I remember signing a
10  document preservation order that I publicly stated since that I
11  regret.  I didn't have the level of knowledge that I have now.
12  I would now sign a far more refined order than I did then,
13  because I just learned so much in the last bunch of years about
14  what should be preserved and the cost of preservation.  Another
15  topic I talk about too much, but anyway, I do.
16         So you might want to begin some negotiations with one
17  another about that, because actually this time, unlike the last
18  time, there may actually be documents on both sides.  And so
19  you may want to have your own meet and confer about issues of
20  document preservation, about all issues of electronic
21  discovery, including former production.  There are many things
22  to talk about these days, we have all advanced in the last five
23  years.  So again, I don't want to get into it today, but I
24  suggest it could be high on your list of meet and confer
25  topics.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

53

43RTMTBEC                    Conference
1          In terms of planning this preliminary discovery, which
2  is really still not merits discovery, the defendants want the
3  discovery to plaintiffs to identify whether in some cases it
4  should go on lack of standing, but the plaintiffs want
                    Page 25

43RTMTBEC

```
 5   discovery of defendants to decide who should be named in which
 6   suit and maybe there are more out there.  So each side has some
 7   preliminary needs in discovery.  Why shouldn't it begin on both
 8   sides?
 9           MR. SACRIPANTI:  We would have no objections to that,
10   your Honor.  We would suggest perhaps giving us a period of
11   time to meet and confer on the issues to see if we agree on the
12   bounds of the reciprocal discovery.
13           THE COURT:  So I'll not schedule it at all today but
14   leave that to your first meet and confer also.
15           I think that is good.  In your meet and confer,
16   besides talking about issues of production and form and
17   electronic data and all that stuff, why don't you also talk
18   about what you sought, you the plaintiffs sought at page 6 of
19   your proposed topic E and what the defense sought at page 7,
20   topic B, and I'm going to schedule another case management
21   conference anyway in the range of 30 days or so, and whatever
22   you have haven't worked out, I will.
23           MR. SACRIPANTI:  That's fair enough.  We have no
24   objection.
25           THE COURT:  Now both sides say that we are going to
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

54

43RTMTBEC                    Conference

```
 1   forego mandatory disclosures here, that's the proposal of
 2   everybody.
 3           MR. SACRIPANTI:  Yes, your Honor.
 4           THE COURT:  All right.  Topic seven, of course the
 5   Court may issue additional case management orders, that's
 6   obvious.
 7           MR. McNEW:  We add a sentence at the end of that.
 8           THE COURT:  30 days in which to move for remand.
 9   Right.  Okay.
10           MR. McNEW:  There was one last provision in our
11   proposed order, your Honor, it was 5D.
12           THE COURT:  Say again?
13           MR. McNEW:  5D, which addressed answers and motions.
14   We were just trying to provide a timetable for the filing of
15   answers or motions.  I guess it's optimistic to suggest that
16   anybody is going to answer anything here.
17           THE COURT:  There's a lot of motions, obviously, still
18   to be made by both sides.  And you folks are still very
19   interested in remand, and the defense is obviously interested
20   in standing and personal jurisdiction and then making the real
21   motions to dismiss.
22           MR. McNEW:  Correct.
23           THE COURT:  Real meaning substantive such as
24   pre-emption.
25           MR. McNEW:  We think that the standing motions would
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

55

43RTMTBEC                    Conference

```
 1   be raised.  I don't know why the defendants would need seriatim
 2   dispositive motions.
 3           THE COURT:  We just talked about that.  Your view is
 4   that standing really can't -- they can't win a pleading motion
 5   on standing, that would have to be done with some discovery on
 6   something other than the pleadings.
 7           MR. McNEW:  One would assume that if they raised it
 8   and lost it in a Rule 12 motion they would have to answer and
 9   have their discovery.
```

Page 26

Exhibit B
Page 26 of 28

43RTMTBEC

```
10          THE COURT:  There may be an interim way to deal with
11   it.  I appreciate the argument the gentleman made, Mr. Lyons,
12   about the Tahoe case.  It shouldn't take three years to find
13   out you never have should have been a plaintiff.  So there may
14   interposition where it's not the face of proceedings per se but
15   based on some limited discovery, sort of the way we do
16   jurisdictional discovery where we will have some standing
17   discovery and have a standing motion.
18          MR. MCNEW:  But with respect to Mr. Lyon's position,
19   understand the hydrogeology of Long Island and California are
20   vastly different.
21          THE COURT:  I'm sure that's true.
22          MR. MCNEW:  That's another day.
23          THE COURT:  I wouldn't even understand the words at
24   this point.
25          MR. MCNEW:  Under D we broke it into two pieces,
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

43RTMTBEC                    Conference
```
 1   because one thing that we haven't discussed this morning are
 2   declaratory judgment actions, which we understood to be a
 3   another jurisdictional route to the Court that the defendants
 4   opened.  So we had a provision first, a timetable for answering
 5   and\or moving under Rule 12 for the actions that we're all here
 6   for, we have a separate paragraph to deal with declaratory
 7   judgment actions, because otherwise --
 8          THE COURT:  You want to move against the declaratory
 9   judgment action on the basis of no federal jurisdiction?  Is
10   that what you're saying?  In other words, they're the
11   plaintiffs, you want to say there's no jurisdiction?
12          MR. MCNEW:  We don't believe a declaratory judgment
13   action lies in this context where there's already -- the issues
14   have already been joined in substance of litigation.  We had
15   understood that they had filed these merely as a way to get to
16   this Court in the event that they didn't have success on the
17   removal strategy, so we would assume that if we were all here
18   that those become surplusage and gets dismissed, but we may be
19   wrong on that.
20          THE COURT:  The point is that you're continuing to
21   oppose being here.  You want reconsideration, you want to talk
22   about non-RFG states, you want certification.  There is enough
23   uncertainty at this point I would hardly think about dismissing
24   the declaratory judgment action solely on the grounds that
25   there is duplicative routes to this Court, since you're
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

43RTMTBEC                    Conference
```
 1   fighting being here, and I respect that, but I am just saying
 2   this point I wouldn't do it.  If you had an independent ground
 3   that there is no jurisdiction over that action, then yeah.
 4          MR. GORDON:  Your Honor, we would then move to
 5   continue this stay in effect on the declaratory judgment action
 6   as a whole until we have some response either on the
 7   reconsideration, the appeal, et cetera.
 8          MR. SACRIPANTI:  I would have no objection to the
 9   existing declaratory judgment actions.
10          THE COURT:  Okay.  So that's done.  You got that.
11          All right.  I think we talked about everything except
12   for a next date.
13          MR. WALLACE:  Your Honor, we do have two other small
14   matters.
```
Page 27

Exhibit B
Page 27 of 28

43RTMTBEC

15          THE COURT:  I hope they're small because you went half
16     an hour over my schedule.
17          MR. WALLACE:  One is we still don't have complaints in
18     seven of the cases that are before you.
19          THE COURT:  All right.  Mr. Alpert, you're liaison
20     counsel, make sure they get complaints.
21          MR. ALPERT:  Yes, your Honor.
22          MR. WALLACE:  And does your order provide that our
23     time to answer will be set at the next conference?
24          THE COURT:  We will put it in, the time to answer or
25     move will be set at the next conference, and the next
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                  58

43RTMTBEC          Conference
1      conference will be, and then you can leave, how about Thursday
2      April 22, at 10:00.  Thursday, April 22, 10:00.  Going once,
3      twice, done.
4           We'll put that in the order that the time to answer
5      will be set at the conference scheduled for April 22.
6                              oOo
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Exhibit B
Page 28 of 28