

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 19 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

|   |   |
|---|---|
| IN RE:<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | **MDL Docket No.: 1358**<br><br>This Document Relates to:<br><br>*Hope Koch, et al. v. John R. Hicks, et al.*, 04-3345 (D. Md.) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF KOCHS' REPLY – CERTAIN DEFENDANTS' CONSOLIDATED RESPONSE OPPOSING ALL MOTIONS TO VACATE CONDITIONAL TRANSFER ORDER ("CTO") 11

Plaintiffs Hope Koch and Frank Koch, by and through undersigned counsel, file this reply in response to Certain Defendants' (including ExxonMobil Corporation) Consolidated Response Opposing Plaintiffs' motion to vacate its conditional transfer order, CTO-11, as it applies to the *Koch* action for the reasons set forth below.

**OFFICIAL FILE COPY**

IMAGED APR 19 2005

I.    **THE KOCH ACTION IS NOT A PRODUCTS LIABILITY ACTION AND WOULD NOT BE APPROPRIATE FOR INCLUSION IN MDL-1358.**

The MDL-1358 cases are primarily products liability cases brought by states, municipalities, and water utilities; it was the similar products liability claims that warranted the transfer of those actions to MDL-1358.  For this reason, the matters before the Honorable Shira Scheindlin are aptly titled:  *In re: Methyl Tertiary Butyl Ether ("**MTBE**") **Products Liability Litigation**.*  This title emphasizes a core issue common to all of the actions in MDL-1358:  *e.g.*, what and when the manufacturers of gasoline with MTBE knew about MTBE's potential danger to the Nation's groundwater resources and whether they conspired to have oxygenate use mandated for the sake of profit.  In contrast, the *Koch* action does <u>not</u> involve a products liability claim.  Rather, the *Koch* action involves solely Defendant ExxonMobil's failure (as a property operator / owner) to contain the gasoline containing MTBE at its station in Fallston, Maryland.  The Defendants have failed to rebut or even address this key difference between the *Koch* action and the actions in MDL-1358.   Consequently, the Defendants' arguments of commonality, convenience, and efficiency must fail.

The Defendants make much of the fact that other plaintiffs in MDL-1358 have opposed transfer, but were overruled by this Panel.  *See* Certain Defendants' Opposition Memorandum at 1, 9.  The plain language of the relevant statute indicates that the Panel must consider whether there are "common questions of fact."  28 U.S.C. § 1407(a).  Moreover, common questions of fact must predominate over individualized questions of fact.  *In re Asbestos School Products Liability Litig.*, 606 F.Supp. 713, 714 (J.P.M.L. 1985).  Thus, the statutory standard for transfer requires an inquiry into the facts of each case and a comparison of the case subject to transfer with the cases already before the transferee court.  *See In re Nat'l Student Mktg. Litig.*, 368 F.Supp. 1311, 1319 (J.P.M.L. 1973) (J. Weigel concurring) (acknowledging the Panel's "case-

by-case method of determination on standards expressed in [28 U.S.C. § 1407]"). It would seem the Defendants are urging this Panel to ignore the statutory mandate of evaluating each case individually and sweep the *Koch* action into MDL-1338 merely because MTBE is the primary contaminant of concern.

The Defendants mischaracterize the *Koch* Plaintiffs' well-plead complaint. Unlike other actions in MDL-1358, the *Koch* complaint never raised a strict product liability count or alleged that the addition of MTBE to gasoline rendered it a defective product.[1]  Thus, the common issue in MDL-1358 of "whether the defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" has only marginal relevance to the *Koch* case. As to the other common question of fact, "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination," which Defendants claim applies to the *Koch* action, the majority of the proposed class in *Koch* have confirmed detections of MTBE in their wells or live in close proximity to someone that does. Moreover, the Defendant ExxonMobil has already admitted at least partial responsibility for the contamination of the aquifer in the Fallston/Baldwin area.[2]

In *Holten et al. v. Chevron et al.*, No. 3-00-CV-04703 (D.N.J.), this Panel recognized that a case involving the contamination of private wells from a single identified source was not appropriate for transfer to MDL-1358. *See* Order Vacating Conditional Transfer Order, MDL-1358, *Holten, et al. v. Chevron U.S.A., et al.*, No. 3:00-4703 (D.N.J.) (Apr. 18, 2001). *Holten* involved the contamination with MTBE of numerous private wells in Bayville, New Jersey and

---

[1] The Koch complaint is clear on its face. *See* Exhibit 1 (attached hereto). The complaint raised six counts: public nuisance, private nuisance, trespass, violation of state environmental law, negligence, and medical monitoring. Count 4, Violation of § 4-409, Environment Article, Maryland Annotated Code, was later dismissed voluntarily by the plaintiffs.

[2] *See* Josh Mitchell, *ExxonMobil takes some responsibility for MTBE contamination in Fallston*, BALTIMORE SUN, March 26, 2005, at 3B. *See* Exhibit 2 (attached hereto).

other gasoline constituents. The overseeing regulatory authority in the case, the New Jersey Department of Environmental Protection ("NJDEP"), considered a former retail gas station to be the exclusive or primary source of the drinking water contamination in the community, a small town on the New Jersey shore. The plaintiffs were all private well owners, who depended upon their supply wells for all their water needs, including drinking, cooking, bathing, and washing. The defendants were the owners and operators of the gasoline station, as well as the suppliers of gasoline to the station. In addition to claims available under New Jersey law, the *Holten* complaint raised similar claims to that of *Koch*: negligence (including breach of duty to warn and duty to remediate), private nuisance, and trespass. Unlike *Koch*, however, *Holten* actually raised a strict products liability count. *See* Sixth Amended Complaint, *Holten, et al. v. Chevron, et al.*, No. 00-4703 at 14 (D.N.J. 2000) (Exhibit 3 hereto).

Even with the strict products liability claim alleging that the addition of MTBE to gasoline was a design defect, however, this Panel decided against transfer of *Holten* to MDL-1358. This Panel based its decision on the fact that the private well owner actions in MDL-1358 at that time were primarily numerous plaintiffs over four states,[3] many of which did not have MTBE contamination in their wells. These MDL-1358 plaintiffs were suing on behalf of everyone that *could* be threatened by MTBE contamination, as well as those that did have contaminated wells. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F.Supp.2d 593, 603-05 (S.D.N.Y. 2001) (describing private well owner actions before MDL-1358). Their cases did not focus solely upon a release from a single source, and they sued every known manufacturer of gasoline with MTBE, primarily as *manufacturers. See id.*

---

[3] These states were Florida, Illinois, New York, and California. *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 329, 344 (S.D.N.Y. 2002).

The situation has changed little from 2001, and *Holten* is directly on point. The few private well owner cases presently before the MDL-1358 court may allege specific releases, but they still are predominantly products liability actions. In contrast, *Koch* and *Holten* both revolve around an identified source of the contamination that has been recognized as such by the relevant environmental regulatory authority. Moreover, *Koch* has the added distinction of not raising a strict products liability claim. ExxonMobil was sued as operator / owner of a gasoline station with the leaking USTs and dispensing systems, *not* as a manufacturer of gasoline containing MTBE. If *Holten*, which *did* raise a strict products liability claim similar to all of the cases in MDL-1358, was not appropriate for transfer, then, *a fortiori*, *Koch* should not be transferred, either.

The Defendants completely ignore the fact that *Koch* does not raise a products liability claim, unlike all of the actions in MDL-1358. Instead, the Defendants, relying in part on *In re Bridgestone/Firestone, Inc., ATX, ATX II, and Wilderness Tires Products Liability Litigation*, Case No. 1373, 2000 WL 33416573 (J.P.M.L. Oct. 24, 2000), relegate the central claims in the MDL-1358 actions to the status of "additional legal theories."[4]  In so doing, the Defendants fail to recognize the critical factual thread that linked the *In re Bridgestone/Firestone* (and indeed the MDL-1358) actions together: products liability claims. *In re Bridgestone/Firestone* was a products liability litigation involving alleged uniform design / manufacturing defects in certain

---

[4] The Defendants also cite *In re Phenylpropanolamine (PPA) Products. Liability Litigation*, 173 F.Supp.2d 1377 (J.P.M.L. 2001); *In re Continental Grain Co., Inc.*, 482 F.Supp.330 (J.P.M.L. 1979); and *In re Holiday Magic Securities and Antitrust Litigation*, 375 F.Supp. 1400 (J.P.M.L. 1974), in support of their point. These too are inapposite. *In re PPA* was a products liability litigation where all actions involved the safety of phenyl-propanolamine. *See In re PPA*, 173 F.Supp.2d at 1379. In *In re Holiday Magic Securities and Antitrust Litigation*, the transferee court had already certified a class that included the plaintiffs in the actions under consideration for transfer. *See In re Holiday Magic Co., Inc. Sec. & Antitrust Litig.*, 375 F.Supp. at 1401. *In re Continental Grain Co., Inc.* involved actions, which all arose from explosion of a single grain elevator owned and operated by Continental Grain Company, Inc. in Westwego, Louisiana. *See In re Continental Grain Co., Inc.*, 482 F.Supp. at 331.

tires manufactured by Firestone and used in certain Ford Motor Company vehicles. *Id.* at *1. As such, all of the *In re Bridgestone/Firestone* actions arose from a common factual core. That is not the case in MDL-1358 as applied to *Koch*: *Koch* has nothing to do with the *manufacture* of gasoline; it is a failure-to-store-safely case. The *Koch* action does not challenge Defendant ExxonMobil's decision to add MTBE to gasoline. Rather, the *Koch* action seeks remedies for Defendants' failure to properly contain gasoline with MTBE at a particular facility in Maryland.

Furthermore, as a policy matter, transfer of the *Koch* action to MDL-1358 would also create precedent for transferring every leaking underground storage tank ("UST") case to federal court, just because the tanks contained gasoline with MTBE. At the end of 2001 alone, there were 416,702 known releases from USTs across the United States. *See MTBE Contamination from Underground Storage Tanks, Statement of John Stephenson Before the Subcommittee on Environment and Hazardous Materials, Committee on Energy and Commerce, U.S. House of Representatives,* GAO-02-753T, at 10, May 21, 2002, *available at* http://www.gao.gov/new.items/d02753t.pdf (Exhibit 4 hereto). Even if a fraction of these tank releases lead to litigation, the result would flood the MDL-1358 docket, which already has over 70 cases. Needless to say, this is not consistent with notions of limited federal jurisdiction, nor consonant with the reality of over-burdened federal dockets; nor would this result promote judicial efficiency or the expedient administration of justice for thousands of private well owners across the Nation.

## II.   THE MARYLAND DISTRICT COURT IS THE BETTER FORUM FOR DECIDING REMAND TO STATE COURT AND OTHER ISSUES

The Defendants erroneously accuse the *Koch* plaintiffs of arguing that the pendency of a remand motion is grounds for denying transfer. *See* Certain Defendants Opposition at 16. The *Koch* Plaintiffs are well aware of the Second Circuit's holding in *In re Ivy*, 901 F.2d 7 (2d Cir.

1990).   It is clear that a transferee court, and not this Panel, can resolve questions of remand.   *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 368 F.Supp. 812, 813 n.1 (J.P.M.L. 1973).   However, this Panel has the implicit authority to decide which forum would be better able to decide the remand issue and all other issues. 28 U.S.C. § 1407(b).

The MDL-1358 Court has not addressed issues of Maryland law that will be or have been raised in the *Koch* action.   These include whether there is a cognizable cause of action for medical monitoring[5] and whether Maryland Rule 2-503(a) (re: consolidation) creates a single cause of action for purposes of the federal removal statutes. The *Koch* Plaintiffs do not question the ability of the MDL-1358 court to apply the law of different states.   However, where unresolved issues of state law exist, a federal District Court in that state is the better choice for addressing these matters.  *See Lepley v. Pfizer Corp. et al.*, No. S-01-3988, slip op. at 2 (D. Md. Jan. 18, 2002) (opting to decide issue of remand before potential transfer to an MDL court because of the existence of unique questions of Maryland law) (Exhibit 5 hereto); *Karofsky v. Abbot Lab.*, 921 F.Supp. 18, 21 n.4 (D. Me. 1996) (explaining that the District Court in Maine was better equipped to interpret Maine law than the MDL transferee court).   Because of these unresolved issues of Maryland law, transferring *Koch* to MDL-1358 might well result in a recommendation for remand to the United States District Court for the District of Maryland pursuant to J.P.M.L. Rule 7.6(c)(ii) soon after transfer.  This would hardly serve the interests of efficiency as counsel would have to rebrief the remand issues for the MDL-1358 court, whereas the remand issues have already been fully briefed before the Maryland District Court.

---

[5] The Court of Appeals of Maryland has not resolved the issue of whether it is a cognizable cause of action in Maryland. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 782, 752 A.2d 200, 251 (Md. 2000).

## III. CONCLUSION

For the reasons set forth herein, Plaintiff Kochs' motion to vacate CTO-11 should be granted.

Respectfully submitted,

Charles J. Piven (Md. Federal Bar No. 00967)
Marshall N. Perkins (Md. Federal Bar No. 25514)
**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
(410) 332-0030

Lon Engel (Md. Federal Bar No. 02470)
**ENGEL & ENGEL, P.A.**
11 E. Lexington Street
Suite 200
Baltimore, MD 21202
(410) 727-5095

*Counsel for Koch Plaintiffs*

23794

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**CERTIFICATE OF SERVICE**          APR 1 9 2005

FILED
CLERK'S OFFICE

I HEREBY CERTIFY that on this 18th day of April, 2005, a copy of Plaintiffs' Reply

– Certain Defendants' Consolidated Response Opposing All Motions To Vacate Conditional

Transfer Order ("CTO") 11 was served *via* postage prepaid, first-class U. S. mail, upon:

Stanley N. Alpert
Weitz & Luxenberg
180 Maiden Lane
17th Floor
New York, NY 10038

Lon C. Engel
Engel & Engel, P.A.
11 E. Lexington Street
Suite 200
Baltimore, MD 21204

Paul W. Ishak
Law Office Of Paul Ishak
30 Office Street
Bel Air, MD 21014

Michael E. Leaf
Hodes, Ulman, Pessin & Katz, P.A.
112 S. Main Street
Suite 102
Bel Air, MD 21014

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Susan Mae Euteneuer
Hodes, Ulman, Pessin, & Katz
901 Dulaney Valley Road
Baltimore, MD 21204

Andrew Gendron
Venable, LLP
1800 Mercantile Bank & Trust
Building
2 Hopkins Plaza
Baltimore, MD 21201

Marshall N. Perkins

2005 APR 19  A 10: 46
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

RECEIVED
CLERK'S OFFICE

23794                          9

6/30/04

| | |
|---|---|
| HOPE KOCH | * IN THE |
| FRANK KOCH | |
| 2310 Franklin's Chance Court | * CIRCUIT COURT |
| Fallston, Maryland 21047, | |
| | * FOR |
| Plaintiffs, | |
| | * HARFORD COUNTY |
| —versus— | |
| | * |
| JOHN R. HICKS (d/b/a Crossroads Exxon) | * Case No. 12-C-04-1834 |
| 2800 Fallston Road | |
| Fallston, Maryland 21047, | * |
| | |
| SERVE ON: | * |
| John R. Hicks | **CLASS ACTION COMPLAINT** |
| 1040 Alexandria Way | * |
| Bel Air, Maryland 21014, | |
| | * |
| —and— | **JURY TRIAL DEMANDED** |
| | * |
| EXXONMOBIL OIL CORPORATION | |
| (d/b/a Exxon Corporation) | * |
| 5959 Las Colinas Boulevard | |
| Irving, Texas 75039, | * |
| | |
| SERVE ON: | * |
| CSC-Lawyers Incorporating Serv. Co. | |
| 11 East Chase Street | * |
| Baltimore, Maryland 21202, | |
| | * |
| Defendants. | |
| | * |

*    *    *    *    *    *    *    *    *    *    *

## CLASS ACTION COMPLAINT

NOW COME Plaintiffs, Hope and Frank Koch, by and through undersigned counsel, to allege and to seek relief from the honorable Court against Defendants, as follows:

## INTRODUCTION

1.     This action involves the unlawful and wrongful storage of MTBE, such tortious activity causing substantial property damage and materially increased

FILED
04 JUN 30  AM 8: 34
CLERK OF CIRCUIT CT
HARFORD COUNTY, MD

EXHIBIT
1
tabbies

23082

to homeowners and/or residents of properties in the vicinity of the Crossroads Exxon (a/k/a Upper Crossroads Exxon) located at 2800 Fallston Road, Fallston, Maryland.

2.      As detailed further herein, this action is a proposed class action filed pursuant to Maryland Rule 2-231. Plaintiffs and one proposed sub-class seek medical monitoring relief, as requested herein (the "Monitoring Sub-Class"). Additionally, Plaintiffs and one proposed sub-class seek redress for economic and other damage (including property damages) suffered as a proximate result of Defendants' tortious conduct (the "Homeowners' Sub-Class").

## PARTIES

3.      Plaintiffs Hope Koch and Frank Koch (a/k/a Franklin Koch) own, and reside at, the real property known as 2310 Franklin's Chance Court, Fallston, Maryland, 21047. Plaintiffs' Franklin's Chance Court property has been contaminated with MTBE as a result of Defendants' wrongful conduct, as further alleged herein. Plaintiffs have suffered substantial injuries and damages as a proximate result of Defendants' wrongful conduct, including economic damage, increased risk of significant adverse health problems, and/or other material non-economic damages (including increased anxiety and mental anguish).

4.      Defendant John R. Hicks, d/b/a Crossroads Exxon, resides at 1040 Alexandria Way, Bel Air, Harford County, Maryland, 21014. Defendant Hicks operates Crossroads Exxon (hereinafter, "Upper Crossroads Exxon"), including through a licensing, franchise, and/or other agreement with Defendant ExxonMobil Oil Corporation. Regarding matters complained of herein, both Defendants have acted in

concert throughout the relevant period; hence, any allegation involving Defendant ExxonMobil Oil Corporation applies equally to Defendant Hicks.

5.      Defendant ExxonMobil Oil Corporation, d/b/a Exxon Corporation ("ExxonMobil"), owns the real property known as 2800 Fallston Road, Fallston, Maryland.  In addition, upon information and belief, Defendant ExxonMobil exercises legal authority over (and/or otherwise controls with Defendant Hicks) the Upper Crossroads Exxon located at 2800 Fallston Road, Fallston, Maryland.[1]

## VENUE

6.      Venue is proper in this jurisdiction pursuant to Maryland Code (1974, 2002 Repl.Vol.), § 6-201, *et seq*., of the Courts & Judicial Proceedings Article:   either this jurisdiction is a venue applicable to all Defendants; or, if there is no single venue applicable to all Defendants, one (or more) of them may be sued in this venue.

7.      Each Defendant carries on a regular business, is employed, and/or habitually engages in a vocation in this jurisdiction.  *See* § 6-201(a), Courts & Judicial Proceedings Article.

## SUBJECT MATTER JURISDICTION

8.      Because the amount in controversy exceeds $10,000.00, jurisdiction is proper in this Court.  Jurisdiction is also proper in this Court because of the injunctive and/or declaratory relief sought by Plaintiffs.

---

[1]  The entity ExxonMobil was formed as a result of a merger on November 30, 1999 between Exxon Corporation and Mobil Corporation.   Herein, any reference to ExxonMobil is a corresponding reference to its predecessor entities (or entity, as the case may be) Exxon Corporation and/or Mobil Corporation.

23082                                    3

**PERSONAL JURISDICTION**

9.     This Court has personal jurisdiction over each Defendant because each Defendant resides, carries on a regular business, is employed, habitually engages in a vocation, and/or maintains principal offices in the State of Maryland.

10.     Alternately, each Defendant has sufficient minimum contacts with the State of Maryland such that this Court may properly exercise personal jurisdiction over each Defendant.   Each Defendant transacted business in the State of Maryland; contracted to supply goods, services, or manufactured products in the State; caused tortious injury in the State by an act or omission in the State; (alternately,) caused tortious injury in the State by an act or omission outside the State, yet regularly did or solicited business, engaged in other persistent courses of conduct, and/or derived substantial revenue from goods, services, or manufactured products used in the State; had an interest in, used, or possessed real property in the State; and/or acted as a surety in the State of Maryland.

**RESPONDEAT SUPERIOR**

11.     Hereinafter, whenever it is alleged that any Defendant acted, or failed to act, that allegation applies equally to that respective Defendant's affiliates, representatives, servants, employees, and/or agents (whether actual, apparent, or otherwise).

**FACTUAL BACKGROUND**

12.     Methyl tertiary butyl ether ("MTBE") is a chemical compound designed to increase the oxygen content of gasoline.  It is produced from methanol and isobutylene, a by-product of the gasoline-refining process.  MTBE is highly soluble and travels faster

and farther in water than other gasoline components.  As a result, whenever MTBE is released into the environment it has the ability to infiltrate underground water reservoirs and contaminate wells drawing from underground aquifers.  At a certain point of contamination, MTBE's foul taste and odor render water unusable and unfit for human consumption.  The chemical make-up of MTBE also allows it to persist in underground aquifers for decades at a time.  MTBE is a known animal carcinogen that has been linked to many potential human health problems.  The United States Environmental Protection Agency has classified MTBE as a possible human carcinogen.

13.     Every year over nine million gallons of gasoline with MTBE escape into the environment in the United States, including from storage of MTBE.  Thousands of gallons also enter the ground from gas stations, including from underground storage tanks.

14.     The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States.  According to a report by a special EPA Blue Ribbon Panel, MTBE is a "threat to the nation's drinking water resources," has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used.

15.     Defendants' storage of MTBE at the Upper Crossroads Exxon has produced an underground "plume" (or other leakage) of MTBE that has contaminated nearby properties (including Plaintiffs' Franklin's Chance Court property).  Such MTBE contamination has occurred with Defendants' knowledge, and at the direction and/or control of Defendants.  Such contamination poses known, material health risks to nearby

residents due to contamination of the water supply.  Such contamination has also had an immediate, material adverse impact upon the real property of nearby property owners (including the value of said property).  Such MTBE leakage includes into the soil, into ground wells, and/or into the groundwater of affected properties.

16.    Testing has detected MTBE in the wells of 77 homes in the Upper Crossroads area, near the Upper Crossroads Exxon.

17.    Tests have revealed extremely high levels (up to 26,000 parts per billion) in the groundwater at and/or near the Upper Crossroads Exxon.  Defendant ExxonMobil (per correspondence of 6/10/04) has acknowledged the appropriate standard for MTBE to be no more than 20 parts per billion.

18.    Defendants have been aware of specific incidents of MTBE groundwater contamination as early as 1980 (and no later than 1984).  Defendants were also aware of scientific studies describing the danger posed to groundwater by MTBE no later than 1986.  One report by a State of Maine agency recommended that MTBE be stored in double-contained facilities.  In 1987, Defendants prepared internal memoranda that echoed these concerns (and/or other related concerns) involving the storage of MTBE and/or consequences of the failure to safely store MTBE.

19.    Nonetheless, Defendants intentionally, knowingly, and deliberately withheld from all non-oil-industry parties information identified in the preceding paragraph, including information known to Defendants related to:  specific incidents of groundwater contamination; health dangers posed to humans by MTBE contamination (including those resulting from the failure to store MTBE properly); and/or other adverse consequences resulting from the failure to safely store MTBE.  Indeed, in 1986-87,

Defendants took the public positions that (*i*) further medical testing related to the health effects of MTBE exposure was unnecessary; (*ii*) MTBE was only slightly soluble in water; (*iii*) potential environmental exposure to MTBE was low; and (*iv*) MTBE had excellent degradation characteristics— all public positions which Defendants knew to be false (or misleading); this false information being put forth by Defendants exclusively for their own benefit.

20.     Defendants' conduct, as alleged in the preceding two paragraphs, continued, and continues, through the present time— including Defendants' present stated position that the MTBE contamination in the vicinity around the Upper Crossroads Exxon did *not* emanate from the Upper Crossroads Exxon; when, in fact, Defendants know with near certainty that such contamination arose (in whole or in part) from the Upper Crossroads Exxon.

21.     Particularly, an ExxonMobil spokesperson has stated that ExxonMobil has no evidence that the Upper Crossroads Exxon is the source of the MTBE contamination complained of herein. In fact, Defendants know that statement to be false.

22.     In and before 1991 (including 1990, 1989, and before), unbeknownst to Plaintiffs and the proposed two sub-classes (collectively, the "Class"), properties in and around the Upper Crossroads Exxon were contaminated with MTBE as a result of Defendants' conduct complained of herein. For instance, a test by the Harford County Health Department in October of 1991 revealed high levels of MTBE contamination at and/or around the Upper Crossroads Exxon, facts known to, but intentionally concealed by, Defendants.

23. Neither Plaintiffs nor any member of the Class had knowledge of the primary matters complained of herein until June of 2004. In addition, Defendants' fraudulent conduct, as alleged herein, tolls any applicable time-bar (including statute of limitations, laches, *etc.*).

## CLASS ALLEGATIONS

24. Plaintiffs seek to represent the Homeowners' Sub-Class, defined as follows:

> All persons (and/or entities) owning real property in the vicinity of the Upper Crossroads Exxon who have suffered legal injury due to MTBE contamination, including those whose property has suffered diminution in value (and/or who have otherwise suffered economic damage) as a result of MTBE contamination emanating from (and/or involving) the Upper Crossroads Exxon.

25. Plaintiffs also seek to represent the Monitoring Sub-Class, defined as follows:

> All persons residing within a 1½-mile radius of the Upper Crossroads Exxon (2800 Fallston Road, Fallston, Maryland) from 1989 until the present (inclusive) who consumed groundwater on more than one occasion drawn from any property that has tested positive for MTBE.

26. Each sub-class is composed of numerous persons (and/or entities), primarily in Maryland. The joinder of all Class members individually in one action would be impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court. Upon information and belief, Plaintiffs aver that the Class is composed of at least one hundred, and possibly hundreds, of members.

27.    Plaintiffs are asserting claims typical of the claims of the Class. Defendants, pursuant to a common scheme and plan, have illegally contaminated groundwater in the area of the Upper Crossroads Exxon and have intentionally concealed information related thereto.  In sum, Defendants have treated Plaintiffs and all members of the Class in a uniform, illegal manner.  Plaintiffs have no interests that conflict with, or are antagonistic to, the interests of Class members.  Plaintiffs have retained counsel competent and experienced in class actions.

28.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The expense and burden of individual litigation may well make it impracticable for Class members, individually, to seek redress for the wrongful conduct alleged herein.

29.    Common questions of law and/or fact exist as to all members of the Class (including each sub-class) and predominate over any questions that may affect individual members.   Among the questions of law and/or fact common to the Class are the following:

    a.    Whether Defendants leaked MTBE, including into the ground and/or into the groundwater (including from the Upper Crossroads Exxon), in violation of law;

    b.    Whether MTBE reached the soil and/or groundwater beneath the homes comprising the Homeowners' Sub-Class;

    c.    If practicable, determining the damages sustained by each member of the Homeowners' Sub-Class as a proximate result of the foregoing; and

    d.    Whether medical monitoring is appropriate for each member of the Monitoring Sub-Class; and, if so, the extent and duration of same.

30.     Plaintiffs and the Monitoring Sub-Class bring this action for equitable, injunctive, and/or declaratory relief pursuant to Maryland Rule 2-231(b)(2) and/or (b)(3) to create Court-supervised relief (including any necessary funds) to provide medical monitoring as further requested, *infra*, to assure that members of the Monitoring Sub-Class receive prompt and proper diagnosis and treatment of MTBE-induced (or MTBE-related) health problems.  Class certification is appropriate pursuant to Maryland Rule 2-231(b)(2) because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable or other relief in the form of the monitoring requested herein.  Alternately, the Monitoring Sub-Class is properly certified per Rule 2-231(b)(1) because of the risks of inconsistent adjudications of similar issues.

31.     The names and addresses of Class members are readily available, whether from public records (including land records) or otherwise.  From such records, individual notice can be provided to Plaintiffs and the Class by mail or by other appropriate means; alternately, published notice and/or notice posted on the internet can also provide adequate notice.

## Count 1

### Public Nuisance

32.     The allegations set forth in paragraphs 1 through 31 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

33.     The conduct complained of herein unreasonably interferes with the rights of the community at large.

23082

34.     The conduct complained of herein includes greater harm suffered by Plaintiffs and the Class than by the community at large (*e.g.*, economic loss, consumption of tainted groundwater, *etc.*).

35.     The conduct complained of herein has proximately caused damages to Plaintiffs and the Class.

36.     The public nuisance complained of herein is ongoing in nature, and must be abated by injunctive (or other) order of this Court as the only reasonable means to abate the nuisance.  No adequate remedy at law exists for Plaintiffs and the Class, who would be forced to institute a multiplicity of lawsuits to recover for the continuing harm caused by the nuisance.  The public interest is served by granting the requested injunctive relief.

37.     The intentional, knowingly wrongful, conduct of Defendants constitutes actual malice under Maryland law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.     Granting injunctive medical monitoring relief, as further requested herein;

D.     Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.     Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 2

### Private Nuisance

38.     The allegations set forth in paragraphs 1 through 37 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

39.     The conduct complained of herein constitutes an invasion of Plaintiffs' interest (and the Class' interest) in the private use and enjoyment of land.

40.     Defendants' conduct is a legal cause of the invasion of (and/or interference with) Plaintiffs' (and the Class') interest in the use and enjoyment of Plaintiffs' property; and the interference is either:   (*i*) intentional and unreasonable; and/or (*ii*) otherwise actionable under the rules controlling liability for reckless or other conduct.

41.     The conduct complained of herein constitutes unreasonable and/or intentional conduct that has caused, and continues to cause, substantial and unreasonable injury or interference with Plaintiffs' (and the Class') use and enjoyment of property.

42.     The conduct complained of herein is of such a nature as to diminish materially the value of the property and/or seriously interfere with the ordinary comfort and enjoyment of the property.

23082                                         12

43.   The conduct complained of herein is unreasonable in nature, and imposes immediate, substantial, and irreparable injury upon Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.   Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.   Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.   Granting injunctive medical monitoring relief, as further requested herein;

D.   Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.   Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 3

### Trespass to Property

44.   The allegations set forth in paragraphs 1 through 43 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

45.     Defendants entered (or infringed) upon, and/or continue to enter (or infringe) upon, property (including real property) owned (or controlled) by Plaintiffs and the Class in an unlawful manner.

46.     Plaintiffs and the Class are (and/or were) in legal, equitable, and/or other beneficial possession of such property (and/or such property interest).

47.     Neither Plaintiffs nor the Class consented to, or gave legally effective permission for Defendants' trespassory conduct, as alleged herein.  Defendants have neither authority, privilege, nor permission to legally authorize their trespassory conduct (including constructive trespassory conduct), as alleged herein.

48.     Defendants' conduct, as alleged herein, interferes with the possession and/or use of the property owned (and/or controlled) by Plaintiffs and the Class, amounting to an (intentional, reckless, negligent, and/or other) intrusion upon the possessory interest of another.  Defendants— through their storage of MTBE and their failure to safely store MTBE as alleged herein— have engaged in abnormally dangerous activity.

49.     Plaintiffs and the Class have suffered actual damages as a proximate result of Defendants' trespassory conduct, as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law, determined by the trier of fact;

B.      Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.      Granting injunctive medical monitoring relief, as further requested herein;

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 4

### Violation of § 4-409, Environment Article

50.      The allegations set forth in paragraphs 1 through 49 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

51.      As further stated herein, Defendants have violated § 4-409 of Maryland's Environment Article by being responsible for "oil spillage" as defined under the statute, thereby proximately damaging the property (including real property) of Plaintiffs and the Class.

52.      Defendants are "responsible" persons, as well as persons "responsible for the discharge," as defined under the statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

23082                             15

A.    Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.    Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.    Granting injunctive medical monitoring relief, as further requested herein;

D.    Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.    Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 5

### Negligence

53.    The allegations set forth in paragraphs 1 through 52 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

54.    Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care and judgment, including the duty to use the care, skill, and/or diligence that a reasonable person in the circumstances of each Defendant would have so exercised.

55.    As further detailed herein, Defendants breached one or more duties owed to Plaintiffs and the Class.

56.    As a direct and proximate result of Defendants' negligence, and/or as a direct and proximate result of Defendants' breach of one or more duties owed to Plaintiffs

and the Class, Plaintiffs and the Class suffered the injuries and damages complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.      Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.      Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.      Granting injunctive medical monitoring relief, as further requested herein;

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 6

### Medical Monitoring

57.      The allegations set forth in paragraphs 1 through 56 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

58.      Plaintiff Hope Koch has suffered from migraine headaches, sinus infections, and fatigue since moving to her Fallston residence.  Prior to moving to her

Franklin's Chance Court residence, Plaintiff Hope Koch did not suffer such symptoms in the degree to which she has suffered from them while residing at the Franklin's Chance Court property. Defendants' conduct, as alleged herein, has caused Plaintiff Hope Koch to be exposed to MTBE and (upon information and belief) has caused (in whole or in part) the migraine headaches, sinus infections, and/or fatigue from which she suffers.

59.     The foregoing unlawful and other wrongful acts, omissions, and/or other conduct by Defendants constitutes actionable conduct (including negligence) under Maryland law, including the common law.

60.     Defendants' negligent and other wrongful acts are a proximate cause of Plaintiffs and the Monitoring Sub-Class suffering an increased risk of serious injury and disease, which they will continue to suffer. Plaintiffs and the Monitoring Sub-Class have been exposed to a hazardous product (including MTBE) and suffer a significantly increased risk of contracting serious injury or latent disease, including cancer. This increased risk makes periodic diagnostic and medical examinations reasonable and necessary. The United States Environmental Protection Agency classifies MTBE as a potential human carcinogen.

61.     Early detection and diagnosis of increased potential health risks to Plaintiffs and the Monitoring Sub-Class is clinically invaluable because it can prevent, reduce, and/or delay resulting symptoms, suffering, and/or death.

62.     Cost-effective monitoring and testing procedures can be administered to Plaintiffs and the Monitoring Sub-Class that will make the early detection and treatment of such potential injuries or disease likely or possible.

63.     The recommended testing procedures will be subject to expert testimony at the time of trial, or as otherwise directed by the Court.

64.     Court-ordered medical monitoring may be especially essential to the extent that one or more members of the Monitoring Sub-Class can *not* afford to have testing and/or monitoring performed absent such requested relief.

65.     The increased susceptibility to injuries and irreparable threat to the health of Plaintiffs and the Monitoring Sub-Class proximately resulting from prolonged, significant exposure to MTBE can be addressed effectively only by the creation of a comprehensive medical monitoring program:

   a.      Notifying members of the Monitoring Sub-Class of potential health risks and available treatment;

   b.      Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of the Monitoring Sub-Class exposed to MTBE;

   c.      Providing for periodic medical examinations for all members of the Monitoring Sub-Class;

   d.      Providing for accumulation and analysis of relevant medical and demographic information from members of the Monitoring Sub-Class; and

   e.      Providing any other appropriate treatment, care, and/or information as ordered by the Court.[2]

---

[2]  As alleged herein, Plaintiffs and the Class (1) have experienced exposure greater than normal background levels (2) to a proven hazardous substance— MTBE— (3) caused by Defendants' negligence and/or other tortious conduct; (4) as a proximate result of the exposure, Plaintiffs and the Class have an increased risk of contracting a serious latent injury or disease (including

66.     Plaintiffs and the Monitoring Sub-Class have no adequate remedy at law, including because monetary damages alone do not compensate for the continuing nature of harm to them.  A monitoring program will enable members of the Monitoring Sub-Class to ascertain the presence of injury and/or disease which are presently asymptomatic or only slightly symptomatic.

67.     Defendants have acknowledged the health dangers of MTBE contamination by repeatedly advising residents in the vicinity of the Upper Crossroads Exxon *not* to drink the groundwater and *not* to cook with the groundwater.

68.     Defendants have admitted to installing equipment to pump and treat MTBE-contaminated groundwater beneath the Upper Crossroads Exxon.  If Defendants are taking steps to monitor and treat contaminated groundwater, no lesser degree of care should be given to humans contaminated by prolonged, repeated exposure to MTBE.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

B.     Granting injunctive medical monitoring relief, as further requested herein and/or as further ordered by the Court;

---

cancer); (5) monitoring procedures exist that make the early detection of one or more health concerns possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary based upon contemporary healthcare principles.

23082                                                           20

C.      Ordering Defendants to establish a fund for the monitoring relief to be directed by the Court (and/or ordering ancillary relief related thereto), *cf. Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992);

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

Respectfully submitted,

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**

Charles J. Piven
Marshall N. Perkins
The World Trade Center—Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

Lon Engel, Esquire
**ENGEL & ENGEL, P.A.**
Suite 200
11 East Lexington Street
Baltimore, Maryland  21202
(410) 727-5095

*Counsel for Plaintiffs and the proposed Class*

## JURY DEMAND

Plaintiffs and the proposed class hereby demand a trial by jury of all issues so triable.

Marshall N. Perkins

Circuit Court for _Harford County_
City or County

## CIVIL—NON-DOMESTIC CASE INFORMATION REPORT

**Directions:**

_Plaintiff:_ This Information Report must be completed and attached to the complaint filed with the Clerk of the Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111. A copy must be included for each defendant to be served.

_Defendant:_ You must file an Information Report as required by Rule 2-323(h).

**THIS INFORMATION REPORT CANNOT BE ACCEPTED AS AN ANSWER TO RESPONSE.**

FORM FILED BY: ☒ PLAINTIFF   ☐ DEFENDANT   CASE NUMBER: _____

CASE NAME: _Hope Koch, et al._ v. _John R. Hicks, et al._
Plaintiff        Defendant

JURY DEMAND: ☒ Yes ☐ No   Anticipated length of trial: _____ hours or __20__ days

RELATED CASE PENDING? ☐ Yes ☒ No   If yes, Case #(s), if known: _____

HAS ALTERNATIVE DISPUTE RESOLUTION (ADR):

    Been Tried? ☐ Yes ☒ No

    Requested? ☐ Yes ☒ No

If yes, specify: _____

Special Requirements? ☐ Interpreter/communication impairment

    ☐ Other ADA accommodation: _____

| NATURE OF ACTION (CHECK ONE BOX) | | DAMAGES/RELIEF |
|---|---|---|

### NATURE OF ACTION (CHECK ONE BOX)

**TORTS**
- ☐ Motor Tort
- ☐ Premises Liability
- ☐ Assault & battery
- ☐ Product Liability
- ☐ Professional Malpractice
- ☐ Wrongful Death
- ☐ Business & Commercial
- ☐ Libel & Slander
- ☐ False Arrest/Imprisonment
- ☒ Nuisance
- ☐ Toxic Torts
- ☐ Fraud
- ☐ Malicious Prosecution
- ☐ Lead Paint
- ☐ Asbestos
- ☒ Other _Other causes of action_

**LABOR**
- ☐ Workers' Comp.
- ☐ Wrongful Discharge
- ☐ EEO
- ☐ Other

**CONTRACTS**
- ☐ Insurance
- ☐ Confessed Judgment
- ☐ Other

**REAL PROPERTY**
- ☐ Judicial Sale
- ☐ Condemnation
- ☐ Landlord/Tenant
- ☐ Other

**OTHER**
- ☐ Civil Rights
- ☐ Environmental
- ☐ ADA
- ☐ Other

### DAMAGES/RELIEF

**A. TORTS**

Actual Damages
- ☐ Under $7,500
- ☐ $7,500 - $50,000
- ☐ $50,000 - $100,000
- ☒ Over $100,000 _incl. all class members_

- ☐ Medical Bills $_____
- ☒ Property Damages $ _unliquidated_
- ☐ Wage Loss $_____

**B. CONTRACTS**
- ☐ Under $10,000
- ☐ $10,000 - $20,000
- ☐ Over $20,000

**C. NONMONETARY RELIEF**
- ☒ Declaratory Judgment
- ☒ Injunction
- ☒ Other _incl. class action, medical monitoring_

### TRACK REQUEST

With the exception of Baltimore County, Baltimore City, and Prince George's County, please fill in the estimated LENGTH OF TRIAL. THIS CASE WILL THEN BE TRACKED ACCORDINGLY.

- ☐ ½ day of trial or less
- ☐ 1 day of trial time
- ☐ 2 days of trial time
- ☐ 3 days of trial time
- ☒ More than 3 days of trial time

IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE COUNTY, BALTIMORE CITY, OR PRINCE GEORGE'S COUNTY, PLEASE SEE REVERSE SIDE OF FORM FOR INSTRUCTIONS.

Date: _6/30/04_   Signature: _Marshall N. Perkins_

NDCIR (1/95)

Over

— Staff and wire reports

## fatally shot
## king in Cherry Hill

l two homicides yesterday: a fatal
ay night in Cherry Hill and the
month of a man beaten outside

, 25, was fatally shot about 10:30
block of Round Road, police said.
in the 700 block of Cherry Hill

officers for the Police De-
ey had no additional information

aid he was walking to get food for
when he was shot by a person in

vas nicknamed "Pumpkin" — had
rry Hill, was unemployed and was
said relative Robert House.

, police said the death of Harold
Glen Burnie has been ruled a

March 1, three days after he was
bar in the 4600 block of Curtis

e was drunk and being verbally
e bar, was asked to leave and was
m. in an alley outside the bar. He
, police said.

ve been made in either case, po-

## RE
## elebration set
## at Inner Harbor

e Office of Promotion & the Arts
orplace and the Gallery for an In-
day celebration tomorrow begin-

e entertainment includes contem-
nd composer David Bach from 11
ike Rosman performing his physi-
m 1 p.m. to 3 p.m.; Milkshake
ldren-oriented music from 4 p.m.
n ensemble of musicians perform-
ds and other material from 5 p.m.

uled to play at the portico of the
ht Street Pavilion, and the other
ill be in the Inner Harbor Amphi-
ght St.

unny is also scheduled to appear
p.m.

— Ryan Davis

---

The amendment was offered by House
Speaker Michael E. Busch, an Anne Arun-
del Democrat, as the delegation was pre-
paring to vote on a measure to hold a refer-
endum or straw poll on the elected school
board question.

Both the House of Delegates and Senate
generally yield to the wishes of local legisla-
tors for local bills. A majority of the coun-
ty's five senators would need to sign on,
though, and two senators expressed skepti-
cism about its chances yesterday.

Sen. James E. DeGrange Sr., a Demo-
crat, said he was not likely to support the
measure because he does not like elected
school boards that do not have taxing au-
thority.

Sen. Philip C. Jimeno, also a Democrat,
said he cannot support the delegates' pro-

---

Currently, Anne Arundel is one of eight
school districts that relies on a nominating
convention to forward names of prospec-
tive school board members to the governor,
who makes the final selections.

Local officials team with the governor to
appoint members to school boards in
Prince George's County and Baltimore
City. In the remaining 14 districts, mem-
bers are elected.

Busch argued that a local commission
made up of residents with experience and
expertise would draw candidates who were
reluctant to go before the convention.

County Executive Janet S. Owens said
through a spokeswoman that she was
"pleased to see that more people could be
involved in the process and that there
could be broader representation."

---

# ExxonMobil takes some responsibility for MTBE contamination in Fallston

*By JOSH MITCHELL*
SUN STAFF

ExxonMobil Corp. acknowledged yester-
day that it may be responsible for up to
half of the chemically contaminated drink-
ing-water wells in Fallston, but said it
needs to do additional tests to determine
the extent of its culpability.

In a report to the Maryland Department
of the Environment, the oil company said it
needs to do additional tests on about 145
wells to the southwest of an Exxon station
at routes 152 and 165 in the Upper Cross-
roads area. Most of the wells have shown a
trace of methyl tertiary butyl ether, or
MTBE, a gasoline additive used to make
fuel burn cleaner. The substance has also
been linked to cancer in laboratory ani-
mals, though its toxicity to humans at the
low levels found in the wells has never been
determined.

Exxon offers to treat any contaminated
water from those wells as it performs the
additional tests. The state environmental
department is reviewing the request for
further testing.

"We need more investigation to deter-
mine to what extent within that revised
study area the MTBE might have come
from the station," said Betsy Eaton, a com-
pany spokeswoman. In the report, the com-
pany said it has determined that the Exxon
station was not the source of chemical con-
tamination of about 115 wells mostly north
and northwest of the station. In all, about
227 wells in the area are contaminated.

"Contamination outside of the revised
area did not emanate from the station," Ea-
ton said. The oil company listed a number
of other possible sources of the contamina-
tion: automobile accidents, former gasoline

stations in the area, and widespread resi-
dential and commercial petroleum use in
the area.

Steven J. Scheinin, president of the
Greater Fallston Association, said Exxon's
continued testing suggests the company is
more responsible for contaminating the
wells than it has acknowledged.

"If they're not responsible, why are they
doing the other testing? They put the con-
clusion before the research," Scheinin said.
"The MTBE didn't get in our wells from the
rain, from the skies. It came from some-
thing on the ground here, and they're the
only thing around here.

"Until they can show us any logical alter-
native, our position is, 'You're it.' "

State environmental officials will meet
with residents in a town hall-style meeting
in the next two weeks and then hold a joint
meeting with residents and Exxon repre-
sentatives in April to discuss the report.

"We're reviewing it, and we're going to
see what the citizens have to say about it,"
said Julie Oberg, an MDE spokeswoman.
"We'll comment after we have all that infor-
mation."

The company proposes to test about 145
wells, most of them tainted, roughly be-
tween the Exxon station and Crystal Lane,
to the southwest. It would examine drink-
ing water, soil water and geology such as
bedrock fractures, Eaton said. Eaton said
the company would pump and treat con-
taminated water as it performed more
tests.

MTBE has been added to gasoline since
the 1970s and is credited with helping to re-
duce air pollution. But it dissolves easily in
water and has tainted wells nationwide.

*Sun staff writer Timothy B. Wheeler
contributed to this article.*

---

EXHIBIT
2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | |
|---|---|
| THEODORE HOLTEN, CRAIG HOLTEN, EMILY HOLTEN, THEODORE HOLTEN, JR., EDWARD MAINETI, STANLEY ZALEWSKI, JEAN ZALEWSKI, BEVERLY M. WINN, RAYMOND M. WINN, ROSE DITOTO, WILLIAM KINARD, SUZANNE KINARD, JAIME KINARD, KACEY KINARD a minor, by and through their guardian ad litem, BARRY KLEIN, NANCY KLEIN, ANDREW KLEIN, a minor, by and through their guardian ad litem  MERIDETH MCGOVERN, CHRISTOPHER FELLOWS, DIANNE COTTRELL, DANIEL COTTRELL, SR., DANIEL COTTRELL JR., a minor, by and through their guardian ad litem, NICHOLAS COTTRELL, a minor, by and through their guardian ad litem, JAKE COTTRELL, a minor by and through their guardian ad litem, ERIC SQUIRE, CLAUDIA SQUIRE, JESSE SQUIRE, ANGELA SQUIRE, AMANDA SQUIRE, CAITLYN THOMPSETT, a minor, by and through their guardian ad litem, JAMES SMITH, SR., JAMES SMITH, JR., MARYLIN SMITH, KENNETH WEDDING, PATRICIA WEDDING, KATHERINE WEDDING, BRIAN WEDDING,  JAMES J. LEWIS, SARAH ELIZABETH LEWIS, a minor, by and through their guardian ad litem, CHARLOTTE FORD, ANDREW FORD, HAZEL LUCE, THOMAS LUCE, SR., HEATHER MCCOMBIE, DOROTHY MCCOMBIE, BRIAN WHITMAN, WILLIAM ROSANIO, JOANN ROSANIO, WILLIAM R. ROSANIO, JOSEPH A. ROSANIO, a minor, by and through their guardian ad litem, JASON C. ROSANIO, a minor, by and through their guardian ad litem, VINCENT FUSARO, PATRICIA L. FUSARO, MARYANN MOONEY, DANA MOONEY, a minor, by and through their guardian ad litem, KATHRYN MOONEY, a minor, by and   through their guardian ad litem, MARK PAUL MINETTI, DAVID W. MINETTI, CHRISTIAN MINETTI, JASON BRITTON, a minor, by and through their guardian ad litem, TYLER MORONG, a | CIVIL ACTION NO.: 00-4703<br><br>CIVIL ACTION<br><br>*SIXTH AMENDED COMPLAINT* |

1

*FOURTH AMENDED COMPLAINT*

EXHIBIT

3

| | |
|---|---|
| 1 | minor, by and through their guardian ad litem, |
| | KIMBERLY MOONEY, CHARLES DANIEL |
| 2 | MOONEY, RUTH M. BIANGARDI, PAUL |
| | MINETTI, CAROL MINETTI, JORDAN C. |
| 3 | MINETTI, a minor, by and through their |
| | guardian ad litem, TINA HAMMOND, |
| 4 | MATHEW DICENSO, DEBRAH DICENSO, |
| 5 | AURORA DICENSO, a minor, by and through |
| | their guardian ad litem, LORRAINNE HILL, |
| 6 | GORDON LEE HILL, RICHARD HILL, |
| | DAVID HILL, JUNE K. |
| 7 | PIETRO, PAUL PIETRO, LAURA ANN |
| 8 | ANCINI, ANTHONY MANCINI, |
| | CATHERINE MANCINI, a minor, by and |
| 9 | through their guardian ad litem, BRITTANY |
| | MANCINI, a minor, by and through their |
| 10 | guardian ad litem, ANTHONY J. MANCINI, a |
| | minor, by and through their guardian ad litem, |
| 11 | MARIE GORDON, MICHAEL GORDON, |
| | MADISON GORDON, a minor, by and |
| 12 | through their guardian ad litem, TIMOTHY |
| 13 | YEOMAN, a minor, by and through their |
| | guardian ad litem, GARY GETTIS, TRACY |
| 14 | GETTIS, GARY MICHAEL GETTIS, a minor, |
| | by and through their guardian ad litem, |
| 15 | KAYLIN ROSE GETTIS, a minor, by and |
| | through their guardian ad litem, ROBERT |
| 16 | MOORES, DEBORAH MOORES, JOSEPH |
| | FRANKS, DONNA M. FRANKS, CHRISTA |
| 17 | M. FRANKS, a minor, by and through their |
| 18 | guardian ad litem, BRIANNA FRANKS, a |
| | minor, by and through their guardian ad litem, |
| 19 | CARMEN L. DIAZ, MARCELINA DIAZ, JR., |
| 20 | LYDIA DIAZ, TELAH M. DIAZ, a minor, by |
| | and through their guardian ad litem, LETICIA |
| 21 | ADAMES, a minor, by and through their |
| | guardian ad litem, CAROLINE HOLTEN, |
| 22 | GLENN MCCOMBIE, AMY FUSARO, |
| | CINDY FUSARO, BRIAN FUSARO, LISA |
| 23 | WEBB, LOUIS F. BARBERIA, ALBERT, |
| | KATHRYN GEIGER, MATTHEW GEIGER, |
| 24 | STANLEY SMOLUCHA, DAWN |
| | SCADUTO, RAYMOND MERTZ, MARY |
| 25 | MERTZ, ESTATE OF MARIE GEARL and |
| | MARIE GEARL, deceased, STEVEN P. |
| 26 | GEARL, JASON M. GEARL, NATASHA A. |
| | DELLAPERUTE, PETER MEROLA ALFRED |
| 27 | APONTE, CARMEN I. APONTE, SOMMER |
| 28 | |

2

*FOURTH AMENDED COMPLAINT*

1  A. CAVANAUGH a minor, by and through )
2  their guardian ad litem, CARMEN P. )
   CAVANAUGH, TRACY GARMON, )
3  MICHAEL GARMON, JOSHUA C. GARMON )
   a minor, by and through their guardian ad litem, )
4  KRISTY L. GARMON, a minor, by and )
   through their guardian ad litem, TYLER )
5  BENTLY, a minor, by and through their )
   guardian ad litem, JOHN MOLITOR, )
6  JENNIFER MOLITOR, ALESHA MOLITOR, )
   a minor, by and through their guardian ad litem, )
7  EMILY MOLITOR, a minor, by and through )
   their guardian ad litem, KAREN AQUILINA, )
8  CHARLES AQUILINA, CHARLES )
9  AQUILINA, JR., JAMES AQUILINA, KIM )
   AQUILINA, TERESA DIAZ, MINDY )
10 CLARK, JOHN A. CLARK, HEATHER )
   CLARK, a minor, by and through their guardian )
11 ad litem, ARIEL CLARK, a minor, by and )
   through their guardian ad litem, A.J. CLARK, a )
12 minor, by and through their guardian ad litem, )
   CAROLE DITTUS, JUNE JORDAN, PETER )
13 JORDAN, MICHAEL SIDDONS, TRAVIS )
14 SIDDONS, CODY JORDAN, a minor, by and )
   through their guardian ad litem, CARRIE )
15 JORDAN, a minor, by and through their )
   guardian ad litem, JOSEPH JORDAN, a minor, )
16 by and through their guardian ad litem, )
   KRISTINA AUSTIN, MICHAEL THOMAS )
17 SIDDONS, a minor, by and through their )
18 guardian ad litem, PATRICIA FARRINGTON, )
   VIRGINIA RICKMERS, JOHN ULISSI, )
19 MARYILYN TIMONEY, DAWN TOMS, )
   ROBIN M. TOMS, RICKSON M. STEWART, )
20 DAWN M. KACHMAR, CATHERINE G. )
   DEVINNEY, STEPHEN R. DEVINNEY, )
21 ANGELA NOLZE, H. CHRISTOPHER )
22 NOLZE, CHRISTOPHER J. NOLZE, ESTATE )
   OF BARBARA HOLTEN and BARBARA )
23 HOLTEN, deceased, Michael Fusaro, Albert )
   Mascola, Anthony Mascola, Matthew Holten, )
24 Edward Smith, Amy McCombie, Marcie )
   McCombie, Liam Fellows, a minor, by and )
25 through his guardian ad litem, JOHN DOES 3- )
   100, JANE DOES 3-100, )
26                          Plaintiffs, )
27         vs. )
28

3

*FOURTH AMENDED COMPLAINT*

1  CHEVRON U.S.A., INC., GULF OIL      )
   CORPORATION, CUMBERLAND FARMS,      )
2  INC., SUNOCO, GULF OIL LIMITED      )
   PARTNERSHIP, and DOES 3-100,        )
3                 Defendants.          )
                                       )
4                                      )
                                       )
5  _____)

6

7  Plaintiffs, by way of this Fourth Amended Complaint, say:

8                      **INTRODUCTION**

9       1.    This case is about the reckless contamination and poisoning of numerous

10  individual drinking wells located in the Township of Bayville, County of Ocean, New Jersey.

11  The Defendants in this action destroyed and contaminated the community's drinking water

12  supply by placing gasoline containing methyl tertiary butyl ether ("MTBE"), a gasoline additive,

13  and Benzene Toluene Ethylbenzene and Xylene ("BTEX") common gasoline chemical

14  components into leaking underground storage tanks, piping and dispensing systems (hereinafter

15  referred to collectively as "UST systems") and in negligently and intentionally placing MTBE

16  into the stream of commerce without taking proper precautions and without warning of MTBE's

17  propensity to contaminate drinking water.

18      2.    MTBE is toxic in that it is a known carcinogen in rats.  In fact, MTBE is more

19  carcinogenic in laboratory test animals than the majority of currently regulated chemical

20  carcinogens.

21      3.    MTBE is a colorless liquid that may cause water to contain foul taste and odor.

22  While it has often been said that oil does not mix with water, MTBE mixes perfectly with water.

23  It mixes so well with water that it spreads its toxic plumes faster and farther than other chemical

24  components contained in gasoline.  Moreover, because MTBE takes more time to decompose,

25  once discharged, it stays in the environment longer and wreaks much more havoc than other

26  gasoline chemical components.

27      4.    MTBE does not occur naturally but is produced in very large amounts from

28  isobutylene, a by-product in the refining process.  MTBE is a member of a class of chemical

                                4
                    *FOURTH AMENDED COMPLAINT*

1   compounds, ethers, whose unique properties are enhanced solubility in water and chemical
2   attraction to water molecules.  MTBE does not readily attach to soil particles and is not
3   susceptible to natural degradation.  Many Plaintiffs' private wells contained MTBE above New
4   Jersey's maximum level and at least five Plaintiffs' well contained MTBE at 300 ppb.

5       5.      Benzene and Toluene are colorless liquids that are known to cause cancer in
6   human beings.  Three of the Plaintiffs' private well contained Benzene and Toluene above New
7   Jersey's maximum level.

8       6.      Plaintiffs are Bayville community members, and former community members,
9   many of whom have had their drinking water contaminated with MTBE and/or BTEX.  Records
10  from the New Jersey Department of Environmental Protection ("DEP") reflect that the Agency
11  considers a former retail gasoline service station owned and operated by Gulf Oil Corporation
12  ("Gulf"), now Chevron U.S.A., Inc. ("Chevron") and Cumberland Farms, Inc. ("Cumberland
13  Farms") to be the exclusive or primary source of the drinking water contamination in the
14  community.  That station is located at Route 9 and Morris Avenue, Bayville, New Jersey 08721
15  and is hereinafter referred to as the "site".

16      7.      Defendant CHEVRON U.S.A., INC. is a Pennsylvania corporation (hereinafter
17  referred to as "Chevron") doing business in New Jersey.

18      8.      Defendant CUMBERLAND FARMS, INC. is a Massachusetts corporation
19  (hereinafter referred to as "Cumberland Farms or CFI") doing business in New Jersey.

20      9.      Defendant GULF OIL CORPORATION is a foreign corporation (hereinafter
21  referred to as "Gulf") doing or having done business in New Jersey.

22      10.     Defendant SUNOCO is a Pennsylvania Corporation (hereinafter referred to as
23  "Sunoco") doing business in New Jersey.  Defendant was formerly named as "JOHN DOE"
24  Defendant Number 1.

25      11.     Defendant GULF OIL LIMITED PARTNERSHIP, is a Limited Partnership
26  (hereinafter referred to as "Gulf Oil LP") doing business in New Jersey  Defendant was formerly
27  named as "JOHN DOE" Defendant Number 2.

28

12.   All of the fictitious Defendants are companies that buy, process, or otherwise take gasoline from oil refineries and deliver it to gasoline stations (hereafter referred to "Jobbers"). The Jobber Defendants in this Action have delivered MTBE laden gasoline to the Bayville gasoline station.

13.   Defendant Cumberland Farms, Inc. ("CFI") was the owner/operator of the site located in Bayville, New Jersey, and is believed to have negligently caused gasoline to leak from the site.

14.   Chevron, Gulf Oil, Gulf Oil LP, and Sunoco (hereinafter collectively referred to as the "Oil Company Defendants") are manufacturers and/or wholesalers of gasoline brought to the Cumberland Farms site.

15.   Gulf Oil, Gulf Oil LP, Sunoco, Chevron, Cumberland Farms, and the Jobbers (hereinafter collectively referred to as "Defendants") intentionally, negligently and/or recklessly placed MTBE laced gasoline into the stream of commerce without warning of its dangers. The MTBE laced gasoline was sold and/or delivered to Cumberland Farms and was placed into underground storage tanks located at the site.

16.   In or about May 2000, Plaintiff Theodore Holten learned that his water was contaminated with MTBE. He determined this because professional sampling of his drinking water yielded this information.

17.   Shortly thereafter, the DEP determined that community wide sampling was required and other Plaintiffs discovered that they too had MTBE and/or BTEX in their drinking water.

18.   On information and belief, the MTBE and BTEX chemicals were discharged from an underground storage tank at the Cumberland Farms gas station. This tank was in violation of Federal laws requiring that all tanks of similar design be removed from the ground.

19.   In or about June 2000, several other groundwater samples taken in Bayville showed that MTBE and/or BTEX contamination was present at levels well above the New Jersey health advisory level for both MTBE and/or BTEX.

20. Plaintiffs were alarmed to learn that they had been drinking, cleaning and cooking with MTBE and/or BTEX contaminated water. What is worse, many Plaintiffs were terrified to find that they had been feeding and cleaning their children and grandchildren and children in their care, with the same contaminated water.

21. Starting in or about June 2000, certain Defendants agreed to provide bottled water to certain area residents. In addition, certain Defendants paid for certain Plaintiffs to be connected to a permanent alternate water supply. However, not all Plaintiffs received this benefit and in any event, none of the Plaintiffs can use their drinking water wells as a result of the water contamination.

22. As of this date, the Bayville area is still contaminated by MTBE and BTEX. The contamination has not been cleaned up.

23. As a result of Plaintiffs' exposure to MTBE, they have been placed at an increased risk of suffering nausea, vomiting, diarrhea, eyes, nose and throat irritation, rashes, as well as other illnesses now and in the future. Because of this increased risk of suffering future health problems, the Plaintiffs reasonably require medical surveillance. As a result of the exposure to Benzene and Toluene, some Plaintiffs have suffered and continue to suffer significant health impacts.

24. Today, numerous hard working people living in Bayville have no permanent source of drinking water. In addition, Plaintiffs' property values have plummeted and businesses have suffered. Some Plaintiffs have had to use bottled water to bathe and drink, and have generally had the quality of their lives disrupted as a result of the MTBE and/or BTEX contamination.

25. The harm suffered by the Plaintiffs was a result of the Defendants acts and omissions, and such acts and omissions where actuated by actual malice or accompanied by a wanton or willful disregard of the safety of product users, consumers, and others who foreseeably might be harmed by the MTBE and BTEX, including the Plaintiffs. The Defendants engaged in intentional wrongdoing, in the sense of an evil minded acts, by allowing MTBE and BTEX to be placed into an UST system that they knew would leak chemicals into the ground and

7

1  into the groundwater where it would contaminate people's drinking water.  These defendants

2  then failed to remediate the contamination for years.  They simply allowed the contamination to

3  spread and spread without warning and without concern for the health and safety of the

4  neighbors nor their neighbors' children.

5        26.  Moreover, these Defendants placed MTBE into the stream of commerce knowing

6  that the chemical possesses special dangers in that it has the propensity to contaminate even

7  more water than BTEX.  The Defendants knew full well of the probably hazards and ill effects

8  that could be realized by unknowing individuals such as the Plaintiffs.  Defendants also

9  deliberately acted or failed to act with knowledge of a high degree of probability of harm to

10  unknown persons such as the Plaintiffs and with reckless disregard of to the consequences of

11  such actions or omissions.

12        27.  When, in this complaint, reference is made to any act of the Defendants, such

13  shall be deemed to mean that the officers, directors, agents, employees, or representatives of the

14  Defendants committed or authorized such acts, or failed and omitted to adequately supervise or

15  to properly control or direct their employees while engaged in the management, direction,

16  operation, or control of the affairs of Defendants and did so while acting within the scope of their

17  employment or agency.

18        28.  Defendants DOES 3-100, are named herein under fictitious names, their true

19  names and capacities being unknown to Plaintiffs.  Plaintiffs are informed and believe, and

20  thereon allege, that each of said DOES is responsible, in some actionable manner, for the events

21  and happenings hereinafter referred to, either through said Defendants' conduct, or through the

22  conduct of Defendants' agents, servants or employees, or in some other manner, causing the

23  harms alleged by Plaintiffs in this complaint.

24        29.  Plaintiffs do not know the true names or capacities of the persons or entities sued

25  herein as Does 3 through 100, inclusive, and therefore sue these Defendants by such fictitious

26  names.  Plaintiffs will amend this complaint to set forth the names and capacities of said

27  Defendants along with appropriate charging allegations when the same have been ascertained.

28

## JURISDICTION AND VENUE

30.  This Court has subject matter jurisdiction over all causes of action asserted herein.

31.  This Court has jurisdiction over Defendants because they are New Jersey corporations, corporations authorized to do business in New Jersey and/or registered with the New Jersey Secretary of State, reside in New Jersey, do sufficient business with sufficient minimum contacts in New Jersey, or otherwise intentionally avail themselves of the New Jersey market through the sale, manufacturing, and/or processing of petroleum-related products in New Jersey to render the exercise of jurisdiction over Defendants by the New Jersey courts consistent with traditional notions of fair play and substantial justice.

32.  Venue is proper in this Court because the actions of Defendants give rise to transitory causes of action and at least one of these Defendants resides and or does business in Ocean County, New Jersey.  Furthermore, all of the Plaintiffs reside or did reside in Ocean County, New Jersey.

### COUNT I
### NEGLIGENCE

33.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 32 inclusive.

34.  This lawsuit involves Defendants who mix, sell and/or transport MTBE laced gasoline.  Defendants' MTBE laced gasoline was delivered to the site.

35.  MTBE's propensity to contaminate water is so menacing that even if gasoline storage tanks and pipelines were completely impenetrable, which they are not, the mixing of MTBE in gasoline would still pose a significant threat to groundwater.

36.  In fact, Chevron put together a "White Paper" to ". . . provide [its] perspective on the relation between the LUST [Leaking Underground Storage Tank] and MTBE issues."  In the White Paper, Chevron provides the following observations:

> **The physical and chemical properties of MTBE make it more likely to reach groundwater than other gasoline components, as a result of incidental spills, overfills, and gasoline deliveries, _even without_ underground storage tank leaks. (emphasis original).**

9

These concerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999. This information indicates there is MTBE groundwater contamination from small spills of gasoline (e.g. a spill in a parking lot, or a car accident) . . .

. . . Short of eliminating car accidents, stopping customer overfilling of tanks, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they get in the environment.

37. However, despite Defendants' past and current knowledge of MTBE's negative characteristics, Defendants have placed, and continue to place, MTBE laced gasoline into the Country's stream of commerce without taking any special precautions to prevent MTBE discharges to people's drinking water.

38. MTBE should have never been mass-produced and distributed to a place like Bayville without proper education and warning of MTBE's propensity to contaminate water. Moreover, Defendants should have also properly educated and warned the appropriate government agencies, gasoline station owners and operators, and the public of MTBE's negative environmental characteristics.

39. Prior to placing MTBE into the stream of commerce, Defendants knew or should have known that in the event MTBE was released into soil, it would easily mix with groundwater and spread its toxic plume over great distances without biodegradation or bioremediation.

40. Defendants further knew, or should have been known, that when MTBE was placed into Bayville's gasoline system there was a strong probability that it would escape into the surrounding environment and contaminate Plaintiffs' soil and well water.

### PRE-SALE DUTY TO PREVENT AND TO WARN

**A.    DUTY TO PREVENT**

41. Defendants breached their duty to make sure that their product was safe before putting it into the stream of commerce. Specifically, Defendants failed to take appropriate

10
*FOURTH AMENDED COMPLAINT*

1   precautions to protect public and private drinking water supplies, including Plaintiffs' water

2   supplies, from being contaminated with MTBE.  In failing to take adequate steps to prevent

3   MTBE water contamination, Defendants also breached their duty to protect the public from

4   unwittingly ingesting MTBE contaminated water.

5       42.   CFI further breached their duty to prevent gasoline from being discharged and

6   released from the UST system into the soil and groundwater.  Indeed, records taken from the

7   New Jersey Department of Environmental Protection (hereinafter referred to as "NJDEP" or

8   "State") indicated that these particular Defendants have known for years that gasoline was

9   leaking from their UST system. They did nothing to stop the chemicals from leaking.

10

11      43.   In fact, even after a substantial amount of gasoline leaked into the ground, CFI

12  failed to prevent the continued migration of chemicals from the soil to groundwater. These

13  Defendants knew, or should have known, that the petroleum contaminated soil acted as a

14  continuous source of groundwater contamination that poisoned Bayville community members'

15  private wells for years.  These Defendants were the only ones who were in a position to stop this

16  contamination from spreading and yet they did nothing.

17

18      44.   To add insult to injury, to this date, Defendant Cumberland Farms continue to

19  deny liability notwithstanding its knowledge that the UST systems on this site were leaking.  See

20  Exhibits 1 and 2.

21  **B.**   **DUTY TO WARN**

22      45.   Defendants in this action failed in their duty to warn public agencies and

23  owner/operators of "Mom & Pop" gasoline stations of MTBE's propensity to contaminate water.

24      46.   Specifically, Defendants failed to warn the Bayville community that as a result of

25  having MTBE laced gasoline delivered to the Cumberland Farms gasoline station, their drinking

26  water was in danger of being contaminated.  The people of Bayville deserved to be warned that

27

28

1   their health and property might be placed in great danger as a result of Defendants' business

2   activities.

3       47.   In addition to failing to warn the public of MTBE's negative characteristics,

4   Defendants also failed in their duty to warn Bayville residents that they should obtain medical

5   surveillance after they ingested MTBE and/or BTEX contaminated water.

6       48.   As a direct and proximate result of Defendants' breach of their duties, as outlined

7   above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

8   ## POST-SALE DUTY TO WARN AND REMEDIATE

9       49.   Plaintiffs are informed and believe and thereon allege that Defendants placed

10   MTBE laced gasoline into the stream of commerce.  Defendants' MTBE laced gasoline was

11   delivered to the gasoline system located at the site without warning the proper governmental

12   authorities, or the operators of the Cumberland Farms gas station, of MTBE's dangers and

13   defects.  Defendants' MTBE laced gasoline was placed into the Cumberland Farms' gasoline

14   system thereby causing Plaintiffs' water and soil to be contaminated with MTBE.

15       50.   CFI further knew that BTEX chemicals were being discharged into the soil and

16   groundwater underneath the Cumberland Farms gasoline station and did nothing to prevent this

17   contamination from spreading into Plaintiffs' drinking water.

18       51.   Moreover, Defendants knew or should have known that, at the time the

19   contamination was released, Plaintiffs' were defenseless to protect themselves because they had

20   no knowledge of MTBE, Benzene and Toluene's carcinogenicity or of its negative impacts on

21   soil and drinking water.

22       52.   Also, once it became known that Bayville's drinking water had been

23   contaminated, CFI should have warned Plaintiffs of the problem and immediately remediated the

24   contamination that their business activities had caused.

25   A.   **DUTY TO WARN**

26       53.   After realizing that Plaintiffs' soil and water had been contaminated as a result of

27   Defendants' actions, CFI failed to adequately warn the community that they needed to obtain

28   medical surveillance.

**B.**   **DUTY TO REMEDIATE**

54.   Once the contamination became publicly known, CFI failed to control the contamination plume from continually expanding into Bayville's soil and water wells.

55.   Once the contamination became publicly known, Defendants failed to remediate the MTBE and BTEX contamination. Defendants have left Plaintiffs to fend for themselves knowing that Plaintiffs did not have the expertise or the resources to properly remediate the contamination plume that these Defendants created.

56.   Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce has interfered with Plaintiffs' use and enjoyment of their property, and quality of life, and has diminished the value of their real property.

57.   Defendants' improper use and placement of MTBE laced gasoline into the stream of commerce caused Plaintiffs' need for medical surveillance.

58.   Bayville community members are troubled by the fact that they have bathed in MTBE and/or BTEX contaminated water and have consumed this water.

59.   Bayville community members are also troubled by the fact that they have unwittingly bathed their children in MTBE and/or BTEX contaminated water and given them this same water to drink.

60.   Many Bayville community members have had to pay to be connected to an alternate water supply and incur monthly water expenses as a result of the MTBE and/or BTEX contamination.

61.   As a direct and proximate result of Defendants' breach of their duties, as outlined above, Plaintiffs have suffered extensive damages in an amount to be proven at time of trial.

62.   Defendants' actions, placing dangerous chemicals into the stream of commerce without taking proper precautions or providing adequate warnings, while knowing that they would surely contaminate drinking water, are wholly inappropriate.

63.   Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of Plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

13

64.   Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

a.   A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b.   Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination and compensation for personal injury suffered by the Plaintiffs.

c.   Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.   Compensatory damages in an amount determined to be just and equitable by this Court.

e.   For special, exemplary and/or punitive damages according to proof.

f.   An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.   Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.   For such other relief as this Court deems appropriate and just.

## COUNT II
## STRICT PRODUCTS LIABILITY

65.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 64 inclusive.

66.   Defendants placed MTBE, into the stream of commerce without taking proper precautions or providing adequate warnings.

67.   Defendants mixed MTBE with gasoline thereby using it as an oxygenated additive.

14

68. Defendants sold MTBE laced gasoline, thereby placing it into the stream of commerce without taking proper precautions or providing adequate warnings.

69. Plaintiffs are informed and believe and thereon allege that MTBE is a particularly hazardous chemical in that it has a propensity to contaminate drinking and may cause serious disease and health problems.

70. Defendants failed to warn appropriate governmental agencies, gasoline station operators and the potentially impacted public that MTBE had the propensity to contaminate water, including Bayville's drinking water.  Therefore, the MTBE placed into the stream of commerce by Defendants was defective because Defendants neither warned the appropriate governmental agencies nor the community of Bayville of MTBE's propensity to contaminate surrounding water resources when it is discharged into the environment.

71. Thus, not only does the MTBE additive contain a design defect due to its inherent dangerous characteristics, it is also defective because Defendants failed to properly warn relevant regulatory agencies, distributors and consumers of MTBE's inherent dangerous characteristics.

72. Defendants' action, placing an inherently dangerous chemical into the stream of commerce without taking proper precautions or providing adequate of any warnings, while knowing that it would surely contaminate drinking water, is wholly inappropriate.

73. Moreover, the Defendants willfully and intentionally breached their duty of care and acted with conscious disregard of plaintiffs' safety with malice and oppression for which punitive and exemplary damages should be imposed.

74. Plaintiffs have suffered great harm from Defendants' conduct and are entitled to recover punitive or exemplary damages.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination and compensation for personal injury suffered by the Plaintiffs.

c.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d.  Compensatory damages in an amount determined to be just and equitable by this Court.

e.  For special, exemplary and/or punitive damages according to proof.

f.  An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.  For such other relief as this Court deems appropriate and just.

## COUNT III

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND FEAR OF FUTURE INJURY

75.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 74 inclusive.

76.  With conscious disregard for the safety of the Bayville residents, Defendants negligently placed MTBE laced gasoline into the stream of commerce without providing any warnings or taking proper or adequate precautions.  The Defendants' MTBE laden gasoline was eventually delivered to the site.

77.  In placing MTBE into the stream of commerce the Defendants knew or should have known that MTBE was certain to invade Plaintiffs' homes, groundwater and property.

78.  Defendants' failure to properly warn governmental agencies, MTBE distributors, dispensers and sellers of MTBE's negative characteristics or otherwise take appropriate

precautions in preventing the wide-spread contamination caused by MTBE led to the contamination of Plaintiffs' homes, groundwater and property.

79. Defendants' failure to warn or take appropriate safety measures when placing this dangerous chemical into the stream of commerce constitutes outrageous acts that exceed all bounds of decency tolerated by our society.

80. Defendants exhibited a reckless disregard for the probability of causing Plaintiffs severe emotional distress by contaminating Plaintiffs' property, water supply, soil and environment, and by failing to take any steps to warn or otherwise remedy the likely impacts of their actions.

81. Defendants negligently failed to take any steps to stop the contamination or to warn Plaintiffs of the MTBE and/or BTEX contamination and its consequences.

82. As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally distressed due to their reasonable fear that MTBE and/or BTEX laced gasoline will continue to contaminate their drinking water and property, the drinking water and property of their neighbors, and cause more damage to their community.

83. As a proximate cause of Defendants' acts, Plaintiffs are severely emotionally distressed because Plaintiffs are now aware of the potential repercussions of exposure to MTBE and/or BTEX laced gasoline. Plaintiffs suffer and will continue to suffer severe emotional distress due to the reasonable belief that the MTBE and/or BTEX contaminated water that they ingested, or were otherwise exposed to, will likely cause future medical health problems or complications. Moreover, Plaintiffs are reasonably distressed at the prospect of their children and other family members suffering future medical health problems or complications as a result of the MTBE and/or BTEX exposure.

84. Defendants' actions, placing dangerous chemicals into the stream of commerce without taking proper precaution or providing adequate warnings, while knowing that they would surely contaminate drinking water, are wholly inappropriate.

1    85.   Moreover, the Defendants willfully and intentionally breached their duty of care

2  and acted with fraud, malice and oppression for which punitive and exemplary damages should

3  be imposed.

4    86.   Plaintiffs have suffered great harm from Defendants' conduct and are entitled to

5  recover punitive or exemplary damages.

6    **WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

7      a.  A declaration by the Court that Defendants  and each of them, have been and

8  continue to be in violation of each of the above statutes, regulations, standards and legal duties.

9      b.  Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or

10  BTEX contamination.

11      c.  Preliminary and permanent injunctions to pay money into a fund sufficient

12  to clean and remediate the contamination that these Defendants' caused to be discharged into

13  Plaintiffs' well water and property.

14      d.  Compensatory damages in an amount determined to be just and equitable by

15      e.  For special, exemplary and/or punitive damages according to proof.

16      f.  An order mandating that the Defendants, and each of them, and their

17  successors and assigns, take every action necessary to assure that all relief requested herein is

18  obtained and fully funded.

19      g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of

20  Court.

21      h.  For such other relief as this Court deems appropriate and just.

22

23                        **COUNT IV**
                 **QUALITY OF LIFE DAMAGE**

24

25    87.   Plaintiffs reallege and incorporate by reference as if fully set forth herein

    Paragraphs 1 through 86 inclusive.

26

27    88.   Plaintiffs' quality of life has deteriorated tremendously as a result of the MTBE

    and/or BTEX contamination in the Bayville area drinking water.

28

89. Plaintiffs have been unable to drink their water, bathe in their water, invite guests to their homes for fear that they too may be injured as a result of ingesting or coming into contact with the MTBE and/or BTEX laden water, swim, grow vegetables in their garden, wash their cars, allow their children to play in their yards.

90. Plaintiffs have suffered from medical injuries, including but not limited to, respiratory problems, rashes, dizziness, headaches, from consuming and otherwise using or coming into contact with their MTBE laden water.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

a. A declaration by the Court that Defendants, and each of them, have been and continue to be in violation of each of the above statutes, regulations, standards and legal duties.

b. Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

d. Compensatory damages in an amount determined to be just and equitable by this Court.

e. For special, exemplary and/or punitive damages according to proof.

f. An order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded.

g. Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h. For such other relief as this Court deems appropriate and just.

## COUNT V
### PRIVATE NUISANCE

91.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 90 inclusive.   At all times material hereto, Plaintiffs were in lawful possession of their land.  CFI's use, occupation and operation of their facilities have resulted in an intrusion and the continued intrusion upon Plaintiffs' properties, significantly and negatively impacting upon the Plaintiffs' rights to use and enjoy their own property.

92.   Specifically, CFI's unreasonable emission, disposal and release of toxic and hazardous substances into the Plaintiffs' water supply were substantially offensive, discomforting, and annoying to persons of ordinary sensibilities, tastes, and habits drinking and bathing in the water supply.  The Oil Company Defendants' placement of MTBE into the stream of commerce without proper precautions or adequate warnings, allowed the gasoline from the CFI site to migrate farther and faster and the enter the wells of Plaintiffs'.

93.   The Defendants interference with Plaintiffs' rights was so unusual and excessive that it necessarily caused injury, damage, harm and inconvenience to Plaintiffs, and it substantially, materially and unusually interfered with their comfort, and with the proper use and enjoyment of their property.  Such invasion of Plaintiffs' right was unreasonable.

94.   CFI's use, occupation and operation of its service station has resulted in an entry and intrusion, and the continued entry and intrusion onto the property of Plaintiffs' without privilege, permission, invitation or justification.  Defendants' conduct directly and proximately caused Plaintiffs' injuries, including actual or increased harm to their property and economic interests and an increased risk of future illness.  Plaintiffs are entitled to recover damages for such injuries.

95.   All injuries and damages to Plaintiffs are substantial.  Many of the injuries to the Plaintiffs, however, are as yet to undetermined in magnitude.  The amount of damages for some of the injuries will be established at the time of trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

20

1       a.  A declaration by the Court that Defendants, and each of them, have been and

2  continue to be in violation of each of the above statutes, regulations, standards and legal duties.

3       b.  Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or

4  BTEX contamination.

5       c.  Preliminary and permanent injunctions to pay money into a fund sufficient

6  to clean and remediate the contamination that these Defendants' caused to be discharged into

7  Plaintiffs' well water and property.

8       d.  Compensatory damages in an amount determined to be just and equitable by

9  this Court.

10       e.  For special, exemplary and/or punitive damages according to proof.

11       f.  An order mandating that the Defendants, and each of them, and their

12  successors and assigns, take every action necessary to assure that all relief requested herein is

13  obtained and fully funded.

14       g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of

15  Court.

16       h.  For such other relief as this Court deems appropriate and just.

17

18
## COUNT VI
## TRESPASS

19    96.  Plaintiffs reallege and incorporate by reference as if fully set forth herein

20  Paragraphs 1 through 95 inclusive.

21    97.  Plaintiffs were at all relevant times in possession of land they owned and/or

22  occupied.

23    98.  Upon information and belief, CFI's discharge of contaminants have migrated onto

24  Plaintiffs' land and into their homes.

25    99.  Upon information and belief, this discharge was a trespass.

26    100.  Upon information and belief, Plaintiffs' real property, residences and

27  personal property continue to be exposed to and contaminated by hazardous chemicals and

28

1  materials emanating from the Service Station due to the discharge at the site and the MTBE in

2  the gasoline which allowed the gasoline to migrate further and faster then gasoline without

3  MTBE and therefore reach the wells of Plaintiffs'.

4       101.     CFI's use, occupation, ownership and operation of its Service Station the

5  spills and overfills and the Oil Company Defendants' placement of MTBE into the stream of

6  commerce (without proper precautions or adequate warnings) has resulted in an entry and

7  intrusion into the homes and onto the properties owned and/or occupied by the Plaintiffs' without

8  privilege, permission, invitation or justification.

9       102.     The Defendant's conduct directly and proximately caused Plaintiffs'

10  injuries, including actual physical harm to property and economic interests and an increased risk

11  of future harm to their person.  Plaintiffs are entitled to recover damages for such injuries.

12       103.     All injuries and damages to Plaintiffs are substantial.  Many of the injuries

13  to the Plaintiffs, however, are as yet undetermined in magnitude.   The amount of damages for

14  some of the injuries will be established at the time of trial.

15       **WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

16       a.   A declaration by the Court that Defendant has committed a trespass.

17       b.   Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or

18  BTEX contamination and compensation for personal injury suffered by the Plaintiffs.

19       c.   Preliminary and permanent injunctions to pay money into a fund sufficient

20  to clean and remediate the contamination that these Defendants' caused to be discharged into

21  Plaintiffs' well water and property.

22       d.   Compensatory damages in an amount determined to be just and equitable by

23  this Court.

24       e.   For special, exemplary and/or punitive damages according to proof.

25       f.   An order mandating that the Defendants, and each of them, and their

26  successors and assigns, take every action necessary to assure that all relief requested herein is

27  obtained and fully funded.

28

g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of Court.

h.  For such other relief as this Court deems appropriate and just.

## COUNT VI
## PERSONAL INJURY

104.     Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 103 inclusive.

105.     As a result of the negligence and trespass and strict liability of the Defendants as aforesaid, the Plaintiffs sustained personal injuries which caused and will cause in the future:  permanent disability, disfigurement, loss of bodily function, medical and other expenses, loss of income and reduced earning capacity, pain and suffering; and interface with Plaintiffs' ability to engage in active pursuits and an impairment of the quality of life.

106.     As a result of the gross negligence and the willful and wanton indifference of the Defendants as aforesaid, the Plaintiffs sustained personal injuries which caused and will cause in the future:  permanent disability, disfigurement, loss of bodily function, medical and other expenses, loss of income and reduced earning capacity, pain and suffering; and interface with Plaintiffs' ability to engage in active pursuits and an impairment of the quality of life.

107.     All injuries and damages to Plaintiffs are substantial.  Many of the injuries to the Plaintiffs, however, are as yet undetermined in magnitude.  The amount of damages for some of the injuries will be established at the time of trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

a.  A declaration by the Court that Defendant's have committed a trespass.

b.  Medical surveillance for each of the Plaintiffs exposed to the MTBE and/or BTEX contamination.

c.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that these Defendants' caused to be discharged into Plaintiffs' well water and property.

1      d.  Compensatory damages in an amount determined to be just and equitable by

2   this Court.

3      e.  For special, exemplary and/or punitive damages according to proof.

4      f.  An order mandating that the Defendants, and each of them, and their

5   successors and assigns, take every action necessary to assure that all relief requested herein is

6   obtained and fully funded.

7      g.  Plaintiffs' fees and costs, as authorized by Statute and the applicable Rules of

8   Court.

9      h.  For such other relief as this Court deems appropriate and just.

10

11

12   Dated:  June 24, 2004

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEBERMAN & BLECHER, P.C.

By: Shari M. Blecher, Esq.
LIEBERMAN & BLECHER, P.C.
30 Jefferson Plaza
Princeton, N.J. 08540
(732) 355-1311

**Attorneys for Plaintiffs**

## CERTIFICATION

I Certify that there are no other lawsuits or actions relating to the subject of this litigation of which I am aware.

Shari M. Blecher, Esq.

## DEMAND FOR INSURANCE COVERAGE INFORMATION

Pursuant to the New Jersey Rules of Court, please provide all required information relating to any insurance carriers who may provide coverage in this matter.

Shari M. Blecher, Esq.

*FOURTH AMENDED COMPLAINT*

*Bayville, New Jersey Litigation*
*Holten, et al. vs. Chevron, U.S.A., Inc., et al.*
*U.S. District Court, District of New Jersey (Trenton)*
*Civil Action No.: 3-00-CV-04703*

### Attorneys for Plaintiffs:

**Shari M. Blecher, Esq.**
Lieberman & Blecher, P.C.
30 Jefferson Plaza
Princeton, NJ 08540
Tel.: (732) 355-1311
Fax: (732) 355-1310
sblecher@liebermanblecher.com

**Nancy Eichler, Esq.**
Masry & Vititoe
5707 Corsa Avenue, 2nd Floor
Westlake Village, CA 91362
Tel.: (818) 991-8900
Fax: (818) 991-6200
neichler@masryvititoe.com

**Scott Summy, Esq.**
Baron & Budd
3102 Oak Lawn Avenue
Dallas, TX 75219
Tel No.: (214) 523-6267
Fax No.: (214) 520-1181
ssummy@baronbudd.com

### Attorneys for Chevron/Gulf:

**Matthew S. Slowinski, Esq.**
Slowinski, Atkins & Czyz, L.L.P.
One Newark Center
Newark, NJ 07102-3211
Tel.: (973) 824-0900
Fax: (973) 824-8009
mslowinski@slowinskiatkins.com

**Richard E. Wallace, Esq.**
Wallace, King, Marraro & Branson
1050 Thomas Jefferson Street, NW
Washington, DC 20007
Tel.: (202) 204-3710
Fax: (202) 204-1001
rwallace@wallaceking.com

### Attorneys for Sunoco:

**Heather M. Fusco, Esq.**
Beveridge & Diamond, P.C.
26 Franklin Street
Tenafly, NJ 07670-2515
Tel: (201) 568-2797
Fax: (201) 568-9570
hfusco@bdlaw.com

**John S. Guttmann, of Counsel**
Beveridge & Diamond, P.C.
1350 I Street, N.W Suite 700
Washington, DC 20005-3311
Tel: (202) 789-6000
Fax: (202) 789-6190
jguttmann@bdlaw.com

### Attorneys for Gulf Oil, Limited Partnership:

**Joseph T. Walsh, III, Esq.**
McCusker, Anselmi, Rosen, Carvelli & Walsh
127 Main Street
Chatham, New Jersey 07928
Tel.: (973) 635-6300
Fax: (973) 635-6363
jwalsh@marc-law.com

### Attorney for Cumberland Farms, Inc.:

**Debra S. Rosen, Esq.**
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033
Tel.: (856) 354-3084
Fax: (856) 795-0574
drosen@archerlaw.com

United States General Accounting Office

**GAO**

## Testimony

Before the Subcommittee on Environment and
Hazardous Materials, Committee on Energy and
Commerce, House of Representatives

For Release on Delivery
Expected at 3:30 p.m., EDT
Tuesday, May 21, 2002

# ENVIRONMENTAL PROTECTION

# MTBE Contamination From Underground Storage Tanks

Statement of John Stephenson
Director, Natural Resources and Environment



**G A O**
Accountability * Integrity * Reliability

EXHIBIT
4

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss the increasing concern that our nation's waters are becoming contaminated with methyl tertiary butyl ether (MTBE). About a third of the states, in certain areas, use gasoline that contains MTBE to help them limit air pollution because it burns cleaner. However, the substance could also pose risks to human health, especially as a contaminant in drinking water wells. One of the primary ways in which the contaminant has migrated into wells and groundwater is from leaking underground tanks used to store gasoline. The Environmental Protection Agency (EPA) has the responsibility through the Underground Storage Tank Program and working primarily through the states to ensure the tanks do not leak, and if they do, that the contamination is cleaned up. However, several studies, including our own report on EPA's implementation of the tank program,[1] showed that many tanks have leaked—and continue to leak—hazardous substances, such as MTBE and benzene. These leaks, in turn, contaminate soil and groundwater, posing health risks to those who live nearby or drink the water. Such health risks can range from nausea to kidney or liver damage or even cancer. As a result, some communities have closed their drinking water wells. A recent news report illustrates the problem. A school in Roselawn, Indiana, discovered that the children had been using and drinking water with nearly 10 times the EPA-recommended safe level of MTBE. I understand that an investigation is trying to determine whether the MTBE came from a nearby tank and whether it is a factor contributing to the children's nosebleeds and other reported health problems.

When there is a gasoline overflow, spill, or tank leak—referred to as releases—the tank owners and operators are to report the incident to EPA if the release is on tribal lands, or otherwise to the state agency implementing the tank program, and to initiate cleanup. Most releases are not discovered, however, until the tanks are taken out of service, when they must be permanently closed to eliminate future leaks. To help states cover their program costs, the Congress annually provides the states with grants from a trust fund it created in 1986. In fiscal year 2001, states each received from $252,000 to $4.5 million, depending primarily on their cleanup workload, for a total of $58.7 million. States can use these resources for, among other things, cleaning up releases when the owner or

---

[1] *Environmental Protection: Improved Inspections and Enforcement Would Better Ensure the Safety of Underground Storage Tanks* (GAO-01-464, May 4, 2001).

GAO-02-753T  MTBE from Underground Tanks

operator is unable or unwilling to perform the cleanup, or cannot be identified. The fund is replenished primarily through a $.001/gallon federal tax on gasoline and other fuels and had a balance of $1.7 billion at the end of fiscal year 2001.

Because of rising concerns about continuing releases and the resulting contamination, especially from MTBE, we determined the (1) extent to which these releases may contain MTBE, and whether the contaminant poses health risks or affects cleanups, (2) progress states have made in cleaning up releases, and (3) the party responsible for the cleanup costs. In summary, we found the following:

- A majority of the 50 states have reported finding MTBE when they discover gasoline contamination at their tank sites and, increasingly, in their groundwater, surface water, and drinking water. This widespread contamination occurs, even though currently only certain communities in only about one-third of the states use gasoline with MTBE as a fuel additive. Contamination continues because, among other things, MTBE has been used in the past as an octane enhancer and is currently transported through the same fuel pipes and trucks that deliver gasoline across the country.[2] MTBE's health effects have not been conclusively established, but the federal government has determined it to be a potential human carcinogen. Because of the health uncertainties, EPA has not regulated MTBE; instead it has simply advised people not to drink water that contains concentrations in excess of 20 to 40 parts per billion. Fourteen states have gone further on their own and partially or completely banned the use of MTBE within their borders or established other regulations on its use. According to a December 2000 report on a survey of state tank program managers sponsored by EPA,[3] finding MTBE at a tank site does not typically affect the cleanup method but can increase the time and cost of cleanup because MTBE travels faster and farther than other gasoline contaminants. Several states reported that their cleanup costs doubled as a result of addressing MTBE.

---

[2] According to a recent EPA estimate, MTBE is used as an additive in about 87 percent of gasoline in the United States.

[3] New England Interstate Water Pollution Control Commission, *A survey of State Experiences with MTBE Contamination at LUST Sites* (Dec. 15, 2000).

- States have made progress in addressing the releases they have discovered, including MTBE contamination, but face a continuing and substantial cleanup workload. States reported to EPA that they have completed cleanups of 64 percent of the more than 400,000 identified releases as of the end of fiscal year 2001, and have begun some type of cleanup action for another 26 percent. Nevertheless, states still have to both complete these ongoing cleanups and begin cleanups for almost another 40,000 releases, or determine that they do not pose enough risk to warrant a cleanup. In addition, states face a potentially large, but unknown, future workload in addressing releases from a number of sources, as we previously reported. These include unidentified abandoned tanks, identified but empty and inactive tanks that have not yet been removed, active tanks that leak because their leak detection and prevention equipment is not being properly operated and maintained, and unreported leaks from tanks in those states that do not inspect them. Some states reported that even their new tanks with the latest leak detection and prevention equipment are leaking, increasing the cleanup workload. A majority of the 13 states that we contacted—those that had cleaned up many releases or had a large backlog left to address—identified the lack of staff to oversee cleanups as a barrier affecting cleanup progress.

- States typically depend on tank owners or operators to pay some portion of cleanup costs and cover the remainder with their own funding programs. The states depend on the relatively small federal trust fund grants to pay staff to oversee cleanups and administer their programs. States typically do not receive appropriations from their legislatures to cover their cleanup costs but pay for them out of funds supported by state gasoline tax revenues, annual tank fees, or both. In a May 2001 survey of state funding programs, by the Vermont Department of Environmental Conservation,[4] 36 states reported having adequate funding to cover their current costs while 11 reported having more costs to cover than funds available. In addition, 16 states have stopped accepting, or are scheduled to stop accepting, new claims for reimbursements, leaving it up to tank owners to obtain adequate insurance or other means to cover their cleanup liabilities. In the future, some states may seek additional federal support when and if their funding programs end and they turn their attention to addressing

---

[4] Vermont Department of Environmental Conservation, *A Summary of State Fund Survey Results* (May 2001). The Department conducts this survey annually.

the many unidentified abandoned tanks nationwide that have no financially viable owners to pay for cleanup.

## MTBE Has Been Detected Nationwide But the Extent of Its Effect on Human Health and the Cleanup of Releases Is Uncertain

While the full extent of MTBE contamination is unknown, most states reported in the EPA-sponsored survey that they are finding the contaminant in groundwater from releases at tank sites, and some are beginning to find it in their drinking water sources. The extent to which the contaminant poses a health risk is uncertain, however, in part because EPA does not yet have the data necessary to determine MTBE's health effects. Detecting MTBE from a release typically does not influence the type of cleanup method selected, but could increase the time and cost of the cleanup, according to a number of states.

### Most States Have Found MTBE in Groundwater from Releases at Tank Sites; Fewer Have Found It in Their Drinking Water

Portions of 17 states and the District of Columbia currently use gasoline potentially containing the additive MTBE to limit air pollution (see figure 1). However, MTBE is being detected nationwide because, among other things, it had been used as an octane enhancer in gasoline in the past and because the pipes and trucks used to carry gasoline throughout the nation have been cross contaminated with the substance.

**Figure 1: States Using MTBE and Other Fuel Additives to Limit Air Pollution**



Source: EPA.

Forty-four states reported in the EPA-sponsored survey that they sample groundwater at leaking tank sites and test it for MTBE. [5] Furthermore, 35 states reported that they find MTBE in groundwater at least 20 percent of the time they sample for it, and 24 states said that they find it at least 60 percent of the time.

States are not only finding MTBE at tank sites with reported releases—half of the states reported finding it at tank sites even when there was no documented release, although they did not know the number of these cases. About half of the states also reported finding MTBE that they could not attribute to a leaking tank and suspected that it came from other sources, such as above-ground tanks used to store fuel.

The extent of MTBE contamination may be understated because some tank releases go undetected and because only 19 states said that they are

---

[5] Washington reported that it planned to add such testing by 2001.

taking any extra steps to make sure that MTBE is not migrating further from a tank site than other contaminants when a release has been detected. MTBE is less likely to cling to soil than other gasoline components and dissolves more easily in water, allowing it to travel faster, farther, and sometimes deeper. Therefore, parties might have to use more test wells around a leaking tank to determine if and where MTBE is present. If states do not conduct the extra tests, they may not detect the MTBE.

Some of the states that have identified MTBE contamination have also found that it reached drinking water sources. More states may not have reported finding MTBE in part because only 24 states in the EPA-sponsored survey said that their drinking water program offices routinely analyzed drinking water sources for MTBE, while another 24 said that their offices were not conducting these analyses. Although a number of states were not sure how many public or private drinking water wells had been contaminated by MTBE, 11 states said that at least 10 public wells had been contaminated at the time of the survey, and 15 states reported that 10 private wells had been closed. The Maryland Department of the Environment reported that MTBE was found in low concentrations in about 100 of more than 1,200 water systems tested. In contrast, some communities in California, Kansas, and Maine have had more extensive problems with contaminated groundwater. For example, Santa Monica, California, closed seven wells supplying 50 percent of the city's water.

At the national level, the U.S. Geologic Survey (USGS) and EPA have conducted some water-monitoring efforts, but have yet to find high concentrations of MTBE in many drinking water sources. According to a USGS study, MTBE was detected in generally lower concentrations in 14 percent of surface water sources.[6] Another USGS study points out, however, that it was 10 times more likely to find MTBE in areas that use it as a fuel additive to reduce pollution.[7] A third USGS study, done in cooperation with EPA and issued in 2001, examined monitoring data from over 2,000 randomly selected community water systems in the northeast and mid-Atlantic regions and reported that MTBE was detected in about 9

---

[6] *National Survey of MTBE, Other Ether Oxygenates, and Other VOCs in Community Drinking Water Sources,* U.S. Geological Survey (Open-File Report 01-399, 2001).

[7] *Contaminants of Drinking Water Sources in 2001: Recent Findings of the U.S. Geological Survey,* U.S. Geological Survey (Open-File Report 00-510, 2001).

percent of the systems that analyzed samples for MTBE.[8] Finally, EPA has completed the first year of a 3-year effort—under the recently implemented Unregulated Contaminant Monitoring Rule—to have all large water systems (serving populations of 10,000 or more), as well as selected small public water systems (serving populations of 3,000 or less), test their water for MTBE. Of the one-third of the systems required to test in the first year, 1 of 131 large systems and 3 of the 283 small systems detected the substance.

## Reviews on the Extent that MTBE in Drinking Water Poses Health Risks Are Still Pending

An interagency assessment of potential health risks associated with fuel additives to gasoline, primarily MTBE, concluded that while available data did not fully determine risks, MTBE should be regarded as a potential carcinogenic risk to humans.[9] However, the extent that MTBE may be present in high concentrations in drinking water and jeopardizing public health is unknown. Because MTBE has a bad taste and odor at relatively low concentrations, people may not be able to tolerate drinking contaminated water in large enough quantities to pose a health risk. On the other hand, some people may become desensitized to the taste and smell and could end up drinking MTBE for years in their well water, according to the EPA program manager.

EPA has efforts underway to fill in some of the data gaps on the health effects of MTBE and its occurrence in drinking water supplies. Additional research and water quality monitoring must be concluded before EPA can determine whether a water quality standard—an enforceable limit on the concentration of MTBE allowed in drinking water—is warranted. EPA has issued an advisory suggesting that drinking water should not contain MTBE in concentrations greater than 20 to 40 parts per billion, based on taste and odor concerns. EPA is considering taking further steps to regulate MTBE, but notes that to establish a federally enforceable standard could take about 10 years.

---

[8] *Occurrence and Distribution of Methyl tert-Butyl Ether and Other Volatile Organic Compounds in Drinking Water in the Northeast and Mid-Atlantic Regions of the United States, 1993-98,* U.S. Geological Survey (Water Resources Investigations Report 00-4228, 2001).

[9] National Sciences and Technology Council, Committee on Environment and Natural Resources, *Interagency Assessment of Potential Health Risks Associated with Oxygenated Gasoline* (Feb. 1996).

While the potential health risks of MTBE are uncertain, 14 states——9 of which are not required to use a fuel additive to limit air pollution in certain areas—have partially or completely banned the use of MTBE within their boundaries (see figure 2).

**Figure 2: States That Have Banned MTBE**

(year of ban)



Source: EPA.

In addition, seven states reported in the December 2000 EPA-sponsored survey that they had established their own health-based primary drinking water standard for MTBE, as shown in figure 3. Six of these states currently use fuel additives to limit air pollution and the seventh state voluntarily used such additives until 1999.

**Figure 3: States With a Health-Based Drinking Water Standard for MTBE**



Source: A Survey of State Experiences with MTBE Contamination at Leaking Underground Storage
Tank Sites, New England Interstate Water Pollution Control Commission (December 15, 2000).

Another five states reported establishing a secondary standard to limit the allowable amount of MTBE in drinking water. These standards vary considerably, however, with concentrations ranging from 5 to 70 parts per billion.

| | |
|---|---|
| Discovery of MTBE Does Not Drive the Cleanup Methods Implemented, but Could Increase the Cleanup's Duration and Cost | According to the EPA-sponsored survey, 37 states said that finding gasoline, or its components of concern, [10] in soil or groundwater at a tank site is the primary driver of cleanup activities, not the presence of MTBE. In other words, the methods used to clean up gasoline can also be used to address MTBE contamination. These proven cleanup technologies include pumping and treating groundwater at its source, treating the water at its point of use by running it through a filter, or using a process known as air sparging (injecting air into the contaminated area to volatilize and extract MTBE). Letting the contaminant naturally break down over time—known |

[10] Some of the components of concern in gasoline include benzene, toluene, ethylbenzene, and xylene

as natural attenuation—may not be as effective as with other components of gasoline because MTBE persists longer in soil and groundwater.

However, addressing MTBE could add time and costs to cleanups. According to the EPA-sponsored survey, 16 states reported cost increases as a result of MTBE cleanup, most less than 20 percent; 5 states reported that their costs had doubled. States spent, on average, about $88,000 addressing releases at each tank site in fiscal year 2001. Nineteen states indicated that it could cost more to test for MTBE because they take additional steps to ensure that this contaminant is not migrating beyond other contaminants in a release. Several states reported that their laboratories charged $10 to $50 more per sample to analyze for MTBE. In addition, many of the 16 states that cited higher cleanup costs for MTBE attributed these increases to such factors as longer plumes and increased cleanup time. Finally, the discovery of MTBE can increase costs because filters used to remove MTBE from water have to be changed more frequently.

## States Have Made Progress in Cleaning Up Tank Releases, but Still Face a Potentially Large Cleanup Workload

States reported to EPA that as of the end of 2001, they had completed cleanups of 64 percent (267,969) of the 416,702 known releases at tank sites and had begun some type of cleanup action for another 26 percent (109,486), as figure 4 illustrates.

**GAO-02-753T  MTBE from Underground Tanks**



**Figure 4: States Have Made Progress in Cleaning Up Tank Releases**

Cleanups started but not completed
109,486

26%

64%

9%

Cleanups not started
39,247

Cleanups completed
267,969

Note: Due to rounding, the percentages do not total 100 percent.

Source: GAO's analysis of data provided by states to EPA.

Because states typically set priorities for their cleanups by first addressing those releases that pose the most risk, states may have already begun to clean up some of the worst releases to date. However, EPA tank program managers cautioned that some of the many cleanups that are underway may still be in their early stages because states have varying criteria for "underway." For example, California reports a cleanup is underway as soon as a release is reported, even if no work has begun. In addition, states still have to address the remaining 39,247 known releases (9 percent) where cleanup is not underway by either ensuring it has begun or is not needed because the releases do not pose a risk. Figure 5 illustrates the remaining cleanup workload for known releases in each state and the District of Columbia.

**Figure 5: States Still Have a Number of Cleanups to Initiate or Complete**



greater than 5,000 remaining cleanups

Source: GAO's analysis of data provided by states to EPA.

As the figure shows, while states have made progress, seven states still have more than 5,000 releases that they have not fully addressed. Most of the 13 states we contacted cited a lack of staff as a barrier to achieving more cleanups. For example, the May 2001 Vermont survey of state funding programs indicated that, on average across the states, each staff person was responsible for overseeing about 130 tank sites during that year.

In addition to this known workload, states most likely will continue to face a potentially large but unknown future cleanup workload for a number of reasons:

- In a June 2000 report to the Congress, EPA estimated that as many as 200,000 tanks nationwide may be unregistered, abandoned, or both, and have not been assessed for leaks.[11]

---

[11] *Report to Congress on a Compliance Plan for the Underground Storage Tank Program*, U.S. Environmental Protection Agency (EPA 510-R-00-001, June 2000).

GAO-02-753T  MTBE from Underground Tanks

- Furthermore, even though many owners chose to close their tanks rather than upgrade them with leak detection and prevention equipment as federally required, tens of thousands of tanks nationwide are still empty and inactive, and have not been permanently closed, as we previously reported. Consequently, any leaks from these tanks may not have been identified.

- We also reported that an estimated 200,000 or more active tanks were not being properly operated or maintained, increasing the chance of a spill or leak. For example, 15 states reported that leak detection equipment was frequently turned off or improperly maintained.

- In addition, we reported that many states do not inspect their tanks frequently enough to ensure that they are not leaking and that known releases are reported. Only 19 states were physically inspecting all of their tanks at least once every 3 years—the minimum EPA considers necessary for effective tank monitoring. In addition, 22 states were not inspecting all of their tanks on any regular basis.

- While the number of leaks should decrease in the future—because all new of active tanks should have leak detection and prevention equipment—we previously reported that 14 states traced newly discovered leaks to upgraded tanks and 20 states did not know whether their upgraded tanks leaked.

- Finally, 10 states reported in the EPA-sponsored survey that they had reopened a small number of completed cleanups because MTBE had been subsequently detected. If more states follow suit, the future cleanup workload will increase, although the size of this workload is unknown. In addition, states may be responsible for the costs of these reopened cleanups because tank owners and operators are not required to maintain financial responsibility for tanks that were properly cleaned up or closed.

## States Rely on Their Own Programs and Private Parties to Pay for Cleanups, but May Require Federal Funding to Accelerate Cleanups and Address Abandoned Tanks

States have relied primarily on their own funding programs and private parties to pay for cleanups, using the relatively small federal trust fund grants they receive for staff, program administration, and to a lesser extent, cleanups. States' reliance on private and federal funding could increase in the future if they end their funding programs and begin to address the problem of abandoned tanks with no financially viable owner.

## State Funding Programs and Private Parties Have Paid for Most Cleanups

In creating the Underground Storage Tank program, the Congress expected tank owners and operators to take financial responsibility for cleaning up contamination from their tanks, correcting environmental damage, and compensating third parties for any injuries. Tank owners and operators were to demonstrate that they had the financial resources to cover potential cleanup liabilities. Initially, private insurers were hesitant to take on the risks of providing liability coverage to owners and operators of underground storage tank systems, so many states created their own financial assurance funds. These state funds could be used to cover the financial responsibilities of owners and operators for site cleanup as long as the state funds met the federal financial responsibility requirements. Forty-seven states established such programs most often from a gasoline tax, an annual tank fee, or both, rather than state appropriations. The remaining three states relied on owners and operators to locate suitable insurance, now more readily available, or other financial resources. Under many state programs, owners or operators pay for the cleanup and seek reimbursement for a portion of the cleanup costs from the state. Six of the 13 states we contacted cap the amount of reimbursements and expect tank owners and operators to be financially liable for the remaining costs.

In the May 2001 Vermont survey of state funding programs, states reported spending a cumulative $6.2 billion from their funds since their programs began (13 states did not report their costs). The amount of private funds spent on cleanups is unknown. At the time of the survey, 36 states reported having adequate funding to cover their current costs, but 11 other states said that they were about $625 million short of the funds necessary to cover known claims. Program managers in five of the 13 states we contacted said that their state funds were stable. In addition, nine states

reported that eligibility for their programs had ended[12]—meaning they would no longer accept any reimbursement claims for new releases—and another seven states expected eligibility to end by 2026. Furthermore, the program fees used to replenish state programs had expired in 1 state and were expected to expire in another 12 states within the next decade. As a result of these provisions, tank owners and operators would be responsible for cleanup costs with no state funding support.

## States Have Used Federal Funds Primarily for Cleanup Oversight

States have been using federal grants from the Leaking Underground Storage Tank Trust Fund primarily to pay for staff to oversee cleanups and pursue owners and operators so that they clean up their sites, according to the EPA program manager. States cannot use these federal funds to clean up releases when an owner or operator can pay. States spent $662.5 million in federal trust fund dollars from fiscal year 1987 through fiscal year 2001, roughly 10 percent of the expenditures from states' funds during the same period. States used $19.5 million, or 36 percent, of the $58.7 million they received in fiscal year 2001 grants on cleanup (see figure 6).

---

[12] In Maine, fund eligibility expired only for "non-conforming" tanks—those which had not been upgraded with leak detection and prevention equipment.

GAO-02-753T  MTBE from Underground Tanks

**Figure 6: States' Use of Grants from the Federal Trust Fund**



Source: EPA.

Of the 13 states we contacted, 7 said that their programs rely on the federal grants. On the other hand, for example, a program manager in Florida said that the state's program does not depend on federal grants because it is a small amount of money compared with the amount coming from the state fund. Some states use their federal funds for staffing costs. However, a Maryland program official pointed out that the size of the annual federal grants to states has not kept pace with the salary and other costs they must cover for staff. An Indiana program official attributed a backlog of 4,000 cleanups at one point in the state's program to a lack of federal funding that could be used to pay for additional staff. States may be using their federal trust fund grants to pay for staff because the use of these funds is more restrictive than the state funds, which can be used to reimburse tank owners for their cleanup costs, among other things.

Six states have used an additional funding source that receives federal support to cover some cleanup costs, namely, their Clean Water State Revolving Funds. States get federal seed money to initiate and maintain this type of fund. Eligible parties can apply for loans under the fund and have used them to cover a variety of leak prevention and cleanup projects. According to the EPA, the six states using this vehicle have made a total of $84 million in loans for tank cleanups through June 2000. Program managers in 9 of the 13 states we contacted said that they did not expect to use their revolving loan fund for tank cleanups.

## Some States May Seek More Federal Support for Cleanups in the Future

In addition to the federal grants and loan funds, some states may look to the federal government in the future to help them clean up those abandoned tanks that pose health risks when financially viable parties cannot be identified to pay for cleanups. States admit that they do not often identify releases until they are closing or removing tanks, meaning that EPA and the states might inadvertently be underestimating the risks and cleanup workload that abandoned tanks pose.

States may seek additional federal assistance to address abandoned tanks if state funding programs expire or are depleted. As of January 2002, states can access one new source of federal funding for abandoned tanks, made possible by the Small Business Liability Relief and Brownfields Revitalization Act. Under the act, the Congress authorized up to $50 million annually to clean up properties that may be contaminated by a petroleum release, including abandoned tanks.

## Scope and Methodology

To respond to your questions, we primarily analyzed data (1) that states reported to EPA on the status of tank releases, (2) from the December 2000 report on the EPA-sponsored survey of state tank programs, and (3) from the May 2001 Vermont survey of state cleanup funding programs. In addition, we contacted 13 state tank program managers to discuss their cleanup workload, their concerns with MTBE, and their approach for funding cleanups. We selected these states because they had addressed the largest number of releases, had the largest backlog, or both. We also met with EPA tank program managers to discuss cleanup efforts. We performed our work from April to May 2002 in accordance with generally accepted government auditing standards.

Mr. Chairman, this concludes my statement. I would be pleased to respond to any question you or Members of the Committee may have.

### Contact and Acknowledgments

For further information, please contact John Stephenson at (202) 512-3841. Individuals making key contributions to this testimony were Ellen Crocker, Rich Johnson, Eileen Larence, Gerald Laudermilk, Christopher Murray, and Paul Schearf.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BARRY C. LEPLEY, SR., on            :
behalf of himself and all
others similarly situated           :

     v.                            :            CIVIL NO. S 01-3988

PFIZER CORPORATION;                 :
WARNER-LAMBERT COMPANY;
PARKE-DAVIS; and                    :
GIANT FOOD, INC.
                                    :

MEMORANDUM OPINION

This is a products liability case (one among many) involving a prescription drug called Rezulin, which allegedly caused serious side effects in the diabetics who used it. It is a class action brought by a named Maryland plaintiff against a number of defendants, including Giant Food, Inc., which sold Rezulin through its pharmacies. The case was removed by defendants (other than Giant) on the basis of diversity of citizenship, their argument being that Giant's Maryland citizenship should be disregarded under the doctrine of "fraudulent joinder." After reviewing the extensive briefs and applying appropriate Fourth Circuit and Maryland law (no oral hearing being necessary, Local Rule 105.6 (D. Md. 2001)), the Court is of the opinion that Giant was _not_ fraudulently joined and that the case should be remanded for lack of federal subject matter jurisdiction.

EXHIBIT

5

tabbies'

The first issue to be addressed is whether this Court, or a transferee court should this case be transferred under MDL rules, should decide the motion to remand.  Although the general rule favors decision of such matters by the transferee court, in this case there are valid reasons for the decision to be made by this Court, including the presence of unique questions of Maryland law, such as interpretation of the so-called "sealed container defense," discussed *post,* and the application of Fourth Circuit and District of Maryland precedent on the issue of fraudulent joinder.

Although the removing defendant cites to out-of-circuit precedent, it is black letter Fourth Circuit law that controls on the issue of fraudulent joinder, and under such law, in cases in which there is no collusion or outright fraud in the naming of the defendant (and none is alleged here), the "fraudulent joinder" doctrine should only be applied to the state court complaint's naming of a non-diverse defendant against whom there is "no possibility" that a judgment can be returned.  *See, e.g., Wright v. Lead Indus. Ass'n, Inc.,* 878 F. Supp. 47, 48 (D. Md. 1995)(citing *Marshall v. Manville Sales Corp.,* 6 F.3d 229, 232-33 (4th cir. 1993)).  This, of course, squares with the general rule that federal courts should strictly scrutinize jurisdictional questions in removal cases to prevent the dreadful waste that would follow in the wake of litigating, for example, a diversity case to judgment

2

in the trial court, only to have the judgment nullified on appeal because an appellate court was of the view that the non-diverse defendant was not fraudulently joined.   *See* 14A CHARLES ALLAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, Jurisdiction § 3721, at 341-52 (3d ed. 1998).

In this case, there is certainly a possibility that a judgment could be entered against Giant.  Giant clearly is a "seller" of Rezulin within the class of sellers who can make express or implied warranties with regard to goods under the Uniform Commercial Code. *See* MD. CODE ANN., COMM. LAW I [U.C.C.] § 2-314(1)(1997).  The defendants argue that the possibility of a judgment against Giant is foreclosed, *inter alia,* by the sealed container defense found in MD. CODE ANN., CTS. & JUD. PROC. § 5-405(1998).  The problem with that argument is that the sealed container defense is not an absolute defense, even in cases where it applies *prima facie.*  For example, where a defendant has been granted summary judgment under § 5-405(d)(1), the judgment may be vacated, and the action reinstated without regard to any running of limitations, if, for example, the out-of-state manufacturer becomes insolvent within the meaning of § 5-405(c)(2).  Thus, the Court could hardly ever say that a judgment is rendered *impossible* against an in-state defendant which has successfully used the Maryland sealed container defense, given the prospect of, for example, subsequent bankruptcy

3

of the item's manufacturer.  Additionally, the sealed container defense does not apply where the Maryland seller has made an express warranty, *see* U.C.C. § 2-313, the making of which by Giant is alleged in this case by way of the product information documents it enclosed with the filled Rezulin prescriptions.  *See* MD. CODE ANN., CTS. & JUDG. PROC. § 5-405(c)(6).  Plaintiff alleges that these documents stated that there were no common reported side effects noted with Rezulin, when in fact there were serious side effects, the existence of which was known to Giant.  This allegation adequately identifies an affirmation of fact relating to the goods.  The defendant argues that there is no showing that such statement became a "part of the basis of the bargain," because there was no bargaining over the contents of the insert, nor did Giant prepare the insert itself.  In order to form a part of the basis of the bargain, however, an affirmation of fact needs neither to have been specifically relied upon nor specifically bargained over, nor, so far as this Court can determine, to have been originated by the seller who iterates it, so long as it is transmitted by that seller to the buyer.  To hold otherwise, as some courts seem to have done in the Rezulin removal context, would be to ignore Official Comment 3 to U.C.C. section 2-313, which points out that "no particular reliance on [a seller's affirmations of fact] need be shown in order to weave them into the fabric of

the agreement.   Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof.  The issue normally is one of fact."  Thus, under the "no possibility" standard, this Court cannot say that a fact-finder could not possibly find the existence of an express warranty here.

The removing defendants strongly assert that the Court of Appeals of Maryland, in *People's Service Drug Stores, Inc. v. Somerville,* 161 Md. 662 (1932), laid down a rule barring imposition of liability on a pharmacy for filling a doctor's prescription as written, unless it has knowledge that the dose called for is lethal.  The broad construction argued for by defendants is simply not supported by any fair reading of the case.  The court merely held, in that case, that the pharmacist had no duty to second-guess a doctor's prescription where there was no evidence that the prescribed dose, though high, was lethal or that it proximately caused the harm complained of by plaintiff.  Its holding certainly does not establish a case law shield for all claims of pharmacist liability falling short of, for example, dispensing the wrong medicine or knowingly dispensing a lethal dose of the right medicine.  Furthermore, *People's Service* appears to have been a negligence case, and it obviously was decided long before the enactment of the Uniform Commercial Code, and at a time when all

product liability cases in Maryland were, essentially, negligence cases.

For the reasons stated, an Order will be entered separately, granting the plaintiff's Motion to Remand, and remanding these proceedings to the Circuit Court for Baltimore City, Maryland, for lack of federal subject matter jurisdiction. Costs of removal and remand will be borne by the removing defendants, although each side will bear its own attorney's fees.

_____
Frederic N. Smalkin
Chief U.S. District Judge

Dated: January 18th, 2002

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BARRY C. LEPLEY, SR., on            :
behalf of himself and all
others similarly situated           :

      V.                              :          CIVIL NO. S 01-3988

PFIZER CORPORATION;                 :
WARNER-LAMBERT COMPANY;
PARKE-DAVIS; and                    :
GIANT FOOD, INC.
                                    :

ORDER

    For the reasons stated in the foregoing Memorandum Opinion, it is, this 18th day of January, 2002, by the Court, ORDERED:

    1.  That the plaintiff's Motion to Remand BE, and it hereby IS, GRANTED for lack of federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332;

    2.  That this case BE, and it hereby IS, REMANDED to the Circuit Court for Baltimore City, Maryland, with costs of removal and remand to be borne by the removing defendants, but with each side to bear its own attorney's fees; and

    3.  That the Clerk of Court mail copies of this Order and of the foregoing Memorandum Opinion to counsel for the parties.

Frederic N. Smalkin
Chief U.S. District Judge