MDL 1358

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY – 9 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**MDL Docket No. 1358**

EDITH QUICK, et al.,

    Plaintiffs,

v.

SHELL OIL COMPANY, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

United States District Court,
Central District of Illinois, Urbana Division,
C.A. No. 2:05-2072
(Judge Michael P. McCuskey)

## PLAINTIFFS' MOTION TO VACATE

## CONDITIONAL TRANSFER ORDER

## OR IN THE ALTERNATIVE

## TO CONTINUE STAY

## PENDING A DECISION ON PLAINTIFFS'

## MOTION TO REMAND



OFFICIAL FILE COPY

IMAGED MAY 1 0 2005

## **Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   Shell's Notice of Removal Is Untimely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  Shell's Removal Notice Does Not Satisfy Any of the Elements of the Test for
     Removal Pursuant to the "Acting Under" Provision of § 1442(a) . . . . . . . . . . . . . . . . . . 7

     A.   Shell Was Not "Acting Under" a Federal Officer in 1988 . . . . . . . . . . . . . . . . . . 7

     B.   Shell Has No Colorable Federal Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     C.   Adjudication of Plaintiffs' Claims in State Court in No Way Threatens the
          Enforcement of Federal Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. Shell's Attempt to Use its "Preemption" Defense to Invoke 28 U.S.C. § 1441
     Ignores the Well-pled Complaint Rule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  The Panel Should Stay the Conditional Transfer Order Pending Disposition of
     Plaintiffs' Pending Motion for Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Table of Authorities**

<u>Cases</u>

<u>Abundiz v. Explorer Pipeline Co.</u>, 2002 WL 1592604 (N.D. Tex. 2002) . . . . . . . . . . . . . . . . . 17

<u>Allen v. Allen</u>, 291 F.Supp. 312 (S.D. Iowa 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Ammons v. Great Lakes Chemical Corp.</u>, 1986 WL 10743 (W.D. Wash. July 23, 1986) . . 12, 17

<u>Arizona v. Manypenny</u>, 451 U.S. 232 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

<u>Bakalis v. Crossland Savings Bank</u>, 781 F.Supp. 140 (E.D.N.Y. 1991) . . . . . . . . . . . . . . . . . 12

<u>Brown v. Philip Morris, Inc.</u>, 250 F.3d 789 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

<u>Cantrell v. Great Republic Insurance Company</u>, 873 F.2d 1249 (9th Cir. 1989) . . . . . . . . . . . . 6

<u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Colorado v. Maxwell</u>, 125 F.Supp. 18 (D. Colo. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Colorado v. Symes</u>, 286 U.S. 510 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>ExxonMobil Corp. v. EPA</u>, 217 F.3d 1246 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

<u>General Electric Co. v. Byrne</u>, 611 F.2d 670 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Goepel v. Nat'l. Postal Mail Handler's Union</u>, 36 F.3d 306 (3d. Cir. 1996) . . . . . . . . . . . . . . . 16

<u>Group Health, Inc., v. Blue Cross Assoc.</u>, 587 F.Supp. 887 (S.D.N.Y. 1984) . . . . . . . . 10-11, 13

<u>Guckin v. Nagle</u>, 259 F.Supp.2d 406 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Gurda Farms, Inc., v. Monroe County Legal Assistance Corp.</u>, 358 F.Supp. 841
(S.D.N.Y. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

<u>Gutierrez v. Mobil Oil Corp.</u>, 798 F. Supp. 1280 (W.D. Tex. 1982) . . . . . . . . . . . . . . . . . . . . . 17

<u>In re Agent Orange Product Liability Litigation</u>, 304 F.Supp.2d 442
(E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,
    175 F.Supp.2d 593 (S.D.N.Y. 2001) (In re MTBE I) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,
    342 F.Supp.2d 147 (S.D.N.Y. 2004) (In re MTBE II) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jamison v. Purdue Pharma Co., 251 F.Supp.2d 1315 (S.D. Miss. 2003) . . . . . . . . . . . . . . . . . 12

Jefferson County v. Acker, 527 U.S. 423 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

Jeffrey M. Goldberg & Associates v. Collins, Tuttle & Company, Inc., 739 F.Supp. 426
    (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Johnson v. Heublein, Inc., 227 F.3d 236 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Knudsen v. Samuels, 715 F.Supp. 1505 (D. Kan. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Kuenstler v. Occidental Life Insurance Co., 292 F.Supp. 532 (C.D. Cal. 1968) . . . . . . . . . . . . 13

Little v. Purdue Pharma L.P., 227 F.Supp.2d 838 (S.D. Ohio 2002) . . . . . . . . . . . . . . . . . . . . 12

Lloyd v. Cabell Huntington Hosp., Inc., 58 F.Supp.2d 694 (S.D. W.Va. 1999) . . . . . . . . . . . . 19

Lowe v. Norfolk and Western Railway Co., 529 F.Supp. 491 (S.D. Ill. 1982) . . . . . . . . . . . . . 12

Megill v. Worthington Pump, Inc., 1999 WL 191565 (D. Del. March 26, 1999) . . . . . . . . . . . 14

Mesa v. California, 489 U.S. 121 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15

Miles v. Starks, 440 F.Supp. 947 (N.D. Tex. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

New Jersey Dept. of Envt'l. Protection v. Gloucester Envt'l. Mgt. Services,
    719 F.Supp. 325 (D.N.J. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Northern Colorado Water District v. Board of County Commissioners,
    482 F.Supp. 1115 (D. Colo. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Overly v. Raybestos Manhattan, Inc., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996) . . . . . . . . . 14

Oxygenated Fuels Assoc. v. Davis, 163 F.Supp.2d 1182 (E.D. Cal. 2001) (Davis I),
    aff'd, 331 F.3d 665 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Oxygenated Fuels Assoc. v. Davis, 331 F.3d 665 (9th Cir. 2003) (Davis II) . . . . . . . . . . . . . . 10

Oxygenated Fuels Assoc., Inc., v. Pataki, 158 F.Supp.2d 248 (N.D.N.Y. 2001)
(Pataki I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

Oxygenated Fuels Assoc. [OFA] v. Pataki, 293 F.Supp.2d 170 (N.D.N.Y. 2003)
(Pataki II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Potty Pals, Inc. v. Carson Financial Group, Inc., 887 F.Supp. 208 (E.D. Ark. 1995) . . . . . . . . 4, 6

Railway Labor Executives Ass'n. v. Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936
(3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rains v. Criterion Systems, Inc., 80 F.3d 339 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 3-4, 16

Rosenthal v. Coates, 148 U.S. 142, 13 S.Ct. 576, 37 L.Ed. 399 (1893) . . . . . . . . . . . . . . . . . 6-7

Ryan v. Dow Chemical Co., 781 F.Supp. 934 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . 9, 16, 17

Samura v. Kaiser Foundation Health Plan, Inc., 715 F.Supp. 970 (N.D. Cal. 1989) . . . . . . . . . . 6

State of Oregon v. Cameron, 290 F.Supp. 36 (D. Or. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Teague v. Grand River Dam Authority, 279 F.Supp. 703 (N.D. Okla. 1968) . . . . . . . . . . . . . . 13

Tennessee v. Davis, 100 U.S. 257 (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Tramonte v. Chrysler Corp., 1999 WL 440456 (E.D. La. June 28, 1999) . . . . . . . . . . . . . . 18-19

Tremblay v. Philip Morris, Inc., 231 F.Supp.2d 411 (D.N.H. 2002) . . . . . . . . . . . . . . . . . . . . 7, 11

Willingham v. Morgan, 395 U.S. 402 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

Wilson v. Intercollegiate (Big Ten) Conference Athletic Association, 668 F.2d 962
(7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5-6

**Statutes**

28 U.S.C. § 1441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

28 U.S.C. § 1441(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1442(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 15

28 U.S.C. § 1442(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11, 12, 16

28 U.S.C. § 1446(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 6

28 U.S.C. § 1447(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

42 U.S.C. §§ 7401-7671q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 7604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 7607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Court Rules

Panel Rule 1.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Panel Rule 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Other Authorities

44 Fed. Reg. 12,242-12,243 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

53 Fed. Reg. 33,846 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

64 Fed. Reg. 29,575-29,576 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

Plaintiffs previously filed a Notice of Opposition to the proposed transfer of this case.

Pursuant to Rule 7 of the Panel's Rules, plaintiffs now move to vacate the conditional transfer

order entered on February 25, 2005.

The conditional transfer order should be vacated for three reasons:  (1) this case was

initially filed in 2001, and defendants' removal is untimely;  (2) the pipeline spill involved in this

litigation occurred in 1988, prior to the 1990 amendments to the Clean Air Act (CAA) that

ostensibly provide federal jurisdiction in this case; and (3) defendants do not, and cannot, rely in

this case upon the "bankruptcy" argument that the MDL court relied upon as an alternative basis

for federal jurisdiction.

In the alternative, plaintiffs move for an extension of the existing stay of the conditional

transfer order, to allow the transferor judge (Judge Michael P. McCuskey of the Central District

of Illinois) to rule on plaintiffs' pending motion to remand.  The briefing to Judge McCuskey has

been completed, and includes copies of the correspondence that defendant Shell initiated with

chambers of the transferee judge (Judge Shira Ann Scheindlin of the Southern District of New

York) without waiting for rulings from either Judge McCuskey or this Panel.

## INTRODUCTION

This case arises from a pipeline spill of gasoline containing methyl tertiary butyl ether

(MTBE) in Kankakee County, Illinois, in 1988.  See Shell's Notice of Related, Tag-Along

Action, Exhibit 1 (Notice of Removal, Ex. B (third amended complaint)).  The original

complaint was filed in 2001 (Notice of Removal, ¶ 1).  The 30 day period in which Shell could

have removed the case has long passed.  See 28 U.S.C. § 1447(c) (removal petitions must be

filed within 30 days of filing or service of complaint).

1

Shell has seized upon an amendment to the original complaint to allege that the time limits of 28 U.S.C. § 1447(c) should not apply. (Notice of Removal at 4). The amendment upon which Shell relies, however, does not allege any new "operative facts" or otherwise justify Shell's tardy removal. Compare Exhibit A, attached (Second Amended Complaint) with Removal Notice, Exhibit B (Third Amended Complaint). See Wilson v. Intercollegiate (Big Ten) Conference Athletic Association, 668 F.2d 962 (7th Cir. 1982) (hereafter Wilson) (amendment to add new causes of action based upon same operative facts did not excuse tardy removal, even though original case could have been removed).[1] See generally Part I, infra.

Shell's removal is also without substantive merit. Shell invokes two grounds for removal: (1) the amendment allows Shell for the first time to invoke 28 U.S.C. § 1442(a) (the "federal officer" removal statute); and (2) the amendment allows Shell for the first time to argue that plaintiffs' claims are "preempted" by the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, and therefore invoke 28 U.S.C. § 1441 (the "federal question" removal statute). There are several fundamental problems with Shell's arguments.

First, Shell completely fails to explain why it could not have removed on "federal officer" or "preemption" grounds within the 30 days provided by 28 U.S.C. § 1446(b). Plaintiffs' amended complaint alleges no new facts and adds no new parties, but simply adds a "strict liability" theory to the existing complaint. Adding a new theory of liability based on the same underlying facts does not alter the strict time limits for removal actions in 28 U.S.C. § 1446(b).

---

[1] It is no coincidence that Shell filed its removal immediately after the state court entered an order setting a hearing date for class certification. See Exhibit A to Removal Notice, Order at ¶ 4. Shell is simply engaging in eleventh-hour forum shopping to avoid an unfavorable state court ruling.

All of the "facts" and "law" upon which Shell bases its "federal officer" and "preemption"

arguments were present in both the first and second amended complaints in this case, and could

have been raised as a basis for removal long ago.

Second, Shell's "federal officer" argument is substantively wrong and internally

inconsistent. Unlike other cases involved in the MDL, the pipeline rupture that is the basis of the

complaint in this case occurred in 1988. See Complaint, Exh. B to Notice of Removal, at 2, ¶¶ 7-

9. The statutory and regulatory provisions Shell relies on were not adopted until 1990 and 1995,

years after the conduct complained of in the complaint. See Notice of Removal at 7 ("[Plaintiffs]

seek[] to hold [Shell] liable for conduct directed by the EPA – specifically the RFG

[Reformulated Gasoline] Program and inclusion of MTBE in gasoline to comply with the

requirements of the CAA. . . . the RFG requirements went into effect on January 1, 1995 and

remain in effect through the present.") (emphasis added). See also Notice of Removal at 9, ¶ 32

(The RFG program that "went into effect" in 1995 was required by the 1990 amendments to the

Clean Air Act). Since the provisions that allegedly made Shell a "federal officer" were not

adopted until after the 1988 pipeline rupture, Shell can hardly claim that it was acting as a federal

officer at the time of the rupture.[2] See Part II, infra.

Third, 28 U.S.C. § 1441 does not allow removal based upon a "preemption" defense. See

Rains v. Criterion Systems, Inc., 80 F.3d 339, 344 (9th Cir. 1996) ("The artful pleading doctrine

---

[2] Shell points to an allegation in the complaint that the pipeline continues to leak "gasoline." Notice of removal at 9. Neither that allegation nor any other allegation in the complaint however, alleges that Shell released MTBE from the pipeline subsequent to 1988, and Shell does not, and cannot argue, that Shell has "federal officer" status from manufacturing gasoline without MTBE. Although Shell's attorneys now claim that gasoline leaking from the pipeline after 1990 may have contained MTBE, the complaint contains no such allegation, and statements by Shell's attorneys cannot form a basis for federal jurisdiction.

does not permit defendants to achieve what they are trying to achieve here:  to rewrite a plaintiff's properly pleaded complaint in order to remove it to federal court.")  Shell's "preemption" argument in any event has no merit, and has been rejected in every published opinion to address the argument. <u>See</u> Part III, <u>infra</u>.

The Panel should vacate its conditional transfer order, and reject Shell's tardy and groundless attempt to have this state law case transferred into MDL 1358.  Alternatively, the Panel should extend the existing stay, pending a decision by Judge McCuskey on plaintiffs' remand motion.

## I.    **Shell's Notice of Removal Is Untimely.**

Parties seeking removal from state to federal court must file a notice of removal:  "within thirty days after the receipt by the defendant . . . of a copy of the initial pleading . . . If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant . . .of a copy of an amended pleading . . . from which it may first be ascertained that the case is one which is or has become removable . . . ."  28 U.S.C. § 1446(b). Shell's removal would be timely <u>only</u> if the Third Amended Complaint changed "the basic motive of the case" from what was pled in the Second Amended Complaint. <u>Potty Pals, Inc. v. Carson Financial Group, Inc.</u>, 887 F.Supp. 208, 209-10 (E.D. Ark. 1995).

Shell argues that removal is timely because the Third Amended Complaint adds a product liability claim based on MTBE, thereby invoking federal question jurisdiction.  The Second Amended Complaint, however, contained numerous allegations concerning MTBE that Shell could have used to raise the same removal arguments it (tardily) raises now.  See Exhibit A (Second Amended Complaint) ¶¶ 8, 10, 37, 41, 42, 43, 56, 66, 70, 90, 109, and 122.

4

The Seventh Circuit strictly enforces the time limits of 28 U.S.C. § 1446(b).  In Wilson, supra, plaintiff alleged in state court that defendant violated the United States and Illinois Constitutions.  668 F.2d at 964.  Defendants did not remove to federal court.  Seven months later plaintiff amended his complaint to add several additional counts, including federal civil rights statutes (42 U.S.C. §§ 1981, 1983, and 1985);  Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 et seq., dealing with sex discrimination);  the First Amendment to, and the full faith and credit clause of, the United States Constitution;  and the Illinois Antitrust Act.  Id. Defendants removed the case to federal district court based on these amendments. The Seventh Circuit (Judge Posner) found:

> The purpose of the 30-day limitation is twofold:  to deprive the defendant of the undeserved tactical advantage that he would have if he could wait and see how he was faring in state court before deciding whether to remove the case to another court system; and to prevent the delay and waste of resources involved in starting a case over in a second court after significant proceedings, extending over months or even years, may have taken place in the first court.  These considerations might be overborne in a case where a plaintiff, seeking to mislead the defendant about the true nature of his suit and thereby dissuade him from removing it, included in his initial complaint filed in state court an inconsequential but removable federal count unlikely to induce removal and then, after the time for removal had passed without action by the defendant, amended the complaint to add the true and weighty federal grounds that he had been holding back. [Citations.]

Id.  The Court held that plaintiff's amendments "did not change the original complaint so drastically that the purposes of the 30-day limitation would not be served by enforcing it." Id. at 966.  The amendments "merely added constitutional and statutory references purporting to further show that the treatment of which Wilson complained was unlawful." Id.

> In fact this case illustrates very nicely the purposes behind the 30-day limitation. Removal to federal court long after the original complaint had been filed and substantial proceedings – unfavorable to the defendants – had taken place in the state courts interrupted an active litigation, thus reducing judicial economy, and delivered a

5

substantial and unearned tactical advantage into the hands of the defendants. It is more likely that the defendants removed the case because they were doing badly in the state courts than because they felt that the amended complaint confronted them with a different case from the one they had been fighting in those courts. Nor, as we said before, is there any basis for supposing that the original complaint was designed to lull the defendants into waiving their right to remove by concealing from them the true nature and dimensions of the plaintiff's federal case.

Id. Numerous cases have followed Wilson's rationale and found that amendments that did not change the "basic motive" of the case could not excuse tardy removals.[3]

Plaintiffs' Third Amended Complaint here does not change the nature, parties, or facts of plaintiffs' case. The changes simply add a strict liability count to the complaint. This in no way represent a "virtually new, more complex, and substantial case." The Supreme Court long ago warned that removal acts "do not contemplate that a party may experiment on his case in the state court, and, upon an adverse decision, then transfer it to the federal court." Rosenthal v. Coates,

---

[3] See, e.g., Cantrell v. Great Republic Insurance Company, 873 F.2d 1249, 1255-56 (9th Cir. 1989) [defendant failed to remove a state court complaint alleged preempted by ERISA remove after amended complaint added a guardian as a plaintiff and added a defendant]; Potty Pals, Inc. v. Carson Financial Group, Inc., supra, 887 F.Supp. at 209-10 [action alleging breach of distribution agreement amended to seek an equitable remedy, injunctive relief; not removable because "basic nature" of case had not changed]; Jeffrey M. Goldberg & Associates v. Collins, Tuttle & Company, Inc., 739 F.Supp. 426, 430 (N.D. Ill. 1990) [amended complaint merely set forth theories consistent with the facts alleged in the preceding complaint]; Knudsen v. Samuels, 715 F.Supp. 1505, 1507 (D. Kan. 1989) [diversity complaint not removable after amendment alleged violation of Uniform Commercial Code: "[U]nder 28 U.S.C. § 1446(b), the question is not whether the initial pleading discloses the potential for removal but whether it discloses that the case is not removable"]; Samura v. Kaiser Foundation Health Plan, Inc., 715 F.Supp. 970, 972 (N.D. Cal. 1989) [complaint allegedly preempted by ERISA could not be removed after amended complaint added a new federal cause of action: "If a case is removable from the outset, it must be removed within the initial thirty-day period specified by § 1446(b); subsequent events do not make it 'more removable' or 'again removable.' [Citation]"]; Miles v. Starks, 440 F.Supp. 947, 948 (N.D. Tex. 1977) [diversity complaint charging breach of a contract to purchase cattle amended to add as a defendant the surety on the original defendant's bond]. See also Johnson v. Heublein, Inc., 227 F.3d 236, 242 (5th Cir. 2000) (removal proper where "the allegations contained in the [amended complaint] bear no resemblance whatsoever to the allegations of the [original complaint] . . . . Id. at 242.

148 U.S. 142, 147, 13 S.Ct. 576, 37 L.Ed. 399 (1893).

Shell's attempt, at this late date, to remove this case to federal court is not based upon any new "surprise" basis for federal jurisdiction. Rather, it is based upon the fact that Shell does not like how things are going in state court.

## II.   Shell's Removal Notice Does Not Satisfy Any of the Elements of the Test for Removal Pursuant to the "Acting Under" Provision of § 1442(a).

To invoke § 1442(a), Shell must:  (1) establish that it was acting under the direction of a federal officer <u>and</u> that its federally directed actions are causally connected to the harm about which the plaintiff complains;  (2) assert a colorable defense based on federal law in the notice of removal;  and (3) demonstrate that adjudication of the plaintiff's claims in state court sufficiently threaten the enforcement of federal policy to warrant removal.  <u>Tremblay v. Philip Morris, Inc.</u>, 231 F.Supp.2d 411, 417 (D.N.H. 2002).  Shell cannot satisfy any of these elements.

### A.   Shell Was Not "Acting Under" a Federal Officer In 1988.

Shell argues: "Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate because this action is one brought against [Shell] acting under the direction of a federal officer or agency at the time of the conduct of which Plaintiffs complain."  Notice of Removal at 3 (citing <u>In re Methyl Tertiary Butyl Ether Products Liability Litigation</u>, 342 F.Supp.2d 147 (S.D.N.Y. 2004) (<u>In re MTBE II</u>)).  The "time of the conduct of which Plaintiffs complain," however, is 1988.  As we explain below, even if Shell's "acting under" argument was correct (it isn't), Shell could not have been "acting under" any federal direction in 1988.  This fact alone distinguishes this case from <u>In re MTBE II</u>, the case Shell relies on for removal.  In addition, Shell does not (and cannot) invoke in this case the alternative "bankruptcy" basis for jurisdiction relied upon by

7

Judge Scheindlin in <u>In re MTBE II</u>.

Shell's "acting under" argument is that Congress required Shell to add MTBE to gasoline when Congress amended the CAA in 1990. <u>See</u> Notice of Removal at 7 ("[Plaintiffs] seek[] to hold [Shell] liable for conduct directed by the EPA – specifically the RFG [Reformulated Gasoline] Program and inclusion of MTBE in gasoline to comply with the requirements of the CAA. . . . the RFG requirements went into effect on <u>January 1, 1995</u> and remain in effect through the present.") (emphasis added). <u>See also</u> Notice of Removal at 9, ¶ 32 (The RFG program that "went into effect" in 1995 was required by the 1990 amendments to the Clean Air Act).

Even if the CAA amendments of 1990 required Shell to add MTBE to Shell's gasoline (they didn't) the amendments did not occur until two years <u>after</u> the pipeline rupture of which plaintiffs complain. Shell could not have been "acting under" the amendments at the time of the rupture, because the amendments were not even in existence.[4]

Even if the pipeline rupture had occurred after 1990, rather than in 1988, Shell's argument that the CAA oxygenate provisions allow Shell to invoke § 1442(a)(1) is wrong. Every published opinion considering the claim that the petroleum industry was "effectively" directed to

---

[4] Shell also cites the 1977 amendments to the Clean Air Act, and two EPA decisions granting requests from Arco (1979) and Sun Oil (1988) for permission to add MTBE to gasoline. Shell does not explain how those amendments, or the two cited decisions, could be a basis for finding that Shell was a "federal officer." <u>See</u> Removal Notice, ¶ 31 (citing 44 Fed. Reg. 12,242-12,243 (1979) (granting waiver request of Arco) and 53 Fed. Reg. 33,846 (1988) granting waiver request of Sun Oil). The cited decisions did not involve Shell, were responding to <u>requests</u> from other companies to add MTBE to gasoline, and in no way <u>directed</u> Shell (or anyone else) to add MTBE to gasoline. Shell asserts: "Plaintiffs ask the Circuit Court of Kankakee County, Illinois to construe a complicated web of federal statutes and implementing regulations that reflect the EPA's own balancing and conclusions." Removal Notice at 19. The actual complaint in this case, however, does not so much as mention any "federal statute," any "implementing regulations" or even the EPA, much less ask "the Circuit Court of Kankakee County to construe a complicated web" of federal law. The only "web" involved here is the one being spun by Shell.

8

sell MTBE gasoline has rejected the claim. EPA, the agency that purportedly "directed" the industry to sell MTBE gasoline, has expressly denied any such "direction." See 64 Fed. Reg. 29,575-29,576 (1999). Shell's actions in this very case refute the claim that the government "directed" Shell to put MTBE in gasoline, because Shell was selling MTBE gasoline long before the 1990 amendments to the CAA. See e.g., Ryan v. Dow Chemical Co., 781 F.Supp. 934, 950 (E.D.N.Y. 1992) (one factor in considering defendants' "acting under federal official or agency" claim was that defendants manufactured product before entering into government contracts).

Judge Scheindlin herself previously determined that the CAA does not preempt state tort law causes of action for damages caused by MTBE. See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 175 F.Supp.2d 593 (S.D.N.Y. 2001) (In re MTBE I). In reaching this conclusion, the Court found as a matter of law that: "The RFG program does not mandate the use of MTBE, nor was it 'intended to maintain the status quo or to protect certain fuel additives.'" 175 F.Supp.2d at 615 (emphasis added) (quoting Oxygenated Fuels Assoc., Inc., v. Pataki, 158 F.Supp.2d 248, 256 (N.D.N.Y. 2001) (Pataki I). The Court went on to find:

> [W]hile members of Congress may have anticipated that MTBE would be used to meet the oxygenate requirements . . . the legislative history of the 1990 CAA amendments indicates that Congress, through the RFG Program, sought to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations." [citation omitted.] Indeed, Congress expected that oxygenates would compete in the marketplace and 'preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA . . . .

175 F.Supp.2d at 612-13. Although Judge Scheindlin did not reach the question of whether, as a factual matter, "alternatives [to MTBE] are 'practicable' and have been available to defendants for their use in the RFG program" (175 F.Supp.2d at 616), this fact inquiry is not relevant to

whether defendants were "acting under" a federal officer or agency. In any event, subsequent to

the In re MTBE I court's 2001 opinion deferring any "practicability" determination, the court in

Oxygenated Fuels Assoc. [OFA] v. Pataki, 293 F.Supp.2d 170 (N.D.N.Y. 2003) (Pataki II) held a

six day bench trial and rejected industry "impracticability" claims.[5]

      "Acting under" defendants typically point to a contract or other document directing them

to engage in the conduct for which they were sued in state court. See, e.g., Gurda Farms, Inc., v.

Monroe County Legal Assistance Corp., 358 F.Supp. 841, 844-45 (S.D.N.Y. 1973) (Office of

Economic Opportunity grant imposed "voluminous" directives as to how defendant was to

operate on a "day to day basis."); In re Agent Orange Product Liability Litig., 304 F.Supp.2d

442, 445 (E.D.N.Y. 2004) ("facts supporting removal . . . set forth in extensive contractual and

other documents"). The federal agency giving the directions may even be named as a defendant

(see, e.g., New Jersey Dept. of Envt'l. Protection v. Gloucester Envt'l. Mgt. Services, 719

F.Supp. 325, 328 (D.N.J. 1989)) or seek to intervene to protect federal interests. See, e.g., Group

Health, Inc., v. Blue Cross Assoc., 587 F.Supp. 887 (S.D.N.Y. 1984) (Department of Health and

---

[5] In Pataki II, the Oxygenated Fuels Association (OFA) admitted that alternatives to
MTBE were available, and even affirmatively argued that "as a result of N.Y. MTBE Law,
refineries will supply RFG containing ethanol, the only viable oxygenate alternative to MTBE . .
." 293 F.Supp.2d at 176 (emphasis added). The Deputy Commissioner of the New York
Department of Environment and Conservation (DEC) testified that alternative methods of
emissions reductions were also available should other alternatives to MTBE fail to meet air
quality standards. 293 F.Supp.2d at 180. Finally, the Pataki II court found that "the testimony of
[OFA's] economist, Gordon Rausser, was speculative and . . . even accepting Rausser's
predictions, the Court finds that the predicted effects are not of sufficient magnitude to support a
finding that the economic impacts of N.Y. MTBE Law will interfere with the goals of the CAA."
293 F.Supp.2d at 182. The Pataki II findings at a minimum significantly undercut Shell's claim
that it was "in effect" forced to sell MTBE gasoline. See also Oxygenated Fuels Assoc. v. Davis,
331 F.3d 665, 673 (9th Cir. 2003) (Davis II) ("It is questionable whether a smoothly functioning
market should be considered a 'goal' of the Clean Air Act; the statutory test describing the
purposes of the Act mentions no such goal.").

Human Services sought to intervene as defendant when case was removed to federal court).

Shell points to no such contract. EPA has specifically disavowed that EPA "directed" or

"required" the petroleum industry to sell gasoline containing MTBE.[6]

Private sector manufacturers subject to federal regulations, but not acting pursuant to a

federal contract or direct federal instructions, are not acting "under the direction" of federal

officers within the meaning of § 1442(a)(1).  See Tremblay v. Philip Morris, supra:  ("The mere

fact that a . . . company has complied with the requirements of a federal law cannot suffice to

transform it into a federal actor . . . .") 231 F.Supp.2d at 417 (quoting Brown v. Philip Morris,

Inc., 250 F.3d 789, 801 (3d Cir. 2001)).  The profit motive, not EPA or the CAA, "directed"

Shell's actions in this case.[7]

In contrast to the In re MTBE II decision, other courts have rejected arguments that

---

[6] EPA stated, for example, in rejecting an industry argument that local regulations were
preempted by the RFG provisions of the CAA:

> There is no indication that Congress intended a limitation so potentially injurious
> to public health and so contrary to rational planning.  This interpretation is also
> inconsistent with the principle that a statute should not be read to preempt state
> authority unless it is clear that Congress intended such a result.

64 Fed. Reg. 29,575 (1999).  EPA also noted: "there is no indication that Congress intended to
bar the states from setting more stringent oxygenate requirements" – even if that meant banning
MTBE within the state.  64 Fed. Reg. 29,575 (1999).  In reaching these conclusions, EPA
exhaustively reviewed the legislative history of § 211, and confirmed that the only "direction"
given to defendants by the federal government was to use oxygenates in gasoline in some areas of
the country.  64 Fed. Reg. 29,575-29,576 (1999).  EPA's disavowal of any federal "requirement"
that the industry use MTBE was upheld by the Ninth Circuit.  See ExxonMobil Corp. v. EPA,
217 F.3d 1246 (9th Cir. 2000).

[7] If federal regulation made regulated corporations "federal officers" entitled to remove to
federal court, the federal government would be much bigger than anyone imagined, and federal
courts would be seeing a lot of removal actions.  No court has adopted such a sweeping
interpretation of § 1442(a).

11

federal regulations "requiring" defendants to engage in conduct for which they are sued in state

court can provide a basis for 28 U.S.C. § 1442(a) "acting under" jurisdiction. See Brown v.

Philip Morris Inc., supra, 250 F.3d 801 ("the mere fact that a . . . company has complied with the

requirements of federal law cannot suffice to transform it into a federal actor any more than

compliance with a myriad of private enterprises with federal law and administrative regulations

could of itself work such a transformation.").[8]

    Cases upholding removal under § 1442(a) uniformly involve attempts to raise official,

contractor, or sovereign immunity defenses by either (1) federal employees;[9] (2) federal

---

[8] See also, Bakalis v. Crossland Savings Bank, supra, 781 F.Supp. at 145 (regulation
requiring submission of report for which removing defendants were sued did not mean
defendants were "acting under" a federal agency); Little v. Purdue Pharma L.P., 227 F.Supp.2d
838 (S.D. Ohio 2002) (drug manufacturers' "acts must conform to federal regulations," but
manufacturers "are under no duty, or direction, to act"); Northern Colorado Water District v.
Board of County Commissioners, 482 F.Supp. 1115 (D. Colo. 1980) (requirements of Clean
Water Act did not mean local governments were "acting under" direction of federal officer);
Lowe v. Norfolk and Western Railway Co., 529 F.Supp. 491, 495 (S.D. Ill. 1982) ("The acts
undertaken were not pursuant to federal law, but were pursuant to a private contract, subject to
the overriding requirements of federal regulation."); Jamison v. Purdue Pharma Co., 251
F.Supp.2d 1315, 1326 (S.D. Miss. 2003) (defendants, while subject to federal regulation, "are
for-profit corporations that do not derive their primary income from federal funding. They are
not government contractors, delivering either a product or a service to the United States, or to
beneficiaries designated by the government."); Guckin v. Nagle, 259 F.Supp.2d 406, 416-17
(E.D. Pa. 2003) (private, for-profit corporation not "acting under" federal officer or agency,
despite the fact that its products were subject to "exceedingly complex regulations, guidelines
and evaluation schemes."); Ammons v. Great Lakes Chemical Corp., 1986 WL 10743 at *5
(W.D. Wash. July 23, 1986) ("Great Lakes also argues that this action [for damages caused by
pesticides] is removable under 28 U.S.C. § 1442(a)(1) . . . Great Lakes is not an agent of EPA
and does not act under EPA in the distribution of pesticides.").

[9] See Tennessee v. Davis, 100 U.S. 257 (1880) (removing defendant was deputy collector
for internal revenue); Colorado v. Symes, 286 U.S. 510 (1932) (internal revenue agent);
Willingham v. Morgan, 395 U.S. 402 (1969) (Warden and Chief Medical Officer at federal
prison); Arizona v. Manypenny, 451 U.S. 232 (1981) (employee of Immigration and
Naturalization Service); Mesa v. California, 489 U.S. 121 (1989) (postal employees); Jefferson
(continued...)

12

contractors;[10]  (3) individuals acting on express instructions from a federal officer;[11]  or (4)

individuals acting under some other form of direct and substantial ongoing control by a federal

officer.[12]  Shell does not fall into any of these accepted categories.[13]

    Even if Shell had been "acting under" the direction of a federal officer when its pipeline

---

[9] (...continued)

County v. Acker, 527 U.S. 423 (1999) (federal judges).  Every Supreme Court case discussing §
1442(a) has involved a federal employee.

[10] Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., supra, 358 F.Supp. at
844-45 (legal services corporation that received all of its funding from federal grants and was
subject to "voluminous O.E.O. directives under which it must operate on a day to day basis" was
"acting under" federal officer);  In re Agent Orange Product Liability Litig., supra, 304 F.Supp.2d
at 445 ("facts supporting removal . . . set forth in extensive contractual and other documents");
Group Health, Inc. v. Blue Cross Assoc., supra, 587 F.Supp. 887 (insurance company was acting
under contract as a "fiscal intermediary" for the federal government);  Kuenstler v. Occidental
Life Insurance Co., 292 F.Supp. 532 (C.D. Cal. 1968) (defendant acting under contract with
federal government to administer benefits at issue).

[11] Colorado v. Maxwell, 125 F.Supp. 18 (D. Colo. 1954) (civilian police officer acting on
specific instructions of United States Air Force Captain);  Teague v. Grand River Dam Authority,
279 F.Supp. 703, 704 (N.D. Okla. 1968) (defendant operating dam under individual license with
Army Corps of Engineers, which provided that licensee's operations "shall at all times be subject
to the control of the Secretary of War" and acted "only upon orders from an officer of the United
States.").

[12] State of Oregon v. Cameron, 290 F.Supp. 36, 37 (D. Or. 1968) (defendants serving in
VISTA were "paid by the United States," "recruited and trained" by the Office of Economic
Opportunity (OEO), and "responsible to the Director of the OEO.");  Allen v. Allen, 291 F.Supp.
312 (S.D. Iowa 1968) (garnishment action against state for funds owed by Medicare not only
subject to "acting under" provision, but actually a "suit against the United States.").

[13] Shell's arguments do not address the facts that (1) the petroleum industry, including
Shell "created" the market for MTBE by selling MTBE for a profit long before the oxygenate
provisions of the CAA were adopted; and (2) the industry did not oppose the oxygenate
provisions of the CAA, or the references to MTBE in the CAA that Shell now claims "directed"
defendants to put MTBE in gasoline, because the industry wanted to continue selling gasoline
with MTBE, and to do so without sacrificing the discretion to create new markets with additional
oxygenates should they decide to do so.

ruptured in 1988, there is simply no way that the regulatory requirements of the CAA are

"causally connected" to the plaintiffs' injuries (groundwater contamination) in this case.  The

absence of a causal connection between an asserted federal "direction" and the harm claimed by

plaintiffs is often revealed when a removing defendant is unable to assert an "immunity" defense.

See e.g., Mesa v. California, supra, 489 U.S. at 133 ("we decline to divorce the federal official

immunity defense from the pleadings required to allege it and transform those pleading

requirements into an independent basis for jurisdiction.").  Like the defendants remanded to state

court in Mesa, Shell has no basis for an "immunity" defense in this case, because there is no

causal connection between any federally directed activity and plaintiffs' injuries.

Courts closely examine claims of a causal connection between any federal "direction"

asserted by removing defendants and the injuries actually claimed by plaintiffs.  See e.g., Overly

v. Raybestos Manhattan, Inc., 1996 WL 532150 at *4 (N.D. Cal. Sept. 9, 1996) ("The

government in no way restricted Avondale's ability to notify individuals of the presence of

asbestos in the work environment.  Thus, there is no causal connection between the control

exercised by the United States over Avondale and the legal theory under which plaintiffs seek to

hold Avondale liable.");  Megill v. Worthington Pump, Inc., 1999 WL 191565 at *4 (D. Del.

March 26, 1999) ("Worthington has not established that the U.S. Navy prohibited it from

substituting materials or otherwise changing the specifications, so long as protocol was followed

. . . .  Under these circumstances, the court concludes that there is no causal connection between

plaintiffs' claims and the conduct performed under color of a federal officer;  thus, there is no

colorable federal defense.")

14

**B.** **Shell Has No Colorable Federal Defense.**

Shell also cannot satisfy the second element of the test for "acting under" removal, because it does not have a colorable federal defense.  The "preemption" defense that Shell seeks to raise is not a defense that Congress intended to be resolved exclusively by federal courts.  As explained in Part III, <u>infra</u>, even if a preemption defense <u>could</u> provide a basis for removal under 28 U.S.C. § 1441, the factual predicate for Shell's "preemption" defense has been rejected by every published opinion to have addressed the defense.

**C.** **Adjudication of Plaintiffs' Claims in State Court in No Way Threatens the Enforcement of Federal Policy.**

The third element Shell must establish in order to properly invoke 28 U.S.C. § 1442(a) "acting under" jurisdiction is to show that adjudication of plaintiffs' claims in state court would threaten the enforcement of federal policy.  Shell makes no attempt at such a showing.

Shell's "federal officer" argument also is contrary to Supreme Court opinions addressing § 1442(a).  Those opinions stress that § 1442(a) was intended to allow federal officers to remove to federal court in order to assert "immunity" defenses, not "preemption" defenses.  <u>See Arizona v. Manypenny</u>, <u>supra</u>, 451 U.S. at 242 (federal officer removal provisions are "limited to assuring that an impartial setting is provided in which the federal defense of immunity can be considered during prosecution under state law.");  <u>Mesa v. California</u>, <u>supra</u>, 489 U.S. at 133 (ordering remand where defendant federal employees "have not and could not present an official immunity defense to the state criminal prosecutions brought against them.");  <u>Willingham v. Morgan</u>, <u>supra</u>, 395 U.S. at 407 ("one of the most important reasons for removal is to have the validity of the defense of official immunity heard in a federal court.").

As we explain in more detail below, state courts routinely decide federal preemption issues, and federal courts uniformly reject "preemption" defenses as a basis for federal jurisdiction. See Ryan v. Dow Chemical Co., supra, 781 F.Supp. at 945 ("defendants asserting federal preemption defenses are ordinarily not entitled to removal").

**III.   Shell's Attempt to Use its "Preemption" Defense to Invoke 28 U.S.C. § 1441 Ignores the Well-pled Complaint Rule.**

28 U.S.C. § 1441(a) allows removal only when "a federal question is presented on the face of the plaintiff's properly plead complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987). Preemption defenses, although they involve federal law, do not provide a basis for removal. Id. at 393. Under the "well-pled complaint" rule, defendants may not invoke 28 U.S.C. § 1441 by arguing, as Shell argues with respect to preemption, that plaintiffs' complaint "in effect" raises a federal question. See Rains v. Criterion Systems, Inc., supra, 80 F.3d at 344 ("The artful pleading doctrine does not permit defendants to achieve what they are trying to achieve here:  to rewrite a plaintiff's properly pleaded complaint in order to remove it to federal court.").[14]

Preemption defenses are routinely decided in state court, and federal courts routinely hold

---

[14] The fact that Congress expected preemption defenses to be heard in state court is reinforced by the "complete preemption" exception to the "well-pled complaint" rule. That exception allows removal of preemption defenses under § 1441 only if the defendant is able meet two conditions. First, the state law claims must fall within the scope of the allegedly preemptive statute's civil enforcement provisions. Goepel v. Nat'l. Postal Mail Handler's Union, 36 F.3d 306, 311 (3d. Cir. 1996). Second, the allegedly preemptive statute must contain "a clear indication of a Congressional intention to permit removal despite the plaintiff's exclusive reliance on state law." Id. The CAA's "civil enforcement" provisions, 42 U.S.C. §§ 7604, 7607, have nothing to do with pipeline ruptures or groundwater contamination. Shell also should not be allowed to bootstrap itself around the second element necessary for "preemption" to form a basis for removal by using § 1442(a)(1) as a substitute for the "specific Congressional intention to permit removal" otherwise required by § 1441 as a precondition to removal.

16

that "preemption" defenses do not satisfy the "arising under federal law" requirement for removal

under 28 U.S.C. § 1441. <u>Ammons v. Great Lakes Chemical Corp.</u>, <u>supra</u>, 1986 WL 10743 at *5

("the conduct of EPA is relevant, if at all, only to a possible defense for Great Lakes. Therefore,

this action does not arise under federal law for jurisdictional purposes"); <u>Ryan</u>, <u>supra</u>, 781

F.Supp. at 945 ("defendants asserting federal preemption defenses are ordinarily not entitled to

removal."). <u>See also</u> <u>Railway Labor Executives Ass'n. v. Pittsburgh & Lake Erie R.R. Co.</u>, 858

F.2d 936, 942 (3d Cir. 1988) ("State courts are competent to determine whether state law has

been preempted by federal law and they must be permitted to perform that function in cases

brought before them, absent a Congressional intent to the contrary.").

Shell's "preemption" argument has in any event been rejected in every published opinion

to have considered the argument, including the court to which Shell ultimately wishes to steer

this case.[15]

---

[15] <u>See</u> <u>e.g.</u>, <u>Pataki I</u>, <u>supra</u>, 158 F.Supp.2d 248 (New York law banning sale and use of
MTBE not preempted by the CAA); <u>In re MTBE I</u>, <u>supra</u>, 175 F.Supp.2d at 616 ("the RFG
[Reformulated Gasoline] Program does not <u>deliberately</u> seek to employ various 'means-related'
objectives, such as maintaining a mix of oxygenates . . . in order to further its goal in reducing air
pollution" – rejecting preemption argument); <u>Abundiz v. Explorer Pipeline Co.</u>, 2002 WL
1592604 at *3-*5 (N.D. Tex. 2002) ("[T]his Court finds that <u>Geier</u> does not dictate preemption
in this matter and permitting this state lawsuit to proceed would not conflict with the
Congressional clean air objectives"); <u>Oxygenated Fuels Assoc. v. Davis</u>, 163 F.Supp.2d 1182,
1188 (E.D. Cal. 2001) (<u>Davis I</u>) ("OFA's argument that the MTBE ban conflicts with Congress's
goal of ensuring oxygenate neutrality finds little support in the present statutory scheme. . . . Its
'goal' is to assure a particular oxygen content"), <u>aff'd</u>, 331 F.3d 665 (9th Cir. 2003);
<u>ExxonMobil Corp. v. EPA</u>, <u>supra</u>, 217 F.3d at 1254-56 (rejecting preemption claim); <u>Gutierrez
v. Mobil Oil Corp.</u>, 798 F. Supp. 1280, 1284 (W.D. Tex. 1982) ("To hold that the Clean Air Act
preempts purely private state law causes of action for damages would preclude relief for any
person who can prove the elements of the common law claims. Such a result is clearly not
intended under, and would not further the goals of, the Clean Air Act.")

**IV.    The Panel Should Stay the Conditional Transfer Order Pending Disposition of Plaintiffs' Pending Motion for Remand.**

In the alternative to vacating the conditional transfer order, plaintiffs move for an extension of the existing stay of the conditional transfer order, to allow the transferor judge, Judge McCuskey of the Central District of Illinois, to rule on plaintiffs' pending motion to remand.  The briefing to Judge McCuskey has been completed, and includes copies of the correspondence that defendant Shell initiated with chambers of the MDL Judge (Judge Scheindlin) without waiting for rulings from either Judge McCuskey or this Panel.

The Manual for Complex Litigation (Fourth) explains why the pending motion to remand should be decided before the issue of transfer:

> During the pendency of a motion (or show cause order) for transfer . . . the court in which the action was filed retains jurisdiction over the case. [¶]  The transferor court should not automatically stay discovery;  . . . Nor should the court automatically postpone rulings on pending motions, or generally suspend further proceedings.  When notified of the filing of a motion for transfer, therefore, matters such as motions to dismiss or to remand, raising issues unique to the particular case, may be particularly appropriate for resolution before the Panel acts on the motion to transfer.  The Panel has sometimes delayed ruling on transfer to permit the court in which the case is pending to decide critical, fully briefed and argued motions.

Manual for Complex Litigation, Fourth, § 20.131 at 220-21 (2004) (footnotes omitted).

As described in the Manual, the Panel delayed ruling on transfer in <u>Tramonte v. Chrysler Corp.</u>, 1999 WL 440456 at *1 (E.D. La. June 28, 1999), requesting that the district judge rule on a pending remand motion before the Panel's hearing on the motion to transfer.  The transferor judge wrote: "This Court notes that the lead case in this matter has been pending for four years and has a rather tortured procedural history.  The Court feels that it is time for a final decision on such a threshold issue as whether or not federal jurisdiction exists, and apparently the Judicial

18

Panel recognizes this as well." Id. Here, plaintiffs' state court action has been pending for more than three years, so plaintiffs should receive a prompt determination on the threshold issue of whether federal jurisdiction exists.

District courts retain jurisdiction to rule on remand motions before the Panel issues a transfer order. See Panel Rule 1.5 ("The pendency of a . . . conditional transfer order . . . before the Panel concerning transfer or remand of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court."). In Lloyd v. Cabell Huntington Hosp., Inc., 58 F.Supp.2d 694 (S.D. W.Va. 1999), the transferor court ruled that it must first determine whether remand was proper before the Panel acted on a tag-along transfer request. Id. at 696-97 (citing 28 U.S.C. § 1447(c) ["If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."]). In General Electric Co. v. Byrne, 611 F.2d 670, 671 (7th Cir. 1979), five factually similar cases were removed from state court to federal district court. The Panel considered transferring these cases to a pending MDL as tag-along actions. The Panel entered conditional transfer orders in four of the five cases, and oppositions to transfer were filed. Id. at 671-72. The transferor judge then granted motions to remand all five cases to state court. Id. at 672. The Seventh Circuit dismissed petitions for writs of mandamus to prevent the transferor court (Judge Byrne) from remanding the actions:

> The mere pendency of a motion to transfer before the Multidistrict Panel does not affect or suspend the jurisdiction of the transferor court, or limit its ability to act on matters properly before it. [Citations.] Therefore, it appears that Judge Byrne had jurisdiction to act in these cases.

Id. at 673.

Here, Judge McCuskey has jurisdiction over the motion to remand, which is fully briefed and ready for decision.  Transfer before the remand motion is ruled upon will increase inefficiency and delay and impose an unnecessary burden on the parties, particularly the group of individuals comprising the plaintiffs.

### CONCLUSION

For the above reasons, plaintiffs respectfully request that the Panel vacate its conditional transfer order.  In the alternative, plaintiffs request that the Panel extend its stay of the conditional transfer order until Judge McCuskey reaches a decision on plaintiffs' pending remand motion.

Respectfully submitted,

Dated:  May 6, 2005

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By:  _Michael D. Axline_
MICHAEL AXLINE
Attorneys for Plaintiffs
Miller, Axline & Sawyer
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825
Telephone:  (916) 488-6688

20

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY - 9 2005

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Methyl Tertiary Butyl Ether ("MTBE")    **MDL Docket No. 1358**
Products Liability Litigation

| | |
|---|---|
| EDITH QUICK, et al., | ) United States District Court, |
| | ) Central District of Illinois, Urbana Division, |
| Plaintiffs, | ) C.A. No. 2:05-2072 |
| | ) (Judge Michael P. McCuskey) |
| v. | ) |
| | ) |
| SHELL OIL COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' SCHEDULE OF ACTION**

RECEIVED
CLERK'S OFFICE
2005 MAY -9 A 10: 37
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

1

Plaintiffs hereby submit the following Schedule of Action pursuant to Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.

A.      Plaintiffs are: Edith Quick; Lisa Kibbons and Carl Kibbons, Individually and as parents of Evan Kibbons, a minor; Edith Buckley and Gregory Buckley, individually and as parents of Ellen Buckley, a minor; Jeffery Quick; Lisa Quick; Charles Quick, Jr.; Cathy Quick; John Panozzo, guardian of Marguerite Panozzo, a disabled person; Christopher Burge; Angela Burge; Kenneth Clark; Lisa Kibbons; and John Panozzo.

B.      The district court and division in which this action is pending is the United States District Court, Central District of Illinois, Urbana Division.

C.      The civil action number is 2:05-2072

D.      The Judge assigned to this action is the Honorable Michael P. McCuskey.

Respectfully submitted,

Dated: May 6, 2005

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By: _Michael D Axline_

MICHAEL AXLINE
Attorneys for Plaintiffs
Miller, Axline & Sawyer
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825
Telephone:  (916) 488-6688

2

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY - 9 2005

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Methyl Tertiary Butyl Ether ("MTBE")          **MDL Docket No. 1358**
Products Liability Litigation

EDITH QUICK, et al.,                    ) United States District Court,
                                        ) Central District of Illinois, Urbana Division,
         Plaintiffs,                    ) C.A. No. 2:05-2072
                                        ) (Judge Michael P. McCuskey)
v.                                      )
                                        )
SHELL OIL COMPANY, et al.,              )
                                        )
         Defendants.                    )
_____   )

**PROOF OF SERVICE RE: PLAINTIFFS' MOTION TO VACATE**

**CONDITIONAL TRANSFER ORDER**

**OR IN THE ALTERNATIVE**

**TO CONTINUE STAY**

**PENDING A DECISION ON PLAINTIFFS'**

**MOTION TO REMAND**

1

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action. My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA 95825, which is located in the county in which this mailing occurred. I am familiar with my office's business practice for collection and processing of correspondence for mailing with the United States Postal Service, and under such practice the correspondence would be deposited with the United States Postal Service, postage pre-paid, the same day in the ordinary course of business.

On May 6, 2005, I served:

**PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER OR IN THE ALTERNATIVE TO CONTINUE STAY PENDING A DECISION ON PLAINTIFFS' MOTION TO REMAND**

**PLAINTIFFS' EXHIBITS RE: PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER OR IN THE ALTERNATIVE TO CONTINUE STAY PENDING A DECISION ON PLAINTIFFS' MOTION TO REMAND**

**PLAINTIFFS' SCHEDULE OF ACTION**

on the following persons or parties by placing a true copy thereof in a sealed envelope, showing the addresses set forth below, for collection and deposit in the United States Postal Service on that date following ordinary business practices:

Lawrence P. Riff
STEPTOE & JOHNSON, LLP
633 West 5th Street, Suite 700
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

IN ADDITION TO THE ATTACHED LIST

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on May 6, 2005, at Sacramento, California.

CHRISTINA HISE

# PANEL SERVICE LIST (CTO-13)
## DOCKET NO. 1358
## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*Edith Quick, et al. v. Shell Oil Co., et al.,* C.D. Illinois, C.A. No. 2:05-2072

Michael D. Axline
Miller, Axline & Sawyer
1050 Fulton Avenue
Suite 100
Sacramento, CA 95825-4272

Stanley N. Alpert
Weitz & Luxenberg
180 Maiden Lane
17th Floor
New York, NY 10038

Christopher Bohlen
Barmann, Bohlen & Woodruff, PC
200 E. Court Street
Suite 602
Kankakee, IL 60901

John B. Cashion
Three First National Plaza
70 West Madison Street
Suite 2100
Chicago, IL 60602

John E. Galvin
Fox Galvin, LLC
One Memorial Drive
Eighth Floor
St. Louis, MO 63102

Anthony F. King
Wallace, King, Domike & Branson, LLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockerfeller Plaza
New York, NY 10020

Joseph R. Yurgine
Law Office Of Joseph R. Yurgine
One Dearborn Square
Suite 500
Kankakee, IL 60901

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY – 9 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Methyl Tertiary Butyl Ether ("MTBE")          MDL Docket No. 1358
Products Liability Litigation

| | | |
|---|---|---|
| EDITH QUICK, et al., | ) | United States District Court, |
| | ) | Central District of Illinois, Urbana Division, |
| Plaintiffs, | ) | C.A. No. 2:05-2072 |
| | ) | (Judge Michael P. McCuskey) |
| v. | ) | |
| | ) | |
| SHELL OIL COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' EXHIBITS RE: MOTION TO VACATE

## CONDITIONAL TRANSFER ORDER

## OR IN THE ALTERNATIVE

## TO CONTINUE STAY

## PENDING A DECISION ON PLAINTIFFS'

## MOTION TO REMAND

1

**EXHIBIT A**

IN THE CIRCUIT COURT OF KANKAKEE COUNTY, ILLINOIS

21ST JUDICIAL CIRCUIT

| | | |
|---|---|---|
| EDITH QUICK; LISA KIBBONS and CARL KIBBONS, Individually and as parents of EVAN KIBBONS, a Minor; EDITH BUCKLEY and GREGORY BUCKLEY, Individually and as parents of ELLEN BUCKLEY, a Minor; JEFFERY QUICK and LISA QUICK; CHARLES QUICK, Jr. and CATHY QUICK; JOHN PANOZZO, guardian of MARGUERITE PANOZZO, a disabled person; CHRISTOPHER BURGE and ANGELA BURGE; KENNETH CLARK, and LISA KIBBONS and JOHN PANOZZO, as purported representatives of a class, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | NO. |
| SHELL OIL COMPANY, a foreign corporation; SHELL PIPE LINE CORPORATION, a foreign corporation; EQUILON PIPE LINE COMPANY, LLC., a foreign limited liability company; PARSONS ENGINEERING SCIENCE, INC., an Illinois corporation; RICHARD M. FRENDT; and SASA JAZIC; | ) ) ) ) ) ) ) ) ) ) ) | PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS |
| Defendants. | ) | |

## SECONDED AMENDED
## COMPLAINT AT LAW

## ALLEGATIONS COMMON TO ALL PLAINTIFFS

1. All plaintiffs are or were residents and/or owners of real estate in Limestone

1

**EXHIBIT A**

Township, Kankakee County, Illinois, as is stated in more detail hereinafter.

2.   The Defendant,   SHELL PIPE LINE CORPORATION, a Maryland corporation ("SHELL PIPE LINE") is or until some time after the year 1999 was a wholly owned subsidiary of the Defendant, SHELL OIL COMPANY, a Delaware corporation   ("SHELL OIL"),   and SHELL PIPE LINE operated, managed, maintained, and controlled an underground PIPE LINE, *"the Pipeline"*,  which transported certain petroleum products including gasoline from the State of Texas to the vicinity of Chicago, Illinois.

3.   SHELL OIL   directed or controlled the policies and management of SHELL PIPE LINE including but not limited to the sale of  the assets of SHELL PIPE LINE  to EQUILON PIPE LINE  COMPANY LLC. ("EQUILON") at some time after the year 1999.

4.   On November 9, 1988,  an announcement was made of an estimated  release of 16,000 gallons of SU2000 gasoline from the PIPE LINE, hereinafter referred to as the "release"  or "spill."

5.   At the time of the aforesaid announcement there was no method by which SHELL OIL  and/or SHELL PIPE LINE could accurately calculate in a scientific manner the precise quantity of the gasoline released in the 1988 PIPE LINE spill.

6.   The release from the PIPE LINE occurred in a rural agricultural area in Limestone Township, west of the City of Kankakee,  in Kankakee County, Illinois.

7.   Certain types of gasoline transported by or for SHELL OIL in the PIPE LINE contain methyl tertiary-butyl ether (hereinafter "MTBE"), and other chemicals such as benzene, ethyl-benzene, toluene and xylene.

8.   The SU2000 gasoline manufactured by SHELL contains methyl tertiary butyl ether

(hereinafter "MTBE"),  and forms of the chemicals benzene, ethyl benzene, toluene and xylene (hereinafter "BETX" or "BETX COMPOUNDS").

9.  Toluene, xylene  and benzene are listed as a "toxic substance" by certain agencies of the United States of America.

10.  Benzene, toluene, MTBE, BETX and xylene can enter the human body in one or more or all of the following ways: (a) through inhalations of vapors from these chemicals; (b) absorbed by contact of these chemicals with skin surfaces, such as using contaminated water for showering or baths or by swimming in a pool or an open body of water containing the chemicals; and (c) through consumption in liquid, including drinking water alone or mixed with baby formula, frozen orange juice, alcoholic liquors and other items, and including foods such as vegetables cooked in contaminated water.

11.  For  purposes of this complaint, the term "consumption" of water shall include any of the aforesaid ways such chemicals can enter the human body.

12.  Benzene and toluene have been reported in medical articles to be a cause of cancer in animals and are suspected to cause cancer  in humans when brought into contact by consumption by humans.

13.  Benzene and toluene have been reported in medical articles to be toxic to the liver and also cause central nervous system malfunction and  also cause cardiac irregularities in humans through consumption.

14.  Benzene and toluene have been reported in medical articles to be teratogenic and mutagenic chemicals in humans through consumption.

15. The term "teratogenic" means that the toxic effect of a chemical can be passed from a pregnant mother to her fetus in utero or by a lactating mother to her child through feeding her baby with breast milk; the term "mutagenic" means that the chemicals have the capability of causing abnormal physiological effects to a fetus.

16. On information and belief Plaintiff avers that in addition to the quantities of refined gasoline which escaped during the original spill in 1988, the persistence of the local presence of gasoline during the 1990's in surface water and groundwater in the general vicinity of the location of the original 1988 PIPLE LINE spill indicates that a subsurface PIPE LINE spill at another location different from the original point of release probably has occurred or, alternatively, that leakage from the original PIPE LINE spill location was never permanently sealed off.

17. Illinois Environmental Protection Act (the "Act"), 415 ILCS Section 5/1 through 5/7.5 was enacted to protect the public, including the plaintiffs herein from the hazards or conditions described in the Act.

18. Section 3.33 of the Act, 415 ILCS 5/3.33 (1996), defines release as follows:

> "RELEASE" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment.

19. The nearest public water supply wells, serving the Oakdale Acres and Village Green subdivisions, are located approximately 3/4 of a mile to the northwest of the estimated release point of the 1988 PIPE LINE spill.

20. After the 1988 PIPE LINE spill several monitoring wells were installed on behalf of SHELL and SHELL PIPE LINE located approximately one (1) mile northwest and southeast of the estimated release point of the 1988 PIPE LINE spill.

4

21.    The groundwater flow data obtained from the monitoring wells shows that the groundwater flows from the release point in a  general northerly direction toward the Kankakee River.

22.    The flow of subsurface  groundwater is subject to the complex and fractured geophysical nature of the underground terrain within a radius of  3 miles of the estimated release point of the 1988 PIPE LINE  spill, and at different times can flow in different directions.

23.    The direction and rate of the groundwater flow and the precise geographical limits of the subsurface flow and presence of gasoline  within the aforesaid 3-mile radius has never been precisely determined by SHELL and SHELL PIPE LINE.

24.    A sampling program conducted  on behalf of SHELL and SHELL OIL from March 1989 to March of 1996 confirmed the presence of BETX, a component in the SU2000 gasoline, and gasoline product in several monitoring wells, located approximately within one (1) mile, primarily northwest and southeast of the estimated release point of the 1988 PIPE LINE spill.

25.    A sampling program conducted on behalf of SHELL and SHELL OIL in August 1993 confirmed the presence of benzene, a component in the SU2000 gasoline, in several monitoring wells, located approximately within one (1) mile, primarily northwest and southeast of the release point.

26.    Section 3.65 of the Act, 415 ILCS 5/3.65 (1996), defines potable water as follows:

"POTABLE" means generally fit for human consumption in accordance with accepted water supply principles and practices.

27.    The public and private water supply wells used by residents within the aforesaid 3-mile radius  constitute "potable water" as that term is defined in Section 3.65 of the Act,. 415

5

ILCS 5/3.65 (1996). These wells shall be collectively hereinafter referred to as the "potable water supply wells" or "the potable water supply".

28.     A sampling program conducted on behalf of SHELL and SHELL OIL from March 1996 to May 1996, confirmed the presence of MTBE, in CIWC  public water supply wells, serving the Oakdale Acres and Village Green  subdivisions, located approximately 3/4 of a mile to the northwest of the estimated release point of the 1988 PIPE LINE spill.

29.     In August of 2001, a surface scum of gasoline was observed in a large pond in the Oakdale Acres subdivision used  by children that summer for swimming,  which indicates that either surface water or groundwater contamination has invaded ponds within the 3-mile radius area.

30.     Aside from subsurface groundwater,  the flow of gasoline contaminants in surface water enters and travels drainage ditches in the aforesaid 3-mile radius area, some of which ditches empty directly into the Kankakee River.

31.     Section 3.64 of the Act, 415 ILCS 5/3 (1996), defines groundwater as follows:

> "GROUNDWATER" means underground water which occurs within the saturated zone and geologic materials where the fluid pressure in the pore space is equal to or greater than atmospheric pressure.

32.     The monitoring wells and the public and private  water supply wells within the aforesaid 3-mile radius contain "groundwater" as that term is defined in Section 3.64 of Act,' 415 ILCS 5/3.64 (1996).

33.     Section 12(a) of the Act, 415 ILCS 5/12(a) (1996), provides as follows:

> No person shall:

a.   Cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act;

34.   Section 3.26 of the Act, 415 ILCS 5/3.26 (1996) provides the following definition:

"PERSON" is any individual , partnership, co-partnership, firm, company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agency or assigns.

35.   SHELL  and SHELL PIPE LINE  are persons as that term is defined by Section 3.26 of the Act, 415 ILCS 5/3.26 (1996).

36.   Section 3.06 of the Act, 415 ILCS 5/3.06 (1996), defines contaminant as follows:

"CONTAMINANT" is any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source.

37.   The MTBE, BETX compounds, benzene, and the gasoline product released into the ground, the potable water supply well and groundwater within the aforesaid 3-mile radius are contaminants as that term is defined in Section 3.06 of the Act.

38.   Section 3.55 of the Act, 415 IL'CS 5/3.55 ('1996), defines water pollution as follows:

"WATER POLLUTION" is such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life.

39.    Section 3.56 of the Act, 415 ILCS 5/3.56 (1996), defines waters as follows:

"WATERS" means all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State.

40.    Surface waters and Subsurface groundwater within a radius of 3 miles from the estimated 1988 release point from the PIPE LINE including all groundwater supplying public and private water wells within such radius constitute "waters" of the State as that term is defined in Section 3.56 of the Act.

41.    The presence of MTBE, BETX compounds, including benzene, toluene, and xylem in the potable water supply within the aforesaid radius area are contaminants of the potable water supply in said area and also constitutes an alteration of the physical, thermal, chemical, or biological properties of the water of the State of Illinois.

42.    During the year 2001, through testing,  the chemicals toluene or  benzene or MTBE were discovered in the blood and urine of residents within the aforesaid 3-mile radius area .

43.    Discovery of the chemicals toluene or benzene or MTBE in the blood and urine of residents within the aforesaid 3-mile radius are an indication that the levels of the aforesaid chemical contaminants in the groundwater likely render such waters harmful or detrimental or injurious to public health, safety or welfare, thereby constituting "water pollution" as defined in section 3.55 of the Act.

44.    The 1988 PIPE LINE spill by SHELL and SHELL PIPE LINE caused or tended to cause water pollution in that said contaminants migrated and continue to migrate into the potable water supply and groundwater within the aforesaid radius area.

45.     On information and belief, plaintiff avers that in addition to the contamination from the 1988 PIPE LINE spill, a PIPE LINE release at another location, or else leakage from the original PIPE LINE release location which was never permanently sealed off, has caused water pollution in that said contaminants migrated and continue to migrate into the potable water supply and subsurface groundwater and surface drainage ditch waters within the aforesaid radius area, and such contamination was present within the last two (2) year period.

46.     Plaintiff also avers on information and belief that women residing in the aforesaid 3-mile radius and using private well water area who are trying to get pregnant have had more difficulty in doing so than women residents of other nearby areas supplied by City of Kankakee water.

47.     From at least November 9, 1988, and continuing until filing of this Complaint, SHELL OIL has maintained and controlled a continuing source of contamination into the waters of the State of Illinois and the gasoline and other products that have been released have come into and penetrated in, under and upon the lands owned or occupied by the plaintiffs including their wells used for drinking water purposes.

48.     SHELL OIL  and SHELL PIPE LINE  erected or controlled the erection of a green barnlike structure  in Limestone Township on a farm property owned by Martha Danhausen and inside that barnlike structure  are equipment and machinery which include a "stripper" machine through which contaminated water is run in order to eliminate and treat gasoline contained or dissolved in recovered groundwater.

49.     SHELL OIL and SHELL PIPE LINE have  maintained and controlled operations which have also sunk  40 to 50 wells on the Danhausen property.

50.     The aforesaid green barnlike structure  is about 1700 feet in a   straight west/southwesterly line from plaintiff, EDITH  QUICK'S  home.

51.     When the same quantity of gasoline-contaminated water is run through the "stripper" as many as six (6) times, the resulting "cleansed" water, which is returned to the soil, still shows traces of the contaminants.

52.     In the area of the Danhausen farm, which is where the original 1988 release occurred, the subsurface limestone extends at points to within about four (4) feet of the surface.

53.     The PIPE LINE where it runs through the Danhausen farm is buried so that its topmost point lies about three feet underground.

54.     The groundwater level under the Danhausen farm is high,  and when the groundwater level approaches the surface large quantities of raw gasoline, easily identified because of its reddish-orange color, have been observed to gush directly out of the ground over the last 6 year period.

55.     The position of SHELL OIL and SHELL PIPE LINE  is that their remediation after the 1988 PIPE LINE  was effective, as stated in a May 26, 1994 letter by Gene Sherwin on behalf of SHELL PIPE LINE  stated: ".... of the 16,000 gallons of gasoline that were released in 1988, almost all has been removed, either through the initial actions, or by the ongoing site remediation activity. Cleanup is 95 percent complete. We anticipate remedial action to continue for another year or so."

56.     The same May 26, 1994 letter states that  410 wells had been tested, , and ".... our information indicates that there should be no health issues related to the presence of MTBE in the concentrations found in the Limestone Township water wells. For that reason,  Shell will not fund the long-term health study brought up during the discussion."

57.     Defendant, PARSONS ENGINEERING SCIENCE, INC., ("PARSONS")  is a California corporation and has its Illinois headquarters in the Village of  Westmont, DuPage County, Illinois and during the period 1994 to the present time PARSONS in the Westmont office employed the Defendant RICHARD M.  FRENDT  ("FRENDT") as its Project Manager

and the Defendant  SASA  JAZIC ("JAZIC") as a person who took water samples from various private supply water wells within the aforesaid  3-mile radius area  for purposes of a project involving analyzing the water samples and reporting the results to residents in the area whose water wells were sampled.


### COUNT I – EDITH QUICK: COMMON LAW  TRESPASS/<br>SHELL DEFENDANTS AND EQUILON PIPE LINE


Plaintiff,  EDITH QUICK,  complaining against  Defendants    SHELL OIL and SHELL PIPE LINE  and  EQUILON PIPE  LINE   states:


    58.     Plaintiff EDITH QUICK repeats and realleges paragraphs 1 through  57 herein.


    59.     The Plaintiff , EDITH QUICK  ("EDITH")  is presently 70 years of age and lives at the common address of 913 A North 4000 West Road,  in Limestone  Township, Kankakee County, Illinois.


    60.     The property EDITH resides on and has continuously resided on a farmstead she and her deceased husband bought in 1960 and she has lived there ever since on what is now about 68 acres of her own land, after she sold off parcels of the original property to some of her children who now reside on the nearby sold-off parcels.


    61.     From 1960 until September of 2001 EDITH  got her drinking water and general household use water from a well on her own property.


    62.     EDITH lives right across the road from  a farm where Martha Danhausen resides.


    63.     EDITH lives in a rural area where water lines from the City of Kankakee extend

to some structures but not to others and so EDITH and other homeowners within a radius of 3 miles of the estimated release point of the 1988 PIPE LINE spill depend for their potable water supply from their own wells.

64.    EDITH's daughter LISA KIBBONS and her husband CARL KIBBONS and their family, EDITH's daughter EDITH BUCKLEY and her husband GREGORY BUCKLEY and their family, and EDITH'S son JEFFREY QUICK and his wife LISA QUICK live on the same road known as the "Townhall Road 4000 West", and all of them reside within about 1600 feet of each other in a north/south direction along the east side of the road.

65.    At periodic intervals during the period 1994 through March of 2001 persons representing PARSONS, came to EDITH's home and took samples out of an exterior water faucet located near her house.

66.    The water sampling by PARSONS during the aforesaid period 1994 to the present time took place at various times on a twice-a-month basis, or monthly, or every second or every third month.

67.    During the aforesaid period PARSONS took samples from EDITH's well and sent EDITH periodic reports stating that the laboratory test reports on the water on her property all of which written reports stated that the testing result was "ND", meaning "not detected above the laboratory detection limit. All concentrations are given in parts per billion" for MTBE, benzene, toluene, ethyl-benzene and xylene.

68.    Plaintiff avers on information and belief that with some few exceptions, all written reports of water testing by PARSONS of wells with the 3-mile radius area were reported as "ND" to residents within the area.

69.    In March of 2000 EDITH's skin color suddenly turned "high-lighter yellow" and she went to Alfred L. Baker, MD. at the University of Chicago Hospitals in Chicago who examined her and put her through some liver function tests and sent her a written report dated

March 28, 2000 stating that she had chronic hepatitis with the report making no mention of the possibility of her body having been subjected to the effects of any type of chemical.

70.     In June of 2001 LISA KIBBONS drew a water sample from the wells on the property of EDITH and of LISA KIBBONS and of EDITH BUCKLEY and of JEFFREY QUICK and sent it to a laboratory to be tested for MTBE and the laboratory report came back positive for MTBE from each of the four wells.

71.     In August of 2001 the Kankakee County Health Department took samples of well waters at 10 locations, including the homes of EDITH and other nearby homes and EDITH was told that the results for her well were positive for the presence of benzene.

72.     EDITH's son CHARLES QUICK, JR. has a home about 2 miles in a straight west/northwesterly line from the aforesaid green barnlike structure and CHARLES' well water was sampled and tested in August of 2001 by the Kankakee County Health Department and was reported positive for the presence of benzene.

73.     In September of 2001 EDITH had some blood and urine tests performed and was told by a physician at St. Mary's/Provena Hospital in Kankakee that her blood and urine tested positive for the likely presence of toluene.

74.     September of 2001 was the first time that EDITH had anybody tell her or that she became possessed of sufficient information or understanding on her own part that she was likely affected by the chemicals in her well's drinking water that came into her water at any time from any gasoline discharges from the PIPE LINE.

75.     Starting in September of 2001 EDITH quit drinking the water from the well on her property.

76.     The water EDITH consumed from her well at various times from 1988 to September of 2001 was a likely cause of the presence of toluene in her blood and urine in

13

September 2001 and  is also a likely cause of the liver disease she has.

77.     The contamination of EDITH's well water  was likely caused by the 1988 PIPE LINE spill and/or an additional  spills or discharges from the PIPE LINE since 1988.

78.     The hydrology of the underground areas of  Limestone Township permit the movement of groundwater containing gasoline into different areas and different compass directions at different times, so that any contamination of  private wells by groundwater was likely to be cyclical and periodic.

79.     The gasoline-contaminated groundwater described herein resulted in a subsurface physical invasion of the real property on which plaintiff  resided and in the interference with the use of the property both past, present and prospective, which constitutes a common law trespass to the exclusive right to the use of the real property by plaintiff.

80.     The gasoline contaminated groundwater has returned on a cyclical basis and continues to   do so with the result that the common law trespass is a continuing wrong affecting the interest of  plaintiff.

81.     The aforesaid common law trespass was a proximate cause of damage to the Plaintiff, EDITH QUICK.

82.     The nature of the injury or damage which the plaintiff has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)     The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical  pain and mental anguish as a result of her own injuries;

(b)     Disfigurement  resulting from the injury;

(c)     The reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)     The disability experienced and reasonably certain to be experienced in the future;

(e)     The emotional distress experienced and reasonably certain to be experienced in the future as the result of Plaintiff's knowledge of the actual and potential condition of (1) the physical health of her children with reference to their exposure to benzene and toluene and (2) the physical health of her grandchildren through teratogenic means.

(f)     The emotional distress experienced and reasonably certain to be experienced in the future as the result of the exposure of her own physical health to the risk of cancer.

(g)     The diminution in market value of her real estate by reason of its groundwater contamination.

(h)     Physical discomfort and deprivation of the use and comfort of her home and property.

Wherefore, Plaintiff, EDITH QUICK, demands judgment from the Defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC. jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages and demands trial by jury.

## COUNT II - EDITH QUICK: PRIVATE NUISANCE/ SHELL DEFENDANTS AND EQUILON PIPE LINE

Plaintiff, EDITH QUICK, complaining against Defendants SHELL OIL, SHELL PIPE LINE and EQUILON PIPE LINE states:

83.     Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1 through 78.

84.     The contamination of groundwater  as alleged in this Complaint constituted a common law private nuisance, in that it constituted a substantial invasion of the use and enjoyment of the real property owned by the plaintiff and upon which plaintiff and his or her family members resided.

85.     The continuation of said nuisance persists over  a  long period of  years without SHELL OIL  and SHELL PIPE LINE  and/or EQUILON  stopping the continued discharge of its gasoline and preventing further releases  into subsurface groundwater, and continues to persist.

86.     The nuisance as alleged was a proximate cause of injury or damage to  Plaintiff.

87.     The nature of the injury or damage which the plaintiff has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)     The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical  pain and mental anguish as a result of her own injuries;

(b)     Disfigurement  resulting from the injury;

(c)     The reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)     The disability experienced and reasonably certain to be experienced in the future;

(e)     The emotional  distress experienced and reasonably certain to be experienced in the future as the result of  Plaintiff's knowledge of the actual and potential condition of  (1) the physical health of her children with reference to their exposure to benzene and toluene  and (2) the physical health of her grandchildren through teratogenic means.

16

(f)    The emotional  distress experienced and reasonably certain to be experienced in the future as the result of  the exposure of her own physical health to the risk of cancer.

(g)    The  diminution in market value of her real estate by reason of its groundwater contamination.

(h)    Physical discomfort and deprivation of the use and comfort of her home and property.

WHEREFORE,  Plaintiff,  EDITH QUICK, demands judgment from the Defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY plus costs and demands trial by jury

### COUNT III- EDITH QUICK/NEGLIGENCE/
### SHELL DEFENDANTS AND EQUILON PIPE LINE

Plaintiff, EDITH QUICK,  complaining against Defendants   SHELL OIL and SHELL PIPE LINE  and  EQUILON PIPE LINE  states:

88.    Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1 through 78.

89.    The defendants had a duty to the plaintiff to use ordinary care for the safety of adjacent landowners including the plaintiff, in the operation of their pipeline.  They owed a duty to maintain their pipeline in a reasonably safe condition by periodic inspection  of the pipeline for potential leaks, periodic replacement of or relining of all sections of the pipeline, redigging and placement of the pipeline below worst-case front line levels in Limestone Township, and use of all reasonable means to prevent a break in the integrity of the pipe line.

90.    Notwithstanding their duties, the defendants, SHELL OIL and SHELL PIPELINE, and EQUILON PIPE LINE were  negligent and breached their duty in one or more

or all of the following ways:

(a)     Failed to prevent the contamination of plaintiff's well water and property with petroleum products from a leaking underground pipeline components owned and controlled by the defendants, SHELL OIL and SHELL PIPELINE, which contained benzene and MTBE, known carcinogens;

(b)     Failed to prevent the release of gasoline or other petroleum products from a leaking underground pipeline that they owned and controlled from migrating onto plaintiff's property and into plaintiff's private drinking well;

(c)     Failed to notify and warn plaintiff of the release and contamination of benzene and    MTBE, known carcinogens, from their leaking underground pipeline onto her property and into her well water after they had actual or constructive notice that their pipeline was leaking;

(d)     Failed to adequately protect the pipeline from winter frost by placing it deep enough in the ground;

(e)     Failed to properly test and inspect the underground pipeline at sufficient periodic intervals and in an adequate manner to ensure against a break in the pipe line;

(f)     Failed to replace or reline the section of pipe line in Limestone Township to ensure against a break in the pipe line.

(g) Violated and continues to violate Section 12(a) of the Act, 415 ILCS 5/12(a) (1998), Section 12(d) of the Act, 415 ILCS 5/12 (1998) and 35 Ill. Adm. Code 620.301, 620.405 and 620.410(b);

91.     The negligence of the defendants SHELL OIL and SHELL PIPELINE and EQUILON PIPE LINE  was and continues to be a proximate cause of injury and damage to the plaintiff.

92.     The nature of the injury or damage which the plaintiff has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)     The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical  pain and mental anguish as a result of her own injuries;

(b)     Disfigurement resulting from the injury;

(c)     The reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)     The disability experienced and reasonably certain to be experienced in the future;

(e)     The emotional distress experienced and reasonably certain to be experienced in the future as the result of Plaintiff's knowledge of the actual and potential condition of (1) the physical health of her children with reference to their exposure to benzene and toluene and (2) the physical health of her grandchildren through teratogenic means.

(f)     The emotional distress experienced and reasonably certain to be experienced in the future as the result of the exposure of her own physical health to the risk of cancer.

(g)     The diminution in market value of her real estate by reason of its groundwater contamination.

(h)     Physical discomfort and deprivation of the use and comfort of her home and property.

WHEREFORE, Plaintiff, EDITH QUICK, demands judgment from the Defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC.,, jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages and demands trial by jury.


## COUNT IV - EDITH QUICK/NEGLIGENCE/PARSONS DEFENDANTS

Plaintiff, EDITH QUICK, complaining against Defendants PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC states:

93.     Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1 through 78.

94.    In general, the physical and chemical properties of gasoline include the property that although soluble in water, it separates from water and floats upon water and does not mix with it except on a temporary basis, in roughly the same manner as cream mixes with milk which is not homogenized and then if left alone rises to the top of the non-homogenized milk.

95.    In a well, gasoline which enters the well with groundwater will rise to the top and float on top of the water in the well if the water has been at rest for a period of time and not agitated, and if the pump at or near the bottom of the well is immersed in water significantly below the top of the water level in the well upon which gasoline is floating, then the water pumped up likely will have less gasoline contaminants soluble in the water immediately pumped up. By the same token, if the water in the well is drawn down through a sustained operation of the well pump, then eventually the pump action will likely bring up water with a greater concentration of soluble gasoline in it.

96.    In order to take an accurate sample of water from a well, the person taking the sample should conduct part of the sampling by drawing the sample after a sustained pumping so as to duplicate the conditions of the actual manner in which typical well users water draw water out of their well under conditions of maximum draw and low groundwater levels.

97.    FRENDT and JAZIC and other PARSONS employees who directed, supervised or took water samples from EDITH's well and other private water supply wells within the aforesaid 3-mile radius had to have followed a procedure or protocol in taking water samples without first drawing down the well water by sustained pumping, because the "ND" reports by PARSONS indicating insignificant levels of the five chemicals reported upon are inconsistent with the presence of benzene and other toxic chemicals in the blood and urine of EDITH discovered through testing of her blood and urine in September of 2001, and are also inconsistent with testing of samples drawn and tested by persons unaffiliated with PARSONS which did show the presence of gasoline chemical contaminants in the water samples at greater levels than reported by PARSONS.

98.    During the period 1994 to the present time,  PARSONS, FRENDT and JAZIC were negligent in one or more or all of the aforesaid ways:

(a)    When water samples were taken by various employees of PARSONS, including FRENDT and JAZIC, the samples were taken in such a manner as to permit  and facilitate an inaccurate reading of the quantities of toxic chemicals in well water.

(b)    The water sampling protocol or procedure designed by PARSONS or otherwise promulgated by PARSONS  was such as to permit and facilitate an inaccurate reading of the quantities of toxic chemicals in well water.

99.    The negligence of  PARSONS, FRENDT and JAZIC was a proximate cause of injury and damage to plaintiff.

100.    The nature of the injury or damage which the plaintiff has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical  pain in the area of her breasts and  in other parts of her body as well as mental anguish as a result of her own injuries;

(b)    Disfigurement  resulting from the injury;

(c)    The reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)    The disability experienced and reasonably certain to be experienced in the future;

(e)    The emotional  distress experienced and reasonably certain to be experienced in the future as the result of  Plaintiff's knowledge of the actual and potential condition of  (1) the physical health of her children with reference to their exposure to benzene and toluene  and (2) the physical health of her grandchildren through teratogenic means.

(f)     The emotional distress experienced and reasonably certain to be experienced in the future as the result of the exposure of her own physical health to the risk of cancer.

(g)     The diminution in market value of her real estate by reason of its groundwater contamination.

(h)     Physical discomfort and deprivation of the use and comfort of her home and property.

WHEREFORE, Plaintiff, EDITH QUICK, demands judgment from the Defendants, PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, jointly and severally with SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION, and EQUILON PIPE LINE COMPANY LLC., in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages only, and demands trial by jury.

### COUNT V - RES IPSA LOQUITUR – SHELL DEFENDANTS

Now comes the plaintiff, EDITH QUICK, and complaining of the defendants, SHELL, OIL, SHELL PIPE LINE and EQUILON PIPE LINE and states:

101.    Plaintiff, EDITH QUICK, repeats, re-alleges and incorporates by reference paragraphs 1 through 78.

102.    That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

103.    At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive control of the underground pipeline.

104.    As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

22

105. The nature of the injury or damage which the plaintiff has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)     The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical  pain and mental anguish as a result of her own injuries;

(b)     Disfigurement resulting from the injury;

(c)     The reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)     The disability experienced and reasonably certain to be experienced in the future;

(e)     The emotional  distress experienced and reasonably certain to be experienced in the future as the result of  Plaintiff's knowledge of the actual and potential condition of (1) the physical health of her children with reference to their exposure to benzene and toluene  and (2) the physical health of her grandchildren through teratogenic means.

(f)     The emotional  distress experienced and reasonably certain to be experienced in the future as the result of  the exposure of her own physical health to the risk of cancer.

(g)     The  diminution in market value of her real estate by reason of its groundwater contamination.

(h)  Compensation for physical discomfort and deprivation of the use and comfort of her home and property.


WHEREFORE, plaintiff demands judgment from defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION AND EQUILON PIPE LINE COMPANY, LLC.,  for an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

## COUNT VI - LISA AND CARL AND EVAN KIBBONS / TRESPASS SHELL DEFENDANTS AND EQUILON PIPE LINE

23

LISA KIBBONS and CARL KIBBONS, Individually and on behalf of their son EVAN KIBBONS, complaining of the defendants SHELL OIL, SHELL PIPE LINE AND EQUILON PIPE LINE, state:

106.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 – 78.

107.    Plaintiffs  LISA KIBBONS ("LISA")  and  CARL KIBBONS ("CARL")  own property located  at 993  North West Road, Kankakee, Illinois 60901 and have resided there on a  continuous basis since 1988.

108.    Their son EVAN KIBBONS ('EVAN")  was born January 12, 1990.

109.    EVAN has been diagnosed by his physician as having the following conditions, all of central nervous system ("CNS") origin; facial twitching, involuntary spasms in his arms, fatigue, nausea,  and chest pains despite a normal echocardiogram, all of which symptoms are claimed by LISA and CARL as likely caused by the presence of  MTBE  and benzene and toluene in  EVANS' body from his home water consumption  in the uterus of his mother and thereafter.

110.    In addition, CARL  recently went to the dentist to have a wisdom tooth pulled and as a routine matter the dentist ran an ECG on CARL  and it was found that CARL had an irregular heartbeat  which CARL claims is likely caused by the presence of MTBE and benzene and toluene in his body from his home water consumption.

111.    Following the gasoline  release in 1988, it was determined that the well on the premises at 993 North West Road, Kankakee, Illinois which was utilized for drinking. cooking, cleaning washing and bathing  purposes was in fact contaminated with MTBE.

112.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 78 through 80 of Count I as their  claims of common law trespass.

113.    The common law trespass as alleged was a proximate cause of injury or damage

to Plaintiffs.

114.   The nature of the injury or damage which the plaintiff  EVAN has sustained by wrongful conduct of any defendant includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)   The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical pain and mental anguish as a result of his injuries;

(b)   the reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future

(c)   the disability experienced and reasonably certain to be experienced in the future;

115.   The nature of the injury or damage which the plaintiffs LISA and CARL have sustained by wrongful conduct of any defendant includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)   the diminution in market value of their real estate by reason of its groundwater contamination.

(b)   the emotional distress experienced and reasonably certain to be experienced in the future as the result of Plaintiffs' knowledge of the actual and potential condition of the physical health of their children with reference to their exposure to benzene and toluene.

116.   The nature of the injury or damage which CARL alone has sustained by wrongful conduct of any defendant includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)   The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical pain and mental anguish as a result of his injuries;

(b)      the reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(c)      the disability experienced and reasonably certain to be experienced in the future

WHEREFORE, Plaintiffs LISA KIBBONS AND CARL KIBBONS, as parents of EVAN KIBBONS, a Minor, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of EVAN KIBBON, plus costs and demands trial by jury..

Wherefore,  Plaintiffs LISA KIBBONS and CARL KIBBONS,  Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, and EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

### COUNT VII - LISA AND CARL AND EVAN KIBBONS / PRIVATE NUISANCE - SHELL DEFENDANTS AND EQUILON PIPE LINE

LISA KIBBONS and CARL KIBBONS, Individually and on behalf of their son EVAN KIBBONS, complaining of  the defendants SHELL OIL, SHELL PIPE LINE AND EQUILON PIPE LINE, state:

117. Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 107  through 111.

26

118.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 84 through 85 of Count II as their claims of common law private nuisance.

119.    The private nuisance as alleged was proximate cause of injury or damage to the Plaintiffs.

120.    Plaintiffs repeat, re-allege and incorporate by reference paragraphs 114 through 116 as their injury and damage counts.

WHEREFORE, Plaintiffs LISA KIBBONS AND CARL KIBBONS, as parents of EVAN KIBBONS, a Minor, demand judgment from the Defendants, SHELL OIL COMOPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC.. jointly and severally in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of EVAN KIBBONS, plus costs and demands trial by jury..

WHEREFORE, Plaintiffs LISA KIBBONS and CARL KIBBONS, Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, and EQUILON PIPE LINE COMPANY, LLC.., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

## COUNT VIII- LISA AND CARL AND EVAN KIBBONS / NEGLIGENCE – SHELL DEFENDANTS AND EQUILON PIPE LINE

LISA KIBBONS and CARL KIBBONS, Individually and on behalf of their son EVAN KIBBONS, complaining of the defendants SHELL OIL, SHELL PIPE LINE AND EQUILON PIPE LINE, state:

121.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 107 through 111.

122.     Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 89 through 91 as their claims of common law negligence.

123. Plaintiffs repeat and reallege and incorporate by reference paragraphs 114 through 116 as their injury or damage counts.

WHEREFORE, Plaintiffs LISA KIBBONS AND CARL KIBBONS, as parents of EVAN KIBBONS, a Minor, demand judgment from the Defendants, SHELL OIL COMOPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC. jointly and severally in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of EVAN KIBBONS, plus costs and demands trial by jury.

WHEREFORE,   Plaintiffs LISA KIBBONS and CARL KIBBONS,   Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, and  EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.


## COUNT IX – LISA AND CARL AND EVAN KIBBONS / NEGLIGENCE – PARSONS DEFENDANTS

LISA KIBBONS and CARL KIBBONS, Individually and on behalf of their son EVAN KIBBONS,  complaining of  the defendants PARSONS, FRENDT and JAZIC, state:

124.     Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 107 through 111.

125.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 94 through 99.

126.    Plaintiffs repeat, re-allege and incorporate by reference paragraphs 114 through 116 as their damage or injury counts.

WHEREFORE, Plaintiffs LISA KIBBONS AND CARL KIBBONS, as parents of EVAN KIBBONS, a Minor, demand judgment from the Defendants, PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC  jointly and severally in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of EVAN KIBBONS, plus costs and demands trial by jury.

WHEREFORE,  Plaintiffs LISA KIBBONS and CARL KIBBONS,  Individually, demand judgment from the Defendants, PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.


## COUNT X -  RES IPSA LOQUITUR – SHELL DEFENDANTS

Now comes the plaintiffs, LISA KIBBONS and CARL KIBBONS, individually and on behalf of their son, EVAN KIBBONS, and complaining of the defendants, SHELL, OIL, SHELL PIPE LINE and EQUILON PIPE LINE and states:

127.  Plaintiffs  repeat, re-alleges and incorporates by reference paragraphs 1 through 78 and 107 through 111..

128.  That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

129.  At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive

control of the underground pipeline.

130.  As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

131.  Plaintiffs repeat, re-allege and incorporate by reference paragraphs 114 through 116.

WHEREFORE, Plaintiffs LISA KIBBONS AND CARL KIBBONS, as parents of EVAN KIBBONS, a Minor, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC.  jointly and severally in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of EVAN KIBBONS, plus costs and demands trial by jury.

Wherefore,  Plaintiffs LISA KIBBONS and CARL KIBBONS,  Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, and  EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

## COUNT XI  - GREGORY AND EDITH AND ELLEN  BUCKLEY / TRESPASS SHELL DEFENDANTS AND EQUILON PIPE LINE

EDITH BUCKLEY and GREGORY BUCKLEY,  individually and on behalf of their daughter, ELLEN BUCKLEY, complaining of   the defendants SHELL OIL, SHELL PIPE LINE AND EQUILON PIPE LINE, state:

132.    Plaintiffs repeat, re-allege, and incorporate by reference paragraphs 1 – 78.

133.   Plaintiffs   EDITH BUCKLEY ("EDITH B") and GREGORY BUCKLEY ("GREGORY")   own property located   at 947 North West Road, Kankakee, Illinois 60901 where they have resided since 1987.

134..   EDITH  B. and GREGORY have a daughter, ELLEN BUCKLEY,  ("ELLEN") who was born  on May 9, 1999.

135.   When ELLEN was eight (8) months old she was operated upon because a cancerous tumor known as a Wilm's tumor had engulfed her right kidney and the kidney was removed.

136.  Following the gasoline  release in 1988, it was determined that the well on the premises at  947 North West Road, Kankakee, Illinois which was utilized for drinking. cooking, cleaning washing and bathing  purposes was in fact contaminated with MTBE.

137.  Following the gasoline  release in 1988, it was determined that the well on the premises at 993 North West Road, Kankakee, Illinois which was utilized for drinking. cooking, cleaning washing and bathing  purposes was in fact contaminated with MTBE.

138.   The tumor in ELLEN was likely caused by the presence of MTBE and benezene and toluene  in her body from her home water consumption.

139.  Plaintiffs repeat and re-allege and incorporate by reference paragraphs 78 through 80 of Count I as their  claims of common law trespass.

140.   The common law trespass as alleged was a proximate cause of injury or damage to  Plaintiffs.

141.   The nature of the injury or damage which ELLEN has sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    The pain and suffering experienced and reasonably certain to be experienced in the future, including both physical pain and mental anguish as a result of her own injuries;

(b)    Disfigurement resulting from the injury;

(c)    the reasonable expense of medical care treatment and services provided and the present cash value of the reasonable expense of necessary medical care, treatment and services reasonably certain to be received in the future;

(d)    the disability experienced and reasonably certain to be experienced in the future;

(e)    the emotional distress experienced and reasonably certain to be experienced in the future as the result of the exposure of her own physical health to the risk of cancer.

142.    The nature of the injury or damage which EDITH B. and GREGORY have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the diminution in market value of their real estate by reason of its groundwater contamination.

(b)    the emotional distress experienced and reasonably certain to be experienced in the future as the result of Plaintiffs' knowledge of the actual and potential condition of the physical health of their children with reference to their exposure to benzene and toluene.

WHEREFORE, Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY, as parents of ELLEN BUCKLEY, a Minor, demand judgment from the Defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as

and for COMPENSATORY damages on behalf of  ELLEN BUCKLEY, plus costs and demands trial by jury.

WHEREFORE,  Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

## COUNT XII-  GREGORY AND EDITH AND ELLEN BUCKLEY / PRIVATE NUISANCE - SHELL DEFENDANTS AND EQUILON PIPE LINE

EDITH BUCKLEY and GREGORY BUCKLEY,  individually and on behalf of their daughter, ELLEN BUCKLEY, complaining of   the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

143.  Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 132 through 138.

144.   Plaintiffs repeat and re-allege and incorporate by reference paragraphs 84 through 85 of Count II as their  claims of common law private nuisance.

145.   The common law private nuisance as alleged was  a proximate cause of injury or damage to the Plaintiffs.

146.      Plaintiffs repeat, re-allege and incorporate by reference paragraphs 140 through141 as their injury and damage counts.

WHEREFORE,  Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY,  as parents of ELLEN BUCKLEY, a Minor, demand judgment from the Defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC.,

jointly and severally,  in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as
and for COMPENSATORY damages on behalf of  ELLEN BUCKLEY, plus costs and demands
trial by jury.


WHEREFORE,  Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY Individually,
demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE
CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally,  in a sum
greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY
damages, plus costs and demands trial by jury

## COUNT XIII - GREGORY AND EDITH AND ELLEN BUCKLEY / NEGLIGENCE – SHELL DEFENDANTS AND EQUILON PIPE LINE

EDITH BUCKLEY and GREGORY BUCKLEY,  individually and on behalf of their
daughter, ELLEN BUCKLEY, complaining of   the defendants SHELL OIL COMPANY,
SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

147.  Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through
78 and 132  through 138.

148.     Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 89
through 90 as their claims of common law negligence.

149.    The common law negligence  as alleged was a proximate cause of injury or
damage to  Plaintiffs.

150.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 140
through 141 and their injury and damage counts.

WHEREFORE, Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY, as parents of ELLEN BUCKLEY, a Minor, demand judgment from the Defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of ELLEN BUCKLEY, plus costs and demands trial by jury.

WHEREFORE, Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY Individually, demand judgment from the Defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

### COUNT XIV   – GREGORY AND EDITH AND ELLEN BUCKLEY / NEGLIGENCE – PARSONS DEFENDANTS

EDITH BUCKLEY and GREGORY BUCKLEY, individually and on behalf of their daughter, ELLEN BUCKLEY, complaining of   the defendants PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, state:

151..    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 133 through 138.

152.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 94 through 99 of Count IV as their claims of common law negligence.

153. The common law negligence as alleged was a proximate cause of injury or damage to Plaintiffs.

154.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 140 through 141 and their injury and damage counts.

WHEREFORE, Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY, as parents of ELLEN BUCKLEY, a Minor, demand judgment from the Defendants PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages on behalf of ELLEN BUCKLEY, plus costs and demands trial by jury.

WHEREFORE, Plaintiffs EDITH BUCKLEY and GREGORY BUCKLEY Individually, demand judgment from the Defendants, PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) as and for COMPENSATORY damages, plus costs and demands trial by jury.

## COUNT XV - RES IPSA LOQUITUR – SHELL DEFENDANTS

EDITH BUCKLEY and GREGORY BUCKLEY, individually and on behalf of their daughter, ELLEN BUCKLEY, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORAITON and EQUILON PIPE LINE COMPANY, LLC., state:

155. Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 133 through 138.

156. That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

157. At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON had exclusive control of the underground pipeline.

158. As a direct and proximate result of the contamination, the plaintiff was injured as

hereinafter alleged.

159.  Plaintiffs repeat and reallege paragraphs 140 through 141.

WHEREFORE, plaintiffs demand judgment from defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC.,  for an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

### COUNT  XVI - JEFFREY QUICK AND LISA QUICK / TRESPASS –SHELL DEFENDANTS AND EQUILON PIPE LINE

JEFFREY QUICK  and  LISA  QUICK,  complaining of   the defendants SHELL OIL COMPANY,  SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

160.    Plaintiffs repeat, reallege and incorporate by reference paragraphs 1 through 78.

161.    JEFFREY QUICK  and  LISA  QUICK  own property located at 781 North  4000 West Road, Kankakee, Illinois 60901 where they have resided since 1996.  The property of JEFFREY QUICK and LISA QUICK is adjacent to that of EDITH QUICK and divided from the property of EDITH QUICK by a drainage ditch that carries surface water from the Danhausen property to Wiley Creek, and the drainage ditch has been tested for gasoline contaminants since 1988 and such test results were positive.

162.  The premises at 781 North 4000 West Road, Kankakee, Illinois use its own private well water for drinking, cooking, cleaning, washing and bathing

163.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 78 through 80 of Count I as their  claims of common law trespass.

164.    The common law trespass as alleged was a proximate cause of injury or damage

37

to Plaintiffs.

165.   The nature of the injury or damage which JEFFREY QUICK and LISA QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)   the diminution in market value of their real estate by reason of its groundwater contamination.

(b)   Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, JEFFREY QUICK and LISA QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

## COUNT XVII - JEFFREY QUICK AND LISA QUICK / PRIVATE NUISANCE –
## SHELL DEFENDANTS AND EQUILON PIPE LINE

JEFFREY QUICK and LISA QUICK, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

166.   Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 161 through 162.

167.   Plaintiffs repeat and reallege and incorporate by reference paragraphs 84 through 85 of Count II as their claims of common law private nuisance.

168.   The common law private nuisance as alleged was a proximate cause of injury or damage to Plaintiffs.

169.    The nature of the injury or damage which JEFFREY QUICK and LISA QUICK have  sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the  diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, JEFFREY QUICK and LISA QUICK, individually demand judgment from the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

### COUNT  XVIII - JEFFREY QUICK AND LISA QUICK / NEGLIGENCE – SHELL DEFENDANTS AND EQUILON PIPE LINE

JEFFREY QUICK  and  LISA  QUICK,  complaining of   the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

170.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and  161 through 162.

171.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 89 through 90 of Count III as their  claims of common law negligence.

172.   The common law negligence  as alleged was a proximate cause of injury or damage to Plaintiffs.

173.   The nature of the injury or damage which JEFFREY QUICK  and LISA  QUICK have  sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)      the  diminution in market value of their real estate by reason of its groundwater contamination.

(b)      Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, JEFFREY QUICK and LISA QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

## COUNT XIX -  RES IPSA LOQUITUR – SHELL DEFENDANTS

JEFFREY QUICK and LISA QUICK, complaining of the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

174.   Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 161 through 162.

175.   That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

176.   At all times when the release and leakage of gasoline that contaminated plaintiff's

property and drinking well was occurring, the defendants SHELL, had exclusive control of the underground pipeline.

177.  As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

178.  The nature of the injury or damage which JEFFREY QUICK  and  LISA  QUICK have  sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the  diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, JEFFREY QUICK and LISA QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

## COUNT  XX - JEFFREY QUICK AND LISA QUICK / NEGLIGENCE – PARSONS DEFENDANTS

JEFFREY QUICK  and  LISA  QUICK,  complaining of   the defendants PARSONS, FRENDT and JAZIC, state:

179.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and   161 through 162.

180.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 94 through 98 of Count IV as their claims of common law negligence.

181.    The common law negligence as alleged was a proximate cause of injury or damage to Plaintiffs.

182.    The nature of the injury or damage which JEFFREY QUICK and LISA QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, JEFFREY QUICK and LISA QUICK, individually demand judgment from the defendant, PARSONS ENGINEERING SCIENCE, INC.,, RICHARD M. FRENDT, and SASA JAZIC, jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.


## COUNT - XXI  CHARLES QUICK, JR. AND CATHY QUICK / TRESPASS – SHELL DEFENDANTS AND EQUILON PIPE LINE

CHARLES QUICK, JR. and CATHY QUICK, complaining of the defendants SHELL OIL, SHELL PIPE LINE AND EQUILON PIPE LINE, state:

183.    Plaintiffs repeat, reallege and incorporate by reference paragraphs 1 through 78.

184.    CHARLES QUICK, JR. and CATHY QUICK own property located at 1768 North 6250 West Road, Bonfield, Illinois 60913 where they have resided since 1973.

185. Following the gasoline release in 1988, it was determined that the well on the premises at 6250 West Road, Bonfield, Illinois which was utilized for drinking. cooking, cleaning washing and bathing purposes was in fact contaminated with MTBE.

186. Plaintiffs repeat and reallege and incorporate by reference paragraphs 78 through 80 of Count I as their claims of common law trespass.

187. The common law trespass as alleged was a proximate cause of injury or damage to Plaintiffs.

188. The nature of the injury or damage which CHARLES QUICK, JR. and CATHY QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)   the diminution in market value of their real estate by reason of its groundwater contamination.

(b)   Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, CHARLES QUICK, JR. and CATHY QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.


## COUNT XXII CHARLES QUICK, JR. AND CATHY QUICK / PRIVATE NUISANCE – SHELL DEFENDANTS AND EQUILON PIPE LINE

CHARLES QUICK, JR. and CATHY QUICK, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

189.     Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and  184 through 185.

190.     Plaintiffs repeat and reallege and incorporate by reference paragraphs 84 through 85 of Count II as their  claims of common law private nuisance.

191.     The common law private nuisance  as alleged was a proximate cause of injury or damage to  Plaintiffs.

192.     The nature of the injury or damage which CHARLES QUICK, JR.  and  CATHY QUICK have  sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)      the  diminution in market value of their real estate by reason of its groundwater contamination.

(b)      Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, CHARLES QUICK, JR. and CATHY QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

**COUNT  XXIII - CHARLES QUICK, JR. AND CATHY QUICK / NEGLIGENCE –
SHELL DEFENDANTS AND EQUILON PIPE LINE**

CHARLES QUICK,  JR.  and CATHY  QUICK,  complaining of   the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., state:

193.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 184 through 185.

194.    Plaintiffs repeat and reallege and incorporate by reference paragraphs 89 through 91 of Count III as their claims of common law negligence.

195.    The nature of the injury or damage which CHARLES QUICK, JR. and CATHY QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, CHARLES QUICK, JR. and CATHY QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

### COUNT XXIV - RES IPSA LOQUITUR – SHELL DEFENDANTS

CHARLES QUICK, JR. and CATHY QUICK, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORAITON and EQUILON PIPE LINE COMPANY, LLC., state:

196.    Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 184 through 185.

197.    That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

198.    At all times when the release and leakage of gasoline that contaminated plaintiff's

property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive control of the underground pipeline.

199.  As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

200.  The nature of the injury or damage which CHARLES QUICK, JR. and CATHY QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, Plaintiffs, CHARLES QUICK, JR. and CATHY QUICK, individually demand judgment from the defendant, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

## COUNT XXV - CHARLES QUICK, JR. AND CATHY QUICK / NEGLIGENCE – PARSONS DEFENDANTS

CHARLES QUICK, JR. and CATHY QUICK, complaining of the defendants PARSONS, FRENDT and JAZIC, state:

201.    Plaintiffs repeat, re-allege and incorporate herein by reference paragraphs 1 through 78 and 184 through 185.

202.  Plaintiffs repeat and reallege and incorporate by reference paragraphs 94 through 99 of Count IV as their claims of common law negligence.

203.    The nature of the injury or damage which CHARLES QUICK, JR. and CATHY QUICK have sustained includes one or more or all of the following elements of damage, taking into account the nature, extent and duration of the injury:

(a)    the diminution in market value of their real estate by reason of its groundwater contamination.

(b)    Physical discomfort and deprivation of the use and comfort of their home and property.


Wherefore, Plaintiffs CHARLES QUICK, JR. and CATHY QUICK demand judgment from the Defendants, PARSONS ENGINEERING SCIENCE, INC., RICHARD M. FRENDT, and SASA JAZIC, jointly and severally, in a sum greater than FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and demands trial by jury.

## COUNT XXVI - JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person: TRESPASS - SHELL OIL AND SHELL PIPE LINE AND EQULON PIPE LINE COMPANY, LLC.

Plaintiff, JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person, complaining against the defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC. states:

204.   Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1 through 78.

205.  Plaintiff, JOHN PANOZZO, is the Court appointed guardian of the Estate of MARGUERITE PANOZZO, a disable person, having been so appointed on October 7, 1994, Case Number 94-P-199, in the Circuit Court of Kankakee County. The disabled person, MARGUERITE PANOZZO, is the mother of plaintiff, JOHN PANOZZO, and is 95 years of age. Prior to 1998, the disabled person, MARGUERITE PANOZZO, resided at 4045 West

Route 17, Kankakee, Illinois, and is the owner of approximately 125 acres partially contiguous and situated directly south of the Danhausen Farm;

206.  That the acreage, owned by MARGUERITE PANOZZO, described aforesaid, encompasses two (2) residences located at 4045 West Route 17, Kankakee, Illinois, and 129 North 4000 West Road, Kankakee, Illinois, which in 1988 and subsequent thereto, shared a common well;

207.  That following the release and gas spill in 1988, it was determined by the defendant, SHELL, that the common well for said residences was in fact contaminated with MTBE;

208.  The contamination of the plaintiff's well was likely caused by the 1988 pipe line spill and/or additional spills or discharges from the pipe line since 1988.

209.  The hydrology of the underground areas of Limestone Township permit the to be cyclical and movement of groundwater containing gasoline into different areas and different compass directions at different times, so that any contamination of private wells by ground water was likely periodic.

210.  The gasoline-contaminated ground water described herein resulted in a subsurface physical invasion of the real property on which plaintiff resided and in the interference with the use of the property both past, present and prospective which constitutes a common law trespass to the exclusive right to the use of the real property by plaintiff.

211.  The gasoline contaminated ground water has returned on a cyclical basis and continues to do so with the result that the common law trespass is a continuing wrong affecting the interests of plaintiff and plaintiff's disabled person.

212.  The aforesaid common law trespass was a proximate cause of damage to the plaintiff and plaintiff's disabled person.

213.  The nature of the injury or damage which the plaintiffs have sustained includes physical discomfort and deprivation of the use and comfort of their home and property and diminution and market value of their real estate by reason of it's ground water contamination, the inability to develop said real estate for residential homes resulting in substantial monetary loss and income.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

**COUNT XXVII - JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO,
a disabled person:  PRIVATE NUISANCE - SHELL OIL AND SHELL PIPE LINE AND
EQUILON PIPE LINE COMPANY, LLC.**

Plaintiff, JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person, complaining against the defendants, SHELL OIL AND SHELL PIPE LINE, and EQUILON PIPE LINE COMPANY, LLC. states:

214.  Plaintiff repeats, re-alleges and incorporates by reference paragraphs  1 through 78 and 205 through 209.

215.  Since 1988, the defendants, SHELL OIL and SHELL PIPELINE and EQUILON PIPE LINE COMPANY, LLC.,  as alleged aforesaid, have caused and allowed gasoline, benzene, and MTBE, to migrate toward, seep into, and contaminate plaintiff's well and the ground water, surface water, and the air in the area surrounding the plaintiff's property and which could further contaminate the sewer systems and public water supplies.  The release of gasoline, benzene, and MTBE, present an immediate threat to health and the environment and

wildlife and aquatic life and farm crops on or near the plaintiff's property, which are thus threatened by the contamination;

216. Plaintiffs repeat and reallege and incorporate by reference paragraphs 84 through 85 of Count II as their claims of common law private nuisance.

217. The private nuisance as alleged was proximate cause of injury or damage to the Plaintiffs.

218. Plaintiffs repeat and re-allege and incorporate by reference paragraph 213.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY and SHELL PIPELINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand dollars and 00/100 ($50,000.00) plus costs and demands trial by jury.

## COUNT XXVIII -JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person: NEGLIGENCE - SHELL OIL AND SHELL PIPE LINE AND EQUILON PIPE LINE COMPANY, LLC.

Plaintiff, JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person, complaining against the defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION, and EQUILON PIPE LINE COMPANY, LLC. states:

219. Plaintiffs repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 205 through 209.

220. Since 1988, the defendants, SHELL OIL and SHELL PIPELINE and EQUILON PIPE LINE COMPANY, LLC., as alleged aforesaid, have caused and allowed gasoline, benzene, and MTBE, to migrate toward, seep into, and contaminate plaintiff's well and the

ground water, surface water, and the air in the area surrounding the plaintiff's property and which could further contaminate the sewer systems and public water suplies. The release of gasoline, benzene, and MTBE, present an immediate threat to health and the environment and wildlife and aquatic life and farm crops on or near the plaintiff's property, which are thus threatened by the contamination;

221. Plaintiffs repeat, re-allege and incorporate by reference paragraphs 89 through 91 of Count III as their claims of common law negligence.

222. Plaintiffs repeat, re-allege and incorporate by reference paragraph 213.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY and SHELL PIPELINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand dollars and 00/100 ($50,000.00) plus costs and demands trial by jury.

## COUNT XXIX - RES IPSA LOQUITUR – SHELL DEFENDANTS

Plaintiff, JOHN PANOZZO, GUARDIAN OF MARGUERITE PANOZZO, a disabled person, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, AND EQUILON PIPE LINE COMPANY, LLC., state:

223. Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 205 through 209.

224. That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

225.  At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive control of the underground pipeline.

226.  As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

227.  Plaintiff repeats, re-alleges and incorporates by reference paragraph 213.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY and SHELL PIPELINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand dollars and 00/100 ($50,000.00) plus costs and demands trial by jury.

## COUNT XXX - CHRISTOPHER BURGE and ANGELA BURGE: TRESPASS - SHELL OIL AND SHELL PIPE LINE AND EQULON PIPE LINE COMPANY, LLC.

Plaintiffs, CHRISTOPHER BURGE and ANGELA BURGE, complaining against the defendants, SHELL OIL COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC. state:

228.  Plaintiffs repeat, re-allege and incorporate by reference paragraphs 1 through 78.

229.  Plaintiffs own and occupy a residence located at 5627 W. Rt. 17, Kankakee, Illinois.

230.  That in August of 2001, plaintiffs were informed by the Kankakee County Health Department that the well for their residence was contaminated with trace levels of gasoline additives.

231. That since being so informed, plaintiffs have ceased using their well for drinking purposes and now rely on bottled water.

232. That the contamination of plaintiffs' well water was likely caused by the 1988 pipe line spill and/or additional spills or discharges from the pipe line since 1988.

233. Plaintiffs repeat, re-allege and incorporate by reference paragraphs 78 through 81.

234. The nature of the injury or damage which the plaintiffs have sustained includes diminution and market value of their real estate by reason of it's ground water contamination and for physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, plaintiffs demand judgment against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

## COUNT   XXXI- CHRISTOPHER BURGE and ANGELA BURGE: NEGLIGENCE - SHELL OIL AND SHELL PIPE LINE AND EQULON PIPE LINE COMPANY, LLC.

Plaintiffs, CHRISTOPHER BURGE and ANGELA BURGE, complaining against the defendants, SHELL OIL COMPANY, and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC. state:

235. Plaintiffs  repeat, re-allege and incorporate by reference paragraphs 1 through 78 and paragraphs 229 to 232.

236. Plaintiffs repeat, re-allege and incorporate by reference paragraphs 89 through 91.

237. The nature of the injury or damage which the plaintiffs have sustained includes diminution and market value of their real estate by reason of it's ground water contamination

and for physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, plaintiffs demand judgment against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORAITON and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

### COUNT  XXXII- CHRISTOPHER BURGE and ANGELA BURGE: PRIVATE NUISANCE - SHELL OIL AND SHELL PIPE LINE AND EQULON PIPE LINE COMPANY, LLC.

Plaintiffs, CHRISTOPHER BURGE and ANGELA BURGE, complaining against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC. state:

238.  Plaintiffs  repeat, re-allege and incorporate by reference paragraphs 1 through 78 and paragraphs  229 to 232.

239.  Plaintiffs repeat, re-allege and incorporate by reference paragraphs 84 through 86.

240.  The nature of the injury or damage which the plaintiffs have sustained includes diminution and market value of their real estate by reason of it's ground water contamination and for physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, plaintiffs demand judgment against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

## COUNT XXXIII - RES IPSA LOQUITUR – SHELL DEFENDANTS

Plaintiff, CHRISTOHER BURGE and ANGELA BURGE, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, AND EQUILON PIPE LINE COMPANY, LLC., state:

241.   Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 229 through 232.

242.   That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

243.   At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive control of the underground pipeline.

244.   As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

245.   Plaintiff repeats, re-alleges and incorporates by reference paragraph 240.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY and SHELL PIPELINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand dollars and 00/100 ($50,000.00) plus costs and demands trial by jury.

## COUNT  XXXIV- KENNETH CLARK: TRESPASS - SHELL OIL AND SHELL PIPE LINE AND EQUILON PIPE LINE COMPANY, LLC.

Plaintiff, KENNETH CLARK, complaining against the defendants, SHELL OIL

COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY,

LLC. states:

246. Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1 through 78.

247. Plaintiff, for many years, has owned and occupied a residence at 5675 W. 1000 N.

Rd., Kankakee, Illinois, which is a single family residence with a well wherein plaintiff and his

family obtained their drinking water and general household use water.

248. That in February of 2002, plaintiff ascertained that his well was contaminated with

MTBE and since that time has ceased using the well for drinking purposes.

249. That the contamination of plaintiff's well water was likely caused by the 1988 pipe

line spill and/or additional spills or discharges from the pipe line since 1988.

250. Plaintiff repeats, re-alleges and incorporates by reference paragraphs 78 through 80.

251. The aforesaid trespass was a proximate cause of damage to the plaintiff and the

nature of the injury or damage which the plaintiff has sustained includes diminution and market

value of their real estate by reason of it's ground water contamination and for physical

discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL
COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY,
LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands
trial by jury.

## COUNT XXXV- KENNETH CLARK:   NEGLIGENCE - SHELL OIL AND SHELL PIPE LINE AND EQUILON PIPE LINE COMPANY, LLC.

Plaintiff KENNETH CLARK, complaining against the defendants, SHELL OIL

COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY,

LLC. states:

252. Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1 through 78

and paragraphs 247 to 249.

253. Plaintiff repeats, realleges and incorporates by reference paragraphs 89 through 91.

254. The nature of the injury or damage which the plaintiff has sustained includes

diminution and market value of their real estate by reason of it's ground water contamination

and  for physical discomfort and deprivation of the use and comfort of their home and

property.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL

COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE

COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs

and demands trial by jury.

### COUNT XXXVI  - KENNETH CLARK:
### PRIVATE NUISANCE - SHELL OIL AND SHELL PIPE LINE AND
### EQULON PIPE LINE COMPANY, LLC.

Plaintiff, KENNETH CLARK, complaining against the defendants, SHELL OIL

COMPANY and SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY,

LLC. states:

255. Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1 through 78

and paragraphs  247 to 249.

256. Plaintiff repeats, re-alleges and incorporates by reference paragraphs 84 through 86.

257. The nature of the injury or damage which the plaintiff has sustained includes diminution and market value of their real estate by reason of it's ground water contamination and for physical discomfort and deprivation of the use and comfort of their home and property.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION and EQUILON PIPE LINE COMPANY, LLC., in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs and demands trial by jury.

## COUNT XXXVI I - RES IPSA LOQUITUR – SHELL DEFENDANTS

Plaintiff, KENNETH CLARK, complaining of the defendants SHELL OIL COMPANY, SHELL PIPE LINE CORPORATION, AND EQUILON PIPE LINE COMPANY, LLC., state:

258. Plaintiffs, repeat, re-allege and incorporate by reference paragraphs 1 through 78 and 247 through 249.

259. That underground pipelines do not ordinarily leak to the extent that gasoline would migrate over 100 feet through soil and into private drinking wells in the absence of negligence.

260. At all times when the release and leakage of gasoline that contaminated plaintiff's property and drinking well was occurring, the defendants SHELL and EQUILON, had exclusive control of the underground pipeline.

261. As a direct and proximate result of the contamination, the plaintiff was injured as hereinafter alleged.

262. Plaintiff repeats, re-alleges and incorporates by reference paragraph 257.

WHEREFORE, plaintiff demands judgment against the defendants, SHELL OIL

COMPANY and SHELL PIPELINE CORPORATION and EQUILON PIPE LINE COMPANY,

LLC., in an amount in excess of Fifty Thousand dollars and 00/100 ($50,000.00) plus costs and

demands trial by jury.


## COUNT XXXVIII - LISA KIBBONS / DECLARATORY JUDGMENT

LISA KIBBONS, complaining of the Defendants SHELL OIL COMPANY, SHELL

PIPE LINE CORPORATION, and EQUILON states:

263.   Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1 – 262.

264.   SHELL OIL  sold its wholly-owned subsidiary corporation SHELL PIPE LINE

to EQUILON PIPE LINE  COMPANY LLC. ("EQUILON"), a company that in turn is  wholly

owned by  SHELL OIL  and TEXACO.

265.   Beginning at least by 1996 SHELL OIL  knew or must have known that the original

1988 PIPE LINE spill  was far greater in volume than the 16,000 gallons which was the official

SHELL OIL position,  in that the volume of gasoline being put through its "stripper" machinery

was substantial  for a contamination site which was  described in 1994 as being 95 percent

remediated, and large quantities of gasoline were observable to the naked eye on the Danhausen

farm, and that the substantial possibility existed that residents in the 3-mile radius area would

make claims for personal injuries and  property damages  and  punitive damages.

266.   Plaintiff  claims one or more or all of the following:  (a) that a major reason

SHELL OIL  directed, controlled and entered into the transaction and sold SHELL PIPE LINE

was fraudulently to avoid liability in damages to  her and other persons similarly situated,

particularly as to the possibility of  both compensatory and punitive damages for personal

injuries and property damage, to be achieved by and through the vehicle of a successor "limited

liability company"; (b) that the sale to EQUILON transaction amounted to a consolidation or merger; (c) the purchaser EQUILON was in substance a "mere continuation" of SHELL OIL as the controlling seller of PIPE LINE.

267.   Plaintiff makes the foregoing claim whether or not EQUILON has assumed liability for both compensatory and punitive damages of the 1988 PIPE LINE as part of the sale transaction by SHELL OIL to EQUILON, and despite the presence of TEXACO as a JOINT co-owner of EQUILON.

268.   Plaintiff also claims that SHELL OIL cannot enjoy the cash flow or profits or other benefits from its subsidiary SHELL PIPE LINE for 45 years and in the process create a situs of substantial environmental pollution and a superannuated in-ground pipeline subject to corrosion and further spills and then walk away from what SHELL OIL has created by means of a later purported sell-off of its dangerous asset through a corporate labyrinth transaction, and that to permit such would be contrary to the public policy of the State of Illinois.

269.   Plaintiff also claims that a significant reason the PIPE LINE was sold to EQUILON was to allow SHELL OIL to assert that EQUILON cannot be liable for punitive damages incurred by SHELL OIL relating to a time that SHELL PIPE LINE operated the PIPE LINE even if liability for compensatory damage and for punitive damages was assigned to EQUILON by SHELL OIL.

270.   On information and belief Plaintiff claims that SHELL OIL claims that the conditions of the sale to EQUILON entitles SHELL OIL to avoid liability for compensatory and punitive damages for personal injury and property damage arising out of the 1988 PIPE LINE spill.

271.   An actual and substantial controversy exists as between all Plaintiffs and SHELL OIL, SHELL PIPE LINE, AND EQUILON regarding the foregoing matters.

272.   Plaintiff claims that the Court should enter a Declaratory Judgment pursuant to 735 ILCS 5/2-701 as follows:

(a)   that SHELL OIL cannot assign its liability for the 1988 PIPE LINE spill to EQUILON, other entity on the basis that such an assignment would violate the public policy of Illinois; or

(b)   that SHELL OIL and any other entity to which SHELL OIL has purported to assign, sell or otherwise transfer shall remain jointly liable for damages arising out of the 1988 PIPE LINE spill.

273.   Plaintiff also claims that the Court should also enter a further Declaratory Judgment pursuant to 735 ILCS 5/2-701 as follows:

In the event that the Court makes a finding that the test of EDITH's blood and urine in September of 2001 showing the presence of toluene could or might be accurate, or if SHELL OIL and SHELL PIPE LINE do not dispute the possible accuracy of such test, and if the Court makes a finding that that it is likely that toxic chemicals from gasoline products are present in the well water within some portion of the aforesaid 3-mile area, or that SHELL OIL and SHELL PIPE LINE do not dispute such a possibility, then in order to safeguard the health of residents in the area whose consumption in various forms of water comes from public and private wells within such area, the Court should enter a Declaratory Judgment pursuant to 735 ILCS 5/2-701 as follows:

(A)   declaring that the presence of the contaminants constitutes a common law public nuisance and/or a violation of 415 ILCS 5/11(a) (1) (1996) [which states in part: "The General Assembly finds: (a) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, ... depresses property values, and offends the senses"] in that gasoline contaminants likely have caused pollution of the waters of the State of Illinois;

61

(B)    prescribing an impartial protocol for the independent testing of public and private water supply wells within the 3-mile radius area at the expense of SHELL OIL;

(C)    prescribing the contents of a warning notice to be sent by SHELL OIL to all residents and businesses drawing their water from public and private water supply wells within the 3-mile radius area at the expense of SHELL OIL;

(D)    prescribing the conditions for the independent testing of blood and urine testing of selected individuals resident in or working in businesses within the 3-mile radius area and who are and have been consuming water from public and private water supply wells in the area, the reasonable expense of such testing to be at the expense of SHELL OIL;

(E)    determining the route of and estimated cost for running City of Kankakee water lines to all structures in the 3-mile radius area now using well water, part or all of the cost of which SHELL OIL could agree to pay, the expense of which could be held by the court to constitute a setoff against any potential awards of damages to real owners within the affected 3-mile radius area.

274.    Plaintiff asserts that ensuring safe water to well users for all forms of water consumption is an urgent situation for which the Court should set an accelerated schedule for ruling on the issues raised in this Count of the complaint.

## COUNT XXXIX: LISA KIBBONS AND JOHN PANOZZO:  CLASS ACTION

LISA KIBBONS and JOHN PANOZZO, complaining of all Defendants, states:

275.  Plaintiffs repeat, re-allege and incorporate by reference paragraphs 1-273.

276.    The requirements for a class action whereby  LISA and JOHN sue as representative parties of a class in Illinois pursuant to 735 ILCS 5/2-801 in Illinois are:

(1)     the class is so numerous that joinder of all parties is impracticable;

(2)     there are questions of law or fact common to the class, which common questions predominate over any questions affecting only individual members

(3)     the representative parties will fairly and adequately protect the interest of the class;

(4)     The class action is an appropriate method for the fair and efficient adjudication of the controversy.

277     The members of the proposed class are all  persons resident in or working in businesses within the aforesaid 3-mile radius area  and  who have been consuming water on a regular basis from public and private water supply wells in the area and all persons who own real estate in the area which may have suffered a diminution its market value because of gasoline contamination to the groundwater.

278.   The population of Limestone Township in the year 2000 census was 4,659, according to a Kankakee County Planning Commission document already on file with this Court. This document also shows there are 1,652 "occupied housing units" in said Township so that if the number of wells stated by SHELL as being tested is 450, that equates to about one-third of all

63

1,490 "owner-occupied housing units" in the Township.  Even if a mailed notice were sent to every householder in Limestone Township such a mailing would total less than 1700 letters.

279    Plaintiff estimates that the minimum potential size of the class is the residents and employees of structures within the 3-mile radius area which accounts for about 450 private wells and at least one thousand affected persons, which is approximately one percent of the total population of Kankakee County.

280.    The only way of finding out what potential claimants have sustained personal injury from consumption of well water in the 3-mile radius area is to test their blood and urine and test their well water,  with such tests being performed under specific protocols approved by the court.

281.    The only way of preventing persons within the 3-mile radius area from sustaining further damage from consumption of contaminated well water is to engage in a program to notify such persons to stop consuming well water until further notice, but for persons whose only source of water in quantity for purposes of washing and bathing is a private well in the affected area, a different source of water other than a private well ought to be regarded as a necessity from the standpoint of health considerations.

282.    The common questions of law are those set forth in Count I and Count II in terms of  (a) nuisance, (b) compensatory damages, with particular attention to the Illinois Doctrine of "fluid recovery" of damages with respect to depreciation of property values;  (c) negligence, (d) declaratory judgment issues of  statute of limitation tolling, well and person testing and notification procedures, and predecessor/corporate successor liability all of which questions of  law will affect each class member in substantially  and probably exactly the same way.

283.    The common questions of fact with respect to personal injuries are whether and to what extent the five toxic chemicals in gasoline can and do cause cancer,  damage to the liver,

damage to the central nervous system, damage to cardiac functions, and damage to children through the mother's consumption of contaminated water

284. The common questions of fact with respect to property damage is whether and to what extent damage to the market value of agricultural, residential and business real estate results from contamination of ground water on those real estate parcels which have water supply wells used for human consumption.

285. Although the damages to individual class claimants may vary in amount depending on the extent of their personal injuries or property damage, Illinois law provides that such individual differences do not necessarily preclude or militate against class certification.

286. In terms of common questions of law, class status is particularly important with respect to issues of limitations on the time in which persons must bring suit in order to preserve their rights to a legal claim in their own behalf, since this lawsuit, if given class certification, may preserve the right to sue on behalf of persons as of the date this action was filed.

287. LISA KIBBONS would be entitled to the status or a class member whose family members have suffered personal injury and she will fairly and adequately protect the rights of the class members who have suffered personal injury.

288. JOHN PANOZZO would be entitled to the status or a class member whose family members have suffered property damage and he will fairly and adequately protect the rights of the class members who have suffered property damage.

289. Persons who are within the definition adopted by the court if class certification is allowed have the right to exclude themselves, and persons who fit within such definition but through error or oversight are not named later as class members are allowed to intervene under Illinois law.