**MDL 1358**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG - 3 2005

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:** <br> **METHYL-TERTIARY BUTYL ETHER** <br> **PRODUCTS LIABILITY LITIGATION** | **MDL Docket No. 1358 (SAS)** <br><br> **Master File No. 1:00-1898** |
| **This Document Relates Only To:** <br><br> *City of Merced v. Chevron U.S.A., Inc., et al.*, <br> Case No. 1:05-cv-00662-REC-LJO (E.D. Cal.) | |

**CERTAIN DEFENDANTS' OPPOSITION TO**
**MOTION TO VACATE CONDITIONAL TRANSFER ORDER NO. 14**

PLEADING NO. 194

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2005 AUG -3 P 3: 27

RECEIVED
CLERK'S OFFICE

**OFFICIAL FILE COPY**

IMAGED AUG - 8 2005

## **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

I.      CREATION OF MDL 1358.................................................................... 3

II.     PROCEEDINGS IN MDL 1358............................................................ 3

III.    THE PANEL'S DENIAL OF SIMILAR MOTIONS TO VACATE CTOs.................. 5

ARGUMENT ...................................................................................................... 5

I.      THE CITY OF MERCED ACTION IS CLEARLY A TAG-ALONG CASE THAT
        IS APPROPRIATELY TRANSFERRED TO MDL 1358............................................ 6

        A.      This Action Raises The Same Common Questions Of Fact As The Other
                Cases Transferred To MDL 1358...................................................... 6

        B.      Transferring The City of Merced Case Will Serve The Convenience Of The
                Parties And Witnesses And Prevent Duplicative Discovery .............................. 8

        C.      Giving Effect To The CTO Is Necessary For The Efficient Conduct Of
                The Litigation, Avoiding Inconsistent Pretrial Rulings, And Judicial
                Economy............................................................................................ 9

II.     NONE OF THE ARGUMENTS IN THE MOTION MERITS VACATING
        CTO-14................................................................................................... 10

        A.      The Previously-Pending Remand Motion Is Not a Basis for Denying
                Transfer............................................................................................. 10

        B.      The Presence Of Common Issues Makes Transfer Appropriate Despite
                The City of Merced 's Allegations of "Differing Legal Theories".................... 11

CONCLUSION .................................................................................................. 13

## TABLE OF AUTHORITIES

### CASES

In re Armored Car Antitrust Litig.,
    462 F. Supp. 394 (J.P.M.L. 1978)................................................................ 8, 9

In re Bridgestone/Firestone, Inc.,
    2000 WL 33416573 (J.P.M.L. Oct. 24, 2000) ........................................ 11, 12

In re Continental Grain Co., Inc.,
    482 F. Supp. 330 (J.P.M.L. 1979)........................................................... 11, 12

In re Crown Life Ins. Co. Premium Litig.,
    178 F. Supp. 2d 1365 (J.P.M.L. 2001)...................................................... 9, 10

In re Data Gen. Corp. Antitrust Litig.,
    510 F. Supp. 1220 (J.P.M.L. 1979)............................................................ 8, 9

In re Enron Corp. Sec. Derivative & "ERISA" Litig.,
    227 F. Supp. 2d 1389 (J.P.M.L. 2002)........................................................ 10

In re "Fine Paper" Antitrust Litig.,
    453 F. Supp. 118 (J.P.M.L. 1978).............................................................. 8, 9

In re Holiday Magic Sec. & Antitrust Litig.,
    375 F. Supp. 1400 (J.P.M.L. 1974)......................................................... 11, 12

In re Ivy,
    901 F.2d 7 (2d Cir. 1990).......................................................................... 10

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation
    2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000) .............................. 12

In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,
    342 F. Supp. 2d 147 (S.D.N.Y. 2004)...................................................... 7, 12

In re Multi-Piece Rim Products Liability Litigation,
    464 F. Supp. 969 (J.P.M.L. 1979)............................................................... 13

In re National Century Fin. Enters., Inc. Investment Litig.,
    293 F. Supp. 2d 1375 (J.P.M.L. 2003)........................................................ 10

In re Phenylpropanandamine (PPA) Products Liability Litig.,
    173 F. Supp. 2d 1377 (J.P.M.L. 2001)................................................... 11, 12

In re Sugar Indus. Antitrust Litig. (East Coast),
 437 F. Supp. 1204 (J.P.M.L. 1977)..................................................................... 9

In re Wireless Tel. Fed. Cost Recovery Fees Litig.,
 293 F. Supp. 2d 1378 (J.P.M.L. 2003).......................................................... 10

## **STATUTES**

28 U.S.C. § 1407 ............................................................................................ 1, 11, 12

## INTRODUCTION

The undersigned defendants support this Panel's Conditional Transfer Order (CTO-14), request that plaintiff City of Merced's ("Plaintiff" or "the City of Merced") Motion to Vacate Conditional Transfer Order ("Motion") be denied, and urge that the *City of Merced v. Chevron U.S.A., Inc.*, et al., Case No. 1:05-cv-00662-REC-LJO (E.D. Cal.) case ("*City of Merced* action") be transferred to MDL 1358 and consolidated with the seventy-plus MTBE actions the Panel has already transferred since February 2004.

Plaintiff's Motion should be denied because it fails to comply with the Panel's Rules of Procedure, Rule 7.1(a), which requires that "[a]verments in any motion seeking action by the Panel shall be made in numbered paragraphs, each of which shall be limited, as far as practicable, to a statement of a single factual averment." If the Panel nonetheless considers the Motion, the undersigned defendants state, pursuant to Rule 7.1(b), that all of Plaintiff's arguments in its Motion are without merit and that the *City of Merced* action satisfies the criteria for transfer pursuant to 28 U.S.C. § 1407.

Plaintiff's Motion fails to satisfy the standard for vacating a Conditional Transfer Order (i.e., proving that there are not one or more common questions of fact and that the transfer will not be for the convenience of parties and witnesses or promote the just and efficient conduct of such actions). *See* 28 U.S.C. § 1407(a). In fact, notwithstanding its title of "Motion to Vacate Conditional Transfer Order", the Motion fails even to address the transfer standard. Rather, the only argument advanced by Plaintiff is that removal was not proper. (*See* Motion at p. 1 (arguing that "[t]he conditional transfer order should be vacated because there is no federal jurisdiction in the case, and defendant ExxonMobil Corporation et al.'s (ExxonMobil's) removal to federal court was improper."); *see also* Motion at p. 2–10 (same)). However, Plaintiff does *not* ask the Panel

to decide Plaintiff's motion for remand[1] and, in fact, concedes that "the Panel does not have the power to remand the case to state court" (Motion at p.1/2nd ¶). Thus, Plaintiff's Motion to Vacate should be denied and the motion for remand should be decided by the transferee judge who, by virtue of the ongoing proceedings in MDL 1358 and prior analysis of numerous motions to remand, is thoroughly familiar with the arguments being asserted by the parties, the legal authorities, and the factual issues.

To the extent Plaintiff suggests that transfer is improper because the *City of Merced* complaint is somehow "different" from every one of the more than seventy other cases in MDL 1358, such argument is baseless. The *City of Merced* case raises the same common questions of fact—*e.g.*, what defendants knew and represented about MTBE and whether plaintiff's water was contaminated by MTBE—that have led to the transfer of over seventy MTBE actions to MDL 1358. As the Panel well knows, the City of Merced's argument that it is "different" has been repeatedly rejected as a basis for denying multi-district treatment. Indeed, it was rejected in the very decision that established MDL 1358, as well as the decision that denied motions to vacate CTO-4 and CTO-5. Therefore, this MTBE case should join the other seventy-plus actions that have been transferred to the Southern District of New York for consolidated proceedings, where the parties can receive the benefits of convenience, justice, and efficiency resulting from centralized proceedings under a judge experienced in MTBE litigation.

---

[1]    Plaintiff filed a Motion for Remand, which defendants opposed (see Opposition to Plaintiff's Motion for Remand, attached as Ex. C). Rather than re-state their remand Opposition arguments herein, defendants attach the Opposition as an exhibit and incorporate it by reference. As demonstrated in the remand Opposition, the removal was proper.

## BACKGROUND

I.   CREATION OF MDL 1358

The Panel created MDL 1358 on October 10, 2000 to centralize two putative class actions brought by private well owners.  (October 10, 2000 MTBE Transfer Order, Ex. A)  The Panel found that the actions involved two common questions of fact:

1.   "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and

2.   "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination."  (*Id.*)

The Panel explained that centralization would be more convenient for parties and witnesses, promote justice and efficiency, avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary.  (*Id.*)  Pursuant to the Transfer Order, Judge Scheindlin of the Southern District of New York became the transferee judge for the MTBE cases.

II.   PROCEEDINGS IN MDL 1358

Judge Scheindlin has spent several years managing MDL 1358, becoming intimately familiar with the facts and legal theories presented by MTBE cases.  The MDL 1358 Court has ruled on various substantive motions, including defendants' motions to dismiss and plaintiffs' motion for class certification.  Judge Scheindlin also oversaw class certification and other discovery, including creation of a document depository in New York, entered a document preservation order, oversaw electronic and paper document production, and had the parties create an MDL 1358 website.

Beginning in Fall 2003, a new round of MTBE cases was filed in state courts throughout the nation, seeking to impose conflicting state standards on refiners' use of MTBE in gasoline to satisfy federal requirements. All of the complaints allege that plaintiffs' water supplies have been (or are threatened with becoming) contaminated by gasoline with MTBE and that the defendants misrepresented the nature of MTBE.

In response to this mass of MTBE cases, defendants began removing the cases to federal court with the goal of having a single court issue uniform rulings. Immediately after removal, defendants began filing tag-along notices alerting the Panel that the new actions were subject to transfer pursuant to the October 2000 Transfer Order in MDL 1358. This Panel began issuing CTOs in February 2004 and has continued through the present day, with fourteen CTOs being issued so far. Over seventy cases have been transferred to Judge Scheindlin as presiding judge of MDL 1358 based on the Panel's finding that the MTBE cases involve common questions of fact with actions previously transferred.

Since receiving this new wave of MTBE actions, Judge Scheindlin has promptly undertaken the management of the cases.[1/] Judge Scheindlin has held regular status conferences, issued rulings denying the various plaintiffs' motion for remand, entered ten Case Management Orders ("CMO") and a document preservation order, issued rulings on motions to dismiss, appointed a Special Master to manage discovery, and selected four "focus cases" to help guide the resolution of the scores of other pending cases. In short, the MDL 1358 Court has been actively managing all aspects of MTBE cases like the *City of Merced* action.

---

2      MDL 1358 became temporarily inactive in the Southern District of New York after the Court denied the private well-owner plaintiffs' motion for class certification on July 16, 2002.

III.    THE PANEL'S DENIAL OF SIMILAR MOTIONS TO VACATE CTOs

The City of Merced's motion to vacate CTO 14 is not the first time the Panel has been called upon to adjudicate efforts to prevent the efficient coordination of MTBE cases.  In early 2004, plaintiffs including the State of New Hampshire, the Sacramento District Attorney, and various California counties, municipalities, water districts, corporations and individuals filed motions to vacate portions of CTO-4 and CTO-5 to prevent their cases from being transferred to MDL 1358.  Among other assertions, these objectors claimed that there were individual and/or local questions of fact and differing legal theories in their actions that justify excluding them from the MDL 1358.[3/]  The Panel rejected these arguments in a Transfer Order entered on June 16, 2004, and ordered that the subject cases be transferred to Judge Scheindlin.  (June 16, 2004 Transfer Order, Ex. B).

## ARGUMENT

Approximately seventy MTBE cases have now been consolidated in MDL 1358 before Judge Scheindlin.  There is no reason to exclude the *City of Merced* action from the benefits of coordination, efficiency, and consistency that MDL 1358 is providing.  This action is a classic tag-along case that easily meets the standards for transfer.

---

[3]    *See, e.g.,* Br. in Support of State of N.H. Motion to Vacate CTO 4 at 14–16, attached as Ex. D; Cal-Amer. Mot. to Vacate CTO 4 at 13–16, attached as Ex. E; Br. in Support of Plaintiffs' Motion to Vacate CTO 5 at 14–20, attached as Ex. F; Br. of People of the State of California in Support of Mot. to Vacate CTO 5 at 13–15, attached as Ex. G.

I.      THE *CITY OF MERCED* ACTION IS CLEARLY A TAG-ALONG CASE THAT IS APPROPRIATELY TRANSFERRED TO MDL 1358

        Each of the reasons identified in the Transfer Order establishing MDL 1358—common questions of fact, convenience of parties and witnesses, just and efficient conduct of the litigation, avoidance of duplicative discovery, avoidance of inconsistent pretrial rulings, and judicial economy—applies here.

      A.      This Action Raises The Same Common Questions Of Fact As The Other Cases Transferred To MDL 1358

        Both common questions of fact found by the Panel in the MTBE Transfer Order are clearly at issue in the *City of Merced* action. As stated by the Panel, those common questions include:

      1.      "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and

      2.      "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." (MTBE Transfer Order, Ex. A; *see also* June 16, 2004 Transfer Order, Ex. B).

        The *City of Merced* complaint repeatedly alleges facts implicating these exact questions. For example, it alleges that:

- "defendants sold gasoline containing MTBE and/or TBA to Merced gasoline stations that released gasoline containing MTBE and/or TBA into the environment. Gasoline containing MTBE and/or TBA has contaminated, polluted, and threatened, and continues to contaminate, pollute, and threaten, the City's water system." (Compl. ¶ 3)

- "these Defendants: (1) sold, promoted, marketed, distributed, transported, and/or exchanged gasoline containing MTBE /or TBA, which is contaminating, polluting and threatening Merced's public water supplies; owned, operated, and/or controlled gasoline delivery systems, including, but not limited to, gasoline stations, gasoline storage, transfer, delivery,

and dispensing systems (collectively herein "gasoline delivery systems") in areas affecting Merced's public water supplies"  (Compl. ¶ 12)

- "The Defendants promoted the use of gasoline containing MTBE and/or TBA by claiming that it was environmentally beneficial and would improve air quality. At the same time, Defendants concealed and/or failed to disclose that MTBE would contaminate groundwater and render it not potable."  (Compl. ¶ 21)

- "At all times, Defendants represented to purchasers of MTBE, TBA, and/or gasoline containing MTBE and/or TBA, as well as to the public and government agencies, that such products were environmentally sound and appropriate for distribution, sale and use.  Indeed, Defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface."  (Compl. ¶ 23)

- "Defendants, and each of them, falsely represented, asserted, claimed and warranted that gasoline containing MTBE and/or TBA could be used in the sane manner as gasoline not containing these compounds, did not require any different or special handling or precautions, and/or was environmentally beneficial."  (Compl. ¶ 31; *see also* Compl. ¶ 32 (alleging that "Defendants intentionally concealed and/or failed to disclose" information regarding the nature of MTBE)).

In short, the *City of Merced* action raises identical common questions of fact as the MTBE actions already transferred to MDL 1358.  In addition, the *City of Merced* complaint alleges similar causes of action seeking identical relief as other cases in MDL 1358.  (*See* Order Granting Defendants' Motion For Stay Pending Determination By Panel On Multi-District Litigation, Denying Defendants' Ex Parte Request, Vacating Oral Argument Set For July 25, 2005, and Staying Further Proceedings, *City of Merced v. Chevron U.S.A., Inc., et al.*, Case No. 1:05-cv-00662-REC-LJO (E.D. Cal.) (July 11, 2005) ("E.D. Order") at 2, attached as Ex. H ("Plaintiff argues that its case is different from those consolidated into <u>MDL No. 1358</u> because Plaintiff does not state a cause of action for products liability. There are, however, causes of action within MDL No. 1358 that mirror those in Plaintiff's complaint—failure to warn, negligence and nuisance."));  Compl. ¶¶ 29–59 (alleging causes of action for failure to warn, negligence, trespass, and nuisance purportedly arising from MTBE contamination of Merced's

water system); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 342 F. Supp. 2d 147, 150 (S.D.N.Y. 2004) (complaints in MDL 1358 include causes of action for nuisance, failure to warn, and negligence); Compl. ¶¶ 3, 12, 30–36 (seeking to punish defendants for the sale or use of MTBE gasoline); *see, e.g.,* Complaint, *City of Fresno v. Chevron U.S.A., Inc., et al.*, MDL 1358, attached as Ex. I, at ¶¶ 5, 25, 74, 76, 80, 81 (same)).

      B.      Transferring The *City of Merced* Case Will Serve The Convenience Of The Parties And Witnesses And Prevent Duplicative Discovery

      The same convenience to parties and witnesses and avoidance of duplicative discovery that supported the creation of MDL 1358 apply to the transfer of the *City of Merced* action. It involves the same factual allegations and the same or similar claims, is brought against some of the same defendants as the cases already transferred to MDL 1358, and is brought by counsel (Miller, Axline & Sawyer) who represents other plaintiffs in MDL 1358. Thus, this case will involve discovery on many of the same factual issues against many of the same defendants, by counsel for the City of Merced. That discovery should proceed in a coordinated fashion in the MDL 1358 Court. Indeed, Judge Scheindlin already is managing significant MTBE discovery. Having document production and depositions occur in a single centralized proceeding will avoid duplicative discovery and be more convenient for parties and witnesses than producing the same documents and witnesses over and over. *In re Data Gen. Corp. Antitrust Litig.*, 510 F. Supp. 1220, 1227 (J.P.M.L. 1979) (transferring cases under CTO to "avoid duplicative discovery and prevent waste of resources by the parties, their counsel and the courts."); *In re Armored Car Antitrust Litig.*, 462 F. Supp. 394, 396 (J.P.M.L. 1978) (transferring action brought by State of Maryland pursuant to CTO "to eliminate the potential for duplicative discovery, inconsistent pretrial rulings and waste of judicial resources"); *In re "Fine Paper" Antitrust Litig.*, 453 F. Supp. 118, 121 (J.P.M.L. 1978) (transferring cases covered by CTO "to prevent duplicative discovery and eliminate any possibility of conflicting class and other pretrial rulings").

C.     Giving Effect To The CTO Is Necessary For The Efficient Conduct Of The Litigation, Avoiding Inconsistent Pretrial Rulings, And Judicial Economy

The MDL 1358 Court already has considered motions to remand MTBE cases for lack of subject matter jurisdiction, as well as motions to dismiss for lack of personal jurisdiction over certain parties and for failure to state a claim. Some defendants may file motions for summary judgment or other motions in the *City of Merced* action that largely duplicate the motions that will be filed for the cases already transferred to MDL 1358. Judge Scheindlin's Case Management Orders establish procedures for such motions as well as for other summary judgment motions. (*see* Judge Scheindlin's CMOs, collectively attached as Ex. J) Filing these motions in multiple courts rather than only before Judge Scheindlin runs a high risk of producing conflicting rulings. Additionally, allowing this action to proceed separately from MDL 1358 will likely result in conflicting discovery schedules and case management orders.

There simply is no need to consume judicial resources by having multiple courts familiarize themselves with the issues presented by MTBE litigation and consider and rule on the same questions. This is especially true given that Judge Scheindlin is well versed in the facts and the law of the cases. *E.g.*, *In re Crown Life Ins. Co. Premium Litig.*, 178 F. Supp. 2d 1365, 1366 (J.P.M.L. 2001) (noting that "judge's familiarity with this [MDL] docket furthers the expeditious resolution of the litigation taken as a whole."); *In re Sugar Indus. Antitrust Litig. (East Coast)*, 437 F. Supp. 1204, 1208 (J.P.M.L. 1977) (noting the court was "thoroughly familiar with the all issues involved in this complex litigation, and therefore is clearly in the best position to fully consider and monitor the effects" of the issues presented by the party objecting to transfer). Thus, centralizing the *City of Merced* action with the other MTBE cases is appropriate. *See Data General*, 510 F. Supp. at 1227; *Armored Car*, 462 F. Supp. at 396; *Fine Paper*, 453 F. Supp. at 122.

II.    NONE OF THE ARGUMENTS IN THE MOTION MERITS VACATING CTO-14

Despite the similarity between the allegations in the *City of Merced* action and the cases now centralized in MDL 1358, the City of Merced moved to vacate CTO-14, arguing that removal was not proper and requesting that the Honorable Robert E. Coyle, U.S. District Judge for the Eastern District of California, decide its motion for remand.  In addition, the City of Merced implies that its complaint is somehow "different" from every one of the seventy-plus other cases in MDL 1358 because it omitted an express product liability cause of action.  None of these objections withstands scrutiny—in fact, the Panel regularly rejects similar arguments and did so when it created MDL 1358 and again when it denied the motions to vacate CTO-4 and CTO-5.

A.    The Previously-Pending Remand Motion Is Not a Basis for Denying Transfer

The City of Merced previously filed a motion for remand, which it restates, nearly verbatim, in its Motion to Vacate the CTO.  The City of Merced requests, without supporting argument or legal authorities, that the Panel vacate the CTO to allow Judge Coyle to decide the remand motion.  See Motion at p. 1.  That request should be denied.  As the Panel has routinely held, the pendency of a remand motion is not grounds for denying transfer.  *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("the MDL Panel has jurisdiction to transfer a case in which a jurisdictional objection is pending, that objection to be resolved by the transferee court") (citation omitted); *see also In re National Century Fin. Enters., Inc. Investment Litig.*, 293 F. Supp. 2d 1375, 1377 (J.P.M.L. 2003); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 293 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 227 F. Supp. 2d 1389, 1391 (J.P.M.L. 2002); *In re Crown Life Ins. Co. Premium Litig.*, 178 F. Supp.

-10-

2d 1365, 1366 (J.P.M.L. 2001). Moreover, here there is not even a motion for remand pending—Judge Coyle ordered it withdrawn without prejudice. (See E.D. Order, Ex. H, at 3).

If Plaintiff believes it has different legal theories for remand, it can present those theories to the MDL Court. As explained below, however, the presence of different or additional legal theories (in this case relating to remand) does not support having factually similar cases proceed in different forums. *See, e.g., In re Phenylpropandamine (PPA) Products Liability Litig.*, 173 F.Supp.2d 1377, 1379 (J.P.M.L. 2001); *In re Bridgestone/Firestone, Inc.*, 2000 WL 33416573, at *2 (J.P.M.L. Oct. 24, 2000); *In re Continental Grain Co., Inc.*, 482 F. Supp. 330, 332 (J.P.M.L. 1979); *In re Holiday Magic Sec. & Antitrust Litig.*, 375 F. Supp. 1400, 1402 (J.P.M.L. 1974). Furthermore, defendants opposed the City of Merced's motion for remand, relying in part on Judge Scheindlin's previous remand decisions (*see* Defendants' Opposition to Remand Motion, Ex. C), and expect to do so if the City of Merced files another remand motion. The City of Merced seeks to prove that its claims fall within an exception to the previous decisions, defendants contend just the opposite, and the MDL 1358 Court is in the best position to decide whether to remand the *City of Merced* case.

B.  The Presence Of Common Issues Makes Transfer Appropriate Despite The City of Merced 's Allegations of "Differing Legal Theories"

The standard for transferring actions pending in different districts to an MDL for coordinated or consolidated proceedings is that they "involv[e] one or more common questions of fact." 28 U.S.C. § 1407(a). Applying this standard previously in MDL 1358, the Panel denied numerous motions to vacate CTO-4 and CTO-5:

> On the basis of the papers filed and hearing session held, the Panel finds that these nine actions share questions of fact with actions in this litigation previously transferred to the Southern District of New York arising out of allegations that defendants knew about and misrepresented the nature of MTBE resulting in

-11-

drinking water contamination. Transfer of these actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. We note that any pending motions to remand to state court can be presented to and decided by the transferee judge. . . . The Panel further finds that transfer of these actions is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. The Panel held that the Southern District of New York was a proper Section 1407 forum for actions involving allegations relating to MTBE contamination. *See In re Methyl Tertiary Butyl Ether* ("*MTBE*") Products Liability *Litigation*, 2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000).

(June 16, 2004 MTBE Transfer Order, Ex. B, at 2).

      The City of Merced argues that its lawsuit is different than the cases in MDL 1358 because its complaint does not include an express "defective product" claim. (*See* Motion at p. 4/last ¶). However, the City of Merced ignores the fact that its theories of failure to warn, negligence, trespass, and nuisance are present in virtually every MTBE action transferred to MDL 1358. (*See* 342 F. Supp. 2d at 150). Moreover, the City of Merced ignores legal authorities holding that the presence of different or additional legal theories does not support having factually similar cases proceed in different forums. *See In re Bridgestone/Firestone, Inc.*, 2000 WL 33416573, at *2 ("Nor is the presence of additional or differing legal theories significant when the underlying actions still arise from a common factual core.").[1/]  In fact, the

---

[4]     *See also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F Supp. 2d at 1379 (transferring factually similar actions even though cases were based on different legal theories of recovery" and objectors argued that their particular cases "involve unique matters not present in other actions"); *In re Continental Grain Co., Inc.*, 482 F. Supp. at 332 (Cases appropriately transferred because the "presence of differing legal theories in some of the actions does not

Panel has already rejected the same argument in deciding motions to vacate prior CTOs in MDL 1358, stating:

> Opponents argue that the presence of individual and/or local questions of fact as well as differing legal theories in these actions should militate against inclusion of these actions in Section 1407 proceedings. We are unpersuaded by these arguments. Indeed, we point out that the inclusion of these actions in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F. Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.

(June 16, 2004 MTBE Transfer Order, Ex. B, at 2). The same result is warranted here—the City of Merced's claims share questions of fact with actions previously transferred to MDL 1358 arising out of allegations that defendants knew about and misrepresented the nature of MTBE resulting in drinking water contamination. This action should be transferred to MDL 1358.

## CONCLUSION

Well over seventy MTBE cases already have been transferred to MDL 1358 for pre-trial coordination. Judge Scheindlin, presiding over MDL 1358, has welcomed these cases and can be expected to bring experience and expertise to bear in guiding the MTBE actions forward. In light of the substantial economies to be achieved, the justice and efficiency to be

---

negate the existence of common questions of fact"); *In re Holiday Magic Sec. & Antitrust Litig.*, 375 F. Supp. at 1402 ("It is not unusual for plaintiffs in multidistrict litigation to base their claims for relief on different legal theories. But it is the facts underlying those theories which we must look to in making our determination under Section 1407.").

achieved, and the inconsistencies to be avoided, the City of Merced should not be permitted to splinter off the *City of Merced* action to the detriment of the other participants. This is especially true where the only arguments the objectors can offer have been rejected time and again by this Panel. Therefore, for the reasons stated above, the undersigned defendants respectfully request that the Panel deny the City of Merced's motion to vacate CTO-14 and order the transfer of *City of Merced* to MDL 1358 for coordinated and consolidated pretrial proceedings.

DATED: August 3, 2005

Respectfully submitted,

By:  *Stephen J. Riccardulli*

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, NY 10020-1605
(212) 547-5400
(212) 547-5444 (Facsimile)

Jeffrey J. Parker
Lori J. Osmundsen
Whitney D. Jones
SHEPPARD MULLIN RICHTER & HAMPTON LLP
333 South Hope Street 48th Floor
Los Angeles, California 90071
(213) 620-1780
(213) 620-1398 (facsimile)

Attorneys for Defendant Exxon Mobil Corporation

-14-

Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (facsimile)

David L. Schrader
Allison N. Shue
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, California 90071
 (213) 612-2500
 (213) 612-2501 (facsimile)

Attorneys for Defendant Chevron U.S.A, Inc.


Richard E. Wallace, Jr.
Peter C. Condron
WALLACE KING MARRARO & BRANSON LLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
(202) 204-1000
(202) 204-1001 (facsimile)

William D. Temko
Patrick J, Cafferty, Jr.
Hojoon Hwang
MUNGER, TOLLES & OLSON LLP
355 South Grand, Suite 3500
Los Angeles, CA 90071
(213) 683-9100
(213) 687-3702 (facsimile)

Attorneys for Defendants Shell Oil Company and
Equilon Enterprises LLC

WP-LA:LJA\70860704.1

-15-

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG - 3 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE:<br>**METHYL-TERTIARY BUTYL ETHER<br>PRODUCTS LIABILITY LITIGATION** | **MDL Docket No. 1358 (SAS)**<br><br>**Master File No. 1:00-1898** |
| **This Document Relates Only To:**<br><br>*City of Merced v. Chevron U.S.A., Inc., et al.*, Case<br>No. 1:05-cv-00662-REC-LJO (E.D. Cal.) | |

## RULE 5.2 CERTIFICATION

I hereby certify that I have this 3rd day of August, 2005, I caused to be served by electronic means upon plaintiffs' liaison counsel, Robin Greenwald, Esq., Weitz & Luxenberg, 180 Maiden Lane, New York, New York 10038, a true and correct copy of each of the following documents:

1. Certain Defendants' Opposition to Motion to Vacate Conditional Transfer Order No. 14; and

2. Exhibits in Support of Certain Defendant's Opposition to Motion to Vacate Conditional Transfer Order No. 14.

Brian A. McGill

Panel Service List (CTO-14)
Docket No. 1358
In re: Methyl Tertiary Butyl Either ("MTBE") Products Liability Litigation

*City of Merced v. Exxon Mobil Corp., et al.*, E.D. Cal., C.A. No. 1:05-662 (Judge R. E. Coyle)

Robin Greenwald
Weitz & Luxenberg, P.C.
180 Maiden Lane
17th Floor
New York, New York 10038

Gregory George Diaz
City of Merced
Deputy City Attorney
678 W. 18th Street
Merced, CA 95340

Evan Eickmeyer
Miller, Axline & Sawyer
1050 Fulton Ave.
Sacramento, CA 95825

Allison Shue
Morgan, Lewis & Bockius
300 S. Grand Avenue
22nd Floor
Los Angeles, CA 90071

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2005 AUG -4   P 3: 53

RECEIVED
CLERK'S OFFICE

RECEIVED
CLERK'S OFFICE

2005 AUG -3  P 3: 27

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 10 2000

DOCKET NO. 1358

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*David England, et al. v. Atlantic Richfield Co., et al.,* S.D. Illinois, C.A. No. 3:00-370
*David England, et al. v. Atlantic Richfield Co., et al.,* S.D. Illinois, C.A. No. 3:00-371
*Donna Berisha, et al. v. Amerada Hess Corp., et al.,* S.D. New York, C.A. No. 1:00-1898

## BEFORE JOHN F. NANGLE, CHAIRMAN, LOUIS C. BECHTLE, JOHN F. KEENAN, WM. TERRELL HODGES,* MOREY L. SEAR,* BRUCE M. SELYA* AND JULIA SMITH GIBBONS, JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of three actions pending in the following federal districts: two actions in the Southern District of Illinois and one action in the Southern District of New York.[1] Before the Panel is a motion by five oil company defendants seeking centralization of these actions, pursuant to 28 U.S.C. §1407, in the Southern District of Illinois for coordinated or consolidated pretrial proceedings. Five additional defendants agree that centralization is appropriate, although two of these defendants prefer centralization in the Southern District of New York. The Illinois plaintiffs support centralization in the Illinois court. The New York plaintiffs along with eight defendants oppose centralization; if the Panel deems centralization appropriate, the New York plaintiffs and at least one opposing defendant favor centralization in the New York court.[2]

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact concerning i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public, and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination. Centralization under Section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Section 1407 proceedings are desirable in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.

Opponents of transfer argue that the presence of individual questions of fact militate against 1407 transfer. We are unpersuaded by this argument. Indeed, we point out that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who

---

* Judges Hodges, Sear and Selya took no part in the decision of this matter.

[1] The Panel has been notified that two potentially related actions have been recently filed in the Middle and Southern Districts of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 192 F.R.D. 459, 468-470 (2000).

[2] In an interested party response, plaintiffs in a potentially related action – *Buddy Lynn, et al. v. Amoco Oil Company, et al.,* M.D. Alabama, C.A. No. 96-940 – suggest centralization of MDL-1358 in the Middle District of Alabama.

IMAGED OCT 12 '00

- 2 -

can formulate a pretrial program that: 1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or an action can be remanded to their transferor district for trial in advance of completion of the other actions in the transferee district. But we are unwilling, on the basis of the record before us, to make such a determination at this time. Should the transferee judge deem remand of any claims or an action appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 192 F.R.D. 459, 470-472 (2000).

We are persuaded that centralization of this litigation in the Southern District of New York is appropriate. We note that the New York action is proceeding apace before Judge Shira Ann Scheindlin and we are confident in her ability to conduct pretrial proceedings in this litigation in an expeditious manner.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the above-captioned actions pending in the Southern District of Illinois be, and the same hereby are, transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for coordinated or consolidated pretrial proceedings with the action pending there.

FOR THE PANEL:

John F. Nangle
Chairman

Exhibit B

# UNITED STATES OF AMERICA
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge John F. Keenan
United States District Court
Southern District of New York

Judge Bruce M. Selya
United States Court of Appeals
First Circuit

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

**DIRECT REPLY TO:**

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888

http://www.jpml.uscourts.gov

June 16, 2004

TO INVOLVED COUNSEL

Re: MDL-1358 -- In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

    *Hicksville Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1278
    *Roslyn Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1280
    *Franklin Square Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1281
    *County of Suffolk, et al. v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1321

Dear Counsel:

    Attached is a copy of a conditional transfer order filed today by the Judicial Panel on Multidistrict Litigation involving the above matter. The actions are transferred pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001). Copies of Rule 5.2, dealing with service, and Rules 7.4 and 7.5, regarding "tag-along" actions, are attached.

    Inasmuch as there is an unavoidable time lag between notification of the pendency of the tag-along action and the filing of a conditional transfer order, counsel are required by Rule 7.4(b) to notify this office **BY FACSIMILE**, at (202) 502-2888, of any official changes in the status of the tag-along action. These changes could involve dismissal of the action, remand to state court, transfer to another federal court, etc., as indicated by an order filed by the district court. Your cooperation would be appreciated.

      **NOTICE OF OPPOSITION DUE ON OR BEFORE:** <u>July 1, 2004</u> **(4 p.m. EST)**
             (Facsimile transmission is suggested.)

    If you are considering opposing this conditional transfer order, please review Rules 7.4 and 7.5 of the Panel <u>Rules</u> before filing your Notice of Opposition. Please file one Notice of Opposition (with an attached schedule of actions, if necessary) if you are opposing the transfer of more than one action. A consolidated Motion and Brief to Vacate the CTO, with attached schedule of actions, is acceptable and encouraged.

    A list of involved counsel is attached.

                    Very truly,

                    Michael J. Beck
                    Clerk of the Panel

                    By *Teresa Bishop*
                    Deputy Clerk

Attachments

                                        JPML Form 39A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 1 8 2004

FILED
CLERK'S OFFICE

*DOCKET NO. 1358*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*Hicksville Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1278
*Roslyn Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1280
*Franklin Square Water District v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1281
*County of Suffolk, et al. v. Amerada Hess Corp., et al.,* E.D. New York, C.A. No. 2:04-1321

### CONDITIONAL TRANSFER ORDER (CTO-8)

On October 10, 2000, the Panel transferred two civil actions to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Since that time, 48 additional actions have been transferred to the Southern District of New York. With the consent of that court, all such actions have been assigned to the Honorable Shira Ann Scheindlin.

It appears that the actions on this conditional transfer order involve questions of fact which are common to the actions previously transferred to the Southern District of New York and assigned to Judge Scheindlin.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Southern District of New York for the reasons stated in the order of October 10, 2000, and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Southern District of New York. The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Michael J. Beck*

Michael J. Beck
Clerk of the Panel

**INVOLVED COUNSEL LIST (CTO-8)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

Samuel J. Abate, Jr.
McCarter & English, L.L.P.
245 Park Avenue
New York, NY 10167

Brent H. Allen
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Stanley N. Alpert
Weitz & Luxenberg
180 Maiden Lane
17th Floor
New York, NY 10038

Dan H. Ball
Bryan Cave, L.L.P.
One Metropolitan Square
Suite 3600
211 N. Broadway
St. Louis, MO 63102

Peter A. Bellacosa
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675

Anton J. Borovina
Borovina & Marullo, PLLC
425 Broadhollow Road
Melville, NY 11747

Mitchell M. Breit
Weitz & Luxenberg
180 Maiden Lane
17th Floor
New York, NY 10038

Peter C. Condron
Wallace, King, Marraro & Branson
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007

Mindy G. Davis
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92823

John J. Fanning
Cullen & Dykman Bleakley Platt
177 Montague Street
Brooklyn, NY 11201

Heather M. Fusco
Beveridge & Diamond, P.C.
477 Madison Avenue
15th Floor
New York, NY 10022

Christopher J. Garvey
Goodwin Procter, LLP
599 Lexington Avenue
New York, NY 10022

J. Clifford Gunter, III
Bracewell & Patterson LLP
South Tower Pennzoil Place
711 Louisiana Street
Suite 2900
Houston, TX 77002-2781

Steven R. Gustavson
Baker & Botts
30 Rockefeller Plaza
New York, NY 10112

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W.
Suite 700
Washington, DC 20005

Alan J. Hoffman
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Joseph Conrad Kearfott
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Ben M. Krowicki
Bingham McCutchen, LLP
One State Street
Hartford, CT 06103-3178

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Steven L. Leifer
Baker, Botts, L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400

John McGahren
Latham & Watkins
One Newark Center
16th Floor
Newark, NJ 07101-3174

Charles S. McNew
Weitz & Luxenberg
180 Maiden Lane, 17th Floor
New York, NY 10038

Lisa S. Meyer
Eimer, Stahl, Klevorn & Solberg, LLP
224 S. Michigan Avenue
Suite 1100
Chicago, IL 60604

James A. Pardo
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605

Paul J. Reilly
Baker & Botts
30 Rockefeller Plaza
44th Floor
New York, NY 10112

Lauren E. Rosenblatt
Hunton & Williams
200 Park Avenue
44th Floor
New York City, NY 10166

INVOLVED COUNSEL LIST (CTO-8) MDL-1358

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockerfeller Plaza
New York, NY 10020

Laurence S. Shtasel
Blank, Rome, Comisky & McCauley
One Logan Square
18th & Cherry Street
Philadelphia, PA 19103-6998

Lori J. Shyavitz
McCarter & English, L.L.P.
300 Park Avenue
18th Floor
New York, NY 10022

Andrew M. Smith
Getty Properties Corp.
General Counsel
125 Jericho Turnpike, Suite 103
Jericho, NY 11753

Rod G. Smith
ConocoPhillips
600 North Dairy Ashford
Houston, TX 77079

Jeffrey G. Stark
Meyer, Suozzi, English & Klein, P.C.
1505 Kellum Place
Mineola, NY 11501

Scott Summy
Baron & Budd
The Centrum Building, Suite 1100
3102 Oak Lawn Avenue
Dallas, TX 75219-4281

Mark E. Tully
Goodwin Procter
Exchange Place
Second Floor
Boston, MA 02109-2881

Lynn Wright
Edwards & Angell
750 Lexington Avenue
New York, NY 10022

RULE 5.2.      SERVICE OF PAPERS FILED

(a)      All papers filed with the Clerk of the Panel shall be accompanied by proof of previous or simultaneous service on all other parties in all actions involved in the litigation.  Service and proof of service shall be made as provided in Rules 5 and 6 of the Federal Rules of Civil Procedure.  The proof of service shall indicate the name and complete address of each person served and shall indicate the party represented by each.  If a party is not represented by counsel, the proof of service shall indicate the name of the party and the party's last known address.  The proof of service shall indicate why any person named as a party in a constituent complaint was not served with the Section 1407 pleading.  The original proof of service shall be filed with the Clerk of the Panel and copies thereof shall be sent to each person included within the proof of service.  After the "Panel Service List" described in subsection (d) of this Rule has been received from the Clerk of the Panel, the "Panel Service List" shall be utilized for service of responses to motions and all other filings.  In such instances, the "Panel Service List" shall be attached to the proof of service and shall be supplemented in the proof of service in the event of the presence of additional parties or subsequent corrections relating to any party, counsel or address already on the "Panel Service List."

(b)      The proof of service pertaining to motions for transfer of actions pursuant to 28 U.S.C. §1407 shall certify that copies of the motions have been mailed or otherwise delivered for filing to the clerk of each district court in which an action is pending that will be affected by the motion.  The proof of service pertaining to a motion for remand pursuant to 28 U.S.C. §1407 shall certify that a copy of the motion has been mailed or otherwise delivered for filing to the clerk of the Section 1407 transferee district court in which any action affected by the motion is pending.

(c)      Within eleven days of filing of a motion to transfer, an order to show cause or a conditional transfer order, each party or designated attorney shall notify the Clerk of the Panel, in writing, of the name and address of the attorney designated to receive service of all pleadings, notices, orders and other papers relating to practice before the Judicial Panel on Multidistrict Litigation.  Only one attorney shall be designated for each party.  Any party not represented by counsel shall be served by mailing such pleadings to the party's last known address.  Requests for an extension of time to file the designation of attorney shall not be granted except in extraordinary circumstances.

(d)      In order to facilitate compliance with subsection (a) of this Rule, the Clerk of the Panel shall prepare and serve on all counsel and parties not represented by counsel, a "Panel Service List" containing the names and addresses of the designated attorneys and the party or parties they represent in the actions under consideration by the Panel and the names and addresses of the parties not represented by counsel in the actions under consideration by the Panel.  After the "Panel Service List" has been received from the Clerk of the Panel, notice of subsequent corrections relating to any party, counsel or address on the "Panel Service List" shall be served on all other parties in all actions involved in the litigation.

(e)      If following transfer of any group of multidistrict litigation, the transferee district court appoints liaison counsel, this Rule shall be satisfied by serving each party in each affected action and all liaison counsel.  Liaison counsel designated by the transferee district court shall receive copies of all Panel orders concerning their particular litigation and shall be responsible for distribution to the parties for whom he or she serves as liaison counsel.

RULE 7.4:    CONDITIONAL TRANSFER ORDERS FOR "TAG-ALONG ACTIONS"

(a)    Upon learning of the pendency of a potential "tag-along action," as defined in Rule 1.1 of these Rules, an order may be entered by the Clerk of the Panel transferring that action to the previously designated transferee district court on the basis of the prior hearing or hearings and for the reasons expressed in previous opinions and orders of the Panel in the litigation. The Clerk of the Panel shall serve this order on each party to the litigation but, in order to afford all parties the opportunity to oppose transfer, shall not send the order to the clerk of the transferee district court for fifteen days from the entry thereof.

(b)    Parties to an action subject to a conditional transfer order shall notify the Clerk of the Panel within the fifteen-day period if that action is no longer pending in its transferor district court.

(c)    Any party opposing the transfer shall file a notice of opposition with the Clerk of the Panel within the fifteen-day period. If a notice of opposition is received by the Clerk of the Panel within this fifteen-day period, the Clerk of the Panel shall not transmit said order to the clerk of the transferee district court until further order of the Panel. The Clerk of the Panel shall notify the parties of the briefing schedule.

(d)    Within fifteen days of the filing of its notice of opposition, the party opposing transfer shall file a motion to vacate the conditional transfer order and brief in support thereof. The Clerk of the Panel shall set the motion for hearing at the next appropriate session of the Panel. Failure to file and serve a motion and brief shall be treated as withdrawal of the opposition and the Clerk of the Panel shall forthwith transmit the order to the clerk of the transferee district court.

(e)    Conditional transfer orders do not become effective unless and until they are filed with the clerk of the transferee district court.

(f)    Notices of opposition and motions to vacate such orders of the Panel and responses thereto shall be governed by Rules 5.12, 5.2, 7.1 and 7.2 of these Rules.

RULE 7.5:    MISCELLANEOUS PROVISIONS CONCERNING "TAG-ALONG ACTIONS"

(a)    Potential "tag-along actions" filed in the transferee district require no action on the part of the Panel and requests for assignment of such actions to the Section 1407 transferee judge should be made in accordance with local rules for the assignment of related actions.

(b)    Upon learning of the pendency of a potential "tag-along action" and having reasonable anticipation of opposition to transfer of that action, the Panel may direct the Clerk of the Panel to file a show cause order, in accordance with Rule 7.3 of these Rules, instead of a conditional transfer order.

(c)    Failure to serve one or more of the defendants in a potential "tag-along action" with the complaint and summons as required by Rule 4 of the Federal Rules of Civil Procedure does not preclude transfer of such action under Section 1407. Such failure, however, may be submitted by such a defendant as a basis for opposing the proposed transfer if prejudice can be shown. The inability of the Clerk of the Panel to serve a conditional transfer order on all plaintiffs or defendants or their counsel shall not render the transfer of the action void but can be submitted by such a party as a basis for moving to remand as to such party if prejudice can be shown.

(d)    A civil action apparently involving common questions of fact with actions under consideration by the Panel for transfer under Section 1407, which was filed or came to the attention of the Panel either after the initial hearing before it or too late to be included in the initial hearing, will be treated by the Panel as a potential "tag-along action."

(e)    Any party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential "tag-along actions" in which that party is also named or in which that counsel appears.

Exhibit C

1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   JEFFREY J. PARKER, Cal. Bar No. 155377
3  LORI OSMUNDSEN, Cal. Bar No. 211964
   WHITNEY D. JONES, Cal. Bar No. 211541
4  333 South Hope Street, 48th Floor
   Los Angeles, California 90071-1448
5  Telephone:  213-620-1780
   Facsimile:  213-620-1398
6
   Attorneys for Defendant
7  EXXON MOBIL CORPORATION

8

9                  UNITED STATES DISTRICT COURT

10        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

11

12  CITY OF MERCED,                    Case No. 1:05-CV-00662-REC-LJO

13            Plaintiff,

14       v.

15  CHEVRON U.S.A., INC., SHELL OIL    **OPPOSITION TO MOTION FOR**
    COMPANY, EXXONMOBIL               **REMAND**
16  CORPORATION, EXXON
    CORPORATION, KINDER MORGAN
17  ENERGY PARTNERS L.P.,
    EQUILON ENTERPRISES LLC,
18  SFPP, L.P. and DOES 1 through 200,  Date:    July 25, 2005
    inclusive,                         Time:    1:30 p.m.
19                                      Crtrm.:  1 (REC)
            Defendants.
20

21                                     [Complaint Filed:  April 22, 2005]

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................1

II. PROCEDURAL HISTORY ...................................................................2

III. THE MOTION TO REMAND SHOULD BE DENIED .........................5

    A.    Removal Based on Substantial Federal Question and Complete
Preemption Is Appropriate ...........................................................5

        1.    Gasoline is Subject to Federal Regulation Requiring
Oxygenates...................................................................5

            a.    The General Structure of the Clean Air Act.......................5

            b.    1970 and 1977 Provisions Establish Federal Control
Over Fuels ...................................................................6

            c.    The 1990 Amendments Specify Oxygenated Fuels...........6

            d.    EPA's Implementation of Oxy-Fuel and RFG
Programs.....................................................................10

            e.    Federal Legislation Provides Means to Address
Concerns Over MTBE in Groundwater ..........................12

        2.    Removal Was Proper Because Plaintiff's Claims Present
Substantial Federal Questions .....................................13

        3.    Removal was Proper Because Plaintiff's Claims Are
Completely Preempted By Federal Law.......................17

    B.    Federal Officer Removal is Proper Pursuant to "Acting Under"
Provision of 28 U.S.C. § 1442(a)..........................................21

        1.    Defendants  Are "Persons" Acting "Under" the Direction
of a Federal Officer for Purposes of Removal............................21

        2.    Defendants Have a "Colorable Federal Defense" For
Purposes of Removal. ...............................................24

        3.    There Is A "Causal Nexus" Between the Directive to Use

W02-LA:LWJ\70852512.1

OPPOSITION TO MOTION FOR REMAND

MTBE and Plaintiff's Alleged Harm. .........................................24

IV. CONCLUSION .................................................................................25

W02-LA:LWJ\70852512.1                    OPPOSITION TO MOTION FOR REMAND

## TABLE OF AUTHORITIES

**Federal Cases**

Arness v. Boeing N.A., Inc.,
  997 F. Supp. 1268 (C.D. Cal. 1998)....................................21

Beneficial Nat'l Bank v. Anderson,
  539 U.S. 1 (2003) ....................................17

Bright v. Bechtel Petroleum, Inc.,
  780 F.2d 766 (9th Cir. 1986)....................................16

Chevron, U.S.A., Inc. v. NRDC,
  467 U.S. 837 (1984) ....................................5, 6

City of Chicago v. Int'l College of Surgeons,
  522 U.S. 156 (1997) ....................................14

Colorado v. Symes,
  286 U.S. 510 (1932) ....................................24

Deakins v. Monaghan,
  484 U.S. 193 (1988) ....................................14

Drawhorn v. Qwest Communs. Int'l, Inc.,
  121 F. Supp. 2d 554 (E.D. Tex. 2000) ....................................16

Envtl. Def. Fund v. Thomas,
  657 F. Supp. 302 (D.D.C. 1987)....................................12, 13

GMC v. United States,
  496 U.S. 530 (1990) ....................................5

Jefferson County,
  527 U.S. at 431 ....................................21, 23, 24

Marcus v. AT&T Corp.,
  138 F.3d 46 (2d Cir. 1998) ....................................14, 16

Merrell Dow Pharm., Inc. v. Thompson,
  478 U.S. 804 (1986) ....................................14

Mesa v. California,
  489 U.S. 121 (1989) ....................................23

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,
  341 F. Supp. 2d 386 (S.D.N.Y. 2004)....................................3, 21, 22, 25

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,
  342 F. Supp. 2d 147 (S.D.N.Y 2004)....................................3, 4, 21, 22, 24, 25

In re MTBE Product Liability Litigation,
  2004 U.S. Dist. LEXIS 22100 (S.D.N.Y. Nov. 3, 2004) ....................................24

OFA v. Davis,
  331 F.3d 665 (9th Cir. 2003) ............................................................................... 20

Rains v. Criterion Systems, Inc.,
  80 F.3d 339 (1996) ............................................................................................... 23

Ryan v. Dow Chemical Co.,
  781 F. Supp. 934 (E.D.N.Y. 1992) ................................................................. 21, 22

Schaeffer v. Cavallero,
  29 F. Supp. 2d 184 (S.D.N.Y. 1998) .................................................................... 16

Tellez v. Dole Food Company, Inc.,
  No. CV 04-03216 PA (CTx)  at p. 7-8 (C.D. Cal. June 18, 2004) ...................... 23

Train v. NRDC,
  421 U.S. 60 (1975) ................................................................................................. 5

Tremblay v. Philip Morris, Inc.,
  231 F. Supp. 2d 411 (D.N.H. 2002) ..................................................................... 21

Whitman v. American Trucking Ass'ns,
  531 U.S. 457 (2001) ......................................................................................... 9, 17


**State Cases**

Barker v. Lull Engineering Co.,
  20 Cal. 3d 413 (1978) .......................................................................................... 15

Etcheverry v. Tri-Ag Service, Inc.,
  22 Cal. 4th 316 (2000) ......................................................................................... 23

Soule v. General Motors Corp.,
  8 Cal. 4th 548 (1994) ........................................................................................... 15


**Statutes, Regulations and Other Citations**

40 C.F.R. § 19.4 ..................................................................................................... 13

40 C.F.R. § 80.1(b) ................................................................................................ 11

40 C.F.R. § 80.45 ................................................................................................... 10

40 C.F.R. § 80.72 ................................................................................................... 11

40 C.F.R. § 81.305 ................................................................................................... 7


59 Fed. Reg. 7716 ...................................................................................... 11, 17, 18

-iv-

OPPOSITION TO MOTION FOR REMAND

61 Fed. Reg. 12030 ................................................................................................ 18

62 Fed. Reg. 54552 .......................................................................................... 10, 11

65 Fed. Reg. 16094 ................................................................................................ 13

66 Fed. Reg. 56476 .................................................................................................. 7

15 U.S.C. § 2605 ................................................................................................... 12

15 U.S.C. § 2608 ................................................................................................... 12

15 U.S.C. § 2620 ................................................................................................... 12

28 U.S.C. § 1441 ............................................................................................. 1, 2, 5

28 U.S.C. § 1442 ................................................................................ 1, 3, 5, 21, 22

42 U.S.C. § 6972 ................................................................................................... 13

42 U.S.C. § 6991 ............................................................................................. 13, 18

42 U.S.C. § 7409 ..................................................................................................... 5

42 U.S.C. § 7545 ............................................................... 6, 7, 8, 9, 17, 18, 19

42 U.S.C. § 7607 ......................................................................................... 12, 19, 20

136 Cong. Rec. H2756 ............................................................................................ 7

136 Cong. Rec. H12848 .......................................................................................... 8

136 Cong. Rec. S648 ............................................................................................. 24

136 Cong. Rec. S3504 ............................................................................................ 7

136 Cong. Rec. S6383 ............................................................................................ 7

135 Cong. Rec. S13375 .......................................................................................... 7

136 Cong. Rec. S17232 ................................................................................... 8, 9, 10

W02-LA:LWJ\70852512.1                                    OPPOSITION TO MOTION FOR REMAND

# I.

## **INTRODUCTION**

Plaintiff City of Merced's ("Plaintiff") Motion to Remand ("Motion") should be denied because Defendants are entitled to defend themselves in federal court pursuant to 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1441(a).

Two fundamental allegations in Plaintiff's complaint are fatal to the remand motion. First, Plaintiff's allegation that "[w]henever referred to in this complaint, MTBE means not only methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE, as well as other oxygenates and ethers, including, but not limited to, TAME, DIPE, and ETBE." (Complt., ¶ 13). Second, Plaintiff's allegation that Defendants are liable because they "sold, promoted, marketed, distributed, transported, and/or exchanged gasoline containing MTBE and/or TBA, which is contaminating and threatening Merced's public water supplies." (Complt., ¶ 12; *see also id.* ¶¶ 30, 38, 39). Because these allegations seek to impose liability on Defendants merely for complying with the Federal Government's gasoline-content mandates, they squarely place this action within the scope of federal agent removal jurisdiction pursuant to 28 U.S.C. § 1442 (a)(1).

Like the more than seventy complaints that have been filed in state court (and removed to federal court) since late-2003, Plaintiff's allegations here are a broadside attack on the comprehensive federal system that regulates the content of gasoline – a system that expressly authorizes and effectively requires the conduct that the Plaintiff seeks to prohibit here. Unlike the majority of those complaints, however, Plaintiff's claims here intrude even further into the realm of federal jurisdiction. Specifically, Plaintiff here seeks to punish Defendants not only for the sale, distribution and storage of gasoline containing methyl tertiary butyl ether ("MTBE", a federally-approved oxygenate), but also for the use of <u>any of</u> the other six oxygenates that Congress mandated, and USEPA approved, to comply with the

-1-

1   federal Clean Air Act ("CAA") and its implementing regulations.  Simply put:

2   Plaintiff's allegations challenge the entire reformulated gasoline program, making

3   this case as appropriate for federal resolution as the 60+ others that already have

4   been successfully removed to (and are pending in) federal court.

5          This lawsuit implicates serious and substantial federal questions in an

6   area—the content of motor fuel—that has been pervasively occupied by federal

7   statutes and regulations.  Piecemeal state court litigation would result in scores of

8   state judges across the country independently interpreting the CAA and EPA

9   regulations regarding fuel content.  Inconsistent decisions from state to state would

10  interfere with and disrupt the federal regulatory regime, putting the oil industry in

11  the impossible situation of trying to comply with federal regulations at the risk of

12  incurring substantial state penalties and civil liability.  The orderly supply of

13  gasoline would be threatened, as would the viability of the national gasoline

14  distribution system.

15         Because federal law so pervades the area, state law claims premised on

16  the sale, distribution, and storage of gasoline containing MTBE are preempted.  In

17  addition, Plaintiff's claims require interpretation of federal law and regulations

18  concerning fuel content.  Thus, the Complaint presents on its face a substantial

19  federal question in an area completely preempted by federal law and removal is,

20  therefore, also proper pursuant to 28 U.S.C. § 1441(a).

21

22                                    **II.**

23                         **PROCEDURAL HISTORY**

24

25         In 1999, several MTBE cases were removed and consolidated in the

26  United States District Court for the Southern District of New York in MDL 1358 –

27  *In re MTBE Products Liability Litigation*.  After the court dismissed much of those

28

1  claims and refused to certify four statewide purported class actions, the individual

2  actions were settled and dismissed.  MDL 1358 remained pending but inactive.

3          Since September 2003, Defendants have removed and filed Notices of

4  Relatedness for over sixty MTBE cases filed in courts across the country, requesting

5  that the Judicial Panel on Multidistrict Litigation ("JPML") consolidate and transfer

6  the cases to MDL 1358.  The JPML transferred 76 cases—sixty-three (63) similar to

7  the case before this Court and thirteen (13) declaratory judgment actions related to

8  MTBE—to MDL 1358.  Most, if not all, plaintiffs in the pending MDL 1358 actions

9  filed or joined in motions to remand.  On March 16, 2004, the Honorable Shira

10  Scheindlin, denied plaintiffs' motions, holding that the Court had federal agent

11  jurisdiction pursuant to 28 U.S.C. § 1442 (a).  *See In re Methyl Tertiary Butyl Ether*

12  *("MTBE") Products Liability Litigation*, 342 F. Supp. 2d 147, 153-158 (S.D.N.Y

13  2004) ("March 16, 2004 Order").  Subsequently, certain MDL 1358 plaintiffs,

14  including several from California, sought clarification from Judge Scheindlin

15  regarding the extent of federal agent jurisdiction.  Judge Scheindlin again found that

16  federal agent jurisdiction existed and denied remand. *See In re Methyl Tertiary Butyl*

17  *Ether ("MTBE") Products Liability Litigation*, 341 F. Supp. 2d 386 (S.D.N.Y.

18  2004) ("September 3, 2004 Order").

19          On April 22, 2005, plaintiff the City of Merced filed this action in the

20  Superior Court for the County of Merced.  This action, like all the others, seeks to

21  hold oil industry participants liable for conduct directed by the EPA—the federal

22  Oxy-Fuel and Reformulated Gasoline Programs and inclusion of MTBE in gasoline

23  to comply with the requirements of the Clean Air Act ("CAA").  Specifically,

24  Plaintiff alleges that Defendants "had a duty to use due care in the sale, labeling,

25  warnings, use, and instructions for use of MTBE" (Complt. ¶ 38); that Defendants

26  sold, promoted, marketed, distributed, transported and/or exchanged gasoline

27  containing "MTBE" (expansively defined to include "methyl tertiary butyl ether . . .

28  as well as other oxygenates") within the City of Merced (*id.* ¶¶ 3, 12, 13, 30, 39);

-3-

1   and that the use of MTBE has "contaminated, polluted, and threatened, and

2   continues to contaminate, pollute, and threaten, the City's water system." (*id.* ¶ 3.)

3          Plaintiffs in MDL 1358 assert products liability, alleging that gasoline

4   containing MTBE has certain "bad characteristics" that make it a defective product

5   and alleging that the refiner defendants were negligent by failing to give adequate

6   warnings about these characteristics. *See* 342 F. Supp. 2d at 149-150.  Just as in

7   MDL 1358, the gravamen of Plaintiff's claims in this action are the presence of

8   MTBE in gasoline, the alleged hazard that MTBE represents as a constituent of

9   gasoline, and the supposed obligation to warn of those alleged special hazards.

10  (Complt., ¶¶ 3, 12-15, 17-19, 29-36.)  Plaintiff here goes one step further, actually

11  challenging the use of ***any*** oxygenate. (Complt. ¶ 13)  Plaintiff's omission of a

12  products liability claim in this case cannot mask the fundamental similarity with the

13  MDL actions.  The actions seek the same result (punishing the oil industry for the

14  sale or use of MTBE gasoline) and would have the same consequence (interference

15  with the field of motor vehicle fuel regulation).

16          On May 20, 2005, Defendants removed this action to federal court.

17  Simultaneously, Defendants filed a Notice of Tag-Along with the JPML seeking to

18  have this action transferred to MDL 1358.  On June 14, 2005, the JPML issued a

19  Conditional Transfer Order (copy attached as Ex. A).  On June 29, 2005, Plaintiff

20  filed an opposition to the Conditional Transfer Order.  To date, the JPML has not

21  made a final decision regarding transfer.[1]

22

23

24

25

---

26  [1]  On June 17, 2005, Defendants filed in this Court a Motion to Stay pending the
     outcome of the JPML's decision to transfer this case to the MDL.  Defendants
27  respectfully request that this Court defer consideration of Plaintiff's Motion to
     Remand until after the JPML has issued an order regarding the transfer.

28

-4-

## III.

## THE MOTION TO REMAND SHOULD BE DENIED

Defendants have properly removed this action to federal court on the following independent grounds: 1) substantial question of federal law pursuant to 28 U.S.C. § 1441; and 2) federal officer removal pursuant to 28 U.S.C. § 1442(a)(1).

**A.** **Removal Based on Substantial Federal Question and Complete Preemption Is Appropriate**

  **1.** **Gasoline is Subject to Federal Regulation Requiring Oxygenates**

  a. The General Structure of the Clean Air Act

The CAA as a whole, and especially its control over vehicle emissions and fuel content, is premised upon the pressing need for federal control. "In the 1950's and 1960's Congress enacted a series of statutes designed to encourage and to assist the States in curtailing air pollution." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 845 (1984). That approach "made little progress," and "Congress reacted by taking a stick to the States in the form of the Clean Air Act Amendments of 1970 . . . . These Amendments sharply increased federal authority and responsibility in the continuing effort to combat air pollution." *Train v. NRDC*, 421 U.S. 60, 64 (1975); *see also GMC v. United States*, 496 U.S. 530, 532 (1990). Specifically, the 1970 amendments required EPA to set federal air quality standards and required the states to meet these standards under EPA's close supervision. *Train*, 421 U.S. at 64-65; *see* 42 U.S.C. § 7409.

OPPOSITION TO MOTION FOR REMAND

b.   <u>1970 and 1977 Provisions Establish Federal Control Over Fuels</u>

The 1970 amendments required the federal registration of fuels and fuel additives and prohibited the sale of unregistered fuels. *See* 42 U.S.C. § 7545(a), (f). Congress also forbade the states to regulate the content of fuels or fuel additives. 42 U.S.C. § 7545(c)(4)(A) ("no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine... (ii) if the Administrator has prescribed ... a control or prohibition applicable to such characteristic or component ....")

In 1977, Congress, "frustrated that its statutory goals were not attained," increased federal regulation of fuels. *Chevron,* 467 U.S. at 847-48. The 1977 amendments made mandatory the previously optional health testing of fuels and fuel additives. *See* 42 U.S.C. § 7545(e)(2). Accordingly, before a fuel or fuel additive could be registered, EPA, as of 1977, had to take into account not just the air quality effects but also "tests to determine potential public heath effects of such fuel or additive." *Id.* § 7545(b)(2)(A).

c.   <u>The 1990 Amendments Specify Oxygenated Fuels</u>

Despite Congress's best efforts in 1970 and 1977, "many of the Nation's most important air pollution problems ha[d] failed to improve or ha[d] grown more serious." H.R. Rep. No. 101-490, at 144. In response, Congress again amended the CAA, this time creating a comprehensive scheme for regulating car and truck emissions and addressing fuel content (Title II). As one of the Act's leading sponsors stated, "[i]ts provisions are unusually prescriptive and far reaching. . . . [T]itle II's requirements will affect every car that is sold, every gallon of gasoline that is pumped, and ultimately the very success or failure of the nation's efforts to control urban smog, stop toxic emissions, and reduce acid rain." Waxman,

-6-

1 *et al., Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act*
2 *Amendments of 1990*, 21 Envtl. L. Rev. 1947, 1949 (1999).

3        Beginning in 1992, the Oxy-Fuel program required that "oxygenated
4 gasoline" be sold in all carbon monoxide non-attainment areas during certain
5 months of the year. 42 U.S.C. § 7545(m). Beginning in 1995, the Reformulated
6 Gasoline ("RFG") program required that gasoline sold in the nation's nine largest
7 metropolitan areas with the most severe summertime ozone levels meet additional
8 federally-mandated specifications, including an oxygenate requirement. *Id.* §
9 7545(k)(5)(A). Both programs are governed by detailed and comprehensive statutes
10 and regulations, which among other things mandate oxygenates so that gasoline will
11 burn more completely and cause fewer toxic emissions from the tailpipe. *See* 42
12 U.S.C. § 7545(k), (m). Here, the Complaint alleges that Plaintiff "owns and
13 operates a water system which serves the public, including drinking water wells" in
14 the City of Merced (Complt. at p. 2), an area subject to the federal oxygenated fuel
15 mandate. *See, e.g.,* 66 Fed. Reg. 56476 (Nov. 8, 2001); 40 C.F.R. § 81.305; 42
16 U.S.C. § 7545(k)(10)(D).

17        Congress framed these programs with the specific knowledge and
18 expectation that MTBE would be the principal means by which refiners would meet
19 oxygenate requirements. Senator Daschle noted in the floor debate that "EPA
20 predicts that the amendment will be met almost exclusively by MTBE." 136 Cong.
21 Rec. S6383 (1990) (emphasis added).[2] In fact, in order to ensure that MTBE could

22 _____
   [2]   *See also* 135 Cong. Rec. S13375-02 (1989) (Sen. Dole) (noting that, in test
23 programs using oxygenates in gasoline, "MTBE has captured nearly all of this
   market from ethanol as well"); 136 Cong. Rec. S3504-01 (1990) (Sen. Daschle)
24 ("The ethers, especially MTBE and ETBE, are expected to be major components of
   meeting a clean octane program"); 136 Cong. Rec. H2756, 2764 (May 23, 1990)
25 (Rep. Alexander) ("you don't have to use ethanol to meet the requirements. You
   can use other additives like MTBE"); 136 Cong. Rec. S16895, 16954 (Oct. 27,
26 1990) (Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing
   additives like ethanol and MTBE"); 136 Cong. Rec. S17512, 17514 (Oct. 27, 1990)
27 (Sen. Heinz) ("Reformulated gasoline will also encourage the use of oxygen-
   containing additives like ethanol and MTBE").

28

-7-

be used by refiners, Congress modified the legislation from an earlier version that would have permitted only ethanol. Specifically, Congress reduced a proposed OxyFuel 3.1% oxygenate level to 2.7% to "provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether (or MTBE), and ethyl alcohol (or ethanol). The Administrator may not discriminate among these different oxygenates and should encourage fair competition among them." 136 Cong. Rec. H12848, 12859 (1990) (Rep. Sharp). As Senator Wallop explained, "[t]he original [RFG] language would have limited new fuels to ethanol blends or corn gas, [but] the final provision . . . provides for real competition." 1990 CAA Legis. Hist. 763 (Senate Debate of 10/27/1990).

Although the primary goal of the oxygenated fuels programs was to improve air quality, Congress explicitly directed that the program be administered to ensure the reliable supply of reasonably priced gasoline while balancing other costs:

> Such [RFG] regulations shall require the greatest reduction in emissions of ozone forming volatile organic compounds (during the high ozone season) and emissions of toxic air pollutants ... achievable through the reformulation of conventional gasoline, *taking into consideration the cost of achieving such emission reductions, any non-air quality and other air-quality health and environmental impacts and energy requirements.*

42 U.S.C. § 7545(k)(1) (emphasis added).

Congress focused (and required EPA to focus) on the costs of the program and its effects on the national supply of gasoline. For example, Senator Simpson stated that "one of the Nation's major energy requirements is an adequate supply of transportation fuels at a reasonable cost. Reformulated gasoline thus is not an 'at any cost' program, and is not to be administered in a way that results in pump price increases that are significantly in excess of this estimate." 136 Cong. Rec. S17232-01, 17249 (Oct. 26, 1990).[3] The Supreme Court has noted that this

---

[3] Senator Simpson also stated that "this program shall not be carried out in a manner that permits even modest physical shortages of refining and oxygenate capacity...." *Id.* This idea was echoed by Senator Baucus: "Others will argue that

W02-LA:LWJ\70852512.1                                    OPPOSITION TO MOTION FOR REMAND

1   balancing aspect of the RFG program is intentionally different from Congress's

2   prior CAA mandates such as Section 109 of the legislation.  "'[E]conomic

3   considerations [may] play no part in the promulgation of ambient air quality

4   standards under Section 109' of the CAA." *Whitman v. American Trucking Ass'ns,*

5   531 U.S. 457, 464 (2001) (other citations omitted).  By contrast, "[s]ubsequent

6   amendments to the CAA have added many more provisions directing, in explicit

7   language, that the Administrator consider costs in performing various duties.  *See,*

8   *e.g.,* 42 U.S.C. § 7545(k)(1) (reformulated gasoline to 'require the greatest reduction

9   in emissions ... taking into consideration the cost of achieving such emissions

10  reductions')."  *Id.* at 466.

11          The RFG provisions governing opt-ins demonstrate a similar concern.

12  States not initially subject to RFG requirements may petition EPA to opt in to the

13  RFG program.  42 U.S.C. § 7545(k)(6).  The statute, however, permits EPA to delay

14  an opt-in if "there is insufficient domestic capacity to produce gasoline certified

15  under" the RFG program.  *Id.* § 7545(k)(6)(B).  Senator Simpson clarified that EPA

16  must be satisfied "[t]hat new demand from the new areas will not stretch limited

17  domestic capacity already dedicated to the [RFG and Oxy-Fuel] areas."  136 Cong.

18  Rec. at 17251.  Likewise, under the Oxy-Fuel program, EPA is empowered to waive

19  the program's requirements if "there is, or is likely to be, for any area, an inadequate

20  domestic supply of, or distribution capacity for, oxygenated gasoline."  42 U.S.C.

21  § 7545(m)(3)(C)(i).

22          Moreover, Congress intended that EPA exercise its authority under

23  these provisions, and under the RFG program generally, to avoid multiple fuel

24  requirements.  "Title II does not allow a proliferation of new or different

25  ─────────────────

26  cleaning our Nation's air is so urgent that we should ignore cost and technical
    feasibility . . . .  They, too, are wrong. . . . [T]he key to this conference report is

27  balance. . . . [W]here economics could be balanced against control requirements, it
    was."  136 Cong. Rec. at 17233.

28

1    reformulated gasolines in the same State or the same ozone nonattainment area."

2    136 Cong. Rec. at 17252 (Sen. Simpson).  EPA "regulations must ensure that no

3    more than one prohibition or requirement respecting reformulated gasoline will

4    apply in any area, and shall provide maximum air quality benefit consistent with

5    technical feasibility, cost, flexibility, and domestic supply and distribution

6    capacity." *Id.* at 17253.  Indeed, Congress's directive to EPA was especially

7    important given that many non-attainment areas, including three of the ten

8    mandatory RFG areas, overlapped state boundaries.  *See* 62 Fed. Reg. 54552-01,

9    54553 n.1 (Oct. 20, 1997).  Senator Simpson noted the practical concerns with

10   multiple fuel requirements, stating:

11          New [RFG and Oxy-Fuel requirements] already create several new
            kinds of gasoline .... Further balkanizing of the gasoline industry –
12          with different oxygen concentrations in different east coast cities, for
            example – potentially risks further disruptions and precision from
13          refiners that may not be possible.  Segregating a great many
            individually-tailored blends will also create substantial difficulties for
14          the pipeline and terminal segments of the industry. For example, the
            Colonial Pipeline, which serves six of the 40 areas, would be more
15          prone to bottlenecks, for any given shipment might be legal in only
            some or one of those cities.
16

17   136 Cong. Rec. at 17254.

18

19                d.    EPA's Implementation of Oxy-Fuel and RFG Programs

20          In accord with Congress's expectations, EPA certified MTBE as an

21   approved oxygenate for the RFG program.  *See* Regulation of Fuels and Fuel

22   Additives:  Standards for Reformulated and Conventional Gasoline, 59 Fed. Reg.

23   7716-01 (1994).  As a result, refiners began selling MTBE gasoline in RFG areas.

24          EPA's fuel regulations, which occupy over 400 pages of the CFR, are

25   unusually extensive.  EPA's "complex model," which every batch of RFG must

26   meet, specifically permits refiners to use MTBE to create RFG.  40 C.F.R. § 80.45.

27   In addition, EPA's own regulations specify that states may only regulate a "fuel or

28

                                        -10-

1  additive for use in motor vehicles and motor vehicle engines which is not explicitly

2  regulated by [Part 80]." 40 C.F.R. § 80.1(b).

3         In adopting the RFG standards, EPA expressly stated its intent to

4  occupy the field of RFG content and to preclude any varying state requirements:

5         The regulations proposed here will affect virtually all of the gasoline
       sold in the United States. As opposed to commodities that are
6         produced and sold in the same area of the country, gasoline produced in
       one area is often distributed to other areas. The national scope of
7         gasoline production and distribution suggests that federal rules should
       preempt State action to avoid an inefficient patchwork of potentially
8         conflicting regulations. Indeed, Congress provided in the 1977
       Amendments to the Clean Air Act that federal fuels regulations
9         preempt non-identical State controls except under certain specified
       circumstances. EPA believes that the same approach to federal
10        preemption is desirable for the reformulated gasoline and anti-dumping
       programs.

11

12  59 Fed. Reg. 7716, 7809 (Feb. 16, 1994).

13         This concern for uniformity and minimizing the impact on the nation's

14  fuel supply was manifested in other rules EPA adopted. The principal example is

15  EPA's rule that states opting in to the RFG program may not opt out for a six year

16  period. *See* 40 C.F.R. § 80.72. This rule, EPA said, was necessary to give

17  "appropriate lead time for industry to transition," and permit adequate "cost

18  recovery," thereby avoiding "higher gasoline prices which would diminish the cost-

19  effectiveness of EPA's RFG program." *See Transitional and General Opt Out*

20  *Procedures for Phase II Reformulated Gasoline Requirements*, 62 Fed. Reg. 54552-

21  01, 54553. EPA's bottom line demonstrates that the agency (like Congress) was

22  taking an all-things-considered approach: "Today's action helps maintain a

23  consistent market, adequate supplies and reasonable prices, thus maintaining the

24  RFG program's cost-effectiveness." *Id.* at 54555.

25

26

27

28

1        e.     Federal Legislation Provides Means to Address Concerns Over

2                MTBE in Groundwater

3      As noted above, the 1990 CAA Amendments required EPA to address

4 the non-air quality health and environmental impacts of MTBE when implementing

5 RFG regulations, and EPA's regulations were subject to challenge through the

6 regular administrative process, including review before the D. C. Circuit.  The CAA

7 further provides that any new grounds to reconsider EPA's prior exercise of

8 discretion should be raised before EPA.  42 U.S.C. § 7607(b)(1), (d)(7)(b).

9 Moreover, other federal statutes also provide authority to address the alleged

10 problem central to plaintiffs' complaints – *i.e.,* MTBE in groundwater.

11      *First,* EPA has authority under the Toxic Substances Control Act

12 ("TSCA") to regulate chemicals that "present an unreasonable risk of injury to

13 health or the environment."  15 U.S.C. § 2605(a).  TSCA is a comprehensive statute,

14 giving EPA broad authority.  *Envtl. Def. Fund v. Thomas*, 657 F. Supp. 302,

15 304 (D.D.C. 1987).  TSCA was designed specifically to remedy what Congress

16 perceived as "fragmented" or "piecemeal" regulation and to eliminate any gaps in

17 federal law.  *Id.*  Under TSCA, EPA must consider environmental and non-

18 environmental impacts of a proposed ban or lesser control, and it must engage in the

19 sort of wide-ranging cost/benefit analysis that plaintiff claims state courts should

20 conduct under state tort law.  *See* 15 U.S.C. § 2605(c).  TSCA, moreover, explicitly

21 requires EPA to consider the effects of such a ban or control on other federal

22 environmental programs.  *See, e.g., id.* §§ 2605(c), 2608.

23      Importantly for these purposes, private parties may "petition [EPA] to

24 initiate a proceeding" under TSCA, and seek judicial review of any EPA action.  *See*

25 § 2620(b)(4); *Thomas*, 657 F. Supp. at 305.  This citizen action provision allows

26 private parties to question EPA's current regulatory approach to a particular

27 substance.  *Id.*  In fact, EPA has initiated TSCA proceedings for MTBE.  In a Notice

28 of Proposed Rulemaking, EPA offers a tentative view that, if the presence of MTBE

1   in groundwater is serious, the appropriate course may be to ban MTBE under

2   TSCA.  *See* Methyl Tertiary Butyl Ether, Advance Notice of Proposed Rulemaking,

3   65 Fed. Reg. 16094 (2000).

4        *Second*, federal legislation addresses the problem of leaking

5   underground storage tanks, which Plaintiff highlights as one of the ways that MTBE

6   may enter groundwater.  *See, e.g.*, Complaint ¶ 3.  In fact, federal law requires the

7   registration of all underground storage tanks (42 U.S.C. § 6991(a)(1)); mandates that

8   EPA establish comprehensive regulations governing USTs (*Id.* § 6991b); and

9   requires all owners and operators of underground tanks to comply with standards

10  that ensure leak detection, reporting, and clean up (*Id.* § 6991b(c)).  This federal

11  statute provides penalties ($11,000 per day) for violation of the regulations.  *Id.* §

12  6991e(d); 40 C.F.R. § 19.4.  And parties have a private right of action under RCRA

13  generally for any breach of these UST standards.  *Id.* § 6972(a).  This cause of

14  action permits a private party to seek an order compelling remediation of any

15  leaking tank.  *Id.*

16       Thus, since 1970, Congress and EPA have increasingly regulated fuel

17  content in an effort to improve air quality, balancing federal concerns for a reliable

18  supply of reasonably priced gasoline, and health and environmental impacts.  The

19  extensive federal control over fuel content, and in particular reformulated gasoline,

20  makes removal appropriate because Plaintiff's claims raise substantial federal

21  questions, implicate a field (fuel content regulation) that the federal government has

22  completely preempted, or raise issues of federal immunity (or all of these).

23

24       **2.**   **Removal Was Proper Because Plaintiff's Claims Present**

25          **Substantial Federal Questions**

26

27       Removal was proper and federal jurisdiction exists because Plaintiff's

28  state law claims require the determination of substantial questions of federal law.

-13-

1   "[E]ven though state law creates [a party's] causes of action, its case might still

2   'arise under' the laws of the United States if a well-pleaded complaint established

3   that its right to relief under state law requires resolution of a substantial question of

4   federal law." *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164

5   (1997); *see also Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986);

6   *Marcus v. AT&T Corp.*, 138 F.3d 46, 55-56 (2d Cir. 1998).

7          Indeed, given the overwhelming federal control over gasoline content,

8   and the undeniable federal interest in ensuring a reliable supply of reasonably priced

9   gasoline, this is precisely the type of case in which a federal court should respect its

10  "virtually unflagging obligation to exercise [its] jurisdiction," *Deakins* v.

11  *Monaghan,* 484 U.S. 193, 203 (1988).  Removal in this area depends upon "an

12  evaluation of the *nature* of the federal interest at stake," for which there is no "kind

13  of automatic test," but which ensures that the "substantial" questions are resolved in

14  federal court.  *Merrell Dow*, 478 U.S. at 814 & n.12.

15         Both of these elements are met here: plaintiff's claims present issues of

16  federal law and interest and these federal matters are substantial and vital.  *First*, the

17  risks and benefits of MTBE gasoline have been already weighed by the government

18  and any challenge to that balance, explicit or implicit, is improper.  On its face, the

19  Complaint asserts that the use of MTBE in gasoline presents a significant threat to

20  public health and that MTBE can render water undrinkable. (Complt., ¶¶ 17, 18,

21  32.).  It further alleges that a) gasoline containing MTBE had characteristics

22  rendering it, essentially, defective such that warnings of the alleged defects were

23  required and b) Defendants' sale, use, etc., of gasoline containing MTBE with those

24  defective characteristics were negligent.  (Complt., ¶¶ 17, 18, 23, 30-32, 38-39).

25         In the analogous setting of an explicit product liability action,

26  California's Supreme Court has stated that, when assessing the adequacy of a

27  product under attack that is not "within the common knowledge of lay jurors," the

28  jury applies a risk/utility test to determine if it is defective.  *Soule v. General Motors*

-14-

1  *Corp.*, 8 Cal. 4th 548, 567 (1994); *see Barker v. Lull Engineering Co.,* 20 Cal. 3d

2  413 (1978).  The adequacy of a product's design is evaluated through consideration

3  of various factors including, among other things, the feasibility, cost, and

4  disadvantages of an alternative design.  *Id.* at 431.  With respect to the product being

5  attacked here—gasoline containing MTBE—the presence of a practicable

6  alternative satisfying the federal oxygenate mandates is therefore necessary to the

7  determination of whether a product is defectively designed, which Plaintiff

8  recognizes in alleging that reasonable alternatives were available. (Complt. ¶ 23.)

9  The content and composition of gasoline requires balancing multiple air quality,

10  water quality, and economic concerns, and it is therefore a matter outside "the

11  common knowledge of lay jurors.  As a result, to resolve Plaintiff's claims that

12  a) gasoline containing MTBE had characteristics rendering it, essentially, defective

13  such that warnings of the alleged defects were required and b) Defendants' sale, use,

14  etc., of gasoline containing MTBE with those defective characteristics were

15  negligent, the jury must evaluate the relevant "risks and utilities" of the product and,

16  specifically, whether a feasible alternative existed.

17        Plaintiff would ask a California state jury to construe a complicated

18  web of federal statutes and implementing regulations that reflects the EPA's own

19  balancing and conclusions.  That jury's conclusions could easily undermine the

20  policy choices reflected in the EPA's initial waiver of MTBE into commerce and its

21  subsequent registration of MTBE as one of the few oxygenates that could be used to

22  comply with OFP and RFG requirements.[4]

23

---

24  [4]     It is beyond dispute that the choice of gasoline components involves
tradeoffs.  Each of the approved oxygenates share, to varying degrees, the very

25  characteristics of MTBE of which Plaintiff now complains.  And certain oxygenates
other than MTBE pose additional tradeoffs and risks.  If state claims challenging the

26  sale and use of MTBE such as those brought by Plaintiff are permitted to coexist
with federal fuel content regulations, there is no legal reason why comparable

27  claims cannot be asserted against Defendants and others for using any of the
oxygenates approved to comply with federal fuel content requirements.  Thus,

28  Defendants, although required by federal law to blend an oxygenate into gasoline,

-15-

OPPOSITION TO MOTION FOR REMAND

1          This case is therefore like other cases in which federal jurisdiction has

2    been found on the ground that a plaintiff's state law claim presented substantial

3    federal questions.  In *Schaeffer v. Cavallero*, 29 F. Supp. 2d 184 (S.D.N.Y. 1998),

4    the court sustained removal of the plaintiff's state law claims involving his alleged

5    wrongful ejection from an airplane because a federal statute permitted airlines to

6    "refuse to transport a passenger or property the carrier decides is or might be

7    inimical to safety."  "[T]he construction of [the statute], itself a matter of federal

8    law, is necessarily a substantial issue in any case involving state law claims

9    regarding a passenger's removal from an airplane."  *Id.* at 185-86.  Similarly, in

10   *Marcus v. AT&T Corp.*, the Second Circuit affirmed removal of a state-law breach

11   of warranty claim brought against AT&T by its customer, on the ground that it

12   would require an interpretation of the carrier's tariff.  "Because the tariff is filed

13   with the FCC pursuant to [the Communications Act], the breach of warranty claim

14   arises under federal law."  138 F.3d at 56; *see also, e.g., Bright v. Bechtel*

15   *Petroleum, Inc.*, 780 F.2d 766, 769 (9th Cir. 1986) (plaintiff alleged that defendant's

16   withholding of federal taxes was the underlying breach); *Drawhorn v. Qwest*

17   *Communs. Int'l, Inc.*, 121 F. Supp. 2d 554, 563-64 (E.D. Tex. 2000) (state law

18   trespass and quiet title actions required Plaintiff to prove that defendants did not

19   have possessory and use rights under certain federal statutes).

20         *Second*, these federal questions and interests are substantial and,

21   indeed, can only be resolved in federal court.  As discussed above, Congress

22   expressed the need for national uniformity in the oxygenated fuels program, by

23   ───────────────────────────────────────────
  have had and will have no means of determining which oxygenates they may use

24   without subjecting themselves to the uncertainties of what is, in effect, state-by-state
  fuel content regulation through individual tort actions for adding MTBE or adding

25   any of the other "alternative" oxygenates.  In fact, Plaintiff's complaint actually
  seeks to impose liability on Defendants for the sale, distribution, transportation,

26   promotion, and use of <u>any</u> oxygenate, (*See* Complt., ¶ 13 ("Whenever referred to in
  this complaint, MTBE means not only methyl tertiary butyl ether, but also the

27   contaminants in commercial grade MTBE, as well as other oxygenates and ethers,
  including, but not limited to, TAME, DIPE, and ETBE.")).

28

                                                  

1  limiting the proliferation of fuel standards. *See supra* pp. 10-11. Additionally, as

2  the Supreme Court noted in *Whitman*, 531 U.S. at 466, Congress intentionally

3  adopted a structure requiring the clean air benefits of RFG to be weighed against

4  federal interests in maintaining adequate supplies of reasonably priced gasoline.

5  Plaintiff's claims pose the very threat of price increases, product shortages, and fuel

6  balkanization that Congress sought to avoid in passing the 1990 amendments.

7

8      **3.      Removal was Proper Because Plaintiff's Claims Are Completely**

9            **Preempted By Federal Law.**

10

11            Removal is also appropriate where, as here, the federal government has

12  completely preempted the field. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1

13  (2003). Through the CAA, Congress established the minimum oxygenate levels

14  needed to comply with OFP and RFG mandates nationwide (specifically adjusting

15  such levels, as described above, to permit use of MTBE), authorized EPA to

16  evaluate and specify the permissible gasoline additives used to satisfy such federal

17  mandates, required EPA to monitor closely the implementation of such oxygenate

18  standards to avoid undue fuel supply impacts or other dislocations, and, in doing so,

19  expressly directed EPA to "tak[e] into consideration . . . any nonair quality . . .

20  health and environmental impacts." 42 U.S.C. § 7545(k)(1); *Final Rule, Regulation*

21  *of Fuels sand Fuel Additives: Standards for Reformulated and Conventional*

22  *Gasoline*, 59 Fed. Reg. 7716 (Feb. 16, 1994). EPA then comprehensively exercised

23  its powers granted by this far-ranging federal statutory scheme by promulgating in

24  exhaustive detail the timing and locations at which oxygenated fuels were required

25  to be sold and approving the particular oxygenate additives used to comply with

26  these federal standards and by spelling out the myriad other requirements affecting

27  the sale, blending and transportation of oxygenated fuel essential to enable such

28  standards to be implemented and enforced. 42 U.S.C. § 6691 *et seq.*; 59 Fed. Reg.

7716. This comprehensive scheme of federal regulation of fuel content, including particularly its specification of the oxygenate additives added to gasoline to control motor vehicle emissions, wholly displaces state law within the regulated field.[5]

In promulgating its requirements for RFG, the EPA also specifically and expressly concluded that its regulations of fuel content preempted state law relating to the content of such fuel.  59 Fed. Reg. 7716, 7732.  The EPA's regulations pertaining to fuel content cover more than 400 pages of the C.F.R., set forth at 40 C.F.R. Parts 79 and 80.

A purported state claim challenging the sale, distribution, and storage of gasoline is really a federal claim asserting that the EPA's cost-benefit analysis with respect to fuel content—grounded in that Agency's technical expertise and nationally focused judgment—does not adequately protect the environment. Congress unambiguously authorized the EPA to conduct this cost-benefit analysis. 42 U.S.C. § 7545(k)(1).

Here, Plaintiff seeks to punish Defendants not only for the use of MTBE, but also for the use of *all* other oxygenates (Complt., ¶ 13), notwithstanding the fact that Defendants were required by the federal government to use oxygenates.

---

[5]    42 U.S.C. § 7545(c)(4)(B) granted to California a limited exception permitting imposition of a "control or prohibition" affecting motor vehicle fuels designed to achieve vehicle emission reductions going beyond that mandated by federal law.  61 Fed. Reg. 12030, 12038 (EPA revision of reformulated gasoline regulations stating "[w]hile the federal standards for reformulated and conventional gasoline do apply in California, if California has imposed its own more stringent regulations, as it has regarding oxygen content, then fuels producers must abide by California's more stringent standards"); *see also* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("On the question of preemption, representatives of the State of California were clearly opposed to displacing the State's right to set more stringent standards to meet peculiar local conditions"); 113 Cong. Reg. 32478 (1967) (remarks of Senator Murphy) ("I am firmly convinced that the United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions"). This exception, at most, relieves California from the ambit of 42 U.S.C. § 7545(c)(4)(A), a provision on which Defendants do not rely for purposes of this removal petition. The exception is not inconsistent with Congress' intent to preempt the field (*i.e.*, regulation of fuel content) but merely allowed California—and California only—to impose requirements that were at least as restrictive as those imposed by federal law.

-18-

1   Plaintiff effectively seeks to hold Defendants liable for complying with the
2   oxygenate mandate.  Taking Plaintiff's allegations to their logical conclusion,
3   Plaintiff is essentially arguing that Defendants should have refused to comply with
4   the government's oxygenate mandate and should have not sold gasoline with any
5   oxygenate component, MTBE or otherwise.

6          Following promulgation of the federally-mandated oxygenate
7   requirements, Plaintiff did not challenge EPA's exercise of discretion to preempt the
8   entire field of motor vehicle fuel content, although it was free to do so under the
9   exclusive terms for such review set forth in 42 U.S.C. § 7607(b)(1).  Accordingly,
10  state court litigants cannot now collaterally challenge EPA's determination on
11  preemption in the guise of state tort actions.

12         The Complaint requests that the California state court supplant the
13  judgment and conclusions of Congress and the EPA regarding fuel content with its
14  own.  It thus interferes with an area that Congress has expressed a clear intent to
15  carve out for federal dominance, given the national reach of the gasoline transport
16  and delivery system, and the effects of these products on the nation as a whole, not
17  just on the citizens or environment of a particular state.  Indeed, Plaintiff's claim
18  presents precisely the issue that Congress placed within the sole purview of the EPA
19  when it gave EPA the exclusive authority to determine whether a fuel or fuel
20  additive could be introduced into commerce and again when it required the agency
21  to certify oxygenates for the federally-mandated oxygenate programs, "taking into
22  consideration the cost of achieving such emission reductions, *any nonair-quality* and
23  other air-quality *environmental impacts* and energy requirements."  42 U.S.C.
24  § 7545(k)(1) (emphasis added).  And the federal law sets up a specific framework
25  that the EPA must use in balancing these various factors.  Thus, a state law tort
26
27
28

-19-

1  claim is in fact covered by the federal scheme and remitted to the EPA for its

2  determination.[6]

3          If thirty state courts determine the question of federal preemption, the

4  result will be a landslide of legal and factual outcomes that could be at odds not only

5  with the Congressional intent and the EPA's decisions based on its interpretation of

6  that intent, but at odds with one another. Each state would have its own standards

7  for the sale, distribution, and storage of gasoline containing MTBE, its own rules for

8  the type of balancing a manufacturer has to undertake to supply its products in that

9  state, and its own factors for evaluating the hazards to its citizenry. Within each

10 state (or various subdivisions within the same state) judges could apply those

11 standards differently or juries can draw different conclusions based on their

12 understanding of the balancing tests. Conceivably, the industry could be held liable

13 in one California court for its decisions to add MTBE, exonerated in another, fined

14 in one state and subjected to substantial damages in another. Such disparate results

15 will eviscerate the carefully constructed federal scheme and the industry's ability to

16 rely upon the Congressional intent to both provide and maintain an assured supply

17 of gasoline and to protect the nation's environment and its citizens.[7]

18

19

20

21

---

22  [6]    In *OFA v. Davis*, 331 F.3d 665, 670-673 (9th Cir. 2003), the Ninth Circuit
    rejected Oxygenated Fuels Association's attack upon California's proposed MTBE
23  phaseout. In *Davis*, the OFA relied upon different theories of preemption than those
    raised here and, in rejecting those theories, the Ninth Circuit did not address or
24  decide the preemption issues underlying this removal petition. *See* 331 F.3d at 670-
    71 (relying solely upon "conflict" preemption theories); *id.* at 673 ("OFA does not
25  argue that California's MTBE ban will inhibit federal efforts to fight air pollution").

26  [7]    Recognizing how imperative uniformity is to the national distribution system,
    Congress did not even want to risk inconsistent results among the federal circuits
27  with respect to judicial review of fuel content regulations. Accordingly, it vested
    exclusive jurisdiction in the D.C. Circuit Court of Appeals. 42 U.S.C. § 7607(6).

28

W02-LA:LWJ\70852512.1                                           OPPOSITION TO MOTION FOR REMAND

**B.**    **Federal Officer Removal is Proper Pursuant to "Acting Under"**
      **Provision of 28 U.S.C. § 1442(a).**

Corporations acting under the direction of federal officers or agencies are permitted to remove state actions for federal court pursuant to 28 U.S.C. § 1442(a)(1). To remove a case under § 1442(a)(1), the removing party must establish that (1) it acted under the direction of a federal officer, (2) it has a colorable federal defense; and (3) there is a sufficient causal nexus between the conduct directed by the federal officer or agency and the harm about which Plaintiff complains.[8] *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); 341 F. Supp. 2d at 396-397.

    **1.**    **Defendants Are "Persons" Acting "Under" the Direction of a**
        **Federal Officer for Purposes of Removal.**

A corporation is a "person" for purposes of the federal officer removal statute. *See, e.g., Arness v. Boeing N.A., Inc.* 997 F. Supp. 1268,1271 (C.D. Cal. 1998); *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934 (S.D.N.Y. 1992). Furthermore, Judge Scheindlin has already determined that Defendants acted under the direction of a federal officer when they added MTBE to gasoline. *See* 342 F. Supp. 2d at 156 ("defendants have sufficiently alleged that they added MTBE to gasoline at the

---

[8]   When stating the standard for federal officer removal, Plaintiff incorrectly asserts that Defendants must also demonstrate that adjudication of Plaintiff's claims in state court sufficiently threatens the enforcement of federal policy. (Motion, p. 2:3-4.) This is not a necessary element of federal officer removal and none of the Plaintiff's case citations suggest that it is. *See Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411, 417 (D.N.H. 2002); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992). Furthermore, as discussed in Part 2, *supra*, enforcement of federal policy is, in fact, implicated by Plaintiff's state law claims.

-21-

1 | direction of the EPA, a federal agency, thereby meeting the first requirement of

2 | removal pursuant to section 1442(a)(1)").[9]

3 |          In an effort to thwart removal, Plaintiff argues that it is not suing

4 | Defendants for putting MTBE in gasoline, but rather for failing to warn about the

5 | propensity of MTBE to contaminate ground water and failing to prevent the escape

6 | of MTBE. (Motion, p.3:1-4.)  Although Plaintiff attempts to narrow the scope of its

7 | claims, the actual allegations in the complaint are quite broad.  For example, the

8 | complaint alleges that Defendants sold, promoted, marketed, distributed, transported

9 | and/or exchanged gasoline containing MTBE within the City of Merced. (Complt.

10 | ¶¶ 3, 12, 30, 39.)  Though Plaintiff does not expressly allege the phrase "putting

11 | MTBE in gasoline," Plaintiff alleges the same thing, in substance, when it states that

12 | Defendants are liable for compensatory and punitive damages because they "sold,

13 | promoted, marketed, distributed, transported, and/or exchanged gasoline containing

14 | MTBE and/or TBA, which is contaminating and threatening Merced's public water

15 | supplies" (Complt., ¶ 12), "sold, distributed, . . . gasoline containing MTBE and/or

16 | TBA" (*id.* ¶ 30), "had a duty to use due care in the sale . . . of gasoline containing

17 | MTBE and/or TBA" (*id.* ¶ 38), and "so negligently, carelessly, and/or recklessly

18 | sold . . . gasoline containing MTBE and/or TBA" (*id.* ¶ 39).  In addition, Plaintiff

19 | seeks the same result—punishing Defendants for the use of MTBE or other

20 | oxygenates.  As a result, because Defendants were expressly directed to use an

21 | oxygenate by the federal government, they are entitled to remove pursuant to 28

22 | U.S.C. § 1442(a).

23 |          Plaintiff argues, based on *Tellez v. Dole Food Company, Inc.*, that the

24 | defendants were not acting under the "direction" of EPA sufficient to establish

25 |

26 | [9]    Moreover, the Court in MDL 1358 has previously ruled that federal agent
   | jurisdiction pursuant to 28 U.S.C. § 1442(a) is properly established in "spillover"
27 | areas that are not otherwise subject to the year-round RFG Program. *See* 341 F.
   | Supp. 2d at 397-400.

28 |

-22-

1    federal officer jurisdiction. (Motion, p. 2:18-25.)  Contrary to Plaintiff's assertion,

2    the *Tellez* Court specifically noted that the EPA mandates regarding MTBE are

3    fundamentally different from the EPA mandates regarding the pesticides at issue

4    there.  *See Tellez v. Dole Food Company, Inc.*, No. CV 04-03216 PA (CTx)  at p. 7-

5    8 (C.D. Cal. June 18, 2004).  Although the *Tellez* court concluded that the EPA

6    mandates relating to pesticide labeling were not sufficient to establish federal officer

7    jurisdiction, it distinguished that situation from MTBE gasoline, specifically noting

8    that the EPA regulations regarding MTBE *did* establish federal officer jurisdiction

9    because the EPA fully understood that MTBE would be used in most gasoline and

10   the EPA was well aware of the risks posed by the use of MTBE.  *See id.*

11          Plaintiff next argues that, under the "artful pleading" doctrine,

12   Defendants are not allowed to recast Plaintiff's state law claims as federal claims in

13   order to remove to federal court. (Motion, p. 3:6-14.)  This is an incorrect statement

14   of the law.  The Supreme Court has repeatedly recognized that the federal officer

15   removal statute overcomes the well-pleaded complaint doctrine and allows removal

16   despite the absence of an express federal cause of action.  *See Mesa v. California*,

17   489 U.S. 121, 136 (1989); *Jefferson County*, 527 U.S. at 431 ("Suits against federal

18   officers are exceptional in this regard.  Under the federal officer removal statute,

19   suits against federal officers may be removed despite the nonfederal cast of the

20   complaint.").[10]  Accordingly, because this case involves substantive federal issues,

21   Defendants are entitled to remove this action notwithstanding the fact that Plaintiff

22   has not expressly pled a federal claim.

23

24

25
_____

26   [10]   Plaintiff's case citations regarding the well-pleaded complaint doctrine should
     be disregarded because they do not address federal officer removal, which
27   overcomes the well-pleaded complaint doctrine.  *See Etcheverry v. Tri-Ag Service,
     Inc.*, 22 Cal.4th 316 (2000); *Rains v. Criterion Systems, Inc.*, 80 F.3d 339 (1996).

28

W02-LA:LWJ\70852512.1                                      OPPOSITION TO MOTION FOR REMAND

2.   **Defendants Have a "Colorable Federal Defense" For Purposes of Removal.**

At this point in the litigation, Defendants' federal defense need only be "colorable," not clearly sustainable. *See Jefferson County*, 527 U.S. at 431 ("We...do not require the officer virtually to 'win this case before he can have it removed.'") (citation omitted); *Colorado v. Symes*, 286 U.S. 510, 519 (1932) (where a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the removal] claim is not without foundation and is made in good faith.").

Defendants have a colorable federal defense: federal law preempts Plaintiff's claims. As discussed in Part A, *supra*, Defendants cannot be held liable for the sale, distribution, and storage of gasoline containing MTBE when the EPA mandated oxygenated gasoline and approved and effectively required MTBE as an oxygenate. In fact, Judge Scheindlin stated that, "I have no doubt that the preemption defenses asserted by defendants in this litigation are colorable." 342 F. Supp. 2d at 158. Further, Judge Scheindlin has held that preemption is a federal defense on which removal pursuant to Section 1442(a) of Title 28 is properly predicated. *See In re MTBE Product Liability Litigation,* 2004 U.S. Dist. LEXIS 22100, * 20-22 (S.D.N.Y. Nov. 3, 2004).

3.   **There Is A "Causal Nexus" Between the Directive to Use MTBE and Plaintiff's Alleged Harm.**

There is a strong causal nexus between the EPA's oxygenate mandate and the conduct about which Plaintiff complains. As discussed above, Congress and the EPA fully understood and expected MTBE to be used in the vast majority of oxygenated gasoline sold in the United States. In this case, Plaintiff allegedly owns

-24-

1  and operates a public water system in the City of Merced, an area in which

2  oxygenated gasoline was mandated or was sold because of the "spillover" effect.[11]

3  Accordingly, the federal government was "intimately involved in [Defendants']

4  decision to add MTBE to gasoline" (*see* 342 F. Supp. 2d at 158) in this case, and

5  Defendants have sufficiently alleged the causal nexus requirement for removal

6  under the federal officer removal statute, section 1442(a)(1) of Title 28. *See id.*

## IV.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the

Court deny Plaintiff's motion to remand.

DATED:  July 11, 2005

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By          /s/ Whitney D. Jones
                    WHITNEY D. JONES

Attorneys for Defendant
EXXON MOBIL CORPORATION

---

[11]   For a number of reasons, gasoline subject to the RFG requirements is often delivered and sold in non-RFG areas through a phenomenon known as "spillover". This most often occurs because the boundaries between the RFG and non-RFG areas and the fuel distribution system do not coincide. *See* 341 F. Supp. 2d at 395.  When enacting the CAA, Congress was aware that some MTBE would be directed into non-RFG areas as a result of the "spillover" effect. 136 Cong. Rec. S648, S6460 (daily ed. May 17, 1990) (comment of Sen. Daschle that assuming ten or twenty percent "spillover" would be more reasonable than assuming no "spillover").

W02-LA:LWJ\70852512.1                                    OPPOSITION TO MOTION FOR REMAND

# EXHIBIT A

# EXHIBIT A

# UNITED STATES OF AMERICA
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

**DIRECT REPLY TO:**
Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888

http://www.jpml.uscourts.gov

June 14, 2005

TO INVOLVED COUNSEL

Re: MDL-1358 -- In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

   *City of Merced v. Exxon Mobil Corp., et al.,* E.D. California, C.A. No. 1:05-662

Dear Counsel:

   Attached hereto is a copy of a conditional transfer order filed today by the Panel involving the above-captioned matter. This matter is transferred pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001). Copies of Rule 5.2, dealing with service, and Rules 7.4 and 7.5, regarding "tag-along" actions, are attached for your convenience.

   Inasmuch as there is an unavoidable time lag between notification of the pendency of the tag-along action and the filing of a conditional transfer order, counsel are required by Rule 7.4(b) to notify this office **BY FACSIMILE**, at (202) 502-2888, of any official changes in the status of the tag-along action. These changes could involve dismissal of the action, remand to state court, transfer to another federal court, etc., as indicated by an order filed by the district court. Your cooperation would be appreciated.

   **NOTICE OF OPPOSITION DUE ON OR BEFORE: June 29, 2005   (4 p.m. EST)**
         (Facsimile transmission is suggested.)

   If you are considering opposing this conditional transfer order, please review Rules 7.4 and 7.5 of the Panel Rules before filing your Notice of Opposition.

   A list of involved counsel is attached.

                              Very truly,

                              Michael J. Beck
                              Clerk of the Panel

                              By
                                   Deputy Clerk

Attachments

JPML Form 39

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 1 4 2005

FILED
CLERK'S OFFICE

*DOCKET NO. 1358*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY
LITIGATION*

*City of Merced v. Exxon Mobil Corp., et al.,* E.D. California, C.A. No. 1:05-662

*CONDITIONAL TRANSFER ORDER (CTO-14)*

On October 10, 2000, the Panel transferred two civil actions to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  Since that time, 67 additional actions have been transferred to the Southern District of New York. With the consent of that court, all such actions have been assigned to the Honorable Shira Ann Scheindlin.

It appears that the action on this conditional transfer order involves questions of fact which are common to the actions previously transferred to the Southern District of New York and assigned to Judge Scheindlin.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), this action is transferred under 28 U.S.C. § 1407 to the Southern District of New York for the reasons stated in the order of October 10, 2000, and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Southern District of New York.  The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Michael J. Beck
Michael J. Beck
Clerk of the Panel

RULE 5.2:     SERVICE OF PAPERS FILED

(a)     All papers filed with the Clerk of the Panel shall be accompanied by proof of previous or simultaneous service on all other parties in all actions involved in the litigation.  Service and proof of service shall be made as provided in Rules 5 and 6 of the Federal Rules of Civil Procedure.  The proof of service shall indicate the name and complete address of each person served and shall indicate the party represented by each.  If a party is not represented by counsel, the proof of service shall indicate the name of the party and the party's last known address.  The proof of service shall indicate why any person named as a party in a constituent complaint was not served with the Section 1407 pleading.  The original proof of service shall be filed with the Clerk of the Panel and copies thereof shall be sent to each person included within the proof of service.  After the "Panel Service List" described in subsection (d) of this Rule has been received from the Clerk óf the Panel, the "Panel Service List" shall be utilized for service of responses to motions and all other filings.  In such instances, the "Panel Service List" shall be attached to the proof of service and shall be supplemented in the proof of service in the event of the presence of additional parties or subsequent corrections relating to any party, counsel or address already on the "Panel Service List."

(b)     The proof of service pertaining to motions for transfer of actions pursuant to 28 U.S.C. §1407 shall certify that copies of the motions have been mailed or otherwise delivered for filing to the clerk of each district court in which an action is pending that will be affected by the motion.  The proof of service pertaining to a motion for remand pursuant to 28 U.S.C. §1407 shall certify that a copy of the motion has been mailed or otherwise delivered for filing to the clerk of the Section 1407 transferee district court in which any action affected by the motion is pending.

(c)     Within eleven days of filing of a motion to transfer, an order to show cause or a conditional transfer order, each party or designated attorney shall notify the Clerk of the Panel, in writing, of the name and address of the attorney designated to receive service of all pleadings, notices, orders and other papers relating to practice before the Judicial Panel on Multidistrict Litigation.  Only one attorney shall be designated for each party.  Any party not represented by counsel shall be served by mailing such pleadings to the party's last known address.  Requests for an extension of time to file the designation of attorney shall not be granted except in extraordinary circumstances.

(d)     In order to facilitate compliance with subsection (a) of this Rule, the Clerk of the Panel shall prepare and serve on all counsel and parties not represented by counsel, a "Panel Service List" containing the names and addresses of the designated attorneys and the party or parties they represent in the actions under consideration by the Panel and the names and addresses of the parties not represented by counsel in the actions under consideration by the Panel.  After the "Panel Service List" has been received from the Clerk of the Panel, notice of subsequent corrections relating to any party, counsel or address on the "Panel Service List" shall be served on all other parties in all actions involved in the litigation.

(e)     If following transfer of any group of multidistrict litigation, the transferee district court appoints liaison counsel, this Rule shall be satisfied by serving each party in each affected action and all liaison counsel.  Liaison counsel designated by the transferee district court shall receive copies of all Panel orders concerning their particular litigation and shall be responsible for distribution to the parties for whom he or she serves as liaison counsel.

**INVOLVED COUNSEL LIST (CTO-14)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

Stanley N. Alpert
Weitz & Luxenberg, P.C.
180 Maiden Lane
17th Floor
New York, NY 10038

Gregory George Diaz
City of Merced
Deputy City Attorney
678 W. 18th Street
Merced, CA 95340

Whitney D. Jones
Sheppard, Mullin, Richter & Hampton, LLP
333 South Hope Street
48th Floor
Los Angeles, CA 90071-1448

Duane C. Miller
Miller, Axline & Sawyer
1050 Fulton Avenue
Suite 100
Sacramento, CA 95825-4272

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockerfeller Plaza
New York, NY 10020

Exhibit D

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

|  |  |
|---|---|
| **IN RE:**<br><br>**METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | ) MDL Docket No. 1358<br>)<br>) This Document Relates to:<br>) *State of New Hampshire v. Amerada*<br>) *Hess Corp. et al.*, D.N.H. Case No. 03-<br>) CV-486, D.R.I. Case No. 03-0529L<br>)<br>) **PLAINTIFF STATE OF NEW**<br>) **HAMPSHIRE'S MOTION TO**<br>) **VACATE CONDITIONAL**<br>) **TRANSFER ORDER (CTO-4);**<br>) **BRIEF IN SUPPORT THEREOF**<br>)<br>)<br>) |

**PLAINTIFF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)**

1.      The State of New Hampshire ("State") is plaintiff in the action *State of New Hampshire v. Amerada Hess Corp., et al.*, Case No. 03-486 (D.N.H.), 03-0529 (D.R.I.) (the "*State Action*" or "Action"), which is identified as a "tag-along case" in the schedule of district court civil actions subject to CTO-4, issued by the Judicial Panel on Multidistrict Litigation ("Panel") on February 6, 2004.

2.      The State hereby moves the Panel to vacate the above-referenced conditional transfer order as it applies to the *State* Action on the grounds that such action does not meet the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

3.      Specifically, resolution of the State's pending Remand Motion by the Transferee Court will result in no significant savings of judicial resources, because the jurisdictional issues

1

raised therein differ materially from those raised by the plaintiffs currently before the Transferee

Court. Second, even if the *State* Action is not remanded to state court, the likelihood of

inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) unique questions

of law and localized questions of fact overwhelmingly predominate in the Action; (b) discovery

regarding the few questions of fact shared with other case involving methyl tertiary butyl ether

("MTBE") already has largely been completed in the prior proceedings and can be made

available to all parties; and (c) the Transferee Court, as well as numerous other federal and state

courts, already have issued remarkably consistent rulings on most, if not all, common legal

issues.

      4.     This Motion is based on the attached Brief in support thereof, along with the

Declaration of Victor M. Sher, the Statement of Reasons Why Oral Argument Should Be Heard,

the files, pleadings, and documents on file with the Panel, and upon such further documentary

and oral evidence as may be presented in the hearing on this matter.

      WHEREFORE, the State respectfully requests that the Panel:

      A.     Vacate the Conditional Transfer Order as it applies to the *State* Action;

      B.     Schedule oral argument on this Motion; and

      C.     Grant such other relief deemed just and appropriate.

      Respectfully submitted,

      THE STATE OF NEW HAMPSHIRE
      PETER W. HEED, ATTORNEY GENERAL

Dated: March 4, 2004

      Maureen D. Smith, NH Bar # 4857
      Senior Assistant Attorney General
      Environmental Protection Bureau
      33 Capitol Street
      Concord, NH 03301-6397

Tel: (603) 271-3679
Fax: (603) 223-6270


SHER LEFF, LLP
Victor M. Sher (Admitted *pro hac vice*)
Todd E. Robins (Admitted *pro hac vice*)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted *pro hac vice*)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

Counsel for Plaintiff State of New
Hampshire (*State of New Hampshire v.
Amerada Hess Corp., et al.*, Case No. 03-
486 (D.N.H.), 03-0529 (D.R.I.))

3

## BRIEF IN SUPPORT OF STATE OF NEW HAMPSHIRE'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

### I.   INTRODUCTION

The Panel should vacate the Conditional Transfer Order as it applies to the *State* Action because the State's case is fundamentally different from every other MTBE-related lawsuit. Unlike any other MTBE case before the Panel, the *State* Action is not brought by a single drinking water purveyor or well owner, but by a sovereign State, with its unique common law, statutory and constitutionally-based interests in protecting all waters and all citizens of the State. The *State* Action, therefore is uniquely based upon the State's ability to seek statewide relief, a factor that calls for separate adjudication. *See In re Tobacco/Governmental Health Care Costs Litig.*, 76 F. Supp. 2d 5, 9 (D.D.C. 1999) (denying 28 U.S.C. § 1407 transfer of governmental action "based on sections of United States Code that permit only the United States to seek relief," because case presented "entirely different, perhaps crucial, legal issues").

In addition to the broader set of interests involved, there is a substantial difference in scope between the *State* Action and other MTBE-related cases. The *State* Action involves the damage caused by MTBE to *all* State waters, which presents a host of issues related to breadth of liability and remedies that are exclusive to this case. *See In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (transfer denied where "tremendous, overriding difference in scope" between cases resulted in "critical factual and legal disparities"). As the potential breadth of the *State* Action dwarfs the other MTBE cases, consolidation poses the risk of overwhelming the transferee court. *In re Motion Picture Licensing Antitrust Litig.*, 479 F. Supp. 581, 592 (JPML 1979) (Panel "vitally concerned" that MDL proceedings "remain manageable;" inclusion of action with "unique legal and factual nuances would serve only to add further layers of complexity . . . without providing any overriding benefit").

4

The State's pending motion to remand vividly illustrates the critical differences between the *State* Action and other MTBE cases removed to federal court. The State's remand motion raises unique – and dispositive – jurisdictional issues related to state sovereignty and governmental police power not present in the remand motions currently before the presiding judge in MDL No. 1358 (the "Transferee Court"). Accordingly, no efficiencies will be gained by transferring the State's Action to MDL No. 1358 (or any other MDL) for consolidated treatment of remand motions.

Moreover, even if the Action were somehow to remain in federal court, there are few, if any, common questions of fact between the *State* Action and other MTBE cases on which discovery is not already largely completed. A great deal of the generally applicable liability discovery (including discovery on what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when) already has been completed in connection with the prior incarnation of MDL No. 1358 and other MTBE cases that were not consolidated, and this discovery is or can be made available to the parties in this Action. The discovery that remains – the bulk of the case —revolves primarily around New Hampshire-specific issues, such as the particulars of New Hampshire's gasoline market and infrastructure, the extent of MTBE contamination in State waters, who is responsible for the contamination in those waters, and what it will cost to remediate and treat.

Furthermore, potentially dispositive motions involving the State, including federal preemption, have been litigated in MDL No. 1358 and other cases with remarkably consistent outcomes. The Transferee Court published a lengthy opinion that provides useful guidance to any court applying common law tort doctrines in the MTBE context. *See In Re MTBE Products Liability Litig.,* 175 F. Supp. 2d 593 (S.D.N.Y. 2001). As a result, many of the threshold legal

questions that would normally justify MDL treatment already have been resolved and are extremely unlikely either to produce inconsistent outcomes or to require significant additional judicial energy.

In sum, MTBE litigation is sufficiently mature at this point that MDL handling is unwarranted. There is no "gathering storm" that will produce a blizzard of motions and conflicting opinions, notwithstanding the recent flurry of removal notices filed by defendants. Transfer of the *State* Action to the Southern District of New York, therefore, will not create efficiencies. Instead it will create delay and inconvenience by forcing the State to litigate this important lawsuit in a distant forum that has no particular expertise on the localized issues that overwhelmingly predominate in the case.

## II.   BACKGROUND

### A.   The State Action.

MTBE is a chemical used by some refiners in some gasoline products in some parts of the country. Writ of Summons and Declaration ("Complaint"), ¶ 26.[1] Contamination of New Hampshire's ground and surface waters with MTBE is widespread and involves thousands of drinking water sources. *Id.*, ¶¶ 68-71. Because defendants' choice to use MTBE in gasoline has created an unprecedented threat to the water resources of New Hampshire, the State of New Hampshire Attorney General filed the *State* Action in the Superior Court of Merrimack County, New Hampshire on September 30, 2003 against 22 major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE to retail gasoline stations in New Hampshire.

---

[1] The State's Complaint is attached as Exhibit 1 to the Declaration of Victor M. Sher ("Sher Decl.") submitted herewith.

This is the only MTBE-related action brought by a sovereign state.  The State seeks, among other things, to ensure that the costs of responding to MTBE contamination in the State's waters are borne by the companies that chose to make and use it, knowing of its risks and yet failing to take the steps (including warnings) necessary to avoid or mitigate them.  Complaint, ¶ 76, pp. 51-53.  The State asserts damages claims under state common law theories (including strict products liability, public nuisance, trespass, and negligence), as well as claims for cleanup costs and civil penalties under state statutes (including strict liability for environmental cleanup costs under N.H. Revised Statutes Annotated ("RSA") 146-A:3-a and penalties for violations of the State's consumer protection statute, RSA 358-A:2).  The Attorney General is uniquely situated to bring these claims on behalf of all citizens of the State to obtain statewide relief for a statewide problem.

### B.    Procedural History.

On November 10, 2003, certain defendants removed the *State* Action to the U.S. District Court for the District of New Hampshire, citing two bases for federal subject matter jurisdiction: (1) that, pursuant to 28 U.S.C. § 1442(a)(1), they were acting "under the direction" of federal officers when they chose to add MTBE to gasoline; and (2) that the Action somehow implicates a 1988 federal bankruptcy order pertaining to the predecessor of a single defendant.  On November 19, 2003, the State timely filed a motion to remand the Action to state court (the "Remand Motion") on the grounds that no federal subject matter jurisdiction exists over this matter.[2]  Soon thereafter, due to recusal by each of the district judges in the District of New

---

[2] Neither of the bases for federal jurisdiction asserted by defendants has merit.  First, no court has ever accepted the "federal officer" argument defendants advance in their removal notice. *See, e.g., Tremblay v. Philip Morris, Inc.,* 231 F. Supp. 2d 411, 418 (D.N.H. 2002) (defendant's mere "participa[tion] in a regulated industry … is not enough to demonstrate that it acted under the direction of a federal officer"); *Little v. Purdue Pharma, LP,* 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'"); *Good v. Armstrong*

Hampshire, the Action was referred to the Hon. Ronald R. Lagueux of the District of Rhode

Island pursuant to a reciprocity agreement between District Courts of New Hampshire and

Rhode Island.[3]  On or about December 1, 2003, certain defendants filed a motion to stay the

hearing on the State's Remand Motion (and all other pretrial proceedings) pending possible

transfer of the Action to MDL No. 1358.  On December 18, 2003, the court granted defendants'

stay motion.

    Meanwhile, on November 12, 2003, certain defendants filed with the Panel (but never

served the State with) a Notice of Related, Tag-Along Actions alleging that certain recently filed

actions, including the *State* Action, involve common questions of fact with actions previously

transferred to MDL 1358.  MDL No. 1358 was an inactive MDL proceeding before the Hon.

Shira A. Scheindlin in the U.S. District Court for the Southern District of New York that

previously involved several consolidated "actions brought on behalf of private well-owners

seeking relief from the contamination or threatened contamination of their wells" by MTBE.  *In*

*Re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d at 598.[4]

    On December 19, 2003, Judge Scheindlin held a hearing in connection with several

MTBE cases filed by New York water purveyors that were removed to federal court and

---

*World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos). Second, civil actions brought by governmental units pursuant to their police or regulatory powers, such this one, are exempt from removal on grounds of bankruptcy jurisdiction. 28 U.S.C. § 1452(a); *see In re Forster*, 146 B.R. 383 (Bkrtcy. N.D. Ohio 1992) (state action to enforce environmental legislation and recover cleanup costs could not be removed under §1452(a)).

[3] Pursuant to the Local Rules of District of New Hampshire, a complaint may be referred to the District of Rhode Island (or the District of Maine) due to recusal of the judges of the New Hampshire District. D.N.H. Local Rule 77.5.  When such a referral occurs, the New Hampshire local rules continue to apply to the referred action, all pleadings are filed in both districts, and conferences, hearings and pretrials may be held in either district. *Id.*

[4] Judge Scheindlin later denied class certification in the matter, *see In Re: MTBE*, 209 F.R.D. 323 (S.D.N.Y. 2002), and all the cases were resolved.

assigned to her (the "December 19 Hearing"). *See* Transcript of December 19 Hearing (attached as Exhibit 5 to Sher Decl.). At the December 19 Hearing, the parties present before Judge Scheindlin (which did *not* include the State, *see* Sher Decl., ¶ 21) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. *Id.*, Exhibit 5 at 13-18. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties *they represented* to MDL No. 1358 for the same purposes. *Id.* That stipulation resulted in an order entered by Judge Scheindlin on December 23, 2003 stating that remand motions "in these and all similar removed actions, wherever filed," should be heard as part of MDL No. 1358. *Id.*, Exhibit 6. The State had no opportunity to participate in the December 19 Hearing or address the procedures stipulated by the parties at the Hearing, and subsequently notified Judge Scheindlin of its intent to object to any transfer of its case to the Southern District of New York. *Id.*, ¶23, Exhibit 8.[5] On February 13, 2004, Judge Scheindlin held oral argument on the remand motions before her, which remain pending at this time. *Id.*, Exhibit 9.

On February 6, 2004, the Panel issued CTO-4. On February 18, 2004, the State filed with the Panel a Notice of Opposition to the CTO. The State now moves to vacate.

## C.    Previous MTBE Litigation.

The *State* Action and other MTBE-related cases recently removed to federal courts in various parts of the country are preceded by a significant number of cases filed in federal and state courts regarding MTBE, some of which have produced universally-applicable discovery on

---

[5] Upon first learning of the December 19 Hearing in New York, the State initially anticipated that it may not object to transfer of this Action to the Southern District of New York, because it appeared that the procedures contemplated at that Hearing would have allowed the State's Remand Motion to be argued and resolved expeditiously in that court. Sher Decl., ¶ 24. However, no such procedure for transfer and prompt hearing of the State's Remand Motion came to pass, and other parties' remand motions have now proceeded in the Transferee Court without the State's participation. *Id.*

common questions of fact and consistent rulings on common legal questions. Sher Decl., ¶¶ 3-20. In at least three major cases – the prior proceedings in MDL No. 1358, *South Tahoe Public Utility District v. Atlantic Richfield Co.,* Cal. Super. Ct., S.F. Cty. Case No. 999128 ("*South Tahoe*"), and *Communities for a Better Environment v. Unocal Corp.,* Cal. Super. Ct., S.F. Cty. Case No. 997013 ("*CBE*") – the parties completed detailed, extensive and coordinated discovery on generally applicable issues related to defendant liability. Sher Decl., ¶¶ 7-10, 12-13, 14-16. The *South Tahoe* action went to trial on the issues of refiner/manufacturer liability, product defect and malice, and, after a four-month trial, resulted in a plaintiff's verdict on each of these issues. *Id.,* ¶¶ 7, 9. All of the discovery and testimony from these cases exists and can be made available to the parties in the *State* Action. *Id.,* ¶¶ 11, 13, 17-18, Exhibit 4.

### III.   LEGAL ARGUMENT

Regardless of how other MTBE cases are treated, the conditional transfer of the *State* Action to MDL No. 1358 (or any other MDL) should be vacated because transfer would neither further the just and efficient conduct of the litigation on common questions of fact or law, nor serve the convenience of the parties and witnesses. The statutory factors considered by the Panel in deciding whether to uphold the conditional transfer of an alleged tag-along action are: (1) whether there are common questions of fact between the alleged tag-along action and existing MDL cases; (2) whether transfer would serve the convenience of parties and witnesses; and (3) whether transfer would serve the just and efficient conduct of the actions. 28 U.S.C. § 1407; JPML Rule 1.1; *In re Managed Care Litig.,* 246 F. Supp 2d 1363, 1364 (JPML 2003); *In re Enron Corp.,* 227 F.Supp.2d 1389, 1391 (JPML 2002). The Panel has held that all three criteria must be met to justify transfer, *In re Highway Acc. Near Rockville, Connecticut, on December 30, 1972,* 388 F. Supp. 574, 575 (JPML 1975), and that the third criterion is the "most

important." *In re Tobacco/Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 8, *citing* 15 C. Wright, A Miller & E. Cooper, Federal Practice And Procedure, § 3863 at 535 (1986).  In analyzing whether transfer would serve the just and efficient conduct of actions under § 1407, the Panel considers primarily whether transfer and consolidation will avoid duplicative discovery and inconsistent pretrial rulings. *See, e.g., In re TMJ Implants Products Liability Litig.*, 844 F. Supp. 1553, 1554 (JPML 1994).

The *State* Action is singularly inappropriate for MDL treatment for two reasons.  First, resolution of the State's Remand Motion – the first, and likely only, substantive motion to be considered by a federal court in this Action – by an MDL court will not conserve judicial resources, because jurisdictional issues raised therein differ materially from those raised by the plaintiffs currently before the Transferee Court.  Second, even if the Action is not remanded to state court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) as the only case brought by a sovereign state to address MTBE contamination of natural resources on a statewide basis, unique questions of law and localized questions of fact overwhelmingly predominate in the Action; (b) discovery regarding the few questions of fact shared with other MTBE-related cases already has been completed in large part and is or can be made available to all parties; and (c) the Transferee Court, as well as numerous other federal and state courts, already have issued remarkably consistent rulings on most, if not all, common legal issues.  Thus, the District of New Hampshire is in a position to rule expeditiously on the Remand Motion, as well as on other pretrial motions, and to preside over the remaining New Hampshire-specific discovery.  For these reasons, the *State* Action will "proceed more expeditiously if left alone." *See In re Sears, Roebuck & Co. Employment Practices Litig.*, 487 F. Supp. 1362, 1363 (JPML 1980).

A.     **No Savings Of Judicial Resources Will Be Gained From Consolidated Treatment Of the State's Remand Motion.**

Because Judge Scheindlin did not have a copy of the complaint, removal notice, or Remand Motion filed in the *State* Action before her, the determination in her December 23, 2003 Order that the remand issues raised in various "similar removed" cases around the country are "appropriate" for MDL treatment should not apply to the *State* Action. *See* Sher Decl., ¶¶ 23, 26. The *State* Action is the only MTBE-related case filed by a sovereign state on behalf of all of its citizens, and, therefore, certain of the State's grounds for seeking remand of its case to state court are not raised in the remand motions currently pending before Judge Scheindlin. This militates against MDL transfer, notwithstanding the presence of some common issues. *See also In re 'East of the Rockies' Concrete Pipe Antitrust Cases*, 302 F. Supp. 244, 254 (JPML 1969) (Weigel, J., conc.) ("neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, ipso facto, by transfer just because there are common questions").

The State's Remand Motion differs from the remand motions before Judge Scheindlin in several important respects. First, unlike any other MTBE case, the *State* Action is brought by a state entity, whose Eleventh Amendment and sovereign immunities bar removal of this Action to federal court.[6]  Second, the State is a "governmental unit" that (among other things) seeks cost recovery pursuant to its police and regulatory powers. Under 28 U.S.C. § 1452(a), such governmental civil actions are exempt from removal on grounds of bankruptcy jurisdiction. The State's status as sovereign thus raises unique – and dispositive – issues not addressed by the remand motions pending in the Transferee Court. *See, e.g., In re Harmony Loan Company, Inc.*

---

[6] *See, e.g., People of State of Cal. v. Steelcase Inc.*, 792 F. Supp. 84, 86 (C.D. Cal. 1992) ("since the immunity granted by the Eleventh Amendment is an immunity from being made an involuntary party to an action in federal court, it should apply equally to the case where the state is a plaintiff in an action commenced in state court and the action is removed to federal court by the defendant"); *Moore ex rel. State of Mississippi v. Abbott Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995) (same); *contra, In re Rezulin Products Liability Litig.*, 133 F. Supp. 2d 272, 297 (S.D.N.Y. 2001).

12

*Securities Litigation*, 372 F. Supp. 1405, 1407 (JPML 1974) (denying motion to transfer where

case contained issues not common to other cases, including sovereign immunity); *In re*

*Tobacco/Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 9 (rejecting transfer

because federal government's action "is based on sections of United States Code that permit only

the United States to seek relief, thus presenting entirely different, perhaps crucial, legal issues").[7]

Because the State's Remand Motion raises additional issues not raised in those pending

before Judge Scheindlin, it cannot necessarily be resolved based on what Judge Scheindlin

decides in those cases. Thus, the risk of inconsistent rulings absent transfer, as well as any

perceived judicial economy, is illusory. As the court held in *Board of Trustees v. Worldcom*, 244

F. Supp. 2d 900, 903 (N.D. Ill. 2002):

> When remand motions in cases potentially subject to MDL
> consolidation raise unique issues of law or fact, channeling the
> decisions to a single court would result in little or no savings of
> judicial resources. The threat of inconsistent judgments in either
> case is de minimis.

*See also Havens Protected "C" Clamps, Inc., supra*, 2000 WL 382027, at *2 (holding that where

"resolution of the motion to remand does not necessarily implicate issues common to the other

actions currently pending before the MDL Panel-designated court," remand motion should be

considered by transferor court). Consequently, there is nothing but delay to be gained from

transferring this action to the Southern District of New York, when the District of New

Hampshire is at least as capable of deciding the unique issues raised in the State's Remand

Motion in an expeditious manner.

---

[7] In addition, a review of the transcript from the February 13, 2004 hearing on the remand motions before
the Transferee Court reveals that, in those cases, defendants' jurisdictional arguments hinge largely (if not
entirely) on specific allegations from the complaints in those cases, *see* Sher Decl., Exhibit 9 at 10-12, 20-
22, 25-28 – not a single one of which appears in the State's Complaint.

**B.**     **Even If the *State* Action Is Not Remanded to State Court, The Likelihood Of Inconsistent Pretrial Rulings And Duplicative Discovery Is Minimal.**

Even if the *State* Action were somehow to remain in federal court, pretrial consolidation would serve neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation because this Action differs materially in nature and scope from other recently removed MTBE cases.  Moreover, to the extent the *State* Action shares common questions of fact or law with other pending cases, discovery on common factual questions is largely completed and available and most common legal issues already have been addressed by the Transferee Court and other courts.

**1.**     **There Is A "Tremendous Overriding Difference in Scope" Between The *State* Action And Other MTBE-Related Cases.**

The *State* Action is a fundamentally different kind of lawsuit than any other MTBE case currently pending in the federal (or state) courts.  While virtually every other MTBE damages case is brought by an individual public or private purveyor of drinking water in connection with contamination of a particular well or water supply, this Action is brought by a sovereign state and seeks to address injury to statewide water resources caused by MTBE.  For purposes of § 1407 consolidation, both the unique sovereign status of the State and the overriding difference in the scope of the litigation constitute critical distinctions that militate against consolidation.

*In re Tobacco/Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d 5, should control here.  In that case, the U.S. District Court for the District of Columbia denied a motion to transfer the United States' health care costs recovery action against the tobacco industry to an MDL proceeding involving foreign government tobacco cases that was pending in the same district.  Applying § 1407, the court concluded that transfer would not serve the just and efficient conduct of the litigation on the following grounds:

14

> The United States' action is based on sections of the United States
> Code that permit only the United States to seek relief, thus
> presenting entirely different, perhaps crucial, legal issues from
> those implicated by the foreign government actions. The Court
> therefore concluded that most of the legal questions to be decided
> before trial are unique to the lawsuit filed by the United States,
> eliminating any increase in efficiency or justice to be gained by
> consolidation of the U.S. and foreign government actions.

*Id.* at 9.

The same is true here. Unlike other MTBE cases brought by water suppliers and well-owners pursuant to their usufructuary and other property interests, the State's Action is expressly based on specific state statutes and recognized legal doctrines unique to the State – such as the State's status as trustee of the resource and the *parens patriae* doctrine – that permit only the State to seek relief. Each and every claim asserted by the State is brought pursuant to sovereign, quasi-sovereign, public trust, police power, regulatory, property, and other legal interests in protecting ground and drinking water resources that are exclusively held by the State. *See* Complaint, ¶¶ 8-11. For example, the State's statutory claims for environmental remediation costs under RSA 146-A:3-a and civil penalties for violations of the State's consumer protection statute, RSA 358-A:2, may be brought only by the Attorney General on behalf of the State. *See* RSA 146-A:9; RSA 358-A:4; *see also Mesiti v. Microdot, Inc.*, 739 F. Supp. 57, 63 (D.N.H. 1990) (only the State may bring an action pursuant section 146-A:3-a in order "to hold those who discharge oil into surface or ground waters strictly liable for relevant [cleanup] costs").

The State's claims for statewide damages under various common law theories of recovery (products liability, nuisance, trespass), while superficially similar to those asserted in other MTBE cases, are also claims that only the State can assert in its capacity as *parens patriae* and public trustee of the waters of New Hampshire. *See* RSA 21-M:10, II (Attorney General authorized to enforce statutes pertaining to environmental protection, exercise common law

15

powers to protect the environment, and to bring public nuisance and other actions in the name of the State); *Coakley v. Maine Building and Casualty Co.,* 136 N.H. 402, 413 (1992) (groundwater is a "unique and irreplaceable government resource"); *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607 (1982) ("[i]n order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties, . . . [t]he State must express a quasi-sovereign interest"); *Maine v. M/V Tamano,* 357 F. Supp. 1097 (D.Me. 1973) (holding that under its *parens patriae* power state could pursue damages claim for injuries to natural resources caused by oil spill); *Colorado River Indian Tribes v. Town of Parker,* 776 F.2d 846, 848 (9th Cir. 1985) (municipalities may not sue as *parens patriae* "because their power is derivative and not sovereign"). The *State* Action, therefore, is distinct from other MTBE cases. In light of these significant and crucial differences from the typical drinking water purveyor case, the Panel should find, as the court did in *In re Tobacco,* that there is no efficiency or justice to be gained by consolidation.

The *State* Action is also much broader in scope than other pending MTBE cases. In *In re Gasoline Lessee Dealers Antitrust Litig., supra,* 479 F. Supp. 578, a case involving two groups of antitrust actions brought by service station lessees against major oil companies, the Panel denied a motion to transfer and consolidate the actions, finding that individual rather than common factual issues predominated. Noting that one set of actions alleged violations affecting "a relatively limited geographic area," while the other set alleged a broad, nationwide conspiracy, the Panel determined that there were "critical factual and legal disparities between those actions" because of this "tremendous, overriding difference in scope." *Id.* at 580. Similarly, in *In re Sears, Roebuck & Co. Employment Practices Litig., supra,* 487 F. Supp. at 1363, the Panel found that the "distinctive elements" in pending employment discrimination

16

cases against Sears "overwhelmingly predominate[d]," because the cases ranged from those involving allegations of discrimination at "no more than three facilities" to those "involving across-the-board allegations of sex discrimination at 3,000 facilities."

These distinctions apply with equal force here. First, unlike other MTBE cases from around the nation also designated as tag-alongs, this case involves MTBE contamination *only* in New Hampshire. Second, also unlike other MTBE cases (which generally seek the costs of treating a limited number of particular contaminated wells), the *State* Action seeks a broad, statewide remedy that will involve, among other things, the investigation, monitoring and treatment of potentially tens of thousands of publicly and privately owned drinking water supplies as well as restoration of waters held in trust for the public. *See* Complaint, pp. 51-53. As the court observed in *In re Gasoline Lessee Dealers*, *supra*, 479 F. Supp at 580, discovery and pretrial proceedings concerning common factual questions will "clearly be dwarfed" by the scope of individual factual issues presented by this case. Likewise, in light of the potential breadth of the *State* Action, consolidation with other MTBE cases poses a risk of overwhelming the resources of the Transferee Court. *In re Motion Picture Licensing Antitrust Litig.*, *supra*, 479 F. Supp. at 592 (Panel "vitally concerned" that MDL proceedings "remain manageable;" inclusion of action with "unique legal and factual nuances would serve only to add further layers of complexity," with no "overriding benefit"). As such, the *State* Action is simply in another league and will not benefit from MDL treatment.

**2.    There Are Relatively Few Common Questions Of Fact Between The *State* Action And Other MTBE Cases On Which Available Discovery Is Not Already Largely Completed.**

The Panel consistently has held that MDL transfer of later-filed actions is neither necessary nor appropriate when discovery relating to common issues already has been completed in the transferee court and/or can be made available to the parties in actions before the Panel

without recourse to § 1407.[8]  In this instance, discovery pertaining to the few common factual questions shared between the *State* Action and other allegedly related MTBE cases is also largely completed and available to all parties.  Accordingly, the risk of duplicative discovery is minimal, and there is no need for MDL consolidation.

In their Notice of Related, Tag-Along Actions, defendants identify the following alleged "common question of fact" arising in this and the other listed actions: "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public."  Notice of Related Tag-Along Actions, filed Nov. 12, 2003, ¶2.  To the extent this constitutes a question of fact shared by the *State* Action and other alleged tag-along actions, discovery on this question as to many of the defendants named in the *State* Action was largely completed in the prior

---

[8] *See, e.g., In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377, 1378 (JPML 2002) (transfer denied where litigation was mature, discovery nearly completed in some constituent actions in the docket, and alternatives to transfer existed to minimize the possibility of duplicative discovery); *In re Indian Motorcycle Bankruptcy and Receivership Litig.*, 206 F. Supp. 2d 1365 (JPML 2002) (same);  *In re Air Crash Disaster Near Upperville, Virginia*, 430 F. Supp 1295, 1297 (JPML 1977) (CTO vacated where all actions in transferee court were already tried or settled, and all parties in the new actions before the Panel have access to all discovery obtained in the transferee district); *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, 505 F. Supp 221, 223 (JPML 1981) (CTO vacated where discovery of common issues has been completed in the transferee district and could be made available to the parties in the actions before the Panel without recourse to section 1407); *In Re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation*, 582 F Supp 890, 891 (JPML 1984) (same); *In re Western Electric Co., Inc. Semiconductor Patent Litigation*, 436 F. Supp. 404, 406 (JPML 1977) (transfer denied where discovery on common issues in transferee court "virtually completed"); *In re Eli Lilly & Co. "Oraflex" Products Liability Litig.*, 578 F. Supp. 422, 423 (JPML 1984) (transfer denied because possibility of duplicative discovery "eliminated" by availability of extensive discovery in areas of common factual inquiry from already concluded and well-advanced related actions); *In re Dow Chemical Co. "Polystyrene Foam" Products Liability Litig.*, 429 F. Supp. 1035, 1036 (JPML 1977) (need for transfer "obviated" because discovery on common questions of fact regarding defendants' knowledge and product's defectiveness had been completed and parties had agreed that such discovery would be applicable in all actions); *In re McDonald's Franchise Antitrust Litigation*, 472 F. Supp. 111, 114-115 (JPML 1979) (transfer denied where discovery on common questions was largely completed in some cases and available for use in less advanced cases).

incarnation of MDL No. 1358, as well as in the *South Tahoe* and *CBE* cases.[9]  Sher Decl., ¶¶ 7-10, 12-13, 14-16, 19-20.  The same is true with respect to expert discovery on the related question of whether MTBE and/or MTBE gasoline is a defective product.  *Id.*, ¶¶ 10, 13, 15, 19-20.  Overall, literally millions of liability-related documents have been produced and hundreds of witnesses have been deposed, including percipient witnesses at the defendant companies and at trade associations like the American Petroleum Institute and Oxygenated Fuels Association, and numerous expert witnesses.  *Id.*, ¶¶ 8, 13, 15-16.

Moreover, all of this discovery is, or could easily be made, readily available to the parties in the *State* Action.  *Id.*, ¶¶ 11, 13, 17-18.  For example, the document depository in the Transferee Court, which still exists, was established with the specific purpose of making those documents available to parties in other cases.  *Id.*, ¶ 17-18, Exhibit 4 (*In re MTBE Products Liability Litig.*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001) (providing that attorneys in any MTBE action may make use of documents produced in the litigation subject to the requirements of the order)).  The documents, depositions and trial testimony from the *South Tahoe* and *CBE* cases also can be made available to the parties in the *State* Action.  Sher Decl., ¶¶ 11, 13.  Indeed, as the Panel has routinely recognized, procedures other than MDL consolidation are available to both courts and parties to permit use of discovery on common issues from prior related cases, such as stipulations and orders to show cause.  *See, e.g. In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, *supra*, 199 F. Supp. 2d at 1378, citing Manual for Complex Litigation, Third, § 31.14 (1995).

In contrast, few, if any, of the remaining major factual issues in the *State* Action – such as causation, the nature of warnings given to particular vendees, the feasibility of alternatives to

---

[9] This "notice and knowledge" discovery is relevant to each of the State's common law claims against the refiner defendants, as well as its deceptive business practice claim under the State's consumer protection statute.  *See* Complaint, ¶¶ 80, 96, 105, 124, 135-136, 147.

MTBE, the extent of contamination, the available remedies, the cost of those remedies, and liability for those damages – can be considered "common questions of fact," as they revolve primarily, if not exclusively, around New Hampshire-specific issues.  For example, the questions of causation and product identification (*i.e.* whose MTBE and/or gasoline containing MTBE is in New Hampshire's waters), warnings, and the feasibility of alternatives will require extensive discovery regarding the gasoline infrastructure in New Hampshire and the way gasoline is supplied to the State from out-of-state refineries – discovery that will be "of no interest" to other MTBE plaintiffs in other parts of the country.  *In re Gasoline Lessee Dealers*, *supra*, 479 F. Supp at 580 (denying transfer where discovery in one action would be "of no interest" to parties in another); *see also Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003) (economic effect of MTBE ban influenced by gasoline infrastructure, which varies from state to state); *In re MTBE Products Liability Litig.*, 209 F.R.D. 323, 347 (S.D.N.Y. 2002) (issues regarding warnings given to intermediate vendees and UST owners and operators are "individual").

Similarly, questions regarding the extent of contamination, available remedies, and implementation and cost of those remedies will also be New Hampshire-specific.  In fact, in denying class certification in the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding contamination of any particular well present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each will require." *In re MTBE Products Liability Litig.*, *supra*, 209 F.R.D. at 337, 344; *see also In re Grand Funk Railroad Trademark Litig.*, 371 F. Supp. 1084, 1085 (JPML 1974) (no benefit from transfer where discovery "will focus localized factual issues"); *In re Air Crash at Pago Pago, Am. Samoa,* 394 F. Supp. 799, 800 (JPML 1975) (noting

that in tort litigation, common questions may pertain to liability, whereas the issue of damages is unique).

In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery is largely complete and available to all parties. The discovery that remains will focus primarily on New Hampshire-specific issues, which can be better handled by the District of New Hampshire.

### 3.   The Transferee Court And Other Courts Already Have Resolved Most Common Legal Issues.

Just as discovery on any common factual issues is already well-advanced in the Transferee Court (and elsewhere), common pretrial legal issues already have been decided by the Transferee Court, and by other federal and state courts. Indeed, the Transferee Court's prior rulings "provide a convenient expression of the conclusions of the transferee judge which have been reached through [her] familiarity with the litigation, and can serve as an aid in . . . preventing inconsistent pretrial rulings." *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation, supra,* 505 F. Supp at 223; *see also In re Western Electric Co., Inc. Semiconductor Patent Litigation, supra,* 436 F. Supp. at 406 (transfer unwarranted where transferee court's views on key legal issues are well documented, and will put home-court judge "closer to the shoes of the transferee judge").

In her landmark ruling on defendants' motions to dismiss in the original set of cases transferred to MDL No. 1358, Judge Scheindlin, in a lengthy and thorough opinion, set forth a roadmap for the many of the key common legal issues in these cases that other judges can easily follow. *See In re MTBE Products Liability Litig., supra,* 175 F. Supp. 2d 593. First, the Court

rejected defendants' federal preemption defense, *id.* at 611-616,[10] as has every other published opinion addressing the question.[11]  The Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related argument that defective product claims concerning MTBE require an impermissible reexamination of EPA's cost-benefit analysis regarding MTBE. *In re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d at 616-618, 623-625.  The court further upheld the sufficiency of each of the common law tort claims asserted in the *State* Action, including claims alleging refiner liability under theories of strict products liability, negligence, nuisance and trespass.  *Id.* at 623-629.[12]

With this extensive guidance already in place, the risk of inconsistent pretrial rulings on these common legal questions in the *State* Action, if left to proceed in its home district, is minimal.  At the same time, the pretrial legal questions raised in the *State* Action that have not yet been resolved by the Transferee Court or other courts in the context of MTBE litigation – such as the State's standing and authority to pursue damages claims on behalf of its residents, the scope and applicability of the state statutory claims asserted in the case, the applicability of any

---

[10] Although Judge Scheindlin left open the factual question of whether there were practicable alternatives to MTBE available for defendants' use under the federal Clean Air Act, *id.* at 616, this question, as described in section III.B.2., *supra*, depends on the gasoline market and infrastructure in the relevant locality, and thus is not the kind of question on which coordinated discovery will yield any efficiencies.

[11] *See Oxygenated Fuels Ass'n v. Davis* ("*Davis II*"), 331 F.3d 665 (9th Cir. 2003) (upholding California ban of MTBE in gasoline), *affirming Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182 (E.D. Cal. 2001); *ExxonMobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246 (9thCir. 2000) (upholding Nevada county regulation that effectively banned MTBE); *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA); *see also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").

[12] In evaluating the sufficiency of the plaintiffs' common law claims, the Transferee Court applied California, New York, Illinois and Florida law – not New Hampshire law.  To the extent there are any nuances in New Hampshire law that would affect any of the otherwise "common" legal questions in the *State* Action, the transferor court is equally, if not better, suited to address them.

statute of limitations or other defenses – are not shared with other MTBE cases.  These questions are best addressed by a court with more experience and familiarity with New Hampshire law. Thus, the benefits of permitting this case to proceed on its own in its home district outweigh the benefits (if any) of transfer.  *See In re Grand Funk Railroad, supra*, 371 F. Supp. at 1085 ("Panel must weigh any benefit that transfer would provide in the way of eliminating the possibility of inconsistent pretrial decisions against the efficient administration of the litigation as a whole"). Accordingly, the Conditional Transfer Order (CTO-4) as it applies to the *State* Action should be vacated.

## IV.   CONCLUSION

For the foregoing reasons the State's Motion to Vacate Conditional Transfer Order (CTO-4) as it applies to the *State* Action should be granted.

Respectfully submitted,

THE STATE OF NEW HAMPSHIRE
PETER W. HEED, ATTORNEY GENERAL

Dated:  March 4, 2004

Maureen D. Smith, NH Bar #4857
Senior Assistant Attorney General
Environmental Protection Bureau
33 Capitol Street
Concord, NH  03301-6397
Tel: (603) 271-3679
Fax: (603) 223-6270

SHER LEFF, LLP
Victor M. Sher (Admitted *pro hac vice*)
Todd E. Robins (Admitted *pro hac vice*)
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

23

LAW OFFICES OF MATTHEW F. PAWA, P.C.
Matthew F. Pawa (Admitted *pro hac vice*)
1280 Centre Street, Suite 230
Newton Center, MA  02459
Tel: (617) 641-9550
Fax: (617) 641-9551

ORR & RENO, P.A.
Martha Van Oot, NH Bar # 963
One Eagle Square, P.O. Box 3550
Concord, NH  03302
Tel: (603) 224-2381
Fax: (603) 224-2318

Counsel for Plaintiff State of New
Hampshire

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: | ) MDL Docket No. 1358 |
| | ) |
| **METHYL TERTIARY BUTYL ETHER** | ) This Document Relates to: |
| **PRODUCTS LIABILITY LITIGATION** | ) *State of New Hampshire v. Amerada* |
| | ) *Hess Corp. et al.*, D.N.H. Case No. 03- |
| | ) CV-486, D.R.I. Case No. 03-0529L |
| | ) |
| ———————————————— | ) **PROOF OF SERVICE** |

///

///

///

1

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA      )
                              )    ss
COUNTY OF SAN FRANCISCO   )

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

       I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to this action. My business address is 450 Mission Street, Suite 500, San Francisco, CA 94105.

       On **MARCH 4, 2004,** I served the following documents described as:

1.      **PLAINTIFF'S MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER AND BRIEF IN SUPPORT THEREOF**
2.      **STATEMENT OF REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD RE: MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER**
3.      **DECLARATION OF VICTOR M. SHER IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER**
4.      **SCHEDULE CTO-4 TAG ALONG CASES**

[ X ]    by placing true copies thereof in sealed envelope(s) addressed as follows:

### SEE ATTACHED SERVICE LIST

[ X ]   **(BY MAIL)** I caused to such envelope to be deposited in the mail at San Francisco, California with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit. Executed on **MARCH 4, 2004,** at San Francisco, California.

[ X ]    **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

                                            Julie Choate

{1000-002 / 00006007.DOC;1}

PANEL SERVICE LIST (Excerpted from CTO-4)
Docket No. 1358
IN RE METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

*California-American Water Company v. Atlantic Richfield Company, et al.*
N.D. California, C.A. No. 5:03-5379

*State of New Hampshire v. Amerada Hess Corporation, et al.*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Tower Center Drive, Suite 2000
Costa Mesa, CA 92626

Michael Axline
Miller Axline & Sawyer
1651 Response Road
Second Floor
Sacramento, CA 95815

Peter G. Beeson
Devine, Millimet & Branch PA
111 Amherst Street
PO Box 719
Manchester, NH 03105-0719

J. Stephen Bennett
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802

Rebecca L. Bouchard
Bingham McCutchen LLP
One State Street
Hartford, CT 06103-3178

Michael DeMarco
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corporation
376 S. Valencia Avenue
Brea, CA 92626

William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Dive, Suite 5400
Chicago, IL 60601

Matthew F. Madeiros
Little, Bulman, Medeiros & Whitney PC
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody LLP
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann & Bernstein LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Stephen J. Riccardulli
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605

3

Colleen P. Doyle
Diane P. Martin
Bingham & McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 Michigan Avenue, Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson & Middleton
900 Elm Street
PO Box 326
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
PO Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond PC
1350 I Street, NW
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Lawrence P. Riff
Steptoe & Johnson LLP
633 West Fifth Street, Suite 700
Los Angeles, CA 90071

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
Bracewell & Patterson LLP
711 Louisiana St., Ste. 2900
Houston, Texas 77002

Andrew W. Serell
Rath, Young, & Pignatelli
PO Box 1500
Concord, NH 03302

Scott Summy
Baron & Budd PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

Stephen L. Tober
Tober Law Offices, PA
PO Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132

4

Hojoon Hwang
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105


MAILED FOR FILING TO:
James R. Starr
Clerk of the Court
United States District Court for the District of New Hampshire
55 Pleasant Street, Room 110
Concord, NH 03301-3941

David A. DiMarzio
Clerk of the Court
United States District Court for the District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02903

**PANEL SERVICE LIST (Excerpted from CTO-4)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

*California-American Water Co. v. Atlantic Richfield Co., et al.,*
N.D. California, C.A. No. 5:03-5379
*State of New Hampshire v. Amerada Hess Corp., et al.,*
D. New Hampshire, C.A. No. 1:03-486

Jon D. Anderson
Latham & Watkins
650 Town Center Drive
Suite 2000
Costa Mesa, CA 92626

Peter G. Beeson
Devine, Millimet & Branch, P.A.
111 Amherst Street
P.O. Box 719
Manchester, NH 03105-0719

Michael DeMarco
Kirkpatrick & Lockhart, LLP
75 State Street
Boston, MA 02109

Brendan M. Dixon
Unocal Corp.
376 S. Valencia Avenue
Brea, CA 92626

Colleen P. Doyle
Bingham McCutchen, LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071

John V. Dwyer
Winer & Bennett
110 Concord Street
PO Box 488
Nashua, NH 03060

Lawrence M. Edelman
Pierce Atwood
Pease International Tradeport
One New Hampshire Avenue
Suite 350
Portsmouth, NH 03801

Nathan P. Eimer
Eimer, Stahl, Klevorn & Solberg
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Bruce W. Felmly
McLane, Graf, Raulerson
& Middleton
900 Elm Street
Manchester, NH 03105

Steven M. Gordon
Shaheen & Gordon
Two Capital Plaza
P.O. Box 2703
Concord, NH 03302

John S. Guttmann
Beveridge & Diamond, P.C.
1350 I Street, N.W.
Suite 700
Washington, DC 20005

Alan J. Hoffman, Jr.
Blank Rome L.L.P.
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998

Hojoon Hwang
Munger, Tolles & Olson, LLP
33 New Montgomery Street
19th Floor
San Francisco, CA 94105

William J. Kayatta, Jr.
Pierce, Atwood
One Monument Square
Portland, ME 04101

J. Andrew Langan
Kirkland & Ellis
200 East Randolph Drive
Suite 5400
Chicago, IL 60601

Matthew F. Medeiros
Little, Bulman, Medeiros
& Whitney, P.C.
72 Pine Street
Providence, RI 02903

Peter W. Mosseau
Nelson, Kinder, Mosseau & Saturley
99 Middle Street
Manchester, NH 03101

W. Scott O'Connell
Nixon & Peabody, L.L.P.
889 Elm Street
Manchester, NH 03101

Morris A. Ratner
Lieff, Cabraser, Heimann
& Bernstein, L.L.P.
780 Third Avenue
48th Floor
New York, NY 10017

Lawrence P. Riff
Steptoe & Johnson, LLP
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Andrew W. Serell
Rath, Young & Pignatelli
P.O. Box 1500
Concord, NH 03302-1500

Victor M. Sher
Sher & Leff
450 Mission St.
Suite 500
San Francisco, CA 94105

Stephen L. Tober
Tober Law Offices, P.A.
P.O. Box 1377
Portsmouth, NH 03801

John J. Wasilczyk
Morgan, Lewis & Bockius
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

Exhibit E

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | ) | MDL Docket No. 1358 |
| | ) | |
| | ) | This Document Relates to: |
| **IN RE:** | ) | *California-American Water Company* |
| | ) | *v. Atlantic Richfield Co.*, Case |
| **METHYL TERTIARY BUTYL ETHER** | ) | No. 03-5379 JSW (N.D. Cal.) |
| **PRODUCTS LIABILITY LITIGATION** | ) | |
| | ) | **PLAINTIFF CALIFORNIA-** |
| | ) | **AMERICAN WATER COMPANY'S** |
| | ) | **MOTION TO VACATE** |
| | ) | **CONDITIONAL TRANSFER** |
| | ) | **ORDER (CTO-4); BRIEF IN** |
| | ) | **SUPPORT THEREOF** |
| | ) | |
| | ) | |

### PLAINTIFF CALIFORNIA-AMERICAN WATER COMPANY'S
### MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

1.      California-American Water Company ("Cal-American") is plaintiff in the action

*California-American Water Co. v. Atlantic Richfield Co., et al.*, Case No. 03-5379 (N.D. Cal.) (the

"*Cal-American* Action" or "Action"), which is identified as a "tag-along case" in the schedule of

district court civil actions subject to CTO-4, issued by the Judicial Panel on Multidistrict Litigation

("Panel") on February 6, 2004.

2.      Cal-American hereby moves the Panel to vacate the above-referenced conditional

transfer order as it applies to the *Cal-American* Action on the grounds that such action does not meet

the required criteria for transfer and consolidation set forth in 28 U.S.C. § 1407.

3.      Specifically, resolution of Cal-American's pending Remand Motion by the

Transferee Court will result in no significant savings of judicial resources, because the

1

jurisdictional arguments raised therein differ materially from those raised by the plaintiffs currently before the Transferee Court. Second, even if the *Cal-American* Action is not remanded to state court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) discovery regarding the few questions of fact shared with other cases involving methyl tertiary butyl ether ("MTBE") already has largely been completed in the prior proceedings and can be made available to all parties; and (b) the Transferee Court, as well as numerous other federal and state courts, already have issued remarkably consistent rulings on most, if not all, common legal issues.

    4.    This Motion is based on the attached Brief in support thereof, along with the Declaration of Victor M. Sher, the Statement of Reasons Why Oral Argument Should Be Heard, the files, pleadings, and documents on file with the Panel, and upon such further documentary and oral evidence as may be presented in the hearing on this matter.

    WHEREFORE, Cal-American respectfully requests that the Panel:

    A.    Vacate the Conditional Transfer Order as it applies to the *Cal-American* Action;

    B.    Schedule oral argument on this Motion; and

    C.    Grant such other relief deemed just and appropriate.

    Respectfully submitted,

Dated: March 4, 2004

SHER LEFF, LLP
Victor M. Sher, SBN 96197
Todd E. Robins, SBN 191853
450 Mission Street, Suite 500
San Francisco, CA 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

BARON & BUDD, P.C.
Scott Summy (Admitted *Pro Hac Vice*)
Celeste A. Evangelisti, SBN 225232
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for Plaintiff California-American Water Company

## BRIEF IN SUPPORT OF CALIFORNIA-AMERICAN WATER COMPANY'S
## MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-4)

### I.    INTRODUCTION

The Panel should vacate the Conditional Transfer Order as it applies to the *Cal-American* Action because transfer of this exclusively state-law case, regarding local contamination caused by a product manufactured, sold and distributed entirely in-state, to an already over-burdened district court 3,000 miles away will benefit neither the parties nor the judicial system.

Cal-American's pending motion to remand its Action to state court vividly illustrates that there is neither convenience nor savings of judicial resources to be gained by transferring this case to the Southern District of New York.  Cal-American's remand motion raises unique – and dispositive – jurisdictional arguments related to federal preemption not applicable to the remand motions currently before the presiding judge in MDL No. 1358 (the "Transferee Court").  As these unique issues ultimately will have to be addressed by whatever court decides Cal-American's remand motion, no efficiencies will be gained by transferring the *Cal-American* Action to MDL No. 1358 (or any other MDL) for consolidated treatment of remand motions.

Moreover, even if the Action somehow remains in federal court, there are few, if any, common questions of fact between the *Cal-American* Action and other MTBE cases on which discovery is not already largely completed.  A great deal of the generally applicable liability discovery (including discovery on what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when, as well as discovery on the gasoline infrastructure in California) was conducted in connection with the prior incarnation of MDL No. 1358 and other MTBE cases that were not consolidated, and this discovery is or can be made available to the parties in the *Cal-American* Action.  The discovery that remains – the bulk of the

case – revolves primarily around location-specific issues, such as the sources and extent of

contamination and what it will cost to remediate and treat

Furthermore, potentially dispositive motions involving Cal-American already have been

resolved in prior MTBE litigation with remarkably consistent outcomes.  For example, both the

Ninth Circuit and the Transferee Court have definitively rejected defendants' federal preemption

defense.  *See Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 670, 673 (9th Cir. 2003)

(upholding California ban of MTBE in gasoline); *ExxonMobil Corp. v. U.S. E.P.A.,* 217 F.3d

1246, 1253 (9thCir. 2000) (upholding Nevada county regulation that effectively banned MTBE);

*In Re MTBE Products Liability Litig., supra,* 175 F. Supp. 2d 593 (S.D.N.Y. 2001).  In fact, the

Transferee Court published a lengthy opinion that provides useful guidance to any court applying

common law tort doctrines in the MTBE context.  *In re MTBE, supra.*  As a result, many of the

threshold legal questions that would normally create the need for MDL treatment already have

been litigated and are extremely unlikely to produce inconsistent outcomes or to require

significant additional judicial energy.

In sum, MTBE litigation is sufficiently mature at this point that MDL handling of the

*Cal-American* Action is unwarranted.  There is no "gathering storm" that will produce a blizzard

of motions and conflicting opinions, notwithstanding the recent flurry of removal notices filed by

defendants.  Transfer of the *Cal-American* Action to the Southern District of New York,

therefore, will not create efficiencies.  Instead it will create delay and inconvenience by forcing

Cal-American to litigate this important lawsuit in a distant forum that has no particular expertise

on the localized issues that overwhelmingly predominate in the case.

## II.   BACKGROUND

### A.   The Cal-American Action.

Cal-American is an investor-owned water utility that owns and operates public drinking

water systems in various locations throughout California, including but not limited to Monterey

County.  First Amended Complaint ("Complaint"), ¶ 4 (Attached as Exhibit 1 to the Declaration

of Victor M. Sher ("Sher Decl.")).  MTBE is a chemical used by some refiners in some gasoline

products in some parts of the country.  Complaint, ¶ 41.  Expanding plumes of MTBE are

contaminating and threatening Cal-American's groundwater supplies in dispersed locations

throughout California.  *Id.*, ¶¶ 1, 59.  Accordingly, Cal-American filed the *Cal-American* Action

in the Superior Court of Monterey County, California on September 30, 2003 against 17 major

oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or

supply gasoline containing MTBE in California.

Cal-American seeks, among other things, to ensure that the costs of responding to MTBE

contamination in groundwaters affecting Cal-American's water supply are borne by the

companies that chose to make and use it, knowing of its risks and yet failing to take the steps

(including warnings) necessary to avoid or mitigate them.  Complaint, ¶ 3.  Cal-American asserts

damages claims under state common law theories (including strict products liability, public

nuisance, trespass, and negligence), as well as claims for cleanup costs under state statutes (Cal.

Health & Safety Code §116366 and Cal. Water Code § 13285) and a statutory claim for treble

damages for utility tampering (Cal. Civil Code § 1882).

### B.   Procedural History.

On November 25, 2003, certain defendants removed the *Cal-American* Action to the U.S.

District Court for the Northern District of California, citing four bases for federal subject matter

jurisdiction: (1) that Cal-American's claims are "completely preempted" by the federal Clean Air Act; (2) that "a substantial federal question" is a necessary element of Cal-American's defective product claim; (3) that, pursuant to 28 U.S.C. § 1442(a)(1), defendants were acting "under the direction" of federal officers when they chose to add MTBE to gasoline; and (4) that the Action somehow implicates a 1988 federal bankruptcy order pertaining to the predecessor of a single defendant. On December 9, 2003, Cal-American timely filed a motion to remand the Action to state court (the "Remand Motion") on the grounds that no federal subject matter jurisdiction exists over this matter.[1] On or about December 5, 2003, certain defendants filed a motion to stay the hearing on Cal-American's Remand Motion (and all other pretrial proceedings) pending possible transfer of the Action to MDL No. 1358. A hearing on both motions is scheduled before the Hon. Jeffrey S. White for April 16, 2004.

Meanwhile, on December 5, 2003, certain defendants filed with the Panel (but never served Cal-American with) a Notice of Related, Tag-Along Actions alleging that certain recently filed actions, including the *Cal-American* Action, involve common questions of fact with actions

---

[1] None of the bases for federal jurisdiction asserted by defendants has merit. *First*, defendants' "substantial federal question" and "complete preemption" arguments both hinge entirely on preemption arguments that already have been soundly rejected by the Ninth Circuit. See *Oxygenated Fuels Ass'n v. Davis II*, 331 F.3d 665; *ExxonMobil, supra*, 217 F.3d 1246. *Second*, no court has ever accepted the "federal officer" argument defendants advance in their removal notice. See, e.g., *Tremblay v. Philip Morris, Inc.*, 231 F. Supp. 2d 411, 418 (D.N.H. 2002) (defendant's mere "participa[tion] in a regulated industry ... is not enough to demonstrate that it acted under the direction of a federal officer"); *Little v. Purdue Pharma, LP*, 227 F. Supp. 2d 838, 860-61 (S.D. Ohio 2002) ("body of law" does not support removal where defendant is "merely 'subject to complex regulations'"); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (no nexus between Navy procurement contract for turbines and state complaint regarding asbestos exposure where contract did not require manufacturer to use asbestos). *Third*, Defendants' attempt to predicate federal jurisdiction on the toehold of 1988 bankruptcy order has no merit, especially in light of the obviously applicable remand factors under 28 U.S.C. § 1452(b). See *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988) (no bankruptcy jurisdiction because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate"); *In re McGhan*, 288 F.3d 1172 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court").

previously transferred to MDL No. 1358. MDL No. 1358 was an inactive MDL proceeding

before the Hon. Shira A. Scheindlin in the U.S. District Court for the Southern District of New

York that previously involved several consolidated "actions brought on behalf of private well-

owners seeking relief from the contamination or threatened contamination of their wells" by

MTBE. *In Re MTBE Products Liability Litig., supra*, 175 F. Supp. 2d at 598.[2]

On December 19, 2003, Judge Scheindlin held a hearing in connection with several

MTBE cases filed by New York water purveyors that were removed to federal court and

assigned to her (the "December 19 Hearing"). *See* Transcript of December 19 (attached as

Exhibit 5 to Sher Decl.). At the December 19 Hearing, the parties present before Judge

Scheindlin (which did *not* include Cal-American, *see* Sher Decl., ¶ 21) stipulated to a transfer of

their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state

court be heard and decided by that court. *Id.*, Exhibit 5 at 13-18. In addition, counsel for those

parties further stipulated to support transfer of other cases involving other parties *they*

*represented* to MDL No. 1358 for the same purposes. *Id.* That stipulation resulted in an order

entered by Judge Scheindlin on December 23, 2003 stating that remand motions "in these and all

similar removed actions, wherever filed," should be heard as part of MDL No. 1358. *Id.*, Exhibit

6. Cal-American had no opportunity to participate in the December 19 Hearing or address the

procedures stipulated by the parties at the Hearing, and, subsequently notified Judge Scheindlin

of its intent to object to any transfer of its case to the Southern District of New York. *Id.*, ¶23,

Exhibit 7-8. On February 13, 2004, Judge Scheindlin held oral argument on the remand motions

before her, which remain pending at this time. *Id.*, Exhibit 9.

---

[2] Judge Scheindlin denied class certification in the matter, *see In Re: MTBE*, 209 F.R.D. 323 (S.D.N.Y. 2002), and all the cases were resolved.

On February 6, 2004, the Panel issued CTO-4.  On February 18, 2004, Cal-American

filed with the Panel a Notice of Opposition to the CTO.  Cal-American now moves to vacate.

**C.    Previous MTBE Litigation.**

The *Cal-American* Action and other MTBE-related cases recently removed to federal

courts in various parts of the country are preceded by a significant number of cases filed in

federal and state courts regarding MTBE, some of which have produced universally-applicable

discovery on common questions of fact and consistent rulings on common legal questions.  Sher

Decl., ¶¶ 3-20.  In at least three major cases – the prior proceedings in MDL No. 1358, *South

Tahoe Public Utility District v. Atlantic Richfield Co.*, Cal. Super. Ct., S.F. Cty. Case No. 999128

("*South Tahoe*"), and *Communities for a Better Environment v. Unocal Corp.*, Cal. Super. Ct.,

S.F. Cty. Case No. 997013 ("*CBE*") – the parties completed detailed, extensive and coordinated

discovery on generally applicable issues related to defendant liability.  Sher Decl., ¶¶ 7-10, 12-

13, 14-16.  The *South Tahoe* action went to trial on the issues of refiner/manufacturer liability,

product defect and malice, and, after a four-month trial, resulted in a plaintiff's verdict on each

of these issues.  *Id.*, ¶¶ 7, 9.  All of the discovery and testimony from these cases exists and can

be made available to the parties in the *Cal-American* Action.  *Id.*, ¶¶ 11, 13, 17-18, Exhibit 4.

### III.    LEGAL ARGUMENT

Regardless of how other MTBE cases are treated, the conditional transfer of the *Cal-

American* Action to MDL No. 1358 (or any other MDL) should be vacated because transfer

would neither further the just and efficient conduct of the litigation on common questions of fact

or law, nor serve the convenience of the parties and witnesses. The statutory factors considered

by the Panel in deciding whether to uphold the conditional transfer of a an alleged tag-along

action are: (1) whether there are common questions of fact between the alleged tag-along action

and existing MDL cases; (2) whether transfer would serve the convenience of parties and witnesses; and (3) whether transfer would serve the just and efficient conduct of the actions. 28 U.S.C. § 1407; JPML Rule 1.1; *In re Managed Care Litig.*, 246 F. Supp 2d 1363, 1364 (JPML 2003); *In re Enron Corp.*, 227 F.Supp.2d 1389, 1391 (JPML 2002). The Panel has held that all three criteria must be met to justify transfer, *In re Highway Acc. Near Rockville, Connecticut, on December 30, 1972,* 388 F. Supp. 574, 575 (JPML 1975), and that the third criterion is the "most important." *In re Tobacco/ Governmental Health Care Costs Litig., supra,* 76 F. Supp. 2d at 8, *citing* 15 C. Wright, A. Miller & E. Cooper, Federal Practice And Procedure, § 3863 at 535 (1986). In analyzing whether transfer would serve the just and efficient conduct of actions under section 1407, the Panel primarily considers whether transfer and consolidation will avoid duplicative discovery and inconsistent pretrial rulings. *See, e.g., In re TMJ Implants Products Liability Litig.,* 844 F. Supp. 1553, 1554 (JPML 1994).

The *Cal-American* Action is inappropriate for MDL treatment for two reasons. First, resolution of Cal-American's Remand Motion – the first, and likely only, substantive motion to be considered by a federal court in this Action – by an MDL court will not conserve judicial resources, because jurisdictional arguments raised therein differ materially from those raised by the plaintiffs currently before the Transferee Court. Second, even if the Action somehow remains in federal court, the likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a) discovery regarding the few questions of fact shared with other MTBE-related cases already has largely been completed and is or can be made available to all parties; and (b) the Transferee Court, as well as numerous other federal and state courts, already have

10

issued remarkably consistent rulings on most, if not all, common legal issues. Thus, the

Northern District of California is in a position to rule expeditiously on the Remand Motion, as

well as on other pretrial motions, and to preside over the remaining localized and site-specific

discovery. For these reasons, the *Cal-American* Action will "proceed more expeditiously if left

alone." *See In re Sears, Roebuck & Co. Employment Practices Litig.*, 487 F. Supp. 1362, 1363

(JPML 1980).

A.   **No Savings Of Judicial Resources Will Be Gained From Consolidated Treatment Of Cal-American's Remand Motion.**

Because Judge Scheindlin did not have a copy of the complaint, removal notice, or

Remand Motion filed in the *Cal-American* Action before her, the determination in her December

23, 2003 Order that the remand issues raised in various "similar removed" cases around the

country are "appropriate" for MDL treatment should not apply to the *Cal-American* Action. *See*

Sher Decl., ¶¶ 23, 26. In fact, Cal-American's Remand Motion differs from, and, is significantly

less complex than, the remand motions pending before Judge Scheindlin. This militates against

transfer.

Unlike the MTBE cases in the Transferee Court, the *Cal-American* Action arises in the

Ninth Circuit, which has *twice* definitively rejected as a matter of law the Clean Air Act

preemption arguments on which defendants base their assertion of federal jurisdiction. *Davis II,*

*supra,* 331 F.3d at 670, 673; *ExxonMobil, supra,* 217 F.3d at 1253.[4] Thus, although the

jurisdictional bases asserted by the defendants in this Action may overlap with those raised by oil

company defendants in other recently removed MTBE cases, Cal-American's Remand Motion

cannot necessarily be resolved based on what Judge Scheindlin decides in the cases before her.

---

[4] In addition, a review of the transcript from the February 13, 2004 hearing on the remand motions before the Transferee Court reveals that, in those cases, defendants' jurisdictional arguments hinge largely (if not entirely) on specific allegations from the complaints in those cases, *see* Sher Decl., Exhibit 9 at 10-12, 20-22, 25-28 -- not a single one of which appears in Cal-American's Complaint.

See In re 'East of the Rockies' Concrete Pipe Antitrust Cases, 302 F. Supp. 244, 254 (JPML 1969) (Weigel, J., conc.) ("neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, ipso facto, by transfer just because there are common questions") As the underlying legal arguments raised in Cal-American's Remand Motion are different, the risk of inconsistent rulings absent transfer, as well as any perceived judicial economy, is illusory. As the court held in Board of Trustees v. Worldcom, 244 F. Supp. 2d 900, 903 (N.D. Ill. 2002):

> When remand motions in cases potentially subject to MDL consolidation raise unique issues of law or fact, channeling the decisions to a single court would result in little or no savings of judicial resources. The threat of inconsistent judgments in either case is de minimis.

See also Havens Protected "C" Clamps, Inc., supra, 2000 WL 382027, at *2 (holding that where "resolution of the motion to remand does not necessarily implicate issues common to the other actions currently pending before the MDL Panel-designated court," remand motion should be considered by transferor court). Consequently, there is nothing but delay to be gained from transferring this action to the Southern District of New York, when the Northern District of California is at least as capable of deciding the unique issues raised in Cal-American's Remand Motion in an expeditious manner.

**B.      Even If the *Cal-American* Action Is Not Remanded to State Court, The Likelihood Of Inconsistent Pretrial Rulings And Duplicative Discovery Is Minimal.**

Even if the *Cal-American* Action were somehow to remain in federal court, pretrial consolidation would serve neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation because: (1) to the extent that the Action shares common questions of fact or law with other pending cases, discovery on common factual questions is

largely completed and available; and (2) most common legal issues already have been addressed by the Transferee Court and other courts.

### 1. There Are Relatively Few Common Questions Of Fact Between The *Cal-American* Action And Other MTBE Cases On Which Available Discovery Is Not Already Largely Completed.

The Panel consistently has held that MDL transfer of later-filed actions is neither necessary nor appropriate when discovery relating to common issues already has been completed in the transferee court and/or can be made available to the parties in actions before the Panel without recourse to § 1407.[5] In this instance, discovery pertaining to the few common factual questions shared between the *Cal-American* Action and other allegedly related MTBE cases is also largely completed and available to all parties. Accordingly, the risk of duplicative discovery is minimal, and there is no need for MDL consolidation.

In their Notice of Related, Tag-Along Actions, defendants identify the following alleged "common question of fact" arising in this and the other listed actions: "whether defendants knew

---

[5] *See, e.g., In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377, 1378 (JPML 2002) (transfer denied where litigation was mature, discovery nearly completed in some constituent actions in the docket, and alternatives to transfer existed to minimize the possibility of duplicative discovery); *In re Indian Motorcycle Bankruptcy and Receivership Litig.*, 206 F. Supp. 2d 1365 (JPML 2002) (same); *In Re Air Crash Disaster Near Upperville, Virginia*, 430 F. Supp 1295, 1297 (JPML 1977) (CTO vacated where all actions in transferee court were already tried or settled, and all parties in the new actions before the Panel have access to all discovery obtained in the transferee district); *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, 505 F. Supp 221, 223 (JPML 1981) (CTO vacated where discovery of common issues has been completed in the transferee district and could be made available to the parties in the actions before the Panel without recourse to section 1407); *In Re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation*, 582 F Supp 890, 891 (JPML 1984) (same); *In re Western Electric Co., Inc. Semiconductor Patent Litigation*, 436 F. Supp. 404, 406 (JPML 1977) (transfer denied where discovery on common issues in transferee court "virtually completed"); *In re Eli Lilly & Co. "Oraflex" Products Liability Litig.*, 578 F. Supp. 422, 423 (JPML 1984) (transfer denied because possibility of duplicative discovery "eliminated" by availability of extensive discovery in areas of common factual inquiry from already concluded and well-advanced related actions); *In re Dow Chemical Co. "Polystyrene Foam" Products Liability Litig.*, 429 F. Supp. 1035, 1036 (JPML 1977) (need for transfer "obviated" because discovery on common questions of fact regarding defendants' knowledge and product's defectiveness had been completed and parties had agreed that such discovery would be applicable in all actions); *In re McDonald's Franchise Antitrust Litigation*, 472 F. Supp. 111, 114-115 (JPML 1979) (transfer denied where discovery on common questions was largely completed in some cases and available for use in less advanced cases).

about and misrepresented the nature of MTBE and conspired to market MTBE without
disclosing its risks to downstream users, the federal government or the public." Notice of
Related Tag-Along Actions, filed Dec. 5, 2003, ¶2. To the extent this constitutes a question of
fact shared by the *Cal-American* Action and other alleged tag-along actions, discovery on this
question as to many, if not all, of the defendants named in the *Cal-American* Action was largely
completed in the prior incarnation of MDL No. 1358, as well as in the *South Tahoe* and *CBE*
cases.[6] Sher Decl., ¶¶ 7-10, 12-13, 14-16, 19-20. The same is true with respect to expert
discovery on the related question of whether MTBE and/or MTBE gasoline is a defective
product. *Id.*, ¶¶ 10, 13, 15, 19-20. Overall, literally millions of liability-related documents have
been produced and hundreds of witnesses have been deposed, including percipient witnesses at
the defendant companies and at trade associations like the American Petroleum Institute and
Oxygenated Fuels Association, and numerous expert witnesses. *Id.*, ¶¶ 8, 13, 15-16.

Moreover, all of this discovery is, or could easily be made, readily available to the parties
in the *Cal-American* Action. *Id.*, ¶¶ 11, 13, 17-18. For example, the document depository in the
Transferee Court, which still exists, was established with the specific purpose of making those
documents available to parties in other cases. *Id.*, ¶ 17-18, Exhibit 4 (*In re MTBE Products
Liability Litig.*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001) (providing that
attorneys in any MTBE action may make use of documents produced in the litigation subject to
the requirements of the order)). The documents, depositions and trial testimony from the *South
Tahoe* and *CBE* cases also can be made available to the parties in the *Cal-American* Action.
Sher Decl., ¶¶ 11, 13. Indeed, as the Panel has routinely recognized, procedures other than MDL
consolidation are available to both courts and parties to permit use of discovery on common

---

[6] This "notice and knowledge" discovery is relevant to each of Cal-American's common law claims
against the refiner defendants, *See* Complaint, ¶¶ 64, 81, 91, 100, and 109.

issues from prior related cases, such as stipulations and orders to show cause. *See, e.g. In re Telecommunication Providers' Fiber Optic Cable Installation Litig., supra*, 199 F. Supp. 2d at 1378, citing Manual for Complex Litigation, Third, § 31.14 (1995).

In contrast, few, if any, of the remaining major factual issues in the *Cal-American* Action – such as causation, the nature of warnings given to particular vendees, the feasibility of alternatives to MTBE, the extent of contamination, the available remedies, the cost of those remedies, and liability for those damages – can be considered "common questions of fact," as they revolve primarily, if not exclusively, around localized and site-specific issues. For example, the questions of causation, warnings, and the feasibility of alternatives will require extensive discovery regarding the gasoline infrastructure in California generally and in the area of specific product identification (*i.e.* whose MTBE and/or gasoline containing MTBE was delivered to release sites affecting California-American's water supply) – discovery that will be "of no interest" to other MTBE plaintiffs. *In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (denying transfer where discovery in one action would be "of no interest" to parties in another; *see also Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003) (economic effect of MTBE ban influenced by gasoline infrastructure, which varies from state to state); *In re MTBE Products Liability Litig.*, 209 F.R.D. 323, 344, 347 (S.D.N.Y. 2002) (denying class certification because there are differences in the source of contamination for each well owner and issues regarding warnings given to intermediate vendees and UST owners and operators are "individual").

Similarly, questions regarding the extent of contamination, available remedies, and implementation and cost of those remedies will also be location and site-specific. In fact, in denying class certification in the original MDL No. 1358 cases, the Transferee Court itself

concluded that questions regarding contamination of any particular well present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each will require." *In re MTBE Products Liability Litig.*, *supra*, 209 F.R.D. at 337, 344; *see also In re Grand Funk Railroad Trademark Litig.*, 371 F. Supp. 1084, 1085 (JPML 1974) (no benefit from transfer where discovery "will focus localized factual issues"); *In re Air Crash at Pago Pago, Am. Samoa*, 394 F. Supp. 799, 800 (JPML 1975) (noting that in tort litigation, common questions may pertain to liability, whereas the issue of damages is unique).

In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery is largely complete and available to all parties. The discovery that remains will focus primarily on California and site-specific issues, which can be better handled by the Northern District of California.

3.    **The Transferee Court And Other Courts Already Have Resolved Most Common Legal Issues.**

Just as discovery on any common factual issues is already well-advanced in the Transferee Court (and elsewhere), common pretrial legal issues already have been decided by the Transferee Court, and by other federal and state courts. Indeed, the Transferee Court's prior rulings "provide a convenient expression of the conclusions of the transferee judge which have been reached through [her] familiarity with the litigation, and can serve as an aid in . . . preventing inconsistent pretrial rulings." *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, *supra*, 505 F. Supp at 223; *see also In re Western Electric Co., Inc. Semiconductor Patent Litigation*, *supra*, 436 F. Supp. at 406 (transfer unwarranted where transferee court's views on key legal issues are well documented, and will put home-court judge "closer to the shoes of the transferee judge").

16

In her landmark ruling on defendants' motions to dismiss in the original set of cases transferred to MDL No. 1358, Judge Scheindlin, in a lengthy and thorough opinion, set forth a roadmap for the many of the key common legal issues in these cases that other judges can easily follow. *See In re MTBE Products Liability Litig., supra,* 175 F. Supp. 2d 593. First, the Court rejected defendants' federal preemption defense, *id.* at 611-616,[7] as has the Ninth Circuit and every other published opinion addressing the question.[8] The Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related argument that defective product claims concerning MTBE require an impermissible reexamination of EPA's cost-benefit analysis regarding MTBE. *In re MTBE Products Liability Litig., supra,* 175 F. Supp. 2d at 616-618, 623-625. The court further upheld the sufficiency of each of the common law tort claims asserted in the *Cal-American* Action, including claims alleging refiner liability under theories of strict products liability, negligence, nuisance and trespass. *Id.* at 623-629.[9] In addition, at least one California jury has found that MTBE gasoline is a defective product. Sher. Decl., Exhibit 3.

With this extensive guidance already in place, the risk of inconsistent pretrial rulings on these common legal questions in the *Cal-American* Action, if left to proceed in its home district,

---

[7] Although Judge Scheindlin left open the factual question of whether there were practicable alternatives to MTBE available for defendants' use under the federal Clean Air Act, *id.* at 616, the Ninth Circuit has closed the door on this question by holding as a matter of law that a smoothly functioning gasoline market and inexpensive gasoline are not goals of the Clean Air Act. *Davis II, supra,* 331 F.3d at 673. In any case, as described in section III.B.1., *supra,* the question of feasibility of alternatives depends on the gasoline market and infrastructure in the relevant locality, and thus is not the kind of question on which coordinated discovery will yield any efficiencies.

[8] *See Davis II,* 331 F.3d 665, *affirming Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182 (E.D. Cal. 2001); *ExxonMobil, supra,* 217 F.3d 1246; *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA); *see also Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").

[9] In evaluating the sufficiency of the plaintiffs' common law claims, the Transferee Court specifically applied California law.

is minimal. At the same time, the pretrial legal questions raised in the *Cal-American* Action that have not yet been resolved by the Transferee Court or other courts in the context of MTBE litigation – such as the scope and applicability of the state statutory claims asserted in the case and the applicability of any statute of limitations or other equitable defenses, to name a few – are not shared with other MTBE cases. These questions are best addressed by a court with more experience and familiarity with California law. Thus, the benefits of permitting this case to proceed on its own in its home district outweigh the benefits (if any) of transfer. *See In re Grand Funk Railroad, supra*, 371 F. Supp. at 1085 ("Panel must weigh any benefit that transfer would provide in the way of eliminating the possibility of inconsistent pretrial decisions against the efficient administration of the litigation as a whole"). Accordingly, the Conditional Transfer Order (CTO-4) as it applies to the *State* Action should be vacated.

## IV.    CONCLUSION

For the foregoing reasons the State's Motion to Vacate Conditional Transfer Order (CTO-4) as it applies to the *State* Action should be granted.

Respectfully submitted,

Dated: March 4, 2004

SHER LEFF, LLP
Victor M. Sher, SBN 96197
Todd E. Robins, SBN 191853
450 Mission Street, Suite 500
San Francisco, CA 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

BARON & BUDD, P.C.
Scott Summy (Admitted *Pro Hac Vice*)
Celeste A. Evangelisti, SBN 225232
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for Plaintiff California-American Water Company

18

Exhibit F

### BRIEF IN SUPPORT OF PLAINTIFFS' JOINT
### MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)

## I.  INTRODUCTION

The Panel should vacate the Conditional Transfer Order as it applies to the *Sacramento County, Orange County, Riverside, Quincy, Roseville* and *Silver* Actions (collectively, the "California Actions") because transfer of these exclusively state-law cases, each regarding local contamination caused by a product manufactured, sold and distributed entirely to uniquely California specifications, to an already over-burdened district court 3,000 miles away will benefit neither the parties nor the judicial system.  In light of the distinctly local and state-specific factual and legal issues on which they are focused, the California Actions are substantially different from the other actions subject to CTO-5, as well as virtually all of the actions subject to CTO-4.[1]  Whatever may be appropriate for other recently removed MTBE-related cases, it is not appropriate to transfer these California Actions to the Southern District of New York.

If the California Actions somehow remain in federal court (which the California Parties believe they should not), the Actions share with other MTBE cases few, if any, common questions of fact on which discovery is not already largely completed.  A great deal of the generally applicable liability discovery (including discovery on what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when) was conducted in connection with the prior incarnation of MDL No. 1358 and/or other MTBE cases that were not consolidated, and this discovery is or can be made available to the parties in the California Actions.  Indeed, this discovery has been pursued in exceptional depth with respect to

---

[1] Two similarly situated California cases subject to CTO-4 (*California-American Water Company v. Atlantic Richfield Co., et al.*, 03-5379 (N.D. Cal.) and *City of Fresno v. Chevron U.S.A., Inc., et al.*, 03-5378 (N.D. Cal.)) and the State of New Hampshire's unique statewide MTBE suit (*State of New Hampshire v. Amerada Hess Corp. et al.*, 03-486 (D.N.H.), 03-0529 (D.R.I)) are the only other cases with parties resisting transfer to MDL No. 1358.

California-related defendants.  The discovery that remains – the bulk of these cases – revolves almost exclusively around local and state-specific issues, such as the unique and isolated gasoline refining and distribution system in California, the sources and extent of contamination affecting each Plaintiff, and what it will cost to remediate and treat it.

Nor is the legal landscape for these cases novel or challenging.  Potentially dispositive motions already have been resolved in prior MTBE litigation with remarkably consistent outcomes.  For example, both the Ninth Circuit and the Transferee Court have definitively rejected defendants' federal preemption defense.  *See Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 670, 673 (9th Cir. 2003) (upholding California ban of MTBE in gasoline); *ExxonMobil Corp. v. U.S. E.P.A.,* 217 F.3d 1246, 1253 (9thCir. 2000) (upholding Nevada county regulation that effectively banned MTBE); *In re MTBE Products Liability Litig.* ("*In re MTBE*"), 175 F. Supp. 2d 593, 611-616 (S.D.N.Y. 2001) (rejecting federal preemption of state tort claims).  In fact, the Transferee Court published a lengthy opinion that provides useful guidance to any court applying common law tort doctrines in the MTBE context.  *In re MTBE, supra* at 606-635.  As a result, many of the threshold legal questions that would normally justify MDL treatment already have been litigated and are unlikely to produce inconsistent outcomes or to require significant additional judicial energy.

Even Plaintiffs' respective motions to remand these California Actions to state court illustrate that there is neither convenience nor savings of judicial resources to be gained by transferring these cases to MDL No. 1358.  Plaintiffs' remand motions raise unique – and dispositive – jurisdictional arguments related to federal preemption not applicable to the remand motions recently ruled upon by the presiding judge in MDL No. 1358 (the "Transferee Court").  As these unique issues ultimately will have to be addressed by whatever court decides Plaintiffs'

7

remand motions, no efficiencies will be gained by transferring the California Actions to MDL No. 1358 for consolidated treatment.

In sum, MTBE litigation is sufficiently mature at this point that MDL handling of the California Actions is unwarranted. There is no "gathering storm" that will produce a blizzard of motions and conflicting opinions, notwithstanding the recent flurry of removal notices filed by defendants. Transfer of the California Actions to the Southern District of New York, therefore, will not create efficiencies. Instead it will create delay and inconvenience by forcing Plaintiffs to litigate these important lawsuits in a distant forum that has no particular expertise on the localized issues that overwhelmingly predominate in these cases.

## II.   BACKGROUND

### A.   The California Actions.

The Sacramento County Plaintiffs include two cities that own and operate public drinking water systems, one investor-owned water utility, and nine public agencies charged with managing and/or purveying water resources in Sacramento County, California. *See* First Amended Complaint in *Sacramento County* Action ("Sacramento County Complaint"), ¶¶ 11-33 (attached as Exhibit 1 to the Declaration of Victor M. Sher ("Sher Decl.")).[2]

Orange County Water District is a special water agency formed pursuant to the Orange County Water District Act ("OCWDA"), Cal. Water Code Appendix, § 40-1 *et seq.*, to manage and protect the groundwater resource in much of Orange County, California. *See* First Amended Complaint in *Orange County* Action ("Orange County Complaint"), ¶ 4 (Sher Decl., Exhibit 2).

The City of Riverside and City of Roseville are California cities that own and operate public drinking water systems. *See* First Amended Complaint in *Riverside* Action ("Riverside

---

[2] Carmichael Water District is named as a plaintiff in the Sacramento County Complaint, but has since withdrawn from the case.

Complaint"), ¶ 4 (Sher Decl., Exhibit 3); First Amended Complaint in *Roseville* Action ("Roseville Complaint"), ¶¶ 4-5 (Sher Decl., Exhibit 4).

Quincy Community Services District is a community services district, formed pursuant to Cal. Government Code § 61000 *et seq.*, that owns and operates a public drinking water system in Quincy, California. *See* Complaint in *Quincy* Action ("Quincy Complaint"), ¶ 4 (Sher Decl., Exhibit 5).

The Silver Plaintiffs are owners of Alpine Mobile Home Estates, a mobile home park located in Alpine, California, in connection with which they own and operate a public drinking water system. *See* First Amended Complaint in *Silver* Action ("Silver Complaint"), ¶ 2 (Sher Decl., Exhibit 6).

MTBE is a chemical used by some refiners in some gasoline products in some parts of the country.[3] Expanding plumes of MTBE are contaminating and threatening Plaintiffs' drinking water supplies and groundwater resources. Beginning in May, 2003, Plaintiffs filed their respective lawsuits in California state court against the major oil and chemical companies that manufacture MTBE, refine gasoline containing MTBE, and/or supply gasoline containing MTBE in California, as well as the local gasoline distributors and retailers allegedly responsible for releasing MTBE to the subsurface in areas affecting Plaintiffs' drinking water supplies and groundwater resources.

---

[3] Originally introduced as an octane enhancer in some gasoline, MTBE came into widespread use in the mid-1990s, when some refiners chose it to meet the requirements of the Reformulated Gasoline ("RFG") and Oxygenated Fuels programs under the federal Clean Air Act, *see* 42 U.S.C. §§ 7545(k) and (m), for gasoline in some areas of the country. *See* 40 C.F.R. § 80.70 (listing areas covered by RFG program); 40 C.F.R. §81.305 (listing carbon monoxide nonattainment areas). The MTBE contamination at issue in the *Quincy* Action occurred in an area never subject to RFG or Oxygenated Fuels program requirements. *Id.*

| Action | Date Filed | State Court |
|---|---|---|
| *Orange County* Action | May 6, 2003 | Orange County Superior Court |
| *Sacramento* Action | September 30, 2003 | Sacramento County Superior Court |
| *Silver* Action | September 30, 2003 | San Diego County Superior Court |
| *Roseville* Action | October 16, 2003 | Placer County Superior Court |
| *Riverside* Action | October 17, 2003 | Riverside County Superior Court |
| *Quincy* Action | November 7, 2003 | Sacramento County Superior Court |

Plaintiffs each seek, among other things, to ensure that the costs of responding to MTBE contamination are borne by the companies that chose to make and use it, while knowing of its risks and yet failing to take the steps (including warnings) necessary to avoid or mitigate them. Plaintiffs each assert damages claims under state common law theories (including strict products liability, public nuisance, trespass, and negligence). Orange County Water District asserts a statutory claim for clean up costs under the OCWDA. Certain Sacramento County Plaintiffs, City of Riverside, City of Roseville and Quincy Community Services District also assert claims for cleanup costs under state statutes (Cal. Health & Safety Code §116366 and Cal. Water Code §§ 13285 and 13304) and statutory claims for treble damages for utility tampering (Cal. Civil Code § 1882).

**B.    Procedural History.**

In December 2003, certain oil company defendants removed each of the California Actions to federal district court, citing four bases for federal subject matter jurisdiction in each case: (1) that Plaintiffs' claims are "completely preempted" by the federal Clean Air Act; (2) that "a substantial federal question" is a necessary element of Plaintiffs' state-law defective product claims; (3) that, pursuant to 28 U.S.C. § 1442(a)(1), defendants were acting "under the direction" of federal officers when they chose to add MTBE to gasoline; and (4) that the Actions somehow implicate long-since-concluded bankruptcy proceedings pertaining to one or two defendants (depending on the Action). Plaintiffs immediately filed motions to remand their respective

10

Actions to state court (the "Remand Motions") on the grounds that no federal subject matter

jurisdiction exists over these cases.  At or around the same time, the removing defendants filed

motions to stay the hearings on Plaintiffs' respective Remand Motions (and all other pretrial

proceedings in the Actions) pending possible transfer to MDL No. 1358.

| Action | Removal | Federal District Court | Remand Motion filed | Stay Motion filed |
|---|---|---|---|---|
| *Orange County* Action | Dec. 1, 2003 | C.D. Cal. | Jan. 6, 2004 | Jan. 6, 2004 |
| *Silver* Action | Dec. 3, 2003 | S.D. Cal. | Dec. 18, 2003 | Dec. 16, 2003 |
| *Sacramento County* Action | Dec. 8, 2003 | E.D. Cal. | Dec. 15, 2003 | Dec. 19, 2003 |
| *Riverside* Action | Dec. 12, 2003 | C.D. Cal. | Jan. 8, 2004 | Jan. 9, 2004 |
| *Quincy* Action | Dec. 15, 2003 | E.D. Cal. | Dec. 22, 2003 | Dec. 31, 2003 |
| *Roseville* Action | Dec. 18, 2003 | E.D. Cal. | Dec. 23, 2003 | Dec. 31, 2003 |

Stays have been granted in the *Sacramento County*, *Orange County*, *Riverside*, *Roseville* and

*Quincy* Actions, although Quincy Community Services District has moved for reconsideration of

the order granting the stay in the *Quincy* Action.  The Remand and stay motions in the *Silver*

Action are currently set for hearing on April 16, 2004.

Meanwhile, certain defendants filed with the Panel Notices of Related, Tag-Along

Actions alleging that certain recently filed actions, including the California Actions, involve

common questions of fact with actions previously transferred to MDL No. 1358.  MDL No. 1358

was an inactive MDL proceeding before the Hon. Shira A. Scheindlin in the U.S. District Court

for the Southern District of New York that previously involved several consolidated "actions

brought on behalf of private well-owners seeking relief from the contamination or threatened

contamination of their wells" by MTBE.  *In re MTBE, supra*, 175 F. Supp. 2d at 598.[4]

On December 19, 2003, Judge Scheindlin held a hearing in connection with several

MTBE cases filed by New York water purveyors that were removed to federal court and

---

[4] Judge Scheindlin denied class certification in the matter, *see In re MTBE*, 209 F.R.D. 323 (S.D.N.Y. 2002), and all the cases were resolved.

assigned to her (the "December 19 Hearing"). *See* Transcript of December 19 Hearing (Sher Decl., Exhibit 10). At the December 19 Hearing, the parties present before Judge Scheindlin (which did *not* include Plaintiffs here, *see* Sher Decl., ¶ 26) stipulated to a transfer of their cases to MDL No. 1358 in order that the plaintiffs' motions to remand those cases to state court be heard and decided by that court. *Id.*, Exhibit 10 at 13-18. In addition, counsel for those parties further stipulated to support transfer of other cases involving other parties *they represented* to MDL No. 1358 for the same purposes. *Id.* That stipulation resulted in an order entered by Judge Scheindlin on December 23, 2003 stating that remand motions "in these and all similar removed actions, wherever filed," should be heard as part of MDL No. 1358. *Id.*, Exhibit 11. Plaintiffs had no opportunity to participate in the December 19 Hearing or address the procedures stipulated by the parties at the Hearing, and, subsequently notified Judge Scheindlin of their intent to object to any transfer of their cases to the Southern District of New York. *Id.*, ¶28, Exhibits 12-13. On February 13, 2004, Judge Scheindlin held oral argument on the remand motions before her. *Id.*, Exhibit 14.

On February 25, 2004, the Panel issued CTO-5. On March 11, 2004, Plaintiffs filed with the Panel a Notice of Opposition to CTO-5. On March 16, 2004, Judge Scheindlin issued an opinion and order denying the remand motions before her. *Id.*, Exhibit 15. Plaintiffs now move to vacate CTO-5 as it applies to them.

## C.     Previous MTBE Litigation.

The California Actions and other MTBE-related cases recently removed to federal courts in various parts of the country are preceded by a significant number of cases filed in federal and state courts regarding MTBE, some of which have produced universally-applicable discovery on common questions of fact and consistent rulings on common legal questions. Sher Decl., ¶¶ 8-

25. In at least three major cases – the prior proceedings in MDL No. 1358, *South Lake Tahoe Public Utility District v. Atlantic Richfield Co., et al.*, No. 999128 (Cal. Super. Ct. filed Nov. 10, 1998) ("*South Tahoe*"), and *Communities for a Better Environment v. Unocal Corp., et al.*, No. 997013 (Cal. Super. Ct. filed August 6, 1998) ("*CBE*") – the parties completed detailed, extensive and coordinated discovery on generally applicable issues related to defendant liability. Sher Decl., ¶¶ 12-15, 17-18, 19-21. The *South Tahoe* action went to trial on the issues of refiner/manufacturer liability, product defect and malice, and, after a four-month trial, resulted in a plaintiff's verdict on each of these issues. *Id.*, ¶¶ 12, 14. All of the discovery and testimony from these cases exists and can be made available to the parties in the California Actions. *Id.*, ¶¶ 16, 18, 22-23, Exhibit 9.

Moreover, a significant number of pending MTBE cases are currently proceeding in state courts around the country. Sher Decl., ¶ 9, Exhibit 17. Defendants never sought to remove these cases to federal court, and now cannot. *See* 28 U.S.C. § 1446(b). Accordingly, no matter what happens with respect to the cases now before the Panel, MDL treatment will not result in consolidation of all MTBE cases before a single judge.

### III.   LEGAL ARGUMENT

Regardless of how other MTBE cases are treated, the conditional transfer of the California Actions to MDL No. 1358 (or any other MDL) should be vacated because transfer would neither further the just and efficient conduct of the litigation on common questions of fact or law, nor serve the convenience of the parties and witnesses. The statutory factors considered by the Panel in deciding whether to uphold the conditional transfer of an alleged tag-along action are: (1) whether there are common questions of fact between the alleged tag-along action and existing MDL cases; (2) whether transfer would serve the convenience of parties and witnesses;

and (3) whether transfer would serve the just and efficient conduct of the actions.  28 U.S.C. §

1407; JPML Rule 1.1; *In re Managed Care Litig.*, 246 F. Supp 2d 1363, 1364 (JPML 2003); *In*

*re Enron Corp.*, 227 F.Supp.2d 1389, 1391 (JPML 2002).  The Panel has held that all three

criteria must be met to justify transfer, *In re Highway Acc. Near Rockville, Connecticut, on*

*December 30, 1972*, 388 F. Supp. 574, 575 (JPML 1975), and that the third criterion is the "most

important."  *In re Tobacco/Governmental Health Care Costs Litig.*, 76 F. Supp. 2d 5, 8 (D.D.C.

1999) *citing* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3863 at 535

(1986).  In analyzing whether transfer would serve the just and efficient conduct of actions under

section 1407, the Panel primarily considers whether transfer and consolidation will avoid

duplicative discovery and inconsistent pretrial rulings.  *See, e.g., In re TMJ Implants Products*

*Liability Litig.*, 844 F. Supp. 1553, 1554 (JPML 1994).

   The California Actions are inappropriate for MDL treatment for at least two fundamental

reasons.  First, even assuming *arguendo* that the California Actions remain in federal court, the

likelihood of inconsistent pretrial rulings and duplicative discovery is minimal, because: (a)

discovery regarding the few questions of fact shared with other MTBE-related cases already has

largely been completed and is or can be made available to all parties; and (b) the Transferee

Court, as well as numerous other federal and state courts, already have issued remarkably

consistent rulings on most, if not all, common legal issues.  Second, resolution of Plaintiffs'

Remand Motions – the first, and likely only, substantive motions to be considered by a federal

court in these Actions – by the Transferee Court will not conserve judicial resources, because

jurisdictional arguments raised therein differ materially from those raised in remand motions

recently ruled upon by the Transferee Court.  Thus, the California district courts where the

California Actions are currently pending are in a position to rule expeditiously on the Remand

Motions, as well as on other pretrial motions, and to preside over the remaining localized and site-specific discovery. For these reasons, the California Actions will "proceed more expeditiously if left alone." *See In re Sears, Roebuck & Co. Employment Practices Litig.*, 487 F. Supp. 1362, 1363 (JPML 1980).

**A.     If The California Actions Remain in Federal Court, The Likelihood Of Inconsistent Pretrial Rulings And Duplicative Discovery Is Minimal.**

Even if the California Actions were somehow to remain in federal court, pretrial transfer to MDL No. 1358 would serve neither the convenience of the parties and witnesses nor the just and efficient conduct of the litigation. To the extent that the Actions share common questions of fact or law with other pending cases, (1) discovery on common factual questions is largely completed and available, and (2) most common legal issues already have been addressed by the Transferee Court and other courts.

**1.     There Are Relatively Few Common Questions Of Fact Shared By The California Actions And Other MTBE Cases On Which Available Discovery Is Not Already Largely Completed.**

The Panel consistently has held that MDL transfer of later-filed actions is neither necessary nor appropriate when discovery relating to common issues already has been completed in the transferee court and/or can be made available to the parties in actions before the Panel without recourse to § 1407.[5] In this instance, discovery pertaining to the few common factual

---

[5] *See, e.g., In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, 199 F. Supp. 2d 1377, 1378 (JPML 2002) (transfer denied where litigation was mature, discovery nearly completed in some constituent actions in the docket, and alternatives to transfer existed to minimize the possibility of duplicative discovery); *In re Indian Motorcycle Bankruptcy and Receivership Litig.*, 206 F. Supp. 2d 1365 (JPML 2002) (same); *In Re Air Crash Disaster Near Upperville, Virginia*, 430 F. Supp 1295, 1297 (JPML 1977) (CTO vacated where all actions in transferee court were already tried or settled, and all parties in the new actions before the Panel have access to all discovery obtained in the transferee district); *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation*, 505 F. Supp 221, 223 (JPML 1981) (CTO vacated where discovery of common issues has been completed in the transferee district and could be made available to the parties in the actions before the Panel without recourse to section 1407); *In re Petroleum Products Antitrust Litigation*, 476 F. Supp. 455, 458 (JPML 1979) (conditional transfer order vacated because common-question discovery already completed in transferee

questions shared between the California Actions and other allegedly related MTBE cases is also largely completed and available to all parties.  Accordingly, the risk of duplicative discovery is minimal, and there is no need for MDL consolidation.

In their Notices of Related, Tag-Along Actions, defendants identify the following alleged "common question of fact" arising in this and the other listed actions: "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public."  Notices of Related Tag-Along Actions, filed December 12, 2003, December 19, 2003, and December 31, 2003, ¶ 2.  To the extent this constitutes a question of fact shared by the California Actions and other alleged tag-along actions, discovery on this question as to many, if not all, of the defendants named in the California Actions was largely completed in the prior incarnation of MDL No. 1358, and was pursued in exceptional depth in the *South Tahoe* and *CBE* cases with respect to the California-related defendants named in the California Actions.  Sher Decl., ¶¶ 12-15, 17-18, 19-21, 24-25.[6]  The same is true with respect to expert discovery on the related question of whether MTBE and/or MTBE gasoline is a defective product.  *Id.*, ¶¶ 15, 18, 20, 24-

---

court and "unique discovery" in new cases "would disrupt and substantially delay the orderly progress of pretrial proceedings in the transferee district"); *In re Richardson-Merrell, Inc. "Bendectin" Products Liability Litigation*, 582 F Supp 890, 891 (JPML 1984) (same); *In re Western Electric Co., Inc. Semiconductor Patent Litigation*, 436 F. Supp. 404, 406 (JPML 1977) (transfer denied where discovery on common issues in transferee court "virtually completed"); *In re Eli Lilly & Co. "Oraflex" Products Liability Litig.*, 578 F. Supp. 422, 423 (JPML 1984) (transfer denied because possibility of duplicative discovery "eliminated" by availability of extensive discovery in areas of common factual inquiry from already concluded and well-advanced related actions); *In re Dow Chemical Co. "Polystyrene Foam" Products Liability Litig.*, 429 F. Supp. 1035, 1036 (JPML 1977) (need for transfer "obviated" because discovery on common questions of fact regarding defendants' knowledge and product's defectiveness had been completed and parties had agreed that such discovery would be applicable in all actions); *In re McDonald's Franchise Antitrust Litigation*, 472 F. Supp. 111, 114-115 (JPML 1979) (transfer denied where discovery on common questions was largely completed in some cases and available for use in less advanced cases).

[6] This "notice and knowledge" discovery is relevant, among other things, to each of Plaintiffs' common law claims against the refiner defendants.  *See* Sher Decl., Exhibits 1-6.

25. Overall, literally millions of liability-related documents have been produced and hundreds of witnesses have been deposed, including percipient witnesses at the defendant companies and at trade associations like the American Petroleum Institute and Oxygenated Fuels Association, and numerous expert witnesses. *Id.*, ¶¶ 13, 18, 20-21.

Moreover, all of this discovery is, or could easily be made, readily available to the parties in the California Actions. *Id.*, ¶¶ 16, 18, 22-23. For example, the document depository in the Transferee Court, which still exists, was established with the specific purpose of making those documents available to parties in other cases. *Id.*, ¶ 22-23, Exhibit 9 (*In re MTBE*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001) (providing that attorneys in any MTBE action may make use of documents produced in the litigation subject to the requirements of the order)). The documents, depositions and trial testimony from the *South Tahoe* and *CBE* cases also can be made available to the parties in the California Actions. Sher Decl., ¶¶ 16, 18. Indeed, as the Panel has routinely recognized, procedures other than MDL consolidation are available to both courts and parties to permit use of discovery on common issues from prior related cases, such as stipulations and orders to show cause. *See, e.g. In re Telecommunication Providers' Fiber Optic Cable Installation Litig.*, *supra*, 199 F. Supp. 2d at 1378, *citing* Manual for Complex Litigation, Third, § 31.14 (1995).

In contrast, few, if any, of the remaining major factual issues in the California Actions – such as causation, the nature of warnings given to particular vendees, the feasibility of alternatives to MTBE, the extent of contamination, the available remedies, the cost of those remedies, and liability for those damages – can be considered "common questions of fact" with other MTBE cases, as they revolve primarily, if not exclusively, around localized and site-specific issues. For example, the questions of causation and warnings in each California Action

17

will require extensive, site-specific product identification discovery (*i.e.* discovery of whose MTBE and/or gasoline containing MTBE was delivered to release sites affecting Plaintiffs' respective water supplies and/or groundwater resources) that will be unique to each Action. *See In re MTBE*, 209 F.R.D. 323, 344, 347 (S.D.N.Y. 2002) (denying class certification because (1) there are differences in the source of contamination for each well owner and (2) issues regarding warnings given to intermediate vendees and UST owners and operators are "individual").

Questions related to causation, warnings and the feasibility of alternatives will also require discovery into the particulars of California's gasoline infrastructure. Such discovery will be completely irrelevant to parties in MTBE cases outside California, because the regulatory regime, refining centers and distribution systems in California are distinct and/or isolated from those in other gasoline markets in the United States. *See, e.g., Oxygenated Fuels Ass'n v. Pataki*, No. 1:00-CV-1073 at 5-6 (N.D.N.Y. Oct. 3, 2003) (gasoline infrastructures in California and New York "could not be more divergent"). As the only "state that regulated automotive emissions before Congress entered the field," California is the only state with authority to regulate fuels without EPA approval. *Oxygenated Fuels Ass'n v. Davis* ("*Davis I*"), 163 F. Supp. 2d 1182, 1885-1187 (E.D. Cal. 2001) (observing that, under the Clean Air Act, 42 U.S.C. § 7545(c)(4)(B), California has broad authority in the field of fuels regulation). Pursuant to this authority, California Air Resources Board ("CARB") regulations impose special requirements on gasoline sold in the state. *See* Cal. Code of Regulations, Title 13, §§ 2250 *et seq*. As a result, gasoline sold in California is formulated differently than gasoline in the rest of the country. *See, e.g., Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 838 (2001) (gasoline used in California is "unique" and state's gasoline market is "isolated" in light of CARB fuel content regulations).

To serve this unique market, approximately 90 percent of California gasoline is refined in-state and distributed by means of a pipeline, terminal and distribution system that is separate and distinct from the gasoline infrastructure serving other regions of the country. *See California Energy Commission, Question & Answers: California Gasoline Price Increases*, March 5, 2004 (Sher Decl., Exhibit 16 at 1). According to the California Energy Commission,

> California is . . . isolated from other refining centers in the United States. Our gasoline must meet stringent air quality requirements to burn cleanly to protect public health and the environment.
> - -[Therefore,] our gasoline is different from others made in the U.S.

*Id.* Discovery regarding gasoline formulation, refining and distribution in the California Actions thus will be "of no interest" to non-California plaintiffs. *See In re Gasoline Lessee Dealers Antitrust Litig.*, 479 F. Supp. 578, 580 (JPML 1979) (denying transfer where discovery in one action would be "of no interest" to parties in another).

Similarly, questions regarding the extent of contamination, available remedies, and implementation and cost of those remedies will also be location and site-specific.[7] In denying class certification in the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding contamination of any particular well present "a factually unique set of circumstances," because there are "differences in the level of contamination . . . and the nature of relief that each will require." *In re MTBE, supra*, 209 F.R.D. at 337, 344; *see also In re Grand Funk Railroad Trademark Litig.*, 371 F. Supp. 1084, 1085 (JPML 1974) (no benefit from transfer where discovery "will focus localized factual issues"); *In re Air Crash at Pago Pago, Am. Samoa*, 394 F. Supp. 799, 800 (JPML 1975) (noting that in tort litigation, common questions may pertain to liability, whereas the issue of damages is unique).

---

[7] Defendants allege in their Notices of Related, Tag-Along Actions that "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination" is a "common question of fact" in these cases. *See* Notices of Related Tag-Along Actions, filed December 12, 2003, December 19, 2003, and December 31, 2003, ¶ 2. As set forth in the text, this is obviously not the case.

Finally (on this point), transferring the instant actions to MDL 1358 will not reduce the risk of inconsistent discovery rulings (if any), as there are a significant number of other MTBE cases proceeding in different state courts around the country that have not been, and cannot be, removed to federal court and transferred to MDL No. 1358. *See* Sher Decl., ¶ 9, Exhibit 17; *In re Tobacco/ Governmental Health Care Costs Litig., supra*, 76 F. Supp. 2d at 9 (denying transfer in part because the defendants "will be faced with rulings by two different judges on discovery requests made of [them] regardless of whether the consolidation motion is granted or denied").

In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery is largely complete and available to all parties.  The discovery that remains will focus almost exclusively on California and site-specific issues, which can be better handled by the local district courts where the California Actions are pending.

### 2.   The Transferee Court And Other Courts Already Have Resolved Most Common Legal Issues.

Just as discovery on any common factual issues is already well-advanced in the Transferee Court (and elsewhere), common pretrial legal issues already have been decided by the Transferee Court, and by other federal and state courts.  Indeed, the Transferee Court's prior rulings "provide a convenient expression of the conclusions of the transferee judge which have been reached through [her] familiarity with the litigation, and can serve as an aid in . . . preventing inconsistent pretrial rulings." *In re AH Robins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation, supra*, 505 F. Supp at 223; *see also In re Western Electric Co., Inc. Semiconductor Patent Litigation, supra*, 436 F. Supp. at 406 (transfer unwarranted where transferee court's views on key legal issues are well documented, and will put home-court judge "closer to the shoes of the transferee judge").

In her landmark ruling on defendants' motions to dismiss in the original set of cases transferred to MDL No. 1358, Judge Scheindlin, in a lengthy and thorough opinion, set forth a roadmap for many of the key common legal issues in these cases that other judges can easily follow. *See In re MTBE, supra*, 175 F. Supp. 2d at 606-635. First, the Court rejected defendants' federal preemption defense, *id.* at 611-616,[8] as has the Ninth Circuit and every other published opinion addressing the question.[9] The Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related argument that defective product claims concerning MTBE require an impermissible reexamination of EPA's cost-benefit analysis regarding MTBE. *In re MTBE, supra*, 175 F. Supp. 2d at 616-618, 623-625. The court further upheld the sufficiency of each of the common law tort claims which are also asserted in the California Actions, including claims alleging refiner liability under theories of strict products liability, negligence, nuisance and trespass. *Id.* at 623-629.[10] In addition, at least one California jury has found that MTBE gasoline is a defective product. Sher Decl., Exhibit 8.

With this extensive guidance already in place, the risk of inconsistent pretrial rulings on these common legal questions in the California Actions, if left to proceed in their home districts,

---

[8] Although Judge Scheindlin left open the factual question of whether there were practicable alternatives to MTBE available for defendants' use under the federal Clean Air Act, *id.* at 616, the Ninth Circuit has closed the door on this question by holding as a matter of law that a smoothly functioning gasoline market and inexpensive gasoline are not goals of the Clean Air Act. *Davis II, supra*, 331 F.3d at 673. In any case, as described in section III.A.1., *supra*, the question of feasibility of alternatives depends on the gasoline market and infrastructure in the relevant locality, and thus is not the kind of question on which coordinated discovery will yield any efficiencies.

[9] *See Davis II*, 331 F.3d 665, *affirming Davis I*, 163 F. Supp. 2d 1182; *ExxonMobil, supra*, 217 F.3d 1246; *Oxygenated Fuels Ass'n v. Pataki* (N.D.N.Y. 2001) 158 F.Supp.2d 248 (upholding New York ban of MTBE); *Oxygenated Fuels Ass'n v. Pataki* ("*Pataki III*"), 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after a bench trial that New York MTBE ban does not conflict with any aspect of the CAA); *see also Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002) (state MTBE contamination case does "not conflict with the Congressional clean air objectives").

[10] In evaluating the sufficiency of the plaintiffs' common law claims, the Transferee Court specifically applied California law. *See id.* at 620-623, 625, 627-628, 632-633.

is minimal.  At the same time, the pretrial legal questions raised in the California Actions that have not yet been resolved by the Transferee Court or other courts in the context of MTBE litigation – such as the scope and applicability of the state-specific and even plaintiff-specific (e.g., the OCWDA) statutory claims asserted in these Actions and the applicability of any statute of limitations or other defenses, to name a few – are not shared with other MTBE cases.  These questions are best addressed by a court with more experience and familiarity with California law.  Thus, the benefits of permitting these cases to proceed on their own in their home districts outweigh the benefits (if any) of transfer to the Southern District of New York.  *See In re Grand Funk Railroad, supra,* 371 F. Supp. at 1085 ("Panel must weigh any benefit that transfer would provide in the way of eliminating the possibility of inconsistent pretrial decisions against the efficient administration of the litigation as a whole").[11]  Accordingly, the Conditional Transfer Order (CTO-5) as it applies to the California Actions should be vacated.

## B.   No Savings Of Judicial Resources Will Be Gained From Consolidated Treatment Of Plaintiffs' Remand Motions.

Because Judge Scheindlin did not have copies of the complaints, removal notices, or Remand Motions filed in any of the California Actions before her, the determination in her December 23, 2003 Order that the remand issues raised in various "similar removed" cases around the country are "appropriate" for MDL treatment should not apply to the California Actions.  *See* Sher Decl., ¶¶ 28, 31.  In fact, Plaintiffs' Remand Motions differ from, and, are significantly less complex than, the remand motions recently ruled upon by Judge Scheindlin.  This also militates against transfer.

In her March 16, 2004 opinion and order denying the remand motions before her, Judge Scheindlin ruled that, based on the allegations in the defendants' removal notices, defendants

---

[11] The significant number of pending MTBE cases in various state courts (*see* Sher Decl., ¶ 9, Exhibit 17) also illustrates the lack of efficacy that would result from transferring these actions to MDL 1358.

were acting "under the direction" of the federal government for purposes of 42 U.S.C. §

1442(a)(1) when they added MTBE to gasoline in order to comply with Clean Air Act

regulations. *See* Sher Decl., Exhibit 15.   A necessary element of this ruling was Judge

Scheindlin's finding that, in the cases before her, defendants' preemption arguments constitute a

"colorable federal defense." *Id.*; *see also Jefferson County v. Acker*, 527 U.S. 423, 431 (removal

under § 1442(a)(1) proper only where defendant alleges a "colorable federal defense").

The California Actions present an entirely different set of circumstances.  Unlike the

MTBE cases in the Transferee Court, the California Actions arise in the Ninth Circuit, which has

*twice* definitively rejected *as a matter of law* the Clean Air Act preemption arguments on which

defendants base their assertion of "federal officer" jurisdiction. *Davis II, supra,* 331 F.3d at 670,

673; *ExxonMobil, supra,* 217 F.3d at 1253.  As defendants have no "colorable" preemption

defense in the Ninth Circuit, Judge Scheindlin's March 16 ruling regarding defendants' "federal

officer" argument has no bearing on the Remand Motions in the California Actions.[12]

Additionally, the conduct at issue in the *Quincy* Action occurred in an area that has never

been subject to the requirements of the federal RFG or Oxygenated Fuels programs. *See* 40

C.F.R. §§ 80.70, 81.305.  As such, the *sine qua non* of defendants' federal officer basis for

---

[12] None of the other bases for federal jurisdiction asserted by defendants has merit.  As with defendants' "federal officer" assertions, their "substantial federal question" and "complete preemption" arguments depend entirely on preemption arguments that already have been soundly rejected by the Ninth Circuit as a matter of law.  *See Oxygenated Fuels Ass'n v. Davis II,* 331 F.3d 665; *ExxonMobil, supra,* 217 F.3d 1246.  Second, Defendants' attempt to predicate federal jurisdiction on the toehold of remote bankruptcy orders has no merit, as these Actions can have no conceivable effect on the administration of already-concluded bankruptcy proceedings. *See In re Feitz,* 852 F.2d 455, 457 (9th Cir. 1988) (no bankruptcy jurisdiction because prior entry of confirmation order "destroyed any possible relationship between the outcome of [a subsequent] suit and the administration of the bankruptcy estate").  Even if there were bankruptcy jurisdiction, it is non-exclusive, *see In re McGhan,* 288 F.3d 1172 (9th Cir. 2002) ("a state court [has] jurisdiction to construe or determine the applicability of a discharge order when discharge in bankruptcy is raised as a defense to a state cause of action filed in state court"), and remand is warranted in light of the obviously applicable remand factors under 28 U.S.C. § 1452(b).

removal – that they were required by federal law to use MTBE – has no possible basis in fact in the *Quincy* Action.[13]

Consequently, although the jurisdictional bases asserted by the defendants in the California Actions may overlap with those raised by oil company defendants in other recently removed MTBE cases, Plaintiffs' Remand Motions cannot be resolved based on Judge Scheindlin's March 16 opinion and order. *See In re 'East of the Rockies' Concrete Pipe Antitrust Cases*, 302 F. Supp. 244, 254 (JPML 1969) (Weigel, J., conc.) ("neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, ipso facto, by transfer just because there are common questions"). The underlying legal arguments and factual circumstances raised in Plaintiffs' Remand Motions are different, and the risk of inconsistent rulings absent transfer, as well as any perceived judicial economy, is therefore illusory. As the court held in *Board of Trustees v. Worldcom*, 244 F. Supp. 2d 900, 903 (N.D. Ill. 2002):

> When remand motions in cases potentially subject to MDL consolidation raise unique issues of law or fact, channeling the decisions to a single court would result in little or no savings of judicial resources. The threat of inconsistent judgments in either case is de minimis.

*See also Havens Protected "C" Clamps, Inc. v. Pilkington PLC*, No. 00-2035-JWL, 2000 WL 382027, at *2 (D. Kan. March 28, 2000) (holding that where "resolution of the motion to remand does not necessarily implicate issues common to the other actions currently pending

---

[13] Plaintiffs in the California Actions also raise unique arguments with respect to bankruptcy jurisdiction – an issue not decided in Judge Scheindlin's March 16 ruling. Orange County Water District, City of Riverside, City of Roseville, Quincy Community Services District and all but one of the twelve Sacramento County Plaintiffs are "governmental units" that (among other things) seek cost recovery pursuant to regulatory powers established by specific state statutes. *See* Sher Decl., Exhibit 1 (Fourteenth-Seventeenth Causes of Action); Exhibit 2 (Fifth Cause of Action); Exhibit 3 (Sixth-Ninth Causes of Action); Exhibit 4 (Sixth-Ninth Causes of Acton); Exhibit 5 (Sixth-Ninth Causes of Action). Under 28 U.S.C. §1452(a), such civil actions are exempt from removal on grounds of bankruptcy jurisdiction. This argument was not addressed by the remand motions recently decided Judge Scheindlin.

before the MDL Panel-designated court," remand motion should be considered by transferor court).  There is, therefore, nothing but delay to be gained from transferring the California Actions to the Southern District of New York, when the local district courts where these Actions are pending are at least as capable of deciding the unique issues raised in Plaintiffs' Remand Motions in an expeditious manner.

### IV.   CONCLUSION

The Panel should grant Plaintiffs' Joint Motion to Vacate Conditional Transfer Order (CTO-5) as it applies to the California Actions.

Respectfully submitted,

Dated:  March 24, 2004

SHER LEFF, LLP
Victor M. Sher
Todd E. Robins
450 Mission Street, Suite 500
San Francisco, CA  94105
Tel: (415) 348-8300
Fax: (415) 348-8333

Counsel for Orange County Water District, City of Riverside,
Quincy Community Services District, City of Roseville, City of
Elk Grove, Sacramento County Water Agency, Sacramento
Groundwater Authority, Citrus Heights Water District, Del Paso
Manor Water District, Fair Oaks Water District, Florin Resource
Conservation District, Rio Linda Elverta Community Water
District, Sacramento Suburban Water District, San Juan Water
District, California-American Water Company, City of
Sacramento, Martin Silver, Pauline Silver, Laura Silver, John T.
Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K. Crandall, and
Adrian Kruso

BARON & BUDD, P.C.
Scott Summy
Celeste A. Evangelisti
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 523-6267
Facsimile: (214) 520-1181

Counsel for City of Riverside, Quincy Community Services
District, City of Roseville, City of Elk Grove, Sacramento County
Water Agency, Sacramento Groundwater Authority, Citrus Heights
Water District, Del Paso Manor Water District, Fair Oaks Water
District, Florin Resource Conservation District, Rio Linda Elverta
Community Water District, Sacramento Suburban Water District,
San Juan Water District, California-American Water Company,
City of Sacramento, Martin Silver, Pauline Silver, Laura Silver,
John T. Kruso, Dennis A. Kruso, Stephen L. Kruso, Diane K.
Crandall, and Adrian Kruso

MILLER, AXLINE & SAWYER
Duane A. Miller
Michael D. Axline
1050 Fulton Avenue, Ste. 100
Sacramento, CA 95825
Telephone: (916) 488-6688
Facsimile: (916) 488-4288

Counsel for Orange County Water District

Exhibit G



RECEIVED
MAR 2 5 2004

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE:<br><br>METHYL BUTYL TERTIARY ETHER ("MTBE")<br>PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1358<br><br>This Document Relates to *The People of the State of California, et al., v. Atlantic Richfield Co., et al.,* Case No. 03-2653 (E.D. Cal.)<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5) |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iii

    CASES ............................................................................................................iii

    STATUTES ......................................................................................................v

    PERIODICALS ...............................................................................................vi

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-5)...........................................1

    I.     STATEMENT OF THE CASE .............................................................1

    II.    ARGUMENT ........................................................................................2

        A.    Because the People of the State of California are Sovereign and Immune From Process, the JPML Lacks Jurisdiction to Issue a Transfer Order in this Case, and Must in Consequence Vacate the Conditional Transfer Order Already Issued ...................................................................3

            1.    Decisions by U.S. District Courts in the *Steelcase* and *Moore* Cases Recognize that a State Cannot Be Removed to Federal Court Against Its Will, Even Where the State is a Plaintiff in an Action Filed in State Court ...........................................................3

            2.    The Decisions in *Steelcase* and *Moore*, Based on the Eleventh Amendment, are Consistent with Federal Precedent on the Broader Basis of Sovereign Immunity ...........................................................5

            3.    The Decisions of Other Federal Courts, Failing to Follow *Steelcase* and *Moore*, are Incorrect as they Limit the Scope of Sovereign Immunity to the "Mere Letter" of the Eleventh Amendment ........8

        B.    Even Assuming that the JPML has Jurisdiction, Transfer is Inappropriate Because the Moving Parties Have Failed to Meet Their Burden Pursuant to 28 U.S.C. § 1407(a) .............................................................12

            1.    The Moving Parties Have Failed to Establish Sufficient Commonality of Facts .............................................................13

                a.    This Case is Unique Given that a Sovereign is Involved ..13

                b.    Individual Rather Than Common Facts Predominate .......14

            2.    The Moving Parties Have Failed to Establish that Transfer Would Best Serve the Convenience of Parties and Witnesses ................15

            3.    The Moving Parties Have Failed to Establish that Transfer Would Promote the Just and Efficient Conduct of the Action ................16

                a.    The Risk of Duplicative Discovery is Minimal ...............16

1         b.     The Risk of Inconsistent Rulings is Minimal ...................18

2    III.     CONCLUSION ...........................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Abundiz v. Explorer Pipeline Co.,* 2002 W.L. 1592604 (N.D. Tex. 2002) ....................................19

*Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed. 2d 1114 (1978) ....................................4

*Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed. 2d 636 (1999) .......................3, 7, 8, 12

*Ames v. Kansas*, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 (1884) .......................................9, 10, 11

*Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed. 2d 171 (1985) ....7

*Banco y Agencia de Fianciamiento de la Vivienda e Puerto Rico v. Urbanizadora Villalba*, 681 F.Supp. 981 (D. P.R. 1988) .........................................................................................................8

*Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed. 2d 686 (1991) ...........................................................................................................................7

*California v. Acme Fill Corp.,* 1997 U.S. Dist. LEXIS 16847 (N.D. Cal. 1997) ........................11

*California v. Steelcase, Inc.,* 792 F.Supp. 84 (C.D. Cal. 1992) .......................3, 4, 5, 7, 8, 9, 11, 12

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793) ....................................................5, 6

*Communities for a Better Environment v. Unocal Corp.,* Cal. Super. Ct., S.F. Cty. Case No. 997013 .............................................................................................................................................17

*Cornyn v. Real Parties in Interest,* 110 F.Supp. 2d 514 (E.D. Tex. 2000) ...................................11

*Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed. 2d 662 (1974) ....................................4

*Ex Parte New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921) ........................................6

*ExxonMobil Corp. v. United States Environmental Protection Agency,* 217 F.3d 1246 (9th Cir. 2000) .............................................................................................................................................19

*Federal Maritime Commission v. South Carolina State Ports Authority,* 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed. 2d 962 (2002) .....................................................................................................7

*Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) ......................5, 6, 8, 10, 11, 12

*Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed. 2d 712 (1972) ..........9, 10, 11

*In re AH Robbins Co. Inc. "Dalkon Shield" IUD Products Liability Litigation,* 505 F.Supp. 221 (JPML 1981) ..................................................................................................................................18

*In re Air Crash at Pago Pago, American Samoa on January 30, 1974,* 394 F.Supp. 799 (JPML 1975) .............................................................................................................................................14

*In re Gasoline Lessee Dealers Antitrust Litigation*, 479 F.Supp. 578 (JPML 1979) .................15

*In re Grand Funk Railroad Trademark Litigation*, 371 F.Supp. 1084 (JPML 1974) .............15, 19

*In re Harmony Loan Company, Inc., Securities Litigation*, 372 F.Supp. 1406 (JPML 1974) ......14

*In re Highway Accident Near Rockville, Connecticut, on December 30, 1972*, 388 F.Supp. 574 (JPML 1975) ..................................................................................................................................12

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 175 F.Supp.2d 593 (S.D. N.Y. 2001) .....................................................................................................................19

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 209 F.R.D. 323 (S.D. N.Y. 2002) .....................................................................................................................18

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL 1358, Master File C.A. No. 1:00-1898 (SAS) (S.D. N.Y. Stay Order Dec. 23, 2003) ...................................2, 17

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 2004 U.S. Dist. LEXIS 4068 (S.D. N.Y. March 16, 2004) .......................................................................................19

*In re Mirtazapine Patent Litigation*, 199 F.Supp.2d 1380 (JPML 2002) ........................12, 15, 16

*In re National Student Marketing Litigation*, 368 F.Supp. 1311 (JPML 1973) .............................15

*In re Pacific Gas & Electric Company*, 281 B.R. 1, 2002 Bankr. LEXIS 1400 (Bankr. N.D. Cal. 2002) ..................................................................................................................................11

*In re Rezulin Products Liability Litigation*, 133 F.Supp. 2d 272 (S.D. N.Y. 2001) ...................11

*In re Sears, Roebuck & Co. Employment Practices Litigation*, 487 F.Supp. 1362 (JPML 1980) ..................................................................................................................................15

*In re State of New York v. Citibank, N.A.*, 537 F.Supp. 1192 (S.D. N.Y. 1982) .....................9, 10

*In re Tobacco/Governmental Health Care Costs Litigation*, 76 F.Supp. 2d 5 (D. D.C. 1999) ..................................................................................................................12, 13, 14, 16

*In re Truck Accident Near Alamargordo, New Mexico, on June 18, 1969*, 387 F.Supp. 732 (JPML 1975) ..................................................................................................................................16

*In re Western Electric Co. Semiconductor Patent Litigation*, 436 F.Supp. 404, 406 (JPML 1977) ..................................................................................................................................18

*Kansas v. Home Cable Inc.*, 35 F.Supp. 2d 783 (D. Kan. 1998) ...................................................11

*Medtronic, Inc., v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed. 2d 700 (1996) .......................5

*Missouri v. Coeur D'Alene Tribe*, 1997 U.S. Dist. LEXIS 14980 (W.D. Mo. 1997), *vacated by* 164 F.3d 1102 (8th Cir. 1999) ..................................................................................................11

*Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) ...............................6, 7

*Moore ex rel. Mississippi v. Abbott Laboratories, Inc.*, 900 F.Supp. 26 (S.D. Miss. 1995) ..................................................................................................................3, 4, 5, 7, 8, 11, 12

*New Hampshire v. Amerada Hess Corp.*, D. N.H. Case No. 03-CV-386, D. R.I. Case No. 03-0529L ...................................................................................................................13, 14

*New York ex rel. Lefkowitz v. Transcience Corp.*, 362 F.Supp. 922 (S.D. N.Y. 1973) ...............10

*Oklahoma ex rel. Edmondson v. Magnolia Marine Transport Co.*, 2004 U.S. App. LEXIS 3432 (10th Cir. February 24, 2004) .....................................................................................11, 12

*Oregon v. City of Rajneeshpuram*, 1984 U.S. Dist LEXIS 14903 (D. Ore. 1984) ........................8

*Oxygenated Fuels Association v. Davis ("Davis II")*, 331 F.3d 665 (9th Cir. 2003), *affirming Oxygenated Fuels Association v. Davis ("Davis I")*, 163 F.Supp. 2d 1182 (E.D. Cal. 2001) .....19

*Oxygenated Fuels Association v. Pataki*, 158 F.Supp. 2d 248 (N.D. N.Y. 2001) .......................19

*Oxygenated Fuels Assocation v. Pataki*, 293 F.Supp. 2d 170 (N.D. N.Y. 2003) ........................19

*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ....................................................................................................................................7

*Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed. 2d 605 (1993) ..................................................................................................16

*Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed. Cir. 1997) ........11

*Regents of the University of Minnesota v. Glaxo Wellcome, Inc.*, 58 F.Supp.2d 1036 (D. Minn. 1999) ....................................................................................................................................11

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed. 2d 252 (1996) ..................................................................................................................................7, 8

*Smith v. Reeves*, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900) ...........................................6

*South Dakota State Cement Plant Commission v. Wausau Underwriters Insurance Company*, 778 F.Supp. 1515 (D. S.D. 1991) ...................................................................................................8

*South Tahoe Public Utility District v. Atlantic Richfield Co.*, Cal. Super. Ct., S.F. Cty. Case No. 999128 ...............................................................................................................................16, 17

*State Engineer of Nevada v. South Fork Band of the Te-Moak Tribe of Western Shoshone Indians of Nevada*, 66 F.Supp. 2d 1163 (D. Nev. 1999), *aff'd* 339 F.3d 804 .....................................11

*Terrebonne Parish School Board v. Mobil Oil Corporation*, 1989 U.S. Dist. LEXIS 13703 (E.D. La. 1989) ...............................................................................................................................8

*Vermont v. Oncor Communications, Inc.*, 166 F.R.D. 313 (D. Vt. 1996) ................8, 9, 10, 11, 12

## STATUTES

U.S. CONST. Art I, § 10 .............................................................................................................5

U.S. CONST. Amend. XI ...............................................................:.3, 4, 5, 6, 7, 8, 9, 10, 11

28 U.S.C. § 1407 ..................................................................................2, 12, 13, 15, 16 20

28 U.S.C. § 1441 ...................................................................................................................10

Cal. Bus. & Prof. Code § 17200 et seq. ...........................................................................1, 4

Cal. Bus. & Prof. Code § 17500 et seq. .................................................................................1

Cal. Bus. & Prof. Code § 17580.5 ..........................................................................................1

Cal. Civil Code § 3479 ............................................................................................................1

Cal. Civil Code § 3480 ............................................................................................................1

Cal. Fish & Game Code § 5650 ..............................................................................................1

Cal. Health & Safety Code § 25189(d) ..................................................................................1

Cal. Health & Safety Code § 25189.2(c) ...............................................................................1

### **PERIODICALS**

Alfred Hill, *In Defense of Our Law of Sovereign Immunity,* 42 B.C.L. Rev. 485 (2001) ..............3

## I.   STATEMENT OF THE CASE

Plaintiffs are the People of the State of California, two cities, one investor-owned water utility, and nine public agencies charged with managing and/or purveying water resources in Sacramento County. Plaintiffs filed this action in Sacramento County Superior Court on September 30, 2003, and filed a First Amended Complaint ("FAC") on October 31, 2003.[1]   The FAC names as defendants 16 major oil and chemical companies that manufacture methyl tertiary butyl ether ("MTBE"), refine gasoline containing MTBE, and/or supply gasoline containing MTBE to retail gasoline stations in Sacramento County, as well as the owner/operators of certain gasoline stations in the County. FAC, ¶¶ 37-63. Defendants' choice to use MTBE in gasoline and/or their discharge of such gasoline to the subsurface has resulted in the contamination of groundwater resources in Sacramento County - resources on which hundreds of thousands of people ultimately depend for their drinking water. FAC, ¶¶ 1, 37.  The People and the other plaintiffs have jointly sued for public nuisance (Cal. Civil Code §§ 3479, 3480) and jointly seek declaratory relief. The People alone, in the exercise of their police powers, have sued for the unauthorized disposal of hazardous waste under both strict liability (Cal. Health & Safety Code § 25189.2(c)) and negligence (Cal. Health & Safety Code § 25189(d)) theories, for water pollution (Cal. Fish & Game Code § 5650), for false advertising and false environmental advertising (Cal. Bus. & Prof. Code §§ 17500 et seq., 17580.5), for unfair business practices (Cal. Bus. & Prof. Code § 17200 et seq.) and for civil conspiracy.  The remaining plaintiffs have brought suit in an additional six causes of action under tort and other theories.

On or about December 8, 2003, certain defendants removed this action to the Eastern District of California.[2]  A week later, on December 15, 2003, the plaintiffs filed a Motion to Remand the case to state court.[3]  The defendants filed no substantive response to the plaintiffs' motion, instead requesting on December 18, 2003[4] and then again *ex parte* on January 29, 2004[5]

---

1.  A true and correct copy of the FAC is attached as Exhibit 1
2.  A true and correct copy of which is attached as Exhibit 2.
3.  A true and correct copy of which is attached as Exhibit 3.
4.  A true and correct copy of which is attached as Exhibit 4.
5.  A true and correct copy of which is attached as Exhibit 5.

1

1   that a hearing on the matter be stayed pending a decision by the Judicial Panel on Multidistrict

2   Litigation ("JPML," or "the Panel") to transfer this case to the Southern District of New York.[6]

3   Plaintiffs opposed this request for a stay in briefs filed on January 30th[7] and February 6, 2004,[8]

4   to no avail; without conducting a hearing the Hon. Garland E. Burrell issued an indefinite stay on

5   February 6th and deemed the plaintiffs' Motion to Remand to be withdrawn without prejudice.[9]

6        On February 25, 2004, the JPML issued Conditional Transfer Order Number Five

7   ("CTO-5"), transferring this case to the Southern District of New York.  On March 11, 2004, the

8   plaintiffs filed a joint Notice of Opposition to this transfer. Because of the unique issues arising

9   from the fact that the People of the State of California are sovereign, we are filing this motion

10  with its accompanying points and authorities separately from the other plaintiffs.

11                              II.   **ARGUMENT**

12       Plaintiff moves to vacate CTO-5 on two bases: first, on the ground that the federal courts

13  lack jurisdiction in this matter given that the People of the State of California object to removal

14  and transfer pursuant to the doctrine of sovereign immunity, and second, even assuming for the

15  sake of argument that this Court has jurisdiction to issue a Transfer Order, it should not do so as

16  the moving parties have failed to meet their burden of proof pursuant to 28 U.S.C. § 1407(a).

17

---

18

19  6.   Parallel to these proceedings the defendants also filed with the JPML a Notice of Related, Tag-Along Actions to *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358, Master File

20  C.A. No. 1:00-1898 (SAS) (S.D. N.Y. stay order Dec. 23, 2003) (a true and correct copy of which is attached as Exhibit 6), which was at the time an inactive MDL proceeding pending before the Hon. Shira A. Scheindlin of the Southern District Court of New York.  On December 19, 2003, Judge Scheindlin conducted a hearing concerning

21  two new cases removed to her district that had pending remand and stay motions (see Reporter's Transcript ("RT") of the Proceedings of December 19, 2003, a true and correct copy of which is attached as Exhibit 7). Counsel for the

22  plaintiffs present ultimately stipulated with defense counsel to the conditional transfer of a number of cases to Judge Scheindlin's court to join the proceedings pending before her. The plaintiffs in this action were not present and did not

23  consent to the stipulation. Nonetheless, this case was included in a list of cases submitted to Judge Scheindlin by the parties as a potential tag-along action (see the attachment to the Order of December 23, 2003, a true and correct copy

24  of which is attached as Exhibit 8).  On December 23, 2003, Judge Scheindlin issued an order "respectfully request[ing]" the district courts in any case on the list to stay proceedings pending transfer to her court (see the Order

25  of December 23, 2003, a true and correct copy of which is attached as Exhibit 8).  The plaintiffs in this action objected to any proposed transfer by letters directed to Judge Scheindlin dated January 5, 2004 (a true and correct

26  copy of which is attached as Exhibit 9 to this Motion) and January 27, 2004 (a true and correct copy of which is attached as Exhibit 10 to this Motion).  Counsel for one of the defendants in this action also objected to transfer by

27  letter to Judge Scheindlin dated January 5, 2004 (a true and correct copy of which is attached as Exhibit 11).

        7.   True and correct copies of which are attached as Exhibits 12 and 13.

28       8.   A true and correct copy of which is attached as Exhibit 14.

        9.   A true and correct copy of which is attached as Exhibit 15.

A.   **Because the People of the State of California are Sovereign and Immune From Process, the JPML Lacks Jurisdiction to Issue a Transfer Order in this Case, and Must in Consequence Vacate the Conditional Transfer Order Already Issued**

The People of the State of California object to the jurisdiction of this or any other federal court on the ground that, as a separate sovereign, we cannot be compelled to attend this court absent our consent - and we do not consent. The People submit that our rights as sovereign must prevail over any statute authorizing the removal of this action to federal court, or the transfer of this action from one federal court to another.

At the outset it needs to be made clear that the People are not relying solely upon the plain wording of the Eleventh Amendment[10] to the U.S. Constitution in asserting this immunity, but upon their broader sovereign rights.[11]   The distinction is important, but often overlooked.  As the Supreme Court recently explained:

> We have ... sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, *for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment.* Rather, as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, *the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today* ... except as altered by the plan of the Convention or certain constitutional Amendments.

*Alden v. Maine*, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed. 2d 636 (1999) (emphasis added).

1.   **Decisions by U.S. District Courts in the *Steelcase* and *Moore* Cases Recognize that a State Cannot Be Removed to Federal Court Against Its Will, Even Where the State is a Plaintiff in an Action Filed in State Court**

Two District Courts have sustained Eleventh Amendment challenges to the jurisdiction of federal courts in cases very similar to ours. In *California v. Steelcase, Inc.*, 792 F.Supp. 84 (C.D.Cal. 1992) the District Attorney of Los Angeles brought a civil enforcement action for

---

10. The Eleventh Amendment, adopted in 1798, provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

11. For a history of the law of sovereign immunity see Alfred Hill, *In Defense of Our Law of Sovereign Immunity*, 42 B.C.L. Rev. 485 (2001).

3

1  violation of the state antitrust and unfair competition statutes[12] in state court. The defendant

2  removed the action to federal court on the grounds of diversity of citizenship. The federal court

3  remanded the action back to state court on the grounds that a) citizenship was not in fact diverse

4  insofar as at least one cause of action was concerned[13] and b) the Eleventh Amendment

5  prohibited removal.  Insofar as this second ground was concerned the Court found that it lacked

6  jurisdiction because the Eleventh Amendment "is in 'the nature of a jurisdictional bar.'" *Steelcase*,

7  792 F. Supp. at 86, citing *Alabama v. Pugh*, 438 U.S. 781, 782 n.1, 98 S.Ct. 3057, 57 L.Ed. 2d

8  1114, (1978) (per curiam), which in turn quoted from *Edelman v. Jordan*, 415 U.S. 651, 678, 94

9  S.Ct. 1347, 39 L.Ed. 2d 662, (1974).  The court noted the defendant's argument that a literal

10  reading of the Eleventh Amendment provides immunity to states as defendants, not as plaintiffs,

11  but found this of no moment, stating at page 86 that:

12      since *the immunity* granted by the Eleventh Amendment is an
    immunity from being made an involuntary party to an action in

13      federal court, it *should apply* equally to the case *where the state is*
    *a plaintiff* in an action commenced in state court and the action is

14      *removed* to federal court by the defendant. (emphasis added).

15      *Steelcase* was subsequently followed in the case of *Moore ex rel. Mississippi v. Abbott*

16  *Laboratories, Inc.*, 900 F. Supp. 26 (S.D. Miss. 1995). In *Moore* the state Attorney General sued

17  corporations in state court on the same general grounds as in *Steelcase* - namely, violation of the

18  state antitrust statute and state consumer protection act.  The defendants removed the case to

19  federal court on diversity and federal question grounds, and the state moved to remand to state

20  court.  The district court discussed the language found in *Steelcase* and then said, at page 30,

21  that:

22      The Court finds the reasoning of the *Steelcase* court to be sound.
    By removing this matter to federal court, Defendants have

23      involuntarily subjected the State of Mississippi to the jurisdiction
    of this Court. Because the State does not consent to this removal,

24      the Court finds that it lacks subject matter jurisdiction over this
    action due to the Eleventh Amendment proscription ....

25

26  _____

27  12. Cal. Bus. & Prof. Code section 17200 et seq.  The People have brought this identical charge against the
defendants in the instant case; see FAC Cause of Action Number Eight.

    13. Because the unfair competition statute expressly allows prosecutions by District Attorneys in the name of

28  the People of the State of California, and a state is not a citizen for diversity purposes, at least the second cause of
action could not be removed pursuant to diversity jurisdiction. *Steelcase*, 792 F. Supp. at 85-86.

4

1    Our case is indistinguishable from *Steelcase* and *Moore*. In this case, as in *Steelcase* and

2    *Moore*, the sovereign is not just suing corporate defendants in state court - it is doing so in the

3    exercise of its police powers.[14]   In this case, as in *Steelcase* and *Moore*, the defendant

4    corporations have removed the action to federal court without the consent of that sovereign. And

5    in this case, as in *Steelcase* and *Moore*, this Court must defer to the wishes of a sovereign people

6    who desire to litigate their police action in their own courts.

7        2.    **The Decisions in *Steelcase* and *Moore*, Based on the Eleventh Amendment,**
             **are Consistent with Federal Precedent on the Broader Basis of Sovereign**
8            **Immunity**

9        While neither the *Steelcase* nor *Moore* courts cited it, their reading of the scope of

10   sovereign immunity is consistent with the ruling in the seminal Eleventh Amendment case, *Hans*

11   *v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In *Hans* the defendant was a citizen

12   of the state he was suing, and brought action pursuant to the Contracts Clause of the U.S.

13   Constitution.[15]   The Eleventh Amendment recognizes the immunity enjoyed by states from suits

14   in federal court brought by citizens of other states and countries, but is silent on the subject of

15   suits brought against a state by its own citizens. The U.S. Supreme Court recognized that if it was

16   bound by the "mere letter" of the Eleventh Amendment suit might be had, but after an extensive

17   discussion of the history of the subject[16] it concluded that any attempt to limit sovereign

18   _____

19       14. The People submit that the protections afforded by sovereign immunity are absolute, and that it does not
20   matter in what context a state is forced into federal court where its immunity is not waived, but it is appropriate to
     emphasize how particularly important that immunity is where the exercise of the state's inherent police powers are
21   concerned. "Throughout our history the several States have exercised their police powers to protect the health and
     safety of their citizens. Because these are 'primarily, ... matter[s] of local concern,' the 'States traditionally have had
     great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet
22   of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed. 2d 700 (1996) (internal
     citations omitted).

23       15. It was alleged that the State of Louisiana was reneging on its obligation to pay bonds it had previously
     issued, in contravention of Article I, Section 10 of the Constitution.

24       16. In summary, the Court noted that the Eleventh Amendment was enacted in response to *Chisholm v.*
     *Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), where the Supreme Court, utilizing a literal interpretation, found
25   that the Constitution permitted a state to be sued by the citizens of another state. While there had been rumblings
     during the debates over the enactment of the Constitution from opponents that a literal interpretation of the document
26   would lead to just such a result, supporters such as James Madison ("It is not in the power of individuals to call any
     state into court ...," *Hans*, 134 U.S. at 14), John Marshall ("I hope that no gentleman will think that a State will be
27   called at bar of the federal court. . . . It is not rational to suppose that the sovereign power should be dragged before a
     court," *id.*) and Alexander Hamilton ("It is inherent in the nature of sovereignty not to be amenable to the suit of an
28   individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as
     one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union," *Hans*, 134 U.S.

                                                        5

1   immunity to the "mere letter" of that amendment "is an attempt to strain the Constitution and the

2   law to a construction never imagined or dreamed of." *Hans*, 134 U.S. at 14 and 15. In spite of the

3   fact that the case fell outside the literal wording of the Eleventh Amendment the Supreme Court

4   dismissed the suit on the grounds that the doctrine of sovereign immunity was broader than the

5   Amendment, and that doctrine - if not the Eleventh Amendment per se - protected the state from

6   suits it did not agree to entertain.

7        There have been a number of cases since *Hans* in which the Supreme Court has sustained

8   state claims of sovereign immunity from suit - even though the language of the Eleventh

9   Amendment did not specifically immunize the state. See *Smith v. Reeves*, 178 U.S. 436, 445-448,

10   20 S.Ct. 919, 44 L.Ed. 1140 (1900) (claim of state sovereign immunity from suit sustained, even

11   though suit was brought by a federal corporation, which was not a citizen by the terms of the

12   Eleventh Amendment), *Ex Parte New York*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)

13   (claim of state sovereign immunity from suit sustained, even though the terms of the Eleventh

14   Amendment said nothing of suits brought in admiralty; "[t]hat a State may not be sued without its

15   consent is a fundamental rule of jurisprudence … [T]he entire judicial power granted by the

16   Constitution does not embrace authority to entertain a suit brought by private parties against a

17   State without consent given … because of the fundamental rule of which the Amendment is but

18   an exemplification," p. 497), *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282

19   (1934) (claim of state sovereign immunity from suit sustained, even though the Eleventh

20   Amendment did not specifically mention state immunity from suits brought by foreign states;

21   "Behind the words of the constitutional provisions are postulates which limit and control. There

22

---

23   at 13), denied it.  When the Supreme Court opted for just such a literal interpretation in *Chisholm* the decision

24   "created such a shock of surprise throughout the country that, at the first meeting of Congress thereafter, the Eleventh
     Amendment was almost unanimously proposed, and was in due course adopted by the legislatures of the States."
     *Hans*, 134 U.S. at 11. As the *Hans* court summarized it at p. 12:

25

26        Looking back from our present standpoint at the decision in *Chisholm v.*
          *Georgia*, we do not greatly wonder at the effect which it had upon the country.
          Any such power as that of authorizing the federal judiciary to entertain suits by

27        individuals against the States, had been expressly disclaimed, and even resented,
          by the great defenders of the Constitution whilst it was on its trial before the

28        American people.

6

1   is the essential postulate that the controversies ... shall be found to be of a justiciable character.

2   There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall

3   be immune from suits, without their consent ...," p. 322), *Blatchford v. Native Village of Noatak*

4   *and Circle Village*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed. 2d 686 (1991) (immunity from suit

5   by Indian tribes; "we have understood the Eleventh Amendment to stand not so much for what it

6   says, but for the presupposition ... which it confirms," at 779), *Alden*, 527 U.S. at 730 (claim of

7   sovereign immunity sustained where Congress permitted suit in state court, even though the

8   terms of the Eleventh Amendment only addresses limits on the federal judicial branch), and

9   *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743, 753, 122

10  S.Ct. 1864, 152 L.Ed. 2d 962 (2002) (immunity from administrative actions; "the Eleventh

11  Amendment does not define the scope of the States' sovereign immunity; it is but one particular

12  exemplification of that immunity"). In case after case, for over a century, the Supreme Court has

13  continued to reaffirm the principles, reasoning and ruling of *Hans*.

14      *Steelcase* and *Moore* are also consistent with caselaw holding that state consent to be

15  sued in its own courts does not amount to consent that it be sued in federal court. See *Pennhurst*

16  *State School and Hospital v. Halderman*, 465 U.S. 89, 100 n. 9, 104 S.Ct. 900, 79 L.Ed. 2d 67

17  (1984) ("the Court consistently has held that a State's waiver of sovereign immunity in its own

18  courts is not a waiver of the Eleventh Amendment immunity in the federal courts"). Not only

19  does a state have the right to decide whether it shall waive immunity from suit - it has the right to

20  determine the forum in which immunity shall be waived. *Pennhurst*, 465 U.S. at 100 ("A State's

21  constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it

22  may be sued"). Any waiver of sovereign immunity must be unequivocally expressed.

23  *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 239-240, 105 S.Ct. 3142, 87 L.Ed. 2d 171

24  (1985) ("we have held that a State will be deemed to have waived its immunity only where stated

25  by the most express language or by such over-whelming implications from the text as [will] leave

26  no room for any other reasonable construction" (internal quotes and citations omitted)). And

27  immunity is not limited to those situations where a party is seeking a monetary judgment against

28  a State - it serves as well to avoid "the indignity of subjecting a State to the coercive process of

7

1   judicial tribunals at the instance of private parties," *Seminole Tribe of Florida v. Florida*, 517

2   U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed. 2d 252 (1996) (internal quotation marks and citation

3   omitted). From all these decisions it is apparent that the *Steelcase* and *Moore* cases were

4   correctly decided - a defendant cannot remove a sovereign plaintiff to federal court without that

5   plaintiff's consent, let alone to a federal court 3,000 miles away.

6        3.   <u>The Decisions of Other Federal Courts, Failing to Follow *Steelcase* and</u>

       <u>*Moore*, Are Incorrect as They Limit the Scope of Sovereign Immunity to the</u>

7          <u>"Mere Letter" of the Eleventh Amendment</u>

8         Other federal districts have reviewed *Steelcase* and *Moore* and have refused to follow

9   them.  The People submit, however, that these cases are in error given that they uniformly limit

10  themselves to a discussion of the "mere letter" of the Eleventh Amendment without reference to

11  the broader concept of sovereign immunity underlying it.[17]

12        It appears that the earliest dissenting voice to the *Steelcase/Moore* decisions can be found

13  in *Vermont v. Oncor Communications, Inc.*, 166 F.R.D. 313 (Vt. 1996).[18]  In *Oncor*

14  *Communications* the state sued a telecommunications company on the grounds that its practices

15

---

16      17. In fairness to these courts it must be said that their analyses were not aided by the fact that the *Steelcase* and *Moore* courts did not discuss the broader concept of sovereign immunity either, limiting their discussion to the

17  Eleventh Amendment proper.  It would have been better for all of these courts if they had broadened the scope of their analyses, but as the quote from *Alden* above makes clear, courts have routinely resorted to the shorthand of

18  having the Eleventh Amendment apply to both concepts - even if the result is a distortion of the analysis.

    18. There are decisions earlier than *Steelcase* and *Moore*, but they are not particularly helpful.  In *Oregon v.*

19  *City of Rajneeshpuram*, 1984 U.S.Dist.LEXIS 14903 (D. Ore. 1984), the federal district court denied the state's Eleventh Amendment claims in a remand motion - without any citation to authority - on the summarily stated

20  grounds that a federal question was raised. In *Banco y Agencia de Financiamiento de la Vivienda de Puerto Rico v. Urbanizadora Villalba*, 681 F.Supp. 981 (D. P.R. 1988) the court denied the Commonwealth's Eleventh Amendment

21  claims in a remand motion on the ground that the Eleventh Amendment protects the states as defendants but says nothing about states as plaintiffs. In *Terrebonne Parish School Board v. Mobil Oil Corporation*, 1989 U.S. Dist.

22  LEXIS 13703 (E.D. La. 1989) a school board sued an oil company over royalties due to it pursuant to a leasehold. The federal court denied the motion to remand because the Eleventh Amendment was unavailable for two reasons:

23  first because "[w]e are aware of no case holding that the Eleventh Amendment prevents removal of a suit filed by a state as a plaintiff," and second because it could not be said that the school board was litigating as the state's alter

24  ego.  And in *South Dakota State Cement Plant Commission v. Wausau Underwriters Insurance Company*, 778 F.Supp. 1515 (D. S.D. 1991) the federal court remanded to state court on the ground that diversity jurisdiction was

25  lacking. It made passing reference to the Eleventh Amendment, noting at page 1522 that "[i]n this case, the State is the plaintiff, not the defendant," but declined to rule on the claim - a ruling that would have been pointless in any

26  event given that federal jurisdiction was lacking on diversity grounds.  In none of these cases, however, is there a discussion of the broader concept of sovereign immunity underlying the Eleventh Amendment.  As *Hans* made clear,

27  and as *Alden* reiterated only five years ago, the concept of sovereign immunity is broader than the "mere letter" of the Eleventh Amendment, and a determination that a suit does not fit within the parameters of the Eleventh

28  Amendment should only be the first step in a two-step analysis to determine whether sovereign immunity applies.  In none of these pre *Steelcase* and *Moore* cases was that second step taken.

1   violated state consumer fraud laws and FCC guidelines. The case was removed to federal court.

2   The state moved to remand, arguing (among other things) Eleventh Amendment immunity and

3   citing the *Steelcase* decision.  The court disagreed. Its reasoning in its entirety, found at page 321,

4   is as follows:

5       It has long been the case that suits brought by a state against parties
        who are not other states may "be brought in or removed to the
6       [District Courts] ..." *Illinois v. City of Milwaukee*, 406 U.S. 91,
        101, 31 L.Ed. 2d 712, 92 S.Ct. 1385 (1972), quoting *Ames v.*
7       *Kansas*, 111 U.S. 449, 470, 28 L.Ed. 482, 4 S.Ct. 437 (1884). See
        also *[In re] State of New York v. CitiBank, N.A.*, 537 F.Supp. 1192,
8       1197 (S.D.N.Y. 1982). The Eleventh Amendment does not bar
        removal of an action involving a federal question in which a state
9       is the plaintiff.

10          The People submit that the authorities relied upon by *Oncor Communications* are

11  distinguishable and in consequence do not stand for the proposition stated.  *City of Milwaukee*

12  involved a suit by Illinois against Wisconsin public entities to abate a public nuisance. Illinois

13  sought leave to file the complaint with the U.S. Supreme Court - skipping over the federal district

14  and circuit courts - on the ground that the Supreme Court had original jurisdiction under the

15  Constitution where one state was suing another. The Supreme Court found, however, that in this

16  instance Wisconsin was not a mandatory party even if certain of its subdivisions might be.  Given

17  that, federal district courts also had jurisdiction, and the Court denied Illinois' request.  The issue

18  in *City of Milwaukee* was therefore not whether a state consented to suit in federal court - it

19  *wanted* to be in federal court - the issue was *which* federal court had subject matter jurisdiction.

20  The Eleventh Amendment, and the broader subject of the sovereign immunity underlying it, was

21  not at issue.

22          *Ames* was cited by *City of Milwaukee* because it, too, dealt with *which* federal court had

23  subject matter jurisdiction.  In *Ames* the state of Kansas challenged a proposed corporate merger

24  in state court. Because federal rights were allegedly involved the defendants sought to remove the

25  matter to federal Circuit Court. The state objected - not on the grounds of immunity, but on the

26  grounds that the Constitution vested exclusive jurisdiction over cases in which a state was a party

27  in the Supreme Court rather than some lesser federal court created by statute.  The Supreme

28  Court disagreed, finding that while the "judicial power of the United States exists under the

9

1   Constitution," Congress has the ability "to distribute that power among courts." *Ames*, 111 U.S.

2   at 472. Again, neither the Eleventh Amendment nor the principle of sovereign immunity factored

3   into the decision.

4          *Citibank* did not involve the Eleventh Amendment or sovereign immunity either.  In

5   *Citibank* the Attorney General of New York sued the defendant in state court over fraudulent use

6   of ATMs.  While the causes of action were state claims they were based exclusively upon

7   allegations of illegality under federal law - namely, the Electronic Fund Transfers Act (EFTA).

8   The defendant removed the case to federal court and the Attorney General moved to remand it

9   back to state court.  The Attorney General does not appear to have demanded remand as a matter

10  of right pursuant to sovereign immunity, but rather as a matter of discretion pursuant to federal

11  principles of comity.[19]  The federal district court declined to defer on the grounds that

12  construction of the EFTA was essential to the resolution of the state claims, adding that "[i]t is

13  clear that an action can be removed *notwithstanding the fact that a state is the plaintiff. Ames v.*

14  *Kansas*, 111 U.S. 449, 463, 4 S.Ct. 437, 443, 28 L.Ed. 482 ...." *Citibank*, 537 F.Supp. at 1197

15  (emphasis added). This language in *Citibank* appears to come closest to supporting the

16  proposition found in *Oncor Communcations*, but like *City of Milwaukee* it relies upon *Ames* for

17  this proposition, and again *Ames* does not deal with the Eleventh Amendment or sovereign

18  immunity issues at all.[20]

19          In short, none of the three cases relied upon by the *Oncor Communications* court dealt

20  with the issue posed here, and the *Oncor Communications* court's attempt to distinguish

---

22  19. See *Citibank*, 537 F. Supp at 1197: "The Attorney General insists that he should be permitted to pursue
the relief he seeks in the state courts, as the state legislature intended. He is the people's representative by state law,
23  and claims he should be allowed to proceed in the forum designated for the purpose by the legislation, and to seek
the remedies specified. He notes specifically the valid observation in *New York ex rel. Lefkowitz v. Transcience*
24  *Corp.*, 362 F. Supp. 922, 928 (S.D.N.Y. 1973), a section 63(12) proceeding, that a state forum for cases brought by
the Attorney General is desirable to give 'free scope to the police power of the States' in consumer protection cases."
25         20. The *Citibank* court did cite to a different page in the *Ames* opinion than the *City of Milwaukee* court -
namely, 111 U.S. at page 463.  At that page the *Ames* court dealt with the authority to remove an action to federal
26  court pursuant to the 1875 statute in place at the time. This forerunner of 28 U.S.C. section 1441(a) permitted either
party to remove an action to federal court (the current version, of course, permits only defendants to do so), and the
27  *Ames* court noted that it made no distinction between suits with ordinary parties and those in which a State was a
party.  This discussion of the scope of the statute, however, included no mention of the concept of sovereign
28  immunity or the Eleventh Amendment, which would trump any mere statute.  This is perhaps not surprising, given
that *Ames* preceded *Hans* by some six years.

10

1   *Steelcase* and *Moore* on their authority must fail. This did not, unfortunately, occur to a number

2   of subsequent federal district courts, which opted with little or no independent analysis to follow

3   *Oncor Communications* rather than *Steelcase* and *Moore* based on these same cases. See

4   *Missouri v. Coeur D'Alene Tribe*, 1997 U.S. Dist. LEXIS 14980, *7-8 (W.D. Mo. 1997), *vacated*

5   *by* 164 F.3d 1102 (8th Cir. 1999), *California v. Acme Fill Corp.*, 1997 U.S. Dist. LEXIS 16847,

6   *3-4 (N.D. Cal. 1997),[21] *Kansas v. Home Cable Inc.*, 35 F.Supp.2d 783, 789 (D. Kan. 1998),

7   *Regents of the University of Minnesota v. Glaxo Wellcome, Inc.*, 58 F.Supp. 2d 1036, 1039 (D.

8   Minn. 1999), *In re Rezulin Products Liability Litigation*, 133 F.Supp. 272, 297 (S.D. N.Y. 2001),

9   and *In re Pacific Gas & Electric Company*, 281 B.R. 1, 2002 Bankr. LEXIS 1400 (Bankr. N.D.

10  Cal. 2002).[22] Recently the Tenth Circuit weighed in on the issue in *Oklahoma ex rel. Edmondson*

11  *v. Magnolia Marine Transport Co.*, 2004 U.S. App. LEXIS 3432 (10th Cir. February 24, 2004).[23]

12  Unfortunately it, too, failed to discuss the broader concept of sovereign immunity. It did at least

13  acknowledge - as no other court had done - that *City of Milwaukee* and *Ames* did not involve

14  Eleventh Amendment issues, but said that because "nearly every court to consider" the issue "has

15  relied on the unconditional holding of those cases, in conjunction with the pointed and specific

16  language used in the constitutional text itself" to bar Eleventh Amendment claims, it would do so

17

---

18   21. Interestingly, the court in *Acme Fill* not only mentioned *Hans* but noted that pursuant to it the "Supreme
19   Court has extended the Amendment's protection beyond its literal meaning to cover suits brought against a state by
     its own citizens," *Acme Fill*, 1997 U.S. Dist. LEXIS 168947 at *3. It failed to discuss why the *Hans* court provided
20   that extension, however, or explain how it was that the *Hans* extension would affect the question before it.
         22. Other cases criticized *Steelcase* without relying specifically on the authorities cited by *Oncor*
     *Communications*, but are distinguishable for other reasons. In *State Engineer of Nevada v. South Fork Band of the*
21   *Te-Moak Tribe of Western Shoshone Indians of Nevada*, 66 F.Supp. 2d 1163, 1170 (D. Nev. 1999), *aff'd* 339 F.3d
     804, the court found that *Steelcase* was not controlling because *Steelcase* was a diversity of citizenship case rather
22   than a federal question case. The distinction is of no moment - *Hans* involved a federal question rather than diversity
     too, which had no bearing whatsoever on the sovereign immunity issue - but perhaps more to the point, given that the
23   state was suing the United States (among others), and the Eleventh Amendment clearly does not extend to suits
     between those two sovereigns, there was no need to discuss let alone try to distinguish *Steelcase* at all. *Cornyn v.*
24   *Real Parties in Interest*, 110 F.Supp. 2d 514 (E.D. Tex. 2000) involved an action brought by the State of Texas in
     state court against certain private attorneys it had retained to help in litigation against the tobacco industry after that
25   litigation was settled. The case was removed and the state tried to remand it. The court refused, declining to follow
     *Steelcase* and *Moore* and citing *Oncor Communications* and its progeny instead. But it did not need to discuss these
26   cases at all. Given that the state of Texas had originally brought the tobacco litigation in *federal* court, the Court
     ruled that it had waived its sovereign immunity anyway.
27      23. Among the cases relied upon by *Edmondson* is *Regents of the University of California v. Eli Lilly & Co.*,
     119 F.3d 1559, 1564 (Fed. Cir. 1997). In *Regents*, however, the plaintiff university originally filed the case in
28   *federal* court - it later complained when it was transferred to another district. That case is obviously very different
     from this one.

1   too. *Edmondson*, *7.  The People submit that this is not a particularly helpful analysis. An error -

2   no matter how often repeated - remains an error.  These cases all fail because they ultimately

3   relied upon authority having nothing to do with sovereign immunity or the Eleventh Amendment

4   - merely repeating the error in *Oncor Communications* - and because they all neglected to

5   discuss, let alone appreciate, the distinction drawn by the *Hans* court and later reiterated by the

6   *Alden* court between the "mere letter" of the Eleventh Amendment and the much broader concept

7   of sovereign immunity underlying it.

8            In the final analysis *Steelcase* and *Moore* got it right.  A sovereign state cannot be hauled

9   in front of a federal court without its consent, and the mere decision to file suit in state court to

10   validate a police action does not constitute such consent.  Attempts to dismiss these cases while

11   ignoring the lessons taught by *Hans* and recently reiterated by *Alden* are neither persuasive nor

12   correct.  *Steelcase* and *Moore* should be followed by this Court.  This sovereign's immunity

13   should be recognized.  In light of the fact that this immunity exists, this Court by definition lacks

14   jurisdiction to issue a Transfer Order, and it should in consequence vacate the Conditional

15   Transfer Order already issued.

16   **B.   Even Assuming that the JPML has Jurisdiction, Transfer is Inappropriate Because**

17   **the Moving Parties Have Failed to Meet Their Burden Pursuant to 28 U.S.C. §1407(a)**

18            In evaluating a request for transfer made pursuant to 28 U.S.C. § 1407(a) the JPML must

19   evaluate three often interconnected factors: 1) whether the actions raise common questions of

20   fact; 2) whether transfer and consolidation would best serve the convenience of the parties and

21   witnesses; and 3) whether transfer and consolidation would promote the just and efficient

22   conduct of the litigation. *In re Tobacco/Governmental Health Care Costs Litigation*, 76

23   F.Supp.2d 5, 8 (D. D.C. 1999).  Or, to put it another way, is transfer "necessary in order to

24   eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources

25   of the parties, their counsel and the judiciary." *In re Mirtazapine Patent Litigation*, 199

26   F.Supp.2d 1380, 1381 (JPML 2002). All three of these factors need to be met, *In re Highway*

27   *Accident Near Rockville, Connecticut, on December 30, 1972*, 388 F.Supp. 574, 575 (JPML

28   1975), and the burden is upon the moving party to establish that these criteria have been met, *In*

1    re Tobacco/Governmental Health Care Costs Litigation, 76 F.Supp. 2d at 7-8.  The People of the

2    State of California submit that, even if the Panel has jurisdiction over this matter, the moving

3    parties have failed to meet their burden of proving any one of these three factors. In consequence

4    their motion to transfer should be denied, and CTO-5 vacated.

5         **1.**  **The Moving Parties Have Failed to Establish Sufficient Commonality of Facts**

6         In their Notice of Related, Tag-Along Actions ("Notice"), the moving parties have alleged

7    two common questions of fact between this case and others: "whether defendants knew about and

8    misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks

9    to downstream users, the federal government or the public" and "whether plaintiffs sustained

10    drinking water contamination as a result of MTBE contamination." Notice at p. 2, quoting from

11    *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* Transfer Order at p. 1

12    (October 10, 2000). While the People agree that there is commonality insofar as the first of these

13    factors is concerned, the People submit that the second factor concerns site-specific information

14    that is uncommon rather than common among the parties.  In addition, neither of these listed

15    factors takes into account the differences inherent in the fact that this plaintiff is a sovereign.

16         **a.**     **This Case is Unique Given that a Sovereign is Involved**

17         Perhaps the greatest dissimilarity between this case and others currently consolidated is

18    that a sovereign is bringing the action under causes of action uniquely related to its police

19    powers.[24]  A similar situation arose in the case of *In re Tobacco/Government Health Care Costs*

20    *Litigation*, where a number of unions and foreign governments sued the tobacco industry.  They

21    wound up before separate judges in the same district.  The United States filed relatively late in

22    the litigation, and was placed in the same courtroom as the unions.  The defendants sought to

23    consolidate the U.S. case with the cases for the plaintiff foreign governments. Applying the

24    factors found in § 1407 the district court declined to do so, finding that consolidation would not

25    serve the just and efficient conduct of the litigation because:

26

27    _____

28    24. The only other sovereign who is a party to the MTBE actions and tag-along actions that the People are
aware of is the State of New Hampshire, plaintiff in *New Hampshire v. Amerada Hess Corp.*, D. N.H. Case No.
03-CV-386, D. R.I. Case No. 03-0529L, transferred pursuant to CTO-4.

1   The United States' action is based on sections of the United States
2   Code that permit only the United States to seek relief, thus
    presenting entirely different, perhaps crucial, legal issues from
3   those implicated by the foreign government actions. The Court
    therefore concludes that most of the legal questions to be decided
4   before trial are unique to the lawsuit filed by the United States,
    eliminating any increase in efficiency or justice to be gained by the
5   consolidation of the U.S. and foreign actions.

6   *Id.*, at 9.  Our case is analogous.  While the People and the other plaintiffs in this case

7   have jointly sued under a public nuisance cause of action, and both seek declaratory relief, the

8   People have brought six other causes of action in which they are the only plaintiff.  The People

9   are not aware of any other plaintiffs in any other case that have alleged the same causes of

10  action.[25]   The legal issues regarding these causes of action brought solely by a sovereign in the

11  valid exercise of its police power are therefore unique, and there is no reason to include them in

12  the raft of tort-related claims that are to be litigated in New York by private parties.  See also *In*

13  *re Harmony Loan Company, Inc., Securities Litigation*, 372 F.Supp. 1406, 1407 (JPML 1974)

14  (claim of sovereign immunity was a factor in denial of transfer).

15          **b.     Individual Rather Than Common Facts Predominate**

16          At one level - the level concerning the liability of the oil industry for the decisions it made

17  relative to the promotion, production and distribution of MTBE - there are common facts

18  between the actions the moving parties seek to have consolidated.  At another level, however, - at

19  the level concerning the damages done to individual plaintiffs as a result of the defendants'

20  collective decisions - there is little in common between the parties.  This can be a distinction of

21  import when weighing the first criterion; see, e.g., *In re Air Crash at Pago Pago, American*

22  *Samoa on January 30, 1974*, 394 F.Supp. 799, 800 (JPML 1975) (noting that in tort litigation,

23  common questions may pertain to liability, but the issue of damages will be unique). As will be

24  discussed further below, discovery for the facts common to these actions has been largely

25  completed.  What remains is discovery about the site-specific and community-specific damage -

26  discovery that will only be of interest to those parties involved in those site and

27

28
_____

25. Similar charges may have been brought by New Hampshire, but of course under New Hampshire law.

14

1   community-specific cases.  When the balance between the common facts and individual facts

2   reach a certain level, the courts have found that the benefits of transfer and consolidation are

3   outweighed by the burdens.  In *In re Gasoline Lessee Dealers Antitrust Litigation*, 479 F.Supp.

4   578, 580 (JPML 1979), for example, the Panel found that even though the actions pending before

5   it "share some questions of fact," the "individual rather than common factual questions

6   predominate," and given that "discovery and other pretrial proceedings concerning the common

7   factual questions would clearly be dwarfed by matters" of little or no interest to certain of the

8   parties, transfer was inappropriate. And in the case of *In re Sears, Roebuck & Co. Employment*

9   *Practices Litigation*, 487 F.Supp. 1362, 1364 (JPML 1980), the Panel refused to consolidate and

10  transfer after finding that "whatever common questions of fact ... may be involved in

11  determining these motions are simply insufficient, in our view, to overcome the overall

12  predominance of individual factual questions ...."[26] So, too, here.  While there are facts in

13  common, they do not outweigh those that are independent of one another.  The moving parties

14  have failed to establish that there is sufficient commonality to justify herding all of this litigation

15  into one courtroom.

16  **2.   The Moving Parties Have Failed to Establish that Transfer Would Best Serve**

17  **the Convenience of Parties and Witnesses**

18      The second criterion focuses on whether transfer and consolidation will "conserve the

19  resources of the parties, their counsel and the judiciary." *In re Mirtazapine Patent Litigation*, 199

20  F.Supp.2d at 1381.  Stated more bluntly, "[t]he basic purpose underlying the enactment of 28

21  U.S.C. § 1407 was to secure, in multi-district civil litigation as in all other civil litigation, the 'just,

22  speedy and inexpensive determination of every action.' [citation]" *In re National Student*

23  *Marketing Litigation*, 368 F.Supp. 1311, 1316 (JPML 1973).

24      The moving parties made no attempt in their Notice to establish how transfer would best

25  serve the convenience of the parties and witnesses in this case, other than to apparently assume

26  that because of the "substantially similar nature of the allegations involved" convenience would be

27

28  _____

26. See also *In re Grand Funk Railroad Trademark Litigation*, 371 F.Supp. 1084, 1085 (JPML 1974) (no benefit where "discovery will focus on localized factual issues.")

15

1  a given.  Notice at pages 2-3.  Obviously the People disagree that there is sufficient commonality

2  for the reasons stated above, but even if the moving parties had met their burden of proof on the

3  first criterion, "a mere showing that common questions of fact exist amongst the actions for which

4  Section 1407 treatment is proposed is not sufficient, in and of itself, to warrant transfer by the

5  Panel.  The other criteria of the statute must also be satisfied." *In re Truck Accident Near*

6  *Alamagordo, New Mexico, on June 18, 1969*, 387 F.Supp. 732, 733 (JPML 1975).

7      Litigating this matter in New York may well serve the convenience of the moving parties,

8  but these same moving parties elected to enter the market in California.  Transfer of this action

9  across the country is neither convenient nor agreeable to the People of the State of California, a

10  sovereign whose dignitary interests are entitled to respect.  *Puerto Rico Aqueduct and Sewer*

11  *Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed. 2d 605 (1993).

12      3.    **The Moving Parties Have Failed to Establish that Transfer Would Promote the**
          **Just and Efficient Conduct of the Action**
13

14      The third criterion is the "most important." *In re Tobacco/Governmental Health Care*

15  *Costs Litigation*, 76 F.Supp.2d at 8.  In analyzing whether transfer would promote the just and

16  efficient conduct of actions, the JPML considers primarily whether transfer and consolidation will

17  avoid duplicative discovery and prevent inconsistent pretrial rulings. See, e.g., *In re Mirtazapine*

18  *Patent Litigation*, 199 F.Supp.2d at 1381.

19      The moving parties in their Notice again made no effort to establish that this criterion has

20  been met, other than to apparently assume that because the actions share common facts transfer

21  and consolidation would of necessity serve to promote the just and efficient conduct of the action.

22  For the reasons set forth below, they are wrong.

23      a.    **The Risk of Duplicative Discovery is Minimal**

24      The moving parties have identified as the first common fact "whether defendants knew

25  about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing

26  its risks to downstream users, the federal government or the public." Notice at p. 2.  Discovery on

27  this question as to many, if not all, of the defendants in this action was largely completed in the

28  prior incarnation of MDL No. 1358, as well as in *South Tahoe Public Utility District v. Atlantic*

1  *Richfield Co.*, Cal. Super. Ct., S.F. Cty. Case No. 999128 and *Communities for a Better*

2  *Environment v. Unocal Corp.*, Cal. Super. Ct., S.F. Cty. Case No. 997013. See Declaration of

3  Victor M. Sher ("Sher Decl.") attached to Plaintiff California-American Water Company's Motion

4  to Vacate CTO-4, filed March 4, 2004, at ¶¶ 7-10, 12-13, 14-16, 19-20.[27] The same is true with

5  respect to expert discovery on the related question of whether MTBE is a defective product. *Id.*,

6  ¶¶ 10, 13, 15, 19-20. Overall, millions of pages of discovery have been produced and hundreds of

7  witnesses deposed. *Id.*, ¶¶ 8, 13, 15-16.

8        Moreover all of this discovery is, or could easily be made, readily available to all of the

9  parties. *Id.*, ¶¶ 11, 13, 17-18. For example, the document depository in the Transferee Court,

10  which still exists, was established with the specific purpose of making those documents available

11  to parties in other cases. *Id.*, ¶¶ 17-18, *In re MTBE Products Liability Litigation*, Confidentiality

12  Agreement & Order (S.D.N.Y. June 1, 2001).[28] The documents, depositions and trial testimony

13  from the *South Tahoe* and *CBE* cases can also be made available to the parties. Sher Decl., ¶¶ 11,

14  13.

15        In contrast the remaining "common fact" cited by the moving parties - "whether plaintiffs

16  sustained drinking water contamination as a result of MTBE contamination" - will revolve

17  primarily around localized and site-specific issues.  A number of examples come to mind.

18  Determining where releases of MTBE have been detected will require examination of records

19  maintained in Sacramento by the County Environmental Management Department and the

20  Regional Water Quality Control Board, among others, and the number of these sites - and their

21  corresponding files - may be in the hundreds.  Determining the damage done or threatened by

22  these releases and the potential remedies and costs of those remedies will require experts to

23  evaluate and model groundwater aquifers with their attendant flow rates and flow directions.

24  Determining the sources of the MTBE found at these sites will require document productions

25  from and depositions of station owners and operators in the county, along with the truckers and

26  terminals who supplied them, the pipeline owners and operators who supplied the terminals, and

27

28        [27]. A true and correct copy of which is attached as Exhibit 16.
      [28]. A true and correct copy of which is attached as Exhibit 17.

1    ultimately the refineries proper - in short, there will be extensive discovery regarding the gasoline

2    infrastructure in northern California generally and Sacramento in particular.  While the discovery

3    will be carried out locally, all of the litigation about the propriety and scope of that discovery will

4    - if the moving parties have their way - take place 3,000 miles away.  The People fail to see the

5    efficiency. Certainly the moving parties have not shown it. In fact, in denying class certification in

6    the original MDL No. 1358 cases, the Transferee Court itself concluded that questions regarding

7    contamination of any particular well present "a factually unique set of circumstances," because

8    there are "differences in the level of contamination ... and the nature of relief that each will

9    require." *In re MTBE Products Liability Litigation*, 209 F.R.D. 323, 337, 344 (S.D. N.Y. 2002).

10        In sum, MTBE litigation is sufficiently mature at this point that common-issue discovery

11   is largely complete and available. The discovery that remains will focus primarily on issues

12   specific to Sacramento County - issues which can be better handled in California.

13                        **b.    The Risk of Inconsistent Rulings is Minimal**

14        Another potential reason for transfer and consolidation is that it would reduce the risk of

15   inconsistent rulings.  The People submit that there is little risk of that in this case. First, it should

16   go without saying that where cases are dissimilar the rulings in one will likely be irrelevant to

17   another.  For the reasons set forth in section "B1" above, the People submit that this case is so

18   different from the others consolidated in MDL No. 1358 that the decisions made in this case will

19   have little bearing on the decisions in other cases - and vice versa.

20        In addition, just as discovery on common factual issues is already well advanced,

21   published opinions from a number of courts provide clear precedent that any district court can

22   adopt.  Indeed, the Transferee Court's prior rulings "provide a convenient expression of the

23   conclusions of the transferee judge which have been reached through [her] familiarity with the

24   litigation, and can serve as an aid in ... preventing inconsistent rulings." *In re AH Robins Co. Inc.*

25   *"Dalkon Shield" IUD Products Liability Litigation*, 505 F.Supp. 221, 223 (JPML 1981); see also

26   *In re Western Electric Co. Inc. Semiconductor Patent Litigation*, 436 F.Supp. 404, 406 (JPML

27   1977) (transfer unwarranted where transferee court's views on key legal issues were well

28   documented, and would put the other judge "closer to the shoes of the transferee judge").

1    In her ruling on defendants' motions to dismiss in the original set of cases transferred to
2    MDL No. 1358, Judge Scheindlin set forth a roadmap for handling these cases which other judges
3    can easily follow. See *In re MTBE Products Liability Litigation*, 175 F.Supp. 2d 593 (S.D. N.Y.
4    2001). First, the Court rejected the defendants' federal preemption defense, *id.*, at 611-616,[29] as
5    has the Ninth Circuit and every other published opinion addressing this question.[30] The
6    Transferee Court also rejected defendants' primary jurisdiction argument, as well as their related
7    argument that defective product claims concerning MTBE require an impermissible
8    reexamination of EPA's cost-benefit analysis regarding MTBE. *Id.*, at 616-618, 623-625. The
9    Court further upheld the sufficiency of each of the common law tort claims asserted, including
10   claims alleging refiner liability under a theory of public nuisance. *Id.*, at 627-629.

11   With this extensive guidance already in place, the risk of inconsistent pretrial rulings on
12   these common legal questions is minimal. At the same time, any pretrial legal questions raised by
13   virtue of the People's sovereign status and the exercise of our police power are not shared by the
14   vast majority of the other plaintiffs. These questions are best addressed by a court with more
15   experience and familiarity with California law. Thus, the benefits of permitting this case to
16   proceed in California outweigh the benefits (if any) of transfer. See *In re Grand Funk Railroad*
17   *Trademark Litigation*, 371 F.Supp. at 1085 ("the Panel must weigh any benefit that transfer would
18   provide in the way of eliminating the possibility of inconsistent pretrial decisions against the
19   efficient administration of the litigation as a whole"). Accordingly, CTO-5 should be vacated.

20

21

22

23   29.  Judge Scheindlin recently determined that a "colorable" claim of preemption was raised by defendants
24   in the context of a motion to remand in her court in *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability*
     *Litigation*, 2004 U.S. Dist. LEXIS 4068, *29-30 (S.D. N.Y. March 16, 2004). Given the lower burden of proof
25   involved at the remand level the People do not anticipate that this ruling will much affect her ultimate ruling on
     whether the defense is viable.
26   30.  See *Oxygenated Fuels Association v. Davis ("Davis II")*, 331 F.3d 665 (9th Cir. 2003), *affirming*
     *Oxygenated Fuels Association v. Davis ("Davis I")*, 163 F.Supp.2d 1182 (E.D. Cal. 2001), *ExxonMobil Corp. v.*
     *United States Environmental Protection Agency*, 217 F.3d 1246 (9th Cir. 2000), *Oxygenated Fuels Association v.*
27   *Pataki*, 158 F.Supp. 2d 248 (N.D. N.Y. 2001), *Oxygenated Fuels Association v. Pataki*, 293 F.Supp.3d 170 (N.D.
     N.Y. 2003), see also *Abundiz v. Explorer Pipeline Co.*, 2002 W.L. 1592604, *3-5 (N.D. Tex. 2002).
28

## III. CONCLUSION

For the reasons stated above the People of the State of California submit that this Court lacks jurisdiction to issue a Transfer Order in this case, and in consequence should vacate CTO-5 on the grounds of lack of jurisdiction. Alternatively, the People submit that the parties moving to transfer this matter to New York have failed to meet their burden pursuant to 28 U.S.C. § 1407(a), and in consequence CTO-5 should be vacated on the merits.

DATED: 3/22          , 2004

Respectfully submitted,

JAN SCULLY, DISTRICT ATTORNEY
ALBERT LOCHER,
Assistant Chief Deputy District Attorney

By: _____
RUSS DETRICK
Supervising Deputy District Attorney
Consumer & Environmental
Protection Division, Sacramento Office
of the District Attorney
906 G Street, Suite 700
Sacramento, CA 95814
Telephone: (916) 874-6174
Facsimile: (916) 874-7660
Attorney for Plaintiff
The People of the State of California

20

Exhibit H

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF MERCED, | ) | No. CV-F-05-0662 REC LJO |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR STAY PENDING |
| vs. | ) | DETERMINATION BY PANEL ON |
| | ) | MULTI-DISTRICT LITIGATION, |
| CHEVRON U.S.A., INC.; SHELL OIL | ) | DENYING DEFENDANTS' EX PARTE |
| COMPANY; EXXONMOBIL CORPORATION | ) | REQUEST, VACATING ORAL |
| EXXON CORPORATION; KINDER | ) | ARGUMENT SET FOR JULY 25, |
| MORGAN ENERGY PARTNERS L.P.; | ) | 2005, AND STAYING FURTHER |
| EQUILON ENTERPRISES LLC; SFPP, | ) | PROCEEDINGS. |
| L.P. and DOES 1-20, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Defendants move to stay the present action pending a
decision by the Judicial Panel on Multidistrict Litigation ("MDL
Panel") on whether to transfer this case to the United States
District Court for the Southern District of New York in its
capacity as the MDL NO. 1258 court.  Also pending are Plaintiff's
motion to remand and Defendants' *ex parte* application to continue
the hearing on Plaintiff's motion.  This matter is suitable for
determination without oral argument, see E.D. R. 78-230(h), and
argument previously set for Monday, July 25, 2005, at 1:30 p.m.

1

1    is hereby VACATED.

2         Prior to this action being filed, the MDL No. 1358 court

3    issued an order requesting that all proceedings in potentially

4    transferable cases be stayed pending such transfer.  Defendants

5    argue that this order suggests that this case should be stayed as

6    well and that denying the stay would waste judicial resources and

7    create a risk of conflicting pre-trial rulings in similar cases.

8    The Court is in receipt of a letter from the MDL Panel providing

9    notice of a conditional transfer order issued in this case and

10   remarking that a stay may be appropriate if a pending motion

11   raises questions likely to be common amongst cases that may be

12   consolidated.  Plaintiff argues that its case is different from

13   those consolidated into MDL No. 1358 because Plaintiff does not

14   state a cause of action for products liability.  There are,

15   however, causes of action within MDL No. 1358 that mirror those

16   in Plaintiff's complaint - failure to warn, negligence and

17   nuisance.

18        The power to stay proceedings in a case is a matter within

19   the Court's discretion.  Goode v. Prudential Ins. Co., 5 F. Supp.

20   2d 804, 806 (N.D. Cal. 1998).  Stays are frequently granted when

21   a decision is pending before the MDL Panel.  Id. at 809.  Indeed,

22   "a majority of courts have concluded that it is often appropriate

23   to stay preliminary pretrial proceedings while a motion to

24   transfer and consolidate is pending with the MDL Panel because of

25   the judicial resources that are conserved."  Rivers v. Walt

26   Disney Co., 980 F. Supp. 1360, 1362 (C.D. Cal. 1997).

2

1     Here, considerations of judicial economy and the potential

2   for conflicting decisions warrant a temporary stay of these

3   proceedings.  Defendants' motion for a temporary stay pending

4   transfer is hereby GRANTED.  Plaintiff's motion to remand is

5   deemed withdrawn without prejudice.  The stay to be imposed

6   renders Defendants' *ex parte* application moot, and therefore the

7   request is hereby DENIED.

8     **ACCORDINGLY, IT IS ORDERED** that this action shall be stayed

9   pending a determination by the MDL Panel regarding transfer and

10  consolidation.

11    **FURTHER ORDERED** that Defendants are ordered to update the

12  Court in writing regarding the status of the consolidation.  Such

13  update is due on or before September 30, 2005.

14

15  IT IS SO ORDERED.

16  **Dated:  July 11, 2005**              ___/s/ Robert E. Coyle___
    ia40ij                            UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24

25

26

3

Exhibit I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**This Document Relates To:**

CITY OF FRESNO

     Plaintiff,

     vs.

CHEVRON U.S.A. INC.; CHEVRON
ENVIRONMENTAL SERVICES COMPANY;
SHELL OIL COMPANY; EXXON CORPORATION;
TOSCO CORPORATION; UNOCAL
CORPORATION; UNION OIL COMPANY OF
CALIFORNIA; KERN OIL &  REFINING
COMPANY; VALERO REFINING COMPANY-
CALIFORNIA; VALERO MARKETING AND
SUPPLY COMPANY [DOE 1]; TESORO
PETROLEUM CORPORATION [DOE 2]; TESORO
REFINING AND MARKETING COMPANY, INC.
[DOE 3]; TEXACO REFINING AND MARKETING
INC.; ULTRAMAR, INC.; ARCO
CHEMICAL COMPANY; LYONDELL
CHEMICAL COMPANY; COASTAL CHEM, INC.;
EXXON MOBIL CORPORATION;
CONOCOPHILLIPS CORPORATION; ATLANTIC
RICHFIELD COMPANY; EQUIVA
SERVICES LLC; TEXACO, INC.; EQUILON
ENTERPRISES LLC; CHEVRONTEXACO
CORPORATION; NEW WEST PETROLEUM;
DUKE ENERGY MERCHANTS, LLC; DUKE
ENERGY TRADING AND MARKETING, LLC;
PACIFIC SOUTHWEST TRADING; NORTHRIDGE
PETROLEUM MARKETING U.S., INC.; DUKE
ENERGY MERCHANTS CALIFORNIA, INC.; NEW
WEST PETROLEUM, LLC;
WESTPORT PETROLEUM INC.; NELLA
OIL COMPANY LLC; CITGO PETROLEUM
CORPORATION [DOE 201]; AND DOES 4
THROUGH 200, 202 THROUGH 400, and
401 THROUGH 600, inclusive,

     Defendants.

Master File C.A. No. 1:00-Civ.
1898

MDL No 1358 (SAS)

Case No. 04 CV-04973 (SAS)

Transferred from:
United States District Court for
the Northern District of California
Case No. C 03-5378 JSW
(Honorable Jeffrey S. White)

Removed from:
Superior Court of California,
County of San Francisco,
Case No. CGC-03-425649

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff City of Fresno hereby alleges as follows:

## I. SUMMARY OF THE CASE

1. The City of Fresno is responsible for purveying clean, safe drinking water to approximately 450,000 people in the County of Fresno, California. Expanding plumes of methyl tertiary butyl ether ("MTBE") and tertiary butyl alcohol ("TBA") contaminate and threaten the water system and drinking water on which Fresno's schools, hospitals, businesses, residents and visitors depend.

2. The defendants in this action are the refiners who manufacture gasoline containing MTBE and TBA, manufacturers of MTBE, and the designers, promoters, marketers, formulators, distributors, suppliers, and retailers of gasoline containing MTBE and TBA, which contaminate and threaten Fresno's water system and public water supply. Among other things, the defendants knowingly and willfully promoted and marketed MTBE and TBA and/or gasoline containing MTBE and/or TBA, when they knew or reasonably should have known that these compounds would reach groundwater, pollute public water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare, as they have in Fresno.

3. Fresno filed this lawsuit to recover compensatory and all other damages, including all necessary funds to remove MTBE and TBA pollution from public drinking water supplies, to restore the reliability of Fresno's water system and drinking water supply, to abate MTBE and TBA plumes, and to assure that the responsible parties -- and not the City of Fresno nor the public -- bear the expense.

## II. PLAINTIFF

4. Plaintiff City of Fresno ("Fresno") provides water to the residents of Fresno. The City of Fresno bears the responsibility of owning and operating a water system which serves the public, including drinking water wells with related and ancillary equipment, pumps, pipes, water treatment equipment, delivery systems and infrastructure which will be referred to collectively in this complaint as the "water system." The drinking water sources for the Fresno water system include more than two hundred and fifty (250) wells owned and operated by Fresno within or near city limits. Among other things, the water system includes Fresno's right to appropriate and use groundwater for water supplies.

## III. **DEFENDANTS**

5. Most of the defendants in this action are corporate members of the gasoline industry. As described below, the defendants include manufacturers and promoters of gasoline containing MTBE and/or TBA, distributors of gasoline containing MTBE and/or TBA, manufacturers and promoters of MTBE and/or TBA, and owners and operators of facilities that released MTBE and/or TBA and/or gasoline containing MTBE and/or TBA into the environment. MTBE, TBA, and gasoline containing MTBE and/or TBA have contaminated, polluted and threatened, and continue to contaminate, pollute and threaten, Fresno's water system.

6. When this complaint refers to any act or omission of the defendants, such reference shall be deemed to mean that the officers, directors, agents, employees, or representatives of the defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of defendants, and did so while acting within the scope of their employment or agency.

### A. Refiner Defendants

7. These defendants owned and operated refineries in California and/or designed, formulated, refined, manufactured, promoted, marketed, supplied and provided gasoline containing MTBE and/or TBA which, at all times relevant to this complaint, was distributed and sold in areas affecting Fresno's water system:

8. Defendant Chevron U.S.A. Inc. ("Chevron USA") is a Pennsylvania corporation with its principal place of business in San Ramon, California.

9. Defendant Shell Oil Company, individually and doing business as Shell Oil Products US ("Shell") is a Delaware corporation doing business in California.

10. Defendant Exxon Corporation ("Exxon") is a New Jersey corporation with its principal place of business located in Texas.

11. Defendant Tosco Corporation ("Tosco") is a Nevada corporation with its principal place of business in Stamford, Connecticut.

12. Defendant Unocal Corporation ("Unocal") is a Delaware corporation doing business in California.

3

13. Defendant Union Oil Company of California ("Union Oil") is a California corporation with its principle place of business in El Segundo, California.

14. Defendant Kern Oil & Refining Company ("Kern Oil") is a California corporation with its principal place of business located in Long Beach, California.

15. Defendant Valero Refining Company-California ("Valero Refining") is a Delaware corporation with its principle place of business in San Antonio, Texas, and doing business in California.

16. Defendant Valero Marketing and Supply Company ("Valero Marketing") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Valero Marketing and Supply Company is named in place of DOE 1.

17. Defendant Tesoro Petroleum Corporation ("Tesoro") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Tesoro is named in place of DOE 2.

18. Defendant Tesoro Refining and Marketing Company, Inc. ("Tesoro Refining"), a wholly owned subsidiary of Tesoro, is a Delaware corporation with its principal place of business in San Antonio, Texas, doing business in California. Tesoro Refining is named in place of DOE 3.

19. Defendant Texaco Refining and Marketing Inc. ("TRMI") is a Delaware corporation with its principal place of business in New York.

20. Defendant Ultramar, Inc. ("Ultramar") is a Nevada corporation with its principal place of business in San Antonio, Texas.

21. Defendant Exxon Mobil Corporation ("ExxonMobil") is a New Jersey corporation with its principal place of business located in Texas. Plaintiff is informed that Exxon Mobil was formed on or about November 30, 1999 as a result of a merger of Mobil Corporation and Exxon Corporation and is a successor in interest to Exxon Corporation and Mobil Corporation.

22. Defendant ConocoPhillips Corporation ("Conoco") is a Delaware Corporation doing business in California and is a successor in interest to Tosco Corporation.

23. Defendant ChevronTexaco Corporation ("ChevronTexaco") is a Delaware corporation with its headquarters in San Ramon California. Plaintiff is informed and believes that

4

ChevronTexaco Corporation is a successor in interest to certain Chevron-related and Texaco-related entities.

24. Defendant Equilon Enterprises LLC ("Equilon") is a Delaware Limited Liability Company.  Plaintiff is informed and believes that Equilon Enterprises LLC is a successor in interest to certain Shell-related and Texaco-related entities.

25. Defendants Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero Refining, Valero Marketing, Tesoro, Tesoro Refining, TRMI, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 4 through 100, will be collectively referred to hereafter as the "Refiner Defendants." The Refiner Defendants, and each of them, owned and/or operated gasoline refineries that manufactured and supplied gasoline containing MTBE and/or TBA to locations in the vicinity of Fresno's water system, such that releases of such products to the subsurface contaminated and polluted the water system. Among other things, these defendants (1) designed, formulated, refined, manufactured, promoted, marketed, distributed, transported, packaged, exchanged and/or sold gasoline containing MTBE and/or TBA, which is contaminating, polluting and threatening Fresno's public water supplies; (2) owned, operated, and/or controlled gasoline delivery systems including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems (collectively herein "gasoline delivery systems") in areas affecting Fresno's water system; (3) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA;  (5) negligently designed, constructed, installed, fabricated, owned, operated, controlled, inspected and/or repaired gasoline delivery systems from which MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6) negligently and/or intentionally failed and refused to take appropriate remediation action to abate MTBE and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems; and (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

5

26. Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein under the fictitious names DOES 4 through 100, inclusive.

**B. MTBE/TBA Manufacturer/Supplier Defendants**

27. These defendants manufactured, promoted, marketed, sold, supplied and provided MTBE and/or TBA which, at all times relevant to this complaint, was added to gasoline which was distributed and sold in areas affecting Fresno's water system:

28. Defendant ARCO Chemical Company ("ARCO Chemical") is a corporation with its principal place of business in Los Angeles, California.

29. Defendant Lyondell Chemical Company ("Lyondell"), as successor-in-interest to ARCO Chemical Company, is a corporation with its headquarters in Houston, Texas, and doing business in California.

30. Defendant Coastal Chem, Inc. ("Coastal") is a Delaware corporation.

31. Defendant Chevron Environmental Services Company is a Delaware corporation with its principal place of business in San Francisco, California.

32. Defendants ARCO Chemical, Lyondell, Coastal, Chevron Environmental Services Company, and also defendants Chevron USA, Shell, Exxon, Tosco, Valero Refining, Valero Marketing, Tesoro, Tesoro Refining, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 101 through 200, will be collectively referred to hereafter as the "MTBE/TBA Manufacturer/Supplier Defendants." The MTBE/TBA Manufacturer/Supplier Defendants, and each of them, manufactured and/or supplied MTBE and/or TBA for use in gasoline which was distributed to and sold in locations in the vicinity of Fresno's water system, such that releases of that gasoline to the subsurface contaminated, polluted, and threaten the water system. Among other things, these defendants (1) negligently designed, manufactured, formulated, refined, promoted, marketed, distributed, failed to adequately warn about, transported, packaged, exchanged and/or sold MTBE and/or TBA, which is contaminating, polluting, and threatening Fresno's public water supplies; (2) owned, operated, and controlled gasoline delivery systems in areas affecting Fresno's water system; (3) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA;

6

(5) negligently operated , designed, constructed, owned, repaired, controlled, installed, inspected, and/or fabricated gasoline delivery systems from which MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6) negligently and/or intentionally failed and refused to take appropriate remediation action to abate MTBE and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems; and (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

## C. Distributor Defendants

33.  These defendants have supplied and continue to supply gasoline containing MTBE and/or TBA for resale in areas that affect Fresno's water system:

34. Defendant Atlantic Richfield Company ("ARCO"), is a Delaware corporation doing business in California.

35. Defendant Equiva Services LLC ("Equiva") is a Delaware Limited Liability Company doing business in California.

36. Defendant New West Petroleum ("New West") is a California corporation with its principle place of business in Sacramento, California.

37. Defendant Duke Energy Merchants, LLC ("Duke Energy") is a limited liability company, incorporated in Delaware and doing business in California.

38. Defendant Duke Energy Trading and Marketing, LLC ("Duke Marketing") is a limited liability company, incorporated in Delaware and doing business in California.

39. Defendant Pacific Southwest Trading, also known as PS Trading, Inc., ("PS Trading") is a California corporation.

40. Defendant New West Petroleum LLC ("New West LLC") is a California limited liability company with its principal place of business in Sacramento, California.

41. Defendant Northridge Petroleum Marketing U.S., Inc., ("Northridge") is a Colorado corporation doing business in California.

42. Defendant Duke Energy Merchants California, Inc., ("Duke Energy California") formerly known as Northridge Petroleum Marketing U.S., Inc., is a Colorado corporation doing business in California.

43. Defendant Westport Petroleum Inc. ("Westport") is a California corporation with its principal place of business in Pasadena, California.

44. Defendant Nella Oil Company LLC ("Nella") is a California limited liability company with its principle place of business in Auburn, California.

45. Defendant Citgo Petroleum Corporation ("Citgo") is a Delaware corporation with its principal place of business in Tulsa, Oklahoma, and doing business in California. Citgo is named in place of DOE 201.

46. Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein under the fictitious names DOES 202 through 400, inclusive.

47. Defendants Arco, Equiva, New West, Duke Energy, Duke Marketing, PS Trading, New West LLC, Northridge, Duke Energy California, Westport, Nella and also defendants Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero Refining, Valero Marketing, TRMI, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 202 through 400, will be collectively referred to herein as the "Distributor Defendants." The Distributor Defendants, and each of them: (1) designed, manufactured, formulated, promoted, marketed, distributed, transported, packaged, and sold gasoline containing MTBE and/or TBA which is contaminating and threatening Fresno's public water supplies; (2) were legally responsible for and committed each of the tortious and wrongful acts alleged in this complaint; (3) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; and (4) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

### D. Owner/Operator Defendants

48. These defendants own and/or operate gasoline delivery facilities, including, but not

limited to, pipelines, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems (collectively herein "gasoline delivery systems") in areas affecting Fresno's water system:

49.  Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein under the fictitious names DOES 401 through 600, inclusive.

50.  DOES 401 through 600, shall be referred to collectively herein as the "Owner/Operator Defendants."   The Owner/Operator Defendants, and each of them: (1) designed, constructed, installed, fabricated, owned, operated, controlled, inspected and/or repaired gasoline delivery systems from which gasoline containing MTBE and/or TBA is contaminating, polluting, and threatening Fresno's water system;  (2) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint; (3) participated in one or more enterprise(s) to promote, market, distribute, and sell gasoline containing MTBE and/or TBA;  and (4) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

## IV.  ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

### A. The Contaminants:  MTBE and TBA

51.  MTBE is an additive to gasoline.  Wherever referred to in this complaint, MTBE means not only methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE, as well as other oxygenates and ethers, including, but not limited to, TAME, DIPE, and ETBE.

52.  TBA is present in some gasoline.  TBA is variously a gasoline constituent, an impurity in commercial grade MTBE, and a degradation or breakdown product of MTBE.

53.  MTBE and TBA contaminate the environment through leaks and spills from gasoline delivery systems.  Once released to the environment from gasoline delivery systems, MTBE and TBA each have unique characteristics that cause extensive environmental contamination and a corresponding threat to the public health and welfare.  In particular, the fate and transport of

MTBE and TBA in the subsurface differs significantly from that of gasoline constituents that have historically been of environmental and/or toxicological concern, specifically the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

54. Once released into the subsurface, MTBE and TBA separate from other gasoline constituents in the presence of moisture. In contrast to the BTEX compounds, MTBE and TBA have a strong affinity for water. If MTBE and/or TBA are released into the environment in sufficient quantities, MTBE and/or TBA have the capacity to migrate through the soil, the groundwater, penetrate deeper within the aquifer, and cause persistent contamination that can threaten the potability of drinking water wells. There is a potentially lengthy delay, based on site specific factors, between the time MTBE and/or TBA are released and the time they accumulate in potentially usable ground water in sufficient quantities to contaminate public drinking water resources.

55. MTBE and TBA spread farther and faster than other components of gasoline, resist biodegradation, and are difficult and costly to remove from groundwater and drinking water supplies.

### B. Regulatory Standards Applicable to MTBE and TBA

56. No federal or state agency has approved either MTBE or TBA as an additive to drinking water. No federal or state agency has approved releasing MTBE or TBA into groundwater. No federal or state agency has ever required that gasoline contain MTBE and/or TBA.

57. Along with its other properties, MTBE can render water supplies undrinkable by changing the taste and odor of water into a foul smelling liquid with a turpentine odor and chemical taste unfit for human consumption. The State of California established a Secondary Maximum Contaminant Level ("MCL") for MTBE of 5 parts per billion ("ppb"). This means that the law prohibits using water containing MTBE at or above this level in public drinking water because of MTBE's aesthetic properties. Individuals, however, can smell and taste MTBE in water at even lower levels.

58. MTBE also presents a significant public health threat. Because of MTBE's potential for causing cancer, the State of California has established a Primary (health) MCL for MTBE of

13 ppb. This means that the law prohibits using water containing MTBE at or above this level in public drinking water because of MTBE's threat to public health.

59. TBA also presents a significant threat to public health. The State of California has set an Action Level for TBA of 12 parts per billion in water, based on an interim assessment performed by the California Office of Environmental Health Hazard Assessment. The interim assessment concluded that exposure to TBA at levels above 12 ppb in water creates an unacceptable public health risk of cancer.

60. California Governor Gray Davis ordered state agencies to phase out MTBE use in motor fuel in California, to achieve 100% removal no later than December 31, 2003. Because of MTBE's threat to drinking water, the federal government has also announced its intent to "significantly reduce or eliminate" MTBE from gasoline in an Advance Notice of Proposed Rulemaking published in the Federal Register. Eighteen states, including California, have either banned or are phasing out the use of MTBE in gasoline.

### C. Defendants' Promotion of MTBE and TBA

61. The Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants, all of whom have promoted the use of MTBE and/or TBA, and/or gasoline containing MTBE and/or TBA, for its purported environmental benefits, knew or should have known of the grave harm and threat to the public health and welfare represented by the proliferating use of these compounds, including (among other things): widespread pollution of groundwater with MTBE and TBA, contamination of public drinking water by these compounds, drinking water supplies rendered unfit and unusable for consumption, public health threatened, and increased costs to public water suppliers and their ratepayers. Plaintiff is informed and believes, however, and based thereon alleges, that defendants Tosco and Ultramar did not gain this knowledge until 1996, due to concealment of information by another defendant or defendants, including but not limited to ARCO Chemical.

62. Despite knowing that MTBE and TBA pollution was inevitable, and despite the availability of reasonable alternatives, (including, but not limited to, adequate warnings), defendants chose not to warn customers, retailers, regulators or public officials, including the City of Fresno. As production and sales of these compounds and gasoline containing them

11

increased, defendants failed to take any reasonable, appropriate and special precautions to store gasoline containing MTBE and/or TBA safely, or to prevent, detect, and clean up spills and leaks of gasoline containing these products. Despite knowing the risk of harm posed by these compounds, defendants also failed to warn purchasers, the public, the City of Fresno, and/or regulators, that without such precautions more and more MTBE and/or TBA would be released into the environment and cause, among other significant adverse effects, long term groundwater contamination, pollution of public drinking water supplies, and threats to public health and safety.

63. The Refiner and Distributor Defendants further exacerbated the situation by continuing unreasonable intentional and/or negligent acts, including providing gasoline containing MTBE and/or TBA to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent releases of MTBE and/or TBA to the subsurface, knowing that release to the environment of these compounds would be inevitable because a substantial percentage of those gasoline stations would store such gasoline without taking reasonable, appropriate or special precautions, such as by placing the gasoline in inadequate and leaking gasoline delivery systems, and without taking reasonable, appropriate or special measures to monitor, detect, and respond to releases of MTBE and/or TBA to soil and/or groundwater, and without taking reasonable, appropriate or special precautions to investigate, contain, and clean up releases of these compounds.

64. At all times, the Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants and Distributor Defendants have represented to purchasers of MTBE, TBA, and/or gasoline containing MTBE and/or TBA, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use. Indeed, defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface.

65. The Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants and Distributor Defendants had a duty (which they breached) to test MTBE and TBA thoroughly to determine their environmental fate and transport characteristics, and potential human health

impacts, before they sold these compounds and/or gasoline containing them, and had a further duty (which they breached) to take precautions necessary to assure that gasoline containing MTBE and/or TBA was properly stored and to institute all necessary measures to contain and promptly abate the inevitable spills and leaks. Nonetheless, the defendants, and each of them, failed to adequately test, store, warn, or control gasoline containing MTBE and/or TBA, and, among other things, failed to abate groundwater contamination caused by MTBE and/or TBA, including contamination in and threats to Fresno's water system.

66. The widespread problems of leaking gasoline delivery systems were well known to the defendants prior to the introduction of MTBE and TBA. At least as early as the mid-1960's these defendants knew, or reasonably should have known, that gasoline delivery systems suffer significant and widespread leaks and failures, and release gasoline products into the environment, including into groundwater.

67. Before introducing MTBE and/or TBA into gasoline delivery systems, the Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants and Distributor Defendants knew, or reasonably should have known, among other things, that MTBE and/or TBA released into the environment would mix easily with groundwater, move great distances, resist biodegradation or bioremediation, render drinking water unsafe and/or non-potable, cause significant expenses to remediate and to remove from public drinking water supplies, and otherwise threaten the public health and welfare. The defendants knew, or they reasonably should have known, that the gasoline distribution and retail system statewide – and in the vicinity of Fresno's water system – contained leaking gasoline delivery systems. They knew, or they reasonably should have known, that gasoline facilities, including those in the vicinity of Fresno's water system, commonly lacked adequate storage facilities for gasoline containing MTBE and/or TBA and that the operators of these facilities were unaware of either the special hazards of MTBE and/or TBA or the steps necessary to eliminate or mitigate those hazards.

68. At all times relevant to this action:

(a)   the MTBE/TBA Manufacturer/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided MTBE and/or TBA to the Refiner Defendants, and the Refiner Defendants and

Distributor Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided gasoline containing MTBE and/or TBA to retail gasoline stations and/or other gasoline delivery systems within or near the District's boundaries.  Such sales, exchanges, supplies, distributions, deliveries and/or other provisions of gasoline containing MTBE and/or TBA to such facilities occurred over time through the end of 2002 and, for at least certain defendants, beyond;

(b)     gasoline containing MTBE and/or TBA was released to the subsurface from retail gasoline facilities owned and/or operated by the Owner/Operator Defendants, and each of them, and from other facilities at dispersed locations within or near Fresno's water system.  Such releases of gasoline containing MTBE and/or TBA have occurred over time and are still occurring, all in varying amounts at different locations; and

(c)     MTBE and TBA take time to migrate from release points to locations within the subsurface at which they have an appreciable impact on groundwater resources. Because of the distance from release points to groundwater, relatively low precipitation rates, and potential presence of intermittent clay layers which retard downward movement, there may be significant delay between the release of gasoline and its occurrance in groundwater.  MTBE and TBA have over time migrated in the subsurface from dispersed release points at or near the surface at retail gasoline facilities within or near Fresno's water system, causing pollution, contamination, and substantial damage to the groundwater resources of Fresno, causing appreciable injury to Fresno within the past three years, currently and continuously damaging Fresno at such times and in amounts to be proved at trial.

69.  The City of Fresno seeks compensatory damages needed to investigate, remediate, and remove MTBE and/or TBA from drinking water supplies, to secure alternative water supplies on an interim basis, to make associated changes to its operating systems and practices, and for past, present, and future damage to Fresno's water system and water rights.  In addition,

Fresno seeks punitive damages to punish certain defendants and deter future wrongful and harmful conduct, and other relief as described in the Prayer below.

## FIRST CAUSE OF ACTION

### (Strict Liability Against All Defendants)

70. Fresno refers to paragraphs 1 through 69 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

71. The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants, and each of them, designed, formulated, compounded, refined, manufactured, packaged, distributed, recommended, merchandised, advertised, promoted, and/or sold gasoline containing MTBE and/or TBA.

72. The MTBE/TBA Manufacturer/Supplier Defendants, and each of them, designed, formulated, compounded, manufactured, packaged, distributed, supplied, recommended, merchandised, advertised, promoted, and/or sold MTBE and/or TBA and their constituents, which were intended by defendants, and each of them, to be used as gasoline additive(s).

73. Defendants' design and manufacture of these products was defective, and defendants failed to adequately warn against the dangers of these products.

74. Defendants, and each of them, falsely represented, asserted, claimed and warranted that gasoline containing MTBE and/or TBA could be used in the same manner as gasoline not containing these compounds, and did not require any different or special handling or precautions.

75. Defendants, and each of them, knew that said product(s) were to be purchased and used without inspection for defects.

76. Gasoline containing MTBE and/or TBA, and MTBE and TBA themselves, are defective products because, among other things:

      (a)    The benefits of using MTBE and/or TBA in gasoline, if any, are greatly outweighed by the associated costs and negative impacts imposed on society, consumers, and the environment, and on the City of Fresno's water system, and those who rely on it;

      (b)    MTBE and TBA cause extensive groundwater contamination, even when used in their foreseeable and intended manner;

(c)     Even at extremely low levels, MTBE renders drinking water putrid, foul, and unfit for purveying to consumers, and TBA also renders drinking water unfit for purveying as drinking water to the pubic;

(d)     MTBE and TBA and gasoline containing MTBE and/or TBA pose significant threats to public health;

(e)     Defendants failed to provide adequate warnings of the known and foreseeable risks of MTBE and TBA and gasoline containing MTBE and/or TBA, including but not limited to groundwater contamination with both MTBE and TBA;

(e)     Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of MTBE and/or TBA and gasoline containing MTBE and/or TBA; and

(f)     Commercial grade MTBE is defectively designed and manufactured when it contains unnecessary but environmentally harmful impurities such as TBA.

77.  MTBE, and/or TBA, and/or gasoline containing MTBE and/or TBA, were used in a manner in which they were forseeably intended to be used, and as a proximate result of the defects previously described, MTBE and/or TBA and gasoline containing MTBE and/or TBA proximately caused the City of Fresno to sustain the injuries and damages set forth in this complaint.

78.  As a direct and proximate result of the acts and omissions of the defendants alleged herein, the City of Fresno must assess, evaluate, investigate, monitor, abate, clean-up, correct, contain, and remove MTBE and/or TBA from Fresno's water system, and secure alternative water supplies (with related operational impacts), all at significant expense, loss, and damage.

79.  As a further direct and proximate result of the acts and omissions of the defendants alleged herein, Fresno will sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Fresno's damage in an amount within the

jurisdiction of this court. Fresno is also entitled to recover costs incurred in prosecuting this action and prejudgment interest to the full extent permitted by law.

80. Defendants ARCO, Chevron USA, Chevron Environmental Services Company, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200 knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage. These defendants committed each of the above described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice and with conscious disregard of the health and safety of others, and of plaintiff's water rights.

81. This conduct is reprehensible, despicable, and was performed to promote sales of MTBE and/or TBA and/or gasoline containing MTBE and/or TBA in conscious disregard of the known risks of injury to health and property. These defendants acted with willful and conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Fresno. Therefore, Fresno requests an award of exemplary damages in an amount sufficient to punish ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200. After the completion of additional investigation and discovery, Fresno may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

## SECOND CAUSE OF ACTION

### (Negligence Against All Defendants)

82. Fresno refers to paragraphs 1 through 81 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

83. Defendants had a duty to use due care in the design, manufacture, formulation, handling, control, disposal, sale, testing, labeling, warnings, use, and instructions for use of MTBE and TBA, and gasoline containing MTBE and/or TBA, and gasoline delivery systems.

84. Defendants so negligently, carelessly, and/or recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or the lack thereof), tested (or the lack

thereof), released, spilled, failed to warn, and/or sold MTBE and/or TBA, and/or so negligently, carelessly and recklessly designed, manufactured, formulated, handled, labeled, instructed, entrusted, controlled (or the lack thereof), tested (or the lack thereof), released, spilled, failed to warn, dispensed and/or sold gasoline containing MTBE and/or TBA, and/or so negligently, carelessly, and recklessly dispensed MTBE and/or TBA and/or gasoline containing MTBE and/or TBA into gasoline delivery systems, and/or so negligently, carelessly and/or recklessly designed, installed, failed to warn, operated and/or maintained gasoline delivery systems for use with gasoline containing MTBE and/or TBA, that they breached their duties to plaintiff and directly and proximately caused MTBE and/or TBA to contaminate, pollute and threaten Fresno's water system, resulting in the harm which warrants the award of compensatory and punitive damages as prayed for in this complaint.

85.   Defendants, and each of them, among other things, negligently, carelessly, and/or recklessly failed to: (1) use appropriate technology to prevent leaks of gasoline containing MTBE and/or TBA;  (2) install and maintain gasoline delivery systems that prevented leaks and facilitated prompt detection and containment of any leaks;  (3) monitor and discover leaks as soon as possible;  (4) warn those who may be injured as a result of the leaks; (5) warn those who handled MTBE of its properties; and (6) clean up and abate spills of gasoline containing MTBE and/or TBA as thoroughly and as soon as reasonably possible and in a manner necessary to prevent harm and injury.

86.   The Refiner Defendants and Distributor Defendants had actual control over the Owner/Operator Defendants through a variety of means, including but not limited to written agreements, inspection rights, prescribing certain procedures and operating practices, training, sale of branded goods, and agreements obligating the respective Owner/Operator Defendants to acquire, store and sell gasoline containing MTBE and/or TBA.  Therefore, the Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the Owner/Operator Defendants.

87.   The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants also undertook tank system testing, tank integrity testing, inventory reconciliation and testing,

thereby affirmatively undertaking the duty to prevent releases of gasoline containing MTBE and/or TBA from gasoline delivery systems, but they negligently failed to properly discharge these duties.

88. The Refiner Defendants, Distributor Defendants, and Owner/Operator Defendants further undertook to retain consultants to conduct environmental investigations and cleanups, thereby affirmatively undertaking the duty to detect and remediate releases of gasoline containing MTBE and/or TBA from gasoline delivery systems, but they negligently failed to properly discharge these duties.

89. The Refiner Defendants and Distributor Defendants knew, or should have known, that certain of the Owner/Operator Defendants had leaking gasoline delivery systems, but nonetheless negligently supplied, sold, and/or entrusted gasoline containing MTBE and/or TBA to these Owner/Operator Defendants knowing that MTBE and/or TBA would leak into the soil and contaminate groundwater.

90. By their conduct defendants, and each of them, among other things, are:

(a)    Committing, authorizing, aiding and/or abetting the tampering with property owned and/or used by Fresno as a public agency to provide water to its water customers within the meaning of Civil Code section 1882 et seq.;

(b)    Causing and/or permitting the discharge of wastes into Fresno's public drinking water supplies, creating conditions of pollution and/or nuisance within the meaning of California Water Code section 13050;

(c)    Using Fresno's public water supply for waste disposal, an unreasonable and non-beneficial use, in violation of California Constitution Article 10, Section 2;

(d)    Interfering with Fresno's vested water rights;

(e)    Impairing Fresno's right to appropriate water whose quality is not impaired.

91. As a direct and proximate result of defendants' acts and omissions as alleged herein, Fresno has incurred, is incurring, and will continue to incur MTBE and/or TBA investigation, remediation and treatment costs and expenses required to restore its water system and to obtain alternative water supplies, and other damages, in an amount to be proved at trial.

92.  Defendants ARCO, Chevron USA, Chevron Environmental Services Company, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200 knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.  These Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants committed each of the above-described acts and omissions with reckless disregard of the health and safety of others, and of plaintiff's water rights.

93.  This conduct is reprehensible, despicable, and was performed to promote sales of MTBE and/or TBA and/or gasoline containing MTBE and/or TBA in reckless disregard of the known risks of injury to health and property.  These Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants acted with reckless disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the City of Fresno.  Therefore, the City requests an award of exemplary damages in an amount sufficient to punish Defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200.  After the completion of additional investigation and discovery, Fresno may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

### THIRD CAUSE OF ACTION

**(Trespass Against All Defendants)**

94. Fresno refers to paragraphs 1 through 93 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

95. Fresno is the owner and/or actual possessor of property rights and interests, easements, wells, the right to appropriate and use groundwater, and water rights.  Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE and TBA and gasoline containing MTBE and/or TBA are extremely hazardous to groundwater and to public water systems, including the property and other rights of the City of Fresno.

96. The defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE and/or TBA, and/or failed to clean up spills and leaks of gasoline containing MTBE and/or TBA, that they directly and proximately caused MTBE and/or TBA to contaminate Fresno's water system as follows:

(a)  The defendants participated in the use, storage, and release of gasoline containing MTBE and/or TBA by owning, controlling, regulating, designing, installing, operating, monitoring, inspecting and testing, or by failing to do so, the gasoline delivery systems and thereby proximately caused gasoline containing MTBE and/or TBA to be released into groundwater;

(b)  The Refiner Defendants and MTBE/TBA Manufacturer/Supplier Defendants negligently provided instructions and/or warnings to the Distributor Defendants and Owner/Operator Defendants concerning MTBE and/or TBA, knowing that there was a substantial danger that if their instructions and/or warnings were followed that gasoline containing MTBE and/or TBA dispensed into gasoline delivery systems would escape into the environment and contaminate groundwater;

(c)  The Refiner Defendants and Distributor Defendants negligently delivered (directly or indirectly) gasoline containing MTBE and/or TBA into gasoline delivery systems which they knew, or should have known, were inadequate, old, leaking, and/or defective, and thereby created a substantial known danger that MTBE and TBA would be released into the environment and contaminate groundwater; and negligently provided instructions and/or warnings to the Owner/Operator Defendants concerning MTBE and TBA, knowing that there was a substantial danger that if their instructions and/or warnings were followed that gasoline containing MTBE and/or TBA dispensed into gasoline delivery systems would escape into the environment and contaminate groundwater;

(d)  Defendants retained consultants and negligently controlled and/or directed their cleanup and remediation activities (or the lack thereof) at gasoline station sites,

21

thereby causing and permitting MTBE and/or TBA to contaminate and threaten Fresno's water system, and defendants failed to warn the appropriate entities and individuals, including Fresno, of known risks, spills, releases and/or leaks, and/or failed to undertake reasonable, appropriate, or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

(e)     Defendants negligently overfilled gasoline delivery systems with gasoline containing MTBE and/or TBA, and/or spilled or released it at gasoline facilities near Fresno's water system.

(f)     When defendants learned, or reasonably should have learned, that MTBE and/or TBA were persistent, significant and/or widespread sources of groundwater contamination, or threatened to be so, defendants failed to warn the appropriate entities and individuals, including Fresno, of known risks, spills, releases and/or leaks, and/or failed to undertake reasonable, appropriate or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

97.  The Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants through a variety of means, including but not limited to written agreements, inspection rights, prescribing certain procedures and operating practices, sale of branded goods, agreements obligating the respective Owner/Operator Defendants to acquire, store and sell gasoline containing MTBE and/or TBA, and training. Therefore, the Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the Owner/Operator Defendants.

98.  The MTBE and TBA contamination of Fresno's water system has varied and will vary over time and requires investigation, remediation, abatement, and/or treatment. The City of Fresno has engaged, or will engage, in remediation, abatement, investigation, and/or treatment programs and in securing replacement water supplies, and thereby has sustained, is sustaining, and will sustain, the damages alleged herein.

99.  The defendants, and each of them, caused, created, and/or assisted in the creation of the trespass alleged herein.

100.  For the reasons alleged herein, Fresno is entitled to an award of exemplary damages against defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100 through 200.  After the completion of additional investigation and discovery, Fresno may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

## FOURTH CAUSE OF ACTION

### (Nuisance Against All Defendants)

101. Fresno refers to paragraphs 1 through 100 above, and by this reference incorporates them into this cause of action as though fully set forth herein.

102. The negligent, reckless, intentional and ultrahazardous activity of the defendants and each of them, as alleged herein, has resulted in the contamination and pollution of and threats to Fresno's water system and thereby constitutes a nuisance.  The contamination, pollution, and threats to Fresno's water system with MTBE and/or TBA and gasoline containing MTBE and/or TBA is a public nuisance as defined in Civil Code section 3479, Civil Code section 3480, Health and Safety Code section 5410, and Water Code section 13050, as it is injurious to health, indecent and offensive to the senses, obstructs the free use of property, interferes with the comfortable enjoyment of life or property, and is reasonably abatable.  The defendants, and each of them, caused, created, and/or assisted in the creation of the nuisance alleged herein.

103.  The Refiner, Manufacturer and Distributor Defendants, their agents and employees, marketed, distributed, promoted, and/or sold their products with reckless disregard for human health and the environment.

104. Fresno's water system is adversely affected by the nuisance.

105. The nuisance caused by defendants, and each of them, has substantially interfered with and obstructed Fresno's ability to provide a water supply free from unacceptable health risk, taste, odor, color, pollution and contamination, and to protect its water system and groundwater supplies from such harm.

106. Fresno owns and holds property rights and interests damaged by the nuisance. Fresno's injury is separate and distinct from that of the public.

107.  Fresno has not consented to and does not consent to this nuisance.  Defendants, and each of them, knew or should have known, that Fresno would not consent to this nuisance.

108.  The Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants through a variety of means, including but not limited to written agreements, inspection rights, prescribing certain procedures and operating practices, sale of branded goods, agreements obligating the respective Owner/Operator Defendants to acquire, store and sell gasoline containing MTBE and/or TBA, and training.  Therefore, the Refiner and Distributor Defendants had actual control over the Owner/Operator Defendants with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the Owner/Operator Defendants.

109.  As a direct and proximate result of the nuisance, Fresno has been damaged and is entitled to the compensatory and exemplary damages alleged herein, or to such other appropriate relief as Fresno may elect at trial, including, but not limited to equitable relief in the form of an order requiring the defendants to abate the nuisance properly as to Fresno.

110.  For the reasons alleged herein, Fresno is entitled to an award of exemplary damages against Defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200.  After the completion of additional investigation and discovery, Fresno may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

### PRAYER

WHEREFORE, the City of Fresno requests judgment against defendants, and each of them, for:

1. Compensatory damages according to proof;

2. Exemplary damages in an amount sufficient to punish defendants ARCO, Chevron USA, Shell, Exxon, Tosco (after 1996), Unocal, Union Oil, Kern Oil, TRMI, Ultramar (after 1996), Conoco, Equilon, ARCO Chemical, Lyondell, Valero Refining, Valero Marketing, and DOES 100-200 and to deter those defendants from ever committing the same or similar acts;

3. An Order declaring that the defendants' gasoline delivery systems constitute a nuisance in the manner they are maintained and operated, and compelling defendants to abate that nuisance;

4. Pursuant to Civil Code section 1882.2, three times the amount of actual damages, plus the cost of the suit and reasonable attorneys' fees;

5. Reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5 or otherwise, and costs incurred in prosecuting this action, and prejudgment interest to the full extent permitted by law; and

6. Such and other further relief as the court may deem just and proper.

Dated: October 28, 2004

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By: _____
     DANIEL BOONE
     Attorneys for Plaintiff

Exhibit J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

4-0%-04

-------------------------------------------------------X
             :
In re: Methyl Tertiary Butyl Ether   :
("MTBE") Products Liability Litigation  :
             :         **ORDER**
             :
This Document Relates To:   All Cases  :    **MDL No. 1358 (SAS)**
             :
             :
-------------------------------------------------------X

## CASE MANAGEMENT ORDER

**I.**    **Prior Orders; Filing; Service**

        Except as otherwise noted below, this Order supersedes prior Case

Management Orders in MDL No. 1358.  Attached hereto as Appendix A is a list of

the cases that are currently consolidated in this multidistrict litigation, designated

MDL 1358, which have either been filed in this Court or transferred to this Court

pursuant to 28 U.S.C. § 1407.  A copy of this Order shall be filed in each case

listed in Appendix A.  In cases subsequently filed in, removed or transferred to

this Court as part of MDL 1358, a copy of this Order shall be provided by the

Clerk to each plaintiff at the time the case is filed in, removed or transferred to this

Court, and each Plaintiff shall promptly serve a copy of this Order on any

defendant not previously a party in MDL 1358.



## II.    Interim Measures

### A.    Pre-Trial Consolidation

The cases listed in Appendix A are consolidated for pre-trial proceedings.  This Order does not constitute a determination that these actions shall be consolidated for trial, nor does it have the effect of making any entity a party to an action in which it has not been joined or served in accordance with the Federal Rules of Civil Procedure.  All cases subsequently filed in, removed or transferred to this Court as part of MDL No. 1358, shall be similarly consolidated for pre-trial proceedings.

### B.    Master Docket and File

The Clerk will maintain a master docket and case file under the style In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No. 1358, as Master File No. 1:00-1898 (SAS).  Orders, pleadings, motions and other documents bearing a caption similar to that of this Order will, when docketed and filed in the Master File, be deemed docketed and filed in each individual case to the extent applicable, and ordinarily will not be docketed separately or physically filed in such individual cases.

### C.    Captions; Separate Filing

Orders, pleadings, motions and other documents will bear a caption

2

similar to that of this Order.  If generally applicable to all consolidated matters, they shall include in the caption the notation that they relate to "all cases" and shall be filed and docketed only in the Master File.  Documents intended to apply only to particular cases will indicate in their caption the name(s) of the case(s) to which they apply, and extra copies shall be provided to the Clerk to facilitate filing and docketing both in the Master File and each of the specified individual files.

## III.   Party Organization; Liaison Counsel

### A.   Liaison Counsel

The Court directs the parties to coordinate their actions through Liaison Counsel. Nothing herein shall restrict the substantive rights of any party, including the right to be represented by separate counsel or to take separate positions from other parties.  For purposes of nominating and coordinating with the Liaison Counsel, the parties to the declaratory judgment actions in Appendix A shall be reversed, so that the nominal plaintiffs in those actions are aligned with defendants in the other cases and vice-versa.  Liaison Counsel shall:

1.  Maintain and distribute to co-counsel and to the opposing Liaison Counsel an up-to-date service list;

2.  Coordinate with opposing Liaison Counsel and with the Court on scheduling issues;

3

3.    Be responsible for the service and filing of joint pleadings and

communications with the Court to the extent practicable;

4.    Receive and, as appropriate, distribute to co-counsel orders

from the Court and documents from opposing parties and

counsel; and

5.    Maintain and make available to co-counsel at reasonable hours

a complete file of all documents served by or upon each party

except such documents as may be available at a document

depository.

Plaintiffs designate as their liaison counsel Stanley N. Alpert, Weitz

& Luxenberg, 180 Maiden Lane, 17th Floor, New York, New York 10038.

Defendants designate as their liaison counsel Peter Sacripanti, McDermott, Will &

Emery, 50 Rockefeller Plaza, New York, New York 10020.

**B.    Plaintiffs' Co-Lead Counsel  and Executive Committee**

The Court hereby incorporates Parts III.A ("Plaintiffs' Co-Lead

Counsel") and III.C ("Plaintiffs' Executive Committee") from Case Management

Order No. 1 filed Nov. 8, 2000.  The following attorneys shall serve as co-lead

counsel pursuant to Part III.A of CMO No. 1:   Robert J. Gordon, Weitz &

Luxenberg, 180 Maiden Lane, 17th Floor, New York, New York 10038; Victor M.

4

Sher, Sher Leff, 450 Mission Street, Suite 500, San Francisco, California 94105; and Scott Summy, Baron & Budd, 3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas 71209. The Plaintiffs' Executive Committee shall consist of Co-Lead Counsel as well as the following attorneys pursuant to Part III.C of CMO 1: Marc Bern, Napoli Kaiser & Bern, New York, New York, and Duane Miller, Miller, Axline and Sawyer, Sacramento, California.

## IV.   Service of Documents

### A.   Orders

A copy of each order will be provided electronically to Plaintiffs' and Defendants' Liaison Counsel for distribution as appropriate to other counsel and parties. Plaintiffs' Liaison Counsel shall distribute copies to other counsel for plaintiffs; defendants' Liaison Counsel shall distribute copies to other counsel for defendants.

### B.   Pleadings, Motions, and Other Documents

The parties shall serve other parties with all pleadings, motions and other Court filings in PDF format by electronic means, either by electronic mail or by such other method as the parties and the Court might agree. Pursuant to Fed. R. Civ. P. 5, service on Liaison Counsel constitutes service on other attorneys and parties for whom Liaison Counsel acts. For the purpose of computing time under

5

Fed. R. Civ. P. 6, 1 day shall be added to the prescribed period when effecting service by electronic means under this CMO.

## V.   Motions; Pleadings; Discovery

### A.   Reconsideration; Interlocutory Appeal

Any party who wishes to move for reconsideration or certification for interlocutory appeal of the Court's March 16, 2004, order denying remand shall do so by April 9, 2004.  In the event any party files such a motion, any party opposing the motion shall file its briefs in opposition by May 24, 2004, and movants may file reply briefs by June 7, 2004.

### B.   Misjoinder; Personal Jurisdiction

Any defendant who contends that it was improperly named, or that personal jurisdiction over it is lacking, shall identify itself in writing to counsel for plaintiffs, with an explanation of the grounds for that contention, by April 23, 2004.

### C.   Amendments to Complaints

Any plaintiff in any removed action that wishes to amend its complaint may do so as of right by April 23, 2004.

### D.   Answers; Rule 12(b) Motions

1. *Removed actions.*  The time for defendants to answer or move in

6

response to the complaints will be set at the status conference scheduled for April 22, 2004, at 10:00 a.m.

2. *Declaratory judgment actions.* The declaratory judgment actions shall be stayed pending resolution of the proposed motion for reconsideration, and/or motion seeking certification for interlocutory appeal.

**E.    Discovery Pending Resolution of Preliminary Motions**

Pending the resolution of motions to dismiss, discovery shall be limited to subjects necessary to the resolution of objections to personal jurisdiction and the standing of plaintiffs. The parties shall meet and confer in an attempt to agree on the parameters of this preliminary reciprocal discovery. If the parties are unable to agree, the Court will address this issue at the status conference scheduled for April 22, 2004, at 10:00 a.m. Additional discovery shall be deferred pending further order.

**F.    Consolidated Papers**

In all motions and briefs filed in this MDL, plaintiffs and defendants are each instructed, to the extent possible, to file consolidated papers to avoid a multiplicity of motions and briefs.

**VI.    Disclosures Pursuant to Rule 26(a)**

Disclosures pursuant to Rule 26(a)(1) shall not be required.

7

## VII.  Subsequent Cases and Case Management Orders

The Court may issue additional case management orders as appropriate to provide for the prompt, fair and efficient administration of this matter.  As and when additional cases may be transferred or removed to or filed in this Court as part of MDL 1358, the Court will issue orders calling for those cases to proceed in a manner consistent with the procedure set forth herein and, to the extent practicable, will require those cases to follow a schedule that is the same as or similar to the schedule herein.

## VIII. Privileges Preserved

No communication among any Plaintiffs' Counsel and any Plaintiff, or among any Defendants' Counsel and any Defendant, shall be taken as a waiver of any privilege or protection to which they would otherwise be entitled.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          April 1, 2004

8

## APPENDIX A

| State | Short Case Name | Court/Index No. |
|---|---|---|
| CT | *American Distilling & Manufacturing Co., Inc. v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1926** |
| CT | *Canton Board of Education v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1921** |
| CT | *Childhood Memories v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1924** |
| CT | *Columbia Board of Education v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1923** |
| CT | *Our Lady of the Rosary Chapel v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1925** |
| CT | *Town of East Hampton v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-1927** |
| CT | *United Water CT, Inc. v. Amerada Hess Corp., et al.* | **D. Conn.**<br>**3:03-CV-2017** |
| CT | *Exxon Mobil Corp., et al. v. American Distilling & Manufacturing Co, Inc., et al.* | **D. Conn.**<br>**3:03-CV-2252** |
| FL | *Escambia County Utilities Authority v. Adcock Petroleum, Inc, et al.* | **N.D. Fla.**<br>**3:03-CV-539** |
| FL | *Exxon Mobil Corp., et al. v. Escambia County Utilities Authority* | **N.D. Fla.**<br>**3:03-CV-597** |
| IA | *City of Sioux City, Iowa, et al. v. Amerada Hess Corp., et al.* | **S.D. Iowa**<br>**4:03-CV-90663** |
| IA | *Exxon Mobil Corp., et al. v. City of Galva, et al.* | **N.D. Iowa**<br>**C-03-4124** |
| IL | *City of Crystal Lake, et al. v. Amerada Hess Corp., et al.* | **N.D. Ill.** |

9

| State | Short Case Name | Court Index No. |
|-------|-----------------|-----------------|
| | | 03-CV-8973 |
| IL | *Exxon Mobil Corp., et al. v. City of Crystal Lake, et al.* | N.D. Ill. 03-CV-9026 |
| IN | *City of Mishawaka v. Amerada Hess Corp., et al.* | N.D. Ind. 3:03-CV-904 |
| IN | *City of Rockport v. v. Amerada Hess Corp., et al.* | S.D. Ind. 3:03-CV-201 |
| IN | *City of South Bend, Indiana v. Amerada Hess Corp., et al.* | N.D. Ind. 3:03-CV-905 |
| IN | *North Newton School Corp v. Amerada Hess Corp., et al.* | N.D. Ind. 4:03-CV-013 |
| IN | *Exxon Mobil Corp., et al. v. City of Rockport, et al.* | S.D. Ind. 3:03-CV-223 |
| KS | *Chisholm Creek Utility Authority v. Alon USA Energy Inc., et al.* | D. Kan. 03-CV-1457 |
| KS | *City of Bel Aire v. Alon USA Energy Inc., et al.* | D. Kan. 03-CV-1458 |
| KS | *City of Dodge City v. Alon USA Energy Inc., et al.* | D. Kan. 03-CV-1456 |
| KS | *City of Park City, Kansas v. Alon USA Energy Inc., et al.* | D. Kan. 03-CV-1455 |
| KS | *Exxon Mobil Corp., et al. v. Chisholm Creek Utility Authority, et al.* | D. Kan. 04-CV-1009 |
| MA | *Town of Duxbury, et al. v. Amerada Hess Corp., et al.* | D. Mass. 03-CV-12399 |
| MA | *Exxon Mobil Corp. v. Brimfield Housing Authority, et. al.* | D. Mass. |

10

| State | Short Case Name | Court/Index No. |
|---|---|---|
| | | 03-CV-12539 |
| NH | *City of Dover v. Amerada Hess Corp., et al.* | D.N.H. C-03-546 |
| NH | *City of Portsmouth v. Amerada Hess Corp., et al.* | D.N.H. C-03-542 |
| NH | *Exxon Mobil Corp., et al. v. City of Portsmouth, New Hampshire, et al.* | D.N.H. 03-CV-518 |
| NJ | *New Jersey American Water Co., Inc., et al. v. Amerada Hess Corp., et al.* | D.N.J. 03-CV-5562 |
| NY | *Carle Place Water District v. AGIP, et al.* | S.D.N.Y. 03-CV-10053 |
| NY | *Town of East Hampton v. AGIP, et al.* | S.D.N.Y. 03-CV-10056 |
| NY | *Village of Hempstead v. AGIP, et al.* | S.D.N.Y. 03-CV-10055 |
| NY | *Village of Mineola v. AGIP, et al.* | S.D.N.Y. 03-CV-10051 |
| NY | *County of Nassau v. Amerada Hess Corp., et al.* | S.D.N.Y. 03-CV-9543 |
| NY | *West Hempstead Water District v. AGIP, et al.* | S.D.N.Y. 03-CV-10052 |
| NY | *Westbury Water District v. AGIP, et al.* | S.D.N.Y. 03-CV-10057 |
| NY | *Town of Southhampton v. AGIP, et al.* | S.D.N.Y. 03-CV-10054 |

| State | Short Case Name | Court/Index No. |
|-------|-----------------|-----------------|
| NY | *Water Authority of Western Nassau v. Amerada Hess, et al.* | S.D.N.Y. 03-CV-9544 |
| NY | *Long Island Water Corp. v. Amerada Hess Corp, et al.* | E.D.N.Y. 03-CV-6125 |
| NY | *Water Authority of Great Neck North v. Amerada Hess Corp, et al.* | E.D.N.Y. 03-CV-6077 |
| NY | *Exxon Mobil Corp., et al. v. Long Island Water Corp., et al.* | E.D.N.Y. 03-CV-6274 |
| NY | *Town of Wappinger v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 CV 2388 |
| NY | *United Water New York Inc. v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 CV 2389 |
| NY | *Village of Pawling v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 CV 2390 |
| VA | *Patrick County School Board v. Amerada Hess Corp., et al.* | W.D. Va. 4:03-CV-104 |
| VA | *Exxon Mobil Corp., et al. v. Patrick County School Board, et al.* | W.D. Va. 4:03-CV-105 |
| VT | *Town of Hartland v. Amerada Hess Corp., et al.* | D. Vt. 2:03-CV-337 |
| VT | *Exxon Mobil Corp., et al v. Town of Hartland* | D. Vt. 2:03-CV-343 |

12

- Appearances -

**Liaison Counsel for Plaintiffs:**

Stanley N. Alpert, Esq.
Robert Gordon, Esq.
C. Sanders McNew, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel:  (212) 558-5500
Fax:  (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel:  (212) 547-5583
Fax:  (212) 547-5444

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------X
                             :

In re: Methyl Tertiary Butyl Ether   :
("MTBE") Products Liability Litigation  :

                             :      **ORDER**

This Document Relates To:  All Cases  :

                             :      **Master File No. 00 Civ. 1898**

                             :      **MDL No. 1358 (SAS)**

                             :
------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## CASE MANAGEMENT ORDER #2

On July 23, 2004, in advance of a status conference, the parties

submitted a joint proposed agenda and letters outlining the issues to be addressed

with the Court.  Because certain issues do not require further argument, IT IS

HEREBY ORDERED:

    1.    Procedures for Status Conferences:

        Plaintiffs and Defendants are each to submit <u>one</u> letter through their

        liaison counsel five (5) business days prior to the scheduled

        conference.  Each letter shall not exceed five (5) single space pages.

        Plaintiffs and Defendants may each submit <u>one</u> reply letter, two (2)

        business days prior to the scheduled conference.  The reply letters

1

PAGE 4/6 * RCVD AT 7/27/2004 2:39:37 PM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):01-50

may not exceed three (3) single space pages. The parties shall submit

a joint proposed agenda, indicating topics of agreement and

disagreement two (2) business days prior to the scheduled conference.

The parties must meet and confer before a dispute is submitted to

either the Court or the Special Master.

2.    The parties shall continue to work towards establishing an electronic

service mechanism.

3.    The Sacramento district attorney may participate in MDL 1358

without waiving any jurisdictional arguments. Participation includes,

without limitation, involvement in discovery and motion practice.

4.    The Sacramento district attorney is granted leave to file a Second

Amended Complaint in *The People of the State of California, et al. v.*

*Atlantic Richfield Co., et al.*, 04 Civ. 4972, immediately, separate and

apart from establishment of a coordinated schedule for integrating

newly-transferred cases.

5.    The parties shall meet and confer regarding the issue of future

discovery and shall submit a joint proposed discovery plan seven (7)

days in advance of the next status conference.

6.    The Special Master, Kenneth E. Warner, shall hear those matters

2

referred to him by this Court.

7.     All discovery matters are referred to the Special Master, with the exception of resolving issues relating to the overall order and schedule of discovery in these consolidated actions.

8.     The Special Master is to make an order with respect to all non-dispositive matters. By definition, this includes all discovery-related matters. As set forth in the June 18, 2004 Order, a party may file an objection to any order issued by the Special Master. *See* June 18 Order ¶ 4. There is no need to make a report or recommendation with respect to a discovery dispute.

5.     The dispute regarding the Confidentiality Order is specifically referred to the Special Master. He should make whatever order he deems appropriate. Any party wishing to object should follow the procedures set forth in the June 18 Order.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
         July 27, 2004

3

PAGE 6/6 * RCVD AT 7/27/2004 2:36:37 PM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):01-50

-Appearances-

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

In re: Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation

This Document Relates To:   All Cases

------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

MCDERMOTT WILL & EMERY LLP

DATE   8-02-04

PETER JOHN SACRIPANTI

ORDER

Master File No. 00 Civ. 1898

MDL No. 1358 (SAS)

## CASE MANAGEMENT ORDER #3

On April 1, 2004, this Court issued a case management order

("CMO I") setting forth procedures governing all cases then pending before the

Court.  Since the entry of CMO I, the Judicial Panel on Multidistrict Litigation has

transferred additional related cases to this Court, including, but not limited to,

cases filed by the State of New Hampshire, the People of California, and non-state

plaintiffs from five additional states.[1]  These newly-transferred cases are therefore

---

[1] The newly-transferred cases include: (1) *Orange County Water Dist. v. Unocal, et al.*, 04 Civ. 4968; (2) *City of Riverside v. Atlantic Richfield Co., et al.*, 04 Civ. 4969; (3) *Quincy Community Servs. Dist. v. Atlantic Richfield Co., et al.*, 04 Civ. 4970; (4) *City of Roseville v. Atlantic Richfield Co., et al.*, 04 Civ. 4971; (5) *City of Fresno v. Chevron USA, Inc., et al.*, 04 Civ. 4973; (6) *California-American Water Co. v. Atlantic Richfield Co., et al.*, 04 Civ. 4974; (7) *Martin Silver, et al. v. Alon USA Energy, Inc., et al.*, 04 Civ. 4975; (8) *People of the State of California, et al. v. Atlantic Richfield Co., et al.*, 04 Civ. 4972; (9) *State of New*

1



not bound by the deadlines set pursuant to CMO 1. In order to advance all cases in MDL 1358 in the most efficient manner, newly-transferred cases must be "caught up" to and coordinated with the previously pending cases. This Order memorializes certain deadlines established by the Court at a status conference on July 28, 2004.

IT IS HEREBY ORDERED that the following schedule shall apply:

1.   **ALL CASES**

Motions for § 1292(b) Certification

- Deadline for any plaintiff who                 August 31, 2004
  wishes to join in pending
  1292(b) motion by the California plaintiffs[2]

---

*Hampshire v. Amerada Hess Corp., et al.*, 04 Civ. 4976; (10) *County of Suffolk, et al. v. Amerada Hess Corp., et al.*, 04 Civ. 5424; (11) *Franklin Square Water Dist. v. Amerada Hess Corp., et al.*, 04 Civ. 5423; (12) *Roslyn Water Dist. v. Amerada Hess Corp., et al.*, 04 Civ. 5422; (13) *Hicksville Water Dist. v. Amerada Hess Corp., et al.*, 04 Civ. 5421; (14) *Town of Campbellsburg, Indiana v. Amerada Hess Corp., et al.*, 04 Civ. 4990; (15) *City of Marksville v. Alon Usa, LP, et al.*, 04 Civ. 3412; (16) *Town of Raysville v. Alon USA Energy, Inc., et al.*, 04 Civ. 3413; (17) *Exxon Mobil Oil Corp., et al. v. New Jersey Am. Water Co., Inc., et al.*, 04 Civ. 3414; (18) *Port Washington Water Dist. v. Amerada Hess Corp., et al.*, 04 Civ. 3415; (19) *Incorporated Village of Sands Point v. Amerada Hess Corp., et al.*, 04 Civ. 3416; (20) *The City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417; (21) *Buchanan County School Bd. v. Amerada Hess Corp., et al.*, 04 Civ. 3418; (22) *Craftsbury Fire Dist. #2 v. Amerada Hess Corp., et al.*, 04 Civ. 3419; (23) *Town of Matoaka, West Virginia, et al. v. Amerada Hess Corp., et al.*, 04 Civ. 3420.

[2] *See supra* note 1, cases numbered (1)–(7).

2

| • Defendants' opposition | Ten (10) days after Court's decision on all remaining remand-related motions[3] |
| • Plaintiffs' replies | Ten (10) days after opposition served |

2.   **NEWLY-TRANSFERRED CASES**

Defendants identify possible defendants

| • CA/NH cases[4] | August 30, 2004 |
| • Other cases | September 21, 2004 |

Plaintiffs file amended complaints and describe standing

| • CA/NH cases | September 29, 2004 |
| • Other cases | October 29, 2004 |

Defendants serve limited interrogatories

| • CA/NH cases | October 13, 2004 |
| • Other cases | October 12, 2004 |

Plaintiffs respond to defendants' interrogatories

| • CA/NH cases | November 12, 2004 |
| • Other cases | November 12, 2004 |

---

[3] Pending before this Court are three motions to remand by plaintiffs in cases numbered (1)–(9), and a motion for clarification, which was joined by plaintiffs in cases numbered (14)–(16) and (21)–(23).

[4] *See supra* note 1, cases numbered (1)–(9).

3

<u>Defendants' Rule 12 motions</u>

- CA/NH cases                    October 29, 2004
- Other cases                    November 29, 2004

<u>Plaintiffs' responses to Rule 12 motions</u>

- CA/NH cases                    November 29, 2004
- Other cases                    December 31, 2004

<u>Defendants' replies to Rule 12 motions</u>

- CA/NH cases                    December 13, 2004
- Other cases                    January 14, 2005


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:     New York, N.Y.
           July 29, 2004



Appearances

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

PAGE 2/25 * RCVD AT 10/23/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:300 * CSID:* DURATION (mm-ss):07-34

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------X

In re: Methyl Tertiary Butyl Ether     :
("MTBE") Products Liability Litigation  :
                                         :     **ORDER**
                                         :
This Document Relates To:   All Cases    :     Master File No. 1:00-1898
                                         :
                                         :     **MDL 1358 (SAS)**
                                         :     No. M21-88
                                         :
-----------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## CASE MANAGEMENT ORDER #4

### I.   Prior Order; Filing; Service

      All case management orders requiring production of documents or

other information, previously made by the Court, shall remain in full force and

effect. Attached hereto as Appendix A is a list of cases that are currently

consolidated in this multi-district litigation, designated MDL 1358, which have

either been filed in this Court or transferred to this Court pursuant to 28 U.S.C. §

1407. A copy of this Order shall be filed in each case listed in Appendix A. In

cases subsequently filed in, removed to, or transferred to this Court as part of

MDL 1358, a copy of this Order shall be provided by the Clerk to each Plaintiff at

the time the case is filed in, removed, or transferred to this Court, and each

1

plaintiff shall promptly serve a copy of this Order on any defendant not previously

a party in one or more of the cases listed in Appendix A.

## II.    Focus Cases

A.    For purposes of this Order, the following cases are focus cases:

*County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, 04 Civ. 5424; *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968; *City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417; and *United Water New York, Inc. v. Amerada Hess Corp., et al.*, 04 Civ. 2389.

B.    For purposes of this Order, all cases not listed in subsection II(A) are non-focus cases at this time.

C.    For purposes of this Order, the term "Relevant Geographic Area" shall mean the following:

1.    *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, 04 Civ. 5424:  Suffolk County, New York;

2.    *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968:  the Orange County Water District service area;

3.    *City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417: physical area comprising United States of America zip code numbers 11001, 11003, 11004, 11355, 11364, 11365, 11366, 11367, 11368, 11374, 11375, 11385,

2

11411, 11412, 11413, 11414, 11415, 11416, 11417, 11418, 11419, 11420, 11421,

11422, 11423, 11426, 11427, 11428, 11429, 11430, 11432, 11433, 11434, 11435,

11436, 11451, 11580; and

        4.    *United Water New York, Inc. v. Amerada Hess Corp., et al.*, 04

Civ. 2389: Rockland County, New York.

        The definition of "Relevant Geographic Area" for any focus case may

be modified by the parties upon both plaintiffs' and defendants' consent.

## III.  Discovery

    A.    Plaintiffs: Liability Discovery in Focus Cases

        1.    Written Discovery and Production of Documents

        Upon entry of this Order, as to those defendants in focus cases who

were not parties to *South Tahoe Public Utilities District v. Atlantic Richfield Co.,*

*et al.*, No. 999128, Superior Court of the State of California for the County of San

Francisco; or *Communities for a Better Environment v. Unocal Corp., et al.*, No.

997013, Superior Court of the State of California for the County of San Francisco

or MDL 1358 I (the "Prior MTBE Litigations"), Plaintiffs may engage in written

discovery on the following issues:

            (i)    MTBE's characteristics in groundwater and

                containment systems;

PAGE 5/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):07-34

(ii)    taste and odor of MTBE;

(iii)   alternatives, including the availability of ethanol;

(iv)    knowledge of MTBE's characteristics and industry

releases;

(v)     the formation of and participation in industry

groups or committees relating to MTBE;

(vi)    contacts and communications by both refiners and

those industry groups with governmental

regulators and officials and the substance of those

communications relating to MTBE;

(vii)   decisions to select an oxygenate for use in

gasoline, including the decision to use MTBE, and

the decision to use or not to use ethanol;

(viii)  the decision to use MTBE to boost octane;

(ix)    the decision to use MTBE in conventional

gasoline;

(x)     the decision to use MTBE in Non-Reformulated

Gasoline/Non-Oxy-Fuel areas;

(xi)    the foreseeability of contamination, including

4

knowledge of historical problems associated with

underground storage tank systems;

(xii) programs by defendants, their subsidiaries or their

affiliates, to identify, prioritize and/or remediate

MTBE/TBA contamination within the Relevant

Geographic Area of each focus case;

(xiii) warnings relating to gasoline containing MTBE;

(xiv) the decision to discontinue using MTBE in

gasoline;

(xv) surveys of the defendants that show the extent of

contamination by MTBE;

(xvi) vulnerability studies which describe potential

impacts on public drinking water supplies and/or

wells in the Relevant Geographic Areas, and/or

any programs to require additional and/or different

remedial work to prevent MTBE and/or TBA from

entering public drinking water supplies and/or

wells in the Relevant Geographic Areas; and

(xvii) topics (i)–(xvi) as they relate to TBA.

5

PAGE 7/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:300 * CSID: * DURATION (mm-ss):07:36

### 2. Depositions

On or after March 1, 2005, as to those defendant in focus cases who were not parties in *South Tahoe Public Utilities District v. Atlantic Richfield Co., et al.*, No. 999128, Superior Court of the State of California for the County of San Francisco; or *Communities for a Better Environment v. Unocal Corp., et al.*, No. 997013, Superior Court of the State of California for the County of San Francisco, plaintiffs may take deposition on topics (i) through (xvii) above. Nothing in this Section otherwise limits a party's right to request the production of documents on topics (i) through (xvii) in connection with a deposition so far as permitted by the Federal Rules of Civil Procedure.

### 3. Liability Discovery from Parties in Prior MTBE Litigation

In accordance with the Court's Order, dated October 18, 2004 ("Oct. 18 Order"), the Special Master shall determine whether documents produced but not copied in prior MTBE cases other than MDL 1358 shall be made available to all parties.

4. Any discovery of the type described in subsections III(A)(1) and III(A)(2) above shall be applicable to and for use in non-focus cases as well, and parties in non-focus cases will be given notice and the opportunity to participate in this discovery.

6

PAGE 8/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:300 * CSID: * DURATION (mm-ss):07-34

B.   Plaintiffs:   Other Discovery in Focus Cases

1.   Production of MTBE/TBA Release Information

(a)   On or before November 1, 2004, each defendant in *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968, and *City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417, shall produce one representative site remediation file, which representative file shall be related to gasoline or MTBE or TBA releases of any kind within the Relevant Geographic Area and relevant time periods applicable to these focus cases.

(b)   Each defendant in *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, 04 Civ. 5424, and *United Water of New York, Inc. v. Amerada Hess Corp., et al.*, 04 Civ. 2389, shall produce the following:

(i)   On or before November 30, 2004, each defendant shall produce all site remediation files in its possession, custody or control for each gasoline station, terminal and bulk storage facility where there has been any release or spill of gasoline, since 1979, within the Relevant Geographic Area covered by these focus cases;

7

PAGE 9/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/H * DNIS:500 * CSID: * DURATION (mm-ss):07:34-

        (ii)     Subject to all foundational requirements in, and in the format required by, subsection III(B)(2)(a) below, on or before November 30, 2004, each defendant shall identify the address of all gasoline stations that they either own or have owned, operate or have operated, lease or have leased, or are or have been subject to a retail supply contract, and such dates of ownership, operation, lease or retail supply contract, since 1979, within the Relevant Geographic Area covered by these focus cases.

    (c)    Each Defendant in *City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417 (from 1979 to present) and *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968 (from 1986 to present), shall produce the following:

        (i)     On or before December 31, 2004, each defendant shall produce all site remediation files in its possession, custody or control for each gasoline station, terminal and bulk storage facility where there has been any release or

P.09/25

OCT-22-2003  08:49

spill of gasoline within the Relevant Geographical Area

covered by these focus cases;

(ii)    Subject to all foundational requirements in, and in the

format required by, subsection III(B)(2)(a) below, on or

before December 31, 2004, each defendant shall identify

the address of all gasoline stations that they either owned

or have owned, operate or have operated, lease or have

leased, or are or have been subject to a retail supply

contract, and such dates of ownership, operation, lease or

retail supply contract, within the Relevant Geographic

Area covered by these focus cases.

(iii)   On or before March 15, 2005, the parties shall meet and

confer to discuss what additional information is needed

to conduct further discovery on this topic.

2.   <u>Declarations</u>

(a)    On or before December 31, 2004, each defendant, to the

extent it is named as a defendant in one or more of the focus cases shall provide

declarations, applicable to *County of Suffolk and Suffolk County Water Authority*

*v. Amerada Hess Corp, et al.*, 04 Civ. 5424 (from 1979-present); *Orange County*

9

PAGE 11/25 * RCVD AT 10/21/2004 10:71:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):07-34

*Water District v. Unocal Corp., et al.*, 04 Civ. 4968 (from 1986-present); and *City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417 (from 1979-present), based upon all non-privileged information, including documents, within the possession, custody or control of a defendant and retrievable through reasonable effort. The declarations shall identify databases and categories of documents that were used to gather the information contained in the declarations. The declarations shall contain the following information:

      (i)    defendants in each focus case will identify jobbers supplied by them that provide gasoline containing MTBE to the Relevant Geographic Area;

      (ii)    manufacturers of neat MTBE and/or TBA will disclose how and where it is made;

      (iii)    manufacturers of neat MTBE and/or TBA will identify each refiner to whom it has sold or delivered neat MTBE and/or TBA, during the relevant time period for each focus case listed in subparagraph (a) above, that may have been added to gasoline for delivery in the Relevant Geographic Area of each focus case;

10

(iv)    each refiner will provide a history of ownership, during the relevant time period for each focus case listed in subparagraph (a) above, including changes in corporate structure, of each refinery it owns or has owned that serve the Relevant Geographical Area in each focus case;

(v)    each refiner will disclose the date it first blended MTBE and/or TBA into gasoline for deliveries to terminals that supplied the Relevant Geographical Area of each focus case.

(vi)    each refiner shall describe the records, which include the name, contents and location of records, including electronically stored records, that record the batch number for batches of gasoline delivered from defendants' refineries to terminals in the Relevant Geographical Areas;

(vii)    for each petroleum product containing MTBE refined and/or marketed by the defendant into the Relevant Geographical Area of each focus case,

11

PAGE 13/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):07-34

the defendant shall disclose the name and grade (if applicable) of the product, the product and product code;

(viii)    each refiner will disclose the date it last blended MTBE and/or TBA into gasoline for deliveries into the Relevant Geographical Area of each focus case; and

(ix)    each defendant will respond to the seven categories identified by Judge Scheindlin in her Order to Marathon Ashland Petroleum, LLC, dated June 22, 2004, as that information pertains to the Relevant Geographic Area at issue in each focus cases.

Each defendant will designate, as to each sub-topic, the person(s) most qualified to testify on defendant's behalf based on defendant's investigation.

(b)    On or before January 15, 2005, the parties shall meet and confer to arrange a schedule for providing a declaration including the information listed in subsections (a)(i) through (ix) above applicable to *United Water New York, Inc. v. Amerada Hess Corp., et al.*, 04 Civ. 2389.

12

3. <u>Declaration Depositions</u>

In accordance with the Oct. 18 Order, the Special Master shall

determine whether plaintiffs may serve document subpoenas in connection with

their "person most knowledgeable" depositions, in accordance with Fed. R. Civ. P.

30(b)(6).

C.   <u>Defendants: Motion Discovery in Focus Cases</u>

1.   <u>Written Discovery and Production of Documents</u>

(a)   Upon entry of this Order, defendants may engage in

written discovery as to each plaintiff in the focus cases on the following issues:

(i)   pumping data for each well that is impacted by

MTBE and/or TBA, including any documents that

relate to distribution of water from these wells,

and special testing, treatment, or handling of water

from those wells;

(ii)   the construction or maintenance of each of

plaintiffs' wells, including "as built" construction

data for each of plaintiffs' wells, including

monitoring and potable wells, that are impacted by

MTBE and/or TBA

13

    (iii)   any contact with governmental and/or other

regulatory authorities in addressing releases and

remediation activities relating to MTBE and/or

TBA releases that have impacted plaintiffs' wells

and/or any aquifer supplying water to their wells;

    (iv)   any releases of petroleum products, including

MTBE and/or TBA, from sites owned, controlled

and/or operated by plaintiff and any investigative

and/or remedial response activities related to such

release; and

    (v)   any complaints from customers and/or purveyors

within any plaintiffs' service area or jurisdiction

relating to the taste, odor or quality of potable

water served in said area or jurisdiction;

    (vi)   any Wellhead Protection studies or computer

modeling of Wellhead Protection Areas, source

water assessments, vulnerability studies, or

computer modeling of well or aquifer vulnerability

and/or § 208 Water Management or Water Basin

14

studies performed by and/or on behalf of each

focus case plaintiff, or that relate to the

groundwater or aquifer system located within the

Relevant Geographic Area.

In accordance with the Oct. 18 Order, the Special Master shall

determine whether defendants may take discovery about contaminants in

plaintiffs' wells other than MTBE or TBA, and how plaintiffs have responded to

the presence of those contaminants.

    2.    <u>Depositions</u>

    (a)    After March 1, 2005, defendants may depose

representatives of the plaintiffs in the focus cases concerning any of the topics (i)

through (vi) above. Nothing in this Section otherwise limits a party's right to

request the production of documents on topics (i) through (vi) in connection with a

deposition so far as permitted by the Federal Rules of Civil Procedure.

D.    <u>Preemption Discovery</u>

In accordance with the Oct. 18 Order, the Special Master shall

determine a schedule for conducting discovery related to defendants' preemption

motions and the scope of any such discovery.

E.    <u>Non-Party Discovery</u>

15

1.     Upon entry of this Order, the parties may engage in full discovery with respect to non-parties.

2.     Upon entry of this Order, the parties shall promptly meet and confer regarding procedures to assure that non-party discovery proceeds in an efficient manner.

F.     Non-Focus Cases

1.     All discovery previously ordered by the Court shall proceed in non-focus cases.

2.     As set forth in subsection III(A)(4) above, the parties in non-focus cases will be given notice and opportunity to participate in liability discovery.

3.     No other discovery shall proceed in non-focus cases except as set forth herein or upon further Order of the Court.

G.     Preservation Order

1.     On or before November 1, 2004, the parties shall submit a document preservation order to the Court applicable to focus and non-focus cases.

H.     Prior Depositions

In accordance with the Oct. 18 Order, the Special Master shall determine whether prior depositions taken in Prior MTBE Litigations shall be

16



PAGE 18/25 ▪ RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] ▪ SVR:RF/1 ▪ DNIS:500 ▪ CSID: ▪ DURATION (mm-ss):07:04

applicable to all defendants.

I.       **Reservation of Rights**

Notwithstanding the forgoing, nothing in this Order shall preclude a party from being permitted to object to a discovery request on the grounds that said request is overly broad, unduly burdensome, not designed to lead to the discovery of relevant or admissible evidence, or otherwise not permitted under the applicable Federal Rules of Civil Procedure.

IV.      **Summary Judgment Motions**

A.       **Preemption**

Upon consideration of the parties' submissions, the Court will establish a schedule for filing preemption motions.

B.       **Statutes of Limitations**

1.       On or before November 15, 2004, the parties shall meet and confer regarding a stipulation as to recent releases within the *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968, target area, during an agreed-upon time frame, solely for purposes of defendants' motion.

2.       On or before January 15, 2005, the parties shall meet and confer to identify focus issues for defendants' statutes of limitations motions applicable to *Orange County Water District v. Unocal Corp., et al.*, 04 Civ. 4968.

17

3.     After March 31, 2005, Defendants may file statutes of

limitations motions applicable to the focus cases.

C.     Justiciability/No Impact/Lack of Imminent Threat

Upon consideration of the parties' submissions, the Court will

establish a schedule for filing any justiciability/no impact/lack of imminent threat

motions applicable to the focus cases.

D.     Primary Jurisdiction

Defendants may submit this motion on or after February 15, 2005.

E.     Lack of Cognizable Legal Interest

On or before January 15, 2005, the parties shall meet and confer

regarding discovery related to this motion.

18

PAGE 20/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):07-34

F.   All Other Motions

All other motions, other than those subject to an existing scheduling

order from the Court, shall be brought only after a pre-motion conference and

subsequent Order of the Court.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       October 19, 2004

19



PAGE 21/25 ' RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] ' SVR:RF/1 ' DNIS:500 ' CSID: ' DURATION (mm-ss):07-36

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

20

PAGE 22/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):02-34

## Exhibit A

| | | |
|---|---|---|
| CA | California-American Water Co. v. Atlantic Richfield Co., et al. | 04 Civ. 4974 |
| CA | City of Fresno v. Chevron U.S.A. Inc., et al. | 04 Civ. 4973 |
| CA | City of Riverside v. Atlantic Richfield Co., et al. | 04 Civ. 4969 |
| CA | City of Roseville v. Atlantic Richfield Co., et al. | 04 Civ. 4971 |
| CA | Orange County Water District v. Unocal Corp., et al. | 04 Civ. 4968 |
| CA | People of the State of California, et al. v. Atlantic Richfield Co., et al. | 04 Civ. 4972 |
| CA | Quincy Community Services District v. Atlantic Richfield Co., et al. | 04 Civ. 4970 |
| CA | Martin Silver, et al. v. Alon USA Energy, Inc., et al. | 04 Civ. 4975 |
| CT | American Distilling & Manufacturing Co., Inc. v. Amerada Hess Corp., et al. | 04 Civ. 1719 |
| CT | Columbia Board of Education v. Amerada Hess Corp., et al. | 04 Civ. 1716 |
| CT | Our Lady of the Rosary Chapel v. Amerada Hess Corp., et al. | 04 Civ. 1718 |
| CT | Town of East Hampton v. Amerada Hess Corp., et al. | 04 Civ. 1720 |
| CT | United Water CT, Inc. v. Amerada Hess Corp., et al. | 04 Civ. 1721 |
| FL | Escambia County Utilities Authority v. Adcock Petroleum, Inc, et al. | 04 Civ. 1722 |
| IA | City of Sioux City, Iowa, et al. v. Amerada Hess Corp., et al. | 04 Civ. 1723 |
| IL | City of Island Lake v. Amerada Hess Corp., et al. (f/k/a Crystal Lake, et al. v. Amerada Hess Corp., et al.) | 04 Civ. 2053 |
| IN | Town of Campbellsburg v. Amerada Hess Corp., et al. | 04 Civ. 4990 |

PAGE 23/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:300 * CSID: * DURATION (mm-ss):07-34

| IN | City of Mishawaka v. Amerada Hess Corp., et al. | 04 Civ. 2055 |
|----|-------------------------------------------------|--------------|
| IN | City of Rockport v.  v. Amerada Hess Corp., et al. | 04 Civ. 1724 |
| IN | City of South Bend, Indiana v. Amerada Hess Corp., et al. | 04 Civ. 2056 |
| IN | North Newton School Corp v. Amerada Hess Corp., et al. | 04 Civ. 2057 |
| KS | Chisholm Creek Utility Authority v. Alon USA Energy Inc., et al. | 04 Civ. 2061 |
| KS | City of Bel Aire v. Alon USA Energy Inc., et al. | 04 Civ. 2062 |
| KS | City of Dodge City v. Alon USA Energy Inc., et al. | 04 Civ. 2060 |
| KS | City of Park City, Kansas v. Alon USA Energy Inc., et al. | 04 Civ. 2059 |
| LA | City of Marksville v. Alon USA Energy, Inc., et al. | 04 Civ. 3412 |
| LA | Town of Rayville v. Alon USA Energy, Inc., et al. | 04 Civ. 3413 |
| MA | Town of Duxbury, et al. v. Amerada Hess Corp., et al. | 04 Civ. 1725 |
| NH | City of Dover v. Amerada Hess Corp., et al. | 04 Civ. 2067 |
| NH | City of Portsmouth v. Amerada Hess Corp., et al. | 04 Civ. 2066 |
| NH | State of New Hampshire v. Amerada Hess. Corp. | 04 Civ. 4976 |
| NJ | New Jersey American Water Co., Inc., et al. v. Amerada Hess Corp, et al. | 04 Civ. 1726 |
| NY | Basso, et al. v. Sunoco, Inc., et al. | 03 Civ. 9050 |
| NY | Carle Place Water District v. AGIP, et al. | 03 Civ. 10053 |
| NY | County of Suffolk v. Amerada Hess Corp., et al. | 04 Civ. 5424 |

2

PAGE 24/25 * RCVD AT 10/21/2004 10:21:24 AM [Eastern Daylight Time] * SVR:RF/1 * DNIS:500 * CSID: * DURATION (mm-ss):07-34

| NY | City of New York v. Amerada Hess Corp., et al. | 04 Civ. 3417 |
|---|---|---|
| NY | County of Nassau v. Amerada Hess Corp., et al. | 03 Civ. 9543 |
| NY | Franklin Square Water District v. Amerada Hess Corp., et al. | 04 Civ. 5423 |
| NY | Hicksville Water District v. Amerada Hess Corp., et al. | 04 Civ. 5421 |
| NY | Incorporated Village of Sands Point v. Amerada Hess Corp., et al. | 04 Civ. 3416 |
| NY | Long Island Water Corp. v. Amerada Hess Corp, et al. | 04 Civ. 2068 |
| NY | Port Washington Water District v. Amerada Hess Corp., et al. | 04 Civ. 3415 |
| NY | Roslyn Water District v. Amerada Hess Corp., et al. | 04 Civ. 5422 |
| NY | Tonneson, et al. v. Exxon Mobil Corp., et al. | 03 Civ. 8248 |
| NY | Town of East Hampton v. AGIP, et al. | 03 Civ. 10056 |
| NY | Town of Southampton v. AGIP, et al. | 03 Civ. 10054 |
| NY | Town of Wappinger v. Amerada Hess Corp., et al. | 04 Civ. 2388 |
| NY | United Water New York Inc. v. Amerada Hess Corp, et al. | 04 Civ. 2389 |
| NY | Village of Hempstead v. AGIP, et al. | 03 Civ. 10055 |
| NY | Village of Mineola v. AGIP, et al. | 03 Civ. 10051 |
| NY | Village of Pawling v. Amerada Hess Corp., et al. | 04 Civ. 2390 |
| NY | Water Authority of Great Neck North v. Amerada Hess Corp, et al. | 04 Civ. 1727 |
| NY | Water Authority of Western Nassau v. Amerada Hess Corp., et al. | 03 Civ. 9544 |
| NY | West Hempstead Water District v. AGIP, et al. | 03 Civ. 10052 |
| NY | Westbury Water District v. AGIP, et al. | 03 Civ. 10057 |
| | | |
| PA | Northampton, Bucks County Municipal Authority v. Amerada Hess Corp., et al. | 04 Civ. 6993 |



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                       :

In re: Methyl Tertiary Butyl Ether     :
("MTBE") Products Liability Litigation  :
                       :

This Document Relates To:   All Cases  :
                       :
                       :
                       :
-----------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

**ORDER**

Master File No. **00 Civ. 1898**

MDL No. 1358 (SAS)

## CASE MANAGEMENT ORDER #5

On October 29 and November 5, 2004, plaintiffs filed amended complaints in the majority of cases in this multi-district litigation. Among other things, the amended complaints added new defendants who are not bound by the Court's previously-set deadlines. Plaintiffs are in the process of serving these amended complaints on both the previously-named and the new defendants. In order to avoid a multiplicity of responsive pleadings on varying deadlines, the schedule must be amended to allow new defendants to "catch up" and coordinate with the other parties.

IT IS HEREBY ORDERED that the following schedule shall apply:

1.   <u>New Hampshire Cases</u>
(*City of Dover v. Amerada Hess Corp., et al.*, No. 04 Civ. 2067; *City of Portsmouth v. Amerada Hess Corp., et al.*, No. 04 Civ. 2066)

- January 4, 2005          Plaintiffs file response briefs on pending 12(b)(6) motions

- January 18, 2005         Defendants file reply briefs on pending 12(b)(6) motions or other responsive pleadings

2.   <u>California and Pennsylvania Cases</u> (Listed in Exhibit A)

- January 18, 2005         Defendants file Rule 12 motions or other responsive pleadings

- February 18, 2005        Plaintiffs file responses to Rule 12 motions or to other responsive pleadings

- March 4, 2005            Defendants file replies on Rule 12 motions or other responsive pleadings

3.   <u>Other Cases</u> (Listed in Exhibit B[1])

- January 18, 2005         Defendants file Rule 12 motions or other responsive pleadings (*e.g.*, joinder in pending motions, stand-alone Rule 12 motions, answers, etc.)

- February 18, 2005        Plaintiffs file responses to Rule 12 motions or to other responsive pleadings

- March 4, 2005            Defendants file replies on Rule 12 motions or other responsive pleadings

---

[1]   The cases listed in Exhibit B have motions to dismiss pending.

*[handwritten: 4. State Plaintiffs' Cases — dates?]*

4.    State Plaintiffs' Cases
      (*State of New Hampshire v. Amerada Hes*[...]
      *People of the State of California, et al. v.* [...]
      04 Civ. 4972)

      The parties shall meet and confer to discu[...]
      State Plaintiffs' appeals divest the Court c[...]
      while said appeals remain pending.  No re[...]
      be filed before the schedule set forth abov[...]
      and B.

5.    Notices of Appearance

      All newly named parties (and any other party who has not previously done
      so) shall file a Notice of Appearance within thirty (30) days of service of an
      amended complaint.

6.    Waivers of Service

      By letter dated November 23, 2004, as to each of the cases referenced
      herein, each newly named defendant that is corporally related to, and which
      shares common counsel with, an entity previously named as a defendant in
      these cases, has waived service of process for each summons and amended
      complaint to which said defendant has been added as a party.  In lieu of
      formal service of process, the amended complaints shall be delivered to
      such defendants via email to their common counsel.  Defendants' waiver of
      service shall not apply to any amended complaint filed in a Virginia action,
      and formal service of process must be completed for any such case(s).
      Furthermore, a defendant's waiver of service shall not constitute a waiver

3

by that defendant of any defenses or jurisdictional objections, including objections to personal jurisdiction.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 29, 2005

## Exhibit A

| | | |
|---|---|---|
| CA | *California-American Water Co. v. Atlantic Richfield Co., et al.* | S.D.N.Y. 04 Civ. 4974 |
| CA | *City of Fresno v. Chevron U.S.A. Inc., et al.* | S.D.N.Y. 04 Civ. 4973 |
| CA | *City of Riverside v. Atlantic Richfield Co., et al.* | S.D.N.Y. 04 Civ. 4969 |
| CA | *City of Roseville v. Atlantic Richfield Co., et al.* | S.D.N.Y. 04 Civ. 4971 |
| CA | *Orange County Water District v. Unocal Corp., et al.* | S.D.N.Y. 04 Civ. 4968 |
| CA | *People of the State of California, et al. v. Atlantic Richfield Co., et al.* | S.D.N.Y. 04 Civ. 4972 |
| CA | *Quincy Community Services District v. Atlantic Richfield Co., et al.* | S.D.N.Y. 04 Civ. 4970 |
| CA | *Martin Silver, et al. v. Alon USA Energy, Inc., et al.* | S.D.N.Y. 04 Civ. 4975 |
| PA | *Northampton, Bucks County Municipal Authority v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 6993 |

Exhibit B

| | | |
|---|---|---|
| CT | *American Distilling & Manufacturing Co., Inc. v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1719 |
| CT | *Columbia Board of Education v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1716 |
| CT | *Our Lady of the Rosary Chapel v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1718 |
| CT | *Town of East Hampton v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1720 |
| CT | *United Water CT, Inc. v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1721 |
| FL | *Escambia County Utilities Authority v. Adcock Petroleum, Inc, et al.* | S.D.N.Y. 04 Civ. 1722 |
| IA | *City of Sioux City, Iowa, et al. v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1723 |
| IL | *City of Island Lake v. Amerada Hess Corp., et al. (f/k/a Crystal Lake, et al. v. Amerada Hess Corp., et al.)* | S.D.N.Y. 04 Civ. 2053 |
| IN | *Town of Campbellsburg v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 4990 |
| IN | *City of Mishawaka v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 2055 |
| IN | *City of Rockport v.  v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1724 |
| IN | *City of South Bend, Indiana v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 2056 |
| IN | *North Newton School Corp v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 2057 |

| | | |
|---|---|---|
| KS | *Chisholm Creek Utility Authority v. Alon USA Energy Inc., et al.* | S.D.N.Y.<br>04 Civ. 2061 |
| KS | *City of Bel Aire v. Alon USA Energy Inc., et al.* | S.D.N.Y.<br>04 Civ. 2062 |
| KS | *City of Dodge City v. Alon USA Energy Inc., et al.* | S.D.N.Y.<br>04 Civ. 2060 |
| KS | *City of Park City, Kansas v. Alon USA Energy Inc., et al.* | S.D.N.Y.<br>04 Civ. 2059 |
| LA | *City of Marksville v. Alon USA Energy, Inc., et al.* | S.D.N.Y.<br>04 Civ. 3412 |
| LA | *Town of Rayville v. Alon USA Energy, Inc., et al.* | S.D.N.Y.<br>04 Civ. 03413 |
| MA | *Town of Duxbury, et al. v. Amerada Hess Corp., et al.* | S.D.N.Y.<br>04 Civ. 01725 |
| NJ | *New Jersey American Water Co., Inc., et al. v. Amerada Hess Corp, et al.* | S.D.N.Y.<br>04 Civ. 1726 |
| NY | *Basso, et al. v. Sunoco, Inc., et al.* | S.D.N.Y.<br>03 Civ. 9050 |
| NY | *Carle Place Water District v. AGIP, et al.* | S.D.N.Y.<br>03 Civ. 10053 |
| NY | *County of Suffolk v. Amerada Hess Corp., et al.* | S.D.N.Y.<br>04 Civ. 5424 |
| NY | *City of New York v. Amerada Hess Corp., et al.* | S.D.N.Y.<br>04 Civ. 3417 |
| NY | *County of Nassau v. Amerada Hess Corp., et al.* | S.D.N.Y.<br>03 Civ. 9543 |

| State | Short Case Name | Court / Case No. |
|---|---|---|
| NY | *Franklin Square Water District v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 5423 |
| NY | *Hicksville Water District v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 5421 |
| NY | *Incorporated Village of Sands Point v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 3416 |
| NY | *Long Island Water Corp. v. Amerada Hess Corp, et al.* | S.D.N.Y. 04 Civ. 2068 |
| NY | *Port Washington Water District v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 3415 |
| NY | *Roslyn Water District v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 5422 |
| NY | *Tonneson, et al. v. Exxon Mobil Corp., et al.* | S.D.N.Y. 03 Civ. 8248 |
| NY | *Town of East Hampton v. AGIP, et al.* | S.D.N.Y. 03 Civ. 10056 |
| NY | *Town of Southampton v. AGIP, et al.* | S.D.N.Y. 03 Civ. 10054 |
| NY | *Town of Wappinger v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 2388 |
| NY | *United Water New York Inc. v. Amerada Hess Corp, et al.* | S.D.N.Y. 04 Civ. 2389 |
| NY | *Village of Hempstead v. AGIP, et al.* | S.D.N.Y. 03 Civ. 10055 |
| NY | *Village of Mineola v. AGIP, et al.* | S.D.N.Y. 03 Civ. 10051 |
| NY | *Village of Pawling v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 2390 |
| NY | *Water Authority of Great Neck North v. Amerada Hess Corp., et al.* | S.D.N.Y. 04 Civ. 1727 |

| | Single Product | |
|---|---|---|
| NY | Water Authority of Western Nassau v. Amerada Hess Corp., et al. | S.D.N.Y. 03 Civ. 9544 |
| NY | West Hempstead Water District v. AGIP, et al. | S.D.N.Y. 03 Civ. 10052 |
| NY | Westbury Water District v. AGIP, et al. | S.D.N.Y. 03 Civ. 10057 |
| VA | Buchanan County School Board v. Amerada Hess Corp., et al. | S.D.N.Y. 04 Civ. 3418 |
| VA | Patrick County School Board v. Amerada Hess Corp., et al. | S.D.N.Y. 04 Civ. 2070 |
| VT | Craftsbury Fire District #2 v. Amerada Hess Corp., et al. | S.D.N.Y. 04 Civ. 3419 |
| VT | Town of Hartland v. Amerada Hess Corp., et al. | S.D.N.Y. 04 Civ. 2072 |
| W.Va | Town of Matoaka v. Amerada Hess Corp., et al. | S.D.N.Y. 04 Civ. 03420 |

-Appearances-

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel:  (212) 558-5500
Fax:  (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel:  (212) 547-5583
Fax:  (212) 547-5444

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X
                                    :

In re: Methyl Tertiary Butyl Ether    :
("MTBE") Products Liability Litigation   :

                                  :      __   **ORDER**

                                  :

This Document Relates To:    **All Cases**   :      **Master File No. 1:00-1898**
                                  :      **MDL 1358 (SAS)**
                                  :      **M21-88**

                                  :

-------------------------------------------------X
**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## CASE MANAGEMENT ORDER #6

        All case management orders requiring the production of documents or

other information, previously made by the Court, shall remain in full force and

effect.  A copy of this Order shall be filed in each case listed in Appendix A of

Case Management Order #4 ("CMO #4").  In cases subsequently filed in, removed

to, or transferred to this Court as part of MDL 1358, the Clerk shall provide a copy

of this Order to each plaintiff at the time the case is filed in, removed, or

transferred to this Court, and each plaintiff shall promptly serve a copy of this

Order on any defendant not previously a party in one or more of the cases listed in

Appendix A of CMO #4.

## I.    Addendum to Case Management Order #4

This Court issued CMO #4 on October 19, 2004, to govern the course of discovery in this multi-district litigation. The Court referred five discovery disputes to the Special Master, which he resolved on November 12, 2004, through Pre-Trial Order #2 (later modified by Pre-Trial Order #3). Since that time, the parties have asked the Court to amend CMO #4 to incorporate certain agreed upon language and the findings of the Special Master. There is no reason to deny the request. Accordingly, CMO #4 is modified to the extent that follows:

1.    On or before February 15, 2005, the parties shall meet and confer to discuss what additional information is needed to conduct further discovery in *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, No. 04 Civ. 5424, and *United Water of New York, Inc. v. Amerada Hess Corp., et al.*, No. 04 Civ. 2389.[1]

2.    Prior to bringing a dispute to the Special Master for resolution, the parties must meet and confer in good faith to resolve the issues in dispute.

3.    On or before November 15, 2004, the parties shall meet and confer to arrange a schedule for conducting discovery related to defendants'

---

[1]    The Court granted, by letter endorsement, the parties' request to add this language to CMO 4 on December 9, 2004. I have added it again here so that the parties may refer to one document for modifications to CMO 4.

2

conflict preemption motions, it being anticipated that no further discovery is needed with respect to defendants' express preemption motions. Notwithstanding the foregoing, discovery related to preemption issues by the parties may occur prior to November 15, 2004, insofar as such discovery is part of discovery already occurring within that period pursuant to CMO #4. Any disputes with respect to the foregoing shall be brought to the Special Master for resolution.[2]

      4.    Defendants are on notice that plaintiffs intend to offer all depositions taken in Prior MTBE Litigations (as defined in CMO #4) against all defendants herein. Therefore, depositions of persons already deposed in Prior MTBE Litigations may be opened for the purpose of supplementing the prior questioning of a deponent, if a party needs to do so. However, the repetition of prior questioning of a deponent is not permitted, and prior depositions shall not be opened for that purpose. Plaintiffs shall promptly supply defendants with the identity – by date, person deposed and litigation in which conducted – of the depositions plaintiffs intend to so offer, so that those depositions will be clearly and specifically known to all parties.

      5.    A party wishing to open a deposition in a Prior MTBE

---

[2]    Because plaintiffs requested that *all* of the Special Master's rulings be incorporated into an addendum, I have included those that required action before the date of this Order.

3

Litigation to supplement the testimony therein shall include, in its deposition notice, a general statement of the nature of the supplementing testimony sought. Any dispute as to whether a need exists to supplement deposition questioning in a particular instance, or whether a deposing party is merely repeating what had already been asked in the prior deposition, shall be brought to the Special Master for resolution.

6.    As a consequence of the above, the parties may not object to depositions taken in a Prior MTBE Litigation being used against them in this litigation simply because they were not parties to the Prior MTBE Litigation, or because the deposition was taken in another litigation. However, any other objections to the use of such depositions, or any parts thereof, that are permitted under law shall remain available.

7.    Written discovery and production of documents pursuant to CMO #4, Section III.C(1) shall not include, at this time, discovery by defendants about contaminants in plaintiffs' wells other than MTBE or TBA or about how plaintiffs have responded to the presence of those contaminants; provided, however, to the extent that responsive documents kept in the normal course of business by plaintiffs include both MTBE/TBA contaminant information *and* information about other contaminants, the full documents shall be produced

4

without redaction.  This ruling is without prejudice to the right of defendants, at a

later time and not in connection with or in anticipation of dispositive motions, and

pursuant to any subsequent order from the Court or the Special Master, to obtain

discovery regarding other contaminants.

8.    In addition to the issues listed in CMO #4 Sections

III.C(1)(a)(i)-(vi), defendants may engage in written discovery as to each plaintiff

in the focus cases on the following issues:

    a.    Water sampling and laboratory testing results for MTBE

and/or TBA for potable water treated and distributed in

each plaintiff's water system that is impacted by MTBE

and/or TBA for the relevant time period for each of these

focus cases;

    b.    Well sampling and laboratory testing results for MTBE

and/or TBA for each of plaintiffs' wells or water

resources, including monitoring wells and potable wells,

that are impacted by MTBE and/or TBA; and

    c.    Plaintiffs' past and present knowledge of the

characteristics of MTBE and/or TBA; the behavior of

MTBE and/or TBA in the environment; taste and odor

issues relating to MTBE and/or TBA, and any studies

relating to analysis or testing of taste or odor problems

associated with water containing detectable levels of

MTBE and/or TBA; historical policies regarding testing

for MTBE and/or TBA; early knowledge of releases of

MTBE and/or TBA to the water or aquifer system that

supplies plaintiffs' wells; and plaintiffs' knowledge

regarding the alleged dangers posed to their water

systems by gasoline underground storage tanks, and

historical policies and/or practices concerning the sale or

delivery to its customers of water with MTBE and/or

TBA below MCL's.

9.    As to those defendants in focus cases who were parties to the

Prior MTBE Litigations listed in CMO #4, Section III.A(1), plaintiffs may take

discovery on topics (i) through (xvii) thereunder only to fill gaps in the discovery

taken in those Litigations on the same schedule set forth in CMO #4, Section

III.A(2).  Documents produced but not copied by plaintiffs in Prior MTBE

Litigations need not be made available (*i.e.*, produced again) to all parties as a

matter of right; provided, however, if plaintiffs so request, the parties shall meet

6

and confer in good faith to discuss making such documents available in the present proceeding. In that regard, plaintiffs shall identify the particular categories or collections of documents falling within the topics listed in CMO #4, Section III.A(1) that were produced, but not copied by plaintiffs, in the Prior MTBE Litigations and that plaintiffs are requesting. Disputes shall be brought to the Special Master for resolution and shall be determined based upon good cause being shown for the requested production.

10.     After March 1, 2005, plaintiffs may depose the person(s) most knowledgeable for each defendant in order to obtain clarifications and specific explanations regarding all aspects of each defendant's declaration, which declarations will have been provided in compliance with CMO #4, Section III.B(2). Plaintiffs may subpoena documents, in accordance with Federal Rule of Civil Procedure 30(b)(6), to aid in obtaining those clarifications and specific explanations, such as representative or exemplar documents or other documents reasonably appropriate for that purpose. However, plaintiffs may not use the foregoing subpoenas to embark on product tracing at this time. Any disputes regarding the scope of subpoenaed documents shall be brought to the Special Master for resolution.

11.     On or before July 1, 2005, the parties shall meet and confer

to establish, for each focus case, a date by which plaintiffs will specify which wells in their respective systems have been impacted by MTBE and/or TBA and/or which wells are imminently threatened by MTBE and/or TBA so as to cause injury-in-fact to plaintiffs, and to identify such additional discovery by the parties as is needed to specify such threatened and/or impacted wells and to ascertain the factual basis for plaintiffs' designation of such wells.

12.    In the case of *Orange County Water Dist. v. Unocal Corp.*, No. 04 Civ. 4968, plaintiffs shall specify what water resources have been impacted by MTBE and/or TBA or that are imminently threatened by MTBE and/or TBA so as to cause injury-in-fact to the District, and the parties shall identify such additional discovery as is needed to specify such threatened and/or impacted water resources. Notwithstanding the foregoing, and relying on the good faith of plaintiffs, to whatever extent plaintiffs have a reasonable amount of impact/threat identification information ready for disclosure prior to the meet and confer, they shall disclose same to defendants without waiting for the meet and confer.

13.    The dates chosen for plaintiffs' disclosures of impacted/ threatened wells in each focus case shall be staggered in accordance with the progress of discovery and the particular circumstances of each case; provided, however, that presumptively, albeit without prejudice to change upon application

to the Special Master, the date for *United Water New York, Inc. v. Amerada Hess Corp., et al.*, No. 04 Civ. 2389, shall come first, followed by *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, No. 04 Civ. 5424. Moreover, to the extent that a simultaneous two track disclosure process is feasible without compromising the foregoing, the date for *City of New York v. Amerada Hess Corp., et al.*, No. 04 Civ. 3417, shall come first, followed by *Orange County Water Dist. v. Unocal Corp., et al.*, No. 04 Civ. 4968, on the other track.

## II.   Addendum to Case Management Order #5

Case Management Order #5 ("CMO #5") requires newly added defendants to file Rule 12 motions or other responsive pleadings by January 18, 2005. However, that date does not give the parties enough time to meet and confer regarding potential Rule 12(b)(2) motions. Previous discussions between plaintiffs and the original defendants resulted in a number of voluntary dismissals. Because discussions could result in additional dismissals and avoid some motion practice, CMO #5 is modified to the extent that follows:

1.    The date by which newly added defendants shall file a motion under Rule 12(b)(2) challenging personal jurisdiction is extended to February 18, 2005. The newly added defendants shall file other Rule 12 motions or responsive

pleadings by January 18, 2005. No newly added defendant shall waive or otherwise prejudice its right to file personal jurisdiction motions under Rule 12(b)(2) by filing other Rule 12 motions or responses, responding to discovery authorized by the Court or otherwise participating in MDL 1358 proceedings.

2.      Any newly added defendant which contends that it was improperly named or that personal jurisdiction over it is lacking shall provide to counsel for plaintiffs the factual basis for its contentions by January 18, 2005. The parties thereafter shall meet and confer in an effort to resolve as many disputes as possible.

3.      For personal jurisdiction disputes that are not resolved, the following schedule shall apply:

    a.      February 18, 2005:  Defendants shall file their motions and supporting briefs, affidavits, and exhibits.

    b.      March 18, 2005:  Plaintiffs shall file their responses.

    c.      April 4, 2005:  Defendants shall file their replies.

4.      The page limitations and the methodology for filing briefs established by this Court for personal jurisdiction motions at the May 11, 2004 status conference shall apply.

5.      In the case of *Orange County Water Dist. v. Unocal Corp., et*

*al.*, No. 04 Civ. 4968, Rule 12 motions are now due on February 1, 2005.

Plaintiffs shall file responses by March 4, 2005, and defendants shall file replies

by March 18, 2005.

## III.   **Miscellaneous**

1.    The limits set forth in Rules 30 and 33 of the Federal Rules of

Civil Procedure shall not apply in this MDL.  Any Disputes regarding the number

of interrogatories or the number of depositions shall be decided on a case by case

basis by the Special Master.

2.    Defendants may respond to the common allegations of the

complaints in a Master Answer in accordance with Section 40.52(6)(b) of the

Manual for Complex Litigation (Fourth).  However, they must also address case-

specific allegations to the extent they exist.  Newly added defendants that intend to

join in the filing of a Master Answer are not bound by the previously set deadline

for responsive pleadings.  The Master Answer is due thirty (30) days after the

Court's ruling on the pending 12(b)(6) motions to dismiss.[3]

---

[3]    Pending before the Court are fourteen (14) motions to dismiss
pursuant to Rule 12(b)(6).  The motions were made and briefed by state:
Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts,
New Hampshire, New Jersey, New York, Vermont, Virginia, and West Virginia.
These motions will be resolved in an omnibus opinion and order.

3.    Defendants are not precluded from arguing, at the appropriate time, both prongs of their conflict preemption defense – to wit:  (1) it would be impossible for defendants to comply with both the state law sought to be imposed and the federal requirements (impossibility); or (2) the state law sought to be imposed would prove an obstacle to the achievement and execution of the full purposes and objectives of Congress (frustration of purpose).

4.    The parties are permitted to take discovery regarding the quantity of oxygenates available to implement the Reformulated Gasoline Program.  This discovery is aimed at preparing (and defending against) defendants' potential motion for summary judgment based on the impossibility of complying with both state and federal requirements.  At this time, they are not permitted to take discovery regarding frustration of purpose.

5.    To the extent there are no genuine issues of material fact, defendants may bring a summary judgment motion based on the impossibility prong of conflict preemption.  They may argue frustration of purpose only to the extent it is based on the same factual predicate as the impossibility argument.

6.    The parties shall meet and confer regarding the preservation of "current" back-up tapes ( *i.e.*, back-up tapes that are being routinely recycled in the ordinary course of business).  They should use Section A of the Court's

12

Proposed Document Retention Questionnaire ("Questionnaire") as a starting point for discussions.

      7.     Defendants shall submit responses to Sections B and C of the Questionnaire to the Court and plaintiffs by February 3, 2005.

SO ORDERED:

_____

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
            January 14, 2005

13

**-Appearances-**

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel:  (212) 558-5500
Fax:  (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel:  (212) 547-5583
Fax:  (212) 547-5444

S Alper

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X
                                  :

In re: Methyl Tertiary Butyl Ether   :
("MTBE") Products Liability Litigation   :
                                  :

This Document Relates To:   All Cases   :
                                  :
                                  :
------------------------------------------------------X

          **ORDER**

          **Master File No. 1:00-1898**

          **MDL 1358 (SAS)**
          **No. M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## CASE MANAGEMENT ORDER #7

      The parties having "met and conferred" pursuant to the requirement set forth in CMO #4

Sec.III.B.2.(b), and, having reached agreement on a date for defendants' production for certain

declarations in *United Water New York, Inc v. Amerada Hess Corp., et al.*, 04 Civ. 2389,

pursuant to that Section:

      IT IS HEREBY ORDERED that on or before March 31, 2005, each defendant, to the

extent it is named as a defendant in *United Water New York, Inc v. Amerada Hess Corp., et al.*,

04 Civ. 2389, shall provide a declaration pursuant to the requirements set forth in CMO#4 Sec.

III.B.2.

                                 SO ORDERED:

                                   Shira A. Scheindlin
                                   U.S.D.J.

Dated:       New York, New York
             March 7, 2005

**-Appearances-**

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
                                          :
In re: Methyl Tertiary Butyl Ether        :     **ORDER**
("MTBE") Products Liability Litigation    :
                                          :     **Master File No. 1:00–1898**
This Document Relates To:  All Cases      :     **MDL 1358 (SAS)**
                                          :     **M21-88**
_____X

## CASE MANAGEMENT ORDER #8

This Order supersedes sections II.B and II.C of the Case Management

Order dated April 1, 2004.

    1.    All orders, pleadings, motions and other documents

(collectively, "Documents") shall bear a caption similar to that of this Order,

including the master file number (1:00–1898), MDL number (1358), and MDL

docket number (M21-88).

    2.    If generally applicable to all consolidated matters, Documents

shall include in the caption the notation that they relate to "all cases." If only

applicable to particular cases, Documents shall include in the caption the name(s)

of the case(s) to which they apply, along with the corresponding civil docket

number(s) from the Southern District of New York. As an example, see Appendix

A.

1

3.    Any party filing a Document relating to "all cases" shall provide the original plus one copy to the Clerk.  Any party filing a Document relating to particular cases shall provide the original, one copy for each case indicated in the caption, plus one additional copy to the Clerk.

4.    The Clerk shall maintain under the style In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation both (i) a master docket and case file under Master File No. 1:00–1898 and (ii) an MDL docket and case file under M21-88.

5.    The Clerk shall file and docket all original Documents under Master File No. 1:00–1898.  For Documents relating to "all cases," the Clerk shall file and docket copies under M21-88.  For Documents relating to particular cases, the Clerk shall file and docket copies under M21-88, as well as each case indicated in the caption.  If a filing party has failed to provide the relevant number of copies, the Clerk may require the filing party to provide such copies before the

Document(s) will be filed and docketed, or the Clerk may make a notation in M21-88 and the individual case dockets referring to the original Document(s) in Master File No. 1:00–1898.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
     April 18, 2005

# APPENDIX A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : : : |
| This document relates to: | : : : |
| Columbia Board of Education v. Amerada Hess Corp., et al., No. 04 Civ. 1716 | : : |
| Our Lady of the Rosary Chapel v. Amerada Hess Corp., et al., No. 04 Civ. 1718 | : : : : |
| American Distilling and Manufacturing Co., Inc. v. Amerada Hess Corp., et al., No. 04 Civ. 1719 | : : : : |
| Town of East Hampton v. Amerada Hess Corp., et al., No. 04 Civ. 1720 | : : : |
| United Water Connecticut, Inc. v. Amerada Hess Corp., et al., No. 04 Civ. 1721 | : : : : |
| Escambia County Utilities Authority v. Amerada Hess Corp., et al., No. 04 Civ. 1722 | : : : : |

**Master File No. 1:00–1898
MDL 1358 (SAS)
M21-88**

4

### -Appearances-

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

In re: Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation

This Document Relates To:    All Cases

-----------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:



ORDER

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

## CASE MANAGEMENT ORDER #2

Upon Plaintiffs' request,  CMO #1 is amended so that effective June 1, 2005

Plaintiffs' Liaison Counsel shall be Robin Greenwald, Esq., Weitz & Luxenberg, 180

Maiden Lane, 17th Floor, New York, New York 10038.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 2, 2005

MICROFILM
9:00 AM
MAY - 9 2005

1

-Appearances-

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
C. Sanders McNew, Esq.
Stanley N. Alpert, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

In Re: Methyl Tertiary Butyl Ether ("MTBE")          **ORDER**
Products Liability Litigation
                                                     Master File No. 1:00-1898

                                                     **MDL 1358 (SAS)**
This Document Relates To: All Cases                  No. M21-88

————————————————————

SHIRA A. SCHEINDLIN, U.S.D.J.:

              CASE MANAGEMENT ORDER NO. 10

        On April 1, 2004, this Court issued a case management order ("CMO-1") setting forth

procedures governing all cases then pending before the Court.  On July 29, 2004, this Court issued a

third case management order ("CMO-3") setting forth procedures and deadlines for additional cases

that had been transferred to this Court by the Judicial Panel on Multidistrict Litigation ("JPML")

subsequent to the entry of CMO-1.  Since the entry of CMO-3, the JPML has transferred additional

related cases to this Court.[1]  These newly-transferred cases are therefore not bound by the deadlines

pursuant to CMO-1 and CMO-3.  In order to advance all cases in MDL 1358 in the most efficient

manner, these newly-transferred cases must be "caught up" to and coordinated with the previously

pending cases.  In addition, cases so transferred in the future will have to be "caught up" to and

coordinated with the previously pending cases.  Therefore, this Order sets out deadlines for those

newly-transferred cases named herein as well as any related cases transferred to this Court in the future.

———————————————

[1]  The newly-transferred cases include: (1) *California Water Service Co. v. Atlantic Richfield Co.*, 05 Civ.
3227; (2) *City of Lowell v. Amerada Hess Corp., et al.*, 05 Civ. 04018; (3) *Greenville County Water and Sewer
Authority, County of Greenville v. Amerada Hess Corp., et al.*, 05 Civ. 1310; and (4) *Shannon v. Texaco
Investments, LLC, et al.*, 05 Civ. 1309.

IT IS HEREBY ORDERED that the following schedule shall immediately apply to the newly-transferred cases named herein and to all related cases transferred to this Court in the future upon entry of any final transfer order by the JPML:

1.   Notices of Appearance

Within twenty (20) days, all newly named defendants (and any other defendant who has not done so) shall file a Notice of Appearance.

2.   Compliance with Order for Preservation of Documents

Within forty-five (45) days, all newly named defendants (and any other defendant who has not done so) shall provide information required by section 2(c) of the Order for Preservation of Documents.

3.   Personal Jurisdiction

Within twenty (20) days, any defendant who contends that it was improperly named, or that personal jurisdiction over it is lacking, shall identify itself in writing to counsel for plaintiffs, with an explanation of the grounds for that contention. The parties shall promptly meet-and-confer to resolve the issue. Should the parties fail to resolve the issue, defendants' 12(b)(2) motions will be due within sixty (60) days. Plaintiffs' opposition to said motions will be due thirty (30) days thereafter. Defendants' reply briefs will be due ten (10) days after service of plaintiffs' opposition.

4.   Standing Interrogatories

Within fifteen (15) days, defendants will serve their limited standing interrogatories. Plaintiffs shall file responses within thirty (30) days.

5.   Rule 12(b)(6) Motions or Responsive Pleadings

Within thirty (30) days, defendants will file Rule 12(b)(6) motions or other responsive pleadings (e.g. joinder in pending motions, stand-alone Rule 12 motions, answers, etc.).[3]  Plaintiffs' opposition to any Rule 12 motions will be due within thirty (30) days.  Defendants' reply briefs will be due ten (10) days after service of plaintiffs' opposition.

6.   Answers

If the Court denies the Rule 12 motions or other responsive pleadings or postpones their resolution until trial on the merits, Answers shall be due within thirty (30) days after notice of the Court's action.  If the Court grants a motion for a more definite statement, Answers are due within thirty (30) days after the service of the more definite statement.

[3]   ... Stipulation and Order Extending Time to Respond to Complaint entered in the United States ... the Northern District of California on February 14, 2005, defendants may not file ... ... ... with respect to their claims in the *California Water Service Co. v. Atlantic* ... ... The Court's decisions with respect to the California Motions to Dismiss ... ... apply to the aforementioned case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
        June 28, 2005

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X
In re: Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation

This Document Relates To:   All Cases
-------------------------------------------------X
SHIRA A. SCHEINDLIN, U.S.D.J.:

RECEIVED
CHAMBERS OF

JUL - 6 2005

ORDER SCHEINDLIN

Master File No.
1:00-1898

MDL 1358 (SAS)
No. M21-88

## CASE MANAGEMENT ORDER # 11

The parties having "met and conferred" and having reached agreement on modifying the procedures for submitting pre-conference letters:

IT IS HEREBY ORDERED that pre-conference letters shall be submitted pursuant to the following schedule:

The parties shall reach agreement on a joint agenda eight (8) business days prior to the status conference.

The parties shall file with the Court initial pre-conference letters and the agenda six (6) business days prior to the status conference.

Any party wishing to file a reply letter shall do so three (3) business days prior to the status conference.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             July 18, 2005

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                          :

In re: Methyl Tertiary Butyl Ether    :     ORDER
("MTBE") Products Liability Litigation  :

                          :     Master File No. 1:00–1898

This Document Relates To:        :     MDL 1358 (SAS)
All Cases In MDL 1358            :     M21-88
-------------------------------------------------------X
Shira A. Scheindlin, U.S.D.J.:

## CASE MANAGEMENT ORDER #12
### (Procedures for Discovery Disputes)

This Order supersedes prior Case Management Orders and Pre-Trial Order

Nos. 1, 4 and 7 relating to discovery disputes. It is hereby ordered, beginning July18,

2005, that all discovery disputes, except as otherwise provided herein, shall be filed

with the Court in accordance with the following procedures:

I.    **Discovery Conferences**

    A.    The Court shall hold in-person discovery conferences during the 2005

calendar year according to the following schedule: July 28, 2:30 p.m.; August 12,

4:00 p.m.; August 26, 4:00 p.m.; September 9, 4:00 p.m.; October 7, 4:00 p.m.;

November 18, 4:00 p.m.; December 2, 4:00 p.m.; and December 30, 4:00 p.m.  If the

parties agree that a scheduled discovery conference is not necessary, the parties shall

inform the Court , by email to the Court MTBE clerk, of their desire to cancel the

1

conference as soon as practicable, but in no event later than three (3) days before the scheduled conference.

B.     Any party wishing to raise a discovery dispute with the Court at a scheduled conference shall serve a letter brief setting forth that dispute no later than ten (10) days before the scheduled conference.  However, the parties are encouraged to submit disputes as they arise, rather than waiting until ten (10) days prior to conference.  Any party wishing to respond must serve its opposition letter brief no later than five (5) days before the conference.  Any party wishing to reply shall serve its reply letter brief no later than two (2) days before the conference.

C.     Discovery disputes noticed in accordance with the procedures set forth in Paragraph I(B) may be heard at the Conference for which they are noticed.

D.     Whenever a motion is made by any party pursuant to this Order, the moving party, together with its Reply or other final submission on the motion, shall certify to the Court that the motion has been fully submitted and is ready for decision. Together with that certification, the moving party shall identify all submissions made on the motion, including the name of the party who made the submission and the date and nature thereof.  Copies of the certification shall be sent to all parties identified as having made submissions, as well as Liaison Counsel for both sides and the Court MTBE clerk.

2

E.    The Court may elect to refer certain written discovery disputes to the Special Master.  In such circumstances, the procedures for conferences on such referred motions shall be governed by the procedures for motions submitted to the Court, subject to the modifications to such procedures set forth in Section X below.

F.    Prior to submission of a written discovery dispute, the parties may agree that the dispute should be heard by the Special Master rather than by the Court. Under such circumstances, the motion should be filed directly with the Special Master, with a copy to the Court's MTBE clerk, and shall be governed by the procedures for motions submitted to the Court, subject to the modifications to such procedures set forth in Section X below

II.    **Interim Conferences**

A.    In the event that any discovery dispute needs resolution, in good faith, prior to the next in-person conference, any party may submit a letter brief to the Court at any time raising a dispute and asking that it be heard prior to the next scheduled conference.  Any party wishing to respond must serve its opposition letter brief no later than five (5) days following service of the letter application.  Any party wishing to reply shall serve its reply letter brief no later than two (2) days after service of the opposition letter brief.

B.    This briefing schedule may be modified by the Court upon application

3

of any party.

III.   **Page Limits and Compliance with Local Civil Rule 37.1**

    A.    Letter briefs permitted by these procedures shall be limited to ten (10) pages, double spaced for moving and opposition letter briefs, unless the Court permits otherwise.  Reply letter briefs shall not exceed five (5) pages, double-spaced, unless the Court permits otherwise.  This page limit does not apply to attachments or exhibits.  Counsel should avoid submitting voluminous attachments and exhibits, where possible.

    B.  Any submission to the Court comprising twenty-five (25) or more pages, inclusive of exhibits, shall be submitted in a three-hole punch binder with side tabs. The party making the submission shall also provide an electronic copy of the documents, whether by computer disk or e-mail, to the Court and to the MTBE clerk.

    C.    Local Civil Rule 37.1, requiring verbatim quotation of interrogatories, requests for admissions and objections and exceptions, shall not apply to the procedures before the Court.

IV.   **Communications with and Submissions to the Court**

    A.    Any party communicating with the Court via e-mail shall forward the e-mail to the Court's MTBE clerk and shall copy (*i.e., cc:*)  all liaison counsel.  The subject line of such e-mail communications shall always begin with the designation

4

"MTBE".

B.     The Court will not conduct telephonic discovery conferences.

V.     **Obligations to Meet-and-Confer**

A.     The parties shall meet and confer on all discovery disputes. The time frame for the meet and confer process is limited to 30 days, the time period commencing on the date of the first written communication of the party raising the discovery objection. Any party wishing to bring a discovery dispute to the Court must first meet and confer with the appropriate plaintiff(s) and defendant(s).

B.     Each party submitting a letter brief must certify in that letter brief that the relevant parties previously have conferred in a good faith effort to resolve the dispute being put before the Court.

VI.    **Service and Notice**

A.     All service required by these procedures will be by electronic mail, except for the additional hard copies to be provided to the Court.

B.     Service shall be effect no later than 6:00 p.m., Eastern Standard Time.

C.     Letter briefs shall be served to the Court and to both parties' Liaison Counsel. If a discovery dispute involves individual plaintiffs or defendants, the parties shall serve via mail copies of relevant letter brief(s) directly to counsel for said plaintiffs and defendants, in addition to serving both Liaison Counsel.

5

D.    All written communications from the Court shall be sent directly to counsel for the parties in dispute as well as to plaintiffs' liaison counsel and to defendants' liaison counsel. The latter shall be responsible for promptly forwarding same to all of the plaintiffs and defendants, respectively, in this proceeding.

## VII.  **Orders**

The Court will send its orders to the parties to any dispute, as well as to liaison counsel for plaintiffs and liaison counsel for defendants, who will be responsible for prompt service of same on all plaintiffs and defendants, respectively.

## VIII.  **Days**

All references to "days" for any time period that is less than eleven (11) days means business days. All references to "days" for any time period that is eleven (11) days or more, shall refer to calendar days. Where the last day of a briefing period falls on a Saturday, Sunday or legal holiday, the period shall run until the next day that is not one of the aforementioned days.

## IX.  **Disputes Arising During Depositions**

A.    The Special Master shall hear all disputes arising during depositions.

B.    All disputes arising at depositions shall be resolved in accordance with the telephonic conference procedures of Local Civil Rule 37.3(b) (Eastern District rule).

6

C.     To the extent that the Special Master is not available to resolve the dispute  by telephone during the deposition, the procedures in Local Civil Rule 37.3(c) (Eastern District rule) shall apply, allowing letter briefing not to exceed three (3) pages.

D.     The reconsideration procedures set forth in Local Civil Rule 37.3(d) (Eastern District rule) for deposition rulings shall also apply.

X.     **Procedures Governing Written Discovery Disputes Referred to the Special Master by the Court or on Agreement of the Parties**

A.   When the Court  refers a written discovery dispute to the Special Master or when the parties agree that a written discovery dispute should be filed directly with the Special Master, all procedures set forth in this Order apply, subject to the following additions and modifications:

　　　　　1.     At the sole discretion of the Special Master, any discovery dispute noticed in accordance with the procedures set forth herein may be heard at a telephonic session, may be ruled upon without oral argument, may be heard at a specially scheduled in-person conference or may be deferred to the next in-person conference. If the conferences are in-person conferences, the Special Master shall try to hold the conferences in conjunction with the Court's

7

scheduled discovery conferences set forth in Section I(A) or with each scheduled Court status conference in MDL 1358.

2.    Any party communicating with the Special Master via telephone will first have the adversary on the line as well, so that *ex parte* communications are avoided.

3.    The parties shall agree on court reporting services, and such court reporting service shall transcribe all conferences unless the Special Master directs otherwise.

4.    For in-person conferences, the parties shall have alternating responsibility for securing the services of an agreed upon court reporting service, and the parties shall share the cost of the reporting services equally.

5.    For Interim Conferences, the party filing an application or seeking the services of the Special Master shall be responsible for securing the services of an agreed upon court reporting service and for paying the costs of such services, subject to paragraph 6 below.  This will include telephonic conferences, which shall always be transcribed unless otherwise ordered by the Special Master.

6.      Each party shall be responsible for procuring its own copy of the transcript.

7.      The party that arranged for the court reporter shall provide a hard copy of the minuscript version and disk of the transcript to the Special Master and to the MTBE clerk.

8.      The Special Master will send his orders to the parties to any dispute, as well as to liaison counsel for plaintiffs and liaison counsel for defendants, who will be responsible for prompt service of same on all plaintiffs and defendants, respectively. The Special Master will also file a copy of his orders with the Court, as required by paragraph 3 of the Court's June 18, 2004 Order.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
         July __, 2005

9

**-Appearances-**

**Liaison Counsel for Plaintiffs:**

Robert Gordon, Esq.
Robin Greenwald, Esq.
C. Sanders McNew, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444