MDL 1358

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 9 2005

FILED
CLERK'S OFFICE

**DOCKET NO. 1358**

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE: METHYL-TERTIARY BUTYL ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION**

**MOTION OF PLAINTIFFS ANTHONY SANGUINO AND MARIA SANGUINO
TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-15)**

Plaintiffs Anthony Sanguino and Maria Sanguino file this Motion to Vacate
Conditional Transfer Order (CTO-15).

1.      On October 10, 2000, the Panel transferred two cases to the United

District Court for the Southern District of New York and created MDL 1358, *In re
Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*.  Since that time, 69

additional actions have been transferred to MDL 1358 and assigned to the Honorable

Shira Ann Scheindlin.

2.      The cases that have been joined to MDL all share products liability claims

made by states, towns and municipalities based upon the contamination or threatened

contamination of groundwater by MTBE.

3.      The cases pending in the MDL are brought against numerous major oil

companies, and allege that defendants are liable as co-conspirators for allegedly

concealing information about MTBE.

4.      On July 28, 2005, Exxon Mobil Corporation wrote the Clerk of the Panel

to notify the court that the matter of *Sanguino v. Bain's Automotive, Inc., et al.*, No. 2:05-

cv-3743(JAG) was a Related, Tag-Along Action.

PLEADING NO. 200

2005 SEP -9 A 10: 52
JUDICIAL PANEL ON
MULTIDISTRICT
RECEIVED
CLERK'S OFFICE

**OFFICIAL FILE COPY**

5.      On August 10, 2005, the Clerk of the Panel issued a Conditional Transfer Order (CTO-15) proposing to transfer to the *Sanguino* case to MDL 1358.

6.      On August 25, 2005, Plaintiffs filed Notice of Opposition to CTO-15.

7.      As explained more fully in an accompanying brief, CTO-15 should be vacated because *Sanguino* lacks commonality with the issues currently pending in MDL 1358, and individual questions of fact in the instant matter predominate as against any alleged common questions with the cases pending in MDL 1358.  The facts that support vacating the transfer include:

A.      The *Sanguino* case involves claims of the owners of a single piece of property who allege damages from a single service station site.  These property owners are not named in any of the cases consolidated in MDL 1358.  The station at issue is owned and operated by Bain's Automotive, Inc., which is a defendant in *Sanguino* and is not named in any of the cases consolidated in MDL 1358.

B.      The only defendants in *Sanguino* are Bain's Automotive, Inc. and Exxon Mobil Corporation.  These defendants are joined together because of their alleged involvement with the single site at issue.  There are no allegations of an industry-wide conspiracy in *Sanguino*, by contrast to the MDL cases.

C.      The Plaintiffs in the MDL case are all states, towns, and municipalities, while the Plaintiffs in the *Sanguino* case are two individuals who own a single piece of property.

D.      The *Sanguino* case involves allegations of contamination to the Plaintiffs' drinking water and exposure to vaporous MTBE, while the MDL cases solely involve allegations of contamination to groundwater.

For the foregoing reasons and those stated in the accompanying memorandum, Plaintiffs Anthony Sanguino and Maria Sanguino respectfully request that the Panel vacate the Conditional Transfer Order (CTO-15).

Stuart J. Lieberman, Esq. (SL0205)
Mara Epstein, Esq. (ME2783)
Lieberman & Blecher, P.C.
10 Jefferson Plaza, Suite 100
Princeton, New Jersey 08540
Attorneys for Plaintiffs Anthony and
Maria Sanguino

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 9 2005

FILED
CLERK'S OFFICE

## DOCKET NO. 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE: METHYL-TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

## BRIEF IN SUPPORT OF THE MOTION OF PLAINTIFFS ANTHONY SANGUINO AND MARIA SANGUINO TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-15)

Plaintiffs Anthony and Maria Sanguino (hereinafter referred to as "Plaintiffs") submit this brief in support of their Motion to Vacate the Conditional Transfer Order entered in this matter on August 10, 2005, designated CTO-15.

CTO-15 proposes to transfer a case pending in the District Court of New Jersey, *Sanguino v. Bain's Automotive, Inc., et al.*, No. 2:05-cv-3743(JAG), to an MDL proceeding in the Southern District of New York, MDL 1358. The *Sanguino* matter should not be transferred to MDL 1358 because *Sanguino* lacks commonality with the issues currently pending in MDL 1358 and individual questions of fact in the instant matter predominate over any alleged common questions with the cases pending in MDL 1358. Therefore, Conditional Transfer Order (CTO-15) should be vacated.

## BACKGROUND

In January 2003, Plaintiffs purchased the subject property. See Exhibit "A," Certification of Anthony Sanguino (hereinafter referred to as the "Sanguino Certification"). The subject property utilized a well for drinking water, bathing water, and water for general activities. *See id.* Soon after the purchase, Plaintiffs noticed a

RECEIVED
CLERK'S OFFICE

2005 SEP -9 A 10: 52

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

gasoline smell inside their house at the subject property. *See id.* In addition, in or around April 2003, Plaintiffs noticed that the drinking water began to taste strange. *See id.*

In June 2003, Plaintiffs filed a complaint with the New Jersey Department of Environmental Protection ("DEP") regarding the omnipresent gasoline smell and the strange tasting water. *See id.* After the complaint was filed, the DEP initiated testing of the subject property and the surrounding properties. *See id.* The DEP concluded that Bain's was leaking gasoline into the Plaintiffs' drinking water. *See* Exhibit "A," appended to the Sanguino Certification.

On or around June 15, 2003, Bain's began to provide Plaintiffs with bottled water. *See* Sanguino Certification. The Plaintiffs were eventually connected to the municipal water supply on July 1, 2003. However, to date, strong fumes continue to exist on the subject property. *See id.*

Bain's hired an environmental consulting firm, EnviroScience, to perform tests on the subject property in 2003 and 2004. *See id.* The subject property is still contaminated and Plaintiffs have never been provided with a proposed remediation schedule from Bain's.

On June 23, 2005, Bain's had an illegal nighttime delivery of gasoline. *See id.* Plaintiffs were awoken by strong gas fumes that made the air in Plaintiff's house stifling and unbearable. *See id.* As a result of this late delivery, Bain's was issued a Municipal Violation. *See* Exhibit "C," appended to the Sanguino Certification.

Plaintiffs have been seen by Dr. Iris Udasin, a specialist in the effects of gasoline contamination at the Environmental and Occupational Health Sciences Institute. *See* Sanguino Certification. Dr. Udasin has expressed her concern that Plaintiffs' residence

2

must be remediated as soon as possible and that Mr. and Mrs. Sanguino need be removed

from the home to protect their health. *See* Exhibit "E," appended to the Sanguino

Certification.

Due to the contaminated state of the subject property, Plaintiffs are unable to sell

the property to any potential buyers. *See id.* In addition, Plaintiffs do not have the

financial resources to find temporary housing until the remediation is complete.

Therefore, Plaintiffs are being forced to live in a contaminated house, constantly

breathing in noxious fumes which may have an adverse affect on Plaintiffs' health. Any

delay in the disposition of this matter puts the Plaintiffs at far greater risk for harm from

the contamination that still exists in, on, and under the subject property and further

damages the Plaintiffs' financial wellbeing.

**ARGUMENT**

**I.    CTO-15 SHOULD BE VACATED BECAUSE THE "COMMON
QUESTION" PRESENTED IN MDL 1358 IS DIFFERENT THAN THE LEGAL
BASIS ALLEGED IN THE SANGUINO MATTER**

In a previous decision by MDL No. 1358, the Court stated that the cases that have

been joined to the MDL all share products liability claims based upon the contamination

of drinking water by MTBE. *See In re: Methyl Tertiary Butyl Ether ("MTBE") Products*

*Liability Litigation*, 342 F. Supp. 2d 147, 150 (S.D.N.Y. 2004). However, the crux of

Plaintiffs' Complaint against Exxon is that Exxon failed to warn Plaintiffs' of MTBE's

carcinogenic qualities and its propensity to contaminate water.

Common to every claim pending in MDL 1358 is an oil company asserting that it

was acting as a federal agent of United States' Congress by placing MTBE into gasoline

pursuant to 28 U.S.C.S. § 1442(a)(1).  To establish federal jurisdiction under this section, the oil company must satisfy a four prong test:

> (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

> [*Feidt v. Owens Corning Fiberglas Corp.,* 153 F.3d 124, 127 (3d Cir. 1998).]

In this case, to establish entitlement to the MDL, Exxon must prove that it satisfies *every* prong.  Under established Third Circuit case law, Exxon cannot satisfy every prong of this test.

*Feidt* is on point with the case at bar.  The plaintiffs in *Feidt* filed a products liability action against CBS Corporation due to exposure to asbestos.  CBS Corporation removed the matter to federal court pursuant to 28 U.S.C.S. § 1442(a)(1), arguing that it acted as a government contractor and therefore was acting under the direction, control and supervision of an officer of the United States.  The District Court found that although the defendant raised a colorable federal defense, CBS Corporation failed to prove a causal nexus between the claims and the conduct performed.  *Id.* at 127.

As in the instant matter, the District Court found that the basis of plaintiff's claim against CBS Corporation was the failure to warn.  The Court held that the defendant did not submit proof that the Navy, the government agency that contracted with the defendant, prohibited the defendant from issuing warnings about installing asbestos.  *Id.*

Plaintiffs' claims against Exxon are virtually identical, and for this reason, this case does not belong in MDL 1358.  Plaintiffs are claiming that Exxon failed to warn Plaintiffs of MTBE's carcinogenic qualities and its propensity to contaminate water.

Nowhere in Exxon's Notice of Removal or Exxon's Notice of Related, Tag-Along Action

does Exxon allege that Congress or the EPA, the government agencies Exxon claims it

was acting under the direction of, ever prohibited Exxon from issuing warnings about

MTBE. Exxon cannot satisfy the fourth prong of the test, namely the causal nexus

between Plaintiffs' claims of failure to warn and Exxon's allegations in its Notice of

Removal that it added MTBE to gasoline at the behest of Congress and the EPA.

Therefore this matter does not belong in the MDL.

## II.   CTO-15 SHOULD BE VACATED BECAUSE COMMON QUESTIONS OF FACT DO NOT PREDOMINATE OVER INDIVIDUAL QUESTIONS OF FACT AND CONSOLIDATION WOULD NOT SERVE THE CONVENIENCE OF THE PARTIES OR WITNESSES

A transfer pursuant to 28 U.S.C. § 1407 is generally allowed only if the actions

involve common questions of fact, the transfer will serve the convenience of the parties

and witnesses, and the transfer will promote the just and efficient conduct of the actions

to be consolidated. *See* 28 U.S.C. § 1407(a). The *Sanguino* matter does not meet those

standards.

The Panel has consistently denied transfer when common questions of fact do not

predominate over the individual questions of fact in each action. Transfer is not

appropriate merely because the underlying matter involves allegations of MTBE

contamination. Where discrete factual issues predominate over the common issues,

transfer is not warranted.

In the matter of *In re Westinghouse Electric Corp. Employment Discrimination

Litigation*, 438 F. Supp. 937 (J.P.M.L. 1977), transfer was denied where individual

discriminatory acts predominated over a common issue of allegations of division-wide

5

racial discrimination.  In *In re Royal Typewriter co. (Royal Bond Copier) Breach of Warranty Litigation*, 435 F. Supp. 925 (J.P.M.L. 1977), the Panel found that the existence of individual contract relationships predominated and transfer was not appropriate. Finally, in *Environmental Protection Agency Pesticide Listing Confidentiality Litigation*, 434 F. Supp. 1235 (J.P.M.L. 1977), the Panel found that individual questions of whether data is exempt from disclosure predominated over the common question of the Environmental Protection Agency's interpretation of the disclosure statute.

In the instant matter, individual issues clearly predominate over any common issues shared with MDL 1358 and the Plaintiffs' allegations.   First of all, the Plaintiffs in this action are two (2) individual home owners of a single property that has been contaminated with MTBE.  On the contrary, the Plaintiffs in the MDL action are all cities, states, and municipalities whose water supply has been contaminated with MTBE.

Secondly, the instant matter involves allegations of damages from a single service station site.  The current owner of that station, Bain's, is not named in any of the cases consolidated in MDL 1358.  The other named Defendant, Exxon, is named in the instant matter because of its alleged involvement with the single site at issue.  There are no allegations of industry-wide products liability questions, only the use of gasoline laden with MTBE at the subject site and its subsequent contamination of Plaintiffs' property. The discovery that will be conducted will be limited to this particular site, which has no bearing on the discovery or any of the issues involved in the cases in MDL 1358.

In addition, the other cases in the MDL do not require the type of urgent judicial action that is needed in the instant matter.  None of these other cases involve claims of MTBE in the ambient air.  This is significant because, while bottled water can be

6

delivered, thereby avoiding the harm caused by ingesting MTBE, Plaintiffs are being

forced, due to economic considerations, to remain in a home where they are being

exposed to toxic chemicals that may have a deleterious effect on their health.  Plaintiffs

cannot sell their house because of the toxic fumes, and cannot afford to move out of the

house until this matter is concluded.  If this matter is transferred to the MDL, it will cause

substantial delay, as the MDL case, with its numerous plaintiffs and numerous

defendants, will take years to come to fruition.  In addition, the Plaintiffs, who are

individual homeowners, will not be able to afford to continue in the MDL, unlike the

multi-billion dollar corporate defendants and state and municipal plaintiffs.  In this case,

justice delayed will certainly be justice denied.

     In sum, the *Sanguino* matter involves the discovery of many different facts,

documents, and witnesses on causation and damages that are unrelated to the issues in

MDL 1358.  Additionally, a transfer would not serve the convenience of the parties and

witnesses.  Finally, a transfer in this matter would only serve to delay this matter and

cause the Plaintiffs to continue to suffer harm from the MTBE fumes invading their

home.  For these reasons, transfer should be rejected by the Panel.

### III.    CTO-15 SHOULD BE VACATED BECAUSE THE SANGUINO MATTER IS PREDOMINANTLY A LOCAL ACTION

     The Panel has held that the transfer of a predominantly local action should

be denied where the issues are primarily based upon local or state factual, legal and

administrative issues.  *See In re Brandywine Associates Antitrust and Mortgage

Foreclosure Litigation*, 407 F. Supp. 236, 238 (J.P.M.L. 1976).  The *Sanguino* matter, as

stated above, involves MTBE contamination at a single property in New Jersey which

touches on uniquely local issues, such as state and local environmental concerns that predominate the case. Moreover, the DEP has exercised authority over the investigation and remediation of Plaintiffs' property relating to the MTBE contamination. *See* Exhibit "A," appended to the Sanguino Certification. Therefore, the Panel should vacate CTO-15.

## IV.   CTO-15 SHOULD BE VACATED BECAUSE THERE IS A LACK OF COMMONALITY AMONG THE PARTIES IN THESE ACTIONS

The *Sanguino* matter involves claims of the owners of a single piece of property who allege damages from a single service station. As stated above, that service station is owned and operated by Bain's, which is a defendant in the *Sanguino* matter but is not named in any of the cases consolidated in MDL 1358. The other defendant in *Sanguino* is Exxon who is named in cases pending in MDL 1358. The Plaintiffs in *Sanguino* are not named in any of the MDL 1358 cases. Thus, there is just one party that is involved in *Sanguino* and in any of the MDL 1358 cases.

The Panel has examined the lack of commonality among parties as a factor in considering a denial of a transfer order. For example, in *In re Asbestos and Asbestos Insulation Material Products Liability Litigation*, 431 F. Supp. 906 (J.P.M.L. 1977), the Panel weighed the lack of commonality in its decision to deny transfer.[1] Therefore, due to a lack of commonality among parties, CTO-15 should be vacated.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Panel Vacate the Conditional Transfer Order (CTO-15).

---

[1] The asbestos cases were later transferred because more than 26,000 cases were filed after the original decision, but the Panel did not disclaim its prior denials of transfer. *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991).

Dated: September 8, 2005                    Respectfully submitted,


                                            Stuart J. Lieberman, Esq. (SL0205)
                                            Mara Epstein, Esq. (ME2783)
                                            Lieberman & Blecher, P.C.
                                            10 Jefferson Plaza, Suite 100
                                            Princeton, New Jersey 08540
                                            Attorneys for Plaintiffs Anthony and
                                            Maria Sanguino

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 9 2005

## CERTIFICATE OF SERVICE

FILED
CLERK'S OFFICE

The undersigned certifies that a copy of the attached **MOTION and BRIEF IN SUPPORT OF THE MOTION OF PLAINTIFFS ANTHONY SANGUINO AND MARIA SANGUINO TO VACATE THE CONDITIONAL TRANSFER ORDER (CTO-15)** was served on the following counsel on the attached Panel Service List via overnight mail, on this 8th day of September 2005:

Marc A. Rollo, Esq.
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968

Attorneys for Defendant
Exxon Mobil Corporation

David J. Montag, Esq.
Peter Seiden, Esq.
Milber Makris Plousadis & Seiden, LLP
411 Hackensack Avenue
Suite 303
Hackensack, NJ 07601

Attorneys for Defendant
Bain's Automotive, Inc.

Robin Greenwald, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
17th Floor
New York, NY 10038

Plaintiffs' Liaison Counsel
for MDL 1358

Peter J. Sacripanti, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Defendants' Liaison Counsel
for MDL 1358

Dated:  September 8, 2005

MARA EPSTEIN, ESQ.

RECEIVED
CLERK'S OFFICE
2005 SEP -9  A 10: 52
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**PANEL SERVICE LIST (CTO-15)**
**DOCKET NO. 1358**
**IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY**
**LITIGATION**

*Anthony Sanguino, et al. v. Bain's Automotive, Inc., et al.,* D. New Jersey, C.A. No. 2:05-3743

Robin Greenwald
Weitz & Luxenberg
180 Maiden Lane
17th Floor
New York, NY 10038

Stuart J. Lieberman
Lieberman & Blecher, P.C.
10 Jefferson Plaza
Suite 100
Princeton, NJ 08540

David J. Montag
Milber, Makris, Plousadis & Seiden, LLP
411 Hackensack Avenue
Suite 303
Hackensack, NJ 07601

Marc A. Rollo
Archer & Greiner, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Peter Seiden
Milber, Makris, Plousadis & Seiden, LLP
411 Hackensack Avenue
Suite 303
Hackensack, NJ 07601

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 9 2005

A

FILED
CLERK'S OFFICE

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 9 2005

FILED
CLERK'S OFFICE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTHONY SANGUINO and MARIA SANGUINO, <br><br> Plaintiffs, <br><br> v. <br><br> BAIN'S AUTOMOTIVE, INC. d/b/a BAIN'S EXXON QWIK MART, EXXON MOBIL CORPORATION, JANE DOES 1-100, JOHN DOES, INC. 1-100 <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 2:05-cv-3743(JAG) |

I, Anthony Sanguino, of full age, hereby certifies as follows:

1) I have lived at 5 West Street, Succasunna Township, Morris County, New Jersey since January 2003.

2) The residence was my dream house that I had been searching for some time. It held all the qualities and characteristics I wanted in a house to raise a family in.

3) Shortly after moving into our residence, my wife and I began to notice a musty, gas smell in the residence.

4) Our residence has shallow well water which I used for bathing, drinking and other general activities.

5) Around April 2003, we noticed that the water began to taste funny.

6) In addition, a constant gas smell began to be present in the house.

7) I contacted the New Jersey Department of Environmental Protection (hereinafter referred to as "DEP") shortly after the strange smells and tastes began.

8) In June 2003, I filed a complaint with the DEP.

9)  We have been getting headaches from time to time, and believe this to be related to the contamination.

10) The DEP arrived within a short time at our residence and began doing testing of our property and the surrounding properties.

11) They concluded that a gas station near our residence, Bain's Automotive (hereinafter referred to as "Bain's"), was leaking gasoline into our drinking water.  <u>See</u> Exhibit "A", DEP Correspondence.

12) I ingested the foul-tasting water for a few months before Bain's provided us with bottled water around June 15, 2003, and we were eventually shifted over to city water on July 1, 2003.   I no longer use the well.

13) The presence of strong fumes continues to exist in the house, subtly, especially during heavy activity at the gas station and on abundantly windy days.

14) Bain's hired an environmental consulting company called EnviroScience to do some testing and digging on our property in 2003 and 2004.  Bain's led me to believe that the contamination was not a big deal and as long as I cooperated, the contamination would be cleaned up in a short time.

15) EnviroScience continued to test and dig into 2004 but by the end of 2004, I had not heard of any conclusion or strategy to completely remediate our residence.

16) By the end of 2004, almost two full years after contacting the DEP and the involvement of Bain's in the matter, I did not hear anything from either Bain's or EnviroScience as to the status of the cleanup or whether or not the contamination had been remediated.

17) Every time Bain's has a gasoline delivery by tanker truck, our house becomes filled with overbearing gas vapors that makes the air temporarily unsuitable to breath, giving us headaches. The powerful vapors remain in our house for at least one hour following the delivery of the gasoline at Bain's. See Exhibit "B", Related Letter to Bain's former counsel Michael Savett, Esq. and Roxbury Health Dept.

18) At least twice in the past few years, Bain's has received gasoline by tanker truck in the middle of the night. When this occurred just recently on June 23, 2005, my wife and I were both awoken by strong gas fumes that made the air in our house stifling and unbearable.

19) Roxbury Township prohibits the delivery of gasoline at night. As a result of this late delivery, Bain's was issued a Municipal Violation. See Exhibit "C", Roxbury Township Municipal Violation.

20) We are concerned that the contamination is slowly killing us as a result of the contaminated air my wife and I are still breathing and the contaminated water we ingested for six months when we first moved into the residence. I am also concerned about any potential adverse health effects the contamination may have on visiting friends and relatives or any children we may have in the future.

21) The present contaminated state of our house has made our property un-sellable to any potential buyer, and therefore worthless.

22) Our combined income is $63,000 a year and we do not have the means to afford to purchase a new house or rent an apartment and continue to pay the mortgage on this valueless piece of property.

23) Therefore, we are being forced to remain in a home where we constantly breathe in noxious fumes, which may have an adverse affect on our health.

24) Our attorney, Stuart J. Lieberman, Esq., has drafted numerous letters to Bain's counsel, imploring Bain's to pay for us to find a suitable alternate residence in which to move until the contamination is completely abated; however, Bain's has denied our requests. See Exhibit "D", Counsel Correspondence between Stuart J. Lieberman, Esq. and Michael Savett, Esq.

25) I have also seen Dr. Iris Udasin, a specialist in the effects of gasoline contamination at the Environmental and Occupational Health Sciences Institute and she expressed her concern in a report that our residence must be remediated as soon as possible and Mr. and Mrs. Sanguino be removed from the home.  See Exhibit E, Dr. Udasin Final Report, June 20, 2005.

26) The longer we stay in the house, the greater the risk that we may develop severe medical problems related to the contamination. Any delay in our case proceeding puts us at far greater risk for harm from the contamination that still exists in our home and further damage to our financial wellbeing.

27) I cannot afford to have any delay in finding a resolution to our situation as the Bain's contamination has created a financial and medical burden on our lives we can no longer bear.

28) I certify that these statements are true to the best of my knowledge.  I understand that I may be subject to penalty if any statement is willfully false.

Dated: 8 / 24 / 05

Anthony Sanguino

# EXHIBIT A



## State of New Jersey

Richard J. Codey
*Acting Governor*

Department of Environmental Protection
Bureau of Safe Drinking Water
P. O. Box 426
401 East State Street
Trenton, New Jersey 08625-0426
Fax: (609)-292-1654

Bradley M. Campbell
Commissioner

Frank Grisi
Roxbury Township Board of Health
72 Eyland Avenue
Succasunna, NJ 07876-1622

JUN 1 4 2005

Re:    **Potable Well Water Analyses in vicinity of Bain's Automotive Inc site ( Case # 03-06-10-1129-04), 65 Rt 10 Succasunna, Morris County.**

Dear Mr Grisi:

Summarized below are the significant results of a water sample collected from a potable well on October 28, 2004 in the municipality of Roxbury, Morris County. George Bains sampled this potable well due to ground water contamination identified at Bain's Automotive Inc, which is located at 65 Rt 10, Succasunna. This sample was analyzed for Volatile Organics, including TBA plus 10 TICS using USEPA Method 524.2, Revision 4.1.

Well Owner Name and Complete Address:     Joseph and Jennifer McLangan
7 West Street
Succasunna, NJ

Well Location (Block/Lot):     7 West Street
Block: 3707 / Lot 3

Table 1. Analytical results of potable water sample (results are in parts per billion)

| Compound | Concentration | Standard | Standard Type (see footnotes below) |
|---|---|---|---|
| Methyl tertiary butyl ether (MTBE) | 0.116 | 70 | MCL |

Footnotes:
    MCL        Safe Drinking Water Act Primary Standard or Maximum contaminant level.

By copy of this letter, the property owner is hereby informed that no regulated compounds were detected at concentrations that exceeded the standards established in the Safe Drinking Water regulations for the parameters sampled. Based on these results, the property owner is hereby informed that the water obtained from this well is acceptable for drinking water and other domestic uses.

A preliminary assessment of ground water and soil data collected in relation to the site under investigation, thus far indicates that the subject well has not been affected at concentrations above the Safe Drinking Water Primary Standards for the above referenced site. These results will be used in combination with other ground water and soil data collected during the continuing investigation of the Bain's Automotive Inc site

It is recommended that you provide guidance and assistance to the property owner and resident, if warranted.   If there are questions regarding the status of the remedial investigation at the above referenced site, please contact Ted Zagorski, case manager of the Bureau of Southern Case Management, at 609-777-0124.

Very truly yours,

Barker Hamill, Chief
Bureau of Safe Drinking Water

cc:   Joseph and Jennifer McLangan; Property Owner, 7 West Street, Sucasunna, NJ  07876
      Roxbury Clerk
      Ted Zagorski, BSCM Case Manager
      Fred Dickert, BSDW

ID 961-2776



**State of New Jersey**

Department of Environmental Protection

James E. McGreevey
*Governor*

Bradley M. Campbell
Commissioner

Bureau of Southern Case Management
PO Box 433
Trenton, NJ 08625-0433

Maria Sanguino
5 West Street
Succasunna, NJ 07876

DEC 0 4 2003

Re:     Indoor Residential Air Sampling Analyses in the vicinity of the Bain's Automotive/Mobil Quick Mart site,
        65 Route 10 East
        DEP Case #03-06-10-1129-04
        House:    Block 3707, Lot 4

Dear Ms. Sanguino:

The New Jersey Department of Environmental Protection (Department) is writing to inform you of the results from the air samples collected at your house on 29 August 2003.

The Department has been overseeing the remedial investigation and remedial actions associated with a discharge of gasoline from underground storage tanks (USTs) at the above referenced Bain's Automotive/Mobil Quick Mart (Bain's) site, DEP Case #03-06-10-1129-04. A release was identified in June 2003 associated with the system piping which was repaired in September 2002. Sampling of the ground water monitoring wells located on the station property and off-site at 5 West Street has identified contamination, specifically gasoline free product and/or dissolved gasoline constituents in the ground water in the vicinity of the site. The primary contaminants of concern in ground water include the gasoline constituents benzene, toluene, ethylbenzene, xylenes, methyl tertiary butyl ether (MTBE) and tertiary butyl alcohol (TBA). The presence of gasoline free product and/or high dissolved contaminant levels in the ground water, warranted action to assess indoor air contaminant levels. Consequently, at the direction of the Department, Enviro-Sciences Inc., on behalf of Bain's (site owner), collected air samples at your residence.

On 29 August 2003 indoor air samples were collected from the basement and dining room of your residence. One outside air sample was also collected. The summa canister samples were analyzed for volatile organic compounds according to USEPA Method TO-15. While the laboratory analyzed a large series of potential compounds, the primary compounds associated with gasoline that could affect air quality are benzene, ethylbenzene, toluene, xylenes, and MTBE. The compounds presented in the following table are only those which exceeded the minimum detection limits for this method. The laboratory analytical data sheets for each sampling event are attached.

As part of each air-sampling episode, a three (3) page Indoor Air Building Survey questionnaire was completed. These questions are designed to identify potential sources of air contamination associated with consumer products, household activities, and building materials. For example, benzene is utilized in general performance sealants and in the manufacture of scatter rugs, xylenes are used in varnish, paint thinners and rust preventatives; 1,4-dichlorobenzene is a primary constituent found in moth balls and other deodorant blocks, and toluene is utilized in paints and perfumes. In addition, a number of chemicals are found in cigarette smoke, including benzene, xylenes and naphthalenes

A review of the analytical results from the air samples collected at your house was conducted by comparing the data with the NJDEP Indoor Air Screening Levels (refer to the last column in the attached summary tables). If screening levels are exceeded, further evaluation may be warranted to determine if indoor air quality is compromised. The

Screening levels are based on conservative, USEPA exposure assumptions that consider daily, long-term exposure. Daily long-term exposure corresponds to a residential exposure of 24 hours a day, 350 days a year, over 30 years. The potential exposure of young children is also considered in the calculation. The New Jersey Department of Health and Senior Services (NJDHSS) concurs that the screening levels are appropriate when assessing indoor air quality.

The 29 August 2003 air sample results revealed exceedances of the screening limits for MTBE in the dining room (9.7 ug/m3) and in the basement (12 ug/m3). MTBE was also detected in an outside air sample at 7.2 ug/m3. Other contaminants identified during the air sampling event did not exceed the applicable screening level. MTBE may be associated with the ground water contamination or originate from ambient air; however, the presence of site-related contaminants of concern in your home warrants further investigation of the vapor intrusion pathway. The NJDEP will be requiring Bain's to further monitor the air quality from your home and/or from the air below your basement floor. You will, of course, be contacted in order to arrange the date/time of the sampling event. The compounds presented in the following tables are only those which exceeded the minimum detection limits for this method. The laboratory analytical data sheets are attached.

If you have questions regarding the sampling process, please contact Bain's environmental consultant, Envo-Sciences Inc., at (973) 398-8183. The Department recommends that you contact the Roxbury Health Department at (973) 448-2028 for guidance on reducing indoor air contaminants.

Gasoline contaminants are still present in the ground water in the vicinity of the Bain's Service Station site. Delineation wells have been installed and the Department has recently approved a partial Remedial Action Workplan (RAW) for remediation of the contamination. The proposed remedial action consists of soil vapor extraction and air sparging. It is expected that the system will further reduce the levels of ground water contamination in the site area.

If you have any questions regarding this correspondence, please feel free to contact Ted Zagorski, Case Manager, Bureau of Southern Case Management at (609) 777-0124.

Sincerely,

Kevin J. Kratina

Kevin Kratina
Chief, Bureau of Southern Case Management

Enclosure: Summary Table

c:    Bain's Automotive/Mobil Quick Mart
      Consultant
      Roxbury Health Department
      Ted Zagorski, Case Manager, BSCM

## AUGUST 29 2003,  AIR SAMPLING EVENT

| All Compounds Detected | Dining Room | Basement | Ambient Air Results | NJDEP Residential Indoor Air Screening Level |
|---|---|---|---|---|
| **Volatile Organics** | | | | |
| Acetone | 25 | 18 | 7.4 | 370 |
| Benzene | 1.2 | 1.6 | 1.0 | 1.6 |
| 2-Butanone | ND | 2.9 | ND | 1000 |
| Carbon disulfide | ND | ND | 0.78 | 730 |
| Chloromethane | 1.2 | 1.0 | 0.78 | 95 |
| 1,4-Dichlorobenzene | 0.90J | 1.2 | ND | 3.01 |
| Dichlorodifluoromethane | 2.4 | 2.3 | 2.7 | 180 |
| Ethylbenzene | 1.2 | 1.4 | 0.61J | 1100 |
| n-Heptane | 0.78J | 0.66J | ND | N/A |
| n-Hexane | ND | ND | 1.1 | N/A |
| Methylene chloride | 0.76 | 0.90 | ND | 3.80 |
| Methyl tert-butyl ether | **9.7** | **12** | **7.2** | 1.80 |
| Toluene | 6.4J | 7.2J | 3.8J | 420 |
| Freon 11 | 1.3 | ND | 1.1J | 730 |
| 1,2,4-Trimethylbenzene | 1.2J | 1.3 | 0.84J | 6.20 |
| Xylenes – total | 4.6 | 4.3 | 2.0 | 110 |

Only compounds detected in the basement or ambient air samples are reported in this table. All concentrations are listed in ug/m$^3$.

Notes:

J – Indicates an estimated value and has been qualified
N/A – A screening level is not yet available
ND  -None Detected

# SUMMARY OF GROUNDWATER MONITORING WELL ANALYTICAL RESULTS

Enviro-Sciences, Inc.

| | NJDEP Class IIA Groundwater Quality Standards | MW-5 5-803 07506-004 8/27/2003 | | | MW-5 5-1121 10553-012 11/21/2003 | | | MW-5 M5-1203 00017-005 1/2/2004 | | | MW-11 11-1103 10553-006 11/20/2003 | | | MW-11 M11-1203 00017-011 12/31/2003 | | | MW-5-40 M540-1203 00017-014 1/2/2004 | | | MW-5-40 M540-0404 02878-005 4/1/2004 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sample Location** / **ESI Sample ID Number** / **Laboratory Sample Number** / **Date Sampled** | (ug/L) | (ug/L) | | | (ug/L) | | | (ug/L) | | | (ug/L) | | | (ug/L) | | | (ug/L) | | | (ppb) | | |
| COMPOUNDS (units) | | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q |
| Dilution Factor | -- | | 2500 | | | | | | 100 | | | | | | 1 | | | 25 | | | 1 | |
| **VOCs** | | | | | | | | | | | | | | | | | | | | | | |
| Benzene | 1 | 37.5 | 1,250 | | 75.0 | 654 | | 15.0 | 132 | | 0.150 | 8.44 | | 0.150 | ND | | 3.75 | 98 | | 0.570 | 2.07 | |
| Ethylbenzene | 700 | 60.0 | ND | | 120 | 169 | | 24.0 | ND | | 0.240 | 9.93 | | 0.240 | ND | | 6.00 | 12 | | 0.720 | 1.13 | |
| Methyl-t-butyl ether (MTBE) | 70 | 550 | 191,000 | | 110 | 42,000 | | 22.0 | 6,470 | | 0.220 | 7.64 | | 0.220 | 0.347 | | 5.50 | 2,440 | | 1.60 | 31.1 | |
| Naphthalene | 300 | 675 | ND | | 135 | ND | | 27.0 | ND | | 0.270 | ND | | 0.270 | ND | | 6.75 | ND | | 0.690 | ND | |
| t-Butyl Alcohol (TBA) | 100 | 573.0 | ND | | 1150 | 14,800 | | 229 | 685 | D | 2.29 | ND | | 2.29 | ND | | 57.3 | 1,470 | | 1.70 | 17.8 | |
| Toluene | 1,000 | 525 | 4,570 | | 105 | 2,080 | | 21.0 | 360 | | 0.210 | 94.7 | D | 0.210 | ND | | 5.25 | 96 | | 0.630 | 0.673 | |
| Xylenes (total) | 1,000 | 130.0 | ND | | 260 | 433 | | 52.0 | 53 | | 0.520 | 47.5 | | 0.520 | ND | | 13.0 | ND | | 2.14 | ND | |
| Total VOCs: | -- | | 197,000 | | | 59,482 | | | 7,700 | | | 168.21 | | | 0.347 | | | 4,116 | | | 52.773 | |
| Total TICs: | -- | | ND | | | 2,600 | | | ND | | | 5.70 | | | ND | | | ND | | | ND | |
| Total VOCs & TICs: | -- | | 197,000 | | | 62,082 | | | 7,700 | | | 173.91 | | | 0.347 | | | 4,116 | | | 52.773 | |

NOTES:
MDL - Method Detection Limit
CONC - Concentration
Q - Qualifier
(ug/L) - micrograms per liter
TICs - Tentatively Identified Compounds
ND - Not Detected
VOCs - Volatile Organic Compounds

## SUMMARY OF GROUNDWATER POTABLE WELL
## ANALYTICAL RESULTS

**Enviro-Sciences, Inc.**

| ESI Sample ID Number:<br>Laboratory Sample Number:<br>Date Sampled: | NJDEP and Federal<br>Drinking Water<br>Standards | 5 WEST<br>39591.5<br>6/26/2003 | | | 5 WEST<br>09708-010<br>10/30/2003 | | | 5 WEST<br>00638-002<br>1/22/2004 | | | 5 WEST<br>03294-001<br>4/15/2004 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMPOUNDS  (units) | (ug/L) | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q | MDL | CONC | Q |
| Dilution Factor | -- | | (ug/L) | | | (ug/L) | | | (ug/L) | | | (ug/L) | |
| | | | | | | 1 | | | 1 | | | 100 | |
| **VOCs** | | | | | | | | | | | | | |
| Chloromethane | NLE | 2.7 | 2.700 | | 0.160 | ND | | 0.250 | ND | | 25 | ND | |
| Chloroform | 6 | 0.06 | ND | | 0.160 | ND | | 0.160 | ND | | 16 | ND | |
| Benzene | 1 | 0.04 | ND | | 0.140 | ND | | 0.140 | 0.330 | | 14 | ND | |
| Carbon Disulfide | NLE | 1.5 | ND | | 0.140 | ND | | 0.200 | ND | | 20 | ND | |
| Ethylbenzene | 700 | 0.15 | ND | | 0.120 | ND | | 0.120 | ND | | 12 | ND | |
| Methyl-t-butyl ether (MTBE) | 70 | 1 | 3,010 | D | 7.00 | 774 | D | 0.350 | 851 | D | 7 | 893 | |
| Naphthalene | 300 | 0.06 | ND | | 0.100 | ND | | 0.100 | ND | | 10 | ND | |
| t-Butyl Alcohol (TBA) | 100 | 3.3 | 548 | D | 83.0 | 246 | D | 0.530 | 43.6 | | 83 | 169 | |
| Toluene | 1,000 | 0.06 | ND | | 0.120 | ND | | 0.120 | 0.122 | | 12 | ND | |
| Xylenes (total) | 1,000 | 0.05 | ND | | 0.340 | ND | | 0.340 | ND | | 34 | ND | |

**NOTES:**

VOCs - Volatile Organic Compounds
MDL - Method Detection Limit
CONC - Concentration
Q - Qualifier
(ug/L) - micrograms per liter
NLE - No Level Established
ND - Not Detected
D - Result otained from diluted analysis

# EXHIBIT B

# LIEBERMAN & BLECHER

### A PROFESSIONAL CORPORATION

10 JEFFERSON PLAZA, SUITE 100
PRINCETON, NEW JERSEY 08540
TEL: (732) 355-1311
FAX:(732) 355-1310
WEBSITE: WWW.LIEBERMANBLECHER.COM

STUART J. LIEBERMAN
ATTORNEY AT LAW
SLIEBERMAN@LIEBERMANBLECHER.COM

June 23, 2005

**VIA FACSIMILE & REGULAR MAIL**

Michael S. Savett, Esq.
Weber Gallagher Simpson Stapleton
Fires & Newby, LLP
2000 Market Street, 13th Floor
Philadelphia, PA 19103
Fax-215-564-7699

> *Re:    Sanguino/Bain's Automotive Matter*

Dear Mr. Savett:

This letter is to notify you of a troubling event which occurred last night involving your client, Bain's Automotive. Apparently, your client received a gas delivery at approximately 3 am from a large tanker truck. As a result of this delivery, my clients' home became completely engulfed in choking gas fumes, making the residence uninhabitable for many hours during and subsequent to the delivery.

As we have advised you on multiple occasions, the incredible nuisance and health risks posed by the choking gas vapors being released from Bain's Automotive is completely unacceptable. The irreparable harm being imposed upon my clients by virtue of Bain's failure to remedy this situation is without a doubt, unconscionable. This harmful activity must be abated and my clients must be provided with an alternative, temporary residence.

I once again assert that your clients have an affirmative obligation to protect my clients from the constant vapors, fumes and contamination that is invading their home as a result of your client's actions. I request that you provide my clients with funding in order that they may be relocated to another location away from the constant gas contamination. I remind you again, as each day passes, especially days such as this past one, increased consequential and punitive damages attach.

If you have any questions or concerns, please contact my office.

Very truly yours,

STUART J. LIEBERMAN

SJL/kbh
cc:    Ted Zagorski, DEP Site Manager (via regular mail)
       Mr. and Mrs. Sanguino (via regular mail)

# EXHIBIT C

*Township of Roxbury*
1715 Route 46
Ledgewood, New Jersey 07852

INFORMATION 448-2000
CONSTRUCTION/BLDG. 448-7009
COURT 448-2034
ENGINEER 448-2018
FIRE OFFICIAL 448-2012
HEALTH 448-2028
MANAGER 448-2002
MAYOR & COUNCIL 448-2001
POLICE 448-2100

PLANNING/ZONING 448-2008
PUBLIC WORKS 448-2069
RECREATION 445-2015
TAX ASSESSOR 448-2021
TAX COLLECTOR 448-2022
TOWNSHIP CLERK 448-2001
TREASURER 448-2006
WASTEWATER TREATMENT PLANT 584-5360
ZONING OFFICER 448-2015 2.00

## NOTICE OF VIOLATION

**RECEIVED**

DATE OF NOTICE:   12/15/99

DATE OF INSPECTION:   12/14/99

DEC 16 1999

Bains Mobil Station
65 Route 10
Succasunna NJ  07876

**Roxbury Township
Health Department**

Block 339, Lot 6

DEAR PROPERTY OWNER:

PURSUANT TO ARTICLE 21-3-6.24 CHAPTER 21 OF THE GENERAL ORDINANCE OF ROXBURY TOWNSHIP, NEW JERSEY, YOU HAVE VIOLATED THE FOLLOWING:

Ordinance 21-3, Section 6.2.4 Noise Control Ordinance

It has come to my attention that you are receiving fuel shipments during the early morning hours between 10:00 p.m. and 5:00 a.m. This is a violation of the above captioned ordinance due to the noise created by the delivery of the fuel.

YOU ARE HEREBY ORDERED THAT YOU MUST ABATE THE VIOLATION WITHIN 10 DAYS OF RECEIPT OF THIS NOTICE. FAILURE TO ABATE WITHIN 10 DAYS WILL CAUSE A SUMMONS FOR MUNICIPAL COURT TO BE ISSUED. YOU WILL NOTE THAT YOU HAVE THE RIGHT TO APPEAL THIS DETERMINATION WITHIN TWENTY (20) DAYS UNDER SECTION 40:55 d-70 OF THE NEW JERSEY STATE STATUTE. TO APPEAL, CONTACT THE ZONING BOARD OF ADJUSTMENT SECRETARY OF ROXBURY TOWNSHP.

RESPECTFULLY,

SAM WILSON
ZONING OFFICER

SW:lm
Registered No. Z 592 813 103
bains/planning/sw
cc:     Peter Elwell
        Russell Stern
        Abigail Montgomery

# ROXBURY TOWNSHIP HEALTH DEPARTMENT
## Interoffice Memo

December 21, 1999

TO:  Sam Wilson, Zoning Officer

FROM:  Abigail M. Montgomery, Sr. REHS

SUBJECT:  Loading/Unloading at Bain's Mobil, 65 Route 10E, Succasunna (Block 339, Lot 6)

As of November 9, 1999, a new Noise Control Ordinance took effect. The new noise ordinance no longer deals with noise from loading and unloading. A new police ordinance, Chapter III, Section 3-4 Excessive Noise, has been adopted. It deals with alarms, amplified music and loading and unloading. This took effect on November 23, 1999. You may want to notify the complainant.

AMM:t

Cc:  Mark Noll, Police Chief

# EXHIBIT D

# LIEBERMAN & BLECHER
### A PROFESSIONAL CORPORATION

10 JEFFERSON PLAZA, SUITE 100
PRINCETON, NEW JERSEY 08540
TEL: (732) 355-1311
FAX:(732) 355-1310
WEBSITE: WWW.LIEBERMANBLECHER.COM

STUART J. LIEBERMAN
ATTORNEY AT LAW
SLIEBERMAN@LIEBERMANDLECHER.COM

April 26, 2005

## CONFIDENTIAL NEGOTIATIONS FOR SETTLEMENT PURPOSES ONLY

### VIA FACSIMILE & REGULAR MAIL

Michael S. Savett, Esq.
Weber Gallagher Simpson Stapleton
Fires & Newby, LLP
2000 Market Street, 13th Floor
Philadelphia, PA 19103
215-972-7930

    *Re:*    *Sanguino Matter*

Dear Mr. Savett:

Thank you for the courtesy of your phone call the other day. As I explained, I have been retained by the Sanguino's to commence a property damage and personal injury litigation against Bain's Automotive and other parties liable under, among other things, a products liability theory of law. I am in the process of drafting a lawsuit at this time.

In a nutshell, your client is gassing my clients out of their home. They have known that this has been ongoing since at least 2003. The levels of MTBE are from my substantial experience in MTBE litigation almost unprecedented. I believe that there is exposure in this case not just for compensatory damages but for punitive damages.

As I indicated to you, I am always willing to look for an amicable way to resolve the legal dispute. You asked me what I want in order to allow you access onto my clients property. I believe that the access agreement was absolutely immoral in that it provided for access but paid nothing in terms of rent. We see this kind of technique employed by oil companies all the time and candidly and respectfully, it is despicable.

In order to gain access, my clients have to be moved out of their home. They can bear no expense whatsoever with regard to this move and they must be moved to a location that is at least consistent with their present standard of living and poses no hardship to them. In addition, my clients require that I be immediately copied on any communications transmitted to any government agency by your client or its consultants, included but not limited to the DEP. This

## LIEBERMAN & BLECHER
A PROFESSIONAL CORPORATION

means contemporaneous transmission, not delayed transmission. This will provide you with access. It will also provide your client with the ability to mitigate damages. Nobody would accept anything less than this under these horrible circumstances.

What I have just described would provide your client with access. If you are interested in resolving the soon to be commenced litigation, that will require monetary compensation for among other things, diminution of property value, medical monitoring, infliction of emotional distress, negligence, and failure to warn. Please do not assume that this list is exhausted.

Should you wish to engage in discussions with regard to a potential resolution of the litigation, I stand ready to do so. But as I said, I am promptly moving forward with this litigation and will not stop doing so unless something meaningful is proposed.

Please call me with any questions.

Very truly yours,

*Stuart J. Lieberman/gmk*

STUART J. LIEBERMAN, ESQ.
Lieberman & Blecher, P.C.

SJL/gmk

cc:    Mr. and Mrs. Sanguino

\\Server\firm files\Clients\sanguino\Corres\4-22-05 ltr to savett.doc

# LIEBERMAN & BLECHER

A PROFESSIONAL CORPORATION

10 JEFFERSON PLAZA, SUITE 100
PRINCETON, NEW JERSEY 08540
TEL: (732) 355-1311
FAX:(732) 355-1310
WEBSITE: WWW.LIEBERMANBLECHER.COM

STUART J. LIEBERMAN
ATTORNEY AT LAW
SLIEBERMAN@LIEBERMANBLECHER.COM

May 31, 2005

**VIA FACSIMILE AND REGULAR MAIL**

Michael Savett, Esq.
Weber Gallagher Simpson Stapleton Fires and Newby
2000 Market Street, 13th Floor
Philadelphia, PA 19103

> RE:   *Sanguino/ Bain's Automotive Inc.*
> *Implementation of DEP Remedy*
> *File No.: 0028793*

Dear Mr. Savett:

As you are aware, this firm represents the Plaintiffs Anthony and Maria Sanguino in the above referenced matter. In a recent communication you advised me that you disagree with my position that the access agreement had been terminated. Accordingly, I have been under the belief that the DEP mandated remediation has been continuing. It is now my understanding based on information from a consultant who visited my clients' residence this morning that no site remediation is occurring. This is a surprise to me.

As I have stated previously, my clients believe that your client has an affirmative obligation to protect my clients from the vile fumes and harm associated with the petroleum release from Bain's Automotive. Litigation is being finalized and will be filed shortly relating to the claims that my clients have against your client. We continue to assert this position and advise you that each day your client fails to pay to remove my clients from the unhealthy environment made exclusively by the Bain's Automotive discharge is yet another day for which greater consequential and punitive damages attach.

Not withstanding this, I fully anticipate your client will comply with any DEP cleanup in order and obligations. I am copying the DEP on this letter so that this issue is disseminated and clear.

If you have any questions or concerns, please feel free to contact our office.

Very truly yours,

Stuart J. Lieberman, Esq.

Cc:   Mr. Ted Zagorski, DEP Site Manager
Mr. and Mrs. Sanguino

# LIEBERMAN & BLECHER

A PROFESSIONAL CORPORATION

10 JEFFERSON PLAZA, SUITE 100
PRINCETON, NEW JERSEY 08540
TEL: (732) 355-1311
FAX:(732) 355-1310
WEBSITE: WWW.LIEBERMANBLECHER.COM

STUART J. LIEBERMAN
ATTORNEY AT LAW
SLIEBERMAN@LIEBERMANBLECHER.COM

June 22, 2005

**VIA FACSIMILE AND REGULAR MAIL**

Michael Savett, Esq.
Weber Gallagher Simpson Stapleton Fires and Newby
2000 Market Street, 13th Floor
Philadelphia, PA 19103

      **RE:**    *Sanguino/ Bain's Automotive Inc.*
             *File No.: 0028793*

Dear Mr. Savett:

      As you are aware, this firm represents the Plaintiffs Anthony and Maria Sanguino in the above referenced matter.

      I have enclosed a June 14, 2005 letter from the DEP which demonstrates that the contaminants detected in my clients' drinking water exceeds what the DEP considers to be acceptable levels for drinking.

      As I have stated, your client has an affirmative obligation to protect my clients from the vile fumes and harm associated with the petroleum release from Bain's Automotive.  We again request that your client covers the cost of relocating my clients to a temporary location as soon as possible.  We continue to assert this position and advise you that each day your client fails to pay to remove my clients from the unhealthy environment caused exclusively by the Bain's Automotive discharge is yet another day for which greater consequential and punitive damages attach.

      If you have any questions or concerns, please feel free to contact our office.

                     Very truly yours,

                     Stuart J. Lieberman, Esq.

SJL/kbh
Cc:   Mr. Ted Zagorski, DEP Site Manager
      Mr. and Mrs. Sanguino

Enclosure



### State of New Jersey

Richard J. Codey
*Acting Governor*

Department of Environmental Protection
Bureau of Safe Drinking Water
P. O. Box 426
401 East State Street
Trenton, New Jersey 08625-0426
Fax: (609) 292-1654

Bradley M. Campbell
Commissioner

JUN 1 4 2005

Frank Grisi
Roxbury Township Board of Health
72 Eyland Avenue
Succasunna, NJ 07876-1622

Re:    **Potable Well Water Analyses** in vicinity of Bain's Automotive Inc site ( Case # 03-06-10-1129-04), 65 Rt 10 Succasunna, Morris County.

Dear Mr Grisi:

Summarized below are the significant results of a water sample collected from a potable well on October 28, 2004 in the municipality of Roxbury, Morris County. George Bains sampled this potable well due to ground water contamination identified at Bain's Automotive Inc, which is located at 65 Rt 10, Succasunna. This sample was analyzed for Volatile Organics, including TBA plus 10 TICS using USEPA Method 524.2, Revision 4.1.

Well Owner Name and Complete Address:      Maria Sanguino
                                           5 West Street
                                           Succasunna, NJ

Well Location (Block/Lot):                 5 West Street
                                           Block: 3707 / Lot 4

Table 1. Analytical results of potable water sample (results are in parts per billion)

| Compound | Concentration | Standard | Standard Type (see footnotes below) |
|---|---|---|---|
| Tertiary butyl alcohol (TBA) | 24.2 | 100 | GWQS-IS |
| Benzene | 0.206 | 1 | MCL |
| Methyl tertiary butyl ether (MTBE) | 465 D | 70 | MCL |
| Unknown (Retention Time =2.06) | 7.50 J | 100.0 | GWQS-IG |
| 2-methoxy-2methyl-Butane (RT 6.58) | 5.0 J | 100.0 | GWQS-IG |

Footnotes:

MCL       Safe Drinking Water Act Primary Standard or Maximum contaminant level.

GWQS-IS   No Primary Drinking Water Standard or Ground Water Quality Standard exists for this contaminant. An interim specific ground water quality criteria has been developed by the Department of Environmental Protection, however, to ensure public health and safety. The interim specific criteria will be proposed for adoption as a ground water quality standard in future revisions to the Ground Water Quality Standards, N.J.A.C. 7:9-6 et seq. The Bureau of Safe Drinking Water currently uses, for guidance, this health based criteria that was developed by the New Jersey Department of Environmental Protection, Division of Science, Research and Technology.

GWQS-IG   No Primary Drinking Water Standard, Ground Water Quality Standard or interim specific ground water quality criteria exists for this contaminant. The Ground Water Quality Standards, N.J.A.C. 7:9-6 et seq., have, however, established an interim generic criteria for synthetic organic compounds (SOCs) lacking a specific standard or interim specific criteria. SOCs lacking evidence of carcinogenicity have an individual interim generic criterion of 100 ppb and a total interim generic criterion of 500 ppb.

D - Diluted sample

By copy of this letter the property owner is informed that the contaminant(s) identified in the table above are not acceptable in drinking water and that water from this well should not be used for drinking water purposes.

H. 981. 2775

The potable well located at 5 West Street has been disconnected and the resident was connected to municipal water on 1 July 2003. This well was sampled as part of the continuing investigation of the Bain's Automotive Inc site. By assessing the analytical results of this well and other local wells and identifying the ground water flow direction, the Department advises that the contaminants identified in this well may have resulted from contaminant migration originating at the Bain's Automotive Inc site. If additional sampling of this well is required, it will be performed by the owner/operator for the Bain's Automotive Inc site.

It is recommended that you provide guidance and assistance to the property owner and resident, if warranted. If there are questions regarding the status of the remedial investigation at the above referenced site, please contact Ted Zagorski, case manager of the Bureau of Southern Case Management, at 609-777-0124.

Very truly yours,

Barker Hamill, Chief
Bureau of Safe Drinking Water

cc:   Maria Sanguino; Property Owner, 5 West Street, Succasunna, NJ 07876   *(Certified Letter)*
      Roxbury Clerk
      Ted Zagorski, BSCM Case Manager
      Fred Dickert, BSDW
      Rocky Richards, Bureau of Wellfield Remediation
      Frank Pinto, Environmental Claims Administration

ID: 961/2775

# EXHIBIT E

# E   O   H   S   I

## ENVIRONMENTAL AND OCCUPATIONAL HEALTH SCIENCES INSTITUTE

170 Frelinghuysen Road  ■  Piscataway, NJ 08854
■ (732) 445-0123 Ext. 600  ■  Fax (732) 445-0127

### OCCUPATIONAL HEALTH DIVISION
### CLINICAL CENTER

June 20, 2005

Mr. Anthony Sanguino
5 West Street
Succasunna, NJ 07876

Dear Mr. Sanguino,

Enclosed is our final report from your visit with us in our consultation clinic on May 17, 2005.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Damir Mazlagic, MD
Fellow – Occupational Medicine

Iris G. Udasin, MD
Associate Professor, Attending Physician

Enclosure:    Report

IGU/DM: mp

EOHSI is jointly sponsored by the University of
Medicine and Dentistry of New Jersey - Robert Wood Johnson Medical School
and Rutgers, The State University of New Jersey

♻ Printed on Recycled Paper

# E     O     H     S     I

### ENVIRONMENTAL AND OCCUPATIONAL HEALTH SCIENCES INSTITUTE

170 Frelinghuysen Road ■ Piscataway, NJ 08854
■ (732) 445-0123 Ext. 600 ■ Fax (732) 445-0127

OCCUPATIONAL HEALTH DIVISION
CLINICAL CENTER

**Patient's Name:** SANGUINO, ANTHONY
**Date of Exam:** May 17, 2005
**D.O.B.:** July 8, 1971

**From:** Damir Mazlagic, MD, Fellow – Occupational Medicine
Iris Udasin, MD, Associate Professor
Division of Occupational Health
Department of Environmental and Occupational Medicine
UMDNJ-Robert Wood Johnson Medical School
170 Frelinghuysen Road
Piscataway, NJ 08854

_____
Damir Mazlagic, MD
Fellow – Occupational Medicine

_____
Iris Udasin, MD
Associate Professor, Attending Physician

## Chief Complaint:

Mr. Sanguino is referred to us by his lawyer, Stewart Lieberman (Princeton, NJ), to be evaluated for presence of any health effects after prolonged exposure to gasoline vapors at his home. He is accompanied by his wife, who is here for the same reason.

## History of Present Illness:

Mr. Sanguino is a 33-year-old male with a history of GERD. He lives with his wife in a 40-year-old, one-floor house with a basement, in Succasunna, NJ. They purchased the house and moved into it in February 2003. This is a ranch house, with two bedrooms, located next to a gas station on Route 10. There is a water-well in their backyard, which was tested in two occasions just before the purchase of the house. The water was found to be safe for drinking, and they continued to use it for their everyday needs.

About three months after they have moved into the house, Mrs. Sanguino complained that the well water had "musty" taste and smell. Although Mr. Sanguino did not notice the change, they decided to have water from the well tested again (May 2003). The result came positive for gasoline components in the water. As per Mr. Sanguino, the values of benzene, MTBE (methyl tert-butyl ether), and many other volatile organic compounds

RUTGERS   EOHSI is jointly sponsored by the University of
UMDNJ    Medicine and Dentistry of New Jersey - Robert Wood Johnson Medical School
and Rutgers, The State University of New Jersey

♻ Printed on Recycled Paper

07/08/05  11:23  FAX 973 5 0538      SGPAPISH DO                    ⓐ04

Mr. Anthony Sanguino
May 17, 2005
Page 2 of 7

(VOCs) were "skyrocketing". He contacted the DEP (Department of Environmental Protection), which subsequently found that the gas station on Route 10 had a leaking underground gasoline storage tank. The station is located between 70 and 100 ft from Mr. and Mrs. Sanguino's house, flanking their backyard. Since that time the gas station has been providing them with city water through a regular water line. In August 2003 the environmental company sent by the gas station (*Enviro-Sciences*) performed the air testing of the house for cleanup purposes. The air levels of benzene, acetone, MTBE, and other VOCs were all above the DEP standards, as per Mr. Sanguino. The same environmental agency has placed few monitoring wells in the backyard, and performed testing every two months. However, they did not supply Mr. and Mrs. Sanguino with any results. In June 2004 *Enviro-Sciences* placed the PVC piping system into the backyard ground with the goal of soil remediation, but the system has never been fully activated since, according to Mr. Sanguino.

In winter 2004, after turning on the portable electric coil-heater in his basement, Mr. Sanguino sensed strong, gasoline-like odor coming from the heater. As he was worried about continuous presence of elevated gasoline components in the house, he decided to appoint a lawyer in his pursuit of resolution of the situation. On his request, *Envirogenics* (environmental consulting firm) performed another air sampling and the test showed elevated levels of various VOCs again. Although he and his wife continued to live in the same house until present, both of them would like to leave the house or to make it fully safe for residence. They are anxious and concerned regarding safety for their planned baby in such an environment, but are afraid of not being able to sell or replace the house due to its contamination with gasoline.

Throughout this period, Mr. Sanguino continued to work at his job without difficulties. However, for the last two years he would get sore throat in the morning, about two times a week. He denies any fever, chills, shortness of breath, cough, chest pain, nausea, or vomiting.

## Occupational History:
2004 - until present – *Colgate*, Piscataway, NJ; system analyst (office work)
2001-2004 – *Waste Management*; field technician (computer support)
1999-2000 – *Natex Communications*, Morristown, NJ; network engineer
1997-1998 – *Vanstar* (computer repair store), Worton, NJ; customer representative
1986-1996 - Retail

## Past Medical/Surgical History:
GERD x five years; occasional episodes treated with Nexium (esmoprazole)

Mr. Anthony Sanguino
May 17, 2005
Page 3 of 7

**Medications:**
Nexium PRN; baby ASA daily (due to family history of heart disease); multivitamins

**Allergies:**
Hay fever (seasonal)

**Family History:**
Father and mother alive – healthy; maternal grandfather died at age of 30 from massive MI; paternal grandfather died from colon cancer at his 70's

**Social History:**
He is married, and has no children; smokes ½ pack of cigarettes per day; denies use of illicit drugs; socially consumes alcohol twice a month; currently takes bachelor in science (information technology) at University of Phoenix, AZ. He has three cats at home.

**Hobbies:**
Computers, home improvement (he renovated many parts of their house), landscaping

**Physical Exam:**
**Vitals:** T: 98.1°F BP: 130/84 HR: 82  RR: 20  Ht: 68 ¼ "  Wt: 263 lb  BMI: 39
**General:** 33-year-old male; obese; no acute distress; awake, alert, oriented; pleasant
**Skin:** dry, warm, with good turgor; few brownish striae visible at flanks B/L
**HEENT:** normocephalic, atraumatic head; EOMI; PERRL, sclerae anicteric; tympanic membranes clear bilaterally; no ear discharge; moist nasal mucosa, with minimal clear secretion R>L; no pharyngeal edema, erythema or exudates; no sinus tenderness found
**Neck:** supple; no thyromegaly or lymphadenopathy found
**CV:** Sl, S2 distant due to obesity; RRR; no murmurs heard
**Chest:** (+) gynecomasty; small surgical scar seen over the L nipple (status post mole removal); lungs resonant to percussion; clear to auscultation bilaterally (B/L)
**Abdomen:** obese; BS (+); soft abdominal wall; no rebound, guarding, or organomegaly
**Extremities and musculoskeletal examination:** no edema, cyanosis or clubbing noted; peripheral pulses full B/L
**Neurologic exam:** Cranial nerves II-XII grossly intact; motor strength 5/5 in all four extremities B/L; deep tendon reflexes 2+ B/L in biceps, brachioradialis, knee, and ankle; sensations preserved; Romberg test (-); no tremor noted; heel-to-shin test normal; diadochokinesis and sequential finger movements WNL

**Pertinent Labs/ Diagnostic Tests:**
N/A

Mr. Anthony Sanguino
May 17, 2005
Page 4 of 7

**Pertinent records reviewed:**
3/2/2005 - *Envirogenics*, Mercerville, NJ: Results of air samples analysis for VOCs by
EPA Method (outdoors and indoors)

**Impression:**
Mr. Sanguino is a 33-year-old male, who was referred by his lawyer for evaluation of
possible health effects or health risks from exposure to gasoline vapors at his home. He
and his wife would like to know if it is safe for them to stay in the house and if it would
be safe for his wife to get pregnant.

Gasoline is a mixture of various compounds, such as benzene (0- 5%), MTBE (0-15%),
ethanol (0-10%), toluene (up to 20%), hexane mixture, xylene mixture, ethyl benzene,
and others. However, its content varies from company to company and from one batch to
another. Both outdoors and indoors airborne concentrations of VOCs (including benzene,
MTBE, toluene, and other components of gasoline) tested in March 2005, were below the
threshold limit values (TLVs[1]) for chemical substances and physical agents published in
ACGIH's (American Conference of Governmental Industrial Hygienists) 2002 guidelines
and/or below the Occupational Safety and Health Administration's (OSHA) permissible
exposure limits in the air. These values are intended mainly for use as guidelines in
industrial hygiene. It is, though, impossible to predict the effects of the chronic,
continuous or intermittent exposure to low-doses of these chemicals in a home
environment, given the variation in individual susceptibility of humans. We were not
provided with the initial reports of water and air testing; hence we can not comment on
them. Many of the compounds found in the air samples are either known or suspected
human or animal carcinogens (benzene, ethyl benzene, MTBE), and some can cause
reproductive dysfunction in animals (acetone, toluene, n-hexane, xylene). Since Mr.
Sanguino has family history of cancer, and his wife has fertility problems that she has
been worked-up for, we would strongly recommend that they do not continue to live in
their current home, especially given their plans to have children. This is better to be
resolved sooner than later, because Mrs. Sanguino is approaching the age after which the
pregnancy carries increased risks of unwanted outcomes, even without being exposed to
environmental chemicals.

Some of the chemicals found on the testing are not commonly found in gasoline (e.g.
acetone, isopropyl alcohol), but rather are part of background air contamination
originating from use of pesticides and other commercial products (glues, cleaners,
solvents etc.). As Mr. Sanguino's undertook significant renovation of his house, it is
likely that such intervention contributed to the levels of non-gasoline related airborne
chemicals found in the air sample. Proper ventilation of the house, especially when

---
[1] TLVs refer to airborne concentrations of substances and represent conditions under which it is believed
that nearly all workers may be repeatedly exposed day after day without adverse effects, based on available
information from industrial experience and experimental human and animal studies.

Mr. Anthony Sanguino
May 17, 2005
Page 5 of 7

renovation work is performed, is generally advised and should help keep the concentration of these compounds at relatively safe levels.

Tobacco smoke contains small amounts of benzene, xylene, and toluene, among other 4,000 compounds, and it can contribute to the toxic effects of other chemicals found in the tested air sample. In addition, smoking (including second hand smoking) during pregnancy is associated with miscarriage, low birth weight, premature birth, and other developmental disturbances. Thus, it is strongly recommended that Mr. Sanguino quit smoking, in coordination with his primary care physician if needed. Quitting smoking might also help with sore throat resolution, as should the treatment for his GERD under follow-up by his primary care physician.

There would be little use from testing for the blood or urine levels of the chemicals found in the air sample or their metabolites, as many of these compounds leave the human body soon after they enter it. Furthermore, the tests would not be a reliable indicator of how much of these chemicals a person has been exposed to.

**Conclusion:**
Although the concentrations of chemicals found in the outdoor and indoor air sample tested in March 2005 at Mr. Sanguino's home are below the OSHA's and/or ACGIH's TLVs, it is impossible to predict the effects of the chronic, continuous or intermittent exposure to low-doses of these chemicals in a home environment, given the variation in individual susceptibility of humans. Many of the compounds found in the air samples are either known or suspected human or animal carcinogens, and some can cause reproductive dysfunction in animals. Given Mr. Sanguino's family history of cancer, and his and his wife's intention to have children, we would strongly recommend that they do move out of their current home. Even though we believe that for the short-term it is relatively safe for them to live there regarding the air contamination, the alternative residence should be found before Mrs. Sanguino gets pregnant. That is better to be accomplished sooner than later as she is approaching the age after which the pregnancy carries increased risks of birth defects, even without being exposed to environmental chemicals. It would be unreasonable to expose her or her future child to an additional risk from the current airborne contaminants at their home.

We strongly recommend that Mr. Sanguino stop smoking, as the tobacco smoke can contribute to the toxic and carcinogenic effects of the compounds found in the air sample tested. He should continue a follow-up with his primary care physician regarding both smoking cessation and his GERD treatment, as both of these interventions can also help improving his sore throat.

Mr. Anthony Sanguino
May 17, 2005
Page 6 of 7

We asked Mr. and Mrs. Sanguino to provide us with the copy of the initial water and/or
air test results obtained by DEP. We would gladly review them and send you additional
comments if deemed necessary.

Thank you for the opportunity to take part in medical evaluation of Mr. Sanguino.

**References:**

1) The Agency for Toxic Substances and Disease Registry (ATSDR); Toxicologic
   profile for acetone, benzene, ethyl benzene, MTBE n-hexane, xylene;
   http://www.atsdr.cdc.gov/ toxpro2.html
2) Material Safety Data Sheet (MSDS) for Chevron regular unleaded gasoline;
   http://www.albina.com/Fuel/ChevronRUGasMSDS.htm
3) *MTBE in New Jersey's environment, Permit Limits and Monitoring Requirements*; NJ
   Department of Environmental Protection; MTBE Work Group and Division of
   Science, Research and Technology; http://www.state.nj.us/dep/dsr/mtbe/permit_
   limits.htm
4) Lynge E., Andersen A., Nilsson R., Barlow L., Pukkala E., Nordlinder R. et al.; *Risk
   of cancer and exposure to gasoline vapors*; American Journal of Epidemiology.
   145(5): 449-58, March 1997
5) Kenny S. Crump; *Risk of benzene-induced leukemia predicted from the Pliofilm
   cohort*; EHP, Vol. 104, Supplement 6: 1437-41, 1996 Dec.
6) Kaldor-J; Harris-JA; Glazer-E; Glaser-S; Neutra-R; Mayberry-R; Nelson-V;
   Robinson-L; Reed-D; Statistical association between cancer incidence and major-
   cause mortality, and estimated residential exposure to air emissions from petroleum
   and chemical plants; EHP, Vol. 54, pp. 319-332; 1984

**July 21, 2005**

**Addendum:**

We have subsequently received and reviewed the reports of air sampling, groundwater
monitoring well, and groundwater potable well analysis performed by NJ DEP, Garden
State Laboratories (Hillside, NJ), and Enviro-Sciences (Mt. Arlington, NJ).

The DEP air sample analysis from August 29, 2003 revealed MTBE levels in the dining
room of 9.7 ug/m3, in the basement 12 ug/m3, and outdoor levels of 7.2 ug/m3, all of
which exceeded NJDEP Indoor Air Screening Level of 1.8 ug/m3. Other contaminants
identified during the analysis did not exceed these. Gasoline contaminants (MTBE, TBA,
Toluene, Benzene) were still present in the ground water in the vicinity of the gas station.
The remediation arrangements were made.

Mr. Anthony Sanguino
May 17, 2005
Page 7 of 7

The Garden State Laboratories drinking water sample (May 30, 2003) analysis showed
MTBE concentration of 4334 ug/L, and Benzene concentration of 39 ug/L. The
maximum contaminant levels (MCL) allowed by State and Federal regulations were 70
and 1.0 ug/L, respectively.

The remedial investigation report by Enviro-Sciences, Inc. for Bain's Automotive
Inc./Mobil Quick Mart from March 9, 2004 on environmental evaluations from October
2003 to January 2004 states the recommendations for remediation and related
environmental monitoring activities at that site.

Our assessment and recommendations remain the same. We agree with the need for
continuous monitoring and remediation processes as deemed necessary per NJDEP
and/or other appropriate environmental services.

If you have any questions regarding our report, please contact our clinic.

# E  O  H  S  I

## ENVIRONMENTAL AND OCCUPATIONAL HEALTH SCIENCES INSTITUTE

170 Frelinghuysen Road  ■  Piscataway, NJ 08854
■ (732) 445-0123 Ext. 600  ■  Fax (732) 445-0127

OCCUPATIONAL HEALTH DIVISION
CLINICAL CENTER

June 20, 2005

Mrs. Maria Sanguino
5 West Street
Succasunna, NJ 07876

Dear Mrs. Sanguino,

Enclosed is our final report from your visit with us in our consultation clinic on May 17, 2005.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Damir Madhagic, MD
Fellow – Occupational Medicine

Iris G. Udasin, MD
Associate Professor, Attending Physician

Enclosure:     Report

IGU/DM:  mp

EOHSI is jointly sponsored by the University of
Medicine and Dentistry of New Jersey - Robert Wood Johnson Medical School
and Rutgers, The State University of New Jersey

♻ Printed on Recycled Paper

# E    O    H    S    I

## ENVIRONMENTAL AND OCCUPATIONAL HEALTH SCIENCES INSTITUTE

170 Frelinghuysen Road  ■  Piscataway, NJ 08854
■ (732) 445-0123 Ext. 600  ■  Fax (732) 445-0127

### OCCUPATIONAL HEALTH DIVISION
### CLINICAL CENTER

**Patient's Name:** SANGUINO, MARIA
**Date of Exam:** May 17, 2005
**D.O.B.:** ~~July 8, 1971~~ July 11th 1974  (AS)

**From:** Damir Mazlagic, MD, Fellow – Occupational Medicine
Iris Udasin, MD, Associate Professor
Division of Occupational Health
Department of Environmental and Occupational Medicine
UMDNJ-Robert Wood Johnson Medical School
170 Frelinghuysen Road
Piscataway, NJ 08854

Damir Mazlagic, MD
Fellow – Occupational Medicine

Iris Udasin, MD
Associate Professor, Attending Physician

## Chief Complaint:

Mrs. Sanguino and her husband are referred to us by their lawyer, Stewart Lieberman (Princeton, NJ), to be evaluated for presence of any health effects or health risks from prolonged exposure to gasoline vapors at their home.

## History of Present Illness:

Mrs. Sanguino is a 30-year-old female with a history of fertility problems, who lives with her husband in a 40-year-old, one-floor house with a basement, in Succasunna, NJ. They purchased the house in February 2003. This is a ranch house, with two bedrooms, located next to a gas station on Route 10. There is a water-well in their backyard, which was tested in two occasions just before the purchase of the house. The water was found to be safe for drinking, and they continued to use it for their everyday needs.

About three months after they have moved into the house, Mrs. Sanguino complained that the well water had "musty" taste and smell. Although Mrs. Sanguino did not notice the change, they decided to have water from the well tested again (May 2003). The result came positive for gasoline components in the water. As per Mr. Sanguino, the values of benzene, MTBE (methyl tert-butyl ether), and many other volatile organic compounds

EOHSI is jointly sponsored by the University of Medicine and Dentistry of New Jersey - Robert Wood Johnson Medical School and Rutgers, The State University of New Jersey

♲ Printed on Recycled Paper

Mrs. Maria Sanguino
May 17, 2005
Page 2 of 7

(VOCs) were "skyrocketing". He contacted the DEP (Department of Environmental
Protection), which subsequently found that the gas station on Route 10 had a leaking
underground gasoline storage tank. The station is located between 70 and 100 ft from Mr.
and Mrs. Sanguino's house, flanking their backyard. Since that time the gas station has
been providing them with city water through a regular water line.

In August 2003 the environmental company sent by the gas station (*Enviro-Sciences*)
performed the air testing of the house for cleanup purposes. The air levels of benzene,
acetone, MTBE, and other VOCs were all above the DEP standards, as per Mr. Sanguino.
The same environmental agency has placed few monitoring wells in the backyard, and
performed testing every two months. However, they did not supply Mr. and Mrs.
Sanguino with any results.

In June 2004 *Enviro-Sciences* placed the PVC piping system into the backyard ground
with the goal of soil remediation, but the system has never been fully activated since,
according to Mr. Sanguino.

In winter 2004, they decided to appoint a lawyer in their pursuit of resolution of the
problem. On their request, *Envirogenics* (environmental consulting firm) performed
another air sampling and the test showed elevated levels of various VOCs again.
Although Mrs. and Mr. Sanguino continued to live in the same house until present, both
of them would like to leave the house or to make it fully safe for residence. They are
anxious and concerned regarding safety for Mrs. Sanguino's planned pregnancy in such
an environment, but are afraid of not being able to sell or replace the house due to its
contamination with gasoline components.

Since moving into their house, Mrs. Sanguino has been waking up in the morning with
sore throat almost daily. She also complains of "sinus-like", frontal headache that usually
starts in the morning, lasting throughout the day, and occurring about four times per
month. It is relieved by Advil. She denies fever, chills, shortness of breath, cough, chest
pain, nausea, or vomiting.

**Occupational History:**
1999 – present - office manager for MD office (Dr. Pappish)
1995-1998 - *Carnick Pharmaceutical*, Cedar Noels, NJ; account payable
1989-1994 – Retail

**Past Medical/Surgical History:**
Dermoid cyst and fibroid tumor (1999)
She tested positive for genetic predisposition for hypercoagulability during pregnancy,
and due to history of fertility problems, is under care of specialist for fertility issues.

Mrs. Maria Sanguino
May 17, 2005
Page 3 of 7

**Medications:**
Prenatal multivitamins; folic acid; baby aspirin; spironolactone; dexamethasone; birth
control pills; Gonal-F (recombinant FSH, ovulation stimulator); HCG (gonadotropin,
ovulation stimulator); Citrical (calcium + vitamin D)

**Allergies:**
Morphine – hives

**Family History:**
Noncontributory

**Social History:**
She is married, and has no children; denies smoking or use of illicit drugs; socially
consumes alcohol twice a month; does not exercise; the highest level of education – high
school. They have three cats at home.

**Hobbies:**
Cooking, croshe

**Physical Exam:**
**Vitals:** T: 98.4°F  BP: 118/80  HR: 78  RR: 14  Ht: 63 ½ "  Wt: 174 lb  BMI: 30
**General:** 30-year-old female; overweight; in no acute distress; awake, alert, oriented x 3
**Skin:** dry, warm, with good turgor; no rash
**HEENT:** normocephalic, atraumatic head; EOMI; PERRL, sclerae anicteric; tympanic
membranes clear bilaterally; no ear discharge; moist nasal mucosa; no pharyngeal edema,
erythema or exudates; no sinus tenderness found
**Neck:** supple; no thyromegaly or lymphadenopathy found
**CV:** Sl, S2; RRR; no murmurs heard
**Chest:** lungs resonant to percussion; clear to auscultation bilaterally (B/L)
**Abdomen:** BS (+); soft abdominal wall; no rebound, guarding, or organomegaly
**Extremities and musculoskeletal examination:** no edema, cyanosis or clubbing noted;
peripheral pulses full B/L
**Neurologic exam:** Cranial nerves II-XII grossly intact; motor strength 5/5 in all four
extremities B/L; deep tendon reflexes 2+ B/L in biceps, brachioradialis, knee, and ankle;
sensations preserved; no tremor noted; heel-to-shin test normal; diadochokinesis and
sequential finger movements WNL

**Pertinent Labs/ Diagnostic Tests:**
N/A

Mrs. Maria Sanguino
May 17, 2005
Page 4 of 7

## Pertinent records reviewed:

3/2/2005 - *Envirogenics*, Mercerville, NJ: Results of air samples analysis for VOCs by
EPA Method (outdoors and indoors)

## Impression:

Mrs. Sanguino is a 30-year-old female, who was referred by his lawyer for evaluation of
possible health effects or health risks from exposure to gasoline vapors at her home. She
and her husband would like to know if it is safe for them to stay in the house and if it
would be safe for her to get pregnant.

Gasoline is a mixture of various compounds, such as benzene (0- 5%), MTBE (0-15%),
ethanol (0-10%), toluene (up to 20%), hexane mixture, xylene mixture, ethyl benzene,
and others. However, its content varies from company to company and from one batch to
another. Both outdoors and indoors airborne concentrations of VOCs (including benzene,
MTBE, toluene, and other components of gasoline) tested in March 2005, were below the
threshold limit values (TLVs[1]) for chemical substances and physical agents published in
ACGIH's (American Conference of Governmental Industrial Hygienists) 2002 guidelines
and/or below the Occupational Safety and Health Administration's (OSHA) permissible
exposure limits in the air. These values are intended mainly for use as guidelines in
industrial hygiene. It is, though, impossible to predict the effects of the chronic,
continuous or intermittent exposure to low-doses of these chemicals in a home
environment, given the variation in individual susceptibility of humans. We were not
provided with the initial reports of water and air testing; hence we can not comment on
them. Many of the compounds found in the air samples are either known or suspected
human or animal carcinogens (benzene, ethyl benzene, MTBE), and some can cause
reproductive dysfunction in animals (acetone, toluene, n-hexane, xylene). Since Mrs.
Sanguino has fertility problems that she has been followed-up for by her physicians, and
since her husband has family history of cancer, we would strongly recommend that they
do not continue to live in their current home, especially given their plans to have
children. This is better to be resolved sooner than later, because Mrs. Sanguino is
approaching the age after which the pregnancy carries increased risks of unwanted
outcomes, even without being exposed to environmental chemicals.

Some of the chemicals found on the testing are not commonly found in gasoline (e.g.
acetone, isopropyl alcohol), but rather are part of background air contamination
originating from use of pesticides and other commercial products (glues, cleaners,
solvents etc.). As Mrs. Sanguino's house underwent a significant renovation since its
purchase, it is likely that such intervention contributed to the levels of non-gasoline

---

[1] TLVs refer to airborne concentrations of substances and represent conditions under which it is believed
that nearly all workers may be repeatedly exposed day after day without adverse effects, based on available
information from industrial experience and experimental human and animal studies.

Mss. Maria Sanguino
May 17, 2005
Page 5 of 7

related airborne chemicals found in the air sample. Proper ventilation of the house, especially when renovation work is performed, is generally advised and should help keep the concentration of these compounds at relatively safe levels.

Acute intoxication with many pharmaceutical and industrial agents (especially nitrites, carbon monoxide, toluene, and lithium) is associated with headaches (usually vascular type). The headaches are usually brief or in series lasting for a few days. Anxiety and depression concerning a perceived toxic exposure can trigger tension headache in susceptible individuals, which we believe is more likely cause in Mrs. Sanguino's case, given the low concentration of the airborne chemicals found in her home. It should be mentioned that some of the medications that Mrs. Sanguino takes have headache listed as one of the possible side effects, as in the case of Gonal-F or spironolactone. Mrs. Sanguino should discuss this with the physician who prescribed these medications to her.

Tobacco smoke contains small amounts of benzene, xylene, and toluene, among more than 4,000 other compounds, and it can contribute to the toxic effects of other chemicals found in the tested air sample. Secondhand smoke has been classified by the Environmental Protection Agency (EPA) as a known cause of cancer in humans (Group A carcinogen). In addition, a second hand smoking during pregnancy is found to be associated with low birth weight, miscarriages, and other developmental disturbances. Thus, it is strongly recommended that ~~Mrs. Sanguino quit smoking.~~  fix  not a smoker.

There would be little use from testing for the blood or urine levels of the chemicals found in the air sample or their metabolites, as many of these compounds leave the human body soon after they enter it. Furthermore, the tests would not be a reliable indicator of how much of these chemicals a person has been exposed to.

Mrs. Sanguino should continue regular follow-up with her primary care physician and/or physicians involved in treatment of her infertility.

### Conclusion:

Although the concentrations of chemicals found in the outdoor and indoor air sample tested in March 2005 at Mrs. Sanguino's home are below the OSHA's and/or ACGIH's TLVs, it is impossible to predict the effects of the chronic, continuous or intermittent exposure to low-doses of these chemicals in a home environment, given the variation in individual susceptibility of humans. Many of the compounds found in the air samples are either known or suspected human or animal carcinogens, and some can cause reproductive dysfunctions in animals. Given Mrs. Sanguino's fertility problems, her intention to have children, and given Mr. Sanguino's family history of cancer, we would strongly recommend that they move out of their current home. Even though we believe that for the short-term it is relatively safe for them to live there regarding the air

Mrs. Maria Sanguino
May 17, 2005
Page 6 of 7

contamination, the alternative residence should be found before Mrs. Sanguino gets pregnant. That is better to be accomplished sooner than later as she is approaching the age after which the pregnancy carries increased risks of birth defects, even without being exposed to environmental chemicals. It would be unreasonable to expose her or her future child to an additional risk from the current airborne contaminants at their home.

We asked Mrs. and Mr. Sanguino to provide us with the copy of the initial water and/or air test results obtained by DEP. We would gladly review them and send you additional comments if deemed necessary.

We strongly recommend that Mrs. Sanguino stop smoking, as the tobacco smoke (even passively inhaled) can contribute to the toxic and carcinogenic effects of the compounds found in the air sample tested. She should continue a follow-up with her primary care physician and/or with other doctors involved in her care.

Thank you for the opportunity to take part in medical evaluation of Mrs. Sanguino.

### References:
1) The Agency for Toxic Substances and Disease Registry (ATSDR); Toxicologic profile for acetone, benzene, ethyl benzene, MTBE n-hexane, xylene; http://www.atsdr.cdc.gov/ toxpro2.html
2) Material Safety Data Sheet (MSDS) for Chevron regular unleaded gasoline; http://www.albina.com/Fuel/ChevronRUGasMSDS.htm
3) *MTBE in New Jersey's environment, Permit Limits and Monitoring Requirements*; NJ Department of Environmental Protection; MTBE Work Group and Division of Science, Research and Technology; http://www.state.nj.us/dep/dsr/mtbe/permit_limits.htm
4) Lynge E., Andersen A., Nilsson R., Barlow L., Pukkala E., Nordlinder R. et al.; *Risk of cancer and exposure to gasoline vapors*; American Journal of Epidemiology. 145(5): 449-58, March 1997
5) Kenny S. Crump; *Risk of benzene-induced leukemia predicted from the Pliofilm cohort*; EHP, Vol. 104, Supplement 6: 1437-41, 1996 Dec.
6) Kaldor-J; Harris-JA; Glazer-E; Glaser-S; Neutra-R; Mayberry-R; Nelson-V; Robinson-L; Reed-D; Statistical association between cancer incidence and major-cause mortality, and estimated residential exposure to air emissions from petroleum and chemical plants; EHP, Vol. 54, pp. 319-332; 1984
7) Goel, P., Radotra, A., Singh, I., Aggarwal, A., Dua, D.; *Effects of passive smoking on outcome in* pregnancy; Journal of Postgraduate Medicine, 50(1): 12-16 (2004)
8) *Secondhand Smoke Fact Sheet*; November 2004; American Lung Association; http://www.lungusa.org/site/pp.asp?c=dvLUK9O0E&b=35422

Mrs. Maria Sanguino
May 17, 2005
Page 7 of 7

9) Jonathan Samet, MD, Ms: Passive smoking; UptoDate Online, Version 13.1
(UpToDate is a comprehensive evidence-based clinical information resource
available to physicians on the internet); this topic was las changed on September 24.
2004

**July 21, 2005**

<u>Addendum:</u>

We have subsequently received and reviewed the reports of air sampling, groundwater
monitoring well, and groundwater potable well analysis performed by NJ DEP, Garden
State Laboratories (Hillside, NJ), and Enviro-Sciences (Mt. Arlington, NJ).

The DEP air sample analysis from August 29, 2003 revealed MTBE levels in the dining
room of 9.7 ug/m3, in the basement 12 ug/m3, and outdoor levels of 7.2 ug/m3, all of
which exceeded NJDEP Indoor Air Screening Level of 1.8 ug/m3. Other contaminants
identified during the analysis did not exceed these. Gasoline contaminants (MTBE, TBA,
Toluene, Benzene) were still present in the ground water in the vicinity of the gas station.
The remediation arrangements were made.

The Garden State Laboratories drinking water sample (May 30, 2003) analysis showed
MTBE concentration of 4334 ug/L, and Benzene concentration of 39 ug/L. The
maximum contaminant levels (MCL) allowed by State and Federal regulations were 70
and 1.0 ug/L, respectively.

The remedial investigation report by Enviro-Sciences, Inc. for Bain's Automotive
Inc./Mobil Quick Mart from March 9, 2004 on environmental evaluations from October
2003 to January 2004 states the recommendations for remediation and related
environmental monitoring activities at that site.

Our assessment and recommendations remain the same. We agree with the need for
continuous monitoring and remediation processes as deemed necessary per NJDEP
and/or other appropriate environmental services.

If you have any questions regarding our report, please contact our clinic.