MDL 1358

**PLEADING NO. 215**

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Methyl Tertiary Butyl Ether ("MTBE")          **MDL Docket No. 1358**
Products Liability Litigation

| | |
|---|---|
| HOWARD GRAHAM and RHEA McMANNIS, | ) |
| | ) |
| | ) |
|     Plaintiffs, | ) United States District Court |
| | ) Southern District of Illinois |
| v. | ) Case No. 05-CV-703-MJR |
| | ) (Hon. Michael J. Reagan, District Judge) |
| EXXON MOBIL CORPORATION, et al. | ) |
| | ) |
|     Defendants. | ) |

### DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS'
### CONSOLIDATED MOTION TO VACATE
### CONDITIONAL TRANSFER ORDER

Defendants Exxon Mobil Corporation ("ExxonMobil") and Shell Oil Company ("Shell")

oppose the Motion of Plaintiffs Howard Graham and Rhea McMannis to Vacate the Conditional

Transfer Order because the sole issue raised in that Motion, whether ExxonMobil and Shell's

removal was timely, is a jurisdictional issue that the MDL court can and should resolve. In

further opposition to the Motion to Vacate, ExxonMobil and Shell state:

OFFICIAL PANEL ON MULTIDISTRICT LITIGATION

2005 NOV 34

Dec. 1

RECEIVED
CLERK'S OFFICE
A 10-58 2003

IMAGED DEC 5  2005

OFFICIAL FILE COPY

## BACKGROUND

### A.      The Graham-McMannis Complaint.

On September 14, 2005, plaintiffs Graham and McMannis filed a new complaint (the

"Graham-McMannis Complaint" attached as Exhibit A) which asserts individual claims for

negligence and nuisance based on an alleged risk to their private water wells posed by

defendants' use of MTBE in Illinois.  The Graham-McMannis Complaint also seeks to assert a

claim for declaratory judgment on behalf of a class of virtually all Illinois private well owners

located within 3000 feet of a service station owned or operated by ExxonMobil or Shell and to

obtain a declaration that the use of MTBE was negligent, that the defendants negligently failed to

warn about the risks of using MTBE, or that the introduction of MTBE or gasoline containing

MTBE into the chain of commerce created a nuisance.

### B.      Removal and Consolidation.

On September 28, 2005 (only fourteen days after the Graham-McMannis Complaint was

filed), ExxonMobil and Shell removed this case and sought to consolidate it with the *In re*

*Methyl Tertiary Butyl Ether ("MTBE")* multidistrict litigation, MDL 1358 (the "*MTBE* MDL").

Removal is premised on five bases: (1) the Energy Policy Act of 2005; (2) the Class Action

Fairness Act of 2005; (3) diversity jurisdiction under 28 U.S.C. § 1332(a)(1); (4) "federal agent"

jurisdiction under 28 U.S.C. § 1442(a)(1); and (5) "federal question" jurisdiction under 28

U.S.C. § 1331.

Consolidation is sought because the Graham-McMannis Complaint alleges facts that fall

directly within two common questions this Panel has identified as the reasons the *MTBE* MDL

was created.  Specifically, the first common question this Panel identified was whether

"defendants knew about and misrepresented the nature of MTBE and [marketed] MTBE without

disclosing its risks to downstream users, the federal government or the public." (MTBE Transfer

Order, Exhibit B). The Graham-McMannis Complaint contains allegations demonstrating this

will be a significant factual issue, including plaintiffs' allegations:

> 17.    Despite the Defendants' knowledge of the dangerous
> characteristics of MTBE . . these Defendants . . . conspired to
> misrepresent and the public the true characteristics of
> MTBE, in order to pave the way for MTBE to become one of the most
> widely-used petroleum products in the United States.

Details regarding this allegation fill large portions of the Graham-McMannis Complaint, in

particular paragraphs 16 through 21 and 36 through 38.

The second common question the *MTBE* MDL was created to resolve was whether

"plaintiffs sustained drinking water contamination as a result of MTBE contamination."   (MTBE

Transfer Order, Exhibit B.)  Again, the Graham-McMannis Complaint raises almost this exact

factual issue:

> 39.    As a direct and proximate result of one or more foregoing
> acts or omissions of negligence on the part of the Defendants, the
> Plaintiffs['] water supply wells are at risk for MTBE contamination and/or
> TBA contamination.
>
> . . .
>
> 44.    As a direct result of Defendant's conduct, Plaintiffs and
> members of the proposed class have suffered and will suffer damages and
> injury . . . including the Plaintiffs['] water supply wells are at risk for
> MTBE and/or TBA contamination.

Based on these allegations, Plaintiffs seek relief in Counts I and II for "all monetary damages

associated with their actual or threatened MTBE/TBA contamination situation." (Graham-

McMannis Complaint, Ex. A, at Count I and II Prayers for Relief.)

Moreover, the Graham-McMannis Complaint contains many of the same allegations that

plaintiffs asserted in the first round of *MTBE* MDL cases, including *England v. Atlantic Richfield

Co.*, 1:00-cv-729 (S.D.N.Y.) – an earlier *MTBE* MDL case in which McMannis herself was

apparently a plaintiff – and *Berisha v. Amerada Hess Corp.*, 00-cv-1898 (S.D.N.Y.). The original *MTBE* MDL cases as well as some of the present *MTBE* MDL cases involve class-action claims by private well owners to recover for actual or threatened contamination of their private water supply wells by MTBE. In the earlier *MTBE* MDL cases (such as *England*), plaintiffs sought to represent a class comprised of all non-commercial property owners in states including Illinois who had water supply wells that were or might be used to provide drinking water. (*See England* Complaint, Exhibit C at ¶ 43.) The *England* and other *MTBE* MDL private plaintiffs also made allegations like those Graham and McMannis make, including that defendants (including ExxonMobil and Shell) had been negligent in failing to test MTBE, in failing to warn handlers, government agencies, and the public about the risks associated with MTBE. (*See id.* at ¶ 47.) Finally, the *MTBE* MDL plaintiffs sought to recover – as Graham and McMannis seek to recover – on claims for negligence and (in *Berisha* but not *England*) nuisance.

Thus, the Graham-McMannis Complaint raises factual issues relating to both common questions of fact the *MTBE* MDL is to address, as well as a host of legal and factual issues the *MTBE* MDL court over which the *MTBE* MDL has already allowed discovery and which the *MTBE* MDL has already considered. This case should be consolidated into the MDL, so that the parties may have the benefit of the consolidated discovery and the *MTBE* MDL court's experience in presiding over matters relating to the use of MTBE in gasoline and the possible (as yet undiscovered) impact MTBE might have on plaintiffs' wells.

### C.    Status of the *MTBE* MDL.

Since 2000, the United States District Court for the Southern District of New York[1] has presided over an MDL with more than 80 MTBE cases, becoming extensively familiar with the

---

[1]    The Hon. Shira Scheinlin, United States District Judge.

facts and legal theories presented by litigation relating to Congress's decision to mandate the use

of MTBE and other approved oxygenates in gasoline and the actual or threatened contamination

of public and private wells by MTBE.  The *MTBE* MDL court has ruled on various substantive

motions, including defendants' motions to dismiss (which apparently resulted in a dismissal of

current plaintiff Rhea McMannis's claims after she testified MTBE had not contaminated or

threatened her well), and plaintiffs' motion for class certification.  The *MTBE* MDL has ruled

upon motions to remand in dozens of these cases, and has issued at least seven decisions relating

to federal jurisdiction over cases in the *MTBE* MDL,[2] including rulings on some of the precise

grounds raised by Graham and McMannis's Motion.

The *MTBE* MDL has also presided over discovery, including entry of a document

preservation order, overseeing electronic and paper document production, and coordinating

creation of an *MTBE* MDL website.  Plaintiffs' counsel are quite familiar with this MDL.  Both

plaintiffs' firms have held leadership roles in the MDL, and plaintiffs' Texas counsel represents

parties in the majority of the approximately 80 cases currently pending before the *MTBE* MDL.

### D.    Plaintiffs' Opposition to the Transfer.

Plaintiffs now oppose transfer to the *MTBE* MDL.  They identify only one issue relevant

to the transfer: "whether Defendants [] failed to satisfy the timeliness requirements of 1446(b) in

*Graham*."  (Motion to Vacate at 2.)

---

[2]    *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, ___ F. Supp. 2d ___, 2005 WL 2482557 (S.D.N.Y. Oct. 7, 2005); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, ___ F. Supp. 2d ___, 2005 WL 2254495 (S.D.N.Y. Sept. 16, 2005); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 364 F. Supp. 2d 329 (S.D.N.Y. Nov. 3, 2004); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 361 F. Supp. 2d 137 (S.D.N.Y. Oct. 19, 2004); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 341 F. Supp. 2d 386 (S.D.N.Y. Sept. 3, 2004); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 341 F. Supp. 2d 351 (S.D.N.Y July 13, 2004); and *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. Mar. 16, 2005).

## ARGUMENT

### A.     Plaintiffs' allegations plainly involve the common questions of the *MTBE* MDL, such that consolidation is proper.

As noted, Graham and McMannis do not really contest that, if federal jurisdiction exists, their case should be consolidated into the *MTBE* MDL.  Transfer to an MDL court under Section 1407 is not dependent on a strict identity of issues and parties; instead, the existence of one or more common questions of fact justifies consolidation.  *See In re Japanese Elec Prods. Liab. Antitrust Litig.*, 388 F. Supp. 565, 567 (J.P.M.L. 1975); *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp.2d 1380, 1381 (J.P.M.L. 2004) ("[T]ransfer under Section 1407 does not require a complete identity or even majority of common factual issues as a prerequisite to transfer.").

This Panel has identified two common questions that support consolidation of MTBE cases: whether (1) "defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and (2) "plaintiffs sustained drinking water contamination as a result of MTBE contamination."  (MTBE Transfer Order, Ex. B.)  As discussed *supra*, the Graham-McMannis Complaint plainly alleges facts relating to both these issues.  Plaintiffs do not contest this point, effectively conceding that, if federal jurisdiction exists, this case should be consolidated into the *MTBE* MDL.

### B.     The *MTBE* MDL Court can resolve jurisdictional issues.

The sole basis on which plaintiffs oppose transfer is the timeliness of the removal, a jurisdictional issue that is also the sole basis for plaintiffs' motion to remand.  But this Panel has repeatedly held that the pendency of a remand motion has no bearing on whether transfer should be ordered.

Simply put, a remand motion can be decided as easily by the transferee judge as by the transferor judge.  Thus, the Panel consistently has rejected attempts, like that of plaintiffs here, to defeat or delay transfer on the basis of a pending remand motion.  In *In re Antibiotic Drugs*, 299 F. Supp. 1403 (J.P.M.L. 1969), the Panel explained that the pendency of a motion to remand to state court "has no bearing on a motion to transfer." *Id.* (quoting *Chicago, R.I. & P.R. Co. v. Igoe*, 212 F.2d 378 (7th Cir. 1954)).  "The real question," the Panel held, "is whether this action lacks commonality of factual questions which permeate other cases." *Id.* at 1405-06.  Since that case, like this one, did not lack such commonality, the Panel transferred it notwithstanding the pending remand motion.

Similarly, in *In re Professional Hockey Antitrust Litig.*, 369 F. Supp. 1117 (J.P.M.L. 1974), an action had been removed from a Texas state court to federal court, and the plaintiff opposed "transfer on the ground that the remand motion should be decided by the Texas federal court." *Id.* at 1117.  The Panel rejected this argument, holding that "[i]nasmuch as the transferee judge has the power to rule on the question of remand, we perceive no reason to delay transfer." *Id.*; *see also In re Crown Life Ins. Co. Premium Litig.*, 178 F.Supp.2d 1365, 1366 (J.P.M.L. 2001) (granting transfer and holding "any anticipated motion to remand this action to Alabama state court can be presented to and decided by the transferee judge"); *In re Franklin Nat'l Bk. Sec. Litig.*, 393 F. Supp. 1093, 1095 (J.P.M.L. 1975) ("We see no reason for delaying transfer of [the action] because it certainly shares a commonality with the other actions in this litigation and the transferee judge can easily resolve the remand issue.").

The Second Circuit Court of Appeals has engaged in perhaps the most extensive discussion of this issue.  In *Ivy v. Diamond Shamrock Chemicals Co.*, 901 F.2d 7 (2d Cir. 1990), plaintiffs filed their lawsuit in Texas state court claiming harm from exposure to Agent Orange

used during the Vietnam War. Although their complaint expressly disavowed any federal-law

basis for the suit, the defendants removed the case to the Eastern District of Texas and asked the

MDL Panel to transfer the case to the Eastern District of New York, where MDL 388 was

pending, for coordinated pretrial proceedings. The Panel issued a conditional transfer order to

this effect. *Id.* at 8. Plaintiffs then moved to vacate the conditional transfer order and also moved

in the Eastern District of Texas to remand the action to state court. The Panel denied the

plaintiffs' motion to vacate and transferred the case to the MDL court, the Eastern District of

New York, finding that plaintiffs' motion to remand could be heard and decided by the transferee

judge. *Id.* at 9.

Plaintiffs appealed this decision to the Second Circuit Court of Appeals, which upheld the

Panel's transfer order. The Court held: "Section 1407 does not empower the MDL Panel to

decide questions going to the jurisdiction or the merits of the case, including issues relating to a

motion to remand." *Id.* at 9 (citing *In re Air Crash Disaster at Florida Everglades on December

29, 1972*, 368 F. Supp. 812, 813 n. 1 (J.P.M.L. 1973 (per curiam) (citing 28 U.S.C. § 1407). It

further held:

> The jurisdictional issue is easily capable of arising in hundreds or even thousands
> of cases in district courts throughout the nation. That issue, however, involves
> common questions of law and fact, some or all of which relate to the Agent
> Orange class action and settlement, and there are real economies in transferring
> such cases to Judge Weinstein, who has been handling the Agent Orange
> litigation for several years. Once transferred, the jurisdictional objections can be
> heard and resolved by a single court and reviewed at the appellate level in due
> course. Consistency as well as economy is thus served. We hold, therefore, that
> the MDL Panel has jurisdiction to transfer a case in which a jurisdictional
> objection is pending, that objection to be resolved by the transferee court.

*Id.* (internal citations omitted).

Similarly here, the role of the Panel is not to address the merits of ExxonMobil's and

Shell's removal. As the *Ivy* Court noted, Section 1407 does not authorize the Panel to pass upon

the jurisdictional objections raised by the plaintiffs in this case.  Indeed, transfer to the Southern

District of New York is even more appropriate given the pendency of Plaintiffs' Motion for

Remand and the *MTBE* MDL court's familiarity with the federal agent removal statute and the

jurisdictional issues surrounding the use of MTBE in gasoline.  That is, Plaintiffs' Motion for

Remand does not raise unique jurisdictional issues – indeed, some issues raised are virtually

identical to the *MTBE* MDL court's previous rulings under the federal agent removal statute. *See*

*Moore v. Wyeth Labs.*, 236 F. Supp. 509, 511-512 (D. Md. 2002) (a products liability case where

the court refused to rule upon a plaintiff's remand motion while a conditional transfer order was

pending since the transferor court had ruled on similar motions and was intimately familiar with

the jurisdictional issues involved in the case).

Moreover, if removal were timely, consolidation is clearly appropriate.  The Graham-

McMannis Complaint plainly raises factual issues covered by the common questions the *MTBE*

MDL is to address.  Plaintiffs' argument suggesting that "there is only one question to address"

ignores that, should plaintiffs lose on that question (the timeliness of removal), there are a host of

issues relating to standing, discovery, class certification, potential liability in the absence of

actual contamination, and the like, issues that the *MTBE* MDL has addressed and will continue to

address in numerous cases currently consolidated in the MDL.

### C.      Removal was proper under the "revival exception."

Finally, should this Panel wish to reflect upon the jurisdictional merits, removal of this

case was proper under the "revival exception."  Plaintiffs' argument for remand and against

consolidation centers on the fact that in 2001 other plaintiffs, Frances Misukonis and Frank and

Dolores Provaznik, filed a complaint in Madison County, Illinois, seeking to represent a class of

Illinois private well owners.  Misukonis and the Provazniks amended their complaint several

times, including the filing of a Fourth Amended Complaint (the "Misukonis-Provaznik

Complaint") before September 2005 when Misukonis and the Provazniks sought leave to file the

Graham-McMannis Complaint.

The Graham-McMannis Complaint dropped Misukonis and the Provazniks as plaintiffs

and six defendants from the lawsuit, dropped a prior claim and asserted new claims, sought relief

relating to new wells that were four miles or more from the wells formerly at issue, and sought

new type of declaratory relief for a newly defined class.

Fairly stated, new plaintiffs, new claims, a new class, and new relief equal a new lawsuit.

Thus, the filing of the Graham-McMannis Complaint constituted the commencement of a new

cause of action for which a new thirty-day period of removal was available under the revival

exception as recognized and applied in *Johnson v. Heublein Inc.*, 227 F.3d 236, 240 (5th Cir.

2000) (affirming removal of case removed under revival exception); *Wilson v. Intercollegiate

(Big Ten) Conference Athletic Ass'n*, 668 F.2d 962 (7th Cir. 1982); and numerous other cases.

Defendants removed the case within the "revived" thirty-day period for removal; therefore,

removal was timely. Thus, a federal court should retain jurisdiction over this case.

## RESPONSE TO PLAINTIFFS' AVERMENTS

Pursuant to JPML Rule 7.1, ExxonMobil and Shell respond to Plaintiffs' averments as

follows:

1.      Defendants admit that a case entitled *Misukonis v. Atlantic Richfield Co. et al.*

was filed in the Circuit Court of Madison County, Illinois, on September 20, 2001. Defendants

also admit that this case was removed on September 28, 2005. However, as set forth in greater

detail in defendants' Joint Memorandum in Opposition to Remand (attached hereto as Exhibit

C), the "Graham-McMannis Complaint" filed on September 14, 2005, constitutes a new case

because the Graham-McMannis Complaint removed the old plaintiffs and their claims and added new plaintiffs, new claims, a new putative class definition, new proof, and new requests for relief. Therefore, the filing of the Graham-McMannis Complaint commenced a new cause of action for which a new thirty-day period of removal was available under the revival exception as recognized and applied in *Johnson v. Heublein Inc.*, 227 F.3d 236, 240 (5th Cir. 2000) (affirming removal of case removed under revival exception); *Wilson v. Intercollegiate (Big Ten) Conference Athletic Ass'n*, 668 F.2d 962 (7th Cir. 1982); and numerous other cases. Defendants removed the case within the "revived" thirty-day period for removal; therefore, removal was timely.

2.      Defendants admit that plaintiffs correctly summarize 28 U.S.C. § 1446(b). However, as noted *supra* in paragraph 1 of this Response to Averments, the filing of the Graham-McMannis Complaint constituted the commencement of a new lawsuit, opening a new thirty-day period for removal. Defendants' removed within 30 days of receipt of *Graham's and McMannis's initial* pleading in that case; therefore, removal was timely.

3.      Defendants deny the averments in paragraph 3 of Plaintiffs' Motion. Although the case number remained unchanged, the filing of the Graham-McMannis Complaint effectively commenced a new lawsuit. Specifically, original lawsuit plaintiffs Frances Misukonis and Frank Provaznik had in the "Misukonis-Provaznik Complaint" filed on November 17, 2003, as the sole named plaintiffs asserted four claims against eight defendants as follows:

Individual Plaintiffs:  Frances Misukonis and Frank and Dolores Provaznik

Putative Class:        All Illinois non-commercial property owners who have private drinking wells

Individual Claims:  Three individual claims – negligence, strict product liability, and civil conspiracy – to recover for alleged contamination or risk of contamination to Misukonis' and the Provazniks' wells

Putative Class Claims: Declaratory judgment claim to obtain "judgment" that (a) defendants were negligent when they added MTBE to gasoline distributed in Illinois; (b) defendants were negligent when they allegedly failed to warn of the risks associated with using MTBE; (c) gasoline containing MTBE was allegedly defective or unreasonably dangerous; and (d) defendants allegedly conspired and acted in concert when they chose to add MTBE to gasoline

Defendants: (1) Atlantic Richfield Company; (2) BP Amoco Corporation; (3) Citgo Petroleum Company; (4) Conoco, Inc.; (5) Chevron U.S.A. Inc.; (6) Exxon Mobil Corporation; (7) Phillips Petroleum Company; and (8) Shell Oil Company

With their individual claims, Misukonis and the Provazniks sought relief including damages, bottled water, and hookup to a commercial or private water system as relief for these claims. (*See generally* Misukonis-Provaznik Complaint.)

After settling with all defendants except ExxonMobil and Shell, Misukonis and Provaznik sought leave to file the Graham-McMannis Complaint, to "vitiate" all prior case management orders, and to begin the litigation "from scratch" against ExxonMobil and Shell. When leave was granted, Misukonis and Provaznik were no longer parties to the litigation, and no relief was sought for their private wells. Instead, the Graham-McMannis Complaint substituted two new plaintiffs, Graham and McMannis, who had not previously been named parties in this case. The Graham-McMannis Complaint also redefined the putative class, added a nuisance claim for the individual plaintiffs, dropped the strict product liability and conspiracy counts, and made comparable adjustments to the declaratory judgment claim. To summarize this Graham-McMannis Complaint:

Individual Plaintiffs:  Howard Graham and Rhea McMannis

Putative Class:      All Illinois non-commercial property owners who have private drinking wells and reside within 3000 feet of a service station owned or operated by ExxonMobil or Shell

Individual Claims: Two individual claims – negligence and nuisance – to recover for alleged contamination or risk of contamination to Graham's and McMannis' wells.

Putative Class Claims: Declaratory judgment claim that (a) defendants were negligent when they added MTBE to gasoline distributed in Illinois; (b) defendants were negligent when they allegedly failed to warn of the risks associated with using MTBE; and (c) defendants created a nuisance when they placed gasoline containing MTBE into the stream of commerce

Defendants: (1) ExxonMobil and (2) Shell

Just as the Misukonis-Provaznik Complaint (and its prior versions) did not mention or seek relief for Graham or McMannis, the Graham-McMannis Complaint did not mention Misukonis or the Provazniks or seek any relief for them. Thus, the Graham-McMannis Complaint effectively commenced a new action.

4. Defendants deny the averments in paragraph 4 of Plaintiffs' Motion to Vacate. Defendants are aware of no case in which the number and type of changes plaintiffs have made in this case as summarized in paragraph 3 *infra* – including substituting new plaintiffs, asserting new causes of action, seeking new relief for wholly unrelated properties, changing the class definition, and altering the legal theories for which both individual and class relief were sought – did not open a thirty-day period during which defendants could remove that new action.

5. Defendants deny the averment in paragraph 5 of Plaintiffs' Motion to Vacate. Plaintiffs seek relief based on many of the same factual allegations made in the approximately 80 cases currently pending before the *In re Methyl Tertiary Butyl Ether ("MTBE")* multidistrict litigation. Specifically, this Panel created the MTBE MDL in part to resolve two common questions. The first common question relates to whether "defendants knew about and misrepresented the nature of MTBE and [marketed] MTBE without disclosing its risks to downstream users, the federal government or the public." (MTBE Transfer Order, Ex. B). The

Graham-McMannis Complaint contains allegations demonstrating this will be a significant issue in the case. In the Graham-McMannis Complaint, plaintiffs Graham and McMannis allege:

> "17.    Despite the Defendants' knowledge of the dangerous characteristics of MTBE . . these Defendants . . . conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States."

Details regarding this allegation fill large portions of the Complaint, in particular paragraphs 16 through 21 and 36 through 38.

The second common question the *MTBE* MDL was created to resolve was whether "plaintiffs sustained drinking water contamination as a result of MTBE contamination."  (MTBE Transfer Order, Ex. B.)  Again, the Graham-McMannis Complaint raises almost this identical issue:

> "39.    As a direct and proximate result of one or more foregoing acts or omissions of negligence on the part of the Defendants, the Plaintiffs['] water supply wells are at risk for MTBE contamination and/or TBA contamination.
>
> . . .
>
> 44.    As a direct result of Defendant's conduct, Plaintiffs and members of the proposed class have suffered and will suffer damages and injury . . . including the Plaintiffs['] water supply wells are at risk for MTBE and/or TBA contamination.

Graham and McMannis also seek relief in Counts I and II for "all monetary damages associated with their actual or threatened MTBE/TBA contamination situation."  (Graham-McMannis Complaint, Ex. A, at Count I and II Prayers for Relief.)

Thus, the Graham-McMannis Complaint raises issues squarely within those the *MTBE* MDL was created to consider, has considered during the five years the MDL has been in place, and continues to consider in approximately 80 pending cases.  Thus, consolidation of this

litigation with the *MTBE* MDL would promote just and efficient resolution of both this case and the other consolidated cases.

## CONCLUSION

This litigation involves common questions of fact with those cases currently pending before the *MTBE* MDL in the United States District Court for the Southern District of New York. For that reason, pursuant to Section 1407, transfer of this case will serve the convenience of the parties and witnesses and promote the fair and efficient conduct of this litigation. Transfer, in short, is necessary to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the judiciary, the parties, and their counsel. Therefore, this case should be transferred and consolidated into the *MTBE* MDL, MDL 1358.

Respectfully submitted,

THOMPSON COBURN LLP

Edward A. Cohen/MAS (by consent)
Edward A. Cohen #06194012
Roman P. Wuller #06195096
Robert J. Wagner #06231377
One US Bank Plaza
St. Louis, Missouri
314-552-6000
314-552-7000 (Facsimile)

and

McDERMOTT WILL & EMERY LLP
Craig H. Zimmerman
227 West Monroe
Chicago, Illinois 60606-5096
312-372-2000
312-984-7700 (Facsimile)

Attorneys for Defendant Exxon Mobil
Corporation


FOX GALVIN, LLC

John Galvin #06205935
Michael Downey #06257380
One Memorial Drive
Eighth Floor
St. Louis, Missouri 63102
314-588-7000
314-588-1965 (Facsimile)

Mr. Richard Wallace
Mr. Peter C. Condron
WALLACE KING DOMIKE &
      BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007
202-204-3707
202-204-1001 (Facsimile)

Attorneys for Defendant Shell Oil Company

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 2 2005

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served upon the attorneys of record of all parties to the above cause by enclosing same in an envelope addressed to such attorneys by U.S. Mail, postage prepaid, on this 30th day of November, 2005.

Stephen M. Tillery
Christine J. Moody
Aaron M. Zigler
KOREIN TILLERY
701 Market Street, Suite 300
St. Louis, Missouri 63101

Scott Summy
Celeste Evangelesti
BARRON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
*Counsel for Plaintiffs*

Ms. Robin L. Greenwald
Weitz & Luxenberg
180 Maiden Lane
New York, NY 10038
*Plaintiffs' Liaison Counsel*

Mr. Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605
*Defendants' Liaison Counsel*

RECEIVED CLERK'S OFFICE
2005 NOV 31 A 10: 59
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 2 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re Methyl Tertiary Butyl Ether ("MTBE")            **MDL Docket No. 1358**
Products Liability Litigation

| | | |
|---|---|---|
| HOWARD GRAHAM and RHEA McMANNIS, | ) ) ) | |
| Plaintiffs, | ) ) | United States District Court Southern District of Illinois |
| v. | ) ) | Case No. 05-CV-703-MJR (Hon. Michael J. Reagan, District Judge) |
| EXXON MOBIL CORPORATION, et al. | ) ) | |
| Defendants. | ) | |

### PROOF OF SERVICE

Pursuant to JPML Rule 5.2, the undersigned counsel certifies that on this __30th__ day of

November, 2005, a copy of the Joint Opposition to Plaintiffs' Consolidated Motion to Vacate

Conditional Transfer Order was filed with (a) the Joint Panel on Multidistrict Litigation by

FedEx; (b) the clerk of the United States District Court for the Southern District of Illinois by

electronic filing; and (c) counsel in the case and liaison counsel by e-mail and United States

Mail, first class postage prepaid, as follows:

2005 NOV 31  A 10: 53
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
RECEIVED
CLERK'S OFFICE

Stephen M. Tillery
Christine J. Moody
Aaron M. Zigler
KOREIN TILLERY
701 Market Street, Suite 300
St. Louis, Missouri 63101
Ms. Robin L. Greenwald
Weitz & Luxenberg
180 Maiden Lane
New York, NY 10038
*Plaintiffs' Liaison Counsel*

Scott Summy
Celeste Evangelesti
BARRON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Counsel for Plaintiffs
Mr. Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605
*Defendants' Liaison Counsel*

Respectfully submitted,

FOX GALVIN, LLC

John Galvin #06205935
Michael Downey #06257380
One Memorial Drive
Eighth Floor
St. Louis, Missouri 63102
314-588-7000
314-588-1965 (Facsimile)

Mr. Richard Wallace
Mr. Peter C. Condron
WALLACE KING DOMIKE &
    BRANSON, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007
202-204-3707
202-204-1001 (Facsimile)

Attorneys for Defendant Shell Oil Company

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 2 2005

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served upon the attorneys of record of all parties to the above cause by enclosing same in an envelope addressed to such attorneys by U.S. Mail, postage prepaid, on this <u>30th</u> day of November, 2005.

Stephen M. Tillery
Christine J. Moody
Aaron M. Zigler
KOREIN TILLERY
701 Market Street, Suite 300
St. Louis, Missouri 63101

Scott Summy
Celeste Evangelesti
BARRON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
*Counsel for Plaintiffs*

Ms. Robin L. Greenwald
Weitz & Luxenberg
180 Maiden Lane
New York, NY 10038
*Plaintiffs' Liaison Counsel*

Mr. Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605
*Defendants' Liaison Counsel*

RECEIVED
CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
2005 Dec ( NOV 31 A 10: 58

DEC − 2 2005

FILED
CLERK'S OFFICE

FILED

SEP 28 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

HOWARD GRAHAM and RHEA MCMANNIS,   )
   )
      Plaintiffs,   )
   )
vs.   )
   )
SHELL OIL COMPANY and   )
EXXON MOBIL CORPORATION,   )
   )
      Defendants.   )

05-cv-703-MJR

Cause No. 01-L-1472

## FIFTH AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs, HOWARD GRAHAM and RHEA MCMANNIS, by and through their undersigned counsel, on behalf of themselves and all others similarly situated, and for their Fifth Amended Complaint against Defendants, state as follows:

1.     Plaintiff HOWARD GRAHAM is an adult citizen and resident of St. Clair County, Illinois. He is the owner of a privately owned well reliant on groundwater, which well is within 3000 feet of a station owned or controlled by EXXON MOBIL CORPORATION.

2.     Plaintiff RHEA MCMANNIS is an adult citizen and resident of Madison County, Illinois. She is the owner of a private well reliant on groundwater, which well is within 3000 feet of a station owned or controlled by SHELL OIL COMPANY.

3.     EXXON MOBIL CORPORATION, formed as a result of the merger on November 30, 1999 of EXXON CORPORATION and MOBIL CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

1



EXHIBIT
A

4.      SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

5.      When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

6.      Defendants in this action are manufacturers of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

7.      This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice. There is no diversity of citizenship in this action.

8.      Venue is proper in this Court because the actual or threatened contamination of one of Plaintiffs' property by MTBE took place in Madison County, Illinois.

9.      Methyl tertiary butyl ether ("MTBE") is the gasoline additive that has caused wide-spread contamination to drinking water sources throughout the United States.

2

10.    MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process. MTBE is a member of a class of chemical compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water. Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

11.    Tert butyl alcohol ("TBA") is a degradation product of MTBE.

12.    TBA is used as a raw material in the production of isobutylene, which is then used to produce MTBE, it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often shows up wherever there is MTBE contamination.

13.    TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility ( more so than MTBE); resistance to biodegradation, etc.

14.    To make matters worse, TBA is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of

3

health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

15.     In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. There is also some evidence that TBA causes cancer and it causes kidney and thyroid tumors in rats and mice exposed to it.

16.     Defendants failed to warn Plaintiffs, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiffs of the need to test their water wells for contamination by TBA.

17.     In or around 1979, Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

18.     Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information regarding MTBE and its risk to the environment from being known. Among the many Committees established was the "MTBE Committee." The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed. An MTBE Committee

4

was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE ..., provide technical data to appropriate regulatory agencies and legislative bodies ..., conduct[ ] and fund[ ] testing of MTBE ..., [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

19.    In 1986, the Defendants, individually and via the MTBE Committee, submitted a written report to the EPA regarding MTBE. However, despite the innocuous description of the MTBE Committee's goals, the information provided by Defendants was misleading and false. Clearly, the purpose behind the Defendants' comments was to dissuade the EPA from requiring additional health and environmental testing of MTBE. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, that MTBE had excellent biodegradation characteristics, and that additional testing should not be done. The representations made by the Defendants to the EPA were an alarming and inaccurate attempt to obtain approval for use of MTBE without adequate testing so that the Defendants could avoid public scrutiny of the product and thereby maximize their profits. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of the people of the United States.

5

20.    Defendants misled not only the EPA, but Plaintiffs and Class members. Despite their duties to provide a safe product and to warn Plaintiffs, government regulators, and those who handle and store their product, of MTBE's dangerous properties and other known or reasonably knowable risks, Defendants failed to take proper action. Neither state agencies nor public well providers were told of the existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE.

21.    Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

22.    In deciding to add MTBE to their gasoline, Defendants were fully aware that leaking USTs threatened the nation's water supply and the presence of MTBE served to exacerbate this threat. Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the country's groundwater system, as well as the safety and well-being of residents who were dependent on groundwater. Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

23.    Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year. In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country.

6

Defendants were also aware that gasoline is used and stored by nearly every adult person in the United States. With this many fuel handling events, human error inevitably occurs. Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

24.     Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed. It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential harm without warning of the potential health risks associated with MTBE.

25.     Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

26.     MTBE contamination has become so severe that the EPA has recently initiated an Advanced Notice of Proposed Rule-making regarding MTBE in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the

nation's drinking water resources;" and that it "has caused widespread and serious contamination." As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

27.     As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiffs and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the nation's groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii) a duty to warn gasoline station operators, public water providers, and the general public, including the Plaintiffs, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all entities who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

28.     Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents. Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there were numerous other pathways that would allow for MTBE to get into the environment and cause extensive pollution of this country's groundwater.   Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE. Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiffs and the Class, of the various pathways that MTBE can enter the environment and its effect on groundwater.

8

29.     The process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the United States. The specific manufacturer of MTBE for any particular groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiffs and members of the Class they seek to represent.

30.     MTBE is fungible, such that it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment. Defendants in this action are manufacturers that control the market for gasoline containing MTBE in the United States during the relevant time frame, and one or more of the Defendants is responsible for the harm to Plaintiffs and the Class, as alleged in this Complaint. Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in the United States and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

31.     Each Defendant agreed to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs and the Class' expense, to contaminate Plaintiffs and the Class' aquifers and wells, and to avoid liability for such contamination, and each Defendant acted tortiously in pursuance of this agreement. Concert of action liability attaches to all Defendants.

32.     Defendants were jointly aware of the risks of MTBE, as alleged in this Complaint, and had a joint capacity to reduce or affect these risks. Enterprise liability attaches to all of the Defendants.

9

## COUNT I (NEGLIGENCE)

Come Now Plaintiffs, individually, and for Count I of their Complaint against Defendants, state as follows:

33.    Plaintiffs incorporate paragraphs 1 through 32 of this Complaint by reference in this Count, as if fully set forth herein.

34.    The Plaintiffs are and have been captives to the petroleum industry of which Defendants are a part.  Literally every resident of the United States is heavily dependent upon gasoline in their day-to-day lives.  Defendants are responsible for the design, manufacture, sale and distribution of all chemicals that are part of gasoline.  As a result, the Plaintiffs and the residents of the United States are in a disadvantaged position where they must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage.  Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiffs concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

35.    Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists.  Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE and/or TBA. Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE and/or TBA.

36.    With respect to MTBE and/or TBA, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

10

A.    MTBE is an ether and is, therefore, water soluble;

B.    MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

C.    MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

D.    MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

E.    millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

F.    there is a tremendous problem with leaking USTs throughout the Country;

G.    Plaintiffs' resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

H.    Private Well Owners including Plaintiffs, would be unsuspecting and not test for MTBE on a regular basis, if at all.

37.    Defendants had a duty to:

A.    ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater from which Plaintiffs and the Class draw their water;

B.    determine whether MTBE contains any latent defects and to warn Plaintiffs, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

C.    warn Plaintiffs and others who own or control a well that provides water of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

D.    warn anyone who owns or operates a water well that it should frequently be tested for MTBE; and,

E.    take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

11

38.   Defendants have negligently breached these duties by:

A.   using MTBE as a gasoline additive, knowing of its dangerous propensities;

B.   failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

C.   failing to adequately test, identify and remediate wells that are contaminated with MTBE;

D.   failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

E.   failing to adequately warn Plaintiffs, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

F.   forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

G.   failing to eliminate or minimize the harmful impacts and risks posed by MTBE;

H.   failing to curtail or reduce MTBE's manufacture and distribution;

I.   failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

J.   failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or,

K.   making material misrepresentations and/or omissions of material facts regarding MTBE.

39.   As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, the Plaintiffs water supply wells are at risk for MTBE and/or TBA contamination.

40.     Plaintiffs individually bring this action for all monetary damages associated with their potential MTBE contamination situation, including damages for reduction of value of their property, and request that Defendants be required to pay all costs associated with supplying bottled water and a filtration system on a temporary basis and pay all costs associated with a permanent hook up a local municipal or private water system.  Defendants should also be required to pay all costs of supplying this alternative water for a reasonable amount of time into the future until MTBE no longer poses a risk.  In the event a permanent water supply is unavailable, Plaintiffs request that Defendants be required to pay all costs associated with an appropriate filter system at the wellhead as well as all costs associated with maintenance and upkeep of the filter system until a reasonable amount of time into the future until MTBE no longer poses a risk.  Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all MTBE contamination that is located on or threatens their property.

41.     All of the damages of which Plaintiffs complain were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows:  Awarding the Named Plaintiffs individually compensatory damages, costs of suit, and attorneys' fees, including all monetary damages associated with their actual or threatened MTBE/TBA contamination situation, including damages for reduction of value of their property, and all costs associated with testing, supplying bottled water and a filtration system on a temporary basis, and all costs associated with a permanent hook up a local municipal or private water system.  Defendants should also be required to pay all costs of supplying this alternative water for a reasonable amount of time into the future until MTBE no longer poses a risk.  In the event a

13

permanent water supply is unavailable, Plaintiffs request that Defendants be required to pay all costs associated with an appropriate filter system at the wellhead as well as all costs associated with maintenance and upkeep of the filter system until a reasonable amount of time into the future until MTBE no longer poses a risk. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all MTBE/TBA contamination that is located on or threatens their property.

### COUNT II (NUISANCE)

Come Now Plaintiffs, individually, and for Count II of their Complaint against Defendants, state as follows:

42.     Plaintiffs incorporates paragraphs 1 through 41 of this Complaint by reference in this Count, as if fully set forth herein.

43.     Defendant, by the wide-scale production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE and/or TBA, performed in a negligent, reckless and/or abnormally dangerous manner, has caused contamination of the nation's groundwater supply, thereby contaminating or potentially contaminating private water wells and creating a public nuisance. Defendants knew or had reason to know that their production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE and/or TBA, would have a significant, long-standing effect on the public's rights, as described above. The nuisance caused by Defendants is continuing and abatable.

44.     As a result of Defendants' conduct, Plaintiffs and members of the proposed class have suffered and will suffer damages and injury distinct from these harms to the general public, namely the Plaintiffs water supply wells are at risk for MTBE and/or TBA contamination.

14

45.    All of the damages of which Plaintiffs complain were reasonably foreseeable and proximately caused by the Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows: Awarding the Named Plaintiffs individually compensatory damages, costs of suit, and attorneys' fees, including all monetary damages associated with their actual or threatened MTBE/TBA contamination situation, including damages for reduction of value of their property, and all costs associated with testing, supplying bottled water and a filtration system on a temporary basis, and all costs associated with a permanent hook up a local municipal or private water system. Defendants should also be required to pay all costs of supplying this alternative water for a reasonable amount of time into the future until MTBE no longer poses a risk.  In the event a permanent water supply is unavailable, Plaintiffs request that Defendants be required to pay all costs associated with an appropriate filter system at the wellhead as well as all costs associated with maintenance and upkeep of the filter system until a reasonable amount of time into the future until MTBE no longer poses a risk. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all MTBE/TBA contamination that is located on or threatens their property.

## COUNT III (DECLARATORY JUDGMENT)

Come Now Plaintiffs, individually and on behalf of all others similarly situated, and for Count III of their Complaint against Defendants, state as follows:

46.    Plaintiffs incorporate paragraphs 1 through 45 of this Complaint by reference in this Count, as if fully set forth herein.

15

47.     This action is brought by Plaintiffs on their own behalf and on behalf of all others similarly situated, pursuant to 735 ILCS 5/2-801, on behalf of a Class, defined as follows:

> All persons who own real property in the State of Illinois that is not used for commercial purposes upon which a private water supply well exists that provides drinking water, and who are within 3000 feet of services stations that are or were owned or operated by Defendants.

> Specifically excluded from the proposed Class are: (1) any claims brought by Public Water Providers[1]; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

48.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class Members is unknown at this time, it is generally ascertainable by appropriate discovery, and it is believed that the Class includes hundreds of members.

49.     Common questions of law or fact arising from Defendants' conduct exist as to all members of each Class, as required by 735 ILCS 5/2-801. These common questions predominate over any questions which affect individual members of each Class. These common questions include:

A.     Were the Defendants negligent by adding MTBE to gasoline that was distributed in the State of Illinois.

B.     Were the Defendants negligent when they failed to warn of the risks associated with gasoline containing MTBE distributed in the State of Illinois?

C.     Did Defendants' placing of MTBE and gasoline containing MTBE into the stream of commerce in the State of Illinois create a nuisance?

---

[1]     "Public Water Provider" is defined as an entity, regardless of ownership, whose primary business purpose is to provide water for human consumption for purchase to its customers through pipes or other constructed conveyances, and where the system has 15 or more service connections, or regularly serves 25 or more persons. This definition includes all publicly-held and privately-held entities.

50.     Class Action treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impracticable.  The Class Action provides an appropriate and effective method whereby the enforcement of the rights of Plaintiffs and members of the Class can be fairly managed without unnecessary expense or duplication. The expense and burden of individual litigation of a case of this magnitude make it impractical for individual Class Members to seek redress for the wrongs done to them.

51.     Individual litigation of all claims which might be asserted by all Class Members would produce such a multiplicity of cases that the judicial systems having jurisdiction of the claims would remain congested for years.  The certification of a Class would allow litigation of claims that, in view of the expenses of the litigation, may be insufficient in amount to support separate actions. Concentrating this litigation in one forum would aid judicial economy and efficiency, promote parity among the claims of individual Class Members, and result in judicial consistency.

52.     Plaintiffs will fairly and adequately protect the interests of the Class they represent. The interests of Plaintiffs, as the Class Representative, are consistent with those of the members of the Class.  In addition, Plaintiffs are represented by counsel experienced in complex class action litigation.

53.     The prosecution of separate actions by individual members of the Class would create a risk of:

        A.     Inconsistent or varying adjudications with respect to individual members of the Class; and

17

        B.      Adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

54.     Plaintiffs and Class Members envision no unusual difficulty in the management of this action as a Class Action.

55.     Plaintiffs, on behalf of themselves and all others similarly situated, bring this case as a Class Action on behalf of all persons who own real property in the State of Illinois that is not used for commercial purposes upon which a private water supply well exists that provides drinking water. Plaintiffs bring this action on behalf of the Class to determine:

        A.      Were the Defendants negligent by adding MTBE to gasoline that was distributed in the State of Illinois.

        B.      Were the Defendants negligent when they failed to warn of the risks associated with gasoline containing MTBE distributed in the State of Illinois?

        C.      Did Defendants' placing of MTBE and gasoline containing MTBE into the stream of commerce in the State of Illinois create a nuisance?

56.     Plaintiffs, on behalf of themselves and all others similarly situated, bring this claim pursuant to 735 ILCS 5/2-701 for a declaration of the legal rights of the Class as set forth herein.

57.     An actual controversy exists in the State of Illinois between the Plaintiffs and the members of the class and the Defendants regarding the issues of: whether the Defendants negligent by adding MTBE to gasoline that was distributed in the State of Illinois; whether the Defendants were negligent when they failed to warn of the risks associated with gasoline containing MTBE

distributed in the State of Illinois; whether at the time Defendants placed MTBE and gasoline

containing MTBE into the stream of commerce in the State of Illinois, was it defective and/or

unreasonably dangerous for its intended and foreseeable uses; and whether the Defendants conspires

and acted in concert when they chose to add MTBE to gasoline.

58.     Plaintiffs bring this action on behalf of the Class to certify and make a determination

of the legal rights of the Class with respect to the following three issues:

A.     Were the Defendants negligent by adding MTBE to gasoline that was
distributed in the State of Illinois.

B.     Were the Defendants negligent when they failed to warn of the risks
associated with gasoline containing MTBE distributed in the State of Illinois?

C.     Did Defendants' placing of MTBE and gasoline containing MTBE into the
stream of commerce in the State of Illinois create a nuisance?

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and

severally, as follows:

a.     Ordering that the action be maintained as a class action pursuant to 735 ILCS 5/2-801

and the following Class be certified as follows:

All persons who own real property in the State of Illinois that is not
used for commercial purposes upon which a private water supply well
exists that provides drinking water, and which is within 3000 feet of
services stations that are or were owned or operated by Defendants.

19

Specifically excluded from the proposed Class are: (1) any claims brought by Public Water Providers[2]; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

b.　Determining the legal rights of the Class with respect to the following four issues:

1)　Were the Defendants negligent by adding MTBE to gasoline that was distributed in the State of Illinois.

2)　Were the Defendants negligent when they failed to warn of the risks associated with gasoline containing MTBE distributed in the State of Illinois?

3)　Did Defendants' placing of MTBE and gasoline containing MTBE into the stream of commerce in the State of Illinois create a nuisance?

c.　Entering an Order appointing Plaintiffs and their counsel to represent the Class.

KOREIN TILLERY

STEPHEN M. TILLERY #1834995
CHRISTINE J. MOODY #6211904
#10 Executive Woods Court
Swansea, IL 62226
Telephone:　618/277-1180
Facsimile:　314/241-1854

BARON & BUDD, P.C.
SCOTT SUMMY & CELESTE A. EVANGELISTI
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

*Attorneys for Plaintiffs and the Class*

---

[2]　"Public Water Provider" is defined as an entity, regardless of ownership, whose primary business purpose is to provide water for human consumption for purchase to its customers through pipes or other constructed conveyances, and where the system has 15 or more service connections, or regularly serves 25 or more persons. This definition includes all publicly-held and privately-held entities.

20

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 0 2000

FILED
CLERK'S OFFICE

## DOCKET NO. 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-370
*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-371
*Donna Berisha, et al. v. Amerada Hess Corp., et al.*, S.D. New York, C.A. No. 1:00-1898

## BEFORE JOHN F. NANGLE, CHAIRMAN, LOUIS C. BECHTLE, JOHN F. KEENAN, WM. TERRELL HODGES,* MOREY L. SEAR,* BRUCE M. SELYA* AND JULIA SMITH GIBBONS, JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of three actions pending in the following federal districts: two actions in the Southern District of Illinois and one action in the Southern District of New York.[1] Before the Panel is a motion by five oil company defendants seeking centralization of these actions, pursuant to 28 U.S.C. §1407, in the Southern District of Illinois for coordinated or consolidated pretrial proceedings. Five additional defendants agree that centralization is appropriate, although two of these defendants prefer centralization in the Southern District of New York. The Illinois plaintiffs support centralization in the Illinois court. The New York plaintiffs along with eight defendants oppose centralization; if the Panel deems centralization appropriate, the New York plaintiffs and at least one opposing defendant favor centralization in the New York court.[2]

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact concerning i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public, and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination. Centralization under Section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Section 1407 proceedings are desirable in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.

Opponents of transfer argue that the presence of individual questions of fact militate against 1407 transfer. We are unpersuaded by this argument. Indeed, we point out that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who

---

* Judges Hodges, Sear and Selya took no part in the decision of this matter.

[1] The Panel has been notified that two potentially related actions have been recently filed in the Middle and Southern Districts of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 192 F.R.D. 459, 468-470 (2000).

[2] In an interested party response, plaintiffs in a potentially related action – *Buddy Lynn, et al. v. Amoco Oil Company, et al.*, M.D. Alabama, C.A. No. 96-940 – suggest centralization of MDL-1358 in the Middle District of Alabama.


EXHIBIT

- 2 -

can formulate a pretrial program that:  1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.  It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or an action can be remanded to their transferor district for trial in advance of completion of the other actions in the transferee district.  But we are unwilling, on the basis of the record before us, to make such a determination at this time.  Should the transferee judge deem remand of any claims or an action appropriate, procedures are available whereby this may be accomplished with a minimum of delay.  *See* Rule 7.6, R.P.J.P.M.L., 192 F.R.D. 459, 470-472 (2000).

We are persuaded that centralization of this litigation in the Southern District of New York is appropriate.  We note that the New York action is proceeding apace before Judge Shira Ann Scheindlin and we are confident in her ability to conduct pretrial proceedings in this litigation in an expeditious manner.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the above-captioned actions pending in the Southern District of Illinois be, and the same hereby are, transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for coordinated or consolidated pretrial proceedings with the action pending there.

FOR THE PANEL:

John F. Nangle
Chairman

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

DAVID ENGLAND, DONNA L. AZBILL, JAMES BAUER, )
MARVIN OWCA, RHEA SUSAN MCMANNIS, and )
CLAUDIA CHRISTIANSEN, Individually and on )
Behalf of All Others Similarly Situated, )
                                      )
      Plaintiffs, )
                                        )
v. )         Cause No. *QC L 331*
                                        )
ATLANTIC RICHFIELD COMPANY; BP AMOCO )
CORPORATION; AMOCO OIL COMPANY; CITGO )
PETROLEUM CORPORATION; CONOCO, INC.; EXXON )
MOBIL CORPORATION, f/k/a EXXON CORPORATION )
and f/k/a MOBIL CORPORATION; EQUILON )
ENTERPRISES, LLC; CHEVRON U.S.A. INC.; )
PHILLIPS PETROLEUM COMPANY; SHELL OIL )
COMPANY; and TEXACO REFINING AND )
MARKETING, INC. )
                                        )
      Defendants. )



FILED

APR 11 2000

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

Hon George Moran

## CLASS ACTION COMPLAINT

Come now Plaintiffs, by and through their undersigned counsel, on behalf of themselves and all others similarly situated, and for their Complaint against Defendants, state as follows:

### NATURE OF THE CASE

1.    Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has caused wide-spread contamination to drinking water sources throughout the United States.

2.    Plaintiffs, on behalf of themselves and all others similarly situated, bring this case as a Class Action on behalf of all persons who own real property in the following states: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New

1

EXHIBIT

C

Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas , Wisconsin and Virginia (hereinafter referred to as "the RFG States") that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE. Plaintiffs bring this action for the costs of such testing or reimbursement of the cost of such testing and all necessary future testing.  Plaintiffs also bring this action on behalf of all persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes who have water that has been contaminated by MTBE. Plaintiffs request that, for those who own a water supply well that is found to have been contaminated by MTBE, Defendants be required to pay the costs associated with supplying bottled water on a temporary basis until a permanent hook up to the local municipal or private water system or a filter system is installed for those wells where a permanent water supply is unavailable.

## THE PARTIES

### The Plaintiffs

3.    Plaintiffs JAMES BAUER, MARVIN OWCA, DONNA L. AZBILL and RHEA SUSAN MCMANNIS are adult citizens and residents of Madison County, Illinois. They are owners of private wells reliant on groundwater, and are concerned with the risks MTBE poses to their water.  Their water supply wells have recently been tested for MTBE.  Although their wells were not contaminated with MTBE on the last date they were tested, they seek to recover reimbursement for the cost of such testing and the cost of future testing.

4.    Plaintiff DAVID ENGLAND is an adult citizen and resident of Madison County, Illinois.

2

13.     CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

14.     CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

15.     EXXON MOBIL CORPORATION, formed as a result of the merger on November 30, 1999 of EXXON CORPORATION and MOBILE CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

16.     EQUILON ENTERPRISES, LLC ("EQUILON") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

17.     PHILLIPS PETROLEUM COMPANY ("PHILLIPS") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

18.     SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

19.     TEXACO REFINING AND MARKETING, INC. ("TEXACO") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

20.     When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment

4

He is an owner of a private well, reliant on groundwater, which is contaminated with MTBE.

5.      Plaintiff CLAUDIA CHRISTIANSEN is an adult citizen and resident of Amador County, California. She is the owner of a private well, reliant on ground water, which is contaminated with MTBE.

6.      Plaintiffs bring this action on their own behalf and on behalf of the Class(es) they seek to represent, pursuant to 735 ILCS 5/2-801.

7.      Plaintiffs and all private water well owner residents of the RFG States have a stake in the preservation of clean groundwater, the protection of property, and the health and well-being of all citizens of the RFG States.

8.      All references to "Plaintiff[s]" throughout this Complaint are made on behalf of the named Plaintiffs and the putative Class(es), and vice versa.

**The Defendants**

9.      Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

10.      ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

11.      BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois. Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

12.      CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

or agency.

## Jurisdiction and Venue

21.    This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

22.    Venue is proper in this Court because at least one of the Plaintiffs resides and owns real property wherein a private well is located in Madison County, Illinois.

## STATEMENT OF FACTS

### MTBE's Characteristics and Defendants' Knowledge of Same

23.    Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive. MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process. MTBE is a member of a class of chemical compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to

5

contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water. Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

## Introduction of MTBE Into the Marketplace.

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

24.     In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

•     *TSCA and the First Federal Register Notice Issued by EPA*

25.     The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks that such chemicals may present to health and the environment. Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601). TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

26.     On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its

6

persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable.  For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

- *The Committees*

27.    Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information regarding MTBE and its risk to the environment from being known.  Among the many Committees established was the "MTBE Committee."  The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed.  An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE."  The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . . , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

28.    The Defendants, individually and via the MTBE Committee, submitted their written

7

comments to the EPA. However, despite the innocuous description of the MTBE Committee's goals, the information provided by Defendants was misleading and false. Clearly, the purpose behind the Defendants' comments was to dissuade the EPA from requiring additional health and environmental testing of MTBE. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, that MTBE had excellent biodegradation characteristics, and that additional testing should not be done. The representations made by the Defendants to the EPA were an alarming and inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid public scrutiny of the product and thereby maximize their profits. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of the people of the United States.

29.     Defendants misled not only the EPA, but Plaintiffs and Class members. Despite their duties to provide a safe product and to warn Plaintiffs, government regulators, and those who handle and store their product, of MTBE's dangerous properties and other known or reasonably knowable risks, Defendants failed to take proper action. Neither state agencies nor well owners were told of the existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence regarding MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

30.     Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information

8

Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990

*Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act*

31.     Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem.  The oil industry became concerned that Congress might consider alternative non-petroleum based fuels.  As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990.  In the Act, Congress mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems.  In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

*MTBE Became the Oxygenate of Choice*

32.     The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable.  MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available.  Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

9

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

33.     In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat. Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiffs who were dependent on groundwater.  Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

34.     Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year. In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the United States. With this many fuel handling events, human error inevitably occurs.  Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

35.     Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed.

It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiffs, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

36.     One of the provisions of the Amendments to the Clean Air Act authorized the EPA to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[1] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

## MTBE Is Responsible for Massive Water Contamination across the Country

37.     Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently

---

[1]   Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

38.    MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

39.    As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiffs and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii) a duty to warn gasoline station operators and the general public, including the Plaintiffs, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

40.    Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents. Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there

12

were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater. Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice. Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiffs and the Class, of the various pathways that MTBE can enter the environment and its effect on groundwater. As a result, many of the RFG States' residents, including certain of Plaintiffs and the Class, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given the opportunity to avoid potentially harmful exposure to their drinking water supplies.

41.     Plaintiffs are informed and believe and therefore allege that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states. The specific manufacturer of MTBE for any particular groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiffs and members of the Class(es) they seek to represent.

42.     Plaintiffs and class members find themselves in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which they did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse

13

effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

## CLASS ACTION ALLEGATIONS

43.     This action is brought by Plaintiffs JAMES BAUER, MARVIN OWCA, DONNA L. AZBILL and RHEA SUSAN MCMANNIS, on their own behalf and on behalf of all other persons similarly situated, pursuant to 735 ILCS 5/2-801, on behalf of a Sub-Class (hereinafter referred to as the "Testing Sub-Class"), defined as follows:

> All persons who own real property in the RFG States that is not used
> for commercial purposes upon which a private water supply well
> exists that provides or may provide drinking water and/or water used
> for domestic purposes and who have had or would like to have their
> water supply well tested for MTBE.

44.     This action is also brought by Plaintiffs DAVID ENGLAND and CLAUDIA CHRISTIANSEN, on their own behalf and on behalf of all other persons similarly situated, pursuant to 735 ILCS 5/2-801, on behalf of a Sub-Class (hereinafter referred to as the "Alternative Water Source Sub-Class"), defined as follows:

> All persons who own real property in the RFG States that is not used
> for commercial purposes upon which a private water supply well
> exists that provides or may provide drinking water and/or water used
> for domestic purposes which has been contaminated by MTBE.

45.     Specifically excluded from the proposed Sub-Classes are: (1) all other claims, including claims for any personal injury or other property damage sustained by the Class; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

14

46.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class Members is unknown at this time, it is generally ascertainable by appropriate discovery, and it is believed that the Class includes hundreds of thousands of members.

47.     Common questions of law or fact arising from Defendants' conduct exist as to all members of each Sub-Class, as required by 735 ILCS 5/2-801. These common questions predominate over any questions which affect individual members of each Sub-Class. These common questions include, without limitation:

1.     whether MTBE, if released into groundwater supplies, adversely impacts the groundwater;

2.     whether MTBE is slow to biodegrade and/or difficult and/or expensive to remediate;

3.     whether Defendants failed to adequately test MTBE, prior to its manufacture, distribution and/or sale, for risks to groundwater;

4.     whether Defendants failed to provide adequate warning to people in the business of operating gasoline stations and storage tanks containing MTBE regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

5.     whether Defendants failed to adequately warn Plaintiffs, government agencies and/or regulators, and/or the public regarding MTBE's properties and characteristics, including but not limited to, its high solubility and its potential adverse impact on groundwater if released into the environment;

6.     whether Defendant knew or should have known that MTBE is hazardous to groundwater aquifers and private water systems;

7.     whether Defendants made false, misleading, inaccurate and/or incomplete assertions regarding the threat posed by MTBE to the Nation's groundwater;

8.     whether Defendants conspired to conceal and/or misrepresent the characteristics of MTBE and the risks of MTBE use to public and private water supplies to Plaintiffs, government agencies and/or regulators and the public at large; and

9.     whether Defendant formed joint committees and/or task forces or other organizations

15

which generated misrepresentations or omissions regarding MTBE and its properties and/or characteristics.

48.     Class Action treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impracticable.   The Class Action provides an appropriate and effective method whereby the enforcement of the rights of Plaintiffs and members of the Class can be fairly managed without unnecessary expense or duplication. The expense and burden of individual litigation of a case of this magnitude make it impractical for individual Class Members to seek redress for the wrongs done to them.

49.     Individual litigation of all claims which might be asserted by all Class Members would produce such a multiplicity of cases that the judicial systems having jurisdiction of the claims would remain congested for years. The certification of a Class would allow litigation of claims that, in view of the expenses of the litigation, may be insufficient in amount to support separate actions. Concentrating this litigation in one forum would aid judicial economy and efficiency, promote parity among the claims of individual Class Members, and result in judicial consistency.

50.     Plaintiffs will fairly and adequately protect the interests of the Class they represent. The interests of Plaintiffs, as the Class Representatives, are consistent with those of the members of the Class.  In addition, Plaintiffs are represented by counsel experienced in complex class action litigation.

51.     The prosecution of separate actions by individual members of the Class would create a risk of:

       1.     Inconsistent or varying adjudications with respect to individual members of the Class; and

16

2.   Adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

52.   Plaintiffs and Class Members envision no unusual difficulty in the management of this action as a Class Action.

### CLAIMS FOR RELIEF

### COUNT I – NEGLIGENCE

53.   Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

54.   The residents of the RFG States, including Plaintiffs, are and have been captives to the petroleum industry of which Defendants are a part. Literally every resident of the RFG States is heavily dependent upon gasoline in their day-to-day lives. Defendants are responsible for the design, manufacture, sale and distribution of all chemicals that are part of gasoline. As a result, the Plaintiffs and the residents of the RFG States are in a disadvantaged position where they must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage. Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiffs concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

55.   Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists. Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE. Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale

17

production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE.

56.    With respect to MTBE, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

    a.    MTBE is an ether and is, therefore, water soluble;

    b.    MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

    c.    MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

    d.    MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

    e.    millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

    f.    there is a tremendous problem with leaking USTs throughout the Country;

    g.    the RFG States' and Plaintiffs' resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

    h.    owners of private water wells, including Plaintiffs, would be unsuspecting and not test for MTBE on a regular basis, if at all.

57.    Defendants had a duty to:

    a.    ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiffs and the Class;

    b.    determine whether MTBE contains any latent defects and to warn Plaintiffs, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

    c.    warn Plaintiffs and others who own or control a well that provides domestic water of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

    d.    warn anyone who owns or operates a water well that it should frequently be tested for MTBE; and

    e.    take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

58.    Defendants have negligently breached these duties by:

    a.    Using MTBE as an oxygenate, knowing of its dangerous propensities;

    b.    failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

    c.    failing to adequately test, identify and remediate wells that are contaminated with MTBE;

    d.    failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

    e.    failing to adequately warn Plaintiffs, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

    f.    forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

    g.    failing to eliminate or minimize the harmful impacts and risks posed by MTBE,

    h.    failing to curtail or reduce MTBE's manufacture and distribution;

    i.    failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

    j.    failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

    k.    making material misrepresentations and/or omissions of material facts regarding MTBE.

59.    As a direct and proximate result of one or more of the foregoing acts or omissions of

19

negligence on the part of Defendants, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class. As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

60.     As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class. As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local or private municipal water system, or will be required to install a system to filter out MTBE from contaminated well water supplies.

61.     All of the damages of which Plaintiffs complain were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

**PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT I**

**COUNT II - STRICT LIABILITY**

62.     Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

63.     At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

       a.     MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation; and

20

b.    If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

c.    Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

   (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

   (ii)   if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

   (iii)  it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

   (iv)   testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

   (v)    secondary containment is essential to storing MTBE; and

   (vi)   in the event of a leak, anyone living or residing near a site should be immediately warned.

d.    Defendants failed to warn Plaintiffs and members of the Class(es) they seek to represent that:

   (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

   (ii)   if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

   (iii)  anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

   (iv)   that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

64.   As a direct and proximate result of the unreasonably dangerous and/or defective

21

condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class. As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

65.     As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class. As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local municipal or private water system, or will be required to install a system to filter out MTBE from contaminated well water supplies.

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT II

COUNT III - CONSPIRACY

66.     Plaintiffs reallege and reaffirm each and every allegation contained in paragraphs 1 through 52 as if fully restated herein.

67.     As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

68.     Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

22

69.     Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

70.     With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater.  Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiffs and the Class(es) they seek to represent.

71.     Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

72.     Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis.  Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or downplay any adverse findings related to MTBE.  Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiffs and the public at large, including members of the Class Plaintiffs seek to represent.

73.     Defendants did act in furtherance of the above-alleged conspiracy and ratified and

23

adopted the acts of each co-conspirator.

74.     As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated groundwater in the RFG States and poses the threat of contaminating water wells of Plaintiffs and the Testing Sub-Class.  As a result, Plaintiffs and members of the Testing Sub-Class have been and/or will be required to conduct tests of their well water supply for MTBE contamination.

75.     As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water wells of certain of the Plaintiffs and the Alternative Water Source Sub-Class.  As a result, Plaintiffs and members of the Alternative Water Source Sub-Class have been and/or will be required to obtain water from alternative sources, including bottled water or through a connection to a local municipal or private water system, or will be required to install a system to filter out MTBE from contaminated well water supplies. Plaintiffs and members of the Alternative Water Source Sub-Class suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

### PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT III

### PRAYER FOR RELIEF FOR COUNTS I, II AND III

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows:

1.     Ordering that the action be maintained as a class action pursuant to 735 ILCS 5 /2-801 and the following sub-classes be certified as follows:

a.     Testing Sub-Class:

All persons who own real property in the RFG States that is not used

24

for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes and who have had or would like to have their water supply well tested for MTBE.

b.   <u>Alternative Water Source Sub-Class:</u>

All persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes which has been contaminated by MTBE.

Specifically excluded from the proposed Sub-Classes are: (1) all other claims, including claims for any personal injury or other property damage sustained by the Class; (2) Defendants herein, any entity in which any Defendant has a controlling interest, and the employees, affiliates, legal representatives, heirs, successors, or assignees of Defendants; and (3) any Judge conducting any proceeding in this action and members of their immediate families.

2.   An Order appointing Plaintiffs and their counsel to represent the Class.

3.   Awarding Plaintiff and class members compensatory damages, costs of suit, and attorneys' fees in an amount less than $75,000 per Plaintiff or class member, with compensatory damages as follows:

a.   compensatory damages for the systematic sampling and analysis for detectable quantities of MTBE for of all persons who own real property in the RFG States that is not used for commercial purposes upon which a private water supply well exists that provides or may provide drinking water and/or water used for domestic purposes who wish to have their well tested and to provide for reimbursement to those persons who have had their system or well tested. Plaintiffs also requests that this procedure be repeated at least once annually to provide testing to those who wish to have their well tested so long as Defendants manufacture and/or distribute gasoline containing MTBE in the RFG States, and for at least five (5) years thereafter; and

b.   compensatory damages associated with supplying bottled water and/or providing a permanent hook up to the local municipal or private water system, or providing a filter system to redress the contamination by MTBE for those Plaintiffs and Class Members who own a water supply well in the RFG States where the groundwater underlying such property is or has been

25

contaminated with MTBE.

## COUNT IV - NEGLIGENCE

76.     Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has caused wide-spread contamination to drinking water sources throughout the United States.

77.     Plaintiff DAVID ENGLAND is an adult citizen and resident of Madison County, Illinois. He is an owner of a private well, reliant on groundwater, which is contaminated with MTBE.

**The Defendants**

78.     Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

79.     ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

80.     BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois.  Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

81.     CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

82.     CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

83.     CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

84.     EXXON MOBIL CORPORATION,  formed as a result of the merger on November 30,

1999 of Exxon Corporation and Mobile Corporation, ("Exxon") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

85.     Equilon Enterprises, LLC ("Equilon") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

86.     Phillips Petroleum Company ("Phillips") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

87.     Shell Oil Company ("Shell") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

88.     Texaco Refining and Marketing, Inc. ("Texaco") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

89.     When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### Jurisdiction and Venue

90.     This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the

27

Illinois courts consistent with traditional notions of fair play and substantial justice.

## STATEMENT OF FACTS

### MTBE's Characteristics and Defendants' Knowledge of Same

91.     Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive.  MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process.  MTBE is a member of a class of chemical compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption.  Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water.  Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

### Introduction of MTBE Into the Marketplace.

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

92.     In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane.  Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics

of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

- *TSCA and the First Federal Register Notice Issued by EPA*

93.    The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks that such chemicals may present to health and the environment.  Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601).  TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

94.    On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable.  For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

- *The Committees*

95.    Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information

29

regarding MTBE and its risk to the environment from being known.  Among the many Committees established was the "MTBE Committee."  The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed.  An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE."  The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE . . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule . . . , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

96.     The Defendants, individually and via the MTBE Committee, submitted their written comments to the EPA.  However, despite the innocuous description of the MTBE Committee's goals, the information provided by Defendants was misleading and false.  Clearly, the purpose behind the Defendants' comments was to dissuade the EPA from requiring additional health and environmental testing of MTBE.  For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, that MTBE had excellent biodegradation characteristics, and that additional testing should not be done.  The representations made by the Defendants to the EPA were an alarming and inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid public scrutiny of the product and thereby maximize their profits.  In making and supporting such

30

representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of the people of the United States.

97.    Defendants misled not only the EPA, but Plaintiff. Despite their duties to provide a safe product and to warn Plaintiff, government regulators, and those who handle and store their product, of MTBE's dangerous properties and other known or reasonably knowable risks, Defendants failed to take proper action. Neither state agencies nor well owners were told of the existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence on MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

98.    Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government. Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990
*Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act*

99.    Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem. The oil industry became concerned that Congress might consider alternative non-petroleum based fuels. As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990. In the Act, Congress

31

mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems. In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

*MTBE Became the Oxygenate of Choice*

100.   The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable. MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

101.   In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat. Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiff who was dependent on groundwater. Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

32

102.    Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year. In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the United States. With this many fuel handling events, human error inevitably occurs. Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

103.    Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed. It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiff, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

104.    One of the provisions of the Amendments to the Clean Air Act authorized the EPA

33

to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[2] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

## MTBE Is Responsible for Massive Water Contamination across the Country

105.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

106.    MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant

---

2    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

risk to the nation's drinking water supply."

107.    As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiff and even of government regulators, Defendants individually and severally had and have:  (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii) a duty to warn gasoline station operators and the general public, including Plaintiff, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

108.    Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents.  Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater.  Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice.  Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiff, of the various pathways that MTBE can enter the environment and its effect on groundwater.  As a result, many of the RFG States' residents, including Plaintiff, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given

35

the opportunity to avoid potentially harmful exposure to their drinking water supplies.

109.    Plaintiff is informed and believes and therefore alleges that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states.  The specific manufacturer of MTBE for any particular groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiff.

110.    Plaintiff finds himself in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which he did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

111.    Plaintiff is in a disadvantaged position where he must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage.  Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

112.    Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists.  Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE.  Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale

36

production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE.

113.   With respect to MTBE, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

    a.    MTBE is an ether and is, therefore, water soluble;

    b.    MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

    c.    MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

    d.    MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

    e.    millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

    f.    there is a tremendous problem with leaking USTs throughout the Country;

    g.    Plaintiff's resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

    h.    owners of private water wells, including Plaintiff, would be unsuspecting and not test for MTBE on a regular basis, if at all.

114.   Defendants had a duty to:

    a.    ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiff;

    b.    determine whether MTBE contains any latent defects and to warn Plaintiff, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

    c.    warn Plaintiff of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

37

    d.        warn Plaintiff that a water well that it should frequently be tested for MTBE; and

    e.        take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

115.    Defendants have negligently breached these duties by:

    a.        Using MTBE as an oxygenate, knowing of its dangerous propensities;

    b.        failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

    c.        failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

    d.        failing to adequately warn Plaintiff, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

    e.        forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

    f.        failing to eliminate or minimize the harmful impacts and risks posed by MTBE;

    g.        failing to curtail or reduce MTBE's manufacture and distribution;

    h.        failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

    i.        failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

    j.        making material misrepresentations and/or omissions of material facts regarding MTBE.

116.    As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, MTBE has contaminated the water well of Plaintiff, thereby

causing a diminution in the value of Plaintiff's real property.

117.   All of the damages of which Plaintiff complains were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

### PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT IV

### COUNT V - STRICT LIABILITY

118.   Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 76 through 111 as if fully restated herein.

119.   At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

a.   MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

b.   If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

c.   Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

(i)   MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

(ii)   if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

(iii)   it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

39

    (iv)    testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

    (v)    secondary containment is essential to storing MTBE; and

    (vi)    in the event of a leak, anyone living or residing near a site should be immediately warned.

d.    Defendants failed to warn Plaintiff that:

    (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

    (ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

    (iii)    anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

    (iv)    that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

120.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT V

## COUNT VI - CONSPIRACY

121.    Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 76 through 111 as if fully restated herein.

122.    As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

123.    Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

124.    Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

125.    With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater.  Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiff.

126.    Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

127.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport

41

characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis. Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or downplay any adverse findings related to MTBE. Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiff.

128.    Defendants did act in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator.

129.    As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property. Plaintiff suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff DAVID ENGLAND prays damages against Defendants for the diminution in value of his real property in an amount, when combined with all other requested damages he seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VI

COUNT VII - NEGLIGENCE

130.    Methyl tertiary butyl ether ("MTBE") is the gasoline oxygenate additive that has caused wide-spread contamination to drinking water sources throughout the United States.

131.    Plaintiff CLAUDIA CHRISTIANSEN is an adult citizen and resident of Amador County, California. She is the owner of a private well, reliant on ground water, which is contaminated with MTBE.

42

**The Defendants**

132.    Defendants in this action are manufacturers and/or distributors of MTBE and gasoline containing MTBE, and do business in the State of Illinois.

133.    ATLANTIC RICHFIELD COMPANY (hereinafter referred to as "ARCO") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

134.    BP AMOCO CORPORATION ("AMOCO") is a Indiana corporation with its principal place of business in the State of Illinois.  Defendant AMOCO OIL COMPANY is a wholly owned subsidiary of BP AMOCO CORPORATION and has its principal place of business in the State of Illinois.

135.    CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

136.    CONOCO, INC. ("CONOCO") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

137.    CHEVRON U.S.A. INC. ("CHEVRON") is a Delaware corporation with its principal place of business in California and doing business in the State of Illinois.

138.    EXXON MOBIL CORPORATION, formed as a result of the merger on November 30, 1999 of EXXON CORPORATION and MOBILE CORPORATION, ("EXXON") is a New Jersey corporation with its principal place of business in Texas and doing business in the State of Illinois.

139.    EQUILON ENTERPRISES, LLC ("EQUILON") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

140.    PHILLIPS PETROLEUM COMPANY ("PHILLIPS") is a Delaware corporation with its principal place of business in Oklahoma and doing business in the State of Illinois.

43

141.    SHELL OIL COMPANY ("SHELL") is a Delaware corporation with its principal place of business in Texas and doing business in the State of Illinois.

142.    TEXACO REFINING AND MARKETING, INC. ("TEXACO") is a Delaware corporation with its principal place of business in New York and doing business in the State of Illinois.

143.    When reference in this Complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## Jurisdiction and Venue

144.    This Court has jurisdiction over Defendants because they are either Illinois corporations authorized to do business in Illinois, are registered with the Illinois Secretary of State, do sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally avail themselves of the Illinois market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Illinois to render the exercise of jurisdiction over Defendants by the Illinois courts consistent with traditional notions of fair play and substantial justice.

## STATEMENT OF FACTS

## MTBE's Characteristics and Defendants' Knowledge of Same

145.    Methyl tertiary butyl ether ("MTBE") is a gasoline oxygenate additive.  MTBE does not occur naturally but is produced in very large amounts from isobutylene, a by-product produced by the oil companies in the gasoline refining process.  MTBE is a member of a class of chemical

44

compounds, ethers, whose unique properties include enhanced solubility in water and chemical attraction to water molecules. Unlike oil, which does not mix with water, MTBE mixes so well with water that it spreads its toxic plumes faster and farther than other chemical components contained in gasoline. Once MTBE is released into the environment and is permitted to contaminate groundwater, its foul taste and odor may render the water virtually unusable and unfit for human consumption. Moreover, MTBE does not attach readily to soil particles and is therefore not readily susceptible to natural biodegradation. Thus, once it has been discharged and/or permitted to contaminate groundwater, MTBE will continue to exist for an extensive period of time and poses a danger of spreading to uncontaminated sources of drinking water. Additionally, once in the groundwater, MTBE is costly and difficult to remediate.

## Introduction of MTBE Into the Marketplace.

*Defendants Conspired to Mislead the EPA and the Public about the Dangers of MTBE*

146.   In or around 1979, MTBE Defendants began using MTBE as a gasoline additive to boost octane. Despite the Defendants' knowledge of the dangerous characteristics of MTBE and its propensity to contaminate groundwater, these Defendants formed joint task-forces and committees, and in doing so, conspired to misrepresent to the government and the public the true characteristics of MTBE, in order to pave the way for MTBE to become one of the most widely-used petroleum products in the United States.

* *TSCA and the First Federal Register Notice Issued by EPA*

147.   The Toxic Substances Control Act ("TSCA") authorized the Administrator of the United States Environmental Protection Agency ("EPA") to promulgate regulations to require the testing of chemical substances and mixtures in order to develop data relevant to determine the risks

that such chemicals may present to health and the environment. Toxic Substances Control Act of 1978, Pub. L. No. 94-469, 90 Stat. 2003 (codified at 15 U.S.C. § 2601). TSCA also established an Interagency Testing Committee ("ITC") to make recommendations to the EPA of chemicals to be examined and the testing to be performed.

148.   On October 31, 1986, the ITC submitted its Nineteenth Report to the EPA recommending that MTBE be reviewed and tested to determine its health and environmental risks. The ITC characterized MTBE as having relatively high water solubility and indicated that its persistence in groundwater following spills is unknown, but that MTBE is not likely to be readily biodegradable. For these reasons, the ITC recommended chemical fate monitoring of MTBE to determine the extent of risk posed by MTBE to the environment. The ITC invited written comments.

• *The Committees*

149.   Since the early 1980's, the Defendants formed numerous Committees under the auspices of various trade organizations including the American Petroleum Institute ("API") and the Oxygenated Fuels Association ("OFA") to analyze MTBE and its impact on the environment. Although these trade organizations allegedly state that their purpose is to provide information to regulatory agencies and the public, the members in effect conspired to keep truthful information regarding MTBE and its risk to the environment from being known. Among the many Committees established was the "MTBE Committee." The oil industry mobilized an effort to convince the EPA that MTBE was safe and that additional testing of MTBE was not needed. An MTBE Committee was formed by Defendants with the express and stated purpose as set forth in a written agreement of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee lauded

46

itself as "being a source of information to MTBE producers, users, the government and the public"

and stated that its goal was to "address environmental health and safety issues relating to MTBE

. . . , provide technical data to appropriate regulatory agencies and legislative bodies . . . , conduct[]

and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order

or Test Rule . . . , [and] make available to interested parties and the general public technical and

scientific information relating to the use of MTBE in fuels."

150.   The Defendants, individually and via the MTBE Committee, submitted their written

comments to the EPA.   However, despite the innocuous description of the MTBE Committee's

goals, the information provided by Defendants was misleading and false.   Clearly, the purpose

behind the Defendants' comments was to dissuade the EPA from requiring additional health and

environmental testing of MTBE.   For example, the Defendants provided information to the EPA

representing that MTBE is only slightly soluble in water, that potential environmental exposure is

not high, that MTBE had excellent biodegradation characteristics, and that additional testing should

not be done.   The representations made by the Defendants to the EPA were an alarming and

inaccurate attempt to obtain approval without adequate testing so that the Defendants could avoid

public scrutiny of the product and thereby maximize their profits.   In making and supporting such

representations, the Defendants demonstrated their willingness to use any means to place their

economic interest above the health, property and well-being of the people of the United States.

151.   Defendants misled not only the EPA, but Plaintiff.   Despite their duties to provide

a safe product and to warn Plaintiff, government regulators, and those who handle and store their

product, of MTBE's dangerous properties and other known or reasonably knowable risks,

Defendants failed to take proper action.   Neither state agencies nor well owners were told of the

47

existence of MTBE in gasoline, much less that ground water should be tested for the presence of MTBE. Since 1990, the Defendants' silence on MTBE allowed the Defendants to convince everyone that they could use an oxygenate to clean the air and that alternative fuels were not needed as part of the Amendments to the Clean Air Act of 1990.

152.    Further, Defendants continued to misrepresent the characteristics of MTBE to the public and the government.  Despite the fact that the true story about MTBE is now coming to light, Defendants have not only failed to take steps to inform the EPA and the public that the information Defendants provided about MTBE was inaccurate and/or misleading, but have continued to tout MTBE as a benefit to the environment and have withheld information regarding MTBE's harmful characteristics and risks to the Nation's groundwater.

## MTBE Became the Oxygenate of Choice under the Clean Air Act Amendments of 1990

*Defendants Lobbied for the Use of Oxygenates under the Amendments to the Clean Air Act*

153.    Prior to 1990, it was well known that Congress was preparing to take action to address the Nation's smog problem.  The oil industry became concerned that Congress might consider alternative non-petroleum based fuels.  As a result of tremendous lobbying efforts by the industry, the Clean Air Act Amendments ("the Act") were passed in 1990.  In the Act, Congress mandated the use of Reformulated Gasoline (RFG), containing 2% oxygen by weight, in those areas of the country with the worst ozone or smog problems.  In 1992, in conjunction with the Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required 2.7 % oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

48

*MTBE Became the Oxygenate of Choice*

154.   The Act requires the use of an oxygenate but it does not require the use of MTBE. MTBE was the product Defendants chose to promote and market when they realized that a change in law to protect the country's air quality was inevitable.  MTBE was Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available.  Additionally, Defendants could manufacture MTBE from their refinery by-products and were not forced to purchase an oxygenate from a third-party.

*Defendants' Decision to Use MTBE Was Made with Knowledge of the National UST Crisis and That Gasoline Can and Will Enter the Subsurface at Virtually Every Gasoline Station That Dispenses Gasoline*

155.   In making MTBE their oxygenate of choice, Defendants were fully aware that leaking underground storage tanks ("UST") threatened the RFG States' water supply and the presence of MTBE served to exacerbate this threat.  Defendants chose to place MTBE gasoline in leaking USTs without regard for the integrity of the RFG States' groundwater system, as well as the safety and well-being of Plaintiff who was dependent on groundwater.  Substantial industry reports, Congressional testimony and concerns expressed by the EPA document Defendants' knowledge of the UST crisis.

156.   Further, Defendants were also fully aware that thousands of gallons of gasoline enter the soil from gasoline dispensing stations due to consumer overfills of automobile gas tanks and jobber overfills of the USTs each year.  In fact, it has been predicted that over 15 million UST over-filling events and over 12 billion automotive over-fueling events occur annually in this country. Defendants were also aware that gasoline is used and stored by nearly every adult person in the

United States. With this many fuel handling events, human error inevitably occurs. Defendants knew that the human error involved in the millions of fuel handling events would allow gasoline containing MTBE to migrate through the soil and into the groundwater. Nevertheless, they introduced MTBE into the stream of commerce and distributed gasoline containing MTBE to thousands of sites in the United States without warning anyone about the risks of MTBE.

*Defendants' Decision to Use MTBE Was Made Without Adequate Toxicity Studies*

157.    Although this case does not involve claims for personal injury, it is important to note that Defendants added MTBE to gasoline before decisive, long-term cancer studies were completed. It is common knowledge within the scientific community and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed by pointing to tests which Defendants structured and funded. Thus, Defendants exposed millions of Americans, including Plaintiff, to potential harm without warning of the potential health risks associated with MTBE.

**The RFG States**

158.    One of the provisions of the Amendments to the Clean Air Act authorized the EPA to mandate that certain areas of the country participate in reformulated gasoline programs within areas designated non-attainment for carbon monoxide (CO).[3] The following states are among those participating in the oxygenated fuel program: California, Connecticut, Delaware, Illinois, Indiana,

---

3    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, and were forced to sell gasoline containing 2% oxygenate by weight. Defendants primarily chose to promote and market MTBE as an oxygenate and sold gasoline containing MTBE in these States. In the RFG states, MTBE comprises up to 15% of every gallon of gasoline.

## MTBE Is Responsible for Massive Water Contamination across the Country

159.   Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

160.   MTBE contamination has become so severe that the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline. The EPA report indicates that MTBE is a "threat to the nation's drinking water resources;" that it "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

161.   As manufacturers and distributors of MTBE with vastly superior knowledge and resources to those of Plaintiff and even of government regulators, Defendants individually and severally had and have: (i) a duty to protect the RFG States' groundwater/drinking water; (ii) a duty to timely and fully inform government agencies and regulators of the nature and risks of MTBE; (iii)

51

a duty to warn gasoline station operators and the general public, including Plaintiff, of MTBE's unique properties, and transport characteristics; and (iv) a duty to warn all persons who own a water supply well of MTBE's propensity to migrate great distances upon being released, of its potential adverse effects and of the need for testing.

162.    Defendants have known of MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents. Defendants knew that the storage systems responsible for storing gasoline containing MTBE were deteriorating and/or leaking and that there were numerous other pathways that would allow for the MTBE to get into the environment and cause extensive pollution of this country's groundwater. Despite this knowledge, Defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE as its oxygenate of choice. Further, Defendants have failed to warn the appropriate persons that own and operate gasoline stations and storage tanks, as well as Plaintiff, of the various pathways that MTBE can enter the environment and its effect on groundwater. As a result, many of the RFG States' residents, including Plaintiff, have been unwittingly exposed to MTBE through normal activities such as drinking, cooking, cleaning and bathing with tap water. Those persons who own water wells that provide water contaminated with MTBE were never given the opportunity to avoid potentially harmful exposure to their drinking water supplies.

163.    Plaintiff is informed and believes and therefore alleges that the process of manufacturing and distribution of petroleum products, principally gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout the RFG states. The specific manufacturer of MTBE for any particular

52

groundwater contamination cannot always be fairly and accurately determined, thereby necessitating the pursuit of all Defendants, jointly and severally, for those damages which they have collectively visited upon Plaintiff.

164.    Plaintiff finds herself in the unenviable position of having to solve an enormous problem of groundwater and drinking water contamination which she did not even know existed. While Defendants have neglected to warn the public and private water supply well owners or other proper persons as to the actual extent of MTBE contamination, its adverse effects, and its propensity to mix with and contaminate large volumes of groundwater, many well owners continue to use their wells on a daily basis, unaware of MTBE and the risks it poses.

165.    Plaintiff is in a disadvantaged position where she must rely on Defendants to provide gasoline of a nature and in a manner that is safe in anticipated and foreseeable usage. Defendants possess vastly superior knowledge, resources, experience and other advantages to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline and particularly MTBE.

166.    Many of Defendants employ scientists such as hydrogeologists, chemists, engineers and toxicologists. Defendants are in a position to "know" the effects of wide scale production, distribution and use of certain chemicals contained in gasoline, including MTBE. Defendants have tremendous economic power, as well as substantial resources to analyze all facets of the wide scale production, distribution and use of the chemicals they place and distribute in gasoline, including MTBE.

167.    With respect to MTBE, Defendants knew or should have known, prior to and subsequent to the wide scale production of MTBE, that:

a.      MTBE is an ether and is, therefore, water soluble;

53

    b.    MTBE has certain fate and transport characteristics which make it highly pervasive in water and that once in water, it would not adsorb to soil particles and would be recalcitrant to biodegradation;

    c.    MTBE plumes would spread faster and farther than BTEX plumes and thereby threaten groundwater and drinking water;

    d.    MTBE is extremely hazardous to groundwater aquifers and Plaintiffs' wells and water systems;

    e.    millions of Americans would handle gasoline containing MTBE in the course of their daily lives;

    f.    there is a tremendous problem with leaking USTs throughout the Country;

    g.    Plaintiff's resources were inadequate to deal with the wide scale contamination problem MTBE would cause; and

    h.    owners of private water wells, including Plaintiff, would be unsuspecting and not test for MTBE on a regular basis, if at all.

168.    Defendants had a duty to:

    a.    ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater belonging to Plaintiff;

    b.    determine whether MTBE contains any latent defects and to warn Plaintiff, the public and others of any such latent defects known or reasonably knowable by them, their agents and employees;

    c.    warn Plaintiff of MTBE's propensity to migrate great distances upon being released and of its potential adverse effects;

    d.    warn Plaintiff that a water well that it should frequently be tested for MTBE; and

    e.    take reasonable actions to minimize or eliminate the harmful impacts and risks of their product.

169.    Defendants have negligently breached these duties by:

    a.    Using MTBE as an oxygenate, knowing of its dangerous propensities;

b.   failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

c.   failing to warn sellers of gasoline containing MTBE about the risks associated with the use of MTBE;

d.   failing to adequately warn Plaintiff, government agencies and/or regulators, and the general public regarding MTBE and its associated risks, including the impact on water;

e.   forming joint committees and task-forces to create strategic approaches to keep information surrounding MTBE concealed while promoting and defending MTBE;

f.   failing to eliminate or minimize the harmful impacts and risks posed by MTBE;

g.   failing to curtail or reduce MTBE's manufacture and distribution;

h.   failing to instruct the purchasers and users of gasoline containing MTBE about the safe handling and use of such product;

i.   failing to inspect, test and take the necessary steps to prevent the distribution and storage system from releasing MTBE in the general public's water or threatening such release; and/or

j.   making material misrepresentations and/or omissions of material facts regarding MTBE.

170.   As a direct and proximate result of one or more of the foregoing acts or omissions of negligence on the part of Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

171.   All of the damages of which Plaintiff complains were reasonably foreseeable and proximately caused by the negligence of Defendants, jointly and severally, as hereinbefore alleged.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested

55

damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

### PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VII

### COUNT VIII - STRICT LIABILITY

172.  Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 130 through 163 as if fully restated herein.

173.  At the time Defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses for the following reasons:

    a.    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

    b.    If gasoline containing MTBE is leaked, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.    Defendants failed to warn persons in the business of owning and operating gasoline stations and storage tanks, and government regulators that:

        (i)    MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

        (ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

        (iii)    it is necessary to maintain and require that USTs be kept tight and that overfills must immediately be addressed;

        (iv)    testing should be conducted on a frequent basis in and around USTs and related systems where MTBE is stored for early detection to prevent harmful exposure to humans and property;

        (v)    secondary containment is essential to storing MTBE; and

        (vi)    in the event of a leak, anyone living or residing near a site should be

immediately warned.

d.      Defendants failed to warn Plaintiff that:

(i)     MTBE is highly soluble in water and recalcitrant to bioremediation and biodegradation;

(ii)    if MTBE is leaked, it has a tendency to mix with groundwater and migrate great distances;

(iii)   anyone storing gasoline is at risk for contaminating wells and what care should have been taken in handling and storing gasoline containing MTBE; and

(iv)    that anyone who owns or controls a well or water system should frequently test for the presence of MTBE because of its rapid movement through groundwater and propensity to contaminate large volumes of groundwater and drinking water.

174.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT VIII

COUNT IX - CONSPIRACY

175.    Plaintiff realleges and reaffirms each and every allegation contained in paragraphs 130 through 163 as if fully restated herein.

57

176.    As set forth above, Defendants formed joint task-forces and committees with the express purpose of providing information about MTBE to the public and to government agencies.

177.    Instead of providing truthful and accurate information about the fate and transport characteristics, propensity to contaminate ground water, and health effects of MTBE, Defendants intentionally misrepresented to the EPA and the public that MTBE was safe and did not pose a risk to groundwater.

178.    Defendants agreed among themselves to continue to conceal the dangers of MTBE from the government and the public by repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third-parties.

179.    With respect to the foregoing wrongful conduct, Defendants have conspired and acted in concert to use the oxygenate MTBE because it was the most profitable gasoline additive and without due regard for the risks posed by MTBE to groundwater.  Defendants thereby directly and proximately caused reasonably foreseeable damages to Plaintiff.

180.    Defendants have conspired and colluded to make misrepresentations and omissions to promote the acceptance and use of MTBE and to create a market for such chemical without disclosing the characteristics of and risks posed by MTBE to groundwater.

181.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have knowingly and wilfully acted in concert for the unlawful purposes of suppressing and concealing material information concerning the adverse fate and transport characteristics of MTBE, the propensity of MTBE to contaminate groundwater, the potential adverse health effects of MTBE, and the extent of the leaking UST crisis. Defendants have organized UST and MTBE task forces to collectively use their resources to fight UST legislation and conceal or

58

downplay any adverse findings related to MTBE.  Defendants further conspired to conceal and/or represent, in an inaccurate and misleading fashion, the chemical fate and transport characteristics and the public health risks associated with MTBE to not only the EPA, but to Plaintiff.

182.    Defendants did act in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator.

183.    As a direct and proximate cause of the wrongful acts committed in furtherance of the conspiracy described above, MTBE has contaminated the water well of Plaintiff, thereby causing a diminution in the value of Plaintiff's real property.  Plaintiff suffered proximate and reasonably foreseeable damages as set out herein for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff CLAUDIA CHRISTIANSEN prays damages against Defendants for the diminution in value of her real property in an amount, when combined with all other requested damages she seeks in all other counts of this Complaint, less than seventy-five thousand dollars ($75,000.00).

PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNT IX

CARR, KOREIN, TILLERY, KUNIN,
MONTROY, CATES, KATZ & GLASS

STEPHEN M. TILLERY #2834995
CHRISTINE J. MOODY #6211904
10 Executive Woods Court
Swansea, Illinois 62226
Telephone:      (618) 277-1180
Facsimile:      (314) 241-3525

59

COOPER & SCULLY, P.C.
SCOTT SUMMY, TX Bar No. 19507500
CELESTE EVANGELASTI, TX Bar No. 00793706
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone:     (214) 712-9500
Facsimile:      (214) 712-9540

LAW OFFICES OF MASRY & VITITOE
EDWARD MASRY, CA Bar No. 31016
JOSEPH D. GONZALEZ, CA Bar No. 189947
5707 Corsa Avenue, Second Floor
Westlake Village, CA 91362
Telephone:     (818) 991-8900
Facsimile:      (818) 991-6200

MILLER, SHER & SAWYER
VICTOR M. SHER, CA Bar No. 96197
DUANE C. MILLER, CA Bar No. 57812
A. CURTIS SAWYER, JR., CA Bar No. 101324
100 Howe Avenue, Suite S-120
Sacramento, CA 95825-5407

ROUNDTREE & SEAGLE, LLP
J. HAROLD SEAGLE, NC Bar No. 8017
P.O. Box 1409
Wilmington, NC  28402-1409

*Attorneys for Plaintiffs and the Class*

60

# IN THE CIRCUIT COURT
## THIRD JUDICIAL CIRCUIT
### MADISON COUNTY, ILLINOIS

DAVID ENGLAND, DONNA L. AZBILL, JAMES BAUER, )
MARVIN OWCA, RHEA SUSAN MCMANNIS, and )
CLAUDIA CHRISTIANSEN, Individually and on )
Behalf of All Others Similarly Situated, )
                     )
        Plaintiffs, )
                     )     Cause No. _00 L 331_
v.                        )
                     )
ATLANTIC RICHFIELD COMPANY; BP AMOCO )
CORPORATION; AMOCO OIL COMPANY; CITGO )
PETROLEUM CORPORATION; CONOCO, INC.; EXXON )
MOBIL CORPORATION, f/k/a EXXON CORPORATION )
and f/k/a MOBIL CORPORATION; EQUILON )
ENTERPRISES, LLC; CHEVRON U.S.A. INC.; )
PHILLIPS PETROLEUM COMPANY; SHELL OIL )
COMPANY; and TEXACO REFINING AND )
MARKETING, INC. )
                     )
        Defendants. )

**FILED**

APR 1 1 2000

CLERK OF CIRCUIT COURT #9
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

## AFFIDAVIT OF STEPHEN M. TILLERY

I, Stephen M. Tillery, being first duly sworn upon my oath, depose and state as follows:

1.     That I am the attorney representing the Plaintiffs filing the above-captioned cause of action.

2.     That the total of money damages sought by Plaintiffs in this cause of action exceeds Fifty Thousand Dollars ($50,000.00) but less than Seventy-five Thousand Dollars ($75,000.00) per plaintiff or class member.

    Further affiant sayeth not.

_____
STEPHEN M. TILLERY

STATE OF ILLINOIS            )
                            ) SS
COUNTY OF ST. CLAIR         )

Subscribed and sworn to before me, a notary public, this __11th__ day of April, 2000.

"OFFICIAL SEAL"
Charlotte A Mabry
Notary Public, State of Illinois
My Commission Exp. 06/21/2003

_____
Notary Public