**MDL 1358**

# BEFORE THE JUDICIAL PANEL ON
# MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| | * |
| | * |
| | * |
| | * |
| | *  **MDL Docket No.: 1358** |
| IN RE: | * |
| | *  This Document Relates to: |
| **METHYL TERTIARY** | * |
| **BUTYL ETHER PRODUCTS** | *  *John F. Larrabee, et al. v. Exxon Mobil Oil* |
| **LIABILITY LITIGATION** | *  *Corp., et al., 06-1059 (D. Md.)* |
| | * |
| | * |
| | * |
| | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' MOTION TO VACATE
## CONDITIONAL TRANSFER ORDER ("CTO") 22;
## AND REQUEST FOR ORAL ARGUMENT

1. *John F. Larrabee, et al. v. Exxon Mobil Oil Corp., et al.*, Case No. 06-1059 (D. Md.),

has been identified as a tag-along action in the schedule of district court cases subject to CTO-22,

issued by the Panel on May 30, 2006. The *Larrabee* Plaintiffs hereby move the Panel to vacate

the above-referenced conditional transfer order as it applies to the *Larrabee* action on the

grounds that such action does not meet the required criteria for transfer and consolidation set

forth in 28 U.S.C. § 1407.

**OFFICIAL FILE COPY** IMAGED JUN 2 8 2006

2.  This Motion is based on the attached Memorandum of Law in support thereof; the files, pleadings, and documents on file with the Panel; and upon such further documentary and oral evidence as may be presented in the hearing on this matter.

WHEREFORE, Plaintiffs respectfully request that the Panel:

A.      Vacate the CTO-22 as it applies to the Larrabee action;

B.      Schedule oral argument on this Motion; and

C.      Grant such other relief as deemed just and appropriate.

Respectfully submitted,

Dated: June 27, 2006

Mary V. McNamara-Koch (Md. Fed. Bar No. 26591)
Karyn S. Bergmann (Md. Fed. Bar No. 16112)
**LAW OFFICES OF PETER G. ANGELOS**
100 N. Charles Center
22nd Floor
401 East Pratt Street
Baltimore, Maryland 21201
(410) 649-2007

*Counsel for Plaintiffs*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

|                              |   |                                              |
|------------------------------|---|----------------------------------------------|
|                              | * |                                              |
|                              | * |                                              |
|                              | * |                                              |
|                              | * |                                              |
| **IN RE:**                   | * | **MDL Docket No.: 1358**                     |
|                              | * | This Document Relates to:                    |
| **METHYL TERTIARY**          | * |                                              |
| **BUTYL ETHER PRODUCTS**     | * | *John F. Larrabee, et al. v. Exxon Mobil Oil* |
| **LIABILITY LITIGATION**     | * | *Corp., et al., 06-1059 (D. Md.)*            |
|                              | * |                                              |
|                              | * |                                              |
|                              | * |                                              |
|                              | * |                                              |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION TO VACATE CTO-22

Plaintiffs by and through undersigned counsel respectfully move that the Honorable

Judicial Panel on Multidistrict Litigation ("JPML") vacate its conditional transfer order, CTO-22,

as it applies to the *Larrabee* action for the reasons set forth below.[1]

## I. FACTUAL BACKGROUND

---

[1] Plaintiffs wish to make the Panel aware that the Honorable Judge Garbis of the Federal District Court for the Northern District of Maryland has set this matter for hearing on the issues of Defendant's Motion to Stay and Plaintiffs' Motion for Remand. The hearing is presently scheduled for July 12, 2006. See Exhibit 1, Correspondence of June 26, 2006 from Judge Garbis to all counsel in Larrabee. See Exhibit 2, Order issued by Judge Garbis on June 16, 2006 in the matter of *Alban, et al. v. Exxon Mobil Corp., et al.*, United States District Court for the District if Maryland, MJG-06-1448.

1

Plaintiffs and Proposed Class Representatives are property owners and citizens of Baltimore County, State of Maryland, and currently reside in Jacksonville/Phoenix, Maryland. Their water supply is contaminated and/or threatened by contamination with gasoline constituents as a result of a 25,000 gallon release of gasoline from the Jacksonville Exxon.

John and Barbara Larrabee, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3507 Hampshire Glen Court, in Phoenix, Maryland 21131, approximately a quarter to a half mile from the Jacksonville Exxon. Their drinking water is supplied by a well located on their property, which has tested positive for gasoline constituents. They also have a second well on their property, which serves as a back-up drinking water supply and is used for watering the lawn and other outdoor purposes. The water from this well has had detections of methyl tertiary-butyl ether (hereinafter "MTBE") and has gone dry since gasoline recovery efforts began at the Jacksonville Exxon.

Paul DiPino Jr. and Gina DiPino, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3525 Southside Avenue in Jacksonville, Maryland 21131, approximately a quarter to a half mile from the Jacksonville Exxon. They have resided in their home with four minor children since 1997. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. Although one VOC was detected, no gasoline constituents were detected at that time. However, the properties adjoining or near their property, i.e., 3523, 3529 and 3531 Southside Avenue, have all had detections of gasoline constituents, namely MTBE. Additionally, Defendant ExxonMobil has placed a monitoring well on their property for the purpose of detecting gasoline constituents in the ground water on and around their property. Based on the proximity of their home to the

2

source of contamination, and the proximity of their home to wells found to be contaminated with gasoline constituents, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water.

Charles R. Reigger Jr. and Julia DiPino-Reigger, Plaintiffs and Proposed Class representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3527 Southside Avenue in Jacksonville, Maryland 21131, approximately a quarter to a half mile from the Jacksonville Exxon. They have resided in their home since May 2004. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. No VOCs were detected at that time. However, the properties adjoining or near their property, i.e., 3523, 3529, 3531 Southside Avenue, have all had detections of gasoline constituents, namely MTBE. Based on the proximity of their home to the source of contamination, and the proximity of their home to wells found to be contaminated with gasoline constituents, namely MTBE, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water. Moreover, having had two heart transplants, Mr. Riegger's immune system is compromised, and he is currently taking numerous medications for his condition. Consequently, he is highly sensitive to toxins of any kind.

Defendant ExxonMobil Oil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation (collectively referred to as "ExxonMobil") is a New Jersey corporation with its principal place of business in Irving, Texas. ExxonMobil is the owner of the Jacksonville Exxon located at 14258 Jarrettsville Pike, Phoenix, MD 21131.

Defendant Storto Enterprises (hereinafter "Storto"), d/b/a Jacksonville Exxon, is a Maryland corporation with its principal place of business in Jacksonville, Baltimore County, Maryland. Defendant Storto operates the Jacksonville Exxon at 14258 Jarrettsville Pike,

3

Phoenix, MD 21131, through a licensing, franchise, and/or other agreement with Defendant ExxonMobil.

The Jacksonville Exxon has been in operation since 1984 as a gasoline filling station and contains four USTs for the storage of gasoline[2], which until the recent release, were in operation. According to MDE records, the Stage II vapor recovery systems for the USTs at the Jacksonville Exxon have failed their annual integrity tests on several occasions since 2003. In September 2005, Defendant ExxonMobil submitted two reports regarding the installation of four monitoring wells on the Jacksonville Exxon property. These reports indicated that MTBE and tertiary butyl alcohol ("TBA"), which is believed to be a degradation product of MTBE, were present in the shallow groundwater on the site. The highest concentration for MTBE was 69 ppb.

On January 13, 2006, a hole was allegedly punctured in the fiberglass regular grade gasoline line by a contractor doing work on the supreme grade gasoline containment sump. The line leak detector system triggered an audible alarm at the station, and the regular product line shut down. As a result of the incident, the station's automatic leak detection system sent a signal to Defendant ExxonMobil's monitoring center in Greensboro, North Carolina. Defendant ExxonMobil sent a contractor to investigate the cause of the alarm. After examining the system, Defendant ExxonMobil's contractor determined that the reason for the alarm was a faulty motor in the regular gasoline sump. Defendant ExxonMobil's contractor replaced the motor, tested the system, and cleared the alarm.

Between January 14th and February 14th, contractors were allegedly dispatched to the site twice to investigate certain other electronic message codes from the leak detection system. According to Defendant ExxonMobil's public statement, Defendant Storto first contacted

---

[2] The UST registration indicates that there are two 8,000-gallon (gasoline), one 12,000-gallon (gasoline), and one 10,000-gallon (diesel), double-walled, fiberglass tanks.

ExxonMobil regarding inventory discrepancies on February 16th. Defendant ExxonMobil has stated that an ExxonMobil employee went to the site and examined the dealer's inventory records immediately following the call from Defendant Storto. After reviewing the discrepancies, the ExxonMobil employee allegedly ordered the regular gasoline line be shut down.

According to Defendant ExxonMobil's statement, Defendants arranged for a manual precision line test on February 17th. The regular gasoline line failed this test. On information and belief, from approximately January 13, 2006 until February 17, 2006, inventory records of the Jacksonville Exxon reflected substantial discrepancies. However, Defendants failed to investigate the possibility of a leak or to inform the MDE until February 17, 2006, when Defendants reported the failure of the regular gasoline line. Upon notice of the situation, the MDE directed Defendants to cease operations at the Jacksonville Exxon and to begin recovery operations by installing wells in the source area and on surrounding properties. On or about February 18, 2006, Defendants sampled the on-site monitoring wells for VOCs, including MTBE. Elevated levels above state cleanup standards of gasoline constituents, including BTEX and MTBE, were found in two of the monitoring wells. The highest level of MTBE was detected in monitoring well (hereinafter "MW") 1 at 434,000 ppb.

On or about February 21, 2006, the MDE directed Defendants to sample all drinking water wells located within a half-mile southwest of, and select supply wells north of, the Jacksonville Exxon. Results of this sampling round indicated the presence of dissolved MTBE in several wells. Gasoline was found in the Bradford Bank well, located immediately northeast of the Jacksonville Exxon. The MDE ordered Defendants to provide an alternate water source to the commercial property and to begin recovery of liquid phase petroleum from that well. On or about February 21, 2006, Defendants again sampled on and off-site monitoring wells for VOCs.

5

MTBE and BTEX were found in four monitoring wells (MW-1, MW-5, MW-8, MW-9). The level of MTBE in MW-1 increased to 565,000 ppb.

From its review of the Jacksonville Exxon inventory records, the MDE estimated that 25,000 gallons of regular unleaded gasoline were released, with an average daily loss of over 675 gallons over a 37-day period. By February 24, 2006, Defendants had installed 31 monitoring wells on and off-site. On or about February 24, 2006, Defendants again sampled on and off-site monitoring wells for VOCs. MTBE and BTEX were found in eleven of the thirteen monitoring wells sampled. The level of MTBE in MW-1 increased to 779,000 ppb. Free gasoline product was found in eleven of the new monitoring wells installed between February 17 and 24, 2006. On or about March 2, 2006, the MDE verbally directed Defendants to sample all drinking water supply wells located within a half-mile northeast of the Jacksonville Exxon.

As of April 13, 2006 Defendants have "reported" recovering 10,480 gallons of liquid phase gasoline product from selected monitoring wells and have installed 180 monitoring wells in the area. Upon information and belief, it is impossible to recover all the gasoline lost. As of March 29, 2006, MTBE has been detected at some level in the water supply wells of over 110 properties in the Jacksonville/Phoenix area.

## II. PROCEDURAL HISTORY

Plaintiffs John F. Larrabee, et al., filed a Class Action Complaint in the Circuit Court for Baltimore County, Maryland on March 17, 2006. The Class Action Complaint was filed against Defendant ExxonMobil and Defendant Storto for the release of gasoline from the UST systems located at the Jacksonville Exxon, 14258 Jarrettsville Pike, Phoenix, Maryland.[3] See Exhibit 3, Complaint at ¶¶ 21-33. The Complaint raised five state law counts – negligence, strict liability

---

[3] As outlined in the Complaint, the most recent, known release from the Jacksonville Exxon's USTs occurred on or about January 12, 2006, when a contractor for the Defendants allegedly drilled a hole into a product line. The hole spewed gasoline into the environment unchecked until February 17, 2006, when Defendants notified the Maryland Department of the Environment. The MDE estimated the loss at over 25,000 gallons. Complaint at ¶¶ 21-33.

for an abnormally dangerous activity, private nuisance, public nuisance, and trespass – and seeks punitive damages and medical monitoring, in addition to compensatory damages. Complaint at ¶¶ 53-83. The Complaint alleges no claim arising under federal law, and no claim in the Complaint raises a federal question.

The Defendants removed this action from the Circuit Court for Baltimore County, Maryland to the United States District Court for the District of Maryland, Northern Division, on April 26, 2006. The Defendants based their removal on three grounds. First, Defendants claim that this Court has original jurisdiction over *Larrabee* pursuant to 28 U.S.C. § 1331 and the Energy Policy Act of 2005, Pub. L. No. 109-58, § 1503, 119 Stat. 594, 1076 (2005). Notice of Removal at ¶¶ 3, 41, 49. Second, Defendants claim federal officer status pursuant to 28 U.S.C. § 1442(a)(1). *See* Notice of Removal at ¶¶ 3, 40. Third, while conceding that plaintiffs assert only state-law causes of action (Defendant ExxonMobil's Notice of Removal, hereinafter "Notice of Removal", at ¶¶ 9, 14), Defendants contend that elements of those causes of action will require an adjudication of a substantial question of federal law.[4] *See* Notice of Removal at ¶11, 15, 42 ("state MTBE actions such as *Larrabee* implicate substantial federal questions" and "Plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law."). Defendants further contend that supplemental jurisdiction, pursuant to section 1367(a), exists over state-law claims, wholly "unrelated to the content of fuel". Notice of Removal at ¶¶ 14 n.2, 50.

On May 3, 2006, the Defendant ExxonMobil filed its Motion to Stay Proceedings Pending Action by JPML and Memorandum of Law in Support ("ExxonMobil's Stay Motion").

---

[4] As part of their argument that the determination of liability rests on the decision to add MTBE to gasoline, Defendants claim that all state law tort claims are completely preempted by federal law and that the EPA has the power to adjudicate any claims for property damage and personal injury of third parties. *See* Notice of Removal at ¶ 48 (stating, "a state law tort claim is in fact covered by the federal scheme and remitted to the EPA for its determination.").

7

On May 8, 2006, Defendant ExxonMobil filed a Notice of Relatedness advising the JPML and this Court that this matter is a potential "tag-along action" subject to transfer for consolidation with cases currently pending under *In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, Master File No. 1:00-1898, MDL-1358 (hereinafter "MDL-1358"). On May 17, 2006, Defendant Storto filed a Motion to Stay Proceedings Pending Action by JPML, which incorporated the Memorandum of Law filed in support of Defendant ExxonMobil's Motion. Plaintiffs were served electronically with Defendant Storto's Motion on May 17, 2006. On the same day, the Federal District Court for the Northern District of Maryland signed the Order granting Defendant Storto's Motion, which was then filed by the Clerk of Court on May 18, 2006.[5]

## III. ARGUMENT

**A.** **Transfer of *Larrabee* does not meet the standard for transfer pursuant to 28 U.S.C. § 1407(a).**

*Larrabee* involves a set of facts distinctly different from the factual issues in the cases in MDL-1358. *Larrabee* is a case about one specific gas station that is a known source of gasoline contamination of a local aquifer in a specific geographic location. All residents in the area rely on well water for their water supply. *Larrabee* is unique from any case in MDL-1358 in that the contamination occurred as a result of a 25,000 gallon gasoline spill and Defendants' failure to take the necessary steps to contain the spill. In this regard, *Larrabee* is not even akin to *Koch, et al. v. Hicks, et al.*,[6] where private well owners are Plaintiffs as they are in the instant case. *Larrabee* is not a case about what the EPA may have required the oil industry to do or about

---

[5] Although the case file in the District Court for the District of Maryland is currently closed, Plaintiffs are filing this Motion to preserve any and all objections to removal of this case to federal court.
[6] While Plaintiffs maintain that Larrabee is distinguishable from Koch on the facts, Plaintiffs do not concede that Koch was properly transferred to the MDL because the Koch Plaintiffs also do not allege a products liability claim.

contamination of municipal water sources or about a speculative claim of future contamination. The only commonality between *Larrabee* and the MDL-1358 cases is the fact that MTBE is the primary contaminant of concern. However, the critical issue in the instant case is that there was a 25,000 gallon gasoline leak from the Jacksonville Exxon station and that Defendants failed to prevent it from contaminating Plaintiffs' well water.

1.   *There are few common questions of fact between Larrabee and the cases in the transferee court.*

The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the cases already before the transferee court. Title 28, section 1407(a) of the United States Code states, "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions *may* be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a) (emphasis added). This Panel has repeatedly recognized this principal. *See In re Janus Mutual Funds Inv. Litig.*, 310 F.Supp.2d 1359, 1361 (J.P.M.L. 2004) (concluding that all cases involved common questions of fact concerning allegations of market timing); *In re Worldcom, Inc. Sec. & ERISA Litig.*, 226 F.Supp.2d 1352, 1354 (J.P.M.L. 2002) (transferring schedule A actions because they share factual questions arising out of alleged omissions or misrepresentations concerning WorldCom's financial condition and accounting practices, but vacating the CTO for schedule B actions because the factual and legal issues were largely distinct from those currently before the MDL court); *In re Multi-Piece Rim Prod. Liab. Litig.*, 464 F.Supp. 969, 974 (J.P.M.L. 1979) (finding substantial common factual issues regarding the overall design of multi-piece rims, the state of knowledge within the industry, and the alleged failure of defendants to warn); *but see In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent*

*Litig.*, 446 F.Supp. 242, 244 (J.P.M.L. 1978) (denying transfer where common questions of fact are not sufficiently complex and the associated discovery is not greatly time consuming).

The *Larrabee* action, however, does not share substantial common issues of fact with the cases in MDL-1358. Most of the plaintiffs before Judge Scheindlin are states, municipalities, public and private water companies, and water districts.[7] Those plaintiffs in the MDL who are private well owners primarily raised products liability claims against numerous manufacturers and sought to represent entire classes in their respective states of private well owners with or without detections of MTBE in their wells. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F.Supp.2d 593, 603-05 (S.D.N.Y. 2001) (describing private well owner actions before MDL-1358) (referred hereinafter as *In re: MTBE*). Accordingly, the core issue of fact common to the MDL-1358 cases is whether the industry decision to add MTBE to gasoline is a design defect.

Conversely, the *Larrabee* plaintiffs have not raised a strict liability claim and have focused solely upon the Defendants' failure to contain the gasoline. Thus, the core issue of fact in *Larrabee* is whether the Defendants are responsible for the contamination of the bedrock aquifer in the Jacksonville/Phoenix, Maryland area. The cases before the MDL-1358 court are factually dissimilar from the instant case, and therefore, the MDL-1358 court has not addressed nor is it likely to address the core issue in this case.

This Honorable Panel has already recognized the distinction between cases like *Larrabee* and those in MDL-1358. In the case of *Theodore Holten, et al. v. Chevron U.S.A., et al.*, No. 3:00-4703 (D.N.J.), this Panel vacated its CTO-2 as it applied to *Holten* after determining that transfer of this case to MDL-1358 was not warranted. Order Vacating Conditional Transfer

[7] Examples include *The State of New Hampshire v. Amerada Hess Corp., et al.*, No. 04-4976; *City of Riverside v. Atlantic Richfield Co., et al.*, No. 04-4969; *City of Fresno v. Chevron USA Inc., et al.*, No. 04-4973; *California-American Water Co. v. Atlantic Richfield Co., et al.*, No. 04-4974; *Orange County Water District v. Unocal Corp. et al.*, No. 04-4968.

Order, MDL-1358, *Holten, et al. v. Chevron U.S.A., et al.,* No. 3:00-4703 (D.N.J.) (Apr. 18, 2001). *Holten* involved over 50 residents and former residents of Bayville, New Jersey, whose wells were contaminated by one local gas station's USTs and dispensing systems. This Honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in *Larrabee*.

2.   *Transfer will not serve the convenience of the parties or promote the just and efficient conduct of the litigation.*

Even if *Larrabee* shares a common question of fact with the MDL-1358 cases, transfer is not warranted here. Common questions of fact alone are not a sufficient reason for transfer. *See In re "East of the Rockies" Concrete Pipe Antitrust Cases*, 302 F.Supp. 244, 254 (J.P.M.L. 1969) (Weigel, J. concurring) (stating, "neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, *ipso facto*, by transfer just because there are common questions of fact"). The Panel must also conclude that transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a); *see also In re Highway Acc. Near Rockville, Conn., on Dec. 30, 1972,* 388 F.Supp. 574, 575 (J.P.M.L. 1975) (explaining that the proposed transfer must meet the statutory standard, otherwise it is not warranted). Thus, the Panel must decline to transfer the case if "'significant economy and efficiency in judicial administration [could not] be obtained.'" *In re: Ivy,* 901 F.2d 7, 9 (2d Cir. 1990) (quoting H.R. Rep. No. 1130, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1898, 1900).

Whether transfer would promote convenience and efficiency involves consideration of several factors. *See In re Asbestos and Asbestos Insulation Material Prod. Liab. Litig.*, 431 F.Supp. 906, 909-10 (J.P.M.L. 1977) (discussing arguments against transfer). One important

11

factor is whether individualized and unique questions of fact and law predominate over common questions of fact. *See Id.* at 910 (denying transfer because the many factual questions unique to each action clearly predominated over the common factual questions); *In re Asbestos School Prod. Liab. Litig.,* 606 F.Supp. 713, 714 (J.P.M.L. 1985) (holding that transfer would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of the litigation where common questions of fact did not predominate over individual questions of fact present in each action).   Moreover, this Panel has found transfer for consolidated pre-trial proceedings to be of no benefit where discovery "will focus on localized factual issues." *In re Grand Funk R.R. Trademark Litig.*, 371 F.Supp. 1084, 1085 (J.P.M.L. 1974).

The MDL-1358 court has already recognized the numerous individualized issues in the cases of private wells: "[t]here are ... differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require." *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 344 (S.D.N.Y. 2002).  Thus, even if the common thread in the MDL-1358 actions and *Larrabee* may be contamination of groundwater with MTBE, the circumstances of the contamination in *Larrabee* are unique. *In re Asbestos and Asbestos Insulation Material Prod. Liab. Litig.*, 431 F.Supp. at 909. These differences from other MDL-1358 actions include the geology of the contaminated aquifer; the geographic extent of the contamination; the levels of contamination; the source of contamination; the presence of other potential sources of MTBE in the area and their relative responsibility for the contamination; the type of release, *e.g.*, liquid spills versus vapor leaks; the storage device for the product containing MTBE, *e.g.*, UST versus pipeline; the local real estate values; and the local economy.  In short, the core issue of fact in *Larrabee* – the contamination of a discrete aquifer located completely in Maryland in a distinct geographic area

where all homeowners rely on well water – predominates over any questions of the Defendants' knowledge of MTBE's properties and dangers.

To address this core issue, discovery in *Larrabee* will necessitate depositions of, among others, officials from the local health department and the MDE; former and current employees of the Jacksonville Exxon and; local environmental scientists and engineers who have performed environmental investigations on behalf of the Defendants, other businesses in the area or residents; local real estate appraisers and agents; and residents of the Jacksonville/Phoenix area who have been affected by the contamination. The depositions of the necessary witnesses in the *Larrabee* case have not occurred nor are they expected to occur in the MDL-1358 cases.

Another consideration is whether the discovery common to the actions can be accomplished outside of MDL consolidation. *See, e.g., In re Telecomm. Providers' Fiber Optic Cable Installation Litig.*, 199 F.Supp.2d 1377, 1378 (J.P.M.L. 2002) (denying transfer where alternative existed that would minimize duplicative discovery). To the extent that Defendants' knowledge of the nature of MTBE is relevant to the *Larrabee* case, there are already documents in the public record that show Defendants' awareness of the danger and its duty to store and handle the product with a higher degree of care. *See, e.g., In re: MTBE Prod. Liab. Litig.*, 175 F.Supp.2d at 601-02 (discussing various reports on MTBE by environmental agencies and the industry in the 1980's and early 1990's). Indeed, most of this type discovery has already been conducted in other MTBE cases. For example, *South Lake Tahoe Public Util. District v. Atlantic Richfield Co., et al.*, No. 999128 (Cal. Super. Ct., filed Nov. 10, 1998), proceeded to trial in 2002 on the issue of whether MTBE-containing gasoline is a defective product and resulted in a verdict finding oil companies liable. Furthermore, the MDL-1358 court maintains a document depository that can be accessed by attorneys in any MTBE action. *See In re: MTBE Prod. Liab. Litig.*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001). Given these resources,

discovery of these materials for *Larrabee* will not be so burdensome as to require consolidation with cases now in MDL-1358.

A final consideration is whether there is a significant possibility of inconsistent pretrial rulings if the actions under consideration are not transferred. *In re TMJ Implants Prod. Liab. Litig.*, 844 F.Supp. 1553, 1554 (J.P.M.L. 1994). Here, there is no such danger. If a class were certified in *Larrabee*, it could be limited easily to residents of the area surrounding the Jacksonville Exxon, and thus, would not conflict with class certification determinations in other MDL-1358 actions. *See In re MTBE Prod. Liab. Litig.*, 209 F.R.D. at 329 (denying class certification for all private well owners with detections of MTBE in New York, Florida, California, and Illinois). Indeed, the MDL-1358 court's multiple decisions on common legal issues can provide guidance to other courts hearing MTBE cases. *See In re AH Robins Co. Inc. "Dalkon Shield" IUD Prod. Liab. Litig.*, 505 F.Supp. 221, 223 (J.P.M.L. 1981) (a transferee court's prior decisions "can serve as an aid in avoiding duplication of discovery and preventing inconsistent pretrial rulings"); *In re Western Elec. Co., Inc. Semiconductor Patent Litig.*, 436 F.Supp. 404, 406 (J.P.M.L. 1977) (denying transfer where the transferee court's conclusions on key legal issues are well documented).

Given these concerns, transferring the *Larrabee* action to the Southern District of New York will not necessarily conserve the resources of the parties; reduce duplicative efforts; or prevent conflicting rulings. By virtue of the geographic distance and the fact that witnesses will be deposed in Maryland regardless of which court oversees discovery, the Southern District of New York offers no increased convenience for the majority of witnesses and parties or efficiency in the *Larrabee* case.

**B.       The *Larrabee* action involves unresolved questions of Maryland law.**

While the test for deciding whether to transfer an action to an MDL focuses on factual commonalities between actions to be consolidated, questions of law may also be relevant. *See In re U.S. Navy Variable Reenlistment Bonus Litig.*, 407 F.Supp. 1405, 1407 (J.P.M.L. 1976) (finding questions of law to be preponderant in actions being considered for transfer and denying transfer under Section 1407). The *Larrabee* action presents unresolved questions of Maryland law that would be more appropriately decided by the United States District Court for the District of Maryland, which has more experience and familiarity with Maryland law than the MDL-1358 court.

It is axiomatic that federal district courts situated in a state are better able to interpret the law of that state. *See Karofsky v. Abbot Lab.*, 921 F.Supp. 18, 21 n.4 (D. Me. 1996) (explaining that the district court in Maine was better equipped to interpret Maine law than the MDL court). One issue of law that likely will be addressed by a judge in pre-trial proceedings in *Larrabee* is whether a class should be certified for medical monitoring. This will require determining whether medical monitoring is a cognizable cause of action or form of relief in Maryland. The Court of Appeals of Maryland has not resolved this issue. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 782, 752 A.2d 200, 251 (Md. 2000). A court in Maryland is better suited to deciding this question of Maryland law than a court in New York.

### III. CONCLUSION

For the reasons set forth herein, Plaintiffs' motion to vacate CTO-22 should be granted.

Respectfully submitted,

Dated: June 27, 2006

_____

Mary V. McNamara-Koch (Md. Fed. Bar No. 26591)
Karyn S. Bergmann (Md. Fed. Bar No. 16112)
**LAW OFFICES OF PETER G. ANGELOS**
100 N. Charles Center
22nd Floor
401 East Pratt Street
Baltimore, Maryland 21201
(410) 649-2007

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2006, a copies of Plaintiffs' Motion To Vacate Conditional Transfer Order ("CTO") 22; And Request For Oral Argument and Memorandum Of Law In Support Of Plaintiffs' Motion To Vacate CTO-22 were served *via* postage prepaid, first-class U. S. mail, upon:

Andrew Gendron
Venable, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201

Harry C. Storm
Lerch, Early & Brewer, Chtd.
Three Bethesda Metro Center
Suite 460
Bethesda, Maryland 20814

Robin Greenwald
Weitz & Luxemberg, P.C.
180 Maiden Lane
40th Floor
New York, NY 10038

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Mary V. McNamara-Koch

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2006

FILED
CLERK'S OFFICE

# PANEL SERVICE LIST (CTO-22)
## DOCKET NO. 1358
## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*John F. Larrabee, et al. v. Exxon Mobil Oil Corp., et al.,* D. Maryland, C.A. No. 1:06-1059 (Judge Marvin J. Garbis)

Andrew Gendron
Venable, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201

Robin Greenwald
Weitz & Luxenberg, P.C.
180 Maiden Lane
40th Floor
New York, NY 10038

Mary V. McNamara-Koch
Law Offices of Peter G. Angelos, P.C.
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201-3804

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Harry C. Storm
Lerch, Early & Brewer, Chtd.
Three Bethesda Metro Center
Suite 460
Bethesda, MD 20814-5367

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 8 2006

FILED
CLERK'S OFFICE

# EXHIBIT 1

JUN 28 2006

FILED
CLERK'S OFFICE



# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### 101 W. LOMBARD STREET
### BALTIMORE, MARYLAND 21201

**Chambers of**
**Hon. Marvin J. Garbis**
**United States District Judge**
**410-962-7700**

June 26, 2006

TO ALL COUNSEL OF RECORD

Re: Exxon - Storto Cases, MJG-06-1448-1503
Larrabee v. Exxon, MJG-06-1059

Dear Sir/Madam:

I find that briefing has been completed on pending motions in Larrabee.

The following reasons lead me to have a consolidated hearing on the pending motions in the above-identified cases on July 12, 2006 at 10:00 a.m.:

1.  All cases are against the same Defendants and relate to the same spill.

2.  Essentially, the same counsel represent Defendants in all cases.

3.  Plaintiffs in all cases seek to avoid having the cases end up in pending multi-district litigation.

4.  While it does not appear that the issues are the same in all cases, there is sufficient overlap to render it beneficial for me to hear all motions in the same hearing.

After I have a chance to read the papers I will provide an agenda for the hearing to the extent feasible.

Yours truly,

Marvin J. Garbis
**United States District Judge**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

# FACSIMILE COVER SHEET

*from:*



The Hon. Marvin J. Garbis
5-C United States Courthouse
101 W. Lombard Street
Baltimore, MD 21201
(410) 962-7700
(410) 962-0896 (fax)



| TO | FAX NO. | PHONE NO. |
|---|---|---|
| **MJG-06-1448, etc.** | | |
| Stephen L. Snyder, Esquire | 410-653-3024 | |
| C. Carey Deeley, Jr., Esquire | 410-821-0147 | |
| Andrew Gendron, Esquire | 410-244-7742 | |
| Harry Storm, Esquire | 301-347-1520 | |
| | | |
| **MJG-06-1059** | | |
| Karyn S. Bergmann, Esquire | 410-649-2101 | |
| Andrew Gendron, Esquire | 410-244-7742 | |
| Harry Storm, Esquire | 301-347-1520 | |

Re: Exxon - Storto Cases
    Larrabee v. Exxon

**DATE OF TRANSMISSION:**    June 26, 2006
**TOTAL NO. OF PAGES (including cover):  2**

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFF ALBAN, et al.                    *

            Plaintiffs           *

        vs.                       *   CIVIL ACTION NO. MJG-06-1448
                                      (Consolidated with MJG-06-1449 to 1503)
EXXON MOBIL CORPORATION           *
et al.
            Defendants

        *        *        *        *        *        *        *

ORDER

In accordance with the proceedings held in this matter on

this date:

      1.   By July 5[1], responses to pending motions shall be
        filed.

      2.   By July 7, replies may be filed

      3.   A hearing shall be held on pending motions on
        July 12, commencing at 10:00 a.m.

SO ORDERED, on Friday, June 16, 2006.

_____ / s / _____
Marvin J. Garbis
United States District Judge

---

[1]   All date references herein are to the year 2006 unless
otherwise indicated.

# EXHIBIT 3

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY

|  |  |
|---|---|
| **JOHN F. LARRABEE** | * |
| **and** | * |
| **BARBARA LARRABEE** | * |
| **3507 Hampshire Glen Court** | * |
| **Phoenix, MD 21131** | * |
|  | * |
| *and* | * |
|  | * **CASE NO.** |
| **PAUL DIPINO JR.** | * |
| **and** | * |
| **GINA M. DIPINO** | * |
| **3525 Southside Avenue** | * |
| **Jacksonville, MD 21131** | * **JURY TRIAL REQUESTED** |
|  | * |
| *and* | * |
|  | * |
| **CHARLES R. RIEGGER JR.** | * |
| **and** | * |
| **GINA DIPINO-RIEGGER** | * |
| **3527 Southside Avenue** | * |
| **Jacksonville, MD 21131** | * |
|  | * |
| **Plaintiffs** | * |
|  | * |
| *versus* | * |
|  | * |
| **EXXON MOBIL OIL CORPORATION** | * |
| **f/k/a EXXON CORPORATION** | * |
| **1251 Avenue Of The Americas** | * |
| **New York, NY 10020** | * |
|  | * |
| **Serve On:** | * |
| **CSC-Lawyers Incorporating** | * |
| **Service Company** | * |
| **11 East Chase Street** | * |
| **Baltimore, MD 21202** | * |
|  | * |
| *and* | * |
|  | * |
| **STORTO ENTERPRISES** | * |
| **d/b/a Jacksonville Exxon** | * |
| **14258 Jarrettsville Pike** | * |
| **Phoenix, MD 21131** | * |
|  | * |

RECEIVED AND FILED
06 MAR 17  PM 3: 55
CLERK OF THE
BALTIMORE COUNTY

1

Serve On:                          *
PATRICK STORTO                     *
2113 Laurel Brook Road             *
Fallston, Maryland 21047           *
                                   *
        Defendants                 *
                                   *

    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, the Law Offices of Peter G. Angelos, a Professional

Corporation, for their Complaint against the above-named Defendants, allege, upon information

and belief, as follows:

## I. PARTIES AND PROPOSED CLASS REPRESENTATIVES

1.  Plaintiffs and Proposed Class Representatives are property owners and citizens of

Baltimore County, State of Maryland, and currently reside in Jacksonville/Phoenix, Maryland.

Their water supply is threatened by and/or contaminated with gasoline that contains, among

other things, methyl tertiary-butyl ether, herein referred to as "MTBE", as well as other volatile

gasoline constituents.

a.   John and Barbara Larrabee, Plaintiffs and Proposed Class Representatives, are

citizens and residents of Maryland, who own and occupy with their two minor children a single-

family dwelling unit located at 3507 Hampshire Glen Court in Phoenix, Maryland 21131. They

have occupied the premises since 1999. Their drinking water is supplied by a well located on

their property and has tested positive for the presence of gasoline constituents including MTBE.

In one instance, MTBE was detected at 57.1 parts per billion ("ppb"), well over the state action

level of 20 ppb. They also have a second well on their property, which serves as a back-up

drinking water supply and is used for watering the lawn and other outdoor purposes. The water

2

from this well has had detections of MTBE and has gone dry since the gasoline recovery efforts began at the Jacksonville Exxon.

      b.  Paul DiPino Jr. and Gina M. DiPino, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3525 Southside Avenue in Jacksonville, Maryland 21131. They have resided in their home with their four minor children since 1997. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. Although one VOC was detected, no gasoline constituents were detected at that time. However, based on the proximity of his home to the source of contamination, and the proximity of their home to wells found to be contaminated with MTBE, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water.

      c.  Charles R. Riegger Jr. and Julia DiPino-Riegger, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3527 Southside Avenue in Jacksonville, Maryland 21131. They have resided in their home since May 2004. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. No VOCs were detected at that time. However, based on the proximity of his home to the source of contamination, and the proximity of their home to wells found to be contaminated with MTBE, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water. Moreover, having had two heart transplants, Mr. Riegger's immune system is compromised, and he is currently taking numerous medications for his condition. Consequently, he is highly sensitive to toxins of any kind.

3

2. Defendant Exxon Mobil Corporation, formerly known and d/b/a Exxon Corporation (collectively referred to herein as "Exxon")[1] is a New Jersey corporation with its principal place of business in New York City, New York.

3. Defendant Exxon was and is a duly organized foreign corporation authorized to do business in the State of Maryland.

4. Defendant Exxon was and is a duly organized foreign corporation transacting business in the State of Maryland.

5. Defendant Storto Enterprises (referred to hereinafter as "Storto"), d/b/a Jacksonville Exxon, is a Maryland corporation with it principal place of business in Jacksonville, Baltimore County, Maryland.

6. Defendant Storto was and is a duly organized domestic corporation authorized to do business in the State of Maryland.

7. Defendant Storto was and is a duly organized domestic corporation transacting business in the State of Maryland.

8. Defendant Storto operates the Jacksonville Exxon, including through a licensing, franchise, and/or other agreement with Defendant Exxon. Regarding matters complained of herein, both Defendants have acted in concert throughout the relevant period; hence, any allegation involving Defendant Exxon applies equally to Defendant Storto.

9. Defendant Exxon owns the real property known as the Jacksonville Exxon, located at 14258 Jarrettsville Pike, Phoenix, Maryland 21131. In addition, upon information and belief, Defendant Exxon, with Defendant Storto, exercises legal authority over and/or otherwise

controls the Jacksonville Exxon. On information and belief, Defendant Exxon is also responsible for maintaining underground storage tanks and associated piping, above-ground dispensers and associated systems and supplies all fuel products to this location in the 14200 block of Jarrettsville Pike, Phoenix, Maryland 21131.

WHEREFORE, jurisdiction is proper in the Circuit Court for Baltimore County, State of Maryland.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, the provisions of Maryland Code, Courts & Judicial Proceedings Article, Sec. 1-501. This Court has personal jurisdiction over the Defendants pursuant to, *inter alia*, the provisions of Courts & Judicial Proceedings Article, Secs. 6-102 and 6-103.

11. Venue is proper in the Circuit Court for Baltimore County pursuant to, *inter alia*, the provisions of the Maryland Code, Courts & Judicial Proceedings Article, Secs. 6-201, 6-202.

## II. CLASS ACTION ALLEGATIONS

12. Plaintiffs bring this action, pursuant to Rule 2-231 of the Maryland Rules of Civil Procedure, on behalf of themselves and all others similarly situated, as representative members of the following proposed sub-classes of (a) property owners and (b) medical monitoring.

a.   Property Owners: All persons (and/or entities) owning real property located within or in close proximity to the plume of groundwater contamination who have suffered a legal injury as a result of contamination with MTBE, and/or other gasoline constituents, leaking and/or otherwise released from the Jacksonville Exxon causing diminution in property value and/or other damages.

---

[1] The entity Exxon Mobil was formed as a result of a merger on November 30, 1999 between Exxon Corporation and Mobil Corporation. Herein, any reference to Exxon Mobil is a corresponding reference to its predecessor

b.   Medical Monitoring: All persons who now, or during the relevant time periods, owned and/or occupied residential dwelling units with on-site drinking wells situated in the Jacksonville/Phoenix, also known as Four Corners, area of Baltimore County, State of Maryland and located within or near the plume of contamination who ingested, on more than one occasion, water drawn from a contaminated well.

The officers, directors and agents of the Defendants are specifically excluded from the proposed class.

13. Numerosity of the Class.  Maryland Rule 2-231(a)(1).  Plaintiffs are unable to state with precision the exact size of the class (and subclasses) noted above, but believe that it is so numerous that individual joinder of all of its members is impracticable.  While the exact number and identities of class members are unknown, reliable estimates suggest that there are in excess of 100 class members in the State of Maryland.  The ultimate identity of class members will be readily ascertainable by virtue of public tax, title and land records.

14. Existence and Predominance of Common Questions of Law and Fact.  Maryland Rule 2-231(a)(2) and 2-231(b)(3).  Common questions of law and fact exist as to all members of the class.  These questions predominate over any questions affecting only individual members of the class.  These common legal and factual questions include, but are not limited to, the following:

a.   Whether the existence of MTBE, and other volatile gasoline constituents, in groundwater creates a health hazard to residents;

b.   Whether contamination of groundwater by MTBE, and/or other volatile gasoline constituents adversely affects or impairs the market value of residential and/or commercial property;

---

entities (or entity, as the case may be) Exxon Corporation and/or Mobil Corporation.

    c.  Whether Defendants leaked MTBE, and/or other volatile gasoline constituents, into the ground and/or groundwater in violation of law;

    d.  Whether MTBE, and/or other volatile gasoline constituents, reached the soil and/or groundwater beneath the homes in the Jacksonville/Phoenix area of Baltimore County;

    e.  Whether the Defendants should be required to contribute to a court-administered fund to pay for the abatement of MTBE, and/or other volatile gasoline constituents, in the ground and/or groundwater of residents located in the Jacksonville/Phoenix area of Baltimore County, State of Maryland;

    f.  Determination of the damages sustained by each member of the property owners' sub-class;

    g.  Determination of the necessity for medical monitoring and the extent, frequency and duration of that medical monitoring for the medical monitoring sub-class.

15. <u>Typicality of Claims.  Maryland Rule 2-231(a)(3)</u>.  Plaintiffs claims are typical of the claims of members of the class, all of whom have been damaged or will be damaged by virtue of their ownership and occupation of land within the area of the groundwater contamination. Plaintiffs and all members of the class have sustained and will continue to sustain damages and injuries arising out of Defendants' tortious conduct.

16. <u>Adequacy of Representation.  Maryland Rule 2-231(a)(4)</u>.  Plaintiffs are adequate representatives of the class because they are members of the class and their interests do not conflict, but are identical with the interests of the members of the class they seek to represent. They have retained counsel competent and experienced in the prosecution of complex civil actions in the areas of tobacco and asbestos litigation and they intend to prosecute this action

vigorously for the benefit of the class.  The interest of the members of the class will be fairly and adequately protected by Plaintiffs and their counsel.

17. Superiority.  Maryland Rule 2-231(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Individual litigation is both impracticable and unnecessary under the model proposed herein.  Class members are all identically united in their injuries.  All are damaged by virtue of their present and/or prior ownership of properties situated within the plume of contamination and their ingestion and/or exposure to MTBE and/or other volatile gasoline constituents.  Proof of damage is established by demonstrating the existence of MTBE, and/or other volatile gasoline constituents, groundwater contamination, the cost of abatement, and the loss of property value resulting therefrom.  All members of the class suffered potential injury as a result of their ingestion and/or exposure to MTBE and/or other volatile gasoline constituents.  All are entitled to prompt and accurate diagnosis and treatment of MTBE, and/or other volatile gasoline constituents, induced health problems.

No individual issues predominate in this case, because membership in the class is premised upon proof of ownership and occupancy of premises located within the area of groundwater contamination and exposure and/or ingestion of MTBE, and/or other volatile gasoline constituents, contained in their well water.  In all respects, individual litigation would be identical to the class action litigation.  Yet, individual litigation would be unduly burdensome to the courts and to damaged claimants.  Individual litigation further presents a potential for inconsistency or contradictory judgments and would increase delay and expense to all parties and the court system in resolving the complex issues of the case.  This delay and expense would be particularly inefficient in this case, where the injuries sustained by all claimants is similar.  In

addition to being inefficient, the delay and increased expense of individual cases would be unfair and prohibitively expensive to individual property owners. The class action device proposed herein provides the benefits of a single adjudication, economies and skill, and comprehensive supervision by a single court of hundreds of claims which are identical in all respects. In every respect, class action is the best method for the fair and efficient adjudication of this litigation. Notice of the pendency and any resolution of this class action can be provided to class members by publication and broadcast.

18. The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Maryland Rule 2-231(b)(1) and/or 2-231(b)(2) because:

a.   The prosecution of separate actions by the individual class members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, thus establishing incompatible standards of conduct for the Defendants;

b.   The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other class members not parties to such adjudications or would substantially impair or impede the ability of such non-party class members to protect their interests; and,

c.   The Defendants has acted or refused to act on grounds generally applicable to the class, thereby making appropriate and final injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate.

## IV. FACTS COMMON TO ALL COUNTS

19. The Jacksonville Exxon, located in the 14200 block of Jarrettsville Pike, has been in operation since 1984 as a gasoline filling station.

20.  The Jacksonville Exxon property contains four[2] underground storage tank ("UST") systems for the storage of gasoline that, until the recent release, were in operation.

21. On or about January 12, 2006, a contractor performing routine maintenance on the underground storage tank system allegedly drilled a pencil-sized hole in the piping for unleaded, regular gasoline.

22. As a result of the incident, the station's automatic leak detection alarm was triggered and sent a signal to Defendant Exxon's monitoring center in North Carolina.  Defendant Exxon sent a contractor to investigate the cause of the alarm.  After examining the system, Defendant Exxon's contractor determined that the reason for the alarm was a malfunctioning component of the fuel dispensing system and replaced the component.

23. On information and belief, from approximately January 13, 2006 until February 17, 2006, inventory records of the Jacksonville Exxon reflected substantial discrepancies.  However, Defendants failed to investigate the possibility of a leak or to inform the Maryland Department of the Environment ("MDE") until on or about February 17, 2006, when Defendants reported that 15 feet of gasoline was found in an on-site monitoring well.

24. On or about February 17, 2006, the MDE directed Defendants to cease operations at the Jacksonville Exxon and to begin recovery operations by installing wells in the source area and on surrounding properties.

25. On or about February 18, 2006, Defendants sampled the on-site monitoring wells for VOCs, including methyl tertiary butyl ether ("MTBE"), a gasoline additive.  Elevated levels above state cleanup standards of gasoline constituents, including benzene, ethylbenzene, toluene,

---

[2] The UST registration indicates that there are two 8,000-gallon (gasoline), one 12,000-gallon (gasoline), and one 10,000-gallon (diesel), double-walled, fiberglass tanks.

xylene (collectively referred to as "BTEX"), and MTBE, were found in two of the monitoring wells. The highest level of MTBE was detected in MW-1 at 434,000 parts per billion ("ppb").

26. On or about February 21, 2006, the MDE directed Defendants to sample all drinking water wells located within a half-mile southwest of and select supply wells north of the Jacksonville Exxon. Results of this sampling round indicated the presence of dissolved MTBE in several wells. Gasoline was found in the well of a commercial facility immediately northeast of the Jacksonville Exxon, and the MDE ordered Defendants to provide an alternate water source to the commercial property and to begin recovery of liquid phase petroleum from that well.

27. On or about February 21, 2006, Defendants again sampled on- and off-site monitoring wells for VOCs. MTBE and BTEX were found in four monitoring wells (MW-1, MW-5, MW-8, MW-9). MTBE in MW-1 increased to 565,000 ppb.

28. From its review of the Jacksonville Exxon inventory records, the MDE estimated that 25,000 gallons of regular unleaded gasoline was released, with an average daily loss of over 675 gallons over a 37-day period.

29. By February 24, 2006, Defendants had installed 31 monitoring wells on and off-site.

30. On or about February 24, 2006, Defendants again sampled on- and off-site monitoring wells for VOCs. MTBE and BTEX were found in eleven of the thirteen monitoring wells sampled. MTBE in MW-1 increased to 779,000 ppb.

31. Free gasoline product was found in eleven of the new monitoring wells installed between February 17 and 24, 2006.

32. On or about March 2, 2006, the MDE verbally directed Defendants to sample all drinking water supply wells located within a half-mile northeast of the Jacksonville Exxon.

33. As of March 10, 2006, Defendants have recovered 7,275 gallons of liquid phase gasoline product from selected monitoring wells and have installed 66 monitoring wells in the area. MTBE has been detected at some level in the water supply wells of over 40 properties in the Jacksonville/Phoenix area. Upon information and belief, it is impossible to recover all the gasoline lost.

34. MTBE is a chemical compound designed to increase the oxygen content of gasoline. MTBE is a member of a class of chemical compounds, called ethers, whose unique properties have enhanced solubility in water and chemical attraction to water molecules. It is produced from methanol and isobutylene, a by-product of the gasoline-refining process.

35. MTBE is many times more soluble in water than other components of gasoline. MTBE is "hydrophilic" or water seeking and travels rapidly through soil into groundwater. As a result, whenever MTBE is released into the environment it has the ability to infiltrate aquifers and contaminate wells drawing from those aquifers. At a certain point of contamination, MTBE's foul taste and odor render water unusable and unfit for human consumption. The chemical make-up of MTBE also allows it to persist in underground aquifers for decades at a time.

36. MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other common gasoline components such as the BTEX compounds. When MTBE and gasoline are spilled on the ground, the BTEX compounds tend to absorb or bind to soil. In contrast, MTBE does not adhere to the soil particles but instead travels rapidly through soil, mixing with water and contaminating underground aquifers.

37. MTBE not only travels faster and further from spill and leak sources and is found in far higher concentrations as a groundwater contaminant than BTEX compounds, it also is slow to

degrade or break down once it is released into the environment, particularly in the subsurface of the ground. Because of its "recalcitrance," plumes of MTBE can persist in underground aquifers for decades.

38. The greater the MTBE content of gasoline, the higher the risk to water. However, even small concentrations of MTBE create an enhanced threat to groundwater.

39. In or around June of 1984, the American Petroleum Institute ("API"), a trade association and agent of Defendant Exxon, indicated potential for rapid migration of MTBE and noticeable taste and odor from water contaminated with MTBE.

40. A 1986 report by Peter Garrett, et al. (hereinafter referred to as the "Garrett report") analyzed MTBE groundwater contamination at two sites in Maine. This report was known to the industry. The Garrett report showed that high levels of MTBE contamination could result from gasoline containing low concentrations of MTBE. It reported findings of extremely high concentrations of MTBE in the water and relatively low or no concentrations of other gasoline components. The Garrett report concluded that MTBE, because of its solubility in water and recalcitrance to biodegradation and clean-up, posed an unusual threat to groundwater.

41. MTBE is a known animal carcinogen that has been linked to many potential human health problems. The United States Environmental Protection Agency has classified MTBE as a possible human carcinogen.

42. Every year over nine million gallons of gasoline with MTBE escape into the environment in the United States, including from storage of MTBE. Thousands of gallons also enter the ground from gas stations, including from underground storage tanks.

43. The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. According to a report by a

special EPA Blue Ribbon Panel, MTBE is a "threat to the nation's drinking water resources," has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used.

44. Defendants' storage of gasoline at the Jacksonville Exxon has produced an underground "plume" (or other leakage) that has contaminated or threatens to contaminate nearby properties (including Plaintiffs' properties). Such MTBE contamination has occurred with Defendants' knowledge. Such contamination poses known, material health risks to nearby residents due to contamination of the water supply. Such contamination has also had an immediate, material adverse impact upon the real property of nearby property owners (including the value of Plaintiffs' properties). Such MTBE leakage includes into the soil, into ground wells, and/or into the groundwater of affected properties.

45. The Defendants were aware of the properties and dangers of MTBE.

46. Clean water is a basic and most precious resource as well as a fundamental commodity of incalculable value. Water serves direct human needs and also supports wild life and natural resources that contribute to the health, economy, and general well being of the people of Baltimore County, Maryland.

47. Defendants were aware that residents in the Jacksonville/Phoenix area are supplied water through individual wells located on Plaintiffs' properties.

48. Defendants have a duty to use care when conducting activities on their property so as to avoid causing harm to the neighboring properties, but have breached that duty by threatening and/or recklessly contaminating and poisoning the individual wells that supply water in the Jacksonville/Phoenix area of Baltimore County, Maryland.

49. As a result of MTBE water contamination, Plaintiffs have been placed at an increased risk of cancer and risk of exacerbation of current medical conditions.

50. Plaintiffs' property values will suffer as a result of Defendants' contamination.

51. Plaintiffs may be required to expend large sums of money to remediate MTBE contamination of their land caused by the introduction of MTBE into their water supply and to develop a new and/or alternative source(s) of water. This remediation includes, but is not limited to, to purchase, installation and maintenance of granular carbon activation systems and continual testing of Plaintiffs' water supply.

52. The harm suffered by Plaintiffs was the result of Defendants' acts and omissions. Such acts and omissions were actuated by actual malice or accompanied by a wanton or willful disregard for the safety of product users, consumers and others who foreseeably might be harmed by the leak of gasoline-containing MTBE, and/or other volatile gasoline constituents, including Plaintiffs. Defendants engaged in intentional wrongdoing by failing to appropriately monitor and control underground storage tank systems that they knew were capable of leaking volatile chemicals into the ground and groundwater and contaminate drinking water. Defendants failed to remediate the threat and/or contamination. Defendants allowed this contamination to spread without warning Plaintiffs or the surrounding area and without concern for the health and safety of the citizens of the Jacksonville/Phoenix area, including Plaintiffs.

## V.  CAUSES OF ACTION

### Count 1: Negligence

53.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 52 inclusive.

54.  Defendants stored gasoline-containing MTBE, and/or other volatile chemical constituents, including benzene, at the Jacksonville Exxon.

55.  Defendants knew or should have known that if gasoline-containing MTBE, Benzene and/or other volatile gasoline constituents were spilled or released into soil, it would mix with groundwater and spread its toxic plume over great distances without biodegradation or bioremediation.

56. Defendants owed Plaintiffs a duty of due care which could be satisfied by safe and proper use, management, storage and sale of all petroleum-related products.  Defendants had a specific duty to prevent the discharge and release of such substances which might harm the persons, property or economic interests of Plaintiffs.  Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to toxic and hazardous substances and to warn or notify Plaintiffs that discharges or releases of these substances had occurred, were likely to occur in the future and threaten Plaintiffs.

57.  Defendants breached these duties by their negligent, and reckless management, storage, and use of its petroleum-related products.  Such conduct was in noncompliance with applicable regulations and guidelines.  Defendants' reckless, negligent and illegal conduct resulted in the actual dangerous releases of hazardous and toxic substances into the Plaintiffs' water supply.  These actual and continued releases and discharges have subjected Plaintiffs to unreasonable risk of harm, threat of future harm, and to actual injuries to their property,

economic interests and persons. Defendants also failed to warn Plaintiffs of the actual and threatened releases of such substances and of the reasonably foreseeable effects of such releases, an omission that was reckless, grossly negligent and/or negligent. Finally, Defendants failed to and continue to fail to act to prevent the release of these volatile chemicals from harming Plaintiffs.

58. Defendants' negligence was a direct and proximate cause of injuries to Plaintiffs causing both actual present harm to Plaintiffs' property and economic interests and creating an increased risk of personal harm to Plaintiffs. Plaintiffs are entitled to recover damages for such injuries and anticipated additional costs for their damages.

59. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages. Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continue to be in violation of the above legal duties;

b. Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c. For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d. An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e. Awarding Plaintiffs damages for diminution in their property values;

f. Requiring Defendants to connect Plaintiffs with a new primary water source;

g. Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

h. Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

i. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

j. An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k. Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction in quality of life, lost wages and reasonable medical expenses;

l. Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

m. Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n. Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

**Count 2: Strict Liability**

60.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 59 inclusive.

61.  The use and storage of gasoline containing MTBE is an abnormally dangerous activity in this context, exposing persons patronizing nearby businesses, working and living near the Jacksonville Exxon to a severe risk of harm, regardless of the degree of caution which Defendants might have exercised.

62. Upon information and belief, Defendants knew of the environmental and health hazards associated with the release of gasoline constituents.  Although Plaintiffs maintain that Defendants' activities are abnormally dangerous *per se*, the location of such activities in a well-populated area, such as Jacksonville/Phoenix, that relies on groundwater as a water resource independently renders them abnormally dangerous.

63.  As a direct and proximate result of Defendants' sale and storage of gasoline containing MTBE, contaminants were released into the environment, thereby injuring Plaintiffs. Injuries include actual present harm to Plaintiffs' property and economic interests, and potential future harm to Plaintiffs due to the threat of future contamination.  These injuries constitute the type and harm which make the activities abnormally dangerous.

64.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages for which the Defendants are liable.  Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a.  A declaration by the Court that Defendants have been and continue to be in violation of the above legal duties;

     b.  Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

     c.  For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

     d.  An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

     e.  Awarding Plaintiffs damages for diminution in their property values;

     f.  Requiring Defendants to connect Plaintiffs with a new primary water source;

     g.  Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

     h.  Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

     i.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

     j.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

     k.  Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction of quality of life, lost wages and reasonable medical expenses;

l.   Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

m.   Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n.   Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

### COUNT 3: PRIVATE NUISANCE

65.   Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 64 inclusive.

66.   At all times material hereto, Plaintiffs were in lawful possession of their land. Defendants' use, occupation, storage and sale of gasoline from the Jacksonville Exxon has resulted in an unreasonable and continuous invasion of Plaintiffs' property, which has materially diminished the value of the Plaintiffs' property and seriously interfered with their rights to use and enjoy their property.

67.   Specifically, Defendants' unreasonable emission, disposal and release of toxic and hazardous substances into Plaintiffs' drinking water supply is substantially offensive, discomforting and annoying to persons of ordinary sensibilities, tastes and habits.

68.   Defendants' interference with Plaintiffs' rights was so unusual and excessive that it necessarily caused and continues to cause injury, damage, harm and inconvenience to Plaintiffs. Plaintiffs' specific damages include, but are not limited to, obtaining an alternate water supply for their personal use and remediation costs attributable to the presence of MTBE, and/or other volatile gasoline constituents, on their property.

69. Defendants' use, occupation, storage and sale of gasoline from Jacksonville Exxon has resulted in an entry and intrusion, and the continued entry and intrusion onto the property of Plaintiffs without privilege, permission, invitation or justification.

70. Defendants' conduct directly and proximately caused and continues to cause Plaintiffs' injuries, including actual or increased harm to their property and economic interests and injuries to their persons. Plaintiffs are entitled to recover damages for such injuries. Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continue to be in violation of the above legal duties;

b. Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c. For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d. An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e. Awarding Plaintiffs damages for diminution in their property values;

f. Requiring Defendants to connect Plaintiffs with a new primary water source;

g. Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

h. Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

i. Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

j. An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k. Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction of quality of life, lost wages and reasonable medical expenses;

l. Establishing a court monitored trust fund for medical monitoring of Plaintiffs and the Class;

m. Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n. Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## COUNT 4: PUBLIC NUISANCE

71. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 70 inclusive.

72.   The conduct complained of herein unreasonably interferes with the rights of the community at large to use the bedrock aquifer as a drinking water supply.  The contamination of the bedrock aquifer will persist for many years, if not permanently, and has rendered the aquifer unfit for use by all present and future members of the community at large.

73.   The contamination of the aquifer with gasoline constituents significantly interferes with the public health, safety, comfort and convenience.  Benzene is a known human carcinogen. MTBE is a known animal carcinogen and may be a human carcinogen.

74.   The contamination of the waters of the State is proscribed by both federal and state law.

75.   Defendants' conduct directly and proximately caused and continues to cause a public nuisance.  Injunctive relief is the only reasonable means to abate this nuisance, and the public interest is served by granting the requested injunctive relief.  Each of the class members has suffered a specific harm different from the public at large.

WHEREFORE, Plaintiffs pray for relief as follows:

a.   A declaration by the Court that Defendants have been and continues to be in violation of the above legal duties;

b.   An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

c.   Requiring Defendants to provide a new primary water source;

24

d.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged and continues to discharge into Plaintiffs' water supply;

e.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

f.  Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class; and

g.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## COUNT 5: TRESPASS

76. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 75 inclusive.

77. Plaintiffs were at all relevant times in possession of land they owned and/or occupied.

78. Upon information and belief, Defendants knew its intentional discharge of contaminants had migrated or was likely to migrate into Plaintiffs' drinking water supply.

79. Upon information and belief, despite Defendants' knowledge of the harm the practices at the Jacksonville Exxon were causing Plaintiffs, Defendants intentionally persisted in its conduct and continued to discharge contaminants into the groundwater and surrounding soil.

80. Upon information and belief, the discharge, which Defendants knew or should have known was migrating into Plaintiffs' drinking water supply and property, constitutes an actual and/or constructive trespass, because the discharge interfered and continues to interfere with the Plaintiffs' interests in the exclusive possession their land.

81.  Upon information and belief, Plaintiffs' real property continues to be threatened, exposed to and/or contaminated by hazardous chemicals and materials emanating from the Jacksonville Exxon.

82.  Defendants' use, occupation, storage, ownership and sale of gasoline from the Jacksonville Exxon has resulted in an entry and intrusion onto Plaintiffs' property without privilege, permission, invitation or justification.

83.  Defendants' conduct directly and proximately caused Plaintiffs' injuries, including actual physical harm to property and economic interests and an increased risk of future harm to their persons.  Plaintiffs are entitled to recover damages for such injuries.  Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a.  A declaration by the Court that Defendants have been and continues to be in violation of the above legal duties;

b.  Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c.  For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d.  An Order enjoining Defendant from allowing the continued migration of MTBE into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e.  Awarding Plaintiffs damages for diminution in their property values;

      f.   Requiring Defendants to connect Plaintiffs and the Class with a new primary water source;

      g.   Requiring Defendant to pay all excess future costs incurred by Plaintiffs and the Class for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

      h.   Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

      i.   Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

      j.   An Order mandating that Defendants, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

      k.   Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction in quality of life, lost wages and reasonable medical expenses;

      l.   Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

      m.   Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

      n.   Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

Respectfully submitted,

Mary V. Koch
Karyn S. Bergmann
Law Offices of Peter G. Angelos, P.C.
100 North Charles Street, 22nd Floor
Baltimore, MD  21201
(410) 649-2000

Attorneys for Plaintiffs

## PRAYER FOR JURY TRIAL

Plaintiffs elect to have their case tried before a jury.

Mary V. Koch