JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL 1358**

JUL 1 9 2006

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
|  | * |  |
| **In re:** | * | **MDL Docket No.:  1358** |
|  | * |  |
| **METHYL TERTIARY BUTYL ETHER** | * | This Document Relates to: |
| **("MTBE") PRODUCTS LIABILITY** |  | *John F. Larrabee, et al. v. Exxon Mobil* |
| **LITIGATION** | * | *Corporation, et al.*, |
|  |  | D. Maryland, C.A. No. 1:06-1059 |
|  | * | (the "*Larrabee* Action") |
|  | * |  |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## EXXON MOBIL CORPORATION'S OPPOSITION TO
## PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-22)

Defendant Exxon Mobil Corporation ("ExxonMobil"), by its undersigned counsel,

submits this opposition to the Motion to Vacate CTO-22 filed by Plaintiffs John F. Larrabee and

others (the "*Larrabee* Plaintiffs").

### PROCEDURAL BACKGROUND

On July 12, 2006, after the *Larrabee* Plaintiffs filed their Motion to Vacate CTO-22, the

Honorable Marvin J. Garbis of the United States District Court for the District of Maryland held

a hearing on their motion to remand the *Larrabee* Action to the Circuit Court for Baltimore

County, Maryland.  No decision has yet been issued.

**OFFICIAL FILE COPY** IMAGED JUL 1 9 2006

## ARGUMENT

Transfer of the *Larrabee* Action for consolidated or coordinated pretrial proceedings to MDL-1358 is appropriate if: (1) the *Larrabee* Action shares one or more common questions of fact with actions previously transferred; (2) the transfer is for the convenience of the parties and witnesses; and (3) the transfer promotes the just and efficient conduct of the actions. 28 U.S.C. §1407(a). Because these requirements are satisfied, this Panel should deny the *Larrabee* Plaintiffs' Motion to Vacate CTO-22 as applied to the *Larrabee* Action.

### A.   This Panel Has Rejected the *Larrabee* Plaintiffs' Argument, Word for Word, Twice Before.

This Panel transferred the original actions to MDL-1358 because they involved common questions of fact concerning "whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." (*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.* Transfer Order of 10/10/2000, at 1.) The *Larrabee* Plaintiffs concede that the *Larrabee* Action shares at least a "few common questions of fact" with the actions now before the Honorable Shira A. Scheindlin in MDL-1358. (Mem. in Supp. of Mot. to Vacate CTO-22, at 9.) The *Larrabee* Plaintiffs' concession, however, grossly understates the commonality.

So common, if fact, is the *Larrabee* Action with the other MDL-1358 actions that the *Larrabee* Plaintiffs' eight-or-so-page argument to vacate CTO-22 reproduces, almost verbatim, the eight-or-so-page argument made first by plaintiffs to vacate CTO-11, as applied to another

Maryland action against ExxonMobil,[1] then again by plaintiffs to vacate CTO-16, as applied to a subsequently filed Maryland action against ExxonMobil.[2] (*Compare* Mem. in Supp. of Mot. to Vacate CTO-22, at 8-15, *with Koch* Pls.' Mem. in Supp. of Mot. to Vacate CTO-11, at 6-15, attached hereto as Exhibit 1; *Morgan* Pls.' Mem. in Supp. of Mot. to Vacate CTO-16, at 5-12, attached hereto as Exhibit 2.)

This Panel rejected the argument when made by the *Koch* Plaintiffs, it rejected the argument when recycled by the *Morgan* Plaintiffs, and it should reject the self-same argument now re-recycled by the *Larrabee* Plaintiffs. (*See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.* Transfer Order of 6/17/05, at 1, attached hereto as Exhibit 3 (transferring the *Koch* Action to MDL-1358 because it "share[d] questions of fact with" the actions previously transferred and because transfer would "serve the convenience of the parties and witnesses and promote the just and efficient conduct" of the litigation); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.* Transfer Order of 12/2/2005, at 1, attached hereto as Exhibit 4 (transferring the *Morgan* Action to MDL-1358 for the same reasons).)

A comparison of the *Larrabee* Plaintiffs' Memorandum and the memoranda of the *Morgan* and *Koch* Plaintiffs reveals the startling extent of the replication. Thus, section A.1 of the *Larrabee* Plaintiffs' Memorandum, addressing common questions of fact, begins, on page 9:

> The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the cases already before the transferee court. Title 28, section 1407(a) of the United States Code states . . . .

---

[1] *Hope Koch, et al. v. John R. Hicks, et al.*, D. Maryland, C.A. No. 1:04-3345 (the "*Koch* Action").

[2] *Carl G. Morgan, et al. v. Exxon Mobil Corporation*, D. Maryland, C.A. No. 1:05-108 (the "*Morgan* Action").

- 3 -

It concludes, on page 11:

> This honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in *Larrabee*.

Section A.1 of the *Morgan* Plaintiffs' memorandum, addressing common questions of fact, begins, on page 5:

> The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the cases already before the transferee court. Title 28, section 1407(a) of the United States Code states . . . .

It concludes, on pages 7-8:

> This honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in this case.

Section A.1 of the *Koch* Plaintiffs' memorandum, addressing common questions of fact, begins, on page 6:

> The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the cases already before the transferee court. Title 28, section 1407(a) of the United States Code states . . . .

It concludes, on page 9:

> This honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in *Koch*.

- 4 -

In between, the sentences, words, punctuation, and citations of the *Larrabee* Plaintiffs'

Memorandum match, almost to a T, the sentences, words, punctuation, and citations of the

*Morgan* Plaintiffs' memorandum, which, in turn, match, almost to a T, the sentences, words,

punctuation, and citations of the *Koch* Plaintiffs' memorandum – other than substitutions of

"*Larrabee*," "the *Larrabee* action," or "the *Larrabee* case" for the *Morgan* Plaintiffs' "this case,"

"this action," or "the instant action" and the *Koch* Plaintiffs' "*Koch*," "the *Koch* action," or "the

*Koch* case." So too do the sentences, words, punctuation, and citations in sections A.2 of all

three documents, addressing the convenience of the parties and the just and efficient conduct of

the litigation. (*Compare* Mem. in Supp. of Mot. to Vacate CTO-22, at 11-14, *with Morgan* Pls.'

Mem. in Support of Mot. to Vacate CTO-16, at 8-11, *and Koch* Pls.' Mem. in Supp. of Mot. to

Vacate CTO-11, at 9-13.)

The very fact that the *Larrabee* Plaintiffs can submit to this Panel a near-xerograph of the

*Morgan* and *Koch* Plaintiffs' memoranda demonstrates, beyond peradventure, that the *Larrabee*

Action belongs in MDL-1358. The *Larrabee* Plaintiffs contend that their case "is unique from

any case in MDL-1358 in that the [alleged] contamination occurred as a result of a 25,000 gallon

spill ... and Defendants' failure to take the necessary steps to contain the spill." (Mem. in Supp.

of Mot. to Vacate CTO-22, at 8.)  But this kind of uniqueness is irrelevant:  almost every single

one of the cases previously transferred to MDL-1358 arises from a distinct alleged spill of

MTBE-containing gasoline and the defendants' alleged failure to take the necessary steps to

contain the spill.[3]

---

[3] Some cases in MDL-1358, such as the *Koch* and *Morgan* Actions, arise from the same alleged
spill.

BA2DOCS1\297235

The specific alleged locations, durations, magnitudes, and mechanisms of the various

spills necessarily differ.  What binds all of the MDL-1358 cases together are common questions

of fact concerning "whether defendants knew about and misrepresented the nature of MTBE and

conspired to market MTBE without disclosing its risks to downstream users, the federal

government or the public" or "whether plaintiffs sustained drinking water contamination as a

result of MTBE contamination."  (*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*

*Litig.* Transfer Order of 10/10/2000 at 1.)  The *Larrabee* Action shares these common questions.

Indeed, it can only be inconvenient, unjust, and inefficient to have the MDL-1358 court regulate

discovery and other pre-trial matters in the *Koch* and *Morgan* Actions – both originating in

Maryland, both naming ExxonMobil as a defendant – but have a different court regulate those

same matters in the *Larrabee* Action.

**B.     The *Larrabee* Plaintiffs Concede that Common Questions of Fact Exist, and Substantial Common Questions of Fact Abound.**

The *Larrabee* Plaintiffs claim to represent a class of

> [a]ll persons (and/or entities) owning real property located within
> or in close proximity to the plume of groundwater contamination
> who have suffered a legal injury as a result of contamination with
> MTBE, and/or other gasoline constituents, leaking and/or
> otherwise released from the Jacksonville Exxon causing
> diminution in property value and/or other damages.

(*Larrabee* Compl. ¶ 12.a, attached hereto as Exhibit 5.)  Contamination of their drinking water

by MTBE is the principal harm that the *Larrabee* Plaintiffs allege they have suffered:

> Defendants' storage of gasoline at the Jacksonville Exxon has
> produced an underground "plume" (or other leakage) that has
> contaminated or threatens to contaminate nearby properties
> (including Plaintiffs' properties).  Such MTBE contamination has
> occurred with Defendants' knowledge.  Such contamination poses
> known, material health risks to nearby residents due to
> contamination of the water supply.…  Such MTBE leakage

- 6 -

includes into the soil, into ground wells, and/or into the
groundwater of affected properties.

(*Larrabee* Compl. ¶ 44; *see also id.* ¶ 1 ("[Plaintiffs'] water supply is threatened by and/or

contaminated with gasoline that contains, among other things, methyl tertiary-butyl ether, herein

referred to as 'MTBE,' as well as other volatile gasoline constituents."); *id.* ¶ 14.d (identifying

as a question of fact common to the proposed class "[w]hether MTBE, and/or other volatile

gasoline constituents, reached the soil and/or groundwater beneath the homes in the Jacksonville/

Phoenix area of Baltimore County").  Thus, the *Larrabee* Plaintiffs concede that the "core issue

of fact in *Larrabee*" (Mem. in Supp. of Mot. to Vacate CTO-22, at 10) is one of the two core

issues of fact that prompted this Panel to create MDL-1358.

The *Larrabee* Plaintiffs' attempt to distinguish the "core issue of fact" in the *Larrabee*

Action accentuates, rather than attenuates, the similarity.  The *Larrabee* Plaintiffs describe the

"core issue of fact in *Larrabee*" as "the contamination of a discrete aquifer located completely in

Maryland in a distinct geographic area where all homeowners rely on well water." (Mem. in

Supp. of Mot. to Vacate CTO-22, at 12-13.)  They catalog the "differences" between the

*Larrabee* Action and others previously transferred to MDL-1358 to include:

> the geology of the contaminated aquifer; the geographic extent of
> the contamination; the levels of contamination; the source of
> contamination; the presence of other potential sources of MTBE
> in the area and their relative responsibility for the contamination;
> the type of release ...; the storage device for the product
> containing MTBE ...; the local real estate values; and the local
> economy.

(Mem. in Supp. of Mot. to Vacate CTO-22, at 12.)  These factual differences, however, do not

distinguish the *Larrabee* Action from the set of other MDL-1358 actions; they distinguish ***each***

of the MDL-1358 actions from one another.[4]  This commonality of specific factual differences

demonstrates that the *Larrabee* Action belongs to the same factual genus as the other MDL-1358

actions.  That is, each of the MDL-1358 actions – regardless whether plaintiffs are private well

owners (as in *Larrabee*, *Morgan*, *Koch*, or the original actions) or "states, municipalities, public

and private water companies, and water districts" (Mem. in Supp. of Mot. to Vacate CTO-22, at

10) (as in many of the other actions) – concerns the contamination of a discrete water supply in

any of more than fifteen states.[5]

    Even the other core issue of fact shared by the actions originally coordinated or

consolidated in MDL-1358 – defendants' alleged knowledge of the nature of MTBE and their

alleged conduct regarding its inclusion in gasoline – plays a substantial role in the *Larrabee*

claims.  Though the *Larrabee* Plaintiffs now disavow this commonality (*see* Mem. in Supp. of

Mot. to Vacate CTO-22, at 10), their Complaint belies their disavowal.  The section of the

*Larrabee* Complaint headed "Facts Common to All Counts" teems with allegations of

---

[4] The *Larrabee* Plaintiffs assert that the transferee court "has already recognized the numerous individualized issues in the cases of private wells." (Mem. in Supp. of Mot. to Vacate CTO-22, at 12.) Such recognition, however, occurred in a very different context:  resolution of a motion for class certification under Federal Rule of Civil Procedure 23(b)(2).  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 344 (S.D.N.Y. 2002).  It has no bearing on the issue before this Panel.

[5] The *Larrabee* Plaintiffs attempt to analogize the *Larrabee* Action to *Theodore Holten, et al. v. Chevron, U.S.A., Inc., et al.*, D. New Jersey, C.A. No. 00-4703, an action brought by residents or former residents of Bayville, New Jersey, alleging that their private wells were contaminated with MTBE, benzene, toluene, ethylbenzene, and xylene leaking from a local gasoline station's underground storage tanks. (*See* Mem. in Supp. of Mot. to Vacate CTO-22, at 10-11.)  In vacating the conditional transfer order as applied to the *Holten* action, this Panel noted (at a very early stage in the MDL-1358 docket proceedings) not only that most of the actions then in MDL-1358 involved "claims by persons or entities whose well water has not yet tested positive for the presence of MTBE"; it also noted that "all *Holten* parties along with several MDL-1358 oil company defendants oppose inclusion of *Holten* in Section 1407 proceedings." (*In re MTBE Prods. Liab. Litig.* Transfer Order of 10/10/2000, at 1.)  As this Panel observed some years ago, although the "virtually unanimous opposition of the parties to transfer" is not *per se* "determinative of the question of transfer," it is "a very persuasive factor." *In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig.*, 431 F. Supp. 906, 910 (J.P.M.L. 1977).  The *Larrabee* Plaintiffs alone oppose transfer of the *Larrabee* Action.

Defendants' knowledge and conduct that resemble, if not match, allegations in many previously transferred actions – especially the *Koch* Action.

Thus, the *Larrabee* Plaintiffs allege that "MTBE is many times more soluble in water than other constituents of gasoline," and that "MTBE ... travels rapidly through soil into groundwater." (*Larrabee* Compl. ¶ 35.) So too do the *Koch* Plaintiffs. (*See Koch* Compl. ¶ 12, attached hereto as Exhibit 6.[6]) So too do plaintiffs in at least fifteen of the other actions previously transferred to MDL-1358. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358(SAS), M21-88, 2005 WL 106936, at *1 n.2, *2 & n.13 (S.D.N.Y. Jan. 18, 2005) ("*MTBE II*"). The *Larrabee* Plaintiffs allege that MTBE "persist[s] in underground aquifers for decades." (*Larrabee* Compl. ¶ 37.) So too do the *Koch* Plaintiffs. (*See Koch* Compl. ¶ 12.) So too do plaintiffs in the fifteen actions in *MTBE II. See MTBE II*, 2005 WL 106936, at *1 n.2, *2 & n.16. The *Larrabee* Plaintiffs allege that "MTBE's foul taste and odor render water unusable and unfit for human consumption." (*Larrabee* Compl. ¶ 35.) So too do the *Koch* Plaintiffs. (*See Koch* Compl. ¶ 12.) So too do plaintiffs in the fifteen actions in *MTBE II. See MTBE II*, 2005 WL 106936, at *1 n.2, *2 & n.17. The *Larrabee* Plaintiffs allege that MTBE is a "possible human carcinogen." (*Larrabee* Compl. ¶ 41.) So too do the *Koch* Plaintiffs. (*See Koch* Compl. ¶ 12.) So too do plaintiffs in the fifteen actions in *MTBE II. See MTBE II*, 2005 WL 106936, at *1 n.2, *2 & n.20.

---

[6] Exhibit 6 is a copy of the *Koch* Plaintiffs' original Class Action Complaint ("*Koch* Complaint"), filed on June 30, 2004, in the Circuit Court for Harford County, Maryland. After this Panel denied the *Koch* Plaintiffs' motion to vacate CTO-11 and the MDL-1358 court denied their motion to remand to state court, *see In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358(SAS), M21-88, 2005 WL 2254495 (S.D.N.Y. Sept. 16, 2005), the *Koch* Plaintiffs filed a First Amended Class Action Complaint. Their amended complaint reiterates each of the allegations of the original *Koch* Complaint quoted herein.

Other allegations of the *Larrabee* Plaintiffs mimic allegations of the *Koch* Plaintiffs, of plaintiffs in the original actions, and of plaintiffs in *Young v. Exxon Mobil Oil Corp., et al.*, M.D. Florida, C.A. No. 00-1912, as summarized by the transferee court in *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ("*MTBE I*"). Thus:

| *Larrabee* Allegations | *Koch* Allegations | *MTBE I* Allegations |
|---|---|---|
| "The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States." (*Larrabee* Compl. ¶ 43.) | "The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States." (*Koch* Compl. ¶ 14.) | "The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States." *MTBE I*, 175 F. Supp. 2d at 603. |
| "According to a report by a special EPA Blue Ribbon Panel, MTBE is a 'threat to the nation's drinking water resources,' has 'caused widespread and serious contamination' of the nation's groundwater, and has been found in 21% of the ambient groundwater tested in non-attainment areas where MTBE is used." (*Larrabee* Compl. ¶ 43.) | "According to a report by a special EPA Blue Ribbon Panel, MTBE is a 'threat to the nation's drinking water resources,' has 'caused widespread and serious contamination' of the nation's groundwater, and has been found in 21% of the ambient groundwater tested in non-attainment areas where MTBE is used." (*Koch* Compl. ¶ 14.) | "According to a report by a special EPA Blue Ribbon Panel, MTBE is a 'threat to the nation's drinking water resources,' has 'caused widespread and serious contamination' of the nation's groundwater, and has been found in 21% of the ambient groundwater tested in non-attainment areas where MTBE is used." *MTBE I*, 175 F. Supp. 2d at 603. |

| _Larrabee_ Allegations | _Koch_ Allegations | _MTBE I_ Allegations |
|---|---|---|
| "A 1986 report by Peter Garrett, et al. (hereinafter referred to as the 'Garrett Report') analyzed MTBE groundwater contamination at two sites in Maine. This report was known to the industry. The Garrett report showed that high levels of MTBE contamination could result from gasoline containing low concentrations of MTBE. It reported findings of extremely high concentrations of MTBE in the water and relatively low or no concentrations of other gasoline components. The Garrett report concluded that MTBE, because of its solubility in water and recalcitrance to biodegradation and clean-up, posed an unusual threat to groundwater." (_Larrabee_ Compl. ¶ 40.) | "Defendants [ExxonMobil and its dealer] have been aware of specific incidents of MTBE groundwater contamination as early as 1980 (and no later than 1984). Defendants were also aware of scientific studies describing the danger posed to groundwater by MTBE no later than 1986. One report by a State of Maine agency recommended that MTBE be stored in double-contained facilities." (_Koch_ Compl. ¶ 18.) | "Defendants were also cognizant of scientific studies describing the dangers of MTBE. In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection authored an environmental report entitled _Methyl Tertiary Butyl Ether as a Ground Water Contaminant_ (the 'Garrett Report'), which detailed the threat posed to groundwater by MTBE and recommended that MTBE be banned as a gasoline additive, or at the very least, be stored in double-contained facilities. A draft of this report was circulated throughout the oil industry...." _MTBE I_, 175 F. Supp. 2d at 601 (citations omitted). |

The _Larrabee_ Plaintiffs contend that they "have not raised a strict liability claim," and therefore suggest that the questions of fact raised by the above-charted allegations are, at most, peripheral to their claims. (_See_ Mem. in Supp. of Mot. to Vacate CTO-22, at 10.) Even if the _Larrabee_ Complaint lacks a product liability claim (an absence that ExxonMobil does not concede), the appropriateness of transfer pursuant to 28 U.S.C. § 1407 focuses on commonality of underlying factual allegations, not legal theories. _See In re Gen. Motors Class E Stock Buyout Sec. Litig._, 696 F. Supp. 1546, 1546-47 (J.P.M.L. 1988).

Legal theories, of course, shape the contours of relevance, and so raise or suppress certain questions of fact. In many of the actions previously transferred to MDL-1358, the allegations concerning defendants' knowledge of the nature of MTBE might, if proved, support _prima facie_ claims of strict liability for design defect or failure-to-warn. Although strict liability depends

- 11 -

BA2DOCS1\297235

primarily on proof of facts about the product rather than the defendant, liability for design defect

and failure-to-warn also draws inevitably on facts about the defendant's knowledge and conduct.

*See* Restatement (Third) of Torts:  Products Liability § 2 cmt. *d* (1998); *see also* Dan B. Dobbs,

*The Law of Torts* § 355, at 980-81 (2000) (noting that "courts seem to be requiring negligence or

at least some similar species of fault" in claims of defective design); *MTBE I*, 175 F. Supp. 2d at

624 (finding allegations, *inter alia*, that "defendants knew of the unreasonable dangers associated

with gasoline containing MTBE" and that "safer alternatives to MTBE were known and

available to the defendants for use in gasoline" relevant and sufficient to state a claim in strict

liability for design defect).

Even if the *Larrabee* Complaint does not expressly rely on a product liability claim, the

*Larrabee* Plaintiffs do expressly seek punitive damages under legal theories of negligence, strict

liability for abnormally dangerous activity, private nuisance, and trespass. (*Larrabee* Compl. ¶¶

59.c, 64.c, 70.c, 83.c.)  The applicable law of Maryland permits an award of punitive damages in

non-intentional tort actions only if plaintiffs establish, by clear and convincing evidence, "that

the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.*,

'actual malice.'"  *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 601 A.2d 633, 652 (1992);

*see also id.* at 469, 601 A.2d at 657.  To establish such "actual malice," the *Larrabee* Plaintiffs

will likely have to prove, at least, that ExxonMobil actually knew that MTBE was not reasonably

safe and deliberately disregarded the consequences.  *See id.* at 462, 601 A.2d at 653 (defining the

characteristics of "actual malice" in a product liability claim); *see also Hoffman v. United Iron &

Metal Co.*, 108 Md. App. 117, 148-49, 671 A.2d 55, 71 (1996) (finding plaintiffs not entitled to

punitive damages in trespass claim for lead contamination without proof that defendants knew

that their "lead emissions were so high as to cause health problems or property damage").

- 12 -

Accordingly, even under the legal theories that the *Larrabee* Plaintiffs acknowledge and

espouse, ExxonMobil's knowledge, or lack of knowledge, about the nature of MTBE is not a

peripheral question of fact; it is crucial.  Just as "whether defendants knew about … the nature of

MTBE" is a common, substantial, and complex question of fact shared by the original actions to

MDL-1358 (*In re MTBE Prods. Liab. Litig.* Transfer Order of 10/10/2000, at 1) and by other

subsequently transferred actions, so too is it shared by the *Larrabee* Action.  *See In re*

*Commercial Lighting Prods., Inc. Contract Litig.*, 415 F. Supp. 392, 393 (J.P.M.L. 1976)

(emphasizing significance of the complexity of the common questions of fact and accompanying

discovery).

**C.** **Transfer Will Serve the Overall Convenience of the Parties and Promote the Just and Efficient Conduct of the Actions.**

In the context of multidistrict litigation, the convenience of the parties and witnesses must

be viewed from a comprehensive group perspective rather than from the perspective of any one

party or witness.  *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333

F. Supp. 299, 304 (S.D.N.Y. 1971) (construing 12 U.S.C. § 1404(a), which uses the same

language as the multidistrict litigation statute, and stating that "instead of looking to the

individual convenience of *each* party and *each* witness, the court must look to the overall

convenience of all parties and witnesses").  This Panel "must weigh the interests of all the

plaintiffs and all the defendants, and must consider multiple litigation as a whole in light of the

purposes of the law." *In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311, 1317 (J.P.M.L. 1973)

(internal quotation marks omitted).

The requirement that transfer "promote the just and efficient conduct" of the actions

implements the prime objective of the multidistrict litigation statute, which Congress enacted "as

a means of conserving judicial resources in situations where multiple cases involving common

- 13 -

questions of fact were filed in different districts." *In re Food Lion, Inc., Fair Labor Standards Act "Effective Scheduling" Litig.*, 73 F.3d 528, 531-32 (4th Cir. 1996); *see also In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("It is expected that such transfer is to be ordered only where significant economy and efficiency in judicial administration may be obtained.") (quoting H.R. Rep. No. 1130 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898, 1900)) (internal quotation marks omitted).

The *Larrabee* Plaintiffs argue that transfer will not serve the goals of convenience, justice, and efficiency for three reasons:  first, because local discovery in the *Larrabee* Action will predominate over common discovery and will necessitate depositions of numerous Maryland witnesses; second, because inconsistent pretrial rulings by the MDL-1358 court and the District of Maryland are unlikely; and third, because discovery common to all of the actions can be achieved through access to "documents in the public record" or in the "document depository" maintained by the MDL-1358 court.  (*See* Mem. in Supp. of Mot. to Vacate CTO-22, at 12-14.)  None of these reasons withstands scrutiny.

Although discovery in the *Larrabee* Action will implicate local Maryland witnesses, local discovery will not so predominate as to offset the significant benefits that consolidation or coordination will achieve.  Indeed, much of the local Maryland discovery will likely consist in depositions of many of the same "officials from … the [Maryland Department of the Environment]" and the same "local environmental scientists and engineers who have performed environmental investigations on behalf of the Defendants" likely to be deposed in the previously transferred *Koch* and *Morgan* Actions.  (*Compare* Mem. in Supp. of Mot. to Vacate CTO-22, at 13, *with Koch* Pls.' Mem. in Supp. of Mot. to Vacate CTO-11, at 11, *and Morgan* Pls.' Mem. in Supp. of Mot. to Vacate CTO-16, at 10.)

- 14 -

Accordingly, unless the *Larrabee*, *Morgan* and *Koch* Actions are under the control of a single court, the risk of conflicting rulings regarding Maryland-based discovery and duplicative depositions of Maryland-based witnesses is acute.   Judge Scheindlin, moreover, can direct the *Larrabee* Plaintiffs to conduct local Maryland discovery regarding non-common questions of fact in a manner that best serves the interests of all parties – whether concurrently with discovery regarding common issues or otherwise.

Finally, reliance on public documents and document depositories can hardly be expected to meet all of the parties' legitimate discovery needs.  The MDL-1358 court can see that those needs are met fairly and efficiently.  *See In re MOSAID Techs., Inc. Patent Litig.*, 283 F. Supp. 2d 1359, 1360 (J.P.M.L. 2003) (rejecting proposed alternatives to consolidation and coordination of pretrial proceedings because MDL transfer provides a more comprehensive mechanism for addressing common discovery issues).

In sum, as this Panel concluded when it transferred both the *Koch* and *Morgan* Actions to MDL-1358:

> [I]nclusion of th[is] action[] in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that:  1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F. Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.

(*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.* Transfer Order of 6/17/05, at 2;

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.* Transfer Order of 12/2/05, at 1-

2.)  By advancing the same assertions of fact and legal arguments *twice* before rejected by this

- 15 -

Panel, the *Larrabee* Plaintiffs have provided the most eloquent argument that the result should,

in this instance, be identical.[7]

## CONCLUSION

For the foregoing reasons, ExxonMobil asks that the Panel deny the *Larrabee* Plaintiffs'

Motion to Vacate CTO-22.

Dated: July 18, 2006

Respectfully submitted,

Andrew Gendron (Md. Fed. Bar No. 5111)
Michael J. De Vinne (Md. Fed. Bar No. 26812)
VENABLE LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201
410-244-7439 (telephone)
410-244-7742 (facsimile)

Of counsel:
ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033-0968
856-795-2121 (telephone)

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, New York 10020-1605

*Attorneys for Defendant Exxon Mobil Corporation*

---

[7] The *Larrabee* Plaintiffs also point out that they are seeking relief in the form of medical monitoring, note that Maryland's highest court has not yet resolved whether medical monitoring is a cognizable cause of action or form of relief, and urge that "a court in Maryland is better suited to deciding" such a novel question of Maryland law "than a court in New York." (Mem. in Supp. of Mot. to Vacate CTO-22, at 15; *see also Larrabee* Compl. ¶¶ 59.*l*, 64.*l*, 70.*l*, 75.f, 83.*l*.) The *Larrabee* Plaintiffs need not worry. Although the legal viability of medical monitoring remains unresolved by the Maryland Court of Appeals, the MDL-1358 court has already predicted that "Maryland is likely to permit claims for medical monitoring, either as a distinct cause of action or as a remedy depending on the circumstances of a particular case," and has allowed the *Koch* Plaintiffs' medical-monitoring claims to proceed. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, Nos. 1:00-1898, M 21-88, MDL 1358(SAS), 2006 WL 928997, at *12 (S.D.N.Y. Apr. 7, 2006) (denying ExxonMobil's motion to dismiss for failure to state a claim); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. MASTER FILE 1:00-189, MDL 1358(SAS), M 21-88, 2006 WL 1816308, at *2-3 (S.D.N.Y. June 26, 2006) (denying ExxonMobil's motion for reconsideration).

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 19 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July 2006, copies of Exxon Mobil Corporation's

Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order (CTO-22) were sent by

first-class mail, postage prepaid, to:

Mary V. McNamara-Koch
LAW OFFICES OF PETER G. ANGELOS, P.C.
100 North Charles Center, 22nd Floor
401 East Pratt Street
Baltimore, Maryland 21201

*Attorneys for Plaintiffs*

Robin Greenwald
WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 40th Floor
New York, New York 10038

*Plaintiffs' Liaison Counsel for MDL 1358*

Harry C. Storm
LERCH, EARLY & BREWER, CHTD.
Three Bethesda Metro Center
Suite 460
Bethesda, Maryland 20814

*Attorneys for Defendant Storto Enterprises*

Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
MCDERMOTT, WILL & EMERY
50 Rockefeller Plaza
New York, New York 10020

*Defendant's Liaison Counsel for MDL 1358*

Michael J. De Vinne

- 17 -

BA2DOCS1\297235

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 9 2006

FILED
CLERK'S OFFICE

**INVOLVED COUNSEL LIST (CTO-22)**
**DOCKET NO. 1358**
## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

Andrew Gendron
Venable, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201

Robin Greenwald
Weitz & Luxenberg, P.C.
180 Maiden Lane
40th Floor
New York, NY 10038

Mary V. Koch
Law Offices of Peter G. Angelos, P.C.
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Peter J. Sacripanti
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020

Harry C. Storm
Lerch, Early & Brewer, Chtd.
Three Bethesda Metro Center
Suite 460
Bethesda, MD 20814-5367

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JUL 1 9 2006**

FILED
CLERK'S OFFICE

Exhibit 1

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

|  |  |
|---|---|
| | \* |
| | \* |
| | \* |
| | \* |
| **IN RE:** | \*   **MDL Docket No.: 1358** |
| | \*   This Document Relates to: |
| **METHYL TERTIARY** | \* |
| **BUTYL ETHER PRODUCTS** | \*   *Hope Koch, et al. v. John R. Hicks, et al.,* |
| **LIABILITY LITIGATION** | \*   04-3345 (D. Md.) |
| | \* |
| | \* |
| | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF KOCH PLAINTIFFS'
MOTION TO VACATE CTO-11**

Plaintiffs Hope Koch and Frank Koch by and through undersigned counsel respectfully move that the honorable Judicial Panel on Multidistrict Litigation ("JPML") vacate its conditional transfer order, CTO-11, as it applies to the *Koch* action for the reasons set forth below.

**I. FACTUAL BACKGROUND**

Plaintiffs and Proposed Class Representatives are property owners and citizens of Harford County, State of Maryland, and currently reside in the communities of Fallston and Baldwin, Maryland. Their water supply is contaminated and/or threatened by contamination with gasoline constituents, particularly methyl tertiary-butyl ether, herein referred to as "MTBE."

Hope Koch and Frank Koch, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 2310 Franklin's Chance Court in Fallston, Maryland 21047. Their water is

23730

supplied by a well located on their property, which has tested positive for gasoline constituents.

Defendant ExxonMobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation (collectively referred to as "ExxonMobil") is a New Jersey corporation with its principal place of business in Irving, Texas. ExxonMobil is the owner of the Upper Crossroads Exxon (hereinafter "Upper Crossroads Exxon"), located at 2800 Fallston Road, Fallston, MD 21047.

Defendant John R. Hicks d/b/a Crossroads Exxon, resides at 1040 Alexandria Way, Bel Air, Harford County, Maryland 21014, the same county where this contamination occurred. Defendant Hicks operates the Upper Crossroads Exxon at 2800 Fallston Road, Fallston, MD 21047, through a licensing, franchise, and/or other agreement with Defendant ExxonMobil Oil Corporation.

The Upper Crossroads Exxon has been in operation since 1987 and currently operates four active underground storage tank ("USTs"). There are three gasoline USTs (one 12,000 gallon and two 10,000 gallon) and one 10,000 gallon diesel UST. Two additional tanks – one 1,000 gallon heating oil UST and one 1,000 gallon used oil UST – were removed in April and June of 1997, respectively.

In October 1991, unbeknownst to Plaintiffs and the proposed two sub-classes (referred to collectively as the "Class"), the Harford County Health Department tested the supply wells for the restaurants in close proximity to the Upper Crossroads Exxon and found high levels of MTBE. In response the Maryland Department of the Environment ("MDE") required Defendants to conduct an investigation of the Upper Crossroads Exxon. The investigation included the installation of three shallow monitoring wells and

the collection of surface water and groundwater samples.  The analytical results from the investigation revealed the presence of MTBE in the Upper Crossroads Exxon's drinking water supply well at 9.5 parts per billion ("ppb").  The MDE closed the case at that time.

In December of 1998, routine Harford County drinking water sampling of commercial establishments in close proximity to the Crossroads Exxon revealed elevated concentrations of MTBE in the groundwater.  The highest concentration was 126 ppb, which was found at a local eating establishment.  The MDE directed the Defendants to install a carbon filtration system at that eating establishment and to sample additional drinking water wells in the immediate vicinity of the Upper Crossroads Exxon.

In June 2002, annual groundwater sampling identified a second commercial property at the intersection of Routes 152 and 165 in Fallston, Maryland testing positive for MTBE at 42.9 ppb.  This commercial property was also in close proximity to the Defendant.

In August 2003, the MDE approved the Defendants' work plans to install four monitoring wells at the Upper Crossroads Exxon.  Sampling of those monitoring wells confirmed the presence of MTBE in the groundwater at levels as high as 26,000 ppb.

In October 2003, the Defendants submitted an environmental subsurface investigation report.  Based on the results of that investigation, the MDE required the Defendants to expand its groundwater monitoring program for offsite wells to include several additional commercial and residential properties within the immediate vicinity of the Upper Crossroads Exxon.

The drinking water sampling in May of 2004 confirmed additional MTBE contamination in off-site wells with some more than a half mile from the Upper Crossroads Exxon.

In June of 2004, Plaintiffs first learned of the contamination of their wells and/or wells on neighboring properties, with MTBE. As a result of Defendants failing to inform the Plaintiffs of the MTBE-contamination, Plaintiffs have been drinking, cleaning, bathing, cooking and living with MTBE-contaminated water for years – a fact that was unknown to the plaintiffs and should have been known by the Defendants.

Since June of 2004 and under the direction of the MDE, the Defendant ExxonMobil has been conducting an environmental investigation of the contamination; providing bottled water to all residents within a half-mile radius of the Upper Crossroads Exxon; and installing granular activated carbon ("GAC") systems in homes.

As of October 2004, over 70 private wells in the Fallston/Baldwin area had some level of MTBE. There have been even more detections of MTBE in private wells since that time, and it is unlikely that this contamination will resolve in the near future without substantial remediation of the aquifer.

## II. PROCEDURAL HISTORY

On June 30, 2004, Plaintiffs filed a Class Action Complaint in the Circuit Court for Harford County, Maryland. The complaint specified several state causes of action and relief; specifically, public and private nuisance, trespass, violation of state environmental laws, negligence, and medical monitoring.

The complaint was served on the Defendants on or about June 30, 2004.

On September 23, 2004, the Circuit Court for Harford County, Maryland *sua sponte* consolidated *Koch* pursuant to Maryland Rule 2-503(a) with another case[1] that had been filed after the Kochs filed suit.

The Defendants removed *Koch* from the Circuit Court for Harford County to the United States District Court for the District of Maryland, Northern Division on October 15, 2004, which amounts to more than 100 days after service of the *Koch* complaint on Defendants.

The *Koch* plaintiffs filed in the United States District Court for the District of Maryland two motions to remand: the first on October 21, 2004 and the second on October 25, 2004. The Defendants filed their opposition to the Plaintiffs' motions to remand on November 8, 2004, and the Plaintiffs filed their reply on November 19, 2004. Defendant ExxonMobil filed for leave to file a surreply with the surreply attached on December 1, 2004. As of March 21, 2005, the district court has not ruled on the motions to remand.

On January 5, 2005, the Defendant filed a Notice of Relatedness advising the JPML and this Court that this matter is a potential "tag-along action" subject to transfer for consolidation with cases currently pending under *In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, Master File No. 1:00-1898, MDL-1358 (hereinafter "MDL-1358").

On January 10, 2005, the Defendant filed ExxonMobil Corporation's Motion to Stay Proceedings and Memorandum of Law in Support ("Exxon's Stay Motion") in federal district court. In response, Plaintiffs filed an Opposition to Defendant Exxon's

---

[1] The case is *Stephen J. Wagner, et al. v. John R. Hicks, et al.*, Case No. 12-C-04-2448 (filed Sept. 1, 2004). The *Wagner* plaintiffs have since dismissed their complaint without prejudice, leaving only the *Koch* action.

Stay Motion on January 27, 2005.  On February 11, 2005 Defendant ExxonMobil filed a reply.  No hearing has been scheduled and the district court has not yet ruled on the motions to stay.

On February 22, 2005, this honorable Panel filed CTO-11.  Plaintiffs filed a Notice of Opposition to CTO-11 on March 8, 2005, via facsimile transmission.  Plaintiffs respectfully request that the Panel vacate CTO-11 as to the *Koch* case for reasons set forth herein.

### III. ARGUMENT

#### A.  Transfer of *Koch* does not meet the standard for transfer pursuant to 28 U.S.C. § 1407(a).

On the surface, the *Koch* case may appear to involve the same issues of fact as the cases in MDL-1358 before the Honorable Shira Scheindlin. However, a closer inspection of the facts reveals there are very few common issues of fact between *Koch* and the cases in MDL-1358. *Koch* is a case about a single gas station that is a known source of MTBE contamination of a local aquifer, upon which residents in the area rely for their water supply. *Koch* is not a case about what the EPA may have required the oil industry to do or about contamination of municipal water sources or about a speculative claim of future contamination. The only commonality between *Koch* and the MDL-1358 cases is the fact that MTBE is the primary contaminant of concern.  This single common fact is not sufficient to meet the standard for transfer to MDL-1358, because transfer will not serve the convenience of the parties or witnesses or promote efficiency.

1.  *There are few common questions of fact between Koch and the cases in the transferee court.* The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the

23730                                    6

cases already before the transferee court. Title 28, section 1407(a) of the United States Code states, "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions *may* be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a) (emphasis added). This Panel has repeatedly recognized this principal. *See In re Janus Mutual Funds Inv. Litig.*, 310 F.Supp.2d 1359, 1361 (J.P.M.L. 2004) (concluding that all cases involve common question of fact concerning allegations of market timing); *In re Worldcom, Inc. Sec. & ERISA Litig.*, 226 F.Supp.2d 1352, 1354 (J.P.M.L. 2002) (transferring schedule A actions because they share factual questions arising out of alleged omissions or misrepresentations concerning WorldCom's financial condition and accounting practices, but vacating the CTO for schedule B actions because the factual and legal issues were largely distinct from those currently before the MDL court); *In re Multi-Piece Rim Prod. Liab. Litig.*, 464 F.Supp. 969, 974 (J.P.M.L. 1979) (finding substantial common factual issues regarding the overall design of multi-piece rims, the state of knowledge within the industry, and the alleged failure of defendants to warn); *but see In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F.Supp. 242, 244 (J.P.M.L. 1978) (denying transfer where common questions of fact are not sufficiently complex and the associated discovery is not greatly time consuming).

The *Koch* action, however, does not share substantial common issues of fact with the cases in MDL -1358. To begin, most of the plaintiffs before Judge Scheindlin are states, municipalities, public and private water companies, and water districts.[2]  *See*

---

[2] Examples include *The State of New Hampshire v. Amerada Hess Corp., et al.*, No. 04-4976; *City of Riverside v. Atlantic Richfield Co., et al.*, No. 04-4969; *City of Fresno v. Chevron USA Inc., et al.*, No. 04-4973; *California-American Water Co. v. Atlantic Richfield Co., et al.*, No. 04-4974; *Orange County Water District v. Unocal Corp. et al.*, No. 04-4968.

Exhibit 1 herein (Judicial Panel on Multidistrict Litigation Case Listing Report). Those plaintiffs in the MDL who are private well owners raised products liability claims against numerous manufacturers and sought to represent entire classes in their respective states of private well owners with or without detections of MTBE in their wells. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F.Supp.2d 593, 603-05 (S.D.N.Y. 2001) (describing private well owner actions before MDL-1358) (referred hereinafter as *In re: MTBE*).[3] In other words, the core issue of fact common to the MDL-1358 cases is whether the industry decision to add MTBE to gasoline is a design defect.

In contrast, the *Koch* plaintiffs have not raised a strict liability claim and have focused solely upon the Defendants' failure to contain the gasoline at this single location, not upon any role the Defendant ExxonMobil may have played in the decision to include MTBE in the gasoline. Thus, the core issue of fact in the *Koch* case is whether the Defendants are responsible for the contamination of the bedrock aquifer in the Fallston, Maryland area. The MDL-1358 court has not addressed nor is it likely to address this issue in any of the cases before it.

This honorable Panel has already recognized the distinction between cases like *Koch* and those in MDL-1358. In the case of *Theodore Holten, et al. v. Chevron U.S.A.,*

---

[3] The *Young, England, Berisha,* and *Berrian* cases described by Judge Scheindlin have been settled. *See* Exhibit 1. The CTO for *Holten, et al. v. Chevron USA, Inc., et al.,* was vacated. *Id.* To Koch Plaintiffs' best knowledge, the only active cases in MDL-1358 that involve private well owners are *Silver, et al., v. Alon USA Energy, Inc., et al.,* No. 04-4975, and *Tonneson, et al., v. Sunoco, Inc. et al.,* No. 03-8248. Like the other private well cases in MDL-1358, these complaints raise a strict liability count and emphasize facts related primarily to a products liability case. *See, e.g.,* Exhibit 2 hereto: *Tonneson* Complaint (filed October 17, 2003). Additionally, *Tonneson* was originally filed in federal court in the Southern District of New York, because the case involved contamination a New York aquifer; thus, it was never subject to section 1407 transfer. *Silver* is also distinguishable from *Koch* in that the plaintiffs own and operate a private drinking water system for their mobile home park. Thus, they are more analogous to a water utility than to a single residential well owner.

23730                                       8

*et al.*, No. 3:00-4703 (D.N.J.), this Panel vacated its CTO-2 as it applied to *Holten* after determining that transfer of this case to MDL-1358 was not warranted. Order Vacating Conditional Transfer Order, MDL-1358, *Holten, et al. v. Chevron U.S.A., et al.*, No. 3:00-4703 (D.N.J.) (Apr. 18, 2001). *Holten* involved over 50 residents and former residents of Bayville, New Jersey, whose wells were contaminated by one local gas station's USTs and dispensing systems. This honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in *Koch*.

    2. *Transfer will not serve the convenience of the parties or promote the just and efficient conduct of the litigation.* Even if *Koch* shares a common question of fact with the MDL-1358 cases, transfer is not warranted here. Common questions of fact alone are not a sufficient reason for transfer. *See In re "East of the Rockies" Concrete Pipe Antitrust Cases*, 302 F.Supp. 244, 254 (J.P.M.L. 1969) (Weigel, J. concurring) (stating, "neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, *ipso facto*, by transfer just because there are common questions of fact"). The Panel must also conclude that transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a); *see also In re Highway Acc. Near Rockville, Conn., on Dec. 30, 1972*, 388 F.Supp. 574, 575 (J.P.M.L. 1975) (explaining that the proposed transfer must meet the statutory standard, otherwise it is not warranted). Thus, the Panel must decline to transfer the case if "'significant economy and efficiency in judicial administration [could not] be

obtained.'" *In re: Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) (quoting H.R. Rep. No. 1130, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1898, 1900).

Answering this question – whether transfer would promote convenience and efficiency – involves consideration of several factors. *See In re Asbestos and Asbestos Insulation Material Prod. Liab. Litig.*, 431 F.Supp. 906, 909-10 (J.P.M.L. 1977) (discussing arguments against transfer). One important factor is whether individualized and unique questions of fact and law predominate over common questions of fact. *See Id.* at 910 (denying transfer because the many factual questions unique to each action clearly predominated over the common factual questions); *In re Asbestos School Prod. Liab. Litig.*, 606 F.Supp. 713, 714 (J.P.M.L. 1985) (holding that transfer would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of the litigation where common questions of fact did not predominate over individual questions of fact present in each action). Moreover, this Panel has found transfer for consolidated pre-trial proceedings to be of no benefit where discovery "will focus on localized factual issues." *In re Grand Funk R.R. Trademark Litig.*, 371 F.Supp. 1084, 1085 (J.P.M.L. 1974).

The MDL-1358 court has already recognized the numerous individualized issues in the cases of private wells: "[t]here are ... differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require." *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 344 (S.D.N.Y. 2002). Thus, even if the common thread in the MDL-1358 actions and *Koch* may be contamination of groundwater with MTBE, the circumstances of the contamination in *Koch* are unique. *In re Asbestos and Asbestos*

*Insulation Material Prod. Liab. Litig.*, 431 F.Supp. at 909. These differences from other MDL-1538 actions include the geology of the contaminated aquifer; the geographic extent of the contamination; the levels of contamination; the source of contamination; the presence of other potential sources of MTBE in the area and their relative responsibility for the contamination; the type of release, *e.g.*, liquid spills versus vapor leaks; the storage device for the product containing MTBE, *e.g.*, UST versus pipeline; the local real estate values; and the local economy. In short, the core issue of fact in *Koch* – the contamination of a discrete aquifer[4] located completely in Maryland – predominates over any questions of the Defendants' knowledge of MTBE's properties and dangers.

To address this core issue, discovery in *Koch* will necessitate depositions of, among others, officials from the local health department and the MDE; former and current employees of the Upper Crossroads Exxon; local environmental scientists and engineers who have performed environmental investigations on behalf of the Defendants, other businesses in the area or residents; local real estate appraisers and agents; and residents of the Fallston area who have been affected by the contamination. The depositions of the necessary witnesses in the *Koch* case have not occurred nor are they expected to occur in the MDL-1358 cases. Currently, discovery in MDL-1358 is only being served on the defendants in four focus cases: *Orange County Water District v. Unocal Corp. et al.*, No. 04-4968; *County of Suffolk v. Amerada Hess Corp., et al.*, 04-5424; *United Water New York, Inc. v. Amerada Hess Corp., et al.*, 04-2389; and the *City of New York v. Amerada Hess Corp., et al.*, No. 04-3417. *See 4 MTBE Suits Designated 'Focus Cases' in MDL*, 18 MEALEY'S POLLUTION LIABILITY REPORT, November 2004, at

---

[4] The regional bedrock aquifer in the area of the Upper Crossroads Exxon station lies in the Wissahickon Formation. Site Assessment Report Exxon Service Station, #2-8329 at 5-6 (October 8, 2004).

28. None of this discovery would touch in any way upon the actual factual issues that will be decided in *Koch*.

Another consideration is whether the discovery common to the actions can be accomplished outside of MDL consolidation. *See, e.g., In re Telecomm. Providers' Fiber Optic Cable Installation Litig.*, 199 F.Supp.2d 1377, 1378 (J.P.M.L. 2002) (denying transfer where alternative existed that would minimize duplicative discovery). To the extent that Defendant ExxonMobil's knowledge of the nature of MTBE is relevant to the *Koch* case, there are already documents in the public record that show the Defendant ExxonMobil's awareness of the danger and its duty to store and handle the product with a higher degree of care. *See, e.g., In re: MTBE Prod. Liab. Litig.*, 175 F.Supp.2d at 601-02 (discussing various reports on MTBE by environmental agencies and the industry in the 1980's and early 1990's). Indeed, most of this type discovery has already been conducted in other MTBE cases. For example, *South Lake Tahoe Public Util. District v. Atlantic Richfield Co., et al.*, No. 999128 (Cal. Super. Ct., filed Nov. 10, 1998), proceeded to trial in 2002 on the issue of whether MTBE-containing gasoline is a defective product and resulted in a verdict finding oil companies liable. Furthermore, the MDL-1358 court maintains a document depository that can be accessed by attorneys in any MTBE action. *See In re: MTBE Prod. Liab. Litig.*, Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001). Given these resources, discovery of these materials for *Koch* will not be so burdensome as to require consolidation with cases now in MDL-1358.

A final consideration is whether there is a significant possibility of inconsistent pretrial rulings if the actions under consideration are not transferred. *In re TMJ Implants*

*Prod. Liab. Litig.*, 844 F.Supp. 1553, 1554 (J.P.M.L. 1994). Here, there is no such danger. If a class were certified in *Koch*, it could be limited easily to residents of the area surrounding the Upper Crossroads Exxon, and thus, would not conflict with class certification determinations in other MDL-1358 actions. *See In re MTBE Prod. Liab. Litig.*, 209 F.R.D. at 329 (denying class certification for all private well owners with detections of MTBE in New York, Florida, California, and Illinois). Indeed, the MDL-1358 court's multiple decisions on common legal issues can provide guidance to other courts hearing MTBE cases. *See In re AH Robins Co. Inc. "Dalkon Shield" IUD Prod. Liab. Litig.*, 505 F.Supp. 221, 223 (J.P.M.L. 1981) (a transferee court's prior decisions "can serve as an aid in avoiding duplication of discovery and preventing inconsistent pretrial rulings"); *In re Western Elec. Co., Inc. Semiconductor Patent Litig.*, 436 F.Supp. 404, 406 (J.P.M.L. 1977) (denying transfer where the transferee court's conclusions on key legal issues are well documented).

As for jurisdictional issues, there are material differences between the *Koch* remand motions and the remand motions before the MDL-1358 court. For instance, the *Koch* Plaintiffs maintain that the removal was improper, because it was not done within the statutory mandated 30 days from service of the complaint on the Defendants.[5] The main issues in deciding remand in the MDL-1358 cases were federal officer status and bankruptcy. *In re: MTBE Prod. Liab. Litig.*, MDL-1358, 341 F.Supp.2d 386, 416

---

[5] Defendant ExxonMobil asserts that an order by a state court to consolidate *Koch* with another case qualifies as an "order ... from which it may first be ascertained that the case is one which is or has become removable" pursuant to 28 U.S.C. § 1446(b). However, they gave no caselaw supporting this proposition. Plaintiffs contend that the consolidation by the state court *sua sponte* does not constitute a new trigger for removal purposes, and that the *Koch* action never was removable nor became removable upon consolidation in state court with another case. To the extent that this is a real legal issue, it involves interpretation of Maryland Rule 2-503(a), as well as 28 U.S.C. § 1446(b).

(S.D.N.Y. 2004). However, because there is no product liability count in *Koch*, there is no federal officer basis for jurisdiction pursuant to 28 U.S.C. § 1442, and because ExxonMobil has not declared bankruptcy under Title 11 of the United States Code, there is no bankruptcy jurisdiction pursuant to 28 U.S.C. § 1334.

Given these concerns, transferring the *Koch* action to the Southern District of New York will not necessarily conserve the resources of the parties; reduce duplicative efforts; or prevent conflicting rulings. By virtue of the geographic distance and the fact that witnesses will be deposed in Maryland regardless of which court oversees discovery, the Southern District of New York simply offers no increased convenience for the majority of witnesses and parties or efficiency in the *Koch* case.

### B. The *Koch* action involves unresolved questions of Maryland law.

While the test for deciding whether to transfer an action to an MDL focuses on factual commonalities between actions to be consolidated, questions of law may also be relevant. *See In re U.S. Navy Variable Reenlistment Bonus Litig.*, 407 F.Supp. 1405, 1407 (J.P.M.L. 1976) (finding questions of law to be preponderant in actions being considered for transfer and denying transfer under Section 1407). The *Koch* action presents unresolved questions of Maryland law that would be more appropriately decided by the United States District Court for the District of Maryland, which has more experience and familiarity with Maryland law than the MDL-1358 court.

It is axiomatic that federal district courts situated in a state are better able to interpret the law of that state. *See Karofsky v. Abbot Lab.*, 921 F.Supp. 18, 21 n.4 (D. Me. 1996) (explaining that the district court in Maine was better equipped to interpret Maine law than the MDL court). One issue of law that likely will be addressed by a judge in pre-trial proceedings in *Koch* is whether a class should be certified for medical

monitoring. This will require determining whether medical monitoring is a cognizable cause of action or form of relief in Maryland. The Court of Appeals of Maryland has not resolved this issue. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 782, 752 A.2d 200, 251 (Md. 2000). A court in Maryland is better suited to deciding this question of Maryland law than a court in New York.

### III. CONCLUSION

For the reasons set forth herein, Plaintiff Koch's motion to vacate CTO-11 should be granted.

Respectfully submitted,

Dated: March 23, 2005

Charles J. Piven (Md. Federal Bar No. 00967)
Marshall N. Perkins (Md. Federal Bar No. 25514)
**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
(410) 332-0030

Lon Engel (Md. Federal Bar No. 02470)
**ENGEL & ENGEL, P.A.**
11 E. Lexington Street
Suite 200
Baltimore, MD 21202
(410) 727-5095

*Counsel for Plaintiffs*

23730

15

Exhibit 2

MDL Docket No. 1358

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

| | | |
|---|---|---|
| *Carl G. Morgan, et al v. Exxon Mobil Corp.* | * | United States District Court |
| | | District of Maryland |
| | * | C.A. No. 1:05-108 |
| | | (Judge Marvin Garbis) |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**BRIEF IN SUPPORT OF**
**PLAINTIFFS' MOTION TO VACATE CTO-16**

Plaintiffs, Carl G. Morgan, *et al*, by their undersigned counsel, file this brief in support of the Motion to Vacate CTO-16 and state as follows:

## I. FACTUAL BACKGROUND

Plaintiffs are property owners and citizens of Harford County, Maryland, in the community known generally as Fallston. The various plaintiffs own 16 residential, commercial and agricultural properties in Fallston. All of the properties rely on wells for their water supply. The Plaintiffs' wells have been contaminated and/or threatened by contamination with gasoline constituents, particularly methyl tertiary butyl ether ("MTBE").

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

Defendant, Exxon Mobil Corporation, f/k/a Exxon Corporation and f/k/a Mobil Corporation (collectively referred to as "Exxon Mobil") is a New Jersey corporation with its principal place of business in Irving, Texas.  Exxon Mobil is the owner of the Upper Crossroads Exxon (hereinafter "Upper Crossroads Exxon"), located at 2800 Fallston Road, Fallston, MD 21047.

The Upper Crossroads Exxon began operating in 1987 and until June 2005 operated four active underground storage tanks ("USTs").  There were three gasoline USTs (one 12,000 gallon and two 10,000 gallon) and one 10,000 gallon diesel UST.  Two additional tanks – one 1,000 gallon heating oil UST and one 1,000 gallon used oil UST – were removed in April and June of 1997, respectively.   The station was torn down and the underground storage tanks removed in July and August 2005, respectively.

In October 1991, the Harford County Health Department tested the domestic wells for restaurants in close proximity to the Upper Crossroads Exxon and found high levels of MTBE. In response the Maryland Department of the Environment ("MDE") required Exxon Mobil to conduct an investigation of the Upper Crossroads Exxon. The investigation included the installation of three shallow monitoring wells and the collection of surface water and groundwater samples. The analytical results from the investigation revealed the presence of MTBE in the Upper Crossroads Exxon's drinking water well at 9.5 parts per billion ("ppb"). The MDE closed the case at that time.

In December of 1998, routine Harford County Health Department sampling of drinking water at commercial establishments in close proximity to the Upper Crossroads Exxon revealed elevated concentrations of MTBE in the groundwater. The highest concentration was

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

126 ppb, which was found at a local eating establishment. The MDE directed Exxon Mobil to install a carbon filtration system at that eating establishment and to sample additional domestic wells in the immediate vicinity of the Upper Crossroads Exxon.

In June 2002, annual groundwater sampling identified a second commercial property at the intersection of Routes 152 and 165 in Fallston, Maryland testing positive for MTBE at 42.9 ppb. This commercial property was also in close proximity to the Upper Crossroads Exxon.

In August 2003, the MDE approved Exxon Mobil's work plans to install four monitoring wells at the Upper Crossroads Exxon. Sampling of those monitoring wells confirmed the presence of MTBE in the groundwater at levels as high as 26,000 ppb.

In October 2003, Exxon Mobil submitted an environmental subsurface investigation report. Based on the results of that investigation, the MDE required Exxon Mobil to expand its groundwater monitoring program for offsite wells to include several additional commercial and residential properties within the immediate vicinity of the Upper Crossroads Exxon.  The drinking water sampling in May of 2004 confirmed additional MTBE contamination in off-site wells with some more than a half mile from the Upper Crossroads Exxon.

In April of 2004, Plaintiffs first learned of the contamination of their wells and/or wells on neighboring properties, with MTBE. As a result of Exxon Mobil's failing to inform the Plaintiffs of the MTBE-contamination, Plaintiffs have been drinking, cleaning, bathing, cooking and living with MTBE-contaminated water for years — a fact that was unknown to the plaintiffs and should have been known by Exxon Mobil.

Since June of 2004 and under the direction of the MDE, Exxon Mobil has been conducting an environmental investigation of the contamination; providing bottled

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

3

water to all residents within a half-mile radius of the Upper Crossroads Exxon; and installing

granular activated carbon ("GAC") systems in homes.

As of October 2004, over 70 private wells in the Fallston area had some level of MTBE.

There have been even more detections of MTBE in private wells since that time, and it is

unlikely that this contamination will resolve in the near future without substantial remediation

of the aquifer.

## II. PROCEDURAL HISTORY

On December 8, 2004, Plaintiffs filed a sixty-three count Complaint in the

Circuit Court for Baltimore County alleging state causes of action in strict liability, nuisance,

trespass and negligence.

The Complaint was served on Exxon Mobil on December 14, 2004.

Exxon Mobil removed the case to the United States District Court for the District of

Maryland, Northern Division, on January 13, 2005.

On August 16, 2005, Exxon Mobil filed a Notice of Related, Tag-Along Action advising

the JPML that this matter is a potential "tag-along action" subject to transfer for consolidation

with cases currently pending under In Re: Methyl Tertiary Butyl Ether ("MTBE") Products

Liability Litigation, Master File No. 1:00-1898, MDL-1358 (hereinafter "MDL-1358").

On September 2, 2005, this Honorable Panel filed CTO-16.  Plaintiffs filed a Notice of

Opposition to CTO-16 on September 16, 2005, via facsimile transmission.  Plaintiffs

respectfully request that the Panel vacate CTO-16 for the reasons set forth herein.

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

## III. ARGUMENT

### A.   This Case Does Not Satisfy The Standard For Transfer Required By 28 U.S.C. §1407(a).

Plaintiffs submit that simply because the substance "MTBE" is identified in their Complaint as the cause of the contamination in their wells does not necessarily require the transfer of the case under 28 U.S.C. §1407. In fact, careful analysis of Plaintiffs' claims reveals that the fact that MTBE was the substance identified in their wells is incidental to their claims. Plaintiffs' claims would be no different had the substance been benzene, toluene, xylene or any of the various other constituents of formulated gasoline. The critical issue is that a constituent of gasoline escaped from the Upper Crossroads Exxon station and contaminated the Plaintiffs' well water.

This case is brought by a discrete, identifiable group of individuals arising out of an incident or incidents at a single service station. No issues concerning the propriety vel non of the use of MTBE in gasoline products are raised by Plaintiffs' claims.

### 1.   This case does not share substantial common factual issues with the cases already transferred.

The first requirement that must be met for transfer is the existence of common questions of fact between the cases under consideration for transfer and the cases already before the transferee court. Title 28, section 1407(a) of the United States Code states, "when civil actions involving one or more common questions of fact are pending in different districts, such actions *may* be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a) (emphasis added). This Panel has repeatedly recognized this principal. *See In re Janus Mutual Funds Inv. Litig.*, 310 F.Supp.2d 1359, 1361 (J.P.M.L. 2004) (concluding that

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

all cases involve common question of fact concerning allegations of market timing); *In re Worldcom, Inc. Sec. & ERISA Litig.*, 226 F.Supp.2d 1352, 1354 (J.P.M.L. 2002) (transferring schedule A actions because they share factual questions arising out of alleged omissions or misrepresentations concerning WorldCom's financial condition and accounting practices, but vacating the CTO for schedule B actions because the factual and legal issues were largely distinct from those currently before the MDL court); *In re Multi-Piece Rim Prod. Liab. Litig.*, 464 F.Supp. 969, 974 (J.P.M.L. 1979) (finding substantial common factual issues regarding the overall design of multi-piece rims, the state of knowledge within the industry, and the alleged failure of defendants to warn); *but see In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F.Supp. 242, 244 (J.P.M.L. 1978) (denying transfer where common questions of fact are not sufficiently complex and the associated discovery is not greatly time consuming).

This action does not share substantial common issues of fact with the cases in MDL-1358. Most of the plaintiffs in the case before the transferee court are states, municipalities, public and private water companies, and water districts.[1]  The plaintiffs in the MDL who are private well owners raised products liability claims against numerous manufacturers and sought to represent entire classes in their respective states of private well owners with or without detections of MTBE in their wells. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F.Supp.2d 593, 603-05 (S.D.N.Y. 2001) (describing private well owner actions before MDL-1358) (referred hereinafter as *In re: MTBE*).  The core issue of fact common to the MDL-1358 cases is whether the industry decision to add MTBE to gasoline is a design defect.  As

---

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

[1]  Examples include *The State of New Hampshire v. Amerada Hess Corp., et al.*, No. 04-4976; *City of Riverdale v. Atlantic Richfield Co., et al.*, No. 04-4969; *City of Fresno v. Chevron USA Inc., et al.*, No. 04-4973; *California-American Water Co. v. Atlantic Richfield Co., et al.*, No. 04-4974; *Orange County Water District v. Unocal Corp., et al.*, No. 04-4968.

stated in the Panel's initial Transfer Order:

> "… the Panel finds that the actions in this litigation involve common questions of fact concerning i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public; and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination.[2]

In contrast, the Plaintiffs in this case have not raised a strict liability claim predicated on the use of MTBE in gasoline and have focused solely upon the Defendant's failure to contain the gasoline at this single location, not upon any role the Defendant Exxon Mobil may have played in the decision to include MTBE in the gasoline. Thus, the core issue of fact in this case is whether the Defendant is responsible for the contamination of the aquifer in the Fallston, Maryland area. The MDL-1358 court has not addressed nor is it likely to address this issue in any of the cases before it.

This honorable Panel has already recognized the distinction between cases like the instant case and those in MDL-1358. In the case of *Theodore Holten, et al. v. Chevron U.S.A., et al.*, No. 3:00-4703 (D.N.J.), this Panel vacated its CTO-2 as it applied to *Holten* after determining that transfer of this case to MDL-1358 was not warranted, Order Vacating Conditional Transfer Order, MDL-1358, *Holten, et al. v. Chevron U.S.A., et al.*, No. 3:00-4703 (D,N.J.) (Apr. 18, 2001), *Holten* involved over 50 residents and former residents of Bayville, New Jersey, whose wells were contaminated by one local gas station's USTs and dispensing systems. This honorable Panel found that the "MDL-1358 actions, on the other hand, are purported class actions which focus on claims by persons or entities whose well water has not

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

---

[2]   See Transfer Order attached as Exhibit 1.

yet tested positive for the presence of MTBE." The facts in *Holten* are analogous to those in this case.

        **2.**      *Transfer will not serve the convenience of the parties or promote the just and efficient conduct of the litigation.*

Even if this case shares a common question of fact with the MDL-1358 cases, transfer is not warranted here. Common questions of fact alone are not a sufficient reason for transfer. *See In re "East of the Rockies" Concrete Pipe Antitrust Cases,* 302 F.Supp. 244, 254 (J.P.M.L. 1969) (Weigel, J. concurring) (stating, "neither the convenience of witnesses and parties nor the just and efficient conduct of actions are served, *ipso facto,* by transfer just because there are common questions of fact"). The Panel must also conclude that transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a); *see also In re Highway Acc. Near Rockville, Conn., on Dec. 30, 1972,* 388 F.Supp. 574, 575 (J.P.M.L. 1975) (explaining that the proposed transfer must meet the statutory standard, otherwise it is not warranted). Thus, the Panel must decline to transfer the case if "significant economy and efficiency in judicial administration [could not] be obtained." *In re: Ivy,* 901 F.2d 7, 9 (2d Cir. 1990) (quoting H.R, Rep. No. 1130, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1898, 1900).

The determination of whether transfer would promote convenience and efficiency involves consideration of several factors. *See In re Asbestos and Asbestos Insulation Material Prod. Liab. Litig.,* 431 F.Supp. 906, 909-10 (J.P.M.L. 1977) (discussing arguments against transfer). One important factor is whether individualized and unique questions of fact and law predominate over common questions of fact. *See Id.* at 910 (denying transfer because the many

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

factual questions unique to each action clearly predominated over the common factual questions); *In re Asbestos School Prod. Liab. Litig.*, 606 F.Supp. 713, 714 (J.P.M.L. 1985) (holding that transfer would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of the litigation where common questions of fact did not predominate over individual questions of fact present in each action). Moreover, this Panel has found transfer for consolidated pre-trial proceedings to be of no benefit where discovery "will focus on localized factual issues." *In re Grand Funk R.R. Trademark Litig.*, 371 F.Supp. 1084, 1085 (J.P.M.L. 1974).

The MDL-1358 court has already recognized the numerous individualized issues in the cases of private wells: "[t]here are ... differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require." *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 344 (S.D.N.Y, 2002). Thus, even if the common thread in the MDL- 1358 actions and this case may be contamination of groundwater with MTBE, the circumstances of the contamination in this case are unique. *In re Asbestos and Asbestos Insulation Material Prod. Liab. Litig.*, 431 F.Supp. at 909. These differences from other MDL-1538 actions include the geology of the contaminated aquifer; the geographic extent of the contamination; the levels of contamination; the source of contamination; the presence of other potential sources of MTBE in the area and their relative responsibility for the contamination; the type of release, *e.g.*, liquid spills versus vapor leaks; the storage device for the product containing MTBE, *e.g.*, UST versus pipeline; the local real estate values; and the local economy. In short, the core issue of fact in this case — the

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

contamination of a discrete aquifer located completely in Maryland — predominates over any questions of the Defendant's knowledge of MTBE's properties and dangers.

To address this core issue, discovery in this case will necessitate depositions of, among others, officials from the local health department and the MDE; former and current employees of the Upper Crossroads Exxon; local environmental scientists and engineers who have performed environmental investigations on behalf of the Defendant, other businesses in the area or residents; local real estate appraisers and agents; and residents of the Fallston area who have been affected by the contamination. The depositions of the necessary witnesses in the this case have not occurred nor are they expected to occur in the MDL-1358 cases. Currently, discovery in MDL-1358 is only being served on the defendants in four focus cases: *Orange County Water District v. Unocat Corp. et at.*, No. 04-4968; *County of Suffolk v. Amerada Hess Corp., et at.*, 04- 5424; *United Water New York, Inc. v. Amerada Hess Corp., et al.*, 04-2389; and the *City of New York v. Ainerada Hess Corp., et al.*, No. 04-3417. *See 4 MTBE Suits Designated 'Focus Cases' in MDL*, 18 MEALEY'S POLLUTION LIABILITY REPORT, November 2004, at 28. None of this discovery would be pertinent to the actual factual issues that will be decided in this case.

Another consideration is whether the discovery common to the actions can be accomplished outside of MDL consolidation. *See, e.g., In re Telecomm. Providers ' Fiber Optic Cable Installation Litig.*, 199 F.Supp.2d 1377, 1378 (J.P.M.L. 2002) (denying transfer where alternative existed that would minimize duplicative discovery). To the extent that Defendant Exxon Mobil's knowledge of the nature of MTBE is relevant to this case, there are already documents in the public record that demonstrate the Defendant Exxon Mobil's awareness of

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

the danger and its duty to store and handle the product with a higher degree of care. *See, e.g., In re. MTBE Prod. Liab. Litig.,* 175 F.Supp.2d at 601-02 (discussing various reports on MTBE by environmental agencies and the industry in the 1980's and early 1990's). Indeed, most of this type discovery has already been conducted in other MTBE cases. For example, *South Lake Tahoe Public Util. District v. Atlantic Richfield Co., et al.,* No. 999128 (Cal. Super. Ct., filed Nov. 10, 1998), proceeded to trial in 2002 on the issue of whether MTBE-containing gasoline is a defective product and resulted in a verdict finding oil companies liable. Furthermore, the MDL-1358 court maintains a document depository that can be accessed by attorneys in any MTBE action. *See In re: MTBE Prod. Liab. Litig.,* Confidentiality Agreement & Order (S.D.N.Y. June 1, 2001). Given these resources, discovery of these materials for this case, if necessary, will not be so burdensome as to require consolidation with cases now in MDL-1358.

A final consideration is whether there is a significant possibility of inconsistent pretrial rulings if the actions under consideration are not transferred. *In re TMJ Implants Prod. Liab. Litig.,* 844 F.Supp. 1553, 1554 (J.P.M.L. 1994). Here, there is no such danger as this case is brought by a discrete group of plaintiffs who do not seek certification as a class action. Further, since the instant multidistrict litigation has been pending for five (5) years, the panel's decisions on common legal issues can provide guidance to other courts hearing MTBE cases. *See In re AH Robins Co. Inc. "Dalkon Shield" IUD prod. Liab. Litig.,* 505 F.Supp. 221, 223 (J.P.M.L. 1981) (a transferee court's prior decisions "can serve as an aid in avoiding duplication of discovery and preventing inconsistent pretrial rulings"); *In re Western Elec. Co., Inc. Semiconductor Patent Litig.,* 436 F.Supp. 404, 406 (J.P.M.L. 1977) (denying transfer where the transferee court's conclusions on key legal issues are well documented).

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

11

Transferring this action to the Southern District of New York will not conserve the resources of the parties; reduce duplicative efforts; or prevent conflicting rulings.  Due to the geographic distance and the fact that witnesses will be deposed in Maryland regardless of which court oversees discovery, the Southern District of New York simply offers no increased convenience for the majority of witnesses and parties or efficiency in this case.

## IV.  CONCLUSION

For the reasons set forth herein, Plaintiffs' motion to vacate CTO-16 should be granted.

Respectfully submitted,

Dated: October 3, 2005

Robert L. Hanley, Jr. 00150
Nolan, Plumhoff & Williams, Chartered
502 Washington Avenue, Suite 700
Towson, MD 21204
(410) 823-7800
fax - (410) 296-2765
rhanley@nolanplumhoff.com

Attorneys for Plaintiffs, Carl G. Morgan,
Patricia A. Morgan, Kristen M. Raynor,
Keith Spencer, Leroy A. Chenworth, Jr.,
Jean T. Chenworth, Fallston Properties,
LLC, Don-Bar, Inc., David H. March,
Catherine C. March, Jeffrey Kundratic,
Cathleen Kundratic, James G. Wagner, Sr.
and Darlene R. Wagner

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE CTO-16 was served on the following counsel of record via United States Mail, postage prepaid, on this 3rd day of October, 2005.

Daniel J. Hanley                                    Attorney for the Plaintiffs
Hanley & Hanley
206 Washington Avenue
Towson, MD 21204

Peter John Sacripanti                              Attorneys for Defendant,
James A. Pardo                                      ExxonMobil Corporation
Stephen J. Riccardulli
McDermott, Will & Emery
50 Rockefeller Plaza
New York, NY 10020-1605

and

Andrew Gendron                                     Attorneys for Defendant,
Brien M. Penn                                       ExxonMobil Corporation
VENABLE LLP
Two Hopkins Plaza, Suite 1800
Baltimore, MD 21201-2978

Robin L. Greenwald                                 Plaintiffs' Liaison Counsel
Weitz & Luxenberg, PC                              for MDL 1358
180 Maiden Lane, 17th Floor
New York, NY 10038

Peter J. Sacripanti                                Defendant's Liaison Counsel
McDermott, Will & Emery                            for MDL 1358
50 Rockefeller Plaza
New York, NY 10020

Dated: October 3, 2005

Robert L. Hanley, Jr.

LAW OFFICES
NOLAN, PLUMHOFF
& WILLIAMS,
CHARTERED

13

Exhibit 3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 1 7 2005

FILED
CLERK'S OFFICE

*DOCKET NO. 1358*

# *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION*

*James Quinn, et al. v. Shell Oil, Inc., et al.*, N.D. California, C.A. No. 3:04-5180
*Hope Koch, et al. v. John R. Hicks, et al.*, D. Maryland, C.A. No. 1:04-3345

## *BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,\* ROBERT L. MILLER, JR., KATHRYN H. VRATIL\* AND DAVID R. HANSEN, JUDGES OF THE PANEL*

### *TRANSFER ORDER*

Presently before the Panel are motions by plaintiffs in these two actions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), to vacate the Panel's order conditionally transferring the actions to the Southern District of New York for inclusion in the Section 1407 proceedings occurring there in this docket. The oil company defendants[1] favor inclusion of these actions in MDL-1358 proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that these actions share questions of fact with actions in this litigation previously transferred to the Southern District of New York arising out of allegations that defendants knew about and misrepresented the nature of MTBE resulting in drinking water contamination. Transfer of these actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Pending motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). The Panel further finds that transfer of these actions is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. In that order, the Panel held that the Southern District of New York was a proper Section 1407 forum for actions involving allegations relating to MTBE contamination. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000).

---

\* Judge Motz took no part in the decision of this matter as it relates to the Maryland *Koch* action. Judge Vratil took no part in the decision of both actions.

[1] In *Quinn*: Shell Oil Company, Atlantic Richfield Company, BP Products North America Inc., and Union Oil of California; and in *Koch*: ExxonMobil Corporation.

- 2 -

Opponents argue that the presence of individual and/or local questions of fact as well as differing legal theories in these actions should militate against inclusion of these actions in Section 1407 proceedings. We are unpersuaded by these arguments. Indeed, inclusion of these actions in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. *See In re StarLink Corn Products Liability Litigation*, 152 F.Supp.2d 1378 (J.P.M.L. 2001). It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or actions can be remanded to their transferor districts for trial in advance of the other actions in the transferee district. Should the transferee judge deem remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L.,199 F.R.D. at 436-38.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

Exhibit 4

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**DEC - 2 2005**

FILED
CLERK'S OFFICE

## *DOCKET NO. 1358*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION*

*Carl G. Morgan, et al. v. ExxonMobil Corp.*, **D. Maryland, C.A. No. 1:05-108**
*Anthony Sanguino, et al. v. Bain's Automotive, Inc., et al.*, **D. New Jersey, C.A. No. 2:05-3743**

## *BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL*

### *TRANSFER ORDER*

Presently before the Panel are motions by plaintiffs in these two actions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), to vacate the Panel's orders conditionally transferring the actions to the Southern District of New York for inclusion in the Section 1407 proceedings occurring there in this docket. Defendant Exxon Mobil Corp. favors inclusion of these actions in MDL-1358 proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that these actions share questions of fact with actions in this litigation previously transferred to the Southern District of New York arising out of allegations that defendants knew about and misrepresented the nature of MTBE resulting in drinking water contamination. Transfer of these actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Any pending or anticipated motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). The Panel further finds that transfer of these actions is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. In that order, the Panel held that the Southern District of New York was a proper Section 1407 forum for actions involving allegations relating to MTBE contamination. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000).

Opposing plaintiffs argue that the presence of individual and/or local questions of fact as well as differing legal theories in these actions should militate against inclusion of these actions in Section 1407 proceedings. We are unpersuaded by these arguments. Indeed, inclusion of these actions in

---

* Judge Motz took no part in the decision of this matter.

- 2 -

Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. *See In re StarLink Corn Products Liability Litigation*, 152 F.Supp.2d 1378 (J.P.M.L. 2001).  It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or actions can be remanded to their transferor districts for trial in advance of the other actions in the transferee district. Should the transferee judge deem remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L.,199 F.R.D. at 436-38.

    IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

                    FOR THE PANEL:


                    Wm. Terrell Hodges
                    Chairman

Exhibit 5

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY

|  |  |
|---|---|
| **JOHN F. LARRABEE** <br> and <br> **BARBARA LARRABEE** <br> 3507 Hampshire Glen Court <br> Phoenix, MD 21131 | * <br> * <br> * <br> * <br> * <br> * |

**JOHN F. LARRABEE**
and
**BARBARA LARRABEE**
3507 Hampshire Glen Court
Phoenix, MD 21131

   *and*

**PAUL DIPINO JR.**
and
**GINA M. DIPINO**
3525 Southside Avenue
Jacksonville, MD 21131

   *and*

**CHARLES R. RIEGGER JR.**
and
**GINA DIPINO-RIEGGER**
3527 Southside Avenue
Jacksonville, MD 21131

      **Plaintiffs**

   *versus*

**EXXON MOBIL OIL CORPORATION**
f/k/a EXXON CORPORATION
1251 Avenue Of The Americas
New York, NY 10020

     Serve On:
     **CSC-Lawyers Incorporating**
     **Service Company**
     **11 East Chase Street**
     **Baltimore, MD 21202**

   *and*

**STORTO ENTERPRISES**
d/b/a Jacksonville Exxon
14258 Jarrettsville Pike
Phoenix, MD 21131

CASE NO.   *C-06-2997*

**JURY TRIAL REQUESTED**


RECEIVED AND FILED
08 MAR 17 PH 3: 55
BALTIMORE COUNTY

1

| | |
|---|---|
| **Serve On:** | * |
| **PATRICK STORTO** | * |
| **2113 Laurel Brook Road** | * |
| **Fallston, Maryland 21047** | * |
| | * |
| **Defendants** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, the Law Offices of Peter G. Angelos, a Professional Corporation, for their Complaint against the above-named Defendants, allege, upon information and belief, as follows:

## I. PARTIES AND PROPOSED CLASS REPRESENTATIVES

1.   Plaintiffs and Proposed Class Representatives are property owners and citizens of Baltimore County, State of Maryland, and currently reside in Jacksonville/Phoenix, Maryland. Their water supply is threatened by and/or contaminated with gasoline that contains, among other things, methyl tertiary-butyl ether, herein referred to as "MTBE", as well as other volatile gasoline constituents.

a.   John and Barbara Larrabee, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy with their two minor children a single-family dwelling unit located at 3507 Hampshire Glen Court in Phoenix, Maryland 21131. They have occupied the premises since 1999. Their drinking water is supplied by a well located on their property and has tested positive for the presence of gasoline constituents including MTBE. In one instance, MTBE was detected at 57.1 parts per billion ("ppb"), well over the state action level of 20 ppb. They also have a second well on their property, which serves as a back-up drinking water supply and is used for watering the lawn and other outdoor purposes. The water

2

from this well has had detections of MTBE and has gone dry since the gasoline recovery efforts began at the Jacksonville Exxon.

b. Paul DiPino Jr. and Gina M. DiPino, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3525 Southside Avenue in Jacksonville, Maryland 21131. They have resided in their home with their four minor children since 1997. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. Although one VOC was detected, no gasoline constituents were detected at that time. However, based on the proximity of his home to the source of contamination, and the proximity of their home to wells found to be contaminated with MTBE, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water.

c. Charles R. Riegger Jr. and Julia DiPino-Riegger, Plaintiffs and Proposed Class Representatives, are citizens and residents of Maryland, who own and occupy a single-family dwelling unit located at 3527 Southside Avenue in Jacksonville, Maryland 21131. They have resided in their home since May 2004. Their water is supplied by a well located on their property, which was tested for gasoline and volatile organic constituents ("VOCs"), including MTBE, on March 2, 2006. No VOCs were detected at that time. However, based on the proximity of his home to the source of contamination, and the proximity of their home to wells found to be contaminated with MTBE, their well supply is imminently threatened by the contamination of the aquifer from which they draw their water. Moreover, having had two heart transplants, Mr. Riegger's immune system is compromised, and he is currently taking numerous medications for his condition. Consequently, he is highly sensitive to toxins of any kind.

3

2. Defendant Exxon Mobil Corporation, formerly known and d/b/a Exxon Corporation (collectively referred to herein as "Exxon")[1] is a New Jersey corporation with its principal place of business in New York City, New York.

3. Defendant Exxon was and is a duly organized foreign corporation authorized to do business in the State of Maryland.

4. Defendant Exxon was and is a duly organized foreign corporation transacting business in the State of Maryland.

5. Defendant Storto Enterprises (referred to hereinafter as "Storto"), d/b/a Jacksonville Exxon, is a Maryland corporation with it principal place of business in Jacksonville, Baltimore County, Maryland.

6. Defendant Storto was and is a duly organized domestic corporation authorized to do business in the State of Maryland.

7. Defendant Storto was and is a duly organized domestic corporation transacting business in the State of Maryland.

8. Defendant Storto operates the Jacksonville Exxon, including through a licensing, franchise, and/or other agreement with Defendant Exxon. Regarding matters complained of herein, both Defendants have acted in concert throughout the relevant period; hence, any allegation involving Defendant Exxon applies equally to Defendant Storto.

9. Defendant Exxon owns the real property known as the Jacksonville Exxon, located at 14258 Jarrettsville Pike, Phoenix, Maryland 21131. In addition, upon information and belief, Defendant Exxon, with Defendant Storto, exercises legal authority over and/or otherwise

controls the Jacksonville Exxon. On information and belief, Defendant Exxon is also responsible for maintaining underground storage tanks and associated piping, above-ground dispensers and associated systems and supplies all fuel products to this location in the 14200 block of Jarrettsville Pike, Phoenix, Maryland 21131.

WHEREFORE, jurisdiction is proper in the Circuit Court for Baltimore County, State of Maryland.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, the provisions of Maryland Code, Courts & Judicial Proceedings Article, Sec. 1-501. This Court has personal jurisdiction over the Defendants pursuant to, *inter alia*, the provisions of Courts & Judicial Proceedings Article, Secs. 6-102 and 6-103.

11. Venue is proper in the Circuit Court for Baltimore County pursuant to, *inter alia*, the provisions of the Maryland Code, Courts & Judicial Proceedings Article, Secs. 6-201, 6-202.

## II. CLASS ACTION ALLEGATIONS

12. Plaintiffs bring this action, pursuant to Rule 2-231 of the Maryland Rules of Civil Procedure, on behalf of themselves and all others similarly situated, as representative members of the following proposed sub-classes of (a) property owners and (b) medical monitoring.

a. Property Owners: All persons (and/or entities) owning real property located within or in close proximity to the plume of groundwater contamination who have suffered a legal injury as a result of contamination with MTBE, and/or other gasoline constituents, leaking and/or otherwise released from the Jacksonville Exxon causing diminution in property value and/or other damages.

---

[1] The entity Exxon Mobil was formed as a result of a merger on November 30, 1999 between Exxon Corporation and Mobil Corporation. Herein, any reference to Exxon Mobil is a corresponding reference to its predecessor

b.   Medical Monitoring: All persons who now, or during the relevant time periods, owned and/or occupied residential dwelling units with on-site drinking wells situated in the Jacksonville/Phoenix, also known as Four Corners, area of Baltimore County, State of Maryland and located within or near the plume of contamination who ingested, on more than one occasion, water drawn from a contaminated well.

The officers, directors and agents of the Defendants are specifically excluded from the proposed class.

13. Numerosity of the Class.  Maryland Rule 2-231(a)(1).  Plaintiffs are unable to state with precision the exact size of the class (and subclasses) noted above, but believe that it is so numerous that individual joinder of all of its members is impracticable.  While the exact number and identities of class members are unknown, reliable estimates suggest that there are in excess of 100 class members in the State of Maryland.  The ultimate identity of class members will be readily ascertainable by virtue of public tax, title and land records.

14. Existence and Predominance of Common Questions of Law and Fact.  Maryland Rule 2-231(a)(2) and 2-231(b)(3).  Common questions of law and fact exist as to all members of the class.  These questions predominate over any questions affecting only individual members of the class.  These common legal and factual questions include, but are not limited to, the following:

a.   Whether the existence of MTBE, and other volatile gasoline constituents, in groundwater creates a health hazard to residents;

b.   Whether contamination of groundwater by MTBE, and/or other volatile gasoline constituents adversely affects or impairs the market value of residential and/or commercial property;

---

entities (or entity, as the case may be) Exxon Corporation and/or Mobil Corporation.

c.   Whether Defendants leaked MTBE, and/or other volatile gasoline constituents, into the ground and/or groundwater in violation of law;

d.   Whether MTBE, and/or other volatile gasoline constituents, reached the soil and/or groundwater beneath the homes in the Jacksonville/Phoenix area of Baltimore County;

e.   Whether the Defendants should be required to contribute to a court-administered fund to pay for the abatement of MTBE, and/or other volatile gasoline constituents, in the ground and/or groundwater of residents located in the Jacksonville/Phoenix area of Baltimore County, State of Maryland;

f.   Determination of the damages sustained by each member of the property owners' sub-class;

g.   Determination of the necessity for medical monitoring and the extent, frequency and duration of that medical monitoring for the medical monitoring sub-class.

15.   Typicality of Claims.  Maryland Rule 2-231(a)(3).  Plaintiffs claims are typical of the claims of members of the class, all of whom have been damaged or will be damaged by virtue of their ownership and occupation of land within the area of the groundwater contamination. Plaintiffs and all members of the class have sustained and will continue to sustain damages and injuries arising out of Defendants' tortious conduct.

16.   Adequacy of Representation.  Maryland Rule 2-231(a)(4).  Plaintiffs are adequate representatives of the class because they are members of the class and their interests do not conflict, but are identical with the interests of the members of the class they seek to represent. They have retained counsel competent and experienced in the prosecution of complex civil actions in the areas of tobacco and asbestos litigation and they intend to prosecute this action

vigorously for the benefit of the class. The interest of the members of the class will be fairly and adequately protected by Plaintiffs and their counsel.

17. Superiority. Maryland Rule 2-231(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this litigation. Individual litigation is both impracticable and unnecessary under the model proposed herein. Class members are all identically united in their injuries. All are damaged by virtue of their present and/or prior ownership of properties situated within the plume of contamination and their ingestion and/or exposure to MTBE and/or other volatile gasoline constituents. Proof of damage is established by demonstrating the existence of MTBE, and/or other volatile gasoline constituents, groundwater contamination, the cost of abatement, and the loss of property value resulting therefrom. All members of the class suffered potential injury as a result of their ingestion and/or exposure to MTBE and/or other volatile gasoline constituents. All are entitled to prompt and accurate diagnosis and treatment of MTBE, and/or other volatile gasoline constituents, induced health problems.

No individual issues predominate in this case, because membership in the class is premised upon proof of ownership and occupancy of premises located within the area of groundwater contamination and exposure and/or ingestion of MTBE, and/or other volatile gasoline constituents, contained in their well water. In all respects, individual litigation would be identical to the class action litigation. Yet, individual litigation would be unduly burdensome to the courts and to damaged claimants. Individual litigation further presents a potential for inconsistency or contradictory judgments and would increase delay and expense to all parties and the court system in resolving the complex issues of the case. This delay and expense would be particularly inefficient in this case, where the injuries sustained by all claimants is similar. In

addition to being inefficient, the delay and increased expense of individual cases would be unfair and prohibitively expensive to individual property owners. The class action device proposed herein provides the benefits of a single adjudication, economies and skill, and comprehensive supervision by a single court of hundreds of claims which are identical in all respects. In every respect, class action is the best method for the fair and efficient adjudication of this litigation. Notice of the pendency and any resolution of this class action can be provided to class members by publication and broadcast.

18. The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Maryland Rule 2-231(b)(1) and/or 2-231(b)(2) because:

a.   The prosecution of separate actions by the individual class members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, thus establishing incompatible standards of conduct for the Defendants;

b.   The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other class members not parties to such adjudications or would substantially impair or impede the ability of such non-party class members to protect their interests; and,

c.   The Defendants has acted or refused to act on grounds generally applicable to the class, thereby making appropriate and final injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate.

## IV. FACTS COMMON TO ALL COUNTS

19. The Jacksonville Exxon, located in the 14200 block of Jarrettsville Pike, has been in operation since 1984 as a gasoline filling station.

20. The Jacksonville Exxon property contains four[2] underground storage tank ("UST") systems for the storage of gasoline that, until the recent release, were in operation.

21. On or about January 12, 2006, a contractor performing routine maintenance on the underground storage tank system allegedly drilled a pencil-sized hole in the piping for unleaded, regular gasoline.

22. As a result of the incident, the station's automatic leak detection alarm was triggered and sent a signal to Defendant Exxon's monitoring center in North Carolina. Defendant Exxon sent a contractor to investigate the cause of the alarm. After examining the system, Defendant Exxon's contractor determined that the reason for the alarm was a malfunctioning component of the fuel dispensing system and replaced the component.

23. On information and belief, from approximately January 13, 2006 until February 17, 2006, inventory records of the Jacksonville Exxon reflected substantial discrepancies. However, Defendants failed to investigate the possibility of a leak or to inform the Maryland Department of the Environment ("MDE") until on or about February 17, 2006, when Defendants reported that 15 feet of gasoline was found in an on-site monitoring well.

24. On or about February 17, 2006, the MDE directed Defendants to cease operations at the Jacksonville Exxon and to begin recovery operations by installing wells in the source area and on surrounding properties.

25. On or about February 18, 2006, Defendants sampled the on-site monitoring wells for VOCs, including methyl tertiary butyl ether ("MTBE"), a gasoline additive. Elevated levels above state cleanup standards of gasoline constituents, including benzene, ethylbenzene, toluene,

---

[2] The UST registration indicates that there are two 8,000-gallon (gasoline), one 12,000-gallon (gasoline), and one 10,000-gallon (diesel), double-walled, fiberglass tanks.

xylene (collectively referred to as "BTEX"), and MTBE, were found in two of the monitoring wells. The highest level of MTBE was detected in MW-1 at 434,000 parts per billion ("ppb").

26. On or about February 21, 2006, the MDE directed Defendants to sample all drinking water wells located within a half-mile southwest of and select supply wells north of the Jacksonville Exxon. Results of this sampling round indicated the presence of dissolved MTBE in several wells. Gasoline was found in the well of a commercial facility immediately northeast of the Jacksonville Exxon, and the MDE ordered Defendants to provide an alternate water source to the commercial property and to begin recovery of liquid phase petroleum from that well.

27. On or about February 21, 2006, Defendants again sampled on- and off-site monitoring wells for VOCs. MTBE and BTEX were found in four monitoring wells (MW-1, MW-5, MW-8, MW-9). MTBE in MW-1 increased to 565,000 ppb.

28. From its review of the Jacksonville Exxon inventory records, the MDE estimated that 25,000 gallons of regular unleaded gasoline was released, with an average daily loss of over 675 gallons over a 37-day period.

29. By February 24, 2006, Defendants had installed 31 monitoring wells on and off-site.

30. On or about February 24, 2006, Defendants again sampled on- and off-site monitoring wells for VOCs. MTBE and BTEX were found in eleven of the thirteen monitoring wells sampled. MTBE in MW-1 increased to 779,000 ppb.

31. Free gasoline product was found in eleven of the new monitoring wells installed between February 17 and 24, 2006.

32. On or about March 2, 2006, the MDE verbally directed Defendants to sample all drinking water supply wells located within a half-mile northeast of the Jacksonville Exxon.

11

33. As of March 10, 2006, Defendants have recovered 7,275 gallons of liquid phase gasoline product from selected monitoring wells and have installed 66 monitoring wells in the area. MTBE has been detected at some level in the water supply wells of over 40 properties in the Jacksonville/Phoenix area. Upon information and belief, it is impossible to recover all the gasoline lost.

34. MTBE is a chemical compound designed to increase the oxygen content of gasoline. MTBE is a member of a class of chemical compounds, called ethers, whose unique properties have enhanced solubility in water and chemical attraction to water molecules. It is produced from methanol and isobutylene, a by-product of the gasoline-refining process.

35. MTBE is many times more soluble in water than other components of gasoline. MTBE is "hydrophilic" or water seeking and travels rapidly through soil into groundwater. As a result, whenever MTBE is released into the environment it has the ability to infiltrate aquifers and contaminate wells drawing from those aquifers. At a certain point of contamination, MTBE's foul taste and odor render water unusable and unfit for human consumption. The chemical make-up of MTBE also allows it to persist in underground aquifers for decades at a time.

36. MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to the other common gasoline components such as the BTEX compounds. When MTBE and gasoline are spilled on the ground, the BTEX compounds tend to absorb or bind to soil. In contrast, MTBE does not adhere to the soil particles but instead travels rapidly through soil, mixing with water and contaminating underground aquifers.

37. MTBE not only travels faster and further from spill and leak sources and is found in far higher concentrations as a groundwater contaminant than BTEX compounds, it also is slow to

degrade or break down once it is released into the environment, particularly in the subsurface of the ground. Because of its "recalcitrance," plumes of MTBE can persist in underground aquifers for decades.

38. The greater the MTBE content of gasoline, the higher the risk to water. However, even small concentrations of MTBE create an enhanced threat to groundwater.

39. In or around June of 1984, the American Petroleum Institute ("API"), a trade association and agent of Defendant Exxon, indicated potential for rapid migration of MTBE and noticeable taste and odor from water contaminated with MTBE.

40. A 1986 report by Peter Garrett, et al. (hereinafter referred to as the "Garrett report") analyzed MTBE groundwater contamination at two sites in Maine. This report was known to the industry. The Garrett report showed that high levels of MTBE contamination could result from gasoline containing low concentrations of MTBE. It reported findings of extremely high concentrations of MTBE in the water and relatively low or no concentrations of other gasoline components. The Garrett report concluded that MTBE, because of its solubility in water and recalcitrance to biodegradation and clean-up, posed an unusual threat to groundwater.

41. MTBE is a known animal carcinogen that has been linked to many potential human health problems. The United States Environmental Protection Agency has classified MTBE as a possible human carcinogen.

42. Every year over nine million gallons of gasoline with MTBE escape into the environment in the United States, including from storage of MTBE. Thousands of gallons also enter the ground from gas stations, including from underground storage tanks.

43. The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. According to a report by a

special EPA Blue Ribbon Panel, MTBE is a "threat to the nation's drinking water resources," has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used.

44. Defendants' storage of gasoline at the Jacksonville Exxon has produced an underground "plume" (or other leakage) that has contaminated or threatens to contaminate nearby properties (including Plaintiffs' properties). Such MTBE contamination has occurred with Defendants' knowledge. Such contamination poses known, material health risks to nearby residents due to contamination of the water supply. Such contamination has also had an immediate, material adverse impact upon the real property of nearby property owners (including the value of Plaintiffs' properties). Such MTBE leakage includes into the soil, into ground wells, and/or into the groundwater of affected properties.

45. The Defendants were aware of the properties and dangers of MTBE.

46. Clean water is a basic and most precious resource as well as a fundamental commodity of incalculable value. Water serves direct human needs and also supports wild life and natural resources that contribute to the health, economy, and general well being of the people of Baltimore County, Maryland.

47. Defendants were aware that residents in the Jacksonville/Phoenix area are supplied water through individual wells located on Plaintiffs' properties.

48. Defendants have a duty to use care when conducting activities on their property so as to avoid causing harm to the neighboring properties, but have breached that duty by threatening and/or recklessly contaminating and poisoning the individual wells that supply water in the Jacksonville/Phoenix area of Baltimore County, Maryland.

49. As a result of MTBE water contamination, Plaintiffs have been placed at an increased risk of cancer and risk of exacerbation of current medical conditions.

50. Plaintiffs' property values will suffer as a result of Defendants' contamination.

51. Plaintiffs may be required to expend large sums of money to remediate MTBE contamination of their land caused by the introduction of MTBE into their water supply and to develop a new and/or alternative source(s) of water. This remediation includes, but is not limited to, to purchase, installation and maintenance of granular carbon activation systems and continual testing of Plaintiffs' water supply.

52. The harm suffered by Plaintiffs was the result of Defendants' acts and omissions. Such acts and omissions were actuated by actual malice or accompanied by a wanton or willful disregard for the safety of product users, consumers and others who foreseeably might be harmed by the leak of gasoline-containing MTBE, and/or other volatile gasoline constituents, including Plaintiffs. Defendants engaged in intentional wrongdoing by failing to appropriately monitor and control underground storage tank systems that they knew were capable of leaking volatile chemicals into the ground and groundwater and contaminate drinking water. Defendants failed to remediate the threat and/or contamination. Defendants allowed this contamination to spread without warning Plaintiffs or the surrounding area and without concern for the health and safety of the citizens of the Jacksonville/Phoenix area, including Plaintiffs.

# V. CAUSES OF ACTION

## Count 1: Negligence

53.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 52 inclusive.

54.  Defendants stored gasoline-containing MTBE, and/or other volatile chemical constituents, including benzene, at the Jacksonville Exxon.

55.  Defendants knew or should have known that if gasoline-containing MTBE, Benzene and/or other volatile gasoline constituents were spilled or released into soil, it would mix with groundwater and spread its toxic plume over great distances without biodegradation or bioremediation.

56.  Defendants owed Plaintiffs a duty of due care which could be satisfied by safe and proper use, management, storage and sale of all petroleum-related products.  Defendants had a specific duty to prevent the discharge and release of such substances which might harm the persons, property or economic interests of Plaintiffs.  Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to toxic and hazardous substances and to warn or notify Plaintiffs that discharges or releases of these substances had occurred, were likely to occur in the future and threaten Plaintiffs.

57.  Defendants breached these duties by their negligent, and reckless management, storage, and use of its petroleum-related products.  Such conduct was in noncompliance with applicable regulations and guidelines.  Defendants' reckless, negligent and illegal conduct resulted in the actual dangerous releases of hazardous and toxic substances into the Plaintiffs' water supply.  These actual and continued releases and discharges have subjected Plaintiffs to unreasonable risk of harm, threat of future harm, and to actual injuries to their property,

economic interests and persons.  Defendants also failed to warn Plaintiffs of the actual and

threatened releases of such substances and of the reasonably foreseeable effects of such releases,

an omission that was reckless, grossly negligent and/or negligent.  Finally, Defendants failed to

and continue to fail to act to prevent  the release of these volatile chemicals from harming

Plaintiffs.

58.  Defendants' negligence was a direct and proximate cause of injuries to Plaintiffs

causing both actual present harm to Plaintiffs' property and economic interests and creating an

increased risk of personal harm to Plaintiffs.  Plaintiffs are entitled to recover damages for such

injuries and anticipated additional costs for their damages.

59.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries

and damages.  Damages will be determined at trial and are in excess of TWENTY-FIVE

THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a.  A declaration by the Court that Defendants have been and continue to be in

violation of the above legal duties;

b.  Compensatory damages in an amount in excess of this Court's minimal

jurisdictional limits;

c.  For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE

MILLION DOLLARS ($535,000,000.00);

d.  An Order enjoining Defendants from allowing the continued migration of MTBE,

and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited

to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from

that location;

    e.  Awarding Plaintiffs damages for diminution in their property values;

    f.  Requiring Defendants to connect Plaintiffs with a new primary water source;

    g.  Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

    h.  Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

    i.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

    j.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

    k.  Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction in quality of life, lost wages and reasonable medical expenses;

    l.  Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

    m.  Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

    n.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 2: Strict Liability

60. Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 59 inclusive.

61. The use and storage of gasoline containing MTBE is an abnormally dangerous activity in this context, exposing persons patronizing nearby businesses, working and living near the Jacksonville Exxon to a severe risk of harm, regardless of the degree of caution which Defendants might have exercised.

62. Upon information and belief, Defendants knew of the environmental and health hazards associated with the release of gasoline constituents. Although Plaintiffs maintain that Defendants' activities are abnormally dangerous *per se*, the location of such activities in a well-populated area, such as Jacksonville/Phoenix, that relies on groundwater as a water resource independently renders them abnormally dangerous.

63. As a direct and proximate result of Defendants' sale and storage of gasoline containing MTBE, contaminants were released into the environment, thereby injuring Plaintiffs. Injuries include actual present harm to Plaintiffs' property and economic interests, and potential future harm to Plaintiffs due to the threat of future contamination. These injuries constitute the type and harm which make the activities abnormally dangerous.

64. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages for which the Defendants are liable. Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continue to be in violation of the above legal duties;

b.  Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c.  For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d.  An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e.  Awarding Plaintiffs damages for diminution in their property values;

f.  Requiring Defendants to connect Plaintiffs with a new primary water source;

g.  Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

h.  Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

i.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

j.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k.  Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction of quality of life, lost wages and reasonable medical expenses;

l.  Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

m.  Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

### COUNT 3: PRIVATE NUISANCE

65.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 64 inclusive.

66.  At all times material hereto, Plaintiffs were in lawful possession of their land. Defendants' use, occupation, storage and sale of gasoline from the Jacksonville Exxon has resulted in an unreasonable and continuous invasion of Plaintiffs' property, which has materially diminished the value of the Plaintiffs' property and seriously interfered with their rights to use and enjoy their property.

67.  Specifically, Defendants' unreasonable emission, disposal and release of toxic and hazardous substances into Plaintiffs' drinking water supply is substantially offensive, discomforting and annoying to persons of ordinary sensibilities, tastes and habits.

68.  Defendants' interference with Plaintiffs' rights was so unusual and excessive that it necessarily caused and continues to cause injury, damage, harm and inconvenience to Plaintiffs. Plaintiffs' specific damages include, but are not limited to, obtaining an alternate water supply for their personal use and remediation costs attributable to the presence of MTBE, and/or other volatile gasoline constituents, on their property.

69. Defendants' use, occupation, storage and sale of gasoline from Jacksonville Exxon has resulted in an entry and intrusion, and the continued entry and intrusion onto the property of Plaintiffs without privilege, permission, invitation or justification.

70. Defendants' conduct directly and proximately caused and continues to cause Plaintiffs' injuries, including actual or increased harm to their property and economic interests and injuries to their persons. Plaintiffs are entitled to recover damages for such injuries. Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continue to be in violation of the above legal duties;

b. Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c. For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d. An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e. Awarding Plaintiffs damages for diminution in their property values;

f. Requiring Defendants to connect Plaintiffs with a new primary water source;

22

g.  Requiring Defendants to pay all excess future costs incurred by Plaintiffs for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

h.  Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

i.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

j.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k.  Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction of quality of life, lost wages and reasonable medical expenses;

l.  Establishing a court monitored trust fund for medical monitoring of Plaintiffs and the Class;

m.  Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## COUNT 4: PUBLIC NUISANCE

71.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 70 inclusive.

72. The conduct complained of herein unreasonably interferes with the rights of the community at large to use the bedrock aquifer as a drinking water supply. The contamination of the bedrock aquifer will persist for many years, if not permanently, and has rendered the aquifer unfit for use by all present and future members of the community at large.

73. The contamination of the aquifer with gasoline constituents significantly interferes with the public health, safety, comfort and convenience. Benzene is a known human carcinogen. MTBE is a known animal carcinogen and may be a human carcinogen.

74. The contamination of the waters of the State is proscribed by both federal and state law.

75. Defendants' conduct directly and proximately caused and continues to cause a public nuisance. Injunctive relief is the only reasonable means to abate this nuisance, and the public interest is served by granting the requested injunctive relief. Each of the class members has suffered a specific harm different from the public at large.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continues to be in violation of the above legal duties;

b. An Order enjoining Defendants from allowing the continued migration of MTBE, and/or other volatile gasoline constituents, into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

c. Requiring Defendants to provide a new primary water source;

d.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged and continues to discharge into Plaintiffs' water supply;

e.  An Order mandating that Defendants and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

f.  Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class; and

g.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

### COUNT 5: TRESPASS

76.  Plaintiffs reallege and incorporate by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 75 inclusive.

77.  Plaintiffs were at all relevant times in possession of land they owned and/or occupied.

78.  Upon information and belief, Defendants knew its intentional discharge of contaminants had migrated or was likely to migrate into Plaintiffs' drinking water supply.

79.  Upon information and belief, despite Defendants' knowledge of the harm the practices at the Jacksonville Exxon were causing Plaintiffs, Defendants intentionally persisted in its conduct and continued to discharge contaminants into the groundwater and surrounding soil.

80.  Upon information and belief, the discharge, which Defendants knew or should have known was migrating into Plaintiffs' drinking water supply and property, constitutes an actual and/or constructive trespass, because the discharge interfered and continues to interfere with the Plaintiffs' interests in the exclusive possession their land.

81. Upon information and belief, Plaintiffs' real property continues to be threatened, exposed to and/or contaminated by hazardous chemicals and materials emanating from the Jacksonville Exxon.

82. Defendants' use, occupation, storage, ownership and sale of gasoline from the Jacksonville Exxon has resulted in an entry and intrusion onto Plaintiffs' property without privilege, permission, invitation or justification.

83. Defendants' conduct directly and proximately caused Plaintiffs' injuries, including actual physical harm to property and economic interests and an increased risk of future harm to their persons. Plaintiffs are entitled to recover damages for such injuries. Damages will be determined at trial and are in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) for each Plaintiff.

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaration by the Court that Defendants have been and continues to be in violation of the above legal duties;

b. Compensatory damages in an amount in excess of this Court's minimal jurisdictional limits;

c. For punitive damages in the amount of FIVE HUNDRED THIRTY FIVE MILLION DOLLARS ($535,000,000.00);

d. An Order enjoining Defendant from allowing the continued migration of MTBE into Plaintiffs' water supply including, but not limited to, cessation of all operations at the Jacksonville Exxon and removal of all toxic substances from that location;

e. Awarding Plaintiffs damages for diminution in their property values;

f.  Requiring Defendants to connect Plaintiffs and the Class with a new primary water source;

g.  Requiring Defendant to pay all excess future costs incurred by Plaintiffs and the Class for public water and/or private water, including the costs of installment and maintenance of granular carbon activation systems and continued water testing;

h.  Requiring Defendants to pay all of Plaintiffs' costs for alternate water obtained as a result of the contamination of Plaintiffs' drinking water supply;

i.  Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that Defendants caused to be discharged into Plaintiffs' water supply;

j.  An Order mandating that Defendants, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

k.  Awarding Plaintiffs sufficient sums to compensate them for past, present and future pain and suffering, inconvenience, reduction in quality of life, lost wages and reasonable medical expenses;

l.  Establishing a court supervised trust fund for medical monitoring of Plaintiffs and the Class;

m.  Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorney's fees recoverable by law; and

n.  Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

Respectfully submitted,

_____
Mary V. Koch
Karyn S. Bergmann
Law Offices of Peter G. Angelos, P.C.
100 North Charles Street, 22nd Floor
Baltimore, MD  21201
(410) 649-2000

Attorneys for Plaintiffs

## PRAYER FOR JURY TRIAL

Plaintiffs elect to have their case tried before a jury.

_____
Mary V. Koch

Exhibit 6

HOPE KOCH                                    *       IN THE
FRANK KOCH
2310 Franklin's Chance Court                 *       CIRCUIT COURT
Fallston, Maryland  21047,
                                             *       FOR
          Plaintiffs,
                                             *       HARFORD COUNTY
       —versus—
                                             *
JOHN R. HICKS (d/b/a Crossroads Exxon)
2800 Fallston Road                           *       Case No. 12-C-04-1834
Fallston, Maryland  21047,
                                             *
    SERVE ON:
    John R. Hicks                            *       **CLASS ACTION COMPLAINT**
    1040 Alexandria Way
    Bel Air, Maryland  21014,                *

       —and—                                 *       **JURY TRIAL DEMANDED**

EXXONMOBIL OIL CORPORATION                   *
(d/b/a Exxon Corporation)
5959 Las Colinas Boulevard                   *
Irving, Texas  75039,
                                             *
    SERVE ON:
    CSC-Lawyers Incorporating Serv. Co.      *
    11 East Chase Street
    Baltimore, Maryland  21202,              *

          Defendants.                        *

*     *     *     *     *     *     *     *     *

Case: C-04-1834
CIVIL
APPEARANCE FE              20.00
CV CLERK FEE-             80.00
MD. LEGAL SER            25.00
* TOTAL *               125.00
Rec# HA01    Rcpt # 78106
JUR    KDH    Blk # 1403
Jun 30, 2004          08:35 am

## CLASS ACTION COMPLAINT

NOW COME Plaintiffs, Hope and Frank Koch, by and through undersigned

counsel, to allege and to seek relief from the honorable Court against Defendants, as

follows:

## INTRODUCTION

FILED

1.      This action involves the unlawful and wrongful storage of MTBE, such

tortious activity causing substantial property damage and materially increased health risks

04 JUN 30  AM 8: 35

_____ CIRCUIT CT
HARFORD COUNTY, MD

23082

#2009

to homeowners and/or residents of properties in the vicinity of the Crossroads Exxon (a/k/a Upper Crossroads Exxon) located at 2800 Fallston Road, Fallston, Maryland.

2.    As detailed further herein, this action is a proposed class action filed pursuant to Maryland Rule 2-231.  Plaintiffs and one proposed sub-class seek medical monitoring relief, as requested herein (the "Monitoring Sub-Class").   Additionally, Plaintiffs and one proposed sub-class seek redress for economic and other damage (including property damages) suffered as a proximate result of Defendants' tortious conduct (the "Homeowners' Sub-Class").

## PARTIES

3.    Plaintiffs Hope Koch and Frank Koch (a/k/a Franklin Koch) own, and reside at, the real property known as 2310 Franklin's Chance Court, Fallston, Maryland, 21047.  Plaintiffs' Franklin's Chance Court property has been contaminated with MTBE as a result of Defendants' wrongful conduct, as further alleged herein.  Plaintiffs have suffered substantial injuries and damages as a proximate result of Defendants' wrongful conduct, including economic damage, increased risk of significant adverse health problems, and/or other material non-economic damages (including increased anxiety and mental anguish).

4.    Defendant John R. Hicks, d/b/a Crossroads Exxon, resides at 1040 Alexandria Way, Bel Air, Harford County, Maryland, 21014.  Defendant Hicks operates Crossroads Exxon (hereinafter, "Upper Crossroads Exxon"), including through a licensing, franchise, and/or other agreement with Defendant ExxonMobil Oil Corporation.  Regarding matters complained of herein, both Defendants have acted in

23082                                             2

concert throughout the relevant period; hence, any allegation involving Defendant ExxonMobil Oil Corporation applies equally to Defendant Hicks.

5.       Defendant ExxonMobil Oil Corporation, d/b/a Exxon Corporation ("ExxonMobil"), owns the real property known as 2800 Fallston Road, Fallston, Maryland.  In addition, upon information and belief, Defendant ExxonMobil exercises legal authority over (and/or otherwise controls with Defendant Hicks) the Upper Crossroads Exxon located at 2800 Fallston Road, Fallston, Maryland.[1]

## VENUE

6.       Venue is proper in this jurisdiction pursuant to Maryland Code (1974, 2002 Repl.Vol.), § 6-201, *et seq.*, of the Courts & Judicial Proceedings Article:  either this jurisdiction is a venue applicable to all Defendants; or, if there is no single venue applicable to all Defendants, one (or more) of them may be sued in this venue.

7.       Each Defendant carries on a regular business, is employed, and/or habitually engages in a vocation in this jurisdiction.  *See* § 6-201(a), Courts & Judicial Proceedings Article.

## SUBJECT MATTER JURISDICTION

8.       Because the amount in controversy exceeds $10,000.00, jurisdiction is proper in this Court.  Jurisdiction is also proper in this Court because of the injunctive and/or declaratory relief sought by Plaintiffs.

---

[1]   The entity ExxonMobil was formed as a result of a merger on November 30, 1999 between Exxon Corporation and Mobil Corporation.  Herein, any reference to ExxonMobil is a corresponding reference to its predecessor entities (or entity, as the case may be) Exxon Corporation and/or Mobil Corporation.

23082                                                   3

## PERSONAL JURISDICTION

9.      This Court has personal jurisdiction over each Defendant because each Defendant resides, carries on a regular business, is employed, habitually engages in a vocation, and/or maintains principal offices in the State of Maryland.

10.     Alternately, each Defendant has sufficient minimum contacts with the State of Maryland such that this Court may properly exercise personal jurisdiction over each Defendant.   Each Defendant transacted business in the State of Maryland; contracted to supply goods, services, or manufactured products in the State; caused tortious injury in the State by an act or omission in the State; (alternately,) caused tortious injury in the State by an act or omission outside the State, yet regularly did or solicited business, engaged in other persistent courses of conduct, and/or derived substantial revenue from goods, services, or manufactured products used in the State; had an interest in, used, or possessed real property in the State; and/or acted as a surety in the State of Maryland.

## RESPONDEAT SUPERIOR

11.     Hereinafter, whenever it is alleged that any Defendant acted, or failed to act, that allegation applies equally to that respective Defendant's affiliates, representatives, servants, employees, and/or agents (whether actual, apparent, or otherwise).

## FACTUAL BACKGROUND

12.     Methyl tertiary butyl ether ("MTBE") is a chemical compound designed to increase the oxygen content of gasoline.   It is produced from methanol and isobutylene, a by-product of the gasoline-refining process.   MTBE is highly soluble and travels faster

and farther in water than other gasoline components. As a result, whenever MTBE is released into the environment it has the ability to infiltrate underground water reservoirs and contaminate wells drawing from underground aquifers. At a certain point of contamination, MTBE's foul taste and odor render water unusable and unfit for human consumption. The chemical make-up of MTBE also allows it to persist in underground aquifers for decades at a time. MTBE is a known animal carcinogen that has been linked to many potential human health problems. The United States Environmental Protection Agency has classified MTBE as a possible human carcinogen.

13. Every year over nine million gallons of gasoline with MTBE escape into the environment in the United States, including from storage of MTBE. Thousands of gallons also enter the ground from gas stations, including from underground storage tanks.

14. The United States Geological Survey has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. According to a report by a special EPA Blue Ribbon Panel, MTBE is a "threat to the nation's drinking water resources," has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used.

15. Defendants' storage of MTBE at the Upper Crossroads Exxon has produced an underground "plume" (or other leakage) of MTBE that has contaminated nearby properties (including Plaintiffs' Franklin's Chance Court property). Such MTBE contamination has occurred with Defendants' knowledge, and at the direction and/or control of Defendants. Such contamination poses known, material health risks to nearby

residents due to contamination of the water supply.  Such contamination has also had an immediate, material adverse impact upon the real property of nearby property owners (including the value of said property).  Such MTBE leakage includes into the soil, into ground wells, and/or into the groundwater of affected properties.

16.     Testing has detected MTBE in the wells of 77 homes in the Upper Crossroads area, near the Upper Crossroads Exxon.

17.     Tests have revealed extremely high levels (up to 26,000 parts per billion) in the groundwater at and/or near the Upper Crossroads Exxon.  Defendant ExxonMobil (per correspondence of 6/10/04) has acknowledged the appropriate standard for MTBE to be no more than 20 parts per billion.

18.     Defendants have been aware of specific incidents of MTBE groundwater contamination as early as 1980 (and no later than 1984).  Defendants were also aware of scientific studies describing the danger posed to groundwater by MTBE no later than 1986.  One report by a State of Maine agency recommended that MTBE be stored in double-contained facilities.  In 1987, Defendants prepared internal memoranda that echoed these concerns (and/or other related concerns) involving the storage of MTBE and/or consequences of the failure to safely store MTBE.

19.     Nonetheless, Defendants intentionally, knowingly, and deliberately withheld from all non-oil-industry parties information identified in the preceding paragraph, including information known to Defendants related to:  specific incidents of groundwater contamination; health dangers posed to humans by MTBE contamination (including those resulting from the failure to store MTBE properly); and/or other adverse consequences resulting from the failure to safely store MTBE.  Indeed, in 1986-87,

Defendants took the public positions that (*i*) further medical testing related to the health effects of MTBE exposure was unnecessary; (*ii*) MTBE was only slightly soluble in water; (*iii*) potential environmental exposure to MTBE was low; and (*iv*) MTBE had excellent degradation characteristics— all public positions which Defendants knew to be false (or misleading); this false information being put forth by Defendants exclusively for their own benefit.

20.   Defendants' conduct, as alleged in the preceding two paragraphs, continued, and continues, through the present time— including Defendants' present stated position that the MTBE contamination in the vicinity around the Upper Crossroads Exxon did *not* emanate from the Upper Crossroads Exxon; when, in fact, Defendants know with near certainty that such contamination arose (in whole or in part) from the Upper Crossroads Exxon.

21.   Particularly, an ExxonMobil spokesperson has stated that ExxonMobil has no evidence that the Upper Crossroads Exxon is the source of the MTBE contamination complained of herein.  In fact, Defendants know that statement to be false.

22.   In and before 1991 (including 1990, 1989, and before), unbeknownst to Plaintiffs and the proposed two sub-classes (collectively, the "Class"), properties in and around the Upper Crossroads Exxon were contaminated with MTBE as a result of Defendants' conduct complained of herein.  For instance, a test by the Harford County Health Department in October of 1991 revealed high levels of MTBE contamination at and/or around the Upper Crossroads Exxon, facts known to, but intentionally concealed by, Defendants.

23.     Neither Plaintiffs nor any member of the Class had knowledge of the primary matters complained of herein until June of 2004.   In addition, Defendants' fraudulent conduct, as alleged herein, tolls any applicable time-bar (including statute of limitations, laches, *etc.*).

## CLASS ALLEGATIONS

24.     Plaintiffs seek to represent the Homeowners' Sub-Class, defined as follows:

> All persons (and/or entities) owning real property in the vicinity of the Upper Crossroads Exxon who have suffered legal injury due to MTBE contamination, including those whose property has suffered diminution in value (and/or who have otherwise suffered economic damage) as a result of MTBE contamination emanating from (and/or involving) the Upper Crossroads Exxon.

25.     Plaintiffs also seek to represent the Monitoring Sub-Class, defined as follows:

> All persons residing within a 1½-mile radius of the Upper Crossroads Exxon (2800 Fallston Road, Fallston, Maryland) from 1989 until the present (inclusive) who consumed groundwater on more than one occasion drawn from any property that has tested positive for MTBE.

26.     Each sub-class is composed of numerous persons (and/or entities), primarily in Maryland.   The joinder of all Class members individually in one action would be impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.   Upon information and belief, Plaintiffs aver that the Class is composed of at least one hundred, and possibly hundreds, of members.

27.     Plaintiffs are asserting claims typical of the claims of the Class. Defendants, pursuant to a common scheme and plan, have illegally contaminated groundwater in the area of the Upper Crossroads Exxon and have intentionally concealed information related thereto.  In sum, Defendants have treated Plaintiffs and all members of the Class in a uniform, illegal manner.  Plaintiffs have no interests that conflict with, or are antagonistic to, the interests of Class members.   Plaintiffs have retained counsel competent and experienced in class actions.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The expense and burden of individual litigation may well make it impracticable for Class members, individually, to seek redress for the wrongful conduct alleged herein.

29.     Common questions of law and/or fact exist as to all members of the Class (including each sub-class) and predominate over any questions that may affect individual members.   Among the questions of law and/or fact common to the Class are the following:

    a.     Whether Defendants leaked MTBE, including into the ground and/or into the groundwater (including from the Upper Crossroads Exxon), in violation of law;

    b.     Whether MTBE reached the soil and/or groundwater beneath the homes comprising the Homeowners' Sub-Class;

    c.     If practicable, determining the damages sustained by each member of the Homeowners' Sub-Class as a proximate result of the foregoing; and

    d.     Whether medical monitoring is appropriate for each member of the Monitoring Sub-Class; and, if so, the extent and duration of same.

30.     Plaintiffs and the Monitoring Sub-Class bring this action for equitable, injunctive, and/or declaratory relief pursuant to Maryland Rule 2-231(b)(2) and/or (b)(3) to create Court-supervised relief (including any necessary funds) to provide medical monitoring as further requested, *infra*, to assure that members of the Monitoring Sub-Class receive prompt and proper diagnosis and treatment of MTBE-induced (or MTBE-related) health problems.  Class certification is appropriate pursuant to Maryland Rule 2-231(b)(2) because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable or other relief in the form of the monitoring requested herein.  Alternately, the Monitoring Sub-Class is properly certified per Rule 2-231(b)(1) because of the risks of inconsistent adjudications of similar issues.

31.     The names and addresses of Class members are readily available, whether from public records (including land records) or otherwise.  From such records, individual notice can be provided to Plaintiffs and the Class by mail or by other appropriate means; alternately, published notice and/or notice posted on the internet can also provide adequate notice.

## Count 1

## Public Nuisance

32.     The allegations set forth in paragraphs 1 through 31 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

33.     The conduct complained of herein unreasonably interferes with the rights of the community at large.

34.     The conduct complained of herein includes greater harm suffered by Plaintiffs and the Class than by the community at large (*e.g.*, economic loss, consumption of tainted groundwater, *etc.*).

35.     The conduct complained of herein has proximately caused damages to Plaintiffs and the Class.

36.     The public nuisance complained of herein is ongoing in nature, and must be abated by injunctive (or other) order of this Court as the only reasonable means to abate the nuisance.  No adequate remedy at law exists for Plaintiffs and the Class, who would be forced to institute a multiplicity of lawsuits to recover for the continuing harm caused by the nuisance.  The public interest is served by granting the requested injunctive relief.

37.     The intentional, knowingly wrongful, conduct of Defendants constitutes actual malice under Maryland law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.     Granting injunctive medical monitoring relief, as further requested herein;

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 2

### Private Nuisance

38.     The allegations set forth in paragraphs 1 through 37 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

39.     The conduct complained of herein constitutes an invasion of Plaintiffs' interest (and the Class' interest) in the private use and enjoyment of land.

40.     Defendants' conduct is a legal cause of the invasion of (and/or interference with) Plaintiffs' (and the Class') interest in the use and enjoyment of Plaintiffs' property; and the interference is either:   (*i*) intentional and unreasonable; and/or (*ii*) otherwise actionable under the rules controlling liability for reckless or other conduct.

41.     The conduct complained of herein constitutes unreasonable and/or intentional conduct that has caused, and continues to cause, substantial and unreasonable injury or interference with Plaintiffs' (and the Class') use and enjoyment of property.

42.     The conduct complained of herein is of such a nature as to diminish materially the value of the property and/or seriously interfere with the ordinary comfort and enjoyment of the property.

43.     The conduct complained of herein is unreasonable in nature, and imposes immediate, substantial, and irreparable injury upon Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.     Granting injunctive medical monitoring relief, as further requested herein;

D.     Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.     Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 3

### Trespass to Property

44.     The allegations set forth in paragraphs 1 through 43 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

45.    Defendants entered (or infringed) upon, and/or continue to enter (or infringe) upon, property (including real property) owned (or controlled) by Plaintiffs and the Class in an unlawful manner.

46.    Plaintiffs and the Class are (and/or were) in legal, equitable, and/or other beneficial possession of such property (and/or such property interest).

47.    Neither Plaintiffs nor the Class consented to, or gave legally effective permission for Defendants' trespassory conduct, as alleged herein.  Defendants have neither authority, privilege, nor permission to legally authorize their trespassory conduct (including constructive trespassory conduct), as alleged herein.

48.    Defendants' conduct, as alleged herein, interferes with the possession and/or use of the property owned (and/or controlled) by Plaintiffs and the Class, amounting to an (intentional, reckless, negligent, and/or other) intrusion upon the possessory interest of another.  Defendants— through their storage of MTBE and their failure to safely store MTBE as alleged herein— have engaged in abnormally dangerous activity.

49.    Plaintiffs and the Class have suffered actual damages as a proximate result of Defendants' trespassory conduct, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.    Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law, determined by the trier of fact;

B.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.     Granting injunctive medical monitoring relief, as further requested herein;

D.     Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.     Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 4

### Violation of § 4-409, Environment Article

50.     The allegations set forth in paragraphs 1 through 49 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

51.     As further stated herein, Defendants have violated § 4-409 of Maryland's Environment Article by being responsible for "oil spillage" as defined under the statute, thereby proximately damaging the property (including real property) of Plaintiffs and the Class.

52.     Defendants are "responsible" persons, as well as persons "responsible for the discharge," as defined under the statute.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.     Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.     Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.     Granting injunctive medical monitoring relief, as further requested herein;

D.     Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.     Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 5

### Negligence

53.     The allegations set forth in paragraphs 1 through 52 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

54.     Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care and judgment, including the duty to use the care, skill, and/or diligence that a reasonable person in the circumstances of each Defendant would have so exercised.

55.     As further detailed herein, Defendants breached one or more duties owed to Plaintiffs and the Class.

56.     As a direct and proximate result of Defendants' negligence, and/or as a direct and proximate result of Defendants' breach of one or more duties owed to Plaintiffs

and the Class, Plaintiffs and the Class suffered the injuries and damages complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.      Entering judgment in favor of Plaintiffs and the Class for the full amount of compensatory and punitive damages permitted by law as determined by the trier of fact;

B.      Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

C.      Granting injunctive medical monitoring relief, as further requested herein;

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

## Count 6

### Medical Monitoring

57.     The allegations set forth in paragraphs 1 through 56 and all other allegations herein, except as inconsistent with the allegations of this count, are adopted by reference as if set forth fully herein.

58.     Plaintiff Hope Koch has suffered from migraine headaches, sinus infections, and fatigue since moving to her Fallston residence.  Prior to moving to her

Franklin's Chance Court residence, Plaintiff Hope Koch did not suffer such symptoms in the degree to which she has suffered from them while residing at the Franklin's Chance Court property. Defendants' conduct, as alleged herein, has caused Plaintiff Hope Koch to be exposed to MTBE and (upon information and belief) has caused (in whole or in part) the migraine headaches, sinus infections, and/or fatigue from which she suffers.

59.     The foregoing unlawful and other wrongful acts, omissions, and/or other conduct by Defendants constitutes actionable conduct (including negligence) under Maryland law, including the common law.

60.     Defendants' negligent and other wrongful acts are a proximate cause of Plaintiffs and the Monitoring Sub-Class suffering an increased risk of serious injury and disease, which they will continue to suffer. Plaintiffs and the Monitoring Sub-Class have been exposed to a hazardous product (including MTBE) and suffer a significantly increased risk of contracting serious injury or latent disease, including cancer. This increased risk makes periodic diagnostic and medical examinations reasonable and necessary. The United States Environmental Protection Agency classifies MTBE as a potential human carcinogen.

61.     Early detection and diagnosis of increased potential health risks to Plaintiffs and the Monitoring Sub-Class is clinically invaluable because it can prevent, reduce, and/or delay resulting symptoms, suffering, and/or death.

62.     Cost-effective monitoring and testing procedures can be administered to Plaintiffs and the Monitoring Sub-Class that will make the early detection and treatment of such potential injuries or disease likely or possible.

63.    The recommended testing procedures will be subject to expert testimony at the time of trial, or as otherwise directed by the Court.

64.    Court-ordered medical monitoring may be especially essential to the extent that one or more members of the Monitoring Sub-Class can *not* afford to have testing and/or monitoring performed absent such requested relief.

65.    The increased susceptibility to injuries and irreparable threat to the health of Plaintiffs and the Monitoring Sub-Class proximately resulting from prolonged, significant exposure to MTBE can be addressed effectively only by the creation of a comprehensive medical monitoring program:

a.    Notifying members of the Monitoring Sub-Class of potential health risks and available treatment;

b.    Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of the Monitoring Sub-Class exposed to MTBE;

c.    Providing for periodic medical examinations for all members of the Monitoring Sub-Class;

d.    Providing for accumulation and analysis of relevant medical and demographic information from members of the Monitoring Sub-Class; and

e.    Providing any other appropriate treatment, care, and/or information as ordered by the Court.[2]

---

[2]   As alleged herein, Plaintiffs and the Class (1) have experienced exposure greater than normal background levels (2) to a proven hazardous substance— MTBE— (3) caused by Defendants' negligence and/or other tortious conduct; (4) as a proximate result of the exposure, Plaintiffs and the Class have an increased risk of contracting a serious latent injury or disease (including

23082                              19

66.    Plaintiffs and the Monitoring Sub-Class have no adequate remedy at law, including because monetary damages alone do not compensate for the continuing nature of harm to them.  A monitoring program will enable members of the Monitoring Sub-Class to ascertain the presence of injury and/or disease which are presently asymptomatic or only slightly symptomatic.

67.    Defendants have acknowledged the health dangers of MTBE contamination by repeatedly advising residents in the vicinity of the Upper Crossroads Exxon *not* to drink the groundwater and *not* to cook with the groundwater.

68.    Defendants have admitted to installing equipment to pump and treat MTBE-contaminated groundwater beneath the Upper Crossroads Exxon.  If Defendants are taking steps to monitor and treat contaminated groundwater, no lesser degree of care should be given to humans contaminated by prolonged, repeated exposure to MTBE.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that this Court enter judgment against the Defendants, jointly and severally, as follows:

A.    Granting permanent injunctive relief ordering appropriate abatement and/or other remediation of MTBE contamination;

B.    Granting injunctive medical monitoring relief, as further requested herein and/or as further ordered by the Court;

---

cancer); (5) monitoring procedures exist that make the early detection of one or more health concerns possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary based upon contemporary healthcare principles.

C.      Ordering Defendants to establish a fund for the monitoring relief to be directed by the Court (and/or ordering ancillary relief related thereto), *cf. Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992);

D.      Entering judgment in favor of Plaintiffs and the Class for litigation costs and expenses reasonably incurred; pre-judgment interest; post-judgment interest; and attorneys' fees recoverable by law; and

E.      Issuing such other and further relief as the nature of Plaintiffs' and the Class' cause may require.

Respectfully submitted,

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**

*Marshall M. Perkins*
_____
Charles J. Piven
Marshall N. Perkins
The World Trade Center—Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

Lon Engel, Esquire
**ENGEL & ENGEL, P.A.**
Suite 200
11 East Lexington Street
Baltimore, Maryland  21202
(410) 727-5095

*Counsel for Plaintiffs and the proposed Class*

## JURY DEMAND

Plaintiffs and the proposed class hereby demand a trial by jury of all issues so triable.

*Marshall M. Perkins*
_____
Marshall N. Perkins

23082