**MDL 1 3 5 8**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**   MAR – 3 2009

FILED
CLERK'S OFFICE

```
-------------------------------------------------- x
                                                   :
IN RE:                                             :
                                                   :
METHYL BUTYL TERTIARY ETHER ("MTBE")               :
PRODUCTS LIABILITY LITIGATION                      :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
-------------------------------------------------- x
```

MDL Docket No. 1358

This Document Relates to
*Spiroff v. Exxon Mobil Corp., et
al.*, Case No. 06-CV-2865
(KAM)(RML)(E.D.N.Y.)

**ORAL ARGUMENT
REQUESTED**

PLEADING NO. 280

## EXXON MOBIL CORPORATION'S MOTION TO VACATE
## CONDITIONAL TRANSFER ORDER (CTO-33)

1.    ExxonMobil Corporation ("ExxonMobil") is a defendant in the action *Spiroff et
al. v. ExxonMobil Corporation et al.*, Case No. 1:06-CV-2865 ("*Spiroff*"), which is identified as
a "Tag-Along" action in Conditional Transfer Order 33 ("CTO-33"), issued by the Judicial Panel
on Multidistrict Litigation (the "Panel") on January 29, 2009 and conditionally transferring the
*Spiroff* matter to the Methyl Tertiary Butyl Ether Products Liability Litigation, Multidistrict
Litigation No. 1358 (the "MTBE MDL"), pending in the Southern District of New York.

2.    ExxonMobil hereby moves the Panel to vacate CTO-33 as it applies to the *Spiroff*
action on the grounds that such action does not meet the required criteria for transfer and
consolidation set forth in 28 U.S.C. § 1407.

3.    Specifically, Plaintiffs have failed to establish a sufficient commonality of facts
between the *Spiroff* action and the MTBE MDL because, unlike the 150 cases pending in the
MTBE MDL, the *Spiroff* action does not set forth any allegations or causes of action concerning
MTBE or contamination of drinking water.

**OFFICIAL FILE COPY**   IMAGED MAR  3 2009

4.     Moreover, Plaintiffs have failed to establish that transfer would promote the just and efficient conduct of the action.  Plaintiffs' counsel is already counsel in the MTBE MDL, and accordingly, is already in a position to coordinate to ensure duplicative MTBE discovery is avoided.  Second, even if the Panel were to transfer the instant action, related cases that share a greater commonality of facts with the Plaintiffs' claims, would continue in the EDNY, thereby obviating any presumed efficiencies gained in the transfer.  Third, it would be highly inefficient to take the *Spiroff* action away from Magistrate Judge Levy, who possesses a unique familiarity with the facts alleged in the *Spiroff* action and the parallel cases pending in the EDNY.

5.     Lastly, transfer is inappropriate because Plaintiffs delayed in notifying the Panel of the *Spiroff* action and therefore have failed to meet their obligations under the Rules of Multidistrict Litigation.

6.     This Motion is based on the attached Memorandum of Law in support thereof, along with the Declarations of John J. Calandra, declared on February 27, 2009, and James A. Pardo, declared on February 27, 2009, the files, pleadings, and documents on file with the Panel, and upon such further documentary and oral evidence as may be presented in the hearing on this matter.

WHEREFORE, ExxonMobil respectfully requests that the Panel:

A.  Vacate Conditional Transfer Order 33 as it applies to ExxonMobil;

B.  Schedule oral argument on this Motion; and

C.  Grant such other relief deemed just and appropriate.

Dated: February 27, 2009
      New York, New York

Respectfully Submitted,

By: John J. Calandra
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
212-547-5400
jcalandra@mwe.com

*Counsel For Defendant Exxon Mobil
Corporation*

cc:  Attached Service List

RECEIVED
CLERK'S OFFICE

2009 MAR -2  P 1: 28

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR - 3 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

---------------------------------------------------------------- x

|  |  |
|---|---|
| | : MDL Docket No. 1358 |
| IN RE: | : |
| | : This Document Relates to |
| METHYL BUTYL TERTIARY ETHER ("MTBE") | : *Spiroff v. Exxon Mobil Corp., et* |
| PRODUCTS LIABILITY LITIGATION | : *al.*, Case No. 06-CV-2865 |
| | : (KAM)(RML)(E.D.N.Y.) |

---------------------------------------------------------------- x

**MEMORANDUM OF LAW SUBMITTED BY
EXXON MOBIL CORPORATION IN SUPPORT OF MOTION
TO VACATE CONDITIONAL TRANSFER ORDER (CTO-33)**

RECEIVED
CLERK'S OFFICE
2009 MAR -2  P 1: 28
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

BACKGROUND ......................................................................................................................... 4

ARGUMENT ............................................................................................................................... 9

I.      PLAINTIFFS HAVE FAILED TO ESTABLISH A SUFFICIENT
        COMMONALITY OF FACTS BETWEEN THIS ACTION AND THE CASES
        PENDING IN THE MTBE MDL ..................................................................................... 9

II.     PLAINTIFFS HAVE FAILED TO ESTABLISH THAT TRANSFER  WOULD
        PROMOTE THE JUST AND EFFICIENT CONDUCT OF THE ACTION.................. 11

III.    TRANSFER IS ALSO INAPPROPRIATE BECAUSE THE  PLAINTIFFS
        HAVE FAILED TO MEET THEIR OBLIGATIONS UNDER THE RULES OF
        MULTIDISTRICT LITIGATION ................................................................................ 13

CONCLUSION ......................................................................................................................... 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Auction Rate Secs. Mktg Litig.*, 581 F.Supp.2d 1371 (J.P.M.L. 2008) .................................9

*In re Blood and Blood Prods. Hepatitis C Virus Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 11149 (J.P.M.L Aug. 2, 2000).............................................................................11

*In re Cessna Aircraft*, 460 F.Supp. 159 (J.P.M.L 1978)................................................................14

*In re Highway Accident Near Rockville*, 388 F.Supp. 574 (J.P.M.L. 1975)...................................12

*In re MTBE Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000)............10

*In re Magic Marker Secs. Litig.*, 470 F.Supp. 862 (J.P.M.L. 1979) ..............................................12

*In re McDonnell Douglas "Wild Weasel AN/APR-38" Contract Litig.*, 415 F.Supp. 387 (J.P.M.L. 1976) ..........................................................................................................10

*In re Seeburg-Commonwealth United Merger*, 333 F.Supp. 911 (J.P.M.L. 1971)........................10

*In re Shoulder Pain Pump Chondrolysis Prods. Liab. Litig.*, 571 F.Supp.2d 1367 (J.P.M.L. 2008) ..........................................................................................................9

*In re Tobacco/Governmental Health Care Costs Litig.*, 76 F.Supp.2d 5 (D.D.C. 1999) ..........9, 11

*In re Truck Accident Near Alamagordo*, 387 F.Supp. 732 (J.P.M.L. 1975)...................................11

*In re Zimmer, Inc., Centralign Hip Prosthesis Prods. Liab. Litig.*, 366 F.Supp.2d 1384 (J.P.M.L. 2005) ................................................................................................. 11-12

## FEDERAL STATUTES

28 U.S.C. § 1407.............................................................................................................................9, 10

## SECONDARY SOURCES

17 MOORE'S FEDERAL PRACTICE § 112.02[1][a] (3d Ed. 1997)......................................................12

Exxon Mobil Corporation ("ExxonMobil"), a Defendant in the putative class action, *Spiroff et al. v. ExxonMobil Corporation et al.*, Case No. 06-CV-2865 (EDNY) ("*Spiroff*"), respectfully submits this Memorandum of Law, together with the accompanying Declarations of John J. Calandra and James A. Pardo, declared on February 27, 2009 (the "Calandra Decl." and "Pardo Decl.," respectively), in support of ExxonMobil's Motion To Vacate CTO-33,which conditionally transfers the *Spiroff* action to the MTBE[1] Multidistrict Litigation No. 1358 (the "MTBE MDL"), pending in the Southern District of New York ("SDNY").

## PRELIMINARY STATEMENT

No longer content with the Court that has presided over this and three other companion cases for the past three years, Plaintiffs' counsel now seeks to transfer the *Spiroff* putative class action, from the Eastern District of New York ("EDNY") to the MTBE MDL pending in the SDNY.  Plaintiffs' belated attempt to forum shop should not prevail for many reasons, and cannot prevail for one very simple reason:  the *Spiroff* Complaint is not about MTBE; it contains no allegations about MTBE; and it asserts no claim whatsoever relating to MTBE.[2]  In fact, nowhere in Plaintiffs' 183 paragraph Complaint is the word "MTBE" even mentioned.[3]  Quite obviously, a complaint that does not concern MTBE cannot be transferred to the MTBE MDL.

The fact that the *Spiroff* Complaint is not about MTBE contamination was not lost on Plaintiffs' counsel.  Plaintiffs' counsel tacitly acknowledges this fact when, in its Notice of Tag-Along, it claims that it just "now learned" of "[MTBE] contamination of groundwater and sub-surface soil" in the historic petroleum plume in Greenpoint, Brooklyn.[4] (*See also,* Plaintiffs'

---

[1] MTBE is an acronym for Methyl-Tertiary Butyl Ether, a gasoline additive.
[2] Calandra Decl. at ¶ 3, Exhibit ("Ex.") 1.
[3] *Id.* Decl. at ¶ 3
[4] *Id.* Decl. at ¶ 4, Ex. 2.

January 15, 2009 letter to Magistrate Judge Robert M. Levy ("We have now been advised by our experts that the contamination in Greenpoint includes [MTBE]....").)[5]  Even if this statement were true, which it is not, Plaintiffs' so-called recent "discovery" does not alter the fact that the *Spiroff* Complaint, as it now stands, contains no MTBE allegations and no claim related to MTBE.  At the very least, before coming to this Panel and seeking a transfer, Plaintiffs would have to move the Court in the EDNY for permission to amend their class action complaint to add MTBE allegations/claims.  Defendants would vigorously oppose any such amendment, and the amendment may well not be granted given, among other things, its belatedness and unrelatedness to the gravamen of the *Spiroff* action (*i.e.*, pre-MTBE spills).

Moreover, despite Plaintiffs' counsel's claim that its experts recently advised it of the presence of MTBE in the plume, which is the subject of the *Spiroff* action, Plaintiffs' own experts flatly contradict that claim.  Plaintiffs' *Spiroff* experts recently submitted expert reports in which they specifically acknowledged that they were "*retained by Plaintiffs' counsel to provide expert testimony* on the effects of being exposed to benzene *and methyl tertiary-butyl ether (MTBE)* in groundwater and sub-soil," making clear that Plaintiffs' counsel had *prior* knowledge of MTBE in the plume.[6]  Thus, it was Plaintiffs' counsel who told their experts about MTBE, not the other way around.[7]  In fact, the presence of a small amount of MTBE in the Greenpoint plume has been a matter of public record for a number of years.[8]  Indeed, to support the proposition that the plume contains some MTBE, Plaintiffs' expert relied on a public report that Roux Associates, Inc., ExxonMobil's consultant and co-defendant herein, submitted to the

---

[5] *Id.* at ¶ 4, Ex. 3.
[6] *Id.* at ¶ 7, Ex. 4 at ¶ 3 (emphasis added), Ex. 5 at ¶ 111.
[7] Calandra Decl. at ¶ 8
[8] *Id.*

New York State Department of Environmental Conservation (the "DEC") in 2004, well *before* Plaintiffs' filed the *Spiroff* action.[9]

Plaintiffs' counsel -- who has represented various plaintiffs in the MTBE MDL since well before it filed the *Spiroff* action -- was well aware of the minor presence of MTBE in the plume. It chose not to include an MTBE claim in its *Spiroff* Complaint for the simple reason that the *Spiroff* case clearly does not belong in the MTBE MDL:

The order that created the MTBE MDL (the "MTBE MDL Order") does not provide for transfers to the MTBE MDL simply by using the magic four letters:  M--T--B--E.  Rather, it specifically requires an allegation of "**drinking water** contamination as a result of MTBE contamination."  Unlike any of the 150 actions consolidated in the MTBE MDL, and as admitted by Plaintiffs' own expert, the Greenpoint plume has not contaminated anyone's drinking water. No drinking water wells exist in Brooklyn.  Brooklyn residents (like all New York City residents) obtain their drinking water from Upstate New York.  Moreover, the Plaintiffs in *Spiroff*, unlike the plaintiffs in the MTBE MDL, are not water purveyors or private well owners, nor do they drink or have any rights to drill a well into the groundwater beneath their homes.

Moreover, transferring the *Spiroff* action to the MTBE MDL would not promote efficiency, nor would it benefit the parties or the judicial system.  The *Spiroff* action is one of four companion actions pending in the EDNY (the "Companion Cases").  Magistrate Judge Levy, who has presided over these cases for three years now, has become intimately familiar with the history and issues surrounding the petroleum plume.  His institutional knowledge is invaluable to the *Spiroff* matter and transferring it away from him would be the height of inefficiency.  Indeed, even if the Complaint were amended to include MTBE claims, the

---

[9] *Id.* at ¶ 8, Ex. 6 at p. 8.

gravamen of the *Spiroff* Complaint would remain the historic spills that occurred at the former Greenpoint refineries -- spills which Plaintiffs' experts admit occurred decades *before* MTBE came to be used in gasoline.

Additionally, since Plaintiffs' counsel has been involved in the MTBE MDL for years now, it already has access to all of the MTBE discovery it would possibly need to prosecute MTBE related claims; a transfer, therefore, is not necessary to coordinate discovery, as Plaintiffs' counsel already has the discovery and does not need to "coordinate" with anyone beyond itself (and these defendants) to obtain any additional site specific MTBE discovery it may seek. Thus, no efficiencies would be achieved by transferring this matter from the Court that has presided over it for the last several years, certainly none that would offset the significantly greater efficiencies that would be lost by such a transfer.

In sum, the Panel should vacate the Conditional Transfer Order ("CTO-33") as it applies to the *Spiroff* action because the Complaint is not about MTBE, the matter is fundamentally different from the actions consolidated in the MTBE MDL, and no benefit to the parties or efficiencies would be gained by transferring the case.

## BACKGROUND

### A.    Creation of the MTBE MDL

This Panel created the MTBE MDL more than eight years ago, on October 10, 2000, to centralize three lawsuits that alleged MTBE contamination of drinking water wells. Pardo Decl. at ¶ 7, Ex. 1. The MTBE MDL Order stated that the actions involved common questions of fact: (1) "whether the defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public;" and (2) "whether plaintiffs sustained drinking water contamination as a result of MTBE contamination." *Id.* at ¶ 8, Ex. 1. Explaining that centralization of cases related to MTBE would

promote the "convenience of the parties and witnesses and promote the just and efficient

conduct" of the litigation, this Panel assigned the cases to The Honorable Shira A. Sheindlin for

coordinated pretrial proceedings in the Southern District of New York. *Id.* at ¶ 9, Ex. 1.

**B.     Proceedings in the MTBE MDL**

In the eight years since the MTBE MDL was created, over 150 cases have been

transferred to Judge Scheindlin. *Id.* at ¶ 10. Plaintiffs' counsel here has been involved in dozens

of MDL cases. Indeed, at the time it filed the *Spiroff* action Plaintiffs' counsel had already filed

more than 15 MTBE cases in the MTBE MDL. *Id.* at ¶ 12.

The Plaintiffs in each of these 150 cases in the MTBE MDL include private well owners,

public and private water suppliers, and/or government trustees of drinking water resources, each

of whom have alleged that MTBE contaminated or (or threatens to contaminate) its respective

drinking water supply. Pardo Decl. at ¶ 11. Plaintiffs' counsel has alleged in these cases that no

amount of MTBE is safe, and indeed, that even the threat of exposure to the slightest amount of

MTBE poses unacceptable risks. *Id.* at ¶ 13, Ex. 2 at ¶¶ 98-99, 107-112. Each of the MTBE

MDL cases consolidated into the MTBE MDL involves, of course, MTBE and MTBE

contamination. *Id.* at ¶ 13. For example, the vast majority of cases allege that refiners' use of

MTBE in gasoline rendered that gasoline "unreasonably safe" because of, among other things,

MTBE's alleged propensity to spread faster and farther if leaked into the ground (*i.e.,* product

liability claims). Likewise, the vast majority of the consolidated cases allege that refiners failed

to inform various persons and entities about the so-called dangers of MTBE, and many cases

allege that such conduct was a violation of the Toxic Substances Control Act ("TOSCA"). *Id.,*

Ex. 2 at ¶¶ 96, 211-244, 236-247. (No such claims are made in the *Spiroff* Complaint.)

A great deal of the discovery has already taken place in the MTBE MDL. To date, there

have been more than two hundred depositions of the defendant oil companies (including

experts), more than two dozen of which were directly related to defendant ExxonMobil.
Millions of pages of documents have been produced in the MTBE MDL, over one million by
defendant ExxonMobil alone. *Id.* at ¶ 14. As one of the MTBE MDL counsel in more than 20
cases already consolidated in the MDL, Plaintiffs' counsel in *Spiroff* already has access to <u>all</u> of
this discovery. This discovery covers the issues common to all MTBE cases, such as: whether
MTBE rendered gasoline "unreasonably dangerous"; the oil companies' knowledge of the
alleged risks of MTBE; the decision to add MTBE to gasoline; and the distribution of gasoline
containing MTBE to New York and elsewhere. Pardo Decl. at ¶ 15.

**C.      The Nature of the *Spiroff* Action and Related Proceedings**

The Plaintiffs filed the *Spiroff* putative class action on April 14, 2006, in New York State
court, along with over a dozen non-class action cases involving residents who were/are bringing
the exact same claims.[10] The Defendants, which include ExxonMobil, BP Products North
America Inc., and Roux Associates Inc. (ExxonMobil's remediation consultant), thereafter
removed it to the EDNY. Calandra Decl. at ¶ 13. It is now one of the four Companion Cases
pending before The Honorable Kiyo A. Matsumoto and Magistrate Judge Robert Levy. The
Companion Cases consist of related lawsuits brought by the State, an environmental group (*i.e.*,
Riverkeeper), and several local politicians in Brooklyn.[11] *Id.* at ¶¶ 15, 17, Ex. 7. Like the *Spiroff*
action (and the related state court actions), the Companion Cases do not contain any allegations
regarding the presence of MTBE, any claims relating to MTBE, or any allegation of
contamination to drinking water. *Id.* at ¶ 17.

---

[10] To date, Plaintiffs' counsel has more than 20 related lawsuits pending in state court in Brooklyn, which involve more than three hundred Plaintiffs. Like the *Spiroff* Complaint, not one of them asserts MTBE claims or even mentions MTBE. *Id.* at ¶ 14.

[11] In addition to *Spiroff*, the three other lawsuits are: *Riverkeeper et al. v. ExxonMobil; Markowitz et al. v. ExxonMobil; and The State of New York et al. v. ExxonMobil et al..* *Id.* at ¶ 15, Ex. 7.

The *Spiroff* complaint alleges that the value of properties belonging to residents and/or property owners located in the Greenpoint neighborhood of Brooklyn, New York, have diminished in value as a result of Defendants' "negligent, willful, and/or wanton storage, disposal, [and] release of oil and oil products" in the Greenpoint area...." *Id.* at ¶ 18, Ex. 1 at ¶ 57.  According to the expert report recently submitted by Plaintiffs' counsel, "the *bulk* of the product found in the Greenpoint spill area was discharged at the former refinery property (now the BP/Amoco Terminal), most likely from leaking product storage tanks and piping." *Id.* at ¶ 19, Ex. 6 at p. 5 (emphasis added); *see also, id.* Ex. 1 at ¶ 43.  Plaintiffs' expert acknowledges that "the refinery ceased operations in 1965" -- nearly 20 years *before* MTBE even entered the petroleum market -- and that "the main spill may have begun during or prior to the year 1948." Calandra Decl. at ¶ 20, Ex. 6 at p. 5.

To be sure, the *Spiroff* Complaint and Plaintiffs' expert report mention separate additional spills that allegedly occurred at petroleum storage terminals that were operated *after* the refinery closed in 1965.  Plaintiffs' expert cites publicly documented spills at these terminals from 1986 to 1999, totaling approximately 125,000 gallons.  *Id.* at ¶ 21, Ex. 6 at pp. 5-7, Ex. 1 ¶¶ 40-43.  Plaintiffs' experts attributes the MTBE contamination in the Greenpoint plume to these newer spills, acknowledging that it could not have come from the old refineries because they preceded the use of MTBE.  *Id.* at ¶ 21, Ex. 6 at pp. 5-7.  When compared to the total spill estimates of 17.0 to 30.0 million gallons in the overall plume, however, these more recent spills allegedly emanating from the terminals clearly represent the proverbial "drop in the bucket," certainly not the gravamen of the *Spiroff* Complaint.  *Id.* at ¶ 22.

While Plaintiffs' *Spiroff* Complaint assert various causes of action relating to the Greenpoint plume, unlike the cases consolidated in the MTBE MDL, Plaintiffs do not assert <u>any</u>

claims relating to contamination of drinking water, nor do they claim that they had drinking water wells. *Id.* at ¶ 23; Ex. 1. Moreover, there are no claims about MTBE whatsoever, and certainly no claims that MTBE is "unreasonably dangerous" or that the defendants failed to warn about the dangers of MTBE (*i.e.*, product liability claims). Calandra Decl. at ¶ 24. This is not surprising. Although Plaintiffs' counsel was well aware of the presence of MTBE in the plume at the time it filed the *Spiroff* case, it was also well aware that MTBE was not impacting drinking water and was not a material portion of the plume; MTBE is at best a *de minimis* part of the Greenpoint oil plume. *Id.* at ¶ 25.

**D.      The Status of the Proceedings in the Eastern District of New York**

The *Spiroff* action, as well as the substantially similar Companion Cases, have been pending in the EDNY for several years.[12] Magistrate Judge Levy has supervised and presided over these cases, including the pre-trial discovery in *Spiroff*, since their inception in 2005. *Id.* at ¶ 26. In fact, given the commonality of factual issues among the Plaintiffs' action and the Companion Cases, the majority of the discovery produced to Plaintiffs to date has been the very same discovery that was produced by defendant ExxonMobil in the *Riverkeeper* matter. *Id.* at ¶ 27.

To date, ExxonMobil has produced to the *Spiroff* Plaintiffs over 150 thousand pages relating to the subject refinery and the terminal, and the remediation of the Greenpoint plume. To the extent any documents also mentioned MTBE, they were produced as well, and Plaintiffs' counsel has been in possession of them for years. ExxonMobil has also provided Plaintiffs with copies of interrogatory responses it previously provided to *Riverkeeper* in the Companion Cases.

---

[12] The Companion Cases were initially assigned to Judge Carol B. Amon, but have recently been transferred to the Honorable Kiyo A. Matsumoto. Magistrate Judge Levy, however, continues to preside over these matters, and has done so since their inception.

Calandra Decl. at ¶ 28.  For their part, Plaintiffs have allegedly produced whatever documents they had, all ten of the class representatives have been deposed, and Plaintiffs recently submitted their expert reports in support of a class certification motion, per the schedule established by Magistrate Judge Robert Levy.  *Id.* at ¶ 29.  Thus, not only does the *Spiroff* Complaint have nothing to do with MTBE, but  Plaintiffs' belated effort to change the forum comes after a significant amount of discovery has already occurred.  *Id.* at ¶ 30.

## ARGUMENT

Under 28 U.S.C. § 1407(a), a court should only consolidate a federal civil action with a MDL when (1) the action raises common questions of fact with a MDL; (2) consolidation would best serve the convenience of the parties and witnesses; and (3) consolidation would promote the just and efficient conduct of the litigation.  *See, e.g.*, *In re Auction Rate Secs. Mktg. Litig.*, 581 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008); *In re Shoulder Pain Pump Chondrolysis Prods. Liab. Litig.*, 571 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008).  Plaintiffs, as the party moving for transfer, bear the burden of demonstrating that the action they seek to transfer meets these requirements. *In re Tobacco/Governmental Health Care Costs Litig.*, 76 F. Supp. 2d 5, 7 (D.D.C. 1999).  As we discuss below, the Plaintiffs have failed to meet this burden, and therefore CTO-33 as it relates to the *Spiroff* action should be vacated.

### I.

**PLAINTIFFS HAVE FAILED TO ESTABLISH SUFFICIENT
COMMONALITY OF FACTS BETWEEN THIS ACTION
AND THE CASES PENDING IN THE MTBE MDL**

Section 1407(a) requires commonality between the instant action and those in the MTBE MDL, and the MTBE MDL Order, in turn, specifies the following common questions that need to exist for transfer to the MTBE MDL:

(i)     whether defendants knew about and represented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public, <u>and</u>

(ii)    whether plaintiffs sustained ***drinking water*** contamination as a result of MTBE contamination.

*In re MTBE*, 2000 U.S. Dist. LEXIS 14901, at *2-3 (J.P.M.L. Oct. 10, 2000) (emphasis added);

*see,* Pardo Decl. at ¶ 4, Ex. 1.

Here, the Plaintiffs cannot show the requisite commonality.  First, the *Spiroff* complaint fails to make any allegations or claims regarding MTBE -- the common thread that binds all other cases consolidated in the MTBE MDL.  Calandra Decl. at ¶ 3, Ex. 1.  Transfer must be disallowed for this reason alone.  Second, even if the *Spiroff* complaint were amended, there will be no allegations that drinking water has been contaminated, as required by the MTBE MDL Order.  Again, Plaintiffs' drinking water is supplied from reservoirs in Upstate New York.  *Id.* at ¶ 10.  Third, even then, MTBE contamination would not be the gravamen of the lawsuit; rather, it would only be a *small* portion of a spill that Plaintiffs expert attributes mostly to refineries that operated pre-MTBE.  *Id.* at ¶ 19, Ex. 6 at p. 5.  Accordingly, any "common issues" between the amended complaint and the MTBE MDL action would be outweighed by the non-common issues, and thus, transfer would still be inappropriate.  *In re Seeburg-Commonwealth United Merger*, 333 F. Supp. 911, 912 (J.P.M.L. 1971) ("Although there may be some common questions of fact, the non-common issues clearly predominate"); *In re McDonnell Douglas "Wild Weasel AN/APR-38" Contract Litig.*, 415 F. Supp. 387, 388-89 (J.P.M.L. 1976) (transfer denied where the complaints did not demonstrate "any substantial commonality").

-- 10 --

## II.

## PLAINTIFFS HAVE FAILED TO ESTABLISH THAT TRANSFER
## WOULD PROMOTE THE JUST AND EFFICIENT CONDUCT OF THE ACTION

In addition to having common issues that predominate, a proposed transfer must also

promote the just and efficient conduct of the action. *See, e.g., In re Truck Accident Near

Alamagordo*, 387 F. Supp. 732, 733 (J.P.M.L. 1975) ("[A] mere showing that common questions

of fact exist amongst the actions … is not sufficient, in and of itself, to warrant transfer[,] … [the

moving party must also show that the proposed transfer would enhance] … the just and efficient

conduct of the litigation…."). Indeed, this factor is widely considered the "most important" of

the three statutory criteria. *See, In re Tobacco*, 76 F. Supp. 2d at 8 (citing 15 CHARLES ALAN

WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE §

3863 at 535 (1986)). Here Plaintiffs cannot meet their burden of establishing that a transfer

would promote efficiency for three independent reasons.

First, Plaintiffs counsel are already counsel in the MTBE MDL, and accordingly, they are

already in a position to coordinate to ensure duplicative MTBE discovery is avoided. *See, e.g.,

In re Blood and Blood Prods. Hepatitis C Virus Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS

11149, at *3 (J.P.M.L. Aug. 2, 2000) (the possibility of duplicative discovery is reduced "where,

as here, the same plaintiffs' counsel is involved in all, or nearly all, the actions"); *In re Zimmer,

Inc., Centralign Hip Prosthesis Prods. Liab. Litig.*, 366 F. Supp. 2d 1384, 1385 (J.P.M.L. 2005)

(upholding previous decision to deny transfer where plaintiff "was represented by counsel who

also represented" plaintiffs in another subject action). Indeed, defendants ExxonMobil *and* BP

are also involved in the MTBE MDL. Pardo Decl. at ¶ 2.

Where, as here, counsel is involved in both the proposed tag-along action and the MTBE

MDL, parties can remain apprised of developments in parallel cases with little difficulty and can

coordinate activities. For instance, the Panel has recognized that there are a myriad of tools available to parties wishing to coordinate discovery efforts between actions. *In re Magic Marker Secs. Litig.*, 470 F. Supp. 862, 865 (J.P.M.L. 1979) ("parties can easily take steps to coordinate whatever discovery remains to be accomplished in the two actions"). These options are far less disruptive to both the proposed tag-along action and the pending MTBE MDL proceedings, and can be accomplished with minimal effort relative to the procedural (and logistical) burdens associated with a transfer. Therefore, any claim by Plaintiffs that the transfer of this action would mitigate the danger of duplicative discovery is misguided. *See In re Highway Accident Near Rockville*, 388 F. Supp. 574, 575 (J.P.M.L. 1975) (even though "some common questions of fact exist between these actions, [we] find that the possibility of duplicative discovery in this litigation is more illusory than real").

Indeed, over the course of the past eight years, the MTBE MDL has matured to a point where most, if not all, of the discovery Plaintiffs' counsel would need to prosecute any MTBE claim (including what the oil industry knew, or reasonably should have known, regarding MTBE's risks to the environment, and when) has been completed and is available to all the MTBE MDL counsel. Pardo Decl. at ¶ 15. As counsel to more than 20 water purveyors in the MTBE MDL, Plaintiffs' counsel is either in possession of or can easily access such discovery. *Id.* Thus, the just and efficient conduct of the instant action would be promoted by allowing it to remain in its current district, not by transferring it now, three years later after much discovery has already been completed.

Second, the very purpose of multidistrict litigation is "to conserve judicial resources and to avoid the delays that would inevitably result if all aspects . . . were conducted separately." 17 MOORE'S FEDERAL PRACTICE § 112.02[1][a] (3d ed. 1997). The transfer of the *Spiroff* action,

however, would not serve this function because additional cases – *i.e.*, the Companion Cases – which share a greater commonality of facts with the Plaintiffs' claims, would remain in the current district.  None of these Companion Cases have sought tag-along status with the MTBE MDL.  Nor is it anticipated that the plaintiffs in these other cases will *ever* seek tag-along status for the simple reason that they share no commonality of facts with the cases currently proceeding in the MTBE MDL.  Calandra Decl. at ¶ 17.  Even if the Panel were to transfer the instant action, parallel cases would continue in the EDNY, thereby obviating any presumed efficiencies gained in the transfer.

Third, Magistrate Judge Levy, who has supervised all pre-trial discovery in these EDNY cases since the filing of the *Riverkeeper* matter in 2005, possesses a unique familiarity with the facts alleged therein.  *Id.* at ¶ 11.  His command over the facts of the cases, as well as his institutional knowledge of their procedural status, is invaluable to their continued progress.  *Id.*  It would be highly inefficient to allow Plaintiffs' counsel to take this case away from him now by bootstrapping it into the MTBE MDL upon its mere utterance of the four magic letters:  M--T--B--E.[13]

## III.

### TRANSFER IS ALSO INAPPROPRIATE BECAUSE THE PLAINTIFFS HAVE FAILED TO MEET THEIR OBLIGATIONS UNDER THE RULES OF MULTIDISTRICT LITIGATION

MDL Rule 7.5(e) requires that "[a]ny party or counsel in actions previously transferred … shall promptly notify the Clerk of the Panel of any potential 'tag-along actions' in which that party is also named or in which that counsel appears."  This Panel has previously considered

---

[13] Although we do not separately address it, we can discern no basis on which Plaintiffs could carry their burden of showing that a transfer would also promote the convenience of the parties.

inexcusable delay as a factor when ruling against transfer. For instance, in *In re Cessna Aircraft Distributorship Antitrust Litig.*, the Panel noted:

> Furthermore, we note that the actions in the transferee district have been pending for more than six years . . . and that the [movants] have now waited for more than two years after the filing of [the tag-along action] to move for transfer . . . under Section 1407. Under these circumstances, we cannot conclude that the [movants] have met their burden of persuading us that transfer of [the tag-along action] would promote the just and efficient conduct of this litigation.

460 F. Supp. 159, 162 (J.P.M.L. 1978).

As discussed above, the efforts by Plaintiffs' counsel to claim that it was only recently advised of the presence of MTBE in the Greenpoint plume by its experts is contradicted by those same experts, whose reports state that Plaintiffs' counsel advised *them* of the presence of MTBE, not the other way around. Indeed, in making its claims relating to MTBE in the plume, Plaintiffs' counsel (though their experts) cited to public documents that were on file with the DEC even before Plaintiffs filed the *Spiroff* Complaint. Calandra Decl. at ¶ 8, Ex. 6 at p. 8. In light of the inexcusable delay here in seeking a transfer, Plaintiffs' counsel cannot now claim that transfer would promote the "just and efficient conduct of this litigation." *In re Cessna Aircraft*, 460 F. Supp. at 162.

## CONCLUSION

For all the forgoing reasons, Plaintiffs' counsel's attempt to forum shop should be denied and the Panel should grant ExxonMobil's Motion and vacate CTO-33.

Dated: New York, New York
      February 27, 2009

Respectfully Submitted,

John J. Calandra Esq.
McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10017
Telephone: 212-547-5400
Facsimile: 212-547-5444

*Attorneys for Defendant Exxon Mobil Corporation*

RECEIVED
CLERK'S OFFICE
2009 MAR -2  P 1: 28
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## CERTIFICATE OF SERVICE

MAR – 3 2009

FILED
CLERK'S OFFICE

Michael D. Hall, pursuant to 28 USC 1746, hereby declares under penalty of perjury, that on the 2nd day of March, 2009, I caused the accompanying Exxon Mobil Corporation's Motion to Vacate Conditional Transfer Order (CTO-33); Memorandum of law; and Declarations of James A. Pardo and John J. Calandra, dated February 27, 2009 and exhibits annexed thereto, to be served upon all counsel named in the attached Panel Service List.  Such service was completed by delivering true and correct copies of the aforementioned documents to the offices of said counsel via hand delivery.

Michael D. Hall

RECEIVED
CLERK'S OFFICE
2009 MAR -2  P 1:28
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION

MDL No. 1358

## PANEL SERVICE LIST (EXCERPTED FROM CTO-33)

Deborah V. Spiroff, et al. v. Exxon Mobil Corp., et al., E.D. New York, C.A. No. 1:06-2865
(Judge Kiyo Matsumoto)

Marc Jay Bern
NAPOLI BERN RIPKA & ASSOCIATES LLP
350 5th Avenue
Suite 7413
New York, NY 10118

John J. Calandra
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10017

Jonathan K. Cooperman
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178

Robin Greenwald
WEITZ & LUXENBERG PC
180 Maiden Lane
40th Floor
New York, NY 10038

Brian A. McGill
MCDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005-3096

Margaret M. Murphy
WILSON ELSER MOSKOWITZ EDELMAN &
DICKER
150 East 42nd Street
New York, NY 10017-5639

Mathew Paul Ross
WILSON ELSER MOSKOWITZ EDELMAN &
DICKER
150 East 42nd Street
New York, NY 10017-5639

Peter J. Sacripanti
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
14th Floor
New York, NY 10173-1922

John F. Tully
FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY 10103



BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR – 3 2009

FILED
CLERK'S OFFICE

```
------------------------------------------------------------- x
                                          :    MDL Docket No. 1358
                                          :
IN RE:                                    :
                                          :    This Document Relates to
METHYL BUTYL TERTIARY ETHER ("MTBE")      :    Spiroff v. Exxon Mobil Corp., et
PRODUCTS LIABILITY LITIGATION             :    al., Case No. 06-CV-2865
                                          :    (KAM)(RML)(E.D.N.Y.)
                                          :
                                          :    DECLARATION OF
                                          :    JOHN J. CALANDRA
                                          :
                                          :
                                          :
                                          :
------------------------------------------------------------- x
```

I, JOHN J. CALANDRA, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a member of McDermott Will & Emery LLP, counsel for defendant Exxon Mobil Corporation ("ExxonMobil") in *Spiroff et al. v. Exxon Mobil Corporation et al.* ("*Spiroff*"), a putative class action that has been pending for several years in the Eastern District of New York ("EDNY").

2.     I am duly admitted to the bar of the Courts of the State of New York and to practice in the Southern and Eastern Districts of New York, and respectfully submit this Declaration in support of ExxonMobil's Motion to Vacate Conditional Transfer Order 33 ("CTO-33"), which conditionally transfers the *Spiroff* action to the Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, Multidistrict Litigation No. 1358 (the "MTBE MDL"), now pending in the Southern District of New York.  I am fully familiar with the facts of the *Spiroff* matter and make this Declaration based on my personal knowledge.

3.      As demonstrated in ExxonMobil's accompanying Memorandum of Law, and the Declaration of James A. Pardo, declared on February 27, 2009, the Judicial Panel on Multidistrict Litigation (the "Panel") should not transfer the *Spiroff* action to the MTBE MDL, as the *Spiroff* action does not concern MTBE. Indeed, nowhere in Plaintiffs' 183 paragraph Complaint is the word "MTBE" even mentioned. A true and correct copy of the *Spiroff* Complaint is attached hereto as Exhibit ("Ex.") 1.

4.      The fact that the *Spiroff* Complaint is not about MTBE contamination was not lost on Plaintiffs' counsel. Plaintiffs' counsel tacitly acknowledges this fact when, in its Notice of Tag-Along, it claims that it just "now learned" of "[MTBE] contamination of groundwater and sub-surface soil" in the historic petroleum plume in Greenpoint, Brooklyn. A true and correct copy of Plaintiffs' Notice of Tag-Along is attached hereto as Exhibit 2. (*See also*, true and correct copy of Plaintiff's January 15, 2009 letter to Magistrate Judge Robert M. Levy attached hereto as Exhibit 3 ("We have now been advised by our experts that the contamination in Greenpoint includes [MTBE]....").)

5.      Even if this statement were true, which it is not, Plaintiffs' so-called recent "discovery" does not alter the fact that the *Spiroff* Complaint, as it now stands, contains no MTBE allegations and no claim related to MTBE. At the very least, before coming to this Panel and seeking a transfer, Plaintiffs would have to move the Court in the EDNY for permission to amend their class action complaint to add MTBE allegations/claims. Defendants would vigorously oppose any such amendment, and the amendment may well not be granted given, among other things, its belatedness and unrelatedness to the gravamen of the *Spiroff* action (*i.e.*, pre-MTBE spills).

6.      Moreover, despite Plaintiffs' counsel's claim that its experts recently advised it of the presence of MTBE in the plume, which is the subject of the *Spiroff* action, Plaintiffs' own experts flatly contradict that claim.

7.      Plaintiffs' *Spiroff* experts recently submitted expert reports in which they specifically acknowledged that they were "*retained by Plaintiffs' counsel to provide expert testimony* on the effects of being exposed to benzene *and methyl tertiary butyl ether (MTBE)* in groundwater and sub-soil," making clear that Plaintiffs' counsel had *prior* knowledge of MTBE in the plume.  True and correct copies of selected excerpts from the expert reports of Myron A. Mehlman and Shira Kramer are attached hereto as Exhibits 4 and 5, respectively. (*See,* Ex. 4 at ¶ 3 (emphasis added); Ex. 5 at ¶ 111.)

8.      Thus, it was Plaintiffs' counsel who told their experts about MTBE, not the other way around.  In fact, the presence of a small amount of MTBE in the Greenpoint plume has been a matter of public record for a number of years.  Indeed, to support the proposition that the plume contains some MTBE, Plaintiffs' expert relied on a public report that Roux Associates, Inc., ExxonMobil's consultant and co-defendant herein, submitted to the New York State Department of Environmental Conservation ("DEC") in 2004, well *before* Plaintiffs filed the *Spiroff* action.  True and correct copies of selected excerpts from the expert report of H2M Associates Inc. are attached hereto as Exhibit 6.  (*See,* Ex. 6 at p. 8.)

9.      Plaintiffs' counsel -- who has represented various plaintiffs in the MTBE MDL since well before it filed the *Spiroff* action -- was well aware of the minor presence of MTBE in the plume.  It chose not to include an MTBE claim in its *Spiroff* Complaint for the simple reason that the *Spiroff* case clearly does not belong in the MTBE MDL.

3

10.     Unlike any of the 150 actions consolidated in the MTBE MDL, and as admitted by Plaintiffs' own expert (*See* Ex. 5 ¶ 141), the Greenpoint plume has not contaminated anyone's drinking water.  No drinking water wells exist in Brooklyn.  Brooklyn residents (like all New York City residents) obtain their drinking water from upstate New York.

11.     Moreover, transferring the *Spiroff* action to the MTBE MDL would not promote efficiency, nor would it benefit the parties or the judicial system.  The *Spiroff* action is one of four related actions pending in the EDNY.  Magistrate Judge Levy, who has presided over these cases for three years now, has become intimately familiar with the history and issues surrounding the petroleum plume.  His institutional knowledge is invaluable to the *Spiroff* matter and transferring it away from him would be the height of inefficiency.

12.     Indeed, even if the Complaint were amended to include MTBE claims, the gravamen of the *Spiroff* Complaint would remain the historic spills that occurred at the former Greenpoint refineries -- spills which Plaintiffs' experts admit occurred decades *before* MTBE came to be used in gasoline.  (*See infra*).

**The Nature of the *Spiroff* Action and Related Proceedings**

13.     The Plaintiffs filed the *Spiroff* putative class action on April 14, 2006, in New York State court, along with over a dozen non-class action cases involving residents who were/are bringing the exact same claims.  The Defendants, which include ExxonMobil, BP Products North America Inc, and Roux Associates Inc. (ExxonMobil's remediation consultant), thereafter removed it to the EDNY.

14.     To date, Plaintiffs' counsel has more than twenty related lawsuits pending in state court in Brooklyn, which involve more than three hundred plaintiffs.  Like the *Spiroff* Complaint, not one of them asserts MTBE claims or even mentions MTBE.

15.     The *Spiroff* action is one of four related cases (*i.e.*, the "Companion Cases") pending in the EDNY before The Honorable Kiyo A. Matsumoto and Magistrate Judge Levy. The Companion Cases are:  *Riverkeeper et al. v. ExxonMobil; Markowitz et al. v. ExxonMobil; and The State of New York et al. v. ExxonMobil et al.*.  True and correct copies of the Companion Cases complaints are attached hereto as Exhibit 7.

16.     The *Spiroff* action and the Companion Cases were initially assigned to Judge Carol B. Amon, but were recently transferred to the Honorable Kiyo A. Matsumoto. Magistrate Judge Levy, however, has been presiding over these matters since their inception.

17.     The Companion Cases consist of related lawsuits brought by the State, an environmental group (*i.e.*, Riverkeeper), and several local politicians in Brooklyn.  Like the *Spiroff* action (and the related state court actions), the Companion Cases do not contain any allegations regarding the presence of MTBE, any claims relating to MTBE, or any allegation of contamination to drinking water.  (*See generally* Ex. 7.)

18.     The *Spiroff* Complaint alleges that the value of properties belonging to residents and/or property owners located in the Greenpoint neighborhood of Brooklyn, New York, have diminished in value as a result of Defendants' "negligent, willful, and/or wanton storage, disposal, [and] release of the oil and oil products" in the Greenpoint area.  (*See,* Ex. 1 at ¶ 57.)

19.     According to the expert report recently submitted by Plaintiffs' counsel, "the *bulk* of the product found in the Greenpoint spill area was discharged at the former refinery property (now the BP/Amoco Terminal), most likely from leaking product storage tanks and piping."  (*See,* Ex. 6 at p. 5 (emphasis added); *see also,* Ex. 1 at ¶ 43.)

20.     Plaintiffs' expert acknowledges that "the refinery ceased operations in 1965" --

nearly 20 years *before* MTBE even entered the petroleum market -- and that "the main spill

may have begun during or prior to the year 1948." (*Id.*)

21.     To be sure, the *Spiroff* Complaint and Plaintiffs' expert report

mention separate additional spills that allegedly occurred at petroleum storage terminals that

were operated *after* the refinery closed in 1965. Plaintiffs' expert cites publicly documented

spills at these terminals from 1986 to 1999, totaling approximately 125,000 gallons. (Ex. 6 at

pp. 5-7; Ex. 1 ¶¶ 40-43.) Plaintiffs' expert attributes the MTBE contamination in the

Greenpoint plume to these newer spills, acknowledging that it could not have come from the

old refineries because they preceded the use of MTBE. (*Id.*)

22.     When compared to the total spill estimates of 17.0 to 30.0 million gallons in the

overall plume, however, these more recent spills allegedly emanating from the terminals

clearly represent the proverbial "drop in the bucket," certainly not the gravamen of the *Spiroff*

Complaint.

23.     While Plaintiffs' *Spiroff* Complaint asserts various causes of action relating to

the Greenpoint plume, unlike the cases consolidated in the MTBE MDL, Plaintiffs do not

assert any claims relating to contamination of drinking water, nor do they claim that they had

drinking water wells. (*See generally* Ex. 1.)

24.     Moreover, there are no claims about MTBE whatsoever, and certainly no

claims that MTBE is "unreasonably dangerous" or that the defendants failed to warn about the

dangers of MTBE (*i.e.,* product liability claims). (*Id.*)

25.     This is not surprising. Although Plaintiffs' counsel was well aware of the

presence of MTBE in the plume at the time it filed the *Spiroff* case, it was also well aware that

MTBE was not impacting drinking water and was not a material portion of the plume; MTBE is at best a *de minimis* portion of the Greenpoimt oil plume.

**The Status of the Proceedings in the Eastern District of New York**

26.     The *Spiroff* action, as well as the substantially similar Companion Cases, have been pending in the EDNY for several years.  Magistrate Judge Levy has supervised and presided over these cases, including the pre-trial discovery in *Spiroff*, since their inception in 2006.

27.     In fact, given the commonality of factual issues among the Plaintiffs' action and the Companion Cases, the majority of the discovery produced to Plaintiffs to date has been the very same discovery that was produced by defendant ExxonMobil in the *Riverkeeper* matter.

28.     To date, ExxonMobil has produced to the *Spiroff* Plaintiffs over 150 thousand pages relating to the subject refinery and the terminal, and the remediation of the Greenpoint plume.  To the extent any pages also mentioned MTBE, they were produced as well, and Plaintiffs' counsel has been in possession of them for years.  ExxonMobil has also provided Plaintiffs with copies of interrogatory responses it previously provided to *Riverkeeper* in the Companion Cases.

29.     For their part, Plaintiffs' have allegedly produced whatever documents they had, all ten of the class representatives have been deposed, and Plaintiffs recently submitted their expert reports in support of a class certification motion, per the schedule established by Magistrate Judge Robert Levy.

30.     Thus, not only does the *Spiroff* Complaint have nothing to do with MTBE, but Plaintiffs' belated effort to change the forum comes after a significant amount of discovery has already occurred.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed at New York, New York on February 27, 2009.

John J. Calandra

RECEIVED
CLERK'S OFFICE

2009 MAR -2  P 1: 28

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR – 2 2009

FILED
CLERK'S OFFICE

**Exhibit 1**

RECEIVED
CLERK'S OFFICE

2009 MAR -2  P 1: 28

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| DEBORAH V. SPIROFF, LESZEK HAWRO and BEATA HAWRO, SLAWOMIR PERKOWSKI and his wife ELZBIETA PERKOWSKA, GLORIA FRASCO, SZYMON GABRYS and ZDZISLAWA GABRY, WILLIAM KENNEY and SYLVIA KENNEY, individually and on behalf of others similarly situated, | Index No. 11662/06 |

*Plaintiffs,*

-against -

EXXONMOBIL CORPORATION, BP PRODUCTS NORTH AMERICA INC., PEERLESS IMPORTS INC., ROUX ASSOCIATES INC. and JOHN and JANE DOES 1 through 100,

*Defendants.*

SUMMONS and AMENDED CLASS ACTION COMPLAINT

Trial by jury is desired in the County of Kings

Venue is designated pursuant to CPLR §§ 503(a), (c), & 507 in that plaintiffs reside in this county, at least one corporate defendant has its principal office in this county, and that the judgment demanded would affect the possession and use or enjoyment of real property situated in the County of Kings.

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to serve upon the plaintiffs' attorneys an answer to the

complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of

service, or within thirty (30) days after service is complete if this summons is not personally delivered to

you within the State of New York. In case of your failure to answer, judgment will be taken against you by

default for the relief demanded in the complaint.

Dated:   New York, New York
         May 22, 2006

Yours, etc.,
NAPOLI BERN RIPKA & ASSOCIATES, LLP
*Attorneys for Plaintiffs*

Alan S. Ripka

Marc Jay Bern

115 Broadway, 12th Floor
New York, New York  10006
(212) 267-3700

To:
EXXONMOBIL CORPORATION
Registered Agent
c/o The Prentice-Hall Corporation System
80 State Street
Albany, NY 12207

BP PRODUCTS NORTH AMERICA INC.
**(f/k/a Amoco Oil Company)**
Registered Agent
c/o The Prentice-Hall Corporation System
80 State Street
Albany, NY 12207

**BP Corporation America, Inc.**
**(f/k/a BP Amoco Corporation)**
c/o The Prentice-Hall Corporation System
80 State Street
Albany, NY 12207

PEERLESS IMPORTERS INC.
16 Bridgewater Street
Brooklyn, New York, 11222

ROUX ASSOCIATES INC.
**Corporate Headquarters**
 209 Shafter Street
Islandia, New York 11749
(631) 232-2600


JOHN and JANE DOES 1 through 100

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

DEBORAH V. SPIROFF, LESZEK HAWRO and BEATA
HAWRO, SLAWOMIR PERKOWSKI and his wife
ELZBIETA PERKOWSKA, GLORIA FRASCO,
SZYMON GABRYS and ZDZISLAWA GABRY,
WILLIAM KENNEY and SYLVIA KENNEY,
individually and on behalf of others similarly situated,

*Plaintiffs,*

-*against* -

EXXONMOBIL CORPORATION, BP PRODUCTS NORTH
AMERICA INC., PEERLESS IMPORTS INC., ROUX
ASSOCIATES INC. and JOHN and JANE DOES 1 through 100,

*Defendants.*

Index No. 11662/06

AMENDED
CLASS ACTION COMPLAINT

Trial by jury is desired in the
County of Kings

Venue is designated pursuant to
CPLR §§ 503(a), (c), & 507 in that
plaintiffs reside in this county, at least
one corporate defendant has its
principal office in this county, and
that the judgment demanded would
affect the possession and use or
enjoyment of real property situated
in the County of Kings.

Plaintiffs DEBORAH V. SPIROFF, LESZEK HAWRO and BEATA HAWRO,

SLAWOMIR PERKOWSKI and his wife ELZBIETA PERKOWSKA, GLORIA FRASCO,

SZYMON GABRYS and ZDZISLAWA GABRY, WILLIAM KENNEY and SYLVIA

KENNEY, individually and on behalf of others similarly situated, through their attorneys,

NAPOLI BERN RIPKA & ASSOCIATES, LLP complaining of defendants, respectfully allege

the following upon information and belief, except as to the allegations, which pertain to the

plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are

based upon; *inter alia,* the investigation made by and through their attorneys. Plaintiffs, by and

through their attorneys NAPOLI BERN RIPKA & ASSOCIATES, LLP as and for their

complaint, hereby allege:

## INTRODUCTION

1.  Plaintiffs are all individuals who are and/or were residents and/or property owners

and/or employees of companies of/in the Greenpoint area of the Borough of Brooklyn, New York

City, New York. Plaintiffs, at the time of sustaining the injuries complained of herein, have been the owners, lessees and/or occupants of certain real property consisting of various lands and various types of residences located in Brooklyn, New York that are located near the real property and facilities currently known and used as the ExxonMobil Brooklyn Terminal and/or ExxonMobil Kingsland Avenue ("TERMINAL"), the BP Brooklyn Terminal ("BP TERMINAL") located at or about 315 Norman Avenue, and the real property formerly owned by the corporation known as Texaco Inc. ("TEXACO PROPERTY") located at or about 16 Bridgewater Street.

2.   Due to the negligent, willful, and/or wanton actions of the various defendants, millions of gallons of oil and oil products have been released into the ground and Defendants have continued to this date to fail to remove the contamination that migrated and continues to migrate onto plaintiffs' properties causing plaintiffs to suffer ongoing injury and damages to their persons and properties.

### THE PARTIES: PLAINTIFFS

3.   Plaintiff DEBORAH V. SPIROFF is an owner and/or resident of the property located at 593 Morgan Avenue, in the Greenpoint area of Brooklyn, New York, 11222.  Plaintiff DEBORAH V. SPIROFF has suffered foreseeable injury and damage as a proximate result of defendants' actions and failures to act in that her property has been damaged, trespassed upon, her property rights have been violated, and the value of her home has been adversely affected and she has been exposed to toxic chemicals. Plaintiff DEBORAH V. SPIROFF brings suit against each defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

4.   Plaintiffs LESZEK HAWRO and BEATA HAWRO own and reside, along with their two infant daughters, in a three-family house located at 162 Monitor Street in the Greenpoint area

2

of Brooklyn. In addition, they own and derive rental income from a second three family house located at 160 Monitor Street. Plaintiffs LESZEK HAWRO and BEATA HAWRO have suffered foreseeable injury and damage as a proximate result of defendants' actions and failures to act in that their properties have been damaged and trespassed upon, and their property rights have been violated, and the value of their home and rental property have been adversely affected and both, along with their children, have been exposed to toxic chemicals. Plaintiffs LESZEK HAWRO and BEATA HAWRO bring suit against each defendant named herein for each cause of action listed herein and seek general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

5. Plaintiffs SLAWOMIR PERKOWSKI and his wife ELZBIETA PERKOWSKA reside with their adult son and two infant children in a three-family house located at 188 Russell Street in the Greenpoint area of Brooklyn. In addition, they own and derive rental income from a second three family house located at 210 North Henry Street. Plaintiffs SLAWOMIR PERKOWSKI and his wife ELZBIETA PERKOWSKA have suffered foreseeable injury and damage as a proximate result of defendants' actions and failures to act in that their properties have been damaged and trespassed upon, and their property rights have been violated, and the value of their home and rental property have been adversely affected and both, as well as their children, have been exposed to toxic chemicals. Plaintiffs SLAWOMIR PERKOWSKI and his wife ELZBIETA PERKOWSKA bring suit against each defendant named herein for each cause of action listed herein and seek general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

3

6.   Plaintiff GLORIA FRASCO owns a home located at 142 Newton Street, in Greenpoint, Brooklyn, where she resides along with her husband who is not a named plaintiff. Plaintiff GLORIA FRASCO has suffered foreseeable injury and damage as a proximate result of defendants' actions and failures to act in that her property has been damaged and trespassed upon, and her property rights have been violated; the value of her home has been adversely affected and she has been exposed to toxic chemicals. Plaintiff GLORIA FRASCO brings suit against each defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

7.   Plaintiffs SZYMON GABRYS and ZDZISLAWA GABRY are owners of the property located at 244 Nassau Avenue, where they own a ground floor business and reside with their two adult children and one infant child.  They also own and derive rental income from the property located at 70 Newell Street where they own and operate a ground floor business, as well as rent residential space therein.  Both properties are in the Greenpoint area of Brooklyn.  Plaintiffs SZYMON GABRYS and ZDZISLAWA GABRY have suffered foreseeable injury and damage as a proximate result of DEFENDANTS' actions and failures to act in that their properties have been damaged, trespassed upon, their property rights have been violated, and the value of their home and rental properties have been adversely affected and they, along with their children, have been exposed to toxic chemicals. Plaintiffs SZYMON GABRYS and ZDZISLAWA GABRY bring suit against each defendant named herein for each cause of action listed herein and seek general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

8.   Plaintiffs WILLIAM KENNEY and SYLVIA KENNEY are owners of the property located at 195 Russell Street, where reside.  Plaintiffs WILLIAM KENNEY and SYLVIA

4

KENNEY have suffered foreseeable injury and damage as a proximate result of defendants' actions and failures to act in that their properties have been damaged, trespassed upon, their property rights have been violated, and the value of their home has been adversely affected and they have been exposed to toxic chemicals. Plaintiffs WILLIAM KENNEY and SYLVIA KENNEY bring suit against each defendant named herein for each cause of action listed herein and seek general damages directly and foreseeably resulting from defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

## THE PARTIES: DEFENDANTS

9.   Upon information and belief, defendant EXXONMOBIL CORPORATION is a New Jersey corporation with its corporate headquarters in Irving, Texas.

10.   The EXXONMOBIL TERMINAL is owned, operated, managed, and/or controlled by defendant EXXONMOBIL.

11.   Defendant EXXONMOBIL, at all times relevant herein was and is, authorized to do business and is doing business in State of New York.

12.   Defendant EXXONMOBIL owned, operated, managed, controlled and/or was liable for toxic pollution emanating from the EXXONMOBIL TERMINAL and properties located in Brooklyn, New York, currently and formerly owned, occupied, and controlled by defendant EXXONMOBIL.

13.   Upon information and belief, defendant BP PRODUCTS NORTH AMERICA INC. is an Indiana corporation with its corporate headquarters in Warrenville, Illinois.

14.   The BP TERMINAL is owned, operated, managed, and/or controlled by defendant BP.

15.   The BP TERMINAL was formerly owned, operated, managed and/or otherwise controlled by defendant EXXONMOBIL and/or its corporate predecessor Mobil Oil Company.

5

16.   Defendant BP at all times relevant herein was and is, doing business in the State of New York.

17.   Defendant BP owned, operated, managed, controlled and/or was liable for toxic pollution emanating from operated the BP TERMINAL in Brooklyn, New York.

18.   Upon information and belief, defendant PEERLESS IMPORTERS, INC. ("PEERLESS") is a New York Corporation with its corporate headquarters and/or principal place of business located at 16 Bridgewater Street, Brooklyn, New York, 11222.

19.   Defendant PEERLESS currently owns, possesses, controls, and/or otherwise occupies the TEXACO PROPERTY.

20.   During the time that the TEXACO PROPERTY was owned, possessed, controlled and/or occupied by defendant PEERLESS, the oil spill and/or ground contamination discussed herein occurred, and at least some of the oil and/or hazardous materials were spilled or released on and from the TEXACO PROPERTY.

21.   At all times relevant herein defendant PEERLESS was and is, authorized to do business and is doing business in State of New York, and defendant PEERLESS owned, operated,-managed, controlled and/or was liable for toxic pollution emanating from the TEXACO PROPERTY located in Brooklyn, New York.

22.   Upon information and belief, defendant ROUX ASSOCIATES INC. ("ROUX") is a New York Corporation with its corporate headquarters in Islandia, New York.

23.   Defendant ROUX by contract, or gratuitously, undertook to test, evaluate, remediate, eliminate, contain, and/or clean-up the oil and oil products spilled or released by the other defendants.

24.   Defendant ROUX has acted negligently or otherwise wrongfully in testing, evaluating, remediating, eliminating, containing and/or cleaning-up oil and oil products.

6

25. Defendant ROUX has sought and received compensation for undertaking such actions.

26. At all times relevant herein defendant ROUX was and is, authorized to do business and is doing business in State of New York.

27. Upon information and belief, defendants JOHN and JANE DOES 1 through 100, inclusive, and each of them ("DOE DEFENDANTS"), are corporations or other entities and/or individuals organized and existing under and by virtue of one of the states of the United States, or by a foreign state and/or country, and authorized to do business and doing business in the State of New York.

28. Plaintiffs are unaware of the true names and capacities whether individual, corporate, associate, or otherwise, of DOE DEFENDANTS sued herein as DOES 1 through 100, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will seek leave of the court to amend this complaint to allege the true names and capacities of said fictitiously named defendants when the same have been ascertained. Said defendants are sued as principals, and all of the acts performed by them as agents, servants and employees were performed within the course and scope of the authority and employment.

29. Upon information and belief, some or all of the defendants named herein and the DOE DEFENDANTS are the agent, partner, manager, or controlling entity of the other defendants, and in doing the things hereinafter alleged each were and are acting within the course and scope of such agency, partnership, management or control with the full knowledge and consent of the other defendants, and that at all times all agents of defendants acted with the advance knowledge or under the direction or with the ratification of corporate officers who had the ability to bind the corporation.

7

30.     Upon information and belief, each of the defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to plaintiffs, as alleged, either through each defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

31.     At the time of defendants' acts complained of herein, plaintiffs, an individual, at all relevant times, have or had owned property, and/or have or had resided, within the vicinity of the EXXONMOBIL TERMINAL and BP TERMINAL. Plaintiffs have each suffered injury and/or damage as a result of defendants' actions.

## VENUE

32.     This case is properly venued in this Court pursuant to CPLR 503(a), due to the residence of plaintiffs, pursuant to CPLR 503(c), as defendant PEERLESS is a New York corporation with its primary office in Kings County, and pursuant to CPLR 507 because the judgment demanded would affect the possession, use or enjoyment of real property situated in the County of Kings. The actions, injuries, and damages alleged herein occurred in Kings County, New York.

## JURISDICTION

33.     This Court has personal jurisdiction over the defendants as each of them are doing business in New York and own property in New York such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this state.

8

## BACKGROUND

34.     The Greenpoint area of Brooklyn, New York, has a long history of supporting both industrial and residential property uses. This industrial history includes oil or petroleum refineries and storage.

35.     One such company that engaged in the business of refining and storing oil was Standard Oil. Standard Oil owned the Greenpoint property including but not limited to the real property bordered on the west by N. Henry Street, on the northeast and east by Newtown Creek, and on south by Norman Avenue. This property includes the property referred to herein as the EXXONMOBIL TERMINAL. After Standard Oil was broken up under anti-trust laws and after a series of mergers, the business owning this real property was known as Mobil Oil Company ("Mobil").

36.     Mobil sold portions of this land to other companies in the 1960's but retained the real property identified herein as the EXXONMOBIL TERMINAL. Mobil is now known as the defendant referred herein as EXXONMOBIL and said defendant still owns, occupies and controls the EXXONMOBIL TERMINAL and, until approximately 1994, used the EXXONMOBIL TERMINAL for petroleum bulk storage.

37.     Another company engaged in the business of refining and storage of oil and petroleum products was Amoco Oil Corporation. Amoco Oil Company purchased property in Greenpoint from Mobil. This property is bordered on the east by Newtown Creek and the south by Norman Avenue. This property has been owned, possessed, and controlled by Amoco Oil Company since that purchase, though Amoco Oil Company is now known as BP PRODUCTS NORTH AMERICA INC. (referred herein as DEFENDANT BP) after merging with British Petroleum. The real property and facility located on such real property is referred to herein as the BP TERMINAL.

9

38.     A third relevant company engaged in the business of refining and storage of oil and/or petroleum in Greenpoint was Paragon Oil. Paragon Oil owned and operated an oil refinery and storage facility on real property previously identified herein as the TEXACO PROPERTY. Texaco Inc. purchased Paragon Oil and with it, the TEXACO PROPERTY. Thereafter, Texaco owned the TEXACO PROPERTY and operated a business refining and/or storing petroleum and/or oil.

39.     Defendants EXXONMOBIL, BP, PEERLESS, and DOES 1-100 (collectively, "defendants") so negligently stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released the oil, petroleum, petroleum products, oil additives, petroleum additives, petroleum product additives, gasoline, gasoline additives, including but not limited to lead, benzene, toluene, xylene, kerosene, refinery oil, solvents, and other hazardous and toxic substances and chemicals (collectively referred to as "oil and oil products") so as to cause severe contamination of the ground, soil, groundwater, and/or aquifer, and/or said defendants own or owned property upon which such actions and/or results occurred.

40.     In 1978, the Coast Guard discovered oil seeping out of the banks of Newtown Creek in the area of defendants' properties in Brooklyn. The Coast Guard launched a formal investigation and hired the firm Geraghty & Miller ("G&M") to evaluate the spill.

41.     G&M spent a year investigating the spill to determine its nature and origin. G&M estimated that a 17 million gallon plume of oil and oil products (the "plume") extended under 55 acres of commercial, industrial, and residential Greenpoint including the TERMINALS and TEXACO PROPERTY. The Coast Guard subsequently stated that the plume may contain up to 30 millions gallons of oil and oil products.

42.     According to G&M, the spill likely migrated and would continue to migrate with groundwater and by following underground conduits such as sewer pipes and the ancient bed of the tidal creek.

43.     G&M concluded that the majority of the spill most likely originated either at defendant EXXONMOBIL'S EXXON TERMINAL or defendant BP's BP TERMINAL.

44.     At or about the time of that the oil and oil products were spilled, disposed of, or otherwise released into ground, the TEXACO PROPERTY was being used to store diesel fuel, kerosene, gasoline, fuel oil, etc., at a capacity of over six million gallons.

45.     Accordingly to information released by defendant ROUX in 2005, there is evidence that the source of the oil and oil products residing under the TEXACO PROPERTY and migrating off of the TEXACO PROPERTY is the storage units formerly owned, maintained, and used by Paragon Oil on the TEXACO PROPERTY.

46.     In the decade that followed the 1979 report, after the defendants received formal notice of the dangerous conditions created by their actions, little action, if any, was taken by defendants to eliminate, correct, and or remedy the plume or prevent its continued migration.

47.     After much delay, in 1990, defendant EXXONMOBIL entered into an agreement to take action to remediate "on- and off-site" plumes. Defendant EXXONMOBIL continued to delay and fail to take action with respect to recovering oil and oil products that had migrated off the EXXONMOBIL TERMINAL, not even starting its offsite remediation system until 1995.

48.     Defendant EXXONMOBIL has continued to make promises to the State environmental authorities and to the people residing near the plume that it would diligently pursue a cleanup, but those promises have been broken.

49.     Defendant ROUX has undertaken to evaluate, remediate, eliminate, contain, and/or clean-up the oil and oil products in the plume.

11

50.     Over the several years since defendant ROUX undertook such actions and responsibilities, ROUX has delayed, failed to act, and/or failed to act in a reasonably diligent manner to perform such actions and responsibilities.

51.     Defendant ROUX was responsible to properly study the contamination and design and implement plans for cleanup but did so in a negligent or otherwise wrongful manner by, upon information and belief, among other things, designing sampling plans in a manner that avoided revealing contamination and improperly or ineffectively remediating.

52.     Defendant ROUX's past and continued failure to take reasonable actions to remediate, eliminate, contain, and/or clean-up the oil and oil products has caused and continues to cause plaintiffs harm, injury and damages.

53.     Neither Texaco Inc., nor any subsequent owner or lessee of that property has taken any significant actions to eliminate, correct, or remedy the oil and oil products on the TEXACO PROPERTY.

54.     Defendant PEERLESS has not taken any significant actions to eliminate, correct, or remedy the oil and oil products on its property.

55.     The remediation plans, if any, set forth by defendants were and are inadequate and insufficient given size of the spill and the present and historical migration. Defendants have failed to exercise reasonable care to eliminate, correct, and/or remedy the dangerous condition created by them and/or located upon their land.

56.     Defendants have further intentionally delayed and chosen courses of action patently adequate and unreasonable given the circumstances presented. The actions chosen and taken by defendants were with knowledge that such delay and minimal action would cause the oil and oil products to disburse and migrate off of the TERMINALS and TEXACO PROPERTY and onto

12

plaintiffs' land and property. These actions have been undertaken with actual malice and in wanton and willful and/or reckless disregard for plaintiffs' rights, health, and property.

57.     As a result of defendants' negligent, willful, and/or wanton storage, disposal, release of the oil and oil products and hazardous and toxic substances into soil and/or groundwater, and/or the subsequent and continuing failure to remediate or take reasonable action to remediate the release and migration of said substances, there is contamination located in or about various areas and neighborhoods of the Greenpoint, as well as surrounding communities, which has migrated and continues to migrate throughout these areas and "neighborhoods and onto the properties of plaintiffs at dangerous levels, including at concentration levels in excess of federal and/or state regulatory limits. In addition, defendants' failure to properly investigate, test and remediate the hazardous and toxic substances on their own real properties continues to allow dangerous chemicals to migrate onto plaintiffs' properties.

58.     The presence of defendants' hazardous materials including the oil and oil products in plaintiffs' environment and on plaintiffs' properties has resulted in permanent and continuing harm to plaintiffs' persons and properties.

59.     As the oil and oil products migrate from defendants' property across other properties and onto plaintiffs' properties, said oil and oil products continually come in contact with, mix with, and react to otherwise benign substances, materials, and chemicals. Such contacts, mixtures, and reactions foreseeably result in new, different and/or additional hazardous materials entering upon, trespassing, and interfering with the rights of plaintiffs as a result of defendants' actions.

60.     Further, as the oil and oil products age and decompose, they create byproducts and/or release noxious gases, fumes, and odors including methane. Such by-products including methane rising through the soil becomes trapped under foundations, streets, and driveways and

13

creates a real and foreseeable risk of ignition and/or explosion, as well as exposures to harmful toxins and odors.

61.     According to reports published by the New York State Department of Environmental Conservation on January 25, 2006 and by defendant ROUX ASSOCIATES on or about February 6, 2006, results from sampling tests conducted on properties on and around the plume. Said sampling results evidenced new information regarding elevated levels of methane and benzene present in the soil above the groundwater plume and potentially causing vapor intrusions into neighboring properties and into the ambient air. News of these results and this new information was first disseminated on or about July 13, 2005. This new information became known to plaintiffs at some point thereafter.

62.     On or about September 16, 2005, the New York State Department of Environmental Conservation announced its approval of a work plan from defendant EXXONMOBIL to sample soil gas at approximately 16 additional points in the Greenpoint area. The purpose of the sampling was to determine if vapors from the plume are impacting indoor air.

63.     Defendant EXXONMOBIL started the investigation on or about September 19, 2005. Plaintiffs have not received the results of such sampling. The sampling program, while needed to assist in determining the harm being done by defendants, has a devaluing impact on plaintiffs' properties.

64.     At all times prior to September 2005, defendants have stated and maintained that the plume and/or the oil and oil products were not affecting plaintiffs' properties, air, or health.

65.     Due to the defendants' negligent handling of the oil and oil products, defendants' failure to avoid spilling, unsafe disposal, and/or release of said toxic substances into environment, failure to adequately warn plaintiffs of the condition of their property, and failure to act reasonably in eliminating, correcting, and/or remediating the condition, defendants, and each of them, are

14

obligated to institute reasonable care and compensation plans to halt, prevent and correct injuries to all plaintiffs, their physical and mental well-being, their real and personal property, and their economic interests.

66.     Due to their proximity to the TERMINALS and TEXACO PROPERTY, plaintiffs would be, and are foreseeably and unnecessarily injured by the discharge of defendants' oil and oil products, failure to warn, and failure to exercise reasonable care to eliminate, correct, and/or remediate the dangerous condition created and maintained by defendants on and around the TERMINALS and TEXACO PROPERTY.

67.     Defendants knowingly and negligently released or allowed to be released toxic contaminants into the environment; and/or continue to allow the migration of toxic chemicals into the environment on and around plaintiffs' properties.

68.     Plaintiffs were and are exposed to these toxic contaminants by ingestion, inhalation, and dermal exposure.

69.     Plaintiffs have been and continue to be exposed to these toxic contaminants through dust dispersing through the air into plaintiffs' properties and surrounding communities; through the migration of the contaminants through the water table and groundwater which percolates up through the soil into the soil and the environment and into the plaintiffs' homes through the vapor intrusion pathway. In addition, plaintiffs have been exposed to these toxic contaminants through contact with the soil.

70.     The defendants intentionally and/or negligently failed to adequately warn or advise plaintiffs and other members of the public as to the nature, extent, composition, effects, and location of the contamination, the fact that plaintiffs and their property were being exposed to the contamination, that the nature of the contaminants and risks could change over time, and that exposure to the contamination could cause adverse health effects.

71.     The numerous egregious actions and incidents occurring at and near the TERMINALS by defendants constitute intentional and/or negligent breach of their duty of reasonable care, and violations of state law.

72.     Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each plaintiffs' rights to possession and undisturbed occupancy of their residences, have repeatedly trespassed by causing migration of "toxic contaminants onto plaintiffs' real properties, have caused continuing damage to plaintiffs' persons and real and personal properties and have caused continuous injury to the land values of those plaintiffs holding real property due to devaluation, resulting from negative publicity that has unfairly injured their competitive status in home equity- and re-sale value in relation to real property owners similarly situated in areas outside of the areas affected by the plume and contamination.

73.     Each and every plaintiff has suffered and continues to suffer various types of injuries due to the acts of the defendants as herein before alleged. Plaintiffs, and each of them, have, due to the acts of all the defendants, suffered and continue to suffer sudden, repeated and continual invasions of their rights of possession and to undisturbed occupancy of their residences and living areas.

74.     Those plaintiffs who own real property have, due to the acts of the defendants, suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property. This injury has resulted, in part, from the numerous public interest reports in the printed press concerning the contamination.

75.     Due to the negligent and/or intentional acts of each of the defendants, plaintiffs have suffered and continue to suffer from the damage to the air, water and subterranean soils around the TERMINALS, the TEXACO PROPERTY, and plaintiffs' homes. This dilemma further concerns

16

plaintiffs in light of the anticipated risk of potentially injurious and unhealthy vapors escaping through the surface of residential grounds and adjacent private property.

76.     Plaintiffs have, due to the acts of each of the defendants, suffered and continue to suffer from the general diminution in the aesthetic qualities of their homes and the area in which they reside, caused by the total compounded effect of all of the above-described circumstances, causing injury to the visual, audible and physically sensible environment of the vicinity surrounding the TERMINALS and TEXACO PROPERTY.

77.     In order to compensate plaintiffs for damages suffered due to defendants' acts, each plaintiff requires, among other things, that defendants, and each of them, pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the PLUME, with plaintiffs retaining freedom of choice relative to choosing their experts. Many of these costs would not be covered by plaintiffs' health care insurers, and if covered, may unfairly result in increased premiums.

78.     Further, plaintiffs seek compensation for: the diminution in the economic value of their personal and real property; residential soil and air space testing and monitoring; cleanup, removal and remediation of any and all contamination of plaintiffs' properties including the costs of investigation and testing of plaintiffs' properties; repairs to real property damaged by defendants; other damages; and attorneys' fees and costs as allowed by law.

79.     Further, plaintiffs seek injunctive relief as allowed by law and required by justice, including, but not limited to, an order compelling defendants to take specific actions to cleanup, remediate, and/or correct the plume.

80.     To the extent that defendants' oil and oil products have commingled, defendants are jointly and severally liable for the damages from contamination in this case.



## CLASS ACTION ALLEGATIONS

81.     Plaintiffs repeat and reallege each and every one of the allegations set forth in the foregoing paragraphs numbered 1 through 84, inclusive, as if fully set forth herein.

82.     The class represented by the plaintiffs herein comprises a group of homeowners, renters, property owners, residents and their family members living or owning property in Greenpoint, Brooklyn, and as such, is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

83.     There are questions of law or fact common to the class which predominates over any questions affecting only individual members.  These include but are not limited to whether the negligence of the defendants herein caused or contributed to or will in the future cause a diminution of property and resale values; the necessity of remediation of the hazardous condition(s); the need for environmental and medical testing and monitoring.

84.     The claims or defenses of the representative parties are typical of the claims or defenses of the class.

85.     The representative parties will fairly and adequately protect the interests of the class. Each of the plaintiffs named in the caption herein are either homeowners who live in their Greenpoint homes and/or property owners who earn rental income from such properties owned in Greenpoint. *See, e.g.,* "The Parties," *supra.*

86.     A class action pursuant to CPLR Article 9 is superior to other available methods for the fair and efficient adjudication of the controversy.

### AS AND FOR A FIRST CAUSE OF ACTION:
### NEGLIGENCE AS TO DEFENDANTS EXXONMOBIL, BP,
### TEXACO, PEERLESS, AND DOES 1 THROUGH 100)

87.     Plaintiffs hereby repeat reallege and reiterate each and every allegation in the

paragraphs numbered 1 through 86 as if fully restated herein.

88.     Defendants failed to employ reasonable care which a reasonably prudent person

should use under the circumstances by storing, transporting, disposing of, or otherwise releasing

into the ground between 17 and 30 million gallons of oil and oil products.

89.     Defendants, and each of them, owed plaintiffs a cognizable duty to exercise

reasonable care in the storage, transportation, and disposal of the oil and oil products and the

maintenance their tools and equipment used for such acts.

90.     Upon learning of the release of the oil and oil products, defendants owed plaintiffs a

duty to act reasonably to remediate, contain, and eliminate the spill before it injured plaintiffs and

their property and/or to act reasonably to minimize the damage to plaintiffs and their property.

91.     Defendants breached that duty by failing to act reasonably in the storage,

transportation, disposal and release of the oil and oil products. Further defendants failed to take

reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy the spill after it

occurred.

92.     Upon learning of the release of the oil and oil products, defendants owed plaintiffs a

duty to timely notify plaintiffs that the aforementioned spills in the vicinity of defendants' storage

and refining facilities had occurred.

93.     Defendants breached that duty by failing to timely notify the plaintiffs of the spills of

oil and oil related products in the vicinity of the defendants' storage and refining facilities, and,

consequently, in the vicinity of plaintiffs' homes and rental properties.



94.    As a result of defendants' breaches of their duty to timely notify the plaintiffs, the plaintiffs were forestalled from undertaking effective and immediate remedial measures and plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of defendants' negligence for many years into the future.

95.    Defendants negligently breached their duties to the plaintiffs to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of oil and oil products into the environment surrounding their facilities and, consequently, surrounding the plaintiffs' homes and rental properties.

96.    Defendants' breaches of their duties were direct and proximate causes of plaintiffs' damages and imminent, substantial and impending harm to the plaintiffs' homes, rental properties and health.

97.    Defendants owed plaintiffs a duty to warn plaintiffs that the aforementioned spills in the vicinity of defendants' storage and refining facilities might occur .

98.    Defendants breached that duty by failing to warn the plaintiffs of the likelihood of spills of oil and oil related products in the vicinity of the defendants' storage and refining facilities, and, consequently, in the vicinity of plaintiffs' homes and rental properties.

99.    As a result of defendants' breaches of their duty to warn the plaintiffs, the plaintiffs were forestalled from undertaking effective and immediate remedial measures and plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of defendants' negligence for many years into the future.

100.    Plaintiffs suffered foreseeable injuries and damages as a proximate result of said defendants' negligent breach of their duties as set forth above. At the time defendants breached their duties to plaintiffs, defendants' acts and/or failures to act posed recognizable and foreseeable

20



possibilities of danger to plaintiffs so apparent as to entitle plaintiffs to be protected against such actions or inactions.

101.    Accordingly, plaintiffs seek damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of defendants conduct in an amount to be proved at trial.  Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

### AS AND FOR A SECOND CAUSE OF ACTION:<br>NEGLIGENCE PER SE

102.    Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 101 as if fully restated herein.

103.    Defendants had a duty to comply with applicable laws, regulations and guidelines applicable to persons refining, managing, storing, using and distributing oil and oil products, including but not limited to New York's Navigation Law.

104.    Upon information and belief, defendants failed to operate their facilities in compliance with the applicable laws and regulations relevant to air, soil and water quality protection.

105.    These laws and regulations were intended for the protection of public and private health, safety, property and economic interests.

106.    Plaintiffs are members of the group(s) whose protection was intended by the drafters of such laws and regulations.

107.   These violations were a direct and proximate cause of the substantial damages and imminent, substantial and impending harm to plaintiffs' homes, rental properties and health.

108.   The risk of damages and the imminent, substantial and impending harm to the plaintiffs are precisely the types of injuries the applicable laws were designed to prevent.

109.   Violations of these laws and regulations thereby constitute per se negligence.  The amount of damages for the injuries will be established at the time of trial.

## AS AND FOR A THIRD CAUSE OF ACTION: NUISANCE AS TO DEFENDANTS EXXONMOBIL, BP, TEXACO, PEERLESS, AND DOES 1 THROUGH 100

110.   Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 109 as if fully restated herein.

111.   Defendants have maintained and continue to maintain a condition on their properties that is an illegal burden and/or servitude on plaintiffs' properties.

112.   Defendants' wrongful actions in the creation of the contamination, maintenance of their land and the plume, and failure to reasonably abate, minimize or remediate the plume resulting in migration of oil and oil products onto plaintiffs' properties', creation of noxious fumes, gases and odors, and the risk of explosion, injures and/or annoys plaintiffs in their enjoyment of their legal rights and quality of life. Such conditions constitute an ongoing specific, particular and unique burden on the plaintiffs' persons and their property.

113.   Such wrongful acts by defendants in the maintenance and use of their land and failure to remediate the contamination was and is a foreseeable and proximate cause of injury, discomfort, annoyance, inconvenience, and/or damage to plaintiffs themselves and their property.

114.     Defendants' conduct is the legal cause of the intentional, unreasonable, negligent, and/or reckless invasion of plaintiffs' interests in the private use and enjoyment of their land. Such actions' tendency is to create danger and inflict injury upon person and property.

115.     Defendants' conduct in performing acts or failing to act has caused one or more substantial, unreasonable, and intentional interference with plaintiffs' right to use and enjoy their property as discussed above.

116.     Accordingly, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of defendants conduct in an amount to be proved at trial.  Upon information and belief, such amount exceeds the jurisdictional amounts of the lower courts.

## AS AND FOR A FOURTH CAUSE OF ACTION: PREMISES LIABILITY AS TO DEFENDANTS EXXONMOBIL, BP, TEXACO, PEERLESS, AND DOES 1 THROUGH 100

117.     Plaintiffs hereby repeat, realloge and reiterate each and every allegation in the paragraphs numbered 1 though 116 as if fully restated herein.

118.     Defendants, and each of them, acted with a lack of reasonable care which an ordinary prudent person would use under the circumstances which caused foreseeable damage to plaintiffs.

119.     Defendants EXXONMOBIL and DEFENDANT BP owned and continue own, occupied and continue to occupy, and controlled and continue to control the real property referred to

23

as the EXXONMOBIL TERMINAL and BP TERMINAL, respectively. Texaco, Inc. owned, occupied, and controlled the TEXACO PROPERTY at the time of the spill or release of OIL AND OIL PRODUCTS. Defendant PEERLESS owns, occupies, and controls the TEXACO PROPERTY and has owned, occupied and controlled said property for several years.

120.    Defendants owned, occupied, controlled and/or still own, occupy and control their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

121.    At all times mentioned herein, defendants had knowledge and/or notice of the dangerous condition that the oil and oil products and the plume presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

122.    Plaintiffs have suffered foreseeable injury and damages proximately caused by the negligent creation and/or maintenance of the dangerous condition by defendants. Defendants owed a duty to plaintiffs and those similarly situated to refrain from creating and/or maintaining a dangerous condition on defendants' properties that was reasonably foreseeable to injure plaintiffs and/or their real property.

123.    Additionally, defendants owed a duty to plaintiffs and those similarly situated to take reasonable action to eliminate, correct, or remedy any dangerous condition existing on defendants' property that was reasonably foreseeable to injure plaintiffs and/or plaintiffs' real property, and of which they had knowledge and/or notice.

124.    Additionally, defendants owed a duty to plaintiffs and those similarly situated to warn of a particular hazard arising out of a condition on defendants' property and/or defendants' maintenance of their property that was reasonably foreseeable to injure plaintiffs and/or their real property and of which defendants had knowledge and/or notice.

125.    Further, defendants owed a duty to plaintiffs and those similarly situated to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants.

126.    Defendants owed a duty to plaintiffs and those similarly situated to exercise reasonable care to keep dangerous substances such as oil and oil products from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

127.    Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities oil and oil products to be spilled, disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer on their property. This dangerous condition is reasonably foreseeable to cause injury and damage to plaintiffs and their property due to the size and nature of the spill and the proximity of plaintiffs and their properties.

128.    Defendants have further breached their duty by continuing and maintaining this dangerous condition on defendants' property that was reasonably foreseeable to injure plaintiffs and/or their real property.

129.    Defendants breached their duty to plaintiffs and those similarly situated by failing to take reasonable actions under the circumstances to warn of a particular hazard arising out of a condition on defendants' property and/or defendants' maintenance of their property that was reasonably foreseeable to injure plaintiffs and/or their real property and of which they had knowledge and/or notice.

130.    Defendants breached their duty to plaintiffs and those similarly situated by failing to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the

neighboring premises and occupants. Specifically, defendants negligently, willfully, and/or wantonly allowed massive quantities oil and oil products to be spilled, disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer on their property.

131.   Defendants further breached their duty to plaintiffs and those similarly situated by failing to exercise reasonable care and by maintaining their property in such a condition as to allow and fail to prevent millions of gallons of oil and oil products degrade, mix with other chemicals, and escape from their property and enter onto and under plaintiffs' property. The above-described breaches endangered, injured, and damaged the neighboring premises and occupants. Such a dangerous condition is reasonably foreseeable to cause injury and damage to plaintiffs and their property.

132.   Defendants' breach caused dangerous and hazardous oil and oil products onto plaintiffs' land and caused noxious gases, fumes and odors to emanate from their soil and homes. Accordingly, this breach has caused plaintiffs injury to their persons and property that is certain, substantial, and this resulting condition interferes with plaintiffs' physical comfort.

133.   Accordingly, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of defendants conduct in an amount to be proved at trial. Upon information and belief, such amount exceeds the jurisdictional amount of all lower courts.

26

## AS AND FOR A FIFTH CAUSE OF ACTION: TRESPASS
## AS TO DEFENDANTS EXXONMOBIL, BP, TEXACO,
## PEERLESS, AND DOES 1 THROUGH 100

134.     Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the

paragraphs numbered 1 though 133 as if fully restated herein.

135.     Defendants EXXONMOBIL, BP, TEXACO, PEERLESS, and DOES 1-100's

negligent, willful, and/or wanton actions and/or intentional failures to act caused between 17 and 30

million gallons of oil and oil products to be spilled, disposed of, or otherwise released into the

ground, soil, groundwater, and aquifer on defendants' real property.

136.     Defendants' willful, wanton, and intentional failure to act and/or their affirmative

choice of action and following course of action caused the oil and oil products to enter and trespass

upon the land and realty of the plaintiffs and cause an injury to their possession and/or right of

possession.

137.     Defendants took affirmative, voluntary, and intentional actions to store and/or

transport oil and oil products in leaking or faulty containers and/or intentionally disposed of oil

and oil products into the ground. Further, after such acts, defendants undertook affirmative,

voluntary, and intentional acts that were insufficient to remedy the condition caused by the release

of the oil and oil products.

138.     At the time that the above described affirmative, voluntary, and intentional acts were

performed defendants had good reason to know or expect that the millions of gallons of oil and oil

products would pass through the soil, groundwater, and aquifer from defendants' land to the land of

plaintiffs and the neighboring properties.

139.     The above-described affirmative, voluntary, and intentional acts were performed

with the willful intent to cause the oil and oil products to be disbursed through the soil, groundwater,

and aquifer onto the land and property of plaintiffs and the neighboring properties.

140.    These voluntary actions resulted in the immediate and continued trespass, injury and damage to plaintiffs, their property and their right of possession of their property.

141.    Further, defendants' actions in disposing of massive amounts of oil and oil products into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for plaintiffs' rights, health and property.

142.    Additionally and/or alternatively, defendants' decision to delay and resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the soil, groundwater, and aquifer on their properties after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for plaintiffs' rights, health and property.

143.    Further, defendants' actions that were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were with actual malice and in wanton and willful and/or reckless disregard for plaintiffs' rights, health and property.

144.    Based upon the above, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of defendants conduct, and exemplary or punitive damages.



### AS AND FOR A SIXTH CAUSE OF ACTION: STRICT LIABILITY UNDER NAVIGATION LAW ARTICLE 12 AS TO DEFENDANTS EXXONMOBIL, BP, TEXACO, PEERLESS, AND DOES 1 THROUGH 100

145.    Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 144 as if fully restated herein.

146.    Defendants EXXONMOBIL, BP, TEXACO, PEERLESS, and DOES 1-100 are and were persons who discharged, participated in actions constituting discharge, and/or are otherwise dischargers of petroleum as defined by New York Navigation Law Article 12.   Additionally, defendants are owners and/or operators of properties and/or facilities upon which petroleum was discharged.

147.    Defendants discharged petroleum and/or petroleum was discharged onto properties owned, leased, occupied and/or otherwise controlled by defendants.

148.    Defendants knew that oil and oil products were stored on their properties, and/or had reason to believe that oil and oil products were stored on their properties.

149.    Defendants also knew and/or had reason to believe that millions of gallons of oil and oil products were stored or situated *in* the form of the plume on and/or under their property. Defendants knew and/or had reason to believe that the oil and oil products on and under their properties were and are being released, leaking, spilling, and/or otherwise being emitted onto or into state lands, waters, and plaintiffs' properties and causing injury and damage. Said oil and oil products continue to be released and/or emitted onto and into state lands, waters, and plaintiffs' properties, causing injury and damage.

150.    As a result of defendants' discharge of petroleum onto and into state lands, waters, and plaintiffs' properties, plaintiffs and their properties have been injured and damaged and continue to suffer injury and damage.

151.    Based upon the above, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, stigma loss to property value, the cost of cleanup, removal, repair, and/or restoration, the costs associated with cleanup and removal including testing, monitoring and interpretation of such tests, relocation costs, the, consequential damages flowing from discharge including attorneys' fees and costs, which are the natural and proximate result of defendants conduct, and exemplary or punitive damages.  Upon information and belief, said amount exceeds the jurisdictional amounts of all of the lower courts.

### AS AND FOR A SEVENTH CAUSE OF ACTION: FOR NEGLIGENCE AS TO DEFENDANT ROUX

152.    Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 151 as if fully restated herein.

153.    Defendant ROUX failed to employ reasonable care which a reasonably prudent person should use under the circumstances while evaluating, remediating, containing, eliminating and/or cleaning-up the oil and oil products.

154.    Defendant ROUX undertook, either by contract or gratuitously to evaluate, remediate, contain, eliminate, and/or clean-up the oil and oil products.

155.    Defendant ROUX owed plaintiffs a cognizable duty to exercise reasonable care in the evaluating, remediating, containing, eliminating and/or cleaning-up the oil and oil products and the maintenance their tools and equipment used for such acts.

156.    Defendant ROUX failed to exercise that duty by failing to act reasonably in the evaluating, remediating, containing, eliminating and/or cleaning-up the oil and oil products. More

specifically, defendant ROUX has failed to perform adequate and appropriate testing in the appropriate locations, failed to create and implement a reasonable and adequate plan for evaluating, remediating, containing, eliminating and/or cleaning-up the oil and oil products, and/or failed to take diligent action or took improper action and caused significant delay in the remediation of the oil and oil products.

157.   Plaintiffs suffered foreseeable injuries and damages as a proximate result of said failures. At the time defendant ROUX breached its duties to plaintiffs, defendant's acts and/or failures to act posed recognizable and foreseeable possibilities of danger to plaintiffs so apparent as to entitle plaintiffs to be protected against such actions or inactions.

158.   Accordingly, plaintiffs seek damages from defendant ROUX, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of defendant's conduct in an amount to be proved at trial.  Upon information and belief, said amount exceeds the jurisdictional limits of all of the lower courts.

## AS AND FOR A EIGHTH CAUSE OF ACTION AS TO ALL DEFENDANTS:  FEAR OF CANCER

159.   Plaintiffs hereby repeat reallege and reiterate each and every allegation in the paragraphs numbered 1 though 158 as if fully restated herein, and further allege as follows on behalf of themselves and all others similarly situated:

31



160.   As a direct and proximate result of defendants' acts, omissions, and conduct as set forth above, plaintiffs have been exposed to hazardous substances and as a result have an increased risk of invisible genetic damages and have a fear of developing cancer.

161.   That the prospective consequences may with reasonable probability be expected to flow from the past harm.

162.   That plaintiffs will incur future expenses for medical monitoring and as a result seek future medical expenses as an element of the consequential damages.

163.   That the degree of probability of plaintiffs developing cancer(s) at a higher rate than might be expected in the general population is such that there is a reasonable certainty that such cancer(s) will develop, thus entitling plaintiffs to recover for apprehended consequences not presently manifested.

164.   That a rational basis exists between plaintiffs' exposure to the aforesaid toxins and contaminants that plaintiffs' fear of developing cancer in the future.

165.   That as a result of the foregoing, plaintiffs seek compensatory damages in a sum to be determined by a jury and seek punitive damages in a sum to be determined by a jury.  Upon information and belief, said amount exceeds the jurisdictional limits of all of the lower courts.

### AS AND FOR A NINTH CAUSE OF ACTION AS TO ALL DEFENDANTS: MEDICAL AND ENVIRONMENTAL TESTING AND MONITORING

166.   Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 165 as if fully restated herein.

167.   As a direct and proximate result of defendants' acts, omissions, and conduct as set forth above, plaintiffs have been exposed to a hazardous substance and as a result suffer a significantly increased risk of contracting a serous injury or latent disease.  This increased risk makes periodic diagnostic medical examinations reasonably necessary.

32



168.    Early detection and diagnosis of these diseases is clinically invaluable since it can prevent, reduce and/or significantly delay resulting discomfort, suffering and/or death and since these conditions can often appear asymptomatic absent proper testing.

169.    Easily administered, cost-effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.  For example, administration of the several readily available non-invasive tests readily diagnoses the presence of liver failure, respiratory ailments and heart dysfunction, even in asymptomatic individuals.  Early diagnosis of these diseases and conditions will allow prompt and effective treatment, which will reduce the risk of morbidity, and mortality, which these patients would suffer if treatment were delayed until their conditions became overly symptomatic.

170.    The recommended testing procedures will be subject to expert testimony at the time of class certification and/or trial.  Appropriate testing regimes will likely include the following non-invasive, readily administrable initial tests and procedures: blood screen tests, pulmonary function tests and electrocardiograms.

171.    Many individuals at risk for respiratory injury have not been advised, and do not otherwise know, of the need to undergo testing.  Class members also need to be advised of the availability of non-invasive testing as a diagnostic tool and treatment, which will prevent even more grave injury.

172.    The increased susceptibility to injuries and irreparable threat to the health of plaintiffs and other class members resulting from their exposure to these hazardous substances and chemicals can only be mitigated or addressed by the creation of a medical monitoring fund to provide for a medical monitoring programs including:

    a)    Notifying persons who worked at the premises and rescue recovery sites of the potential harm from exposure to toxicants at the site.

    b)    Funding further studies of the long term effects of exposure.

33



c) Funding research into possible cures for the detrimental effects of breathing and working with the toxicants at the site.

d) Gathering and forwarding to treating physicians information related to the diagnosis and treatment of injuries which result from the exposure.

e) Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of plaintiffs.

### AS AND FOR A TENTH CAUSE OF ACTION: ABNORMALLY DANGEROUS ACTIVITY AND ABSOLUTE AND STRICT LIABILITY

173.    Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 172 as if fully restated herein.

174.    Defendants' aforesaid failure to  employ reasonable care which a reasonably prudent person should use under the circumstances by storing, transporting, disposing of, or otherwise releasing into the ground between 17 and 30 million gallons of oil and oil products constituted ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

175.    Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leach into the surrounding land and ground water, and in doing so, failed to warn plaintiffs of the dangerous condition that was caused thereby.

176.    The risk of such activities outweighs any value associated with same. As the result of the said ultra-hazardous and abnormally dangerous activities, plaintiffs have suffered damages and imminent, substantial and impending harm to their health, their families, to the value of their homes and rental properties, and plaintiffs have expended or will be forced to expend significant resources to safeguard their health and their property, obtaining monitoring, testing, remediating services or equipment, as well as health monitoring, indefinitely for years and decades into the future.

34



177.   As a result, the contaminated land and ground water will act as a continuous source of danger to these plaintiffs for many years.

178.   By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by the plaintiffs.

179.   As a result of the foregoing, plaintiffs seek compensatory damages in a sum to be determined by a jury and seek punitive damages in a sum to be determined by a jury.  Upon information and belief, said amount exceeds the jurisdictional limits of all of the lower courts.

## AS AND FOR A ELEVENTH CAUSE OF ACTION: DECEPTIVE BUSINESS ACTS AND PRACTICES IN VIOLATION OF GENERAL BUSINESS LAW § 349 AS TO DEFENDANTS EXXONMOBIL, BP, PEERLESS AND DOES 1-100.

180.   Plaintiffs hereby repeat, reallege and reiterate each and every allegation in the paragraphs numbered 1 though 179 as if fully restated herein.

181.   Defendants are engaged in the business of refining and storage of oil and petroleum products in the State of New York.

182.   Defendants engaged in materially deceptive and misleading acts and practices in the refining and storage of oil and petroleum products, including but not limited to:

   a.   representing that their business practices in refining and storage of oil and petroleum products did not pose an unusual threat to land and groundwater contamination in the areas surrounding their facilities;

   b.   leading the public to believe that the oil and petroleum products they were refining and storing was safely contained during transport, storage and use;

   c.   failing to disclose the fact of and extent of the contamination caused by their negligent release of oil and petroleum products into the land and groundwater surrounding their facilities;

   d.   concealing the necessity for the land and groundwater in the areas surrounding their facilities to be regularly tested for early detection of contamination by oil and petroleum products.

183.    Defendants' materially deceptive and misleading practices proximately caused and continue to cause plaintiffs to incur damages including expending significant resources to test, monitor and remediate the contamination of their property and to test and monitor their health for untoward effects thereupon that may have occurred or may yet develop as a proximate result of the defendants' actions and omissions.  Plaintiffs are thus entitled to recover damages from defendants pursuant to GBL § 349.

### PRAYER FOR RELIEF

**WHEREFORE, plaintiffs demand judgment against defendants EXXONMOBIL, BP, PEERLESS, ROUX, and JOHN DOES 1-100 as follows:**

A.  As and for plaintiffs' First Cause of Action sounding in negligence, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of defendants' conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

B.  As and for plaintiffs' second cause of action sounding in negligence per se, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of

repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of defendants' conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

C.  As and for plaintiffs' third cause of action sounding in nuisance, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of defendants conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

D.  As and for plaintiffs' fourth cause of action sounding in premises liability, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of defendants conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

E.  As and for plaintiffs' fifth cause of action sounding in trespass, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their

37

injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, consequential damages flowing from the trespass which are the natural and proximate result of defendants' conduct, in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

F.   As and for plaintiffs' sixth cause of action based upon New York Navigation Law, plaintiffs seek general damages from defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by plaintiffs and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, stigma loss to property value, the cost of cleanup, removal, repair, and/or restoration, the costs associated with cleanup and removal including testing, monitoring and interpretation of such tests, relocation costs, the, consequential damages flowing from discharge including attorneys' fees and costs, which are the natural and proximate result of defendants' conduct, and exemplary or punitive damages in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

G.   As and for plaintiffs' Seventh Cause of Action sounding in negligence, plaintiffs seek general damages from defendant ROUX for the damages directly resulting from their injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and

38

consequential damages flowing from the trespass which are the natural and proximate result of defendant's conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

H.   As and for plaintiffs' Eighth Cause of Action for plaintiffs' fear of developing cancer directly resulting from the defendants' acts and omissions alleged herein, for the plaintiffs' injuries and losses sustained and to restore plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of defendants' conduct in the amount of ONE BILLION DOLLARS ($1,000,000,000.00).

I.   As and for plaintiffs' Ninth Cause of Action seeking a fund to cover the costs and expenses of Medical and Environmental Monitoring for all plaintiffs and their real property affected by the defendants' negligence and other tortious acts alleged, plaintiffs seek an order of this Court requiring defendants and each of them to contribute to a fund sufficient to cover the costs and expenses of a program for medical and environmental monitoring for each and every of the plaintiffs herein, but in any case, SUCH FUND SHOULD NOT BE LESS THAN ONE BILLION DOLLARS ($1,000,000,000.00).

J.   As and for plaintiffs' combined claims on each of the foregoing causes of action, all of which flow directly as a result of the wanton, willful and reckless conduct of the defendants and each of the defendants herein, plaintiffs seek exemplary or punitive damages in addition to the compensatory damages set forth, *supra*, in an amount not less than FIFTY BILLION DOLLARS ($50,000,000,000.00).

K.    Preliminary and permanent injunctions to pay money into a fund sufficient to clean and remediate the contamination that the defendants caused to be discharged on , in and/or around plaintiffs' property;

L.    An Order mandating that the defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

M.    Award plaintiffs the costs of this lawsuit, including but not limited to attorneys' fees and expert costs.

N.    Awarding plaintiffs such other, further, and different relief as the Court may deem appropriate and just.

Dated: New York, New York
       May 22, 2006

_____
Alan S. Ripka

_____
Marc Jay Bern

40



## VERIFICATION

I, **ALAN S. RIPKA**, am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for the plaintiffs in the above entitled-action. I have read the foregoing **SUMMONS & VERIFIED CLASS ACTION COMPLAINT** and know the contents thereof, and upon information and belief, affirmant believes after an inquiry reasonable under the circumstances the matters alleged herein to be true, and that the contentions herein are not frivolous, as that term is defined in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by plaintiffs is that the plaintiffs herein reside in a County other than the County in which I maintain my offices.

The source of affirmant's information and the grounds of his belief are communications, papers, reports and investigations contained in the file maintained by this office.

Dated: New York, New York
      May 22, 2006

                                      **ALAN S. RIPKA**

*Exhibit 2*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DEBORAH V. SPIROFF, LESZEK HAWRO and
BEATA HAWRO, SLAWOMIR PERKOWSKI, and his
wife ELZBIETA PERKOWSKI, GLORIA FRASCO,           Index No. CV-06-2865 (CBA/RML)
SZYMON GABRYS and ZDZISLAWA GABRYS,
WILLIAM KENNEY and SYLVIA KENNEY,
individually and on behalf of others similarly situated,

        Plaintiff,                                   **NOTICE OF "TAG ALONG**
                                                     **ACTION"**

   -against-

EXXON MOBIL CORPORATION, BP PRODUCTS
NORTH AMERICA INC., PEERLESS IMPORTS INC.,
ROUX ASSOCIATES INC. and JOHN and JANE DOES
1 through 100,

        Defendants.


-------------------------------------------------------------------X

January 15, 2009

Clerk of the Panel
One Columbus Circle, NE
Federal Judiciary Building
Room G-255, North Lobby
Washington, DC 20002-8004

To the Clerk of the Multidistrict Panel:

      Please take notice that Plaintiffs in the above-captioned action, whose Complaint is
attached as Exhibit "A," have now learned that their suit involves methyl tertiary butyl ether
("MTBE") contamination of groundwater and sub-surface soil, consistent with allegations and
claims currently pending in In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability
Litigation, Master File No.: 1:00-1989, MDL 1358 (SAS): M21-88.

      The Plaintiffs in the above-captioned case are residents and business owners in the
Greenpoint section of Brooklyn, New York, live in the vicinity of two gasoline refineries and
storage centers found or suspected to have leaked gasoline into the soil. After water and soil
tested positive for contamination, the above plaintiffs brought these actions in the Supreme Court
of King's County, New York, which the defendants then removed to the United States District
Court for the Eastern District of New York. Plaintiffs claim that the MTBE contamination has

lowered their property values and their exposure to the contamination has caused them to fear that they or their family members will develop cancer or sustain other ill-health effects in the future, requiring, in part, medical monitoring. Experts who have reviewed test data on behalf of Plaintiffs and from whom reports will shortly be served upon the defendants have indicated that the MTBE contamination is in significant amounts sufficient to pose a risk to public health, including the putative class representatives and the proposed class.

As such, the claims pertaining to MTBE contamination and demanded redress are identical in all material respects with the other complaints that are the subject matter of the established MDL for MTBE. See, e.g. *In re MTBE Prods. Liab. Litig.*, 528 F.Supp.2d 303, 305 (S.D.N.Y.2007).

Respectfully submitted,

Napoli Bern Ripka, LLP

By:_____
William J. Dubanevich
350 Fifth Avenue, Suite 7413
New York, New York  10118
Phone:  (212) 267-3700; Fax: (212) 587-0031
E-mail:  WDubanevich@napolibern.com

**Exhibit 3**

# NAPOLI BERN LLP
### Attorneys · At · Law

1)+P

January 15, 2009

The Honorable Robert M. Levy
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                    Re:    *Deborah Spiroff, et al., v. ExxonMobil Corporation, et al.,*
                           06-CV-2865 (CBA)

Dear Judge Levy:

        We represent the Plaintiffs in the above-referenced matter.  We have now been advised
by our experts that the contamination in Greenpoint includes methyl tertiary-butyl ether
("MTBE") in significant amounts sufficient to pose a risk to public health, including the putative
class representatives and the proposed class.

        As the Court is or may be aware, a federal MDL has been established for MTBE-
involved litigation in the Southern District of New York, presided over by the Honorable Shira
A. Scheindlin, U.S.D.J. (MDL 1358 (SAS)).  Cases filed there include plaintiffs in communities
contaminated by MTBE, who were exposed by physical contact (ingestion) and/or inhalation of
MTBE fumes and who, like the plaintiffs in *Spiroff*, fear the future development of cancer and
seek medical monitoring.  See, e.g., *Tonneson, et al., v, Sonoco, Inc., et al.*, 03 Civ. 8284; *Basso,
et al., v, Sonoco, Inc., et al.*, 03 Civ. 9050; *In re MTBE Prods. Liab. Litig.*, 528 F.Supp.2d
303(S.D.N.Y.2007).

        Pursuant to 28 U.S.C. §1442, we believe that we are required to notify the Judicial Panel
on Multidistrict Litigation of the relation of the present litigation to MTBE as a potential "tag-a-
long" action.  We attach a copy of our notice to the Judicial Panel for the Court's convenience.

        Plaintiffs are proceeding to serve their expert reports by January 16, 2009, as set forth in
the Court's most recent Order (with the exception of a single report from one expert who was
recently injured and whom opposing counsel graciously stipulated to an additional 10 days).  We
Intend to continue to comply with the deadlines previously set by this Court unless and until we
are otherwise notified to the contrary, in the event of a transfer to the referenced MDL.

        Thank you for your kind consideration.

Respectfully,

Napoli Bern Ripka, LLP

By: _____
    W. Steven Berman
Enclosure
CC:  all counsel of record

*Exhibit 4*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DEBORAH V. SPIROFF, LESZEK HAWRO and
BEATA HAWRO, SLAWOMIR PERKOWSKI, and his
wife ELZBIETA PERKOWSKI, GLORIA FRASCO,         Index No. CV-06-2865
SZYMON GABRYS and ZDZISLAWA GABRYS,            (CBAiRML)
WILLIAM KENNEY and SYLVIA KENNEY, individually
and on behalf of others similarly situated,     PLAINTIFFS'

       Plaintiff,

  -against-

EXXON MOBIL CORPORATION, BP PRODUCTS
NORTH AMERICA 1NC., PEERLESS IMPORTS INC.,
ROUX ASSOCIATES INC. and JOHN and JANE DOES
1 through 100,

     **Defendants.**

### AFFIRMATION OF MYRON A. MEHLMAN, Ph.D.

I, Myron A. Mehlman, affirm the following to be true under penalty of perjury :

1.     I am qualified by virtue of my education, knowledge, training, and experience in the fields of toxicology, public health, biochemistry, and environmental medicine to assess the scientific significance of the underlying data and information and methodology and to explain the bases for the opinions that I have reached and have articulated herein. My curriculum vitae, which includes a list of my publications is attached as Attachment 1. A summary of my professional qualifications is attached as Attachment 2.

2.     In previous years, as Director of Toxicology at Mobil Oil Corp., and my greater than 50 years of experience, I worked with toxicologists and medical directors from major oil companies to develop and implement medical monitoring for employees in the petroleum refining industry because many were exposed to benzene and other petroleum hydrocarbons.

Mehlman MA                                                                              2

3.      I was retained by Plaintiffs' counsel to provide expert testimony on the effects of being exposed to benzene and methyl tertiary-butyl ether (MTBE) in groundwater and sub-soil and to prepare an affirmation addressing the type of diseases, if any, that would be expected from Plaintiffs' exposure by inhalation to benzene and MTBE from gasoline releases to under and/or surrounding Plaintiffs' property.

4.      In reaching my conclusions in this matter, I employed the standard methodology utilized by toxicologists and epidemiologists. In this case, I have reviewed the medical and scientific literature concerning human health effects, toxicological and epidemiological studies on benzene, gasoline, MTBE, and other compounds found in gasoline releases to groundwater and sub-surface soil. I have also reviewed Government and Industry reports and documents.

5.      I used scientific methodology involving data and information reasonably relied on by experts in the scientific field to support my analysis and conclusions. I am well aware of the available literature in general on cancer risks from benzene and MTBE exposure and rely in part upon this total body of evidence for my opinions in this case.

6.      To form my specific opinions in this matter, I reviewed groundwater sampling data, defendants' pumping data, the published and peer-reviewed scientific and medical literature, governmental and industrial studies, reports, and documents. I also have relied on my direct observations and interviews of thousands of men and women of different ages, and vocations who were exposed to contamination with MTBE and BTEX in New Jersey, New York, California, Texas, Wisconsin, Maine, Massachusetts, Connecticut, Texas, Pennsylvania, Maryland, Arizona, New Hampshire, and other States.

7.      MTBE does not occur naturally in the environment. Its only source is gasoline; and if MTBE is identified in a well, underground water source or body of water or sub-surface soil, it could only have gotten there from gasoline.

**Exhibit 5**



**Epidemiology International**

---

## FINAL REPORT:
## Expert Opinion of Shira Kramer, Ph.D.

Shira Kramer, Ph.D.

Epidemiology International, Inc.

11400-E Cronrtdge Drive

Ov~ngs Mills, MD 2! ! 17

Shira Kramer, Ph.D.

January 16, 2009

Napoli Bern Ripka, LLP

350 5th Avenue

Suite 7413

New York, NY 10118

## 5. SUMMARY LIST OF OPINIONS

111. The goal of this report was to conduct a weight-of-evidence analysis of the health risks associated with exposure to gasoline vapor and specific volatile chemical constituents of gasoline, including benzene, other solvents, and methyl tert-butyl ether (MTBE).

112. For this report, I reviewed original peer-reviewed research papers as well as review papers, meta-analyses, abstracts, and the opinions of expert panels. Scientific literature sources included PubMed, Google Scholar, direct searching of relevant journals and scientific conference abstracts, and relevant references cited in articles. Terms used for searches included appropriate synonyms. Websites reviewed included The U.S. Environmental Protection Agency (EPA)'s National Center for Environmental Assessment (NCEA) and the Integrated Risk Information System (IRIS), the Centers for Disease Control (CDC)'s National Center for Occupational Health, the World Health Organization (WHO)'s International Agency for Research on Cancer (IARC), the U.S. Department of Health and Human Services (US DHHS)'s Agency for Toxic Substances and Disease Registry (ATSDR), and the National Cancer Institute (NCI).

113. This report represents my findings establishing gasoline, benzene, and solvents as causal agents in both childhood and adult cancers. In addition, the report details the causal link between gasoline, benzene, MTBE, and solvent exposures and risks of numerous adverse neurobehavioral, reproductive, allergic, respiratory, hematological, immunological, and genotoxic health outcomes.

114. The opinions I provide in this report are given to a reasonable degree of scientific certainty, and are based on my knowledge, skills, experience, training, education, research, and the information and data available to me at the time these opinions were rendered. If additional information becomes available (including the submission of new or revised expert reports on or after January 16, 2009 by Plaintiffs' experts in this litigation, or the receipt of other information or data after the time that I prepared this report), I may supplement my opinion to reflect such additional information.

## 5.1. Opinion 1: Greenpoint Area Contaminant Exposure

115. The exposed population is defined as individuals residing within the Greenpoint area affected by the petroleum free-product and vapor plumes. Residents of this area have been exposed to gasoline vapor

Greenpoint area could allow for exposure to through dermal contact with contaminated soils [71].

140. The presence of hazardous levels of benzene in soil gases and the identification of numerous constituent chemicals of gasoline known to be harmful to human health in soil sampled from a limited number of locations within the Greenpoint area indicates that more widespread sampling is necessary to more completely characterize the size of the area impacted by contaminants from the Greenpoint plume.

### 6.1.3. GROUNDWATER AND SURFACE WATER

141. Potable water is provided to the Greenpoint community by the City of New York from water sources located outside of the Greenpoint area, so drinking water is not currently a major exposure pathway for Greenpoint residents [71]. Fishing in Newton Creek is restricted, and fishing advisories for the East River and its tributaries limit the ingestion pathway as a major source of exposure for Greenpoint residents [71].

142. However, the ongoing presence of a petroleum free-product plume in the Greenpoint area could allow for exposure through dermal contact with contaminated surface waters [71].

### 6.1.4. EXPOSURE LEVELS IN PLAINTIFF RESIDENCES

143. The plaintiffs reside in an area known to be contaminated with petroleum and petroleum products since 1979. Exposure to gasoline vapors and chemical constituents of gasoline has been documented in this area through multiple media, including indoor and outdoor air, soil, and ground and surface waters [267].

144. Previously conducted environmental sampling has demonstrated measurable levels of benzene, toluene, ethylbenzene, xylenes, MTBE, and other chemical constituents of gasoline vapor in the Greenpoint area, often in excess of EPA and New Jersey state guidelines [70, 267].

145. In addition, a limited survey of current indoor and outdoor sampling data at three plaintiff residences was conducted on January 7, 2009. Sampling was conducted in the sub-slab, basement, and first floor living areas of each residence, and outdoor ambient air was collected from an up-gradient outdoor location identified as being clear of indoor air [115].

146. Benzene levels across the 12 samples ranged from not detectable to 0.65 ppb [115]. Excluding the two samples with non-detectable benzene

**Exhibit 6**

# REPORT OF FINDINGS

## GREENPOINT PETROLEUM PRODUCT PLUME
## BROOKLYN, NY

**PREPARED FOR:**

**NAPOLI BERN RIPKA, LLP**
**350 FIFTH AVENUE, SUITE 7413**
**NEW YORK, NEW YORK  10118**

**PREPARED BY:**

**HOLZMACHER, McLENDON & MURRELL, P.C.**
**575 BROAD HOLLOW ROAD**
**MELVILLE, NEW YORK  11747**

## JANUARY 16, 2009

**HOLZMACHER, McLENDON & MURRELL, P.C.**
**H2M ASSOCIATES, INC.**

575 Broad Hollow Road, Melville, New York 11747



**H2M**

Engineers | Architects | Scientists | Planners | Surveyors



predecessor, took over refinery operations in 1911. The refinery covered an area of approximately 79 acres, extending along Newton Creek from approximately Apollo Street, west beyond Kingsland Avenue, and north again to Newton Creek (SAIC, 2006). While operating, the Mobil refinery had a throughput of 31,000 barrels (1.3 million gallons) a day, and produced solvents, gasoline, kerosene, fuel oil, and refinery fuel. The refinery ceased operations in 1965.

In 1968 all aboveground refinery structures were demolished and the refinery property was divided into parcels. Mobil retained one parcel and utilized it as a petroleum bulk storage terminal (North Henry Street Terminal) until 1993 when storage operations ceased. Another parcel adjacent to Newton Creek was sold to Amoco Oil Company (subsequently renamed BP/Amoco Oil Company). BP/Amoco constructed a bulk fuel storage terminal in late 1969 which is still operational. Parcels located to the West of BP/Amoco and South of the Mobil Terminal were sold to United Kingsway Carpet Company (subsequently renamed Long Island Carpet Cleaners, Inc.), New York Telephone Company (now Verizon), Wilson Freight Company, Kreger Track Renting Company, Mendon Leasing Corporation, and North Penn Transfer (now Joydan Express Trucking Company).

In addition to the petroleum facilities of the former Mobil refinery site, Paragon Oil (now ChevronTexaco) operated an oil storage terminal between Bridgewater Street along Newton Creek. In approximately 1969, Peerless Importers purchased the property and built a warehouse there.

### Sources of Product Spills and Release Dates

According to the 1979 G&M report, the bulk of the product found in the Greenpoint spill area was discharged at the former refinery property (now the BP/Amoco Terminal), most likely from leaking product storage tanks and piping. The main spill may have begun during or prior to the year 1948. (The refinery ceased operations in 1965.) This origin of the main oil spill was based on several lines of evidence, including historical records, the presence of residual product contamination in soil at shallow depth within the suspected discharge area (as revealed by historical and newer soil borings), product composition ("predominantly a petroleum distillate with minor amount of refined product"), product elevations and thickness, and product travel time calculations to reach Newton Creek at the foot of Meeker Avenue. From its main source area at the BP/Amoco site, the spilled oil migrated southward (the Off-site Plume), northward (ExxonMobil's On-site Plume) and westward (Long Island Carpet Cleaners and Verizon properties).

In addition to the main spill at the current BP/Amoco site, a number of documented spills occurred at Mobil's North Henry Street and BP/Amoco Terminals. These newer spills of petroleum product contributed to the floating product resulting from the main spill released during the refinery operations.

Mobil reported that a tank explosion with a catastrophic release of naphtha to the subsurface from Tank Number 33 occurred on December 30, 1954. Tank 33 had a capacity of 90,300 gallons, and was located in the southwest corner of the present BP/Amoco Terminal property.



On April 1, 1988, premium gasoline was found in a recovery well located in the western portion of the terminal. The gasoline came from a leak in an underground product line running under Monitor Street. Approximately 35,000 gallons (subsequently revised to 60,000 gallons) of gasoline was spilled.

In February 1990, approximately 50,000 gallons of kerosene was lost from a 100-year old tank. Mobil initially reported that the spill involved only 80 gallons of product, and was fined $500,000 by the NYSDEC.

Other notable more recent releases at the Henry Street Mobil Terminal reported to the NYSDEC Spill Reports Database, and compiled by Delta (2002) are listed below:

- November 30, 1990 - Approximately 100 gallons of waste oil was released to a "soil area" during a tank overfill.

- June 6, 1991 - Approximately 1,000 gallons of gasoline was released in a tunnel under Geenpoint Avenue.

- October 18, 1995 - An unknown volume of gasoline was reported released due to equipment failure. A subsequent explosion at 5 Bridgewater Street (the location of a Mobil offsite system recovery well) was noted to have occurred.

- August 7, 1996 - Approximately 100 gallons of diesel fuel was released due to equipment failure.

- May 2, 1997 - A tank overfill at 5 Bridgewater Street (the location of a Mobil offsite system recovery well) caused an unknown volume of product to be pumped onto the asphalt ground.

- August 13, 1999 - Approximately 300 gallons of gasoline was spilled to the ground surface.

A number of additional spills reported to the NYSDEC occurred at the BP/Amoco property after Mobil sold this former refinery property to Amoco, as compiled by Delta (2002) from the NYSDEC Spill Reports Database.

- May 26, 1986 - A tank overfill caused approximately 18,000 gallons of gasoline to be spilled into the tank dyke. The NYSDEC noted that the product may have "gotten into the ground".

- February 6, 1993 - During a delivery from the Buckeye pipeline, approximately 500 gallons of gasoline was spilled onto the ground.

- September 17, 1993 - A seal broke in a storage tank and spilled approximately 3,000 gallons of gasoline into the secondary containment unit. The spill was contained by the concrete and recovered.

- November 3, 1993 - During a tank truck overfill, approximately 80 gallons were released to the concrete covered loading rack. The spill was contained at the loading rack.

- June 23, 1994 - Approximately 2,100 gallons of Number 2 fuel oil was released to a "soil area" due to a pipeline rupture.

- July 29, 1994 - Approximately 15 gallons of gasoline was released into a concrete containment area.

# H2M

- March 21, 1995 - Approximately 31 gallons of diesel was spilled onto the parking lot due to a delivery truck equipment failure. The spill was contained within the oil-water separator by the site drainage system.

- January 7, 1996 - Approximately 300 gallons of gasoline was spilled into a containment dyke area.

- January 15, 1996 - Approximately 100,000 gallons of gasoline was released due to an overfill at a Storage Tank Number 8. The release was contained within the containment area. The NYSDEC noted that the product was contained and no sewer or ground water was affected.

- December 19, 1997 - Approximately 37 gallons of diesel was released due to a human error at a loading rack. The release was contained and cleaned.

- December 27, 1997 - Approximately 125 gallons of diesel was released due to a faulty valve. NYSDEC noted that the spill was contained.

- April 3, 1998 - Approximately 400 gallons of gasoline was released at the loading rack due to equipment failure. The spill was contained within the onsite drainage system and the oil-water separator.

- March 13, 1999 - Approximately 20 gallons of gasoline was spilled during a tank truck overfill. The NYSDEC noted that the spill went to the ground.

- November 5, 1999 - Approximately 8 gallons of Number 2 Fuel Oil was spilled during a tank truck traffic accident. The spill was contained at the loading rack and fed to the oil-water separator.

According to the NYSDEC Spill Reports, approximately 124,616 gallons of petroleum products have been released at the BP/Amoco Terminal property during operation of the terminal be BP/Amoco.

In addition to the documented releases by ExxonMobil and BP Amoco at the properties, Buckeye Pipeline released between 440 and 1,260 gallons of unleaded gasoline at 30-25 Greenpoint Avenue on February 16, 1999. Approximately 1.5 inches of fresh product was detected in onsite monitoring wells.

### Contaminants Released

A number of free-phase hydrocarbon product samples were collected from recovery and monitoring wells at the BP/Amoco site in 1979, 1980, 1999 and 2001 and subjected to gas chromatography, density and other specialized forensic methods to characterize variations in product sample composition, and draw conclusions on the origin and age of the product. Gene W. Schmidt, a forensic expert on petroleum product, interpreted the results of the analyses. He concluded that the product samples were composed of mixtures, at varying proportions in individual samples, of degraded distillate (diesel/fuel oil) and weathered catalytic naphtha (Delta, 2002; p.16).

The constituent fractions of the samples indicated that the product had been in the subsurface for more than 20 years. A comparison of the isoprenoid percentages indicated that the distillate portion of the samples appeared to originate from at least three separate historical release events. According to New

7



York Fire Department files, naphtha was stored by ExxonMobil in as many as 24 Aboveground Storage Tanks (ASTs) formerly located on the southwestern portion of the current BP/Amoco Terminal property and also properties west of the BP/Amoco Terminal (Delta, 2002; p. 16).

Some leakage of gasoline has taken place on the BP/Amoco site and is superimposed on the primary spill product, as indicated by the detection of blue whitener dye, a marker used exclusively in Amoco gasoline, in some product samples collected form the BP/Amoco site. The G&M report provides a lengthy discussion of the analytical evidence related to the gasoline presence in the floating product. Another indication of more recent gasoline releases at the BP/Amoco property is provided by higher concentrations of gasoline additive methyl tertiary-butyl ether (MTBE) found in groundwater samples from recovery wells RW-1, RW-2 and RW-4 at the BP/Amoco site (Remedial Engineering, 2004; EPA, 2007).

MTBE was used as an octane-enhancing replacement for lead since 1979; its widespread use as a fuel oxygenate was triggered by the 1990 Clean Air Act Amendments, and by 1993 MTBE became the most produced organic chemical in the United States (EPA, 1998). As to the possible use of MTBE on the ExxonMobil terminal, Mobil began blending MTBE into gasoline as early as 1985, and MTBE was present in material shipped to terminals as early as in 1983, based on a transcript of deposition of R.D. "Ray" McGraw (State of Rode Island Sup. Court Dept., No. PC02-2437).

### *Hydrogeologic Controls on Product Migration and Distribution*

Geologic and hydrogeologic conditions have exerted major controls on the migration, and present distribution of petroleum product within the Greenpoint spill area.

The area is underlain by a wedge of unconsolidated deposits over a bedrock surface that slopes to the southeast and is found approximately at 100 to 200 feet below the ground. The unconsolidated deposits include fill material and glacial drift. The surficial fill occurs throughout most of the area, ranging in depth from a few feet to approximately 25 feet in a reclaimed/filled area adjacent to Newton Creek. The water table near the creek is within this fill material that overlies fine-grained, low-permeability alluvial deposits and till. Glacial outwash deposits, consisting of well-sorted fine to medium sand with occasional coarse sand, silt and gravel, are found beneath the fill material over most of the area. The saturated thickness of the outwash is approximately 70 to 100 feet beneath the center of the Greenpoint plume, and thins to the west. The outwash deposits are either absent or less than 20 feet in thickness near the western boundary of the product plume, where till is dominant glacial deposit (Roux 1991; Buxton et. al, 1981).

Prior to year 1947, the highly permeable and vertically extensive outwash that forms a regional aquifer (or the upper glacial aquifer) was extensively pumped to supply water for Brooklyn. During the 1930's through mid-1940's, estimated groundwater withdrawals for public supply in Brooklyn (Kings County) averaged approximately 25 Mgal/day (17,400 gpm), based on data compiled by Cartwright (2002). Estimated industrial groundwater withdrawal of additional 37 Mgal/day (25,700 gpm) was reduced to about 25 Mgal/day by 1943, as the heavy pumping lowered groundwater levels and caused

*Exhibit 7*

CV 05 5229

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AMON. J.

-------------------------------------------------------x

MARTY MARKOWITZ, DAVID YASSKY, and
ERIC GIOIA,

MANN. M.J.

                      Plaintiffs,

  – against –

EXXON MOBIL CORPORATION,

              Defendant.

COMPLAINT
FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

NOV 07 2005

BROOKLYN OFFICE

-------------------------------------------------------x

       Plaintiffs Marty Markowitz, David Yassky and Eric Gioia, by their attorneys,

Emery Celli Brinckerhoff & Abady LLP, allege as follows:

## INTRODUCTION

      1.    This action seeks redress for violations of section 505(a)(1) of the Clean

Water Act, 33 U.S.C. § 1365(a)(1), and section 7002(a)(1)(B) of the Resource Conservation and

Recovery Act, 42 U.S.C. § 6972(a)(1)(B).

      2.    Defendant is responsible for releasing approximately 17 million gallons of

petroleum products from leaking tanks and pipelines.  These petroleum products have spread

over approximately 55 acres beneath Brooklyn and are seeping into Newtown Creek which forms

the border between Brooklyn and Queens.  The petroleum discharge leaves an oily sheen on

Newtown Creek's surface and creates a petroleum smell in the area.

W:\1449\1\MDB1622.WPD

3.      As a result of defendant's unlawful acts, petroleum products now permeate the soil and groundwater, posing an imminent and substantial danger to humans and wildlife visiting or living in and around (I) Greenpoint, Brooklyn, (ii) Newtown Creek, and (iii) the East River. Defendant has thus violated the terms and provisions of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA").

### JURISDICTION AND VENUE

4.      The jurisdiction of this Court is predicated upon 28 U.S.C. § 1331, section 505(a) of the CWA, 33 U.S.C. § 1365(a), and section 7002(a) of the RCRA, 42 U.S.C. § 6972(a).

5.      The acts complained of occurred in the Eastern District of New York. Venue is appropriate in this court pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), section 7002(a) of the RCRA, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1391(b).

### PARTIES

6.      Plaintiff Marty Markowitz, the Brooklyn Borough President, is a citizen of the United States and a resident of Brooklyn, New York. He brings this action in his individual capacity.

7.      Plaintiff David Yassky, a New York City Council Member representing the 33rd Council District in Brooklyn, is a citizen of the United States and a resident of Brooklyn, New York. He brings this action in his individual capacity.

8.      Plaintiff Eric Gioia, a New York City Council Member representing the Queens neighborhoods adjacent to Newtown Creek, including Hunters Point and Maspeth, is a citizen of the United States and a resident of Queens, New York. He brings this action in his individual capacity.

9.      Defendant Exxon Mobil Corporation is a publicly held corporation organized under the laws of the State of New Jersey.  Mobil Oil Corporation was the owner of a petroleum facility located at 300 North Henry Street, Brooklyn, New York, and it owned and operated a refinery located between Greenpoint and Norman Avenues, Brooklyn, New York, before 1968.  Exxon Mobil Corporation is the corporate successor of Mobil Oil Corporation.  Exxon Mobil Corporation continues to own and operate the North Henry Street Facility.

### FACTS

10.      Defendant Exxon Mobil Corporation owned and operated an oil refinery in Greenpoint, Brooklyn, New York, from at least 1950 from which an explosion and a series of leaks and spills released approximately 17 million gallons of petroleum products into the underlying soils and aquifer.

11.      The former Mobil refinery occupied the entire area east of Kingsland Avenue between Greenpoint Avenue south to Norman Avenue.

12.      This refinery, with a capacity of 31,000 barrels per day, produced solvents, gasoline, kerosene, fuel oil and refinery oil.

13.      Naptha, gasoline, gas oil and fuel oil and possibly other petroleum products were stored at this refinery.

14.      The petroleum plume, created by defendant's release of about 17 million gallons of petroleum products, now extends from Norman Avenue (where an Exxon Mobil facility now owned by BP Amoco Corporation was located before 1969), south of Meeker Avenue, east of Bridgewater Street, and to the banks of Newtown Creek.  This plume covers approximately 55 acres.

W:\1449A1\MDB1622.WPD                                     -3-

15.     The petroleum product discharge potentially includes, but is not limited to, the following constituents: benzene and benzo(a)pyrene; benz(a)anthracene; indeno(1,2,3-cd)pyrene; dibenz(a,h)anthracene; chrysene; benzo(b)fluoranthene; and benzo(k)fluoranthene; MTBE; and lead.

16.     Exxon Mobil's petroleum products flow through fissures of the bulkhead constructed along the creek on the property located at 42-44 Bridgewater Street, into the creek water, through sections of the containment boom that floats in front of the wall and into Newtown Creek.

17.     The quality of Newtown Creek directly and adversely affects the recreational, aesthetic, economic, environmental, and health interests of all that have contact with it.

18.     Neither Exxon Mobil nor any other person has a Clean Water Act permit for this discharge of petroleum products through the bulkhead.

## STATUTORY PREREQUISITES

19.     All conditions precedent to filing a citizen suit under section 505 of the CWA, 33 U.S.C. § 1365, and section 7002 of the RCRA, 42 U.S.C. § 6972, have been satisfied.

20.     In 2004, plaintiffs mailed notices of the violations complained of in this action, and of their intent to file suit, to the Administrator of the United States Environmental Protection Agency ("EPA"), the New York Department of Environmental Conservation ("DEC"), and to the defendant as required by section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A).  More than sixty days have passed since notice was served.

21.     In 2004, plaintiffs also mailed notice of the violations complained of in this action, and their intent to file suit, to the Administrator of the United States Environmental Protection Agency ("EPA"), the New York Department of Environmental Conservation ("DEC"), and to the defendant as required by section 7002(b)(2)(A) of the RCRA, 42 U.S.C. § 6972(b)(2)(A).  More than ninety days have passed since notice was served.

22.     The violations complained of in this case are ongoing and will continue in the future.

23.     Neither EPA nor DEC has commenced and diligently prosecuted a court action under section 505(b)(1)(B) of the CWA, 33 U.S.C. §1365(b)(1)(B), which would bar this court action.

24.     Neither EPA nor DEC has commenced and diligently prosecuted a court action under section 7002(b)(2)(B) or (C) of the RCRA, 42 U.S.C. § 6972(b)(2)(B), (C), which would bar this action.

25.     Neither EPA nor DEC has expended response costs with respect to the site of the violations complained of herein under section 104 of the Comprehensive Environmental Response Cleanup and Liability Act, 42 U.S.C. § 9604, which would bar this action.

**FIRST CAUSE OF ACTION**
(Clean Water Act)

26.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

27.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source, into waters of the United States, unless such discharge is in

W:\1449A1\MDB1622.WPD                                    -5-

compliance with specified portions of the Act.  Discharges not authorized by, or in violation of

the terms of a National Pollutant Discharge Elimination System ("NPDES") permit, or a State

Pollutant Elimination System ("SPDES") permit, are prohibited.

28.     Under sections 402(a) and (b) of the CWA, 33 U.S.C. §§ 1342(a) and (b),

the Administrator of the EPA has authorized the New York DEC to implement a NPDES/SPDES

permit program.

29.     Defendant's discharges of pollutants into Newtown Creek are illegal and

unpermitted discharges within the meaning of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

30.     Defendant Exxon Mobil has not applied for, nor been granted, a permit

pursuant to section 402 of the CWA, 33 U.S.C. § 1342, from the EPA or the DEC for the

petroleum product discharges from the bulkhead and containment boom into Newtown Creek.

31.     Defendant's violations are ongoing.

32.     Section 505 of the CWA, 33 U.S.C. § 1365, authorizes a citizen suit to

enforce the provisions of section 301 of the CWA, 33 U.S.C. § 1311.

33.     Plaintiffs are citizens who live and recreate near Newtown Creek.

34.     The fissures in the bulkhead and the gaps between the sections of the

containment boom are both "point sources" within the meaning of section 502(14) of the Clean

Water Act, 33 U.S.C. § 1362(14).

35.     The discharge through the fissures and gaps contains petroleum products.

36.     Petroleum products are a "pollutant" within the meaning of section 502(6)

of the Clean Water Act, 33 U.S.C. § 1362(6).

37.     The petroleum product discharge causes an oily sheen on Newtown Creek and causes the area to smell of petroleum.

38.     The constituents present in the petroleum product discharge have been shown to cause harm to aquatic life.

39.     New York DEC has designated Newtown Creek as class SD, which prohibits the addition of petroleum products in amounts that cause a visible sheen.

40.     The petroleum discharge violates water quality standards for petroleum product discharges in Newtown Creek.

41.     The petroleum product discharge is seeping through a point source into navigable waters without a NPDES/SPDES permit.

42.     Defendant Exxon Mobil has neither applied for, nor been granted, a NPDES/SPDES permit for the discharge of petroleum products into Newtown Creek.

43.     Newtown Creek is a "navigable water" of the United States within the meaning of section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

44.     The petroleum product discharge enters navigable water when it discharges through the fissures in the bulkhead and into Newtown Creek.

45.     Some of the petroleum product discharge escapes from the containment boom, traveling with the tide of Newtown Creek and its tributaries.  Newtown Creek is a tidal waterway, its ebb and flow dependent on the East River, which, in turn, flows into to the Hudson River and into New York Harbor.

46.     The tidal nature of Newtown Creek causes pollutants to travel quickly and for great distances, harming the biological, physical, and chemical integrity of the navigable waters in the area affected by the tide.

47.     The petroleum product discharge into Newtown Creek is the "addition" of a pollutant within the meaning of section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(13).

48.     Defendant Exxon Mobil has violated and will continue to violate "an effluent standard or limitation" under section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), because of its illegal and unpermitted discharges from the bulkhead and containment boom into Newtown Creek.

### SECOND CAUSE OF ACTION
( Resource Conservation and Recovery Act)

49.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

50.     Section 7002(a)(1)(B) of the RCRA, 42 U.S.C. § 6972(a)(1)(B), permits any person to commence a civil action against any person who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial danger to health or the environment.

51.     Petroleum is a "solid waste" within the meaning of §1004(27) of the RCRA, 42 U.S.C. §6903(27). A "solid waste" includes a liquid that results from industrial, commercial, mining or agricultural operations.

52.     Petroleum is a "hazardous waste" within the meaning of § 1004(5) of the RCRA, 42 U.S.C. § 6903(5).

53.     The explosions, leaks, releases and spills of petroleum products from Mobil's Greenpoint facility over the years constitute an improper "disposal" within the meaning of section 1004(3) of the RCRA, 42 U.S.C. § 6903(3).

54.     Defendant is a past owner and operator of a solid waste disposal facility within the meaning of section 7002(a)(1)(B) of the RCRA, 42 U.S.C. § 6792(a)(1)(B).

55.     The underground petroleum product plume constitutes an imminent and substantial danger to the environment in that the high levels of hazardous wastes in the soil pose a significant threat to human beings, to Newtown Creek and to the fish, birds and other wildlife in and around the river.

56.     As a result of the improper storage and/or disposal of hazardous wastes from the former Exxon Mobil site, groundwater has been contaminated.  The contaminated groundwater flows to Newtown Creek, which is part of the Hudson estuary.

57.     Contaminated groundwater discharges into Newtown Creek pose a threat to human beings and wildlife that live and recreate near the creek.

58.     Defendant has contributed to the past and present handling, storage and/or disposal of hazardous waste as defined by the RCRA § 1004, 42 U.S.C. § 6903 and 40 C.F.R. §§ 261.2, 261.3.

59.     As a past and present owner or operator, under section 7002(a)(1)(B) if the RCRA, 42 U.S.C. § 6972(a)(1)(B), defendant is liable for conditions on their present or formerly owned property that present an imminent and substantial danger to health or the environment.

60.     Petroleum flows through fissures in the bulkhead located on the property at 42-44 Bridgewater Street into Newtown Creek. Petroleum flows through sections of the containment boom and into the middle of Newtown Creek.

61.     Petroleum products cause an increase in mortality and an increase in serious irreversible or incapacitating reversible illness within the meaning of § 1004(5) of the RCRA, 42 U.S.C. § 6903(5).

62.     The presence of petroleum products in the environment presents an imminent and substantial danger to health and the environment.

63.     The presence of petroleum products is a significant danger to wildlife and wildlife habitat in the area. The ingestion of petroleum can cause disruption in normal internal organ function.

64.     A single drop of oil on a bird egg can cause mortality and developmental defects in affected embryos. When birds are exposed to petroleum products on their feathers, the feathers are unable to trap air and repel water. This causes hypothermia, the inability to fly and eventually, death. Petroleum products can cause other physiological problems when ingested or absorbed through the skin.

65.     Large quantities of petroleum products can result in the death of fish. For fish, the presence of petroleum products even in small concentrations results in changes in growth, feeding, fertility and survival rates and displacement.

66.     Chemical migration is occurring through the groundwater. The groundwater generally travels through this area via two aquifer zones towards Newtown Creek. The aquifer zones are interconnected.

67.     The Brooklyn-Queens aquifer is an untapped resource that cannot be used due to the continued contamination caused by the presence of petroleum products.

68.     The petroleum product discharge contains benzene, a known carcinogen.

69.     The presence of underground petroleum products can cause petroleum vapors.

70.     Petroleum vapors may cause an imminent and substantial danger to health and the environment within the meaning of §7002(a)(1)(B) of the RCRA, 42 U.S.C. §6792(a)(1)(B).

71.     The breakdown of underground petroleum causes methane gases to occur. These gasses accumulate in confined structures, such as homes and commercial buildings, resulting in potentially explosive conditions.

72.     The potentially explosive conditions are an imminent and substantial danger to health and the environment within the meaning of §7002(a)(1)(B) of the RCRA, 42 U.S.C. §6792(a)(1)(B).

WHEREFORE, plaintiffs request the following relief:

1.     A judgment declaring that defendant has committed the violations of law alleged in this action;

2.     An order permanently enjoining, compelling and directing defendant:

   A.     to repair or replace the leaking bulkhead and containment boom to eliminate the fissures and gaps in order to prevent the discharge of petroleum into Newtown Creek;

B.      to obtain NPDES/SPDES permits in compliance with section 301(a) of the
Clean Water Act, 33 U.S.C. § 1311(a) to be effective until an impermeable
bulkhead and containment boom are constructed;

C.      to take such measures necessary to minimize or eliminate the pollutants
from discharging through the bulkhead and containment boom during the
construction of an impermeable bulkhead;

D.      to remediate all damage to the environment because of their illegal and
unpermitted discharges;

E.      to pay $27,500 per day for each illegal discharge prior to March 15, 2004
and $32,500 per day for each day of violation thereafter, pursuant to
section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d).

F.      to eliminate health hazards and minimize potential health effects by the
contamination of the site;

G.      to eliminate all damage to the environment caused by its activities at the
site; and

H.      to repair the damage to the land of the former Exxon Mobil site and its
surrounds and to Newtown Creek as part of the Hudson River estuary; and

3.      An order awarding costs, including reasonable attorney, witness, and consultation
fees, as authorized by section 505(d) of the CWA, 33 U.S.C. § 1365(d), and
section 7002(e) of the RCRA, 42 U.S.C. §6972(e); and

W:\1449\1\MDB1622.WPD                                    -12-

4.      Such other and further relief that may be just and proper.


Dated: November 7, 2005
       New York, New York


                          EMERY CELLI BRINCKERHOFF
                              & ABADY LLP


                          By: _____
                              Matthew D. Brinckerhoff (3552)
                              Eric Hecker (0989)

                          545 Madison Avenue
                          New York, New York 10022
                          (212) 763-5000

                          *Attorneys for Plaintiffs*


W:\1449\1\MDB1622.WPD                    -13-

To:

Alberto R. Gonzales
U.S. Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington D.C. 20460

Alan J. Steinberg,
Region II Regional Administrator
U.S. Environmental Protection Agency
290 Broadway
New York, NY 10007

Erin Crotty
New York State Department of Environmental Conservation
625 Broadway
Albany, New York 12233

Thomas Kunkel
New York State Department of Environmental Conservation, Region II
1 Hunter's Point Plaza
47-40 21st Street
Long Island City, NY 11101

4.      Such other and further relief that may be just and proper.


Dated: November 7, 2005
        New York, New York


                        EMERY  CELLI  BRINCKERHOFF
                        & ABADY LLP

                        By: _____
                            Matthew D. Brinckerhoff (3552)
                            Eric Hecker (0989)

                        545 Madison Avenue
                        New York, New York 10022
                        (212) 763-5000

                        *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

STATE OF NEW YORK and ALEXANDER B.
GRANNIS, as Commissioner of the New York State
Department of Environmental Conservation and Trustee of
Natural Resources,

No. _____

Plaintiffs,

-against-

**COMPLAINT AND
DEMAND FOR
JURY TRIAL**

EXXONMOBIL CORPORATION and
EXXONMOBIL REFINING & SUPPLY COMPANY,

Defendants.

U.S. DISTRICT COURT E.D.N.Y.

JUL 17 2007

--------------------------------------------------------------x

BROOKLYN OFFICE

Plaintiffs State of New York and Alexander B. Grannis, as Commissioner of the New

York State Department of Environmental Conservation ("DEC") and Trustee of its Natural

Resources (together the "State"), by their attorney, Andrew M. Cuomo, Attorney General of the

State of New York, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this civil action pursuant to the citizen suit provisions of the

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), the citizen suit

provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), the Comprehensive

Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C.

§ 9601 *et seq.*, the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, the New York State

Navigation Law, § 1 *et seq.*, the New York State Environmental Conservation Law ("ECL"),

and the New York common law of public nuisance, indemnification, and restitution.

2.      On information and belief, Defendants ExxonMobil Corporation and

ExxonMobil Refining & Supply Company (together referred to as "Exxon"), and their predecessors spilled, leaked, released, discharged, or otherwise discarded at least seventeen million gallons of various petroleum products and other non-petroleum pollutants from certain oil refining and storage facilities in Greenpoint, Brooklyn, New York, into the surrounding environment, including into the air, soils, subsurface soils, groundwater, wetlands, and the surface waters and sediments of Newtown Creek (the "Creek"). The widespread contamination has formed a massive plume of underground petroleum and other pollutants in the Greenpoint area (the "Spill") (together the Spill and the Creek are referred to as the "Site").

3.     This action seeks a cleanup of the Spill, including the soils, subsurface soils and groundwater, wetlands, the vapors in the soil and air, and of the Creek, including its sediments, as well as the recovery of all past and future costs incurred by the State in response to the release and threatened release of petroleum, pollutants, solid and hazardous wastes, and hazardous substances into the environment as part of the Spill and into the Creek. The State also seeks from Exxon all available penalties and natural resource damages arising from its contamination at the Site.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over the federal statutory claims in this complaint, pursuant to 28 U.S.C. § 1331, 33 U.S.C. § 1365(a)(1), 42 U.S.C. § 6972(a)(1)(B), 33 U.S.C. § 2701 et seq., 42 U.S.C. §§ 9607 and 9613, and 28 U.S.C. § 2201. The Court has supplemental jurisdiction, under 28 U.S.C. § 1367, for the remaining claims, which are based upon New York statutes and common law and arise out of a common nucleus of operative facts shared with the federal claims. The Court also has jurisdiction to enter a declaratory judgment

2

under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 9613.

5.     Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C.
§ 1391(b) because the threatened and actual releases of petroleum, pollutants, solid and
hazardous wastes, and/or hazardous substances that give rise to this action occurred and/or are
occurring in this District and the Site is located in this District.

6.     On February 8, 2007, the State of New York mailed to the defendants notices of
its intent to sue on the violations described in this complaint arising under the CWA, 33 U.S.C.
§ 1365(b)(1)(A), and under RCRA, 42 U.S.C. § 6972(b)(2)(A), and also mailed copies of those
notices to the Administrator of the United States Environmental Protection Agency ("EPA") and
to the Commissioner of DEC, as required under the CWA, 33 U.S.C. § 1365(b)(1)(A), and
RCRA, 42 U.S.C. § 6972(b)(2)(A).  The notice describing the violations under RCRA is
annexed as Exhibit 1, and the notice describing the violations under the CWA is annexed as
Exhibit 2.

7.     Exxon's violations of the CWA and RCRA are ongoing and will continue in the
future.

8.     Neither EPA nor the State of New York has commenced and is diligently
prosecuting a prior court action relating to Exxon's contamination of the Site under the CWA,
33 U.S.C. § 251 *et seq.*, or under RCRA, 42 U.S.C. § 6972(a)(1)(B); has incurred costs to
initiate a remedial investigation and feasibility study under section 104 of CERCLA, 42 U.S.C.
§ 9604, and is diligently proceeding with a remedial action under section 104 of CERCLA, 42
U.S.C. § 9604; is actually engaging in a removal action under section 104 of CERCLA, 42
U.S.C. § 9604; or has commenced an action or issued an administrative order under section 106

3

of CERCLA, 42 U.S.C. § 9606, or under RCRA, 42 U.S.C. § 6973.

9. All requirements for filing a citizen suit under the CWA, 33 U.S.C. § 1365(b)(1)(A), and under RCRA, 42 U.S.C. § 6972(b)(2)(A)-(C), have been satisfied.

## THE PARTIES

10. Plaintiff, State of New York, as a body politic and a sovereign entity, brings this action on behalf of itself and as *parens patriae*, trustee, guardian, and representative on behalf of all residents and citizens of New York, particularly those citizens and residents who live in the vicinity of the Site.

11. Plaintiff Alexander B. Grannis, Commissioner of DEC, and Trustee of the State of New York's natural resources pursuant to CERCLA, 42 U.S.C. § 9607(f)(2)(b), joins in this action to recover damages for injury to, or loss of, the State's natural resources.

12. On information and belief, Defendant ExxonMobil Corporation is a publicly held corporation organized under the laws of the State of New Jersey. It is the successor of the Mobil Oil Corporation ("Mobil"), through a merger in 1999, and of other companies that operated at the Site.

13. Mobil was the owner and operator of a petroleum facility located at 300 North Henry Street, Brooklyn, New York and an oil refinery located between Greenpoint and Norman Avenues, Brooklyn, New York.

14. On information and belief, Defendant ExxonMobil Refining & Supply Company is a corporation organized under the laws of the State of New Jersey. On information and belief, it operates and manages refining and supply facilities on behalf of ExxonMobil Corporation, including operating and managing remediation efforts at such facilities.

4

## FACTS COMMON TO ALL CLAIMS

15.     Since at least the early 1900's, Exxon and its predecessors, including the
Standard Oil Company, the Standard Oil Company of New York, and Mobil Oil Company, have
owned and operated petroleum refining and storage facilities – at times known as the Brooklyn
Terminal – located in the Greenpoint neighborhood of Brooklyn, New York.  On information
and belief, Exxon also owned the property on which the facilities were located.

16.     These facilities included a large tank farm property and a refinery and storage
facility that encompassed all of the land now bounded by North Henry Street, Greenpoint
Avenue, Norman Avenue, and Apollo Street in Brooklyn, and Newtown Creek.  On information
and belief, Exxon continues to own an inactive petroleum storage facility within the area.

17.     In the course of operations at these facilities, Exxon spilled, leaked, released,
discharged, or otherwise discarded over seventeen million gallons of petroleum, pollutants, solid
and hazardous wastes, and other hazardous substances into the environment, including into the
soils, subsurface soils, groundwater, wetlands, and surface waters.

18.     The plume of contaminants from Exxon's Spill has migrated, and continues to
migrate, to the Creek.  As it reaches the edge of the Creek these contaminants seep into the
Creek's waters through discrete cracks, fissures, channels and gaps in bulkheads located along
the Creek's shoreline including at properties known as the Peerless Importers and the Steel
Equities properties.  The Peerless Importers property is located at 26 Bridgewater Street and
Meeker Avenue in Brooklyn (Block #2666, Lots 1, 52, 125), and the Steel Equities property is
located at 100 and 120 Apollo Street and Bridgewater Street in Brooklyn (Block #2666, Lots
101 and 201).  The bulkhead seepages have occurred, without limitation, on the dates set forth

in exhibit C to the notice of intent to sue attached as Exhibit 2, and they continue to occur.

19.   In February 1990, an oil spill of 50,000 gallons from an aboveground storage tank, No. 69, occurred at the Mobil Oil Terminal, 300 North Henry Street, Brooklyn.  DEC entered into an administrative Order on Consent with Mobil, under NY Navigation Law §§173, 175, and 176, and the Water Pollution Control Law, ECL § 17-0501, for the investigation and remediation of only the spill from tank No. 69 and the petroleum free product plume under Exxon's current and former petroleum refining and storage facilities ("On-Site Order").  The On-Site Order did not address the Spill's dissolved groundwater plume, soil contamination, vapor releases, or contamination of the Creek and its biota.

20.   In June 1990, DEC entered into a separate administrative Order on Consent with Mobil, under NY Navigation Law §§173, 175, and 176, and the Water Pollution Control Law, ECL § 17-0501, for the investigation and remediation of only the petroleum free product plume that had migrated through the subsurface and off the boundaries of Exxon's current and former petroleum refining and storage facilities ("Off-Site Order").  The Off-Site Order did not address the Spill's dissolved groundwater plume, soil contamination, vapor releases, or contamination of the Creek and its biota.

21,   Exxon owns and operates two systems to recover only petroleum free product from the subsurface in Greenpoint, Brooklyn:  (1) the Off-Site Free Product Recovery System ("Off-Site Recovery System") located on Bridgewater Street, Greenpoint, Brooklyn, New York, which includes an outfall into Newtown Creek located at the end of Meeker Avenue; and (2) the Brooklyn Terminal Free Product Recovery System ("On-Site Recovery System") located at 400 Kingsland Avenue, Brooklyn, New York, which also includes an outfall into Newtown Creek.

6

22.    As an incident of their operation, these free product recovery systems recover contaminated groundwater, which is treated with air strippers and then discharged into Newtown Creek through the two aforesaid outfalls. Each of these outfalls is currently regulated by the New York State Pollution Discharge Elimination System ("SPDES") permit equivalency program, with oversight by DEC.

23.    Over the history of the operations of these outfalls, Exxon discharged through these outfalls various petroleum contaminants, pollutants, solid and hazardous wastes, and other hazardous substances, some of which were not authorized to be discharged by the SPDES. permit equivalency program. Such unauthorized discharges occurred, without limitation, on the dates set forth in exhibit A to the notice of intent to sue annexed as Exhibit 2.

24.    From March 9, 2007, until on or about June 28, 2007, Exxon shut down both of its petroleum free product recovery systems despite the objection to the shutdown made by the State and the State's demand that Exxon continue recovery of released petroleum and treatment of contaminated groundwater. This shutdown reduced Exxon's recovery of petroleum free product to *de minimis* amounts and thus effectively suspended Exxon's on-site and off-site recovery efforts, in violation of Exxon's obligations under the On-Site and Off-Site Orders and under law. The Exxon On-Site and Off-site Orders require the recovery of petroleum free product from the subsurface in Greenpoint, Brooklyn.

25.    On information and belief, Exxon's shutdown exacerbated the Spill's contamination of the Site, including worsening groundwater seepage into the Creek and causing visible petroleum sheens on the Creek's surface waters.

26.    Despite the On-Site and Off-Site Orders, and Exxon's obligations under the law,

7

millions of gallons of petroleum, pollutants, solid and hazardous wastes, and hazardous substances remain under the subsurface at least fifty years after the Spill, thereby presenting ongoing imminent and substantial endangerments to the people who live near the Site and to the environment at and surrounding the Site.

27.     The presence of the Spill in the subsurface of the affected area of Greenpoint presents the risk of toxic vapors from the Spill migrating through the subsurface and entering the homes and commercial establishments in the area.

28.     Exxon has refused and failed to investigate and remediate the environmental conditions created by its Spill, including refusing and failing to address the contaminated soils, the contaminated subsurface soils, the contaminated groundwater and dissolved groundwater plume, the contaminated wetlands, and the contaminated Creek, which refusal and failure has created risks to the public health and the environment at the Site.

29.     The State has incurred costs and expenses in responding to Exxon's releases of petroleum and other pollutants and contaminants, including without limitation costs of oversight and investigation.

### FIRST CLAIM FOR RELIEF
### RESOURCE CONSERVATION AND RECOVERY ACT

30.     Petroleum is a "solid waste" and a "hazardous waste" under sections 1004(27) and 1004(5), respectively, of RCRA, 42 U.S.C. § 6903(27) and § 6903(5). Other pollutants discharged by Exxon from its facilities and recovery systems are also solid and hazardous wastes under RCRA.

31.     The release, leaks, spills and other discharges from Exxon's current and former

8

Greenpoint petroleum refining and storage facilities over the years constitute illegal "disposal" under section 1004(3) of RCRA, 42 U.S.C. § 6903(3).

32.    Exxon is the past owner and operator of a solid waste disposal facility within the meaning of section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

33.    Exxon has contributed to the past and present handling, storage, and disposal of solid and hazardous waste, as defined in section 1004 of RCRA, 42 U.S.C. § 6903.

34.    Exxon's petroleum, other pollutants, and solid and hazardous wastes have entered into, and continue to enter into the environment at and about the Site, including the soils, subsurface soils and groundwater, the air, and the Creek.

35.    The presence of the petroleum, other pollutants, and solid and hazardous wastes, including vapors and explosive gases, in the environment at and about the Site presents imminent and substantial endangerments to the health of persons and to the environment within the meaning of section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

36.    Exxon is liable for penalties not to exceed $25,000 per day per violation payable to the United States pursuant to 42 U.S.C. §§ 6928(a) and (g), 6972(a).

### SECOND CLAIM FOR RELIEF
### CLEAN WATER ACT

37.    The CWA prohibits the discharge of any pollutant by any person without a permit. 33 U.S.C. § 1311(a).

38.    Petroleum products are pollutants under section 502(6) of the CWA, 33 U.S.C. § 1362(6). Other chemical wastes and solid and hazardous wastes have been discharged into the environment by Exxon and these wastes are also pollutants under section 502(6) of the CWA,

33 U.S.C. § 1362(6).

39.     The petroleum and other pollutants from Exxon's Spill have migrated to the Creek and entered, and continue to enter into the Creek through discrete cracks, fissures, channels and gaps in bulkheads along the Creek that constitute "point sources" under section 502(14) of the CWA, 33 U.S.C. § 1362(14).

40.     Newtown Creek is a navigable water of the United States under section 502(7) of the CWA, 33 U.S.C. § 1362(7).

41.     Exxon's discharge of the petroleum and other pollutants from point sources in the bulkheads is not authorized by a SPDES permit or other requirement of the State's SPDES permit equivalency program. These discharges, whose dates are specified, without limitation, in exhibit C to the notice of intent to sue attached as Exhibit 2, have violated the prohibition set forth in 33 U.S.C. § 1311(a), and such discharges to the Creek from point sources in the bulkheads are continuing.

42.     Exxon's discharges of the petroleum and other pollutants to the Creek constitute unlawful discharges of a pollutant under section 502(12) of the CWA, 33 U.S.C. § 1362(12), and are in violation of 33 U.S.C. § 1311(a) and of effluent standards or limitations under the CWA.

43.     Exxon is liable for penalties up to $25,000 per day per violation payable to the United States pursuant to 33 U.S.C. §§ 1319(d) and 1365(a).

### THIRD CLAIM FOR RELIEF
### OIL POLLUTION ACT

44.     Exxon's current and former Greenpoint oil refining and storage facilities

constitute an "onshore facility" under section 1001(24) of OPA, 33 U.S.C. § 2701(24).

45.     Exxon is the owner or operator of an onshore facility from which there has been and continues to be a discharge of oil, within the meaning of sections 1001(7), (23), and (26) of OPA, 33 U.S.C. §§ 2701(7), (23), and (26). The discharges continue and said discharges constitute an incident under section 1001(14) of OPA, 33 U.S.C. § 2701(14), which incident occurred after August 18, 1990.

46.     Newtown Creek is a navigable water of the United States under section 1001(21) of OPA, 33 U.S.C. § 2701(21).

47.     Accordingly, Exxon is a "responsible party" and is liable to the State for the State's removal costs and damages, within the meaning of section 1002(a) of OPA, 33 U.S.C. § 2702(a).

48.     Exxon's release of oil into navigable waters and adjoining shorelines, and the environment, has caused injury to, destruction of, and/or loss of the natural resources of the State under sections 1001(20) and 1002 of OPA, 33 U.S.C. §§ 2701(20) and 2702.

### FOURTH CLAIM FOR RELIEF
### COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

49.     Exxon's Greenpoint oil refining and storage facilities constitute a "facility" under section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

50.     Among the chemicals that were released and that threaten to be released into the environment from the facility are hazardous substances, which contaminated the environment, including soils, surface waters, groundwater, and the Creek, within the meaning of sections 101(14) and 101(22) of CERCLA, 42 U.S.C. §§ 9601(14) and 9601(22).

11

51.   The release and threatened release of hazardous substances have caused the State to incur response costs for investigation, oversight, and related activities.  The State will incur further response costs as defined in section 101 of CERCLA, 42 U.S.C. § 9601, for investigations, remediation, oversight, and enforcement.

52.   The response costs mentioned above are costs of removal or remedial action with the meaning of sections 101(23), (24), (25), (31), and section 107(a) of CERCLA, 42 U.S.C. §§ 9601(23), (24), (25), (31), and § 9607(a).

53.   The State is entitled to recover from responsible persons all response costs for actions that are not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, under section 107(a) of CERCLA, 42 U.S.C. § 9607.

54.   Pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Exxon is liable as owner and/or operator at the time of disposal, as current owner and/or operator, and/or as generator of materials containing hazardous substances, which materials were disposed at the Site.

55.   Pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Exxon is strictly, jointly, and severally liable to the State for past response costs incurred by the State in response to the release or threatened release at and from the Site.

56.   Pursuant to sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, Exxon is strictly, jointly, and severally liable for future response costs to be incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site.

57.   The release of hazardous substances into the environment has caused injury to, destruction of and/or loss of the natural resources of the State within the meaning of sections

12

101(16) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(16) and 9607(a).

58.     Pursuant to sections 107(a) and 113 of CERCLA, 42 U.S.C. §§ 9607(a) and 9613, Exxon is strictly, jointly, and severally liable for any natural resource damages.

## FIFTH CLAIM FOR RELIEF
## NEW YORK STATE NAVIGATION LAW

59.     At all relevant times, Exxon or one of its predecessors owned the Greenpoint oil refining and storage facilities along the Creek.

60.     At all relevant times, Exxon or one of its predecessors operated the Greenpoint oil refining and storage facilities along the Creek

61.     At all times relevant hereto, Exxon's acts or omissions resulted in a discharge of petroleum at the Site.

62.     At all times relevant hereto, Exxon failed to timely report said petroleum discharge.

63.     At the times relevant hereto, Exxon failed to take all measures necessary to clean up and remove said discharge.

64.     Pursuant to Article 12 of the NY Navigation Law, Exxon is strictly liable, without regard to fault, for all cleanup and removal costs incurred and to be incurred by the State, and for all direct and indirect damages, including without limitation damages to natural resources and the costs of restoration of Newtown Creek and the soils and groundwater affected by the Spill.

65.     By reason of Exxon's discharge of petroleum and its failure to timely report said discharge, and its failure to take all measures necessary to clean up and remove said discharge,

13

Exxon has violated the provisions of Article 12 of the NY Navigation Law and is liable under NY Navigation Law § 192 to the State for mandatory penalties in the amount of not more than $25,000 for each offense and, for any continuing violation, a like penalty for each day that the offenses continued or are continuing.

66.     Pursuant to NY Navigation Law § 176, Exxon has an obligation to contain its discharges of petroleum.

67.     By shutting down each of the petroleum free product recovery systems, Exxon breached its duty set forth in NY Navigation Law § 176, and is liable under NY Navigation Law § 192 to the State for mandatory penalties in the amount of not more than $25,000 for each day from March 9, 2007 to June 28, 2007, that the On-Site Recovery System was shutdown, and is liable under NY Navigation Law § 192 to the State for mandatory penalties in the amount of not more than $25,000 for each day from March 9, 2007 to June 28, 2007, that the Off-Site Recovery System was shutdown.

## SIXTH CLAIM FOR RELIEF
## NEW YORK STATE ENVIRONMENTAL CONSERVATION LAW

68.     Groundwater in general and Newtown Creek are "waters of the state" as defined in ECL § 17-0105. The Creek is also a tidal waterway that contains designated tidal wetlands.

69.     Newtown Creek is classified by the State as a class SD water body, which prohibits the addition of petroleum products in amounts that cause a visible sheen.

70.     Groundwater beneath and surrounding the Site is classified as GA, which prohibits the addition of pollutants to such water in excess of groundwater standards of the State.

14

71.    For decades, Exxon has discharged and continues to discharge petroleum, pollutants, solid and hazardous wastes, and hazardous substances into the waters of the State, including into groundwater and Newtown Creek and its tidal wetlands.

72.    The discharge of said pollutants and wastes has caused and is causing or contributing to a condition in contravention of surface water and groundwater standards adopted by DEC. These discharges accordingly are in violation of ECL § 17-0501 *et seq.* and the standards established under ECL § 17-0301.

73.    The discharge of said pollutants also violates ECL § 25-0101 *et seq.* and related regulations, which prohibit the pollution of the State's tidal wetlands.

74.    The contaminants from Exxon's Spill and its facilities have migrated to the Creek and entered, and continue to enter, into the Creek through discrete fissures, channels, conduits and other means in bulkheads along the Creek that constitute "point sources" under ECL §§ 17-0105(16), and 17-0505.

75.    These discharges through the point sources in and about the bulkheads are unpermitted and in contravention of ECL §§ 17-0501, 17-0505, 17-0511, 17-0701, 17-0803, and 17-0807, and 6 New York Codes, Rules and Regulations § 750-1.4(a).

76.    Exxon also discharged pollutants to the Creek from its On-Site and Off-Site Recovery Systems through the two outfalls, and the discharge of certain of these pollutants, as specified in exhibit A to the notice of intent to sue annexed as Exhibit 2, was not authorized by a SPDES permit or any other requirement of the State's SPDES permit equivalency program.

77.    These discharges through the two outfalls, as specified in exhibit A to the notice of intent to sue annexed as Exhibit 2, were unpermitted and in contravention of ECL §§ 17-

15

0501, 17-0505, 17-0511, 17-0701, 17-0803, and 17-0807, and 6 New York Codes, Rules and Regulations § 750-1.4(a).

78.     Pursuant to ECL § 71-1929, Exxon has violated Article 17, titles 1-11, the regulations promulgated thereunder, and/or the permit issued pursuant thereto by (a) discharging through point sources in the bulkheads without a SPDES permit or its equivalency, and (b) discharging pollutants in the past through the two outfalls not authorized by a SPDES permit or a permit equivalency, and is subject to a civil penalty not to exceed $37,500 per day for each violation.

79.     Pursuant to ECL §§ 71-1929 and 71-1931, the State is entitled to an injunction requiring Exxon to cease these unpermitted discharges of contaminants into the groundwater and Creek unless and until it obtains a SPDES permit for such discharges from DEC.

80.     As a result of its discharges to tidal wetlands, Exxon has violated the tidal wetlands provision of Article 25 of the ECL, and pursuant to ECL §§ 71-2501, 71-2503, 71-2505, and 71-2507, the State is entitled to civil penalties of not more than $25,000 for each violation and injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**PUBLIC NUISANCE**

81.     The release of petroleum, pollutants, solid and hazardous wastes, and hazardous substances from the Site and their presence in the environment, including groundwater, at and in the vicinity of the Site constitute a continuing public nuisance.

82.     Exxon participated in the creation of this continuing public nuisance at and in the vicinity of the Site. Exxon has maintained this continuing public nuisance at and in the vicinity

of the Site.

83.    The State has incurred costs to abate the public nuisance at this Site.

84.    Exxon is liable to the State under the common law of public nuisance and New York Real Property and Proceedings Law, Section 841, for all costs of abatement of this public nuisance, and all damages, including natural resource damages arising from it.

**EIGHTH CLAIM FOR RELIEF**
**INDEMNIFICATION**

85.    At all times relevant hereto, Exxon had and continues to have a duty and obligation to the public to investigate the scope of and abate completely and permanently the contamination described herein, and to alleviate the harm and risk of harm resulting from the contamination.

86.    Exxon has failed to perform its duties and obligations to do so.

87.    The State has the duty and obligation to protect the public health and the environment and to remediate Inactive Hazardous Waste Disposal Sites, such as this Site, pursuant to ECL §§ 3-0301, 27-1301 *et seq.*, and other environmental and public health laws of the State.

88.    Because of Exxon's failure to perform its duties and obligations, the State has had to investigate the scope of and abate the chemical contamination at and near the Site at the State's expense.

89.    In taking the action and incurring the expenses set forth herein, the State has performed duties and obligations owed by Exxon.

90.    Accordingly, by reason of the State's payments for the costs of investigation and

17

remediation of the Site, the State obtained by operation of law an implied right to
indemnification against Exxon in the amount of such payments.

## NINTH CLAIM FOR RELIEF
## RESTITUTION

91.     The actions taken and expenses incurred by the State were necessary to ensure
the health, safety, and well-being of the public and the environment of the State.

92.     Exxon has been unjustly enriched by the State's performance of the duties and
obligations owed by Exxon.

93.     The State is entitled to restitution from Exxon for the expenses incurred by it in
performing Exxon's duties and obligations.

94.     The State has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against Exxon upon each
claim and, further, requests that this Court enter judgment against Exxon on each claim:

1.     Declaring Exxon to be strictly, jointly, and severally liable to the State for the
remediation of the Spill's contamination of the Site and surrounding groundwater, and ordering
Exxon to investigate, remediate and abate the contamination of the soils, subsurface soils,
groundwater, air, and Creek, including its sediments and biota;

2.     Declaring Exxon to be strictly, jointly, and severally, liable to the State for, and
awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs
of enforcement, incurred by the State in responding to the release or threat of release of the
petroleum, pollutants, solid and hazardous wastes, and hazardous substances at the Site, and

18

damages to the State's natural resources, and entering judgment in an amount to be determined by the Court;

3.      Declaring Exxon to be strictly, jointly, and severally, liable to the State for all further response costs and expenses, including interest, attorneys' fees, and other costs of enforcement, to be incurred by the State in responding to the release or threat of release of the petroleum, pollutants, solid and hazardous wastes, and hazardous substances at the Site, and damages to the State's natural resources;

4.      Declaring Exxon strictly, jointly, and severally liable to the State for penalties under the NY Navigation Law and the ECL for each violation to the maximum extent provided by law, and applying all appropriate civil penalties under the CWA pursuant to 33 U.S.C. § 1365(a) and under RCRA pursuant to 42 U.S.C. § 6972(a), and entering judgment against Exxon in an amount to be determined by the Court;

5.      Enjoining Exxon from further discharges of petroleum, pollutants, solid and hazardous wastes, and hazardous substances into the groundwater and Creek in violation of law; and

6.      Granting the State all costs of litigation, including reasonable attorney and expert witness fees, pursuant to 33 U.S.C. § 1365(d) and 42 U.S.C. § 6972(e); and

7.      Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the State demands trial by

19

jury in this action of all issues triable by jury in this matter.

Dated: New York, New York
      July 17, 2007

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Plaintiffs

By: _____

KATHERINE KENNEDY
GORDON J. JOHNSON
Assistant Attorneys General
New York State Department of Law
Environmental Protection Bureau
120 Broadway – 26th Fl.
New York, New York  10271
(212) 416-8450, 8448
Katherine.Kennedy@oag.state.ny.us
Gordon.Johnson@oag.state.ny.us

20

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

RIVERKEEPER, INC., ROLF CARLE, LAURA HOFFMAN,
MICHAEL HOFFMAN, DEBORAH MASTERS,
WILLIAM SCHUCK, TERESA TORO,

                     Plaintiffs,

-against-

EXXON MOBIL CORPORATION,

                     Defendant.

-------------------------------------------------------------X

**PLAINTIFF'S COMPLAINT**

CV 04 2056

GLASSER, J.

MANN, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ MAY 1 8 2004 ★

BROOKLYN OFFICE

## COMPLAINT

Riverkeeper Incorporated, Rolf Carle, Laura Hoffman, Michael Hoffman, Deborah Masters, William Schuck, and Teresa Toro, by their attorneys, Pace Environmental Litigation Clinic, Inc., allege for their complaint herein as follows:

## NATURE OF ACTION

1. This is a citizen suit, brought under section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B), for the defendant's violations of the terms and provisions of those Acts by the unpermitted and unlawful discharge of pollutants into Newtown Creek and the imminent and substantial endangerment posed by the solid waste spreading under Greenpoint, Brooklyn.

## JURISDICTION

2. This Court has original jurisdiction over the claims set forth in this complaint by virtue of section 1331 of the Judiciary and Judicial Procedure Act, 28 U.S.C. § 1331, because this action arises under the laws of the United States.

1

3. This Court has subject matter jurisdiction over the claims set forth in this complaint by virtue of section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), and section 7002(a) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a).

4. On or about January 20, 2004, Plaintiffs mailed notice of the violations complained of herein, and of its intent to file suit, to the Administrator of the United State Environmental Protection Agency ("EPA"), the New York Department of Environmental Conservation ("DEC"), and to the defendant as required by section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).  More than sixty days have passed since notice was served.

5. On or about January 20, 2004, Plaintiffs mailed notice of the violations complained of herein, and its intent to file suit, to the Administrator of the United State Environmental Protection Agency ("EPA"), the New York Department of Environmental Conservation ("DEC"), and to the defendant as required by section 7002(b)(2)(A) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(b)(2)(A).  More than ninety days have passed since notice was served.

6. The violations complained of herein are ongoing and will continue in the future.

7. Neither EPA nor DEC has commenced and diligently prosecuted a court action under section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. §1365(b)(1)(B), which would bar this court action.

8. Neither EPA nor DEC has commenced and diligently prosecuted a court action under section 7002(b)(2)(B) or (C) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(b)(2)(B), (C), which would bar this action.

9. Neither EPA nor DEC has expended response costs with respect to the site of the violations complained of herein under section 104 of the Comprehensive Environmental Response Cleanup and Liability Act, 42 U.S.C. § 9604, which would bar this action.

10. This action is not barred by section 309(g)(6), 33 U.S.C. § 1319(g)(6), because the complaint is filed before the 120th day after service of the Clean Water Act Notice Letter of Intent to Sue pursuant to section 309(g)(6)(B)(ii) of the Clean Water Act, 33 U.S.C. § 1319(g)(6)(B)(ii).

2

11. All conditions precedent to filing a citizen suit under section 505 of the Clean Water Act, 33 U.S.C. § 1365, and section 7002 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, have been satisfied.

## VENUE

12. Venue is appropriate in the Eastern District of New York pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), and section 7002(a) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), because the source of the violations complained of is located within the district.

## PARTIES

13. Plaintiff Riverkeeper Incorporated sues on behalf of its supporting members. Riverkeeper is a non-profit corporation, organized under the law of the State of New York. Riverkeeper and its 5,000 supporting members are dedicated to conserve, protect, and restore the Hudson River, New York Harbor, East River, Long Island Sound, and connected bays, tributaries, and watersheds, which includes Newtown Creek. Riverkeeper is a "person" for the purpose of the citizen suit provisions of sections 505 and 502(5) of the Clean Water Act, 33 U.S.C. §§ 1365, 1362(5), and sections 1004(15) and 7002(a) of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6903(15), 6972(a). Some supporting members of Riverkeeper live near Newtown Creek and would enjoy the use of the creek were it not for Defendant's discharge of pollutants into Newtown Creek. The petroleum discharge leaves an oily sheen on Newtown Creek's surface, it emits a petroleum smell in the area, and the petroleum spill has affected property values. Petroleum products have permeated the soil and groundwater, posing an imminent and substantial endangerment to humans and wildlife living in Greenpoint, Brooklyn, New York. The interest of the Riverkeeper's supporting members are being, and will continue to be, adversely affected by the Defendant's failure to comply with the requirements of the Clean Water Act and the Resource Conservation and Recovery Act.

3

14. Rolf Carle is a resident of Greenpoint, Brooklyn, New York. Newtown Creek's degraded condition impairs Mr. Carle's use and enjoyment of the Creek, and he is offended by the oily sheen and petroleum smell of the Creek.

15. Plaintiff Laura Hoffman is a resident of Greenpoint, Brooklyn, New York. Newtown Creek's degraded condition impairs Ms. Hoffman's use and enjoyment of the Creek, and she is offended by the oily sheen and petroleum smell of the Creek.

16. Plaintiff Michael Hoffman is a resident of Greenpoint, Brooklyn, New York. Newtown Creek's degraded condition impairs Mr. Hoffman's use and enjoyment of the Creek, and he is offended by the oily sheen and petroleum smell of the Creek.

17. Plaintiff Deborah Masters is a resident of Willaimsburg, and she works in Greenpoint, Brooklyn, New York. Newtown Creek's degraded condition impairs Ms. Masters' use and enjoyment of the Creek, and she is offended by the oily sheen and petroleum smell of the Creek.

18. Plaintiff William Schuck lives on the shores of Newtown Creek. Newtown Creek's degraded condition impairs Mr. Schuck's use and enjoyment of the Creek, and he is offended by the oily sheen and petroleum smell of the Creek.

19. Teresa Toro is a resident of Greenpoint, Brooklyn, New York. Newtown Creek's degraded condition impairs Ms. Toro's use and enjoyment of the Creek, and she is offended by the oily sheen and petroleum smell of the Creek.

20. The quality of Newtown Creek directly and adversely affects the recreational, aesthetic, economic, environmental, and health interests of the Plaintiffs. The Plaintiffs have been, are being, and will continue to be adversely affected by the Defendant's illegal and unpermitted discharges into Newtown Creek and the spread of pollutants under Plaintiff supporting members' property.

21. Defendant Exxon Mobil Corporation is a publicly held corporation organized under the laws of the State of New Jersey. Mobil Oil Corporation was the owner of a petroleum facility located at 300 North Henry Street, Brooklyn, New York, and it owned and operated a refinery located between Greenpoint and Norman Avenues, Brooklyn, New York, before 1968. Exxon Mobil Corporation is the

4

corporate successor of Mobil Oil Corporation, after the two companies merged in 1999.  Exxon Mobil Corporation continues to own and operate the North Henry Street Facility.  Over a period of several years before 1968, the refinery released approximately 17 million gallons of petroleum products from leaking tanks and pipelines.  The petroleum products have spread over approximately 55 acres underground and are seeping into Newtown Creek.  Exxon Mobil continues to operate a remediation system in the Greenpoint area which continues to affect the direction of flow of the petroleum products in the soil, and which includes the containment boom on Newtown Creek through which petroleum products are released to the Creek.

## BACKGROUND

22. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source, into waters of the United States, unless such discharge is in compliance with specified portions of the Act. Discharges not authorized by, or in violation of the terms of a National Pollutant Discharge Elimination System ("NPDES") permit, or a State Pollutant Elimination System ("SPDES") permit, are prohibited.

23. Under sections 402(a) and (b) of the Act, 33 U.S.C. §§ 1342(a) and (b), the Administrator of the EPA has authorized the New York DEC to implement a NPDES/SPDES permit program.

24. Section 505 of the Clean Water Act, 33 U.S.C. § 1365, authorizes a citizen suit to enforce the provisions of section 301, 33 U.S.C. § 1311.

25. Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), of the Resource Conservation and Recovery Act permits any person to commence a civil action against any person who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

5

26. Defendant Exxon Mobil Corporation owned and operated an oil refinery in Greenpoint, Brooklyn, New York, from at least 1950 from which an explosion and a series of leaks and spills released approximately 17 million gallons of petroleum products into the underlying soils and aquifer.

27. The former Mobil refinery occupied the entire area east of Kingsland Avenue between Greenpoint Avenue south to Norman Avenue.   This refinery, with a capacity of 31,000 barrels per day, produced solvents, gasoline, kerosene, fuel oil and refinery oil.  Naptha, gasoline, gas oil and fuel oil and possibly other petroleum products were stored at this refinery.

28. The petroleum plume now extends from Norman Avenue where an Exxon Mobil facility now owned by BP Amoco Corporation was located before 1969, south of Meeker Avenue, and east of Bridgewater Street, and to the banks of Newtown Creek. This plume covers approximately 55 acres.

29. The petroleum product discharge potentially includes, but is not limited to, the following constituents: benzene and benzo(a)pyrene; benz(a)anthracene; indeno(1,2,3-cd)pyrene; dibenz(a,h)anthracene; chrysene; benzo(b)fluoranthene; and benzo(k)fluoranthene; MTBE; and lead.

30. Exxon Mobil's petroleum products flow through fissures of the bulkhead constructed along the creek on the property located at 42-44 Bridgewater Street, into the creek water, through sections of the containment boom that floats in front of the wall and into Newtown Creek.  Neither Exxon Mobil nor any other peron has a Clean Water Act permit for this discharge of petroleum products through the bulkhead.

## FIRST CLAIM: CLEAN WATER ACT

31. Plaintiff's supporting members and co-plaintiffs include residents of the Greenpoint Community who live and recreate near Newtown Creek, and some supporting members own property near Newtown Creek whose market value may be affected by the pollution in Newtown Creek.

6

32. The fissures in the bulkhead and the gaps between the sections of the containment boom are both "point sources" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

33. The discharge through the fissures and gaps contains petroleum products.

34. Petroleum products are a "pollutant" within the meaning of section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

35. The petroleum product discharge causes an oily sheen on Newtown Creek and causes the area to smell of petroleum.

36. The constituents present in the petroleum product discharge have been shown to cause harm to aquatic life.

37. New York DEC has designated Newtown Creek as class SD, which prohibits the addition of petroleum products in amounts that cause a visible sheen.

38. The petroleum discharge violates water quality standards for petroleum product discharges in Newtown Creek.

39. The petroleum product discharge is seeping through a point source into navigable waters without a NPDES/SPDES permit.

40. Defendant Exxon Mobil has neither applied for, nor been granted, a NPDES/SPDES permit for the discharge of petroleum products into Newtown Creek.

41. Newtown Creek is a "navigable water" of the United States within the meaning of section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

42. The petroleum product discharge enters navigable water when it discharges through the fissures in the bulkhead and into Newtown Creek.

43. Some of the petroleum product discharge escapes from the containment boom, traveling with the tide of Newtown Creek and its tributaries. Newtown Creek is a tidal waterway, its ebb and flow dependent on the East River, which, in turn, flows into to the Hudson River and into New York Harbor.

44. The tidal nature of Newtown Creek causes pollutants to travel quickly and for great distances, harming the biological, physical, and chemical integrity of the navigable waters in the area affected by the tide.

7

45. The petroleum product discharge into Newtown Creek is the "addition" of a pollutant within the meaning of section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(13).

46. Defendant Exxon Mobil has violated and will continue to violate "an effluent standard or limitation" under section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), because of its illegal and unpermitted discharges from the bulkhead and containment boom into Newtown Creek.

### FIRST CLAIM FOR RELIEF

47. Defendant's discharges of pollutants into Newtown Creek are illegal and unpermitted discharges within the meaning of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

48. Defendant Exxon Mobil has not applied for, nor been granted, a permit pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342, from the EPA or the DEC for the petroleum product discharges from the bulkhead and containment boom into Newtown Creek.

49. Defendant's violations are ongoing.

### SECOND CLAIM:
### RESOURCE CONSERVATION AND RECOVERY ACT

64. Petroleum is a "solid waste" within the meaning of §1004(27) of the Resource Conservation and Recovery Act, 42 U.S.C. §6903(27). A "solid waste" includes a liquid that results from industrial, commercial, mining and agricultural operations.

65. Petroleum is a "hazardous waste" within the meaning of § 1004(5) of the Resource Conservation and Recovery Act, 42 U.S.C.A §6903(5).

55. The explosions, leaks, releases and spills of petroleum products from Mobil's Greenpoint facility over the years constitute an improper "disposal" within the meaning of section 1004(3) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6903(3).

8

59.  Exxon Mobil Corporation is a past owner and operator of a solid waste disposal facility within the meaning of section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6792(a)(1)(B).

60.  Petroleum flows through fissures in the bulkhead located on the property at 42-44 Bridgewater Street into Newtown Creek. Petroleum flows through sections of the containment boom and into the middle of Newtown Creek.

66.  Petroleum products cause an increase in mortality and an increase in serious irreversible or incapacitating reversible illness within the meaning of § 1004(5) of the Resource Conservation and Recovery Act, 42 U.S.C. §6903(5).

67.  The presence of petroleum products in the environment presents an imminent and substantial endangerment to the health of persons and wildlife and to the environment.

67.  The presence of petroleum products is a significant endangerment to wildlife and wildlife habitat in the area. The ingestion of petroleum can cause disruption in normal internal organ function.

68.  A single drop of oil on a bird egg can cause mortality and developmental defects in affected embryos. When birds are exposed to petroleum products on their feathers, the feathers are unable to trap air and repel water. This causes hypothermia, the inability to fly and eventually, death. Petroleum products can cause other physiological problems when ingested or absorbed through the skin.

69.  Large quantities of petroleum products can result in the death of fish. For fish, the presence of petroleum products even in small concentrations results in changes in growth, feeding, fertility and survival rates and displacement.

68.  Chemical migration is occurring through the groundwater. The groundwater generally travels through this area via two aquifer zones towards Newtown Creek. The aquifer zones are interconnected.

69.  The Brooklyn-Queens aquifer is an untapped resource that cannot be used due to the continued contamination caused by the presence of petroleum products.

71.  The petroleum product discharge contains benzene, a known carcinogen.

72.  The presence of underground petroleum products can cause petroleum vapors.

9

73. Petroleum vapors may cause an imminent and substantial endangerment to the health and environment within the meaning of §7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. §6792(a)(1)(B).

74. The breakdown of underground petroleum causes methane gases to occur. These gasses accumulate in confined structures, such as homes and commercial buildings, resulting in potentially explosive conditions.

75. The potentially explosive conditions are an imminent and substantial endangerment to the health and environment within the meaning of §7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. §6792(a)(1)(B).

### SECOND CLAIM FOR RELIEF

50. The underground petroleum product plume is an imminent and substantial endangerment to the environment in that the high levels of hazardous wastes in the soil pose a significant threat to human beings, to Newtown Creek and to the fish, birds and other wildlife in and around the river.

51. As a result of the improper storage and/or disposal of hazardous wastes from the former Exxon Mobil site, groundwater has been contaminated. The contaminated groundwater flows to Newtown Creek, which is part of the Hudson estuary.

52. Contaminated groundwater discharges into Newtown Creek pose a threat to human beings and wildlife that live and recreate near the creek.

54. Exxon Mobil has contributed to the past and present handling, storage and/or disposal of hazardous waste as defined by the Resource Conservation and Recovery Act § 1004, 42 U.S.C. § 6903 and 40 C.F.R. §§ 261.2, 261.3.

56. As a past and present owner or operator, under the Resource Conservation and Recovery Act 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), Defendant is liable for

10

conditions on their present or formerly owned property that present an imminent and substantial endangerment to the health or the environment.

### RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request this court to grant the following relief:

A. Declare Defendant to have violated, and to be in violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311.

B. Require the Defendant to repair or replace the leaking bulkhead and containment boom to eliminate the fissures and gaps in order to prevent the discharge of petroleum into Newtown Creek.

C. Require the Defendant to obtain NPDES/SPDES permits in compliance with section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) to be effective until an impermeable bulkhead and containment boom are constructed.

D. Require Defendant to take such measures necessary to minimize or eliminate the pollutants from discharging through the bulkhead and containment boom during the construction of an impermeable bulkhead.

E. Compel Defendant to remediate all damage to the environment because of their illegal and unpermitted discharges.

F. Order Defendant, pursuant to section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), to pay $27,500 per day for each illegal discharge prior to March 15, 2004 and $32,500 per day for each day of violation thereafter.

G. Declare the Defendant Exxon Mobil, as past owner and operator of a facility that disposed of solid waste, liable for the imminent and substantial endangerment to Newtown Creek and to the Hudson River estuary and the surrounding land created by the contamination on the site.

H. Compel Defendant to eliminate health hazards and minimize potential health effects by the contamination of the site.

11

I.   Compel Defendant to eliminate all damage to the environment caused by its activities at the site.

J.   Compel Defendant to repair the damage to the land of the former Exxon Mobil site and its surrounds and to Newtown Creek as part of the Hudson River estuary.

K.   Award Plaintiffs' costs including reasonable attorney, witness, and consultation fees, as authorized by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and section 7002(e) of the Resource Conservation and Recovery Act, 42 U.S.C. §6972(e).

L.   Award such other relief as this court deems just and proper.

Dated: White Plains, NY

May 18, 2004

Respectfully submitted,

Karl Coplan (KC3877)
Attorney for Plaintiffs
Pace Environmental Litigation
Clinic, Inc.
78 North Broadway
White Plains, NY 10603

Kirstin Etela
Legal Intern
Pace Environmental Litigation
Clinic, Inc.
78 North Broadway
White Plains, NY 10603

Megan Joplin
Legal Intern
Pace Environmental Litigation
Clinic, Inc.
78 North Broadway
White Plains, NY 10603

12

Cc:

John Ashcroft
U.S. Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Michael Leavitt
U.S. Environmental Protection Agency Headquarters
Mail Code 1101-A
1200 Pennsylvania Avenue, N.W.
Washington D.C. 20460

Jane Kenny
U.S. Environmental Protection Agency, Region II
290 Broadway
New York, NY 12233

Erin Crotty
New York State Department of Environmental Conservation
625 Broadway
Albany, New York 12233

Thomas Kunkel
New York State Department of Environmental Conservation, Region II
1 Hunter's Point Plaza
47-40 21st Street
Long Island City, NY 11101

13

JS 44 (Rev. 3/99)

**CIVIL COVER SHEET**

04CJ2056 (RG)
MAG. MANN

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CV 04 2056**

**I. (a) PLAINTIFFS**

Riverkeeper, Inc. and others
(see attached)      Putnam

**DEFENDANTS**

Exxon Mobil Corporation

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

GLASSER, MANN, M.J.

MAY 18 2004
BROOKLYN OFFICE

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Karl Coplan, Pace Environmental Litigation Clinic
78 North Broadway.
White Plains, NY 10603

Attorneys (If Known)

Ellen Tenenbaum, McDermott, Will & Emery
600 13th Street, N.W.
Washington, D.C. 20005

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane    **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product  ☐ 362 Personal Injury— | ☐ 625 Drug Related Seizure | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability     Med. Malpractice | of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &  ☐ 365 Personal Injury— | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| & Enforcement of | Slander     Product Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers'  ☐ 368 Asbestos Personal | ☐ 650 Airline Regs. | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability     Injury Product | ☐ 660 Occupational | | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine    Liability | Safety/Health | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| Student Loans | ☐ 345 Marine Product   **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 861 HIA (1395ff) | Exchange |
| (Excl. Veterans) | Liability    ☐ 370 Other Fraud | | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle  ☐ 371 Truth in Lending | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle  ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | Product Liability    Property Damage | Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | | ☒ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | Product Liability | ☐ 730 Labor/Mgmt.Reporting | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| | | & Disclosure Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | or Defendant) | Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | 26 USC 7609 | Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. | | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

33 U.S.C. sections 1311, 1365 of the Clean Water Act for the discharge of pollutants without a permit and under 42 U.S.C. section 6972(a)(1)(B) of the Resource Conservation and Recovery Act for solid waste disposal that presents an imminent and substantial endangerment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23   CHECK YES only if demanded in complaint:   JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  5/18/2004   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

## ARBITRATION CERTIFICATION

I,_____, counsel for ___ _____
_____do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of
my knowledge and belief the damages recoverable in the above captioned civil action exceed the
sum of $150,000 exclusive of interest and costs.
_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its
stocks: Riverkeeper has no shareholders, is not publicly held, and
has no publicly traded parents, subsidiaries, or affiliates.

Did the cause arise in Nassau or Suffolk County? _NO_

If answered yes, please indicate which county. _____

County of residence of plaintiff(s)    (1) Putnam _____
                                       (2) Kings _____
                                       (3) Kings _____

County of residence of defendant(s)   (1) Dallas _____
                                      (2)_____
                                      (3)_____

I am currently admitted in the Eastern District of New York and currently a member in
good standing of the bar of this court.

Yes_X_____                              No_____

Are you currently the subject of any disciplinary action(s) in this or any other state or
federal court?

Yes_____(If yes, please explain)        No_X_____

_____

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials
of your first and last name and the first four digits of your social security number or any other
four digit number registered by the attorney with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).
ATTORNEY BAR CODE: KC3877 _____

E-MAIL Address: kcoplan@law.pace.edu _____

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order
No. 97-12, "In re Electronic Filing Procedures(EFP)", and consent to the electronic service of all
papers.

Signature:_____

Riverkeeper, Incorporated v. Exxon Mobil Corporation

These additional plaintiffs are included in the above captioned complaint:

Rolf Carle
Laura Hoffman
Michael Hoffman
Deborah Masters
William Schuck
Teresa Toro

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION** MAR - 3 2009

FILED
CLERK'S OFFICE

```
------------------------------------------------ x
                                                 :
IN RE:                                           :
                                                 :
METHYL BUTYL TERTIARY ETHER ("MTBE")             :
PRODUCTS LIABILITY LITIGATION                    :
                                                 :
                                                 :
                                                 :
                                                 :
                                                 :
                                                 :
                                                 :
------------------------------------------------ :
                                                 x
```

MDL Docket No. 1358

This Document Relates to
*Spiroff v. Exxon Mobil Corp., et
al.*, Case No. 06-CV-2865
(KAM)(RML)(E.D.N.Y.)

**DECLARATION OF
JAMES A. PARDO**

I, JAMES A. PARDO, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of McDermott Will & Emery LLP and am duly admitted to the bar of the Courts of the State of New York and to practice in the Southern and Eastern Districts of New York.  I respectfully submit this Declaration in support of ExxonMobil's motion to vacate Conditional Transfer Order 33 ("CTO-33"), which conditionally transfers *Spiroff et al. v. Exxon Mobil Corporation et al.*, a putative class action that has been pending for several years in the Eastern District of New York ("EDNY"), to the Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, Multidistrict Litigation No. 1358 (the "MTBE MDL"), now pending in the Southern District of New York.

2.      Since 2000, I have served as counsel for defendant Exxon Mobil Corporation ("ExxonMobil"), and as *liaison counsel* for all defendants, in the MTBE MDL.  In these capacities, I am fully familiar with the facts of the MTBE MDL proceedings and make this Declaration based on my personal knowledge.

3.     As demonstrated in ExxonMobil's accompanying Memorandum of Law, and the Declaration of John Calandra, declared on February 27, 2009, the Judicial Panel on Multidistrict Litigation (the "Panel") should not transfer the *Spiroff* action to the MTBE MDL because it bears no legal or factual resemblance to any of the approximately 150 actions that the Panel previously has transferred for consolidated proceedings .

4.     As the Panel knows, the gravamen of the MTBE MDL are product liability claims premised on the use of MTBE in gasoline and its impact on Plaintiffs' drinking water.  The *Spiroff* action does not make a single allegation about MTBE, or about any impact on Plaintiffs' drinking water, as required by the Panel's October 10, 2000 Order that created the MTBE MDL (the "MTBE MDL Order").  A true and correct copy of the MTBE MDL Order is attached hereto as Exhibit ("Ex.") 1.

5.     Indeed, *Spiroff* does not make any of the MTBE-specific claims or allegations that are the centerpiece of the MTBE MDL.  In short:  *Spiroff* looks <u>nothing</u> like any case that has been consolidated into the MTBE MDL.

6.     Additionally, since Plaintiffs' counsel in *Spiroff* also has been counsel to several plaintiffs in the MTBE MDL for the past six or more years, Plaintiffs' counsel already has access to, and is aware of, all of the discovery that has been completed in the MDL and in other MTBE actions.  Therefore, Plaintiffs' counsel cannot argue that transfer is necessary for purposes of coordination of discovery.

**Creation of the MDL**

7.     This Panel created the MDL more than eight years ago, on October 10, 2000, to centralize three lawsuits that alleged MTBE contamination of certain drinking water supplies.  (*See*, Ex. 1.)

8.      The MDL Order stated that the actions involved common questions of fact: (1) "whether the defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public" and (2) "whether plaintiffs sustained *drinking water* contamination as a result of MTBE contamination." *Id.* (emphasis added.)  There are no drinking water contamination claims in *Spiroff*.

9.      Explaining that centralization of cases related to MTBE would promote the "convenience of the parties and witnesses and promote the just and efficient conduct" of the litigation, this Panel assigned the cases to The Honorable Shira A. Sheindlin for coordinated pretrial proceedings in the Southern District of New York.  *Id.*

**Proceedings in the MDL**

10.      In the eight years since the MTBE MDL was created, approximately 150 MTBE cases have been transferred to Judge Scheindlin.

11.      The plaintiffs in each of those 150 cases include private well owners, public and private water suppliers, and/or governmental trustees of drinking water resources, each of whom have alleged that MTBE contaminated (or threatens to contaminate) its respective drinking water supply.

12.      Plaintiffs' counsel in *Spiroff* is counsel in many of the matters which have been transferred to the MTBE MDL.  Indeed, to date, Plaintiffs' counsel in *Spiroff* is lead counsel in more than 20 cases now consolidated into the MTBE MDL.

13.      Plaintiffs' counsel has alleged in these cases that no amount of MTBE is safe, and indeed, that even the threat of exposure to the slightest amount of MTBE poses unacceptable risks.  A true and correct copy of a typical MDL case, indeed one of Plaintiffs' counsel's own complaints in the MDL, *Plainview Water District v. Amerada Hess Corporation et al.*, is

attached hereto as Exhibit 2. (*See, e.g.,* Ex. 2 at ¶¶ 98-99, 107-112.) Each of the cases

consolidated into the MTBE MDL involves, of course, MTBE and MTBE contamination. For

example, the vast majority of cases allege that refiners' use of MTBE in gasoline rendered that

gasoline "unreasonably safe" because of, among other things, MTBE's alleged propensity to

spread faster and farther if leaked into the ground. Likewise, the vast majority of the

consolidated cases  allege that refiners failed to inform various persons and entities about the so-

called dangers of MTBE, and many of the cases allege that such conduct was in violation of the

Toxic Substances Control Act ("TOSCA"). *Id.* at ¶¶ 96, 211-244; 236-247. (No such claims are

made in the *Spiroff* Complaint.)

14.     A great deal of the discovery already has taken place in the MTBE MDL.  To

date, there have been more than 100 depositions of the defendant oil companies (including

experts), more than two dozen of which were directly related to defendant ExxonMobil.

Millions of pages of documents have been produced in the MTBE MDL, over one million by

defendant ExxonMobil alone.

15.     As counsel in more than 20 cases already consolidated into the MTBE MDL,

Plaintiffs' counsel in *Spiroff* already has access to <u>all</u> of this discovery.  This discovery covers

the issues common to all MTBE cases, such as:  whether MTBE rendered gasoline

"unreasonably dangerous" (*i.e.*, products liability); the oil companies' knowledge of the alleged

risks of MTBE; the decision to add MTBE to gasoline; and the distribution of gasoline

containing MTBE to New York and elsewhere.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed at New York, New York on February 27, 2009.

_____
James A. Pardo

RECEIVED
CLERK'S OFFICE
2009 MAR -2  P 1: 29
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR - 3 2009

FILED
CLERK'S OFFICE

**Exhibit 1**

RECEIVED
CLERK'S OFFICE

2009 MAR -2  P 1:29

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 10 2000

FILED
CLERK'S OFFICE

## DOCKET NO. 1358

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-370
*David England, et al. v. Atlantic Richfield Co., et al.*, S.D. Illinois, C.A. No. 3:00-371
*Donna Berisha, et al. v. Amerada Hess Corp., et al.*, S.D. New York, C.A. No. 1:00-1898

## BEFORE JOHN F. NANGLE, CHAIRMAN, LOUIS C. BECHTLE, JOHN F. KEENAN, WM. TERRELL HODGES,* MOREY L. SEAR,* BRUCE M. SELYA* AND JULIA SMITH GIBBONS, JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of three actions pending in the following federal districts: two actions in the Southern District of Illinois and one action in the Southern District of New York.[1] Before the Panel is a motion by five oil company defendants seeking centralization of these actions, pursuant to 28 U.S.C. §1407, in the Southern District of Illinois for coordinated or consolidated pretrial proceedings. Five additional defendants agree that centralization is appropriate, although two of these defendants prefer centralization in the Southern District of New York. The Illinois plaintiffs support centralization in the Illinois court. The New York plaintiffs along with eight defendants oppose centralization; if the Panel deems centralization appropriate, the New York plaintiffs and at least one opposing defendant favor centralization in the New York court.[2]

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact concerning i) whether defendants knew about and misrepresented the nature of MTBE and conspired to market MTBE without disclosing its risks to downstream users, the federal government or the public, and ii) whether plaintiffs sustained drinking water contamination as a result of MTBE contamination. Centralization under Section 1407 in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Section 1407 proceedings are desirable in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.

Opponents of transfer argue that the presence of individual questions of fact militate against 1407 transfer. We are unpersuaded by this argument. Indeed, we point out that transfer under Section 1407 has the salutary effect of placing all actions in this docket before a single judge who

---

* Judges Hodges, Sear and Selya took no part in the decision of this matter.

[1] The Panel has been notified that two potentially related actions have been recently filed in the Middle and Southern Districts of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 192 F.R.D. 459, 468-470 (2000).

[2] In an interested party response, plaintiffs in a potentially related action – *Buddy Lynn, et al. v. Amoco Oil Company, et al.*, M.D. Alabama, C.A. No. 96-940 – suggest centralization of MDL-1358 in the Middle District of Alabama.

IMAGED OCT 12'00

- 2 -

can formulate a pretrial program that:  1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.  It may be, on further refinement of the issues and close scrutiny by the transferee judge, that some claims or an action can be remanded to their transferor district for trial in advance of completion of the other actions in the transferee district.  But we are unwilling, on the basis of the record before us, to make such a determination at this time. Should the transferee judge deem remand of any claims or an action appropriate, procedures are available whereby this may be accomplished with a minimum of delay.  *See* Rule 7.6, R.P.J.P.M.L., 192 F.R.D. 459, 470-472 (2000).

We are persuaded that centralization of this litigation in the Southern District of New York is appropriate.  We note that the New York action is proceeding apace before Judge Shira Ann Scheindlin and we are confident in her ability to conduct pretrial proceedings in this litigation in an expeditious manner.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the above-captioned actions pending in the Southern District of Illinois be, and the same hereby are, transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Shira Ann Scheindlin for coordinated or consolidated pretrial proceedings with the action pending there.

FOR THE PANEL:

John F. Nangle,
Chairman

**Exhibit 2**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

   

-------------------------------------------------- X

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

-------------------------------------------------- X

MDL No. 1358
(Scheindlin, J.)

PLAINVIEW WATER DISTRICT,

                        Plaintiff



 - against -

AMERADA HESS CORPORATION;
ATLANTIC RICHFIELD COMPANY, individually
   and d/b/a ARCO PRODUCTS COMPANY, f/k/a
   ARCO PETROLEUM CO. and a/k/a ARCO;
BP PRODUCTS NORTH AMERICA, INC.,
   individually and as successor-by-merger to AMOCO
   OIL COMPANY and BP EXPLORATION and OIL
   INC., successor-by-merger to BP NORTH
   AMERICA INC;
CHEVRONTEXACO CORPORATION, individually
   and as successor-in-interest to CHEVRON
   CORPORATION and as successor-in-interest to
   TEXACO, INC.;
CHEVRON U.S.A., INC., individually and f/k/a
   GULF OIL CORPORATION, d/b/a CHEVRON
   PRODUCTS COMPANY, d/b/a CHEVRON
   CHEMICAL COMPANY;
CITGO PETROLEUM CORPORATION;
CITGO REFINING and CHEMICAL COMPANY, LP;
COASTAL EAGLE POINT OIL COMPANY;
COLORADO REFINING COMPANY;
CONOCOPHILLIPS COMPANY, f/k/a PHILLIPS
   PETROLEUM COMPANY, individually and as
   successor-in-interest to TOSCO CORPORATION,
   and d/b/a PHILLIPS 66 COMPANY;
CROWN CENTRAL PETROLEUM
   CORPORATION;
EL PASO MERCHANT ENERGY-PETROLEUM
   COMPANY, individually and f/k/a COASTAL
   REFINING and MARKETING INC., and f/k/a
   COASTAL STATES TRADING, INC.;
EQUILON ENTERPRISES, LLC, d/b/a SHELL OIL

**JURY TRIAL DEMANDED**

1

PRODUCTS US, individually and as successor-by-
merger to EQUIVA SERVICES LLC;
EQUISTAR CHEMICALS, LP;
EXXONMOBIL CHEMICAL COMPANY, INC.,
  individually and f/k/a MOBIL CHEMICAL
  COMPANY INC.;
EXXONMOBIL CORPORATION, f/k/a EXXON
  CORPORATION and d/b/a EXXONMOBIL
  REFINING and SUPPLY COMPANY, EXXON
  CHEMICAL U.S.A. and EXXONMOBIL
  CHEMICAL CORPORATION;
EXXONMOBIL OIL CORPORATION;
FLINT HILLS RESOURCES, LP, f/k/a KOCH
  PETROLEUM GROUP, LP;
GETTY PETROLEUM MARKETING, INC.;
GETTY PROPERTIES CORPORATION, individually
  and f/k/a GETTY PETROLEUM CORP.;
GULF OIL LIMITED PARTNERSHIP, f/k/a
  CATAMOUNT PETROLEUM LIMITED
  PARTNERSHIP;
HUNTSMAN PETROCHEMICAL CORPORATION;
IRVING OIL CORPORATION;
IRVING OIL, LIMITED;
LUKOIL AMERICAS;
LYONDELL CHEMICAL COMPANY, individually
  and f/k/a LYONDELL PETROCHEMICAL
  COMPANY and f/k/a ARCO CHEMICAL
  COMPANY;
LYONDELL-CITGO REFINING, LP;
MARATHON ASHLAND PETROLEUM, LLC;
MARATHON OIL COMPANY;
MOBIL CORPORATION;
MOTIVA ENTERPRISES, LLC, f/k/a STAR
  ENTERPRISES LLC;
THE PREMCOR REFINING GROUP, INC.,
  individually and f/k/a CLARK REFINING;
PDV MIDWEST REFINING, LLC;
SABIC AMERICAS, INC.;
SHELL OIL COMPANY;
SHELL OIL PRODUCTS COMPANY;
SHELL OIL PRODUCTS COMPANY, LLC;
SHELL PETROLEUM, INC.;
SHELL TRADING (US) COMPANY, individually
  and f/k/a EQUIVA TRADING COMPANY and a/k/a
  STUSCO;
SUNOCO, INC., individually and f/k/a SUN OIL

COMPANY and f/k/a SUN COMPANY, INC.;
SUNOCO, INC. (R&M), individually and f/k/a SUN
  REFINING and MARKETING COMPANY and
  f/k/a SUN COMPANY, INC. (R&M);
TEXACO, INC.;
TEXAS PETROCHEMICAL
TEXACO REFINING & MARKETING, INC.;
TEXACO REFINING & MARKETING (EAST),
  INC.;
TMR COMPANY, f/k/a TEXACO REFINING and
  MARKETING, INC., individually and as successor-
  by-merger to TRME COMPANY f/k/a TEXACO
  REFINING and MARKETING (EAST), INC.;
TOSCO CORPORATION, individually and as
  predecessor-in-interest to CONOCOPHILIPS
  COMPANY, and a/k/a TOSCO REFINING
  COMPANY and a/k/a TOSCO MARKETING
  COMPANY;
TEXAS PETROLEUM CHEMICALS;
TOTAL PETROCHEMICALS USA, INC., f/k/a
  ATOFINA PETROCHEMICALS, INC.;
TPI PETROLEUM, INC.;
VALERO ENERGY CORPORATION;
VALERO MARKETING AND SUPPLY
  COMPANY;
VALERO REFINING COMPANY;
VALERO REFINING AND MARKETING
  COMPANY,

Defendants.

------------------------------------------------------------------

X

     Plaintiff, Plainview Water District ("The District"), by and through their attorneys Napoli

Bern Ripka & Associates, LLP, for their complaint against Defendants allege as follows:

3

## NATURE OF THE CASE

1.      Plaintiff brings this action against Defendants to forestall an ever-increasing water quality emergency and the attendant irreparable harm created by the contamination of soil and groundwater in The District by Methyl Tertiary Butyl Ether ("MTBE"), a gasoline additive that was used by the Defendants. As used herein, the term "MTBE" shall include all its degradation products, such as tributyl alcohol ("TBA"). As a result of the Defendants' careless and negligent practices, MTBE has entered into the District's drinking water aquifer system and the groundwater, and has contaminated production wells, causing significant damages to Plaintiff and its customers.

2.      MTBE is highly soluble in water and does not readily biodegrade. MTBE is a possible human carcinogen, a known animal carcinogen, and even very small amounts (as little as 1 part per billion ["ppb"]) impart a foul taste and odor to water. The District's groundwater is the sole source of drinking water for approximately 32,000 residents.

3.      Defendants added MTBE to their gasoline knowing it would contaminate and create a greatly enhanced risk to groundwater, as it did. Defendants have engaged in joint efforts and have conspired to use and market MTBE as a gasoline additive for years with full knowledge of the serious threat MTBE poses to groundwater.

4.      Defendants conspired to maximize their profits at the expense of (and to the detriment of) Plaintiff and the environment and, in furtherance of this conspiracy to conceal the problems associated with MTBE, to proliferate its use, to pollute Plaintiff's wells and the ground water from which Plaintiff draws its potable water, and to avoid responsibility for their contamination.

5.      Plaintiff seeks to: (a) protect the public from additional exposure to this contamination; (b) prevent further and continuing injury to vital groundwater resources; (c)

enjoin Defendants from damaging Plaintiff's vital water resource and to remediate the problem they created; (d) compel Defendants to abate the continuing nuisance by removing the contaminants from the groundwater and soil; (e) obtain testing and monitoring, and alternative water where necessary; (f) compel Defendants Lyondell Chemical Company, Chevron USA Inc., Chevron Corporation, Texaco Inc., Texaco Refining and Marketing Inc., TRM Company, TRME, Shell Oil Company, Shell Oil Products Company, LLC, Shell Trading (US) Company, Equilon Enterprises, LLC, and ExxonMobil Corporation ("TSCA" Defendants) immediately to provide to the Administrator of the U.S. Environmental Protection Agency (the "EPA") all information that TSCA Defendants have obtained which reasonably supports the conclusion that MTBE and MTBE containing gasoline present a substantial risk of injury to health or the environment; (g) recover damages for, among other things, testing costs, remediation, or treatment costs, and damages to Plaintiff's property, including wells, pumping stations, filters, and usufructuary rights to the water drawn from the aquifers; and (h) ensure that the Defendants, as the responsible parties - and not the Plaintiff or its customers - bear all costs.

6.    Plaintiff asserts claims for: (a) violation of Section 8(e) of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2607(e); (b) public nuisance; (c) strict liability for design defect; (d) strict liability for failure to warn; (e) negligence; (f) private nuisance; (g) violation of New York's General Business Law; (h) violation of New York's Navigation Law; and (i) trespass.

## JURISDICTION and VENUE

7.    Jurisdiction lies in this Court pursuant to 15 U.S.C. § 2619(a)(1).

8.      This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367.

9.      Venue is proper in this court because one or more Defendants reside in the District within the meaning of 15 U.S.C. § 2619(a) and 28 U.S.C. § 1391(c); and/or one or more Defendants maintain a registered office or principal place of business in the District; and/or one or more Defendants regularly conducts business in the District; and/or one or more violations of TSCA occurred in the District; and/or the cause of action arose in the District; and/or at least one of the transactions giving rise to these causes of action – the actual or threatened contamination of plaintiff's property by MTBE and/or TBA – took place in the District.

## THE PARTIES

### Plaintiff

10.     The District is an improvement district comprising the habitants within its boundaries and formed for the purpose of exercising such powers and discharging such duties of local government and administration of public affairs as may be imposed or conferred upon them by law. The District possesses inherent authority to perform acts to preserve or benefit the corporate property of the region entrusted to them and the corporations may maintain actions to recover damages to corporate property.

11.     Established in or about 1928, The District is one of the oldest public water suppliers on Long Island, serving about 32,000 residents of Plainview, Old Bethpage and small segment of Syosset and Woodbury.

12.     The District was established pursuant to Article 12 of New York Town Law for the purpose of providing potable water to the District's residents. It currently provides water to approximately 32,000 residents.

13.     The New York Town Low provides that, in carrying out its powers, purposes and duties, the District is acting in all respects for the benefit of the people of Plainview Water District. Included among its powers is the power to sue and be sued and to do all things necessary or convenient to carry out its purposes.

### B. Defendants

14.     At all times relevant to this litigation, defendants did business in New York as manufacturers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

15.     At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from the exploration for and extraction of crude oils to the refining and/or the distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE sold in New York and other states, and the marketing and sale of MTBE.

16.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

17.     When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

7

18.     When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

19.     Amerada Hess Corporation is a Delaware corporation with its principal place of business at 1185 Avenue of the Americas, 40th Floor, New York, New York 10036, doing business in the State of New York.

20.     Ashland, Inc., is a Kentucky Corporation, with its principal place of business at 50 E. River Center Blvd., Covington, KY 41011, doing business in the State of New York.

21.     Atlantic Richfield Company, individually and doing business as ARCO Products Company (f/k/a Arco Petroleum Co.), and also known as ARCO, a subsidiary of BP America, Inc., is a Delaware corporation with its principal place of business at 4 Center Pointe Drive, La Palma, California 90623, doing business in the State of New York.

22.     BP Products North America, Inc., individually and as successor-by-merger to Amoco Oil Company and BP Exploration and Oil Inc., and successor-by-merger to PB North America, Inc., is a Maryland corporation with its principal place of business at 200 East Randolph Drive, Chicago, Illinois 60601, doing business in the State of New York.

23.     ChevronTexaco Corporation, individually and as successor-in-interest to Chevron Corporation and as successor-in-interest to Texaco, Inc., is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the State of New York.

24.      Chevron U.S.A., Inc., individually and formerly known as Gulf Oil Corp. (d/b/a Chevron Products Company, d/b/a Chevron Chemical Company), is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Road, San Ramon, California 94583, doing business in the State of New York.

25.      Citgo Petroleum Corporation is a Delaware corporation with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of New York.

26.      Citgo Refining and Chemicals Company, LP, a subsidiary of Citgo Investment Company, is an Oklahoma limited partnership with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of New York.

27.      Coastal Eagle Point Oil Company is a Delaware corporation with its principal place of business at 1-130 & 1-295, Westville, New Jersey 08093, doing business in the State of New York.

28.      Colorado Refining Co., is a Colorado Corporation, with its principal place of business at 5800 Brighton Boulevard, Commerce City, Colorado 56610, doing business in the State of New York.

29.      Coastal Oil New England is a Massachusetts Corporation, with its principal place of business at 1001 Louisiana Street, Houston, TX 77002, doing business in the State of New York.

30.      ConocoPhillips Company, formerly known as Phillips Petroleum Company, individually and as successor-in-interest to Tosco Corporation, and d/b/a Phillips 66 Company, is a Delaware corporation with its principal place of business at 600 North Dairy Ashford Road, Houston, Texas 77079, doing business in the State of New York.

31.     Crown Central Petroleum Corporation is a Maryland corporation with its principal place of business at 1 North Charles Street, Baltimore, Maryland 21203, doing business in the State of New York.

32.     El Paso Merchant Energy-Petroleum Company, individually and formerly known as Coastal Refining and Marketing, Inc. and formerly known as Coastal States Trading, Inc., is a Delaware corporation with its principal place of business at 1001 Louisiana Street, Houston, Texas 77002, doing business in the State of New York.

33.     Equilon Enterprises, LLC, d/b/a Shell Oil Products US, individually and as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at 1100 Louisiana Street, Suite 2200, Houston, Texas 77002, doing business in the State of New York.

34.     Equistar Chemicals, LP, is a foreign corporation with its principal place of business at 1221 McKinney Street, Suite 1600, Houston, TX 77010, doing business in the State of New York.

35.     ExxonMobil Chemical Company, Inc., individually and formerly known as Mobil Chemical Company Inc., a subsidiary of Exxon Mobil Oil Corporation, is a Delaware corporation with its principal place of business at 13501 Katy Freeway, Houston, Texas 77079, doing business in the State of New York.

36.     ExxonMobil Corporation, f/k/a Exxon Corporation and d/b/a Exxon Mobil Refining and Supply Company, Exxon Chemical U.S.A. and ExxonMobil Chemical Corporation, is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the State of New York.

37.     ExxonMobil Oil Corporation, a subsidiary of Mobil Corporation, is a New York corporation with its principal place of business at 800 Bell Street, Corp EMB Room 2441 Houston, Texas 77002, doing business in the State of New York.

38.     Flint Hills Resources, LP, formerly known as Koch Petroleum Group, LP, is a Delaware Corporation, with its principal place of business at 4111 E. 37th Street North, Wichita, Kansas 67220, doing business in the State of New York.

39.     Getty Petroleum Marketing, Inc. is a Maryland corporation with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York 1154, doing business in the State of New York.

40.     Getty Properties Corporation, individually and formerly known as Getty Petroleum Corp., is a Delaware corporation with its principal place of business at 125 Jericho Turnpike, Jericho, New York 11753, doing business in the State of New York.

41.     Giant Yorktown, Inc. is a Delaware Corporation, with its principal place of business at 23722 N. Scottsdale Road, Scottsdale. AZ 85255, doing business in the State of New York.

42.     Gulf Oil Limited Partnership f/k/a Catamount Petroleum Limited Partnership is a Delaware corporation with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts 02150, doing business in the State of New York.

43.     Huntsman Petrochemical Corporation is a Delaware Corporation with it principal place of business at 500 Huntsman Way, Salt Lake City, Utah 84108, doing business in the State of New York.

44.     Irving Oil Corporation is a Maine corporation with its principal place of business at 700 Main Avenue, Bangor, Maine, doing business in the State of New York.

11

45.     Irving Oil, Limited is a Canadian corporation with its principal place of business at 210 Crown Street/10 Sydney Street, Saint John, New Brunswick, Canada, doing business in the State of New York.

46.     LUKOIL Americas, Corp., is a New York corporation with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York 11554

47.     Lyondell Chemical Company, individually and formerly known as Lyondell Petrochemical Company and formerly known as Arco Chemical Company, is a Delaware corporation with its principal place of business at 1221 McKinney Street, Suite 700, Houston, Texas 77010, doing business in the State of New York.

48.     Lyondell-Citgo Refining, LP is a Foreign Corporation, with its principal place of business at 12000 Lawndale, Houston, TX 77017, doing business in the State of New York.

49.     Marathon Ashland Petroleum, LLC, is a Foreign Corporation, with its principal place of business at 539 South Main Street, Findlay, Ohio 45840, doing business in the State of New York.

50.     Marathon Oil Company is a Ohio Corporation, with its principal place of business at 5555 San Felipe Road, Houston, Texas 77056-2723, doing business in the State of New York.

51.     Mobil Corporation, a subsidiary of ExxonMobil Corporation, is a Delaware corporation with its principal place of business 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the State of New York.

52.     Motiva Enterprises, LLC, individually and formerly known as Star Enterprises LLC, is a Delaware limited liability corporation with its principal place of business at 1100 Louisiana Drive, Houston, Texas 77210, doing business in the State of New York.

53.     Occidental Chemical Corporation is a New York corporation with its principal place of business at 10889 Wilshire Boulevard Los Angeles, California 90024.

54.     PDV Midwest Refining LLC is a Foreign Corporation, with its principal place of business at 135th & New Avenue, Bolingbrook, IL 60439, doing business in the State of New York.

55.     SABIC Americas, Inc. is a Delaware corporation with its principal place of business at 2500 City West Blvd., Detec Towers, Suite 650 Houston, Texas 77042, doing business in the State of New York.

56.     Shell Oil Company is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas 77002, doing business in the State of New York.

57.     Shell Oil Products Company is a Delaware corporation with its principal place of business at One Shell Place, Houston, Texas 77002, doing business in the State of New York.

58.     Shell Oil Products Company, LLC is a Delaware limited liability corporation with its principal place of business at 500 Dallas Street, Houston, Texas 77002, doing business in the State of New York.

59.     Shell Petroleum, Inc., which owns Shell Oil Company, is a Delaware corporation with its principal place of business 910 Louisiana Street, Houston, Texas 77002, doing business in the State of New York.

60.     Shell Trading (US) Company, individually and formerly known as Equiva Trading Company, and also known as Stusco, is a Delaware corporation with its principal place of business at PO Box 3075, Houston, TX 77253, and 500 Dallas Street, Houston, Texas 77002, doing business in the state of New York.

61.     Sunoco, Inc., individually and formerly known as Sun Oil Company, and formerly known as Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company, is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27th Floor, Philadelphia, Pennsylvania 19103, doing business in the State of New York.

62.     Sunoco, Inc. (R&M), individually and formerly known as Sun Refining and Marketing Company and formerly known as Sun Company Inc. (R&M), is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27 Floor, Philadelphia, Pennsylvania 19103, doing business in the State of New York.

63.     Texaco, Inc., a subsidiary of ChevronTexaco Corporation, is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the State of New York.

64.     Texaco Refining & Marketing Inc., a/k/a TRMI Holdings, is a Delaware corporation with its principal place of business at 1111 Bagby Street, Houston, Texas 77002, doing business in the State of New York.

65.     Texaco Refining & Marketing (East), Inc., is a Delaware corporation with its principal place of business at 1111 Bagby Street, Houston, Texas 77002, doing business in the State of New York.

66.     Texas PetroChemical is a non registered foreign corporation with it principal place of business at 5151 San Felipe, Suite 800, Houston, Texas 77056, doing business in the State of New York.

67.     The Premcor Refining Group Inc., individually and formerly known as Clark Refining, is a Delaware corporation with its principal place of business at 8182 Maryland Avenue, St. Louis, Missouri 63105, doing business in the State of New York.

68.     TMR Company, formerly known as Texaco Refining and Marketing, Inc., individually and as successor-by-merger to TRMI Company, formerly known as Texaco Refining and Marketing (East), Inc., with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of New York.

69.     ToscoCorporation, individually and as predecessor-in-interest to ConocoPhilips Company, and also known as Tosco Refining Company, and also known as Tosco Marketing Company, a subsidiary of ConocoPhillips Company, is a Nevada corporation with its principal place of business at 1500 North Priest Drive, Tempe, Arizona 85281, doing business in the State of New York.

70.     Total Petrochemicals USA, Inc., f/k/a Atofina Petrochemicals, Inc., individually and as successor-by-merger to Fina, Inc., with its principal place of business at 15710 John F. Kennedy Boulevard, Houston, Texas 08628, doing business in the State of New York.

71.     TPI Petroleum, LLC, is a foreign corporation, with a principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of New York.

72.     Valero Energy Corporation, the parent company of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of New York.

73.     Valero Marketing and Supply Company, a subsidiary of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of New York.

74.     Valero Refining and Marketing Company is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of New York.

15

75.     Valero Refining Company is a foreign corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the State of New York.

## SUMMATION OF FACTS

76.     In 1978, the EPA designated the Long Island aquifer system as one of the first "sole source" aquifers in the country under the Safe Drinking Water Act, 42 U.S.C. §300h-3(e). A "sole source" aquifer is "an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health". The EPA observed that "[s]ince contamination of ground-water aquifer can be difficult or impossible to reverse, contamination of the aquifer system underlying Nassau and Suffolk Counties, New York, would pose a significant hazard to those people dependent on the aquifer system for drinking purposes."

77.     The District maintains over 130 miles of water mains, serving approximately about 32,000 residents over a nine square miles area. The District produces its supply of potable water through the use of twelve (12) separate wells drilled into the aquifers underlying the district's service areas.

78.     Upon information and belief, MTBE has been detected in at least two Plant 4 sentinel monitoring wells since October 2007.  Plant 4 houses two supply wells – Wells Nos. 4-2 and 4-3.

79.     Upon information and belief, all of the District's supply wells are threatened by MTBE contamination.

80.     As directed by the Nassau County Department of Health, the District began to test and monitor its wells for levels of MTBE in or about 1998.

81.     Further, in order to insure that MTBE does not further contaminate Plaintiff's supply wells, Defendants are liable for cleansing the water at Plaintiff's wells and for installing an early warning mechanism to notify Plaintiff when MTBE is nearing their wells and a wellhead protection program to ensure that Plaintiff's wells are kept permanently free from the MTBE contamination that Defendants caused.

## MTBE FACTS

82.     MTBE is a member of a class of chemical compounds called aliphatic ethers, one of whose properties is that they are "hydrophilic," or water-seeking; *i.e.*, they have enhanced solubility in water and chemical attraction to water molecules.

83.     MTBE does not occur naturally.

84.     MTBE breaks down into TBA and formaldehyde.

85.     MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process. MTBE is not found in gasoline unless it is added to the gasoline.

86.     New York Legislature banned MTBE in the State of New York as of January 1, 2004.

> No person shall import into, or sell, dispense or offer for sale any gasoline which contains **methyl tertiary butyl ether**.

NY Agriculture and Markets Law § 192-g (emphasis in the original).

87.     At all times relevant to this litigation defendants used and/or continued to use MTBE as a gasoline additive.

17

## WHY DEFENDANTS ADD MTBE TO GASOLINE: PROFIT

88.     Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations up to 11% in order to boost the octane level in higher grades of gasoline.

89.     MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants, to make money off gasoline refining waste by-products.

90.     Since the late 1970's and early 1980's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE. The Clean Air Act of 1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap method to comply.

91.     Ironically, it is now apparent that MTBE does not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE does little or nothing to reduce such air-polluting emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.

92.     In May 1999, the National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.

18

93.    NAS previously had concluded that reduction of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.

94.    In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals, including MTBE itself. MTBE discharged to the air contaminates groundwater because rain returns it to the soil.

## GASOLINE CONTAINING MTBE HAS WIDELY CONTAMINATED AND CONTINUES TO POSE A THREAT TO GROUNDWATER

95.    MTBE is much more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to other common gasoline components — benzene, toluene, ethylbenzene and xylene (collectively "BTEX compounds").

96.    Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the MTBE races through underground water aquifers, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

97.    In addition to traveling faster and further, MTBE resists physical, chemical and microbial degradation. As a result, MTBE is slow to break down after it is released into the environment, particularly in the subsurface of the ground. Plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

98.     Even in very small quantities (MTBE is measured in water in terms of "parts per billion"), MTBE gives water a foul taste and odor that renders the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

99.     Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as one part per billion ("ppb") or lower.

100.     MTBE is also a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

### THE LONGSTANDING PREVALENCE OF UNINTENDED GASOLINE DISCHARGES ENSURES THAT GASOLINE WITH MTBE WILL CONTAMINATE GROUNDWATER

101.     Prior to the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") and other gasoline discharges were a known threat to New York's groundwater. The introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs. Because of MTBE's unique properties, the addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline, as well as from rainwater.

102.     Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable by Defendants.

### DEFENDANTS HAVE KNOWN ALL ALONG THAT MIXING MTBE WITH GASOLINE WOULD RESULT IN

## MASSIVE GROUNDWATER CONTAMINATION.

103.    At all times relevant to this litigation, Defendants were aware that there was/is a national crisis involving gasoline leaking from multiple sources, such as USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA show Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

104.    At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as well as other sources.

105.    At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

106.    At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

## DEFENDANTS' KNOWLEDGE OF THE THREAT TO GROUNDWATER AS A RESULT OF UNINTENDED DISCHARGES OF GASOLINE MIXED WITH MTBE

107.    At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, resistance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

108.    For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry, including Defendants, in a broad range of topics,

21

formed a Toxicology Committee in or around 1980. The Toxicology Committee included

Defendants Exxon, Mobil, Shell, Arco, Tosco, and ChevronTexaco.

109.    API's Toxicology Committee had a specific program to study MTBE. Meeting

minutes make plain that committee members shared information and repeatedly discussed

MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the

need for certain toxicological information due to MTBE's propensity to contaminate groundwater

and thus the likelihood of extensive ingestion of MTBE through drinking water.

110.    Despite early knowledge and a shared recognition of the need to do ingestion

studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

111.    Defendants possess and have always had knowledge, resources, experience and

other advantages that are vastly superior to those of Plaintiffs concerning the manufacture,

distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of

their tremendous economic power and analytical resources, including the employment of

scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all

times relevant to this litigation been in a position to know the threat which MTBE poses to

groundwater.

112.    In addition, by virtue of this superior knowledge, and/or by virtue of the

Defendants' partial and incorrect statements regarding the nature and impacts of MTBE,

Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

### A.    Defendants' Early Knowledge Of Specific Instances Of MTBE Contamination Of Groundwater

113.    Defendants knew at least as early as 1980 of the impact of MTBE and its

contamination of water.

22

114.   In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

115.   In April 1983, a serious MTBE incident in Jacksonville, Maryland, located in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by Defendant ExxonMobil, the other owned by ChevronTexaco (then Chevron), created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

116.   Defendants were also aware of two MTBE groundwater contamination events in Liberty, New York, and East Patchogue, New York, both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

117.   At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE. Although trace levels of BTEX were eventually found in the wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

118.   A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the

mass of these compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing through biodegradation.

119.    The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

120.    In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the then New York State Department of Health drinking water standard of 50 ppb.

### B.    Defendants' Awareness Of The 1986 Garrett Report Specifically Warning Of Inevitable MTBE Contamination Of Groundwater

121.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report"). The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

122.    As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum

24

Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

123.    As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE.  Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

124.    Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

125.    On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API forwarded the Garrett Report to members of the GTTF including representatives of Shell, Arco, and Exxon. These individuals were asked to review the Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

126.    The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE. . . be either banned
> as gasoline additives or require double-lined storage is clearly a

policy statement and not an objective credible scientific
conclusion. Further, data presented in this paper as well as those
generated by ongoing API research indicate that such a policy is
reactionary, unwarranted and counter-productive.

127.    However, the API letter to the National Well Water Association in no way refuted

the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste

threshold, the fact that MTBE could travel faster in groundwater than the other gasoline

constituents, or the conclusion that MTBE was difficult to remediate.  These issues were not

even addressed.

128.    Defendant BP Corporation (then known as "Amoco") publicly denounced the

Garrett Report, stating flatly that the report "isn't true."


### C.    Defendants' Internal Documents Demonstrate Their Awareness Of MTBE Contamination Of Groundwater

129.    Privately, however, Defendants acknowledged that the major findings of the

Garrett Report were correct. For instance, while the oil companies, via the GTTF, attacked the

authors of the Garrett Report, saying the paper had a "general lack of technical data to support

the rather strong policy statements," behind closed doors, Defendants were admitting that the

authors might in fact be correct. Arco Chemical, in communications to others within the oil

industry, admitted that they had no data to refute the Garrett Report's conclusions. For example,

a letter dated February 4, 1987, states "we don't have any data to refute comments made in the

paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up

than other gasoline constituents."

130.    On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo

based upon a compilation of data on MTBE contamination of groundwater in New York State

and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in

water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE.   From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

131.    Communications among officials at Defendant ChevronTexaco (then Chevron) were similar. A 1987 memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

132.    In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a document entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." The purpose of the document was to put together what was known about the movement of MTBE in groundwater and the document was to be circulated internally among the employees of the various Shell companies.

133.    According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than benzene and therefore, MTBE's plumes are expected to move faster and farther than benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper indicates that MTBE does not biodegrade in the subsurface environment. Finally, Shell's MTBE White Paper indicates that MTBE has a low odor and taste threshold and that "at many locations odor and taste criteria may determine clean-up levels."

134.    Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a few Shell marketing terminals and service stations to date. However, as the usage of this oxygenate begins to increase, a stringent clean-up criteria for MTBE will become adopted in more states, we should anticipate increased concerns over how its release to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

135.    A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status" states:

> MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the groundwater, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from groundwater than other gasoline components such as BTEX.

136.    The threat MTBE poses to groundwater was also discussed in a May 1999 paper by employees of Defendant Chevron entitled "Solving Problems From MTBE Contamination — It's Not Just Regulating Underground Tanks." The document reads:

> [C]oncerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999. This information indicates there is MTBE ground water contamination from small spills of gasoline (e.g., a spill in a

parking lot, a car accident) — incidences that stand in contrast to known historical causes of MTBE contamination (e.g., point source discharges from leaking underground storage tanks). The physical and chemical properties of MTBE (and thus its mobility and persistence in the environment) differ markedly from other components of gasoline. These differences make MTBE (and other ethers and heavy alcohols) more likely to get into ground water and problematic to contain and clean up when releases occur... .

Short of eliminating car accidents, stopping customer overfilling, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment.

### D. Defendants' Knowledge That No Adequate Toxicity Studies Had Been Done Prior To Defendants' Decision To Add MTBE To Gasoline

137.   Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken.  Studies showed MTBE caused cancer in animals. It is common knowledge within the scientific community, and Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed.  However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce.  Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed.

### E. Despite Knowing That Adding MTBE To Gasoline Inevitably Results In Widespread MTBE Groundwater Contamination, Defendants Conspired To Mislead The EPA, Downstream Handlers And The Public About The Hazards Of Adding MTBE To Gasoline

138.   Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants'

29

use of MTBE without regard to its impact on Plaintiffs and convincing the public and regulators

that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint

task-forces and committees under the auspices of trade organizations such as the API and the

Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task forces and

committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to

use MTBE, thereby placing corporate profits above harm to the environment and Plaintiffs that

was known to them but concealed from the public. Defendants manufactured and distributed

MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would

cause harm in groundwater and wells and took affirmative steps to conceal those effects.

### F. Defendants Misled The EPA Into Not Testing MTBE Under TSCA in the late 1980's

139.    In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant

to TSCA, recommended testing and review to assess MTBE's health and environmental risks.

The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's

persistence in groundwater following spills was unknown but that it likely was not readily

biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk

MTBE poses to the environment. The ITC also recommended additional medical testing of

MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for

supplying the government with MTBE information.

140.    The oil industry, including Defendants, mobilized to convince the EPA that

additional testing of MTBE was not needed.

141.    On or about December 12, 1986, Defendant Arco, speaking on behalf of and/or

with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further

testing of MTBE.    ARCO's comments included a critique of the Dynamac Corporation's

information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the

CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the

hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated

the following:

> Characteristics — Moderate water solubility is reported. However,
> an ARCO Technical Bulletin states that *'MTBE is only slightly
> soluble in water...'*

* * *

> The CRSC/Dynamac report states that potential environmental
> exposure is 'high.' *This conclusion is not supported by the
> available information.*

* * *

> Exposure from accidental spills of MTBE could occur, but should
> be regarded as *a minimal possibility*. The closed nature of the
> manufacturing and transportation process reduces worker exposure
> and product loss. Training and safety programs also lower the
> possibility of accidental spills. Many current programs at EPA and
> industry are underway to monitor and reduce the possibility of
> gasoline loss from leaking underground storage tanks .... *MTBE
> losses would be extremely small* from this source.

***

> As has been reportedly stated, environmental entry would not
> occur in every stage of the gasoline marketing chain . . . .
> Environmental entry of MTBE from this source would be
> considerably less than the report indicates.

> *MTBE is only slightly soluble* so environmental fate projections
> based on this assumption will not be correct.

(Emphasis added.)   ARCO's comments, made with Defendants' explicit or implicit approval,

were misleading when made, improperly downplaying the risks of MTBE contamination of

groundwater and omitting material facts known to Defendants at the time.

142.    On or about December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The Minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The Minutes show that Defendants Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

143.    In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE."   The MTBE Committee included Defendants BP Corporation (Amoco), Arco, ChevronTexaco  (Chevron and Texaco), Citgo, ExxonMobil (Exxon), Shell, and Sunoco.

144.    The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE... , provide technical data to appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule... , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

145.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting.   The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the
> ITC report is as follows: Since each producer must respond to the

32

> EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter....the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20....The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

146.    Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

147.    At the same time that Arco Chemical was telling the EPA that MTBE posed no significant environmental or health problems, Arco Chemical admitted to other Defendants that it "had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat of groundwater contamination."

148.    On or around February 27, 1987, the MTBE Committee submitted written comments drafted to convince the EPA not to require additional health and environmental testing

33

of MTBE. The information provided by Defendants was misleading and false. For example, the

Defendants provided information to the EPA representing that MTBE is only slightly soluble in

water, that potential environmental exposure is not high, and that MTBE has excellent

biodegradation characteristics. The MTBE Committee's Statement added:

> There is no evidence that MTBE poses any significant risk of harm
> to health or the environment, that human exposure to MTBE and
> release of MTBE to the environment is negligible, that sufficient
> data exists to reasonably determine or predict that manufacture,
> processing, distribution, use and disposal of MTBE will not have
> an adverse effect on health or the environment, and that testing is
> therefore not needed to develop such data. Furthermore, issuance
> of a test rule requiring long term chronic testing will have a
> significant adverse environmental impact.

149.    The agenda of the MTBE Committee is reflected in the following excerpt from

those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4
> years to complete, great uncertainty will be created as to whether
> MTBE is a safe fuel additive. As a result, demand for MTBE and
> expansion of productive capacity is not likely to grow
> significantly. Refiners will be likely to commit capital to more
> costly alternative methods of octane enhancement such as
> isomerization and reformate plants that do not have the
> environmental benefits of MTBE. Thus, requiring long term testing
> of MTBE will have a significant adverse environmental and
> economic impact.

150.    The MTBE Committee acknowledged in its February 27, 1987, comments that

MTBE had not been the subject of long term chronic health testing, but claimed that such testing

was unnecessary. Under the heading "MTBE in Groundwater" it stated that:

> [t]he results of a number of acute and sub-chronic health effect
> studies are presented in the Health Effects Summary of this report.
> These data suggest that the odor detection level of 700 ppb
> (approximately 0.7 mg/l) is such that the organoleptic properties of
> MTBE are sufficient to protect against human ingestion of toxic
> quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

151.    On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

152.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including Defendants BP Corporation (Amoco), ExxonMobil (Exxon), and Sunoco signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE. The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

153.    The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of

MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiffs particularly and the America public generally, and intended to (a) continue to use MTBE without regard to its impact on Plaintiffs and the environment, and (b) prevent Plaintiffs from becoming aware of the contamination and/or impact of contamination from MTBE.

154.    Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiffs. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

> **G.      Defendants Misled Congress Into Effectively Broadening The Market For MTBE By Including Oxygenate Requirements In The Reformulated Gasoline ("RFG") Program Adopted In The 1990 Amendments To The Clean Air Act**

155.    Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

156.    During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

157.    As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

158.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs. New York is one of the participants in the oxygenated fuel program.

159.    In 1992, under the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

160.    The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available.   Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

161.    Safer, more environmentally sound alternatives were available.

### H.    Defendants Misled The Plaintiffs And Public, Including AH Downstream Gasoline Handlers, About The Hazards Of Gasoline With MTBE

162.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

163.    On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline

spills have been effectively dealt with." Although the MTBE Committee was represented to have

been formed to address environmental issues and to make available to the general public

information regarding MTBE in fuels, nowhere in the presentation did Mr. Dominguez inform

the audience that MTBE is different from other components of gasoline, that it is resistant to

biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater

contamination.

164.    In 1994, in response to an article that raised questions about the environmental

and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut

what he called "an inaccurate and negative view of Methyl Tertiary Butyl Ether (MTBE), one of

the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide

emissions."   The letter unambiguously represented to Plaintiff that there was "no basis to

question the continued use of MTBE." Given information known to Defendants and API at the

time, this statement misrepresented to the general public the safety of gasoline with the MTBE

and concealed known hazards.

165.    As the reality of widespread MTBE groundwater contamination started coming to

light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated

Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet

fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been

discovered in private drinking water wells where the source of MTBE has been attributed to

leaks from nearby underground storage tanks." OFA expressed confidence that federal

regulations and industry practices made such contamination largely a thing of the past. This kind

of misleading communication utterly failed to alert public officials or non-Defendant persons and

entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such

gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

166.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

167.    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or even the only, contaminant found in groundwater. Moreover, MTBE contamination is most often judged to be too costly to clean up.

168.    Had Defendants warned Downstream Handlers and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

169.    Up until MTBE was banned in New York as of January 1, 2004, defendants continued to blend MTBE in their gasoline, continuing the injury to Plaintiffs groundwater with no new safeguards and entirely insufficient warnings, if any.

170.    As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, plaintiff was deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

I.   **Defendants Dramatically Increased Their Use Of MTBE In Gasoline After The Creation Of The RFG Program**

171.   National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

172.   Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

173.   Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

174.   Defendants then made MTBE the additive of choice throughout New York when the public and government agencies sought year-round reductions in air pollution caused by cars.

175.   In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout New York when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

176.   Until MTBE was banned in New York as of January 1, 2004, most if not all gasoline pumped in the RFG areas of New York was laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

177.   According to the OFA, MTBE accounted recently for nearly 95 percent of the oxygenates used in New York and MTBE consumption statewide is approximately 17,500 to

21,500 barrels per day. OFA even filed a lawsuit on behalf of MTBE manufacturers to prevent a New York State law from going into affect that eventually would ban MTBE in the year 2004.

178.   In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### J.   MTBE's Degradation Product: TBA

179.   TBA is used as a raw material in the production of isobutylene, which is then used to produce MTBE, it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often shows up wherever there is MTBE contamination.

180.   TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: high solubility (even more so than MTBE), resistance to biodegradation, etc.

181.   To make matters worse, TBA is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

182.   In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. There is also some evidence that TBA causes cancer and it causes kidney and thyroid tumors in rats and mice exposed to it.

183.   Defendants failed to warn Plaintiff, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiff of the need to test their water supply for contamination by TBA.

184.   As a result, TBA is showing up in water supplies all across the country, wherever MTBE contamination exists.

### K.   MTBE Has Had A Predictably Damaging Effect Upon Groundwater and Groundwater Wells

185.   One can reach and affect the largest number of Americans by adding something to gasoline: everybody drives. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996 MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

186.   Since gasoline containing MTBE at increased levels was introduced in the early 1990's, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

187.   For example, large MTBE leaks or spills have occurred in every county in New York. As a result, MTBE has been found in drinking water at levels near or above the state's drinking water standard in communities all over the state including, but not limited to, the towns of West Hempstead, Bedford, Cairo, Churubosco, East Patchogue, Elmont, Glen Park, Greenburgh, Hudson Falls, Hyde Park, Laurel, Liberty, Madrid, Mayfield, Middle Island, Mahopac, New Windsor, Norfolk, Orient, Phelps, Pound Ridge, Schodack, Smithtown, West

Harrison, West Kill, Cold Spring, Huntington, Patterson and State Hill. It is found at levels that produce a noxious taste and odor in many New York communities.

188.    The U.S.G.S. annually tests the groundwater near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places, like New York, where high MTBE-content gasoline was used.

189.    In or around November 1999, Governor George Pataki directed New York's Department of Environmental Conservation to lower the state's guidelines for remediation of groundwater containing MTBE from 50 ppb to 10 ppb. This announcement was part of a trend among governments to take action to counter the problem of MTBE contamination of water supplies and the resulting public health threat.

190.    A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the Nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the Nation's drinking water supply."

191.    In its September 15, 1999 report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water

43

quality testing of private wells." No actual plans or source of funds for such testing exist in any state, including the State of New York.

### TSCA DEFENDANTS FAILED TO INFORM EPA OF THE SUBSTANTIAL INFORMATION THAT THEY HAVE OBTAINED WHICH REASONABLY SUPPORTS THE CONCLUSION THAT MTBE AND MTBE CONTAINING GASOLINE PRESENT A SUBSTANTIAL RISK OF INJURY TO HEALTH OR THE ENVIRONMENT

192.    Based on the recommendations of the Blue Ribbon Panel, on or about March 24, 2000, the EPA published an Advanced Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline ("EPA's Notice of Intent").

193.    In the EPA's Notice of Intent, the agency included requests for the following information:

a.      In order to ensure that EPA has the most recent and accurate data available, EPA requests information regarding incidents of both releases of gasoline containing MTBE and the detection of MTBE in groundwater, surface waters or drinking water supplies. Comments should include, to the extent possible, the amounts, locations, sources, and types of MTBE releases, and the levels and sources of water resource contamination from MTBE.

b.      EPA is interested in additional information concerning the toxicity of MTBE, the levels at which its taste or odor can be detected in water, [and] the levels at which its taste or odor makes water unacceptable to consumers.

c.      EPA's summary of current MTBE contamination problem suggests that there is significant risk of additional future contamination of water resources by MTBE

from gasoline. In order to more comprehensively characterize this risk EPA is requesting comment regarding the likely future occurrence of MTBE contamination in groundwater, surface water, and/or drinking water.

        d.     EPA is requesting information regarding the relative contribution of different sources (such as USTs, spills, storm water runoff, air deposition, and marine engines) to present and future MTBE contamination of groundwater, surface water, and drinking water.

        e.     EPA is requesting information regarding the cost and efficacy of technologies for remediating soil and drinking water sources that have been contaminated with MTBE. EPA is particularly interested in examples of remediation efforts that have addressed MTBE contamination, and cost and efficacy comparisons with remediation efforts for other components of gasoline (such as such BTEX).

*See* 65 Fed. Reg. 16094, 16107 (Mar. 24, 2000).

      194.    At the time of EPA's Notice of Intent, Defendants, as manufacturers, processors or distributors of MTBE or MTBE containing gasoline, had obtained information which reasonably supports the conclusion that MTBE and MTBE-containing gasoline present a substantial risk of injury to health or the environment ("the Substantial Risk Information"). Nevertheless, and despite the EPA's request for that information in its Notice of Intent, Defendants failed to inform the EPA of that information at that time, and have continued to fail to inform the EPA of that information and of the Substantial Risk Information that Defendants have obtained subsequent to EPA's Notice of Intent.

      195.    The Substantial Risk Information that Defendants have obtained but have not provided to the EPA includes the following:

a. Information concerning the amounts, locations, sources and types of MTBE releases, and the levels of water resource contamination from MTBE, developed in connection with the large number of releases of MTBE containing gasoline that have occurred from underground storage tanks at service stations owned or operated by Defendants, as well as from tanks at refineries and terminals storing MTBE-containing gasoline.

b. Surveys that many Defendants conducted in the mid-1990s to determine the extent of MTBE contamination of groundwater at their gasoline service stations where there have been releases of gasoline. The results of those surveys showed that upwards of 85% of their service stations with known releases had MTBE contamination of groundwater.

c. Other "confidential" studies or surveys documenting the extent of MTBE contamination or MTBE's risks to the environment.

d. Examples of specific Substantial Risk Information that Defendants Chevron Corporation (formerly ChevronTexaco), Chevron U.S.A., Texaco, Inc., Texaco Refining & Marketing Inc., TRM Company, and TRMI (formerly Texaco refining & Marketing (East), Inc.) (collectively "Chevron-Texaco") obtained is set forth in the Notice Letter to Chevron-Texaco dated June 20, 2008, attached as Exhibit A to this Complaint and incorporated as if here fully set forth.

e. Examples of specific Substantial Risk Information that Defendant ExxonMobil obtained is set forth in the Notice Letter to ExxonMobil dated June 20, 2008, attached as Exhibit B to this Complaint and incorporated as if here fully set forth.

46

f.    Examples of specific Substantial Risk Information that Defendants

Lyondell Chemical Company (formerly known as Lyondell Petrochemical Company and

as Arco Chemical Company) obtained is set forth in the Notice Letter to Lyondell dated

June 20, 2008, attached as Exhibit C to this Complaint and incorporated as if here fully

set forth.

g.    Examples of specific Substantial Risk Information that Defendants Shell

Oil Company, Shell Oil Products Company, LLC, Shell Trading (US) Company, and

Equilon Enterprises, LLC (collectively "Shell") obtained is set forth in the Notice Letter

to Shell dated June 20, 2008, attached as Exhibit D to this Complaint and incorporated as

if here fully set forth.

196.    Defendants knew or should have known, and continue to know or should know,

that the EPA has not been informed of the Substantial Risk Information that Defendants have

obtained. Nevertheless, Defendants have failed and continue to fail, to inform the EPA of that

information.

## IT IS IMPOSSIBLE TO IDENTIFY WHICH MANUFACTURERS' GASOLINE POSES A THREAT OF MTBE CONTAMINATION OR HAS ALREADY CAUSED MTBE CONTAMINATIONOF ANY PARTICULAR AQUIFER OR WELL

197.    Gasoline containing MTBE, once it has been released to the environment, lacks

characteristics or "a chemical signature" that would enable identification of the refinery or

company that manufactured that particular batch.

198.    The process of manufacture and distribution of petroleum products, including

gasoline containing MTBE, includes complex arrangements whereby the Defendants trade,

barter or otherwise exchange product for delivery throughout New York.

47

199.    A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners.

200.    The East Patchogue, New York case is typical: even though a source of the MTBE plume (an abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose MTBE-containing gasoline contributed to the resulting MTBE contamination of well water.

201.    Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

202.    Defendants are also jointly and severally liable because they conspired to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiff's expense, to contaminate Plaintiff's aquifers and wells, and to avoid liability for such contamination.

### MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

203.    Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in New York and are jointly responsible for the increased threat to groundwater in New York and for causing the injuries complained of in this Complaint. Market share liability attaches to all Defendants and that liability of each should be assigned according to its percentage of the market for gasoline containing MTBE in New York at issue in this Complaint. MTBE is fungible; it is impossible to identify the exact defendant who manufactured any given batch of MTBE found free in the environment; and, each of these

48

Defendants participated in a state-wide and national market for gasoline with MTBE during the relevant time.

204.    Concert of action liability attaches to all Defendants each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

205.    Enterprise liability attached to all of the named Defendants.

206.    There are no limitations on liability as set forth in CPLR 1602 applicable to this action in that one or more of the exceptions set forth in CPLR 1602 apply, including subsections (5) and/or (11).

## CONSPIRACY

207.    Defendants actually knew of the hazards which MTBE posed to groundwater throughout New York to wells owned by Plaintiffs.

208.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

      a.    creating a market for MTBE despite knowledge of the hazards which MTBE poses to groundwater throughout New York;

      b.    concealing the nature of MTBE, and its impact on Plaintiff and the environment; and

      c.    maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's wells.

49

209.    Defendants carry out their conspiracy by one or more of the following overt acts or omissions:

    a.    Intentionally representing to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

    b.    Concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

    c.    Concealing the dangers of MTBE from Downstream Handlers and consumers;

    d.    Using their considerable resources to fight UST legislation; and

    e.    Collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program because MTBE was the most profitable oxygenate for Defendants to use.

210.    As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation has:

    a.    Posed and continues to pose a threat to Plaintiff's water and wells;

    b.    Required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

    c.    Contaminated Plaintiff's water and wells;

    d.    Required and will require remediation of MTBE groundwater

contamination or, where remediation is impracticable for Plaintiff, installation of a

system to filter out MTBE or procurement of water from alternative sources;

     e.     Diminished and will continue to diminish confidence in, and the use and

enjoyment of, Plaintiff's water and property because the water and well water are now

less safe than water from other sources; and

     f.     Diminished and will continue to diminish Plaintiff's property value due to

actual, impending, or threatened contamination, which is an injury.

### AS AND FOR A FIRST CAUSE OF ACTION: CITIZEN SUIT PURSUANT TO TSCA §§ 8(e), 15 U.S.C. §2607(e) AND 20(a)(1), 15 U.S.C. §2619(a)(1)

211.    Plaintiff realleges and reaffirms each and every allegation set forth in all

preceding paragraphs as if fully restated herein.

212.    In enacting TSCA, Congress determined that:

     (a)     Human beings and the environment are being exposed each year to a large number of chemical substances and mixtures;

     (b)     Among the many chemical substances and mixtures that are constantly being developed and produced, there are some whose manufacture, processing, distribution in commerce, use, or disposal may present an unreasonable risk of injury to health or the environment.... .

15 U.S.C. § 2601(a)(1)-(2).

213.    Congress also declared that it is the policy of the United States that "adequate data

should be developed with respect to the effect of chemical substances and mixtures on the health

and the environment and that the development of such data should be the responsibility of those

who manufacture and those who process such chemical substances and mixtures." 15 U.S.C. §

2601(b)(1).

214.   To effectuate those findings and policy, Congress enacted Section 8(e) of TSCA, which provides that:

> Any person who manufactures, processes, or distributes in commerce a chemical substance or mixture or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the [EPA] Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information.

15. U.S.C. § 2607(e).

215.   Section 15 of TSCA, 15 U.S.C. § 2614(3)(B), states that "[I]t shall be unlawful for any person to . . . (3) fail or refuse to . . . (B) submits reports, notices, or other information . . . as required by this chapter or a rule thereunder . . ."

216.   MTBE and MTBE containing gasoline are a chemical substance or mixture, as defined by TSCA, 15 U.S.C. §§ 2602(2), (8).

217.   TSCA Defendants are persons who manufacture, process or distribute in commerce TBA and/or MTBE containing gasoline for commercial purposes, within the meaning of 15. U.S.C. §§ 2607(e)-(f).

218.   Pursuant to TSCA Section 8(e), 15 U.S.C. § 2607(e), TSCA Defendants have an ongoing duty to inform the Administrator of the EPA of all Substantial Risk Information that they have obtained. TSCA Defendants have failed and continue to fail to inform the Administrator of the EPA of that information, in violation of 15 U.S.C. §§ 2607(e) and 2614(3)(B).

219.   Section 20(a)(1) of TSCA, 15 U.S.C. § 2619(a)(1), provides that "any person may commence a civil action . . . against any person who is alleged to be in violation this chapter . . . to restrain such violation . . ."

220.    TSCA Defendants are "persons" within the meaning of Section 20(a)(1) of TSCA, 15 U.S.C. § 2619(a)(1), who are alleged to be in violation of 15 U.S.C. Chapter 53 (TSCA).

221.    Plaintiff is a "person" within the meaning of Section 20(a) of TSCA, 15 U.S.C. § 2619(a) which have been harmed, and continue to be harmed, as a direct result of TSCA Defendants' ongoing failure to inform the EPA of the Substantial Risk Information that TSCA Defendants have obtained. That information, if disclosed to EPA, would be accessible to Plaintiff and would provide Plaintiff with information material for discharging their duties of providing the public with adequate supply of potable water, including, among other things, information concerning the scope of contaminated and threatened groundwater resources, effective and ineffective methods of remediating MTBE contamination in groundwater, remediation time frames and costs, and taste and odor information. The harm to Plaintiff can be redressed by an injunction compelling TSCA Defendants to provide to the EPA the Substantial Risk Information in TSCA Defendants' possession, custody or control. Plaintiff has no adequate remedy at law for TSCA Defendants' violations of TSCA.

222.    Plaintiff duly served TSCA Defendants and the EPA Administrator with proper notices of Plaintiff's intention to file a TSCA citizen suit claim ("the Notices"), as set forth herein, on or about June 20, 2008 (ExxonMobil, ChevronTexaco, Lyondell, and Shell).

223.    At least 60 days have elapsed since Plaintiff served the Notices. During the 60-day period, the EPA Administrator did not commence a proceeding against TSCA Defendants to require their compliance with TSCA, as set forth herein. TSCA Defendants did not provide to EPA or to Plaintiff the Substantial Risk Information in TSCA Defendants' possession, custody, or control.

## AS AND FOR A SECOND CAUSE OF ACTION: PUBLIC NUISANCE

224.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

225.    Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

226.    Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, unleashed massive, long-lasting and still spreading contamination of groundwater and drinking water wells, having concealed the threat from all, thereby causing MTBE contamination of groundwater. This contamination has migrated into aquifers from which Plaintiff draws its water.

227.    By their conduct, Defendants violated and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

228.    Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused injury to Plaintiff in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

229.    Defendants' conduct has also injured the property, health, safety and/or comfort of a considerable number of persons.

230.    Gasoline and MTBE contamination, both real and immediate, constitutes a current existing, as well as prospective public nuisance.

231.    As owners of water production wells and purveyors of drinking water, Plaintiff suffers injuries different in kind from the community at large precisely because it relies upon production wells for its functions.

232.    Whereas many New York residents rely on water drawn from surface water sources that are not susceptible to the problems caused by MTBE in groundwater, Plaintiff's production wells are entirely dependent upon groundwater.

233.    Plaintiff's special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers, groundwater and well water have been rendered less certain, safe and reliable than the other sources of water; various wells belonging to the Plaintiff have been and/or may be contaminated and taken out of service and alternative sources of water may be required.

234.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff.

235.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries common to the public at large and

additional special injuries from actual and threatened contamination of groundwater supplying Plaintiff's production wells.

## AS AND FOR A THIRD CAUSE OF ACTION: STRICT LIABILITY FOR DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

236.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

237.    Defendants during the relevant time period were manufacturers, refiners, formulators, sellers, marketers and suppliers of petroleum products including gasoline containing MTBE.

238.    As manufacturers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

239.    When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective and unreasonably dangerous for its intended purpose and foreseeable transportation, storage, handling, and uses for the following reasons:

a.    unintended discharges of gasoline are commonplace throughout New York;

b.    MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

c.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

d.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

56

e.      when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is resistant to biodegradation and bioremediation;

f.      very low concentrations of MTBE ruin the taste and smell of water; and

g.      MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

240.    Defendants had knowledge of the risks and failed to use reasonable care in the design of gasoline containing MTBE.

241.    Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, Downstream Handlers and the general public exercising reasonable care.

242.    The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

243.    Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

244.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm caused by gasoline with MTBE.

245.   Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

246.   Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

247.   As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

     a.   posed and continues to pose a threat to groundwater and to Plaintiff's production wells;

     b.   required and/or will require additional testing and monitoring of the groundwater and Plaintiff's production wells for MTBE contamination;

     c.   contaminated and/or will contaminate the groundwater and Plaintiff's production wells or groundwater in the vicinity of Plaintiff's property;

     d.   required or will require remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources;

     e.   diminished and will continue to diminish consumer confidence in Plaintiff's water.

## AS AND FOR A FOURTH CAUSE OF ACTION: FAILURE TO WARN

248.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

249.   As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by MTBE.

250.   Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without notice of defects related to the hazards which MTBE poses to groundwater and wells.

251.   At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

      a.      unintended discharges of gasoline are commonplace;

      b.      MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

      c.      when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

      d.      MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

e.        when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

f.        at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

g.        MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

h.        MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

i.        MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE; MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE.

j.        MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.        the foregoing  facts relating to  the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

252.    Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, Downstream Handlers, and/or the general public.

253.   Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff. Plaintiff and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

254.   As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

a.   posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.   required and/or will require additional testing and monitoring of the groundwater and Plaintiff's production wells for MTBE contamination;

c.   contaminated and/or will contaminate the groundwater and Plaintiff's wells;

d.   raised the need to develop a comprehensive vulnerability study for Plaintiff's well-fields;

e.   will require remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f.   diminished and will continue to diminish consumer confidence in Plaintiff's water.

## AS AND FOR A FIFTH CAUSE OF ACTION: NEGLIGENCE

255.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

256.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

257.    Defendants had a duty and the financial and technical means to test MTBE, gasoline containing MTBE, and to warn Plaintiff, public officials, Downstream Handlers and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

258.    At all times relevant to this litigation, Defendants knew or should have known that:

        a.      unintended discharges of gasoline are commonplace;

        b.      MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

        c.      when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

        d.      MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

  e.  when gasoline containing MTBE is released into the environment, MTBE

persists over long periods of time because MTBE is recalcitrant to

biodegradation and bioremediation;

  f.  very low concentrations of MTBE can ruin the taste and smell of water;

  g.  MTBE is a known animal carcinogen and a possible human carcinogen;

  h.  MTBE greatly increases the importance of preventing leaks of gasoline;

  i.  MTBE increases the need to maintain underground storage tanks, prevent

overfills, and respond immediately to the loss of any gasoline containing MTBE;

  j.  MTBE creates the need to issue warnings to all groundwater users in the

area of any spill of gasoline containing MTBE;

  k.  MTBE creates a need for more regular testing and monitoring of wells for

early detection of gasoline containing MTBE; and

  l.  the foregoing facts relating to the hazards which MTBE poses to

groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general

public could ordinarily discover or protect themselves against in the absence of sufficient

warnings.

  259.  Defendants have negligently breached their duties of due care to Plaintiff,

Downstream Handlers, and the general public by, among other things:

  a.  using MTBE as an octane-booster and oxygenate;

  b.  failing to adequately test MTBE prior to its manufacture, distribution

and/or sale;

  c.  failing to adequately test, identify and remediate wells that are

contaminated with MTBE;

d.      forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

e.      voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

f.      failing to design and/or manufacture gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiff;

g.      marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

h.      failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

i.      failing to curtail or reduce MTBE's manufacture and distribution;

j.      failing to instruct Plaintiff, Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE;

k.      failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

l.      negligently releasing MTBE into the environment; and

m.      failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE, about the necessary

64

precautions and steps to prevent or minimize spills and leaks of gasoline in distribution,

storage and use, and about how to remediate such spills and leaks promptly.

n.     posed and continues to pose a threat to groundwater and Plaintiff's wells;

o.     required and/or will require additional testing and monitoring of

groundwater and Plaintiff's wells for MTBE contamination;

p.     contaminated the groundwater system and zone of influence of the area

that supplies Plaintiff's production wells;

q.     raised the need to develop a comprehensive vulnerability study for each

Plaintiff's well-field;

r.     required or will require remediation of gasoline and MTBE contamination

of groundwater or, when remediation is impracticable, installation of a system to filter

out MTBE or procurement of alternative water sources; and

s.     diminished and will continue to diminish consumer confidence in

Plaintiff's water.


## AS AND FOR A SIXTH CAUSE OF ACTION: PRIVATE NUISANCE

260.     Plaintiff realleges and reaffirms each and every allegation set forth in all

preceding paragraphs as if fully restated herein.

261.     The groundwater system, including the zone of influence in the groundwater that

supplies Plaintiff's wells, and Plaintiff's wells themselves, has been contaminated by MTBE, as

a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of

Defendants, all as alleged herein.

262.   Gasoline and MTBE contamination caused by Defendants' conduct has damaged Plaintiff's property and functions and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

263.   As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs have suffered injuries from contamination of the Long Island underground aquifers and the groundwater supplying Plaintiff's production wells.

## AS AND FOR A SEVENTH CAUSE OF ACTION: DECEPTIVE BUSINESS ACTS AND PRACTICES IN VIOLATION OF GBL § 349

264.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

265.   At all times relevant to this litigation, defendants were engaged in the business of providing gasoline containing MTBE to consumers, including Plaintiff, in the State of New York.

266.   At all times relevant to this litigation, defendants were engaged in materially deceptive and misleading acts and practices in the distribution, marketing and selling of gasoline containing MTBE, including but not limited to:

a.      overstating any environmental benefits of gasoline containing MTBE while neglecting to mention or understating its actual environmental costs;

b.      marketing gasoline containing MTBE as a "clean" and environmentally beneficial fuel;

c.      misrepresenting the properties of MTBE, including by stating that it is only slightly soluble in water;

d.      representing that the product does not pose an unusual threat of

groundwater contamination as compared to conventional gasoline;

      e.     failing to disclose that when gasoline containing MTBE is spilled, the MTBE was far more likely than other gasoline components to get into well water;

      f.     leading the people to believe that gasoline containing MTBE was safely contained during transport, storage and use;

      g.     stating that MTBE and gasoline containing MTBE were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

      h.     concealing the necessity for wells, particularly those located near sites where gasoline containing MTBE is stored to be tested regularly for early detection of the presence of MTBE.

267.    Upon information and belief, defendants' materially deceptive and misleading practices proximately

caused injury to Plaintiff, including loss of use and enjoyment of their wells and property, the need for periodic well water testing and monitoring and the need to obtain a source of uncontaminated water.

### AS AND FOR AN EIGHTH CAUSE OF ACTION: VIOLATION OF NAVIGATION LAW § 170 – THE NEW YORK SPILL PREVENTION, CONTROL AND COMPENSATION ACT

268.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

269.    Navigation Law § 181(1) (Article 12) provides, in relevant part, that: "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all

cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section."

270.   Defendants are dischargers of petroleum products including gasoline, and gasoline containing MTBE into groundwater and Plaintiff's production wells.

271.   As a direct and proximate result of Defendants' discharge, Plaintiff has sustained direct or indirect damages as defined under the Navigation Law, including but not limited to costs associated with investigation tests and studies, engineering, reduction in the value of real and personal property, lost income, clean-up removal and/or relocation, and restoration and/or replacement of natural resources damaged or destroyed.

272.   Under the Navigation Law, Defendants are strictly liable to Plaintiff for all such direct and indirect damages sustained by Plaintiff.

### AS AND FOR A NINTH CAUSE OF ACTION: TRESPASS

273.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

274.   Plaintiff is and was at all times material to the Complaint, in lawful possession of the land, property, water, and supply wells it owned and occupied.

275.   Defendants' actions and omissions complained of caused and constituted actual, imminent, substantial, and threatened unlawful entry, intrusion and trespass onto the aforesaid land, property, water and supply wells.

276.   As the result of Defendants' intentional actions and omissions, Plaintiff has expended and will be forced to expend significant resources to safeguard their land, property, water, and supply wells, and to install monitoring, testing, remediation and other equipment, and to perform other activities indefinitely for years and decades into the future.

277.    The MTBE will act as a continuous source of groundwater contamination of Plaintiff's land, property, water and supply wells for many years into the foreseeable future.

278.    Plaintiff has been damaged by and are entitled to recover damages for such trespass, in an amount to be established at trial, and is entitled to remediation and other injunctive relief to address the continuing harm that has been and will continue to be caused by the trespass.

## PUNITIVE DAMAGES

279.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

280.    The conduct of the Defendants, including but not limited to:

a.    intentionally misrepresenting the properties of MTBE and gasoline containing MTBE;

b.    marketing and promoting gasoline containing MTBE as environmentally safe and beneficial;

c.    issuing no warnings and failing to divulge material information concerning the risks of MTBE; and

d.    knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers, groundwater and production in areas using high MTBE-content gasoline,

caused great harm to Plaintiff, was outrageous and demonstrates a conscious disregard of Plaintiff's customers' safety with implied malice and oppression for which punitive and exemplary damages should be imposed.

69

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants for:

1. Injunctive and equitable relief as the Court deems appropriate including:

    a. investigation;

    b. testing and monitoring;

    c. alternative water;

    d. well head treatment;

    e. early warning system to detect MTBE before it reaches a well;

    f. well head protection program;

    g. preventing Defendants from engaging in further releases of MTBE;

    h. compelling TSCA Defendants immediately to provide to the EPA all Substantial Risk Information in Defendants' possession, custody, or control;

    i. compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater; and

    j. taking all further measures necessary to remedy the MTBE contamination and to protect the groundwater, public health and safety from further MTBE contamination;

2. Compensatory damages according to proof including for the above, loss of consumer confidence and resulting business in an amount to be demonstrated and proven at trial but which is:

    a. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Second Cause of Action;

    b. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Third Cause of Action;

    c. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Fourth Cause of Action;

    d. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Fifth Cause of Action;

    e. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Sixth Cause of Action;

    f. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Seventh Cause of Action;

    g. Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Eighth Cause of Action;.

h.     Above the jurisdictional minimum of this court (*i.e.,* $75,000.00) on the Ninth Cause of Action.

3.     Punitive damages to deter future instances of Defendants' (and others') above-described conduct in an amount calculated to effectively punish the conduct and to deter future similar conduct;

4.     Interest on the damages according to law;

5.     Reasonable fees for attorneys and expert witnesses, pursuant to 15 U.S.C. § 2619 (c)(2);

6.     Costs and disbursements of this lawsuit; and

7.     Interest on the damages according to law;

8.     Any other and further relief as the Court deems just, proper and equitable.

Dated: Great River, New York
       November 10, 2008

Respectfully submitted,

NAPOLI BERN RIPKA & ASSOCIATES, LLP

Attorneys for the Plaintiff
Plainview Water District

_____

Robert Gitelman (RG7813)
3500 Sunrise Hwy., Suite T-207
Great River, New York  11739
Telephone: (212) 267-3700

71

ATTORNEY VERIFICATION
-----------------------

ROBERT GITELMAN, an attorney at law, duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury that:

He is the attorney for the plaintiff(s) in the above entitled action.   That he has read the foregoing SUMMONS AND VERIFIED COMPLAINT and knows the contents thereof, and upon information and belief, deponent believes the matters alleged therein to be true.

The reason this Verification is made by deponent and not by the plaintiff(s) is that the plaintiff(s) herein reside(s) in a county other than the one in which the plaintiff's attorneys maintain their office.

The source of deponent's information and the grounds of his belief are communication, papers, reports and investigation contained in the file.

DATED:      New York, New York
            November 10, 2008

                                    ROBERT GITELMAN (RG7813)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PLAINVIEW WATER DISTRICT,

|                                    |                          |
|------------------------------------|--------------------------|
|                    Plaintiff,      | MDL 1358 (SAS)           |
|   -against-                        |                          |
| AMERADA HESS CORPORATION, et al.,  | Master File No. 1:00-1898|
|                    Defendants.     |                          |

-----------------------------------------------------------------X

### SUMMONS AND VERIFIED COMPLAINT

NAPOLI BERN RIPKA & ASSOCIATES, LLP
*Attorneys for* : Plaintiff
3500 Sunrise Hwy. T-207
Great River, NY 11739
(212) 267-3700

The undersigned attorney hereby certifies, pursuant to Fed. R. Civ. P. 11 and/or 22 NYCRR §130-1.1-a, that I have read the within papers and that to the best of my knowledge and belief they are not frivolous as that term is defined in 22 NYCRR § 130-1.1(c).

Attorney name:

Service of a copy of the within _____ is hereby admitted.
Dated,                             _____
                                   Attorney(s) for

PLEASE TAKE NOTICE:
☐ NOTICE OF ENTRY
     that the within is a (certified) true copy of an              duly entered in the         office of the
          clerk of the within named court on _____ 200__.
☐ NOTICE OF SETTLEMENT
     that an order          of which the within is a true copy,  will be presented for settlement to the
     HON_____, one of the judges of the within named Court, at _____     on
     _____,      200___  at_____  O'clock ____.M.

Dated,

Yours, etc.

NAPOLI BERN RIPKA & ASSOCIATES,  LLP