**ATTACHMENT A**

## U.S. District Court
### Eastern District of Missouri (LIVE) (Cape Girardeau)
### CIVIL DOCKET FOR CASE #: 1:10-cv-00148-SNLJ

Kennett, City Of et al v. Ashland, Inc. et al
Assigned to: Honorable Stephen N. Limbaugh, Jr
Cause: 28:1441 Petition for Removal– Torts to Land

Date Filed: 09/28/2010
Jury Demand: Plaintiff
Nature of Suit: 893 Environmental Matters
Jurisdiction: Federal Question

#### Plaintiff

**Kennett, City Of**
200 Cedar Street
Kennett, MO 63857
*Plaintiff*

represented by **Andrea R. Vandeloecht**
CHAPMAN AND COWHERD
412 W. Helm
P.O. Box 218
Brookfield, MO 64628
660–258–7447
Email: aravens@ccttlaw.com
*ATTORNEY TO BE NOTICED*

V.

#### Defendant

**Ashland, Inc.**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105

#### Defendant

**BP Amoco Chemical Company**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Amoco Chemical Company
*formerly known as*
Amoco Chemicals Company
*formerly known as*
Amoco Chemicals Corporation

#### Defendant

**BP–Husky Refining, LLC**
4001 Cedar Point Road
Oregon, OH 43616

#### Defendant

**BP Products North America Inc.**
Prentice–Hall Corporation System
221 Bolivar Street
Jefferson City, MO 65101
*formerly known as*
Amoco Oil Company
*Secretary Of*
BP Exploration and Oil Inc.
*Successor In Interest*
BP North America, Inc.

#### Defendant

**Chevron Corporation**
6001 Bollinger Canyon Road
San Ramon, CA 94583

*formerly known as*
Chevron Texaco Corporation

**Defendant**

**Chevron USA Inc.**
Prentice–Hall Corporation System
221 Bolivar Street
Jefferson City, MO 65101
*formerly known as*
Gulf Oil Corporation
*doing business as*
Chevron Products Company
*doing business as*
Chevron Chemical Company

**Defendant**

**Citgo Petroleum Corporation**
The Corporation Company
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Cities Service RMT Corporation

**Defendant**

**Citgo Refining and Chemicals
Company, LP**
6100 South Yale Avenue
Tulsa, OK 74136

**Defendant**

**ConocoPhillips Company**
United States Corporation Company
221 Bolivar Street
Jefferson City, MO 65101
*formerly known as*
Phillips Petroleum Company
– –
Conoco, Inc.
– –
Tosco Corporation
*doing business as*
Phillips 66 Company
*doing business as*
Phillips Chemical Company
*doing business as*
Phillips Oil Company

**Defendant**

**Crown Central, LLC**
CSC–Lawyers Incorporating Service
Company
7 St. Paul Street
Baltimore, MD 21202
– –
Crown Central Petroleum Corporation
*Successor In Interest*
La Gloria Oil &Gas Company

**Defendant**

**El Paso Merchant Energy–Petroleum
Company**

CT Corporation System
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Coastal Refining and Marketing, Inc.
*formerly known as*
Coastal States Trading, Inc.

### Defendant

**Equilon Enterprises, LLC,**
The Corporation Company
120 South Central Avenue
Clayton, MO 63105
‒ ‒

Equiva Services, LLC
*doing business as*
Shell Oil Products Us

### Defendant

**Exxon Mobil Corporation**
Corporation Service Company
221 Bolivar Street
Jefferson City, MO 65101
*formerly known as*
Exxon Corporation
*doing business as*
ExxonMobil Refining and Supply
Company
*doing business as*
Exxon Chemical USA
*doing business as*
ExxonMobil Chemical Corporation

### Defendant

**ExxonMobil Oil Corporation**
Prentice‒Hall Corporation System
221 Bolivar Street
Jefferson City, MO 65101
*formerly known as*
Mobil Oil Corporation
*formerly known as*
Socony Mobil Oil Company, Inc.
*formerly known as*
Socony Vacuum Oil Company,
Incorporated

### Defendant

**Flint Hills Resources, LP**
CT Corporation System
120 South Central Avenue
Clayton, Mo 63105
*formerly known as*
Koch Refining Company Limited
Partnership of Delaware
*formerly known as*
Koch Petroleum Group, LP
*formerly known as*
Koch Refining, LP

### Defendant

**Marathon Petroleum Company, LLC**
The Corporation Company

120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Embro Supply, LLC
*formerly known as*
Marathon Ashland Petroleum LLC

**Defendant**

**Marathon Oil Company**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
USS Holdings Company

**Defendant**

**Mobil Corporation**

**Defendant**

**Motiva Enterprises LLC**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Star Enterprises, LLC

**Defendant**

**PDV Midwest Refining, LLC**
1293 Eldridge Parkway
Houston, TX 77077

**Defendant**

**The Premcor Refining Group Inc.**
CT Corporation System
120 South Central Avenue
Clayton, Mo 63105
*formerly known as*
Clark Refining &Marketing, Inc.
*formerly known as*
Clark Oil &Refining Corporation
*formerly known as*
AOC Acquisition Corporation

**Defendant**

**Shell Oil Company**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105

**Defendant**

**Shell Oil Products Company LLC**
CT Corporation System
120 South Central Avenue
Clayton, Mo 63105
*doing business as*
Shell Oil Products Company

**Defendant**

**Shell Petroleum, Inc.**
1100 Louisiana Drive

Houston, TX 77210

**Defendant**

**Shell Trading (US) Company**
CT Corporation System
120 South Central Avenue
Clayton, Mo 63105
*formerly known as*
Equiva Trading Company
*doing business as*
Stusco

**Defendant**

**Sun Company, Inc.**
The Corporation Company
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Sunoco, Inc.

**Defendant**

**Sunoco, Incorporated (R**
**CT Corporation System**
**120 South Central Avenue**
**Clayton, MO 63105**
*also known as*
**Sunoco, Inc. (R**
*formerly known as*
**Sun Company, Inc. (R**
*formerly known as*
**Sun Refining and Marketing Company**
*formerly known as*
**Sun Oil Company of Pennsylvania**

**Defendant**

**Texaco, Inc.**
6001 Bollinger Canyon Road
San Ramon, CA 94583
*formerly known as*
The Texas Corporation

**Defendant**

**TMR Company**
910 Louisiana Street
Houston, TX 77002
*formerly known as*
Texaco Refining and Marketing, Inc.
– –
TRME Company
*formerly known as*
Texaco Refining and Marketing (East),
Inc.

**Defendant**

**Total Petrochemicals USA, Inc.**
CT Corporation System
120 South Central Avenue
Clayton, MO 63105
*formerly known as*
Atofina Petrochemicals Inc.
*formerly known as*

American Petrofina Company of Texas
*formerly known as*
Fina Oil and Chemical Company

**Defendant**

**Valero Energy Corporation**
One Valero Place
San Antonio, TX 78212

**Defendant**

**Valero Marketing and Supply
Company**
The Corporation Company
120 South Central Avenue
Clayton, MO 63105

**Defendant**

**Valero Refining and Marketing
Company**
One Valero Place
San Antonio, TX 78212

**Defendant**

**Valero Refining Company − Oklahoma**
One Valero Place
San Antonio, TX 78212

**Defendant**

**Valero Refining Company Texas, LP**
One Valero Place
San Antonio, TX 78212
*Successor In Interest*
Valero Refining Company − Texas
*Successor In Interest*
Valero Refining Company

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2010 | 1 | COMPLAINT against defendant Ashland, Inc., BP Amoco Chemical Company, BP Products North America Inc., BP−Husky Refining, LLC, Chevron Corporation, Chevron USA Inc., Citgo Petroleum Corporation, Citgo Refining and Chemicals Company, LP, ConocoPhillips Company, Crown Central, LLC, El Paso Merchant Energy−Petroleum Company, Equilon Enterprises, LLC,, Exxon Mobil Corporation, ExxonMobil Oil Corporation, Flint Hills Resources, LP, Marathon Oil Company, Marathon Petroleum Company, LLC, Motiva Enterprises LLC, PDV Midwest Refining, LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Petroleum, Inc., Shell Trading (US) Company, Sun Company, Inc., Sunoco, Incorporated (RTMR Company, Texaco, Inc., The Premcor Refining Group Inc., Total Petrochemicals USA, Inc., Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining Company − Oklahoma, Valero Refining Company Texas, LP, Valero Refining and Marketing Company with receipt number 0865−2424968, in the amount of $350 Jury Demand,, filed by Kennett, City Of. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Summons Batch 1, # 4 Summons Batch 2, # 5 Summons Batch 3, # 6 Summons Batch 4, # 7 process server batch 1, # 8 process server batch 2, # 9 corporate interest disclosure)(Vandeloecht, Andrea) (Entered: 09/28/2010) |
| 09/28/2010 |  | Case Opening Notification Judge Assigned: Lewis M. Blanton. (JMC) (Entered: 09/28/2010) |

| 09/28/2010 | 2 | NOTICE OF PROCESS SERVER by Plaintiff Kennett, City Of Process Server: Arthur B. Circillo, ABC Process Service (JMC) (Entered: 09/29/2010) |
|---|---|---|
| 09/28/2010 | 3 | NOTICE OF PROCESS SERVER by Plaintiff Kennett, City Of Process Server: Arthur B. Circillo, ABC Process Service (JMC) (Entered: 09/29/2010) |
| 09/29/2010 | | Summons Issued as to defendant Ashland, Inc., BP Amoco Chemical Company, BP Products North America Inc., BP−Husky Refining, LLC, Chevron Corporation, Chevron USA Inc., Citgo Petroleum Corporation, Citgo Refining and Chemicals Company, LP, ConocoPhillips Company, Crown Central, LLC, El Paso Merchant Energy−Petroleum Company, Equilon Enterprises, LLC,, Exxon Mobil Corporation, ExxonMobil Oil Corporation, Flint Hills Resources, LP, Marathon Oil Company, Marathon Petroleum Company, LLC, Mobil Corporation, Motiva Enterprises LLC, PDV Midwest Refining, LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Petroleum, Inc., Shell Trading (US) Company, Sun Company, Inc., Sunoco, Incorporated (RTMR Company, Texaco, Inc., The Premcor Refining Group Inc., Total Petrochemicals USA, Inc., Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining Company − Oklahoma, Valero Refining Company Texas, LP, Valero Refining and Marketing Company. (JMC) (Entered: 09/29/2010) |
| 09/29/2010 | | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401. (CSAW) (Entered: 09/29/2010) |
| 10/26/2010 | 4 | CJRA ORDER (jgw). Judge Magistrate Judge Lewis M. Blanton termed. Case reassigned to Judge Honorable Stephen N. Limbaugh, Jr for all further proceedings. (CSG) (Entered: 10/26/2010) |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MISSOURI, SOUTHEAST DIVISION

---------------------------------------------------------------X

**CITY OF KENNETT,**
*A Missouri Municipality*

                  **Plaintiff,**

vs.

Ashland Inc.
BP Amoco Chemical Company, (f/k/a Amoco
        Chemical Company, Amoco Chemicals
        Company and Amoco Chemicals Corporation)
BP-Husky Refining, LLC
BP Products North America Inc., (f/k/a Amoco
        Oil Company, individually and as successor-
        by-merger to BP Exploration and Oil Inc. and
        successor-in-interest to BP North America, Inc.
Chevron Corporation
        (f/k/a ChevronTexaco Corporation)
Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation
        and d/b/a Chevron Products Company
        and Chevron Chemical Company)
Citgo Petroleum Corporation (f/k/a Cities Service
        RMT Corporation)
Citgo Refining and Chemicals Company, LP
ConocoPhillips Company, (f/k/a Phillips Petroleum
        Company, individually and as successor-by
        -merger to Conoco, Inc. and Tosco Corporation
        and d/b/a Phillips 66 Company, Phillips
        Chemical Company and Phillips Oil Company)
Crown Central, LLC, individually, as successor-
        by-merger to Crown Central Petroleum
        Corporation, and as successor-in-interest
        to La Gloria Oil & Gas Company
El Paso Merchant Energy-Petroleum
        Company, (f/k/a Coastal Refining and
        Marketing, Inc. and Coastal States Trading,
        Inc.)
Equilon Enterprises LLC, individually, as
        successor-by-merger to Equiva Services, LLC
        and doing business as Shell Oil Products US

Case No. _____

Division No._____

JURY TRIAL DEMANDED

Exxon Mobil Corporation, f/k/a Exxon Corporation
    (and d/b/a ExxonMobil Refining and
    Supply Company, Exxon Chemical U.S.A.
    and ExxonMobil Chemical Corporation)
ExxonMobil Oil Corporation (f/k/a Mobil Oil
    Corporation, Socony Mobil Oil Company,
    Inc., and Socony Vacuum Oil Company,
    Incorporated)
Flint Hills Resources, LP, (f/k/a Koch Refining
    CompanyLimited Partnership of Delaware,
    Koch Petroleum Group, L.P., and Koch
    Refining, L.P., and d/b/a Koch Refining
    Company Limited Partnership of Delaware)
Marathon Petroleum Company, LLC (f/k/a Embro
    Supply, LLC, and Marathon Ashland
    Petroleum LLC)
Marathon Oil Company (f/k/a USS Holdings Company)
Mobil Corporation
Motiva Enterprises LLC, (f/k/a Star Enterprises, LLC)
PDV Midwest Refining, LLC
The Premcor Refining Group Inc., (f/k/a Clark Refining
    & Marketing, Inc., Clark Oil &Refining
    Corporation, and AOC Acquisition Corporation)
Shell Oil Company
Shell Oil Products Company LLC, (individually and
    d/b/a Shell Oil Products Company)
Shell Petroleum, Inc.
Shell Trading (US) Company, (individually, f/k/a
    Equiva Trading Company and d/b/a Stusco)
Sun Company, Inc. (f/k/a Sunoco, Inc.)
Sunoco, Incorporated (R&M), a/k/a Sunoco, Inc. (R&M)
    (f/k/a Sun Company, Inc. (R&M), Sun Refining
    and Marketing Company and Sun Oil
    Company of Pennsylvania)
Texaco, Inc. (f/k/a The Texas Corporation)
TMR Company (f/k/a Texaco Refining and Marketing,
    Inc., individually and as successor-by-merger to
    TRME Company (f/k/a Texaco Refining and
    Marketing (East), Inc.))
Total Petrochemicals USA, Inc., individually and (f/k/a
    Atofina Petrochemicals Inc. American Petrofina
    Company of Texas, and Fina Oil and Chemical
    Company)
Valero Energy Corporation
Valero Marketing and Supply Company

Valero Refining and Marketing Company
Valero Refining Company - Oklahoma
Valero Refining Company Texas, L.P.,
     individually and as successor-in-interest to
     Valero Refining Company - Texas and Valero
     Refining Company

        Defendants.
-----------------------------------------------------------------X

## PLAINTIFF'S ORIGINAL PETITION

    Plaintiff CITY OF KENNETT, a Missouri municipality, makes the following allegations against the Defendants listed above:

## NATURE OF THE CASE

1.    This case involves the nation's most precious natural resource – water. Throughout this great state, public water wells are contaminated by methyl tertiary butyl ether ("MTBE"), a gasoline additive needlessly and recklessly added to gasoline supplied to many parts of the United States. Because MTBE is highly soluble in water and does not readily biodegrade, it readily contaminates sources of drinking water including those in Missouri. MTBE is a possible human carcinogen, a known animal carcinogen, and even very small amounts impart a foul taste and odor to water. Despite knowing that MTBE has unique characteristics in water which allows it to contaminate water sources never seen before its addition to gasoline, these Defendants chose to make it the second largest chemical manufactured in the United States. In doing so, these Defendants have unleashed an unprecedented assault on the water supplied to the citizens of Missouri.

**PARTIES**

**Plaintiff**

2.   The Plaintiff, CITY OF KENNETT ("City"), a municipality, is a public water provider organized under the laws of the State of Missouri. Plaintiff operates a public water system that supplies drinking water to the residents of the City and nearby communities.

3.   At least one of Plaintiff's wells has been contaminated with MTBE and/or tertiary butyl alcohol ("TBA"), one of MTBE's degradation byproducts.

**Defendants**

4.   Defendants do business in Missouri as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

5.   At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from manufacturing MTBE and adding it to gasoline at the refinery, the distribution of gasoline containing MTBE, including the design and manufacture of gasoline containing MTBE and/or MTBE sold in Missouri, and the marketing and sale of MTBE in Missouri.

6.   Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

7.   When the term "Defendants" is used alone, it refers to all Defendants jointly. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their

employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

8.    Ashland Inc., is a Kentucky corporation doing business in the State of Missouri. Ashland Inc. may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

9.    BP Amoco Chemical Company, (formerly known as Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation), is a Delaware corporation doing business in the State of Missouri. BP Amoco Chemical Company may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

10.   BP-Husky Refining, LLC, is a Delaware limited liability company doing business in the State of Missouri. BP-Husky Refining, LLC may served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business 4001 Cedar Point Road, Oregon OH 43616.

11.   BP Products North America Inc., (formerly known as Amoco Oil Company), individually and as successor-by-merger to BP Exploration and Oil, Inc. and as successor-in-interest to BP North America, Inc.), is a Maryland corporation doing business in the State of Missouri. BP Products North America Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, 221 Bolivar Street, Jefferson City, MO 65101.

12.   Chevron Corporation, formerly known as ChevronTexaco Corporation, is a Delaware corporation doing business in the State of Missouri. ChevronTexaco Corporation may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street,

Third Floor, Springfield, Missouri 62756, at its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.

13. Chevron U.S.A. Inc., (formerly known as Gulf Oil Corporation), and doing business as Chevron Products Company and Chevron Chemical Company, is a Pennsylvania corporation doing business in the State of Missouri. Chevron U.S.A. Inc. may be served with process through its registered agent Prentice-Hall Corporation System, 221 Bolivar Street, Jefferson City, MO 65101.

14. Citgo Petroleum Corporation, (formerly known as Cities Service RMT Corporation), is a Delaware corporation doing business in the State of Missouri. Citgo Petroleum Corporation may be served with process through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, MO 63105.

15. Citgo Refining and Chemicals Company, LP is an Oklahoma limited partnership doing business in the State of Missouri. Citgo Refining and Chemicals Company, LP may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136.

16. ConocoPhillips Company, (formerly known as Phillips Petroleum Company), individually, as successor-by-merger to Conoco, Inc. and Tosco Corporation, and doing business as Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company), is a Delaware corporation doing business in the State of Missouri. ConocoPhillips Company may be served with process through its registered agent, United States Corporation Company, 221 Bolivar Street, Jefferson City, MO 65101.

17.   Crown Central, LLC, individually, as successor-by-merger to Crown Central Petroleum
Corporation, and successor-in-interest to La Gloria Oil & Gas Company, is a Maryland
corporation doing business in the State of Missouri. Crown Central Petroleum Corporation
may be served with process through the Secretary of State, State of Missouri, 501 South 2nd
Street, Third Floor, Springfield, Missouri 62756, at its principal place of business: c/o CSC-
Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 1660, Baltimore, MD 21202.

18.   El Paso Merchant Energy-Petroleum Company, (formerly known as Coastal Refining and
Marketing, Inc., Coastal Derby Refining Company, Derby Refining Company and as Colorado
Oil and Gas Corporation), is a Delaware corporation doing business in the State of Missouri.
El Paso Merchant Energy-Petroleum Company may be served with process through  its
registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

19.   Equilon Enterprises LLC, individually, as successor-by-merger to Equiva Services, LLC and
doing business as Shell Oil Products US, is a Delaware limited liability company doing
business in the State of Missouri. Equilon Enterprises LLC may be served with process
through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton,
MO 63105.

20.   Exxon Mobil Corporation, (formerly known as Exxon Corporation), and doing business as
ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., and ExxonMobil
Chemical Corporation,  is a New Jersey corporation doing business in the State of Missouri.
Exxon Mobil Corporation may be served with process through its registered agent,
Corporation Service Company, 221 Bolivar Street, Jefferson City, MO  65101.

21. ExxonMobil Oil Corporation, (formerly known as Mobil Oil Corporation, Socony Mobil Oil Company, Inc., and Socony Vacuum Oil Company, Incorporated), is a New York corporation doing business in the State of Missouri. ExxonMobil Oil Corporation may be served with process through its registered agent, Prentice-Hall Corporation System, 221 Bolivar Street, Jefferson City, MO 65101.

22. Flint Hills Resources, LP, (f/k/a Koch Refining Company Limited Partnership of Delaware, Koch Petroleum Group, L.P., and Koch Refining, L.P.), is a Delaware limited partnership doing business in the State of Missouri. Flint Hills Resources, LP, may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

23. Marathon Petroleum Company, LLC, (formerly known as Embro Supply, LLC, and Marathon Ashland Petroleum, LLC), is a Delaware corporation doing business in the State of Missouri. Marathon Petroleum Company, LLC may be served with process through its registered agent The Corporation Company, 120 South Central Avenue, Clayton, MO 63105.

24. Marathon Oil Company (formerly known as USS Holdings Company), is an Ohio corporation doing business in the State of Missouri. Marathon Oil Company may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

25. Mobil Corporation, is a Nevada corporation doing business in the State of Missouri. Mobil Corporation may be served with service of process through its registered agent, Prentice-Hall Corporation System, 221 Bolivar Street, Jefferson City, MO 65101.

26. Motiva Enterprises LLC, (formerly known as Star Enterprises LLC), is a Delaware limited liability company doing business in the State of Missouri. Motiva Enterprises LLC may be

served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

27. PDV Midwest Refining, LLC, is a Delaware limited liability company doing business in the State of Missouri. PDV Midwest Refining, LLC may be served with process via through the Secretary of State, State of Missouri, 501 South 2nd Street, 3rd Floor, Springfield, Missouri 62756, at its principal place of business at 1293 Eldridge Parkway, Houston TX 77077.

28. The Premcor Refining Group Inc., (formerly known as Clark Refining & Marketing, Inc., Clark Oil & Refining Corporation, and AOC Acquisition Corporation), is a Delaware corporation doing business in the State of Missouri. The Premcor Refining Group Inc. may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

29. Shell Oil Company is a Delaware corporation doing business in the State of Missouri. Shell Oil Company may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

30. Shell Oil Products Company LLC, individually and doing business as Shell Oil Products Company, is a Delaware limited liability company doing business in the State of Missouri. Shell Oil Products Company LLC may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

31. Shell Petroleum, Inc., is a Delaware corporation doing business in the State of Missouri. Shell Petroleum, Inc. may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business at 1100 Louisiana Drive, Houston, Texas 77210.

32.   Shell Trading (US) Company, is a Delaware corporation doing business in the State of Missouri.  Shell Trading (US) Company may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

33.   Sun Company, Inc., (formerly known as Sunoco, Inc.), is a Pennsylvania corporation doing business in the State of Missouri.  Sun Company, Inc. may be served with process through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, MO 63105.

34.   Sunoco, Incorporated (R&M), (also known as, Sunoco, Inc. (R&M), formerly known as Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation doing business in the State of Missouri.  Sunoco, Incorporated (R&M) may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO  63105.

35.   Texaco, Inc., (formerly known as The Texas Corporation), is a Delaware corporation doing business in the State of Missouri.  Texaco, Inc. may be served with process may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business at 6001 Bollinger Canyon Rd., San Ramon, CA 94583.

36.   TMR Company, formerly known as Texaco Refining and Marketing, Inc., individually and as successor-by-merger to TRME Company (formerly known as Texaco Refining and Marketing (East), Inc.), is a Delaware corporation doing business in the State of Missouri.  TMR Company  may be served with process through the Secretary of State, State of Missouri, 501 S. 2nd St., Springfield, Missouri 62756, at its principal place of business at 910 Louisiana Street, Houston TX 77002.

37.   Total Petrochemicals USA, Inc., (formerly known as Atofina Petrochemicals, Inc., Fina Oil and Chemical Company, and American Petrofina Company of Texas), is a Delaware corporation doing business in the State of Missouri. Total Petrochemicals USA, Inc. may be served with process through its registered agent, C T Corporation System, 120 South Central Avenue, Clayton, MO 63105.

38.   Valero Energy Corporation is a Delaware corporation doing business in the State of Missouri. Valero Energy Corporation may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business at business One Valero Place, San Antonio, Texas 78212.

39.   Valero Marketing and Supply Company, is a Delaware corporation doing business in the State of Missouri. Valero Marketing and Supply Company may be served with process through its registered agent, The Corporation Company, 120 South Central Avenue, Clayton, MO 63105.

40.   Valero Refining and Marketing Company is a Delaware corporation doing business in the State of Missouri. Valero Refining and Marketing Company may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756, at its principal place of business at business One Valero Place, San Antonio, Texas 78212.

41.   Valero Refining Company - Oklahoma is a Michigan corporation doing business in the State of Missouri, and may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756 at its principal place of business, One Valero Place, San Antonio, Texas 78212.

42.   Valero Refining Company Texas, LP, individually and as successor-in-interest to Valero Refining Company - Texas and Valero Refining Company, is a Texas limited partnership

doing business in the state of Missouri, and may be served with process through the Secretary of State, State of Missouri, 501 South 2nd Street, Third Floor, Springfield, Missouri 62756 at its principal place of business, One Valero Place, San Antonio, Texas 78212.

## JURISDICTION AND VENUE

45.   This Court has jurisdiction over Defendants because they are either Missouri corporations authorized to do business in Missouri, are registered with the Missouri Secretary of State, do sufficient business with sufficient minimum contacts in Missouri, or otherwise intentionally avail themselves of the Missouri market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Missouri to render the exercise of jurisdiction over Defendants by the Missouri courts consistent with traditional notions of fair play and substantial justice. There is no diversity of citizenship in this action.

46.   Venue is proper in this Court because at least one of the transactions giving rise to these causes of action — the actual or threatened contamination of Plaintiff's property by MTBE and/or TBA — took place in this County.

## MTBE FACTS

47.   MTBE is a synthetic chemical blended into some gasolines by some refiners at some times since 1979. As used in this Complaint, "MTBE" refers not only to methyl tertiary butyl ether, but also to the contaminants in and degradation byproducts of MTBE, including TBA.

48.   MTBE contaminates the environment primarily through discharges, disposals, deposits, leaks, and spills from gasoline delivery systems. Once released to the environment, MTBE has properties that cause substantial environmental contamination and threaten public health and welfare. In particular, the fate and transport of MTBE in the subsurface is substantially

different than the fate and transport of other gasoline components, including the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

49.     Once released into the subsurface, MTBE separates from other gasoline components in the presence of moisture. In contrast to the BTEX compounds, MTBE has a strong affinity for water and does not readily adsorb (*i.e.* stick) to soil particles. Rather, it moves freely with groundwater at approximately the rate of the water's movement. In addition, MTBE is more persistent than BTEX compounds because it does not readily biodegrade in the subsurface. Thus, in comparison to BTEX components, MTBE is significantly more mobile in the subsurface and migrates from the source area more quickly. MTBE is also more difficult and expensive to remove from water than BTEX components. If MTBE is released into the environment, it has the capacity to migrate through the soil and groundwater, penetrate deep within the aquifer, and cause persistent contamination that can destroy and/or threaten drinking water wells. Plumes of MTBE can persist in underground aquifers for many decades — far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

50.     In short, MTBE spreads farther and faster than other components of gasoline, resists biodegradation, is difficult and costly to remove from groundwater, and can continue to migrate long after its initial discharge, contaminating additional drinking water wells as its moves.

51.     Along with its other harmful properties, MTBE renders water supplies unusable by changing contaminated water's odor and taste. Specifically, MTBE-contaminated water has a turpentine odor and chemical taste that renders it unfit for use as drinking water. Many individuals can

smell and taste MTBE in water at very low levels — as low as one part per billion ("ppb") or lower.

52. MTBE also presents a significant public health threat because of its potential for causing cancers. MTBE is also a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

53. TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often appears wherever there is MTBE contamination.

54. TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant. And TBA is a public health threat. It is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. Some evidence links TBA to cancer and kidney and thyroid tumors in animals.

55. Defendants used and continue to use MTBE as a gasoline additive.

### Why Defendants Add MTBE to Gasoline: Profit

56. Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

57. MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants, to make money off gasoline refining waste byproducts.

58.  Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE. The Clean Air Act of 1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap method to comply.

59.  It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE did little or nothing to reduce such air-polluting car emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

60.  In May 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[2]

61.  NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

---

[1]     "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[2]     The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[3]     "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996).

62. In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

**The longstanding prevalence of unintended gasoline discharges ensures
that gasoline with MTBE will contaminate groundwater.**

63. Before the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") and other gasoline discharges were a known threat to Missouri's groundwater. The introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs and other spills. Because of MTBE's unique properties, the addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline.

64. Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable by Defendants.

**Defendants have known all along that adding MTBE
to gasoline would result in massive groundwater contamination.**

65. At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, including USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA show Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

66. At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

67.    At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

68.    At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

69.    At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater through vaporization from USTs, and that such vaporization and other small releases occur even when a tank is considered to have tested tight.

**Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline blended with MTBE.**

I.    **Defendants' constructive knowledge of MTBE's threat to groundwater.**

70.    At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

71.    For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980. The Toxicology Committee included Exxon, Mobil, Shell, Arco, Tosco and ChevronTexaco, among others.

72.    API's Toxicology Committee had a specific program to study MTBE. Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need

for certain toxicological information due to MTBE's propensity to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE through drinking water.

73.    Despite early knowledge and a shared recognition of the need to do long term, low level ingestion studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

74.    Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular.  By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know the threat which MTBE poses to groundwater.

75.    In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

        II.    **Defendants' early knowledge of specific instances of MTBE contamination of groundwater.**

76.    Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

77.    In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers.  Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

- 18 -

78.   In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came
to public attention.  Spills or leaks that occurred at least two years earlier at two different gas
stations, one owned by ExxonMobil, created a large underground reservoir of MTBE that
fouled the domestic wells of local residents and stalled a planned housing project.

79.   Defendants were also aware of two MTBE groundwater contamination events in Liberty,
N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of
gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

80.   At the East Patchogue site, spilled gasoline left over from the operation of a filling station
whose underground storage tanks had been dug up and removed in 1988 sent a plume of
MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water
from a private well 4,000 feet from the old filling station site was rendered undrinkable with
350 ppb of MTBE. Although trace levels of BTEX were eventually found in wells, that did
not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

81.   A decade after the spill in East Patchogue, government officials were still tracking the MTBE
plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds were
found concentrated in the soils and water much closer to the spill site, and the mass of these
compounds was observed to be steadily decreasing through the Liberty incident started
sometime before August 1990, when state health officials learned that a sample of the Village
of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

82.   In December 1992, MTBE was again found in Liberty's water at concentrations approximately
three times higher than the New York State Department of Health drinking water standard of
50 ppb.

**III.   Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.**

83.   In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[4] The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

84.   As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities.  The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

85.   As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise

---

[4]      Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water — Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

86.   Arco Chemical which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

87.   On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF") of API forwarded the Garrett Report to members of the GTTF including representatives of Shell and Exxon. These individuals were asked to review the Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

88.   The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE. . . be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counter-productive.

89.   However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate. These issues were not even addressed.

90.   BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating

flatly that the report "isn't true."

### IV.   Defendants' internal documents demonstrating their awareness of MTBE Contamination of groundwater.

91.   Privately, however, Defendants were forced to acknowledge that the major findings of the

Garrett Report were correct. For instance, while the oil companies, via the GTTF, attacked the

authors of the Garrett Report, saying the paper had a "general lack of technical data to support

the rather strong policy statements," behind closed doors, Defendants were admitting that the

authors might in fact be correct.  Arco Chemical, in communications to others within the oil

industry, admitted that they had no data to refute the Garrett Report's conclusions.  For

example, a letter dated February 4, 1987, states "we don't have any data to refute comments

made in the paper that MTBE may spread farther in a plume or may be more difficult to

remove/clean up than other gasoline constituents."

92.   On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon

a compilation of data on MTBE contamination of groundwater in New York State and

elsewhere in the region, including laboratory analyses verifying the presence of MTBE in

water samples from three wells in Harrison, New York and four wells in Port Jefferson, New

York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve

in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report

further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons

are not found, we feel it is important for you to be aware of MTBE. From an environmental

and engineering standpoint, you may need to be informed of its presence to assist you in

responding effectively to regulatory and remedial requirements."

93.   Communications among officials at ChevronTexaco (Chevron) were similar. A 1987 memo,

widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is
> increased solubility over normally regulated constituents of interest, i.e. benzene,
> toluene and xylene (BTX).

> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved
> "halo" from a leak containing MTBE can be expected to extend farther and spread faster
> than a gasoline leak that does not include MTBE as one of its constituents.

> Further compounding the problem of increased solubility, MTBE is more difficult to
> remove from groundwater using current technology (air stripping or carbon adsorption).
> Because of its lower volatility, MTBE requires more than double to air stripping
> capacity to reach a 95 percent reduction. Removal using carbon adsorption is even
> worse. MTBE breaks through activated carbon four times faster than BTX.

94.   In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a document

entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." The purpose of

the document was to put together what was known about the movement of MTBE in

groundwater and the document was to be circulated internally among the employees of the

various Shell companies.

95.   According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than benzene

and therefore, MTBE's plumes are expected to move faster and farther than benzene plumes

emanating from a gasoline spill. Further, Shell's MTBE White Paper indicates that MTBE

does not biodegrade in the subsurface environment. Finally, Shell's MTBE White Paper

indicates that MTBE has a low odor and taste threshold and that "at many locations odor and

taste criteria may determine clean-up levels."

96.   Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a few Shell marketing
> terminals and service stations to date. However, as the usage of this oxygenate begins
> to increase, a stringent clean-up criteria for MTBE will become adopted in more states,

we should anticipate increased concerns over how its release to groundwater is
managed.

Not surprisingly, this paper was never published outside of Shell.

97.    A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status" states:

> MTBE is relatively quite soluble in water (compared to other components in gasoline,
> like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead
> the plume" whenever there is a gasoline spill or leak. MTBE also has a very low
> biodegradation potential, which makes it more difficult to remove from ground water
> than other gasoline components such as BTEX.

### V.    Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline.

98.    Defendants added MTBE to gasoline even though no long-term cancer studies had been

undertaken. Studies showed MTBE caused cancer in animals. It is common knowledge within

the scientific community, and Defendants knew, that prior to the introduction of a widely used

chemical like MTBE, toxicological tests must first be performed. However, Defendants did

not perform the standard toxicological procedures to test the effects of MTBE prior to placing

it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health

testing of MTBE was not needed. Thus, Defendants exposed millions of Americans to

potential harm without warning of the potential health risks associated with MTBE.

### VI.    Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.

99.    Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants,

beginning in the early 1980's, formed various formal and informal task-forces and committees

for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of

MTBE without regard to its impact on Plaintiff and convincing the public and regulators that

increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations such as the API and the Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiff. Defendants manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in groundwater and production wells and took affirmative steps to conceal those effects.

### A.   Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980's.

100.   In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.[5] The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

101.   The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

102.   On or about December 12, 1986, Atlantic Richfield Company ("ARCO"), speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to

---

[5]   Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Rep. 220 (1986) (the "1986 Notice").

derail further testing of MTBE. ARCO's comments included a critique of the Dynamac

Corporation's information review of MTBE, on which the ITC had relied. ARCO stated that

its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been

made that cause the hazards of MTBE to be seriously overestimated." In further comments to

the EPA, ARCO stated the following:

> Characteristics — Moderate water solubility is reported. However, an ARCO Technical
> Bulletin states that 'MTBE is only slightly soluble in water...'
>
> ***
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.' This
> conclusion is not supported by the available information.
>
> ***
>
> Exposure from accidental spills of MTBE could occur, but should be regarded as a
> minimal possibility. The closed nature of the manufacturing and transportation process
> reduces worker exposure and product loss. Training and safety programs also lower the
> possibility of accidental spills. Many current programs at EPA and industry are
> underway to monitor and reduce the possibility of gasoline loss from leaking
> underground storage tanks.... MTBE losses would be extremely small from this source.
>
> ***
>
> VI.   Environmental Information
>
> As has been reportedly stated, environmental entry would not occur in every stage of the
> gasoline marketing chain . . . . Environmental entry of MTBE from this source would
> be considerably less than the report indicates.
>
> MTBE is only slightly soluble so environmental fate projections based on this
> assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading

when made, improperly downplaying the risks of MTBE contamination of groundwater and omitting

material facts known to Defendants at the time.

103.  On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the

need for additional testing of MTBE. The Minutes of the meeting show that government

officials expressed concern over the need to assess the potential for groundwater contamination. The Minutes show that Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

104. In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants, BP Corporation (Amoco), Arco, ChevronTexaco (Chevron), Citgo, ExxonMobil (Exxon), Shell, and Sunoco, among others.

105. The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE ..., provide technical data to appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule..., [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

106. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter....the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for

their approval on February 20... The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

107. Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

108. At the same time that Arco Chemical was telling the EPA that MTBE posed no significant environmental or health problems, Arco Chemical admitted to other Defendants that it "had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat of groundwater contamination."

109. On or around February 27, 1987, the MTBE Committee submitted written comments drafted to convince the EPA not to require additional health and environmental testing of MTBE. The information provided by Defendants was misleading and false. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, and that MTBE has excellent biodegradation characteristics. The MTBE Committee's Statement added:

there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an

adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

110. The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

111. The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had not been the subject of long term chronic health testing, but claimed that such testing was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

112. On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

113. On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others, signed

a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[6] The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

114.  The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiff particularly and the America public generally, and clearly intended to (a) continue to use MTBE without regard to its impact on Plaintiff and the environment, and (b) prevent Plaintiff from becoming aware of the contamination and/or impact of contamination from MTBE.

115.  Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies

---

[6]      Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiff. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

**B.   Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

116. Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

117. During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

118. As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

119. In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

120. In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in

---

[7]    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

121. The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

122. Safer, more environmentally sound alternatives were available.

C.   Defendants misled the Plaintiff and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.

123. Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

124. On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

125. In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented to Plaintiff that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

126. As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

127. In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater,

triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

128. This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is most often judged to be too costly to clean up.

129. Had Defendants warned the government, users, and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

130. As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, Plaintiff was deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

## VII. Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.

131. National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

132. Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.  MTBE comprises a significant amount of gasoline even in areas that do not participate in the RFG Program.

133.   Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

134.   In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

135.   At is peak, most if not all gasoline supplied to the RFG areas was laced with high concentrations (11 to 15 percent) of MTBE.   In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

136.   In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol.  In fact, belatedly, some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary.  Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### VIII.       MTBE's degradation product: TBA.

137.   TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate.   Therefore, TBA often appears wherever there is MTBE contamination.

138. TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

139. To make matters worse, it is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

140. In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. There is also some evidence that TBA causes cancer and kidney and thyroid tumors in rats and mice exposed to it.

141. Defendants failed to warn Plaintiff, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiff of the need to test its water supply for contamination by TBA.

142. As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

### IX. MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.

143. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

144. Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells

have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

145. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline is used.

146. A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

147. In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8] No actual plans or source of funds for such testing exist in any state, including the State of Missouri.

---

[8] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

148. Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

> **X.    It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.**

149. Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

150. The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Missouri.

151. A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners. Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers. The gasoline at any particular service station comes from many different refiners.

152. The East Patchogue, New York case was typical: even though a source of the MTBE plume (an abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

153. Plaintiff's damages were caused, therefore, by the joint action of Defendants acting together. Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must

pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

154.   Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in Missouri and are therefore jointly responsible for the increased threat to groundwater in Missouri and for causing the injuries complained of in this Complaint. Liability jointly attaches to all Defendants supplying gasoline containing MTBE in Missouri.

155.   Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Missouri and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

156.   Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

157.   Defendants are also jointly and severally liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers. Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE. One or more Defendants committed overt acts in furtherance of this conspiracy. Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

## COUNT I

### Strict Liability – Design Defect and/or Defective Product

158.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

159. Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers, and suppliers of petroleum products, including gasoline containing MTBE.

160. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including the Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

161. When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

    a.  unintended discharges of gasoline are commonplace throughout Missouri;

    b.  when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.  MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.  when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.  very low concentrations of MTBE will ruin the taste and smell of water; and

    f.  MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

162. Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

163. Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as the Plaintiff, downstream handlers, users, and the general public exercising reasonable care.

164. The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

165. Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

166. The above-described defects exceeded the knowledge of the ordinary person, and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

167. Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

168. Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

169. Gasoline containing MTBE failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner.

170. As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

   a.   posed and continues to pose a threat to groundwater and to Plaintiff's production wells;

b.   required and/or will require additional testing and monitoring of Plaintiff's production wells for MTBE contamination;

c.   contaminated and/or will contaminate Plaintiff's production wells or groundwater in the vicinity of Plaintiff's property;

d.   raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfield;

e.   will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f.   diminished consumer confidence in Plaintiff's water; and

g.   caused and/or will cause Plaintiff's to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

171.   Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies.   Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.   Defendants intentionally undertook the reprehensible and despicable conduct described above  to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

172.   Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT II

### Strict Liability – Failure to Warn

173. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

174. As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials, downstream handlers, and users of the risk posed by MTBE.

175. Defendants knew that gasoline mixed with MTBE would be purchased, transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

176. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

   a.   unintended discharges of gasoline are commonplace;

   b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

   c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

   d.   when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

   e.   at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

   f.   MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

   g.   MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.   MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.   MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.   the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, downstream handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

177.  Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, downstream handlers, users, and/or the general public.

178.  Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff.  Plaintiff and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up.  Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

179.  As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

a.   posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.   required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE;

c.   contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiff's wells;

d.   raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfield;

e. required the need for remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f. diminished consumer confidence in Plaintiff's water; and

g. caused and/or will cause Plaintiff's to sustain substantially increased expenses, loss of the use of water and a threat to its appropriate water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

180. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

181. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT III

### Negligence

182. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

183. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably

harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

184.   Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn public officials, downstream handlers, users, and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

185.   Defendants had a duty not to contaminate the environment.

186.   At all times relevant to this litigation, Defendants knew or should have known that:

    a.    unintended discharges of gasoline are commonplace;

    b.    MTBE evaporates and returns via rainwater to contaminate drinking water supplies.

    c.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    d.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    e.    when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

    f.    very low concentrations of MTBE can ruin the taste and smell of water;

    g.    MTBE is a known animal carcinogen and a possible human carcinogen;

    h.    MTBE greatly increases the importance of preventing leaks of gasoline;

    i.    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    j.    MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    k.    MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE; and

l.   the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, downstream handlers, users, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

187.   Defendants have negligently breached their duties of due care to Plaintiff, downstream handlers, users, and the general public by, among other things:

a.   failing to adequately test, identify and remediate wells that are contaminated with MTBE;

b.   forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

c.   voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

d.   marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environment and potential health hazards posed by MTBE;

e.   failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

f.   failing to curtail or reduce MTBE's distribution;

g.   failing to instruct downstream handlers, users, and the general public about the safe handling and use of gasoline containing MTBE;

h.   failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

i.   negligently releasing MTBE into the environment;

j.   failing to warn and instruct downstream handlers, users, and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and used and to remediate such spills and leaks promptly.

188.   As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.   posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.   required and/or will require additional testing and monitoring of groundwater and Plaintiff's production wells for MTBE contamination;

c.   contaminated the groundwater system and zone of influence of the area that supplies Plaintiff's production wells;

d.   raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfield;

e.   required and will require remediation of gasoline and MTBE contamination of groundwater or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources; and

f.   diminished consumer confidence in the Plaintiff's water; and

g.   caused and/or will cause Plaintiff's to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

189.  Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

190.  Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT IV

### Public Nuisance

191. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

192. Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

193. Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting, and still spreading, contamination of groundwater and drinking water wells, having concealed the threat from all, thereby causing MTBE contamination of groundwater and contamination and threat of contamination of Plaintiff's wells.

194. By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

195. By their conduct, Defendants have unreasonably interfered with the right to uncontaminated groundwater and drinking water, common to the general public.

196. Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to the Plaintiff in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and

annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

197. Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

198. Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

199. Plaintiff, as owner of water production wells and as a purveyor of drinking water, suffers injuries different in kind from the community at large precisely because it relies upon production wells for its business.

200. Plaintiff's special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers have been rendered less certain, safe and reliable relative to other sources of water.

201. Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by the Plaintiff.

202. As a direct and proximate result of Defendants' acts and omissions that knowingly and willfully created the above-described nuisance, Plaintiff suffers injuries common to the public at large and additional special injuries from actual and/or threatened contamination of the Plaintiff's wells and the groundwater supplying Plaintiff's production wells.

203. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

204. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT V

### Private Nuisance

205. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

206. The groundwater system, including the zone of influence in the groundwater that supplies Plaintiff's production wells, has been contaminated by MTBE as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

207. This nuisance that Defendants have inflicted upon Plaintiff is substantial, unreasonable, and intentional or negligent.

208. Gasoline and MTBE contamination caused by Defendants' conduct has damaged the Plaintiff's property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

209. As a direct and proximate result of Defendants' acts and omissions that knowingly and willfully created  the above-described nuisance, Plaintiff has suffered injuries from contamination of the groundwater supplying the Plaintiff's production wells.

210. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property.  Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

211. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT VI

### Trespass

212. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

213. Plaintiff is the owner and/or actual possessor of  property, easements, wells, the right to appropriate and use groundwater, and water rights. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE is extremely hazardous to groundwater and public water systems, including the property and other rights of the Plaintiff.

214. Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate the Plaintiff's water system and the groundwater system and zone of influence of the area that supplies Plaintiff's production wells.

215. As a direct and proximate result of the trespass, Plaintiff has been damaged and is entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to such other appropriate relief Plaintiffs may elect at trial.

216. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

217. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT VII

### Civil Conspiracy

218. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

219. At all times relevant to this lawsuit, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Missouri, including Plaintiff's water systems.

220. Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants knowingly and intentionally engaged in a common plan and concerted action to commit, assist and/or encourage a to

rtious act among Defendants.

221. One or more of the Defendants committed overt acts in furtherance of the conspiracy, and such acts were tortious and unlawful.

222. Specifically, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

   a.   creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout Missouri;

   b.   concealing the nature of MTBE and its impact on the Plaintiff and the environment;

   c.   maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's wells.

223. Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

   a.   intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

- 54 -

b.  concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c.  concealing the dangers of MTBE from downstream handlers, users, consumers, and the general public;

d.  using their considerable resources to fight underground storage tank legislation; and

e.  collectively deciding to use MTBE rather than other, safer oxygenates because MTBE was the most profitable oxygenate for Defendants to use.

224.  As a direct and proximate result of Defendants' conspiracy, MTBE at all times relevant to this litigation has:

a.  posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.  contaminated and/or will contaminate Plaintiff's wells and groundwater in the vicinity of Plaintiff's property;

c.  required and/or will require testing and monitoring of the Plaintiff's wells for MTBE contamination;

d.  requires or will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources;

e.  diminished and will continue to diminish the Plaintiff's and consumers' confidence in, and the use and enjoyment of, Plaintiff's water and property;

f.  diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination; and

g.  caused and/or will cause Plaintiff's to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

225.  Defendants knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.

226. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

227. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, CITY OF KENNETT, seeks judgment against these Defendants for:

1.   Compensatory damages according to proof including, but not limited to,

    (i)   costs of investigation;

    (ii)   costs of testing and monitoring;

    (iii)   costs of providing water from an alternate source;

    (iv)   costs of installing and maintaining wellhead treatment;

    (v)   costs of installing and maintaining a wellhead protection program;

    (vi)   costs of installing and maintaining an early warning system to detect MTBE before it reaches a well;

    (vii)  damages to compensate Plaintiff for loss of consumer confidence and resulting business;

    (viii)  interest on the damages according to law;

2.    Punitive damages;

3.    Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4.    Prejudgment interest;

5.    Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  August 20, 2010

Andrea Ravens Vandeloecht, Missouri Bar No. 51118
CHAPMAN, COWHERD, TURNER & TSCHANNEN, P.C.
412 W. Helm
PO Box 218
Brookfield, MO  64628
Telephone:  (660) 258-7447
Facsimile:  (660) 258-7449

Scott Summy, *licensed in Texas and North Carolina*
Carla Burke, *licensed in Texas and New York*
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605
Facsimile:  (214) 520-1181

Robert J. Gordon, *licensed in New York,*

*Pennsylvania, and New Jersey*
Robin Greenwald, *licensed in Illinois*
**WEITZ & LUXENBERG, P.C.**
180 Maiden Lane, 17th Floor
New York, NY   10038-4925
Telephone: (212) 558-5500
Fax:  (212) 558-5506

***Attorneys for Plaintiff***