**ATTACHMENT A**

CONSENTPENDING

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:10-cv-11500-RBC

| | |
|---|---|
| Bridgewater Water Department v. Atlantic Richfield Company et al | Date Filed: 09/03/2010 |
| Assigned to: Magistrate Judge Robert B. Collings | Jury Demand: Plaintiff |
| Demand: $9,999,000 | Nature of Suit: 245 Tort Product Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Bridgewater Water Department**     represented by   **Richard M. Sandman**
Rodman Rodman & Sandman
442 Main Street
Malden, MA 02148-5122
781-322-3720
Fax: 781-324-6906
Email: rsandman@rrslaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Atlantic Richfield Company**

**Defendant**

**BP Amoco Chemical Company**

**Defendant**

**BP Products North America, Inc.**

**Defendant**

**Chevron Corporation**

**Defendant**

**Chevron U.S.A., Inc.**

**Defendant**

**Citgo Petroleum Corporation**

**Defendant**

**Citgo Refining and Chemicals Company, LP.**

**Defendant**

**Coastal Eagle Point Oil Company**

<u>Defendant</u>
**Conocophillips Company**

<u>Defendant</u>
**Crown Central, LLC**

<u>Defendant</u>
**El Paso Merchant Energy-Petroleum Company**

<u>Defendant</u>
**Equilon Enterprises LLC**

<u>Defendant</u>
**Exxon Mobil Corporation**

<u>Defendant</u>
**Exxonmobil Oil Corporation**

<u>Defendant</u>
**Flint Hills Resources, LP**

<u>Defendant</u>
**Getty Petroleum Marketing, Inc.**

<u>Defendant</u>
**Hess Corporation**

<u>Defendant</u>
**Mobil Corporation**

<u>Defendant</u>
**Motiva Enterprises LLC**

<u>Defendant</u>
**The Premcor Refining Group, Inc.,**

<u>Defendant</u>
**Shell Oil Company**

<u>Defendant</u>
**Shell Oil Products Company, LLC**

<u>Defendant</u>
**Shell Petroleum, Inc.**

<u>Defendant</u>

**Shell Trading (US) Company**

**Defendant**

**Sunoco, Inc.**

**Defendant**

**Sunoco, Inc. (R&M)**

**Defendant**

**Texaco Inc.**

**Defendant**

**TMR Company**

**Defendant**

**Total Petrochemicals USA, Inc.**

**Defendant**

**Valero Energy Corporation**

**Defendant**

**Valero Marketing and Supply Company**

**Defendant**

**Valero Refining-Texas, L.P.**

**Defendant**

**Valero Refining and Marketing Company**

**Defendant**

**Valero Refining Company - New Jersey**

**Defendant**

**7-Eleven, Inc.,**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/03/2010 | 1 | COMPLAINT against All Defendants, filed by Bridgewater Water Department. (Attachments: # 1 Civil Cover Sheets)(Abaid, Kimberly) (Entered: 09/03/2010) |
| 09/03/2010 | 2 | ELECTRONIC NOTICE of Case Assignment. Magistrate Judge Robert B. Collings assigned to case. Plaintiff's counsel, or defendant's counsel if this case was initiated by the filing of a Notice of Removal, are directed to the attached General Order and Notice regarding Consent to Proceed before the Magistrate Judge. These documents will be mailed to counsel not receiving notice |

| | | electronically. (Abaid, Kimberly) (Entered: 09/03/2010) |
|---|---|---|
| 09/03/2010 | 3 | **Summons Issued as to All Defendants. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Abaid, Kimberly) (Entered: 09/03/2010) |
| 09/03/2010 | 4 | NOTICE issued to Attorney Richard Sandman regarding mandatory use of ECF in compliance with Local Rule 5.4. Failure to comply may result in the imposition of sanctions. (Abaid, Kimberly) (Entered: 09/03/2010) |
| 09/07/2010 | | Filing fee/payment: $ 350.00, receipt number BST019412 for 1 Complaint (Russo, Patricia) (Entered: 09/07/2010) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/10/2010 13:09:23 | | |
| **PACER Login:** mw0036 | **Client Code:** | 009900-0021-10149 |
| **Description:** Docket Report | **Search Criteria:** | 1:10-cv-11500-RBC |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

```
-----------------------------------------------------------------X
```

**BRIDGEWATER WATER DEPARTMENT**
**Memorial Building**
**25 South Street**
**Bridgewater, MA 02324,**

**Case No.** _____

**PLAINTIFF**

**Jury Trial Demanded**

    v.

**ATLANTIC RICHFIELD COMPANY**
**28100 Torch Parkway**
**Warrenville, IL 60555**

      **SERVE ON REGISTERED AGENT:**
      **C T Corporation System**
      **155 Federal Street, Suite 700**
      **Boston, MA 02110**

**BP AMOCO CHEMICAL COMPANY**
**4101 Winfield Road**
**Warrenville, IL 60555**

      **SERVE ON REGISTERED AGENT:**
      **C T Corporation System**
      **155 Federal Street, Suite 700**
      **Boston, MA 02110**

**BP PRODUCTS NORTH AMERICA INC.**
**4101 Winfield Road**
**Warrenville, IL 60555**

      **SERVE ON REGISTERED AGENT:**
      **The Prentice Hall Corporation System, Inc.**
      **84 State Street**
      **Boston, MA 02109**

- 1 -

**CHEVRON CORPORATION**
**6001 Bollinger Canyon Road**
**San Ramon, CA  94583**

**CHEVRON U.S.A., INC.**
**6001 Bollinger Canyon Road**
**San Ramon, CA  94583**

> **SERVE ON REGISTERED AGENT:**
> **The Prentice Hall Corporation System, Inc.**
> **84 State Street**
> **Boston, MA  02109**

**CITGO PETROLEUM CORPORATION**
**6100 S. Yale Ave.**
**Tulsa, OK  74136**

> **SERVE ON REGISTERED AGENT:**
> **C T Corporation System**
> **155 Federal Street, Suite 700**
> **Boston, MA  02110**

**CITGO REFINING AND CHEMICALS COMPANY, LP**
**6100 S. Yale Ave.**
**Tulsa, OK  74136**

**COASTAL EAGLE POINT OIL COMPANY**
**1001 Louisiana St.**
**Houston, TX  77002**

**CONOCOPHILLIPS COMPANY**
**600 N. Dairy Ashford Road**
**Houston, TX   77070**

> **SERVE ON REGISTERED AGENT:**
> **U.S. Corporation Company**
> **84 State Street**
> **Boston, MA  02108**

**CROWN CENTRAL, LLC**
**1 North Charles Street**
**Baltimore, MD   21203**

**EL PASO MERCHANT ENERGY-PETROLEUM
COMPANY**
**1001 Louisiana Street**
**Houston, TX 77002**

> **SERVE ON REGISTERED AGENT:**
> **C T Corporation System**
> **155 Federal Street, Suite 700**
> **Boston, MA 02110**

**EQUILON ENTERPRISES LLC**
**910 Louisiana Street**
**Houston, TX 77002**

> **SERVE ON REGISTERED AGENT:**
> **C T Corporation System**
> **155 Federal Street, Suite 700**
> **Boston, MA 02110**

**EXXON MOBIL CORPORATION**
**5959 Las Colinas Boulevard**
**Irving, TX 75039**

> **SERVE ON REGISTERED AGENT:**
> **Corporation Service Company**
> **84 State Street**
> **Boston, MA 02109**

**EXXONMOBIL OIL CORPORATION**
**5959 Las Colinas Boulevard**
**Irving, TX 75039**

> **SERVE ON REGISTERED AGENT:**
> **The Prentice-Hall Corporation System, Inc.**
> **84 State Street**
> **Boston, MA 02109**
**FLINT HILLS RESOURCES, L.P.**
**4111 E. 37th St. North**
**Wichita, KS 67220**

> **SERVE ON REGISTERED AGENT:**
> **C T Corporation System**
> **155 Federal Street, Suite 700**
> **Boston, MA 02110**

**GETTY PETROLEUM MARKETING INC.**
**1500 Hempstead Turnpike**
**East Meadow, NY 11753**

>    **SERVE ON REGISTERED AGENT:**
>    **C T Corporation System**
>    **155 Federal Street, Suite 700**
>    **Boston, MA 02110**

**HESS CORPORATION**
**1185 Avenue of the Americas**
**New York, NY 10063**

>    **SERVE ON REGISTERED AGENT:**
>    **C T Corporation System**
>    **155 Federal Street, Suite 700**
>    **Boston, MA 02110**

**MOBIL CORPORATION**
**5959 Las Colinas Boulevard**
**Irving, TX 75039**

**MOTIVA ENTERPRISES LLC**
**910 Louisiana, 25th Floor**
**Houston, TX 77002**

>    **SERVE ON REGISTERED AGENT:**
>    **C T Corporation System**
>    **155 Federal Street, Suite 700**
>    **Boston, MA 02110**

**THE PREMCOR REFINING GROUP INC.**
**One Valero Way**
**San Antonio, TX 78249**

**SERVE ON REGISTERED AGENT:**
>    **C T Corporation System**
>    **155 Federal Street, Suite 700**
>    **Boston, MA 02110**

**SHELL OIL COMPANY**
**910 Louisiana Street**
**Houston, TX 77002**

> **SERVE ON REGISTERED AGENT:**
> C T Corporation System
> 155 Federal Street, Suite 700
> Boston, MA 02110

**SHELL OIL PRODUCTS COMPANY LLC**
910 Louisiana Street
Houston, TX 77002

> **SERVE ON REGISTERED AGENT:**
> C T Corporation System
> 155 Federal Street, Suite 700
> Boston, MA 02110

**SHELL PETROLEUM, INC.**
910 Louisiana Street
Houston, TX 77002

**SHELL TRADING (US) COMPANY**
909 Fannin, Plaza Level 1
Houston, TX 77010

> **SERVE ON REGISTERED AGENT:**
> C T Corporation System
> 155 Federal Street, Suite 700
> Boston, MA 02110

**SUNOCO, INC.**
1209 Orange Street
Wilmington, DE 19801

> **SERVE ON REGISTERED AGENT:**
> C T Corporation System
> 155 Federal Street, Suite 700
> Boston, MA 02110

**SUNOCO, INC. (R&M)**
1735 Market Street
Philadelphia, PA 19103

> **SERVE ON REGISTERED AGENT:**
> C T Corporation System
> 155 Federal Street, Suite 700
> Boston, MA 02110

TEXACO INC.
6001 Bollinger Canyon Road
San Ramon, CA  94583

TMR COMPANY
910 Louisiana Street
Houston, TX  77096

TOTAL PETROCHEMICALS USA, INC.
1201 Louisiana Avenue, Suite 1800
Houston, TX  77002

     SERVE ON REGISTERED AGENT:
     C T Corporation System
     155 Federal Street, Suite 700
     Boston, MA  02110

VALERO ENERGY CORPORATION
One Valero Way
San Antonio, TX  78249

VALERO MARKETING AND SUPPLY COMPANY
One Valero Way
San Antonio, TX  78249

     SERVE ON REGISTERED AGENT:
     C T Corporation System
     155 Federal Street, Suite 700
     Boston, MA  02110

VALERO REFINING-TEXAS, L.P
One Valero Way
San Antonio, TX  78249

VALERO REFINING AND MARKETING COMPANY
One Valero Way
San Antonio, TX  78249

VALERO REFINING COMPANY - NEW JERSEY
800 Billingsport Road
Paulsboro, NJ  08066

7-ELEVEN, INC.
1722 Routh Street, Suite 100
Dallas, TX  75201

**SERVE ON REGISTERED AGENT:**
**Corporation Service Company**
**84 State Street**
**Boston, MA  02109**

      **DEFENDANTS.**
----------------------------------------------------------------------X

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff BRIDGEWATER WATER DEPARTMENT, a public drinking water provider,

makes the following allegations against the Defendants listed above:

## NATURE OF THE CASE

1.      This case involves the nation's most precious natural resource – water.  Throughout this

great state, public water wells are contaminated by methyl tertiary butyl ether ("MTBE"),

a gasoline additive needlessly and recklessly added to gasoline supplied to many parts of

the United States.  Because MTBE is highly soluble in water and does not readily

biodegrade, it readily contaminates sources of drinking water including those in

Massachusetts.  MTBE is a possible human carcinogen, a known animal carcinogen, and

even very small amounts impart a foul taste and odor to water.  Despite knowing that

MTBE has unique characteristics in water which allows it to contaminate water sources

never seen before its addition to gasoline, these Defendants chose to make it the second

largest chemical manufactured in the United States.  In doing so, these Defendants have

unleashed an unprecedented assault on the water supplied to the citizens of

Massachusetts.

## PARTIES

### Plaintiff

2.    Plaintiff Bridgewater Water Department ("Bridgewater") is a public drinking water provider that supplies drinking water to the residents of the Town of Bridgewater, Massachusetts. Plaintiff's drinking water wells, water system, and water supplies have been contaminated MTBE and/or tertiary butyl alcohol ("TBA"), one of MTBE's degradation byproducts.

### Defendants

3.    Defendants do business in Massachusetts as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

4.    At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, from manufacturing MTBE and adding it to gasoline at the refinery, the distribution of gasoline containing MTBE, including the design and manufacture of gasoline containing MTBE and/or MTBE sold in Massachusetts, and the marketing and sale of MTBE in Massachusetts.

5.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

6.    When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint, jointly and severally, except as otherwise provided.

7.    When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants

committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agent.

8.  ATLANTIC RICHFIELD COMPANY, (formerly known as Atlantic Richfield Delaware Corporation), individually, as successor-by-merger to Atlantic Richfield Company (a Pennsylvania corporation), and doing business as ARCO Products Company, is a Delaware corporation doing business in the Commonwealth of Massachusetts.  Atlantic Richfield Company may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

9.  BP AMOCO CHEMICAL COMPANY, (formerly known as Amoco Chemical Company) is a Delaware corporation doing business in the Commonwealth of Massachusetts.  BP Amoco Chemical Company may be served with process through its registered agent, C T Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

10.  BP PRODUCTS NORTH AMERICA, INC., (formerly known as Amoco Oil Company), individually and as successor-by-merger to BP Exploration and Oil Inc., and successor-in-interest to BP North America Inc.) is a Maryland corporation doing business in the Commonwealth of Massachusetts.  BP Products North America, Inc. may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 84 State Street, Boston, MA  02109.

11.  CHEVRON CORPORATION, (formerly known as ChevronTexaco Corporation) is a Delaware corporation doing business in the Commonwealth of Massachusetts.  Chevron Corporation may be served with process through the Massachusetts Secretary of the

Commonwealth, at its principal place of business: 6001 Bollinger Canyon Road, San Ramon, California 94583.

12.    CHEVRON U.S.A., INC. (formerly known as Gulf Oil Corporation), is a Pennsylvania corporation doing business in the Commonwealth of Massachusetts. Chevron U.S.A. Inc. may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 84 State Street, Boston, MA 02109.

13.    CITGO PETROLEUM CORPORATION is a Delaware corporation doing business in the Commonwealth of Massachusetts. Citgo Petroleum Corporation may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston MA 02110.

14.    CITGO REFINING AND CHEMICALS COMPANY, LP is an Oklahoma limited partnership doing business in the Commonwealth of Massachusetts. Citgo Refining and Chemicald Company, LP may be served with process through the Massachusetts Secretary of the Commonwealth, at its principal place of business: 6100 South Yale Avenue, Tulsa, Oklahoma 74136.

15.    COASTAL EAGLE POINT OIL COMPANY is a Delaware corporation doing business in the Commonwealth of Massachusetts. Coastal Eagle Point Oil Company may be served with process through the Secretary of the Commonwealth, at its principal place of business: 1001 Louisiana Street, Houston, Texas 77002.

16.    CONOCOPHILLIPS COMPANY (formerly known as Phillips Petroleum Company), individually and as successor-by-merger to Conoco, Inc. and Tosco Corporation, and doing business as Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company, is a Delaware corporation doing business in the Commonwealth of

Massachusetts. ConocoPhillips Company may be served with process through its

registered agent, U.S. Corporation Company, 84 State Street, Boston, MA 02108.

17.     CROWN CENTRAL, LLC, (individually, as successor-by-merger to Crown Central

Petroleum Corporation, and successor-in-interest to La Gloria Oil & Gas Company), is a

Maryland limited liability company doing business in the Commonwealth of

Massachusetts. Crown Central, LLC may be served with process through the

Massachusetts Secretary of the Commonwealth at its principal place of business: 1 North

Charles Street, Baltimore, Maryland 21203.

18.     EL PASO MERCHANT ENERGY-PETROLEUM COMPANY, (formerly known as

Coastal Refining and Marketing, Inc. and formerly known as Coastal States Trading,

Inc.), is a Delaware corporation doing business in the Commonwealth of Massachusetts.

El Paso Merchant Energy-Petroleum Company may be served with process through its

registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston MA

02110.

19.     EQUILON ENTERPRISES, LLC, individually, as successor-by-merger to Equiva

Services LLC, and doing business as Shell Oil Products US, is a Delaware limited

liability company doing business in the Commonwealth of Massachusetts. Equilon

Enterprises, LLC may be served with process through its registered agent, CT

Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

20.     EXXON MOBIL CORPORATION, (formerly known as Exxon Corporation, and doing

business as ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A. and

ExxonMobil Chemical Corporation), is a New Jersey corporation doing business in the

Commonwealth of Massachusetts. ExxonMobil Corporation may be served with process

through its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02109.

21.   EXXONMOBIL OIL CORPORATION , is a New York corporation, doing business in the Commonwealth of Massachusetts. ExxonMobil Oil Corporation may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 84 State Street, Boston, MA  02109.

22.   FLINT HILLS RESOURCES, LP, (formerly known as  Koch Petroleum Group, LP and Koch Refining Company, LP and doing business as Koch Refining, L.P.), is a Delaware limited partnership doing business in the Commonwealth of Massachusetts. Flint Hills Resources, LP  may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

23.   GETTY PETROLEUM MARKETING, INC., is a Maryland corporation doing business in the Commonwealth of Massachusetts.  Getty Petroleum Marketing, Inc. may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston  MA 02110.

24.   HESS CORPORATION, (formerly known as Amerada Hess Corporation) is a Delaware corporation doing business in the Commonwealth of Massachusetts.  Hess Corporation may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

25.   MOBIL CORPORATION  is a Nevada corporation doing business in the Commonwealth of Massachusetts.  Mobil Corporation may be served with service of process through the Secretary of the Commonwealth at its principal place of business: 5959 Las Colinas Boulevard, Irving, TX 75039.

26.    MOTIVA ENTERPRISES, LLC, ( formerly known as Star Enterprises LLC), is a

Delaware limited liability company doing business in the Commonwealth of

Massachusetts.  Motiva Enterprises, LLC may be served with process through its

registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA

02110.

27.    THE PREMCOR REFINING GROUP, INC., (formerly known as Clark Refining &

Marketing, Inc.), is an Delaware corporation doing business in the Commonwealth of

Massachusetts.  The Premcor Refining Group Inc. may be served with process through its

registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA

02110.

28.    SHELL OIL COMPANY is a Delaware corporation doing business in the

Commonwealth of Massachusetts.  Shell Oil Company may be served with process

through its registered agent, CT Corporation System, 155 Federal Street, Suite 700,

Boston, MA 02110.

29.    SHELL OIL PRODUCTS COMPANY, LLC  is a Delaware limited liability company

doing business in the Commonwealth of Massachusetts.  Shell Oil Products Company,

LLC may be served with process through its registered agent, CT Corporation System,

155 Federal Street, Suite 700, Boston, MA 02110.

30.    SHELL PETROLEUM, INC. is a Delaware corporation doing business in the

Commonwealth of Massachusetts. Shell Petroleum, Inc. may be served with process

through the Secretary of the Commonwealth at its principal place of business: 910

Louisiana Street, Houston, Texas 77002.

31.   SHELL TRADING (US) COMPANY, (formerly known as Equiva Trading Company, and doing business as Stusco), is a Delaware corporation doing business in the Commonwealth of Massachusetts.  Shell Trading (US) Company may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

32.   SUNOCO, INC., (formerly known as Sun Oil Company, and formerly known as Sun Company, Inc.) is a  Pennsylvania corporation doing business in the Commonwealth of Massachusetts.  Sunoco, Inc. may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston MA 02110.

33.   SUNOCO, INC. (R&M), (formerly known as Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation doing business in the Commonwealth of  Massachusetts.  Sunoco, Inc. (R&M) may be served with process through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

34.   TEXACO, INC. , is a Delaware corporation doing business in the Commonwealth of Massachusetts. Texaco, Inc. may be served with process through the Secretary of the Commonwealth at its principal place of business: 6001 Bollinger Canyon Road, San Ramon, CA 94583.

35.   TMR COMPANY, (formerly known as Texaco Refining and Marketing, Inc.), individually and as successor-by-merger to TRME Company, (formerly known as Texaco Refining and Marketing (East), Inc.)) is a Delaware corporation doing business in the Commonwealth of  Massachusetts. TMR Company may be served with process through

the Secretary of the Commonwealth at its principal place of business: 910 Louisiana
Street, Houston, Texas 77002.

36.   TOTAL PETROCHEMICALS USA, INC., (formerly known as Atofina Petrochemicals,
Inc.) is a Delaware corporation doing business in the Commonwealth of Massachusetts.
Total Petrochemicals USA, Inc. may be served with process via its registered agent, CT
Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

37.   VALERO ENERGY CORPORATION, is a Delaware corporation doing business in the
Commonwealth of Massachusetts. Valero Energy Corporation may be served with
process through the Secretary of the Commonwealth at its principal place of business:
One Valero Place, San Antonio, Texas 78212.

38.   VALERO MARKETING AND SUPPLY COMPANY, is a Delaware corporation doing
business in the Commonwealth of Massachusetts.  Valero Marketing and Supply
Company may be served with process through its registered agent, CT Corporation
System, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

39.   VALERO REFINING TEXAS, L.P., (individually and as successor-in-interest to Valero
Refining Company - Texas and Valero Refining Company) is Texas limited partnership
doing business in the Commonwealth of Massachusetts.  Valero Refining Texas, L.P.
may be served with process through the Secretary of the Commonwealth at its principal
place of business: One Valero Way, San Antonio, Texas 78212.

40.   VALERO REFINING AND MARKETING COMPANY is a Delaware corporation doing
business in the Commonwealth of Massachusetts.  Valero Refining and Marketing
Company may be served with process through the Secretary of the Commonwealth at its
principal place of business: One Valero Way, San Antonio, Texas 78212.

41.  VALERO REFINING COMPANY — NEW JERSEY is a Delaware corporation doing business in the Commonwealth of Massachusetts.  Valero Refining Company — New Jersey may be served with process through the Secretary of the Commonwealth, at its principal place of business: 800 Billingsport Road, Paulsboro, NJ 08060.

42.  7-ELEVEN, INC. is a Texas corporation doing business in the Commonwealth of Massachusetts. 7-Eleven, Inc. may be served with process through its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02110.

## JURISDICTION AND VENUE

43.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties, and the amount in controversy for each Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, this Court has jurisdiction over Defendants because they are either authorized to do business in Massachusetts, are registered with the Massachusetts Secretary of State, do sufficient business with sufficient minimum contacts in Massachusetts, or otherwise intentionally avail themselves of the Massachusetts market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Massachusetts to render the exercise of jurisdiction over Defendants by the Massachusetts courts consistent with traditional notions of fair play and substantial justice.

44.  Venue is proper in this Court because Plaintiff is located in and operates its business in Plymouth County, Massachusetts.

## MTBE FACTS

45.     MTBE is a synthetic chemical blended into some gasolines by some refiners at some

        times since 1979.  As used in this Complaint, "MTBE" refers not only to methyl tertiary

        butyl ether, but also to the contaminants in and degradation byproducts of MTBE,

        including TBA.

46.     MTBE contaminates the environment primarily through discharges, disposals, deposits,

        leaks, and spills from gasoline delivery systems.  Once released to the environment,

        MTBE has properties that cause substantial environmental contamination and threaten

        public health and welfare.  In particular, the fate and transport of MTBE in the subsurface

        is substantially different than the fate and transport of other gasoline components,

        including the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

47.     Once released into the subsurface, MTBE separates from other gasoline components in

        the presence of moisture.  In contrast to the BTEX compounds, MTBE has a strong

        affinity for water and does not readily adsorb (*i.e.* stick) to soil particles.  Rather, it moves

        freely with groundwater at approximately the rate of the water's movement.  In addition,

        MTBE is more persistent than BTEX compounds because it does not readily biodegrade

        in the subsurface.  Thus, in comparison to BTEX components, MTBE is significantly

        more mobile in the subsurface and migrates from the source area more quickly.  MTBE is

        also more difficult and expensive to remove from water than BTEX components.  If

        MTBE is released into the environment, it has the capacity to migrate through the soil and

        groundwater, penetrate deep within the aquifer, and cause persistent contamination that

        can destroy and/or threaten drinking water wells.  Plumes of MTBE can persist in

        underground aquifers for many decades — far longer than other components of gasoline.

Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

48.     In short, MTBE spreads farther and faster than other components of gasoline, resists biodegradation, is difficult and costly to remove from groundwater, and can continue to migrate long after its initial discharge, contaminating additional drinking water wells as its moves.

49.     Along with its other harmful properties, MTBE renders water supplies unusable by changing contaminated water's odor and taste.  Specifically, MTBE-contaminated water has a turpentine odor and chemical taste that renders it unfit for use as drinking water. Many individuals can smell and taste MTBE in water at very low levels — as low as one part per billion ("ppb") or lower.

50.     MTBE also presents a significant public health threat because of its potential for causing cancers.  MTBE is also a known animal carcinogen that is linked to many potential human health problems.  The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

51.     TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate.  Therefore, TBA often appears wherever there is MTBE contamination.

52.     TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant.  And TBA is a public health threat.  It is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes.  Some evidence links TBA to cancer and kidney and thyroid tumors in animals.

53.    Defendants used and continue to use MTBE as a gasoline additive.

## Why Defendants Add MTBE to Gasoline:   Profit.

54.    Sometime after 1979, Defendants started manufacturing, distributing and/or selling

gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost

the octane level in higher grades of gasoline.

55.    MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use

reflected a choice and preference of Defendants, to make money off gasoline refining

waste byproducts.

56.    Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater

concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE,

an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants'

motivation for including MTBE in gasoline, however, was to boost octane cheaply and

increase their own profits, and their use of MTBE as a gasoline additive predated the

environmental concerns they invoke to justify their use of MTBE.  The Clean Air Act of

1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a

cheap method to comply.

57.    It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air.

Contrary to industry assurances, MTBE did little or nothing to reduce such air-polluting

car emissions as carbon monoxide or smog precursors. A detailed 1998 report

commissioned by the State of California concluded that "there is no significant air quality

benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

58.     In May 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[2]

59.     NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

60.     In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

**The longstanding prevalence of unintended gasoline discharges
ensures that gasoline with MTBE will contaminate groundwater.**

61.     Before the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") and other gasoline discharges were a known threat to Illinois's groundwater. The introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs and other spills. Because of MTBE's unique

---

[1]      "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[2]      The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[3]      "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996).

properties, the addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline.

62.   Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable by Defendants.

### Defendants have known all along that adding MTBE to gasoline would result in massive groundwater contamination.

63.   At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, including USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA show Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

64.   At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

65.   At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

66.   At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

67.   At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater through vaporization from

USTs, and that such vaporization and other small releases occur even when a tank is

considered to have tested tight.

### Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline blended with MTBE.

**I.      Defendants' constructive knowledge of MTBE's threat to groundwater.**

68.    At all times relevant to this litigation, Defendants were or should have been aware that

MTBE contamination of groundwater was inevitable, as a result of MTBE's water-

seeking properties, recalcitrance to biodegradation and bioremediation, and the long

history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and

use.

69.    For example, the American Petroleum Institute ("API"), a trade association representing

the domestic petroleum industry including Defendants in a broad range of topics, formed

a Toxicology Committee in or around 1980. The Toxicology Committee included Exxon,

Mobil, Shell, Arco, Tosco and ChevronTexaco, among others.

70.    API's Toxicology Committee had a specific program to study MTBE. Meeting minutes

make plain that committee members shared information and repeatedly discussed

MTBE's propensity to contaminate groundwater. The Committee specifically

acknowledged the need for certain toxicological information due to MTBE's propensity

to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE

through drinking water.

71.    Despite early knowledge and a shared recognition of the need to do long term, low level

ingestion studies on the effects of MTBE, none was ever undertaken or completed by

Defendants.

72.   Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know the threat which MTBE poses to groundwater.

73.   In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

### II.   Defendants' early knowledge of specific instances of MTBE contamination of groundwater.

74.   Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

75.   In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

76.   In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by ExxonMobil, created a large underground reservoir

of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

77.   Defendants were also aware of two MTBE groundwater contamination events in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

78.   At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE. Although trace levels of BTEX were eventually found in wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

79.   A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing through the Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

80.   In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

III.   **Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.**

81.   In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental

Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water

Contaminant" ("the Garrett Report").[4]  The paper described approximately 30 Maine

wells contaminated with MTBE. The authors explained that as a result of their experience

dealing with the contamination, they learned that: (a) groundwater contaminated with

MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of

gasoline and therefore a plume of MTBE in groundwater will be more extensive than the

plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like"

odor in low concentrations.

82.   As a result of MTBE's characteristics, the Garrett Report's authors recommended that

MTBE be banned as a gasoline additive or at least be stored in double-contained

facilities.  The paper was to be presented at and published in the proceedings of the

"Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference"

sponsored by the National Well Water Association and the API in November of 1986.

83.   As soon as the existence of the Garrett Report was known, even before it was published,

the draft was widely circulated throughout the oil industry. Oil industry representatives,

including many of the Defendants, joined forces and acted to pressure the authors to

radically revise their negative conclusions and recommendations about MTBE. Even after

---

[4]     Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water
Contaminant," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals
in Ground Water — Prevention, Detection, and Restoration, Houston, TX, November 12-14,
1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

succeeding in having the report's language softened, Defendants continued to discredit

the report.

84.    Arco Chemical which was then a part of Arco, initially became involved in October of

1986, prior to the presentation of the first version of the paper. Arco Chemical provided

"data that indicated that many of their theories were incorrect" to the authors of the paper

in an attempt to change their opinions. However, despite Arco Chemical's efforts, the

authors concluded that "MTBE presented an environmental hazard different to other

gasoline components" and went ahead with their presentation of the paper to the National

Well Water Association in November of 1986.

85.    On December 23, 1986, a staff person to the Groundwater Technical Task Force

("GTTF") of API forwarded the Garrett Report to members of the GTTF including

representatives of Shell and Exxon. These individuals were asked to review the Garrett

Report and provide comments/critiques. The stated reason was that the article was "of

possible grave concern to the oxygenate producers."

86.    The comments from the GTTF members culminated in a letter from API to the National

Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE. . . be either banned as gasoline
> additives or require double-lined storage is clearly a policy statement and not an
> objective credible scientific conclusion. Further, data presented in this paper as
> well as those generated by ongoing API research indicate that such a policy is
> reactionary, unwarranted and counter-productive.

87.    However, the API letter to the National Well Water Association in no way refuted the

Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste

threshold, the fact that MTBE could travel faster in groundwater than the other gasoline

constituents, or the conclusion that MTBE was difficult to remediate. These issues were
not even addressed.

88.     BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating
flatly that the report "isn't true."

#### IV.     Defendants' internal documents demonstrating their awareness of MTBE Contamination of groundwater.

89.     Privately, however, Defendants were forced to acknowledge that the major findings of the
Garrett Report were correct. For instance, while the oil companies, via the GTTF,
attacked the authors of the Garrett Report, saying the paper had a "general lack of
technical data to support the rather strong policy statements," behind closed doors,
Defendants were admitting that the authors might in fact be correct.  Arco Chemical, in
communications to others within the oil industry, admitted that they had no data to refute
the Garrett Report's conclusions.  For example, a letter dated February 4, 1987, states "we
don't have any data to refute comments made in the paper that MTBE may spread farther
in a plume or may be more difficult to remove/clean up than other gasoline constituents."

90.     On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based
upon a compilation of data on MTBE contamination of groundwater in New York State
and elsewhere in the region, including laboratory analyses verifying the presence of
MTBE in water samples from three wells in Harrison, New York and four wells in Port
Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in
gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon,
including benzene." The report further stated that "[b]ecause of its more frequent
occurrence, even when other hydrocarbons are not found, we feel it is important for you
to be aware of MTBE. From an environmental and engineering standpoint, you may need

to be informed of its presence to assist you in responding effectively to regulatory and

remedial requirements."

91.   Communications among officials at ChevronTexaco (Chevron) were similar.  A 1987

memo, widely circulated within the company, states:

> Two considerations impact MTBE.  One is potential health risk, and the second is
> increased solubility over normally regulated constituents of interest, i.e. benzene,
> toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX.  Consequently, the
> dissolved "halo" from a leak containing MTBE can be expected to extend farther
> and spread faster than a gasoline leak that does not include MTBE as one of its
> constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult
> to remove from groundwater using current technology (air stripping or carbon
> adsorption).  Because of its lower volatility, MTBE requires more than double to
> air stripping capacity to reach a 95 percent reduction.  Removal using carbon
> adsorption is even worse.  MTBE breaks through activated carbon four times
> faster than BTX.

92.   In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a document

entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." The purpose

of the document was to put together what was known about the movement of MTBE in

groundwater and the document was to be circulated internally among the employees of

the various Shell companies.

93.   According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than

benzene and therefore, MTBE's plumes are expected to move faster and farther than

benzene plumes emanating from a gasoline spill.  Further, Shell's MTBE White Paper

indicates that MTBE does not biodegrade in the subsurface environment. Finally, Shell's

MTBE White Paper indicates that MTBE has a low odor and taste threshold and that "at

many locations odor and taste criteria may determine clean-up levels."

94.   Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a few Shell
> marketing terminals and service stations to date. However, as the usage of this
> oxygenate begins to increase, a stringent clean-up criteria for MTBE will become
> adopted in more states, we should anticipate increased concerns over how its
> release to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

95.   A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status"

states:

> MTBE is relatively quite soluble in water (compared to other components in
> gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE
> tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also
> has a very low biodegradation potential, which makes it more difficult to remove
> from ground water than other gasoline components such as BTEX.

**V.      Defendants' knowledge that no adequate toxicity studies had been
done prior to Defendants' decision to add MTBE to gasoline.**

96.   Defendants added MTBE to gasoline even though no long-term cancer studies had been

undertaken. Studies showed MTBE caused cancer in animals.  It is common knowledge

within the scientific community, and Defendants knew, that prior to the introduction of a

widely used chemical like MTBE, toxicological tests must first be performed. However,

Defendants did not perform the standard toxicological procedures to test the effects of

MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to

convince the EPA that health testing of MTBE was not needed. Thus, Defendants

exposed millions of Americans to potential harm without warning of the potential health

risks associated with MTBE.

**VI.     Despite knowing that adding MTBE to gasoline inevitably results in
widespread MTBE groundwater contamination, Defendants
conspired to mislead the EPA and the public about the hazards of
adding MTBE to gasoline.**

97.     Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants,

beginning in the early 1980's, formed various formal and informal task-forces and

committees for the purpose of concealing the actual threat of MTBE, facilitating the

Defendants' use of MTBE without regard to its impact on Plaintiff and convincing the

public and regulators that increasing concentrations of MTBE in gasoline was desirable.

Defendants formed these joint task-forces and committees under the auspices of trade

organizations such as the API and the Oxygenated Fuels Association ("OFA").

Defendants, as members of these joint task forces and committees, conspired to conceal

the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby

placing corporate profits above known-but-concealed harm to the environment and

Plaintiff. Defendants manufactured and distributed MTBE with actual knowledge of

MTBE's defects and with actual knowledge that MTBE would cause harm in

groundwater and production wells and took affirmative steps to conceal those effects.

**A.     Defendants misled the EPA into not testing MTBE under the Toxic
Substances Control Act (TSCA) in the late 1980's.**

98.     In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the

Toxic Substances Control Act, recommended testing and review to assess MTBE's health

and environmental risks.[5] The ITC characterized MTBE as having relatively high water

solubility, and stated that MTBE's persistence in groundwater following spills was

unknown but that it was likely not to be readily biodegradable. The ITC recommended

chemical fate monitoring of MTBE to determine the risk MTBE poses to the

environment. The ITC also recommended additional medical testing of MTBE and

_____

[5]      Nineteenth Report of the ITC to the Administrator, Receipt and Request for
Comments Regarding Priority List of Chemicals, 51 Fed. Rep. 220 (1986) (the "1986 Notice").

invited written comments. The 1986 Notice credited the Dynamac Corporation for

supplying the government with MTBE information.

99.     The oil industry, including Defendants, mobilized to convince the EPA that additional

testing of MTBE was not needed.

100.    On or about December 12, 1986, Atlantic Richfield Company ("ARCO"), speaking on

behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an

effort to derail further testing of MTBE. ARCO's comments included a critique of the

Dynamac Corporation's information review of MTBE, on which the ITC had relied.

ARCO stated that its "critique of the CRCS/Dynamac report revealed that some

erroneous assumptions had been made that cause the hazards of MTBE to be seriously

overestimated." In further comments to the EPA, ARCO stated the following:

> Characteristics — Moderate water solubility is reported. However, an ARCO
> Technical Bulletin states that 'MTBE is only slightly soluble in water...'
>
> ***
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.'
> This conclusion is not supported by the available information.
>
> ***
>
> Exposure from accidental spills of MTBE could occur, but should be regarded as
> a minimal possibility. The closed nature of the manufacturing and transportation
> process reduces worker exposure and product loss. Training and safety programs
> also lower the possibility of accidental spills. Many current programs at EPA and
> industry are underway to monitor and reduce the possibility of gasoline loss from
> leaking underground storage tanks.... MTBE losses would be extremely small
> from this source.
>
> ***
>
> VI.     Environmental Information
>
> As has been reportedly stated, environmental entry would not occur in every stage
> of the gasoline marketing chain . . . . Environmental entry of MTBE from this
> source would be considerably less than the report indicates.

> MTBE is only slightly soluble so environmental fate projections based on this
> assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were
misleading when made, improperly downplaying the risks of MTBE contamination of
groundwater and omitting material facts known to Defendants at the time.

101.   On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments
on the need for additional testing of MTBE. The Minutes of the meeting show that
government officials expressed concern over the need to assess the potential for
groundwater contamination. The Minutes show that Arco and Exxon made a presentation
to support the industry position that additional medical testing of MTBE was
unnecessary. Other Defendants assented to these representations either explicitly or by
their silence.

102.   In or around early 1987, Defendants formed the "MTBE Committee," with the express
and stated purpose, as set forth in a written agreement, of "addressing the environmental,
health, safety, legislative and regulatory issues concerning MTBE of importance to the
public and the producers and users of MTBE." The MTBE Committee included
Defendants, BP Corporation (Amoco), Arco, ChevronTexaco (Chevron), Citgo,
ExxonMobil (Exxon), Shell, and Sunoco, among others.

103.   The MTBE Committee lauded itself as "being a source of information to MTBE
producers, users, the government and the public" and stated that its goal was to "address
environmental health and safety issues relating to MTBE ..., provide technical data to
appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of
MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test

Rule..., [and] make available to interested parties and the general public technical and

scientific information relating to the use of MTBE in fuels."

104.   On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE

Committee, had its first meeting. The meeting minutes, circulated February 2, 1987,

indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as
> follows: Since each producer must respond to the EPA before February 12 on the
> 8A and 8D [sic] questions and many will respond individually to production and
> economic questions which were also sought by EPA, a letter will be sent by
> George Dominguez requesting that information requested by the EPA be sent to
> the MTBE Committee before February 9. A form will be included in George's
> letter....the Technical Committee will then meet on February 19 to combine the
> three reports from the working groups and draft a response to the EPA which will
> then be passed on to the Steering Committee for their approval on February 20...
> The combined response to the EPA will be submitted by February 27, to be
> followed shortly thereafter by a formal visit to EPA. Dominguez will meet with
> EPA and notify them that the MTBE Committee has been formed and will be
> submitting its overview.

105.   Although Defendants were keenly aware that the EPA was interested in obtaining more

information about MTBE in groundwater, Defendants were not forthcoming in their

responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's

request for information about "data gaps" concerning MTBE's environmental and health

effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in
> groundwater. We are not aware of any incidents where MTBE contaminated
> groundwater at manufacturing facilities. Where gasoline containing MTBE is
> stored at refineries, terminals, or service stations, there is little information on
> MTBE in groundwater. We feel there are no unique handling problems when
> gasoline containing MTBE is compared to hydrocarbon-only gasoline.

106.   At the same time that Arco Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, Arco Chemical admitted to other

Defendants that it "had no data to refute the claims made in the Garrett Report that

MTBE posed a significant threat of groundwater contamination."

107.    On or around February 27, 1987, the MTBE Committee submitted written comments

drafted to convince the EPA not to require additional health and environmental testing of

MTBE. The information provided by Defendants was misleading and false. For example,

the Defendants provided information to the EPA representing that MTBE is only slightly

soluble in water, that potential environmental exposure is not high, and that MTBE has

excellent biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm to health or the
> environment, that human exposure to MTBE and release of MTBE to the
> environment is negligible, that sufficient data exists to reasonably determine or
> predict that manufacture, processing, distribution, use and disposal of MTBE will
> not have an adverse effect on health or the environment, and that testing is
> therefore not needed to develop such data. Furthermore, issuance of a test rule
> requiring long term chronic testing will have a significant adverse environmental
> impact.

108.    The agenda of the MTBE Committee is reflected in the following excerpt from those

comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to
> complete, great uncertainty will be created as to whether MTBE is a safe fuel
> additive. As a result, demand for MTBE and expansion of productive capacity is
> not likely to grow significantly. Refiners will be likely to commit capital to more
> costly alternative methods of octane enhancement such as isomerization and
> reformate plants that do not have the environmental benefits of MTBE. Thus,
> requiring long term testing of MTBE will have a significant adverse
> environmental and economic impact.

109.    The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had

not been the subject of long term chronic health testing, but claimed that such testing was

unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are
> presented in the Health Effects Summary of this report. These data suggest that

the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

110.    On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

111.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others, signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[6] The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

---

[6]    Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

112.    The foregoing representations by the MTBE Committee are evidence of Defendants'
pattern of exaggerating the environmental benefits of MTBE while understating or
concealing the real environmental hazards, all of which Defendants knew or should have
known at the time. The comments also reveal Defendants' plans to forestall all public
scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or
obstruct important health and environmental safety research that would have corroborated
Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and
supporting such representations, the Defendants demonstrated their willingness to use any
means to place their economic interest above the health, property and well-being of
Plaintiff particularly and the America public generally, and clearly intended to
(a) continue to use MTBE without regard to its impact on Plaintiff and the environment,
and (b) prevent Plaintiff from becoming aware of the contamination and/or impact of
contamination from MTBE.

113.    Although the MTBE Committee represented to the EPA that the Committee was going to
"address environmental issues related to MTBE by a) collecting data from member
companies and other sources, and b) sponsoring programs to develop data unavailable
from other sources," the MTBE Committee did no such thing. The MTBE Committee's
Charter statement was intended to mislead the government and the public, including
Plaintiff. The MTBE Committee disbanded approximately one year after achieving its
goal of avoiding testing.

     **B.**     **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

114. Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

115. During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

116. As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

117. In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

118. In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

---

[7]     Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

119.   The Clean Air Act requires the use of some oxygenate, but it does not require that

oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it

was the most inexpensive oxygenate to produce and offered Defendants the highest profit

margin of all the oxygenates available. Defendants could manufacture MTBE from their

already available refinery by-products and were therefore not forced to purchase a

different oxygenate, such as ethanol, from a third-party.

120.   Safer, more environmentally sound alternatives were available.

**C.   Defendants misled the Plaintiff and public, including all downstream
gasoline handlers, about the hazards of gasoline with MTBE.**

121.   Defendants misrepresented the properties of MTBE and withheld information even as

they were insisting that no such information existed. Only more recently, through the

escalating contamination of groundwater resources, has the public started to become

aware of the dangers of MTBE.

122.   On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral

presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that

"MTBE removal from groundwater is consistent with commercial experience. MTBE

gasoline spills have been effectively dealt with." Although the MTBE Committee was

represented to have been formed to address environmental issues and to make available to

the general public information regarding MTBE use in fuels, nowhere in the presentation

did Mr. Dominguez inform the audience that MTBE is different from the other

components of gasoline, that it is resistant to biodegradation, that it is difficult to

remediate and that it causes a greater risk of groundwater contamination.

123.   In 1994, in response to an article that raised questions about the environmental and health

benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what

he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented to Plaintiff that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

124.   As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (referred to in this Complaint as "downstream handlers") or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

125.   In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

126.  This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the
fact that MTBE is usually not merely the first, but also the worst or sometimes the only,
contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is
most often judged to be too costly to clean up.

127.  Had Defendants warned the government, users, and the general public of the known
hazards MTBE presented to drinking water supplies, they would have sought alternatives
and demanded that Defendants provide environmentally-responsible gasoline free of
MTBE.

128.  As a result of Defendants' failure to warn of the hazards posed by MTBE contamination
of groundwater, Plaintiff was deprived of facts from which its injury from MTBE
contamination could reasonably have been inferred.

### VII.   Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.

129.  National annual production figures for MTBE reflect the oil industry's decision to make
MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in
1980 to 75 million barrels in 1998.

130.  Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that
Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to
15% of every gallon of gasoline used in those areas.  MTBE comprises a significant
amount of gasoline even in areas that do not participate in the RFG Program.

131.  Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan
areas in 1992 as part of the Oxyfuel Program.

132.  In or around January 1995, Defendants started putting gasoline containing higher levels of
MTBE into the stream of commerce when moved by market factors and financial

considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

133.   At is peak, most if not all gasoline supplied to the RFG areas was laced with high concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

134.   In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol.  In fact, belatedly, some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary.  Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### VIII.   MTBE's degredation product:  TBA.

135.   TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate.  Therefore, TBA often appears wherever there is MTBE contamination.

136.   TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

137.    To make matters worse, it is even more expensive to clean up than MTBE.  In fact, the

presence of TBA in water being treated for MTBE may generate compounds potentially

of health and environmental concern, limiting the usefulness of these technologies and

further increasing costs.

138.    In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and

mucous membranes.  There is also some evidence that TBA causes cancer and kidney and

thyroid tumors in rats and mice exposed to it.

139.    Defendants failed to warn Plaintiff, regulators, and the general public that they often add

TBA to their gasoline and that MTBE breaks down into TBA.  Further, Defendants failed

to warn Plaintiff of the need to test its water supply for contamination by TBA.

140.    As a result, TBA is appearing in water supplies all across the country, where MTBE

contamination exists.

### IX.    MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.

141.    Before the 1980's, production and sales totals for MTBE were negligible, but by 1996,

MTBE ranked second among all organic chemicals produced in the United States, with

virtually the entire production going into gasoline.

142.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s,

the United States Geological Survey ("USGS") has reported that MTBE is the second

most frequently detected chemical in groundwater in the United States. MTBE-

contaminated wells have been found from coast-to-coast with serious incidents in states

from New Hampshire to California.

143.  The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline is used.

144.  A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

145.  In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8]  No actual plans or source of funds for such testing exist in any state, including the State of Massachusetts.

146.  Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

---

[8]      "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

X.   **It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.**

147.   Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

148.   The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Massachusetts.

149.   A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners.  Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers.  The gasoline at any particular service station comes from many different refiners.

150.   The East Patchogue, New York case was typical: even though a source of the MTBE plume (an abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

151.   Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

## COLLECTIVE LIABILITY, CONCERT OF ACTION, AND CIVIL CONSPIRACY

152.   Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in Massachusetts and are therefore jointly responsible for the increased threat to groundwater in Massachusetts and for causing the injuries complained of in this Complaint.  Liability jointly attaches to all Defendants supplying gasoline containing MTBE in Massachusetts.

153.   Defendants in this action are manufacturers that control the market for gasoline containing MTBE in Massachusetts during the relevant time frame, and one or more of the Defendants is responsible for the harm to Plaintiff, as alleged in this Complaint.  Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Massachusetts and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

154.   Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

155.   Defendants are also liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers.  Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE.  One or more Defendants committed overt acts in furtherance of this conspiracy.  Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

156.   Defendants are also jointly and severally liable because they conspired and acted in

concert to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiff's

expense, to contaminate groundwater and Plaintiff's wells, and to avoid liability for such

contamination.

## FIRST CAUSE OF ACTION

### Public Nuisance

157.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

158.   Defendants have manufactured, distributed, marketed and promoted their product in a

manner that created or participated in creating a public nuisance that unreasonably

endangers or injures the property, health, safety and comfort of the general public and

Plaintiff, causing inconvenience and annoyance.

159.   Defendants, by their intentional, negligent, reckless and ultrahazardous acts and

omissions set forth above, have, among other things, unleashed massive, long-lasting, still

spreading, and still migrating contamination of groundwater and drinking water wells,

while concealing the threat from all, thereby causing MTBE contamination of

groundwater and contamination and threat of contamination of Plaintiff's aquifers and

wells.

160.   By their conduct, Defendants violated, continue to violate, and/or threaten to violate

public rights to pure drinking water as well as a clean and unpolluted natural

environment, including reserves of unpolluted groundwater.

161.   Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct

has caused and continues to cause injury to Plaintiff in the form of present serious

interference with the use, benefit and/or enjoyment of its property in a way that an
ordinary, reasonable person would find is a substantial inconvenience and annoyance.
MTBE presents a serious health hazard because it is a known animal carcinogen that the
EPA considers to be a possible human carcinogen.

162.   Defendants' conduct has also injured and continues to injure the property, health, safety
and/or comfort of a considerable number of persons, including a considerable number of
persons in the Commonwealth of Massachusetts.

163.   Gasoline and MTBE contamination, both real and immediate, constitutes a current
existing as well as prospective public nuisance.

164.   Defendants knew or in the exercise of reasonable care should have known that the
introduction and use of MTBE in gasoline would and has unreasonably and seriously
endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital
groundwater resources relied upon by Plaintiff.

165.   As a direct and proximate result of Defendants' acts and omissions creating the above-
described nuisance, Plaintiff has been damaged and is entitled to injunctive relief to abate
the nuisance and other damages to which it may be entitled.

166.   Defendants willfully and wantonly corrupted and polluted waters taken or held under
M.G.L.A. 40 §§ 39A-39E, and injured other property owned, held or used by Plaintiff
under the authority and for the purposes of M.G.L.A. 40 §§ 39A-39E.  Therefore,
Plaintiff requests an award of three times the amount of damages assessed, as provided by
M.G.L.A. 40 §39G..

## SECOND CAUSE OF ACTION

### Breach of Warranty for Design Defect and/or Defective Product

167.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

168.   Defendants during the relevant time period were designers, manufacturers, refiners,

formulators, sellers, marketers and suppliers of petroleum products, including gasoline

containing MTBE.

169.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and

marketers of petroleum products, including gasoline containing MTBE, Defendants owed

a duty to all persons whom Defendants' petroleum products might foreseeably harm,

including Plaintiff, not to market any product which is unreasonably dangerous for its

intended and foreseeable uses.

170.   Defendants represented, asserted, claimed and warranted that gasoline containing MTBE

could be used in the same manner as gasoline not containing this compound, or otherwise

did not require any different or special handling or precautions.

171.   When Defendants placed gasoline containing MTBE into the stream of commerce, it was

defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable

and ordinary transportation, storage, handling, and uses for the following reasons:

a.      Unintended discharges of gasoline are commonplace throughout Massachusetts;

b.      When gasoline containing MTBE is released into the environment, MTBE has a
        tendency to mix with groundwater and migrate great distances;

c.      M1BE is highly soluble in water and many times more soluble in water than the
        other organic (BTEX) components of gasoline;

  d. When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

  e. Very low concentrations of MTBE will ruin the taste and smell of water; and

  f. MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

172. Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

173. Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, Downstream Handlers and the general public exercising reasonable care.

174. The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

175. Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

176. The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

177. Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

178.  Gasoline containing MTBE reached the consumer and the environment in a condition

substantially unchanged from that in which it left Defendants' control.

179.  As a direct and proximate result of the unreasonably dangerous and/or defective condition

of gasoline containing MTBE and its introduction into the stream of commerce by

Defendants, MTBE at all times relevant to this litigation has:

   a.     posed and continues to pose a threat to Plaintiff's aquifers and to production
          wells;

   b.     required and/or will require additional testing and monitoring of the aquifers and
          production wells for MTBE contamination;

   c.     contaminated, continues to contaminate, and/or will contaminate Plaintiff's
          aquifers and production wells or groundwater in the vicinity of Plaintiff's
          property;

   d.     will require remediation of MTBE groundwater contamination or, where
          remediation is impracticable, installation of a system to filter out MTBE or
          procurement of water from alternative sources;

   e.     diminished and will continue to diminish consumer confidence in Plaintiff's
          water.

180.  Defendants willfully and wantonly corrupted and polluted waters taken or held under

M.G.L.A. 40 §§ 39A-39E, and injured other property owned, held or used by Plaintiff

under the authority and for the purposes of M.G.L.A. 40 §§ 39A-39E.  Therefore,

Plaintiff requests an award of three times the amount of damages assessed, as provided by

M.G.L.A. 40 §39G.

## THIRD CAUSE OF ACTION

### Breach of Warranty: Failure to Warn

181.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

182. As manufacturers, designers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty not to put on the market a product that poses a serious danger to Plaintiff's aquifers and to groundwater that is the source for Plaintiff's production wells without issuing warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by the product.

183. Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without inspection for defects related to the hazards which MTBE poses to groundwater and wells.

184. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

    a.    Unintended discharges of gasoline are commonplace;

    b.    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.    When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.    At extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

    f.    MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

    g.    MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    h.    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.     MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.     MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.     The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

185.    Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, Downstream Handlers, and/or the general public.

186.    Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

187.    As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

a.     posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.     required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE contamination;

c.     contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiff's wells;

d.     required and/or will require installation of a system to filter out MTBE;

e.     diminished and will continue to diminish consumer confidence in Plaintiff's water.

188.    Defendants willfully and wantonly corrupted and polluted waters taken or held under M.G.L.A. 40 §§ 39A-39E, and injured other property owned, held or used by Plaintiff under the authority and for the purposes of M.G.L.A. 40 §§ 39A-39E.  Therefore,

Plaintiff requests an award of three times the amount of damages assessed, as provided by

M.G.L.A. 40 §39G.

## FOURTH CAUSE OF ACTION

### <u>Negligence</u>

189.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

190.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers,

marketers, shippers and handlers of petroleum products, including gasoline containing

MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants'

petroleum products might foreseeably harm to exercise due care in the design,

manufacture, formulation, handling, control, disposal, sale, testing, labeling, use,

warning, and instructing for use of gasoline containing MTBE.

191.   Defendants had a duty and the financial and technical means to determine whether any

latent defects exist in MTBE or gasoline containing MTBE and to warn public officials,

Downstream Handlers and the general public of any such latent defects known to them,

their agents and employees.

192.   At all times relevant to this litigation, Defendants knew or should have known that:

a.      Unintended discharges of gasoline are commonplace;

b.      When gasoline containing MTBE is released into the environment, MTBE has a
        tendency to mix with groundwater and migrate great distances;

c.      MTBE is highly soluble in water;

d.      When gasoline containing MTBE is released into the environment, MTBE persists
        over long periods of time because MTBE is recalcitrant to biodegradation and
        bioremediation;

e.      Very low concentrations of MTBE can ruin the taste and smell of water;

    f.       MTBE may expose people to unknown health risks;

    g.       MTBE greatly increases the importance of preventing leaks of gasoline;

    h.       MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    i.       MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    j.       MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE; and

    k.       The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

193.    Defendants have negligently breached their duties of due care to Plaintiff, Downstream

Handlers, and the general public by:

    a.       chosing to use MTBE as an octane-booster and oxygenate;

    b.       failing to adequately test MTBE prior to its manufacture, distribution and/or sale;

    c.       failing to adequately test, identify and remediate wells that are contaminated with MTBE;

    d.       forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

    e.       voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

    f.       failing to design gasoline containing MTBE so that it would not be unreasonably dangerous to Downstream Handlers and the general public, including Plaintiff;

    g.       marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

    h.       failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

i.     failing to curtail or reduce MTBE's manufacture and distribution;

j.     failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE;

k.     failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

l.     failing to warn and instruct Downstream Handlers and the general public about the risks to groundwater posed by gasoline containing MTBE, about the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and use, and to about how remediate such spills and leaks promptly; and

m.     failing to use safer available oxygenates other than MTBE.

194.    As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.     posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.     required and/or will require additional testing and monitoring of groundwater and Plaintiff's production wells for MTBE contamination;

c.     contaminated the groundwater system and zone of influence of the area that supplies Plaintiff's production wells;

d.     contaminated, continues to contaminate, and/or will contaminate groundwater and Plaintiff's production wells;

e.     required and/or will require installation of a system to filter out MTBE;

f.     diminished and will continue to diminish consumer confidence in Plaintiff's water.

## FIFTH CAUSE OF ACTION

### Private Nuisance

195.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

196.   The groundwater system, including the zone of influence in the groundwater that supplies

Plaintiff's production wells, has been contaminated by MTBE, and continues to be

contaminated by migration of MTBE, as a direct and proximate result of the intentional,

unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

197.   Gasoline and MTBE contamination caused by Defendants' conduct has damaged and

continues to damage Plaintiff's property and business and unreasonably interfered with

the use, benefit and enjoyment of Plaintiff's property.

198.   As a direct and proximate result of Defendants' acts and omissions creating the above-

described nuisance, Plaintiff has suffered injuries from contamination of their aquifers

and the groundwater supplying Plaintiff's production wells, and continue to suffer

injuries from ongoing migration of MTBE into the groundwater and Plaintiff's water

system.

## SIXTH CAUSE OF ACTION

### Trespass

199.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

200.   Plaintiff is the owner and/or actual possessor of property, easements, wells, the right to

appropriate and use groundwater, and water rights. Defendants, their agents and

employees, knew, or in the exercise of reasonable care should have known, that MTBE is

extremely hazardous to groundwater and public water systems, including the property and

other rights of Plaintiff.

201.   Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed

to properly control, handle, store, contain, and use gasoline containing MTBE, and/or

clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate Plaintiff's water system and the groundwater system and zone of influence of the area that supplies Plaintiff's production wells.

202.  As a direct and proximate result of the trespass, Plaintiff has been damaged and is entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to such other appropriate relief Plaintiff may elect at trial.

203.  Defendants willfully and wantonly corrupted and polluted waters taken or held under M.G.L.A. 40 §§ 39A-39E, and injured other property owned, held or used by Plaintiff under the authority and for the purposes of M.G.L.A. 40 §§ 39A-39E. Therefore, Plaintiff requests an award of three times the amount of damages assessed, as provided by M.G.L.A. 40 §39G.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy

204.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

205.  At all times relevant to this lawsuit, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Massachusetts, including Plaintiff's water system.

206.  Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants. Specifically, Defendants formed joint

task-forces and committees and otherwise colluded for the avowed purpose of providing

information about MTBE to the public and to government agencies, but with the true,

unlawful purpose of:

    a.    creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout the Commonwealth of Massachusetts;

    b.    concealing the nature of MTBE and its impact on Plaintiff and the environment;

    3.    maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's water system.

207.    Defendants carried out their conspiracy by one or more of the following overt acts or

omissions:

    a.    intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

    b.    concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

    c.    using their considerable resources to fight underground storage tank legislation; and

    d.    collectively deciding to use MTBE rather than other, safer oxygenates because MTBE was the most profitable oxygenate for Defendants to use.

208.    As a direct and proximate result of Defendants' conspiracy, MTBE at all times relevant to

this litigation has:

    a.    posed and continues to pose a threat to Plaintiff's water system;

    b.    contaminated and/or will contaminate Plaintiff's water system and/or groundwater in the vicinity of Plaintiff's property;

    c.    required and/or will require testing and monitoring of Plaintiff's water system for MTBE contamination;

d.   requires and/or will require a remedial program to assess, evaluate, investigate, monitor, abate, treat, correct, and remove MTBE from Plaintiff's water system;

e.   diminished and will continue to diminish Plaintiff's and consumers' confidence in, and the use and enjoyment of, Plaintiff's water and property;

f.   diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination; and

g.   caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

209.   Defendants knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.

210.   Defendants willfully and wantonly corrupted and polluted waters taken or held under M.G.L.A. 40 §§ 39A-39E, and injured other property owned, held or used by Plaintiff under the authority and for the purposes of M.G.L.A. 40 §§ 39A-39E.  Therefore, Plaintiff requests an award of three times the amount of damages assessed, as provided by M.G.L.A. 40 §39G.

## EIGHTH CAUSE OF ACTION

### Violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act

211.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

212.   By committing the acts alleged in this complaint, each Defendant has acted in the capacity of a person who (a) by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of

hazardous material; (b) directly, or indirectly, transported any hazardous material to

transport, disposal, storage or treatment vessels or sites from or at which there is or has

been a release or threat of release of such material; and/or (c) otherwise caused or is

legally responsible for a release or threat of release of oil or hazardous material from a

vessel or site, as defined by M.G.L.A. 21E § 5(a)(3)-(5).

213.   As a direct and proximate result of Defendants' conduct, Defendants have caused and

continue to cause significant damage to Plaintiff and Plaintiff's property, as alleged

herein.

214.   By committing the acts alleged in this complaint, Defendants are liable, jointly and

severally, and without regard to fault, to Plaintiff for damage to Plaintiff's real and

personal property incurred or suffered as a result of such release or threatened release of

MTBE, pursuant to M.G.L.A.  21E § 5(a).

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants for:

1.   Compensatory damages according to proof including, but not limited to,

     (i)     costs of investigation;

     (ii)    costs of testing and monitoring;

     (iii)   costs of providing water from an alternate source;

     (iv)   costs of installing and maintaining wellhead treatment;

     (v)    costs of installing and maintaining a wellhead protection program;

     (vi)   costs of installing and maintaining an early warning system to detect

             MTBE before it reaches a well;

   (vii) damages to compensate Plaintiff for loss of consumer confidence and resulting business;

   (viii) interest on the damages according to law;

2. Punitive damages;

3. Costs (including reasonable attorney fees and costs of litigation);

4. Prejudgment interest;

5. Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

**DATED:** September ___3___, 2010

Richard M. Sandman
RODMAN, RODMAN & SANDMAN, P.C.
442 Main Street, Suite 300
Malden, MA  02148
Telephone:  800- 649-0932
Fax:  781- 324-6906

*Attorneys for Plaintiff*

**OF COUNSEL:**

Scott Summy, *licenced in Texas and North Carolina*
Carla Burke, *licenced in Texas and New York*
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX   75219-4281
Telephone:  214- 521-3605
Fax:  214- 520-1181

Robert J. Gordon, *licenced in New York and New Jersey*
Robin Greenwald, *licenced in Illinois*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY  10003
Telephone:  212- 558-5500
Fax:  212- 558-5506

*Attorneys for Plaintiff*

≈JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Bridgewater Water Department

**(b)** County of Residence of First Listed Plaintiff   Plymouth County, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Rodman, Rodman & Sandman, P.C.; 442 Main Street, Suite 300;
Malden, MA 02148-5122; 781-322-3720

## DEFENDANTS

Atlantic Richfield Company, et al.

County of Residence of First Listed Defendant   DuPage County, IL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☒ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 465 Other Immigration Actions | | |

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332 (a)

Brief description of cause:
MTBE contamination of drinking water

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 50,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE Shira Scheindlin   DOCKET NUMBER 2003-12399RGS MDL 1358 (SAS)

DATE   09/03/2010

SIGNATURE OF ATTORNEY OF RECORD   Richard Sann

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

* Case Closed over 2 years. Random case Assignment.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Bridgewater Water Dept. v. Atlantic Richfield Company, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121
740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. for patent, trademark or copyright cases

☑ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 462, 463, 465, 480, 490, 510, 530, 610,
620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
2003-12399RGS (consolidated in NY before Judge Shira Scheindlin; MDL 1358 (SAS))

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
YES ☐ NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
YES ☐ NO ☑
If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
YES ☐ NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
YES ☐ NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
YES ☐ NO ☑

A. If yes, in which division do all of the non-governmental parties reside?
Eastern Division ☑ Central Division ☐ Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
Eastern Division ☐ Central Division ☐ Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
YES ☐ NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Richard M. Sandman, Esq.
ADDRESS RODMAN, RODMAN & SANDMAN, P.C.; 442 Main Street, Suite 300; Malden, MA 02148-5122
TELEPHONE NO. 781-322-3720

(CategoryForm-08.wpd -2/8/08)