not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

124. The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had

not been the subject of long term chronic health testing, but claimed that such testing was

unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk

without conducting the research needed to reach such a conclusion.

125. On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese

study... reports that MTBE in the presence of gasoline has excellent biodegradation

characteristics." This misrepresentation concerning the biodegradability of MTBE, which

omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing

from government regulators and the public the actual risk that MTBE poses to

groundwater.

126. On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors,

including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others,

signed a Testing Consent Order with EPA. However, a subsequent notice shows that after

extensive negotiation, the oil industry, including Defendants, convinced EPA that

additional chemical fate testing was not necessary to determine the environmental risk

posed by MTBE.[6]  The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

127.  The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiffs particularly and the America public generally, and clearly intended to (a) continue to use MTBE without regard to its impact on Plaintiffs and the environment, and (b) prevent Plaintiffs from becoming aware of the contamination and/or impact of contamination from MTBE.

128.  Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member

_____

[6] Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 ed. Reg. 62 (1988).

companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiffs. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

B.   **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

129.  Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

130.  During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

131.  As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

132.  In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

---

[7]  Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

133. In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel
Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline
in certain metropolitan areas to reduce carbon monoxide emissions during the fall and
winter months.

134. The Clean Air Act requires the use of some oxygenate, but it does not require that
oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it was
the most inexpensive oxygenate to produce and offered Defendants the highest profit
margin of all the oxygenates available. Defendants could manufacture MTBE from their
already available refinery by-products and were therefore not forced to purchase a different
oxygenate, such as ethanol, from a third-party.

135. Safer, more environmentally sound alternatives were available.

       **C.**   **Defendants misled the Plaintiffs and public, including all downstream
gasoline handlers, about the hazards of gasoline with MTBE.**

136. Defendants misrepresented the properties of MTBE and withheld information even as they
were insisting that no such information existed. Only more recently, through the escalating
contamination of groundwater resources, has the public started to become aware of the
dangers of MTBE.

137. On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral presentation
at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal
from groundwater is consistent with commercial experience. MTBE gasoline spills have
been effectively dealt with." Although the MTBE Committee was represented to have been
formed to address environmental issues and to make available to the general public
information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez
inform the audience that MTBE is different from the other components of gasoline, that it

is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

138. In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxideemissions." The letter unambiguously represented to Plaintiffs that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

139. As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, ad response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

140. In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

141. This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is most often judged to be too costly to clean up.

142. Had Defendants warned the government, users, and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

143. As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, Plaintiffs were deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

VII. **Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.**

144. National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

145. Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to

15% of every gallon of gasoline used in those areas. MTBE comprises a significant amount of gasoline even in areas that do not participate in the RFG Program.

146. Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

147. In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

148. At is peak, most if not all gasoline supplied to the RFG areas was laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

149. In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly, some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with ethanol in our gasoline because it helps clean the air without harming our drinking water.

## VIII.    MTBE's degradation product:  TBA.

150.  TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate.  Therefore, TBA often appears wherever there is MTBE contamination.

151.  TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

152.  To make matters worse, it is even more expensive to clean up than MTBE.  In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

153.  In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes.  There is also some evidence that TBA causes cancer and kidney and thyroid tumors in rats and mice exposed to it.

154.  Defendants failed to warn Plaintiffs, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA.  Further, Defendants failed to warn Plaintiffs of the need to test its water supply for contamination by TBA.

155.  As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

## IX.    MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.

156. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

157. Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

158. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline is used.

159. A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

160. In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the

Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8]  No actual plans or source of funds for such testing exist in any state, including the State of Maryland.

161.. Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

X.   It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.

162.  Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

163.  The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Maryland.

164.  A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners.  Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers.  The gasoline at any particular service station comes from many different refiners.

---

[8] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

165. The East Patchogue, New York case was typical: even though a source of the MTBE plume (an abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

166. Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiffs.

167. Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in Maryland and are therefore jointly responsible for the increased threat to groundwater in Maryland and for causing the injuries complained of in this Complaint. Liability jointly attaches to all Defendants supplying gasoline containing MTBE in Maryland.

168. Defendants in this action are manufacturers that control the market for gasoline containing MTBE in Maryland during the relevant time frame, and one or more of the Defendants is responsible for the harm to Plaintiffs, as alleged in this Complaint. Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Maryland and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

169. Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

170. Defendants are also liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers. Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE. One or more Defendants committed overt acts in furtherance of this conspiracy. Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

171. Defendants are also jointly and severally liable because they conspired and acted in concert to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs' expense, to contaminate groundwater and Plaintiffs' wells, and to avoid liability for such contamination.

## COUNT I

### Strict Liability -- Design Defect and/or Defective Product

172. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

173. Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers, and suppliers of petroleum products, including gasoline containing MTBE.

174. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a

duty to all persons whom Defendants' petroleum products might foreseeably harm, including the Plaintiffs, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

175. When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

    a.    unintended discharges of gasoline are commonplace throughout Maryland;

    b.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.    when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.    very low concentrations of MTBE will ruin the taste and smell of water; and

    f.    MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

176. Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

177. Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as the Plaintiffs, downstream handlers, users, and the general public exercising reasonable care.

178. The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

179. Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

180. The above-described defects exceeded the knowledge of the ordinary person, and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm caused by gasoline with MTBE.

181. Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

182. Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

183. Gasoline containing MTBE failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner.

184. As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

    a.   posed and continues to pose a threat to groundwater and to Plaintiffs' production wells;

    b.   required and/or will require additional testing and monitoring of Plaintiffs' production wells for MTBE contamination;

    c.   contaminated and/or will contaminate Plaintiffs' production wells or groundwater in the vicinity of Plaintiffs' property;

    d.   raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

    e.   will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources; and

    f.   diminished consumer confidence in Plaintiffs' water; and

    g.   caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriate water rights, all to Plaintiffs' damages in an amount within the jurisdiction of this court.

185.  Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

186.  Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT II

### Strict Liability – Failure to Warn

187.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

188.   As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiffs, the public, public officials, downstream handlers, and users of the risk posed by MTBE.

189.   Defendants knew that gasoline mixed with MTBE would be purchased, transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

190.   At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

a.   unintended discharges of gasoline are commonplace;

b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.   when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.   at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

f.   MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

g.   MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    i.   MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    j.   MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

    k.   the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

191. Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiffs, public officials, downstream handlers, users, and/or the general public.

192. Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiffs. Plaintiffs and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

193. As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

    a.   posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

    b.   required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE;

    c.   contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiffs' wells;

d.  raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

e.  required the need for remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f.  diminished consumer confidence in Plaintiffs' water; and

g.  caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

194.  Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

195.  Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT III

### Negligence

196.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

197. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiffs as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

198. Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn public officials, downstream handlers, users, and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

199. Defendants had a duty not to contaminate the environment.

200. At all times relevant to this litigation, Defendants knew or should have known that:

    a.    unintended discharges of gasoline are commonplace;

    b.    MTBE evaporates and returns via rainwater to contaminate drinking water supplies.

    c.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    d.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    e.    when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

    f.    very low concentrations of MTBE can ruin the taste and smell of water;

    g.    MTBE is a known animal carcinogen and a possible human carcinogen;

    h.    MTBE greatly increases the importance of preventing leaks of gasoline;

i.    MTBB increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

j.    MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

k.    MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE; and

l.    the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, downstream handlers, users, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

201.  Defendants have negligently breached their duties of due care to Plaintiffs, downstream handlers, users, and the general public by, among other things:

a.    failing to adequately test, identify and remediate wells that are contaminated with MTBE;

b.    forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

c.    voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

d.    marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environment and potential health hazards posed by MTBE;

e.    failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

f.    failing to curtail or reduce MTBE's distribution;

g.    failing to instruct downstream handlers, users, and the general public about the safe handling and use of gasoline containing MTBE;

h.   failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

i.   negligently releasing MTBE into the environment;

j.   failing to warn and instruct downstream handlers, users, and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and used and to remediate such spills and leaks promptly.

202.   As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.   posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

b.   required and/or will require additional testing and monitoring of groundwater and Plaintiffs' production wells for MTBE contamination;

c.   contaminated the groundwater system and zone of influence of the area that supplies Plaintiffs' production wells;

d.   raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

e.   required and will require remediation of gasoline and MTBE contamination of groundwater or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources; and

f.   diminished consumer confidence in the Plaintiffs' water; and

g.   caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

203.   Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and the fact that MTBE contaminates groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described

above to promote sales of MTBE and gasoline containing MTBE in conscious and/or

reckless disregard of the known risks of injury to health and property. Defendants

committed each of the above described acts and omissions knowingly, willfully, and/or

with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the

health and safety of others, the safety of groundwater and drinking water supplies, and for

the Plaintiffs' water rights.

204. Because Defendants acted with malice in their conscious, willful, and wanton disregard of

the probable dangerous consequences of their conduct and its foreseeable impact upon the

Plaintiffs, Plaintiffs are entitled to punitive damages.

### COUNT IV

#### Public Nuisance

205. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

206. Defendants have manufactured, distributed, marketed and promoted their product in a

manner that created or participated in creating a public nuisance that unreasonably

endangers or injures the property, health, safety and comfort of the general public and

Plaintiffs, causing inconvenience and annoyance.

207. Defendants, by their negligent, reckless and willful acts and omissions set forth above,

have, among other things, knowingly unleashed massive, long-lasting, and still spreading,

contamination of groundwater and drinking water wells, having concealed the threat from

all, thereby causing MTBE contamination of groundwater and contamination and threat of

contamination of Plaintiffs' wells.

208. By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

209. By their conduct, Defendants have unreasonably interfered with the right to uncontaminated groundwater and drinking water, common to the general public.

210. Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to the Plaintiffs in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

211. Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

212. Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

213. Plaintiffs, as owners of water production wells and as a purveyors of drinking water, suffered injuries different in kind from the community at large precisely because it relies

upon production wells for its business.

214. Plaintiffs' special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers have been rendered less certain, safe and reliable relative to other sources of water.

215. Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by the Plaintiffs.

216. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs suffered injuries common to the public at large and additional special injuries from actual and/or threatened contamination of the Plaintiffs' wells and the groundwater supplying Plaintiffs' production wells.

## COUNT V

### Private Nuisance

217. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

218. The groundwater system, including the zone of influence in the groundwater that supplies Plaintiffs' production wells, has been contaminated by MTBE as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

219. This nuisance that Defendants have inflicted upon Plaintiffs is substantial, unreasonable, and intentional or negligent.

220. Gasoline and MTBE contamination caused by Defendants' conduct has damaged the Plaintiffs' property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiffs' property.

221. As a direct and proximate result of Defendants' acts and omissions, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

    b.    contaminated and/or will contaminate Plaintiffs' wells and groundwater in the vicinity of Plaintiffs' property;

    c.    required and/or will require testing and monitoring of the Plaintiffs' wells for MTBE contamination;

    d.    requires or will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.    diminished and will continue to diminish the Plaintiffs' and consumers' confidence in, and the use and enjoyment of, Plaintiffs' water and property;

    f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination; and

    g.    caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

222. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs have suffered injuries from contamination of the groundwater supplying the Plaintiffs' production wells.

223. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

224. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT VI

### Conspiracy Claim Against Defendants

225. Plaintiffs incorporate and repeat herein the allegations contained in paragraphs 1 through 231 and the tortuous acts pled within this complaint.

226. At all relevant times, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Maryland, including wells that Plaintiff owned.

227. Defendants conspired throughout the relevant time period to insure their ability to use MTBE as an oxygenate in gasoline.

228. The Oil Industry in general and these Defendants in particular have exhibited a pattern and practice of failing to warn the public, those that handle gasoline containing MTBE, water

---

providers, federal and state regulators, and federal and state governments about MTBE and its harmful effects on human health and the environment.

229. Indeed, oftentimes the Oil Industry in general and these Defendants in particular, provided blatantly inaccurate and misleading information about MTBE and its characteristics, both when it had a duty to provide honest information, and in response to direct inquiries by the EPA and others for such information.

230. Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants knowingly and intentionally engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants.

231. One or more of the Defendants committed overt acts in furtherance of the conspiracy, and such acts were tortious and unlawful.

232. Beginning in the early 1980s and continuing for many years, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

   a.   creating a market for MTBE despite knowledge of the hazards which MTBE poses to groundwater throughout Maryland;

   b.   concealing the nature of MTBE, and its impact on Plaintiff and the environment; and

   c.   maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's wells.

233. These actions were not just done individually by each Defendant; rather, the Defendants in many instances joined together and made specific agreements to so act.

234. As a direct result of these concerted actions on behalf of the Oil Industry and these Defendants to protect MTBE, MTBE use increased dramatically in the 1990s and as a result, MTBE has decimated the nation's groundwater in general and Plaintiff's water system in particular.

## Ad Hoc MTBE Group

235. One of the earlier examples of a concerted effort to protect MTBE involved the Ad Hoc MTBE Group created in 1979 whose sole purpose was to assess the health effects of MTBE and conduct toxicological testing on MTBE.

236. Members of the Ad Hoc MTBE Group included: Arco, Gulf, Exxon, Phillips, Huels, Texaco, Shell, and BF Goodrich

237. This group supported certain limited studies on MTBE.

238. Even though the Ad Hoc MTBE Group members specifically agreed, however, that they had a duty to make the studies public, they did not immediately publish the studies.

239. They waited an unreasonable and unjustified period of time after completion to publish them.

240. When the Ad Hoc MTBE Group did publish the studies, the abstracts of the studies were misleading and did not accurately describe the results of the studies.

241. The Ad Hoc MTBE Group routinely reported its on-going efforts to the members of the American Petroleum Institute ("API") Toxicology Committee, whose members were aware of the studies and aware that they were not being reported within a reasonable time after completion. Members of the API Toxicology Committee in that general time frame included: Union Oil, Conoco, BP, Marathon, Huels, Diamond Shamrock, Ashland,

Tenneco, Tosco, Texaco, Exxon, Shell, Mobil, Arco, Unocal, Tosco, Sun, Phillips, Standard of Indiana, Gulf, and Chevron.

242. As a direct result of these actions, public health officials did not have the information that was available to the Defendants because it was not in the public domain. Public health officials, accordingly, could not utilize the information when responding to the public's health effects concerns.

243. As a result of the Defendants' collective actions, regulators and the public were kept in the dark regarding MTBE's health effects and the negative publicity which ultimately resulted in MTBE largely being removed from gasoline in the United States, was delayed for a decade or more.

### OFA's MTBE Committee

244. On November 1, 1986, the ITC transmitted its nineteenth report to the EPA, and the report recommended MTBE with an "intent to designate" under §§ 8(a) and 8(d) of the Toxic Substances Control Act ("TSCA").

245. The ITC's presentation indicates that the designation "will allow preliminary review of health and safety data which will be used by the Committee to either designated or not designated MTBE in a subsequent report to the Administrator."

246. The ITC recommended that MTBE be tested for "chemical fate" including "monitoring studies to determine typical concentrations of MTBE at representative sites where MTBE containing gasoline is transferred." In addition, the Test Rules Development Branch requested "more information on the presence and persistence of MTBE in groundwater."

247. In response, the MTBE Committee was formed in January of 1987 under the auspices of the Oxygenated Fuels Association ("OFA"). Members of MTBE Committee included: Texaco, Exxon, Citgo, Diamond Shamrock, Phillips, Amoco, Conoco, Valero, Snamprogetti and Sun.

248. One of the MTBE Committee's stated purposes, as reflected in the proposal for its formation was to "handle the development of communication between companies and the EPA."

249. The "rationale behind the establishment of an MTBE group" was "not only because of the EPA action which might necessitate toxicological and environmental effects of MTBE," but "in order to provide an organization that would be responsive to the overall needs of the development of MTBE itself."

250. On February 27, 1987 a Statement on behalf of the MTBE Committee was presented to the EPA relative to the Federal Register announcement of the ITC's intention to designate MTBE for priority testing. In the MTBE Statement, its members represented to the EPA that:

> There is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacturer, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

251. Despite the representation that they would collect and provide data from member companies to the EPA and the general public, the members of the MTBE Committee

provided a statement that they knew, from their own experiences with MTBE contamination, was patently false.

252. The Defendants were largely successful in their purpose of reducing testing and protecting MTBE. Although the EPA initially expressed interest in requiring testing with respect to the environmental aspects of MTBE, the Oil Industry ultimately signed a Consent Agreement with the EPA that did not require such testing.

### Coordinated Response to Early Contamination Report

253. The petroleum industry's response to an article drafted in 1986 entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" ("the Maine Paper") provides another example of the defendants' coordinated effort to protect MTBE and its use as an oxygenate.

254. In the Maine Paper, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection described some 30 Maine sites contaminated with MTBE. As a result of their experiences with MTBE, the authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities.

255. The paper was to be presented at and later published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

256. OFA formed the MTBE Committee, in part, as a response to the Maine Paper so that it could represent the petroleum industry in Maine, including "possible representation with the state of Maine regarding contention that MTBE is a groundwater contaminant."

257. On December 23, 1986 the Maine Paper was disseminated to the Ground Water Technical Task Force of the API ("GWTTF"), including specifically representatives of Amoco, Shell,

Arco, Penzoil and Exxon, who were asked to review the Maine Paper and provide comments/critiques.

258. GWTTF became involved due to API's "grave concern" about the paper's conclusion that MTBE be banned from gasoline stored underground or that gasoline containing MTBE be stored in double contained facilities.

259. The MTBE Committee subsequently discussed the Maine Paper at a meeting, where it was reported that the authors had been approached, that the paper was dropped from the agenda, and that API was going to try to prevent publication at a November 1986 meeting.

260. As planned, comments were provided to the authors specifically on behalf of the GWTTF which stated that their recommended policies were "reactionary, unwarranted and counterproductive."

261. Internally, of course, the Oil Industry admitted they did not have any data to refute the authors' statements in the paper that MTBE may spread further in a plume or may be more difficult to remove or clean up than other gasoline constituents.

262. After Garrett and Moreau publicly presented the Maine Paper, API and the MTBE Committee continued to "assess the potential impact of this paper on state policy makers, to contain the potential 'damage' from the paper, and to develop short term and long term responses to the issues raised in the paper."

263. The MTBE Committee advised members that "[w]e consider this a short term effort at damage control that should mitigate most if the issue[s] raised in the DEP paper" and "[t]he presentation by the MTBE Committee will put additional pressure on the author to back up his comments with technical data. While we don't expect the issue to go away, we think

we have sufficient technical data to minimize the potential for any adverse governmental

regulation."

### General Conspiracy Considerations

264. The defendants' involvements in these committees and others reflect their general

participation in this conspiracy.

265. Such activities were not limited to industry-wide organization committees.

266. Amoco coordinated the formation of the "Consumers for Fuel Quality" lobbying

association to oppose alcohol fuel blend mandates and companies involved with this group

included Exxon, Marathon, Phillips, Unocal, Mobil and others.

267. Defendants carried out their conspiracy by one or more of the following overt acts or

omissions:

    a.   Intentionally representing to the EPA and the public that MTBE was safe and
        did not pose a risk to groundwater;

    b.   Concealing the dangers of MTBE (including MTBE's adverse fate and transport
        characteristics and the propensity of MTBE to contaminate groundwater) from
        the government and the public by, among other means, repeatedly requesting
        that information about the dangers and health effects of MTBE be suppressed
        and not otherwise published by third parties and by downplaying any adverse
        findings related to MTBE;

    c.   Concealing the dangers of MTBE from Downstream Handlers and consumers;

    d.   Using their considerable resources to fight UST legislation; and

    e.   Collectively deciding to use MTBE rather than other, safer oxygenates to
        satisfy the requirements of the RFG program because MTBE was the most
        profitable oxygenate for Defendants to use.

268. As a result of this continued and ongoing pattern and practice of failing to warn, failing to

provide information, and being dishonest when asked, information about MTBE's risk to

human health and the environment that was within the possession of the Defendants was unavailable to the public and governmental regulators.

269. Had Defendants been open and honest with respect to MTBE instead of doing their best to protect it, the publicity and interest in MTBE that began to develop a decade later would have occurred in the 1980s, not the 1990s and 2000s.

270. As a clear example, all of the concerns expressed by the EPA in its March 2000 Advance Notice of Intent to Initiate Rulemaking, were known by the Defendants back in the early to mid 1980s and were things they discussed internally and within industry meetings. Had all of these concerns been brought to light and given credence back in the 1980s, MTBE would likely not have been used as the Oil Industry's oxygenate of choice.

271. The Defendants possessed information concerning the fate and transport of MTBE, its low rate of biodegradation and its taste and odor thresholds at the time of the passage of the Clean Air Act Amendments and the subsequent regulatory negotiations with the EPA.

272. As with the instances above, the defendants acted with a common design to withhold information from the federal government.

273. Defendants' representatives formed part of the group involved in assisting the federal government in drafting regulations for the enforcement and requirements under the Clean Air Act Amendments of 1990.

274. In order to insure only specific information, strongly weighted in favor of MTBE was presented to the EPA from the petroleum industry, defendants' representatives frequently met to determine what information the defendants would and would not disclose to the federal government.

275. Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's negligible rate of biodegradation and its probable long-term presence in groundwater.

276. Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's low taste and odor detect threshold and, accordingly, the adverse impact that a very small release of MTBE into an aquifer could have on a potable water supply.

277. Defendants withheld information within their possession and failed to disclose to the EPA information concerning the known releases of MTBE into the environment, the characteristics of such releases, the number of these releases with the limited use of MTBE prior to 1990 and any projections of potential contamination of public water supplies from a widespread use of MTBE in gasoline.

278. Defendants withheld information within their possession and failed to disclose to the EPA information concerning the significant environmental risk that MTBE presented to aquifers and municipal water supplies.

279. Defendants also failed to disclose to the EPA information concerning the extent of their near total commitment to use of MTBE as their oxygenate of choice in order to comply with the CWAA and the hundreds of millions of dollars that defendants had already committed to the production or purchase of MTBE before the regulatory process was even completed.

280. Defendants also worked in concert against other retail providers of gasoline and other companies to limit or block the use of ethanol as an alternative to MTBE as a permitted oxygenate.

281. As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation has:

    a.    Posed and continues to pose a threat to Plaintiff's water and wells;

    b.    Required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

    c.    Contaminated Plaintiff's water and wells;

    d.    Required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.    Diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiff's water and property because the water and well water are now less safe than water from other sources; and

    f.    Diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination, which is an injury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, MAYOR AND COUNCIL OF BERLIN, CITY OF ABERDEEN, THE TOWN OF CHESTERTOWN, CITY OF SALISBURY, COMMISSIONERS OF SHARPTOWN, THE CITY OF TANEYTOWN and COUNTY COMMISSIONERS OF WORCESTER COUNTY, ask judgment against the Defendants, in a sum in excess of twenty million dollars ($20,000,000).  Specifically, Plaintiffs seek judgment against these Defendants for:

    1.    Compensatory damages according to proof including, but not limited to,

(i)     costs of investigation;

(ii)    costs of testing and monitoring;

(iii)   costs of providing water from an alternate source;

(iv)    costs of installing and maintaining wellhead treatment;

(v)     costs of installing and maintaining a wellhead protection program;

(vi)    costs of installing and maintaining an early warning system to detect MTBE before it reaches a well;p

(vii)   damages to compensate Plaintiffs for loss of consumer confidence and resulting business;

(viii)  interest on the damages according to law;

2.     Punitive damages;

3.     Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4.     Prejudgment interest;

5.     Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:   January   17 , 2011

John M. Broaddus
WEITZ & LUXENBERG, P.C.
200 Lake Drive East, Suite 205
Cherry Hill, New Jersey   08002
Telephone:  (856) 755-1115
Fax:  (856) 755-1995

OF COUNSEL:

P. Scott Summy, *licensed in Texas and North Carolina*
Carla M. Burke, *licensed in Texas and New York*
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas  75219-4281
Telephone:  (214) 521-3605
Fax:  (214) 520-1181

Robert J. Gordon, *licensed in Pennsylvania, New Jersey and New York*
Robin Greenwald, *licensed in Illinois*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York   10003
Telephone:  (212) 558-5500
Fax:  (212) 558-5506

Charles D. MacLeod
Jefferson L. Blomquist
FUNK & BOLTON, P.A.
315 High Street, Suite 202
Chestertown, Maryland   21620
Telephone:  (410) 810-1381
Fax:  (410) 810-1383

*Attorneys for Plaintiffs*