# EXHIBIT A

MAYOR AND COUNCIL OF BERLIN
Mayor and Council of Berlin
10 William Street
Berlin, Maryland  21811

CITY OF ABERDEEN
60 N. Parke Street
Aberdeen, Maryland  21001

THE TOWN OF CHESTERTOWN
118 N. Cross Street
Chestertown, Maryland  21620

CITY OF SALISBURY
125 N. Division Street
Salisbury, Maryland  21801

COMMISSIONERS OF SHARPTOWN
401 Main Street
Sharptown, Maryland  21861

THE CITY OF TANEYTOWN
17 E. Baltimore Street
Taneytown, Maryland  21787

COUNTY COMMISSIONERS OF
WORCESTER COUNTY
1 West Market Street
Snow Hill, Maryland  21863

     Plaintiffs,

v.

7-ELEVEN, INC.
2711  N. Haskell Avenue
Dallas, TX 75204

ASHLAND, INC.,
50 E. Rivercenter Boulevard
Covington, Kentucky  41012

ATLANTIC RICHFIELD COMPANY
28100 Torch Parkway
Warrenville, IL 60555

*

*

*   IN THE

*   CIRCUIT COURT

*   FOR

*   BALTIMORE CITY

*   24C 11- 001207

*   Case No.: _____

*

*

*

*

*

*

*

*

*

*

*

*

*

*

*



BP AMOCO CHEMICAL COMPANY
4101 Winfield Road
Warrenville, Illinois  60555

BP PRODUCTS NORTH AMERICA, INC.
4101 Winfield Road
Warrenville, Illinois  60555

CHEVRON CORPORATION
6001 Bollinger Canyon Road
San Ramon, California  94583

CHEVRON U.S.A., INC.
6001 Bollinger Canyon Road
San Ramon, California  94583

CITGO PETROLEUM CORPORATION
1293 Eldridge Parkway
Attn: Tax Department
Houston, TX 77077

CITGO REFINING AND CHEMICALS COMPANY, LP
6100 S. Yale Avenue
Tulsa, Oklahoma  74136

COASTAL EAGLE POINT OIL COMPANY
1001 Louisiana Street
Houston, Texas  77002

COASTAL OIL NEW ENGLAND
1001 Louisiana Street
Houston, Texas 77002

CONOCOPHILLIPS COMPANY
600 N. Dairy Ashford Road
Houston, Texas  77070

CROWN CENTRAL, LLC
1 North Charles Street
Baltimore, Maryland  21201

EL PASO MERCHANT ENERGY-PETROLEUM
COMPANY
1001 Louisiana Street
Houston, Texas  77002

EQUILON ENTERPRISES, LLC
1100 Louisiana Street, Suite 2200
Houston, Texas 77002

EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039

EXXONMOBIL OIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039

FLINT HILLS RESOURCES, LP
4111 E. 37th Street N.
Wichita, Kansas 67220

GETTY PETROLEUM MARKETING, INC.
1500 Hempstead Turnpike
East Meadow, New York 11554

GULF OIL LIMITED PARTNERSHIP
100 Crossing Boulevard E.
Framingham, Massachusetts 01702

HESS CORPORATION
1185 Avenue of the Americas
New York, New York 10036

MARATHON PETROLEUM COMPANY, LLC
539 S. Main Street
Findlay, Ohio 45840

MARATHON OIL COMPANY
5555 San Felipe Road
Houston, Texas 77056

MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, Texas 75039

MOTIVA ENTERPRISES, LLC
910 Louisiana Street, 25th Floor
Houston, Texas 77002

PDV MIDWEST REFINING, LLC
1293 Eldridge Parkway
Houston, TX 77077

PLACID REFINING COMPANY, LLC          *
1601 Elm Street, Suite 3400
Dallas, TX 75201                      *

THE PREMCOR REFINING GROUP INC.       *
8182 Maryland Avenue
St. Louis, Missouri  63105            *

SHELL OIL COMPANY                     *
910 Louisiana Avenue
Houston, Texas  77002                 *

SHELL OIL PRODUCTS COMPANY, LLC       *
910 Louisiana Avenue
Houston, Texas  77002                 *

SHELL PETROLEUM, INC.                 *
910 Louisiana Avenue
Houston, Texas  77002                 *

SHELL TRADING (US) COMPANY            *
910 Louisiana Avenue
Houston, Texas  77002                 *

SUNOCO, INC.                          *
1735 Market Street
Philadelphia, Pennsylvania  19103     *

SUNOCO, INC. (R&M)                    *
1818 Market Street
Philadelphia, Pennsylvania  19103     *

TEXACO, INC.                          *
6001 Bollinger Canyon Road
San Ramon, California  94583          *

TMR COMPANY                           *
910 Louisiana Avenue
Houston, TX  77002                    *

TOTAL PETROCHEMICALS USA, INC.        *
1201 Louisiana Avenue, Suite 1800
Houston, Texas  77002                 *

VALERO ENERGY CORPORATION             *
One Valero Way
San Antonio, Texas  78249             *

VALERO MARKETING AND SUPPLY COMPANY     *
One Valero Way
San Antonio, Texas 78249                *

VALERO REFINING AND MARKETING COMPANY   *
One Valero Way
San Antonio, Texas 78249                *

VALERO REFINING COMPANY - NEW JERSEY    *
800 Billingsport Road
Paulsboro, New Jersey 08066             *

VALERO REFINING COMPANY - DELAWARE, LLC *
One Valero Way
San Antonio, Texas 78249                *

                    Defendants.         *

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs MAYOR AND COUNCIL OF BERLIN, CITY OF ABERDEEN, THE
TOWN OF CHESTERTOWN, CITY OF SALISBURY, COMMISSIONERS OF
SHARPTOWN, THE CITY OF TANEYTOWN and COUNTY COMMISSIONERS OF
WORCESTER COUNTY, ("Plaintiffs") make the following allegations against the Defendants
listed above:

### NATURE OF THE CASE

1.  This case involves Maryland's most precious natural resource – water.  Throughout this
    great state, public water wells are contaminated by methyl tertiary butyl ether ("MTBE").
    As used in this Complaint, the term "MTBE" includes all its degradation products, such as
    tert-butyl alcohol ("TBA").  MTBE is a gasoline additive needlessly and recklessly added
    to gasoline in Maryland. MTBE is highly soluble in water and does not readily biodegrade.
    MTBE is a possible human carcinogen, a known animal carcinogen, and even very small

amounts impart a foul taste and odor to water. Despite knowing that MTBE has unique characteristics in water which allows it to contaminate water sources never seen before its addition to gasoline, these Defendants chose to make it the second largest chemical manufactured in the United States. In doing so, these Defendants have unleashed an unprecedented assault on the water supplied to the citizens of Maryland.

## PARTIES

### Plaintiffs

2.    Plaintiff, Mayor and Council of Berlin, is a body corporate and politic of the State of Maryland (*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland Constitution and the laws of the State) that is authorized to sue under its municipal charter. Plaintiff operates a public water system that supplies drinking water to the residents of the Town.

3.    Plaintiff City of Aberdeen is a body corporate and politic of the State of Maryland (*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland Constitution and the laws of the State) that is authorized to sue under its municipal charter. Plaintiff operates a public water system that supplies drinking water to the residents of the City.

4.    Plaintiff The Town of Chestertown is a body corporate and politic of the State of Maryland (*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland Constitution and the laws of the State) that is authorized to sue under its municipal charter. Plaintiff operates a public water system that supplies drinking water to the residents of the Town.

5.    Plaintiff City of Salisbury is a body corporate and politic of the State of Maryland (*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland Constitution and

the laws of the State) that is authorized to sue under its municipal charter.  Plaintiff

operates a public water systems that supplies drinking water to the residents of the City.

6.   Plaintiff Commissioners of Sharptown is a body corporate and politic of the State of

Maryland (*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland

Constitution and the laws of the State) that is authorized to sue under its municipal charter.

Plaintiff operates a public water system that supplies drinking water to the residents of the

Town.

7.   Plaintiff The City of Taneytown is a body corporate and politic of the State of Maryland

(*i.e.*, a municipal corporation organized pursuant to Article XI-E of the Maryland

Constitution and the laws of the State) that is authorized to sue under its municipal charter.

Plaintiff operates a public water system that supplies drinking water to the residents of the

City.

8.   Plaintiff County Commissioners of Worcester County ("Worcester County") is a Code

Home Rule County (organized pursuant to Article XI-F of the Maryland Constitution and

the laws of the State).  Plaintiff Worcester County is a body corporate and politic of the

State of Maryland that is authorized to sue.  Plaintiff Worcester County owns and operates

the wells that serve the unincorporated community of Ocean Pines, Maryland.

9.   At least one of each Plaintiffs' wells have been contaminated with MTBE and/or TBA.

**Defendants**

10.   Defendants do business in Maryland as manufacturers, designers, refiners, formulators,

distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing

MTBE.

11.   At all times relevant to this litigation, Defendants engaged in one or more phases of the

petroleum business, from manufacturing MTBE and adding it to gasoline at the refinery,

the distribution of gasoline containing MTBE, including the design and manufacture of gasoline containing MTBE and/or MTBE sold in Maryland, and the marketing and sale of MTBE in Maryland.

12. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

13. When the term "Defendants" is used alone, it refers to all Defendants jointly. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

14. 7-ELEVEN, INC. is a Texas corporation with its principal place of business at: 2711 N. Haskell Avenue, Dallas, TX 75204, doing business in the State of Maryland.

15. ASHLAND,INC. is a Kentucky corporation with its principal place of business at: 50 E. Rivercenter Boulevard, Covington, KY 41012, doing business in the State of Maryland.

16. ATLANTIC RICHFIELD COMPANY, (formerly known as Atlantic Richfield Delaware Corporation), individually, as successor-by-merger to Atlantic Richfield Company (a Pennsylvania corporation), and doing business as ARCO Products Company, is a Delaware corporation with its principal place of business at: 28100 Torch Parkway, Warrenville, IL 60555, doing business in the State of Maryland.

17. BP AMOCO CHEMICAL COMPANY, (formerly known as Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation) is a Delaware

corporation with its principal place of business at: 4101 Winfield Road, Warrenville, IL 60555, doing business in the State of Maryland.

18. BP PRODUCTS NORTH AMERICA, INC., (formerly known as Amoco Oil Company), individually and as successor-by-merger to BP Exploration and Oil Inc., and successor-in-interest to BP North America Inc., is a Maryland corporation with its principal place of business at: 4101 Winfield Road, Warrenville, IL 60555, doing business in the State of Maryland.

19. CHEVRON CORPORATION, (formerly known as ChevronTexaco Corporation) is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Maryland.

20. CHEVRON U.S.A., INC. (formerly known as Gulf Oil Corporation), is a Pennsylvania corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Maryland.

21. CITGO PETROLEUM CORPORATION is a Delaware corporation with its principal place of business at: 1293 Eldridge Parkway, Attn: Tax Department, Houston, TX 77077, doing business in the State of Maryland.

22. CITGO REFINING AND CHEMICALS COMPANY, LP is a Delaware limited partnership with its principal place of business at: 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of Maryland.

23. COASTAL EAGLE POINT OIL COMPANY is Delaware corporation with its principal place of business at: 1001 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

24. COASTAL OIL NEW ENGLAND is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

25. CONOCOPHILLIPS COMPANY (formerly known as Phillips Petroleum Company), individually and as successor-by-merger to Conoco, Inc. and Tosco Corporation, and doing business as Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company, is a Delaware corporation with its principal place of business at: 600 N. Dairy Ashford Road, Houston, TX 77079-1175, doing business in the State of Maryland.

26. CROWN CENTRAL, LLC, (individually, as successor-by-merger to Crown Central Petroleum Corporation, and successor-in-interest to La Gloria Oil & Gas Company), is a Maryland limited liability company with its principal place of business at: 1 N. Charles Street, Baltimore, MD 21203, doing business in the State of Maryland.

27. EL PASO MERCHANT ENERGY-PETROLEUM COMPANY, (formerly known as Coastal Refining and Marketing, Inc., Coastal Derby Refining Company, and Derby Refining Company), is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Houston, TX 77002-5089, doing business in the State of Maryland.

28. EQUILON ENTERPRISES, LLC, individually, as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

29. EXXON MOBIL CORPORATION, (formerly known as Exxon Corporation, and doing business as ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A. and ExxonMobil Chemical Corporation), is a New Jersey corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, TX 75039, doing business in the State of Maryland.

30. EXXONMOBIL OIL CORPORATION , is a New York corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, TX 75039, doing business in the State of Maryland.

31. FLINT HILLS RESOURCES, LP, (formerly known as Koch Petroleum Group, LP and Koch Refining Company, LP and doing business as Koch Refining, L.P.), is a Delaware limited partnership with its principal place of business at: 4111 E. 37th Street North Wichita, KS 67220, doing business in the State of Maryland.

32. GETTY PETROLEUM MARKETING, INC. is a Maryland corporation with its principal place of business at: 1500 Hempstead Turnpike, East Meadow, NY 11753, doing business in the State of Maryland.

33. GULF OIL LIMITED PARTNERSHIP is Delaware limited partnership with its principal place of business at: 1500 Hempstead Turnpike, East Meadow, NY 11753, doing business in the State of Maryland.

34. HESS CORPORATION, (formerly known as Amerada Hess Corporation) is a Delaware corporation with it principal place of business at: 1185 Avenue of the Americas, New York, NY 10063, doing business in the State of Maryland.

35. MARATHON PETROLEUM COMPANY, LLC is a Delaware limited liability company with its principal place of business at: 555 San Felipe, Houston, TX 77056, doing business in the State of Maryland..

36. MARATHON OIL COMPANY is an Ohio corporation with its principal place of business at: 5555 San Felipe, Houston, TX 77056, doing business in the State of Maryland.

37. MOBIL CORPORATION is a Nevada corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, TX 75039, doing business in the State of Maryland.

38. MOTIVA ENTERPRISES LLC is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, 25th Floor, Houston, TX 77002, doing business in the State of Maryland.

39. PDV Midwest Refining, L.L.C. is a Delaware limited liability company with its principal place of business at: 1293 Eldridge Parkway, Houston, TX 77077, doing business in the State of Maryland.

40. PLACID REFINING COMPANY, LLC is a Delaware limited liability company with its principal place of business at: 1601 Elm Street, Suite 3400, Dallas, TX 75201.

41. THE PREMCOR REFINING GROUP, INC. is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, TX 78249, doing business in the State of Maryland.

42. SHELL OIL COMPANY is a Delaware corporation with its principal office address at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

43. SHELL OIL PRODUCTS COMPANY, LLC is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

44. SHELL PETROLEUM, INC. is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

45. SHELL TRADING (US) COMPANY is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Maryland.

46. SUNOCO, INC. is a Pennsylvania corporation with its principal place of business at: 1209 Orange Street, Wilmington, DE 19801, doing business in the State of Maryland.

47. SUNOCO, INC. (R&M), (formerly known as Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation with its principal place of business at: 1735 Market Street, Philadelphia, PA 19103, doing business in the State of Maryland.

48. TEXACO INC, is a Delaware corporation with its principal place of business at:: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Maryland.

49. TMR COMPANY, (formerly known as Texaco Refining and Marketing, Inc.), individually and as successor-by-merger to TRMB Company, (formerly known as Texaco Refining and Marketing (East), Inc.)) is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002, doing business in the State of Maryland.

50. TOTAL PETROCHEMICALS USA, INC., (formerly known as Atofina Petrochemicals, Inc., and Fina Oil and Chemical Company) is a Delaware corporation with its principal place of business at: 1201 Louisiana Street, Suite 1800, Attn: Legal Department, Houston, TX 77002, doing business in the State of Maryland.

51. VALERO ENERGY CORPORATION, is a Delaware corporation with its principal office address at: One Valero Way, San Antonio, TX 78249, doing business in the State of Maryland.

52. VALERO MARKETING AND SUPPLY COMPANY, is a Delaware corporation with its principal office address at: One Valero Way, San Antonio, TX 78249, doing business in the State of Maryland.

53. VALERO REFINING TEXAS, L.P., (individually and as successor-in-interest to Valero Refining Company - Texas and Valero Refining Company) is Texas limited partnership with its principal office address at: One Valero Way, San Antonio, TX 78249, doing business in the State of Maryland.

54. VALERO REFINING AND MARKETING COMPANY is a Delaware corporation with its principal office address at: One Valero Way, San Antonio, TX 78249, doing business in the State of Maryland.

55. VALERO REFINING COMPANY — NEW JERSEY is a Delaware corporation with its principal office address at: 800 Billingsport Road, Paulsboro, NJ 08060, doing business in the State of Maryland.

## JURISDICTION AND VENUE

56. This Court has jurisdiction over Defendants because they are either Maryland corporations authorized to do business in Pennsylvania, are registered with the Maryland Secretary of the State, do sufficient business with sufficient minimum contacts in Maryland, or otherwise intentionally avail themselves of the Maryland market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Maryland to render the exercise of jurisdiction over Defendants by the Maryland courts consistent with traditional notions of fair play and substantial justice.

57. Venue is proper in this Court pursuant to Maryland Code, Courts and Judicial Proceedings, § 6-201, because at least one Defendant maintains its principal offices in Baltimore. Specifically, CROWN CENTRAL, LLC is a Maryland limited liability company with its principal place of business at 1 N. Charles Street, Baltimore, Maryland, 21203.

## MTBE FACTS

58. MTBE is a member of a class of chemical compounds called aliphatic ethers, one of whose properties is that they are "hydrophilic," or water-seeking, i.e., they have enhanced solubility in water and chemical attraction to water molecules.

59. MTBE does not occur naturally.

60.   MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process. MTBE is not found in gasoline unless someone adds it.

61.   Defendants used and continue to use MTBE as a gasoline additive.

### Why Defendants Add MTBE to Gasoline:   Profit

62.   Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

63.   MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants, to make money off gasoline refining waste byproducts.

64.   Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE.  The Clean Air Act of 1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap method to comply.

66.   It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE did little or nothing to reduce such air-polluting car emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the

use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

67. In May 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[2]

68. NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

69. In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

### Gasoline containing MTBE has widely contaminated and continues to pose a threat to groundwater

70. MTBE is more than an order of magnitude more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to other common gasoline components — benzene, toluene, ethylbenzene and xylene (collectively "BTEX compounds").

---

[1] "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).

[2] The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

[3] "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996).

71. Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the MTBE races through underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers.

72. In addition, MTBE resists physical, chemical and microbial degradation. As a result, MTBE is slow to break down after it is released into the environment, particularly in the subsurface of the ground. Plumes of MTBE can persist in underground aquifers for many decades — far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

73. Even in very small quantities, MTBE gives water a foul taste and odor that renders the water unusable and unfit for human consumption. MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

74. Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations in water as low as one part per billion ("ppb") or lower.

75. MTBE is also a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

### The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.

76. Before the introduction by Defendants of MTBE as a gasoline additive, leaking underground storage tanks ("UST") and other gasoline discharges were a known threat to Maryland's groundwater. The introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat to groundwater caused by leaking USTs and other spills. Because of MTBE's unique

properties, the addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline.

77.    Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was and is both inevitable and foreseeable by Defendants.

**Defendants have known all along that adding MTBE to gasoline would result in massive groundwater contamination.**

78.    At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, including USTs. Substantial industry reports, Congressional testimony, and concerns expressed by the EPA show Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.

79.    At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

80.    At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

81.    At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

82.    At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and groundwater through vaporization from

USTs, and that such vaporization and other small releases occur even when a tank is considered to have tested tight.

### Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline blended with MTBE.

I. Defendants' constructive knowledge of MTBE's threat to groundwater.

83. At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use.

84. For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980. The Toxicology Committee included Exxon, Mobil, Shell, ARCO, Tosco and ChevronTexaco, among others.

85. API's Toxicology Committee had a specific program to study MTBE. Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and thus the likelihood of extensive ingestion of MTBE through drinking water.

86. Despite early knowledge and a shared recognition of the need to do long term, low level ingestion studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

87. Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiffs concerning the manufacture,

distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know the threat which MTBE poses to groundwater.

88.  In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

> **II.   Defendants' early knowledge of specific instances of MTBE contamination of groundwater.**

89.  Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

90.  In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

91.  In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by ExxonMobil, created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

92.  Defendants were also aware of two MTBE groundwater contamination events in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

93.  At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE. Although trace levels of BTEX were eventually found in wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

94.  A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing through the Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

95.  In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

III.   Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.

96.   In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[4] The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

97.   As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

98.   As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

---

[4] Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminant," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water — Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

99.  Arco Chemical, which was then a part of ARCO, initially became involved in October of
     1986, prior to the presentation of the first version of the paper.  Arco Chemical provided
     "data that indicated that many of their theories were incorrect" to the authors of the paper in
     an attempt to change their opinions.  However, despite Arco Chemical's efforts, the authors
     concluded that "MTBE presented an environmental hazard different to other gasoline
     components" and went ahead with their presentation of the paper to the National Well
     Water Association in November of 1986.

100. On December 23, 1986, a staff person to the Groundwater Technical Task Force ("GTTF")
     of API forwarded the Garrett Report to members of the GTTF including representatives of
     Shell and Exxon. These individuals were asked to review the Garrett Report and provide
     comments/critiques. The stated reason was that the article was "of possible grave concern
     to the oxygenate producers."

101. The comments from the GTTF members culminated in a letter from API to the National
     Well Water Association, which was to present the paper. The letter states in part:

          The authors' "recommendations" that MTBE. . . be either banned as gasoline
          additives or require double-lined storage is clearly a policy statement and not an
          objective credible scientific conclusion. Further, data presented in this paper as well
          as those generated by ongoing API research indicate that such a policy is reactionary,
          unwarranted and counter-productive.

102. However, the API letter to the National Well Water Association in no way refuted the
     Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste
     threshold, the fact that MTBE could travel faster in groundwater than the other gasoline
     constituents, or the conclusion that MTBE was difficult to remediate. These issues were not
     even addressed.

103. BP (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

　　　IV.　Defendants' internal documents demonstrating their awareness of MTBE Contamination of groundwater.

104. Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct. For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct. Arco Chemical, in communications to others within the oil industry, admitted that they had no data to refute the Garrett Report's conclusions. For example, a letter dated February 4, 1987, states "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

105. On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

106. Communications among officials at ChevronTexaco (Chevron) were similar. A 1987
memo, widely circulated within the company, states:

> Two considerations impact MTBE. One is potential health risk, and the second is
> increased solubility over normally regulated constituents of interest, i.e. benzene,
> toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved
> "halo" from a leak containing MTBE can be expected to extend further and spread
> faster than a gasoline leak that does not include MTBE as one of its constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult to
> remove from groundwater using current technology (air stripping or carbon
> adsorption). Because of its lower volatility, MTBE requires more than double to air
> stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption
> is even worse. MTBE breaks through activated carbon four times faster than BTX.

107. In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a document
entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." The purpose of
the document was to put together what was known about the movement of MTBE in
groundwater and the document was to be circulated internally among the employees of the
various Shell companies.

108. According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than
benzene and therefore, MTBE's plumes are expected to move faster and farther than
benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper
indicates that MTBE does not biodegrade in the subsurface environment. Finally, Shell's
MTBE White Paper indicates that MTBE has a low odor and taste threshold and that "at
many locations odor and taste criteria may determine clean-up levels."

109.  Shell's MTBE White Paper further states:

> MTBE has had an impact on groundwater management at only a few Shell marketing
> terminals and service stations to date. However, as the usage of this oxygenate begins
> to increase, a stringent clean-up criteria for MTBE will become adopted in more
> states, we should anticipate increased concerns over how its release to groundwater is
> managed.

Not surprisingly, this paper was never published outside of Shell.

110.  A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status"

states:

> MTBE is relatively quite soluble in water (compared to other components in
> gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE
> tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a
> very low biodegradation potential, which makes it more difficult to remove from
> ground water than other gasoline components such as BTEX.

> V.  Defendants' knowledge that no adequate toxicity studies had been done
> prior to Defendants' decision to add MTBE to gasoline.

111.  Defendants added MTBE to gasoline even though no long-term cancer studies had been

undertaken. Studies showed MTBE caused cancer in animals.  It is common knowledge

within the scientific community, and Defendants knew, that prior to the introduction of a

widely used chemical like MTBE, toxicological tests must first be performed. However,

Defendants did not perform the standard toxicological procedures to test the effects of

MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to

convince the EPA that health testing of MTBE was not needed. Thus, Defendants exposed

millions of Americans to potential harm without warning of the potential health risks

associated with MTBE.

VI.   Despite knowing that adding MTBE to gasoline inevitably results in
      widespread MTBE groundwater contamination, Defendants conspired to
      mislead the EPA and the public about the hazards of adding MTBE to
      gasoline.

112.  Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants,

      beginning in the early 1980's, formed various formal and informal task-forces and

      committees for the purpose of concealing the actual threat of MTBE, facilitating the

      Defendants' use of MTBE without regard to its impact on Plaintiffs and convincing the

      public and regulators that increasing concentrations of MTBE in gasoline was desirable.

      Defendants formed these joint task-forces and committees under the auspices of trade

      organizations such as the API and the Oxygenated Fuels Association ("OFA"). Defendants,

      as members of these joint task forces and committees, conspired to conceal the risk of

      MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate

      profits above known-but-concealed harm to the environment and Plaintiffs.  Defendants

      manufactured and distributed MTBE with actual knowledge of MTBE's defects and with

      actual knowledge that MTBE would cause harm in groundwater and production wells and

      took affirmative steps to conceal those effects.

      A.   Defendants misled the EPA into not testing MTBE under the Toxic
           Substances Control Act (TSCA) in the late 1980's.

113.  In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the

      Toxic Substances Control Act, recommended testing and review to assess MTBE's health

      and environmental risks.[5] The ITC characterized MTBE as having relatively high water

---

[5] Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of
Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

114. The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

115. On or about December 12, 1986, Atlantic Richfield Company ("ARCO"), speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE. ARCO's comments included a critique of the Dynamac Corporation's information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated the following:

> Characteristics — Moderate water solubility is reported. However, an ARCO Technical Bulletin states that 'MTBE is only slightly soluble in water...'
>
> ***
>
> The CRSC/Dynamac report states that potential environmental exposure is 'high.' This conclusion is not supported by the available information.
>
> ***
>
> Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking

underground storage tanks.... MTBE losses would be extremely small from this source.

\*\*\*

VI.   Environmental Information

As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain . . . . Environmental entry of MTBE from this source would be considerably less than the report indicates.

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading when made, improperly downplaying the risks of MTBE contamination of groundwater and omitting material facts known to Defendants at the time.

116.  On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The Minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The Minutes show that Arco and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

117.  In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants, BP Corporation (Amoco), Arco, ChevronTexaco (Chevron), Citgo, ExxonMobil (Exxon), Shell, and Sunoco, among others.

118. The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE ..., provide technical data to appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule..., [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

119. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter....the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20... The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

120. Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

121. At the same time that Arco Chemical was telling the EPA that MTBE posed no significant

environmental or health problems, Arco Chemical admitted to other Defendants that it "had

no data to refute the claims made in the Garrett Report that MTBE posed a significant

threat of groundwater contamination."

122. On or around February 27, 1987, the MTBE Committee submitted written comments

drafted to convince the EPA not to require additional health and environmental testing of

MTBE. The information provided by Defendants was misleading and false. For example,

the Defendants provided information to the EPA representing that MTBE is only slightly

soluble in water, that potential environmental exposure is not high, and that MTBE has

excellent biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

123. The agenda of the MTBE Committee is reflected in the following excerpt from those

comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do

not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

124.   The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had

not been the subject of long term chronic health testing, but claimed that such testing was

unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are presented
> in the Health Effects Summary of this report. These data suggest that the odor
> detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic
> properties of MTBE are sufficient to protect against human ingestion of toxic
> quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk

without conducting the research needed to reach such a conclusion.

125.   On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese

study... reports that MTBE in the presence of gasoline has excellent biodegradation

characteristics." This misrepresentation concerning the biodegradability of MTBE, which

omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing

from government regulators and the public the actual risk that MTBE poses to

groundwater.

126.   On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors,

including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others,

signed a Testing Consent Order with EPA. However, a subsequent notice shows that after

extensive negotiation, the oil industry, including Defendants, convinced EPA that

additional chemical fate testing was not necessary to determine the environmental risk

posed by MTBE.[6] The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

127. The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiffs particularly and the America public generally, and clearly intended to (a) continue to use MTBE without regard to its impact on Plaintiffs and the environment, and (b) prevent Plaintiffs from becoming aware of the contamination and/or impact of contamination from MTBE.

128. Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member

---

[6] Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 ed. Reg. 62 (1988).

companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiffs. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

  **B.**  **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

129.  Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

130.  During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

131.  As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

132.  In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

---

[7] Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

133. In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

134. The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

135. Safer, more environmentally sound alternatives were available.

   **C.   Defendants misled the Plaintiffs and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.**

136. Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

137. On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it

is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk
of groundwater contamination.

138.   In 1994, in response to an article that raised questions about the environmental and health
benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he
called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the
oxygenates that help make gasoline cleaner burning by reducing carbon
monoxide emissions." The letter unambiguously represented to Plaintiffs that there was "no
basis to question the continued use of MTBE." Given information known to Defendants
and API at the time, this statement misrepresented to the general public the safety of
gasoline with MTBE and concealed known hazards.

139.   As the reality of widespread MTBE groundwater contamination started coming to light,
Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated
Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet
fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has
been discovered in private drinking water wells where the source of MTBE has been
attributed to leaks from nearby underground storage tanks." OFA expressed confidence that
federal regulations and industry practices made such contamination largely a thing of the
past. This kind of misleading communication utterly failed to alert public officials, persons
and entities engaged in the storage, transport, handling, retail sale, use, ad response to spills
of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to
the dangers posed by MTBE and omitted and concealed information required to minimize
such dangers.

140. In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

141. This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is most often judged to be too costly to clean up.

142. Had Defendants warned the government, users, and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

143. As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, Plaintiffs were deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

### VII. Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.

144. National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

145. Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to

15% of every gallon of gasoline used in those areas.  MTBE comprises a significant

amount of gasoline even in areas that do not participate in the RFG Program.

146.  Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan

areas in 1992 as part of the Oxyfuel Program.

147.  In or around January 1995, Defendants started putting gasoline containing higher levels of

MTBE into the stream of commerce when moved by market factors and financial

considerations to do so. Gas stations owners and pump operators, whom Defendants never

warned about the properties of MTBE or gasoline containing MTBE, started selling

Defendants' gasoline with greatly elevated concentrations of MTBE.

148.  At is peak, most if not all gasoline supplied to the RFG areas was laced with high

concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated

concentrations of MTBE was often sold at other locations at the discretion of the oil

industry, including Defendants.

149.  In making MTBE their oxygenate of choice, Defendants decided to forego safer

oxygenates, such as ethanol.  In fact, belatedly, some gasoline sellers have publicly

acknowledged that MTBE is neither environmentally safe nor necessary.  Getty Marketing,

for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in
> environmentally-friendly ways. That's what we're doing at Getty. We have replaced
> MTBE with ethanol in our gasoline because it helps clean the air without harming
> our drinking water.

## VIII.   MTBE's degradation product: TBA.

150. TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate.  Therefore, TBA often appears wherever there is MTBE contamination.

151. TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

152. To make matters worse, it is even more expensive to clean up than MTBE.  In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

153. In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes.  There is also some evidence that TBA causes cancer and kidney and thyroid tumors in rats and mice exposed to it.

154. Defendants failed to warn Plaintiffs, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA.  Further, Defendants failed to warn Plaintiffs of the need to test its water supply for contamination by TBA.

155. As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

### IX.   MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.

156. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

157. Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells have been found from coast-to-coast with serious incidents in states from New Hampshire to California.

158. The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills, and now detects MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline is used.

159. A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

160. In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the

Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[4] No actual plans or source of funds for such testing exist in any state, including the State of Maryland.

161. Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

> X.   It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.

162. Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

163. The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Maryland.

164. A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners. Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers. The gasoline at any particular service station comes from many different refiners.

---

[4] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

165. The East Patchogue, New York case was typical: even though a source of the MTBE plume (an abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

166. Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiffs.

167. Defendants in this action are manufacturers that control a substantial share of the market for gasoline containing MTBE in Maryland and are therefore jointly responsible for the increased threat to groundwater in Maryland and for causing the injuries complained of in this Complaint. Liability jointly attaches to all Defendants supplying gasoline containing MTBE in Maryland.

168. Defendants in this action are manufacturers that control the market for gasoline containing MTBE in Maryland during the relevant time frame, and one or more of the Defendants is responsible for the harm to Plaintiffs, as alleged in this Complaint. Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Maryland and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

169. Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

170. Defendants are also liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers. Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE. One or more Defendants committed overt acts in furtherance of this conspiracy. Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

171. Defendants are also jointly and severally liable because they conspired and acted in concert to conceal the true nature of MTBE, to profit from the use of MTBE at Plaintiffs' expense, to contaminate groundwater and Plaintiffs' wells, and to avoid liability for such contamination.

## COUNT I

### Strict Liability – Design Defect and/or Defective Product

172. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

173. Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers, and suppliers of petroleum products, including gasoline containing MTBE.

174. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a

duty to all persons whom Defendants' petroleum products might foreseeably harm, including the Plaintiffs, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

175. When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

    a.    unintended discharges of gasoline are commonplace throughout Maryland;

    b.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.    when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.    very low concentrations of MTBE will ruin the taste and smell of water; and

    f.    MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

176. Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

177. Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as the Plaintiffs, downstream handlers, users, and the general public exercising reasonable care.

178. The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

179. Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

180. The above-described defects exceeded the knowledge of the ordinary person, and by the exercise of reasonable care Plaintiffs would not be able to avoid the harm caused by gasoline with MTBE.

181. Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

182. Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

183. Gasoline containing MTBE failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner.

184. As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to groundwater and to Plaintiffs' production wells;

    b.    required and/or will require additional testing and monitoring of Plaintiffs' production wells for MTBE contamination;

    c.    contaminated and/or will contaminate Plaintiffs' production wells or groundwater in the vicinity of Plaintiffs' property;

    d.    raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

e.   will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f.   diminished consumer confidence in Plaintiffs' water; and

g.   caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damages in an amount within the jurisdiction of this court.

185.   Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.  Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property.  Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

186.   Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT II

### Strict Liability – Failure to Warn

187.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

188.  As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiffs, the public, public officials, downstream handlers, and users of the risk posed by MTBE.

189.  Defendants knew that gasoline mixed with MTBE would be purchased, transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

190.  At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

    a.   unintended discharges of gasoline are commonplace;

    b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.   when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.   at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

    f.   MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

    g.   MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.      MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.      MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.      the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

191.    Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiffs, public officials, downstream handlers, users, and/or the general public.

192.    Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiffs. Plaintiffs and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

193.    As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

a.      posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

b.      required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE;

c.      contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiffs' wells;

    d.    raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

    e.    required the need for remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

    f.    diminished consumer confidence in Plaintiffs' water; and

    g.    caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

194.  Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willifully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

195.  Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT III

### Negligence

196.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

197. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiffs as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

198. Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn public officials, downstream handlers, users, and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

199. Defendants had a duty not to contaminate the environment.

200. At all times relevant to this litigation, Defendants knew or should have known that:

   a.  unintended discharges of gasoline are commonplace;

   b.  MTBE evaporates and returns via rainwater to contaminate drinking water supplies.

   c.  when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

   d.  MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

   e.  when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

   f.  very low concentrations of MTBE can ruin the taste and smell of water;

   g.  MTBE is a known animal carcinogen and a possible human carcinogen;

   h.  MTBE greatly increases the importance of preventing leaks of gasoline;

    i.      MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    j.      MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    k.     MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE; and

    l.      the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiffs, downstream handlers, users, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

201.  Defendants have negligently breached their duties of due care to Plaintiffs, downstream handlers, users, and the general public by, among other things:

    a.     failing to adequately test, identify and remediate wells that are contaminated with MTBE;

    b.     forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

    c.     voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

    d.     marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environment and potential health hazards posed by MTBE;

    e.     failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

    f.     failing to curtail or reduce MTBE's distribution;

    g.     failing to instruct downstream handlers, users, and the general public about the safe handling and use of gasoline containing MTBE;

h. failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

i. negligently releasing MTBE into the environment;

j. failing to warn and instruct downstream handlers, users, and the general public about the risks to groundwater posed by gasoline containing MTBE and the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and used and to remediate such spills and leaks promptly.

202. As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a. posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

b. required and/or will require additional testing and monitoring of groundwater and Plaintiffs' production wells for MTBE contamination;

c. contaminated the groundwater system and zone of influence of the area that supplies Plaintiffs' production wells;

d. raised the need to develop a comprehensive vulnerability study for Plaintiffs' wellfield;

e. required and will require remediation of gasoline and MTBE contamination of groundwater or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources; and

f. diminished consumer confidence in the Plaintiffs' water; and

g. caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

203. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and the fact that MTBE contaminates groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described

above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

204. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT IV

### Public Nuisance

205. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

206. Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

207. Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting, and still spreading, contamination of groundwater and drinking water wells, having concealed the threat from all, thereby causing MTBE contamination of groundwater and contamination and threat of contamination of Plaintiffs' wells.

208. By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

209. By their conduct, Defendants have unreasonably interfered with the right to uncontaminated groundwater and drinking water, common to the general public.

210. Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to the Plaintiffs in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

211. Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

212. Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

213. Plaintiffs, as owners of water production wells and as a purveyors of drinking water, suffered injuries different in kind from the community at large precisely because it relies

upon production wells for its business.

214. Plaintiffs' special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers have been rendered less certain, safe and reliable relative to other sources of water.

215. Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by the Plaintiffs.

216. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs suffered injuries common to the public at large and additional special injuries from actual and/or threatened contamination of the Plaintiffs' wells and the groundwater supplying Plaintiffs' production wells.

## COUNT V

### Private Nuisance

217. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

218. The groundwater system, including the zone of influence in the groundwater that supplies Plaintiffs' production wells, has been contaminated by MTBE as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

219. This nuisance that Defendants have inflicted upon Plaintiffs is substantial, unreasonable, and intentional or negligent.

220. Gasoline and MTBE contamination caused by Defendants' conduct has damaged the Plaintiffs' property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiffs' property.

221. As a direct and proximate result of Defendants' acts and omissions, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to groundwater and Plaintiffs' production wells;

    b.    contaminated and/or will contaminate Plaintiffs' wells and groundwater in the vicinity of Plaintiffs' property;

    c.    required and/or will require testing and monitoring of the Plaintiffs' wells for MTBE contamination;

    d.    requires or will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.    diminished and will continue to diminish the Plaintiffs' and consumers' confidence in, and the use and enjoyment of, Plaintiffs' water and property;

    f.    diminished and will continue to diminish Plaintiffs' property value due to actual, impending, or threatened contamination; and

    g.    caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' damage in an amount within the jurisdiction of this court.

222. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs have suffered injuries from contamination of the groundwater supplying the Plaintiffs' production wells.

223. Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold. Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' water rights.

224. Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiffs, Plaintiffs are entitled to punitive damages.

## COUNT VI

### Conspiracy Claim Against Defendants

225. Plaintiffs incorporate and repeat herein the allegations contained in paragraphs 1 through 231 and the tortuous acts pled within this complaint.

226. At all relevant times, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Maryland, including wells that Plaintiff owned.

227. Defendants conspired throughout the relevant time period to insure their ability to use MTBE as an oxygenate in gasoline.

228. The Oil Industry in general and these Defendants in particular have exhibited a pattern and practice of failing to warn the public, those that handle gasoline containing MTBE, water

providers, federal and state regulators, and federal and state governments about MTBE and its harmful effects on human health and the environment.

229. Indeed, oftentimes the Oil Industry in general and these Defendants in particular, provided blatantly inaccurate and misleading information about MTBE and its characteristics, both when it had a duty to provide honest information, and in response to direct inquiries by the EPA and others for such information.

230. Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants knowingly and intentionally engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants.

231. One or more of the Defendants committed overt acts in furtherance of the conspiracy, and such acts were tortious and unlawful.

232. Beginning in the early 1980s and continuing for many years, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

    a.    creating a market for MTBE despite knowledge of the hazards which MTBE poses to groundwater throughout Maryland;

    b.    concealing the nature of MTBE, and its impact on Plaintiff and the environment; and

    c.    maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's wells.

233. These actions were not just done individually by each Defendant; rather, the Defendants in many instances joined together and made specific agreements to so act.

234. As a direct result of these concerted actions on behalf of the Oil Industry and these Defendants to protect MTBE, MTBE use increased dramatically in the 1990s and as a result, MTBE has decimated the nation's groundwater in general and Plaintiff's water system in particular.

## Ad Hoc MTBE Group

235. One of the earlier examples of a concerted effort to protect MTBE involved the Ad Hoc MTBE Group created in 1979 whose sole purpose was to assess the health effects of MTBE and conduct toxicological testing on MTBE.

236. Members of the Ad Hoc MTBE Group included: Arco, Gulf, Exxon, Phillips, Huels, Texaco, Shell, and BF Goodrich

237. This group supported certain limited studies on MTBE.

238. Even though the Ad Hoc MTBE Group members specifically agreed, however, that they had a duty to make the studies public, they did not immediately publish the studies.

239. They waited an unreasonable and unjustified period of time after completion to publish them.

240. When the Ad Hoc MTBE Group did publish the studies, the abstracts of the studies were misleading and did not accurately describe the results of the studies.

241. The Ad Hoc MTBE Group routinely reported its on-going efforts to the members of the American Petroleum Institute ("API") Toxicology Committee, whose members were aware of the studies and aware that they were not being reported within a reasonable time after completion. Members of the API Toxicology Committee in that general time frame included: Union Oil, Conoco, BP, Marathon, Huels, Diamond Shamrock, Ashland,

Tenneco, Tosco, Texaco, Exxon, Shell, Mobil, Arco, Unocal, Tosco, Sun, Phillips, Standard of Indiana, Gulf, and Chevron.

242. As a direct result of these actions, public health officials did not have the information that was available to the Defendants because it was not in the public domain. Public health officials, accordingly, could not utilize the information when responding to the public's health effects concerns.

243. As a result of the Defendants' collective actions, regulators and the public were kept in the dark regarding MTBE's health effects and the negative publicity which ultimately resulted in MTBE largely being removed from gasoline in the United States, was delayed for a decade or more.

### OFA's MTBE Committee

244. On November 1, 1986, the ITC transmitted its nineteenth report to the EPA, and the report recommended MTBE with an "intent to designate" under §§ 8(a) and 8(d) of the Toxic Substances Control Act ("TSCA").

245. The ITC's presentation indicates that the designation "will allow preliminary review of health and safety data which will be used by the Committee to either designated or not designated MTBE in a subsequent report to the Administrator."

246. The ITC recommended that MTBE be tested for "chemical fate" including "monitoring studies to determine typical concentrations of MTBE at representative sites where MTBE containing gasoline is transferred." In addition, the Test Rules Development Branch requested "more information on the presence and persistence of MTBE in groundwater."

247. In response, the MTBE Committee was formed in January of 1987 under the auspices of the Oxygenated Fuels Association ("OFA"). Members of MTBE Committee included: Texaco, Exxon, Citgo, Diamond Shamrock, Phillips, Amoco, Conoco, Valero, Snamprogetti and Sun.

248. One of the MTBE Committee's stated purposes, as reflected in the proposal for its formation was to "handle the development of communication between companies and the EPA."

249. The "rationale behind the establishment of an MTBE group" was "not only because of the EPA action which might necessitate toxicological and environmental effects of MTBE," but "in order to provide an organization that would be responsive to the overall needs of the development of MTBE itself."

250. On February 27, 1987 a Statement on behalf of the MTBE Committee was presented to the EPA relative to the Federal Register announcement of the ITC's intention to designate MTBE for priority testing. In the MTBE Statement, its members represented to the EPA that:

> There is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacturer, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

251. Despite the representation that they would collect and provide data from member companies to the EPA and the general public, the members of the MTBE Committee

provided a statement that they knew, from their own experiences with MTBE contamination, was patently false.

252. The Defendants were largely successful in their purpose of reducing testing and protecting MTBE. Although the EPA initially expressed interest in requiring testing with respect to the environmental aspects of MTBE, the Oil Industry ultimately signed a Consent Agreement with the EPA that did not require such testing.

### Coordinated Response to Early Contamination Report

253. The petroleum industry's response to an article drafted in 1986 entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" ("the Maine Paper") provides another example of the defendants' coordinated effort to protect MTBE and its use as an oxygenate.

254. In the Maine Paper, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection described some 30 Maine sites contaminated with MTBE. As a result of their experiences with MTBE, the authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities.

255. The paper was to be presented at and later published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

256. OFA formed the MTBE Committee, in part, as a response to the Maine Paper so that it could represent the petroleum industry in Maine, including "possible representation with the state of Maine regarding contention that MTBE is a groundwater contaminant."

257. On December 23, 1986 the Maine Paper was disseminated to the Ground Water Technical Task Force of the API ("GWTTF"), including specifically representatives of Amoco, Shell,

Arco, Penzoil and Exxon, who were asked to review the Maine Paper and provide comments/critiques.

258. GWTTF became involved due to API's "grave concern" about the paper's conclusion that MTBE be banned from gasoline stored underground or that gasoline containing MTBE be stored in double contained facilities.

259. The MTBE Committee subsequently discussed the Maine Paper at a meeting, where it was reported that the authors had been approached, that the paper was dropped from the agenda, and that API was going to try to prevent publication at a November 1986 meeting.

260. As planned, comments were provided to the authors specifically on behalf of the GWTTF which stated that their recommended policies were "reactionary, unwarranted and counterproductive."

261. Internally, of course, the Oil Industry admitted they did not have any data to refute the authors' statements in the paper that MTBE may spread further in a plume or may be more difficult to remove or clean up than other gasoline constituents.

262. After Garrett and Moreau publicly presented the Maine Paper, API and the MTBE Committee continued to "assess the potential impact of this paper on state policy makers, to contain the potential 'damage' from the paper, and to develop short term and long term responses to the issues raised in the paper."

263. The MTBE Committee advised members that "[w]e consider this a short term effort at damage control that should mitigate most if the issue[s] raised in the DEP paper" and "[t]he presentation by the MTBE Committee will put additional pressure on the author to back up his comments with technical data. While we don't expect the issue to go away, we think

we have sufficient technical data to minimize the potential for any adverse governmental regulation."

### General Conspiracy Considerations

264. The defendants' involvements in these committees and others reflect their general participation in this conspiracy.

265. Such activities were not limited to industry-wide organization committees.

266. Amoco coordinated the formation of the "Consumers for Fuel Quality" lobbying association to oppose alcohol fuel blend mandates and companies involved with this group included Exxon, Marathon, Phillips, Unocal, Mobil and others.

267. Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

   a.   Intentionally representing to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

   b.   Concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

   c.   Concealing the dangers of MTBE from Downstream Handlers and consumers;

   d.   Using their considerable resources to fight UST legislation; and

   e.   Collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program because MTBE was the most profitable oxygenate for Defendants to use.

268. As a result of this continued and ongoing pattern and practice of failing to warn, failing to provide information, and being dishonest when asked, information about MTBE's risk to

human health and the environment that was within the possession of the Defendants was unavailable to the public and governmental regulators.

269. Had Defendants been open and honest with respect to MTBE instead of doing their best to protect it, the publicity and interest in MTBE that began to develop a decade later would have occurred in the 1980s, not the 1990s and 2000s.

270. As a clear example, all of the concerns expressed by the EPA in its March 2000 Advance Notice of Intent to Initiate Rulemaking, were known by the Defendants back in the early to mid 1980s and were things they discussed internally and within industry meetings. Had all of these concerns been brought to light and given credence back in the 1980s, MTBE would likely not have been used as the Oil Industry's oxygenate of choice.

271. The Defendants possessed information concerning the fate and transport of MTBE, its low rate of biodegradation and its taste and odor thresholds at the time of the passage of the Clean Air Act Amendments and the subsequent regulatory negotiations with the EPA.

272. As with the instances above, the defendants acted with a common design to withhold information from the federal government.

273. Defendants' representatives formed part of the group involved in assisting the federal government in drafting regulations for the enforcement and requirements under the Clean Air Act Amendments of 1990.

274. In order to insure only specific information, strongly weighted in favor of MTBE was presented to the EPA from the petroleum industry, defendants' representatives frequently met to determine what information the defendants would and would not disclose to the federal government.

275. Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's negligible rate of biodegradation and its probable long-term presence in groundwater.

276. Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's low taste and odor detect threshold and, accordingly, the adverse impact that a very small release of MTBE into an aquifer could have on a potable water supply.

277. Defendants withheld information within their possession and failed to disclose to the EPA information concerning the known releases of MTBE into the environment, the characteristics of such releases, the number of these releases with the limited use of MTBE prior to 1990 and any projections of potential contamination of public water supplies from a widespread use of MTBE in gasoline.

278. Defendants withheld information within their possession and failed to disclose to the EPA information concerning the significant environmental risk that MTBE presented to aquifers and municipal water supplies.

279. Defendants also failed to disclose to the EPA information concerning the extent of their near total commitment to use of MTBE as their oxygenate of choice in order to comply with the CWAA and the hundreds of millions of dollars that defendants had already committed to the production or purchase of MTBE before the regulatory process was even completed.

280. Defendants also worked in concert against other retail providers of gasoline and other companies to limit or block the use of ethanol as an alternative to MTBE as a permitted oxygenate.

281. As a direct and proximate result of Defendants' above-described conspiracy, MTBE at all times relevant to this litigation has:

    a.    Posed and continues to pose a threat to Plaintiff's water and wells;

    b.    Required and/or will require testing and monitoring of Plaintiff's water and wells for MTBE contamination;

    c.    Contaminated Plaintiff's water and wells;

    d.    Required and will require remediation of MTBE groundwater contamination or, where remediation is impracticable for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.    Diminished and will continue to diminish confidence in, and the use and enjoyment of, Plaintiff's water and property because the water and well water are now less safe than water from other sources; and

    f.    Diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination, which is an injury.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, MAYOR AND COUNCIL OF BERLIN, CITY OF ABERDEEN, THE TOWN OF CHESTERTOWN, CITY OF SALISBURY, COMMISSIONERS OF SHARPTOWN, THE CITY OF TANEYTOWN and COUNTY COMMISSIONERS OF WORCESTER COUNTY, ask judgment against the Defendants, in a sum in excess of twenty million dollars ($20,000,000). Specifically, Plaintiffs seek judgment against these Defendants for:

    1.    Compensatory damages according to proof including, but not limited to,

    (i)     costs of investigation;

    (ii)    costs of testing and monitoring;

    (iii)   costs of providing water from an alternate source;

    (iv)   costs of installing and maintaining wellhead treatment;

    (v)    costs of installing and maintaining a wellhead protection program;

    (vi)   costs of installing and maintaining an early warning system to detect MTBE before it reaches a well;p

    (vii)  damages to compensate Plaintiffs for loss of consumer confidence and resulting business;

    (viii)  interest on the damages according to law;

2.    Punitive damages;

3.    Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4.    Prejudgment interest;

5.    Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:   January ___17___, 2011

John M. Broaddus
WEITZ & LUXENBERG, P.C.
200 Lake Drive East, Suite 205
Cherry Hill, New Jersey   08002
Telephone:   (856) 755-1115
Fax:   (856) 755-1995

OF COUNSEL:

P. Scott Summy, *licensed in Texas and North Carolina*
Carla M. Burke, *licensed in Texas and New York*
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas   75219-4281
Telephone:   (214) 521-3605
Fax:   (214) 520-1181

Robert J. Gordon, *licensed in Pennsylvania, New Jersey and New York*
Robin Greenwald, *licensed in Illinois*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York   10003
Telephone:   (212) 558-5500
Fax:   (212) 558-5506

Charles D. MacLeod
Jefferson L. Blomquist
FUNK & BOLTON, P.A.
315 High Street, Suite 202
Chestertown, Maryland   21620
Telephone:   (410) 810-1381
Fax:   (410) 810-1383

*Attorneys for Plaintiffs*