# EXHIBIT   A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF IOWA, CENTRAL DIVISION

-----------------------------------------------------------------------X

CITY OF MANNING,
*An Iowa Municipality*

           Plaintiff,                    Case No. _____

vs.                                 Division No. _____

Ashland Inc. (formerly known as New EXM Inc.)    JURY TRIAL DEMANDED
Atlantic Richfield Company, (formerly known as
        Atlantic Richfield Delaware Corporation),
        individually, as successor-by-merger to
        Atlantic Richfield Company (a Pennsylvania
        corporation), and doing business as ARCO
        Products Company
BP Amoco Chemical Company, (f/k/a Amoco
        Chemical Company, Amoco Chemicals
        Company and Amoco Chemicals Corporation)
BP-Husky Refining, LLC
BP Products North America Inc., (f/k/a Amoco Oil
        Company and The American Oil Company,
        individually and as successor-by-merger to
        BP Exploration and Oil Inc. and successor-in-
        interest to BP North America, Inc.
Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation and
        d/b/a Chevron Products Company and
        Chevron Chemical Company)
Citgo Petroleum Corporation (f/k/a Cities Service
        RMT Corporation)
Citgo Refining and Chemicals Company, LP,
        individually, and as successor-by-merger to
        Citgo Refining and Chemicals Company
Coastal Eagle Point Oil Company
Coastal Oil New England, Inc. (f/k/a Belcher New
        England, Inc.)
ConocoPhillips Company, (f/k/a Phillips Petroleum
        Company and d/b/a Phillips 66 Company,
        Phillips Chemical Company, and Phillips Oil
        Company), individually, as successor-by-
        merger to Conoco, Inc. and Tosco
        Corporation

- 1 -

Crown Central LLC, individually, as successor-by-
        merger to Crown Central Petroleum
        Corporation, and successor-in-interest to La
        Gloria Oil & Gas Company
El Paso Merchant Energy-Petroleum Company, (f/k/a
        Coastal Refining & Marketing, Inc., Coastal
        Derby Refining Company, Derby Refining
        Company and as Colorado Oil and Gas
        Corporation),
Equilon Enterprises LLC, (d/b/a Shell Oil Products
        US), individually, as successor-by-merger to
        Equiva Services  LLC
Exxon Mobil Corporation, (f/k/a Exxon Corporation
        and d/b/a ExxonMobil Refining and Supply
        Company, Exxon Chemical U.S.A., and
        ExxonMobil Chemical Corporation)
ExxonMobil Oil Corporation, (f/k/a Mobil Oil
        Corporation, Socony Mobil Oil Company,
        Inc., and Socony Vacuum Oil Company,
        Incorporated)
Four Star Oil & Gas Company (f/k/a Getty Oil
        Company)
Hess Corporation (f/k/a Amerada Hess Corporation)
Marathon Oil Company (f/k/a USS Holdings
        Company)
Marathon Petroleum Company LP (f/k/a Marathon
        Petroleum Company LLC, Embro Supply,
        LLC, and Marathon Ashland Petroleum LLC)
Mobil Corporation
Motiva Enterprises LLC, (f/k/a Star Enterprises,
        LLC)
PDV Midwest Refining, LLC
The Premcor Refining Group Inc., (f/k/a Clark
        Refining & Marketing, Inc., Clark Oil &
        Refining Corporation, and AOC Acquisition
        Corporation)
Shell Oil Company
Shell Oil Products Company LLC, (d/b/a Shell Oil
        Products Company)
Shell Petroleum, Inc.
Shell Trading (US) Company, (individually, f/k/a
        Equiva Trading Company and d/b/a Stusco)
Sun Company, Inc., (f/k/a Sunoco, Inc., Sun Oil
        Company (PA) and Sun Oil Company)

Sunoco, Incorporated (R&M), (a/k/a, Sunoco, Inc.
     (R&M), f/k/a Sun Company, Inc. (R&M), Sun
     Refining and Marketing Company, and Sun
     Oil Company of Pennsylvania)
Texaco, Inc. (f/k/a The Texas Corporation)
TMR Company (f/k/a Texaco Refining and
     Marketing, Inc., individually and as
     successor-by-merger to TRME Company
     (f/k/a Texaco Refining and Marketing (East),
     Inc.))
Total Petrochemicals & Refining USA, Inc., (f/k/a
     Atofina Petrochemicals, Inc., Fina Oil and
     Chemical Company, and American Petrofina
     Company of Texas)
TRMI-H LLC (f/k/a TRMI Holdings Inc., Texaco
     Refining and Marketing Inc., Getty Refining
     and Marketing Company, and Getty Oil
     Company (Eastern Operations), Inc.)
Valero Energy Corporation
Valero Marketing and Supply Company
Valero Refining and Marketing Company
Valero Refining Company - Oklahoma
Valero Refining Company Texas, L.P., individually
     and as successor-in-interest to Valero
     Refining Company - Texas and Valero
     Refining Company

          Defendants.
-----------------------------------------------------------------X

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CITY OF MANNING, an Iowa municipality, makes the following allegations against the Defendants listed above.

## NATURE OF THE CASE

1.  This case involves the nation's most precious resource – water.  Throughout this great state, public water wells are contaminated by methyl tertiary butyl ether ("MTBE"), a gasoline additive needlessly and recklessly added to gasoline supplied to many parts of the United States.  Because MTBE is highly soluble in water and does not readily biodegrade, it readily

contaminates sources of drinking water, including those in Iowa.  MTBE is a possible human carcinogen and a known animal carcinogen.  Even a very small amount of MTBE imparts a foul taste and odor to water.  Despite knowing that MTBE has unique characteristics in water which allows it to contaminate water sources in ways not seen before its addition to gasoline, these Defendants chose to make it the second largest chemical manufactured in the United States.  In doing so, these Defendants have unleashed an unprecedented assault on the water supplied to the citizens of Iowa.

**PARTIES**

**Plaintiff**

2.  The Plaintiff, CITY OF MANNING ("City"), a municipality, is a public water provider organized under the laws of the State of Iowa.  Plaintiff operates a public water system that supplies drinking water to the residents of the City.

3.  At least one of Plaintiff's wells has been contaminated with MTBE and/or tertiary butyl alcohol ("TBA"), one of MTBE's degradation byproducts.

**Defendants**

4.  Defendants do business in Iowa as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

5.  At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, including: manufacturing MTBE and adding it to gasoline at the refinery, distributing gasoline containing MTBE, designing and manufacturing gasoline containing MTBE and/or MTBE sold in Iowa, and marketing and selling MTBE in Iowa.

6. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

7. When the term "Defendants" is used alone, it refers to all Defendants jointly. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

8. Ashland Inc. (formerly known as New EXM Inc.) is a Kentucky corporation with its principal place of business at: 50 E River Center Boulevard, Covington, KY 41012, doing business in the State of Iowa.  Ashland Inc. may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

9. Atlantic Richfield Company, (formerly known as Atlantic Richfield Delaware Corporation), individually, as successor-by-merger to Atlantic Richfield Company (a Pennsylvania corporation), and doing business as ARCO Products Company, is a Delaware corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, TX 77079, doing business in the state of Iowa.  Atlantic Richfield Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

10. BP Amoco Chemical Company, (f/k/a Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation), is a Delaware corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, TX 77079, doing business in

- 5 -

the State of Iowa.  BP Amoco Chemical Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

11. BP-Husky Refining, LLC, is a Delaware limited liability company with its principal place of business at: 4001 Cedar Point Road, Oregon, OH 43616-1310, doing business in the State of Iowa.

12. BP Products North America Inc., (f/k/a Amoco Oil Company and The American Oil Company, individually and as successor-by-merger to BP Exploration and Oil, Inc. and as successor-in-interest to BP North America Inc.), is a Maryland corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, TX 77079, doing business in the State of Iowa.  BP Products North America Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, 505 5th Avenue, Suite 729, Des Moines, IA 50309.

13. Chevron U.S.A. Inc., (f/k/a Gulf Oil Corporation, and d/b/a Chevron Products Company and Chevron Chemical Company), is a Pennsylvania corporation with its principal place of business at:  6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Iowa.  Chevron U.S.A. Inc. may be served with process through its registered agent Prentice-Hall Corporation System, 505 5th Avenue, Suite 729, Des Moines, IA 50309.

14. Citgo Petroleum Corporation, (f/k/a Cities Service RMT Corporation), is a Delaware corporation with its principal place of business at:  1293 Eldridge Parkway, Houston, TX 77077, doing business in the State of Iowa.  Citgo Petroleum Corporation may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

15. Citgo Refining and Chemicals Company, L.P., individually, and as successor-by-merger to Citgo Refining and Chemicals Company, Inc., is a Delaware limited partnership with its principal place of business at: 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the State of Iowa.

16. Coastal Eagle Point Oil Company is a Delaware corporation with its principal place of business at: P.O. Box 2511 Houston, TX 77252, doing business in the State of Iowa.

17. Coastal Oil New England, Inc. (f/k/a Belcher New England, Inc.) is a Massachusetts corporation with its principal place of business at: 1001 Louisiana Street, Suite 1000, Houston, TX 77002, doing business in the State of Iowa.

18. ConocoPhillips Company, (f/k/a Phillips Petroleum Company and d/b/a Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company), individually, as successor-by-merger to Conoco, Inc. and Tosco Corporation, is a Delaware corporation with its principal place of business at:  600 North Dairy Ashford Road, Houston, TX 77079, doing business in the State of Iowa.  ConocoPhillips Company may be served with process through its registered agent, United States Corporation Company, 505 5th Avenue, Suite 729, Des Moines, IA 50309.

19. Crown Central LLC, individually, as successor-by-merger to Crown Central Petroleum Corporation, and successor-in-interest to La Gloria Oil & Gas Company, is a Maryland corporation with its principal place of business: c/o CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 1660, Baltimore, MD 21202, doing business in the State of Iowa.

20. El Paso Merchant Energy-Petroleum Company, (f/k/a Coastal Refining & Marketing, Inc., Coastal Derby Refining Company, Derby Refining Company and as Colorado Oil and Gas

Corporation), is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Suite 1000, Houston, TX 77002, doing business in the State of Iowa. El Paso Merchant Energy-Petroleum Company may be served with process through the Iowa Secretary of State, Lucas State Office Building, 321 E. Walnut, Des Moines, IA 50319.

21. Equilon Enterprises LLC, (d/b/a Shell Oil Products US), individually, as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at: 910 Louisiana, Houston, TX 77002, doing business in the State of Iowa. Equilon Enterprises LLC may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

22. Exxon Mobil Corporation, (f/k/a Exxon Corporation and d/b/a ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., and ExxonMobil Chemical Corporation), is a New Jersey corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, TX 75039, doing business in the State of Iowa. Exxon Mobil Corporation may be served with process through its registered agent, Corporation Service Company, 505 5th Avenue, Suite 729, Des Moines, IA 50309.

23. ExxonMobil Oil Corporation, (f/k/a Mobil Oil Corporation, Socony Mobil Oil Company, Inc., and Socony Vacuum Oil Company, Incorporated), is a New York corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, TX 75039, doing business in the State of Iowa. ExxonMobil Oil Corporation may be served with process through its registered agent, Prentice-Hall Corporation System, 505 5th Avenue, Suite 729, Des Moines, IA 50309.

24. Four Star Oil & Gas Company (f/k/a Getty Oil Company) is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Iowa.

25. Hess Corporation (f/k/a Amerada Hess Corporation) is a Delaware corporation with its principal place of business at: 1185 Avenue of the Americas, New York, NY 10036, doing business in the State of Iowa.  Hess Corporation may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

26. Marathon Oil Company, (f/k/a USS Holdings Company), is an Ohio corporation with its principal place of business at: 5555 San Felipe, Houston, TX 77056, doing business in the State of Iowa.  Marathon Oil Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

27. Marathon Petroleum Company LP (f/k/a Marathon Petroleum Company LLC, Embro Supply, LLC, and Marathon Ashland Petroleum LLC), is a Delaware limited partnership with its principal place of business at: 1209 Orange Street, Wilmington, DE 19801, doing business in the State of Iowa.  Marathon Petroleum Company LP may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

28. Mobil Corporation, is a Nevada corporation with its principal place of business at: 800 Bell Street, Suite 1503, Houston, TX 77002, doing business in the State of Iowa.  Mobil Corporation may be served with process through the Iowa Secretary of State, Lucas State Office Building, 321 E. Walnut, Des Moines, IA 50319.

29. Motiva Enterprises LLC, (f/k/a Star Enterprises LLC), is a Delaware limited liability company with its principal place of business at: OSP 25th Floor, 910 Louisiana Street, Houston, TX 77002, doing business in the State of Iowa.

30. PDV Midwest Refining, LLC, is a Delaware limited liability company with its principal place of business at: 1293 Eldridge Parkway, Houston TX 77077, doing business in the State of Iowa.   PDV Midwest Refining, LLC may be served with process through the Iowa Secretary of State, Lucas State Office Building, 321 E. Walnut, Des Moines, IA 50319.

31. The Premcor Refining Group Inc., (f/k/a Clark Refining & Marketing, Inc., Clark Oil & Refining Corporation, and AOC Acquisition Corporation), is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, TX 78249, doing business in the State of Iowa.   The Premcor Refining Group Inc. may be served with process through the Iowa Secretary of State, Lucas State Office Building, 321 E. Walnut, Des Moines, IA 50319.

32. Shell Oil Company is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Iowa.   Shell Oil Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

33. Shell Oil Products Company LLC, (d/b/a Shell Oil Products Company), is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, Houston, TX 77002, doing business in the State of Iowa.

34. Shell Petroleum Inc., is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002, doing business in the State of Iowa.

35. Shell Trading (US) Company, (individually, f/k/a Equiva Trading Company and d/b/a Stusco), is a Delaware corporation with its principal place of business at:  909 Fannin Plaza,

- 10 -

Level 1, Houston, TX 77010, doing business in the State of Iowa.  Shell Trading (US) Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

36. Sun Company, Inc., (f/k/a Sunoco, Inc., Sun Oil Company (PA) and Sun Oil Company), is a Pennsylvania corporation with its principal place of business at: 1209 Orange Street, Wilmington, DE 19801, doing business in the State of Iowa.  Sun Company, Inc. may be served with process at 1209 Orange Street, Wilmington, DE 19801.

37. Sunoco, Incorporated (R&M), (a/k/a, Sunoco, Inc. (R&M), f/k/a Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation with its principal place of business at: 1818 Market Street, Suite, 1500, Philadelphia, PA 19103, doing business in the State of Iowa.  Sunoco, Incorporated (R&M) may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

38. Texaco, Inc., (f/k/a The Texas Corporation), is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Iowa.  Texaco, Inc. may be served with process may be served with process at 6001 Bollinger Canyon Road, San Ramon, CA 94583.

39. TMR Company, (f/k/a Texaco Refining and Marketing, Inc.), individually and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.), is a Delaware corporation with its principal place of business at: 910 Louisiana, Houston, TX 77002, doing business in the State of Iowa.

40. TRMI-H LLC (f/k/a TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.) is a

Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, CA 94583, doing business in the State of Iowa.

41. Total Petrochemicals & Refining USA, Inc., (f/k/a Atofina Petrochemicals, Inc., Fina Oil and Chemical Company, and American Petrofina Company of Texas), is a Delaware corporation with its principal place of business at: 1201 Louisiana Street, Suite 1800, Houston, TX 77002, doing business in the State of Iowa.  Total Petrochemicals & Refining USA, Inc. may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

42. Valero Energy Corporation is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429, doing business in the State of Iowa.

43. Valero Marketing and Supply Company, is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, TX 78429, doing business in the State of Iowa. Valero Marketing and Supply Company may be served with process through its registered agent, C T Corporation System, 500 East Court Avenue, Des Moines, IA 50309.

44. Valero Refining and Marketing Company is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429, doing business in the State of Iowa.

45. Valero Refining Company - Oklahoma is a Michigan corporation with its principal place of business at:  One Valero Way, San Antonio, Texas  78429, doing business in the State of Iowa.

46. Valero Refining Company Texas, L.P., individually and as successor-in-interest to Valero Refining Company - Texas and Valero Refining Company, is a Texas limited partnership

with its principal place of business at: One Valero Way, San Antonio, TX 78429, doing business in the State of Iowa.

## JURISDICTION AND VENUE

47. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties, and the amount in controversy for Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, this Court has jurisdiction over Defendants because they are either authorized to do business in Iowa, are registered with the Iowa Secretary of State, do sufficient business with sufficient minimum contacts in Iowa, or otherwise intentionally avail themselves of the Iowa market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Iowa to render the exercise of jurisdiction over Defendants by the Iowa courts consistent with traditional notions of fair play and substantial justice.

48. Venue is proper in this Court because Plaintiff is located in and operates its business in Carroll County.

## MTBE FACTS

49. MTBE is a synthetic chemical blended into some gasolines by some refiners at some times since 1979.  As used in this Complaint, "MTBE" refers not only to methyl tertiary butyl ether, but also to the contaminants in and degradation byproducts of MTBE, including TBA.

50. MTBE contaminates the environment primarily through discharges, disposals, deposits, leaks, and spills from gasoline delivery systems. Once released to the environment, MTBE has properties that cause substantial environmental contamination and threaten public health and welfare. In particular, the fate and transport of MTBE in the subsurface is substantially

- 13 -

different than the fate and transport of other gasoline components, including the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

51. Once released into the subsurface, MTBE separates from other gasoline components in the presence of moisture. In contrast to the BTEX compounds, MTBE has a strong affinity for water and does not readily adsorb (i.e. stick) to soil particles. Rather, it moves freely with groundwater at approximately the rate of the water's movement. In addition, MTBE is more persistent than BTEX compounds because it does not readily biodegrade in the subsurface. Thus, in comparison to BTEX components, MTBE is significantly more mobile in the subsurface and migrates from the source area more quickly. MTBE is also more difficult and expensive to remove from water than BTEX components. If MTBE is released into the environment, it has the capacity to migrate through the soil and groundwater, penetrate deep within the aquifer, and cause persistent contamination that can destroy and/or threaten drinking water wells. Plumes of MTBE can persist in underground aquifers for many decades – far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

52. In short, MTBE spreads farther and faster than other components of gasoline, resists biodegradation, is difficult and costly to remove from groundwater, and can continue to migrate long after its initial discharge, contaminating additional drinking water wells as its moves.

53. Along with its other harmful properties, MTBE renders water supplies unusable by changing contaminated water's odor and taste. Specifically, MTBE-contaminated water has a turpentine odor and chemical taste that renders it unfit for use as drinking water. Many

individuals can smell and taste MTBE in water at very low levels - as low as one part per billion ("ppb") or lower.

54. MTBE also presents a significant public health threat because of its potential for causing cancers. MTBE is also a known animal carcinogen that is linked to many potential human health problems. The U.S. Environmental Protection Agency ("EPA") considers MTBE to be a possible human carcinogen.

55. TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often appears wherever there is MTBE contamination.

56. TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant.  And TBA is a public health threat. It is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes.  Some evidence links TBA to cancer and kidney and thyroid tumors in animals.

57. Defendants used MTBE as a gasoline additive.

### I.      Why Defendants Add MTBE to Gasoline:  Profit

58. Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

59. MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants.

60. Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11 to 15%, in all grades of gasoline. Defendants claim that MTBE,

an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' original motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE. The Clean Air Act of 1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap method to comply.

61. It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE did little or nothing to reduce such air-polluting car emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

62. In May 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog?[2]

63. NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

64. In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

---

[1]  "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).
[2] The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).
[3] "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels, "Nat'l Research Council, Nat'l Academy of Sciences (1996).

II.  **The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

65. Before Defendants first used MTBE as a gasoline additive, the industry was well aware that leaking underground storage tanks ("UST") and other gasoline discharges presented a known threat to Iowa's groundwater.  Defendants' introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat that leaking USTs and other spills presented to groundwater.  Because of MTBE's unique properties, Defendants' addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline.

66. Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was inevitable and Defendants either knew of the probable consequence or should have foreseen it.

III.  **Defendants have known all along that adding MTBE to gasoline would result in massive groundwater contamination.**

67. At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, including USTs.  Substantial industry reports, Congressional testimony, and EPA expressed concerns illustrate and detail Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involved leaks and spillages at all links in the gasoline distribution chain.

68. At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline entered the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

- 17 -

69. At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

70. At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reached the soil and groundwater in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

71. At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reached the soil and groundwater through vaporization from USTs, and that such vaporization and other small releases occurred even when a tank is considered to have tested tight.

**IV.    Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline blended with MTBE.**

      **A.    Defendants' constructive knowledge of MTBE's threat to groundwater.**

72. At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable.  MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use guaranteed substantial and repeated releases of MTBE-"enhanced" gasoline into the environment.

73. For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980.   The Toxicology Committee included representatives from Exxon, Mobil, Shell, Atlantic Richfield Company ("ARCO"), Tosco and Chevron Texaco, among others.

- 18 -

74. API's Toxicology Committee had a specific program to study MTBE.  Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and the resulting likelihood of extensive ingestion of MTBE through drinking water.

75. Despite early knowledge and a shared recognition of the need to do long-term, low-level ingestion studies on the effects of MTBE, Defendants postponed for decades and never completed such a study.

76. Defendants possess and have always possessed vastly superior knowledge, resources, experience and other advantages, in comparison to anyone or any agency, concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular.  By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know, identify and confirm the threat which MTBE posed and poses to groundwater.

77. In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

        **B.**    **Defendants' early knowledge of specific instances of MTBE contamination of groundwater.**

78. Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

79. In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well. This evidence of contamination prompted leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

80. In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by (what is now) ExxonMobil, created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

81. Defendants were also aware of two MTBE groundwater contamination events in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

82. At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE. Although trace levels of BTEX were eventually found in neighboring wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

83. A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds

- 20 -

were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing.

84. The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

85. In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

**C.   Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.**

86. In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[4]   The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

87. As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The

---

[4]  Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water - Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

authors planned to present their paper and have it published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

88. As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

89. Arco Chemical, which was then a part of ARCO, aggressively challenged the initial draft of the Garrett Report in advance of its presentation.  Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

90. On December 23, 1986, a staff member to API's Groundwater Technical Task Force ("GWTTF") forwarded the Garrett Report to members of the GWTTF, including representatives of Shell and Exxon.  API asked these individuals to review the Garrett Report and provide comments/critiques.   API asked for responses because the article was "of possible grave concern to the oxygenate producers."

91. The comments from the GWTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter stated in part:

- 22 -

> The authors' "recommendations" that MTBE ... be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counter-productive.

92.  However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate. These issues were not even addressed.

93.  BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

> ### D. Defendants' internal documents demonstrating their awareness of MTBE Contamination of groundwater.

94.  Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct. For instance, while the oil companies, via the GWTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct. Arco Chemical, in communications to others within the oil industry, admitted that they had no data to refute the Garrett Report's conclusions. For example, a letter dated February 4, 1987, stated "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

95.  On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in

- 23 -

water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

96. Communications among officials at Chevron Texaco (Chevron) were similar. A 1987 memo, widely circulated within the company, stated:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double to air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

97. In 1992, Shell employees C. C. Stanley, W.G. Rixey, and C.Y. Chiang created a document entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." They intended to put together within the document what was known about the movement of MTBE in groundwater and then circulate the white paper internally among the employees of the various Shell companies.

- 24 -

98. According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than benzene and, therefore, Stanley, Rixey and Chiang confirmed that MTBE's plumes would move faster and farther than benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper indicated that MTBE would not biodegrade in the subsurface environment.  Finally, Shell's MTBE White Paper confirmed that MTBE has a low odor and taste threshold and, further, that "at many locations odor and taste criteria may determine clean-up levels."

99. Shell's MTBE White Paper further stated:

> MTBE has had an impact on groundwater management at only a few Shell marketing terminals and service stations to date. However, as the usage of this oxygenate begins to increase, a stringent clean-up criteria for MTBE will become adopted in more states, we should anticipate increased concerns over how its release to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

100.    A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status" stated:

> MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

      **E.**    **Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline.**

101.    Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken.  Studies showed MTBE caused cancer in animals. It is common knowledge within the scientific community, as Defendants knew, that prior to the introduction of a widely used chemical like MTBE, toxicological tests must first be performed. However,

Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed. Thus, Defendants exposed millions of Americans to potential harm without warning of the potential health risks associated with MTBE.

### V. Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.

102. Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiff and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations such as the API and the Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiff. Defendants manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in groundwater and production wells and took affirmative steps to conceal those effects.

### A.    Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act in the late 1980's.

103.    In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.[5]   The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

104.    The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

105.    On or about December 12, 1986, ARCO, speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE. ARCO's comments included a critique of the Dynamac Corporation's information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated the following:

> Characteristics - Moderate water solubility is reported.  However, an ARCO Technical Bulletin states that 'MTBE is only slightly soluble in water ...'

---

[5] Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Rep. 220 (1986) (the "1986 Notice").

\*\*\*

The CRSC/Dynamac report states that potential environmental exposure is 'high.' This conclusion is not supported by the available information.

\*\*\*

Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks .... MTBE losses would be extremely small from this source.

\*\*\*

Environmental Information

As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain .... Environmental entity of MTBE from this source would be considerably less than the report indicates.

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading when made.  The comments improperly downplayed the risks of MTBE contamination of groundwater and omitted material facts known to Defendants at the time.

106.   On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The minutes show that ARCO and Exxon made a presentation to support the

- 28 -

industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

107.    In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants, BP Corporation (Amoco), Arco, Chevron Texaco (Chevron), Citgo, ExxonMobil (Exxon), Shell, and Sunoco, among others.

108.    The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE ... , provide technical data to appropriate regulatory agencies and legislative bodies ... , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule ... , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

109.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the SA and SD [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter .... the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20 ... The combined

- 29 -

> response to the EPA will be submitted by February 27, to be followed
> shortly thereafter by a formal visit to EPA. Dominguez will meet with
> EPA and notify them that the MTBE Committee has been formed and
> will be submitting its overview.

110.   Although Defendants were keenly aware that the EPA was interested in obtaining more

information about MTBE in groundwater, Defendants were not forthcoming in their

responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request

for information about "data gaps" concerning MTBE's environmental and health effects in a

letter stating:

> Item D requests more information on the presence and persistence of
> MTBE in groundwater. We are not aware of any incidents where
> MTBE contaminated groundwater at manufacturing facilities. Where
> gasoline containing MTBE is stored at refineries, terminals, or service
> stations, there is little information on MTBE in groundwater. We feel
> there are no unique handling problems when gasoline containing
> MTBE is compared to hydrocarbon-only gasoline.

111.   At the same time that Arco Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, Arco Chemical admitted to other Defendants

that it "had no data to refute the claims made in the Garrett Report that MTBE posed a

significant threat of groundwater contamination."

112.   On or around February 27, 1987, the MTBE Committee submitted written comments

drafted to convince the EPA not to require additional health and environmental testing of

MTBE. The information provided by Defendants was misleading and false. For example, the

Defendants provided information to the EPA representing that MTBE is only slightly soluble

in water, that potential environmental exposure is not high, and that MTBE has excellent

biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm to
> health or the environment, that human exposure to MTBE and release

- 30 -

of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

113.   The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

114.   The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had not been the subject of long term chronic health testing, but claimed that such testing was unnecessary.  Under the heading "MTBE in Groundwater", it stated that:

[t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/1) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

115.   On the issue of the persistence of MTBE, the MTBE Committee publicly stated that "a Japanese study ... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, provides further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

116.   On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others, signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE[6].  The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary.  Defendants knew or should have known at the time that this representation was false and misleading.

117.   The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interests above the health, property and well-being of

---

[6] Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

Plaintiff, particularly, and the America public, generally.  These statements also confirm that Defendants intended to (a) continue to use MTBE without regard to its impact on Plaintiff and the environment, and (b) prevent Plaintiff from becoming aware of the potential for contamination and/or impact of contamination from MTBE.

118.    Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter statement was intended to mislead the government and the public, including Plaintiff. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

> **B.**     **Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline Program adopted in the 1990 amendments to the Clean Air Act.**

119.    Prior to 1990, Congress was preparing to take action to address the Nation's smog problem.

120.    During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

121.    As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

- 33 -

122.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

123.    In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

124.    The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE.  MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and therefore were not forced to purchase a different oxygenate, such as ethanol, from a third-party.

125.    Safer, more environmentally sound alternatives were available.

    **C.    Defendants misled the Plaintiff and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.**

126.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

---

[7] Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

127.    On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

128.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions."  The letter unambiguously represented to Plaintiff that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

129.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the OFA, an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices

- 35 -

made such contamination largely a thing of the past. This kind of minimizing and misleading communication hid from public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public the dangers posed by MTBE and omitted and concealed information required to reduce such dangers.

130.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

131.    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is most often judged to be too costly to clean up.

132.    Had Defendants warned the government, users, and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

133.    As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, Plaintiff was deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

- 36 -

**VI.**   **Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.**

134.   National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

135.   Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprised up to 15% of every gallon of gasoline used in those areas. MTBE comprised a significant amount of gasoline even in areas that do not participate in the RFG Program.

136.   Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

137.   In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

138.   At its peak, most if not all gasoline supplied to the RFG areas was laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

139.   In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly, some gasoline sellers publicly acknowledged

subsequently that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### VII.  MTBE's degradation product:  TBA.

140.    TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often appears wherever there is MTBE contamination.

141.    TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

142.    To make matters worse, it is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

143.    In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. There is also some evidence that TBA causes cancer and kidney and thyroid tumors in rats and mice exposed to it.

144.    Defendants failed to warn Plaintiff, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiff of the need to test its water supply for contamination by TBA.

145.    As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

**VIII.    MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.**

146.    Before the 1980's, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

147.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells were found from coast-to-coast with serious incidents in states from New Hampshire to California.

148.    The USGS. annually tests the groundwater not near any known gasoline leaks or spills, and detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

149.    A September 15, 1999 report by a special EPA Blue Ribbon Panel stated that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

150.    In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the

- 39 -

use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8] No actual plans or source of funds for such testing exist in any state, including the State of Iowa.

151.    Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the Toxic Substances Control Act in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

IX.    **It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.**

152.    Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

153.    The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Iowa.

154.    A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners. Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines

---

[8] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

from refineries to distribution centers. The gasoline at any particular service station comes from many different refiners.

155.   The East Patchogue, New York case was typical: even though a source of the MTBE plume (a subsequently abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

156.   Here, the joint action of Defendants acting together caused Plaintiff's damages.  Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

157.   Defendants in this action are manufacturers that controlled a substantial share of the market for gasoline containing MTBE in Iowa and, therefore, are jointly responsible for the increased threat to groundwater in Iowa and for causing the injuries complained of in this Complaint.  Liability jointly attaches to all Defendants for supplying gasoline containing MTBE in Iowa.

158.   Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Iowa and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

159.   Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

- 41 -

Defendants are also jointly and severally liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers. Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE.  One or more Defendants committed overt acts in furtherance of this conspiracy. Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

## FIRST CAUSE OF ACTION

## <u>Design Defect and/or Defective Product</u>

160.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

161.    Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of petroleum products, including gasoline containing MTBE.

162.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

163.    Defendants represented, asserted, claimed and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing this compound, or otherwise did not require any different or special handling or precautions.

164.    When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

      a.   Unintended discharges of gasoline are commonplace throughout Iowa;

      b.   When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

      c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

      d.   When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

      e.   Very low concentrations of MTBE will ruin the taste and smell of water; and

      f.   MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

165.    Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

166.    Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, downstream handlers and the general public exercising reasonable care.

167.    The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

168.    Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

- 43 -

169.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

170.    Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

171.    Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

172.    Gasoline containing MTBE failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner.

173.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

    a.  posed and continues to pose a threat to groundwater and to Plaintiff's production wells;

    b.  required and/or will require additional testing and monitoring of the aquifers and production wells for MTBE contamination;

    c.  contaminated and/or will contaminate Plaintiff's production wells or groundwater in the vicinity of Plaintiff's wells;

    d.  will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.  diminished consumer confidence in Plaintiff's water; and

    f.  caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

174.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies.  Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

175.    Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions with willful and wanton disregard for the rights, health and safety of others, and for Plaintiff's water rights.  Such willful and wanton malicious conduct was directed specifically at the Plaintiff and at the citizens of Iowa. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and deter Defendants and others from ever committing the same or similar acts.

## SECOND CAUSE OF ACTION

### Failure to Warn

176.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.    As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials and downstream handlers of the risk posed by MTBE.

178.   Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

179.   At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

    a.   Unintended discharges of gasoline are commonplace;

    b.   When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d.   When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e.   At extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

    f.   MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

    g.   MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    i.   MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

    j.   MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

    k.   The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, downstream handlers, and the general

public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

180.    Defendants negligently breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, downstream handlers, and/or the general public.

181.    Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff.  Plaintiff and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up.  Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

182.    As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation has:

      a.  posed and continues to pose a threat to groundwater and Plaintiff's production wells;

      b.  required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE contamination;

      c.  contaminated and/or will contaminate production wells or groundwater in the vicinity of Plaintiff's wells;

      d.  raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfields;

      e.  will require remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources;

      f.  diminished consumer confidence in Plaintiff's water; and

- 47 -

g.  caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

183.   Defendants had actual knowledge of MTBE' s propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

184.   Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiff's water rights.

185.   Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

### THIRD CAUSE OF ACTION

### <u>Negligence</u>

186.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

187.   As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum

- 48 -

products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

188.   Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn public officials, downstream handlers and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

189.   Defendants had a duty not to contaminate the environment.

190.   At all times relevant to this litigation, Defendants knew or should have known that:

a.   Unintended discharges of gasoline are commonplace;

b.   When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.   When gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

e.   Very low concentrations of MTBE can ruin the taste and smell of water;

f.   MTBE is a known animal carcinogen and a possible human carcinogen;

g.   MTBE greatly increases the importance of preventing leaks of gasoline;

h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.   MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.   MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE; and

k.   The foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, downstream handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

- 49 -

191.    Defendants have negligently breached their duties of due care to Plaintiff, downstream

handlers, and the general public by, among other things:

a.  failing to adequately test, identify and remediate wells that are contaminated
with MTBE;

b.  forming joint committees and task-forces to promote and defend MTBE while
concealing the threat which MTBE poses to groundwater;

c.  voluntarily undertaking to conduct and report research related to the
environmental hazards and purported benefits of gasoline containing MTBE
and not conducting and reporting that research in a reasonably truthful manner;

d.  marketing, touting, and otherwise promoting the benefits of gasoline mixed
with MTBE without disclosing the truth about the environmental and potential
health hazards posed by MTBE;

e.  failing to eliminate or minimize the harmful impacts and risks posed by
gasoline containing MTBE;

f.  failing to curtail or reduce MTBE's distribution;

g.  failing to instruct downstream handlers and the general public about the safe
handling and use of gasoline containing MTBE;

h.  failing to inspect, test and take the necessary steps to prevent their gasoline
distribution and storage system from releasing MTBE in the general public's
water or threatening such release;

i.  negligently releasing MTBE into the environment; and

j.  failing to warn and instruct downstream handlers and the general public about
the risks to groundwater posed by gasoline containing MTBE, about the
necessary precautions and steps to prevent or minimize spills and leaks of
gasoline in distribution, storage and use, and to about how remediate such
spills and leaks promptly.

192.    As a direct and proximate result of one or more of the foregoing negligent acts or

omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.  posed and continues to pose a threat to groundwater and Plaintiff's production
wells;

b.  required and/or will require additional testing and monitoring of groundwater and Plaintiff's production wells for MTBE contamination;

c.  contaminated the groundwater system and zone of influence of the area that supplies Plaintiff's production wells;

d.  raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfields;

e.  required and will require remediation of gasoline and MTBE contamination of groundwater or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources;

f.  diminished consumer confidence in Plaintiff's water; and

g.  caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

193.   Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

194.   Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiff's water rights.

195.   Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

- 51 -

## FOURTH CAUSE OF ACTION

### Common-Law and Statutory Public Nuisance

196.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

197.   Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

198.   Defendants, by their intentional, negligent, reckless, ultrahazardous, and anti-social acts and omissions set forth above, have, among other things, unleashed massive, long-lasting, still spreading, and still migrating contamination of groundwater and drinking water wells, while concealing the threat from all, thereby causing MTBE contamination of groundwater and contamination and threat of contamination of Plaintiff's aquifers and wells.

199.   By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater, and interfered with the rights of the community at large.

200.   Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to Plaintiff in the form of testing costs and the present serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

- 52 -

201.   Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct is injurious to health, indecent, and/or unreasonably offensive to the senses, and is an obstruction to the free use of property, so as essentially to unreasonably interfere with the comfortable enjoyment of life or property, and is thus an actionable nuisance pursuant to Iowa Code sections 657.1 and 657.2.

202.   Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a substantial number of people, including a considerable number of persons in the State of Iowa.

203.   Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

204.   Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff.

205.   As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has been damaged and is entitled to injunctive relief to abate the nuisance and other damages to which it may be entitled.

## FIFTH CAUSE OF ACTION

### Private Nuisance

206.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

207.   The groundwater system, including the zones of influence in the groundwater that supplies Plaintiff's production wells, have been contaminated by MTBE as a direct and

proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

208.    Gasoline and MTBE contamination caused by Defendants' conduct has damaged and continues to damage Plaintiff's property and businesses and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

209.    Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct is injurious to health, indecent, and/or unreasonably offensive to the senses, and is an obstruction to Plaintiff's free use of property, so as essentially to unreasonably interfere with the comfortable enjoyment of life or property, and is thus an actionable nuisance pursuant to Iowa Code sections 657.1 and 657.2.

210.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries from contamination of the groundwater supplying Plaintiff's production wells.

## SIXTH CAUSE OF ACTION

### Trespass

211.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

212.    Plaintiff is the owner and/or actual possessor of property, easements, wells, the right to appropriate and use groundwater, and water rights.  Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE is extremely hazardous to groundwater and public water systems, including the property and other rights of Plaintiff.

- 54 -

213.    Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate Plaintiff's water system and the groundwater systems and zones of influence of the areas that supply Plaintiff's production wells.

214.    As a direct and proximate result of the trespass, Plaintiff has been damaged and is entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to such other appropriate relief Plaintiff may elect at trial.

215.    Defendants had actual knowledge of MTBE' s propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

216.    Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiff's water rights.

217.    Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy

218.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

219.    At all times relevant to this lawsuit, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Iowa, including Plaintiff's water system. Defendants conspired throughout the relevant time period to insure their ability to use MTBE as an oxygenate in gasoline.

220.    The Oil Industry in general and these Defendants in particular have exhibited a pattern and practice of failing to warn the public, those that handle gasoline containing MTBE, water providers, federal and state regulators, and federal and state governments about MTBE and its harmful effects on human health and the environment.

221.    Indeed, oftentimes the Oil Industry in general and these Defendants in particular, provided blatantly inaccurate and misleading information about MTBE and its characteristics, both when it had a duty to provide honest information, and in response to direct inquiries by the EPA and others for such information.

222.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants knowingly and intentionally engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants.

223.    One or more of the Defendants committed overt acts in furtherance of the conspiracy, and such acts were tortious and unlawful.

224.    Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants knowingly and voluntarily engaged in a common plan and concerted

- 56 -

action to commit, assist and/or encourage a tortious act among Defendants. Specifically, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

    a.  creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout the State of Iowa;

    b.  concealing the nature of MTBE and its impact on Plaintiff and the environment; and

    c.  maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's water system.

225.    These actions were not just done individually by each Defendant; rather, the Defendants in many instances joined together and made specific agreements to so act.

226.    As a direct result of these concerted actions on behalf of the Oil Industry and these Defendants to protect MTBE, MTBE use increased dramatically in the 1990s and as a result, MTBE has decimated the nation's groundwater in general and Plaintiff's water system in particular.

**Ad Hoc MTBE Group**

227.    One of the earlier examples of a concerted effort to protect MTBE involved the Ad Hoc MTBE Group created in 1979 whose sole purpose was to assess the health effects of MTBE and conduct toxicological testing on MTBE.

228.    Members of the Ad Hoc MTBE Group included: Arco, Gulf, Exxon, Phillips, Huels, Texaco, Shell, and BF Goodrich.

229.    This group supported certain limited studies on MTBE.

230.   Even though the Ad Hoc MTBE Group members specifically agreed, however, that they had a duty to make the studies public, they did not immediately publish the studies.

231.   They waited an unreasonable and unjustified period of time after completion to publish them.

232.   When the Ad Hoc MTBE Group did publish the studies, the abstracts of the studies were misleading and did not accurately describe the results of the studies.

233.   The Ad Hoc MTBE Group routinely reported its on-going efforts to the members of the API Toxicology Committee, whose members were aware of the studies and aware that they were not being reported within a reasonable time after completion. Members of the API Toxicology Committee in that general time frame included:   Union Oil, Conoco, BP, Marathon, Huels, Diamond Shamrock, Ashland, Tenneco, Tosco, Texaco, Exxon, Shell, Mobil, Arco, Unocal, Tosco, Sun, Phillips, Standard of Indiana, Gulf, and Chevron.

234.   As a direct result of these actions, public health officials did not have the information that was available to the Defendants because it was not in the public domain. Public health officials, accordingly, could not utilize the information when responding to the public's health effects concerns.

235.   As a result of the Defendants' collective actions, regulators and the public were kept in the dark regarding MTBE's health effects and the negative publicity which ultimately resulted in MTBE largely being removed from gasoline in the United States, was delayed for a decade or more.

**OFA's MTBE Committee**

236.   On November 1, 1986, the ITC transmitted its nineteenth report to the EPA, and the report recommended MTBE with an "intent to designate" under §§ 8(a) and 8(d) of the Toxic Substances Control Act.

237.   The ITC's presentation indicates that the designation "will allow preliminary review of health and safety data which will be used by the Committee to either designated or not designated MTBE in a subsequent report to the Administrator."

238.   The ITC recommended that MTBE be tested for "chemical fate" including "monitoring studies to determine typical concentrations of MTBE at representative sites where MTBE containing gasoline is transferred." In addition, the Test Rules Development Branch requested "more information on the presence and persistence of MTBE in groundwater."

239.   In response, the MTBE Committee was formed in January of 1987 under the auspices of the OFA. Members of MTBE Committee included: Texaco, Exxon, Citgo, Diamond Shamrock, Phillips, Amoco, Conoco, Valero, Snamprogetti and Sun.

240.   One of the MTBE Committee's stated purposes, as reflected in the proposal for its formation was to "handle the development of communication between companies and the EPA."

241.   The "rationale behind the establishment of an MTBE group" was "not only because of the EPA action which might necessitate toxicological and environmental effects of MTBE," but "in order to provide an organization that would be responsive to the overall needs of the development of MTBE itself."

242.    On February 27, 1987 a Statement on behalf of the MTBE Committee was presented to

the EPA relative to the Federal Register announcement of the ITC's intention to designate

MTBE for priority testing. In the MTBE Statement, its members represented to the EPA that:

> There is no evidence that MTBE poses any significant risk of harm to
> health or the environment, that human exposure to MTBE and release
> of MTBE to the environment is negligible, that sufficient data exists to
> reasonably determine or predict that manufacturer, processing,
> distribution, use and disposal of MTBE will not have an adverse effect
> on health or the environment, and that testing is therefore not needed
> to develop such data.  Furthermore, issuance of a test rule requiring
> long term chronic testing will have a significant adverse environmental
> impact.

243.    Despite the representation that they would collect and provide data from member

companies to the EPA and the general public, the members of the MTBE Committee

provided a statement that they knew, from their own experiences with MTBE contamination,

was patently false.

244.    The Defendants were largely successful in their purpose of reducing testing and

protecting MTBE. Although the EPA initially expressed interest in requiring testing with

respect to the environmental aspects of MTBE, the Oil Industry ultimately signed a Consent

Agreement with the EPA that did not require such testing.

**Coordinated Response to Early Contamination Report**

245.    The petroleum industry's response to the Garrett Report provides another example of the

Defendants' coordinated effort to protect MTBE and its use as an oxygenate.

246.    In the Garrett Report, Peter Garrett and Marcel Moreau of the Maine Department of

Environmental Protection described some 30 Maine sites contaminated with MTBE. As a

result of their experiences with MTBE, the authors recommended that MTBE be banned as a

gasoline additive or at least be stored in double-contained facilities.

247.    The paper was to be presented at and later published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

248.    OFA formed the MTBE Committee, in part, as a response to the Garrett Report so that it could represent the petroleum industry in Maine, including "possible representation with the state of Maine regarding contention that MTBE is a groundwater contaminant."

249.    On December 23, 1986 the Garrett Report was disseminated to the GWTTF of the API, including specifically representatives of Amoco, Shell, Arco, Penzoil and Exxon, who were asked to review the Garrett Report and provide comments/critiques.

250.    GWTTF became involved due to API's "grave concern" about the paper's conclusion that MTBE be banned from gasoline stored underground or that gasoline containing MTBE be stored in double contained facilities.

251.    The MTBE Committee subsequently discussed the Garrett Report at a meeting, where it was reported that the authors had been approached, that the paper was dropped from the agenda, and that API was going to try to prevent publication at a November 1986 meeting.

252.    As planned, comments were provided to the authors specifically on behalf of the GWTTF which stated that their recommended policies were "reactionary, unwarranted and counterproductive."

253.    Internally, of course, the Oil Industry admitted they did not have any data to refute the authors' statements in the paper that MTBE may spread further in a plume or may be more difficult to remove or clean up than other gasoline constituents.

254.    After Garrett and Moreau publicly presented the Garrett Report, API and the MTBE Committee continued to "assess the potential impact of this paper on state policy makers, to

- 61 -

contain the potential 'damage' from the paper, and to develop short term and long term responses to the issues raised in the paper."

255.    The MTBE Committee advised members that "[w]e consider this a short term effort at damage control that should mitigate most if the issue[s] raised in the DEP paper" and "[t]he presentation by the MTBE Committee will put additional pressure on the author to back up his comments with technical data. While we don't expect the issue to go away, we think we have sufficient technical data to minimize the potential for any adverse governmental regulation."

**General Conspiracy Considerations**

256.    The Defendants' involvements in these committees and others reflect their general participation in this conspiracy.

257.    Such activities were not limited to industry-wide organization committees.

258.    Amoco coordinated the formation of the "Consumers for Fuel Quality" lobbying association to oppose alcohol fuel blend mandates and companies involved with this group included Exxon, Marathon, Phillips, Unocal, Mobil and others.

259.    Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

a.    Intentionally representing to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

b.    Concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c.    Concealing the dangers of MTBE from Downstream Handlers and consumers;

- 62 -

    d.   Using their considerable resources to fight UST legislation; and

    e.   Collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the RFG program because MTBE was the most profitable oxygenate for Defendants to use.

260.    As a result of this continued and ongoing pattern and practice of failing to warn, failing to provide information, and being dishonest when asked, information about MTBE's risk to human health and the environment that was within the possession of the Defendants was unavailable to the public and governmental regulators.

261.    Had Defendants been open and honest with respect to MTBE instead of doing their best to protect it, the publicity and interest in MTBE that began to develop a decade later would have occurred in the 1980s, not the 1990s and 2000s.

262.    As a clear example, all of the concerns expressed by the EPA in its March 2000 Advance Notice of Intent to Initiate Rulemaking, were known by the Defendants back in the early to mid 1980s and were things they discussed internally and within industry meetings. Had all of these concerns been brought to light and given credence back in the 1980s, MTBE would likely not have been used as the Oil Industry's oxygenate of choice.

263.    The Defendants possessed information concerning the fate and transport of MTBE, its low rate of biodegradation and its taste and odor thresholds at the time of the passage of the Clean Air Act Amendments and the subsequent regulatory negotiations with the EPA.

264.    As with the instances above, the Defendants acted with a common design to withhold information from the federal government.

265.    Defendants' representatives formed part of the group involved in assisting the federal government in drafting regulations for the enforcement and requirements under the Clean Air Act Amendments of 1990.

266.    In order to insure only specific information, strongly weighted in favor of MTBE was presented to the EPA from the petroleum industry, Defendants' representatives frequently met to determine what information the Defendants would and would not disclose to the federal government.

267.    Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's negligible rate of biodegradation and its probable long-term presence in groundwater.

268.    Defendants withheld information within their possession and failed to disclose to the EPA information concerning MTBE's low taste and odor detect threshold and, accordingly, the adverse impact that a very small release of MTBE into an aquifer could have on a potable water supply.

269.    Defendants withheld information within their possession and failed to disclose to the EPA information concerning the known releases of MTBE into the environment, the characteristics of such releases, the number of these releases with the limited use of MTBE prior to 1990 and any projections of potential contamination of public water supplies from a widespread use of MTBE in gasoline.

270.    Defendants withheld information within their possession and failed to disclose to the EPA information concerning the significant environmental risk that MTBE presented to aquifers and municipal water supplies.

271.    Defendants also failed to disclose to the EPA information concerning the extent of their near total commitment to use of MTBE as their oxygenate of choice in order to comply with the CWAA and the hundreds of millions of dollars that Defendants had already committed to the production or purchase of MTBE before the regulatory process was even completed.

272.    Defendants also worked in concert against other retail providers of gasoline and other companies to limit or block the use of ethanol as an alternative to MTBE as a permitted oxygenate.

273.    As a direct and proximate result of Defendants' conspiracy, MTBE at all times relevant to this litigation has:

      a.  posed and continues to pose a threat to groundwater and Plaintiff's water system;

      b.  contaminated and/or will contaminate Plaintiff's water system and/or groundwater in the vicinity of Plaintiff's property;

      c.  required and/or will require testing and monitoring of Plaintiff's water system for MTBE contamination;

      d.  requires and/or will require a remedial program to assess, evaluate, investigate, monitor, abate, treat, correct, and remove MTBE from Plaintiff's water system, including operation and maintenance costs;

      e.  diminished and will continue to diminish Plaintiff's and consumers' confidence in, and the use and enjoyment of, Plaintiff's water and property;

      f.  diminished and will continue to diminish Plaintiff's property values due to actual, impending, or threatened contamination; and

      g.  caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damages in an amount within the jurisdiction of the District Court of Iowa for the County of Carroll.

274.    Defendants knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.

275.    Defendants had actual knowledge of MTBE's propensity to contaminate groundwater and that MTBE did, in fact, contaminate groundwater where gasoline containing MTBE was sold.

- 65 -

276.    Defendants intentionally undertook the reprehensible and despicable conduct described above to promote sales of MTBE and gasoline containing MTBE in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiff's water rights.

277.    Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

## EIGHTH CAUSE OF ACTION

### Breach of Warranty

278.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

279.    In placing gasoline containing MTBE in the stream of commerce as aforesaid, the Defendants, and each of them, impliedly warranted to the Plaintiff, to all foreseeable users, and to all entities/persons who would foreseeably be affected or harmed by MTBE, that said product was of merchantable quality, fit, suitable, and safe for its intended, ordinary, and foreseeable use and for the general purpose for which it was intended.   The Plaintiff reasonably relied upon such warranties.

280.    The Defendants, and each of them, breached the aforesaid warranties in that gasoline containing MTBE, as placed in the stream of commerce, was not reasonably safe, and not as safe as reasonably possible under the existing state of the art, and was neither merchantable,

- 66 -

fit, suitable nor safe for its intended and ordinary use, nor for the general purpose for which it was intended.   To the contrary, gasoline with MTBE was defective and unreasonably dangerous in that, among other things as stated herein, there were no warnings, and/or inadequate, defective warnings and instructions to the foreseeable users of gasoline pertaining to the hazardous properties contained therein.   In this, the Defendants knew, or had to reason to know, that gasoline with MTBE was likely to be dangerous for its intended and foreseeable usage; the Defendants has no reason to believe that the Plaintiff or those for whose the use the gasoline was supplied would realize its dangerous condition; and the Defendants failed to exercise reasonable care to inform foreseeable users, including the Plaintiff, of its dangerous condition or of the facts which made it likely to be dangerous.

<h3 style="text-align:center">NINTH CAUSE OF ACTION</h3>

<h3 style="text-align:center"><u>Fraud</u></h3>

281.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

282.   Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants have been aware of the widespread problem of leaking underground storage tanks and groundwater contamination, knew that toxicology tests of MTBE were needed before MTBE was placed in the stream of commerce, and knew that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination.

283.   Nevertheless, Defendants knowingly made false representations and misleading statements of material fact intending to mislead consumers, the general public, and the EPA concerning the characteristics of MTBE, the necessity for testing of MTBE, and the frequency of groundwater contamination.   For example, Defendants have falsely represented

- 67 -

to the EPA that MTBE is only slightly soluble in water, potential environmental exposure is not high, MTBE has excellent biodegradation characteristics, there is no evidence that MTBE poses any significant risk of harm to health or the environment, human exposure to MTBE and release of MTBE to the environment is negligible, and testing is not needed to assess the adverse effects of MTBE on health and the environment.

284.   At the time Defendants made these misrepresentations, Defendants knew that they were false.

285.   Defendants made these misrepresentations with the intent to induce the government's, consumers', Plaintiff's, and the public's acceptance of MTBE and to leave the Plaintiff and the general public unsuspecting of and unprepared for the foreseeable damage to be occasioned by the manufacture and distribution of gasoline containing MTBE.  Defendants intended that Plaintiff, consumers and the government rely and act upon Defendants' misrepresentations.

286.   Plaintiff, consumers, and the government did in fact justifiably rely and act upon Defendants' misrepresentations concerning MTBE and, until recently, Plaintiff has been unaware of the need to frequently test its water supply wells and otherwise protect its property from contamination by MTBE.

287.   As a result of Defendants' false representations, and Plaintiff's reasonable reliance thereon, Plaintiff has incurred damages.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, CITY OF MANNING, seeks judgment against these Defendants for:

1.   Compensatory damages according to proof including, but not limited to:

- 68 -

(i)     costs of investigation;

(ii)    costs of testing and monitoring;

(iii)   costs of providing water from an alternate source;

(iv)    costs of installing and maintaining wellhead treatment;

(v)     costs of installing and maintaining a wellhead protection program;

(vi)    costs of installing and maintaining an early warning system to detect MTBE before it reaches a well;

(vii)   damages to compensate Plaintiff for loss of consumer confidence and resulting business;

(viii)  interest on the damages according to law;

2.   Punitive damages;

3.   Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4.   Prejudgment interest;

5.   Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated:  June  ___27th___ , 2013


      ___/s/___Brian P. Galligan_____
Brian P. Galligan  AT0002632
**GALLIGAN REID, P.C.**
 300 Walnut Street, Suite 5
Des Moines, IA  50309
Phone:  515-282-3333
Fax:  515-282-0318
bgalligan@galliganlaw.com

Scott Summy, *licensed in Texas, New York
and North Carolina*
Celeste Evangelisti, *licensed in Texas, New York
and California*
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219-3605
Phone:  214-521-3605
Fax:  214-520-1181
ssummy@baronbudd.com
cevangelisti@baronbudd.com

Robert J. Gordon, *licensed in New York,
Pennsylvania and New Jersey*
Robin Greenwald, *licensed in Illinois*
**WEITZ & LUXENBERG, P.C.**
180 Maiden Lane, 17th Floor
New York, NY  10038-4925
Phone:  212-558-5500
Fax:  212-558-5506
rgordon@weitzlux.com
rgreenwald@weitzlux.com

**Attorneys for Plaintiff**

- 70 -