# U.S. District Court
## Western District of Louisiana (Lafayette)
## CIVIL DOCKET FOR CASE #: 6:15-cv-01959-RFD-PJH

City of Breaux Bridge v. Alon Refining Krotz Springs Inc, et al

Assigned to: Judge Rebecca F Doherty

Referred to: Magistrate Judge Patrick J Hanna

Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/25/2015

Jury Demand: Plaintiff

Nature of Suit: 245 Tort Product Liability

Jurisdiction: Diversity

**Plaintiff**

**City of Breaux Bridge**

represented by  **Philip F Cossich , Jr**
Cossich Sumich et al
8397 Hwy 23 Ste 100
Belle Chasse, LA 70037
504-394-9000
Fax: 504-394-9110
Email: cossichlaw@cossichlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Marie Cossich**
Cossich Sumich et al
8397 Hwy 23 Ste 100
Belle Chasse, LA 70037
504-394-9000
Fax: 504-394-9110
Email: ccossich@cossichlaw.com
*ATTORNEY TO BE NOTICED*

**Randy Paul Angelle**
Boyer Hebert et al
401 E Mills Ave
Breaux Bridge, LA 70517
337-332-0616
Fax: 337-332-0633
Email: rpangelle@bhaalaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Alon Refining Krotz Springs Inc**

**Defendant**

**Ashland Oil Inc**

**Defendant**

**Atlantic Richfield Co**
*formerly known as*
Atlantic Richfield Delaware Corp
*doing business as*
Arco Products Co

**Defendant**

**B P Products North America Inc**
*formerly known as*
Amoco Oil Co
*formerly known as*
American Oil Co
*other*
B P Exploration & Oil Inc
*other*
B P North America Inc

**Defendant**

**Chevron U S A Inc**
*formerly known as*
Gulf Oil Corp
*doing business as*
Chevron Products Co
*doing business as*
Chevron Chemical Co

**Defendant**

**Citgo Petroleum Corp**
*formerly known as*
Cities Service R M T Corp

**Defendant**

**Citgo Refining & Chemicals Co L P**
*other*
Citgo Refining & Chemicals Inc

**Defendant**

**Coastal Eagle Point Oil Co**

**Defendant**

**Conoco Phillips Co**
*formerly known as*
Phillips Petroleum Co
*doing business as*
Phillips 66 Co
*doing business as*
Phillips Chemical Co

*doing business as*
Phillips Oil Co
*other*
Conoco Inc
*other*
Tosco Corp

**Defendant**

**Diamond Shamrock Refining Co L P**

**Defendant**

**El Paso Merchant Energy-Petroleum Co**
*formerly known as*
Coastal Refining & Marketing Inc
*formerly known as*
Coastal Derby Refining Co
*formerly known as*
Derby Refining Co
*formerly known as*
Colorado Oil & Gas Corp

**Defendant**

**Equilon Enterprises L L C**
*doing business as*
Shell Oil Products U S
*other*
Equiva Services L L C

**Defendant**

**Exxon Mobil Corp**
*formerly known as*
Exxon Corp
*doing business as*
Exxon Mobil Refining & Supply Co
*doing business as*
Exxon Chemical U S A
*doing business as*
ExxonMobil Chemical Corp

**Defendant**

**ExxonMobil Oil Corp**
*formerly known as*
Mobil Oil Corp
*formerly known as*
Socony Mobil Oil Co
*formerly known as*
Socony Vacuum Oil Co Inc

Case MDL No. 1358   Document 456-4   Filed 07/09/15   Page 4 of 66

## Defendant

**Marathon Oil Co**
*formerly known as*
U S S Holdings Co

## Defendant

**Marathon Petroleum Co L P**
*formerly known as*
Marathon Petroleum Co L L C
*other*
Marathon Ashland Petroleum L L C

## Defendant

**Mobil Corp**

## Defendant

**Motiva Enterprises L L C**
*formerly known as*
Star Enterprises L L C

## Defendant

**Paulsboro Refining Co L L C**
*formerly known as*
Valero Refining Co New Jersey

## Defendant

**P D V Midwest Refining L L C**

## Defendant

**Premcor Refining Group Inc**
*formerly known as*
Clark Refining & Marketing Inc

## Defendant

**Shell Oil Co**

## Defendant

**Shell Oil Products Co L L C**
*doing business as*
Shell Oil Products Co

## Defendant

**Shell Petroleum Inc**

## Defendant

**Shell Trading (U S) Co**
*formerly known as*

Equiva Trading Co
*doing business as*
Stusco

**Defendant**

**Sunoco Inc**
*formerly known as*
Sun Oil Co
*formerly known as*
Sun Co Inc
*other*
Coastal Eagle Point Oil Co

**Defendant**

**Sunoco Inc R & M**
*formerly known as*
Sun Co Inc R & M
*formerly known as*
Sun Refining & Marketing Co
*formerly known as*
Sun Oil Co of Pennsylvania

**Defendant**

**Texaco Inc**

**Defendant**

**T M R Co**
*formerly known as*
Texaco Refining & Marketing Inc

**Defendant**

**Total Petrochemicals & Refining U S A Inc**
*formerly known as*
Total Petrochemicals U S A Inc
*formerly known as*
Atofina PetroChemicals Inc
*formerly known as*
Fina Oil & Chemical Co
*formerly known as*
American Petrofina Co of Texas

**Defendant**

**T R M I H L L C**
*formerly known as*
Texaco Refining & Marketing Inc
*formerly known as*
T R M I Holdings Inc

*formerly known as*
Getty Refining & Marketing Co
*formerly known as*
Getty Oil Co Eastern Operations Inc

**Defendant**

**Ultramar Energy Inc**

**Defendant**

**Valero Energy Corp**
*other*
Ultramar Diamond Shamrock Corp

**Defendant**

**Valero Marketing & Supply Co**

**Defendant**

**Valero Refining & Marketing Co**

**Defendant**

**Valero Refining Texas L P**
*formerly known as*
Valero Refining Co
*formerly known as*
Valero Refining Co Texas

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2015 | 1 | COMPLAINT against All Defendants with Jury Demand (Filing fee $400, receipt number 0536-2832258) filed by City of Breaux Bridge, Louisiana. (Attachments: # 1 Civil cover sheet)(Attorney Philip F Cossich, Jr added to party City of Breaux Bridge, Louisiana(pty:pla))(aty,Cossich, Philip) (Entered: 06/25/2015) |
| 06/25/2015 | | CASE Assigned to Judge Rebecca F Doherty and Magistrate Judge Patrick J Hanna. (crt,Whidden, C) (Entered: 06/26/2015) |
| 06/26/2015 | 2 | SUMMONS ISSUED as to Alon Refining Krotz Springs Inc, Ashland Oil Inc, Atlantic Richfield Co, B P Products North America Inc, Chevron U S A Inc, Citgo Petroleum Corp, Citgo Refining & Chemicals Co L P, Coastal Eagle Point Oil Co, Conoco Phillips Co, Diamond Shamrock Refining Co L P, El Paso Merchant Energy-Petroleum Co, Equilon Enterprises L L C, Exxon Mobil Corp, ExxonMobil Oil Corp, Marathon Oil Co, Marathon Petroleum Co L P, Mobil Corp, Motiva Enterprises L L C, P D V Midwest Refining L L C, Paulsboro Refining Co L L C, Premcor Refining Group Inc, Shell Oil Co, Shell Oil Products Co L L C, Shell Petroleum Inc, Shell Trading (U S) Co, Sunoco Inc, Sunoco Inc R & M, T M R Co, T R M I-H L L C, Texaco Inc, Total Petrochemicals & Refining U S A Inc, Ultramar Energy Inc, Valero Energy Corp, Valero Marketing & Supply Co, Valero Refining & Marketing Co, Valero Refining-Texas L P. (crt,Whidden, C) (Entered: 06/26/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/08/2015 13:06:02 | | | |
| PACER Login: | bb2491:2948481:0 | Client Code: | 15 10593 1 |
| Description: | Docket Report | Search Criteria: | 6:15-cv-01959-RFD-PJH |
| Billable Pages: | 4 | Cost: | 0.40 |

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

**CITY OF BREAUX BRIDGE, LOUISIANA**

    Plaintiff,

vs.

**Alon Refining Krotz Springs, Inc.**
**Ashland Oil Inc.**
**Atlantic Richfield Company**, (f/k/a Atlantic
   Richfield Delaware Corporation),
   individually, as successor-by-merger to
   Atlantic Richfield Company (a Pennsylvania
   corporation), and doing business as ARCO
   Products Company
**BP Products North America Inc**. (f/k/a Amoco Oil
   Company and The American Oil Company,
   individually and as successor-by-merger to
   BP Exploration and Oil, Inc. and as successor-
   in-interest to BP North America Inc.)
**Chevron U.S.A. Inc.** (f/k/a Gulf Oil Corporation and
   d/b/a Chevron Products Company and
   Chevron Chemical Company)
**Citgo Petroleum Corporation** (f/k/a Cities Service
   RMT Corporation)
**Citgo Refining and Chemicals Company, LP,**
   individually, and as successor-by-merger to
   Citgo Refining and Chemicals Company, Inc.
**Coastal Eagle Point Oil Company**
**ConocoPhillips Company,** (f/k/a Phillips Petroleum
   Company and d/b/a Phillips 66 Company,
   Phillips Chemical Company, and Phillips Oil
   Company), individually, as successor-by-
   merger to Conoco, Inc. and Tosco
   Corporation
**Diamond Shamrock Refining Company, L.P.**
**El Paso Merchant Energy-Petroleum Company**,
   (f/k/a Coastal Refining & Marketing, Inc.,
   Coastal Derby Refining Company, Derby
   Refining Company and as Colorado Oil and
   Gas Corporation),
**Equilon Enterprises LLC,** (d/b/a Shell Oil Products

CASE NO.:

DIVISION:

JUDGE:

MAGISTRATE JUDGE:

JURY TRIAL DEMANDED

1

US), individually, as successor-by-merger to
Equiva Services  LLC

**Exxon Mobil Corporation,** (f/k/a Exxon
Corporation and d/b/a ExxonMobil Refining
and Supply Company, Exxon Chemical
U.S.A., and ExxonMobil Chemical
Corporation)

**ExxonMobil Oil Corporation,** (f/k/a Mobil Oil
Corporation, Socony Mobil Oil Company,
Inc., and Socony Vacuum Oil Company,
Incorporated)

**Marathon Oil Company** (f/k/a/ USS Holdings
Company)

**Marathon Petroleum Company LP** (f/k/a Marathon
Petroleum Company LLC; successor to
Marathon Ashland Petroleum LLC)

**Mobil Corporation**

**Motiva Enterprises LLC,** (f/k/a Star Enterprises,
LLC)

**Paulsboro Refining Company, LLC** (f/k/a Valero
Refining Company-New Jersey)

**PDV Midwest Refining, LLC**

**The Premcor Refining Group Inc.** (f/k/a Clark
Refining & Marketing, Inc.)

**Shell Oil Company**

**Shell Oil Products Company LLC,** (d/b/a Shell Oil
Products Company)

**Shell Petroleum, Inc.**

**Shell Trading (US) Company,** (individually, f/k/a
Equiva Trading Company and d/b/a Stusco)

**Sunoco, Inc.** (individually and f/k/a Sun Oil
Company and f/k/a Sun Company, Inc., and as
successor-in-interest to Coastal Eagle Point
Oil Company)

**Sunoco, Inc.** (R&M), (f/k/a Sun Company, Inc.
(R&M), Sun Refining and Marketing
Company, and Sun Oil Company of
Pennsylvania)

**Texaco, Inc.**

**TMR Company** (f/k/a Texaco Refining and
Marketing, Inc.)

**Total Petrochemicals & Refining USA, Inc.,** (f/k/a
TOTAL Petrochemicals USA, Inc.,  Atofina
Petrochemicals, Inc., Fina Oil and Chemical
Company, and American Petrofina Company
of Texas)

2

**TRMI-H LLC** (f/k/a TRMI Holdings Inc., Texaco
    Refining and Marketing Inc., Getty Refining
    and Marketing Company, and Getty Oil
    Company (Eastern Operations), Inc.)
**Ultramar Energy, Inc.**
**Valero Energy Corporation** (individually, as
    successor-by-merger to Ultramar Diamond
    Shamrock Corporation)
**Valero Marketing and Supply Company**
**Valero Refining and Marketing Company**
**Valero Refining-Texas, L.P.** (f/k/a Valero Refining
    Company and Valero Refining Company-
    Texas)

        Defendants

---

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CITY OF BREAUX BRIDGE makes the following allegations against the Defendants listed above.

### NATURE OF THE CASE

1. This case involves the nation's most precious resource – water. Throughout the State of Louisiana, public water wells are contaminated by methyl tertiary butyl ether ("MTBE"), a gasoline additive needlessly and recklessly added to gasoline supplied to many parts of the United States. Because MTBE is highly soluble in water and does not readily biodegrade, it readily contaminates sources of drinking water, including those in the City of Breaux Bridge. Despite knowing that MTBE has unique characteristics in water which allows it to contaminate water sources in ways not seen before its addition to gasoline, these Defendants chose to make it the second largest chemical manufactured in the United States.

3

# PARTIES

**Plaintiff**

2. Plaintiff, CITY OF BREAUX BRIDGE ("Plaintiff" or "City"), is a municipality duly incorporated under the laws of the State of Louisiana and located in St. Martin Parish, Louisiana. Plaintiff operates a public water system that supplies drinking water to approximately 7,500 residents of the City.

3. The City is vested with constitutional and statutory powers, rights, privileges, immunities, authorities, and duties and is authorized to exercise any power and perform any function necessary, requisite, or proper for the management of its affairs not denied by law --- including the right to sue. *See* La. R.S. § 33:361, *et seq.*

4. At least two of Plaintiff's wells have been contaminated with MTBE. MTBE was first detected in regular sampling of Well #1 and Well #4 conducted in 2014. Each of these wells pumps 250-400 gallons per minute.

5. The presence of MTBE in its water supply has adversely affected plaintiff's water supply. The groundwater that supplies Plaintiff's wells is contaminated with MTBE. The drinking water supplied from this groundwater resource to residents is, therefore, contaminated with MTBE. The presence of MTBE compromises the quality and taste and odor of Plaintiff's drinking water.

6. Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

7. Treatment of MTBE-contaminated water typically involves the addition of a granulated activated carbon (GAC) filter to the production well and the carbon in the GAC system removes MTBE from the well water before it is distributed to the public.

## Defendants

8. Defendants do business in Louisiana as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

9. At all times relevant to this litigation, Defendants engaged in one or more phases of the petroleum business, including: manufacturing MTBE and adding it to gasoline at the refinery, distributing gasoline containing MTBE, designing and manufacturing gasoline containing MTBE and/or MTBE sold in Louisiana, and marketing and selling MTBE in Louisiana.

Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

10. When the term "Defendants" is used alone, it refers to all Defendants jointly. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

11. **Alon Refining Krotz Springs, Inc.** Is a Delaware Corporation with its principal place of business 12700 Park Central Dr., Suite 1600, Dallas, TX 75251 Alon Refining Krotz Springs, Inc. may be served with process through its registered agent James Ranspot, 12700 Park Central Drive, Ste. 1600, Dallas, TX 75251.

12. **Ashland Oil Inc.** is a Kentucky corporation with its principal place of business at: 50 E. River Center Blvd., Covington, KY 41012. Ashland Inc. may be served with process

through its registered agent C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

13. **Atlantic Richfield Company,** (formerly known as Atlantic Richfield Delaware Corporation), individually, as successor-by-merger to Atlantic Richfield Company (a Pennsylvania corporation), and doing business as ARCO Products Company), is a Delaware corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, Texas 77079.  Atlantic Richfield Company may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

14. **BP Products North America Inc.,** (f/k/a Amoco Oil Company and The American Oil Company, individually and as successor-by-merger to BP Exploration and Oil, Inc. and as successor-in-interest to BP North America Inc.), is a Maryland corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, Texas 77079.  BP Products North America Inc. may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, LA 70802-6129.

15. **Chevron U.S.A. Inc.,** (f/k/a Gulf Oil Corporation, and d/b/a Chevron Products Company and Chevron Chemical Company), is a Pennsylvania corporation with its principal place of business at:  6001 Bollinger Canyon Road, San Ramon, California 94583.  Chevron U.S.A. Inc. may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, LA 70802-6129.

16. **CITGO Petroleum Corporation,** (f/k/a Cities Service RMT Corporation), is a Delaware corporation with its principal place of business at:  1293 Eldridge Parkway, Houston, Texas 77077.  Citgo Petroleum Corporation may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

17. **CITGO Refining and Chemicals Company L.P.,** individually, and as successor-by-merger to Citgo Refining and Chemicals Company, Inc., is a Delaware limited partnership with its principal place of business at: 6100 South Yale Avenue, Tulsa, Oklahoma 74136. Citgo Refining and Chemicals Company, LP may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

18. **Coastal Eagle Point Oil Company** is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Suite 1000, Houston, Texas 77002. Coastal Eagle Point Oil Company may be served with process through its registered agent, Marie Garcia, Senior Process Specialist c/o C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

19. **ConocoPhillips Company,** (f/k/a Phillips Petroleum Company and d/b/a Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company), individually, as successor-by-merger to Conoco, Inc. and Tosco Corporation, is a Delaware corporation with its principal place of business at: 600 North Dairy Ashford Road, Houston, Texas 77079. ConocoPhillips Company may be served with process through its registered agent, United Stated Corporation Company, 320 Somerulos Street, Baton Rouge, LA 70802-6129.

20. **Diamond Shamrock Refining Company, L.P.** is a Delaware Limited Partnership with a principal place of business at: One Valero Way, San Antonio, TX 78249. Diamond Shamrock Refining Company, L.P can be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

21. **El Paso Merchant Energy-Petroleum Company,** (f/k/a Coastal Refining & Marketing, Inc., Coastal Derby Refining Company, Derby Refining Company and as Colorado Oil and Gas Corporation), is a Delaware corporation with its principal place of business at: 1001

Louisiana Street, Suite 1000, Houston, Texas 77002. El Paso Merchant Energy-Petroleum Company may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

22. **Equilon Enterprises LLC,** (d/b/a Shell Oil Products US) individually, as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at: 910 Louisiana, Houston, Texas 77002. Equilon Enterprises LLC may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

23. **Exxon Mobil Corporation,** (f/k/a Exxon Corporation and d/b/a ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., and ExxonMobil Chemical Corporation), is a New Jersey corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, Texas 75039. Exxon Mobil Corporation may be served with process through its registered agent, Corporation Service Company, 320 Somerulos St., Baton Rouge, LA 70802-6129.

24. **ExxonMobil Oil Corporation,** (f/k/a Mobil Oil Corporation, Socony Mobil Oil Company, Inc., and Socony Vacuum Oil Company, Incorporated), is a New York corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, Texas 75039. ExxonMobil Oil Corporation may be served with process through its registered agent, Corporation Service Company, 320 Somerulos St., Baton Rouge, LA 70802-6129.

25. **Marathon Oil Company** (f/k/a/ USS Holdings Company) is an Ohio corporation with its principal place of business at: 5555 San Felipe, Houston, TX 77056. Marathon Oil Company may be served with process through its registered agent: Bonnie L. Love as Senior Corporate

Operations Specialist for Marathon Oil, Company, c/o Registered Agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

26. **Marathon Petroleum Company LP (f/k/a Marathon Petroleum Company LLC; successor to Marathon Ashland Petroleum LLC)** is a limited partnership organized under the state of Delaware with its principal place of business at: 539 South Main Street, Findlay, Ohio 45840. Marathon Petroleum Company LP may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

27. **Mobil Corporation,** is a Nevada corporation with its principal place of business at: 800 Bell Street, Suite 1503, Houston, Texas 77002. Mobil Corporation may be served with process through: Debra Laird, Office of the Secretary, 5959 Las Colinas Boulevard, Irving, Texas 75039.

28. **Motiva Enterprises LLC,** (f/k/a Star Enterprises LLC), is a Delaware limited liability company with its principal place of business at: OSP 25th Floor, 910 Louisiana Street, Houston, Texas 77002. Motiva Enterprises LLC may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

29. **Paulsboro Refining Company, LLC** (f/k/a Valero Refining Company-New Jersey) is a Delaware Corporation with its principal place of business in 1 Sylvan Way, 2nd Floor, Parsippany, NJ 07054. Paulsboro Refining Company, LLC may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

30. **PDV Midwest Refining, L.L.C.,** is a Delaware limited liability company with its principal place of business at: 1293 Eldridge Parkway, Houston Texas 77077. PDV Midwest Refining, LLC may be served with process through its registered agent, Marie Garcia, Senior Process Specialist c/o C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

31. **The Premcor Refining Group Inc.** (f/k/a Clark Refining & Marketing, Inc.) is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, TX 79249. The Premcor Refining Group Inc. may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

32. **Shell Oil Company** is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002. Shell Oil Company may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

33. **Shell Oil Products Company LLC,** (d/b/a Shell Oil Products Company), is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002. Shell Oil Products Company, LLC may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808

34. **Shell Petroleum, Inc.,** is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002. Shell Petroleum, Inc. may be served with process through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

35. **Shell Trading (US) Company,** (individually, f/k/a Equiva Trading Company and d/b/a Stusco), is a Delaware corporation with its principal place of business at: 1000 Main, 12th Floor, Houston, Texas 77002. Shell Trading (US) Company may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

36. **Sunoco, Inc.** (individually and f/k/a Sun Oil Company and f/k/a Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company) is a Pennsylvania corporation with its principal place of business at: 1818 Market Street, Philadelphia, Pennsylvania 19103. Sunoco, Inc. may be served with process through its registered agent, Corporation Service Company, 320 Somerulos St., Baton Rouge, LA 70802-6129.

37. **Sunoco, Inc. (R&M),** (f/k/a Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation with its principal place of business at: 1735 Market Street, Suite 1500, Philadelphia, Pennsylvania 19103. Sunoco, Inc. (R&M) may be served with process through its registered agent, Corporation Service Company, 320 Somerulos St., Baton Rouge, LA 70802-6129.

38. **Texaco Inc**. is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Rd., San Ramon, CA 94583. Texaco Inc. may be served with process through its registered agent, The Prentice-Hall Corporation System, Inc., 2710 Gateway Oaks Dr, Ste. 150N, Sacramento, CA 95833.

39. **TMR Company,** (f/k/a Texaco Refining and Marketing, Inc.), individually and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.), is a Delaware corporation with its principal place of business at: 910 Louisiana, Houston, Texas

77002. TMR Company may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

40. **Total Petrochemicals & Refining USA, Inc.,** (f/k/a TOTAL Petrochemicals USA, Inc., Atofina Petrochemicals, Inc., Fina Oil and Chemical Company, and American Petrofina Company of Texas), is a Delaware corporation with its principal place of business at: 1201 Louisiana Street, Suite 1800, Houston, Texas 77002. Total Petrochemicals & Refining USA, Inc. may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

41. **TRMI-H LLC** (f/k/a TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.) is a Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road, San Ramon, California 94583. TRMI-H LLC may be served with process through its registered agent, Corporation Service Company, 2338 West Royal Palm Road Suite J, Phoenix, Arizona 85021.

42. **Ultramar Energy, Inc.** is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78249. Ultramar Energy, Inc. may be served with process through its registered agent The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801.

43. **Valero Energy Corporation** (individually, as successor-by-merger to Ultramar Diamond Shamrock Corporation) is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Energy Corporation may be served with process through its registered agent, Marie Garcia, Senior Process Specialist c/o C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

44. **Valero Marketing and Supply Company,** is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Marketing and Supply Company may be served with process through its registered agent, C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808.

45. **Valero Refining and Marketing Company** is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Refining and Marketing Company may be served with process through its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

46. **Valero Refining-Texas, L.P.** (f/k/a Valero Refining Company and Valero Refining Company-Texas) is a Texas Limited Partnership with principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Refining-Texas, L.P. may be served with process through its registered agent Marie Garcia, Senior Process Specialist c/o CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

47. This Court has jurisdiction over the causes of action asserted by CITY OF BREAUX BRIDGE pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the City and the Defendants alleged to have caused its harm, and the amount in controversy for the City exceeds the sum or value of $75,000, exclusive of interest and costs.

48. This Court may exercise personal jurisdiction over Defendants because each is either authorized to do business in Louisiana, registered with the Louisiana Secretary of State, does sufficient business with sufficient minimum contacts in Louisiana, or otherwise intentionally avails itself of the Louisiana market through the sale, manufacturing, distribution and/or

processing of petroleum-related products in Louisiana to render the exercise of jurisdiction consistent with traditional notions of fair play and substantial justice.

49. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the property that is the subject of the action is situated in this judicial district.

## MTBE FACTS

50. MTBE is a synthetic chemical blended into some gasolines by some refiners at some times since 1979. As used in this Complaint, "MTBE" refers not only to methyl tertiary butyl ether, but also to the contaminants in and degradation byproducts of MTBE, including TBA.

51. MTBE contaminates the environment primarily through discharges, disposals, deposits, leaks, and spills from gasoline delivery systems. Once released to the environment, MTBE has properties that cause substantial environmental contamination. In particular, the fate and transport of MTBE in the subsurface is substantially different than the fate and transport of other gasoline components, including the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

52. Once released into the subsurface, MTBE separates from other gasoline components in the presence of moisture. In contrast to the BTEX compounds, MTBE has a strong affinity for water and does not readily adsorb (i.e. stick) to soil particles. Rather, it moves freely with groundwater at approximately the rate of the water's movement. In addition, MTBE is more persistent than BTEX compounds because it does not readily biodegrade in the subsurface. Thus, in comparison to BTEX components, MTBE is significantly more mobile in the subsurface and migrates from the source area more quickly. MTBE is also more difficult and expensive to remove from water than BTEX components. If MTBE is released into the environment, it has the capacity to migrate through the soil and groundwater, penetrate deep

within the aquifer, and cause persistent contamination that can destroy and/or threaten drinking water wells. Plumes of MTBE can persist in underground aquifers for many decades – far longer than other components of gasoline. Once an MTBE plume reaches a well, it continues to contaminate the water drawn from that well.

53. In short, MTBE spreads farther and faster than other components of gasoline, resists biodegradation, is difficult and costly to remove from groundwater, and can continue to migrate long after its initial discharge, contaminating additional drinking water wells as its moves.

54. Along with its other harmful properties, MTBE renders water supplies unusable by changing contaminated water's odor and taste. Specifically, MTBE-contaminated water has a turpentine odor and chemical taste that renders it unfit for use as drinking water. Many individuals can smell and taste MTBE in water at very low levels - as low as one part per billion ("ppb") or lower.

55. TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also sometimes added to gasoline as an oxygenate. Therefore, TBA often appears wherever there is MTBE contamination.

56. TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant. Defendants used MTBE as a gasoline additive.

**I.  Why Defendants Add MTBE to Gasoline:  Profit**

57. Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

58. MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants.

59. Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater concentrations, typically 11 to 15%, in all grades of gasoline. Defendants claim that MTBE, an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants' original motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE. The Clean Air Act of 1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap method to comply.

60. It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air. Contrary to industry assurances, MTBE did little or nothing to reduce such air-polluting car emissions as carbon monoxide or smog precursors. A detailed 1998 report commissioned by the State of California concluded that "there is no significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared to alternative non-oxygenated formulations.[1]

61. In May 1999, The National Research Council of the National Academy of Sciences ("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and smog?[2]

62. NAS previously had concluded that reductions of carbon monoxide concentrations in the nation's air actually took place before MTBE was added to gasoline as a purported "clean air" oxygenate.[3]

---

[1] "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).
[2] The Ozone-Forming Potential of Reformulated Gasoline", Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).

63. In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

## II.    **The longstanding prevalence of unintended gasoline discharges ensures that gasoline with MTBE will contaminate groundwater.**

64. Before Defendants first used MTBE as a gasoline additive, the industry was well aware that leaking underground storage tanks ("UST") and other gasoline discharges presented a known threat to Louisiana's groundwater.  Defendants' introduction of gasoline containing MTBE in steadily increasing quantities and concentrations exponentially exacerbated the threat that leaking USTs and other spills presented to groundwater.  Because of MTBE's unique properties, Defendants' addition of MTBE to gasoline created an entirely new threat from even very small leaks and spills of gasoline.

65. Given the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use, widespread MTBE contamination of groundwater was inevitable and Defendants either knew of the probable consequence or should have foreseen it.

## III.    **Defendants have known all along that adding MTBE to gasoline would result in massive groundwater contamination.**

66. At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, including USTs.  Substantial industry reports, Congressional testimony, and EPA expressed concerns illustrate and detail Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involved leaks and spillages at all links in the gasoline distribution chain.

---

[3] "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels, "Nat'l Research Council, Nat'l Academy of Sciences (1996).

67. At all times relevant to this litigation, Defendants were aware that thousands of gallons of gasoline entered the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks, as described above.

68. At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

69. At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reached the soil and groundwater in the form of rainfall, as a result of evaporation during transport, storage, and fueling, as described above.

70. At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reached the soil and groundwater through vaporization from USTs, and that such vaporization and other small releases occurred even when a tank is considered to have tested tight.

## IV. Defendants' knowledge of the threat to groundwater as a result of unintended discharges of gasoline blended with MTBE.

### A. Defendants' constructive knowledge of MTBE's threat to groundwater.

71. At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable.  MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use guaranteed substantial and repeated releases of MTBE-"enhanced" gasoline into the environment.

72. For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a

18

Toxicology Committee in or around 1980. The Toxicology Committee included representatives from Exxon, Mobil, Shell, Atlantic Richfield Company ("ARCO"), Tosco and Chevron Texaco, among others.

73. API's Toxicology Committee had a specific program to study MTBE. Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and the resulting likelihood of extensive ingestion of MTBE through drinking water.

74. Despite early knowledge and a shared recognition of the need to do long-term, low-level ingestion studies on the effects of MTBE, Defendants postponed for decades and never completed such a study.

75. Defendants possess and have always possessed vastly superior knowledge, resources, experience and other advantages, in comparison to anyone or any agency, concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know, identify and confirm the threat which MTBE posed and poses to groundwater.

76. In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

### B. Defendants' early knowledge of specific instances of MTBE contamination of groundwater.

77. Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

78. In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers. Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well. This evidence of contamination prompted leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

79. In April 1983, a serious MTBE incident in Jacksonville, Maryland in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by (what is now) ExxonMobil, created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

80. Defendants were also aware of two MTBE groundwater contamination events in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

81. At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer. The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE. Although trace levels of BTEX were eventually found in neighboring wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

20

82. A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site, and the mass of these compounds was observed to be steadily decreasing.

83. The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

84. In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

### C. Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.

85. In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[4]   The paper described approximately 30 Maine wells contaminated with MTBE. The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

---

[4] Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water - Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

86. As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The authors planned to present their paper and have it published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986.

87. As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry. Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened, Defendants continued to discredit the report.

88. Arco Chemical, which was then a part of ARCO, aggressively challenged the initial draft of the Garrett Report in advance of its presentation. Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986.

89. On December 23, 1986, a staff member to API's Groundwater Technical Task Force ("GWTTF") forwarded the Garrett Report to members of the GWTTF, including representatives of Shell and Exxon. API asked these individuals to review the Garrett Report and provide comments/critiques. API asked for responses because the article was "of possible grave concern to the oxygenate producers."

90. The comments from the GWTTF members culminated in a letter from API to the National

Well Water Association, which was to present the paper. The letter stated in part:

> The authors' "recommendations" that MTBE ... be either banned as
> gasoline additives or require double-lined storage is clearly a policy
> statement and not an objective credible scientific conclusion. Further,
> data presented in this paper as well as those generated by ongoing API
> research indicate that such a policy is reactionary, unwarranted and
> counter-productive.

91. However, the API letter to the National Well Water Association in no way refuted the Garrett

Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the

fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the

conclusion that MTBE was difficult to remediate. These issues were not even addressed.

92. BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating

flatly that the report "isn't true."

**D.    Defendants' internal documents demonstrating their awareness of
MTBE Contamination of groundwater.**

93. Privately, however, Defendants were forced to acknowledge that the major findings of the

Garrett Report were correct. For instance, while the oil companies, via the GWTTF, attacked

the authors of the Garrett Report, saying the paper had a "general lack of technical data to

support the rather strong policy statements," behind closed doors, Defendants were admitting

that the authors might in fact be correct. Arco Chemical, in communications to others within

the oil industry, admitted that they had no data to refute the Garrett Report's conclusions. For

example, a letter dated February 4, 1987, stated "we don't have any data to refute comments

made in the paper that MTBE may spread farther in a plume or may be more difficult to

remove/clean up than other gasoline constituents."

94. On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

95. Communications among officials at Chevron Texaco (Chevron) were similar. A 1987 memo, widely circulated within the company, stated:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.
>
> Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double to air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

96. In 1992, Shell employees C. C. Stanley, W.G. Rixey, and C.Y. Chiang created a document entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." They intended to put together within the document what was known about the movement of MTBE in

groundwater and then circulate the white paper internally among the employees of the various Shell companies.

97. According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than benzene and, therefore, Stanley, Rixey and Chiang confirmed that MTBE's plumes would move faster and farther than benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper indicated that MTBE would not biodegrade in the subsurface environment.  Finally, Shell's MTBE White Paper confirmed that MTBE has a low odor and taste threshold and, further, that "at many locations odor and taste criteria may determine clean-up levels."

98. Shell's MTBE White Paper further stated:

> MTBE has had an impact on groundwater management at only a few Shell marketing terminals and service stations to date. However, as the usage of this oxygenate begins to increase, a stringent clean-up criteria for MTBE will become adopted in more states, we should anticipate increased concerns over how its release to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

99. A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status" stated:

> MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

        **E.**      **Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline.**

100.   Defendants added MTBE to gasoline even though no long-term cancer studies had been undertaken.  Studies showed MTBE caused cancer in animals. It is common knowledge within the scientific community, as Defendants knew, that prior to the introduction of a

widely used chemical like MTBE, toxicological tests must first be performed. However, Defendants did not perform the standard toxicological procedures to test the effects of MTBE prior to placing it into the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing of MTBE was not needed. Thus, Defendants exposed millions of Americans to potential harm without warning of the potential health risks associated with MTBE.

### V. **Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE groundwater contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.**

101. Despite their superior knowledge of the groundwater threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiff and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations such as the API and the Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiff. Defendants manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in groundwater and production wells and took affirmative steps to conceal those effects.

## A. Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act in the late 1980's.

102.   In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.[5]   The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

103.   The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

104.   On or about December 12, 1986, ARCO, speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE. ARCO's comments included a critique of the Dynamac Corporation's information review of MTBE, on which the ITC had relied. ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated the following:

> Characteristics - Moderate water solubility is reported.  However, an ARCO Technical Bulletin states that 'MTBE is only slightly soluble in water ...'

***

---

[5] Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Rep. 220 (1986) (the "1986 Notice").

The CRSC/Dynamac report states that potential environmental exposure is 'high.' This conclusion is not supported by the available information.

\*\*\*

Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks .... MTBE losses would be extremely small from this source.

\*\*\*

Environmental Information

As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain .... Environmental entity of MTBE from this source would be considerably less than the report indicates.

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were misleading when made. The comments improperly downplayed the risks of MTBE contamination of groundwater and omitted material facts known to Defendants at the time.

105.   On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. The minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination. The minutes show that ARCO and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary. Other Defendants assented to these representations either explicitly or by their silence.

106. In or around early 1987, Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." The MTBE Committee included Defendants, BP Corporation (Amoco), Arco, Chevron Texaco (Chevron), Citgo, ExxonMobil (Exxon), Shell, and Sunoco, among others.

107. The MTBE Committee lauded itself as "being a source of information to MTBE producers, users, the government and the public" and stated that its goal was to "address environmental health and safety issues relating to MTBE ... , provide technical data to appropriate regulatory agencies and legislative bodies ... , conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule ... , [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

108. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the SA and SD [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter .... the Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20 ... The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

109.   Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

110.   At the same time that Arco Chemical was telling the EPA that MTBE posed no significant environmental or health problems, Arco Chemical admitted to other Defendants that it "had no data to refute the claims made in the Garrett Report that MTBE posed a significant threat of groundwater contamination."

111.   On or around February 27, 1987, the MTBE Committee submitted written comments drafted to convince the EPA not to require additional health and environmental testing of MTBE. The information provided by Defendants was misleading and false. For example, the Defendants provided information to the EPA representing that MTBE is only slightly soluble in water, that potential environmental exposure is not high, and that MTBE has excellent biodegradation characteristics. The MTBE Committee's Statement added:

> there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring

long term chronic testing will have a significant adverse environmental impact.

112. The agenda of the MTBE Committee is reflected in the following excerpt from those comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result, demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

113. The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had not been the subject of long term chronic health testing, but claimed that such testing was unnecessary. Under the heading "MTBE in Groundwater", it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/1) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

114. On the issue of the persistence of MTBE, the MTBE Committee publicly stated that "a Japanese study ... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics." This misrepresentation concerning the biodegradability of MTBE, which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, provides further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to groundwater.

31

115.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors, including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco amongst others, signed a Testing Consent Order with EPA. However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE[6]. The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading.

116.    The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon groundwater. In making and supporting such representations, the Defendants demonstrated their willingness to use any means to place their economic interests above the health, property and well-being of Plaintiff, particularly, and the America public, generally. These statements also confirm that Defendants intended to (a) continue to use MTBE without regard to its impact on Plaintiff and the environment, and (b) prevent Plaintiff from becoming aware of the potential for contamination and/or impact of contamination from MTBE.

---

[6] Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

117.    Although the MTBE Committee represented to the EPA that the Committee was going to
"address environmental issues related to MTBE by a) collecting data from member
companies and other sources, and b) sponsoring programs to develop data unavailable from
other sources," the MTBE Committee did no such thing. The MTBE Committee's Charter
statement was intended to mislead the government and the public, including Plaintiff. The
MTBE Committee disbanded approximately one year after achieving its goal of avoiding
testing.

> **B.    Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline Program adopted in the 1990 amendments to the Clean Air Act.**

118.    Prior to 1990, Congress was preparing to take action to address the Nation's smog
problem.

119.    During this time frame, the oil industry, including Defendants, became concerned that
Congress might consider requiring alternative non-petroleum based fuels.

120.    As a result of tremendous lobbying efforts by the industry, including Defendants,
Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990
Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated
gasoline (RFG) was originally generated, developed and promoted by industry, not the
Environmental Protection Agency (EPA) or other parts of the federal government."

121.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG
containing at least 2% oxygen by weight in those areas of the country with the worst ozone
or smog problems. The 1990 Amendments authorized the EPA to mandate that certain areas

of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]

122.    In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

123.    The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE.  MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all of the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and therefore were not forced to purchase a different oxygenate, such as ethanol, from a third-party.

124.    Safer, more environmentally sound alternatives were available.

C.    Defendants misled the Plaintiff and public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.

125.    Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating contamination of groundwater resources, has the public started to become aware of the dangers of MTBE.

126.    On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was

---

[7] Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of groundwater contamination.

127.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions."  The letter unambiguously represented to Plaintiff that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

128.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the OFA, an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of minimizing and misleading communication hid from public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter

referred to as Downstream Handlers) or the general public the dangers posed by MTBE and omitted and concealed information required to reduce such dangers.

129.   In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

130.   This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline. Moreover, MTBE contamination is most often judged to be too costly to clean up.

131.   Had Defendants warned the government, users, and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

132.   As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of groundwater, Plaintiff was deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

## VI.   Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.

133.   National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998.

134.   Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprised up to 15%

of every gallon of gasoline used in those areas. MTBE comprised a significant amount of gasoline even in areas that do not participate in the RFG Program.

135.   Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

136.   In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

137.   At its peak, most if not all gasoline supplied to the RFG areas was laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE was often sold at other locations at the discretion of the oil industry, including Defendants.

138.   In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly, some gasoline sellers publicly acknowledged subsequently that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### VII.   MTBE's degradation product:   TBA.

139.   TBA is used as a raw material in the production of isobutylene (which is then used to produce MTBE), it is an intermediate product of MTBE biodegradation, and it is also

sometimes added to gasoline as an oxygenate. Therefore, TBA often appears wherever there is MTBE contamination.

140.    TBA has the same characteristics as MTBE that make it a persistent and pernicious groundwater contaminant: low solubility (even more so than MTBE); resistance to biodegradation, etc.

141.    To make matters worse, it is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

142.    Defendants failed to warn Plaintiff, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiff of the need to test its water supply for contamination by TBA.

143.    As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

## VIII.   MTBE has had a predictably catastrophic effect upon groundwater and groundwater wells.

144.    Before the 1980's, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

145.    Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated wells were found from coast-to-coast with serious incidents in states from New Hampshire to California.

146.    The USGS annually tests the groundwater not near any known gasoline leaks or spills, and detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

147.    A September 15, 1999 report by a special EPA Blue Ribbon Panel stated that MTBE is a "threat to the nation's drinking water resources;" that MTBE "has caused widespread and serious contamination;" and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

148.    In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8]  No actual plans or source of funds for such testing exist in any state, including the State of Louisiana.

149.    Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the Toxic Substances Control Act in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

---

[8] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

**IX.** **It is impossible to identify which manufacturer's gasoline poses a threat of MTBE contamination or has already caused MTBE contamination of any particular aquifer or well.**

150.    Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

151.    The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Louisiana.

152.    A subsurface plume, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners. Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers. The gasoline at any particular service station comes from many different refiners.

153.    The East Patchogue, New York case was typical: even though a source of the MTBE plume (a subsequently abandoned service station) was identified, state researchers could not determine the identity or even number of manufacturers whose gasoline containing MTBE contributed to the resulting MTBE contamination of well water.

154.    Here, the joint action of Defendants acting together caused Plaintiff's damages. Because precise identification of the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in a well or groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those injuries which Defendants have collectively visited upon Plaintiff.

155.    Defendants in this action are manufacturers that controlled a substantial share of the market for gasoline containing MTBE in Louisiana and, therefore, are jointly responsible for the increased threat to groundwater in Louisiana and for causing the injuries complained of in this Complaint.  Liability jointly attaches to all Defendants for supplying gasoline containing MTBE in Louisiana.

156.    Each Defendant engaged in substantially the same conduct that resulted in substantially the same increased threat to groundwater in Louisiana and risk of causing the injuries complained of in this Complaint, and the conduct of each Defendant was tortious. Therefore, alternative liability attaches to all Defendants.

Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortuously in pursuance of the common plan.

157.    Defendants are also jointly and severally liable for participating in a conspiracy to promote the use of MTBE while concealing its dangers. Defendants agreed to and engaged in a common plan to commit, assist and/or encourage the tortious production, supply, and sale of MTBE.  One or more Defendants committed overt acts in furtherance of this conspiracy. Among other things, as alleged above, Defendants created joint task forces and committees to promote the use of MTBE while concealing its dangers.

### FIRST CAUSE OF ACTION

**Louisiana Products Liability Act R.S. 9:2800.56:**
**Unreasonably Dangerous In Design**

158.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

159. Defendants during the relevant time period were designers, manufacturers (as defined under Louisiana common law and R.S. 9:2800.53), refiners, formulators, sellers, marketers and suppliers of petroleum products, including gasoline containing MTBE.

160. As manufacturers (as defined under Louisiana common law and R.S. 9:2800.53), designers, refiners, formulators, distributors, suppliers, sellers and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

161. When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous in design, and not suited for its reasonably anticipated use for the following reasons:

a.   unintended discharges of gasoline are commonplace throughout Louisiana;

b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.   when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.   very low concentrations of MTBE will ruin the taste and smell of water; and

f.   MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest.

162.   Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE.

163.   Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, Downstream Handlers and the general public exercising reasonable care.

164.   The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

165.   The likelihood and gravity of damage to public drinking water supplies outweigh any burden on Defendants to use oxygenates other than MTBE.

166.   Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

167.   The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

168.   Gasoline containing MTBE was distributed and sold in the manner for its reasonably anticipated use.

169.   Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

170.   As a direct and proximate result of the unreasonably dangerous design of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

   a.   posed and continues to pose a threat to the groundwater and to Plaintiff's production wells;

   b.   required and/or will require additional testing and monitoring of Plaintiff's production wells for MTBE contamination;

   c.   contaminated, continues to contaminate, and/or will contaminate Plaintiff's production wells or groundwater in the vicinity of Plaintiff's property;

   d.   will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of a system to filter out MTBE or procurement of water from alternative sources; and

   e.   diminished consumer confidence in Plaintiff's water.

171.   As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste and odor of Plaintiff's drinking water.  Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

172.   Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of public drinking

water supplies.  Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's water rights.

173.    Defendants acted with wanton or reckless disregard for public safety in the storage, handling, and/or transportation of hazardous or toxic substances.    Therefore, Plaintiff requests an award of exemplary damages under former La. C.C. art. 2315.3 in an amount sufficient to punish these Defendants and deter Defendants from ever committing the same or similar acts.    Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

## SECOND CAUSE OF ACTION

### Louisiana Products Liability Act R.S. 9:2800.57
### Unreasonably Dangerous Due to Inadequate Warning

174.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

175.    As manufacturers (as defined under Louisiana common law and R.S. 9:2800.53), distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by MTBE.

176.    Defendants knew that gasoline mixed with MTBE would be purchased, transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

177.    At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following characteristics of MTBE that cause it to be a danger to groundwater and production wells:

a.    unintended discharges of gasoline are commonplace;

b.    when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.    when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.    at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

f.    MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

g.    MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

h.    MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.    MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

j.    MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE;

k.    MTBE evaporates and returns via rainwater to contaminate drinking water supplies; and

l.    the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

178.    Defendants breached their duty to warn by unreasonably failing to use reasonable care to provide adequate warning of the characteristics of MTBE and failing to use reasonable care to provide adequate warning to Plaintiff, public officials, Downstream Handlers, and/or the general public of the danger MTBE posed to groundwater and drinking water wells.

179.    Defendants' failure to use reasonable care to provide adequate warning of the characteristics of MTBE and the danger it posed to groundwater and drinking water wells as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff. Plaintiff and others would have heeded legally adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

180.    As a direct and proximate result of Defendants' above-described failure to use reasonable care to provide adequate warnings, MTBE at all times relevant to this litigation has:

a.    posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.    required and/or will require additional testing and monitoring of the groundwater and production wells for MTBE and TBA contamination;

c.    contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiff's wells;

d.    raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfield;

e.    will require remediation of MTBE groundwater contamination or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f.    diminished consumer confidence in Plaintiff's water.

181.    As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste and odor of Plaintiff's drinking water.  Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

182.  Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

### THIRD CAUSE OF ACTION

#### Negligence

183.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

184.  Plaintiff's negligence claims as made herein are outside of the scope of the Louisiana Products Liability Act.

185.  As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

186.  At all times relevant to this litigation, Defendants knew or should have known that:

a.  unintended discharges of gasoline are commonplace;

b.  MTBE evaporates and returns via rainwater to contaminate drinking water supplies;

c.  when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

d.  MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

e.  when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

f.  very low concentrations of MTBE can ruin the taste and smell of water;

g.  MTBE is a known animal carcinogen and a possible human carcinogen;

h.     MTBE greatly increases the importance of preventing leaks of gasoline;

i.     MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

j.     MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE;

k.     MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

l.     the foregoing facts relating to the hazards which MTBE poses to groundwater are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

187.    Defendants have negligently breached their duties of due care to Plaintiff, Downstream Handlers and the general public by, among other things:

a.     failing to adequately test, identify and remediate wells that are contaminated with MTBE;

b.     forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

c.     voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

d.     marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

e.     failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

f.     failing to curtail or reduce MTBE's distribution;

g.     failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE;

h.     failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release; and

i.     negligently releasing MTBE into the environment.

188.    As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.      posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b.      required and/or will require additional testing and monitoring of groundwater and Plaintiff's production wells for MTBE and TBA contamination;

c.      contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiff's wells;

d.      raised the need to develop a comprehensive vulnerability study for Plaintiff's wellfield;

e.      required and/or will require remediation of gasoline and MTBE contamination of groundwater or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources; and

f.      diminished consumer confidence in Plaintiff's water.

189.    As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste and odor of Plaintiff's drinking water.  Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

190.    Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

## FOURTH CAUSE OF ACTION

### Public Nuisance

191.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

192.   Plaintiff's public nuisance claim as made herein is outside the scope of the Louisiana Products Liability Act.

193.   Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance

194.   Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting and still spreading, contamination of groundwater and drinking water wells, while having concealed the threat from all, thereby causing MTBE contamination of groundwater and contamination and threat of contamination of Plaintiff's wells.

195.   By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

196.   Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to Plaintiff in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and

annoyance. MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

197.   Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

198.   Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

199.   Plaintiff, as an owner of water production wells and purveyor of drinking water, suffers injuries different in kind from the community at large precisely because it relies upon production wells for its business.

200.   As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste and odor of Plaintiff's drinking water.  Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

201.   Plaintiff's special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers have been rendered less certain, safe and reliable relative to other sources of water.

202.   Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff.

203.   As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff suffers injuries common to the public at large and additional

special injuries from actual and/or threatened contamination of the Plaintiff's wells and the groundwater supplying Plaintiff's production wells.

204.    Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

## FIFTH CAUSE OF ACTION

### Private Nuisance

205.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

206.    Plaintiff's private nuisance claim as contained herein is outside the scope of the Louisiana Products Liability Act.

207.    The groundwater system, including the zone of influence in the groundwater that supplies Plaintiff's production wells, has been contaminated by MTBE as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

208.    Gasoline and MTBE contamination caused by Defendants' conduct has damaged Plaintiff's property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

209.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries from contamination of the groundwater supplying Plaintiff's production wells.

210.    As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste

and odor of Plaintiff's drinking water. Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

211.    Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

## SIXTH CAUSE OF ACTION

### Trespass

212.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

213.    Plaintiff's trespass claim as contained herein is outside the scope of the Louisiana Products Liability Act.

214.    Plaintiff is the owner and/or actual possessor of property, easements, wells, the right to appropriate and use groundwater, and water rights. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE is extremely hazardous to groundwater and public water systems, including the property and other rights of Plaintiff.

215.    Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate Plaintiff's water system and the groundwater system and zone of influence of the area that supplies Plaintiff's production wells.

216.    As a direct and proximate result of the trespass, Plaintiff has been damaged and is entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not

limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to such other appropriate relief Plaintiff may elect at trial.

217. As a result of Defendants' acts and omissions, Plaintiff's groundwater, water supply, wells, and drinking water are contaminated with MTBE, which degrades the quality and taste and odor of Plaintiff's drinking water. Plaintiff must incur costs to filter the MTBE from the water supplied by Wells 1 and 4.

218. Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an award of compensatory damages and any other relief that the Court deems just, proper and equitable.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy/Concert of Action

219. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

220. Plaintiff's claim for civil conspiracy and concert of action as contained herein are outside the scope of the Louisiana Products Liability Act.

221. At all times relevant to this lawsuit, Defendants actually knew of the hazards which MTBE posed to groundwater throughout Louisiana, including Plaintiff's water system.

222. Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants.

223. Specifically, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

a. creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout Louisiana;

b. concealing the nature of MTBE and its impact on Plaintiff and the environment;

c. maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's wells.

224. Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

a. intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

b. concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

c. concealing the dangers of MTBE from Downstream Handlers and consumers;

d. using their considerable resources to fight underground storage tank legislation; and

e. collectively deciding to use MTBE rather than other, safer oxygenates because MTBE was the most profitable oxygenate for Defendants to use.

225. As a direct and proximate result of Defendants' conspiracy, MTBE at all times relevant to this litigation has:

a. posed and continues to pose a threat to groundwater and Plaintiff's production wells;

b. contaminated and/or will contaminate Plaintiff's wells and groundwater in the vicinity of Plaintiff's property;

c. required and/or will require testing and monitoring of Plaintiff's wells for MTBE contamination;

    d.      requires or will require remediation of MTBE groundwater contamination or, where remediation is impracticable or insufficient for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.      diminished and will continue to diminish Plaintiff's and consumers' confidence in, and the use and enjoyment of, Plaintiff's water and property;

    f.      diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination; and

    g.      caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

226.   Defendants knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.  Defendants acted with wanton or reckless disregard for public safety in the storage, handling, and/or transportation of hazardous or toxic substances.

227.   Plaintiff requests an award of exemplary and punitive damages against Defendants. Plaintiff further requests an aware of compensatory damages and any other relief that the Court deems just, proper and equitable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, CITY OF BREAUX BRIDGE, seeks judgment against these Defendants for:

    1.      Compensatory damages according to proof including, but not limited to:

        (i)     costs of investigation;

        (ii)    costs of testing and monitoring;

        (iii)   costs of providing water from an alternate source;

(iv)     costs of installing and maintaining wellhead treatment;

(v)      costs of installing and maintaining a wellhead protection program;

(vi)     costs of installing and maintaining an early warning system to detect MTBE before it reaches a well;

(vii)    damages to compensate Plaintiff for loss of consumer confidence and resulting business;

(viii)   interest on the damages according to law;

2.   Punitive damages;

3.   Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4.   Prejudgment interest;

5.   Any other and further relief as the Court deems just, proper and equitable including injunctive relief compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and groundwater, and/or any other relief necessary to remedy the MTBE contamination.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated:  June 25, 2015

/s/ *Scott Summy*
Scott Summy
Celeste Evangelisti
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219-3605
Phone:  214-521-3605
Fax:  214-520-1181
ssummy@baronbudd.com
cevangelisti@baronbudd.com

/s/ *William A. Walsh*
William A Walsh
**WEITZ & LUXENBERG, P.C.**
180 Maiden Lane, 17th Floor
New York, NY  10038-4925
Phone:  212-558-5500
Fax:  212-558-5506
wwalsh@weitzlux.com

/s/ *Randy Angelle*
Randy Angelle
**BOYER, HEBERT ABELS & ANGELLE, LLC**
401 E. Mills Avenue
Breaux Bridge, LA 70517
Phone: 337-366-8285
Fax: 337-332-0633

/s/ *Philip F. Cossich, Jr.*
Philip F. Cossich, Jr.
Christina Cossich
**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Phone: 504-394-9000
Fax: 504-394-9110
pcossich@cossichlaw.com
ccossich@cossichlaw.com

***Attorneys for Plaintiff***